Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice application forthcoming)
Skye Perryman (pro hac vice application forthcoming)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel.: (202) 448-9090

egoldstein@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs*
[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; AFGE LOCAL 1122; AFGE LOCAL 1236; AFGE LOCAL 2110; AFGE LOCAL 3172; SEIU LOCAL 1000; ALLIANCE FOR RETIRED AMERICANS; AMERICAN GEOPHYSICAL UNION; AMERICAN PUBLIC HEALTH ASSOCIATION; CENTER FOR TAXPAYER RIGHTS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; COMMON DEFENSE CIVIC ENGAGEMENT; MAIN STREET ALLIANCE; NATURAL RESOURCES DEFENSE COUNCIL, INC.; NORTHEAST | Case No. **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

COMPLAINT, No.

ORGANIC FARMING ASSOCIATION, INC.; VOTEVETS ACTION FUND INC.; WESTERN WATERSHEDS PROJECT; COUNTY OF SANTA CLARA, CALIFORNIA; CITY OF CHICAGO, ILLINOIS; MARTIN LUTHER KING, JR. COUNTY, WASHINGTON; HARRIS COUNTY, TEXAS; CITY OF BALTIMORE, MARYLAND; and CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA

     Plaintiffs,

  v.

DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in his official capacity as Director of U.S. Office of Management and Budget; UNITED STATES OFFICE OF PERSONNEL MANAGEMENT; CHARLES EZELL, in his official capacity as Acting Director of the U.S. Office of Personnel Management; DEPARTMENT OF GOVERNMENT EFFICIENCY; ELON MUSK, in his official capacity as the actual head of the Department of Government Efficiency; AMY GLEASON, in her official capacity as the titular Acting Administrator of the Department of Government Efficiency; UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as Secretary of the U.S. Department of Agriculture; UNITED STATES DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in his official capacity as Secretary of the U.S. Department of Commerce; UNITED STATES DEPARTMENT OF DEFENSE; PETE HEGSETH, in his official capacity as

COMPLAINT, No.

Secretary of the U.S. Department of Defense;
UNITED STATES DEPARTMENT OF
ENERGY;
CHRIS WRIGHT, in his official capacity as
Secretary of the U.S. Department of Energy;
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
ROBERT F. KENNEDY JR., in his official
capacity as Secretary of the U.S. Department
of Health and Human Services;
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY;
KRISTI NOEM, in her official capacity as
Secretary of the U.S. Department of Homeland
Security;
UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT;
SCOTT TURNER, in his official capacity as
Secretary of the U.S. Department of Housing
and Urban Development;
UNITED STATES DEPARTMENT OF
JUSTICE;
PAM BONDI, in her official capacity as
Attorney General of the U.S. Department of
Justice;
UNITED STATES DEPARTMENT OF THE
INTERIOR;
DOUG BURGUM, in his official capacity as
Secretary of the U.S. Department of the
Interior;
UNITED STATES DEPARTMENT OF
LABOR;
LORI CHAVEZ-DEREMER, in her official
capacity as Secretary of the U.S. Department
of Labor;
UNITED STATES DEPARTMENT OF
STATE;
MARCO RUBIO, in his official capacity as
Secretary of the U.S. Department of State;
UNITED STATES DEPARTMENT OF
TREASURY;
SCOTT BESSENT, in his official capacity as
Secretary of U.S. Department of Treasury;
UNITED STATES DEPARTMENT OF
TRANSPORTATION;
SEAN DUFFY, in his official capacity as
Secretary for the U.S. Department of
Transportation;

COMPLAINT, No.

UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS;
DOUG COLLINS, in his official capacity as
Secretary of Veterans Affairs;
AMERICORPS (a.k.a. the CORPORATION
FOR NATIONAL AND COMMUNITY
SERVICE);
JENNIFER BASTRESS TAHMASEBI, in her
official capacity as Interim Agency Head of
AmeriCorps;
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY;
LEE ZELDIN, in his official capacity as
Administrator of U.S. Environmental
Protection Agency;
UNITED STATES GENERAL SERVICES
ADMINISTRATION;
STEPHEN EHIKIAN, in his official capacity
as Acting Administrator for U.S. General
Services Administration;
NATIONAL LABOR RELATIONS BOARD;
MARVIN KAPLAN, in his official capacity as
Chairman of the National Labor Relations
Board;
WILLIAM COWEN, in his official capacity as
the Acting General Counsel of the National
Labor Relations Board;
NATIONAL SCIENCE FOUNDATION;
BRIAN STONE, in his official capacity as
Acting Director of the National Science
Foundation;
UNITED STATES SMALL BUSINESS
ADMINISTRATION;
KELLY LOEFFLER, in her official capacity
as Administrator of the U.S. Small Business
Administration;
UNITED STATES SOCIAL SECURITY
ADMINISTRATION; and
LELAND DUDEK, in his official capacity as
Acting Commissioner of the U.S. Social
Security Administration,

   Defendants.

COMPLAINT, No.

# INTRODUCTION

Plaintiffs are a coalition of labor organizations, non-profit groups, and local governments that file this complaint to hold unlawful and stop the unconstitutional dismantling of the federal government by the President of the United States on a scale unprecedented in this country's history and in clear excess of his authority.  Plaintiffs are the American Federation of Government Employees, AFL-CIO ("AFGE"); American Federation of State County and Municipal Employees, AFL-CIO ("AFSCME"); Service Employees International Union, AFL-CIO ("SEIU"); AFGE Local 1122; AFGE Local 1236; AFGE Local 2110; AFGE Local 3172; SEIU Local 1000; Alliance for Retired Americans; American Public Health Association; American Geophysical Union; Center for Taxpayer Rights; Coalition to Protect America's National Parks; Common Defense Civic Engagement; Main Street Alliance; Natural Resources Defense Council, Inc.; Northeast Organic Farming Association Inc.; VoteVets Action Fund Inc.; Western Watersheds Project; the County of Santa Clara, California; Martin Luther King, Jr. County, Washington; the City of Baltimore, Maryland; Harris County, Texas; the City of Chicago, Illinois; and the City and County of San Francisco, California (collectively, "Plaintiffs").

By way of Executive Order, President Donald J. Trump has ordered agencies across the entire federal government to engage in a "critical transformation of the Federal bureaucracy" for the purported purpose of "eliminating waste, bloat, and insularity," including by conducting "large-scale" Reductions in Force ("RIFs") to further the reorganization of the federal agencies—all without *any* Congressional authorization.  *See* Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (Implementing the President's ''Department of Government Efficiency'' Workforce Optimization Initiative).  Executive Order 14210, and the actions taken by the Administration to implement the President's order, usurp Congress's exclusive Article I legislative authority, exceed the President's Article II Executive or statutory authority, and therefore violate the Constitution's fundamental separation of powers principles.  Plaintiffs seek to declare these acts of the President unconstitutional, unlawful, and otherwise in excess of any constitutional or statutory authority; to hold unlawful and set aside the acts of agency defendants implementing his orders as unlawful and in violation of the

Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C) and (D); and to enjoin this unconstitutional reorganization of the federal government without legislative authority.  Plaintiffs therefore hereby plead as follows:

1.      The President does not possess authority to reorganize, downsize, or otherwise transform the agencies of the federal government, unless and until Congress authorizes such action. Federal agencies are "creatures of statute."  *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022).  Since the founding of the nation, federal courts have recognized that the federal agencies are not created by the President:  "To Congress under its legislative power is given the establishment of offices … [and] the determination of their functions and jurisdiction."  *Myers v. United States*, 272 U.S. 52, 129 (1926).

2.      When the President takes for himself the legislative power of Congress to recreate federal agencies in the manner *he* sees fit, he violates the Constitution.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.… And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute.").  And when the President does so across *every* federal agency, he threatens the very constitutional foundation of this nation:  "There can be no liberty where the legislative and executive powers are united in the same person."  *Bowsher v. Synar*, 478 U.S. 714, 721–22 (1986) (quoting James Madison in The Federalist No. 47, p. 325 (J. Cooke ed. 1961)).  Thus, for nearly 100 years, when Presidents have wanted to restructure the government by reorganizing both between and within federal agencies, they have obtained Congressional authorization to do so.  *See* Cong. Rsch. Serv., RL31446, *Reorganizing the Executive Branch in the 20th Century: Landmark Commissions* (June 10, 2002).

3.      President Trump contends he was elected with a mandate to radically transform the size and organization of the entire federal government.  Ignoring applicable constitutional law, he has engaged in a campaign unprecedented in American history:  to eliminate entire federal agencies; drastically reduce the number of employees, functions, programs, and offices at others; terminate

leases for government property; terminate government contracts; and sell off government property, all without Congressional authorization. President Trump has called his plan to downsize and transform the federal government as he desires "The 'Manhattan Project' of our time."[1]

4.      As soon as President Trump took office, he immediately began his "large scale structural reform" project. *Id.*

5.      First, on January 20, 2025, he created the "Department of Government Efficiency" or "DOGE" out of a former information technology office and charged it with enacting an "18-month DOGE agenda" (which the Administration has never made public) and embedding a "DOGE Team" at every federal agency. Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025). He also immediately ordered DOGE, along with the Office of Management and Budget ("OMB") and the Office of Personnel Management ("OPM"), to create "a plan to reduce the size of the Federal Government's workforce." The White House, *Presidential Actions: Hiring Freeze* (Jan. 20, 2025).

6.      The President then proceeded to dismantle several government agencies, either eliminating their functions or transferring and subsuming them within other agencies. Exec. Order No. 14242, 90 Fed. Reg. 13679 (Mar. 20, 2025) (Education); Exec. Order No. 14238, 90 Fed. Reg 13043 (Mar. 14, 2025) (seven agencies); Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025) (four agencies); *see also* Exec. Order No. 14169, 90 Fed. Reg. 8619 (Foreign Aid) and Press Release, U.S. Dep't of State, *Prioritizing America's National Interests One Dollar at A Time* (Jan. 29, 2025) (USAID); *Nat'l Treasury Emps. Union v. Vought*, __ F. Supp. 3d __, No. 25-0381, 2025 WL 942772 (D.D.C. Mar. 28, 2025) (CFPB).

---

[1] Statement by President-elect Donald J. Trump announcing Department of Government Efficiency, The American Presidency Project (Nov. 12, 2024):

> To drive this kind of drastic change, the Department of Government Efficiency ["DOGE"] will provide advice and guidance from outside of Government, and will partner with the White House and Office of Management & Budget to drive **large scale structural reform**, and create an entrepreneurial approach to Government never seen before.

Available at: https://www.presidency.ucsb.edu/documents/statement-president-elect-donald-j-trump-announcing-that-elon-musk-and-vivek-ramaswamy (emphasis added).

7.     On February 11, 2025, President Trump issued the Executive Order 14210 that is the subject of this lawsuit.  Executive Order 14210 (hereinafter "Workforce Executive Order" or "Executive Order 14210") ordered all federal agencies to "commence[]" a **critical transformation of the Federal bureaucracy**" for the purported purpose of "eliminating waste, bloat, and insularity." Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (emphasis added), attached hereto as Exhibit A.

8.     This Workforce Executive Order, in pertinent part, requires all federal agencies to effectuate President Trump's vision for the radical transformation and downsizing of the federal government by:  1) freezing agency hiring and allowing OMB and DOGE to control future hiring government-wide; 2) commencing "large-scale reductions in force" ("RIFs") that serve the purpose of stripping away agency functions, eliminating the offices and functions that the President chooses to eliminate, and dramatically reducing staffing levels throughout the government; and 3) creating corresponding "reorganization" plans reflecting these RIFs that also address whether the "agency or any of its subcomponents should be eliminated or consolidated."  *Id*.

9.     The Workforce Executive Order does not simply suggest or encourage agencies to exercise their own statutory authority to effectuate a government-wide reorganization: it orders them to act according to the President's vision, *regardless* of that statutory authority.  The Workforce Executive Order imposes the following requirements:

a.     Agencies are *required* to commence large-scale RIFs (irrespective of whether staffing reductions are necessary or even appropriate in light of agency functions, obligations, and appropriations);

b.     Agencies are *required* to prioritize in RIFs any "agency initiatives, components, or operations that my Administration suspends or closes" (irrespective of statutory requirements, obligations, or authority delegated to the agencies);

c.     Agencies are *required* to prioritize in RIFs levels of staffing equivalent to  government emergency shutdown levels (which have nothing to do with the staffing needed to properly run fully appropriated agencies);

d.     Agencies are *required* to consider their own abolition, by addressing whether the agency or any subparts should be eliminated by the President (again, regardless of statutory requirements, obligations, or authority delegated to the agencies);

COMPLAINT, No.                                                                                                        4

e.    And finally, agencies are required to reorganize themselves by picking up and arranging the pieces that are left, following these large-scale reductions.

As the President made plain in the White House "Fact Sheet" that accompanied the Executive Order, the Executive Order furthers the President's goals of "reforming the federal workforce" and "reducing the unnecessary footprint of government."[2]

10.    Again and again, the President has explained his plan to reorganize and reform the *entire federal government*: "I got elected on the basis of making our government stronger and smaller, because we have millions of people that — obviously, they're paying millions of people that shouldn't be paid."  The White House, *Remarks by President Trump after Executive Order Signing* (Feb. 18, 2025); *see also* The White House, *Remarks by President Donald J. Trump in Joint Address to Congress* (Mar. 4, 2025) ("Americans have given us a mandate for bold and profound change.  For nearly 100 years, the federal bureaucracy has grown until it has crushed our freedoms, ballooned our deficits, and held back America's potential in every possible way.  The nation founded by pioneers and risk-takers now drowns under millions and millions of pages of regulations and debt. … My administration will reclaim power from this unaccountable bureaucracy, and we will restore true democracy to America again."); The White House, *Fact Sheet: President Donald J. Trump Continues the Reduction of the Federal Bureaucracy* (Mar. 14, 2025) ("President Trump has made reforming the federal workforce a key priority for his second term.").

11.    At no point has Congress authorized President Trump's actions with respect to the federal agencies that Congress created in an exercise of its Article I legislative authority, which the Constitution grants to Congress, not to the President.  Unlike President Trump, nine Presidents on 16 occasions, across the political spectrum, have been granted authority by Congress to propose fast-tracked legislation before reorganizing federal agencies:  Presidents Herbert Hoover, Franklin D. Roosevelt, Harry S. Truman, Dwight D. Eisenhower, John F. Kennedy, Lyndon B. Johnson, Richard Nixon, Jimmy Carter, and Ronald Reagan.  *See* Cong. Rsch. Serv., RL31446, *Reorganizing the*

---

[2] The White House, *Fact Sheet:  President Donald J. Trump Works to Remake America's Federal Workforce* (Feb. 11, 2025).

*Executive Branch in the 20th Century: Landmark Commissions* (June 10, 2002); *see also* Paul Larkin, Jr. & John-Michael Seibler, *The President's Reorganization Authority*, Heritage Foundation Legal Memorandum No. 210 (July 12, 2017).  Congress has given no such authority to President Trump.

12.     President Trump should well understand the constitutional limits on his authority to reorganize the federal government, because he tried and failed to obtain that authorization during his first term in office.  *See* Exec. Order No. 13781, 82 Fed. Reg. 13959 (Mar. 13, 2017) (Comprehensive Plan for Reorganizing the Executive Branch) (ordering OMB to engage in public and agency processes to create a report with recommendations regarding reorganization); Off. of Mgmt. and Budget, *Delivering Government Solutions in the Twenty-First Century:  Reform Plan and Reorganization Recommendations* (June 2018).[3]  As the first-term OMB reorganization report expressly acknowledged, the plans "establish a vision for the Executive Branch that will require further exploration and partnership with the Congress."  *Id.* at 4.  Congress did not re-enact reorganization authority for this first-term plan.  President Trump determined that in his second term he would proceed without Congress.

13.     To serve his goals of radical transformation, the President has also enlisted three centralized agencies with government-wide reach.  OMB, OPM, and DOGE are implementing the President's unconstitutional and unlawful orders to federal agencies by way of requiring all those other agencies to present "Agency RIF and Reorganization Plans" ("ARRPs") for *approval*, according to parameters and requirements imposed on those agencies.  *See* Memorandum from Russel Vought, OMB Director, and Charles Ezell, OPM Acting Director, to Heads of Executive Departments and Agencies re: Guidance on Agency RIF and Reorganization Plans Requested by *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 26, 2025) (attached hereto as Exhibit B).  DOGE, for its part, has been dictating to

---

[3] Available at: https://www.whitehouse.gov/wp-content/uploads/2018/06/Government-Reform-and-Reorg-Plan.pdf.  In 2017, President Trump ordered notice and public comment on the creation of these reorganization recommendations:  "The Director shall publish a notice in the *Federal Register* inviting the public to suggest improvements in the organization and functioning of the executive branch and shall consider the suggestions when formulating the proposed plan described in subsection (c) of this section."  Exec. Order No. 13781, Sec. 2(b).

each agency the required cuts to staffing and programs, in the name of "fraud and waste":  "We are cutting the waste and fraud in real time. Every day like that passes, our goal is to reduce the waste and fraud by $4 billion a day every day, seven days a week. And so far, we are succeeding."[4]

14.     Through these agents, President Trump's orders, effectuated by OMB, OPM, and DOGE, require federal agencies within weeks to create plans to reorganize themselves through massive layoffs, for the purpose of President Trump's desire for "large scale structural reform" and "reducing the size and scope of the federal government."  These orders require agencies to disregard individual authorizing statutes, regulations, and terms that govern each agency, and the requirements of reasoned decision-making.  To be clear, the agencies that are directed to submit ARRPs are *not* the decision-makers here:  even if they are quickly creating and submitting these plans, they are required to submit plans that follow the President's mandate, according to the President's designs, and that are only effectuated by OMB and OPM (and DOGE) approval.

15.     Three months into this Administration, there can be no real doubt that impacted federal agencies are acting according to the direction being given by President Trump through DOGE, OMB, and OPM.  Courts throughout the country have rejected this Administration's attempts to blame agencies for action that this Administration required them to take.  *See New York v. Trump*, 133 F.4th 51, 65 (1st Cir. 2025) (affirming District of Rhode Island's conclusion that "any 'suggest[ion] that the challenged federal funding freezes were purely the result of independent agency decisions' was 'disingenuous.'"); *Am. Fed'n of Gov. Emps., AFL-CIO v. Off. of Pers. Mgmt.*, No. 25-cv-01780-WHA (N.D. Cal.), ECF Nos. 44, 45, 120, 132 (holding that OPM, not federal agencies, unlawfully ordered the terminations of probationary employees government-wide); *Does v. Musk*, __ F. Supp. 3d __, No. 25-0462, 2025 WL 840574 (D. Md. Mar. 18, 2025) (holding DOGE is directing agency action); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, __ F. Supp. 3d __, No. 25-cv-239, 2025 WL 597959, at *7 (D.D.C. Feb. 25, 2025) (rejecting contention that "countless federal

---

[4] Fox News, *Elon Musk and DOGE team give exclusive look at how they're cutting waste, handle critics* (Mar. 27, 2025), available at: https://www.foxnews.com/video/6370654825112.  Transcript available at: https://www.rev.com/transcripts/musk-and-doge-on-brett-baier.

agencies ... suddenly began exercising their own discretion to suspend funding across the board at the exact same time" because it requires "unfathomable" "coincidental assumptions" and "contradicts the record").

16.    Moreover, President Trump himself has touted his ability to control agencies through DOGE, stating that, "after he signs an executive order, it gets 'passed on to [Musk] and his group' and 'they're all getting done.'"  *Does v. Musk*, 2025 WL 840574 at *2 (quoting The White House, *Interview of President Trump and Elon Musk by Sean Hannity*, *"the Sean Hannity Show"*, (Feb. 18, 2025)).[5]  The President explained further:

> [H]e would take that executive order that I'd signed, and he would have those people to whatever agency it was – "when are you doing it?  Get it done.  Get it done."  And some guy that maybe didn't want to do it, all of a sudden, he's signing – he just doesn't want to be bothered.

*Id.*; *see also* The White House, *Remarks by President Trump Before Cabinet Meeting*, (Feb. 26, 2025) (President Trump:  "We're cutting down government.  We're cutting down the size of government.  We have to.  We're bloated.  We're sloppy.  We have a lot of people that aren't doing their job").[6]

17.    Those who work for President Trump confirm that the President is controlling federal agencies according to his vision:

- The President's National Economic Council Director Kevin Hassett, White House Press Briefing (Feb. 20, 2025):
  > I'm saying that *we're studying every agency and deciding who to let go and why*, and we're doing so very rationally with a lot of support from analysis. (Emphasis added.)[7]

---

[5] Available at: https://www.whitehouse.gov/remarks/2025/02/interview-of-president-trump-and-elon-musk-by-sean-hannity-the-sean-hannity-show/.

[6] Available at: https://www.whitehouse.gov/remarks/2025/02/remarks-by-president-trump-before-cabinet-meeting/.

[7] The White House, *Press Briefing by Press Secretary Karoline Leavitt, Deputy Chief of Staff Stephen Miller, National Economic Council Director Kevin Hassett, and National Security Advisor Mike Waltz* (Feb. 20, 20250, available at: https://www.whitehouse.gov/remarks/2025/02/press-briefing-by-press-secretary-karoline-leavitt-deputy-chief-of-staff-stephen-miller-national-economic-council-director-kevin-hassett-and-national-security-advisor-mike-waltz/.

COMPLAINT, No.                                                                                      8

- Elon Musk, who according to the President, is head of DOGE, told reporters on February 11, 2025 that "the people voted for major government reform and that's what people are going to get."[8]  Musk, again on March 27, 2025:  "Well, this is a revolution, and I think it might be the biggest revolution in government since the original revolution."[9]

18.    The Administration has not revealed the transformation and downsizing plans to the press, to the public (even in response to FOIA requests), in response to union information requests, or to Congress.  OMB and OPM required all federal agencies to submit the ARRPs in a two-stage approval process, by deadlines of March 13 and April 14, 2025.  The Administration has refused to make either the March 13 or April 14 version of the ARRPs public, claiming they are "pre-decisional" because they have not been approved by OMB, and that employees and the public will learn what these plans are only when the reorganization occurs and RIF notices come out:

> It's no secret the Trump Administration is dedicated to downsizing the federal bureaucracy and cutting waste, fraud, and abuse. This document is a pre-deliberative draft and does not accurately reflect final reduction in force plans…. When President Trump's Cabinet Secretaries are ready to announce reduction in force plans, they will make those announcements to their respective workforces at the appropriate time.

Email from White House Principal Deputy Press Secretary Harrison Fields, as reported by the Washington Post.[10]

19.    What information Plaintiffs have painstakingly collected is gleaned from RIF notices that have been issued to date, press coverage of agency sources and leaked government documents, and statements by the President and agency heads describing general plans.  That information reveals that the Administration is actively implementing this unprecedented reorganization now.  The

---

[8] Gov't Exec., *Trump orders agencies to plan for widespread layoffs and attrition-based hiring*, (Feb. 11, 2025), available at: https://www.govexec.com/workforce/2025/02/trump-orders-agencies-plan-widespread-layoffs-and-attrition-based-hiring/402938/.

[9] Fox News, *Elon Musk and DOGE team give exclusive look at how they're cutting waste, handle critics* (Mar. 27, 2025), available at: https://www.foxnews.com/video/6370654825112.  Transcript available at: https://www.rev.com/transcripts/musk-and-doge-on-brett-baier.

[10] Washington Post, *Internal White House document details layoff plans across U.S. agencies* (March 27, 2025), available at: https://www.washingtonpost.com/politics/2025/03/27/federal-worker-layoffs-government-agencies/.

COMPLAINT, No.                                                                                                          9

American people have a right to know what the President is doing to dismantle their federal government.

20.    Details are emerging: in late March, pursuant to the mandate of Executive Order 14210, the Department of Health and Human Services ("HHS") began eliminating more than 10,000 positions throughout the Center for Disease Control ("CDC"), Food and Drug Administration ("FDA"), the National Institutes of Health ("NIH"), among other programs, throwing the medical, public health, and scientific community into utter chaos.[11]  As of April 15, 2025, the IRS was slated to commence RIFs ultimately totaling 40% of its workforce, including over 50% of the tax enforcement staff (the very staff that *brings in revenue to the government*).[12]  On April 22, 2025, the EPA began sending RIF notices to employees across its headquarters and regional offices.[13] Other agencies are right behind (*see infra* ¶¶189–256):

- The Department of Agriculture will eliminate at least 9,000 positions and entire regional offices and Research Stations within the Forest Service, taking staff down to at least 2019 levels;

- The Department of Energy will terminate 43% of its staff, eliminating offices and functions (including more than 500 positions at the Nuclear National Security Administration and eliminating the Office of Clean Energy Demonstrations entirely);

- The U.S. Environmental Protection Agency will reportedly lose 65% of its staff and effectively the entire Office of Research and Development (over 1,000 chemists, biologists, toxicologists and other scientists), among others;

- The Department of Housing and Urban Development is looking to cut approximately 51% of staff, eliminating and consolidating offices and functions;

---

[11] *See* March 27, 2025 Press Release:  HHS Announces Transformation to Make America Healthy Again, available at: https://www.hhs.gov/press-room/hhs-restructuring-doge.html.

[12] Fed. News Network, *IRS outlines plan to cut up to 40% of workforce, as tax filing season ends*, (Apr. 15, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/irs-outlines-plan-to-cut-up-to-40-of-workforce-as-tax-filing-season-ends/.  The IRS began RIFs with one office in March.  Gov't Exec., *IRS sends RIF notices as it begins widespread layoffs* (Apr. 4, 2025), available at: https://www.govexec.com/workforce/2025/04/irs-sends-rif-notices-it-begins-widespread-layoffs/404317/.  On April 23, 2025, the IRS confirmed the RIFs are ongoing.  Fed. News Network, *IRS layoff notices to employees delayed by 'glitches,'* (Apr. 23, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/irs-layoff-notices-to-employees-delayed-by-glitches/.

[13] Reuters, *EPA begins layoffs of environmental justice staff* (Apr. 22, 2025), available at: https://www.reuters.com/business/world-at-work/epa-begins-layoffs-environmental-justice-staff-2025-04-22/.

