Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle E. Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs*

[*Additional counsel and affiliations identified on signature page*]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 3:25-cv-03698-SI |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 6

I.    Congressional Authorization Before Government Reorganization ....................... 6

      A.    History of Presidential Reorganization .............................................. 6
      B.    Last Operative Authorization of "Reorganization" Authority .................. 8
      C.    President Trump's Unsuccessful First-Term Reorganization .................... 8

II.   Defendants Are Reorganizing the Federal Government Without
      Congressional Authorization ........................................................................ 9

      A.    President Trump Has Ordered a Massive "Transformation" of
            Agencies ........................................................................................ 9
      B.    OMB, OPM, and DOGE Are Executing the President's
            Reorganization Orders .................................................................... 10
      C.    The Trump Administration is Hiding its Reorganization Plans from
            the Public ...................................................................................... 11

III.  Restructuring and RIFs at Agencies Are Causing Widespread Irreparable
      Harm ......................................................................................................... 12

            1.    AmeriCorps ........................................................................... 14
            2.    Agriculture ............................................................................ 14
            3.    Commerce ............................................................................. 15
            4.    Energy .................................................................................. 16
            5.    Environmental Protection Agency (EPA) ................................. 17
            6.    General Services Administration (GSA) ................................... 18
            7.    Health and Human Services (HHS) ......................................... 18
            8.    Housing and Urban Development (HUD) ................................. 21
            9.    Interior ................................................................................. 21
            10.   Labor .................................................................................... 23
            11.   National Labor Relations Board (NLRB) .................................. 23
            12.   National Science Foundation (NSF) ........................................ 24
            13.   Small Business Administration (SBA) ..................................... 24
            14.   Social Security Administration (SSA) ..................................... 25
            15.   State ..................................................................................... 26
            16.   Treasury ................................................................................ 27
            17.   Veterans Administration (VA) ................................................ 28

ARGUMENT ................................................................................................................ 29

I.     This Court Should Enjoin Defendants' Implementation of Executive Order
       14210 and the Resulting Agency RIF and Reorganization Plans ........................ 29

       A.    Plaintiffs Are Likely to Succeed on Merits of Their Claims that the
             Executive Order and Agency Implementation are Unlawful ................................. 29

             1.   Executive Order 14210 Violates Separation of Powers and is
                  *Ultra Vires* ............................................................................................... 29
                  a.   The President Has No Article II Authority to Reorganize
                       Agencies ........................................................................................... 29
                  b.   The President Has No Statutory Authority to Restructure
                       Agencies ........................................................................................... 32
             2.   OPM's, OMB's, and DOGE's Actions Implementing Executive
                  Order 14210 Exceed Statutory Authority and Are *Ultra Vires* ....................... 35
                  a.   OMB ................................................................................................. 35
                  b.   OPM ................................................................................................. 36
                  c.   DOGE ............................................................................................... 36
             3.   OPM's, OMB's, and DOGE's Actions Implementing Executive
                  Order 14210 Also Violate the APA .............................................................. 37
                  a.   The OPM, OMB and DOGE actions exceed statutory
                       authority ........................................................................................... 38
                  b.   The OPM, OMB, and DOGE actions are arbitrary and
                       capricious ......................................................................................... 38
                  c.   OPM and OMB failed to comply with notice-and-comment
                       rulemaking ....................................................................................... 41
             4.   Federal Agency Defendants Also Violate the APA ......................................... 42
             5.   This Court Has Jurisdiction to Hear These Claims ........................................ 44
                  a.   All Plaintiffs Have Article III Standing ..................................................... 44
                  b.   No Plaintiff is Required to Channel These Claims ....................................... 46

       B.    Defendants Are Causing, and Will Continue to Cause, Irreparable
             Harm .............................................................................................................. 48

       C.    The Balance of Equities and Public Interest Weigh in Plaintiffs'
             Favor .............................................................................................................. 50

II.    Scope of the Order: Require an Immediate Halt to Approvals and the
       ARRPs ..................................................................................................................... 50

CONCLUSION ............................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AFGE v. OPM.*,
  2025 WL 914823 (9th Cir. Mar. 26, 2025) ........................................................... 48

*AFGE v. OPM*,
  N.D. Cal. Case No. 3:25-cv-01780-WHA (N.D. Cal.) ................................... *passim*

*AFL-CIO v. Dep't of Labor*,
  2025 WL 1129227 (D.D.C. Apr. 16, 2025)........................................................ *passim*

*AFSCME v. Soc. Sec. Admin.*,
  2025 WL 868953 (D. Md. Mar. 20, 2025) ........................................... 11, 37, 41

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
  2025 WL 485324 (D.D.C. Feb. 13, 2025)........................................................ 35

*Aids Vaccine Advoc. Coal. v. United States Dep't of State*,
  2025 WL 752378 (D.D.C. Mar. 10, 2025) ...................................................... 34

*Axon Enters., Inc. v. FTC*,
  598 U.S. 175 (2023) ...................................................................... 47, 48

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...................................................................... 38

*Biden v. Texas*,
  597 U.S. 785 (2022) ...................................................................... 38

*Bowsher v. Synar*,
  478 U.S. 714 (1986) ....................................................................... 2

*Chamber of Com. of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996).............................................................. 35

*Chief Prob. Officers of Cal. v. Shalala*,
  118 F.3d 1327 (9th Cir. 1997) ............................................................. 42

*City & Cnty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ............................................................ 39

*City of Sausalito v. O'Neill*,
  386 F.3d 1186 (9th Cir. 2004) ............................................................ 46

*Clapper v. Amnesty International USA*,
  568 U.S. 398 (2013) ...................................................................... 46

*Clarke v. Office of Fed. Hous. Enter. Oversight*,
   355 F.Supp.2d 56 (D.D.C. 2004)..................................................................50

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ..................................................................30, 33

*Cnty. of Santa Clara v. Trump*,
   250 F.Supp.3d 497 (N.D. Cal. 2017)..................................................................49

*Colwell v. Dep't of Health & Hum. Servs.*,
   558 F.3d 1112 (9th Cir. 2009) ..................................................................41

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ..................................................................38, 39, 42, 43

*Elgin v. Dep't of the Treasury*,
   567 U.S. 1 (2012) ..................................................................47

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ..................................................................43

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
   36 F.4th 850 (9th Cir. 2022) ..................................................................38

*Eurofins Elec. & Elec. Testing NA, LLC v. SGS N. Am. Inc.*,
   2024 WL 4453315 (N.D. Cal. Oct. 8, 2024) ..................................................................50

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ..................................................................38, 39

*Feds for Med. Freedom v. Biden*,
   63 F.4th 366 (5th Cir.) (en banc), *judgment vac'd on other grounds*, 144 S. Ct. 480
   (2023) ..................................................................48

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
   82 F.4th 664 (9th Cir. 2023) ..................................................................44, 45, 50

*Food & Drug Admin. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ..................................................................45

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
   561 U.S. 477 (2010) ..................................................................29, 31

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
   512 F.3d 1112 (9th Cir. 2008) ..................................................................49

*Goto.com, Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000) ..................................................................50

*Hemp Indus. Ass'n v. Drug Enf't Admin.*,
  333 F.3d 1082 (9th Cir. 2003) ................................................................................... 41

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935) ................................................................................................... 31

*INS v. Chadha*,
  462 U.S. 919 (1983) ..................................................................................... 2, 7, 29

*Kaweah Delta Health Care Dist. v. Becerra*,
  123 F.4th 939 (9th Cir. 2024) ................................................................................... 38

*League of California Cities v. FCC*,
  118 F.4th 995 (9th Cir. 2024) ............................................................................ 40, 43

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
  752 F.3d 755 (9th Cir. 2014) ................................................................................... 49

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024) ................................................................................................... 47

*Lopez v. Heckler*,
  713 F.2d 1432 (9th Cir. 1983) ................................................................................. 49

*Marbury v. Madison*,
  5 U.S. 137 (1803) ....................................................................................................... 30

*Maryland v. USDA*,
  2025 WL 973159 (D. Md. Apr. 1, 2025) ................................................................. 48

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ................................................................................... 49

*Mims v. Arrow Fin. Servs., LLC*,
  565 U.S. 368 (2012) ................................................................................................... 47

*Morrison v. Olson*,
  487 U.S. 654 (1988) ................................................................................................... 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................................................................................... 39

*Mt. Diablo Hosp. v. Shalala*,
  3 F.3d 1226 (9th Cir. 1993) ..................................................................................... 39

*Murphy Co. v. Biden*,
  65 F.4th 1122 (2023) ................................................................................................. 35

*Myers v. United States*,
  272 U.S. 52 (1926) ..................................................................................... 2, 29, 30

*Nat'l Ass'n of Mfrs. v. United States Dep't of Homeland Sec.*,
   491 F.Supp.3d 549 (N.D. Cal. 2020) ........................................................ 32

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
   2025 WL 597959 (D.D.C. Feb. 25, 2025) ..........................................*passim*

*Nat'l Council of Nonprofits v. OMB*,
   2025 WL 368852 (D.D.C. Feb. 3, 2025) ............................................. 34, 44

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*,
   595 U.S. 109 (2022) ....................................................................... 2, 29

*Nat'l Urb. League v. Ross*,
   977 F.3d 770 (9th Cir. 2020). But the Order ....................................... 42, 43

*New York v. Trump*,
   133 F.4th 51 (1st Cir. 2025) ............................................................ 37, 1

*New York v. Trump*,
   2025 WL 1098966 (D.R.I. Jan. 28, 2025) ................................................ 35

*New York v. Trump*,
   2025 WL 357368 (D.R.I. Jan. 31, 2025) .................................................. 34

*Northwest Env't Advocates v. E.P.A.*,
   537 F.3d 1006 (9th Cir. 2008) ............................................................ 38

*NTEU and Dep't of Treasury, IRS*,
   60 F.L.R.A. 783 (2005) .................................................................... 47

*NTEU v. Helfer*,
   53 F.3d 1289 (D.C. Cir. 1995) (OPM) ................................................... 37

*NTEU v. Newman*,
   768 F.Supp. 8 (D.D.C. 1991) ............................................................. 50

*NTEU v. Trump.*,
   2025 WL 561080 (D.D.C. Feb. 20, 2025) ............................................... 48

*NTEU v. U.S. Dep't of Treasury*,
   838 F. Supp. 631 (D.D.C. 1993) ......................................................... 50

*NTEU v. Vought*,
   2025 WL 942772 (D.D.C. Mar. 28, 2025) ............................................ 9, 31

*NTEU v. Vought*,
   D.C. Cir. Case No. 25-5091 (Apr. 28, 2025) ............................................. 1

*OPM v. AFGE*,
   2025 WL 1035208 (U.S. Apr. 8, 2025) .................................................. 48

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
    465 F.3d 977 (9th Cir. 2006) ........................................................................ 38

*Pacito v. Trump*,
    2025 WL 655075 (W.D. Wash. Feb. 28, 2025) ........................................... 35

*Pangea Legal Servs. v. U.S. Dep't of Homeland Security*,
    512 F.Supp.3d 966 (N.D. Cal. 2021) ........................................................... 49

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ...................................................................................... 41

*PFLAG, Inc. v. Trump*,
    2025 WL 685124 (D. Md. Mar. 4, 2025) ..................................................... 34

*Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*,
    128 F.4th 1089 (9th Cir. 2025) .............................................................. 37, 38

*Robins v. Spokeo*,
    867 F.3d 1108 (9th Cir. 2017) ..................................................................... 46

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ..................................................................... 49

*San Diego Cnty. Credit Union v. Citizens Equity-First Credit Union*,
    65 F.4th 1012 (9th Cir. 2023) ...................................................................... 46

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020) ................................................................................ 30, 31

*Sierra Club v. Trump*,
    929 F.3d 670 (9th Cir. 2019) ....................................................................... 35

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir. 2020), *judgment vacated on other grounds, sub nom. Biden v. Sierra Club*, 142 S.Ct. 46 (2021) ........................................................... 35

*State v. Su*,
    121 F.4th 1 (9th Cir. 2024) ..................................................................... 37, 43

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ..................................................................................... 46

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ..................................................................................... 47

*Townley v. Miller*,
    722 F.3d 1128 (9th Cir. 2013) ..................................................................... 44

*United States v. Perkins*,
   116 U.S. 483 (1886) ...................................................................................................31

*Veit v. Heckler*,
   746 F.2d 508 (9th Cir. 1984) .....................................................................................48

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ...................................................................................49

*Widakuswara v. Lake*,
   2025 WL 1166400 (D.D.C. Apr. 22, 2025).................................................34, 44, 48

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .......................................................................................................29

*Wolford v. Lopez*,
   116 F.4th 959 (9th Cir. 2024).....................................................................................50

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) .........................................................................................2, 29, 30


**U.S. Constitution**

U.S. Const. Article I, §1 ......................................................................................................29

U.S. Const. Article I, §8 ......................................................................................................29

U.S. Const. Article II §1 ......................................................................................................30

U.S. Const. Article II, §2 .....................................................................................................31

U.S. Const. Article II, §3 .....................................................................................................30


**Federal Statutes**

5 U.S.C. §101 ......................................................................................................................30

5 U.S.C. §104 ......................................................................................................................30

5 U.S.C. §105 ......................................................................................................................30

5 U.S.C. §551(4) .................................................................................................................41

5 U.S.C. §553 ......................................................................................................................41

5 U.S.C. §701(b)(1) .............................................................................................................37

5 U.S.C. §704 ......................................................................................................................37

5 U.S.C. §706(2) ................................................................................................ 4, 38, 42

5 U.S.C. §§901-912 ...................................................................................... *passim*

5 U.S.C. §§1101-1105 .............................................................................. 33, 36, 41

5 U.S.C. §2301 ......................................................................................................... 32

5 U.S.C. §3101 ......................................................................................................... 32

5 U.S.C. §3502 .................................................................................................. 33, 36

5 U.S.C. §7117(a)(1) ............................................................................................. 47

5 U.S.C. §7701 ......................................................................................................... 47

6 U.S.C. §542 ........................................................................................................... 34

10 U.S.C. §111 ......................................................................................................... 30

10 U.S.C. §113 ......................................................................................................... 30

26 U.S.C. §7802(d)(3)(C) ..................................................................................... 33

28 U.S.C. §1331 ...................................................................................................... 47

31 U.S.C. §501-507 ................................................................................................ 35

31 U.S.C. §503 .................................................................................................. 35, 36

31 U.S.C. §1512 ...................................................................................................... 36

38 U.S.C. §301 ......................................................................................................... 30

38 U.S.C. §303 ......................................................................................................... 30

38 U.S.C. §510 ......................................................................................................... 34

42 U.S.C. §202 ......................................................................................................... 30

42 U.S.C. §203 ......................................................................................................... 30

42 U.S.C. §281 ......................................................................................................... 33

42 U.S.C §282 .......................................................................................................... 30

42 U.S.C. §7131 ...................................................................................................... 30

42 U.S.C. §8819 ...................................................................................................... 34

**Federal Regulations**

1 C.F.R. §19.2.................................................................................................35

**Federal Rules**

Fed. R. Civ. P. 26(d)....................................................................................50, 51

Fed. R. Civ. P. 65 ............................................................................................29

**Executive Orders and Other Admin Materials**

Exec. Order No. 13781, 82 Fed. Reg. 13959 (Mar. 13, 2017) .........................8

Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ...........................9

Exec. Order No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025) ...........................9

Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025).................... *passim*

Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025)......................1, 9

Exec. Order No. 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025)...........................1

Exec. Order No. 14238, 90 Fed. Reg 13043 (Mar. 14, 2025) .........................9

Exec. Order No. 14242, 90 Fed. Reg. 13679 (Mar. 20, 2025) ........................9

*Limitations on Presidential Power to Create A New Exec. Branch Entity to Receive &*
*Administer Funds Under Foreign Aid Legis.,*
9 Op. O.L.C. 76 (O.L.C. 1985)..............................................................31

*President's Authority To Promulgate a Reorganization Plan Involving the Equal*
*Employment Opportunity*
*Commission*, Op. O.L.C. 248, 250 (1977)............................................31

**INTRODUCTION**

In the first three months of his second term, President Donald J. Trump has engaged in an unprecedented campaign to radically restructure and dismantle the federal government, in disregard of constitutional limits on executive power.  The President calls this "large scale structural reform" the "Manhattan Project of our time."[1]  As part of this plan, the President issued Executive Order 14210, which exceeds his lawful authority by directing the restructuring of entire agencies, the elimination of programs and functions, and the drastic reduction of the number of employees within every agency, all without *any* Congressional authorization.[2]  This TRO motion seeks to preserve the status quo by enjoining the currently ongoing implementation of that Executive Order.

President Trump has neither constitutional authority nor Congressional authorization to effectuate a government-wide reorganization and direct massive federal employee layoffs in service of that reorganization, either across or within agencies, and any attempt to implement such radical

---

[1] Statement by President-elect Donald J. Trump announcing Department of Government Efficiency,  The American Presidency Project (Nov. 12, 2024), available at: https://www.presidency.ucsb.edu/documents/statement-president-elect-donald-j-trump-announcing-that-elon-musk-and-vivek-ramaswamy.  *See also*:

- "**It is the policy of my Administration … to commence the deconstruction of the overbearing and burdensome administrative state**."  Exec. Order No. 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025) (Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative);

- "**It is the policy of my Administration to dramatically reduce the size of the Federal Government, while increasing its accountability to the American people**."  Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025) (Commencing the Reduction of the Federal Bureaucracy); and

- "**I got elected on the basis of making our government stronger and smaller, because we have millions of people that — obviously, they're paying millions of people that shouldn't be paid**."  Remarks by President after Executive Order Signing, The White House (Feb. 18, 2025).

[2] Other actions taken as part of this "policy" of radical transformation of the government have included an attempt to halt *all* spending, the elimination of entire agencies, termination of government property leases and sale of government property, as well as cancellation of government contracts and grants.  The Executive Order enlisting the Office of Management and Budget to halt federal spending has been enjoined as unlawful by two courts.  *New York v. Trump*, 133 F.4th 51, 70 (1st Cir. 2025); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, -- F.Supp.3d --, 2025 WL 597959, at *7 (D.D.C. Feb. 25, 2025).  Efforts to dismantle certain specific agencies have also been enjoined.  *E.g.*, *NTEU v. Vought*, D.C. Cir. Case No. 25-5091 (Apr. 28, 2025) (reversing partial stay of preliminary injunction against further RIFs and terminations of CFPB employees so that court can "carefully consider the separation-of-powers and other arguments raised by the parties").

restructuring is entirely *ultra vires*.  "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  Since the founding of this nation, federal courts have recognized that the Constitution gives the legislative power to create, regulate, and restructure federal agencies to Congress—*not* to the President:  "To Congress under its legislative power is given the establishment of offices … [and] the determination of their functions and jurisdiction."  *Myers v. United States*, 272 U.S. 52, 129 (1926); *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022) (federal agencies are "creatures of statute").

While Congress may choose at times to delegate to the President some of its statutory power with respect to agencies, it has not done so here.  The President exceeds his constitutional authority when he unilaterally assumes and exercises the authority to recreate federal agencies in the manner *he* sees fit, without that legislative authorization.  *Youngstown,* 343 U.S. at 587 ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. … And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute.").  And when the President does so across *every federal agency*, he threatens the nation's constitutional foundations:  "There can be no liberty where the legislative and executive powers are united in the same person."  *Bowsher v. Synar*, 478 U.S. 714, 721-22 (1986) (quoting James Madison in The Federalist No. 47, p. 325 (J. Cooke ed. 1961)).[3]  Thus, for at least 100 years, when Presidents have sought to restructure the government by reorganizing both between and within federal agencies, they have universally obtained Congressional authorization to do so.  *See* Cong. Rsch. Serv., RL31446, *Reorganizing the Executive Branch in the 20th Century: Landmark Commissions* (2002); Heritage Foundation Legal Mem. No. 210, *infra* n.3.

---

[3] *See also* Paul J. Larkin, Jr. & John-Michael Seibler, *The President's Reorganization Authority*, Heritage Foundation Legal Memorandum No. 210, at 1, 3 (July 12, 2017) ("The President may create, reorganize, or abolish an office that he established, but he cannot fundamentally reorganize the executive branch in direct violation of an act of Congress. ... *[T]he President does not have constitutional authority to reorganize the executive branch on his own*." (emphasis added); *accord* John W. York & Rachel Greszler, *A Model for Executive Reorganization*, Heritage Foundation Legal Memorandum No. 4782, at 1-2 (Nov. 3, 2017) (recognizing that "[s]ince [*INS v.*] *Chadha*, [462 U.S. 919 (1983)], sweeping reorganization of the federal bureaucracy requires the active participation of Congress."), both available at:  www.heritage.org.

