Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
dleonard@altber.com
bchisholm@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs*

[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 3:25-cv-03698-SI |
| Plaintiffs, | **DECLARATION OF SARAH HUNTER** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**DECLARATION OF SARAH HUNTER**

I, Sarah Hunter, declare as follows:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am an Attorney Adviser at the United States Department of State ("State Department"). I have worked for the State Department for over four years in the Office of the Legal Adviser. For roughly the first two and half years of my employment in the Office of the Legal Adviser, I worked in employment law defending the State Department on a variety of litigation matters before the MSPB, EEOC, and in federal court. I additionally advised management on numerous matters related to both the Civil and Foreign Service including disciplinary matters, promotions, and employee benefits. In my current role, I work in the Legal Adviser's human rights office primarily on matters before the Inter-American Commission on Human Rights.

3.      I am steward of the American Federation of Government Employees Local 1534 ("Local 1534" or the "Union") and offer this declaration in that capacity. I have been involved in the Union for the past several months, primarily in providing bargaining unit employees information about their rights. We have a small Union Leadership team at the State Department that has been working closely together as pressing issues have arisen in the past several months. While typically someone in a more senior Union Leadership position would be providing the below information in a judicial proceeding, there have been potentially retaliatory acts taken against some of our leadership.

4.      Local 1534 currently represents a bargaining unit of approximately 7,909 civil servants who work for the State Department. Local 1534 bargaining unit employees include Administrative Officers, Occupational Health Specialists, Geographers, Training Specialists,

Systems Accountants, Transportation Specialists, Historians, Economists, Nurses, Clinical Psychologists, Attorneys, Librarians, Engineering Technicians, and Records and Information Management Specialists, among many others. Local 1534 members work primarily in Washington, D.C. and surrounding areas, as well as in Charleston, South Carolina. These bargaining unit members perform varied administrative, supportive, policy-focused, and systems functions that are all vital to the State Department.

5. Local 1534's mission is to advocate for and promote the interests of bargaining unit members in their federal employment, including working for a safe and fair workplace for all State Department members. As the exclusive bargaining representative of these workers, the Union provides many services to all bargaining unit members. Core functions of the Union include collective bargaining with the agency to obtain a fair and reasonable collective bargaining agreements ("CBAs"); filing and negotiating grievances against the agency to enforce the terms and conditions of the CBAs; pursuing arbitrations on behalf of workers to enforce the CBAs; and providing other support, guidance, and resources to bargaining unit employees. Local 1534 strives to resolve labor-management conflicts at the lowest (earliest) possible level. Even in cases where formal proceedings are necessary, we aim to amicably settle cases through alternative dispute resolution whenever feasible, benefiting employees and the State Department by ensuring that minimal resources are expended on any given matter.

6. The Union first became aware of President Trump's plan to conduct "large-scale" RIFs through the February 11, 2025 Executive Order. No one from the Department had communicated a plan for large-scale RIFs to the Union prior to that Order.

7. Following a request for information on any proposed RIFs, on March 24, 2025, GTM's Chief Labor Management Negotiator, Steve Polson, informed the Union that "the

1    Department is not certain whether or not there will be a need to conduct a Reduction in Force

2    (RIF)."

3         8.      In the past several weeks, Bureau Executive Directors across the State Department

4    have held weekly meetings with Global Talent Management ("GTM"), the State Department's

5    human resources Bureau, and State Department leadership to discuss personnel matters.  Until

6    April 16, 2025, most information the Union had about potential reorganization or RIFs at the State

7    Department came from information shared in these meetings.

8         9.      Initial reports we received suggested that the RIFs could take years to fully

9    implement in order to comply with applicable regulations.  This is in line with the experience of

10   prior RIFs and attempted RIFs, which have been rare and have at times taken several months if not

11   years to plan and implement.  It has been years since any RIF was conducted. But more recent

12   information Union members have received suggests that the current plan will implement

13   restructuring and RIFs in a matter of months instead.  Based on my understanding of RIF

14   procedures and the associated workload created, there is no way for the State Department to

15   administer RIFs and restructure in a manner consistent with the RIF regulations and the statutory

16   mandates of the Department on such a shortened time period.

17       10.     The Union was also made aware that managers were told to prepare to incorporate

18   some staff and functions that had previously been housed in the United States Agency for

19   International Development (USAID).

20       11.     In view of recent Executive Orders and information the Union was receiving from

21   members, the Union sent Information Requests on February 13, 2025 to Steve Polson, Chief Labor

22   Management Negotiator, requesting information on probationary employees, potential RIFs,

23   DOGE's role in the Department, the hiring freeze, and implementation of Executive Orders 14151

24   and 14171.  On March 11, 2025, our requests were denied in full.  A true and correct copy of the

25

1  request and denial are attached hereto as Exhibits A and B and incorporated herein by this

2  reference.

3        12.     On Wednesday, April 16, 2025, the State Department announced the closure of the

4  Counter Foreign Information Manipulation and Interference office and termination of all staff who

5  were working at that Office within 30 days unless they were able to find a new position. Staff

6  were not provided with sufficient resources or access to internal postings to make that a realistic

7  possibility for most, especially given the current hiring freeze.  The Union was provided with no

8  notice of this closure and RIF.  We were only made aware of this RIF by Union members and

9  news reports.

10        13.     Although the Union has not been informed about the content of the Department's

11  planned Reorganization or been sent any RIF notices from management, on April 20, 2025,

12  multiple news sources reported on a draft Executive Order proposing to restructure the State

13  Department ("EO Reorganization Plan").  Copies of articles discussing this Reorganization Plan

14  are attached hereto as Exhibit C.

15        14.     Secretary of State Marco Rubio denied the accuracy of this reporting in a post on

16  X, formerly Twitter.

17        15.     The EO Reorganization Plan widely reported in the press "would be one of the

18  biggest reorganizations of the department since its founding in 1789," according to Bloomberg.

19        16.     This proposal would eliminate the Bureau of African Affairs, the special envoy for

20  climate, the Bureau of International Organizations, and the Office of Global Women's Issues,

21  among other offices.

22        17.     In addition, the EO Reorganization Plan would eliminate regional bureaus and

23  restructure them into four "corps": Eurasia Corps, consisting of Europe, Russia and Central Asia;

24  Mid-East Corps, consisting of Arab nations, Iran, Pakistan and Afghanistan; Latin America Corps,

25

Declaration of Sarah Hunter

consisting of Central America, South America and the Caribbean; and Indo-Pacific Corps, consisting of East Asia, Southeast Asia, India, Bangladesh, Sri Lanka, Nepal, Bhutan and the Maldives.

18.     The EO Reorganization Plan also proposes the elimination and downsizing of embassies and consulates worldwide, including closing "nonessential" embassies and consulates in sub-Saharan Africa by October 1.  The proposal also envisions significant cuts to staff, such as shrinking the U.S. Embassy in Ottawa, Canada to 10 Consular officers, among other reductions.

19.     By the very nature of the proposed cuts to embassies, offices, and bureaus, thousands would lose their jobs.  The EO Reorganization Plan also envisions cutting employees through voluntary buyout options.  A true and correct copy of the EO Reorganization Plan is attached hereto as Exhibit D.

20.     On April 22, 2025, Secretary Rubio announced the State Department Reorganization Plan ("April 22 Reorganization Plan") for domestic operations.  A true and correct copy of that announcement is attached as Exhibit E.

21.     On April 22, 2025, a new organization chart was published, which was subsequently edited and reuploaded twice that same day, which differs significantly from a recent May 2024 Reorganization Chart.  True and correct copies of the third iteration of the April 22, 2025 organization chart and May 2024 organization chart are attached hereto as Exhibits F and G.

22.     Additionally, an FAQ on the Reorganization Plan and Factsheet were provided to employees.  True and correct copies of these documents are attached as Exhibits H and I.

23.     This sweeping April 22 Reorganization Plan, while less severe than the leaked EO Reorganization Plan, is unprecedented and will cause immediate, substantial, and irreparable harm not just to workers at the State Department, but also to the vital diplomatic work the Department performs.

24.     The April 22 Reorganization Plan involves "consolidating 734 bureaus/offices down to 602, in addition to transitioning 137 offices to another location within the Department[.]" *See* Exhibit I.

25.     In addition to these cuts, "the Under Secretaries will also submit a path to reducing staff in domestic offices by 15 percent[.]"  *See* Exhibit I.  In subsequent meetings on April 23, employees were made aware that this 15 percent applied to employees, not positions, and would be made on top of the reductions that had occurred between January 2025 and April 22, 2025. Employees were additionally informed that this 15 percent reduction would not take into account offices that had been eliminated.  Accordingly, the reduction in personnel will be far greater than 15 percent of the workforce as of January 2025.  Management has communicated that plans to meet this 15 percent reduction are meant to begin implementation no later than July 1, 2025.

26.     To put that in perspective, the Office of Inspector General at the State Department published a "Review of the Effects of the Department of State Hiring Freeze" ("OIG Report") that occurred between January 2017 and May 2018.  A true and correct copy of that Report is attached hereto as Exhibit J.

27.     Although during this time period "Civil Service on-board employment levels declined by 7.1 percent," markedly less than the cuts proposed in the April 22 Reorganization Plan, the OIG found that 95 percent of the bureaus and offices that responded to the OIG survey reported that the freeze had a somewhat negative or very negative effect on overall operations. Domestically, some Bureaus reported an adverse effect on their ability to carry out key programs. *See* Exhibit J at 8-9.  The OIG also reported that the hiring freeze had significant detrimental effects on protection of people and facilities, medical services, foreign assistance, and policy implementation.  *See* Exhibit J at 9-18.

28.    The diplomatic mission of the State Department is vital to the national security of the country.  Diplomacy addresses possible threats before they become national security issues.  These vast proposed cuts to Bureaus, offices, and personnel will cause immediate and irreparable harm to that mission and to the ability of the United States to effectively conduct diplomacy in entire regions.

29.    The April 22 Reorganization Plan purporting to move some of those functions to other offices or bureaus does not mitigate these harms.  Reorganizing, moving staff and functions, and conducting extensive RIFs will also disrupt established diplomatic channels, relationships, and networks.  Moreover, to the extent functions are moved to other offices without providing appropriate staff, which appears to be part of the plan, the ability to perform these functions will surely be compromised.

30.    The elimination of the Counter Foreign Information Manipulation and Interference office, which tracks and counters foreign disinformation and misinformation campaigns, is just one example of the significant negative impacts to come.  As recently as January 2024, the State Department explained that "[f]oreign information manipulation and interference is a national security threat to the United States as well as to its allies and partners."[1]  Dismantling the office and terminating staff leaves the State Department without a key tool to respond to that threat and counter the increasingly sophisticated disinformation campaigns from foreign governments, such as Russia, Iran, and China.

31.    Although we do not yet know the complete scope of which offices will be eliminated or downsized, based on the elimination of the Undersecretariat for Civilian Security, Democracy, and Human Rights and statements by Secretary Rubio, we expect to see vast cuts to

---

[1] https://2021-2025.state.gov/the-framework-to-counter-foreign-state-information-manipulation/

1  programs that focus on democracy, human rights, refugees, and conflict and stabilization

2  operations.  These programs help ensure stability around the world and losing them, in whole or in

3  part, will inevitably be paid for in lives.

4       32.    From the new reorganization chart and press statements, it appears that dozens of

5  Special Envoys, Representatives, and Coordinators, which are often congressionally mandated

6  positions, are slated to be eliminated. These positions and their staff provide high-level,

7  specialized attention to pressing issues such as climate change, global criminal justice, hostage

8  affairs, nuclear nonproliferation and particularly geopolitically sensitive States like Iran, Sudan,

9  and North Korea. The gap left by the elimination of these positions and offices will hamper the

10 Department's ability to effectively respond to some of the most pressing situations around the

11 world.

12      33.    The downsizing of embassies, and the additional cuts and closures referenced in the

13 EO Reorganization plan, would also cause substantial harm.  Embassies perform numerous vital

14 functions: embassy staff have a primary diplomatic mission, but also provide American citizen

15 services, supporting and assisting Americans abroad who experience everything from visa issues

16 to muggings and lost passports, to—in extreme circumstances—criminal prosecution and

17 incarceration in foreign countries.  Embassies also promote and support American business

18 operating internationally through a variety of diplomatic means.

19      34.    Elimination of large numbers of embassies is unprecedented and will stop that

20 work in its tracks.  The downsizing of embassies would also make this work substantially more

21 difficult and could introduce security risks for the remaining employees.  And cutting Bureaus and

22 offices in D.C. that assist employees and embassies around the world in a variety of ways, the

23 harm to the work of the State Department abroad and international security efforts will compound

24 that harm.

25

Declaration of Sarah Hunter

35.    The April 22 Reorganization Plan will also have an immediate impact on the workers who remain in the State Department, including AFGE Local 1534 members.

36.    Many projects and programs at the State Department operate in collaboration across offices and federal agencies.  Sweeping cuts and the elimination of entire offices mean that remaining employees in the State Department and employees in agencies like the Department for Homeland Security that often coordinate with the State Department will all need to take on additional work to cover for the reductions.  The scale of the planned April 22 Reorganization Plan will make it extremely hard for remaining employees to keep that work going without severe disruptions.

37.    Bargaining unit members have already been forced to take on additional work to make up for employees who have left the State Department.  On information and belief, the Union has heard from at least three employees who have been placed on Performance Improvement Plans because they are unable to satisfactorily perform their roles with these additional functions. Scores of State Department employees, including members of the bargaining unit, will be put in this position upon implementation of large-scale RIFs.  If they cannot perform the work of multiple positions, these employees could be at risk of being terminated for cause, harming their future job prospects as well.

38.    The April 22 Reorganization Plan will also have an immediate adverse effect on the Union's ability to provide core services to unit members and to accomplish its mission.  The Union has already received questions from many bargaining unit members, and has had to divert significant time and resources from its core work to respond to those questions.  For instance, we have already spent many hours responding to the Counter Foreign Information Manipulation and Interference RIF that occurred just a few days ago and expect any challenges to that RIF to take a

1  significant amount of Union resources.  Our limited resources will become impossibly stretched

2  almost immediately.

3         39.    The Union's activities and staff training are funded through members' voluntary

4  dues.  If the Union no longer receives dues from the members who are being laid off, that will

5  make it even more difficult for the Union to continue to function and to provide the services and

6  protection to bargaining units identified here.

7         40.    If the April 22 Reorganization Plan was published in the Federal Register for notice

8  and comment, the Union would comment on these plans and encourage bargaining unit members

9  with subject matter expertise in affected offices to similarly comment on those plans.

10        I declare under penalty of perjury under the laws of the United States that the foregoing is

11 true and correct.  Executed April 24, 2025, in Washington, D.C.

12

13 _____

14 Sarah Hunter

15

16

17

18

19

20

21

22

23

24

25

Exhibit A

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, LOCAL 1534**
**Department of State, U.S. Agency for International Development and Development Finance Corporation**



February 13, 2025

President
*Sylvia Joyner*
*(Acting)*

Treasurer
*Terry Williams*

Chief Steward
*Vacant*

1ˢᵗ V.P. State
*Celeste Nelson*

2ⁿᵈ V.P. State
*Nicholas Davis*

1ˢᵗ V.P. DFC
*Sarah Polaski*

2ⁿᵈ V. P DFC
*Carey Campbell*

1ˢᵗ V.P. USAID
*Sylvia Joyner*

2ⁿᵈ V. P. USAID
*John Moynihan*

**FROM:** Celeste Nelson, 1ˢᵗ Vice President AFGE 1534 DoS

**TO:** Steve Polson, Chief Labor Management Negotiator

**SUBJECT:** Response to Union Request for Information Under Section 7114(b)(4) of the Federal Service Labor-Management Relations Statute

**BACKGROUND**

**Over the past few weeks, President Trump has issued a variety of Executive Actions and the Office of Personnel Management (OPM) has issued requests and guidance with implications for the Department's workforce, including many of AFGE 1534's bargaining unit members. Accordingly, pursuant to 5 U.S.C. § 7114(b)(4), the Union is requesting the following information.**
**The Federal Labor Relations Authority (FLRA) specifies that to show requested information is "necessary", a union must establish a particularized need for the information by stating, with specificity: why it needs the information; how it will use the information; and how its use of the information relates to carrying out its representational responsibilities under the Statute.**

**Generally, Section 7114(b)(4) requires the Agency to provide "data (A) which is normally maintained by the agency in the regular course of business; (B) which is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining; and (C) which does not constitute guidance, advice, counsel, or training provided for management officials or supervisors, relating to collective bargaining.**
**AFGE Local 1534's particular need for this information described below is generally that we are the exclusive representative of employees who may be listed or referenced in these documents or whose positions may be impacted by any implementation of the various Executive Orders and Memorandum listed. Additional details on the particularized need for each request are discussed below.**

**SPECIFIC INFORMATION SOUGHT**

### 1. Request 1: Information on Probationary Employees

With regard to OPM's request that Agencies submit lists of probationary employees to them, the Union requests the list of bargaining unit employees the agency has identified as employees, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment. The Union also requests the information sent to OPM requesting that certain probationary/trial employees be retained and the rationales provided to justify retention of these positions. Finally, we request that the Agency provide us with information as to whether individuals with prior continuous service who are nonetheless currently in a probationary period have been included or excluded from the list sent to OPM.

With regard to information on probationary employees, in our capacity as exclusive representatives, we intend to utilize all available mechanisms to assist employees who assert they were listed erroneously and/or who want to challenge the agency's calculation of their probationary period. We have had several members of collective bargaining units reach out and express concern that they may have been incorrectly included on the list sent to OPM given the rushed nature of that request. This is especially concerning for those who have prior federal service who may not rightly be classified as probationary employees, even if they have served less than the one year required for competitive service positions or two years required for excepted service positions.  AFGE local 1534 will also use the data to assess the potential impact of the implementation of the January 20, 2025 memo from OPM and exercise our rights under the statute as exclusive representative as it relates to this initiative. AFGE local 1534 needs this information to fully perform our representational function and fulfill our duty of fair representation.

