Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
dleonard@altber.com
bchisholm@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs*

[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br>      Plaintiffs, <br><br>   v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br>      Defendants. | Case No. 3:25-cv-03698-SI <br><br> **DECLARATION OF ELENA MEDINA NEUMAN** |

**DECLARATION OF ELENA MEDINA NEUMAN**

I, Elena Medina Neuman, declare as follows:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am an Associate General Counsel with the Service Employees International Union (SEIU). I have been employed by SEIU for approximately 12½ years. My office is located at 3055 Wilshire Blvd., Suite 1050, Los Angeles, California.

3.      I am familiar with the broad range of work performed by SEIU members through my work, materials I have reviewed, and information made available to me pursuant to my duties at SEIU. President Trump's plan to drastically downsize or eliminate federal agencies, cut potentially hundreds of thousands of jobs, slash programs and services, shutter offices and departments, and terminate contracts will detrimentally impact SEIU, our members, and our communities. The dismantling of one level of government disrupts the operation of all levels of government. SEIU members whose work involves city, county, state, and federal government are experiencing or will experience substantial harm as a result of the President's actions, as will the public.

**A.      SEIU is an Organization of Diverse Working People United by the Belief in the Dignity and Worth of Workers and the Services They Provide.**

4.      SEIU represents approximately two million members in healthcare, the public sector, and property services. SEIU has over 150 affiliates across the United States, Puerto Rico, and Canada. In California, SEIU and our 17 local affiliates represent approximately one million workers in 58 counties across the state. In the Northern District of California, SEIU and our affiliates represent over 200,000 workers. SEIU members include physicians, technicians, long-term care workers, janitors, security officers, airport workers, child care workers, educators, fast food workers, city, county, state, and federal employees, and many more.

5.      Our work is guided by our vision for a just society where all workers are valued and all people respected—no matter where we are from or the color of our skin, where all families and communities can thrive, and where we leave a better and more equitable world for generations to come. *See* Exhibit A (SEIU Constitution & Bylaws).[1]

6.      To achieve this vision, SEIU's work is centered on forging a multi-racial, multi-generational, multi-lingual labor movement that builds worker power through unions, raises standards in workplaces and in communities, and—crucially—seeks to end poverty wages forever. *See* Exhibit A (SEIU Constitution & Bylaws).[2]

7.      Accordingly, SEIU supports workers in organizing their workplaces, and helps workers enforce their rights through agencies at the state and federal level, including through the National Labor Relations Board, the Equal Employment Opportunity Commission, and the Occupational Safety and Health Administration. As the exclusive representative for our bargaining units, SEIU and our affiliates support workers in negotiating collective bargaining agreements (CBAs) that govern their wages and working conditions and in enforcing those agreements. SEIU and our affiliates also advocate for local, state, and federal laws, regulations, policies, and programs that advance our members' interests. For example, SEIU frequently submits comments during regulatory rulemaking (*see, e.g.*, footnote 8, *infra*). If the Trump administration's reorganization plans were subject to notice and comment pursuant to the Administrative Procedure Act, SEIU would certainly submit comments on the plans to represent our members' interests and emphasize the importance of fully functional agencies at all levels of government.

---

[1] *See* SEIU 2024 Constitution and Bylaws, SEIU Mission Statement 5, available at https://www.seiu.org/docs/2024SEIUConstitution&BylawsEnglish.pdf.
[2] *Id.*

3
DECLARATION OF ELENA MEDINA NEUMAN

**B.      SEIU Represents Public Sector and Private Sector Members who are or will be Harmed by President Trump's Dismantling of Federal Agencies.**

8.      SEIU, together with our affiliates, represent approximately 80,000 federal sector employees in the United States, including nurses, doctors, police officers, first responders, office workers, scientists, engineers, analysts, maintenance workers, and many more. SEIU-represented workers work at many federal agencies, including the Department of Veterans Affairs (VA), the National Institutes of Health (NIH), the Department of Transportation, the Department of the Interior, and the Environmental Protection Agency (EPA).

9.      SEIU federal sector members have been or are at risk of being laid off as a result of the Trump administration's massive overhaul of the federal government.

10.     SEIU also represents about 785,000 care providers and over 700,000 non-federal public sector employees, employed by states, counties, cities, school boards, and other public entities across the country. Our care provider members care for children, the elderly, and people with disabilities, often in home settings. Our public sector members include nurses, public transit workers, park rangers, adjunct faculty, educators, librarians, accounting officers, fish and wildlife technicians, inspectors, graphic artists, food services workers, and many more.

11.     SEIU care providers and public sector members rely on federal agencies to provide technical support and assistance, research and data, and reliable processing of applications, grant awards, and disbursement of federal funding in order to provide essential services to their communities. Without fully functioning federal agencies, applications will languish, disbursements will be delayed, phone calls and emails will go unanswered, critical federal resources will be less accessible, and state, local, and other publicly-funded programs and services will suffer. As a result, it is likely that a significant number of SEIU members will lose their jobs.

12.     In addition, SEIU and our affiliates represent over 6,000 workers employed by companies who provide cleaning, security, maintenance, and other services at federally-owned

DECLARATION OF ELENA MEDINA NEUMAN

and federally-leased sites operated by federal agencies, such as the Social Security Administration, Department of Agriculture, Department of Treasury, General Services Administration, Department of Health and Human Services, Department of State, Department of Labor, Department of Homeland Security, Department of the Interior, Department of Housing and Urban Development, National Science Foundation, and Food and Drug Administration.

13.    Due to their proximity to the federal workforce, SEIU members who work for federal contractors will likely experience job losses, furloughs, and/or hours and shift reductions as their employers' service contracts get scaled back or terminated by federal agencies.

14.    In sum, President Trump's plans pose significant risks to SEIU members across industries and across all levels of government. When SEIU members lose jobs, SEIU loses members. Membership losses depletes resources used to support the negotiation, bargaining, and enforcement of strong CBAs. These losses also require the redeployment of resources to support laid off workers. For instance, during the COVID-19 pandemic, we engaged in extra bargaining with employers to mitigate harmful impacts of layoffs and assisted displaced workers seeking to apply for unemployment benefits.

**C.    SEIU and our Members Rely on a Functioning Department of Health and Human Services and Without One, will be Irreparably Harmed.**

15.    The Department of Health and Human Services (HHS) plays a crucial role in promoting and protecting public health—from supporting Head Start programs to managing Medicare and Medicaid to providing a wide range of programs and services to elderly individuals, people with disabilities, and others. In addition, HHS's Administration for Children and Families (ACF) administers the Head Start program through its Office of Head Start (OHS) and the Child Care Development Fund (CCDF) through its Office of Child Care (OCC). The OCC distributes funding to states under the Child Care Development Block Grant Act (CCDBGA), which subsidizes low-income families' child care, including family child care providers, and supports training and workforce development for child care providers.

DECLARATION OF ELENA MEDINA NEUMAN

16.    HHS staff, however, have been reduced by 40 to 50 percent at OHS and OCC and HHS has closed five of 10 ACF regional offices. *See* Exhibit B (Ctr. For Law and Social Policy).[3] The now-shuttered regional offices oversaw grantees in 23 states and five territories, providing training and technical assistance, supporting grantees to ensure grants reached facilities, and serving as liaisons between program administrators and the federal government.

17.    SEIU members work in state departments that oversee child care and administer publicly-funded child care programs. SEIU Local 1000, for example, represents employees at California's Department of Social Services (CDSS), which is responsible for licensing and monitoring all child care facilities in the state, and developing and managing California's CCDF state plan. State employees rely on guidance from OHS and OCC on a number of issues related to program and grant application and administration, guidance for compliance with federal law, regulations, and agency procedures, and responses to emergency or unforeseen circumstances. With only about half of the staff remaining at these offices, it is highly unlikely that HHS staff will be able to produce or provide a comparable level of guidance and support.

18.    SEIU also represents Head Start workers, local government employees who engage with federal employees in the OHS regarding county and city grants, and state employees who license and monitor child care centers receiving Head Start grants. In California, Head Start programs receive $1.5 billion annually to provide child care for 85,000 children and families. Head Start grants are awarded in increments of five years, but programs are required to apply for and receive annual approval from OHS to continue providing child care services. Grant recipients must receive an annual Notice of Award from OHS to continue access to the Payment Management System (PMS), which pays for operating expenses and payroll.

19.    Child care is one of the lowest paid occupations nationally, and many child care workers are paid poverty-level or close to poverty-level wages. *See* Exhibit C (Early Learning

---

[3] Shira Small, *Federal Cuts to Child Care and Head Start are an Attack of Families with Low Incomes*, Ctr. for Law and Social Policy (Apr. 23, 2025), available at https://www.clasp.org/blog/federal-cuts-child-care-head-start/.

DECLARATION OF ELENA MEDINA NEUMAN

Nation).[4]  In 2024, HHS finalized a rule to make changes to Head Start's Program Performance Standards, aimed at improving retention rates by addressing wages, training, and working conditions for Head Start staff. 45 C.F.R. §§ 1302.23(b), 1302.52(d)(2), 1302.92, and 1302.101(a)(2). OHS is responsible for educating Head Start grantees about program rules, monitoring their compliance, and addressing any violations. SEIU members are relying on OHS to ensure implementation of the new rule, but the abrupt and unprecedented layoffs at OHS jeopardize the agency's ability to carry out basic functions like monitoring compliance with program rules throughout the country.

20.    The vast majority of SEIU's 6,400 Head Start members live and work in California, Connecticut, Massachusetts, Illinois, New York, and Washington. These states were all directly impacted by the ACF regional office closures in San Francisco, Boston, Chicago, New York, and Seattle. SEIU affiliates are already reporting concerns about the lack of federal guidance in renewing Head Start grants, which is likely attributable to staff reductions and regional office closures. This information vacuum raises the risks of layoffs for SEIU members and the interruption of child care services for vulnerable families.

21.    SEIU Local 521, for example, represents employees at Santa Clara County, whose Head Start grant funds a county child care program for approximately 900 preschoolers and 300 infants and toddlers, and is up for renewal on June 30, 2025. Prior to March 31, 2025, county employees consulted with federal staff at OHS's regional office in San Francisco to receive guidance and direction for submitting their application to continue the Head Start services provided under the current grant. County employees timely submitted the application, and anticipated that the renewal would be approved because they had followed OHS's guidance and there was no competing applicant. However, the grant proposal has not yet been approved. County employees do not know whom to contact for guidance because the federal employees

---

[4] Amanda Geduld, *Poverty Wages, Staffing Crisis: New Federal Rule Looks to Sustain Head Start*, Early Learning Nation (Sept. 24, 2024), available at: https://earlylearningnation.com/2024/09/poverty-wages-staffing-crisis-new-federal-look-looks-to-sustain-head-start/.

they previously worked with have all been laid off. Given the uncertainty regarding who at OHS will process the application submitted to the now-defunct San Francisco regional office, and when the renewal grant will be approved, the County Office of Education's interim superintendent notified staff in the early learning services program that they will be laid off on July 1, 2025, unless OHS issues a Notice of Award. Up to 144 SEIU Local 521 members are subject to these layoffs. The delay or lack of approval for Santa Clara County's grant will result in 1,200 children (and their parents) in Santa Clara County losing child care on July 1, 2025.

22.     Meanwhile, SEIU Local 221 represents Head Start workers facing similar issues in San Diego. At least 750 of the SEIU Local 221-represented Head Start workers are covered by grants that, like Santa Clara County's program, are due for renewal on June 30, 2025. They will likewise face layoffs if grant renewals are not approved in time. Despite filing timely applications for renewal, approval is uncertain and there has been no information from OHS regarding which staff or regional office will review applications submitted to the San Francisco regional office before it was closed. In past years, programs could get temporary approval from the ACF San Francisco regional office pending OHS approval, which enabled them to receive a Notice of Award before the deadline. But without any regional office assignment, grantees do not know whom to contact to find out information about OHS's processing of their renewal application or to request temporary approval in order to continue providing child care services.

23.     For child care workers living paycheck to paycheck, layoffs are devastating and harm workers' ability to afford housing, food, and healthcare for their families. After receiving a layoff notice, most workers have no choice but to start looking for more stable employment. Even if funding is eventually restored, the damage is done: it will be difficult to find sufficient staff to reopen in a timely manner, the loss of familiar and trusted staff will impact children, and parents and their children will have had to deal with the disruption and destabilization of losing access to child care during that period. Indeed, parents who are relying on the Head Start

program may end up losing their jobs, too, if they are forced to miss work due to lack of child care.

24.    Even if geographies covered by the closed offices are assigned to the remaining OHS offices, the lack of any transition and increased workload on remaining OHS staff make it unlikely that renewals will be approved in time. Indeed, when the administration accidentally and temporarily froze Head Start's Payment Management System in January, it caused nearly two dozen child care centers to suspend services. *See* Exhibit D (Associated Press).[5] OHS layoffs have created confusion and stress for Head Start grantees and staff, already resulted in layoff notices for SEIU-represented Head Start workers, and threaten to interrupt child care services for families that rely on Head Start.

25.    The HHS overhaul is also detrimentally impacting other SEIU members who rely on CCDF programs. SEIU represents about 50,000 family child care providers in seven states, including 36,000 family child care providers in California. Family child care providers care for children in a personal home setting (as opposed to a child care center), and offer crucial child care options for families that need more personalized care (for example, for children with disabilities) or more flexible hours (for example, due to parents' overnight, early morning, or late night work schedules). Most of SEIU's family child care members live and work in states previously covered by ACF regional offices that are now closed.

26.    OCC sets policies for CCDF programs and provides guidance and technical assistance to states, tribes, and territories regarding program administration. It also reviews and approves plans that states, tribes, and territories submit annually. Block grant recipients are required to submit comprehensive CCDF plans to OCC every three years, but must also apply annually for approval to continue receiving CCDF funds to carry out the comprehensive plan.

---

[5] Moriah Balingit, *Mass Layoffs Rattle Head Start Leaders Already on Edge Over Funding Problems*, Associated Press (Apr. 2, 2025), available at https://apnews.com/article/head-start-office-closures-hhs-trump00b1a6b33ef918cb66e59b7ffb07ac13.

DECLARATION OF ELENA MEDINA NEUMAN

Yearly applications address several factors that affect how much OCC will allocate from different funding sources, including from mandatory, discretionary, matching, and tribal funds.

27.     SEIU members who work in state agencies that administer the state plans, as well as SEIU members who are family child care providers funded by the plans, depend on OCC staff's ability to provide guidance and technical assistance and to timely approve CCDF plans and plan amendments. SEIU Locals 99 and 521, as part of California Child Care Providers Union (CCPU), represent family child care providers funded by California's CCDF plan. They consider OCC the first line of contact for state questions related to CCDF implementation. SEIU members have previously depended on the ACF San Francisco regional office to provide assistance with emergency response—such as the COVID-19 pandemic—and advice on responding to large-scale unforeseen circumstances that may require CCDF plan amendments. OCC's diminished capacity due to recent layoffs and office closures, and confusion about whom at OCC to contact (particularly in the event of emergency), endangers the continuity and integrity of CCDF state plans, funding for family child care providers, and availability of child care options for low-income families.

