Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
dleonard@altber.com
bchisholm@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs*

[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 3:25-cv-03698-SI |
| Plaintiffs, | **DECLARATION OF NINA E. OLSON** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

1

**DECLARATION OF NINA E. OLSON**

2    I, Nina E. Olson, affirm:

3       1. I am the Executive Director of the Center for Taxpayer Rights (the "Center"). I have

4           served in that position since August 1, 2019.  I make this statement based on personal

5           knowledge and if called as a witness could and would testify competently thereto.

6       2. I served as the National Taxpayer Advocate of the United States from March 2001 to July

7           2019. The Office of the National Taxpayer Advocate (known as "TAS") is a

8           congressionally-mandated independent governmental organization within the Internal

9           Revenue Service ("IRS") dedicated to helping taxpayers resolve their problems with the

10          IRS. The office also makes administrative and legislative recommendations to mitigate

11          taxpayer issues systemically. *See* 26 U.S.C. § 7803(c). It helps taxpayers who are

12          experiencing "significant hardship" because of what the IRS was doing, about to do, or not

        doing. *See* 26 CFR 301.7811-1(a)(4)(ii) (defining "significant hardship").

13

   3. Earlier in my career, I founded and directed the first independent Low-Income Taxpayer

14          Clinic in the U.S. and maintained a private legal practice where I represented taxpayers in

15          disputes with the IRS.

16

**Center for Taxpayer Rights: Mission, Functions, and Clients**

17

18      4. The Center for Taxpayer Rights is a nonpartisan nonprofit organization dedicated to

        furthering taxpayers' awareness of and access to taxpayer rights. We accomplish our

19          mission, in part, by educating the public and government officials about the role taxpayer

20          rights play in promoting compliance and trust in systems of taxation. We also provide

21          technical support for the establishment and expansion of taxpayer advocate and ombuds

22          offices as independent voices of taxpayer rights and systemic change.

23

24

25

Declaration of Nina E. Olson

5. The Center develops materials to educate the public about the function of taxes and taxpayer rights in civil society. The organization also develops training programs for tax administration officials as a component of leadership training, focusing on tax procedure and tax administration principles, taxpayer rights, and tax compliance research, with examples and instructors from around the world.

6. The Center for Taxpayer Rights brings its expertise to bear by commenting on proposed regulations, publishing public communications, and participating in conferences. Specifically, the organization submits comments on proposed U.S. Treasury regulations raising significant issues pertaining to taxpayer rights and the Taxpayer Bill of Rights. It publishes a newsletter called the "Taxpayer Rights Digest" which shares information about developments and events relating to taxpayer rights around the world. And the organization organizes and participates in—and has hosted—the annual International Conference on Taxpayer Rights. The conference connects experts from diverse disciplines including government, law, economics, psychology, anthropology, and sociology, to explore how taxpayer rights globally serve as a foundation for effective tax administration and better compliance with tax laws.

7. The Center operates LITC Connect, a nationwide network of Low-Income Taxpayer Clinics (LITCs) and volunteer attorneys, certified public accountants, and enrolled agents, that promotes access to justice for low-income taxpayers and ensures a fair and just tax system for all. The Center serves members of the LITC Connect network by matching LITCs with tax professionals who can provide pro-bono representation to low-income taxpayers and provide support and expertise for specific issues. The Center, through LITC Connect, provides training when needed to LITC staff and tax professionals supporting LITCs in serving low-income taxpayers and hosts weekly calls with LITCs who are LITC Connect members. It also carries professional liability coverage for the professionals serving the LITCs that support. Around two-thirds of all federally-funded LITCs in the

Declaration of Nina E. Olson

country are members of LITC connect. In 2023, LITCs, most of whom are members of

LITC Connect and the weekly calls, represented nearly 20,000 taxpayers nationwide,

educated over 140,000 taxpayers and service providers about their rights and

responsibilities before the IRS, secured over $10 million in tax refunds, and decreased or

corrected over $41 million in tax liabilities. *See* IRS.gov*, Low Income Taxpayer Clinics*

(last accessed: April 26, 2025), available at: https://www.taxpayeradvocate.irs.gov/about-

us/low-income-taxpayer-clinics-litc/.

8.   The Center also represents clients through its Low-Income Taxpayer Clinic (the "Center's

LITC"). *See* 26 U.S.C. § 7526. As an LITC, the organization provides free representation

to low-income taxpayers in disputes with the IRS and in the federal courts.

9.   All of the clients of the Center's LITC are low-income taxpayers. In addition, many of the

clients of the Center's LITC are either survivors of domestic violence or speak English as a

second language. Both of these populations often face extra barriers to being able to

independently resolve issues with the IRS.

