OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
TONY LOPRESTI, State Bar #289269
KAVITA NARAYAN, State Bar #264191
MEREDITH A. JOHNSON, State Bar #291018
RAPHAEL N. RAJENDRA, State Bar #255096
HANNAH M. GODBEY, State Bar #334475
70 West Hedding Street, East Wing, Ninth Floor
San José, California  95110-1770
Telephone: (408) 299-5900
Facsimile:  (408) 292-7240
E-Mail:    Tony.LoPresti@cco.sccgov.org
           Kavita.Narayan@cco.sccgov.org
           Meredith.Johnson@cco.sccgov.org
           Raphael.Rajendra@cco.sccgov.org
           Hannah.Godbey@cco.sccgov.org

*Attorneys for Plaintiff
County of Santa Clara, Calif.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-3698-SI<br><br>**DECLARATION OF SANTA CLARA COUNTY EXECUTIVE JAMES R. WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF** |

## DECLARATION OF JAMES R. WILLIAMS

I, JAMES R. WILLIAMS, declare:

1. I make this declaration in support of Plaintiffs' motion for preliminary relief. I am a resident of the State of California. I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify to them competently under oath.

2. I am the County Executive of the County of Santa Clara ("Santa Clara" or the "County"), which is a charter county and political subdivision of the State of California and a governmental entity that serves the Santa Clara County geographic region.

3. I have held the position of County Executive since July 2023. I began my career with Santa Clara in 2010 as a Social Justice and Impact Litigation Fellow in the Office of the County Counsel, and subsequently served as a Deputy County Counsel. In June 2012, I moved to the Office of the County Executive. From 2013 to 2016, I served as a Deputy County Executive and oversaw several County departments and programs, including components of the emergency response, criminal justice, and procurement and contracting systems. In 2016, the Board of Supervisors appointed me as the County Counsel, a position I held from August 2016 to July 2023. As the County Counsel, I managed more than 200 staff and was the chief legal advisor to the Board of Supervisors and all County officials, agencies, and departments. My position as the County Executive is also an appointment by the Board of Supervisors.

4. As the County Executive, I am the chief administrative officer of the County and I am responsible for oversight of almost all County employees and the proper administration of the County's operations. Under the County Charter, the County Executive is responsible for supervising and directing the preparation of the annual budget, which is submitted to the Board of Supervisors for final approval. In addition to its fiscal importance, the budget is also the major annual policy document for the County. The budget identifies priorities for the County and allocates projected resources and funding in order to implement those priorities. Once the budget is approved by the Board of Supervisors, it is the responsibility of the County Executive to ensure that those policies are implemented with the allocated resources.

//

## The County of Santa Clara

5. Santa Clara is home to 1.9 million residents, making it the most populous county in Northern California and more populous than 12 U.S. states.

6. Santa Clara's mission is to plan for the needs of a dynamic community, provide quality services, and promote a healthy, safe, and prosperous community for all. Under law, Santa Clara is responsible for administering the social safety net and providing services to meet the basic needs of vulnerable residents. Santa Clara is also responsible for public services that promote the safety and welfare of the community overall, including public health, disaster response, and public safety functions.

7. In light of these responsibilities, Santa Clara provides many community services that hold together the fabric of society in the region. For example, the County provides hospital and outpatient medical and psychiatric services for both the vulnerable members of our community and all those in need; ongoing mental health services and substance use services; social assistance for individuals in poverty; criminal justice services, including custody, patrol, probation, public defense, prosecution, and community services; regional emergency response services and communication; public health services, including disease control and pandemic response; and general government services such as property assessment, tax collection, official recording, and finance and investment support for regional governmental agencies.

8. Santa Clara employs around 25,000 employees to carry out its essential safety net and other public-service functions. These employees include, among many others, doctors, nurses, epidemiologists, and other staff providing health services within Santa Clara's comprehensive public safety net Health System and Public Health Department; social workers and eligibility workers who provide protective services and administer benefits within Santa Clara's Social Services Agency; community outreach specialists; park rangers; law enforcement officers; accountants; housing and community development specialists; and numerous other workers who provide and support necessary public services for the Santa Clara County community.

