Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
dleonard@altber.com
bchisholm@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs*

[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>　　　　Defendants. | Case No. 3:25-cv-03698-SI<br><br>**DECLARATION OF BRIAN P. MCKEON** |

## DECLARATION OF BRIAN P. MCKEON

I, Brian P. McKeon, declare as follows:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. Over the course of three decades of federal employment, I have served in senior roles at the U.S. Departments of State and Defense, and on the staff of the National Security Council ("NSC").

3. From 2012 to 2014, I served as Executive Secretary and Chief of Staff to the National Security Council. In this role, I managed all administrative and operational aspects of the NSC's work, and served as a liaison between the NSC and other leadership offices within the departments and agencies responsible for national and homeland security.

4. At the Defense Department, I served as Principal Deputy Under Secretary of Defense for Policy from 2014 to 2017, and concurrently as Acting Under Secretary for the final seven months of the Obama Administration. In that position, I advised the Secretary and Deputy Secretary on matters concerning defense and national security policy.

5. Most recently, I served as the Deputy Secretary of State for Management and Resources, a role I held from March 19, 2021 to December 31, 2022.

6. In this position, I was the Chief Operating Officer of the Department and supervised the work of senior officials responsible for personnel decisions within the Department.

7. No Reductions in Force ("RIFs") occurred during my tenure at the State Department. Had RIFs occurred, however, I would have been responsible for their lawful implementation and am therefore familiar with the requirements for conducting a RIF at the Department of State.

8. At the Department, a RIF would be a highly individualized, resource-intensive process, with several mandatory steps involving complex evaluations and consultations between officers at every level of the Department. The evaluation process would be based on merit and with maximum transparency.

9. At the outset, the decision to engage in a RIF is a serious one and would require extensive deliberation among Department leadership. This decision would almost certainly involve

consultation between the primary decisionmaker, the Secretary, and a long list of advisors—the Deputy Secretaries, the Under Secretaries, as well as other senior officials. Only after all other alternatives were exhausted would the Secretary elect a RIF.

10. The decision to engage in a RIF is fundamentally a decision based on the level of funds available to the Department in a fiscal year.

11. A RIF would be viewed as a last resort. Preferable options include reductions to non-personnel costs (such as extending already lengthy replacement cycles for facilities and equipment), Voluntary Early Retirement, Voluntary Separation, eliminating vacant positions, and deferring funding for new initiatives.

12. Department leadership views RIFs as a last resort because of their harmful effect on employees and the Department. Like any loss of personnel (whether through attrition, termination, or otherwise), RIFs would harm employee morale and place significant workload burdens on the remaining employees.

13. Only if it became apparent that the Department had no other options available within current budgets would leadership decide to engage in a RIF.

14. Once this point is reached, the Secretary would instruct the Under Secretary for Management to work with the Director General of the Foreign Service and Director of Human Resources (or head of Personnel, if the Director General position is vacant, which it is at this moment) to begin the RIF. The Secretary would specify the resource level that would have to be reached worldwide to attain the necessary fiscal reduction, as well as the timeframe for doing so. The Under Secretary for Management would then work with the other Under Secretaries and the heads of the various offices and bureaus to identify positions that must be eliminated to achieve the savings necessary.

15. A RIF process would also require a careful evaluation of every position at the Department to determine which positions could be eliminated at the least risk to U.S. national security. This, too, would be a deliberative process between leaders at different levels of the Department.

16. After those steps would come the most complex part: the ranking of employees to determine which should be retained.

17. Pursuant to the provisions of the Foreign Affairs Manual, each Department employee in a functional area and grade which is being eliminated must be evaluated against other Foreign Service employees in the same field and at the same grade, according to a specified points system, taking into account several enumerated criteria, to determine whether an individual in a position slated for elimination should be transferred or released. Merely releasing an individual occupying a specific position is not permitted. This ranking process would be highly time-consuming.

18. In the case of an employee being transferred from a position being abolished, Department officials must determine the position to which that individual should be transferred and whether the current occupant of that position is being transferred or released. This once again requires careful consideration of each employee's merits based on a points system.

19. State Department personnel consist primarily of members of the Foreign and Civil Services. After the positions have been identified for abolition, the first step of a RIF is for the Bureau of Personnel to divide those positions identified between those occupied by members of the Foreign Service and those occupied by Civil Service personnel. While RIFs of members of the Civil Service may largely resemble the procedures at other agencies, there are specialized procedures for members of the Foreign Service.

20. Like the U.S. military, members of the Foreign Service are ranked by class, with the lower class numbers representing those with more seniority in the Service (i.e., class 1 is the senior-most rank prior to entry into the Senior Foreign Service; the Senior Foreign Service is roughly analogous to the ranks of general or flag officers in the military). Members of the Foreign Service are elevated to a new class when they are promoted. Promotion decisions are made based on a set of criteria emphasizing the ability to perform at the next highest level.

21. Members of the Foreign Service are also separated by skill set. Broadly speaking, members of the Foreign Service fall into two categories: Foreign Service generalists and Foreign Service specialists.

22. As the name suggests, Foreign Service specialists perform a specific job function, for example, Information Technology.

23. Foreign Service generalists are what members of the public would consider to be a traditional "diplomat." These are individuals who perform a wide array of functions at specific duty stations. Generalists are also divided into specific job areas: political reporting and analysis, economic reporting, analysis and trade promotion, public diplomacy, consular affairs, and management.

