1  Stacey M. Leyton (SBN 203827)
   Barbara J. Chisholm (SBN 224656)
2  Danielle Leonard (SBN 218201)
   ALTSHULER BERZON LLP
3  177 Post Street, Suite 300
4  San Francisco, CA 94108
   Tel. (415) 421-7151
5  Fax (415) 362-8064
   sleyton@altber.com
6  dleonard@altber.com
7  bchisholm@altber.com

8  Elena Goldstein (pro hac vice)
   Skye Perryman (pro hac vice)
9  DEMOCRACY FORWARD FOUNDATION
   P.O. Box 34553
10 Washington, DC 20043
   Tel: (202) 448-9090
11 Fax: (202) 796-4426
12 egoldstein@democracyforward.org
   sperryman@democracyforward.org
13
14 *Attorneys for Plaintiffs*

15 [Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Case No. 3:25-cv-03698-SI <br><br> **DECLARATION OF REGINALD WELLS** |

**DECLARATION OF REGINALD WELLS**

I, Reginald Wells, declare as follows:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I served as Deputy Commissioner for Human Resources at the Social Security Administration ("SSA") for 15 years, from 2002 until my retirement in 2017. In this role, I was responsible for all issues related to the workforce at the SSA. I had responsibility for the office of personnel, office of civil rights and equal opportunity, office of learning, and the office of labor and employee relations. I also had responsibility for overseeing the Senior Executive Service program at the agency.

3. Prior to that, I served as Deputy Commissioner of the Administration on Developmental Disabilities within the Department of Health and Human Services from 1994 to 2002.

4. In my 15 years at the SSA, a Reduction in Force ("RIF") never occurred, nor did the agency's leadership ever meaningfully consider one as a possibility, due to the consequences that a RIF would have for the agency's ability to successfully perform its required functions.

5. Throughout my entire tenure at the SSA, the agency's most significant problem was staffing shortages. These shortages led to excess wait times, both on the SSA's customer service telephone line and at field offices. They also slowed down the speed at which the SSA processed applications for social security benefits, particularly disability benefits. From the time I joined, a substantial backlog had accumulated at the SSA because there were simply not enough employees to handle the ever-increasing volume of applications. This problem was due in large part to a lack of personnel to staff phone lines and offices.

6. As a result of these shortages during my tenure, any action in which the SSA would release a significant number of its employees was unthinkable.

7.     While the SSA did face budget shortfalls during my tenure, its senior leadership never considered a RIF to be a workable solution. The most extreme personnel-reduction measure employed by the SSA was seeking authority to offer Voluntary Early Retirement to certain employees. The agency also, to my knowledge, did not offer Voluntary Separation Incentive Payments.

8.     I understand that these staffing shortages have not only persisted, but worsened, since I departed the SSA. In light of this, I am unable to conceive of any reason that would justify a RIF at the present moment, even in response to a (hypothetical) serious budget shortfall.

9.     If a RIF had occurred during my tenure, it would have been managed by me in my capacity as Deputy Commissioner for HR.

10.     Based on my understanding of the relevant rules and general SSA personnel management practice, a RIF at the SSA would be a time and resource-intensive process. It would require extensive planning among the senior leadership of the administration, in consultation with leaders of regional and field offices, and implementation would have been highly complex.

*Social Security Administration Background and Structure*

11.     The mission of the Social Security Administration is to provide financial protection for the American people through the many programs it administers. In order to achieve its mission, the SSA must efficiently and in a timely manner provide information, claims processing, and related services to the American people. This is only possible with the help of the agency's personnel.

12.     Based on my current understanding, the Social Security Administration is presently staffed across 10 regional offices, 6 processing centers, 15 Social Security Card Centers, and 1,230 field offices, as well as a headquarters in Baltimore, MD.

