ELIZABETH B. WYDRA (BAR NO. 218200)
BRIANNE J. GOROD
MIRIAM BECKER-COHEN
ANNA K. JESSURUN
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for Amicus Curiae*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| | Case No. 3:25-cv-03698-SI |
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*, | |
| Plaintiffs, | **BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| PRESIDENT DONALD TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants. | Date: May 9, 2025 |
| | Time: 10:30 a.m. (PDT) |
| | Place: Courtroom 1, 17th Floor |
| | 450 Golden Gate Avenue |
| | San Francisco, CA 94102 |
| | Judge: Honorable Susan Illston |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

INTEREST OF *AMICUS CURIAE* ....................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................... 1

ARGUMENT ........................................................................................................................ 3

    I.   The Authority to Create, Restructure, and Abolish Federal
       Departments and Agencies Belongs to Congress ....................................................... 3

    II.  As Historical Practice Demonstrates, When Congress Wants to Give the President
       Authority to Reorganize the Executive Branch, It Does So Through Legislation...... 10

CONCLUSION..................................................................................................................... 14

i

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Bowsher v. Synar,*
    478 U.S. 714 (1986) ................................................................................ 14

*Buckley v. Valeo,*
    424 U.S. 1 (1976) .................................................................................... 4

*Free Ent. Fund v. PCAOB,*
    561 U.S. 477 (2010) ............................................................................. 1, 3

*INS v. Chadha,*
    462 U.S. 919 (1983) ............................................................................ 9, 13

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ................................................................................ 6

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ................................................................................ 9

*Myers v. United States,*
    272 U.S. 52 (1926) .................................................................................. 4

*Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.,*
    462 U.S. 810 (1983) ................................................................................ 8

*NFIB v. OSHA,*
    595 U.S. 109 (2022) ............................................................................. 4, 6

*NLRB v. Noel Canning,*
    573 U.S. 513 (2014) ................................................................................ 9

*The Pocket Veto Case,*
    279 U.S. 655 (1929) ................................................................................ 9

*United States v. Midwest Oil Co.,*
    236 U.S. 459 (1915) ................................................................................ 9

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ............................................................................. 3, 9

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

<u>CONSTITUTIONAL PROVISIONS</u>

U.S. Const. art. I, § 1 ..................................................................................... 1, 3

U.S. Const. art. I, § 8, cl. 18 ............................................................................... 4

U.S. Const. art. II, § 2, cl. 2 ............................................................................... 4

<u>LEGISLATIVE MATERIALS</u>

Act of July 27, 1789, ch. 4, 1 Stat. 28 ............................................................. 4, 5

Act of Aug. 7, 1789, ch. 7, 1 Stat. 49 ............................................................. 4, 5

Act of Sept. 2, 1789, ch. 12, 1 Stat. 65 ........................................................... 4, 5

Act of Sept. 11, 1789, ch. 13, 1 Stat. 67 ............................................................. 5

Act of Sept. 15, 1789, ch. 14, 1 Stat. 68 ............................................................. 6

Act of Apr. 25, 1812, ch. 68, 2 Stat. 716 ............................................................. 6

Act of July 4, 1836, ch. 352, 5 Stat. 107 ............................................................. 7

Act of July 4, 1836, ch. 357, 5 Stat. 117 ............................................................. 7

Act of Mar. 3, 1849, ch. 108, 9 Stat. 395 ........................................................... 5, 7

Act of June 22, 1870, ch. 150, 16 Stat. 162 ......................................................... 5

Act of June 30, 1932, Pub. L. No. 72-212, 47 Stat. 382 ....................................... 11

Act of Mar. 3, 1933, Pub. L. No. 72-428, tit. IV, 47 Stat. 1489 ........................... 12

Act of Oct. 19, 1984, Pub. L. 98-532, 98 Stat. 2705 ............................................ 13

Act to Regulate Commerce, ch. 104, 24 Stat. 379 (1887) ..................................... 5

