PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Fax: (415) 436-6748

ERIC J. HAMILTON (CABN 296283)
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
ANDREW M. BERNIE
Trial Attorney
Civil Division, Federal Programs Branch

    1100 L Street, NW
    Washington, DC 20005
    Telephone: (202) 353-7203
    andrew.m.bernie@usdoj.gov

Counsel for Defendants

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.* <br><br>     Plaintiffs, <br><br>        v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br>     Defendants. | Case No. 3:25-cv-03698-SI <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Hearing Date: May 9, 2025 <br> Time: 10:30 am <br> Judge: Hon. Susan Illston <br> Place: San Francisco Courthouse <br>        Courtroom 1 |

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 5

I.    Statutory and Regulatory Background ............................................................. 5

      A.    Agency Authority to Engage in RIFs ..................................................... 5

      B.    Modern RIFs ........................................................................................... 9

      C.    Exclusive Scheme for Administrative and Judicial Review of Labor and
            Personnel Disputes Involving Federal Civil Servants ......................... 12

II.   Factual Background ...................................................................................... 13

      A.    Executive Order 14210 ......................................................................... 13

      B.    February 26, 2025 Memorandum .......................................................... 14

III.  Procedural History ........................................................................................ 17

STANDARD OF REVIEW ....................................................................................... 19

ARGUMENT ............................................................................................................ 19

I.    Plaintiffs' Delay Alone Warrants Denial of the TRO Motion ........................... 19

II.   Plaintiffs Satisfy None of the *Winter* Requirements ..................................... 22

      A.    Plaintiffs Are Unlikely to Succeed on the Merits of their Claims ...... 22

            1.    The Workforce Executive Order and Workforce Memorandum are
                  Not Subject to Review .............................................................. 22

                  a.    The FSLMRS and CSRA Preclude District-Court
                        Jurisdiction Over Plaintiffs' Challenge to the Workforce
                        Executive Order and Workforce Memorandum. ............... 23

                  b.    Plaintiffs Fail to Show Standing ...................................... 31

                  c.    Independent of the FSLMRS and CSRA, the Workforce
                        Executive Order Is Not Reviewable Here ........................ 34

                  d.    The Workforce Memorandum is Not a Reviewable Final
                        Agency Action .................................................................. 35

2.   The Workforce Executive Order and Workforce Memorandum are
     Lawful ........................................................................................ 38

     a.    The Workforce Executive Order is Lawful ................................. 39

     b.    The Workforce Memorandum is Lawful ..................................... 44

3.   To the Extent Plaintiffs Purport to Challenge Particular RIFs, Any
     Such Challenge is Likewise Precluded and In Any Event Lacks
     any Legal or Factual Basis ....................................................... 45

B.   Plaintiffs Have Not Demonstrated Irreparable Harm Warranting the Broad
     TRO They Seek ........................................................................... 46

C.   The Balance of the Equities and Public Interest Do Not Favor a TRO ............... 48

III.   Plaintiffs Are Not Entitled to Release of the ARRPs ...................................... 48

IV.   Plaintiffs Are Not Entitled to any Relief Against USDS or "DOGE" ........................... 49

V.   Any Relief Should be Limited ........................................................... 49

VI.   Plaintiffs Should Be Ordered to Post Security in Connection with Any Relief .............. 50

CONCLUSION ................................................................................. 50

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*AFGE v. OPM,*
No. 25-01780, 2025 WL 900057 (N.D. Cal. Mar. 24, 2025) .................................................. 30

*AFGE v. Sec'y of the Air Force,*
716 F.3d 633 (D.C. Cir. 2013) .................................................................................................. 27

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell,*
No. 25-cv-10276, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ......................................... 23, 24

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
929 F.3d 748 (D.C. Cir. 2019) .............................................................................................. *passim*

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) ..................................................................................................... 33

*Arnett v. Kennedy,*
416 U.S. 134 (1974) .................................................................................................................. 19

*Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. California Dep't of Transp.,*
713 F.3d 1187 (9th Cir. 2013) ................................................................................................... 32

*Atomic Oil Co. of Okl. v. Bardahl Oil Co.,*
419 F.2d 1097 (10th Cir. 1969) ................................................................................................ 50

*Axon Enters., Inc. v. FTC,*
598 U.S. 175 (2023) .............................................................................................................. *passim*

*Bennett v. Spear,*
520 U.S. 154 (1997) .................................................................................................................. 36

*Bldg. & Const. Trades Dep't v. Allbaugh,*
295 F.3d 28 (D.C. Cir. 2002) ................................................................................... 4, 39, 40, 42

*California v. Azar,*
911 F.3d 558 (9th Cir. 2018) ..................................................................................................... 50

*Chamber of Com. of U.S. v. Reich,*
74 F.3d 1322 (D.C. Cir. 1996) .................................................................................................. 34

*City and County of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ............................................................................ 40

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ........................................................................................... 31

*Common Cause v. Trump,*
  506 F. Supp. 3d 39 (D.D.C. Nov. 25, 2020) ....................................................... 39

*Ctr. for Biological Diversity v. Trump,*
  453 F. Supp. 3d 11 (D.D.C. 2020) ...................................................................... 34

*Curlott v. Campbell,*
  598 F.2d 1175 (9th Cir. 1979) ............................................................................ 48

*Dalton v. Specter,*
  511 U.S. 462 (1994) ..................................................................................... 34, 35

*Dep't of Educ. v. California,*
  145 S. Ct. 966 (2025) ......................................................................................... 25

*Devasahayam v. DMB Cap. Grp.,*
  No. 3:17-cv-02095-BEN-WVG, 2017 WL 6547897 (S.D. Cal. Dec. 20, 2017) ...................... 20

*Disney Enters., Inc. v. VidAngel, Inc.,*
  869 F.3d 848 (9th Cir. 2017) .............................................................................. 46

*Duenas v. Garland,*
  78 F.4th 1069 (9th Cir. 2023) ............................................................................. 43

*E. Bay Sanctuary Covenant v. Barr,*
  934 F.3d 1026 (9th Cir. 2019) ............................................................................ 50

*Eagle Tr. Fund v. USPS,*
  365 F. Supp. 3d 57 (D.D.C. 2019) ...................................................................... 43

*Elgin v. Dep't of the Treasury,*
  567 U.S. 1 (2012) ..................................................................................... *passim*

*Env't Prot. Info. Ctr. v. Carlson,*
  968 F.3d 985 (9th Cir. 2020) .............................................................................. 22

*Fed. L. Enf't Offs. Ass'n v. Ahuja*,

    62 F.4th 551 (D.C. Cir. 2023) ................................................................................. 28

*Feds for Med. Freedom v. Biden*,

    63 F.4th 366 (5th Cir. 2023) ................................................................................... 30

*Filebark v. U.S. Dep't of Transp.*,

    555 F.3d 1009 (D.C. Cir. 2009) ......................................................................... 24-25

*Food & Drug Admin. v. All. for Hippocratic Med.*,

    602 U.S. 367 (2024) ...................................................................................... 31, 33

*Franklin v. Massachusetts*,

    505 U.S. 788 (1992) ............................................................................................... 34

*Free Enterprise Fund v. Public Company Accounting Oversight Bd.*,

    561 U.S. 477 (2010) ............................................................................................... 42

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,

    460 F.3d 13 (D.C. Cir. 2006) ................................................................................. 35

*Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*,

    739 F.2d 466 (9th Cir. 1984) ................................................................................. 47

*Granny Goose Foods, Inc. v. Bhd. of Teamsters Loc. No. 70*,

    415 U.S. 423 (1974) ............................................................................................... 20

*Hanson v. District of Columbia*,

    120 F.4th 223 (D.C. Cir. 2024) ............................................................................. 32

*HIAS, Inc. v. Trump*,

    985 F.3d 309 (4th Cir. 2021) ................................................................................. 40

*Hilton v. Sullivan*,

    334 U.S. 323 (1948) ............................................................................................ 5, 6

*Hindes v. FDIC*,

    137 F.3d 148 (3d Cir. 1998) .................................................................................. 43

*Int'l Tech. Univ. Found. v. WASC Senior Coll. & Univ. Comm'n*,

    No. 22-cv-4576, 2023 WL 2621344 (N.D. Cal. Mar. 23, 2023) ............................ 20

*Jarkesy v. SEC*,
 803 F.3d 9 (D.C. Cir. 2015) ...................................................................... 23

*Jones v. U.S. Secret Serv.*,
 701 F. Supp. 3d 4 (D.D.C. 2023) .............................................................. 35

*Kalispel Tribe of Indians v. U.S. DOI*,
 999 F.3d 683 (9th Cir. 2021) ..................................................................... 44

*Keim v. United States*,
 177 U.S. 290 (1900) ...................................................................................... 5

*Kerr v. Jewell*,
 836 F.3d 1048 (9th Cir. 2016) ................................................................... 23

*Kirby Corp. v. Pena*,
 109 F.3d 258 (5th Cir. 1997) ..................................................................... 44

*Lampon-Paz v. OPM*,
 732 F. App'x 158 (3d Cir. 2018) ............................................................... 26

*Larson v. Domestic & Foreign Com. Corp.*,
 337 U.S. 682 (1949) .................................................................................... 44

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) .................................................................................... 31

*Lujan v. Nat'l Wildlife Fed.*,
 497 U.S. 871 (1990) .......................................................................... 1, 25, 35

*Lundeen v. Mineta*,
 291 F.3d 300 (5th Cir. 2002) ............................................................... 43, 44

*Lyons v. Dep't of Veteran's Affs.*,
 273 F. App'x 929 (Fed. Cir. 2008) ............................................................ 27

*Madsen v. Women's Health Ctr., Inc.*,
 512 U.S. 753 (1994) .................................................................................... 50

*Markland v. OPM*,
 140 F.3d 1031 (Fed. Cir. 1998) ................................................................... 9

*Marshall v. HHS*,
   587 F.3d 1310 (Fed. Cir. 2009) .................................................................. 27

*Maryland v. U.S. Dep't of Agriculture*,
   No. 25-1248, 2025 WL 1073657 (4th Cir. April 9, 2025) ................................. 23, 24

*Medkirk v. United States*,
   45 Ct. Cl. 395 (Ct. Cl. 1910) ...................................................................... 5

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ..................................................................... 48

*Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*,
   991 F.2d 536 (9th Cir. 1993) ..................................................................... 19

*Myers v. United States*,
   272 U.S. 52 (1926) ............................................................................. 4, 42

*N.Y. Republican State Comm. v. SEC*,
   799 F.3d 1126 (D.C. Cir. 2015) .................................................................. 23

*NARA v. Favish*,
   541 U.S. 157 (2004) ............................................................................... 39

*Nat'l Min. Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ................................................................... 36

*Nat'l Treasury Emps. Union v. Trump*,
   No. 25-CV-420 (CRC), 2025 WL 561080 (D.D.C. Feb. 20, 2025) ................................. *passim*

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................... 48

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ................................................................................ 35

*NTEU and Dep't of Treasury, IRS*,
   60 F.L.R.A. 783 (2005) ............................................................................ 27

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ................................................................... 44

*Pan Am. World Airways, Inc. v. Flight Engineers' Int'l Ass'n, PAA Chapter, AFL-CIO,*
   306 F.2d 840 (2d Cir. 1962)................................................................................... 20

*Pennhurst State Sch. & Hosp. v. Halderman,*
   465 U.S. 89 (1984).............................................................................................. 44

*Perez v. City of Petaluma,*
   No. 21-CV-06190-JST, 2021 WL 3934327 (N.D. Cal. Aug. 13, 2021).................................. 20

*Pom Wonderful LLC v. Hubbard,*
   775 F.3d 1118 (9th Cir. 2014) .............................................................................. 47

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce,*
   128 F.4th 1089 (9th Cir. 2025) ............................................................................. 37

*Sampson v. Murray,*
   415 U.S. 61 (1974).............................................................................. 21, 47, 48

*Seila Law LLC v. CFPB,*
   591 U.S. 197 (2020)....................................................................... 4, 42, 43

*Sherley v. Sebelius,*
   689 F.3d 776 (D.C. Cir. 2012) ................................................................................ 4

*Singh v. Berger,*
   56 F.4th 88 (D.C. Cir. 2022) ................................................................................ 32

*Special Counsel ex rel. John Doe v. Department of Agriculture,*
   No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), (Order on Stay Request)
   https://perma.cc/3F45-PKG5 .............................................................................. 28

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016)............................................................................................. 31

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
   240 F.3d 832 (9th Cir. 2001) .............................................................................. 19

*Summers v. Earth Island Institute,*
   555 U.S. 488 (2009).............................................................................................. 32

*Thunder Basin Coal Co. v. Reich*,
 510 U.S. 200 (1994) ................................................................................................ 23

*TransUnion LLC v. Ramirez*,
 594 U.S. 413 (2021) ................................................................................................ 33

*U.S. Army Corps. of Eng'rs v. Hawkes Co., Inc.*,
 578 U.S. 590 (2016) ................................................................................................ 36

*United States v. Arthrex, Inc.*,
 594 U.S. 1 (2021) .................................................................................................... 42

*United States v. Fausto*,
 484 U.S. 439 (1988) ........................................................................................ 25, 27

*United States v. Texas*,
 599 U.S. 670 (2023) ................................................................................................ 33

*Veit v. Heckler*,
 746 F.2d 508 (9th Cir. 1984) .................................................................................. 26

*Washington v. Trump*,
 847 F.3d 1151 (9th Cir. 2017) ................................................................................ 19

*Weinberger v. Romero-Barcelo*,
 456 U.S. 305 (1982) ................................................................................................ 19

*West v. PBC Mgmt. LLC*,
 No. 23-cv-3283, 2023 WL 4477296 (N.D. Cal. July 10, 2023) ............................. 20

*Whitmore v. Arkansas*,
 495 U.S. 149 (1990) ................................................................................................ 31

*Widakuswara v. Lake*,
 No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ............................... *passim*

*Widakuswara v. Lake*,
 No. 25-cv-1015, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) .................................. 25

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ............................................................................................. 19, 46

*Youngstown Sheet & Tube Co. v. Sawyer*,

   343 U.S. 579 (1952) ................................................................................. 35

**Constitution**

U.S. CONST. art. II, § 1, cl. 1 ............................................................... 42, 43

U.S. CONST. art. II, § 3 ............................................................................ 42

**Statutes**

5 U.S.C. § 551(13) .............................................................................. 35, 36

5 U.S.C. § 553(a)(2) ................................................................................. 48

5 U.S.C. § 702 .......................................................................................... 25

5 U.S.C. § 704 ............................................................................... 35, 36, 38

5 U.S.C. § 1204 ................................................................................. 12, 47

5 U.S.C. § 2302(a)(2)(A) ................................................................... 12-13

5 U.S.C. § 3328 ....................................................................................... 30

5 U.S.C. § 3502 ................................................................................ *passim*

5 U.S.C. § 7105 ................................................................................. 12, 26

5 U.S.C. § 7116(a) ................................................................................... 12

5 U.S.C. § 7118 ....................................................................................... 12

5 U.S.C. § 7123(a) ............................................................................. 12, 26

5 U.S.C. § 7511(a)(1) ............................................................................. 12

5 U.S.C. § 7512 ....................................................................................... 12

5 U.S.C. § 7513(d) ................................................................................... 12

5 U.S.C. § 7701(g) ............................................................................ 12, 47

5 U.S.C. § 7703(b) ................................................................................... 26

5 U.S.C. §§ 7101-35 ............................................................................... 12

28 U.S.C. § 1295(a)(9) ........................................................................... 12

19 Stat. 169 (Aug. 15, 1876) ..................................................................... 5

37 Stat. 413 (Aug. 23, 1912) ..................................................................... 5

Federal Service Labor-Management Relations Statute,

Pub. L. No. 95-454, tit. VII, § 701, 92 Stat. 1111, 1191-1216 .................................... 12

