Bryan Weir (SBN 310964)
**CONSOVOY MCCARTHY PLLC**
1600 Wilson Blvd., Suite 700
Arlington, VA, 22209
Telephone: (703) 243-9423
Facsimile: (703) 243-8696
Email: bryan@consovoymccarthy.com

*Attorney for Amici Curiae State of Montana and 20 other states*

[*Additional counsel identified on signature page*]

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

Defendants.

Case No. 3:25-cv-03698-SI

**PROPOSED BRIEF OF MONTANA AND 20 OTHER STATES AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTERESTS OF AMICI CURIAE ........................................................................... 1

SUMMARY OF ARGUMENT ................................................................................ 1

ARGUMENT ......................................................................................................... 2

I.  The Separation of Powers Support Defendants, Not Plaintiffs. ...................... 3

    A. The Article II Branch Manages the Government's
       Workforce. ............................................................................................. 3

    B. The Article I Branch Has Created a Separate Process for Federal
       Employment Issues. .............................................................................. 5

    C. The Article III Branch Should Avoid Infringing the  Separation of Powers. .......... 8

II. Plaintiffs Have Failed to Show Irreparable Harm. ....................................... 10

    A. Plaintiffs Have Failed to Show a "Genuinely Extraordinary" Situation. .............. 10

    B. Plaintiffs Have Failed to Present Sufficient Facts of Irreparable Harm. ............... 11

III. The Equities Favor the Defendants. ........................................................... 12

CONCLUSION ................................................................................................... 14

1

# TABLE OF AUTHORITIES

2

3

**Cases**

4

*Arnett v. Kennedy*,
  416 U.S. 134, 168 (1974) ......................................................................... 9

5

*Ass'n of Admin. L. Judges v. Colvin*,
  777 F.3d 402 (7th Cir. 2015) ................................................................. 6

6

7

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*,
  501 U.S. 1301 (1991) ............................................................................ 13

8

9

*Billops v. Dep't of Air Force, Little Rock Air Force Base*,
  725 F.2d 1160 (8th Cir. 1984) ................................................................ 6

10

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ................................................................................ 8

11

12

*Bowsher v. Synar*,
  478 U.S. 714 (1986) ................................................................................ 9

13

14

*Broadway v. Block*,
  694 F.2d 979 (5th Cir. 1982) ................................................................. 6

15

16

*Clinton v. City of N.Y.*,
  524 U.S. 417 (1998) ................................................................................ 9

17

*Collins v. Yellen*,
  594 U.S. 220 (2021) ........................................................................... 3, 4

18

19

*Dep't of Educ. v. California, No. 24A910*,
  2025 WL 1008354 (U.S. Apr. 4, 2025) ................................................ 13

20

21

*Does 1-26 v. Musk*,
  No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025) ............... 13, 14

22

23

*Elgin v. Dep't of Treasury*,
  567 U.S. 1 (2012) ................................................................................ 6, 7

24

*Engquist v. Or. Dep't of Agric.*,
  553 U.S. 591 (2008) ................................................................................ 5

25

26

*Filebark v. U.S. Dep't of Transp.*,
  555 F.3d 1009 (D.C. Cir. 2009) .......................................................... 6, 7

27

28

*Fornaro v. James*,
   416 F.3d 63 (D.C. Cir. 2005) ................................................................. 7

*Free Enter. Fund v. Pub. Co. Acctg. Oversight Bd.*,
   561 U.S. 477 (2010) ............................................................... 2, 3, 4, 5

*Gandola v. F.T.C.*,
   773 F.2d 308 (Fed. Cir. 1985) ............................................................. 10

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
   512 F.3d 1112 (9th Cir. 2008) ............................................................. 11

*Graham v. Ashcroft*,
   358 F.3d 931 (D.C. Cir. 2004) ............................................................... 7

*Grosdidier v. Chairman, Broad. Bd. of Governors*,
   560 F.3d 495 (D.C. Cir. 2009) ............................................................ 6, 7

*In re Aiken Cnty.*,
   645 F.3d 428 (D.C. Cir. 2011) ............................................................... 9

*INS v. Chadha*,
   462 U.S. 919 (1983) ............................................................................... 9

*Kilbourn v. Thompson*,
   103 U.S. 168 (1880) ............................................................................... 8

*Lindahl v. Off. of Pers. Mgmt.*,
   470 U.S. 768 (1985) ............................................................................... 5

*Mahoney v. Donovan*,
   721 F.3d 633 (D.C. Cir. 2013) ............................................................... 6

