Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle E. Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Telephone: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*

[*Additional counsel and affiliations identified on signature page*]

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 3:25-cv-03698-SI |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ...................................................................................................... 1

BACKGROUND ...................................................................................................... 3

I.    Additional Plaintiffs and Defendants ............................................................ 3

II.   Restructuring and RIFs at Agencies Pursuant to the EO Are Causing
      Widespread Irreparable Harm...................................................................... 4

      A.    Ongoing Restructuring and RIFs Pursuant to the EO ........................ 4

      B.    Ongoing and Imminent Harms from the Reorganization and RIFs.......... 8

ARGUMENT ...................................................................................................... 10

I.    This Court Should Enjoin Defendants' Implementation of Executive Order
      14210 and the Resulting Agency RIF and Reorganization Plans ................... 10

      A.    Defendants' Government-wide Order and Actions Are Causing
            Ongoing, Nationwide Irreparable Harm and the Balance of the
            Equities and Public Interest Weigh Heavily in Favor of a
            Preliminary Injunction ...................................................... 10

      B.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims that
            the Executive Order and Agency Implementation are Unlawful.......... 11

      C.    This Court Has Jurisdiction Over All Plaintiffs' Claims ................... 16

            1.    Standing.......................................................... 16

            2.    Administrative Channeling.............................. 17

II.   Plaintiffs' Proposed Relief Is Necessary to Maintain the Status Quo for the
      Duration of this Litigation and to Prevent Ongoing Nationwide Irreparable
      Harm .................................................................................... 21

      A.    Plaintiffs' Proposed Injunction ............................................. 21

      B.    The Injunction Protects the Status Quo ..................................... 22

      C.    The Scope of the Injunction Is Necessitated by the Scope of
            Defendants' Government-Wide Actions and Extent of the Harm to
            Plaintiffs...................................................................... 23

      D.    The Proposed Injunction Does Not Exceed the Equitable Powers of
            this Court ....................................................................... 24

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*AFGE v. OPM*,
2025 WL 914823 (9th Cir. Mar. 26, 2025) .......................................................................... 19

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ............................................................................................................. 19

*American School of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902) ............................................................................................................... 24

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ............................................................................................................. 24

*Axon Enters., Inc. v. FTC*,
598 U.S. 175 (2023) ............................................................................................................. 19

*Bowsher v. Synar*,
478 U.S. 714 (1986) ............................................................................................................. 14

*Bresgal v. Brock*,
843 F.2d 1163 (9th Cir. 1987) ............................................................................................. 22

*Building & Construction Trades Department v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ........................................................................................ 12, 13

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) .......................................................................................... 10, 22

*Chen v. I.N.S.*,
95 F.3d 801 (9th Cir. 1996) ................................................................................................. 15

*City & Cnty. of San Francisco v. Barr*,
965 F.3d 753 (9th Cir. 2020) ............................................................................................... 23

*County of Santa Clara v. Trump*,
250 F.Supp.3d 497 (N.D. Cal. 2017) ................................................................................... 24

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) ............................................................................................................. 18

*Driftless Area Land Conservancy v. Valcq*,
16 F.4th 508 (7th Cir. 2021) ................................................................................................ 25

*E. Bay Sanctuary Covenant v. Garland*,
994 F.3d 962 (9th Cir. 2020) ............................................................................................... 24

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018) ........................................................................................ 19

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir.) (en banc) ................................................................... 19

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
    82 F.4th 664 (9th Cir. 2023) ........................................................................... 17

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ........................................................................................ 17

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
    512 F.3d 1112 (9th Cir. 2008) ......................................................................... 10

*Griffin v. HM Florida-ORL, LLC*,
    144 S. Ct. 1 (2023) .......................................................................................... 24

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944) ........................................................................................ 24

*Kerr v. Jewell*,
    836 F.3d 1048 (9th Cir. 2016) ......................................................................... 18

*Kingdomware Techs., Inc. v. U.S.*,
    579 U.S. 162 (2016) ........................................................................................ 12

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ........................................................................... 11

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ........................................................................... 22

*Longview Fibre Co. v. Rasmussen*,
    980 F.2d 1307 (9th Cir. 1992) ......................................................................... 13

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ............................................................................ 18, 19, 20

*Lopez v. Heckler*,
    713 F.2d 1432 (9th Cir. 1983) ......................................................................... 11

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ..................................................................... 10, 11

*Mims v. Arrow Fin. Servs., LLC*,
    565 U.S. 368 (2012) ........................................................................................ 18

*Monsanto v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ........................................................................................ 24

*NTEU and Dep't of Treasury, IRS*,
  60 F.L.R.A. 783 (2005) ........................................................................................... 18

*Nw. Forest Res. Council v. Glickman*,
  82 F.3d 825 (9th Cir. 1996) ..................................................................................... 12

*Pangea Legal Servs. v. DHS*,
  501 F.Supp.3d 792 (N.D. Cal. 2020) ....................................................................... 24

*PFLAG, Inc. v. Trump*,
  No. CV 25-337-BAH, 2025 WL 510050 (D. Md. Feb. 14, 2025) ........................... 24

*Regents of Univ. of Cal. v. DHS Sec'y*,
  908 F.3d 476 (9th Cir. 2018), *vacated in part on other grounds*, 591 U.S. 1 (2020) ............ 24

*Russell v. U.S. Dep't of the Army*,
  191 F.3d 1016 (9th Cir. 1999) .................................................................................. 18

*Saul v. United States*,
  928 F.2d 829 (9th Cir. 1991) .................................................................................... 18

*State v. Su*,
  121 F.4th 1 (9th Cir. 2024) ....................................................................................... 16

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) .................................................................................................. 20

*Trump v. Int'l Refugee Assistance Project*,
  582 U.S. 571 (2017) .................................................................................................. 22

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
  578 U.S. 590 (2016) ............................................................................................ 19, 20

*United States v. Fausto*,
  484 U.S. 439 (1988) .................................................................................................. 19

*United States v. Oakland Cannabis Buyers' Coop.*,
  532 U.S. 483 (2001) .................................................................................................. 24

*United Steel v. Mine Safety & Health Admin.*,
  925 F.3d 1279 (D.C. Cir. 2019) ................................................................................ 24

*Veit v. Heckler*,
  746 F.2d 508 (9th Cir. 1984) .................................................................................... 18

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
  586 U.S. 9 (2018) ...................................................................................................... 19

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................................................... 10

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................... 1, 14

**Federal Statutes**

5 U.S.C. §705 ........................................................................... 25

5 U.S.C. §903 ........................................................................... 15

5 U.S.C. §1103 ......................................................................... 19

5 U.S.C. §1105 ......................................................................... 19

5 U.S.C. §3502 ......................................................................... 15

5 U.S.C. §7117(a)(1) ................................................................. 18

5 U.S.C. §7134 ......................................................................... 19

5 U.S.C. § 7701 ........................................................................ 18

28 U.S.C. §1331 ....................................................................... 18

29 U.S.C. §793(b) ...................................................................... 7

38 U.S.C. §4212 ........................................................................ 7

**Rules**

Fed. R. Civ. P. 65(a) ................................................................. 10

Fed. R. Civ. P. 65(b)(3) ............................................................. 10

**Other Authorities**

John W. York & Rachel Greszler, *A Model for Executive Reorganization*, Heritage
    Foundation Legal Memorandum No. 4782 (Nov. 3, 2017) available at:
    www.heritage.org ................................................................. 14

Lewis Caroll, *Through the Looking-Glass and What Alice Found There* .................... 1

Paul J. Larkin, Jr. & John-Michael Seibler, *The President's Reorganization Authority*,
    Heritage Foundation Legal Memorandum No. 210 (July 12, 2017) ...................... 14

### INTRODUCTION

As this Court found in its May 9, 2025 Order granting Plaintiffs' Motion for TRO, "[t]he new presidential administration has made clear that it intends to change the way the federal government operates." ECF 85 at 1.[1] It is axiomatic that the President's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Despite this bedrock constitutional law, President Donald Trump is implementing a plan to restructure the entire federal government through unconstitutional actions, for which he plainly does not have any authority. To effectuate this plan, the President issued his Workforce Executive Order, requiring all federal agencies to commence this "transformation" by engaging in large-scale RIFS and reorganizations, on the President's terms. Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (*Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, hereinafter "Workforce Executive Order" or "EO") (attached as App. A). Notwithstanding Defendants' attempts to mischaracterize the President's Order and agency implementation as a mere planning process for agency decision-making, the EO contains directives that all federal agencies "shall" implement, and federal agencies acting on these orders are proceeding to dismantle the government *now*. The President and the implementing agencies should not be permitted to dismantle the federal government in violation of the Constitution and federal law, and then claim at the conclusion of this case that it is too late to put the government back together.[2]

Based on briefing and argument on the Plaintiffs' Motion for Temporary Restraining Order ("TRO") (to which Defendants responded but did not submit any evidence), this Court concluded that Plaintiffs are likely to establish that Sections 3(c) and (e) of the Workforce Executive Order exceed

---

[1] The President has been quite clear about his plans, referring to this "**large scale structural reform**" the "**Manhattan Project of our time**." ECF 37-1 at 1 (citation provided) (emphasis added); *see also id.* ("**It is the policy of my Administration … to commence the deconstruction of the overbearing and burdensome administrative state**." (citing Exec. Order No. 14219, 90 Fed. Reg. 10583 (Feb. 19, 2025); "**It is the policy of my Administration to dramatically reduce the size of the Federal Government, while increasing its accountability to the American people**." Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025); "**I got elected on the basis of making our government stronger and smaller, because we have millions of people that — obviously, they're paying millions of people that shouldn't be paid**." Remarks by President after Executive Order Signing, The White House (Feb. 18, 2025)) (emphases added).

[2] "All the King's horses and all the King's men — Couldn't put Humpty Dumpty in his place again." Lewis Caroll, *Through the Looking-Glass and What Alice Found There*.

1    the President's lawful authority by directing the restructuring of entire agencies, elimination of

2    agency programs and functions, and drastic reduction of the number of employees within every

3    agency, all without *any* Congressional authorization, and therefore violate the fundamental separation

4    of powers principles embodied in the U.S. Constitution.  ECF 85 at 26-32.  As this Court also held,

5    Plaintiffs are also likely to prove that the President's implementing agencies—the Office of

6    Management and Budget ("OMB"), Office of Personnel Management ("OPM"), and Department of

7    Government Efficiency ("DOGE")—have exceeded their authority as well, and engaged in ultra vires

8    actions in implementing this EO.  *Id.* at 32-34; App. B (Memo).  This Court further concluded that

9    OMB and OPM's February 26, 2025 Memorandum implementing the EO ("Memo"), and the

10    approvals of the Agency RIF and Reorganization Plans ("ARRPs") required by the EO and the

11    Memo, violate the substantive and procedural provisions of the Administrative Procedure Act

12    ("APA"), 5 U.S.C. §701 *et seq.*  ECF 85 at 34-38.  In that Order, this Court reserved judgment on the

13    merits of two additional claims: whether DOGE violated the APA, and whether the Federal Agency

14    Defendants violated the APA by acting arbitrarily and capriciously in implementing the EO through

15    their ARRPs.  *Id.* at 38.  The Court issued a TRO halting further implementation of these unlawful

16    government acts and orders, and set a schedule for Plaintiffs' preliminary injunction motion.[3]

17          Plaintiffs now hereby move for a preliminary injunction to restore the status quo pending the

18    duration of this litigation.  As this Court recognized in granting the TRO, restoring and maintaining

19    the status quo is necessary to protect both this Court's ability to grant effective relief and Congress's

20    role in establishing and regulating the federal administrative agencies, and thereby restore the proper

21    separation of powers enshrined in the Constitution, and to prevent irreparable harm.  ECF 85 at 2, 39-

22    40.  Because Plaintiffs have already extensively briefed and provided evidence regarding the issues

23    raised by Defendants' actions, and because this Court has written on many of the issues raised by this

24    Motion, Plaintiffs incorporate by reference their prior briefing and evidence on the TRO Motion and

25    Reply, as well as this Court's decision granting that Motion.  ECF 37, 70, and 85.  This brief

---

[3] The Government's "compliance" declaration raises more questions than it answers.  ECF 95, 95-1.  Defendants did not, for example, provide this Court with the requested explanation "detailing what additional steps, if any, *they* have taken to comply."  ECF 85 at 40 (emphasis added).  Defendants provided a declaration from counsel only, claiming privilege, not a factual explanation of the steps Defendants have actually taken to comply with this Court's order.

supplements that existing record with the following points:

1.    Plaintiffs update the record regarding agency actions, in particular actions that have taken place and information and documents obtained after the filing of Plaintiffs' TRO briefing, and briefly summarize some of the evidence to date.

