Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
dleonard@altber.com
bchisholm@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel.: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*

[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants. | Case No. 3:25-cv-03698-SI<br><br>**DECLARATION OF JENNIFER SASS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

Declaration of Jennifer Sass in Support of Motion for Preliminary Injunction; Case No. 3:25-cv-03698-SI

**DECLARATION OF JENNIFER SASS, PH.D.**

I, Jennifer Sass, Ph.D., declare as follows:

1. I make the following declaration from personal knowledge, information, and belief, and if called to testify, I could competently testify thereto.

2. I am a Senior Scientist for plaintiff Natural Resources Defense Council (NRDC).

3. I have advanced degrees in Anatomy and Cell Biology, with specific expertise in developmental biology, neurobiology, molecular biology, and environmental health. I have published over fifty articles in peer-reviewed scientific journals, including many pertaining to pesticide hazards and regulations. On numerous occasions, I have provided testimony and scientific briefings to Congress relevant to U.S. federal government science and policy practices, including the science and regulatory policies relevant to pesticide harms.

4. NRDC is a non-profit organization whose mission is to restore balance between the way we live and the world we live in. Among NRDC's priorities is protecting public health from the substantial adverse health effects caused by exposure to toxic chemicals.

5. I started working at NRDC in January 2001. In my position with NRDC, I am responsible for reviewing the science underlying many of the federal regulations of industrial chemicals and pesticides. Over the last two decades, in addition to publishing peer-reviewed articles and testifying to Congress, on behalf of NRDC, I have also provided written and oral testimony to the Environmental Protection Agency ("EPA") on the hazard assessment and registration of dozens of pesticides during EPA's registration process. I participate as a policy advocate on NRDC's behalf and help set the agenda for NRDC's priorities so that NRDC can most effectively leverage its resources.

6. I am aware of news reports of the federal cuts to the Centers for Disease Control's ("CDC") National Institute for Occupational Safety and Health ("NIOSH"). I am also aware of a letter to Congress in which NIOSH employees stated that over 90% of NIOSH employees have received "reduction-in-force" letters and have been placed on administrative leave pending more permanent layoffs.[1] NIOSH is a federal agency that focuses on research and making

---

[1] https://www.nbcnews.com/news/us-news/federal-workplace-safety-workers-letter-to-congress-rcna206076

recommendations to prevent work-related injuries, illnesses, and deaths. NIOSH also provides information on safe levels of exposure to toxic materials and other hazards.

7. My work for NRDC heavily relies on information from NIOSH, including NIOSH's recommended exposure limits. NIOSH's exposure limits are unique compared to other exposure limits because they solely focus on health protection rather than other non-health factors. I use the NIOSH exposure limits to evaluate other proposed regulatory exposure limits in part to determine whether the proposed regulatory limits are protective of human health. I use this information in many ways in NRDC's advocacy--to draft comments on federal regulations, help NRDC team members draft proposed legislation, and help defend proposed legislation. This information also helps inform my advice on how NRDC can most effectively use its resources to achieve its goals.

8. Specifically for my work on ethylene oxide, NIOSH research has been a critical resource. NIOSH scientists studied the effects of ethylene oxide on sterilization workers. Sterilization workers include many women workers, making the industry somewhat unusual among chemical industry worker populations, such as ethylene oxide manufacturing facilities, which has less women working directly with ethylene oxide. NIOSH scientists conducted critical research on ethylene oxide and breast cancer based on the data they collected on sterilization workers. Based in large part on this NIOSH research, NRDC has been actively involved in advocating for stronger regulations and protections against the harmful effects of ethylene oxide. NIOSH is uniquely positioned to conduct this study because it has the legal authority to enter a workplace to conduct Health Hazard Evaluations (HHEs) to determine whether workers may be exposed to hazardous materials like ethylene oxide.[2] NIOSH's legal rights include access to relevant data and information held by the employer and the right to meet with employees to gather information.[3] Thus, NIOSH conducts independent health and safety investigations of workplaces and provides critical life-saving recommendations about preventing harm that can be used by employers, workers, and their representatives, researchers, and the public. If reductions in force proceed as reported at NIOSH, and

---

[2] See NIOSH, Health Hazard Information (2000), https://www.cdc.gov/niosh/docs/2000-133/pdfs/2000-133.pdf

[3] *Id.*

NIOSH will not continue to research the health impacts of ethylene oxide and other industrial chemicals, there will be a void of reliable scientific information on these health impacts that NIOSH used to fill. This will reduce NRDC's ability to advocate for strong health protections, especially for worker populations who are heavily exposed to industrial chemicals and fenceline communities that are at risk from exposure to ethylene oxide as an air pollutant.

