PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
Fax: (415) 436-6748

ERIC J. HAMILTON (CABN 296283)
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
ANDREW M. BERNIE
Trial Attorney
Civil Division, Federal Programs Branch

1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-7203
andrew.m.bernie@usdoj.gov

Counsel for Defendants

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.*<br><br>        Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>        Defendants. | Case No. 3:25-cv-03698-SI<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date: May 22, 2025<br>Time: 10:30 am<br>Judge: Hon. Susan Illston<br>Place: San Francisco Courthouse<br>        Courtroom 1 |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

STANDARD OF REVIEW .................................................................................................. 4

ARGUMENT ...................................................................................................................... 4

I.      Plaintiffs' Delay Warrants Denial of the PI Motion ...................................... 4

II.     Plaintiffs Satisfy None of the *Winter* Requirements ........................................ 6

      A.      Plaintiffs Are Unlikely to Succeed on the Merits of their Claims ......................... 6

            1.      The FSLMRS and CSRA Preclude District-Court Jurisdiction Over Plaintiffs' Challenge to the Workforce Executive Order and Workforce Memorandum ................................................................ 6

            2.      The Workforce Executive Order and Workforce Memorandum are Not Reviewable ........................................................................ 12

            3.      The Workforce Executive Order is Lawful ................................. 14

            4.      The Workforce Memorandum is Lawful ................................... 18

      B.      The Remaining *Winter* Factors Likewise Favor the Government ...................... 19

III.    Any Relief Should Be Limited ................................................................. 22

IV.    Plaintiffs Should Be Ordered to Post Security in Connection with Any Relief .............. 25

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Alder* v. *Tennessee Valley Auth.*,
   43 F. Appx. 952 (6th Cir. 2002)...................................................................... 7

*American Fed'n of Gov't Emps., AFL-CIO v. Ezell*,
   No. 25-cv-10276, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ................................. 8

*American Fed'n of Gov't Emps.*, AFL-CIO v. OPM,
   No. 25-cv-01780, 2025 WL 900057 (N.D. Cal. Mar. 24, 2025) ............................... 8

*American Fed'n of Gov't Emps., AFL-CIO* v. *Trump*,
   929 F.3d 748 (D.C. Cir. 2019)......................................................... 7, 8, 10, 11

*American Foreign Serv. Ass'n v. Trump*,
   No. 25-cv-352, 2025 WL 573762 (D.D.C. Feb. 21, 2025)........................................ 8

*Arc. of Cal. v. Doulas*,
   757 F.3d 975 (9th Cir. 2014) ....................................................................... 4

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ..................................................................... 22

*Axon Enters., Inc. v. FTC*,
   598 U.S. 175 (2023)........................................................................... 11, 12

*Benisek v. Lamone*,
   585 U.S. 155 (2018)................................................................................. 4

*Bennett v. Spear*,
   520 U.S. 154 (1997) .............................................................................. 13

*Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
   295 F.3d 28 (D.C. Cir. 2002) ................................................................ 12, 17

*City and County of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) .................................................................. 17

*Common Cause v. Trump*,
   506 F. Supp. 3d 39 (D.D.C. Nov. 25, 2020) ................................................... 17

*Dalton v. Specter*,
   511 U.S. 462 (1994).............................................................................. 12

*Department of Education* v. *California*,
   145 S. Ct. 966 (2025)............................................................................. 21

*Disney Enters., Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017) ............................................................. 19

*Doe #1 v. Trump*,
    957 F.3d 1050 (9th Cir. 2020) ........................................................... 24

*Elgin v. Department of the Treas-ury*,
    567 U.S. 1 (2012) ............................................................... 7, 9, 10

*Env't Prot. Info. Ctr. v. Carlson*,
    968 F.3d 985 (9th Cir. 2020) .............................................................. 6

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir.) .................................................................... 11

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
    82 F.4th 664 (9th Cir. 2023) ............................................................. 24

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
    98 F.4th 1180 (9th Cir. 2024) ........................................................... 22

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ........................................................................ 12

*Graham v. Ashcroft*,
    358 F.3d 931 (D.C. Cir. 2004) .......................................................... 10

*Hanson v. Dist. of Columbia*,
    120 F.4th 223 (D.C. Cir. 2024) ......................................................... 24

*Heckler v. Turner*,
    468 U.S. 1305 (1984) ...................................................................... 21

*Knight v. Department of Def.*,
    332 F.3d 1362 (Fed. Cir. 2003) ........................................................... 7

*Lujan v. National Wildlife Fed'n*,
    497 U.S. 871 (1990) ........................................................................ 13

*Lydo Enters., Inc. v. City of Las Vegas*,
    745 F.2d 1211 (9th Cir. 1984) ............................................................ 5

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ........................................................................ 22

*Markland v. OPM*,
    140 F.3d 1031 (Fed. Cir. 1998) ........................................................ 14

*Maryland v. U.S. Dep't of Agriculture*,
  No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025) .................................................. 8

*McKenna v. Dep't of Interior*,
  996 F.2d 1235 (Fed. Cir. 1993) ....................................................................................... 15

*Monsanto Co.* v. *Geertson Seed Farms*,
  561 U.S. 139 (2010) ........................................................................................................ 21

*Myers v. United States*,
  272 U.S. 52 (1926) .......................................................................................................... 12

*National Treasury Emps. Union v. Trump*,
  No. 25-cv-420, 2025 WL 561080 (D.D.C. Feb. 20, 2025) ........................................... 6, 8

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) .................................................................................................. 13, 15

*NLRB v. Cal. Pac. Med. Ctr.*,
  991 F.2d 536 (9th Cir. 1993) ............................................................................................ 5

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
  762 F.2d 1374 (9th Cir. 1985) .......................................................................................... 5

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984) .......................................................................................................... 12

*Sampson v. Murray*,
  415 U.S. 61 (1974) .................................................................................................... 20, 21

*Scott v. Schedler*,
  826 F.3d 207 (5th Cir. 2016) .......................................................................................... 23

*Singh v. Berger*,
  56 F.4th 88 (D.C. Cir. 2022) .......................................................................................... 24

*Smith* v. *Department of the Army*,
  89 M.S.P.R. 82 (2001) .................................................................................................... 20

*Trump* v. *United States*,
  603 U.S. 593 (2024) ........................................................................................................ 14

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) .......................................................................................................... 8

*United States* v. *Arthrex, Inc.*,
  594 U.S. 1 (2021) ............................................................................................................ 15

*United States* v. *Fausto*,
    484 U.S. 439 (1988) ................................................................. 7, 9

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................... 4

**Statutes**

5 U.S.C. § 704 ............................................................................. 13

5 U.S.C. § 1204(a)(2) ................................................................... 7

5 U.S.C. § 1301 ........................................................................... 19

5 U.S.C. § 1302(b) ...................................................................... 19

5 U.S.C. § 3502 ........................................................................... 14

5 U.S.C. § 3502(a) ...................................................................... 19

5 U.S.C. § 3502(d)(1)(B) ............................................................ 16

5 U.S.C. § 5361(7) ...................................................................... 17

5 U.S.C. § 7105(a)(2) ................................................................... 7

5 U.S.C. § 7123(a) ........................................................................ 7

5 U.S.C. § 7701(a) ................................................................... 7, 9

5 U.S.C. § 7701(g) ................................................................. 7, 20

5 U.S.C. § 7703(b)(1) ................................................................... 7

5 U.S.C. § 1103(a)(5)(A) ............................................................ 19

5 U.S.C. § 1103(c) ...................................................................... 19

28 U.S.C. § 1331 ........................................................................ 11

31 U.S.C. § 503(b) ...................................................................... 19

**Executive Orders, Rules, and Regulations**

Exec. Order 14210,
    90 Fed. Reg. 9669 (Feb. 11, 2025) ..................... 6, 15, 17, 18, 19, 23

