UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, et al., <br><br> Defendants. | Case No. 25-cv-03698-SI <br><br> **ORDER GRANTING PRELIMINARY INJUNCTION** <br><br> Re: Dkt. No. 101 |

Presidents may set policy priorities for the executive branch, and agency heads may implement them. This much is undisputed. But Congress creates federal agencies, funds them, and gives them duties that—by statute—they must carry out. Agencies may not conduct large-scale reorganizations and reductions in force in blatant disregard of Congress's mandates, and a President may not initiate large-scale executive branch reorganization without partnering with Congress. For this reason, nine Presidents over the last one hundred years have sought and obtained authority from Congress to reorganize the executive branch. Other Presidents—including President George W. Bush, President Obama, and President Trump in his first term—asked Congress for agency reorganization authority but did not receive it.

The defendants in this case are President Trump, numerous federal agencies, and the heads of those agencies. Defendants insist that the new administration does not need Congress's support to lay off and restructure large swathes of the federal workforce, essentially telling the Court, "Nothing to see here." In their view, federal agencies are not reorganizing. Rather, they have simply initiated reductions in force according to established regulations and "consistent with applicable law." The Court and the bystanding public should just move along.

United States District Court
Northern District of California

1    Yet the role of a district court is to examine the evidence, and at this stage of the case the

2    evidence discredits the executive's position and persuades the Court that plaintiffs are likely to

3    succeed on the merits of their suit. On February 11, 2025, the President ordered agencies to plan

4    for "large-scale reductions in force" (RIFs) and reorganizations. The agencies began submitting

5    "Agency RIF and Reorganization Plans" for review and approval by the President's centralized

6    decisionmakers. Agencies then rapidly began to implement these reorganizations and large-scale

7    reductions in force (RIFs) without Congressional approval. In some cases, as plaintiffs' evidence

8    shows, agency changes intentionally or negligently flout the tasks Congress has assigned

9    them. After dramatic staff reductions, these agencies will not be able to do what Congress has

10   directed them to do.[1]

11   Defendants try to refute this conclusion by insisting there are no relevant facts to review. In

12

13       [1] To illustrate what is at stake in this litigation, the Court highlights a few examples from the
     evidence submitted by plaintiffs.

14       The National Institute for Occupational Safety and Health (NIOSH) is part of the Centers
     for Disease Control in the Department of Health and Human Services. Dkt. No. 41-1 ("Decl.
15   Niemeier-Walsh AFGE") ¶ 5. There are (or were) 222 NIOSH employees in the agency's Pittsburgh
     office that research health hazards faced by mineworkers. *Id.* ¶ 28. According to the union that
16   represents many of these employees, the department's reduction in force will terminate 221 of 222
     of these positions. *Id.*
17       The federal Office of Head Start resides in the Department of Health and Human Services.
     Plaintiff Santa Clara County, California runs a childcare and early learning program for 1,200
18   infants and preschoolers with funding from federal Head Start, but that funding expires June 30,
     2025. Dkt. No. 37-26 ("Decl. Neuman SEIU") ¶ 21. County staff worked with Office of Head Start
19   employees to apply for a grant renewal, but those federal employees have now all been laid off and
     their San Francisco office closed. *Id.* Unsure whether its funding will continue, the county has
20   notified more than one hundred early learning program workers that they might lose their jobs on
     July 1, 2025. *Id.*
21       The Farm Service Agency in the U.S. Department of Agriculture provides specialized, low-
     interest loans to small farmers not available from the private sector. Dkt. No. 37-37 ("Decl. Davis
22   NOFA") ¶¶ 20-21. After unprecedented flooding in 2024, one Vermont farmer asked the Farm
     Service Agency for disaster assistance to plant a new crop, but the agency first had to inspect the
23   fields. *Id.* ¶ 28. Due to low staffing levels, the farmer had to wait three to four weeks for an
     inspection and consequently missed the planting window that season. *Id.* The department now
24   reportedly intends to further reduce staff at the agency. *Id.* ¶ 18. Other farmers have reported their
     contacts at the department have been laid off and the remaining staff are not familiar with their farms
25   or their projects. *Id.* ¶¶ 40-41.
         The Social Security Administration seeks to reduce its workforce by 7,000 employees.
26   Dkt. No. 37-11 ("Decl. Couture AFGE") ¶ 9, Ex. C. Since staff reductions began, retirees have
     reported long wait times to reach an agency representative on the phone, problems with the
27   agency's website, and difficulty making in-person appointments. Dkt. No. 37-39 ("Decl. Fiesta
     ARA") ¶ 7. One individual got through to a representative only after eleven attempts to call, each
28   involving hours on hold. Dkt. No. 41-2 ("Decl. Nelson AFSCME") ¶ 12.

the face of dozens of declarations in support of plaintiffs, defendants have submitted only one sworn declaration by an agency official. Defendants fought the Court's order for them to disclose the most relevant documents—the agencies' RIF and reorganization plans themselves.

Defendants maintain that the federal agencies are acting of their own accord and not at the President's direction, asking this Court to review the relevant executive actions using tunnel vision and ignore whatever may be happening on the ground. Numerous courts have rejected similar arguments in recent months. *See New York v. Trump*, 133 F.4th 51, 69 (1st Cir. 2025) (approving district court's finding that the "suggest[ion] that the challenged federal funding freezes were purely the result of independent agency decisions rather than the OMB Directive or the Unleashing Guidance . . . [was] disingenuous"); *Am. Fed'n of Gov't Employees, AFL-CIO v. OPM*, No. 25-cv-1780-WHA, --- F. Supp. 3d ----, 2025 WL 820782, at *5-6 (N.D. Cal. Mar. 14, 2025) (rejecting the government's contention that OPM did not issue a "directive" to terminate probationary employees and stating, "even the fig leaf of agency discretion allowed for in the [OPM memo] was illusory"); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, --- F. Supp. 3d ----, Civil Action No. 25-239 (LA), 2025 WL 597959, at *6-7 (D.D.C. Feb. 25, 2025) ("Defendants would have the court believe that countless federal agencies . . . suddenly began exercising their own discretion to suspend funding across the board at the exact same time. That would be a remarkable—and unfathomable—coincidence.").

Put simply, in this case, defendants want the Court to either declare that nine Presidents and twenty-one Congresses[2] did not properly understand the separation of powers, or ignore how the executive branch is implementing large-scale reductions in force and reorganizations. The Court can do neither. On May 9, 2025, the Court ordered defendants to pause their activities for two weeks while it received further arguments from the parties. Dkt. No. 85. Plaintiffs—a collection of unions, non-profit organizations, and local governments—now ask the Court to approve a preliminary injunction that pauses further RIFs and reorganization of the executive branch for the duration of

---

[2] Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* (2012).

United States District Court
Northern District of California

this lawsuit.  To preserve the status quo and protect the power of the legislative branch, the Court GRANTS the motion.

**BACKGROUND**

**I.    Executive Order 14210 and the Challenged Memorandum**

On February 11, 2025, President Trump issued Executive Order 14210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative."  90 Fed. Reg. 9669 (Feb. 11, 2025).  The order "commences a critical transformation of the Federal bureaucracy[.]" *Id.* § 1.  Section 3(c) of the order states,

> Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs. All offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website. This subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement.

*Id.* § 3(c).  The order also directs agencies to submit a report within thirty days to the Office of Management and Budget that "shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated."  *Id.* § 3(e).

In response to Executive Order 14210, the directors of the Office of Management and Budget (OMB) and the Office of Personnel Management (OPM) sent a memo to heads of executive departments and agencies on February 26, 2025.  Dkt. No. 37-1, Ex. B ("OMB/OPM Memo").  The memo states that "tax dollars are being siphoned off to fund unproductive and unnecessary programs that benefit radical interest groups while hurting hard-working American citizens.  [¶]  The American people registered their verdict on the bloated, corrupt federal bureaucracy on November 5, 2024 by voting for President Trump and his promises to sweepingly reform the federal government."  *Id.* at 1.  The memo instructed agency heads to submit Agency RIF and

4

Reorganization Plans (ARRPs) to OMB and OPM for review and approval. Agencies were directed to submit a "Phase 1" ARRP by March 13, 2025—i.e., in two weeks—that included, among other information, any Congressional statutes that established the agency, whether parts of the agency should be eliminated, a list of essential positions, how the agency intends to reduce positions, a "suggested plan for congressional engagement to gather input and agreement on major restructuring efforts," and the agency's timeline for implementation. *Id.* at 3-4. The memo directs agencies to submit "Phase 2" ARRPs by April 14, 2025 that include, among other information, all reductions that will occur through RIFs, proposed relocations of offices from the Washington, D.C. area to "less-costly parts of the country," "[a]n explanation of how the ARRPs will improve services for Americans and advance the President's policy priorities," a certification that the ARRPs will improve the delivery of direct services, and a timetable for implementation. *Id.* at 4-6. The memo also instructs agencies to send monthly progress reports to OMB and OPM on May 14, June 16, and July 16, 2025. *Id.* at 6. The memo excludes law enforcement, border security, national security, immigration enforcement, public safety, military personnel, the Executive Office of the President, and the U.S. Postal Service. *Id.*

## II.     The Agency Defendants and Their Locations Within the Federal Bureaucracy

### A.     The Central Agencies: OMB, OPM, and DOGE

In 1970, Congress transferred OMB to the President's authority. Reorganization Plan No. 2 of 1970, 84 Stat. 2085 (1970) (located at 5 U.S.C. Appendix, page 213). In 1982, Congress codified OMB's current location in the Executive Office of the President[3] at 5 U.S.C §§ 501-507. In 1978, Congress established OPM as an "independent establishment in the executive branch" and the agency resides outside of the Executive Office of the President. 5 U.S.C. § 1101; Pub. L. No. 95-454, Title II, § 201(a), 92 Stat. 1111, 1118 (1978). In 2025, President Trump refashioned the U.S.

---

[3] "Established in 1939, the Executive Office of the President (EOP) consists of a group of federal agencies immediately serving the President." Harold C. Relyea, Cong. Rsch. Serv., 98-606, *The Executive Office of the President: An Historical Overview* (2008).

Digital Service—an office that President Obama created within OMB[4]—into the U.S. DOGE Service via Executive Order 14158.  90 Fed. Reg. 8441 (Jan. 20, 2025).  DOGE is known colloquially as the Department of Government Efficiency, but it derives no authority from statutes.

### B.    The Other Federal Agency Defendants

The defendants include twenty-two other federal departments or agencies that are arguably more public facing.  For ease of reference, this order refers to these defendants collectively as the "federal agency defendants."  That term does not include OMB, OPM, or DOGE.  Fourteen of the federal agency defendants are considered "executive departments" under 5 U.S.C. § 101 and have been established by Congressional statute.[5]  *See, e.g.*, 7 U.S.C. § 2201 (USDA); 22 U.S.C. § 2651 (State); 38 U.S.C. § 301 (VA); 42 U.S.C. § 3532 (HUD).

Seven additional defendant agencies have a statutory basis elsewhere in the United States Code and one was created by President Nixon under reorganization authority granted by Congress, as follows:

Defendant AmeriCorps, known formally as the Corporation for National and Community Service, received its current statutory formulation through the National and Community Service Trust Act of 1993.  Pub. L. No. 103-82, Title II, §§ 202-03, 107 Stat. 785, 873 (1993) (codified at 42 U.S.C. § 12651 et seq.).  AmeriCorps is a "government corporation."  42 U.S.C. § 12651 (referring to 5 U.S.C. § 103).

Defendant Peace Corps was created by Congressional adoption of the Peace Corps Act in 1961.  Pub. L. No. 87-293, 75 Stat. 612 (1961) (now codified at 22 U.S.C. § 2501 et seq.).

Defendant General Services Administration (GSA) was established by Congress in the

---

[4] *See* Clinton T. Brass and Dominick A. Fiorentino, Cong. Rsch. Serv., IN12493, *Department of Government Efficiency (DOGE) Executive Order: Early Implementation* (2025).

[5] These include the departments of Agriculture (USDA), Commerce, Defense, Energy, Health and Human Services (HHS), Homeland Security (DHS), Housing and Urban Development (HUD), Justice (DOJ), Interior, Labor, State, Treasury, Transportation, and Veterans Affairs (VA). The only executive department not named in this suit is the Department of Education.  Plaintiffs' preliminary injunction request does not implicate the departments of Defense, Justice, or Homeland Security.  *See* Dkt. No. 101 at 1.

6

1   Federal Property and Administrative Services Act of 1949.  Pub. L. No. 81-152, 63 Stat. 277 (1949).

2   The structure of the agency is now codified at 42 U.S.C. § 301 et seq.

3           Defendant National Labor Relations Board (NLRB) was created by the National Labor

4   Relations Act of 1935.  Pub. L. No. 74-198, ch. 372, 49 Stat. 449 (1935).  The structure of the agency

5   is codified at 29 U.S.C. § 153.

6           Defendant National Science Foundation (NSF) was established by the National Science

7   Foundation Act of 1950.  Pub. L. No. 81-507, ch. 171, 64 Stat. 149 (1950).  The structure of the

8   agency is codified at 42 U.S.C. § 1861 et seq.

