Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*

[Additional counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Case No. 3:25-cv-03698-SI <br><br> **DECLARATION OF DANIELLE LEONARD IN SUPPORT OF PLAINTIFFS' URGENT REQUEST FOR STATUS CONFERENCE** |

**DECLARATION OF DANIELLE LEONARD**

I, Danielle Leonard, declare as follows:

1.      I am a member in good standing of the State Bar of California and the bar of this Court.  I represent the Plaintiff organizations in this action.  I make this declaration in support of Plaintiffs' urgent request for a status conference regarding Defendants' non-compliance with the Court's orders.  I have personal knowledge of the matters set forth herein.

2.      A true and correct copy of the State Department's transcript of the April 22, 2025 State Department Press Briefing is attached hereto as **Exhibit A**.  That document was downloaded at my direction and is available at https://www.state.gov/briefings/department-press-briefing-april-22-2025/.

3.      On May 29, 2025, I learned that the Department of State submitted a notification to various congressional appropriations committees that stated that it intends to move forward with the reorganization plan previously announced on April 22, 2025.  I understand that the Department of State was taking the position that it could impose further significant reductions in force (RIFs) as early as June 13, 2025, 15 days after the May 29 notification.

4.      The "State Department Reorganization Fact Sheet" originally provided to State Department employees on April 22, 2025 (previously attached as Exhibit I to the Declaration of Sarah Hunter (ECF 37-20)) is attached again hereto for the Court's convenience as **Exhibit B**.  An updated version of this Fact Sheet, which states that it was revised as of May 13, 2025, and removes any reference to the "President's Workforce Optimization Initiative," is attached hereto as **Exhibit C**.

5.      During the week of May 26, Plaintiffs' counsel learned that multiple probationary employees at the Department of Housing and Urban Development ("HUD") had been terminated by HUD on May 15.

6.      During the week of May 26, Plaintiffs' counsel also learned that multiple employees of the Department of Health and Human Services ("HHS") had been placed on administrative leave and/or subjected to offboarding action after this Court's orders.

7.      On May 29, 2025, Plaintiffs' counsel contacted counsel for the Defendants regarding the actions at State, HUD and HHS.  Counsel for the parties proceeded to exchange information and

meet and confer in an attempt to resolve any disputes regarding compliance.  A true and correct copy of that email correspondence is attached hereto as **Exhibit D**.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on June 3, 2025, in Alameda, California.

_____
Danielle Leonard

Exhibit A

An official website of the United States Government   Here's how you know

Home  >    ...    >  Department Press Briefing – April 22, 2025

# Department Press Briefing – April 22, 2025

**TAMMY BRUCE, DEPARTMENT SPOKESPERSON**
**WASHINGTON, D.C.**

APRIL 22, 2025

---

### A R T I C L E   I N D E X

**DEPARTMENT / REORGANIZATION**

**RUSSIA / UKRAINE**

**COLOMBIA**

**IRAN**



12:23 p.m. EDT

**MS BRUCE:**  Hi, everybody.  Hello, sir.

**QUESTION:**  Hi.

**MS BRUCE:**  Oh, thank you, ma'am.  Welcome aboard, everyone.  Thank you for being here.  I know a few people are doing some hits so we might have some people coming in.  Appreciate, again, you being here.

All right.  An announcement – I think a rather important one for certainly all of you here and everyone watching at home, and certainly everyone here at the State Department.  Welcome aboard.  Today, under President Trump's leadership and at the direction of Secretary Rubio, we are reversing decades of bloat and bureaucracy at the State Department.  The Secretary announced a reorganization plan to build an America First State Department to meet the challenges of a new era.

He has issued the following statement on the plan, which you can get at State Department – D-E-P-T or – how – is it dot gov?

**STAFF:**  State.gov.

**MS BRUCE:**  State.gov is where you can get this statement and links to other information on what we're about to discuss:

We are facing tremendous challenges across the globe.  To deliver on President Trump's America First foreign policy, we must make the State Department great again.

In its current form, the department is bloated, bureaucratic, and unable to perform its essential diplomatic mission in this new era of great power competition.  Over the past 15 years, the department's footprint has had unprecedented growth and costs have soared. But far from seeing a return to investment, taxpayers have seen less effective and less efficient diplomacy.  The sprawling bureaucracy created a system more beholden to radical political ideology than advancing America's core national interests.

That is why today Secretary Rubio is announcing a comprehensive reorganization plan that will bring the department into the 21st century.  This approach will empower the department from the ground up, from the bureaus to the embassies.  Region-specific functions will be consolidated to increase functionality, redundant offices will be removed, and non-statutory programs that are misaligned with America's core national interests will cease to exist.

Under President Trump's leadership, we have a commander in chief committed to putting America and Americans first.  As his Secretary of State, Secretary Rubio announces that he is in fact confident a reformed State Department will meet the moment and help make our country great once again.

So the bottom line here is that these sweeping changes will empower our talented diplomats to put America and Americans first.  It is also – I will remind for those of you who are in the bullpen and those watching at home – as I've mentioned before, there's a number of journalists and organizations that are a member of our bullpen.  They're people who cover the State Department and work here in the building.  And we had a discussion earlier today with some more background on this that also for State Department personnel – everyone in the building – will be receiving, of course, this statement, and there is an opinion piece that is available from the Secretary at the new State Department Substack link, and that is State – D-E-P-T.Substack.com.  Is that it?  Go there and it will ask if you want to subscribe.  You don't have to.  You can just click on the title and you'll get additional commentary from the Secretary in this regard.

Also, for everyone in this building, there is additional information.  There is a fact sheet.  There are frequently asked questions.  There's an additional statement from the Deputy Secretary Landau, so you will be able to see that as well.  And as a reminder again, because I know there's been a lot of fake news out there, this is a reorganization plan.  It is not something where people are being fired today.  They're not – you're not – no one's going to be walking out of the building.  It's not that kind of a dynamic.  It is a roadmap; it's a plan.  It is something that we've – there's been a congressional notice that has been sent.  And so the steps and the procedures that happen through the government are also taking place at this point as well.

And at this stage, I will open it up for questions on this issue.  Yes.  Shaun.

**QUESTION:**  Sure.  Thanks.  If you don't mind, just – obviously there'll be lots of questions on this, but just to make sure we get to it.

**MS BRUCE:**  Of course.

 **QUESTION:**  The Russians said that – are saying that Special Envoy Witkoff is coming back.

**MS BRUCE:**  All right.  So we're doing – that's a different issue.

**QUESTION:** All right.

**MS BRUCE:**  Let's stick with this.  If we – I – it's an interesting – if none of you have any questions about this.

**QUESTION:**  No, no, we certainly have questions about it.

**MS BRUCE:**  Yeah, so I mean —

**QUESTION:**  We'll get to that later.

**MS BRUCE:**  I mean questions about this.

**QUESTION:**  Okay.

**MS BRUCE:**  And then of course I know – Lord knows – there is many other things that are happening as well.

**QUESTION:**  Again, sure.

**MS BRUCE:**  All right.  Yes, go ahead.

**QUESTION:**  Hi, just on the hiring freeze and the way that this affects the folding in of USAID to the State Department.

**MS BRUCE:**  Sure.

**QUESTION:**  How – given the fact that these people are not considered State Department employees, what opportunities, if any, are going to be given to them to able to reapply or not for their position?

**MS BRUCE:**  Sure.  Sure.  First of all, the USAID fold-in that in a way is kind of the genesis of this, right?  We knew that was going to happen, USAID was going to become a part of the State Department.  And in this framework, what you'll see – and it makes, I think, perfect sense and people seeing this will see that it makes sense – is that instead of this monolithic entity that was its own object in Washington, D.C., making decisions about aid and where the money would go, the usual experience – and I've experienced this with the Secretary's travels and his conversations with the leaders and also our own embassy and consulate staffs – is that you would have donations or funding for a project that the country itself was not interested in or did not want and had other needs, that the embassy staff or the ambassador was never consulted, that the opinions of the people who are working in the country were not consulted.

So they would see money going into a nation, as an example, put in to fund something that was even, in some cases, detrimental to the nation that we were working with or opposed by an ambassador, and yet there was no input and no action.  In this particular kind of re-org, it's about consolidating things, right, weaving certain offices into other bureaus, making situations smaller, reorganizing it literally.  And in that case, you will see the bureaus which used to have a lot of power but had really kind of lost that in a certain way through the giant bureaucracy that became evident through the '70s and '80s and '90s, and that you would have a dynamic now where the intention is – and described in this plan – to

have each regional bureau have the element of the USAID that is relevant to that bureau so that they would be working together.

