1  Scott C. Pitcock (pro se)
2  [Address and phone number omitted from public filing in accordance with Civil L.R. 5-1(c)(5);
3  contact information on file]
4  scott_pitcock@hotmail.com
5
6
7
8
9
10  Amicus Curiae
11  Scott C. Pitcock (Pro Se)
12
13  UNITED STATES DISTRICT COURT
14  NORTHERN DISTRICT OF CALIFORNIA
15  SAN FRANCISCO DIVISION
16
17
18  AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.,
19  Plaintiffs
20  v.
21  DONALD J. TRUMP. et al..
22  Defendants.
23
24  Case No. 3:25-cv-03698-SI
25  **AMICUS CURIAE BRIEF OF SCOTT PITCOCK IN SUPPORT OF PLAINTIFFS**
26
27
28

RECEIVED JUN 1 0 2025 CLERK, U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 1 | TABLE OF CONTENTS |
| 2 | |

| | |
|---|---|
| 3 | COVER PAGE………………………………………………………………………………….i |
| 4 | TABLE OF CONTENTS ……………………………………………………………………....ii |
| 5 | TABLE OF AUTHORITIES ……………………………………….…..……………………....iii |
| 6 | EXECUTIVE SUMMARY……………………………………………………………………..iv |
| 7 | INTEREST OF AMICUS…………………………………………………………………….....1 |
| 8 | SUMMARY OF ARGUMENT……………………………………………………………….....1 |
| 9 | ARGUMENT……………………………………………………………………………….…..2 |
| 10 | A. GAPS IN CYBERSECURITY COMPLIANCE……………………………………….…..2 |
| 11 | B. TERMINATION NOTICE TIMING AND COMMUNICATION BREAKDOWNS………..4 |
| 12 | C. INTERACTIVE PROCESS………………………………………………..………….…..5 |
| 13 | CONCLUSION……………………………………………………………………...…………6 |
| 14 | ENDNOTES……………………………………………………………………………………..8 |
| 15 | APPENDIX – TABLES……………………………………………………...…………………9 |
| 16 | TABLE OF EXHIBITS……………………………………………………………………….12 |

| | |
|---|---|
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

# TABLE OF AUTHORITIES

**Statutes**

44 U.S.C. § 3551 et seq. (Federal Information Security Modernization Act of 2014) .............. 1

31 U.S.C. §§ 3729–3733 (False Claims Act) .......................................................................... 8

**Regulations & Executive Guidance**

Office of Management and Budget, Circular A-130, Managing Information as a Strategic Resource (July 28, 2016) .......................................................................................................... 4

U.S. Office of Personnel Management, Credentialing Standards for HSPD-12 .................... 2

**Federal Agency Publications**

Department of Health & Human Services, Office of Inspector General, Audit of HHS Systems Access Controls, A-18-22-11300 (July 2023) ........................................................................ 10

U.S. Government Accountability Office, Insider Threats: Critical Infrastructure Entities Generally Have Controls in Place, but Could Improve Their Reporting, GAO-21-104 (Mar. 2021) ........................................................................................................................................ 11

**National Institute of Standards and Technology (NIST) Publications**

NIST Special Publication 800-37, Risk Management Framework, Rev. 2 (Dec. 2018) ........ 7

NIST Special Publication 800-53, Security and Privacy Controls, Rev. 5 (Sep. 2020) ........ 3, 5, 6

NIST 800-63-3, Digital Identity Guidelines ............................................................................ 6

NIST 800-137, Information Security Continuous Monitoring (ISCM) ................................. 4

**Other**

U.S. Department of Justice, Civil Cyber-Fraud Initiative, https://www.justice.gov/civil-cyber-fraud-initiative ........................................................................................................... 9

# EXECUTIVE SUMMARY

1. Interest

    a. Amicus is a former GS-12 IT Specialist employed with the U.S. Food and Drug Administration (FDA), and was subject to removal under Executive Order 14210.

2. Purpose

    a. This brief provides firsthand documentation and supporting materials from the perspective of an internal systems analyst, detailing procedural and operational lapses observed following the issuance of EO 14210 on February 14, 2025.

