Exhibit B

Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
Alice X. Wang (SBN 335224)
Robin S. Tholin (SBN 344845)
Talia Stender (SBN 341654)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
awang@altber.com
rtholin@altber.com
tstender@altber.com

*Attorneys for Plaintiffs*

[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OFFICE OF MANAGEMENT AND BUDGET, *et al.*;<br><br>Defendants. | Case No. 3:25-cv-08302-VC<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND .....................................................................................................................2

    I.    The Antideficiency Act and Government Shutdowns.................................................2

    II.    Efforts of the Administration, through OMB and OPM, to Downsize the
        Government .................................................................................................................5

    III.    The October 2025 Government Shutdown and the Decision to Impose
        Widespread Government Layoffs.................................................................................7

    IV.    Administration Threats of Imminent and Partisan RIFs..............................................9

    V.    Imminent Harm to Plaintiffs.....................................................................................12

ARGUMENT .......................................................................................................................14

    I.    This Court Should Enjoin Defendants' Imminent Unlawful RIFs During the
        Government Shutdown................................................................................................14

        A.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims...................14

            1.    The OPM Lapse Memorandum, OPM Guidance, and decisions
                to engage in and prepare for imminent RIFs are contrary to and
                exceed any legal authority, are therefore ultra vires and violate
                the APA. ...........................................................................................14

            2.    The OPM Lapse Memorandum, OPM Guidance, and imminent
                RIFs are arbitrary and capricious and violate the APA.....................18

            3.    The OPM Lapse Memorandum, OPM Guidance and decisions
                regarding imminent RIFs are all final agency action for
                purposes of the APA.........................................................................21

            4.    Article II constitutional supervisory authority to take care laws
                are faithfully executed does not authorize using a government
                shutdown to justify RIFs contrary to statute.....................................22

        B.    Plaintiffs Face Imminent and Irreparable Harm.............................................23

        C.    The Balance of Equities and Public Interest Weigh in Plaintiffs' Favor ......24

    II.    Scope of the Proposed TRO .....................................................................................25

CONCLUSION ....................................................................................................................25

## INTRODUCTION

On October 1, 2025, the new fiscal year for the federal government began with Congress deadlocked over appropriations for discretionary spending, and the federal government entered a period of temporary shutdown pending Congressional enactment of appropriations legislation.  It is well established—under federal law and in historical practice—that, during a shutdown, "excepted" federal employees are required to work without pay, and all other employees are furloughed and statutorily *prohibited* (on pain of administrative and criminal penalties) from working.  Both sets of employees are statutorily entitled to back pay for the shutdown period once the shutdown ends.

In contravention of binding authority, even before the shutdown began, the Administration announced its plan to engage in mass terminations of federal employees—not temporary furloughs, but permanent reductions-in-force ("RIFs")—during the shutdown.  And now, it has become clear that those threats have become action and will soon be carried out.  Public statements since the shutdown began on Wednesday, October 1, 2025, confirm that the decision to engage in these actions *has already been made*, widespread RIFs are imminent, and RIF notices will be sent to employees within the next "day or two"—so likely, if not before, on Monday, October 6; *see also infra* at 7-12 (setting forth, in greater detail, the series of public statements making clear that RIFs are imminent).

Defendants' threats and actions to engage in mass RIFs during the shutdown are for two purposes, both of which are unlawful.  First, Defendants are using the threat of mass terminations for political pressure and retribution against members of Congress who are taking legislative actions that are contrary to Defendants' wishes.  In fact, evidence including statements by President Donald Trump and OMB Director Russell Vought demonstrate that Defendants are targeting these RIFs at agencies, programs, and employees they believe to be "Democrats" and "Democrat agencies."  And second, Defendants are using this threat to effectuate their goal of downsizing and dismantling the federal government during the shutdown, in total disregard of statutory authority and mandates.

This decision to implement RIFs during the federal shutdown, and the actions taken to implement it, are contrary to federal law, for reasons including the following.  First, they rest on the clearly erroneous legal premise that a temporary interruption of federal funding rescinds the statutory mandates and authorities for agency operations, allowing large-scale RIFs notwithstanding those

agencies' mandates and authorities.  Second, by authorizing (or indeed, requiring) agency personnel to work during a shutdown in order to plan and implement RIFs, Defendants' actions violate the Antideficiency Act and force federal employees to violate that Act.  Third, the actions are arbitrary and capricious because, inter alia, they require agencies to disregard their own statutory obligations and authorities in making RIF decisions; they reverse the federal government's longstanding and well established interpretation of the Antideficiency Act without any reasoned explanation; they direct RIFs without consideration of reliance interests of federal employees and members of the public who depend on federal government services; they direct RIFs of employees who have been deemed necessary to preserve public safety and property; and—perhaps most egregiously—serve political and partisan goals which Defendants have indicated will impact their implementation.  For these reasons, they violate the Administrative Procedure Act ("APA") and are ultra vires.

The federal employees who will be on the receiving end of these actions have already suffered through waves of terminations and reversals (whether due to federal injunctive relief or, in many cases, Defendants' reconsideration of their own actions)—that have inflicted, as intended, "*trauma*" on federal employees.[1]  Because the Administration's public statements since the shutdown began on October 1, 2025 make clear the decision to conduct mass RIFs has been made, work to prepare those RIFs is underway, and RIFs are likely to begin on, if not before, Monday, October 6, 2025, Plaintiffs ask this Court to issue a TRO as immediately as possible—to maintain the status quo and temporarily halt any implementation of RIFs during the shutdown until further injunctive relief may be briefed and considered; and to issue an order to show cause and, at the Court's earliest availability, set a hearing on that order, to address whether any immediately issued TRO should remain in place for the full permitted 14 days and/or should be converted to a preliminary injunction.

## BACKGROUND

### I.     The Antideficiency Act and Government Shutdowns

The federal fiscal year runs from October 1 to September 30.  Congress authorizes and controls discretionary funding for many agencies and programs through annual appropriations acts

---

[1] *Infra* at 5-7.

that typically consist of twelve appropriations bills, one for each Appropriations subcommittee. Other agencies and programs receive mandatory funding, including through multi-year appropriations and budget authority provided in and controlled by other statutes. For agencies and programs that rely on discretionary funding, Congress and the President must enact interim or full-year appropriations prior to October 1 (or by the expiration of any continuing resolution ("CR") providing interim funding), or else the government experiences a "funding gap" or lapse in appropriations.[2] Such a funding gap generally triggers a government "shutdown," in which the affected agencies cease most operations pursuant to the Antideficiency Act, 31 U.S.C. §1341.[3]

In the absence of appropriations legislation or a CR, the federal government must shut down. Congress did not enact a CR or appropriations legislation for the upcoming 2026 fiscal year by September 30, 2025, and accordingly, on October 1, 2025, the government shut down.[4]

The Antideficiency Act governs federal spending and operations during a shutdown. That Act prohibits the government from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation" and from "involv[ing] either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. §1341(a)(1)(A)-(B). The government is also prohibited from accepting voluntary services for the United States, or employing personal services not authorized by law, except in cases of emergency involving the safety of human life or the protection of property. 31 U.S.C. §1342. Generally speaking, federal agencies must discontinue all non-excepted discretionary functions until new funding legislation is passed and signed into law, unless those functions qualify for statutory exception.

