Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*

[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 3:25-cv-03698-SI |
| Plaintiffs, | **PLAINTIFFS' MEMORADUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................3

I.    FEMA's Statutory Mandate and Workforce .............................................................3

    A.    FEMA's Mandate and Required Functions Before, During, and After Disasters ............................................................................................3

    B.    The FEMA Workforce ......................................................................6

    C.    FEMA's Chronic Staffing Shortages..............................................10

II.    The Unlawful Directive to Reduce FEMA's Workforce .........................................12

    A.    This Presidential Administration's Efforts to Reduce and Undermine FEMA ...............................................................................................12

    B.    The DHS December 2025 Directive to Cut FEMA Staffing in Half ...........14

        1.    DHS gives FEMA target cuts .............................................14

        2.    DHS orders FEMA to begin cuts on New Year's Eve .....................16

        3.    The temporary winter storm pause .............................................19

III.    The Impact of These Cuts on FEMA's Functions and Plaintiffs .............................19

    A.    Cutting FEMA Staff Will Eliminate FEMA's Ability to Function ..............19

    B.    Impact on Local Governments and Public Employees Represented by AFSCME and SEIU ........................................................................22

    C.    Impact on Plaintiff AFGE and FEMA Employees........................................25

ARGUMENT .......................................................................................................................27

I.    Plaintiffs Are Likely to Succeed on the Merits ....................................................27

    A.    The Actions of DHS and FEMA Are Contrary to Law................................27

        1.    FEMA cannot fulfill its statutory obligations without adequate personnel ......................................................................27

        2.    The Post-Katrina Act prohibits DHS from impairing FEMA's ability to perform its missions, authorities, and responsibilities........................................................................31

        3.    The Continuing Resolution prevents the reduction of CORE positions..............................................................................32

    B.    The Actions of DHS and FEMA Are Arbitrary and Capricious ..................33

C.    The Challenged Actions Are Final for Purposes of the APA ........................35

II.    All Other Factors Weigh in Plaintiffs' Favor ................................................................36

A.    The Actions of DHS and FEMA Are Causing Irreparable Harm ................36

1.    AFGE and the CORE employees suffer ongoing harm.....................36

2.    Local governments and the state and local government
employees represented by AFSCME suffer irreparable harm...........37

B.    The Balance of Equities and Public Interest Support a TRO ......................39

III.    Scope of Relief Necessary to Prevent Harm to Plaintiffs...........................................40

CONCLUSION ........................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AFGE v. OMB*,
    2025 WL 3654116 (N.D. Cal. Dec. 17, 2025) ...................................................................39, 40

*AFGE v. Trump*,
    139 F.4th 1020 (9th Cir. 2025) ...........................................................................28, 36, 39, 40

*AFGE v. Trump*,
    782 F.Supp.3d 793 (N.D. Cal.) .......................................................................................... 38

*AFSCME v. OMB*,
    2025 WL 3018250 (N.D. Cal. Oct. 28, 2025) .............................................................36, 37, 39

*Am. Libr. Ass'n v. Sonderling*,
    2025 WL 1262054 (D.D.C. May 1, 2025) ........................................................................ 39

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...................................................................................................35, 36

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ............................................................................................. 38

*Center for Biological Diversity v. U.S. Fish and Wildlife Serv.*,
    67 F.4th 1027 (9th Cir. 2023) ........................................................................................... 34

*County of Santa Clara v. Noem*,
    2025 WL 3251660 (N.D. Cal. Nov. 21, 2025) ................................................................... 13

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ......................................................................................................33, 34

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ............................................................................................. 36

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ......................................................................................................... 33

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
    82 F.4th 664 (9th Cir. 2023) ............................................................................................. 40

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
    512 F.3d 1112 (9th Cir. 2008) ........................................................................................... 37

*Illinois v. FEMA*,
    801 F.Supp.3d 75 (D.R.I. 2025) ....................................................................................... 13

*Illinois v. Noem*,
　2025 WL 3707011 (D.R.I. Dec. 22, 2025) ........................................................... 13

*Kaweah Delta Health Care Dist. v. Becerra*,
　123 F.4th 939 (9th Cir. 2024) ........................................................................... 27

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
　752 F.3d 755 (9th Cir. 2014) ............................................................................. 38

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
　571 F.3d 873 (9th Cir. 2009) ............................................................................. 40

*Michigan v. Noem*,
　2025 WL 3720147 (D. Or. Dec. 23, 2025) ......................................................... 13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983) ........................................................................................... 34

*Mt. Diablo Hosp. v. Shalala*,
　3 F.3d 1226 (9th Cir. 1993) ............................................................................... 34

*Murphy Co. v. Biden*,
　65 F.4th 1122 (9th Cir. 2023) ........................................................................... 27

*New York v. Kennedy*,
　789 F.Supp.3d 174 (D.R.I. 2025) ...................................................................... 28

*New York v. McMahon*,
　784 F.Supp.3d 311 (D. Mass. 2025) .................................................................. 38

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
　465 F.3d 977 (9th Cir. 2006) ............................................................................. 35

*Pangea Legal Servs. v. U.S. Dep't of Homeland Security*,
　512 F.Supp.3d 966 (N.D. Cal. 2021) ................................................................. 36

*Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*,
　128 F.4th 1089 (9th Cir. 2025) ......................................................................... 35

*Regents of the Univ. of Cal. v. Am. Broad. Cos.*,
　747 F.2d 511 (9th Cir. 1984) ............................................................................. 40

*Sackett v. E.P.A.*,
　566 U.S. 120 (2012) ......................................................................................... 36

*Tanner Motor Livery, Ltd. v. Avis, Inc.*,
　316 F.2d 804 (9th Cir. 1963) ............................................................................. 40

*Washington v. Fed. Emergency Mgmt. Agency*,
　2025 WL 3551751 (D. Mass. Dec. 11, 2025) ........................................... 13, 28, 32

*Washington v. FEMA,*
    2025 WL 2229394 (D. Mass. Aug. 5, 2025) ........................................................ 13

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................................... 27

*Wolford v. Lopez,*
    116 F.4th 959 (9th Cir. 2024) ............................................................................ 39


**Federal Statutes**

5 U.S.C.
    § 704 ................................................................................................................. 35
    § 706 ................................................................................................................. 27

6 U.S.C.
    §§ 311-323 ................................................................................................. 4, 27
    § 313 ...................................................................... 1, 3, 4, 5, 12, 27, 28, 29
    § 314 .............................................................................. 3, 4, 28, 29, 30
    § 315 ............................................................................................... 1, 5, 32
    § 316 ......................................................................................... 1, 5, 6, 31, 32
    § 317 ............................................................................................. 5, 28, 29, 30
    § 319 ................................................................................................................. 28
    § 320 ................................................................................................................. 28
    § 321 ............................................................................................................ 28, 29
    § 452 .............................................................................................................. 6, 32
    §§ 711-825 .................................................................................................. 4, 27
    § 721 ................................................................................................................. 28
    § 724 ................................................................................................................. 29
    §§ 725-26 .......................................................................................................... 28
    §§ 743-44 .......................................................................................................... 28
    § 746 ................................................................................................................. 27
    § 748 ................................................................................................................. 28
    §§ 749-53 .......................................................................................................... 28
    § 762 ................................................................................................................. 28
    §§ 771-775 ........................................................................................................ 29
    § 791 ................................................................................................................. 28
    § 796 ................................................................................................................. 29

42 U.S.C.
    §§ 5121-5207 .................................................................................................... 27
    § 5122 ................................................................................................................. 3
    § 5136 ............................................................................................................... 28
    § 5144 ...................................................................................................... 4, 29, 30
    § 5149 ...................................................................................................... 6, 9, 33
    § 5165 ............................................................................................................... 27

§ 5195 ....................................................................................................................28
§ 5196 ....................................................................................................................28
§ 5197 ....................................................................................................................28
§ 5204 ....................................................................................................................29

Pub. L. No. 100-707 (1988) ........................................................................................3

Pub. L. No. 107-296 (2002) ........................................................................................5

Pub. L. No. 109-295 (2006) ...................................................................................3, 28

Pub. L. No. 113-2 (2013) .......................................................................................3, 28

Pub. L. No. 115-254 (2018) ...................................................................................3, 28

Pub. L. No 119-37 (2025) .........................................................................................33

Pub. L. No. 119-75 (2026) ....................................................................................1, 33

**Other Authorities**

Executive Order 12127, 44 Fed. Reg. 19367 (Mar. 31, 1979) ........................................3

Executive Order 14180, 90 Fed. Reg. 8743 (Jan. 24, 2025) ...................................12, 14

Executive Order 14239, 90 Fed. Reg. 13267 (Mar. 18, 2025) ......................................12

Executive Order 14356, 90 Fed. Reg. 48387 (Oct. 15, 2025) ......................................15

Notice of Meeting, 90 Fed. Reg. 54360 (Dec. 11, 2025) .............................................14

1

**INTRODUCTION**

2     For years, Defendant Federal Emergency Management Agency ("FEMA") has performed

3     critical disaster and emergency prevention, relief, and recovery work nationwide while operating

4     below staffing levels necessary to fulfill its mandate: "to reduce the loss of life and property and

5     protect the Nation from all hazards, including natural disasters, acts of terrorism, and other man-

6     made disasters, by leading and supporting the Nation in a risk-based, comprehensive emergency

7     management system of preparedness, protection, response, recovery, and mitigation." 6 U.S.C.

8     §313(b)(1).[1] FEMA itself has repeatedly acknowledged its compelling need to *increase* staffing to

9     perform the functions mandated by Congress.

10    Congress expanded these mandatory duties in the wake of disasters like Hurricanes Katrina

11    and Sandy.[2] After Hurricane Katrina, in order to ensure FEMA's independence and protect its

12    staffing levels from interference, Congress transferred supervisory authority over FEMA away

13    from Defendant Department of Homeland Security ("DHS") and expressly prohibited the DHS

14    Secretary from reducing or transferring FEMA personnel or funding. *E.g.*, 6 U.S.C. §§315, 316.

15    Further, to protect *all* federal agencies (including FEMA) from workforce reductions,

16    Congress has recently banned further reduction of all federal employee positions government-wide

17    through appropriations legislation including Section 120(a) of the November 12, 2025 Continuing

18    Resolution, which has been extended through mid-February 2026. *See* Consolidated

19    Appropriations Act, 2026, Pub. L. No. 119-75, Div. H, §101.

20    Contrary to all these congressional mandates and the needs of the agency, Defendants

21    President Donald J. Trump and DHS Secretary Kristi Noem have repeatedly expressed their desire

22    to "eliminate" or dramatically reduce FEMA's staff and functions, to serve the stated goal of

23    pushing sole responsibility for disaster relief to state and local governments. To further this

24    objective, in December 2025, DHS and Secretary Noem unlawfully usurped FEMA's *exclusive*

25

26    [1] *See* Declaration of AFGE Local 4060 President Khaalis Jackson, Exs. H-J (attaching recent GAO reports on FEMA understaffing and its impact on disaster response).

27    [2] Jackson Decl. Exs. M, N (FY2025 and FY2026 FEMA Congressional Budget Justifications, requesting funding for increased staff); Ex. H (2023 GAO Report addressing FEMA's internal staffing need projections); Ex. P (the FEMA Katrina Declaration, a petition of current and former FEMA employees addressed to Trump Administration's efforts to reduce and undermine FEMA).

28

statutory authority to manage its own functions, defied Congress's ban on reducing positions, and ignored FEMA's statutory mandate, by directing rolling separations of FEMA employees aimed at cutting the agency staff *in half this year,* eliminating over 11,000 positions.

DHS began by targeting a category of disaster relief employees authorized by the 1988 Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act") called the Cadre of On-Call Response/Recovery Employees ("CORE"). DHS ordered that as of December 31, 2025 FEMA lacked authority to renew *any* CORE employees past their statutory employment term expiration dates, known as "Not to Exceed" dates or "NTEs," and directed FEMA to send notices separating CORE employees beginning January 1, 2026. As a result, in January 2026, hundreds of full-time FEMA employees were given abrupt—in some cases, even *same day*—notice of their termination from federal employment.

After three weeks of terminations, on January 22, 2026, DHS announced a temporary "pause" in anticipation of a severe winter storm. Even during this pause, many NTEs passed without either renewal or notice of nonrenewal, leaving employees in uncertain limbo. And now, multiple sources confirm that the pause will be lifted imminently, so thousands more CORE employees are slated for separation in the coming days, weeks, and months on their NTE dates.

DHS's decision to impose a workforce reduction plan that involved removing all FEMA authority to maintain its CORE workforce, eliminating CORE positions on their NTE dates, and reducing FEMA staffing by 50 percent is not based on any considered assessment of function or agency need. These terminations have all been directly contrary to the recommendations of FEMA supervisors, who approved these positions for renewal, and to FEMA's past practice of uniformly (with few exceptions) renewing these positions based on agency need. The result will be to incapacitate the agency and its ability to respond to the year-round threat of disasters, risking a repeat of the tragedy of Hurricane Katrina, which Congress vowed would never again occur.

Congress, not DHS or the President, establishes FEMA's mandatory functions. DHS and Secretary Noem's actions defy statutory mandates and, unless enjoined, will cause further irreparable injury to FEMA employees, the federal employee union that represents them, and local governments that rely on FEMA's staff and services. Plaintiffs seek a TRO and order to show

cause why a preliminary injunction should not issue to reestablish the status quo by restoring the CORE employees who were separated in January 2026, halting any further DHS interference with FEMA functions or personnel, and halting further separations of CORE or other employees in service of this unlawful workforce reduction plan.[3]

**BACKGROUND**

**I.    FEMA's Statutory Mandate and Workforce**

**A.    FEMA's Mandate and Required Functions Before, During, and After Disasters**

Before 1979, disaster relief was largely provided by charitable organizations, localities, states, and a smattering of disparate federal agencies. FEMA was established in 1979 because of the need for a coordinated, unified federal response to major disasters and emergencies, and to assist state and local governments in adequately preparing for and responding to disasters and emergencies across the United States.[4] Since its establishment, Congress has only expanded—and never reduced—FEMA's mission and mandate, including in the 1988 Stafford Act, Pub. L. No. 100-707, 102 Stat. 4689, Post-Katrina Emergency Management Reform Act of 2006, Pub. L. No. 109-295, 120 Stat. 1394, Sandy Recovery Improvement Act of 2013, Pub. L. No. 113-2, 127 Stat. 39, and Disaster Recovery Reform Act of 2018, Pub. L. No. 115-254, 132 Stat. 3438. To support this mission, Congress established federal funding called the Disaster Relief Fund, which funds the vast majority of FEMA's functions and positions.[5]

FEMA's many required "preparedness, protection, response, recovery, and mitigation" functions are set forth in 6 U.S.C. §§313, 314, and 42 U.S.C. Chapter 68. FEMA summarizes its statutory mission as providing federal assistance "before, during, and after" disasters and other emergencies including terrorist attacks.[6] FEMA's response obligations are mobilized by certain presidential declarations of emergency and major disasters, as defined by statute, 42 U.S.C. §5122.