COMPLAINT, No.                                                                                          10

- The Department of the Interior is going to engage in large-scale RIFs of positions and programs that are deemed not "critical to public safety" or not "linked to highest priority programs";

- The Department of Labor will eliminate the entire Office of Federal Contract Compliance Programs, among other cuts;

- The Small Business Administration will lay off 43% of staff;

- The Social Security Administration will engage in "agency-wide organizational restructuring that will include significant workforce reductions" that the agency describes as "massive reorganizations" eliminating over 5,000 positions and potentially closing up to 47 field offices; and

- The Department of Veterans' Affairs looks to roll back to at least 2019 staffing levels by cutting *over 83,000 jobs across the country*, in critical veterans' service roles.

The list goes on, because the President has directed nearly every agency to make massive cuts to its workforce in furtherance of a reorganization of the entire federal government. These are no minor reforms or policy judgments: this is an express attempt to "transform" the country's federal administrative structure.

21.    By ordering and enacting the radical transformation President Trump contends he was elected to enact, President Trump has exceeded any constitutional authority granted to him in Article II or statutorily delegated by Congress, and has thereby usurped Congress's Article I authority. President Trump's Executive Order 14210 requiring agencies to engage in these large-scale RIF and reorganization plans is therefore *ultra vires* and unconstitutional.

22.    Moreover, neither OMB, OPM, nor DOGE have their own authority to order federal agencies to engage in large-scale RIFs or take any other action in service of government reorganization. The statutory authority defined by Congress does not give OMB or OPM any authority to *require* agencies to RIF employees, or to do so according to specific parameters, including because the President has decided to eliminate programs, functions, or positions, or take agencies down to shutdown levels of staff, or for either OMB or OPM to assert decision-making authority over the agencies. Nor does DOGE have any authority to require agencies to meet targets imposed by DOGE for reductions of staff and/or spending. By implementing the President's orders,

COMPLAINT, No.                                                                                         11

OMB, OPM, and DOGE therefore are each exceeding their authority, engaging in arbitrary and capricious action, and ignoring proper procedure, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), and (D).

23.     Finally, the impacted agencies themselves do not have the authority to do the President's unconstitutional bidding, under the terms set by the President rather than by Congress. Over and over, newly appointed agency heads have explained that they are reorganizing, eliminating programs, and cutting thousands upon thousands of jobs, because the President directed them to and because DOGE told them how much and what to cut.  As Veterans Affairs Secretary Doug Collins stated on the "Fox & Friends" program in early March 2025, the VA's plan to cut 80,000 jobs pursuant to the President's Executive Order was not his idea:  "No, that is a goal that was put out … [as] President Trump and [the Office of Personnel Management] have said let's look at a reduction in force across government,…And that is a goal, that is our target."[14]  *See also, e.g.*, U.S. Dep't of Health & Hum. Servs., *Fact Sheet: HHS Transformation to Make America Healthy Again* (Mar. 27, 2025) ("The restructuring of HHS is proceeding in accordance with President Trump's Executive Order").[15]  By implementing the President's unconstitutional orders, effectuated by DOGE's, OMB's, and OPM's requirements, these agencies have acted and are acting not in accordance with law and are engaged in arbitrary and capricious action in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C).

24.     The President's insistence on implementing this politically driven "mandate" comes at a nearly immeasurable cost to federal agencies, millions of public employees, state and local governments, and all those who depend on the services the agencies provide every day.  Plaintiffs stand together to name these harms at their source, pursue their right to judicial review, and stop actions that threaten the very foundations of our constitutional democracy.

---

[14] The Hill, *VA Secretary: Cutting 80,000 is "our target,"* (Mar. 10, 2025), available at: https://www.yahoo.com/news/va-secretary-cutting-80-000-170115439.html.
[15] Available at: https://www.hhs.gov/press-room/hhs-restructuring-doge-fact-sheet.html.

COMPLAINT, No.                                                                                                      12

25.     And so it falls upon this Court to play its Article III role in restraining the President's unconstitutional acts and the unlawful actions of the agencies that implement those directives. *Marbury v Madison*, 5 U.S. 137 (1803).  None of the actions at issue here are dedicated by the Constitution to the President and out of this Court's reach.  Plaintiffs call upon this Court to hold unlawful President Trump's unconstitutional reorganization and dismantling of the federal government by and through Executive Order 14210, and to enjoin the actions of the agencies implementing that unconstitutional presidential order.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

27.     Venue is appropriate in this district under 28 U.S.C. § 1391(e).  Plaintiffs AFGE, AFGE Local 1122, AFGE Local 1236, AFGE Local 2110, AFGE Local 3172, AFSCME, SEIU, and SEIU Local 1000 represent federal, state, and/or local government employees whose place of employment is within the Northern District of California, and Plaintiffs the City and County of San Francisco and the County of Santa Clara are located within the Northern District of California.

28.     Intradistrict assignment is appropriate in the San Francisco/Oakland division of this Court.

## PARTIES

29.     Plaintiff AFGE is a labor organization and unincorporated association headquartered at 80 F Street N.W., Washington, D.C. 20001.  AFGE, the largest union of federal employees, represents approximately 800,000 federal civilian employees through its affiliated councils and locals at 192 Departments, agencies and sub-agencies of the federal government, and in every state in the United States.

30.     Plaintiff AFSCME is a labor organization and unincorporated association headquartered at 1625 L Street, N.W., Washington, D.C. 20036.  AFSCME is the largest trade union of public employees in the United States, with 1.4 million members organized into approximately 3,400 local unions, 58 councils and affiliates in 46 states, the District of Columbia, and Puerto Rico. AFSCME members include nurses, corrections officers, child care providers, emergency medical

technicians, sanitation workers, school bus drivers, civil engineers, policy analysts, and more, all with one thing in common:  a dedication to making our communities stronger, healthier, and safer. AFSCME represents federal civilian employees in numerous agencies and departments across the federal government, and state and local government employees who rely on the services of the federal government every day.

31.    Plaintiff SEIU is a labor organization of approximately two million working people united by the belief in the dignity and worth of workers and the services they provide.  SEIU's members work in healthcare, the public sector, and property services.  SEIU has more than 150 affiliates across the United States, Canada, and Puerto Rico, and is headquartered at 1800 Massachusetts Ave., N.W., Washington, D.C. 20036.  SEIU members include physicians, technicians, long-term care workers, janitors, security officers, airport workers, librarians, childcare workers, educators, fast food workers, employees who work for city, county, and federal governments, and many more.  SEIU, together with its local affiliates, represent approximately 80,000 federal sector employees in the United States, including nurses, doctors, other healthcare workers, police officers, firefighters, first responders, office workers, scientists, engineers, analysts, maintenance workers, and more.  SEIU federal sector members provide a broad swath of services and bring a substantial amount of expertise to numerous agencies across the federal government.  SEIU also represents about 785,000 care providers and over 700,000 non-federal public sector employees employed by states, counties, cities, and school boards across the country, which rely on federal agencies in order to continue providing essential services to their communities.  SEIU's members also include over 8,000 workers employed by contractors to provide cleaning, security, maintenance, and other services at federally owned and federally leased sites run by numerous federal agencies.

32.    Plaintiff AFGE Local 1122 is a labor organization and unincorporated association headquartered in Richmond, California.  AFGE Local 1122 represents approximately 600 employees at a Social Security Administration Western Program Service Center in Richmond, California, in addition to other units within SSA's San Francisco region.  Those employees work in positions including Claims Specialists, Benefits Authorizers, and other clerical staff.

COMPLAINT, No.                                                                                                14

33.     Plaintiff AFGE Local 1236 is a labor organization and unincorporated association headquartered in San Francisco, California.  AFGE Local 1236 represents approximately 74 attorney-advisors at Environmental Protection Agency Region 9 Headquarters in San Francisco, California, and EPA's National Center for Radiation Field Operations in Las Vegas, Nevada.

34.     Plaintiff AFGE Local 2110 is a labor organization and unincorporated association headquartered in Palo Alto, California.  AFGE Local 2110 represents approximately 4,000 employees at the Department of Veterans' Affairs Palo Alto Health Care System, including its Menlo Park and Livermore Divisions, and at several Community-Based Outpatient Clinics in Fremont, San Jose, Monterey, and Capitola.  Those employees work as doctors, nurses, emergency medical services personnel, food service workers, custodial staff, and administrative staff.

35.     Plaintiff AFGE Local 3172 is a labor organization and unincorporated association headquartered in Pacifica, California.  AFGE Local 3172 represents approximately 1,600 employees at SSA field offices in California and Nevada.  Those employees work in positions including Claims Services Representatives, Claims Specialists, Technical Experts, and other administrative and facilities staff.

36.     Plaintiff SEIU Local 1000 is a labor organization and unincorporated association headquartered in Sacramento and has a Coastal & Central Representation office located at 436 14th Street, Suite 200, in Oakland, California.  SEIU Local 1000 represents approximately 96,000 employees who work in the California state government.  Those employees live and work throughout the State, including in San Francisco, Oakland, and Sacramento.  The employees represented by SEIU Local 1000 work in a wide range of positions across the state government, including as office assistants, secretaries, data entry staff, technical assistants, information technology analysts, accounting officers, auditors, and departmental analysts.

37.     Plaintiff Alliance for Retired Americans ("ARA" or the "Alliance") is a grassroots organization with 4.4 million retiree members.  Founded by the AFL-CIO Executive Council in 2001, the Alliance has 40 state alliances and members in every state, including 950,000 members—nearly 300,000 of whom are retirees—in California.  The Alliance's retiree members are from all walks of

COMPLAINT, No.                                                                                                                    15

life.  They are former teachers, industrial workers, state and federal government workers, construction workers, and community leaders united in the belief that every American deserves a secure and dignified retirement after a lifetime of hard work.

38.    Plaintiff American Geophysical Union ("AGU") is a 501(c)(3) membership association for Earth and space scientists.  The organization, founded in 1919, pursues a mission "to support and inspire a global community of individuals and organizations interested in advancing discovery in Earth and space sciences and its benefit for humanity and the environment."  AGU has more than 42,000 members worldwide, with 29,000 residing in the U.S., of whom more than 4,000 are in California; approximately 8,400 of those members work in the federal government, 28,000 are university researchers, and 2,000 are scientists at nonprofit organizations.  In addition to traditional career support provided by an association, AGU publishes a portfolio of 24 high-impact scholarly journals and convenes regular scientific meetings, including its Annual Meeting, which had more than 30,000 attendees in 2024.

39.    Plaintiff the American Public Health Association ("APHA") is a non-partisan, non-profit organization that champions the health of all people and all communities; strengthens the profession of public health; shares the latest research and information; promotes best practices; and advocates for public health issues and policies grounded in scientific research.  APHA represents more than 23,000 individual members who reside in all 50 states, including 2,100 individual members in California, and also has 52 state and regional affiliates.  APHA's membership also includes organizational members, including groups interested in health, state and local health departments, and health-related businesses.  APHA is the only organization that combines a 150-year perspective, a broad-based member community, and the ability to influence federal policy to improve the public's health.  APHA's membership additionally includes more than 250 California students in university public health schools or related programs, and over 50 California agency or organizational members, including the California Department of Public Health, Contra Costa County Public Health, Marin County Public Health, and the Los Angeles Trust for Children's Health.

40.     Plaintiff Center for Taxpayer Rights is a nonpartisan nonprofit organization dedicated to furthering taxpayers' awareness of and access to taxpayer rights. The Center accomplishes its mission, in part, by educating the public and government officials about the role taxpayer rights play in promoting compliance and trust in systems of taxation. The Center provides technical support for the establishment and expansion of taxpayer advocate and ombuds offices as independent voices of taxpayer rights and systemic change. The Center develops materials to educate the public about the function of taxes and taxpayer rights in civil society. The organization also develops training programs for tax administration officials as a component of leadership training. Through the Center's Low Income Taxpayer Clinic ("LITC"), the organization provides free representation to low-income taxpayers in disputes with the IRS and in the federal courts. All of the clients of the Center's LITC are low-income taxpayers. The Center also operates LITC Connect, a nationwide network of Low-Income Taxpayer Clinics and volunteer attorneys, certified public accountants, and enrolled agents that matches LITCs with tax professionals who can provide pro bono representation to low-income taxpayers and support for specific issues. The Center, through LITC Connect, provides training when needed to LITC staff and tax professionals supporting LITCs in serving low-income taxpayers and hosts weekly calls with LITCs who are LITC Connect members. In 2023, LITCs, most of whom are members of LITC Connect and the weekly calls, represented nearly 20,000 taxpayers nationwide, educated over 140,000 taxpayers and service providers about their rights and responsibilities before the IRS, secured over $10 million in tax refunds, and decreased or corrected over $41 million in tax liabilities.

41.     Plaintiff Coalition to Protect America's National Parks ("Parks Coalition") is a non-profit organization made up of over 4,000 members, all of whom are current, former, and retired employees and volunteers of the National Park Service. Together, they have accumulated over 50,000 years of experience caring for America's most valuable natural and cultural resources. The Coalition's goal is to support the preservation and protection of the National Park System and the mission-related programs of the National Park Service ("NPS") to ensure the survival of the park system for generations to come. The Coalition's members are regular and avid users of the National

COMPLAINT, No.                                                                                              17

1    Park System and NPS programs, as well as the national forests and other public lands, for recreation

2    and conservation activities.

3        42.    Plaintiff Common Defense Civic Engagement ("Common Defense") is a grassroots

4    membership organization of progressive veterans, military families, and civilian supporters standing

5    up for our communities against the rising tide of racism, hate, and violence.  Common Defense

6    invests in the leadership of its members through training and deployment in campaigns that connect

7    directly to their history of service, including voting rights, climate justice, and anti-militarism.

8    Approximately 33,187 of Common Defense's members live in California, including approximately

9    2,000 veterans.

10       43.    Plaintiff Main Street Alliance ("MSA") is a national network of small businesses, with

11   approximately 30,000 members throughout the United States.  MSA helps small business owners

12   realize their full potential as leaders for a just future that prioritizes good jobs, equity, and community

13   through organizing, research, and policy advocacy.  MSA also seeks to amplify the voices of its small

14   business membership by sharing their experiences with the aim of creating an economy where all

15   small business owners have an equal opportunity to succeed.  MSA is nonpartisan and is a Section

16   501(c)(3) organization.  MSA has approximately 1,410 small business members in California,

17   including more than 70 small businesses in Alameda, Santa Clara, San Francisco, Sonoma, and

18   Contra Costa Counties.

19       44.    Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a not-for-profit

20   environmental and public health membership organization that works to ensure the rights of all

21   people to clean air, clean water, and healthy communities.  NRDC has many hundreds of thousands

22   of members throughout the United States.  NRDC engages in research, policy analysis, advocacy,

23   public education, and litigation to protect public health and the environment.  As part of its work,

24   NRDC petitions federal agencies for rulemaking and other actions to protect the environment and

25   human health, comments on proposed regulations issued by federal agencies, researches and informs

26   its members about important environmental and public health issues, and publishes scientific papers

27   and advocacy briefs to inform the scientific community, policymakers, and the public.

28   COMPLAINT, No.                                                                          18

45.     Plaintiff Northeast Organic Farming Association Inc. ("NOFA") is a non-profit organization of over 5,000 farmers, farmworkers, gardeners, landscape professionals, and consumers working to promote healthy food, organic farming practices, and a cleaner environment.  NOFA is comprised of seven state-chapters:  Connecticut, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island, and Vermont.  Each of these organizations offers educational conferences, workshops, farm tours, and printed materials to educate farmers, gardeners, consumers, and land care professionals on organic farming.  NOFA also publishes a quarterly newspaper, *The Natural Farmer*, that provides features on organic farming techniques, certification issues, organic market conditions, and environmental developments that may impact farmers and growers; administers the Organic Land Care program, which trains landscape professionals and others on the principles and practices of organic land care, as laid out by the *NOFA Standards for Organic Land Care*; runs a professional accreditation program; provides advice, support and cross-credentialing to partner institutions engaged in sustainable landscape education; and educates the public about the importance of using standards-based organic landscaping services.

46.     Plaintiff VoteVets Action Fund Inc. ("VoteVets") is a non-partisan, non-profit organization incorporated under the laws of the District of Columbia.  Its purpose is to lift up the voices of veterans on matters of national security, veterans' care, and everyday issues that affect the lives of those who served as well as their families including foreign policy, veterans' unemployment, robust investment in care for veterans, energy security, protecting the rights of those who serve, and upholding the Constitution and democracy that every military member swore to uphold and protect. VoteVets has nearly two million supporters across the country, in all fifty states, with whom it regularly communicates about issues affecting veterans, including the operations, programs, and services available through the VA.  Approximately 417,000 of VoteVets' supporters live in California, including 131,000 in Northern California.

47.     Plaintiff Western Watersheds Project ("WWP") is a non-profit environmental conservation group that works to influence and improve public lands management throughout the western United States to protect native species and conserve and restore the habitats they depend

COMPLAINT, No.                                                                                                      19

on.  WWP's primary focus is on the negative impacts of livestock grazing, including harm to ecological, biological, cultural, historic, archeological, scenic resources, wilderness values, roadless areas, Wilderness Study Areas, and designated Wilderness.  WWP was founded in 1993 and has more than 14,000 members and supporters and field offices in Colorado, Utah, Idaho, Montana, Wyoming, Arizona, Nevada, and Oregon.  WWP covers over 250 million acres of public land spanning all of the western states.

48.　　The Plaintiffs identified in the preceding paragraphs are all proceeding on their own behalf as an organization, including based on injury to their mission and organizational activities, as well as on a representative or associational basis, based on injury to their members.

49.　　Plaintiff County of Santa Clara, California ("Santa Clara") is a charter county and political subdivision of the State of California.

50.　　Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

51.　　Plaintiff the Mayor and City Council of Baltimore ("Baltimore") is the corporate identity of the Plaintiff City of Baltimore, Maryland, a home-rule jurisdiction created by the Baltimore City Charter as an entity that may sue and be sued.

52.　　Plaintiff Harris County, Texas ("Harris County") is a local government entity in the state of Texas.

53.　　Plaintiff the City of Chicago, Illinois ("Chicago") is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

54.　　Plaintiff the City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California and is a charter city and county.

55.　　Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

COMPLAINT, No.　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　20

56.    Defendant Office of Management and Budget ("OMB") is a federal agency headquartered in Washington, D.C.  OMB is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).

57.    Defendant Russell Vought is the Director of OMB and is sued in his official capacity.

58.    Office of Personnel Management ("OPM") is a federal agency headquartered in Washington, D.C.  OPM is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

59.    Defendant Charles Ezell has been the Acting Director of OPM since January 20, 2025. He is sued in his official capacity.

60.    Defendant Department of Government Efficiency ("DOGE") is a federal agency headquartered in Washington, D.C.  DOGE is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

61.    Defendant Elon Musk is the actual head of DOGE and is sued in his official capacity.

62.    Defendant Amy Gleason is the titular Acting Administrator of DOGE and is sued in her official capacity.

63.    The following federal departments and agencies, including their agency heads, may be referred to collectively herein as "Federal Agency Defendants."  For purposes of this Complaint, the Federal Agency Defendants do not include OMB, OPM, or DOGE, which will be specifically identified.  The Federal Agency Defendants are sued for their own unlawful conduct in Claims Six and Seven below, and also pursuant to Rule 19 for purposes of effectuating complete relief as to Claims One through Five against the President, OMB, OPM, DOGE and their agency heads.

64.    Defendant United States Department of Agriculture ("USDA" or "Agriculture") is a federal agency headquartered in Washington, D.C.  USDA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

65.    Defendant Brooke Rollins is the Secretary of Agriculture and is sued in her official capacity.

66.     Defendant United States Department of Commerce ("Commerce") is a federal agency headquartered in Washington, D.C.  Commerce is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

67.     Defendant Howard Lutnick is the Secretary of Commerce and is sued in his official capacity.

68.     Defendant United States Department of Defense ("DoD" or "Defense") is a federal agency headquartered in Washington, D.C.  Defense is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

69.     Defendant Pete Hegseth is the Secretary of Defense and is sued in his official capacity.

70.     Defendant United States Department of Energy ("Energy") is a federal agency headquartered in Washington, D.C.  Energy is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

71.     Defendant Chris Wright is the Secretary of Energy and is sued in his official capacity.

72.     Defendant United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C.  HHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

73.     Defendant Robert F. Kennedy Jr. is the Secretary of HHS and is sued in his official capacity.

74.     Defendant United States Department of Homeland Security ("DHS") is a federal agency headquartered in Washington, D.C.  DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

75.     Defendant Kristi Noem is the Secretary of DHS and is sued in her official capacity.

76.     Defendant United States Department of Housing and Urban Development ("HUD") is a federal agency headquartered in Washington, D.C.  HUD is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

77.     Defendant Scott Turner is the Secretary of HUD and is sued in his official capacity.

78.     Defendant United States Department of Justice ("DOJ") is a federal agency headquartered in Washington, D.C.  DOJ is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

79.     Defendant Pam Bondi is the Attorney General and is sued in her official capacity.

80.     Defendant United States Department of the Interior ("DoI" or "Interior") is a federal agency headquartered in Washington, D.C.  Interior is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

81.     Defendant Doug Burgum is the Secretary of the Interior and is sued in his official capacity.

82.     Defendant United States Department of Labor ("DOL") is a federal agency headquartered in Washington, D.C.  DOL is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

83.     Defendant Lori Chavez-DeRemer is the Secretary of Labor and is sued in her official capacity.

84.     Defendant United States Department of State ("State") is a federal agency headquartered in Washington, D.C.  State is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

85.     Defendant Marco Rubio is the Secretary of State and is sued in his official capacity.

86.     Defendant United States Department of Treasury ("Treasury") is a federal agency headquartered in Washington, D.C.  Treasury is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

87.     Defendant Scott Bessent is the Secretary of Treasury and is sued in his official capacity.

88.     Defendant United States Department of Transportation ("DOT") is a federal agency headquartered in Washington, D.C.  DOT is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

COMPLAINT, No.                                                                                          23

89.     Defendant Sean Duffy is the Secretary of Transportation and is sued in his official capacity.

90.     Defendant United States Department of Veterans Affairs ("the VA") is a federal agency headquartered in Washington, D.C.  The VA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

91.     Defendant Doug Collins is the Secretary of Veterans Affairs and is sued in his official capacity.

92.     Defendant AmeriCorps (a.k.a. the Corporation for National and Community Service) is a federal agency headquartered in Washington, D.C.  AmeriCorps is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

93.     Defendant Jennifer Bastress Tahmasebi is the Interim Agency Head of AmeriCorps and is sued in her official capacity.

94.     Defendant United States Environmental Protection Agency ("EPA") is a federal agency headquartered in Washington, D.C.  EPA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

95.     Defendant Lee Zeldin is the EPA Administrator and is sued in his official capacity.

96.     Defendant United States General Services Administration ("GSA") is a federal agency headquartered in Washington, D.C.  GSA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

97.     Defendant Stephen Ehikian is the GSA Acting Administrator and is sued in his official capacity.

98.     Defendant National Labor Relations Board ("NLRB") is a federal agency headquartered in Washington, D.C.  NLRB is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

99.     Defendant Marvin Kaplan is the Chairman of the NLRB and is sued in his official capacity.

100.     Defendant William Cowen is the Acting General Counsel of the NLRB and is sued in his official capacity.

101.     Defendant National Science Foundation ("NSF") is a federal agency headquartered in Alexandria, Virginia.  NSF is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

102.     Defendant Brian Stone is the Acting Director of the NSF and is sued in his official capacity.

103.     Defendant United States Small Business Administration ("SBA") is a federal agency headquartered in Washington, D.C.  SBA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

104.     Defendant Kelly Loeffler is the Administrator of the SBA and is sued in her official capacity.

105.     Defendant United States Social Security Administration ("SSA") is a federal agency headquartered in Baltimore, Maryland.  SSA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

106.     Defendant Leland Dudek is the Acting Commissioner of the SSA and is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I.    The Constitution's Distribution of Legislative and Executive Authority With Respect to the Agencies of the Federal Government

107.     Article I vests in Congress the legislative power to create the departments, agencies, and offices within the executive branch; to define their duties; and to fund their activities.  U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."); *INS v. Chadha*, 462 U.S. 919 (1983).  Thus, "[t]o Congress under its legislative power is given the establishment of offices … [and] the determination of their functions and jurisdiction."  *Myers v. United States*, 272 U.S. 52, 129 (1926); U.S. Const. art I, § 8, cl. 18 ("The Congress shall have Power To…make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer

COMPLAINT, No.                                                                                    25

thereof."). Congress thus "control[s]" the very "existence of executive offices." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd*., 561 U.S. 477, 500 (2010); *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute.").

108.    Among Congress's very first acts were "establishing executive departments and staffs." David Engdahl, Necessary and Proper Clause, *The Heritage Guide to the Constitution*, The Heritage Foundation.[16]  When the First Congress created the Treasury Department, for example, it established therein "distinct offices—Secretary, Comptroller, Auditor, Treasurer and Register—and their duties." Harvey C. Mansfield, *Reorganizing the Federal Executive Branch: The Limits of Institutionalization*, 35 L. & Contemporary Problems 462, 463 (1970).

109.    Those executive agencies of the federal government are identified in various statutes, including 5 U.S.C. §§ 101 (listing Cabinet-level departments), 104 (independent establishments), and 105 (defining "agency" to include, inter alia, Cabinet departments and independent establishments). Each agency has its own authorizing statutes that govern its administration, including statutory provisions that authorize one or more individuals to act as the head of the agency. *See e.g.*, 10 U.S.C. §§ 111, 113 (Defense); 16 U.S.C. § 551 (Agriculture/Forest Service); 38 U.S.C. §§ 301, 303 (VA); 42 U.S.C. §§ 202, 203 (HHS); 42 U.S.C §§ 281, 282 (NIH); 42 U.S.C. § 7131 (Energy).