1    Despite these limits on Presidential authority, Executive Order No. 14210 was issued on

2  February 11, 2025, to "*commence a critical transformation of the Federal bureaucracy*."  Exec.

3  Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (*Implementing the President's "Department of

4  Government Efficiency" Workforce Optimization Initiative*, hereinafter "Workforce Executive Order"

5  (emphasis added)*, attached as App. A.  It directs all federal agencies to "eliminat[e] waste, bloat, and

6  insularity" by immediately engaging in "large-scale reductions-in-force (RIFs)" in furtherance of

7  government "reorganization."  *Id*.  While superficially ordering agencies to act "consistent with

8  applicable law," *id.*, the President orders agencies to immediately take actions that the President has

9  no authority to direct—and which are necessarily inconsistent with the obligation of federal agencies

10  faithfully to adhere to their authorizing statutes and appropriations, and to engage in considered and

11  rational decision-making consistent with those statutes and the needs of the agencies.  This Executive

12  Order is plainly ultra vires.

13    Further, the President has enlisted three agencies, the Office of Management and Budget

14  ("OMB"), Office of Personnel Management ("OPM"), and newly created Department of Government

15  Efficiency ("DOGE"), to implement this unlawful Executive Order.  OMB, OPM, and DOGE have

16  assumed decision-making power with respect to the Order's implementation.  OMB and OPM swiftly

17  required all federal agencies to submit "Agency RIF and Reorganization Plans" ("ARRPs") designed

18  to implement the Executive Order *for OMB and OPM approval* by two deadlines: March 13 and

19  April 14, 2025.  *See* Feb. 26, 2025 OMB and OPM Memorandum (attached hereto as App. B).

20  Cabinet-level departments and other federal agencies were thus given mere *weeks* to address how to

21  enact the President's "large-scale" RIFs (including, per the Executive Order, cutting any programs or

22  functions "my Administration" decides to eliminate) and to propose a reorganization of whatever

23  agency functions remain (including "[w]hether the agency or any of its subcomponents should be

24  *eliminated or consolidated*").  *Id.* at 4 (implementing App. A, Sec. 3(c) and (e)) (emphasis added).

25    By conditioning ARRPs on OMB and OPM approval, OMB and OPM have usurped the

26  agencies' ultimate decision-making power.  DOGE, for its part, is imposing and enforcing directives

27  for agencies to cut spending on staff and programs and eliminate offices deemed contrary to the

28  President's policy vision.  OMB, OPM, and DOGE have taken these actions largely in secret,

refusing to reveal the ARRPs to employees, their labor representatives, the public, or Congress. OMB, OPM, and DOGE's actions are in excess of any authority, arbitrary and capricious, and flaunt rule-making requirements, and violate the Administrative Procedure Act ("APA"), 5 U.S.C. §706(2)(A), (C), (D).  Plaintiffs seek to enjoin OMB, OPM, and DOGE from further unlawful action.

What information has become public makes clear that implementation of those ARRPs, including through large-scale RIFs and reorganizations ordered by the President and approved by OMB and OPM, and with cuts directed by DOGE, is now ongoing or imminent across the federal government.  The evidence collected by Plaintiffs eliminates any doubt that the agencies are acting according to the President's unlawful directive as executed by OMB, OPM, and DOGE, not based on their own independent analysis or reasoned decision-making with respect to their myriad and complex statutory obligations and agency functions.

The radical restructuring of agencies and the attendant harms are addressed below, agency-by-agency.  Just by way of example, on March 27, 2025, the Department of Health and Human Services ("HHS") announced a "transformation" of the department that includes a "reduction in workforce of about 10,000 full-time employees" (with more to come), across agencies performing important medical, public health, and scientific work (the Center for Disease Control ("CDC"); the Food and Drug Administration ("FDA"); National Institutes of Health ("NIH"); Community Health Service ("CHS")).[4]  As HHS explained, *The restructuring of HHS is proceeding in accordance with President Trump's Executive Order…* ."[5]  Secretary Kennedy further admitted that the restructuring was directed not only by the President's Executive Order but also by DOGE, and did not take into account the proper function and requirements of the agency:

> "Personnel that should not have been cut, were cut," Kennedy told reporters on Thursday. "We're reinstating them. *And that was always the plan. Part of the Doge, we talked about this from the beginning, is we're going to do 80% cuts, but 20% of*

---

[4] Press Release, U.S. Dep't of Health & Hum. Servs., *HHS announces transformation to make America healthy again* (Mar. 27, 2025).  The Department's chosen url says it all: https://www.hhs.gov/press-room/**hhs-restructuring-doge**.html (emphasis added).

[5] U.S. Dep't of Health & Hum. Servs., *Fact Sheet: HHS' transformation to make America healthy again* (Mar. 27, 2025) (emphasis added), available at:  https://www.hhs.gov/press-room/hhs-restructuring-doge-fact-sheet.html.

*those are going to have to be reinstated, because we'll make mistakes*."[6]

As Secretary Kennedy further revealed, these Administration-ordered cuts terminated, among other functions, the *entire office* at the CDC that monitors lead exposure in children (the Lead Poisoning Prevention and Surveillance Branch).[7]

Other Departments and agencies are marching in line to implement the President's unconstitutional orders:   The Small Business Administration ("SBA") announced that pursuant to the Executive Order it "will reduce its workforce by 43 including by "eliminating non-essential roles."[8] The Department of Veterans Affairs ("VA") revealed in an internal memorandum that it would implement the President's Executive Order by returning to 2019 staffing levels and cutting 80,000 jobs.[9]  When asked about this, VA Secretary Doug Collins confirmed he too was following orders:

> "So, the 80,000 number that has come out, is that number already done? Have you already decided who to let go?" Fox's Brian Kilmeade questioned.
>  *"No, that is a goal that was put out ... [as] President Trump and [the Office of Personnel Management] have said let's look at a reduction in force across government*," Collins replied. "*And that is a goal, that is our target.*" (*Id.*)

Plaintiffs set forth below, and extensively catalogued (Compl. ¶¶189-261) the currently available information regarding implementation of these ARRPs.  These agency actions pursuant to this Executive Order are also arbitrary and capricious in violation of the APA, 5 U.S.C. §706(2)(A),(C).

The size and scale of the destruction and harm caused by the Workforce Executive Order cannot be overstated.  The ill-considered actions at HHS alone have disrupted tens of thousands of lives and irreplaceable scientific research, and threatened the health, safety, and well-being of Plaintiffs and their members and the communities they serve.  The estimates of federal employees actually or imminently affected by this Executive Order, by losing their jobs and their benefits, are in

---

[6] The Guardian, *RFK Jr says 20% of Doge's health agency job cuts were mistakes* (April 4, 2025) (emphasis added), available at:  https://www.theguardian.com/us-news/2025/apr/04/rfk-jr-doge-cuts.

[7] CBS News, *RFK Jr. says 20% of health agency layoffs could be mistakes* (April 3, 2025), available at:  https://www.cbsnews.com/amp/news/rfk-jr-hhs-job-cuts-doge-mistakes/.

[8] U.S. Small Business Administration, *Small Business Administration announces agency-wide reorganization*, available at:  https://www.sba.gov/article/2025/03/21/small-business-administration-announces-agency-wide-reorganization.

[9] The Hill, *VA secretary: Cutting 80,000 jobs 'is our target'* (Mar. 10, 2025), available at: https://thehill.com/homenews/state-watch/5186097-va-seek-cuts-80000-jobs/

1  the hundreds of thousands.  The federal labor unions are being decimated by these efforts to gut the

2  civil service.  And local governments, unions representing state and local government employees, and

3  nonprofits—all of whom depend on the services of federal agencies—are facing overwhelming

4  harms, as detailed in the more than 50 declarations submitted along with this Motion.  All factors

5  weigh heavily in favor of injunctive relief.

6      Plaintiffs have sued and move for relief now because sufficient information has finally been

7  made public to discern some of the significant actions and impact of the President's Order,

8  notwithstanding the efforts to keep these plans from the public eye.  While this Executive Order

9  applies to hundreds of agencies, Plaintiffs' TRO focuses on the government dismantlement that is

10  already or poised to be underway, at the agencies engaged in ongoing and imminent plans to

11  implement the Executive Order by engaging in large-scale RIFs and reorganizations.[10]

12      To maintain the status quo pending consideration of a preliminary injunction, Plaintiffs seek a

13  TRO ordering an immediate halt to the following:  (1) any further "approval" of ARRPs by OMB and

14  OPM; (2) any further orders by DOGE to agencies to cut programs or staff in conjunction with

15  implementing the Executive Order, the OMB/OPM Memorandum, or the ARRPs; (3) any further

16  implementation of the Executive Order, the OMB/OPM Memorandum, or ARRPs by Federal Agency

17  Defendants, including but not limited to execution of any existing RIF notices, issuance of any

18  further RIF notices, and placement of employees on administrative leave; and (4) any further transfer

19  of functions of any component of the Federal Agency Defendants between agencies.  In furtherance

20  of this Court's ability to consider and resolve the challenge to these illegal actions, Plaintiffs also ask

21  this Court to shine a light on these plans by requiring Defendants to reveal their ARRPs.

22      Plaintiffs have served counsel for the United States, and ask that this Court set this motion for

23  hearing as soon as possible next week, with Defendants' response due Tuesday, May 6 (for which

24  Plaintiffs attempted to reach agreement, but Defendants opposed this schedule), followed by full

25  consideration of Plaintiffs' request for a preliminary injunction as soon as possible thereafter.

26                                    **BACKGROUND**

27

28  _____
   [10] These include: AmeriCorps; USDA; Commerce; Energy; EPA; GSA; HHS; HUD; Interior; Labor; NLRB; NSF; SBA; SSA; State; Treasury; and the VA.

1    **I.    Congressional Authorization Before Government Reorganization**

2        **A.    History of Presidential Reorganization**

3        Congress first delegated to the President the authority to reorganize federal agencies in 1932.

4    Economy Act of 1932, Pub. L. 72-212, tit. VI, §§401-08, 47 Stat. 413.  From 1932 through 1984,

5    Congress "amended, extended, narrowed, or reactivated" this government reorganization authority 16

6    times to grant Presidents limited authority to develop plans to reorganize the executive branch.  S.

7    REP. 115-381 (2018); *see also* Henry B. Hogue, Cong. Rsch. Serv., R44909, *Executive Branch*

8    *Reorganization* at 6 (2017).  The most recent authority (the Reorganization Act Amendments of

9    1984) expired on December 31, 1984.  Pub. L. No. 98-614, 98 Stat. 3192; *see* 5 U.S.C. §905(b).[11]

10       Presidents have used such statutory authorities to accomplish reorganizations of government,

11   large and small, with Congressional approval.  *See* Cong. Rsch. Serv., R44909, at *6 (reorganizations

12   have included "relatively minor reorganizations within individual agencies" and "the creation of large

13   new organizations" – such as the predecessor to HHS in 1953, EPA in 1970, and FEMA in 1979).

14   Congress has also rejected various presidential reorganization plans—for example, proposals to

15   eliminate the Department of Education, *see, e.g.*, H.R. 714, 98th Cong. (1983); H.R. 1510, 115th

16   Cong. (2017), to merge the Department of Labor, Department of Commerce, and SBA, *see, e.g.*, S.

17   1116, 112th Cong. (2011), and to consolidate agencies into a new Food Safety Administration, *see*

18   H.R. 609, 114th Cong. (2015), among others.  Congress has also denied requests for reorganization

19   authority, as with Presidents Reagan in 1981, Bush in 2003, and Obama in 2012.  *See* Cong. Rsch.

20   Serv., R42852, at 29, 32-34; S. 2129, 112th Cong. (2012); H.R. 4409, 112th Cong. (2012).  At other

21   times, Congress has reorganized the government through the regular legislative process.  *See, e.g.*,

22   Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135. Congress has also sometimes

23   delegated to the President limited reorganization authority with respect to specific agencies.  *See, e.g.*,

24   Pub. L. 105-277, div. G, subdiv. A, §1601, 112 Stat. 2681-795 (1998) (authorizing reorganization of

25

26       [11] The 1984 amendments "altered the method by which a plan could take effect," replacing prior procedures involving a one-house legislative veto with a requirement of a joint resolution of

27   Congress approved by the President.  This change responded to *INS v. Chadha*, 462 U.S. 919 (1983), which invalidated on separation of powers grounds a one-house legislative veto provision in another

28   statute.  Henry B. Hogue, Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* 30-31 (2012).

USAID). Such laws typically set expiration dates for the delegated authority. *E.g.*, *id.* §6601(e) (prohibiting presidential reorganization of USAID after 1998).

President Trump has been given no such authorization by Congress.

**B.    Last Operative Authorization of "Reorganization" Authority**

The reorganization authority that expired in 1984 remains codified at 5 U.S.C. §§901-912 and is instructive:  Congress defined "reorganization" as including changes to the structure of federal agencies both *between* and *within* agencies, including "the abolition of all or a part of the functions of an agency, except that no enforcement function or statutory program shall be abolished by the plan," and "the consolidation or coordination of part of an agency or the functions thereof with another part of the same agency or the functions thereof." *Id.* §903(a).  Congress authorized the President to reorganize agencies only for purposes determined *by Congress*. *Id.* §901.  And Congress required the President to explain how any changes would comport with the agencies' statutory requirements and funding levels, to facilitate Congress's consideration of the President's changes. *Id.* §903(b).[12]

**C.    President Trump's Unsuccessful First-Term Reorganization**

President Trump sought to reorganize the government during his first term and was never authorized by Congress to do so.  First, on March 17, 2017, President Trump issued Executive Order 13781, which required OMB "to propose a plan to reorganize governmental functions and eliminate unnecessary agencies …, components of agencies, and agency programs."  Exec. Order No. 13781, 82 Fed. Reg. 13959 (2017).[13]  On June 21, 2018, the Administration released *Delivering Government Solutions in the 21st Century*, which listed over 30 government-wide reorganization proposals and

---

[12] Congress required a *detailed* explanation:

> In his message transmitting a reorganization plan, the President shall specify with respect to each abolition of a function included in the plan the statutory authority for the exercise of the function.  The message shall also estimate any reduction or increase in expenditures (itemized so far as practicable), and describe any improvements in management, delivery of Federal services, execution of the laws, and increases in efficiency of Government operations, which it is expected will be realized as a result of the reorganizations included in the plan.

5 U.S.C. §903(b) (also requiring detailed implementation plan).

[13] Notably, in that plan the President required and OMB implemented a notice and public comment process.  Apr. 12, 2017 OMB Memorandum M-17-22, at 2.

conceded those "significant changes will require legislative action." *Id.* at 4;[14] *see also id.* at 21 (emphasizing need for "support of the Congress"); *id.* at 6 ("OMB would begin a "dialogue with Congress to prioritize and refine proposals"); *id.* at 55 (plan "would necessarily require a partnership with the Congress, including the granting of statutory authorities as necessary.").

Members of the House and Senate introduced bills in 2018 to give President Trump the reorganization authority needed for his plan, under 5 U.S.C. chapter 9, but neither bill passed. H.R. 6787, 115th Congress (2017-2018); S. 3137, 115th Congress (2018). Congress also considered the Trump administration's first-term reorganization proposals by convening numerous hearings before and after OMB publicly released the 2018 Plan. ECF 1 ¶135 (listing hearings); Cong. Rsch. Serv., *Trump Administration Reform and Reorganization Plan: Discussion of 35 "Government-Wide" Proposals*, at 1 (July 25, 2018). Congress chose not to engage in any large-scale reorganization.[15]

## II.    Defendants Are Reorganizing the Government Without Congressional Authorization

### A.    President Trump Has Ordered a Massive "Transformation" of Agencies

President Trump has been unequivocal about his intent to radically transform the size and organization of the government via "large scale structural reform." *Supra* n.1. To carry out his reorganization agenda (an "18-month DOGE agenda," never made public), he created DOGE and embedded "DOGE Teams" in every federal agency. Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025). And he ordered OMB, OPM, and DOGE to create "a plan to reduce the size of the Federal Government's workforce." The White House, *Presidential Actions: Hiring Freeze* (Jan. 20, 2025).[16]

---

[14] Available at: https://www.whitehouse.gov/wp-content/uploads/2018/06/Government-Reform-and-Reorg-Plan.pdf

[15] *See, e.g.*, Gov't Exec., *Omnibus puts kibosh on White House efforts to unilaterally reorganize agencies*, *shed workers* (Mar. 22, 2018), available at: https://www.govexec.com/management/2018/03/omnibus-puts-kibosh-white-house-efforts-unilaterally-reorganize-agencies-shed-workers/146894/; Gov't Exec., *Congress begins formally blocking Trump's government reorganization plan* (Sep. 12, 2018), available at: https://www.govexec.com/management/2018/09/congress-begins-formally-blocking-trumps-government-reorganization-plan/151218/.

[16] The President separately dismantled several government agencies, either eliminating their functions or transferring and subsuming them within other agencies. Exec. Order No. 14242, 90 Fed. Reg. 13679 (Mar. 20, 2025) (Education); Exec. Order No. 14238, 90 Fed. Reg 13043 (Mar. 14, 2025) (seven agencies); Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025) (four agencies); *see also* Exec. Order No. 14169, 90 Fed. Reg. 8619 (Foreign Aid); Press Release, U.S. Dep't of State, *Prioritizing America's national interests one dollar at a time* (Jan. 29, 2025) (USAID); *NTEU v. Vought*, -- F.Supp.3d --, 2025 WL 942772 (D.D.C. Mar. 28, 2025) (CFPB).

On February 11, 2025, President Trump issued the Workforce Executive Order, commencing his "transformation" of the government without waiting for Congressional authorization. *See* App. A. The Order applies to almost all federal agencies, including 15 cabinet-level departments and hundreds of lower agencies and commissions. *Id.* §2(a) (excluding only Executive Office of the President). It requires hundreds of agencies to reorganize themselves through "large-scale" RIFs. *Id.* §§3(c), (e). In those RIFs, agencies must "prioritize[]" "agency initiatives, components, or operations that *my Administration* suspends or closes," and, remarkably, "all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website." *Id.*[17] The President also required agencies, within 30 days, to submit reorganization plans reflecting these required RIFs, and to assess their own eradication: "whether the agency or any of its subcomponents should be eliminated or consolidated." *Id.* §3(e). The Order excluded from the RIF requirements only "functions related to public safety, immigration enforcement, or law enforcement," and authorized OPM to grant agencies exemptions from the Order's requirements as "necessary [to] assist in promoting workforce reduction." *Id.* §§3, 4(c).

**B.    OMB, OPM, and DOGE Are Executing the President's Reorganization Orders**

On February 26, 2025, OMB and OPM issued a Memorandum to all federal agencies directing compliance with the President's Workforce Order. App. B. OMB and OPM combined the various requirements of the Executive Order into one "Agency RIF and Reorganization Plan," due initially in *two weeks*. *Id.* at 3. They assumed decision-making "approval" for the content of these ARRPs. *Id.* at 3, 4 ("Each agency will submit a Phase 1 ARRPs to OMB and OPM for review and approval **no later than March 13, 2025**."; "Agencies should then submit a Phase 2 ARRP to OMB and OPM for review and approval **no later than April 14, 2025**.") (emphasis in original).

---

[17] The referenced Contingency Plans, known as "Lapse Plans," set forth the minimal staffing needed when agencies are not appropriated at all (to protect, for example, against the destruction of property or loss of life). Agencies *by law cannot* perform their normal Congressional-intended functions during such circumstances: "The Antideficiency Act restricts the conduct of business by agencies during a lapse of appropriations." Dep't of Commerce, *Plan for Orderly Shutdown Due to Lapse of Congressional Appropriations* (September 27, 2023), available at: https://www.commerce.gov/sites/default/files/2023-09/DOC-Lapse-Plan-2023.pdf.

OMB and OPM then provided extensive direction to agencies regarding the mandatory content of these ARRPs, consistent with and amplifying the President's Executive Order.  *Id.* at 3, 4 ("Phase 1 ARRPs shall focus on initial agency cuts and reductions. … Phase 2 plans shall outline a positive vision for more productive, efficient agency operations going forward.").  The Memorandum instructed that "[p]ursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated."  *Id.* at 2; *see also id.* at 1-2 ("Principles to Inform ARRPs" that included "significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required").  OMB and OPM also ordered that agency heads must "collaborate with their … DOGE … team leads within the agency" in developing RIFs. *Id.*  They further clarified that the agencies and their DOGE leads should not just use Lapse Plan levels as a "starting point" for RIFs, but (without explanation) *2019* Lapse Plan levels.  *Id.*

OMB has subsequently confirmed in court pleadings that it has final decision-making authority with respect to the ARRPs, withholding them as "pre-decisional" pending OMB review. *Democracy Forward Found. v. Off. of Mgmt. & Budget*, No. 1:25-cv-00858 (D.D.C.), ECF No. 9 (Defendants' Apr. 2, 2025 Motion to Dismiss: "[A]gency reduction-in-force plans are still under development by the Executive Branch[,] and OMB is currently actively reviewing these plans").

DOGE is also implementing the Workforce Executive Order, by giving agencies mandatory reduction targets for the ARRPs, including cuts to specific programs and functions, as publicly confirmed by at least HHS Secretary Kennedy and VA Secretary Rollins (*supra*, at 4-5).[18]

### C.    The Trump Administration is Hiding its Reorganization Plans from the Public

The Trump Administration has refused requests from the press, employees, their labor representatives and the public for the ARRPs.  *See Democracy Forward Foundation v. OMB*, No.

---

[18] Courts have recognized that DOGE is imposing mandates on federal agencies.  *See AFSCME v. Soc. Sec. Admin.*, 2025 WL 868953, at *68 (D. Md. Mar. 20, 2025); *AFL-CIO v. Dep't of Lab.*, 2025 WL 1129227, at *45 (D.D.C. Apr. 16, 2025) (allegations that "USDS has been directing operations and personnel decisions at Congressionally-created agencies that Congress has imbued with the authority to exercise specific responsibilities.").  *See also* Anna Bower, *On DOGE, Directives, and DOJ*, Lawfare (Apr. 27, 2025) ("Recent litigation is also increasingly producing documentary evidence proving that DOGE has taken control of some agency functions, such as terminating contracts, despite the government's representations that DOGE merely 'consults.'"), available at: https://www.lawfaremedia.org/article/on-doge--directives--and-doj.