### 2. Request 2: Information on Potential Reductions in Force

It is the Union's understanding that Management has not at this point formalized any plans to complete any reductions in force. To the extent that understanding is incorrect or should Management contemplate any reductions in force, the Union requests to be informed in advance of any such plans and offered the opportunity to negotiate as required by Article 29 of the Collective Bargaining Agreements.[1]

This information is necessary to ensure that Management is complying with the terms laid out in the Collective Bargaining Agreements and to determine whether the Union is in a position to file a grievance or unfair labor practice. To the extent that Management has not reached the stage at which it is required to notify the Union of any potential reductions in force, the Union requests that Management treat this request for information as a continuing one.

---

[1]  Articles 29.2 of the Collective Bargaining Agreements state that "the Employer, recognizing the Union's interest in protecting and representing employees, will give the Union advance notice and an opportunity to negotiate on the impact and procedures to be used in a RIF, and keep the Union informed of RIF developments." Additional requirements are described throughout that Article.

2

### 3.   Request 3: Information Regarding DOGE's role/activities in the Department

As a general matter, the Union is concerned about the possible relationship between Global Talent Management (GTM) and the Department of Government Efficiency (DOGE) as it is fully unclear if DOGE is directing GTM to take certain actions or is directly intervening in the workings of GTM. Given that the Union has an interest in knowing this information for any potential challenges that may develop over actions taken, the Union requests information related to the nature of the relationship between DOGE and GTM such as any memorandums of understanding between the two, whether any DOGE affiliates have been given access to GTM systems, and whether and to what degree DOGE has been authorized to act in GTM's stead in any employment matters.

The Union's request with regard to information about DOGE's interactions with GTM is also essential to fulfilling its representational function. Without this information, the Union will be unable to fully represent its bargaining unit members should employees be faced with any grievable adverse employment actions. For instance, it may be unclear without this information who the proper deciding official is in a particular matter. It is further necessary for the Union to know this information in order to properly ensure that management is complying with its obligations under the Collective Bargaining Agreements and thus is necessary for proper administration of these contracts.

### 4.   Request 4: Information Concerning Implementation of Executive Order 14151

The Union requests information related to implementation of President Trump's Executive Order 14151"Ending Radical and Wasteful Government DEI Programs and Preferencing." Specifically, the Union requests the following:
- A complete list of offices, programs, policies, and mandates that Management had determined/determines fall under Section 2 of this Executive Order;
- A complete list of all bargaining unit positions, committees, and services that Management had determined/determines fall under Section 2(b)(i)-(ii) of this Executive Order; and
- A list of all bargaining unit employees who have been placed on administrative leave in response to this Executive Order and/or removed or terminated.

The Union is well aware that many collective bargaining members have been affected by the shuttering of various DEI positions, offices, and programs. In order to determine the proper course of action with regard to any grievances or unfair labor practices, the Union needs specific information as to how this Executive Order has been implemented.

5.  **Request 5: Information Concerning Implementation of Executive Order 14171**

The Union requests information related to implementation of President Trump's Executive Order 14171 entitled "Restoring Accountability to Policy-Influencing Positions within the Federal Workforce."  Specifically, the Union requests the following:

- A complete list of all positions Management previously determined would or would likely fall under the previous Executive Order, Executive Order 13957, Creating Schedule F in the Excepted Service (Oct. 21, 2020);
- A complete list of "interim recommendation on positions" that are part of the bargaining unit that Management intends to provide/has provided to the OPM under this Executive Order and information as to how Management determined each position fell under this Executive Order (for instance, what characteristics of these positions led to it being included in the list of positions); and
- Any other information that Management intends to send/sends OPM pursuant to this Executive Order

In order to ensure that any change in job classification is in line with the requirements of the Classification Act, relevant regulations, and the Collective Bargaining Agreements, it is necessary to know which positions Management has determined may properly fall under Schedule Policy Career (formerly referred to as Schedule F). This knowledge is also critical to determining whether management is complying with the terms of the Collective Bargaining Agreement, for instance Article 16 on job classification and position descriptions.

6.  **Request 6: Information Concerning Implementation of Hiring Freeze Memorandum**

The Union requests information related to implementation of President Trump's Memorandum to Executive Departments and Agencies entitled "Hiring Freeze." Specifically, the Union requests the following:

- A list of all positions subject to the hiring freeze;
- A list of all positions exempted from the hiring freeze;
- Criteria used by Management in determining exemptions; and
- Information on whether and how the hiring freeze is impacting transfers within the Department.

As a general matter, hiring freezes often lead to individuals taking on additional duties to compensate for lower staffing. This can lead to an accretion of duties that could require that Management promote remaining employees. Without this information, the Union is not fully able to represent employees as it will be in an information deficit. Further, to the extent that any hiring freeze leads to employee overwork and potential underperformance it will be necessary for the Union to determine whether the hiring freeze had any impact on individual employees for the purpose of filing grievances and/or responding to performance-based actions taken against any employee.

4

Exhibit B



United States Department of State

March 11, 2025

<u>UNCLASSIFIED</u>
MEMORANDUM

TO: Celeste Nelson, State 1ˢᵗ Vice President, AFGE Local 1534

FROM: GTM-PPC-LM – Bradley Phillips  

SUBJECT: Information Request Response

The Bureau of Global Talent Management acknowledges AFGE's request for information under 5 U.S.C. §7114(b)(4). This request for information incorporates several different requests, which will be discussed below.

The first subsection of the request for information is entitled "Information on Probationary Employees." In this request, the Union stated that they are seeking the following information:

•       The list of bargaining unit employees the agency has identified as employees, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment.

•       The information sent to OPM requesting that certain probationary/trial employees be retained and the rationales provided to justify retention of these positions.

•       The Agency provide us with information as to whether individuals with prior continuous service who are nonetheless currently in a probationary period have been included or excluded from the list sent to OPM.

The second subsection of information requested by the Union is titled "Information on Potential Reductions in Force." Specifically, the Union is requesting:

•   The Union requests to be informed in advance of any such plans and offered the opportunity to negotiate as required by Article 29 of the Collective Bargaining Agreements.

The third subsection of information requested in the Union's February 13th information request is titled "Information Regarding DOGE's Role/Activities in the Department." Specifically, the Union is requesting the following information:

•   The Union requests information related to the nature of the relationship between DOGE and GTM such as any memorandums of understanding between the two, whether any DOGE affiliates have been given access to GTM systems, and whether and to what degree DOGE has been authorized to act in GTM's stead in any employment matters.

The fourth subsection of information requested in the Union's February 13th information request is titled "Information Concerning Implementation of Executive Order 14151." Specifically, the Union is requesting the following information:

•   A complete list of offices, programs, policies, and mandates that Management had determined/determines fall under Section 2 of this Executive Order.

•   A complete list of all bargaining unit positions, committees, and services that Management had determined/determines fall under Section 2(b)(i)-(ii) of this Executive Order

•   A list of all bargaining unit employees who have been placed on administrative leave in response to this Executive Order and/or removed or terminated

The fifth subsection of information requested in the Union's February 13th information request is titled "Information Concerning Implementation of Executive Order 14171." Specifically, the Union is requesting the following information:

•   A complete list of all positions Management previously determined would or would likely fall under the previous Executive Order, Executive Order 13957, Creating Schedule F in the Excepted Service (Oct. 21, 2020)

- A complete list of "interim recommendation on positions" that are part of the bargaining unit that Management intends to provide/has provided to the OPM under this Executive Order and information as to how Management determined each position fell under this Executive Order (for instance, what characteristics of these positions led to it being included in the list of positions)

- Any other information that Management intends to send/sends OPM pursuant to this Executive Order

The final subsection of information requested in the Union's February 13th information request is titled "Information Concerning Implementation of Hiring Freeze Memorandum."  Specifically, the Union is requesting the following information:

- A list of all positions subject to the hiring freeze

- A list of all positions exempted from the hiring freeze

- Criteria used by Management in determining exemptions any other information that Management intends to send/sends OPM pursuant to this Executive Order

- Information on whether and how the hiring freeze is impacting transfers within the Department.

To be provided information under 5 U.S.C. 7114(b)(4), a union must articulate a connection between the information that it requests, the uses for the information, and the representational purposes for supporting the request, more commonly known as a particularized need. Our analysis of each subsection of the information request will be discussed below.

In the first subsection of the information request, the Union states that it needs the requested information to utilize all available mechanisms to assist employees who assert they were listed incorrectly and/or challenge the Agency's calculation of their probationary period. Additionally, the Union states that AFGE local 1534 will also use the data to assess the potential impact of the implementation of the January 20, 2025, memo from OPM and exercise our rights under the statute as exclusive representative as it relates to this initiative. AFGE local 1534 needs this

information to fully perform our representational function and fulfill our duty of fair representation.

The Agency does not believe that the Union has met their particularized need for this information. It is well settled that merely stating that the Union needs records to audit management's actions, does not meet the burden of supplying a particularized need *Kirtland AFB,* 60 FLRA 791 (2005). Additionally, under *IRS, Kansas City*, 50 FLRA 561 (1995) a union must identify, with sufficient specificity, 1) why it needs the information; 2) how it will use the information; and 3) how its use of the information relates to carrying out its representational responsibilities. Your request does not specifically state how the information would assist you in performing your representational duties, therefore, this portion of the Union's request is denied.

In the second subsection of the information request, the Union states that they need the information to ensure that Management is complying with the terms laid out in the Collective Bargaining Agreements and to determine whether the Union can file a grievance or unfair labor practice.

The Agency does not believe that what the Union is requesting constitutes a proper request for information. The request laid out above is only seeking to be notified should the Agency engage in a Reduction in Force. As such, there will be no further response on that part of the request.

In the third subsection of the Union's information request, the Union states that they need the information to fulfill its representational functions. The Union goes on to state that without the information, they will be unable to represent their bargaining unit employees in grievable adverse employment actions. Lastly, the Union states that they would not be able to ensure that management is complying with its collective bargaining obligations and therefore it is necessary for proper administration of these contracts.

As mentioned above, *Kirland AFB* requires that the Union's request must be more than just an audit of management's actions. In this request, the Union is seeking information so that they can ensure compliance of collective bargaining obligations, which in and of itself, is not sufficient for the Agency to provide the information. Additionally, as found under *Director of Administration, Air Force,* 6

FLRA 110 (1981) the Agency does not need to provide information in a matter that does not impact the bargaining unit. The Union has not provided sufficient direct connection between DOGE being in the Agency and the bargaining unit. Therefore, the information requested under subsection three is denied.

In the fourth subsection of the Union's information request, the Union states that they need the information to determine the proper course of action with regard to any grievances or unfair labor practices, the Union needs specific information as to how this Executive Order has been implemented.

As stated above, the Union is required to provide a certain level of specificity when establishing their particularized need for the requested information (see *IRS, Kansas City).* The Union has not met that burden in this instance; therefore, the Agency is denying the request for information in this subsection.

In the fifth subsection of the Union's information request, the Union states that they need the information to ensure that any change in job classification is consistent with applicable law, regulations and the collective bargaining agreement. This knowledge is also critical to determining whether management is complying with the terms of the Collective Bargaining Agreement.

The Agency is denying this request based on *Kirtland AFB* as the Union is only seeking the information so that it can audit Management's actions. Additionally, in *Department of Justice, Office of Justice Programs, and AFSCME, Local 2830*, 45 FLRA 1022 (1992) the Authority has held that, when a union requests information for the purpose of determining whether to file a grievance or institute other proceedings against an agency based upon a violation of the parties' collective bargaining agreement or other applicable authority, the union, as a precondition to entitlement to the information requested, must provide the agency with some evidence that the agency in fact has committed such a violation. The union, in its request, stated that it needed the information to determine whether to file a grievance against the agency regarding the alleged investigation. *Id*. The Authority, reasoning that "if the information is sought to process a grievance, or consider such action, a union's bare assertion that it needs the data for that reason does not automatically oblige the agency to supply it," held that, because the union had offered no evidence that the agency in fact was conducting an investigation

into the union that might support a grievance, the agency did not commit an unfair labor practice by refusing to provide the union with the requested information.  Id. Office of Justice Programs stands for the proposition that, if a union requests information for the purpose of filing, or considering filing, a grievance, unfair labor practice, or other charge against an agency, some evidence to support the contemplated charge must have a locus external to that of the requested information.  Accord id.  Otherwise, the union has engaged in a mere "fishing expedition," and has failed to establish the required particularized need for the information.  *Id*.

Finally, in the sixth subsection of the Union's information request, the Union states that they need the information because without this information, the Union is not fully able to represent employees as it will be in an information deficit. Further, to the extent that any hiring freeze leads to employee overwork and potential underperformance it will be necessary for the Union to determine whether the hiring freeze had any impact on individual employees for the purpose of filing grievances and/or responding to performance-based actions taken against any employee.

After careful consideration, the Agency does not believe that the Union has met their particularized need burden as discussed above in *Kirtland AFB.* Without the showing of a particularized need, the providing of information would be inappropriate.

For the reasons set forth above, we are denying your request for information under 5 U.S.C. 7114(b)(4).

Exhibit C

# Trump Administration Draft Order Calls for Drastic Overhaul of State Department

The draft executive order would eliminate Africa operations and shut down bureaus working on democracy, human rights and refugee issues.



**By Edward Wong**
Edward Wong is a diplomatic correspondent and former Beijing bureau chief who reports on foreign policy from Washington and often travels with the secretary of state.

April 20, 2025

A draft of a Trump administration executive order proposes a drastic restructuring of the State Department that includes eliminating almost all of its Africa operations and shutting down embassies and consulates across the continent, according to American officials and a copy of the document.

The draft also calls for cutting offices at State Department headquarters that address climate change and refugee issues, as well as democracy and human rights concerns.

It was not immediately clear who had compiled the document or what stage of internal debates over a restructuring of the State Department it reflected. It is one of several recent documents proposing changes to the department, and internal administration conversations take place daily on possible actions.

Some of the ideas have been debated among U.S. officials in recent weeks, though it is unclear to what degree they would be adopted or how active the draft is, officials said.

Elements of the draft executive order could change before final White House review or before President Trump signs it, if he decides to do so.

Secretary of State Marco Rubio wrote a short comment on social media after this article was published, calling it "fake news." There are no indications that Mr. Rubio or his top aides have signed off on the document, though they have been working on a reorganization of the State Department.

Neither the State Department nor the White House National Security Council replied to requests for comment early Sunday before this article was published, including a question asking whether Mr. Trump would sign such an executive order.

The purpose of the executive order is to impose "a disciplined reorganization" of the State Department and "streamline mission delivery" while cutting "waste, fraud and abuse," according to a copy of the draft order obtained by The New York Times. The order says the department is supposed to make the changes by Oct. 1.

Some of the proposed changes outlined in the draft document would require congressional notification and no doubt be challenged by lawmakers, including mass closures of diplomatic missions and headquarters bureaus, as well as an overhaul of the diplomatic corps. Substantial parts, if officials tried to enact them, would likely face lawsuits.

On Sunday afternoon, Representative Gregory Meeks of New York, the top-ranking Democrat on the House Foreign Affairs Committee, said in a social media post: "Whether parts of this draft EO ever reach Trump's desk, it's already clear this administration is determined to gut the @StateDept and run American diplomacy and development capabilities into the ground."

A White House official said the same afternoon that the proposals were not true and that the White House was not considering them.

The document began circulating among current and former U.S. diplomats and other officials on Saturday.

Major structural changes to the State Department would be accompanied by efforts to lay off both career diplomats, known as foreign service officers, and civil service employees, who usually work in the department's headquarters in

Case 3:25-cv-03698-SI Trump Draft Order Would Drastically Overhaul U.S. State Department - The New York Times Filed 05/01/25 Page 27 of 99

Washington, said current and former U.S. officials familiar with the plans. The department would begin putting large numbers of workers on paid leave and sending out notices of termination, they said.

The draft executive order calls for ending the foreign service exam for aspiring diplomats, and it lays out new hiring criteria that includes "alignment with the president's foreign policy vision."

The draft says the department must greatly expand its use of artificial intelligence to help draft documents, and to undertake "policy development and review" and "operational planning."

The proposed reorganization would get rid of regional bureaus that help make and enact policy in large parts of the globe.

Instead, the draft says, those functions would fall under four "corps": Eurasia Corps, consisting of Europe, Russia and Central Asia; Mid-East Corps, consisting of Arab nations, Iran, Pakistan and Afghanistan; Latin America Corps, consisting of Central America, South America and the Caribbean; and Indo-Pacific Corps, consisting of East Asia, Southeast Asia, India, Bangladesh, Sri Lanka, Nepal, Bhutan and the Maldives.



Secretary of State Marco Rubio in Brussels this month.  Pool photo by Jacquelyn Martin

One of the most drastic proposed changes is to eliminate the bureau of African affairs, which oversees policy in sub-Saharan Africa. It would be replaced by a much smaller special envoy office for African affairs that would report to the National Security Council. The office would focus on a handful of issues, including "coordinated counterterrorism operations" and "strategic extraction and trade of critical natural resources."

The draft also said all "nonessential" embassies and consulates in sub-Saharan Africa would be closed by Oct. 1. Diplomats would be sent to Africa on "targeted, mission-driven deployments," the document said.

Canadian operations would be put into a new North American affairs office under Mr. Rubio's authority, and it would be run by a "significantly reduced team," the draft said. The department would also severely shrink the U.S. embassy in Ottawa.

The department would eliminate a bureau overseeing democracy and human rights issues; one that handles refugees and migration; and another that works with international organizations. The under secretary position overseeing the first

two bureaus would be cut. So would the office of the under secretary of public diplomacy and public affairs.

The department would also get rid of the position of the special envoy for climate.

The department would establish a new senior position, the under secretary for transnational threat elimination, to oversee counternarcotics policy and other issues, the draft memo said.

The Bureau for Humanitarian Assistance would absorb the remnants of the U.S. Agency for International Development, which has been gutted over the last two months by Mr. Rubio and other members of the Trump administration.