**D.     SEIU and our Members Rely on a Functioning Department of Labor and Without One, will be Irreparably Harmed.**

28.     The Department of Labor (DOL) is tasked with administering federal labor laws, protecting workers' rights to fair, safe, and healthy working conditions, and producing valuable employment data and reports. Among other responsibilities, the DOL ensures compliance with the Service Contract Act (SCA) and with non-discrimination laws and regulations that protect federally-contracted workers. The DOL also receives and processes complaints of labor law violations through its Wage and Hour Division and the Occupational Safety and Health Administration (OSHA).

29.     According to reports, nearly one in five DOL employees are participating in the Department's "deferred resignation" program. *See* Exhibit E (Bloomberg Law).[6] DOL also reportedly plans to cut up to 90 percent of staff at the Office of Federal Contract Compliance Programs (OFCCP) and close more than 50 of its local offices. *See* Exhibit F (Bloomberg Law).[7] These reductions will detrimentally, and likely irreparably, harm SEIU and our members.

30.     For a significant number of SEIU members who are employed by federal contractors, the SCA sets a wage floor and ensures that tax dollars are not promoting poverty wages for federally-contracted services. Given the level of DOL staff reductions, there will likely be delays in the investigation, resolution, and, when necessary, recoupment of lost wages in a timely manner. For workers in typically underpaid sectors, the timely disposition of wage and hour matters are often a lifeline to cover costly necessities, such as rising rents and groceries in urban areas. SEIU Local 32BJ, for example, currently has a pending SCA complaint against several janitorial and security contractors alleging an estimated underpayment of up to $6 million dollars.

31.     The decimation of the OFCCP will likewise harm federally-contracted workers. The OFCCP investigates worker complaints, proactively monitors federal contractors' employment practices, and supports equal opportunity recruitment. In FY 2024, OFCCP recovered over $22 million for nearly 13,000 impacted workers and negotiated employment opportunities for hundreds of workers. SEIU has submitted comments in support of enhancing OFCCP's enforcement powers and also opposed efforts during the first Trump administration to close OFCCP. *See* Exhibits G and H.[8]

---

[6] Rebecca Rainey, *Labor Department to Lose 20% of Staff to Resignation Offers*, Bloomberg Law (Apr. 22, 2025), available at https://news.bloomberglaw.com/daily-labor-report/labor-department-to-lose-20-of-staff-to-fork-resignation-offer.
[7] Rebecca Klar, *DOL Contractor Watchdog Plans to Cut Staff by 90%, Memo Says*, Bloomberg Law (Feb. 27, 2025), available at https://news.bloomberglaw.com/daily-labor-report/dol-contractor-watchdog-directed-to-cut-staff-by-90-memo-says.
[8] Comment in Support of OFCCP Notice of Proposed Rulemaking, RIN 1250-AA14, Pre-Enforcement Notice and Conciliation Procedures (Apr. 21, 2022), available at https://civilrightsdocs.info/pdf/policy/letters/2022/OFCCP-PreEnforcementNotice-Comment-4.21.22.pdf; *see also* Letter from the Leadership Conference on Civil and Human Rights to DOL Secretary Alexander Acosta and Office of Management and Budget Director John M. Mulvaney (May 26, 2017), available at https://civilrightsdocs.info/pdf/policy/letters/2017/OFCCP_sign_on_5-26-2017.pdf.

32.    Additionally, SEIU relies on the DOL to process, investigate, and remedy worker complaints of federal labor law violations. Because SEIU often organizes workers in low-wage industries, it is not uncommon for organizers to engage with workers contending with various forms of wage theft. When SEIU organizers are working with unrepresented workers who are not protected by collective bargaining agreements, organizers routinely direct employees to the DOL to address such violations. For instance, the Union of Southern Service Workers (USSW), a campaign of SEIU, currently has a pending wage complaint alleging a violation of the federal minimum wage law due to an employer's failure to properly account for tips actually received by workers. Both SEIU and these workers are relying on the DOL to follow through with its investigation in a timely manner. Remedying such violations is a crucial way for workers to vindicate their rights and experience the power of engaging in collective action with their co-workers.

33.    OSHA, which ensures that workers have safe and healthy working conditions, is also at risk due to DOL's staggering staff reductions. During organizing campaigns, unrepresented workers frequently raise health and safety issues. SEIU organizers are able to refer these workers to the DOL. For example, in 2022, SEIU Texas supported workers in filing an OSHA complaint against an airline service contractor alleging multiple health and safety issues, including lack of heat mitigation and faulty vehicles and machinery. The complaint led to repairs and protocol changes in their workplace.

34.    OSHA is also a vital agency for existing SEIU members. Notwithstanding the fact that represented union workers can address some health and safety issues in bargaining and via arbitration, it is sometimes critical that a federal agency investigate and create a record in addition to imposing financial penalties. Especially in particularly dangerous jobs, the government investigation and record may be as important as the final resolution. For instance, SEIU Local 509 relied on OSHA to address unsafe working conditions in group homes operated by a private non-profit agency under contract with the Commonwealth of Massachusetts. Like

many health care and social service workplaces, which are known to have a high rate of workplace violence, SEIU members had been injured, assaulted, and bitten at work. In one tragic instance, a female direct care worker who was working alone was killed by a mentally ill client who had stopped taking his medications. After an investigation, the DOL issued a citation, and ultimately entered into a comprehensive settlement agreement that instituted various risk assessment and violence prevention policies and procedures. Those policies and procedures have been used as a model at other agencies, thereby helping many of the other thousands of SEIU Local 509-represented direct care workers who staff community-based group homes for the developmentally disabled and the seriously mentally ill. This would not have been possible had the DOL not been adequately staffed.

35.    The ability of workers—unionized and non-unionized—to contact DOL staff for guidance on how to pursue labor law violations is vitally important. It ensures that labor law violations are remedied, unsafe or unlawful conditions are investigated, and workplace hazards and risks are reduced.

**E.    SEIU and our Members Rely on a Functioning National Labor Relations Board and Without One, will be Irreparably Harmed.**

36.    The National Labor Relations Board (NLRB) is responsible for enforcing the National Labor Relations Act (NLRA), which was passed by Congress in 1935 to address the "inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association." 29 U.S.C. § 151. The NLRA establishes and protects private sector workers' rights to organize, to form and join unions, to strike, to collectively bargain, and to engage in other forms of mutual aid and protection, without actual or threatened retaliation. Because these rights are enforced by the NLRB, a reduction in staffing poses an enormous harm to the ability of SEIU and our members to enforce these federal rights.

DECLARATION OF ELENA MEDINA NEUMAN

37.     The NLRB is responsible for conducting elections that enable workers to democratically choose whether to join a union. This is a labor-intensive process: NLRB staff investigate the election petition, communicate with both the union and the employer regarding election procedures, determine the appropriate bargaining unit, assist the parties in reaching an agreement on how to conduct the election or hold hearings to allow parties to submit evidence regarding their respective positions, and conduct an election via mail or in-person.

38.     Election petitions—which are central to SEIU's ability to grow and admit new members—thus require substantial NLRB staff time and require NLRB staff to be available to conduct hearings and elections. With fewer staff, the NLRB will not be able to efficiently process election petitions, which will delay and interfere with SEIU's ability to become the certified bargaining representative for new bargaining units of workers. This harm is compounded when employers unlawfully retaliate against, harass, and/or surveil workers during lengthy NLRB proceedings without timely recourse for the union or the workers (often due to delays in processing complaints, as described in the next paragraph), or workers simply opt to walk away from bad jobs or organizing campaigns because they become discouraged by the protracted process. The loss of momentum and the chilling of workers' rights can extinguish even the strongest organizing campaigns.

39.     The NLRB's enforcement of workers' rights is just as critical to workers' ability to freely form unions. In SEIU's experience, many employers respond to workers' union organizing efforts by violating workers' rights. These NLRA violations often include unlawful termination of workers involved in organizing campaigns, threats and discrimination against workers, unlawful surveillance of workers' organizing activity, and refusal to bargain in good faith, among other violations. Workers file Unfair Labor Practice (ULP) charges with their NLRB regional office to redress NLRA violations. After receiving a ULP charge, NLRB staff conduct a thorough investigation, represent workers when the NLRB finds merit to the complaint, and order and enforce remedies.

40.    SEIU files ULPs on behalf of workers across the country and already experiences substantial delays in the ULP processing. For FY 2023, the average time between charge filing and a regional decision as to whether to issue a complaint was 124.2 days. For the same time period, the average time from the issuance of a NLRB complaint to a decision by an administrative law judge was 330.2 days.

41.    NLRB staff reductions will exacerbate the harm that SEIU and our members already experience due to delays. For example, if a worker in an SEIU organizing campaign is unlawfully fired, and the NLRB fails to promptly require and secure reinstatement of the worker, the organizing campaign is much more likely to fail. The same is true where an employer violates the NLRA during collective bargaining with SEIU. Delayed enforcement of workers' rights irreparably harms SEIU's and its members' ability to win strong wages, benefits, and working conditions through the collective bargaining process.

**F.    SEIU and our Members Rely on Functioning Student Loan Programs and Without Them, will be Irreparably Harmed.**

42.    Many groups of SEIU-represented workers, such as nurses and higher education faculty, have high rates of reliance on federal aid to earn their professional degrees. Union members with student loan debt have benefited from the Public Service Loan Forgiveness (PSLF) program and income-driven repayment options that attach to the federal student loans of those employed in the public sector. The Department of Education (ED) has administered the PSLF Program, in particular, since its establishment by Congress in 2007.

43.    Based on news reporting, my understanding is that President Trump intends to transfer the processing of student loans from the now-dismantled ED to the Small Business Administration (SBA), but also to cut the SBA workforce by more than 40 percent. *See* Exhibit I (NPR).[9] Transferring a $1.6 trillion student loan portfolio on behalf of approximately 43 million

---

[9] Cory Turner, *6 things borrowers should know about federal student loans right now*, NPR (Mar. 31, 2025), available at https://www.npr.org/2025/03/31/nx-s1-5343770/trump-student-loan-forgiveness#:~:text=Trump%20recently%20made%20the%20surprise,stay%20at%20the%20Education%20Department.

borrowers to a gutted SBA will have dire consequences. *See* Exhibit I (NPR).[10] There will inevitably be billing issues, delays in processing PSLF applications, and slowdowns in forbearance and loan repayment requests.

44.     As a result, union members who rely on federal student loan programs will experience substantial harm. By way of example, SEIU affiliate California State University Employees Union, Local 2579 (CSUEU) represents student assistants at California State University (CSU). CSUEU's members have made decisions about pursuing education based on the PSLF program. One CSUEU member, an Instructional Support Technician in the Biology Department at CSU Channel Islands, was previously enrolled in PSLF. She took out further loans to pursue her master's degree, in reliance on the availability of the PSLF program. Another CSUEU member, a graduate student at CSU's Northridge Campus, also took out student loans to pursue a master's degree in education, expecting to be eligible for the PSLF program.

45.     In order to respond to members' questions about federal student aid and to support members who want to pursue careers in public service, SEIU has provided education and assistance to members about federal student aid and loan repayment options, including guidance on the PSLF application process. SEIU has held student debt clinics for its members in-person and online. To create the content for these clinics, SEIU relies heavily on technical assistance provided by ED, such as guidance documents, loan repayment calculators on their website, instructions, and more. These resources are designed to advise borrowers regarding which student loan forgiveness program to enroll in. SEIU has also relied on ED employees' assistance in developing content and materials for these clinics, including presenting information directly to members at national webinars in 2022 and 2023.

46.     SEIU and our members will be detrimentally impacted by the transfer of the ED's trillion-dollar student loan portfolio to the SBA. As noted above, SEIU members will be harmed by the administration of their student loans by a severely understaffed. Moreover, it appears

---

[10] *Id.*

DECLARATION OF ELENA MEDINA NEUMAN

unlikely that SBA will have the capacity to provide the same level of technical support and resources about loan forgiveness programs as ED, particularly given the extra workload that will arise due to the commencement of student debt collections on May 5, 2025. The SBA's understaffing and inexperience create a perfect storm that will make it substantially more difficult for SEIU to help our members navigate their career options.

**G.      SEIU and our Members Rely on a Functioning Department of Housing and Urban Development and Without One, will be Irreparably Harmed.**

47.      The Department of Housing and Urban Development (HUD) administers programs that provide housing and community development assistance. Among other programs, HUD is responsible for administering the federal Housing Choice Voucher (HCV) Program. The HCV Program is a federally-funded but locally-administered program providing private market housing to low-income families, the elderly, and individuals with disabilities. HUD distributes, via local intermediaries, housing vouchers (also known as Section 8 vouchers) to HCV participants. They can use the vouchers to choose any housing that satisfies program requirements. The HCV program provides rental assistance to approximately 2.3 million families per year, which represents only about 25 percent of eligible families. *See* Exhibit J (Bloomberg).[11]

48.      According to news reporting, HUD recently lost 2,300 workers who accepted the administration's offer of "deferred resignation." *See* Exhibit K (N.Y. Times).[12] Upon information and belief, President Trump also intends to eliminate additional HUD positions and potentially close HUD field offices in 34 states plus the District of Columbia, including San Francisco's regional office. *See* Exhibit L (Bloomberg).[13]

---

[11] Patrick Sisson, *Cuts to Section 8 Housing Assistance Loom Amid HUD Uncertainty*, Bloomberg (Feb. 27, 2025), available at https://www.bloomberg.com/news/articles/2025-02-27/us-housing-voucher-program-faces-funding-crunch-as-chaos-engulfs-hud.
[12] Tony Romm, *White House Eyes Overhaul of Federal Housing Aid to the Poor*, N.Y. Times (Apr. 17, 2025), available at https://www.nytimes.com/2025/04/17/us/politics/housing-aid-hud-federal-budget.html.
[13] Kirston Capps, *Trump Administration Plans to Eliminate Dozens of Housing Offices*, Bloomberg (Mar. 5, 2025), available at https://www.bloomberg.com/news/articles/2025-03-05/hud-plans-to-eliminate-dozens-of-state-and-local-field-offices.

DECLARATION OF ELENA MEDINA NEUMAN

49.     SEIU members at the state and local level support the administration of the HCV Program. For example, SEIU Local 521 members work for the Santa Clara Housing Authority (SCCHA), the largest provider of affordable housing assistance in Santa Clara County. The SCCHA administers the HCV Program, and SEIU Local 521 members perform a wide range of functions that facilitate the administration of the program.