**The IRS Cannot Function Properly at the Anticipated Low Staffing Levels.**

10. I am aware of reporting that the government plans to cut 40% of IRS staff, with a specific

focus on reducing Taxpayer Services. Taxpayer Services also includes a function known as

the Return Integrity and Compliance Services, which identifies and audits identity theft

and refundable credit returns. I have reviewed news stories saying that the IRS plans to

initiate these cuts in two phases, the first of which will target the IRS Taxpayer Experience

Office, Office of Transformation Strategy, Online Services, and the Office of Civil Rights

and Compliance. Staff at the Office of Civil Rights and Compliance has already been cut

by at least 75%. I have read that the second phase will see the consolidation of some of

these offices and more staffing reductions. Overall, I understand that the IRS plans to cut

Declaration of Nina E. Olson

enforcement staff by 50% or more. Additionally, I have read that the IRS is planning to close more than 110 offices with Taxpayer Assistance Centers, which serve as walk-in clinics for taxpayers seeking assistance. These cuts, particularly in combination, will devastate the IRS's ability to accomplish its core functions and would directly harm taxpayers, including the Center, its LITC Connect members, and its clients.

11. From my time at the IRS and working outside the agency as a taxpayer advocate, I know that periods of dramatic IRS understaffing, including government shutdowns and COVID-19 pandemic-related shortages, have resulted in direct harm to many taxpayers. The impact on low-income taxpayers can be especially acute. However, the impact of those periods of understaffing pale in comparison to the currently contemplated staffing cuts. Reduced staffing levels due to the pandemic and government shutdowns were intended as temporary measures. Harm to taxpayers will be far more dramatic if these staffing cuts are effectuated and become permanent.

12. Staff members in Taxpayer Services are the ones who answer phone calls from taxpayers and who open written correspondence from taxpayers. I witnessed how, during periods of low staffing due to the 2013 shutdown, the 2018 shutdown, and the COVID-19 pandemic, the inability of the IRS to promptly respond to calls or correspondence from taxpayers harmed them.

13. For example, during the 2013 government shutdown, many Taxpayer Services and enforcement employees were furloughed. A 2014 report I wrote shows that from October 1 to 16, 2013, taxpayers faced the following harms when they were unable to reach the IRS because there were no employees available to answer the phone: 1) 3,902 levies on Social Security benefits; 2) 5,455 levies on financial or other taxpayer accounts; 3) 7,025 wage levies; and 4) 4,099 Notices of Federal Tax Liens filed. *See* National Taxpayer Advocate FY 2015 Objectives - Report to Congress, 85 (June 30, 2014).

Declaration of Nina E. Olson

14. Notice of levies (a legal seizure of your property to satisfy a tax debt) and lien filings (a legal claim against property to secure payment of the tax debt) are sent through automated IRS systems. Taxpayers therefore rely on Taxpayer Services and enforcement employees to resolve disputes with their accounts and correct any automated errors. If these collection actions—which all occurred during a 17-day period—were left unresolved, the result would have been significant and economic hardship for taxpayers, particularly low-income taxpayers.

15. If the IRS cuts Taxpayer Services and enforcement personnel by 25 to 40%, taxpayers in 2025 would similarly struggle to reach IRS employees because there would not be sufficient staff to answer the phone lines. This would make it more difficult for taxpayers to resolve issues with their accounts, leaving them to face harsh financial penalties.

16. During the COVID-19 pandemic, there were tractor trailers full of mail waiting to be opened by IRS staff. *See* Katie Lobosco, *The IRS is holding mail in trailers amid the pandemic*, CNN (Apr. 20, 2020), available at: https://www.cnn.com/2020/04/20/politics/irs-mail-trailers-covid/index.html. It took the agency around two years to address the backlog of written correspondence after the initial phase of the pandemic passed. Delayed opening of critical correspondence by taxpayers can have immediate financial impact on those taxpayers.

17. I have also heard reports that the government intends to shutter two out of three IRS printing and correspondence campuses. These campuses are where staff issue written notices and receive written correspondence with taxpayers. The combination of staffing cuts to employees working the phone lines and the closure of more than half of the agencies' correspondence centers will further impact taxpayers who rely on these services to resolve issues with their accounts.