9. Santa Clara carries out its mission in service of one of the most diverse communities in the nation, an uncommonly large and varied geographic area, and a complex and multifaceted

1  economy.

2  10. Santa Clara County covers 1,300 square miles, from Gilroy in the South to Palo Alto and Milpitas in the North, and includes portions of the San Francisco Bay as well as mountains, foothills, flatland, and rivers. Santa Clara County is the home of Silicon Valley, making it an economic engine for California and the United States, and also the site of significant agricultural productivity. The local economy has also produced substantial inequality and disparities, with consequences such as homelessness and unstable housing, food insecurity, gaps in educational access and attainment, and inability of a substantial portion of the workforce to afford to live in Santa Clara.

11. Santa Clara's operations are as broad and diverse as the residents it serves, the economy it supports, and the geographic area in which it sits. Many of its operations are organized around its legal obligations.

12. For example, California law requires Santa Clara—and every county in California—to provide vital safety-net services to vulnerable and indigent residents, Cal. Welf. & Inst. Code § 17000; and assigns Santa Clara the "function and responsibility" to administer "public social services," *id.* § 10800, and to "establish and maintain" specific groups within its "welfare department which shall have sole responsibility for the operation of the child welfare services program," *id.* § 16500.

13. To carry out these statutory duties, Santa Clara operates the only safety-net health system in Santa Clara County. The County's health system includes four general acute care hospitals, over a dozen ambulatory clinics, mobile clinics, and other operations. Its hospitals are legally obligated to provide emergency services and treatment to any person presenting with an emergency medical condition without regard to citizenship, immigration status, insurance status, or ability to pay. Through its hospital and clinics, Santa Clara provides healthcare to hundreds of thousands of individuals each year.

14. Santa Clara also plays a critical role in protecting the public health of Santa Clara County's community as a whole. I am deeply familiar with these functions due to my role in directing Santa Clara's response to the COVID-19 pandemic.

15. Santa Clara's public health functions are carried out by the Public Health Department (PHD), which is responsible for promoting and protecting the health of Santa Clara County's entire population at a community level. PHD works to prevent disease and injury (for example, through communicable disease prevention and sexual health programs); promote healthy lifestyles (for example, by providing public education about childhood obesity and supporting tobacco and violence prevention initiatives); create healthy environments free from health hazards and pollutants; and collect, curate, and use data to inform decision-making. None of Santa Clara County's 15 cities has its own public health department, and therefore all Santa Clara County residents rely on PHD to perform essential public health functions.

16. One critical function of the Public Health Department is to support maternal, child, and family health. To that end, the Public Health Department's Maternal Child and Family Health Branch offers services and programs to support children and families in Santa Clara County. This includes administering the Women, Infants and Children nutrition program (WIC), a federal program that provides monthly assistance to buy healthy foods, breastfeeding support, health information, and other services to pregnant and breastfeeding people, infants, and children; California Children's Services, a program for children and youth with certain serious medical conditions; and other programs to improve the health of vulnerable children and families.

17. PHD is also responsible for the prevention and control of infectious disease. As part of this work, the Public Health Department seeks to ensure that children in Santa Clara County receive required vaccinations, which are essential not only to the health of individual children but to the population overall. For example, PHD runs a vaccination clinic for children who need to get vaccinated quickly in order to register for school and have no other means of obtaining required vaccinations in time. In addition, after the COVID-19 pandemic, when many children ceased attending regular doctor's visits and therefore fell behind in vaccinations, the Public Health Department undertook an extensive public awareness campaign to educate families on the importance of vaccinations and reduce barriers to vaccine uptake.

18. Santa Clara protects its residents' health and safety by preparing for and responding to emergencies of all kinds, including natural disasters like earthquakes, floods, fires, and weather

4

events such as extreme heat or cold; mass shootings and other public-safety events; and major public events like the Super Bowl that pose heightened safety risks.