24. In all, across Foreign Service generalists and specialists, there over 20 different job functions.

25. As described below, any RIF at the Department compliant with the rules would be a technically complex process involving the evaluation of thousands of service members across dozens of competition groups according to multiple parameters, while applying different rules to members of the Civil and Foreign Services. This would take significant time, trained personnel, and specialized technology.

**I.   Decision-making Regarding Function Elimination for the Department of State**

26. Any RIF at the State Department would involve a consideration of what functions to eliminate. Only then can Department leadership determine which individuals to transfer or release to accommodate the elimination or reduction in various capabilities.

27. The decision of which functions to eliminate would involve a collaborative process between the Secretary, the Deputy Secretaries, the Under Secretaries, the Director General, and Bureau and Office heads, all coordinated by the Under Secretary for Management.

28. The Under Secretaries would work with the heads of each Office or Bureau under their supervision to determine which positions the Department can abolish with the least damage to each Office or Bureau's core mission.

29. Once each Under Secretary has prepared a list of positions to be eliminated in their respective areas of responsibility, they would be shared with the other Under Secretaries to ensure that all agree that the resulting cuts cause the least damage to overall operations and U.S. national security interests.

30. The Under Secretary for Management would prepare the coordinated recommendation for transmission to the Secretary for final decision. The Secretary's decision would be transmitted to the Bureau of Personnel, which would then be charged with determining which positions must be terminated as part of the RIF.

**II. Decision-making Regarding Release of Individual Foreign Service Members**

31. The next step with regard to a RIF involving Foreign Service Members would be to determine how many members of the Foreign Service at each grade level and in functional specialty must be released to achieve the necessary reductions in personnel, and how many must be transferred to maintain operations within the funds available.

32. The process for making these determinations involves a highly complex comparative evaluation across each different group of members of the Foreign Service.

33. The first step in this evaluation process is to divide service members into competition groups. A competition group is a cohort of employees competing with one another for retention in a particular skill set specialty at a particular grade. There is no geographical limitation to competition groups.

34. The lowest-rated individuals in these groups would be released from the Department according to Department needs. The remaining members would either remain in their position or be transferred to another position if their current position has been identified for elimination.

35. Competition groups are defined by a servicemember's class (i.e., their rank) and their designated skill set (e.g., consular relations, IT). Individuals in the same class and skill set form a single competition group.

36. Once employees are divided into a competition group, employees are ranked according to a point system, which awards points based on several factors, including being a veteran, employee performance, and language proficiency.

37. The Personnel Bureau would then rank servicemembers according to their composite score and use this to determine who is to be retained.

38.     In the event an individual has been retained, but the position that they currently occupy has been eliminated, that employee will be transferred to a new position of similar class and skill.

**III. Harms from a RIF**

39.     As described above, history indicates that Department leadership views RIFs as a last resort. This is because of the significant harms resulting from termination of a significant number of employees.

40.     This harm is even worse if RIFs occur on an unreasonably compressed timeframe. While it is common for members of the Foreign Service to transfer positions every few years, such transfers are done on a carefully planned timeline based on several factors, including the needs of the Department at particular locations and families' ability to relocate. In the event of a RIF, this may not be possible: if a position is hastily eliminated, and its occupant is retained, they will need to transfer quickly to assume their new position, which will be vacant until they arrive.

41.     The wholesale elimination of positions also compromises Department employees' ability to successfully do their jobs. If, for example, the employment roster of an embassy is reduced substantially, other embassy officers will be expected to perform functions previously handled by multiple employees.

42.     In addition to the damage to morale, such a situation compromises important Department functions, thus posing risks to national security, economic security, and the safety and security of American citizens working and travelling by compromising important Department functions. These include the following:

> [a] the reporting and analysis done by State Department personnel on other nations provides vital input to national security decisions. This work, and that done by the military and intelligence community, assists senior officials in the U.S. government in making critical decisions.
>
> [b] in the same vein, the reporting, analysis, and trade promotion provides essential data highly valued by the Commerce Department, the Export-Import Bank, and other entities in creating trade and investment opportunities abroad and thus increase U.S. export and U.S. employment.

Declaration of Brian McKeon                                     Case No: 3:25-cv-03698-SI

[c] consular operations screen those seeking to visit the United States as tourists or business travelers, as well as to study. These visitors create millions of jobs in the U.S. travel and tourism sector and contribute to economic activity across many sectors. Consular officers also assist American citizens in distress overseas, including publishing warnings about the safety of travel in foreign countries. They also provide passport services, birth and death certificates to those who are born or die abroad and provide liaison for those who need to communicate with the Social Security Administration, the Department of Veterans Affairs and the Internal Revenue Service.

[d] public diplomacy personnel ensure that the truth about American activities reach the foreign public, collect material published about the U.S. in the foreign press, and identify up-and-coming local nationals for exchange programs.

[e] the management operations ensure that the four previous functions have the facilities, security, and operational support they need to successfully achieve their missions. These operations also provide comprehensive support services to other U.S. agencies that need to operate overseas.

43. For these reasons, the Department has avoided RIFs whenever possible. During my career in government, extending back to service in the 1980s working for a senior member of the Senate Committee on Foreign Relations, I do not believe that the Department engaged in a RIF.

## IV. Conclusion

44. Based on the foregoing, any RIF the State Department decides to conduct would be a highly resource and time-intensive process, requiring consultations between officials at different levels of leadership and parallel evaluation processes involving different sets of rules.

45. RIFs can also be harmful. A RIF (especially one imposed on a hasty schedule) would cause significant damage to the nation's national security interests, employee morale, and the Department's ability to pursue its mission.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 30th day of April 2025 in Washington, DC.

_____
Brian McKeon