13.     Regional offices serve as a regional hub for leadership and oversight for the SSA within specified parts of the country.[1]

---

[1] The SSA recently announced plans to reduce the number of its regional offices from 10 to 4. Social

14. Processing centers manage complex social security retirement, survivors, and disability claims.

15. Social Security Card offices focus exclusively on providing social security cards.

16. Field offices offer a full range of social security services, including the handling applications for retirement, disability, and Supplemental Security Income (SSI) benefits. Field offices also process applications for a social security number.

17. Headquarters typically manages operational components of the agency, including by overseeing the SSA's tens of thousands of employees. The leadership of the agency, including the Commissioner and the Deputy Commissioners, serves at Headquarters.

18. In addition to employees at the SSA's headquarters and field offices, the SSA also employs upwards of 1,000 Administrative Law Judges (ALJs), who adjudicate appeals of claim determinations by regional office staff.

19. The SSA also has 24 call centers throughout the country that offer many field office services via telephone.

*Staffing Shortages*

20. One consistent problem my colleagues at the SSA and I faced during my tenure were staffing shortages.

21. When I joined the SSA in 2002, the agency's staff stood at 65,000, a significantly higher number than staffing levels today.

---

Security Administration, *Social Security Announces Workforce and Organization Plans* (last updated Apr. 18, 2025), https://blog.ssa.gov/social-security-announces-workforce-and-organization-plans/#:~:text=SSA%20has%20operated%20with%20a,components%20down%20to%20four%20regions. Under this proposed reduction, 4 regional offices would be charged with interfacing with 50 state governments, as well as the governments of the District of Columbia and America's territories.

Declaration of Reginald Wells                                       Case No: 3:25-cv-03698-SI

22. Even at this level, the SSA was at a shortage. Headquarters would regularly receive a large volume of complaints from SSA beneficiaries concerning wait times, both on the SSA's phone service and at SSA field offices.

23. Upon my departure in 2017, the staffing level had dropped to 59,000. That number is now around 57,000 today and falling.[2]

24. Staffing shortages persisted throughout my time at the SSA, and continue today. In a 2022 survey of field office managers conducted by the SSA's Office of Inspector General, around 70 percent of respondents said staffing levels were not sufficient to serve the number of customers coming into the office.[3]

25. Wait times at offices remain substantial. According to a May 2024 study by the SSA's Office of Inspector General of SSA field offices and Social Security Card offices, customers waited an average of 32 to 45 minutes to receive services at an office after being checked in.[4]

26. Telephone wait times are also lengthy. In 2024, wait times on the SSA's 800 number were an hour on average, and have climbed this year to an hour and a half.[5]

27. Staffing shortages have also led to a slowdown in claims processing. Presently, the SSA has a backlog of 1 million applications for disability benefits. On average, applicants for disability benefits wait seven months to receive an initial disability determination.[6]

*Reduction in Force Avoidance*

---

[2] *Id.*
[3] Office of the Inspector General, Social Security Administration, *Customer Wait Times in the Social Security Administration's Field Offices and Card Centers* at 8 (May 17, 2024), https://oig.ssa.gov/assets/uploads/152307.pdf.
[4] *Id.* at 4.
[5] Ashley Lopez, *Employee Cuts at Social Security are Leaving Remaining Workers Struggling to Keep up*, NPR (Apr. 26, 2025), https://www.npr.org/2025/04/26/nx-s1-5368480/social-security-workforce-cuts.
[6] Jack Smalligan & Adriana Vance, *Downsizing Staff will Make it Harder to Receive Social Security Payments*, Urban Institute (Feb. 20, 2025), https://www.urban.org/urban-wire/downsizing-staff-will-make-it-harder-receive-social-security-payments.

Declaration of Reginald Wells                                             Case No: 3:25-cv-03698-SI

28. In light of the above, it is difficult for me to conceive why SSA leadership would consider engaging in a RIF. As described, the SSA had difficulty meeting the needs of the public even at higher staffing levels.