75 Cong. Rec. (1932) ......................................................................................... 11

83 Cong. Rec. (1938) ......................................................................................... 12

iii

# TABLE OF AUTHORITIES – cont'd

Page(s)

Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, tit. II, 108 Stat. 3178 ................................................................................................................. 8

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, tit. III, 124 Stat. 1520 (2010) .................................................................................... 8

Energy Reorganization Act of 1974, Pub. L. No. 93-438, 88 Stat. 1233 ............................ 9

Henry B. Hogue, Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* (2012) ......................... 10-14

Henry B. Hogue, Cong. Rsch. Serv., R47897, *Abolishing a Federal Agency: The Interstate Commerce Commission* (2024) ...................................................... 6, 7

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 .............................. 8

H.R. Rep. No. 91-1104 (1970) ............................................................................................. 8

ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 903 ...................................... 7

Postal Reorganization Act, Pub. L. 91-375, 84 Stat. 719 (1970) ......................................... 8

Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561 ............................... 12, 13

Reorganization Act of 1945, Pub. L. No. 79-263, 59 Stat. 613 .......................................... 13

Reorganization Act of 1949, Pub. L. No. 81-109, 63 Stat. 203 .......................................... 13

Reorganization Act of 1977, Pub. L. No. 95-17, 91 Stat. 29 ............................................. 13

Reorganization Act Amendments of 1984, Pub. L. No. 98-614, 98 Stat. 3192 ................... 13

5 U.S.C. § 901 ................................................................................................... 2, 13

5 U.S.C. § 902 ................................................................................................... 2, 13

5 U.S.C. § 903 ................................................................................................... 2, 13

5 U.S.C. § 904 ................................................................................................... 2, 13

5 U.S.C. § 905 ................................................................................................... 2, 13

iv

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

5 U.S.C. § 906 .................................................................... 2, 13

5 U.S.C. § 907 .................................................................... 2, 13

5 U.S.C. § 908 .................................................................... 2, 13

5 U.S.C. § 909 .................................................................... 2, 13

5 U.S.C. § 910 .................................................................... 2, 13

5 U.S.C. § 911 .................................................................... 2, 13

5 U.S.C. § 912 .................................................................... 2, 13

6 U.S.C. § 111 .................................................................... 6

6 U.S.C. § 291 .................................................................... 8

12 U.S.C. § 5413 ................................................................. 8

20 U.S.C. § 3411 ................................................................. 6

20 U.S.C. § 3441 ................................................................. 10

21 U.S.C. § 393 .................................................................. 6

42 U.S.C. § 901 .................................................................. 6

51 U.S.C. § 20111 ............................................................... 6

EXECUTIVE BRANCH MATERIALS

Comprehensive Plan for Reorganizing the Executive Branch, Exec. Order No. 13,781, 82
    Fed. Reg. 13959 (Mar. 13, 2017) ..................................... 2, 14

Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025)  ............ 3

Reorganization Plan No. 1 of 1953, *in* 67 Stat. 631 ................... 10

Reorganization Plan No. 3 of 1970, *in* 84 Stat. 2086 ................. 10

v

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Reorganization Plan No. 3 of 1978, *in* 92 Stat. 3788 ............................................................. 10

Statement About Congressional Action on Reorganization of the Executive Branch (Feb. 24, 1932), *in Public Papers of the Presidents of the United States: Herbert Hoover* 74 (U.S. Gov't Printing Off., Wash. 1977) ......................................................... 11

Statement About Signing the "Economy Act" (June 30, 1932), *in Public Papers of the Presidents of the United States: Herbert Hoover* 283 (U.S. Gov't Printing Off., Wash. 1977) ......................................................... 11

## BOOKS, ARTICLES, AND OTHER AUTHORITIES

Paul Stephen Dempsey, *The Rise and Fall of the Interstate Commerce Commission: The Tortuous Path from Regulation to Deregulation of America's Infrastructure*, 95 Marq. L. Rev. 1151 (2012) ......................................................... 5-7

Robert L. Rabin, *Federal Regulation in Historical Perspective*, 38 Stan. L. Rev. 1189 (1986) ......................................................... 5, 6

2 *Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ............................... 4

### INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees. CAC accordingly has an interest in this case and the questions it raises about our Constitution's separation of powers.