Pub. L. No. 89-554, 80 Stat. 428 (1966) ........................................................................ 7

Veterans' Preference Act of 1944,

Pub. L. 78-359, 58 Stat. 387 ........................................................................................ 6

**Rules**

Fed. R. Civ. P. 65(b) ...................................................................................................... 19

Fed. R. Civ. P. 65(c) ...................................................................................................... 50

**Legislative Materials**

H.R. Rep. No. 78-1289 (1944) ........................................................................................ 6

S. Rep. No. 79-265 (1945) .............................................................................................. 7

**Administrative & Executive Materials**

5 C.F.R. § 301.806 ........................................................................................................ 12

5 C.F.R. § 315.801 ........................................................................................................ 12

5 C.F.R. pt. 351 ........................................................................................................... 7, 8

5 C.F.R. § 351.201 ................................................................................................... 7, 8, 41

5 C.F.R. § 351.203 .......................................................................................................... 7

5 C.F.R. § 351.204 .......................................................................................................... 8

5 C.F.R. § 351.205 ................................................................................................... 38, 44

5 C.F.R. § 351.402 .......................................................................................................... 8

5 C.F.R. § 351.403(a)(1) ................................................................................................. 8

5 C.F.R. § 351.505(b)(1) ............................................................................................... 22

5 C.F.R. § 351.701 .......................................................................................................... 8

5 C.F.R. § 351.703 .......................................................................................................... 8

5 C.F.R. § 351.801(b) ................................................................................................. 9, 46

5 C.F.R. § 351.802 .......................................................................................................... 9

5 C.F.R. § 351.901 .......................................................................................................... 9

5 C.F.R. § 1201.3(a)(6) ................................................................................................... 9

5 C.F.R. § 1201.22 ............................................................................................... 9

9 Fed. Reg. 9575 (Aug. 8, 1944) ........................................................................... 7

90 Fed. Reg. 13043 (Mar. 14, 2025) .................................................................. 24

Exec. Order 12498,

    50 Fed. Reg. 1036 (Jan. 4, 1985) ................................................................... 10

Exec. Order 12839,

    58 Fed. Reg. 8515 (Feb. 10, 1993) ..................................................... 10, 11, 44

Exec. Order 14158,

    90 Fed. Reg. 8441 (Jan. 20, 2025) .............................................................. 2, 49

Exec. Order 14210,

    90 Fed. Reg. 9669 (Feb. 11, 2025) ......................................................... *passim*

**Other Authorities**

11A Wright & Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. Apr. 2025 update) ..... 20

64 Ann. Rep. U.S. Civil Service Comm'n (1946-1947) ......................................... 9

Chris Cameron, *Judge Refuses to Immediately Reinstate Inspectors General Fired by Trump*,

    N.Y. Times (Feb. 14, 2025),

    https://www.nytimes.com/2025/02/14/us/politics/trump-inspectors-general-ruling.html ........ 20

Elena Kagan, *Presidential Administration*,

    114 Harv. L. Rev. 2245 (2001) .................................................................... 45

Harry S Truman, Statement by the President on Federal Employees Displaced by the Reduction-

    in-Force (Sept. 3, 1949),

    https://www.trumanlibrary.gov/library/public-papers/201/statement-president-federal-

    employees-displaced-reduction-force ............................................................ 9

Reuters, *Trump Tells Cabinet Secretaries They, Not Musk, are in Charge of Staff Cuts* (March 7,

    2025),

    https://www.reuters.com/world/us/trump-tells-cabinet-secretaries-they-not-musk-are-charge-

    staff-cuts-2025-03-06/ ................................................................................ 14

Ronald Reagan, Radio Address to the Nation on Federal Civilian Employment (Aug. 20, 1983),
https://www.reaganlibrary.gov/archives/speech/radio-address-nation-federal-civilian-
employment.................................................................................................................... 10

Saikrishna Bangalore Prakash, *Imperial from the Beginning: The Constitution of the Original
Executive* (2015) .................................................................................... 42, 43

The Federalist No. 72 (Alexander Hamilton) (George W. Carey & James McClellan eds.,  2001)
........................................................................................................................... 42

The Hill, *VA secretary: Cutting 80,000 jobs 'is our target'* (Mar. 10, 2025),
https://thehill.com/homenews/state-watch/5186097-va-seek-cuts-80000-jobs/ ...................... 49

United States Civil Service Commission, *Civil Service Act and Rules, Statutes, Executive Orders
and Regulations* (amended to November 15, 1925) .................................................. 6

United States Civil Service Commission, Departmental Circular No. 372 (Sept. 4, 1942) .......... 6

United States Office of Personnel Management, Workforce Reshaping Operations Handbook
(2017),
https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-
rif/workforce_reshaping.pdf ................................................................................. 8

William J. Clinton, Memorandum on Career Transition Assistance for Federal Employees, (Sept.
12, 1995),
https://www.presidency.ucsb.edu/documents/memorandum-career-transition-assistance-for-
federal-employees ............................................................................................. 11

William J. Clinton, Memorandum on Implementing Management Reform in the Executive
Branch (Oct. 1, 1993),
https://www.presidency.ucsb.edu/node/327737 ...................................................... 11

William J. Clinton, Memorandum on Streamlining the Bureaucracy (Sept. 11, 1993),
https://www.presidency.ucsb.edu/node/327725 ...................................................... 11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

The Administrative Procedure Act (APA) allows a plaintiff to challenge a specific final agency action for which there is no other adequate remedy in a court, but plaintiffs cannot seek "systemic improvement" to agency-wide policy. *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 894 (1990). Yet in this lawsuit of staggering breadth, Plaintiffs do not challenge any discrete final agency action or even any agency-specific policy. They instead seek to enjoin implementation virtually government-wide of an Executive Order that is not subject to review and is in any event unquestionably lawful on its face. Plaintiffs also challenge a memorandum from the Office of Personnel Management (OPM) and Office of Management and Budget (OMB), but that document is also not a final agency action, does not affect Plaintiffs, and is entirely lawful.

Plaintiffs' request for government-wide relief is not the only respect in which their motion is extraordinary. Plaintiffs seek to prevent reductions in force (RIFs) for which affected individuals have or would have administrative remedies and judicial review directly in a court of appeals. That fact deprives this Court of jurisdiction. And Plaintiffs seek to forestall implementation of the Executive Order based on a legal theory—that a statutory authorization to *federal agencies* deprives the *President* of any role in directing or shaping how agencies exercise that authority— that upends the very structure of Article II. They seek in their motion to prevent 20 government components (including 12 cabinet-level departments) from implementing the Executive Order and memorandum—based on broad and novel structural constitutional theories, in a brief that is more than twice the presumptive limit under the local rules while claiming support in nearly 1,300 pages of declarations and exhibits—in the context of moving for a *temporary restraining order* (TRO). All this even though the Executive Order and memorandum they challenge were issued more than 11 and 9 weeks before they sought emergency relief from this Court. Because the TRO motion is procedurally improper and lacks any legal basis, the Court should deny the motion.

As no one disputes, Congress has expressly authorized federal agencies to engage in RIFs and has done so for nearly 150 years. Congress has further directed OPM to "prescribe regulations for the release of competing employees in a [RIF] which give due effect to" four statutorily prescribed factors. 5 U.S.C. § 3502. OPM implements the RIF statute through regulations

published in part 351 of title 5 of the Code of Federal Regulations. Consistent with these authorities, on February 11, 2025, President Trump issued Executive Order 14210, which aims to "restore accountability to the American public" by "eliminating waste, bloat and insularity." Exec. Order. 14210, § 1, 90 Fed. Reg. 9669 (Feb. 11, 2025) (Workforce Executive Order). The Workforce Executive Order directed agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law." *Id.* § 3(c). On February 26, 2025, OPM and OMB issued a memorandum (Workforce Memorandum) to agencies providing certain guidance for complying with the Executive Order, stating that the agencies should submit Agency RIF and Reorganization Plans (ARRPs) in two phases on March 13, 2025, and April 14, 2025, delineating certain categories of information the ARRPs should include, and further stating that the Phase 2 plans should be planned for implementation by September 30, 2025.

The Workforce Executive Order and Workforce Memorandum thus include general principles agencies should follow in preparing and submitting ARRPs, including a focus on statutorily provided functions as well as subcomponents and offices that provide direct services to citizens. But both sources make clear that RIFs must be carried out consistent with all applicable legal requirements. And neither the Workforce Executive Order nor the Workforce Memorandum directs RIFs of particular employees or otherwise dictates the results of agencies' decisionmaking processes. Nor, contrary to Plaintiffs' briefing, are RIFs being carried out "in secret." TRO Brief at 3. The Workforce Memorandum suggests a notice period of at least 30 days before RIFs are effectuated (and in many cases significantly longer than that).

On April 28, 2025, Plaintiffs nonetheless filed a 115-page complaint seeking broad relief against virtually every cabinet-level department, as well as OPM, OMB, and the United States DOGE Service (USDS)[1], in addition to the President himself. On May 1, 2025, Plaintiffs filed the

---

[1] It is unclear whether Plaintiffs are referring to USDS, which is a nonstatutory component located within the Executive Office of the President, as to which Amy Gleason serves as the Acting Administrator. Though Plaintiffs use the term Department of Government Efficiency, the Department of Government Efficiency and USDS are not the same thing. The Department of Government Efficiency or "DOGE" is the umbrella term for the government-wide initiative to implement the President's DOGE Agenda. It consists of USDS, the USDS Temporary Organization, and Agency DOGE Teams. Exec. Order 14158, § 3(a)–(c), 90 Fed. Reg. 8441 (Jan. 20, 2025). Consistent with Executive Order 14158 and as the government has repeatedly explained

instant motion for a TRO, seeking to enjoin OPM, OMB, USDS, as well as seventeen departments or agencies and their heads from implementing the Workforce Executive Order or Workforce Memorandum, in addition to other relief. For multiple reasons, the motion should be denied.

First, Plaintiffs cannot establish the immediacy required for a TRO. The Motion seeks to enjoin implementation of the Workforce Executive Order and Workforce Memorandum on the legal ground that they are ultra vires and exceed the President's authority (as to the Workforce Executive Order) and the authority of OPM and OMB (as to the Workforce Memorandum). Nothing would have prevented Plaintiffs from filing their May motion in February immediately after the Executive Order and Memorandum were issued. Indeed, in the intervening time, multiple similar suits have been filed challenging, inter alia, the Workforce Executive Order and personnel actions across numerous federal agencies. This includes a February challenge to the Workforce Executive Order filed the day after that Order was issued (the district court in that case denied a preliminary injunction on jurisdictional grounds that equally bar this lawsuit). Consistent with extensive case law in this District, that delay alone warrants rejection of Plaintiffs' plea for emergency relief now on a highly expedited timetable.

Second, Plaintiffs cannot challenge the Workforce Executive Order or the Workforce Memorandum here. The comprehensive, reticulated administrative-judicial review scheme set forth in the Federal Service Labor-Management Relations Statute and the Civil Service Reform Act foreclose that. Plaintiffs have not established standing. And putting aside these jurisdictional defects, the Workforce Executive Order and Workforce Memorandum would still not be reviewable. The Workforce Executive Order is not subject to review under the APA or on an ultra vires theory. The Workforce Memorandum is not reviewable because it is not a final agency action.

Even if the Court could review the legality of the Workforce Executive Order and Workforce Memorandum on the merits, that merits analysis would be exceptionally easy. The

---

in other litigation, Agency DOGE Teams (which consist of employees from the relevant agency and detailees, who take actions within their agency, and who report to agency leadership) are distinct from USDS and the USDS Temporary Organization (which are nonstatutory components with limited and advisory responsibilities). We use the term USDS in this brief but, regardless, this distinction is not relevant to the TRO motion, which must be denied in any event.

Executive Order makes clear that any RIFs or other action must be "consistent with applicable law." And there is no question that the Executive Order *can be* applied lawfully because, again, no one disputes that agencies have authority to conduct RIFs. Plaintiffs' "*ultra vires*" argument thus rests on a contention that "Congress has delegated authority to determine *which* employees to employ and *how many* (consistent with appropriations) to the heads of the federal agencies, not to the President." TRO Brief at 32 (emphases in original). But putting aside that the Workforce Executive Order neither orders specific RIFs nor divests agency heads of their discretion in this area, this is precisely backwards. The President has inherent authority to exercise "'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Bldg. & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)) (citation omitted); *see also Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020) (authority exercised by federal officers "remains subject to the ongoing supervision and control of the elected President"). Agencies thus "*must* implement the President's policy directives to the extent permitted by law." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012). There is no colorable argument that President Trump acted unlawfully in providing direction for agencies to follow, consistent with applicable law, in exercising the authority Congress expressly provided them. The Workforce Memorandum—which provides broad guidance (concerning information agencies should provide about the actions the *agencies* decide to take), and emphasizes to agencies that they should only undertake actions that are consistent with their statutory authority—is also plainly lawful.

Plaintiffs also cannot demonstrate any irreparable harm that would justify the broad injunction they seek here. The Workforce Memorandum makes clear that any specific RIFs must be preceded by a 60-day formal notice period (which OPM can shorten to 30 days), which provides ample opportunity for any individual affected employees to attempt to seek relief, including emergency relief. More broadly, the Supreme Court has made clear that loss of government employment generally does not constitute irreparable injury. And in the exclusive remedial scheme Congress provided, prevailing employees may obtain reinstatement, backpay, and attorney's fees.

Likewise, the balance of equities and the public interest favor Defendants, as Plaintiffs'

requested TRO would interfere with the President's ability to manage the federal workforce to more closely reflect policy preferences and the needs of the American public.

Finally, if the Court does enter injunctive relief (which, respectfully, it should not), any injunction should be limited to only members of Plaintiff unions who themselves have Article III standing (specifically individual members, if any, who face a certainly impending RIF). And if the Court enjoins implementation of the Workforce Executive Order and Workforce Memorandum, it should make clear that its injunction does not prevent agencies from conducting RIFs and acting on other personnel and organizational matters independent of the Workforce Executive Order.

## BACKGROUND

### I. Statutory and Regulatory Background

#### A. Agency Authority to Engage in RIFs

For approximately 150 years, Congress has recognized federal agencies' authority to engage in RIFs. The first such statute, enacted in 1876, required that veterans receive a preference over other employees when such reductions were undertaken. 19 Stat. 169 (Aug. 15, 1876); *see also Hilton v. Sullivan*, 334 U.S. 323, 336-39 (1948) (summarizing history of veterans' preferences in reductions in force). A subsequent enactment precluded agencies from discharging or reducing the rank or salary of honorably discharged veterans. 37 Stat. 413 (Aug. 23, 1912). Interpreting this statutory framework, courts repeatedly rejected challenges to RIFs, recognizing that such reductions were a matter of executive discretion. *See Medkirk v. United States*, 45 Ct. Cl. 395, 401 (Ct. Cl. 1910) ("The matter of qualification as between the persons then employed in the service was an administrative function which the courts could neither supervise nor inquire into after the exercise of the discretion of the proper official in dispensing with the services of those adjudged to be least qualified under the law which required a reduction in the force."); *Keim v. United States*, 177 U.S. 290, 295 (1900) (provision authorizing reductions in force "do[es] not contemplate the retention in office of a clerk who is inefficient, nor attempt to transfer the power of determining the question of efficiency from the heads of departments to the courts").