*Middle East Broadcasting Networks, Inc. v. United States*, No. 25-5150, at *12 (D.C. Cir.
   May 3, 2025) ......................................................................................... 14

*Morrison v. Olson*,
   487 U.S. 654 (1988) ............................................................................... 9

*Myers v. United States*,
   272 U.S. 52 (1926) ............................................................................... 13

*Nat'l Aeronautics & Space Admin. v. Nelson*,
   562 U.S. 134 (2011) ............................................................................. 11

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ............................................................................... 2

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................. 13

*Pinar v. Dole*,
    747 F.2d 899 (4th Cir. 1984) ...................................................... 6

*Rodriguez v. United States*,
    852 F.3d 67 (1st Cir. 2017) ........................................................ 6

*Roth v. United States*,
    952 F.2d 611 (1st Cir. 1991) ...................................................... 5

*Russell v. U.S. Dep't of the Army*,
    191 F.3d 1016 (9th Cir. 1999) .................................................... 7

*Ryon v. O'Neill*,
    894 F.2d 199 (6th Cir. 1990) ...................................................... 6

*Sampson v. Murray*,
    415 U.S. 61 (1974) ............................................................. 10, 11

*Saul v. United States*,
    928 F.2d 829 (9th Cir. 1991) .................................................... 10

*Seila Law L.L.C. v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020) ............................................................. 2, 3

*Springer v. Gov't of Philippine Islands*,
    277 U.S. 189–02 (1928) ........................................................... 8

*Stephens v. Dep't of Health & Hum. Servs.*,
    901 F.2d 1571 (11th Cir. 1990) ................................................. 6

*Stern v. Marshall*,
    564 U.S. 462 (2011) ................................................................. 9

*Tiltti v. Weise*,
    155 F.3d 596 (2d Cir. 1998) ...................................................... 6

*Trump v. United States*,
    603 U.S. 593 (2024) ................................................................. 3

*Trump v. Vance*,
    591 U.S. 786 (2020) ................................................................. 3

*United States v. Fausto*,
    484 U.S. 439 (1988) .................................................... 5, 6, 7, 8

*United States v. Lopez,*
    514 U.S. 549 (1995) .................................................................................. 1

*Veit v. Heckler,*
    746 F.2d 508 (9th Cir. 1984) ................................................................ 5, 6

*Weatherford v. Dole,*
    763 F.2d 392 (10th Cir. 1985) ............................................................. 6, 9

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................. 10

*Yu v. U.S. Dep't of Veterans Affairs,*
    528 F. App'x 181 (3d Cir. 2013) ............................................................. 6

**Federal Materials**

U.S. Const. art. II, § 1, cl. 1, § 3 ........................................................... 2

**Other Materials**

1 *Annals of Cong.* 463 (1789) ................................................................. 2

*The Federalist No. 70* at 471-72 (J. Cooke ed., 1961) ............................ 3

*The Federalist No. 70* at 478 ................................................................. 4

*The Federalist No. 78* at 466 (C. Rossiter ed. 1961) .............................. 9

Claudia Deane, *American's Deepening Mistrust of Institutions*, Pew (Oct. 17, 2024) ... 13

Frank Newport, *Public Support for Making U.S. Government More Efficient*, Gallup (Nov. 22, 2024) ........................................................................................ 13

Jackie DeFusco, *Federal employees on edge as Trump promises big changes*, WBAL TV (Nov. 16, 2024) ...................................................................................... 4

U.S. Dep't of State, *Protecting and Championing Free Speech at the State Department*, Apr. 16, 2025 ........................................................................................ 12

**INTEREST OF *AMICI CURIAE***

*Amici curiae* are the 21 States of Montana, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Mississippi, Missouri, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, West Virginia, and the Arizona Legislature ("Amici States") which submit this brief in support of Defendants. The Supreme Court has recognized that the States have a unique role in preserving the vitality of the Constitution's structural guarantees of liberty. *See, e.g., United States v. Lopez,* 514 U.S. 549, 575-77 (1995) (Kennedy, J., concurring). Because Plaintiffs seek to turn the separation of powers on its head and diminish the President's authority under Article II of the Constitution, the Amici States have a direct and substantial interest in this case.

**SUMMARY OF ARGUMENT**

Plaintiffs seek a temporary restraining order to block more than 20 federal agencies from carrying out efforts to manage their workforce. In essence, Plaintiffs invite this court to begin micromanaging the personnel decisions of virtually the entire federal government, from the Department of Defense and Department of State to the EPA and Social Security Administration. This sweeping request may be more extreme than any currently pending case. Plaintiffs' request should be denied.