2.    Plaintiffs have filed an amended complaint adding two Plaintiffs, SEIU Locals 521 and 1021, and one Federal Agency Defendant, the Peace Corps, and therefore address the evidence pertaining to these parties.

3.    Plaintiffs address the record evidence to respond to Defendants' recent arguments that misconstrue the nature and relevance of the ARRPs to the EO, Memo, and Plaintiffs' claims.

4.    Plaintiffs further address the merits of their constitutional and APA claims in light of the current factual record.

5.    Plaintiffs address the scope of relief requested by this Motion.

Plaintiffs initially requested a TRO that temporarily paused further implementation of the EO and Memo to allow this Court to hear this full preliminary injunction request. Plaintiffs now ask the Court to issue a preliminary injunction that maintains the proper, pre-unlawful conduct, status quo. This relief is necessary to preserve this Court's ability to rule, in the end, that the President's actions and agency implementation thereof are ultra vires and unlawful pursuant to the APA, to issue the remedies the law provides for vacating such unlawful action, and to prevent the irreparable harm this unprecedented and improper assertion of power is wreaking nationwide. The scope and scale of the relief requested are a function of the President's overreach and Defendants' continuing actions to implement the unlawful EO, and do not exceed the proper authority of this Article III court.

## BACKGROUND

### I.    Additional Plaintiffs and Defendants

Plaintiffs that previously moved for a TRO included six local government agencies, ten non-profits, and eight labor unions representing federal and non-federal employees impacted by the EO. Those Plaintiffs are now joined by SEIU Locals 521 and 1021, which represent workers who provide critical child care, health care, and other services affected by the challenged reorganization and RIFs; and Plaintiff Natural Resources Defense Council ("NRDC") joins this Motion.

Plaintiffs' amended complaint also adds the Peace Corps as a defendant. On May 9, 2025, public reports revealed that the Peace Corps is poised to implement the President's EO by "reduc[ing] its global staff by 25 percent, potentially closing some of its 60 international posts," and cutting its Washington, DC headquarters staffing even more drastically, terminating anywhere from 50 to 80% of existing staff. Black Decl. ¶¶12-14, Ex. A (AFSCME).

## II.    Restructuring and RIFs at Agencies Pursuant to the EO Are Causing Widespread Irreparable Harm

### A.    Ongoing Restructuring and RIFs Pursuant to the EO

As Plaintiffs have previously shown, federal agencies are currently implementing the ARRPs that the President required them to create and the Memo required them to submit to OMB/OPM for approval. The uncontroverted record evidence to date establishes that the agencies are, in fact, following the President's orders to reorganize the entire federal government, including by eliminating offices and functions that the President and his agents direct; engaging in large-scale RIFs that greatly reduce the size of federal agencies; and transferring functions across agencies. *See* ECF 37-1 at 12-29; ECF 70 at 2-3; *see also* ECF 96-1 ¶15, Ex. 1 at 2, 5 (Soriano Supp. Decl.). The RIFs are plainly the centerpiece of the reorganization plans, and indeed, OMB and OPM ordered federal agencies to conduct RIFS *first*, and then arrange the pieces of what remains of these agencies. ECF 37-1, App. A, B. The evidence submitted to date conclusively demonstrates:

1.    *Agencies confirm they are implementing the President's orders.* Federal Agency Defendants have repeatedly stated that they are implementing the EO to conduct RIFs and other actions in service of reorganizing the government. *See, e.g.*, ECF 70-2 Exs. A, B, C (*DOL*: communications and RIF notice stating that abolition of program office was based on Presidential order, and RIF "due to the impact of the [EO]"); ECF 96-1 ¶15 (*NSF*: RIF of Division of Equity for Excellence in STEM likely dictated by OPM, OMB, and DOGE); *accord* ECF 70-1 Ex. A (quoting USDA Secretary Rollins); ECF 37-1 at 14 (*AmeriCorps*: nearly all staff RIF'd per EO); ECF 70-1 ¶6, Ex. C (*EPA*: scientific research office cut per EO); ECF 37-14 at ¶¶9-12, Exs. A-D (*GSA*: RIFs and offices cut "[i]n support of the [EO]"); ECF 37-1 at 4-5 (*HHS*: cuts "proceeding in accordance with [EO]" including entire programs and offices); ECF 41-1 ¶15, Ex. C (*HUD*: large-scale RIFs in "[c]ompliance with [EO]"); ECF 37-1 at 24 (*NSF*: cutting half of staff under "orders from the White

House"); *id.* at 24-25 (*SBA*: 43% reduction per EO); *id.* at 25-26 (*SSA*: plans per EO include "abolishment of organizations and positions" and RIFs); *id.* at 27 (*State*: consolidation, 15% reduction per EO); *id.* (*Treasury*: 40% IRS cut per EO); *id.* at 5, 28 (*VA*: cuts to 2019 levels per EO).

OMB, OPM, and DOGE continue to implement the President's mandates by *directing agencies to cut offices and functions and RIF their staff.* ECF 37-1 at 12 (NLRB, NSF); ECF 96-1 ¶¶7-8, 15 (Soriano Supp. Decl.) ("the Division [of Equity for Excellence in STEM] was not originally included in the Phase 1 ARRP that NSF had submitted for OMB and OPM approval, and … OPM, OMB, and DOGE instructed NSF leadership to eliminate the Division after reviewing and rejecting the Phase 1 ARRP."); ECF 37-12 (Daly) (OMB rejected AmeriCorps ARRP for not including RIF).

Plaintiffs have submitted what appears to be the standardized format for Phase 2 ARRP documents required by OMB/OPM: the "Agency ARRP Phase 2 Cover Sheet," recently disclosed to a union by a federal agency. In that Agency ARRP Phase 2 Cover Sheet, OMB/OPM instructs that "[e]ach Agency **is directed** to notate the figures defined in this sheet and reflect them with additional context in their Phase 2 plans" including, inter alia, "**RIFs/Terminations**" conducted through 4/15 and between 4/15 and 9/30, with corresponding cost savings calculations. ECF 96-1, Ex. 1, Att. D (Soriano Supp. Decl.) (emphases added). That document, along with other record evidence, makes clear that RIFs are *not* the only actions being taken to implement the ARRPs. Rather, the ARRPs are being used to implement the EO and Memo through a range of actions to achieve the "Anticipated Reduction in FTEs." *Id.* Thus, consistent with the original OMB/OPM Memo, agencies are also *directed* by OMB/OPM to detail the other actions required by these ARRPs (including but not limited to hiring freezes, Deferred Resignation Program and other voluntary retirement measures, and terminating other employees including probationary employees). *Id.*; *see also* ECF 37-1, App. B at 2 (Available Tools: "In their ARRPs, agencies should employ all available tools to effectuate the President's directive for a more effective and efficient government and describe how they will use each."); ECF 37-28 ¶¶13-14 & Ex. C (SSA); ECF 37-17 ¶17 (FDA); ECF 37-24 ¶14 (DOL); Black Decl. ¶12 (Peace Corps). In disclosing that document, the agency explained to the union:

> In accordance with President Trump's February 11, 2025 Executive Order titled "Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative," the Department of Government Efficiency (DOGE) instructed

[non-defendant agency] to reduce the agency's workforce through a Reduction In Force (RIF).

ECF 96-1, Ex. 1 at 5; *see also id.* at 6 ("[T]he AR[R]P Phase 1 was a pre-decisional document and submitted to OPM for approval. After submission of that report, DOGE instructed NEH to conduct a RIF on an expedited basis.").[4]  The President's agents rejected that agency's (and those of others like NSF) initial ARRPs and instructed them to cut substantially more staff.  *Id.* ¶¶7-8, 15.

    *2.  Agencies are closing the offices and programs that the President eliminates.*  The EO requires agencies to RIF the employees who work in "all agency initiatives, components, or operations that *my Administration suspends or closes*" government-wide. App. A (§3(c)).  As this Court recognized in the TRO Order, that is exactly what agencies are doing.  ECF 85 at 2-4.

    For example, the Department of Health and Human Services ("HHS") has shut down numerous statutorily mandated offices and programs.  The Administration for Children and Families terminated every employee administering a program to cover heating and cooling bills for millions of low-income households and eliminated the division overseeing a case management system tracking child abuse and neglect.  ECF 37-36 ¶¶22-23 (APHA).  The statutorily mandated National Institute for Occupational Safety and Health ("NIOSH"), which is part of the Centers for Disease Control ("CDC") within HHS, plans to implement deep cuts that will decimate NIOSH.  ECF 85 at 2-3 (citing ECF 41-4 & Pub. L. 91-596 322, 84 Stat. 1590, 1612 (1970)); *see also* ECF 41-4 ¶21 (AFGE; estimating that "93% of NIOSH employees … received RIF notices"); Mammel PI Decl. Ex. E.  NIOSH RIFs also initially closed a federal screening program for black lung disease.  ECF 37-36 ¶25

---

[4] As Plaintiffs explained in opposing Defendants' Motion for Protective Order, the ARRPs produced to Plaintiffs were provided by a non-defendant agency, but are illustrative and provide factual support for the directions being imposed government-wide.  ECF 96 at 4 & n.2.  It is noteworthy that with respect to that agency, the instructions from DOGE on timing and content of the cuts were mandatory and urgent:  on April 14, 2025, the agency wrote:  "**The Department of Government Efficiency (DOGE) instructed NEH to start the workforce restructuring and Reduction in Force (RIF) processes last week… [describing RIFs]… Therefore, NEH is already in the process of completing its Phase 2 workforce restructuring process** *in compliance with the Executive Order and approved by DOGE.*"  ECF 96-1 (Supp. Soriano Decl.) Ex. A at internal Att. D (emphases added).  This instruction from DOGE is consistent with the OMB/OPM memo instruction:  "ARRPs should also list the competitive areas for large-scale reductions in force, **the RIF effective dates (which may be a date prior to when the plan is submitted),** the expected conclusion of the RIFs, the number of FTEs reduced, and additional impact of RIFs such as cancellation of related contracts, leases or overhead."  App. B at 3 (emphasis added).  OMB/OPM/DOGE are plainly *approving* these cuts and demanding *compliance*, consistent with the plain language of the Memo.

(APHA).  At the Department of Labor ("DOL"), all positions with the Office of Federal Contract Compliance Programs were given RIF notices because the office was being abolished.  ECF 85 at 3 (citing ECF 37-24).  While Congress has directed that DOL "shall promptly investigate" complaints of discrimination against disabled workers and veterans by federal contractors, *id.* (citing 29 U.S.C. §793(b), 38 U.S.C. §4212), the elimination of this office has made compliance with that mandate impossible.  *See also* ECF No. 37-24 ¶9, Ex. C (AFGE; DOL has directed that enforcement efforts cease). AmeriCorps has been similarly gutted, with over 80% of its staff placed on leave, leaving it "unable to complete the day-to-day work required to keep the Agency running."  ECF 37-12 ¶¶14, 18, 20-22, 25-26, 36, Ex. A (AFSCME).  And the entire Office of Research and Development (an arm of the Environmental Protection Agency ("EPA"), with 1155 chemists, biologists, toxicologists and other scientists) will be dismantled, with more than 1500 EPA scientists informed they can reapply for just 500 jobs elsewhere.  ECF 37-19 ¶¶8, 17, Exs. A, E (AFGE); ECF 70-1 Ex. D.

   *3.  Functions are being transferred between agencies.*  Federal Defendant Agencies are also transferring functions and offices *between* agencies. *See, e.g.*, ECF 37-26 ¶¶42-43 (SEIU; DOE student aid office planned to move to SBA); ECF 70-1 ¶¶3-4, Ex. A (USDA plans potentially include consolidating functions with up to seven other agencies across government, including housing and firefighting); ECF 37-1 at 13, 26-27 (USAID functions transferred to Department of State)

   *4.  Agencies are implementing the President's "large-scale" RIFs.*  Plaintiffs identified at least seven agencies that had issued RIF notices as of the May 1 TRO Motion filing: AmeriCorps, EPA, GSA, HHS, HUD, Labor, and the SBA.  ECF 37-1 at 12.  Additional agencies had announced RIFs, ECF 70-1 Exs. L, H (DOT and Interior), or instituted RIFs, *id.* Ex. K (OPM), as of the May 8 Reply.  As of today, May 14, Plaintiffs have identified additional RIFs at the Department of State and National Science Foundation.  Mammel PI Decl. Ex. A (State: employees "have begun to receive informal notifications [that] their roles will be cut"; RIF notices will go out June 2); ECF 96-1 ¶15 (AFGE; NSF sent RIF notices to all employees working in Division of Equity for Excellence in STEM on May 9, 2025). There are also imminent RIFs at the Peace Corps, Black Decl. ¶13 (AFSCME), and a RIF slated at the National Centers for Environmental Information in the National Oceanic and Atmospheric Administration ("NOAA"), Mammel PI Decl. Ex. B.