9. NRDC's advocacy on pesticides also relies on information provided by NIOSH. NIOSH operates the Sentinel Event Notification System for Occupational Risks ("SENSOR"), which is a program that monitors pesticide-related illness and injury. This is the only national program that monitors health harms from pesticide exposures while at work. SENSOR aggregates reports from states, physicians, emergency room records, and workers' compensation claims. Importantly, NIOSH provides technical expertise to state health departments to track workplace pesticide poisoning incidents and illnesses, thus strengthening the capacity of states across the country to recognize, diagnose, and document pesticide illnesses. NIOSH experts compile data from the SENSOR-Pesticides Program and the National Poison Data System and reports the findings to the public in its Pesticide Illness and Injury Surveillance Program. I have used the public online data and mapping tools that NIOSH provides on its SENSOR webpages to see how often and in what states acute pesticide-related illnesses occur. This information is important for assessing whether EPA-required restrictions on pesticide use are effective at reducing human pesticide poisonings.

10. I represented NRDC in negotiating the most recent agreement under the Pesticide Registration Improvement Act (PRIA), called "PRIA5" in 2023. The PRIA5 agreement requires that EPA allocate some funding to support the NIOSH SENSOR program. My understanding at the time of this writing is that EPA has provided the funding to NIOSH as agreed.[4] If reductions in force proceed as reported at NIOSH, and NIOSH discontinues, stalls or downsizes the SENSOR program, I will lose a significant source of information that I rely on to understand the impact of pesticides and to advocate for measures that protect public health, including farmworkers and their families, on behalf of NRDC. I also use this information to answer requests for scientific information and analysis

---

[4]  See EPA, PRIA5 Implementation, https://www.epa.gov/pria-fees/pria-5-implementation (last visited May 13, 2025).

Declaration of Jennifer Sass in Supp. of Motion for Preliminary Injunction; Case No: 3:25-cv-03698-SI   4

sent to me by NRDC partners. Providing this scientific support to NRDC partner organizations, that often work directly with worker populations, is a key responsibility of my job and critical to achieving NRDC's goal of protecting public health.

11. Often the health-protective measures that NRDC advocates for include use of respirators, such as the disposable filtering half facepiece respirator mask that are in common use. NIOSH tests respirators and certifies that they are effective. The most reliable effective "N95" respirator is one that is labeled as approved by NIOSH, which means it meets strict "quality assurance and performance requirements" for its stated purpose.[5] The EPA Agriculture Worker Protection Standard specifies a NIOSH approval number for required respirators. 40 C.F.R. § 170.607(e)(3). The lack of NIOSH certification of respirators will undermine health-protective measures that specify the use of them, such as the EPA Agriculture Worker Protection Standard. This will negatively impact public health and undermine NRDC's advocacy for the use of these health-protective measures and NRDC's goal to protect public health.

12. Additionally, I am aware of reported restructuring to the CDC's Agency for Toxic Substances and Disease Registry ("ATSDR").[6]

13. Without NIOSH and ATSDR, I would not have comprehensive, national, scientific information for many pesticides and industrial chemicals. For example, NIOSH and ATSDR resources have been a great source of information with NRDC's advocacy regarding the pesticide glyphosate, a weed-killer and the main ingredient in "Roundup" herbicide products. I authored an NRDC expert blog on the cancer risks of glyphosate and advised other NRDC programs on setting their institutional agenda for glyphosate.[7] I regularly read ATSDR Toxicological Profiles for hazardous chemicals, which are detailed reports with expert interpretation of the relevant scientific information on human health concerns for many chemicals that I work on. I also frequently rely on ATSDR's short summaries of the human health concerns for hazardous chemicals, called "Tox

---

[5] NIOSH, *How To Tell If Your N95 Respirator is NIOSH Approved* (2021), https://www.cdc.gov/niosh/docs/2021-124/pdfs/2021-124.pdf
[6] https://www.fedsmith.com/2025/03/27/hhs-announces-layoffs-as-part-of-dramatic-restructuring-plan/
[7] https://www.nrdc.org/bio/jennifer-sass/regulatory-failures-superweeds-and-glyphosate-cancers

FAQs", which summarize the scientific risk information, including how people may be exposed, what health harms are associated with exposure, and any regulatory exposure limits. For chemicals that I am preparing Agency comments on, I may check the ATSDR chemical health hazard reports and information on its website at least on a weekly basis for my work at NRDC. If ATSDR is unable to update and maintain this information because of reductions in force and reorganizations, then I will be substantially less able to do my work analyzing scientific information in support of NRDC's advocacy.

      I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed May 14, 2025, in Kensington, Maryland.

_____
Jennifer Sass