Fed. R. Civ. P. 65(a) ..................................................................... 4

Fed. R. Civ. P. 65(d)(1)(C) ......................................................... 22

5 C.F.R. Pt. 351 .................................................................................................................. 19

5 C.F.R. § 351.201(a)(2) .................................................................................................... 17

5 C.F.R. § 351.205 .............................................................................................................. 19

5 C.F.R. § 351.803(b) ........................................................................................................ 16

5 C.F.R. § 351.901 ........................................................................................................... 7, 9

**Other Authorities**

Elena Kagan, *Presidential Administration*,
  114 Harv. L. Rev. 2245 (2001) ..................................................................................... 15

The Federalist No. 72, at 487 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) ...................... 14

**INTRODUCTION**

Plaintiffs' motion for a preliminary injunction, ECF No. 101 (PI Motion), and memorandum in support, ECF No. 101-1 (PI Brief), confirm that this sprawling lawsuit and Plaintiffs' request for near government-wide relief does not belong in federal district court. The essence of Plaintiffs' Complaint and the PI motion is a challenge to the legality of steps taken by the Executive Branch—principally President Trump, the Office of Personnel Management (OPM), and the Office of Management and Budget (OMB)—to facilitate reductions in force (RIFs) within agency workforces. That is unquestionably a suit concerning "employee relations in the federal sector" and "federal labor-management relations," the subject matters that Congress enacted the Civil Service Reform Act (CSRA) and the Federal Service Labor-Management Relations Statute (FSLMRS) to govern, and which preclude district court jurisdiction here. And even if this Court had jurisdiction, Plaintiffs lack a viable Administrative Procedure Act (APA) or *ultra vires* cause of action to challenge the Workforce Executive Order or Workforce Memorandum in the abstract.

In any event, Plaintiffs' claims are meritless. Plaintiffs devote a significant portion of their PI Brief to describing actions that Agency Defendants[1] have allegedly taken pursuant to the Workforce Executive Order and Workforce Memorandum. But Plaintiffs do not even attempt to argue—let alone establish—that any of these agency activities or future agency activities are unlawful, in the sense of exceeding the relevant *agencies' authority* under their governing statutes or other legal sources. Nor could they. Federal law expressly permits RIFs, Congress has consistently recognized agencies' authority to engage in RIFs since the nineteenth century, and judicial review of RIF decisions (in the Federal Circuit, not this Court), is highly deferential.

To succeed on the merits then, Plaintiffs must show that the Workforce Executive Order and Workforce Memorandum *necessarily* direct illegal agency action and *cannot* be implemented lawfully. That is not the case. The President plainly has constitutional and statutory authority to tell agencies how to exercise their own statutory authorities to conduct RIFs within the boundaries

---

[1] Again, for ease of reference Defendants use the term "Agency Defendants" and "agencies" in describing Defendants other than President Trump, OPM, OMB, and the United States DOGE Service (USDS). Defendants do not concede that all these components are properly characterized as agencies for purposes of the APA, FOIA, Federal Records Act, or any other purpose.

set by Congress. That is what the Workforce Executive Order does. The Order makes clear that RIFS may be conducted only where "consistent with applicable law," that in proposing RIFs, agencies should ensure that they do not eliminate any "subcomponents" that are "statutorily required" or prevent the performance of "functions" that are "mandated by statute or other law"; the Workforce Memorandum similarly reaffirms that "[a]gencies should review their statutory authority and ensure that their plans and actions are consistent with such authority." There is nothing plausibly unlawful about an Executive Order directing agency heads to "promptly undertake preparations to initiate large-scale reductions in force" consistent with all applicable statutory restrictions. In granting a temporary restraining order (TRO),[2] the Court focused on the President's supposed lack of operative "statutory authority to reorganize the executive branch." But this is not a basis for challenging the Workforce Executive Order. A RIF is not a reorganization and, in any event, the Workforce Executive Order does not even arguably direct any reorganizations that conflict with agencies' statutory mandates. And although this Court faulted OPM and OMB for exceeding their authority by unilaterally ordering agencies to carry out RIFs, the Workforce Memorandum leaves that decision to agencies. Finally, to the extent the Court's previous analysis of the merits rested on a conclusion that the President lacks any authority to direct agencies how to exercise the statutory authority that the *agencies have*, that conclusion, is incorrect and upends both Article II and basic principles of democratic accountability.

The other *Winter* factors likewise weigh against relief. Plaintiffs do not establish irreparable harm sufficient to warrant relief. This Court primarily rested its contrary finding on the prospect of members of Plaintiffs unions being subjected to RIFs. That form of injury is by no means irreparable, as the Supreme Court has made clear. And any harm to Plaintiffs is outweighed by harm to the Government. A preliminary injunction would require the Government to retain— at taxpayer expense—thousands of employees whose continuance in federal service agencies have determined not to be in the public interest. That unrecoverable monetary loss is irreparable.

Any preliminary injunction should also be significantly narrower than the TRO Order (let

---

[2] Defendants contest that this Court's prior order is properly characterized as a TRO, but for ease of reference, Defendants will refer to it as a TRO here.

alone Plaintiffs' PI Motion, which inexplicably seeks relief even broader than they sought in their TRO Motion). For one, it should not extend beyond the parties to the litigation. For another, Defendants once again ask the Court to make clear that agencies may conduct RIFs under their existing authorities that are independent of the Workforce Executive Order and the process set forth in the Workforce Memorandum. In addition, any injunction should clearly and concretely identify what conduct is permitted and prohibited, and should be crafted to be no broader than necessary to prevent any irreparable harm to Plaintiffs. Respectfully, the TRO Order reflects neither of these limitations.

## BACKGROUND

Defendants incorporate by reference the statutory and regulatory background, and factual background set forth in their brief in opposition to Plaintiffs' motion for a preliminary injunction. *See* ECF No. 60 (TRO Opposition) at 5-17. In litigating against Plaintiffs' TRO Motion, Defendants did not make any factual representations and instead relied upon the Workforce Executive Order and Workforce Memorandum themselves, as well as other legal sources plainly establishing agencies' longstanding authority to conduct RIFs, which in turn establishes that the Workforce Executive Order and Workforce Memorandum can be implemented lawfully. We similarly do not make or rely on any factual representations here.

And indeed, no factual development is necessary to resolve Plaintiffs' preliminary injunction motion. Plaintiffs' legal theory, which this Court endorsed at the TRO stage, was that the Executive Order and Workforce Memorandum were facially unlawful. Plaintiffs PI Brief repeats this point. To be sure, Plaintiffs' PI Brief, like their TRO Reply, devotes significant space to discussing how components are supposedly implementing the Workforce Executive Order and Workforce Memorandum. *See* PI Brief at 4-11. But even Plaintiffs apparently do not believe that these allegations are relevant to the merits of their claims, since they frame these allegations only in terms of their alleged irreparable harm, *id.*, and their merits section does not discuss these purported agency-specific facts, *id.* at 11-16. And for good reason. If how an agency is implementing the Workforce Executive Order and Workforce Memorandum were relevant to the merits of Plaintiffs' claims, then that is just another way of saying that the Executive Order and

Memorandum *can* be implemented lawfully—in which case there would be no basis for enjoining implementation of them virtually across the Executive Branch. And the fact that Plaintiffs nominally bring two claims challenging agency actions does not change the analysis; neither claim is based on (or even discusses) any particular agency decision. ECF No. 103 at 12-13. Nor does Plaintiffs' preliminary injunction motion even attempt to develop an argument that any of the alleged agency activities they discuss are unlawful except by reference to the Workforce Executive Order and Workforce Memorandum.