9           Defendant Small Business Administration (SBA) was established by the Small Business Act

10  of 1953 as amended in 1958.  Pub. L. No. 85-536, 72 Stat. 384 (1958).  The structure of the agency

11  is now codified at 15 U.S.C. § 633 et seq.

12          Defendant Social Security Administration (SSA) was first established by Congress in the

13  Social Security Act of 1935, known at that time as the Social Security Board.  Pub. L. No. 74-271,

14  § 701 et seq., 49 Stat. 620, 635 (1935) (now codified at 42 U.S.C. § 901 et seq.).

15          Defendant Environmental Protection Agency (EPA) was created by the Reorganization Plan

16  No. 3 of 1970 under statutory reorganization authority granted to the President by Congress at that

17  time.  35 Fed. Reg. 15623, 84 Stat. 2086 (1970) (located at 5 U.S.C. Appendix, page 216).  Congress

18  later ratified the agency's creation by statute.  Pub. L. No. 98-532, 98 Stat. 2705 (1984).

19

20  **III.    Agency RIF and Reorganization Plans (ARRPs)**

21          Pursuant to the terms of the OMB/OPM February 26, 2025 memo, federal agencies were

22  directed to submit Phase 1 ARRPs by March 13, 2025 and Phase 2 ARRPs by April 14, 2025.

23  OMB/OPM Memo at 3-4.  Defendants have not publicly released these plans despite requests from

24  the public, employees, and members of Congress.  The Court has reviewed *in camera* the ARRPs

25  of four defendant agencies.  *See* Dkt. No. 109.

26          From the Court's understanding of the evidence filed in this case, an agency's action steps

27  in response to the OMB/OPM Memo would include the following: (1) submitting its ARRP to OMB

28  and OPM; (2) receiving approval of the ARRP by OMB and OPM, either formally or informally;

United States District Court
Northern District of California

1    (3) sending RIF notices; (4) placing employees on administrative leave; and (5) terminating

2    employees.

3        As described in sworn declarations submitted by plaintiffs, the federal agency defendants

4    are at different points along this continuum.  In a May 16 filing, the Solicitor General told the

5    Supreme Court that his office "has been informed by OPM that about 40 RIFs in 17 agencies were

6    in progress and are currently enjoined by [this Court's May 9] TRO."  Application for Stay, No.

7    24A1106 (U.S.), 29.  From plaintiffs' evidence, these agencies include defendants HHS, HUD,

8    Labor, State, AmeriCorps, GSA, and SBA.  After sending RIF notices to employees, agencies have

9    sometimes placed these employees on immediate administrative leave until the termination date set

10   by the RIF, usually sixty days after the notice.  *See*, *e.g.*, Dkt. No. 37-14 ("Decl. Fabris AFGE") ¶¶

11   11-15.  The earliest RIF termination date that the Court can discern from the declarations would

12   have been May 18, 2025, at which point some HUD employees would have been terminated but for

13   the Court's temporary restraining order.  Dkt. No. 41-1 ("Decl. Bobbitt AFGE") ¶¶ 13-14, Exs. C,

14   D.

15       As directed by Executive Order 14210, the scale of the RIFs is "large."  Here are some

16   examples.  HHS is issuing RIF notices to 8,000-10,000 employees.  Dkt. No. 37-17 ("Decl.

17   Garthwaite AFGE") ¶ 7, Ex. A.  Reports indicate the Department of Energy has identified 8,500

18   positions as eligible for cuts, nearly half of its workforce.  Dkt. No. 37-8 ("Decl. Braden AFGE")

19   ¶ 12, Ex. A.  The National Oceanic and Atmospheric Administration is reportedly preparing a RIF

20   to reduce its workforce by more than half.  Dkt. No. 37-40 ("Decl. Molvar WWP") ¶ 23.  Reports

21   also suggest that HUD is preparing to cut half of its staff and close many field offices.  Decl. Bobbitt

22   AFGE ¶¶ 9, 11, Exs. A, B.  Department of Labor management have said internally that they intend

23   to cut the agency's headquarters staff by 70%.  Dkt. No. 37-16 ("Decl. Gamble AFGE") ¶ 12.

24   Reports suggest the Internal Revenue Service in the Department of the Treasury plans to cut 40%

25   of its staff.  Dkt. No. 37-42 ("Decl. Olson CTR") ¶ 10.  The VA is planning to cut 83,000 positions.

26   Dkt. No. 37-5 ("Decl. Bailey SEIU") ¶ 12.  AmeriCorps sent an email to employees announcing a

27   reorganization that will cut more than half of its workers.  Dkt. No. 37-12 ("Decl. Daly AFSCME")

28   ¶ 14, Ex. A.  National Science Foundation has been directed to cut about half of its 1,700 staff.  Dkt.

United States District Court
Northern District of California

8

1    No. 37-32 ("Decl. Soriano AFGE") ¶¶ 9-10, Ex. A.  The Small Business Administration announced

2    it planned to cut its workforce by more than 40%.  Dkt. No. 37-18 ("Decl. Gustafsson AFGE") ¶ 6,

3    Ex. A.

4

5    **IV.    Plaintiffs**

6           The union plaintiffs in this case consist of the American Federation of Government

7    Employees (AFGE) and four of its locals (Local 1122, Local 1236, Local 2110, and Local 3172);

8    the American Federation of State, County and Municipal Employees (AFSCME); and the Service

9    Employees International Union (SEIU) and three of its locals (Local 521, Local 1000, and Local

10   1021).  Eleven membership-based non-profit organizations have joined the unions as co-plaintiffs:

11   Alliance for Retired Americans, American Geophysical Union, American Public Health

12   Association, Center for Taxpayer Rights, Coalition to Protect America's National Parks, Common

13   Defense Civic Engagement, Main Street Alliance, Natural Resources Defense Council, Northeast

14   Organic Farming Association, VoteVets Action Fund, and Western Watersheds Project.  Six local

15   governments have also joined the suit: Santa Clara County, CA; King County, WA; Baltimore, MD;

16   Harris County, TX; Chicago, IL; and San Francisco, CA.

17          The plaintiffs in this action are discussed more fully in the Court's consideration of standing

18   below.

19

20   **V.    Procedural History**

21          Plaintiffs filed suit on April 28, 2025.  Dkt. No. 1.  The complaint alleges that President

22   Trump's Executive Order 14210 is *ultra vires* and usurps Congressional authority, in violation of

23   the Constitution's separation of powers (Claim One); that OMB, OPM, and DOGE also acted *ultra*

24   *vires* or beyond their authority in implementing Executive Order 14210, including by issuing the

25   OMB/OPM Memo (Claim Two); that the OMB/OPM Memo violated the Administrative Procedure

26   Act (APA) in several ways (Claims Three through Five); and that the federal agency defendants'

27   ARRPs also violate the Administrative Procedure Act (Claims Six and Seven).

28          On May 1, 2025, plaintiffs filed a motion for a temporary restraining order.  Dkt. No. 37-1

*United States District Court*
*Northern District of California*

9

("TRO Mot."). Per the Court's schedule, defendants filed an opposition on May 7, 2025, and plaintiffs filed a reply the following day. Dkt. Nos. 60 ("TRO Opp'n"), 70 ("TRO Reply"). The Court received several briefs from *amici curiae*. Dkt. Nos. 51, 69, 71, 75. The Court heard oral arguments on the motion on Friday, May 9, 2025 and issued a two-week temporary restraining order (TRO) later that day. Dkt. No. 85.

Defendants then asked the Court to reconsider a portion of that order that compelled production of the ARRPs. Dkt. No. 88. The Court stayed that part of its order to receive further briefing from the parties. Dkt. No. 92. After reviewing the parties' arguments, the Court ordered defendants to produce a sampling of the ARRPs to the Court for *in camera* review and to plaintiffs' counsel for their eyes only. Dkt. No. 109.[6]

On May 14, 2025, plaintiffs filed an amended complaint, adding two local union plaintiffs (SEIU Locals 521 and 1021) and one additional federal agency defendant (the Peace Corps). Dkt. No. 100. Plaintiffs filed a motion for a preliminary injunction that same day. Dkt. No. 101-1 ("PI Mot."). On May 19, 2025, defendants filed an opposition to the motion for a preliminary injunction. Dkt. No. 117 ("PI Opp'n"). Plaintiffs replied on May 20, 2025. Dkt. No. 120 ("PI Reply"). The Court heard oral argument on the preliminary injunction motion on May 22, 2025.

## LEGAL STANDARD

"[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). In order to obtain a preliminary injunction, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20 (citations omitted). When the nonmoving party is the government, the final two factors merge. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418,

---

[6] Though defendants provided the documents, the parties continue to dispute whether the ARRPs defendants provided are the versions "approved" by OMB and OPM. *See* Dkt. No. 119.

435 (2009)).

Alternatively, under the "serious questions" test, the plaintiff may demonstrate "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," so long as the other two *Winter* factors are also met. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal quotation marks and citation omitted). This formulation recognizes a sliding scale approach, where "a stronger showing of one element may offset a weaker showing of another." *Id.* at 1131, 1134-35.

## DISCUSSION

### I.    Timing

As at the TRO stage, defendants first argue that plaintiffs' motion for a preliminary injunction should be denied because it was brought too late after the Executive Order and the OMB/OPM Memo issued.  TRO Opp'n at 19-22; PI Opp'n at 4-6.  Defendants' argument is not well-taken.  Due to defendants' ongoing decision not to release the ARRPs publicly, the details of the federal agency defendants' RIF and reorganization plans have come into public view only slowly and at random.  Moreover, in a case where other plaintiffs challenged Executive Order 14210 shortly after it was issued, as defendants suggest should have been done here, the government's attorneys argued that plaintiffs' harm was still too "speculative" to establish injury.  *See Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), Dkt. No. 14 at 10-11 (D.D.C. filed Feb. 17, 2025). Defendants cannot have it both ways.  If defendants' position is that people will find out about the RIFs when the RIF notices begin to go out, then the Court finds that plaintiffs reasonably waited to gather what information they could about the harm they may suffer from the Executive Order, the OMB/OPM Memorandum, and the ARRPs before moving for emergency relief.  When the harm became readily apparent, they filed suit.

### II.    Standing

Federal courts may only hear a case if plaintiffs can show they have standing to sue. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016, revised May 24, 2016).  "As a general rule, in an injunctive

United States District Court
Northern District of California

United States District Court
Northern District of California

1  case this court need not address standing of each plaintiff if it concludes that one plaintiff has

2  standing." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523

3  (9th Cir. 2009).

4       To establish standing to sue, plaintiffs must show an injury, trace that injury to the

5  defendants' conduct, and prove that courts can provide adequate redress for the injury. *Lujan v.*

6  *Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The injury "must be concrete, particularized, and

7  actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation

8  marks and citation omitted). To be imminent, a threatened injury must be "*certainly impending*"—

9  "allegations of *possible* future injury are not sufficient." *Id.* (internal quotation marks, brackets, and

10  citations omitted). Plaintiffs cannot base standing on a theory of harm that "relies on a highly

11  attenuated chain of possibilities." *Id.* at 410. The standing inquiry must be "rigorous" where the

12  court faces claims that Congress or the executive branch has acted unconstitutionally. *Id.* at 408.

13       Organizational plaintiffs such as trade unions or membership-based non-profit organizations

14  have two paths to establish standing. "[A]n association has standing to bring suit on behalf of its

15  members when: (a) its members would otherwise have standing to sue in their own right; (b) the

16  interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim

17  asserted nor the relief requested requires the participation of individual members in the lawsuit."

18  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Organizations without

19  formal members may achieve associational standing if they are "the functional equivalent of a

20  membership organization." *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002)

21  (citing *Hunt*, 432 U.S. at 342-45).

22       Injury may come in many forms. The threat of a pending job loss constitutes a concrete

23  economic injury. *Am. Fed'n of Lab. v. Chertoff*, 552 F. Supp. 2d 999, 1014 (N.D. Cal. 2007). The

24  possible loss of federal funding is also sufficient to establish injury. *Nat'l Urb. League v. Ross*, 508

25  F. Supp. 3d 663, 688 (N.D. Cal. 2020). A failure to provide relevant information can constitute

26  injury where one might be entitled to such information. *Fed. Election Comm'n v. Akins*, 524 U.S.

27  11, 20 (1998). While the Ninth Circuit has held an organization can meet the injury requirement by

28  showing it had to divert resources to fight a problem affecting the organization, *La Asociacion de*

*Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010), the Supreme Court recently rejected organizations seeking standing "simply by expending money to gather information and advocate against the defendant's action," *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

With this framework in mind, the Court now turns to the question of standing as applied to plaintiffs in this case. Since the Court need not address the standing of each plaintiff to proceed, so long as it finds standing for at least one plaintiff, it limits its discussion below.

### A.    Injury

The numerous plaintiffs in this case can be divided into three general groups, each with its own set of alleged injuries.

#### 1.    Union Plaintiffs

In the declarations filed in support of their motions for a temporary restraining order and preliminary injunction, the union plaintiffs assert the following categories of harm.