And it would be a coalition, if you will, of ideas and minds and efforts to then also bring in and have the embassies, the ambassadors, and the governments who we're working with having a say in making sure that the money that's donated is relevant to that nation, is relevant to the region. And that's what we'll be – that's where USAID essentially is going, is into positions where, as I've mentioned to you, don't – as we were doing our review of USAID – is don't mistake a change for being something – for indicating something is gone or missing, that it was never about us abandoning our commitment to funding to any kind of life-saving efforts or our work with other nations in assisting them, but it was going to look different, and now it will.

But it will not just look different, but it's actually going to be within a functional framework to make sure that any aid that goes out is aid that the – that we work with the nation on, that we work with the embassies on, and people on the ground with an interest who are stakeholders, will have a say in that. I think that that's a – certainly a much more functional way to move foreign aid through.

QUESTION: But on the employees themselves —

MS BRUCE: Oh, sure.

QUESTION: — that are already sort of in limbo in terms of how their jobs are going to change —

MS BRUCE: Sure. Sure.

QUESTION: — when the department was going to be taking over USAID. Are those employees going to have the opportunities to apply for other positions? How many people —

MS BRUCE: Well, some will. Some will. So in – again, this is a proposal. This obviously could change. But as you have offices that are cut or even some bureaus that were set up for a specific situation that end up being cut entirely, that you will have people who then, Foreign Service officers, career workers, et cetera being able to apply for something else. So these are a – it's a dynamic where you've got a certain number of open seats that exist

Case 3:25-cv-03698-SI    Document 148-1    Filed 06/03/25    Page 11 of 48

and then people who, of course, will then be out of the seat where they were if, in fact, their office is cut or even folded into another bureau.

So these are – again, this is, again, a road map and it's a dynamic, whereas we've said in the past certain dynamics where people – and this is new for me as somebody who's never worked for government – very much, in a way, like the military where you can be working for the State Department, working in a specific, let's say, embassy overseas and then that job ends, and then you come home and you get slotted into a new job.  That – I think for the American people, maybe for large corporations, that makes sense.  But that's how it works here when, of course, that's possible.  So that is possible, and we will clearly watch that as it plays out.

Yes, sir.

**QUESTION:**  Thank you very much, Tammy.  You said things will – you said things will look different, and thank you for that response.

**MS BRUCE:**  Sure.

**QUESTION:**  But I think a lot of people around the world will be wondering what – especially perhaps in the Middle East, Africa – what it will actually mean for them on the ground, what – how will these changes take effect? Will we see offices over there that are being closed, the consulates and so on?  Can you talk a little bit about what people around the world can actually expect?

**MS BRUCE:**  Well, I can't speak to – it's a very separate issue, right?  This is an organizational roadmap for this department here, right, in Washington, D.C.  The arguments about what will occur in other countries when you're talking about embassies and consulates, that's not addressed here.  It's not a factor that this – this reorg doesn't affect them except, as I've mentioned, is more involvement, right, more direct – direct person-to-person framework, as opposed to bureaucracy-to-bureaucracy.

No more calling up USAID and going through 17 messages and trying to get an answer back about what's happening with a certain grant or what's happening with a certain plan, that this is really in a way that I think I've heard many people here note, including the Secretary and the deputy secretary, of returning the State Department to its traditional

base, to the nature of human diplomacy, of getting things done, and my goodness, especially in the 21st century that moves so rapidly, faster than any other time in history.

And this is what the State Department used to be able to do.  It has grown, as the Secretary's statements indicated, quite bloated, unable to move, stuck in really just a – just a bloated inability bureaucratically to make decisions or to get things done.  And if decisions are made, the levels that have to be gone through extend the amount of time to where you can get a decision made.

So I would say for embassies and consulates and the world itself, as they're already seeing when it comes to the way that President Trump operates, the way that Secretary Rubio operates, it's about faster results with, I think, a more nimble effort.

All right.  Yes, Humeyra.

**QUESTION:**  Thank you, Tammy.  So in the reorg we see that the under secretary for Civilian Security, Democracy, Human Rights, as known as J inside the State Department, seems to have been eliminated, and some of the bureaus under that is being put under – brought under different under secretaries.  But for example, Office of Global Criminal Justice, which works on monitoring atrocities overseas, which cooperates with different governments on war crimes accountability, seems to be completely eliminated.

So I'm wondering – this under secretariat was a place where U.S. basically did democracy and rights promotion globally.  Does the new State Department under President Trump no longer sees that as a mission?  Is that no longer a priority?

**MS BRUCE:**  Sure.

**QUESTION:**  Yeah, I have a follow-up.

**MS BRUCE:**  I mean, it's a legitimate question.  Again, we have – we have grown used to seeing something and then that would indicate that's where that lives, and if that's gone, the effort is gone.  Many times during the USAID argument I've made that argument.  Just because the USAID building was going to be something else doesn't mean – or that the – certain aid was cut that was not long with our – aligned with our vision or President Trump's vision doesn't mean that our commitment to foreign aid ended.

So you're right; there are going to be certain offices and certain bureaus that are going to be gone or folded into other bureaus.  I would say this is one of the most important aspects of this.  For everyone in the building and everyone watching at home, because you might have had a specific bureau that dealt with a discrete issue doesn't mean because it's now folded into another larger bureau doesn't mean that it's gone or we don't care.

It means that, in fact, certain issues deserve to be considered part – not like some specialized, separate, segregated interest.  Why shouldn't that interest be in every bureau, right?  If you've got bureaus that – and for people watching at home, as I mentioned I think in my very first briefing, that the State Department isn't just a bunch of people at a desk looking at the internet and people figuring out what it is they want to say to a world leader.

There's bureaus filled with people who care about the country, the State Department, and are experts, researchers, individuals who are committed to a certain region who understand it, who have also, though, the relationships with people in the countries in that region.  And then they inform us.  They do the research.  They inform me for this briefing.  I go onto the screen and it's every bureau in this building that has what we call lines, which are – which is the information about what's happening on an issue.  They tell me what those things are, what – why it matters, and what – et cetera.

So I come here and a great deal of what I say to you, if not most, is from the body of knowledge from the people who work in this building who are the Foreign Service officers, the career people, right, the career people, these – the Civil Service officers and workers who are here.

So that's how this – it is the government as a whole is people.  It is a collection of people who've gathered to further the Founders' vision, and who with each election gather to further the vision of the person who leads this government.

So when we think about the nature of USAID or those other bureaus you mentioned, if a bureau is gone, that is – certainly all these issues are important.  It means that we're looking at certainly blending in with the regional bureaus, taking certain issues away from being specialty issues and making sure that they're in the frameworks of the bureaus so that they can be weaved in and dealt with as a whole within all the work.

Yes.

**QUESTION:** Can I follow up on Ukraine?

**MS BRUCE:** Of course. Please.

**QUESTION:** Can we stay with this?

**MS BRUCE:** No? Next, once we get through this.

**QUESTION:** Okay, I do have a follow-up on this too.

**MS BRUCE:** Okay. Hold it, but I'll make sure I give it to you guys. We're good.

**QUESTION:** You said earlier that – you talked about some of the programs and you described them as the aims of the programs were not in line with the aims of the country. Now there are country – like, U.S. has made democracy promotion a priority, but that priority actually did not go down well with some of the countries in the world. So if a country – for example, a lot of people would give the example of Hungary. I mean, U.S. has funded some independent media organizations in Hungary. If those are in contradiction with Hungary's goals, the U.S. is no longer going to do that kind of thing?

**MS BRUCE:** Oh, no, no, it's not – without, of course, speculating on what we would do in a particular country, the point is, is that American tax dollars that are sent as aid or to supplement something in another country deserves to be used to reflect the values and the interests of the United States, which of course is democracy and freedom around the world. I think it's safe to say that with all of our actions – certainly the Trump Administration – we have made it clear that that is our priority.

But also, making sure that the ambassadors who are also appointed – who are representing this nation in countries and others who work at the consulates in concert with the nation that we are working with diplomatically – that we have a coalition, if you will, on knowing how that money is being spent and making sure that the stakeholders actually have a say. I think that's fair. Some people would argue that sending money into a country, spending on something that nobody else discussed – like as USAID would do – is unfair and that the people in the country that we're working with have – should have a say.

But bottom line is this now moves into something that is more accountable, more specific, easier to describe, easier to ask questions about, and easier, effectively, to – for everyone involved here at the State Department and at the embassies and consulates involved, more accessible and more transparent.

All right.  Yes.