3. Key Content

    a. Amicus makes no personal claim for relief; the sole purpose of this submission is to assist the Court in evaluating the implementation and oversight of EO 14210.

    b. Included are records and statements showing continued systems access following termination status changes, raising compliance concerns under the Federal Information Security Modernization Act (FISMA)[1] and Office of Personnel Management (OPM)[2] credential revocation guidelines.

    c. The official termination notice was received after the effective date of the Temporary Restraining Order (TRO), although faster notification methods had previously been used.

    d. The record reflects interruptions in the interactive process for affected employees.

4. Consideration Requested

    a. Amicus respectfully requests that the Court take this factual record into account when assessing agency compliance with the TRO and other obligations arising from EO 14210.

**INTEREST OF AMICUS**

Amicus previously served as a GS-12 IT Specialist in the FDA's Office of Digital Transformation and supported the same team as a contractor for several years prior to federal appointment. To provide relevant context for the observations in this brief, amicus offers the following first-person account:

In that role, I managed secure system access across FDA environments, responded to major IT disruptions, and helped enforce cybersecurity protocols under the Federal Information Security Modernization Act of 2014 (FISMA)[1] and NIST Special Publication 800-53[3]. This work included user offboarding, access remediation, and coordination with cybersecurity teams on threat response and evaluating risk. These responsibilities were supported by academic training, including a B.S. in Computer Science and ongoing graduate study in artificial intelligence and machine learning, with a focus on cybersecurity. I was formally recognized for disaster recovery efforts during my service.

These facts are presented solely to establish the operational expertise underlying the technical and procedural concerns that follow.

**SUMMARY OF ARGUMENT**

Amicus draws on firsthand experience as a former federal IT specialist to document procedural and technical deviations including access control lapses, interactive process gaps, and delayed communication of employment status. These deviations support the plaintiffs' claims concerning due process and agency compliance. In amicus's view, these breakdowns warrant continued judicial scrutiny to ensure compliance and operational accountability with federal standards.

1  **ARGUMENT**
2
3  **A. GAPS IN CYBERSECURITY COMPLIANCE**
4
5      This section outlines access control deviations observed during the implementation of
6  Executive Order 14210 and evaluates their alignment with federal cybersecurity mandates. These
7  technical issues may assist the Court in reviewing pre-TRO agency conduct and understanding
8  the procedural environment in place when the May 9 Order was issued. The evidence reflects
9  delays in disabling system access after employment status changed, a core requirement for
10 insider threat mitigation.
11
12     Records show that terminated probationary employees reported continued system access
13 following their separation dates (see Scott Pitcock statement, Ex. A [redacted], and sealed
14 Exhibits B–E [employee statements submitted under seal pursuant to Civil L.R. 79-5]) retained
15 access to FDA systems after separation. My former supervisor noted that account deprovisioning
16 tickets did not begin appearing until Tuesday, February 18, several days after terminations began
17 and nearly three weeks before the Court's Temporary Restraining Order. These delays diverge
18 from the following federal mandates:
19  • FISMA requires timely, risk based access controls.[1]
20  • NIST SP 800-53 mandates prompt credential termination [3] and flags delays as systemic risk. [5]
21  • OMB Circular A130 assigns access control responsibility to agency heads. [4]
22
23     I retained elevated administrative access to FDA infrastructure until February 18, more
24 than 60 hours after receiving my termination notice, inconsistent with privileged access control
25 standards.[6] As shown in Exhibit F ([redacted] emails forwarded to personal account showing
26 retained access to FDA email), I accessed and forwarded email to my personal account during
27 this time. My supervisor's sworn statement (see Ex E., sealed supervisor statement) confirms that
28 system permissions remained active and deprovisioning had not begun until that Tuesday. It

documents similar delays and oversight gaps affecting another employee removed the same weekend, further underscoring the procedural uncertainty surrounding decisions during this period.

These delays reflect more than minor processing variances. They raise questions about adherence to required federal procedures and best practices, including:

- Federal identity and access management policy, including ICAM and NIST SP 800-53, requires prompt termination of system access upon separation to reduce insider threat risk. [3][5]
- NIST SP 800-37, which, while not naming personnel transitions specifically, stresses timely adjustment of controls in response to operational change and risk exposure.[7]
- Department of Justice guidance, which indicates that unmet cybersecurity obligations may trigger enforcement under the False Claims Act.[8]
- The Civil Cyber-Fraud Initiative, which targets deficient cybersecurity practices under federal contracts, including access control failures.[9]

Access and communication patterns align with systemic deficiencies outlined in the HHS Inspector General's 2023 audit.[10] While the audit predates EO 14210, the surrounding record indicates that key vulnerabilities, particularly those involving deprovisioning delays and unclear separation procedures, remained present throughout the order's implementation.