Congress has created five narrow categories of exceptions to the Act, which define the excepted services that continue to function during a shutdown. *See Gov't Operations In the Event of a Lapse in Appropriations*, 1995 WL 17216091, at *3-4 (Aug. 16, 1995) ("*1995 OLC Op.*") (citing

---

[2] Clinton T. Brass et al., Cong. Rsch. Serv., RL34680, *Shutdown of the Federal Government: Causes, Processes, and Effects* (2025), https://www.congress.gov/crs-product/RL34680.

[3] *See id.*

[4] Hanna Park, et al., *October 1, 2025: Day 1 coverage of the government shutdown*, CNN (Oct. 2, 2025), https://www.cnn.com/politics/live-news/government-shutdown-us-congress-10-01-25.

*Auth. for the Continuance of Gov't Functions During a Temp. Lapse in Appropriations*, 43 Op. Att'y Gen. 293 (Jan. 16, 1981) ("*1981 AG Op.*") (explaining "the various exceptions in the Antideficiency Act that permit some continuing government functions" during a shutdown).  These include 1) government functions that operate under multi-year or indefinite appropriations (which do not lapse if Congress and the President fail to enact an annual appropriations act), *1995 OLC Op.* at *3;[5] 2) express authorizations from Congress (e.g., Department of Defense authority to contract for necessary clothing, food, and supplies without an appropriation), *id.*;  3) a limited number of government functions funded through annual appropriations that must otherwise continue during a shutdown because they are necessary to other activities expressly required by Congress (called the "necessary implication" exception), *id.*; 4) a narrow exception for "functions instrumental in the discharge of the President's constitutional powers," *id.* at *4;[6] and 5) services provided in "emergencies involving the safety of human life or the protection of property," 31 U.S.C. §1342; *1995 OLC Op.* at *4, 6.   The last exception "does not include ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property."  *1995 OLC Op. at *4, 6* (recognizing that Congress intended this language to "prohibit[] overly expansive interpretations of the 'emergency' exception.").

Employees are either furloughed during the shutdown, or are "excepted" employees within the categories described above and who are required to work without pay.[7]  To comply with the

---

[5] Activities that have funds available are often referred to as "exempted" from a lapse in appropriations rather than "excepted."  *See* Huddleston Decl. ¶23, Ex. S (US Environmental Protection Agency Contingency Plan For Shutdown at 5 (Mar. 10, 2025) ("EPA Shutdown Plan")).

[6] *See, e.g.*, Huddleston Dec. ¶15, Ex. L  (Sept. 30, 2025 Executive Office of the President, *Updated Contingency Plan for Shutdown Furlough*, at 3, identifying the 183 excepted employees performing functions "support[ing] the President and Vice President in executing their constitutional responsibilities" as "including supporting the President's conduct of foreign relations and advancing national security, reviewing and coordinating legislative proposals pending before Congress that may be presented to the President, and facilitating certain Presidential appointments").

[7] There are two different types of furloughs for federal employees:  Administrative ("Money-Saving") Furloughs and Shutdown ("Emergency") Furloughs.  *See* Taylor N. Riccard, Cong. Rsch. Serv., IF11703, Federal Employee Furloughs: Types and Implications (2020), https://www.congress.gov/crs-product/IF11703.   "An administrative furlough is a planned event by an agency which is designed to absorb reductions necessitated by downsizing, reduced funding, lack of work, or any budget situation other than a lapse in appropriations."  U.S. Office of Personnel

Antideficiency Act, agencies prepare "lapse plans."[8]  Agency lapse plans identify the employees excepted from furlough under the Antideficiency Act, and specify under which of the categories of exceptions identified by DOJ each employee qualifies.[9]

The length of any shutdown depends on how quickly Congress and the President are able to enact an interim or full-year appropriations act.  Although some shutdowns are very brief, others have lasted for several weeks, with the longest in 2018 lasting 35 days.[10]  Following that shutdown, in 2019, then-President Trump signed the Government Employee Fair Treatment Act, requiring that employees "furloughed as a result of a covered lapse in appropriations shall be paid for the period of the lapse in appropriations, and each excepted employee who is required to perform work during a covered lapse in appropriations shall be paid for such work, at the employee's standard rate of pay, at the earliest date possible after the lapse in appropriations."  31 U.S.C. §1341(c)(2).

Nothing in the Antideficiency Act or any other statute authorizes RIFs of employees who work in agencies or programs with a lapse in funding.  31 U.S.C. §1341-42; *see also* 5 U.S.C. §3502 (RIF statute).  To Plaintiffs' knowledge, no existing agency lapse plan currently designates the function of administering RIFs during a shutdown as "excepted" from furlough.[11]

## II.    Efforts of the Administration, through OMB and OPM, to Downsize the Government

Since taking office, President Donald J. Trump has enlisted the OMB as well as other agencies and officials in a wide-ranging plan to dramatically reduce the size of the federal workforce,

---

Management, Furlough Guidance, https://www.opm.gov/policy-data-oversight/pay-leave/furlough-guidance/.  A shutdown furlough "occurs when there is a lapse in appropriations."  *Id.*

[8] Huddleston Decl. ¶24, Ex. T (OMB Circular A-11, Preparation, Submission, and Execution of the Budget §124 (July 2024), https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf; *see, e.g.*, *id.* ¶23, Ex. S (EPA Shutdown Plan); *id.* ¶25, Ex. U (U.S. Merit Systems Protection Board, Shutdown Plan: Contingency Plan for Periods of Lapsed Appropriations (updated March 11, 2025), https://www.mspb.gov/MSPB_Shutdown_Plan_3.11.2025.pdf ("MSPB Shutdown Plan")).

[9] *See, e.g.*, Huddleston Decl. ¶25, Ex. U (MSPB Shutdown Plan) at 3 (providing for two employees to be retained as "Necessary to perform activities expressly authorized by law"); *id.* ¶23, Ex. S (EPA Shutdown Plan) at 2 (providing for, among other excepted employees, 597 to be retained as "Necessary to protect life and property").

[10] Justin Murray & Carol Wilson, Cong. Rsch. Serv., R41759, *Past Government Shutdowns: Key Resources* (2025), https://www.congress.gov/crs-product/R41759.

[11] *See* Huddleston Decl. ¶25, Ex. U (MSPB Shutdown Plan); *id.* ¶23, Ex. S (EPA Shutdown Plan); *id.* ¶15, Ex. L (September 2025 EOP Plan for Shutdown Furlough).

including through unlawful means.  In the President's own words:  "It is the policy of my Administration … to commence the deconstruction of the overbearing and burdensome administrative state."  Exec. Order No. 14219 (Feb. 19, 2025) (Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Deregulatory Initiative).[12]

Defendant Vought has made clear that the arbitrary, cruel, and punitive manner in which this plan has been implemented is part of the objective.  Before officially joining the government he explained: "We want the bureaucrats" (referring to federal employees) "to be traumatically affected." "When they wake up in the morning," he stated, "we want them to not want to go to work because they are increasingly viewed as the villains…  We want to put them in trauma."[13]

On numerous occasions this year, federal employees have been issued RIF notices or otherwise terminated, and then been brought back to work.  Sometimes, this has been because the Administration's unlawful actions were enjoined.[14]  Other times, the Administration has itself recognized the need to reinstate or rehire federal employees who were previously RIFed or whose resignations were previously accepted.  For example, the Internal Revenue Service reduced its workforce by tens of thousands of employees during the first half of 2025 but after realizing the consequences of the depletion of essential personnel, has now begun rescinding deferred resignation offers.[15]  After terminating 10,000 employees, HHS similarly reinstated essential employees at the Centers for Disease Control and National Institutes of Health, acknowledging "we were not able to perform our job" without them.[16]

---

[12] The series of executive orders and other measures taken by the administration in implementing this plan are set forth in greater detail in paragraphs 89-106 of Plaintiffs' Amended Complaint, being filed contemporaneously.