FEMA's five statutorily designated mission areas (preparedness, protection, mitigation,

---

[3] For purposes of this Motion, the moving Plaintiffs include AFGE, AFSCME, SEIU, and the Local Government Plaintiffs.

[4] *See* Executive Order No. 12,127 (Mar. 31, 1979); FEMA website, "History of FEMA," https://www.fema.gov/about/history.

[5] Jackson Decl., Ex. M (CRS, *Disaster Relief Fund State of Play* (Apr. 9, 2025) at *3).

[6] *Id*., Ex. S (Pub. No. 1: *We Are FEMA*); https://www.fema.gov/about/how-fema-works.

response, and recovery, see 6 U.S.C. §313(b)(1)), require a wide range of services to state and local governments, communities and people impacted by emergencies and major disasters.

● Before an emergency or major disasters, FEMA is responsible for mitigation, protection, and preparedness, which includes "planning, training, and building the emergency management profession to prepare effectively for, mitigate against, respond to, and recover from any hazard" and "taking sustained actions to reduce or eliminate long-term risks to people and property from hazards and their effects." 6 U.S.C. §314(a)(9)(A), (B).

● During an emergency and major disaster and in the immediate aftermath, FEMA initiates response efforts, including "conducting emergency operations to save lives and property through positioning emergency equipment, personnel, and supplies, through evacuating potential victims, through providing food, water, shelter, and medical care to those in need, and through restoring critical public services." *Id.* §314(a)(9)(C).

● After an emergency and major disaster, FEMA transitions to recovery work, which involves "rebuilding communities so individuals, businesses, and governments can function on their own, return to normal life, and protect against future hazards." *Id.* §314(a)(9)(D).

Fulfilling these statutory mandates requires substantial federal resources. *See generally* 6 U.S.C. §§313, 314. This includes the provision of grant funding to individuals, community organizations, states, and localities as well as substantial staffing and expertise to assist states and local communities with preparation, mitigation, response, and recovery. *E.g.*, 6 U.S.C. §313(b)(2)(C) (FEMA must "develop a Federal response capability that … can act effectively and rapidly to deliver assistance essential to saving lives or protecting or preserving property or public health and safety in a natural disaster, act of terrorism, or other man-made disaster."); *see generally* 6 U.S.C. §§311-323, 711-825; 42 U.S.C. Chapter 68. For example, FEMA must maintain "at a minimum 3 national response teams" and "sufficient regional response teams, including Regional Office strike teams." 42 U.S.C. §5144(b). Those "Federal emergency response teams [must] consist of adequate numbers of properly planned, organized, equipped, trained, and exercised personnel to achieve the established target capability level." *Id.* §5144(b)(3). The Regional Office teams must include, among other things, "personnel trained in incident management" and "public

affairs, response and recovery, and communications support personnel." 6 U.S.C. §317(f)(1).

As FEMA's own FY2025 Budget Justification to Congress explained, "[l]aws such as the Post Katrina Emergency Management Reform Act, the Post Sandy Recovery Act, and the Homeland Security Act of 2002 have set requirements for FEMA *to gain and maintain capabilities* to not only coordinate the Federal family's ability to provide lifesaving and life sustaining resources and activities during disasters, but to also be the industry leader in training and education of the emergency management field across all levels of society."[7] FEMA's 2026 budget request explained further: "As the nation continues to face an unprecedented number of complex and catastrophic disasters, emergency management has never been more critical. *FEMA must be ready to act at any moment* to support States in disaster recovery."[8]

In light of this mission's importance and complexity, Congress required that the FEMA Administrator be appointed by the President and Senate-confirmed and have "demonstrated ability in and knowledge of emergency management and homeland security." 6 U.S.C. §313(c)(1)-(2). In 2002, Congress moved FEMA into the then-newly created DHS (which consolidated previously independent functions and agencies after the September 11, 2001 tragedy). Homeland Security Act of 2002, Pub. L. No. 107-296 §503, 116 Stat. 2135, 2213. But a few years later, Congress decided that DHS's control impaired FEMA's ability to adequately respond to emergencies and disasters,[9] so the Post-Katrina Act restricted DHS authority over FEMA. 6 U.S.C. §§315, 316.

The Post-Katrina Act transferred "[a]ll functions of the [FEMA]" as well as "all of its personnel, assets, components, authorities, grant programs, and liabilities" back "to the Agency." 6 U.S.C. §315(a)(1). Further, Congress prohibited DHS from changing this structure, mandating that "[t]he Agency shall be maintained as a distinct entity within the Department," 6 U.S.C. §316(a),

---

[7] Jackson Decl., Ex. N (FEMA FY 2025 Congressional Justification at FEMA – O&S - 33) (emphasis added).

[8] *Id*., Ex. O (FEMA FY 2026 Congressional Justification at FEMA - 7) (emphases added).

[9] *Id.*, Ex. Q (*Federal Response to Hurricane Katrina Lessons Learned*). This White House report identifying the "structural flaw[s]" that led to the inadequate federal response to Hurricane Katrina explained that "DHS has spread FEMA's planning and coordination capabilities and responsibilities among DHS's other offices and bureaus. DHS also did not maintain the personnel and resources of FEMA's regional offices." *Id.* at 53. Congress relied heavily on this report in developing the Post-Katrina Act. *See* H. Rep. 109-476, 92-93 (2006).

and removing FEMA from the DHS Secretary's authority to reorganize DHS, including to "allocate or reallocate functions" and "establish, consolidate, alter, or discontinue organizational units." 6 U.S.C. §452; *see* 6 U.S.C. §316(b) ("Section 452 of this title shall not apply to" FEMA).

Congress also expressly prohibited DHS from making "changes to [the] missions" of FEMA, 6 U.S.C. §316(c), including by prohibiting the DHS Secretary from "*substantially or significantly reduc[ing] ... the authorities, responsibilities, or functions of [FEMA] or the capability of [FEMA] to perform those missions, authorities, responsibilities*." 6 U.S.C. §316(c)(1) (emphasis added). Congress also barred DHS from transferring any "asset, function, or mission" to any other DHS unit, 6 U.S.C. §316(c)(2), and expressly reiterated the DHS Secretary's obligation to comply with Congress's instructions in any annual appropriations act with respect to the transfer or reprogramming of appropriated funds, 6 U.S.C. §316(d).

### B. The FEMA Workforce

To serve this broad and complex statutory mandate, FEMA requires a physical presence in its own offices as well as the ability to deploy staff across the country as disasters strike. FEMA is structured with a headquarters in Washington D.C. and ten regional offices, and establishes field offices as necessary.[10] Its employees are organized to provide support for FEMA's functions and services across disasters, and all FEMA employees, including the top levels of management, are typically assigned a disaster relief role in addition to their programmatic position, and are frequently deployed from their programmatic position to the field. Tierney Decl. ¶19.

To fulfill its mandatory functions, FEMA is authorized to employ both permanent civil service employees, who are covered by Title 5 protections, and other full-time employees, who are not. Thus, FEMA may "appoint and fix the compensation of such temporary personnel as may be necessary, without regard to the provisions of Title 5 governing appointments in competitive service." 42 U.S.C. §5149(b)(1). This allows FEMA flexibility to hire under a more streamlined process, including for specific types of expertise demanded by disaster management.[11] These

---

[10] *See* https://www.fema.gov/about/organization/offices-leadership; *see also* https://www.fema.gov/about/regions.

[11] Jackson Decl. Ex. H (GAO, *FEMA Hiring and Staff Shortages* (May 2023) at *12).

1   "Stafford Act" employees are funded through the Disaster Relief Fund.[12]

2        FEMA's Stafford Act employees largely fall into two further categories: CORE and

3   reservists. Coen Decl. ¶5. CORE employees are full-time and, until recently, hired for two-to-four-

4   year terms, renewable according to agency need, and intended to work across disasters rather than

5   being hired for a particular disaster. *Id.* ¶¶5, 17; Tierney Decl. ¶¶11, 25. Reservists are on-call

6   employees who may be activated in a particular emergency, whose terms are also renewable

7   according to agency need. Tierney Decl. ¶22. The vast majority of FEMA's staff fall into these two

8   categories, so are not part of the civil service. According to a recent Government Accounting

9   Office ("GAO") report, FEMA employed 23,620 total staff as of June 1, 2024, of which only

10  approximately 5,100 (fewer than one-quarter) were permanent civil service employees.[13] As of

11  fiscal year 2022, FEMA employed approximately 5,000 Title 5 employees, 9,000 Stafford Act

12  CORE employees, and 8,000 Stafford Act reservists as well as 1,000 other assorted employees.[14]

13       All FEMA employees, including CORE employees, are assigned to position categories:

14  incident management, incident support, ancillary support, and mission essential. The incident

15  management (or "disaster") workforce is comprised of individuals who "deploy to disaster sites to

16  administer federal emergency response and recovery programs," while the latter three groups

17  provide support services to deployed incident management staff and to FEMA more generally.[15]

18  Included in the incident management workforce are statutorily mandated "emergency response

19  teams" and "Regional Office Strike teams," referred to by FEMA as "Federal Incident

20  Management Assistance Teams" ("IMATs"),[16] which are primarily staffed by CORE employees.[17]

21       CORE employees perform roles across nearly every aspect of FEMA's required functions,

22

23       [12] *Id.*, Ex. AA (FEMA Manual 252-11-1, Cadres of On-Call Response/Recovery Employee
24  (CORE) Program), p. 33 ("COREs are hired under a Stafford Act appointment authority and their
    salaries and benefits are funded by the DRF…").
25       [13] *Id.*, Ex. I (GAO, *Disaster Assistance High-Risk Series: Federal Response Workforce
    Readiness* (September 2025) at *9).
26       [14] *Id.*, Ex. H (GAO, *FEMA Hiring and Staff Shortages* (May 2023) at *6).
         [15] *Id.*
27       [16] *Id.*, Ex. G (GAO, *Actions to Implement the Post-Katrina Act* (Nov. 21, 2008)).
28       [17] *Id.*, Ex. K (CRS, *Deployable Federal Assets Supporting Domestic Disaster Response
    Operations: Summary and Considerations for Congress* (May 13, 2015)).

1  but are overwhelmingly assigned to the disaster workforce, which provides services directly to the

2  public and to state, local and tribal governments.[18] The disaster workforce is further divided into 23

3  subject matter "cadres."[19] The cadres are overseen by cadre management teams, which themselves

4  are comprised of CORE employees, which ensure FEMA's deployable disaster workforce is

5  properly trained and mobilize the cadres when necessary.[20] Of the cadres, the largest are individual

6  assistance, public assistance, logistics, hazard mitigation, and disaster survivor assistance, which

7  collectively make up about two-thirds of FEMA's disaster workforce.[21] CORE and reservist

8  employees assigned to these cadres perform functions as set forth below.

9      *Individual assistance:* These employees work to "ensure[] that individuals and families

10  affected by disasters have access to the full range of FEMA programs and information in a timely

11  manner."[22] This includes "communicating with applicants about their case status and disaster

12  assistance programs; coordinating disaster resources with state, local and non-governmental

13  organizations; developing partnerships with stakeholders; and supporting the delivery of lifesaving,

14  life-sustaining services."[23] FEMA's programs include mass care/emergency assistance; individuals

15  and households program assistance; disaster case management; crisis counseling assistance;

16  disaster legal services; disaster unemployment assistance; and voluntary agency coordination.[24]

17      *Public assistance:* These employees "assist[] state, local, Tribal Nation, and territorial

18  (SLTT) governments and certain types of private nonprofit (PNP) organizations so that

19

20

---

21      [18] *See* Tierney Decl. ¶¶11-14; Burton Decl. ¶16.

22      [19] Jackson Decl. Ex. H (GAO, *FEMA Hiring and Staff Shortages* (May 2023) at *7).

       [20] *Id*., Ex. V (FEMA, *FEMA Cadre Management Guide* (Oct. 2014) at *6-8, 45-46).

23      [21] *Id*., Ex. H (GAO, *FEMA Hiring and Staff Shortages* (May 2023) at *7-8). The complete list
    of cadres includes: Acquisitions, Alternative Dispute Resolution, Civil Rights, Disability

24  Integration, Disaster Emergency Communications, Disaster Field Training Operations, Disaster
    Survivor Assistance, Environmental Historic Preservation, External Affairs, Field Leadership,

25  Financial Management, Hazard Mitigation, Human Resources, Individual Assistance, Information
    Technology, Logistics, Interagency Recovery Coordination, Office of Chief Counsel, Operations,

26  Planning, Public Assistance, Safety, and Security. *Id*.

       [22] https://www.fema.gov/careers/paths/cadres.

27      [23] *Id.*

28      [24] Jackson Decl. Ex. T (FEMA, *Individual Assistance Program and Policy Guide (IAPPG)*
    (May 2021)).