110.    The President's Constitutional authority is set forth in Article II.  U.S. Const. art. II § 1, cl. 1. ("The executive Power shall be vested in a President of the United States of America.").  The President has no constitutional legislative authority.  *INS v. Chadha*, 462 U.S. 919, 951, 956–59 (1983); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952).  Thus, the President has no constitutional power to unilaterally enact, amend, or repeal parts of duly enacted statutes.  *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998).  The declared purpose of separating and dividing the powers of government was to "diffuse[] power the better to secure liberty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see also Bowsher v. Synar*, 478 U.S. 714, 721–22 (1986) ("Justice Jackson's words echo the famous warning of Montesquieu,

---

[16] Available at: http://www.heritage.org/constitution/#!/articles/1/essays/59/necessary-and-proper-clause.

quoted by James Madison in The Federalist No. 47, that 'there can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates'...."  The Federalist No. 47, p. 325 (J. Cooke ed. 1961).").

111.    The Article II "Take Care Clause" requires that "[the President] shall take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  The Take Care Clause "refutes the idea that [the President] is to be a lawmaker.  The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 587 (1952).

112.    And yet, the President does not execute the laws alone:  "He must execute them by the assistance of subordinates."  *Myers v. United States*, 272 U.S. 52, 117 (1926).  "To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority and in conformity with his orders."  *Marbury v. Madison*, 5 U.S. 137, 166 (1803).

113.    The President's Constitutional authority with respect to those who assist him in taking care that the law is faithfully executed is established in the Appointments Clause which reads, "The President … shall nominate, and by and with the Advice and Consent of the Senate, shall appoint … [the] Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law."  U.S. Const. art. II, § 2, cl. 2.  That power extends to removal of those appointed officers. *See Myers*, 272 U.S. at 135.

114.    This does not mean, however, that the President has carte blanche authority over federal agencies.  The President may exercise Article II authority to create, reorganize, or abolish an office that he established (such as the Executive Office of the President), but Article II does not authorize the President to fundamentally reorganize the executive branch by, for example, ordering government-wide terminations of federal employees, or restricting or abolishing the congressionally authorized work of even a single agency that he did not establish.  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 217 (2020); *see also Bessent v. Dellinger*, No. 24A79 (U.S.) (Feb. 16, 2025 Application to Vacate the Order Issued by the U.S. District Court for the District of Columbia

COMPLAINT, No.                                                                                                                    27

1    and Request for an Immediate Administrative Stay), at *27 (U.S. Solicitor General conceding:

2    *"Agency heads…control hiring and firing decisions for subordinates*." (emphasis added)).

3           115.    "The President's power, if any, to issue [an] order must stem either from an act of

4    Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,

5    585 (1952).  The President may, therefore, exercise only that legislative authority that Congress has

6    constitutionally delegated.  *Id.* at 587.

7           116.    The President does not employ the millions of federal employees; the agencies do.  5

8    U.S.C. § 3101 ("General authority to employ":  "Each Executive agency, military department, and the

9    government of the District of Columbia may employ such number of employees of the various

10   classes recognized by chapter 51 of this title as Congress may appropriate for from year to year.").

11   Thus, Congress has largely delegated authority, particularly for employment decisions, to the heads of

12   the federal agencies, not to the President.  *Id.*; *see also, e.g.*, 26 U.S.C. §§ 7803, 7804 (IRS: "the

13   Commissioner of Internal Revenue is authorized to employ such number of persons as the

14   Commissioner deems proper for the administration and enforcement of the internal revenue laws, and

15   the Commissioner shall issue all necessary directions, instructions, orders, and rules applicable to

16   such persons.").

17          117.    Congress has never delegated corresponding authority to the President to make the

18   employment decision to lay off federal employees.  Instead, Congress has delegated to the President

19   only rule-making authority to issue government-wide regulations consistent with merit-systems

20   principles required by Congress.  *E.g.*, 5 U.S.C. § 2301 (delegating to President rule-making authority

21   "necessary to ensure that personnel management is based on and embodies the merit system

22   principles."); *id.* § 3301 (regulations for the efficiency of hiring); *id.* § 3302 (authority to create

23   excepted service from the usual competitive requirements).  Likewise, to the extent that the authority

24   to engage in reductions-in-force is grounded in statute, that statute only delegates the authority to

25   OPM (not the President) and only to make government-wide rules for the "order of retention," not to

26   make the decisions.  5 U.S.C. § 3502.

27

28
     COMPLAINT, No.                                                                                    28

118.    Nor has Congress delegated to the President the authority to transfer or excise specific programs, functions, or offices that Congress established and placed within a specific agency's statutory authority or discretion.  Such a delegation would come dangerously close to the line-item veto struck down as unconstitutional in *Clinton v. City of New York*, 524 U.S. 417 (1998).  Many of President Trump's recent actions effectively assume that line-item veto power, namely the power to excise programs that do not fall within the President's desired vision.

119.    Finally, Congress has not delegated to President Trump the broader authority to impose his transformation on the federal government.  When Congress has wanted to grant reorganization authority to a President, it has done so; but that grant of authority that has been used by Presidents over the last century has *not* been reactivated for President Trump.

## II.    The 100-Year History of Congressionally Authorized Government Reorganization

120.    Congress first delegated to a President the legislative authority to propose reforms to federal agencies in 1932.  Economy Act of 1932, Pub. L. 72-212, tit. VI, §§ 401-408, 47 Stat. 413. Since then, from time to time, Congress has delegated to presidential administrations limited authority to propose reorganizations of the executive branch under specified conditions, usually within specified time limits.  *See, e.g.*, Economy Act of 1933, Pub. L. 73-2, tit. VI, §§ 401-408, 47 Stat. 1517; Reorganization Act of 1939, Pub. L. 76-19, 53 Stat. 561; Reorganization Act of 1945, Pub. L. 79-263, 59 Stat. 613; Reorganization Act of 1949, Pub. L. 81-109, 63 Stat. 203, as amended by 67 Stat. 4 (1953), 69 Stat. 14 (1955), 71 Stat. 611 (1957), 75 Stat. 41 (1961), 78 Stat. 240 (1964), 79 Stat. 135 (1965), 83 Stat. 6 (1969), and 85 Stat. 574 (1971); and the Reorganization Act of 1977, Pub. L. No. 95-17, 91 Stat. 29 (1977) (codified at 5 U.S.C. §§ 901-913 (1982)), as amended by 94 Stat. 329 (1980) and 98 Stat. 3192 (1984).

121.    Nine different Presidents on 16 occasions have been granted this authority to fast-track reorganizations of government, large and small, through the legislative process.  *See* Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority:  History, Recent Initiatives, and Options for Congress* (Dec. 11, 2012) ("Presidents used the authority for a variety of purposes, from relatively minor reorganizations within individual agencies to the creation of large new organizations, including

COMPLAINT, No.                                                                                                    29

the Department of Health, Education, and Welfare; the Environmental Protection Agency; and the Federal Emergency Management Agency.").  Presidents have submitted many other proposals that have not been accepted:  "Between 1932 and 1984, presidents submitted 126 reorganization proposals to Congress, of which 93 were implemented and 33 were affirmatively rejected by Congress." *Id.*

122.    A House of Representatives committee report for the Reorganization Act of 1977 explained the history of such laws:  "Reorganizations, of course, may be made in the executive branch by legislation proposed by the President or originating within the Congress.  This reorganization authority [in the Reorganization Act], however, is a cooperative effort by the President and the Congress to expedite needed reorganizations and to respond readily to changed requirements."  H.R. Rep. 95-105, 2, 1977 U.S.C.C.A.N. 41, 42.

123.    The most recent authorization, the Reorganization Act of 1977, as amended, expired on December 31, 1984, and has not been renewed.  5 U.S.C. § 905(b).  The expired law remains codified, however, and is instructive.  The law defines reorganization as including changes to the structure of federal agencies effectuated by consolidating and transferring functions *between* agencies, and *within* agencies:

> (2) the abolition of all or a part of the functions of an agency, except that no enforcement function or statutory program shall be abolished by the plan;
> …
> (4) the consolidation or coordination of part of an agency or the functions thereof with another part of the same agency or the functions thereof;
> …
> (6) the abolition of the whole or a part of an agency which agency or part does not have, or on the taking effect of the reorganization plan will not have, any functions.

5 U.S.C. § 903(a).

124.    In that same law, Congress imposed requirements on the President, first requiring the President to transmit any reorganization plan to Congress, and then that the President explain how any changes to federal agencies would comport with statutory requirements and congressionally authorized funding levels to facilitate Congress's consideration of the reforms reflected in such a plan:

COMPLAINT, No.                                                                                                              30

In his message transmitting a reorganization plan, the President shall specify with respect to each abolition of a function included in the plan the statutory authority for the exercise of the function.

The message shall also estimate any reduction or increase in expenditures (itemized so far as practicable), and describe any improvements in management, delivery of Federal services, execution of the laws, and increases in efficiency of Government operations, which it is expected will be realized as a result of the reorganizations included in the plan.

In addition, the President's message shall include an implementation section which shall (1) describe in detail (A) the actions necessary or planned to complete the reorganization, (B) the anticipated nature and substance of any orders, directives, and other administrative and operational actions which are expected to be required for completing or implementing the reorganization, and (C) any preliminary actions which have been taken in the implementation process, and (2) contain a projected timetable for completion of the implementation process.

The President shall also submit such further background or other information as the Congress may require for its consideration of the plan.

5 U.S.C. § 503(b).

125.    On some occasions, Congress has denied presidential requests for reorganization authority, as when President Barack Obama sought such authority in 2012.  *See* S. 2129, 112th Cong. (2012); H.R. 4409, 112th Cong. (2012).  *See also Retooling Government for the 21st Century: The President's Reorganization Plan and Reducing Duplication*: *Hearing Before the S. Comm. on Homeland Sec. & Gov't Aff.*, 112th Cong. (2012) (S. Hrg. 112-531).  In 2003, reorganization authority for then-President Bush passed the House, but was defeated in the Senate.  CRS Report R42852, *supra*, at 32-33.

126.    Congress, exercising its Article I legislative authority, has also over the decades rejected specific presidential reorganization plans presented through the regular legislative process. These have included, for example, proposals to eliminate the Department of Education, *see, e.g.*, H.R. 714, 98th Cong. (1983) and H.R. 1510, 115th Cong. (2017); to merge the Department of Labor, the Department of Commerce, and the Small Business Administration, *see, e.g.* S. 1116, 112th Cong. (2011); and to consolidate parts of several agencies into a new Food Safety Administration.  H.R. 609, 114th Cong. (2015); among others.

COMPLAINT, No.                                                                                                          31

127.    At other times, Congress has authorized reorganizations via regular legislation, after legislative debate and compromise by the people's representatives in Congress, such as when Congress enacted the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135; *Communication from the President of the United States: A Reorganization Plan for the Department of Homeland Sec.*, 108th Cong. 16 (Jan. 7, 2003); Cong. Rsch. Serv., RL31493, *Homeland Security Department of Organization and Management – Legislative Phase* (Feb. 25, 2003).  Congress has also sometimes delegated to the President limited reorganization authority with respect to specific executive agencies, under specific conditions, and for specific periods of time.  One such law, for example, authorized a reorganization of the U.S. Agency for International Development ("USAID") and related foreign affairs agencies in 1998.  *See, e.g.,* Pub. L. 105-277, div. G, subdiv. A, § 1601, 112 Stat. 2681-795 (1998) (codified at 22 U.S.C. § 6601).  Such laws typically set expiration dates for the delegated authority:  that particular law, for example, prohibits presidential reorganization of USAID after the effective date of the reorganization plan authorized in 1998.  22 U.S.C. § 6601(e).

128.    The long history of this reorganization authority legislation makes abundantly clear that the power is legislative, rests with Congress, and is only delegated to the President when Congress expressly decides to do that.

**III.    President Trump's First Unsuccessful Attempt at Government Reorganization**

129.    President Trump should be well aware that he does not possess the constitutional authority to order reorganization of the government and that that is an authority that rests with Congress, as evidenced by his experience during his first term.

130.    On March 13, 2017, during his first term, President Trump issued Executive Order 13781, which required the Director of OMB "to propose a plan to reorganize governmental functions and eliminate unnecessary agencies ... , components of agencies, and agency programs."  Exec. Order No. 13781, 82 Fed. Reg. 13959 (2017).  OMB's implementing memorandum created a process for both agency and public input to contribute to a proposed plan.  Memorandum from Mick Mulvaney, OMB Director, to Heads of Executive Departments and Agencies re: Comprehensive Plan for

COMPLAINT, No.                                                                                                          32

Reforming the Federal Government and Reducing the Federal Civilian Workforce, M-17-22, at 2 (Apr. 12, 2017).[17]

131.    OMB released its comprehensive plan to the public on June 21, 2018.  OMB, *Delivering Government Solutions in the Twenty-First Century:  Reform Plan and Reorganization Recommendations* (June 2018) (hereinafter "2018 Reorganization Plan").[18]

132.    The 2018 Reorganization Plan listed 32 proposals and conceded that "significant changes will require legislative action." *Id.* at 4; *id.* at 21 (emphasizing the Administration's need for "the support of the Congress,"); *id*. at 55 ("Fully and effectively achieving the end-state vision presented here would necessarily require a partnership with the Congress, including the granting of statutory authorities as necessary.").  The 2018 Plan committed that, in September 2018, OMB would begin negotiations with Congress for legislative action. *Id*. at 6.

133.    In 2018, Rep. Jody Hice (R-GA) introduced a bill that would have resurrected 5 U.S.C. ch. 9 to give President Trump reorganization authority. *See* H.R.6787, 115th Congress (2017-2018).[19]  Senator Ron Johnson (R-WI) introduced a companion bill in the Senate. *See* S.3137,115th Congress (2018).[20]  The Senate bill cleared the committee following a hearing, but it was never brought up for a vote in the Senate.  The Senate's committee report does not appear to indicate (or even suggest) that the Trump administration expressly requested authority, but OMB's deputy director testified in support of Trump's reorganization plan at the committee hearing. *See Reforming Government Act of 2018 Report of Comm. on Govt'l Aff. to Accompany S. 3137*, 115th Cong. 381 (2018).[21]

---

[17] Available at: https://web.archive.org/web/20170716192101/https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2017/M-17-22.pdf.

[18] Available at: https://www.whitehouse.gov/wp-content/uploads/2018/06/Government-Reform-and-Reorg-Plan.pdf.

[19] Available at: https://www.congress.gov/bill/115th-congress/house-bill/6787/subjects.

[20] Available at: https://www.congress.gov/bill/115th-congress/senate-bill/3137.

[21] Available at: https://www.congress.gov/115/crpt/srpt381/CRPT-115srpt381.pdf.

COMPLAINT, No.                                                                                              33

134.    In 2019, the Trump administration issued an update on the progress of the 2018 Plan. Off. of Mgmt. & Budget, Exec. Off. of the President, *One Year [sic] Update: Reform Plan and Reorganization Recommendations* (2019) (hereinafter "2019 Update").[22]  The update noted that "some proposals require action by Congress."  *Id*. at 2.  Along those lines, the update acknowledged that "Congress has taken action to consider at least 10 of the proposals, via hearings, legislation, or discussions with Members or staff."  *Id*.

135.    Congress gave due consideration to the Trump administration's first-term reorganization ambitions by convening numerous hearings before and after OMB publicly released the 2018 Plan.  *See, e.g.*, *FAA Reauthorization: Administration Perspectives: Hearing Before the S. Comm. on Commerce, Science & Transp.*, 115th Cong. (June 7, 2017) (S. Hrg. 115-221);[23] *Agency Approaches to Reorganization Examining OMB's Memorandum on the Federal Workforce: Hearing Before S. Comm. on Homeland Sec. & Govt'l Aff.*, 115th Cong. (June 15, 2017) (S. Hrg. 115-165);[24] *A Review of the State Department Reauthorization Bill for Fiscal Year 2018 and the State Department Reorganization Plans: Hearing Before the S. Comm. on For. Rel.*, 115th Cong. (July 17, 2017) (S. Hrg. 115-704);[25] *Examining OMB's Memorandum on The Federal Workforce Part II: Expert Views on OMB's Ongoing Government-Wide Reorganization: Hearing Before the S. Comm. on Homeland Sec. & Govt'l Aff.*, 115th Cong. (Sep. 13, 2017) (S. Hrg. 115-6177);[26] *Department of Energy: Management and Priorities; Hearing Before the H. Comm. on Science, Space, & Tech.*, 115th Cong. (Jan. 1, 2018) (Serial No. 115-45);[27] *Financing Overseas Development: The Administration's Proposal: Hearing Before the H. Comm. on For. Rel.*, 115th Cong. (Apr. 11, 2018) (Serial No. 115-

---

[22] Available at: https://web.archive.org/web/20200716100903/https://www.performance.gov/GovReform/Reform-and-Reorg-Plan-Update.pdf.

[23] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg29974/CHRG-115shrg29974.pdf.

[24] Available at: https://www.govinfo.gov/content/pkg/CHRG-115shrg27394/pdf/CHRG-115shrg27394.pdf.

[25] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg38105/CHRG-115shrg38105.pdf.

[26] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg28405/CHRG-115shrg28405.pdf.

[27] Available at: https://www.congress.gov/115/chrg/CHRG-115hhrg28932/CHRG-115hhrg28932.pdf.

119);[28] *Workforce for the 21st Century: Analyzing the President's Management Agenda: Hearing Before the H. Comm. on Oversight & Gov't Reform*, 115th Cong. (May 16, 2018) (Serial No. 115-96);[29] *USAID Resources and Redesign: Hearing Before the S. Comm. on For. Rel.*, 115th Cong. (June 20, 2018) (S. Hrg. 115-791);[30] *Examining the Administration's Government-Wide Reorganization Plan: Hearing Before H. Comm. on Oversight & Gov't Reform*, 115th Cong. (June 27, 2018) (Serial No. 115-88);[31] *Reviewing the Administration's Government Reorganization Proposal: Hearing Before the S. Comm. on Homeland Sec. & Gov't Aff.,* 115th Cong. (July 18, 2018) (S. Hrg. 115-547);[32] *Administration Reorganization and Modernization Proposals Related to the Department of Energy and the Department of the Interior: Hearing Before S. Comm. on Energy and Nat'l Resources*, 115th Cong. (July 19, 2018) (S. Hrg. 115-524);[33] *The Challenges and Opportunities of the Proposed Government Reorganization on OPM and GSA: Hearing Before the S. Comm. on Homeland Sec. & Gov't Aff.* (July 26, 2018) (S. Hrg. 115-451);[34] *Oversight Hearing on No Road Map, No Destination, No Justification: The Implementation and Impacts of the Reorganization of the Department of the Interior: Hearing Before the H. Comm. on Nat. Res.*, 116th Cong. (Apr. 30, 2019) (Serial No. 116-13);[35] *The Administration's War on a Merit Based Civil Service: Hearing Before the Subcomm. on Gov't Ops., H. Comm on Oversight & Reform*, 116th Cong. (May 21, 2019) (Serial No. 116-26);[36] *Document Production Status Update: OPM, FBI, and GSA: Hearing Before the Subcomm. on Gov't*

---

[28] Available at: https://www.congress.gov/115/meeting/house/108115/documents/HHRG-115-FA00-Transcript-20180411.pdf.

[29] Available at: https://www.congress.gov/115/chrg/CHRG-115hhrg31422/CHRG-115hhrg31422.pdf.

[30] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg40341/CHRG-115shrg40341.pdf.

[31] Available at: https://www.congress.gov/115/chrg/CHRG-115hhrg31276/CHRG-115hhrg31276.pdf.

[32] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg34573/CHRG-115shrg34573.pdf.

[33] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg30984/CHRG-115shrg30984.pdf.

[34] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg32987/CHRG-115shrg32987.pdf.

[35] Available at: https://www.congress.gov/116/chrg/CHRG-116hhrg36257/CHRG-116hhrg36257.pdf.

[36] Available at: https://docs.house.gov/meetings/GO/GO24/20190521/109516/HMTG-116-GO24-Transcript-20190521.pdf.

*Ops., H. Comm on Oversight & Reform*, 116th Cong. 42 (June 27, 2019);[37] *BLM Disorganization: Examining the Proposed Reorganization and Relocation of the Bureau of Land Management Headquarters to Grand Junction, Colorado: Hearing Before the H. Comm. on Nat. Res.*, 116th Cong. (Sep. 19, 2019) (Serial No. 116-21).[38]

136.    The Congressional Research Service aided Congress in its deliberations by preparing a report, which discussed the 2018 Plan's 32 proposals and 3 significant subproposals.  Cong. Rsch. Serv., *Trump Administration Reform and Reorganization Plan: Discussion of 35 "Government-Wide" Proposals*, at 1 (July 25, 2018).[39]

137.    Congress largely did not support the proposed reforms.  *See The Administration's War on a Merit Based Civil Service: Hearing Before the Subcomm. on Gov't Ops., H. Comm on Gov't Oversight & Reform*, 116th Cong. (May 21, 2019) (Serial No. 116-26); *see also* Fed. News Network, *Congress not yet convinced of Trump administration's proposed OPM-GSA merger* (May 22, 2019) ("Lawmakers on Tuesday afternoon expressed bipartisan concern and skepticism for the Trump administration's proposed merger of the Office of Personnel Management with the General Services Administration.  And they weren't alone.  The Government Accountability Office, OPM's inspector general and a former agency director said the administration hasn't demonstrated enough evidence to date to show the proposed OPM-GSA merger makes sense.");[40] Gov't Exec., *Omnibus Puts Kibosh on White House Efforts to Unilaterally Reorganize Agencies, Shed Workers*. (Mar. 22, 2018);[41] Gov't Exec., *Congress Begins Formally Blocking Trump's Government Reorganization Plan*. (Sep. 12, 2018).[42]

---

[37] Available at: https://www.congress.gov/116/chrg/CHRG-116hhrg37283/CHRG-116hhrg37283.pdf.
[38] Available at: https://www.congress.gov/116/chrg/CHRG-116hhrg37679/CHRG-116hhrg37679.pdf.

[40] Available at: https://federalnewsnetwork.com/opm-reorganization/2019/05/congress-not-yet-convinced-of-trump-administrations-proposed-opm-gsa-merger/.
[41] Available at: https://www.govexec.com/management/2018/03/omnibus-puts-kibosh-white-house-efforts-unilaterally-reorganize-agencies-shed-workers/146894/.
[42] Available at: https://www.govexec.com/management/2018/09/congress-begins-formally-blocking-trumps-government-reorganization-plan/151218/.

IV.    **President Trump's Second-Term Reorganization Without Congressional Authorization**

138.    Since Congress, as the representatives duly elected by the American people to the legislative branch of government, may not support his reform proposals, President Trump has chosen to proceed with his "Manhattan project of our time" without first obtaining Congressional authorization—or even providing Congress with clear information about the unprecedented reorganization he intends.  And unlike during President Trump's first term, there has been absolutely no public process by which the Administration's current proposals have been vetted.  Instead, the Administration is proceeding secretly, and by fiat.

139.    The President has acknowledged that he needs and does not have Congressional authorization.  The President responded "Yeah," when asked in a February 18, 2025 interview by TV host Sean Hannity whether his Executive Order would "have to be codified into law" and "need the Republican Congress to follow up."  The White House: *Interview of President Trump and Elon Musk by Sean Hannity, "the Sean Hannity Show"* (Feb. 18, 2025).[43]

A.    **The Mandate to OMB, OPM, and DOGE to Reform and Downsize**

140.    On January 20, 2025, the President created DOGE to engage in his project of radically transforming the size and scope of the federal government.  Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025) (Establishing and Implementing the President's "Department of Government Efficiency").  That Order reorganized and renamed the U.S. Digital Service as DOGE and moved that office from reporting to OMB within the Executive Office of the President to reporting directly to the President's Chief of Staff.  *Id.*  The January 20 Order created two other structures:  a "U.S. DOGE Service Temporary Organization … headed by the [DOGE] Administrator and … dedicated to advancing the President's 18-month DOGE agenda" and "DOGE Teams" embedded at each agency and jointly appointed by DOGE and the agency head.  *Id.*  The Administration has never made public the "18-month DOGE agenda" for the federal government.  *Id.*

---

[43] Available at: https://www.whitehouse.gov/remarks/2025/02/interview-of-president-trump-and-elon-musk-by-sean-hannity-the-sean-hannity-show/.

141.    On January 20, 2025, the President also issued a Presidential Memorandum imposing a government-wide hiring freeze on all federal agencies, with limited exceptions.  The White House: *Presidential Actions: Hiring Freeze* (Jan. 20, 2025).[44]  The President generally ordered: "this freeze applies to all executive departments and agencies regardless of their sources of operational and programmatic funding." *Id.*  The President then ordered DOGE, OMB, and OPM to create a plan to reduce the size of the federal government.  *Id.* ("Within 90 days of the date of this memorandum, the Director of the Office of Management and Budget (OMB), in consultation with the Director of OPM and the Administrator of the United States DOGE Service (USDS), shall submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition.").

142.    As other federal courts have found, individuals affiliated with DOGE, hired into the federal government on a temporary basis, proceeded to embed within federal agencies and centralize decision-making, with the part of DOGE based in the Executive Office of the President headed by Elon Musk.  *See, e.g.*, *Does v. Musk*, __ F. Supp. 3d __, No. 25-0462, 2025 WL 840574, at *1–4 (D. Md. Mar. 18, 2025); *New York v. Trump*, __ F. Supp. 3d __, No. 25-CV-01144, 2025 WL 573771, at *3–7 (S.D.N.Y. Feb. 21, 2025); *AFL-CIO v. Dep't of Lab.*, __F. Supp. 3d __, No. 25-339, 2025 WL 1129227, at *1–4 (D.D.C. Apr. 16, 2025).

143.    In a March 2025 interview, Elon Musk, on behalf of DOGE, explained the DOGE goals as follows:

> We want to reduce the spending by eliminating waste and fraud, reduce the spending by 15%, which seems really quite achievable.
> …
> We are cutting the waste and fraud in real time. Every day like that passes, our goal is to reduce the waste and fraud by $4 billion a day every day, seven days a week. And so far, we are succeeding.[45]

---

[44] Available at: https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze/.