1:25-cv-00858 (D.D.C.), ECF 9-1 ¶23 (denying FOIA request for ARRPs).[19]  Recent reports indicate

that individuals involved in discussions of the ARRPs at the VA had to sign Non-Disclosure

Agreements ("NDAs").[20]  The White House has stated that the plans will be revealed only "*once …*

*enacted.*"[21]

**III.      Restructuring and RIFs at Agencies Are Causing Widespread Irreparable Harm**

The ARRPs were due to OMB/OPM on April 14, 2025.  App. B.  Some agencies' ARRPs

(such as NLRB and NSF, which proposed few or no RIFs) were rejected by OMB and required to be

resubmitted.  Chisholm Decl. Ex. 1; Soriano Decl. ¶¶8-11 (AFGE).  Although ARRPs are not public,

agency statements and employee RIF notices show that other agencies have begun implementation.

RIFs:  As of today (May 1, 2025), the agencies known to have begun RIFs include at least:

AmeriCorps, EPA, GSA, HHS, HUD, Labor, and SBA.  The agencies for which Plaintiffs have

collected evidence of imminent RIFs include:  Agriculture, Commerce, Energy, Interior, NLRB,

NSF, SSA, State, Treasury, and VA.  Breaking news reveals more agency RIFs every day.[22]

Programs/offices:  Nearly agencies or programs are being eliminated through these ARRPs an

RIFs.  At least one agency Congress created to provide important public services nationwide—

AmeriCorps—has been decimated, with 85% of staff given RIF notices and immediately put on

leave, all to "comply[]" with the Executive Order.  Daly Decl. ¶25 & Ex. A (AFSCME).  Other

known ongoing or imminent RIFs impacting entire programs and offices include:  Labor—OFCCP,

---

[19] Bachelder Decl. ¶¶12-13; Bailey Decl. ¶¶14-15, 17; Bobbitt Decl. ¶¶19-23; Couture Decl. ¶¶10-11; Daly Decl. ¶21; Gamble Decl. ¶¶7, 9-10; Gustafsson Decl. ¶7; Howell Decl. ¶¶9-11; Hunter Decl. ¶11; Jacobs Decl. ¶¶15, 17; Kelley Decl. ¶¶12-14; Levin Decl. ¶¶17, 19-20; Niemeier-Walsh Decl. ¶¶16-17; Soldner Decl. ¶12.

[20] *E.g.*, Gov't Exec., *VA forces staff in workforce reduction discussions to sign non-disclosure agreements* (Apr. 24, 2025) ("Senior leaders are contemplating which jobs to keep and which to slash in meetings, but telling staff they cannot discuss those topics."),available at: https://www.govexec.com/workforce/2025/04/va-forces-staff-workforce-reduction-discussions-sign-non-disclosure-agreements/404808/.

[21] Wash. Post, *White House expects 'mass reduction' of federal workforce as deadline looms* (Mar. 13, 2025), available at:  https://www.washingtonpost.com/politics/2025/03/13/government-agency-reorganization-rif-federal-workers/; *see also* Wash. Post, *Internal White House document details layoff plans across U.S. agencies* (Mar. 27, 2025).

[22] For example, after Plaintiffs' complaint was filed on April 28, 2025, the press reported that DOGE is imposing cuts on the Peace Corps, which is not a named defendant.  *See* N.Y. Times, *Peace Corps, under review by DOGE, is said to plan 'significant' staff cuts* https://www.nytimes.com/2025/04/28/us/politics/peace-corps-cuts-doge.html.

Neuman Decl. ¶29 & Ex. F (SEIU) (cutting 90% of AFSCME-represented staff); EPA—OEJ and External Civil Rights, and ORD, Dreyfus Decl. ¶13 (AFGE); Howell Decl. ¶¶16-18 (AFGE); HHS—NIOSH, Niemeier-Walsh Decl. ¶21 (AFGE) (cutting 93% of staff), including its Coal Workers' Health Surveillance Program, National Firefighter Registry for Cancer, and Health Hazard Evaluation Program, *id.* ¶¶24-29; Benjamin Decl. ¶25 (APHA); Substance Abuse and Mental Health Services Administration, Prendiville Decl. (SEIU Local 1021) ¶¶12-14; National Center for Injury Prevention and Control, Benjamin Decl. ¶¶16, 18 (APHA); Low-Income Home Energy Assistance Program, *id.* ¶23; HUD—OFPM, Bobbitt Decl. ¶13 (terminating nearly all positions).

Intra-agency transfers:  Agencies already reduced due to the illegal reorganization are simultaneously having the functions of *other* agencies transferred to them.  In particular, the functions of the Department of Education (targeted for elimination by a different Executive Order so not a defendant here) are to be moved to agencies including the SBA.  *Infra.* at 24.  USAID (also a different Executive Order) is being merged into the State Department.  *Infra* at 26.

These actions have caused and continue to cause Plaintiffs irreparable harm, including:

*Harm to Unions and Others Representing Federal Employees.*  Plaintiffs AFGE, AFSCME, SEIU, and their locals are labor unions representing federal employees at agencies subject to the President and OMB, OPM, and DOGE's orders, and are implementing ARRPs.  *See* App C.[23]  These Plaintiffs' hundreds of thousands of federal employee members are directly impacted by Defendants' unlawful acts.  Employees subject to RIFs by each Federal Agency Defendant will imminently lose compensation, health benefits, and important work and careers as dedicated public servants; those who remain will face "worse and harmful" working conditions.  Daly Decl. ¶30 (AFSCME).[24]

---

[23] Appendix C to this Motion is a chart identifying the agencies for which each Plaintiff asserts harm.  The chart identifies the agencies at which each of these unions represents federal employees.

[24] *AmeriCorps*: Blake ¶¶38-39 (AFSCME); Daly Decl. ¶¶30, 32, 36 (AFSCME); *USDA*: Blake ¶¶25-37 (AFSCME); Bachelder Decl. ¶17 (AFSCME); Kelley Decl. ¶3 (AFGE); Soldner Decl. ¶26 (AFGE); *Commerce*: Kelley Decl. ¶3 (AFGE); *Energy*: *id.* ¶3; *EPA*: *id.* ¶3; Dreyfus Decl. ¶15 (AFGE); Neuman Decl. ¶8 (SEIU); *GSA*: Kelley Decl. ¶3 (AFGE); Fabris Decl. ¶33 (AFGE); *HHS*: Kelley Decl. ¶3 (AFGE); Niemeier-Walsh Decl. ¶32 (AFGE); Neuman Decl. ¶8 (SEIU); *HUD*: Kelley Decl. ¶3 (AFGE); Bobbitt Decl. ¶37 (AFGE); *Interior*: Kelley Decl. ¶3 (AFGE); Cochran Decl. ¶¶19-21 (AFGE); Neuman Decl. ¶8 (SEIU); *Labor*: Kelley Decl. ¶3 (AFGE); Gamble Decl. ¶15 (AFGE); *SBA*: Kelley Decl. ¶3 (AFGE); Gustafsson Decl. ¶16 (AFGE); *SSA*: Kelley Decl. ¶3 (AFGE); Wilson Decl. ¶¶6-9 (AFGE); Couture Decl. ¶4 (AFGE); *State*: Kelley Decl. ¶3 (AFGE);

Plaintiff AGU's members likewise include thousands of federal employee scientists.[25] *See also* Shah Decl. ¶11 (Common Defense; mass terminations disproportionately affect veteran members).[26]

 <u>*Harm to Other Unions and Their Members, Non-Profit Organizations, and Local Governments*</u>.  Plaintiffs summarize some of the harms they and their members will face from cuts to agencies on which they and their members rely, arranged by Federal Agency Defendant:

**1.** **AmeriCorps**

 As explained above, in April, AmeriCorps sent RIF notices and placed immediately on leave approximately 90% of its staff, locking them out of their computer systems.  Daly Decl. ¶¶14, 20-22 & Ex. A (AFSCME).  As the New York Times reported, the agency "has placed on administrative leave almost all of its federal staff *at the direction of Elon Musk's cost-cutting team,* according to people familiar with developments at the agency."[27]

 These severe staffing cuts left the gutted agency "unable to complete the day-to-day work required to keep the Agency running."  Id. ¶¶18, 26, 36.  As a result, educational funds to former AmeriCorps participants are endangered, grantees will be left without assistance, and grants will not be timely processed or renewed.  *Id.* ¶¶26, 28-29, 31.  Local governments and non-profits rely on AmeriCorps to provide disaster relief, public health services and training, wildfire mitigation, emergency management, and other programs, and will be left without assistance.  Dively Decl. ¶¶18-20 (King County); Benjamin Decl. ¶39 (APHA).

**2.** **Agriculture (USDA)**

 In April, USDA Secretary Brooke Rollins warned employees that "USDA is pursuing an aggressive plan to optimize its workforce by eliminating positions that are no longer necessary," that RIFs were imminent, and that regional offices would be eliminated/consolidated, and headquarters employees would be moved to rural communities.  Soldner Decl. ¶¶13-14 & Ex. B (AFGE);

---

Hunter Decl. ¶¶36-37 (AFGE); <u>*Treasury*</u>: Kelley Decl. ¶3 (AFGE); <u>*VA*</u>: Blake Decl. ¶45 (AFSCME); Kelley Decl. ¶3 (AFGE); Burke Decl. ¶21 (AFGE); Bailey Decl. ¶¶20, 22 (SEIU).

[25] Shultz Decl. ¶¶5-6, 8-27 (USDA, Commerce, EPA, Energy, Interior, NSF).

[27] N.Y. Times, DOGE guts agency that organizes community service programs (April 17, 2025), available at:  https://www.nytimes.com/2025/04/17/us/politics/doge-cost-americorps-community-service.html.

1    Bachelder Decl. ¶11 & Ex. A (AFSCME).  "[S]ome employees have been told to expect the

2    department to cut back to fiscal 2019 staffing levels—which would lead to USDA slashing around

3    9,000 of its 98,000 employees—while others have been told there is an overall federal workforce

4    reduction number the administration has developed and the department will do its part proportionally

5    to meet that target."  Soldner Decl. Ex. B.  A USDA "executive" confirmed that DOGE, not USDA,

6    "was making the decisions on where cuts will take place."  *Id.*

7         Local governments will be directly impacted.  Counties that operate ports and airports or

8    otherwise receive imports rely on USDA to screen and seize prohibited or dangerous agricultural and

9    food products and to test animals for disease, inspect food for safety, conduct safety studies,

10   quarantine invasive pests, and disseminate critical information.  Barton Decl. ¶¶10-12 (Harris

11   County); Williams Decl. ¶¶25-28 (Santa Clara).  With reduced ability to rely on those services,

12   counties will face risks such as the spread of food-borne disease and avian flu and other public health

13   threats.  Barton Decl. ¶¶10-11 (Harris County); Williams Decl. ¶25 (Santa Clara); Dively Decl. ¶¶15-

14   17 (King County relies on USDA to reduce risk of bird impacts to airplanes and for food assistance).

15        Cuts to Forest Service staff will reduce park services and oversight of livestock grazing,

16   causing damage to habitats, the survival of sensitive species, and Plaintiffs' members' recreational

17   experience.  Molvar Decl. ¶¶28-33 (including on WWP-leased land); *see also* Williams Decl. ¶24

18   (Forest Service reductions will shift wildfire response burden to Santa Clara firefighting agencies);

19   Crispen Decl. ¶¶2-4 (San Francisco; same).  Reductions in USDA staffing will cause many other

20   serious harms to Plaintiffs.  *See* Davis Decl. ¶¶9-19, 21, 23-24 (NOFA; cuts will undermine organic

21   certification and standards, leading to unfair competition, and interfere with access to loans and other

22   programs, financially harming member farmers); O'Brien Decl. ¶¶17-19 (AFSCME members in K-

23   12 food service and child and adult care programs depend on effective processing of USDA funds);

24   Shultz Decl. ¶¶21-25 (AGU member scientists rely on USDA research, data, and expertise);

25   Bachelder Decl. ¶¶14-16, 19-20 (AFSCME) (cuts harm farmers, market participants, and public, who

26   rely on USDA information, including in relation to the beef trade and mad cow disease); Soldner

27   Decl. ¶¶19-21 (AFGE; cuts will compromise slaughterhouse and processing facility inspections, with

28   "serious implications for the safety and quality of meat, poultry, and eggs that Americans consume").

### 3.    <u>Commerce</u>

In March, the press began reporting that the Department of Commerce's National Oceanic and Atmospheric Administration ("NOAA") was planning to cut over 1000 positions or 20% of its staff, "as part of the Trump administration's mandate for agencies to prepare 'reductions in force,' according to multiple sources familiar with the matter."[28]  PBS also reported on the planned cuts, and that DOGE had listed "19 NOAA facilities for lease termination" including the Radar Operations Center, where the nation's Doppler radar network, which provides real-time weather data and operates 24 hours a day, is staffed.[29]

These cuts will be devastating to, and compromise public safety in, cities and counties that rely on NOAA's National Weather Service for detailed and real-time weather information, data, and expertise, and on the agency's assistance, including on-site, to support localities handling emergency weather events.  Williams Decl. ¶¶29-30 (Santa Clara); Velez Decl. ¶¶6-7, 11 (Chicago) Bechelli Decl. ¶4c (San Francisco).  Localities lack the capacity to make up for this loss and will be forced to rely on less-accurate private weather services, which could have "catastrophic life-safety ramifications."  Pena Decl. ¶¶7-9 (Harris County); *see* Velez Decl. ¶¶8, 10; Jue Decl. ¶3; Dively Decl. ¶22 (King County); Leach Decl. ¶¶20-21, 24. Plaintiff organizations' conservation, recovery, and environmental protection efforts will also be harmed, Molvar Decl. ¶¶23-27 (WWP); Neubacher Decl. ¶13 (CPANP), as will their members' scientific research, Shultz Decl. ¶¶5, 21-27 (AGU).

### 4.    <u>Energy</u>

The Department of Energy's March 13 ARRP, which was leaked, identified 43% of its staff as "non-essential."[30]  Braden Decl. ¶13 & Ex. C.  U.S. Senate Democrats released a fact sheet:

---

[28] ABC News, *NOAA braces for mass layoffs, fueling concerns about lifesaving weather services* (March 12, 2025), available at:  https://abcnews.go.com/Politics/noaa-braces-mass-layoffs-fueling-concerns-lifesaving-weather/story?id=119730398.

[29] PBS News, *As NOAA braces for more cuts, scientists say public safety is at risk* (March 14, 2025) available at: https://www.pbs.org/newshour/nation/as-noaa-braces-for-more-cuts-scientists-say-public-safety-is-at-risk; *see also* PBS News, *As NOAA shrinks under Trump's cuts, employees speak out* (April 16, 2025), available at:  https://www.pbs.org/newshour/politics/fired-rehired-and-fired-again-noaa-employees-are-caught-in-a-liminal-state.

[30] Federal News Network, *Energy Department extends hiring freeze, deems 43% workforce non-'essential' in reorganization plan* (Apr. 4, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/energy-department-extends-hiring-freeze-deems-43-workforce-non-essential-in-reorganization-plan/.

> DOGE is reportedly proposing staffing cuts of up to 50% of the workforce at the Department of Energy (DOE), with new reductions in force (RIFs) hitting key priorities such as clean energy, grid resilience, and state and community programs the hardest while even targeting national security programs.

*Id.* ¶11 & Ex. A. The cuts included 54% (1,800+ positions) to science and innovation programs; 61% (990+ positions) to energy infrastructure and deployment programs; 71% (3,000+ positions) to the Deputy Secretary's Office, environmental management programs, and other policy programs; 18% (540+ positions) to the Nuclear National Security Administration (NNSA); and 10% (520+ positions) to the Power Marketing Administrations (PMAs). *Id.*

These planned cuts will undermine cities' building and vehicle electrification goals, leading to continued pollutant exposure in the community, and harm cities that depend on the Department's support for energy policy implementation. Jue Decl. ¶¶5-6 (San Francisco); Leach Decl. ¶¶32-36 (Baltimore); *see also* Gabel Decl. ¶¶7, 12-13 (AFSCME; cuts will harm efforts to make homes energy efficient). They will increase the risk of large-scale power outages throughout the country. Braden Decl. ¶¶17, 19-20 (AFGE), and harm scientists including Plaintiff organizations' members who rely on the Department's research, data, and expertise. Shultz Decl. ¶¶5, 21-27 (AGU).

**5.     Environmental Protection Agency (EPA)**

On April 21, 2025, EPA began sending RIF notices to employees across its headquarters and regional offices, including the Office of Environmental Justice. Dreyfus Decl. ¶¶12-14, Exs. A-C (AFGE). Both the President and EPA Administrator have stated that up to 65% of EPA's workforce could be cut, and the press reported that the Office of Research and Development, with 1,155 chemists, biologists, toxicologists and other scientists, will be dismantled. Howell Decl. ¶¶8, 17, Exs. A, E (AFGE). The New York Times reported:  "The strategy is part of large-scale layoffs, known as a 'reduction in force,' being planned by the Trump administration, which is intent on shrinking the federal work force." *Id.*, Ex. E (AFGE).

These ongoing and planned cuts will render Plaintiff localities unable to depend on the expertise and support of EPA's scientists and engineers to remediate hazardous environmental conditions, Ige Decl. ¶¶25-28 (Chicago); to register pesticides and approve off-label uses for new invasive species, to protect farmers' crops, Williams Decl. ¶32 (Santa Clara). *See also id.* ¶¶33-34

(Santa Clara depends on EPA tracking of hazardous waste shipments to ensure facilities manage waste properly and to prepare for emergency response); Dively Decl. ¶¶29-32 (King County relies on EPA staff to process and support grants and environmental initiatives, and for data and tools to reach decarbonization targets and support climate planning; EPA reductions will impede implementation of energy efficiency and conservation grant); Worthington Decl. ¶¶4, 6-8 (Chicago relies on EPA staff for advice on brownfield inspections and remediation, toxic site clean-up, and complying with federal requirements); Jue Decl. ¶4 (San Francisco relies on EPA research to electrify vehicles and buildings); Leach Decl. ¶¶27-31 (Baltimore relies on EPA data and technical assistance for environmental exposures and climate strategies); Dreyfus Decl. ¶16 (AFGE; RIFs will limit EPA's work with tribal governments to ensure environmental regulations are observed across state borders); Howell Decl. ¶¶18, 22 (AFGE; RIFs will hamstring mitigation of environmental hazards following natural disasters like floods and wildfires, and cause loss of years of work in ongoing research and likely need to euthanize lab animals); *id.* ¶¶17, 21 (AFGE; RIFs will harm states that rely on EPA for management of Clean Water Act permits and guidance and oversight of state-managed programs and undermine environmental justice efforts).

6. **General Services Administration (GSA)**

GSA has announced plans for a nearly 50% cut in staff and issued RIF notices throughout the agency, including to more than 600 employees in the Public Buildings Service. Fabris Decl. ¶¶23-25, Exs. J-L (AFGE).[31] The RIFs to GSA's public buildings staff threaten the health and safety of federal employees federal contractors, and all visitors to federal courthouses and other buildings throughout the country. *Id.* ¶¶28-32. No employees remain to maintain fire protection systems, oversee water testing for hazards, manage indoor air quality, supervise asbestos inspections, or address other health or safety concerns. *Id.* In addition, SEIU represents hundreds of federally contracted janitors at GSA locations as well as federal buildings at numerous other agencies who face layoffs if GSA staff are laid off or locations are closed. Adler Decl. ¶9 (SEIU); *see also id.* ¶7 (members laid off after U.S.

---

[31] *See, e.g.*, Gov't Exec., *GSA seeks 50% spending cuts, nonvoluntary RIF after OPM's resignation offer* (Feb. 4, 2025), available at: https://federalnewsnetwork.com/hiring-retention/2025/02/gsa-seeks-50-spending-cuts-nonvoluntary-rif-after-opms-resignation-offer/.

1    Institute of Peace shuttered); *id.* ¶8 (contracted janitor layoffs imminent at DOL sites).

2    **7.    Health and Human Services (HHS)**

3    On March 27, 2025 HHS announced "a dramatic restructuring in accordance with President

4    Trump's Executive Order." *Supra* at 4; *see also* Fact Sheet: HHS' Transformation (Mar. 27, 2025)

5    ("The restructuring of HHS is proceeding in accordance with President Trump's Executive Order");

6    Jacobs Decl. ¶14, Ex. B (AFGE).  HHS immediately noticed "a reduction in workforce of about

7    10,000 full-time employees who are part of this most recent transformation" with a total goal of

8    cutting 20,000 staff, including 3500 at the FDA, 2400 at the CDC, 1200 at NIH, and 300 at CMS; and

9    consolidating divisions and closing regional offices.  *Id.*  Secretary Kennedy attributed the cuts to the

10   President's Executive Order and DOGE.  *Supra* at 4.

11   Cities and counties depend on CDC laboratories that have been or will be weakened by RIFs,

12   including CDC's now-eliminated sexually transmitted disease ("STD") lab branch, without which

13   public health agencies will lose important information about antimicrobial resistant organisms and

14   STDs generally and may face difficulty in ensuring effective treatment and stopping further disease

15   transmission.  Philip Decl. ¶¶4-5, 7-8 (San Francisco).  Santa Clara relies on several CDC labs that

16   are the only ones capable of testing for certain infectious diseases; delays or disruptions in the CDC's

17   ability to test specimens or report results would produce information gaps and delays resulting in the

18   avoidable spread of infectious diseases.  Williams Decl. ¶¶38-39 (Santa Clara).