As for personnel, the memo said, the department needs to move from its "current outdated and disorganized generalist global rotation model to a smarter, strategic, regionally specialized career service framework to maximize expertise."

That means people trying to get into the Foreign Service would choose during the application process which regional corps they want to work in.

The department would offer buyouts to foreign service and civil service officers until Sept. 30, the draft said.

The State Department has about 80,000 employees, with 50,000 of those being local citizens abroad. Of the rest, about 14,000 are trained diplomats who rotate overseas, called foreign service officers and specialists, and 13,000 are members of the civil service who work mostly out of Washington.

The draft order also calls for narrowing Fulbright scholarships so that they are given only to students doing master's level studies in national security matters.

And it says the department will end its contract with Howard University, a historically Black institution, to recruit candidates for the Rangel and Pickering fellowships, which are to be terminated. The goal of those fellowships has been to help students from underrepresented groups get a chance at entering the Foreign Service soon after graduation.

The draft executive order is one of several internal documents that have circulated in the administration in recent days laying out proposed changes to the State Department. Another memo outlines a proposed cut of nearly 50 percent to the agency's budget in the next fiscal year. Yet another internal memo proposes cutting 10 embassies and 17 consulates.

Greg Jaffe contributed reporting.

**Edward Wong** reports on global affairs, U.S. foreign policy and the State Department.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: State Dept. Faces Plan for Big Cuts



archive.today
webpage capture

Saved from    https://www.bloomberg.com/news/articles/2025-04-20/trump-draft-looks-for-r    search    20 Apr 2025 14:36:55 UTC

All snapshots    from host www.bloomberg.com

Webpage | Screenshot

share    download .zip    report bug or abuse

The Company & its Products  |  Bloomberg Terminal Demo Request  |  Bloomberg Anywhere Login  |  Customer Support

Subscribe

**Trump's First 100 Days:**  Tariffs  |  Tourists Stay Away  |  Harvard Threats  |  Executive Orders  |  Musk's Network  |  Court Cases to Watch

Politics

# Trump Draft Proposes Radical Reshaping of State Department

The US Department of State headquarters in Washington, *Photographer: Jim Watson/AFP/Getty Images*

By Neil Munshi and Simon Marks
April 20, 2025 at 9:38 AM UTC
*Updated on April 20, 2025 at 12:16 PM UTC*

Save  |  Translate  |  Listen 4:15

Copy Link

✦ **Takeaways** NEW                                          Hide ⌃

A draft Trump administration executive order proposes a radical reduction and restructuring of the State Department, which would be one of the biggest reorganizations of the Department since its founding in 1789.

Summary by Bloomberg AI

The order would eliminate dozens of positions and departments, including those dealing with climate, refugees, democracy, and Africa, and would reorganize the State Department into four regional bureaus.

Summary by Bloomberg AI

The cl
by Oc
draft,
the en
order
Presi

Summa

‹  ›

A draft Trump administration executive order circulating among US diplomats proposes a radical reduction to and restructuring of the

State Department, according to a copy of the document seen by Bloomberg.

The changes, if implemented, would be one of the biggest reorganizations of the Department since its founding in 1789. The 16-page draft has been spread among diplomats around the world, according to officials familiar with the document.

US Secretary of State Marco Rubio on Sunday called the reported overhaul "fake news" in a post on X.

The order would eliminate dozens of positions and departments, including those dealing with climate, refugees, democracy and Africa, as well as the Bureau of International Organizations, which liaises with the United Nations. It would also include a sharp cut to diplomatic operations in Canada.



The proposals continue the Trump administration's repudiation of the US role in the multilateral world order that it helped create.



Marco Rubio, US secretary of state, right, in the Oval Office with President Donald Trump. *Photographer: Yuri Gripas/Abaca/Bloomberg*

Under the changes, the sprawling State Department would be reorganized into four regional bureaus covering Indo-Pacific, Latin America, the Middle East and Eurasia. An unspecified number of "non-essential" embassies and consulates in Sub-Saharan Africa would be shuttered.

The changes should be made by Oct. 1, according to the draft.

The draft order was first reported by the New York Times. A spokesperson for the US embassy in Nairobi declined to comment.

Read more: How Trump's USAID Dismantling Will Affect Foreign Aid: QuickTake

It remains unclear if the entire contents of the draft order will be signed by President Donald Trump. One senior official in Africa said information circulating within the State Department about reforms that are set to be announced to the foreign service – potentially as soon as Tuesday – would be less sweeping than those described in the document.

Some employees writing on a foreign service-dedicated Reddit page also expressed doubt about how such an order could be implemented.

"I suspect this is being leaked as a red herring designed to make us grateful for a more modest but still unpopular reorganization," wrote one user. "It will be basically immediately challenged and enjoined, and then 'implementation' will be dragged out until Trump is voted out."

## Africa, Canada Operations

The order as written would eliminate, among others, the Bureau of African Affairs, the special envoy for climate, the Bureau of

International Organizations, and the Office of Global Women's Issues, as well as a number of other public diplomacy and public affairs bureaus.

"Diplomatic relations with Canada shall fall under a significantly reduced team delegated as the North American Affairs Office (NAAO) within the Office of the Secretary," according to the document. That includes a substantial downsizing of the US embassy in the capital, Ottawa.

Diplomatic staff would now be assigned to regions, where they would be expected to stay throughout their careers, rather than rotate around the world; current diplomats who don't want to join the regional ranks could apply for a buyout until Sept. 30.

Read more: Trump Jolts Africa Nations Emerging From 'Great Funding Squeeze'

A new foreign service exam would also be formulated requiring "alignment with the President's foreign policy vision," according to the draft memo.

The prestigious Fulbright scholarship, which has sent thousands of promising students around the world for studies, would be recast as "solely for master's-level study in national security-related disciplines" with priority "given to programs with intensive instruction in critical languages," including Mandarin Chinese, Russian, Farsi and Arabic.

The order would also end fellowships associated with historically-Black Howard University in Washington, as part of the Trump administration's rollback of diversity, equity and inclusion (DEI) initiatives.

Under the plan, the Bureau of Humanitarian Affairs would "assume any mission-critical duties previously carried out by the United States Agency for International Development (USAID)," which the administration has largely shuttered over the past few months and put under State Department control.

Read more: Judge Finds Musk Role in USAID Closure Likely Violated Law

"All positions and duties must receive explicit written approval from the President of the United States," according to the order.

The State Department's workforce includes some 13,000 members of the Foreign Service, 11,000 Civil Service employees, and 45,000 locally employed staff at more than 270 diplomatic missions worldwide, according to its website.

*(Updates with Rubio comment in third paragraph.)*



Get Alerts for:

+ Neil Munshi      + Simon Marks

○ ○ ○ ○ ○ ○

🔖 Save

How easy or hard was it to use Bloomberg.com today?
**Share feedback** ⧉
Have a confidential tip for our reporters? **Get in Touch**

Before it's here, it's on the Bloomberg Terminal

## More From Bloomberg



### First Shockwaves of Trump's Tariffs Are About to Hit the World Economy



### Trump Releases Files on 1968 Assassination of Robert F. Kennedy



### Trump Shuts Down Volunteer Agency in Latest DOGE Takeover



### Summers Slams Trump 'Tyranny' in Escalating Attacks on Harvard



### Trump Confident of EU Deal But in 'No Rush' as Meloni Visits

## Top Reads





### Caos arancelario de Trump devasta a

### 'Like a Direct Attack:' Canadian Auto Town

Exhibit D

# Executive Order on the Strategic Reform and Reorganization of the U.S. Department of State

## Section 1. Purpose and Effective Date.

This Executive Order institutes a disciplined reorganization of the U.S. Department of State to streamline mission delivery, project American strength abroad, cut waste, fraud, abuse, and align the Department with an America First Strategic Doctrine reflecting the priorities of the Executive Branch.

The America First Strategic Doctrine: All foreign policy decisions are to be based on the principle – Does it make America safer, stronger and more prosperous?

(a) Pursuant to the President's constitutional authority under Article II, Sections 1 and 2, and consistent with statutory authorities granted under:

- Foreign Service Act of 1980 (22 U.S.C. § 3901 et seq.)
- State Department Basic Authorities Act of 1956 (22 U.S.C. § 2651a)
- Reorganization Plan No. 4 of 1970 (5 U.S.C. App)

The President hereby directs the Secretary of State to immediately execute structural and personnel reforms necessary to fulfill this vision.

(b) These reforms shall also be implemented in accordance with:

- 22 U.S.C. § 3921 – Authorizing the Secretary of State to manage personnel and structure
- 22 U.S.C. § 2656 – Permitting reorganization and reassignment of functions within the Department
- 5 U.S.C. § 3301 – Authorizing the President to prescribe regulations for the admission and regulation of the civil service
- 5 U.S.C. § 301 – Authorizing heads of departments to prescribe regulations for their departments
- Executive Orders 12871 and 13781 – Regarding executive branch reorganization and performance improvement

All changes contained within this Order shall be implemented with aggressive speed, clarity, and resolve. The Department shall complete full structural reorganization and

transition no later than October 1, 2025. Interim implementation measures shall commence immediately upon issuance of this order, later to be solidified as part of congressional budget authorizations for FY 2026.

## Sec. 2. Regional Bureau Reorganization.

(a) The Department of State shall immediately merge existing regional bureaus into four regional corps under the Under Secretary for Political Affairs:

(i) Eurasia Corps (EURA) – Europe, Russia, and post-Soviet states including Central Asia (excluding Afghanistan)

(ii) Mid-East Corps (MEC) – Arab World, Iran, Pakistan, and Afghanistan (MEC acronym defined here)

(iii) Latin America Corps – Central America, South America, and the Caribbean

(iv) Indo-Pacific Corps – East Asia, Southeast Asia, India, Bangladesh, Sri Lanka, Nepal, Bhutan, and the Maldives

Hybrid Regional Posts (HRP) – Certain nations with complex geopolitical or cultural alignment—specifically Turkey and the Central Asian republics—shall be designated as Hybrid Posts. FSOs serving in or transitioning into roles assigned to either the Mid-East Corps or the Eurasia Corps are eligible to bid on these posts.

The Bureau of Counter Terrorism (CT) is to remain unchanged as an independent bureau but moved under the newly formed Undersecretary for Transnational Threat Elimination (TTE) and out of the Under Secretary for Political Affairs.

(b) Therefore, the offices and functions listed below are absorbed into the new regional corps or eliminated as outlined in section 2(a):

- Bureau of South and Central Asian Affairs (SCA)
- Bureau of African Affairs (AF)
- Bureau of Near Eastern Affairs (NEA)
- Bureau of East Asian and Pacific Affairs (EAP)
- Bureau of Western Hemisphere Affairs (WHA)
- Bureau of European and Eurasian Affairs (EUR)

(c) In addition to the four newly established Corps under Section 2(a), specialized offices under the Office of the Secretary will be created, primarily for Canada and other diplomatic functions limited and specialized in scope. Diplomatic relations with Canada shall fall under a significantly reduced team delegated as the North American Affairs Office (NAAO) within the Office of the Secretary.

The Embassy of the United States of America in Ottawa, Canada, by October 1, 2025, shall significantly downscale all major staff and operations and dedicate a specialized team of no more than 10 Consular officers, 1 economically focused POL coned FSO, and 1 focused on matters of military, defense obligations and accountability, and political relations pertaining primarily to immigration and national security policy handpicked by the U.S. Ambassador to Canada at the advice of internal department procedures. These individuals will serve alongside the U.S. Ambassador to Canada, also known as the Chief of Mission (COM). There will be no more than 5 MGT coned FSOs at any given time.

(d) The Joint Contagion Control Task Force (JCCTF): This shall be a joint office established under the shared authority of the Office of Global Health Affairs (OGHA), a collaborative body between the Department of Health and Human Services (HHS) and the Department of State. The JCCTF shall reside under OGHA and focus specifically on health surveillance, epidemic coordination, and outbreak response, with the task force itself consisting of FSOs and CDC officials.

(e) Special Envoy Office for African Affairs: Reporting directly to the White House National Security Council, is established and is to replace both the AF Bureau at DoS as well as any overlapping offices at the NSC. It shall lead elite intelligence and diplomatic missions across Sub-Saharan Africa in four domains:

(i) Coordinated counterterrorism operations

(ii) Strategic extraction and trade of critical natural resources

(iii) Direct select bilateral diplomacy advancing the Administration's national priorities for particular temporary matters.

(iv) JCCTF–Africa, a regional branch of the Joint Contagion Control Task Force (JCCTF), focused on health surveillance, epidemic coordination, and outbreak response in Sub-Saharan Africa under the authority of the joint HHS-DoS Office of Global Health Affairs (OGHA), where JCCTF shall reside.

(f) A dedicated Office of the United Nations (UN) Ambassador is reorganized as an office under the Office of the Secretary of State. This office shall consist solely of the Ambassador's immediate professional team and coordinate direct UN engagement. This office is replacing the Bureau of International Organizations (IO), which has been eliminated.

(g) The creation of any future offices or Bureaus within the Department shall be determined by the Secretary of State but shall require written signature approval from either the President or the Director of the Office of Management and Budget

**Sec. 3. Regional Specialization Transition Within the Foreign Service (FS).**

Effective immediately, the Department of State shall transition the United States Foreign Service from the current outdated and disorganized generalist global rotation model to a smarter, strategic regionally specialized career service framework to maximize expertise. While statutory amendments to the Foreign Service Act of 1980 and related congressional appropriations are forthcoming, the Department shall not delay interim internal implementation of this framework. All newly reformed internal structures, staffing models, training pipelines, and assignment protocols guided with this order shall be operational not later than (NLT) October 1, 2025.

(a) **Entry Requirements and Corps Assignments.** All applicants for the Foreign Service must select a Regional Corps of specialization at the time of application. Entry into the Foreign Service shall be contingent on the availability of positions within the applicant's selected region. If no vacancies exist at the time of application, the applicant may reapply during the next selection cycle—held every six (6) months—with no penalty or prejudice to future consideration. Applicants may also rank and choose their first and second Regional Corps preference choices for positions within the Foreign Service with no penalty.

Upon entry, Foreign Service Officers (FSOs) shall be assigned to a Regional Corps based on their regional interests, language proficiency, and alignment with Administration priorities. Officers will remain within that Corps throughout their careers, barring rare exceptions.

(b) **Tours and Assignment Policy.**

(i) All standard overseas assignments shall be three (3) years in length, except for designated danger posts, which are twelve (12) months in length.

(ii) FSOs must complete a total of three (3) full overseas tours within their assigned Regional Corps—equal to nine (9) years of service in that region—before becoming eligible for cross-regional reassignment.

(iii) FSOs may serve a one-year danger post outside their assigned region. Upon completion, they are entitled to a "post of choice" tour anywhere globally, regardless of Corps affiliation. That follow-on tour shall count toward the three-tour minimum.

(iv) FSOs must then return to their original Corps to complete any remaining tours required to reach the nine-year regional service threshold.

(v) Once an officer has completed the equivalent of three standard overseas tours within their original Regional Corps, they may request reassignment to a new Regional Corps.

(vi) No FSO shall be compelled to serve at a post they have not voluntarily bid on.

(c) **Danger Post Incentive Program.**

Any FSO who successfully completes a danger post tour shall automatically receive the following three benefits:

(i) *Post of Choice:* The officer may select any post worldwide—regardless of Regional Corps affiliation—for their next standard tour.

(ii) *Standard Tour Length:* The follow-on assignment shall be a full three-year tour, consistent with normal service guidelines.

(iii) *Tour Credit:* The one-year danger post shall count as one full tour toward the three-tour minimum required before cross-regional reassignment eligibility.

*Reintegration Requirement:*

- If the reward post was outside their assigned Regional Corps: The officer must re-register with their original Regional Corps to resume region-specific service.
- If the reward post was within their assigned region: The officer shall continue service within the same Regional Corps without interruption.

These benefits are designed to recognize personal sacrifice, incentivize high-risk service, and reward operational courage with unmatched flexibility.

(d) **Language Training and Immersion.**

The Foreign Service Institute (FSI), in partnership with the Bureau of Global Talent Management, shall provide targeted, immersive language training based on each officer's regional assignment and projected post needs. Officers must meet a minimum level of functional fluency in a critical language relevant to their Corps prior to their overseas assignment or shift in mission.

FSOs shall be eligible for comprehensive language courses on any language within their respective registered Regional Corps.

(e) **Voluntary Buyout Option.**

Current FSOs and eligible Civil Service personnel who do not wish to participate in the new regional specialization model or serve the interests of the administration may elect to voluntarily separate from the Department through a one-time buyout and transition program. This option shall remain open through September 30, 2025.

**Sec. 4. Civil Service Structural Reforms.**

This section authorizes the termination, renaming, and reassignment of bureaus, offices, and personnel structures within the Department of State to reflect the strategic direction of the Executive.

(a) The following positions and offices are hereby eliminated:

   (i) U.S. Special Presidential Envoy for Climate

   (ii) Bureau of Oceans and International Environmental and Scientific Affairs (OES)

   (iii) Special Envoy for Afghan Women, Girls, and Human Rights (functions transferred to the Afghanistan Desk under the Mid-East Corps (MEC))

   (iv) Office of Global AIDS Coordinator (OGAC) / PEPFAR (functions transferred to OGHA and JCCTF)

   (v) Secretary's Special Representative for Syria Engagement (functions transferred to the Syria Desk under MEC)

   (vi) Special Envoy for Iran (functions transferred to the Iran Desk under MEC and Special Envoys to the Middle East)

   (vii) U.S. Special Coordinator for the Partnership for Global Infrastructure and Investment (PGI)

(b) The Office of the Executive Secretariat is renamed the Office of Internal Coordination (OIC).

(c) The Office of the Security Coordinator is eliminated.

(d) The Office of Israel-Palestine Affairs is established within the Mid-East Corps (MEC). A Global Jewish Affairs Coordinator shall be appointed within this office and shall assume responsibilities previously held by the Office of the Special Envoy to Monitor and Combat Antisemitism.