50.     HUD staffing cuts and office closures imperil the SCCHA, SEIU Local 521 members, and California residents. As a local administrator of a federal program, the SCCHA receives substantial funds from HUD and administers approximately 20,000 vouchers in the County. It relies on the timely processing of grants and prompt disbursement of grant funds, the collection of local data, and the development and maintenance of local relationships to ensure the success of local initiatives and partnership amongst stakeholders. The SCCHA must also document certain categories of information about the housing vouchers that they assigned and submit this information to HUD.

51.     SEIU members fear that impending staffing shortages at HUD will delay grant funding and the release of federal voucher funds. Even a temporary delay in funding would imperil users of the SCCHA's services, and would likely cause furloughs or layoffs of SEIU Local 521 members.

52.     As Preston Prince, executive director of the SCCHA explained, "What this does to us is just put us in a constant state of chaos, not knowing what to say to our families or what to say to our landlords." For SEIU and our members, the constant state of chaos is, in and of itself, an irreparable harm.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed April 29, 2025, in Los Angeles, California.

Elena Medina Neuman

18
DECLARATION OF ELENA MEDINA NEUMAN

# Exhibit A



# SEIU 2024 Constitution and Bylaws

AS ADOPTED at the 2024 Convention

Service Employees International Union, SOC, CLC

# CONSTITUTION AND BYLAWS

## PREAMBLE

As almost every improvement in the condition of working people has been accomplished by the efforts of organized labor and as the welfare of wage, salary, and professional workers can best be protected and advanced by their united action in one International Union, we have organized the Service Employees International Union and have adopted the following Constitution:

## SEIU MISSION STATEMENT

SEIU's vision is for a just society where all workers are valued and all people respected—no matter where we are from or the color of our skin, where all families and communities can thrive, and where we leave a better and more equitable world for generations to come.

*Vision for a Just Society*

This union's mission is to build the power to win Unions for All and end poverty wages forever. It takes all of us. Because when we say Unions for All, that's just what we mean—nobody left out or left behind. We will write new rules so that all workers—of every race, from every place—can organize across employers, industries, sectors, and geographies, not just worksite by worksite. This sectoral approach will give SEIU members more power to raise standards in our industries and communities, bargain better contracts, and win our fights for immigration, climate, healthcare, and racial justice.

We know there's only one way forward, together, with millions of us united in unions to voice our demands. Our work has dignity. Our lives have value. And we have hope. We're using that hope to fuel our fight to win Unions for All, no matter where we work, no matter where we live.

In every breakroom, at every bargaining table, in community forums and at the corner store, in our schools, our hospitals, our houses of worship, on social media and video meetings, at every door we knock, and at the ballot boxes where we cast our votes as demands for change, we will make a full-throated demand for Unions for All. Together in this union, we will build power and win for and with one another to create a brand new labor movement, write new rules, and make sure future generations can live free, just, hope-filled lives.

## STATEMENT OF VALUES

As we work together to fulfill our mission and realize our goals, we will be guided by our core values: equity, integrity, solidarity, justice, respect, inclusion and hope. These concepts speak to what we care most about. We hold ourselves to them as standards for all of our work, to ensure that our actions are in keeping with the values we hold most dear.

## Article I

## NAME

*Name and Organization*

This organization shall be known as the Service Employees International Union, affiliated with Change to Win and the Canadian Labour Congress, and shall consist of an unlimited number of Local Unions chartered by it, and the membership thereof, and such affiliated bodies as may be established from time to time. In order to add the strength of this great union to the efforts of its members at every level of the Union, the name of every Local Union and affiliated body shall begin with "SEIU."

Exhibit B

Case 3:25-cv-02699-SI   Document 27-86   Filed 05/01/25   Page 24 of 84
Federal Cuts to Child Care and Head Start are an Attack on Families with Low Incomes | CLASP

# Federal Cuts to Child Care and Head Start are an Attack on Families with Low Incomes

**By Shira Small**

The Trump Administration's cuts to federal child care and early education programs and staff are putting children, families, and the economy at risk. Children are already losing access to care, (https://www.tri-cityherald.com/news/local/education/article304297591.html) the remaining federal workforce is overburdened, child care providers are losing their jobs, communication channels are being eliminated, and parents are experiencing uncertainty over whether they will have care tomorrow. All of this upheaval only exacerbates the existing access and affordability crisis facing the child care sector, particularly for families with low incomes and families of color who face disproportionate barriers to access (https://epaa.asu.edu/index.php/epaa/article/view/7003/2774) as the result of systemic racial and economic injustice.

The chaos began in late January when the administration froze federal funding (https://apnews.com/article/trump-federal-grants-pause-freeze-e5f512ae6f1212f621d5fa9bbec95e08), which locked Head Start providers and Child Care and Development Fund (CCDF) administrators out of the websites they use to access grants. This contributed to dozens of Head Start programs (https://apnews.com/article/head-start-medicaid-federal-funding-4fe440e35df70c7ede8ce8e0409cb581) closing temporarily. Though the funds were restored, program administrators received limited to no communication about whether they would be able to access the grants needed to keep their programs open and their providers paid.

In the months that followed, the administration took a number of additional actions that are harming programs, families, and providers, including:

**Laying off federal employees.** Probationary staff at the Office of Head Start (OHS) and the Office of Child Care (OCC) were laid off in February (https://www.cbsnews.com/news/thousands-of-probationary-federal-health-agency-

workers-fired-by-letter-this-weekend/), resulting in a reduction of approximately 20 percent of staff. This was followed by the mass layoffs (https://apnews.com/article/health-human-services-layoffs-restructuring-rfk-jr-fa4e89285e668a3939e20b6cf4c26fd4) announced on April 1, resulting in an overall reduction of 40-50 percent of staff in OHS and OCC and the closure of five regional offices, which provided training and technical assistance, administrative support in ensuring grants reached facilities, and served as a liaison between program administrators and the federal government. These offices in Boston, Chicago, New York, San Francisco, and Seattle oversaw grantees in 23 states and five territories (https://www.americanprogress.org/article/5-things-to-know-about-head-start/), and comprised half of the total regional offices across the country.

**Impounding funds.** Recent data shows that nearly $1 billion fewer dollars (https://www.appropriations.senate.gov/news/minority/new-trump-admin-withholding-nearly-1-billion-in-funding-for-head-startcrunching-centers-nationwide-and-forcing-devastating-closures) have been disseminated to Head Start programs compared to this time last year. The exact cause for this is unclear. Whether this is an intentional decision or the result federal workforce cuts, the reduction causes confusion and strain for already underfunded programs.

**An Executive Order targeting diversity, equity, and inclusion (DEI).** Head Start grantees received a directive in mid-March (https://acf.gov/ohs/news/federal-funding-restrictions-diversity-equity-and-inclusion-initiatives) from the Acting Assistant Secretary at the Administration for Children and Families saying that no funds will be approved for program expenditures that promote or take part in diversity, equity, and inclusion initiatives. Given Head Start's core commitment to these values, it is unclear what the implications will be for the children, families, and staff in their programs.

**Proposing the elimination of Head Start.** Recent news (https://www.usatoday.com/story/news/education/2025/04/11/trump-proposal-eliminating-head-start/83045346007/) indicates that President Trump will propose complete elimination of Head Start in his forthcoming Fiscal Year 2026 budget proposal.

# Impact on Children, Families, Providers, and the Economy

Children and families are paying the price for these actions. Head Start serves over 750,000 children (https://www.headstart.gov/program-data/article/head-start-program-facts-fiscal-year-2023) and CCDF, administered within OCC, subsidizes care for 1.4 million (https://acf.gov/occ/data/fy-2022-preliminary-data-table-1) children annually, according to the most recent available data. Longstanding economic and racial inequities (https://news.duke.edu/stories/2024/06/10/u-s-racial-wealth-gap-is-persistent-and-growing-new-research-finds/) mean that families of color, particularly Black and Latino families, will be hit the hardest by these cuts, compounded by the administration's degradation and removal (https://apnews.com/article/trump-dei-executive-order-diversity-inclusion-f67ea86032986084dd71c5aa0c6b8d1d) of DEI programs that are intended to advance equity.

We are already seeing the direct impacts on children and families. Head Start programs in Washington have had to shut down (https://www.tri-cityherald.com/news/local/education/article304297591.html) because of the loss of federal support. As a result, 400 preschool children are without care and 70 staff members have been laid off. Even more children (https://www.clasp.org/publications/fact-sheet/cuts-to-ssbg-tanf-would-eliminate-child-care-for-40k-children-disrupt-care-for-millions-more/) are at risk of losing care as the House and Senate make decisions on which programs will be impacted by the recently passed budget resolution (https://www.clasp.org/press-room/press-releases/u-s-house-passes-budget-that-enriches-the-wealthy-by-slashing-medicaid-snap/), which calls on committees to slash funding for programs supporting families with low incomes to fund tax breaks for the wealthy. These cuts are attacks on families with low incomes, the child care workforce, and the economy, and Congress must push back.

The child care sector is one of many under assault by the current administration, and widespread federal funding cuts and layoffs will only worsen existing racial and economic inequalities. The racial wealth gap is widening (https://news.duke.edu/stories/2024/06/10/u-s-racial-wealth-gap-is-persistent-and-growing-new-research-finds/), wealth inequality is growing (https://apps.urban.org/features/wealth-inequality-charts/), and the cost of living is rising (https://www.cbsnews.com/news/price-tracker/) — and the Trump Administration is eliminating the policies that support families with low incomes and families who face racial injustice. This administration may want to enrich the wealthy, but CLASP is fighting (https://www.clasp.org/press-room/press-releases/proposed-cuts-to-hhs-services-would-

4/29/25, 5:46 PM
Case 3:25-cv-03698-SI   Document 37-36   Filed 05/01/25   Page 27 of 84
Federal Cuts to Child Care and Head Start are an Attack on Families with Low Incomes | CLASP

devastate-families-children-workers-and-the-economy/) back to defend the programs that help children and families thrive.



## Shira Small

RESEARCH ASSISTANT, CHILD CARE AND EARLY EDUCATION
Policy Expertise: Children, Youth & Families , Child Care and Early Education
ABOUT SHIRA SMALL →

Exhibit C







HOME          ABOUT US          IN THE STATES          EARLY LEARNING NATION STUDIO

Reading
Poverty Wages, Staffing Crisis: New Federal Rule Looks to Sustain Head Start

SHARE     TWEET

# Poverty Wages, Staffing Crisis: New Federal Rule Looks to Sustain Head Start

*New federal rule raises annual Head Start teacher salaries by $10,000 over time — but congressional funding is not guaranteed.*

Amanda Geduld  ·  Public Policy  ·  Sep 24, 2024  ·  *6 min read*



Head Start/Facebook

A ndrea Muñeton has been a Head Start educator in California for 14 years. The work is important but greuling, she said, involving up to 80 hours a week of mental and physical labor that doesn't end when her students head home at the end of the day.

Case 3:25-cv-03698-SI    Document 37-26    Filed 05/01/25    Page 30 of 84

And the pay? It doesn't compare, she said.

"We're underpaid, overworked and we're not appreciated. We're seen as, 'Oh you're just a day care. No, I'm not a day-care person. I'm a teacher.'"

Muñeton started off as an aide and worked her way up to full-time teacher and president of the Early Childhood Federation, an American Federation of Teachers local union in California.



*Andrea Muñeton has been a Head Start educator for 14 years. (Andrea Muñeton)*

Muñeton said when she was an assistant teacher, more than half of her paycheck went to health insurance, and her husband was forced to work a second job to help support their two kids, who are both Head Start students. This year, Muñeton said she reached a breaking point and considered leaving her decade-and-a-half -long career in early childhood education to apply for a job at Target.

Muñeton is far from alone: child care workers nationally have one of the lowest-paid occupations, with 11% to 34% living in poverty. While the average salary of a public preschool teacher and a kindergarten teacher is about $49,000 and $60,000, respectively, the average annual salary for Head Start and other preschool teachers is about $35,000.

But this could all change over the next several years according to a new final rule recently released by the U.S. Department of Health and Human Services, which oversees Head Start and aims to raise annual wages for teachers in the program by about $10,000 and increase access to benefits such as high-quality, affordable health care coverage and paid leave. The rule is largely in response to the struggle to hire and retain qualified staff, which has ultimately led to classrooms closing.

Head Start organizations must comply with some elements of the ruling by October but have until August 2031 to begin providing increased pay. There is an emergency exemption for the 35% of agencies with fewer than 200 funded slots, but they must still make "measurable improvements in wages for staff over time."

Some agencies may also be eligible for waivers for wage requirements in 2028, if the funding does not increase at a sufficient pace, which could be the rule's greatest challenge. In order to qualify, they would need to demonstrate that implementing the pay raises would force them to cut occupied seats and show that they're meeting certain quality requirements.

The National Head Start Association, a nonprofit organization that represents Head Start families, providers and educators, welcomed the federal announcement in an Aug. 16 press release, but expressed disappointment that the edict does not address the need for significant additional funding to fully achieve its goals and could end up forcing operators to slash staff to meet the salary mandates.

"The organization remains concerned that, if Congress and future administrations do not agree to such increases, the impact of the final rule could prove devastating, by significantly reducing the number of children and families served by Head Start programs," the organization wrote.

While the rule is an important step forward from a policy perspective, it is a "double-edged sword" in terms of funding, according to Dan Wuori, the founder and president of Early Childhood Policy Solutions and a former kindergarten teacher and South Carolina school district administrator.

"They're sort of stuck either way," he said. "If they can't attract teachers then they can't serve kids. But if they have to compensate at a higher level to draw qualified staff then that — in the absence of new funding — could mean serving a much smaller number of children."

Katie Hamm, deputy assistant secretary for Early Childhood Development at the Administration for Children and Families, which is overseen by the Department of Health and Human Services, said in an Aug. 30 interview that she believes the administration can partner with Congress to increase Head Start appropriations over time while simultaneously restructuring the current budget to put more money toward wages.

Khari Garvin, the director of the office of Head Start, says the hope is that the changes will position the program to recruit, attract and retain the "best and brightest talent in this field," which "translates into better developmental outcomes for children and families."

"The great irony … is that for too long we've had individuals — committed staff — working in what is an anti-poverty program, many of whom have made either poverty-level wages, or close to poverty-level wages," he said. "And so now we're correcting that."

Muñeton doesn't think Head Start teachers should have to wait so many years for this potential shift in pay, benefits and working conditions. But when — and if — it does happen, it'll be life changing, she said.

"I'll be able to afford maybe purchasing a house rather than renting out of my parents'. I'll be able to tell my husband, 'Hey, quit the other job so we can see you more often.' I'll be able to pay off the debt that I'm still trying to pay off monthly," she said.