5

Declaration of Nina E. Olson

18. Low staffing in these offices harms taxpayers. At the beginning of the COVID-19 pandemic, the IRS call centers were not set up for remote work, and distancing requirements dramatically reduced the number of IRS staff who could be physically on-site to answer phone calls. As a result, taxpayers reported needing to call many, many times before reaching a live person. Often a taxpayer caller would sit on hold for so long that the phone line would automatically disconnect, and they would need to try again. In or around May 2020, the IRS reopened live phone assistance lines, but wait times remained longer than usual. *See* GAO*, More Delays Ahead—Pandemic Continues to Slow Down IRS,* March 25, 2021 available at: https://www.gao.gov/blog/more-delays-ahead-pandemic-continues-slow-down-irs.  For example, the National Taxpayer Advocate's Annual Report to Congress noted that in FY 2021, due to a high volume of callers and fewer employees, "the IRS received about 282 million telephone calls [but] customer service representatives only answered about 32 million, or 11 percent, of those calls." *See* National Taxpayer Advocate - Annual Report to Congress, 3 (2021).

19. During the pandemic, the IRS website also saw a large increase in daily visitors; because fewer taxpayers could reach employees on the phone, they went to seek answers online. *See* GAO*, More Delays Ahead—Pandemic Continues to Slow Down IRS* (March 25, 2021), available at: https://www.gao.gov/blog/more-delays-ahead-pandemic-continues-slow-down-irs (noting that during 2020, IRS's website received 1.4 billion visits, about three times as much traffic compared to 2019). However, given that staffing cuts are projected in both Taxpayer Services and, from reports I've read, Online Services, it will be more difficult for individuals to get the answers they need during phone calls or online at IRS.gov. *See* Matt Bracken, IRS cuts about 50 IT executives, sources say, FedScoop (March 29, 2025), available at: https://fedscoop.com/irs-it-layoffs-tax-agency-doge/.

**IRS Understaffing Causes Concrete Harms Which Are Disproportionally Borne by Low-Income Taxpayers, Including the Center's Clients.**

20. Delayed opening of critical correspondence by taxpayers—or the IRS's inability to answer critical phone calls—can have immediate financial impact on those taxpayers.

21. For example, there are situations where the IRS can charge a taxpayer additional tax without any administrative hearing unless the taxpayer objects within 60 days by using "Math Error authority" under 26 § U.S.C. 6213(b) and (g). Under this statute, in certain congressionally-designated situations, the IRS can summarily assess additional tax, without first giving the taxpayer a hearing or opportunity to protest. Once the additional amount is assessed, the taxpayer has 60 days to contact the IRS, by phone or in writing, and protest; if the taxpayer protests, the IRS *must* abate the adjustment—that is, reverse the additional tax charge. If the IRS then wants to make the adjustment, it must audit the return, give the taxpayer the opportunity to provide documentation, and—if the taxpayer does not agree with the adjustment— issue a "Notice of Deficiency" which gives the taxpayer a right to petition the U.S. Tax Court without first paying the proposed additional tax.

22. Math Error assessments that aren't challenged within 60 days are *automatically* put into collections. This means that, if a taxpayer can't reach an IRS employee on the phone, or if the taxpayer's written correspondence is sent within 60 days but simply isn't opened or processed and associated with the taxpayer's account, the automated collection system will issue levies on bank accounts, or offset the taxpayer's next year's tax refund, automatically. In this situation, due to understaffing, the agency will not be fulfilling its legal obligation to abate the adjustment.

23. This is especially egregious because, according to a 2011 research study, in 55% of those cases in which the IRS automatically issued Math Error notices disallowing claims relating to dependents' identifying numbers, the IRS reversed at least part of these errors after the taxpayer protested the assessment via phone or written correspondence. The average

7

Declaration of Nina E. Olson

amount of funds restored to taxpayers was $2,000. *See* 2011 National Taxpayer Advocate Annual Report to Congress, Volume 2: TAS Research and Related Studies, (2011).

24. For a sense of the scope and magnitude of the risk to taxpayers, in FY 2023, the IRS issued 2,217,754 Math Error notices. By contrast, for the same fiscal year, the IRS closed 582,944 audits, of which 450,357 were correspondence audits of individual taxpayers. Individual taxpayers experienced Math Errors almost five times more than audits. *See* IRS Data Book, Table 4 at https://www.irs.gov/statistics/compliance-presence. Unlike audits, in which the IRS decides how many it will commence based on its current staffing levels, Math Errors are automated; the notices will continue to be issued as part of the return processing stream, regardless of staffing levels.

25. The specific error described above is one of many ways that prompt opening of correspondence is critical to a functioning tax system that does not improperly financially burden taxpayers. Other collection actions are similarly set to automatically take effect if a taxpayer does not object within a given time period. And if a taxpayer can not reach the IRS via phone or mail, they can be improperly levied against. Although errors can theoretically be undone, the cost and effort of fixing these problems is too burdensome—financially and otherwise—for many taxpayers.