19. Across the country, emergency management is organized into federal, state, regional, and local operational areas. Within that framework, the County is the lead emergency management agency for the Santa Clara County Operational Area, which encompasses all 15 incorporated cities and all special districts within Santa Clara County. Santa Clara houses this function within its Office of Emergency Management (OEM). The central nervous system for large-scale emergency response within the Santa Clara County Operational Area is the Emergency Operations Center (EOC), which the County activates, staffs, and operates. When not engaged in active emergency response, OEM helps residents prepare for disasters and emergencies by engaging the whole community in assessing needs and developing strategies to achieve stronger preparedness, response, and mitigation capabilities within the Santa Clara County Operational Area.

20. Santa Clara also operates several offices expert in reaching and engaging with particular communities. For example, Santa Clara operates an Office of Veterans Services, which assists veterans, military personnel, and their families in obtaining federal, state, and local benefits earned through active duty military service. Its primary mission is to assist the veteran community in applying for and obtaining compensation benefits through the U.S. Department of Veterans Affairs. It employs state and nationally accredited Veteran Services Representatives with experience and training to connect with and assist veterans throughout the process of submitting claims and applications.

21. Santa Clara's operations also include several offices focused on reducing and mitigating the harmful and socially disruptive effects of economic disparity. For example, Santa Clara's Office of Supportive Housing serves people who are experiencing homelessness or at risk of homelessness. Clients include community members who previously experienced homelessness and are now housed but continue to receive rental assistance and other supportive services to remain stably housed. People experiencing or at risk of homelessness are as diverse as the population of the county and include seniors, families with children, youth and young adults, veterans, people with disabilities, recent immigrants, and other low-income individuals.

22. Santa Clara's Consumer and Environmental Protection Agency (CEPA) is responsible for administering local agricultural programs to protect the environment and the public's health and safety, and the sealer of weights and measures' duties to test and certify all commercial weighing and measuring devices within the county to ensure consumers are charged the correct prices.

### Santa Clara's Interactions with and Reliance on Federal Agencies

23. To prepare for, respond to, and recover from natural disasters and other emergencies across its vast geographical area, Santa Clara's Office of Emergency Management coordinates with, interacts with, and relies on the work of several federal agencies, including the U.S. Department of Agriculture (USDA). For instance, in the aftermath of a major wildfire in Summer 2020 called the SCU Lightning Fire Complex, Santa Clara coordinated with USDA to facilitate USDA employees coming to the area that had been affected, set up and staffed a nearby field station to help guide ranchers who had lost their livestock grazing lands through the process of applying for low-interest loans, obtaining machinery and tools, and even repairing damaged equipment. If USDA follows through on its Agency RIF and Reorganization Plan (ARRP), including reported plans to cut staff and close offices at the local level and to relocate staff, Santa Clara will be substantially less able to support its residents, including those who live in remote areas that are more difficult to serve, in the aftermath of wildfires and other natural disasters, particularly those that affect the substantial amount of agricultural production in the area. The results could include a weakened economy, potential loss or relocation of agricultural businesses, diminished community resilience after disasters, and additional costs to Santa Clara itself (in the form of staff time and funds) to support recovery.

24. Santa Clara is also at risk if the U.S. Forest Service, another component of USDA, is curtailed or reorganized. The U.S. Forest Service performs essential work to manage federal wildland, to mitigate the risks of wildfire, and to fight wildfires when they occur. It is a critical component of the system of mutual aid used by firefighters across the United States. Santa Clara has experienced very large wildfires in recent years, including one that was, at the time, one of the largest in California history. Diminishment of the U.S. Forest Service would force local and state firefighting agencies to carry more of the burden of responding to wildfires and go without the

1  assistance on which they often rely.