29. As the Deputy Commissioner for Human Resources at the SSA, I was regularly involved in discussions concerning changes to SSA's workforce.

30. At times, the SSA would face budget shortfalls, due to lower than expected congressional appropriations or unanticipated costs. When this would occur, the Commissioner would request the deputy Commissioners to propose a plan for how to remove these shortfalls.

31. During my tenure, whenever circumstances required savings from the personnel budget, the Commissioner and his deputies considered an array of options, none of which involved a RIF.

32. In some instances, the SSA would seek Voluntary Early Retirement Authority ("VERA"). This would enable the SSA to lower the retirement age to give certain employees the opportunity to retire with full retirement benefits.

33. Leadership recognized that even this, however, came at a substantial cost to the agency's mission. As staff decreased, application processing speed went down, wait times at offices and on the phone went up, and the agency diminished in its overall ability to serve beneficiaries.

34. To my knowledge, the agency never offered a Voluntary Separation Incentive Payment ("VSIP") to employees during my tenure.

35. While leadership did consider VSIP as an option during my tenure, we consistently rejected the option, because the agency simply could not afford the blow to its staffing levels.

36. Likewise, the chief reason the SSA never elected to engage in a RIF during my tenure was because it could not afford to lose staffing, for reasons described above.

37. In addition, a RIF would be a substantial blow to workplace morale. I have witnessed the serious toll regular staff departures can have on the wellbeing of SSA employees.

Declaration of Reginald Wells                                    Case No: 3:25-cv-03698-SI

38. The SSA has a unique need for high workplace morale because of the people-centric nature of its work. The SSA is one of the few agencies that serves the public directly; its employees must interface with beneficiaries, make disability determinations, process claims, and the like. If morale drops, the quality of service will inevitably drop. That, combined with a staffing shortage, could be catastrophic for the agency's mission.

*Reduction in Force Procedures*

39. If the SSA were to choose to engage in a RIF, the RIF process would be managed by the Deputy Commissioner for Human Resources, *i.e.*, the position I held for 15 years.

40. This process would require a painstaking evaluation of where SSA resources are being spent and where those resources can be cut with minimal damage to the SSA's mission.

41. In light of the staffing issues already faced by the SSA, this would be no easy task. The Commissioner, in collaboration with his deputies and the regional and field office heads, would need to navigate competing priorities including, for instance, maximizing the speed of response on SSA's phone lines and at its field offices, expediting the processing of benefits applications, and ensuring timely adjudication of social security disputes. In all likelihood, this would involve a scramble for resources between different sectors of the agency, one which the Commissioner must mediate.

42. A RIF at the SSA would also need to take place in strict compliance with OPM regulations on RIFs.

43. These regulations require the grouping of employees by specified groups, the creation of employee registers, and the methodical movement and release of employees according to a specified points system.

44. To confirm that the RIF plan complied with the applicable regulations during this process, senior leadership, including the Commissioner and I, would need to consult with the agency's general counsel.

Declaration of Reginald Wells                                   Case No: 3:25-cv-03698-SI

*Conclusion*

45. Based on my 15 years of experience as the seniormost human resources officer at the SSA, it is difficult for me to conceive of why the agency would elect to engage in a RIF. Both during my tenure and continuing today, the SSA has faced significant staffing shortages. Reducing staffing still further would make a bad problem worse.

46. In addition, even if a RIF were an advisable course of action, it would require a careful and deliberative process, balancing competing interests across the agency's offices and taking due account of the well-being of its employees and workplace morale. This would require significant time, resources, and human capital.

47. Ultimately, the greatest victims of a RIF at the SSA would also be the most important: the tens of millions of Americans who benefit from programs the SSA administers. A cut to the SSA workforce would mean longer wait times, slower application processing, and more social security appeals languishing in the agency's appeals process. This is an outcome wholly at odds with the SSA's mission and values.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 30th day of April in Baltimore, MD

*[signature]*

Reginald Wells