### INTRODUCTION AND SUMMARY OF ARGUMENT

Congress—not the President—"has plenary control over the . . . existence of executive offices." *Free Ent. Fund v. PCAOB*, 561 U.S. 477, 500 (2010). Thus, any action to create, restructure, or eliminate a federal agency must stem from an act of Congress. Though Congress may temporarily delegate this authority to the President—subject, of course, to appropriate restraints—the President lacks the power to unilaterally reorganize a government agency in the absence of such a delegation.

Congress's authority over the structure of the federal government is grounded in Article I, which vests "[a]ll legislative Powers" in Congress. U.S. Const. art. I, § 1. With these powers, Congress has created, restructured, and eliminated executive departments and agencies since the Founding. Among Congress's first statutes were those creating the Departments of Treasury, War, and Foreign Affairs. As the nation grew and faced new challenges, Congress established different departments, agencies, and offices to address them. And in response to changing conditions, Congress has at times reorganized and eliminated executive agencies to ensure that the executive

---

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief. All parties consent to the filing of this brief.

branch can meet the needs of the American people in an efficient manner.  Critically, all of these actions to restructure the executive branch have been accomplished through legislation passed by Congress and signed into law by the President.

That the power to reorganize the executive branch belongs to Congress is underscored by the fact that when Presidents have reorganized the executive branch, they have always done so pursuant to congressional delegations of that power—delegations made through legislation and subject to appropriate restraints.  Throughout the twentieth century, Congress passed statutes called Reorganization Acts.  *See, e.g.*, 5 U.S.C. §§ 901-12.  These Acts, which always had expiration dates, authorized the President to make substantial changes to the executive branch that could not be accomplished through ordinary discretionary actions like modifying internal operations, managing federal employees, and determining policy priorities.  The reorganizations authorized by these Acts ranged from creating and abolishing certain agencies to consolidating the statutory functions of various agencies.  *Id.* § 902(2).  The history of the Reorganization Acts demonstrates that when Congress wants to give the President the power to reorganize the executive branch or abolish agencies, it knows how to do so.

Congressionally authorized reorganization authority came to an end in 1984.  Since then, Congress has repeatedly denied requests from Presidents across the political spectrum to renew it—including from President Trump during his first term.  *See* Comprehensive Plan for Reorganizing the Executive Branch, Exec. Order No. 13,781, 82 Fed. Reg. 13959 (Mar. 13, 2017) (ordering OMB to create a report with reorganization recommendations while acknowledging the need for congressional approval).

This time, President Trump decided that he would not take no for an answer.  Rather than ask Congress for reorganization authority, he chose to unilaterally effectuate "a critical

2

transformation of the Federal bureaucracy" by eliminating what he deemed "waste, bloat, and insularity" in the federal government's structure.  Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025).

That is not how it works.  As the Supreme Court made clear half-a-century ago, "[t]he President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  When it comes to reorganizing the federal government, the President enjoys no constitutional authority "except for recommendation and veto," *id.* at 655 (Jackson, J., concurring)—his limited roles in the lawmaking process.  And not only has Congress declined to delegate to President Trump the reorganization power that it delegated to some prior Presidents through Reorganization Acts, it has affirmatively enacted countless statutes mandating the existence of federal agencies that Trump now seeks to fundamentally restructure to the point of dismantlement.  Thus, Defendants' efforts to unilaterally reorganize the federal government are "incompatible with the expressed or implied will of Congress."  *Id.* at 637.  This Court should grant Plaintiffs' motion for a temporary restraining order and put an end to this destruction of the federal government's infrastructure by executive fiat.