Later, the Executive Branch implemented a system whereby employees were placed into classes for purposes of determining which positions would be eliminated in a RIF. In 1921,

President Harding issued an executive order directing demotions and dismissals of employees with the lowest ratings in each class, with a preference provided to veterans. United States Civil Service Commission, *Civil Service Act and Rules, Statutes, Executive Orders and Regulations* (amended to November 15, 1925), at 104. A subsequent executive order issued by President Coolidge detailed how to categorize employees during a RIF. *Id.* The Civil Service Commission then issued regulations that codified the various requirements governing RIFs. United States Civil Service Commission, Departmental Circular No. 372 (Sept. 4, 1942). These regulations recognized that a RIF may be "necessary because of insufficient appropriations, consolidation of functions, diminution of work, or other reason, whereby one or more employees serving in other than temporary appointments will be required to be dropped from the rolls[.]" *Id.* ¶ 1.

As World War II concluded, a widespread understanding emerged that the federal government would need to shrink dramatically as the nation shifted from a war-time footing to a peace-time posture. President Roosevelt recognized that agencies may need to undertake reductions in personnel: "Veterans should be accorded special consideration in connection with any reductions in total personnel which it may be necessary for Federal agencies to work out from time to time." H.R. Rep. No. 78-1289 (1944). Congress then enacted the Veterans' Preference Act of 1944. The intent of the statute was to "give legislative sanction to existing veterans' preference, to the rules and regulations in the executive branch of the Government. . . ." *Hilton*, 334 U.S. 323 at 338 (quotation marks omitted). The statute provided, inter alia, that "[i]n any reduction in personnel in any civilian service of any Federal agency, competing employees shall be released in accordance with Civil Service Commission regulations which shall give due effect to tenure of employment, military preference, length of service, and efficiency ratings." Veterans' Preference Act of 1944, § 12, Pub. L. 78-359, 58 Stat. 387, 390.

Similarly, in enacting the Federal Employee Pay Act of 1945, Congress recognized the Executive Branch's authority to reduce the size of the Government. A Senate Committee Report preceding enactment of the Act stated: "It was the feeling of the committee that the interests of efficiency and economy could best be served a policy of reduction of force in many Government agencies. By this proposal, authority of the Director of the Bureau of the Budget to fix personnel

ceilings for agencies within the executive branch is extended to all employees of executive agencies, including the Postal Service, Wage Board employees as well as employees subject to the Classification Act." S. Rep. No. 79-265, at 6 (1945).

In the 1966 recodification of Title 5, Congress amended the Veterans' Preference Act of 1944. Pub. L. No. 89-554, 80 Stat. 428 (1966). The amended statute provided: "[t]he Civil Service Commission shall prescribe regulations for the release of competing employees in a reduction in force which give due effect to" four specified factors. *Id.* The current version of the statute is substantively the same, with OPM substituted. 5 U.S.C. § 3502. It provides that OPM "shall prescribe regulations for the release of competing employees in a reduction in force which give due effect to--(1) tenure of employment; (2) military preference, subject to section 3501(a)(3) of this title; (3) length of service; and (4) efficiency or performance ratings." *Id.* § 3502(a)(1)-(4).

In 1944, the Civil Service Commission exercised the authority delegated by the Veterans' Preference Act of 1944 to enact regulations governing reductions in force. *See* 9 Fed. Reg. 9575, 9575-82 (Aug. 8, 1944). The regulations encouraged agencies to proactively manage the size of their workforce. "Looking ahead for changes in workloads, available funds and employee turnover, and restricting appointments in certain lines of work may prevent a surplus in workers which would otherwise occur." *Id.* "It is better practice to keep a working staff down to the number required than to cut down an oversize staff of employees." *Id.* at 9576-77. Since the regulations were promulgated in 1944, they have been periodically amended, and are codified at 5 C.F.R. part 351.

Under current regulations, agencies may invoke RIF authority "when the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights or restoration rights; or reclassification of an employee's position due to erosion of duties." *Id.* § 351.201. A "reorganization" is defined as "the planned elimination, addition, or redistribution of functions or duties in an organization." *Id.* § 351.203.

The regulations acknowledge agencies' discretion when deciding that a RIF is necessary. "Each agency is responsible for determining the categories within which positions are required, where they are to be located, and when they are to be filled, abolished, or vacated." *Id.* § 351.201(a)(1). "This includes determining when there is a surplus of employees at a particular

location in a particular line of work." *Id.* The regulations further emphasize that "[e]ach agency covered by this part is responsible for following and applying the regulations in this part when the agency determines that a reduction [in] force is necessary." *Id.* § 351.204.

Statutory RIFs generally involve seven steps. First, agencies must establish competitive areas in which employees compete for retention. *Id.* § 351.402. Employees potentially subject to a RIF compete for retention with other employees also within their competitive areas. Second, after establishing competitive areas, agencies must establish competitive levels. A competitive level consists of "all positions in a competitive area which are in the same grade (or occupational level) and classification series, and which are similar enough in duties, qualification requirements, pay schedules, and working conditions so that an agency may reassign the incumbent of one position to any of the other positions in the level without undue interruption." *Id.* § 351.403(a)(1). Third, after establishing competitive levels, the agency establishes a retention register for each competitive level that classifies employees based upon their retention standing. The agency applies the four retention factors required by statute. *See* 5 U.S.C. § 3502. Fourth, the agencies must decide which employees to release from the competitive level based upon the ranking in the retention register.[2] Fifth, agencies must assess whether employees have "bump and retreat" rights. 5 C.F.R. Part 351 Subpart G.[3] In addition, released employees may be reassigned to vacant positions following the same retention procedures that apply to an employee's bump and retreat rights. *Id.* § 351.703. Sixth, agencies must provide notice to affected employees. Agencies are generally required to provide written notice to employees affected by a RIF 60 full days in advance of the date of release. 5 U.S.C. § 3502; 5 C.F.R. Part 351 Subpart H. When a RIF is caused by

---

[2] Before an agency releases any employee from a competitive level, it must first release any noncompeting employee. *See* United States Office of Personnel Management, Workforce Reshaping Operations Handbook, 52-53 (2017), https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/workforce_reshaping.pdf.

[3] "Bumping" is the assignment of an employee to a position in a different competitive level that "[i]s held by another employee in a lower tenure group or in a lower subgroup within the same tenure group." 5 C.F.R. § 351.701(b). "Retreating" is the assignment of an employee to a position in a different competitive level that "[i]s held by another employee with lower retention standing in the same tenure group and subgroup." *Id.* § 351.701(c).

"circumstances not reasonably foreseeable," the head of an agency or designee may request approval from OPM to provide notice less than 60 days in advance, provided that the notice is issued at least 30 days in advance of the release. 5 C.F.R. § 351.801(b). The regulations detail the information that RIF notices must include, such as the reasons for the action, its effective date, and information about the judicial review available to the employee. *Id.* § 351.802. Seventh, the regulations authorize judicial review for affected employees. Generally, employees may challenge RIFs at the MSPB. *Id.* § 351.901 ("An employee who has been furloughed for more than 30 days, separated, or demoted by a reduction in force action may appeal to the Merit Systems Protection Board"); *Id.* § 1201.3(a)(6).[4] Appeals must generally be brought within 30 days of the effective date of the RIF. *Id.* § 1201.22. The MSPB's decision can be appealed to the Federal Circuit. *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998).

**B. Modern RIFs**

On numerous occasions since the Veterans' Preference Act of 1944 was enacted, the federal government has exercised its authority to conduct RIFs. As noted, widespread reductions in the federal workforce were necessary after World War II ended. *See* 64 Ann. Rep. U.S. Civil Service Comm'n 10 (1946-1947). President Truman acknowledged the widespread reductions in force, and expressed hope that separated employees would be able to compete for other federal positions. Harry S Truman, Statement by the President on Federal Employees Displaced by the Reduction-in-Force (Sept. 3, 1949), https://www.trumanlibrary.gov/library/public-papers/201/statement-president-federal-employees-displaced-reduction-force. President Truman also noted that "[i]t is unrealistic to expect . . . that all these employees can be placed in current vacancies in the Federal service, which very properly is contracting in size." *Id.*

The 1980s also featured Executive Branch-led efforts to reduce the federal workforce, including through RIFs. These efforts were undertaken under the Reagan Administration's policy

---

[4] Employees covered by collective bargaining agreements may have mandatory agency grievance procedures they must use in lieu of an MSPB appeal (unless there is an allegation of discrimination, in which case they either go through the agency grievance procedure or the MSPB).

of reducing the size of Government. As President Reagan explained in a radio address, "[f]ifteen departments, agencies, and commissions have been able to reduce their payroll numbers by 20 percent or more." Ronald Reagan, Radio Address to the Nation on Federal Civilian Employment (Aug. 20, 1983), *available at* https://www.reaganlibrary.gov/archives/speech/radio-address-nation-federal-civilian-employment.

The Reagan administration combined its emphasis on reducing the Federal workforce with increased oversight of federal agencies through OMB. *See* Executive Order 12498, 50 Fed. Reg. 1036 (Jan. 4, 1985). Executive Order 12498 set out the following goals: "to create a coordinated process for developing on an annual basis the Administration's Regulatory Program, establish Administration regulatory priorities, increase the accountability of agency heads for the regulatory actions of their agencies, provide for Presidential oversight of the regulatory process, reduce the burdens of existing and future regulations, minimize duplication and conflict of regulations, and enhance public and Congressional understanding of the Administration's regulatory objectives." *Id.* It required executive agencies to "submit to the Director of the Office of Management and Budget (OMB) each year, starting in 1985, a statement of its regulatory policies, goals, and objectives for the coming year and information concerning all significant regulatory actions underway or planned." *Id.* Further, the Executive Order required that "[t]he head of each Executive agency subject to this Order shall ensure that all regulatory actions are consistent with the goals of the agency and of the Administration, and will be appropriately implemented." *Id.*

In the 1990s, the Clinton Administration maintained the policies of the Reagan Administration, both in terms of reducing the number of federal employees and in exercising control over agencies to ensure that they were responsive to the President's policy goals. To promote the goal of reducing the size of the Federal Government, President Clinton issued Executive Order 12839 the month after he took office. Executive Order 12839, 58 Fed. Reg. 8515 (Feb. 10, 1993). The order outlined a plan to reduce 100,000 Federal positions.

Executive Order 12839 relied upon "the authority vested in me as President by the Constitution and the laws of the United States of America, including section 301 of title 3, United States Code, section 3301 of title 5, United States Code, and section 1111 of title 31, United States

Code." *Id.* The Order required that "[e]ach executive department or agency with over 100 employees shall eliminate not less than 4 percent of its civilian personnel positions (measured on a full-time equivalent (FTE) basis) over the next 3 fiscal years." *Id.* It further instructed that "[t]he positions shall be vacated through attrition or early out programs established at the discretion of the department and agency heads." *Id.* The Executive Order also required that "[a]t least 10 percent of the reductions shall come from the Senior Executive Service, GS-15 and GS-14 levels or equivalent." *Id.* The Executive Order set "target dates" for these reductions: "Each department and agency shall achieve 25 percent of its total reductions by the end of fiscal year 1993, 62.5 percent by the end of fiscal year 1994, and 100 percent by the end of fiscal year 1995." *Id.* Finally, the Executive Order created a role for OMB, instructing the Director of OMB to "issue detailed instructions regarding the implementation of this order, including exemptions necessary for the delivery of essential services and compliance with applicable law." *Id.*

Later in 1993, President Clinton signed a presidential memorandum entitled "Streamlining the Bureaucracy" in which he "direct[ed] each head of an executive department or agency to prepare . . . a streamlining plan to be submitted to the Director of the Office of Management and Budget as part of a goal "to reduce the executive branch civilian work force by 252,000."[5] Also in 1993, President Clinton signed a presidential memorandum directing departments and agencies to appoint officials responsible for, among other things, "overseeing agency-specific application of . . . personnel reduction."[6] Ultimately, during the Clinton Administration, there was a substantial reduction in the number of federal employees, due in part to the implementation of RIFs.[7]

---

[5] William J. Clinton, Memorandum on Streamlining the Bureaucracy (Sept. 11, 1993), https://www.presidency.ucsb.edu/node/327725 (last accessed May 6, 2025).

[6] William J. Clinton, Memorandum on Implementing Management Reform in the Executive Branch (Oct. 1, 1993), https://www.presidency.ucsb.edu/node/327737.

[7] William J. Clinton, Memorandum on Career Transition Assistance for Federal Employees, (Sept. 12, 1995), https://www.presidency.ucsb.edu/documents/memorandum-career-transition-assistance-for-federal-employees (transition services to federal employees who "either have been or are likely to be separated from Federal service due to a reduction in force").

### C. Exclusive Scheme for Administrative and Judicial Review of Labor and Personnel Disputes Involving Federal Civil Servants

The Federal Service Labor-Management Relations Statute (FSLMRS), set forth in Title VII of the Civil Service Reform Act of 1978 (CSRA), Pub. L. No. 95-454, § 701, 92 Stat. 1111, 1191-1216 (codified at 5 U.S.C. §§ 7101-35), governs labor relations between the Executive Branch and its employees. The statute further "establishes a scheme of administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*"). Under that scheme, the Federal Labor Relations Authority (FLRA) reviews matters including negotiability and "unfair labor practice[]" disputes or claims. *See* 5 U.S.C. § 7105(a). When reviewing unfair labor practice complaints, it is "the FLRA [that] resolves whether an agency must bargain over a subject, violated the duty to bargain in good faith, or otherwise failed to comply with the Statute." *AFGE v. Trump*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105(a)(2)(G), 7116(a), 7118)). Direct review of the FLRA's decisions on unfair labor practice and negotiability issues is available in the courts of appeals. 5 U.S.C. § 7123(a).

The CSRA "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees." *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5 (2012) (citation omitted). If an agency takes a final adverse action against an employee no longer in his or her probationary period—including removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less, 5 U.S.C. § 7512—the employee may appeal to the MSPB. *Id.* § 7513(d). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id.* §§ 1204(a)(2), 7701(g). Non-probationary employees may appeal final MSPB decisions to the Federal Circuit, which generally has "exclusive jurisdiction" over such appeals. 28 U.S.C. § 1295(a)(9). This statutory review scheme, too, is "exclusive, even for employees who bring constitutional challenges to federal statutes." *Elgin*, 567 U.S. at 13.[8]

---

[8] Federal employees serving in their probationary periods (for the Competitive Service) or trial periods (for the Excepted Service) generally do not enjoy a right to appeal to the MSPB, as they are not considered "employee[s]" for purposes of the CSRA's Chapter 75, 5 U.S.C. § 7511(a)(1), but remain properly considered as "applicants" for employment under an extended hiring and evaluation period. *See* 5 U.S.C. § 7511(a)(1)(A)-(B) (one-year trial period), (C) (two-year trial period); 5 C.F.R. §§ 315.801, 301.806. However, many of the protections of the CSRA's Chapter 23 extend to both "applicants and employees." *See*, *e.g.*, 5 U.S.C. § 2302(a)(2)(A)(i)–(xii)

## II. Factual Background

### A. Executive Order 14210

On February 11, 2025, President Trump issued the Workforce Executive Order, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025). As relevant to this motion, subpart c of Section 3—"*Reductions in Force*"—directs "Agency Heads [to] promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Id*. § 3(c). Further, it directs that "[a]ll offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website." *Id*. Finally, it directs that "[t]his subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement." *Id*.