Plaintiffs are not likely to succeed on the merits. The separation of powers supports the Defendants, not Plaintiffs, because Article II empowers the President to manage Executive Branch employees. In addition, Congress created a separate, comprehensive process for federal employment issues, which guts Plaintiffs' Administrative Procedure Act claims. And the Court should be cautious before interfering with the President's Article II power to manage the federal workforce or Congress' intent to resolve claims through a carefully defined statutory process.

Plaintiffs also fail to show irreparable harm. The Supreme Court applies a heightened standard that requires Plaintiffs to show a genuinely extraordinary situation before a government agency can be enjoined from terminating employees. Plaintiffs have failed to make this showing. For example, Plaintiffs speculate about no longer receiving weather

data and complain about not continuing to censor American speech.

Finally, the balance of the equities favors Defendants. The President will suffer irreparable harm by being unable to exercise his Article II powers. The public is interested in a more efficient executive branch. And the public is interested in the branches staying within their lanes.

For these reasons, the Court should deny Plaintiffs' request for a preliminary injunction.

## ARGUMENT

### I.     The Separation of Powers Supports Defendants, Not Plaintiffs.

Plaintiffs' challenge to Executive Branch personnel actions seeks to upend the separation of powers by restricting a core executive power, ignoring a statutory scheme created by Congress, and inserting the judicial branch into executive branch decision-making. The Court should deny that relief, which would cause a severe breach of the separation of powers.

### A.     The Article II Branch Manages the Government's Workforce.

1. "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law L.L.C. v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1, § 3). "[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." *Free Enter. Fund v. Pub. Co. Acctg. Oversight Bd.*, 561 U.S. 477, 492 (2010) (quoting 1 *Annals of Cong.* 463 (1789) (J. Madison)). "Article II confers on the President the general administrative control of those executing the laws." *Id.* (quotation omitted). "This grant of authority establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity," including the "management of the Executive Branch." *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982).

The President has supervised the federal workforce under Article II since the Founding. "Since 1789, the Constitution has been understood to empower the President to

keep these officers accountable—by removing them from office, if necessary." *Free Enter. Fund*, 561 U.S. at 483. "The President's power to remove— and thus supervise—those who wield executive power on his behalf follows from the text of Article II, was settled by the First Congress, and was confirmed in the landmark decision *Myers v. United States*, . . ." *Seila Law L.L.C.*, 591 U.S. at 204 (citation omitted). "The removal power helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch, and it works to ensure that these subordinates serve the people effectively and in accordance with the policies that the people presumably elected the President to promote." *Collins v. Yellen*, 594 U.S. 220, 252 (2021).

The power to supervise and manage the federal workforce is a critical power and responsibility entrusted to the President. "The President 'occupies a unique position in the constitutional scheme,' as 'the only person who alone composes a branch of government.'" *Trump v. United States*, 603 U.S. 593, 610 (2024) (citations omitted). Indeed, "[t]he President's duties are of 'unrivaled gravity and breadth.'" *Id.* at 607 (quoting *Trump v. Vance*, 591 U.S. 786, 800 (2020)). The Founders believed that a "vigorous" and "energetic" Executive was needed "to ensure 'good government,' for a 'feeble executive implies a feeble execution of the government.'" *Id.* at 610 (quoting *The Federalist No. 70* 471-72 (J. Cooke ed., 1961)) (A. Hamilton).

Article II provides the President with broad authority to manage the federal workforce. The Founders confirmed this authority, and the courts have recognized it for more than two centuries except in limited circumstances not relevant here. *See Trump*, 603 U.S. at 608 ("noting only 'two exceptions to the President's unrestricted removal power'") (citation omitted). Restricting the President's ability to delegate to his cabinet the authority to implement reductions in force will cripple both the President and the ability to ensure good government.

2. The President's power to supervise also provides important accountability to the people. The American people do not vote for individual federal employees, but "instead look to the President to guide the 'assistants or deputies ... subject to his superintendence.'"

*Free Enter. Fund*, 561 U.S. at 497–98 (quoting *The Federalist No. 72* 487 (J. Cooke ed., 1961)) (A. Hamilton). "Because the President, unlike agency officials, is elected, this control [over subordinates] is essential to subject Executive Branch actions to a degree of electoral accountability." *Collins*, 594 U.S. at 252 (citation omitted). "That is why the Framers sought to ensure that 'those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.'" *Free Enter. Fund*, 561 U.S. at 498 (quoting 1 Annals of Cong., at 499 (J. Madison)).