**B.    Ongoing and Imminent Harms from the Reorganization and RIFs**

Plaintiffs' TRO evidence demonstrated detailed harms at each enjoined Defendant Federal Agency.  *See* ECF 37-1 at 14-29; ECF 70 at 12-13.  These significant harms are either already occurring or imminent.  Many employees have been placed on immediate administrative leave, *e.g.*, ECF 37-12 ¶20 (AmeriCorps); ECF 37-14 ¶11 (GSA); ECF 37-21 ¶18 (HHS); 37-16 ¶10 (DOL); and others have already been subjected to RIFs, *see, e.g.*, ECF 37-13 ¶¶12-14 (EPA); ECF 41-1 ¶¶13-18 (HUD); ECF 37-18 ¶¶8-14 (SBA); ECF 96-1 ¶¶15, 18 (NSF; RIF notices sent but temporarily suspended due to this Court's TRO).  The harms directly stemming from the gutting of these agencies range from local governments' and non-profits' loss of AmeriCorps' assistance in providing disaster relief, public health services, wildfire mitigation, emergency management, and more, ECF 41-6 ¶¶8-20 (King County), ECF 37-36 ¶39 (APHA); *see* ECF 37-1 at 25; to harms from the loss of USDA programs including but not limited to food safety inspections, assistance in quarantining invasive pests, and processing of food service and child and adult care programs, *see* ECF 37-1 at 26 (citing declarations from Plaintiffs AFGE, Harris County, County of Santa Clara, King County, WWP, NOFA, AFSCME, and AGU); to severe public health threats from cuts to the CDC, including decreased ability to control outbreaks of contagious diseases such as measles, to improve prevention of birth defects, and to treat drug-resistant STDs and stop disease transmission, ECF 37-1 at 19-21 (citing declarations); to termination of every employee administering the program that covers the heating and cooling bills for millions of low-income households, and elimination of the division overseeing a tracking of child abuse and neglect, ECF 37 at 20 (citing ECF 37-36 ¶¶22-23 (APHA)).

Added to this catalogue of harm detailed in Plaintiffs' TRO papers is additional evidence of harms flowing from the evisceration of the Peace Corps, EPA, NIOSH, NOAA, USDA, CDC, Department of Energy ("DOE"), and Department of Interior ("Interior").

Peace Corps:  Planned RIFs will cause imminent harm to Plaintiff AFSCME's members who will lose their jobs and be prevented from "the promotion of world peace and friendship through public service" to which they "have dedicated [their] lives."  Black Decl. ¶¶2, 14-15, 19.  Plaintiff AFSCME will itself be harmed by impairing its mission, depriving it of membership dues, and forcing it to allocate resources and attention to responding to RIFs.  *Id.* ¶¶15-16.

1    EPA:  The announced elimination of the Office of Research and Development ("ORD") will

2    impede the abatement of lead contamination in drinking water across the nation, including ongoing

3    NRDC programs that rely on ORD testing, technical support, and expertise.  Olson Decl. ¶¶19-27,

4    36-39 (NRDC).  The elimination of the Energy Star program, which was created at the direction of

5    Congress and certifies and identifies energy-efficient products for the information of business and

6    consumers, will severely hinder energy efficiency efforts, including NRDC's building efficiency

7    program.  Cunningham Decl. ¶¶2-12 (NRDC); Mammel PI Decl. Exs. C. D.

8    NIOSH:  RIFs have halted certification of personal protective equipment (PPE), without

9    which Santa Clara will be forced to discontinue clinically indicated medical procedures, to the

10    detriment of patients (and resulting loss of revenue), or to use equipment that is not certified and may

11    inadequately protect patients or workers or fail to comply with applicable regulations.  Supp.

12    Williams Decl. ¶¶8-¶9.  RIFs will also impair the County's ability to respond to the measles outbreak,

13    develop guidance that limits injury risk for its workforce, and protect its workers from industrial

14    chemical exposure.  *Id.* ¶¶9-15.

15    USDA:  The Animal and Plant Health Inspection Service ("APHIS") is responsible for

16    training and accrediting local officials to inspect agricultural products being exported to other

17    countries, of which Santa Clara County exports a considerable amount.  Supp. Williams Decl. ¶¶4-5

18    (Santa Clara).  Planned RIFs at APHIS could impair certification of local officials and grind

19    agricultural exports to a halt; even short delays may cause products to spoil, eat into farms' thin

20    margins, cause irreparable harm to local industry, and cause Santa Clara fiscal harm.  *Id.*

21    DOE, Interior, CDC, NOAA, EPA, NIOSH: These agencies maintain public databases of vital

22    scientific information on which researchers, including NRDC staff, regularly rely; loss or degradation

23    of these datasets due to cuts will obstruct important environmental and public health research and

24    policy initiatives.  McKinzie Decl. ¶¶7-20 (NRDC); Sass Decl. ¶¶6-13 (NRDC).

25    Appendix C to this brief is a chart identifying the agencies for which each Plaintiff asserts

26    harm.

27

28

**ARGUMENT**

**I.** **This Court Should Enjoin Defendants' Implementation of Executive Order 14210 and the Resulting Agency RIF and Reorganization Plans**

Plaintiffs show (1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; and (3) the balance of equities and (4) public interest support an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also* Fed. R. Civ. P. 65(a), (b)(3).

**A.** **Defendants' Government-wide Order and Actions Are Causing Ongoing, Nationwide Irreparable Harm and the Balance of the Equities and Public Interest Weigh Heavily in Favor of a Preliminary Injunction**

Plaintiffs have extensively documented irreparable harms they and their members face. ECF 37-1 at 12-29; ECF 70 at 12-14; ECF 85 at 14-17. As previously explained, "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Hundreds of thousands of federal employee members of union and organizational Plaintiffs are at risk of employment termination, losing their incomes and long careers in public service as well as health insurance for themselves and their families, and even being required to relocate. ECF 37-1 at 13 n.24 (citing declarations; ECF 70 at 12); Black Decl. ¶¶2, 13-14, 19 (AFSCME); *see Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (loss of health benefits is irreparable harm). Workers who remain face degraded and dangerous working conditions and significantly increased workloads, risking termination for cause if they cannot cover the work of those RIF'ed. ECF 37-20 ¶37; *see also* ECF 37-35 ¶¶12-13 (SSA layoffs included staff who tested water for Legionnaire's Disease, which caused death of two employees several years ago); ECF 37-21 ¶32 (RIFs leave CDC employees with disabilities no way to seek accommodations); ECF 37-1 at 13, 45 n.58; 70 at 12 n.20. Local government Plaintiffs are suffering and will suffer irreparable harm from disruption of the federal services, sources, and support that they rely on, impeding their ability to serve and protect their residents, imposing direct fiscal harms, and necessitating the expenditure of substantial resources. ECF 37-1 at 14-29, 46; ECF 70 at 14 & nn. 22-26; Williams Supp. Decl ¶¶5-15 (Santa Clara). This monetary harm is irreparable because Plaintiffs cannot recover monetary damages in this case. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). Non-profit organization Plaintiffs' members, and labor Plaintiffs' non-federal members, face irreparable injury from loss or degradation of important government services

they rely on, including difficulty obtaining government benefits, halting of critical scientific research, increased risks to public health, underenforcement of safety and labor standards, and environmental destruction. *See Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) (loss of government benefits is irreparable); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) ("[E]nvironmental injury, by its nature, … is … irreparable.") (citation omitted); ECF 37-1 at 14-29 (detailing injuries); ECF 70 at 12-13 (same).[5]

Defendants, on the other hand, have to date put forth no evidence of harm they will incur from preserving the status quo.[6]  To the extent they argue they will be required to temporarily retain employees they otherwise would have terminated under the EO and Memo, that purported harm pales by comparison to the injuries to Plaintiffs and their members.  *See Lopez*, 713 F.2d at 1437 ("Faced with such a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor.").  Moreover, Plaintiffs' requested preliminary injunction would *not* prevent the President from carrying out any *lawful* plan to reorganize the government—by obtaining authorization from Congress.  A preliminary injunction would simply help ensure that the President and agencies act constitutionally and in accordance with statutes, which "is always in the public interest."  *Melendres*, 695 F.3d at 1002.

### B.  Plaintiffs Are Likely to Succeed on the Merits of Their Claims that the Executive Order and Agency Implementation are Unlawful

This Court should again reject Defendants' assertion that the EO and Memo provide only "guidance" for "planning."  ECF 85 at 31-34.  As discussed previously, the record evidence conclusively demonstrates that President Trump has ordered federal agencies to engage in a government-wide reorganization and to RIF massive numbers of employees in service of that reorganization.  The plain language of the EO and Memo mandate these actions and remove agency decision-making and discretion.  "As is true of interpretation of statutes, the interpretation of an

---

[5] Irreparable injuries also include deprivation of the ability to participate in notice-and-comment and harm to the organizations' mission, activities, and finances. *See* ECF 37-1 at 45-46 (organizational and procedural injuries); ECF 70 at 14 (organizational injuries); Black Decl. ¶¶15-16 (harm to mission)
[6] Defendants' "compliance" declaration (ECF 95.1) identifies no difficulty complying with the Court's TRO.  At least one federal agency jumped at the chance:  NSF immediately reinstated employees and halted RIFs based on the TRO.  ECF 96-1 ¶19 & Ex. 4 (Soriano Supp. Decl.).

Executive Order begins with its text, which must be construed consistently with the Order's object and policy." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018) (cleaned up); *see also Bassidji v. Goe*, 413 F.3d 928, 934 (9th Cir. 2005); *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 830 (9th Cir. 1996).  The Court should take President Trump at his word that the EO commences systemic "transformation," by "eliminating" what he perceives to be problematic aspects of government, as set forth in "Section 1. *Purpose.*" App. A ("To restore accountability to the American public, this order *commences a critical transformation* of the Federal bureaucracy. By *eliminating* waste, bloat, and insularity, my Administration will empower American families, workers, taxpayers, and our system of Government itself.") (emphasis added).

The EO goes on in Section 3 (entitled, "Reforming the Federal Workforce to Maximize Efficiency and Productivity") to order agencies to take actions in mandatory language ("shall") that is not consistent with mere "guidance."  *E.g., Kingdomware Techs., Inc. v. U.S.,* 579 U.S. 162, 172 (2016) ("It is generally clear that 'shall' imposes a mandatory duty.").  The President is also plainly acting categorically with respect to all federal agencies and the entire federal workforce.  Among these mandates imposed on all agencies, the President orders that agencies "shall" engage in mandatory "large-scale" RIFs.  He then requires agencies to "prioritize" a list of required items that "shall" be included, expressly defining a sole exception.  Nothing about the President's language is permissive or advisory.  The structure of this EO, containing a list of mandatory items with an identified exclusion, reinforces the mandatory force, as the Ninth Circuit has concluded with respect to a parallel structure, and leads to the same conclusion:

> "Under the doctrine of '*inclusio unius est exclusio alterius*' (the inclusion of one is the exclusion of the other), 'when a statute limits a thing to be done in a particular mode, it includes a negative of any other mode.' " .... The canon applies here. By specifically excluding grants "deemed necessary for law enforcement purposes," the Executive Order directs the Attorney General and the Secretary to cut all other grant programs.

*San Francisco,* 897 F.3d at 1239.

Finally, savings clause language, such as "consistent with applicable law," cannot override the EO's plain text:  "Savings clauses are read in their context, and they cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language." *Id.* at 1239-40 (holding "distinguishable" *Building & Construction Trades Department v. Allbaugh*, 295

1    F.3d 28 (D.C. Cir. 2002)); *see also New York*, 133 F.4th at 70-71 (rejecting same argument regarding

2    funding freeze Executive Order).  This Court's conclusion at the TRO stage that the EO-imposed

3    mandatory actions in service of federal government reorganization, removing agency decision-

4    making and discretion (ECF 85 at 31-32), was supported by all applicable maxims of interpretation.

5         The same analysis applies to the Memo, which, like the EO, contains mandatory, not

6    permissive, language.  Like the President, OMB and OPM should be taken at their word.  And OMB

7    and OPM told Agency Heads that the EO was mandatory, stating that the EO "**directed** agencies to

8    'eliminat[e] waste, bloat, and insularity' in order to 'empower American families, workers, taxpayers,

9    and our system of Government itself.'"  App. B (emphasis added).  OMB and OPM confirmed the

10   RIFs were for the purpose of reorganization:  they required agencies to combine these in the same

11   ARRP document.  *Id*.  OMB and OPM imposed mandatory requirements for those ARRPs, not mere

12   guidance:  "the **instruction** that such plans be submitted to OMB and OPM"; requiring that agencies

13   "**will** submit" the plans for "**approval**" by required deadlines.  *Id*. (emphases added).