### STANDARD OF REVIEW

Rule 65 of the Federal Rules of Civil Procedure empowers district courts to issue preliminary injunctions. *See* Fed. R. Civ. P. 65(a). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008). Plaintiffs must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Id.* at 20.

### ARGUMENT

Plaintiffs satisfy none of the four *Winter* requirements, let alone all of them. Defendants incorporate by reference our previous arguments on this point (including our argument that Plaintiffs have not established standing, which we will not repeat here). *See* TRO Opposition at 22-48. Below, Defendants further respond to Plaintiffs' arguments while also explaining why, respectfully, the Court's previous analysis of these issues was incorrect.

### I. Plaintiffs' Delay Warrants Denial of the PI Motion

The Court should deny a preliminary injunction on the threshold ground that Plaintiffs waited too long to seek this relief —a circumstance which weighs against finding that irreparable harm or the balance of the equities favor Plaintiffs. *See Arc. of Cal. v. Douglas,* 757 F.3d 975, 989 (9th Cir. 2014); *Benisek v. Lamone*, 585 U.S. 155, 160 (2018). As previously noted, Plaintiffs filed their motion for a TRO on May 1, more than eleven weeks after the President signed the Workforce Executive Order (on February 11, 2025), and more than nine weeks after OPM and OMB issued the Workforce Memorandum. They have since filed their PI Motion on May 14, more than three

months following issuance of the Workforce Executive Order. PI Motion; PI Brief. Plaintiffs' delay forecloses preliminary injunctive relief. A "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993); *see also Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm"); *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief"); *W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (holding that the district court properly considered the plaintiff's "delay in seeking a preliminary injunction" when it found that "the balance of equities and the public interest" "weighed against issuing a preliminary injunction").

The Court previously excused Plaintiffs' delay, stating that "[t]he details of the ARRPs have only trickled into public view due to defendants' ongoing decision not to release the plans publicly." TRO Opinion at 11. But Plaintiffs' claims are not based on the contents of any particular ARRP. The gravamen of Plaintiffs' claims, which this Court accepted, is that the Workforce Executive Order and Workforce Memorandum are unlawful on their face and cannot be lawfully implemented. Plaintiffs repeat this argument in their PI briefing. *See* PI Brief at 11 ("The plain language of the EO and Memo mandate these actions and remove agency decision-making and discretion."); *id.* at 16 ("The President's and OMB/OPM's *categorical* instructions and the agencies' implementation of those instructions are necessarily divorced from reasoned decision-making that takes into account all appropriate factors (because the categorial instruction took into account nothing other than the President's will to restructure government according to his plans)."). And Plaintiffs' merits argument in their PI briefing focuses entirely on the supposed illegality of the Executive Order and Memorandum. PI Brief at 11-16.[3] No further factual

---

[3] Any criticism of Defendants for not releasing the ARRPs is also mistaken since, as Defendants have previously explained, ARRPs are predecisional and deliberative agency planning documents that contain discussion of many topics aside from RIFs. If an agency actually decides to go forward with steps that might affect Plaintiffs, Plaintiffs and the public will learn about those decisions when they are made. ECF No. 103 at 7. Indeed, when final determinations have been made,

development was needed for Plaintiffs to challenge the Workforce Executive Order and Workforce Memorandum on their face.

The Court also noted that in another case "where other plaintiffs challenged Executive Order 14210 shortly after it was issued . . . the government's attorneys argued that plaintiffs' harm was too 'speculative' to establish injury.'" TRO Decision at 11 (quoting *Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), Dkt. No. 14 at 10-11 (D.D.C. filed Feb. 17, 2025)). But the Government's claim in that case that the asserted injury was "speculative" was based on the union's claim that it would lose membership and dues. *Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), Dkt. No. 14 at 10-11 (D.D.C. filed Feb. 17, 2025). And in any event Judge Cooper did not rely on that ground in denying relief; he concluded that the lawsuit was jurisdictionally barred by the CSRA and FSLMRS. *Nat'l Treasury Emps. Union v. Trump*, No. 25-cv-420, 2025 WL 561080, at *5-*8 (D.D.C. Feb. 20, 2025). More fundamentally, a party who seeks the extraordinary remedy of a TRO or a preliminary injunction is required to move with dispatch, and cannot delay seeking relief based on the *mere possibility* that the Government *might assert* that the motion is premature. That is particularly true here, when Plaintiffs seek to enjoin implementation of the Workforce Executive Order and Workforce Memorandum virtually across the government, based solely on the content of those documents.

## II.  Plaintiffs Satisfy None of the *Winter* Requirements

### A.  Plaintiffs Are Unlikely to Succeed on the Merits of their Claims

The likelihood-of-success factor "is a threshold inquiry and is the most important factor." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). Plaintiffs can show no likelihood of success in their challenge to the Workforce Executive Order and the Workforce Memorandum. Neither may be challenged here and, even if they could, both are lawful.

#### 1.  The FSLMRS and CSRA Preclude District-Court Jurisdiction Over Plaintiffs' Challenge to the Workforce Executive Order and Workforce Memorandum.

The CSRA "establishe[s] a comprehensive system for reviewing personnel action taken

---

agencies are publicly releasing their final plans (*see, e.g.*, https://www.state.gov/building-an-america-first-state-department/).

against federal employees." *United States* v. *Fausto*, 484 U.S. 439, 455 (1988). It provides that "[a]n employee . . . may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation." 5 U.S.C. § 7701(a). In addition, "[a]n employee who has been furloughed for more than 30 days, separated, or demoted by a reduction in force action may appeal to the Merit Systems Protection Board." 5 C.F.R. § 351.901; *see Alder* v. *Tennessee Valley Auth.*, 43 F. App'x 952, 956 (6th Cir. 2002) (describing a "reduction-in-force decision" as "a fundamental employment claim subject to MSPB review"), *cert. denied*, 537 U.S. 1112 (2003). The MSPB can order relief to prevailing employees, including reinstatement. 5 U.S.C. § 1204(a)(2), 7701(g). The Federal Circuit has exclusive jurisdiction to review final decisions of the MSPB, including decisions concerning RIFs. 5 U.S.C. § 7703(b)(1); *Knight v. Department of Def.*, 332 F.3d 1362, 1364 (Fed. Cir. 2003) (RIF demotion claim). The CSRA also includes the FSLMRS, which governs labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135; *Am. Fed'n of Gov't Emps., AFL-CIO* v. *Trump* (*AFGE*), 929 F.3d 748, 752 (D.C. Cir. 2019) (*AFGE v. Trump*). The Federal Labor Relations Authority (FLRA) is charged with adjudicating federal labor disputes. 5 U.S.C. § 7105(a)(2). Congress has authorized review of the FLRA's decisions only in the courts of appeals, not in federal district courts. 5 U.S.C. § 7123(a).

This statutory framework precludes jurisdiction. Plaintiffs' suit concerns "employee relations in the federal sector" and "federal labor-management relations." *AFGE v. Trump*, 929 F.3d at 755 (citations and internal quotation marks omitted). Congress would not have enacted the "'elaborate' framework" of the CSRA and FSLMRS for reviewing federal-employee terminations and labor disputes, *Elgin v. Department of the Treasury*, 567 U.S. 1, 11 (2012) (citation omitted), while allowing an end-run around those procedures in the form of a preemptive district-court action like this one. The statutory scheme laid out in the CSRA and FSLMRS preclude jurisdiction here.