First, and perhaps most obviously, they assert injury on behalf of their federal employee members who have received RIF notices or who suffer under the looming threat of such notices. *See, e.g.*, Dkt. No. 37-23 ("Decl. Kelley AFGE") ¶ 16. Second, they contend that their federal employees who are not let go will be injured by significantly increased workloads. *See, e.g.*, Dkt. No. 37-9 ("Decl. Burke AFGE") ¶ 21; Decl. Daly AFSCME ¶ 30. Third, they assert injury to the unions themselves, in the form of "thousands of hours" of diverted staff resources and the loss in dues revenue that will result from the loss of employee members. *See, e.g.*, Decl. Kelley AFGE ¶¶ 12-13, 15, 20.

The unions also assert injury on behalf of their non-federal employee members who stand to lose their jobs as a result of federal workforce reductions. For example, SEIU represents 6,000 federal contract workers at facilities that may face closure in the wake of staff reductions. Dkt. No. 37-3 ("Decl. Adler SEIU") ¶¶ 4, 9. These workers have lost their jobs during government shutdowns, or in the recent contested closure of the U.S. Institute of Peace facility. *Id.* ¶¶ 5, 7. SEIU

United States District Court
Northern District of California

1    Local 521 represents Head Start workers who have been informed they may lose their jobs on July

2    1, 2025, because staffing reductions at the Office of Head Start has created uncertainty about the

3    renewal of funding.  Dkt. No. 101-4 ("Decl. Woodard SEIU") ¶ 9.  Similarly, if staff reductions lead

4    to the delay in processing of Medicare enrollment or other federal funding sources like grant

5    payments, union members that work in sectors that depend on these revenue streams face layoffs.

6    As just two provided examples, AFSCME members work in local housing authorities and local

7    transit agencies that rely on a steady stream of federal funding.  Dkt. No. 41-5 ("Decl. O'Brien

8    AFSCME") ¶¶ 39-40, 45-46; Decl. Woodard SEIU ¶¶ 10-11.

9         At the TRO stage, defendants first argued that the unions do not show that a specific federal

10   employee has been harmed or will imminently be harmed.  TRO Opp'n at 32 (citing *Summers v.*

11   *Earth Island Inst.*, 555 U.S. 488, 499 (2009)).  Defendants are factually mistaken and overstate their

12   legal case.  Factually, multiple declarants have asserted personal harm.  *See*, *e.g.*, Decl. Fabris AFGE

13   ¶ 10 (declarant received RIF notice); Dkt. No. 37-24 ("Decl. Levin AFGE") ¶¶ 14-15 (declarant

14   placed on same-day administrative leave); Decl. Bobbit AFGE, Ex. D (declarant received and

15   provided redacted list of employees in RIF notice).  As to the doctrine, the Court in *Summers* wanted

16   to ensure that injury had been specifically established by sworn affidavits.  The Ninth Circuit later

17   clarified that naming individuals is not necessary "when it is clear and not speculative that a member

18   of a group will be adversely affected by a challenged action and a defendant does not need to know

19   the identity of a particular member to defend against an organization's claims."  *Mi Familia Vota v.*

20   *Fontes*, 129 F.4th 691, 708 (9th Cir. 2025).  It is not speculative here that the unions' members are

21   being harmed by defendants' challenged actions.

22        The unions also establish standing as organizations representing federal employees based on

23   impending direct financial harm to their organizations in the form of lower membership numbers

24   and lower dues.  *See*, *e.g.*, Decl. Kelley AFGE ¶¶ 12-13, 15, 20.

25        SEIU has also established standing based on the federal contract workers that it represents.

26   These workers have lost their jobs when federal facilities close.  Decl. Adler SEIU ¶¶ 5, 7.  The

27

28

14

1    ARRPs are likely to result in the closure of more federal facilities,[7] and when that happens SEIU's

2    contract workers will lose their jobs. This is not like the attenuated five-link chain of cascading

3    events in *Clapper*; given the breadth of the RIFs that have been announced, these injuries are

4    "certainly impending." *See Clapper*, 568 U.S. at 410.

5        AFSCME also represents non-federal employee workers who rely on the federal workforce

6    to process grants to support their work. In the Department of Energy's Weatherization Assistance

7    Program, reports indicate the number of federal staff will decrease by 75%. Dkt. No. 37-15 ("Decl.

8    Gabel AFSCME") ¶ 11. If or when these cuts are implemented, AFSCME workers at a non-profit

9    supported by this program will find it "extremely challenging to get the necessary grant money to

10   operate, and layoffs . . . are almost certain." *Id.* ¶ 12. While slightly more attenuated than the

11   contract workers' basis for standing, the Court finds that these facts support an independent basis

12   for standing as well.

13       Defendants have also challenged whether the employees who will be saddled with more

14   work will have experienced a concrete harm. TRO Opp'n at 33. The Court need not decide at this

15   stage whether this type of injury is sufficient for standing.

16

17           **2.    Non-Profit Plaintiffs**

18       All the non-profit organization plaintiffs have submitted declarations that detail the harms

19   that significant federal workforce reductions impose upon their members or the organizations

20   themselves. Two consistent themes emerge from these declarations. First, the organizations'

21   members benefit from services provided by federal employees, but significant staffing reductions

22   across various agencies impact their ability to continue to benefit. Second, many of the

23   organizations assert that they have had to divert resources away from their primary mission to

24   respond to the impact of federal staffing cuts on their members.

25       As defendants note, the diversion of resources theory rests on shakier ground after *Food &*

26

27   ───────────────

28   [7] One of the principles to inform the ARRPs, per the OMB/OPM Memorandum, is "[a] reduced real property footprint." OMB/OPM Memo at 2.

United States District Court
Northern District of California

*Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024).[8]  But at least some of the non-profit organization plaintiffs establish injury on other bases.  For example, the American Geophysical Union attests that implementation of ARRPs will cause the organization to lose membership, publication authors, and conference attendees, resulting in a loss of revenue to the organization.  Dkt. No. 37-45 ("Decl. Shultz AGU") ¶¶ 9, 28-29.  Based on its past experience, the Center for Taxpayer Rights suggests that its low-income members will see delays to the processing of refunds that they rely on for day-to-day expenses.  Dkt. No. 37-42 ("Decl. Olson CTR") ¶¶ 35-37.

The Court finds these types of harm sufficient to establish injury.  None are as attenuated as the causal chain of events leading to potential injury in *Clapper*.  The Court reserves a full discussion of standing for each non-profit plaintiff for a later stage.

### 3.    Local Government Plaintiffs

To establish standing, a local government must assert a harm to its own "proprietary interests," which "are as varied as a municipality's responsibilities, powers, and assets."  *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004).  Proprietary interests include a local government's ability to enforce regulations, collect revenue, and protect its natural resources.  *Id.* at 1198.

The local government plaintiffs assert that large-scale reductions in the federal workforce will jeopardize the timely delivery of many different federal funding streams that their budgets rely on.  Baltimore also asserts a more direct financial injury in the form of lost municipal tax revenues, given that 12,400 city residents are (or were) federal employees.  Dkt. No. 37-54 ("Decl. Leach—Baltimore") ¶¶ 5-8.  The local governments also contend that they will be forced to expend more resources in the absence of federal support, in areas like fighting wildfires or providing shelter.  Dkt.

---

[8] The Supreme Court there denied standing when plaintiff organizations incurred costs opposing the government's actions but explained that organizations have standing when a defendant's acts "directly affected and interfered with [plaintiff's] core business activities."  *All. for Hippocratic Med.*, 602 U.S. at 395.

United States District Court
Northern District of California

United States District Court
Northern District of California

No. 37-58 ("Decl. Williams—SCC") ¶¶ 24, 43.

The Court finds the local governments have standing on the basis of impending financial harm. For example, King County has a budget that includes more than $200 million in federal revenue for its operating budgets and $500 million in federal funds in its capital budget for 2025. Dkt. No. 41-6 ("Decl. Dively—King County") ¶¶ 6, 8. The county communicates with staff across multiple federal agencies to process grants and permits for capital projects; any delay in these communications delays projects and increases costs. *Id.* ¶¶ 22, 26, 31, 33, 38. With large-scale RIFs happening across agencies, such delay is likely.[9] As another example, Harris County Public Health receives grants from the Centers for Disease Control and Prevention, an agency within defendant HHS, but has begun to experience a delay in communication after HHS initiated its RIF. Dkt. No. 37-46 ("Decl. Barton—Harris County") ¶¶ 23, 26.

Finding the above sufficient to establish standing for at least some of the local governments, the Court reserves a fuller analysis for another day.

### 4.    Procedural Injury

Lastly, plaintiffs across all of the above categories assert a procedural injury for their notice-and-comment claims, because they contend they would have submitted comments had they been given a chance. *See*, *e.g.*, Dkt. No. 37-31 ("Decl. Soldner AFGE") ¶ 27. Some explained that they provided comments in response to notices about similar proposals during President Trump's first administration. *See*, *e.g.*, *id.*

A procedural injury must be related to a plaintiff's concrete interests. *Summers*, 555 U.S. at 496. As a collection of plaintiffs have established standing based on harm to their concrete interests, the plaintiffs also have standing to challenge a lack of notice and comment procedures.

---

[9] As one example, King County believes the closure of HUD's regional office in Seattle will result in delays in disbursement of the County's $47 million in federal grant funds. Decl. Dively—King County ¶¶ 37-38.

### B. Causation and Redressability[10]

Plaintiffs challenge three layers of action: the President's Executive Order, the OMB/OPM Memo issued pursuant to the Executive Order, and the agency ARRPs submitted pursuant to the memorandum. The harm experienced by plaintiffs or imminently threatening them comes from the reorganizations and RIFs established by the ARRPs. As many declarants have offered, the agencies had not talked about large-scale RIFs or reorganizations prior to President Trump's February 11, 2025 Executive Order. *See, e.g.*, Decl. Bailey SEIU ¶ 10; Decl. Garthwaite AFGE ¶ 6. These harms are fairly traceable to defendants' actions at all three levels; beyond the defendants, there are no intervening actors causing these harms. *See Lujan*, 504 U.S. at 560.

Finally, the Court can redress the harms by vacating the unlawful actions as allowed by the APA and Supreme Court precedent.

### C. Conclusion as to Standing

At this preliminary injunction stage, the Court finds at least some collection of the plaintiffs have sufficient standing to bring their claims.

## III. Subject Matter Jurisdiction—*Thunder Basin* Preclusion

Courts generally have jurisdiction under 28 U.S.C. § 1331 to review federal government actions. *Califano v. Sanders*, 430 U.S. 99, 105 (1977). But Congress sometimes precludes district court review "by specifying a different method to resolve claims about agency action," *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023), often through channeling review to an adjudicative body within an agency. In determining whether Congress has removed district court jurisdiction, courts ask two questions: whether "the 'statutory scheme' displays a 'fairly discernible' intent to limit jurisdiction" and whether "the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,

---

[10] Defendants do not specifically challenge causation or redressability in their opposition briefs, but the Court must complete the standing inquiry regardless.

561 U.S. 477, 489 (2010) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)).

When examining the second question—whether the particular claims should be channeled to agency review—courts consider three factors from *Thunder Basin*: "First, could precluding district court jurisdiction foreclose all meaningful judicial review of the claim? Next, is the claim wholly collateral to the statute's review provisions? And last, is the claim outside the agency's expertise?" *Axon*, 598 U.S. at 186 (internal quotation marks, brackets, and citations omitted). Affirmative answers to these questions suggest that Congress did not intend to limit jurisdiction, "[b]ut the same conclusion might follow if the factors point in different directions." *Id.* Together, these factors recognize that agency action should rarely evade effective judicial review, but channeling from a district court to an agency adjudication may be appropriate "in the matters [an agency] customarily handles, and can apply distinctive knowledge to." *Id.*

Defendants argue that the Federal Service Labor-Management Relations Statute and the Civil Service Reform Act of 1978 preclude district court jurisdiction over plaintiffs' claims. TRO Opp'n at 23-31; PI Opp'n at 6-11. The Federal Service Labor-Management Relations Statute established a Federal Labor Relations Authority to resolve issues related to collective bargaining between federal employee unions and their employers, including "issues relating to the granting of national consultation rights," "issues relating to determining compelling need for agency rules or regulations," "issues relating to the duty to bargain in good faith," and "complaints of unfair labor practices." 5 U.S.C. § 7105(a)(2). In passing the statute, Congress specified that its provisions "should be interpreted in a manner consistent with the requirement of an effective and efficient Government." *Id.* § 7101(b). The Civil Service Reform Act provides a mechanism for employees who have suffered an adverse action to appeal to the Merit Systems Protection Board. 5 U.S.C. §§ 7512, 7513(d); *see also* 5 U.S.C. § 1204 (delineating functions of the Board). The Civil Service Reform Act of 1978 excluded reductions in force from the definition of "adverse action" appealable to the Board. 5 U.S.C. § 7512(B); 5 C.F.R. § 752.401(b)(3). However, per federal regulations issued by OPM, employees who have been furloughed, separated or demoted by a reduction in force

can appeal to the Board.  5 C.F.R. § 351.901.[11]  Judicial review of final orders of both the Authority and the Board is available at circuit courts.  5 U.S.C. §§ 7703, 7123(a).