**QUESTION:**  Okay, I just wanted to follow up on Humeyra, on Global Criminal Justice.

**MS BRUCE:**  Sure.

**QUESTION:**  Because there seems to be a bit of a mixed message, because on the one hand this is clearly being eliminated from the organizational chart, but when we're pressing you on it you're saying —

**MS BRUCE:**  Well, it may be moved.  I mean, things may – if you don't see it on the chart, it may be moved.

**QUESTION:**  But I – and then the Secretary has retweeted an article which says very specifically that this is an aggressive shakeup; it will close agency offices, including those launched to further human rights, advance democracy overseas, counterextremism, and prevent war crimes.  So it's just a simple question, really.  Is it – is the investigation and prevention of war crimes overseas still an important —

**MS BRUCE:**  Of course.

**QUESTION:**  — piece of work and a priority of the State Department?

**MS BRUCE:**  Democracy is always important, obviously.  And again, going – and I understand the tendency.

**QUESTION:**  I understand, but the question is about war crimes.

**MS BRUCE:**  I understand the tendency.  War crimes – again, for me being here now, we're approaching what, a hundred days?  My deciding to do this is based on this nation's history, and it clearly is committed to the nature of the values of the American people and of this country.

And just because – and this is why I think it's difficult to do.  You've seen a bureau dedicated just to that.  Just because it has been folded into a different bureau or as an element underneath a different kind of office, and that particular bureau that was maybe specialized, which could be implemented in a better, more nimble, faster way – especially when we're talking about war crimes and things immediately that are moving on the ground – this is the kind of adjustment and reorganization that makes it better.  And that will always be the argument:  This will be seen.

But it is – it is of course – those values that you know are American values remain, and while the approach or the bureaus or an office might be called something differently or even eliminated as an office, but is moved through the bureau as a whole, you'll see that the American approach to the world not only remains the same but will be more obvious, more clear, more dynamic, and more active.

All right.

**QUESTION:**  Do you know where will that role move to?  Because it's very hard to see in the chart, for example, on war crimes or Global Criminal Justice, where that will now exist.

**MS BRUCE:**  Well, but again, this is a roadmap.  It is a plan.  This is something that in this process – and there is a process in this government – where there may be certain things that change.  And there'll be a point where we're talking about implementation.  So those details – this gives you, I think, a very good idea, transparently for everyone who's watching this, that this is a change.  It is – the issue is – certainly sometimes we all know that change is difficult, but in this particular case it had to happen because of the bulk, because of the unsustainability of the size of the government.  And that's why we're doing it.

All right.  Yes, sir.

**QUESTION:**  Thank you, Tammy.  Two questions.  I know this came up on different setting, just wanted to make sure —

**MS BRUCE:**  It's the same issue?

**QUESTION:**  Yes.

**MS BRUCE:**  Okay.

**QUESTION:** To put you on the record that this will not impact whatsoever when it comes to the department's reports on different issues like human rights, which appears to be delayed.

**MS BRUCE:** Well, I can't – I'm not going to speculate on whatsoever impact on how a report is issued, when it's issued, the content of the report, the nature of how our discussing human rights is done. I will not – all of that would require speculation here beyond, I think, the reorganization report.

**QUESTION:** And my second question. I know that – I guess the spokesperson's role will be promoted; congratulations on that – but I want to understand, with the GEC – closure of GEC recently, the Global Engagement Center —

**MS BRUCE:** GEC, yes.

**QUESTION:** — and also —

**MS BRUCE:** Yes. Now, that's a very good question, yeah.

**QUESTION:** And also eliminating some of the fundings, like grants to Moldova to fight against Russian disinformation —

**MS BRUCE:** Well —

**QUESTION:** Is the issue of Russian disinformation or Chinese disinformation – is this something that you are concerned about, or are you out of business of combating it?

**MS BRUCE:** Well, it's obvious that everyone's concerned about interference in elections. None of us want that. But, of course, the specifics of how a reorganizational roadmap is not going to – I'm not going to be able to answer the question about how that would be affected, of course. But – and your other question was —

**QUESTION:** Russian – Chinese and Russian disinformation and combating —

**MS BRUCE:** No, there was a different one. I just —

**QUESTION:** Your office will be promoted. I see the —

**MS BRUCE:** Well, it's – it's – and this is, I think again, a bit in the weeds for the people at home. I mean, there is an organizational chart. My office is now answerable to the Secretary, which of course all of you probably already presumed that. That's true, but now technically it sits within that umbrella. So nothing has really changed in that regard except it's a little bit more specific and obvious when it comes to the nature of my work.

**QUESTION:** Can you please come back to me later on Ukraine?

**MS BRUCE:** Well, I – forgive me. I am going to move on. I was also going to ask – answer your first question, which —

**QUESTION:** GEC.

**MS BRUCE:** The GEC. Thank you. He remembered. In fact, that's a good question, because things beyond this roadmap will also happen. That bureau has been eliminated. Things will change in the State Department separate from this roadmap. That bureau, which had been ordered to be removed last fall – what they did is they changed its name and moved people around. And so that, of course – by eliminating that bureau, $50 million a year – perfect example – that worked to censor the American public. That is not, certainly, the vision of the Trump Administration or the American people who put him in office. So yes, that bureau is gone. It is really gone this time, and the American people are better off for it.

**QUESTION:** Can I just ask one quick question?

**MS BRUCE:** Yes, of course you can.

**QUESTION:** It's on this process.

**MS BRUCE:** Yes.

**QUESTION:** There is an internal State Department memo that was put out about this that said that the under secretaries are going to be submitting a path to reduce domestic staff by 15 percent. Can you just help us understand how the leadership in charge of this reorg came up with the 15 percent number and if there's any wiggle room there, or if that's set in stone?

**MS BRUCE:** Well, you said this is an internal document. I'm not going to speak on something that you may or may – I'm not going to presume you didn't see something, so forgive me. But I'm not going to speak on the specifics of something like that, but the under secretaries do have a role here. This is, again, not from on high things being swept away with one of those large yard brooms. This is a very specific dynamic brought to the under secretaries, who have daily operational experience.

I see you. Keep your hand down, please. I'm sorry, it's a little distracting.

These are under secretaries who are working daily with the people in this building, who work in this building, who know what's being produced, who know what has to happen, and they are best suited to make a determination when it comes to this roadmap about how to apply the nature of what we want to accomplish. So the under secretaries are directly involved and they will – I think they'll have about 30 days to make their own plan in this framework, and then, of course, we'll see how that manifests in the meantime.

**QUESTION:** And then just one quick question.

**MS BRUCE:** Sure.

**QUESTION:** Is DOGE involved at all on this plan, or was this just a State Department proposal?

**MS BRUCE:** This I think is a very good example of the importance – we know the American people love the result of DOGE. I think there were some questions, perhaps, about how it was applied. And what we do know is that the DOGE approach, the goal of that entity and of that committee, is something the President appreciated and still does, as do the American people very much.

But when – I believe the President said a few weeks ago that ultimately this was going to be approach – an approach that the secretaries were going to begin to apply. And also that does make sense, because whether it's the secretaries or the under secretaries or the people running the offices, it is a daily – the daily work of individuals committed to the country, making a difference for the world, and the people on the ground working together know best about how this works, what could change, and how it should change.

So this is, I think, a very good example of the continuation of that mission and the value of that mission to cut government down to size, get people used to the idea that it can happen without it being a bad thing, and then watching the benefits that flow. So secretaries now in charge of this – remember, this is a – from an executive order. This is a whole-of-government – every department looking at how they can make their department more efficient, less burdensome, less bureaucratic. This is the State Department's version of that. I would say that DOGE is not in charge of this, but this is the result of what we've learned and the fact that we appreciate the results, and we want more of those results. And it is now in the hands of the secretaries as well.

All right. All right. Shaun.

QUESTION: Can I switch topics? Is it —

MS BRUCE: All right. Now, are we done here? So we should switch to some other important topics we have. As a matter of fact, one of my rules is, of course, our friend Karoline Leavitt will be starting in about 10 to 15 minutes. I've started earlier here because of the nature of the issues, but there are some other issues on our plate. Shall we start with some other ones at this point?

QUESTION: Sure. Not that —

MS BRUCE: Shaun, go ahead. You were first.

QUESTION: Sure. Not that I'm not interested in reorganization, but —

MS BRUCE: Yes.

QUESTION: Could I ask you – Russia said today that – or Russian state media said that Special Envoy Witkoff will be on his way to Moscow. Is that something you can confirm? And if so, could you explain the nature of his discussions this time?

MS BRUCE: I can't confirm that, no.

QUESTION: Cannot?

MS BRUCE: I cannot.

**QUESTION:** Is it incorrect, or is it just —

**MS BRUCE:** I can't speak to that.

**QUESTION:** Okay.  But –

**MS BRUCE:** Yes.  I mean, that is – yeah, that's not something I can speak to.

**QUESTION:** Okay.  Could I ask you about the Secretary's schedule?

**MS BRUCE:** Sure.

**QUESTION:** Just if I'm not mistaken, you were on Fox earlier this morning, and you mentioned –

**MS BRUCE:** Yeah.

**QUESTION:** — the potential of travel.

**MS BRUCE:** Right, sure.

**QUESTION:** Could you just explain his travel schedule?

**MS BRUCE:** Yes.  There's – and there's – normally when we have travel schedules, you guys get an announcement, and there was no announcement.  And I was asked, and I'd known that this was possible and had mentioned it, presuming it would happen.  The – as we know, Secretary Rubio is a busy man.  He is one of the most active, if not the most active, Secretary of State I think we've had.  And that, of course, affects every day for him.  And so when there's certain plans, they're conditional.  And in this particular instance, while the meetings in London are still occurring, he will not be attending.  But that is not a statement regarding the meetings; it's a statement about logistical issues in his schedule.