While I recognize the sensitivity of this disclosure, being one with the access, but it is necessary to show that I and others retained privileged access without oversight. In my judgment as a former agency IT specialist, this reflected conditions consistent with high risk and high impact security lapses. The mere existence of such a vulnerability heightened insider threat exposure and disrupted basic operational norms. The operational timeline surrounding EO 14210's rollout, including a federal holiday weekend, resulted in a period during which separated employees, many under personal and professional stress, retained access without review. This

1  exposure was not hypothetical; it was documented, extended in duration, and introduced elevated
2  security risk.
3     To better illustrate these events, the following supporting exhibits are included in the
4  Appendix:
5  - Exhibit J: Post Termination Access Timeline
6  - Exhibit K: Timeline of Agency Action and Notice
7  - Exhibit L: Regulatory Requirements and Evidence of Deviation
8
9  **B. TERMINATION NOTICE TIMING AND COMMUNICATION BREAKDOWNS**
10
11     This section outlines the delayed, uncertified delivery of termination notices received by
12  mail after the Court's Temporary Restraining Order, and the absence of agency follow up
13  reported by multiple impacted employees. These circumstances may be relevant to the Court's
14  assessment of procedural consistency during the enforcement period.
15
16     I received physical notice of termination by USPS mail on May 12, 2025, three days after
17  this Court issued its Temporary Restraining Order (see Exhibit G1, [redacted] postmarked
18  envelope with termination letter; see sealed Exhibit G2, [redacted] court ordered letter from a
19  separate case with Westlaw slip and included footnote). The packet was sent using standard
20  USPS delivery and did not require a signature. Another employee also reported receiving notice
21  under the same conditions (see sealed Exhibit D, statement submitted to show that other
22  employees were affected similarly). As of the date of this amicus, no corrective action has been
23  taken as far as I'm aware.
24
25     In contrast, a prior restraining order had been communicated by email (see Exhibit H,
26  [redacted ] TRO from a different court's ruling sent to personal email on March 13, 2025). The
27  reliance on delayed and uncertified physical mail in this instance raises concerns about
28  procedural consistency during a period when the agency was subject to court oversight. Between

1  May 12 and May 22, I received no response to repeated outreach (see Exhibit I, [redacted]
2  attempts to assert and confirm employment). No agency communication clarified my
3  employment status beyond a leave and earnings statement (see Exhibit M, submitted in full
4  under seal).
5       This lack of acknowledgment or follow-up may contribute to ambiguities in employment
6  status, also affecting auditability under FISMA[1], which requires agencies to document control
7  activities and maintain traceable oversight of security-relevant events. In the absence of recorded
8  responses to post-separation inquiries, continuity and accountability may erode. This can be
9  devastating for displaced employees when personnel actions require later verification or
10 correction.
11
12 **C. INTERACTIVE PROCESS**
13
14      This section outlines communication breakdowns and the absence of an interactive
15 process following the initial separation actions taken under Executive Order 14210. These
16 procedural gaps are relevant to the Court's review of agency adherence to federal offboarding
17 protocols and cybersecurity requirements. When internal communication falters during
18 involuntary separation, it introduces ambiguity, discourages internal reporting, and increases
19 long-term risk to security and procedural integrity.
20
21 This silence broke from standard protocol and introduced uncertainty during a period that should
22 have followed a defined sequence of post-employment actions. My former supervisor (see sealed
23 Exhibit E, statement and communications from direct supervisor) described leadership's
24 reluctance to provide support, noting a sense of constraint due to direction from above. The
25 declaration suggests that this lack of engagement affected multiple employees, indicating broader
26 procedural breakdown.
27

These issues are especially significant in the cybersecurity domain. FISMA[1] and NIST Special Publication 800-53, Rev. 5 [3] emphasize the importance of reliable communication, responsive separation protocols, and documented procedures to reduce insider threat risk. When these interactive processes break down, the organization's risk profile shifts. Employees affected by opaque offboarding may lose trust, while others anticipating separation may act defensively, potentially escalating operational or security threats.