[13] Huddleston Decl. ¶8, Ex. E.

[14] E.g., *Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1865971, at *27 (D. Md. July 7, 2025); *Victim Rights L. Ctr. v. U.S. Dep't of Educ.*, 2025 WL 1704311, at *20 (D. Mass. June 18, 2025); *Wiley v. Kennedy*, 2025 WL 1384768, at *13 (S.D. W. Va. May 13, 2025); *AFGE v. OPM*, 2025 WL 66053, at *14 (N.D. Cal. Feb. 28, 2025).

[15] Natalia Alms & Eric Katz, *IRS is canceling its layoff plans, will ask some it fired or pushed out to return*, Gov't Exec. (August 22, 2025), https://www.govexec.com/workforce/2025/08/irs-canceling-its-layoff-plans-will-ask-some-it-fired-or-pushed-out-return/407620/.

[16] Huddleston Decl. ¶9, Ex. F.

OMB and OPM have played a key role in implementing the Administration's plan to reduce the size of the federal government, including by arrogating to themselves the power to direct other agencies to conduct terminations or carry out other employment actions even when purporting to offer mere guidance or advice.  For example, while claiming that it was providing only guidance, OPM was found to have "directed agencies across the federal government to terminate their probationary employees *en masse*."  *AFGE v. OPM*, 2025 WL 2633791, at *1 (N.D. Cal. Sept. 12, 2025).  Similarly, in relation to the OMB/OPM memorandum implementing Executive Order 14210, this Court rejected Defendants' argument that they "were merely providing guidance"; rather, the Court found, "[l]ike other directives from the current administration, … the memo 'amounted to a command, not a suggestion.'"  *AFGE v. Trump*, 784 F. Supp. 3d 1316, 1352 (N.D. Cal. 2025) (quoting *New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *8 (D.R.I. Mar. 6, 2025)); *see also AFGE v. Trump*, 784 F. Supp. 3d at 1327 ("Defendants maintain that the federal agencies are acting of their own accord and not at the President's direction, asking this Court to review the relevant executive actions using tunnel vision and ignore whatever may be happening on the ground. Numerous courts have rejected similar arguments in recent months.").[17]

## III. The October 2025 Government Shutdown and the Decision to Impose Widespread Government Layoffs

As the appropriations deadline for the new fiscal year approached, the Administration announced plans to use any shutdown to engage in unprecedented mass layoffs.  No prior Administration has ever used RIFs or even announced consideration of RIFs for such purposes.  The language used by the Administration in describing this decision has also been unabashedly political, directing that RIFs target the President's perceived political opponents.

On September 24, 2025, OMB issued a memorandum to all agencies threatening that if "congressional Democrats" do not agree to the administration's demands, and the federal government

---

[17] Examples from other courts abound.  *See, e.g.*, *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 115-16 (D.D.C. 2025) ("Defendants would have the court believe that countless federal agencies ... suddenly began exercising their own discretion to suspend funding across the board at the exact same time.  That would be a remarkable—and unfathomable—coincidence.").

shuts down, there will be mass firings of federal employees (hereinafter, "Lapse Memorandum").[18] Huddleston Decl. ¶4, Ex. A at 1.  That Memorandum states that "congressional Democrats are currently blocking th[e] clean CR" supported by the Trump administration "due to their partisan demands."  *Id*.  It thus expressly attributes any shutdown to the actions of "congressional Democrats," who it describes as "intend[ing] to break this bipartisan trend and shut down the government in the coming days over a series of insane demands."  *Id.*

The Memorandum then makes clear that "congressional Democrats" will be responsible not only for a shutdown but for mass terminations.  It directs: "[w]ith Respect to those Federal programs whose funding would lapse and which are otherwise unfunded*, such programs are no longer statutorily required to be carried out*."  *Id*. (emphasis added).  The Memorandum cites no authority for this conclusion.  It continues: "agencies are directed to use this opportunity to consider Reduction in Force (RIF) notices for all employees in programs, projects, or activities (PPAs) that satisfy all three of the following conditions:  (1) discretionary funding lapses on October 1, 2025; (2) another source of funding, such as H.R. 1 (Public Law 119-21) is not currently available; and (3) the PPA is not consistent with the President's priorities."  *Id*.  The Memorandum further expressly directs that these "RIF notices will be in addition to any furlough notices provided due to the lapse in appropriation.  RIF notices should be issued to all employees working on the relevant PPA, *regardless of whether the employee is excepted or furloughed* during the lapse in appropriations."  *Id.* at 1 (emphasis added).  OMB thus directs agencies to issue RIF notices even to employees that the agency has already determined are excepted as necessary to protect life or property during the shutdown.  Then, after the shutdown ends, OMB directs: "agencies should revise their RIFs as needed to retain the minimal number of employees necessary to carry out statutory functions.  Any proposed RIF plan must be submitted to OMB."  *Id*.

Four days after the Lapse Memorandum was issued, the Administration ordered that personnel (like human resources personnel) who would otherwise be furloughed be authorized to work to administer RIFs during the shutdown.  On September 28, 2025, OPM updated its "Guidance

---

[18] *See* Huddleston Decl. ¶5, Ex. B.

for Shutdown Furloughs" to include a new section on Reductions in Force (hereinafter "OPM Guidance"). Huddleston Decl. ¶6, Ex. C at 53, 67. This update was accompanied by a separate document entitled "Special Instructions for Agencies Affected by a Possible Lapse in Appropriations Starting on October 1, 2025," which specifically cites OMB's Lapse Memorandum (hereinafter, "OPM Special Instructions"). *Id.* ¶7, Ex. D at 9-10.

OPM's Guidance and Special Instructions both state that "OMB has determined that agencies are authorized to direct employees to perform work necessary to administer the RIF process during the lapse in appropriations as excepted activities." *Id.* ¶¶6-7, Ex. C at 53; D at 10. Neither document explains the legal basis for this determination. This OMB determination, repeated by OPM, is inconsistent with the rest of OPM's documents. The Guidance expressly states: "Reductions in force (RIF) furlough regulations … *are not applicable to emergency shutdown furloughs* because the ultimate duration of an emergency shutdown furlough is unknown at the outset and is dependent entirely on Congressional action, rather than agency action." Huddleston Decl. ¶6, Ex. C at 47 (emphasis added). The Special Instructions also state: "[a] RIF process is conducted separately from the process for administering a shutdown due to a lapse in appropriations," *id.* ¶7, Ex. D at 10.