PLAINTIFFS' MEM. ISO MOTION FOR TRO, No. 3:25-cv-03698-SI

communities can quickly respond to and recover from major disasters or emergencies."[25] They "provide[] supplemental federal grant assistance for debris removal, emergency protective measures, and the restoration of disaster-damaged, publicly owned facilities, and specific facilities of certain PNP organizations."[26]

*Logistics:* These employees "coordinate[] and monitor[] all aspects of resource planning, movement, ordering, tracking, and property management of Initial Response Resources, teams, and accountable property during the life of an incident." This cadre is "responsible for the operational readiness in support of FEMA's incident workforce."[27]

*Hazard mitigation*: These employees "promote risk reduction activities from all-natural hazards through community engagement" and "promote[] awareness of the benefits of hazard mitigation through public education, encourage[] private sector partnership, and provide[] technical assistance to local and state governments in the form of grants management, community planning, and floodplain management."[28]

*Disaster survivor assistance*: This is the "boots on the ground" cadre that "establishes a timely presence at every disaster, primarily focusing on addressing the needs of disaster survivors by collecting targeted information to support leadership and operational decision-making, providing accessible, in-person case-specific information and referrals, providing referrals to whole community partners, as needed, and identifying disability-inclusive public information needs so strategic messaging can be developed and disseminated."[29]

CORE employees are hired under Stafford Act statutory authority, not by contract. 42 U.S.C. §5149(b)(1).[30] FEMA assesses and approves each position based agency need.[31] Because the Stafford Act designates these as "temporary" positions, CORE and reservist employees are

---

[25] *Id.*, Ex. U (FEMA, *Public Assistance Program and Policy Guide* (Jan. 6, 2025)).

[26] *Id.*

[27] https://www.fema.gov/careers/paths/cadres.

[28] *Id.*

[29] *Id.*

[30] Jackson Decl., Ex. AA (FEMA Core Manual) at p. 33 ("COREs are hired under a Stafford Act appointment authority and their salaries and benefits are funded by the DRF…").

[31] *Id.* at pp. 25-26.

1    given "not-to-exceed" ("NTE") dates.[32] This date is recorded in standardized employment records,

2    including the SF-52, which are used government-wide for Title 42 "temporary" term employees.[33]

3    Prior to an employee's NTE, the employee and supervisor submit renewal paperwork that includes

4    the supervisor's approval.[34] Historically, CORE employee renewals were approved by FEMA

5    supervisors with no DHS involvement. Coen Decl. ¶18; Tierney Decl. ¶26.[35]

6            Although CORE employees are hired under Stafford Act statutory authority for a set term,

7    their employment has historically been routinely renewed. *See* Blanton Decl. ¶9; Nelson Decl.

8    ¶8; Fleming Decl. ¶16; Coen Decl. ¶17; Tierney Decl. ¶28. Many CORE employees have worked

9    for FEMA for years. *E.g.*, Fleming Decl. ¶4; Heath Decl. ¶4; Shell Decl. ¶3; Prell Decl. ¶4.

10           **C.    FEMA's Chronic Staffing Shortages**

11           In recent years, FEMA has acknowledged it is operating well below staffing levels required

12   to perform statutory functions. As explained in a 2023 GAO report, FEMA's calculations of the

13   baseline number of required staff identified a *35 percent* gap in FEMA's disaster workforce

14   (largely comprised of CORE employees): "As of the beginning of fiscal year 2022, FEMA had a

15   disaster force strength of approximately 11,400 employees, creating an overall staffing gap of

16   approximately 6,200 staff (35 percent) across different positions and cadres." FEMA likewise "fell

17   short of its yearly staffing target between 2019 and 2022."[36] A 2025 GAO report noted that this

18   "gap" between the necessary and actual staffing "continues to grow."[37] Although FEMA had aimed

19   to increase the disaster workforce to hit the "target of 17,670 disaster employees across all cadres"

20   by "fiscal year 2024," it "*has since pushed it out to fiscal year 2026.*"[38]

21

22   _____

     [32] *Id.*

23   [33] Jackson Decl. ¶19.

     [34] *E.g.*, Shell Decl. ¶17; Newton Decl. ¶11.

24   [35] *See, e.g.*, Jackson Decl. Ex. V (*FEMA Cadre Management Guide* (October 2014), at *13

25   (first line supervisors of incident management CORE employees are responsible for, in
     consultation with second line supervisors, "terminat[ing] or renew[ing] the appointments of IM
     COREs […] as required based on lack of work or other mission-related needs).

26   [36] *Id.*, Ex. I (GAO, *Disaster Assistance High-Risk Series: Federal Response Workforce
     Readiness* (Sept. 2025) at *7); *see also id.* Ex. J (GAO, *Disaster Assistance High-Risk Series: State

27   and Local Response Capabilities* (Dec. 18, 2025).

     [37] *Id.*, Ex. I (Sept. 2025 GAO Report).

28   [38] *Id.*, Ex. H (GAO, *FEMA Hiring and Staff Shortages*, (May 2023) at *17-18).

1    FEMA's 2025 budget justification warned that the ongoing gap in its incident management

2    workforce was "creating operational performance risk" that could render it unable to provide "the

3    disaster response and recovery operations it is responsible for leading and supporting."[39] Recent

4    events, including probationary employee terminations and the Deferred Resignation Program, have

5    exacerbated this problem.[40] FEMA's 2026 budget justification sought an *increase* of over 1,000

6    full-time equivalents from the prior year to "help close capability and performance gaps."[41]

7        Chronic understaffing has impaired FEMA's ability to provide disaster-related services. As

8    the GAO explained, FEMA "faced workforce challenges related to the concurrent nature of the

9    disasters, disaster workforce capacity, and training gaps during Hurricanes Helene and Milton and

10   the 2025 Los Angeles wildfires."[42] FEMA employees explain that this chronic understaffing has at

11   times impaired the agency's ability to provide key services like individual post-disaster assistance.

12   *See* Fleming Decl. ¶9 ("We have nowhere near the level of staffing needed to meet our applicants'

13   basic needs."); *id.* at ¶6 (FEMA's understaffing meant individuals calling for assistance following

14   the 2017 hurricanes had to wait on hold for "18 or 19 hours" at a time, even with FEMA employees

15   working "10-14 hour days, 7 days a week"); *id.* at ¶9 (in 2025 FEMA was "so understaffed" that it

16   required "every single individual assistance inspector the agency had in order to make all the

17   eligibility determinations needed" in response to "a relatively mild disaster"); Nelson Decl. ¶14

18   (Region 8 Grants Division only has 4 of the 18 employees they had at the beginning of 2025);

19   Burton Decl. ¶10 ("[T]he significant attrition caused by the 2025 deferred resignation programs,

20   combined with the hiring freeze that has been in place over the last year, has resulted in FEMA

21   losing—and being unable to replace—many of our experienced employees who were trained and

22   certified to perform certain disaster response roles."); Tierney Decl. ¶¶28, 32; Coen Decl. ¶26.

23

24

25   _____

     [39] *Id.*, Ex. N (FEMA FY 2025 Congressional Justification at FEMA – O&S - 51).

26   [40] *Id.*, Ex. I (GAO, *Disaster Assistance High-Risk Series: Federal Response Workforce Readiness* (Sept. 2025) at *12-13).

27   [41] *Id.*, Ex. O (FEMA FY 2026 Congressional Justification at FEMA - 7 )

     [42] *Id.*, Ex. I (GAO, *Disaster Assistance High-Risk Series: Federal Response Workforce*

28   *Readiness* (Sept. 2025) at *7).

## II.    The Unlawful Directive to Reduce FEMA's Workforce

### A.    This Presidential Administration's Efforts to Reduce and Undermine FEMA

Since January 20, 2025, President Trump has refused to nominate a FEMA Administrator to the Senate, as required by 6 U.S.C. §313(c).[43] Various individuals (without disaster relief backgrounds) have held the role of Senior Official Performing the Duties of FEMA Administrator, including Cameron Hamilton (from January 2025 to May 8, 2025), David Richardson (May 9, 2025 to November 17, 2025), and Karen Evans (December 1, 2025 to the present).[44]

Meanwhile, President Trump has repeatedly stated that FEMA should be eliminated and disaster relief returned to state and local governments.[45] On January 24, 2025, President Trump issued Executive Order 14180 creating a "Council to Assess the Federal Emergency Management Agency" to engage in a "full-scale review" of FEMA and directing the Council to "evaluat[e] whether FEMA can serve its functions as a support agency, providing supplemental Federal assistance, to the States rather than supplanting State control of disaster relief." 90 Fed. Reg. 8743 (Jan. 24, 2025). On March 18, 2025, the President issued a further Executive Order 14239 (Achieving Efficiency Through State and Local Preparedness), declaring the official federal "policy" that "State and local governments and individuals play a more active and significant role in national resilience and preparedness…." 90 Fed. Reg. 13267 (Mar. 18, 2025).

DHS Secretary Noem shares that view, announcing at a March 24, 2025 Cabinet meeting that "we're going to eliminate FEMA."[46] Around the same time, Secretary Noem held a meeting of advisors to discuss options for eliminating FEMA, including advocating "winding down" the agency by the end of the year and rescinding the FEMA Advisory Council Executive Order to allow this process to move more quickly.[47] Secretary Noem admitted during this time frame that

---

[43] *Id.*, Ex. R (June 9, 2025 Letter from United States Senators to President Trump).

[44] *See* Shively Decl., Ex. N (CNN, *'She's the enforcer': New FEMA chief led effort to rein in agency spending, strip funding from Muslim groups, sources say*, (Nov. 24, 2025)).

[45] *See id.*, Ex. B (NPR, *Trump wants states to handle disasters. States aren't prepared* (March 21, 2025)); *id.*, Ex. I (NPR, *The Trump administration says it wants to eliminate FEMA. Here's what we know* (June 26, 2025)).

[46] Shively Decl., Ex. C (Government Executive, *FEMA set for elimination, Noem says, amid bipartisan House reform proposal* (March 24, 2025)).

[47] *Id.*, Ex. D (Politico, *New Noem plan leaves FEMA on the chopping block* (March 26, 2025)).

1    winding down FEMA would require Congressional action.[48]

2        On May 6, 2025, Secretary Noem again stated, in testimony to Congress, her intent to

3    eliminate FEMA.[49] The next day, then-acting FEMA administrator Hamilton testified in response

4    that FEMA was vital to communities "in their greatest times of need" and that it was not in the

5    "best interest of the American people to eliminate [FEMA]."[50] The next day, he was fired.[51] It was

6    later reported that Secretary Noem had required Mr. Hamilton, before he was fired, to draft a memo

7    setting forth how FEMA could "abolish itself and create a re-branded, radically smaller disaster

8    response organization."[52] This memo acknowledged that many of the proposed changes could not

9    be implemented "without the engagement and action of Congress," and that most states are

10   "unprepared" to assume these roles. *Id*. Among the names proposed for any smaller agency that

11   would remain was the "National Office of Emergency Management," or "NOEM." *Id*.

12       Throughout 2025, DHS and FEMA implemented the Administration's plan to radically

13   reduce FEMA's function by cutting programs and imposing conditions on state and local

14   governments' receipt of statutorily mandated federal grants.[53] Litigation followed, and these actions

15   have been uniformly enjoined as unlawful.[54]

16       The Advisory Council eventually met in May, July, and August 2025 and debated proposals

17   for FEMA reform.[55] At the first meeting, Secretary Noem (co-chair of the Council) said, "The

18

19       [48] *Id.*, Ex. A (USA Today, *Trump should 'get rid' of FEMA, Homeland Security chief Kristi Noem says* (Feb. 10, 2025)).

20       [49] *Id.*, Ex. G (New York Times, *Leader of FEMA Is Dismissed as Trump Administration Takes Aim at the Agency* (May 8, 2025)).

21       [50] *Id.*

22       [51] *Id.*

23       [52] *Id.*, Ex. H (Bloomberg News, *'Abolishing FEMA' Memo Outlines Ways for Trump to Scrap Agency* (June 16, 2025)).

24       [53] *E.g.*, *id.*, Ex. I (NPR, *The Trump Administration says it wants to eliminate FEMA. Here's what we know* (June 26, 2025)).

25       [54] *E.g.*, *id.*, Ex. F (The HILL, *Judge finds FEMA withholding grants in violation of court order,* (Apr. 4, 2025)). *See also County of Santa Clara v. Noem*, 2025 WL 3251660 (N.D. Cal. Nov. 21, 2025) (granting preliminary injunction); *Washington v. FEMA*, 2025 WL 2229394 (D. Mass. Aug. 5, 2025) (same); *id.*, 2025 WL 3551751 (D. Mass. Dec. 11, 2025) (granting summary judgment to plaintiffs); *Illinois v. FEMA*, 801 F.Supp.3d 75 (D.R.I. 2025) (same); *Illinois v. Noem*, 2025 WL 3707011 (D.R.I. Dec. 22, 2025) (same); *Michigan v. Noem*, 2025 WL 3720147 (D. Or. Dec. 23, 2025) (same).

26

27

28       [55] https://www.dhs.gov/federal-emergency-management-agency-review-council.

president and I have had many, many discussions about this agency. I want to be very clear. The President wants it eliminated as it currently exists. He wants a new agency."[56] In November 2025, it was widely reported that Secretary Noem was "at odds" with the Council and "instead of further shrinking and dismantling FEMA, the FEMA Review Council wants to make it more independent."[57] The draft Council report recommended elevating FEMA to a Cabinet agency and removing it from DHS supervision. *Id*. But according to multiple press accounts, Secretary Noem reduced the draft Council report from 160 pages to 20 pages and altered the recommendations.[58] "*Noem's revisions also include a recommendation to further cut FEMA staff by about half* and have FEMA only handle debris removal and emergency protective measures when responding to a disaster, moving most of its other work—such as helping repair damaged utilities, roads and bridges, public buildings and parks—to other agencies …." *Id*. (emphasis added).

The Council was scheduled to approve and release its final report at a December 11, 2025 meeting (*see* 90 Fed. Reg. 54360). On December 10, 2025, CNN reported on the draft report, confirming Noem's recommendation to cut FEMA staff by half.[59] The December 11 meeting was then abruptly cancelled, and the Council has not to date released that report (missing the deadline set by Executive Order 14180).[60] The DHS website states only: "The FEMA Review Council's meeting has been postponed. We will keep you apprised of the new date as soon as possible."[61]

**B.    The DHS December 2025 Directive to Cut FEMA Staffing in Half**

**1.    DHS Gives FEMA Target Cuts**

On December 23, 2025, management employees across FEMA received an email directing

---

[56] Shively Decl., Ex. I (NPR, *supra*, n.53).