[45] Fox News, *Elon Musk and DOGE team give exclusive look at how they're cutting waste, handle critics* (Mar. 27, 2025), available at: https://www.foxnews.com/video/6370654825112.  Transcript available at: https://www.rev.com/transcripts/musk-and-doge-on-brett-baier.

144.    The President issued many other directives aimed at furthering the goals of transformation of the government and federal employment according to his vision, at each step enlisting the aid of OPM, OMB and/or DOGE to implement his directives, including:

- Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) (Ending Radical and Wasteful Government DEI Programs and Preferencing) (OMB and OPM);

- Exec. Order No. 14170, 90 Fed. Reg. 8621 (Jan. 20, 2025) (Reforming the Federal Hiring Process and Restoring Merit to Government Service) (OMB, OPM, DOGE, working with "the Assistant to the President for Domestic Policy");

- Exec. Order No. 14171, 90 Fed. Reg. 8625 (Jan. 20, 2025) (Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce) (OPM); and

- Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) (Ending Illegal Discrimination and Restoring Merit-Based Opportunity) (OMB).

In the President's own words:  "It is the policy of my Administration … to commence the deconstruction of the overbearing and burdensome administrative state."  Exec. Order No. 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025) (Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative) (enlisting DOGE and OMB); *see also* Exec. Order No. 14222, 90 Fed. Reg. 11095  (Feb. 26, 2025) (Implementing the President's Department of Government Efficiency Cost Efficiency Initiative: enlisting DOGE in "a transformation in Federal spending").

145.    The President also eliminated certain agencies with the following proclamation:

It is the policy of my Administration to dramatically reduce the size of the Federal Government, while increasing its accountability to the American people.  This order commences a reduction in the elements of the Federal bureaucracy that the President has determined are unnecessary.  Reducing the size of the Federal Government will minimize Government waste and abuse, reduce inflation, and promote American freedom and innovation.

Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025) (Commencing the Reduction of the Federal Bureaucracy) (enlisting OMB and OPM to eliminate the Presidio Trust; the Inter-American Foundation; the United States African Development Foundation; and the United States Institute of Peace).

1    146.    The President further enlisted OMB to "reduce the performance" of the following

2    agencies to "the minimum presence and function required by law":  the Federal Mediation and

3    Conciliation Service; the United States Agency for Global Media; the Woodrow Wilson International

4    Center for Scholars in the Smithsonian Institution; the Institute of Museum and Library Services; the

5    United States Interagency Council on Homelessness; the Community Development Financial

6    Institutions Fund; and the Minority Business Development Agency.  Exec. Order No. 14238, 90 Fed.

7    Reg. 13043 (Mar. 14, 2025) (Continuing the Reduction of the Federal Bureaucracy).  The President

8    explained:  "This order continues the reduction in the elements of the Federal bureaucracy that the

9    President has determined are unnecessary."  *Id.*

10    147.    The President also ordered the "closure" of the entire United States Department of

11    Education and transfer of certain functions to other agencies.  Exec. Order No. 14242, 90 Fed. Reg.

12    13679 (Mar. 20, 2025) (Improving Education Outcomes by Empowering Parents, States, and

13    Communities).  The President likewise closed the United States Agency for International

14    Development, firing nearly all of its staff, and subsumed what remained into the State Department,[46]

15    as well as shuttered the Consumer Financial Protection Bureau, attempting to fire nearly all of its

16    staff as well.[47]  Most recently, the President decimated AmeriCorps, ending core programs and

17    placing nearly all staff on leave before later laying them off and cutting the bulk of grants to

18    AmeriCorps grantees.[48]

19

20    _____

21    [46] Carnegie Endowment for International Peace, *Trump's Move to Gut USAID Reveals the Crux of*
22    *His Foreign Policy* (Feb. 4, 2025), available at:
      https://carnegieendowment.org/emissary/2025/02/usaid-trump-foreign-aid-policy-why.
23    [47] NBC News, *Trump administration and Musk's DOGE plan to fire nearly all CFPB staff and wind*
      *down agency, employees say* (Feb. 28, 2025), available at:
24    https://www.nbcnews.com/business/business-news/trump-administration-musks-doge-plan-fire-cfpb-
      staff-close-agency-rcna194217.
25    [48] NY Times, *DOGE Guts Agency That Organizes Community Service Programs* (Apr. 17, 2025),
      available at: https://www.nytimes.com/2025/04/17/us/politics/doge-cost-americorps-community-
26    service.html; *see also* MSN, *AmeriCorps Faces Major Blow As Elon Musk-Led DOGE Slashes $400*
      *Million In Federal Grants* (Apr. 26, 2025), available at: https://www.msn.com/en-
27    in/news/world/americorps-faces-major-blow-as-elon-musk-led-doge-slashes-400-million-in-federal-
      grants/ar-AA1DEjSo.
28

148.    DOGE and/or OPM have taken a series of other actions since January 20, 2025 aimed at deconstructing and drastically reducing the size of the federal government, including: the "Fork in the Road" Deferred Resignation Program, announced via e-mail to millions of federal employees; the unlawful termination of probationary employees nationwide; the mandated email reporting ("5 bullets") to all federal employees and corresponding threats for failure to respond; and the placement of employees throughout the federal government on administrative leave for a variety of reasons.

**B.    President's February 11, 2025 Executive Order to All Federal Agencies to Downsize and Reorganize Themselves Via Agency RIF and Reorganization Plans**

149.    The President's February 11, 2025 Workforce Executive Order is in the same vein as these other actions, furthering the President's express goal of "transforming" and "deconstruct[ing]" the agencies of the federal government.  Ex. A.

150.    The Executive Order applies to the executive departments and agencies, including but not limited to the Federal Agency Defendants.  *Id.* (citing 44 U.S.C. § 3502).  There are currently fifteen executive cabinet-level departments, 5 U.S.C. § 101, and hundreds of federal agencies and commissions.[49]

151.    The President ordered, in pertinent part:

a.    Reduction of the number of federal employees via hiring freezes, hiring/departure ratios, and OMB and DOGE control of agency hiring.  Ex. A, Sec. 3.  Specifically, the President required OMB to submit to him a "plan to reduce the size of the Federal Government's workforce" that will "require that each agency hire no more than one employee for every four employees that depart, consistent with the plan and any applicable exemptions and details provided for in the Plan." *Id.*  The President allowed limited exceptions for "functions related to public safety, immigration enforcement, or law enforcement."  The President required all agency heads to submit *all career federal hiring* to DOGE for approval.  *Id.*

b.    All federal agencies "shall promptly undertake preparations to initiate large-scale reductions in force (RIFs)."  *Id.*  In making these cuts, the President ordered that "[a]ll offices that

---

[49] Available at: https://www.usa.gov/agency-index.

perform functions not mandated by statute or other law *shall be prioritized* in the RIFs, including":

- "all agency diversity, equity, and inclusion initiatives";

- "all agency initiatives, components, or operations that my Administration suspends or closes"; and

- "all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website" ("Funding Lapse Plan Staffing Levels").

*Id.* (emphasis added).  The President allowed limited exceptions:  "This subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement."  *Id.*

c.      All federal agencies shall submit to OMB a "reorganization plan" that "shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated."  *Id.*

152.    The President's Executive Order removed agency discretion and authority, by ordering agencies to act.  The President's Executive Order necessarily orders agencies to disregard applicable statutory authorizations and appropriations, by implementing the following mandates:

a.      Agencies are *required* to implement "large-scale" RIFs (irrespective of whether staffing reductions are necessary or even appropriate in light of agency functions and appropriations);

b.      Agencies are *required* to prioritize in RIFs "all agency initiatives, components, or operations that [the] Administration suspends or closes" (irrespective of statutory requirements or authority delegated to the agencies);

c.      Agencies are *required* to prioritize in RIFs "all components and employees" not deemed "essential"—and therefore that do not continue working—during a government shutdown when annual appropriations have temporarily lapsed (aka Funding Lapse Plan Staffing Levels, which have nothing to do with the staffing needed to properly run fully appropriated agencies);

d.      Agencies are *required* to consider their own destruction, by addressing whether the agency or any subparts should be eliminated by the President (again, regardless of statutory requirements or authority delegated to the agencies);

e.    And finally, agencies are *required* to reorganize themselves by picking up and
arranging the pieces that are left, following these large-scale reductions.

153.    The President further granted OPM, rather than the agencies, the power to "grant
exemptions from this order where those exemptions are otherwise necessary and shall assist in
promoting workforce reduction." *Id.*, Sec. 4.

154.    The President gave agencies a mere 30 days, after commencing their planning for the
massive RIFs, to submit reorganization reports describing how they would pick up and organize the
pieces of what will be left.  *Id.*, Sec. 3.

155.    Notwithstanding all of these requirements that order agencies to apply parameters that
cannot be reconciled with agency statutory authority, the President then stated the Order should be
implemented consistent with applicable law.  *Id.* Sec. 5.

### C.    OMB, OPM, and DOGE Implementation of the President's Orders: February 26 Directive, March 13 Deadline, and April 14 Deadline

156.    On February 26, 2025, OMB and OPM issued a Memorandum to Heads of Executive
Departments and Agencies, including but not limited to the Federal Agency Defendants, regarding
"Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's
'Department of Government Efficiency' Workforce Optimization Initiative."  Ex. B.

157.    OMB and OPM echoed the President's purposes in transforming the federal
bureaucracy, explaining:

> The federal government is costly, inefficient, and deeply in debt. At the same time, it
> is not producing results for the American public.  Instead, tax dollars are being
> siphoned off to fund unproductive and unnecessary programs that benefit radical
> interest groups while hurting hard-working American citizens.
>
> The American people registered their verdict on the bloated, corrupt federal
> bureaucracy on November 5, 2024 by voting for President Trump and his promises to
> sweepingly reform the federal government.

*Id.*

158.    In this Memorandum, OMB and OPM directed federal agencies to comply with the
President's Executive Order by submitting the "Agency RIF and Reorganization Plans" ("ARRPs")
required by the Workforce Executive Order to OMB and OPM for "review and approval."  *Id.*

COMPLAINT, No.                                                                                43

159.    The OMB and OPM February 26 Memorandum, by imposing onerous requirements under exceptionally unreasonable time frames, guarantees that agencies will not be able to comply with their statutory and regulatory mandates, will not exercise any existing discretion in a manner that is faithful to those mandates or results from considered, proper decision-making, and will instead do the President's unlawful bidding.  The OMB and OPM February 26 Memorandum, by endowing OMB and OPM with ultimate decision-making power as to the ARRPs, transfers decision-making to those without personal knowledge of or experience with the particular requirements and obligations of these agencies, their component parts, or of the work performed by their employees—and the impacts of eliminating that work.

160.    OMB and OPM set forth requirements for the ARRPs that included instructing that ARRPs "should" include "[a] significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required."  OMB and OPM explained further: "Pursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily required functions."  *Id.*  OMB and OPM further directed that agencies "should also[,]" among other things:

- "seek to consolidate areas of the agency organization chart that are duplicative";
- "consolidate management layers where unnecessary layers exist"; and
- "seek reductions in components and positions that are non-critical[.]"

OMB and OPM further instructed:  "When taking these actions, agencies should align closures and/or relocation of bureaus and offices with agency return-to-office actions to avoid multiple relocation benefit costs for individual employees."  *Id.*

161.    OMB and OPM also directed agencies to work with DOGE in planning required RIFs for non-essential positions, and to use 2019 Funding Lapse Plan Staffing Levels as the "starting point" for identifying those positions that are "essential."  Ex. B.

COMPLAINT, No.                                                                                    44

162.    Among the "tools" OMB and OPM directed agencies could use:  "Eliminating non-statutorily mandated functions through RIFs (Appendix 1 contains a sample timeline)."  Then, OMB and OPM directed that agencies must include the following in the plans submitted for approval:

> ARRPs should also list the competitive areas for large-scale reductions in force, the RIF effective dates (which may be a date prior to when the plan is submitted), the expected conclusion of the RIFs, the number of FTEs reduced, and additional impact of RIFs such as cancellation of related contracts, leases or overhead.

*Id.*

163.    OMB and OPM required the ARRPs to be submitted for approval in two phases, the first of which was due merely *two weeks* later on March 13, 2025, and the second on April 14, 2025, and then gave specific requirements for each phase.  *Id.*

164.    The March 13 "Phase 1 ARRPs shall focus on initial agency cuts and reductions."  *Id.* Agencies were required to identify, among other things, Funding Lapse Plan Staffing Levels:

> All agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations (because the functions performed by such employees do not fall under an exception to the ADA) using the Agency Contingency Plans submitted to OMB *in 2019* referenced above.

*Id.* (emphasis added).  Agencies were also required to identify "[w]hether the agency or any of its subcomponents should be eliminated or consolidated."  *Id.*

165.    The April 14 Phase 2 plans were required to contain further information regarding the reorganization in light of the required RIFs, including a new organization chart and, among other things:

- The agency's plan to ensure that employees are grouped, to the greatest extent possible, based on like duties and job functions to promote effective collaboration and management, and that the agency's real estate footprint is aligned with cross-agency efforts coordinated by GSA to establish regional federal office hubs.

- Any proposed relocations of agency bureaus and offices from Washington, D.C. and the National Capital Region to less-costly parts of the country.

- The competitive areas for subsequent large-scale RIFs.

- All reductions, including FTE positions, term and temporary positions, reemployed annuitants, real estate footprint, and contracts that will occur in relation to the RIFs.

COMPLAINT, No.                                                                                          45

- Any components absorbing functions, including how this will be achieved in terms of FTE positions, funding, and space.

*Id.*

166.    Finally, OMB and OPM instructed once again that "law enforcement, border security, national security, immigration enforcement, or public safety responsibilities" as well as political appointees were exempt from these "transformation" efforts and that agencies providing services to the public were not permitted to implement any RIFs without OMB or OPM sign-off.  *Id.*

167.    On information and belief, it is not possible for any federal agency, let alone all federal agencies, to create an ARRP that both accommodates the specific parameters required by the President, OMB, and OPM *and* complies with all of the federal agency's statutory and regulatory requirements in a mere two weeks, by the March 13 deadline, or even realistically by the April 14 deadline.  The OMB/OPM Memorandum did not provide agencies enough time to properly assess an agency's statutory requirements, let alone assess how to comply with them *and* the President's directives.

168.    The requirements for the ARRPs imposed by OMB and OPM on all federal agencies effectively removed independent decision-making authority from the agencies and required agencies to disregard the statutory authority governing the agency's organization, functions, personnel requirements, and appropriations.  The language directing agencies to comply with applicable law in creating these plans was disingenuous.

169.    The February 26, 2025 OMB and OPM memorandum contained new or modified rules without engaging in notice and comment rule-making, and effectively required agencies (including but not limited to Federal Agency Defendants) to comply with these new and modified rules regardless of any prior existing regulations.

170.    On information and belief, DOGE, via individuals in the Executive Office of the President and DOGE teams embedded at agencies (including but not limited to Federal Agency Defendants), has enforced the requirements of the President's Executive Order and OMB/OPM Memorandum, including by ordering federal agencies to make mandated cuts eliminating positions, programs, offices, and functions.  On information and belief, DOGE has required federal agencies to

COMPLAINT, No.                                                                                                46

1    comply with required targets imposed by DOGE for spending reductions by eliminating positions,

2    programs, offices, and functions to meet the DOGE stated goal of imposing spending cuts

3    government-wide.

4          171.    In sum, OMB, OPM, and DOGE have usurped agency authority, exceeded their own

5    authority, acted in an arbitrary and capricious manner, and ignored procedural requirements by

6    requiring federal agencies throughout the government, including but not limited to Federal Agency

7    Defendants, to:

8          a.      Submit ARRPs for OMB and OPM approval;

9          b.      Include in those ARRPs large-scale RIFs (irrespective of whether staffing reductions

10                 are necessary or even appropriate in light of agency functions and appropriations);

11         c.       Prioritize in those large-scale RIFs any functions that "[the President's]

12                 Administration suspends or closes" (irrespective of statutory requirements or authority

13                 delegated to the agencies);

14         d.      Prioritize in those large-scale RIFs 2019 government emergency shutdown levels of

15                 staffing (which have nothing to do with the staffing needed to properly run fully appropriated

16                 agencies);

17         e.      Include in their ARRPs consideration of their own destruction, by addressing whether

18                 the agency or any subparts should be eliminated by the President (again, regardless of

19                 statutory requirements or authority delegated to the agencies);

20         f.      Include in their ARRPs a plan to reorganize themselves by picking up and arranging

21                 the pieces that are left, following these large-scale reductions;

22         g.      Submit these plans for approval on timeframes that do not permit agencies to actually

23                 consider and assess their own needs or their statutory authority; and

24         h.      Impose cuts to functions and staffing according to "targets" and "goals" imposed by

25                 DOGE.

26

27

28

**D.     OMB, OPM, and DOGE Lack of Statutory Authority to Order Agencies to Reorganize or Engage in a RIF**

172.     OMB must source its authority either directly from an act of Congress, or a delegation by Congress to the President that the President has in turn delegated to OMB.  OMB lacks the authority to order federal agencies to downsize or reorganize themselves, or to assume final decision-making power by requiring agencies to submit such plans for OMB approval.  31 U.S.C. §§ 501-507. Insofar as neither Article II nor any act of Congress gives the President authority to reorganize federal agencies or order them to engage in massive layoffs of federal employees, OMB cannot cloak itself in Presidential authority, either.

173.     OPM has no statutory authority to approve agency plans to reorganize or conduct RIFs in service of such a reorganization.  5 U.S.C. §§ 1101-1105.  OPM's statutory authority with respect to RIFs consists of setting government-wide order of retention rules for the release of employees in a RIF.  5 U.S.C. § 3502.  OPM cannot order federal agencies to downsize or reorganize themselves, or assume final decision-making power by requiring agencies to submit such plans for approval.  *See, e.g.*, *Am. Fed'n of Gov't Emps., AFL-CIO v. Off. of Pers. Mgmt.*, No. 3:25-cv-01780-WHA (N.D. Cal.), ECF No. 45 (Feb. 28, 2025 Order), ECF No. 132 (Mar. 14, 2025 Order), ECF No. 202 (Apr. 18, 2025 Order).  To the extent that Congress has generally authorized OPM to implement the President's rules for the federal workforce (5 U.S.C. § 1103), that authorization is coextensive with the President's authority and cannot exceed it.  Insofar as neither Article II nor any act of Congress gives the President authority to reorganize federal agencies or order them to engage in massive layoffs of federal employees, OPM cannot cloak itself in Presidential authority, either.

174.     DOGE has no statutory authority at all.  Insofar as neither Article II nor any act of Congress gives the President authority to reorganize federal agencies or order them to engage in massive layoffs of federal employees, DOGE cannot cloak itself in Presidential authority, either.

**E.     The Administration's Lack of Transparency Regarding Reorganization Plans**

175.     The Trump Administration has never made public the "18-month DOGE agenda" referenced in Executive Order 14158.

COMPLAINT, No.                                                                                                    48

176.    The Trump Administration has never made public any plan being created by DOGE in conjunction with OPM and OMB pursuant to the President's January 20, 2025 Memorandum requiring a "plan to reduce the size of the Federal Government's workforce."

177.    When asked by Fox News in March 2025 whether DOGE's actions would result in a report ("And the process is a report at some point?  At 100 days?"), Elon Musk responded on behalf of DOGE:  "Not really a report.  We are cutting the waste and fraud in real time.  Every day like that passes, our goal is to reduce the waste and fraud by $4 billion a day every day, seven days a week. And so far, we are succeeding."[50]

178.    The Trump Administration has refused to make public the phase-one agency ARRPs that were to be submitted by March 13 to OMB and OPM for approval, including in response to requests from members of the public via the Freedom of Information Act ("FOIA"), federal employee unions, the press, and Congress.

179.    In lawsuits filed against the Trump Administration seeking disclosure under FOIA of the March 13 plans submitted to OMB and OPM, OMB and OPM refused to disclose those plans on the ground that they were "pre-decisional" and described them as pending OMB review and approval. *See, e.g.*, *Democracy Forward Foundation v. Off. of Mgmt. & Budget*, No. 1:25-cv-00858 (D.D.C.), ECF No. 9 (Defendants' Apr. 2, 2025 Motion to Dismiss:  "'[A]gency reduction-in-force plans are still under development by the Executive Branch[,] and OMB is currently actively reviewing these plans as part of Phase 1' … OMB explained, the plans Plaintiff requested 'are part of a longer two-phase process that has just been initiated.'").

180.    Executive Order 14210 did not, in ordering agencies to prepare and submit reorganization plans to OMB and OPM, create any process for notice and public comment, unlike the reorganization Executive Order issued in President Trump's first term.

181.    On March 13, 2025, the Washington Post reported: "Agencies across the federal government faced a Thursday deadline to submit plans for a large-scale firing of employees, but scant

---

[50] *Supra*, n.9.

COMPLAINT, No.                                                                                      49

details were made public about what the White House said would be a 'mass reduction' of the federal workforce.  The White House did not preview the plans, saying only that it would share their contents 'once the plans are enacted.'"  Wash. Post, *White House expects 'mass reduction' of federal workforce as deadline looms* (Mar. 13, 2025).[51]  White House press secretary Karoline Leavitt said: "The coming mass reduction will 'streamline our broken bureaucracy, save taxpayers millions of dollars and make the government more efficient for all.'"  *Id.*

182.    On March 27, 2025, the Washington Post published a report regarding "an internal White House document obtained by The Washington Post" that "contains closely held draft plans for reshaping the 2.3-million-person bureaucracy."  Wash. Post, *Internal White House document details layoff plans across U.S. agencies* (Mar. 27, 2025).[52]  The Post explained:  **"**The details are compiled from plans that President Donald Trump ordered agencies to submit, according to two people familiar with the document who spoke on the condition of anonymity because they were not authorized to talk about it."  *Id.*  The document shows that "[f]ederal officials are preparing for agencies to cut between 8 and 50 percent of their employees as part of a Trump administration push to shrink the federal government."  When confronted with questions regarding this document, the Post reports that White House Principal Deputy Press Secretary Harrison Fields responded by e-mail:

> "It's no secret the Trump Administration is dedicated to downsizing the federal bureaucracy and cutting waste, fraud, and abuse.  This document is a pre-deliberative draft and does not accurately reflect final reduction in force plans…  When President Trump's Cabinet Secretaries are ready to announce reduction in force plans, they will make those announcements to their respective workforces at the appropriate time."

*Id.*

183.    When individuals at agencies have gone public with information regarding the wide-scale (and unlawful) scope of these plans, the Trump Administration has claimed they are "fraudulent."  For example:  On April 9, 2025, the Las Vegas ABC-news affiliate KTNV published a report titled, "As concerns among veterans rise, VA source shares details of workforce reduction

---

[51]Available at: https://www.washingtonpost.com/politics/2025/03/13/government-agency-reorganization-rif-federal-workers/.
[52]Available at: https://www.washingtonpost.com/politics/2025/03/27/federal-worker-layoffs-government-agencies/.

1    plan."[53]  The source described in detail the plans for cutting 80,000 jobs.  The VA responded by

2    calling the document "fraudulent" and an "intentionally false leaked document."  *Id.*

3        184.    The Trump Administration has largely refused to make the April 14 ARRPs publicly

4    available either, until it starts issuing RIF notices (and not even then).

5        185.    Members of Congress have submitted multiple requests for information to the Trump

6    Administration regarding these reorganization plans.

7        186.    For example, on April 7, the Ranking Member of the Senate Budget Committee sent a

8    demand letter requesting the OMB provide the Senate with documents including the March 13 plans

9    as well as any further plans, and expressing concern that "[t]hese sweeping workforce reductions will

10   not only strain agency operations and delay critical services for seniors and veterans, but they will

11   also harm the government's efforts to protect public health, conserve natural resources, and manage

12   federal lands."[54]

13       187.    On April 10, another group of Senators wrote to OPM and OMB, requesting

14   documents pertaining to the RIF and Reorganization plans; expressing concern regarding the

15   illegality, harm, and lack of transparency; and noting that the parameter to use government-shutdown

16   levels as a baseline could threaten the jobs of *700,000 federal employees.*  Letter from Senators to

17   Off. of Mgmt. and Budget and Off. of Pers. Mgmt. (Apr. 10, 2025), attached hereto as Exhibit C.  The

18   Senators continued:

19       Further, the size and scope of the reported RIF plans are clearly not about government
20       efficiency.  The Department of Education has announced layoffs of 50% and the
         Department of Veterans Affairs has proposed cuts of over 80,000 employees.  The
21       Department of Defense is seeking to reduce its civilian workforce by 5-8%, or 61,000
         employees, and the IRS reportedly plans to cut around 25% of its workforce, or 20,000
22       employees.  On April 1, 2025, the Department of Health and Human Services began
         the process of firing 10,000 employees, in addition to 10,000 employees who left their
23       positions through the deferred resignation program and other downsizing efforts.  Two
         days later, Secretary Kennedy suggested that 20% of these terminations could be
24       mistakes.  The Secretary stated, "[p]ersonnel that should not have been cut were cut...

25

26   [53] Available at: https://www.ktnv.com/news/as-concerns-among-veterans-rise-va-gives-timeline-of-
     how-their-workforce-reduction-plan-will-affect-them.

27   [54] Letter from Jeffrey Merkley, Ranking Member of S. Comm. on the Budget, to Russell Vought,
     OMB Director (Apr. 7, 2025), available at:

28   https://www.budget.senate.gov/imo/media/doc/letter_to_omb_re_rif_plans.pdf.

that was always the plan.  Part of the DOGE, we talked about this from the beginning, is we're going to do 80% cuts, but 20% of those are going to have to be reinstated, because we'll make mistakes."  The Social Security Administration (SSA) has already lost over 7,000 employees through terminations and resignations since February and closed 6 of 10 regional offices, leading to increased wait times and multiple website crashes over the past month—yet SSA plans to cut thousands more.