19   Municipalities depend on the CDC to help them control outbreaks of contagious diseases such

20   as measles.  Ige Decl. ¶¶7-11, 13-17 (Chicago); Philip Decl. ¶15 (San Francisco); Barton Decl. ¶¶20-

21   22 (Harris County), Williams Decl. ¶¶35-37, 39 (Santa Clara).  Yet the CDC staff responding to the

22   current measles outbreak in Texas were put on administrative leave.  Jacobs Decl. ¶27 (AFGE).

23   Localities also depend on the CDC to help serve certain rare and high-risk patients, Philip Decl. ¶14

24   (San Francisco); to train city staff to prevent the spread of diseases like HIV and syphilis, *id.* ¶6; to

25   provide personnel supporting an HIV treatment clinic, Dively Decl. ¶33(b) (King County); and for

26   maternal and infant health data, Ige Decl. ¶¶18-19 (Chicago).  *See also* Benjamin Decl. ¶¶16, 18-20

27   (APHA) (RIFs effectively shuttered CDC offices on injury control, birth defects, and smoking and

28   health; disrupted research on women's reproductive health and drug-resistant STDs; closed reference

1    laboratories critical to nationwide public health measures); O'Brien Decl. ¶¶12-13 (AFSCME).

2        Many of these effects are already being felt. RIFs have caused CDC to cancel plans to

3    support Milwaukee public schools with lead exposure; severely hindered monitoring, testing, and

4    prevention efforts for communicable diseases; and endangered disease testing for first responders and

5    firefighters. Benjamin Decl. ¶¶17, 25, 29-34 (APHA); *see* Ige Decl. ¶¶12-15 (Chicago: lost access to

6    HIV resources). Decimation of the Center for Injury Prevention and Control halted updates to

7    guidance on diagnosing traumatic brain injury, Jacobs Decl. ¶24 (AFGE), and shut down critical data

8    systems, publications, and grants on drownings, opioid overdoses, and suicides, *id.* ¶¶24-25; *see also*

9    Barton Decl. ¶18 (Harris County; cessation of public health emergency preparedness calls); Leach

10   Decl. ¶¶37-38 (Baltimore; delayed response when seeking CDC guidance and feedback); Dively

11   Decl. ¶33(a) (King County; unable to reach HHS personnel that support public health grants,

12   requiring county to divert funds); Philip Decl. ¶12 (San Francisco; difficulty with grant reporting).

13       Nor is CDC the only HHS agency where RIFs have caused or will cause irreparable harm.

14   The Administration for Children and Families terminated every employee administering a program to

15   cover heating and cooling bills for millions of low-income households and eliminated the division

16   overseeing a case management system tracking child abuse and neglect. Benjamin Decl. ¶¶22-23

17   (APHA); *see also* Neuman Decl. ¶21 (lack of approval for a Head Start grant will force layoffs of up

18   to 144 SEIU members and result in 1,200 children in Santa Clara losing childcare on July 1, 2025);

19   O'Brien Decl. ¶7 (delay in HHS grants will harm AFSCME members at Head Start Programs and

20   limit development services to children and families). Layoffs at NIOSH shuttered a federal screening

21   program for black lung disease, Benjamin Decl. ¶25 (APHA); stopped routine mine safety

22   inspections, Jacobs Decl. ¶23 (AFGE); shut down the program that investigates and recommends

23   ways to reduce exposure to health hazards in workplaces, Niemeier-Walsh Decl. ¶¶24-27 (AFGE);

24   O'Brien Decl. ¶16; and left no one to continue research to reduce cancer risk among firefighters or

25   the risk of black lung disease among coal miners, Niemeier-Walsh Decl. ¶¶28-29 (AFGE); *see also*

26   Pena Decl. ¶¶21-22 (Harris County; NIOSH information on causes of certain industrial fires can

27   inform future life-saving practices); O'Brien Decl. ¶15 (AFSCME members in medical fields rely on

28   NIOSH to certify respirators). Closure of the Substance Abuse and Mental Health Services

Administration impairs resources on which therapists and substance abuse counselors rely. Prendiville Decl. ¶¶12-14 (SEIU).  Layoffs of FDA administrative staff forced the postponement or cancellation of site visits to inspect facilities.  Garthwaite Decl. ¶¶12-14 (AFGE).

**8.**    **Housing and Urban Development (HUD)**

In April, HUD commenced a RIF of positions in the Office of Field Policy and Management ("FPM") throughout the country.  Bobbitt Decl. ¶¶13-14 (AFGE).  The FPM serves as the first point of contact for HUD and housing-related questions and concerns within a community.  *Id.* ¶¶24-28. Press reports staffing cuts of up to 50% and closed field offices.[32]  *Id.* ¶¶9-12 & Exs. A-B (AFGE).

These FPM cuts will drastically limit access to HUD services, in particular among vulnerable populations like homeless veterans, seniors, and people with disabilities, and prevent effective coordination of important community development efforts.  *Id.* ¶¶26-27.  Further RIFs will harm states, cities, and counties that depend on HUD staff for technical assistance, grant administration, and timely processing of housing assistance program applications and payments and authorizations necessary for large-scale development projects; without those resources, housing instability will rise. Williams Decl. ¶43 (Santa Clara); Leach Decl. ¶¶49-53 (Baltimore); Dively Decl. ¶38 (King County); Wander Decl. ¶¶10-11 (SEIU); Neuman Decl. ¶51 (SEIU); O'Brien Decl. ¶¶39-40 (AFSCME).  Local governments receive from HUD millions of dollars in federal contracts, loans, and grants that support community capital projects, affordable housing development, and disaster recovery, any delay of which would divert local resources and increase housing instability.  Dively Decl. ¶¶37-39 (King County); Leach ¶¶49-53 (Baltimore); *see also* Bobbitt Decl. ¶¶9, 11-12, 28 (AFGE; forthcoming RIFs will reduce support for disaster relief and homelessness, limit rental assistance and support for public housing, and reduce housing discrimination investigations).

**9.**    **Interior**

---

[32] Associated Press, *Trump Administration looks to slash HUD workers tackling the housing crisis* (Feb. 21, 2025), available at:  https://apnews.com/article/doge-hud-trump-turner-affordable-housing-musk-0176c8539fa9b5959198c351c97b8652; Bloomberg News, *Trump Administration Plans to Eliminate Dozens of Housing Offices* (Mar. 5, 2025), available at: https://www.bloomberg.com/news/articles/2025-03-05/hud-plans-to-eliminate-dozens-of-state-and-local-field-offices.

In April, sources leaked a "major reorganization" being led by DOGE.[33]  The Department responded:  "under President Trump's leadership, we are implementing necessary reforms to ensure fiscal responsibility, operational efficiency, and government accountability," and refused to "comment on personnel matters."  *Id*.  Shortly thereafter, the Secretary transferred authority for complying with Executive Order 14210 and for the "consolidation, unification and optimization efforts within the Department" to the DOGE Team.[34]  Soon after, additional reports broke regarding upcoming RIFs.[35]  Neubacher Decl. ¶8 & Ex. B (CPANP).

Like other Department components, the National Park Service ("NPS") is already suffering from reduced staffing.  *Id*. ¶¶5, 6 (CPANP).  Further cuts will force NPS employees who lose their positions, and live in park housing, to relocate.  *Id*. ¶16.  Cuts will also undermine the agency's work of protecting and preserving national parks, including by impacting threatened and endangered species and sensitive ecological areas; harm the visitor experience, including leading to the closure of areas, miles-long waits to enter parks, traffic problems, limitations on ranger tours and other educational programs, and reduction of park hours; and threaten visitors' safety, including due to trails and trees that are not properly maintained and longer emergency response times.  *Id*. ¶¶9-12, 14.

RIFs to the Interior Department will also harm WWP by impeding timely access to public records necessary to accomplish its conservation mission; diminishing the Bureau of Land Management's prevention of ecologically destructive grazing on federal lands; hindering WWP's ability to research and obtain information for its conservation efforts; impacting the Fish and Wildlife Service's ability to protect endangered species such as the Wyoming toad and Arctic grayling; and causing other adverse effects that will decimate National Wildlife Refuges, harm WWP's ability to

[33] Politico Pro, *Major reorganization looms for Interior* (Apr. 10, 2025), available at: https://subscriber.politicopro.com/article/eenews/2025/04/10/major-reorganization-looms-for-interior-00283745.

[34] Dep't of Interior Order No. 3429, *Consolidation, Unification and Optimization of Administrative Functions* (Apr. 25, 2025), available at:  https://www.doi.gov/document-library/secretary-order/so-3429-consolidation-unification-and-optimization-administrative; Gov't Exec., *Interior solicits employees' resumes in preparation for widespread layoffs* (Apr. 23, 2025), available at: https://www.govexec.com/workforce/2025/04/interior-solicits-employees-resumes-preparation-widespread-layoffs/404786/.

[35] Gov't Exec., *Interior solicits employees' resumes in preparation for widespread layoffs* (Apr. 23, 2025), available at https://www.govexec.com/workforce/2025/04/interior-solicits-employees-resumes-preparation-widespread-layoffs/404786/.

protect native wildlife, and impede the enjoyment of land by WWP's staff and members.  Molvar Decl. ¶¶6-8, 10-22, 39.  AGU members also depend on access to research, data, expertise, and grants that will be impaired by Interior's layoffs.  Shultz Decl. ¶¶5, 21-27.

The cuts will also harm Plaintiff localities.  *See* Bechelli Decl. ¶4(d) (San Francisco relies on U.S. Park Police to assist during emergencies and for incidents on federal property); Williams Decl. ¶44 (Santa Clara relies on U.S. Geological Survey resources and guidance on earthquake hazards).

## 10.    **Labor**

In April, Labor sent RIF notices to the "vast majority" of the staff of the Office of Federal Contract Compliance Programs ("OFCCP"), placing those staff immediately on administrative leave, and telling employees they were being terminated "due to the agency's 'significantly reduced scope of mission.'"[36]  The Department announced that more RIFs "should be expected" in the coming weeks.[37] Gamble Decl. ¶14 & Ex. E (AFGE).

Cuts will make it impossible for the Department to continue to conduct OSHA workplace safety inspections and mine inspections, increasing the likelihood of preventable workplace deaths and injuries.  *Id.* ¶16 (AFGE); *see* Neuman Decl. ¶34 (SEIU) (OSHA likely will be unable to provide crucial services and investigations, particularly to workers in dangerous jobs, including SEIU members); O'Brien Decl. ¶¶21-28 (AFSCME).  The shutdown of the OFCCP has already harmed employment prospects for veteran and disabled workers and left them vulnerable to discrimination.  Levin Decl. ¶18 (AFGE); Gamble Decl. ¶16 (AFGE); Neuman Decl. ¶31 (SEIU).  Chicago's labor enforcement office also relies on the Department for coordination on training, education and outreach, investigation, and enforcement.  Campos Decl. ¶¶3, 5-11.

## 11.    **National Labor Relations Board (NLRB)**

When the NLRB first submitted its ARRP, it told OMB it had determined it would not engage in any RIF, because the employees' work was too essential to the agency's mission.  Chisholm Decl.,

---

[36] Bloomberg Law, *DOL puts contractor watchdog employees on leave as layoffs loom* (Apr. 16, 2025), available at:  https://news.bloomberglaw.com/daily-labor-report/dol-puts-contractor-watchdog-employees-on-leave-as-layoffs-loom; *see also*, *e.g.*, Neuman Decl. ¶¶29, 31 (SEIU).

[37] Bloomberg Law, *Lawmakers, workers push Chavez-DeRemer to stop labor DOGE cuts* (Apr. 14, 2025), available at:  https://news.bloomberglaw.com/daily-labor-report/lawmakers-workers-push-chavez-deremer-to-stop-labor-doge-cuts.

1    Ex. 1.  But OMB reportedly rejected the NLRB's first ARRP and required the agency to submit a

2    new one proposing staff reductions including layoffs, which OMB is currently reviewing.  *Id.*

3         Cuts will increase delays in enforcing labor laws and harm unions and workers who rely on

4    the NLRB.  The average time between filing a charge and issuance of a complaint was already 120

5    days in 2023, and from complaint to decision was 330 days.  Neuman Decl. ¶¶40-41 (SEIU).  These

6    delays will get worse.  *Id.*; O'Brien Decl. ¶48 (AFSCME members already experiencing delays).

7    When employers violate workers' rights without recourse or timely response, it chills union

8    organizing campaigns and bargaining.  Neuman Decl. ¶38 (SEIU); O'Brien Decl. ¶48 (AFSCME).

9    **12.    National Science Foundation (NSF)**

10        NSF submitted an initial ARRP that did not include large-scale RIFs and instead relied on

11   voluntary separation offers to satisfy the Executive Order and OMB/OPM Memorandum.  Soriano

12   Decl. ¶8 (AFGE).  But OMB, OPM, and DOGE rejected that plan and instructed NSF to lay off half

13   of the agency's employees under "orders from the White House."[38]  *Id.* ¶¶9-11.

14        Cutting NSF staff by half will have devasting effects on the development of scientific

15   research and technology.  NSF provides funding to almost all scientific disciplines, and NSF-funded

16   projects have led to discoveries that form the basis of many important technologies, including the

17   Internet, artificial intelligence, electric batteries, and Magnetic Resonance Imaging ("MRI").  *Id.* ¶16.

18   RIFs will drastically limit the agency's ability to review proposals and provide funding for critical

19   research projects.  *Id.* ¶¶17-19.  They will harm WWP by interrupting or canceling studies on certain

20   species that WWP needs for its conservation efforts.  Molvar Decl. ¶¶34-37.  AGU's member

21   scientists also rely on NSF for research, data, funding, and expertise.  Shultz Decl. ¶¶5, 21-26.

22   **13.    Small Business Administration (SBA)**

23        In March and April, SBA sent RIF notices to employees at the COVID-19 Economic Injury

24   Disaster Loan Serving Center, Office of Entrepreneurial Development, Office of Entrepreneurial

25

26

27

28   _____

     [38] Science, *Exclusive: NSF director to resign amid grant terminations, job cuts, and controversy*
     (Apr. 24, 2025), available at:  https://www.science.org/content/article/nsf-director-resign-amid-grant-
     terminations-job-cuts-and-controversy.

1    Education, procurement office, and field, district, and branch offices.[39]  Gustafsson Decl. ¶¶8-9, 13

2    (AFGE).  The SBA then announced that as required by the President's Executive Order, "the agency

3    will reduce its workforce by 43%," cutting over 2700 jobs as a "strategic reorganization."[40]  The SBA

4    Administrator explained that the RIF plan "will be actioned in the coming weeks."[41]

5        The anticipated 43% reduction will cause significant delays to loans, disaster loan guarantees,

6    and other services.  Gustafsson Decl. ¶¶14, 17 (AFGE).  MSA members depend on low-interest loans

7    to rebuild after disasters like hurricanes or fires, and any delays compound financial harm to those

8    small businesses.  Phetteplace Decl. ¶10.  The cuts will harm localities as well: SBA provides disaster

9    assistance for San Francisco businesses, homeowners, and renters and without sufficient SBA staff

10   residents will be unable to access these funds, hindering rebuilding and recovery from disasters.

11   Bechelli Decl. ¶4(b); *see also* Dively Decl. ¶44 (King County similarly relies on SBA disaster loans).

12       Reduced SBA staff will also likely prevent small businesses from reaching SBA to modify

13   loans when facing repayment difficulty, causing defaults; make it harder to secure loan guarantees,

14   with ripple effects on contractors, suppliers, and employees; and harm small businesses that rely on

15   the SBA for government contracting opportunities, education, and affordable business consulting.

16   Phetteplace Decl. ¶¶11-16 (MSA); Gustafsson Decl. ¶17 (AFGE).  These harms will be compounded

17   by the reported transfer of student loan processing from the Department of Education to SBA, further

18   straining the dramatically reduced staff.  Neuman Decl. ¶43 (SEIU); O'Brien Decl. ¶41 (AFSCME).

19   This will inevitably cause billing issues and delays in processing Public Service Loan Forgiveness

20   applications and forbearance and loan repayment requests.  Neuman Decl. ¶¶43-46 (SEIU).

21   **14.    Social Security Administration (SSA)**

22       In April, the SSA confirmed it is "proceeding with plans that may include abolishment of

23   organizations and positions, directed reassignments, and reductions in force (RIF)."  Couture Decl.

24   ¶12.  The SSA had previously stated plans to implement the Executive Order via RIFs that "could

25   

26   [39] Gov't Exec., *SBA hit with more layoffs* (Apr. 18, 2025), available at:
     https://www.govexec.com/workforce/2025/04/sba-hit-more-layoffs/404682/.

27   [40] SBA, *Small Business Administration Announces Agency-Wide Reorganization* (Mar. 21, 2025),
     available at:  https://www.sba.gov/article/2025/03/21/small-business-administration-announces-
     agency-wide-reorganization.

28   [41] *Id.*

include abolishment of organizations and positions" and would "soon implement agency-wide organizational restructuring."[42]  *Id.*  DOGE posted 47 SSA field offices for sale, and the SSA ARRP was reported to include "field office consolidation" and cuts of approximately 5 to 7,000 employees.[43]  The Acting Commissioner discussed consolidation of regional offices and credited the reorganization as "support[ing] President Trump's priorities to streamline functions."  *Id.* ¶10 & Ex. D.  On April 4, the Washington Post reported SSA leaders were *directed* to provide OMB with a "more extensive RIF proposal."  *Id.* ¶13 & Ex. E.

Even before any RIFs, SSA was at a 50-year staffing low, with high average call wait times; only 84% of retirement, survivor, and Medicare claims timely processed; and only 43% of people receiving appointments within 28 days (down from 85% in 2020).  *Id.* ¶¶16-17.  During the past two months, benefits recipients or applicants have experienced longer wait times, difficulty accessing the SSA website to apply for benefits, and delays in making appointments.  Fiesta Decl. ¶¶7, 9-10 (ARA); *see also id.* ¶¶12, 16-18; Nelson Decl. ¶¶7-13 (AFSCME; appointment request denied after 11 calls and hours-long waits).  Only 39% of callers in March 2025 reached a representative, compared to 70% last year.  Fiesta Decl. ¶17 (ARA).  And the SSA website has crashed repeatedly.  *Id.* ¶¶13-15; Nelson Decl. ¶10 (AFSCME).

RIFs to SSA will worsen these issues.  Couture Decl. ¶¶20, 22, 25-26 (AFGE); Norman Decl. ¶¶16, 22 (AFGE); Fiesta Decl. ¶¶8, 13, 20, 21 (ARA); Nelson Decl. ¶18 (AFSCME); O'Brien Decl. ¶¶35-38 (AFSCME); Wells Decl. ¶¶20-28, 45 (former SSA official).  This will threaten access to benefits, with particularly detrimental effects on individuals with disabilities or beneficiaries who are defrauded, or scammed.  Wilson Decl. ¶15 (AFGE); Couture Decl. ¶22 (AFGE); Fiesta Decl. ¶¶8, 19, 21-23 (ARA); O'Brien Decl. ¶38 (AFSCME); Jefferies Decl. ¶¶12-14 (SEIU Local 1000).

**15.    State**

On April 22, 2025, the State Department announced a reorganization plan for domestic

---

[42] Press Release, Soc. Sec. Admin (Feb. 28, 2025), available at:  https://blog.ssa.gov/social-security-announces-workforce-and-organization-plans/.

[43] Gov't Exec., *SSA reorg plan contemplates field office closures, contradicting public statements* (Apr. 7, 2025), available at:  https://www.govexec.com/management/2025/04/ssa-reorg-plan-contemplates-field-office-closures-contradicting-public-statements/404369/.

operations, including significant consolidation and reorganization of bureaus and offices and "reducing staff in domestic offices by 15 percent, consistent with the President's Workforce Optimization Initiative." Hunter Decl. ¶¶21-25, Ex. I (AFGE).

The proposed consolidation and elimination of staff will stop crucial diplomatic work, day-to-day operations assisting American citizens abroad who lose passports or face criminal prosecution, and promotion of American business interests abroad. *Id.* ¶33; McKeon Decl. ¶¶42, 45 (former State Department official). Cuts to the Department's programs focusing on democracy, human rights, refugees, and conflict stabilization operations "will inevitably be paid for in lives." Hunter Decl. ¶31 (AFGE). The proposed terminations of Special Envoys, Representatives, and Coordinators will hamper the Department's ability to respond to pressing issues like climate change, global criminal justice, hostage affairs, nuclear nonproliferation and geopolitically sensitive states like Iran, Sudan, and North Korea; and the dismantlement of the Counter Foreign Information Manipulation and Interference office eliminated a key tool to counter the sophisticated disinformation campaigns from foreign governments, such as Russia, Iran, and China. *Id.* ¶¶30, 32. The proposed reductions will also harm localities that depend on the State Department to ensure the security of events like the 2026 FIFA World Cup. Dively Decl. ¶13 (King County); *see also* Williams Decl. ¶¶18, 40.

**16.** **Treasury**

In April, an internal IRS memorandum was leaked to the press detailing planned cuts of up to 40% of the IRS workforce, including approximately 60,000 to 70,000 positions, through bi-weekly RIF notices starting "this week."[44] The leaked ARRP included plans to cut up to 50% of IRS tax enforcement staff, and 20% across the board for other components of Treasury.[45]

Reduction of IRS staff will harm taxpayers served by Plaintiff Center for Taxpayer Rights, including delaying tax refunds. Olson Decl. ¶29 (CTR). The staffing reduction and office closures

---

[44] Fed. News Network, *IRS outlines plan to cut up to 40% of workforce, as tax filing season ends* (Apr. 15, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/irs-outlines-plan-to-cut-up-to-40-of-workforce-as-tax-filing-season-ends; *see also* CNBC, *Tax attorneys say IRS has become a 'zombie' as agency cuts staff and halts audits of the wealthy* (Apr. 17, 2025), available at: https://www.cnbc.com/2025/04/17/irs-staff-cuts-fewer-audits-of-wealthy.html.