(e) The Office of Global Women's Issues (S/GWI) is eliminated.

(f) The Office of Foreign Assistance (F) is eliminated:

   (i) Political-military assistance functions are transferred to the Bureau of Political-Military Affairs.

(ii) Limited humanitarian functions, upon passing GED review, are transferred to the Bureau of Humanitarian Affairs (BHA).

(g) The Office of the Under Secretary for Public Diplomacy and Public Affairs (R) is eliminated:

(i) Bureau of Educational and Cultural Affairs (ECA) is eliminated.

(ii) Bureau of Global Public Affairs (GPA) is eliminated.

(iii) Office of Policy, Planning, and Resources for Public Diplomacy and Public Affairs (R/PPR) is eliminated.

(iv) All funding and programmatic authority for the Critical Language Scholarship (CLS) and Fulbright Program are transferred from the eliminated Bureau of Educational and Cultural Affairs (ECA) to the National Security Education Program (NSEP). The Fulbright English Teaching Assistant component is discontinued. NSEP shall prioritize immersive language acquisition in critical or high-risk regions to expand the national pipeline of individuals with linguistic and cultural competencies essential to U.S. intelligence and security objectives. The Boren Awards cap is raised to fully cover tuition for eligible overseas study aligned with strategic language and regional specialization needs.

(v) The one-year federal service requirement for NSEP award recipients is waived for individuals who completed their funded programs between January 1, 2024, and January 1, 2026, due to impacts of the federal hiring freeze. Federal contractors serving in national security–designated roles shall be recognized as having met the service obligation.

(vi) The Fulbright Program is reauthorized solely for master's-level study in national security–related disciplines, including but not limited to strategic studies, cybersecurity, nuclear policy, counterterrorism, intelligence, energy security, and regional or area studies. Fields such as international relations or political science are permitted only when tied directly to national security applications. Priority shall be given to programs with intensive instruction in critical languages, including Mandarin Chinese, Russian, Farsi, Arabic, and others determined as vital for great power competition or counterterrorism missions by the Department of Defense (DoD).

(h) The Office of the Under Secretary for Civilian Security, Democracy and Human Rights (J) is eliminated:

(i) Bureau of Democracy, Human Rights, and Labor (DRL) is eliminated.

(ii) Office of International Religious Freedom is eliminated.

(iii) Office of the Special Envoy to Monitor and Combat Antisemitism is eliminated; functions transferred to the Global Jewish Affairs Coordinator under the Office of Israel - Palestinian Affairs under the MEC.

(iv) Office of Multilateral and Global Affairs (DRL/MLGA) is eliminated.

(v) Office of Global Programming (DRL/GP) is eliminated.

(vi) All regional DRL units are eliminated.

(vii) Bureau of Population, Refugees, and Migration (PRM) is eliminated.

(viii) Office of Global Criminal Justice (J/GCJ) is eliminated.

The following units are retained and reassigned under the Under Secretary for Transnational Threat Elimination (TTE):

(i) Bureau of International Narcotics and Law Enforcement Affairs (INL), renamed Bureau of Counter-Narcotics (CNC)

(ii) Office to Monitor and Combat Trafficking in Persons, renamed Office for Combatting Human Trafficking (CHT)

(iii) Bureau of Conflict and Stabilization Operations (CSO) is eliminated. Strategic conflict, crisis, red team and wargaming like exercises shall be delegated to inter-agency coordination within other Bureaus or offices alongside the Department of Defense (DoD).

(iv) Bureau of Diplomatic Security (DS) moved under TTE

(j) The Bureau of Humanitarian Affairs (BHA) shall establish the following divisions:

(i) Office of Genocide Prevention (OGP), led by a Coordinator appointed by the President

(ii) Division for Genital Mutilation Prevention (DGM), led by a Special Envoy appointed by the President

(k) The Office of Global Health Security and Diplomacy (GHSD) is eliminated. All functions are absorbed by the Office of Global Health Affairs (OGHA), under joint authority of the Department of State and HHS.

(l) The Office of Policy Planning (S/P) is eliminated. Strategic policy functions will be coordinated directly by the Secretary of State with the President and the personal Counselor to the Secretary (C).

(m) The Office of the Under Secretary for Arms Control and International Security (T) is eliminated:

(i) The Bureau of International Security and Nonproliferation (ISN) and the Bureau of Arms Control, Deterrence, and Stability (AVC) are merged into the Bureau of Non-Proliferation (NP) under TTE.

(n) The Office of Management Strategy and Solutions (MSS) is eliminated. All functions are transferred to the Office of Internal Coordination (OIC).

(o) The Government Efficiency Division (GED) is established as the Department's central authority on organizational efficiency. No new office, division, or personnel expansion may occur without GED approval.

(p) Additional restructuring actions:

(i) Bureau of Administration (A) is eliminated. Functions are reassigned to GTM and OIC.

(ii) Office of Language Services (LS) is eliminated. All translation services are absorbed by FSI.

(iii) Bureau of Budget and Planning (BP) is renamed Office of Budget Planning and moved under GED.

(iv) Office of the Ombuds is eliminated. Functions are transferred to OIC.

(v) Bureau of the Comptroller and Global Financial Services (CGFS) is renamed Office of Diplomatic Financial Services (DFS) and moved under GED.

(vi) Office of Foreign Missions (OFM) is retained and expanded to absorb Bureau of Overseas Buildings Operations (OBO).

(vii) Bureau of Consular Affairs (CA) is decentralized into regional Corps-aligned Consular Divisions.

(viii) Bureau of Diplomatic Security (DS) is retained and reassigned under TTE.

(ix) Bureau of Global Talent Management (GTM) is retained and restructured as the sole centralized personnel command, reporting to OPM.

(x) Bureau of Medical Services (MED) is retained as an independent entity.

(xi) Foreign Service Institute (FSI) is retained and expanded for training and language services.

(xii) Bureau of Diplomatic Technology (DT) is retained and elevated under the Chief Information Officer for AI and cybersecurity operations.

**Sec. 5. Foreign Service Reform.**

(a) The Foreign Service Officer Test (FSOT) in its current form is permanently discontinued.

(b) A new entry framework shall be established by the U.S. Secretary of State, adopted by October 1, 2025, with evaluation based on:

(i) Demonstrated charisma and regional knowledge

(ii) Verbal authenticity and public speaking ability

(iii) Regional language proficiency

(iv) Knowledge of U.S. history and geopolitics

(v) English fluency, writing ability, and public communication

(vi) Diplomatic appearance, professionalism, and personal conduct

(vii) In-person negotiation skills and crisis simulations

(viii) Alignment with the President's foreign policy vision

All Foreign Service Officers shall enter through one of the following career tracks:

**Primary Tracks:**

(i) Political Officers (POL) – including political analysis, economic affairs, public diplomacy, and both micro and macro-level policy engagement

(ii) Consular Officers (CON) – managing citizen services, visa operations, and emergency response

(iii) Management Officers (MGT) – overseeing operations, logistics, staffing integrity, and financial administration

**Specialized Tracks:**

(i) Technical Specialists (TECH) – responsible for cyber defense, diplomatic technology systems, and coordination with Diplomatic Security on technical matters through the Department's cyber defense division

(ii) Regional Security Officers (RSO) – part of Diplomatic Security, these officers manage security operations at posts worldwide and are now formally recognized as Foreign Service Officers

(iii) JCCTF Specialists – pandemic control specialists deployed under the Joint Contagion Control Task Force to monitor, contain, and coordinate global outbreak responses

(iv) Medical Officers (MED) – responsible for health services, emergency medical care, and wellness programs for diplomatic personnel and their families at overseas posts

All selection committee interviews are required to have at least one individual from the White House for final approval of any finalists to ensure the candidate's alignment with Administration priorities.

## Sec. 6. Sub-Saharan Africa Diplomatic Realignment

(a) All non-essential embassies and consulates in Sub-Saharan Africa shall be closed by October 1, 2025. The determination of what posts or facilities are deemed essential shall be under the discretion of the Secretary of State (S), with restructuring complete by October 1, 2025.

(b) All diplomatic and development operations in the Sub-Saharan African region that may remain shall be consolidated under the office of the Special Envoy for African Affairs using targeted, mission-driven deployments.

## Sec. 7. DEI Fellowship Termination and Service Transition.

In recognition of the Department's duty to uphold merit-based standards in public service, this Administration concludes that diversity, equity, and inclusion (DEI) initiatives—while originally conceived to foster equal opportunity—have evolved into ideologically driven mechanisms that compromise professional integrity and institutional cohesion. The Pickering and Rangel Fellowship Programs have increasingly evolved as a reflection of these trends. Accordingly, the Department will reorient its talent pipeline to focus exclusively on individual merit, strategic discipline, and alignment with national interest.

(a) All Department contracts with Howard University regarding the Rangel and Pickering Fellowship Programs are terminated. These programs are inconsistent with the reformed Foreign Service model established by this order, grounded in merit, professional discipline, and strategic ideological cohesion rather than one's socioeconomic, religious, or ethnic struggles being a component for selection. A new fellowship program contract, one where the selection process is free of DEIA political ideology, can be established later if approved by the Secretary of State  and Director of OMB. All selection committee interviews are required to have at least one individual from the White House for final approval of any finalists to ensure the candidate's alignment with Administration priorities. The Secretary (S) is authorized to look for partnerships with other colleges besides Howard to initiate a future fellowship program more in line with the America First Strategic Doctrine.

(b) The 2026–2027 application cycle of both fellowships is canceled. No new applications shall be accepted for any future cohorts beyond those already awarded prior to October 1, 2025.

(c) All fellows currently enrolled in the academic phase, including those expected to graduate in Spring 2026 and those who accepted awards for academic programs ending in Spring 2027, shall receive final disbursements by October 1, 2025. Fellows must complete their graduate studies on time and at their currently enrolled institutions. Additionally, all summer internship assignment components are cancelled.

(d) Upon graduation, current fellows may:

   (i) Enter the Foreign Service under their original five-year service obligation contract, although amended to align with a regional specialization skill profile and demonstrated willingness to uphold the administration's foreign policy agenda;

or

   (ii) Be released from their service obligation entirely without penalty.

(e) Fellows from both the graduating Spring 2026 and Spring 2027 cohorts must declare their intent by December 31, 2025. Appointments shall also require a demonstrated professional commitment to upholding the President's foreign policy agenda.

(f) All individuals who participated in the Payne Fellowship Program prior to its termination in February 2025 are fully released from any prior contractual service obligations, including any previously assigned placements related to USAID. All funding allocations by Congress for the Payne cohort shall be disbursed as a lump sum to allow former Payne fellows who will be in their second year of a master's degree program set to

conclude before July 1, 2026, are hereby disbursed for that academic year cycle. Additionally, all summer internship assignment components are cancelled.

**Sec. 8. Strategic Cohesion Doctrine.**

All employees of the U.S. Department of State, including both Foreign Service and Civil Service personnel, are expected to professionally execute the foreign policy priorities of the President under the Department's new Strategic Cohesion Doctrine. This doctrine emphasizes message discipline, operational alignment, and unified mission execution.

Nothing in this doctrine shall be construed to:

   (i) Interfere with protections under the Hatch Act;

   (ii) Infringe upon any employee's private political beliefs or freedom of expression outside the scope of their official duties; or

   (iii) Require ideological conformity beyond the execution of assigned responsibilities in a manner consistent with lawful, nonpartisan, and strategic foreign policy delivery as directed from the White House. Personnel have the right to hold differing personal views so long as they do not interfere with professional conduct that remains aligned with Department expectations during official service both on and off the clock.

**Sec. 9. U.S. Foreign Service Internship Program (USFSIP) Reform.**

(a) The USFSIP is expanded and restructured as a direct, strategic, and merit-based entry path into the Foreign Service. The State Department Student Internship Program (SIP) and Pathways Programs are eliminated. USFSIP shall remain open to juniors and seniors in undergraduate college or vocational school.

(b) USFSIP interns will be compensated at GS-4 Step 1 as they previously were before.

(c) Two annual seasonal cohorts shall be established:

   (i) Summer Cohort: July 1 – December 20

   (ii) Winter Cohort: January 10 – June 30

(d) Each cohort shall include 45 interns total, selected with the intention that 10 each are specialized for a particular Regional Corps relating to their second overseas post. Their first domestic assignment shall be unrelated to these criteria and will be provided with a bid list of domestic offices to choose from, but final assignment will be based on the needs of the Department.

(i) **Phase I (Domestic):** A six-month domestic internship at one of the offices of the Department of State (DOS) in Washington, D.C. (ii) **Phase II (Overseas):** Mandatory; all 45 interns are assigned overseas placements based on regional alignment based off skill set and preferences. Placement distribution will ensure approximately 10-12 interns per region.

(e) Finalists must be selected prior to cohort placement. From this pool of finalists, 40 interns per cohort will be selected. Finalists not selected may serve as alternates to fill any vacancies in either phase.

(f) Selection factors shall include:

(i) Language and regional expertise fluency

(ii) Exceptional understanding of U.S. history, current events, and geopolitics

(iii) Structured virtual interviews

(iv) Demonstrated respect, charisma, and region-specific knowledge

(v) Verbal authenticity and public speaking ability

(vi) Commitment to the Administration's foreign policy agenda

(g) Academic Waivers:

Students selected and completing the 1-year USFSIP track in their academic school year will receive a federal academic waiver issued by the U.S. Department of State to their college to ensure they are not penalized or disenrolled from their respective academic institutions.

(h) Logistics:

Housing for USFSIP interns during both domestic and overseas phases shall be Department-provided, utilizing existing resources reallocated from the SIP and Pathways programs. All placements will meet basic safety and cleanliness standards, consistent with TDY housing protocols.

**Sec. 10. Interagency Oversight and Workforce Streamlining.**

The Office of Personnel Management (OPM) is authorized to supervise the Government Efficiency Division (GED) to ensure spending allocation is balanced and costs are cut where possible.

**Sec. 11. Bureau of Humanitarian Affairs (BHA).**

The Bureau of Humanitarian Affairs (BHA) shall assume any mission-critical duties previously carried out by the United States Agency for International Development (USAID), with the office serving directly under the supervision of the Department of State's Government Efficiency Division (GED). All positions and duties must receive explicit written approval from the President of the United States, contingent upon passing a GED review to ensure that no humanitarian-related functions under BHA overlap with duties assigned to any other office or bureau. Redundant, duplicative, or legacy programming shall be fully sunset by October 1, 2025. Strict scrutiny of the opening of new positions or expanded duties shall be applied to ensure the total elimination of waste, fraud, and abuse.

## Sec. 12. Secure AI Integration in Diplomatic Operations.

The Department shall task Diplomatic Technology (DT) to secure AI to assist with:

(i) Drafting internal documents

(ii) Policy development and review

(iii) Operational planning

(iv) Be supervised by cleared personnel

(v) Meet or exceed GPT-4o intelligence standards

(vi) Not have any mechanism to share any classified information outside the classified network servers

(vii) Supplement, not replace, human decision-making and operate solely on classified and secure networks

Operational protocols are to be issued by the Chief Information Officer of the U.S. Department of State within 60 days.

### Sec. 13. Repatriation Operations

The Office of Human Services Emergency Preparedness and Response (OHSEPR), under the Administration for Children and Families (ACF), U.S. Department of Health and Human Services (HHS), shall maintain a physical liaison officer assigned to the Department of State (DOS). This position may be filled by a either federal contractor or Civil Service employee assigned to OHSEPR. The liaison shall ensure close, continuous coordination between OHSEPR and the Department of State on repatriation-related

matters, including classified intelligence sharing on emerging threats, repatriation logistics, and domestic preparedness. The liaison may rotate physically between OHSEPR offices and the Department of State, as determined by internal operational requirements. The liaison shall also coordinate directly with state governments to support effective planning and response for incoming repatriation issues through state-managed ports of entry.

**Sec. 14. Severability.**

If any provision of this Order, or the application thereof to any person or circumstance, is held to be invalid in a court of law, the remainder of the Order and its application shall not be affected.

Exhibit E

An official website of the United States Government  Here's how you know

⊙ **Live Now:** Department Press Briefing

**Home** >  ...  > Building an America First State Department

# Building an America First State Department

**PRESS STATEMENT**

**MARCO RUBIO, SECRETARY OF STATE**

APRIL 22, 2025

We are facing tremendous challenges across the globe. To deliver on President Trump's America First foreign policy, we must make the State Department Great Again.

In its current form, the Department is bloated, bureaucratic, and unable to perform its essential diplomatic mission in this new era of great power competition. Over the past 15 years, the Department's footprint has had unprecedented growth and costs have soared. But far from seeing a return on investment, taxpayers have seen less effective and efficient diplomacy. The sprawling bureaucracy created a system more beholden to radical political ideology than advancing America's core national interests.

That is why today I am announcing a comprehensive reorganization plan that will bring the Department into the 21st Century. This approach will empower the Department from the ground up, from the bureaus to the embassies. Region-specific functions will be consolidated to increase functionality, redundant offices will be removed, and non-statutory programs that are misaligned with America's core national interests will cease to exist.

Under President Trump's leadership, we have a commander in chief committed to putting America and Americans first. As his Secretary of State, I am confident a reformed State Department will meet the moment and help make our country great once again.