## 'A really important stake in the ground'

Head Start began as an eight-week demonstration project in the 1960s, as part of President Lyndon B. Johnson's War on Poverty. Since then, the programs have reached more than 38 million children and their families, the majority of whom meet federal low-income

guidelines. Currently, it serves about 650,000 children from birth to age 5 and their families, in urban, suburban and rural areas in all

They also connect families to community and federal assistance and can help provide a career pathway for parents into early care and education: As of 2022, almost a quarter of Head Start's 260,000 staff were parents of current or former Head Start children. The vast majority of Head Start center-based preschool teachers nationally (68%) had a bachelor's degree or higher in early childhood education or a related field with experience. About a quarter of education staff members are Black, 30% are Latino and the vast majority are women.

The 1,600 local agencies are funded by the federal government, though many also tap into state and local revenue sources. For years, these agencies have struggled to hire and retain highly qualified educators, with turnover hitting 17% in 2023.

"We really have a crisis on our hands," Hamm said.

For a single adult with one child, median child care worker pay does not meet a living wage in any state. Salary and benefits were cited as the top reason why almost 1 in 5 staff positions were vacant nationwide in a 2023 National Head Start Association survey. Of the 20% of Head Start and Early Head Start classrooms that were reported closed in the survey, 81% attributed the shutdowns to staffing vacancies.

These persistently low wages come from a century-long history of falsely dichotomizing care and education, according to Wuori, the policy expert and former kindergarten teacher.

"We think of early care as being almost an industrialized form of babysitting," he said, "whereas education kicks in — from a policy level — maybe a few years later. And one of the side effects of that then is that the people who work with the youngest children are not respected as the professionals that they are. And a primary way that that is the case is through their compensation, which … lags well behind that of fast food workers and employees at big box stores."

This new federal rule, he said, serves as a "really important stake in the ground" to rectify that mindset.

*This article was published in partnership with The 74.*



**Amanda Geduld**

The 74

Amanda is a Staff Reporter at The 74.

# Related

Exhibit D

4/29/25, 6:00 PM
Case 3:25-cv-03698-SI   Document 27-26   Filed 05/01/25   Page 34 of 84
Head Start office closures, HHS layoffs worry preschool leaders | AP News

# Mass layoffs rattle Head Start leaders already on edge over funding problems



 **BY MORIAH BALINGIT**
Updated 8:59 AM PDT, April 2, 2025

WASHINGTON (AP) — The problems for Head Start began days after President Donald Trump took office.

Trump's administration announced it would freeze federal grants — the primary funding for the early education program that serves more than half a million low-income children. Then came glitches with the funding website that forced nearly two dozen Head Start centers to close temporarily.

Even after the funding freeze was aborted — and the website was restored — those who run the programs remained on edge. On Tuesday, the administration gave them another reason to worry: mass layoffs.

Scores of government employees who help administer Head Start, which is federally funded but run by schools and nonprofits, have been put on leave. Preschool operators say they have received no communication from the Office of Head Start and don't know who to turn to if they have questions about grants or need the office to sign off on equipment expenditures.

ADVERTISEMENT

They fear the program, which serves some of the [nation's nee](link) [families](link), could fall victim to the Trump administration's sweeping cuts.

Head Start was started six decades ago as part of President Lyndon B. Johnson's War on Poverty. While the early childhood program has enjoyed bipartisan support since then, some Republicans have emphasized its shortcomings and criticized efforts to increase funding. And Project 2025, the policy blueprint created by the conservative Heritage Foundation, called for eliminating Head Start altogether.

**RELATED STORIES**



**Head Start funding eliminated under Trump White House budget**



**Head Start funding lags by nearly $1 billion this year, causing some preschool closures**



**Harvard faces another dispute with Trump**

Joel Ryan, head of the Washington State Association of Head Start, said he is worried the administration is slowly dismantling the program without outright eliminating it. "It doesn't have to be from an act of Congress," Ryan said. "You can kneecap programs simply by cutting significant numbers of their workforce."

ADVERTISEMENT

## Preschools say they need federal staff

Head Start operates in all 50 states, helping families who are homeless or are in poverty. Parents who otherwise would not be able to afford child care rely on it when they work or go to school. Supporters say that underscores the importance of Head Start to the economy and at-risk children alike.

At least five of the 12 regional offices for Head Start were closed Tuesday as part of layoffs at the Department of Health and Human Services, according to the National Head Start Association. While individual preschools' funding remains unchanged, the association's statement said the cuts happened without a "clear plan for how the administration intends on supporting Head Start."

Some worry Head Start will become partisan.

"What I don't want Head Start to be is a political football," said Rhett Cecil, executive director of the Indiana Head Start Association. "Because a Republican household, a Democratic household, a libertarian household could be a Head Start household."

In mid-March, Health Secretary Robert F. Kennedy Jr., whose department oversees Head Start, visited a Head Start in Alexandria, Virginia, praising the program and its staff.

"I had a very inspiring tour," Kennedy said in a video on his department's Instagram account. "They're getting the kind of education and socialization that they need."

ADVERTISEMENT

Still, advocates worry the GOP's efforts to slash the federal budget will ensnare programs like Head Start.

Already, the staff layoffs have caused concerns. Head Start preschools in Washington state had been awaiting approval to replace downed fencing around a playground and to purchase a refrigerator for a center. Ryan said he fears some operators will lose funding because grant applications won't get processed.

## Panic, then closures

The preschools are deeply reliant on federal money. During the brief hold on federal grants, no program was impacted more immediately. Unable to make payroll the day of the freeze, several Head Start centers temporarily closed — cutting off child care for low-income families, for whom a day without work is often a day without pay.

The news about the funding freeze emerged in January as Head Start leaders from across the country were together at the Capital Hilton, a few blocks away from the White House, preparing to meet with Congress members. Gathered in a conference room, many leaders simultaneously realized they were locked out of their funds.

ADVERTISEMENT

"You could almost feel … the wave of panic all over the room when I think we all realized at the same time that everyone was locked out of that payment management system," said Chanda Hillman, executive director of Early Flowers Learning. The group operates 17 Head Start campuses in rural parts of southwestern Michigan.

A few hours later, Hillman had to make the call: She would shut down the Early Flowers Learning campuses.

Kahli Lorenz, whose daughter attends Early Flowers, had traveled with Hillman to D.C. as part of a parent advisory council. She had been reeling at the possibility her daughter would have no place to go the following day — or that her beloved preschool would close. So when Lorenz heard Hillman make the announcement, she fell apart.

ADVERTISEMENT

Both she and her husband work — and she was out of town. Without Head Start the next day, he would miss half of his shift — and half of his pay — at the factory where he works. But she thought of all of her daughter's classmates, and all the parents like her who might not be able to work without Head Start.

"That meant all of the families were not going to have anywhere to have their kids," she said.

## 'They cannot go to work'

Halfway across the country, Cecil of the Indiana Head Start Association learned about the reported freeze from a Head Start director, and immediately began to fret. The closure of Head Start centers across the state would leave families in a pinch. But he also worried about those who would be furloughed — Head Start is Indiana's 78th largest employer with nearly 4,000 staff.

4/29/25, 6:00 PM
Case 3:25-cv-03698-SI    Document 27-26    Filed 05/01/25    Page 39 of 84
Head Start office closures, HHS layoffs worry preschool leaders | AP News

Not long after came another confusing piece of news: Head Start was never supposed to be a part of the funding freeze. So why, Head Start directors wondered, had they been shut out of the funding portal? Asked about the pause, the Department of Health and Human Services responded with an automatic message that said it was freezing all communication.

Even after the freeze was aborted and the Head Start portal was supposed to be fixed, many centers discovered they still could not access their funds. A week later, at least 45 grant recipients across the country were still locked out, and many were on the verge of closure. In Waukesha, Wisconsin, Head Start programs shut their doors and furloughed most of their staff. The programs would not reopen until the following week when their leaders could access the funds.

Unable to make payroll, two Head Start centers that served rural communities in western New York shut their doors, laying off 84 employees and leaving the families of more than 200 children without care. They would not reopen until Feb. 10, when they were finally able to draw down funds.

Head Start leaders said members of Congress from both parties were in touch during the crisis, working to get them answers.

For Hillman, it raised hope that Head Start will continue to enjoy bipartisan support — even if some conservatives oppose it.

―――

Cheyanne Mumphrey contributed reporting from Phoenix, Arizona.

―――

The Associated Press' education coverage receives financial support from multiple private foundations. AP is solely responsible for all content. Find AP's standards for working with philanthropies, a list of supporters and funded coverage areas at AP.org.

 **MORIAH BALINGIT**
Balingit is an Associated Press national reporter focused on child care, preschool and the early grades.

Exhibit E

4/29/25, 6:04 PM
Case 3:25-cv-03698-SI    Document 37-26    Filed 05/04/25    Page 41 of 84
Labor Department to Lose 20% of Staff to Fork Resignation Offer

Daily Labor Report ®
April 22, 2025, 12:15 PM PDT; Updated: April 22, 2025, 2:01 PM PDT

# Labor Department to Lose 20% of Staff to Resignation Offers (1)

Exclusive

---

- **Nearly 3,000 DOL workers agree to leave agency later this year**
- **Move comes after two rounds of exit offers to employees**

Nearly one in five workers at the US Department of Labor opted to leave their jobs later this year as part of the Trump administration's deferred resignation program, according to two DOL employees briefed on the matter.

More than 2,700 of the DOL's 14,578 employees agreed to voluntarily separate from the agency under the exit offer, which allows federal employees to receive pay and benefits through September if they resign, the employees said.

Labor Secretary Lori Chavez-DeRemer reopened the program for DOL staff earlier this month after it was first launched in January, warning that reductions in force at the agency were forthcoming.

"My goal is to provide as many options and as much information as possible to enable informed decision-making regarding your career and your future," Chavez-DeRemer said in the email at the time.

Between the January and April voluntary exit offers, close to 20% of all DOL employees decided to take part in the program, agency staffers were told in multiple meetings.

Worker advocates and employment attorneys have warned that any cuts to DOL staff could hurt the agency's ability to enforce child labor, minimum wage, family leave, or other worker protections, resulting in fewer inspections and fines for businesses covered by the agency.

The deferred resignation program, which was sent to all federal employees in an email infamously titled "Fork in the Road," is part of President Donald Trump's efforts to reduce the size of the federal workforce and was initially opened up to federal employees shortly after he took office.

But in recent weeks, workers at multiple federal agencies, including the Labor, Defense, Transportation, Agriculture, and Energy departments, received renewed buyout offers requesting that staff opt-in by various deadlines in April.

Unions representing federal workers have challenged the program in federal court. The American Federation of Government Employees and two other unions amended their February lawsuit against the initial buyout program to include the new offer sent out to multiple agencies in late March and early April. The federal judge overseeing the case previously allowed the Trump administration to continue implementing the program, after finding that the unions failed to show standing to sue.

The mass exodus of staff at the DOL follows earlier efforts by the Trump administration to terminate probationary employees at the DOL's Women's Bureau, Employment and Training Administration, Office of Disability Employment Policy, Mine Safety and Health Administration, Employee Benefits Security Administration, and the Bureau of International Labor Affairs. Many of those employees were reinstated in March following a separate lawsuit filed by unions representing government workers.

To contact the reporter on this story: Rebecca Rainey in Washington at rrainey@bloombergindustry.com

To contact the editor responsible for this story: Alex Ruoff at aruoff@bloombergindustry.com

© 2025 Bloomberg Industry Group, Inc.   All Rights Reserved

Exhibit F

Daily Labor Report ®
Feb. 27, 2025, 12:58 PM PST; Updated: Feb. 27, 2025, 2:34 PM PST

# DOL Contractor Watchdog Plans to Cut Staff by 90%, Memo Says (1)

- **Workforce reduction to hit agency targeted by Trump order**
- **Labor Department memo outlines plan to cut about 450 workers**

The Department of Labor is preparing to cut the workforce of its federal contractor watchdog by 90% after the Trump administration gutted much of the office's enforcement power, according to a memo reviewed by Bloomberg Law.

The Feb. 25 memo from the acting director of the Office of Federal Contract Compliance Programs to Acting Secretary of Labor Vincent Mincone said the OFCCP will shift from 55 offices to four, and reduce its 479 employees to 50. The changes will go along with the OFCCP's reduced purview and create a "fiscally efficient" structure, the memo said.

The Washington Post was first to report on the memo.

Amid a broader attempt to downsize the federal workforce, Trump Jan. 21 revoked the executive order that established most of the OFCCP's responsibilities to police federal contractors for anti-discrimination violations and affirmative action compliance. Tens of thousands of companies had government contracts worth a total of $769.5 billion in fiscal 2024, according to Bloomberg Government data.

The OFCCP under decades-old Executive Order 11246 enforced requirements that companies that do business with the government must evaluate their workforce for bias, and maintain affirmation action plans. It also conducted hiring bias and equal pay compliance audits of contractors under the order.

The office already halted audits and investigations in line with Trump's executive action.

It will now "focus its mission" on enforcement of Section 503 of the Rehabilitation Act and the Vietnam Era Veterans' Readjustment Assistance Act, the memo stated. The OFCCP also monitors contractors for bias against disabled workers and veterans through these statutorily-mandated enforcement priorities, which were not affected by Trump's rescission of EO 11246.

Under the plan outlined in the memo, the agency would maintain a "limited field presence" that is necessary for Section 503 and VEVRAA reviews.

A policy division, slated for five employees, would review and suggest changes to agency regulations "designed to reflect the removal of EO 11246" and shift focus on Section 503 and VEVRAA, according to the memo.

The OFCCP's plan would eliminate the division of enforcement comprised of labor economists and statisticians, who were charged with conducting systemic statistical analyses previously required. Those "skillsets are no longer needed" for Section 503 and VEVRAA enforcement, the memo said.

The OFCCP seeks to use voluntary early retirement authority and the voluntarily separation incentive program to achieve its personnel cuts, according to the memo, which said the office is awaiting confirmation that 42 employees have participated thus far in the Trump administration's deferred resignation program.

The office remains funded through March 14, and the workforce reduction will require additional funds to cover costs such as buyouts, annual leave lump sump payments, severance pay, relocation expenses, and office closures, the memo said.

The Labor Department didn't respond to multiple requests for comment on the memo.