26. This harm of being overcharged by the IRS–and being unable to timely remedy the error–affects low-income taxpayers in particular. For example, the IRS may erroneously conclude that a taxpayer is ineligible for the earned income credit or child tax credit. These credits are worth thousands of dollars, and for low-income individuals, losing out on thousands of dollars can affect access to food, housing, and other necessities. Even delaying the receipt of this money can severely harm low-income taxpayers and their families. As the COVID-19 pandemic demonstrated, the Center's clients are thus uniquely

8

Declaration of Nina E. Olson

impacted by staffing shortfalls. The Center's clientele is thus directly and disproportionately affected by staffing cuts at the IRS.

**The Specific IRS Offices Targeted for Staff Cuts Are Critical to Serving the Center's Clients.**

27. Enforcement and compliance staff—which are set to be cut by around 50%—perform many functions, including audits, collections, and processing administrative appeals. Understaffing in these offices harms all taxpayers by, among other things, increasing mistakes in audits and delaying resolution of disputes—which can delay tax refunds rightfully owed to taxpayers.

28. One subset of taxpayers uniquely affected by lack of enforcement staff at the IRS is domestic violence survivors, who make up a large proportion of the Center's LITC's direct clients and individual consultations. Enforcement staff processes, for example, requests for Innocent Spouse Relief under 26 U.S.C. § 6015. Survivors of domestic violence sometimes do not control, or have knowledge of, income listed by their spouse on past-filed joint returns. If they meet certain criteria, those survivors can be relieved of tax burdens associated with those returns. This financial relief can mean the difference between being able to start fresh and returning to the abuser. However, staffing shortages delay this process and can keep domestic violence survivors—including the Center's clients—in financially untenable situations, causing significant harm.

29. Staffing shortages that result in delays can harm domestic violence survivors in other ways as well. If the survivor has left their former partner and has taken the children, but the partner filed taxes first and improperly claimed those children as dependents, the domestic violence survivor's later-filed return claiming those children will be rejected—or they could be told they do not qualify for the child tax credit because they cannot claim the

Declaration of Nina E. Olson

children as dependents.  There are ways to challenge the IRS's decision in this situation, but I know from past periods of low IRS staffing that these processes take inordinate amounts of time when the IRS is understaffed. The proposed cuts would create delays in domestic violence survivors receiving the refunds to which they are entitled. Again, this can result in a loss or delay of thousands of dollars, which can severely impact these individuals' lives, including by resulting in the domestic violence survivor returning to their abuser.

30. My understanding is that the Office of the Taxpayer Advocate is also facing significant staffing reductions, which will lead to dramatically higher caseloads per TAS advocate. The Office of the Taxpayer Advocate serves taxpayers facing "a serious privation caused or about to be caused to the taxpayer as the result of the particular manner in which the revenue laws are being administered by the IRS." 26 U.S.C. § 7811. Based on my experience, I have seen how higher caseloads per TAS advocate have degraded the services TAS can provide to the people it serves, particularly by extending wait times.

31. In FY 2023, a year where staffing for TAS was stable, TAS received 219, 251 cases. Of the top five issues that led a taxpayer to go to TAS in 2023, three are ones that are extremely common to clients of the Center and LITC Connect. One of these common issues includes pre-refund wage verification holds—where the IRS holds a tax refund because they have questions about the W2 filed with the taxpayer's return. In that same year, TAS closed 222,996 cases (from 2023 and years prior). Of those closed cases, it obtained full relief for taxpayers in 63.6% of the cases, and partial relief in 9.6% of the cases. That is a relief rate of around 73%. This means that the automated function at IRS that flags issues with a taxpayer's return erred in tens of thousands of cases. In these cases, taxpayers need both IRS and TAS employees to resolve these automated errors. If there are no TAS employees to advocate for the release of returns that are delayed due to pre-refund

10

Declaration of Nina E. Olson

wage verification holds or other issues, then taxpayers—in particular low-income taxpayers that are the Center's clients—will be harmed financially.

32. Moreover, many of the problems that lead a taxpayer to needing TAS services will *themselves* become more frequent as a result of large-scale layoffs. This is because many of the problems that come to TAS are the result of taxpayers not being able to have someone in other parts of the IRS—such as compliance or enforcement— resolve the issue, making TAS involvement absolutely necessary. Thus, demands on TAS services will increase, exacerbating the problems caused by the shortages in the Office of Taxpayer Advocate.

33. TAS employees were furloughed during the 2013 shutdown, for example, and the number of taxpayers who were not able to receive assistance but were facing significant hardship from IRS errors (or simply because of their inability to contact the IRS) skyrocketed. That shutdown lasted for only 17 days. The proposed significant cuts to TAS would be permanent, and would hobble this office, which is supposed to be a backstop—the safety valve —for taxpayers in truly dire financial situations.