2      25.    Santa Clara's hospitals and public health department will be affected if
3  implementation of USDA's ARRP diminishes the capacity of USDA's already understaffed Food
4  Safety Inspection Service, which is responsible for ensuring that the nation's meat supply is free
5  from disease and contamination. If USDA's ARRP weakens that inspection service, it would
6  increase the likelihood of foodborne diseases in the meat consumed by Santa Clara residents. The
7  resulting illness will tax Santa Clara's health and hospital system as residents seek care, including at
8  hospital emergency rooms, and will also burden Santa Clara's public health department, which
9  monitors, investigates, and responds to reports of illness in the community. The risks to community
10 health are imminent, not theoretical: the Santa Clara Public Health Department is already dedicating
11 resources to proactively collecting data, issuing critical public health updates to the community, and
12 sharing surveillance data with other local and state agencies regarding H5N1 (bird flu). In these and
13 other ways, the Santa Clara PHD, like other public health departments and the public at large, relies
14 on three USDA components—the Food Safety Inspection Service, the Animal and Plant Health
15 Inspection Service, and the Agricultural Research Service—to continue their labor-intensive work of
16 collecting and testing cows across the country for the disease, conducting beef safety studies, and
17 disseminating information promptly.

18     26.    In addition, USDA's Animal and Plant Health Inspection Service is an essential
19 partner in Santa Clara's efforts to monitor and respond to agricultural pests. Santa Clara's Division
20 of Agriculture is responsible for identifying the presence of these pests, and often works in
21 coordination with USDA's Animal and Plant Health Inspection Service. For instance, after the
22 Mediterranean fruit fly was detected near Santa Clara in August 2024, Santa Clara worked with
23 USDA officials to establish a quarantine area to prevent the spread of that fly, and then continually
24 assessed and ultimately expanded that quarantine. If USDA's ARRP diminishes or destroys
25 USDA's ability to coordinate, establish, assess, and modify quarantine areas for invasive species and
26 pests on a time-sensitive basis, it would heighten the risks of harm to the health of Santa Clara
27 residents and to agricultural businesses, and impose on Santa Clara the burden of dedicating
28 additional time and resources to try to back-fill for the work that the ARRP could make USDA itself

1 unable to do.

2     27. Santa Clara's CEPA also interacts regularly with, and relies on the work of, the USDA to protect both Santa Clara and the nation at large from invasive pests arriving from overseas. Division of Agriculture staff are the front-line investigators who go to UPS, FedEx, and other locations to inspect incoming packages for illicit fruit that may harbor invasive pests. When they are discovered, Santa Clara staff alert federal staff in USDA's Smuggling Interdiction and Trade Compliance Program to promptly coordinate a federal quarantine to prevent the pest from spreading. Diminishment or elimination of this Program could have profound effects on residents in Santa Clara and across the nation because it would dramatically reduce the likelihood, speed, and effectiveness of federal quarantines. This is a concrete and imminent risk, not theoretical. In one recent example, Santa Clara staff biologists found several invasive pests living in camellias illicitly imported from China, and then coordinated immediately with USDA staff to establish a federal quarantine. Agriculture Departments across California coordinate with USDA in the same way.

    28. USDA's Wildlife Services program is also active in Santa Clara and across California. That program depredates predators and other animals, including, for example, mountain lions, bears, and pigs, and then tests them to see if they have any infectious diseases or pose any other risks. In one recent example, USDA's Wildlife Services staff depredated several feral swine in Santa Clara, and upon testing them learned—and alerted Santa Clara staff—that those specific swine carried diseases that would pose risks to residents (and their pets) and property in areas near the pigs as well as agricultural producers that raise or use pigs, which in turn could pose risk to the human food supply and residents who live near the farms. If USDA terminates or hobbles the Wildlife Services program or thins or removes staff from its on-site locations in Santa Clara, the resulting information gap would heighten the risks to Santa Clara, its agriculture industry, and its residents, and there is simply no way for Santa Clara to fully make up for the resulting gap.

    29. On an ongoing and frequent basis, Santa Clara relies on and interacts with the National Weather Service (NWS), which is within the National Oceanic and Atmospheric Administration within the Department of Commerce.