## ARGUMENT

### I.   The Authority to Create, Restructure, and Abolish Federal Departments and Agencies Belongs to Congress.

**A.**  The Constitution provides that "[a]ll legislative Powers," U.S. Const. art. I, § 1, including "plenary control over the . . . existence of executive offices," *Free Ent. Fund*, 561 U.S. at 500, "shall be vested in a Congress of the United States," U.S. Const. art. I, § 1.  It also grants Congress the exclusive power to "carr[y] into Execution" not only the "foregoing Powers" under Article I, Section 8, but also "all other Powers vested by this Constitution in the Government of

3

the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18. By referencing the Vesting Clauses of Article II and Article III, this affirmative textual grant of congressional power "undoubtedly" authorizes Congress to pass laws creating executive departments, agencies, and offices. *Buckley v. Valeo*, 424 U.S. 1, 138 (1976); *see* U.S. Const. art. II, § 2, cl. 2 (granting Congress the authority to establish offices "by Law"); *Myers v. United States*, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices [and] the determination of their functions and jurisdiction."). Agencies are thus "creatures of statute," *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam), and Congress has plenary authority over the structure of the federal government.

With that plenary authority comes substantial flexibility. Indeed, the Framers rejected a plan to delineate in the Constitution the specific departments of the executive branch and their duties, choosing instead to give Congress the power to create those departments through the legislative process. *See* 2 *Records of the Federal Convention of 1787*, at 335-36 (Max Farrand ed., 1911). The First Congress promptly exercised that power, recognizing that executive departments would be essential to a functional government. Thus, some of the first statutes Congress passed were those establishing executive departments, including the Department of Treasury, Act of Sept. 2, 1789, ch. 12, § 1, 1 Stat. 65, 65; the Department of War, Act of Aug. 7, 1789, ch. 7, § 1, 1 Stat. 49, 49-50; and the Department of Foreign Affairs, Act of July 27, 1789, ch. 4, § 1, 1 Stat. 28, 28-29.

To ensure that these departments could function as envisioned, the First Congress gave some of them specifically delineated responsibilities, while instructing others simply to execute the duties the President assigned them. For example, Congress required the Treasury Secretary to "digest and prepare plans for the improvement and management of the revenue . . . ; to prepare

and report estimates of the public revenue, and the public expenditures . . . and generally to perform all such services relative to . . . finances." Act of Sept. 2, 1789, § 2, 1 Stat. at 65-66.  By contrast, Congress authorized the Secretaries of War and Foreign Affairs to "perform and execute such duties as shall from time to time be enjoined on or intrusted to him by the President."  Act of July 27, 1789, § 1, 1 Stat. at 29; *see* Act of Aug. 7, 1789, §1, 1 Stat. at 50 (similar).  And whatever the scope of their statutorily designated responsibilities, Congress ensured that these departments could hire the staff they needed to accomplish their work.  *See* Act of Sept. 11, 1789, ch. 13, § 2, 1 Stat. 67, 68 ("the heads of the [Treasury, State, and War] departments . . . shall appoint such clerks therein respectively as they shall find necessary").  Over the next several decades, Congress created additional executive departments to meet the fledgling nation's new needs.  *See, e.g.*, Act of Mar. 3, 1849, ch. 108, § 1, 9 Stat. 395, 395 (Interior Department); Act of June 22, 1870, ch. 150, § 1, 16 Stat. 162, 162 (Justice Department).

Congress's power over the structure of the federal government extends beyond the establishment of executive departments to the creation of agencies to address the nation's most pressing problems.  In 1887, Congress created the first regulatory agency: the Interstate Commerce Commission (ICC).  *See* Act to Regulate Commerce, ch. 104, § 11, 24 Stat. 379, 383 (1887).  Railroads were "central[] . . . to the national economy in the post-Civil War period," Robert L. Rabin, *Federal Regulation in Historical Perspective*, 38 Stan. L. Rev. 1189, 1197 (1986), but with this booming industry came considerable challenges, including "[r]uinous rate wars," "price fixing and pooling agreements," and "onerous" working conditions, Paul Stephen Dempsey, *The Rise and Fall of the Interstate Commerce Commission: The Tortuous Path from Regulation to Deregulation of America's Infrastructure*, 95 Marq. L. Rev. 1151, 1155-56, 1159 (2012).  Because states were unable to address these problems themselves, a national solution was needed.  *See*