The Workforce Executive Order further provides that, within 30 days of its issuance (i.e., by March 13, 2025), "Agency Heads shall submit to" OMB and OPM "a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities." *Id*. § 3(e). That report "shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated." *Id*. The Executive Order further provides that agency heads "may exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities." *Id*. § 4(b). The Director of OPM is also authorized to "grant exemptions from [the] order." *Id*. § 4(c). Finally, the order states that it "shall be implemented consistent with applicable law and subject to the availability of appropriations," *id*.

---

(identifying "personnel action[s]" that may form the basis for alleged prohibited personnel practices "with respect to an employee in, or applicant for, a covered position in an agency").

Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Order to Show Cause
3:25-cv-3698-SI

§ 5(b), and shall not "be construed to impair or otherwise affect the authority granted by law to an executive department, agency, or the head thereof," *id.* § 5(a)(i).

The Workforce Executive Order does not direct specific RIFs and contains no specific requirements related to RIFs except for the guidance set forth above. Consistent with the Order's language, the President has confirmed that agencies have ultimate responsibility for planning and implementing RIFs. *See* Reuters, *Trump Tells Cabinet Secretaries They, Not Musk, are in Charge of Staff Cuts* (March 7, 2025), *available at* https://www.reuters.com/world/us/trump-tells-cabinet-secretaries-they-not-musk-are-charge-staff-cuts-2025-03-06/.

### B. February 26, 2025 Memorandum

On February 26, 2025, OPM and OMB jointly issued the Workforce Memorandum (Memorandum or Workforce Memorandum). ECF No. 37-1 App. 2. We describe the guidance provided by that Memorandum here.

**Agency Plans:** The Memorandum noted that the Workforce Executive Order required agencies to submit reports by March 13 and the Memorandum "submit[s] guidance on these Agency RIF and Reorganization Plans ('ARRP'), along with the instruction that such plans be submitted to OMB and OPM." *Id.* AARPs should seek to achieve five principles: (1) "Better service for the American people; (2) "Increased productivity"; (3) "A significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required"; (4) "A reduced real property footprint"; and (5) "Reduced budget topline." *Id.* at 1-2. "Pursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions." *Id.* at 2. The Memorandum identifies in broad terms "principles" agencies should consider in undertaking reorganization and reduction actions. Specifically, agencies should:

> seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical; implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities; close and/or consolidate regional field offices to the extent consistent with efficient service delivery; and maximally reduce the use of outside consultants and contractors.

*Id.* at 2. The Memorandum cautions that "[a]gencies should review their statutory authority and ensure that their plans and actions are consistent with such authority." *Id.*

**Formulation of Plans:** The Memorandum provides a list of "available tools" agencies should consider employing in crafting their ARRPs to effectuate the President's directive. This includes the hiring freeze President Trump set forth in a January 20, 2025 Presidential Memorandum, processes to ensure that agency heads have visibility and sign off onto potential job offers, eliminating non-statutorily mandated functions through RIFs, reviewing underperforming employees as well as employees engaged in misconduct and probationary employees, reducing headcount through attrition and allowing term or temporary positions to expire without renewal, separating reemployed annuitants in areas likely subject to RIFs, and renegotiating collective bargaining agreements that inhibit government efficiency and employee accountability. *Id.* at 3. The Memorandum also notes that agencies should consider changes to regulations and agency policies that would reduce or eliminate agency subcomponents and otherwise hasten implementation of ARRPs, while cautioning that some such changes "must be pursued through notice-and-comment rulemaking[.]" *Id.*

**Submission of Plans**: The Memorandum states that agencies should submit ARRPs in two phases: Phase 1 ARRPs, to be submitted by March 13, 2025, which "shall focus on initial agency cuts and reductions, *id.* at 3; and Phase 2 ARRPs, to be submitted by April 14, 2025, which "shall outline a positive vision for more productive, efficient agency operations going forward," *id.* at 4.

**Phase 1:** Phase 1 ARRPs should provide a list of agency subcomponents or offices that provide direct services to citizens, any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities, any agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations, "[w]hether the agency or any of its subcomponents should be eliminated or consolidated; and which specific subcomponents or functions, if any, should be expanded to deliver on the President's priorities[,]" tools the agency intends to use to increase efficiencies, "[a] list by job position of all positions categorized as essential for purposes of exclusion from large-scale RIFs," "[t]he agency's suggested plan for congressional engagement to gather input and

agreement on major restructuring efforts and the movement of fundings between accounts," and the agency's timetable for implementation of each part of the Phase 1 AARP. *Id.*

**Phase 2:** Phase 2 ARRPs should provide, among other things: confirmation that the agency has reviewed all its personnel data, plans to ensure that employees are grouped based on like duties and functions to the maximum extent possible, any proposed relocations from Washington, D.C. to less expensive areas of the country, "[t]he competitive areas for subsequent large-scale RIFs[,]" all reductions (of FTE positions and otherwise), the agency's plan to ensure new career appointment hires are in highest-need areas, any collective bargaining agreement provisions that inhibit efficiency and cost-savings (and the agency's plan to renegotiate any such provisions), an explanation how the ARRP will improve services for Americans and advance the President's priorities, "[f]or agencies that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care), the agency's certification that implementation of the ARRPs will have a positive effect on the delivery of such services" (a certification that "should include a written explanation from the Agency Head"), plans to improve efficiency and reduce costs through improved technology, "[a]ny changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking," as well as the agency's timetable and plan for implementing the ARRP. *Id.* at 5-6. The Memorandum further states that agencies should continue sending monthly progress reports on May 14, 2025, June 16, 2025, and July 16, 2025. *Id.* at 6. Phase 2 Plans should be planned for implementation by September 30, 2025. *Id.* at 4.

**Exclusions:** The Memorandum contains several exclusions, including the Postal Service, positions "necessary to meet law enforcement, border security, national security, immigration enforcement, or public safety responsibilities[,]" the Executive Office of the President, military personnel in the armed forces and Federal uniformed personnel. *Id.* at 6. Agencies providing direct services to citizens may "not implement any proposed ARRPs until OMB and OPM certify that the plans will have a positive effect on the delivery of such services." *Id.*

**Relation to RIFs:** ARRPs are distinct from RIFs. The Workforce Memorandum states that, before a RIF is implemented and an employee separated from service, there must be a formal RIF notice period of 60 days (or 30 days if the agency obtains an OPM waiver), in which affected

employees are issued formal RIF notices, as well as provided appeal rights, career transition assistance, and priority placement options. ECF No. 37-1 App. 2 at 7. As noted above, OPM's regulations independently codify these notice requirements.

## III. Procedural History

More than two months after OPM and OMB issued the Memorandum, Plaintiffs—employee unions, organizations, cities, and counties—sued on April 28, 2025. *See* ECF No. 1 (Complaint). They filed the TRO motion three days later. *See* ECF No. 37 (TRO Motion); ECF No. 37-1 (TRO Brief). The Complaint names President Trump, OPM, OMB, USDS, and 23 other components as well as their heads as defendants (including virtually every Cabinet-level Department). Complaint ¶¶ 55-106.[9]

The Complaint contains seven claims for relief. Claim I, styled as a "Separation of Powers/*Ultra Vires*" claim that is asserted against President Trump, asserts that "Executive Order 14210 exceeds the President's lawful authority" by, in Plaintiffs' characterization of the Order, directing the Federal Agency Defendants to implement large-scale RIFs, and prioritize certain items and functions in those RIFs, among other things. *Id.* ¶ 359. According to Plaintiffs, "Congress has not delegated to the President the authority to employ and discharge the subordinate employees of the agencies or to spend appropriated funds on those positions; rather, it delegated those functions exclusively to the heads of federal agencies." *Id.* ¶ 356.

Claims II-V consist of claims against OPM, OMB, and USDS.[10] Claim II asserts a Separation of Powers/*Ultra Vires* claim against OPM, OMB, and USDS as well as their directors,

---

[9] Plaintiffs refer to the 23 other defendants as "Federal Agency Defendants." Complaint ¶ 63. We do not concede that all of these entities are agencies for the purposes of the Freedom of Information Act, Federal Records Act, APA, or any other purpose (it is well-established that the President is not an agency; the government's position is also that USDS is not an agency). But since the TRO must be denied regardless of whether any or all the Defendants are agencies, we do not address that issue further (except to note below that the President is not an agency who can be sued under the APA). And for ease of reference, we also use the "agency" terminology in this brief.

[10] Again, Plaintiffs characterize this claim as being brought against "DOGE" but we assume that the intended defendant is USDS, since the DOGE structure—consisting of USDS, the USDS Temporary Organization, and every DOGE Team housed within agencies—is not even an entity that can be sued. In any event, the claim fails and is not the basis for a TRO regardless of who Plaintiffs purport to bring it against.

---

Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Order to Show Cause
3:25-cv-3698-SI

and contends that the Workforce Memorandum exceeds these entities' authority by supposedly "supplant[ing] the decision-making authority of the federal agencies with respect to federal agency employment or organization." *Id.* ¶ 365. Claim III, an APA claim, asserts that the same Memorandum is not in accordance with law and exceeds the authority of OPM, OMB, and USDS on similar grounds. *Id.* ¶¶ 369-379. Claim IV, also an APA claim, asserts that OPM, OMB, and USDS acted arbitrarily and capriciously by issuing the Workforce Memorandum, and issuing any decision approving an ARRP (and that USDS's supposed directives ordering agencies to make staffing and spending cuts are likewise arbitrary and capricious) because they supposedly "order federal agencies to cede decision-making authority to" those entities and direct large-scale RIFs regardless of agency's statutory requirements, regulations, and necessary functions. *Id.* ¶¶ 380-83. Claim V asserts that the Workforce Memorandum is a "rule" under the APA that was subject to notice-and-comment requirements. *Id.* ¶¶ 384-91.

Claims VI and VII are advanced against Federal Agency Defendants. Claim VI, an APA claim for action not in accordance with law, contends that that the Federal Agency defendants have unlawfully "cede[d] their decision-making authority with respect to the employees of that agency to the President, OMB, OPM, or DOGE." *Id.* ¶ 396. Claim VII, an APA claim for arbitrary and capricious agency action, asserts (again, without discussion of any specific RIFs) that the agencies' implementation of the Workforce Executive Order is arbitrary and capricious. *Id.* ¶ 403.

On May 1, 2025, Plaintiffs filed the TRO Motion against OPM, OMB, USDS, and 17 of the agency defendants, seeking to enjoin implementation of the Workforce Executive Order and Workforce Memorandum, including approvals of ARRPs, execution of any RIF notices, issuance of further RIF notices, placement of employees on administrative leave, "any further transfer of functions or programs between any Federal Agency Defendants in conjunction with implementing the Executive Order, the OMB/OPM Memorandum, or the ARRPs" and "any further orders by DOGE to agencies to cut programs or staff in conjunction with implementing the Executive Order, the OMB/OPM Memorandum, or the ARRPs[.]" TRO Motion at 1-2.[11]

---

[11] In citing to filings, unless otherwise indicated, we use the page numbers corresponding to the pages in the underlying document rather than on the ECF stamp.

1

**STANDARD OF REVIEW**

2
3 Rule 65 of the Federal Rules of Civil Procedure empowers district courts to issue TROs.
3 *See* Fed. R. Civ. P. 65(b). Like a preliminary injunction, a TRO is "an extraordinary remedy never
4 awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also*
5 *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (standards applicable to TROs and
6 preliminary injunctions "substantially identical" (quoting *Stuhlbarg Int'l Sales Co. v. John D.*
7 *Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)). A court should not "mechanically" grant an
8 injunction for every violation of law. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).
9 Instead, plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are
10 "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities
11 tips in [their] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20.

12

**ARGUMENT**

13 Plaintiffs seek the extraordinary remedy of a temporary restraining order, and not just any
14 restraining order. They ask this Court to enjoin implementation of an Executive Order on a
15 virtually government-wide basis, in an area of core Executive Branch responsibility. *See Arnett v.*
16 *Kennedy*, 416 U.S. 134, 168 (1974) ("[T]he Government, as an employer, must have wide
17 discretion and control over the management of its personnel and internal affairs."). But Plaintiffs
18 are not entitled to any TRO because they waited far too long to bring this motion and any
19 "emergency" is thus entirely of their own making. And even putting that aside, Plaintiffs satisfy
20 none of the four *Winter* requirements, let alone all of them.

21 **I.  Plaintiffs' Delay Alone Warrants Denial of the TRO Motion**

22 The Court should deny the TRO on the threshold ground that Plaintiffs waited too long to
23 seek this "emergency" relief. Plaintiffs filed their motion for a TRO on May 1, *more than eleven*
24 *weeks* after the President signed the Workforce Executive Order (on February 11, 2025), and *more*
25 *than nine weeks* after OPM and OMB issued the Workforce Memorandum. Plaintiffs' delay
26 forecloses preliminary injunctive relief—let alone a temporary restraining order. A "long delay
27 before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Miller ex*
28 *rel. NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993) (citation omitted). "Delays of

Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Order to Show Cause
3:25-cv-3698-SI

one month or more are common grounds for denying motions for temporary restraining orders, and some courts deny temporary relief based on delays of as little as ten days." *Int'l Tech. Univ. Found. v. WASC Senior Coll. & Univ. Comm'n*, No. 22-cv-4576, 2023 WL 2621344, at *3 (N.D. Cal. Mar. 23, 2023).

This Court and other federal district courts in California have denied motions for TROs by plaintiffs who delayed much less than Plaintiffs' 11-week delay. *See, e.g.*, *Perez v. City of Petaluma*, No. 21-CV-06190-JST, 2021 WL 3934327, at *1 (N.D. Cal. Aug. 13, 2021) (one-month delay); *West v. PBC Mgmt. LLC*, No. 23-cv-3283, 2023 WL 4477296, at *2 (N.D. Cal. July 10, 2023) (eight-week delay); *Devasahayam v. DMB Cap. Grp.*, No. 3:17-cv-02095-BEN-WVG, 2017 WL 6547897, at *4 (S.D. Cal. Dec. 20, 2017) (one-month delay was "reason enough to deny a TRO"). In February, a federal judge in Washington, D.C., criticized attorneys who waited 21 days before filing a motion for a TRO challenging the removal of inspectors general. Chris Cameron, *Judge Refuses to Immediately Reinstate Inspectors General Fired by Trump*, N.Y. Times (Feb. 14, 2025), https://www.nytimes.com/2025/02/14/us/politics/trump-inspectors-general-ruling.html.

At bottom, preliminary relief exists to give a court enough time to engage in the ordinary adjudicative process. *See* 11A Wright & Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. Apr. 2025 update) ("Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief."). Thus, to obtain a temporary restraining order, Plaintiffs must show that they will suffer irreparable harm in the time before the Court can hold a hearing on a preliminary injunction; if they cannot meet that burden, they are not entitled to a TRO. *Pan Am. World Airways, Inc. v. Flight Engineers' Int'l Ass'n, PAA Chapter, AFL-CIO*, 306 F.2d 840, 842–43 (2d Cir. 1962); *cf. Granny Goose Foods, Inc. v. Bhd. of Teamsters Loc. No. 70*, 415 U.S. 423, 439 (1974) (ex parte TROs "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."). Here, where plaintiffs have produced a 50-page motion and 1,300 pages of declarations, where the government has been provided notice, and where the Court will hold a live hearing before resolving the motion, plaintiffs cannot show irreparable harm in the time before a preliminary injunction could be issued because this Court

could just as easily have considered this motion as one for a preliminary injunction. Plaintiffs' weeks-long delay in filing suit and in seeking a TRO underscores that they do not need immediate relief to preserve the Court's ability to grant them effectual relief should they prevail on the merits. That they have titled their motion one for a TRO does not make it so. *See Sampson v. Murray*, 415 U.S. 61, 86-87 (1974) (TRO label does shield a coercive order from appellate review).