"The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so," *Free Enter. Fund*, 561 U.S. at 513, including the power to make personnel decisions. "The President must be able to remove not just officers who disobey his commands but also those he finds 'negligent and inefficient,' those who exercise their discretion in a way that is not 'intelligen[t] or wis[e],' those who have 'different views of policy,' those who come 'from a competing political party who is dead set against [the President's] agenda,' and those in whom he has simply lost confidence." *Collins*, 594 U.S. at 256 (internal citations omitted). "Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enter. Fund*, 561 U.S. at 514. Indeed, "[s]uch diffusion of authority 'would greatly diminish the intended and necessary responsibility of the chief magistrate himself.'" *Id.* (quoting The Federalist No. 70, at 478).

Restricting the ability of the President and his cabinet to manage federal employees "subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to pass judgment on his efforts." *Id.* at 498. By reducing the number of government employees, President Trump and his cabinet are honoring commitments that the President made to the American people on the campaign trail. *See, e.g.*, Jackie DeFusco,

*Federal employees on edge as Trump promises big changes*, WBAL TV (Nov. 16, 2024).[1]

\* \* \*

Plaintiffs seek to undermine the President's Article II authority by injecting this Court into federal workforce decisions made by President Trump and his cabinet. "The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 609 (2008) (citation omitted). The relief sought by Plaintiffs is thus "incompatible with the Constitution's separation of powers." *Free Enter. Fund*, 561 U.S. at 498. The Court can avoid infringing the separation of powers by leaving federal workforce management to the President and his cabinet.

### B.    The Article I Branch Has Created a Separate Process for Federal Employment Issues.

More than 40 years ago, Congress passed the Civil Service Reform Act of 1978 ("CSRA"), which "comprehensively overhauled the civil service system." *Lindahl v. Off. of Pers. Mgmt.*, 470 U.S. 768, 773 (1985). "A leading purpose of the CSRA was to replace the haphazard arrangements for administrative and judicial review of personnel action, part of the 'outdated patchwork of statutes and rules built up over almost a century' that was the civil service system." *United States v. Fausto*, 484 U.S. 439, 444 (1988) (citation omitted). "Congress responded to this situation by enacting the CSRA, which replaced the patchwork system with an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *Id.* at 445.

"The CSRA provides a comprehensive scheme for administrative and judicial review of federal personnel actions and practices." *Veit v. Heckler*, 746 F.2d 508, 510 (9th Cir. 1984); *see also Roth v. United States*, 952 F.2d 611, 616 (1st Cir. 1991) ("In general, a federal employee whose position comes within CSRA's reach may seek redress for the

---

[1]    *Available at* https://www.wbaltv.com/article/federal-employees-on-edge-trump-big-changes/62926509.

untoward effects of a prohibited personnel practice only through the panoply of remedies that CSRA itself affords."). For example, employee appeals of certain agency personnel actions are heard by the Merit Systems Protection Board ("MSPB") and the United States Court of Appeals for the Federal Circuit, which "has 'exclusive jurisdiction' over appeals from a final decision of the MSPB." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 6 (2012) (statutory citations omitted).

The CSRA's comprehensive scheme prevents employees from pursuing statutory claims in federal district court that arose from adverse employment actions. *See Fausto*, 484 U.S. at 455. In fact, with respect to employee claims under the Administrative Procedure Act, circuit courts "have long held that federal employees may not use the Administrative Procedure Act to challenge agency employment actions." *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009) (citing cases); *see also Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (Kavanaugh, J.). This view is shared across the circuits, including in the Ninth Circuit. *See Veit*, 746 F.2d at 511; *see also Rodriguez v. United States*, 852 F.3d 67, 82 (1st Cir. 2017); *Ass'n of Admin. L. Judges v. Colvin*, 777 F.3d 402, 405 (7th Cir. 2015); *Yu v. U.S. Dep't of Veterans Affairs*, 528 F. App'x 181, 184-85 (3d Cir. 2013); *Tiltti v. Weise*, 155 F.3d 596, 601 (2d Cir. 1998); *Ryon v. O'Neill*, 894 F.2d 199, 203 (6th Cir. 1990); *Stephens v. Dep't of Health & Hum. Servs.*, 901 F.2d 1571, 1575 (11th Cir. 1990); *Weatherford v. Dole*, 763 F.2d 392, 394 (10th Cir. 1985); *Pinar v. Dole*, 747 F.2d 899, 912-13 (4th Cir. 1984); *Billops v. Dep't of Air Force, Little Rock Air Force Base*, 725 F.2d 1160, 1163 (8th Cir. 1984); *Broadway v. Block*, 694 F.2d 979, 986 (5th Cir. 1982). As the Ninth Circuit explained, "We agree that the federal courts have no power to review federal personnel decisions and procedures unless such review is expressly authorized by Congress in the CSRA or elsewhere." *Veit*, 746 F.2d at 511. Significantly, the CSRA "precludes suit under the Administrative Procedure Act even when the claim concerns 'a *type* of personnel action' the [CSRA] does not cover—that is, even when the [CSRA] provides no relief for the complained-of employment action." *Mahoney v. Donovan*, 721 F.3d 633, 636 (D.C. Cir.