14        Defendants' portrayal of these documents as permitting agencies to exercise meaningful

15   discretion or to make their own considered decisions as to the offices or functions removed, size of

16   the cuts reflected in these plans, or timeframe under which they will be effectuated, is directly

17   contrary to the EO and Memo's plain language.  So too is the attempt to portray the Memo as simply

18   beginning an ongoing planning process:  the President ordered agencies to act and OMB/OPM

19   reinforced that directive by requiring submission of the initial phase of plans focusing on RIFs within

20   a *mere two weeks*, with the second to follow only a month later.  App. B.  Nor does Defendants'

21   attempt to rely on the later "report" dates as a basis for arguing that the ARRPs are mere planning

22   purposes to be revised ad infinitum (ECF 88-1 ¶6) work either:  the Memo separately defines "plans"

23   (for approval in March and April) and "reports" submitted later (plainly referring to how the

24   implementation of the approved plans is proceeding).  App. B.  The Memo also sets an ultimate

25   implementation deadline: "Phase 2 plans should be planned for implementation by September 30,

26   2025."  *Id.*, App. B at 4.  As with the EO, this Court's conclusion regarding the mandatory orders

27   contained in the OMB/OPM directive is backed by all maxims of interpretation.  ECF 85 at 33-34.

28        Plaintiffs' evidence confirms the plain language of these documents:  agencies are following

the President and OMB/OPM's orders, by implementing plans that reflect the President's elimination of programs and functions and by commencing large-scale RIFs.  *Supra* at 4-6.

From the plain language of the EO and the OMB/OPM Memo, and the uncontroverted record that agencies are, indeed, implementing these mandatory orders, flows the inevitable conclusion that Defendants' actions are ultra vires.  Defendants identify no specific source of Constitutional or statutory authority for the President's actions, beyond general Article II supervisory powers, which in Defendants' view give the President plenary power over the federal agencies.  But the Constitution is predicated on the idea that Executive power is not unlimited:  "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co.*, 343 U.S. at 585.[7]  And where, as here, Congress has declined to reauthorize the power to reorganize the federal government that the President needs to take such action, his power is "at its lowest ebb."  *Id.* at 637 (Jackson, J., concurring); *accord San Francisco*, 897 F.3d at 1233-34. There is no *real* dispute that the President lacks the authority to reorganize the federal government without Congressional authorization.  *E.g.*, Paul J. Larkin, Jr. & John-Michael Seibler, *The President's Reorganization Authority*, Heritage Foundation Legal Mem. No. 210, at 1, 3 (July 12, 2017) ("The President may create, reorganize, or abolish an office that he established, but he cannot fundamentally reorganize the executive branch in direct violation of an act of Congress. … [T]he President does not have constitutional authority to reorganize the executive branch on his own.").[8]

Nor can there be any real dispute that this EO does in fact order a reorganization of the entire federal government—imposing a radical transformation of all federal agencies, at the same time, by eliminating programs and functions, transferring functions between agencies, and ordering agencies to restructure themselves through large-scale RIFs.  The actions the EO requires fall squarely within the previously granted reorganization authority that expired in 1984, and which Congress, thus far,

---

[7]  "Unchecked presidential power is not what the Framers had in mind."  ECF 85 at 1 (quoting amicus brief filed by former federal officials, Dkt. No. 69-1 at 1).  Indeed, "[t]here can be no liberty where the legislative and executive powers are united in the same person."  *Bowsher v. Synar*, 478 U.S. 714, 721-22 (1986) (quoting James Madison in The Federalist No. 47, p. 325 (J. Cooke ed. 1961).

[8]  *Accord* John W. York & Rachel Greszler, *A Model for Executive Reorganization*, Heritage Foundation Legal Memorandum No. 4782, at 1-2 (Nov. 3, 2017) (recognizing that "[s]ince [*INS v.*] *Chadha*, [462 U.S. 919 (1983)], sweeping reorganization of the federal bureaucracy requires the active participation of Congress."), both available at:  www.heritage.org.

1    has *not* granted.  *See* 5 U.S.C. §903.

2         Defendants' argument regarding the Article II executive power to supervise agencies

3    necessarily piggybacks on the authority granted to those agencies by Congress.  But no statute

4    delegating authority to an agency (such as the statute addressing RIFs, 5 U.S.C. §3502) gives the

5    President the power to reorganize the government.  ECF 85 at 27-28.[9]  Indeed, 5 U.S.C. §3502

6    predates the last congressional authorization of Presidential reorganization authority in 1984.  Pub. L.

7    89-554, Sept. 6, 1966, 80 Stat. 428-29.  That conclusion is further supported by the EO and

8    OMB/OPM Memo's directions, which go far beyond asking agencies to exercise their own statutory

9    authority and discretion.  The President has imposed government-wide, categorical requirements that

10   include the (1) mandate to commence imposing "large-scale" RIFs across all agencies; (2) removal of

11   agency decision-making power and transfer of that authority to OMB/OPM/DOGE; (3) requirement

12   that agencies RIF employees in programs and functions that the President and his agents eliminate;

13   (4) requirement that agencies maximally RIF and eliminate all non-statutory mandated functions

14   (with the President and his agents defining those requirements), regardless of the agencies' prior

15   assessment of need or reasons for those functions;  and (5) directive to prioritize government shut-

16   down levels of staffing that cannot, by definition, support proper agency function.[10]

17        This Court has thus correctly concluded that Plaintiffs are likely to succeed on claims that the

18   President's order that agencies implement a reorganization on his mandated terms and conditions,

19   including through RIFs for the purpose of reorganization, and the consolidation, transfer, and

20   elimination of agency functions, usurp legislative authority and are unconstitutional and ultra vires.

21   ECF 85 at 26-32; *see Chen v. I.N.S.*, 95 F.3d 801, 805 (9th Cir. 1996) ("the Executive Order lacked

22   the force and effect of law because it was never grounded in a statutory mandate or congressional

23

24   _____

     [9] This Court also correctly concluded that no statute authorizes OMB, OPM or DOGE to assume the

25   authority to direct agencies to act in the manner that they have here.  ECF 85 at 32-34.  Defendants
     effectively seek to cloak these agencies in the President's borrowed power, but to the extent the
     President has none, neither do OMB, OPM, or DOGE.

26   [10]The Contingency Plans referenced in the EO and Memo, known as "Lapse Plans," set forth the
     minimum staffing needed (to protect, for example, against the destruction of property or loss of life)

27   when agencies receive no appropriations at all.  In such circumstances, agencies *by law cannot* perform
     their normal Congressionally authorized functions.  Dep't of Commerce, *Plan for Orderly Shutdown*

28   *Due to Lapse of Congressional Appropriations* (September 27, 2023), available at:
     https://www.commerce.gov/sites/default/files/2023-09/DOC-Lapse-Plan-2023.pdf.

delegation of authority"); *State v. Su*, 121 F.4th 1, 13 (9th Cir. 2024) ("In sum, the President cannot issue an executive order instructing agencies to carry out [his] mandate" without Constitutional or statutory authority); *San Francisco*, 897 F.3d at 1235 (enjoining implementation of unconstitutional Executive Order). This conclusion does not upend the Constitution, as Defendants have claimed. Rather, it reestablishes the proper balance of authority between the democratically elected Congress and the executive branch, as this Court previously concluded.

Likewise, this Court's prior conclusions that OMB, OPM, and DOGE's actions are ultra vires apply with equal force to this motion. ECF 85 at 34-37. This Court need not decide whether DOGE is subject to the APA (although for reasons explained by other courts, it is, notwithstanding Defendants' attempts to cloak it within the Executive Office of the President—where OMB, which is subject to the APA, is also housed). *Id*. at 36. Plaintiffs are likely to succeed on APA claims against OMB and OPM for actions that exceed authority and fail to comply with notice-and-comment rulemaking, for reasons previously given. *Id*. at 37. And while for purposes of this Motion (including because Plaintiffs do not yet have access to the ARRPs) this Court need not reach Plaintiffs' claims against OMB/OPM and the Federal Agency Defendants for engaging in arbitrary and capricious action, it could, for the reasons provided by the First Circuit in *New York*, 133 F.4th at 70-71. The President's and OMB/OPM's *categorical* instructions and the agencies' implementation of those instructions are necessarily divorced from reasoned decision-making that takes into account all appropriate factors (because the categorial instruction took into account nothing other than the President's will to restructure government according to his plans). *See* ECF 37-1 at 42-44.

### C.    This Court Has Jurisdiction Over All Plaintiffs' Claims

#### 1.    Standing

Plaintiffs have amply demonstrated Article III standing through the TRO briefing and accompanying declarations, which Plaintiffs incorporate. *See* ECF 37-1 at 44-46 & nn. 57-63 (citing to plaintiff declarations); ECF 70 at 12-14 & nn. 19-27.

New plaintiffs SEIU Local 521 and SEIU Local 1021, and new movant NRDC, also have Article III standing. Local 521's members include employees at an early learning services program in Santa Clara who have been notified that they will be laid off on July 1, 2025 unless the federal

Head Start program is functional and able to renew the grant—but all the federal employees with whom the local program staff previously worked have been removed from their positions.  Woodard Decl. ¶9; *see also id.* ¶¶10-12; ECF 37-26 ¶27 (impacts on Local 521 members who are family child care providers and depend on federal agencies' technical assistance).  Local 1021's members are also severely impacted by actions taken to implement the Executive Order, including cuts to federal Head Start programs, which will harm members who work at those programs; members who work as counselors, care coordinators, case managers and more, who are directly impacted by HHS's shuttering of its Substance Abuse and Mental Health Services Administration; and health care worker members whose ability to provide services is impacted by the lack of normal operations at the Social Security Administration and its effect on Medicare and Medi-Cal processing.  *See* ECF 37-30.

NRDC's members are injured by the environmental harm that results from staffing and program cuts at environmental agencies.  *See, e.g.*, Asmutis-Silvia Decl. ¶¶4-19, 23-26 (NOAA cuts will inhibit member's ability to respond to whale strandings and increase endangered whales' risk of extinction).  NRDC also has standing to sue because the elimination of programs at EPA, CDC, NIOSH, Interior, DOE, and NOAA "directly affects and interferes with [NRDC's] core business activities" of research, policy analysis, advocacy, and public education to protect public health and the environment.  *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).  NRDC's activities are hindered by the loss of these agencies' research, data, and collaboration, and NRDC will be required to divert and expend resources to try to fill the gaps.  *See* McKinzie Decl. ¶¶7-20; Sass Decl. ¶¶6-13; Olson Decl. ¶¶19-27, 36-39; Cunningham Decl. ¶¶5-13; *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 682 (9th Cir. 2023) (organization has standing where government's "behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose").

### 2.    Administrative Channeling

Plaintiffs have explained, and this Court correctly concluded, that the Court has subject matter jurisdiction over Plaintiffs' claims challenging a government-wide Presidential Executive Order and agencies' implementation of that order, and that no Plaintiff is required to "channel" its claims.  ECF 37-1 at 46-48; ECF 70 at 10-11.  The claims of NRDC and the SEIU Locals are no more "channeled"

than those of the existing government, non-profit organization, and labor union Plaintiffs.  The Court's authority to hear the claims of these Plaintiffs has not been removed, implicitly, by Congress.  *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 383 (2012) ("[J]urisdiction conferred by 28 U.S.C. §1331 should hold firm against 'mere implication flowing from subsequent legislation'").

Defendants' argument appears to be that, because Congress created administrative agencies to handle *some* claims by employees involving federal employment, *all* claims bearing on federal employees are excluded from federal court.[11]  To the contrary, as the Supreme Court recently cautioned, "a statutory review scheme [that precludes district court jurisdiction] does not necessarily extend to every claim concerning agency action."  *Axon Enters., Inc. v. FTC*, 598 U.S. 175, 185 (2023); *Kerr v. Jewell*, 836 F.3d 1048, 1052-53 (9th Cir. 2016).

Plaintiffs do not, as Defendants previously argued, attempt to evade an inapplicable procedure: they simply bring *different claims* than what those statutory schemes are designed for, by challenging ultra vires Presidential action and ensuing violations of the APA, which fall under well-established express federal jurisdiction.  28 U.S.C. §1331.  Far more textual indication of Congressional intent is needed before removing the "command" of APA review of government action.  *Dep't of Commerce v. New York*, 588 U.S. 752, 771-72 (2019); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-93 (2024) ("The text of the APA means what it says.").