As this Court acknowledged, *see* TRO Opinion at 19-22, numerous courts in recent months and years have applied the same preclusion principle to similar federal-employment suits. *See, e.g.*, *AFGE v. Trump*, 929 F.3d at 753, 761 (challenge to three executive orders governing

collective bargaining and grievance processes); *Maryland v. U.S. Dep't of Agriculture*, No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025) (termination of probationary employees); *Am. Foreign Serv. Ass'n v. Trump*, No. 25-cv-352, 2025 WL 573762, at *8-*11 (D.D.C. Feb. 21, 2025) (challenge to employees' placement on administrative leave); *Nat'l Treasury Emps. Union*, 2025 WL 561080, at *5-*8 (challenge to terminations of probationary employees, anticipated RIFs, and deferred-resignation program); *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. 25-cv-10276, 2025 WL 470459, at *1-*3 (D. Mass. Feb. 12, 2025) (challenge to deferred-resignation program); *but see Am. Fed'n of Gov't Emps.*, AFL-CIO v. OPM, No. 25-cv-01780, 2025 WL 900057 (N.D. Cal. Mar. 24, 2025) (asserting jurisdiction over challenge to probationary-employee terminations).[4] And in concluding that the Court had jurisdiction over Plaintiffs' claims, the Court's TRO opinion seemed to acknowledge that it was departing from this weight of authority. *See* TRO Opinion at 22-23.

The Court's jurisdictional analysis was in error. The Court highlighted the "pre-implementation" nature of the suit, concluding that precluding Plaintiffs' suit would "foreclose meaningful judicial review" because they seek to challenge, in advance, "'large-scale reductions in force' happening rapidly across multiple agencies." TRO Opinion at 23. This distinction does not provide the Court with jurisdiction. In *Thunder Basin Coal Co. v. Reich*, the Supreme Court held that district-court jurisdiction was precluded by a scheme that did not permit *pre-enforcement review at all*. 510 U.S. 200, 212-16 (1994). The D.C. Circuit correctly recognized this in *AFGE v. Trump*. 929 F.3d at 755 ("The unions argue that the scheme does not provide for meaningful judicial review because they are unable to obtain 'pre-implementation' review of the executive orders or immediate relief barring all agencies from implementing the executive orders. This argument is foreclosed by the Supreme Court's decision in *Thunder Basin . . .*").

This Court also suggested that it was "unlikely" Congress intended to channel review of RIF claims because "employees' rights to appeal a RIF to the Merit Systems Protection Board comes not directly from statute but from regulation." TRO Opinion at 24; *see also* 5 C.F.R.

---

[4] Defendants explained in their TRO opposition why Judge Alsup's opinion in that case was incorrect but, in any event, clearly distinguishable from this case. *See* TRO Opposition at 30-31.

§ 351.901. But Congress expressly authorized MSPB review of "any action which is appealable to the Board under any law, rule, *or regulation*." 5 U.S.C. § 7701(a) (emphasis added). There is no reason to think Congress intended to allow federal employees to bypass available review in the MSPB and the Federal Circuit based merely on the *source* of their right to seek MSPB review.

The Court also emphasized that Plaintiffs raise "fundamental questions of executive authority and separation of powers," "not the individual employee or labor disputes [the MSPB and FLRA] customarily handle." TRO Opinion at 22, 24. Plaintiffs similarly assert that "they simply bring *different claims* than what those statutory schemes are designed for, by challenging ultra vires Presidential action and ensuing violations of the APA." PI Brief at 18. But again, this makes no difference. The plaintiffs in *Elgin v. Department of the Treasury*, 567 U.S. 1, 7 (2012) similarly raised "fundamental questions" concerning the Constitution's equal-protection guarantee when they challenged the Military Selective Service Act's requirement that men and only men are required to register. And the Court held that such claims were still precluded: Plaintiffs' "constitutional claims are the vehicle by which they seek to reverse the removal decisions, to return to federal employment." *Id.* at 22. And "[a] challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the CSRA scheme." *Id.*

So too here. What matters is that Plaintiffs challenge federal employment actions, most prominently RIFs. It makes no difference that *their theory* is that the Executive Order and Memorandum are unlawful. Indeed, when the federal government is the employer, practically any employment or labor-management-relations claim can be dressed up in constitutional garb. That is not a basis for bypassing the CRSRA and FSLMRS's exclusive schemes.

This Court further noted that, even if the union Plaintiffs and their members could seek relief under the FSLMRS and CSRA, the other Plaintiffs (such as nonprofits and local governments) could not. TRO Opinion at 25. But the Supreme Court has held that the CSRA's comprehensive remedial scheme precludes a federal district court action even if a particular plaintiff could not receive relief under the CSRA. *See Fausto*, 484 U.S. at 447-55. Indeed, the Court reached that conclusion in *Fausto* even though the plaintiffs there were federal employees. As then-Judge Roberts observed, even where "the CSRA provides no relief," it "precludes other

avenues of relief." *Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.) (citation omitted). Since the CSRA precludes federal employees and their unions from *themselves* raising claims or remedies that the CSRA does not recognize, third parties (indeed, on this theory, presumably any third party who can clear the minimum threshold of establishing Article III standing) cannot bypass Congress's comprehensive scheme to bring claims second-guessing the Government's treatment of its employees in federal district court. *See* PI Brief at 19 (characterizing these other Plaintiffs as "third parties to any relationship between federal employees and their employing agencies").

Finally, to the extent specific consideration of the *Thunder Basin* factors is required, they reinforce that Plaintiffs are required to channel their federal employment and labor disputes. The first step under *Thunder Basin*—Congress's intent to preclude—is satisfied here. TRO Opposition at 26-27. As to the factors under the second step, they too all support channeling. Both statutory schemes provide meaningful judicial review over Plaintiffs' claims. TRO Opposition at 27. As Defendants previously argued, affected employees can bring Plaintiffs' constitutional, *ultra vires*, and related claims within the administrative scheme and, even if the FLRA and MSPB cannot resolve them, a reviewing Court can. *See* TRO Opposition at 27. Plaintiffs have no meaningful response. And although Plaintiffs complain that they could not obtain relief directly against the President, OPM, OMB, or USDS, PI Brief at 20, that is irrelevant even if true; Plaintiffs do not seek injunctive relief against the President here and any relief they receive against employing agencies would be sufficient to redress any injuries associated with those agencies' RIFs. *See AFGE v. Trump*, 929 F.3d at 758.