Defendants' opposition cites to courts across the country that have begun to address this question in the context of similar claims.  On February 12, 2025, a District of Massachusetts court declined to enjoin enforcement of the deadline for opting into a deferred resignation program.  *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459, at *1-3 (D. Mass. Feb. 12, 2025).  The court determined the plaintiff unions lacked standing and that the claims were precluded by the Federal Service Labor-Management Relations Statute and the Civil Service Reform Act of 1978, which establish "exclusive procedures for disputes involving employees and their federal employers and disputes between unions representing federal employees and the federal government."  *Id.*

In a February 20, 2025 ruling, a D.C. district court denied a temporary restraining order and preliminary injunction because it found that the union plaintiffs were precluded by the Federal Service Labor-Management Relations Statute under *Thunder Basin*.  *Nat'l Treasury Emps. Union v. Trump*, No. 25-CV-420 (CRC), 2025 WL 561080, at *8 (D.D.C. Feb. 20, 2025).  There, the plaintiffs sought to prevent the termination of probationary employees, anticipated large-scale RIFs, and any renewal of deferred resignation programs.  *Id.* at *1.  The court determined that the unions' claimed injuries—financial harm and loss of bargaining power—could be meaningfully reviewed through the Federal Labor Relations Authority, even though that body could not resolve the unions' constitutional claims.  *Id.* at *6-7.  The constitutional question could be revived in an appeal of the Federal Labor Relations Authority's decision.  *Id.* at * 7.

The next day, February 21, 2025, another D.C. district court rejected the injunctive relief requested by two employee unions that sought to pause the administration's attempt to dismantle the U.S. Agency for International Development.  *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-CV-352 (CJN), 2025 WL 573762, at *1 (D.D.C. Feb. 21, 2025).  The court held that while "at a high

---

[11] As defendants' TRO opposition noted, some employees may be precluded from appealing to the Board under the terms of their collective bargaining agreements.  TRO Opp'n at 9 n.4.

level of generality and in the long run, plaintiffs' assertions of harm could flow from their constitutional and APA claims regarding the alleged unlawful 'dismantl[ing]' of USAID," the court noted that "the agency is still standing, and so the alleged injuries on which plaintiffs rely in seeking injunctive relief flow essentially from their members' existing employment relationships with USAID." *Id.* at *7. The court held that the Federal Service Labor-Management Relations Statute, the Civil Service Reform Act, and the Foreign Service Act of 1980 indicated that Congress intended for these types of claims to be channeled first to the administrative review offered by those statutory schemes. *Id.* at *8-10. The court noted that the Foreign Service Act's scheme was "even broader" than the other two and reasoned that "plaintiffs have presented no irreparable harm they or their members are *imminently* likely to suffer from the hypothetical future dissolution of USAID" absent immediate judicial review. *Id.* The court concluded that it likely lacked jurisdiction, so plaintiffs were unlikely to succeed on the merits of their claims. *Id.* at *11.

All three of the above opinions relied on *American Federation of Government Employees, AFL-CIO v. Trump*, 929 F.3d 748 (D.C. Cir. 2019). In that case, federal employee unions challenged executive orders regarding federal labor-management relations from President Trump's first term. *Id.* at 753. The orders directed federal agencies to remove certain subjects from labor negotiations, limit the time employees could spend on union affairs during their workday, and exclude disputes over for-cause terminations from grievance proceedings. *Id.* The appellate court determined that the unions' claims—some of which asserted that the Executive Orders violated the Federal Service Labor-Management Relations Statute itself—must be channeled first to the Federal Labor Relations Authority. *Id.* at 753-54, 761.

More recently, on April 22, 2025, in a case involving the administration's attempt to dismantle the U.S. Agency for Global Media, the district court held that a conclusion that the claims at issue "boiled down to a quotidian employment dispute . . . would ignore the facts on the record and on the ground." *Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at *11 (D.D.C. Apr. 22, 2025). The district court determined that the administrative tribunals "have no jurisdiction to review the cancelation of congressional appropriations" and that the case involved administrative and constitutional law issues, separate from federal employment questions. *Id.* at

United States District Court
Northern District of California

*11 n.22. On appeal, however, a majority opinion from the D.C. Circuit determined that "[t]he 'dismantling' that plaintiffs allege is a collection of 'many individual actions' that cannot be packaged together and 'laid before the courts for wholesale correction under the APA.'" *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025) (citation omitted).

Finally, Judge Alsup of this district found that federal employee unions' challenge to the OPM directive to agencies to terminate probationary employees should not be precluded based on the *Thunder Basin* analysis. *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-cv-1780-WHA, 2025 WL 900057 (N.D. Cal. Mar. 24, 2025).[12] First, the court decided that the *ultra vires* and APA claims in that case would not benefit from the administrative expertise of the Federal Labor Relations Authority or the Merit Systems Protection Board. *Id.* at *2. It also found the claims collateral to the review authority of those agencies, because the claims challenged executive power, not a specific personnel action. *Id.* at *3. Lastly, it determined that the district court offered the only opportunity for meaningful judicial review. *Id.* at *4-5. The court noted that probationary employees could not appeal a decision to the Merit Systems Protection Board and distinguished the claims in this case from the bargaining-related issues sent to the Federal Labor Relations Authority in *American Federation of Government Employees, AFL-CIO v. Trump*, 929 F.3d 748 (D.C. Cir. 2019). *Id.*[13]

### A.    Federal Employee Union Plaintiffs

The Court starts its analysis with the union plaintiffs. The Court agrees with Judge Alsup in this district that the D.C. Circuit's 2019 decision in *AFGE v. Trump* is not particularly helpful to

---

[12] The district court reversed its earlier decision finding preclusion under *Thunder Basin*, upon further briefing.

[13] The preliminary injunction in Judge Alsup's case is currently on appeal. On April 8, 2025, the Supreme Court granted the government's application for an emergency stay of the injunction pending appeal, stating that the non-profit organization plaintiffs on whose claims the original injunction was based had not sufficiently shown standing. *OPM v. AFGE*, --- S. Ct. ----, No. 24A904, 2025 WL 1035208, at *1 (S. Ct. Apr. 8, 2025) (citing *Clapper*). On return to the district court, the case proceeded and the court granted relief as to the claims of the plaintiff unions and the State of Washington.

United States District Court
Northern District of California

resolving the claims channeling question here. In that case, the claims involved executive orders that touched directly on matters related to collective bargaining, which are central to the purpose of the Federal Labor Relations Authority. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d at 753-54, 761. To the extent that other recent orders rely on the 2019 opinion, the Court disagrees with their reasoning. Here, the claims are far afield from the central concerns of the Federal Labor Relations Authority, *see* 5 U.S.C. § 7105(a)(2), instead touching on fundamental questions of executive authority and separation of powers.

Defendants also cite two opinions from the Fourth Circuit and the D.C. Circuit that found it likely that plaintiffs with similar claims to those here would ultimately be channeled to administrative review schemes. TRO Opp'n at 24-25 (citing *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025); *Maryland v. U.S. Dep't of Agriculture*, No. 25-1248, 2025 WL 1073657 (4th Cir. Apr. 9, 2025)); PI Opp'n at 7-8. When considering out-of-circuit authority, the Court looks to its persuasive value. *See Jones v. PGA TOUR, Inc.*, 668 F. Supp. 3d 907, 917 (N.D. Cal. 2023). The Fourth Circuit offers no reasoning for its conclusion that the district court lacked jurisdiction, and this Court finds the dissenting opinion in that case more robust and more persuasive. The D.C. Circuit provides slightly more (two paragraphs) on the question of jurisdiction, but again the dissenting judge in that case centered the claims in the appropriate context—the comprehensive dismantling of an entire agency—more concretely and persuasively than the panel majority.

The Court now moves to its own application of *Thunder Basin*. Recognizing, as other courts have, that the Federal Service Labor-Management Relations Statute and the Civil Service Reform Act indicate an intent to limit jurisdiction in some instances, the Court turns to the second inquiry: "whether the claims at issue are of the type Congress intended to be reviewed within the statutory structure." *Free Enter. Fund*, 561 U.S. at 489 (internal quotation marks, brackets, and citation omitted). The Court concludes the answer is no. To explain, the Court examines each of the three *Thunder Basin* factors in turn, all of which favor a finding of subject matter jurisdiction.

First, precluding district court jurisdiction for the union plaintiffs at this time would foreclose meaningful judicial review. Plaintiffs seek an opportunity to challenge "large-scale reductions in

force" happening rapidly across multiple agencies in the federal government. In some offices or agencies, nearly all employees are receiving RIF notices. Defendants contend that plaintiffs must take their concerns to what can be a prolonged administrative process and *then* appeal in order to present their constitutional claim in federal court. By that point, if they prevailed, they "would return to an empty agency with no infrastructure" to support a resumption of their work. *See Widakuswara*, 2025 WL 1166400, at *11 n.22.

Defendants contend that *Thunder Basin* forecloses this line of argument but they overstate the holding in that case. *See* PI Opp'n at 8. There, a mining company sought "pre-enforcement injunctive relief" against a regulation that required the company to post union material or face a penalty, arguing that the regulation conflicted with the National Labor Relations Act. *Thunder Basin*, 510 U.S. at 204-05. The company also argued that it should not be channeled to the federal Mine Act's comprehensive administrative review scheme because doing so would violate the company's due process rights by forcing it to choose noncompliance and penalties or compliance with an unlawful regulation. *Id.* at 205. In reviewing the statute, the Supreme Court found the Mine Act "facially silent with respect to pre-enforcement claims" but ultimately held the company's "statutory and constitutional claims here can be meaningfully addressed in the Court of Appeals" after administrative review. *Id.* at 208-09, 215. Importantly, however, the Court determined that "neither compliance with, nor continued violation of, the statute will subject petitioner to a serious prehearing deprivation." *Id.* at 216. In other words, the company would not suffer any serious harm from having to go first through the administrative tribunal, because any penalty was only due after exhausting appellate review. *Id.* at 218. Plaintiffs here face a very different situation. They cannot continue business as usual as they wind their way through the administrative scheme with the goal of reaching an appellate court. Rather, they face immediate and life-altering consequences in the absence of prompt judicial review.

Second, the claims at issue here are wholly collateral to the review authority of the Federal Labor Relations Authority and the Merit Systems Protection Board. As noted above, this lawsuit involves questions of constitutional and statutory authority and the separation of powers. Federal employees are simply the ones to suffer most immediately the collateral damage of the allegedly

unlawful actions. In other words, "[t]he plaintiffs in this lawsuit challenge the evisceration of their jobs only insofar as it is the means by which they challenge defendants' unlawfully halting the work of [their offices or agencies] and shutting [them] down." *See Widakuswara*, 2025 WL 1288817, at *8 (Pillard, J., dissenting). Moreover, employees' rights to appeal a RIF to the Merit Systems Protection Board come not directly from statute but from regulation. *See* 5 C.F.R. § 351.901;[14] *see also* 5 U.S.C. § 7512(B) (excluding reductions in force from the review provisions for "adverse actions"). When Congress did not directly specify Board review for reductions-in-force claims, it seems unlikely that Congress intended the Merit Systems Protection Board to be the *exclusive* avenue for such claims, let alone claims that involve broader questions about constitutional and administrative law. The same holds true for the Federal Labor Relations Authority—Congress desired that body's enabling statute to be interpreted "in a manner consistent with the requirement of an effective and efficient Government." 5 U.S.C. § 7101(b). There is nothing efficient about sending constitutional claims to a body that cannot decide them, only to wait for an opportunity to appeal.[15] *See Elgin*, 567 U.S. at 25 (Alito, J., dissenting) ("I doubt that Congress intended to channel petitioners' constitutional claims into an administrative tribunal that is powerless to decide them[.]").

Third, the claims here involve issues related to the appropriate distribution of authority to and within the executive branch, not the individual employee or labor disputes these two

---

[14] 5 U.S.C. § 7701 arguably provides *indirect* statutory authority with its rather circular proposition: "An employee, or applicant for employment, may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation." Defendants argue that it does not matter whether the authority for Board review was direct or indirect. PI Opp'n at 8-9. The Court disagrees: when the question is about what Congress intended, it matters that Congress chose not to provide an administrative path to RIF challenges themselves.

[15] In *Elgin v. Department of Treasury*, the Supreme Court decided that there was no exception to Civil Service Reform Act exclusivity for constitutional challenges to federal statutes, in that case a statute that bars those who fail to register for the draft from federal employment. 567 U.S. 1, 12 (2012). The Court held that plaintiffs were obliged to wait to present their constitutional claim to the Federal Circuit after proceeding through the Merit Systems Protection Board. *Id.* at 21. However, the *Elgin* plaintiffs sought to vindicate their own personal rights to employment. Here, plaintiffs confront an issue much larger in scope: how to interpret the constitutional structure of the federal government. And while the *Elgin* plaintiffs were likely to have a job and an agency to return to in the event they eventually won their case after winding through two layers of administrative and judicial review, the same cannot be said in this case.

administrative bodies customarily handle.  The heart of this case does not concern whether agencies followed established RIF regulations and procedures—subject matters within the administrative tribunals' expertise—but whether agencies were unlawfully instructed to initiate large-scale RIFs and reorganizations in the first place.  As the Supreme Court has repeated, "agency adjudications are generally ill suited to address structural constitutional challenges."  *Axon,* 598 U.S. at 195.  Neither the Merit Systems Protection Board nor the Federal Labor Relations Authority have special expertise to bear on the questions in this suit.