**QUESTION:** Can you confirm who will participate from the U.S. side?

**MS BRUCE:** Well, I do know – yes – that General Kellogg is there, and so he will be having those conversations.  So we look forward to hearing back from him about whether or not we've had some success in London.

**QUESTION:** Just briefly from me —

**QUESTION:** (Inaudible.)

**MS BRUCE:** I'm sorry?

**QUESTION:** On the U.S. hostage —

**MS BRUCE:** All right. That is another issue, and I will get back to you in a moment, but we've had several other people who've been waiting to deal with that. But let me – yeah, I think that that's – I think that's all I can say to you about London at this point.

**QUESTION:** Could – just briefly, the Secretary on Friday said that – essentially that we're going to see within days whether it's a – his exact words – whether it's possible to go forward with negotiating an end to the war. Is that something that General Kellogg is going to be looking at now? Is this really the time –

**MS BRUCE:** Well, what we all look to is President Trump's approach. President Trump has expressed optimism about what's possible. And of course, he has great envoys and a great Secretary of State who's been moving through to determine if that is, in fact, the case. President Trump wants this to be solved diplomatically. Obviously, he does not and does not believe – like, when it comes to certainly Ukraine and Russia, they've said multiple times, both of the Secretary and the President have said that this cannot be won militarily, and so they want diplomacy to work.

The Secretary said a few weeks ago at NATO that it was a few weeks where we would determine as we look to Russia based on their actions, not their words. And of course, now a few weeks have gone by, and we are in London. And I think it's about what will be reported, which we will know soon. But then that is also the good news about being the Secretary of State, is that he is the one who sees everything, can make the assessment of everything that's on the ground. And of course, in partnership with the President, who is the visionary and the decider, that will make a determination about whether or not peace is possible.

Yes, ma'am.

**QUESTION:** Thank you so much, Tammy. The President of Colombia Gustavo Petro is claiming that he no longer has a visa to travel to the United States. Can you confirm that report and explain the justification, if he's right or not?

**MS BRUCE:**  Well, I can't do that.  Of course, we don't speak about direct individual visa issues.  We – visa records are confidential for everyone.  But we are aware of the reports; we're aware of what he said.  What I can say is that our two countries have had opportunities to create a brighter future for our citizens through efforts aimed at targeting violent drug cartels that are now poisoning our citizens and destabilizing our region, creating economic opportunities that advance prosperity, and ending the regional crisis of illegal immigration.  So that's what I know about our two countries.  His comments are not something that I'll remark on.

**QUESTION:**  But can that —

**MS BRUCE:**  All right.  Yes, sir.

**QUESTION:**  Yeah.  Thank you.  I have a question about the Iranian talks.  Do you have any —

**MS BRUCE:**  I'm sorry, about the —

**QUESTION:**  The Iranian talks.

**MS BRUCE:**  Yes.

**QUESTION:**  Do you have any updates about the third round with the Iranian?  And how do you see the Iranian engagement with Russia and China when they are updating them and talking and meeting with them about the negotiations that they have with you?  And will there be the next round direct talks with them, or it's indirect talk?

**MS BRUCE:**  Well, I – again, these are diplomatic missions.  I know I speak – often I have to say no to you when it comes to the questions you ask, because you're looking for some details, I understand, about the nature of what may or may not happen in an issue that the world cares about.  But if it involves, of course, negotiations, diplomatic considerations, diplomatic conversations here between American leaders, I'm not going to remark on that. As far as what might be next, I have nothing new to report to you at this point.

All right.  Yes.

**QUESTION:** Thanks, Tammy. The Diplomatic Security Service says it's been assisting the Virginia Homeland Security Task Force in arresting undocumented migrants and some people who are connected to transnational gangs. Wonder if you can say more about the decision to have DSS jump in there and whether you expect this collaboration to be ongoing and if there's any concern that this will detract from the original mission.

**MS BRUCE:** Well, good question, if that's accurate. And so I need to – we'll take that back, and I'll get back to you on that.

And your question is going to be the last one, because we are just a few minutes to 1 o'clock. Thank you, everyone. We will have – I do want to let you know also for Thursday, my principal deputy, Tommy Pigott, will be briefing you for the first time. So that will be fun on Thursday. It's a very, very exciting time. Thank you, everyone. Appreciate it. Thank you. Have a great rest of your day.

(The briefing was concluded at 12:57 p.m.)

---

**TAGS**

Colombia     Iran     Office of the Spokesperson     Russia     Ukraine

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# Exhibit B

**STATE DEPARTMENT REORGANIZATION FACT SHEET**
April 22, 2025

President Trump and Secretary Rubio are focused on realigning U.S. foreign policy to reflect America's core national interests and deliver better results for Americans.  Over the past several decades, the Department's unchecked growth has created a proliferation of bureaus and offices with unclear or overlapping mandates, as well as blurred reporting lines.  The Department does not speak with one voice, responsibility for policy implementation is divided and unaccountable, transparency is diminished, and, most importantly, outcomes for Americans are not optimized.

Secretary Rubio is committed to leading] a State Department that puts America First and that empowers the Department from the ground up, from bureaus to embassies.

The new organization chart (linked HERE) will allow the Department to better set and communicate the direction of American foreign policy.  It will consolidate Department reporting lines, drive efficiencies in our operations, strengthen our workforce, and produce better outcomes for Americans both domestically and abroad.

To achieve this proposed structure and operational efficiency, the Under Secretaries have been charged with creating implementation plans that will be reviewed and approved by Department leadership.

As part of the plan, the Under Secretaries will also submit a path to reducing staff in domestic offices by 15 percent, consistent with the President's Workforce Optimization Initiative.

Consistent with all statutory obligations, some of the major components of the proposed reorganization plan include:

- <u>Overall toplines</u>: The Department will be consolidated from 734 bureaus / offices to 602, in addition to transitioning 137 offices to another location within the Department to increase efficiency.
- <u>Political Affairs (P)</u>: The reorganization will empower regional bureaus under P. These bureaus, along with our embassies, are the tip of the spear in our diplomatic efforts. Moving forward, the regional bureaus will absorb a number of functional issues to increase the authority, responsibility, and accountability of regional bureau heads, allowing them to seamlessly align policy with non-security foreign assistance and to provide leadership within the Department.
  - Each of the regional bureaus will create an Office of Assistance that coordinates aid for the bureau.  Some bureaus (e.g, EUR and NEA) already have such offices and so will not need to create something entirely new.
- <u>Arms Control and International Security (T)</u>: Security assistance, which has unique functions and authorities, will be consolidated in the T family so it can be managed comprehensively.
  - To better align with this remit, the Bureau of International Narcotics and Law Enforcement Affairs (INL) and Bureau of Counter Terrorism (CT) will move into the T family.
  - A new Bureau of Emerging Threats (ET) will consolidate various authorities and lines of effort to cohesively address 21st century threats related to cyber, AI, and space.
  - Elements of Arms Control, Deterrence, and Stability (ADS) will be merged with the Bureau of International Security and Nonproliferation (ISN) and renamed to Bureau of Arms Control, Nonproliferation, and Stability (ANS).
- <u>Economic Growth, Energy, and Environment (E)</u>: Economic and commercial statecraft will be consolidated within the E family, absorbing functions that had previously been spread across other parts of the Department.
  - This includes the Bureau of Cyberspace and Digital Policy (CDP), Office of the Science and Technology Adviser (S/STAS), Office of the Special Envoy for Critical and Emerging Technology (S/TECH), Bureau

of Global Health Security and Diplomacy (GHSD), Office of Sanctions Coordination (S/SC), and Special Presidential Coordinator for the Partnership for Global Infrastructure and Investment (S/PGII).

- o The Bureau of Energy Resources (ENR) will also fold into the Economic and Business Affairs to ensure a laser-like focus on expanding and exporting American energy.

- Public Diplomacy (R): The R family will continue to serve as lead policymaker for the Department's overall public outreach and Department press strategies, as well as countering censorship globally.
   - o The Office of Global Partnerships (E/GP) will move from the E-family.

- Management (M): The M family will continue to lead on issues related to the Department's budget, personnel, and physical assets, as well as its security and technology efforts.
   - o All hiring authorities will be consolidated in Bureau of Global Talent Management (GTM), which will be renamed as Bureau of Personnel (PER) and be inclusive of the Foreign Services Institute (FSI).
   - o Procurement authorities will be consolidated in a new Office of Global Acquisitions (M/GA) answering directly to the Under Secretary for Management.
   - o Financial management functions will be consolidated under the Bureau of the Comptroller and Global Financial Services (CGFS) and IT functions under the Bureau of Diplomatic Technology (DT).