In this case, the absence of an interactive process, prolonged silence following outreach, and documented delays in deprovisioning created overlapping vulnerabilities that would be material under any standard federal cybersecurity audit. These failures reflect broader patterns documented in GAO's 2021 audit[11] of insider threat programs, which identified systemic lapses in offboarding, internal communication, and leadership responsiveness.

**CONCLUSION**

This brief is submitted in the interest of judicial clarity and professional responsibility. The details reflect my personal experience navigating agency procedures during the implementation of Executive Order 14210 and may assist the Court in its review of agency adherence to federal standards and this Court's directives.

Based on detailed documentation and firsthand account, the following patterns are presented for the Court's consideration:

- System access remained active after employment status changed.
- Separation communications were received after the Temporary Restraining Order.
- No formal process was communicated for initiating post-employment procedures.
- Attempts to clarify status received no documented response.

1    These observations are offered without attribution of fault and solely to assist the Court in
2    assessing procedural consistency with federal cybersecurity policy and its own Temporary
3    Restraining Order. Amicus respectfully requests:
4
5
6    1) The Court to consider the following: While NIST defines integrity in technical terms as
7    protection against unauthorized modification, it also recognizes trustworthiness as a broader
8    organizational attribute that includes integrity, transparency, and accountability. Can an agency
9    maintain the integrity of its systems if it fails to apply those same standards to the processes that
10   govern access, separation, and employee oversight?
11
12   2) that the Court consider the technical record, documentation, and statements provided herein as
13   part of its evaluation.
14
15
16   DATED: June 6, 2025
17
18
19   Respectfully submitted,
20
21   /s/ Scott C Pitcock
22   Scott C. Pitcock (pro se)
23   [Address and phone number omitted from public filing in accordance with Civil L.R. 5-1(c)(5);
24   contact information on file]
25   scott_pitcock@hotmail.com
26
27
28

**ENDNOTES**

1) Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (codified at 44 U.S.C. § 3551 et seq.).

2) U.S. Off. of Pers. Mgmt., Credentialing Standards Procedures for Issuing Personal Identity Verification Cards Under HSPD-12, https://www.opm.gov/suitability/suitability-executive-agent/policy/cred-standards.pdf.

3) Nat'l Inst. of Standards & Tech., Security and Privacy Controls for Information Systems and Organizations, NIST Special Pub. 800-53, rev. 5 (Sept. 2020).

4) Off. of Mgmt. & Budget, Circular A-130: Managing Information as a Strategic Resource (July 28, 2016).

5) Nat'l Inst. of Standards & Tech., Security and Privacy Controls, supra note 3, AC-2(4).

6) Nat'l Inst. of Standards & Tech., Security and Privacy Controls, supra note 3, AC-6, AC-17, CM-6.

7) Nat'l Inst. of Standards & Tech., Risk Management Framework for Information Systems and Organizations, NIST Special Pub. 800-37, rev. 2 (Dec. 2018).

8) 31 U.S.C. §§ 3729–3733 (2018).

9) U.S. Dep't of Justice, Civil Cyber-Fraud Initiative, https://www.justice.gov/civil-cyber-fraud-initiative.

10) Dep't of Health & Hum. Servs., Off. of Inspector Gen., Audit of HHS Systems Access Controls, A-18-22-11300 (July 2023).

11) U.S. Gov't Accountability Off., Insider Threats: Critical Infrastructure Entities Generally Have Controls in Place, but Could Improve Their Reporting, GAO-21-104 (Mar. 2021).

12) Nat'l Inst. of Standards & Tech., Information Security Continuous Monitoring (ISCM) for Federal Information Systems and Organizations, NIST Special Pub. 800-137 (Sept. 2011).

## APPENDIX - TABLES

### Exhibit J - Post-Termination Access Timeline

| Employee (Exhibit) | Termination Notice Date | Notification Received | Access Type | Access Revoked (Approx.) |
|---|---|---|---|---|
| S. - Ex. A | Feb 14, 2025 | Feb 15, PM | Elevated + User | Feb 18, ~11:30 AM EST |
| F. - Ex. B | Feb 14, 2025 | Feb 15, PM | Elevated + User | Feb 18, ~11:30 AM EST |
| G. - Ex. C | Feb 14, 2025 | Feb 15, PM | User Only | Feb 18, ~11:30 AM EST |
| P. - Ex. D | Feb 14, 2025 | Feb 15, PM | User Only | Feb 18, ~11:30 AM EST |