Agencies understand themselves to be bound by applicable guidance provided by OMB and OPM in the event of a shutdown. The EPA Shutdown Plan, for example, explains that: "In the event of a 'shutdown', when EPA is required to implement this general guidance, supplemental governmentwide guidance issued by the Office of Management and Budget, the Office of Personnel Management, and the General Services Administration also apply." *Id.* ¶23, Ex. S at 5. Since January 2025, courts have found that when OMB and OPM have used language urging agencies to "consider" or "guidance" with respect to federal employees, OMB and OPM have intended and have conveyed mandatory directives removing agency discretion over whether to comply. Agencies, in turn, have understood such purportedly advisory language to direct them to take the action they have been told to "consider" or the "guidance" they have been told to follow. *See supra* at 7.

## IV.    Administration Threats of Imminent and Partisan RIFs

The President has frequently acknowledged that the decision to engage in RIFs during the shutdown is targeted at his perceived political opponents. *Supra* at 7-8. On September 30, 2025 (the

day before the shutdown), President Trump repeatedly discussed plans to lay off federal workers to serve political ends, warning, "We can do things during the shutdown that are irreversible, that are bad for them and irreversible by them.  Like cutting vast numbers of people out, *cutting things that they like, cutting programs that they like*."  Huddleston Decl. ¶13, Ex. J at 2 (emphasis added).  He further threatened:  "You all know Russell Vought, he's become very popular recently because he can trim the budget to a level that you couldn't do any other way."  *Id.*  Emphasizing this point, he stated, "a lot of good can come down from shutdowns. *We can get rid of a lot of things that we didn't want, and they'd be Democrat things.*"[19]  And he falsely asserted, "When you shut it down, you have to do layoffs… So we'd be laying off a lot of people that are going to be very affected… *And they're gonna be Democrats*."[20]  Likewise, on September 29, 2025, when asked if there would be mass layoffs, the White House spokesperson responded: "There will be if Democrats don't keep the government open."  Huddleston Decl. ¶12, Ex. I at 2.  Again on September 30, 2025, the Administration posted the following statement on HUD's opening web page, advancing heightened partisan rhetoric about the shutdown to any person who accesses this official federal government website and its resources: "The Radical Left are going to shut down the government and inflict massive pain on the American people unless they get their $1.5 trillion wish list of demands."[21]

Director Vought confirmed in public speeches that "We have ... embarked on deconstructing this administrative state," and that "We want to make sure that the bureaucracy can't reconstitute itself later in future administrations."[22]  Subsequently, administration officials, including President Trump and Director Vought, have confirmed through recent public statements that: 1) OMB is directing agencies to conduct RIFs; and 2) the decision to impose wide-spread RIFs has already been made; and 3) the RIFs are to be implemented imminently.

---

[19] Aaron Pellish, *Trump targets states that voted for Harris in shutdown fight*, Politico (Oct. 1, 2025), https://www.politico.com/news/2025/10/01/trump-shutdown-democratic-states-00590368 (emphasis added).

[20] Jarvis DeBerry, *Trump seems to think only Democrats will feel pain during this government shutdown*, MSNBC (Oct. 2, 2025), https://www.msnbc.com/opinion/msnbc-opinion/trump-democrats-republicans-shutdown-federal-worker-layoffs-rcna234974 (emphasis added).

[21] Wayback Machine, the United States Department of Housing and Urban Development website (Sep. 30, 2025), https://web.archive.org/web/20250930032038/https://www.hud.gov/#openModal.

[22] Huddleston Decl. ¶11, Ex. H at 5, 6.

On October 1, 2025, the day the shutdown began, OMB Director Vought conducted a telephone call for Congressional Republicans, in which he confirmed that mass firings of federal employees would begin "in a day or two."[23]  The same day, White House spokesperson Karoline Leavitt confirmed that mass federal layoffs would happen in "[t]wo days, imminent, very soon."[24]  Leavitt further confirmed:  "Unfortunately, because the Democrats shut down the government, *the president has directed his cabinet, and the Office of Management and Budget is working with agencies across the board, to identify where cuts can [b]e made…  And we believe that layoffs are imminent*.  They are unfortunately a consequence of this government shutdown."[25]  (Emphasis added.)  Similarly, that same day, Vice President JD Vance confirmed that layoffs were imminent and "suggested they would hit virtually every agency."[26]

Next, on October 2, the President posted on social media:  "I have a meeting today with Russ Vought, he of PROJECT 2025 Fame, to determine which of the many Democrat Agencies, most of which are a political SCAM, he recommends to be cut, and whether or not those cuts will be temporary or permanent.  I can't believe the Radical Left Democrats gave me this unprecedented opportunity."  Huddleston Decl. ¶18, Ex. O.  The President subsequently shared a video that attributes the cuts to OMB Director Vought:  "He wields the pen, the funds, and the brain."  *Id.* ¶22.

The amount of work required for RIF notices to be issued imminently is substantial.  OPM maintains a detailed website and guidance documents for federal agencies explaining the work that must be performed to prepare for and administer any RIF.[27]  As OPM has explained:  "There are six phases to implementing a RIF" which should occur over many months, and require a "team" to implement. [28]  As OPM's 115-page operations manual for conducting RIFs explains:  "Most RIF

---

[23] *Id.* ¶16, Ex. M at 1.
[24] *Id.* ¶17, Ex. N at 1.
[25] *Id.* ¶16, Ex. M at 3.
[26] *Id.* ¶17, Ex. N at 1-2.
[27] *See* OPM, *Reduction in Force (RIF),* available at:  https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/.
[28] *See* OPM, *Overview of Reduction in Force (RIF),* available at:  https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/rif-overview.pdf; OPM, *Workforce Reshaping Operations Handbook*, available at: https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/workforce_reshaping.pdf.

actions require some employees to work full-time on personnel actions related to the RIF."[29]   OPM recommends the RIF Team include human resources staff that includes at least manager/leader, and support staff including "staffing assistants," clerical support staff," "benefits specialists, " and "computer specialists."  *Id*.  Moreover, sending RIF Notices is only one of the six phases of the RIF process, but in itself involves substantial work:  "determining each released employee's eligibility for benefits, preparing specific written RIF notices and mandatory attachments, sending notices to other organizations if 50 or more employees receive separation notices, notifying bargaining unit representatives, determining how to deliver RIF notices, preparing packages for separating employees, delivering RIF notices, and re-running RIF to reflect changes to the personnel roster in the competitive area."  *Id*. at 20; see also Appendix L, *Issuing RIF Notices*.[30]

OMB has ordered all agencies to begin to prepare RIFs, and notices are expected to be issued as early as Monday, October 6.  Huddleston Decl. ¶¶26-28.  Plaintiffs understand that OMB has ordered agencies to submit RIFs for approval and is giving that approval, consistent with public statements from the President and others.  *Id*. ¶27.  In order for RIF notices to be sent across multiple agencies imminently, a substantial amount of work has been done and is being done by agency staff to prepare notices consistent with the elaborate and involved processes needed to issue such notices described above, consistent with OPM Guidance that staff should do this work during the shutdown.

## V.      Imminent Harm to Plaintiffs

Plaintiffs AFGE, AFGE Local 1236, AFGE Local 3172, and AFSCME each represent, and have as members, federal employees who work in agencies that have shut down as a result of the lapse in appropriations and were directed by OMB that their programs are no longer statutorily required and therefore should implement large-scale RIFs.  Kelley Decl. ¶¶2-3, 20; Blake Decl. ¶¶8-9.  The employees represented by Plaintiffs therefore face the reality of losing their income, health benefits, and other incidents of employment if subject to a RIF, causing severe irreparable harm to them, their families, and their communities.  These federal employees who are impacted by the

---

[29] *Workforce Reshaping Operations Handbook, supra, at* 13 ("Establishing the RIF Team").
[30] Available at:  https://www.opm.gov/policy-data-oversight/workforce-restructuring/reductions-in-force-rif/workforce_reshaping_appx.pdf.