[57] *Id.*, Ex. K (Washington Post, *Noem at odds with Trump-appointed panel over future of FEMA* (Nov. 19, 2025)); *see also id.*, Ex. L (New York Times, *Trump Wanted to Abolish FEMA. His Own Advisers Disagree* (Nov. 21, 2025)).

[58] Shively Decl. Ex. K (W.Post, *supra*, n.57); *id.*, Ex. M (AP News, *Trump administration makes major changes to a report it commissioned on FEMA reforms, AP sources say* (Nov. 21, 2025)).

[59] Shively Decl., Ex. P (CNN, *Exclusive: Trump's FEMA council to recommend dramatic downsizing and overhaul – but not elimination – of the agency* (Dec. 10, 2025)).

[60] *Id.*, Ex. Q (CNN, *White House officials abruptly postpone final meeting of Trump-created FEMA task force* (Dec. 11, 2025)).

[61] https://www.dhs.gov/federal-emergency-management-agency-review-council.

them to plan for a 50 percent reduction of the FEMA workforce in the coming months.[62] While the instructions were described as a "planning exercise," the email required management to identify which employees to retain as necessary and which could be cut. The email attached a spreadsheet for management to complete with "target" cuts for Fiscal Year 26 prepopulated to total 50 percent of the workforce (a reduction of 11,567 positions). ECF 298 ¶474.[63] The sheet included specific target cuts, including a 15 percent reduction in "Permanent Fulltime" (*i.e.* Title 5 civil service), from 4,956 to 4,200 positions; a 41 percent reduction for "Disaster Fulltime" (*i.e.* CORE employees) from 10,571 to 6,200; and an 85 percent reduction of the "Surge Workforce" (*i.e.* reservists) from 7,540 to 1,100. ECF 298 ¶475.[64]

The December 23 email stated that these actions were being taken consistent with the Office of Management and Budget ("OMB") and Office of Personnel Management ("OPM") memorandum implementing Executive Order 14356.[65] This Executive Order and OMB/OPM memorandum required every agency including DHS to submit a "final" "Annual Staffing Plan" that reflected proposed reductions by December 1, 2025, and quarterly updates thereafter. EO 14356, §2(c).[66] Neither OMB, OPM, nor DHS has made public any Annual Staffing Plan for DHS or FEMA, nor disclosed these "final" plans to FEMA employees. Jackson Decl. ¶¶30–35. FEMA Officials were reportedly "stunned and pointed out that getting rid of nearly half of the nation's disaster workforce would greatly harm communities in various stages of disaster recovery."[67]

To achieve the 41 percent reduction in CORE employees, DHS ordered FEMA not to

---

[62] Jackson Decl., Ex. C (CNN, *FEMA planning exercise envisioned deep workforce cuts, adding to uncertainty around agency's future* (Jan. 5, 2026)); *id.*, Ex. E (Washington Post, *Emails outline potential cuts affecting thousands of FEMA disaster responders* (Jan. 5, 2026)); *id.*, Ex. D (Federal News Network, *Concerns mount over FEMA staff reductions* (Jan. 8, 2026)).

[63] Jackson Decl., Ex. C (CNN, *supra* n.62); *id.*, Ex. E (Washington Post, *supra* n.62); *id.*, Ex. D (Federal News Network, *supra* n.62).

[64] The spreadsheet does not exactly track the terminology used within FEMA for its workforce. The numbers used suggest that it includes Stafford Act reservists in the "surge" category.

[65] Jackson Decl., Ex. C (CNN, *supra* n.62); *id.*, Ex. E (Washington Post, *supra* n.62); *id.*, Ex. D (Federal News Network, *supra* n.62).

[66] *See* OMB and OPM Nov. 5, 2025 Memorandum at *4, https://www.opm.gov/chcoc/latest-memos/guidance-on-executive-order-14356-ensuring-continued-accountability-in-federal-hiring.pdf.

[67] Jackson Decl., Ex. E (Washington Post, *Emails outline potential cuts affecting thousands of FEMA disaster responders* (Jan. 5, 2026)).

renew any CORE employees with NTEs beginning on January 1, 2026. The FEMA human resources website announced, **"FEMA's authority to extend CORE appointments ended on December 31, 2025."** Jackson Decl., Ex. A. That website further confirms that all hiring and renewal decisions now require submission of completed and signed forms to the FEMA OCHCO ("Office of Chief Human Capital Officer") for "weekly" routing to the "DHS OCHCO and FEMA leadership for concurrence" and then "for S1 approval." *Id*., Ex. B. "S1" stands for *Secretary Noem. Id*. ¶25. FEMA management is instructed to submit the forms "as soon as you verify a need" for the positions. *Id*., Ex. B. The form that must be attached to any FEMA recommendation to renew CORE employment now contains a space for the signature of DHS Secretary Noem.[68]

Never before in the history of FEMA has DHS attempted to eliminate FEMA's authority to renew any CORE positions. Jackson Decl. ¶18; Tierney Decl. ¶26. Never before in the history of FEMA has DHS required "S1" approval for any FEMA renewal, or denied FEMA renewals notwithstanding FEMA's determination of agency need. Jackson Decl. ¶¶18-21; Tierney Decl. ¶26.

### 2.    DHS Orders FEMA to Begin Cuts on New Year's Eve

At DHS's direction, FEMA began implementing Secretary Noem's blanket disapproval of CORE renewals on December 31, 2025, without any notice to FEMA supervisors or employees.[69] Thus, on and after New Year's Eve, FEMA sent emails to the work email addresses of CORE employees whose NTE dates fell in early January stating as follows:

> The purpose of this message is to notify you that your appointment as a [Position], Cadre of On-Call Response/Recovery Employee (CORE), *will not be renewed*. Your current appointment as a CORE expires [DATE]; therefore, *your services will no longer be needed* beyond this date.

Young Decl., Ex. A (emphases added). The emails told CORE employees to contact FEMA human resources that same day "for assistance with out-processing" and to "turn in all Government-issued equipment, including but not limited to cellular phones, laptop computers, keys, credentials, access or identification cards, Government travel credit/chargecard (cut credit card in half), and any

---

[68] Shively Decl., Ex. U (New York Times, *FEMA Staff Bracing for Dismissal of 1,000 Disaster Workers* (Jan. 13, 2026)); *see also* Young Decl. ¶20.

[69] Shively Decl., Ex. R (CNN, *Exclusive: DHS begins slashing FEMA disaster response staff as 2026 begins* (Jan. 2, 2026); Jackson Decl., Ex. E (Washington Post, *supra* n.67)

FEMA office files or back-up (key drives/discs) computer files you have in your possession no later than close of business" *that same date. Id*.; *see also* Shell Decl., Ex. A.

Employees who received these emails immediately lost systems access. Prell Decl. ¶11. Others were deployed on-site working on hurricane relief. Jackson Decl., Ex. E. Some learned they were terminated on New Year's Day (a federal holiday), and were instructed to return their equipment by January 2. *Id*.

After CNN published a January 2, 2026 article detailing the non-renewals, the DHS spokesperson described them as "a routine staff adjustment of 50 staff out of 8,000."[70] The spokesperson claimed: "The CORE program consists of term-limited positions that are designed to fluctuate based on disaster activity, operational need, and available funding … CORE appointments have always been subject to end-of-term decisions consistent with that structure and there has been no change to policy." *Id*. DHS ignored that FEMA had *recommended* the renewals and did not deny that DHS (not FEMA) had made the non-renewal decision. And its portrayal of non-renewals of CORE employees as "routine" was false, given consistent historical practice. *See supra* at 10, 16.

The New Year's Eve notices were sent to approximately 65 individuals.[71] Hundreds of FEMA employees have NTE dates every month, including approximately 1000 FEMA CORE employees whose dates fell in January 2026.[72] CNN reports that as of January 22, 2026, approximately 300 FEMA CORE employees have been separated, all throughout the agency.[73]

During January 2026, FEMA held meetings with supervisors informing them that CORE employees will not be renewed, even if actively working on rebuilding efforts for recent disasters.[74] FEMA supervisors have been told that thousands of FEMA employees will lose their positions in the coming months,[75] and are "advising their staff to prepare for the elimination of 1,000 jobs [in

---

[70] Shively Decl., Ex. R (CNN, *supra* n.69).

[71] *Id*.; Jackson Decl. ¶37.

[72] Shively Decl., Ex. U (New York Times, *supra* n.68).

[73] Shively Decl., Ex. X (CNN, *FEMA halts terminations of disaster workers as agency prepares for massive winter storm* (Jan. 23, 2026)).

[74] Shively Decl., Ex. V (NPR, *FEMA is getting rid of thousands of workers in areas recovering from disasters* (Jan 16, 2025)); Jackson Decl., Ex. E (Washington Post, *supra* n.67) (supervisors told there is "no plan" to renew any CORE employees in January).

[75] *Id*.

January] as part of changes that [DHS Secretary] Noem … is overseeing at the agency ….”[76]

All FEMA CORE employees facing nonrenewal under this DHS policy hold positions for which FEMA submitted paperwork recommending renewal.[77] This approved renewal paperwork was, per DHS's directives to FEMA, transmitted to DHS—which is denying the renewals.

The Washington Post reported that one FEMA supervisor wrote to human resources, "This must be a mistake," and "explain[ed] that they had approved their employee's renewal and sent the paperwork through the proper channels."[78] Another supervisor overseeing recovery work for Hurricane Helene "expressed concern and confusion over losing a staffer, stating in a New Year's Eve note to human resources that 'based on the attached emails and form,' the worker's 'appointment should be renewed.'" *Id*. That supervisor wrote further: "'I would like to resolve this ASAP, as this is a disappointing and confusing email to get right before a holiday.'" *Id*. A top FEMA human resources official responded that the situation was "out of their hands." *Id*.

DHS and FEMA officials, including Secretary Noem and "Senior Official Acting as FEMA Administrator" Evans, discussed whether to "to extend positions for a month or two until the agency has had enough time to review the need for the roles." *Id*. Secretary Noem rejected that suggestion and ordered commencement of non-renewals by NTE date beginning January 1, 2026.

The elimination of CORE positions by NTE date is indiscriminate and unrelated to any workforce requirements, actual agency need, or statutory mandate. Shell Decl. ¶20 ("[T]hey are approaching this with a sledgehammer, not a scalpel."); Fleming Decl. ¶¶10-11 (describing "haphazard manner" of the cuts and how "entire departments have already been wiped out" because all positions within it had same January NTE date); Nelson Decl. ¶10 (FEMA leaders "were at a loss" with "no idea what was happening or why"); Burton Decl. ¶20 ("Nothing about this rollout appears to have been planned according to agency function or need."). The lack of planning and notice prior to eliminating these positions will exacerbate the adverse impacts on services the agency is required to provide. Fleming Decl. ¶12 (after directive to cut 50 percent,

---

[76] Shively Decl., Ex. U (New York Times, *supra* n.68).

[77] Shively Decl., Ex. V (NPR, supra n.74); *see also* Jackson Decl., Ex. D (*Federal News Network, Concerns mount over FEMA staff reductions* (Jan. 8, 2026)).

[78] Jackson Decl., Ex. E (Washington Post, *supra* n.67).

supervisors desperate to "triage all the specialist roles that have been or soon will be eliminated").

### 3.    The Temporary Winter Storm Pause

After releasing hundreds of CORE employees, including that very day, DHS announced on January 22, 2026 that it would "pause" implementation in light of a forecasted serious winter storm.[79] This announcement followed meetings with governors, after which DHS Secretary Noem reportedly decided to pause the off-boarding.[80] DHS "would not comment on how long the pause would last,"[81] and has provided no further information to employees, their union, or the public.[82]

The Washington Post reported on January 23, 2026 that DHS's prior policy of requiring FEMA to submit justifications for FEMA renewals along with requests to renew has changed.[83] In a January 22, 2026 memo, FEMA officials "said that DHS will be making the calls without collecting justifications," and, if DHS grants any extensions, "they will be limited to 90 days."[84]

Since this "pause," hundreds of CORE employees remain in limbo, as NTE dates have passed without renewal, extension, or separation. Fleming Decl. ¶18. Some employees have heard from supervisors that the plan remains to proceed with cuts, but neither DHS nor FEMA has provided any guidance to FEMA employees or the public, despite promising on January 22, 2026 to provide further guidance. *Id.*; Jackson Decl. ¶¶55-56.

On February 6 and 7, 2026, press reports announced that inside FEMA sources stated that DHS will lift the pause and CORE non-renewals will resume imminently.[85]

### III.    The Impact of These Cuts on FEMA's Functions and Plaintiffs

### A.    Cutting FEMA Staff Will Eliminate FEMA's Ability to Function

DHS's ongoing cuts to FEMA's staffing, especially the ongoing non-renewal of CORE

---

[79] Shively Decl., Ex. W (Washington Post, *DHS pauses cuts to FEMA as massive winter storm barrels in* (Jan. 23, 2026)); *id.* Ex. X (CNN, *FEMA halts terminations of disaster workers as agency prepares for massive winter storm* (Jan. 23, 2026)).

[80] Shively Decl., Ex. W (W.Post, *supra* n.79).

[81] *Id.*

[82] Jackson Decl. ¶51, 54-55.

[83] Shively Decl., Ex. W (W.Post, *supra* n.79).

[84] *Id.*

[85] *E.g.*, Jackson Decl. ¶55; Shively Decl. Ex. Z (Associated Press, *FEMA will resume staff reductions that were paused during winter storm, managers say* (Feb. 6, 2026)).

employees, will eliminate FEMA's ability to carry out current ongoing disaster response work. Burton Decl. ¶¶13, 16; Coen Decl. ¶¶8-16, 19-24; Tierney Decl. ¶¶8, 11-15, 20.