*Id.*

188.    As a result of the Trump Administration's secrecy, federal employees throughout the federal agencies, their labor representatives, state and local governments, organizations including Plaintiffs, non-profits, and the public have been kept in the dark, intentionally, regarding this Administration's plans.  As late as March 28, 2025, *after* the March 13 ARRPs with the required "large-scale RIFs" had been submitted for approval, Elon Musk and his selected DOGE representatives, sitting down for a lengthy interview with Fox News, minimized the terminations of federal employees:

[DOGE lead at OPM] Anthony Armstrong:

And President Trump's been very clear: it's scalpel not hatchet.  And that's the way it's getting done.

And then once those decisions are made, there's a very heavy focus on being generous, being caring, being compassionate, and treating everyone with dignity and respect.  And if you look at how people have started to leave the government, it is largely through voluntary means.  There's voluntary early retirement, there's voluntary separation payments.  We put in place deferred resignation, the eight-month severance program.

So there's a very heavy bias towards programs that are long-dated, that are generous, that allow people to exit and go and get a new job in the private sector.  And you've heard a lot of news about RIFs, about people getting fired.  At this moment in time, less than .15, not 1. 5, less than .15 of the federal workforce has actually been given a RIF notice.

Elon Musk:

*Basically almost no one's gotten fired, is what we're saying.*[55]

_____

[55] *Supra*, n.9.

COMPLAINT, No.                                                                    52

**F.** **Current and Impending Implementation of the President's Mandated ARRPs**

189.    Despite the Trump Administration's failure to provide the public, federal employees and their labor representatives, the press, and Congress with detailed advance information regarding these plans, information about the ARRPs that Plaintiffs have been able to obtain confirmation that some agencies have already begun to implement the large-scale RIFs and reorganization plans ordered by the President, and many other agencies are poised to do so imminently.  Plaintiffs set forth their current information regarding actual and imminent implementation of President Trump's plans to transform the federal government.

**1.**    **Ongoing RIFs and Reorganization**

190.    At least the following Federal Agency Defendants have begun to implement their ARRPs by commencing plans to reorganize, including notifying employees of large-scale RIFs:

- **Health and Human Services**

191.    On March 27, 2025, HHS announced:  "Today, the U.S. Department of Health and Human Services (HHS) announced a dramatic restructuring in accordance with President Trump's Executive Order, 'Implementing the President's 'Department of Government Efficiency' Initiative.'"  Press Release, U.S. Dep't of Health and Human Servs., *HHS Announces Transformation to Make America Healthy Again* (Mar. 27, 2025).[56]  The restructuring involves "a reduction in workforce of about 10,000 full-time employees who are part of this most recent transformation."  *Id.*

192.    HHS explained the restructuring and consolidation of functions that it was engaging in as being pursuant to the President, DOGE, and OMB's orders.  *Id.*  Secretary Kennedy explained, "We aren't just reducing bureaucratic sprawl.  We are realigning the organization…."  *Id.*; *see also Fact Sheet: HHS' Transformation to Make America Healthy Again*, U.S. Dep't of Health and Human Servs. (Mar. 27, 2025) ("The restructuring of HHS is proceeding in accordance with President Trump's Executive Order").[57]

---

[56] https://www.hhs.gov/press-room/hhs-restructuring-doge.html
[57] https://www.hhs.gov/press-room/hhs-restructuring-doge-fact-sheet.html

193.    HHS also revealed that the immediate 10,000-person reduction was just the beginning of a planned reduction:  "The current 82,000 full-time employees will be reduced to 62,000."  *Id.*  The cuts will affect the following subagencies:

- FDA will decrease its workforce by approximately 3,500 full-time employees;

- The CDC will decrease its workforce by approximately 2,400 employees;

- The NIH will decrease its workforce by approximately 1,200 employees;

- CMS will decrease its workforce by approximately 300 employees;

- 28 divisions will be consolidated to 15;

- 10 regional offices will become 5; and

- Human Resources, Information Technology, Procurement, External Affairs, and Policy will be centralized.

*Id.*

194.    Secretary Kennedy told the New York Times, "We're going to do more with less," even as he acknowledged that it would be "a painful period for H.H.S."[58] Senator Patty Murray "called Mr. Kennedy's comments about doing more with less an 'absurd suggestion' that 'defies common sense.'  Her sentiments were echoed by several agency employees, who spoke on the condition of anonymity to avoid retribution."  *Id.*

195.    HHS has never made public the ARRPs submitted to OMB and OPM for approval in conjunction with the March 13 and April 14 deadlines.

- **Department of Labor**

196.    On April 16, 2025, the Department of Labor sent RIF notices to the "vast majority" of the staff of the Office of Federal Contract Compliance Programs (OFCCP).[59]  That office is responsible for ensuring contractors across government agencies comply with a variety of federal laws.  All employees were not just given notice of the RIF but were also immediately placed on

---

[58] NY Times, *10,000 Federal Health Workers to Be Laid Off*  (Mar. 27, 2025), available at: https://www.nytimes.com/2025/03/27/us/politics/health-department-job-layoffs-rfk-jr.html.

[59] Bloomberg Law, *DOL Puts Contractor Watchdog Employees on Leave as Layoffs Loom* (Apr. 16, 2025), available at: https://news.bloomberglaw.com/daily-labor-report/dol-puts-contractor-watchdog-employees-on-leave-as-layoffs-loom.

COMPLAINT, No.                                                                                      54

administrative leave.  *Id.*  The email to employees stated they were being terminated "due to the agency's 'significantly reduced scope of mission.'"  *Id.*

197.    Previously, on April 14, 2025, the Secretary of Labor also warned publicly that more layoffs at the Department "should be expected" in the coming weeks.[60]  One protesting employee explained:  "This is no ordinary federal agency.  This is literally the firewall between workers and exploitation.  The people in this building are training people for jobs.  They're ensuring that they come home safe."  *Id.*

198.    DOL has never made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **AmeriCorps**

199.    On April 9, 2025, AmeriCorps announced to employees that the agency would be taking steps to "comply" with the Executive Order and ARRP, including by implementing a RIF of 50% or more of AmeriCorps staff.

200.    On April 16, 2025, AmeriCorps began sending boilerplate notices of administrative leave to AmeriCorps agency staff, both at headquarters in Washington, D.C. and in regional offices across the country, placing the vast majority of them on leave and locking them out of their computer systems shortly thereafter.

201.    AmeriCorps is a federal agency that staffs community service work around the country, including disaster relief.  As the New York Times reported:

> The independent federal agency that organizes community service work in the United States has placed on administrative leave almost all of its federal staff at the direction of Elon Musk's cost-cutting team, according to people familiar with developments at the agency.

NY Times, DOGE Guts Agency That Organizes Community Service Programs (April 17, 2025).

202.    On Thursday, April 24, 2025, the AmeriCorps employees began to receive RIF notices from the agency.

---

[60] Bloomberg Law, *Lawmakers, Workers Push Chavez-DeRemer to Stop Labor DOGE Cuts* (Apr. 14, 2025), available at: https://news.bloomberglaw.com/daily-labor-report/lawmakers-workers-push-chavez-deremer-to-stop-labor-doge-cuts.

203.    AmeriCorps has not made public the ARRP submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Small Business Administration**

204.    On April 18, 2025, employees at the SBA throughout the COVID-19 Economic Injury Disaster Loan Serving Center were laid off, effective in dates through May 2025.[61]  "They are firing us just to fire us," one SBA employee was quoted as saying.  "We literally made money for the government by taking loan payment and recovering money in bankruptcy."  *Id.*

205.    Between March and April, employees throughout other offices at the SBA also received RIF notices, including the Office of Entrepreneurial Development and Office of Entrepreneurial Education, the procurement office, and positions in field, district, and branch offices.  For example, the entire Office of Entrepreneurial Education received RIF notices; that office is responsible for administering a $17 million grant that helps small businesses throughout the country.

206.    Previously, on March 21, 2025, the SBA issued a news release stating that, as required by President Trump's Workforce Executive Order, "the agency will reduce its workforce **by 43%** – ending the expansive social policy agenda of the prior Administration, eliminating non-essential roles, and returning to pre-pandemic staffing levels."[62]  The agency referred to this elimination of over 2,700 jobs as a "strategic reorganization."  *Id.*

207.    The SBA Administrator explained that SBA has "submitted" such a reorganization plan to OMB for approval.  *Id.*  The news release concluded:  "SBA's reorganization plan will provide for the preservation of public services through a strategic transfer of duties.  It will be actioned in the coming weeks."  *Id.*

---

[61] Gov't Exec., *SBA hit with more layoffs* (Apr. 18, 2025), available at: https://www.govexec.com/workforce/2025/04/sba-hit-more-layoffs/404682/.

[62] U.S. Small Bus. Admin*., Small Business Administration Announces Agency-Wide Reorganization* (Mar. 21, 2025), available at: https://www.sba.gov/article/2025/03/21/small-business-administration-announces-agency-wide-reorganization (emphasis added).

208.    Notwithstanding the RIF notices going out by email on April 18, the SBA has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Environmental Protection Agency**

209.    On April 22, 2025, the EPA began sending RIF notices to some employees across its headquarters and regional offices.[63]

210.    Previously, both President Trump and EPA Administrator Lee Zeldin expressed that up to 65% of the EPA workforce will eventually be cut.

211.    The New York Times reported on March 17, 2025 that the Trump Administration intends to "dismantle" EPA's Office of Research and Development:

> The Environmental Protection Agency plans to eliminate its scientific research arm, firing as many as 1,155 chemists, biologists, toxicologists and other scientists, according to documents reviewed by Democrats on the House Committee on Science, Space and Technology.  The strategy is part of large-scale layoffs, known as a "reduction in force," being planned by the Trump administration, which is intent on shrinking the federal work force.

NY Times, *Trump Administration Aims to Eliminate E.P.A.'s Scientific Research Arm*  (Mar. 17, 2025).[64]

212.    In response to these public statements, 51 former EPA officials from both Democratic and Republican Administrations sent an "Open Letter" to Congress on March 18, 2025, that explained:

> We are former Senate-confirmed officials and Regional Administrators who served in the U.S. Environmental Protection Agency during Republican and Democratic administrations.   We adhere to EPA's long-held core principles that the agency should be apolitical, professional, transparent, and dedicated to following the law and science.
>
> We are greatly alarmed by President Trump's recent comments that his administration is seeking to cut EPA by 65 percent.  We share the concerns expressed by former EPA administrators who recently wrote that "such cuts would render the agency incapable

---

[63] Reuters, *EPA begins layoffs of environmental justice staff* (Apr. 22, 2025), available at: https://www.reuters.com/business/world-at-work/epa-begins-layoffs-environmental-justice-staff-2025-04-22/.

[64] Available at: https://www.nytimes.com/2025/03/17/climate/trump-eliminates-epa-science.html.

of protecting Americans from grave threats in our air, water and land."

We are writing to urge Congress to ensure that EPA has sufficient staff and funding to effectively implement the Clean Air Act, Clean Water Act, and other bedrock environmental laws for the good of all Americans.

Deep cuts to EPA threaten more than 50 years of bipartisan progress under Republican and Democratic Congresses and presidents.  Actions that diminish EPA's capabilities will place at risk the quality of the air our children breathe, the water we all drink, and the waterways we swim, fish and play in.  They would jeopardize EPA's responses to toxic chemical spills and other disasters as well as basic compliance with America's environmental laws.

Policy changes are to be expected from one administration to the next, but not the dismantling of EPA. …

If the administration does not agree with the laws Congress has passed and the programs it has funded, it should work with Congress to seek changes, not unilaterally and recklessly freeze, delay, or eliminate funding.[65]

213.    Notwithstanding the RIF notices that began going out on or about April 22, the EPA has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Housing and Urban Development**

214.    HUD has commenced the RIF of positions in the Office of Field Policy and Management ("FPM") throughout the country, including management analysts, program analysts, customer service representatives, and labor standards specialists.  The FPM serves as the first point of contact for HUD and housing-related questions and concerns within a community

215.    Notwithstanding the RIF notices that have been sent at HUD, it has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

---

[65] Available at: https://www.environmentalprotectionnetwork.org/wp-content/uploads/2025/03/Senate-Confirmed-Officials-and-RA-Letter-to-Congress-Final.pdf.

COMPLAINT, No.

2. **Imminent RIFs in Service of Government-wide Reorganization**

216.    At least the following federal agencies will begin to implement their ARRPs by commencing plans to reorganize, including notifying employees of large-scale RIFs, imminently:

- **USDA**

217.    As of filing, the USDA has not yet made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

218.    However, on April 7, 2025, Government Executive reported from USDA sources:

> Some employees have been told to expect the department to cut back to fiscal 2019 staffing levels—which would lead to USDA slashing around 9,000 of its 98,000 employees—while others have been told there is an overall federal workforce reduction number the administration has developed and the department will do its part proportionally to meet that target.

Gov't Exec., *USDA to slash headquarters, other staff and relocate some to new 'hubs' around the country* (Apr. 7, 2025).[66]

219.    In an email to USDA employees offering them another round of the Fork in the Road Deferred Retirement program, Secretary Rollins stated that RIFs were imminent.  *Id.*

220.    On April 15, 2025, Government Executive reported further:

> The Trump administration is planning to severely scale back or outright eliminate funding for many programs across the Agriculture Department, according to White House documents obtained by Government Executive, as it slashes workers and closes offices at the local level….  The proposed cuts come as USDA is planning to gut its Washington headquarters, consolidate mission areas and administrative functions and relocate some staff to new "hubs" around the country.[67]

- **Department of Commerce**

221.    In March, the press began reporting that the Department of Commerce would seek to cut 20 percent of the NOAA staff.  Later in March, staff at NOAA were told they could take "voluntary" retirement offers rather than be laid off in the coming RIFs.

---

[66] Available at: https://www.govexec.com/workforce/2025/04/usda-slash-headquarters-other-staff-and-relocate-some-new-hubs-around-country/404371/.

[67] Gov't Exec., *White House pitches layoffs, local office closures and program eliminations at USDA* (Apr. 15, 2025), available at: https://www.govexec.com/management/2025/04/white-house-pitches-layoffs-local-office-closures-and-program-eliminations-usda/404580/.

COMPLAINT, No.                                                                                              59

222. The Commerce Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Department of Defense**

223. In March, Military Times reported on Defense Secretary Hegseth's goal of cutting 5-8 percent of the total Department civilian workforce, which amounts to 50,000 to 70,000 jobs.[68]

224. The Defense Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Department of Energy**

225. The Department of Energy's March 13 ARRP submitted to OMB and OPM for approval was, according to press reports, leaked to the press. [69]

226. According to press reports, that ARRP identified 43 percent of its workforce as "non-essential" according to the provided parameters. The report admitted: "While the core group of essential personnel required to remain during a lapse are extremely minimal, such limited capabilities are neither intended nor capable of sustaining ongoing government operations." *Id.*; *see also* Associated Press, *The Energy Department identifies thousands of nonessential positions at risk of DOGE cuts* (Apr. 4, 2025) ("The Energy Department has identified thousands of federal workers it deems "nonessential" and would not be protected if there is another round of large-scale firings, according to a document obtained by The Associated Press.").[70]

227. Then, in early April 2025, U.S. Senate Democrats released a fact sheet detailing information in the possession of Senators that:

> DOGE is reportedly proposing staffing cuts of up to 50% of the workforce at the Department of Energy (DOE), with new reductions in force (RIFs) hitting key

---

[68] MilitaryTimes*, Almost 21,000 DOD employees approved to resign amid workforce cuts* (Mar. 18, 2025), available at: https://www.militarytimes.com/news/pentagon-congress/2025/03/18/almost-21000-dod-employees-approved-to-resign-amid-workforce-cuts/.

[69] Fed. News Network, *Energy Department extends hiring freeze, deems 43% workforce non-'essential' in reorganization plan* (Apr. 4, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/energy-department-extends-hiring-freeze-deems-43-workforce-non-essential-in-reorganization-plan/.

[70] Available at: https://apnews.com/article/energy-federal-employees-layoffs-rif-doge-db7b6446928095c26bfe79c608e1e8e7.

priorities such as clean energy, grid resilience, and state and community programs the hardest while even targeting national security programs.

The document summarizes:

The staffing cuts the Department is reportedly contemplating break down as follows:
1. 54% cut (1,800+ positions) to science and innovation programs
2. 61% cut (990+ positions) to energy infrastructure and deployment programs
3. 71% cut (3,000+ positions) to the Deputy Secretary's Office, environmental management programs, and other policy programs
4. 18% cut (540+ positions) to the Nuclear National Security Administration (NNSA)
5. 10% cut (520+ positions) to the Power Marketing Administrations (PMAs)

228.    The Energy Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Department of the Interior**

229.    The press began reporting the week of April 7, 2025 that a "major reorganization" of the Department of Interior "looms."[71]  "DOGE is leading the reorganization plan," an Interior employee anonymously told the press.  *Id.*  When asked,

Interior spokesperson Elizabeth Peace said that "under President Trump's leadership, we are implementing necessary reforms to ensure fiscal responsibility, operational efficiency, and government accountability."
Peace added, "We do not comment on personnel matters."
*Id.*

230.    On April 17, 2025, the Secretary of the Interior issued a Secretary's Order: Consolidation, Unification and Optimization of Administrative Functions.  The Secretary explained:

The Department is committed to supporting President Trump's Executive Order (EO) No. 14210, titled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," issued on February 11, 2025.  As part of that commitment, the Department will be unifying and consolidating many of its functions within the Office of the Secretary.

Dept. of the Interior, Order No. 3429.  The Secretary then delegated the authority to "lead and coordinate the consolidation, unification and optimization efforts within the Department and its

---

[71] E&E News, *Major reorganization looms for Interior* (Apr. 10, 2025), available at: https://subscriber.politicopro.com/article/eenews/2025/04/10/major-reorganization-looms-for-interior-00283745.

Bureaus and Offices" to an individual who is the DOGE Team lead at the Department (Tyler Hassen). *Id.*[72]

231.    Then, on April 23, 2025, news broke that "Interior solicits employees' resumes in preparation for widespread layoffs."[73]  The U.S. Geological Service emailed employees regarding coming RIFs, collecting resumes to determine which employees were essential.  The NPS was reportedly not far behind.  Alyse Sharpe, an Interior spokesperson, told Government Executive that the department was "adhering to guidelines as laid out by the Office of Personnel Management but had no further details on RIF plans at this time[,]" according to that publication.[74]

232.    Interior has yet to explain the number of employees impacted by this reorganization, or to provide any further details regarding the ARRPs submitted to OMB for approval, including with respect to any of its important subagencies (including the National Park Service, the Bureau of Land Management, and the Bureau of Reclamation).  An earlier memo stated that the Department will implement RIFs "to maximize workforce efficiency," exempting only positions "critical to public safety" or "directly linked to the highest priority programs."

233.    On April 9, 2025, Interior Secretary Doug Blumin denied having a "specific headcount" for coming RIFs.[75]  A document provided to the Washington Post previously showed 1 in 4 positions at Interior being considered for cuts.[76]

234.    The Interior Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

---

[72] *See also* The Hill, *Interior Department gives broad powers to DOGE-tied official* (Apr. 21, 2025).
[73] Gov't Exec., *Interior solicits employees' resumes in preparation for widespread layoffs* (Apr. 23, 2025), available at: https://www.govexec.com/workforce/2025/04/interior-solicits-employees-resumes-preparation-widespread-layoffs/404786/.
[74] *Id.*
[75] E&E News, *How many Interior jobs will be cut? Doug Burgum's not sure, yet* (Apr. 9, 2025), available at: https://www.eenews.net/articles/how-many-interior-jobs-will-be-cut-doug-burgums-not-sure-yet/.
[76] Wash. Post, *Internal White House document details layoff plans across U.S. agencies* (Mar. 27, 2025), available at: https://www.washingtonpost.com/politics/2025/03/27/federal-worker-layoffs-government-agencies/.

- **National Labor Relations Board**

235.    On information and belief, the National Labor Relations Board submitted its ARRP for approval to OMB, telling OMB it had determined it would not engage in any RIF, because the employees' work was too essential to the agency's mission.  On information and belief, OMB rejected the NLRB ARRP and required the agency to submit a different one.

236.    On information and belief, forced to do so, the NLRB now plans to RIF employees.

237.    The NLRB has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **National Science Foundation**

238.    In early April 2025, the press began reporting that the NSF leadership is being forced by the Trump Administration to lay off approximately half of the agency's employees.  NSF also abolished all of its outside advisory committees "in response to President Donald Trump's campaign to shrink the federal government."  Scienceinsider, *NSF scraps most outside advisory panels* (Apr. 15, 2025).[77]

239.    NSF has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Social Security Administration**

240.    On April 7, 2025, Government Executive reported that it had obtained a copy of the SSA's ARRP.[78]  That plan "includes 'field office consolidation' as a goal for next year—even as the agency maintains publicly that it isn't closing field offices."  *Id.*  This was after Elon Musk posted a list of federal real estate for sale that included *47 Social Security Administration field offices*.[79]

---

[77] Available at: https://www.science.org/content/article/nsf-scraps-most-outside-advisory-panels.

[78] Gov't Exec., *SSA reorg plan contemplates field office closures, contradicting public statements* (Apr. 7, 2025), available at: https://www.govexec.com/management/2025/04/ssa-reorg-plan-contemplates-field-office-closures-contradicting-public-statements/404369/.

[79] Associated Press, *A list of the Social Security offices across the US expected to close this year* (Mar. 19, 2025), available at: https://apnews.com/article/social-security-offices-closures-doge-trump-b2b1a5b2ba4fb968abc3379bf90715ff.

241.    That same leaked document confirmed a planned cut of approximately 5,000 to 7,000 employees.  *Id.*

242.    Back in February, the SSA confirmed that it would implement President Trump's executive order by implementing reductions in force that "could include abolishment of organizations and positions" and would "soon implement agency-wide organizational restructuring."  Press Release, Social Security Administration, *Social Security Announces Workforce and Organization Plans* (Feb. 28, 2025).[80]

243.    The SSA has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **State Department**

244.    In recent days, the State Department has put forward conflicting accounts of a massive reorganization plan.  Initially, on April 20, 2025, the New York Times reported on a draft reorganization plan that would require congressional approval and would take the form of another Executive Order.[81]  The State Department disclaimed responsibility and claimed that draft was "fake news."  *Id.*

245.    On April 22, 2025, the Department officially announced a reorganization plan as follows:

> To deliver on President Trump's America First foreign policy, we must make the State Department Great Again.
> …
> In its current form, the Department is bloated, bureaucratic, and unable to perform its essential diplomatic mission in this new era of great power competition.  Over the past 15 years, the Department's footprint has had unprecedented growth and costs have soared. …
>
> That is why today I am announcing a comprehensive reorganization plan that will bring the Department into the 21 Century.  This approach will empower the Department from the ground up, from the bureaus to the embassies.  Region-specific functions will be consolidated to increase functionality, redundant offices will be removed, and non-statutory programs that are misaligned with America's core national

---

[80] Available at: https://blog.ssa.gov/social-security-announces-workforce-and-organization-plans/.

[81] New York Times, *Trump Administration Draft Order Calls for Drastic Overhaul of State Department* (April 20, 2025), available at https://www.nytimes.com/2025/04/20/us/politics/trump-state-department-overhaul.html.

COMPLAINT, No.                                                                                                          64

interests will cease to exist.[82]

The announcement explained that "The Department will implement the changes methodically over the next several months." *Id.*

246.     The Department explained in a "Fact Sheet" that:  "As part of the plan, the Under Secretaries will also submit a path to reducing staff in domestic offices by 15 percent, consistent with the President's Workforce Optimization Initiative." [83]

247.     The Department also issued an "FAQ" that explained the RIFs are coming within the next 60 days.  That FAQ included such questions as "Q: My office is being eliminated.  What happens to me and my colleagues?" and "Q: My bureau is being moved to another office.  What happens to me and my colleagues?"

248.     The Department also explained the efforts to integrate the U.S. Agency for International Development (dismantled by prior Executive Order) into the State Department:

> While implemented separately, these two distinct reorganization efforts are highly complementary, and the Secretary and Department leadership continue to carefully consider the integration of former USAID programs and functions in developing and implementing the Department's reorganization plan.

Secretary of State Rubio explained further:  "To transfer the remaining functions of USAID to such a monstrosity of bureaus would be to undo DOGE's work to build a more efficient and accountable government."[84]

249.     The State Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

---

[82] U.S. State Dept., Building an America First State Department, available at: https://www.state.gov/building-an-america-first-state-department/.

[83] Available at: https://www.nbcnews.com/politics/trump-administration/marco-rubio-unveils-massive-overhaul-state-department-reduction-staff-rcna202458.

[84] Available at: https://statedept.substack.com/p/a-new-state-department-to-meet-the.

COMPLAINT, No.

- **Department of the Treasury**

250.    On April 15, 2025, an internal IRS memo was leaked to the press detailing planned cuts of up to 40% of its workforce, including approximately 60,000 to 70,000 positions, through bi-weekly RIF notices starting "this week."[85]

251.    Previously, on April 9, 2025, leaked ARRP plans indicated that Treasury plans to cut up to 50% of its tax enforcement staff, and 20% across the board for other components.[86]

252.    The Treasury Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Veterans Affairs**

253.    On March 4, 2025, the Chief of Staff of the Department of Veterans Affairs issued a *Memorandum – Department of Veterans Affairs Agency Reduction in Force (RIF) and Reorganization Plan (ARRP)*, Dep't of Veterans Affairs (Mar. 4, 2025).  That memo implements the President's Executive Order, and explains:  "For planning purposes, the Department's initial objective is to return to our 2019 end-strength numbers of 399,957 employees," which reflects an approximate cut of 80,000 jobs.[87]

254.    In early March, VA Secretary Doug Collins appeared on Fox & Friends and was asked about the plans to cut 80,000 jobs:

> "So, the 80,000 number that has come out, is that number already done? Have you already decided who to let go?" Fox's Brian Kilmeade questioned.
> *"No, that is a goal that was put out … [as] President Trump and [the Office of Personnel Management] have said let's look at a reduction in force across*

---

[85] Fed. News Network, *IRS outlines plan to cut up to 40% of workforce, as tax filing season ends* (Apr. 15, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/irs-outlines-plan-to-cut-up-to-40-of-workforce-as-tax-filing-season-ends; *see also* CNBC, *Tax attorneys say IRS has become a 'zombie' as agency cuts staff and halts audits of the wealthy* (Apr. 17, 2025), available at: https://www.cnbc.com/2025/04/17/irs-staff-cuts-fewer-audits-of-wealthy.html.