[45] Fed. News Network, *Treasury plans to cut up to 50% of IRS enforcement staff, 20% of other components* (Apr. 9, 2025), available at: htps://federalnewsnetwork.com/reorganization/2025/04/treasury-plans-to-cut-up-to-50-of-irs-enforcement-staff-20-of-other-components/.

will injure taxpayers who rely on those services and prevent them from resolving account issues and avoiding fines and/or levies. *Id.* ¶¶11-19, 34.  For example, if a taxpayer can't reach an IRS employee, or if their correspondence is not opened or processed, the IRS's automated collection system will issue levies on bank accounts, or offset the next year's tax refund, automatically. *Id.* ¶¶22-25.  Other taxpayers will face severe risks as well. *See id.* ¶34; O'Brien Decl. ¶49 (AFSCME).

**17.    Veterans Administration (VA)**

In March, the VA issued a Memorandum that implements the President's Executive Order and explains:  "For planning purposes, the Department's initial objective is to return to our 2019 end-strength numbers of 399,957 employees," which reflects an approximate cut of 80,000 jobs.  Burke Decl. ¶¶7-9, Ex. A (AFGE).  VA Secretary Doug Collins confirmed this goal was "put out" by President Trump and OPM. *Supra* at 5.  The planned cuts will be implemented in stages including "administrative and support roles"; "medical and healthcare support staff"; "regional and central office staff"; and "field office and call center reductions."  Burke Decl. ¶13, Ex. C (AFGE)

"Cutting 80,000 VA employees will cause immediate chaos across every aspect of VA, including providing health care, helping veterans access other benefits, and processing claims." *Id.* ¶16; *see also* Shah Decl. ¶¶14-22 (cuts will cause "mass disruption" to medical care); Bailey Decl. ¶19.  Staff threatened by RIFs manage patient information, take calls from veterans in crisis, clean patient rooms, install and maintain fire suppression systems, conduct research studies, prevent dangerous workplace conditions, and perform other critical work.  Burke Decl. ¶¶18, 20 (AFGE); *see also* Bailey Decl. ¶19.  VA facilities are already short-staffed and further cuts will have catastrophic consequences for veterans' health care access. *Id.* ¶¶19-20; Turner-Nichols Decl. ¶¶14, 16 (AFGE); O'Brien Decl. ¶¶32-34 (AFSCME).  Cuts to procurement staff will disrupt access to medical devices, supplies, and mobility aids for VA medical centers and veterans.  Burke Decl. ¶17 (AFGE).

Members of Plaintiffs Common Defense and VoteVets will be harmed by delaying or curtailing VA services, cancellation of appointments, increasing wait times, raising barriers to communication and scheduling of appointments, and reducing the quality of services.  Shah Decl. ¶¶12, 14-22 (CD); Eaton Decl. ¶¶2, 9 (VV).  It will also harm Plaintiff localities, which depend on VA hospitals to provide high-quality care, including mental health services, tailored to veterans, such

that disruptions to services will impose additional burdens on county hospitals and support services. Williams Decl. ¶46 (Santa Clara); *see also* Dively Decl. ¶42 (King County).

**ARGUMENT**

**I.     This Court Should Enjoin Defendants' Implementation of Executive Order 14210 and the Resulting Agency RIF and Reorganization Plans**

A TRO is warranted when the moving party (1) is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. Fed. R. Civ. P. 65 (b)(1), (c); *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).  All of these factors strongly favor Plaintiffs.

**A.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims that the Executive Order and Agency Implementation are Unlawful**

**1.     Executive Order 14210 Violates Separation of Powers and is *Ultra Vires***

The President's actions must be authorized by the Constitution or an act of Congress. *Youngstown,* 343 U.S. at 585.  As in *Youngstown*, the President has bypassed and usurped the role of Congress:  "The President's order does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President."  *Id.*  Because, as explained in detail below, sections 3(c), (e), (f) and 4 of the Workforce Executive Order are not authorized by the Constitution or any statute, the President's orders to dismantle federal agencies, including by "large-scale reductions in force," are unlawful. Notably, the President cited no specific statutory authority for this Order.  App. A at 1.

**a.     The President Has No Article II Authority to Reorganize Agencies**

The Constitution vests in Congress the legislative power to create the departments, agencies, and offices within the executive branch; to define their duties; and to fund their activities.  U.S. Const. art. I, §1 (legislative power); *INS v. Chadha*, 462 U.S. 919 (1983); *Myers*, 272 U.S. at 129; U.S. Const. art I, §8, cl. 18 (Necessary and Proper Clause).  By this legislative power Congress thus "control[s]" the very "existence of executive offices."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010); *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022).  Indeed, among Congress's very first acts were "establishing executive departments and staffs."  Gary Lawson, *Necessary and Proper Clause*, *The Heritage Guide to the Constitution*,

1    The Heritage Foundation.[46]  When the First Congress created the Treasury Department, for example,

2    it established therein "distinct offices—Secretary, Comptroller, Auditor, Treasurer and Register—and

3    their duties."  Harvey C. Mansfield, *Reorganizing the Federal Executive Branch: The Limits of*

4    *Institutionalization*, 35 L. & Contemp. Probs. 462, 463 (1970).

5         Those executive agencies of the federal government are defined by various statutes, including

6    5 U.S.C. §§101, 104, 105 (defining "agency" to include departments and agencies).  Each agency has

7    its own authorizing statutes that govern its administration and create the office of the agency head.

8    *See e.g*., 10 U.S.C. §§111, 113 (Defense); 38 U.S.C. §§301, 303 (VA); 42 U.S.C. §§202, 203 (HHS);

9    42 U.S.C §§281, 282 (NIH); 42 U.S.C. §7131 (Energy).

10        The President's constitutional authority, by contrast, is set forth in Article II.  U.S. Const. art.

11   II §1, cl. 1.  The President has no constitutional legislative authority.  *Chadha*, 462 U.S. at 951, 956-

12   59; *Youngstown*, 343 U.S. at 635.  Thus, the President has no constitutional power to unilaterally

13   enact, amend, or repeal parts of duly enacted statutes.  *Clinton v. City of New York*, 524 U.S. 417,

14   438-39 (1998).  Rather than allowing the President to write or re-write statutes, the Constitution

15   instead requires that "[the President] shall take Care that the Laws be faithfully executed."  U.S.

16   Const. art. II, §3.  The Take Care Clause "refutes the idea that [the President] is to be a lawmaker.

17   The Constitution limits his functions in the lawmaking process to the recommending of laws he

18   thinks wise and the vetoing of laws he thinks bad."  *Youngstown*, 343 U.S. at 587.

19        And yet, the President does not execute the laws alone:  "He must execute them by the

20   assistance of subordinates."  *Myers,* 272 U.S. at 117.  "To aid him in the performance of these duties,

21   he is authorized to appoint certain officers, who act by his authority and in conformity with his

22   orders."  *Marbury v. Madison*, 5 U.S. 137, 166 (1803); *see also Seila L. LLC v. Consumer Fin. Prot.*

23   *Bureau*, 591 U.S. 197, 203-04 (2020) ("Because no single person could fulfill that responsibility

24   alone, the Framers expected that the President would rely on subordinate officers for assistance.").

25        The President's constitutional authority with respect to those who assist him in taking care

26   that the law is faithfully executed is established in the Appointments Clause which reads, "[t]he

27

28   ───────────────

[46] Available at:  http://www.heritage.org/constitution/#!/articles/1/essays/59/necessary-and-proper-clause.

President … shall nominate, and by and with the Advice and Consent of the Senate, shall appoint … [the] Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." U.S. Const. art. II, §2, cl. 2. Even the removal of Senate-confirmed officers is subject to recognized constitutionally permissible constraints. *See Seila Law*, 591 U.S. at 204 (recognizing boundaries of Article II authority to remove appointed officers).

Article II authority has *never* been extended to the power to order the removal of rank-and-file federal employees, let alone order the wide-scale layoff of hundreds of thousands of positions authorized by Congress. *Id.* (reaffirming limits of Article II removal authority under *Morrison v. Olson*, 487 U.S. 654 (1988); *Humphrey's Executor v. United States*, 295 U.S. 602 (1935); and *United States v. Perkins*, 116 U.S. 483, (1886)).[47] As the Supreme Court explained in *Free Enterprise Fund*:

> *Humphrey's Executor* did not address the removal of inferior officers, whose appointment Congress may vest in heads of departments. *If Congress does so, it is ordinarily the department head, rather than the President, who enjoys the power of removal*. This Court has upheld for-cause limitations on that power as well.

561 U.S. at 493 (emphasis added and citations omitted).

Article II does not give the President carte blanche authority over the structure or functions of the federal agencies created by Congress, either. Article II does not authorize the President to fundamentally reorganize the executive branch or restrict or abolish the congressionally authorized work of even a single agency that he did not establish. *See, e.g.*, *NTEU v. Vought*, 2025 WL 942772 (D.D.C. Mar. 28, 2025); 2025 WL 1144646, at *4 (D.D.C. Apr. 18, 2025) (affirming that the President lacks authority to dismantle agencies created by Congress). Congress has long understood the power to authorize reorganization both between and within agencies to be a legislative, not executive power. *Supra* at 8; *e.g.*, 5 U.S.C. §§901-905; *see also Limitations on Presidential Power to Create A New Exec. Branch Entity to Receive & Administer Funds Under Foreign Aid Legis.*, 9 Op. O.L.C. 76, 78 (O.L.C. 1985) (recognizing "Executive Branch's acquiescence in the need for reorganization legislation in order to restructure or consolidate agencies within the Executive

---

[47] *See also Bessent v. Dellinger*, No. 24A79 (U.S.) (Feb. 16, 2025 Application to Vacate the Order Issued by the United States District Court for the District of Columbia and Request for an Immediate Administrative Stay), at *27 (U.S. Solicitor General conceding *"Agency heads… control hiring and firing decisions for subordinates*." (emphasis added)).

1  Branch"); *President's Authority To Promulgate a Reorganization Plan Involving the Equal*

2  *Employment Opportunity Commission*, Op. O.L.C. 248, 250 (1977) ("reorganization plan may not

3  transgress the limitations set forth in 5 U.S.C. §905").

4  President Trump is trying to accomplish by executive fiat the exact type of reorganization that

5  has long been understood to be solely within Congress's power to exercise or delegate.  The last

6  version of the (now-lapsed) reorganization authority enacted by Congress defined "reorganization

7  plan" to include the types of actions ordered by President Trump in the Workforce Executive Order

8  14210, including, in particular, the "abolition of all or a part of the functions of an agency" *other than*

9  *statutorily mandated programs, id.* §903(a)(2) ("except that no enforcement function or statutory

10  program shall be abolished by the plan").  There can be no real dispute that the orders contained in

11  the Workforce Executive Order are legislative, not executive in nature, and have not been delegated

12  to President Trump by the power Congress has not reactivated.

13  **b.    The President Has No Statutory Authority to Restructure Agencies**

14  The President does not employ the millions of federal employees; the agencies do.  5 U.S.C.

15  §3101 (employment authority for all agencies).  Congress has delegated authority to determine *which*

16  employees to employ and *how many* (consistent with appropriations) to the heads of the federal

17  agencies, not to the President, in agencies' various authorizing statutes.  *Id.*; AFGE v. OPM, N.D. Cal.

18  Case No. 3:25-cv-01780-WHA (ECF 132 at *9).

19  Congress has never delegated to the President the authority to make the decision to remove

20  federal employees, whether by way of a RIF or for any other reason.  Instead, Congress has delegated

21  to the President only *rule-making authority* to issue government-wide regulations consistent with

22  merit-systems principles required by Congress.  *E.g.*, 5 U.S.C. §2301 (delegating to President rule-

23  making authority "necessary to ensure that personnel management is based on and embodies the

24  merit system principles."); *id.* §3301 (regulations for efficiency of hiring); *id.* §3302 (authority to

25  create excepted service from usual competitive requirements); *id.* §7301 (regulations for "conduct" of

26  employees within federal executive branch).  The plain language of the authority to create rules for

27  the "conduct" of the people who are employed by the government does not extend to the authority *to*

28  *make them no longer employed*, and therefore no longer subject to such rules.  *Cf.  Nat'l Ass'n of*

*Mfrs. v. United States Dep't of Homeland Sec.*, 491 F.Supp.3d 549, 564 (N.D. Cal. 2020) (finding "that Congress did not delegate authority to eviscerate portions of the statute in which the Congressional delegation of power was made.  Logic would so dictate.").

There is a statute within the Civil Service Reform Act ("CSRA") that imposes constraints on how an agency can conduct a RIF, but it does not grant any authority to the President.  That provision delegates authority only to OPM, and only to make government-wide rules for the "order of retention" that applies if agencies engage in such a reduction.  5 U.S.C. §3502.  And, to the extent that Congress designated OPM as the agency responsible for *procedural* implementation of the President's rules (5 U.S.C. §1103), that statute nowhere provides the President (or OPM, *see infra*), with authority to order agencies to implement wide-scale terminations of federal employees.

Nor has Congress delegated to the President the authority to transfer or excise specific programs, functions, or offices that Congress established and placed within a specific agency's statutory authority or discretion.  Such a delegation would come dangerously close to the line-item veto struck down as unconstitutional in *Clinton v. City of New York*, 524 U.S. 417 (1998).  Many of President Trump's recent actions effectively assume that line-item veto power, namely the power to excise programs that do not fall within the President's desired vision (i.e., AmeriCorps).

Nor has Congress delegated to the President the authority to decide to remove agency functions, offices or programs that are *not* statutorily authorized but were established by the agencies in an exercise of the authority given *to them* by Congress.  As discussed above, the 1977 Reorganization Act specifically defined the elimination of agency functions *other than statutorily mandated programs* to require Congressional approval, as a *legislative* act.  5 U.S.C. §903(a)(2).  The President crosses a line defined by Congress, and enters into the legislative arena, when he orders all federal agencies, across the board, to eliminate programs they created and budgeted for, and to wholesale eliminate personnel and cut services, *regardless* of the agencies' respective needs, all in service of the President's desire to reconfigure and shrink the government.  No statute comes close to authorizing that.[48]  And to the extent Congress has previously ever delegated any authority to the

---

[48] Congress at times has imposed significant constraints even on the agencies' ability to reorganize themselves.  *See, e.g.*, 26 U.S.C. §7802(d)(3)(C) (IRS: requiring approval by oversight

President to review and be involved in agency reorganizations in the past, as either general matter or in any agency-specific way, those authorizations have long since expired.[49]

Finally, to the extent that programs, offices, and positions that the President is ordering federal agencies to eliminate via these "large-scale" reductions and reorganizations are authorized by Congress and funded through current appropriations, no statute delegates to the President the power to direct the agencies to eliminate those functions or to cut spending. To the extent the President's order is directed at, in his words, "waste" and "bloat," the President lacks the authority to replace Congress's "considered policy judgment" in appropriating funds for the agencies' approved budgets for this workforce with his own. *E.g.*, *Widakuswara v. Lake*, 2025 WL 1166400, at *15 (D.D.C. Apr. 22, 2025) ("defendants' unwillingness to expend funds in accordance with the congressional appropriations laws is a direct affront to the power of the legislative branch"); *Aids Vaccine Advoc. Coal. v. United States Dep't of State*, 2025 WL 752378, at *15 (D.D.C. Mar. 10, 2025) (President lacks authority "to rescind or defer the funds Congress has appropriated); *PFLAG, Inc. v. Trump*, 2025 WL 685124, at *19 (D. Md. Mar. 4, 2025) (President may not direct agencies to withhold congressionally appropriated funds "in order to further an administrative policy"); *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025) (OMB may not "interfer[e] with Congress's appropriation of federal funds); *New York v. Trump*, 2025 WL 357368, at *2 (D.R.I. Jan. 31, 2025) ("The Executive Branch has a duty to align federal spending and action with the will of the people as expressed through congressional appropriations, not through 'Presidential priorities.'").

Thus, President Trump is now simply bypassing the Congressional authorization that his first-term Administration admitted was necessary for the reorganization plan but which he has not obtained, *supra* at 8. The President lacks either constitutional or statutory authority to order agencies

---

board prior to any agency reorganization); 42 U.S.C. §281 (HHS: requiring Congressional notice prior to reorganizing NIH); 38 U.S.C. §510 (VA: requiring Congressional approval before restructuring or downsizing personnel by more than 15% within any particular office).

[49] *See, e.g.,* 5 U.S.C. §901-905, discussed *supra* at 8; *see also* 6 U.S.C. §542 (authorizing President to reorganize for purposes of creating the Department of Homeland Security, notwithstanding the requirements of 5 U.S.C. §905(b), now expired); 42 U.S.C. §8819 (authorizing President to "review periodically the progress of the Secretary of Agriculture and the Secretary of Energy in carrying out the purposes [of the particular program]" and *apply to Congress to reorganize* pursuant to the now-expired "provisions of chapter 9 of title 5").

to act in the manner his Executive Order directs, and that Order is therefore ultra vires.  And where the government, including the President, takes ultra vires action, it is the proper constitutional role of this Court to declare that action unlawful.  *E.g.*, *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (2023); *Sierra Club v. Trump*, 963 F.3d 874, 888-93 (9th Cir. 2020), *judgment vacated on other grounds, sub nom. Biden v. Sierra Club*, 142 S.Ct. 46 (2021); *Sierra Club v. Trump*, 929 F.3d 670, 696-97 (9th Cir. 2019)); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996).

This Court should thus hold this Administration's actions unlawful and ultra vires.  *See, e.g.*, *Pacito v. Trump*, 2025 WL 655075, at \*11 (W.D. Wash. Feb. 28, 2025) (President Executive Order likely ultra vires); *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, -- F.Supp.3d --, 2025 WL 485324, at \*5 (D.D.C. Feb. 13, 2025) (foreign aid executive order); *New York v. Trump*, 2025 WL 1098966 (D.R.I. Jan. 28, 2025) (executive order suspending federal financial assistance); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 597959 (D.D.C. Feb. 25, 2025) (same).

### 2.    OPM's, OMB's, and DOGE's Actions Implementing Executive Order 14210 Exceed Statutory Authority and Are *Ultra Vires*

Neither OMB, OPM, nor DOGE possesses authority to order agencies to reorganize, to engage in "large-scale" RIFs, or to usurp the decision-making authority delegated by Congress.

**a.    OMB.**  Although OMB is housed within the Executive Office of the President, it was created by Congress.  *See* 31 U.S.C. §§501-507.[50]  OMB carries out statutorily mandated roles with respect to a variety of centralized functions, including budgeting, regulatory review, financial management, the promulgation of Executive Orders, and general management.  The OMB role with respect to Executive Orders is generally a procedural one (1 C.F.R. §19.2), unless the President includes a directive to OMB in an Executive Order, as he has done here.  OMB's authority with respect to financial and other management is generally limited to proposing policies, giving "advice" and making "recommendations" to agencies, along with long-range management planning.  31 U.S.C. §503.  To the extent that OMB assumes a role that goes beyond advising, making recommendations,

---

[50] As this Congressional Research Service Report explains, the roles played by OMB in faithfully implementing statutory authority and effectuating the President's policy can result in tension.  Cong. Rsch. Serv., RS21665, *Office of Management and Budget (OMB): An Overview* (2023).  Most of the roles played by OMB do not remotely authorize the actions here, including "budget formulation and execution;" "legislative coordination and clearance;" "information and regulatory affairs."  *Id*. at \*2.

or gathering reports from agencies, but instead purports to direct and approve (or reject) agency action, OMB crosses the line from clearinghouse or advisor to decision-maker—which Congress did not authorize. *E.g.*, *Nat'l Council of Nonprofits v. OMB*, 1:25-cv-00239, 2025 WL 597959, at *15-16 (D.D.C. Feb. 25, 2025) (rejecting argument that OMB management role set forth in §503 authorizes action implementing Executive Order freezing government spending). And §503 does not give OMB the authority to make significant decisions *for agencies* in the realm of agency organization, agency functions or programs, or the size and scope of programs or staffing, particularly in light of the many statutes delegating those functions to the agencies themselves.[51]

The Administration has already confirmed that OMB is acting as the final decision-maker with respect to the content of the ARRPs. First, the February 26, 2025 Memorandum unambiguously provides "instruction" to submit the ARRPs for "approval." App. B at 1, 3-4; *supra* at 12 (FOIA request for ARRPs rejected as pre-decisional because "*none have been approved by OMB*."). Because OMB lacks the authority to order federal agencies to downsize or reorganize, or to assume final decision-making power by requiring agencies to submit such plans for OMB approval, its actions to implement the President's Executive Order are ultra vires.

**b.    OPM.** OPM similarly has no statutory authority to approve agency plans to reorganize between or within agencies. 5 U.S.C. §§1101-1105. Nor does it have authority to require agencies to terminate workers, as this Court recently held. *AFGE v. OPM*, No. 3:25-cv-01780-WHA (N.D. Cal.), ECF No. 45 (Feb. 28, 2025 Order); ECF No. 132 (Mar. 14, 2025 Order); ECF No. 202 (Apr. 18, 2025 Order). OPM's statutory authority with respect to RIFs consists of setting government-wide order of retention rules for the release of employees in a RIF, *not making the decision whether or how many employees to RIF*. 5 U.S.C. §3502. OPM cannot order federal agencies to downsize or reorganize, or assume final decision-making power. OPM's actions in implementing the President's Executive Order thus exceed any OPM authority and are ultra vires.