_**Click here to view the new organizational chart for the U.S. State Department**_    _**[73 KB]**_. _The Department will implement the changes methodically over the next several months._

---

**TAGS**

Department Organization     Office of the Spokesperson     The Secretary of State

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

Exhibit F



As of July 1, 2025

**NEW ORG CHART**

- Secretary of State (S) and Administrator for USAID
- Counselor (C)
- Chief of Staff (COS)
- United States Mission to the United Nations
- Deputy Secretary of State (D)
- Deputy Secretary of State for Management and Resources (D-MR)
- Executive Secretariat (S/ES) Executive Secretary

Undersecretary for Political Affairs (P)
- African Affairs (AF) Assistant Secretary
- East Asian and Pacific Affairs (EAP) Assistant Secretary
- European and Eurasian Affairs (EUR) Assistant Secretary
- Near Eastern Affairs (NEA) Assistant Secretary
- South and Central Asian Affairs (SCA) Assistant Secretary
- Western Hemisphere Affairs (WHA) Assistant Secretary
- International Organizations (IO) Assistant Secretary

Under Secretary for Economic Growth, Energy, and Environment (S)
- Economic & Business Affairs (EB) Assistant Secretary
- Oceans, Environment, and Int'l Scientific Affairs (OES) Assistant Secretary
- Global Health Security and Diplomacy (GHSD) Ambassador-At-large
- Cyberspace and Digital Policy (CDP) Ambassador-At-Large
- Office of Global Food Security (GFS) Director
- Office of the Chef Economist (CE)

Undersecretary for Arms Control and International Security (I)
- Arms Control, Nonproliferation and Stability (ANS) Assistant Secretary
- International Narcotics and Law Enforcement (INL) Assistant Secretary
- Political-Military Affairs (PM) Assistant Secretary
- Counterterrorism (CT) Ambassador-At-Large
- Emerging Threats (ET) Assistant Secretary

Under Secretary for Public Diplomacy and Public Affairs (R)
- Educational and Cultural Affairs (ECA) Assistant Secretary
- Global Public Affairs (GPA) Assistant Secretary

Under Secretary for Management (M)
- Administration (A) Assistant Secretary
- Budget and Planning (BP) Director
- Comptroller, Global Financial Services (CGFS) Comptroller
- Consular Affairs (CA) Assistant Secretary
- Diplomatic Security (DS) Assistant Secretary
- Office of Foreign Missions (OFM) Director
- Bureau of Global Acquisition (GA) Procurement Exec
- Personnel (PER) Director General of Foreign Service and Chief Human Capital Officer
- Diplomatic Technology (DT) Chief Information Officer
- Office of Management Strategy and Solutions (M/SS) Director
- Medical Services (MED) Director
- Overseas Buildings Operations (OBO) Director

Office of the Director for Foreign Assistance and Human Rights (F)
- Democracy, Human Rights, and Labor (DRL) Assistant Secretary
- Population, Refugees, and Migration (PRM) Assistant Secretary

- Office of Civil Rights and Ombudsman (S/OCR) Director
- Intelligence and Research (INR) Assistant Secretary
- Office of Inspector General (OIG) Inspector General
- Legislative Affairs (H) Assistant Secretary
- Office of the Legal Adviser (L) Legal Adviser
- Office of Policy Planning (S/P) Director
- Office of the Chief of Protocol (S/CPR) Ambassador
- Office of the Spokesperson (S/SPOX)

Exhibit G



May 2024

**United States**
**Department of State Org Chart**

GTM/OTA manages the Department of State's Organizational Chart
* The head of these organizations report directly to the Secretary (S)
for certain purposes

Exhibit H

**Department Reorganization FAQs**

**(as of April 22, 2025)**

**\*Note: As needed, this FAQ will be updated with relevant information.  Please submit any questions you have to the comment portal (available HERE).\***

**Q: My office is being eliminated.  What happens to me and my colleagues?**
A: Consistent with applicable law, employees in offices being eliminated will receive Reduction-in-Force (RIF) notices within the next sixty (60) days. The specific effect of a RIF notice will depend on individual employment classifications, circumstances, seniority, and office assignment. GTM/CDA will work with employees and bureaus to facilitate new assignments as appropriate.

In general, Civil Service employees subject to RIF will be separated from the Department at the conclusion of a legally-sufficient notice period, with the exception of Senior Executive Service (SES) employees, who may be reassigned to other vacant SES positions.

Foreign Service employees subject to a RIF may be separated from federal service, or may be assigned to a different open global role within the Department. Foreign service employees who receive a RIF notice should contact their CDO for further guidance.

Generally, contract employees in offices being eliminated will receive termination notices within sixty (60) days, consistent with the contractual terms and rights in their individual agreements with the Department and third-party contractors.

The Secretary has tasked each Under Secretary with formulating specific reorganization and workforce optimization plans. Following approval of those plans by the Secretary, the Under Secretaries will communicate how these Department-wide changes will affect specific bureaus and offices that report to them.

**Q: My bureau is being moved to another office.  What happens to me and my colleagues?**

A: The Department will evaluate the staffing needs of the bureau on a position-by-position basis.  Decisions to realign or abolish positions may result in employees being reassigned or separated from federal service. As noted, Under Secretaries will be preparing reorganization and implementation plans for their bureau families. As those plans develop, there will be more specific guidance regarding what these changes mean for specific bureaus and employees.

**Q: Will my office physically move at this time?**

There are no immediate changes to work locations or schedules resulting from today's reorganization announcement. As bureau and family reorganization plans are developed, Under Secretaries will communicate any office or work location changes, and provide sufficient adjustment resources as required by law and Department policy.

**Q: During the reorganization, can employees in eliminated offices apply for open jobs in other bureaus?**

A: For employees affected by an upcoming RIF action, forthcoming RIF packets will contain specific and detailed information about transfer, separation, and career services rights and procedures. The following information reflects general practice under federal rules and regulations but is merely advisory and may not reflect individual circumstances.

Civil Service: When an office is eliminated as part of a reorganization, Civil Service employees affected by a reduction in force (RIF) are eligible for the Department's Career Transition Assistance Plan (CTAP).  Under CTAP, employees who meet the eligibility criteria receive priority consideration for vacancies in the Department.  To comply with CTAP procedures, the Department must post vacancies for a minimum of five business days before filling the position through reassignment or other means.  This gives eligible employees an opportunity to apply and be considered before other candidates.  After the employee's final separation date, if they have not secured another position, they may be eligible for the Interagency Career Transition Assistance Plan, or ICTAP, which provides similar priority consideration for vacancies in other federal

agencies. However, the CTAP and ICTAP provide limited opportunities due to the current hiring freeze.

Foreign Service: Foreign Service RIF procedures are set forth in the FAM. Foreign Service Officers may be eligible for reassignment to another open global position at the Department, depending on their individual circumstances and Department needs. Foreign Service Officers subject to a RIF should contact their CDO for further guidance.

**Q: Who is subject to Reduction in Force (RIF) procedures?  Are they different for Foreign Service and Civil Service?**
A: RIF procedures differ for Civil Service and Foreign Service employees, based on the legal authorities and policies that govern each personnel system.

Civil Service employees are subject to RIF procedures outlined in 5 CFR Part 351, which include factors such as organization, tenure group, length of service, performance ratings, and veterans' preference.  These rules determine the order of retention when positions are eliminated.  The Senior Executive Service (SES) are subject to different RIF rules (i.e., 5 U.S.C. 3595) than those that apply to General Schedule RIFs. Retention and job placement opportunities may depend on other factors, including whether an entire competitive area is being eliminated in the RIF action, and the applicability of the government-wide hiring freeze.

Foreign Service employees are subject to RIF procedures as outlined in Section 611 of the Foreign Service Act of 1980, which provides the legal authority for such actions.  The detailed procedures for implementing a RIF are specified in 3 FAM 2580 and explain the compilation of service wide retention registers by skill and grade – which include factors such as tenure groups, selection board ratings, veterans' preference and length of service. The present assignment of Foreign Service employees is not a factor for RIFs.


**Q: Will the centralization to the executive secretariat change the immediate functioning of the Department?**

No, this change will be communicated to the Department once a plan for centralization has been approved by Department leadership.

**Q: How will this affect transfer season?  What if my onward position is being eliminated?**
A: If a Foreign Service employee is assigned to a position that has been eliminated, they should contact their CDO for guidance.  GTM/CDA will work with employees and bureaus to facilitate new assignments.  You may have to rebid for your onward assignment depending on the reorganization plan submitted by your Under Secretary.

**Q: When will TalentMAP be updated to reflect the reorganization's changes?**
A: The Department evaluates staffing needs on an ongoing basis.  As with any bidding season, current projected vacancies may change.  Bidders are encouraged to take a close look at TalentMAP once the bid cycle opens, as their bidding preferences and strategies may be affected.  Our goal is to be transparent and to keep the workforce updated as decisions are made regarding the available positions in the Summer 2026 Cycle.

**Q: What is the status of additional voluntary retirement options?**
A: The Department of State is actively exploring voluntary retirement mechanisms and will have more information in the very near future.

**Q: What happens to overseas employees (Locally Employed Staff, Foreign Service, Civil Service, contractors) at posts during the reorganization?**
A: The reorganization announced today only affects domestic offices and personnel. No embassy, consulate or overseas post closure decisions have been made at this time. Likewise, no overseas personnel actions are being announced at this time. Operations at overseas posts should continue in the normal course.

**Q: When will I know what the new reorganization plan will be for my bureau?**
A: Once Department leadership has reviewed and approved a bureau/family plan, your Under Secretary will communicate how the reorganization will affect your bureau or office, and what your new reporting and organizational structure will look like.

4

**Q: What will happen to my benefits if I am RIFed?**
A: If you receive a RIF notice, it will include information on your benefits. All Department employees will receive all benefits and compensation to which they are entitled, and nobody will lose earned benefits as a result of this reorganization.

**Q: How much notice can I expect if I am subject to a RIF?**
A: All affected Department employees will receive a RIF notice period at least as long as the period required by law. Depending on individual circumstances, generally this means at least 60 or 90 days.

**Q: How does this impact ongoing programming?**

A: This reorganization will not result in any immediate changes to the Department's ongoing programming.  As the Secretary has made clear, following the conclusion of the recent full-scope programming review, the Department's ongoing programs will be fully supported and are expected to remain active. The Department will continue, as necessary and consistent with relevant authorities, to align its activities and programs to the foreign policy priorities of the President and Secretary.

**Q: How does this reorganization affect the J Family?**

As the Secretary has announced, the bureaus currently under the Under Secretary for Civilian Security, Democracy, and Human Rights (J) will be realigned to the Office of Foreign Assistance and Human Rights (F), transferred elsewhere within the Department, or abolished consistent with applicable law.

As with the rest of the Department, J family bureaus and offices will not experience any immediate change. Employees in these areas remain on active duty and approved programs will remain active, ongoing, and fully supported. A detailed implementation plan will be developed by July 1 to integrate or restructure functions currently within the J family.  No other organizational or reporting changes have been made at this time.

**Q: How does this reorganization relate to the USAID Integration?**

5

This Departmental reorganization is separate from the ongoing efforts to integrate certain USAID foreign assistance programs and functions to the Department. The existing USAID Transition Working Group, led by Ambassador Howard VanVranken, will continue to lead the Department's efforts to assume responsibility for USAID's ongoing foreign assistance programming by July 1. Today's announcements do not change the USAID integration plan or timeline.

While implemented separately, these two distinct reorganization efforts are highly complementary, and the Secretary and Department leadership continue to carefully consider the integration of former USAID programs and functions in developing and implementing the Department's reorganization plan.

**\*Note: As needed, this FAQ will be updated with relevant information.  Please submit any questions you have to the comment portal (available HERE).\***

Exhibit I

**STATE DEPARTMENT REORGANIZATION FACT SHEET**
April 22, 2025

President Trump and Secretary Rubio are focused on realigning U.S. foreign policy to reflect America's core national interests and deliver better results for Americans.  Over the past several decades, the Department's unchecked growth has created a proliferation of bureaus and offices with unclear or overlapping mandates, as well as blurred reporting lines.  The Department does not speak with one voice, responsibility for policy implementation is divided and unaccountable, transparency is diminished, and, most importantly, outcomes for Americans are not optimized.

Secretary Rubio is committed to leading] a State Department that puts America First and that empowers the Department from the ground up, from bureaus to embassies.

The new organization chart (linked HERE) will allow the Department to better set and communicate the direction of American foreign policy.  It will consolidate Department reporting lines, drive efficiencies in our operations, strengthen our workforce, and produce better outcomes for Americans both domestically and abroad.

To achieve this proposed structure and operational efficiency, the Under Secretaries have been charged with creating implementation plans that will be reviewed and approved by Department leadership.

As part of the plan, the Under Secretaries will also submit a path to reducing staff in domestic offices by 15 percent, consistent with the President's Workforce Optimization Initiative.

Consistent with all statutory obligations, some of the major components of the proposed reorganization plan include:

- <u>Overall toplines</u>: The Department will be consolidated from 734 bureaus / offices to 602, in addition to transitioning 137 offices to another location within the Department to increase efficiency.
- <u>Political Affairs (P)</u>: The reorganization will empower regional bureaus under P. These bureaus, along with our embassies, are the tip of the spear in our diplomatic efforts. Moving forward, the regional bureaus will absorb a number of functional issues to increase the authority, responsibility, and accountability of regional bureau heads, allowing them to seamlessly align policy with non-security foreign assistance and to provide leadership within the Department.
  - o Each of the regional bureaus will create an Office of Assistance that coordinates aid for the bureau.  Some bureaus (e.g, EUR and NEA) already have such offices and so will not need to create something entirely new.
- <u>Arms Control and International Security (T)</u>: Security assistance, which has unique functions and authorities, will be consolidated in the T family so it can be managed comprehensively.
  - o To better align with this remit, the Bureau of International Narcotics and Law Enforcement Affairs (INL) and Bureau of Counter Terrorism (CT) will move into the T family.
  - o A new Bureau of Emerging Threats (ET) will consolidate various authorities and lines of effort to cohesively address 21st century threats related to cyber, AI, and space.
  - o Elements of Arms Control, Deterrence, and Stability (ADS) will be merged with the Bureau of International Security and Nonproliferation (ISN) and renamed to Bureau of Arms Control, Nonproliferation, and Stability (ANS).
- <u>Economic Growth, Energy, and Environment (E)</u>: Economic and commercial statecraft will be consolidated within the E family, absorbing functions that had previously been spread across other parts of the Department.
  - o This includes the Bureau of Cyberspace and Digital Policy (CDP), Office of the Science and Technology Adviser (S/STAS), Office of the Special Envoy for Critical and Emerging Technology (S/TECH), Bureau

2

of Global Health Security and Diplomacy (GHSD), Office of Sanctions Coordination (S/SC), and Special Presidential Coordinator for the Partnership for Global Infrastructure and Investment (S/PGII).

- o The Bureau of Energy Resources (ENR) will also fold into the Economic and Business Affairs to ensure a laser-like focus on expanding and exporting American energy.

- Public Diplomacy (R): The R family will continue to serve as lead policymaker for the Department's overall public outreach and Department press strategies, as well as countering censorship globally.
    - o The Office of Global Partnerships (E/GP) will move from the E-family.

- Management (M): The M family will continue to lead on issues related to the Department's budget, personnel, and physical assets, as well as its security and technology efforts.
    - o All hiring authorities will be consolidated in Bureau of Global Talent Management (GTM), which will be renamed as Bureau of Personnel (PER) and be inclusive of the Foreign Services Institute (FSI).
    - o Procurement authorities will be consolidated in a new Office of Global Acquisitions (M/GA) answering directly to the Under Secretary for Management.
    - o Financial management functions will be consolidated under the Bureau of the Comptroller and Global Financial Services (CGFS) and IT functions under the Bureau of Diplomatic Technology (DT).

- Foreign and Humanitarian Affairs (F): A reimagined Office of the Coordinator of Foreign and Humanitarian Affairs will coordinate Department foreign assistance, which will be administered and managed by the regional bureaus.  Many of the functions from the Office of the Under Secretary for Civilian Security, Democracy, and Human Rights (J family) bureaus will be transferred and combined within F.
    - o This will include folding the Offices of International Religious Freedom (IRF) and Special Envoy to Monitor and Combat Antisemitism (SEAS) into a Bureau of Democracy, Human Rights, and Labor (DRL).

- o The Office to Monitor and Combat Trafficking in Persons (TIP) will fold into the Bureau of Population, Refugees, and Migration (PRM).
- o The Office of Global Criminal Justice (GCJ) and Conflict and Stabilization Operations (CSO) will be sunset.
- o There will no longer be an Under Secretary for Civilian Security, Democracy, and Human Rights following the change in reporting lines.
- Executive Secretariats: Across the Department, the majority of EX offices will be consolidated at the Under Secretary level with several exceptions, e.g., INL, CA

Next steps:
- The Deputy Secretary for Management and Resources (D-MR) will lead the implementation.  Until D-MR is confirmed, the working group will be organized by Acting Undersecretary for Management Jose Cunningham, with leadership from D-MR staff and support from C staff.
- Under Secretaries will submit reorganization plans for the bureaus and offices under their responsibility. The plans will be submitted to the Office of the Deputy Secretary of State for Management and Resources (D-MR).

As part of this process, a *comment portal (linked HERE)* is available for members of the workforce to provided feedback.

# # #

4

Exhibit J

<u>UNCLASSIFIED</u>



**Office of Inspector General**
United States Department of State

ISP-I-19-23                          Office of Inspections                          August 2019

# Review of the Effects of the Department of State Hiring Freeze

INFORMATION REPORT

**Summary of Review**

The Joint Explanatory Statement for the Consolidated Appropriations Act, 2018[1] instructed OIG to review the effects of the Department of State's (Department) hiring freeze on domestic and overseas operations. Specifically, OIG was asked to determine: (1) the current status of the hiring freeze, including eligible family member employment and lateral transfers; (2) the impact of the hiring freeze on the day-to-day function and mission of the Department, embassies, and consulates during calendar year 2017; (3) the impact of the hiring freeze on the safety, morale, and welfare of Department personnel; (4) the impact of the hiring freeze on Department personnel costs; and (5) the impact of the suspension of eligible family member employment on embassy and consulate operations and on other Federal agencies.

OIG found that the hiring freeze particularly affected the Department's eligible family member and Civil Service workforce. From the start of the hiring freeze in January 2017 until the Department lifted it in May 2018, on-board eligible family member employment[2] levels declined by 20.7 percent. Over the same period, Civil Service on-board employment levels declined by 7.1 percent. By contrast, the Department's Foreign Service employment levels experienced only a 1 percent reduction during this period. OIG also found that on-board Civil Service staffing levels in occupational series with security, medical, and life safety responsibilities declined by 7.6 percent from January 2017 to August 2018.[3] These positions are particularly important because they play a role in ensuring the protection of Department employees.