To contact the reporter on this story: Rebecca Klar in Washington at rklar@bloombergindustry.com

To contact the editors responsible for this story: Rebekah Mintzer at rmintzer@bloombergindustry.com; Jay-Anne B. Casuga at jcasuga@bloomberglaw.com

© 2025 Bloomberg Industry Group, Inc.   All Rights Reserved

Exhibit G

The Leadership Conference
on Civil and Human Rights

1620 L Street, NW
Suite 1100
Washington, DC
20036

202.466.3311 voice
202.466.3435 fax
www.civilrights.org

The Leadership
Conference

April 21, 2022

Tina T. Williams
Director, Division of Policy and Program Development
Office of Federal Contract Compliance Programs
U.S. Department of Labor
200 Constitution Avenue NW, Room C-3325
Washington, DC 20210

*Submitted via regulations.gov*

RE:    RIN 1250-AA14, Pre-Enforcement Notice and Conciliation Procedures

Dear Ms. Williams:

The Leadership Conference on Civil and Human Rights, a coalition charged by its diverse membership of more than 230 national organizations to promote and protect the rights of all persons in the United States, together with the 15 undersigned organizations, write to express our support of the Office of Federal Contract Compliance Programs ("OFCCP") Notice of Proposed Rulemaking, RIN 1250-AA14, Pre-Enforcement Notice and Conciliation Procedures, published in the Federal Register on March 22, 2022 ("the Proposed Rule").[1] The Proposed Rule would modify the final rule titled "Nondiscrimination Obligations of Federal Contractors and Subcontractors: Procedures to Resolve Potential Employment Discrimination," which took effect on December 10, 2020 ("the 2020 Rule").[2]

The 2020 Rule imposed unnecessary, burdensome, and confusing enforcement standards onto OFCCP's pre-enforcement processes that do not align with the requirements of federal anti-discrimination law and serve to hamper the ability of OFCCP to engage with federal contractors at the earliest stages to remedy potential discrimination. Ultimately, these needless barriers make it more difficult for OFCCP to protect working people from unlawful discrimination and may, even more perversely, expose vulnerable workers to additional discrimination and retaliatory treatment, undermining the ability of OFCCP to fulfill its mission. The proposed modifications would, consistent with federal law, restore flexibility to OFCCP, promote greater efficiency, and allow for earlier resolutions that protect federal contract workers from unlawful discrimination.

**Officers**
**Chair**
Judith L. Lichtman
  National Partnership for
  Women and Families
**Vice Chairs**
Derrick Johnson
  NAACP
Thomas A. Saenz
  Mexican American Legal
  Defense and Educational Fund
**Secretary**
Fatima Goss Graves
  National Women's Law Center
**Treasurer**
Lee A. Saunders
  American Federation of State,
  County and Municipal Employees

**Board of Directors**
Gloria L. Blackwell
  AAUW
Ray Curry
  International Union, UAW
Jocelyn Frye
  National Partnership for
  Women and Families
Jonathan Greenblatt
  Anti-Defamation League
Mary Kay Henry
  Service Employees International Union
Damon Hewitt
  Lawyers' Committee for
  Civil Rights Under Law
Sherrilyn Ifill
  NAACP Legal Defense and
  Educational Fund, Inc.
David H. Inoue
  Japanese American Citizens League
Benjamin Jealous
  People for the American Way
Virginia Kase Solomón
  League of Women Voters of the
  United States
Samer E. Khalaf
  American-Arab
  Anti-Discrimination Committee
Joni Madison
  Human Rights Campaign
Marc Morial
  National Urban League
Janet Murguía
  UnidosUS
Christian F. Nunes
  National Organization for Women
Rabbi Jonah Pesner
  Religious Action Center
  of Reform Judaism
Rebecca Pringle
  National Education Association
Lisa Rice
  National Fair Housing Alliance
Anthony Romero
  American Civil Liberties Union
Liz Shuler
  AFL-CIO
Fawn Sharp
  National Congress of American Indians
Maria Town
  American Association of
  People with Disabilities
Randi Weingarten
  American Federation of Teachers
John C. Yang
  Asian Americans Advancing Justice |
  AAJC

**Interim President and CEO**
Wade Henderson

---

[1] 87 Fed. Reg. 16138 (Mar. 22, 2022).
[2] 85 Fed. Reg. 71553 (Nov. 10, 2020).

April 21, 2022
Page 2 of 7



## OFCCP Plays a Unique Role in Protecting Federal Contract Workers from Discrimination

The primary function of OFCCP is to ensure that companies with the privilege of doing business with the federal government do not engage in employment discrimination. To that end, OFCCP is charged with enforcing Executive Order 11246, which prohibits federal contractors from engaging in employment discrimination on the basis of race, color, religion, sex, sexual orientation, gender identity, or national origin; Section 503 of the Rehabilitation Act of 1973, which prohibits employment discrimination against people with disabilities; and the Vietnam Era Veterans Readjustment Assistance Act (VEVRAA), which protects veterans. EO 11246, Section 503, and VEVRAA also impose certain affirmative action obligations on federal contractors to ensure equal employment opportunities. Accordingly, OFCCP broadly oversees the employment practices of federal contractors, who are legally required to proactively monitor workplace diversity and pay equity, to make a meaningful effort to recruit qualified applicants from groups who are under-represented in their workplaces, and to break down barriers to equal opportunity for various marginalized and disadvantaged communities.

To achieve its goals, OFCCP does not merely respond to individual complaints of discrimination. Instead, a distinctive feature of OFCCP enforcement is the power to engage in systemic compliance reviews. Individual employees may lack knowledge of discrimination, even when they are being harmed by discriminatory actions, or may face other obstacles to bringing complaints, including fear of retaliation. Through compliance reviews, OFCCP can proactively identify, investigate, and remedy patterns of discrimination, even in the absence of an individual complaint. OFCCP also provides guidance to contractors to encourage voluntary compliance with anti-discrimination laws. Preventing discrimination and addressing it when it occurs is essential to protecting the economic security of millions of working people employed by federal contractors.

## Workplace Discrimination is a Significant Problem Contributing to Economic Insecurity

Despite longstanding federal prohibitions against workplace discrimination, working people across the United States continue to experience pernicious discrimination that robs them of employment opportunities, economic security, and dignity on the job. The U.S. Equal Employment Opportunity Commission ("EEOC"), for example, reported that it received over 128,000 charges of employment discrimination in fiscal years 2020 and 2021;[3] OFCCP received over 2,700 complaints over that same period from federal contract workers.[4] Research, however, shows that fear of retaliation prevents many working people from ever reporting discrimination.[5] The sheer number of retaliation claims underscores that this fear is not unreasonable: retaliation made up over half of all charges filed at the EEOC in fiscal years 2020 and 2021 respectively,[6] and nearly 43 percent of complaints received by OFCCP just in the

---

[3] U.S. Equal Employment Opportunity Commission, Charge Statistics (Charged filed with EEOC) FY 1997 Through FY 2021, https://www.eeoc.gov/statistics/charge-statistics-charges-filed-eeoc-fy-1997-through-fy-2021 (last visited Apr. 18, 2022).
[4] Office of Federal Contract Compliance Programs, OFCCP By the Numbers. Fiscal Year Data Tables: Complaints Received by Employment Practice, *available at*, https://www.dol.gov/agencies/ofccp/about/data/accomplishments (last visited Apr. 18, 2022).
[5] *See generally*, Deborah L. Brake, *Retaliation*, 90 Minn. Law. Rev. 18, 36-42 (2005) , *available at*, https://www.minnesotalawreview.org/wp-content/uploads/2011/12/Brake_Final.pdf (last visited Apr. 18, 2022).
[6] U.S. Equal Employment Opportunity Commission, *supra* note 3.

April 21, 2022
Page 3 of 7



first quarter of fiscal year 2022 alone.[7] Given incentives not to report discrimination,[8] it can be difficult to determine its prevalence, but an online survey conducted in 2019 found that as many as 60 percent of working people in the United States have experienced or witnessed workplace discrimination based on age, race, sex, gender identity, or sexual orientation.[9]

The cost of discrimination for people of color, women, LGBTQ people, older workers, people with disabilities, and other marginalized and multi-marginalized groups is significant. Workplace discrimination can mean not having access to a job or a promotion, being forced to endure a hostile working environment, or being paid less — all because of who you are. These unlawful practices inhibit economic security and opportunity and help to perpetuate disparities in health outcomes, housing, education, and more.

Discriminatory race- and sex-based pay gaps, for example, directly contribute to high rates of poverty affecting communities of color.[10] In 2020, women working full-time, year-round were paid 83 cents for every dollar paid to men, with women of color paid significantly less than non-Hispanic white men.[11] When comparing the wages of all workers — including full-time, year-round, part-time, and part-year workers — gender and race wage gaps are even larger. Using this comparison, all women workers were paid 73 cents for every dollar paid to all men. All Black women workers were paid just 58 cents, Native American women were paid 50 cents, and Latinas were paid only 49 cents for every dollar paid to a white, non-Hispanic man.[12] For women of color especially, unequal pay means having far less money to cover basic necessities, and less money — or no money at all — to withstand a financial emergency, let alone an economic crisis like the one experienced during the height of the COVID-19 pandemic. Beyond immediate basic needs, unequal pay also has ripple effects for the economic security of families into the future as it negatively impacts access to credit, education, retirement savings, and other investments that help build intergenerational wealth.

Occupational segregation also contributes to wage gaps and economic insecurity. Workers of color, women, and people with disabilities continue to be concentrated in low-paid occupations because of structural barriers to entry as well as discrimination on the job.[13] For example, research shows that women who experience sexual harassment at work are more likely to leave their jobs.[14] A majority of women in male-dominated workplaces report that sexual harassment is a problem in their industry, and

[7] Office of Federal Contract Compliance Programs, *supra* note 4.
[8] *See* Brake, *supra* note 5 at 32-36 (discussing research on the social costs of reporting discrimination, in particular for "low-power or stigmatized social groups.").
[9] Glassdoor, *Diversity and Inclusion Study 2019*, *available at* https://www.glassdoor.com/blog/new-study-discrimination/ (last visited Apr. 18, 2022).
[10] *See* Kaiser Family Foundation, Demographics and the Economy, People in Poverty: Poverty Rate by Race/Ethnicity (2019), *available at* https://www.kff.org/state-category/demographics-and-the-economy/people-in-poverty/ (last visited Apr. 18, 2022).
[11] Jasmine Tucker, National Women's Law Center, Fact Sheet: The Wage Gap Robs Women of Economic Security as the Harsh Impact of COVID-19 Continues (March 2022), *available at* https://nwlc.org/wp-content/uploads/2022/03/Equal-Pay-Day-Factsheet-2022.pdf.
[12] *Id.*
[13] Marina Zhavoronkova, Matthew Brady, and Rose Khattar, Center for American Progress, *Occupational Segregation in America* (Mar. 29, 2020), https://www.americanprogress.org/article/occupational-segregation-in-america/.
[14] *See* Lauren Haumesser and Melissa Mahoney, AAUW, *Factory Flaw: The Attrition and Retention of Women in Manufacturing, available at* https://www.aauw.org/resources/research/factory-flaw/ (last visited Apr. 18, 2022).



more women in male-dominated workplaces report having personally experienced sexual harassment on the job.[15] Fear of harassment and concern for safety may also prevent women from entering these, often better-paying, industries. At the same time, occupational segregation adds to the devaluation of work largely performed by women and marginalized groups, keeping wages low and perpetuating wage gaps.[16]

## The 2020 Rule Must be Modified to Support More Effective OFCCP Enforcement

As a preliminary matter, The Leadership Conference notes that the Notice of Proposed Rulemaking that preceded the final 2020 Rule was published in the Federal Register on December 30, 2019, and provided only a 30-day comment period.[17] On January 27, 2020, The Leadership Conference, together with 31 organizations, sent a letter to Craig Leen, then the director of OFCCP, requesting that the comment period be extended by 30 days to allow the public the opportunity to provide meaningful comments on the proposal given the publication of the notice in the middle of the winter holiday season and before two federal holidays.[18] In our letter, The Leadership Conference noted that the proposed rule, which sought to set out new standards for issuing preliminary notices to contractors, was a "complex undertaking" that necessitated more time for engagement with the public. That time was not granted despite the nature of the rule.[19]

The resulting 2020 Rule weakens critical antidiscrimination protections for federal contract workers by restricting the ability of OFCCP to effectively engage federal contractors early in the compliance evaluation process once indicators of discrimination have been identified but before OFCCP determines whether violations have occurred. In addition, the requirements of the 2020 Rule may undermine OFCCP enforcement by potentially exposing working people to further discrimination or retaliation. By rescinding the inflexible enforcement standards imposed by the 2020 Rule, the proposed modifications would restore the ability of OFCCP to effectively address indicators of discrimination and ultimately strengthen OFCCP enforcement.

*The 2020 Rule Imposes Unnecessary, Burdensome Enforcement Standards on OFCCP*

Pre-enforcement review of preliminary indicators of discrimination is central to OFCCP's unique enforcement role.  The compliance evaluation process allows OFCCP to address potential discrimination quickly and proactively with contractors and identify patterns of discrimination that individual workers may be unable to uncover or challenge. To be effective, the process — which, by definition, is not an enforcement proceeding — must be nimble, within the bounds of the law.

---

[15] Kim Parker, Pew Research Center, *Women in Majority-Male Workplaces Report Higher Rates of Gender Discrimination* (Mar. 7, 2018), https://www.pewresearch.org/fact-tank/2018/03/07/women-in-majority-male-workplaces-report-higher-rates-of-gender-discrimination/.
[16] *See* Zhavoronkova et al., *supra* note 13.
[17] 84 Fed. Reg. 71875 (Dec. 30, 2019).
[18] Letter from The Leadership Conference on Civil and Human Rights et al., to Craig E. Leen, Director, Office of Federal Contract Compliance Programs, U.S. Department of Labor (Jan. 27, 2020), https://civilrights.org/resource/request-for-extended-comment-period-nprm-rin-1250-aa10/
[19] We note that the current NPRM provides only a 30-day comment period. Executive Order 13563 requires agencies to provide the public with an opportunity to participate in the regulatory process through a comment period, which should "generally be at least 60 days." 73 Fed. Reg. 3821 (Jan. 21, 2011).

April 21, 2022
Page 5 of 7



OFCCP has long construed EO 11246's nondiscrimination requirements to align with those of Title VII.[20] This well-established interpretation promotes consistency in the law and increases certainty among employers and employees, which can encourage greater compliance. The 2020 Rule, however, incorrectly and inappropriately burdens OFCCP's pre-enforcement process by imposing evidentiary standards that are not required by Title VII or OFCCP caselaw and that may create, absurdly and without justification, higher evidentiary standards for OFFCP to make out preliminary findings of discrimination than to prove a Title VII case at trial. For example, the 2020 Rule requires OFCCP, with limited exceptions, to present both "quantitative" and "qualitative" evidence of disparate treatment before it can take the initial step of issuing a Predetermination Notice — a notice setting out *preliminary indicators* of discrimination. Yet, as the Proposed Rule notes, Title VII itself does not dictate the specific forms of evidence required to make out a *prima facie* case of discrimination, let alone *require* a showing of both a particular statistical threshold of disparities coupled with qualitative evidence to justify an investigation.[21] Similarly, the 2020 Rule requires OFCCP to demonstrate "practical significance" to support either a disparate impact or disparate treatment theory of discrimination. Practical significance refers to the magnitude of the impact a disparity has on a protected group. The Proposed Rule, however, correctly notes that whether Title VII requires a showing of practical significance is unsettled as a matter of law, and there is no generally accepted understanding of what quantitative measure would even establish a finding of practical significance.[22] Given that the law is unclear with respect to practical significance, including it as a requirement in OFCCP regulations unnecessarily creates confusion and inefficiency.