34. From my professional experience as the National Taxpayer Advocate, I know that serious harm as a result of IRS action is not a hypothetical situation. Nearly every day I worked there, TAS received cases in which taxpayers had their utilities disconnected or their homes foreclosed upon as a result of the IRS's failure to pay a refund or release a levy. TAS had cases in which taxpayers made suicide threats, or in which they needed emergency surgery and required the IRS to release levies or refunds. The significant cuts to TAS will mean that critical employees will not be there to answer the phone or open the mail. And the employees that will be there will be overwhelmed with a large caseload of incoming calls and correspondence. Without adequate staffing, TAS will not be able to ensure that someone doesn't lose his or her job, threaten (or even commit) suicide, or not

Declaration of Nina E. Olson

get emergency surgery in a timely manner. Without a sufficient number of staff, TAS cannot protect these vulnerable taxpayers from serious harm.

**Individual Stories Show the Harm Low-Income Taxpayers Faced Due to COVID-Era Understaffing.**

35. In 2024, the Center employed an anthropologist to conduct a range of ethnographic interviews with low-income taxpayers about the impacts of COVID-era IRS staffing shortages. These low-income taxpayers, who are anonymous in the study and consented to their stories being shared publicly, are all clients of LITCs that are members of The Center's LITC Connect.

36. According to the study, the LITC clients reported spending enormous amounts of time chasing down refunds and attempting to call the IRS during the pandemic. They also described years-long delays in resolving issues, which often resulted in years-long delays in receiving funds owed. For example, seven of the taxpayers ultimately received refunds ranging from $6,500 to $36,000, with an average refund of $22,785. The cases took from one year to six years to resolve, attributable in part to the staffing disruptions and backlogs attributable to the COVID-19 pandemic. *See* Center for Taxpayer Rights, *Two-year study of social benefits through the tax code and tax agency* (2024), available at: *https://taxpayer-rights.org/wp-content/uploads/2024/05/Tax-Chat-CTR-Survey-and-Interviews-05-28-24-1.pdf*

37. "Taxpayer C" in the study and his partner lived together with their ten children and filed every year without issue. In 2021, his partner died and Taxpayer C filed his taxes claiming himself as Head of Housed with his nine minor children. The IRS questioned his filings and held his $36,000 refund. Because Taxpayer C earns $18,000 per year and relies on his refunds to pay living expenses, holding his refund for this length of time seriously

12

Declaration of Nina E. Olson

impacted this grieving family's ability to cover living expenses. Taxpayer C was unable to resolve the case successfully through his own advocacy with the IRS. The LITC received this case in early 2022 and, due to covid-era staffing shortages, it took six months for Taxpayer C to receive his full refund of $36,000 (plus taxable interest of almost $3,000). *Id.*

38. Taxpayer D was audited by the IRS for tax year 2021, and her refund was frozen. The LITC worked with the taxpayer to gather necessary supporting documentation and represented her before the IRS audit function. The IRS finally released her 2021 refund more than12 months after filing, totaling over $6,500, including almost $300 in interest. *Id.*

39. The Center's LITC Connect members and direct clients have suffered harm as a result of IRS understaffing in the past. The LITC Connect members, LITCs themselves, must expend more resources per case and are inhibited in accomplishing their missions. Direct clients of LITCs suffer financially through delay or even the inability to be helped by a clinic due to some clinic's caps. Both LITCs and their clients stand poised to suffer similar harm in the future if the proposed staffing cuts happen.

**IRS Staffing Cuts Will Directly Harm the Center for Taxpayer Rights.**

40. The Center is also more directly impacted by IRS staffing shortfalls. As described above, staffing shortages cause small issues to snowball into enormous ones; what may have initially been a simple and quick case can easily transform into a labor-intensive, years-long matter for our advocates.

41. Additionally, during the period of IRS understaffing due to the COVID pandemic, cases at LITCs skyrocketed, to the point where many had to put caps on the number of cases they could accept. Many low-income taxpayers were unassisted.

13

Declaration of Nina E. Olson

42. LITC Connect also provides technical assistance to members, and the amount and complexity of this assistance increases when cases are more complex, as they are during times of IRS staffing shortages.

43. Increased per-case burdens cause more work for Center staff, reduce the number of people we can serve, and ultimately inhibit the Center's ability to accomplish its mission.

44. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 25th day of April, 2025 in Washington, D.C.


_____

Nina E. Olson

Declaration of Nina E. Olson