    30. The National Weather Service produces and distributes essential, time-sensitive,

detailed, and reliable forecasts and other products upon which Santa Clara depends. Weather is always a critical preparedness factor for emergency-response personnel to understand clearly, both because weather itself can present emergent risks—such as flood threats, extreme heat and cold, and weather situations and events that trigger Public Safety Power Shutoffs, where electric utilities shut down parts of the power grid to reduce the risk of wildfires caused by malfunctions or disruptions to electricity transmission lines—and also because weather is an essential element of the situational awareness that emergency responders must have. The National Weather Service is in direct and ongoing contact with Santa Clara's Office of Emergency Management in order to provide real-time information and briefings upon request, and to develop detailed spot weather reports for specific areas of concern. The backbone of this critical partnership is the labor-intensive and expert work that National Weather Service staff around the country do to gather, analyze, and synthesize weather-related data, including producing time-sensitive, detailed, and granular SPOT weather reports for very specific geographic areas. The NWS is such a critical partner, in fact, that NWS frequently embeds staff within Santa Clara's EOC when it is activated ahead of or during critical events; and Santa Clara's OEM routinely and frequently meets with NWS staff for emergency-operation events. If the Department of Commerce's ARRP is implemented and diminishes the National Weather Service's capacity to develop and distribute its expert analysis, Santa Clara's emergency response will be substantially hampered. Given the wide range of circumstances that emergency first responders address, it is no exaggeration to say that lives hang in the balance.

31. After natural disasters and other emergencies, Santa Clara relies not only on USDA, but also the Environmental Protection Agency (EPA). For instance, after the 2020 SCU Lightning Fire Complex, Santa Clara's OEM coordinated with staff from EPA to come to the burn site and assist with debris removal and ensure areas were cleared of hazardous waste and other contaminants so that impacted residents could return home safely. If EPA's ARRP diminishes EPA's capacity to deploy staff on-site after fires and other natural disasters, that would make it more difficult, more protracted, and less safe for Santa Clara and its residents to recover from natural disasters.

32. EPA's ongoing work is a linchpin for the agricultural industry across the country, including in Santa Clara County. Santa Clara's CEPA regulates and monitors the use of pesticides

in this industry, including by issuing use permits and receiving and reviewing reports from producers regarding when the pesticides are used. But EPA, not Santa Clara, primarily manages and implements the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), which governs the registration, labeling, distribution, sale, and use of pesticides in the United States. EPA determines whether a given manufacturer's product can be registered as a pesticide, which in turn requires EPA to determine its safety for use in the food supply. EPA's involvement is essential not only for registering new pesticides, but also when Santa Clara detects new invasive species or pests that require urgent response, but for which there is not yet a registered pesticide. In those instances EPA must issue approvals for "off-label" use of registered pesticides. Execution of EPA's ARRP could diminish if not altogether destroy EPA's ability to register new pesticides and its ability to act promptly to permit famers to protect their crops from new and emerging threats. The risk is especially acute for Santa Clara: because the Bay Area is a site of significant international travel, there is an especially heightened chance that harmful pests will be detected first in or near Santa Clara.

33. Reorganization of EPA could also undermine Santa Clara's ability to manage hazardous materials, prevent releases of hazardous materials, and respond to emergencies associated with those releases. As a Certified Unified Program Agency under state and federal law, Santa Clara's Department of Environmental Health implements various programs and operations to regulate businesses that generate or manage hazardous materials and waste, and to respond to releases or mismanagement of hazardous materials. These programs and operations rely on EPA's Uniform Manifest ("e-Manifest") system, a program used nationwide to track hazardous waste shipments, which often cross state lines on their way to, from, or through Santa Clara County. If EPA does not maintain the e-Manifest system, it will hobble Santa Clara's ability to ensure that regulated facilities manage their hazardous waste appropriately, posing significant risk to public health and safety and the environment.