5

Rabin, *supra*, at 1206.  Congress thus created the ICC to "regulate the rates and practices of the railroads," Dempsey, *supra*, at 1152, giving it the power to receive and investigate complaints about rail carriers and issue orders if it found rates to be unjust or unreasonable, *see* Henry B. Hogue, Cong. Rsch. Serv., R47897, *Abolishing a Federal Agency: The Interstate Commerce Commission* 4 (2024) [hereinafter Hogue, *ICC*].

In the years since, Congress has repeatedly created other agencies and departments, including the Department of Education, 20 U.S.C. § 3411; the Department of Homeland Security, 6 U.S.C. § 111(a); the Food and Drug Administration, 21 U.S.C. § 393(a); the Social Security Administration, 42 U.S.C. § 901(a); and the National Aeronautics and Space Administration (NASA), 51 U.S.C. § 20111(a).  The creation of each of these departments and agencies reflected Congress's judgment about the proper means to respond to a unique moment in history, provide a public service, or effectuate a policy.  Each agency's powers are prescribed by "the authority that Congress has provided" through statute.  *NFIB*, 595 U.S. at 665.  In other words, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

**B.**  Congress also has the power to restructure and abolish agencies as it finds necessary, including by renaming federal agencies, subsuming one federal agency or office within another, changing an agency's functions, or eliminating an agency altogether.  Indeed, Congress has exercised this power since its earliest days.  *See, e.g.*, Act of Sept. 15, 1789, ch. 14, § 1, 1 Stat. 68, 68 (renaming the "Department of Foreign Affairs" the "Department of State").

In the early nineteenth century, Congress also began creating new offices that were housed within executive departments and, as necessary, began reassigning and reorganizing their functions and supervision.  *See, e.g.*, Act of Apr. 25, 1812, ch. 68, § 1, 2 Stat. 716, 716 (establishing the

6

General Land Office (GLO) within the Treasury Department); Act of July 4, 1836, ch. 352, §§ 1-5, 5 Stat. 107, 107-11 ("reorganiz[ing]" the GLO); Act of July 4, 1836, ch. 357, § 1, 5 Stat. 117, 117-18 (establishing the Patent Office within the State Department).  Later, when Congress created the Department of the Interior, it transferred the GLO and the Patent Office from their original departments to the new Department.  Act of Mar. 3, 1849, §§ 2-3, 9 Stat. at 395.  Congress also reassigned certain powers previously exercised by the Secretaries of Treasury, War, and State to the new Secretary of the Interior.  *See id.* §§ 4-7, 9 Stat. at 395-96.

Even when past Presidents have called for agencies to be abolished, they have always recognized that Congress retains the ultimate power to eliminate agencies and transfer their functions.  Consider the history of the ICC.  Beginning in the 1970s, as the importance of railways waned due to cars and interstate highways, railroads became less profitable and "regulation . . . took the blame."  Dempsey, *supra*, at 1172.  In a series of statutes, Congress began limiting the ICC's powers, *see id.* at 1173, and Presidents Carter and Reagan appointed ICC Commissioners "fervently dedicated to deregulation," *id.* at 1183.  Notably, President Reagan pushed to abolish the ICC and proposed legislation to do so, but Congress did not pass it, so the ICC remained. Hogue, *ICC*, *supra*, at 18.  Then, in 1995, President Clinton and Congress agreed to abolish the ICC.  *See id.* at 19.  Congress eliminated the agency by enacting the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 903, which transferred some of its functions to a newly created Surface Transportation Board and the Department of Transportation, Hogue, *ICC*, *supra*, at 22.