It is no answer to contend, as Plaintiffs have, that RIFs are only now occurring or are occurring soon. ECF No. 43 at 2. The TRO Motion does not make freestanding challenges to particular RIFs, and Plaintiffs do not seek to enjoin particular RIFs on fact-specific grounds. Again, Plaintiffs' challenges involve legal grounds that were fully available to them beginning February 11 and February 26. Although Plaintiffs also assert two claims against the Federal Agency Defendants, *see supra* p. 18, those claims also are not based on any fact-bound attack on particular RIFs. Rather, Plaintiffs complain that these agencies have supposedly ceded decisionmaking authority to the President, OPM, OMB, and USDS, that they are, inter alia, being compelled to act on unrealistic timetables, and that the RIFs they will supposedly engage in are necessarily contrary to statute. *Id.* As discussed further below, these contentions are entirely speculative and have no basis in either the Workforce Executive Order or the Workforce Memorandum. *See infra* pp. 45-46. But for present purposes, it suffices to note that Plaintiffs could have made all of these arguments months ago—beginning February 11 or (at the latest) by February 26.

Plaintiffs also contend that "neither the White House, OMB, OPM, nor any of the implementing agencies made [the ARRPs] public" and "Plaintiffs have been required to uncover the evidence to support this TRO request by relying on leaks and unfolding events." ECF No. 37 at 2. But as the Workforce Memorandum and the description above make clear, the ARRPs are deliberative agency planning documents that discuss a number of steps the agency plans to take to, inter alia, improve the agency's efficiency, as well as to focus on statutorily required functions activities that directly serve the public. *See supra* pp. 15-16. RIFs follow a separate process, including a formal RIF notice period of 60 days (or 30 days if the agency obtains an OPM waiver), in which affected employees are issued formal RIF notices, as well as provided appeal rights, career transition assistance, and priority placement options. ECF No. 37-1 App. 2 at 7. Employees

who receive a RIF notice also have an opportunity to inspect the retention register/related records before the RIF. 5 CFR § 351.505(b)(1). If pre-RIF challenges are judicially cognizable, the appropriate time for such litigation would be during the 60-day (or 30-day) notice period.

And in any event, again, Plaintiffs' legal claims are based on the content of the February 11 Workforce Executive Order, and the February 26 Workforce Memorandum. Had Plaintiffs filed suit in February, these questions could have been litigated long ago—indeed, it is quite possible that this Court could have by now decided modestly expedited *motions for summary judgment* raising the legal issues Plaintiffs raise in this TRO motion. This Court should reject out of hand the notion that Plaintiffs' sprawling current challenge to an Executive Order issued nearly three months ago constitutes an emergency that requires the nearly government-wide TRO that Plaintiffs now request. Because this motion comes far too late, the Court should deny it.

## II. Plaintiffs Satisfy None of the *Winter* Requirements

Given the timing considerations set forth above, this Court should deny the TRO motion without further consideration of the relevant requirements. But even if the Court considers the four *Winter* requirements, Plaintiffs satisfy none of them.

### A. Plaintiffs Are Unlikely to Succeed on the Merits of their Claims

The likelihood-of-success factor "is a threshold inquiry and is the most important factor." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). And it is dispositive here. Plaintiffs can show no likelihood of success in their challenge to the Workforce Executive Order and the Workforce Memorandum. They cannot challenge either and, even if they could, both are lawful. To the extent Plaintiffs purport to challenge particular RIFs, this Court lacks jurisdiction to consider those challenges, and any such challenge would be utterly conclusory.

#### 1. The Workforce Executive Order and Workforce Memorandum are Not Subject to Review

Plaintiffs are unlikely to succeed in challenging the Workforce Executive Order and the Workforce Memorandum because this Court lacks jurisdiction to consider those challenges. Congress's comprehensive remedial scheme for adjudicating employment disputes with the federal government precludes Plaintiffs' suit. They have not established standing to pursue their

claims and to seek the relief sought in the TRO motion. And even putting these threshold obstacles aside, neither the Workforce Executive Order nor the Workforce Memorandum is reviewable in this context. We address each point in turn.

### a. The FSLMRS and CSRA Preclude District-Court Jurisdiction Over Plaintiffs' Challenge to the Workforce Executive Order and Workforce Memorandum.

Congress has broadly empowered the judiciary to hear "claims 'arising under' federal law" "by way of 28 U.S.C. § 1331's grant of jurisdiction." *Axon Enters., Inc. v. FTC*, 598 U.S. 175, 185 (2023). Nonetheless, "[a] special statutory review scheme, . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Id.* Thus, when a statute sets out "a particular procedure and time period" for challenging agency actions, a plaintiff may be precluded from relying on a district court suit. *See N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135-36 (D.C. Cir. 2015). Where Congress has done so implicitly, courts determine whether it intended to preclude particular claims by assessing whether "(i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)); *accord Kerr v. Jewell*, 836 F.3d 1048, 1057-58 (9th Cir. 2016). Applying that framework here, neither the union Plaintiffs nor the non-union Plaintiffs can show that their challenge to any RIFs agencies may undertake in implementing the Workforce Executive Order can be heard in federal district court.

**Union Plaintiffs:** First, the union Plaintiffs cannot show that district courts have jurisdiction over their claims. *See AFGE v. Trump*, 929 F.3d at 752; *Maryland v. U.S. Dep't of Agriculture*, No. 25-1248, 2025 WL 1073657 (4th Cir. April 9, 2025); *Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), 2025 WL 561080 (D.D.C. Feb. 20, 2025); *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-cv-10276, 2025 WL 470459 (D. Mass. Feb. 12, 2025).

In *AFGE v. Trump*, numerous federal unions asserted broad constitutional and statutory challenges to a set of three executive orders issued by President Trump during his first administration that would have enacted substantial changes to the way federal unions operated. On the government's appeal from a district court decision largely in the unions' favor, the D.C. Circuit reversed the underlying decision on jurisdictional grounds, holding that the FSLMRS's

comprehensive administrative-judicial review scheme channeled jurisdiction entirely away from the federal district courts. Federal labor disputes must be heard through the FLRA review scheme, with judicial review in a federal court of appeals following the conclusion of administrative proceedings before the FLRA. *See AFGE v. Trump*, 929 F.3d at 754-61. Applying the logic of that holding, a federal district court in Washington, D.C. recently held—in denying a preliminary injunction that also challenged Executive Order 14210, in the context of alleged firing of 70 CFPB employees—that the FSLMRS channeled jurisdiction away from federal district courts and instead required the unions to pursue their claims before the FLRA. *See Nat'l Treasury Emps. Union*, 2025 WL 561080, at *4. A district court in Massachusetts reached the same conclusion in a lawsuit by labor unions representing federal employees challenging the closing of the deferred resignation offer known as the "Fork in the Road." *Am. Fed'n of Gov' Emps.*, 2025 WL 470459, at *1-*3.

The Fourth and D.C. Circuits reached similar conclusions in decisions from the last month concerning the Administration's workforce policies. The Fourth Circuit stayed a preliminary injunction to "refrain" from certain types of "reductions in force." *Maryland*, 2025 WL 1073657, at *1. "[T]he Government argue[d] . . . that the district court lacked subject-matter jurisdiction because the Civil Service Reform Act . . . provides the exclusive means for review of personnel actions taken against federal employees." *Id.* The Court agreed, recognizing "the Government is likely to succeed in showing the district court lacked jurisdiction over Plaintiffs' claims." *Id.* So too in the D.C. Circuit. *See Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *2 (D.C. Cir. May 3, 2025). In response to an Executive Order directing the United States Agency for Global Media (USAGM) leadership to reduce the agency to the minimum level of operations required by statute, *see* 90 Fed. Reg. 13043 (Mar. 14, 2025), USAGM placed over 1,000 employees on administrative leave, and terminated nearly 600 personal-service contractors. The D.C. Circuit stayed a district court order preliminarily enjoining those actions, finding that "[t]he district court likely lacked jurisdiction over USAGM's personnel actions." *Widakuswara*, 2025 WL 1288817 at *2. The Court noted that "'[w]e have long held that federal employees may not use the Administrative Procedure Act to challenge agency employment actions.'" *Id.* (quoting *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009)). "Congress has instead established

comprehensive statutory schemes for adjudicating employment disputes with the federal government" and "[t]hese remedial schemes provide[] the exclusive procedures by which federal employees may pursue employment- and contractor-related claims." *Id.*

In so concluding, the panel majority also rejected the district court's conclusion that an injunction was warranted because "this case is not simply a collection of employment disputes" since the "facts on the record and on the ground" suggest USAGM is being "dismantl[ed]." *Widakuswara v. Lake*, No. 25-cv-1015, 2025 WL 1166400, at *11 (D.D.C. Apr. 22, 2025). The panel majority did not quibble with the district court's characterization but instead held that it was irrelevant to the channeling question. As the Court explained, "[t]he 'dismantling' that plaintiffs allege is a collection of 'many individual actions' that cannot be packaged together and 'laid before the courts for wholesale correction under the APA.'" *Widakuswara*, 2025 WL 1288817, at *3 (quoting *Nat'l Wildlife Fed'n*, 497 U.S. at 893). Rather, any individual personnel actions "must be pursued through other remedial channels." *Id.*

The same result is required here. "The claims here are brought by a union representing federal employees against their federal employers—thus, they are federal labor-management relations claims." *Nat'l Treasury Emps. Union*, 2025 WL 561080, at *5 (quotation marks omitted). "And the Statute's scheme is 'exclusive' with respect to such claims." *Id.* Indeed, the Supreme Court recognized this exclusivity principle just last month in staying a district court's temporary restraining order under the APA in the funding context: "The APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (quoting 5 U.S.C. § 702). Citing *California*, the Fourth Circuit last month stayed a preliminary injunction

**Non-Union Plaintiffs:** The non-union Plaintiffs also fail to show that their claims can be heard in federal district court. The CSRA provides the exclusive means of redressing employment disputes involving federal employees, *see United States v. Fausto*, 484 U.S. 439, 455 (1988)), even when those disputes involve constitutional claims. *See Elgin*, 567 U.S. at 10-15. Such claims must be pursued before the MSPB (if at all). The CSRA thus imposes an "implied preclusion of district

court jurisdiction," *id.* at 12, and "precludes courts from providing supplemental remedies," *Lampon-Paz v. OPM*, 732 F. App'x 158, 161 (3d Cir. 2018).

This is the exact conclusion the Ninth Circuit reached in *Veit v. Heckler*, 746 F.2d 508, 510-11 (9th Cir. 1984), over four decades ago. In that case, a career employee of the Social Security Administration sued the Secretary of Health and Human Services in federal district court to challenge the agency's appraisal of his job performance. *Id.* at 510. The district court rejected the employee's claim, holding that it was not subject to federal court review, and the Ninth Circuit affirmed. The court noted that "[t]he CSRA provides a comprehensive scheme for administrative and judicial review of federal personnel actions and practices." *Id.* It observed that "other circuits have held that the comprehensive nature of the procedures and remedies provided by the CSRA indicates a clear congressional intent to permit federal court review as provided in the CSRA *or not at all*." *Id.* at 511 (emphasis added). And the Ninth Circuit agreed with those courts that "the federal courts have no power to review federal personnel decisions and procedures unless such review is *expressly* authorized by Congress in the CSRA or elsewhere." *Id.* (emphasis added).

**Plaintiffs' claims are precluded:** Given that well-established precedent demonstrating that Plaintiffs' claims are precluded, specific consideration of the *Thunder Basin* factors is unnecessary here. In any event, analysis of those factors confirms this conclusion.

The first step under *Thunder Basin*—Congress's intent to preclude—is satisfied here: Congress established a detailed scheme for adjudicating federal labor disputes. The FSLMRS provides for "administrative and judicial review" regarding disputes between employees and their federal employers and disputes between unions representing those employees and the government. *AFGE*, 929 F.3d at 752. Congress decided, through the FSLMRS, that federal labor disputes must first be administratively exhausted before the FLRA. Judicial review, if any, is available only in a court of appeals. *See id.* (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *see also* 5 U.S.C. § 7703(b) (judicial review in Federal Circuit or other court of appeals). "Congress typically chooses . . . review in a court of appeals following the agency's own review process" when designing an implicit preclusion scheme. *Axon*, 598 U.S. at 185. That is what this scheme includes. Accordingly, as the D.C. Circuit has recognized, the FSLMRS precludes jurisdiction in the district courts over

federal union disputes. *See AFGE v. Trump*, 929 F.3d at 754. This "enormously complicated and subtle scheme to govern employee relations in the federal sector" does not permit a district court runaround. *See id.* at 755 (quoting *AFGE v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013)). The same is true for the CSRA. *See Elgin*, 567 U.S. at 10-15; *Fausto*, 484 U.S. at 455.

Turning to the second *Thunder Basin* step—whether particular claims are of the type Congress intended to be reviewed in this scheme—the Court must consider "three considerations designed to aid in that inquiry, commonly known now as the *Thunder Basin* factors." *Axon*, 598 U.S. at 186. The factors are: (i) "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim"; (ii) "is the claim wholly collateral to the statute's review provisions"; and (iii) "is the claim outside the agency's expertise?" *Id.* (internal quotation marks, citation, and alteration omitted). These "considerations" are ultimately merely guideposts to "best [] understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id.*

All three factors are satisfied here. First, both statutory schemes provide meaningful judicial review over Plaintiffs' claims. Plaintiffs do not substantially argue otherwise. Plaintiffs briefly contend that "[t]he FLRA hears bargaining unit-specific matters that *expressly exclude* government-wide action." TRO Brief at 47 (citing *NTEU and Dep't of Treasury*, IRS, 60 F.L.R.A. 783, 783 (2005). But even if this assessment of the FLRA's authority is accurate, the assertion is irrelevant. As Judge Cooper observed in *National Treasury Employees Union*, "even if the FLRA cannot decide [Plaintiffs'] constitutional claims, 'it is of no dispositive significance whether the agency has the authority to rule on constitutional claims so long as the claims can eventually reach an Article III court fully competent to adjudicate them.'" 2025 WL 561080 at *7 (quoting *AFGE v. Trump*, 929 F.3d at 758 (some quotation marks omitted)). Here, as in *AFGE v. Trump*, parties can bring certain claims through the administrative process "in the context of concrete . . . disputes." *Id.* at 757. Similarly, if any Plaintiff thinks particular RIFs conflict with any federal rule, guidance, or statute, it may assert such a claim within one of the review schemes. *See, e.g.*, *Marshall v. HHS*, 587 F.3d 1310, 1318 (Fed. Cir. 2009) (reversing based on an erroneous statutory interpretation); *Lyons v. Dep't of Veteran's Affs.*, 273 F. App'x 929, 931 (Fed. Cir. 2008)

(considering whether regulation was violated); *Fed. L. Enf't Offs. Ass'n v. Ahuja*, 62 F.4th 551, 560 (D.C. Cir. 2023) (noting challenges to OPM guidance through the MSPB system).[12]

Plaintiffs' claims are also not wholly collateral. As the Supreme Court explained in *Elgin*, what matters for purposes of this inquiry is whether *the subject* of Plaintiffs' challenge is a matter covered by the CSRA and FSLMRS schemes. Thus, in *Elgin*, Plaintiffs' "constitutional claims [were] the vehicle by which they seek to reverse the removal decisions, to return to federal employment[.]" 567 U.S. at 22. And "[a] challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the CSRA scheme." *Id.* Similarly here, the ultimate subject of Plaintiffs' challenge is agency removals in the form of RIFs; their APA and ultra vires claims are simply the vehicles by which they seek to prevent such RIFs.[13]

Third, and for similar reasons, the agency may bring its expertise to bear on many of the questions raised. As noted, Plaintiffs contend that the Workforce Executive Order and Workforce Memorandum effectively compel agencies to engage in large-scale RIFs that are necessarily contrary to statute, and force them to act under unrealistic timeframes. *See supra* p. 18. That assertion is incorrect but, in any event, is a question expert administrative agencies should assess in the context of challenges to particular RIFs, not a question a federal district court should address

---

[12] The FLRA and MSPB are also both capable of adjudicating claims of multiple employees raising common issues on a consolidated basis. *See Nat'l Treasury Emps. Union*, 2025 WL 561080, at *7 ("NTEU provides no reason why it could not seek relief from the FLRA on behalf of a class of plaintiffs and admits that it would ask other agencies to follow an administrative judge's ruling in its favor."); Order on Stay Request, *Special Counsel ex rel. John Doe v. Department of Agriculture*, No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), https://perma.cc/3F45-PKG5 (single MSPB order staying termination of nearly 6,000 employees); *see also Widakuswara*, 2025 WL 1288817, at *2 n.2 (D.C. Circuit noting this MSPB ruling and stating that "administrative agencies are not powerless to issue broad-reaching relief in large-scale personnel matters").