1    2013) (citation omitted).

2        Constitutional claims are no different. The CSRA's comprehensive scheme prevents

3 employees from pursuing constitutional claims in federal district court that arose from

4 adverse employment actions. *See Elgin*, 567 U.S. at 23. The Ninth Circuit has "consistently

5 held that the CSRA preempts *Bivens* actions and other suits for constitutional violations

6 arising from governmental personnel actions." *Russell v. U.S. Dep't of the Army*, 191 F.3d

7 1016, 1020 (9th Cir. 1999) (citing cases).

8        Requiring review pursuant to the CSRA, rather than through APA or constitutional

9 claims in federal district court, advances Congress' intent. "The CSRA's objective of

10 creating an integrated scheme of review would be seriously undermined if … a covered

11 employee could challenge a covered employment action first in a district court, and then

12 again in one of the courts of appeals, simply by alleging that the statutory authorization for

13 such action is unconstitutional." *Elgin*, 567 U.S. at 14; *see also Grosdidier*, 560 F.3d at

14 497 ("Allowing employees to end-run the CSRA would undermine Congress's efforts to

15 foster a 'unitary and consistent Executive Branch position on matters involving personnel

16 action.'") (citation omitted). "Such suits would reintroduce the very potential for

17 inconsistent decision making and duplicative judicial review that the CSRA was designed

18 to avoid." *Elgin*, 567 U.S. at 14. "In sum, so far as review of determinations under the

19 CSRA is concerned, what you get under the CSRA is what you get." *Fornaro v. James*,

20 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.).

21        Because any Department employee affected by the actions challenged by Plaintiffs

22 would need to pursue relief in accordance with the CSRA, Plaintiffs cannot bring statutory

23 and constitutional claims in federal district court in their stead. "Congress had no intention

24 of providing claimants like these—unmentioned in the CSRA—with a level of access to

25 the courts unavailable to almost any other federal employees, including those that the

26 CSRA identifies as most worthy of procedural protection." *Filebark v. U.S. DOT*, 555 F.3d

27 1009, 1014 (D.C. Cir. 2009). Providing judicial review for Plaintiffs' claims "would give

28 [them] greater rights than the CSRA affords for major adverse actions." *Graham v.*

*Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.). In *Fausto*, the Supreme Court recognized the "comprehensive nature of the CSRA." 484 U.S. at 448. In doing so, the Court stated that it was applying the "same type of analysis" as an earlier decision that barred third-party claims when a statutory scheme provided the exclusive review procedures for affected parties: "In [*Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345-48 (1984),] we observed that, under the Agricultural Marketing Agreement Act of 1937, the omission of review procedures for consumers affected by milk market orders, coupled with the provision of such procedures for milk handlers so affected, was strong evidence that Congress intended to preclude consumers from obtaining judicial review." *Fausto*, 484 U.S. at 447-48.

Under well-settled law, federal employees who are affected by a reduction in force decision must pursue any relief under the CSRA. As numerous courts have found, Congress' careful and comprehensive scheme in the CSRA would be disrupted if federal employees could file statutory or constitutional claims directly in federal district court. And if federal employees cannot directly file these claims, Plaintiffs cannot seek the same relief. At bottom, Plaintiffs seek to block personnel actions by more than 20 different federal agencies. The Court can avoid interfering with the separation of powers by leaving federal employee appeals to the appropriate CSRA procedure.