NRDC and the SEIU Locals are situated similarly to the local government entities, nonprofit organizations, and non-federal sector labor unions, in that the two administrative agencies that Defendants invoke—the Merit Systems Protection Board ("MSPB") and Federal Labor Relations Authority ("FLRA")—could never hear these Plaintiffs' claims.[12]  The SEIU Locals (like AFSCME and SEIU) do not represent federal employee workers: their members are child care, health care, and

---

[11] ECF 60 (TRO Opp.) at 23.  While the Ninth Circuit has channeled individual employee claims against employing agencies, it has never done so with respect to a third-party claim, nor to any challenge of a government-wide Executive Order or its implementation through OMB or OPM.  *See Veit v. Heckler*, 746 F.2d 508 (9th Cir. 1984); *Saul v. United States*, 928 F.2d 829 (9th Cir. 1991) (individual employee); *Russell v. U.S. Dep't of the Army*, 191 F.3d 1016 (9th Cir. 1999) (same).

[12] *See* 5 U.S.C. §7701 (MSPB appeals limited to "employee" or "applicant" claims challenging employer actions listed in §7512); §7703 (appeal rights similarly limited); §§7103(a)(1), 7118 (FLRA: individual, labor organization, or agency); §7123 (FLRA: appeal rights similarly limited).  The FLRA expressly cannot hear disputes arising from "government-wide" action.  *NTEU and Dep't of Treasury, IRS*, 60 F.L.R.A. 783, 783 (2005); 5 U.S.C. §7117(a)(1).

1    other service providers whose jobs are impacted by the EO-directed reorganization and RIFs.  *See,*

2    *e.g.*, ECF 41-5 ¶¶7-49 (O'Brien); ECF 37-3 ¶¶4-11 (Adler); ECF 37-22 ¶¶3-14 (Jefferies); ECF 41-3

3    ¶¶3, 6-15 (Nelson).  Those impacted members are third parties to any relationship between federal

4    employees and their employing agencies.  As the Ninth Circuit recently noted, the notion that

5    Congress intended such third-party plaintiffs' claims to be sent to these agencies lacks any support.

6    *AFGE v. OPM*, 2025 WL 914823, at *1 (9th Cir. Mar. 26, 2025) ("Nor have appellants

7    demonstrated—under existing authority—that they are likely to establish that Congress has channeled

8    the organizational plaintiffs' claims to administrative agencies."); *see also Feds for Med. Freedom v.*

9    *Biden*, 63 F.4th 366, 375 (5th Cir.) (en banc), *judgment vac'd as moot*, 144 S.Ct. 480 (2023)

10   (employee organization challenge to government-wide federal employee vaccine mandate was not

11   channeled to MSPB or FLRA).  Defendants previously invoked *United States v. Fausto*, 484 U.S.

12   439, 455 (1988) (ECF 60 at 25), which involved an employee's attempt to challenge a personnel

13   action by his employing agency; nothing in that decision requires channeling of third-party claims or

14   claims involving government-wide action simply because they impact federal employment.

15          Moreover, the concept of "channeling" is based entirely on an implied doctrine, which cannot

16   exist divorced from the underlying statutory text.  *E.g.*, *Loper Bright Enters.*, 603 U.S. at 391-92;

17   *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001).  Any such separation would contravene a host of

18   APA precedent, which requires exceptions to judicial review to be read narrowly.  *Dep't of*

19   *Commerce*, 588 U.S. at 771-72 (holding that judicial review in APA is mandatory); *see also U.S.*

20   *Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 601-02 (2016) (holding that administrative

21   review provisions did not foreclose APA review); *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,

22   586 U.S. 9, 22-23 (2018) (holding that express exceptions to APA review must be construed

23   narrowly to effectuate purposes of the Act).  The Congress that enacted the CSRA and FSLMRS

24   referenced the APA at least three times (5 U.S.C. §§1103, 1105, 7134) and cannot be said to have

25   silently demonstrated an intent to eliminate the bedrock principle of APA review.  *Epic Sys. Corp. v.*

26   *Lewis*, 584 U.S. 497, 510 (2018) ("A party seeking to suggest that two statutes cannot be harmonized,

27   and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional

28

intention that such a result should follow.").[13]

Defendants try to shoehorn Plaintiffs' claims into this doctrine by mischaracterizing them as challenging only specific RIF decisions. But the shoe does not fit. The EO, Memo, and ARRPs are not covered employment actions. The MSPB hears only challenges to covered employment actions and the FLRA cannot hear any claim involving a "government-wide rule" at all. *Supra*, n.12.

Applying the three-part analysis from *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-13 (1994), this Court correctly concluded that all of the claims at issue in this case—involving constitutional separation of powers issues and APA challenges to the implementation of government-wide Executive Order and OMB/OPM Memorandum—fail all three factors. ECF 85 at 23-35. As to the first factor, meaningful judicial review of these claims would be foreclosed because no Plaintiff can ever sue the President, OMB, OPM, or DOGE before these agencies, and even the federal employee labor unions cannot sue the Federal Agency Defendants for arbitrary and capricious ARRPs implementing a government-wide Executive Order. *Thunder Basin*, 510 U.S. at 207. Moreover, "meaningful" judicial review must account for the type of claim and relief Congress intended, particularly for APA claims (for which the Supreme Court has said judicial review years after agency adjudication is not meaningful, *Hawkes*, 578 U.S. at 601-02).

As to the second factor, Plaintiffs' claims are "wholly collateral" to the CSRA's scheme because they do not challenge individual adverse personnel actions or employer actions under a contract; they concern separation of powers issues and challenge the substantive and procedural lawfulness of the EO and its implementation. *Thunder Basin*, 510 U.S. at 212.

And as to the third, the labor agencies have no particular expertise in resolving constitutional and administrative law questions. *Loper Bright Enters.*, 603 U.S. at 399.

This Court's correct ruling should be extended to the new Plaintiffs as well.

---

[13] This Court also correctly held that the claims brought by the federal union Plaintiffs are not of the type that Congress intended to be heard by administrative agencies. ECF 85 at 23-24. While employees and their labor representatives can bring *certain* claims before these agencies, they cannot bring *these* claims involving constitutional separation of powers issues and APA challenges to the implementation of government-wide Executive Order and OMB/OPM Memorandum, for the same reasons explained above.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II. Plaintiffs' Proposed Relief Is Necessary to Maintain the Status Quo for the Duration of this Litigation and to Prevent Ongoing Nationwide Irreparable Harm

Intervention in the form of a preliminary injunction is necessary to protect the status quo and this Court's authority to enter relief ultimately vacating and remedying unlawful government action. Plaintiffs first describe the injunction they seek and then discuss legal issues pertaining to that relief.

### A. Plaintiffs' Proposed Injunction

As set forth in Plaintiffs' motion and proposed order, Plaintiffs seek a preliminary injunction that enjoins and/or stays Defendants OMB, OPM, DOGE, and the Federal Agency Defendants from implementing or enforcing Sections 3(c) and (e) of the EO or any portion of the Memo, including any OMB/OPM approval or disapproval of ARRPs, DOGE directives to eliminate programs or staff, or Federal Agency Defendant implementation of ARRPs, including but not limited to elimination, consolidation, or transfer of programs, functions, or offices; issuance or execution of RIF notices; or placement of employees on administrative leave, among any other actions required by the ARRPs.

Plaintiffs seek further to enjoin DOGE to rescind and take no further action to enforce any prior orders or directives regarding ARRPs, and to enjoin Federal Agency Defendants to rescind and cease enforcement of previous actions to enforce the EO or Memo, including by rescinding RIFs, restoring offices, programs, and functions, and transferring employees to administrative leave status.

Finally, Plaintiffs request that the Court set deadlines for Defendants to provide a proposed compliance plan, for Plaintiffs to review and respond to that plan, and for a joint submission to the Court of an agreed-upon plan or Defendants' proposal and Plaintiffs' objections.

### B. The Injunction Protects the Status Quo

The status quo is "the legally relevant relationship between the parties before the controversy arose." *Fellowship of Christian Athletes*, 82 F.4th at 684-85. Thus, in *Doe #1 v. Trump*, the Ninth Circuit squarely rejected the government's argument that implementation of the challenged government action constituted the relevant status quo for purpose of a preliminary injunction: "In the government's re-imagining of the status quo in this context, this factor would always tip in the government's favor, effectively rendering the Court powerless to exercise its discretion[.]" 957 F.3d 1050, 1068-69 (9th Cir. 2020). Instead, the Ninth Circuit held that it was the government's action

"that altered the status quo for the Plaintiffs." *Id*. at 1068.  Likewise here, the last uncontested status before the "controversy arose" was prior to the President's unconstitutional EO, prior to OMB/OPM's unlawful Memo and any unlawful DOGE directions, and prior to any Federal Defendant Agency action implementing these unlawful directives, including by (but not limited to) RIFs and actions reorganizing agencies pursuant to the unlawful EO and Memo.  The requested preliminary injunction restores that status quo.

To be clear, the requested injunction would not order *reinstatement* of employees to former federal employment.  As far as Plaintiffs are aware, no employees have yet been separated from service due to the EO and Memo; they have received RIF notices and, in some cases, been placed on paid administrative leave in advance of separation.  ECF 37-1 at 12, ECF 70 at 13 & nn. 27-28.  The injunction would thus require only that Defendants undo actions taken to implement the EO and Memo by, *inter alia*, rescinding pending RIF notices and allowing employees to resume work rather than be paid the same amount and receive the same benefits to remain on paid administrative leave.  While, as here, "it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, … such an injunction restores, rather than disturbs, the status quo ante." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).

### C.    The Scope of the Injunction Is Necessitated by the Scope of Defendants' Government-Wide Actions and Extent of the Harm to Plaintiffs

It is axiomatic that "courts must tailor the scope [of injunctions] 'to meet the exigencies of the particular case.'"  *Cal. v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)).  Broad relief is appropriate when it is "'*necessary* to give prevailing parties the relief to which they are entitled.'"  *Azar*, 911 F.3d at 583 (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987)) (emphasis in *Azar*).

As an initial matter, it would be impossible to take a piecemeal approach to relief here. Plaintiffs have shown injury to themselves and their members across the country. And the harms Plaintiffs complain of arise from implementation of the EO, which is impacting Federal Agency Defendants' ability to provide key public services throughout the country, ranging from the loss of food safety inspections, farm certifications, food service programs, and research by USDA, with impacts to local governments, as well as Plaintiffs Western Watersheds Project, Northeast Organic

Farming Association, American Geophysical Union, and to unions like AFSCME (impacts to federal, state, and local employee members) and AFGE (impacts to federal members);[14] to the devastation wreaked by gutting HHS and its ability to maintain, *inter alia*, lead exposure testing, monitoring and prevention of infectious diseases, research and funding to prevent overdose, suicide, drowning, motor vehicle crashes, and other injuries, support of Head Start programs, safety inspections for mines, and research into reducing cancer risks for firefighters, with impacts on AFGE's federal employee members, on unions representing state and local employees (SEIU and AFSCME), on nonprofit Plaintiffs American Public Health Association and NRDC, and on each of the local government Plaintiffs.[15]  Plaintiffs are harmed by Defendants' actions occurring all across the country, and in centralized offices, that are far from the physical location of the Plaintiffs and their members.[16]  It would be nearly impossible, if not impossible, for the Court to slice and dice injunctive relief, creating a patchwork among Plaintiffs' members—who are spread throughout the country—and the harms emanating from layoffs, reorganization of agencies, and cuts to agency services.  *Cf. City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020) (limiting injunction to California's geographical boundaries because plaintiffs operated within "neat geographic boundaries," while distinguishing case from one "involving plaintiffs that operate and suffer harm in a number of jurisdictions, where the process of tailoring an injunction may be more complex").

Further, where, as here, the action complained of is unconstitutional not simply as applied to certain plaintiffs, but across the board, a nationwide injunction is appropriate and necessary.  *See*

---

[14] ECF 37-59 ¶¶23-28 (Chicago); ECF 37-46 ¶¶10-12 (Harris County); ECF 37-37 ¶¶18-21 (NOFA); ECF 37-40 ¶¶28-33 (WWP); ECF 37-45 ¶19 (AGU); ECF 37-4 ¶¶14-24 (AFSCME); ECF 37-31 ¶¶15-24 (AFGE).

[15] ECF 37-36 ¶¶12-34 (APHA); ECF 37-56 ¶¶4-5, 7-8 (San Francisco); ECF 37-52 ¶¶6-23 (Chicago); ECF 37-54 ¶¶37-43 (Baltimore); ECF 37-46 ¶¶13-26 (Harris County); ECF 41-6 ¶¶33-34 (King County); ECF 37-58 ¶¶35-39 (Santa Clara County); ECF 37-21 ¶¶22-28 (AFGE); ECF 41-4 ¶¶21-31 (AFGE); ECF 41-5 ¶¶4-16 (AFSCME); ECF 37-30 ¶¶7-16 (SEIU); Olson Decl. ¶¶29-38 (NRDC).