Nor are Plaintiffs' claims "wholly collateral" to the CSRA and FLRA scheme. Plaintiffs say their claims "concern separation of powers issues and challenge the substantive and procedural lawfulness of the EO and its implementation." PI Brief at 20. But again, Plaintiffs simply ignore that, as the Supreme Court explained in *Elgin*, what matters for purposes of this inquiry is whether the subject of Plaintiffs' challenge is a matter covered by the CSRA and FSLMRS schemes, not how Plaintiffs describe the claims they are advancing. 567 U.S. at 22. Here, the subject of Plaintiffs' actions is RIFs and related federal employment and labor matters; their contention that

the Workforce Executive Order and Memorandum are unlawful is simply the "vehicle" by which they seek to stop RIFs from taking place. *Id.*; TRO Opposition at 28. Plaintiffs ask "for the same relief that they could ultimately obtain through the statutory scheme, namely rulings on whether the executive orders are lawful and directives prohibiting agencies from following the executive orders." *AFGE v. Trump*, 929 F.3d at 760. Thus, "[t]heir challenge is not wholly collateral to the statutory scheme." *Id.*[5]

Finally, although Plaintiffs assert that "the labor agencies have no particular expertise in resolving constitutional and administrative law questions," PI Brief at 20, Plaintiffs contend that the Workforce Executive Order and Workforce Memorandum effectively compel agencies to engage in large-scale RIFs that are necessarily contrary to statute. The application of the RIF regulations, and the statutes governing agency operations are indeed matters on which administrative agencies have expertise. TRO Opposition at 28; *AFGE v. Trump*, 929 F.3d at 760 (reasoning that "[m]any of [plaintiffs] claims allege that the executive orders direct agencies to violate the Statute by refusing to bargain over mandatory subjects or by taking actions that are inconsistent with the duty to bargain in good faith" and that "[t]hese matters lie at the core of the FLRA's 'specialized expertise in the field of federal labor relations'").[6]

---

[5] As explained in Defendants' TRO opposition, this case is fundamentally unlike *Axon Enters., Inc. v. FTC*, 598 U.S. 175 (2023), where the Supreme Court held that the claims at issue did not need to be channeled. In that case, the core of each plaintiffs' claim was that they were being subjected to "an illegitimate proceeding, led by an illegitimate decisionmaker," which qualified as a "here-and-now injury" that could not be remedied after the fact, because "[a] proceeding that has already happened cannot be undone." *Id.* at 191. Here, Plaintiffs' claims are not based on a claim that the administrative schemes are unconstitutionally structured or otherwise invalid. Nor is this case like *Feds for Med. Freedom v. Biden*, 63 F.4th 366 (5th Cir.) (en banc) (since vacated as moot), where the Fifth Circuit rejected channeling arguments because it concluded that the subject of the challenge—a vaccine mandate—was not a personnel action covered by the CSRA. 63 F.4th at 375. *Contra* PI Brief at 19 (incorrectly characterizing this case as standing broadly for the proposition that "employee organization challenge to government-wide federal employee vaccine mandate was not channeled to MSPB or FLRA"). Plaintiffs' PI Brief relies on these inapt cases, without addressing Defendants' previous arguments.

[6] Plaintiffs claim the mantle of textualism, asserting, inter alia, that "the concept of 'channeling' is based entirely on an implied doctrine, which cannot exist divorced from the underlying statutory text." PI Brief at 19. But although Congress has empowered the judiciary to hear "claims 'arising under' federal law" "by way of 28 U.S.C. § 1331's grant of jurisdiction," it is an equally well-established canon that "[a] special statutory review scheme, . . . may preclude district courts from

### 2.  The Workforce Executive Order and Workforce Memorandum are Not Reviewable

Statutory preclusion aside, neither the Workforce Executive Order nor the Workforce Memorandum may be reviewed in the abstract, as opposed to in a challenge to a specific reviewable final agency action implementing them. The President is not an agency, *see Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), and therefore "actions of the President . . . are not reviewable under the APA," *Dalton v. Specter*, 511 U.S. 462, 470 (1994). Thus, APA review of the Workforce Executive Order is unavailable here, as no one seems to dispute.

And even assuming that an *ultra vires* action outside of the APA's framework may sometimes be cognizable, Plaintiffs' *ultra vires* claim is not. To even potentially state an *ultra vires* claim, Plaintiffs must clear at least two significant hurdles. First, the substantive standard for doing so is extremely high. An "officer may be said to act ultra vires only when he acts without any authority whatever." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984). And second, Plaintiffs must show that the Executive Order directs conduct that the President lacks any authority whatsoever to direct even though the Executive Order does not direct agencies to take any actions inconsistent with law—to the contrary, it contains express language doing the opposite, emphasizing the need to comply with applicable law. *See infra* p. 17.

That standard is not met here. Federal law expressly recognizes that the Government may conduct RIFs, and the President has authority to exercise "'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is the head." *Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)).

In nonetheless concluding that Plaintiffs were likely to succeed on the merits of their *ultra vires* claim, this Court in its TRO Opinion repeatedly framed the inquiry in terms of the President's supposed lack of authority to "broadly restructure federal agencies" and using similar language. TRO Opinion at 28; *see also id.* at 26 ("the President has neither constitutional nor, at this time,

---

exercising jurisdiction over challenges to federal agency action." *Axon*, 598 U.S. at 185. And even if Plaintiffs' textualist arguments were persuasive as a matter of first principles—which they are not—this Court is not writing on a blank slate. Supreme Court and lower court precedent clearly forecloses district court jurisdiction over the claims Plaintiffs assert here.

statutory authority to reorganize the executive branch"); *id.* at 28 ("large-scale reorganization of the federal agencies stems from a long-standing partnership between the executive and legislative branches"); *id.* at 29 ("The simple proposition that the President may not, *without Congress*, fundamentally reorganize the federal agencies is not controversial."). The Court's prior analysis rests on several misconceptions about the President's authority.

First, even if the Executive Order is properly framed as directing certain "reorganizations," this is not an area in which the President has "no authority whatever." To the contrary, in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), the Supreme Court explained that "[i]t clearly is within the President's constitutional and statutory authority to prescribe the manner in which" his subordinates conduct their business, and "this mandate of office must include the authority to *prescribe reorganizations* and reductions in force." *Id.* at 757 (emphasis added). And as discussed in the next section explaining why the Workforce Executive Order is lawful, nothing in the Executive Order directs "large-scale reorganization," let alone reorganizations that would violate any agencies' organic statutes. *See infra* pp. 15-16. And as Defendants also discuss in that section, to the extent the Court suggests that the President acts *ultra vires* when he directs agencies how to exercise their *lawful* authority, *see* TRO Opinion at 31 ("agencies were not discussing a need for large-scale RIFs prior to the President's order"), any such suggestion is plainly incorrect.

The Workforce Memorandum is also not reviewable because it is not "final agency action" subject to APA review, 5 U.S.C. § 704—that is, action "mark[ing] the 'consummation' of the agency's decisionmaking process" and "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow,'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted). Nothing in the Workforce Memorandum finally determines rights or obligations or imposes legal consequences. While The Workforce Memorandum is a final draft (as the Court emphasized, TRO Opinion at 35), but it is not agency action under the APA at all, let alone final agency action. Instead, it sets forth a framework for preparation and review of proposed agency RIF plans. Such a general programmatic document is not subject to APA review. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 893 (1990). Indeed, as Defendants have already explained at length, *see* ECF Nos. 88, 103, not *even the ARRPs themselves* are final agency action since they

are always subject to change and agencies are not bound to follow all of the recommendations, strategies, and proposals ARRPs contain. The Workforce Memorandum—which contains OMB and OPM's guidance on the *topics* ARRPs should address—is even more clearly not final agency action.

### 3. The Workforce Executive Order is Lawful

Even if the Court could review the Workforce Executive Order, it is plainly lawful. The legal basis for the Executive Order is straightforward. Federal law expressly permits agencies to conduct RIFs; Congress has consistently recognized agencies' authority to engage in RIFs since the nineteenth century; and the federal government has repeatedly exercised its authority to conduct RIFs, including in large-scale Presidentially-directed RIFs, most recently during the Clinton Administration. 5 U.S.C. § 3502; TRO Opposition at 5-11. All of that has been done for nearly 150 years with very little apparent legal controversy. And as the Federal Circuit—where challenges to RIFs are properly channeled following required MSPB review—has explained, "[w]e accord an agency wide discretion in conducting a reduction-in-force." *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998). That being so, the President unquestionably had the authority to direct agencies to conduct RIFs, consistent with law, in furtherance of his policy objectives and with the guidance of OPM and OMB.