### B.    Other Plaintiffs

The rest of the plaintiffs in this case, including the non-profit organizations, the local governments, and the unions in their capacity representing non-federal employees, do not have access to the Federal Labor Relations Authority or the Civil Service Reform Act.  Even if the union plaintiffs should be channeled out of court—and this Court thinks they should not—the *Thunder Basin* factors weigh against claims channeling even more strongly when applied to these other plaintiffs.  Defendants fail to show how the cases they cite—involving challenges by federal employees—support the channeling of constitutional and APA claims by non-federal employees, including federal contract workers, non-profit organizations on behalf of their members, or local governments.  In *U.S. v. Fausto*, cited by both defendants and the *amici* states who filed a brief in support of defendants, the Supreme Court held that a type of employee that received lesser privileges in the Civil Service Reform Act was not entitled to district court review that was denied to employees with greater privileges under the Act, because holding otherwise would have flipped the structural logic of the Act.  484 U.S. 439, 448-49 (1988).  But the Civil Service Reform Act says nothing at all about non-federal employee unions, non-profit organizations, or local governments.  The Court is not persuaded that, when Congress created the Merit Systems Protection Board or the Federal Labor Relations Authority, it intended for constitutional and APA claims by these sorts of plaintiffs to be precluded from federal court.  *See Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-1677, 2025 WL 914823, at *1 (9th Cir. Mar. 26, 2025) (in denying an emergency stay, finding the government had not shown it was likely to establish that Congress intended to channel claims

1   by non-profit organizations to the same administrative agencies).

2

3   **IV.    Analysis of the *Winter* Factors**

4         The Court now proceeds to the *Winter* factors, examining whether plaintiffs have established

5   they are likely to succeed on the merits, whether they are likely to suffer irreparable harm in the

6   absence of preliminary relief, if the balance of equities tips in their favor, and whether an injunction

7   is in the public interest.  *See Winter*, 555 U.S. at 22.

8

9         **A.    Likelihood of Success on the Merits**

10               **1.    *Ultra Vires***

11        Plaintiffs' first and second claims for relief allege that President Trump, OMB, OPM, and

12  DOGE have violated the separation of powers and therefore acted *ultra vires* by ordering agencies

13  to engage in large-scale RIFs and reorganizations.  They challenge Executive Order 14210, the

14  OMB/OPM Memo, as well as any other actions and orders of OMB, OPM, and DOGE to implement

15  the President's Executive Order.

16        "When an executive acts *ultra vires*, courts are normally available to reestablish the limits

17  on his authority."  *Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir. 2020), *vacated and remanded*

18  *on other grounds, sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (quoting *Dart v. United States*,

19  848 F.2d 217, 223 (D.C. Cir. 1988)).  The ability to enjoin unconstitutional action by government

20  officials dates back to the courts of equity, "reflect[ing] a long history of judicial review of illegal

21  executive action, tracing back to England."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320,

22  327 (2015) (citing Jaffe & Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72

23  L.Q. Rev. 345 (1956)).  Where the President exceeds his authority, the district court may declare the

24  action unlawful and an injunction may issue.  *Sierra Club*, 963 F.3d at 891 (explaining that, in

25  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952), "The [Supreme] Court never

26  questioned that it had the authority to provide the requested relief.").

27

28

United States District Court
Northern District of California

a.        **Presidential Authority**

Plaintiffs are likely to succeed on their claim that the President's Executive Order 14210 is *ultra vires*, as the President has neither constitutional nor, at this time, statutory authority to reorganize the executive branch.

"In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.  The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad.  And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute."  *Youngstown*, 343 U.S. at 587.

Article I of the U.S. Constitution vests in Congress the legislative power.  U.S. Const. art. I, § 1.  "To Congress under its legislative power is given the establishment of offices, [and] the determination of their functions and jurisdiction . . . ."  *Myers v. United States*, 272 U.S. 52, 129 (1926).  "Congress has plenary power over the salary, duties, *and even existence* of executive offices."  *Free Enter. Fund*, 561 U.S. at 500 (emphasis added).  While "[t]he President may create, reorganize, or abolish an office that *he* established," the Constitution does not authorize him "to enact, to amend, or to repeal statutes."  *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (emphasis added); *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute.").

In 1952, the Supreme Court struck down an Executive Order by President Truman, who had ordered the Secretary of Commerce to seize most of the nation's steel mills to prevent strikes from halting steel production during the Korean War.  *Youngstown,* 343 U.S. at 582.  Although various statutes authorized the President to seize property under certain circumstances, none of the statutory conditions had been met, and so the President claimed the seizures were lawful pursuant to his constitutional authority.  In reviewing whether the district court's preliminary injunction to stop enforcement of the order was proper, the Supreme Court explained, "The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself."  *Id.* at 585.  Where President Truman lacked both constitutional and statutory authority to seize the steel mills, the Supreme Court affirmed the district court injunction.  *Youngstown* applies here.

Defendants do not claim that Executive Order 14210 issued under the President's constitutional powers. *See* PI Opp'n at 14-18. Rather, they attempt to fit the President's actions into existing statutory authority. Such statutory authority, however, is plainly lacking. The Ninth Circuit has explained,

> Justice Jackson's *Youngstown* concurrence provides the operative test in this context:
>
>> When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233 (9th Cir. 2018) (quoting *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring)).

As history demonstrates, the President may broadly restructure federal agencies only when authorized by Congress. "Although the U.S. Constitution vests in Congress the authority to organize the Executive Branch,[] former presidential administrations have asked Congress to grant expedited government reorganization authority to execute cross-agency government reorganizations more efficiently." S. Rep. No. 115-381, at 4 (2018). Since 1932, when President Hoover was the first President to request and receive such reorganization authority, Congress has granted this authority to nine different Presidents, both Republican and Democrat. *Id.*; John W. York & Rachel Greszler, *A Model for Executive Reorganization*, Heritage Found. Legal Memorandum No. 4782, at 3 (Nov. 3, 2017), available at: https://www.heritage.org/sites/default/files/2017-11/IB4782.pdf [https://perma.cc/59KD-JVU5] (hereinafter, "Heritage Found. Legal Memorandum No. 4782"). According to a Senate Report issued during President Trump's first term in office, "[b]etween 1932 and 1984, presidents submitted 126 reorganization proposals to Congress, of which 93 were implemented and 33 were affirmatively rejected by Congress." S. Rep. No. 115-381, at 4 (2018). The most recent statutory authorization for a President to conduct a governmental reorganization

expired December 31, 1984. *See* 5 U.S.C. § 905(b); Henry B. Hogue, Cong. Rsch. Serv., R44909, *Executive Branch Reorganization* 6-7 & n.23 (2017) (hereinafter, "CRS R44909").

The brief of *amicus curiae* Constitutional Accountability Center recounts the long history of Congress exercising its "power to restructure and abolish federal agencies as it finds necessary . . . ." Dkt. No. 51-1 at 6-9. Defendants' TRO opposition brief also recounts this long history, which supports the proposition that large-scale reorganization of the federal agencies stems from a long-standing partnership between the executive and legislative branches. *See* TRO Opp'n at 5-6 (citing, *inter alia*, 19 Stat. 169; 37 Stat. 413; the Veterans' Preference Act of 1944; the Federal Employee Pay Act of 1945; the 1966 recodification and amendment of the Veterans' Preference Act of 1944).

The last time Congress gave the President reorganization authority demonstrates what Congress considered to be a "reorganization." In 5 U.S.C. § 902, Congress defined a "reorganization" as "a transfer, consolidation, coordination, authorization, or abolition, referred to in section 903 of this title." Section 903 then specified what a reorganization plan might entail, including:

> (1) the transfer of the whole or a part of an agency, or of the whole or a part of the functions thereof, to the jurisdiction and control of another agency;
>
> (2) the abolition of all or a part of the functions of an agency, except that no enforcement function or statutory program shall be abolished by the plan;
>
> (3) the consolidation or coordination of the whole or a part of an agency, or of the whole or a part of the functions thereof, with the whole or a part of another agency or the functions thereof;
>
> (4) the consolidation or coordination of part of an agency or the functions thereof with another part of the same agency or the functions thereof;
>
> (5) the authorization of an officer to delegate any of his functions; or
>
> (6) the abolition of the whole or a part of an agency which agency or part does not have, or on the taking effect of the reorganization plan will not have, any functions.

5 U.S.C. § 903. As noted above, the President's authority to submit a reorganization plan to Congress under this chapter expired in 1984. *See id.* § 905(b). Since Congress first enacted this statute in 1966, Congress extended the deadline for presidential reorganization plans several times but has not done so again since 1984. *See* Pub. L. No. 89-554, 80 Stat. 378, 396 (1966); Pub. L. No.

91-5, 83 Stat. 6 (1969); Pub. L. No. 92-179, § 4, 85 Stat. 576 (1971); Pub. L. No. 95-17, § 2, 91 Stat. 29, 32 (1977); Pub. L. No. 96-230, 94 Stat. 329 (1980); Pub. L. No. 98-614, 98 Stat. 3192 (1984).

In recent history, the congressional check on executive reach has stopped Democratic and Republican presidents alike from restructuring federal agencies. Presidents George W. Bush, Barack Obama, and Donald Trump (in his first term) all sought but did not receive Congressional approval to reorganize the executive branch. CRS R44909 at 7; H.R. 6787, 115th Congress (2017-2018); S. 3137, 115th Congress (2018). Indeed, during the first months of his first term in office, President Trump attempted a large-scale reorganization of federal agencies when he issued Executive Order 13781, entitled, "Comprehensive Plan for Reorganizing the Executive Branch." *See* 82 Fed. Reg. 13959 (Mar. 16, 2017). That order called for agency heads to submit plans within 180 days "to reorganize the agency, if appropriate, in order to improve the efficiency, effectiveness, and accountability of that agency." *Id.* The accompanying legislation, however, died in Congress. *See* H.R. 6787, 115th Congress (2017-2018); S. 3137, 115th Congress (2018).

The simple proposition that the President may not, *without Congress*, fundamentally reorganize the federal agencies is not controversial: constitutional commentators and politicians across party lines agree that "sweeping reorganization of the federal bureaucracy requires the active participation of Congress." *See* Heritage Found. Legal Memorandum No. 4782 at 1-2; *see also* Paul J. Larkin, Jr. & John-Michael Seibler, *The President's Reorganization Authority*, Heritage Found. Legal Memorandum No. 210, at 1 (July 12, 2017), available at: https://www.heritage.org/political-process/report/the-presidents-reorganization-authority [https://perma.cc/2T7K-H6EY] (". . . to accomplish major reorganization objectives, [the President] will need explicit statutory authority from Congress . . ."); Ronald C. Moe, Cong. Rsch. Serv., RL30876, *The President's Reorganization Authority: Review and Analysis* 2 (2001) ("It is Congress, through law, that determines the mission of agencies, personnel systems, confirmation of executive officials, and funding, *and ultimately evaluates whether the agency shall continue in existence*.") (emphasis added). As conservative former government officials and advisors note in their *amicus* brief, House Representative James Comer (R-Kentucky) has introduced the Reorganizing Government Act of 2025. *See* Dkt. No. 69-

31

United States District Court
Northern District of California

1 at 3 n.3 (citing H.R. 1295, 119th Cong. (2025)).  The bill would allow "Congress to fast-track President Trump's government reorganization plans by renewing a key tool to approve them swiftly in Congress."  Press Release, House Committee on Oversight and Government Reform, Chairman Comer and Senator Lee Introduce Bill to Fast-Track President Trump's Government Reorganization Plans (Feb. 13, 2025), https://oversight.house.gov/release/chairman-comer-and-senator-lee-introduce-bill-to-fast-track-president-trumps-government-reorganization-plans/ [https://perma.cc/3XSV-TKWL].  The bill contemplates that the President must partner with Congress on a government reorganization effort, acknowledging that presidential "reorganization authority . . . was last in effect in 1984[.]"  *Id.*

In their brief, defendants assert that judicial review of the Executive Order is unavailable, citing *Dalton v. Specter*, 511 U.S. 462, 470 (1994).[16]  PI Opp'n at 12; TRO Opp'n at 34.  The facts of *Dalton* could not be more different from the scenario here.  In *Dalton*, the Supreme Court held that judicial review of the President's decision is unavailable "[w]here a statute . . . commits decisionmaking to the discretion of the President."  511 U.S. at 476-77.  At issue in *Dalton* was a decision by the President to close the Philadelphia Naval Shipyard, pursuant to the Defense Base Closure and Realignment Act of 1990.  The Act provided for the Secretary of Defense, following notice and public comment, to prepare closure recommendations, which then went to Congress and to an independent commission, which then held public hearings and prepared a report, which then went to the President for approval, following which Congress then could enact a joint resolution of disapproval.  *Id.* at 464-65.  As discussed further below regarding the APA claims, nothing close to this level of procedure has occurred here, at least as far as the record shows.  More importantly, *Dalton* challenged Presidential action taken pursuant to statutory authority that Congress delegated to the President.  Thus, defendants misread plaintiffs' *ultra vires* theory against President Trump.  Plaintiffs' claim is not that the President exceeded his statutory authority, as the *Dalton* plaintiffs

---

[16] Defendants appear to conflate the *ultra vires* and APA claims, arguing that President Trump is not subject to the APA and that his Executive Order is not reviewable under APA standards.  *See* TRO Opp'n at 34.  However, plaintiffs do not sue President Trump under the APA, and the APA claims challenge the carrying out of the Executive Order by OPM, OMB, DOGE, and the federal agency defendants but do not challenge the Executive Order itself as violating the APA.