- Foreign and Humanitarian Affairs (F): A reimagined Office of the Coordinator of Foreign and Humanitarian Affairs will coordinate Department foreign assistance, which will be administered and managed by the regional bureaus.  Many of the functions from the Office of the Under Secretary for Civilian Security, Democracy, and Human Rights (J family) bureaus will be transferred and combined within F.
   - o This will include folding the Offices of International Religious Freedom (IRF) and Special Envoy to Monitor and Combat Antisemitism (SEAS) into a Bureau of Democracy, Human Rights, and Labor (DRL).

- o The Office to Monitor and Combat Trafficking in Persons (TIP) will fold into the Bureau of Population, Refugees, and Migration (PRM).
  - o The Office of Global Criminal Justice (GCJ) and Conflict and Stabilization Operations (CSO) will be sunset.
  - o There will no longer be an Under Secretary for Civilian Security, Democracy, and Human Rights following the change in reporting lines.
- Executive Secretariats: Across the Department, the majority of EX offices will be consolidated at the Under Secretary level with several exceptions, e.g., INL, CA

Next steps:
- The Deputy Secretary for Management and Resources (D-MR) will lead the implementation.  Until D-MR is confirmed, the working group will be organized by Acting Undersecretary for Management Jose Cunningham, with leadership from D-MR staff and support from C staff.
- Under Secretaries will submit reorganization plans for the bureaus and offices under their responsibility. The plans will be submitted to the Office of the Deputy Secretary of State for Management and Resources (D-MR).

As part of this process, a *comment portal (linked HERE)* is available for members of the workforce to provided feedback.

# # #

4

Exhibit C

**STATE DEPARTMENT REORGANIZATION FACT SHEET**
*Published April 22, 2025*
*Updated May 13, 2025*

President Trump and Secretary Rubio are focused on realigning U.S. foreign policy to reflect America's core national interests and deliver better results for Americans.  Over the past several decades, the Department's unchecked growth has created a proliferation of bureaus and offices with unclear or overlapping mandates, as well as blurred reporting lines.  The Department does not speak with one voice, responsibility for policy implementation is divided and unaccountable, transparency is diminished, and, most importantly, outcomes for Americans are not optimized.

Secretary Rubio is committed to leading] a State Department that puts America First and that empowers the Department from the ground up, from bureaus to embassies.

The new organization chart (linked HERE) will allow the Department to better set and communicate the direction of American foreign policy.  It will consolidate Department reporting lines, drive efficiencies in our operations, strengthen our workforce, and produce better outcomes for Americans both domestically and abroad.

To achieve this proposed structure and operational efficiency, the Under Secretaries have been charged with creating implementation plans that will be reviewed and approved by Department leadership.

As part of the plan, the Under Secretaries will also submit a path to reducing staff in domestic offices by 15 percent.

Consistent with all statutory obligations, some of the major components of the proposed reorganization plan include:

- <u>Overall toplines</u>: The Department will be consolidated from 734 bureaus / offices to 602, in addition to transitioning 137 offices to another location within the Department to increase efficiency.
- <u>Political Affairs (P)</u>: The reorganization will empower regional bureaus under P. These bureaus, along with our embassies, are the tip of the spear in our diplomatic efforts. Moving forward, the regional bureaus will absorb a number of functional issues to increase the authority, responsibility, and accountability of regional bureau heads, allowing them to seamlessly align policy with non-security foreign assistance and to provide leadership within the Department.
  - Each of the regional bureaus will create an Office of Assistance that coordinates aid for the bureau.  Some bureaus (e.g, EUR and NEA) already have such offices and so will not need to create something entirely new.
- <u>Arms Control and International Security (T)</u>: Security assistance, which has unique functions and authorities, will be consolidated in the T family so it can be managed comprehensively.
  - To better align with this remit, the Bureau of International Narcotics and Law Enforcement Affairs (INL) and Bureau of Counter Terrorism (CT) will move into the T family.
  - A new Bureau of Emerging Threats (ET) will consolidate various authorities and lines of effort to cohesively address 21st century threats related to cyber, AI, and space.
  - Elements of Arms Control, Deterrence, and Stability (ADS) will be merged with the Bureau of International Security and Nonproliferation (ISN) and renamed to Bureau of Arms Control, Nonproliferation, and Stability (ANS).
- <u>Economic Growth, Energy, and Environment (E)</u>: Economic and commercial statecraft will be consolidated within the E family, absorbing functions that had previously been spread across other parts of the Department.
  - This includes the Bureau of Cyberspace and Digital Policy (CDP), Office of the Science and Technology Adviser (S/STAS), Office of the Special Envoy for Critical and Emerging Technology (S/TECH), Bureau

of Global Health Security and Diplomacy (GHSD), Office of Sanctions Coordination (S/SC), and Special Presidential Coordinator for the Partnership for Global Infrastructure and Investment (S/PGII).

- o The Bureau of Energy Resources (ENR) will also fold into the Economic and Business Affairs to ensure a laser-like focus on expanding and exporting American energy.

- Public Diplomacy (R): The R family will continue to serve as lead policymaker for the Department's overall public outreach and Department press strategies, as well as countering censorship globally.
   - o The Office of Global Partnerships (E/GP) will move from the E-family.

- Management (M): The M family will continue to lead on issues related to the Department's budget, personnel, and physical assets, as well as its security and technology efforts.
   - o All hiring authorities will be consolidated in Bureau of Global Talent Management (GTM), which will be renamed as Bureau of Personnel (PER) and be inclusive of the Foreign Services Institute (FSI).
   - o Procurement authorities will be consolidated in a new Office of Global Acquisitions (M/GA) answering directly to the Under Secretary for Management.
   - o Financial management functions will be consolidated under the Bureau of the Comptroller and Global Financial Services (CGFS) and IT functions under the Bureau of Diplomatic Technology (DT).

- Foreign and Humanitarian Affairs (F): A reimagined Office of the Coordinator of Foreign and Humanitarian Affairs will coordinate Department foreign assistance, which will be administered and managed by the regional bureaus. Many of the functions from the Office of the Under Secretary for Civilian Security, Democracy, and Human Rights (J family) bureaus will be transferred and combined within F.
   - o This will include folding the Offices of International Religious Freedom (IRF) and Special Envoy to Monitor and Combat Antisemitism (SEAS) into a Bureau of Democracy, Human Rights, and Labor (DRL).

3

- o The Office to Monitor and Combat Trafficking in Persons (TIP) will fold into the Bureau of Population, Refugees, and Migration (PRM).
  - o The Office of Global Criminal Justice (GCJ) and Conflict and Stabilization Operations (CSO) will be sunset.
  - o There will no longer be an Under Secretary for Civilian Security, Democracy, and Human Rights following the change in reporting lines.
- Executive Secretariats: Across the Department, the majority of EX offices will be consolidated at the Under Secretary level with several exceptions, e.g., INL, CA

Next steps:
- The Deputy Secretary for Management and Resources (D-MR) will lead the implementation.  Until D-MR is confirmed, the working group will be organized by Acting Undersecretary for Management Jose Cunningham, with leadership from D-MR staff and support from C staff.
- Under Secretaries will submit reorganization plans for the bureaus and offices under their responsibility. The plans will be submitted to the Office of the Deputy Secretary of State for Management and Resources (D-MR).

As part of this process, a *comment portal (linked HERE)* is available for members of the workforce to provided feedback.

# # #

4

Exhibit D

**Stacey Leyton**

| | |
|---|---|
| **From:** | Bernie, Andrew (CIV) <Andrew.Bernie@usdoj.gov> |
| **Sent:** | Tuesday, June 3, 2025 7:51 AM |
| **To:** | Stacey Leyton; Bernie, Andrew (ENRD) |
| **Cc:** | Hamilton, Eric (CIV); Danielle Leonard; Corinne Johnson; Tsuki Hoshijima; BJ Chisholm; jules.torti@protectdemocracy.org |
| **Subject:** | RE: [EXTERNAL] RE: AFGE v. Trump |

Stacey,

Thanks. I've asked my client to look into what you said below regarding ACH and I'll get back to you as soon as we can.  As for a status conference, please represent our position as follows:

Defendants are working diligently to comply with the injunction and have been working constructively with Plaintiffs' counsel to address their concerns, and that a status conference is thus unnecessary. But of course, if the Court determines that a status conference is appropriate, Defendants stand ready to participate in any such conference. Defendants respectfully request that any status conference be conducted via telephone or Zoom given that counsel is located in Washington, D.C. In addition, if at all possible, Defendants respectfully request that any status conference be scheduled prior to Friday June 6 because counsel for the government who presented argument at the preliminary injunction hearing will be out of the office beginning June 6, returning June 16.