### Exhibit K - Timeline of Agency Action and Notice

| Date | Event |
|---|---|
| February 14, 2025 | Dated notice of initial termination action under EO 14210. |
| February 15, 2025 | Received termination notice in the evening; reported to supervisor. |
| February 18, 2025 | Credential revocation at approximately 11:30 AM EST. |
| March 13, 2025 | TRO from a separate case received via personal email. |
| May 8, 2025 | Final termination packet postmarked. |
| May 9, 2025 | This Court's TRO goes into effect. |
| May 12, 2025 | Received postmarked termination packet. |
| May 23, 2025 | Final paycheck issued, including full annual leave payout. |

**Exhibit L - Standards and Observed Deviation**

| Standard / Source | Requirement | Observed Violation | Impact / Duration |
|---|---|---|---|
| FISMA – 44 U.S. Code § 3554[1] | Prevent unauthorized system access post-separation | Access remained active for >60 hrs after termination notice | High / 60+ hrs |
| False Claims Act – 31 U.S.C. §§ 3729–3733[8] | Prohibits knowing failure to meet obligations under federal contracts | Delayed access revocation and cybersecurity lapses risk triggering liability | High / systemic |
| OMB A-130[4] | Agency heads responsible for timely ICAM policy enforcement | Credential revocation lagged across terminated employees | High / 60+ hrs |
| OPM Credentialing Standards[2] | Terminate PIV credential access when employment ends | PIV access not confirmed revoked during 60+ hour window | Moderate / unclear |
| NIST 800-53 (Rev. 5)[3] | Terminate accounts promptly upon separation | Multiple users retained access 4+ days post-termination | Critical / 60+ hrs |
| NIST 800-53 AC-6(9), CM-6[6] | Restrict and monitor elevated access | Admin permissions retained after separation | Critical / 60+ hrs |
| NIST 800-63-3[12] | Revoke digital credentials | Credential access remained after employment change | High / 60+ hrs |

| | promptly when no longer needed | | |
|---|---|---|---|
| NIST 800-37 (Rev. 2)[7] | Adjust controls after operational changes | Control changes delayed after bulk terminations | Moderate / policy-wide |
| DOJ Civil Cyber-Fraud Initiative[9] | Holds agencies/contractors accountable for security failures | Noncompliance with cybersecurity standards risks enforcement | High / systemic |
| HHS OIG Audit (2023)[10] | Document and follow separation processes | Findings mirror failures during EO 14210 implementation | High / sustained |
| GAO-21-104[11] | Address offboarding and communication weaknesses | Systemic parallels in delayed coordination and unclear leadership | Moderate / institutional |

**Table of Exhibits**

| Exhibit | Description | Referenced In |
|---|---|---|
| A | Redacted Statement of Scott C. Pitcock – Summary of termination actions and system access | Section II – Technical Facts |
| B | Sealed statement of Employee B – Summary of termination actions and system access | Section II – Technical Facts |
| C | Sealed statement of Employee G – Summary of termination actions and system access | Section II – Technical Facts |
| D | Sealed statement of Employee D – Summary of termination actions and system access | Section II – Technical Facts |
| E | Sealed declaration and communications from former supervisor – Describes offboarding delays and limited support from leadership | Sections II, IV |
| F | Redacted email logs showing continued access to FDA email account following Feb. 15 notice | Section II – Technical Facts |

| G1* | Redacted Outer envelope and postmark (standard USPS, postmarked May 8, 2025) | Section III – TRO Compliance |
|---|---|---|
| G2* | Redacted termination letter and Westlaw printout with disclaimer (submitted under seal) | Section III – TRO Compliance |
| H | Redacted copy of March 13, 2025 TRO notice from unrelated case (received via personal email) | Section III – TRO Compliance |
| I | Redacted emails showing attempts to confirm employment status | Section IV – Interactive Process |
| J | Post-termination access timeline – Documents level and duration of account access following notice | Appendix – Post-Termination Access Timeline |
| K | Standards and observed violations – Summary of policy requirements and procedural lapses | Appendix – Standards and Observed Deviation |
| L | Agency action timeline – Chronological summary of key events through final termination | Appendix – Timeline of Agency Action and Notice |
| M | Sealed Final Leave and Earnings Statement | N/A |

*G1 and G2 were within the same envelope