Administration's current unlawful actions are those who have remained dedicated to their work, public service, and their careers through the recent waves of terminations, RIFs, and voluntary separation offers.

These employees now face the immediate prospect of being subject to a RIF notice and the uncertainty that comes once such a notice is issued. Blake Decl. ¶9; Kelley Decl. ¶¶11-15; Niemeier-Walsh Decl. ¶¶11-14. While RIF notices will likely (as required by the law) call for separation of employment within 30 or 60 days, the notices threaten to upend federal employees' lives, requiring federal career employees (many with decades of service) to uproot their lives to search for new jobs (competing in a difficult labor market made all the more difficult by this Administration's prior terminations) or training and educational opportunities. *Id.* This Administration is putting hundreds of thousands of employees in an untenable position of uncertainty, causing them and their significant others and families to spend time, money and emotional energy making contingent plans. This is the "trauma" that Director Vought clearly recognizes will occur if the Administration is permitted to issue RIF notices and wishes to impose, with the goal of causing pain and disruption and convincing employees to stop fighting for their jobs. Huddleston Decl. ¶8, Ex. E.

Once RIF notices are issued and RIFs take effect, there is a real chance that employees represented by Plaintiffs will lose their income, health benefits, and other incidents of employment, all of which clearly also constitute severe irreparable harm to them, their families, and their communities. Blake Decl. ¶9; Kelley Decl. ¶¶14-15; Niemeier-Walsh Decl. ¶¶13-14.

Even if employees were ultimately to be reinstated after a RIF notice (because the Court so orders or based on the reconsideration that the Lapse Memorandum invites), Plaintiffs AFGE, AFGE Local 1236, AFGE Local 3172, and AFSCME also each represent and have as members federal employees who, if subject to a RIF during the shutdown and then reinstated thereafter, may face claims from the agencies that, because they were RIFed, they are ineligible for back pay. Blake Decl. ¶11; Kelley Decl. ¶16. Plaintiffs also each represent and have as members federal employees who, even if they are not themselves subject to RIFs and keep their jobs, will be required to do more, and more difficult work, to meet the agency's statutory mission and obligations, without the support of colleagues who, until the implementation of the mass RIFs ordered by Defendants, the employing

agencies believed were needed to carry out their work.  Blake Decl. ¶11; Kelley Decl. ¶17; Niemeier-Walsh Decl. ¶¶16-21.  Federal employees who work in positions determined to be necessary to implement RIFs will be forced to choose between violating an order to continue working and being subject to possible criminal penalties under 31 U.S.C §1350.

Each Plaintiff is a labor organization that has the core function of representing employees, including those in federal bargaining units, in collective bargaining and providing counseling, advice, and representation to employees in the event of adverse employment actions.  Blake Decl. ¶¶4, 10; Kelley Decl. ¶5; Niemeier-Walsh Decl. ¶4.  Each union Plaintiff has and will be imminently prevented, by the RIFs directed by OMB during the federal government shutdown, from exercising those core functions as employee representatives.  Blake Decl. ¶10; Kelley Decl. ¶¶18-20; Niemeier-Walsh Decl. ¶¶13, 15.  These Plaintiffs have already expended substantial time and resources as a result of the OMB Lapse Memorandum, addressing member concerns and attempting to provide employees with effective representation.  Blake Decl. ¶10; Kelley Decl. ¶¶18-19; Niemeier-Walsh Decl. ¶13.  Each Plaintiff has been forced to divert resources that would be devoted to representing employees who have, will, or may experience adverse employment actions and/or other representational work.  *Id.*  Each union Plaintiff will be harmed in multiple other ways by the imminent termination of its members, including by the loss of dues income and bargaining power.  Blake Decl. ¶10; Kelley Decl. ¶20; Niemeier-Walsh Decl. ¶15.

## ARGUMENT

**I.    This Court Should Enjoin Defendants' Imminent Unlawful RIFs During the Government Shutdown**

A TRO is warranted when the moving party (1) is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest.  Fed. R. Civ. P. 65 (b)(1), (c); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  All of these factors strongly favor Plaintiffs.

### A.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims

**1.    The OPM Lapse Memorandum, OPM Guidance, and decisions to engage in and prepare for imminent RIFs are contrary to and exceed any legal authority, are therefore ultra vires and violate the APA.**

"Section 706(2) of the APA states that if a reviewing court finds that an agency action is 'in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right' then the court 'shall . . . hold unlawful and set aside' that agency action." *Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 953 (9th Cir. 2024) (emphasis in original); *see also* 5 U.S.C. §706(2)(A), (C); *Northwest Env't Advocates v. E.P.A.*, 537 F.3d 1006, 1025-27 (9th Cir. 2008). If an "action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law." *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943). And where the government, including as directed by the President, takes ultra vires action, it is the proper constitutional role of this Court to declare that action unlawful. *E.g.*, *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023); *Sierra Club v. Trump*, 963 F.3d 874, 888-93 (9th Cir. 2020), *judgment vacated on other grounds, sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021); *Sierra Club v. Trump*, 929 F.3d 670, 696-97 (9th Cir. 2019)); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996). The Lapse Memorandum, OPM Guidance, and decisions to prepare for and implement wide-scale RIFs of federal employees during the government shutdown are directly contrary to the Antideficiency Act, and otherwise exceed any legal authority in at least three independent respects.

First, OMB's Lapse Memorandum directs agencies to conduct RIFs based on a misinterpretation of federal law, by instructing that as to "Federal programs whose funding would lapse and which are otherwise unfunded, *such programs are no longer statutorily required to be carried out*," allowing the agencies to issue RIF notices for the entire program or agency affected. Huddleston Decl. Ex. A (emphasis added). The Antideficiency Act prevents the government from authorizing expenditures for these programs during the lapse in funding, but nothing in the Act repeals the agency's statutory mission and obligations under the law. 31 U.S.C. §§1341-42. A lapse in funding does not repeal, vacate, or otherwise have any effect on statutory provisions requiring or authorizing agencies to perform specified functions. *See, e.g.*, 29 U.S.C. §671 (establishing and giving duties to National Institute for Occupational Safety and Health); 29 U.S.C. §151 et seq. (similar, National Labor Relations Board); 42 U.S.C. §280b (imposing certain duties upon Director of Centers for Disease Control); 42 U.S.C. §901 et seq. (establishing and giving duties to Social Security Administration); 42 U.S.C. §12651 et seq. (similar, for Corporation for National and

Community Service); 42 U.S.C. §4336d (mandating certain environmental studies and reports).  In addition, no other statute grants agencies (or OMB, OPM, or the President), the plenary authority to issue RIFs that repeal programs, positions, and activities authorized by Congress.[31]  In this manner, the OMB Lapse Memorandum unlawfully directs federal agencies to disregard their own authorizing statutes and other statutory requirements that programs be maintained and functions performed, and that Memorandum and any RIFS predicated on this instruction are contrary to law.[32]

Second, these actions are contrary to law and exceed statutory authority by directing other agencies to deviate from the furlough and back pay requirements of the Antideficiency Act, which govern the treatment of employees during a shutdown and the laws and regulations governing RIFs. Specifically, the Antideficiency Act does not authorize layoffs during a shutdown because of a lapse in funding.  OPM's just-updated Guidance document reaffirmed: "Reductions in force (RIF) furlough regulations … are not applicable to emergency shutdown furloughs because the ultimate duration of an emergency shutdown furlough is unknown at the outset and is dependent entirely on Congressional action, rather than agency action."[33]  Instead, the Act expressly provides that all employees who are not paid during a shutdown—whether furloughed or excepted—must receive back pay for that time period once funding is reinstated.  *Supra* at 5.  The OMB Lapse Memorandum's misinterpretation of the law may deny statutorily required backpay to any employees subject to the RIFs, in the event that a shutdown lasts for longer than the RIF notice period.