CORE employees are currently working on disasters that include the recent winter storm,[86] late 2025 flooding in Western Washington,[87] the 2025 Los Angeles fires, Hurricane Helene, Hurricane Milton, wildfires in Maui, and flash flooding in Kerr County, Texas, among many others.[88] FEMA also continues to provide substantial recovery assistance related to older disasters such as Hurricanes Katrina, Wilma, Ike, Sandy, Matthew, Harvey, Irma, and Maria.[89] When FEMA personnel are deployed to a disaster area, "CORE employees … are the backbone of the long-term response and recovery," "making up about 90% of the FEMA workforce that remains on the ground for months, if not years, after a disaster to provide support." Coen Decl. ¶9.

For instance, CORE employees in the Direct Housing Unit provide "planning, coordination, and other operational and strategic support for disaster housing operations," serving as the "brains of the operation" to get emergency and major disaster survivors access to safe, sanitary, and functional housing after a federally declared disaster. Shell Decl. ¶7. Separation of these employees will "wipe out [the DHU] team and all of the institutional knowledge." *Id.* ¶12. One CORE employee facing imminent non-renewal is a Finance Administrative Section Chief, who is deployed approximately 300 days every year, typically within the first 6-8 hours after a formal disaster declaration, to facilitate the movement of FEMA funds to all components of immediate disaster relief. This employee is often the only Finance person deployed to a disaster site, and without them "FEMA's immediate disaster response teams would not be able to function because there would be no funds available to support their efforts." Jackson Decl. ¶47a.

The elimination of CORE positions will significantly impair FEMA's ability to continue disaster recovery efforts. FEMA administers billions of dollars in public assistance grants (which

---

[86] Jackson Decl., Ex. BB (FEMA Press Release (Jan. 23, 2026)).
[87] Shively Decl. Ex. S (Cascadia Daily News, *Regional FEMA offices slashed by DOGE face further cuts; disaster response may suffer* (Jan. 4, 2026)).
[88] Shively Decl. Ex. V (NPR, *supra*, n.74); Jackson Decl. Ex. Z (FEMA, Disaster Relief Fund: Monthly Report (Jan. 14, 2026)).
[89] Jackson Decl. Ex. Z (FEMA, Disaster Relief Fund: Monthly Report (Jan. 14, 2026)).

fund repair and reconstruction efforts) and mitigation grants (to make infrastructure more resilient to prepare for future disasters) to states and localities impacted by disasters.[90] And it continues to provide substantial individual assistance to affected survivors of more recent disasters.[91] For instance, "FEMA's National Process Service Center, the centralized facility processing individual assistance requests and backbone of FEMA's individual assistance program, is staffed primarily by CORE employees. When a disaster survivor calls FEMA for aid, it is generally a CORE employee who picks up the phone and facilitates that process." Tierney Decl. ¶12.

Further, these cuts will eliminate FEMA's ability to properly prepare for and respond to future disasters and emergencies. Key preparation work, such as training other FEMA employees in disaster response skills, happens primarily through CORE employees. Burton Decl. ¶5; Fleming Decl. ¶¶7-8. CORE employees also facilitate various grant programs that provide disaster preparedness and mitigation work funding to states, localities, tribes, and territories. Nelson Decl. ¶¶5-7; Young Decl. ¶10; Blanton Decl. ¶¶5-7; Coen Decl. ¶¶14-15. And CORE employees play a central role in responding to major disasters and emergencies, forming the backbone of the logistics force that coordinates combined federal, state, and local response efforts and comprises FEMA's on-the-ground response. Tierney Decl. ¶¶11-14; Coen Decl. ¶¶9-13; Prell Decl. ¶¶7-8; Jackson Decl. ¶47a. For example, after a disaster, CORE employees perform key functions such as helping survivors access temporary housing, food, water, and medical care. Prell Decl. ¶7; Shell Decl. ¶7; Jackson Decl. ¶¶ 42, 47a. The ongoing non-renewal of CORE employees, along with the other planned staffing cuts, will greatly reduce FEMA's ability to provide these life-saving services at a time where FEMA's services are increasingly necessary.[92]

Non-renewals of CORE employees have already impacted FEMA's ability to provide certain services before, during, and after a disaster. *See* Fleming Decl. ¶11 ("entire departments

---

[90] *Id.* at 6-7, 12-15; Nelson Decl. ¶¶6-7, 14.

[91] Jackson Decl., Ex. Z (FEMA, Disaster Relief Fund: Monthly Report (Jan. 14, 2026)); Young Decl. ¶¶13-16; Jackson Decl. ¶47a.

[92] The prevalence of events requiring FEMA to respond has steadily increased over recent decades. For example, from 2015 through 2024, there was an average of 63 major disasters declared per year, more than twice the average of 25 major disasters declared per year during the first decade of FEMA's existence. Jackson Decl. Ex. L (CRS, *FEMA: Increased Demand and Capacity Strains* (January 2, 2025)).

have already been wiped out" including everyone in the "[Individuals and Households Program] audit department"); Nelson Decl. ¶14 (employee managing Region 8 Emergency Management Performance Grant program terminated and "no one else left has the practical, historical, or institutional knowledge to manage the EMPG program"); Burton Decl. ¶¶7-10 (difficulty finding instructors for FEMA trainings given CORE cuts); Tierney Decl. ¶15 (seven of ten employees responsible for maintaining and transporting temporary housing units in certain facility were non-renewed); Shell Decl. ¶13 (non-renewals will prevent launch of Direct Housing Service Center). If DHS continues executing its plan to eliminate half of FEMA's workforce, the effects on FEMA's ability to provide these services will be devastating. *See* Fleming Decl. ¶12 ("FEMA leaders talk about the decision to cut half of the staff in the agency as a 'level 1 disaster,' *i.e.*, a major hurricane-level disaster, that is happening within the agency."); Tierney Decl. ¶30; Coen Decl. ¶25 ("Cutting FEMA staff risks repeating disasters like Katrina that should never happen again.").

**B.    Impact on Local Governments and Public Employees Represented by AFSCME and SEIU**

State, local, tribal, and territorial governments, including each local government Plaintiff, rely heavily on FEMA assistance, largely provided by CORE employees, before, during, and after a major disaster or emergency.

CORE employees administer a variety of pre-disaster programs on which states, localities, tribes, and territories, including local government Plaintiffs, depend. For example, CORE employees operate FEMA's Hazard Mitigation Grant Program (Tierney Decl. ¶14; Young Decl. ¶10), which provides funding to state and local governments to shore up their infrastructure to prevent damage from future disasters (Velez Decl. ¶9; Pena Decl. ¶8; Rubardt Decl. ¶26). They administer the Emergency Management Performance Grant program (Nelson Decl. ¶5), through which localities receive emergency preparedness funding and technical assistance (Leach Decl. ¶14).  They (Blanton Decl. ¶6) give technical assistance to localities to ensure FEMA-funded projects comply with federal environmental (Padilla Decl. ¶9) and floodplain laws (Rubardt Decl. ¶¶19-21), along with other preparedness training and support (Padilla Decl. ¶10).

Once a significant disaster strikes, CORE employees and reservists provide FEMA's

1   assistance to state, local, tribal, and territorial governments, including each local government

2   Plaintiff.  For example, FEMA's initial damage assessments are performed by CORE employees

3   prior to a Presidential major disaster or emergency declaration (Tierney Decl. ¶11; Reed Decl. ¶9);

4   which is the precondition for local governments and their residents to obtain certain types of

5   federal assistance. (Leach Decl. ¶10; Reed Decl. ¶¶9-10; Pena Decl. ¶16; Velez Decl. ¶6). CORE

6   employees deploy to state and local Emergency Operations Centers (Tierney Decl. ¶11), where

7   they assist with coordinating response efforts (Pena Decl. ¶10; Padilla Decl. ¶7). CORE employees

8   also operate FEMA's Public Assistance program, (Heath Decl. ¶2, 5-8; Tierney Decl. ¶13), which

9   provides local governments with time-sensitive and crucial funding for emergency repairs, debris

10  removal, and infrastructure restoration necessary to protect public health and safety in the

11  immediate and longer-term aftermath of emergencies and disasters (Reed Decl. ¶¶10-11; Pena

12  Decl. ¶¶8, 13-15, 17-19; Barton Decl. ¶¶8-9; Leach Decl. ¶¶10, 13, 15; Padilla Decl. ¶9; Velez

13  Decl. ¶6; Rubardt Decl. ¶¶15-18, 25). The services CORE employees provide, and the funding they

14  administer, are critical to public health and safety because the full cost of response, recovery, and

15  restoration from a major disaster or emergency can outstrip a local government's own resources.

16  Reed Decl. ¶¶11-13; Pena Decl. ¶19; Barton Decl. ¶11; Leach Decl. ¶¶9-10, 14-15, 18; Padilla

17  Decl. ¶9; Rubardt Decl. ¶5; *see also* Heath Decl. ¶9 (costs of disaster response may "wipe out a

18  locality's entire operating fund," so localities "rely on FEMA to replenish those funds" and would

19  "be overwhelmed without the grant programs" FEMA offers). Local government Plaintiffs

20  therefore rely heavily on CORE and other FEMA staff who operate the programs and arrive on-site

21  (often from around the country, within hours or days) who are trained and experienced with

22  helping local governments access needed resources including funding directed by Congress for this

23  purpose. Reed Decl. ¶¶8-10, 12, 17; Pena Decl. ¶10-11, 14, 16; Barton Decl. ¶11; Leach Decl. ¶11,

24  14; Padilla Decl. ¶10; Rubardt Decl. ¶¶11-14. Eliminating FEMA staff will interfere with local

25  governments' ability to access resources they need to recover.

26          State, local, tribal, and territorial governments, including each local government Plaintiff,

27  also rely on FEMA CORE and reservist staff to provide disaster and emergency services (including

28  administering funding) to meet their residents' basic needs in the wake of a disaster. Shell Decl. ¶5;

Jackson Decl. ¶¶42, 47a; Burton Decl. ¶11. CORE employees and reservists staff critical individual

assistance facilities such as the National Process Service Center and local Disaster Recovery

Centers, which triage disaster-affected individuals' requests for aid and help residents and

businesses navigate the procedures and paperwork needed to access needed resources and

information. Prell Decl. ¶¶4-5; Fleming Decl. ¶5; Coen Decl. ¶11; Tierney Decl. ¶12. CORE

employees' individual assistance work includes facilitating or directly providing life-saving food,

water, shelter, and medical care as well as longer term assistance related to housing, legal services,

crisis counseling, and more. Prell Decl. ¶7; Shell Decl. ¶¶7-11; Fleming Decl. ¶¶7-8; Coen Decl.

¶12. These facilities and the individual assistance FEMA's CORE employees provide are critical to

local government Plaintiffs' disaster response and recovery efforts. Reed Decl. ¶¶8-12, 15; *id.* ¶18

(services of CORE employees "can be–and have been–a literal lifeline"); Pena Decl. ¶¶9-11;

Barton Decl. ¶¶11-12, 15; Leach Decl. ¶10, 15; Padilla Decl. ¶¶8, 9; Velez Decl. ¶7; Rubardt Decl.

¶13. The local government Plaintiffs simply cannot replicate or replace these services, nor can they

replace FEMA staff's training and ability to facilitate residents' access to FEMA's individual-

assistance resources. Reed Decl. ¶¶8, 10, 13; Pena Decl. ¶9, 12, 14-15, 22-23; Barton Decl. ¶¶12-

14; Leach Decl. ¶10, 11, 15; Padilla Decl. ¶¶7-9; Velez Decl. ¶8; *see also* Shell Decl. ¶12; Fleming

Decl. ¶¶5, 14-15.[93]

       Further, these actions have and will continue to harm Plaintiffs AFSCME and SEIU and the

millions of state and local employees they collectively represent. ECF 298 ¶¶567-68. For example,

AFSCME represents employees in states' departments of emergency management, health, ecology,

and natural resources whose jobs are funded by FEMA grants. Spiegel Decl. ¶¶17-21. CORE

employees play a key role in facilitating the grant programs that fund these positions, including

emergency management performance grants, public assistance grants, hazard mitigation grants, and

others. Spiegel Decl. ¶¶17-24; Heath Decl. ¶¶2, 5-8; Nelson Decl. ¶¶5-7, 14; Tierney Decl. ¶13;

---

[93] *See also* Jackson Decl., Ex J (GAO, *Disaster Assistance High-Risk Series: State and Local Response Capabilities* (Dec. 2025)). Each local government Plaintiff is and will be adversely affected by the elimination of FEMA positions within as well as outside their geographic borders, because CORE staff and reservists provide services nationwide and are often deployed to work in locations across the country, outside of the region where their duty station is located. Jackson Decl. ¶¶11, 16; Burton Decl. ¶16; Shell Decl. ¶4; Young Decl. ¶¶5-8, 13-15; Prell Decl. ¶¶4-7.

Young Decl. ¶¶10-11. The elimination of FEMA employees who administer these grants and the resulting funding delays puts the jobs of employees represented by AFSCME at risk. Spiegel Decl. ¶26 ("Human Resources … indicated … that if funding is delayed moving forward because of cuts to FEMA personnel, the Department may need to consider layoffs."). Further, AFSCME represents employees of states' divisions of emergency management whose work relates to hazard mitigation, natural disaster response, emergency preparedness, and other functions that are supported by FEMA's grant programs. Lessey Decl. ¶¶4-5, 9-14. The elimination of positions within FEMA's public assistance and hazard mitigation cadres will likely delay receipt of these funds, thereby creating financial uncertainty for and adding pressure on the essential jobs these AFSCME and SEIU members provide. Lessey Decl. ¶14 ("OEM bargaining unit members cannot do our work without our counterparts in FEMA."); *id.* ¶¶20-30 (explaining that personnel cuts at FEMA will make it more difficult for AFSCME-represented employees to perform their jobs and may result in layoffs or furloughs). The cuts to FEMA's staff and the resulting impact on states' ability to fund emergency personnel would also weaken AFSCME's "strength at the bargaining table where [it] negotiate[s] wages, benefits, and other terms and conditions of employment for … members." Spiegel Decl. ¶30; Lessey Decl. ¶¶32-33.

## C.    Impact on Plaintiff AFGE and FEMA Employees

Plaintiff AFGE represents and has as members federal employees who work for FEMA, including CORE and other FEMA employees who have been or will be separated from employment. *E.g.,* Jackson Decl. ¶46a; Heath Decl. ¶11.