[86] Fed. News Network, *Treasury plans to cut up to 50% of IRS enforcement staff, 20% of other components* (Apr. 9, 2025), available at: https://federalnewsnetwork.com/reorganization/2025/04/treasury-plans-to-cut-up-to-50-of-irs-enforcement-staff-20-of-other-components/.

[87] Available at: https://www.afge.org/globalassets/documents/generalreports/2025/va-memo-3-4-25.pdf.

1    *government*," Collins replied. "*And that is a goal, that is our target.*"[88]

2        255.    In April 2025, as the deadline for the April 14 ARRP approached, a VA employee

3    leaked the contents of the plans to the press.  The plan is to RIF the 80,000 employees in four

4    categories, in phases including:

5            1.    Administrative and Support Roles:
                  • Policy and program analysts
6                 • HR personnel
7                 • IT support staff in non-critical functions
                  • Clerical and data entry positions
8            2.    Medical and Healthcare Support Staff
                  • Non-patient-facing administrative healthcare roles
9                 • Some contract positions in VA medical centers
10                • Certain research positions with reduced funding
11           3.    Regional and Central Office Staff:
                  • Veterans Affairs Central Office (VACO) will see cuts in operational,
                    administrative, and policy roles
12                • Reductions in public affairs, strategic planning, and some procurement functions
13           4.    Field Office and Call Center Reductions:
                  • VA call centers are expected to be streamlined with automation, reducing the need
14                  for live agents
15                • Some regional field office roles will be merged or reassigned[89]

16   The VA responded to this report claiming the document was "fraudulent."  *Id.*

17       256.    The VA has not made public the ARRPs submitted for OMB and OPM approval in

18   conjunction with the March 13 and April 14 deadlines.

19                                                    ***

20       257.    The agency plans described above are being created and implemented pursuant to the

21   Workforce Executive Order.  Taken alone, as well as in conjunction with other government-wide

22   actions ordered by this Administration, each would have constituted a "reorganization" within the

23

24

25   ─────────────────────

26   [88] The Hill, *VA Secretary: Cutting 80,000 is "our target,"* (Mar. 10, 2025), available at:
     https://www.yahoo.com/news/va-secretary-cutting-80-000-170115439.html.
27   [89] KTNV Las Vegas, *As concerns among veterans rise, VA source shares details of workforce
     reduction plan* (Apr. 11, 2025), available at: https://www.ktnv.com/news/as-concerns-among-
28   veterans-rise-va-gives-timeline-of-how-their-workforce-reduction-plan-will-affect-them.
     COMPLAINT, No.                                                                            67

meaning of the most recent, but now expired, statute authorizing the President to propose reorganizations.  5 U.S.C. § 903.

258.    There are no public reports, anywhere, of any federal agency planning to engage in "large-scale" RIFs of employees prior to President Trump's February 11, 2025 Executive Order.

259.    On information and belief, no agency had decided such reductions would be consistent with agency mission, statutory obligations, or good policy prior to President Trump's order to plan such reductions.

260.    On information and belief, as confirmed by the public statements of VA Secretary Collins, the "target" cuts in staff are being dictated to agencies by DOGE, in service of the President's policy agenda of "transforming" the federal government.

261.    On information and belief, no agency has or would independently decide to cut the entire offices, programs and functions that DOGE, acting the President's behalf, is ordering agencies to cut.

**V.    Widespread Actual and Imminent Irreparable Harm**

262.    The above ongoing and imminent actions taken by the President, OMB and OPM, DOGE, and the Federal Agency Defendants to implement Executive Order 14210 and the OMB/OPM Memorandum and the resulting ARRPs, have and will cause harm, including irreparable harm, to Plaintiffs, their members, and others, including but not limited to the following:

263.    Plaintiffs were denied the opportunity for advance notice and to publicly comment on the rules imposed by OMB and OPM in the February 26, 2025 Memorandum and thereby prevented from exercising a right guaranteed by the Administrative Procedure Act.

264.    Plaintiffs AFGE, the AFGE locals, AFSCME, and SEIU each represent, and have as members, federal employees who have been or will be laid off as a result of the ARRPs created pursuant to the President's Executive Order No. 14210.  Those federal employees will lose their income, their health benefits, and other incidents of employment, causing severe irreparable harm to them, their families, and their communities.

265.    Plaintiffs AFGE, AFGE locals, AFSCME, and SEIU each represent, and have as members, federal employees who, if they keep their job, will be subject to a reorganization resulting from the large-scale RIFs that makes doing their job more difficult as result of the ARRPs created pursuant to the President's Executive Order 14210.  Each federal employee who remains will be required to do more to meet the agency's statutory mission and obligations, without the support of colleagues who, until the implementation of the President's orders, the agency believed were needed to perform the work of the agency.

266.    Each union Plaintiff has the core function of representing employees, including those in federal bargaining units, in collective bargaining and providing counseling, advice, and representation to employees in the event of adverse employment actions.  Each union Plaintiff has and will be imminently prevented, by the mass terminations ordered by the President and directed by DOGE, OMB, and OPM as part of the purported reorganization of the federal government, from exercising those core functions as employee representatives.

267.    Each union Plaintiff has expended substantial time and resources as a result of the President's Executive Order and OMB/OPM's implementing Memorandum, and the federal agencies' implementing ARRPs, addressing member concerns and attempting to provide employees with effective representation.  Each Plaintiff has been forced to divert resources that would be devoted to representing employees who have or will experience adverse employment actions.

268.    Each union Plaintiff has been harmed in multiple other ways by the actual and imminent termination of its members, including by the loss of dues income and bargaining power. For example, Plaintiffs AFSCME, SEIU, and SEIU Local 1000 have each been harmed because the well-being, job security, and working conditions of their members who work for state, local government, and private employers are significantly and adversely impacted by the reduction in federal government services occasioned by the President's Executive Order, the OMB/OPM implementing Memorandum and the resulting ARRPs.

269.    Each non-profit organization Plaintiff and its members have suffered or will imminently suffer actual and ongoing harm as a result of the implementation of Executive Order

14210, the OMB/OPM Memorandum and the resulting ARRPs, as the direct result of delays and reduction in services provided by the federal agencies on which they rely.

270.    The Plaintiff non-profit organizations are being adversely impacted by these large-scale, agency-wide reorganizations and RIFs across the country and the harms caused by the reductions in staff are and will not be limited to a defined and particular geographic area.

271.    Each local government Plaintiff has suffered or will imminently suffer actual and ongoing harm as a result of the implementation of Executive Order 14210, the OMB/OPM Memorandum and the resulting ARRPs, as the direct result of delays and reduction in services provided by the federal agencies on which they rely.

272.    The Plaintiff local governments are being adversely impacted by these large-scale, agency-wide reorganizations and RIFs that have and will result in reductions in staff and services both within and without their borders, and often involve staff performing work in locations across the country not within the geographic borders of the local government.

273.    Plaintiffs describe some of those harms to the Plaintiffs, by Federal Agency Defendant, as follows.  Plaintiffs would also face severe and irreparable injury to the extent that other Federal Agency Defendants that have not publicly announced their plans, or taken action that has been made public, move forward with reorganization and reductions-in-force, including at the Department of Defense, Department of Homeland Security, and Department of Transportation.

- **USDA**

274.    Implementing the Executive Order and USDA ARRP to imminently terminate many thousands of USDA staff, to return staffing to 2019 levels, will irreparably and immediately harm the federal employees who are terminated, those who remain, and their labor representatives including Plaintiff AFSCME and Plaintiff AFGE.  It will also irreparably and immediately harm the non-federal employee members of Plaintiffs AFSCME and SEIU who work in food service in K-12 schools that rely on USDA's school food programs for funding and for dietary guidelines or provide family childcare services that rely on USDA's childcare food program reimbursements.

COMPLAINT, No.                                                                                          70

275.    These actions will also have a direct and severely detrimental impact on Plaintiff NOFA, its members, and the farmers and other communities the USDA serves.  For example, NOFA's members rely financially on the services provided by the Farm Services Agency (FSA) and the Natural Resources Conservation Service (NRCS), including FSA loans to purchase and improve farms, farm equipment, and anything necessary to run the farms, and rely on their local FSA and NRCS officers to understand their specific farm's physical characteristics and business plans and to conduct in-person business because many lack reliable internet access or proficiency.

276.    These actions will also have a severely detrimental impact on the American Geophysical Union as well as its members, who rely on the USDA's funding, collaboration with its scientists, and use of its research, which is vital to, among other things, supporting the health of forests and rangelands in the face of climate change and other ecological stressors.  Western Watersheds Project will also face injury from the impairment of the Department's ability to control livestock grazing on Forest Service lands, causing damage to riparian habitats and spawning streams that are critical to the survival of certain species, including on WWP-owned land.

277.    In addition, the implementation of the Executive Order and USDA ARRP will cause a direct, immediate and seriously detrimental injury to local governments that interact directly with this agency and rely on its services every day, specifically including but not limited to Plaintiffs King County, Harris County, County of Santa Clara, and the City and County of San Francisco.

278.    For example, Plaintiffs King County and Harris County own and/or operate some of the busiest airports and ports of entry in the nation.  The Department of Agriculture provides personnel at these major transportation centers to manage prey animals that attract predatory birds that create hazards to air traffic through risk of bird strikes to aircraft.  The Department also helps Plaintiff Harris County protect the food supply at food manufacturing facilities processing meat and dairy products.  Absent these critical food safety staff provided by the agency, Plaintiff Harris County lacks the staff capacity, expertise, training, and authority to replace these critical food safety roles and would struggle to prevent outbreaks of food borne illnesses and pathogens such as avian flu that necessitate the destruction of food supply.

COMPLAINT, No.                                                                                            71

279.    Similarly, Plaintiff Santa Clara relies on the USDA Wildlife Services program to deprecate predators and other animals, including, for example, mountain lions, bears, and pigs, and then tests them to determine if they have any infectious diseases or pose any other risks.  In a recent example, USDA Wildlife Services staff deprecated several feral swine in Santa Clara, and upon testing them learned—and alerted Santa Clara staff—that those specific swine carried diseases threatening residents, pets, agricultural producers, and the human food supply.  Reductions to the USDA Wildlife Services program within and outside Santa Clara, will cause an information gap that will  heighten the risks to Santa Clara, its agriculture industry, and its residents, and that Santa Clara (and no other local government) could make up for.

280.    Local jurisdictions also rely on USDA to prepare for, respond to, and recover from natural disasters and other emergencies.  For instance, in the aftermath of a major wildfire in Summer 2020, Santa Clara's Office of Emergency Management coordinated with USDA to facilitate USDA employees coming to the affected area.  The USDA set up and staffed a field station to help ranchers who lost grazing lands apply for low-interest loans, obtain machinery and tools, and even repair damaged equipment.  Reudcing and relocating staff will necessarily adversely impact Santa Clara's ability to support its residents, including those who live in remote areas that are more difficult to serve, in the aftermath of wildfires and other natural disasters, particularly those that affect the substantial amount of agricultural production in the area.  The results could include a weakened economy, potential loss or relocation of agricultural businesses, diminished community resilience after disasters, and additional costs to Santa Clara itself (in the form of staff time and funds) to support recovery.

281.    Diminishment of the U.S. Forest Service staffing would force local and state firefighting agencies to carry more of the burden of responding to wildfires and go without the assistance on which they often rely. The U.S. Forest Service performs essential work to manage federal wildland, to mitigate the risks of wildfire, and to fight wildfires when they occur.  It is a critical component of the system of mutual aid used by firefighters across the United States.  Santa

Clara has experienced several very large wildfires in recent years, including several that were, at the time, the largest in California history.

282.    Reduction of the USDA's already understaffed Food Safety Inspection Service, which is responsible for ensuring that the nation's meat supply is free from disease and contamination, will directly impact local governments by increase the risks of suffer foodborne illness and disease, which will burden local governments' health and hospital systems and public health departments, including those operated by Plaintiff Santa Clara.  Reductions to the USDA's Animal and Plant Health Inspection Service will hamper local governments' efforts to monitor and respond to agricultural pests (such as the Mediterranean fruit fly, which was detected in the Bay Area in August 2024, Santa Clara worked with USDA officials to establish a quarantine area to prevent its spread).  Similarly, Santa Clara's Division of Agriculture also relies on USDA's Smuggling Interdiction and Trade Compliance Program and reductions there would hamper local government's ability to detect and respond to  invasive pests arriving from overseas (such as the invasive pests that Santa Clara staff biologists found living in camellias illicitly imported from China, and then coordinated immediately with USDA staff to establish a federal quarantine).  Agriculture Departments across California coordinate with USDA in the same way.

- **AmeriCorps**

283.    The implementation of the Executive Order and ARRP to virtually eliminate AmeriCorps programs has harmed and will irreparably and immediately harm the employees and members who are terminated, those who remain, and their labor representatives including Plaintiff AFSCME.

284.    These actions will also have a detrimental impact on organizations that rely on AmeriCorps programs.  For example, Plaintiff the American Public Health Association has a program working with the CDC on the education and training of Public Health AmeriCorps members, and its decimation will cause harm to the ability of APHA to build capacity to improve community health.

285.    In addition, the implementation of the Executive Order and AmeriCorps ARRP will cause a direct and seriously detrimental injury to local governments that interact directly with this

COMPLAINT, No.                                                                                              73

agency and rely on its services every day, specifically including but not limited to AmeriCorps' work in schools; AmeriCorps' Disaster Response Team, which is often involved in disaster recovery work for months and years after disasters such as the recent California wildfires; and King County's work with AmeriCorps to expand capacity to deliver public health services, which will face increased costs and reduced program reach if King County's partnerships with AmeriCorps are lost or diminished.

- **Department of Commerce**

286.    The implementation of the Executive Order and ARRP to imminently reduce of staff in the Department of Commerce, including its announced plan to eliminate thousands of positions at NOAA and closure of the Minority Business Development Agency, will have direct and severely detrimental impacts on federal employees who are terminated, employees who remain, and their labor representatives including Plaintiff AFGE.

287.    Terminations of staff at NOAA, which media reports indicate could eliminate 20 percent or more of the agency's 13,000 employees, will prevent NOAA from effectively carrying out its critical work, ranging from research supporting the health of the ocean and aquatic species conducted by the National Marine Fisheries Service to the foundational research conducted and data collected by the Office of Oceanic and Atmospheric Research to understand hurricanes, weather forecasts, extreme storms, and natural disasters.

288.    These actions will have a severely detrimental impact on Plaintiff AGU and its members, who collaborate with NOAA scientists and rely on funding from NOAA as well as on NOAA's funding, science, and research to provide AGU members with the foundational research and data to understand hurricanes, weather forecasts, extreme storms, climate change, the oceans, and natural disasters, among many other services.  For example, AGU members will be harmed by the loss of NOAA's provision of essential data services that they use to model coastal hazards and research that tailors climate adaptation guidance to community organizations.  These actions will also cause injury to the Plaintiff Western Watersheds Project, which relies on NOAA's climate data, data collected by NOAA's National Weather Service, and conservation services by NOAA's National

Marine Fisheries Service, and Plaintiff NRDC, which relies on research from NOAA and the Census Bureau.

289. In addition, the implementation of the Executive Order and Commerce ARRP will cause a direct and seriously detrimental injury to local governments that interact directly with this agency and rely on its services every day, specifically including but not limited to all Plaintiff local governments.

290. All local government Plaintiffs rely on data, staff, services, and expertise provided by NOAA, including data they need to inform emergency preparations, planning, and response.  For example, Plaintiffs Chicago, King County, Santa Clara, and San Francisco specifically rely on forecasts, modeling, and real-time information for major public event safety planning and weather-related operations at a granular level of detail with real-time updates, and Plaintiffs Harris County, King County, Santa Clara County, and others use this same information for major weather events. Plaintiff Chicago also relies on NWS personnel during large-scale outdoor City events, who are often present on site to assist in real-time assessment and response to weather data as it comes in.  And King County relies on interagency County and National Weather Service teams to coordinate and conduct outreach to communities and provide education before major weather events like the November 2024 "bomb cyclone" windstorm that resulted in several fatalities.  Plaintiff local governments would lose valuable information and services that are essential to human safety and resilience.

291. King County also relies on NOAA Fisheries to assist in the development and implementation of Puget Sound Salmon Recovery Plans that are critical to the recovery, management, and protection of several species of salmon within King County—an essential component of the region's economic, recreational, and cultural life.  Also, NOAA Fisheries' consultation and review of capital projects for Endangered Species Act and Essential Fish Habitat compliance is a critical step in permitting projects.  Delays would escalate construction costs, and elimination of review would undermine progress toward salmon recovery and other marine life management and protection goals.

- **Department of Energy**

COMPLAINT, No.                                                                                                    75

292.    The implementation of the Executive Order and ARRP to impose imminent reductions of up to 50% of the staff at the Department of Energy will irreparably and immediately harm the federal employees who are terminated, those who remain, and their labor representatives including Plaintiff AFGE.

293.    These reductions, which are proposed to cut half of the science and innovation programs, will also have a direct and substantially detrimental impact on the members of Plaintiff American Geophysical Union who rely on research by and funding from the Department and regularly collaborate with its scientists, and will directly impair the AGU's financial resources and mission.  They will also harm Plaintiff NRDC, which relies on publications and databases updated and maintained by the Federal Energy Regulatory Commission, National Renewable Energy Laboratory, and Energy Information Administration.  By eliminating weatherization programs, they will harm Plaintiff AFSCME, which has non-federal-employee members who perform weatherization work funded, overseen, and assisted by the Department, which will be interrupted and injured.  And they will cause substantial harm to members of the public, who depend on the Department to keep them safe including by maintaining the nation's nuclear stockpile and operating environmental management programs that, among other things, clean up radioactive waste and prevent the material from contaminating the soil and groundwater.

294.    In addition, the implementation of the Executive Order and Energy ARRP will cause a direct and seriously detrimental injury to local governments that interact directly with this agency and rely on its services every day.

295.    Crises stemming from understaffing of the programs of the Department of Energy will enormously burden city and county governments, which will be left to handle environmental disasters, specifically including but not limited to Plaintiffs City and County of San Francisco and the City of Baltimore.

296.    For example, the Executive Order and AARP have already caused, and will continue to cause, disruptions and harms to vital funding sources and supports.  For example, Plaintiff San Francisco has received federal financial support from the Department of Energy to develop green

building standards, deploy EV charging infrastructure, and continue to transition city vehicles to Zero Emission Vehicles. Three 2024 Department of Energy grants awarded to San Francisco for these purposes are in stasis awaiting information from San Francisco's last known federal program officers on these grants—several of whom are no longer employed at the Department of Energy. Similarly, King County expects these actions to delay implementation of critical work funded by grants from the Department of Energy. As one example, Plaintiff King County is currently implementing a block grant under the DOE's Energy Efficiency and Conservation Block Grant Program. This grant will allow King County to continue its efforts to reduce fossil fuel emissions and energy use, and improve energy efficiency in various sectors. On April 24, 2025, Plaintiff King County was advised that the technical project officer for that particular grant was leaving the agency, and that it may reach out to various email addresses unattached to specific people for issues and questions, and that a new technical project officer has not yet been assigned to the grant. King County expects that the reductions at the Department of Energy have reduced or eliminated its ability to work on this grant. Likewise, Plaintiff City of Baltimore also relies on the Department's data, models, training, and support and funding for climate goals that affect it as a coastal city.

- **Environmental Protection Agency**

297.    The implementation of the Executive Order and ARRP to impose imminent substantial cuts at EPA—including the initial terminations of nearly 300 employees at environmental justice offices, planned elimination of the Office of Research and Development and layoffs of more than 1,000 employees working there, and targets to cut up to 65 percent of the budget, including employees—will directly and significantly harm the federal employees who are terminated, those who remain, and their labor representatives including Plaintiffs AFGE and SEIU.

298.    The actions will also have a direct and severely detrimental impact on Plaintiff American Geophysical Union and its members, who collaborate with and rely on the EPA's research and funding, as well as the public. They will stop the EPA's research, tracking, and responses to health hazards in the air, water, and land. And they will harm non-profits that rely on data, analysis, and funding from the EPA for their work, including Plaintiffs American Geophysical Union and the

NRDC.  In particular, the cuts to the EPA include large-scale staffing reductions at the EPA Office of Research and Development, which produces critical research on PFAS and lead contamination on which NRDC relies, as well as at the EPA Office of Environmental Justice and External Civil Rights, which ran EJScreen, an environmental justice screening and mapping tool on which NRDC relies.

299.    In addition, the implementation of the Executive Order and ARRP will cause a direct and seriously detrimental injury to local governments, specifically including but not limited to Plaintiffs the City of Baltimore, City of Chicago, County of Santa Clara, City and County of San Francisco, and King County.

300.    For example, Plaintiffs including King County and Chicago rely on the EPA in dealing with hazardous materials including Superfund sites, where EPA staffing and support is necessary to protect public health through remediation and technical assistance.  Similarly, local government plaintiffs including Santa Clara rely on the EPA for tracking, tracing, and managing hazardous materials while in transit to, from, or through their jurisdictions, for which they rely on the e-Manifest system and protocols developed and managed by EPA.   Plaintiffs Santa Clara and Chicago also rely on the EPA in the aftermath of disasters, including clearing hazardous waste and determining whether and when it is safe for residents to return to disaster-affected areas.  If the EPA's ARRP diminishes EPA's capacity to deploy staff on-site after fires and other natural disasters, that will make it more difficult and more protracted for Plaintiff Santa Clara to fulfill its role of protecting its residents and the environment from hazardous material leaks and exposures and to facilitate recovery from natural disasters.

301.    Localities like Plaintiff King County rely on EPA staff expertise, collaboration, and data sharing to support effective climate and environmental assessments and program implementation.  Diminished access to EPA staff could hinder accurate greenhouse gas inventories and mitigation planning and limit Plaintiff King County's ability to target mitigation efforts in areas with high pollution burdens and vulnerable populations.

302.    Localities, including Plaintiffs King County and San Francisco, also rely on EPA staff for funding and resources to support local environmental justice work. Without EPA staff to manage

and process grants, support mapping tools and other resources, and provide technical assistance, localities like Plaintiffs will be seriously harmed.  Plaintiff San Francisco's Environment Department will also be impaired in fulfilling its mission to promote environmental justice, and these cuts will detrimentally impact communities in San Francisco that are already harder hit by environmental issues.

303.    In addition, the implementation of the Executive Order and ARRP will cause serious injury to local governments with respect to their agricultural work.  EPA's ongoing work is a linchpin for the agricultural industry across the country, including, for example, in Santa Clara.  Plaintiff Santa Clara's Division of Agriculture regulates and monitors the use of pesticides in this industry, including by issuing use permits and receiving and reviewing reports from producers of when the pesticides are used.  But EPA, not local governments, primarily manages and implements the Federal Insecticide, Fungicide, and Rodenticide Act, which governs the registration, labeling, distribution, sale, and use of pesticides in the United States, by determining whether a given manufacturer's product can be registered as a pesticide, which in turn requires EPA to determine its safety for use in the food supply. The EPA's involvement is essential not only for registering new pesticides, but also when Plaintiff Santa Clara detects new invasive species or pests that require urgent response but for which there is not yet a registered pesticide.  In those instances, the EPA must issue approvals for "off-label" use of registered pesticides.  Execution of EPA's ARRP could diminish if not altogether destroy EPA's ability to register new pesticides and its ability to act promptly to permit famers to protect their crops from new and emerging threats.  The risk is especially acute for Plaintiff Santa Clara: because the Bay Area is a site of significant international travel, there is an especially heightened chance that harmful pests will be detected first in or near Santa Clara.

304.    EPA's reorganization could also diminish or altogether block EPA's capacity to deploy the on-scene coordinators who assist local governments including Plaintiff Santa Clara during emergency response to releases of hazardous materials and other harmful chemicals.  Plaintiff Santa Clara relies heavily and directly on EPA staff to provide interpretation, guidance, and training for EPA's Spill Prevention, Control, and Countermeasure regulations.  Likewise, Plaintiff Santa Clara's

COMPLAINT, No.                                                                                     79

Department of Environmental Health also relies on modeling software that EPA develops, maintains, and updates in order to assess potential offsite consequences of catastrophic releases of hazardous substances.  If EPA does not maintain or continue to update this software, it would substantially diminish the ability of Plaintiff Santa Clara—and, on information and belief, other local and state agencies—to respond to these releases in ways that effectively protect residents.

- **General Services Administration**

305.    The implementation of the Executive Order and ARRP to impose imminent drastic cuts to GSA staff—including a 63 percent reduction in Public Buildings Service staff, which will eliminate more than 3,500 positions—will have direct and severely detrimental impacts on the federal employees who are terminated, employees who remain, their labor representatives including Plaintiff AFGE, and the public.

306.    Federal employees who work at and members of the public who visit federal office buildings, courthouses, and other federal facilities rely on Public Buildings Service staff to ensure their health and safety in the facilities by overseeing the testing of water in the buildings for the presence of bacteria, lead, and copper; maintaining fire prevention systems; managing indoor air quality, including during wildfires; and containing the spread of infectious diseases in the buildings. The severe reduction in Public Buildings Service staff will threaten the health and safety of AFGE members, as well as other federal employees and visitors, at federal buildings and facilities throughout the country.  Cuts to other parts of GSA will similarly undermine the agency's ability to provide real estate, facilities management, procurement, technology, and other services to the federal government and the public.

307.    SEIU has hundreds of members who are employed by federal contractors to provide cleaning services at GSA locations, who are at risk of losing their jobs due to the reduction in GSA staff.