---

[51] OMB's authority to apportion congressional appropriations to federal agencies gives OMB reach across the executive branch, but that apportionment authority is narrowly limited to "prevent[ing] obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period," 31 U.S.C. §1512.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**c.    DOGE.**  DOGE was created by Executive Order and has no statutory authority at all. *See AFL-CIO v. Dep't of Labor*, Case No. 25-cv-00339-JDB (D.D.C. April 16, 2025 Order), ECF No. 78 ("defendants' motion to dismiss points to *no legal source* that grants USDS the authority to take these actions"); Exec. Order 14158 (Jan. 20, 2025).  DOGE cannot cloak itself in authority the President lacks either.  DOGE lacks any authority to order federal agencies to anything and its actions to implement the Executive Order therefore exceed any authority and are ultra vires.

> **3.    OPM's, OMB's, and DOGE's Actions Implementing Executive Order 14210 Also Violate the APA**

OPM, OMB, and DOGE are all agencies subject to the APA.  *See* 5 U.S.C. §701(b)(1); *AFGE v. OPM*, N.D. Cal. Case No. 3:25-cv-01780-WHA (N.D. Cal.) (OPM); *NTEU v. Helfer*, 53 F.3d 1289, 1292-93 (D.C. Cir. 1995) (OPM)); *New York v. Trump*, 133 F.4th 51, 70 (1st Cir. 2025) (OMB); *Nat'l Council of Nonprofits*, 2025 WL 597959, at *12-13 (OMB); *see also AFL-CIO v. Dep't of Lab.,* 2025 WL 1129227, at *45 n.19 (D.D.C. Apr. 16, 2025) ("Defendants do not contest that USDS is an agency—either for purposes of judicial review or APA review"); *AFSCME*, 2025 WL 868953, at *56 (analyzing whether USDS is "agency" including by reference to APA definition).

OPM and OMB's Memorandum requiring agencies to submit ARRPs, and OPM and OMB's "approvals" of ARRPs, are final agency actions that are reviewable under the APA.  *See* 5 U.S.C. §704; *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) ("[F]inal agency actions, even if implementing an executive order, are subject to judicial review under the APA.").  So are DOGE's directives ordering agencies to make staffing and spending cuts.  Final agency action (1) marks the "consummation of the agency's decisionmaking process" and (2) is action by which "rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted).  The finality requirement is "interpreted in a pragmatic and flexible manner" that "focus[es] on the practical … effects of the agency action."  *Pruteh Litekyan: Save Ritidian v. United States Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025) (citation omitted).

Each action challenged here qualifies.  OPM and OMB's Memorandum is final agency action because it is a "definitive statement of [OPM and OMB's] position" on the steps federal agencies must take to comply with Executive Order 14210, and it imposes obligations on federal agencies,

including to submit and implement ARRPs, with which "immediate compliance … is expected."  *See id.*[52]  OPM and OMB's approvals of specific agencies' ARRPs are also independently final agency actions, because they are neither "tentative [n]or interlocutory," *Bennett*, 520 U.S. at 178, but rather final decisions approving the individual ARRPs pursuant to which each agency will conduct RIFs and restructuring.  *See Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006); *New York v. Trump*, 133 F.4th at 67-68.  DOGE's directives to specific agencies requiring cuts to programs and staffing are similarly final agency actions because they are the "consummation" of DOGE's decision-making process, with which "immediate compliance … is expected."  *Id.* (citation omitted); *see supra* at 4, 11.

### a.    The OPM, OMB and DOGE actions exceed statutory authority

The APA prohibits agency action that exceeds statutory or constitutional authority or is otherwise not in accordance with law.  *See* 5 U.S.C. §706(2)(A), (C); *Kaweah Delta Health Care Dist. v. Becerra,* 123 F.4th 939, 944 (9th Cir. 2024) (under APA, vacating agency action that exceeded statutory authority); *Northwest Env't Advocates v. E.P.A.*, 537 F.3d 1006, 1025-27 (9th Cir. 2008) (same).  For the reasons discussed *supra* at 35-37, the OMB, OPM and DOGE actions issuing the Memorandum, exercising approval authority over ARRPs, and dictating cuts to agency staffing and functions exceed any authority those agencies possess and violate 5 U.S.C. §706(2)(A) and (C).

### b.    The OPM, OMB, and DOGE actions are arbitrary and capricious

OPM's, OMB's, and DOGE's actions are also arbitrary and capricious, in violation of 5 U.S.C. §706(2)(A).  The APA requires federal agencies to engage in "reasoned decisionmaking," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), which means that agency action must be both "reasonable and reasonably explained," *FCC v. Prometheus Radio*

---

[52] This Memorandum is final agency action even though "reviewing and approving individual" agency-specific ARRPs remains.  *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 869 (9th Cir. 2022) (agencies' programmatic environmental assessment of offshore well treatments was final agency action even though agencies "will still have to approve permits from private entities .. before the treatments will … be used" and plaintiffs harmed); *Prutehi Litekyan: Save Ritidian*, 128 F.4th at 1108 ("a federal agency's assessment, plan, or decision qualifies as final agency action even if the ultimate impact of that action rests on some other occurrence—for instance, a future site-specific application, a decision by another administrative agency, or conduct by a regulated party"); *Biden v. Texas*, 597 U.S. 785, 807-10 (2022) (DHS memo was final agency action).

*Project*, 592 U.S. 414, 423 (2021).  An agency must "adequately consider[] all relevant factors," *Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1232 (9th Cir. 1993) (citation omitted), and "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It is arbitrary and capricious for an agency to "entirely fail[] to consider [an] important aspect of the problem." *Regents of the Univ. of Cal.*, 591 U.S. at 30 (citation omitted). "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action."  *Id.* at 20 (quotation omitted).

*OMB and OPM Memorandum and ARRP Approvals.* OMB and OPM's Memorandum and approvals of ARRPs are the epitome of arbitrary and capricious action, for several reasons.

1. The time period provided by OMB and OPM to submit plans for massive layoffs and restructuring (a mere *two weeks* for the initial plan that must identify agency-wide cuts) is absurdly short and necessarily means that agencies could not engage in rational decision-making, as opposed to simply following the desires of the President and his agents.  *See, e.g.*, McKeon Decl. ¶¶7-45; Hugler Decl. ¶¶7-21; Wells Decl. ¶¶39-47 (collectively, former government officials describing complex agency deliberations and process required to plan RIFs).

2. OMB and OPM's mandate that all agencies engage in "large-scale RIFs" to achieve a "significant reduction" in personnel and the "maximum elimination of functions" (in the name of eliminating "bloat" and "waste"), is per se unreasonable and necessarily disregards important aspects of the decision at issue, including the impacts on the agencies' ability to effectively perform their statutory functions and requirements and the resulting consequences to the public, the economy, the environment, or anything else.[53]  App. B at 3-4; *see also infra* at 14-29.

---

[53] Although the Executive Order and Memorandum briefly acknowledge agencies are subject to statutory authority, those caveats are "nothing more than window dressing." *New York v. Trump*, 133 F.4th at 69; App. A §3(c); App. B at 2.  The boilerplate references to statutory authority are inherently incompatible with the directive to adhere to the Executive Order's and Memorandum's categorical RIF requirements. "Savings clauses are read in their context, and they cannot be given effect when the Court, by rescuing the [legality] of a measure, would override clear and specific language."  *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018) (rejecting Executive Order's caveat that agency actions be performed "consistent with law" because it conflicted with the order's unambiguous requirements).  Additionally, Federal Agency Defendants' extensive functions and obligations are governed by myriad statutes.  The deadlines imposed do not

1       3. OMB and OPM's categorical requirements that agencies engage in large-scale RIFs, in

2  compliance with instructions to cut all programs the President (or his agents) has targeted, App. B at

3  4; *see also* App. A §3(c), and using 2019 Lapse Plan staffing levels as a baseline, App. B. at 2, are

4  irrational and unmoored from any reasonable consideration of the relevant factors.  Requiring

5  agencies to abolish all offices, programs, and operations identified by the President (or via his agents)

6  necessarily requires agencies to ignore their complex array of statutory authority and obligations and

7  effectively permits the President to wield power that he does not have.  Lapse Plan levels are an

8  arbitrary starting point: *by definition*, they do not reflect staff levels for fully functioning agencies,

9  *see supra* n. 17.  And using 2019 levels (the last year of the prior Trump Administration) is even

10  more arbitrary.  Those levels have nothing to do with agencies' current needs and obligations.

11       These actions by OMB and OPM are neither "reasonable [nor] reasonably explained."

12  *Prometheus Radio Project*, 592 U.S. at 423.  Indeed, they are patently *un*reasonable, given the harm

13  and chaos they are causing.  *See supra* at 14-29.  The APA does not permit a "break it now, fix it

14  later" method of governance.  Even if the Memorandum's stated goal were within OMB/OPM's

15  authority (which it is not), OMB and OPM have provided no explanation, let alone a rational one, for

16  their choice to accomplish that goal through a whirlwind, clandestine process that replaces considered

17  agency decision-making with unqualified mandates and ignores countervailing considerations,

18  including the repercussions that will necessarily result from abruptly abolishing vast swaths of

19  government service and functions.  *See id.; League of California Cities v. FCC*, 118 F.4th 995, 1014

20  (9th Cir. 2024) (agency action is arbitrary and capricious if the agency "entirely failed to consider an

21  important aspect of the problem, or offered an explanation that runs counter to the evidence before

22  the agency or is so implausible that it could not be ascribed to a difference in view or the product of

23  agency expertise").  And OMB and OPM's categorical requirements necessarily preclude the federal

24  agencies that are carrying out RIFs from engaging in reasoned decision-making that considers all

25  important aspects of the decision as required by the APA.  *See infra* at 42-45.

26       *DOGE directives.*  The evidence (including the President's orders, public statements from

27

28  ---

provide them anywhere near sufficient time to assess what staffing and programs are necessary to
adequately provide statutorily required functions.  *See New York v. Trump*, 133 F.4th at 69.

agency officials, and statements from DOGE itself) establishes that DOGE is directing agencies to cut programs and personnel by imposing mandatory targets and using DOGE teams embedded at agencies to enforce those targets.  DOGE's actions are neither reasonable nor reasonably explained. The public explanation provided by representatives of DOGE for its actions is "waste and fraud."[54] But none of the cuts to agency personnel and functions demanded by DOGE have any identified connection to "waste" or "fraud."  As in other cases:

> [DOGE] has not even attempted to explain why a more tailored, measured, titrated approach is not suitable to the task. Instead, the government simply repeats its incantation of a need to modernize the system and uncover fraud.  Its method of doing so is tantamount to hitting a fly with a sledgehammer.

*AFSCME v. Soc. Sec. Admin.*, 2025 WL 868953, at *68 (D. Md. Mar. 20, 2025).  Again, even assuming for the sake of argument that DOGE has any authority here (which it does not), what DOGE's statements make clear is that DOGE has utterly failed to grapple with numerous important relevant aspects of the decision at hand, including the consequences that its directed cuts have for agencies' abilities to perform proper functions and obligations, the financial implications of these ham-handed decisions, and the resulting harms to the constituents the agencies serve and the public.

### c.    OPM and OMB failed to comply with notice-and-comment rulemaking

The APA requires OPM rules to go through a "notice-and-comment" process before enactment, so that the public can weigh in and the agency can consider the public's views.  *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); 5 U.S.C. §553; 5 U.S.C. §1103(b)(1), 1105 (OPM rules subject to APA).  "Rule" is "defined broadly to include any 'statement[s] of general or particular applicability and future effect' that are designed to 'implement, interpret, or prescribe law or policy.'"  *Perez*, 575 U.S. at 95-96 (quoting 5 U.S.C. §551(4)).  OPM and OMB's Memorandum and their decisions "approving" ARRPs are all "rules," because they "create[] new rights and impose[] new obligations" that federal agencies are required to follow.  *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1088 (9th Cir. 2003); *see Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009).  Yet OMB and OPM indisputably failed to proceed through the

---

[54] Fox News, *Elon Musk and DOGE team give exclusive look at how they're cutting waste, handle critics* (Mar. 27, 2025), available at: https://www.foxnews.com/video/6370654825112.

notice-and-comment rulemaking process before issuing the Memorandum and approvals. Those actions were therefore "without observance of procedure required by law" and invalid. 5 U.S.C §706(2)(D); *Chief Prob. Officers of Cal. v. Shalala*, 118 F.3d 1327, 1329 (9th Cir. 1997).

### 4.        Federal Agency Defendants Also Violate the APA

The Federal Agency Defendants named in this TRO Motion are currently or imminently implementing the ARRPs, including by terminating federal employees on a massive scale, shuttering entire agency programs, offices, and functions, and reorganizing and restructuring the remaining agency positions and functions. *See* Section **, *supra*. Those actions to implement the ARRPs are all also final agency action under the APA, because they are the "consummation of [each] agency's decisionmaking process" to comply with the Executive Order, Memorandum, and/or DOGE directives and they determine the legal rights and obligations of, and have legal consequences for, thousands of federal employees. *See New York v. Trump*, 133 F.4th at 62-63, 67-68 (OMB memorandum *and* agency implementing action were both "final agency action" under APA).

Federal Agency Defendants' actions implementing the Workforce Executive Order are arbitrary and capricious for several reasons.

1. Agencies have ceded their decision-making authority to the President and his agents at OMB, OPM, and DOGE, and thereby have defied and ignored any applicable Congressional policy and intent. *See supra* at 9-29.

2. Adhering to the categorical objectives in the President's and his agents' orders necessarily precludes agencies from considering or relying on important relevant factors – including their own statutory, programmatic, and other functions and obligations; their own appropriated funds authorized by Congress; the negative impact on the federal civil servants they employ; and myriad harmful effects that the decimation of government services and functions will have on public health, national security, scientific and medical research, the economy, and the environment. *See supra,* 14-29. An agency's desire to meet one goal "does not excuse the failure to address" the agency's other relevant requirements or obligations. *Nat'l Urb. League v. Ross*, 977 F.3d 770, 779 (9th Cir. 2020). But the Order prevents considering or prioritizing agency functions and public impacts, and agencies therefore "entirely fail[] to consider … important aspect[s] of the problem." *Regents of the Univ. of*

*Cal.*, 591 U.S. at 30 (citation omitted).

3.  Targeting 2019 Lapse Plan staffing levels and mandatory program reductions are necessarily arbitrary and capricious.  "An agency's obligation to consider alternatives is well settled[.]" *Su*, 121 F.4th at 16-17 *see also Nat'l Urb. League*, 977 F.3d at 779.  But the pre-ordained parameters prevent any reasoned assessment or pursuit of alternatives.

4.  Federal Agency Defendants' actions in abolishing fully funded agency offices, programs, and functions (and their corresponding workforces) that the agencies previously implemented and deemed necessary and important to performing the agencies' purposes are an abrupt reversal in position.  Agencies that reverse established policies are required to "take[] into account" the "serious reliance interests" in such policies and "weigh any such interests against competing policy concerns" before acting.  *Regents of the Univ. of Cal.*, 591 U.S. at 30, 32 (quoting *Encino Motorcars, LLC v. Navarro,* 579 U.S. 211, 221-22 (2016)).  "It would be arbitrary and capricious to ignore such matters." *Id.* (quotation omitted).  Here, the directives of the President and his agents prevent any consideration of or accommodation for reliance interests.

5. Federal Agency Defendants' elimination of longstanding programs and the workforces needed to carry out those programs is also insufficiently explained.  An agency that reverses its position is required to "display awareness that it is changing position" and "show that there are good reasons for the new policy."  *Encino Motorc*ars, 579 U.S. at 221 (citation omitted); *League of California Cities*, 118 F.4th at 1014.  But Federal Agency Defendants have provided no "good reasons" for their new position that programs and workforces that have existed for decades are no longer important to performing the agencies' functions.  Indeed, by refusing to make ARRPs public, these agencies have failed to provide *any* reasoned explanation for their actions.  They are not entitled to any presumption of regularity for their irrational and unexplained about-face.

6. The short deadlines in which Federal Agency Defendants were required to make RIF determinations prevented any meaningful consideration of relevant factors, and the oversight authority exercised by OPM and OMB would override attempts to depart from the categorical requirements based on other relevant considerations.  *See Nat'l Council of Nonprofits*, 2025 WL 597959, at *7 (rejecting contention that "countless federal agencies ... suddenly began exercising

1   their own discretion to suspend funding across the board at the exact same time" because it requires

2   "unfathomable" "coincidental assumptions" and "contradicts the record"); *New York v. Trump*, 133

3   F.4th at 68 (affirming conclusion that "any suggest[ion] that the challenged federal funding freezes

4   were purely the result of independent agency decisions was 'disingenuous'").[55]  "A court is not

5   required to exhibit a naiveté from which ordinary citizens are free."  *New York*, 133 F.4th at 68.

6       For all of those reasons, Federal Agency Defendants' actions carrying out the President and

7   his agents' orders are neither reasonable nor reasonably explained.  Courts have enjoined similar

8   arbitrary and capricious conduct by agencies blindly following the President's unlawful orders.[56]

9   ### 5.    This Court Has Jurisdiction to Hear These Claims

10  ### a.    All Plaintiffs Have Article III Standing

11      While all Plaintiffs have standing, this Court can proceed upon finding that even a single

12  plaintiff does.  *See Townley v. Miller*, 722 F.3d 1128, 1135 (9th Cir. 2013).

13      The union Plaintiffs have standing on behalf of their members.  *See Fellowship of Christian*

14  *Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 681 (9th Cir. 2023) (associational

15  standing standard).  Union Plaintiffs' members include many federal employees who have suffered,

16  or imminently will suffer, termination due to the RIFs, and so have lost or will lose salaries, health

17  insurance, and other benefits, and will face moving expenses, new job searches, and in some cases

18

19  ---

    [55] Courts have rejected this Administration's attempts to blame agencies for action the Administration

20  required them to take.  *See AFGE v. OPM*, N.D. Cal. Case No. 25-cv-01780-WHA, ECF Nos. 44, 45, 120, 132 (OPM, not federal agencies, ordered terminations of probationary employees); *Supra at \*\**.

21  [56] *See Widakuswara v. Lake*, 2025 WL 1166400, at \*14 (D.D.C. Apr. 22, 2025) ("[D]efendants had no method or approach … that this Court can discern. They took immediate and drastic action to

22  slash USAGM, without considering its statutorily or constitutionally required functions … and without regard to the harm inflicted on employees, contractors, journalists, and media consumers

23  around the world.  It is hard to fathom a more straightforward display of arbitrary and capricious actions[.]"); *New York*, 2025 WL 715621, at \*8-9 (agencies' funding freezes pursuant to executive

24  order arbitrary and capricious because the record "does not suggest that agencies made individualized assessments … before making the determination to blankety pause … funds"); *New York*, 133 F.4th

25  at 70 ("categorical" funding freezes likely arbitrary and capricious:"given their breadth and immediacy, [they] were likely not supported by rational reasons and [the agencies] failed to consider

26  meaningfully important aspects of the problem"); *Nat'l Council of Nonprofits*, 2025 WL 368852, at \*11 ("Plaintiffs allege that OMB's funding freeze … failed to consider the disastrous effects it would

27  have.  Defendants … insist that … it is done "to ensure compliance with the President's priorities.' But furthering the President's wishes cannot be a blank check for OMB to do as it pleases.  The APA

28  requires a rational connection between the facts, the agency's rationale, and the ultimate decision.").

severe emotional distress.[57]  The members who remain employed will face overwork and worsened

conditions.[58]  And AFSCME and SEIU also represent state, county, city, and private sector

employees who will suffer direct injuries from implementation of the ARRPs.  *Supra* at 13.  The

union Plaintiffs also have standing to sue in their own right because the government's "behavior has

frustrated [their] mission and caused [them] to divert resources in response to that frustration of

purpose."  *Fellowship of Christian Athletes*, 82 F.4th at 681 (citation omitted).  The RIFs "directly

affect[] and interfere[] with [the unions'] core business activities," which include representing and

providing counseling and assistance to all federal employees in the unions' bargaining units.  *Food &*

*Drug Admin. v. All. for Hippocratic Med.,* 602 U.S. 367, 395 (2024).[59]

        The non-profit organization Plaintiffs similarly have standing to sue on behalf of their

members and in their own right.  The accompanying declarations demonstrate that their members

have been and will be harmed by the loss of government services resulting from Defendants'

elimination of agency staff, functions, and programs.[60]  That harm includes, for example, public

health official members of APHA who are left without critical CDC support; AGU scientist members

who face the loss of access to critical data and research from numerous federal agencies; retiree

members of ARA facing barriers getting through to the SSA; small business members of MSA who

face delays in obtaining loans and loan guarantees and the loss of support; and members of veterans

groups facing delays and detriment to services.  Benjamin Decl. ¶¶27-31 (APHA); Shultz Decl. ¶¶5,

21-27 (AGU); Fiesta Decl. ¶¶5-9, 20-23 (ARA); Phetteplace Decl. ¶¶2-3, 6, 9-15 (MSA); Eaton Decl.