OIG found that implementation of the freeze was not guided by strategic goals linked to a discrete, but related, exercise to prepare a plan to improve the economy and efficiency of Department operations, known as the organizational reform effort. This disconnect led to an inability to apply staffing reductions in a way that reflected the Department's strategic goals. Bureaus, offices, and overseas posts consistently described procedures for seeking exemptions to the freeze as cumbersome, time-consuming, and inefficient and said the Department did not fully communicate policies and procedures related to the hiring freeze. Although the Secretary lifted the hiring freeze on May 15, 2018, bureaus and offices told OIG that reduction of their employment ceilings to December 31, 2017, on-board staffing levels and retention of other processes developed during the freeze continued to impede their ability to fill positions.

---

[1] Congressional Record, Vol. 164, No. 50, Book 3, March 22, 2018, pg. H2842.

[2] Eligible family member employment levels reflect overseas positions filled using a Family Member or Temporary Appointment. Civil Service employment levels include eligible family members employed in domestic Civil Service positions.

[3] OIG analysis of the changes in on-board employment levels used Department data for the period January 2017 to May 2018, the dates the Department's hiring freeze was in effect. However, OIG's analysis of the changes in Civil Service occupational series data includes the period January 2017 to August 2018, because the Department did not have data that corresponded to the dates of the hiring freeze.

OIG determined that the hiring freeze had a broad and significant effect on overall Department operations, particularly on its ability to address its most significant management challenges.[4] This conclusion is based on OIG's review of responses from 38 domestic bureaus and offices and 151 overseas posts as well as analysis of Department-furnished staffing data. This report includes examples of hiring freeze effects reported to OIG. However, OIG was unable to validate each individual response due to the number and range of reported effects. One hundred percent of bureaus and offices (38 of 38) that responded to OIG surveys said the hiring freeze had a negative or very negative effect on morale, as did 97 percent of embassy and consulate respondents (145 of 149). OIG was unable to assess the financial costs of the hiring freeze because the Department did not systematically track these costs.

This report does not contain recommendations because the hiring freeze has concluded.[5]

## BACKGROUND

On January 23, 2017, the President ordered a Government-wide freeze on the hiring of Federal civilian employees.[6] The Presidential memorandum gave heads of departments and agencies the authority to exempt positions from the hiring freeze in cases where they were necessary to meet national security or public safety needs. The Office of Management and Budget (OMB) lifted the hiring freeze on April 12, 2017, when its director released a plan to reduce the size of the Federal Government workforce through attrition, fulfilling a Presidential requirement to develop such a plan before lifting the freeze.[7] However, the Department continued the hiring freeze for another 13 months, until the Secretary lifted it on May 15, 2018.[8] A timeline of major events related to the hiring freeze is shown in Figure 1, below.

### Department Extended Hiring Freeze to Facilitate Workforce Reductions

In response to White House guidance and a proposed 30 percent reduction in the Department's FY 2018 budget, the Bureau of Human Resources (DGHR) worked with senior leadership in early 2017 to develop a plan to reduce Department staffing.[9] DGHR had primary responsibility for implementing the hiring freeze within the Department. Concurrent with this exercise, the

---

[4] See *Inspector General Statement on the Department of State's Major Management and Performance Challenges* (OIG-EX-19-01, November 2018) for a discussion of these challenges.

[5] Although this report does not contain any recommendations, OIG provided a draft of this report to Department stakeholders for their review and comment on the findings. The Department provided technical comments that were incorporated into the report, as appropriate.

[6] *Memorandum for Heads of Executive Departments and Agencies, Subject: Hiring Freeze* (January 23, 2017).

[7] OMB, *Comprehensive Plan for Reforming the Federal Government and Reducing the Federal Civilian Workforce* (M-17-22, April 12, 2017).

[8] 18 STATE 64296, "Lifting the Hiring Freeze," June 25, 2018.

[9] As of December 31, 2018, the Department had a worldwide workforce of 75,755 employees in the United States and at 277 overseas posts.

Department also launched planning for an organizational reform effort[10] aimed to improve the economy and efficiency of Department operations.[11] In April 2017, the Department formed a working group[12] to develop options for workforce reductions necessary to meet a 30 percent reduction in the Department's funding proposed in the President's FY 2018 budget. The Secretary selected an option that would reduce the Department's workforce by 8 percent. To avoid an involuntary reduction in force, the group recommended meeting the target through buyouts, reduced hiring, and voluntary attrition. To protect overseas operations, the 8 percent reduction focused on cuts to the Department's Civil Service workforce. Seventy-one percent of the proposed reductions (1,410 positions) were Civil Service, while 29 percent (572 positions) were Foreign Service.

**Figure 1: Timeline of Key Events During the Hiring Freeze**



**Source:** OIG, adapted from Department information

The Department generally implemented the hiring freeze in an across-the-board manner, applying it to most employment categories, including personal services contractors[13] and third-party administrative support contractors. During the freeze, the Department also restricted lateral reassignments of Civil Service employees and detail assignments to other departments

---

[10] The organizational reform effort included the "Redesign" and "Impact Initiative." It also included the Department's listening tour survey and development of an agency reform plan.

[11] OMB Memorandum M-17-22 required Federal agencies to undertake three specific but interrelated efforts: (1) take immediate action to achieve near-term work force reductions and cost savings; (2) develop a plan to maximize employee performance; and (3) submit an agency reform plan. The Department's organizational reform effort to address the requirements in OMB Memorandum M-17-22 is the subject of a separate, forthcoming OIG audit.

[12] The working group consisted of representatives from DGHR, the Bureau of Budget and Planning, and the Offices of the Under Secretary for Management, the Legal Adviser, and the Secretary.

[13] As described in 3 FAM 9112a-b, the Department may contract with individuals to provide services abroad. Although personal services contractors are not considered Department employees, according to Federal Acquisition Regulation 37.104, personal services contracts create an employer-employee relationship.

and agencies. Bureaus, offices, and overseas posts generally sought exemptions to the hiring freeze on a case-by-case basis, through memoranda to the Secretary. Until August 2017, the Secretary personally approved hiring freeze exemptions on a case-by-case basis, after which he began considering some exemptions in batches. DGHR reported that the Secretary approved a total of 4,874 exemptions over the course of the hiring freeze.[14] These included 2,649 exemptions for eligible family member (EFM)[15] positions, 703 locally employed (LE) staff positions, 490 Foreign Service positions, and 225 Civil Service positions, among others.[16] The Department's use of EFM employees is described on page 4, below.

**Figure 2: Percentage Change in On-Board Employee Levels, January 31, 2017, to May 31, 2018**



**Source:** OIG analysis of Department data

## Hiring Freeze Particularly Affected Eligible Family Members and Civil Service

The hiring freeze particularly affected on-board staffing levels for the Department's EFM and Civil Service employees. Between January 2017 and May 2018, when the hiring freeze was lifted, the Department's EFM on-board staffing levels declined by 20.7 percent. Over the same period, the number of Civil Service employees declined by 7.1 percent. By contrast, Foreign Service staffing levels decreased by 1 percent during this period, while LE staff numbers declined by 1.5 percent. Percentage changes in on-board staffing levels from January 2017 to May 2018 are shown in Figure 2, above.

### Eligible Family Member Employees in the Department

The Department employs certain adult family members of U.S. Government personnel overseas, or EFMs, to perform a broad range of duties, such as consular, administrative, information technology, security, and medical functions. Approximately 58 percent of positions typically filled by EFMs require security clearances and thus cannot be performed by LE staff. EFMs do not receive certain allowances and benefits paid to Foreign Service employees. Consequently, hiring

---

[14] The Department generally only tracked exemption requests that were awaiting review by senior Department officials. Bureaus and offices told OIG that exemption requests were subject to a lengthy clearance process and were often modified to reduce the number of requested exemptions. Accordingly, the Department's records do not reflect the total number of exemptions actually requested by bureaus and offices during the hiring freeze.

[15] Use of the term eligible family member or EFM throughout this report refers to adult family members of U.S. Government personnel employed overseas on a Family Member or Temporary Appointment.

[16] The total number of exemptions granted during the freeze refers only to authorizations to fill the positions and does not correspond directly to on-board staffing numbers cited in this report.

EFMs to perform functions that otherwise would require additional Foreign Service employees generally results in lower costs to the Department. The availability of EFM positions also promotes morale and career development for adult family members of U.S. Government personnel posted overseas.

## IMPLEMENTING THE HIRING FREEZE

Hiring freeze policies and procedures evolved continuously over the 16 months it was in effect, which created a challenging implementation environment for DGHR, bureaus, offices, and overseas posts. OIG identified three overall implementation challenges. First, OIG found that the Department did not coordinate the hiring freeze with the discrete, but related, organizational reform effort to improve the efficiency and effectiveness of its operations.[17] A lack of coordination between the hiring freeze and organizational reform effort teams, in turn, led to confusion about any strategic goals the freeze was intended to support and a consequent inability to implement staffing reductions in ways that promoted Department strategic goals. Second, OIG determined that insufficient communication about hiring freeze policies and procedures amplified implementation challenges throughout the Department. Finally, OIG found that cumbersome and time-consuming exemption processes contributed to frustration and inefficiency, both domestically and overseas. These issues are discussed below, along with a description of steps the Department took to enable limited hiring during the hiring freeze.

### Implementation Was Not Guided by the Strategic Goals of the Organizational Reform Effort

OIG found that the Department did not coordinate the hiring freeze with the organizational reform effort, even though Department standards call for integrating strategic goals into major reorganizations of bureaus and offices.[18] Department officials interviewed by OIG said that hiring freeze implementation was generally not coordinated with the organizational reform effort. Instead, separate teams acting independently, with minimal communication between them, conducted the two efforts. As a result, senior Department employees interviewed by OIG said they lacked an understanding of any long-term strategic goals the hiring freeze was intended to support and were unable to apply staffing reductions in a way that reflected the Department's strategic priorities, including those identified in the organizational reform effort. In some cases, they said, staffing reductions undermined pursuit of key administration priorities, such as counterterrorism and border security. Officials in bureaus and offices also told OIG that staffing reductions hindered their ability to support organizational reform effort priorities, such as transitioning to cloud computing and improving the efficiency of the security clearance process.

---

[17] Executive Order 13781, *Comprehensive Plan for Reorganizing the Executive Branch* (March 13, 2017) required Federal agencies to develop such a plan.

[18] 1 Foreign Affairs Manual (FAM) 014.2(2).

## Bureaus, Overseas Posts Described Internal Communication as Insufficient

Bureaus and office employees interviewed by OIG said the Department did not provide sufficient operational guidance or communication on hiring freeze-related issues during the 16 months it was in effect. Embassies and consulates raised similar concerns regarding insufficient communication about hiring freeze policies and procedures in their responses to an OIG survey distributed as part of this review. Bureau and office employees interviewed by OIG noted that information generally was communicated by email or in meetings and was not distributed consistently to bureau senior leadership and human resources staff. As a result, bureaus reported confusion about which employment categories were subject to the hiring freeze and said they lacked an understanding of the process for requesting exemptions.

DGHR told OIG it took seriously its obligation to communicate during the freeze and to provide policies and procedures for implementing the freeze and seeking exemptions. Specifically, DGHR said it used memoranda, emails, and meetings to promptly communicate policies and procedures and to convey changes as they occurred. However, DGHR also stated that the freeze placed unusual demands on its own staff, who were both the public face of the hiring freeze within the Department and themselves subject to staffing shortfalls. OIG determined that the changes to policies and procedures were difficult for the Department to administer across a large number of personnel categories, a challenge magnified by continuous changes to these processes over the duration of the hiring freeze.

## Bureaus, Overseas Posts Described the Department's Exemption Process as Time-Consuming and Frustrating

Because the January 2017 Presidential memorandum initiating the hiring freeze gave heads of departments and independent agencies the authority to exempt positions from the freeze, DGHR had to develop a process for reviewing and approving exemptions. The bureau issued a memorandum on March 2, 2017, stating that priority consideration would be given to exemptions for priority staffing posts;[19] other high-threat posts; Civil Service positions that supported such posts; certain supervisory positions; and mission-critical Civil Service security, medical, consular, and cybersecurity positions. The criteria for approving exemptions remained broadly the same throughout the duration of the hiring freeze. OIG determined that, despite the stated goal of protecting critical functions during the hiring freeze, significant net staffing reductions nonetheless occurred in security, safety, medical, and information technology (IT) Civil Service positions, as discussed later in this report. Furthermore, bureaus and offices interviewed by OIG consistently described the process of requesting exemptions to the hiring freeze as time-consuming, inefficient, and frustrating. Bureau employees told OIG that preparing exemption memoranda required multiple rounds of approvals and clearances by senior bureau officials, DGHR, and the Secretary's office. For example, one bureau reported it was required to redraft a memorandum multiple times, which took months, and ultimately resulted in a reduction in the number of requested exemptions from 10 to 1. Another bureau

---

[19] These included posts responsible for, or located in, Iraq, Afghanistan, Pakistan, Yemen, Syria, and Libya.

reported that its exemption request for three contractor positions took 9 months to receive approval and the bureau had to submit the request four separate times.

**Department Took Steps to Enable Limited Hiring During the Freeze**

Despite the problems described above, DGHR told OIG it took steps to manage the process of reviewing and approving hiring exemptions. Specifically, the Department reported it took the following actions:

- Allowed bureaus to hire up to 25 percent of attrition levels for Civil Service positions and up to 40 percent of attrition levels for Foreign Service positions.
- Increased the number of authorized employees in the Expanded Professional Associates Program from 200 to 400.[20]
- Established a short-term mechanism to permit eventual hiring of 133 interns through the Pathways Internship Program.[21]
- Developed a "Human Capital Map" dashboard report comparing staffing levels for all Department employee categories to aid in monitoring and evaluating those levels.
- Instituted a change to the hiring freeze exemption process that allowed requests to be submitted in batches rather than on a case-by-case basis.
- Continued recruitment and examination activities for Foreign Service generalists and specialists, which allowed rapid resumption of Foreign Service hiring when the freeze was lifted.

## CHALLENGES AFTER THE LIFTING OF THE HIRING FREEZE

Although the Secretary lifted the hiring freeze on May 15, 2018, OIG found that three challenges slowed progress in restoring pre-freeze staffing levels. First, understaffing in a key DGHR office responsible for Civil Service hiring magnified difficulties in meeting performance goals for Civil Service hiring.[22] As a result, as of December 2018, DGHR estimated it would take approximately 2 years to fill Civil Service vacancies created by the freeze. Second, DGHR retained a requirement that bureaus seek approval from DGHR multiple times in the process of filling a vacant position, which contributed to the slow hiring. Third, the Department was

---

[20] The Expanded Professional Associates Program provides eligible spouses with employment opportunities in key positions abroad. The program differs from other EFM employment opportunities in that it offers responsibilities similar to Foreign Service entry-level positions.

[21] The Department's Pathways Internship Program is targeted toward U.S. citizens enrolled in a wide variety of educational institutions and provides students with opportunities to explore Federal careers while being paid for work performed.

[22] During the hiring freeze, DGHR's Office of Shared Services—which is responsible for Civil Service position classification, staffing, and pay administration for 35 bureaus and offices—experienced significant employee attrition and was unable to meet internal performance metrics. Total time to complete recruitment, for example, was 197 days in August 2018, while the office's goal was 80 days. In November 2018, the Department set up a task force to reduce a backlog of 146 vacancy announcement requests from client bureaus. DGHR said the task force accomplished this goal as of March 2019.

subject to reduced bureau employment ceilings,[23] which limited hiring to December 31, 2017 on-board levels.[24] Bureaus and offices interviewed by OIG said the reduced employment ceilings had the practical effect of preventing them from filling many positions that became vacant during the freeze. As a result, OIG found that by January 2019, on-board Civil Service levels had declined an additional 1.9 percent since the end of the hiring freeze. At the same time, Foreign Service staffing levels had nearly recovered to pre-freeze levels, although EFM staffing levels were still 11.9 percent lower than before the hiring freeze.

DGHR told OIG that as of February 2019, the Department had authorized an additional 454 positions over the December 31, 2017, employment ceilings to address bureau concerns. DGHR also said that, as bureaus and offices resumed hiring, it needed to closely monitor overall on-board staffing levels in order ensure hiring did not exceed budgetary resources. Furthermore, DGHR said it had to consider other policy and budget requirements in its workforce planning. For example, OMB guidance on reducing the Federal workforce remained in place, and the Department's FY 2020 Congressional Budget Justification still called for a 24.1 percent reduction in the Department's budget.[25]

## EFFECTS OF THE HIRING FREEZE ON DEPARTMENT OPERATIONS

### Bureaus, Overseas Posts Reported Broadly Negative Effects

OIG determined that the hiring freeze had a broad and significant effect on overall Department operations, particularly on its ability to address its most serious management and performance challenges. Ninety-six percent of embassies and consulates (139 of 145) and 95 percent of bureaus and offices (35 of 37) that responded to OIG's surveys reported that the freeze had a somewhat negative or very negative effect on overall operations. Survey results are summarized in Appendix C of this report.

Overseas, embassies and consulates reported that the freeze on EFM hiring had detrimental effects on security, consular, and administrative operations. For example, one embassy said that "our EFM Residential Security Coordinator position was vacant for an entire year. With a 300-residence housing pool, the loss had a very negative impact on the safety and security of American chief of mission employees and family members." Domestically, the effect on bureaus and offices varied. Some bureaus and offices reported they were able to manage their workloads by adjusting priorities and finding more efficient ways to perform their work. Others

---

[23] The Department develops employment ceilings for each bureau based on Department funding levels and policy considerations. These ceilings typically are lower than the number of authorized positions in each bureau and the number of on-board employees.