The 2020 Rule undermines the purpose of OFCCP's pre-enforcement processes: to notify federal contractors that OFCCP has identified preliminary indicators of discrimination. The notice begins a multi-step process of engagement with contractors to clarify and potentially resolve compliance issues. The 2020 Rule, however, forces OFCCP to delay notice to contractors at an investigatory stage until it can present a "trial ready" case using rigid evidentiary standards that are inconsistent with federal law.

By rescinding the requirement to provide both quantitative and qualitative evidence and to demonstrate practical significance before issuing a Predetermination Notice or Notice of Violation, the Proposed Rule restores to OFCCP the flexibility that allows it to issue pre-enforcement notices based on the specific facts and circumstances discovered through the compliance evaluation. There is no requirement in applicable federal law that forces OFCCP to wait until it can prove a case of discrimination before it can engage a contractor in addressing preliminary indicators of discrimination. The 2020 Rule therefore created an inefficiency where none existed, forcing OFCCP to expend resources to make evidentiary

---

[20] *See, e.g.,* OFCCP v. Oracle America, 17-OFC-00006, 2020 WL 6779321 (U.S. Dept. of Labor Sept. 22, 2020) ("The anti-discrimination provisions of EO 11246 are interpreted through the legal analyses that have been applied to Title VII of the Civil Rights Act.").

[21] The preamble to the 2020 Rule itself acknowledges that the standards contained in the Rule are "neither compelled nor prohibited by Title VII and OFCCP caselaw." 85 Fed. Reg. at 71554. *Cf.* Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 ("[T]he facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from (a plaintiff) is not necessarily applicable in every respect to differing factual situations)." (alterations omitted) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 n.13 (1973)).

[22] 87 Fed. Reg. at 16144. *See also* Office of Federal Contract Compliance Programs, Practical Significance in EEO Analysis Frequently Asked Questions, https://www.dol.gov/agencies/ofccp/faqs/practical-significance (last visited Apr. 18, 2022) ("There is no universally accepted measure of practical significance in the EEO field.")



showings not required by law and delaying its efforts to mitigate harm to workers experiencing unlawful discrimination. The 2020 Rule also created perverse incentives for contractors who received these early notices to challenge whether OFCCP had satisfied these unnecessary evidentiary burdens — burdens that are, again, not required by law and potentially higher than what OFCCP would have to show at trial — instead of working with OFCCP to determine whether discrimination exists, and if so, how it could be eliminated.

*The 2020 Rule May Expose Working People to Additional Discrimination and Retaliation*

In addition to creating burdensome standards that undermine OFCCP's efforts to prevent and remedy workplace discrimination, the 2020 Rule risks exposing working people to additional discrimination and retaliation. The 2020 Rule requires OFCCP not only to gather a robust factual record — including qualitative, anecdotal evidence — to simply begin the preliminary enforcement process but also to disclose that information to contractors "in sufficient detail to allow contractors to investigate allegations and meaningfully respond."[23] With this level of information, even if OFCCP withheld personally identifying information, employers may be able to identify specific employees who shared their experiences of discrimination with OFCCP, who could then be subject to further discrimination or retaliation. Retaliation is already the largest source of charges filed with civil rights enforcement agencies like OFCCP and EEOC.[24] Processes that could even potentially subject employees to further victimization may chill potential claimants and witnesses from coming forward altogether. This chilling effect brought on by retaliatory conduct — especially at this stage in the process — frustrates OFCCP's enforcement efforts by making it more difficult to discover and weed out discrimination.

*OFCCP Should Maintain Portions of the 2020 Rule that Expedite Resolutions of Discrimination*

Although OFCCP should rescind the unnecessary and burdensome evidentiary standards imposed on its pre-enforcement processes by the 2020 Rule, it should retain the portion of the 2020 Rule clarifying that federal contractors can enter into a voluntary conciliation agreement — even at the earliest stages of the pre-enforcement process — to resolve violations of antidiscrimination protections.[25] The availability of early conciliation protects OFCCP resources and improves efficiency while ensuring that unlawful discrimination can be remediated expeditiously, mitigating the harm to working people as quickly as possible. Restoring the ability of OFCCP to use the pre-enforcement process more flexibly than the 2020 Rule allows could also incentivize conciliation as OFCCP would be able to put contractors on notice earlier of any preliminary indicators of discrimination. In keeping with the goal of efficient resolution, the Proposed Rule would also restore the previous practice of providing contractors 15 calendar days, instead of 30 calendar days, to respond to a Predetermination Notice, with the possibility of extension for good cause. This modification is an acknowledgment that the harm wrought by workplace discrimination — both to the workers who directly experience the harm, to the taxpayers who unwittingly support it through their tax dollars and who pay the cost of any inefficiencies caused by the failure to provide equal

---

[23] 41 C.F.R. 60-1.33(a)(4).
[24] *See* U.S. Equal Employment Opportunity Commission, *supra* note 6; Office of Federal Contract Compliance Programs, *supra* note 7.
[25] 41 CFR 60-1.33(c)-(d).

April 21, 2022
Page 7 of 7

 The Leadership Conference

opportunity — necessitates that contractors address preliminary indicators of discrimination promptly, while also allowing reasonable flexibility.

**Conclusion**

OFCCP's enforcement powers are critical to ensuring nondiscrimination, supporting legal requirements to take affirmative action, and securing proactive compliance with Executive Order 11246 and federal civil rights laws that prohibit discrimination in employment based on race, color, religion, sex, sexual orientation, gender identity, national origin, disability, or status as a protected veteran. The 2020 Rule hampers the ability of OFCCP to identify and remedy systemic discrimination, making it more difficult to address problems such hiring and pay discrimination. The Proposed Rule would rescind needless barriers to OFCPP pre-enforcement processes and restore the ability of OFCCP to effectively address preliminary indicators of discrimination at the earliest stages and provide robust protection of workers' civil rights.

Thank you for your consideration of our views. Please contact Josh Boxerman, policy analyst (boxerman@civilrights.org) and Chanel Sherrod, government affairs program manager (sherrod@civilrights.org) at The Leadership Conference, or Gaylynn Burroughs, director of workplace equality (gburroughs@nwlc.org) and Samone Ijoma, legal fellow (sijoma@nwlc.org) at the National Women's Law Center with any questions.

Sincerely,

The Leadership Conference on Civil and Human Rights
National Women's Law Center
A Better Balance
Asian Pacific American Labor Alliance, AFL-CIO
Bazelon Center for Mental Health Law
Economic Policy Institute
Equal Rights Advocates
Institute for Women's Policy Research
Lawyers' Committee for Civil Rights Under Law
League of United Latin American Citizens (LULAC)
National Employment Law Project
National Employment Lawyers Association
National Organization for Women
National Taskforce on Tradeswomen Issues
Public Citizen
Service Employees International Union

Exhibit H

May 26, 2017

Secretary Alexander Acosta
US Department of Labor
2000 Constitution Avenue, NW
Washington, D.C. 20210

John M. Mulvaney, Director
Office of Management and Budget
725 17th Street, NW
Washington, D.C. 20503

Dear Secretary Acosta and Director Mulvaney:

The undersigned organizations are writing to voice our strong opposition to the Administration's proposal to eliminate the Office of Federal Contract Compliance Programs (OFCCP), which is currently part of the Department of Labor, and transfer its functions to the Equal Employment Opportunity Commission (EEOC). This would impede the work of both the OFCCP and the EEOC as each have distinct missions and expertise, and would thereby undermine the civil rights protections that employers and workers have relied on for almost fifty years.

Whereas the EEOC seeks to remedy complaints of discrimination in employment, OFCCP more broadly oversees the employment practices of federal contractors, who are required to proactively monitor workplace diversity and pay equity, to make a meaningful effort to recruit qualified applicants from groups who are under-represented in their workplaces, and to break down barriers to equal opportunity for various disadvantaged groups, including veterans and individuals with disabilities. As a result of the different missions of the two agencies, they have developed different areas of expertise and use different enforcement approaches.

Federal contractors are appropriately held to these high standards of workplace fairness given that they are entrusted with taxpayer dollars. Transferring OFCCP's extensive knowledge of the federal procurement process and responsibility for systemic review and analysis to the already resource-strapped EEOC is likely to result in a significant net reduction in federal commitment to ensuring that federal contractors promote equal employment opportunity on the basis of race, color, national origin, sex, sexual orientation, gender identity, religion, disability or status as a protected veteran, significantly harming the countless individuals across the country for whom employment opportunities depend on these protections.

Across the board, organizations that work with these agencies, from civil and workers' rights organizations, to business groups such as the Chamber of Commerce and the Institute for Workplace Equality, have voiced their opposition to this shift in structure. There is a widespread consensus that OFCCP, as currently constituted, works for both employers and working people and performs a critical civil rights function that the EEOC is not well-suited to take on.

Briefly, here are a number of compelling reasons why the functions of OFCCP should not be transferred to EEOC.

First, eliminating OFCCP and transferring its authority to EEOC would jeopardize the uniquely important missions of each agency and weaken the federal government's ability to effectively enforce our nation's civil rights laws. OFCCP enforces rights beyond those that the EEOC enforces and its staff possesses extensive training and expertise in the procurement process that the EEOC staff does not have and would take years to develop. It protects the rights of all active duty wartime veterans, oversees affirmative responsibilities contractors have for hiring qualified individuals with disabilities, enforces explicit protections against discrimination based on sexual orientation and gender identity, and provides broad protections against retaliation for inquiring about compensation. The EEOC's authority to protect against discrimination on the basis of gender identity and sexual orientation, while well founded in case law, is the subject of ongoing litigation, which amplifies the importance of OFCCP's role in protecting lesbian, gay, bisexual and transgender (LGBT) workers from discrimination.

Next, OFCCP does not just remedy individual instances of discrimination, but rather, works with contractors to ensure that they meet higher standards of fairness and opportunity with regard to their employment practices that comes with taxpayer dollars. When companies are awarded federal contracts, they not only agree to refrain from discrimination based on protected characteristics, they agree also to take affirmative steps to promote employment opportunities for individuals who are members of certain under-represented groups. OFCCP ensures that companies use a broad set of tools to help attract and find diverse applicant pools and its regulations require federal contractors to regularly review their hiring, pay and promotion practices to promote workplace diversity and pay equity. The EEOC enforces no such proactive requirement and it lacks the expertise in the federal procurement process that is central to OFCCP's work and success.

Relatedly, OFCCP's primary mission, unlike that of the EEOC, is to undertake systemic compliance reviews to identify hiring and wage discrimination and other forms of discrimination. Through its comprehensive compliance reviews, OFCCP compares the composition of the pool of applicants for a contractor's open positions with the composition of the group who were hired, and the wages of employees of one race, sex, or national origin with those of employees of other groups. If those comparisons indicate possible unlawful discrimination, OFCCP further examines the contractor's practices and works with the contractor to eliminate any discrimination identified. By contrast, the EEOC only has the authority to investigate charges of discrimination, and in conducting its investigation of any particular charge, cannot request data about matters not raised by the charge. In particular, because applicants and employees are unlikely to know the reason they weren't hired or how their wages compare to their coworkers, EEOC pursues relatively few charges of hiring or wage discrimination.

Nor does the EEOC have the capacity to absorb OFCCP's many unique functions, harming the EEOC's ability to fulfill its existing more expansive enforcement priorities. The EEOC has an extremely heavy workload and a well-known backlog of over 70,000 open yet unresolved cases. OFCCP systemic, affirmative compliance responsibilities cover employers employing nearly a quarter of the civilian workforce. This is an extensive set of enforcement responsibilities that an already over-burdened and under-resourced EEOC, which has existing enforcement priorities that extend beyond the pool of employers OFCCP oversees, does not have the capacity to absorb,

especially in light of the draconian budget cuts contemplated by the Administration and Congress.

Finally, pursuant to longstanding working agreements, OFCCP and the EEOC already closely coordinate to avoid duplication of effort and promote efficiency between their operations.  Thus, eliminating a vital civil rights enforcement agency with a unique mission to promote proactive workplace diversity efforts and pay equity isn't about efficiency or saving money; it's about making it more difficult for federal civil rights agencies to enforce the laws that promote equal opportunity and protect working people from discrimination.

For all these reasons, we strongly oppose any efforts to eliminate OFCCP and transfer its functions to the EEOC, as it is critical to maintain these two vital and distinct agencies.  We welcome any questions you may have about this matter.  You may direct all inquiries to Emily Martin, General Counsel and Vice President for Workplace Justice at the National Women's Law Center, emartin@nwlc.org.

Thank you in advance for your attention to this matter.


Sincerely,

9to5, National Association of Working Women
A Better Balance
AFL-CIO
Alliance for Justice
American Association for Access, Equity and Diversity (AAAED)
American Association of People with Disabilities
American Association of University Women (AAUW)
American Civil Liberties Union
American Federation of State, County and Municipal Employees (AFSCME)
American Foundation for the Blind
Americans for Democratic Action (ADA)
Bazelon Center for Mental Health Law
Bend the Arc Jewish Action
Center for American Progress
Center for Community Change
Center for Law and Social Policy (CLASP)
Communications Workers of America
Demos
Disability Power & Pride, Inc.
Disability Rights Education and Defense Fund
Economic Policy Institute
Epilepsy Foundation
Equal Pay Today!
Equal Rights Advocates
Family Values @ Work
Futures Without Violence

Human Rights Campaign
Institute for Science and Human Values, Inc.
Interfaith Worker Justice
Jewish Women International (JWI)
Labor Council for Latin American Advancement (LCLAA)
Labor Project for Working Families
Lambda Legal
Lawyers' Committee for Civil Rights Under Law
The Leadership Conference on Civil and Human Rights
Legal Aid at Work
Legal Voice
Main Street Alliance
Make It Work
Minority Business Enterprise Legal Defense and Education Fund
NAACP
National Asian Pacific American Women's Forum
National Center for Law and Economic Justice
National Center for Lesbian Rights
National Center for Transgender Equality
National Council of Jewish Women
National Council of La Raza
National Council on Independent Living
National Disability Rights Network
National Domestic Workers Alliance
National Education Association
National Employment Law Project
National Employment Lawyers Association (NELA)
National Guestworker Alliance
National LGBTQ Task Force
National Organization of Nurses with Disabilities (NOND)
National Organization for Women
National Partnership for Women & Families
National Urban League
National Women's Law Center
NETWORK Lobby for Catholic Social Justice
Oxfam America
Paralyzed Veterans of America
PolicyLink
Sargent Shriver National Center on Poverty Law
Service Employees International Union (SEIU)
Taskforce on Tradeswomen's Issues
UltraViolet
United Spinal Association
The Voter Participation Center
Women Employed
Workplace Fairness

YWCA USA

Cc:    Victoria Lipnic, Acting Chair
        Equal Employment Opportunity Commission

Exhibit I

Here's where things stand with federal student loan forgiveness : NPR



Play Live Radio



MY PLAYLIST

 DONATE

EDUCATION

# 6 things borrowers should know about federal student loans right now

MARCH 31, 2025 · 5:00 AM ET

HEARD ON ALL THINGS CONSIDERED

Cory Turner

**3-Minute Listen**                    PLAYLIST    TRANSCRIPT



Eight million federal student loan borrowers are waiting for the courts to decide if their repayment plan is legal, while another 9 million are late on their payments and may be plunging toward default.