34. EPA's reorganization could also diminish or altogether block EPA's capacity to deploy the on-scene coordinators who provide assistance to Santa Clara during its emergency response to releases of hazardous materials and other harmful chemicals. Santa Clara relies heavily

and directly on EPA staff to provide interpretation, guidance, and training for EPA's Spill Prevention, Control, and Countermeasure regulations. Likewise, Santa Clara's Department of Environmental Health relies on modeling software that EPA develops, maintains, and updates in order to assess potential offsite consequences of catastrophic releases of hazardous substances. If EPA does not maintain or continue to update this software, it would substantially diminish the ability of Santa Clara—and, on information and belief, other local and state agencies—to respond to these releases in ways that effectively protect residents.

35. Reorganization of the U.S. Department of Health and Human Services (HHS) could be catastrophic for Santa Clara, including (but not only) because it could have disastrous effects on the ability of Santa Clara's Public Health Department to monitor, prevent, disseminate information about, learn of, respond to, and prevent infectious diseases and other threats to community health. These harms arise from reorganization or reduction in the force of the CDC, the FDA, and the Administration for Strategic Preparedness and Response (ASPR) within HHS.

36. When there is a terrorist attack, disease outbreak, earthquake, or other emergency, and Santa Clara's PHD or its broader Health System (which includes its hospitals and clinics) requires use of medicines, including those that are not quickly or commercially available or in quantities that would exhaust local supplies, those departments can access medicine from the Strategic National Stockpile, which is administered and staffed by HHS's ASPR. Procedures applicable to the Strategic National Stockpile assume and require ASPR employees to be trained and available to respond immediately, at all hours of the day and night, 365 days a year, to requests from local public health officials' requests for emergency medical countermeasures. Santa Clara's Public Health Department and Health System staff also rely on the CDC and FDA to provide them access to drugs that may not be commercially available but are needed to diagnose, monitor, or treat rare diseases and threats like anthrax, botulism, smallpox, mpox, and yellow fever, through the CDC Drug Service and the FDA expanded access program. If HHS's ARRP closes or reduces the capacities of ASPR to operate the Strategic National Stockpile, CDC to operate the Drug Service, or FDA to operate the expanded access program, it would reduce if not altogether block the ability of Santa Clara's PHD and Health System—and, on information and belief, other local and state public

health departments—to access these vital, life-preserving resources in times of emergency.

37. PHD also relies on robust and expert staffing at the CDC to assist with core public health functions relating to traveler management. It is through this CDC function that PHD can protect the nation and the local community by asking CDC to block a person who has an infectious disease but refuses to be treated or take necessary countermeasures but nevertheless attempts to board a flight, and the CDC also informs Santa Clara if a traveler with an infectious disease is coming to Santa Clara County or must be quarantined upon arrival. Diminishment of CDC's staff and expertise could prevent that program's effectiveness, thus exposing Santa Clara to the risk of infectious diseases that spread rapidly through the community instead of being contained and quarantined upon arrival.

38. PHD also relies heavily on the CDC's Laboratory Response Network, as well as several CDC laboratories that are the only ones authorized or capable of testing for certain infectious diseases, including some sexually transmitted diseases. Delays or disruptions in the ability of the CDC to test specimens or report results to PHD can produce information gaps and delays that result in unnecessary and avoidable spread of infectious diseases as well as inadequate directions or recommendations to affected patients. Indeed, PHD has protocols that often require its staff to contact and share specimens with the CDC very quickly and to monitor results that the CDC shares not only for its own specimens, but for tests of specimens from other parts of the country. As the CDC operates the only laboratory that can conduct the testing, HHS's reorganization could mean the difference between life and death—between effective and ineffective treatment, the spread or containment of infectious disease, and the extent to which residents suffer.