The creation of today's Postal Service is another example of a past President—one hardly remembered for his submissiveness to Congress—recognizing that the proper means to seek elimination of an agency is through legislation.  In 1970, postal service reform was urgently needed because, at the time, the nation's "vast sprawling postal complex [was] heavily overburdened and

7

in deep trouble," and struggled to "[keep] pace with the advances of the national economy." H.R. Rep. No. 91-1104, at 3652-53 (1970). After extensive negotiations about how to change the postal system, "President Nixon transmitted the proposed legislation to" Congress, *id.* at 3652, and the reorganization was implemented when "Congress enacted the Postal Reorganization Act," *Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*, 462 U.S. 810, 813 (1983) (citing Pub. L. 91-375, 84 Stat. 719 (1970)). "The Act abolished the Post Office Department, which since 1789 had administered the nation's mails. In its place, the Act established the United States Postal Service as an independent agency." *Id.* (citations omitted).

Congress has reorganized the federal government by abolishing agencies through legislation more recently as well, often with the goal of increasing agency efficiency. For instance, when Congress created the Department of Homeland Security in 2002 in response to 9/11, it abolished the Immigration and Naturalization Service and transferred its functions to the new Department. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205 (codified at 6 U.S.C. § 291). And when Congress reformed federal oversight of financial institutions in the wake of the 2008 recession and sought to "streamline and rationalize the supervision of depository institutions and [their] holding companies," Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, tit. III, § 301, 124 Stat. 1520, 1520 (2010), it abolished the Office of Thrift Supervision, *id.* § 313, 124 Stat. at 1523 (codified at 12 U.S.C. § 5413). Other examples abound. *See, e.g.*, Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, tit. II, §§ 202, 211, 108 Stat. 3178, 3209 (transferring most of the functions of offices within the Agriculture Department to the Secretary of Agriculture "to achieve greater, efficiency, effectiveness, and economies"); Energy Reorganization Act of 1974, Pub. L.

No. 93-438, §§ 101, 104(a), 88 Stat. 1233, 1234, 1237 (abolishing the Atomic Energy Commission and transferring certain functions to a new agency).

**C.** This "[l]ong settled and established practice" of Congress using the lawmaking process to reorganize or eliminate agencies, and receiving due deference from the President, underscores that the authority to create, restructure, and abolish federal agencies lies with Congress as the nation's lawmaking body. *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) ("[l]ong settled and established practice" is entitled to "great weight in a proper interpretation of constitutional provisions' regulating the relationship between Congress and the President" (alteration in original) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929))); *cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("[T]he longstanding practice of the government—like any other interpretive aid—can inform [a court's] determination of what the law is." (quotation marks omitted)). And that lawmaking process must "be exercised in accord with [the] single, finely wrought and exhaustively considered, procedure" of bicameralism and presentment that the Framers selected. *INS v. Chadha*, 462 U.S. 919, 951 (1983). Pursuant to that process, the President can recommend that Congress create an executive agency, and he can veto a congressional effort to create one, but he has no power to create or destroy an agency on his own. *See Youngstown*, 343 U.S. at 587 ("The Constitution limits [the President's] functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad."). The Constitution simply "does not confer upon him any power to enact laws or to suspend or repeal such as the Congress enacts." *United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915).

And that is why if the executive branch seeks authority to reorganize or abolish an agency, it must get Congress to delegate it that authority through the passage of legislation, as the next Section explains.

II.     **As Historical Practice Demonstrates, When Congress Wants to Give the President Authority to Reorganize the Executive Branch, It Does So Through Legislation.**

From 1932 to 1984, Congress gave the President reorganization authority by passing and renewing a series of laws known as the Reorganization Acts.  As the history of these laws demonstrates, when Congress believes that delegating its reorganization power to the President will promote efficiency in government, it knows how to make such a delegation while at the same time limiting the scope of that delegation to protect against presidential overreach.

Broadly speaking, the Reorganization Acts authorized the President to reorganize executive agencies, but they required that he first submit a Reorganization Plan to Congress. Henry B. Hogue, Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* 1 (2012) [hereinafter Hogue, *Presidential Reorganization*].  If Congress consented to the plan (by either inaction or express approval), then the plan became law.  *Id.* at 1-2.