[13] This case is thus unlike *Axon*, where the Supreme Court held that the claims at issue did not need to be channeled. In that case, plaintiffs challenged pending FTC and SEC enforcement actions on the ground that the ALJs could not "constitutionally exercise governmental authority because of their dual-layer protection from removal." 598 U.S. at 183. The core of each plaintiffs' claim was that they were subject to "an illegitimate proceeding, led by an illegitimate decisionmaker," which qualified as a "here-and-now injury" that could not be remedied after the fact, because "[a] proceeding that has already happened cannot be undone." *Id.* at 191 (citation omitted). Here, Plaintiffs' claims are not based on a claim that the administrative schemes are unconstitutionally structured or otherwise invalid.

in a government-wide challenge to an Executive Order that provides agencies with significant discretion in implementation. Indeed, even in *Elgin* (where the question at issue was the constitutionality of a federal statute), the Court noted that the need for agency expertise supported a channeling requirement, since "preliminary questions unique to the employment context" include fact questions about a "resignation" (there whether it "amounted to a constructive discharge") as well as "statutory or constitutional claims that the MSPB routinely considers." 567 U.S. at 22-23. Even if some of the claims could move beyond the administrative expertise of the FLRA or the MSPB, these "threshold questions" may "alleviate [the other] concerns." *Id.*

Against all of this, Plaintiffs address channeling only briefly and unpersuasively. Plaintiffs do not specifically address the *Thunder Basin* factors[14] but insist that the channeling requirement does not apply because "the administrative agencies at issue were never designed to handle claims involving (1) the President, (2) OPM, (3) OMB, or (4) DOGE, *or* (5) agency action effectuating government-wide Presidential orders, whether under the APA or ultra vires doctrine." TRO Brief at 47. But initially, it is not even clear what this means. The personnel actions Plaintiffs seek to prevent—namely, RIFs—will be carried out by individual agency defendants, and there is no basis for Plaintiffs' claim that the President, OPM, OMB, and USDS are dictating specific RIFs.

But in any event, it makes no difference whether labor relations claims covered by the FSLMRS or personnel actions covered by the CSRA are ultimately traceable to the President (or OMB, OPM, or USDS). In *AFGE v. Trump*, an Executive Order was also involved and that did not change the fact that the labor statutes applied. *AFGE v. Trump*, 929 F.3d at 753. Nor is there any exception to channeling requirements for covered personnel actions purportedly taken pursuant to "government-wide" policies. The employees in *Elgin*, to take just one example, were discharged pursuant to a "government-wide" rule: they failed to register for the draft and a federal statute barred from Executive agency employment anyone who has knowingly and willfully failed

---

[14] Plaintiffs cite Justice Gorsuch's concurrence in *Axon* criticizing *Thunder Basin*. *See Axon*, 598 U.S. at 205 (Gorsuch, J., concurring). Justice Thomas also expressed criticism of *Thunder Basin*. *Id.* at 196 (Thomas, J., concurring). But as Judge Cooper pointed out in *National Treasury Employees Union*, 2025 WL 561080 at *5 n.3, the seven other Justices applied the *Thunder Basin* factors, and there is no question this framework remains good law that is binding here.

1   to register for the Selective Service as required by the Military Selective Service Act, 5 U.S.C.

2   § 3328. *See Elgin*, 567 U.S. at 7. Plaintiffs also cite the Fifth Circuit's decision in *Feds for Med.*

3   *Freedom v. Biden*, 63 F.4th 366 (5th Cir. 2023) (en banc) (since vacated as moot) as a case

4   "rejecting channeling of challenge to Presidential mandate." TRO Brief at 48. But the Fifth Circuit

5   there rejected channeling arguments because it concluded that the subject of the challenge—a

6   vaccine mandate—was not a personnel action covered by the CSRA. 63 F.4th at 375. That holding

7   has nothing to do with this case. The FSLMRS and CSRA bar Plaintiffs' claims.

8       Finally on this point, Defendants recognize that, as Plaintiffs note, Judge Alsup recently

9   concluded that public-sector unions were not subject to statutory channeling in a case challenging

10  the termination of probationary employees. *AFGE v. OPM*, No. 25-01780, 2025 WL 900057, at

11  *2 (N.D. Cal. Mar. 24, 2025). Defendants respectfully submit that this decision was incorrect and

12  have appealed it but, in any event, it is clearly distinguishable from this one in several respects.

13      For one, Judge Alsup concluded there that "[t]he public-sector unions' ultra vires and other

14  claims will not be subject to judicial review if not litigated here" because probationary employees

15  do not have appeal rights to the MSPB (whose decision could then be subject to judicial review).

16  *Id.* at *4. That consideration is irrelevant here because this action does not involve a challenge to

17  matters concerning probationary employees in particular.

18      And in applying the *Thunder Basin* factors, Judge Alsup concluded that the case involved

19  OPM directing "all federal agencies to terminate their probationers *en masse*." *Id.* at *3. Based on

20  that characterization[15]—that the case involved whether OPM had the authority to issue a clear

21  directive that agencies purportedly then obeyed—Judge Alsup concluded that the case raised "only

22  a standard issue of administrative and constitutional law, relating not at all to considerations of

23  agency policy," *id.* at *2 (citation omitted), and that the claim was wholly collateral because it

24  involved no challenge to any decision about a particular agency's workforce but, rather, about "a

25  prior controlling event: Did the OPM exceed its authority when it directed all federal agencies to

26  terminate their probationers en masse[,]" *id.* at *3. Here, by contrast, the Workforce Executive

27  Order and Memorandum plainly do not contain the sort of simple directive like the "terminate all

28  ---

[15] Which, to be clear, the government asserts was and is incorrect.

probationary employees" directive that Judge Alsup ascribed to OPM in that case. Neither source directs RIFs of particular employees or classes of employees, and both provide ample discretion for agencies to conduct RIFs consistent with their own workforce needs, and statutorily required functions. Any challenges to RIFs in this context thus necessarily involve consideration of agency policy issues—including agency-specific questions regarding each agency's particular statutory authorities and responsibilities, and the particular RIF action that the agency chose or is planning to carry out—of the sort that must be channeled through the exclusive remedial schemes that Congress has established. Because this Court lacks jurisdiction over Plaintiffs' claims, Plaintiffs are not likely to succeed on the merits of those claims.

**b. Plaintiffs Fail to Show Standing**

To establish standing, a plaintiff must show: (i) an "injury in fact," that is, a violation of a legally protected interest that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (ii) a causal connection between the injury and the defendant's conduct such that the injury is "fairly . . . traceable to the challenged action"; and (iii) that it is "likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up) (omission in original). Plaintiffs "bear[] the burden of establishing these elements," and therefore "must clearly . . . allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up) (omission in original). Because Plaintiffs seek a 14-day TRO and bear the burden of showing standing for each remedy they request, they must demonstrate a redressable injury for that time period.

To establish injury in fact, a plaintiff must show that the defendant's action affects him or her in a "personal and individual way," *Lujan*, 504 U.S. at 560 n.1, rather than being a "generalized grievance," *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). A plaintiff must show more than a "possible future injury"; he or she must show that harm has actually occurred or is "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (citation omitted). "[A]llegations of *possible* future injury are not sufficient" to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted).

The union Plaintiffs have not established their standing. Because they rely on their members' injuries, the union Plaintiffs must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009). Plaintiffs assert that "[u]nion Plaintiffs' members include many federal employees who have suffered, or imminently will suffer, termination due to the RIFs," TRO Brief at 44. But the examples in the footnote accompanying that assertion do not adequately substantiate this claim. Specifically, the Kelley, Blake, Cochran, Norman, Howell, Wilson, and Turner-Nichols declarations do not appear to allege any imminent RIFs of any named Plaintiff union members. *See* ECF Nos. 37-6 (no specific allegations about pending or specific imminent RIFs), 37-10 ¶ 9 ("To date, I have not heard of any formal plans for a RIF at the Department of the Interior or, specifically at NPS."), 37-19 ¶ 14 (noting that formal RIF notices have not been sent but will be 30 days in advance of June 30), 37-23 ¶ 16 (noting that bargaining unit employees have received RIFs but not specifying whether any are members and not naming them), 37-25 (no specific allegations about pending or specific imminent RIFs), 37-28 (same), 37-33 (same), 37-35 (same).[16] Nor can plaintiffs rely (TRO Brief at 44-45) on the speculative possibility that some member may be harmed as a result of a future RIF. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497–98 (2009). Rather, they must identify specific members by name who will suffer harm. *See Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. California Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013). "This requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where *all* the members of the organization are affected by the challenged activity." *Summers*, 555 U.S. at 498-99 (2009). Plaintiffs do not meet that standard here.

---

[16] The TRO motion does not seek relief as to any employee as to whom a RIF has already been effectuated. TRO Motion at 2. And any such request would be without merit given that the purpose of a preliminary injunction (and certainly a TRO) is to preserve the status quo, and "courts must be 'institutionally wary of granting relief that disrupts, rather than preserves, the status quo.'" *Hanson v. Dist. of Columbia*, 120 F.4th 223, 247 (D.C. Cir. 2024) (quoting *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022)).

Plaintiffs' other standing allegations are unavailing. Although Plaintiffs assert that "[t]he members who remain employed will face overwork and worsened conditions," TRO Brief at 45, this contention is entirely conclusory, particularly since—as discussed above—the Executive Order directs agencies to consider RIFs as part of a broader effort to focus agencies on, among other things, the performance of statutorily required functions (not to reduce headcount for its own sake). Nor have Plaintiffs shown that being asked to perform more duties at work is a concrete harm for purposes of Article III. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (plaintiff must show harm of the type cognizable at common law). Plaintiffs also claim standing based on the supposedly impending loss of critical government services. TRO Brief at 45. But this too is speculative, particularly given the discretion afforded to agencies by the Workforce Executive Order, and the Workforce Memorandum's repeated instructions that agencies should not undertake any action that would impair service delivery functions. *See infra* p. 37. Even if it were not speculative, Plaintiffs would *still* lack standing as mere potential end-users of government services. *United States v. Texas*, 599 U.S. 670, 674, 680 n.3 (2023); *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (rejecting contention that any federal policy that "imposes peripheral costs on a State creates a cognizable Article III injury for the State to vindicate in federal court"). Plaintiffs also contend that the prospect of RIFs require them to divert their own resources. TRO Brief at 45. That theory of organizational standing was expressly rejected in the Supreme Court's recent decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). The Court rejected the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions," stating "[t]hat is incorrect." *Id.* at 395. And, in any event, this assertion too is entirely conclusory. Finally, Plaintiffs contend that they "have standing for their procedural claims, because they would have submitted comments had Defendants properly engaged in notice-and-comment rulemaking." TRO Brief at 46. But Plaintiffs' notice and comment claim concerns only the February 26, 2025 Workforce Memorandum, which has no direct effect on any of Plaintiffs. *See infra* p. 36-38.

### c. Independent of the FSLMRS and CSRA, the Workforce Executive Order Is Not Reviewable Here

Even if statutory preclusion did not apply, the Workforce Executive Order still would not be reviewable in this Court. The President is not an agency, *see Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), and therefore "actions of the President . . . are not reviewable under the APA," *Dalton v. Specter*, 511 U.S. 462, 470 (1994). To be sure, final agency actions implementing the Workforce Executive Order may be subject to judicial review (though not in federal district court for personnel and labor actions, *see supra* pp. 23-31), *see Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996), but the Executive Order itself is not. As noted above, Plaintiffs do not challenge any specific RIF. Thus, APA review of the Workforce Executive Order is plainly unavailable here.

Although the "President's actions may still be reviewed for constitutionality" through a cause of action in equity, *Franklin*, 505 U.S. at 801, that cause of action is unavailable here because this exception applies only to constitutional claims. "Claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review under the exception recognized in *Franklin*." *Dalton*, 511 U.S. at 473-74.

In *Dalton*, for example, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id*. at 471. Rather, the Court explained that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id*. at 472. In reaching this conclusion, the Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id*. (collecting cases). It explained that the Constitution is implicated only if executive officers rely on it as an independent source of authority to act or if the officers rely on an unconstitutional statute. *Id*. at 473 & n.5; *see also Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 51-54 (D.D.C. 2020) (rejecting separation-of-powers claim based on Appropriations Clause under *Dalton* because "[a]t bottom, this is just an allegation that [executive officials] exceeded their statutory authority"). That forecloses Plaintiffs' *ultra vires* claim here because it is a claim for statutory violations, not freestanding constitutional claims. *See* TRO Brief at 29-35

(Plaintiffs arguing at length that neither Article II nor a specific statute authorizes the Workforce Executive Order but making no freestanding constitutional arguments).

To be sure, the Supreme Court suggested in *Dalton* that nonstatutory review of the President's actions for constitutionality could be available in a case "involv[ing] the conceded *absence of any* statutory authority." 511 U.S. at 473; *see also id.* (discussing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) as an example of this scenario because the Government in that case had made no argument about statutory authorization and thus "[t]he only basis of authority asserted was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces"). But that narrow exception is plainly inapplicable here because federal law expressly permits RIFs, the governing statute expressly directs OPM to promulgate regulations governing RIFs, and Congress has consistently recognized agencies' authority to engage in RIFs since the nineteenth century. *See supra* pp. 5-11.

### d.  The Workforce Memorandum is Not a Reviewable Final Agency Action

Also independent of the jurisdictional barriers identified above, the Workforce Memorandum is not reviewable because only "final agency action" is reviewable under the APA. 5 U.S.C. § 704. That requirement has two distinct parts. First, what is challenged must be "agency action" recognized by the APA, which defines the term to include a specific "rule, order, license, sanction, relief, or the equivalent[.]" *Id.* § 551(13). Such an action must be a "discrete" act, as plaintiffs are prohibited from leveling a "broad programmatic attack," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004), against programs for which they are seeking "*wholesale* improvement . . . by court decree, rather than in the offices of the Department or the halls of Congress," *Lujan*, 497 U.S. at 891. As the *Lujan* Court explained, the APA is not intended to permit "general judicial review of the [an agency's] day-to-day operations." *Id.* at 899; *see also Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4, 17 (D.D.C. 2023) ("the term [agency action] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency.") (alteration in original) (quoting *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006)), *appeal filed*, No. 23-5288 (D.C. Cir argued Nov. 22, 2024).