## C.     The Article III Branch Should Avoid Infringing the Separation of Powers.

Our Constitution carefully delineates power between the branches. As the Supreme Court observed almost a century ago, it is "a general rule inherent in the American constitutional system, that, unless otherwise expressly provided or incidental to the powers conferred, the Legislature cannot exercise either executive or judicial power; the executive cannot exercise either legislative or judicial power; the judiciary cannot exercise either executive or legislative power." *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 201–02 (1928). "It is also essential to the successful working of this system that the persons intrusted [*sic*] with power in any one of these branches shall not be permitted to encroach

upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other." *Kilbourn v. Thompson*, 103 U.S. 168, 191 (1880). "The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." *INS v. Chadha*, 462 U.S. 919, 951 (1983).

The Founders "viewed the principle of separation of powers as the absolutely central guarantee of a just Government." *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting). They "considered it essential that 'the judiciary remain[ ] truly distinct from both the legislature and the executive.'" *Stern v. Marshall*, 564 U.S. 462, 483 (2011) (The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton)). "As Hamilton put it, quoting Montesquieu, "'there is no liberty if the power of judging be not separated from the legislative and executive powers.'" *Id.*

The separation of powers is critical to the core constitutional values of liberty and democratic accountability. "The Framers were particularly cognizant . . . of the link between accountability of officials in the Legislative and Executive Branches and individual liberty." *In re Aiken Cnty.*, 645 F.3d 428, 440 (D.C. Cir. 2011) (Kavanaugh, J., concurring). "The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986). For example, "[t]he President is dependent on the people for election and re-election, but the officers of agencies in the Executive Branch are not." *In re Aiken Cnty.*, 645 F.3d at 440 (Kavanaugh, J., concurring). "Presidential control of those agencies thus helps maintain democratic accountability and thereby ensure the people's liberty." *Id.* For this reason, any encroachment on the separation of powers necessarily implicates a threat to individual liberty. "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton v. City of N.Y.*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring).

A court should act cautiously before invading the President's well-settled authority to supervise and manage the federal workforce. "Federal agencies must have a certain

latitude to make personnel decisions in order to enhance efficiency and discipline in the workplace." *Weatherford*, 763 F.2d at 392 (citing *Arnett v. Kennedy,* 416 U.S. 134, 168 (1974) (Powell, J., concurring in part)). Indeed, "[a]n agency has wide discretion in conducting a reduction in force," and the Federal Circuit—the proper judicial venue for review of such actions—"will not disturb a reduction in force absent a clear abuse of discretion or a substantial departure from applicable procedures." *Gandola v. F.T.C.*, 773 F.2d 308, 313 (Fed. Cir. 1985) (citations omitted). An agency's "decision on the composition and structure of the work force reflects the kind of managerial judgment that is the essence of agency discretion, and is not meet for judicial reevaluation." *Id.* at 311.

Given these considerations, "if [agency] discretion is to be limited, such limitation is better suited for Congress than the courts, for it is Congress which is better able to evaluate the relevant concerns." *Weatherford*, 763 F.2d at 394. Indeed, "Congress is better equipped than [the courts] to strike an appropriate balance between employees' interests in remedying constitutional violations and the interests of the government and the public in maintaining the efficiency, morale and discipline of the federal workforce." *Saul v. United States*, 928 F.2d 829, 840 (9th Cir. 1991). Congress created the CSRA to handle federal employee appeals of personnel decisions. The Court can avoid interfering with the separation of powers by leaving federal employee management to the Article II branch and employee appeals to the design by the Article I branch.

## II.    Plaintiffs Have Failed to Show Irreparable Harm.

### A.    Plaintiffs Have Failed to Show a "Genuinely Extraordinary" Situation.

Plaintiffs argue the traditional standard for irreparable harm. *See* Doc. 37-1, at 29 (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). But Plaintiffs' requested relief—to halt "execution of any existing RIF notices, issuance of any further RIF notices, and placement of employees on administrative leave," *id.* at 6—requires the Court to apply a higher standard to federal employment actions. To obtain a preliminary injunction, Plaintiffs must demonstrate irreparable harm that is "genuinely extraordinary."

1    *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974).

2         The "genuinely extraordinary" standard is based on "the well-established rule that
3    the Government has traditionally been granted the widest latitude in the 'dispatch of its
4    own internal affairs." *Sampson*, 415 U.S. at 83. "Time and again" over the years, the
5    Supreme Court has "recognized that the Government has a much freer hand in dealing
6    'with citizen employees than it does when it brings its sovereign power to bear on citizens
7    at large.'" *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 148 (2011) (citations
8    omitted). As already discussed, the Plaintiffs should be subject to the same legal
9    requirements as the Department employees subject to the reduction in force decisions. *See*
10   § I.B, *supra*. Plaintiffs have not presented evidence of "genuinely extraordinary" harm.