[16] Plaintiff unions and nonprofit organizations are not geographically limited.  *See, e.g.*, ECF 37-23 ¶2 (AFGE); ECF 37-26 ¶4 (SEIU); ECF 37-36 ¶2 (APHA); ECF 37-39 ¶2 (ARA).  Plaintiff cities and counties' injuries derive not only (or even mainly) from termination of federal employees employed therein, but also the evisceration of federal programs that are based in Washington, D.C. or throughout the country. *See, e.*g., McKinzie Decl. ¶¶7-20 (NRDC); ECF 37-46 ¶¶12-26 (Harris County); ECF 37-47 ¶4(c) (San Francisco County); ECF 41-6 ¶¶22(e), 29-31 (King County); Williams Supp. Decl. ¶¶5-15 (Santa Clara); ECF 37-59 ¶¶4-6 (Chicago); ECF 37-57 ¶¶5-7 (Chicago); ECF 37-56 ¶¶4-10 (San Francisco); ECF 37-54 ¶¶15-19 (Baltimore).

1    *County of Santa Clara v. Trump*, 250 F.Supp.3d 497, 539 (N.D. Cal. 2017), quoted in *PFLAG, Inc. v.*

2    *Trump*, No. CV 25-337-BAH, 2025 WL 510050, at *24 (D. Md. Feb. 14, 2025).  It would make no

3    sense for this Court to rule that the actions of the President, OMB, OPM, and DOGE are ultra vires

4    and should be enjoined only as to members of the Plaintiffs and to residents of the Plaintiff local

5    governments, and yet could somehow otherwise be permitted to continue.

6         Separately, the APA's directive to "hold unlawful and set aside agency action," is not limited

7    by "geographic boundaries."  *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir.

8    2020).  Thus, the "ordinary result [in an APA case] is that the rules are vacated—not that their

9    application to the individual petitioners is proscribed.'"  *Regents of Univ. of Cal. v. DHS Sec'y*, 908

10   F.3d 476, 511 (9th Cir. 2018), *vacated in part on other grounds*, 591 U.S. 1 (2020) (cleaned up);

11   *accord Pangea Legal Servs. v. DHS*, 501 F.Supp.3d 792, 827-28 (N.D. Cal. 2020).

12        **D.      The Proposed Injunction Does Not Exceed the Equitable Powers of this Court**

13        This Court is well within both its intrinsic equitable powers and the APA to require

14   Defendants to rescind their unlawful actions.  Federal courts have the equitable power to grant

15   injunctive relief "with respect to violations of federal law by federal officials."  *Armstrong v.*

16   *Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (citing *American Sch. of Magnetic Healing v.*

17   *McAnnulty*, 187 U.S. 94, 110 (1902)).  "[W]hen district courts are properly acting as courts of equity,

18   they have discretion unless a statute clearly provides otherwise."  *U.S. v. Oakland Cannabis Buyers'*

19   *Coop.*, 532 U.S. 483, 496 (2001); *see also Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) ("The

20   essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each

21   decree to the necessities of the particular case.  Flexibility rather than rigidity has distinguished it.").

22        Further, under the APA, courts are empowered to "'set aside' [unlawful] agency action,"

23   which is "more than a mere non-enforcement remedy."  *Griffin v. HM Florida-ORL, LLC*, 144 S. Ct.

24   1, 2 n.1, (2023) (Kavanaugh, J., concurring in the denial of the application for stay) (Mem.).  The "set

25   aside" remedy also encompasses "the power to 'strike down' an agency's work," so that "the

26   disapproved agency action is treated as though it had never happened."  *Id.*; *see also Monsanto v.*

27   *Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (recognizing vacatur as a presumptively

28   appropriate remedy for APA violation); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279,

1  1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action.").  "Vacatur [of

2  agency action] retroactively undoes or expunges a past [agency] action. … [V]acatur unwinds the

3  challenged agency action."  *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir.

4  2021).  Thus, in this case, the standard remedy of vacatur includes the rescission of the actions taken

5  to date to implement the EO, including through the ARRPs, and including but not limited to

6  unlawfully issued RIF notices, DOGE directives, ARRP approvals, and administrative leave

7  placements, because only that will actually "undo[]" or "expunge[]" the unlawful agency action.  *Id.*

8  This injunction is also consistent with 5 U.S.C. §705's broad grant of authority to "issue all necessary

9  and appropriate process to postpone the effective date of an agency action or to preserve status or

10 rights pending conclusion of the review proceedings" to "the extent necessary to prevent irreparable

11 injury."  5 U.S.C. §705.  Such an order enjoining the actions *caused* by the EO does not preclude the

12 government from planning, proposing, and engaging in action authorized by Congress, but to do so

13 the government would need to comply with all applicable laws, including the APA.  *Cf. NTEU v.*

14 *Vought*, D.C. Circuit Case No. 25-5091 (Apr. 28, 2025 Order:  lifting stay pending appeal to allow

15 district court's injunction of further RIFs, where stay order permitted RIFs based on agency's

16 "particularized assessment" and defendants issued RIFs of "nearly 90 percent of agency employees").

## CONCLUSION

18     For the foregoing reasons, Plaintiffs respectfully request this Court grant this Motion and

19 enter the accompanying proposed preliminary injunction.

21 DATED: May 14, 2025                    Stacey M. Leyton
                                        Barbara J. Chisholm
22                                      Danielle E. Leonard
                                        Corinne Johnson
23                                      Alice X. Wang
                                        Robin S. Tholin
24                                      Aaron Schaffer-Neitz
                                        ALTSHULER BERZON LLP
25                                      177 Post St., Suite 300
                                        San Francisco, CA 94108
26                                      Tel.: (415) 421-7151
                                        Fax: (415) 362-8064
27                                      sleyton@altshulerberzon.com
                                        bchisholm@altshulerberzon.com

1    dleonard@altshulerberzon.com

2    By: */s/ Danielle Leonard*

3    *Attorneys for All Union and Non-Profit Organization*
4    *Plaintiffs*

5

6    Elena Goldstein (pro hac vice)
     Skye Perryman (pro hac vice)
7    Tsuki Hoshijima (pro hac vice)
     DEMOCRACY FORWARD FOUNDATION
8    P.O. Box 34553
     Washington, D.C. 20043
9    Tel: (202) 448-9090
     Fax: (202) 796-4426
10   egoldstein@democracyforward.org
11   sperryman@democracyforward.org

12   By: */s/ Elena Goldstein*

13   *Attorneys for All Union and Non-Profit Organization*
     *Plaintiffs (except NRDC) and for Plaintiffs City of*
14   *Chicago, IL; Martin Luther King, Jr. County, WA;*
     *Harris County, TX; and City of Baltimore, MD*
15

16

17   Jules Torti (pro hac vice)
     PROTECT DEMOCRACY PROJECT
18   82 Nassau St., #601
     New York, NY 10038

19
     Erica J. Newland (pro hac vice)
20   Jacek Pruski (pro hac vice)
     PROTECT DEMOCRACY PROJECT
21   2020 Pennsylvania Ave., N.W., Suite 163
     Washington, D.C. 20006
22   Tel: 202-579-4582
     jules.torti@protectdemocracy.org
23   erica.newland@protectdemocracy.org
24   jacek.pruski@protectdemocracy.org

25   By: */s/ Jules Torti*

26   *Attorneys for All Union and Non-Profit Organization*
27   *Plaintiffs (except NRDC)*

28

Norman L. Eisen (pro hac vice)
Spencer W. Klein (pro hac vice app. forthcoming)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Spencer@statedemocracydefenders.org

By: */s/ Norman L. Eisen*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC)*


Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*

*Attorney for Plaintiffs American Federation of Government Employees, AFL-CIO (AFGE) and AFGE locals*


Teague Paterson (SBN 226659)
Matthew Blumin (pro hac vice)
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.
Washington, D.C. 20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

By: */s/ Teague Paterson*

*Attorneys for Plaintiff American Federation of State County and Municipal Employees, AFL-CIO (AFSCME)*


Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL UNION,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

By: */s/ Steven K. Ury*                                    

*Attorney for Plaintiff Service Employees International
Union, AFL-CIO (SEIU)*


David Chiu (SBN 189542)
City Attorney
Yvonne R. Meré (SBN 175394)
Chief Deputy City Attorney
Mollie M. Lee (SBN 251404)
Chief of Strategic Advocacy
Sara J. Eisenberg (SBN 269303)
Chief of Complex and Affirmative Litigation
Molly J. Alarcon (SBN 315244)
Alexander J. Holtzman (SBN 311813)
Deputy City Attorneys
OFFICE OF THE CITY ATTORNEY FOR THE CITY
AND COUNTY OF SAN FRANCISCO
1390 Market Street, 7th Floor
San Francisco, CA 94102
molly.alarcon@sfcityatty.org
alexander.holtzman@sfcityatty.org

By: */s/ David Chiu*                                    

*Attorneys for Plaintiff City and County of San Francisco*


Tony LoPresti (SBN 289269)
COUNTY COUNSEL
Kavita Narayan (SBN 264191)
Meredith A. Johnson (SBN 291018)
Raphael N. Rajendra (SBN 255096)
Hannah M. Godbey (SBN 334475)
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, 9th Floor
San José, CA 95110
Tel: (408) 299-5900

By: */s/ Tony LoPresti*

1

2

*Attorneys for Plaintiff County of Santa Clara, Calif.*

3

4

David J. Hackett (pro hac vice)
General Counsel to King County Executive & Special
Deputy Prosecutor

5

Alison Holcomb (pro hac vice)
Deputy General Counsel to King County Executive &
Special Deputy Prosecutor

6

Erin King-Clancy (pro hac vice app. forthcoming)

7

Senior Deputy Prosecuting Attorney
OFFICE OF KING COUNTY PROSECUTING
ATTORNEY LEESA MANION

8

401 5th Avenue, Suite 800

9

Seattle, WA 98104
(206) 477-9483

10

David.Hackett@kingcounty.gov
aholcomb@kingcounty.gov

11

aclancy@kingcounty.gov

12

By: */s/ David J. Hackett* _____

13

*Attorneys for Plaintiff Martin Luther King, Jr. County*

14

Sharanya Mohan (SBN 350675)

15

PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115

16

Oakland, CA 94609
Tel: (510) 738-6788

17

sai@publicrightsproject.org

18

By: */s/ Sharanya Mohan* _____

19

*Attorney for Plaintiffs Baltimore, MD, Chicago, IL,*

20

*Harris County, TX, and King County, WA*

21

22

Christian D. Menefee
Harris County Attorney

23

Jonathan G.C. Fombonne (pro hac vice app. forthcoming)

24

Deputy County Attorney and First Assistant
Tiffany Bingham (pro hac vice app. forthcoming)

25

Managing Counsel
Sarah Utley (pro hac vice app. forthcoming)

26

Division Director – Environmental Division
Bethany Dwyer (pro hac vice app. forthcoming)

27

Deputy Division Director - Environmental Division
R. Chan Tysor (pro hac vice)

28

Senior Assistant County Attorney

Alexandra "Alex" Keiser (pro hac vice)
Assistant County Attorney
1019 Congress, 15th Floor
Houston, Texas 77002
Tel.: (713) 274-5102
Fax: (713) 437-4211

jonathan.fombonne@harriscountytx.gov
tiffany.bingham@harriscountytx.gov
sarah.utley@harriscountytx.gov
bethany.dwyer@harriscountytx.gov
chan.tysor@harriscountytx.gov
alex.keiser@harriscountytx.gov

By:  */s/ Jonathan G.C. Fombonne*

*Attorneys for Plaintiff Harris County, Texas*


Mary B. Richardson-Lowry,
Corporation Counsel of the City of Chicago

Stephen J. Kane (IL ARDC 6272490) (pro hac vice app. forthcoming)
Rebecca A. Hirsch (IL ARDC 6279592) (pro hac vice app. forthcoming)
Lucy Prather (IL ARDC 6337780) (pro hac vice)
City of Chicago Department of Law,
Affirmative Litigation Division
121 N LaSalle Street, Suite 600
Chicago, Illinois 60602
Tel: (312) 744-6934
Stephen.kane@cityofchicago.org
Rebecca.Hirsch2@cityofchicago.org
Lucy.Prather@cityofchicago.org

By:  */s/ Stephen J. Kane*

*Attorneys for Plaintiff City of Chicago*


Ebony M. Thompson
Baltimore City Solicitor

Sara Gross (pro hac vice app. forthcoming)
Chief of Affirmative Litigation
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Tel: (410) 396-3947

1

sara.gross@baltimorecity.gov

2

By: */s/ Sara Gross*

3

*Attorneys for Plaintiff City of Baltimore*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Appendix A

Federal Register

Vol. 90, No. 30

Friday, February 14, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14210 of February 11, 2025

## Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose.* To restore accountability to the American public, this order commences a critical transformation of the Federal bureaucracy. By eliminating waste, bloat, and insularity, my Administration will empower American families, workers, taxpayers, and our system of Government itself.