While this Court did not dispute that agencies may lawfully conduct RIFs, TRO Opinion at 31, it treated as "evidence" of "unlawful action" the prospect that "the agencies are acting at the direction of the President and his team" in planning and executing RIFs, *id.* To be clear, Defendants do not dispute, and have never disputed, that agencies are required to comply with the Executive Order and that they are implementing it. And there is nothing wrong with that—that is how Article II *is supposed* to work. Our constitutional structure presumes that federal officers and agencies will be "subject to [the President's] superintendence," *The Federalist* No. 72, at 487 (Alexander Hamilton) (Jacob E. Cooke ed., 1961), and the President thus "bears responsibility for the actions of the many departments and agencies within the Executive Branch," *Trump* v. *United States*, 603 U.S. 593, 607 (2024). Federal agencies depend for their "legitimacy and accountability to the public [on] a 'clear and effective chain of command' down from the President, on whom all the

people vote." *United States* v. *Arthrex, Inc.*, 594 U.S. 1, 11 (2021) (citation omitted); *see* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2331-2340 (2001). There is thus nothing plausibly unlawful about an Executive Order directing agency heads to "promptly undertake preparations to initiate large-scale reductions in force" consistent with all applicable statutory restrictions.[7]

Of course, although an Executive Order cannot validly direct an agency to violate the law, the Workforce Executive Order does not do that. As noted above, the Court repeatedly faulted the Executive Order by reference to the President's supposed lack of authority to "reorganize," "fundamentally reorganize," or "broadly restructure." *See supra* pp. 12-13. The premise that the President and federal agencies have no reorganizational authority at all is incorrect. *Fitzgerald*, 457 U.S. at 757; *McKenna v. Dep't of Interior*, 996 F.2d 1235 (Fed. Cir. 1993) (table) ("The decision to undertake a reorganization necessitating a [RIF] is within the discretion of the agency."). In any event, as Defendants noted, the Workforce Executive Order contains one sub-section—"Developing Agency Reorganization Plans"—dealing with organizational matters. Exec. Order 14210, § 3(e). And that subsection simply directs agencies to prepare a report identifying "any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities," and states that the report should "discuss *whether* the agency or any of its *subcomponents*

---

[7] The Court's Production Order, *see* ECF No. 109, reflects a similarly limited conception of Executive Branch authority and, respectfully, also appears to misunderstand the Government's position.. *See id.* at 2 (asking whether there was "directing" to agencies to make "'large-scale' RIFs" or the provision of "guidance" and suggesting that this is a factual dispute between the parties); *id.* ("if ARRPs are non-final planning documents then "pursuant to *what*, then, are the agencies implementing their large-scale RIFs?"). But there is no factual dispute the Court needs to resolve. The Workforce Executive Order *does* direct action on the part of the agencies, and the ARRPs *are* part of the process by which the agencies determine how to implement the Order. The Government has never disputed either of these propositions. And it makes no difference whether the "directing" is "directing" RIFs on one hand or "providing guidance" about RIFs on the other, because he has unquestioned authority to do both, *provided that* any directives or guidance do not require the agency to violate any statutes or other sources of laws governing their activities. The Government's position, rather, is twofold: (1) the Executive Order, while mandatory, provides agencies with broad discretion to determine how to implement it consistent with any applicable legal restrictions; and (2) either way, the ARRPs are deliberative because they are subject to change, and an agency need not (and in many cases will not) implement all of the guidance, recommendations, and strategies set forth within them.

---

1    *should be* eliminated or consolidated." *Id.* (emphasis added). This is not a mandate to conduct any
2    reorganizations at all, let alone a directive to take any illegal action.

3        In holding otherwise, the Court reasoned that there is no action the agencies can take that
4    is not itself unlawful, because "[t]he evidence plaintiffs have presented paints a very different
5    picture: that the agencies are acting at the direction of the President and his team." TRO Opinion
6    at 31. But even if this is accurate, it does not support a claim that the Executive Order directs
7    agencies to violate the law. For one, it is entirely consistent to acknowledge—as the Government
8    does—that the Workforce Executive Order provides broad direction that agencies *must follow*,
9    while also noting that it does not direct *any specific actions* (and again, even if the Executive Order
10   *did direct specific actions*, there would be nothing wrong with that unless the specific directed
11   actions were *illegal*). And if the Court meant to suggest that agencies are engaging in broad-scale
12   restructuring in violation of agency-specific statutes—a contention that Plaintiffs have not
13   attempted to establish here—that would not mean that the *Executive Order itself* directs actions in
14   violation of the law.

15       And although this Court suggested the Executive Order raises statutory concerns because it
16   contemplates "large-scale" RIFs, TRO Opinion at 31, RIFs, like analogous layoffs in the private
17   sector, are often large-scale by their nature. *See* TRO Opposition at 9-11 (discussing RIFs after
18   World War II and President Clinton's 1993 order of a 4-percent reduction in the federal
19   workforce). And federal law explicitly recognizes that they will sometimes involve "the separation
20   of a significant number of employees." 5 U.S.C. § 3502(d)(1)(B); *see also* 5 C.F.R. § 351.803(b).
21   A large RIF that comports with the agency's statutory structure and function is just as lawful as a
22   small one. And since there is no prohibition on "large" RIFs, neither the RIF statute nor any other
23   legal source provides any judicially manageable standards in determining how to decide whether
24   a particular RIF qualifies as "large." A RIF itself is not a reorganization, which generally refers to
25   a changing an agency's structure either by legislation or internal agency directives, rather than the
26   elimination of positions within an existing agency structure. Thus, while a RIF can be conducted
27   because of a "reorganization," it can also be conducted for other reasons, such as "lack of work"
28

Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction
3:25-cv-3698-SI

16

or "shortage of funds." 5 C.F.R. § 351.201(a)(2); *see, e.g.*, 5 U.S.C. § 5361(7). Nothing in the Executive Order directs unlawful action..

Were there any further doubt on this score, the Workforce Executive Order makes clear that any RIFs may be conducted only where "consistent with applicable law." Exec. Order 14210, § 3(c). The Order also states it shall not "be construed to impair or otherwise affect the authority granted by law to an executive department, agency, or the head thereof," *id.* § 5(a)(i), and directs agencies to identify "any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities," *id.* § 3(e). Courts "cannot ignore . . . unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing" presidential directives, such as the Workforce Executive Order at issue here. *Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. Nov. 25, 2020) (majority opinion for three-judge district court).

Contrary to this Court's analysis, *see* TRO Decision at 32, the Ninth Circuit's decision in *City and County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018), does not at all justify ignoring the Workforce Executive Order's repeated and unambiguous directives to agencies to comply with their governing statutes in conducting RIFs. As the Court noted, *San Francisco* involved a Presidential directive to "withhold all federal grants from so-called 'sanctuary' cities and counties[,]" TRO Opinion at 32. Because the Executive Order at issue there unambiguously directed action consistent with the law, giving effect to the Savings Clause would deprive the Order itself of any meaning. 897 F.3d at 1238 (declining to credit argument "that the Executive Order is all bluster and no bite"). By contrast, a directive to agencies to "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law," does not even plausibly direct agencies to take action incompatible with law. Indeed, the Executive Order at issue here is on all fours with the D.C. Circuit's decision in *Allbaugh*, which the Ninth Circuit distinguished. 295 F.3d at 33 (rejecting Plaintiffs' argument that "notwithstanding the President's instruction that the Executive Order be applied only '[t]o the extent permitted by law,' a particular agency may try to give effect to the Executive Order when to do so is inconsistent with the relevant funding statute").