United States District Court
Northern District of California

1    claimed.  Instead, Claim One is about the President acting without *any* authority, constitutional or

2    statutory.

3         Nor is the Court persuaded that the President's authority derives from a right articulated in

4    *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), as defendants claim.  *See* PI Opp'n at 13.  That case

5    examined the scope of presidential immunity from a lawsuit for damages brought by a former Air

6    Force analyst who lost his job during a departmental reorganization.  In deciding whether the

7    President should be immune from such suits, the Supreme Court explained, "It clearly is within the

8    President's constitutional and statutory authority to prescribe the manner in which the Secretary will

9    conduct the business *of the Air Force.*  See 10 U.S.C. § 8012(b).[17]  Because this mandate of office

10   must include the authority to prescribe reorganizations and reductions in force, we conclude that

11   petitioner's alleged wrongful acts lay well within the outer perimeter of his authority."  *Fitzgerald*,

12   457 U.S. at 757 (emphasis added).  The reorganization and RIF authority referenced in the case,

13   therefore, was derivative of the President's military authority.  No President in the 40-plus years

14   since *Fitzgerald* has used that case to justify reorganizing federal agencies more broadly.[18]

15        As a group of conservative former government officials and advisors have written to the

16

17   _____

18        [17] This statute is now codified at 10 U.S.C. § 9013(g).  *See* Pub. L. No. 99-433, Title V,
     § 521(a)(3), 100 Stat. 1055, § 8013 (1986); Pub. L. No. 115-232, Div. A, Title VIII, § 806(c), 132
     Stat. 1833 (2018).

19
20        [18] Defendants further argue that in the 1990s the Clinton Administration engaged in "large-
     scale Presidentially-directed RIFs[.]"  PI Opp'n at 14 (citing 5 U.S.C. § 3502; TRO Opp'n at 5-
21   11).  This misstates history.  Defendants rely on President Clinton's *Executive Order 12839—
     Reduction of 100,000 Federal Positions*, which issued the month after he took office.  But that
22   Executive Order says nothing about RIFs.  Rather, it states that "positions shall be vacated through
     attrition or early out programs established at the discretion of the department and agency
23   heads."  Exec. Order 12839, § 1, 58 Fed. Reg. 8515 (Feb. 12, 1993); *see also* House Rep. 103-386,
     *available at* 1994 U.S.C.C.A.N. 49, 52 (Nov. 19, 1993) (stating that the OMB bulletin on
24   implementing Executive Order 12839 "specified that neither it [the bulletin] nor the Executive Order
     authorized special early out programs or required agencies to undergo reductions-in-force.").
     Moreover, this Court cannot ignore the issues of scale and timing.  Executive Order 12839
25   directed that agencies "shall eliminate not less than 4 percent of its civilian personnel positions . . .
     over the next 3 fiscal years."  Exec. Order 12839 § 1.  One of the questions to be litigated in this
26   case, and which will require further development of the factual record, is whether the RIFs here are
     so extensive that they essentially "eliminate" Congressionally-created agencies or prevent those
27   agencies from fulfilling their statutory mandates.  A related but separate question will be whether
     defendants' actions were taken so hastily as to constitute arbitrary and capricious action under the
28   APA.

33

Court, "Unchecked presidential power is not what the Framers had in mind. . . .  By proclaiming and implementing Executive Order 14210, the President has usurped for himself the power to restructure entire federal agencies, which can only be accomplished through the constitutionally mandated collaboration between the President and Congress." Dkt. No. 69-1 at 1.  Defendants themselves state in their brief: "[A]n officer may be said to act *ultra vires* 'only when he acts without any authority whatever.'" TRO Opp'n at 44 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 n.11 (1984) (internal quotation marks omitted)).  This is precisely what plaintiffs here have alleged.

### b.    Authority of OPM, OMB, and DOGE

Plaintiffs also assert that the actions by OPM, OMB, and DOGE in implementing the Executive Order are *ultra vires* and therefore unlawful.  Plaintiffs argue that none of these defendants "possesses authority to order agencies to reorganize, to engage in 'large-scale' RIFs, or to usurp the decision-making authority delegated by Congress." TRO Mot. at 35.

**OPM:** The question of whether the President, acting without Congress, may engage in *en masse* termination of rank-and-file employees was recently litigated in a case involving the termination of probationary employees at numerous federal agencies.  In issuing a temporary restraining order, Judge Alsup of this district found plaintiffs likely to succeed on their *ultra vires* claim, explaining, "No statute — anywhere, ever — has granted OPM the authority to direct the termination of employees in other agencies." *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, No. 25-cv-1780-WHA, 2025 WL 660053, at *4 (N.D. Cal. Feb. 28, 2025).[19]  Rather, as laid out in statute, "Each Executive agency . . . may employ such number of employees of the various classes recognized by chapter 51 of this title [regarding classification] as Congress may appropriate for from year to year." 5 U.S.C. § 3101.  With regard to OPM in particular, Congress vested the Director of OPM with a number of functions, none of which include the termination of employees from, or

---

[19] The preliminary injunction in Judge Alsup's case is currently on appeal.

1    the restructuring of, other federal agencies outside of OPM.  *See* 5 U.S.C. § 1103(a).  In the

2    probationary employee case, "OPM concede[d] that it lacks the authority to direct firings outside of

3    its own walls . . . ."  *Am. Fed'n of Gov't Emps.,* 2025 WL 660053, at *5.

4    Defendants cite a host of statutes and regulations that they assert provides OPM with the

5    authority to issue the OMB/OPM Memo.  *See* PI Opp'n at 19.  Upon review of the laws cited, the

6    Court finds that none support the authority that OPM now claims.  By contrast, 5 C.F.R. § 351.201

7    specifies that "*[e]ach agency* is responsible for determining the categories within which positions

8    are required, where they are to be located, and when they are to be filled, abolished, or vacated."  5

9    C.F.R. § 351.201(a)(1) (emphasis added).

10

11   **OMB:**  Housed within the Executive Office of the President, OMB, like OPM, has its

12   functions laid out in statute.  *See* 31 U.S.C. §§ 501-507.  None of the statutes authorize OMB to

13   terminate employees outside of OMB or to order other agencies to downsize, nor do defendants

14   point to any such authority in their brief.  *See also Nat'l Council of Nonprofits*, 2025 WL 597959,

15   at *15 ("the structure and provisions of Section 503 strongly suggest that OMB occupies an

16   oversight role" and 31 U.S.C. § 503(a)(5) "further indicates that OMB's role is mainly supervisory,

17   rather than directly active").   Defendants cite only to 31 U.S.C. § 503(b), which empowers the

18   Deputy Director to "establish general management policies for executive agencies and perform . . .

19   general management functions[.]"  *See* PI Opp'n at 19.  Nothing in that subsection remotely

20   authorizes the level of direction over other agencies that plaintiffs challenge here.

21

22   **DOGE:**  As plaintiffs rightly note, DOGE "has no statutory authority at all."  TRO Mot. at

23   37.  DOGE was created by Executive Order out of the United States Digital Service and is housed

24   in the Executive Office of the President.  *See* Exec. Order No. 14158.  DOGE therefore could not

25   have been acting pursuant to statutory authority in ordering large-scale RIFs and reorganizations of

26   the workforces at the defendant federal agencies.

27                                              * * *

28   In sum, no law gives OPM, OMB, or DOGE the authority to direct other federal agencies to

1    engage in large-scale terminations, restructuring, or elimination of that agency itself. Such action

2    far exceeds the bounds of any authority that Congress vested in OPM or OMB, and, as noted, DOGE

3    has no statutory authority whatsoever. "[A]n agency literally has no power to act . . . unless and

4    until Congress confers power upon it." *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986).

5

6                    **c.    The Challenged Executive Actions**

7          Having examined whether the President and OPM, OMB, and DOGE have authority to direct

8    other federal agencies to conduct large-scale RIFs and reorganizations, the Court now turns to the

9    executive actions challenged in this case: Executive Order 14210, the OMB/OPM Memo, and other

10   implementation steps by OMB, OPM, and DOGE.

11         In defendants' interpretation, there is no unlawful action here because the President did not

12   order the agencies to take any specific actions, and OMB and OPM were merely providing guidance

13   about how agencies should conduct RIFs. Defendants would have the Court look only to the

14   Executive Order and the OMB/OPM memo, arguing that "no factual development is necessary to

15   resolve Plaintiffs' preliminary injunction motion." PI Opp'n at 3; *see also id.* at 15 n.7 ("But there

16   is no factual dispute the Court needs to resolve.").

17         The evidence plaintiffs have presented tells a very different story: that the agencies are acting

18   at the *direction* of the President and his team. At this stage, the Court has now reviewed *in camera*

19   the ARRPs from four of the federal agency defendants.[20] Those plans support plaintiffs' contention

20   that the agencies' understanding is that OMB/OPM "approval," whether formal or otherwise, is a

21   necessary triggering step in the agencies' current RIF and reorganization processes. Other evidence

22   in the record supports this. For instance, an official at the Department of Labor attributes the RIF

23   to Executive Order 14210, citing section 3(c) of that order specifically. Dkt. No. 70-2 ("Decl.

24   Gamble AFGE ISO Reply") ¶ 6, Ex. B. Plaintiffs have come forward with evidence that some of

25   the federal agency defendants have been pressured to institute RIFs on a larger scale than what the

26

27         [20] The Court will not disclose the specific contents of the ARRPs while defendants' motion
     for a protective order remains pending. *See* Dkt. No. 88.

28

                                                    36

United States District Court
Northern District of California

agencies themselves initially sought to do in their plans. *See* Dkt. No. 36, Ex. 1 (April 29 news article that OMB deemed NLRB's proposed cuts to be inadequate); Decl. Soriano NSF ¶¶ 8-14 (reports that OMB, OPM, and DOGE rejected NSF's phase 1 ARRP that lacked large-scale RIFs and directed large-scale RIFs instead); Decl. Daly AFSCME ¶ 24 (OMB rejected AmeriCorps' mid-March ARRP that did not recommend RIFs). In interpreting the Executive Order and the OMB/OPM Memo, the Court cannot ignore the evidence showing that agencies have received extrinsic instructions on how to interpret and respond to these documents.

Moreover, while defendants go to lengths to focus on the "RIF" side of what is happening, the factual record indicates the RIFs are not easily separated from the reorganization. Defendants argue that "federal law expressly permits RIFs, the governing statute expressly directs OPM to promulgate regulations governing RIFs, and Congress has consistently recognized agencies' authority to engage in RIFs since the nineteenth century." TRO Opp'n at 35. Maybe so. But the RIFs at issue here appear inextricably intertwined with broad agency reorganization, which the President undoubtedly cannot undertake without Congress. Indeed, when arguing that agencies are making their final ARRPs public, defendants point to a press release where Secretary of State Marco Rubio announces "a comprehensive reorganization plan." *See* PI Opp'n at 5 n.3; Marco Rubio, *Building an America First State Department*, U.S. Department of State, Apr. 22, 2025, https://www.state.gov/building-an-america-first-state-department [https://perma.cc/MV3Z-6GX5]; *see also* Dkt. No. 37-20 ("Decl. Hunter AFGE") Ex. I (department fact sheet linking reorganization and RIFs). Defendants' proposition that RIFs can be conducted for reasons such as a "lack of work" or "shortage of funds" is irrelevant when they provide no evidence to suggest those were the reasons for the RIFs at issue here. *See* PI Opp'n at 16-17. The OMB/OPM Memo, as plaintiffs note, "confirmed the RIFs were for the purpose of reorganization: they required agencies to combine these in the same document." PI Mot. at 13 (citing OMB/OPM Memo). The memo requires ARRPs be submitted in two "phases": Phase 1 for "initial agency cuts and reductions" and Phase 2 for "more productive, efficient agency operations going forward." OMB/OPM Memo at 3-4. Or, as plaintiffs observe: "OMB and OPM ordered federal agencies to conduct RIFS *first*, and then arrange the pieces of what remains of these agencies." PI Mot. at 4.

1    Even looking to the text of the Executive Order and the OMB/OPM Memo, as defendants

2    encourage this Court to do, these documents are not so permissive as defendants claim.    The

3    Executive Order mandates that "Agency Heads *shall* promptly undertake preparations *to initiate*

4    *large-scale reductions in force* (RIFs), consistent with applicable law," including submitting plans

5    that "shall discuss whether the agency or any of its subcomponents should be eliminated . . . ." Exec.

6    Order 14210 § 3(c), (e) (emphasis added).  The Executive Order directs agencies to prioritize RIFs

7    of "[a]ll offices that perform functions not mandated by statute or other law[,]" regardless of any

8    impact on the agency's overall ability to perform its required functions.  And the order directs

9    prioritization of RIFs of "all agency initiatives, components, or operations that *my* Administration

10   suspends or closes." *Id.* § 3(c) (emphasis added).  In other words, the President will suspend or

11   close agency operations, and that agency must then be prioritized for a RIF.[21]  The Executive Order

12   also gives OPM the authority to "grant exemptions from this order," undercutting defendants'

13   argument that OPM's role is merely advisory.  *See* Exec. Order 14210 § 4(c).