Best regards,
Andrew

**Andrew M. Bernie**
Civil Division
Federal Programs Branch
202-353-7203
andrew.bernie@usdoj.gov

**From:** Stacey Leyton <sleyton@altshulerberzon.com>
**Sent:** Monday, June 2, 2025 8:24 PM
**To:** Bernie, Andrew (CIV) <Andrew.Bernie@usdoj.gov>; Bernie, Andrew (ENRD) <Andrew.M.Bernie@usdoj.gov>
**Cc:** Hamilton, Eric (CIV) <Eric.Hamilton@usdoj.gov>; Danielle Leonard <dleonard@altshulerberzon.com>; Corinne Johnson <cjohnson@altshulerberzon.com>; Tsuki Hoshijima <thoshijima@democracyforward.org>; BJ Chisholm <bchisholm@altshulerberzon.com>; jules.torti@protectdemocracy.org
**Subject:** RE: [EXTERNAL] RE: AFGE v. Trump

Andrew,

Thank you for the information about HHS, and for the commitment to restore the NIH employees to work status by tomorrow.  We do have information that some ACL offboarding meetings actually took place

1

before ACL put the offboarding process on hold, and that that offboarding has not been reversed.  Can you please check on that and let us know what you find?

We do intend to ask the Court for an urgent status conference to be set at the court's convenience to discuss the other compliance issues.  Please let us know your position on that request.

In response to your question about public statements by the State Department, besides the Fact Sheet that we submitted with our TRO papers, the State Department held a press briefing on September 22, 2025, at which it discussed the announced reorganization and the Executive Order at issue in this case, and which your client maintains here: https://www.state.gov/briefings/department-press-briefing-april-22-2025/.  Please let us know if this information changes your position and the State Department will agree to comply with the injunction by halting further implementation of this reorganization plan, or if you have further information to share.

Stacey


Stacey Leyton
(hear my name)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Office: (415) 421-7151 ext. 304
Cell: (415) 378-6427
sleyton@altber.com
Pronouns: she/her
----


Legal administrative assistant: Desiree Medina
dmedina@altber.com

ALTSHULER BERZON LLP

*This email message and any attached documentation are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information. If the reader or recipient of this communication is not the intended recipient or someone authorized to receive the message for the intended recipient, please notify the sender immediately by reply email or telephone, and delete the original communication and any attached documentation without copying or disclosing the contents. Any unauthorized review, use, copying, disclosure, or distribution of this communication and any attached documentation is strictly prohibited. Receipt by anyone other than the intended recipient is not a wver of any attorney-client or work product privilege. Any advice contained in this communication (including attachments) is not intended or written to be used, and cannot be used, as tax advice.  Issues regarding taxation or tax law should be referred to the intended recipient's tax advisor.*

**From:** Bernie, Andrew (CIV) <Andrew.Bernie@usdoj.gov>
**Sent:** Monday, June 2, 2025 1:52 PM
**To:** Stacey Leyton <sleyton@altshulerberzon.com>; Bernie, Andrew (ENRD) <Andrew.M.Bernie@usdoj.gov>

**Cc:** Hamilton, Eric (CIV) <Eric.Hamilton@usdoj.gov>; Danielle Leonard <dleonard@altshulerberzon.com>; Corinne Johnson <cjohnson@altshulerberzon.com>; Tsuki Hoshijima <thoshijima@democracyforward.org>; BJ Chisholm <bchisholm@altshulerberzon.com>; jules.torti@protectdemocracy.org
**Subject:** RE: [EXTERNAL] RE: AFGE v. Trump

Stacey,

I have discussed this further with my clients. I provide further information on each of the three agencies below.

## HUD

As I previously stated, HUD's termination of approximately 79 probationary employees— in addition to being small in scale—was independent of Executive Order 14,210, and the February 26 OPM/OMB memorandum. Executive Order 14,210 does not specifically address probationary employees. And a separate Executive Order which Plaintiffs have not challenged in this action— Strengthening the Probationary Period—issued a new Civil Service Rule, with the aim of requiring agencies "to affirmatively determine that the continued employment of individuals serving probationary or trial periods would benefit the Federal service before such appointments are finalized." And as you know, HUD and other agencies have taken numerous personnel actions related to probationary employees, which is the subject of other litigation. The injunction in this case prevents HUD from implementing Executive Order 14,210 and the OMB/OPM Memorandum. It does not convert probationary employees into tenured employees who cannot be terminated for any reason.

You asked whether "HUD's ARRP included any discussion or information regarding the further termination of probationary employees." HUD's ARRP is confidential, and I cannot characterize it for you. But as explained above, the preliminary injunction is limited to implementation of two sections of the Executive Order and the OMB/OPM Memorandum. Part (4) of the preliminary injunction expressly applies "to the extent [actions] are taken to implement Executive Order 14210 and/or the OMB/OPM Memorandum."

## HHS

Regarding ACL, you say that "We also have information that ACL took steps to offboard employees earlier this week before ACL paused its offboarding." A single email was sent on May 20, providing offboarding instructions, including providing a list of available meeting dates the following week for employees to turn in their equipment. But that mistake was corrected before your compliance-related emails. The meetings were scheduled to take place on Wednesday, Thursday, and Friday of last week but employees were informed via email that the offboarding process was on hold. To our knowledge, no meetings occurred and all meetings were subsequently cancelled. Collection of equipment and the like also did not happen. One employee on her own turned in her equipment, but she was called back within 30 minutes to take her equipment back.

As to NIH, my HHS clients have since discovered that some employees who had received a RIF notice but were still working on May 9 (when the TRO was entered) were subsequently moved to administrative leave. This was a mistake and it is being promptly corrected. These employees will be restored to work status and I am informed that NIH will do this by COB tomorrow.

**State**

The State Department's reorganization—the details of which were meticulously explained in, among other sources, the April 22, 2025 State Department Fact Sheet—is entirely consistent with the injunction.

As previously stated, the reorganization plan was undertaken solely at the direction of Secretary Rubio pursuant to his independent statutory and constitutional authority as the head of a Cabinet-level agency, and not as an implementation of Executive Order 14210 or the February 26, 2025 OPM/OMB Workforce Memorandum. As such, it falls outside the scope of the PI and is therefore not subject to the injunction. Any characterization to the contrary is false. The State Department will not halt further action to implement this plan.

The PI (ECF No. 124 at 47-48) enjoins "implementation of Executive Order 14210 or the February 26, 2025 Memorandum." Secretary Rubio's internal reorganization is fully consistent with that allowance. It neither effectuates nor operationalizes ARRPs and is not tethered to any directives from OPM or OMB.

To the extent the Court's PI order references the State Department's reorganization (see ECF 124 at 37), it does so only in the context of evaluating Defendants' representations about the public dissemination of ARRPs—not as a finding that the reorganization itself constitutes an implementation of the Executive Order. No objection or clarification from the Court was necessary because the Defendants' cited submission did not suggest that the State Department's reorganization was such an implementation, as it stated only that "when final determinations have been made, agencies are publicly releasing their final plans" (PI Opposition at 5 n.3). The general fact of public information about reorganizations does not detract from the State Department's April 22 initiative standing wholly apart from the ARRPs and falling outside the scope of the injunction.

Your suggestion that statements made in public-facing documents or press materials convert the reorganization into an EO-driven initiative is unsupported. Although the Department has consistently emphasized its broader commitment to workforce modernization, this specific restructuring plan was the result of an internal process led by Secretary Rubio. That the internal restructuring is consistent with good governance principles does not transform it into an implementation of the EO or the Memorandum. Moreover, any declarations or information you have relied on by a representative to the union organization does not speak for the Department, nor would they be authorized to do so in any related capacity.

In any event, the public-facing documents you reference do not support your position. Specifically, you say that the "State Department's own documents and announcements . . . informed employees and the public that this reorganization was being undertaken in furtherance of the Workforce Optimization EO, including in documents that were before the Court with respect to both the TRO and PI." Respectfully, that is not at all what the documents you cite say.

You primarily rely on the above-discussed "State Department Fact Sheet," released April 22, 2025, but that supports our position that the reorganization was taken independent of the Workforce Executive Order. It explains in detail how the State Department's existing structure does not reflect America's core national interests or deliver best results for Americans. It further

explains that "the Under Secretaries have been charged with creating implementation plans that will be reviewed and approved by Department leadership." It sets forth "some of the major components of the proposed reorganization plan." It explains that "[t]he Deputy Secretary for Management and Resources (D-MR) will lead the implementation" and that, until the D-MR is confirmed, "the working group will be organized by Acting Undersecretary for Management Jose Cunningham, with leadership from D-MR staff and support from C staff." And the document explains that the reorganization process will be conducted internally through State Department processes: "Under Secretaries will submit reorganization plans for the bureaus and offices under their responsibility. The plans will be submitted to the Office of the Deputy Secretary of State for Management and Resources (D-MR)." The lone reference to the Workforce Executive Order— which simply says that "the Under Secretaries will also submit a path to reducing staff in domestic offices by 15 percent, *consistent with* the President's Workforce Optimization Initiative" (emphasis added)—does not suggest that the future planned reduction in staff (let alone the entire reorganization) was dictated by the Executive Order.