Third, OMB and OPM have instructed agencies to administer RIFs as "excepted activities"

---

[31] The statutes governing RIFs and the accompanying regulations do not provide independent legal authority for agencies to conduct RIFs.  *See* 5 U.S.C. §§3501-3504.  Instead, these statutes and regulations set forth procedures, particularly retention preference procedures, that apply to RIFs that agencies implement.  No statute independently authorizes the President, OMB or OPM to order RIFs.

[32] OMB and OPM are also "creatures of statute" like any other federal agency.  *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022).  "To Congress under its legislative power is given the establishment of offices … [and] the determination of their functions and jurisdiction."  *Myers v. United States*, 272 U.S. 52, 129 (1926).  Congress thus "control[s]" the very "existence of executive offices."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010).  Congress has not granted OMB or OPM the authority to order federal agencies to downsize or reorganize themselves, to assume final decision-making power by requiring agencies to submit such plans for approval, or to RIF employees.  5 U.S.C. §§1101-1105; 31 U.S.C. §§501-507.

[33] Huddleston Decl. ¶6, Ex. C at 44-45 (emphasis added) (specifying that agencies should follow OPM regulations under 5 CFR part 752, for adverse actions rather than applying the RIF procedures).

during a shutdown, in direct violation of the Antideficiency Act, which provides no such exception. *See 1995 OLC Op*.  Planning and implementing a RIF does not qualify under any category of "excepted" work that may be conducted by agency personnel during a shutdown under any of the narrow exceptions to the Antideficiency Act described above, *supra* at 3-4.  *Id.* at *3-4; *1981 AG Op*.  Such work is not otherwise "authorized by law" to continue during a lapse in appropriations, 31 U.S.C. §1341, either through a multi-year appropriation or through another statute expressly authorizing agencies to spend nonappropriated funds to implement and administer RIFs.  The administration of a RIF process cannot be part of the allowable "minimal obligations necessary" for "the orderly termination of those functions that may not continue during a period of lapsed appropriations," *1995 OLC Op*. at *3, as OPM itself acknowledges that "[a] RIF process is conducted separately from the process for administering a shutdown due to a lapse in appropriations," OPM Special Instructions at 10.  Administration of RIFs is also not excepted from the Antideficiency Act as "instrumental in the discharge of the President's constitutional powers," *id.* at *4, as no express provision of Article II authorizes the President plenary authority over federal employment.  The Executive Office of the President agrees, defining the functions supporting the President and Vice President narrowly to those express constitutional authorizations.  *Supra* at n. 6.[34]  Finally, administration of a RIF is in no way necessary to protect life or property from imminent harm.  31 U.S.C. §1342; *see 1995 OLC Op*. at *7.  Thus, without any legal basis for an exception, ordering any employee to work to administer a RIF process directly violates the Antideficiency Act.

Conducting a RIF is a significant undertaking that will require substantial personnel resources.  *Supra* at 11-12.  Under the processes set out in the RIF regulations, an agency is required to determine the organizational units, geographical areas, and specific positions subject to the RIF, 5 C.F.R. §§351.402-403, and then develop a list of affected employees based on type of employment, veteran preference, length of service, and performance that determines the order in which they are

---

[34] Nor would a broader interpretation of this exception be plausible.  If any function related to supervision of federal employees were deemed "instrumental in the discharge of the President's constitutional powers," this exception would swallow the rule set forth by Congress in the Antideficiency Act, as the President could ignore a lack of appropriations and keep any and all federal employees working during a shutdown.

released. 5 C.F.R. §351.501. Employees who are subject to RIFs ordinarily must receive 60 days' notice, although OPM may approve a shorter 30-day notice in certain circumstances, 5 C.F.R. §351.801, and employees who meet certain criteria have the right to be reassigned and displace lower-tenure employees in positions not subject to the RIF, 5 C.F.R. §351.701. These RIF procedures require extensive agency action to plan and implement, which generally cannot legally occur during a shutdown while most employees, including those who would be responsible for planning and implementing such actions, are furloughed and prohibited from carrying out non-excepted duties under the Antideficiency Act. Performing this work risks a criminal violation. *Supra* at 14.[35] The Antideficiency Act is quite clear: a government shutdown is *not* the time to be engaging in workforce reduction procedures because employees are not supposed to be working.

OMB and OPM have no authority to direct other agencies to apply a misinterpretation of, and to violate, federal law. For all of these reasons, the actions of OMB and OPM therefore violate the Administrative Procedure Act because they are inconsistent with law in violation of 5 U.S.C. §706(2)(A) and exceed statutory authority in violation of 5 U.S.C. §706(2)(C), and are ultra vires.

### 2.     The OPM Lapse Memorandum, OPM Guidance, and imminent RIFs are arbitrary and capricious and violate the APA.

The APA requires federal agencies to engage in "reasoned decisionmaking," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), which means that agency action must be both "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must "adequately consider[] all relevant factors," *Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1232 (9th Cir. 1993) (citation omitted), and "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). "Agency action is arbitrary and capricious when the agency 'relies on factors which Congress has not intended it to consider, entirely fails to consider an important aspect of the problem, or offers an explanation for its decision that runs counter to the evidence before the agency.'" *Ctr. for Biological*

---

[35] Beyond the employees who administer the RIFs, the employees on the receiving end, in order to actually receive notice, must be able to log in to their work email. Furloughed employees are not permitted to work (and may not even have access to email). These are plainly work-related activities that employees are not supposed to be performing.

*Diversity v. U.S. Fish and Wildlife Serv.*, 67 F.4th 1027, 1035 (9th Cir. 2023) (quoting *State Farm*, 463 U.S. at 43).  And "judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Regents of the Univ. of Cal.*, 591 U.S. at 20 (quotation omitted).

For the same reasons that Defendants' actions are contrary to law—in particular that OMB, OPM, and the other Defendant agencies all considered irrelevant and improper factors in making the decisions to engage in RIFs during shutdown, while ignoring important aspects of the problem—as well as numerous other independent reasons set forth below, they are also arbitrary and capricious..

First, as previously discussed, the Lapse Memorandum, the OPM Guidance and the decision to implement RIFs rest on a fundamental misunderstanding of the governing law, specifically that a lapse in appropriations removes statutory obligations of the agency.  Even if OMB's statutory interpretation were correct (which it is not), "baldly asserting that" longstanding funding is being terminated to "comply with [an agency's] statutory mandate" does not constitute a "reasoned explanation" under the APA. *Nw. Env't. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 689 (9th Cir. 2007); *see also Thakur v. Trump*, 2025 WL 1734471, at *14 (N.D. Cal. June 23, 2025).