Upon separation, CORE employees lose their income and other incidents of employment, causing severe irreparable harm to them, their families, and their communities. *E.g.*, Heath Decl. ¶17 (loss of income from imminent non-renewal will "force us into impossible choices, such as deciding between paying our mortgage or keeping our home adequately heated"); Newton Decl. ¶16 (concern that loss of income will require son to withdraw from college); Blanton Decl. ¶16 (non-renewal of "dream career" left her "scrambling to figure out healthcare and finances to support my family"). For many CORE employees, non-renewal means the loss of their family's sole source of income. *See, e.g.*, Blanton Decl. ¶13; Newton Decl. ¶17; Prell Decl. ¶13.

Many of these employees are longtime employees of the federal government and/or their agency and will lose not only their current job but a career that has been years in the making. *E.g.*, Young Decl. ¶23 (devasted by loss of career she worked towards since age 19); Fleming Decl. ¶4 ("worked [her] way up to [her] dream position" over the a decade at FEMA); Blanton Decl. ¶14 (job at FEMA was "a life changing opportunity" after putting herself through graduate school while working full time and raising three children but abrupt non-renewal plunged her family back into "survival mode"). After spending years at the agency, employees must immediately begin searching for alternative employment in a competitive job market with few comparable positions. Heath Decl. ¶18; Newton Decl. ¶17; Fleming Decl. ¶21.

In particular, abruptly terminated CORE employees will lose health benefits one month later and vision and dental immediately. Shell Decl. ¶21. Many have already had to cancel vital medical appointments and others will have to stop taking critical daily medications when they lose insurance and can no longer afford them. Jackson Decl. ¶¶46(a), (b). One CORE employee who was abruptly non-renewed on January 12 relies on life-saving technology to address his neurological movement disorder. Prell Decl. ¶¶11-12. Because FEMA was in the midst of processing a change in his health insurance, he had to cancel impending critical healthcare appointments when he was not renewed because he could not afford to pay out of pocket. *Id.* ¶12. Another employee had to cancel her daughter's surgery because she could not take on the medical debt to fund the out-of-pocket expense. Blanton Decl. ¶17. Another is five months pregnant, and her loss of health insurance means paying an extra $600 per month to be covered by her husband's plan out of his limited salary as a public school teacher. Nelson Decl. ¶10.

AFGE-represented employees who keep their jobs will also suffer adverse impacts, because the staffing cuts will make their jobs immensely more difficult. *See* Burton Decl. ¶¶10, 18-20. The non-renewal policy has already eliminated entire teams, Fleming Decl. ¶11 (entire IHP audit department separated by mid-January non-renewals), and poses imminent risk of leaving many teams with too few employees to cover the workload, *id.* ¶¶8-9; Nelson Decl. ¶14, and huge gaps in the institutional knowledge necessary to perform the work successfully, Newton Decl. ¶18; Shell Decl. ¶¶8-13; Prell Decl. ¶14. These actions also have and will continue to harm Plaintiff AFGE's

1    core function of representing employees and providing counseling, advice, and representation to

2    employees in the event of adverse employment actions, forcing it to expend, substantial time and

3    resources that would otherwise be devoted to representing employees who have, will, or may

4    experience adverse employment actions and/or other representational work. Jackson Decl. ¶¶38,

5    48. AFGE is also harmed by the actual and imminent termination of its members employed by

6    FEMA, including CORE employees, including by the loss of dues income. *Id*. ¶6.

### ARGUMENT

7

8            Preliminary injunctive relief is warranted when (1) the moving party is likely to succeed on

9    the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of

10    equities tips in the movant's favor; and (4) an injunction is in the public interest. ECF 85 at 10;

11    Fed. R. Civ. P. 65 (b)(1); *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).

12    **I.    Plaintiffs Are Likely to Succeed on the Merits**

13            **A.    The Actions of DHS and FEMA Are Contrary to Law**

14            The challenged DHS and FEMA actions are directly contrary to and exceed legal authority

15    in at least three independent respects, so violate APA Sections 706(2)(A) and (C) and are *ultra*

16    *vires*. *See* 5 U.S.C. §706(2)(A), (C); *Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939,

17    953 (9th Cir. 2024); *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023).

18                **1. FEMA cannot fulfill its statutory obligations without adequate personnel**

19            Congress has tasked FEMA with the obligation to be prepared at all times to confront

20    emergencies and disasters before, during, and after they occur. *Supra*, at 3-6 (quoting 6 U.S.C.

21    §313(b)(1)). In support of this mandate, Congress imposed a comprehensive set of mandatory

22    duties. *Supra* at 3-6; *see generally* 6 U.S.C. §§311-323, 711-825; 42 U.S.C. §§5121-5207.[94]

23    Where, as here, Congress uses mandatory language to impose these obligations, the agency cannot

24    so dramatically cut its staff as to render performance of these mandatory duties impossible. *See,*

25

---

26            [94] While Congress has *also* granted FEMA a significant number of permissive authorities, this
    brief focuses on duties mandated by statute, which are not discretionary or optional. For example,
27    "[t]he Administrator may provide support for the development of mutual aid agreements
    within States" (6 U.S.C. §746(f)) or "may establish one or more national veterinary emergency
28    teams" (42 U.S.C. §5165g(a)).

1   *e.g.*, *New York v. Kennedy*, 789 F. Supp. 3d 174, 209 (D.R.I. 2025) (directive "dismantling critical,

2   statutorily mandated functions of the Agency" is "contrary to law"); *Washington v. Fed.*

3   *Emergency Mgmt. Agency*, 2025 WL 3551751, at *5 (D. Mass. Dec. 11, 2025) (termination of

4   FEMA grant program mandated by Congress is contrary to law); *see also AFGE v. Trump*, 139

5   F.4th 1020, 1034–35 (9th Cir. 2025) (recognizing "serious questions going to the merits" as to

6   whether federal agencies will be "prevented from fulfilling their statutory duties" by workforce

7   reductions); *accord id*. at 1043-44 (Callahan, J., dissenting) (arguing that the "question that should

8   guide the separation of powers analysis" is whether the workforce reductions will "prevent those

9   agencies from fulfilling their statutory mandates").

10           FEMA's statutory responsibilities are the result of lessons learned from deadly disasters

11   that exposed the fault lines in previous approaches to emergency management. *Supra* at 3.  Then,

12   following the fragmented and inadequate response to Hurricane Katrina, Congress reformed

13   FEMA's structure and established FEMA's modern structure, including through the Post-Katrina

14   Act provisions insulating FEMA from DHS interference and further enhancing FEMA's authority

15   to address disasters before, during, and after they occur. Pub. L. No. 109-295, 120 Stat. 1394. After

16   Hurricanes Sandy, Harvey, Irma, Maria, and the California wildfires, Congress stepped in to

17   further expand and strengthen FEMA's role in disaster support and relief.  *See* Pub. L. No. 113-2,

18   127 Stat. 39 (2013); Pub. L. No. 115-254, 132 Stat. 3438 (2018). At each step of this iterative

19   process, Congress has added to FEMA's statutory authorities and functions, recognizing that

20   inadequate federal disaster management is not only costly but deadly.

21           The result is a statutory structure that obligates FEMA to maintain and administer a federal

22   disaster preparedness and response system that provides assistance at every stage of a major

23   disaster. To this end, Congress has tasked FEMA with extensive statutory obligations related to

24   "preparedness," "protection," and "mitigation" before a disaster occurs;[95] "response" during a

---

[95] *See, e.g.*, 6 U.S.C. §§313(b)(2)(G), 313(b)(2)(H), 314(a)(2), 314(a)(7), 314(a)(9)(A)-(B), 314(a)(15), 317(c)(2)(C), 317(c)(2)(E), 317(c)(2)(I), 317(c)(2)(J), 319(b)(1), 320, 321a(c)(2), 321b, 321k, 721, 725-26, 743-44, 748, 748a, 749-52, 753(c), 762(b), 791; 42 U.S.C. §§5136a, 5195b, 5196a, 5196g, 5197h.

disaster and in the immediate aftermath;[96] and "recovery" after a disaster has occurred.[97]  Critical to FEMA's mandate is that the agency must ensure the availability and capability of a federal disaster and emergency management system. *See, e.g.*, 6 U.S.C. §313(b)(2)(A) (FEMA must "lead the Nation's efforts to prepare for, protect against, respond to, recover from, and mitigate against the risk of natural disasters" and other exigencies); *id.* §313(b)(2)(B) (FEMA must "build a national system of emergency management that can effectively and efficiently utilize the full measure of the Nation's resources to respond" to exigencies); *id.* §313(b)(2)(C) (FEMA must "develop a Federal response capability that … can act effectively and rapidly to deliver assistance essential to saving lives or protecting or preserving property or public health and safety in a natural disaster, act of terrorism, or other man-made disaster"); *id.* §314(a) ("The Administrator shall provide Federal leadership necessary to prepare for, protect against, respond to, recover from, or mitigate[against" disasters); *id.* §314(a)(3) (FEMA must "provid[e] the Federal Government's response to terrorist attacks and major disaster"); *id.* §314(a)(5) (FEMA must "build[] a comprehensive national incident management system"); *id.* §314(a)(6) (FEMA must create "a single, coordinated national response plan"); *id.* §314(a)(18) (FEMA must "develop[] a national emergency management system that is capable of preparing for, protecting against, responding to, recovering from, and mitigating against catastrophic incidents"); *id.* §314(a)(19) (FEMA must carry out its functions and authorities under "the national preparedness system").

To satisfy its many statutory obligations, FEMA requires adequate staffing. Through the Stafford Act and the Disaster Relief Fund, Congress ensured FEMA's ability to hire sufficient staff.  CORE employees—who are entirely funded by this Fund—are central to fulfilling FEMA's statutory obligations across FEMA's mission areas. *Supra* at 6-9. This includes preparedness, protection, and mitigation work such as facilitating state and local governments' trainings and administering grant programs like the Hazard Mitigation Grant Program. *Supra* at 21-22. And CORE employees are especially critical to FEMA's response and recovery mandate, working

---

[96] *See, e.g.*, 6 U.S.C. §§313(b)(2)(C), 314(a)(1), 314(a)(3), 314(a)(5), 314(a)(6), 314(a)(9)(C), 314(a)(11), 314(a)(13), 314(a)(15), 314(a)(17), §317(c)(2)(B), 317(c)(2)(D), 317(c)(2)(H), 317(f), 321b, 321o, 321o-1, 724, 772-775; 42 U.S.C. §§5144, 5204b.

[97] *See, e.g.*, 6 U.S.C. §§314(a)(4), 771-72, 796.

behind the scenes to coordinate the logistics of the unified local, state, and federal response,

providing on-the ground life-saving assistance, and administering individual and public assistance.

*See supra* at 19-25.

Beyond the comprehensive list of mandatory FEMA functions with which these cuts

interfere, the proposed elimination of 50 percent of FEMA's staff, indiscriminate nonrenewal of

CORE staff, and related agency actions directly contravene several specific statutory provisions

that establish personnel and readiness requirements. For example, FEMA is obligated to have (1)

"at a minimum 3 national response teams"; (2) "sufficient regional response teams, including

Regional Office strike teams under section 317 of title 6"; and (3) "other response teams as may be

necessary to meet the incident management responsibilities of the Federal Government."[98] 42

U.S.C. §5144(b)(1). These "emergency response teams" must "consist of adequate numbers of

properly planned, organized, equipped, trained, and exercised personnel." *Id.* §5144(b)(3). These

teams—now referred to as Federal Incident Management Assistance Teams—are primarily staffed

by the CORE employees who DHS has begun indiscriminately terminating.[99] Burton Decl. ¶11.

Similarly, the FEMA Administrator "shall … administer[] and ensur[e] the implementation

of the National Response Plan, including coordinating and ensuring the readiness of each

emergency support function under the National Response Plan." 6 U.S.C. §314(a)(13). The

National Response Plan has been replaced with the National Response Framework, which sets out

numerous detailed Emergency Support Functions FEMA must be prepared to perform following a

disaster.[100] Among other things, FEMA must perform an extensive list of logistics functions[101] and

---

[98] Each FEMA Regional Administrator is required to oversee at least one "Regional Office strike team" that includes, among others, "personnel trained in incident management" and "public affairs, response and recovery, and communications support personnel." 6 U.S.C. §317(c)(2)(D), (f)(1).

[99] Jackson Decl. Ex. K (CRS, *Deployable Federal Assets Supporting Domestic Disaster Response Operations: Summary and Considerations for Congress* 21 & n.77 (May 13, 2015)).

[100] Jackson Decl. Ex. W (DHS, National Response Framework (4th Ed. Oct. 28, 2019))

[101] Among other things, FEMA "[s]ets up and operates incident facilities" and "[s]erves as single integrator for logistics support as part of the national response effort." Jackson Decl., Ex. Y (FEMA, *Emergency Support Function #7 – Logistics Annex*).

provide individual emergency assistance.[102] Those logistics and individual assistance services are provided primarily by CORE employees. Tierney Decl. ¶¶12-14; Coen Decl. ¶¶8-9.[103] FEMA cannot "ensur[e] the readiness of each emergency support function under the National Response [Framework]" if the workforce that performs those functions is gutted.

According to former FEMA officials, DHS's efforts to gut FEMA's staff through this December 2025 plan, especially with respect to its CORE employees, will devastate FEMA's capacity to fulfill its statutorily mandated functions. Coen Decl. ¶23.

### 2. The Post-Katrina Act prohibits DHS from impairing FEMA's ability to perform its missions, authorities, and responsibilities

In the years leading up to Hurricane Katrina, DHS failed to "maintain [FEMA's] personnel and resources" and had "spread FEMA's planning and coordination capabilities and responsibilities among DHS's other offices and bureaus."[104] DHS's reorganization of FEMA proved to be catastrophic, creating one of the key "structural flaw[s]" in our disaster management system that led to the fractured and disorganized federal response to Hurricane Katrina.[105] To prevent a repetition of these fatal blunders, the Post-Katrina Act restores FEMA's independence from DHS decision-making, and expressly prohibits the DHS Secretary from "substantially or significantly reduc[ing] … the authorities, responsibilities, or functions of [FEMA] or the capability of [FEMA] to perform those missions, authorities, responsibilities." 6 U.S.C. §316(c)(1).