- **Department of Health and Human Services**

308.    The implementation of the Executive Order and ARRP has already included RIFs carried out at HHS in late March 2025 that eliminated roughly 10,000 positions across the agency,

including 3,500 at the Food and Drug Administration (FDA), 2,400 at the Centers for Disease Control and Prevention (one-fifth of all CDC employees), 1,200 at the National Institutes of Health (NIH), and 300 at the Centers for Medicare & Medicaid Services (CMS).  Many offices and programs were eliminated entirely or lost the vast majority of their employees, including the National Center for Injury Prevention and Control, National Institute for Occupational Safety and Health, Office of Health Equity, National Center on Birth Defects and Developmental Disabilities, certain programs within the National Center for Environmental Health, and various CDC laboratories.  Five large HHS offices were shuttered: in New York City, Boston, Chicago, Seattle, and San Francisco.

309.    These layoffs have caused immediate and severe harm to the federal employees who were terminated, as well as those who remain, and to their labor representatives including Plaintiffs AFGE.  They are also directly harming Plaintiffs AFSCME and SEIU, and their non-federal employee members, some of whom are employed by Head Start programs that rely on HHS-administered funding, training, technical support, and investigation and enforcement of rules; some of whom are family childcare providers who depend upon HHS's Office of Child Care for the timely receipt of grant funds, regulatory compliance guidance, and oversight; and many of whom work in state administration of Medicaid and in public health positions who have been and will continue to be injured by cuts to CMS and the CDC.  SEIU also has members who are employed by federal contractors to provide cleaning services at HHS locations, who are at risk of losing their jobs due to the reduction in HHS staff.

310.    The actions will also have a direct and severely detrimental impact on Plaintiff American Public Health Association and its members.  Many APHA members are public health officials who work in state and local health departments who have lost access to critical services.  For example, the CDC terminated employees who had been working on the ground responding to the worsening measles outbreak in Texas that has already claimed the lives of two children and lead experts who had been ready to provide essential on-the-ground support to Milwaukee public schools that were closed due to the discovery of widespread presence of lead.  State and local public health officials and offices that relied on data, expertise, and support from HHS will have to expend

COMPLAINT, No.                                                                                    81

significant resources in response to these sweeping terminations and reorganization and run the risk of new or worsening public health crises. The actions will also harm Plaintiff American Geophysical Union and its members, who regularly collaborate with CDC and NIH researchers, as well as Plaintiff NRDC, all of whom rely on CDC and NIH research including on lead contamination.

311.    The virtual elimination of the National Institute for Occupational Safety and Health (NIOSH), which has seen 93% of the staff given RIF notices, will harm non-federal employee members of Plaintiffs SEIU and AFSCME because it will halt NIOSH's research, investigations, and guidance to address occupational injuries and illnesses across all types of workplaces, including coal mines, fire departments, oil and gas wells, healthcare facilities, and small businesses (including Plaintiff Main Street Alliance members) and thereby increase health and safety risks to workers across the country. Firefighter safety programs, which address exposure to toxins and chemicals and cancer risk, and coal miner health surveillance programs, have been shuttered or virtually eliminated.

312.    In addition, the implementation of the Executive Order and HHS ARRP will cause a direct and seriously detrimental injury to local governments that interact directly with this agency and rely on its services every day, specifically including but not limited to all local government Plaintiffs.

313.    For example, Plaintiff San Francisco operates an extensive public health system that relies on CDC services in numerous ways. The CDC supports San Francisco's public health efforts, including through trainings, guidance, public health pipeline programs, transportation services for rare but particularly infectious patients who cannot be treated at San Francisco's public hospital, reference lab services, and surveillance support that is crucial for identifying and tracking the spread of infections and diseases, including resistant strains. Absent adequate CDC support, Plaintiff San Francisco will have to divert and expend resources.

314.    The RIFs and reorganization at HHS are limiting or eliminating national data collection projects, and limiting access to staff with related subject-matter expertise, which will negatively affect the ability of local governments to respond to public health emergencies. For example, Plaintiff Chicago's Department of Public Health relies upon CDC data and guidance to effectively surveil the spread of sexually transmitted diseases, control the spread of infectious

diseases like measles and Mpox, and efficiently allocate resources to address chronic diseases like diabetes and opioid addiction.

315.    Local governments, including Plaintiff Santa Clara, also rely heavily on the CDC's Laboratory Response Network, as well as several CDC laboratories that are the only ones authorized or capable of testing for certain infectious diseases, including some sexually transmitted diseases. Delays or disruptions in CDC's ability to test specimens or report results to Plaintiff Santa Clara's Public Health Department will produce information gaps and delays that result in unnecessary spread of infectious diseases as well as inadequate directions or recommendations to affected patients. Indeed, Plaintiff Santa Clara's Public Health Department has protocols that often require its staff to contact and share specimens with the CDC very quickly and to monitor results that the CDC shares not only for its own specimens, but for tests of specimens from other parts of the country.  When the CDC operates the only laboratory that can conduct the testing, HHS's reorganization could mean the difference between life and death, between effective and ineffective treatment, between spread or containment of infectious disease, and whether residents suffer.

316.    Reductions to the CDC's extensive work developing information about emerging infectious-disease threats in other parts of the world, will directly impact Santa Clara and other local governments where there is frequent travel between Santa Clara and those areas.  When the CDC develops and shares information about outbreaks of Ebola, novel influenza, mpox, and other diseases—recently Marburg haemorrhagic fever and COVID-19--, localities including Plaintiff Santa Clara can be better prepared to handle potential cases that may emerge locally.  The CDC played a critical role in assisting Santa Clara in its response to these threats, including by sending experts with specific expertise in medicine, epidemiology, infection control, community mitigation, and communications to Santa Clara to coordinate with Santa Clara's Emergency Operations Center, and to develop a community mitigation plan.

317.    When there is a terrorist attack, disease outbreak, earthquake, or other emergency, and local government health systems (including both public health departments and hospitals) require use of medicines, including those that are not quickly or commercially available or in quantities that

COMPLAINT, No.                                                                                          83

would exhaust local supplies, those departments can access medicine from the Strategic National Stockpile, which is administered and staffed by HHS's Administration for Strategic Preparedness and Response (ASPR).  The time-sensitive availability of the Strategic National Stockpile is critical.  If HHS's ARRP closes or reduces the capacity of ASPR to operate the Strategic National Stockpile, CDC to operate the Drug Service, or FDA to operate the expanded access program, it would reduce if not altogether block the ability of Plaintiff Santa Clara's Public Health Department and Health System—and other local and state hospitals, clinics, and public health departments—to access these vital, life-preserving resources in times of emergency.

318.    Additionally, NIOSH provides local governments with essential investigative support in fire safety, particularly in the aftermath of industrial incidents.  Plaintiff Harris County contains extensive petrochemical infrastructure, and has relied on NIOSH to identify causation in fires where initial assessments were inconclusive.  Loss of NIOSH personnel and institutional knowledge will compromise this function, leaving Plaintiff Harris County ill-equipped to respond to industrial hazards and fire risks.

- **Department of Housing and Urban Development**

319.    The implementation of the Executive Order and ARRP to impose an imminent RIF of up to 50 percent reduction in HUD staff, which will eliminate certain offices and more than 4,000 positions, will directly and significantly harm the federal employees who are terminated, those who remain, their labor representatives including Plaintiff AFGE, and members of the public who depend on HUD's services.  It will prevent individuals and communities across the country from being able to access funding and support for disaster relief, community development, rental assistance, homeownership, homelessness, and housing discrimination complaints, and exacerbate the housing crisis and housing-related issues throughout the country.

320.    These actions will also cause irreparable injury to Plaintiff AFSCME and SEIU, and their non-federal employee members, who work at housing authorities across the country—including in California—that depend on the regular and timely distribution of HUD funding and who will be harmed by the closure of local HUD offices.  SEIU also represents hundreds of members employed

COMPLAINT, No.                                                                                                                  84

by service contractors who provide cleaning, security, and other services at housing authorities in numerous states, and risk losing their jobs due to the significant reduction in HUD staff and closure of offices. SEIU Local 1000 members work at a California state agency that administers affordable housing programs funded exclusively by HUD, and the cuts to HUD staff and dozens of office closures will imperil the agency's critical functions and services, impede oversight and enforcement, diminish critical technical assistance and support, and threaten affordable housing programs and projects, harming SEIU Local 1000's members and the members of the public whom they serve.

321.    These actions will cause a direct and seriously detrimental injury to local governments that interact directly with this agency and rely on its services every day, specifically including but not limited to Plaintiffs City of Baltimore, County of Santa Clara and King County.

322.    For example, delays in receiving technical assistance and guidance from HUD staff on topics critical to the governance of the Community Development Block Grant, HOME programs, and Section 108 Loan Programs will impact localities like Plaintiff Baltimore. These programs rely on HUD staff to, *inter alia*, review and provide approvals necessary for processing the flow of funds under these programs; reduced staff will hamper the ability of localities like Plaintiff Baltimore to use these funds and to refinance loans through the 108 Loan program, causing financial and economic harms.

323.    In addition, HUD's reorganization will cause delays in processing invoices and payment to local governments and nonprofits in connection with nationwide housing assistance and grant programs. HUD's inability to timely process invoices and payments to grantees, provide technical assistance, or manage future grant cycles will not only hamper the ability of local governments to assist beneficiaries through housing support offices such as Plaintiff Santa Clara's Office of Supportive Housing, but will also cause more residents to experience homelessness due to lack of availability of shelters and services.

- **Department of Interior**

324.    The implementation of the Executive Order and ARRP to impose imminent mass layoffs at the Department of the Interior will have an immediate and detrimental impact on the federal

COMPLAINT, No.                                                                                                    85

employees who are terminated, those who remain, and their labor representatives including Plaintiffs AFGE and SEIU.

325.    These actions will also inflict irreparable injury upon Plaintiff American Geophysical Union and its members, who regularly collaborate with and depend on the agency—in particular, on the U.S. Geological Survey (USGS), Bureau of Land Management, and Fish and Wildlife—for funding and research.  The targeting of USGS will compromise vital public services, including providing reliable science to resource managers, emergency response, other scientists who rely on it, and the public.  For example, the planned reductions of 20 percent will eliminate regional centers that partner with local natural resource managers and communities to help them deal with mounting challenges of climate change, from wildfires to sea level rise.

326.    The reductions in staffing will also harm Plaintiff NRDC, which relies on publications and databases updated and maintained by the Fish and Wildlife Service, U.S. Geological Survey, and the Bureau of Land Management; and Plaintiff Coalition to Protect America's National Parks and its members, because inadequate staffing will endanger animal and plant species and compromise park functioning and operations, harming the recreational activities of members in national parks.  It will harm Plaintiff Western Watersheds Project, by impeding timely access to public records necessary to accomplish its conservation mission, adversely affecting the Bureau of Land Management's prevention of ecologically destructive grazing on federal public lands, hindering WWP's ability to research and obtain information related to conservation efforts, impacting the U.S. Fish and Wildlife Service's ability to categorize and protect endangered species such as the Wyoming toad and Arctic grayling, and causing other adverse effects that will decimate the National Wildlife Refuge, harm WWP's ability to protect native wildlife, and impede the enjoyment of land by WWP's members.

327.    In addition, the implementation of the Executive Order and the Interior ARRP will cause a direct and seriously detrimental injury to local governments, specifically including but not limited to Plaintiffs Santa Clara and King County.  It will harm Plaintiff Santa Clara's emergency-planning efforts and capabilities, which rely on information about earthquake hazards developed by USGS to plan for and respond to earthquakes.  Indeed, Plaintiff Santa Clara is a member of the

COMPLAINT, No.                                                                                                              86

Association of Bay Area Governments, which partners closely with USGS to provide resources and guidance related to earthquakes.  Similarly, implementation of the Executive Order and the Interior ARRP would significantly slow Plaintiff King County's ability to complete infrastructure, transportation, and environmental projects, increase costs, and reduce the effectiveness of efforts to protect endangered species and historic resources.  It would result in Plaintiff King County experiencing, among other things, increased uncertainty and project delays due to extended consultation and permit review and issuance in ESA and EFH reviews conducted by U.S. Fish and Wildlife Service along with NOAA Fisheries, which oversee species like Chinook Salmon and Bull Trout.  It would also cause delays in compliance with federal laws requiring consultation with the Bureau of Indian Affairs and other DOI agencies on the impacts of federally funded or permitted projects on historic properties, potentially stalling project approvals.

- **Department of Labor**

328.    The implementation of the Executive Order and ARRP to impose imminent large-scale layoffs at the Department of Labor will have a direct and severely detrimental impact on the federal employees who are terminated, those who remain, and their labor representatives including Plaintiff AFGE.  For example, the Department has eliminated the enforcement division of the Office of Federal Contract Compliance Programs (OFCCP) and plans to cut OFCCP by 90 percent.

329.    These actions will also have a direct and severely detrimental impact on Plaintiffs AFSCME and SEIU, whose non-federal employee members depends on many programs and subagencies of the Department including the Occupational Health and Safety Administration, Wage and Hour Division, Bureau of Labor Statistics, and Employee Benefits Security Administration.  SEIU also represents members employed by service contractors who provide cleaning services at DOL offices, and risk losing their jobs due to the significant reduction in staff.

330.    In addition, the implementation of the Executive Order and the Labor ARRP will cause a direct and seriously detrimental injury to local governments.

1

- **National Labor Relations Board**

2  331.    The implementation of the Executive Order and ARRP to impose a large-scale

3  reduction-in-force at the NLRB will have a direct and severely detrimental impact on the federal

4  employees who are terminated, those that remain, and their labor representatives.

5  332.    In addition, these actions will also have a direct and severely detrimental impact on

6  Plaintiffs AFSCME and SEIU, both of whom represent private-sector members who depend on the

7  NLRB and who regularly file unfair practice charges and representation petitions at the NLRB.  Due

8  to flat-line budgeting, case processing time has increased over the past decade from 100 days to 444

9  days.  Decreasing staff will further extend the time it takes for the NLRB to prosecute violations of

10  federal labor law, leaving workers and unions unprotected.  Plaintiffs AFSCME and SEIU who

11  regularly file unfair practice charges at the NLRB presently have significant pending petitions for

12  representation and unfair labor practice charges that are not being timely processed due to current low

13  staffing levels.  The delay will mean that NLRA violations will effectively go unremedied and

14  workers will be thwarted in having unions certified as their collective bargaining representatives

15  because the NLRB will not be able to conduct timely elections.

16  **National Science Foundation**

17  333.    The implementation of the Executive Order and ARRP to impose imminent layoffs of

18  up to half of NSF staff will have a direct and severely detrimental impact on the federal employees

19  who are terminated, those who remain, and their labor representatives including Plaintiff AFGE.

20  334.    They will also cause severe harm to science in the United States.  NSF has already

21  abolished eleven of its thirteen advisory panels.  It is a major funder of critical scientific research, and

22  the elimination of staff will cause serious disruptions in funding that created chaos and instability

23  among researchers.  For these reasons, the reduction in NSF staff will have a direct and substantially

24  detrimental impact on the members of Plaintiff the American Geophysical Union, who rely on

25  research by and funding from, and often collaborate with, the NSF.  It will also harm Plaintiff

26  Western Watersheds Project, which regularly uses NSF-funded research for protection and restoration

27  of wildlife and native ecosystems,

28  COMPLAINT, No.                                                                                      88

- **Small Business Administration**

335.    The implementation of the Executive Order and ARRP to impose an imminent 43 percent reduction in SBA staff, which will eliminate thousands of positions, will cause a direct and severely detrimental impact on the federal employees who are terminated, those who remain, and their labor representatives including Plaintiff AFGE.

336.    This reduction will also cause harm to Plaintiffs AFGE, AFSCME, and SEIU members who carry student loan debt, many of whom have benefited from the Public Service Loan Forgiveness program and income-driven repayment options that attach to the federal student loans of those employed in the public sector.  Because the Administration intends to transfer the processing of student loans from the (now eliminated) Department of Education to the SBA, understaffing in the SBA will cause delays in processing loan forgiveness or requests to adjust income-based repayment, causing significant financial harm to AFSCME, SEIU, and AFGE members.

337.    The reductions will also have a severely detrimental impact on the small businesses across the United States, including the members of Plaintiff Main Street Alliance, who rely on SBA services, which include loans, loan guarantees, grants, disaster relief, assistance connecting with government contracting opportunities, a mentoring program, and a national network of Small Business Development Centers that provide counseling and training to help entrepreneurs start their own businesses.

338.    In particular, Main Street Alliance members and other small businesses that have suffered substantial injuries in national disasters rely on the SBA's Emergency Injury Disaster Loan ("EIDL") program.  But without adequate staff, EIDL loan processing will be delayed and loan recipients facing repayment difficulty will be unable to reach EIDL to renegotiate payments, causing them to end up in default and be sent to collection.  Reductions in staffing will also slow the processing of loan guarantees, which will have detrimental effects not only on small business loan recipients but also on contractors and suppliers, and their employees.  Many of these effects have already begun to occur.  The SBA office that funds an important mentoring program has been effectively eliminated.  At least one Small Business Development Center has already closed, with

1    more to come.  As the RIFs continue to unfold, they will have extremely detrimental effects on small

2    businesses throughout the nation including many members of Main Street Alliance.

3         339.    In addition, the implementation of the Executive Order and SBA ARRP will cause a

4    direct and seriously detrimental injury to local governments that interact directly with this agency and

5    rely on its services every day, specifically including but not limited to Plaintiffs the City and County

6    of San Francisco and King County.  The elimination of positions at the SBA threatens the Plaintiff

7    local governments' ability to support communities that are recovering after major disasters, by

8    slowing critical financial assistance.  They will cause delays in, among other things, damage

9    assessments, establishment of Disaster Loan Outreach Centers, and servicing of disaster loans, which

10    are currently fully managed by SBA employees.  In addition, residents and businesses that depend on

11    timely access to disaster loans will face financial harm.  Without sufficient SBA staff to travel to

12    disaster locations to perform assessments and provide loan application technical assistance, residents

13    in disaster areas will face difficulty obtaining low-interest federal disaster loans, therefore hindering

14    their ability to rebuild and recover from disasters

15    - **Social Security Administration**

16         340.    The implementation of the Executive Order and ARRP to imminently eliminate the

17    jobs of 7,000 of the 57,000 SSA employees—at a time when the SSA was already at a 50-year

18    staffing low just as the peak of the Baby Boomer generation become eligible for SSA retirement

19    benefits—will have a direct and severely detrimental impact on the federal employees who are

20    terminated, those who remain, and their labor representatives including Plaintiff AFGE.

21         341.    These layoffs will also affect Plaintiffs AFSCME, SEIU, and SEIU Local 1000 and

22    their non-federal employee members who work for state agencies that determine eligibility for Old

23    Age, Survivors and Disability Insurance and depend on SSA-administered technology to make their

24    assessments, for local or state determination entities, and/or for medical providers that make those

25    determinations, which also depend on SSA staff.  SEIU Local 1000 members are employed by the

26    California state agencies that rely on the provision of social security numbers when issuing driver's

27    licenses and processing unemployment benefits applications, and will likely face long delays in

28    COMPLAINT, No.                                                                                                          90

speaking with SSA staff and resolving problems with social security numbers, which, in turn, will delay the provision of state service, including driver's licenses and unemployment/disability insurance.

342.   In addition, these actions will also have a direct and severely detrimental impact on Plaintiff Alliance for Retired Americans and its members, who are already experiencing long wait times for appointments in person and long wait times (already up to 90 minutes) on the 800-number to apply for benefits or to correct benefit problems by phone.  Employees processing benefits applications will no longer have the necessary information technology support, causing problems including website disruptions that prevent ARA members and others from applying for benefits or calculating benefits to make retirement decisions.  And adding the caseload of employees who are terminated to SSA employees' already overwhelming caseload will mean the current problem of almost one-fifth of benefit applications not being timely processed will expand and people who are entitled to receive Social Security benefits, including ARA members, will not timely receive them. These same issues will also affect Plaintiff AFSCME's significant number of retired members and their families.

- **State Department**

343.   The implementation of the Executive Order and ARRP imminently to impose sweeping cuts at the State Department—including staff reductions in domestic offices of 15%, on top of the elimination of entire offices—will have a direct and severely detrimental impact on the federal employees who are terminated, those who remain, and their labor representatives including Plaintiff AFGE.  SEIU also represents members employed by service contractors who provide cleaning services at State Department offices, and risk losing their jobs due to the significant reduction in staff.

344.   These reductions will also cause immediate, substantial, and irreparable harm to the vital diplomatic work the Department performs.  For example, the planned reorganization eliminates numerous Special Envoys, Representatives, and Coordinators, positions that provide high-level, specialized attention to pressing issues such as climate change, global criminal justice, hostage affairs, nuclear nonproliferation and particularly geopolitically sensitive States like Iran, Sudan, and

COMPLAINT, No.                                                                                                                 91

North Korea.  The scale of the Reorganization Plan announced on April 22 will also make it

extremely hard for the employees who remain to keep the work of their offices going without severe

disruptions.

- **Department of the Treasury**

345.    The implementation of the Executive Order and ARRP to impose the planned and

ongoing 40 percent reduction to the IRS workforce will have a direct and severely detrimental impact

on the federal employees who are terminated, those who remain, and their labor representatives.

346.    The IRS plans to reduce its workforce from 102,000 employees to roughly 60,000 to

70,000, with especially high staffing cuts in taxpayer services and compliance, and to close more than

110 offices with taxpayer assistance centers.  These staffing cuts will reduce the IRS's ability to

accomplish its core functions and will directly and severely harm Plaintiff the Center for Taxpayer

Rights, the members of its LITC Connect program, the clients of its own Low Income Tax Clinic, and

taxpayers across the country.  The planned IRS staffing shortfalls will cause simple, quick cases to

snowball into labor-intensive, years-long matters for the Center's advocates, requiring more technical

assistance from the Center and leaving low-incoming taxpayers unassisted.  The Center's members

will be required to expend more resources per case and be less able to accomplish their missions.

Clients will suffer financially through delayed or denied tax refunds, the inability to reach the IRS to

stop automatic assessments, and—for some prospective clients— the inability to be served by

overwhelmed LITCs that are forced to impose client caps.

347.    These actions will also have a direct and severely detrimental impact on local

governments that interact directly with this agency and rely on its services every day, specifically

including but not limited to Plaintiff Santa Clara.  Federal law entitles local governments to

reimbursement from the IRS for certain interest payments they make on "Qualified Energy

Conservation Bonds."  For example, Plaintiff Santa Clara issued such bonds to provide low-interest

financing to promote alternative energy usage, and is therefore entitled to monthly reimbursement

payments from the IRS.  Because these reimbursements depend on staff for processing,

reorganization will likely cause slowdowns in the issuance of these reimbursement payments.

COMPLAINT, No.                                                                                                    92

348.     The Department of Treasury is also responsible for processing federal payments and disbursing them to state and local governments, including money for block grants, formula grants, and direct payments for specified use by those state and local governments.  The predicted across the board staffing cuts at the Department pose a significant threat to a functional Treasury.  With a lower-staffed Treasury Department, these payments could be delayed or stop altogether, severely harming members of AFSCME and SEIU who work in state and local government, and jeopardizing their jobs.

- **Department of Veterans Affairs**

349.     The implementation of the Executive Order and ARRP to imminently roll out the elimination of approximately 80,000 positions at the VA will directly and significantly harm the federal employees who are terminated, those who remain, and their labor representatives including Plaintiffs AFGE, AFSCME, and SEIU.

350.     This massive reorganization will also harm Plaintiffs AFSCME, SEIU, and SEIU Local 1000 and their non-federal employee members, who are employed by facilities that provide care to veterans and are operated by state government but depend on the VA to timely process government funding.

351.     These actions will also cause immediate and irreparable injuries to veterans who rely on VA services including members of Plaintiffs Common Defense and VoteVets, and to the organizational mission of those organizations.  For example, cuts to support medical and healthcare support staff, IT support, and clerical and data entry positions make it significantly more difficult for VA health care providers to do their jobs and for veterans to make medical appointments and be connected with services.  The RIFs will exacerbate staffing shortages that already exist at many VA facilities and make it harder for veterans to access health care, including mental health care, and other veterans' services including crisis support.  Cuts to research staff will also disrupt important work that benefits veterans and the public generally.  The reductions will stress understaffed veterans' hospitals and other services to the breaking point.

COMPLAINT, No.                                                                                                                93

352.    In addition, the implementation of the Executive Order and VA ARRP will have substantial and deleterious effects on the veterans living in Plaintiff cities and counties and will also impose costs and burdens on the local governments themselves, specifically including but not limited to the County of Santa Clara.

353.    For example, the delays, closures, and loss of staff at the VA—both at VA hospitals and in offices that perform centralized functions like call centers and benefits processing—will also prevent or hinder Plaintiff Santa Clara's Office of Veterans Services from doing its primary, core function of connecting veterans to the healthcare and benefits-processing staff at the VA.  Reduction in force at the VA will also impose additional burdens on hospitals, like those operated by Plaintiff Santa Clara, that operate emergency departments because delays and/or elimination of care options for veterans will make them more reliant on services provided by Plaintiff Satna Clara and other local governments such as housing support and behavioral and medical health care.  And reduced VA staff will impact Plaintiff King County's ability to serve veterans experiencing homelessness or housing instability, weakening a nationally recognized, award-winning program that had been advancing veteran support services.

## CLAIMS FOR RELIEF

### Claim I:
### Separation of Powers/*Ultra Vires*
### Against Defendant President Donald J. Trump

354.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

355.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

356.    The Constitution vests the legislative power in Congress.  U.S. Const., art. I.; *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983).  Congress exercised that Article I legislative authority to create the agencies of the federal government.  Congress has not delegated to the President the authority to employ and discharge the subordinate employees of the agencies or to spend appropriated funds on those positions; rather, it delegated those functions exclusively to the heads of federal agencies.

COMPLAINT, No.                                                                                          94

357.    From time to time in this nation's history, Congress has delegated to the President the authority to fast-track legislation proposing the reorganization of federal agencies.  But Congress has given President Trump no such authority.  While Congress has also delegated certain authorities to President Trump to enact regulations with respect to the management and conduct of the federal civil service, none of those delegations authorize the sweeping authority President Trump has claimed for himself to order agencies to engage in large-scale RIFs, eliminate programs and offices at his direction, reduce staffing to 2019 or government shutdown levels, and otherwise reorganize the federal government.