---

[57]  *See* App. C; Kelley Decl. (AFGE) ¶¶2-3, 22, 24, 25; Blake Decl ¶¶9-45 (AFSCME); Cochran Decl. ¶21; Norman Decl. ¶15 (AFGE); Howell Decl. ¶¶15, 23 (AFGE); Wilson Decl. ¶¶13, 16 (AFGE); Turner-Nichols Decl. ¶¶10, 12 (AFGE).

[58]  *See, e.g.*, Fabris Decl. ¶¶28-33 (AFGE); Wilson Decl. ¶¶12-14 (AFGE); Hunter Decl. ¶37 (AFGE); Bailey Decl. ¶¶20, 22 (SEIU).

[59]  Kelley Decl. ¶¶10-15, 16-21; Levin Decl. ¶20; Dreyfus Decl. ¶17; Gustafsson Decl. ¶16; Fabris Decl. ¶33; Niemeier-Walsh Decl. ¶32; Soldner Decl. ¶25; Bobbitt Decl. ¶37; Braden Decl. ¶21; Bachelder Decl. ¶21; Norman Decl. ¶18; Wilson Decl. ¶17; Daly Decl. ¶32. Union Plaintiffs are also harmed because they will lose members and funding from lack of dues. Kelley Decl. ¶¶16-21; Gamble Decl. ¶17; Dreyfus Decl. ¶¶18-20; Gustafsson Decl. ¶19; Levin Decl. ¶23; Fabris Decl. ¶34; Niemeier-Walsh Decl. ¶33; Soldner Decl. ¶¶23-24; Bobbitt Decl. ¶38; Braden Decl. ¶22; Bachelder Decl. ¶24; Daly Decl. ¶34; Norman Decl. ¶¶20-21; Turner-Nichols Decl. ¶13; Bailey Decl. ¶¶22, 24.

[60]  *See, e.g.*, Olson Decl. ¶¶16, 26, 28-29, 36-39 (CTR); Shah Decl. ¶14-22 (Common Defense); Molvar Decl. ¶¶39, 40 (WWP); Davis Decl. ¶¶30, 32-41 (NOFA); Neubacher Decl. ¶10 (CPANP).

¶¶2, 9 (VV).  The organizations are also suffering organizational injury from the RIFs and

reorganization.[61]  AGU also has federal employee members at risk of job loss and increased workload

burdens due to RIFs.  Shultz Decl. ¶¶5-6, 12, 13-20.  These declarations show actual harm as well as

a "substantial risk" of additional harm, either of which is sufficient.  *See Robins v. Spokeo*, 867 F.3d

1108, 1117-18 (9th Cir. 2017); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (future

injury suffices "if … there is a substantial risk that the harm will occur"); *San Diego Cnty. Credit

Union v. Citizens Equity-First Credit Union*, 65 F.4th 1012, 1025 (9th Cir. 2023) (same).[62]

      The local government Plaintiffs have standing to "protect [their] own proprietary interests…

as varied as a municipality's responsibilities, powers, and assets."  *City of Sausalito v. O'Neill*, 386

F.3d 1186, 1197-98 (9th Cir. 2004).  These Plaintiffs are incurring current and imminent harm cuts to

the federal staff services that they rely on, including, for example, USDA screening of dangerous

products at ports of entry, safety-essential weather forecasts from NOAA, irreplaceable CDC

laboratory resources and support for controlling disease outbreaks, and HUD resources to support

housing assistance and prevent instability—any one of which could present life-threatening and other

serious risks to residents, and many of which will impose serious additional costs.  *See supra,* 14-29.

      Finally, Plaintiffs have standing for their procedural claims, because they would have

submitted comments had Defendants properly engaged in notice-and-comment rulemaking.[63]

### b.    No Plaintiff is Required to Channel These Claims

      This Court has subject matter jurisdiction to hear these federal claims pursuant to 28 U.S.C.

---

[61] *See* Shultz Decl. ¶¶9, 26, 28-29 (AGU; lost revenue and advancement of science that is AGU's mission, due to cuts at USDA, NOAA, DOE, EPA, NSF), ¶30 (resource diversion, pivoting away from priorities); Benjamin ¶33 (APHA: loss of data collection tools, scientific research), 37-38 (diversion of resources to fill gaps in public health advice and information), 41 (revenue loss); Olson Decl. ¶¶40-43 (CTR; resource diversion, overburdened staff); Shah Decl. ¶23 (Common Defense; resource diversion, harming ability to provide services); Davis Decl. ¶43 (same); Eaton Decl. ¶11 (VoteVets; same, plus increased operating costs); Molvar Decl. ¶¶6-8, 10-22 (WWP; lost data and research it relies on for its conservation mission); Neubacher Decl. ¶17 (CPANP); Fiesta Decl. ¶10 (ARA).

[62] This case is nothing like *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), in which the plaintiffs' theory of future injury and causation relied on a "highly attenuated chain of possibilities" that required five separate and "speculative" events by independent actors to occur before the challenged statute would even affect the plaintiffs.

[63] *See, e.g.*, Howell Decl. ¶25 (AFGE); Schelling Soldner Decl. ¶27 (AFGE); Jacobs Decl. ¶37 (AFGE); Hunter Decl. ¶40 (AFGE); Soriano Decl. ¶24 (AFGE); Couture Decl. ¶25 (AFGE); Shah Decl. ¶27 (Common Defense); Fiesta Decl. ¶24 (ARA); Neubacher Decl. ¶18 (CPANP); Leach Decl. ¶54 (Baltimore); Williams Decl. ¶47 (Santa Clara).

§1331.  Defendants may argue, as the Administration has elsewhere, that this Court lacks jurisdiction on the theory that Congress impliedly "channeled" these claims into an administrative adjudicatory scheme under the CSRA (via the Merit Systems Protection Board, "MSPB") or the Federal Service Labor-Management Relations Statute ("FSLMRS") (via the Federal Labor Relations Authority, "FLRA"), *before* they may be heard in federal court, under the doctrine established by *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-13 (1994).  Plaintiffs are likely to succeed, because Congress that created the civil service protections set forth in the CSRA and FSLMRS did not silently foreclose judicial review when the Administration engages in a wholesale dismantling of federal agencies.

i. As a threshold matter, the administrative agencies at issue were never designed to handle claims involving (1) the President, (2) OPM, (3) OMB, or (4) DOGE, *or* (5) agency action effectuating government-wide Presidential orders, whether under the APA or ultra vires doctrine. The MSPB hears employee appeals from specific adverse personnel actions by employing agencies. 5 U.S.C. §7701; *id.* §7703.  The FLRA hears bargaining unit-specific matters that *expressly exclude* government-wide action.  *NTEU and Dep't of Treasury, IRS*, 60 F.L.R.A. 783, 783 (2005) (FLRA lacks jurisdiction to consider challenges to government-wide rules); *see also* 5 U.S.C. §7117(a)(1) (duty to bargain excludes "Government-wide rule or regulation"). Implied doctrines must, of course, remain grounded in and faithful to text.  *E.g., Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391-92 (2024); *see also Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 383 (2012) ("[J]urisdiction conferred by 28 U.S.C. §1331 should hold firm against 'mere implication flowing from subsequent legislation.'").[64]  There is no basis anywhere in text to conclude that the types of claims Plaintiffs assert were ever intended for these agencies.  *See, e.g.*, *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10 (2012) (noting that Congress created an administrative scheme for some claims by "*covered employees* appealing *covered agency actions*" (emphasis added)).  Thus, recent decisions have agreed that government-wide action, or agency dismantling, are not channeled.  *E.g., AFGE,* 2025 WL 900057, at *2; *see also Widakuswara v. Lake*, 2025 WL 1166400, at *11 (D.D.C. Apr. 22, 2025).

ii. *Union Plaintiffs*.  As in the recent *AFGE v. OPM* case, and other union cases challenging

---

[64]  *See also Axon Enters., Inc. v. FTC*, 598 U.S. 175, 217 (2023). (Gorsuch, J., concurring) ("Respectfully, this Court should be done with the *Thunder Basin* project.  I hope it will be soon.").

the dismantling of agencies, these are not the type of claims that are properly sent to the MSPB or the FLRA.  *OPM*, *supra*; *Widakuswara, supra.*  An early challenge to a variety of actions by the President (including the Workforce Executive Order) brought by other unions that asserted limited claims based on impact on bargaining rights and their own financial harm was held to raise labor disputes that should be heard by the FLRA in the first instance.  *NTEU v. Trump*., 2025 WL 561080, at *1 (D.D.C. Feb. 20, 2025).[65]  Plaintiffs bring entirely different claims here.  And the Ninth Circuit has *never* channeled any case other than an employee's individual claim against their employing agency.[66]  It certainly has never channeled an ultra vires or APA claim challenging government-wide orders of any sort, nor any claim against the President, OPM, OMB, or DOGE.  *See also Feds for Med. Freedom v. Biden*, 63 F.4th 366 (5th Cir.) (en banc), *judgment vac'd on other grounds*, 144 S. Ct. 480 (2023) (rejecting channeling of challenge to Presidential mandate).

iii. *Non-Union Organizations and Local Government Plaintiffs*.  Organizations and government entities are not silently barred from bringing systemic challenges to unlawful government acts in federal court.  *See AFGE v. OPM*., 2025 WL 914823, at *1 (9th Cir. Mar. 26, 2025) ("Nor have appellants demonstrated—under existing authority—that they are likely to establish that Congress has channeled the organizational plaintiffs' claims to administrative agencies.");[67] *Maryland v. USDA*, 2025 WL 973159, at *15 (D. Md. Apr. 1, 2025) (states' claims not channeled).

For purposes of this TRO motion, under governing Ninth Circuit law, Plaintiffs have more than a likely chance of success of defeating any argument that these claims are "channeled."

**B.    Defendants Are Causing, and Will Continue to Cause, Irreparable Harm**

First, "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted); *Rodriguez v. Robbins*,

---

[65] That case contended that agencies were going to violate RIF regulations regarding employee retention requirements, which that court believed could be heard by the FLRA.  *Id.*

[66] *E.g.*, *Veit v. Heckler*, 746 F.2d 508, 510-11 (9th Cir. 1984) (federal employee's claims against his employing agency challenging a personnel action).

[67] The Supreme Court's stay in the probationary employees case did not endorse the Administration's channeling arguments.  *OPM v. AFGE*, 2025 WL 1035208, at *1 (U.S. Apr. 8, 2025).  Alsup ultimately rejected these argument, with respect to unions, non-profits, and the State of Washington.  *AFGE v. OPM*, Case 2025 WL 900057, at *2 (N.D. Cal. Mar. 24, 2025); 2025 WL 660053, at *8 (N.D. Cal. Feb. 28, 2025); (ECF No. 88, Order Granting Leave to Amend).

715 F.3d 1127, 1144-45 (9th Cir. 2013).  Where executive action causes constitutional injuries, injunctive relief is appropriate.  *See Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017). These principles apply to structural separation of powers violations.  *Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 537-38 (N.D. Cal. 2017).  Second, the union and other Plaintiffs' federal employee members who have been or will be terminated face irreparable injury from losing their wages and health benefits for themselves and their families and in many cases needing to relocate. *See supra* at 14; *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (loss of health coverage).  Damages are not available in APA cases, making this monetary harm irreparable.  *See Pangea Legal Servs. v. U.S. Dep't of Homeland Security*, 512 F.Supp.3d 966, 976 (N.D. Cal. 2021); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020).[68]

Third, the non-profit organization Plaintiffs' members, and SEIU and AFSCME's non-federal members, face irreparable injury from the disruption of critical government services, including high risks of environmental degradation, impairment of scientific research, risks to public health, nonenforcement of safety and labor standards, and lack of timely access to government benefits.  *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) ("[E]nvironmental injury, by its nature, … is … irreparable.") (citation omitted); *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) (loss of government benefits); *supra*, 14-29. Fourth, the local government Plaintiffs face irreparable harm from the loss of federal services, information, and support, without which they cannot effectively provide government services and protect their populations, and which will require substantial resource diversion and threaten the welfare of their citizens.  *See supra* at 14-29.  Fifth, the union and other non-profit organization Plaintiffs are suffering irreparable organizational injury, because Defendants' actions are interfering with their organizational missions and forcing unexpected and immediate diversion of substantial resources.  *See supra* at 14-29.   Finally, the lack of public rulemaking injured Plaintiffs who would have participated.  *See supra* at n.63; *NTEU v. Newman*, 768 F.Supp. 8, 10 (D.D.C. 1991)

---

[68] Those who remain employed will have more work, *see supra* at 13, in federal buildings that no longer can guarantee healthful and safe conditions, *see* Fabris Decl. ¶¶28-33 (GSA).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.      The Balance of Equities and Public Interest Weigh in Plaintiffs' Favor**

The equities and public interest, which merge when the government is a party, *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024), strongly favor Plaintiffs.  Preserving constitutional and statutory rights "is always in the public interest."  *Melendres*, 695 F.3d at 1002; *see also NTEU v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993); *Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F.Supp.2d 56, 66 (D.D.C. 2004). The severe threats to the public presented by Defendants' actions necessitate a temporary pause to protect the status quo.  *Supra* at 14-29.  By contrast, the government will suffer no harm from halting employee terminations and reorganizing, and will function (indeed function better) if the status quo is maintained.

**II.      Scope of the Order: Require an Immediate Halt to Approvals and the ARRPs**

Plaintiffs request that the Court temporarily restrain and enjoin OMB, OPM, DOGE, and the Federal Agency Defendants from any further implementation or enforcement of Executive Order 14210 or the OMB and OPM Memorandum, including any further approvals of ARRPs, as set forth in the accompanying Proposed Order.  This temporary relief is appropriate to maintain the status quo.  *See Fellowship of Christian Athletes*, 82 F.4th at 684-85; *Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000). Pausing enforcement and implementation of the challenged Administration orders will halt further RIFs and reorganizations, and thus will help maintain the last "uncontested status" between the parties that preceded this case.  *Goto.com, Inc.*, 202 F.3d at 1210. The scope of the relief is appropriate because Plaintiffs have demonstrated that they are suffering irreparable injury from the actions of each of the Federal Agency Defendants named in this motion. Plaintiffs further request that the Court order that OMB and OPM immediately provide to the Court and to Plaintiffs the Federal Defendant Agency ARRPs, which Defendants have to date kept secret. There is good cause for this narrow, expedited discovery to assist the Court in evaluating the illegality of these plans.  *See* Fed. R. Civ. P. 26(d); *Eurofins Elec. & Elec. Testing NA, LLC v. SGS N. Am. Inc.*, No. 5:24-CV-06340-EJD, 2024 WL 4453315, at *1 (N.D. Cal. Oct. 8, 2024) (good cause for expedited discovery to assist court evaluating preliminary injunction).

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request this Court grant this Motion and

enter the accompanying proposed temporary restraining order and/or an order to show cause.

DATED: May 1, 2025

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
Corinne Johnson
Alice X. Wang
Robin S. Tholin
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
sleyton@altshulerberzon.com
bchisholm@altshulerberzon.com
dleonard@altshulerberzon.com

By: */s/ Danielle Leonard*

*Attorneys for All Union and Non-Profit Organization Plaintiffs*

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org

By: */s/ Elena Goldstein*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC) and for Plaintiffs City of Chicago, IL; Martin Luther King, Jr. County, WA; Harris County, TX; and City of Baltimore, MD*

Jules Torti (pro hac vice)
PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038

Erica J. Newland (pro hac vice)
Jacek Pruski (pro hac vice)
PROTECT DEMOCRACY PROJECT

2020 Pennsylvania Ave., N.W., Suite 163
Washington, D.C. 20006
Tel: 202-579-4582
jules.torti@protectdemocracy.org
erica.newland@protectdemocracy.org
jacek.pruski@protectdemocracy.org

By: */s/ Jules Torti*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC)*

Norman L. Eisen (pro hac vice app. forthcoming)
Spencer W. Klein (pro hac vice app. forthcoming)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Spencer@statedemocracydefenders.org

By: */s/ Norman L. Eisen*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC)*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*

*Attorneys for Plaintiffs American Federation of Government Employees, AFL-CIO (AFGE) and AFGE locals*

Teague Paterson (SBN 226659)
Matthew Blumin  (pro hac vice app. forthcoming)
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.

1

Washington, D.C.  20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

2

3

4

By: */s/Teague Paterson*

5

*Attorneys for Plaintiff American Federation of State
County and Municipal Employees, AFL-CIO (AFSCME)*

6

7

Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL UNION,
AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

8

9

10

11

12

By: */s/ Steven K. Ury*

13

*Attorneys for Plaintiff Service Employees International
Union, AFL-CIO (SEIU)*

14

15

David Chiu (SBN 189542)
City Attorney
Yvonne R. Meré (SBN 175394)
Chief Deputy City Attorney
Mollie M. Lee (SBN 251404)
Chief of Strategic Advocacy
Sara J. Eisenberg (SBN 269303)
Chief of Complex and Affirmative Litigation
Molly J. Alarcon (SBN 315244)
Alexander J. Holtzman (SBN 311813)
Deputy City Attorneys
OFFICE OF THE CITY ATTORNEY FOR THE CITY
AND COUNTY OF SAN FRANCISCO
1390 Market Street, 7th Floor
San Francisco, CA 94102
molly.alarcon@sfcityatty.org
alexander.holtzman@sfcityatty.org

16

17

18

19

20

21

22

23

24

25

26

By:  */s/ David Chiu*
David Chiu
City Attorney

27

28

*Attorneys for Plaintiff City and County of San Francisco*

1

2       Tony LoPresti (SBN 289269)
        COUNTY COUNSEL
3       Kavita Narayan (SBN 264191)
4       Meredith A. Johnson (SBN 291018)
        Raphael N. Rajendra (SBN 255096)
5       Hannah M. Godbey (SBN 334475)
        OFFICE OF THE COUNTY COUNSEL
6       COUNTY OF SANTA CLARA
7       70 West Hedding Street, East Wing, 9th Floor
        San José, CA 95110
8       Tel: (408) 299-5900

9       By:  */s/ Tony LoPresti*

10      *Attorneys for Plaintiff County of Santa Clara, Calif.*

11

12      David J. Hackett (pro hac vice  app. forthcoming)
        General Counsel to King County Executive & Special
13      Deputy Prosecutor
        Alison Holcomb (pro hac vice app. forthcoming)
14      Deputy General Counsel to King County Executive &
        Special Deputy Prosecutor
15      Erin King-Clancy (pro hac vice app. forthcoming)
        Senior Deputy Prosecuting Attorney
16      OFFICE OF KING COUNTY PROSECUTING
        ATTORNEY LEESA MANION
17      401 5th Avenue, Suite 800
        Seattle, WA 98104
18      (206) 477-9483
        David.Hackett@kingcounty.gov
19      aholcomb@kingcounty.gov
        aclancy@kingcounty.gov
20
        By: */s/ David J. Hackett*
21
        David J. Hackett
22
        *Attorneys for Plaintiff Martin Luther King, Jr. County*
23

24      Jill Habig (SBN 268770)
        PUBLIC RIGHTS PROJECT
25      490 43rd Street, Unit #115
        Oakland, CA 94609
26      Tel: (510) 738-6788
27      jill@publicrightsproject.org

28

By: */s/ Jill Habig*

*Attorneys for Plaintiffs Baltimore, MD, Chicago, IL, Harris County, TX, and King County, WA*

Christian D. Menefee
Harris County Attorney

Jonathan G.C. Fombonne (pro hac vice app. forthcoming)
Deputy County Attorney and First Assistant
Tiffany Bingham (pro hac vice app. forthcoming)
Managing Counsel
Sarah Utley (pro hac vice app. forthcoming)
Division Director – Environmental Division
Bethany Dwyer (pro hac vice app. forthcoming)
Deputy Division Director - Environmental Division
R. Chan Tysor (pro hac vice app. forthcoming)
Senior Assistant County Attorney
Alexandra "Alex" Keiser (pro hac vice app. forthcoming)
Assistant County Attorney
1019 Congress, 15th Floor
Houston, Texas 77002
Tel: (713) 274-5102
Fax: (713) 437-4211

jonathan.fombonne@harriscountytx.gov
tiffany.bingham@harriscountytx.gov
sarah.utley@harriscountytx.gov
bethany.dwyer@harriscountytx.gov
chan.tysor@harriscountytx.gov
alex.keiser@harriscountytx.gov

By: */s/ Jonathan G.C. Fombonne*
Jonathan G.C. Fombonne

*Attorneys for Plaintiff Harris County, Texas*

Mary B. Richardson-Lowry,
Corporation Counsel of the City of Chicago

Stephen J. Kane (IL ARDC 6272490) (pro hac vice app. forthcoming)
Rebecca A. Hirsch (IL ARDC 6279592) (pro hac vice app. forthcoming)

1    Lucy Prather (IL ARDC 6337780) (pro hac vice app.
     forthcoming)
2    City of Chicago Department of Law,
     Affirmative Litigation Division
3    121 N LaSalle Street, Suite 600
     Chicago, Illinois 60602
4    Tel: (312) 744-6934
     Stephen.kane@cityofchicago.org
5    Rebecca.Hirsch2@cityofchicago.org
     Lucy.Prather@cityofchicago.org
6

7    By:    */s/Stephen J. Kane*
           Stephen J. Kane
8

9    *Attorneys for Plaintiff City of Chicago*

10

11   Ebony M. Thompson
     Baltimore City Solicitor
12
     Sara Gross (pro hac vice app. forthcoming*)*
13   Chief of Affirmative Litigation
     Baltimore City Department of Law
14   100 N. Holliday Street
     Baltimore, Maryland 21202
15   Tel: (410) 396-3947
     sara.gross@baltimorecity.gov
16
     By:  */s/  Sara Gross*
17
     *Attorneys for Plaintiff City of Baltimore*
18

19

20

21

22

23

24

25

26

27

28

# Appendix A

Federal Register

Vol. 90, No. 30

Friday, February 14, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14210 of February 11, 2025

## Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* To restore accountability to the American public, this order commences a critical transformation of the Federal bureaucracy. By eliminating waste, bloat, and insularity, my Administration will empower American families, workers, taxpayers, and our system of Government itself.