[24] Reduced hiring ceilings were based on funding levels provided in the Department's FY 2018 appropriation. In addition, the P.L. 115-141 Joint Explanatory Statement authorized hiring at December 31, 2017 staffing levels and required congressional consultation and notification on staffing increases above that level. The Department, in consultation with congressional committees, subsequently approved the hiring of an additional 454 employees.

[25] The Department reported that the FY 2020 budget request proposes funding to maintain current Foreign Service workforce levels, and would restore most, but not all, of the Civil Service staffing reductions since FY 2016.

said the freeze adversely affected their ability to carry out key programs, particularly new initiatives or activities that arose during the hiring freeze. For example, one bureau said "a lack of mission essential resources, staff, and senior leadership seriously impacted the bureau's capacity to achieve our goals at required levels of quality. New initiatives could only be moved forward at the expense of other initiatives." Another bureau said it "was forced to shift from strategic, long-term planning to more tactical, immediate tasks. This loss of focus on the longer-term goals of the organization has essentially slowed everything down, and the bureau is working to recover and refocus as we staff up to critical levels we fell below."

OIG determined that, in some situations, overseas and domestic staffing issues preceded the hiring freeze, and that these staffing issues may have contributed to the challenges that the Department reported to OIG.

## Protection of People and Facilities

Department employees face security threats related to political violence, crime, terrorism, and natural disasters, making protection of U.S. diplomats a top management challenge for the Department. Several bureaus charged with protecting security, health, and life safety reported to OIG that the hiring freeze had significant detrimental effects on their operations. Although Department guidance from March 2, 2017, stated that the Department would prioritize functions such as safety, security, and support to priority staffing and other high-threat posts during the freeze, OIG found that, in some cases, net staffing reductions for these functions nevertheless occurred, as described below.

### *Bureau of Diplomatic Security Reported Domestic Operations Significantly Affected by Freeze*

The Bureau of Diplomatic Security (DS) is responsible for providing a safe and secure environment for the conduct of U.S. foreign policy. DS employees include Foreign Service and Civil Service special agents, engineers, technical specialists, and diplomatic couriers. According to DS, offices particularly affected by the freeze performed such functions as staffing the bureau's 24-hour Command Center,[26] delivering training, overseeing physical and residential security programs, and managing security clearances. The bureau's on-board Civil Service staffing levels declined by a total of 8 percent during the hiring freeze, while Foreign Service on-board staffing levels essentially remained unchanged during the same period. Staffing numbers for personal services contractors within DS declined by more than 16 percent. Domestic DS offices cited concerns such as excessive workload, staff burnout, and an inability to accomplish their mission as general issues that affected most offices. Specific effects included:

- **Staffing of DS Command Center:** DS told OIG it was unable to staff the DS Command Center with the level of personnel recommended by the Benghazi Accountability Review Board. DS said that even staffing the center with the minimum staff needed to operate

---

[26] The DS Command Center operates 24 hours a day to monitor and report information regarding threats against U.S. diplomatic missions, the Secretary, and American citizens abroad.

contributed to employee burnout and fatigue and led to coverage gaps that could have significantly affected its ability to respond to overseas security crises.

- **Foreign Affairs Security Training Center:** DS reported that the freeze delayed its ability to hire staff to manage the phased opening of the Foreign Affairs Security Training Center—a $424 million facility that will be the Federal Government's second-largest law enforcement training facility when fully operational. The bureau sought exemptions to hire staff required to operate the newly constructed facility, but delays in approval required DS to send teams of 15 or more temporary duty employees at approximately $15,000 a week in travel costs. The bureau submitted the exemption package for these positions on May 23, 2017; it was approved on April 13, 2018.

- **Overseas Security Operations:** Embassies and consulates reported that the freeze on hiring EFMs affected their security programs. Specific challenges included an inability to hire cleared American citizens to assist with issuing badges, residential security program management, and administrative duties that required a security clearance, which embassies reported created additional workload for Foreign Service officers and Specialists, diminishing their ability to focus on core security responsibilities.

- **Physical Security Programs:** The bureau's Project Coordination Division reported that it was unable to complete its goal of conducting 20 residential security evaluation and enhancement reviews, which are important to ensure that embassies comply with Department security standards. DS also stated that staffing gaps reduced the ability of Washington-based staff to conduct required inspections and provide adequate support for overseas physical and residential security.

- **Security Clearance Management:** DS stated that staffing shortfalls in its Office of Personnel Security and Suitability, which is responsible for managing security clearance processes, affected its ability to support increased levels of hiring following the freeze. In addition, DS reported that the freeze negatively affected timeliness for issuing warning letters and permanently revoking security clearances for Department employees who posed a danger to the health, safety, and security of others.

## Ensuring the Health and Safety of Personnel

Department employees work in overseas environments that frequently lack adequate local medical care and are at elevated risk for hazards such as fires, motor vehicle mishaps, and workplace accidents. A number of bureaus are responsible for ensuring the health and safety of Department personnel. For example, the Bureau of Medical Services employs regional medical officers, psychiatrists, social workers, and other medical specialists. In addition, the Bureaus of Overseas Buildings Operations and Administration are responsible for overseas and domestic occupational health and safety programs, respectively, and have employees, such as industrial hygienists and fire protection engineers, with safety responsibilities.

OIG found that the hiring freeze resulted in staffing reductions for safety- and security-related job series, which bureaus said reduced their ability to carry out these functions. For example, the Bureau of Overseas Buildings Operations reported that it conducted 22 percent fewer overseas safety, health, and environmental management inspections in 2018 than in 2016 (56 and 72 inspections, respectively), because of hiring freeze-related staffing shortages.

Additionally, an OIG analysis of Civil Service staffing levels for safety-related job series found that on-board staffing declined by 9.7 percent from January 2017 to August 2018 for this series Department-wide. As described below, OIG also concluded that the freeze significantly affected Bureau of Medical Services' domestic offices.

***Bureau of Medical Services Reported Adverse Effects on Domestic Operations***

The Bureau of Medical Services reported that its domestic programs experienced significant negative effects during the freeze as bureau Civil Service staffing declined by 10.3 percent from January 2017 to May 2018. An OIG analysis of on-board staffing levels for Civil Service job series found that employment levels for the Department's medical, hospital, dental, and public health series declined by 15.2 percent from January 2017 to August 2018—one of the largest reductions of any series in the Department over this period. Specific effects included:

- **Mental Health Services:** The bureau said that staffing shortages during the hiring freeze affected its ability to provide support services for special needs children of overseas employees, process employee medical clearances, and advise on suitability reviews in cases involving mental health issues, including suitability determinations for law enforcement officers authorized to carry weapons.
- **Reviews of Medical Credentials:** The bureau said that a shortage of staff to review medical credentials such as licenses and board certifications, and to conduct medical malpractice and lawsuit checks, hampered the office's ability to ensure that medical staff were current with required training and medical licensing requirements.

Despite the decline in bureau staffing, the majority of embassies and consulates surveyed by OIG did not report specific effects on their operations related to shortages of medical personnel, though some raised concerns about vacancies or freeze-related staffing delays.

## Information Security and Management

The Department annually spends approximately $2.3 billion on IT and related services. OIG consistently has identified concerns about Department IT security and management in its audit and inspection work. The Department's IT workforce is distributed among bureaus, including DS and the Bureaus of Information Resource Management, Consular Affairs, and Administration, among others. Additionally, the Department employs overseas IT Foreign Service Specialists, EFMs, and LE staff. Civil Service on-board staffing levels for the IT series employees declined by 6.3 percent from January 2017 to August 2018, slightly below the Department's average. Bureaus described to OIG difficulties in supporting new and ongoing IT initiatives, including a Department-wide migration of systems to cloud-based solutions and modernization of existing platforms. Specific effects included:

- **IT Security:** The Bureau of Information Resource Management reported that it had to delay implementation of a data encryption initiative, postpone implementation of an

identity management system[27] by 18 months, and delay information assurance reviews[28] for Department systems during the freeze. The bureau was unable to fill two Senior Executive Service positions responsible for cybersecurity, which it said delayed implementing an enterprise risk management program[29] for IT systems. The DS Computer and Technical Security Directorate reported that staffing shortfalls hampered its ability to develop tools and procedures to react and respond to malicious cyber activity targeting Department personnel and information assets. DS also reported delays in conducting penetration testing[30] of Department networks and providing IT security support for integrating cybersecurity for new and existing systems, which they attributed, in part, to the hiring freeze. A bureau that worked with Top Secret/Sensitive Compartmented Information systems reported that extended vacancies in its information security positions placed at risk highly classified information, as the bureau was unable to assign other qualified personnel to handle those functions. Finally, another bureau said that it was unable to fill an Information Systems Security Officer[31] position for the entire duration of the freeze, which affected its ability to ensure IT security for a major Department system.

- **Bureau IT Management:** The Bureau of Democracy, Human Rights, and Labor experienced a 7-month delay in developing a modernized software platform to conduct human rights vetting of security assistance recipients, which it attributed, in part, to delays in receiving approval to hire additional contractors for this effort. Other bureaus reported delays in modernizing IT systems because of hiring freeze-related staffing shortages.

- **Overseas Operations:** Embassies and consulates cited difficulties related to hiring EFMs for overseas IT support functions, particularly for diplomatic pouch and mail operations. One consulate that supported a diplomatic pouch and mail regional hub said it incurred significant overtime during the hiring freeze because it was unable to hire EFMs to support diplomatic pouch shipments.

## Oversight of Contracts, Grants, and Foreign Assistance

In FY 2017, the Department oversaw $18.9 billion in foreign assistance and more than $17.2 billion in operating funds. OIG has identified oversight of contracts, grants, and foreign

---

[27] According to the *U.S. Department of State Information Technology Strategic Plan for Fiscal Years 2019 – 2022,* the Department planned to implement an Enterprise Identity Management System to enable users to access business data more efficiently and to strengthen data security.

[28] The National Institutes for Science and Technology defines information assurance as including measures that protect information and information systems by ensuring their availability, integrity, authentication, confidentiality, and non-repudiation. (Special Publication 800-12, *An Introduction to Information Security*)

[29] The FY 2019-2022 IT strategic plan states the Department planned to expand its cyber risk management program to integrate risk management capabilities between the Bureau of Information Resource Management and DS.

[30] As described in 1 FAM 262.9-2(6), DS's Office of Cyber Monitoring and Operations conducts continuous independent penetration testing to identify specific risks to IT systems and develop risk mitigation strategies to protect the Department's IT infrastructure.

[31] Information Systems Security Officers are responsible for overseeing that security requirements are addressed for IT systems throughout their lifecycles, from design through disposal.

assistance as a key agency management challenge for a number of years. The Department's acquisition and program management workforce includes contracting officers, grants officers, and program managers with expertise in specialized areas such as construction, public health, narcotics and law enforcement, and humanitarian relief.

### Bureaus Reported Mixed Effects on Contracting and Contract Management

The Department's main contracting office, the Bureau of Administration's Office of Acquisitions Management,[32] reported that the hiring freeze did not affect its ability to support contracting and contract management. The office said that increased scrutiny of contracting activities and associated staffing requirements during the hiring freeze facilitated its efforts to encourage category management procurements (strategic sourcing)[33] and that it exceeded OMB's goals for use of Government-wide contracting solutions partly because of this scrutiny. OIG analysis of on-board staffing levels for the contract procurement job series found that staffing declined by 9.8 percent from January 2017 to August 2018 Department-wide.

Some bureaus, however, reported they experienced contract oversight difficulties which, in certain cases, delayed the implementation of programs in which third-party contractors played a significant role. Specific effects included:

- **Reduced Invoice Review and Contract Oversight:** In a recent audit, OIG found that three large bureaus experienced staffing shortages that hampered their ability to thoroughly review invoices, a challenge that was magnified by the hiring freeze.[34] For example, during FY 2017, all three permanent Bureau of International Narcotics and Law Enforcement Affairs contracting officer's representatives assigned to oversee programs in Embassy Kabul departed. Replacement representatives sent on temporary duty assignments lacked invoice review training for the contracts they were assigned to oversee.
- **Construction Contracting Delays:** The Bureau of Overseas Buildings Operations reported that the hiring freeze limited the availability of contracting officer's representatives to oversee and manage construction contracts. As a result, the bureau said it experienced an increase in the time it took to award contracts, issue notices to proceed, and review and process contract modifications.

---

[32] The Office of Acquisitions Management manages, plans, and directs the Department's acquisition programs and conducts contract operations in support of activities worldwide. The office provides the full range of professional contract management services, including acquisition planning, contract negotiations, cost and price analysis, and contract administration.

[33] Category management procurement enables the Government to eliminate redundancies, increase efficiency, and deliver more value and cost savings from its acquisition programs by identifying core spending areas, leveraging shared best practices, and providing acquisition, supply, and demand management solutions.

[34] OIG, *Lessons Learned from Office of Inspector General Audits Concerning the Review and Payment of Contractor Invoices Supporting Overseas Contingency Operations* (AUD-MERO-19-19, April 2019).

### *Bureaus, Overseas Posts Reported Reduced Oversight of Federal Assistance Awards*

The Department uses Federal assistance awards[35] for public diplomacy and foreign assistance programs, among other purposes, and employs grants officers and grants officer representatives domestically and overseas. Embassies reported that the freeze on EFM hiring created vacancies in grants management positions, leading to difficulties in ensuring adequate oversight. Bureaus and offices reported that the freeze affected their ability to oversee Federal assistance awards. Specific effects that were reported included:

- **Heightened Risks to Youth Educational Exchange Participants:** The Bureau of Educational and Cultural Affairs, responsible for more than $1 billion in grants and cooperative agreements, said the hiring freeze contributed to staffing shortfalls in its grants and program offices and impeded oversight of youth educational exchange programs, including those that benefit more than 100,000 young people annually. The bureau told OIG that it was particularly concerned about staffing shortfalls for these exchange programs because they serve populations vulnerable to sexual harassment or assault and thus require additional bureau oversight.
- **Reduced Oversight of Overseas Awards:** An embassy reported that criminal embezzlement of $6,000 by the recipient of a public diplomacy grant went undetected because of the vacancy in an EFM position responsible for oversight. Another embassy attributed the poor performance of a grant for countering violent extremism to the lack of an EFM coordinator to adequately monitor the award. The embassy said that it plans to close the grant, with a significant portion of the funds unspent.
- **Overreliance on Third-Party Contractors:** A recent OIG inspection of the Bureau of Democracy, Human Rights, and Labor found that the bureau had vacancies in 11 of its 23 authorized positions with grants officer's representative duties.[36] The bureau told OIG that these vacancies were, in part, attributable to the hiring freeze. OIG separately reported that staffing vacancies resulted in reduced oversight of foreign assistance grants and increased the likelihood that third-party contractors were performing inherently governmental functions.[37]

### *Bureaus Reported New Foreign Assistance Programs Particularly Affected by Hiring Freeze*

Bureaus and offices with increased foreign assistance budgets or new programs reported that they were unable to increase staffing to manage these programs. For example, one office's funding increased from $20 million in FY 2015 to $52 million in FY 2017. Although the office created an additional grants officer position in FY 2016 to increase its capacity to oversee these

---

[35] Department-managed Federal financial assistance instruments include grants and cooperative agreements, awards to individuals, property grants, awards to public international organizations, and assessed and voluntary contributions.

[36] OIG, *Inspection of the Bureau of Democracy, Human Rights, and Labor's Foreign Assistance Program Management* (ISP-I-19-12, October 2018).

[37] As defined in Federal Acquisition Regulation, Subpart 7.503, inherently governmental functions include the conduct of foreign relations and determination of foreign policy as well as determination of budget policy, guidance, and strategy, among other functions.

funds, the position could not be filled before the hiring freeze began, hampering the office's ability to oversee the new programs. Other specific effects reported by bureaus included:

- **Narcotics and Law Enforcement:** Embassy respondents said that the inability to hire personal services contractors hampered their ability to oversee counternarcotics and transnational crime programs. OIG found in a recent inspection that the hiring freeze prevented the International Narcotics and Law Enforcement Section in Embassy San Jose, Costa Rica, from hiring personal services contractors for its newly expanded aviation and maritime programs, creating an increased risk of mismanagement or unsustainability for these programs.[38]

- **Global Health Programs:** An embassy with a President's Emergency Program for AIDS Relief budget of more than $65 million said that, because of a combination of the hiring freeze and security clearance-related delays, it lacked a program coordinator for two and a half years. The embassy said the vacancy placed at risk program oversight and performance and contributed to deteriorating interagency relationships at the embassy. The Office of the Global AIDS Coordinator—responsible for overseeing approximately $6 billion in programs to combat HIV/AIDS—said the hiring freeze stalled implementation of a reorganization plan it deemed important to more effectively manage HIV/AIDS programs. Similarly, the office reported that its inability to hire grants management specialists led the office to transfer management of a $100 million Federal assistance initiative to another agency because it lacked the capacity to manage the program directly.

- **Leahy Vetting:** Embassies and consulates cited an inability to hire EFMs to process Leahy vetting[39] requests as a challenge that required shifting this workload to direct-hire political officers and office management specialists, which resulted in diminished focus on other portfolios and delays in processing vetting requests. Among other effects, embassies reported that diversion of staff time to manage Leahy vetting requests led to reduced engagement on issues such as human rights reporting and trafficking in persons.

- **Humanitarian Assistance:** The Bureau of Population, Refugees, and Migration reported that staffing vacancies due to the hiring freeze reduced its capacity to manage humanitarian aid programs. For example, the bureau said it decided not to fund certain humanitarian programs in the early stages of the Venezuela crisis in 2017 because it lacked staff to oversee the work.

## Operating in Contingency and Critical Environments

The Department conducts diplomatic operations at posts that face critical threats such as terrorism, political violence, crime, and civil unrest. OIG consistently has found that security and contract management are particularly challenging in these environments. During the hiring

---

[38] OIG, *Inspection of Embassy San Jose, Costa Rica* (ISP-I-18-13, April 2018).