*Illustration by Annelise Capossela for NPR*

The federal student loan system is a mess right now.

"Unprecedented uncertainty," says Beth Akers, a higher education researcher at the conservative-leaning American Enterprise Institute (AEI).

"Total disarray," says Michele Zampini with the left-leaning Institute for College Access and Success.



**EDUCATION**

**The Education Department is being cut in half. Here's what's being lost**

They're talking about the fact that 8 million federal student loan borrowers are waiting for the courts to decide if their repayment plan is legal at the same time another 9 million are late on their payments and may be plunging toward default. All while the federal office that oversees student loans has been cut in half and may be moving to a different federal agency.

NPR has spent the past few weeks catching up with student loan experts and asking the Trump administration for clarity on some of borrowers' biggest questions.

**Sponsor Message**

Here are six takeaways from our effort to clear up some of their confusion.

## 1. 9 million borrowers may be heading for default

When the U.S. Department of Education paused federal student loan payments at the beginning of the COVID-19 pandemic, it paused the threat of default too. And the era of leniency that followed lasted so long — nearly the entire Biden administration — that many borrowers are now being caught off-guard by the loan system's slow return to business-as-usual.



**EDUCATION**

**Trump says Education Department will no longer oversee student loans, 'special needs'**

On Oct. 1, 2024, the system's master clock resumed its telltale ticking toward default for millions of borrowers who fail to make their required payments.

When a borrower goes more than 90 days without a payment, a cascade of consequences kicks in, beginning with reporting that delinquency to the national credit bureaus. Weakened credit can make it harder to do all sorts of things, including buy a car or rent a place to live.

It gets worse. After 270 days without making a payment, a borrower is considered in default, which means wages and tax refunds can be seized by the U.S. government.

Translation: Borrowers who don't pay up front still end up paying.

According to internal department data obtained by NPR, as of March 7, 4.2 million borrowers were more than 90 days late on their payments. And nearly 5 million borrowers were between one and 90 days late.

**Sponsor Message**

4/29/25, 7:22 PM
Here's what borrowers stand to lose with federal student loan forgiveness cut...

Case 3:25-cv-03698-SI    Document 37-26    Filed 05/01/25    Page 64 of 84

That's more than 1 in 5 of the country's roughly 43 million borrowers potentially on their way to default.

"I think we're absolutely going to see an explosion of delinquency and defaults," says Wil Del Pilar of the left-leaning EdTrust.

Scott Buchanan is the executive director of the Student Loan Servicing Alliance, which represents the companies that manage student loans for the federal government. He says many borrowers would have gone into default over the past four years but were saved by the pandemic safety net. Now, "that wave is hitting the shores all at once."

Buchanan points out that the law requires servicers to warn borrowers — repeatedly — before they plunge into default. He has a simple message: Do not ignore these warnings.

If your phone rings and the Caller ID says it's your loan servicer, Buchanan says, "We're not trying to upsell you on anything. We have no product to offer. When you see us calling, it's probably because there's a problem. You need to answer."

You might be on the verge of default and not even know it.

NPR sent the department a list of more than 10 questions related to this article, including asking it to confirm its delinquency numbers. The department responded to one question — about why borrowers haven't been able to enroll in income-driven repayment plans (see takeaway No. 3).

## 2. The SAVE repayment plan is as good as dead

4/29/25, 7:22 PM
Case 3:25-cv-03698-SI    Document 37-26    Filed 05/01/25    Page 65 of 84
Here's where things stand with federal student loan forgiveness : NPR

Former President Joe Biden's Saving on a Valuable Education (SAVE) repayment plan was so generous with its payment terms and promise of forgiveness that federal courts are currently debating whether it's even legal. Before the courts put SAVE on hold, 8 million people had enrolled.

Now, these SAVE borrowers who are in legal limbo don't have to make monthly payments. But if you're a borrower hoping for someone to save SAVE, it's time for your Plan B.

**Sponsor Message**

"There isn't going to be a SAVE plan," says Jason Delisle, a nonpartisan higher education researcher with the Urban Institute. "It's either going down under legislation or it's going down by the judge's ruling."



**POLITICS**

**Reconciliation is the key to unlocking Trump's agenda. Here's how it works**

Delisle and other experts tell NPR that congressional Republicans would benefit from the courts *not* killing SAVE because they want to kill it themselves, as part of their budget reconciliation bill. If they can use that bill to end SAVE, AEI's Akers says they can use the savings to help pay for an extension of the Trump tax cuts. If the courts end SAVE first, Republicans' legislative savings evaporate.

### 3. Income-driven repayment plans are finally back open

4/29/25, 7:22 PM
Case 3:25-cv-03698-SI   Document 37-26   Filed 05/01/25   Page 66 of 84
Here's what things stand with federal student loan forgiveness : NPR

The judge's order freezing the SAVE plan has raised legal questions about the department's other income-driven repayment plans: Pay As You Earn (PAYE) and Income-Contingent Repayment (ICR).

The online form to enroll in these plans was removed from the Education Department's website more than a month ago, which means borrowers haven't been able to enroll in them.

Without access to any of the department's income-driven plans, "essentially, the system has frozen in time," says Zampini with the Institute for College Access and Success.

In a Wednesday statement, the department told NPR: "The Department is working to ensure these [IDR] programs conform with the 8th Circuit's ruling."

The online form was restored soon after on Wednesday.

The monthlong lapse caused headaches for borrowers who were already in an income-driven plan and had been asked to recertify their income, which they couldn't do while the enrollment form was down. This led to horror stories of rising monthly payments.

One borrower in Austin, Texas, told member station KUT that she saw her monthly payments more than quadruple because she couldn't recertify her income.

Scott Buchanan, with the Student Loan Servicing Alliance, says there's nothing nefarious behind the Trump administration's freeze.

---

**Sponsor Message**

4/29/25, 7:22 PM
Case 3:25-cv-03698-SI   Document 37-26   Filed 05/01/25   Page 67 of 84
Here's where things stand with federal student loan forgiveness : NPR

"Biden took [the enrollment form] down [too]. And again, not because of some malintent on the policy. It's just a practical issue." The form needed to be changed because of the court ruling and that takes time, Buchanan says.

## 4. Public Service Loan Forgiveness remains unchanged for now

The Public Service Loan Forgiveness Program (PSLF), which promises student loan forgiveness for any borrower who works 10 years in public service, was created by an act of Congress and only an act of Congress can shut it down.

The Trump administration recently issued an executive action calling for restrictions on who qualifies for PSLF. The plan is to exclude borrowers who work for organizations "that engage in activities that have a substantial illegal purpose," including:

Violating federal immigration law; "supporting terrorism"; "the trafficking of children to so-called transgender sanctuary States for purposes of emancipation from their lawful parents"; "engaging in a pattern of aiding and abetting illegal discrimination"; or violating state laws against "trespassing, disorderly conduct, public nuisance, vandalism, and obstruction of highways."

Many Republicans argue that the Biden administration went too far in expanding who qualifies for PSLF and that the Trump administration is justified in imposing limits. These changes cannot be implemented immediately, though, and will need to go through a rulemaking process.

In the meantime, the Federal Student Aid website makes clear, "There are no changes to PSLF currently, and borrowers do not need to take any action."

Borrowers in the SAVE legal limbo should know that the months they're spending in an administrative forbearance, not making payments, will not count toward PSLF.

## 5. There's likely more confusion ahead

The amount of complexity in the loan program right now, given the legal battles and change in administrations, has made the program even harder for borrowers to understand, says Urban Institute's Delisle. "I mean, it's hard for *me* to understand what's happening."

---

**Sponsor Message**

---

And AEI's Akers says "there's just this sort of overload of information that these changes are happening and maybe no specific sense of how it's going to affect [borrowers]."

Soon, it may be even harder for borrowers to get their questions answered.

The office of Federal Student Aid, or FSA, which oversees the entire federal student loan portfolio, has been cut in half by recent Trump administration efforts to shrink the government. The experts NPR spoke with generally agreed those cuts will eventually complicate borrowers' lives.

According to recent internal FSA data obtained by NPR — data that was also shared with select members of Congress — the five major loan servicers have been

Case 3:25-cv-03698-SI    Document 37-26    Filed 05/01/25    Page 69 of 84

doing a pretty good job over the past year of answering their phones when borrowers have questions — with one exception.

MOHELA took an average of 2 hours and 24 minutes to answer borrowers' calls. The other four servicers all averaged answer times under 6 minutes. Not surprisingly, just over half of borrowers who called MOHELA with questions gave up before getting through.

In a statement, a MOHELA spokesperson explained that the servicer's complex portfolio "has disproportionately more borrowers working toward Public Service Loan Forgiveness, more borrowers are on the SAVE repayment plan, as well as other income-driven repayment plans, and more borrowers are in repayment." And that, MOHELA says, means more *questions*.

"Further, [this data] represents a small snapshot in time, and MOHELA has a long track record of providing excellent customer service," the statement says.

Buchanan, of the Student Loan Servicing Alliance, points out that FSA was also flat-funded in the recent short-term funding bill and says Congress will need to send FSA more money if it doesn't want service to get worse across the board.

Zampini, of the Institute for College Access and Success, is more direct: "The system cannot hold. The system will not function properly and borrowers will pay the price."

---

**Sponsor Message**

## 6. With student loans potentially moving agencies, borrowers need to be their own advocates

Trump recently made the surprise announcement that the student loan program would move "immediately" to the U.S. Small Business Administration (SBA) — one day after the White House press secretary assured reporters the loan program would stay at the Education Department.

The SBA has also said it plans to cut its workforce by more than 40%.

When asked for clarity, the SBA press office told NPR:

"The SBA is working closely with the White House, Department of Education, and Congress to finalize a plan for the strategic transfer of responsibilities related to the student loan program."

The "and Congress" there is key because the Education Department's role in administering the student loan program is baked into law, and only Congress can unbake it.

The point here is, the office responsible for managing the $1.6 trillion student loan portfolio on behalf of roughly 43 million borrowers has lost half its staff, been flat-funded and is being told they may need to pull up stakes and, at no additional cost, move the program to the SBA.

Our experts say every borrower needs to be their own expert and advocate. Get reacquainted with your loans. Spend time at FSA's website or elsewhere, researching your options.

Clarity from the department and its servicers may soon be at a premium. But know this:

The age of leniency is over. The default clock is ticking.

u.s. education department    higher education    trump's presidential transition    student loans

public service loan forgiveness

Exhibit J

CityLab | Housing

# Cuts to Section 8 Housing Assistance Loom Amid HUD Uncertainty

The Housing Choice Voucher program, a rent lifeline for low-income families, faces a funding shortfall as
federal housing agency.



The US Department of Housing and Urban Development (HUD) headquarters in Washington, DC, US, on
Monday, Feb. 24, 2025.  *Photographer: Al Drago/Bloomberg*

By Patrick Sisson
February 27, 2025 at 5:00 AM PST

**✦ Takeaways**  NEW

| | | |
|---|---|---|
| The Housing Choice Voucher program, which provides rental assistance to 2.3 million low-income households, faces uncertainty due to proposed workforce cuts at HUD and funding discussions on Capitol Hill. | The program needs an estimated $4.3 billion increase to maintain current service levels, but the House version of the spending bill only allocates $32.8 billion, and the Senate approved a $2.9 billion increase last year, which would still result in a net loss of vouchers. | The funding uncertainty and potential government shutdo could lead to a shortfall in voucher funding, causing thousands of households to lose assistance, and exacerbating homelessness and instability for low-incom families. |
| Summary by Bloomberg AI | Summary by Bloomberg AI | Summary by Bloomberg AI |

For Americans who rely on so-called Section 8 housing choice vouchers, the first weeks of the se
administration have brought a whirlwind of uncertainty.

The 50-year-old Housing Choice Voucher program is the federal government's largest form of as
income families. Administered by the US Department of Housing and Urban Development, it pro
assistance for some 2.3 million qualified households annually. The program is not an entitlemen
quarter of the households who qualify can access the vouchers. Many spend significant time on
program has struggled to keep up with skyrocketing rents.

---

## Bloomberg CityLab

**A $6 Billion Shortfall Has US Mass Transit Facing a Death Spiral**

**NJ Transit Urges Commuters to Work Remotely If Union Strikes**

**NYC Lost $9 Billion of Income to Miami, Palm Beach in Five Years**

**Ikea Backs Traffic-Free Oxford Street to Serve New London Store**

Now voucher users and their housing providers are facing fresh challenges, in the form of propo
at HUD and important discussions on Capitol Hill that stand to slash the number of people who
8 assistance.

Congress, still mired in the appropriations process, set aside $32.8 billion for the program in the
the spending bill that passed during the last Congress, which would increase funding for Housin
by $115 million. That may sound positive, but according to the Center on Budget and Policy Prio
program would need an estimated $4.3 billion increase just to maintain the same levels of servic
rising cost of living and increase in rental burdens across the US.

The Senate approved a $2.9 billion increase in the program last year, when the chamber was in
control. It's an improvement – but still a net loss in vouchers, with 62,000 fewer households rec

Complicating the budget battles underway is the prospect of a government shutdown if the two
can't agree on a plan, which many see as likely. It's not certain how these different funding level
a bill to keep the government open that needs to pass by March 14. There's also a proposal unde
a one-year continuing resolution and maintain current stopgap funding levels – which would me
funding than the House budget.

"There's a very realistic possibility of a shortfall," said National Low Income Housing Coalition p
manager Kim Johnson. She said she's been discussing potential cuts with staff and congressional
any breakthroughs.

Historically, the budget process ends with 100% of the needed funding for housing vouchers, sai
general counsel for the National Association of Housing and Redevelopment Officials (NAHRO),
organization for affordable housing providers. Advocacy groups and HUD send lawmakers upda
numbers suggesting how much additional funding needs to be added to the previous year's bud
budget gets approved, that would just meet 90% of the need, and an estimated 283,000 househo
eventually lose voucher access, according to CBPP. In a statement, the progressive think tank ca
severe funding shortfall in the history of the voucher program."