39. If HHS's ARRP curtails CDC's extensive work around the world, that would also pose risks directly to Santa Clara, because it would prevent the CDC from developing information about emerging infectious-disease threats in other parts of the world, including where there is frequent travel between Santa Clara and those areas. When CDC develops and shares information about outbreaks of Ebola, novel influenza, mpox, and other diseases, Santa Clara can be better prepared to handle potential cases that may emerge locally. To take two recent examples, because HHS reorganization has already diminished CDC's international presence, public health officials

around the country, including in Santa Clara, have very little information about outbreaks of tuberculosis and Marburg virus disease (MVD), formerly known as Marburg haemorrhagic fever, in parts of Africa. Rather than the on-the-ground, up-to-date information the CDC has historically provided, PHD must now rely instead on reports from news outlets. This prevents Santa Clara from being as prepared as it could be to address cases of MVD or TB locally. Notably, when COVID-19 first emerged, Santa Clara County was one of the first sites in the nation of confirmed community spread of the virus. The CDC played a critical role in assisting Santa Clara in its response, including by sending experts with specific expertise in medicine, epidemiology, infection control, community mitigation, and communications to Santa Clara to coordinate with Santa Clara's Emergency Operations Center. CDC also worked closely with Santa Clara to develop a community mitigation plan based on on-the-ground intelligence gathered by CDC experts in Santa Clara County in the early months of the pandemic. Reorganization or diminishment of the CDC would undermine coordination of this type from occurring in the future.

40. Santa Clara's emergency operations rely on coordination with state and federal partners to plan ahead for large-scale events like the Super Bowl and World Cup games that present heightened risks of harm from physical violence and terrorism, including bioterrorism. The Department of Homeland Security (DHS) deploys its own personnel in the weeks—and often months—ahead of these events, and also coordinates the deployment of personnel from other federal agencies. Reorganization or diminishment of DHS could curtail coordination ahead of these events, which is an essential component of ensuring public safety during those events. This will affect Santa Clara directly and imminently, since it will host Super Bowl 60 in February 2026 and several games of the FIFA World Cup in the Summer of 2026, as Santa Clara worked closely with DHS and the other federal agency staff coordinated by DHS ahead of and during Super Bowl 50, which it hosted in February 2016.

41. Santa Clara also relies on FEMA staff and operations to prepare for and respond after natural disasters and other emergencies, including wildfires, earthquakes, and landslides. Santa Clara is in close contact with local FEMA staff based in Oakland, with whom OEM often confers. For example, in the days, weeks, and months after the SCU Lightning Fire Complex, Santa Clara

and FEMA coordinated closely so that FEMA staff could come to, build, set up, and staff physical stations where residents could come to meet with FEMA staff and get guidance to navigate the financial, logistical, and legal supports that residents need after emergencies, for everything from emergency loans to replacing vital records and recovering physical property. DHS's reorganization would threaten or undermine the ability of Santa Clara and its residents to respond to and recover from disasters if that reorganization diminishes FEMA's capacity to promptly deploy adequate personnel on-site to areas that experience disasters.

42. FEMA is also an essential partner with respect to Santa Clara's planning to recover and rebuild its own facilities and property after emergencies: FEMA staff review, assess, and scope the damage to Santa Clara-owned roadways, bridges, parks, and other land and infrastructure, which is a necessary first step for Santa Clara to then begin the process of physically rebuilding its infrastructure and ensuring staff and resident safety in its parks. DHS reorganization could make these kinds of on-the-ground local responses substantially less effective, thus harming Santa Clara residents and requiring Santa Clara itself to dedicate resources to make up for the federal shortfall and uncertainty.

43. Santa Clara does not directly operate a housing authority, but the reorganization of the U.S. Department of Housing and Urban Development (HUD) could nonetheless cause direct and substantial harm to the programs and operations Santa Clara conducts through its Office of Supportive Housing (OSH). OSH's mission is to increase the supply of housing and supportive housing that is affordable and available to extremely low income and/or special needs households in Santa Clara County, and thereby contribute to ending and preventing homelessness. If HUD's reorganization generates delays in processing applications, enrollments, or payments under housing assistance programs such as Section 8, or diminishes the ability of staff within HUD's Office of Community Planning and Development to provide technical assistance and perform grant administration functions, the reorganization would not only cause residents to experience housing instability, but also hamper Santa Clara's ability to assist those beneficiaries, because it is through their enrollment and access to vouchers that beneficiaries are able to access the intensive case management provided by OSH. In addition, if HUD implements its announced plan to cut the Office