Some of today's major agencies were created by Reorganization Plans.  For example, the Department of Health, Education, and Welfare (HEW)—the predecessor to the Department of Health and Human Services (HHS) and Department of Education—was established by President Eisenhower through a Reorganization Plan.  *See* Reorganization Plan No. 1 of 1953, *in* 67 Stat. 631; 20 U.S.C. § 3441 (transferring the educational functions of the HEW Secretary to the new Secretary of Education); *id.* § 3508 (changing HEW's name to HHS).  The Enivronmental Protection Agency (EPA) and the Federal Emergency Management Agency (FEMA) were similarly created by Reorganization Plans.  *See* Reorganization Plan No. 3 of 1970, *in* 84 Stat. 2086 (creating the EPA); Reorganization Plan No. 3 of 1978, *in* 92 Stat. 3788 (creating FEMA).

Congress passed the first iteration of expressly delegated reorganization authority in 1932 at the urging of President Hoover.  In a statement to Congress on "[t]he need for reorganization,"

10

President Hoover emphasized that the "gradual growth" of the executive branch had led to "overlapping and waste," and he believed that "the number of agencies can be reduced." 75 Cong. Rec. 4181 (1932). He recommended that the "[a]uthority under proper safeguards . . . to effect these transfers and consolidations" should "be lodged in the President" via executive orders subject to Congress's review. *Id.* at 4182; *see* Statement About Congressional Action on Reorganization of the Executive Branch (Feb. 24, 1932), *in Public Papers of the Presidents of the United States: Herbert Hoover* 74, 74 (U.S. Gov't Printing Off., Wash. 1977) ("It is a most unpleasant task to abolish boards and bureaus and to consolidate others. . . . [Reorganization] should be lodged with the Executive with the right of Congress to review the actions taken."). Congress subsequently passed legislation to permit the President to transfer the functions of one agency to another and consolidate the functions of agencies or departments, but it did not allow the President to abolish agencies or departments. *See* An Act of June 30, 1932, Pub. L. No. 72-212, §§ 403, 406, 47 Stat. 382, 413-15. Hoover lamented this limit on his authority. *See* Statement About Signing the "Economy Act" (June 30, 1932), *in Public Papers of the Presidents of the United States: Herbert Hoover*, *supra*, at 283, 283 ("the bill is so framed as to render abolition or consolidation of the most consequential commissions and bureaus impossible of consummation").

Hoover thus continued to push for the expansion of reorganization authority. Hogue, *Presidential Reorganization*, *supra*, at 7-8. In 1933, with the Act set to expire in two years, Congress acquiesced in part, amending the Act to allow the President to abolish an executive agency (defined as "any commission, independent establishment, board, bureau, division, service or office in the executive branch of the Government"), but still prohibiting the abolition of an executive department. *See* Act of Mar. 3, 1933, Pub. L. No. 72-428, tit. IV, §§ 402, 403, 409, 47 Stat. 1489, 1517-19. At the same time, Congress explained that it was delegating this power to

the President only on a temporary basis due to the "serious emergency [that] exists by reason of the general economic depression" and an "imperative to reduce drastically governmental expenditures." *Id.* § 401, 47 Stat. at 1517. After Hoover left office, President Roosevelt used the power to, among other things, consolidate agency functions into newly-designated agencies such as the Office of National Parks, Buildings, and Reservations, and the Division of Territories and Insular Possessions in the Department of the Interior, and abolish the United States Shipping Board and the Board of Indian Commissioners. *See* Hogue, *Presidential Reorganization*, *supra*, at 9.

In 1937, after the authority granted in 1933 expired, Roosevelt requested renewed reorganization authority from Congress and pushed for even greater powers. *Id.* at 10. One of the proposed bills would have allowed the President to reorganize the executive branch without any involvement from Congress and without an expiration date. *See id.* This proposal sparked sharp rebukes from members of Congress who were deeply concerned about giving away their powers over departments and agencies in such a sweeping fashion. *See, e.g.*, 83 Cong. Rec. 4190 (1938) ("[L]eave final authority for changes in the Congress, where it belongs.") (Sen. Brown); *id.* at 4195 ("If the President could abolish or consolidate these agencies without authority of Congress you may rest assured he would not be here asking for authority. He cannot act [unless] we give him power which belongs to Congress.") (Sen. Borah); *id.* at 4196 ("The powers which are proposed to be given by the bill . . . are yet the greatest legislative powers which exist in the Congress of the United States.") (Sen. Johnson).