Second, agency action must be "final." The Supreme Court has laid out a two-part test for finality, including that (1) "the action must mark the consummation of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature[;]" and (2) "the action must be one by which "rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). The APA expressly excludes "preliminary, procedural, or intermediate agency action[s] or ruling[s]." 5 U.S.C. § 704.

Here, the Workforce Memorandum does not qualify as "agency action." As noted above, the Workforce Memorandum is inter-agency correspondence which states that agencies should submit Phase 1 ARRPs by March 13 (reports that were already required under the Workforce Executive Order), and Phase 2 ARRPs by April 14, and sets forth guidance on what those ARRPs should contain. The APA provides a list of five actions which it considers agency action: rules, orders, licenses, sanctions, and relief. 5 U.S.C. § 551(13). The Act further defines each of these terms. *Id.* § 551(4) ("rule"), (6) ("order"), (8) ("license"), (10) ("sanction"), (11) ("relief"). Even construed expansively, none of these terms encompasses the Workforce Memorandum.

But even if the Workforce Memorandum qualifies as an agency action, it is not a *final* agency action. Plaintiffs do not explain how the Memorandum "consummat[es]" any agency's decisionmaking process in such a way that legal consequences flow to Plaintiffs. *U.S. Army Corps. of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (citation omitted). As the D.C. Circuit has explained, this prong of the *Bennet* test is measured by the "actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014).

The Workforce Memorandum has no such effect. It begins an iterative process between agencies and OPM and OMB, while explaining in broad terms what the agency ARRPs should include. Although Plaintiffs contend that the Memorandum provides "extensive direction to agencies," the examples they cite underscore that it provides broad guidance, some of which just replicates the Workforce Executive Order. TRO Brief at 10-11; *see id.* (quoting portions of Memorandum stating that "Phase 1 ARRPs shall focus on initial agency cuts and reductions," that

"Phase 2 plans shall outline a positive vision for more productive, efficient agency operations going forward.").

More fundamentally, as Plaintiffs note, the finality requirement is "interpreted in a pragmatic and flexible manner" that "focus[es] on the practical . . .effects of the agency action." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025) (citation omitted). The Memorandum is multiple steps removed from any agency action that has an actual effect on Plaintiffs (i.e., any RIFs undertaken pursuant to the Workforce Executive Order and an ARRP), which include: (1) the relevant agency's preparation of a Phase 1 ARRP; (2) that agency's preparation of a Phase 2 ARRP; and (3) any RIFs that are noticed and effectuated.

Contrary to Plaintiffs, the statement in the Workforce Memorandum that agencies should submit ARRPs to OMB and OPM for "review and approval" does not change this analysis. That language cannot possibly bear the weight that Plaintiffs assign to it and does not alter the fundamental point that individual agencies (not OPM and OMB) are in charge of crafting and implementing ARRPs as well as making decisions on RIFs. This is clear for at least nine reasons. First, the Executive Order simply provides agencies with broad guidance and does not dictate specific RIFs. Second, the Executive Order directly states that it shall not "be construed to impair or otherwise affect the authority granted by law to an executive department, agency, or the head thereof." Exec. Order 14210, § 5(a)(i). Third, President Trump has publicly stated that agencies are responsible for developing and implementing RIFs. *See supra* p. 14. Fourth, the Workforce Memorandum also contains very broad guidelines, not specific dictates. Fifth, even the Workforce Memorandum's very broad guidance concerning the contents of ARRPs relates only to the *information* to be included in the ARRPs, not what agencies *should do* (to take just one example, Phase 2 ARRPs should include "all reductions (of FTE positions and otherwise)" but a requirement that the agency list all reductions it has chosen to make does not mean that the agency has to *make* any specific reductions in the first place). Sixth, the Workforce Memorandum states at least five times that agencies should only undertake actions that are consistent with their statutory

authority.[17] Seventh, the Memorandum repeatedly makes clear that agencies should not undertake any action that would impair service delivery functions.[18] Eighth, the ARRPs even once finalized by the agency are simply agency planning documents that are distinct from any RIFs themselves. *See supra* pp. 16-17. And ninth, this argument ignores the roles OMB and OPM play in this context. "OPM may examine an agency's preparations for reduction in force at any stage." 5 C.F.R. § 351.205. "When OPM finds that an agency's preparations are contrary to the express provisions or to the spirit and intent of these regulations or that they would result in violation of employee rights or equities, OPM may require appropriate corrective action." And the President's executive order directed agency heads to submit their reorganization plans to OMB.

The Workforce Memorandum is thus *far* removed from any action with an actual effect on Plaintiffs. Even if Plaintiffs could challenge federal employment decisions under the APA (as discussed above, they cannot), employment termination decisions would be the relevant final agency action—even if the Memorandum and ARRPs were "agency action," they would be "preliminary, procedural, or intermediate agency action" that "is subject to review on the review of the final agency action." 5 U.S.C. § 704. The Memorandum is not *itself* a final agency action.

## 2. The Workforce Executive Order and Workforce Memorandum are Lawful

Even if the Court could review the Workforce Executive Order and Workforce Memorandum, both are plainly lawful. We address each in turn.

---

[17] Specifically that: (1) any changes made by agencies should seek to "driv[e] the highest-quality, most efficient delivery of their statutorily-required functions," ECF No. 37-1 App. 2 at 2; (2) agencies should only seek to eliminate "functions that not statutorily mandated," *id.*; (3) "[a]gencies should review their statutory authority and ensure that their plans and actions are consistent with such authority," *id.*; (4) agencies should only seek to "[e]liminat[e] non-statutorily mandated functions through RIFs," *id.* at 3; and (5) in their initial reports, agencies must provide "[a]ny statutes that establish the agency, or subcomponents of the agency, as statutorily required entities," *id.*

[18] Specifically, "(1) Agency field offices should only be closed or consolidated "to the extent consistent with efficient service delivery," ECF No. 37-1 App. 2 at 2; (2) ARRPs must include "[a]n explanation of how the ARRPs will improve services for Americans and advance the President's policy priorities," *id.* at 5; (3) ARRPs must include "[t]he framework and criteria the agency has used to define and determine efficient use of existing personnel and funds to improve services and the delivery of these services," *id.*

### a. The Workforce Executive Order is Lawful

The Workforce Executive Order makes clear that any RIFs may be conducted only where "consistent with applicable law." Exec. Order 14210, § 3(c). The Order also states it shall not "be construed to impair or otherwise affect the authority granted by law to an executive department, agency, or the head thereof." *Id.* § 5(a)(i). In the context of this case—where Plaintiffs effectively make a facial challenge to the Order and seek an injunction prohibiting its implementation virtually across the government—that is dispositive. Courts "cannot ignore . . . unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing" presidential directives, such as the Workforce Executive Order at issue here. *Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. Nov. 25, 2020) (majority opinion for three-judge district court). A court that disregards such qualifications fails to give effect to the presidential directive as drafted, and also acts contrary to the presumption of regularity under which courts assume that co-equal branches of government will follow the law. *See NARA v. Favish*, 541 U.S. 157, 174 (2004) (stating that "in the absence of clear evidence to the contrary, courts presume that [public officials] have properly discharged their official duties" (citation omitted)). Rather, an Executive Order with a lawfulness constraint almost uniformly cannot be unlawful because, if the agency "may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Building & Construction Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

This type of directive is a straightforward way for a President to exercise his undoubted authority to require a subordinate agency to determine what the law allows and then take whatever action is legally available to promote the President's priorities. This Executive Order fits that mold. It does not mandate any RIFs, but directs agencies to prioritize certain areas in RIFs that do take place—e.g., "[a]ll offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives" as well as "all agency initiatives, components, or operations that my Administration suspends or closes." And again, it does so only to the extent the law allows such prioritization. Exec. Order 14210, § 3(c).

A consistent-with-law proviso does not categorically immunize an Executive Order or similar directive from review. But in rare instances where courts have held that such consistent-with-law qualifications are not dispositive, they have done so in only narrow circumstances, where a directive *could not* be implemented lawfully. In *Allbaugh*, for example, the D.C. Circuit suggested that despite such a clause the plaintiffs there could facially challenge the Executive Order at issue if it lacked "any valid application." 295 F.3d at 33. And other courts have reached similar conclusions where a directive "unambiguously commands action" incompatible with the law. *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018); *HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) (similar).

The Ninth Circuit's decision in *San Francisco* is particularly instructive on the narrowness of this exception. There, the Ninth Circuit concluded that giving effect to the savings clause would mean the Executive Order itself would do nothing, and the court refused to accept the assertion that the Order there was meaningless. 897 F.3d at 1238 (declining to credit argument "that the Executive Order is all bluster and no bite"). Similarly, in *HIAS* the Fourth Circuit considered an Executive Order it found essentially "supplant[ed]" the statutory criteria. 985 F.3d at 322.

By contrast, the Workforce Executive Order does not come close to commanding actions that are incompatible with law. Congress has expressly recognized agencies' authority to implement RIFs since shortly after the Civil War. They are expressly authorized by 5 U.S.C. § 3502. OPM has promulgated an extensive set of regulations governing use of RIFs (regulations Congress has also authorized and directed OPM to promulgate). Agencies have repeatedly engaged in RIFs since the nineteenth century, including Presidentially-directed RIFs during the Truman, Reagan, and Clinton Administrations. *See supra* pp. 9-11. There is no colorable argument that the Workforce Executive Order is unlawful on its face.

Plaintiffs thus spend little time actually engaging with the operative terms of the Executive Order. Plaintiffs note (TRO Brief at 3) language in the Order that it is intended to "commence[] a critical transformation of the Federal bureaucracy." Exec. Order 14210, § 1. Plaintiffs repeat this rhetoric of "transformation" throughout their brief. TRO Brief at 1, 3, 9, 10. But this language—located in the Executive Order's "purpose" section—merely explains *why* President Trump issued

the Order and what he hopes will be accomplished by it. This language does not itself *do* anything. And Plaintiffs never explain why the Order's operative provisions (e.g., "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law," Exec. Order 14210, § 3(c)) constitute a direction to violate the law—presumably because there is no such colorable argument.

Plaintiffs instead argue that the Order exceeds the President's authority because the President purportedly has no Article II or statutory authority to "reorganize" agencies. TRO Brief at 29-35. But this entire line of discussion is irrelevant. Executive Order 14210 contains one sub-section—"Developing Agency Reorganization Plans"—dealing with organizational matters. Exec. Order 14210, § 3(e). And that section simply directs agencies to prepare a report identifying "any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities," and states that the report should "discuss *whether* the agency or any of its subcomponents should be eliminated or consolidated." *Id.* (emphasis added). This is not a mandate to conduct any reorganizations at all, let alone a directive to take any illegal action. Nor have plaintiffs pointed to any statutorily mandated agency structures for any of the agencies they have sued, much less established that the government intends to violate those statutory requirements. Thus, Plaintiffs' discussion of this issue is beside the point. If any agency in the future conducts any "reorganization" that Plaintiffs believe is unlawful, they may attempt to challenge any such action.

Plaintiffs' discussion of Reorganization Acts, TRO Brief at 7, 33, is similarly an irrelevant distraction. Although Congress has on occasion enacted Reorganization Acts that authorized the President to propose reorganization plans to Congress, these enactments do not purport to limit the authority to conduct RIFs. As noted, such RIFs are specifically authorized by 5 U.S.C. § 3502. And in OPM's regulations, OPM sets out when agencies can permissibly undertake them. 5 C.F.R. §§ 351.201(a)(1), 351.204. Congress also specifically directed OPM to promulgate such regulations. Plaintiffs thus do not and cannot dispute that federal law expressly allows RIFs.

At bottom, even on Plaintiffs' telling, this is not a *separation-of-powers dispute* in the sense of a dispute about the powers of the Executive Branch vis-à-vis Congress—rather, Plaintiffs make arguments concerning the exercise of authority *within* the Executive Branch. According to them,

"Congress has never delegated to the President the authority to make the decision to remove federal employees, whether by way of a RIF or for any other reason." TRO Brief at 32. Instead, they say, "Congress has delegated authority to determine *which* employees to employ and *how many* (consistent with appropriations) to the heads of the federal agencies, not to the President." *Id.*

This argument is contrary to the basic structure of Article II. "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the laws be faithfully executed.'" *Seila Law*, 591 U.S. at 203 (quoting U.S. CONST. art. II, § 1, cl. 1; id., § 3). To that end, the President has authority to exercise "'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Allbaugh*, 295 F.3d at 32 (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)) (citation omitted). Indeed, "[b]ecause no single person could fulfill" the responsibilities of faithfully executing all the laws, "the Framers expected that the President would rely on subordinate officers for assistance." *Seila Law*, 591 U.S. at 203-04. In recognition of this reality, the U.S. Code is necessarily replete with delegations and authorizations to agencies and other components. Yet there is obviously no legal principle that federal agencies wield their statutory authorities in siloes upon which *the President* cannot intrude. President Trump acted well within his authority in providing broad direction to agencies on how they should exercise the authority Congress has concededly given them.

By asserting that the President violates the separation of powers by directing agency heads to exercise their statutory powers over agency personnel matters and over the structure and priorities of their agencies, Plaintiffs invert a basic underpinning of our constitutional order. Federal agencies depend for their "legitimacy and accountability to the public through a 'clear and effective chain of command' down from the President, on whom all the people vote." *United States v. Arthrex, Inc.*, 594 U.S. 1, 11 (2021) (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 498 (2010)). Our constitutional structure presumes that federal officers and agencies will be "subject to [the President's] superintendence." The Federalist No. 72, at 374 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001); *see also* Saikrishna Bangalore Prakash, *Imperial from the Beginning: The Constitution of the Original*

*Executive* 184-89 (2015) (collecting Founding Era sources). The President's "'ongoing supervision and control' of executive officials legitimizes the power that they exert in his or her name." *Duenas v. Garland*, 78 F.4th 1069, 1072 (9th Cir. 2023) (quoting *Selia Law LLC v. CFPB*, 591 U.S. 197, 224 (2020)). Plaintiffs' theory is anathema to notions of self-governance under the Constitution. To accept plaintiffs' argument that the President may not set the policy direction for executive agencies is to untether those agencies from any form of political accountability. The Constitution, of course, demands the opposite conclusion. *See* U.S. Const., art. II, § 1, cl. 1 ("The executive Power shall be vested in a President of the United States.").

Finally, even if there were limits on the President's authority to direct an agency in the exercise of the agency's statutory authority, the Workforce Executive Order would not implicate any such limits. The Order provides direction only in very broad terms. And President Trump has made clear that agencies are responsible for developing and implementing their own plans to engage in reduction-in-force actions. *See supra* p. 14. Indeed, if anything, the Workforce Executive Order provides *less* extensive direction than the direction President Clinton provided in Executive Order 12839—which directed reductions in the form of specific percentage requirements; directed that at least ten percent of cuts come from the Senior Executive Service, GS-15 and GS-14 levels; and provided agencies with a required timeline to complete the cuts. *See supra* pp. 10-11.