11        **B.**    **Plaintiffs Have Failed to Present Sufficient Facts of Irreparable**
12             **Harm.**

13        Plaintiffs have not made "a showing of irreparable injury sufficient in kind and
14   degree to override these factors cutting against the general availability of preliminary
15   injunctions in Government personnel cases." *Sampson*, 415 U.S. at 84. Based on this fact
16   alone, the Court can find that Plaintiffs have not shown irreparable injury and thus are not
17   entitled to a preliminary injunction.

18        Plaintiffs claim that individual employees "who have been or will be terminated
19   face irreparable injury from losing their wages and health benefits for themselves and their
20   families and in many cases needing to relocate." Generally, "the temporary loss of income,
21   ultimately to be recovered, does not usually constitute irreparable injury." *Sampson*, 415
22   U.S. at 90. Unlike the decision cited in the Motion, *see* Doc. 37-1, at 49, Plaintiffs have not
23   presented evidence of "economic hardship, suffering or even death" that would result from
24   the challenged actions. *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d
25   1112, 1126 (9th Cir. 2008).

26        Plaintiffs assert many theories that do not demonstrate any harm that is irreparable.
27   For example, based on a reduction in force of a fraction of its department and some facility
28   lease terminations, Plaintiffs speculate that they may no longer receive real-time weather

information. Doc. 37-1, at 16. The City of Chicago reports that it relies on an on-site federal worker to support large scale local events. Doc. 37-57, at ¶ 8. But in addition to not providing any proof that weather services will be affected, Plaintiffs do not cite any constitutional or statutory requirement that a federal agency provide Chicago or any other locality with on-site weather support for large events.

As another example, Plaintiffs rely (at Doc. 37-1, at 27) on an attorney advisor in the State Department who opines on matters well outside the employment law matters on which she has largely worked during her four-year department tenure. *See* Doc. 37-20, at ¶ 2. This individual worries that the elimination of the Counter Foreign Information Manipulation and Interference office "leaves the State Department without a key tool to … counter the increasingly sophisticated disinformation campaigns from foreign governments as Russia, Iran, and China." *Id.* at ¶ 30. Of course, this is all second-hand speculation since the individual identifies no expertise in foreign relations, disinformation campaigns, or the State Department's past programs. *See id.* It also is baseless speculation. Secretary of State Marco Rubio reported that, under the past administration, the Counter Foreign Information Manipulation and Interference program, "which cost taxpayers more than $50 million per year, spent millions of dollars to actively silence and censor the voices of Americans they were supposed to be serving." U.S. Dep't of State, *Protecting and Championing Free Speech at the State Department*, Apr. 16, 2025.[2] As Secretary Rubio rightly observed, "[t]his is antithetical to the very principles we should be upholding and inconceivable it was taking place in America." *Id.* Plaintiffs present no proof of harm that will result from the State Department stopping efforts to censor Americans.

None of Plaintiffs' other irreparable harm arguments establish a genuinely extraordinary situation. Instead, Plaintiffs speculate about levels of service and delays, which do not establish irreparable harm, let alone harm that is genuinely extraordinary. Plaintiffs' request for a preliminary injunction should be denied because they have failed

---

[2] *Available at* https://www.state.gov/protecting-and-championing-free-speech-at-the-state-department/.

1    to establish irreparable harm.

2    **III.    The Equities Favor the Defendants.**

3    To complete the preliminary injunction analysis, "[i]t is ultimately necessary… 'to

4    balance the equities—to explore the relative harms to applicant and respondent, as well as

5    the interests of the public at large.'" *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins.

6    Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) (citation and second quotation

7    marks omitted). These factors merge when the government is the opposing party. *Nken v.

8    Holder*, 556 U.S. 418, 435 (2009).

9    While the Plaintiffs will not suffer irreparable harm without an injunction, *see* § II,

10    *supra*, the Defendants will suffer irreparable harm with an injunction. The President suffers

11    harm when he is unable to exercise his Article II powers. As the Supreme Court observed

12    a century ago, "[i]n all such cases, the discretion to be exercised is that of the President in

13    determining the national public interest and in directing the action to be taken by his

14    executive subordinates to protect it." *Myers v. United States*, 272 U.S. 52, 134 (1926).