**Sec. 2.** *Definitions.* (a) "Agency" has the meaning given to it in section 3502 of title 44, United States Code, except that such term does not include the Executive Office of the President or any components thereof.

(b) "Agency Head" means the highest-ranking official of an agency, such as the Secretary, Administrator, Chairman, or Director, unless otherwise specified in this order.

(c) "DOGE Team Lead" means the leader of the Department of Government Efficiency (DOGE) Team at each agency, as defined in Executive Order 14158 of January 20, 2025 (Establishing and Implementing the President's "Department of Government Efficiency").

(d) "Employee" has the meaning given to it by section 2105 of title 5, United States Code, and includes individuals who serve in the executive branch and who qualify as employees under that section for any purpose.

(e) "Immigration enforcement" means the investigation, enforcement, or assisting in the investigation or enforcement of Federal immigration law, including with respect to Federal immigration law that penalizes a person's presence in, entry, or reentry to, or employment in, the United States, but does not include assisting individuals in applying for immigration benefits or efforts to prevent enforcement of immigration law or to prevent deportation or removal from the United States.

(f) "Law enforcement" means:

(i) engagement in or supervision of the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law; or

(ii) the protection of Federal, State, local, or foreign government officials against threats to personal safety.

(g) "Temporary employee" has the meaning given to it in 5 C.F.R. part 316.

(h) "Reemployed annuitant" has the meaning given to it in 5 C.F.R. part 837.

**Sec. 3.** *Reforming the Federal Workforce to Maximize Efficiency and Productivity.* (a) *Hiring Ratio.* Pursuant to the Presidential Memorandum of January 20, 2025 (Hiring Freeze), the Director of the Office of Management and Budget shall submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition (Plan). The Plan shall require that each agency hire no more than one employee for every four employees that depart, consistent with the plan and any applicable exemptions and details provided for in the Plan. This order does not affect the standing freeze on hiring as applied to the Internal Revenue Service. This ratio shall not apply to functions related to public safety, immigration

enforcement, or law enforcement. Agency Heads shall also adhere to the Federal Hiring Plan that will be promulgated pursuant to Executive Order 14170 of January 20, 2025 (Reforming the Federal Hiring Process and Restoring Merit to Government Service).

(b) *Hiring Approval.* Each Agency Head shall develop a data-driven plan, in consultation with its DOGE Team Lead, to ensure new career appointment hires are in highest-need areas.

(i) This hiring plan shall include that new career appointment hiring decisions shall be made in consultation with the agency's DOGE Team Lead, consistent with applicable law.

(ii) The agency shall not fill any vacancies for career appointments that the DOGE Team Lead assesses should not be filled, unless the Agency Head determines the positions should be filled.

(iii) Each DOGE Team Lead shall provide the United States DOGE Service (USDS) Administrator with a monthly hiring report for the agency.

(c) *Reductions in Force.* Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs. All offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website. This subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement.

(d) *Rulemaking.* Within 30 days of the date of this order, the Director of the Office of Personnel Management (OPM) shall initiate a rulemaking that proposes to revise 5 C.F.R. 731.202(b) to include additional suitability criteria, including:

(i) failure to comply with generally applicable legal obligations, including timely filing of tax returns;

(ii) failure to comply with any provision that would preclude regular Federal service, including citizenship requirements;

(iii) refusal to certify compliance with any applicable nondisclosure obligations, consistent with 5 U.S.C. 2302(b)(13), and failure to adhere to those compliance obligations in the course of Federal employment; and

(iv) theft or misuse of Government resources and equipment, or negligent loss of material Government resources and equipment.

(e) *Developing Agency Reorganization Plans.* Within 30 days of the date of this order, Agency Heads shall submit to the Director of the Office of Management and Budget a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities. The report shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated.

(f) Within 240 days of the date of this order, the USDS Administrator shall submit a report to the President regarding implementation of this order, including a recommendation as to whether any of its provisions should be extended, modified, or terminated.

**Sec. 4.** *Exclusions.* (a) This order does not apply to military personnel.

(b) Agency Heads may exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities.

(c) The Director of OPM may grant exemptions from this order where those exemptions are otherwise necessary and shall assist in promoting workforce reduction.

**Sec. 5**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 11, 2025.*

[FR Doc. 2025–02762
Filed 2–13–25; 11:15 am]
Billing code 3395–F4–P

# Appendix B

 

U.S. Office of
Management and Budget

U.S. Office of
Personnel Management

# MEMORANDUM

| | |
|---|---|
| **TO:** | Heads of Executive Departments and Agencies |
| **FROM:** | Russell T. Vought, Director, Office of Management and Budget; Charles Ezell, Acting Director, Office of Personnel Management. |
| **DATE**: | February 26, 2025 |
| **RE**: | Guidance on Agency RIF and Reorganization Plans Requested by *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* |

### I.  Background

The federal government is costly, inefficient, and deeply in debt. At the same time, it is not producing results for the American public. Instead, tax dollars are being siphoned off to fund unproductive and unnecessary programs that benefit radical interest groups while hurting hard-working American citizens.

The American people registered their verdict on the bloated, corrupt federal bureaucracy on November 5, 2024 by voting for President Trump and his promises to sweepingly reform the federal government.

On February 11, 2025, President Trump's Executive Order *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (*Workforce Optimization*) "commence[d] a critical transformation of the Federal bureaucracy." It directed agencies to "eliminat[e] waste, bloat, and insularity" in order to "empower American families, workers, taxpayers, and our system of Government itself."

President Trump required that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law." President Trump also directed that, **no later than March 13, 2025**, agencies develop Agency Reorganization Plans.

The U.S. Office of Management and Budget ("OMB") and the U.S. Office of Personnel Management ("OPM") now submit guidance on these Agency RIF and Reorganization Plans ("ARRP"), along with the instruction that such plans be submitted to OMB and OPM.

### II.  Principles to Inform ARRPs

ARRPs should seek to achieve the following:

1.  Better service for the American people;

2. Increased productivity;

3. A significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required;

4. A reduced real property footprint; and

5. Reduced budget topline.

Pursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions.

Agencies should also seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical; implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities; close and/or consolidate regional field offices to the extent consistent with efficient service delivery; and maximally reduce the use of outside consultants and contractors. When taking these actions, agencies should align closures and/or relocation of bureaus and offices with agency return-to-office actions to avoid multiple relocation benefit costs for individual employees.

Agencies should review their statutory authority and ensure that their plans and actions are consistent with such authority.

Agency heads should collaborate with their Department of Government Efficiency ("DOGE") team leads within the agency in developing competitive areas for ARRPs. In addition, the agency should specifically identify competitive areas that include positions not typically designated as essential during a lapse in appropriations. When making this determination, agencies should refer to the functions that are excepted from the Antideficiency Act (ADA) in the Agency Contingency Plans submitted to OMB in 2019 as the starting point for making this determination.

III.    **Available Tools**

In their ARRPs, agencies should employ all available tools to effectuate the President's directive for a more effective and efficient government and describe how they will use each. Such tools include:

1. Continuing to comply with the hiring freeze outlined in the January 20, 2025 Presidential Memorandum *Hiring Freeze* or (with approval of OPM and OMB) implementing the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart;

2. Establishing internal processes that ensure agency leadership has visibility and/or direct sign-off on all potential job offers and candidates prior to extending offers;

3. Eliminating non-statutorily mandated functions through RIFs (Appendix 1 contains a sample timeline);

4. Removing underperforming employees or employees engaged in misconduct, and continuing to evaluate probationary employees;

5. Reducing headcount through attrition and allowing term or temporary positions to expire without renewal;

6. Separating reemployed annuitants in areas likely subject to RIFs; and

7. Renegotiating provisions of collective bargaining agreements (CBAs) that would inhibit enhanced government efficiency and employee accountability.

ARRPs should also list the competitive areas for large-scale reductions in force, the RIF effective dates (which may be a date prior to when the plan is submitted), the expected conclusion of the RIFs, the number of FTEs reduced, and additional impact of RIFs such as cancellation of related contracts, leases or overhead.

Agencies should also closely consider changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking, that would lead to the reduction or elimination of agency subcomponents or speed up the implementation of ARRPs.

### IV.    Phase 1 ARRPs

Each agency will submit a Phase 1 ARRPs to OMB and OPM for review and approval **no later than March 13, 2025**. Phase 1 ARRPs shall focus on initial agency cuts and reductions. Each Phase 1 ARRP should identify:

1. A list of agency subcomponents or offices that provide direct services to citizens. Such subcomponents or offices should be included in ARRPs to improve services to citizens while eliminating costs and reducing the size of the federal government. But for service delivery subcomponents or offices, implementation shall not begin until certified by OMB and OPM as resulting in a positive effect on the delivery of such services.

2. Any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities. Agency leadership must confirm statutes have not been interpreted in a way that expands requirements beyond what the statute actually requires. Instead, statutes should be interpreted to cover only what functions they explicitly require.

3. All agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations (because the functions performed by such employees do not fall under an exception to the ADA) using the Agency Contingency Plans submitted to OMB in 2019 referenced above.

4. Whether the agency or any of its subcomponents should be eliminated or consolidated; and which specific subcomponents or functions, if any, should be expanded to deliver on the President's priorities.

5. The specific tools the agency intends to use to achieve efficiencies, including, as to each, the number of FTEs reduced and any potential savings or costs associated with such actions in Fiscal Years 2025, 2026 and 2027:

   a. Continuation of the current hiring freeze;
   b. Regular attrition (e.g., retirement, movement between agencies and the private sector);
   c. Attrition through enhanced policies governing employee performance and conduct;
   d. Attrition through the termination or non-renewal of term or limited positions or reemployed annuitants;
   e. Attrition achieved by RIFs. Please refer to Appendix 1 for specific steps and timing. For purposes of the Phase 1 ARRP, the agency should include the following information:

      i. The competitive areas and organizational components that the agency has targeted or will target for initial RIFs, and
      ii. The agency's target for reductions in FTE positions via RIFs.

6. A list by job position of all positions categorized as essential for purposes of exclusion from large-scale RIFs, including the number per each job position and total by agency and subcomponent.

7. The agency's suggested plan for congressional engagement to gather input and agreement on major restructuring efforts and the movement of fundings between accounts, as applicable, including compliance with any congressional notification requirements.

8. The agency's timetable and plan for implementing each part of its Phase 1 ARRP.

## V.    Phase 2 ARRPs

Agencies should then submit a Phase 2 ARRP to OMB and OPM for review and approval **no later than April 14, 2025**. Phase 2 plans shall outline a positive vision for more productive, efficient agency operations going forward. Phase 2 plans should be planned for implementation by September 30, 2025. The Phase 2 plan should include the following additional information:

1. The agency's proposed future-state organizational chart with its functional areas, consolidated management hierarchy, and position titles and counts clearly depicted.

2. Confirmation that the agency has reviewed all personnel data, including each employee's official position description, four most recent performance ratings of record, retention service computation date, and veterans' preference status.

3. The agency's plan to ensure that employees are grouped, to the greatest extent possible, based on like duties and job functions to promote effective collaboration and management, and that the agency's real estate footprint is aligned with cross-agency efforts coordinated by GSA to establish regional federal office hubs.

4. Any proposed relocations of agency bureaus and offices from Washington, D.C. and the National Capital Region to less-costly parts of the country.

5. The competitive areas for subsequent large-scale RIFs.

6. All reductions, including FTE positions, term and temporary positions, reemployed annuitants, real estate footprint, and contracts that will occur in relation to the RIFs.

7. Any components absorbing functions, including how this will be achieved in terms of FTE positions, funding, and space.

8. The agency's internal processes that ensure agency leadership has visibility and/or direct sign-off on all potential job offers and candidates prior to extending offers.

9. The agency's data-driven plan to ensure new career appointment hires are in highest-need areas and adhere to the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart. Until the agency has finalized its post-hiring-freeze plan, agencies should continue to adhere to the current hiring freeze.

10. Any provisions of collective bargaining agreements that would inhibit government efficiency and cost-savings, and agency plans to renegotiate such provisions.

11. An explanation of how the ARRPs will improve services for Americans and advance the President's policy priorities.

12. The framework and criteria the agency has used to define and determine efficient use of existing personnel and funds to improve services and the delivery of these services.

13. For agencies that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care), the agency's certification that implementation of the ARRPs will have a positive effect on the delivery of such services. The certification should include a written explanation from the Agency Head and, where appropriate, the agency's CIO and any relevant program manager.

14. The programs and agency components not impacted by the ARRP, and the justification for any exclusion.

5

15. Plans to reduce costs and promote efficiencies through improved technology, including through the adoption of new software or systems, and elimination of duplicative systems.

16. Any changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking, that would lead to the reduction or elimination of agency subcomponents, or speed up implementation of ARRPs.