Plaintiffs' arguments are likewise unavailing on this point. Plaintiffs stress again that the Order states that it is intended to "commence[] a critical transformation of the Federal bureaucracy." Exec. Order 14210, § 1. Defendants underscored that this language—located in the Executive Order's "purpose" section—merely explains why President Trump issued the order and what he hopes will be accomplished by it. It does not by itself direct the agencies to do anything. This aspirational language does not direct anything by itself, nor is it a specific direction to agencies to violate the law. Plaintiffs note also that the Executive Order uses mandatory language. PI Brief at 12. But it provides agencies with broad discretion to determine how to implement it consistent with any applicable legal restrictions specific to their agency.

Plaintiffs also note that the Executive Order identifies certain offices that "shall be prioritized in the RIFs." Exec. Order 14210, § 3(c); PI Brief at 12. There is nothing improper about a President directing an agency to identify what the law allows, and then take whatever action is legally available to promote the President's priorities. Nothing in the Executive Order directs an agency to prioritize offices for RIFs even if an agency is not lawfully permitted to do so. To take one concrete example: the workforce Executive Order directs "components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations" to be prioritized in RIFs. Exec. Order 14210, § 3(c). Of course, if a particular agency's governing statutes *require* such components, the agency would presumably conclude that it was required to maintain those components—and in that scenario, the Workforce Executive Order directs the agency to follow the law. But there is nothing unlawful about the President directing that agencies prioritize such initiatives in exercising their *lawful* RIF authority.

### 4.  The Workforce Memorandum is Lawful

The Workforce Memorandum is likewise plainly lawful. It provides high-level guidance, setting forth principles that agency RIF Plans "*should* seek to achieve," tools that agencies "*should* employ" in developing ARRPs, and information that ARRPs "*should* include." ECF No. 37-1 App. B at 2, 4, 7 (emphases added). It states at least five times that agencies should only undertake actions that are consistent with their statutory authority. TRO Opposition at 37-38 & n.17. And it

repeatedly makes clear that agencies should not undertake any action that would impair service delivery functions. *Id.* at 38 & n.18. And although the Workforce Memorandum states certain topics ARRPs should address, it does not constrain agencies' discretion as to *how* they should address them. Given all of this, Plaintiffs' contention that the Memorandum does not "permit[] agencies to exercise meaningful discretion," PI Brief at 13, is mistaken.

Insofar as the Workforce Memorandum can be characterized as issuing directives to agencies at all, such as by instructing them to submit Plans to OPM and OMB "for review and approval" by specified dates, it falls comfortably within OPM's and OMB's statutory authorities and the process established by the President in the Executive Order. OPM has express statutory to "prescribe regulations for the release of competing employees in a reduction in force," 5 U.S.C. § 3502(a), and other statutes supplement that authority*, see, e.g.*, 5 U.S.C. § 1301 (OPM "shall aid the President, as he may request, in preparing the rules he prescribes under this title for the administration of the competitive service"); 5 U.S.C. § 1302(b) (OPM "shall prescribe and enforce regulations for the administration of the provisions of this title, and Executive orders issued in furtherance thereof, that implement the Congressional poli-cy" governing, inter alia, preferences for employee "retention"); *see also* 5 U.S.C. §§ 1103(a)(5)(A) and (c), 1104(b)(2). OPM exercised those authorities in promulgating detailed, Executive-wide RIF regulations, 5 C.F.R. Pt. 351, whose validity Plaintiffs do not question. Those regulations provide for OPM to "establish further guidance and instructions for the planning, preparation, conduct, and review of reductions in force" and to "examine an agency's preparations for reduction in force at any stage," 5 C.F.R. § 351.205, which squarely encompasses OPM's directives here. As for OMB, that office is likewise statutorily authorized to "establish general management policies for executive agencies" and "[f]acilitate actions by . . . the executive branch to improve the management of Federal Government operations and to remove impediments to effective administration." 31 U.S.C. §§ 503(b). Moreover, the Executive Order directs agency heads to submit plans. Exec. Order 14210, § 3(e).

## B. The Remaining *Winter* Factors Likewise Favor the Government

A "court need not consider the other factors" if a movant fails to show a likelihood of success on the merits. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

The Court accordingly need not and should not consider the other requirements. In any event, they too favor the Government. As to irreparable harm, any harm to employees associated with RIFs themselves are not irreparable. The MSPB may make wrongly removed employees whole through reinstatement, retroactive benefits, backpay, and attorney's fees. 5 U.S.C. §§ 1204(a)(2), 7701(g). Given these remedies, the Supreme Court has expressly held that loss of governmental employment does not ordinarily qualify as irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974). In its TRO opinion, the Court held that removed employees "will lose wages and health benefits and, in some cases, may need to relocate." TRO Opinion at 38. Although aware of similar circumstances in *Sampson*, the Supreme Court explained that these sorts of burdens common to most losses of government employment are insufficient. *See* 415 U.S. at 92 n.68 ("[I]nsufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury"); *see also Smith* v. *Department of the Army*, 89 M.S.P.R. 82, 83 (2001) (noting remedial actions for life and health insurance for federal employee reinstated after RIF).

The Court also noted *Sampson*'s qualification "that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." 415 U.S. at 92 n.68. The Court found this exception applicable because "[t]he Court here is not considering the potential loss of income of one individual employee, but the widespread termination of salaries and benefits for individuals, families, and communities." TRO Opinion at 38. But as the plain language from this passage in *Sampson* makes clear, the Supreme Court was talking about "circumstances surrounding *an employee's* discharge, together with the resultant effect *on the employee*." 415 U.S. at 92 n.68 (emphasis added)—in other words, an extraordinary injury to a particular employee. This does not mean that an injury "common to most discharged employees" can be transformed into an irreparable one by multiplying it across a group of affected employees. *Id.* Plaintiffs also heavily emphasize other types of alleged harm associated with RIFs, allegedly suffered by other parties. *See* PI Brief at 9 (speculating that RIFs at EPA "will impede

the abatement of lead contamination in drinking water" and that other RIFs will allegedly impair a "County's ability to respond to the measles outbreak"). But assuming that those asserted speculative, indirect, downstream harms sufficed for standing, which they do not, irreparable injury for purposes of injunctive relief requires more. *See Monsanto Co.* v. *Geertson Seed Farms*, 561 U.S. 139, 162 (2010). If the employees who face RIFs are not entitled to injunctive relief as an equitable matter, it would turn equity on its head to grant injunctive relief based on more remote harms to third parties claiming that they are indirectly affected by the employees' treatment.

By contrast, this Court's TRO has inflicted—and a preliminary injunction will further inflict—irreparable harm on the Government and the public interest. Such orders prevent the implementation of agency RIFs pursuant to the Executive Order and Memorandum and seriously hampering agencies' control over their own administration. As the Supreme Court has observed, "the Government has traditionally been granted the widest latitude" in personnel matters and "the 'dispatch of its own internal affairs.'" *Sampson*, 415 U.S. at 83 (citation omitted). Even more concretely, the inevitable consequence of Plaintiffs' requested injunction against 22 components including 12 Cabinet-level Departments, *see* PI Motion at 1, is to compel federal agencies to keep large numbers of employees on the payroll without necessity, at unrecoverable taxpayer expense, thereby frustrating the government's efforts to impose budgetary discipline and build a more efficient workforce. The Supreme Court has expressed concern about the intrusion inflicted by a court order directing the reinstatement of a *single* government employee, *see Sampson*, 415 U.S. at 91-92; it follows that an order freezing much larger layoffs unquestionably inflicts substantial and irreparable injury on the government as an employer and steward of public funds. The Supreme Court has also recognized much smaller fiscal and administrative injuries as constituting irreparable harm. *See Department of Education v. California*, 145 S. Ct. 966 (2025) (stay granted where TRO permitted potentially unrecoverable drawdowns of $65 million in grant funds); *Heckler* v. *Turner*, 468 U.S. 1305, 1307-08 (1984) (Rehnquist, J., in chambers) (prospect of the government being forced to make $1.3 million in improper payments per month supported a stay). And because the TRO broadly enjoins implementation of the Executive Order's directive to prepare for RIFs, it has sown confusion throughout the Executive Branch over what internal

administrative and planning actions agencies are permitted to undertake consistent with the order's terms. *See infra* p. 23.