14           The OMB/OPM Memo interprets Executive Order 14210 as a directive.  It states that the

15   Executive Order "*directed* agencies to 'eliminat[e] waste, bloat, and insularity[;]'" that "President

16   Trump *required* that 'Agency Heads shall promptly undertake preparations to initiate large-scale

17   reductions in force (RIFs) . . .[;]'" and that "President Trump also *directed* that, **no later than March**

18   **13, 2025,** agencies develop Agency Reorganization Plans."  OMB/OPM Memo at 1 (italics added).

19   The memo states, "Pursuant to the President's direction, agencies should focus on the maximum

20   elimination of functions that are not statutorily mandated . . . ." *Id.* at 2.  The memo specifies, "Each

21   agency *will submit* a Phase 1 ARRPs [sic] to OMB and OPM *for review and approval* **no later than**

22   **March 13, 2025**." *Id.* at 3 (italics added); *see also id.* at 4 (agencies shall submit Phase 2 ARRP "to

23   OMB and OPM for review and approval" by April 14).  "Phase 1 ARRPs *shall* focus on initial

24   agency cuts and reductions."  *Id.* at 3 (emphasis added).  "Phase 2 plans *shall* outline a positive

25   vision for more productive, efficient agency operations going forward[,]" with Phase 2 to "be

26   planned for implementation by September 30, 2025." *Id.* at 4 (emphasis added).  The Memo further

27

28   [21] On the present record, this appears to be what is happening.  *See* Decl. Gamble AFGE ISO
     Reply ¶¶ 4-6, Ex. B.

United States District Court
Northern District of California

instructs that "agencies or components that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care) shall not implement any proposed ARRPs until OMB and OPM certify that the plans will have a positive effect on the delivery of such services." *Id.* at 3, 6. Thus, for some of the federal agency defendants, such as the Social Security Administration, the memo explicitly instructs that the agencies cannot implement proposed plans without OMB and OPM approval. Defendants' position that the memo simply "provides high-level guidance, setting forth principles" for what the ARRPs should seek to do, *see* PI Opp'n at 18, is belied by the mandatory nature of what the memo actually instructs. Like other directives from the current administration, the Court finds the memo "amounted to a command, not a suggestion." *See New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *8 (D.R.I. Mar. 6, 2025).

Defendants also argue that the Executive Order and OMB/OPM Memo are lawful because they tell agencies to comply with the law. This argument falls short on three grounds. First, the Court need not give the savings clauses in the Executive Order and OMB/OPM Memo the weight defendants attribute to them. As defendants note in their papers, "[a] consistent-with-law provision does not categorically immunize an Executive Order or similar directive from review." TRO Opp'n at 40. The Ninth Circuit, in considering "whether, in the absence of congressional authorization, the Executive Branch may withhold all federal grants from so-called 'sanctuary' cities and counties[,]" rejected the government's argument that the words "consistent with law" saved an otherwise unlawful Executive Order. *San Francisco*, 897 F.3d at 1231, 1239-40. The court explained, "'It is a commonplace of statutory construction that the specific governs the general[,]' . . . [and t]he Executive Order's savings clause does not and cannot override its meaning." *Id.* at 1239 (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)). Like the Ninth Circuit in the "sanctuary cities" case, this Court is not persuaded by the government's reliance on *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002). *See* PI Opp'n at 17. "*Allbaugh* is distinguishable. Because the Executive Order unambiguously commands action, here there is more than a 'mere possibility that some agency might make a legally suspect decision.'" *See San Francisco*, 897 F.3d at 1239-40 (citing *Allbaugh*, 295 F.3d at 33). Likewise here, the mandatory language of the Executive Order, and of the

1    OMB/OPM Memo interpreting it, create more than a mere possibility of unlawful action if the

2    federal agencies do the large-scale RIFs and reorganizations that are commanded.

3         Second, the Court is not convinced that a directive to respect statutory mandates is a message

4    the agencies have actually received, as the scale of workforce terminations raise significant

5    questions about some agencies' or sub-agencies' capacities to fulfill their statutory missions.  For

6    example, it appears the Department of Health and Human Services is planning to practically wipe

7    out the National Institute for Occupational Safety and Health, an office established by Congress.

8    Decl. Niemeier-Walsh AFGE ¶ 28 ("my understanding is that approximately 93% of NIOSH

9    employees have received RIF notices"); Pub. L. No. 91-596 § 22, 84 Stat. 1590, 1612 (1970).  The

10   cuts to AmeriCorps have reduced agency staff from more than 700 to around 150, a number so small

11   that those remaining cannot fulfill the agency's statutory duties.  Decl. Daly AFSCME ¶¶ 25, 30-

12   31.  Other agencies have plans to reduce staff by 50% or more, a level that raises serious questions

13   about their ability to fulfill the responsibilities Congress has bestowed upon them.  And it is

14   understandable that agencies have interpreted the directives from the President and OMB, OPM,

15   and DOGE to require these cuts when President Trump has made public statements about the federal

16   workforce such as: "obviously, they're paying millions of people that shouldn't be paid" and "It is

17   the policy of my Administration . . . to commence the deconstruction of the overbearing and

18   burdensome administrative state."  *See* TRO Mot. at 1 n.1 (citing Remarks by President after

19   Executive Order Signing, The White House (Feb. 18, 2025); Exec. Order No. 14219, 90 Fed. Reg.

20   10583 (Feb. 19, 2025)); *cf. San Francisco*, 897 F.3d at 1238 ("consideration of those statements

21   suggests that the Administration's current litigation position is grounded not in the text of the

22   Executive Order but in a desire to avoid legal consequences").

23         Third, even if agencies consider all their organic statutory mandates, the executive branch

24   still cannot reorganize at this scale without authority from Congress.  What plaintiffs allege—and

25   what defendants have so far failed to refute—is that Executive Order 14210 and the

26   OMB/OPM/DOGE actions to implement it reach so broadly as to exceed what the President can do

27   without Congress.  In the last presidential reorganization law, Congress defined executive branch

28   reorganizations as including transfers of functions between agencies, abolition of some functions of

an agency, and consolidations of different components within or between agencies.  *See* 5 U.S.C. § 903.  Based on the Court's review of plaintiffs' evidence and the submitted ARRPs, these acts are taking place now, following direction from the Executive Order and the OMB/OPM Memo.  This is not an instance of the President using his "inherent authority to exercise 'general administrative control of those executing the laws,'" *see* TRO Opp'n at 4, because Congress has passed no agency reorganization law for the President to execute.  Congress may choose to do so.  But as of today, Congress has not.[22]

The Court finds plaintiffs have shown a likelihood of success on the merits of Claim One, which alleges that Executive Order 14210 usurps Congress's Article I powers and exceeds the President's lawful authority.  Plaintiffs are also likely to succeed on the merits of their *ultra vires* claims (Claim Two) against OPM, OMB, DOGE, and their Directors.

### 2.    APA Claims

Plaintiffs also challenge, as violative of the APA: the OMB/OPM Memo; OPM and OMB's approvals of specific agencies' ARRPs; and "DOGE's directives to specific agencies requiring cuts to programs and staffing[.]"  TRO Mot. at 37-38.  Plaintiffs' Third through Seventh Claims assert violations of the Administrative Procedure Act against OMB, OPM, DOGE, and their directors, under 5 U.S.C. § 706(2)(A), (C), and (D), and against the federal agency defendants, under 5 U.S.C. § 706(2)(A) and (C).

The APA provides, in relevant part, that

> The reviewing court shall--
>
> **. . . (2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

---

[22] *Amici* the State of Montana et al. filed a brief in support of defendants.  Dkt. No. 71-1.  They argue, among other things, that "Article II provides the President with broad authority to manage the federal workforce. . . , and the courts have recognized it for more than two centuries except in limited circumstances not relevant here."  *Id.* at 3 (citing *Trump v. United States*, 603 U.S. 593, 609 (2024)).  However, a closer read of the cited decision shows that the removal power at issue involved "executive officers of the United States *whom he has appointed*."  *See Trump*, 603 U.S. at 609 (emphasis added).  The removal of Presidentially-appointed officers is simply not at issue in this case.

United States District Court
Northern District of California

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

. . .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law; . . . .

5 U.S.C. § 706(2).

### a.    Final Agency Action

The APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Because plaintiffs do not allege that any action here was made reviewable by statute, the threshold question is whether the challenged actions constitute "final agency action." If not, this Court is without subject matter jurisdiction to decide the APA claim. *See San Francisco Herring Ass'n v. U.S. Dep't of Interior*, 683 F. App'x 579, 580 (9th Cir. 2017).

The Supreme Court has explained that "two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process . . . —it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted). The Supreme Court has "long taken" a "pragmatic approach" to the question what constitutes final agency action. *San Francisco Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 577-78 (9th Cir. 2019) (quoting *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016)).

The record presently before the Court indicates that the challenged actions are final agency actions under the APA. While the ultimate impacts of the RIFs may yet be unknown (in part due to defendants' refusal to publicize the ARRPs), and while certain ARRPs may still be awaiting OMB/OPM approval, nowhere do defendants assert that the OMB/OPM Memo itself is subject to change or is in draft form. These actions—the issuance of the OMB/OPM Memo and the approvals of the ARRPs—are done and final. *See San Francisco Herring Ass'n*, 946 F.3d at 578 ("The Park Service does not suggest it is still in the middle of trying to figure out its position on whether it has

42

jurisdiction over the waters [at issue] . . ."). An agency engages in "final" action, for instance, when it "state[s] a definitive position in formal notices, confirm[s] that position orally, and then send[s] officers out into the field to execute on the directive." *Id.* at 579.

So have OMB, OPM, DOGE, and their directors done here. The OMB/OPM Memo required agencies to submit Phase 1 ARRPs by March 13 and Phase 2 ARRPs by April 14. As alleged, the ARRPs "are only effectuated by OMB and OPM (and DOGE) approval." Amended Compl. ¶ 14. Defendants argue that the ARRPs are living documents, always subject to change. But they have neither released those plans nor submitted any evidence, save one scant declaration, to shed light on how the ARRP process works. The evidence plaintiffs presented on how the ARRP approval process has actually played out shows that at least three defendant agencies initially submitted an ARRP that "did not include plans for large-scale RIFs" and that OMB, OPM, and DOGE rejected this plan "and directed the agency to implement large-scale RIFs instead." Decl. Soriano AFGE ¶¶ 8-9 (NSF); *see also* Decl. Daly AFSCME ¶ 24 (AmeriCorps); Dkt. No. 36, Ex. 1 (NLRB). "It is the imposition of an obligation or the fixing of a legal relationship that is the indicium of finality of the administrative process." *Getty Oil Co. v. Andrus*, 607 F.2d 253, 256 (9th Cir. 1979). Based on the record to date, the Court finds the OMB/OPM Memo and OMB/OPM approval of the ARRPs constitute final agency action under the APA.

At this time, the Court will refrain from opining on whether DOGE's actions are subject to review under the APA. The record is less developed as to DOGE's actions and would benefit from further factual development. Nevertheless, having found above that any actions by DOGE in directing other federal agencies to engage in large-scale RIFs is *ultra vires*, the Court need not reach the APA question specifically in order for injunctive relief to cover DOGE. *See League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 & n.3; *Cmty. Legal Servs. in East Palo Alto v. United States Dep't of Health & Human Servs.*, --- F. Supp. 3d ----, No. 25-cv-2847-AMO, 2025 WL 1233674, at *8 (N.D. Cal. Apr. 29, 2025) (plaintiffs "need only show a likelihood of success on one claim to demonstrate likelihood of success in support of a preliminary injunction").

### b.    Merits

The Court likewise reserves ruling on the merits of the APA claim asserting arbitrary and capricious action by OMB, OPM, and DOGE (Claim Four) and the APA claims asserted against the federal agency defendants (Claims Six and Seven). As previously discussed, a full review of the ARRPs will significantly aid the Court's review of the merits of these APA claims.

Plaintiffs' Third Claim—that OMB, OPM, DOGE, and their directors violated the APA by taking action not in accordance with law and exceeding statutory authority—overlaps with the analysis of the *ultra vires* claim. For the reasons already stated above, plaintiffs have shown a likelihood of success on their claim that at least OPM and OMB are acting outside their statutory authority by directing large-scale layoffs and reorganizations at other federal agencies.

Plaintiffs' Fifth Claim alleges that OMB, OPM, DOGE, and their directors violated the APA by engaging in "rule-making" without publication and opportunity for notice and comment. In their TRO brief, defendants asserted, incorrectly, that OPM has simply promulgated regulations as they are statutorily authorized to do. *See* TRO Opp'n at 44 ("Congress expressly empowered OMB [sic] to promulgate regulations governing RIFs, and OPM has done just that."); *see also id.* at 35 ("the governing statute expressly directs OPM to promulgate regulations governing RIFs . . ."); *id.* at 1, 7-8, 40-41 (citing 5 U.S.C. § 3502).[23] OPM did not promulgate regulations here. Promulgating a regulation would have required a public process, including notice and comment under the APA. *See* 5 U.S.C. § 553. This did not occur. Plaintiffs have shown a likelihood of succeeding on their claim that OPM and OMB engaged in rule-making without notice and comment required by the APA, in issuing the OMB/OPM Memo and in approving the ARRPs.