You also refer "to the public announcements made by the State Department to the press regarding this plan, of which your client is plainly aware." Respectfully, if Plaintiffs are going to accuse our clients of violating an injunction and demanding a swift response, it is incumbent upon Plaintiffs to provide us with the specific documents and specific language from those documents that Plaintiffs believe support their position. For what it's worth, the public statements I have seen are all entirely consistent with our position that the reorganization is being undertaken independently of Executive Order 14,210 (*see* https://www.state.gov/releases/office-of-the-spokesperson/2025/05/next-steps-on-building-an-america-first-state-department/; https://www.state.gov/building-an-america-first-state-department/).

Nor is it relevant that we did not seek clarification of the preliminary injunction on this point, because we did not need to. As we have said, the injunction prohibits enjoined components from taking various actions only "to the extent they are taken to implement Executive Order 14210 and/or the OMB/OPM Memorandum," ECF No. 124 at 48—which is entirely consistent with the argument in our TRO and PI briefing that an injunction should not prohibit agencies from exercising their authority independent of these sources.

To ensure full transparency, and in keeping with the Department's statutory reporting obligations, the Department has provided a congressional notification placing this internal reorganization on the record with the appropriate Congressional committees. This step underscores the Department's continued adherence to lawful processes.

There is therefore no violation of the PI and no legal basis to demand that Secretary Rubio suspend further implementation of an initiative that is neither prohibited by the Court's order nor reliant upon any enjoined authority.

Nonetheless, should you have credible evidence indicating that any specific action taken was, in fact, directed by or pursuant to the enjoined EO or Memorandum, we remain open to reviewing that information.

Best regards,
Andrew

**Andrew M. Bernie**
Civil Division
Federal Programs Branch
202-353-7203
andrew.bernie@usdoj.gov

---

**From:** Bernie, Andrew (CIV)
**Sent:** Friday, May 30, 2025 3:27 PM
**To:** Stacey Leyton <sleyton@altshulerberzon.com>; Bernie, Andrew (ENRD) <Andrew.M.Bernie@usdoj.gov>
**Cc:** Hamilton, Eric (CIV) <Eric.Hamilton@usdoj.gov>; Danielle Leonard <dleonard@altshulerberzon.com>; Corinne Johnson <cjohnson@altshulerberzon.com>; Tsuki Hoshijima <thoshijima@democracyforward.org>; BJ Chisholm <bchisholm@altshulerberzon.com>; jules.torti@protectdemocracy.org
**Subject:** RE: [EXTERNAL] RE: AFGE v. Trump

Stacey,

We are consulting with our clients about this and will respond as soon as practicable.

Andrew

**Andrew M. Bernie**
Civil Division
Federal Programs Branch
202-353-7203
andrew.bernie@usdoj.gov

---

**From:** Stacey Leyton <sleyton@altshulerberzon.com>
**Sent:** Friday, May 30, 2025 1:11 PM
**To:** Bernie, Andrew (CIV) <Andrew.Bernie@usdoj.gov>; Bernie, Andrew (ENRD) <Andrew.M.Bernie@usdoj.gov>
**Cc:** Hamilton, Eric (CIV) <Eric.Hamilton@usdoj.gov>; Danielle Leonard <dleonard@altshulerberzon.com>; Corinne Johnson <cjohnson@altshulerberzon.com>; Tsuki Hoshijima <thoshijima@democracyforward.org>; BJ Chisholm <bchisholm@altshulerberzon.com>; jules.torti@protectdemocracy.org
**Subject:** RE: [EXTERNAL] RE: AFGE v. Trump

Andrew,

Thank you for providing this information.  Our responses as to each agency, which we provide in order to attempt to resolve compliance issues without any need to seek the District Court's enforcement, are set forth below.

**State Department**

The State Department's further implementation of the reorganization announced April 22 is enjoined by the PI.  Plaintiffs included evidence regarding this reorganization in our TRO and PI filings (e.g. ECF 37-20), and moved for both a TRO and PI with respect to this specific reorganization against this Defendant (ECF 37, 124).  In fact, the PI order even noted your position that the State Department's announced reorganization showed that final ARRPs are being made public, and so clearly understood that reorganization plan to be pursuant to the Executive Order (ECF 124 at 37).  The State Department did not raise any objection or make any argument to the Court that its announced reorganization was *not* pursuant to this Executive Order.

The PI order enjoins *any* actions to implement the EO or Memorandum including any further implementation of ARRPs (ECF 124 at 47-48). After you argued that the TRO had caused "confusion," the Court invited Defendants to request clarification (ECF 124 at 48). You did not seek such clarification, and there is no reasonable argument this reorganization plan is not covered by this PI. Please confirm, therefore, that your client will immediately halt any further action to implement this plan.

Moreover, your representations that this reorganization was the "result of an internal process, which is separate and apart from the process called for by Executive Order 14210 and the February 26, 2025 OPM/OMB Workforce Memorandum" and that "This reorganization was undertaken solely at the direction of Secretary Rubio" are further belied by the State Department's own documents and announcements, which informed employees and the public that this reorganization was being undertaken in furtherance of the Workforce Optimization EO, including in documents that were before the Court with respect to both the TRO and PI (e.g., ECF 37-20, Ex. I, "State Department Fact Sheet," released April 22, 2025). We also refer to you to the public announcements made by the State Department to the press regarding this plan, of which your client is plainly aware. Thus, your response claiming this plan was not done pursuant to the EO is contrary to the State Department's own documents and statements.

Your response that it was not part of the "process" is not consistent with the PI: the Court's PI enjoins *any* implementation of the EO *or* the Memorandum calling for the ARRPs (ECF 124 at 47-48). It permits further planning and presentation of proposals to Congress "provided they do not implement any of the prohibited actions above" (*id.* at 48). If you have a further response or factual information you would like us to consider on the issue of whether the State Department is violating the injunction before we present this issue to the Court, we invite you to provide it.

**HUD**

As noted, the Court's TRO and PI enjoin any implementation of the EO, the Memorandum or ARRPs at HUD. We understand that you are confirming that HUD has "recently" terminated probationary employees and are not disputing that these terminations occurred after entry of the TRO. Although you make the factual representation that these terminations were "entirely independent" of the EO, Memorandum, and HUD's ARRP, the Memorandum lists as among available tools "continuing to evaluate probationary employees" and the ARRP Phase 2 cover sheet asks agencies to identify the anticipated reduction in FTE of probationary employees. Please confirm whether or not HUD's ARRP included any discussion or information regarding the further termination of probationary employees. If there is any further factual information you would like us to consider before presenting this issue to the Court, please provide it.

**HHS**

Thank you for the information about HHS. We previously explained that the sub-agencies of HHS at issue are NIH and ACL. Our information is that some NIH employees who had previously received RIF notices with a separation date of June 2 were placed on administrative leave after the TRO and before entry of the preliminary injunction. We have reports of this from several different components within NIH (including the National Library of Medicine and others), all with respect to individuals who previously received RIF notices. Your client has the list of the individuals who received RIF notices with June 2 separation dates, and will be aware of any of those employees who were placed on administrative leave after May 9. Please confirm that the placement of those employees on administrative leave, in violation of the TRO, have been rescinded. We also have information that ACL took steps to offboard employees earlier this week before ACL paused its offboarding. Please confirm that your client has or will take steps to reverse those actions at ACL.