Second, the challenged actions have been taken without considering, or directing agencies to consider, the important interests, including reliance interests, of constituencies directly impacted by these actions: the federal employees who will be subject to RIFs predicated on temporary shutdown, or subject to a RIF and then potentially a revised (or rescinded) RIF based on the restoration of funding; and the members of the public who will be impacted by the harm caused by the RIFs. Ignoring the interests of the federal employees and members of the public directly impacted by these actions is arbitrary and capricious.  Where an agency "changes course" from prior action or decisions, it is "not writing on a blank slate, ... it [is] required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 33.

Third, the challenged actions are expressly aimed at influencing the votes of congressional Democrats—and punishing them (and the people they represent) if they do not agree to appropriations demands.  Defendants have no authority to issue directives to agencies on the pretextual basis of a clearly erroneous interpretation of the law, or to implement those directives, for

partisan objectives.  *State Farm*, 463 U.S. at 43 (an agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider").

Fourth, OMB directs that RIF notices "should be issued to all employees working on the relevant PPA, regardless of whether the employee is excepted or furloughed during the lapse in appropriations."  Huddleston Decl. Ex. A.  This directive ignores the vital work done by excepted employees, including to preserve life and property or pursuant to mandatory appropriations.  Directing agencies to RIF these employees is inherently arbitrary and capricious.

Fifth, in providing that RIF notices should be issued to entire programs and agencies, the OMB Lapse Memorandum further ignores any other statutory obligations of the agency that are required to be carried out and for which funding would resume at the end of a shutdown.  The Memorandum provides that RIFs can simply be revised.  *Id.*  But issuing and revising RIF notices—which require extensive planning and process—based on a temporary funding lapse ignores the primary factors that an agency should consider:  the agency's statutory obligations and capacity.  *Hosp. v. Shalala*, 3 F.3d 1226, 1232 (9th Cir. 1993) ("An agency must "adequately consider[] all relevant factors").  At a minimum, reasoned decision-making would not subject employees who are "necessary to carry out statutory functions" to a RIF that would need to later be reversed or "revised."

Sixth, the OMB Lapse Memorandum and OPM's associated Guidance and Instructions direct agencies to treat work necessary to administer the RIF process as excepted from the Antideficiency Act without providing any basis justifying that exception, and the other federal agencies are complying with these directives to implement the imminent RIFs.  Ignoring binding federal law is arbitrary and capricious.  And "if an agency glosses over or swerves from prior precedents without discussion," they likely "cross the line from the tolerably terse to the intolerably mute." *Bonneville Power Admin.*, 477 F.3d 668, 687-88 (9th Cir. 2007).

Seventh, the OMB Lapse Memorandum and OPM's associated Guidance and Instructions are inherently contradictory.  They direct agencies to carry out RIFs due to the shutdown, but this instruction is in direct conflict with other aspects of OPM's Guidance and Instructions, which explains that "Reductions in force (RIF) furlough regulations … are not applicable to emergency shutdown furloughs because the ultimate duration of an emergency shutdown furlough is unknown at

the outset and is dependent entirely on Congressional action, rather than agency action." This

confusing, conflicting directive is arbitrary and capricious. There is no *rational* connection between

the "facts found" and the "choice made." *State Farm*, 463 U.S. at 43.

Eighth, the OMB Lapse Memorandum and OPM's associated Guidance and Instructions

depart from these agencies' previous positions—including by directing that employees should be

subject to a RIF rather than a furlough during a federal government shutdown, that even excepted

employees may be subject to a RIF, and that administration of RIFs may take place during a

shutdown—but fail to acknowledge those changes in position or to provide a reasoned explanation

for their departure from those positions. *Regents of the Univ. of Cal.*, 591 U.S. at 30-33; *FCC v. Fox

Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

### 3. The OPM Lapse Memorandum, OPM Guidance and decisions regarding imminent RIFs are all final agency action for purposes of the APA.

The OPM Lapse Memorandum, OPM Guidance document, and decisions by the

Administration to prepare for and implement imminent RIF across the government are "final agency

action" and thus judicially reviewable. 5 U.S.C. §704. The APA does not "bar[] a plaintiff from

challenging a number of discrete final agency actions all at once." *New York v. Trump*, 133 F.4th 51,

68 (1st Cir. 2025). To be final, "the action must (1) 'mark the consummation of the agency's

decisionmaking process' and (2) 'be one by which rights or obligations have been determined, or

from which legal consequences will flow.'" *Oregon Nat. Desert Ass'n v. U.S. Forest Serv*., 465 F.3d

977, 982 (9th Cir. 2006) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)); *see also Immigrant

Defs. L. Ctr. v. Noem*, 145 F.4th 972, 991 (9th Cir. 2025). The "pragmatic and flexible" finality

determination must "focus on the practical and legal effects of the agency action." *Id.* (cleaned up).

OMB's Lapse Memorandum and OPM's Guidance and Special Instructions contain definitive

statements that do not reference any further contemplation or future change in course, "mark[ing] the

consummation of the agency's decisionmaking process." *Bennett*, 520 U.S. at 156; 5 U.S.C. §704.

The Memorandum directs agencies to consider specific factors outside the applicable statutes and

regulations as a basis for RIFs, thus altering the established legal regime and determining the rights

from which legal consequences will flow to federal employees. *Bennett*, 520 U.S. at 156; *see also

U.S. Army Corps of Eng'rs v. Hawkes Co*., 578 U.S. 590, 599 (2016) (courts are to take a

"pragmatic" approach to applying the Bennett finality test).  The OPM Guidance and Special Instructions tell agencies to "except" employees for the purposes of carrying out RIFs during the shutdown.  Huddleston Decl. ¶6, Ex. C at 53; *id.* ¶7, Ex. D at 8.  Legal consequences will flow (and indeed have already flowed) to federal employees who should be furloughed.

Sources (including public statements by the President and OMB Director Vought) support the conclusion that OMB is directing federal agencies to implement RIFs and to do it now.  *Supra* at 7-12; Am. Compl. ¶¶142-181.  Like the OPM directive to all federal agencies to terminate probationary employees in February 2025 addressed by this Court in *AFGE v. OPM*, 2025 WL 2633791 (N.D. Cal. Sept. 12, 2025), the OMB directive to federal agencies to conduct layoffs during the shutdown is final agency action.  *Id*. at *14 ("OPM's termination directive constituted a final agency action.").  Any argument by the government that Director Vought is not calling the shots during the shutdown is contrary to his own statements and those of the President and is not credible.  Huddleston Decl. ¶22. Even if agencies were making their own decisions to engage in these RIFs to layoff functions for which funding had lapsed (independently, all at the same time, for the first time in history), those decisions would be final agency action, and reviewable by this Court.  All paths lead to judicial review, and the power of this Court to enjoin and/or stay unlawful government action.