---

[102] Among other things, FEMA must provide "financial and/or direct assistance to eligible survivors for their disaster-related lodging and temporary housing needs" and other "essential assistance, including life-sustaining services, after a major disaster to meet immediate threats to life and property, including congregate, non-congregate, and transitional sheltering; feeding; reunification services; distribution of emergency supplies; rescue, transportation, care, shelter and essential needs of household pets and service animals; mass evacuation; support to children and adults with disabilities and others with access and functional needs in congregate facilities; warehousing and distribution of donations; emergency residential roof covering; and emergency repair of primary residences damaged as the result of a disaster." *Id.*, Ex. X (FEMA, *Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex*).

[103] For example, the CORE nonrenewals have already eliminated the majority of employees at one facility that manages temporary housing units and transports them to disaster sites (Tierney Decl. ¶15), rendering it unable to provide the "direct assistance" related to survivors' "temporary housing needs" for which FEMA is responsible. Jackson Decl., Ex. X.

[104] Jackson Decl. Ex. Q (*The Federal Response to Hurricane Katrina* (2006) at 53-54).

[105] *Id.*

1    DHS Secretary Noem is seeking to override these statutory prohibitions by engaging in the

2    same type of interference with FEMA that led to system failures that cost many their lives during

3    Katrina. *Supra* at 31. Secretary Noem's order that **"FEMA's authority to extend CORE**

4    **appointments ended on December 31, 2025**," *supra* at 16, violates the Post-Katrina Act's plain

5    language, under which she cannot even *reduce* FEMA's authority, let alone eliminate it.

6        Further, the DHS plan to eliminate 50 percent of FEMA's staff, including through mass

7    non-renewal of CORE employees, further violates the Post-Katrina Act by "substantially or

8    significantly reduc[ing]" FEMA's "capability … to perform [its] missions, authorities, [or]

9    responsibilities." 6 U.S.C. §316(c)(1); *see Washington v. Fed. Emergency Mgmt. Agency*, 2025 WL

10   3551751, at *5 (D. Mass. Dec. 11, 2025) (holding that cancelation of one of FEMA's mitigation

11   grant programs was "a substantial reduction of FEMA's mitigation responsibilities").

12       DHS and FEMA's actions are also contrary to numerous other provisions of the Post-

13   Katrina Act. Congress specifically exempted FEMA from the DHS Secretary's general

14   "[r]eorganization" authority under 6 U.S.C. §452, stating that "Section 452 of this title shall not

15   apply to [FEMA], including any function or organizational unit of the Agency." 6 U.S.C. §316(b).

16   DHS's plan to cut the FEMA workforce in half and push functions onto state and local

17   governments is a reorganization for which Secretary Noem has no authority.  Congress also

18   specifically "transferred … [a]ll functions of the [FEMA], … including all of its personnel, assets,

19   components, authorities, grant programs, and liabilities," from DHS control back to FEMA. 6

20   U.S.C. §315(a)(1). DHS's attempt to seize control of FEMA's personnel and curtail FEMA's

21   ability to carry out its functions violates this provision as well (including by removing FEMA's

22   authority to approve renewals; requiring Secretary Noem's personal approval; processing renewals

23   through DHS's OCHCO (not FEMA's); and directing FEMA to eliminate half its staff). Congress

24   also requires that FEMA "shall be maintained as a distinct entity within the Department." *Id.*

25   §316(a). DHS's removal of FEMA's authority and assertion of control over FEMA's staffing seek

26   to fold FEMA into DHS's decision-making structure and violate this provision as well.

27              **3. The Continuing Resolution prevents the reduction of CORE positions**

28       The reduction of CORE positions by NTE date directly violates CR Section 120(a), recently

1    extended through February 13, 2026, because the plain terms of that law prohibit the reduction in

2    positions of temporary employees like the CORE.[106]  Section 120(a) prohibits the use of federal

3    funds "to initiate, carry out, implement, or otherwise notice a reduction in force to reduce the

4    number of employees within any department, agency, or office of the Federal Government." Pub.

5    L. No 119-37, §120(a). Congress defined "reduction in force" to encompass not only reductions in

6    force for Title 5 civil service employees, but also "any similar reduction of positions at any

7    department, agency, or office of the Federal Government." *Id*. §120(d). Then, in line with that

8    expanded coverage, Congress expansively applied the prohibition "to all civilian positions, whether

9    permanent, *temporary*, full-time, part-time, or intermittent, and without regard to the source of

10   funding for such positions." *Id.* §120(b) (emphasis added).

11       CORE employees hold full-time, temporary civilian positions, *see* 42 U.S.C. §5149(b)(1),

12   and are covered by §120(a). DHS's elimination of these positions via a blanket non-renewal policy,

13   divorced from agency need and executed simply by NTE date (*supra* at 16-19), directly reduces the

14   number of positions available for this agency without any regard to individual performance. This

15   elimination of temporary employee positions for the sake of workforce reduction is "similar" to,

16   meaning "having characteristics in common"[107] with, Title 5 reductions in force. The elimination

17   of these positions falls squarely within the definition of a "reduction in position" and DHS and

18   FEMA violated Section 120(a) by using federal funds "to initiate, carry out, implement, or

19   otherwise notice" these reductions, and will continue to do so with respect to any separations

20   imposed through at least February 13, 2026.[108]

21       **B.    The Actions of DHS and FEMA Are Arbitrary and Capricious**

22       The APA requires federal agencies to engage in "reasoned decisionmaking," *Dep't of*

23   *Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), which means that agency

24

25       [106] *See* Pub. L. No 119-37, §120 (2025); Consolidated Appropriations Act, 2026, Pub. L. No.
     119-75, Div. H, §101 (2026).

26       [107] *Similar*, Merriam-Webster Online Dictionary (last accessed Jan. 21, 2026).

27       [108] At this point, no one knows whether Congress will extend the February 13, 2026 date
     further through another extension of the CR. The most current information regarding public
     statements by members of Congress indicates that a further CR is possible. Shively Decl., Ex. AA
28   (Politico, *Capitol Agenda: Republicans prepare DHS punt* (Feb. 2, 2026)).

action must be both "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must "adequately consider[] all relevant factors," *Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1232 (9th Cir. 1993) (citation omitted), and "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation and citation omitted). "Agency action is arbitrary and capricious when the agency 'relies on factors which Congress has not intended it to consider, entirely fails to consider an important aspect of the problem, or offers an explanation for its decision that runs counter to the evidence before the agency.'" *Center for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 67 F.4th 1027, 1035 (9th Cir. 2023) (quoting *State Farm*, 463 U.S. at 43). And "judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Regents of the Univ. of Cal.*, 591 U.S. at 20 (quotation omitted).

DHS's decision to remove the authority to make employment decisions from the agency with knowledge of its own mandate and needs, imposition of dramatic staffing cut targets, and directive not to renew CORE employees by NTE date without any regard to actual agency need present precisely the type of unreasoned decisionmaking the APA prohibits. These mass, indiscriminate non-renewals are contrary to FEMA's own analysis of its staffing needs, which found that its incident management workforce had only two-thirds of the employees needed to adequately respond to disasters. *See supra* at 10. These cuts are contrary to FEMA's own 2025 and 2026 budget justifications to Congress, which sought *increased* staffing to adequately carry out the agency's duties. *See supra* at 11. The abrupt notices provided to employees provide no rationale at all, *supra* at 16-19, and DHS has provided no explanation that takes into account any reliance interests, including those of FEMA employees and all who rely on the services FEMA provides, including state and local governments. Moreover, that DHS temporarily paused these staffing cuts in advance of Winter Storm Fern shows that DHS itself understands that a reduction in FEMA's staff, especially at the scale contemplated in DHS's staffing targets, would leave the agency unable to sufficiently respond to disasters. *Supra* at 19.

Further, DHS's indiscriminate non-renewals have all been carried out despite FEMA

supervisors' approval of these renewals. *Supra* at 10, 18. DHS specifically required FEMA to send over its documentation of the recommendations and justifications for renewal, for "S1" decision-making. *Supra* at 16. As of January 23, 2026, DHS eliminated the renewal justification process by which a supervisor of a CORE employee seeking authorization for renewal would submit an explanation of why renewal of that employee was justified by agency need. *Supra* at 19. DHS has abandoned even the pretense of considering agency need in making renewal decisions.

In many instances, the separated CORE employees are being removed from crucial disaster work teams that were already overburdened as a result of FEMA's long-running understaffing and the earlier DRPs. *See* Fleming Decl. ¶¶6-8; Nelson Decl. ¶14; Tierney Decl. ¶¶28, 32. And many terminated employees performed specific functions necessitating special skills or training, making it difficult or impossible for other FEMA employees to take on their duties. *E.g.*, Blanton Decl. ¶19; Newton Decl. ¶18; Fleming Decl. ¶13. Further, because of the haphazard way these terminations are being carried out, many CORE employees have been unable to complete offboarding or to train others to perform their functions. *E.g.*, Shell Decl. ¶14-15; Burton Decl. ¶¶11-15. DHS's indiscriminate elimination of positions lacks any justification related to agency need.

## C.    The Challenged Actions Are Final for Purposes of the APA

DHS's removal of FEMA decision-making authority over positions at FEMA, workforce reduction plan to eliminate half of FEMA staff including 41 percent of CORE positions, directive to eliminate CORE positions by NTE date, and implementation of that directive are all final agency actions reviewable under the APA. 5 U.S.C. §704. To be final, an "action must (1) 'mark the consummation of the agency's decisionmaking process' and (2) 'be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). Each of the actions at issue satisfy this "pragmatic and flexible" finality standard. *Oregon Nat. Desert Ass'n*, 465 F.3d at 982. DHS's removal of FEMA's authority over renewal of CORE positions was a "definitive statement of the agency's position[]," with which FEMA's "immediate compliance [was] expected." *Prutehi Litekyan: Save Ritidian v. United States*

1     *Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025) (citation omitted). Likewise, DHS's

2     imposition of workforce reduction targets and its blanket non-renewal policy to achieve those

3     targets were neither "tentative" nor "interlocutory." *See Bennett*, 520 U.S. at 178. These actions

4     have and continue to yield very real "legal consequences," having already led to the termination of

5     hundreds of FEMA employees. *Id.* Nor does DHS's brief pause in off-boarding alter the finality of

6     these actions. *See Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012) (the "possibility that an agency

7     might reconsider … does not suffice to make an otherwise final agency action nonfinal"). Finally,

8     FEMA's actions implementing DHS's policies and directives are the culmination of further

9     decision-making from which legal consequences will flow to the affected federal employees.

10     **II.    All Other Factors Weigh in Plaintiffs' Favor**

11     **A.  The Actions of DHS and FEMA Are Causing Irreparable Harm**

12     **1.  AFGE and the CORE employees suffer ongoing harm.**

13           As this Court and the Ninth Circuit have held, federal employees facing job loss from a

14     reduction in force, agency reorganization, or similar mass layoff policy suffer irreparable injuries.

15     *See AFSCME v. OMB*, 2025 WL 3018250, at *22 (N.D. Cal. Oct. 28, 2025); *AFGE v. Trump*, 139

16     F.4th 1020, 1040 (9th Cir. 2025), *stayed on other grounds*, 145 S.Ct. 2635 (2025). "Aside from the

17     obvious economic harm of loss of salary, many of those affected will be left without healthcare."

18     *AFGE*, 139 F.4th at 1040. Here, Plaintiffs present a similar factual record establishing that CORE

19     employees have lost and will lose their income, their health benefits, and other incidents of

20     employment with devastating consequences. *See supra* at 25-27. Damages are unavailable in APA

21     cases, making monetary harms irreparable. *Pangea Legal Servs. v. U.S. Dep't of Homeland*

22     *Security*, 512 F.Supp.3d 966, 976 (N.D. Cal. 2021); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d

23     640, 677 (9th Cir. 2021) (diversion of significant organizational resources and funding losses may

24     be irreparable if parties typically cannot recover damages). Moreover, when confronted with a

25     layoff policy that will devastate a federal agency, "it is obvious that 'back pay' is far from an

26     adequate remedy" because "[b]ack pay does not reinstate entire agency offices and functions" and

27     "cannot account for harms resulting from loss of income in the interim or for gaps in health-and

28     childcare that accompany job loss." *AFGE*, 139 F.4th at 1040.

1     Lack of access to healthcare threatens irreparable injury, particularly for people with

2     serious health conditions. *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d

3     1112, 1125 (9th Cir. 2008). For "some of the impacted workers, the potential loss of health

4     insurance truly feels like a matter of life or death." *AFSCME*, 2025 WL 3018250, at *22. *E.g.*, Prell

5     Decl. ¶12; Jackson Decl. ¶46b. For many CORE employees, losing health insurance will force

6     them to cancel upcoming medical appointments, pause daily medications, and leave conditions

7     untreated. Jackson Decl. ¶46a; Blanton Decl. ¶17; Nelson Decl. ¶10.

8     Employees are being informed of their non-renewals with little to no notice or time to

9     prepare. *Supra* at 16-18. CORE employees with upcoming NTE dates facing non-renewal have

10    been thrust into indefinite uncertainty. Their supervisors have submitted the paperwork justifying

11    the necessity of these employees for FEMA's work, but DHS is not approving the renewal of

12    CORE contracts regardless of the agency's need. Fleming Decl. ¶17. This is causing these

13    employees, and their families, to spend time, money and emotional energy making contingent

14    plans. *Id.* ¶21.

15    CORE employees with NTE dates further in the future will also experience irreparable

16    harm in the form of a radically altered workplace in which they will be called upon to do more with

17    less, in extreme disaster circumstances. *AFSCME*, 2025 WL 3018250, at *22 (significant impact on

18    workloads of plaintiff members constituted irreparable injury).