358.    The Constitution vests executive power in the President, U.S. Const., art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.  The President cannot usurp Congress's legislative authority on his own mandate; any legislative authority wielded by the President must have been delegated within the confines of the Constitutional limitations protecting the respective spheres.  The President has no constitutional power to enact, amend, or repeal parts of duly enacted statutes.  *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998).   The President lacks the constitutional or statutory authority to order large-scale terminations of federal employees, to require agencies to eliminate offices and functions, to require agencies to consider their own elimination, to move agency functions as between agencies, or otherwise to engage in large-scale government reorganization.  The President likewise has no constitutional or statutory authority to impose parameters and requirements for such RIFs and reorganizations that require agencies to defy and ignore their authorizing statutes.

359.    Executive Order 14210 exceeds the President's lawful authority, at a minimum, by ordering agencies, including but not limited to Federal Agency Defendants, to:

    a.    Implement large-scale RIFs (irrespective of whether staffing reductions are necessary or even appropriate in light of agency functions, needs, and appropriations);

    b.    Prioritize in RIFs any functions that "my Administration suspends or closes" (irrespective of statutory requirements or authority delegated to the agencies);

COMPLAINT, No.                                                                                              95

c.    Prioritize in RIFs 2019 and/or government emergency shutdown levels of staffing (aka, Funding Lapse Plan Staffing Levels, which have nothing to do with the staffing needed to properly run fully appropriated agencies);

d.    Consider their own abolition in whole or part, by addressing whether the agency or any subparts should be eliminated by the President (again, regardless of statutory requirements or authority delegated to the agencies); and

e.    Reorganize themselves by picking up and arranging the pieces that are left, following these large-scale reductions.

360.    Therefore, the President's Executive Order 14210 ordering agencies to engage in large-scale RIFs and reorganization plans, and impose hiring freezes, limits, and controls, is not authorized by Article II and usurps Congress's Article I authority, and is thus *ultra vires*.

**Claim II:**
**Separation of Powers/*Ultra Vires***
**Against Defendants OMB, OPM, DOGE and their Directors**

361.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

362.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

363.    Congress exercised its Article I legislative authority to create the agencies of the federal government.  *See generally* United States Code, Title 5 (Government Organization and Employees).  To the agency heads, Congress has also expressly delegated the power to manage the functions of the agencies, including the right to employ and discharge subordinate employees of the agencies and to spend appropriated funds on those positions.

364.    In addition to agency-specific authorizing statutes, Congress has also generally authorized the heads of administrative agencies to make employment decisions (5 U.S.C. § 3101), manage the employees of that agency (5 U.S.C. § 301), or delegate to subordinate officers the management decisions, including the hiring and firing of employees (5 U.S.C. § 302).

365.    Neither OMB, OPM nor DOGE have the statutory authority to supplant the decision-making authority of the federal agencies with respect to federal agency employment or organization;

to require agencies to take general or specific action with respect to employment or organization; or to impose substantive requirements that effectively demand agencies to disregard statutory and regulatory requirements.

366. The February 26, 2025 Memorandum from OMB and OPM to agency heads exceeds statutory authority and usurps the authority delegated by Congress to the agencies, not to OMB or OPM, by, at a minimum, requiring agencies, including but not limited to Federal Agency Defendants, to:

a. Submit ARRPs for OMB and OPM approval;

b. Include in those ARRPs large-scale RIFS (irrespective of whether staffing reductions are necessary or even appropriate in light of agency functions and appropriations);

c. Prioritize in those large-scale RIFs any functions that "[the President's] Administration suspends or closes" (irrespective of statutory requirements or authority delegated to the agencies);

d. Prioritize in those large-scale RIFs 2019 government emergency shutdown levels of staffing (which have nothing to do with the staffing needed to properly run fully appropriated agencies);

e. Include in their ARRPs consideration of their own abolition in whole or part, by addressing whether the agency or any subparts should be eliminated by the President (again, regardless of statutory requirements or authority delegated to the agencies);

f. Include in their ARRPs a plan to reorganize themselves by picking up and arranging the pieces that are left, following these large-scale reductions; and

g. Submit these plans for approval on timeframes that do not permit agencies to actually consider and assess their own needs or the staffing needed to meet their statutory responsibilities.

367. DOGE has no statutory authority. DOGE exceeds any authority it may have to implement the President's orders by usurping the authority delegated by Congress to the agencies, not to the President or DOGE. DOGE has no authority at all to dictate to the agencies created and

COMPLAINT, No.                                                                                              97

governed by Congress any level of staffing cut or spending reduction. DOGE therefore exceeds any authority by ordering agencies, including but not limited to Federal Agency Defendants, to impose cuts to functions and staffing according to "targets" and "goals" imposed by DOGE.

368.    Therefore, the actions and orders of OMB, OPM, and DOGE to implement the President's February 11, 2025 Executive Order, including but not limited to the February 26, 2025 Memorandum to all agencies, as well as any direction, approval, or requirement imposed with respect to any ARRPs that result from that Executive Order, exceed OMB, OPM, and DOGE's authority and are contrary to statute and thus *ultra vires*.

**Claim III:**
**Administrative Procedure Act, 5 U.S.C § 706(2)(A) and (C)**
**Against Defendants OMB, OPM, DOGE and their Directors**
**(Action Not in Accordance With Law and Exceeding Statutory Authority)**

369.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

370.    The Plaintiff unions' federal employee members are subject to the requirements of OMB, OPM, and DOGE actions here at issue, and all Plaintiffs (and/or their members) are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the actions of OMB and its Director, OPM and its Acting Director, and DOGE and its actual and nominal Directors, for purposes of 5 U.S.C. § 702.

371.    Congress exercised its Article I legislative authority to create the agencies of the federal government. *See generally* United States Code, Title 5 (Government Organization and Employees). To the agency heads, Congress has also expressly delegated the power to manage the functions of the agencies, including the right to employ and discharge subordinate employees of the agencies and to spend appropriated funds on those positions.

372.    In addition to specific authorizing statutes, Congress has also generally authorized the heads of administrative agencies to make employment decisions (5 U.S.C. § 3101), manage the employees of that agency (5 U.S.C. § 301), or delegate to subordinate officers the management decisions, including the hiring and firing of employees (5 U.S.C. § 302).

373.    Neither OMB, OPM nor DOGE have the statutory authority to supplant the decision-making authority of the federal agencies with respect to federal agency employment.

COMPLAINT, No.                                                                                           98

374.    The February 26, 2025 Memorandum from OMB and OPM to agency heads exceeds statutory authority and usurps the authority delegated by Congress to the agencies (including but not limited to Federal Agency Defendants), and not to OMB or OPM, by: requiring agencies to submit Agency RIF and Reorganization Plans to OMB and OPM for approval; requiring agencies to include in those plans large-scale RIFs; and imposing an assortment of other parameters and requirements, including considering Funding Lapse Plan Staffing Levels as a baseline.

375.    DOGE has no statutory authority.  DOGE exceeds any authority it may have to implement the President's orders by usurping the authority delegated by Congress to the agencies (including but not limited to Federal Agency Defendants), not to the President or DOGE.  DOGE has no authority at all to dictate to the agencies created and governed by Congress any level of staffing cut or spending reduction.

376.    Therefore, the actions and orders of OMB, OPM, and DOGE to implement the President's February 11, 2025 Executive Order, including but not limited to the February 26, 2025 Memorandum to all agencies, and any direction, approval, or requirement imposed with respect to any ARRPs that result from that Executive Order, exceed authority and are contrary to statute.

377.    OMB, OPM, and DOGE are all agencies that Congress has made subject to the APA. 5 U.S.C. § 701. OMB and OPM's issuance and implementation of the February 26, 2025 Memorandum, any decision "approving" an ARRP, and DOGE's directives ordering agencies to make staffing and spending cuts are all final agency action under the APA.  5 U.S.C. § 704.

378.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "not in accordance with law" (5 U.S.C. § 706(2)(A)), or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (5 U.S.C. § 706(2)(C)).

379.    The actions of OMB, OPM, and DOGE therefore violate the Administrative Procedure Act because they are inconsistent with law in violation of 5 U.S.C. § 706(2)(A) and exceed statutory authority in violation of 5 U.S.C. § 706(2)(C), and for those reasons are also arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

COMPLAINT, No.                                                                                              99

**Claim IV:**
**Administrative Procedure Act, 5 U.S.C § 706(2)(A)**
**Against Defendants OMB, OPM, DOGE and their Directors**
**(Arbitrary and Capricious Agency Action)**

380.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

381.    The Plaintiff unions' federal employee members are subject to the requirements of OMB, OPM, and DOGE actions here at issue, and all Plaintiffs (and/or their members) are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the actions of OMB and its Director, OPM and its Acting Director, and DOGE and its actual and nominal Directors, for purposes of 5 U.S.C. § 702.

382.    OMB, OPM, and DOGE are all agencies that Congress has made subject to the APA. 5 U.S.C. § 701. OMB and OPM's issuance and implementation of the February 26, 2025 Memorandum, any decision "approving" an ARRP, and DOGE's directives ordering agencies to make staffing and spending cuts are all final agency action under the APA.  5 U.S.C. § 704.

383.    The actions of OMB and its Director, OPM and its Acting Director, and DOGE and its actual and nominal Directors, violate the APA because they are arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), including because they: 1) order federal agencies to cede decision-making authority to OMB OPM, and/or DOGE, regardless of the requirements of any applicable statute or regulation; 2) require agencies to disregard their authorizing statutes and regulations and follow the President's unconstitutional directions and directions of OMB,OPM, and/or DOGE;  3) categorically impose requirements to engage in large-scale RIFs that are necessarily contrary to agency function and authorizing statutes and regulations; 4) categorically impose requirements to RIF employees at the President's direction, according to the offices, programs and functions the President and his Administration eliminate regardless of statute or regulation; 5) categorically require agencies to engage in RIFs that will align the agency with Funding Lapse Plan Staffing Levels, which necessarily and by definition cannot adequately staff agencies; 6) require agencies to abandoned reasoned decision-making considering all relevant factors, in service of the President's orders; 7) require agencies to act under unrealistic timeframes that necessarily will result in plans that are not supported

COMPLAINT, No.                                                                                                    100

by rational reasoning or the agency's considered judgment; and 8) require the process for the creation and approval of plans to radically transform the entire federal government to proceed in secret.

### Claim V:
### Administrative Procedure Act, 5 U.S.C § 706(2)(D)
### Against Defendants OMB, OPM, DOGE and their Directors
### (Notice and Comment)

384.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

385.   The Plaintiff unions' federal employee members are subject to the requirements of OMB, OPM, and DOGE actions here at issue, and all Plaintiffs (and/or their members) are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the actions of OMB and its Director, OPM and its Acting Director, and DOGE and its actual and nominal Directors, for purposes of 5 U.S.C. § 702.

386.   OMB, OPM, and DOGE are all agencies that Congress has made subject to the APA. 5 U.S.C. § 701.

387.   Under the APA, a court shall "hold unlawful and set aside agency action …found to be …. without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

388.   OMB and OPM's February 26, 2025 Memorandum, and any decision "approving" an ARRP, and DOGE's directives ordering agencies to make staffing and spending cuts, are all "rules" for purposes of the APA.  5 U.S.C. § 551(4).

389.   Neither OMB, nor OPM, nor DOGE, has published and provided opportunity for notice and comment on its actions pursuant to Executive Order 14210, including but not limited to the February 26, 2025 Memorandum, any decision "approving" an ARRP, or DOGE's directives ordering agencies to make staffing or spending cuts.

390.   Neither OMB nor its Director, OPM nor its Acting Director, nor DOGE and its actual and nominal Directors complied with the rule-making provisions set forth in 5 U.S.C. § 553 before issuing OMB and OPM's February 26, 2025 Memorandum.  That memorandum, as well as any decision "approving" an ARRP and DOGE's directives ordering agencies to make staffing or spending cuts, are all "rules" for purposes of the APA.  5 U.S.C. § 551(4).

391.    OMB, OPM, and DOGE's actions therefore also violate 5 U.S.C. § 706(2)(D) by failing to observe procedures required by law.

**Claim VI:**
**Administrative Procedure Act, 5 U.S.C § 706(2)(A) and (C)**
**Against Federal Agency Defendants**
**(Action Not in Accordance With Law)**

392.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

393.    The Plaintiff unions' federal employee members are subject to the requirements of Federal Agency Defendants' actions here at issue, and all Plaintiffs (and/or their members) are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the actions of the Federal Agency Defendants, for purposes of 5 U.S.C. § 702.

394.    Each Federal Agency Defendant is an agency that Congress has made subject to the APA.  5 U.S.C. § 701. The implementation of ARRPs by RIFing federal employees, closing offices, functions, and programs, and otherwise reorganizing agency functions are all final agency action under the APA.  5 U.S.C. § 704.

395.    On information and belief, each of the Federal Agency Defendants has created and submitted for OMB and OPM approval an ARRP, according to the parameters imposed by OMB, OPM and DOGE.

396.    None of the Federal Agency Defendants have the statutory authority to cede their decision-making authority with respect to the employees of that agency to the President, OMB, OPM, or DOGE.  None of the Federal Agency Defendants have the statutory authority to implement the President's unconstitutional direction to engage in large-scale RIFs, including with respect to functions, programs, or offices that *the President and those acting on his* authority have decided to cut; or to impose staffing cuts that take an agency, irrespective of duty or need, back to government-shutdown lapse levels.  The Federal Agency Defendants have exceeded their authority by implementing the President's unconstitutional plans.

397.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (5 U.S.C.

§ 706(2)(A)), or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (5 U.S.C. § 706(2)(C)).

398.    The actions of Federal Agency Defendants therefore violate the Administrative Procedure Act because they are inconsistent with law in violation of 5 U.S.C. § 706(2)(A) and exceed statutory authority in violation of 5 U.S.C. § 706(2)(C), and are for those reasons also arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

**Claim VII:**
**Administrative Procedure Act, 5 U.S.C § 706(2)(A)**
**Against Federal Agency Defendants**
**(Arbitrary and Capricious Agency Action)**

399.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

400.    The Plaintiff unions' federal employee members are subject to the requirements of Federal Agency Defendants' actions here at issue, and all Plaintiffs (and/or their members) are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the actions of the Federal Agency Defendants for purposes of 5 U.S.C. § 702.

401.    Congress made each Federal Agency Defendant subject to the APA.  5 U.S.C. § 701. The implementation of ARRPs by RIFing federal employees, closing offices, functions, and programs, and otherwise reorganizing agency functions are all final agency action under the APA.  5 U.S.C. § 704.

402.    Each of the Federal Agency Defendants has created and submitted for OMB and OPM approval an ARRP, according to the parameters imposed by OMB, OPM and DOGE.

403.    The actions of the Federal Agency Defendants, including but not limited to implementing the President's unconstitutional orders to reorganize and RIF employees, pursuant to the terms dictated by the President, violate the APA because they are arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), for reasons that include the following: they 1) cede decision-making authority to OMB and OPM, regardless of the requirements of any applicable statute; 2) disregard their authorizing statutes and follow the President's unconstitutional directions and directions of OMB and OPM;  3) engage in large-scale RIFs that are necessarily contrary to agency's ability to maintain required function and authorizing statute; 4) RIF employees at the President's

COMPLAINT, No.                                                                                                          103

direction, according to the offices, programs and functions the President and his Administration eliminate regardless of statute; 5) RIF according to Funding Lapse Plan Staffing Levels, which necessarily and by definition cannot staff agencies at the level necessary to adequately perform; 6) abandon reasoned decision-making considering all relevant factors, in service of the President's orders; 7) act under unrealistic timeframes that necessarily will result in plans that are not supported by rational reasoning or agencies' considered judgment; and 8) conduct the process for the creation and approval of plans to radically transform the entire federal government in secret.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray that this Court:

1. Declare that President Donald J. Trump has violated the United States Constitution by engaging in wholesale transformation of the federal government without any Congressional authorization by and through the Workforce Executive Order;

2. Declare that OMB, OPM, and DOGE have exceeded statutory authority and acted in an arbitrary and capricious manner and therefore acted unlawfully by ordering federal agencies to act in accordance with the President's unconstitutional mandate by and through the Workforce Executive Order and the February 26, 2025 OMB/OPM Memorandum;

3. Declare that Federal Agency Defendants have acted contrary to statutory authority and in an arbitrary and capricious manner and therefore acted unlawfully by implementing the President's unconstitutional Workforce Executive Order and the February 26, 2025 OMB/OPM Memorandum to reorganize the federal government and RIF large numbers of federal employees, without Congressional authorization;

4. Vacate the February 11, 2025 Workforce Executive Order, the February 26, 2025 OMB and OPM Memorandum implementing that order; any and all approvals or exemptions awarded by OMB, OPM, or DOGE; any and all orders by OMB, OPM, or DOGE with respect to federal agency ARRPs; and the ARRPs; and issue all necessary and appropriate

COMPLAINT, No.                                                                                                      104

process to preserve status or rights pending conclusion of the review proceedings under 5 U.S.C. § 705;

5. Temporarily restrain and enjoin the Defendants from implementing or enforcing the February 11, 2025 Workforce Executive Order; the February 26, 2025 OMB and OPM Memorandum implementing that order; any and all approvals or exemptions awarded by OMB, OPM, or DOGE; any and all orders by OMB, OPM, or DOGE with respect to federal agency ARRPs; and the ARRPs, pending further orders from this Court;

6. Pursuant to 5 U.S.C. § 706, vacate, hold unlawful and set aside the February 11, 2025 Workforce Executive Order; the February 26, 2025 OMB and OPM Memorandum implementing that order; any and all approvals or exemptions awarded by OMB, OPM, or DOGE; any and all orders by OMB, OPM, or DOGE with respect to federal agency ARRPS; and the ARRPs;

7. Enter preliminary and/ permanent injunctive relief;

8. Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements as appropriate; and

9. Grant such other relief as this Court may deem proper.

DATED: April 28, 2025

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
Corinne Johnson
Alice X. Wang
Robin S. Tholin
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
sleyton@altshulerberzon.com
bchisholm@altshulerberzon.com
dleonard@altshulerberzon.com

By: */s/ Danielle Leonard*

*Attorneys for All Union and Non-Profit Organization Plaintiffs*

1

2    Elena Goldstein (pro hac vice app. forthcoming)
     Skye Perryman (pro hac vice app. forthcoming)
3    DEMOCRACY FORWARD FOUNDATION
     P.O. Box 34553
4    Washington, D.C. 20043
     Tel: (202) 448-9090
5    Fax: (202) 796-4426
     egoldstein@democracyforward.org
6    sperryman@democracyforward.org

7    By: */s/ Elena Goldstein*

8

9    *Attorneys for All Union and Non-Profit Organization*
     *Plaintiffs (except NRDC) and for Plaintiffs City of*
10   *Chicago, IL; Martin Luther King, Jr. County, WA;*
     *Harris County, TX; and City of Baltimore, MD*

11

12   Jules Torti (pro hac vice app. forthcoming)
     PROTECT DEMOCRACY PROJECT
13   82 Nassau St., #601
     New York, NY 10038
14

15   Erica J. Newland (pro hac vice app. forthcoming)
     Jacek Pruski (pro hac vice app. forthcoming)
16   PROTECT DEMOCRACY PROJECT
     2020 Pennsylvania Ave., N.W., Suite 163
17   Washington, D.C. 20006
     Tel: 202-579-4582
18   jules.torti@protectdemocracy.org
     erica.newland@protectdemocracy.org
19   jacek.pruski@protectdemocracy.org

20

21   By: */s/ Jules Torti*

22   *Attorneys for All Union and Non-Profit Organization*
     *Plaintiffs (except NRDC)*

23

24   Norman L. Eisen (pro hac vice app. forthcoming)
     Spencer W. Klein (pro hac vice app. forthcoming)
25   STATE DEMOCRACY DEFENDERS FUND
     600 Pennsylvania Avenue SE #15180
26   Washington, D.C. 20003
     Tel: (202) 594-9958
27   Norman@statedemocracydefenders.org

28

COMPLAINT, No.                                                    106

1

Spencer@statedemocracydefenders.org

2

By: */s/ Norman L. Eisen*

3

*Attorneys for All Union and Non-Profit Organization*
*Plaintiffs (except NRDC)*

4

5

6

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

7

8

9

10

By: */s/ Rushab Sanghvi*

11

*Attorneys for Plaintiffs American Federation of*
*Government Employees, AFL-CIO (AFGE) and AFGE*
*locals*

12

13

14

Teague Paterson (SBN 226659)
Matthew Blumin  (pro hac vice app. forthcoming)
AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

15

16

17

18

19

20

By: */s/Teague Paterson*

21

*Attorneys for Plaintiff American Federation of State*
*County and Municipal Employees, AFL-CIO (AFSCME)*

22

23

24

Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL UNION,
AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

25

26

27

28

COMPLAINT, No.

107

By: _/s/ Steven K. Ury_

Attorneys for Plaintiff Service Employees International
Union, AFL-CIO (SEIU)


David Chiu (SBN 189542)
City Attorney
Yvonne R. Meré (SBN 175394)
Chief Deputy City Attorney
Mollie M. Lee (SBN 251404)
Chief of Strategic Advocacy
Sara J. Eisenberg (SBN 269303)
Chief of Complex and Affirmative Litigation
Molly J. Alarcon (SBN 315244)
Alexander J. Holtzman (SBN 311813)
Deputy City Attorneys
OFFICE OF THE CITY ATTORNEY FOR THE CITY
AND COUNTY OF SAN FRANCISCO
1390 Market Street, 7th Floor
San Francisco, CA 94102
molly.alarcon@sfcityatty.org
alexander.holtzman@sfcityatty.org

By:  _/s/ David Chiu_
David Chiu
City Attorney

Attorneys for Plaintiff City and County of San Francisco


Tony LoPresti (SBN 289269)
COUNTY COUNSEL
Kavita Narayan (SBN 264191)
Meredith A. Johnson (SBN 291018)
Raphael N. Rajendra (SBN 255096)
Hannah M. Godbey (SBN 334475)
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, 9th Floor
San José, CA 95110
Tel: (408) 299-5900

By:  _/s/ Tony LoPresti_

Attorneys for Plaintiff County of Santa Clara, Calif.

COMPLAINT, No.                                                                           108

1

2      David J. Hackett (pro hac vice  app. forthcoming)
       General Counsel to King County Executive & Special
3      Deputy Prosecutor
       Alison Holcomb (pro hac vice app. forthcoming)
4      Deputy General Counsel to King County Executive &
       Special Deputy Prosecutor
5      Erin King-Clancy (pro hac vice app. forthcoming)
       Senior Deputy Prosecuting Attorney
6      OFFICE OF KING COUNTY PROSECUTING
       ATTORNEY LEESA MANION
7      401 5th Avenue, Suite 800
       Seattle, WA 98104
8      (206) 477-9483
       David.Hackett@kingcounty.gov
9      aholcomb@kingcounty.gov
       aclancy@kingcounty.gov
10

11     By: /s/ David J. Hackett

12     David J. Hackett

13     *Attorneys for Plaintiff Martin Luther King, Jr. County*

14     Jill Habig (SBN 268770)
15     PUBLIC RIGHTS PROJECT
       490 43rd Street, Unit #115
16     Oakland, CA 94609
       Tel: (510) 738-6788
17     jill@publicrightsproject.org

18     By: /s/ Jill Habig

19
       *Attorneys for Plaintiffs Baltimore, MD, Chicago, IL,*
20     *Harris County, TX, and King County, WA*

21

22     Christian D. Menefee
       Harris County Attorney
23
       Jonathan G.C. Fombonne (pro hac vice app. forthcoming)
24     Deputy County Attorney and First Assistant
       Tiffany Bingham (pro hac vice app. forthcoming)
25     Managing Counsel
       Sarah Utley (pro hac vice app. forthcoming)
26     Division Director – Environmental Division
       Bethany Dwyer (pro hac vice app. forthcoming)
27     Deputy Division Director - Environmental Division

28
       COMPLAINT, No.                                              109

R. Chan Tysor (pro hac vice app. forthcoming)
Senior Assistant County Attorney
Alexandra "Alex" Keiser (pro hac vice app. forthcoming)
Assistant County Attorney
1019 Congress, 15th Floor
Houston, Texas 77002
Tel: (713) 274-5102
Fax: (713) 437-4211

jonathan.fombonne@harriscountytx.gov
tiffany.bingham@harriscountytx.gov
sarah.utley@harriscountytx.gov
bethany.dwyer@harriscountytx.gov
chan.tysor@harriscountytx.gov
alex.keiser@harriscountytx.gov

By: */s/ Jonathan G.C. Fombonne*
Jonathan G.C. Fombonne

*Attorneys for Plaintiff Harris County, Texas*

Mary B. Richardson-Lowry,
Corporation Counsel of the City of Chicago

Stephen J. Kane (IL ARDC 6272490) (pro hac vice app. forthcoming)
Rebecca A. Hirsch (IL ARDC 6279592) (pro hac app. forthcoming)
Lucy Prather (IL ARDC 6337780) (pro hac vice app. forthcoming)
City of Chicago Department of Law,
Affirmative Litigation Division
121 N LaSalle Street, Suite 600
Chicago, Illinois 60602
Tel: (312) 744-6934
Stephen.kane@cityofchicago.org
Rebecca.Hirsch2@cityofchicago.org
Lucy.Prather@cityofchicago.org

By:      */s/Stephen J. Kane*
         Stephen J. Kane

*Attorneys for Plaintiff City of Chicago*

COMPLAINT, No.                                                      110

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ebony M. Thompson
Baltimore City Solicitor

Sara Gross (pro hac vice app. forthcoming)
Chief of Affirmative Litigation
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Tel: (410) 396-3947
sara.gross@baltimorecity.gov

By: _/s/  Sara Gross_____

*Attorneys for Plaintiff City of Baltimore*