**Sec. 2**. *Definitions.* (a) "Agency" has the meaning given to it in section 3502 of title 44, United States Code, except that such term does not include the Executive Office of the President or any components thereof.

(b) "Agency Head" means the highest-ranking official of an agency, such as the Secretary, Administrator, Chairman, or Director, unless otherwise specified in this order.

(c) "DOGE Team Lead" means the leader of the Department of Government Efficiency (DOGE) Team at each agency, as defined in Executive Order 14158 of January 20, 2025 (Establishing and Implementing the President's "Department of Government Efficiency").

(d) "Employee" has the meaning given to it by section 2105 of title 5, United States Code, and includes individuals who serve in the executive branch and who qualify as employees under that section for any purpose.

(e) "Immigration enforcement" means the investigation, enforcement, or assisting in the investigation or enforcement of Federal immigration law, including with respect to Federal immigration law that penalizes a person's presence in, entry, or reentry to, or employment in, the United States, but does not include assisting individuals in applying for immigration benefits or efforts to prevent enforcement of immigration law or to prevent deportation or removal from the United States.

(f) "Law enforcement" means:

(i) engagement in or supervision of the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law; or

(ii) the protection of Federal, State, local, or foreign government officials against threats to personal safety.

(g) "Temporary employee" has the meaning given to it in 5 C.F.R. part 316.

(h) "Reemployed annuitant" has the meaning given to it in 5 C.F.R. part 837.

**Sec. 3**. *Reforming the Federal Workforce to Maximize Efficiency and Productivity.* (a) *Hiring Ratio.* Pursuant to the Presidential Memorandum of January 20, 2025 (Hiring Freeze), the Director of the Office of Management and Budget shall submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition (Plan). The Plan shall require that each agency hire no more than one employee for every four employees that depart, consistent with the plan and any applicable exemptions and details provided for in the Plan. This order does not affect the standing freeze on hiring as applied to the Internal Revenue Service. This ratio shall not apply to functions related to public safety, immigration

enforcement, or law enforcement. Agency Heads shall also adhere to the Federal Hiring Plan that will be promulgated pursuant to Executive Order 14170 of January 20, 2025 (Reforming the Federal Hiring Process and Restoring Merit to Government Service).

(b) *Hiring Approval.* Each Agency Head shall develop a data-driven plan, in consultation with its DOGE Team Lead, to ensure new career appointment hires are in highest-need areas.

(i) This hiring plan shall include that new career appointment hiring decisions shall be made in consultation with the agency's DOGE Team Lead, consistent with applicable law.

(ii) The agency shall not fill any vacancies for career appointments that the DOGE Team Lead assesses should not be filled, unless the Agency Head determines the positions should be filled.

(iii) Each DOGE Team Lead shall provide the United States DOGE Service (USDS) Administrator with a monthly hiring report for the agency.

(c) *Reductions in Force.* Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs. All offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website. This subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement.

(d) *Rulemaking.* Within 30 days of the date of this order, the Director of the Office of Personnel Management (OPM) shall initiate a rulemaking that proposes to revise 5 C.F.R. 731.202(b) to include additional suitability criteria, including:

(i) failure to comply with generally applicable legal obligations, including timely filing of tax returns;

(ii) failure to comply with any provision that would preclude regular Federal service, including citizenship requirements;

(iii) refusal to certify compliance with any applicable nondisclosure obligations, consistent with 5 U.S.C. 2302(b)(13), and failure to adhere to those compliance obligations in the course of Federal employment; and

(iv) theft or misuse of Government resources and equipment, or negligent loss of material Government resources and equipment.

(e) *Developing Agency Reorganization Plans.* Within 30 days of the date of this order, Agency Heads shall submit to the Director of the Office of Management and Budget a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities. The report shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated.

(f) Within 240 days of the date of this order, the USDS Administrator shall submit a report to the President regarding implementation of this order, including a recommendation as to whether any of its provisions should be extended, modified, or terminated.

**Sec. 4.** *Exclusions.* (a) This order does not apply to military personnel.

(b) Agency Heads may exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities.

(c) The Director of OPM may grant exemptions from this order where those exemptions are otherwise necessary and shall assist in promoting workforce reduction.

**Sec. 5**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 11, 2025.*

[FR Doc. 2025–02762
Filed 2–13–25; 11:15 am]
Billing code 3395–F4–P

# Appendix B

 U.S. Office of
Management and Budget

U.S. Office of
Personnel Management 

# MEMORANDUM

**TO:**            Heads of Executive Departments and Agencies

**FROM:**       Russell T. Vought, Director, Office of Management and Budget;
Charles Ezell, Acting Director, Office of Personnel Management.

**DATE**:         February 26, 2025

**RE**:            Guidance on Agency RIF and Reorganization Plans Requested by
*Implementing The President's "Department of Government
Efficiency" Workforce Optimization Initiative*

---

## I.    Background

The federal government is costly, inefficient, and deeply in debt. At the same time, it is not producing results for the American public. Instead, tax dollars are being siphoned off to fund unproductive and unnecessary programs that benefit radical interest groups while hurting hard-working American citizens.

The American people registered their verdict on the bloated, corrupt federal bureaucracy on November 5, 2024 by voting for President Trump and his promises to sweepingly reform the federal government.

On February 11, 2025, President Trump's Executive Order *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (*Workforce Optimization*) "commence[d] a critical transformation of the Federal bureaucracy." It directed agencies to "eliminat[e] waste, bloat, and insularity" in order to "empower American families, workers, taxpayers, and our system of Government itself."

President Trump required that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law." President Trump also directed that, **no later than March 13, 2025**, agencies develop Agency Reorganization Plans.

The U.S. Office of Management and Budget ("OMB") and the U.S. Office of Personnel Management ("OPM") now submit guidance on these Agency RIF and Reorganization Plans ("ARRP"), along with the instruction that such plans be submitted to OMB and OPM.

## II.    Principles to Inform ARRPs

ARRPs should seek to achieve the following:

1. Better service for the American people;

2. Increased productivity;

3. A significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required;

4. A reduced real property footprint; and

5. Reduced budget topline.

Pursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions.

Agencies should also seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical; implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities; close and/or consolidate regional field offices to the extent consistent with efficient service delivery; and maximally reduce the use of outside consultants and contractors. When taking these actions, agencies should align closures and/or relocation of bureaus and offices with agency return-to-office actions to avoid multiple relocation benefit costs for individual employees.

Agencies should review their statutory authority and ensure that their plans and actions are consistent with such authority.

Agency heads should collaborate with their Department of Government Efficiency ("DOGE") team leads within the agency in developing competitive areas for ARRPs. In addition, the agency should specifically identify competitive areas that include positions not typically designated as essential during a lapse in appropriations. When making this determination, agencies should refer to the functions that are excepted from the Antideficiency Act (ADA) in the Agency Contingency Plans submitted to OMB in 2019 as the starting point for making this determination.

## III.    Available Tools

In their ARRPs, agencies should employ all available tools to effectuate the President's directive for a more effective and efficient government and describe how they will use each.  Such tools include:

1. Continuing to comply with the hiring freeze outlined in the January 20, 2025 Presidential Memorandum *Hiring Freeze* or (with approval of OPM and OMB) implementing the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart;

2. Establishing internal processes that ensure agency leadership has visibility and/or direct sign-off on all potential job offers and candidates prior to extending offers;

3. Eliminating non-statutorily mandated functions through RIFs (Appendix 1 contains a sample timeline);

4. Removing underperforming employees or employees engaged in misconduct, and continuing to evaluate probationary employees;

5. Reducing headcount through attrition and allowing term or temporary positions to expire without renewal;

6. Separating reemployed annuitants in areas likely subject to RIFs; and

7. Renegotiating provisions of collective bargaining agreements (CBAs) that would inhibit enhanced government efficiency and employee accountability.

ARRPs should also list the competitive areas for large-scale reductions in force, the RIF effective dates (which may be a date prior to when the plan is submitted), the expected conclusion of the RIFs, the number of FTEs reduced, and additional impact of RIFs such as cancellation of related contracts, leases or overhead.

Agencies should also closely consider changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking, that would lead to the reduction or elimination of agency subcomponents or speed up the implementation of ARRPs.

## IV.    Phase 1 ARRPs

Each agency will submit a Phase 1 ARRPs to OMB and OPM for review and approval **no later than March 13, 2025**. Phase 1 ARRPs shall focus on initial agency cuts and reductions. Each Phase 1 ARRP should identify:

1. A list of agency subcomponents or offices that provide direct services to citizens. Such subcomponents or offices should be included in ARRPs to improve services to citizens while eliminating costs and reducing the size of the federal government. But for service delivery subcomponents or offices, implementation shall not begin until certified by OMB and OPM as resulting in a positive effect on the delivery of such services.

2. Any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities. Agency leadership must confirm statutes have not been interpreted in a way that expands requirements beyond what the statute actually requires. Instead, statutes should be interpreted to cover only what functions they explicitly require.

3. All agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations (because the functions performed by such employees do not fall under an exception to the ADA) using the Agency Contingency Plans submitted to OMB in 2019 referenced above.

4. Whether the agency or any of its subcomponents should be eliminated or consolidated; and which specific subcomponents or functions, if any, should be expanded to deliver on the President's priorities.

5. The specific tools the agency intends to use to achieve efficiencies, including, as to each, the number of FTEs reduced and any potential savings or costs associated with such actions in Fiscal Years 2025, 2026 and 2027:

   a. Continuation of the current hiring freeze;
   b. Regular attrition (e.g., retirement, movement between agencies and the private sector);
   c. Attrition through enhanced policies governing employee performance and conduct;
   d. Attrition through the termination or non-renewal of term or limited positions or reemployed annuitants;
   e. Attrition achieved by RIFs. Please refer to Appendix 1 for specific steps and timing. For purposes of the Phase 1 ARRP, the agency should include the following information:

      i. The competitive areas and organizational components that the agency has targeted or will target for initial RIFs, and
      ii. The agency's target for reductions in FTE positions via RIFs.

6. A list by job position of all positions categorized as essential for purposes of exclusion from large-scale RIFs, including the number per each job position and total by agency and subcomponent.

7. The agency's suggested plan for congressional engagement to gather input and agreement on major restructuring efforts and the movement of fundings between accounts, as applicable, including compliance with any congressional notification requirements.

8. The agency's timetable and plan for implementing each part of its Phase 1 ARRP.

### V.    Phase 2 ARRPs

Agencies should then submit a Phase 2 ARRP to OMB and OPM for review and approval **no later than April 14, 2025**. Phase 2 plans shall outline a positive vision for more productive, efficient agency operations going forward. Phase 2 plans should be planned for implementation by September 30, 2025. The Phase 2 plan should include the following additional information:

1. The agency's proposed future-state organizational chart with its functional areas, consolidated management hierarchy, and position titles and counts clearly depicted.

2. Confirmation that the agency has reviewed all personnel data, including each employee's official position description, four most recent performance ratings of record, retention service computation date, and veterans' preference status.

4

3. The agency's plan to ensure that employees are grouped, to the greatest extent possible, based on like duties and job functions to promote effective collaboration and management, and that the agency's real estate footprint is aligned with cross-agency efforts coordinated by GSA to establish regional federal office hubs.

4. Any proposed relocations of agency bureaus and offices from Washington, D.C. and the National Capital Region to less-costly parts of the country.

5. The competitive areas for subsequent large-scale RIFs.

6. All reductions, including FTE positions, term and temporary positions, reemployed annuitants, real estate footprint, and contracts that will occur in relation to the RIFs.

7. Any components absorbing functions, including how this will be achieved in terms of FTE positions, funding, and space.

8. The agency's internal processes that ensure agency leadership has visibility and/or direct sign-off on all potential job offers and candidates prior to extending offers.

9. The agency's data-driven plan to ensure new career appointment hires are in highest-need areas and adhere to the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart. Until the agency has finalized its post-hiring-freeze plan, agencies should continue to adhere to the current hiring freeze.

10. Any provisions of collective bargaining agreements that would inhibit government efficiency and cost-savings, and agency plans to renegotiate such provisions.

11. An explanation of how the ARRPs will improve services for Americans and advance the President's policy priorities.

12. The framework and criteria the agency has used to define and determine efficient use of existing personnel and funds to improve services and the delivery of these services.

13. For agencies that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care), the agency's certification that implementation of the ARRPs will have a positive effect on the delivery of such services. The certification should include a written explanation from the Agency Head and, where appropriate, the agency's CIO and any relevant program manager.

14. The programs and agency components not impacted by the ARRP, and the justification for any exclusion.

15. Plans to reduce costs and promote efficiencies through improved technology, including through the adoption of new software or systems, and elimination of duplicative systems.

16. Any changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking, that would lead to the reduction or elimination of agency subcomponents, or speed up implementation of ARRPs.

17. The agency's timetable and plan for implementing each part of its Phase 2 ARRP, and its plan for monitoring and accountability in implementing its ARRPs.

Agencies should continue sending monthly progress reports each month on May 14, 2025, June 16, 2025, and July 16, 2025. All plans and reports requested by this memorandum should be submitted to OPM at tracking@opm.gov and OMB at workforce@omb.eop.gov; when submitting plans and reports, please ensure both OPM and OMB addresses are included on the message.

**VI.    Exclusions**

Nothing in this memorandum shall have any application to:

1. Positions that are necessary to meet law enforcement, border security, national security, immigration enforcement, or public safety responsibilities;

2. Military personnel in the armed forces and all Federal uniformed personnel, including the U.S. Coast Guard, the Commissioned Corps of the U.S. Public Health Service, and the Commissioned Officer Corps of the National Oceanic and Atmospheric Administration;

3. Officials nominated and appointed to positions requiring Presidential appointment or Senate confirmation, non-career positions in the Senior Executive Service or Schedule C positions in the excepted service, officials appointed through temporary organization hiring authority pursuant to 5 U.S.C. § 3161, or the appointment of any other non-career employees or officials, if approved by agency leadership appointed by the President;

4. The Executive Office of the President; or

5. The U.S. Postal Service.

Finally, agencies or components that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care) shall not implement any proposed ARRPs until OMB and OPM certify that the plans will have a positive effect on the delivery of such services.

cc: Chief Human Capital Officers ("*CHCOs*"), Deputy CHCOs, Human Resources Directors, Chiefs of Staff, and DOGE team leads.

### Appendix 1- Sample RIF Timeline

This sample timeline is prepared in accordance with the U.S. Office of Personnel Management **Workforce Reshaping Operations Handbook.** RIF timing may vary based on agency-specific requirements, collective bargaining agreements, and workforce considerations. Agencies can accelerate these timelines through parallel processing, securing OPM waivers to policy, expediting process steps, and streamlining stakeholder coordination.

**Step 1: Identification of Competitive Areas and Levels (by March 13, 2025 for Phase 1 ARRPs)**

1. Identify competitive areas and levels and determine which positions may be affected. If applicable, seek OPM waiver approval to adjust competitive areas within 90 days of the RIF effective date.
2. For Phase 1 ARRPs, this step should be completed no later than March 13, 2025.

**Step 2: Planning, Preparation & Analysis (up to 30 days)**

1. Explore use of VSIP/VERA.
2. Conduct an impact assessment.
3. Review position descriptions for accuracy, validate competitive levels, and verify employee retention data (e.g., veteran preference, service computation dates).
4. Develop retention register.
5. Draft RIF notices and seek OPM waiver approval for a 30-day notification period.
6. Develop transition materials.
7. Notify unions (if required).
8. Prepare congressional notification (if required).

**Step 3: Formal RIF Notice Period (60 days, shortened to 30 days with an OPM waiver)**

1. Issue official RIF notices.
2. Provide employees with appeal rights, career transition assistance, and priority placement options.
3. Execute any required congressional notification and notice to the Department of Labor, state, and local officials, if applicable.

**Step 4: RIF Implementation & Separation (Final Step)**

1. Officially implement separations, reassignments, or downgrades.
2. Provide final benefits counseling, exit processing, and documentation.
3. Update HR systems and notify OPM of personnel actions.

Appendix C

**Appendix C:  Plaintiff Declarations By Federal Defendant Agency**

| Federal Defendant Agency | Union Plaintiff Declarations | Non-Profit Organization Plaintiff Declarations | Local Government Plaintiff Declarations |
|---|---|---|---|
| AmeriCorps | Blake (AFSCME)<br>Daly (AFSCME) | Benjamin (APHA) | Dively (King County) |
| Department of Agriculture | Kelley (AFGE)<br>Soldner (AFGE)<br>Bachelder (AFSCME)<br>Blake (AFSCME)<br>O'Brien (AFSCME)<br>Adler (SEIU)<br>Neuman (SEIU) | Shultz (AGU)<br>Davis (NOFA)<br>Molvar (WWP) | Barton (Harris County)<br>Dively (King County)<br>Williams (Santa Clara County)<br>Crispen (San Francisco) |
| Department of Commerce | Kelley (AFGE) | Shultz (AGU)<br>Neubacher (CPANP)<br>Molvar (WWP) | Leach (Baltimore)<br>Velez (Chicago)<br>Pena (Harris County)<br>Dively (King County)<br>Williams (Santa Clara County)<br>Bechelli (San Francisco)<br>Jue (San Francisco) |
| Department of Energy | Braden (AFGE)<br>Kelley (AFGE)<br>Gabel (AFSCME) | Shultz (AGU) | Leach (Baltimore)<br>Dively (King County)<br>Jue (San Francisco) |
| Environmental Protection Agency | Howell (AFGE)<br>Kelley (AFGE)<br>Dreyfus (AFGE Local 1236)<br>Bailey (SEIU)<br>Neuman (SEIU) | Shultz (AGU)<br>Molvar (WWP) | Leach (Baltimore)<br>Ige (Chicago)<br>Worthington (Chicago)<br>Dively (King County)<br>Williams (Santa Clara County)<br>Jue (San Francisco) |
| General Services Administration | Fabris (AFGE)<br>Kelley (AFGE)<br>Adler (SEIU)<br>Neuman (SEIU) | | |

| | | | |
|---|---|---|---|
| Department of Health and Human Services | Garthwaite (AFGE)<br>Jacobs (AFGE)<br>Kelley (AFGE)<br>Niemeier-Walsh (AFGE)<br>Gabel (AFSCME)<br>O'Brien (AFSCME)<br>Adler (SEIU)<br>Neuman (SEIU)<br>Prendiville (SEIU) | Benjamin (APHA) | Leach (Baltimore)<br>Ige (Chicago)<br>Barton (Harris County)<br>Pena (Harris County)<br>Dively (King County)<br>Williams (Santa Clara County)<br>Philip (San Francisco) |
| Department of Housing and Urban Development | Bobbitt (AFGE)<br>Kelley (AFGE)<br>O'Brien (AFSCME)<br>Adler (SEIU)<br>Neuman (SEIU)<br>Wander (SEIU Local 1000) | | Leach (Baltimore)<br>Dively (King County)<br>Williams (Santa Clara County) |
| Department of the Interior | Cochran (AFGE)<br>Kelley (AFGE)<br>Adler (SEIU)<br>Neuman (SEIU) | Shultz (AGU)<br>Neubacher (CPANP)<br>Molvar (WWP) | Dively (King County)<br>Williams (Santa Clara County)<br>Bechelli (San Francisco) |
| Department of Labor | Gamble (AFGE)<br>Levin (AFGE)<br>Kelley (AFGE)<br>O'Brien (AFSCME)<br>Adler (SEIU)<br>Neuman (SEIU) | | Campos (Chicago) |
| National Labor Relations Board | O'Brien (AFSCME)<br>Neuman (SEIU) | | |
| National Science Foundation | Kelley (AFGE)<br>Soriano (AFGE)<br>Adler (SEIU)<br>Neuman (SEIU) | Shultz (AGU)<br>Molvar (WWP) | |

| | | | |
|---|---|---|---|
| Small Business Administration | Gustafsson (AFGE) Kelley (AFGE) O'Brien (AFSCME) Neuman (SEIU) | Phetteplace (MSA) | Dively (King County) Bechelli (San Francisco) |
| Social Security Administration | Couture (AFGE) Kelley (AFGE) Wilson (AFGE Local 1122) Norman (AFGE Local 3172) O'Brien (AFSCME) Adler (SEIU) Prendiville (SEIU) Jefferies (SEIU Local 1000) | Fiesta (ARA) | |
| Department of State | Hunter (AFGE) Kelley (AFGE) Adler (SEIU) Neuman (SEIU) | | Dively (King County) Williams (Santa Clara County) |
| Department of Treasury | Kelley (AFGE) O'Brien (AFSCME) Adler (SEIU) Neuman (SEIU) | Olson (CTR) | |
| Department of Veterans Affairs | Burke (AFGE) Kelley (AFGE) Turner-Nichols (AFGE Local 2110) Blake (AFSCME) O'Brien (AFSCME) Neuman (SEIU) Bailey (SEIU) | Shah (Common Defense) Eaton (Vote Vets) | Dively (King County) Williams (Santa Clara County) |