[39] The Leahy Amendment to the Foreign Assistance Act of 1961 prohibits the Department from furnishing assistance to foreign security forces if the Department receives credible information that such forces have committed gross violations of human rights. See 22 USC 2378d.

freeze, the Department generally prioritized staffing at embassies and consulates located in, or responsible for, Iraq, Afghanistan, Pakistan, Yemen, Somalia, and Libya. Early on, for example, the Secretary exempted some EFMs in Iraq from the freeze. Furthermore, the Bureaus of Near Eastern Affairs and South and Central Asian Affairs said almost all exemption requests eventually were approved. However, embassies and bureaus that supported programs in critical environments reported to OIG that the hiring freeze reduced their capacity to fulfill their responsibilities on issues such as security, management, and policy implementation. Specific examples included:

- **Explosive Remnants of War Removal:** The Bureau of Political-Military Affairs reported that the hiring freeze affected its ability to oversee programs in Iraq and Syria aimed at removing explosive remnants of war, such as landmines and unexploded ordnance. The freeze delayed for more than one year hiring three employees responsible for managing these programs, which were intended to support broader policy goals of countering the Islamic State in Iraq and Syria, and thereby hindered program oversight.
- **Delays in Awarding Iraq Life Support Successor Contract:** The Bureau of Near Eastern Affairs stated that staffing shortages contributed to delays of more than one year in establishing a successor contract for an Iraq life support and administrative services contract, which had an original award ceiling of $1 billion.
- **Counterterrorism Programs:** Embassies in Africa and the Middle East said that personnel gaps and vacancies caused by the freeze reduced their ability to support security assistance and counterterrorism initiatives. A bureau with counterterrorism responsibilities said that, because of a staffing gap, a key employee was assigned collateral responsibilities that detracted from the employee's ability to oversee a $39 million counterterrorism-related contract in Africa.

## Consular Operations

The Bureau of Consular Affairs is responsible for the welfare and protection of American citizens abroad, issuing passports, and facilitating legitimate travel to the United States. The bureau employs American citizen services specialists, attorneys, passport specialists, and program analysts, among others, to carry out these responsibilities in the United States. Overseas, Foreign Service consular officers and LE staff provide consular services. From January 2017 to May 2018, on-board Civil Service staffing in the Bureau of Consular Affairs declined by 7.2 percent, near the Department's average for this period. Specific reported effects included:

- **Overseas Operations:** Embassies and consulates consistently reported that the hiring freeze had negative effects on consular operations. Respondents cited the inability to hire EFMs with security clearances[40] as a particular challenge that led to longer wait times for American citizens needing consular services, among other effects.
- **Passport Services:** The Bureau of Consular Affairs reported that it was able to meet demand for passport services during the hiring freeze but said that its passport agencies were critically understaffed at a time when passport issuance increased to an all-time

---

[40] Certain visa-related functions must, by law, be performed by U.S. citizens with security clearances.

high of 19.6 million in 2017. To address this surge, the bureau said it used methods that were either more expensive than hiring regular staff or that degraded long-term planning, training, and staff development. For example, the bureau said it relied heavily on student interns to adjudicate passport applications, an approach that required supervisors to work almost exclusively on oversight of the interns' work at the expense of other supervisory duties. The bureau also attributed at least some of the 50 percent increase in processing times for routine passport applications in 2019 to difficulties filling positions after the lifting of the hiring freeze.

- **Visa Services:** OIG determined that the reported effects of the hiring freeze on overseas visa services was moderated by a worldwide reduction in nonimmigrant visa applications of 13 percent from 2016 to 2018. Nonetheless, the bureau reported that the inability to hire staff significantly affected its Visa Services Directorate. The bureau reported backlogs in responding to litigation requests, issuing guidance to posts, and supporting processes related to visa security reviews and inadmissibility determinations, among other challenges.

- **Office of Children's Issues:** The bureau said that the inability to hire staff in the Office of Children's Issues[41] hampered its ability to support parents whose minor U.S. citizen children had been abducted by family members. Staff shortages also complicated efforts to support intercountry adoptions and work with other countries on implementing international agreements related to adoptions and children's issues.

## Policy Implementation

The Department advances the interests of the American people through diplomacy and advocacy. It carries out its core diplomatic functions through embassies, consulates, bureaus, and offices with policy implementation responsibilities. Employees with policy responsibilities include Foreign Service officers in the areas of political, economic, and public diplomacy and Civil Service foreign affairs officers, program analysts, and specialists in areas such as public health, nonproliferation, and counterterrorism, among others.

Respondents to OIG's surveys said the hiring freeze hindered the Department's effectiveness in carrying out its policy responsibilities. Respondents said the hiring freeze resulted in additional workload and diverted the attention of senior bureau and embassy leadership from their focus on policy issues. They noted that the freeze affected their ability to respond to opportunities, address emerging issues, and conduct strategic planning. Specific examples included:

- **Response to Emerging Policy Issues:** Bureaus and offices reported they were unable to hire or transfer staff[42] to meet new needs, such as responding to the Venezuela crisis,

---

[41] As described in 1 FAM 255.1-2(c), the Office of Children's Issues formulates policy and provides direction to posts on international parental child abduction cases and intercountry adoption policy issues.

[42] The Department implemented restrictions on lateral transfers of Civil Service employees while the hiring freeze was in effect. OIG's analysis reflects comments from Department stakeholders about the effects of these restrictions. OIG was unable to determine the number of transfers that did not occur as a result of the restrictions on lateral transfers because the Department did not track this information.

addressing energy security issues, representing the United States in international legal tribunals, and meeting legal requirements such as implementation of the Child Soldiers Prevention Act. One bureau noted that staffing shortages and time diverted to manage the hiring freeze prevented it from conducting a robust rollout of a priority Administration security initiative related to East Asia. The bureau concluded that poor public messaging about the policy, which it attributed partly to staffing shortfalls, complicated its interactions with foreign partners. Another bureau stated that it was unable to fill a position to support an urgent need related to counterterrorism efforts in Iraq and Syria.

- **Overseas Policy Implementation:** Embassies and consulates reported that staffing gaps resulting from the hiring freeze diverted political, economic, and public affairs officers to manage tasks normally handled by EFMs, leading to reduced focus in areas such as human rights engagement, political reporting, and development of contacts in foreign governments and civil society to advance U.S. interests.

## Workforce Management and Training

OIG concluded that the hiring freeze had a significant effect on training, a key component of workforce management. Bureaus reported they were unable to approve training and other professional development during the hiring freeze because of heavy workloads and Department-wide restrictions on detail assignments, which affected their ability to develop their workforces. OIG found that the total number employees assigned to long-term training at the Department's Foreign Service Institute declined by 17.8 percent from January 2017 to May 2018. In addition, the institute's School of Leadership and Management said it canceled 19 mandatory leadership training sessions due to lack of course instructors. The number of students enrolled in mandatory leadership training declined by 646 students (32 percent) from January 1, 2016, to December 31, 2018. As participation in the mandatory courses is a prerequisite for Foreign Service promotions, the Foreign Service Institute reported that it worked with DGHR to ensure that these course reductions did not adversely impact affected employees.

## Financial and Property Management

Embassies and consulates reported they were unable to staff key positions with internal control responsibilities related to property management and procurement, which they said increased the risk of waste, fraud, and mismanagement. Embassies also consistently cited challenges in managing housing programs, general services, and procurement operations because of the inability to hire staff. Domestically, the Bureau of the Comptroller and Global Financial Services said the freeze required prioritizing resources but that it was able to successfully support financial operations despite the hiring freeze. It reports that it was able to do so in part because the bureau had developed extensive standard operating procedures that allowed it to reassign its workload among employees efficiently.

## EFFECTS ON EMPLOYEE MORALE AND WELFARE

In response to OIG's survey, 100 percent of bureaus and offices (38 of 38) and 97 percent of embassies and consulates (145 of 149) reported that the hiring freeze had either a somewhat negative or very negative effect on employee morale and welfare.

Bureau and office employees told OIG that the hiring freeze contributed to excessive workloads, particularly as the freeze continued and they were unable to fill vacancies. Employees also said the lack of transparency about any objectives intended to be achieved by the hiring freeze and how the freeze would be implemented caused some to be concerned about losing their jobs. One bureau said that "it is impossible to overstate the negative impact of the hiring freeze on employees. Employees felt both overburdened and stuck in their careers, as there was no mechanism for lateral movement or promotion. The hiring freeze conveyed a message from Department top leadership that our work and mission, and the talents and well-being of our employees, were not valued." Another bureau respondent said that "the hiring freeze had a negative effect on bureau morale. The hiring freeze lacked a defined purpose and duration, which made it difficult to rally and 'get the job done' for the immediate future or a specific event. Without a clear end point or resolution of the staff shortage, it became difficult to maintain that higher level of effort in the longer term. Such burnout results in diminishing capability to achieve the mission."

Although bureau and office respondents reported that the hiring freeze had a negative effect on morale, some said that the hiring freeze required leaders to prioritize their organization's workload. For example, one bureau respondent said that although the hiring freeze had the single largest negative impact on morale in that bureau's internal survey, it "forced prioritization and selection—so people who focused on the mission and leaders who delegated tasks well started to succeed, and morale improved, despite the hiring freeze."

Embassies and consulates consistently cited restrictions on EFM hiring as a cause of declining employee morale. One regional bureau stated that "the freeze on EFM employment was a disaster for [this bureau]. Posts were left with hundreds of unfilled positions in critical areas, placing enormous strains on post resources, leaving critical work undone, and severely damaging Foreign Service morale." An embassy respondent said that the hiring freeze "was an unmitigated disaster. EFMs were disappointed, hurt, and angry at anyone and everyone at the same time. They were bored and turned their energy to negativity. They felt as if Department leadership didn't see them as important but as an evil that had to be endured." Overseas posts raised particular concerns about the effects of vacancies in Community Liaison Office coordinator positions, which typically are filled by EFMs. Coordinators carry out functions important to embassy morale, such as emergency preparedness, communication with family members, and newcomer orientation. For example, one embassy respondent stated that the "[Community Liaison Office] coordinator position was vacant for six months…and one of the [assistant] coordinator positions was vacant for 16 months. At a time when the entire community's morale was negatively affected, having such significant gaps in positions dedicated to issues of morale was both further damaging and heavily ironic."

Several indicators of employee morale at the Department, such as the Federal Employee Viewpoint Survey, registered a decline during the hiring freeze. Multiple bureaus reported an increase in the number of employee relations cases or referrals to Employee Consultation Services[43] during and immediately following the hiring freeze. However, it was unclear the extent to which these declines could be attributed to the hiring freeze or reflected factors unrelated to the freeze.

## FINANCIAL COSTS OF THE HIRING FREEZE

### Financial Costs of Hiring Freeze Remain Unclear

OIG was unable to determine the financial costs of the hiring freeze because the Department did not systematically track these costs. Although total Department personnel expenditures increased by approximately $53 million from 2016 to 2017,[44] Department officials told OIG that the hiring freeze resulted in cost savings because costs associated with salaries and benefits did not climb as much as they otherwise would have. For example, the increase in Department expenditures on domestic personnel fell from 3.68 percent in 2016 to 1.81 percent in 2017. Department officials interviewed by OIG attributed this moderation in increases in personnel costs to the hiring freeze.

OIG could not, however, obtain similar information with respect to the potential costs of the freeze, although OIG received anecdotal accounts of these consequences. For example, multiple bureaus reported instances in which the hiring freeze resulted in increased overtime, additional travel costs to cover staffing vacancies at overseas posts and in domestic field offices, and an uptick in requests for separate maintenance allowance applications,[45] which they said increased because family members, unsure of employment opportunities, chose to remain away from post. OIG also acknowledges that staffing shortfalls could have had an effect on oversight of a range of financial, contracting, and related matters. Accordingly, even though OIG cannot definitively determine these financial costs because the Department did not systematically track them, we do not discount the possibility that such costs occurred.

---

[43] Employee Consultation Services, administered by the Bureau of Medical Services, provides crisis intervention, problem assessment, brief counseling, and referral services to eligible employees.

[44] OIG used data provided by the Bureau of the Comptroller and Global Financial Services for personnel expenditure calculations included in this report.

[45] Separate maintenance allowances are intended to offset the additional expenses incurred by an employee to maintain a separate household for his/her family or a member of his/her family. An employee may request a separate maintenance allowance for special needs or hardship prior to or after arrival at post for reasons including but not limited to career, health, education, or family considerations for the spouse or domestic partner, as defined in 3 FAM 1610, children, or other family member.

## APPENDIX A: OBJECTIVES, SCOPE, AND METHODOLOGY

This review was conducted from September 4, 2018, and April 9, 2019,[1] in accordance with the Quality Standards for Inspection and Evaluation, as issued in 2012 by the Council of the Inspectors General on Integrity and Efficiency, and the Inspector's Handbook, as issued by OIG for the Department and the U.S. Agency for Global Media (USAGM).

The Office of Inspections provides the Secretary of State, the Chief Executive Officer of USAGM, and Congress with systematic and independent evaluations of the operations of the Department and USAGM. Consistent with Section 209 of the Foreign Service Act of 1980, OIG's specific objectives for this inspection were to determine:

1. The current status of the hiring freeze and lateral reassignments, including any ongoing effects after the freeze was lifted in May 2018.
2. The impact of the hiring freeze during calendar year 2017 on the day-to-day function and mission of the Department, embassies, and consulates.
3. The impact of the hiring freeze during calendar year 2017 on the safety, morale, and welfare of Department employees.
4. The impact of the hiring freeze during calendar year 2017 on the personnel costs to the Department.
5. The impact of the suspension of eligible family member hiring on embassy and consulate operations and the Department's ability to support other Federal agencies.

For this review, OIG conducted 60 interviews with Department stakeholders, reviewed survey responses from 38 domestic offices and 151 overseas posts, analyzed Department-furnished budget and staffing data, and reviewed classified and unclassified memoranda, files, and records. Finally, OIG used professional judgment, along with physical, documentary, testimonial, and analytical evidence collected or generated, to develop findings and conclusions.

Arne Baker (Team Leader), Jonathon Walz (Team Manager), Colleen Ayers, Ian Brownlee, Robert Silberstein, Karen Stanton, and Barnaby Walsh conducted this review.

---

[1] The issuance of this report was delayed due to the lapse in OIG's appropriations that occurred from 11:59 p.m. December 21, 2018, through January 25, 2019.

# APPENDIX B: OIG SURVEY RESPONSE SUMMARIES

## Table 1: Summary of Survey Results from Overseas Posts (Percentage of Responses)*

| | Very Negative | Somewhat Negative | Neither Positive nor Negative | Somewhat Positive | Very Positive | Not Applicable |
|---|---|---|---|---|---|---|
| **Hiring Freeze Effect on Post Operations** | | | | | | |
| Healthy, Safety, and Security | 40.41 | 39.04 | 17.81 | 0.00 | 0.00 | 2.74 |
| Oversight of Contracts, Grants, and Foreign Assistance | 20.28 | 30.07 | 33.57 | 0.00 | 0.00 | 16.08 |
| Information Security and Management | 30.77 | 23.78 | 28.67 | 0.00 | 0.00 | 16.78 |
| Financial and Property Management | 25.18 | 41.73 | 19.42 | 0.00 | 0.00 | 13.67 |
| Implementation of Integrated Country Strategy Goals | 21.68 | 53.85 | 14.69 | 0.00 | 0.00 | 9.79 |
| Employee Morale and Welfare | 87.25 | 10.07 | 2.01 | 0.00 | 0.00 | 0.67 |
| Overall Post Operations | 52.41 | 43.45 | 3.45 | 0.00 | 0.00 | 0.69 |

**Source:** OIG

*For this review, OIG developed a survey questionnaire that asked deputy chiefs of mission and principal officers at overseas posts to assess the effects of the hiring freeze on post operations. A total of 151 posts responded to the survey.

**Table 2: Summary of Survey Results from Domestic Bureaus and Independent Offices (Percentage of Responses)\***

| | Very Negative | Somewhat Negative | Neither Positive nor Negative | Somewhat Positive | Very Positive | Not Applicable |
|---|---|---|---|---|---|---|
| **Hiring Freeze Effect on Organization Operations** | | | | | | |
| Healthy, Safety, and Security | 28.95 | 13.16 | 28.95 | 0.00 | 0.00 | 28.95 |
| Oversight of Contracts, Grants, and Foreign Assistance | 42.11 | 42.11 | 7.89 | 0.00 | 0.00 | 7.89 |
| Information Security and Management | 32.43 | 24.32 | 21.62 | 0.00 | 0.00 | 21.62 |
| Financial and Property Management | 35.14 | 27.03 | 16.22 | 2.70 | 0.00 | 18.92 |
| Implementation of Policy Goals | 47.37 | 42.11 | 5.26 | 0.00 | 2.63 | 2.63 |
| Ability to Support Posts in Contingency or Critical Operating Environments | 21.62 | 32.43 | 16.22 | 0.00 | 0.00 | 29.73 |
| Employee Morale and Welfare | 73.68 | 26.32 | 0.00 | 0.00 | 0.00 | 0.00 |
| Overall Organization Operations | 56.76 | 37.84 | 2.70 | 2.70 | 0.00 | 0.00 |

**Source:** OIG

\*For this review, OIG developed a survey questionnaire that asked principal deputy assistant secretaries and equivalents to assess the effects of the hiring freeze on bureau and independent office operations. A total of 38 bureaus and independent offices responded to the survey.

UNCLASSIFIED

## ABBREVIATIONS

| | |
|---|---|
| DGHR | Bureau of Human Resources |
| DS | Bureau of Diplomatic Security |
| EFM | Eligible Family Members |
| LE | Locally Employed |
| OMB | Office of Management and Budget |

UNCLASSIFIED



# HELP FIGHT

## FRAUD, WASTE, AND ABUSE

1-800-409-9926
**www.stateoig.gov/HOTLINE**

If you fear reprisal, contact the
OIG Whistleblower Coordinator to learn more about your rights.
**WPEAOmbuds@stateoig.gov**

UNCLASSIFIED