"If you receive federal assistance, that's really scary," said Deborah Thrope, deputy director of th
organization National Housing Law Project. "There's a lot of fear right now among federally assi
HUD tenants that the rent is not going to get paid."

Local housing authorities also have concerns about HUD's ability to administer the voucher prog
administration is looking to make deep job cuts at the housing agency, which is losing experienc
appointees start. (HUD did not return requests for comment.)

CBPP and others have said the current touch-and-go situation has already caused damage. Some
administer vouchers have stopped giving out new vouchers, for example. A shutdown would lik
of many housing agencies, which even in the best of times can only last about a month without r

**Read more:** Shelters Await Billions in Federal Money for Homelessness Providers

The thousands of local housing authorities that administer the housing vouchers have already be
constrained budgets, because the current continuing resolution funding the federal government
cost-of-living increase, said Thorpe. So it's likely fewer have healthy reserves. And paying rent w
priority of these groups, so any budget impasse will mean they'll be forced to curtail the suppor
for tenants. In the worst case, housing authorities would need to hold back vouchers that have a
assigned to households.

"We are closely monitoring the federal budget process and its potential impact on critical housin
Natasha Kersey, deputy press secretary of the New York City Department of Housing Preservatio
Development, which oversees tens of thousands of vouchers.

Preston Prince, executive director of the Santa Clara County Housing Authority, is looking at mu
for what happens next month, since they simply don't know what to expect. The authority admi
20,000 vouchers in San Jose – a monthly payment of about $45 million. They have reserves, but
or a shutdown could be "draconian."

"What this does to us is just put us in a constant state of chaos, not knowing what to say to our f
say to our landlords," he said.



Enter your email

By continuing, I agree to the Privacy Policy and Terms of Service.

Will Fischer, CBPP's director of housing policy, warns that cutting a large number of vouchers w
aggravate levels of homelessness, which reached an all-time high of 770,000 according to HUD's
in-time count in January. In addition, voucher cuts will hit the network of landlords participating
program, who rely on regular government rent payments to cover their mortgages and stay afloa

"We have the resources in this country for everybody to afford a good quality, stable home," said
proposals that we're seeing from the administration and Republicans in Congress are cutting bac
assistance."

As the budget negotiations and impasse continue, it's unclear what views new leadership at HUI
voucher program. NLIHC's Johnson said new HUD Secretary Scott Turner didn't bring up vouch
confirmation hearing, but many of the new appointees have been supportive of adding work rec
other standards to the voucher program.

According to Fischer of the CBPP, this uncertainty could help catalyze nascent state and municip
provide more housing support. But there's no way local funding can come close to meeting fede
added.

"We've had continuing resolutions before, but the talk now of cuts of significance to safety net p
been part of the social fabric – albeit grossly unfunded – threatens the very livelihood of Americ
country," said Jennifer Loving, chair of the Santa Clara Housing Authority in the Bay Area. "It di
safety net was under attack."

How easy or hard was it to use Bloomberg.com today?

**Share feedback** ↗

©2025 Bloomberg L.P. All Rights Reserved.

Exhibit K

# *White House Eyes Overhaul of Federal Housing Aid to the Poor*

The Trump administration has considered sharply curtailing vouchers as part of its budget for the 2026 fiscal year.

 ▶ **Listen to this article · 7:13 min**  Learn more

 **By Tony Romm**
Reporting from Washington

April 17, 2025

The White House is considering deep cuts to federal housing programs, including a sweeping overhaul of aid to low-income families, in a reconfiguration that could jeopardize millions of Americans' continued access to rental assistance funds.

The potential changes primarily concern federal housing vouchers, including those more commonly known as Section 8. The aid generally helps the poorest tenants cover the monthly costs of apartments, town homes and single-family residences.

Administration officials recently discussed cutting or canceling out the vouchers and other rental assistance programs and potentially replacing them with a more limited system of housing grants, perhaps sent to states, according to three people familiar with the matter, who spoke on the condition of anonymity to describe the confidential discussions. The overhaul would be included in President Trump's new budget, which is expected to be sent to Capitol Hill in the coming weeks.

The exact design and cost of the retooled program is unclear, and any such change is likely to require approval from Congress, as White House budgets on their own do not carry the force of law.



But people familiar with the administration's thinking said the expected overhaul would most likely amount to more than just a technical change, resulting in fewer federal dollars for low-income families on top of additional cuts planned for the rest of the Department of Housing and Urban Development. On Thursday, the Trump administration took the first steps toward potentially selling the agency's headquarters in Washington.

Federal voucher programs currently provide assistance to about 2.3 million low-income families, according to the government's estimates, who enroll through their local public-housing authorities. The aid is part of a broader universe of rental assistance programs that are set to exceed $54 billion this fiscal year. But the annual demand for these subsidies is far greater than the available funds, creating a sizable wait list as rents are rising nationally.

---

**What you should know.** The Times makes a careful decision any time it uses an anonymous source. The information the source supplies must be newsworthy and give readers genuine insight.

Learn more about our process.

---

"If there were a cut to the voucher program, essentially, you would see a decrease to the number of families that are served by the program," said Eric Oberdorfer, the director of policy and legislative affairs at the National Association of Housing and Redevelopment Officials, an advocacy group.

At the moment, he added, only one in four families eligible for vouchers are able to obtain them because of funding constraints. A federal cut would put public-housing agencies in a position in which "they would need to make difficult decisions" and in some cases stop providing benefits, Mr. Oberdorfer said.

Rachel Cauley, a spokeswoman for the White House budget office, said in a statement that "no final funding decisions have been made."

Russell Vought, the director of the Office of Management and Budget, previously endorsed an end to the federal voucher program. He wrote in 2022 that the Section 8 program in particular "brings with it crime, decreased property values, and results in dependency and subsidized irresponsibility."

A spokeswoman for the Department of Housing and Urban Development declined to comment on the budget. Appearing on Capitol Hill earlier this year, Scott Turner, the housing secretary, told senators that he believed the goal of the voucher program was to "get people into self sustainability," not "a lifetime on subsidies."

The expected cuts to rental assistance reflect Mr. Trump's broader desire to shrink the footprint of government and its reach into Americans' lives, a project that includes sharp reductions to federal antipoverty programs viewed as too generous or wasteful.

The aggressive campaign has already resulted in the president and his top aides — including the tech billionaire Elon Musk — shuttering entire agencies, freezing billions of dollars and dismissing thousands of civil employees, moves that have enraged Democrats and led to a series of court challenges.

The full scope of Mr. Trump's vision stands to become clearer once he submits his budget to Congress this spring, reflecting his priorities for the 2026 fiscal year, which begins Oct. 1. The proposal is expected to guide Republican lawmakers as they look for ways to pay for the party's costly ambitions to reduce taxes on people and corporations.

Many agencies, including the Department of Housing and Urban Development, could lose funds ranging into the billions of dollars, according to those familiar with the White House blueprint, who cautioned that it remained unfinished.

The cuts to housing programs come in addition to an exodus of the agency's work force. As of last week, about 2,300 employees opted to accept an offer for "deferred resignation" and leave their jobs, according to two people familiar with the matter.

Agency workers had until Friday to decide whether to take the offer, the second they have received, rather than risk being fired by the Trump administration. The department later confirmed the details of the departures, cautioning that they had not been finalized.

The White House also plans to dismantle a key office in the housing agency that helps communities recover from deadly natural disasters, a move that could slow much-needed emergency aid. Separately, Mr. Trump issued an executive order last month eliminating a decades-old, governmentwide commission meant to coordinate the federal response to homelessness.

A potential overhaul of the housing agency comes on the heels of a congressional deal to fund the government through September that increased some housing spending yet did not keep pace with rising rents and the growing demand for federal aid. The funding gap could result in about 32,000 voucher recipients soon losing access to federal housing aid, according to Democrats' estimates, on top of additional cuts once funding runs out in a pandemic-era program that expanded voucher availability.

Many of the foundational changes the White House contemplates for the housing department are consistent with cuts that the president and Mr. Vought, his returning budget chief, previously endorsed. In the final budget of Mr. Trump's first term, the two men proposed a roughly $8.6 billion reduction at the housing agency, though they did not propose to eliminate vouchers entirely.

Years after leaving government, though, Mr. Vought specifically proposed a full end to the Section 8 voucher program. At his conservative nonprofit, the Center for Renewing America, Mr. Vought in 2022 called vouchers supplied to low-income tenants a "hook for implementing the left's fair housing agenda," faulting the government for focusing on racial equity.

Mr. Vought previously served as a key author of Project 2025, a conservative blueprint for the Trump presidency, which similarly endorsed a sweeping overhaul to federal housing spending. Ben Carson, who led the Department of Housing and Urban Development during Mr. Trump's first term, wrote in a chapter about the

agency that it needed to explore significant reforms to the voucher program, such as work requirements on recipients and limits to how long they could collect housing aid.

**Tony Romm** is a reporter covering economic policy and the Trump administration for The Times, based in Washington.

A version of this article appears in print on , Section A, Page 18 of the New York edition with the headline: White House Weighs Steep Cuts to Housing Vouchers for Poor Families

Exhibit L

Case 3:25-cv-03698-SI   Document 37-26   Filed 05/01/25   Page 82 of 84

CityLab | Housing

## Trump Administration Plans to Eliminate Dozens of Housing Offices

A looming reorganization of HUD would leave 34 states without offices that process mortgage insurance,
requiring offices in every state.



The US Department of Housing and Urban Development (HUD) headquarters in Washington, DC. *Photographer:
Al Drago/Bloomberg*

By Kriston Capps
March 5, 2025 at 12:03 PM PST

✦⋮ Takeaways  NEW

| The US Department of Housing and Urban Development plans to close dozens of field offices across the US, potentially violating current federal law. | The closures would leave most states without sites or staff to underwrite mortgages, and could affect the agency's ability to process mortgage insurance for single-family homes, affordable apartment buildings, and more. | The plan would close all fie[...] offices in 34 states plus the[...] District of Columbia, and lea[...] only six field offices open, w[...] regional offices remaining in[...] seven cities. |
|---|---|---|
| Summary by Bloomberg AI | Summary by Bloomberg AI | Summary by Bloomberg AI |

The US Department of Housing and Urban Development plans to close dozens of field offices acr[...]
most states without sites or staff to underwrite mortgages and potentially violating current feder[...]
to staff at the department as well as a union that represents federal workers.

Federal law requires the agency to maintain at least one field office in every state in order to pro[...]
for mortgage insurance. It's one of HUD's most important functions: Each year a division known [...]
Housing Administration underwrites mortgage insurance for hundreds of thousands of buyers, g[...]
of dollars annually for the Treasury.

### Bloomberg CityLab

**A $6 Billion Shortfall Has US Mass Transit Facing a Death Spiral**

**NJ Transit Urges Commuters to Work Remotely If Union Strikes**

**NYC Lost $9 Billion of Income to Miami, Palm Beach in Five Years**

**Ikea Backs Traffic-Free Oxford Street to Serve New London Store**

"They're required to have a field office in every state," says Antonio Gaines, president of the Am of Government Employees (AFGE) National Council 222, which represents some 5,300 employee decide not to do that, they're supposed to ask for a waiver. They're supposed to go to Congress.'

The Trump administration's plans to close all field offices in 34 states plus the District of Columb efforts to <u>slash headcount at the FHA</u>, raise questions about the agency's ability to process mort single-family homes, affordable apartment buildings, hospitals and nursing facilities, and more, staffers, who did not want to use their names for fear of retaliation.

"No decisions have been finalized, however the department is exploring consolidation while cor prioritize service," said a HUD spokesperson.

Two staffers at HUD say the agency is expected to close its regional hub in Seattle, which would Idaho, Oregon and Washington – without any local presence. Of the department's 65 local bran offices would remain open, the staffers said.

Gaines says he was told by managers at the federal agency about the offices to be closed. He add Francisco regional office was on the chopping block as well, which would reduce the number of hubs from 10 to eight and leave California with only one office to facilitate federal housing progr state.

One HUD employee at the field office in Columbus, Ohio, said that they received notice they will the Chicago regional office because the office closures would leave Ohio without any field offices

Staffers at HUD fear that the office closures mean they'll either be asked to relocate to a differen terminated altogether. As with prior decisions involving the Department of Government Efficien terminating staff, Gaines said, HUD has not given AFGE formal notice about its plans to shutters reassign or fire staff.

Under the law, HUD must maintain at least one office in every state "in order to ensure the adeq applications for insurance of loans and mortgages." Closing a field office won't necessarily interr borrowers or lenders in affected states. But a major disruption to local offices or federal staffers capacity of the FHA and other federal housing agencies to do business.

Underwriting loans is just one of the functions of regional and field offices. Dan Burke, former H multifamily for the Midwest region, says that his office assists landlords, tenants and municipalit privately owned and publicly assisted properties. His former portfolio at the Chicago office inclu HUD-insured and HUD-assisted properties across six states, a large proportion of which are for t said.

"Each of the offices has a production staff that know their local markets, that ensure loans withi loss of the insurance function will adversely impact the supply of affordable housing," Burke say mortgage capital to flow to construct housing."

Local governments work with field offices when they need attention from HUD. These offices als housing claims and other issues. "There will be a real loss of people who can handle fair housin Shamus Roller, executive director of the nonprofit National Housing Law Project.

Some HUD offices represent nodes for specialized work that isn't done at other locations. For ex office in Tulsa, Oklahoma – one of the many slated to be shut down – employs key staff for the F Conversion Mortgage program, which processes reverse mortgages. If Tulsa staff are offered the the nearest office is nearly five hours away, in Fort Worth.

"There is no evidence of an overarching strategic plan or any clarity or transparency about the c eliminate staff positions or field and regional offices," says Julia Gordon, former assistant secreta FHA commissioner.

Another underlined federal law states that the reorganization of any regional or field office at HUD can only after the government has released a cost-benefit analysis of closing the office, including a study the local economy. No such analysis has been published in the *Federal Register* since President D into office.

"This process is unprecedented, ignoring statutory requirements and contractual obligations ea signed with union partners," Gaines says. "They're refusing to adhere to any norm or process an reined in."

Under the plan, regional offices would remain open in Atlanta, Boston, Chicago, Denver, Fort We Philadelphia as well as Kansas City, Kansas. Field office closures would leave Arizona, Michigan, states plus the District of Columbia without any local HUD office.

The six field offices that would be left open are those in Anchorage, Alaska; Greensboro, North C Jacksonville, Florida; Los Angeles; and San Juan, Puerto Rico.

How easy or hard was it to use Bloomberg.com today?

**Share feedback** ⧉

©2025 Bloomberg L.P. All Rights Reserved.