Declaration of James R. Williams ISO Plaintiffs' Motion for Preliminary Relief    Case No. 3:25-cv-3698-SI

of Community Planning and Development staff by 84 percent, that would severely diminish HUD's ability to manage housing assistance programs, thereby exacerbating the housing crises that many residents face, likely leading to even more demand on the already overburdened shelter systems that Santa Clara operates. Implementation of the announced plan would also impose additional costs on Santa Clara because it would likely reduce Santa Clara's access to HUD staff members who provide technical assistance for the grants and programs that Santa Clara operates.

44. Reorganization of the U.S. Department of the Interior would harm Santa Clara's emergency-planning efforts and capabilities. Those efforts and capabilities rely on information about earthquake hazards developed by the U.S. Geological Survey (USGS). Without that data, Santa Clara will be less able to plan for and respond to earthquakes. Indeed, Santa Clara is a member of the Association of Bay Area Governments, which partners closely with USGS to provide resources and guidance related to earthquakes.

45. Federal law entitles Santa Clara (and other local governmental entities) to reimbursement from the Internal Revenue Service for certain interest payments they make on Qualified Energy Conservation Bonds. Santa Clara issued such bonds to provide low-interest financing to promote alternative energy usage, and is therefore entitled to monthly reimbursement payments from the IRS. Reorganization of the Treasury Department—including, most importantly, the proposed severe cuts to the IRS workforce—is likely to cause slowdowns in the issuance of these reimbursement payments. In fact, IRS recently acknowledged that it is behind on issuing these reimbursements. The delay in reimbursement payments, as well as the resulting uncertainty, causes financial harm to Santa Clara because it does not have in hand, and cannot therefore reinvest or dedicate to public services, the reimbursements to which it is entitled.

46. Implementation of the ARRP of the U.S. Department of Veterans Affairs (VA) is likely to have deleterious effects on the substantial population of veterans in the Bay Area and would also impose substantial costs and burdens on Santa Clara itself. Santa Clara's Office of Veterans Services works directly with the VA and with veterans and their families living in Santa Clara County to assist them with applying for benefits programs for which they are eligible, and to increase the uptake within the veteran community of medical services at the VA, including

behavioral health services. The VA not only provides healthcare, but it also assists veterans with processing benefits. At this time, there is already a long wait for mental health appointments at the VA Hospital in Palo Alto. If the VA's reorganization causes the VA Hospital in Palo Alto to close or offer reduced services, veterans in Santa Clara County will face longer wait times and could lose access altogether to VA services, forcing veterans to forgo care or turn to other providers. Yet these other providers do not have the same level of familiarity with issues affecting veterans, nor the shared experiences that are often critical to making veterans comfortable seeking behavioral health services, and that underlie the very creation of the VA. The resulting delays will exacerbate existing backlogs and leave veterans without the financial and healthcare support they depend on. The delays, closures, and loss of staff at the VA—both at the VA Hospital in Palo Alto and in offices that perform centralized functions like call centers and benefits processing—will also hamper the efforts of Santa Clara's Office of Veterans Services because it would prevent that office from doing its primary, core function of connecting veterans to the healthcare and benefits-processing staff at the VA. That, in turn, could have devastating effects on the veteran community, which is at disproportionate risk of homelessness and suicide. In turn, implementation of the ARRP would impose additional burdens on hospitals, like those owned by Santa Clara, that operate emergency departments; on housing support service providers like Santa Clara's Office of Supportive Housing; and on other Santa Clara offices and departments.

47. If any of the federal agencies discussed above had notified the public of their reorganization plans and provided an opportunity to comment on those plans, Santa Clara would have prepared and submitted comments opposing any changes that would undermine Santa Clara's operations, activities, or ability to protect the public health and welfare.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 30, 2025 at San José, California.

JAMES R. WILLIAMS