The next year, Congress passed the Reorganization Act of 1939, Pub. L. No. 76-19, 53 Stat. 561, a narrower version of the bills proposed the year before—indeed narrower still than the reorganization authority Congress had granted in 1933. The purpose of the Act was, among other things, to "increase the efficiency of the operations of the Government" and "to abolish such

12

agencies as may not be necessary." *Id.* § 1(a)(2), (4), 53 Stat. at 561. The Act permitted the President to reorganize federal agencies and departments through the submission of a Reorganization Plan (rather than executive order) to Congress, which would become law absent a concurrent resolution rejecting the Plan. *Id.* §§ 4-5, 57 Stat. at 562-63. This time, however, Congress prohibited the President from creating or abolishing executive departments or abolishing independent agencies in whole or in part. *See id.* § 3, 57 Stat. at 561-62. This Reorganization Act expired in 1941. *Id.* § 12, 57 Stat. at 564.

Over the ensuing decades, Congress passed additional Reorganization Acts, each with sunset dates, and at times modified the scope of the delegation of its reorganization power. Hogue, *Presidential Reorganization*, *supra*, at 22; *see, e.g.*, Reorganization Act of 1945, Pub. L. No. 79-263, 59 Stat. 613 (prohibiting the President from limiting the independence of an independent agency); Reorganization Act of 1949, Pub. L. No. 81-109, 63 Stat. 203 (allowing the President to create departments); Reorganization Act of 1977, Pub. L. No. 95-17, 91 Stat. 29 (prohibiting the President from creating or abolishing departments or abolishing an independent agency).

Congressionally authorized presidential reorganization power came to an end in the 1980s. President Reagan requested the authority in 1981, but Congress did not renew the Act until 1984. *See* Reorganization Act Amendments of 1984, Pub. L. No. 98-614, 98 Stat. 3192 (codified at 5 U.S.C. §§ 901-12).[2] The 1984 Act expired on December 31, 1984, *see* 5 U.S.C. § 905(b), and since then, the reorganization authority has not been renewed, despite requests from President

---

[2] In light of the Supreme Court's then-recent decision holding the legislative veto unconstitutional, *Chadha*, 462 U.S. at 959, the 1984 Act changed how reorganization plans became law by requiring a joint resolution by Congress to approve the plans, *see* 5 U.S.C. § 906(a). Congress also passed a law to ratify all the previous reorganization plans that had become law through the previous procedure. Act of Oct. 19, 1984, Pub. L. 98-532, 98 Stat. 2705.

13

George W. Bush, President Obama, and even President Trump during his first term, Hogue, *Presidential Reorganization*, *supra*, at 31-32, 34; Exec. Order No. 13,781, 82 Fed. Reg. at 13959.

\* \* \*

In sum, the history of the Reorganization Acts and longstanding practice demonstrate that the President does not have the power to create, restructure, or abolish federal departments or agencies absent congressional legislation authorizing him to do so. President Trump's executive order seeking to fundamentally reorganize the federal government without congressional consent, as well as his administration's efforts to implement it, should be enjoined to prevent further harm to our governmental structure, as well as to those "structural protections against abuse of power [that are] critical to preserving liberty," *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion for Temporary Restraining Order.

Dated:  May 7, 2025                                  Respectfully submitted,

<u>*Elizabeth B. Wydra*</u>
Elizabeth B. Wydra (Bar No. 218200)
Brianne J. Gorod
Miriam Becker-Cohen
Anna K. Jessurun
Constitutional Accountability Center
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for Amicus Curiae*

14