Finally, to the extent the lawfulness question concerning the Executive Order presented a close case in this context (which it does not), the very high standards for *ultra vires* claims would preclude Plaintiffs from succeeding in any challenge to the Executive Order's legality. To prevail on an *ultra vires* claim, a plaintiff must establish that a government official "acted in a blatantly lawless manner or contrary to a clear statutory prohibition." *Hindes v. FDIC*, 137 F.3d 148, 164 (3d Cir. 1998); *accord Lundeen v. Mineta*, 291 F.3d 300, 312 (5th Cir. 2002) (noting that ultra vires action must involve "a plain violation of an unambiguous and mandatory provision of the statute" that "is of a *summa* or *magna* quality")(emphasis omitted)(citations omitted)). Allegations of constitutional error do not establish ultra vires action. *See Eagle Tr. Fund v. USPS*, 365 F. Supp. 3d 57, 68 n.6 (D.D.C. 2019) (Jackson, J.), *aff'd*, 811 F. App'x 669, 670 (D.C. Cir. 2020) ("[A] constitutional claim is separate from an ultra vires claim."). Neither do claims that "simply involve

1   a dispute over statutory interpretation." *Lundeen*, 291 F.3d at 312 (quoting *Kirby Corp. v. Pena*,

2   109 F.3d 258, 269 (5th Cir. 1997)). Rather, an officer may be said to act *ultra vires* "only when he

3   acts 'without any authority whatever.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89,

4   101-02 n.11 (1984) (citation omitted); *see also Larson v. Domestic & Foreign Com. Corp.*, 337

5   U.S. 682, 689 (1949) (suit must allege that official is "not doing the business which the sovereign

6   has empowered him to do"); *Kalispel Tribe of Indians v. U.S. DOI*, 999 F.3d 683, 691 (9th Cir.

7   2021). This is a "very stringent standard," rendering ultra vires claims "essentially a Hail Mary

8   pass" that "in court as in football, . . . rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of

9   Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.). It does not succeed here.

### b.  The Workforce Memorandum is Lawful

11      Even if the Court could consider the lawfulness of the Workforce Memorandum, it too is

12  lawful. As we have discussed, the Memorandum merely provides broad guidance on what ARRPs

13  should contain, guidance which itself only concerns what information the ARRPs should provide.

14  The Memorandum makes clear to agencies that they should only take actions that are consistent

15  with their statutory authority. *See supra* pp. 37-38. Likewise, it makes clear that agencies should

16  not undertake any action that would impair service delivery functions. *See supra* p. 38.

17      In addition, it is logical (and lawful) to rely on OPM and OMB in this manner. As noted

18  above, Congress expressly empowered OMB to promulgate regulations governing RIFs, and OPM

19  has done just that. The regulations make clear, among other things, that "OPM may examine an

20  agency's preparations for reduction in force at any stage" and that "[w]hen OPM finds that an

21  agency's preparations are contrary to the express provisions or to the spirit and intent of these

22  regulations or that they would result in violation of employee rights or equities, OPM may require

23  appropriate corrective action." 5 C.F.R. § 351.205. As to OMB, just as President Trump relied

24  upon OMB to set out the details of his policy governing reduction of federal personnel, President

25  Clinton relied upon OMB to prescribe similar guidance on the same issue. Exec. Order 12839, 58

26  Fed. Reg. 8515 (Feb. 10, 1993). More generally, the Workforce Memorandum is consistent with

27  the practice of previous administrations that have relied upon OMB to ensure that agency policy

28  was responsive to the President's policy goals. As now-Justice Kagan explained, President Clinton

exercised "presidential directive authority to initiate agency action[,]" thus "accelerat[ing] the shift toward[s] early White House involvement by establishing an instrument for centralized control that functioned before the agencies had adopted a proposal (or perhaps even taken up an issue in the first instance)." *See* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2316 (2001). In this way, now-Justice Kagan explained, President's Clinton's efforts correspond to President Reagan's efforts to "attain[] an ever greater capacity to oversee, supervise, and even to direct administrative action." *Id.* at 2317. Such efforts are not unlawful; rather, they "promote[] accountability" by "enhanc[ing] transparency" and "establish[ing] an electoral link between the public and the bureaucracy, increasing the latter's responsiveness to the former." *Id.* at 2332. The Workforce Memorandum is more of the same, and is straightforwardly lawful.

### 3. To the Extent Plaintiffs Purport to Challenge Particular RIFs, Any Such Challenge is Likewise Precluded and In Any Event Lacks any Legal or Factual Basis

The Complaint also asserts two claims directed at Federal Agency Defendants. But to the extent Plaintiffs seek to challenge particular RIFs as unlawful, any such claim necessarily fails.

Count VI contends that that the Federal Agency defendants have unlawfully "cede[d] their decision-making authority with respect to the employees of that agency to the President, OMB, OPM, or DOGE." Complaint ¶ 396. For the reasons discussed above, this is incorrect but, in any event, just repackages Plaintiffs' complaints about the Workforce Executive Order and Workforce Memorandum. Claim VII asserts that the agencies' implementation of the Workforce Executive Order is arbitrary and capricious. *Id.* ¶ 403. But this contention too is based on systemic complaints that Federal Agency Defendants have, inter alia, ceded decisionmaking authority to OPM and OMB regardless of statutory requirements, are engaging in large-scale RIFs that are necessarily contrary to statute, and have acted under unrealistic timeframes. *Id.* Neither claim identifies any specific RIFs, let alone establishes that any specific RIF violates the relevant agency's organic statutes or otherwise does not comply with the law applicable to that agency.

But to the extent Plaintiffs do purport to challenge individual RIFs, any such challenge fails. Any such challenges also must be channeled through the congressionally required administrative processes, as discussed above. Plaintiffs provide no facts suggesting that any

particular RIF that is currently in progress or that will take place is unlawful, but instead merely state in conclusory fashion that agencies are engaging in large-scale RIFs that are necessarily contrary to statute, and have acted under unrealistic timeframes. If Plaintiffs believe they have a basis for challenging specific RIFs based on facts particular to those RIFs, they may attempt to challenge those RIFs through the review scheme Congress provided. But they are not entitled to a virtually government-wide injunction based on speculation that agencies will implement the Workforce Executive Order in an unlawful fashion.

## B. Plaintiffs Have Not Demonstrated Irreparable Harm Warranting the Broad TRO They Seek

A "court need not consider the other factors" if a movant fails to show a likelihood of success on the merits. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). The Court accordingly need not and should not consider the irreparable-harm requirement.

But if it does, Plaintiffs also cannot demonstrate irreparable harm justifying the TRO they seek. To meet the irreparable harm requirement, the mere "possibility" of irreparable harm is insufficient; instead, the moving party must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Plaintiffs do not meet that standard here.

Plaintiffs most prominently claim irreparable harm in the form of loss of employment for employees subject to RIFs. TRO Brief at 13, 49. But most narrowly, any such potential employment actions cannot justify the government-wide TRO Plaintiffs seek because employees who are the subject of a RIF will receive written notice 60 days before any RIF is implemented (or 30 days with an OPM waiver). *See supra* pp. 16-17. OPM regulations require such notice. 5 C.F.R. § 351.801(b). Thus, Plaintiffs may attempt to seek emergency relief[19] from any specific RIFs during that notice period, which itself is sufficient reason to deny the broad TRO they seek here.

More broadly, as the D.C. Circuit recently noted, "[a]lthough we appreciate the gravity of these harms . . . [l]oss of government employment generally does not constitute irreparable injury, especially since employees seeking to challenge their termination or placement on administrative

---

[19] We of course do not mean that Plaintiffs would be entitled to such relief, or even that any tribunal could grant it. We just note that they could seek emergency relief while a RIF notice is pending.

leave may seek emergency stays from the Office of Special Counsel and MSPB." *Widakuswara*, 2025 WL 1288817, at *5 (citation omitted). Plaintiffs assert that "[d]amages are not available in APA cases, making this monetary harm irreparable." TRO Brief at 49. But the MSPB may order reinstatement, backpay, and attorney's fees. 5 U.S.C. §§ 1204(a)(2), 7701(g). *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) (finding lack of irreparable harm from loss of government employment and explaining that "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm," a conclusion that "is fortified by the Back Pay Act" (quotation marks omitted)); *see also Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal*., 739 F.2d 466, 471 (9th Cir. 1984) ( "[m]ere financial injury . . . will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation"). The same is true for Plaintiffs' concerns that terminated employees "face irreparable injury from losing their wages and health benefits for themselves and their families and in many cases needing to relocate," TRO Brief at 49. *See Sampson*, 415 U.S. at 92 n.68 ("insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury").

Plaintiffs also claim irreparable harm based on the supposedly impending loss of critical government services. TRO Brief at 49. We dealt with this claim in our standing discussion but, even if such allegations were (barely) sufficient to establish Article III standing, they are too speculative to meet Plaintiffs' much higher burden of demonstrating irreparable harm. *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1133 (9th Cir. 2014) (plaintiff "must establish a likelihood of irreparable harm that is grounded in evidence, not in conclusory or speculative allegations of harm."). And allegations certainly do not establish irreparable harm justifying a TRO preventing implementation of the Executive Order *virtually government-wide*.

Plaintiffs also claim that "the lack of public rulemaking injured Plaintiffs who would have participated." TRO Brief at 49. But the Workforce Memorandum is not a "rule" at all. And even if it were, a rule involving "a matter relating to agency management or personnel" is exempt from

1    notice-and-comment requirements. 5 U.S.C. § 553(a)(2); *see Curlott v. Campbell*, 598 F.2d 1175,

2    1180 n.8 (9th Cir. 1979) ("The APA … is inapplicable because the Commission decision

3    [regarding procedures for adjusting employee pay] involves a management/personnel matter.").

4    Nor did the Memorandum or the Executive Order dictate any specific RIFs, and any RIFs will be

5    preceded by at least a 30-day notice period. This is not irreparable harm warranting a TRO.

6    **C.   The Balance of the Equities and Public Interest Do Not Favor a TRO**

7            When the nonmovant is the government, the last two *Winter* factors "merge." *Nken v.*

8    *Holder*, 556 U.S. 418, 435 (2009). Although there is no need to consider the remaining two TRO

9    requirements, they too favor the government. Initially, granting the near government-wide TRO

10    Plaintiffs seek conflicts with "the well-established rule that the Government has traditionally been

11    granted the widest latitude in the dispatch of its own internal affairs." *Sampson*, 415 U.S. at 83

12    (citation omitted). As to the public interest, although Plaintiffs assert that, "[p]reserving

13    constitutional and statutory rights 'is always in the public interest,'" *Melendres v. Arpaio*, 695 F.3d

14    990, 1002 (9th Cir. 2012), that principle does not help them here, because the Workforce Executive

15    Order and the Memorandum are lawful. *See supra* pp. 38-45. In addition, as the D.C. Circuit has

16    noted, "the public has an interest in the Judicial Branch's respect for the jurisdictional boundaries

17    laid down by Congress." *Widakuswara*, 2025 WL 1288817, at *6. "Because personnel and grant

18    disputes directly concern the public fisc, Congress has limited the resolution of these potentially

19    costly claims to specialized tribunals such as the MSPB and the" Court of Federal Claims. *Id.* The

20    public interest is served when courts "respect those boundaries," *id.*—particularly in this context,

21    where Plaintiffs seek a near government-wide injunction against implementation of an Executive

22    Order that directs agencies to follow the law, and provides them with substantial discretion.

23    **III. Plaintiffs Are Not Entitled to Release of the ARRPs**

24            Plaintiffs also request that the Court order "OPM and OMB to provide to the Court and to

25    Plaintiffs the current versions of the ARRPs of the Federal Defendant Agencies identified above."

26    TRO Motion at 2. Plaintiffs provides no basis for this request other than the fact that Defendants

27    have not disclosed them. TRO Brief at 50. If Plaintiffs believe that these documents are subject to

28    disclosure, they may seek them under FOIA, and litigate any withholdings. And although this

motion does not challenge any specific RIFs, Plaintiffs do not need the ARRPs to challenge RIFs in the future since, as previously noted, RIF notices are provided to affected employees.

**IV. Plaintiffs Are Not Entitled to any Relief Against USDS or "DOGE"**

Although Plaintiffs' motion and brief are focused on the Workforce Executive Order and Memorandum, Plaintiffs also seek an injunction against "any further orders by DOGE to agencies to cut programs or staff in conjunction with implementing the Executive Order, the OMB/OPM Memorandum, or the ARRPs." TRO Motion at 2; *see also id.* (contending "that the actions of OMB, OPM, and *DOGE* to implement the Executive Order are" unlawful (emphasis added).

For one, again, it is unclear whether Plaintiffs are referring to USDS or the broader DOGE structure more generally. If Plaintiffs are referring to USDS, USDS lacks the power to issue any directives to federal agencies and Plaintiffs do not identify any such directives. If they are referring to the broader DOGE structure—which consists of USDS, the USDS Temporary Organization, and Agency DOGE Teams—that is not a distinct entity that can be sued. In any event, Agency DOGE Teams consist of employees of the relevant agency who answer to agency leadership. Exec. Order 14,158, § 3(c) (agency heads required to "establish *within their respective Agencies* a DOGE Team of at least four employees" (emphasis added)). An agency does not act *ultra vires* to the extent it exercises statutory authority the agency possesses, through agency employees. In any event, Plaintiffs identify no such "orders." They cite a statement by HHS Secretary Kennedy, but that statement does not suggest any sort of order directed to HHS. *See* TRO Brief at 4. Plaintiffs also note a quote from VA Secretary Collins, in which the Secretary noted that the President and OPM "have said let's look at a reduction in force across government" in the context of noting that *the agency's own goal* to cut 80,000 positions. *See* The Hill, *VA secretary: Cutting 80,000 jobs 'is our target'* (Mar. 10, 2025), *available at* https://thehill.com/homenews/state-watch/5186097-va-seek-cuts-80000-jobs/. Because Plaintiffs' allegation that USDS or "DOGE" are issuing unconstitutional directives to agencies lacks any legal or factual basis, the Court should deny this aspect of the motion for this reason in addition to all the other reasons set forth in this brief.

**V.  Any Relief Should be Limited**

The Court should deny Plaintiffs' motion in its entirety. But even if the Court determines

that a TRO is appropriate, it should limit its scope in at least two respects. Nationwide relief would be improper because "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). The Ninth Circuit has repeatedly vacated or stayed nationwide injunctions. *See, e.g.*, *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019); *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018). The Court should thus limit any relief to any party before it that is able to establish its entitlement to preliminary injunctive relief— which would, at most, be any individual members of the Plaintiff unions who establish that they will imminently be subject to a RIF. Second, the court should make clear that any TRO enjoining implementation of the Workforce Executive Order and/or Workforce Memorandum does not deprive any enjoined components of their preexisting authority to conduct RIFs and otherwise manage their workforce independent of the Executive Order and Memorandum. The TRO motion is clear that it seeks only to prevent the listed components "from taking any action to implement or enforce" the Executive Order and Memorandum. TRO Motion at 1. And Plaintiffs do not dispute that agencies have authority to conduct RIFs. Thus, although such a clarification is arguably unnecessary, the Court should make this limitation clear if it issues a TRO.

## VI.    Plaintiffs Should Be Ordered to Post Security in Connection with Any Relief

Should the Court order any injunctive relief, the Court should order security. The Court may issue an injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). That language is mandatory. *See Atomic Oil Co. of Okl. v. Bardahl Oil Co.*, 419 F.2d 1097, 1100–01 (10th Cir. 1969). If the Court issues an injunction, the Court must require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. Here, an appropriate bond would be commensurate to the salaries and benefits the government must pay for any employees it would prefer to separate from federal service but is unable to for the duration of any preliminary relief.

## CONCLUSION

The Court should deny the motion for a temporary restraining order and order to show cause.

Dated: May 7, 2025

Respectfully submitted,

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC J. HAMILTON (CABN 296283)
Deputy Assistant Attorney General

DIANE KELLEHER
Branch Director

CHRISTOPHER HALL
Assistant Branch Director

s/ Andrew M. Bernie
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-7203
andrew.m.bernie@usdoj.gov

*Counsel for Defendants*