15    Accordingly, "[t]he moment that he loses confidence in the intelligence, ability, judgment,

16    or loyalty of any one of them, he must have the power to remove him *without delay*." *Id.*

17    (emphasis added). Granting Plaintiffs' requested relief will irreparably harm the President

18    by interfering with his Article II decisions and delaying his plans for the Department.

19    "Dictat[ing] and restrict[ing] a separate branch of government … truly is irreparable." *Does

20    1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *6 (4th Cir. Mar. 28, 2025)

21    (Quattlebaum, J., concurring in stay). In addition, the government is unlikely to recover the

22    salary to employees once it is paid. *Cf. Dep't of Educ. v. California*, No. 24A910, 2025

23    WL 1008354, at *1 (U.S. Apr. 4, 2025) (granting stay pending appeal).

24    The public interest supports President Trump and his cabinet. According to recent

25    public opinion surveys, Americans' confidence in the federal government has reached

26    depths not seen since the Vietnam War. Claudia Deane, *American's Deepening Mistrust of*

27

28

*Institutions*, Pew (Oct. 17, 2024).[3] A majority of Americans believe the federal government is too large, inefficient, and wasteful. Frank Newport, *Public Support for Making U.S. Government More Efficient*, Gallup (Nov. 22, 2024).[4] President Trump and his cabinet should not be stopped from being responsive to this public sentiment as they make the federal government more efficient.

Finally, "the public also has an interest in judges wielding power only when so authorized." *Does 1-26*, 2025 WL 1020995, at *6 (Quattlebaum, J., concurring in stay). Indeed, "the public has an interest in the Judicial Branch's respect for the jurisdictional boundaries laid down by Congress." *Middle East Broadcasting Networks, Inc. v. United States*, No. 25-5150, at *12 (D.C. Cir. May 3, 2025) (per curiam) (granting motion for a stay pending appeal).

## CONCLUSION

For these reasons, the Amici States respectfully request that the Court deny Plaintiffs' motion for a temporary restraining order.

Dated: May 8, 2025                    Respectfully submitted,

AUSTIN KNUDSEN
*Montana Attorney General*

*/s/ Bryan Weir*
Bryan Weir (SBN 310964)
**CONSOVOY MCCARTHY PLLC**
1600 Wilson Blvd., Suite 700
Arlington, VA, 22209
Telephone: (703) 243-9423

---

[3] *Available at* https://www.pewtrusts.org/en/trend/archive/fall-2024/americans-deepening-mistrust-of-institutions.

[4] *Available at* https://news.gallup.com/opinion/polling-matters/653657/public-support-making-government-efficient.aspx.

Email: bryan@consovoymccarthy.com

*Attorney for Amici Curiae State of Montana and 20 other states*

**ADDITIONAL SIGNATORIES**

AUSTIN KNUDSEN
Attorney General
*State of Montana*

| | |
|---|---|
| STEVE MARSHALL<br>Attorney General<br>*State of Alabama* | KRIS W. KOBACH<br>Attorney General<br>*State of Kansas* |
| TREG TAYLOR<br>Attorney General<br>*State of Alaska* | LIZ MURRILL<br>Attorney General<br>*State of Louisiana* |
| STEVE MONTENEGRO<br>*Speaker of the Arizona*<br>*House of Representatives* | LYNN FITCH<br>Attorney General<br>*State of Mississippi* |
| WARREN PETERSEN<br>*President of the*<br>*Arizona Senate* | ANDREW BAILEY<br>Attorney General<br>*State of Missouri* |
| TIM GRIFFIN<br>Attorney General<br>*State of Arkansas* | MIKE HILGERS<br>Attorney General<br>*State of Nebraska* |
| JAMES UTHMEIER<br>Attorney General<br>*State of Florida* | DREW WRIGLEY<br>Attorney General<br>*State of North Dakota* |
| CHRISTOPHER M. CARR<br>Attorney General<br>*State of Georgia* | GENTNER DRUMMOND<br>Attorney General<br>*State of Oklahoma* |
| THEODORE E. ROKITA<br>Attorney General<br>*State of Indiana* | ALAN WILSON<br>Attorney General<br>*State of South Carolina* |

1

2        BRENNA BIRD                          MARTY JACKLEY
         Attorney General                    Attorney General
3        *State of Iowa*                      *State of South Dakota*

4

5        JONATHAN SKRMETTI                    KEN PAXTON
         Attorney General                    Attorney General
6        *State of Tennessee*                 *State of Texas*

7

8        JOHN B. MCCUSKY
         Attorney General
9        *State of West Virginia*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28