17. The agency's timetable and plan for implementing each part of its Phase 2 ARRP, and its plan for monitoring and accountability in implementing its ARRPs.

Agencies should continue sending monthly progress reports each month on May 14, 2025, June 16, 2025, and July 16, 2025. All plans and reports requested by this memorandum should be submitted to OPM at tracking@opm.gov and OMB at workforce@omb.eop.gov; when submitting plans and reports, please ensure both OPM and OMB addresses are included on the message.

## VI.  Exclusions

Nothing in this memorandum shall have any application to:

1. Positions that are necessary to meet law enforcement, border security, national security, immigration enforcement, or public safety responsibilities;

2. Military personnel in the armed forces and all Federal uniformed personnel, including the U.S. Coast Guard, the Commissioned Corps of the U.S. Public Health Service, and the Commissioned Officer Corps of the National Oceanic and Atmospheric Administration;

3. Officials nominated and appointed to positions requiring Presidential appointment or Senate confirmation, non-career positions in the Senior Executive Service or Schedule C positions in the excepted service, officials appointed through temporary organization hiring authority pursuant to 5 U.S.C. § 3161, or the appointment of any other non-career employees or officials, if approved by agency leadership appointed by the President;

4. The Executive Office of the President; or

5. The U.S. Postal Service.

Finally, agencies or components that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care) shall not implement any proposed ARRPs until OMB and OPM certify that the plans will have a positive effect on the delivery of such services.

cc: Chief Human Capital Officers ("*CHCOs*"), Deputy CHCOs, Human Resources Directors, Chiefs of Staff, and DOGE team leads.

## Appendix 1- Sample RIF Timeline

This sample timeline is prepared in accordance with the U.S. Office of Personnel Management **Workforce Reshaping Operations Handbook.** RIF timing may vary based on agency-specific requirements, collective bargaining agreements, and workforce considerations. Agencies can accelerate these timelines through parallel processing, securing OPM waivers to policy, expediting process steps, and streamlining stakeholder coordination.

**Step 1: Identification of Competitive Areas and Levels (by March 13, 2025 for Phase 1 ARRPs)**

1. Identify competitive areas and levels and determine which positions may be affected. If applicable, seek OPM waiver approval to adjust competitive areas within 90 days of the RIF effective date.
2. For Phase 1 ARRPs, this step should be completed no later than March 13, 2025.

**Step 2: Planning, Preparation & Analysis (up to 30 days)**

1. Explore use of VSIP/VERA.
2. Conduct an impact assessment.
3. Review position descriptions for accuracy, validate competitive levels, and verify employee retention data (e.g., veteran preference, service computation dates).
4. Develop retention register.
5. Draft RIF notices and seek OPM waiver approval for a 30-day notification period.
6. Develop transition materials.
7. Notify unions (if required).
8. Prepare congressional notification (if required).

**Step 3: Formal RIF Notice Period (60 days, shortened to 30 days with an OPM waiver)**

1. Issue official RIF notices.
2. Provide employees with appeal rights, career transition assistance, and priority placement options.
3. Execute any required congressional notification and notice to the Department of Labor, state, and local officials, if applicable.

**Step 4: RIF Implementation & Separation (Final Step)**

1. Officially implement separations, reassignments, or downgrades.
2. Provide final benefits counseling, exit processing, and documentation.
3. Update HR systems and notify OPM of personnel actions.

Appendix C

**Appendix C:  Plaintiff Declarations By Federal Defendant Agency, With Accompanying ECF Docket Numbers**

| Federal Defendant Agency | Union Plaintiff Declarations | Non-Profit Organization Plaintiff Declarations | Local Government Plaintiff Declarations |
|---|---|---|---|
| AmeriCorps | - Blake (AFSCME) (37-6)<br>- Daly (AFSCME) (37-12) | - Benjamin (APHA) (37-36) | - Dively (King County) (41-6) |
| Department of Agriculture | - Kelley (AFGE) (37-23)<br>- Soldner (AFGE) (37-31)<br>- Bachelder (AFSCME) (37-4)<br>- Blake (AFSCME) (37-6)<br>- O'Brien (AFSCME) (41-5)<br>- Adler (SEIU) (37-3)<br>- Neuman (SEIU) (37-26) | - Shultz (AGU) (37-45)<br>- Davis (NOFA) (37-37)<br>- Molvar (WWP) (37-40)<br>- McKinzie (NRDC)* | - Barton (Harris County) (37-46)<br>- Dively (King County) (41-6)<br>- Williams (Santa Clara County) (37-58)<br>- Supp. Williams (Santa Clara County)*<br>- Crispen (San Francisco) (37-49) |
| Department of Commerce | - Kelley (AFGE) (37-23) | - Shultz (AGU) (37-45)<br>- Neubacher (CPANP) (37-41)<br>- McKinzie (NRDC)*<br>- Asmutis-Silvia (NRDC)*<br>- Molvar (WWP) (37-40) | - Leach (Baltimore) (37-54)<br>- Velez (Chicago) (37-57)<br>- Pena (Harris County) (37-55)<br>- Dively (King County) (41-6)<br>- Williams (Santa Clara County) (37-58)<br>- Bechelli (San Francisco)<br>- Jue (San Francisco) |
| Department of Energy | - Braden (AFGE) (37-8)<br>- Kelley (AFGE) (37-23) | - Shultz (AGU) (37-45)<br>- McKinzie (NRDC)* | - Leach (Baltimore) (37-54)<br>- Dively (King County) (41-6)<br>- Jue (San Francisco) (37-53) |

| Federal Defendant Agency | Union Plaintiff Declarations | Non-Profit Organization Plaintiff Declarations | Local Government Plaintiff Declarations |
|---|---|---|---|
| | - Gabel (AFSCME) (37-15) | | |
| Environmental Protection Agency | - Howell (AFGE) (37-19)<br>- Kelley (AFGE) (37-23)<br>- Dreyfus (AFGE Local 1236) (37-13)<br>- Bailey (SEIU) (37-5)<br>- Neuman (SEIU) (37-26) | - Shultz (AGU) (37-45)<br>- Cunningham (NRDC)*<br>- McKinzie (NRDC)*<br>- Olson (NRDC)*<br>- Molvar (WWP) (37-40) | - Leach (Baltimore) (37-54)<br>- Ige (Chicago) (37-52)<br>- Worthington (Chicago) (37-59)<br>- Dively (King County) (41-6)<br>- Williams (Santa Clara County) (37-58)<br>- Jue (San Francisco) (37-53) |
| General Services Administration | - Fabris (AFGE) (37-14)<br>- Kelley (AFGE) (37-23)<br>- Adler (SEIU) (37-3)<br>- Neuman (SEIU) (37-26) | | |
| Department of Health and Human Services | - Garthwaite (AFGE) (37-13)<br>- Jacobs (AFGE) (37-21)<br>- Kelley (AFGE) (37-23)<br>- Niemeier-Walsh (AFGE) (41-4)<br>- Gabel (AFSCME) (37-15)<br>- O'Brien (AFSCME) (41-5)<br>- Adler (SEIU) (37-3)<br>- Neuman (SEIU) (37-26)<br>- Woodard (SEIU Local 521)* | - Benjamin (APHA) (37-36)<br>- McKinzie (NRDC)*<br>- Olson (NRDC)*<br>- Sass (NRDC)* | - Leach (Baltimore) (37-54)<br>- Ige (Chicago) (37-52)<br>- Barton (Harris County) (37-46)<br>- Pena (Harris County) (37-55)<br>- Dively (King County) (41-6)<br>- Williams (Santa Clara County) (37-58)<br>- Supp. Williams (Santa Clara County)*<br>- Philip (San Francisco) (37-56) |

| Federal Defendant Agency | Union Plaintiff Declarations | Non-Profit Organization Plaintiff Declarations | Local Government Plaintiff Declarations |
|---|---|---|---|
| | - Prendiville (SEIU Local 1021) (37-30) | | |
| Department of Housing and Urban Development | - Bobbitt (AFGE) (41-1)<br>- Kelley (AFGE) (37-23)<br>- O'Brien (AFSCME) (41-5)<br>- Adler (SEIU) (37-3)<br>- Neuman (SEIU) (37-26)<br>- Woodard (SEIU Local 521)*<br>- Wander (SEIU Local 1000) (37-34) | | - Leach (Baltimore) (37-54)<br>- Dively (King County) (41-6)<br>- Williams (Santa Clara County) (37-58) |
| Department of the Interior | - Cochran (AFGE) (41-2)<br>- Kelley (AFGE) (37-23)<br>- Adler (SEIU) (37-3)<br>- Neuman (SEIU) (37-26) | - Shultz (AGU) (37-45)<br>- Neubacher (CPANP) (37-41)<br>- McKinzie (NRDC)*<br>- Molvar (WWP) (37-40) | - Dively (King County) (41-6)<br>- Williams (Santa Clara County) (37-58)<br>- Bechelli (San Francisco) (37-47) |
| Department of Labor | - Gamble (AFGE) (37-16)<br>- Gamble Reply (AFGE) (70-2)<br>- Levin (AFGE) (37-24)<br>- Kelley (AFGE) (37-23)<br>- O'Brien (AFSCME) (41-5)<br>- Adler (SEIU) (37-3)<br>- Neuman (SEIU) (37-26) | | - Campos (Chicago) (37-48) |

3

| Federal Defendant Agency | Union Plaintiff Declarations | Non-Profit Organization Plaintiff Declarations | Local Government Plaintiff Declarations |
|---|---|---|---|
| National Labor Relations Board | - O'Brien (AFSCME) (41-5)<br>- Neuman (SEIU) (37-26) | | |
| National Science Foundation | - Kelley (AFGE) (37-23)<br>- Soriano (AFGE) (37-32)<br>- Supp. Soriano (AFGE) (96-1)<br>- Adler (SEIU) (37-3)<br>- Neuman (SEIU) (37-26) | - Shultz (AGU) (37-45)<br>- Molvar (WWP) (37-40) | |
| Peace Corps | - Black (AFSCME)* | | |
| Small Business Administration | - Gustafsson (AFGE) (37-18)<br>- Kelley (AFGE) (37-23)<br>- O'Brien (AFSCME) (41-5)<br>- Neuman (SEIU) (37-26) | - Phetteplace (MSA) (37-43) | - Dively (King County) (41-6)<br>- Bechelli (San Francisco) (37-47) |
| Social Security Administration | - Couture (AFGE ) (37-11)<br>- Kelley (AFGE) (37-23)<br>- Wilson (AFGE Local 1122) (37-35)<br>- Norman (AFGE Local 3172) (37-28)<br>- O'Brien (AFSCME) (41-5)<br>- Adler (SEIU) (37-3) | - Fiesta (ARA) (37-39) | |

| Federal Defendant Agency | Union Plaintiff Declarations | Non-Profit Organization Plaintiff Declarations | Local Government Plaintiff Declarations |
|---|---|---|---|
| | - Prendiville (SEIU Local 1021) (37-30)<br>- Jefferies (SEIU Local 1000) (37-22) | | |
| Department of State | - Hunter (AFGE) (37-20)<br>- Supp. Hunter (AFGE) (96-2)<br>- Kelley (AFGE) (37-23)<br>- Adler (SEIU) (37-3)<br>- Neuman (SEIU) (37-26) | | - Dively (King County) (41-6)<br>- Williams (Santa Clara County) (37-58) |
| Department of Transportation | - Kelley (AFGE) (37-23)<br>- Blake (AFSCME) (37-6)<br>- O'Brien (AFSCME) (41-5)<br>- Bailey (SEIU) (37-5)<br>- Neuman (SEIU) (37-26) | | - Dively (King County) (41-6)<br>- Leach (Baltimore) (37-54) |
| Department of Treasury | - Kelley (AFGE) (37-23)<br>- O'Brien (AFSCME) (41-5)<br>- Adler (SEIU) (37-3)<br>- Neuman (SEIU) (37-26) | - Olson (CTR) (37-42) | |
| Department of Veterans Affairs | - Burke (AFGE) (37-9)<br>- Kelley (AFGE) (37-23)<br>- Turner-Nichols (AFGE Local 2110) (37-33) | - Shah (Common Defense) (37-44)<br>- Eaton (Vote Vets) (37-38) | - Dively (King County) (41-6)<br>- Williams (Santa Clara County) (37-58) |

| Federal Defendant Agency | Union Plaintiff Declarations | Non-Profit Organization Plaintiff Declarations | Local Government Plaintiff Declarations |
|---|---|---|---|
| | - Blake (AFSCME) (37-6)<br>- O'Brien (AFSCME) (41-5)<br>- Neuman (SEIU) (37-26)<br>- Bailey (SEIU) (37-5) | | |

**\* Filed concurrently with Plaintiffs' Motion for Preliminary Injunction**