### III. Any Relief Should be Limited

The Court should deny Plaintiffs' motion in its entirety. But even if the Court determines that an injunction is appropriate, it should limit its scope in multiple respects.

First, the Court should limit relief to the named parties. Nationwide relief would be improper because "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). In granting broader relief, this Court acknowledged that its order would "provide relief beyond the named parties," but it claimed that "to do otherwise is impracticable and unworkable, particularly where the agencies' RIF plans largely remain secret." TRO Opinion at 39. Plaintiffs repeat this point. PI Brief at 22-23. But it is up to the government to determine whether complying with a properly limited injunction is sufficiently unworkable that it should choose to extend broader relief to make it easier to comply. *See Arizona v. Biden*, 40 F.4th 375, 398 (6th Cir. 2022) (Sutton, C.J., concurring) ("that is initially the National Government's problem, not ours").

Second, Defendants again request that the Court make clear that any injunction enjoining implementation of the Workforce Executive Order and/or Workforce Memorandum does not deprive any enjoined components of their preexisting authority to conduct RIFs and otherwise manage their workforce independent of the Executive Order and the ARRP process set forth in the Workforce Memorandum, authority this Court did not question.

Independent of these arguments, any injunction should be considerably narrower than the TRO Order and significantly narrower than the preliminary injunction Plaintiffs have requested. "Although a district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction, injunctive relief must be tailored to remedy the specific harm alleged." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195 (9th Cir. 2024). An injunction also must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C).

The TRO is not consistent with these principles. It broadly enjoined *all* implementation or enforcement "sections 3(c) and 3(e) of Executive Order 14210." TRO Opinion at 40. Because Section 3(c) directs agencies to "undertake preparations" for RIFs, the TRO limits agencies' latitude to engage in a wide variety of internal planning and organizational activities. By its literal terms, the TRO at least arguably prevents (to take just some examples), drafting of Federal Register notices or similar draft documents, discussions among agency staff and agency counsel about potential future RIFs that might be taken pursuant to the Executive Order, and any other preparatory activities. But mere preparations do not harm Plaintiffs, and the breadth of the TRO represents an unjustified intrusion into the internal affairs of a coequal branch of government. And by broadly enjoining preparations, the TRO runs afoul of the principle that "an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed," *Scott v. Schedler*, 826 F.3d 207, 211-12 (5th Cir. 2016). Any preliminary injunction should be limited to discrete, clear actions that affect individual employees, and that are easily understood by any enjoined parties: issuance of new RIF notices or execution of existing notices pursuant to the Executive Order and Memorandum or, at most, these activities in addition to administrative leave placements, elimination or consolidation of programs or functions, transfer of functions or programs between the Agency Defendants taken pursuant to the challenged Executive Order and Memorandum. So limited to clear and identifiable prohibited actions, there is also no need for—and the Court should not order—"a proposed compliance plan" with the proposed review/response/objection process Plaintiffs propose, ECF No. 101 at 2. That laborious process is also demeaning to a coequal branch of government.

Finally, the Court should reject out of hand Plaintiffs' request "to rescind . . . any prior action taken to implement Executive Order 14210 and/or the OMB/OPM Memorandum and/or the ARRPs." ECF No. 101 at 2. Although not entirely clear, Defendants understand Plaintiffs to seek restoration of the full state of affairs virtually government-wide as it existed on February 10 (the day before the Workforce Executive Order was issued), including by undoing completed actions. Thus, for example, although Plaintiffs allow that "the requested injunction would not order *reinstatement* of employees to former federal employment," that is only because, on Plaintiffs'

understanding, no employees have yet been separated, PI Brief at 22.

Notably, this is far broader than Plaintiffs' TRO motion which sought only prospective relief. ECF No. 37 at 2 (seeking to enjoin "any further approval of" ARRPs, "any further" supposed specified orders by USDS, "any further implementation," and "any further transfer of functions or programs"); *see also* PI Brief at 3 (acknowledging that preliminary injunction motion extends beyond what Plaintiffs requested in seeking a TRO). And any such backward looking relief would be both highly burdensome and contrary to the principle that "courts must be 'institutionally wary of granting relief that disrupts, rather than preserves, the status quo.'" *Hanson v. Dist. of Columbia*, 120 F.4th 223, 247 (D.C. Cir. 2024) (quoting *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022)).

Plaintiffs cite *Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020), and *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 682 (9th Cir. 2023), for the proposition that the "status quo" represents the state of affairs before the challenged assertedly unlawful action. But in those cases the Ninth Circuit simply addressed whether enforcement of the challenged action (a Presidential Proclamation in *Doe #1* and a school district policy in *Fellowship of Christian Athletes*) represented the status quo for purposes of determining whether an injunction enjoining its implementation should be subject to a higher standard. The courts there did not also hold that it would be appropriate on a programmatic level to reach and attempt to unwind every action that might have taken pursuant to the challenged action, including by subjecting the government to a complex and judicially supervised "compliance plan." ECF No. 101 at 2. And in any event, even if the relevant "status quo" were February 10 (and it is not), it would be an abuse of discretion to issue an injunction requiring a virtual Executive Branch wide effort to restore the world as it existed on that date, particularly since Plaintiffs waited more than three months to seek that relief and did not seek it in their TRO Motion.

Finally, whether it grants or denies a preliminary injunction, the Court should leave in place its directive to Plaintiffs' counsel not to "share the [ARRPs] or their contents with their clients or any third parties unless or until the Court orders otherwise." ECF No. 109 at 5. Following the disposition of this motion, Defendants intend to move the Court for an order requiring Plaintiffs' counsel to destroy all copies of the disclosed ARRPs and to certify compliance with any such

1    order.

2    **IV.    Plaintiffs Should Be Ordered to Post Security in Connection with Any Relief**

3          The Government repeats and incorporates by reference its argument that Plaintiffs should

4    be required to post a security bond, as well as its argument about the appropriate scope of any such

5    bond. TRO Opposition at 50.

6                                  **CONCLUSION**

7          The Court should deny the motion for a preliminary injunction.

8    Dated: May 19, 2025                    Respectfully submitted,

9                                          PATRICK D. ROBBINS (CABN 152288)
10                                         Acting United States Attorney
                                           U.S. ATTORNEY'S OFFICE
11                                         450 Golden Gate Avenue, Box 36055
                                           San Francisco, California 94102-3495

12                                         ERIC J. HAMILTON (CABN 296283)
13                                         Deputy Assistant Attorney General

                                           DIANE KELLEHER
14                                         Branch Director

15                                         CHRISTOPHER HALL
                                           Assistant Branch Director

16                                         s/ Andrew M. Bernie
17                                         1100 L Street, NW
                                           Washington, DC 20005
18                                         Telephone: (202) 353-7203
                                           andrew.m.bernie@usdoj.gov

19                                         *Counsel for Defendants*

20

21

22

23

24

25

26

27

28