### B.    Irreparable Harm

The Court discussed plaintiffs' injuries in the standing section above, but in the context of

---

[23] 5 U.S.C. § 3502 states, in part, that OPM "shall prescribe regulations for the release of competing employees in a reduction in force which give due effect to-- (1) tenure of employment; (2) military preference . . .; (3) length of service; and (4) efficiency or performance ratings." 5 U.S.C. § 3502(a).

United States District Court
Northern District of California

the *Winter* analysis the Court must also consider whether this injury is irreparable. Plaintiffs assert that constitutional violations constitute irreparable injury, including violations of the separation of powers. TRO Mot. at 48-49. Plaintiffs assert that union members will face irreparable harm when they lose their wages and health benefits and, in some cases, may need to relocate. *Id.* As the Ninth Circuit has noted, "[l]ack of timely access to health care poses serious health risks," especially for individuals with chronic health conditions. *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1125 (9th Cir. 2008). The Court agrees that these losses constitute irreparable harm and notes, from its review of plaintiffs' declarations and the ARRPs submitted *in camera*, that some RIF terminations were scheduled to begin mid-May or soon thereafter. On May 16, 2025, the government told the Supreme Court "that about 40 RIFs in 17 agencies were in progress and are currently enjoined by the TRO." Application for Stay, No. 24A1106 (U.S.), 29.

Further, facing the potential loss of federal funding, the local government plaintiffs experience irreparable harm when they are forced to plan how to mitigate that loss. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537-38 (N.D. Cal. 2017). These plaintiffs cannot recover damages via an APA claim, making their monetary loss irreparable. *See Cal. v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

Defendants and their supportive *amici* states argue from *Sampson v. Murray* that plaintiffs have not made a sufficient showing of irreparable harm. In *Sampson*, the Supreme Court considered whether to enjoin the dismissal of a single employee and determined the plaintiff had not made a sufficient showing of irreparable harm "in this type of case," even though the plaintiff would suffer at least a temporary loss of income. *Sampson v. Murray*, 415 U.S. 61, 63, 89-90, 92 (1974). But the Court also recognized "that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id.* at 92 n.68. The present case, simply put, is not the same "type of case" as *Sampson*. The Court here is not considering the potential loss of income of one individual employee, but the widespread termination of salaries and benefits for individuals, families, and communities. Moreover, given the scale and speed of defendants' actions, if the reorganization continues, the agencies will not easily return to their prior level of operations.

1    This is irreparable harm.

2

3        **C.    Balance of Interests**

4        The last two factors—assessing the harm to the opposing party and weighing the public

5    interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.  In this

6    context, these factors require the Court to ask whether pausing the government's large-scale RIFs

7    and reorganizations harms the government more than it benefits the plaintiffs.  Defendants have

8    argued that there is no public interest in injunctive relief because its actions are lawful.  TRO Opp'n

9    at 48.  This argument fails, as the Court has found it likely that defendants' actions are not lawful.

10   The Court notes again that its order does not prevent the President from exercising his Article II

11   powers; it prevents him from exercising Congress's Article I powers.

12       Defendants further argue that a continued injunction would "frustrat[e] the government's

13   efforts to impose budgetary discipline and build a more efficient workforce."  PI Opp'n at 21.  As

14   plaintiffs note in their reply, the Constitution gives Congress the power—and responsibility—of the

15   purse.  PI Reply at 8 (citing U.S. Const. art. 1, § 9).  Further, the fact that defendants have placed

16   many employees on paid administrative leave for the duration of the RIF notice period—rather than

17   have them to continue working for their pay—undercuts their ostensible concern for efficient and

18   effective government.[24]  So too do admissions from agency heads that cuts have been or might be

19   made too fast.  *See, e.g.*, TRO Mot. at 4-5 (defendant Kennedy stating, with regard to April

20   terminations of HHS employees: "[p]ersonnel that should not have been cut were cut . . . that was

21   always the plan . . .  we're going to do 80% cuts, but 20% of those are going to have to be reinstated,

22   because we'll make mistakes.").  Some of the ARRPs reviewed by the Court indicate that cuts may

23   be too deep or that cost savings will not be realized in the short term.  In sum, the Court does not

24   find that pausing hastily constructed and likely unconstitutional RIF and reorganization plans

25

26   ───────────────

27       [24] As *amicus curiae* Public Employees for Environmental Responsibility note in their brief, such widespread use of paid leave may also violate the Administrative Leave Act, 5 U.S.C. § 6329a. Dkt. No. 116-1. Violation of this statute is not charged in the complaint and is not directly at issue in this case.

28

United States District Court
Northern District of California

1    constitutes irreparable harm to the government.

2           Furthermore, the Court finds that injunctive relief as ordered below would serve the public

3    interest, because "[t]here is generally no public interest in the perpetuation of unlawful agency

4    action.  To the contrary, there is a substantial public interest in having governmental agencies abide

5    by the federal laws that govern their existence and operations."  *See League of Women Voters of*

6    *United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks and citations

7    omitted).

8

9    **V.      Scope of Remedy and Order**

10          Providing relief beyond the named parties is appropriate where necessary to provide relief

11   to the named parties.  *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987).  The Court has

12   found that plaintiffs are likely to succeed on the merits of their challenges to Executive Order 14210,

13   the OMB/OPM Memo, and OMB/OPM's approval of the ARRPs.  The Court limits its injunction

14   to the named agency defendants, but acknowledges that its order as detailed below will provide

15   relief beyond the named plaintiffs.  To do otherwise remains impracticable and unworkable, in

16   particular considering the diversity of plaintiffs in this case.  *See City & Cnty. of San Francisco v.*

17   *Barr*, 965 F.3d 753, 766 (9th Cir. 2020) (noting that where "a case involve[es] plaintiffs that operate

18   and suffer harm in a number of jurisdictions . . . the process of tailoring an injunction may be more

19   complex").  To be sure, relief must be narrowly tailored, but narrowly tailored does not necessarily

20   mean small.  The Court's relief must be sized to fit the problems presented by the case, no more and

21   no less.

22

23          **A.      Prospective Relief**

24          For the foregoing reasons and for good cause shown, the Court therefore ORDERS as

25   follows:

26                  IT IS HEREBY ORDERED that the agency defendants (as delineated
                    below) and their officers or employees or any other individuals acting
27                  under their authority or the authority of the President are hereby
                    enjoined and/or stayed from taking any actions to implement or
28                  enforce sections 3(c) and 3(e) of Executive Order 14210 or the

                                            47

February 26, 2025 OMB/OPM Memorandum, including but not limited to:

(1) any further approval, disapproval, or certification of ARRPs by OMB and OPM, whether formal or informal, express or implied;

(2) any further waivers of statutorily-mandated RIF notice periods by OMB and OPM, whether formal or informal, express or implied;

(3) any further orders by DOGE, whether formal or informal, express or implied, to agencies to cut programs or staff in conjunction with implementing the Executive Order, the OMB/OPM Memorandum, or the ARRPs;

(4) any further implementation of ARRPs, including but not limited to the following actions, to the extent they are taken to implement Executive Order 14210 and/or the OMB/OPM Memorandum:

    (a) execution of any existing RIF notices (including final separation of employees),

    (b) issuance of any further RIF notices,

    (c) placement of employees on administrative leave, and

    (d) transfer of functions or programs between the agency defendants.

However, this injunction shall not limit federal agency defendants from presenting reorganization proposals for legislative approval or engaging in their own *internal* planning activities without the involvement of OMB, OPM, or DOGE, provided that they do not implement any of the prohibited actions above.

This injunction shall apply to the following defendant agencies: OMB, OPM, DOGE (USDS), USDA, Commerce, Energy, HHS, HUD, Interior, Labor, State, Treasury, Transportation, VA, AmeriCorps, Peace Corps, EPA, GSA, NLRB, NSF, SBA, and SSA. Plaintiffs have presented evidence that these agencies are implementing, or preparing to soon implement, large-scale RIFs and reorganizations pursuant to the Executive Order and OMB/OPM Memo. *See* PI Mot. App'x C (identifying plaintiffs' submitted evidence for each agency). To the extent that defendants need clarification about whether certain activities are prohibited or allowed by the order, they may seek such clarification from the Court. By 3:00 p.m. (PDT) on Friday, May 30, defendants shall file a declaration verifying that all defendants have been given notice of this order and have taken steps to comply. The Court defers decisions about further compliance reporting to a later day.

## B.    Retrospective Relief

Plaintiffs further request that defendant DOGE and the federal agency defendants be ordered

to rescind earlier actions taken to implement the ARRPs, to restore the status quo prior to the likely unlawful action.  Dkt. No. 101 ¶¶ 2-3.  As the Ninth Circuit has stated, "the 'status quo' refers to the legally relevant relationship between the parties before the controversy arose."  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014).  If the government issues a new policy that is challenged, the status quo is the situation before the issuance of the policy.  *Id.*; *see also Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020) (holding a challenged presidential proclamation changed the status quo); *Doe v. Samuel Merritt Univ.*, 921 F. Supp. 2d 958, 963 (N.D. Cal. 2013) (holding, where a student challenged her disenrollment from a university, the status quo would be the "last uncontested status," which was the student's status as enrolled).  Defendants contend that the "status quo" should not be set to before the Executive Order and, even if it was, argue "that it would be an abuse of discretion to issue an injunction requiring a virtual Executive Branch wide effort to restore the world as it existed" before February 11, 2025.  PI Opp'n at 24.

The Court holds that Ninth Circuit authority squarely supports the conclusion that the status quo in this case, for purposes of an injunction, is the situation prior to the February 11, 2025 issuance of the challenged Executive Order 14210.  However, the Court's ability to impose retrospective relief is limited by practical considerations.

> The Court therefore ORDERS that federal agency defendants (1) rescind any RIFs issued pursuant to Executive Order 14210 and (2) transfer any federal employees who were moved into administrative leave status to effectuate Executive Order 14210 back to the status they held prior to being placed on such leave; but the Court STAYS these two components of retrospective relief for the duration of any appeal of this injunctive order.

Plaintiffs may later ask for reconsideration of the stay with a specific showing of harm.

At the preliminary injunction hearing, defendants requested a stay of all injunctive relief, but the Court denies that request.

* * *

In summary, the Court largely continues the prospective relief issued in its temporary restraining order, with some refinement.  The Court also imposes limited retrospective relief, but stays the retrospective relief pending appeal.

Holding that the President, OMB, OPM, and DOGE have exceeded their authority naturally

raises the question of precisely where the line should be drawn between executive and legislative authority over agency reorganization. But as Chief Justice Roberts once wrote, in certain cases "[w]e have no need to fix a line . . . . It is enough for today that wherever that line may be, this [action] is surely beyond it." *See Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 585.

## VI.    Rule 65(c) Security

Rule 65(c) of the Federal Rules of Civil Procedure provides that a district court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The district court retains discretion "as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks and citations omitted).

The government has requested that the Court require plaintiffs give security in an amount "commensurate to the salaries and benefits the government must pay for any employees it would prefer to separate from federal service but is unable to for the duration of any preliminary relief." TRO Opp'n at 50; *see also* PI Opp'n at 25 (incorporating by reference defendants' arguments from its TRO opposition). The Court notes, first, that defendants have not provided support for security in any fixed amount, and the Court cannot establish such an amount without the ARRPs or some other evidence showing the anticipated financial impact. Second, the Court finds there is significant public interest underlying this action, particularly in light of the constitutional claims raised. *See Taylor-Failor v. Cnty. of Haw.*, 90 F. Supp. 3d 1095, 1102-03 (D. Haw. 2015) (citing *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005)). Although defendants allege they will incur costs for retaining federal employees that they would prefer to separate, TRO Opp'n at 50, so too will the government incur costs if the RIFs are implemented hastily and unlawfully. There is also indication in the record before the Court that agencies may not realize immediate cost-savings for separating employees. This consideration further weighs against the government's request that plaintiffs be required to give security. At this time, the Court will require that plaintiffs post a nominal bond of $10 in total (not per plaintiff) by no later than Friday, May 30, 2025.

United States District Court
Northern District of California

1

2
## CONCLUSION

3
The Court reiterates the conclusion from its temporary restraining order. The President has

4
the authority to seek changes to executive branch agencies, but he must do so in lawful ways and,

5
in the case of large-scale reorganizations, with the cooperation of the legislative branch. Many

6
presidents have sought this cooperation before; many iterations of Congress have provided it.

7
Nothing prevents the President from requesting this cooperation—as he did in his prior term of

8
office. Indeed, the Court holds the President likely *must* request Congressional cooperation to order

9
the changes he seeks, and thus issues a preliminary injunction to pause large-scale reductions in

10
force and reorganizations in the meantime.

11

12
**IT IS SO ORDERED**.

13
Dated:  May 22, 2025

14
_____

15
SUSAN ILLSTON
United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California