Thank you,
Stacey

Stacey Leyton
[(hear my name)](#)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Office: (415) 421-7151 ext. 304
Cell: (415) 378-6427
[sleyton@altber.com](mailto:sleyton@altber.com)
Pronouns: she/her
----


Legal administrative assistant: Desiree Medina
[dmedina@altber.com](mailto:dmedina@altber.com)

## ALTSHULER BERZON LLP

*This email message and any attached documentation are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information. If the reader or recipient of this communication is not the intended recipient or someone authorized to receive the message for the intended recipient, please notify the sender immediately by reply email or telephone, and delete the original communication and any attached documentation without copying or disclosing the contents. Any unauthorized review, use, copying, disclosure, or distribution of this communication and any attached documentation is strictly prohibited. Receipt by anyone other than the intended recipient is not a wver of any attorney-client or work product privilege. Any advice contained in this communication (including attachments) is not intended or written to be used, and cannot be used, as tax advice. Issues regarding taxation or tax law should be referred to the intended recipient's tax advisor.*

**From:** Bernie, Andrew (CIV) <[Andrew.Bernie@usdoj.gov](mailto:Andrew.Bernie@usdoj.gov)>
**Sent:** Friday, May 30, 2025 5:40 AM
**To:** Bernie, Andrew (ENRD) <[Andrew.M.Bernie@usdoj.gov](mailto:Andrew.M.Bernie@usdoj.gov)>; Stacey Leyton <[sleyton@altshulerberzon.com](mailto:sleyton@altshulerberzon.com)>
**Cc:** Hamilton, Eric (CIV) <[Eric.Hamilton@usdoj.gov](mailto:Eric.Hamilton@usdoj.gov)>; Danielle Leonard <[dleonard@altshulerberzon.com](mailto:dleonard@altshulerberzon.com)>; Corinne Johnson <[cjohnson@altshulerberzon.com](mailto:cjohnson@altshulerberzon.com)>; Tsuki Hoshijima <[thoshijima@democracyforward.org](mailto:thoshijima@democracyforward.org)>
**Subject:** RE: [EXTERNAL] RE: AFGE v. Trump

Stacey,

Following up on this, I have heard back from HHS. I am told that NIH leadership across the Institutes and Centers were told to keep employees in their current status per the injunctions and that they should not conduct any offboarding activities. NIH has asked that, if you have any specific information about alleged non-compliance with the injunction, that you provide it so that they can investigate it. As to ACL, they have advised team members that offboarding is on hold.

Andrew

**Andrew M. Bernie**
Civil Division
Federal Programs Branch
202-353-7203

andrew.bernie@usdoj.gov

**From:** Bernie, Andrew (CIV)
**Sent:** Thursday, May 29, 2025 7:33 PM
**To:** Bernie, Andrew (ENRD) <Andrew.M.Bernie@usdoj.gov>; Stacey Leyton <sleyton@altshulerberzon.com>
**Cc:** Hamilton, Eric (CIV) <Eric.Hamilton@usdoj.gov>; Danielle Leonard <dleonard@altshulerberzon.com>; Corinne Johnson <cjohnson@altshulerberzon.com>; Tsuki Hoshijima <thoshijima@democracyforward.org>
**Subject:** RE: [EXTERNAL] RE: AFGE v. Trump

Stacey,

Following up on this, earlier today you sent the below email, which set forth in vague terms various allegations against three agency defendants and contended that these allegations constituted "credible information regarding non-compliance with the TRO/PI." To be clear, the Department of Justice takes with the utmost seriousness its obligation to comply with court orders, including the TRO and PI in this case. And if Plaintiffs have specific information raising concerns about our compliance, we of course encourage you to raise any such concerns with us, and ask only that you supply us with reasonably specific information and provide us with a reasonable period to investigate your concerns and report back to you.

Respectfully, the email we received this afternoon does neither. As to HUD, your email referenced "new termination notices to probationary employees since the TRO was issued." As to HHS, you referenced "reports" of employees being placed on administrative leave and other supposed "reports" of HHS taking steps to offboard employees. You supplied us with no further details let alone provided any basis for concluding that these reports demonstrate non-compliance with the PI/TRO. Yet your email simply declared that these alleged actions violate the PI/TRO, and demanded that we rescind these alleged actions ("Please confirm that the State Department will not issue further RIF notices in furtherance of this reorganization plan"; "Please confirm that HUD will rescind these notices"; "Please confirm the steps HHS will take to correct and rescind these actions, which are prohibited by the injunction."). And as you have done in the past, you demanded that we investigate your allegations and provide a response today.

Respectfully, we are not going to continue operating this way in this case. In the future, when Plaintiffs bring multi-faceted factual inquiries to our attention like this, before providing any response, we are going to take the time that we need to consult with our clients, investigate your questions, determine what kind of a response if any is warranted, and formulate complete and accurate non-privileged responses to your questions. That will ordinarily take one to two business days, particularly where, as here, Plaintiffs rely primarily on "reports" and do not provide us with further details or documentation (from their members or otherwise).

Nonetheless, as a courtesy on this one occasion, we will provide you with the information we have been able to uncover thus far.

As to the State Department, it is engaging with Congress on a reorganization plan that has been the result of an internal process, which is separate and apart from the process called for by Executive Order 14210 and the February 26, 2025 OPM/OMB Workforce Memorandum. This reorganization was undertaken solely at the direction of Secretary Rubio. This does not violate the preliminary injunction, which prohibits enjoined components from taking various actions

only "to the extent they are taken to implement Executive Order 14210 and/or the OMB/OPM Memorandum." ECF No. 124 at 48. We would also note that the State Department has not sent any RIF letters and will not do so at least until after the conclusion of the required notification period (by statute, 15 days).

As to HUD, our understanding is that HUD has recently terminated approximately 79 probationary employees. These termination notices were also entirely independent of Executive Order 14,210, the February 26 OPM/OMB memorandum, and any HUD submission(s) in response to that Memorandum, including ARRPs; these termination notices were based on assessments separate and apart from HUD's ARRP.

I have not yet received information from my HHS clients in response to your inquiry. If I have any information I am able to share tomorrow (about HHS or any update to the information we have provided about State/HUD), I will do so.

Best regards,
Andrew


**Andrew M. Bernie**
Civil Division
Federal Programs Branch
202-353-7203
andrew.bernie@usdoj.gov

---

**From:** Bernie, Andrew (ENRD) <Andrew.M.Bernie@usdoj.gov>
**Sent:** Thursday, May 29, 2025 3:28 PM
**To:** Stacey Leyton <sleyton@altshulerberzon.com>
**Cc:** Bernie, Andrew (CIV) <Andrew.Bernie@usdoj.gov>; Hamilton, Eric (CIV) <Eric.Hamilton@usdoj.gov>; Danielle Leonard <dleonard@altshulerberzon.com>; Corinne Johnson <cjohnson@altshulerberzon.com>; Tsuki Hoshijima <thoshijima@democracyforward.org>
**Subject:** Re: [EXTERNAL] RE: AFGE v. Trump

Stacey,


Our clients are committed to complying with the injunction, as we reiterated at the hearing. We continue to strongly object to Plaintiffs' repeated pattern of presenting allegations like this to us – in this case, allegations involving three separate agencies – along with a demand that we investigate and provide a response to Plaintiffs on the same business day. Nonetheless, we are raising this with our clients and will get back to you as soon as we can.


Andrew

On May 29, 2025, at 2:32 PM, Stacey Leyton <sleyton@altshulerberzon.com> wrote:

Counsel,

We have received what appears to be credible information regarding non-compliance with the TRO/PI at several agencies.  We are writing to request a response and compliance, in advance of pursuing enforcement with the Court.  The information we have is described below.  We request that Defendants provide further specific explanation if you believe this information to be incorrect, or, to the extent these agencies have taken any actions described below since the Court enjoined further implementation of the EO, Memorandum, and ARRPs, that you provide confirmation of corrective measures Defendants will take.

**State**

We understand that the State Department has informed Congress that it intends to proceed with large-scale RIFs pursuant to its reorganization plan previously announced on April 22.  Please confirm that the State Department will not issue further RIF notices in furtherance of this reorganization plan, which are prohibited by the injunction.

**HUD**

We understand that HUD issued new termination notices to probationary employees since the TRO was issued on May 9, in furtherance of its ARRP.  Please confirm that HUD will rescind these notices.

**HHS**

We have received multiple reports of employees at NIH, who had previously received RIF notices with a separation date of June 2, being placed on administrative leave subsequent to the TRO. We have also received reports of HHS components, including NIH and ACL, taking other steps toward effectuating those separations, including offboarding by directing employees to turn in government-furnished equipment and ID cards.  Please confirm the steps HHS will take to correct and rescind these actions, which are prohibited by the injunction.

\*\*\*

In light of the nature and urgency of these concerns, we request that Defendants provide a response by the end of the day today.

Thank you,
Stacey

Stacey Leyton
(hear my name)
Altshuler Berzon LLP

177 Post Street, Suite 300
San Francisco, CA 94108
Office: (415) 421-7151 ext. 304
Cell: (415) 378-6427
sleyton@altber.com
Pronouns: she/her

----


Legal administrative assistant: Desiree Medina
dmedina@altber.com

<image001.png>

*This email message and any attached documentation are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information. If the reader or recipient of this communication is not the intended recipient or someone authorized to receive the message for the intended recipient, please notify the sender immediately by reply email or telephone, and delete the original communication and any attached documentation without copying or disclosing the contents. Any unauthorized review, use, copying, disclosure, or distribution of this communication and any attached documentation is strictly prohibited. Receipt by anyone other than the intended recipient is not a wver of any attorney-client or work product privilege. Any advice contained in this communication (including attachments) is not intended or written to be used, and cannot be used, as tax advice.  Issues regarding taxation or tax law should be referred to the intended recipient's tax advisor.*