### 4. Article II constitutional supervisory authority to take care laws are faithfully executed does not authorize using a government shutdown to justify RIFs contrary to statute

The Constitution grants no express authority to the President with respect to managing employment at the federal agencies created by Congress, which are creatures of statute.  U.S. Const. art. I, §1 (legislative power); *INS v. Chadha*, 462 U.S. 919 (1983); *Myers*, 272 U.S. at 129; U.S. Const. art I, §8, cl. 18 (Necessary and Proper Clause).  By this legislative power Congress thus "control[s]" the very "existence of executive offices."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd*., 561 U.S. 477, 500 (2010); *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022).  And the Constitution grants the President no law-making authority of his own, with respect to federal employment or any other matter.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. … And the Constitution is

neither silent nor equivocal about who shall make laws which the President is to execute."); *Bowsher v. Synar*, 478 U.S. 714, 721-22 (1986) (quoting James Madison in The Federalist No. 47, p. 325 (J. Cooke ed. 1961.) ("There can be no liberty where the legislative and executive powers are united in the same person.").

Courts have recognized the President's supervisory authority over federal agencies, to ensure that laws that govern those agencies are faithfully executed.  U.S. Const. art. II, §3 (Take Care Clause).  The President's Article II power to supervise federal agencies cannot, of course, accrete to the President the authority to change or ignore the laws that govern those agencies any more than the agencies can change or ignore those laws themselves.  *Youngstown,* 343 U.S. at 587 ("[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."); *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("[N]o provision in the Constitution [] authorizes the President to enact, to amend, or to repeal statutes.").  The President's power to direct agencies extends no further than the powers granted to the agencies themselves, and certainly does not include the authority to order agencies to violate federal law.[36]

### B.    Plaintiffs Face Imminent and Irreparable Harm

As discussed above, Plaintiffs and their members face significant harm from the current scheme to engage in widespread layoffs of federal employees during the government shutdown, even if some subset of those RIF notices are ultimately revised or rescinded.  *Supra* at 12-14.  These actions inflict myriad types of irreparable harm on federal employees, their families and their labor representatives.  For example, federal employee members who will be terminated face irreparable injury from losing their wages and health benefits for themselves and their families, including by having to relocate.  *See supra* at 12-13; *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (loss of health coverage).  Damages are not available in APA cases, making this monetary harm irreparable.  *See Pangea Legal Servs. v. U.S. Dep't of Homeland Security*, 512 F.Supp.3d 966, 976 (N.D. Cal. 2021); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d

---

[36] Defendants may challenge jurisdiction, but the Plaintiff unions easily qualify for associational and organizational standing to challenge actions directly impacting them and their members, and governing law establishes that jurisdiction has not impliedly been removed by any statutory scheme for administrative adjudication.  *See AFGE v. Trump*, 139 F.4th 1020, 1030-33 (9th Cir. 2025).

962, 984 (9th Cir. 2020).  Even those employees who remain either because they are not included in the RIF or receive a RIF that is revoked, will return to radically altered workplaces and have to do more with fewer colleagues with which to share the workload.  Those employees who are ordered to continue working during a shutdown to administer RIFs are put in the untenable position of violating those orders or facing possible criminal penalties for violating the Antideficiency Act.

Finally, employees who receive RIF notices targeted because of their perceived political affiliation (either because they are perceived to be Democrats, because they live and work in a region or city represented by elected officials from the Democratic Party, or because the President and Director Vought perceive the agency or program to be a "Democrat" program) suffer a particularly insidious form of political discrimination and harm.  This intangible harm of political discrimination cannot be remedied after the fact by money—even if it were available in these cases—or by reinstatement, is truly irreparable, and has no place in our modern democracy.

**C.     The Balance of Equities and Public Interest Weigh in Plaintiffs' Favor**

The equities and public interest, which merge when the government is a party, *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024), strongly favor Plaintiffs.  Preserving constitutional and statutory rights "is always in the public interest."  *Melendres*, 695 F.3d at 1002; *see also NTEU v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993); *Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F.Supp.2d 56, 66 (D.D.C. 2004).  The severe threats to the public presented by Defendants' actions necessitate a temporary pause to protect the status quo.  By contrast, the government will save time and money spent on implementing RIFs and then potentially revising those RIFs when funding is restored.  The government will suffer no harm at all from halting efforts to administer employee terminations during a government shutdown, and will continue to function (and ultimately function better) if the status quo is maintained.

Finally, the public has an interest of the highest order in preventing government functions from being unlawfully used for political retribution.  Actions at the highest levels of government that wield executive power to target political opponents threaten the very foundations of our democratic institutions.  The public interest in halting the politically motivated abuse of governmental power is at its zenith in these circumstances and weighs very heavily in favor of issuing a TRO to allow this

Court to hear Plaintiffs' request for preliminary injunction relief that will maintain the status quo while this Court resolves the important issues raised by this case.

## II.     Scope of the Proposed TRO

Plaintiffs have asked for a tailored injunction and/or stay pursuant to 5 U.S.C. §705 that protects Plaintiffs and their members.  RIFs, if properly conducted, require a balancing and assessment of the respective retention rights of all those employees impacted. *Supra* at 17-18. Because halting a RIF for Plaintiffs and their members necessarily is intertwined with the assessment of retention preferences and the administration of the entire RIF, Plaintiffs and their members cannot simply be excised from any RIF plans.  Defendants have also determined (in the OMB Lapse Memorandum) that RIFs should apply to what Defendants call entire PPAs (programs, positions, or activities).  Huddleston Decl. Ex. A at 1.  Relief necessary to protect Plaintiffs and the employees they represent requires enjoining any RIFs that include employees represented by Plaintiffs. Plaintiffs have therefore moved the Court to enjoin any RIF that impacts any program, position or activity (PPA) that includes any federal employee represented by Plaintiffs.  These include employees at all agencies currently named as Defendants in this case.

Plaintiffs have also moved the Court for disclosure of information pertaining to the scope of any imminent RIFs, to further this Court's consideration of injunctive relief to maintain the status quo through the duration of this lawsuit.  In previous cases involving similar personnel actions, the Administration has not revealed the scope of enjoined actions until briefing at the appellate level, and Plaintiffs seek to foreclose such tactics by an order requiring Defendants to reveal their actions now, for this Court's consideration.  *E.g., AFGE v. Trump*, Case No. 25-cv-3698-SI (ECF No. 232).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court grant this Motion and enter the accompanying proposed temporary restraining order and/or an order to show cause.

Respectfully submitted,

DATED: October 4, 2025

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
Robin S. Tholin
Talia Stender
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com
rtholin@altber.com
tstender@altber.com

By: */s/ Danielle Leonard*

*Attorneys for All Plaintiffs*

Elena Goldstein (pro hac vice app. forthcoming)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 322-1959
egoldstein@democracyforward.org

*Attorneys for All Plaintiffs*

Norman L. Eisen (pro hac vice app. forthcoming)
Craig Becker (pro hac vice app. forthcoming)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Tel: (202) 594-9958
Norman@democracydefenders.org
Craig@democracydefenders.org

*Attorneys for All Plaintiffs*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, D.C. 20001

1   Tel: (202) 639-6426
    Sanghr@afge.org

2

3   *Attorneys for Plaintiffs American Federation of*
    *Government Employees, AFL-CIO (AFGE) and AFGE*

4   *locals*

5

6   Teague Paterson (SBN 226659)
    AMERICAN FEDERATION OF STATE, COUNTY,

7   AND MUNICIPAL EMPLOYEES, AFL-CIO
    1625 L Street, N.W.

8   Washington, D.C. 20036
    Tel: (202) 775-5900

9   TPaterson@afscme.org

10  *Attorneys for Plaintiff American Federation of State*
    *County and Municipal Employees, AFL-CIO (AFSCME)*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28