19    AFGE will also suffer irreparable organizational injury. AFGE has and will be imminently

20    prevented from exercising those core functions as a labor organization providing counseling,

21    advice, and representation to employees in the event of adverse employment actions, and expended

22    time and resources that it would have devoted to assisting employees on other representational

23    matters. *Supra* at 26-27. AFGE will also be harmed in multiple other ways by the imminent

24    termination of its members, including by the loss of voluntary dues income. *Supra* at 26-27.

25    **2. Local governments and the state and local government employees represented by AFSCME suffer irreparable harm.**

26    The elimination of CORE positions will decimate the programs and services FEMA is

27    statutorily obligated to provide. *See supra* at 3-6, 19-22. CORE employees perform roles across

28

nearly every aspect of FEMA's required functions, but the vast majority of CORE and reservist employees are assigned to the disaster workforce, which provides services directly to the public and to state, local and tribal governments. *Supra* at 3-6. DHS is poised to separate employees who are the only ones in their position and to decimate, or eliminate, entire teams. *Supra* at 26.

State and local governments rely on CORE employees to meet the basic needs of their residents after disasters. *Supra* at 23-24.[109] With the loss of federal services, knowledge, and support, the local government plaintiffs cannot effectively provide disaster preparedness and/or disaster relief services and protect their populations. *Id.* The loss of FEMA services and personnel will require substantial resource diversion, increase the demands on local and state government employees beyond their current capacities, and threaten the welfare of their residents. *Id.*[110] These harms are irreparable. *AFGE v. Trump*, 782 F.Supp.3d 793, 826 (N.D. Cal.), *stayed in part on other grounds*, 145 S.Ct. 2635 (2025); *see also California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (holding economic harm threatening states is irreparable because not eligible for recovery under APA); *New York v. McMahon*, 784 F.Supp.3d 311, 361 (D. Mass. 2025) ("financial delay and uncertainty" of substantial grant funding threatened by gutting of Department of Education posed irreparable harm to plaintiff states that had clear interest in preventing educational harms that would flow to citizenry). Local governments also rely on FEMA services before disasters hit. *Supra* at 21-22. For instance, CORE employees work on FEMA's Hazard Mitigation Grant Program, which provides funding to develop hazard mitigation plans and rebuild in ways that reduce or mitigate future disaster losses. Coen Decl. ¶14. CORE employees like Kisha Blanton, who was an Environmental Protection Specialist, work to ensure FEMA project compliance with environmental laws including the Endangered Species Act, Clean Water Act, Clean Air Act, and National Environmental Policy Act. Blanton Decl. ¶5-6. Terminating Blanton and other CORE

---

[109] *E.g.*, Reed Decl. ¶12 ("FEMA personnel who are present on the ground, in person, and on-site during or immediately after major disasters and emergencies also play a critical, irreplaceable role in supporting residents as they navigate the aftermath of an event that may have thrown their lives into turmoil—for example, because their home has been lost, the grazing land necessary to keep their cattle alive has been burned, or their business has been destroyed.").

[110] *E.g.*, Leach Decl. ¶18 ("FEMA staffing cuts translate directly into longer recovery timelines, increased reliance on contractors and short-term staffing, higher local financial burdens, and a reduced capacity to support residents and infrastructure following major disasters.").

employees risks irreparable environmental harm to local governments and their communities. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) ("[E]nvironmental injury, by its nature, … is … irreparable.").

The disruption of these critical government services will also cause irreparable injury to the local and state government employees that AFSCME represents. *Supra* at 22-24; *Am. Fed'n of Gov't Empl. v. Trump,* 139 F.4th 1020, 1040 (9th Cir. 2025) (finding non-federal employees faced irreparable harm). For instance, state employees represented by AFSCME in Washington State and Oregon work on hazard mitigation, natural disaster response, and emergency preparedness initiatives that are supported by FEMA's grant programs. *Supra* at 22-24; Spiegel Decl. ¶¶17-22; Lessey Decl.¶¶4, 9-15. The impending elimination of CORE employees will delay the receipt of those funds, adding financial stress to the initiatives these employees administer, making the employees' job more difficult to execute, and threatening layoffs for employees whose jobs are funded by FEMA grants. Spiegel Decl. ¶¶ 26, 29-31.  For unions in particular, the loss of bargaining strength in ongoing negotiations is also irreparable harm. *Am. Libr. Ass'n v. Sonderling*, 2025 WL 1262054, at *2 (D.D.C. May 1, 2025) (impact of federal funding on ongoing AFSCME collective bargaining warranted TRO); *see also AFSCME*, 2025 WL 3018250, at *13 ("Unions also suffer injury from membership losses and loss of dues when their members are RIF'd, and they lose strength and bargaining power when their numbers are diminished.").

**B.     The Balance of Equities and Public Interest Support a TRO**

The equities and public interest, which merge when the government is a party, *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024), strongly favor Plaintiffs. The severe threats to the public presented by the imminent FEMA and DHS Defendants' actions necessitate a temporary pause to protect the status quo. *See supra* at 19-22. By contrast, the Defendant agencies will save time and money that would be spent on implementing the staffing cuts and processing the separations and then potentially later required to be reversed and rescinded.  And, as this Court has repeatedly held, "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *AFGE v. OMB*, 2025 WL 3654116, at *14 (N.D.

1    Cal. Dec. 17, 2025); ECF 85 at 39. That temporary relief may "require agencies to retain

2    employees that otherwise would have been discharged" is not itself enough to outweigh the harms

3    to federal employees and local governments that Plaintiffs would experience in the absence of

4    immediate injunctive relief. *AFGE,* 2025 WL 3654116 at *13; *see also AFGE*, 139 F.4th at 1030.

5    The balance of equities decidedly supports a temporary restraining order here.

6    **III.    Scope of Relief Necessary to Prevent Harm to Plaintiffs**

7            Plaintiffs seek a TRO that protects federal employees from further implementation of

8    DHS's unlawful directives to FEMA, including by prohibiting the separation of additional CORE

9    employees on their upcoming NTE dates. The requested relief will prevent further irreparable

10   injury by maintaining the status quo pending resolution of Plaintiffs' request for a preliminary

11   injunction. *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 878–79

12   (9th Cir. 2009) (injunction "prohibit[ing] a party from taking action [] preserves the status quo

13   pending a determination of the action on the merits") (cleaned up).

14           Further, Plaintiffs' requested TRO maintains the pre-dispute status quo by restoring FEMA

15   CORE employees who were unlawfully separated from federal employment since January 1,

16   2026.[111] This relief will prevent ongoing irreparable harm to both the terminated employees and

17   those (including but not limited to Plaintiffs) who rely on FEMA.

18                                      **CONCLUSION**

19           For the foregoing reasons, Plaintiffs respectfully request this Court grant this Motion and

20   enter the accompanying proposed temporary restraining order and/or an order to show cause.

21

22

23

24

25

---

26   [111] The pre-dispute status quo—that is, the "last, uncontested status which preceded the pending controversy"—is before the unlawful terminations began. *See Regents of the Univ. of Cal. v. Am.*
27   *Broad. Cos.,* 747 F.2d 511, 514 (9th Cir. 1984); *Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 809 (9th Cir. 1963); *see also Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*
28   *Bd. of Educ.*, 82 F.4th 664, 684-85 (9th Cir. 2023) (court may return parties to status "before the controversy arose").

DATED: February 10, 2026

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
Robin S. Tholin
Elizabeth Eshleman
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
Fax: (415) 362-8064
sleyton@altshulerberzon.com
bchisholm@altshulerberzon.com
dleonard@altshulerberzon.com

By: */s/ Danielle Leonard* _____

*Attorneys for All Union and Non-Profit Organization Plaintiffs*


Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

By: */s/ Elena Goldstein* _____

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC) and for Plaintiffs City of Chicago, IL; Martin Luther King, Jr. County, WA; Harris County, TX; and City of Baltimore, MD*


Jules Torti (pro hac vice)
PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038

Erica J. Newland (pro hac vice)
Jacek Pruski (pro hac vice)
PROTECT DEMOCRACY PROJECT

1

2020 Pennsylvania Ave., N.W., Suite 163
Washington, D.C. 20006

2

Tel: 202-579-4582
jules.torti@protectdemocracy.org

3

erica.newland@protectdemocracy.org
jacek.pruski@protectdemocracy.org

4

5

By: */s/ Jules Torti*  _____

6

*Attorneys for All Union and Non-Profit Organization
Plaintiffs (except NRDC)*

7

8

Norman L. Eisen (pro hac vice)

9

Spencer W. Klein (pro hac vice app. forthcoming)
STATE DEMOCRACY DEFENDERS FUND

10

600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003

11

Tel: (202) 594-9958
Norman@statedemocracydefenders.org

12

Spencer@statedemocracydefenders.org

13

By: */s/ Norman L. Eisen*  _____

14

15

*Attorneys for All Union and Non-Profit Organization
Plaintiffs (except NRDC)*

16

17

Rushab Sanghvi (SBN 302809)

18

AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO

19

80 F Street, NW
Washington, D.C. 20001

20

Tel: (202) 639-6426
Sanghr@afge.org

21

22

By: */s/ Rushab Sanghvi*  _____

23

*Attorney for Plaintiffs American Federation of
Government Employees, AFL-CIO (AFGE) and AFGE
locals*

24

25

26

Teague Paterson (SBN 226659)
Matthew Blumin (pro hac vice)

27

AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES, AFL-CIO

28

1625 L Street, N.W.

1

2

3

Washington, D.C. 20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

4     By: */s/ Teague Paterson*

5

6

7

*Attorneys for Plaintiff American Federation of State
County and Municipal Employees, AFL-CIO
(AFSCME)*

8

9

10

11

12

Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL
UNION, AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

13     By: */s/ Steven K. Ury*

14

15

*Attorney for Plaintiff Service Employees International
Union, AFL-CIO (SEIU)*

16

17

18

19

20

21

22

23

24

25

David Chiu (SBN 189542)
City Attorney
Yvonne R. Meré (SBN 175394)
Chief Deputy City Attorney
Mollie M. Lee (SBN 251404)
Chief of Strategic Advocacy
Sara J. Eisenberg (SBN 269303)
Chief of Complex and Affirmative Litigation
Molly J. Alarcon (SBN 315244)
Alexander J. Holtzman (SBN 311813)
Deputy City Attorneys
OFFICE OF THE CITY ATTORNEY FOR THE
CITY AND COUNTY OF SAN FRANCISCO
1390 Market Street, 7th Floor
San Francisco, CA 94102
molly.alarcon@sfcityatty.org
alexander.holtzman@sfcityatty.org

26     By: */s/ David Chiu*

27

28

*Attorneys for Plaintiff City and County of San
Francisco*

1

2      Tony LoPresti (SBN 289269)
       COUNTY COUNSEL
3      Kavita Narayan (SBN 264191)
4      Meredith A. Johnson (SBN 291018)
       Raphael N. Rajendra (SBN 255096)
5      Hannah M. Godbey (SBN 334475)
       OFFICE OF THE COUNTY COUNSEL
6      COUNTY OF SANTA CLARA
       70 West Hedding Street, East Wing, 9th Floor
7      San José, CA 95110
       Tel: (408) 299-5900
8

9      By:  */s/ Tony LoPresti*

10          *Attorneys for Plaintiff County of Santa Clara, Calif.*

11

12     General Counsel
       Erin King-Clancy (SBN 249197)
13     Senior Deputy Prosecuting Attorney
       OFFICE OF KING COUNTY PROSECUTING
14     ATTORNEY LEESA MANION
       401 5th Avenue, Suite 800
15     Seattle, WA 98104
       (206) 477-9483
16     chrsanders@kingcounty.gov
       eclancy@kingcounty.gov
17

18     By: */s/ Erin King-Clancy*

19          *Attorneys for Plaintiff Martin Luther King, Jr. County*

20

21     Sharanya Mohan (SBN 350675)
       Eliana Greenberg (SBN 366319)
       Toby Merrill (pro hac vice app. forthcoming)
22     PUBLIC RIGHTS PROJECT
       490 43rd Street, Unit #115
23     Oakland, CA 94609
       Tel: (510) 738-6788
24     sai@publicrightsproject.org

25     By: */s/ Eliana Greenberg*

26
       *Attorneys for Plaintiffs Baltimore, MD, Chicago, IL,*
27     *Harris County, TX, and Martin Luther King, Jr.*
       *County, WA*
28

1
2         Jonathan G.C. Fombonne
         *Harris County Attorney*
3
         Sarah Utley (pro hac vice app. forthcoming)
4         Managing Counsel
         Bethany Dwyer (pro hac vice app. forthcoming)
5         Deputy Division Director - Environmental Division
         R. Chan Tysor (pro hac vice)
6         Senior Assistant County Attorney
         Alexandra "Alex" Keiser (pro hac vice)
7         Assistant County Attorney
         1019 Congress, 15th Floor
8         Houston, Texas 77002
         Tel.: (713) 274-5102
9         Fax: (713) 437-4211
10
         jonathan.fombonne@harriscountytx.gov
11        sarah.utley@harriscountytx.gov
         bethany.dwyer@harriscountytx.gov
12        chan.tysor@harriscountytx.gov
         alex.keiser@harriscountytx.gov
13

14     By:  */s/ Jonathan G.C. Fombonne*

15      *Attorneys for Plaintiff Harris County, Texas*

16

17

18         Mary B. Richardson-Lowry,
         Corporation Counsel of the City of Chicago
19
         Rebecca A. Hirsch (pro hac vice)
20        Lucy Prather (pro hac vice)
         City of Chicago Department of Law,
21        Affirmative Litigation Division
         121 N LaSalle Street, Suite 600
22        Chicago, Illinois 60602
         Tel: (312) 744-6934
23        Rebecca.Hirsch2@cityofchicago.org
         Lucy.Prather@cityofchicago.org
24

25     By:  */s/ Rebecca Hirsch*

26      *Attorneys for Plaintiff City of Chicago*

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ebony M. Thompson
Baltimore City Solicitor

Christopher Sousa (SBN 264874)
Chief Solicitor
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Tel: (410) 396-3947
christopher.sousa@baltimorecity.gov

By: */s/ Christopher Sousa*                        

*Attorneys for Plaintiff City of Baltimore*