Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*

[Additional counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 3:25-cv-03698-SI |
| Plaintiffs, | **DECLARATION OF KHAALIS JACKSON** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

1

## DECLARATION OF KHAALIS JACKSON

2 I, Khaalis Jackson, declare as follows:

3        1.    I am over 18 years old and competent to give this declaration. This declaration is

4 based on my personal knowledge, information, and belief.

5        2.    I am an Emergency Management Specialist at the Federal Emergency Management

6 Agency ("FEMA").  I am also the President of the American Federation of Government Employees

7 Local 4060 ("AFGE Local 4060" or the "Union").  I have been the President since March 2024.

8        3.    The American Federation of Government Employees, AFL-CIO (AFGE), is a labor

9 organization and unincorporated association that represents approximately 800,000 federal civilian

10 employees through its affiliated councils and locals nationwide.   AFGE Local 4060 represents

11 FEMA employees throughout the United States.

12       4.    Until March 27, 2025, AFGE Local 4060 was the certified bargaining representative

13 of approximately 4500 FEMA employees nationwide.  The bargaining units represented by AFGE

14 Local 4060 include employees in the civil service and the Cadre of On-Call Response/Recovery

15 Employees ("CORE").  Our best estimate of the number of CORE employees represented in these

16 bargaining units is approximately 1750.

17       5.    The March 27, 2025 Executive Order titled "Exclusions from Federal Labor

18 Management Relations Programs" ("Executive Order") revoked the right of all of these employees

19 to collective bargaining representation.  AFGE has challenged this Executive Order as unlawful in

20 pending litigation.

21       6.    AFGE Local 4060 continues to provide representational services to FEMA

22 employees from its former bargaining units, notwithstanding the Executive Order, including

23 advice, assistance and representation with respect to disciplinary actions and other employment-

24 related issues.  AFGE Local 4060 often provides assistance to FEMA employees, including those

25 inside and outside the former bargaining unit, who are under investigation for alleged disciplinary

26 or performance-related infractions.  This includes, for example, reviewing disciplinary write ups

27 with employees, giving them advice on how to address the situation, and, in some cases, helping to

28 connect them with legal counsel.  In some cases, AFGE Local 4060 will also work with FEMA

management to informally resolve workplace issues that FEMA employees are facing.  These efforts are intended to mitigate disputes at an early stage, reduce unnecessary escalation, and avoid disruptions to mission critical operations.  And AFGE Local 4060 also facilitates legal advice to former bargaining unit employees related to EEOC matters, FLSA violations, and other employment disputes.  AFGE Local 4060 also continues to represent dues-paying members who work for FEMA, notwithstanding the Executive Order.  AFGE Local 4060 has approximately 670 dues paying members who work for the agency. These employees include, for example, Logistics Specialists who are engaged in procuring and delivering equipment and services to areas impacted by a disaster; Grant Management Specialists who manage and oversee the grant application process for disaster recovery; and External Affairs Officers who are engaged in communicating the agency's mission and services to the public.  AFGE's current dues-paying members include civil service and CORE employees.

7.      I started at FEMA as a local hire in 2005 following Hurricane Katrina.  Local hire positions are 120-day appointments related to disaster recovery work.  In that role, I worked at a temporary auxiliary call center in Pasadena, California providing Individual Assistance to survivors impacted by Hurricane Katrina.

8.      After my term expired, I became a Reservist, which at that time was called a disaster assistance employee, in Region 9, which is located in Oakland, California.  As a Reservist I worked in disaster planning, and one of my primary responsibilities was creating incident action plans.  An incident action plan sets out response objectives, tactics, resource assignments, and safety measures for managing a specific disaster based on the needs of the community.  For example, an incident action plan may set an objective of establishing a certain number of disaster recovery centers, delivering a specific amount of food, installing some number of temporary housing units, or providing some other service in a certain place by a certain date through certain means. My duties included facilitating planning meetings, integrating information from multiple operational sources, and ensuring consistency and accuracy across all components of the incident action plans I worked on.

9.      In 2013, I became a CORE employee in the Region 7 office (which is in Kansas

1    City, Missouri), continuing my work in disaster planning.

2        10.    In 2016, I became a Title 5 permanent civil service employee and transitioned to my

3    current position as an Emergency Management Specialist in operations for Region 7, which

4    includes Iowa, Missouri, Kansas, and Nebraska.  In this position, I work with state and local

5    emergency managers to acquire response resources after a disaster or emergency occurs.  These

6    resources include response personnel as well as supplies such as generators, tents, temporary

7    housing, food, water, and medical supplies, among other things.

8        11.    During my time employed by FEMA, I have been deployed to numerous disasters

9    and emergencies across the county, including many incidents outside of Region 7.  For example, I

10   was deployed to respond to hurricanes in New Hampshire and Rhode Island in 2013; a tropical

11   storm in Hawaii in 2016; and hurricanes in South Carolina and Georgia in 2018. My current

12   position is a permanent civil service position.  The majority of FEMA employees, including the

13   employees with whom I work, are CORE or other Stafford Act employees (such as Reservists), not

14   civil service.  I am familiar with the work performed by the CORE and Reservists, and the

15   procedures that apply to these positions through my work at FEMA and my position as AFGE

16   Local 4060 President.

17       12.    CORE employees are full-time workers who are hired for two- to four-year terms,

18   renewable according to agency need, and who work across disasters.  Reservists are on-call

19   employees who may be activated in particular emergencies, and are also renewable according to

20   agency need.  My understanding is that the Stafford Act employees are funded through the Disaster

21   Relief Fund.

22       13.    Based on FEMA numbers most recently made public in January 2026, as of late

23   December 2025 there were 23,067 FEMA employees, of which 4,956 were civil service, 10,571

24   were CORE, and 7,540 other (largely Reservists).  *See* ¶¶29, 32-33, Exs. C, E.

25       14.    FEMA's Stafford Act employees consistently in my experience at FEMA have by

26   far outnumbered the civil service staff.  According to a 2025 Government Accounting Office report

27   on FEMA staffing, FEMA reported employing 23,620 total staff as of June 1, 2024, of which only

28   approximately 5,100 were permanent civil service employees.  *See* ¶59 and Ex. I at *9.  As of fiscal

AFGE Local 4060 President Khaalis Jackson Declaration, No. 3:25-cv-03698-SI

1    year 2022, FEMA employed approximately 5,000 Title 5 employees, 9,000 Stafford Act CORE

2    employees, 8,000 Stafford Act reservists, and approximately 1,000 others. *Id.*

3         15.     CORE employees perform nearly all the roles and functions that FEMA performs.

4    CORE employees are assigned to every Region Office and all 23 cadres.  Of the cadres, the biggest

5    are individual assistance, public assistance, logistics, hazard mitigation, and disaster survivor

6    assistance.  The vast majority of CORE and Reservist employees are assigned to the disaster

7    workforce, which provides services directly to the public and to state, local and tribal governments.

8         16.     Following a disaster, it is very common for FEMA to pull disaster response staff

9    from across the country, not just the regional office where a disaster occurs.  Regional offices

10   generally do not have sufficient incident management staff—or do not have sufficient staff with the

11   specific skills needed—to respond to disasters without personnel from other FEMA offices.  When

12   an especially serious disaster occurs, FEMA often requires all hands on deck, deploying the vast

13   majority of its disaster workforce across all offices.  And the majority of the FEMA employees

14   who are sent as part of these response and recovery efforts are CORE employees or Reservists.

15        17.     Until recently, the terms of CORE employees were routinely renewed.  The FEMA

16   Core Manual explains that renewals are made for "need."  FEMA has been short-staffed for years,

17   and there is a serious and ongoing agency need for the work performed in these positions.  The

18   renewals of CORE employees have never been denied, in my experience, including because of an

19   Administration's policy preferences.

20        18.     To my knowledge, DHS has never been (and is not supposed to be) involved in the

21   renewal of CORE positions.  Until recently, FEMA supervisors approved CORE term renewals as

22   a matter of routine.

23        19.     The SF-52 form ("Request for Personnel Action") is an OPM document that is used

24   for statutory "temporary" employees like the CORE (and others), is maintained in a CORE

25   employee's personnel file, and contains the Not to Exceed ("NTE") date.  These forms are used for

26   the original appointment and also for renewals.  The renewals are accomplished by way of a

27   revised SF-52 form being completed and placed in the employee's personnel file, with a new NTE

28   date.  As an NTE approached, FEMA supervisors typically complete the required paperwork to

AFGE Local 4060 President Khaalis Jackson Declaration, No. 3:25-cv-03698-SI

1    extend these terms.

2        20.    I understand that sometime in 2025, DHS began requiring FEMA to send over

3    justifications for any CORE employees that FEMA wanted to renew (which generally is all of

4    them).  This includes those employees with upcoming NTE dates in early 2026 that FEMA wanted

5    to renew.  Because FEMA was required to send over justifications for these renewals, I believe that

6    the recent denials by DHS by NTE date that began in January 2026 involved positions for which

7    FEMA recommended renewal, and sent justifications to DHS.

8        21.    Prior to January 1, 2026, CORE employees were being renewed per FEMA's

9    recommendations.  That stopped on December 31, 2025.

10       22.    The human resources office for FEMA is called the Office of the Chief Human

11   Capital Officer, or "OCHCO."  The FEMA OCHCO maintains an internal website for FEMA

12   employees.

13       23.    The FEMA OCHCO website explains the recent changes to the CORE renewal

14   process, reflecting that DHS has taken over decision-making for FEMA.  In late December 2025,

15   the FEMA OCHCO website, under "CORE Renewals/Extensions and New Appointments" was

16   changed to state:  "**December Update:**  FEMA's authority to extend CORE appointments ended

17   on December 31, 2025."   A true and correct copy of a screenshot of this webpage provided to

18   AFGE Local 4060 is attached hereto as **Exhibit A.**

19       24.    As of today, the FEMA OCHCO website still contains the statement that FEMA's

20   authority to extend CORE appointments ended on December 31, 2025.

21       25.    The FEMA OCHCO website also now states that only DHS has the authority to

22   approve employment actions, and specifically refers to "S1" approval.  S1 refers to the DHS

23   Secretary, currently Kristi Noem.  A true and correct copy of a screenshot of this webpage

24   provided to AFGE Local 4060 attached hereto as **Exhibit B.**

25       26.    Neither AFGE Local 4060 nor FEMA employees were provided any advance notice

26   that DHS was removing FEMA authority to renew CORE positions as of January 31, 2025.  No

27   one was provided advance notice that DHS was going to deny renewals by NTE date, beginning

28   January 1, 2026 either.

AFGE Local 4060 President Khaalis Jackson Declaration, No. 3:25-cv-03698-SI

27.     I learned of this policy through the press and when employees began receiving abrupt, often same-day non-renewal notices for renewals beginning on January 1, 2026.  January 1, 2026 is a holiday.  I believe at least some employees were not aware of these notices until they returned to work on January 2, 2026 (and the press reported that still others were actually separated while on vacation for the holidays).

28.     At some point in January 2026, I also learned of the December 23, 2025 email to FEMA management regarding targets for reductions in staff.  This email was also widely reported in the press, including at least CNN, the Washington Post, and the Federal News Network all reported that they had obtained the email, and reported on its contents.

29.     A true and correct copy of a January 5, 2026 CNN article entitled *FEMA planning exercise envisioned deep workforce cuts, adding to uncertainty around agency's future* is attached hereto as **Exhibit C**.  CNN reported:

> On December 23, dozens of senior FEMA leaders received a message notifying them that the agency was launching a "workforce capacity planning exercise."
> …
> A spreadsheet attached to the message noted the goal would be to cut FEMA's staff by more than 50% — over 11,500 jobs — by the next fiscal year, which starts in October. The email to agency leaders stressed that no final decisions about workforce reductions have been made yet, and that the exercise is just for planning.
> …
> According to the emailed draft plan, FEMA's permanent full-time staff would shrink by 15%, its disaster response staff would be slashed by 41%, and its surge workforce — the teams that rush in after major disasters — would be cut by 85%. Overall, the reductions would cut staff by more than half.

30.     A true and correct copy of a January 8, 2026 Federal News Network article entitled *Concerns mount over FEMA staff reductions*, is attached hereto as **Exhibit D**.  That article reported:

> In a Dec. 23 email viewed by Federal News Network, FEMA's chief human capital office sought leadership input on a "Workforce Capacity Planning Exercise." The email references how the exercise is "consistent" with a recent executive order and corresponding White House guidance on federal hiring.

This reference is to the October 15, 2025 Executive Order and OMB/OPM Memorandum that Executive Order 14356 required agencies to submit Annual Staffing Plans to OMB/OPM by

December 1, 2025.  FEMA has not made public, or available to AFGE Local 4060 or employees, any Annual Staffing Plan.

31.    The article at Exhibit D also reported:

The email included a "draft workforce plan" with a table laying out FEMA's workforce totals as of Sept. 30 and fiscal 2026 "target" reductions.
The reductions listed in that table include a 50% overall reduction to FEMA's total workforce of 23,000, including a 15% reduction the permanent full-time workforce and a 41% reduction to the disaster full-time workforce, which includes CORE staff.

32.    A true and correct copy of a January 5, 2026 Washington Post article entitled *Emails outline potential cuts affecting thousands of FEMA disaster responders*, is attached hereto as **Exhibit E**.  The Post reported that it had also obtained the December 23 email and planning exercise targets for reductions of 50% of all FEMA staff.   The Post reported that:

Emails sent to senior agency leadership in late December include detailed tables identifying roles that can be cut from the agency's divisions. These tables include a 41 percent reduction in CORE disaster roles, amounting to more than 4,300 positions. They also list reductions in surge staffing, standby workers who are often the first on the ground when a disaster strikes, by 85 percent, or nearly 6,500 roles.

33.    The Post reported further that:

Although the documents call the staffing reduction an "exercise" and say "no staffing actions or personnel decisions are being directed or implemented as part of this request," two officials familiar with the situation said the tables reflect Noem's targets for the agency.

The Executive Order and OPM/OMB Memorandum referenced in this email required DHS to submit a "final" Annual Staffing Plan to OMB and OPM by December 1, 2025.  I am not aware of any Annual Staffing Plan made public or provided to FEMA employees.

34.    Neither AFGE Local 4060 nor FEMA employees were given any notice of a staffing plan, including any plan to reduce the workforce by 50 percent, including 41 percent of the CORE.

35.    I understand that the President's Executive Order 14536 from earlier in 2025 required agencies, including DHS and FEMA to submit a "final" "Annual Staffing Plan" to OMB and OPM, and OMB and OPM directed agencies to do this by December 1, 2025.  Neither DHS nor FEMA have revealed this Annual Staffing Plan to AFGE Local 4060 or FEMA employees.

Impact of the Non-renewal Notices to CORE employees

36.    I have personally reviewed notices sent to CORE employees including employees represented by AFGE.  The emails stated without further explanation that their positions "would

AFGE Local 4060 President Khaalis Jackson Declaration, No. 3:25-cv-03698-SI

7

not be renewed" and "therefore, your services will no longer be needed" after their NTE date in early January. Employees generally received these the same day or day before the renewal date.

37. It is my understanding from press reports and my position as President of AFGE Local 4060 that the initial New Year's Eve implementation notices were sent to approximately 65 individuals, and since that time many more employees have received these non-renewals, including employees represented by AFGE.

38. Neither DHS nor FEMA has provided any information to AFGE Local 4060 regarding the identity or numbers of CORE employees that it is separating. I and others at AFGE have spent considerable time attempting to represent and assist employees impacted by these actions, as well as others with NTE dates coming soon. However, without information about the identity or number of CORE employees that DHS and FEMA are terminating, it has been difficult (and in some cases, impossible) to adequately advise employees, often requiring the union to expend additional resources.

39. It is my understanding that thousands of CORE employees at FEMA have NTEs in the coming year (with likely hundreds each month). It is also my understanding that the Reservists all have the same NTE date in May 2026.

40. I believe that FEMA supervisors (and likely DHS officials) possess the exact numbers of FEMA CORE staff with NTEs in any given month. This information is maintained in FEMA personnel records.

41. From communicating with impacted employees and hearing their stories, I can share some of the impacts that this hasty and unreasoned decision is having on the agency, the employees, and their families.

42. For example, I am aware that CORE staff provided critical support in 2025 to Los Angeles communities that were devastated by the wildfires. I am aware of at least one CORE employee who has already been non-renewed who was deployed in January 2025 to work at the FEMA housing shelter in Pasadena, taking in individuals whose homes had burned in the Eaton fire and had nowhere else to go, registering them for FEMA assistance, and working to relocate displaced families into more permanent, non-shelter housing. Whole families would arrive with

1    their lives packed into a suitcase, relying on FEMA for a place to sleep.

2        43.    In another example, I am aware of another CORE employee with a January 13,

3    2026, NTE date who was informed she was not renewed.  The notice was a shock to this employee

4    and her supervisors.  She had recently been formally recognized and awarded a bonus for being an

5    exemplary Emergency Manager, and she had been hearing from her supervisor and regional

6    leadership for months prior that they were working to make sure she would be renewed because her

7    work was critical to the ongoing Hurricane Maria recovery efforts in Puerto Rico.  Yet after she

8    returned from the holidays, her section chief was standing by her desk, face pale, informing her

9    that she had not been renewed.

10        44.    I understand that upon receiving these notice emails employees almost immediately

11    lost systems access.  They had no time to plan for being cut off from their own employment-related

12    documents, or to transition their work.  My understanding is that supervisors had recommended

13    these employees for renewal (as is routine and reflects the agency's need for the work they

14    perform), and no one was told: plan to be separated or to transition your work.  FEMA did not

15    prepare these employees or their offices for this action.

16        45.    Generally, when separated employees are going to receive at most one additional

17    paycheck, some benefits (such as vision and dental) will be immediately canceled, and others

18    (health insurance) will continue for one remaining 30 day period.   My understanding is that

19    COBRA extensions for health insurance are available but are often prohibitively expensive (many

20    times the current cost to employees).

21        46.    Losing employment (and income and benefits) with no notice is having immediate

22    and serious impacts on employees and their families.  As President of AFGE Local 4060, I have

23    heard heartbreaking stories of how non-renewals are already affecting employees, including the

24    following examples:

25        a.    One bargaining unit member (who wishes to remain anonymous) is terrified that she

26            won't be able to cover the cost of basic necessities and vital medical services for more

27            than a month if she cannot find a new job. Her current savings will only cover the

28            cost of one month of rent, her electricity bills are regularly $300-400/month, and she

AFGE Local 4060 President Khaalis Jackson Declaration, No. 3:25-cv-03698-SI

9

1     is worried about being unable to pay for electricity and housing past February.  She

2     has specialized medical appointments scheduled for March but fears she will have to

3     cancel them because she will no longer have health insurance to cover the cost.  Her

4     insurance will expire on February 13, 2026, and after that she also won't be able to

5     afford the medical pills that she takes daily to maintain her treatment.

6     b.    Another CORE employee (who wishes to remain anonymous) is diabetic and has an

7          auto-immune condition is terrified about the loss of health insurance that would

8          follow their imminent non-renewal.  This employee's entire family – including their

9          fully disabled husband and two sons, one of whom is autistic and has ADHD –

10         relies on this employee's income and health insurance.  If they are separated from

11         the agency and unable to quickly find new employment, they will not be able to

12         afford the cost of the medical care their lives depend on.

13    47.    There are thousands of CORE employees with upcoming NTE dates this year,

14    including in the coming weeks.  Losing these employees will directly undermine FEMA's ability to

15    perform all types of work across the agency.  One example:

16    a.    I am aware of a CORE employee, who has been with the agency since 2019 and has

17         an upcoming NTE date of February 14, 2026, who provides critical support in the

18         immediate aftermath of disaster events as a Finance Administrative Section Chief.

19         In this role, they are deployed approximately 300 days every year. The employee

20         has responded to disasters in many states, including California, Ohio, Iowa,

21         Connecticut, Vermont, New Hampshire, Tennessee, Kentucky, Florida, Louisiana,

22         Arkansas, Virgin Islands, Puerto Rico, Texas, and Virginia.  They are typically

23         deployed within the first six to eight hours after a disaster has been formally

24         declared, and they primarily work from the Joint Field Offices that are established

25         for state and federal coordination during immediate disaster response.  This person

26         works with the Joint Field Office leadership to oversee the movement of FEMA

27         funds to meet the needs of the disaster response effort.  For instance, when a request

28         comes in from the Logistics team for mission supplies, they are responsible for

AFGE Local 4060 President Khaalis Jackson Declaration, No. 3:25-cv-03698-SI

1    ensuring funds are appropriated to fulfill that request and released to the awaiting

2    team.  They oversee the movement of funds across all categories, from public

3    assistance to individual assistance, housing to hazard mitigation, survival kits

4    (water, food, personal protective gear, etc.) to funeral funds.  It is their job to ensure

5    the funding is allocated and directed, so that mission-critical resources are paid for

6    and funding is available for survivors of disaster events.  Because of exiting staffing

7    shortages, this employee is often the only Finance person in the field.  Yet without

8    someone doing their job, FEMA's immediate disaster response teams would not be

9    able to function because there would be no funds available to support their efforts.

10   48.    These actions are having and will have further adverse impacts on AFGE Local

11   4060's ongoing ability to provide representation to these employees.  As explained, I and others at

12   AFGE have already spent considerable time and resources assisting employees impacted by these

13   actions, and attempting to discern further information regarding the scope and impact of these

14   actions and employees' ability to navigate these separations.

15   January 22, 2026 "Pause" for the Winter Storm

16   49.    As of the week of January 19, 2026, weather forecasters were predicting a very

17   serious winter storm affecting large portions of the United States.  DHS and FEMA continued to

18   separate CORE employees that week according to NTEs even though this storm was coming, and

19   FEMA was needed for substantial preparation and relief work.

20   50.    On January 22, 2026, a day before the storm was supposed to start, some FEMA

21   employees received a message stating that the "offboarding" would be stopped as of January 22.  A

22   true and correct copy of this message is attached hereto as **Exhibit F.**

23   51.    As of today, FEMA employees have not received any "updated instructions"

24   regarding the status of these actions.  This is causing extreme confusion, and stress, within the

25   agency, as individuals with imminent NTE dates have been provided no further assurance they will

26   not be separated (or worse, retroactively separated) once DHS decides the storm need has passed.

27   52.    The message referred to employees that had been separated earlier that day (January

28   22).  My understanding from talking to affected employees is that they were contacted by someone

AFGE Local 4060 President Khaalis Jackson Declaration, No. 3:25-cv-03698-SI

from FEMA who told them they would receive only a 90-day renewal.  I have never heard of any CORE employee receiving only a 90-day extension of their term, which are typically renewed for time periods in years.

53.     Other articles regarding the "pause" also quoted inside FEMA officials as telling the press that the pause was caused by the storm, and was temporary.

54.     It has now been over two weeks since this announced temporary pause.  Unclear and confusing information continues to be provided by the agency, with all fingers pointing to a lack of information from DHS.

55.     I am aware that beginning on Friday February 6 and 7, 2026, multiple press reports were published citing inside FEMA sources stating that the "pause" in CORE separations was ending, and the FEMA would begin separating employees again soon.  Neither DHS nor FEMA have told employees, including employees with upcoming separation dates that this is not true, or provided any further information regarding these workforce plans.

56.     As of Monday, February 9, 2026, I have learned that at least one FEMA supervisor has confirmed to FEMA employee(s) that the temporary pause on the non-renewals of CORE employees according to NTE will be lifted and the separations will resume.

Congressional and Other Documents on FEMA Staffing Shortages

57.     A true and correct copy is attached hereto as Exhibit G of the Government Accounting Office ("GAO") Report No. GAO-09-59R, *Actions to Implement the Post-Katrina Act*, (Nov. 21, 2008) available at:  https://www.gao.gov/assets/gao-09-59r.pdf.

58.     A true and correct copy is attached hereto as Exhibit H of GAO Report No. GAO-23-105663, *FEMA Hiring and Staff Shortages*, (May 2023), available at: https://www.gao.gov/assets/gao-23-105663.pdf.

59.     A true and correct copy is attached hereto as Exhibit I of GAO Report No. GAO-25-108598, *Disaster Assistance High-Risk Series: Federal Response Workforce Readiness* (Sept. 2025) available at: https://www.gao.gov/products/gao-25-108598.

60.      A true and correct copy is attached hereto as Exhibit J of GAO Report No. GAO-26-108599, *Disaster Assistance High-Risk Series: State and Local Response Capabilities* (Dec. 18,

AFGE Local 4060 President Khaalis Jackson Declaration, No. 3:25-cv-03698-SI
12

1    2025) available at: https://www.gao.gov/products/gao-26-108599.

2          61.    A true and correct copy is attached hereto as Exhibit K of Congressional Research

3    Service Report, *Deployable Federal Assets Supporting Domestic Disaster Response Operations:*

4    *Summary and Considerations for Congress* (May 13, 2015), available at:

5    https://www.congress.gov/crs_external_products/R/PDF/R43560/R43560.8.pdf.

6          62.    A true and correct copy is attached hereto as Exhibit L of Congressional Research

7    Service Report, *FEMA: Increased Demand and Capacity Strains* (January 2, 2025), available at:

8    https://www.congress.gov/crs-

9    product/IF12834?q=%7B%22search%22%3A%22Fema%22%7D&s=3&r=6.

10         63.    A true and correct copy is attached hereto as Exhibit M of Congressional Research

11   Service Report, *Disaster Relief Fund State of Play* (April 9, 2025), available at:

12   https://www.congress.gov/crs-product/R47676.

13         64.    A true and correct copy is attached hereto as Exhibit N of excerpts of the DHS,

14   FEMA Budget Overview, Fiscal Year 2025 Congressional Justification, available at:

15   https://www.dhs.gov/sites/default/files/2024-

16   04/2024_0320_federal_emergency_management_agency.pdf.

17         65.    A true and correct copy is attached hereto as Exhibit O of excerpts of the DHS,

18   FEMA Budget Overview, Fiscal Year 2026 Congressional Justification, available at:

19   https://www.dhs.gov/sites/default/files/2025-06/25_0613_fema_fy26-congressional-budget-

20   justificatin.pdf .

21         66.    A true and correct copy is attached hereto as Exhibit P the "Katrina Declaration," an

22   online petition signed by current and former FEMA officials and employees addressed to Trump

23   Administration's efforts to reduce and undermine FEMA).

24         67.    A true and correct copy is attached hereto as Exhibit Q of excerpts from the Federal

25   Response to Hurricane Katrina, Lesson Learned (February 2006), available at:

26   https://www.govinfo.gov/content/pkg/GOVPUB-PREX-PURL-LPS67263/pdf/GOVPUB-PREX-

27   PURL-LPS67263.pdf#.

28         68.    A true and correct copy is attached hereto as Exhibit R of a June 9, 2025 Letter from

United States Senators to President Donald J. Trump, available at:

https://www.welch.senate.gov/wp-content/uploads/2025/06/Letter-to-White-House-on-Absence-of-

FEMA-Administrator.pdf.

FEMA Publications and Documents on FEMA Procedures and Structure

69.    A true and correct copy is attached hereto as Exhibit S of FEMA Publication No. 1:

*We Are FEMA:  Helping people before, during and after disasters* available at:

https://www.fema.gov/about/action/pub-1.

70.    A true and correct copy is attached hereto as Exhibit T of FEMA, *Individual*

*Assistance Program and Policy Guide (IAPPG)* (May 2021), available at:

https://www.fema.gov/sites/default/files/documents/fema_iappg-1.1.pdf

71.    A true and correct copy is attached hereto as Exhibit U of FEMA, *Public Assistance*

*Program and Policy Guide* (Jan. 6, 2025), available at:

https://www.fema.gov/sites/default/files/documents/fema_pa_pappg-5.0-amended.pdf

72.    A true and correct copy is attached hereto as Exhibit V of FEMA, *FEMA Cadre*

*Management Guide* (October 2014), available at:  https://www.fema.gov/sites/default/files/2020-

07/FEMA_Cadre_Management_Guide1-10282014.pdf

73.    A true and correct copy is attached hereto as Exhibit W of DHS, *National Response*

*Framework* (4th Ed. Oct. 28, 2019) available at:

https://www.fema.gov/sites/default/files/documents/NRF_FINALApproved_2011028.pdf.

74.    A true and correct copy is attached hereto as Exhibit X of FEMA, *Emergency*

*Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human*

*Services Annex*, available at: https://www.fema.gov/sites/default/files/2020-07/fema_ESF_6_Mass-

Care.pdf.

75.    A true and correct copy is attached hereto as Exhibit Y of FEMA, *Emergency*

*Support Function #7 – Logistics Annex*, available at: https://www.fema.gov/sites/default/files/2020-

07/fema_ESF_7_Logistics.pdf

76.    A true and correct copy is attached hereto as Exhibit Z of FEMA, Disaster Relief

Fund: Monthly Report (Jan. 14, 2026), available at:

1   https://www.fema.gov/sites/default/files/documents/fema_ocfo_disaster-relief-fund-
2   report_122025.pdf.

3       77.    A true and correct copy is attached hereto as Exhibit AA of excerpts of FEMA,
4   *FEMA Manual 252-11-1 Cadre of On-Call Response/Recovery Employees (CORE) Program* (Aug.
5   25, 2015).

6       78.    A true and correct copy is attached hereto as Exhibit BB of FEMA Press Release
7   (Jan. 23, 2026), available at:  https://www.fema.gov/press-release/20260123/fema-coordinating-
8   states-ahead-severe-winter-storm.

9       I declare under penalty of perjury under the laws of the United States that the foregoing is
10  true and correct. Executed February 9, 2026, in Kansas City, Missouri.

11
12
13                                                  Khaalis Jackson
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit A



OCHCO Home    OCHCO Divisions    Events    Dashboards Home ⌄    Policy and Guidance ⌄    Employee Resources ⌄    Supervisor Resources ⌄    Connect ⌄

**FEMA** Talent, Recruitment & Acquisition

☆ Not following    ⌸ Shar

# Welcome to the OCHCO Hiring Toolkit!

This page provides hiring resources, forms, and guidance for hiring managers and HR Liaisons for filling Title V and Stafford Act vacancies.

OCHCO Staffing Division Di

Berry, Emilie
Director, Disaster Field Operations

Birchenough, Sara
Human Resources Specialist

## CORE Renewals/Extensions and New Appointments

**December Update:** FEMA's authority to extend CORE appointments ended on December 31, 2025.

### How do I submit a request for a CORE Renewal/Extension?

For employees with upcoming not-to-exceed (NTE) dates, their Program Office Executive Leadership will be contacted with instructions and next steps.

### If I apply and accept a CORE position, will I get a new appointment and not-to-exceed (NTE) date?

No, employees changing positions will keep their current expiration date.

**HIRING TOOLKIT**

**Stafford Act Hiring**

Resources, forms and guidanc
for filling CORE, Reservist, and
Local Hire positions

Learn more

Exhibit B



# DHS Hiring Verification

## DHS Hiring Verification Requirements

A request (i.e., filling out the provided form and gaining approval) is required and must be approved prior to filling a position under the following conditions:

- **Mission Critical Occupations (MCO) series**: When hiring an external candidate.

- **Non-MCO Series:** When hiring any candidate (internal or external).

- **Title 5 Only:** When seeking to double encumber a position impacted by the Deferred Resignation Program (DRP) or Workforce Transformation Program (WTP).
    - Note: CORE positions may not be double encumbered

- **All GS/IC/IT-15, SL, ST, and SES Hiring Actions**: Including new recruitments, initial appointments, reassignments, transfers, details (and extensions), reinstatements, and limited appointments. *Requests must include an organizational chart with the position highlighted.*

## DHS Hiring Verification Process

The FEMA/DHS verification forms are linked below. Submit completed and signed forms to the appropriate OCHCO Staffing Division.
Stafford Act Staffing: FEMA-OCHCO-SASD@fema.dhs.gov
Title 5: FEMA-TAD-TITLEV@FEMA.DHS.GOV

Requests will be routed weekly through the DHS OCHCO and FEMA leadership for concurrence and then for S1 approval. Please note, this is a multi-week process.

Please work within your offices to identify critical positions that you may need to fill over the next few months and submit the form as soon as you verify a need.

## Hiring Verification Forms

Grade 15/SL, ST, SES

GS/IC-15 -

Exhibit C

# FEMA planning exercise envisioned deep workforce cuts, adding to uncertainty around agency's future

*Gabe Cohen*

Federal Emergency Management Agency leaders were told to prepare for a possible gutting of their workforce — by as much as half — in the coming months, according to an internal email sent to top FEMA officials last month.

On December 23, dozens of senior FEMA leaders received a message notifying them that the agency was launching a "workforce capacity planning exercise." The instructions were blunt: Identify which jobs are absolutely essential to keep FEMA running, and which could be cut.

A spreadsheet attached to the message noted the goal would be to cut FEMA's staff by more than 50% — over 11,500 jobs — by the next fiscal year, which starts in October. The email to agency leaders stressed that no final decisions about workforce reductions have been made yet, and that the exercise is just for planning.

Now, a FEMA spokesperson tells CNN that the White House and Department of Homeland Security, which oversees the agency, have not approved such steep cuts, indicating that the 50% reduction target was included in error.

"Any numerical assumptions reflected in that draft were not approved, were not adopted, and do not represent FEMA policy or leadership direction," the spokesperson said in a statement to CNN.

While Trump administration officials haven't landed on how much to slash FEMA's staffing, multiple FEMA officials who asked not to be named for fear of retribution told CNN that the administration has been discussing major cuts to the agency in 2026.

The confusion over the December email highlights the growing uncertainty surrounding the increasingly messy overhaul of FEMA, marked by shifting directives from the White House and DHS.

"Imagine trying to plan for a catastrophic situation and being told you may or may not have 50 percent of your staff available," a longtime FEMA official told CNN. "What kind of confidence does that inspire at any level?"

Last week, CNN reported that dozens of FEMA workers whose employment contracts were set to expire in early January were abruptly told they wouldn't be renewed and would be jobless within days. The move blindsided many inside the agency, raising fears about what might happen to thousands more whose contracts end in 2026.

A DHS spokesperson insisted the early January terminations were just a "routine staff adjustment," but the internal email shows that much bigger changes were discussed.

According to the emailed draft plan, FEMA's permanent full-time staff would shrink by 15%, its disaster response staff would be slashed by 41%, and its surge workforce — the teams that rush in after major disasters — would be cut by 85%. Overall, the reductions would cut staff by more than half.

If cuts of that magnitude were implemented, there would likely be fewer federal boots on the ground when disaster hits. States would be left to pick up the slack, supporting survivors and navigating a complex federal aid

system — which the Trump administration has also vowed to improve.

A 50% staff reduction across the agency would mirror recommendations from the special task force – known as the FEMA Review Council – that President Donald Trump set up in 2025 to help overhaul FEMA. A draft of that group's final report, obtained exclusively last month by CNN, also called for cutting the agency's workforce in half and moving many full-time staff out of Washington, DC, to regional offices around the country.

After CNN reported on the draft recommendations, the White House abruptly postponed the task force's final meeting, which has yet to be rescheduled, leaving FEMA's future uncertain. Now, DHS — which previously pushed to eliminate FEMA entirely — is signaling that neither the department nor the White House is prepared to support such drastic cuts to the agency.

All of this is part of a broader push by the Trump administration to overhaul FEMA, shrink its size and shift more responsibility for disaster response and recovery to the states. Since President Trump took office, his administration has argued that the disaster relief agency is ineffective, partisan and bloated.

But FEMA leaders warn that a dramatic downsizing would leave fewer federal workers ready to respond when disaster strikes. They note FEMA was already short more than 6,000 employees, according to a 2023 Government Accountability Office report, and thousands more left in 2025 due through layoffs and buyouts.

Inside FEMA and across the country, officials are sounding the alarm. Many warn that most states simply aren't prepared to handle major disasters on their own. Billions in federal aid — the lifeblood of state and local emergency management operations — are already stuck in FEMA's backlog, slowed by new bureaucratic hurdles. With the future of federal funding uncertain, some states are tightening their own budgets and laying off local emergency management staff who depend on FEMA dollars.

# Exhibit D

# Concerns mount over FEMA staff reductions

*Justin Doubleday*

The Federal Emergency Management Agency's workforce continues to face uncertainty amid abrupt cuts to disaster response staff and planning emails that show FEMA has been contemplating deeper reductions.

Late last month, FEMA sent non-renewal notices to 50 Cadre of On-Call Response/Recovery Employees (CORE) whose terms ended between Jan. 1 and Jan. 4. CORE employees are hired for two-to-four year terms, but they are often renewed to continue ongoing disaster work. CORE staff make up the majority of FEMA's workforce, constituting 39% as of 2022.

FEMA did not respond to a request for comment. In other stories on the CORE cuts, a FEMA spokesman has characterized them as "a routine staff adjustment of 50 staff out of 8,000."

But a current FEMA supervisor and former FEMA supervisor, who were granted anonymity to candidly discuss the situation, both disputed the characterization of the terminations as "routine."

They said FEMA CORE staff are almost always renewed due to demand for staff to respond to an increasing rate of disasters and other agency tasks in recent years.

CORE staff are often among the first FEMA employees to be deployed in a disaster, according to Rafael LeMaitre, a former FEMA director of public affairs who now serves on the advisory council for the advocacy group Sabotaging Our Safety.

"While they serve two-year contract terms, those are routinely renewed, because the number of disasters that the nation has been dealing with has not gone down," LeMaitre said. "If anything, it's increased, both in the number of disasters and the severity of disasters, given changes to the climate, and frankly, additional pressures that FEMA has been put under to respond to non-traditional types of emergencies."

But the FEMA supervisors also described how, contrary to the recent non-renewals, decisions about extending CORE appointments are typically done on a case-by-case basis. The process typically includes an analysis of the employee's workload and the need for them to continue working on a given disaster.

"We never fire people just because their renewal dates happened to fall in a given time frame," the current FEMA supervisor said.

The renewal process typically starts 90 days before the employee's "not-to-exceed" date, which refers to when their term ends.

But in early December, emails show FEMA divisions and regions received a tasking from the agency's chief human capital office to submit justification packages for every CORE staff with an NTE date falling in January.

Those packages were submitted, but FEMA CORE staff with renewals falling Jan. 1-4 still received termination letters in late December.

It's unclear what will happen to other FEMA CORE staff whose terms expire in January. With approximately 9,000 total FEMA CORE staff, hundreds could be up for renewal in any given month.

Earlier this week, FEMA leaders received new direction to submit justification packages for CORE staff whose terms expire in February, according to the current supervisor.

"This is not a targeted workforce reduction – this is using a sledgehammer when you should be using a scalpel," the current FEMA supervisor said.

CNN first reported on FEMA's CORE cuts.

## Workforce reductions exercise

The cuts and uncertainty around CORE staff renewals come as FEMA has been analyzing much deeper cuts to its workforce, agency emails show.

In a Dec. 23 email viewed by Federal News Network, FEMA's chief human capital office sought leadership input on a "Workforce Capacity Planning Exercise." The email references how the exercise is "consistent" with a recent executive order and corresponding White House guidance on federal hiring.

The email included a "draft workforce plan" with a table laying out FEMA's workforce totals as of Sept. 30 and fiscal 2026 "target" reductions.

The reductions listed in that table include a 50% overall reduction to FEMA's total workforce of 23,000, including a 15% reduction the permanent full-time workforce and a 41% reduction to the disaster full-time workforce, which includes CORE staff.

The email states that the exercise is "pre-decisional in nature" and that "no staffing actions or personnel decisions are being directed or implemented as part of this request."

But current and former FEMA staff say it would be highly unusual to conduct such an exercise without planning for some form of workforce reductions.

The Washington Post first reported on the workforce planning email.

## FEMA cuts criticized

The latest FEMA cuts come after a year of turmoil at the agency that saw more than 2,000 employees depart through voluntary programs and some terminations. Those departures included two dozen senior leaders, according to the Government Accountability Office.

The Trump-appointed FEMA Review Council's report has been delayed, leaving to question the administration's long-term plan for FEMA.

However, both President Donald Trump and Homeland Security Secretary Kristi Noem have expressed a desire to eliminate or downsize FEMA, and instead shift more disaster recovery responsibilities to state and local governments.

Democrats in Congress were quick to criticize the latest FEMA CORE cuts and reports of deeper potential reductions.

"Even considering cuts of this scale is more evidence of the Trump administration's reckless and dangerous behavior and sends a clear message that the administration is willing to gamble with Americans' lives and violate federal law that Congress passed to ensure readiness for disasters," House Homeland Security Committee Ranking Member Bennie Thompson (D-Miss.) said in a statement.

House Transportation and Infrastructure Committee Ranking Member Rick Larsen (D-Wash.) is among the lead sponsors of a bipartisan bill to overhaul FEMA. The legislation would notably remove FEMA out from under the Department of Homeland Security and have it report directly to the president.

"After multiple Transportation and Infrastructure Committee hearings, we keep concluding FEMA needs more staff to meet the response needs of more frequent and severe disasters — like the recent flooding in my district," Larsen said in a statement. "Cutting CORE staff will leave remaining FEMA workers scrambling and disaster survivors waiting longer for assistance. This is the exact opposite of what we should be doing. The administration must reverse this decision."

*Copyright © 2026 Federal News Network. All rights reserved. This website is not intended for users located within the European Economic Area.*

Exhibit E

# Emails outline potential cuts affecting thousands of FEMA disaster responders

*Brianna Sacks*

The Department of Homeland Security has drafted plans to drastically cut the Federal Emergency Management Agency workforce in 2026, according to documents obtained by The Washington Post that detail potential reductions to thousands of disaster response and recovery roles.

The terminations are likely to come in waves, according to three people familiar with the plans who, like some others interviewed for this report, spoke on the condition of anonymity for fear of retribution. They said the cuts began on New Year's Eve with the elimination of about 65 positions that were part of FEMA's largest workforce, known as the Cadre of On-Call Response and Recovery (CORE) — staffers who are among the first on the ground after a disaster and often stick around for years to help communities recover.

Independent journalist Marisa Kabas and CNN earlier reported a portion of the New Year's Eve cuts.

Emails sent to senior agency leadership in late December include detailed tables identifying roles that can be cut from the agency's divisions. These tables include a 41 percent reduction in CORE disaster roles, amounting to more than 4,300 positions. They also list reductions in surge staffing, standby workers who are often the first on the ground when a disaster strikes, by 85 percent, or nearly 6,500 roles.

**Follow** Climate & environment

In a statement, FEMA spokesperson Daniel Llargués said the agency has "not issued and is not implementing a percentage-based workforce reduction."

"The materials referenced from the leaked documentation stem from a routine, pre-decisional workforce planning exercise conducted in line with OMB and OPM guidance," Llargués added. "The email outlining that exercise did not direct staffing cuts or establish reduction targets."

Homeland Security Secretary Kristi L. Noem has long wanted to cut back on CORE staffing, according to two former senior officials.

Losing a large number of disaster-specific workers over a short period "would mean greater delays in processing and survivors not being dealt with as quickly as they had been before," said Cameron Hamilton, who led FEMA as acting administrator in the early months of President Donald Trump's second term.

Internal agency emails and documents, as well as people familiar with the plans, suggest Noem is spearheading the drastic reductions, which may impede FEMA's ability to fulfill its legal obligation to help the nation respond to disasters, according to three FEMA officials.

Noem, who has exercised a tight grip over FEMA since taking over its parent department, has repeatedly expressed a desire to shrink or eliminate the agency. The Post reported that she previously made recommendations to cut agency staffing by about half.

Although the documents call the staffing reduction an "exercise" and say "no staffing actions or personnel decisions are being directed or implemented as part of this request," two officials familiar with the situation said the tables reflect Noem's targets for the agency.

An email describes the tables, which list total reduction counts and percentages for most of the agency's divisions, as a "planning document."

Llargués said in FEMA's statement that the "accompanying spreadsheet was an internal working tool used to collect planning inputs."

The emails show that there have been "deliberate" discussions regarding workforce reductions, said a person familiar with them, who added that the documents request "senior leadership to review and ensure that whatever staff is retained is absolutely necessary."

DHS has said publicly that it terminated 50 people in early January and that the cuts were "a routine staff adjustment of 50 staff out of 8000."

Two officials with knowledge of the process said that number is closer to 65. The officials had been told to expect that hundreds more people would lose their jobs by the end of January. CORE staffers whose jobs were supposed to be renewed this week still have not heard anything about their status, officials said.

Llargués said the New Year's Eve cuts were unrelated to the "planning exercise described in the leaked email."

The potential for additional cuts come less than a year after a wave of FEMA terminations, including of hundreds of probationary employees. FEMA officials are also awaiting a final draft of a report by a Trump-appointed review council on the agency's future, which was supposed to be released last month. The Post previously reported that a version of that report recommended making FEMA leaner but also more independent — findings that countered recommendations from Noem, the council's co-chair.

Three FEMA officials raised concerns about the rapid and drastic dismantling of the agency workforce.

Under the Post-Katrina Emergency Management Reform Act, the homeland security secretary is prohibited from taking actions that "substantially or significantly reduce the authorities, responsibilities, or functions" of FEMA.

"It's not just unprecedented — it directly contradicts the law," said a veteran FEMA official who has also worked within DHS.

Having the head of DHS determine the fate of disaster response roles "strips FEMA leadership of its statutory authority and puts control of the nation's disaster workforce in the hands of a department that Congress explicitly told to step back after Katrina," that person added.

Emergency management historian Scott Robinson said cutting FEMA's staffing at these levels "would [undo] an act of Congress without an act of Congress."

"The president is using a lot of administrative tools to try and do things we would have traditionally expected legislation to do," Robinson said.

There are about 17,500 CORE employees spread across the country — the majority of FEMA's workforce of 22,316, an agency official said. Under the Stafford Act, FEMA hires these staffers for multiyear terms using the disaster relief fund.

CORE teams partner directly with state and local officials to support ongoing response and recovery after a hurricane strikes or a fire tears through a town. They may move resources from warehouses to hard-hit communities; they process grants and conduct trainings. Some staffers were working on long-term projects related to Hurricanes Sandy, Maria and Fiona. CORE teams also include lawyers, IT experts and others who may help oversee nuclear plant operations or help in hazard reduction for earthquakes.

For example, in a region that includes Texas, Louisiana and more than 60 tribal nations, about 80 percent of the FEMA staffers deployed in support roles are CORE employees, a former senior official said.

Ongoing discussions to downsize FEMA also underscore how much autonomy the nation's emergency management agency has lost since the start of Trump's second term. FEMA has been without a congressionally appointed leader for nearly a year, cycling through temporary officials who have lacked disaster management experience, which is required by law to lead the agency. After David Richardson resigned in November, DHS tapped its chief of staff at the time, Karen Evans, to act as the agency's interim administrator.

An agency official familiar with the discussions said Evans has been part of conversations about the future of this disaster-specific workforce for the past few weeks, including about whether to extend positions for a month or two until the agency has had enough time to review the need for the roles. But the official said it

seemed that Noem was making the final decision.

As documents detailing workforce cuts made rounds within the agency over the past week, FEMA officials were stunned and pointed out that getting rid of nearly half of the nation's disaster workforce would greatly harm communities in various stages of disaster recovery. States would need much more time to prepare and bolster their own disaster capabilities before the federal government significantly pulled back resources such as CORE employees.

"The entire framework of a reduction should be built on stronger state partnerships, not knee-jerk reactions from the federal government," Hamilton said.

CORE appointments are typically renewed every two to four years. When the end of an employee's contracted term approaches, their supervisors submit paperwork to renew those roles and send it up the chain. Most of the positions are usually reinstated, according to four current and former FEMA officials, in part because recovery work is long and complex.

In mid-December, DHS took away FEMA's authority to independently renew these positions, and it instituted a hiring process that requires Noem to review all CORE positions and help decide whether they should continue to exist, according to emails and a person familiar with a meeting where these new requirements were discussed.

An email from Dec. 17 described how Noem — often referred to as "S1" in internal DHS and FEMA conversations and documents — created parameters for keeping the CORE employees.

"To improve DHS review outcomes, each CORE term renewal justification must be written to fit what the S1 verification form is designed to capture," it said.

Noem overseeing hiring for disaster-specific employees "is completely outside the norm," said the veteran FEMA official who also served within DHS. "CORE renewals have always been handled inside FEMA, as Congress intended under the Post-Katrina Emergency Management Reform Act."

The new system created year-end confusion as supervisors scrambled to send in detailed letters justifying a variety of positions.

For example, in one region with 40 CORE employees whose jobs were to be renewed in January, supervisors sent lengthy justification notes for about 35 of those workers. That same day, they were told to trim the letters and send them again.

They heard nothing in response, until they learned on Dec. 31 that they would lose nine employees "regardless of the recommendations of emergency management experts," one official familiar with the situation said. The fate of the rest is unknown, a supervisor said. He said he was also told "there was no plan" to extend any other CORE employees whose jobs were supposed to be renewed this month.

It is unclear whether FEMA or DHS took the justification memos into account.

In the last weeks of December, the office was inundated with hundreds of these justification memos, including statistics and data meant to explain why specific roles were crucial to FEMA's mission to help communities recover from disasters.

Then, on New Year's Eve, human resources staffers were told to inform people they had lost their jobs, according to a person familiar with the situation and memos obtained by The Post. Some CORE staffers learned they were fired on New Year's Day while on vacation, and they were asked to send in their equipment by Jan. 2.

Several agency officials who supervise CORE team members were shocked when they learned that numerous employees had suddenly lost their jobs, emails show.

"This must be a mistake," one supervisor wrote to FEMA's HR services and other officials, explaining that they had approved their employee's renewal and sent the paperwork through the proper channels.

Another supervisor overseeing recovery work for Hurricane Helene expressed concern and confusion over

losing a staffer, stating in a New Year's Eve note to human resources that "based on the attached emails and form," the worker's "appointment should be renewed."

"I would like to resolve this ASAP, as this is a disappointing and confusing email to get right before a holiday," the supervisor said.

In response, a top human resources official said the situation was essentially out of their hands.

Exhibit F

**Subject:** *IMPORTANT* Cessation of Offboarding Beginning January 22nd

Good afternoon Leaders.

Effective immediately, FEMAs Office of the Chief Human Capital Officer (OCHCO) will cease offboarding Stafford Act employees with NTE dates of January 22, 2026, or later. Updated instructions are expected from the Office of the Administrator early next week. Employees that received letters this morning/early afternoon are being contacted individually by OCHCO Employee Relations staff and are requested to remain in a duty status.

OCHCO will provide updated information as it becomes available. Employees may contact fema-hc-employee-relations@fema.dhs.gov with individual requests.

Exhibit G



**GAO**
Accountability * Integrity * Reliability

United States Government Accountability Office
Washington, DC 20548

November 21, 2008

Congressional Requesters:

Subject: *Actions Taken to Implement the Post-Katrina Emergency Management Reform Act of 2006*

On August 29, 2005, and in the ensuing days, Hurricanes Katrina, Rita, and Wilma devastated the Gulf Coast region of the United States. Hurricane Katrina alone affected more than a half million people located within approximately 90,000 square miles spanning Louisiana, Mississippi, and Alabama, ultimately resulted in over 1,600 deaths, and has spawned one of the largest natural disaster relief and recovery operations in U.S. history.

Almost 3 years prior to the hurricanes, the Homeland Security Act of 2002[1] created the Department of Homeland Security (DHS) largely in response to the September 11, 2001, terrorist attacks. The Homeland Security Act merged 22 disparate agencies and organizations into the new department, including the Federal Emergency Management Agency (FEMA). The Homeland Security Act generally charged DHS with securing the homeland against terrorist attacks and carrying out the functions of all transferred entities, including acting as a focal point regarding natural and man-made crises and emergency planning. Among its responsibilities, DHS was to build a comprehensive national incident management system comprising all levels of government and consolidate existing federal government emergency response plans into a single, coordinated national response plan.

Hurricane Katrina severely tested disaster management at the federal, state, and local levels and revealed weaknesses in the basic elements of preparing for, responding to, and recovering from any catastrophic disaster. Beginning in February 2006, reports by the House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, the Senate Homeland Security and Governmental Affairs Committee, the White House Homeland Security Council, the DHS Inspector General, DHS, and FEMA all identified a variety of failures and some strengths in the preparations for, response to, and initial recovery from Hurricane Katrina. We also have an extensive body of work on emergency management and catastrophic disasters, including Hurricane Katrina, which is listed at the end of this document.

---

[1]Pub. L. No. 107-296, 116 Stat. 2135 (2002).

The Post-Katrina Emergency Management Reform Act of 2006 (Post-Katrina Act) was enacted to address various shortcomings identified in the preparation for and response to Hurricane Katrina.[2] The act enhances FEMA's responsibilities and its autonomy within DHS. FEMA is to lead and support the nation in a risk-based, comprehensive emergency management system of preparedness, protection, response, recovery, and mitigation. Under the act, the FEMA Administrator reports directly to the Secretary of Homeland Security; FEMA is now a distinct entity within DHS; and the Secretary of Homeland Security can no longer substantially or significantly reduce the authorities, responsibilities, or functions of FEMA or the capability to perform them unless authorized by subsequent legislation. The act further directs the transfer to FEMA of many functions of DHS's former Preparedness Directorate. The statute codified the existing regional structure, which includes 10 regional offices within FEMA and specifies their responsibilities. It also contains a provision establishing in FEMA a National Integration Center, which is responsible for the ongoing management and maintenance of the National Incident Management System and the National Response Plan—now known as the National Response Framework (NRF). In addition, the act includes several provisions to strengthen the management and capability of FEMA's workforce. For example, the statute calls for a strategic human capital plan to shape and improve FEMA's workforce, authorizes recruitment and retention bonuses, and establishes requirements for a Surge Capacity Force.

The Post-Katrina Act extends beyond changes to FEMA's organizational and management structure and includes legislative reforms in other emergency management areas that were considered shortcomings during Hurricane Katrina. For example, the Post-Katrina Act includes an emergency communications title that requires, among other things, the development of a National Emergency Communications Plan, as well as the establishment of working groups within each FEMA region dedicated to emergency communications coordination. The act also addresses catastrophic planning and preparedness; for example, it charges FEMA's National Integration Center with revising the NRF's catastrophic incident annex, and it makes state catastrophic planning a component of one grant program. In addition, the act addresses evacuation plans and exercises and the needs of individuals with disabilities.

A September 11, 2007, hearing before the House Subcommittee on Economic Development, Public Buildings, and Emergency Management raised some concerns about the way in which DHS and FEMA were implementing several key directives of the Post-Katrina Act. Given the importance of proper implementation of the act and the need for a unified, coordinated national incident-management system capable of preparing for and responding to natural and man-made disasters, including catastrophic disasters, your committees requested that we perform a review of the implementation of the act's requirements.

---

[2]The Post-Katrina Act was enacted as Title VI of the Department of Homeland Security Appropriations Act, 2007, Pub. L. No. 109-295, 120 Stat. 1355 (2006). The provisions of the Post-Katrina Act became effective upon enactment, October 4, 2006, with the exception of certain organizational changes related to FEMA, most of which took effect on March 31, 2007.

This letter describes the actions FEMA and DHS have taken in response to the act's provisions, areas where FEMA and DHS must still take action, and any challenges to implementation that FEMA and DHS officials identified during our discussions with them. In general, we found that FEMA and DHS have made some progress in their efforts to implement the act since it was enacted in October 2006. For most of the provisions we examined, FEMA and DHS had at least preliminary efforts underway to address them. However, we have identified a number of areas that still require action, and it is clear that FEMA and DHS have work remaining to implement the provisions of the act. This letter provides information, at a high level, on the status of implementation efforts for the entire act. We have not made an assessment of the quality or likely outcomes of any of the actions that have been taken. Additional focused evaluation in selected areas, and, in some cases more time for efforts to mature, will be required in order to evaluate the effectiveness of the actions taken to implement the law on enhancing the nation's ability to prepare for, respond to, and recover from disasters.

**Scope, Methodology, and Limitations**

To conduct this work, we analyzed the text of the Post-Katrina Act and identified well over 300 discrete provisions within the legislation that call for DHS or FEMA action to implement requirements or exercise authorities—or to be prepared to do so under the appropriate conditions. We reviewed agency documents and discussed the act's implementation with numerous senior-level program officials at FEMA and DHS to identify actions FEMA and DHS have taken in response to the act's provisions. To determine the status of the Post-Katrina Act's implementation, we compared the actions described in agency documents and reported by knowledgeable officials with the discrete provisions we had identified as requiring agency action to implement. We also identified areas to be addressed, where no or little action had been taken. In addition, when agency officials reported challenges to us in implementing a particular section, we included that information as well.

To structure our findings, we analyzed the provisions appearing under each section heading of the Post-Katrina Act and grouped the various sections, as follows:

- Roles and Responsibilities—Enclosure II: Implementing Organizational Structures, Roles, and Authorities to Prepare for, Respond to, and Recover from Disasters
- Emergency Communications—Enclosure III: Supporting and Enhancing Emergency Communications
- Disaster Assistance Activities—Enclosure IV: Providing Assistance to Disaster-Affected Areas and Populations
- Disaster Planning and Preparation—Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities
- Regional Preparedness—Enclosure VI: Supporting Regional Preparedness and Cooperation
- Logistics—Enclosure VII: Improving Timely Delivery of Goods and Services in Disaster Events

- Contracting—Enclosure VIII: Changing Contracting Practices to Enhance Preparedness and Strengthen Accountability
- Information Technology—Enclosure IX: Improving Information Technology Systems to Support Compatibility, Accessibility, and Tracking
- Human Capital—Enclosure X: Ensuring a Well-Trained, Professional Workforce to Prepare for, Respond to, and Recover from Disasters
- Subject Matter Expertise—Enclosure XI: Applying Specific Expertise—Disability Coordinator, Small State Advocate, and Modeling and Analysis—to Disaster Planning, Response, and Recovery Activities
- Waste, Fraud, and Abuse—Enclosure XII: Implementing Controls to Prevent Waste, Fraud, and Abuse
- Gulf Coast Recovery—Enclosure XIII: Managing Recovery from Hurricanes Katrina and Rita in the Gulf Coast Region

In some cases, a section of the law may be relevant to more than one category—for example, the National Emergency Communications Plan required by the law could have appeared in the Emergency Communications category or in the Disaster Planning and Preparedness category. However, in the enclosures to this letter, each provision appears only once—in the section for which we determined it was most relevant. (For help finding a particular section of the Post-Katrina Act in the enclosures to this letter, please see enc. XIV.)

The enclosures to this letter include summaries of and citations to the relevant Post-Katrina Act sections being discussed. In some instances, a section of the Post-Katrina Act amends another statute, principally the Homeland Security Act[3] or the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act).[4] In such instances, we include both the Post-Katrina Act section and, parenthetically, the section of the amended statute, for example the Homeland Security Act or the Stafford Act. When we report status information under a particular section, we cite to the section of the Post-Katrina Act (or the amended statute) to which the status information relates.

The information in this letter describes the status, as of August 1, 2008,[5] of actions that FEMA and DHS have reported as completed or underway to implement the several hundred discrete provisions of the Post-Katrina Act that we identified. The status of actions to implement the act appears in the enclosures, as follows:

<u>Actions Taken</u> is a description of the actions that FEMA and DHS officials have identified as having been taken to implement one or more provisions of the Post-Katrina Act, including any documentation that describes those actions.

---

[3]Pub. L. No. 107-296, 116 Stat. 2135 (2002).

[4]Pub. L. No. 93-288, 88 Stat. 143 (1974).

[5]In limited instances, we have reported actions taken after August 1, 2008. We collaborated with FEMA to ensure the accuracy of information until days before the report was finalized in November 2008. When FEMA provided us with updates on activities that occurred after August 1, 2008 but would cause us to change or remove an area to be addressed, we included that information.

<u>Areas to Be Addressed</u> are areas where FEMA and DHS either did not provide information or indicated they had not yet initiated action to implement a requirement or be prepared to exercise an authority established by the Post-Katrina Act.

<u>Challenges</u>, if any, are those FEMA and DHS officials identified as associated with implementation of the act's provisions.

It was beyond the scope of this report to determine whether FEMA and DHS had fully complied with all the provisions of the act or to evaluate the effectiveness—individually or collectively—of the actions that FEMA and DHS have taken to implement the Post-Katrina Act. Thus, the description of an "action taken" for any given provision does not necessarily mean that FEMA or DHS has done all that is necessary to implement that particular provision or that either entity has done so effectively. Similarly, the lack of an "area to be addressed" in a particular section does not signify that DHS and FEMA have completely satisfied the law in that area; rather, they have generally taken some action in that area. Further, where actions to be taken are identified, it is not intended to suggest that once that action is completed, the relevant statutory provision will be fully implemented.

We conducted this performance audit from April 2008 to November 2008, in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Agency Comments and Our Evaluation

We provided a draft of this report to DHS and FEMA for review and comment on September 19, 2008. In part because of the demands of responding to Hurricanes Gustav and Ike, FEMA requested several extensions for providing comments. During this time, FEMA continued to provide information on the Post-Katrina Act's implementation. On November 14, 2008, FEMA provided written comments on the draft report, which DHS had also reviewed and approved. These comments are reproduced in full in appendix XV.

In its response, FEMA noted that DHS and GAO collaborated in assembling a substantial amount of information that briefly describes substantive improvements in the wake of Hurricane Katrina, but that time was not available for a more thorough review and substantive report. FEMA noted that the Post-Katrina Act contains more than 250 distinct requirements. By our analysis, that number is closer to 300 and increases to more than 350 if actions required to be taken in each of the regions are counted separately. We appreciate DHS's and FEMA's collaboration in compiling and reviewing the enormous amount of information on the Post-Katrina Act's implementation. In this time of Presidential transition, our report provides a baseline snapshot of actions taken to implement the Post-Katrina Act as August 1, 2008 (later in limited instances). In its comments FEMA also stated that it had completed or made substantial progress on virtually all provisions and used examples from its

response to recent disasters, including Hurricanes Gustav and Ike, to identify some positive effects of changes it has made since the enactment of the Post-Katrina Act. It was not in the scope of this project to assess the potential effectiveness or actual outcomes of the actions FEMA has taken in response to the Post-Katrina Act and during disaster events like Hurricanes Gustav and Ike. However, we have noted that DHS and FEMA have at least preliminary action under way to address most of the act's provisions. We also noted that FEMA and DHS have much work remaining to fully implement the act's provisions. As previously noted, to assess the effectiveness of FEMA's actions to implement the Post-Katrina Act, additional, focused evaluation in selected areas would be required, and, in some cases, more time is needed for efforts to mature. We look forward to the opportunity to continue our collaboration with DHS and FEMA in affirming positive outcomes, as well as examining opportunities to further strengthen emergency management and national preparedness and response.

_____

We are providing copies of this report to interested congressional committees, the FEMA Administrator, and the Secretary of Homeland Security. This report will also be available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staffs have any questions about this report, please contact me at (202) 512-8757 or jenkinswo@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in Enclosure XVI.

William O. Jenkins, Jr.
Director, Homeland Security
   and Justice Issues

encs.

**List of Requesters**

The Honorable Joseph Lieberman
Chairman
Committee on Homeland Security and Governmental Affairs
United States Senate

The Honorable Bennie Thompson
Chairman
Committee on Homeland Security
House of Representatives

The Honorable James Oberstar
Chairman
The Honorable John Mica
Ranking Member
Committee on Transportation and Infrastructure
House of Representatives

The Honorable Eleanor Holmes Norton
Chair
The Honorable Sam Graves
Ranking Member
Subcommittee on Economic Development, Public Buildings, and
   Emergency Management
Committee on Transportation and Infrastructure
House of Representatives

**Enclosure I: List of Abbreviations Used**

| | |
|---|---|
| ACF | Administration for Children and Families |
| CCR | Central Contractor Registration |
| CAP | Corrective Action Program |
| CIO | Chief Information Officer |
| CPG | Comprehensive Preparedness Guide |
| DCMPP | Disaster Case Management Pilot Program |
| DHS | Department of Homeland Security |
| DOD | Department of Defense |
| DOJ | Department of Justice |
| EMAC | Emergency Management Assistance Compact |
| EMI | Emergency Management Institute |
| EMPG | Emergency Management Performance Grant |
| ESF | Emergency Support Functions |
| FAR | Federal Acquisition Regulation |
| FBI | Federal Bureau of Investigation |
| FEMA | Federal Emergency Management Agency |
| FCO | Federal Coordinating Officer |
| FTE | Full Time Equivalent |
| GPD | Grant Programs Directorate |
| GSA | General Services Administration |
| HHS | Health and Human Services |
| HSA | Homeland Security Act |
| HSC | Homeland Security Council |
| HSPD-7 | Homeland Security Presidential Directive-7 |
| HSPD-8 | Homeland Security Presidential Directive-8 |
| HUBZone | Historically Underutilized Business Zone |
| IASD | Infrastructure Analysis and Strategy Division |
| ICC | Inter-Agency Coordinating Council |
| ICTAP | Interoperable Communications Technical Assistance Program |
| IG | Inspector General |
| IHP | Individuals and Households Program |
| IMAT | Incident Management Assistance Team |
| IRPTA | Intelligence Reform and Terrorism Prevention Act |
| IT | Information Technology |
| LEP | Limited English Proficiency |
| LMD | Logistics Management Directorate |
| MOA | Memorandum of Agreement |
| MOU | Memorandum of Understanding |
| NAC | National Advisory Council |
| NCD | National Council on Disability |
| NCR | National Capital Region |
| NECP | National Emergency Communications Plan |
| NEMA | National Emergency Management Association |
| NEMIS | National Emergency Management Information System |
| NESC | National Exercise Simulation Center |
| NDRS | National Disaster Recovery Strategy |

| | |
|---|---|
| NDHS | National Disaster Housing Strategy |
| NIC | National Integration Center |
| NIMSCAST | National Incident Management System Compliance Assessment Support Tool |
| NIMS | National Incident Management System |
| NISAC | National Infrastructure Simulation and Analysis Center |
| NLC | National Logistics Coordinator |
| NOC | National Operations Center |
| NPSC | National Processing Service Center |
| NRF | National Response Framework |
| NRP | National Response Plan |
| OEC | Office of Emergency Communications |
| OIC | Office for Interoperability and Compatibility |
| P25 | Project 25 |
| PA | Public Assistance |
| PFO | Principal Federal Official |
| PFT | Permanent Full Time |
| PSMA | Prescripted Mission Assignment |
| RAMP | Remedial Action Management Program |
| RDTE | Research, Development, Testing, and Evaluation |
| RECC | Regional Emergency Communications Coordination |
| RFP | Request for Proposals |
| SCIP | Statewide Communication Interoperability Plan |
| SES | Senior Executive Service |
| SDB | Small Disadvantaged Business |
| SHCP | Strategic Human Capital Plan |
| SHSP | State Homeland Security Program |
| TAV | Total Asset Visibility |
| TCL | Target Capabilities List |
| TRO | Transitional Recovery Office |
| UASI | Urban Area Security Initiative |

**GAO-09-59R Actions to Implement the Post-Katrina Act**

**Enclosure II: Implementing Organizational Structures, Roles, and Authorities to Prepare for, Respond to, and Recover from Disasters**

<u>Post-Katrina Act § 611 (Homeland Security Act § 503, Federal Emergency Management Agency, and § 504, Authorities and Responsibilities)</u>

Establishes the mission of the Federal Emergency Management Agency (FEMA) within the Department of Homeland Security (DHS) and sets forth the role and responsibilities of the FEMA Administrator, who shall be appointed by the President, with the advice and consent of the Senate. Requires, among other things, that the FEMA Administrator provide advice on request to the President, the Homeland Security Council, or the Secretary of Homeland Security; and that the FEMA Administrator report directly to the Secretary of Homeland Security without having to report through another official.

  Actions Taken:

- **Appointment of FEMA Administrator:** On May 26, 2006, the Senate confirmed the appointment of R. David Paulison to serve as the FEMA Administrator. § 503(c)(1).
- **FEMA Administrator Reporting Relationship:** As reflected in the National Response Framework (NRF) and confirmed by FEMA's Office of Policy and Program Analysis and FEMA General Counsel, a direct reporting relationship exists between the FEMA Administrator and the Secretary of Homeland Security. Although DHS's organizational chart shows that the FEMA Administrator's Office reports to the DHS Office of the Secretary/Deputy Secretary, FEMA's Office of Policy and Program Analysis confirmed that the FEMA Administrator is not required to first report to the deputy secretary before reporting to the secretary. § 503(c)(3).
- **Role of the FEMA Administrator in the NRF:** According to the NRF, the FEMA Administrator
  - reports to the Secretary of Homeland Security;
  - is the principal advisor to the President, the Secretary of Homeland Security, and the Homeland Security Council regarding emergency management; and
  - acting through the Secretary of Homeland Security, may recommend a course of action to the President with regard to requests for Presidential emergency and major disaster declarations. §§ 503(c)(3)-(4), 504(a)(8).
- **FEMA Administrator Advice to Executive Branch:** According to officials from FEMA's Office of Policy and Program Analysis, the FEMA Administrator gives advice to the executive branch as a matter of course at various meetings, including Homeland Security Council (HSC) Principals Committee meetings, HSC Deputies Committee Meetings, and HSC Policy Coordination Committee meetings. These officials said that the FEMA Administrator also gives advice during direct meetings with the President and meetings with the Secretary of Homeland Security. § 503(c)(4).
- **FEMA Administrator Advice to Congress:** According to officials from FEMA's Office of Policy and Program Analysis, the FEMA Administrator gives this advice as a matter of course, through meetings, briefings, testimony, and submittal of written reports, questions for the record, and other correspondence with members of Congress and their respective staffs. § 503(c)(4).

- **FEMA Administrator Potential for Cabinet Designation:** According to FEMA's Office of Policy and Program Analysis, although cabinet designation has not yet happened and is the prerogative of the President, the FEMA Administrator does, as previously mentioned, give advice during direct meetings with the President. § 503(c)(5).
- **Role of FEMA in the NRF:** As stated in the NRF, the Secretary of Homeland Security coordinates with other appropriate departments and agencies to activate plans and applicable coordination structures of the NRF, as required. The FEMA Administrator assists the secretary in meeting these responsibilities. FEMA, as the lead agency for NRF Emergency Support Function #5 – Emergency Management, is responsible for supporting the overall activities of the federal government for domestic incident management. Emergency Support Function #5 serves as the coordination Emergency Support Function for all federal departments and agencies across the spectrum of domestic incident management from hazard mitigation and preparedness to response and recovery. §§ 503(b), 504(a).
- **NRF Responsibilities:** The Post-Katrina Act charges the FEMA Administrator with administering and ensuring the implementation of the National Response Plan (NRP), with FEMA's National Integration Center specifically responsible for periodically reviewing and revising the document, as appropriate. In August 2005, Hurricane Katrina and, shortly after, Hurricanes Wilma and Rita revealed a number of limitations in the NRP, which prompted DHS and FEMA to undertake a comprehensive review of the plan. The result of this process was the issuance, in January 2008, of the NRF (the new name for the NRP). The NRF states that it is to be a guide to how the nation conducts an all-hazards response and manages incidents ranging from the serious but purely local to large-scale terrorist attacks or catastrophic natural disasters. The NRF became effective in March 2008.[6] § 504(a)(13); see also § 509(b).
- **Role of the National Advisory Council (NAC):** The Post-Katrina Act requires the FEMA Administrator to coordinate with the NAC, a nonfederal advisory body established by the Post-Katrina Act, on all aspects of emergency management. On February 6, 2007, the NAC filed its charter, which recites the NAC's broad array of statutory responsibilities. According to the NAC's Charter, the NAC advises the FEMA Administrator on all aspects of emergency management and incorporates state, local, and tribal government and private sector input in the development and revision of, among other things, the NRF, the National Incident Management System (NIMS), and other related plans and strategies.[7] § 504(a)(13)-(14); see also § 508(b).

---

[6]The Post-Katrina Act predated the NRF and referred to the NRF's predecessor, the NRP, which was then the name of the document that served as the nation's comprehensive framework for the management of domestic incidents where federal involvement was necessary. Because the Post-Katrina Act encompasses any successor plan to the NRP, it applies to the NRF just as it did the NRP. See Post-Katrina Act, § 602(13). Therefore, this enclosure will use the term NRF, rather than NRP, in discussing any relevant Post-Katrina Act provisions and the status of their implementation, unless otherwise appropriate.

[7]The NAC was not established in time for the council to have its intended advisory role in the development of the NRF that was issued in January 2008. See GAO, *National Response Framework: FEMA Needs Policies and Procedures to Better Integrate Non-Federal Stakeholders in the Revision Process*, GAO-08-768 (Washington, D.C.: June 11, 2008).

- **Grants Programs Administration and Grants Risk-Analysis Model:** Responsibility for allocating and managing DHS grants is seated within FEMA. As part of its grant-management responsibilities, FEMA relies on other DHS components such as the National Protection and Programs Directorate and the Office of Intelligence and Analysis in the development of the risk-analysis model for grants allocation.[8] According to DHS/FEMA's publicly available organizational chart, FEMA's Grant Programs office, led by an assistant administrator, reports to the FEMA Administrator/Deputy Administrator's office. § 504(a)(12).

- **Continuity of Operations and Government:** The FEMA Office of National Continuity Programs is the lead agent for the federal executive branch on matters concerning continuity of national operations. National Continuity Programs develops and promulgates standards and guidance for executive branch departments and agencies on a broad range of continuity topics, such as preparation and implementation of continuity of operations, continuity of government and contingency programs during emergencies and national-level exercises, and others. § 504(a)(15).

- **National Response Coordination Center:** According to the NRF, the FEMA Administrator's responsibilities include the operation of the National Response Coordination Center. § 504(a)(17).

    Areas to Be Addressed:

- **Technical Assistance to Nonfederal Stakeholders:** According to the NRF Resource Site, FEMA's National Preparedness Directorate is developing steps to help states, tribes, and localities to synchronize their plans and training with the NRF. § 503(b)(2).

- **NRF Revision:** As we have previously reported, FEMA officials acknowledge that the NRF will need to be revised in the future.[9] According to officials from FEMA's Office of Policy and Program Analysis, as FEMA nears the revision date, FEMA will establish further guidance and policies on how it will manage future NRF revisions and how the NAC will be incorporated into the next NRF revision process. FEMA officials said that current efforts are focused on creating training materials to assist all stakeholders in implementing the current NRF. The NAC has not yet determined how it would like to be involved in the next NRF revision process. Although the NAC's February 2007 charter provides a broad description of the NAC's statutory responsibilities, including its advisory role in any NRF revision, the charter does not detail any specific responsibilities the NAC would undertake relative to the NRF revision process. According to the NAC's chairman, the NAC's NRF subcommittee may focus its efforts on helping FEMA train nonfederal stakeholders on the NRF. § 504(a)(13)-(14); see also §§ 508(b), 509(b).

    Challenges FEMA and DHS Identified:

- Agency officials did not identify any challenges for this section.

---

[8]See GAO, *Homeland Security: DHS Risk-Based Grant Methodology Is Reasonable, But Current Version's Measure of Vulnerability is Limited*, GAO-08-852 (Washington, D.C.: June 27, 2008).

[9]We have recommended that FEMA develop policies and procedures for future revisions of the NRF, including how it will involve government and nongovernmental stakeholders, in particular the NAC, in future revisions. See GAO-08-768.

<u>Post-Katrina Act § 611 (Homeland Security Act § 505), Functions Transferred</u>

Maintains existing FEMA functions as of June 1, 2006, while transferring to FEMA functions performed by DHS's Directorate of Preparedness (with certain exceptions).

　　Actions Taken:

- **Transfers to FEMA:** On September 11, 2007, the Secretary of Homeland Security notified Congress that DHS completed the functional transfers to FEMA as required by the Post-Katrina Act. According to the secretary's letter, the new FEMA encompasses all FEMA functions and Preparedness Directorate functions existing as of June 1, 2006 (except for those elements of the Preparedness Directorate statutorily excluded from the transfer). The secretary's letter stated that the transfers were effective as of March 31, 2007, as specified by section 614(b)(3) of the Post-Katrina Act. § 505.

　　Areas to Be Addressed:

- **Delegations of Authority Document:** According to FEMA's Office of Policy and Program Analysis, FEMA has drafted a document that specifically addresses the amended delegations of authority made by the Post-Katrina Act. § 505.

　　Challenges FEMA and DHS Identified:

- Agency officials did not identify any challenges for this section.

<u>Post-Katrina Act § 611 (Homeland Security Act § 506), Preserving the Federal Emergency Management Agency</u>

Requires FEMA to be maintained as a distinct entity within DHS, exempts FEMA from the scope of the secretary's reorganization authority, and affords FEMA specific protections from changes to its mission, including functional or asset transfers.

　　Actions Taken:

- **Preservation of FEMA:** According to FEMA's Office of Policy and Program Analysis, and FEMA General Counsel, FEMA is not aware of any transfers of funds or authorities in violation of the Post-Katrina Act. § 506.

　　Challenges FEMA and DHS Identified:

- Agency officials did not identify any challenges for this section.

<u>Post-Katrina Act § 611 (Homeland Security Act § 508), National Advisory Council</u>

Establishes the NAC to advise the FEMA Administrator on all aspects of emergency management. The NAC is to incorporate state, local, and tribal government and private-sector input in the development and revision of the national preparedness goal, the national preparedness system, NIMS, the NRF, and other related plans and strategies.  Also specifies terms of office for members of the NAC, as well as the geographic and substantive composition of NAC membership.

　　Actions Taken:

- **NAC Establishment:** The NAC has been established. The inaugural meeting was October 22-23, 2007. § 508(a).

- **NAC Membership:** The NAC consists of 35 members, representing a range of federal, state, and local stakeholders from the emergency-management fields. Each member is appointed for a 3-year term. § 508(c).
- **NAC Responsibilities:** The NAC filed a charter on February 6, 2007. The charter articulates the NAC's statutory responsibilities in terms of advising the FEMA Administrator on all aspects of emergency management, incorporating state, local, and tribal government and private-sector input in the development and revision of all statutorily required plans and strategies, such as the NRF. § 508(b).

   Areas to Be Addressed:

- **NAC Input into the Revision of the NRF:** As we have previously reported, the NAC held its inaugural meeting on October 22, 2007, which was the last day of the public comment period for the revision of the draft NRF. As a result, the NAC's only involvement in the NRF revision process occurred when FEMA provided it with a copy of a draft in December 2007, 2 months after the public comment period closed. According to the NAC chairman, the NAC gathered and consolidated comments from individual members and provided these comments to the FEMA Administrator approximately 1 month before FEMA published the NRF in January 2008. The chairman noted that these comments were from individual members and did not reflect the official comments of the NAC as a whole. For the next NRF revision, the chairman stated that he expected the NAC to be actively involved with FEMA throughout the entire revision process. However, neither FEMA nor the NAC have developed any guidance or policies describing specifically how the NAC will be included in the next NRF revision process. § 508(b).

   Challenges FEMA and DHS Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 611 (Homeland Security Act § 509), National Integration Center

Establishes specific responsibilities for the National Integration Center (NIC) to ensure ongoing management and maintenance of NIMS and the NRF. Requires the Secretary of Homeland Security, through the FEMA Administrator, to provide a clear chain of command in the NRF that accounts for the roles of the FEMA Administrator, the Federal Coordinating Officer (FCO), and the Principal Federal Official (PFO), as amended by the Post-Katrina Act.

   Actions Taken:

- **Role of the NIC:** According to the Web site for the NIC, it oversees all aspects of NIMS including the development of compliance criteria and implementation activities at federal, state, and local levels. The NIC provides guidance and support to jurisdictions and incident management and responder organizations as they adopt NIMS. The NIC Incident Management Systems Integration Division was established by the Secretary of Homeland Security to provide strategic direction for and oversight of NIMS. § 509(b).
- **Management and Maintenance of the NRF**: As we have previously reported, FEMA's NIC assisted in the development and issuance of the 2008 NRF, which was a revision of its predecessor, the 2004 NRP. The NRF became effective in

March 2008 and retained the basic structure of the 2004 NRP. For example, like the 2004 NRP, the NRF's core document describes the doctrine that guides national response actions and the roles and responsibilities of officials and entities involved in response efforts. Further, the NRF also includes Emergency Support Functions (ESF), Support Annexes, and Incident Annexes. The 2008 NRF constituted an update not only of the core plan, but an update of the ESFs and the Support Annexes, although, as of August 1, 2008, not all of the NRF's Incident Annexes have been updated and some of the NRP's annexes remain in effect. § 509(b)(2).

- **NRF's Volunteer and Donation Processes:** In reviewing and revising the NRF, the NIC was required to consult with the Corporation for National and Community Service to establish a process to better use volunteers and donations. Several of the NRF's revised ESFs and support annexes address the use of volunteers and donations and designate responsibilities for the Corporation for National and Community Service. These include ESF-3, Public Works and Engineering; ESF-6, Mass Care, Emergency Assistance, Housing, and Human Service; ESF-14, Long-Term Community Recovery; ESF-15, External Affairs; and the Volunteer and Donations Management Support Annex. § 509(b)(2).

- **Chain of Command in the NRF:** According to the NRF, four federal officials, among others, play key roles in the chain of command for leading/coordinating Federal responses—the Secretary of Homeland Security, the FEMA Administrator, the PFO, and the FCO.

  o **Role of the Secretary of Homeland Security:** As stated in the NRF, the Secretary of Homeland Security is the principal federal official for domestic incident management.  When the overall coordination of federal response activities is required, it is implemented through the Secretary of Homeland Security. The secretary's duties include providing the President with an overall architecture for domestic incident management and coordinating the federal response when required, while relying upon support of other federal partners. Depending upon the incident, the secretary also contributes elements of the response consistent with DHS's mission, capabilities, and authorities.

  o **Role of the FEMA Administrator:** As stated in the NRF, the FEMA Administrator reports to the Secretary of Homeland Security and assists the secretary in meeting his or her responsibilities. The FEMA Administrator is the principal advisor to the President, the Secretary of Homeland Security, and the Homeland Security Council on all matters regarding emergency management. According to the NRF, the FEMA Administrator's duties include the effective support of all ESFs, and, more generally, preparation for, protection against, response to, and recovery from all-hazards incidents.

  o **Role of the PFO:** According to the NRF, the Secretary of Homeland Security may elect to designate a PFO to serve as his or her primary field representative to ensure consistency of federal support as well as the overall effectiveness of federal incident management. The NRF repeats the Post-Katrina Act's prohibition that the PFO shall not direct or replace the incident command structure established at the incident or have directive authority over the FCO or other federal and state officials. The PFO's duties include providing situational awareness and a primary point of contact in the field for the secretary; promoting federal interagency collaboration and conflict resolution where

possible; presenting to the secretary any policy issues that require resolution; and acting as the primary federal spokesperson for coordinated media and public communications. According to the NRF, the following criteria limit the instances in which a PFO may be assigned:

- The secretary will only appoint a PFO for catastrophic or unusually complex incidents that require extraordinary coordination.
- The secretary may assign a PFO in cases in which FEMA should not be the lead agency in charge of the response. For example, according to DHS's Office of Operations Coordination, in the event that a nuclear weapon was smuggled into the United States, the secretary may appoint a PFO during the search for the weapon to coordinate prevention and law enforcement incident management activities. An agency other than FEMA, such as the Department of Justice's Federal Bureau of Investigation, may be the lead agency in charge of the response. The PFO would be appointed to promote interagency collaboration and seek resolution for policy issues that arise.
- The secretary may assign a PFO in major non-Stafford Act events that include a Stafford Act component. For example, according to DHS's Office of Operations Coordination, a cyberattack initiated against the United States may be a major non-Stafford Act event requiring incident management. The cyberattack's effect upon a hydroelectric dam operator's software could potentially result in a dam bursting and a Stafford Act declaration being made for the resulting flooding. A PFO could be appointed to manage incident activities associated with the cyberattack, such as law enforcement and information-technology response efforts; whereas the President would appoint an FCO to coordinate flooding response activities for the Stafford Act component of the event.

According to DHS officials, no PFOs have been operationally deployed for a Stafford Act event since the response to Hurricane Katrina.[10]

o **Role of the FCO:** As stated in the NRF, for Stafford Act incidents (i.e., presidentially-declared emergencies or major disasters), upon the recommendation of the FEMA Administrator and the Secretary of Homeland Security, the President appoints an FCO. According to the NRF, the primary role and responsibilities of the FCO include the following:

- The FCO represents the FEMA Administrator in the field to discharge all FEMA responsibilities for the response and recovery efforts underway.
- The FCO has responsibility for administering Stafford Act authorities, including the commitment of FEMA resources and the issuance of mission assignments to other federal departments or agencies.

---

[10]DHS's appropriations acts for fiscal years 2008 and 2009 have included the same prohibition on funding the PFO position for any Stafford Act event. The prohibition states that, "none of the funds provided by this or previous appropriations Acts shall be used to fund any position designated as a Principal Federal Official" for any Stafford Act declared disasters or emergencies. See Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, Title V, § 541, 121 Stat. 1844, 2079 (2007); Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Pub. L. No. 110-329, Div. D, § 526, 122 Stat. 3574 (2008). GAO will address the implications of this funding prohibition in future work.

**GAO-09-59R Actions to Implement the Post-Katrina Act**

- ▪ Within the Unified Coordination Group at the Joint Field Office, the FCO is the primary federal official responsible for coordinating, integrating, and synchronizing federal response activities.
- ▪ The FCO is the primary federal representative with whom the State Coordinating Officer and other state, tribal, and local response officials interface to determine the most urgent needs and set objectives for an effective response in collaboration with the Unified Coordination Group. § 509(c).

Areas to Be Addressed:

- **Management and Maintenance of the NRF:** Although the NRF acknowledges the need for periodic review and revision, which is required by the Post-Katrina Act, the NRF does not specify any procedures, circumstances, or time frames for its review and revision, as did its predecessor, the NRP. FEMA officials said that the process established for the NRP revision would not apply to any NRF revisions because the NAC was not involved in the NRP revision. However, FEMA has not yet developed guidance and procedures for any future NRF revisions because of the need to create training materials to assist stakeholders in implementing the current NRF. § 509(b).
- **NRF Catastrophic Incident Annex and Supplement:** The NIC is statutorily responsible for revising the Catastrophic Incident Annex to the NRF and for finalizing and releasing the Catastrophic Incident Supplement to the annex. FEMA officials stated that FEMA's Disaster Operations Directorate would provide subject matter expertise to assist NIC in producing these documents. However, as of August 1, 2008, the NIC had not revised the Catastrophic Incident Annex to conform with the NRF, and the annex is still based on the NRF's predecessor, the now superseded NRP. The release of the Catastrophic Incident Supplement is also pending. § 509(b)(2).

Challenges FEMA and DHS Identified:

- Agency officials did not identify any challenges for this section.

<u>Post-Katrina Act § 611 (Homeland Security Act § 514), Department and Agency Officials</u>

Grants the President the authority to appoint no more than four FEMA Deputy Administrators with the advice and consent of the Senate, establishes an Assistant Secretary for Cybersecurity and Communications within DHS, and requires the Administrator for the United States Fire Administration to have a rank equivalent to an Assistant Secretary of Homeland Security.

Actions Taken:

- **FEMA Deputy Administrators:** FEMA's senior leadership includes two deputy administrators—the Deputy Administrator and Chief Operating Officer and the Deputy Administrator for National Preparedness. On June 27, 2008, Harvey E. Johnson Jr. was confirmed by the Senate to be Deputy Administrator and Chief Operating Officer of FEMA. On August 3, 2007, Dennis R. Schrader was confirmed by the Senate to be Deputy Administrator for National Preparedness at FEMA. § 514(a).

- **DHS Assistant Secretary for Cybersecurity and Communications**: Gregory T. Garcia was appointed by Secretary Michael Chertoff on September 18, 2006, to be the first Assistant Secretary for Cyber Security and Communications for DHS, within DHS's Preparedness Directorate (now DHS's National Protection and Programs Directorate). § 514(b).
- **Administrator for the United States Fire Administration:** According to FEMA's Office of Policy and Program Analysis, and DHS/FEMA's publicly available organizational chart, the position of the United States Fire Administrator is now an Assistant Administrator within FEMA. According to FEMA's Office of Policy and Program Analysis, this is equivalent to an Assistant Secretary at DHS. § 514(c).

    Challenges FEMA and DHS Identified:
- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 611 (Homeland Security Act § 515), National Operations Center
Establishes the National Operations Center (NOC) as the principal DHS operations center, which is to provide situational awareness for the federal government and for state, local, and tribal governments as appropriate, in the event of a natural or man-made disaster or act of terrorism. The NOC is also to ensure that critical terrorism and disaster-related information reaches government decision makers.

    Actions Taken:
- **Establishment of the NOC:** Located in Washington, D.C., the Homeland Security Operations Center was established on February 19, 2003, and redesignated the NOC on May 25, 2006. § 515(b).
- **NOC Mission:** NOC is a standing inter- and intraagency organization that fuses law enforcement, national intelligence, emergency response, and private sector suspicious activity reporting and serves as a focal point for natural and man-made crisis management and coordination. The NOC—which operates 24 hours a day, 7 days a week, 365 days a year—coordinates information sharing to help deter, detect, and prevent terrorist acts and to manage domestic incidents. § 515(b).

    Challenges FEMA and DHS Identified:
- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 611 (Homeland Security Act § 516), Chief Medical Officer
Establishes the role of the Chief Medical Officer in DHS, who shall be appointed by the President, with the advice and consent of the Senate, and delineates the position's responsibilities, including serving as the principal advisor to the Secretary of Homeland Security and the FEMA Administrator on medical and public health issues.

    Actions Taken:
- **Appointment of Chief Medical Officer:** In July 2005, DHS Secretary Michael Chertoff appointed Dr. Jeff Runge to be the department's first Chief Medical Officer. Subsequently, in October, 2007, President Bush nominated Dr. Runge to become the first DHS Assistant Secretary for Health Affairs and Chief Medical

Officer, which was confirmed by the Senate on December 19, 2007. Dr. Runge resigned from both positions as of August 2008.  Dr. Jon R. Krohmer is the current Acting Assistant Secretary for Health Affairs and Chief Medical Officer. § 516(a).

   Challenges FEMA and DHS Identified:
- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 687 (Stafford Act § 302), Coordinating Officers
Grants the President the authority to appoint a single Federal Coordinating Officer (FCO) for a multistate major disaster or emergency and such Deputy FCOs as the President determines appropriate to assist the FCO.

   Actions Taken:
- **Federal Coordinating Officers for Multistate Major Disasters:** According to the Director of the FEMA Office of Federal Coordinating Officer (FCO) Operations, the President has not, as of August 1, 2008, appointed a single FCO for a multistate major disaster. In his view, the President could have done so even before the passage of the Post-Katrina Act; however, according to the Director of the FCO Office, historically the general practice has been to have one FCO appointed per state for multistate disasters. He further stated that FEMA currently has 21 FCOs predesignated for each state from Maine to Florida and along the Gulf Coast for the 2008 Hurricane Season. In the event that a single FCO is appointed to lead a multistate disaster, he said, the individual predesignated state FCOs would likely serve as the multistate FCO's deputies. § 302(d).

   Areas to Be Addressed:
- **Policies and Procedures for Multistate FCOs:** According to the Director of the FCO Office, FEMA provides the President with recommendations about whom to appoint as an FCO for a given Stafford Act declaration, but FEMA currently has no predesignated multistate FCOs and has not developed guidance to govern the process for recommending a multistate FCO for appointment. Further, FEMA has not developed guidance addressing the procedures FEMA would follow if the President exercised the authority to appoint a multistate FCO. § 302(d).

   Challenges FEMA and DHS Identified:
- Agency officials did not identify any challenges for this section.

For Further Reading
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Homeland Security Grant Program Guidance and Application Kit." http://www.fema.gov/txt/government/grant/hsgp/fy08_hsgp_guide.txt (accessed on Sept. 19, 2008).
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "National Response Framework." http://www.fema.gov/emergency/nrf/ (accessed on Sept. 19, 2008).

**Enclosure III: Supporting and Enhancing Emergency Communications**

<u>Post-Katrina Act § 671[11] (Homeland Security Act § 1801), Office of Emergency Communications</u>

Establishes the Office of Emergency Communications (OEC) in DHS and enumerates the duties of the office and its director.

    Actions Taken:

- **Establishment:** OEC became operational on April 1, 2007, and is located within the Office of Cybersecurity and Communications in DHS's National Protection and Programs Directorate. As of August 1, 2008, the Director of OEC was Chris Essid. § 1801(a)-(b).
- **SAFECOM and Intelligence Reform and Terrorism Prevention Act of 2004[12] (IPRTA) Responsibilities:** SAFECOM—a DHS program intended to strengthen interoperable public safety communications at all levels of government—has been designated as the program responsible for carrying out certain requirements in both the Post-Katrina Act and IRPTA, according to the Director of the Office for Interoperability and Compatibility (OIC). OEC and OIC share responsibility in administering SAFECOM.[13] OEC administers elements of SAFECOM responsible for the development of tools, guidance, and templates on communication-related issues, while OIC is responsible for SAFECOM's research, development, testing, evaluation, and standards activities, according to DHS officials. § 1801(c)(1)–(2), (d)(1), (e)(1).
- **Transferred Functions:** In addition to SAFECOM, OEC has assumed responsibility of the Interoperable Communications Technical Assistance Program and DHS's responsibilities related to the Integrated Wireless Network program, according to the Deputy Director of OEC. § 1801(c)(2)–(3), (d).
- **Conducting Outreach:** According to officials in DHS's National Protection and Programs Directorate, OEC's stakeholder outreach efforts included coordinating with 150 individuals from the emergency response community to develop the National Emergency Communications Plan. These officials stated that the outreach was primarily carried out through several organizations that represent officials from federal, state, and local governments and private-sector representatives from the communications, information technology, and emergency services sectors. According to these officials, OEC plans to work with the emergency response community to implement the National Emergency Communications Plan through these institutions and other stakeholder outreach mechanisms. As of August 1, 2008, OEC was also providing technical assistance to states and reviewing state interoperability plans as part of its outreach efforts, according to OEC officials. § 1801(c)(4)–(5).
- **Technical Assistance:** Through the Interoperable Communications Technical Assistance Program, OEC has been working with Urban Area Working Groups and

---

[11]Section 671 of the Post-Katrina Emergency Management Reform Act amends the Homeland Security Act of 2002 by adding a new Title XVIII, Emergency Communications, §§ 1801-08.

[12]Pub. L. No. 108-458, § 7303, 118 Stat. 3638, 3843-44 (2004).

[13]OIC is located within DHS's Science and Technology Directorate.

states to assess their communications infrastructure for gaps and determine technical requirements that can be used to design or enhance interoperable communications systems. According to the Deputy Director of OEC, OEC provided technical assistance to 13 recipients of the 2007 Urban Area Security Initiative grants by providing guidance on technical issues such as engineering solutions and drafting requests for proposals, as well as providing best practices information. In addition, OEC offered assistance to states and territories in developing their Statewide Communication Interoperability Plans (SCIP) and, as of August 1, 2008, conducted SCIP development workshops for the 30 states and five territories that requested such help, according to testimony from the Director of OEC and the Under Secretary for the National Protection and Programs Directorate. § 1801(c)(6), (d)(3).

- **Coordination of Regional Emergency Communications Efforts:** Officials in DHS's National Protection and Programs Directorate told us that, as of August 1, 2008, there were no formal agreements between OEC, FEMA, and the National Communications System[14] regarding regional coordination activities; however, these three DHS elements have been coordinating to minimize any overlap between the roles and responsibilities of various DHS regional staff offices related to emergency communications. According to the officials, these regional staff offices plan to attend Regional Emergency Communications Coordination (RECC) working group meetings and to share information through the RECC working groups. According to OEC officials, OEC has hired a federal employee to represent OEC at RECC working group meetings. In addition, OEC intends to hire regional interoperability coordinators for each of the 10 FEMA regional offices in fiscal year 2009. These coordinators are to work with FEMA on the activities of the RECC working groups. § 1801(c)(7), (e)(2).

- **Coordinating the Establishment of a National Response Capability for a Catastrophic Loss of Local and Regional Emergency Communications:** Officials in the National Protection and Programs Directorate told us that OEC works closely with FEMA and the National Communications System to coordinate policy and planning efforts relating to the existing response capability managed through the National Response Framework's Communication Annex, Emergency Support Function 2.[15] According to these officials, an example of this coordination was the inclusion of continuity of emergency communications and response operations in the recently released National Emergency Communications Plan. These officials also said that OEC will represent the National Communication System in regions where the system has no presence and support the system's private-sector coordination role as appropriate. In addition, the Director and

---

[14]Established by Presidential Memorandum on August 21, 1963, the National Communications System was created to be a single unified communications system to serve the President, Department of Defense, diplomatic and intelligence activities, and civilian leaders. The National Communications System mandate included linking, improving, and extending the communications facilities and components of various federal agencies, focusing on interconnectivity and survivability. NCS membership currently stands at 24 federal department and agency members and is managed by the DHS Under Secretary for National Protection and Programs.

[15]Emergency Support Function 2 provides a structure for coordinating federal actions to assist in the restoration of public communications infrastructure, public safety communications systems and first responder networks.

**GAO-09-59R Actions to Implement the Post-Katrina Act**

Deputy Director of OEC told us that OEC, FEMA, and the National Communications System are in the early stages of developing a strategy that involves the use of OEC's regional interoperability coordinators to provide technical support, play a role as needed in Emergency Support Function 2, coordinate with OIC SAFECOM officials and provide response capabilities within their designated regions. According to officials in the National Protection and Programs Directorate, FEMA's Mobile Emergency Response Support and Incident Management Assistance Team assets can also support state and local officials with emergency communications during disasters. § 1801(c)(9), (e)(2).

- **Best-Practices Sharing:** OEC has conducted a review of best practices in emergency communications. Much of this information is available at www.llis.gov, an online network of lessons learned and best practices for emergency response providers and homeland security officials. OEC also provided best practices information in its March 2008 progress report on emergency communications. According to the Director and Deputy Director of OEC, additional information on emergency communications best practices will be included in future iterations of the progress report. Furthermore, to facilitate information sharing within the emergency management community at the federal, state, and local levels, OEC plans to create a Web portal and central repository for best practices information related to emergency communications, according to OEC officials. In addition, according to OEC and OIC officials, they will continue to maintain the SAFECOM Web site, which holds tools, templates, and best practice guidance documents. § 1801(c)(8).

- **Consensus Standards:** In coordination with OEC, OIC has continued to help establish and promote nonproprietary, voluntary consensus standards for public safety radio and data communications systems and equipment through participation in Project 25 (P25). P25 is an existing venture that partners the emergency response communications community with industry manufacturers to publish a suite of standards for interoperable digital two-way wireless communications that meet the needs of emergency response practitioners. § 1801(c)(11), (e)(1); see also Homeland Security Act § 314(a)(2), (4), as added by section 672 of the Post-Katrina Act.

- **Review of Interoperability Plans:** OEC, in coordination with FEMA's Grant Programs Directorate[16] and the Department of Commerce's National Telecommunications and Information Administration, oversaw a peer review of the SCIPs in March 2008. All 56 SCIPs for U.S. states and territories were reviewed and approved by April 14, 2008, according to OEC officials. Officials in DHS's National Protection and Programs Directorate stated that FEMA's Disaster Operations Directorate will be included in the review process for future plans to ensure that shortfalls identified in the FEMA assisted statewide communications plans are addressed. In addition, these officials also stated that FEMA's regional disaster emergency communications staff will be included in the reviews to ensure that regional issues are considered. § 1801(c)(12).

---

[16]Under section 1801(c)(12) of the amended Homeland Security Act, OEC is responsible for reviewing interoperable emergency communication plans with the DHS Assistant Secretary for Grants and Training. As a result of the Post-Katrina Act, the Office of Grants and Training transferred to FEMA, and FEMA's Grant Programs Directorate now administers preparedness grants.

Challenges FEMA and DHS Officials Identified:

- According to officials in DHS's National Protection and Programs Directorate, DHS confronted a number of issues in its original efforts to fully comply with relevant statutory requirements contained in the Post-Katrina Act, while balancing the delivery of essential technical services to achieve emergency communications mission objectives. For example, the Post-Katrina Act requires FEMA to perform certain activities related to building operable and interoperable communications capabilities that are nearly identical to some of OEC's statutory responsibilities and also overlapped with other duties assigned to the Secretary of Homeland Security.[17] The Post-Katrina Act also prohibits the transfer of assets, functions, or missions from FEMA to DHS. As a result, according to these officials, a number of interpretations were possible regarding the assignment of responsibility for these certain emergency communications activities, but the flexibility afforded to the secretary to make determinations about how to assign these duties to minimize overlap is not clear. Further, the officials noted that the requirement that the FEMA Administrator minimize reporting requirements for state, local, and tribal governments complicated reconciliation of the role conflicts, particularly with respect to OEC's responsibilities for conducting extensive outreach to the same set of stakeholders.
- In addition, according to OEC officials, OEC has had difficulties finding high-quality candidates to fill specialized positions. According to these officials, OEC has been seeking federal detailees from within DHS, but has had limited success finding suitable candidates. At the time of our work, OEC had been able to secure three detailees from the Federal Communications Commission. The Director of OIC said that his office has also provided support to OEC to compensate for the staffing shortage. Officials in the National Protection and Programs Directorate told us that OEC has made progress in filling its full-time equivalent vacancies. According to these officials, OEC has recently hired nine additional full-time equivalents with several candidates currently in the pipeline. OEC officials also said they are continuing to advertise available positions.

Post-Katrina Act § 671 (Homeland Security Act § 1803), Assessments and Reports

Requires a baseline assessment and inventory of emergency communications capabilities and subsequent reports on DHS's progress in achieving its goals in carrying out the emergency communications requirements in the Post-Katrina Act.

Actions Taken:

- **Baseline Assessment:** OEC addressed the Post-Katrina Act requirement for a baseline assessment by preparing the National Communications Capabilities Report in two phases. OEC submitted an initial report (phase 1) to Congress in March 2008. This report addresses the elements described in section 1803(a) of the Homeland Security Act, as amended. OEC issued phase 2—final results—of the report in July 2008. According to the phase 2 report, it broadened the sample of

---

[17]Officials from DHS's National Protection and Programs Directorate noted, for example, that sections 503(b)(2)(G) and 504(a)(7) of the Homeland Security Act, as amended by the Post-Katrina Act, assign responsibilities to the FEMA Administrator that are very similar to section 1801(c)(6), which delineates the responsibilities of the Director for Emergency Communications and section 1807(a), which contains requirements for the Secretary of Homeland Security.

federal and local agency information and validated phase 1 findings, incorporated state and tribal data from the SCIPs, and expanded the scope of emergency response providers beyond government agencies to include private sector entities. Further, it says phase 2 compiles all of these findings to provide a comprehensive assessment on the state of interoperable emergency communications. § 1803(a).

- **Progress Report:** In March 2008, DHS submitted a progress report to Congress that addresses the elements described in section 1803(d) of the Homeland Security Act, as amended. § 1803(d).

Challenges FEMA and DHS Officials Reported:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 671 (Homeland Security Act § 1804), Coordination of Department Emergency Communications Grant Programs

Requires OEC to ensure that homeland security grant guidelines are consistent with the goals and recommendations in the National Emergency Communications Plan.

Actions Taken:

- **Coordination on Developing Grant Guidance:** According to senior OEC officials, OEC and FEMA's Grant Programs Directorate have been working together to develop the Interoperable Emergency Communications Grant Program and guidance for the Homeland Security Grant Program to ensure that the guidance for these grants is consistent with the goals of the National Emergency Communications Plan. The purpose of the Interoperable Emergency Communications Grant Program, according to DHS officials, is to enable state, territorial, and local governments to implement their SCIPs. For fiscal year 2008, all 56 states and territories have submitted applications for this grant program. According to DHS officials, funds were awarded by September 30, 2008. The Interoperable Emergency Communications Grant Guidance and Application Kit included program funding goals and application requirements to ensure consistency between the goals and objectives of the National Emergency Communications Plan (NECP) and each state and territory's respective SCIP. OEC and FEMA Grants Program Directorate partnered to conduct the federal review process of the grant applications, to better ensure compliance with programmatic goals and requirements of the Interoperable Emergency Communications Grant Program. OEC and FEMA Grants Program Directorate are now in the process of developing the fiscal year 2009 Interoperable Emergency Communications Grant Guidance and Application Kit. § 1804(a).
- **Grant Guidelines:** According to OEC officials, OEC, in coordination with OIC, has developed SAFECOM's coordinated guidance for federal grant programs. The guidance has been incorporated into the fiscal year 2007 and 2008 Homeland Security Grant Program and the fiscal year 2007 Public Safety Interoperable Communications Grant Program. Efforts are underway to incorporate the guidance into FY 2009 interoperable emergency communications-related grant guidance. § 1804(a).

Challenges FEMA and DHS Officials Reported:

- Agency officials did not identify any challenges for this section.

<u>Post-Katrina Act § 671 (Homeland Security Act § 1806), Emergency Communications Preparedness Center</u>

Requires DHS, the Federal Communications Commission, the Department of Defense, the Department of Commerce, the Department of Justice, and other federal departments and agencies to operate jointly an Emergency Communications Preparedness Center in accordance with a Memorandum of Understanding (MOU). This center is, among other things, to serve as the focal point and information clearinghouse for federal interagency emergency communications efforts.

Actions Taken:

- **Charter:** According to OEC officials, OEC currently chairs the Emergency Communications Preparedness Center working group. The officials said that the working group has drafted an MOU that will serve as the center's charter. § 1806(b).

Areas to Be Addressed:

- **Establishment:** The Emergency Communications Preparedness Center will not be officially established until the MOU has been approved by the signatory agencies, according to the Deputy Director of OEC. The deputy director said that DHS, as of August 1, 2008, was still reviewing the draft MOU. The deputy director also said that he does not know when the MOU will be signed. § 1806(a)-(b).
- **Strategic Assessment:** The Post-Katrina Act requires the center to prepare for Congress an annual strategic assessment on federal coordination to advance the continuity and interoperability of emergency communications, which it has not yet done, as the center has not been officially established. The Deputy Director of OEC said that although the center has not been formally established, OEC is preparing a strategic assessment report, with input from the working group that drafted the MOU, to be completed by the end of the calendar year. § 1806(c)(2).

Challenges FEMA and DHS Officials Reported:

- Agency officials did not identify any challenges for this section.

<u>Post-Katrina Act § 672 (Homeland Security Act § 314), Office for Interoperability and Compatibility, and Post-Katrina Act § 673 (Homeland Security Act § 315), Emergency Communications Interoperability Research and Development</u>

Section 314 clarifies the responsibilities of the Director of OIC in establishing standards, conducting research, development, testing, and evaluation activities, and performing other duties; it also requires OIC to coordinate with OEC with respect to the SAFECOM program. Additionally, section 315 requires OIC to conduct research and development for interoperability and further articulates the purposes of that program.

Actions Taken:

- **SAFECOM and Intelligence Reform and Terrorism Prevention Act Responsibilities:** OIC administers the research, development, testing, evaluation, and standards elements of the SAFECOM program, which addresses its responsibility for carrying out certain requirements in both the Post-Katrina Act

and the Intelligence Reform and Terrorism Prevention Act,[18] according to the Director of OIC. § 314(a)(1), (5).

- **Consensus Standards**: OIC works with the National Institute of Standards and Technology to accelerate the development of the P25 suite of standards and equipment. In addition, OIC, according to its Director, promotes standards for channel nomenclature for the public safety interoperability channels. According to the Public Safety National Coordination Committee, a common nomenclature enables responders from different jurisdictions to know which radio channels to use to communicate with one another during an incident. OIC promotes the adoption of these standards through conferences, newsletters, industry and responder publications, manuals, and other materials that can be found at www.safecomprogram.gov. OIC is also partnering with emergency responders, federal agencies, and standards development organizations to accelerate the creation of data messaging standards called Emergency Data Exchange Language, according to OIC officials. The officials stated that these standards will create information sharing capabilities between disparate emergency response software applications, systems, and devices, allowing emergency responders to share data seamlessly and securely when responding to an incident. § 314(a)(2), (4); see also Post-Katrina Act §§ 1801(c)(11), 1804(b)(2).

- **Research, Development, Testing, and Evaluation:** The Director of OIC said that OIC considers the Research, Development, Testing, and Evaluation (RDT&E) programs described in sections 314(a)(3) and 315 of the Homeland Security Act, as amended, as the same program. The Director of OIC said an example of OIC's RDT&E activities is Digital Radio Vocoder testing. In 2006, firefighters were reporting communication problems with their radios due to background noise. A working group that included emergency responders and industry representatives determined that the problem was with the vocoders, the component in a radio that converts speech into digital signals and vice versa. As of August 1, 2008, OIC, in conjunction with its partners, was performing tests to solve this problem. In addition, OIC, through SAFECOM, and in conjunction with its partners, developed evaluation criteria for the Tactical Interoperable Communications Scorecards, according to the Director of OIC. These scorecards were designed to assess the maturity of interoperable communications capabilities in certain urban areas. The following are examples, but not a comprehensive list of OIC RDT&E activities. For more information see www.safecomprogram.gov.

  - **Evaluation and Assessment of New Technology:** According to the Director of OIC, DHS uses the P25 Compliance Assessment Program to assess new technology. This program establishes a process for ensuring that radio communication equipment complies with P25 standards and is capable of interoperating across manufacturers.

  - **Testing Public Safety Communications Systems:** According to the Director of OIC, an example of OIC's testing of public safety communications systems is the Radio over Wireless Broadband research project. Radio over Wireless Broadband is intended to research how to connect to existing land mobile radio systems with advanced wireless broadband technologies, such as push-to-talk cellular, while leveraging Geographic Information System technology. According

---

[18]The Intelligence Reform and Terrorism Prevention Act (IRPTA) of 2004, Pub. L. No. 108-458, § 7303, 118 Stat. 3638, 3843-44 (2004).

to OIC officials, a demonstration of this technology was held in Washington, D.C., in August 2008.

o **Pilot Projects:** One of the pilots that OIC is currently administering is the Multi-Band Radio project. The multi-band radio is a device that can operate on all public-safety radio bands. OIC intends to test and evaluate the multi-band radio through pilots nationwide. In February 2008, DHS awarded a $6.275 million, 1-year contract to demonstrate the first portable multi-band radio.

o **Other RTD&E Activities:** According to OIC officials, OIC will launch a program to support the development of technologies to increase the number of commercial mobile service devices that can receive emergency alerts. Additionally, OIC officials stated that FEMA has asked OIC to assist in developing standards and protocols, providing technical advice, coordinating with industry, and supporting and managing technical demonstrations of applicable technologies for the Integrated Public Alert Warning System. As of August 1, 2008, OIC is working to improve bridge devices that connect radio systems for emergency responders, and enable Computer Aided Dispatch systems to exchange information across jurisdictions, according to OIC officials. §§ 314(a)(3), (6), (8), (10), 315.

- **Establishing Interoperable Emergency Communications Requirements:** According to OIC officials, OIC defined the operational and functional requirements for voice and data communication in day-to-day, task force, and mutual aid operations in its Public Safety Statement of Requirements, which was released in 2004. A second volume of this document was released on August 18, 2006. DHS officials stated that these requirements help drive the identification of key interface standards and the development of technologies that meet emergency response requirements. These officials also stated that OIC and OEC continually work with SAFECOM's Executive Committee and Emergency Response Council to establish requirements that respond to the needs of the emergency response community. Additionally, through its Interoperability Capstone Integration Product Team process, OIC works with FEMA and OEC to identify and prioritize operational capability gaps and requirements to enable DHS to make informed decisions about technology investments, according to the DHS officials. To promote vendor adoption of certain interoperability standards for data (as defined by the Statement of Requirements), OIC, according to its director, developed a software package, using nonproprietary standards, and distributed it to certain federal agencies for free. The Director of OIC said that vendors had to adopt these standards in order to provide the agencies with devices compatible with the free software package. The Director of OIC also said that OIC is drafting Request for Proposals (RFP) language to encourage the use of nonpropriety standards. For example, OIC has developed a data messaging standards guide for RFPs. According to OIC officials, the guide provides language requiring manufacturers to incorporate data messaging standards into their products. § 314(a)(2), (4); see also Post-Katrina Act §§ 1801(c)(11), 1804(b)(2).

- **Encouraging Efficiency:** OIC, according to its Director, developed the Interoperability Continuum to encourage more efficient use of existing resources to achieve interoperability. The continuum is a tool designed to assist emergency response agencies and policy makers to plan and implement interoperability solutions by identifying elements that must be addressed to achieve interoperability

solutions. OIC also developed an operational guide for this tool. To further promote efficiency, OIC encourages the use of mutual aid agreements for instances when a large number of agencies, personnel, and equipment from neighboring regions and states must be brought in to assist the affected jurisdiction, according to OIC officials. The officials stated that OIC describes specific cases where mutual aid agreements would be beneficial in its Statement of Requirements. The officials also stated that OIC developed the Writing Guide for a Memorandum of Understanding to assist localities in creating formal agreements to address multiorganization coordination and communications. § 314(a)(7).

- **Private Sector Coordination:** According to the Director of OIC, OIC coordinates with private sector vendors through meetings, conferences, round table discussions, and other venues to develop solutions to improve emergency communications and interoperability. § 314(a)(9).
- **SAFECOM Coordination:** According to OIC officials, OIC and OEC coordinate together to develop tools and guidance documents for improving interoperability. The officials reported that OIC has transitioned several of the tools that it has developed to OEC for distribution to the emergency response community. OIC and OEC also work together managing SAFECOM's Executive Committee and the Emergency Response Council, and share responsibility for maintaining the SAFECOM Web site, according to OIC officials. In addition, OIC officials stated that OIC and OEC coordinate to report to the Office of Management and Budget on SAFECOM activities. Moreover, OIC and OEC leadership meet on a regular basis to maintain continuity in the SAFECOM program and ensure that the two offices are collaborating, including jointly participating in the DHS Science and Technology Directorate's Interoperability Integrated Product Team, according to OIC officials. Lastly, OIC officials stated that OIC has also provided resources, including staff, to assist OEC as it continues to stand up the office. § 314(b).

    Areas to Be Addressed:

- **SAFECOM Coordination:** The Director of OIC said that OIC does not have a formal mechanism in place to ensure coordination with OEC for their shared SAFECOM program responsibilities. However, the Deputy Director of OEC said that he was in the process of developing a written agreement to institutionalize the working relationships and agreements about roles and responsibilities between OEC and OIC/SAFECOM. § 314(b).

    Challenges FEMA and DHS Officials Reported:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 674, 911 and E911 Services Report

Requires the Federal Communications Commission to submit a report to Congress on the status of efforts of state, local, and tribal governments to develop plans for rerouting 911 and E911 services in the event that public safety answering points are disabled during disasters.

Actions Taken:

- **Report:** In September 2007, the Federal Communications Commission submitted to Congress the report titled *Rerouting 911 and E911 Services when Public Safety Answering Points Are Disabled.* § 674.

Challenges FEMA and DHS Officials Identified:

- Agency officials did not identify any challenges for this section.

For Further Reading

- National Public Safety Telecommunications Council. *Channel Naming Report.* Littleton, Colo.: June 2007.
- U.S. Congress. House. Subcommittee on Emergency Communications, Preparedness and Response and the Subcommittee on Management, Investigations, and Oversight, Committee on Homeland Security. *Statement of Matt Jadacki, Deputy Inspector General for Disaster Assistance Oversight, U.S. Department Of Homeland Security.* 110th Cong., 1st sess., February 28, 2007.
- U.S. Congress. Senate. Committee on Homeland Security and Government Affairs. *Statement of R. David Paulison, Administrator, Federal Emergency Management Agency, U.S. Department of Homeland Security.* 110th Cong., 2nd sess., April 3, 2008.
- U.S. Department of Homeland Security. *National Emergency Communications Plan.* Washington, D.C.: July 2008.
- U.S. Department of Homeland Security. *National Communications Capabilities Report: Phase 1, Initial Results.* Washington, D.C.: March 2008.
- U.S. Department of Homeland Security. *Progress Report to Congress on Emergency Communications.* Washington, D.C.: March 2008.
- U.S. Department of Homeland Security. *Tactical Interoperable Communications Scorecards: Summary Report and Findings.* Washington, D.C.: January 2007.
- U.S. Department of Homeland Security, SAFECOM. *Public Safety Statement of Requirements for Communications & Interoperability, Volume 1, Version 1.2.* Washington, D.C.: October 2006.
- U.S. Department of Homeland Security. *Operational Guide for the Interoperability Continuum: Lessons Learned from RapidCom.* Washington, D.C.: September 2005.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Interoperable Communications Technical Assistance Program." http://www.ojp.usdoj.gov/odp/ta_ictap.htm (accessed on Sept. 5, 2008).
- U.S. Department of Homeland Security. Federal Emergency Management Agency. Lessons Learned Information Sharing. https://www.llis.dhs.gov/index.do (accessed Nov. 12, 2008).
- U.S. Department of Homeland Security. National Response Framework Resource Center. "Annexes." http://www.fema.gov/emergency/nrf/ (accessed on Sept. 5, 2008).
- U.S. Department of Homeland Security SAFECOM. "Interoperability Basics." http://www.safecomprogram.gov/SAFECOM/library/interoperabilitybasics/ (accessed on Sept. 5, 2008).

- U.S. Department of Homeland Security. SAFECOM. "Technology Solutions & Standards." http://www.safecomprogram.gov/SAFECOM/library/technology/ (accessed on Sept. 5, 2008).
- U.S. Department of Homeland Security SAFECOM. "Interoperability Continuum Brochure." http://www.safecomprogram.gov/SAFECOM/library/interoperabilitybasics/1190_interoperabilitycontinuum.htm (accessed on Sept. 5, 2008).
- U.S. Department of Homeland Security. SAFECOM. "P25 Compliance Assessment Fact Sheet." http://www.safecomprogram.gov/SAFECOM/press/factsheets/1338.htm (accessed on Oct. 22, 2008).
- U.S. Department of Homeland Security. SAFECOM. "Radio Over Wireless Broadband Project Fact Sheet." http://www.safecomprogram.gov/SAFECOM/press/factsheets/1325.htm (accessed on Oct. 22, 2008).
- U.S. Department of Homeland Security. SAFECOM. "Multi-Band Radio Project Fact Sheet." http://www.safecomprogram.gov/SAFECOM/press/factsheets/1363.htm (accessed on Oct. 22, 2008).
- U.S. Federal Communications Commission. *Rerouting 911 and E911 Services when Public Safety Answering Points Are Disabled.* Washington, D.C.: September 2007.

*GAO-09-59R Actions to Implement the Post-Katrina Act*

**Enclosure IV: Providing Assistance to Disaster-Affected Areas and Populations**

<u>Post-Katrina Act § 639, Basic Life Supporting First Aid and Education</u>

Requires the FEMA Administrator to enter into agreements with organizations to provide funds for emergency response providers to provide life supporting first aid education and training to children.

Actions Taken:

- **Agreements to Provide First Aid Education to Children**: According to officials in FEMA's National Preparedness Directorate, FEMA, through an award funded by the fiscal year 2008 Competitive Training Grants Program, funded the American College of Emergency Physicians to design, develop, and deliver all-hazards preparedness training for children and adults through interactive Web-based content. The training is to include first aid and other life-saving education topics. The audience for the training is to be responders, caregivers (such as day care professionals), and parents. Training is also to be directed at children in grades 1 through 8, using age-appropriate interactive Web-based games, lessons, practice scenarios, and knowledge tests. The award amount is $1,706,225. The award end date is currently September 30, 2011. These officials also noted that the fiscal year 2008 Competitive Training Grants Program funded the Partnership for Environmental Technology Education to train U.S. citizens on specific protective actions to save lives and minimize injuries after a disaster and before the arrival of first responders. The award amount is $3,500,000 and end date is September 30, 2011. According to the officials, in addition to these programs, FEMA currently supports Teen Community Emergency Response Team (CERT) training, which targets high school students. Teen CERT training is a component of the national CERT Program and includes substantial training on life- supporting first aid. These officials told us that FEMA, through the Homeland Security Grant Program (HSGP), provides funding to states for providing life-supporting first-aid education to children through the Citizen Corps Program. They said that CERT may also be funded by HSGP grants to the states, which are passed through to local emergency responder organizations who conduct the local CERT and Teen CERT training. In addition, FEMA grants are used to provide training to CERT and Teen CERT trainers, building capacity to deliver direct training to greater numbers of high school students. § 639.

Challenges FEMA and DHS Officials Identified:

- Agency officials did not identify any challenges for this section.

<u>Post-Katrina Act § 640a, Disclosure of Certain Information to Law Enforcement Agencies</u>

Grants the FEMA Administrator authority to provide information from any FEMA individual-assistance database, consistent with the Privacy Act,[19] to law enforcement agencies to identify illegal conduct or address public safety and security issues,

---

[19]5 U.S.C. § 552a.

including compliance with sex offender laws, in the event of evacuations, sheltering, or mass relocations.

Actions Taken:

- **Compliance with the Privacy Act:** In order to comply with the Privacy Act, FEMA revised the routine uses of information in a Systems of Record Notice, last updated on July 6, 2006. The Systems of Record Notice:
  o allows the disclosure to law enforcement of a record that, on its face or in conjunction with other information, indicates a violation or potential violation of law;
  o permits FEMA to share information in the event of evacuation, sheltering, or mass relocation, in order to identify illegal or fraudulent conduct and address public safety and security issues;
  o allows FEMA to release applicant information to the Department of Justice (DOJ) or other federal agency in litigation or court-related circumstances; and
  o allows FEMA to release applicant information in order to reunite families and find missing children. § 640a.
- **Disclosure of Information:** Officials in the Office of Chief Counsel told us that FEMA has exercised the authority to share information with law enforcement officials. § 640a.
- **Coordination:** To facilitate the use of this authority, FEMA has entered into multiple agreements with other federal agencies and signed a Memorandum of Agreement (MOA) with each of the following:
  o The Federal Bureau of Investigation (FBI) Crimes against Children Unit, effective January 8, 2007. This MOA allows the FBI access to FEMA's database system in order to assist the FBI in locating missing children in the event of a disaster or an emergency.
  o The United States Marshals Service, effective July 30, 2007, under which FEMA will grant access to FEMA's disaster assistance database for the purposes of identifying and locating sex offenders relocated as a result of a major disaster, and for identifying, locating, and apprehending fugitives and noncompliant sex offenders.
  o DOJ's Hurricane Katrina Fraud Task Force, effective March 1, 2006, under which FEMA will grant access to its database system in order for the Hurricane Katrina Fraud Task Force to investigate fraud cases related to Hurricanes Katrina, Rita, and Wilma. § 640a.

Challenges FEMA and DHS Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 689b, Reunification

Establishes the National Emergency Child Locator Center within the National Center for Missing and Exploited Children and enumerates the responsibilities of the center, among other things, to provide technical assistance in locating displaced children and assist in the reunification of displaced children with their families.

Actions Taken:

- **Establishment:** The National Emergency Child Locator Center has been established within the National Center for Missing and Exploited Children**. §** 689b(b)(1).
- **Center Responsibilities:** The National Center for Missing and Exploited Children Web site states that in the event of a natural disaster, the child locator center will (1) establish a toll-free hotline to receive reports of displaced children; (2) create a Web site to provide information about displaced children; (3) deploy staff to the location of a declared disaster area to gather information about displaced children; (4) provide information to the public about additional resources; (5) partner with federal, state, and local law enforcement agencies; and (6) refer reports of displaced adults to the Attorney General's designated authority and the National Emergency Family Registry and Locator System. § 689b(b)(3).
- **Hotline and Web site:** The child locator center has established a toll-free phone number that is to be activated during disasters and was activated during the 2007 California wildfires. It also created a Web site that is to be activated during disasters and will be found via a link on the National Center for Missing and Exploited Children Web site. § 689b(b)(3).
- **Prior Activation:** According to the Disaster Assistance Directorate Unit Leader with responsibility for mass care, housing, and human services, the child locator center was activated during the 2007 California wild fires—that is, it activated both the hotline and the Web site, and it sent expert groups of volunteers and paid staff to provide technical assistance to local law enforcement agencies. § 689b(b)(3).
- **Emergency Response Plan:** The National Center for Missing and Exploited Children developed an emergency response plan for the National Emergency Child Locator Center. Among other things, the plan defines criteria to be used to activate the National Emergency Child Locator Center, and defines roles and responsibilities of the National Center for Missing and Exploited Children and its staff in operating the National Emergency Child Locator Center. § 689b(b)(3).
- **Reporting Requirement:** FEMA submitted a report to Congress on the status of the child locator center in September 2007. § 689b(d).
- **Coordination:** FEMA has established a memorandum of understanding (MOU), effective March 6, 2007, with the following organizations: the Department of Justice (DOJ), the Department of Health and Human Services (HHS), the National Center for Missing and Exploited Children, and the American Red Cross, that, among other things, requires signatory agencies to participate in a cooperative agreement, and for FEMA, through the National Emergency Family Registry and Locator System, to provide relevant information to the National Emergency Child Locator Center. § 689b(b)(3).

Areas to Be Addressed:

- **Coordination:** The Disaster Assistance Directorate Unit Leader told us that the child locator center is in the process of finalizing cooperative agreements with federal and state agencies and other organizations such as the American Red Cross to help implement its mission. Officials from the Disaster Assistance Directorate told us just before the publication of this document that a cooperative agreement between FEMA and the National Center for Missing and Exploited Children is being reviewed by each entity's respective legal department. § 689b(b)(3).

Challenges FEMA and DHS Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 689c, National Emergency Family Registry and Locator System

Requires the FEMA Administrator to establish the National Emergency Family Registry and Locator System to help reunify families separated after an emergency or major disaster, outlines the operation of the system, and requires a mechanism to inform the public of the system. Also requires the FEMA Administrator to coordinate information sharing to facilitate reunification of families by entering into an MOU with DOJ, the National Center for Missing and Exploited Children, the Department of Health and Human Services (HHS), the American Red Cross, and other private organizations.

Actions Taken:

- **Establishment:** The National Emergency Family Registry and Locator System has been established. The Disaster Assistance Directorate Unit Leader told us that FEMA will activate the locator system in an emergency situation. § 689c(b).
- **Operation of System:** The family locator system has established a permanent toll-free number and has a Web site that is to be publicly available when the family locator system is activated to allow users to register as displaced persons, to search for displaced persons, and to register and search for displaced children. § 689c(c)(1)-(3).
- **Publication of Information:** According to an Executive Officer of the Disaster Assistance Directorate, public affairs officials at the national and regional level will be alerted to the activation of the family locator system, and FEMA will publicize the toll-free number and the Web site on local and national media, as well as share the family locator system information with law enforcement. § 689c(d).
- **Referring Displaced Children:** The family locator system has a mechanism to redirect any request to search for or register displaced children to the National Emergency Child Locator Center, part of the National Center for Missing and Exploited Children. § 689c(c)(4).
- **Coordination:** As previously described, FEMA has established an MOU, effective March 6, 2007, with the following organizations: DOJ and HHS, the National Center for Missing and Exploited Children, and the American Red Cross. Among other things, the MOU is designed to establish and articulate the mission of the family locator system, and to enhance information sharing to facilitate reuniting displaced individuals with their families. § 689c(e).
- **Reporting Requirement:** FEMA submitted a report to Congress describing the status of the family locator system in December 2007.[20] § 689c(f).

Challenges FEMA and DHS Officials Identified:

- Agency officials did not identify any challenges for this section.

---

[20]"The Establishment of the National Emergency Family Registry and Locator System," FY 2007 Report to Congress. Published December 2007.

<u>Post-Katrina Act § 689e (Stafford Act § 616), Disaster-Related Information Services</u>
Requires FEMA to ensure that disaster-related information is made available in understandable formats for population groups with limited English proficiency and for individuals with special needs. Also requires FEMA to develop an informational clearinghouse of model language-assistance programs and best practices for use by state and local governments.

Actions Taken:

- **Identifying Population Groups with Limited English Proficiency, in Coordination with State and Local Governments:** Officials from FEMA's National Processing Service Center told us that they obtain information on language requirements from the region, state, and the U.S Census Bureau at the beginning of each disaster. National Processing Service Center officials further stated that their housing inspectors and contractors include bilingual inspectors and that they hire local interpreters when necessary. Additionally, these contractors recruit inspectors from the actual disaster locations when feasible, to improve relationships in the community and to assist with language barriers. § 616(a)(1)–(2).
- **Ensuring Information Is Made Available in Formats That Can Be Understood by Special Needs Populations:** FEMA's Disability Coordinator and the Civil Rights Program Manager reported they are working to develop information in formats such as Braille, large print and sign language, as well as using interpreters for foreign languages, as part of an effort to implement section 689e of the Post-Katrina Act. In addition, a FEMA working group has developed a series of recommendations for FEMA-wide implementation of section 689e. According to the FEMA Civil Rights Program Manager, this working group was one of several working groups established to develop methods for implementing various provisions of the Post-Katrina Act. The document produced by the working group states that its aim is to ensure that information and services for all disaster victims are not a specialized function of a single individual or office, but rather are integrated into appropriate emergency training, planning, response, and recovery policies and procedures, and part of the overall awareness of all FEMA staff. According to the Civil Rights Program Manager, the document produced by the working group, with recommendations and identified best practices, was circulated to directorates as guidance on implementing limited English proficiency practices and principles. He stated that the document can be used to identify opportunities and requirements for making program functions accessible to limited English proficiency populations. Also, officials from FEMA's National Processing Service Center told us they had implemented several new policies to improve communications with the public, including limited English proficiency populations and those with special needs. For example, they said the National Processing Service Centers rewrote the eligibility letters for disaster victims to make them easier to understand, by, among other things, using plain language, and that they offer translations upon request. After each disaster, FEMA regions can choose to include Spanish translations of the disaster assistance letters. In addition, applicant letters and a guide to FEMA assistance can also be sent in Braille or large print upon request. These officials also told us that all National Processing Service Center registration, help-line, and caseworker personnel have been provided with

training and job aides to better prepare them to communicate with deaf and hard of hearing callers using a variety of methods and devices, including video relay. § 616(a)(2).

- **Informational Clearinghouse:** FEMA's Disability Coordinator and the Civil Rights Program Manager also stated that they are developing an informational clearinghouse of model language-assistance programs and best practices. In researching limited English proficiency programs, the Disability Coordinator stated that she has found some of the best to be in medical facilities, and her office plans to include these best practices in the clearinghouse. According to the Disability Coordinator, her office has identified about 21 or 22 languages thus far to include in the clearinghouse. § 616(a)(3).

Areas to Be Addressed:

- **Issuing the Limited English Proficiency Policy:** FEMA officials told us that FEMA completed a Limited English Proficiency Policy, which was approved by DOJ in 2003. However, before the policy was published in the Federal Register, DHS determined that one overarching limited English proficiency policy would be written and published. The officials did not estimate when the overarching DHS policy would be finalized. § 616(a)(1)-(2).
- **Launching the Informational Clearinghouse:** FEMA has not yet launched the informational clearinghouse of model language-assistance programs. § 616(a)(3).

Challenges FEMA and DHS Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 689f (Stafford Act § 425), Transportation Assistance to Individuals and Households

Authorizes transportation assistance to relocate displaced individuals to and from alternate locations for short- or long-term accommodations, or return them to their predisaster primary residences.

Actions Taken:

- **Development of Policy and Regulations:** FEMA officials in the Disaster Assistance Directorate told us shortly before we published this document that they have developed a draft policy for implementing the transportation assistance authority, which is under review and requires implementation of proposed regulatory changes before becoming effective. A copy of this draft policy did not accompany their comments. § 425.
- **Development of Procedures:** FEMA developed procedures for transportation assistance in the Mass Sheltering and Housing Assistance Strategy, issued in July 2006. § 425.
- **Relocation Policy:** According to the strategy, if the scale of the evacuation overwhelms affected states' sheltering capabilities, FEMA will coordinate and provide air or surface transportation in support of interstate evacuation. § 425.
- **Return Policy:** If the evacuated area is without extensive damage to residences, as stated in the strategy, FEMA will coordinate and fund return mass transportation to the point of transportation origin. If the evacuated area suffered extensive damage

to residences, eligible evacuees are authorized, with host state consent, to use FEMA funding known as Other Needs Assistance to purchase return transportation, when they are able to do so. § 425.

Challenges FEMA and DHS Officials Identified:
• Agency officials did not identify any challenges for this section.

Post-Katrina Act § 689f (Stafford Act § 426), Case-Management Services

Grants the President authority to provide case-management services, including financial assistance to state or local government agencies or private organizations to provide such services, to victims of major disasters.

Actions Taken:
• **Case-Management Projects and Pilots:** Using this authority, FEMA has developed two case-management projects and pilots:
  o FEMA-HHS/Administration for Children and Families (ACF) Disaster Case-Management Pilot:
    ▪ The FEMA-HHS/ACF Disaster Case Management Pilot is to be tested during summer 2008 in a Region 4 state to be determined based on disaster activity.
    ▪ Participants in the FEMA-HHS/ACF Disaster Case Management Pilot will include: FEMA, HHS, Coordinated Assistance Network, Catholic Charities, and other agencies. The period of assistance will depend on the type and size of the presidentially declared disaster, but is not to exceed 18 months.
    ▪ FEMA and HHS/ACF signed an Interagency Agreement for this pilot in April 2008.
  o Disaster Case-Management Pilot Program (DCMPP):
    ▪ DCMPP will provide grant funding to the states of Mississippi and Louisiana, which are then expected to award grants to case-management providers within the state that have a history of offering services to victims of Hurricanes Katrina and Rita.
    ▪ DCMPP is to give assistance to victims of Hurricanes Katrina and Rita who are currently housed in FEMA-provided temporary housing units, those whose case-management services are not yet fully completed, and those who vacated their FEMA temporary housing units and were authorized to stay in a hotel due to health concerns.
    ▪ The DCMPP period of assistance is June 16, 2008-March 1, 2009.
    ▪ Victims are to receive assistance through DCMPP until case closure is achieved or until the end of the grant period, March 1, 2009, whichever occurs first.
    ▪ FEMA plans to gather information through DCMPP to create a permanent disaster case-management program.
    ▪ In DCMPP guidance, FEMA lists June 1, 2009, as the due date for final program, fiscal, and evaluation reports. § 426.
• FEMA officials told us in October 2008 that the state of Texas is in the process of identifying which case-management program to pursue for Hurricane Ike disaster victims, the FEMA-HHS/ACF Case Management Pilot Program or DCMPP. § 426.

Challenges FEMA and DHS Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 689i, Individuals and Households Pilot Program

Requires the President, acting through the FEMA Administrator, and in coordination with state, local, and tribal governments, to establish a pilot program to make better use of existing rental housing located in major disaster areas, where alternative housing options are less available or less cost-effective.

Actions Taken:

- **Program Development:** In May 2008, the Deputy Assistant Administrator for the Disaster Assistance Directorate stated that FEMA had developed the Rental Repair Pilot Program and would implement it as soon as FEMA identified a cost-effective opportunity to do so, something he said FEMA was actively looking to do. **§ 689i(a)(1).**
- **Program Implementation:** FEMA officials in the Disaster Assistance Directorate told us shortly before we published this document that FEMA had implemented the Rental Repair Pilot Program in Iowa. FEMA officials told us that after the Midwest floods during summer 2008, they entered into a lease agreement with a nonprofit organization that owns a multifamily unit in Cedar Rapids, Iowa, an area that was affected by the disaster. Under the 14-month lease with the nonprofit organization, FEMA is to provide funds to repair seven two-bedroom units and, once repaired, is to house eligible applicants in the units for 14 months; but, documentation did not accompany their comments. According to FEMA officials, additional pilot opportunities have yet to be identified or requested by the state-led Housing Task Forces in Texas and Louisiana, following Hurricane Ike in summer 2008. **§ 689i(a)(1–2).**

Challenges FEMA and DHS Officials Identified:

- The Deputy Assistant Administrator for the Disaster Assistance Directorate said that one of the elements of the pilot program under the Post-Katrina Act is cost-effectiveness. However, finding cost-effective opportunities—where the cost is at least evenly offset by a demonstrable benefit—to repair rental housing in a major disaster area has proven difficult.
- The Deputy Assistant Administrator stated that pressing housing needs often dictate the use of mobile homes. He noted that FEMA cannot defer housing to disaster victims while it makes repairs on rental units. Once FEMA incurs the costs of transporting a mobile home, he said it is more cost-effective to continue to use the mobile home than to repair alternative rental housing.
- In addition, the Deputy Assistant Administrator cited diffculties for FEMA to repair apartments in a cost-effective manner: FEMA would have to lease the units from the apartment owners, who would not have an incentive to lease if they could as easily repair apartments themselves and then charge rent at market value or higher. Therefore, the only stock available to FEMA would be buildings with very extensive repair needs, requiring high expenditures for rehabilitation, he concluded.
- The Deputy Assistant Administrator suggested that if the Department of Housing and Urban Development managed the program and bought the apartments, which

could then be added to the public housing inventory, the progam might be cost-effective for the government as a whole.

Post-Katrina Act § 689j, Public Assistance Pilot Program

Requires the President, acting through the FEMA Administrator, and in coordination with state and local governments, to establish a pilot program to reduce costs, increase flexibility, and expedite assistance for specified public-assistance (PA) projects under the Stafford Act. The legislation outlined six procedures that FEMA could—but was not required to—adopt in carrying out the pilot including, among other things, increasing the federal government's share of debris and wreckage removal for state and local governments that have a FEMA-approved debris-management plan and one or more prequalified contractors for such services.

    Actions Taken:

- **Establishment and Coordination:** The Deputy Assistant Administrator for the Disaster Assistance Directorate stated that establishing the PA Pilot program was an extensive effort, and that FEMA coordinated with members of the National Emergency Management Association and the International Association of Emergency Managers, including the states of Georgia, New York, California, and North Carolina. § 689j(a)(1).
- **Pilot Program Workgroup:** FEMA convened a PA Pilot workgroup to develop program guidance and an implementation plan:
  - The work group was composed of members of the National Emergency Management Association, the International Association of Emergency Managers, and FEMA regional and headquarters staff, including members of the Federal Coordinating Officer cadre, to develop program guidance and an implementation plan.
  - The PA Pilot workgroup held two in-person meetings, as well as teleconferences through March 2007. § 689j(a)(1).
- **Pilot Program Procedures:** The PA Pilot workgroup focused on four of the six procedures outlined in the legislation, and identified the following procedures to implement the PA Pilot program:
  - FEMA will provide grants on the basis of estimates for large projects up to $500,000.
  - FEMA will provide an additional 5 percent federal cost share (i.e., the amount of money the federal government will share in the cost), not to exceed 100 percent of the total cost, to applicants who have a FEMA-approved debris-management plan and at least two prequalified debris- and wreckage-removal contractors identified prior to a disaster. Usually the minimum federal cost share is 75 percent, with 90 percent possible by the President's authorization in situations of severe economic impact.
  - FEMA will allow an applicant to retain any revenue from the salvage value of recyclable disaster debris as an incentive to recycle debris.
  - FEMA will reimburse the straight- or regular-time salaries (i.e., not overtime salaries) and benefits of an applicant's permanently employed staff that performs debris-related activities. § 689j(a)(3).
- **Implementation Period:** FEMA stood up the PA Pilot program on June 1, 2007, and it will be implemented until December 31, 2008. § 689j(d).

- **Available Guidance:** In June 2007, FEMA published the Public Assistance Pilot Program Guidance for State and Local Officials. § 689j(a)(3).
- **Reporting Requirement:** FEMA has acknowledged in its Public Assistance Pilot Program Guidance its March 2009 legislative reporting requirement. § 689j(b).

    Challenges FEMA and DHS Officials Identified:
- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 689k, Disposal of Unused Temporary Housing Units

Requires the FEMA Administrator, in coordination with the Department of the Interior or other appropriate federal agencies, to transfer any unused temporary housing units authorized for disposal to tribal governments, if appropriate.

    Actions Taken:
- **Unused Mobile Homes:** FEMA has made available 1,000 unused mobile homes located in Hope, Arkansas, and Texarkana, Texas, for transfer to tribal governments. While FEMA will not impose a cost for the mobile homes, tribal governments will be responsible for transportation, unit set up, and if necessary, retrofitting. The Department of Housing and Urban Development has determined that these costs will be considered eligible costs under the Indian Housing Block Grant Program. § 689k.

    Challenges FEMA and DHS Officials Identified:
- Agency officials did not identify any challenges for this section.

For Further Reading:

- The National Center for Missing & Exploited Children. "Natural Disasters: Is Your Family Prepared?" http://www.missingkids.com/missingkids/servlet/PageServlet?LanguageCountry=en_US&PageId=3252 (accessed on Sept. 5, 2008).
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "The Establishment of the National Emergency Child Locator Center: FY 2007 Report to Congress." September 2007.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "The Establishment of the National Emergency Family Registry and Locator System: FY 2007 Report to Congress." December 2007.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Program Guidance for the Public Assistance Pilot Program: Guidance for FEMA, State and Local Officials." http://www.fema.gov/government/policy/papilot.shtm (accessed Sept. 5, 2008).
- "Privacy Act System of Records: Notice of Amendment to Existing Routine Uses." *Federal Register*, vol. 71, no. 129. July 6, 2006.

**Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities**

<u>Post-Katrina Act § 671[21] (Homeland Security Act §1802), National Emergency Communications Plan</u>

Requires the Secretary of Homeland Security, acting through the Director for Emergency Communications and in cooperation with other relevant entities, to develop a National Emergency Communications Plan (NECP) that includes, among other things, recommendations for how to support and promote the ability of first responders and government officials to continue to communicate during disasters and the attainment of interoperability, nationwide.

     Actions Taken:

- **Plan Release**: The Department of Homeland Security (DHS) released the NECP on July 31, 2008. § 1802(a).
- **Cooperation with Other Entities**: The Deputy Director of the Office for Emergency Communications said that when drafting the NECP, his office reached out to obtain input from federal, state, and local officials, as well as the private sector, including the major telecommunications companies. In addition, this official said that the Emergency Communications Preparedness Center working group, comprised of representatives from DHS, the Federal Communications Commission, the Department of Defense, the Department of Commerce, and the Department of Justice, provided input into the development of the NECP. According to a DHS press release announcing the plan, the Office of Emergency Communications developed the plan with more than 150 public and private sector-emergency communications officials. § 1802(a)-(b).
- **Plan Contents**: The NECP includes an appendix that identifies which NECP sections address the nine content requirements of the Post-Katrina Act (and an additional requirement established by the Implementing Recommendations of the 9/11 Commission Act of 2007).[22] Examples of some NECP initiatives include: targeting federal emergency communications grants to address gaps identified in the NECP, Statewide Communication Interoperability Plans, and Tactical Interoperable Communications Plans; leveraging existing and emerging technologies to expand and integrate disaster communications capabilities among emergency-response providers; and developing and injecting standardized emergency communications performance objectives and evaluation criteria into operational exercises. § 1802(c).

---

[21]Section 671 of the Post-Katrina Act is titled the "21st Century Emergency Communications Act of 2006." It amends the Homeland Security Act of 2002 by adding at the end a new title XVIII, Emergency Communications.

[22]The 9/11 Commission Act requires the NECP to set a date, including interim benchmarks as necessary, by which federal and nonfederal government entities and emergency-response providers expect to achieve a baseline level of interoperability. See Pub. L. No. 110-53, § 301, 121 Stat. 266, 300 (2007). The NECP sets phased interoperability goals with expected completion dates from 2010 to 2013 for different jurisdictions.

      **GAO-09-59R Actions to Implement the Post-Katrina Act**

Challenges DHS and FEMA Officials Identified:
- Agency officials did not identify any challenges for this section.

<u>Post-Katrina Act § 611 (Homeland Security Act § 512), Evacuation Plans and Exercises</u>

Allows grants made to state, local, and tribal governments by DHS through the State Homeland Security Program (SHSP) or the Urban Area Security Initiative (UASI) to be used to establish programs for the development and maintenance of mass evacuation plans, prepare for the execution of mass evacuation plans, and conduct exercises of mass evacuation plans.

Actions Taken:
- **SHSP and UASI Grants Authorized for Evacuation Planning**: According to the Director of Grants Development and Administration, the Federal Emergency Management Agency (FEMA) has informed state, local, and tribal governments that they may use SHSP and UASI grants to assist mass evacuation planning via the fiscal year 2008 Homeland Security Grant Program written guidance, of which both grants are components. The guidance lists strengthening preparedness planning as one of its three objectives, and evacuation planning is included under that objective. Further, the guidance states that developing or enhancing evacuation plans is an allowable expense. § 512(a).
- **State Evacuation Plan Development:** FEMA developed the Mass Evacuation Incident Annex to the National Response Framework (NRF), which provides an overview of mass evacuation functions, agency roles and responsibilities, and overall guidelines for the integration of federal, state, tribal, and local support in the evacuation of large numbers of people in incidents requiring a coordinated federal response. Officials in FEMA's Disaster Operations Directorate also noted that the states participating in FEMA's Catastrophic Disaster Planning Initiative benefit from detailed federal, state, and local catastrophic planning that includes examination of evacuation topics. These states include Florida, Louisiana, California, and the eight Midwestern states in the New Madrid Seismic Zone. In addition, National Preparedness Directorate officials told us that for the last 2 years, FEMA has provided technical assistance to the state of Louisiana in Baton Rouge, helping to develop a mass evacuation plan, including leveraging transportation resources—rail, air, buses, and so forth. § 512(c)(1).

Areas to Be Addressed:
- **State Evacuation Plan Development:** According to officials in FEMA's Disaster Operations Directorate, as of August 1, 2008, FEMA was in the process of finalizing the Mass Evacuation Incident Annex Operational Supplement to the NRF, which is intended to provide additional guidance for mass evacuations. In addition, officials in FEMA's National Preparedness Directorate said that a third document, the Comprehensive Preparedness Guide (CPG) 101, provides guidance for state and local governments to develop emergency operations plans. FEMA released an interim version of CPG 101 in August 2008 with the final CPG 101 expected to be released in December 2008. § 512(b), (c)(1).
- **Technical Assistance for Mass Evacuation Planning:** The Post-Katrina Act requires FEMA to provide mass evacuation planning assistance to institutions that

house individuals with special needs upon request by a state, local, or tribal government. FEMA officials in the Disaster Operations Directorate told us that they had not received any requests for such assistance. These officials said that the draft Mass Evacuation Incident Annex Operational Supplement will include a tab on evacuation issues related to people with special needs and, once issued, can provide guidance to hospitals, nursing homes, and other institutions that house individuals with special needs. Officials from FEMA's National Preparedness Directorate also noted that the Homeland Security Preparedness Technical Assistance Program provides technical assistance upon request to jurisdictions interested in planning for mass evacuations. Additionally, they said the directorate is developing evacuation and reentry planning guidance for use by state and local governments. § 512(c)(2).

Challenges DHS and FEMA Officials Identified:
- Agency officials did not identify any challenges for this section.

<u>Post-Katrina Act § 631 (Stafford Act § 613), State Catastrophic Incident Annex</u>
Amends grant requirements that states must meet under section 613 of the Stafford Act to be eligible for up to a 50 percent federal cost share for emergency preparedness personnel and administrative expenses, based on state plans approved by FEMA. In addition to other requirements, state plans must now provide for the development of catastrophic incident annexes pursuant to standards approved by the FEMA Administrator. A state catastrophic incident annex submitted to FEMA must be consistent with national-level planning documents, such as the national preparedness goal and the NRF's[23] catastrophic incident annex, and must be developed in consultation with emergency responders, local governments, multijurisdictional councils, and regional planning commissions.

Actions Taken:
- **Grant Guidance for State Catastrophic Incident Planning:** In FEMA's overview of its Emergency Management Performance Grant (EMPG) program for fiscal year 2008, FEMA stated that the principal priority for fiscal year 2008 EMPG funds is to sustain and enhance catastrophic planning capabilities, to include addressing the findings of FEMA's gap analysis program and similar capability assessment efforts, and assisting state and local jurisdictions to address national and regional catastrophic planning needs. The fiscal year 2008 EMPG grant process requires applicants to submit a work plan that outlines the state's emergency management enhancement and sustainment efforts, including projects proposed for the EMPG period of performance. According to the fiscal year 2008 EMPG grant guidance, states must focus their EMPG program activities on addressing shortfalls

---

[23]The Post-Katrina Act pre-dated the NRF and refers to the NRF's predecessor, the National Response Plan (NRP). When the Post-Katrina Act was enacted in October 2006, the NRP was the name of the document that served as the nation's comprehensive framework for the management of domestic incidents where federal involvement was necessary. The NRP was subsequently revised and reissued in January 2008 under a new name, the National Response Framework. Because the Post-Katrina Act encompasses any successor plan to the NRP, it applies to the NRF just as it did the NRP. See Post-Katrina Act, § 602(13). Therefore, this enclosure will use the term NRF, rather than NRP, in discussing any relevant Post-Katrina Act provisions and the status of their implementation, unless otherwise appropriate.

and sustaining capabilities in their emergency management programs, with a specific focus on planning for catastrophic events and reducing loss of life and property through mitigation activities. In addition, the grant guidance requires states to work closely with FEMA regional offices in developing their EMPG work plans to address critical assessment findings and ensure appropriate regional coordination and collaboration. FEMA regional offices must concur on final work plans before states may draw down EMPG funds, which will be released on a rolling basis upon approval of the state's final work plan. § 613(b)(3), (c)(2).

Areas to Be Addressed:

- **Update to Federal Catastrophic Incident Annex:** The federal Catastrophic Incident Annex, which states are to use as a model for their own catastrophic incident planning, is still based on the NRF's predecessor, the now superseded National Response Plan. A revised federal Catastrophic Incident Annex has yet to be approved and released, and a Catastrophic Incident Supplement to this annex has yet to be revised. Post-Katrina Act § 509(b)(2); Stafford Act, § 613(c)(1).

Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 632, Evacuation Preparedness Technical Assistance

Requires the FEMA Administrator, in coordination with the heads of other federal agencies, to provide evacuation preparedness technical assistance to state, local, and tribal governments.

Actions Taken:

- **Providing Evacuation Preparedness Technical Assistance:** FEMA officials in the Disaster Operations Directorate cited various examples of the agency having provided evacuation preparedness technical assistance. According to these officials, FEMA has provided such assistance in some cases through the Catastrophic Planning Initiative, an effort to strengthen response planning and capabilities for select scenarios (e.g., a Category 5 hurricane making landfall in southern Florida). Other examples include FEMA regional offices providing mass evacuation technical assistance to the state of Louisiana. FEMA officials also cited workshops in Georgia and Florida and outreach to Texas and Louisiana as further examples of technical assistance provided. § 632.

Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 633 (Stafford Act § 303), Emergency Response Teams

Requires the FEMA Administrator to establish emergency response teams (at least three at the national level and a sufficient number at the regional level); target capability levels for the emergency response teams; and adequate numbers of properly planned, organized, equipped, trained, and exercised personnel to achieve the target capability levels.

Actions Taken:

- **Establishment of Emergency Response Teams:** One national incident management assistance team (IMAT), FEMA's term for emergency response team, has been established in the National Capital Region, according to FEMA officials in the Disaster Operations Directorate. At the regional level, Disaster Operations Directorate officials said that IMATs had been established in FEMA Regions 4, 5, and 6, as of August 1, 2008. According to these officials, they are in the process of establishing a second national IMAT in Sacramento, California, and a fourth regional IMAT in Region 2. They said that FEMA intends to establish IMATs in all 10 regions by the end of fiscal year 2010 and the third national team in Fiscal Year 2011. § 303(b)(1).

- **Personnel:** National IMATs are to consist of 26 positions, including a designated team leader and senior managers for operations, logistics, planning, and finance and administration sections. This sectional organization mirrors the incident command structure presented in the National Incident Management System (NIMS). According to FEMA officials in the Disaster Operations Directorate, although the National IMAT established in the National Capital Region is fully staffed, some IMAT positions are not yet filled with permanent full-time (PFT) employees, but rather with FEMA detailees who have been selected for their advanced training and expertise. In general, the detailees are to provide guidance and support to the PFT personnel until the teams are fully staffed with PFTs who are fully capable of managing their respective IMATs. According to Disaster Operations Directorate officials, FEMA continues to hire personnel for authorized IMAT positions. § 303(b)(3).

- **Exercising:** The National IMAT participated in the National Level Exercise 2008. In addition, Disaster Operations Directorate officials told us that IMATs have supported a number of disasters and special events in 2008 (including recent storms and hurricanes and the Democratic and Republican National Conventions). § 303(b)(3).

- **Equipping:** According to officials in FEMA's Disaster Operations Directorate, FEMA has procured personal equipment for IMAT members and has ordered communications vehicles. § 303(b)(3).

Areas to Be Addressed:

- **Establishment of Emergency Response Teams:** FEMA officials in the Disaster Operations Directorate said that by the end of fiscal year 2008, FEMA intends to establish another national IMAT in Sacramento, California, and two additional regional teams in Regions 2 and 7 in fiscal year 2009. In addition, these officials said that the agency intends to establish IMATs in all 10 regional offices by the end of fiscal year 2010 and the third national team in fiscal year 2011 § 303(b)(1).

- **Target Capability Levels:** According to officials in FEMA's Disaster Operations Directorate, FEMA is finalizing an IMAT doctrine and a Concept of Operations Plan that contain operational details. However, FEMA has not yet described to us how it established or intends to establish target capabilities for the IMATs, which are required by the Post-Katrina Act as the basis for determining whether the IMATs consist of an adequate number of properly planned, organized, equipped, trained, and exercised personnel. § 303(b)(2)–(3).

- **Training and Credentialing:** FEMA has established mandatory training courses for all IMAT personnel, in addition to the standard training required for all FEMA employees. According to officials in FEMA's Disaster Operations Directorate, they are in the process of implementing a credentialing program for the IMATs. FEMA is planning to incorporate training and credentialing for all hazards by identifying core competencies required for each IMAT position and assessing the competencies against existing task descriptions to guide the development of mandatory training and credentialing plans. § 303(b)(3).
- **Readiness Reporting:** FEMA has yet to release the Federal Preparedness Report, which is required by the Post-Katrina Act to include information on readiness levels for the IMATs. Information on the Federal Preparedness Report appears later in this enclosure. § 303(b)(4).

   Challenges DHS and FEMA Officials Identified:
- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 634, Urban Search and Rescue Response System
Establishes the Urban Search and Rescue Response System within FEMA.

   Actions Taken:
- **Administration of the Urban Search and Rescue Response System:** FEMA administers 28 Urban Search and Rescue Task Forces in the continental United States. According to officials in FEMA's Disaster Operations Directorate, the Urban Search and Rescue Response System received a $7.5 million increase of funding over the fiscal year 2007 budget of $25 million, for a total of $32.5 million in fiscal year 2008. § 634(a).

   Challenges DHS and FEMA Officials Identified:
- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 635, Metropolitan Medical Response Grant Program
Establishes the Metropolitan Medical Response Grant Program and requires it to include each program purpose as it existed on June 1, 2006.

   Actions Taken:
- **Continuation of the Metropolitan Medical Response Grant Program:** The Metropolitan Medical Response System program retains the basic purposes, funds similar preparedness activities, and supports similar target capabilities of the program as it was constituted in fiscal year 2006. According to the fiscal year 2008 grant guidance, priorities for Metropolitan Medical Response System recipients are improvements to the Emergency Triage and Pre-Hospital Treatment capability within their operational areas. § 635(a)–(b).

   Challenges DHS and FEMA Officials Identified:
- Agency officials did not identify any challenges for this section.

<u>Post-Katrina Act § 642, National Preparedness, and § 643, National Preparedness Goal</u>
Requires the President, acting through the FEMA Administrator, to complete, revise, and update as necessary a national preparedness goal that defines the target level of preparedness to ensure the nation's ability to prevent, respond to, recover from, and mitigate against natural disasters, acts of terrorism, and other manmade disasters. Requires the goal to be consistent with NIMS and the NRF to the greatest extent practicable. The national preparedness goal is also required by section 642.

    Actions Taken:

- **Issuance of National Preparedness Guidelines:** In September 2007, DHS published the National Preparedness Guidelines, which renamed and replaced the Interim National Preparedness Goal issued in March 2005. The guidelines state that the nation should be prepared with coordinated capabilities to prevent, protect against, respond to, and recover from all hazards in a way that balances risk with resources and need. The guidelines further state that they collate many plans, strategies, and systems into an overarching framework, the National Preparedness System. Among the documents within the umbrella of the guidelines are NIMS and the NRF. § 643; see also § 642.

    Challenges DHS and FEMA Officials Identified:
- Agency officials did not identify any challenges for this section.

<u>Post-Katrina Act § 642, National Preparedness, and § 644, Establishment of National Preparedness System</u>
Requires the President, acting through the FEMA Administrator, to establish a national preparedness system to enable the nation to meet the national preparedness goal. The national preparedness system must include eight required components, which are further described in sections 646 through 653 of the Post-Katrina Act, and may include one optional component, national planning scenarios, as further described in section 645 of the Post-Katrina Act. The national preparedness system is also required by section 642.

    Actions Taken/Areas to Be Addressed:
- For each component of the national preparedness system, information related to FEMA's Actions Taken and Areas to Be Addressed will be presented in the specific Post-Katrina Act section that provides additional information on the components' structure and requirements.

    Challenges DHS and FEMA Officials Identified:
- FEMA officials in the National Preparedness Directorate cited the following three challenges in implementing the National Preparedness System:
  (1) FEMA must coordinate with a large number and wide range of entities such as DHS components, other federal agencies, and state and local governments. For example, these officials said that it will be a challenge to integrate plans and implement them across different governmental boundaries.
  (2) Developing data and performance metrics is a challenge because there are several legacy data systems, with FEMA facing the challenge of picking the best available. In addition, finding the owners of the processes and associated

**GAO-09-59R Actions to Implement the Post-Katrina Act**

data described in the national preparedness system and incorporating these data into a distributed data system is challenging.

(3) FEMA needs to develop protocols and guidelines for assessing target capabilities and any capability gaps that may exist across the federal, state, and local levels. However, these officials said that having staff available at the state level to collect data on target capabilities is a challenge.

Post-Katrina Act § 645, National Planning Scenarios

Allows the FEMA Administrator, in coordination with the heads of appropriate federal agencies and the National Advisory Council (NAC), to develop planning scenarios to reflect the relative risk requirements presented by all hazards, including natural disasters, acts of terrorism, and other manmade disasters, to aid in the development of target capabilities and target capability levels to meet the national preparedness goal.

Actions Taken:

- **Development:** The September 2007 National Preparedness Guidelines include 15 National Planning Scenarios, which are: Improvised Nuclear Device, Aerosol Anthrax, Pandemic Influenza, Plague, Blister Agent, Toxic Industrial Chemicals, Nerve Agent, Chlorine Tank Explosion, Major Earthquake, Major Hurricane, Radiological Dispersal Device, Improvised Explosive Device, Food Contamination, Foreign Animal Disease, and Cyber Attack. According to the guidelines, while preparedness applies across the all-hazards spectrum, the 15 National Planning Scenarios reflect a special emphasis on catastrophic preparedness and are designed to illustrate the potential scope, magnitude, and complexity of a range of major events, from terrorist attacks to major disasters and other emergencies. These scenarios are similar to the scenarios DHS has used for planning since July 2004. § 645.

Areas to Be Addressed:

- **Coordination**: According to the National Preparedness Guidelines, the National Planning Scenarios, utilized by the guidelines, were developed by the Homeland Security Council in partnership with DHS and other federal agencies and state, local, and tribal governments. In its role as the DHS component responsible for the National Planning Scenarios, FEMA did not coordinate with the NAC, because the NAC did not hold its inaugural meeting until October 2007. § 645.

Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 646, Target Capabilities and Preparedness Priorities

Requires the FEMA Administrator, in coordination with the heads of appropriate federal agencies, the National Council on Disability (NCD), and the NAC to develop specific, flexible, and measurable guidelines to define risk-based target capabilities for federal, state, local, and tribal government preparedness, and to establish preparedness priorities that reflect an appropriate balance between the relative risks and resources associated with all hazards. Also requires prompt distribution of the target capabilities guidelines to Congress and the states. Further, authorizes the

FEMA Administrator to provide support for the development of state mutual aid agreements.

Actions Taken:

- **Establishment of Guidelines on Target Capabilities:** DHS published the Target Capabilities List (TCL) in September 2007, which supports an all-hazards approach to building 37 core capabilities to prevent, protect against, respond to, and recover from major events such as terrorist attacks, natural or manmade disasters, or health emergencies. However, FEMA officials in the National Preparedness Directorate said that there is a 3 year effort underway within FEMA to update and revise the TCL. According to these officials, the preliminary concept for the revision is to develop target capabilities that are divided into tiers based on a jurisdiction's population. Further, these officials said that the revised TCL will allow for performance metrics that focus more on outcomes. In addition, according to National Preparedness Directorate officials, FEMA intends to provide more user-friendly, accessible, and credible capability targets with which to link all activities performed along the preparedness cycle, as described in the National Preparedness Guidelines, through the Target Capabilities List Implementation Project. According to these officials, the TCL will be streamlined to provide jurisdictions clearer guidance on the levels of capability they need in order to prevent, protect against, respond to, and recover from a catastrophic natural disaster or large scale terrorist attack. Each of the 37 target capabilities described in the TCL will be revised and released as capability frameworks. § 646(a).
- **Coordination:** According to FEMA, the development of the September 2007 TCL included coordination with stakeholders from federal, state, local, and tribal governments as well as the private sector through workshops and working groups. FEMA officials also said they have briefed the NAC and the NCD on TCL development. Further, FEMA intends to coordinate with the NAC as it updates the TCL, according to officials in FEMA's National Preparedness Directorate. § 646(a).
- **Distribution of Target Capabilities Guidelines**: According to officials in FEMA's National Preparedness Directorate, DHS has posted the TCL, the National Preparedness Guidelines, and other national preparedness documents on the Lessons Learned Information Sharing System, https://www.llis.dhs.gov. These officials also told us that FEMA briefs Congress on the elements of the national preparedness system on a recurring basis. § 646(b).
- **Specific, Flexible, and Measurable Capabilities:** According to the TCL introduction, it supports an all-hazards approach to building interchangeable, flexible capabilities needed to address a broad range of incidents to include terrorist attacks, natural disasters, health emergencies, and other major incidents. The current TCL version contains 37 core capabilities, and each capability includes the following: a definition of the capability, an outcome statement that describes the expected results to be achieved, a description of the major activities and tasks performed with the capability, and performance measures associated with the capability. § 646(c).
- **Risk Assessment Guidelines**: To assist planners and officials at all levels with assessing and determining their greatest risks and to establish priorities for addressing resource gaps, training, and exercises, the TCL introduction describes a preparedness-cycle framework, in which risk assessment is one step. The TCL

states that risk is a combination of credible threats, vulnerabilities, and consequences. It identifies the following risk factors that affect the need for and placement of target capabilities: population and population density; the presence of critical infrastructure and key resources; location in a high-risk area for terrorist events or natural disasters; and capabilities to prevent, protect against, or mitigate against a threat. The TCL explains that the relative importance of these risk factors determines capability needs. § 646(d).

- **Preparedness Priorities:** The National Preparedness Guidelines, also issued in September 2007, and containing the TCL as one of its elements, establish the following eight priorities to guide preparedness efforts: (1) expand regional collaboration; (2) implement NIMS and the NRF; (3) implement the National Infrastructure Protection Plan; (4) strengthen information sharing and collaboration capabilities; (5) strengthen communications capabilities; (6) strengthen chemical, biological, radiological, nuclear, and explosive detection, response, and decontamination capabilities; (7) strengthen medical surge and mass prophylaxis capabilities; and (8) strengthen planning and citizen preparedness capabilities. § 646(e).

- **Mutual Aid Agreements:** FEMA has provided funds to the National Emergency Management Association (NEMA) to develop and market model intrastate mutual aid legislation. According to these officials, this model legislation provides states with a legal framework to address reimbursement, workers compensation and liability issues for official actions, and the foundation to execute mutual aid. This model legislation, according to the officials, also encourages participants to develop a system that addresses the logistical issues of inventory, status, ordering, support, and returning of resources. Moreover, according to officials in FEMA's National Preparedness Directorate, FEMA has entered into a cooperative agreement with the International Association of Fire Chiefs for the development of state mutual aid systems that implement the NEMA-developed model legislation for intrastate mutual aid compacts. These officials told us that as of August 1, 2008, $3 million has been committed to the cooperative agreement with the International Association of Fire Chiefs and 25 states have been engaged in the project with the remaining 25 expected to be incorporated in the next 2 years. Finally, officials in the National Preparedness Directorate said that FEMA provides support to the development of the United South and Eastern Tribes Tribal Emergency Mutual Aid Compact, which is modeled on the interstate Emergency Management Assistance Compact and provides a mechanism that enables participant tribes to support each other during disasters. § 646(f).

    Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 647, Equipment and Training Standards

Requires the FEMA Administrator to support the development, promulgation, and updating, as necessary, of national voluntary consensus standards for (1) equipment used by federal, state, local, and tribal governments and other emergency response providers, and (2) training. In carrying out this section, the FEMA Administrator must consult with public- and private-sector organizations with expertise in the development of national voluntary consensus standards. With respect to equipment

standards, the FEMA Administrator must also consult with the heads of appropriate federal agencies and the NAC. With respect to training standards, the FEMA Administrator must ensure that the training provided by the national training program is consistent with the standards.

   Actions Taken:

- **Equipment Standards:** Officials in FEMA's National Preparedness Directorate reported that since fiscal year 2005, DHS has been working with the InterAgency Board for Equipment Standardization and Interoperability to support voluntary consensus standards reflected in the Authorized Equipment List. These officials also noted that DHS has established an online tool (the Responder Knowledge Base), which provides up-to-date information on commercial equipment and technology to the state, local, and tribal homeland security community in order to assist them with their purchasing and operational equipment decisions. This includes an online, integrated source of equipment-related information such as an interactive version of the FEMA Authorized Equipment List, with the associated FEMA grants, applicable standards and specifications, related certifications, test reports, and other information. Additionally, officials in FEMA's National Preparedness Directorate told us FEMA leverages the activities of DHS's Science and Technology Directorate—specifically, the efforts of the Test & Evaluation and Standards Division in coordinating the development of voluntary consensus standards for equipment used by federal, state, local, and tribal governments and other emergency response providers. According to these officials, FEMA also participates in the work of the American National Standards Institute's Homeland Security Standards Panel, which promotes a cooperative partnership between the public and private sectors in order to meet the needs of the nation for homeland security standards. In addition, these officials told us that FEMA coleads several DHS working groups that address equipment standards, and through these groups, has been able to identify and recommend for DHS the adoption of over 20 equipment standards. § 647(a).
- **Training Standards:** FEMA officials in the National Preparedness Directorate said that DHS adopted training standards in accordance with the American National Standards Institute and the National Fire Protection Association in 2004. According to officials in the U.S. Fire Administration, the National Fire Protection Association consulted with the U.S. Fire Administration in developing their standards. National Preparedness Directorate officials noted that in addition to the U.S. Fire Administration, several other organizations will also be involved in establishing training standards, including the Law Enforcement Training Center and the Center for Domestic Preparedness. In addition, they said training courses are reviewed by FEMA's National Integration Center for compliance with NIMS standards. § 647(b).
- **Consultation with Standards Organizations:** According to officials in FEMA's National Preparedness Directorate, FEMA is working with DHS's Science and Technology Directorate and its Infrastructure Protection Directorate to survey standards for equipment and training currently in use and identify gaps. These officials said that they are working with the National Institute of Standards and Technology on this standards survey. § 647(c).

Areas to Be Addressed:

- **Coordination on the Development of Equipment Standards:** Officials in FEMA's Disaster Operations Directorate told us FEMA has participated in federal, state, local, and private organization forums that are involved in standards setting and development, but did not specify coordination with the NAC. § 647(a)(1), (c).

Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 648, Training and Exercises

Requires the FEMA Administrator, in coordination with the heads of appropriate federal agencies, the NCD, and the NAC, to carry out a national training program and a national exercise program.

Actions Taken:

- **National Exercise Program:** In 2007, the National Exercise Division within FEMA's National Preparedness Directorate introduced and implemented the National Exercise Program. According to officials from the National Preparedness Directorate, the National Exercise Program conducts four Principal Level Exercises and one National Level Exercise annually. These FEMA officials said that the Principal Level Exercises are discussion-based (i.e., tabletop or seminar) to examine emerging issues, and that one is conducted in preparation for the annual National Level Exercise. Further, these officials noted that the National Level Exercise are operations-based exercises (drills, functional exercises, and full-scale exercises) intended to evaluate existing national plans and policies, in concert with other federal and nonfederal entities. § 648(b).

Areas to Be Addressed:

- **National Training Program:** DHS and FEMA are developing the Homeland Security National Training Program, which will oversee and coordinate homeland security training programs, increase training capacity, and ensure standardization across programs, according to FEMA's Deputy for National Preparedness. The Homeland Security National Training Program has provided funding to a variety of training partners, including the National Domestic Preparedness Consortium and the Rural Domestic Preparedness Consortium, for the development and delivery of all-hazards training for federal, state, local, and tribal emergency responders. § 646(a).
- **Coordination:** In developing the National Training Program, FEMA has not yet coordinated with the NCD, the NAC, or other federal agencies. In carrying out the National Exercise Program, FEMA has coordinated with other federal agencies. However, FEMA officials in the National Preparedness Directorate noted that the National Training Program is still being developed. They said that before it is finalized, it will be fully coordinated within the federal interagency community, including NCD and the NAC. § 648(a)(1), (b)(1).

Challenges DHS and FEMA Officials Identified:

- The FEMA official responsible for overseeing the National Training Program said that the greatest challenge to implementing the program is ensuring that lessons learned from each and every exercise and real world incidents are recorded and fed back into the preparedness cycle, including training plans, so that plans and training can be improved.
- Officials from FEMA's National Preparedness Directorate reported that other challenges include identifying and prioritizing training requirements for a wide range of federal, state, local, and tribal positions and recharacterizing the requirements based on the TCL; allocating and balancing training responsibilities among FEMA and DHS training organizations; controlling duplication; and ensuring consistency of doctrine and course content.

Post-Katrina Act § 649, Comprehensive Assessment System

Requires the FEMA Administrator, in coordination with the NCD and the NAC, to establish a comprehensive system to assess, on an ongoing basis, the nation's prevention capabilities and overall preparedness, including operational readiness.

Areas to Be Addressed:

- **Establishment:** FEMA has not yet implemented a comprehensive assessment system. In fiscal year 2008, according to officials in FEMA's National Preparedness Directorate, they began development of the system and established an outreach strategy. The officials said they conducted a comprehensive review of six major assessment systems developed by DHS/FEMA in the last decade with the intention of using the results of the analysis to inform the development and implementation of the Comprehensive Assessment System. According to the officials, they intend to apply the best practices of the six systems to develop an integrated planning and assessment methodology, process, and system. § 649(a).
- **Coordination:** FEMA does not currently have a plan for coordinating with the NCD or the NAC as it develops the comprehensive assessment system. § 649(a).

Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 650, Remedial Action Management Program

Requires the FEMA Administrator, in coordination with the NCD and the NAC, to establish a remedial action management program to, among other things, track lessons learned and best practices from training, exercises, and actual events.

Actions Taken:

- **Establishment of Remedial Action Management Program:** FEMA launched the Remedial Action Management Program (RAMP) in 2003 and released it as a Web application for all FEMA intranet users in January 2006. RAMP uses FEMA facilitators to conduct sessions immediately after exercises or events, and these facilitators are responsible for developing issue descriptions for remedial actions. In addition, FEMA has a related program called the Corrective Action Program (CAP) that is to be used for governmentwide corrective action tracking by federal,

state, and local agencies. While RAMP is FEMA's internal remedial action program, CAP is designed to serve as an overarching program for linking federal, state, and local corrective actions. § 650.

Areas to Be Addressed:

- **Coordination:** FEMA developed RAMP prior to enactment of the Post-Katrina Act. However, FEMA has not yet established any mechanisms to coordinate ongoing implementation of RAMP or CAP with the NCD or the NAC. § 650.

Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 651, Federal Response Capability Inventory

Requires the FEMA Administrator to accelerate the completion of the inventory of federal response capabilities required by the Stafford Act; develop a list of organizations and functions within the Department of Defense (DOD) that may be used to provide support to civil authorities during natural and manmade disasters and terrorist events; and establish an inventory database to allow, among other things, real-time exchange of information regarding capabilities.

Areas to Be Addressed:

- **Completion of Federal Response Capability Inventory:** FEMA has not yet completed the inventory of federal response capabilities. According to FEMA officials in the National Preparedness Directorate, the agency is assessing federal capabilities as part of its comprehensive assessment system efforts. In addition, FEMA is also culling information from work previously conducted to assess overall preparedness and is awaiting the results of the State Preparedness Reports in order to conduct a comprehensive assessment of state and federal response capabilities. § 651(a).
- **List of DOD Organizations and Functions to Support Civil Authorities:** According to FEMA officials in the National Preparedness Directorate, DOD is currently conducting a capabilities-based assessment of homeland security requirements and related capabilities to help prepare for situations in which DOD capabilities would need to be integrated into the homeland security mission. Representatives from DHS are participating with DOD in the assessment. § 651(c).
- **Establishment of Inventory Database:** According to FEMA officials in the National Preparedness Directorate, there is an information system, based on the TCL, that includes a feature that allows grouping of resources into capabilities, but the information system does not provide information in real time. FEMA officials also stated that the system has the capability for real-time exchange to be established in the future, but it needs to be able to pull data from a number of systems that are not currently linked. According to officials in FEMA's Disaster Operations Directorate, FEMA intends to upgrade its National Response Coordination Center capabilities with the installation of a Web-based software system called the Emergency Management Information Management System. These officials said that the software system will operate in real-time and will be used to support disaster operations management, maintain situational awareness, and coordinate information sharing. According to these officials, FEMA's longer term

goal is to use this software system to create a larger national asset database of all federal response teams for all hazards. § 651(d).

Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 652, Reporting Requirements

Requires the FEMA Administrator to submit annually to Congress a Federal Preparedness Report, describing the nation's level of preparedness for all hazards, and a Catastrophic Resource Report, describing the federal resources needed for and devoted to developing the capabilities of all levels of government to respond to a catastrophic incident. This section also requires a state receiving federal preparedness assistance to submit a report to the FEMA Administrator on the state's level of preparedness.

Actions Taken:

- **State Preparedness Report:** In the fiscal year 2008 Homeland Security Grant Program guidance, DHS required that State Preparedness Reports be submitted by March 31, 2008, and DHS received all 56 reports (for the states, territories, and the District of Columbia) by early April 2008. According to officials in FEMA's National Preparedness Directorate, FEMA analyzed each report and used them to produce substantive analysis on nationwide trends, identify areas for increased attention, and inform broader assessments of national preparedness. These officials told us that the agency provided guidance on how states should interpret Post-Katrina Act language for reporting purposes. For example, the law requires states to provide an assessment of their current capability levels, and FEMA guidance for this requirement instructed states to report data using the capabilities included in the TCL. § 652(c).

Areas to Be Addressed:

- **Federal Preparedness Report:** FEMA has not submitted this report to Congress. According to officials in FEMA's National Preparedness Directorate, the Federal Preparedness Report is in the final stages of review, and they expect to submit it to Congress soon. They said that the National Preparedness Directorate is also providing detailed briefings to Congress every 90 days addressing its progress and gathering congressional recommendations for additional data and information. According to these officials, the draft report is based primarily on DHS data and information, but it does contain some other federal information, such as hospital preparedness grants funded by the Department of Health and Human Services. § 652(a).
- **Catastrophic Resource Report:** FEMA has not submitted this report to Congress. Officials in FEMA's National Preparedness Directorate said that FEMA plans to merge this reporting requirement with its Federal Preparedness Report and to incorporate information from the State Preparedness Reports. However, FEMA officials did not provide information regarding the combined report's status or its expected submission date to Congress. § 652(b).

Challenges DHS and FEMA Officials:
- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 653, Federal Preparedness

Requires, among other things, that each federal agency with responsibilities under the NRF develop operational plans and corresponding capabilities to ensure a coordinated federal response. Such plans must be certified by the President on an annual basis. This section further requires the FEMA Administrator, in coordination with other federal agencies with responsibilities under the NRF, to develop prescripted mission assignments.

Actions Taken:
- **Prescripted Mission Assignments:** FEMA finalized a catalogue of prescripted mission assignments (PSMA) in June 2008. There are 223 PSMAs in the catalogue, and they are listed by Emergency Support Function employed under the NRF. According to FEMA officials in the Disaster Operations Directorate, the PSMA catalogue will be continually updated based on experiences and lessons learned from disasters and simulation exercises. For example, since the June publication of the catalogue, officials in the Disaster Operations Directorate reported that it has already been updated with a supplement, bringing the total number of PSMAs to 236, scripted for 33 separate agencies. § 653(c).

Areas to Be Addressed:
- **Development of Operational Plans:** FEMA officials in the National Preparedness Directorate stated that federal agency operational plans in support of the NRF are being developed, but they have yet to be finalized or disseminated. Officials in FEMA's Disaster Operations Directorate told us that the federal government's Integrated Planning System is currently in the final stages of interagency review. The planning system is intended to be the underlying framework for conducting all deliberate federal interagency incident planning, including operational planning. According to these officials, the Secretary of Homeland Security begins the planning process by approving Strategic Guidance Statements for each of the 15 National Planning Scenarios. Once a statement is approved for a planning scenario, a strategic plan will be developed, which will define overarching missions and authorities, and delineate federal roles and responsibilities. FEMA will also begin developing a concept plan, which will describe a concept of operations for integrating and synchronizing existing capabilities to accomplish mission essential tasks. Departmental and agency operational plans, which will identify detailed resource, personnel, and asset allocations in order to execute the objectives of the strategic plan, will be developed, after FEMA completes a concept plan. § 653(a)(4).

Challenges DHS and FEMA Officials Identified:
- Agency officials did not identify any challenges for this section.

Post-Katrina Act, § 654, Use of Existing Resources

Requires the FEMA Administrator to use existing preparedness documents, planning tools, and guidelines in establishing the national preparedness goal and the national

preparedness system, to the extent practicable and consistent with the Post-Katrina Act.

Actions Taken:

- **Revision of Existing Preparedness Documents:** Several initiatives underpinning the Post-Katrina Act's national preparedness system were underway as a result of Homeland Security Presidential Directive-8 (HSPD-8), which was issued on December 17, 2003. HSPD-8 required the development of the national preparedness goal; preparedness priorities; a comprehensive assessment system; a training and exercise program; a system to collect, analyze, and disseminate lessons learned, best practices, and information from exercises, training events, and actual incidents; equipment standards; and a federal response capability inventory, including DOD civil support resources. Because HSPD-8 preceded the Post-Katrina Act, FEMA was able to adapt existing preparedness documents, tools, and guidelines in developing the new preparedness system. For example, the Interim National Preparedness Goal, issued in March 2005, was revised and renamed the National Preparedness Guidelines. Likewise, the TCL and the National Planning Scenarios, which accompanied the Interim National Preparedness Goal, have been retained and updated as part of the new national preparedness system. Other initiatives, such as RAMP (i.e., one of the programs for tracking lessons learned and best practices from training, exercises, and actual events), preceded the Post-Katrina Act and have been continued within the new national preparedness system. § 654.

Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 663, Transfer of Noble Training Center

Specifies that the Noble Training Center is transferred to the Center for Domestic Preparedness, which shall integrate the Noble Training Center into its program structure.

Actions Taken:

- **Transfer:** According to officials in FEMA's National Preparedness Directorate, the Noble Training Center was transferred to the Center for Domestic Preparedness in April 2007 at the same time that the Center for Domestic Preparedness was transferred to FEMA. Officials in the National Preparedness Directorate also told us that the medical training curriculum previously offered at the Noble Training Center, renamed the Center for Domestic Preparedness Noble Training Facility, has been completely revised and fully integrated into the Center for Domestic Preparedness's training program. § 663.

Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 664, National Exercise Simulation Center

Requires the President to establish a National Exercise Simulation Center (NESC) that uses a mix of live, virtual, and constructive simulations to, among other things,

provide a learning environment for the homeland security personnel of all federal agencies, and that uses modeling and simulation for training, exercises, and command and control functions at the operational level.

Actions Taken:

- **Preliminary Support:** FEMA has been using FEMA Simulation Centers, DOD facilities, and other facilities to support exercise simulation while it develops the NESC. For example, FEMA officials said that FEMA has provided initial exercise simulation support for exercises requiring the two highest levels of federal interagency participation in the National Exercise Program. § 664.

Areas to Be Addressed:

- **Establishment:** According to an official in FEMA's National Integration Center, the NESC is currently under development and is estimated to take 3-4 years to fully establish. FEMA, in conjunction with its relevant partners, has started to define requirements for the NESC, according to the Assistant Deputy Administrator for National Preparedness. § 664.

Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 682, National Disaster Recovery Strategy

Requires the FEMA Administrator, in coordination with specified and other appropriate federal agencies, nonfederal government officials (including through the NAC), and representatives from appropriate nongovernmental organizations, to develop, coordinate, and maintain a National Disaster Recovery Strategy (NDRS) to serve as a guide to recovery efforts after major disasters and emergencies. Specifies required contents for the NDRS and requires the FEMA Administrator to submit a report to Congress describing the NDRS in detail and any additional authorities necessary to implement it.

Actions Taken:

- **Initial Draft:** FEMA has developed the NDRS, which is currently in draft form. According to the Deputy Assistant Administrator for Disaster Assistance, the NDRS has had initial vetting by federal partners, but it has not yet gone to the states or out of the Disaster Assistance Directorate for internal DHS review. § 682(a).

Areas to Be Addressed:

- **Completion of the NDRS:** As of August 1, 2008, the NDRS was still under review and FEMA officials could not estimate when it would be released. § 682(a).
- **Coordination:** While FEMA officials stated that they shared the draft NDRS with federal partners for initial vetting, FEMA has not yet taken action to coordinate with nonfederal or nongovernmental stakeholders, including the NAC. § 682(a).
- **Reporting Requirement:** FEMA has not yet reported to Congress on the NDRS and has not yet taken action to consider what, if any, additional authorities will be required to carry out the NDRS for inclusion in that report. § 682(c)(1).

Challenges DHS and FEMA Officials Identified:

- According to the Deputy Assistant Administrator for Disaster Assistance, a number of factors have contributed to the delay in the completion of the NDRS. These factors included waiting for the completion of National Disaster Housing Strategy and the NRF, obtaining current program information from other federal agencies, and deciding the proper extent of the NDRS's review process.

Post-Katrina Act § 683, National Disaster Housing Strategy

Requires the FEMA Administrator, in coordination with specified federal and nonfederal government agencies, the American Red Cross, the NAC, and the NCD, to develop, coordinate, and maintain a National Disaster Housing Strategy (NDHS). Specifies required contents for the NDHS and requires the FEMA Administrator to issue guidance summarizing the types of Stafford Act housing assistance, eligibility requirements, and application procedures.

Actions Taken:

- **Release of Draft National Disaster Housing Strategy:** FEMA released a draft NDHS on July 21, 2008, for a 60-day public comment period, which it later extended by 7 days to September 29, 2008. The draft includes four chapters: (1) Introduction, (2) Responsibilities and Roles (which is a required component of the strategy), (3) Disaster Housing: Current Practices and Future Directions, and (4) Implementing the Strategy. § 683(a), (b)(2).
- **Coordination:** According to officials in FEMA's National Preparedness Directorate, the NAC became involved in October 2007 and has participated in drafting annexes for the second draft version of the NDHS. The officials said the draft has been shared with the NAC and other external agencies and that FEMA has received comments from the NAC, as well as others. In addition, these officials reported that in drafting the annexes, FEMA has been coordinating with several other agencies including, among others, the Department of Housing and Urban Development, the Department of Health and Human Services, the General Services Administration, the Small Business Administration, the U.S. Army Corps of Engineers, the Department of Labor, the Bureau of Indian Affairs, and the Veteran's Administration. § 683(a), (b)(2).

Areas to Be Addressed:

- **Plan Content**: The draft NDHS released for public comment lists seven annexes, but states that these are "under development." The titles of these annexes appear to correspond with specific content requirements of the Post-Katrina Act, as well as the requirement to provide guidance on the types of Stafford Act housing assistance. § 683(b)–(c).
- **Completion of the Strategy:** FEMA has yet to finalize the NDHS. As of August 1, 2008, FEMA officials could not estimate when the draft would be finalized and its annexes completed. § 683(a).

Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

For Further Reading:

- U.S. Department of Homeland Security. *National Emergency Communications Plan*. Washington D.C.: July 2008.
- U.S. Department of Homeland Security. *National Preparedness Guidelines*. Washington D.C.: September 2007.
- U.S. Department of Homeland Security. *National Response Framework*. Washington D.C.: January 2008.
- U.S. Department of Homeland Security. *Target Capabilities List*. Washington D.C.: September 2007.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. *Authorized Equipment List*. https://www.rkb.us/mel.cfm?subtypeid=549 (accessed Sept. 5, 2008).
- U.S. Department of Homeland Security. Federal Emergency Management Agency. *Comprehensive Preparedness Guide 101: Producing Emergency Plans (Interim Version 1.0)*. Washington D.C.: August 1, 2008.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. *Fiscal Year 2008 Emergency Management Performance Grants Guidance and Application Kit*. Washington D.C.: February 2008.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. *Fiscal Year 2008 Homeland Security Grant Program Guidance and Application Kit*. Washington D.C.: February 2008.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. Lessons Learned Information Sharing. https://www.llis.dhs.gov (accessed Nov. 12, 2008).
- U.S. Department of Homeland Security. Federal Emergency Management Agency. *National Disaster Housing Strategy (Draft)*. Washington D.C.: July 2008.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. National Response Framework Resource Center. "Incident Annexes." http://www.fema.gov/emergency/nrf/incidentannexes.htm (accessed Sept. 4, 2008).

**Enclosure VI: Supporting Regional Preparedness and Cooperation**

Post Katrina Act § 611 (Homeland Security Act § 507), Regional Offices

Requires that each of the 10 regional offices be headed by a Regional Administrator; enumerates the responsibilities of Regional Administrators; designates area offices for Alaska, the Pacific, and the Caribbean; requires each Regional Administrator to establish a Regional Advisory Council; requires each Regional Administrator to oversee regional office strike teams; and, if the Federal Emergency Management Agency (FEMA) Administrator determines additional authorities are necessary for deploying or preparing regional office strike teams, requires the FEMA Administrator to report this need to Congress.

Actions Taken:

- **Management of Regional Offices:** According to officials in FEMA's Disaster Operations Directorate, Regional Administrators head each of the regional offices, and are members of the Senior Executive Service. They report directly to the FEMA Administrator. Each of the Regional Administrators had professional experience in emergency management and homeland security prior to his or her appointment as Regional Administrator. § 507(b).
- **Regional Administrator Responsibilities**: According to officials in FEMA's Disaster Operations Directorate, the Regional Administrator's role in enhancing capabilities to prevent, protect against, respond to, and recover from all hazards is outlined in the Regional-National Preparedness Concept of Operations. This document specifies that Regional Administrators and Deputy Regional Administrators are responsible for the day-to-day management and administration of regional activities and staff. This document also specifies that Federal Preparedness Coordinators, as representatives of the Regional Administrators, oversee and coordinate regional preparedness program management for their regional offices. In addition, FEMA has expanded the authority of the Regional Administrators by transferring administrative and operational authority of specific preparedness personnel from their respective headquarters elements to the Regional Administrators. The following are additional actions FEMA and regional offices have taken to implement their Post-Katrina Act responsibilities:
  - **Coordinating the Establishment of Operable and Interoperable Emergency Communications Capabilities:** According to the Deputy Assistant Administrator of FEMA's Disaster Operations Directorate, each of the regional offices has a designated disaster emergency communications staff member who provides operational and tactical support.
  - **Strategic and Operational Planning:** According to FEMA officials in the Disaster Operations Directorate, the regional offices are in the process of hiring regional operational planners. FEMA expects to have three to four operational planners in each of the regional offices by the end of fiscal year 2008. As stated in the Regional-National Preparedness Concept of Operations, each of the regional offices is to have a Preparedness Analysis and Planning Officer, who is responsible for, among other things, the development of annual and multiyear regional preparedness strategies. According to Disaster Operations Directorate officials, each planning officer is expected to have a number of Preparedness Analysis and Planning Specialists to provide support. In addition, FEMA

reported that it has a new Regional Catastrophic Planning Grant Program in place to help improve the level of planning capabilities within the states. The program is administered by the Federal Preparedness Coordinators through their regional offices.

o **Fostering Cooperative Agreements**: According to FEMA officials in the Disaster Operations Directorate, the FEMA Regional Offices have established Regional Emergency Management Advisory Committees that are cross-border emergency management groups comprised of U.S. states, Canadian provinces, and federal partners. For example, one such committee includes Ontario, Quebec, Wisconsin, Illinois, Indiana, Michigan, Ohio, New York, and Pennsylvania. These officials said that there are three other committees based in different regions of the country, two of which have emergency management assistance compacts in place that have been ratified by Congress. Additionally, the officials noted that the regional offices have fostered the development of cooperative agreements through evacuation planning with their respective states as well as New Madrid Seismic Zone catastrophic planning. Furthermore, the officials said the National Emergency Management Association has developed and markets model intrastate mutual aid legislation. According to these officials, this model legislation provides states with a legal framework to address reimbursement, workers compensation and liability issues for official actions, and the foundation to execute mutual aid. This model legislation, according to the officials, also encourages participants to develop a system that addresses the logistical issues of inventory, status, ordering, support, and returning of resources.

o **Identifying Capability Gaps in Responding to Special Needs Populations**: According to officials in the Disaster Operations Directorate, FEMA's Gap Analysis Program uses a consistent, national approach to determine asset gaps at the local, state, and national levels, which they consider to be a critical component of preparedness and planning. The Gap Analysis Program examines transportation and evacuation, sheltering/mass care (general and special needs populations and companion animals), and other areas.

o **Regional Response Coordination Centers:** According to officials in FEMA's Disaster Operations Directorate, each regional office maintains a Regional Response Coordination Center. In addition, they said that the regional offices continue to hire Watch Analysts to support the coordination centers.

o **Participation in Exercises:** According to officials in FEMA's Disaster Operations Directorate, a review of Regional Exercise Support program-funded exercises indicates that out of the 44 regional exercises conducted in fiscal year 2008, all 10 Regional Administrators participated in at least 1 regional-level exercise. These officials said that Regional Administrators from Regions 9 and 10 participated in a national-level exercise program called Top Officials 4 Full-Scale Exercise in 2007. In addition, they reported that Regional Administrators from Regions 3 and 10 participated in a national-level exercise, while the Regional Administrator from Region VI participated in both planning and conducting a regional-level exercise in 2008. Finally, they said that Region 9's Regional Administrator also participated in the conduct of a tabletop exercise in 2008. § 507(c)(2)–(3).

- **Area Offices:** FEMA established area offices for Alaska, the Pacific, and the Caribbean. The Pacific office is located in Hawaii (FEMA Region 9), the Caribbean office is located in Puerto Rico (Region 2), and the Alaska office is located in Anchorage, Alaska (Region 10). § 507(d).
- **Regional Advisory Councils:** The FEMA Associate Deputy Administrator said that each of the regional offices has established a Regional Advisory Council. According to the Regional Administrator for Region 3, each of the Regional Advisory Councils has met at least once and discussed issues ranging from training and exercises to strategies to enhance private/public partnerships. § 507(e).
- **Regional Strike Teams:** According to Disaster Operations Directorate officials, "strike teams" and "emergency response teams," the Post-Katrina Act's terms for the support teams deployed to assist in major disasters and emergencies under the Stafford Act, are now called Incident Management Assistance Teams (IMAT). IMATs are interagency national- or regional-based teams composed of subject matter experts and incident-management professionals, and are designed to manage and coordinate national response emergencies and major disasters. According to the officials, Regional Administrators oversee IMATs based within their regions. IMAT personnel are intended to be permanent, full-time employees whose duties and responsibilities are solely focused on their IMAT functions. The officials said that the IMATs' other functions include working with state and local emergency managers to plan, prepare, and train for disasters; running exercises; and building relationships with emergency managers and other IMAT personnel.
  - **Staffing Regional IMATs:** Disaster Operations Directorate officials said that IMATs had been established in FEMA Regions 4, 5, and 6, as of August 1, 2008. The officials also said that FEMA intends to establish IMATs in all 10 regions by the end of fiscal year 2011. According to the officials, each of the strike team positions described in the Post-Katrina Act, for example, the Federal Coordinating Officer, is represented in the established IMATs. Further, the officials explained that each of the 10 FEMA Regions has a Defense Coordinating Officer. This officer can be added to augment and support the IMAT when activated in response to a major disaster or an emergency. A Defense Coordinating Officer is required by the Post-Katrina Act in each Regional Office Strike Team. According to the officials, FEMA's draft IMAT Concept of Operations states that personnel from FEMA headquarters, other regional offices, and other federal agencies may be organized with the IMAT as appropriate depending on the situation. Further, the draft IMAT Concept of Operations also specifically includes a designated Liaison Officer within the National Team to coordinate with external entities, including the Department of Defense.
  - **Statutory Authority**: According to FEMA officials in the Disaster Operations Directorate, FEMA has made no determination that the statutory authority is inadequate in regards to the IMATs. § 507(c)(2), (f).

  Areas to Be Addressed:

- **Establishing IMATs:** According to Disaster Operations Directorate officials, as of August 1, 2008, FEMA had not established IMATs for 7 of the 10 regions, but intends to do so by the end of fiscal year 2011. § 507(c)(2), (f).

- **IMAT Credentialing and Training Program:** Officials in the Disaster Operations Directorate said that FEMA intends to develop a credentialing and training program for all IMAT positions. According to these officials, the agency is in the process of setting up focus groups to analyze positions and existing courses to identify training requirements for each position. FEMA plans to use this information to guide the development of the IMAT Training and Credentialing Standard Operating Procedures and establish a training curriculum (i.e., courses, field experience, and exercises) for various positions by types/levels. § 507(f)(5).
- **Training for Regional Administrators:** As of August 1, 2008, FEMA has not established specific training requirements for its Regional Administrators. § 507(c)(3).

Challenges FEMA and DHS Officials Identified:
- Agency officials did not identify any challenges for this section.

Post Katrina Act § 661, Emergency Management Assistance Compact Grants

Authorizes FEMA to provide grants to administer the Emergency Management Assistance Compact (EMAC).[24]

Actions Taken:
- **EMAC Grant:** In an undated memorandum of agreement regarding resource typing, credentialing, and mutual aid systems, FEMA agreed to provide the National Emergency Management Association (NEMA) with funds to serve as EMAC's executive agent and administrator through a cooperative agreement. According to the Assistant Deputy Administrator of FEMA's National Preparedness Directorate, in 2007, FEMA provided NEMA $1 million in accordance with this agreement and the amount was increased in 2008 to $2.5 million. FEMA officials said that the funds have been committed and obligated. According to the EMAC Cooperative Agreement Scope of Work, NEMA intends to implement the following objectives and tasks to enhance and improve interstate mutual aid through EMAC: (1) develop and implement an online training and education program; (2) hire additional training and education staff; (3) enhance coordination with FEMA, the Department of Homeland Security (DHS), and the federal government; (4) continue to develop National Incident Management System-compliant resource-typed mission packages and review and analyze existing registries used to support credentialing programs; (5) conduct a pilot project to develop resource staging capabilities in select states; (6) develop internal operational capacity to support major EMAC activations; (7) fund full-time administration and staff for EMAC; and (8) facilitate international mutual aid assistance. Several of these tasks, such as the training and education program, resource typing and credentialing, and developing operational capacity, reflect recommendations that NEMA had made after conducting an after-action review of the mutual aid response during the 2005 Hurricane season. § 661(a)–(b).

---

[24]EMAC is an interstate mutual aid agreement that allows states to assist one another in responding to disasters. In June 2007, we recommended, with FEMA concurring, that FEMA look for ways to build EMAC's administrative capacity, such as cooperative agreements, grants, and training initiatives, to better develop the nation's disaster response capabilities. See GAO, *Emergency Management Assistance Compact: Enhancing EMAC's Collaborative and Administrative Capacity Should Improve National Disaster Response*, GAO-07-854 (Washington, D.C.: June 29, 2007).

GAO-09-59R Actions to Implement the Post-Katrina Act

- **Coordination:** According to FEMA officials, NEMA, under the EMAC Cooperative Agreement, established and maintains the EMAC Advisory Group for the purpose of bringing stakeholders together to coordinate activities, and prevent duplication of efforts and confusion. FEMA officials said that the EMAC Senior Policy Advisor serves on the National Incident Management System Project Support Team as well as several of the nine working groups, which are composed of various emergency management disciplines, to bring EMAC expertise to their deliberations on resource management, resource typing, credentialing, information management for decision support, and Incident Command System field operating guides and forms. In addition, the officials said that the EMAC Executive Task Force Chair served as the Chair of the National Incident Management System Credentialing Working Group that drafted credentialing guidelines. Furthermore, they noted that the EMAC Director has served as a member of the subcommittee preparing a national standard on resource management. § 661(b)(3)–(4), (c).

Challenges FEMA and DHS Officials Identified:
- Agency officials did not identify any challenges for this section.

Post Katrina Act § 671 (Homeland Security Act § 1805), Regional Emergency Communications Coordination

Establishes in each regional office a Regional Emergency Communications Coordination (RECC) working group and enumerates its duties, which include reporting to the Regional Administrator and coordinating across regional entities and jurisdictions to support the ability to communicate during disasters; identifies the agencies and organizations that the working groups are required to represent; and identifies public and private organizations with which to coordinate their activities.

Actions Taken:
- **Establishment**: As of August 1, 2008, 7 of the 10 RECC working groups had been established with 6 having met at least once, according to Disaster Operations Directorate officials. § 1805(a).
- **Coordination:** FEMA officials in the Disaster Operations Directorate stated that 2 RECC workings groups, as of August 1, 2008, had partial coordination with the groups described in the Post-Katrina Act. § 1805(c).
- **Local Emergency Communications Systems Assessment:** According to FEMA officials in the Disaster Operations Directorate, 1 RECC working group, as of August 1, 2008, had completed its assessment of the survivability, sustainability, and interoperability of local emergency communications systems to meet the goals of the National Emergency Communications Plan. The agency further specified that 4 of the regional offices (3 of which have established RECC working groups, but 1 does not) were in the process of completing this assessment, as of August 1, 2008. § 1805(d)(1).
- **Process for Multijurisdictional Coordination:** As of August 1, 2008, 1 RECC working group was establishing a process for the coordination of a multijurisdictional, multiagency emergency communication network for use during disasters through the use of mutual aid agreements, according to officials in the Disaster Operations Directorate. § 1805(d)(3).

Areas to Be Addressed:

- **Establishment:** As of August 1, 2008, three of the ten RECC working groups had not yet been established, according to FEMA Disaster Operations Directorate Officials. § 1805(a).
- **Federal Representation in RECC Working Groups:** We received membership rosters for the seven RECC working groups that have been established to date. At the federal level, although the Post-Katrina Act requires each RECC working group to include representatives from DHS, the Federal Communications Commission, and other federal agencies with relevant responsibilities, only one of the rosters included a representative from the Federal Communications Commission, and two of the rosters listed no federal representatives at all, including none from DHS. § 1805(b)(2).
- **Nonfederal Representation in RECC Working Groups:** As of August 1, 2008, four of the seven RECC working group membership rosters that we received do no not include all the representatives from the nonfederal elements described in the Post-Katrina Act. § 1805(b)(1).
- **Coordination:** FEMA officials from the Disaster Operations Directorate reported that five of the seven established RECC working groups, as of August 1, 2008, had not coordinated with the nonfederal groups described in the Post-Katrina Act. § 1805(c).
- **Local Emergency Communications Systems Assessment:** According to FEMA Disaster Operations Directorate officials, five regional offices (two of which are without RECC working groups), as of August 1, 2008, had not started their assessment of the survivability, sustainability, and interoperability of local emergency communications systems to meet the goals of the National Emergency Communications Plan. § 1805(d)(1).
- **Annual Reporting:** As of August 1, 2008, FEMA officials in the Disaster Operations Directorate said that all the regional offices (i.e., the seven regional offices with established RECC working groups and the three regional offices without them) were preparing to report on the status of their regions in building robust and sustainable interoperable voice and data emergency communications networks. According to these officials, the reports are due on September 31, 2008. § 1805(d)(2).
- **Process for Multijurisdictional Coordination:** As of August 1, 2008, six of the seven established RECC working groups have yet to start establishing a process for the coordination of a multijurisdictional, multiagency emergency communication network for use during disasters through the use of mutual aid agreements, according to officials in the Disaster Operations Directorate. § 1805(d)(3).
- **Establishment of Support Services:** FEMA's Disaster Operations Directorate officials reported that, as of August 1, 2008, none of the RECC working groups have coordinated the establishment of federal, state, local, or tribal support services and networks designed to address immediate and critical human needs in responding to disasters. § 1805(d)(4).

Challenges FEMA and DHS Officials Identified:

- A senior FEMA official in the Disaster Operations Directorate stated that the lack of travel funds for members of the RECC working groups prevented them from meeting and carrying out the duties of the working groups.

**GAO-09-59R Actions to Implement the Post-Katrina Act**

<u>Post Katrina Act § 671 (Homeland Security Act § 1807), Urban and Other High-Risk Area Communications Capabilities</u>

Requires DHS to provide technical guidance, training, and other assistance, as appropriate, to support the rapid establishment of consistent, secure, and effective interoperable emergency communications capabilities in the event of an emergency in urban and other high-risk areas.

Actions Taken:

- **Technical Assistance:** According to the Deputy Director of the Office of Emergency Communications, DHS has supported the rapid establishment of interoperable emergency communications capabilities of urban and other high-risk areas by providing technical assistance to Urban Area Security Initiative (UASI) grant recipients. Through the Interoperable Communications Technical Assistance Program, FEMA provided technical support and conducted workshops to assist UASI grant recipients in developing Tactical Interoperable Communications Plans, which are plans designed to prepare agencies for tactical interoperable communications sharing during an incident. For example, we reported in 2007 that FEMA's technical assistance representatives met with public safety agencies in the Miami area to compile an inventory of regional emergency communications capabilities in support of developing the area's tactical plan. § 1807(a).

Challenges FEMA and DHS Officials Identified:

- Agency officials did not identify any challenges for this section.

<u>For Further Reading</u>

- Emergency Management Assistance Compact. "Intrastate-Mutual Aid Legislation." http://www.emacweb.org/?150 (accessed on Aug. 29, 2008).
- U.S. Congress. House. Subcommittee on Emergency Communications, Preparedness and Response, Committee on Homeland Security. *Hearing on the National Emergency Communications Plan.* 110th Cong., 2nd sess. July 15, 2008.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Disaster Operations Directorate: Fact Sheet." http://www.fema.gov/media/fact_sheets/dod.shtm (accessed on July 17, 2008).
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "FEMA Leadership." http://www.fema.gov/about/bios/index.shtm (accessed on Feb. 26, 2008).
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Interoperable Communications Technical Assistance Program." http://www.ojp.usdoj.gov/odp/ta_ictap.htm (accessed on Sept. 5, 2008).
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Regional Contacts." http://www.fema.gov/about/contact/regions.shtm (accessed on Sept. 5, 2008).
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Resource Management: Mutual Aid." http://www.fema.gov/emergency/nims/rm/ma.shtm (accessed on Sept. 5, 2008).

- U.S. Department of Homeland Security. National Response Framework Resource Center. "References." http://www.fema.gov/emergency/nrf/ (accessed on Sept. 5, 2008).
- U.S. Department of Homeland Security. "TOPOFF: Exercising National Preparedness." http://www.dhs.gov/xprepresp/training/gc_1179350946764.shtm (accessed on Sept. 5, 2008).

**Enclosure VII: Improving Timely Delivery of Goods and Services in Disaster Events**

<u>Post-Katrina Act § 636, Logistics</u>
Requires FEMA to develop an efficient, transparent, and flexible logistics system for procurement and delivery of goods and services necessary for an effective and timely emergency response.

      Actions Taken:

- **FEMA's Logistics Mission:** According to the National Response Framework's Emergency Support Function 7, Logistics Management and Resource Support, FEMA is responsible for providing a comprehensive national disaster logistics planning, management, and sustainment capability that uses the resources of federal partners, public and private groups, and other stakeholders to meet disaster response and recovery needs. FEMA's Logistics Management Directorate (LMD) is the program office responsible for carrying out this mission. The following are actions taken by LMD to improve its logistics capabilities:
    - **Enhancing Logistics Management:** Seeking to develop an effective and efficient logistics planning and operations capability, FEMA elevated its logistics office from the branch to the directorate level in April 2007. Additionally, LMD has adopted the concept of the National Logistics Coordinator (NLC) as its mission. The NLC, as envisioned by FEMA, will work with its partners to coordinate domestic emergency logistics capabilities, promote the collaboration of government agencies, private sector groups and other stakeholders, and improve disaster readiness, responsiveness, and preparedness.
    - **Building Logistics Partnerships:** FEMA and the U.S. General Services Administration—FEMA's colead for Emergency Support Function 7—sponsored the National Logistics Coordination Forum, which was held in March 2008. The forum was intended to open a dialogue between the sponsors and their logistics partners, and to discuss how to better involve the private sector in planning for and recovering from disasters. The forum was also intended to initiate the development of a charter and operating doctrine for the NLC concept. In attendance were representatives from other federal agencies, public and private sector groups, nongovernmental organizations, and other stakeholders.
    - **Improving the Supply Chain:** According to the agency, FEMA's supply chain can deliver disaster commodities and equipment from its logistics centers to points of distribution during disaster operations. To improve its supply chain management, FEMA brought in a supply chain expert from the United Parcel Service through its Loaned Executive Program. FEMA also has a Private Sector Office to exchange information on best practices and to facilitate engagement with the private sector. In addition, FEMA established a Distribution Management Strategy Working Group in January 2008 to analyze and develop a comprehensive distribution and supply chain management strategy.
    - **Improving Logistics Visibility:** As of August 1, 2008, FEMA had fully implemented Total Asset Visibility (TAV) programs in Regions 4 and 6 to track and manage electronically and in real time the movement of its disaster commodities and assets. According to FEMA LMD officials, TAV is partially

available in the other 8 FEMA regions. The tracking and monitoring of disaster assets is performed by a group of trained TAV Specialists in each region.

o **Assuming Emergency Transportation Responsibility:** FEMA's LMD assumed emergency transportation responsibility from the Department of Transportation in 2007, according to LMD officials. These LMD officials said FEMA carries out its emergency transportation responsibilities by (1) processing and coordinating requests for federal transportation support from FEMA Regions, Distribution Centers, National Logistics Staging Areas and Joint Field Offices, Emergency Support Functions, and other organizations, including requests for military transportation; (2) acquiring transportation services and in-transit visibility of transportation assets into and out of disaster areas; and (3) assisting in the implementation of alternate transportation services. DHS and FEMA signed a Memorandum of Agreement (MOA) with the General Services Administration for emergency transportation support, which had previously been supplied by a private-sector vendor under the Department of Transportation. Additionally, the MOA outlines FEMA and the General Services Administration's respective responsibilities for Emergency Support Function 7 (Logistics). The officials also noted that LMD's Transportation Branch works closely with Emergency Support Function 1 (Transportation), to be aware of highway infrastructure issues that could affect FEMA movements.

o **Staffing a Professional Workforce:** At the time of our work, LMD had hired 22 of 25 full-time employees (FTE) for fiscal year 2008, and is continuing the hiring process to meet its fiscal year 2008 hiring goal. LMD intends to complete its hiring actions by September 30, 2008, and has been allocated an additional 30 FTEs for fiscal year 2009.

o **Delivering Individual Assistance Services:** According to the FEMA Administrator, as of August 1, 2008, FEMA can mobilize 60 Mobile Disaster Recovery Centers to assist disaster victims on-site. Mobile Disaster Recovery Vehicles are used to support these centers. As of August 1, 2008, FEMA was in the process of hiring a permanent, full-time manager and drafting a budget for a program to manage its fleet of 60 Mobile Disaster Recovery Vehicles, according to LMD officials.

o **Providing Logistical Support for FEMA's Housing Program:** FEMA transitioned the logistics management of its temporary housing unit program from the regional offices to FEMA headquarters, according to LMD officials. The officials said that the Concept of Operations for the temporary housing unit program was signed by the Assistant Administrator of LMD on May 12, 2008, and issued as a "Working Draft" for the 2008 hurricane season. The officials further noted that LMD plans to collect lessons learned from the 2008 hurricane season and publish a final operating procedure in the first or second quarter of fiscal year 2009. § 636.

Areas to Be Addressed:

• **Transforming LMD:** In 2007, FEMA conducted the Logistics Management Transformation Initiative, a comprehensive assessment of FEMA's logistics planning, processes, and technology. LMD officials intend for this initiative to help inform the development of a long-term strategy to transform FEMA's business processes and identify information technology (IT) development opportunities.

According to LMD officials, FEMA plans to complete this transformation by 2009, and review and refine business processes by 2014. § 636.

- **Strategic and Operational Plans:** The DHS Office of Inspector General reported in May 2008 that, while FEMA had developed a logistics planning strategy that calls for developing three levels of logistics plans (strategic, operational, and tactical), the FEMA Incident Logistics Concept of Operations and a Logistics Management Operations Manual were still in draft. As of August 1, 2008, LMD officials could not estimate when the documents would be finalized. § 636.
- **Logistics Visibility:** In May 2008, the DHS Office of the Inspector General also reported that FEMA's IT systems do not provide the agency with complete asset visibility, comprehensive asset management, or integrated information during disaster response, but noted that FEMA has made efforts to improve its IT systems. According to LMD officials, the aspect of TAV FEMA uses to manage warehouse inventory is only available at Distribution Centers in Atlanta, Georgia, and Fort Worth, Texas. The officials stated that FEMA expects to deploy the warehouse management portion of TAV to the other six FEMA distribution centers—in Berryville, Virginia; Frederick, Maryland; San Jose, California; Guam; Hawaii; and Puerto Rico—in fiscal years 2009 and 2010. Further, the officials said that shipments from FEMA's logistics partners are not yet tracked through TAV, but FEMA is working with the General Services Administration, U.S. Army Corps of Engineers, and American Red Cross to integrate their shipments into TAV to provide full visibility of these partners' critical shipments to disaster areas. § 636.
- **Logistics Credentialing:** As of August 1, 2008, LMD was planning to implement a prototype logistics-management credentialing program, according to LMD officials. The officials said that LMD plans to focus the program initially on the FEMA headquarters workforce, then expand it to the regions, and eventually include other agencies and states. § 636.

Challenges FEMA and DHS Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 637, Prepositioned Equipment Program

Requires FEMA to establish a prepositioned equipment program in at least 11 different locations. This section also requires FEMA, when closing a prepositioned program, to notify affected state, local, and tribal officials not later than 60 days before such closure.

Actions Taken:

- **Prepositioned Equipment Program:** FEMA's Disaster Operations Directorate is responsible for the management of the Prepositioned Equipment Program. As of August 1, 2008, there were prepositioned equipment programs in eight different locations across the country, according to officials in the Disaster Operations Directorate. § 637(a).
- **Advance Notice of Closure:** According to officials in FEMA's Disaster Operations Directorate, four Prepositioned Equipment Program sites were transferred in spring 2006 (prior to the passage of the Post-Katrina Act) from: Long Beach, California to Moffett Field, California; Albuquerque, New Mexico to Ft. Worth, Texas; Chantilly, Virginia to Frederick, Maryland; and Tampa/St. Petersburg, Florida to Atlanta,

Georgia. At the time the program was managed by FEMA's Logistics Branch (now the Logistics Management Division). According to Disaster Operations Directorate officials, FEMA coordinated, to varying degrees, with the affected states prior to the transfers. The officials noted that as of August 1, 2008 they had not closed a prepositioned equipment location since assuming management of the program. § 637(b).

  Areas to Be Addressed:

- **Establishing Prepositioned Equipment Programs:** According to FEMA officials, the Disaster Operations Directorate is drafting the business plans for three additional prepositioned programs, and intends to establish these remaining three programs by fiscal year 2012. The total estimated cost for establishing these three programs is $9 million, said the officials. § 637(a).
- **Advance Notice of Closure Policies:** According to FEMA officials responsible for the Prepositioned Equipment Program, FEMA has not yet developed written guidance for providing advance closure notice, but plans to do so. § 637(b).

  Challenges FEMA and DHS Identified:

- FEMA officials reported funding as a challenge. They said that adequate funding was critical to maintain the current 8 prepositioned equipment program pods, establish 3 additional program pods, and ultimately maintain all 11 program pods, as mandated by the Post-Katrina Act.

Post-Katrina Act § 681 (Stafford Act §§ 402, 502), General Federal Assistance
Amends the Stafford Act to authorize the President to provide accelerated federal assistance in the absence of a specific request where necessary to save lives, prevent human suffering, or mitigate severe damage in a major disaster or emergency. This section also requires the President to promulgate and maintain guidelines to assist governors in requesting the declaration of an emergency in advance of a disaster event.

  Actions Taken:

- **Accelerated Federal Assistance Directive:** According to officials in FEMA's Disaster Operations Directorate, FEMA is currently reviewing a draft policy directive for providing accelerated federal assistance. The officials said that the directive states that FEMA can provide federal assistance without a major disaster or emergency declaration if a state agrees to assume the normal cost share after a declaration has been made or assume total cost if no declaration is made. §§ 402(5), 502(a)(8).
- **Providing Accelerated Federal Assistance:** According to officials in FEMA's Disaster Operations Directorate, FEMA provides accelerated federal assistance in two forms. The first form involves the prepositioning of goods and services in advance of a potential disaster. For example, the officials explained that FEMA was able to respond quickly to a state that had been affected by ice storms because the agency, acting without an initial request from the state, had prepositioned goods in advance of the storms. The officials said that the second form includes the use of gap analysis, a tool in which FEMA asks a given jurisdiction to provide information on its disaster response needs and its current capabilities. According to the

officials, the resulting difference identifies the resources and services FEMA should provide in the event of a disaster. §§ 402(5), 502(a)(8).

- **Guidelines for Governors:** FEMA issued an interim Disaster Assistance Policy in July 2007, which provides guidelines to assist Governors in requesting the declaration of an emergency in advance of a disaster. § 502(c).

Challenges FEMA and DHS Identified:

- Agency officials did not identify any challenges for this section.

For Further Reading

- U.S. Congress. Senate. Committee on Homeland Security and Government Affairs. *Statement of R. David Paulison*, *Administrator*, *Federal Emergency Management Agency*, *U.S. Department of Homeland Security*. 110th Cong., 2nd sess., April 3, 2008.
- U.S. Congress. Senate. Committee on Homeland Security and Government Affairs. *Statement of Richard L. Skinner*, *Inspector General*, *U.S. Department of Homeland Security*. 110th Cong., 2nd sess., April 3, 2008.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Declaration Policies and Guidance." http://www.fema.gov/hazard/guidance.shtm (accessed on Sept. 5, 2008).
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Logistics Management Directorate." U.S. Department of Homeland Security. http://www.fema.gov/media/fact_sheets/lmd.shtm (accessed on Sept. 5, 2008).
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "National Logistics Coordination Forum." http://www.fema.gov/about/divisions/logistics.shtm (accessed on Sept. 5, 2008).
- U.S. Department of Homeland Security. National Response Framework Resource Center. "Annexes." http://www.fema.gov/emergency/nrf/ (accessed on Sept. 5, 2008).
- U.S. Department of Homeland Security. Office of Inspector General. *Emergency Preparedness and Response Could Better Integrate Information Technology with Incident Response and Recovery*. Washington, D.C.: September 2005.
- U.S. Department of Homeland Security. Office of Inspector General. *FEMA's Preparedness for the Next Catastrophic Disaster*. Washington, D.C.: March 2008.
- U.S. Department of Homeland Security. Office of Inspector General. *Logistics Information Systems Need to Be Strengthened at the Federal Emergency Management Agency*. Washington, D.C.: May 2008.

**Enclosure VIII: Changing Contracting Practices to Enhance Preparedness and Strengthen Accountability**

Post-Katrina Act § 691, Advance Contracting
Requires the Federal Emergency Management Agency (FEMA) Administrator to report to Congress on recurring disaster response requirements for which the agency is and is not capable of contracting in advance, to enter into at least one advance contract for each type of the goods and services identified in the report, and to report quarterly on disaster assistance contracts entered into using other than competitive procedures. Also requires the FEMA Administrator to encourage state and local governments to establish prenegotiated contracts for goods and services.

    Actions Taken:

- **Initial Reporting Requirement:** FEMA submitted a report to Congress in December 2007 on advance contracting that:
  - identified specific goods and services that FEMA could contract for in advance of an event, such as construction supplies, communications gear, and food items and services such as engineering, communication services, and environmental services;
  - identified specific goods and services that FEMA could not contract for in advance of an event, such as perishable food items, plasma, and hazmat materials;
  - described FEMA's strategy for maximizing use of advance contracts;
  - identified prenegotiated federal contracts for goods and services; and
  - described FEMA's continuing efforts to coordinate with state and local governments, as well as other federal agencies, on prenegotiated contracts. § 691(a), (b)(1), (3).
- **Entering into Contracts**: Since the December 2007 Congressional Report, FEMA officials told us the following prepositioned goods and services have been placed under contract: consulting and management services for the placement of disaster victims into hotels during a mass evacuation; damage inspection services and field registration; mail services for processing incoming mail and claim forms from disaster victims; installation and maintenance of temporary housing; rail and bus services for evacuees; ground, air fixed and rotary winged, and para-transit services for removal of people and supplies; mass evacuation transportation planning; communications; technical, analytical, planning, and coordination services; base camp initiation and management; fuel and other provisions; hazard mitigation engineering services and technical services; storage, shipping, and maintenance of mail equipment; maintenance of disaster response vehicles; temporary housing units for disaster victims; emergency family registry and locator system for law enforcement; disaster legal services; satellite network communications for disaster operations; verification and authentication of applicants applying for aid; remote registration intake capability at shelters; unemployment assistance; animal and health inspection services; truck drivers and emergency response support specialists; disaster kits to include basic sundry items, cots, and equipment rentals; Web-based disaster training for federal, state and local government, and tribal and private organizations that respond to disasters; and formaldehyde testing. § 691(b)(1).

- **Quarterly Reporting Requirements:** FEMA submitted the first-quarter report for fiscal year 2007 on contracts not using competitive procedures as part of the advance contracting report in December 2007. FEMA submitted a combined third- and fourth-quarter report for fiscal year 2007 in May 2008 on contracts not using competitive procedures. The combined report included two spreadsheet attachments, one listing overall disaster assistance contract awards, and the second listing a subset of noncompetitive contract awards, made during the 2007 third and fourth fiscal quarters. In May and July 2008, FEMA submitted first- and second-quarter 2008 reports, respectively, to Congress on contracts not using competitive procedures. FEMA also submitted the third-quarter 2008 report to Congress in July 2008. § 691(d).

- **Encouraging Prenegotiated State and Local Contracts:** FEMA has taken the following actions to encourage state and local governments to establish prenegotiated contracts for goods and services:
  - **Guidance:** FEMA has provided guidance to Public Assistance applicants through the Debris Removal Applicant's Contracting Checklist, which was prepared August 2006. The checklist can be found at www.fema.gov under the search words Debris Removal Applicant's Contracting Checklist. FEMA issued a 98-page Public-Assistance Debris-Management Guide in July 2007 to encourage nonfederal entities to take a proactive approach to coordinating and managing their debris removal operations as part of their overall emergency management plan.
  - **Strategy:** FEMA produced a Debris-Removal Operations Disaster-Assistance Strategy in June 2007, in order to assist state and local governments, which have principal responsibility for coordinating and managing debris removal operations.
  - **Registry:** FEMA has established a Web-based Debris-Removal Contractor Registry, with over 800 contractors, specifically for state and local governments to use to plan in advance to establish institutional capability for managing debris removal operations. This registry can be found at www.fema.gov under the search words Debris Removal Contractor Registry. This registry is separate from the one required by section 697 of the Post-Katrina Act, which is discussed later in the enclosure. The registry homepage states that the information in the registry is provided and maintained by contractors, not by FEMA, and that state and local governments are responsible for exercising due diligence before entering a contract. However, the registry is available as a tool to assist state and local governments in identifying and contacting debris-removal contractor resources. § 691(b)(4).

Challenges FEMA and DHS Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 692, Limitations on Tiering of Subcontractors

Requires the Secretary of Homeland Security to promulgate regulations to limit contractors' use of subcontracts—at a minimum the regulations are to limit subcontracts to 65 percent of the cost of any DHS disaster response contract, task, or delivery order above the simplified acquisition threshold, unless the secretary determines that such requirement is not feasible or practicable.

Actions Taken:

- **Draft Regulation:** FEMA's Director of Acqusition Operations told us that DHS has drafted a regulation to implement section 692. § 692.
- **Coordination with FEMA:** The FEMA Director of Acqusition Operations told us that DHS has coordinated the drafting of the regulation with FEMA, which is the component likely to be most affected by it. § 692.

Areas to Be Addressed:

- **Final Regulation:** The regulation to implement section 692 is still under review at DHS and has not been published as a proposed rule in the Federal Register. § 692.

Challenges FEMA and DHS Officials Identified:

- The DHS Inspector General (IG) reported in July 2008 that "it does not appear that multitier subcontracting, as an isolated factor, caused significant increases in costs to the government, nor did it reduce subcontracting opportunities for small and local businesses. The prime contractors subcontracted a significant amount of the value of their contracts to small and local business." The DHS IG further reported that, "by limiting subcontracting, section 692 could restrict funding available to small and local businesses while potentially impairing FEMA's ability to respond quickly to future catastrophic disasters." The DHS IG calculated that had section 692 "been in effect following Hurricane Katrina, approximately $300M worth of subcontracting would not have been allowed." The DHS IG report recommended that FEMA and DHS officials work with the Office of Federal Procurement Policy to seek congressional relief from section 692 and the promulgation of less restrictive rules over multitier contracts. FEMA officials told us that they are advocating the repeal of section 692, absent evidence that section 692 would not adversely affect small businesses or the contract workforce available to FEMA. DHS's Office of the Chief Procurement Officer also advocates the repeal of section 692 because, under a new law, the Federal Acquisition Regulations (FAR) must be amended to limit the tiering of subcontractors for cost-type contracts and orders above the simplified acquisition threshold.[25] Because all civilian executive branch agencies will be subject to the new FAR requirement, DHS's Office of the Chief Procurement Officer believes that Congress should repeal the DHS-specific requirement in section 692, which it views as inconsistent with the new civilianwide requirement.

Post-Katrina Act § 694 (Stafford Act § 307), Use of Local Firms and Individuals

Requires federal agencies to provide a local contracting preference in the award of emergency-response contracts to the extent feasible and practicable, to provide a written justification for awards made to nonlocal businesses, and to transition any preexisting emergency-response contracts to local businesses following a Stafford Act declaration, unless the head of the contracting agency determines that it is not feasible or practicable to do so.

---

[25]Duncan Hunter National Defense Authorization Act for Fiscal Year 2009, Pub. L. No. 110-417, § 866, 122 Stat. 4356 (2008).

Actions Taken:

- **Rule:** The DHS Director of Acquisition Policy and Legislation reported that DHS/FEMA sponsored a governmentwide rule to implement section 694 of the Post-Katrina Act. The rule, which is subject to the Federal Acquisition Regulation (FAR) rulemaking process, was published as an interim rule in the Federal Register in November 2007 and took effect at that time, accompanied by a request for public comments.[26] No public comments were received, and the interim rule was adopted as a final rule in September 2008.[27] The rule addresses the requirements of the statute as follows:
  - **Local Area Contracting Preference:** The rule requires federal agencies to provide a local area contracting preference in the award of emergency response contracts to the extent feasible and practicable.
  - **Written Justification:** The rule requires contracting officers to issue a written justification to the contracting file when awarding emergency response contracts to nonlocal businesses.
  - **Local Area Business Transition:** The rule requires agencies to transition any preexisting emergency response contracts to local businesses following a Stafford Act declaration, unless the agency head determines that such transition is not feasible or practicable. Further, the rule states that agencies should not structure emergency-response contracts in such a way that may inhibit the transition of the work to local firms after a Stafford Act event is declared. § 307(a)-(b).
- **Local Area Contracting Preference Instructions:** FEMA's Disaster Contracting Course, published in February 2008, includes specific information on the local area contracting preference. The FEMA Director of Acquisition Operations told us that the tenet of using local sources is covered in FEMA's disaster training and communicated frequently to help ensure that the contracting officers and specialists are aware of it; for example, during recent disaster assistance activities, an e-mail reminded staff of the local area preference. § 307(a).

Areas to Be Addressed:

- **Local Area Business Transition Guidance:** According to FEMA's Branch Chief of Acquisition Policy and Legislation, FEMA plans to issue acquisition guidance to assist contracting officials in structuring emergency response contracts to allow for the transition of the work to local firms, which will reportedly supplement existing guidance issued by the FAR Councils and the DHS Office of the Chief Procurement Officer. FEMA officials told us that FEMA is developing the additional guidance through the use of an Integrated Process Team composed of both acquisition and program personnel and expects to have the guidance in draft no later than October 31, 2008. According to officials from FEMA's Office of Management, FEMA sent a small business and local transition team to Austin, Texas, to pilot a transition program. The process is being documented and from this effort, the local area business transition guidance will be finalized. The officials said the guidance is expected to be finalized no later than March 31, 2009. § 307(b)(2).

---

[26]72 Fed. Reg. 63,084 (Nov. 7, 2007).

[27]73 Fed. Reg. 53,995 (Sept. 17, 2008).

**GAO-09-59R Actions to Implement the Post-Katrina Act**

Challenges FEMA and DHS Officials Identified:
- Agency officials did not identify any challenges for this section.

<u>Post-Katrina Act § 695, Limitation on Length of Certain Noncompetitive Contracts</u>
Requires the Secretary of Homeland Security to promulgate regulations restricting the contract period for noncompetitive emergency-response contracts awarded by DHS. The contract period shall be the minimum necessary to complete the urgent and compelling requirements of the work and enter into another contract using competitive procedures, but shall not exceed 150 days unless the secretary determines that exceptional circumstances apply.

Actions Taken:
- **Inclusion in Homeland Security Acquisition Manual:** DHS has addressed the section 695 restrictions in its Homeland Security Acquisition Manual. In the case of contracts awarded based on unusual and compelling urgency, the manual states that the contract period should be the minimum necessary, but not to exceed 150 days unless a justification is approved that exceptional circumstances apply. § 695.

Areas to Be Addressed:
- **Inclusion in Regulations:** Senior DHS officials in the Office of the Chief Procurement Officer for Acquisition Policy told us that they will include the section 695 restrictions in DHS's Homeland Security Acquisition Regulation, as required by the Post-Katrina Act, but this action has not yet been completed. However, they told us that the Homeland Security Acquisition Manual was mandatory, so the restrictions are effective pending the issuance of a regulation in the Homeland Security Acquisition Regulation. § 695.

Challenges FEMA and DHS Officials Identified:
- DHS officials told us that DHS is seeking a repeal of section 695 because it holds DHS to a different standard than the rest of the federal government, as provided for in section 862 of the recently enacted Duncan Hunter National Defense Authorization Act for Fiscal Year 2009.[28] This law establishes a maximum 1-year period for noncompetitive federal contracts awarded on the basis of unusual and compelling urgency, unless the head of the agency determines that exceptional circumstances apply.[29] In comparison, DHS's limit is 150 days under section 695. Absent unique requirements based on DHS's mission needs, DHS advocates that it be subject to the same restrictions on the length of noncompetitive awards in times of disaster that govern other executive agencies. DHS supports the governmentwide 1-year maximum period of performance for noncompetitive procurements because, according to DHS, it is precisely in a time of emergency that the department's scarce contracting resources need to focus on urgently procuring relief-related goods and services. DHS believes that it is counterproductive to major

---

[28]Pub. L. No. 110-417, 122 Stat. 4356 (2008).

[29]Before this provision was enacted, the FAR Councils had published a similar proposed rule to amend FAR § 6.302-2 by restricting the performance period to no more than 1 year for noncompetitive contracts awarded on the basis of unusual and compelling urgency. See 73 Fed. Reg. 5,784 (Jan. 31, 2008).

disaster relief efforts to require DHS contracting officers to generate new contracts after only 150 days.

Post-Katrina Act § 697, Registry of Disaster Response Contractors
Requires FEMA to establish and maintain a registry of disaster-response contractors that includes their names, locations, areas served, goods or services provided, bonding levels, and socioeconomic status; to verify, through contractors' attestations and documentation, that the information submitted for the registry is true; and to make the registry available on the FEMA Web site for other federal agencies to consult.

   Actions Taken:
- **Modification of Existing Registry:** FEMA asked the General Services Administration (GSA) to modify an existing federal contractor registry, Central Contractor Registration (CCR), to meet the requirements to include additional information on disaster-response contractors. This registry is the primary contractor registrant database for the federal government. FEMA asked GSA to supplement existing CCR data fields to include bonding levels and areas served for disaster response contractors. According to FEMA's Branch Chief of Acquisition Policy and Legislation, the addition of these two fields, coupled with the information already in the CCR, will cover the content required by section 697. GSA added these two categories to the CCR registration process in an optional Disaster Relief Registry, which, according to officials in FEMA's Office of Management, went public on September 24, 2008, in an effort to begin capturing local firm information from the states of Texas and Louisiana. § 697(b)(1)-(2).
- **Categories Included in Registry Contents:** CCR already includes
  o  the name of the business concern;
  o  its location, telephone information, primary place of business, and whether the business concern is
    ▪  (1) a small business concern
    ▪  (2) a small business concern owned and controlled by socially and economically disadvantaged individuals
    ▪  (3) a small business concern owned and controlled by women or
    ▪  (4) a small business concern owned and controlled by service-disabled veterans.  § 697(b)(2).
- **Representation of Small Business Status:** According to FEMA officials, the CCR allows traditional small businesses, women-owned small businesses, veteran-owned small businesses and service-disabled veteran-owned small businesses to self-attest to their small business status. § 697(b)(2)-(3).
- **Certification of Other Statuses**: For other special statuses like small disadvantaged businesses (SDB), section 8(a) small businesses,[30] and historically underutilized business zone (HUBZone) small businesses, FEMA officials stated

---

[30]Section 8(a) small businesses are so called because their business development program derives from section 8(a) of the Small Business Act, 15 U.S.C. § 637(a).

that vendors must enter proof of certification by the Small Business Administration.[31] § 697(b)(2)-(3).

- **Web Site**: A link to the CCR has been added to the FEMA Web site: http://www.fema.gov/business/contractor.shtm. § 697(b)(4).

Areas to Be Addressed:

- **Attestation Process**: FEMA officials have not determined how they intend to implement the attestation requirement contained in section 697. § 697(b)(3).
- **Verification Process**: FEMA officials have not determined how they intend to implement the verification requirement contained in section 697. Shortly before we published this document, FEMA officials told us that they are meeting with Dun & Bradstreet to determine whether the firm can verify the accuracy of information entered into the CCR by vendors. If the firm cannot, FEMA officials said that they will develop the verification process by March 31, 2009. However, they did not provide any related project details. § 697(b)(3).
- **Federal Consultation of Registry**: Just before our publication deadline, the DHS Office of the Chief Procurement Officer, Acquisition Policy and Legislation Branch, advised us that it had developed and submitted a FAR business case to the GSA Civilian Agency Acquisition Council Chairperson, requesting rule making to implement the requirement in section 697 for federal agencies to consult the disaster response contractor registry as part of their acquisition planning. According to DHS, the proposed FAR rulemaking will complement the CCR's collection of business concerns' data (including added data fields for disaster response contractors) for agencies involved with disaster contracting. They told us the FAR rule will provide guidance to federal agencies when contracting for disaster relief activities to consult the registry during acquisition planning. § 697(b)(5).

Challenges FEMA and DHS Officials Identified:

- Cost is a challenge in setting up a FEMA-administered disaster-response contractor registry:  the Branch Chief of Acquisition Policy and Legislation estimated that developing a stand-alone registry would cost millions of dollars.
- Cost is also a challenge for the verification of the information submitted to the database: the Branch Chief raised concerns about the cost-effectiveness of vetting, in advance, each registered business nationwide, and said that funding to set up such a system would be needed.
- FEMA officials in the Office of Management also expressed concern about the attestation and verification elements of the law. They told us that neither FEMA, nor any present DHS organization, possesses the personnel, resources, or funds necessary to review and verify attestations of entities' records in the CCR; presently, there are over 460,000 entities registered in the CCR that can voluntarily register for the "Disaster Response Registry" fields. These officials said they would be required to divert FEMA resources (personnel and funds) that could best be utilized on mission- critical efforts. They also noted concerns about complexities that could arise from the need to handle disputes of records and nonverifiable

---

[31]The Small Business Administration is currently reassessing its role in certifying SDBs. 73 Fed. Reg. 54,881 (Sept. 23, 2008).

information and data. The officials noted that the process of verifying voluntary business submittals in the CCR before any entity receives a contract would be redundant to contracting officials' existing responsibilities to verify business information before the award of a contract.

- In light of these concerns, the DHS Office of the Chief Procurement Officer told us that it is seeking legislative relief from the submission, attestation, and verification requirements of section 697. According to DHS, the legislative proposal reportedly requests relief from what DHS views as very costly and redundant attestation and verification requirements by FEMA at the time of entry into the disaster registry by business concerns. DHS believes the use of the existing CCR, a proven business system, offers the appropriate cost effective electronic business solution to collect the section 697 data for the disaster response registry, and that validation and verification by the contracting officer at the time of award, an existing inherent responsibility, provides more current, cost-effective and potentially more reliable verification than at the time of business concerns' entries into the registry.

For Further Reading:

- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Advance Contracting of Goods and Services: Report to Congress." December 2007.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Debris Management Guide." July 2007. http://www.fema.gov/government/grant/pa/demagde.shtm (accessed on September 5, 2008).
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Disaster Contracts Report for First Fiscal Quarter 2008: Report to Congress." May 2008
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Disaster Contracts Report for Second Fiscal Quarter 2008: Report to Congress." July 2008.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "FEMA Recovery Division Fact Sheet RP9580.201: Debris Removal Applicant's Contracting Checklist." www.fema.gov/pdf/government/grant/pa/9580_201.pdf. (accessed on Sept. 5, 2008).
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Report on Disaster Contracts Issued on a Non-Competitive Basis, 3[rd] and 4[th] Quarters of Fiscal Year 2007: Report to Congress." May 2008.
- U.S. Department of Homeland Security. Office of Inspector General. "Hurricane Katrina Multitier Contracts." OIG-08-81. July 2008.

**Enclosure IX: Improving Information Technology Systems to Support Compatibility, Accessibility, and Tracking**

Post Katrina Act § 640, Improvements to Information Technology Systems

Requires the Federal Emergency Management Agency (FEMA) to take measures to update and improve its information technology (IT) systems and submit to the appropriate committees of Congress a report on its progress in implementing this section.

   Actions Taken:

- **Compatibility of FEMA IT Systems and Asset Tracking Capability:** According to FEMA's 2007 report to Congress on its IT systems, FEMA's Office of the Chief Information Officer (CIO) was managing an IT environment composed of a multitude of independent systems that were experiencing difficulties in sharing information. FEMA employs three IT systems to track personnel, supplies, and commodities during disasters. To electronically track its property, FEMA uses the Logistics Information Management System III. For tracking disaster response personnel and their employee information, FEMA uses the Automated Deployment Database (ADD). Lastly, FEMA uses the Total Asset Visibility (TAV) system for supply-chain management, enabling FEMA to track commodities in real time. FEMA has several initiatives underway to improve system interaction, information sharing, and communication, with the aim to begin integrating the information in its three distinct personnel and asset tracking systems in fiscal year 2009. Through these initiatives, FEMA intends to achieve a more seamless information-sharing environment among its asset-tracking systems, resulting in a more integrated common operating picture for FEMA management. In addition, according to officials in the Office of the CIO, FEMA has developed a data analysis and reporting process that examines and collates data from multiple sources so that FEMA's program offices can analyze combined data and create reports for FEMA offices. FEMA also has a separate system designed to track mission assignments and requests for goods and services. In addition, this system has the capability to store prescripted mission assignments in advance, so that program operations can more quickly and easily manage the assignments during disasters. § 640(a)(1), (4).
- **Timely Technology Enhancements:** According to officials in the Office of the CIO, FEMA currently has a process for the rapid development of technology applications to ensure that technology enhancements reach its offices in a timely fashion. These officials said that FEMA intends to replace that process with a centrally managed process under the Enterprise Application Development Integration Sustainment contract, which is a contract vehicle intended to execute all the software development needs of FEMA offices. § 640(a)(2).
- **Asset Tracking Capability:** FEMA officials told us shortly before we published this document that, as of August 1, 2008, all 10 FEMA regions have TAV program capability to electronically track all orders, shipments in transit, and shipments received of its disaster commodities and assets in real-time status. The tracking and monitoring of disaster assets is performed by a group of trained TAV Specialists in each region. In addition, FEMA officials told us that in September of 2008, FEMA began coordinating with the Defense Logistics Agency, the U.S. Army Corp of

Engineers, and the American Red Cross to link the TAV system to these external agency supply systems to enable tracking of Mission Assignment purchases and shipments from these activities to FEMA disaster support operations, which FEMA expects will be operational by spring 2009. FEMA officials also told us that planned improvements to the TAV program in the next fiscal year include linking the system to a new property management system recommended by DHS, inclusion a function to allow visibility of partner—such as Red Cross and the Defense Logistics Agency—shipments and purchases, and improving the field connectivity of the TAV system by inclusion of these requirements in the overall CIO communications upgrades, but no documentation of these current and planned efforts accompanied their remarks. § 640(a)(4).

- **National Emergency Management Information System Improvements:** FEMA has increased the capacity of its IT system for response and recovery operations—the National Emergency Management Information System (NEMIS)—to process concurrent requests, said officials in the Office of the CIO. According to the officials, FEMA intends to centralize NEMIS into one departmental data center and establish disaster recovery capabilities in a second departmental data center. § 640(a)(5).

- **IT Training:** The Emergency Management Institute (EMI) and FEMA vendors provide training on FEMA's IT systems. EMI provides training on NEMIS and other FEMA systems. EMI training includes user guides, manuals, and other materials. According to officials in the Office of the CIO, training materials and user guides are required on delivery of all commercial-off-the-shelf software packages, and the vendors for ADD and TAV provide training for their systems. § 640(a)(6).

- **Reporting Requirement**: FEMA submitted a report to Congress entitled *Public Law 109-295, Section 640 Response: Improvements to Information Technology Systems* in September 2007. § 640(b).

   Areas to Be Addressed:

- **Completion of IT Upgrades:** FEMA expects that completing alignment of its IT systems with its mission needs will be a long-term process that will extend well into fiscal year 2010 and will require the commitment of both resources and leadership. Officials in the Office of the CIO stated that FEMA anticipates investing $1 million in the redesign of NEMIS (for disaster assistance requests) in fiscal year 2009. In addition to NEMIS's redesign, FEMA plans to transfer ADD's (personnel) functions to a new Human Resource system. FEMA officials told us that a Web-enabled Automated Deployment Database is currently under development, with an introduction scheduled for late first quarter fiscal year 2009, and that it will serve as a bridge to a future Human Resource system. Further, FEMA plans to replace the Logistics Information Management System III (property management) with a new software platform, and improve its mission-assignment (operations) system capabilities. § 640(a).

- **Developing a Testing Environment:** According to FEMA's 2007 IT report, the Office of the CIO's testing environment is limited and needs improvement. To improve its testing capability, FEMA is developing the Consolidated Test Facility, according to officials in the Office of the CIO. The officials said that FEMA plans to house two testing environments in the facility. One environment will be used to

perform integration testing and development for software delivered to the agency. The other will be used to perform stress and performance testing. § 640(a)(3).

Challenges FEMA and DHS Officials Identified:
- Agency officials did not identify any challenges for this section.

For Further Reading
- U.S. Congress. House Subcommittee on Emergency Communications, Preparedness and Response and Subcommittee on Management, Investigations, and Oversight, Committee on Homeland Security. *Statement of Matt Jadacki, Deputy Inspector General for Disaster Assistance Oversight, U.S. Department Of Homeland Security.* 110th Cong., 1ˢᵗ sess., February 28, 2007.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. *Public Law 109-295, Section 640 Response: Improvements to Information Technology Systems.* Washington, D.C.: September 2007.
- U.S. Department of Homeland Security. Office of Inspector General. *DHS' Efforts to Develop the Homeland Secure Data Network.* Washington, D.C.: April 2005.
- U.S. Department of Homeland Security. Office of Inspector General. *Management of the DHS Wide Area Network Needs Improvement.* Washington, D.C.: December 2005.

**Enclosure X: Human Capital: Ensuring a Well-Trained, Professional Workforce to Prepare for, Respond to, and Recover from Disasters**

Post-Katrina Act § 611 (Homeland Security Act § 510), Credentialing and Typing

Requires the Federal Emergency Management Agency (FEMA) Administrator to enter into a Memorandum of Understanding (MOU) with the administrators of the Emergency Management Assistance Compact (EMAC),[32] as well as state, local, and tribal governments, and organizations that represent emergency response providers, to collaborate on developing standards for deployment capabilities, including credentialing and typing[33] of personnel and resources likely needed for a disaster response.

   Actions Taken:

- **Establishment of MOU**: Effective April 1, 2007, the FEMA Administrator entered into an MOU with the National Emergency Management Association, which is the administrator of EMAC, regarding resource typing and credentialing of personnel and mutual aid systems. § 510.
- **Draft Credentialing Standards**: The National Incident Management System (NIMS) Draft Guideline for the Credentialing of Personnel was published in August 2008. The guideline has been developed to establish definitions to explain and identify actions and processes that can provide the foundation for consistent use and interoperability of credentialing on a national scale. By establishing recommended protocols to facilitate coordinated response to incidents, the guideline is intended to encourage interoperability between federal, state, and local officials, and will facilitate deployment for response, recovery, and restoration. § 510.

   Areas to Be Addressed:

- **Final Credentialing Standards:** FEMA has not yet published the final Guideline for the Credentialing of Personnel, but FEMA officials in the National Preparedness Directorate told us that as of October 1, 2008, the draft guideline was being prepared for publication in the Federal Register for a 30-day public comment period. § 510.
- **Resource-Typing Standards**: FEMA has not yet developed resource-typing standards to complement its draft personnel standards; however, FEMA's National Integration Center (NIC) Incident Management Systems Division has a national resource-typing initiative underway. § 510.

---

[32]EMAC is an interstate mutual aid agreement that allows states to assist one another in responding to disasters. In June 2007, we recommended, with FEMA concurring, that FEMA look for ways to build EMAC's administrative capacity, such as cooperative agreements, grants, and training initiatives, to better develop the nation's disaster response capabilities.

[33]Resource typing is the categorization and description of response resources that are commonly exchanged in disasters through mutual aid agreements. Standard resource-typing definitions help responders request and deploy the resources they need through the use of common terminology, and give emergency responders the information they need to make sure they request and receive the appropriate resources during an emergency or disaster.

Challenges FEMA and DHS Officials Identified:
- Agency officials did not identify any challenges for this section.

<u>Post-Katrina Act § 621 (5 U.S.C. § 10102), Strategic Human Capital Plan</u>

Requires the FEMA Administrator to develop a Strategic Human Capital Plan (SHCP) to shape and improve its workforce. Specifically, the plan is to include: a workforce gap analysis, a plan of action for addressing those gaps, and a discussion of selected aspects of the Surge Capacity Force.

Actions Taken:

- **Plan Development**: FEMA published its SHCP for 2008-2012 in May 2008 and submitted it to Congress in June 2008. § 10102(a).
- **Plan Contents:** The SHCP is organized around five key strategic initiatives: Understanding the Composition and Character of the Workforce; Right Sizing the Agency; Building Core Competencies; Training and Professionally Developing the Workforce; and Building the Culture of the New FEMA. § 10102(b).
- **Workforce Gap Analysis:** The SHCP identifies nine operational core competencies such as service to disaster victims and operational planning, and states that FEMA intends to develop occupational competencies for its mission-critical occupations that mirror the operational core competencies. The SHCP also identifies the staffing levels and vacancies of each category of employee type, such as leadership positions, permanent, temporary, and so forth, and addresses workforce trends, including hiring projections and retirement eligibility. § 10102(b)(1).
- **Recruitment and Retention Plan:** The SHCP states that FEMA will use the operational core competencies as the foundation for recruiting and retaining employees and that FEMA will review its current recruitment and employment processes for achievement of maximum results, including review of recruitment bonuses, among other actions**.** § 10102(b)(2).
- **Developing and Training the Workforce:** The SHCP lists FEMA's objectives for improving its learning and development program, such as building a FEMA professional leadership program focused on FEMA's core competencies. FEMA also plans to formally adopt and implement Individual Development Plans for each employee, with annual reviews by the employee and supervisors, and credentialing or certification plans for certain jobs. Lastly, the SHCP states that credentialing programs will measure skills development and competency achievement and that the implementation of a standardized training program for Reservists will ensure that salary and promotions are tied to a consistent qualifications and credential plan. § 10102(b)(2).

Areas to be Addressed:

- **Specific Recruitment and Retention Goals**: The SHCP states FEMA's target levels and intentions for recruitment, including the need to review available human capital flexibilities such as bonuses to support recruitment. The SHCP also states that the new employee training and development initiatives will help support retention goals. However, the SHCP contains no specific list of recruitment and retention goals, including how FEMA will use bonus authorities to support those

goals or how FEMA's program objectives will be achieved through such goals. § 10102(b)(2).

- **Recruiting for State Experience**: While the SHCP refers to critical considerations for rightsizing the agency's workforce, there is no mention of a strategy for recruiting individuals who have had experience carrying out emergency management responsibilities in state agencies. § 10102(b)(2).
- **Surge Capacity Force**: While the SHCP states that FEMA has established a Disaster Reserve Workforce Division, which will integrate each of the existing elements of workforce readiness, the SHCP's discussion of the surge capacity force does not address the content requirements of the statute, such as the number of surge staff not employed by DHS or FEMA and their qualifications or credentials. § 10102(b)(3).

Challenges FEMA and DHS Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 621 (5 U.S.C. § 10103), Career Paths

Requires the FEMA Administrator to identify and publish information on career paths for FEMA personnel, including the education, training, experience, and assignments needed for career progression within the agency; ensure that opportunities for such necessary education, training, and experience are available; and establish a policy for assigning FEMA personnel to positions that balances the need for personnel to serve in career-enhancing positions with the need to require service for a sufficient amount of time to provide necessary stability.

Areas to Be Addressed:

- **Career Paths**: The Deputy Director of FEMA's Human Capital Division told us that FEMA has no structured system that outlines career paths, nor has FEMA developed a new policy for assigning personnel. The Department of Homeland Security (DHS) Inspector General reported in April 2008 that FEMA could not verify the completion of the establishment of career paths. § 10103.

Challenges FEMA and DHS Officials Identified:

- The Deputy Director stated that, in his opinion, the statutory provision is not necessarily structured to match FEMA processes. He said a better question would be how FEMA structures and manages mission-critical positions.

Post-Katrina Act § 621 (5 U.S.C. § 10104), Recruitment Bonuses

Grants the FEMA Administrator the authority, for 5 successive years, to pay recruitment bonuses for positions that would be difficult to fill in the absence of such a bonus; and requires an annual report to Congress on the use of recruitment bonuses.

Actions Taken:

- **Payment of Recruitment Bonuses:** FEMA has exercised the authority to pay recruitment bonuses, totaling over $111,000, to eight new employees in fiscal year 2007. § 10104(a).

- **Service Agreements:** FEMA has established written service agreements for employees receiving recruitment bonuses. § 10104(c).
- **Reporting Requirement:** FEMA submitted a "Combined Report: FEMA Use of Recruitment and Retention Bonuses FY 2007" to Congress in December 2007. § 10104(f).

   Challenges FEMA and DHS Officials Identified:
- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 621 (5 U.S.C. § 10105), Retention Bonuses

Grants the FEMA Administrator the authority, for 5 successive years, to pay retention bonuses to retain employees who are essential based on their unique qualifications or a special need of the agency; and requires an annual report to Congress on the use of retention bonuses.

   Actions Taken:
- **Payment of Retention Bonuses:** FEMA has exercised the authority to pay retention bonuses. FEMA gave relocation bonuses, for the purpose of retention, totaling over $24,000, to two employees in fiscal year 2007. § 10105(a).
- **Service Agreements:** FEMA has established written service agreements for employees receiving relocation bonuses. § 10105(b).
- **Reporting Requirement**: FEMA submitted a "Combined Report: FEMA Use of Recruitment and Retention Bonuses FY 2007" to Congress in December 2007. § 10105(f).

   Challenges FEMA and DHS Officials Identified:
- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 621 (5 U.S.C. § 10106), Quarterly Report on Vacancy Rate in Employee Positions

Requires the FEMA Administrator to submit to Congress an initial report, then quarterly updates for 5 successive years, on the vacancies in employee positions at the agency. Specifies the reports are to include: vacancies of each category of employee position; the number of applicants for each publicly advertised vacancy; the length of time that each vacancy has been pending; the hiring-cycle time for each vacancy that has been filled; and a plan for reducing the hiring-cycle time and reducing the current and anticipated vacancies with highly qualified personnel. Quarterly updates are additionally to contain an assessment on the progress in filling vacant positions.

   Actions Taken:
- **Initial Report**: FEMA submitted its initial report in September 2007, which covered the first two quarters of fiscal year 2007. For the first quarter of fiscal year 2007, FEMA's Human Capital Division was still in the process of developing the capacity to provide quarterly vacancy reports and developed a baseline for comparison and measurement of improvement. For first quarter fiscal year 2007, there was an average pending time of 61 days and an average hiring-cycle time of

120 days. In the second quarter, FEMA reported improvements in reducing the pending-cycle time to 31 days and the hiring-cycle time to 80 days. § 10106(a).
- **Quarterly Updates**: FEMA submitted quarterly vacancy reports for the 4th quarter of fiscal year 2007, and the 1st and 2nd quarters of fiscal year 2008 in May 2008. § 10106(b).
- **Progress Assessments**: The quarterly reports include information on how FEMA is assessing its progress in filling vacancies. §10106(a)(2), (b).
- **Reporting Requirements**: The vacancy reports FEMA has submitted generally contain the elements specified by the Post-Katrina Act: vacancies of each category of employee position; the number of applicants; the length of time that each vacancy has been pending; the hiring-cycle time for each vacancy that has been filled; and planned actions to achieve 95 percent personnel strength by September 30, 2008. §10106(a)(2), (b).

    Challenges FEMA and DHS Officials Identified:
- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 622 (Homeland Security Act § 844), Homeland Security Rotation Program
Requires the Secretary of Homeland Security to establish the Homeland Security Rotation Program to, among other things, expand the knowledge base of the department by providing for rotational assignments of employees to other components. Requires the Chief Human Capital Officer to administer this program and enumerates associated responsibilities, including ensuring the Rotation Program provides professional education and training.

    Actions Taken:
- **Establishment:** DHS established a Department Rotational Assignments Program on November 13, 2007. This program is open to all civilian DHS employees. § 844(a)(1).
- **Best Practices:** The DHS Chief Learning Officer told us that a subcommittee of the DHS Training Leaders Council ensured an inclusive and collaborative process was used to obtain best practices from DHS legacy organizations, as well as best practices from the Department of Defense. § 844(a)(1).
- **Stated Program Goals:** DHS's Management Directive for the rotation program states that the program seeks to foster greater information sharing and team building between DHS and its components and to be a means for employees to obtain depth and breadth of experience while cross-pollinating knowledge, experience, and corporate perspectives. § 844(a)(2).
- **Employee Eligibility and Participation:** All DHS employees in Senior Executive Service (SES) candidate development and selective management or career development programs are to complete a rotational assignment before completion of the program. Other SES members, supervisors, and managers are eligible for rotational assignments. Rotational assignment opportunities may be made available on an individual basis with supervisor support and agreement. From October 1, 2007, to March 31, 2008, more than 269 DHS employees from 20 different DHS components participated in the rotation program. That number does not include DHS employees who have been detailed to support operational or surge mission

requirements. A FEMA Semi-Annual Rotational Assignment Report shows that employees ranging from the GS-7 to GS-14 levels participated in the rotation program. § 844(a)(1)-(2); see also 5 U.S.C. § 10103(b).

- **Administration:** The Chief Human Capital Officer administers the rotation program. § 844(a)(3).
- **Reporting Requirement:** DHS submitted the Rotational Assignments Program Report to Congress in June 2008. § 844(a)(5).

    Areas to Be Addressed:

- **Incentives:** The DHS Management Directive for the Rotation Program does not specify any incentives for employee participation. § 844(a)(3).

    Challenges FEMA and DHS Officials Identified:

- Agency officials did not identify any challenges for this section.

<u>Post-Katrina Act § 623 (Homeland Security Act § 845), Homeland Security Education Program</u>

Requires the Secretary of Homeland Security, acting through the FEMA Administrator, to establish a graduate-level Homeland Security Education Program in the National Capital Region (NCR) to provide educational opportunities to senior federal officials and selected state and local officials with homeland security and emergency management responsibilities; and requires the leveraging of existing resources, as well as establishing student enrollment priorities and selection criteria and employee service commitments.

    Actions Taken:

- **Establishment:** The Naval Postgraduate School's Center for Homeland Defense and Security, FEMA, and DHS have created an 18-month Homeland Security Master's Degree Program for the NCR. The Homeland Security Master's Degree Program is taught, and the degree awarded, by the Naval Postgraduate School's Center for Homeland Defense and Security. The NCR Academy was launched June 6, 2007, in Shepherdstown, West Virginia, at the Office of Personnel Management's Eastern Management Development Center. § 845(a).
- **FEMA Appointment of Program Administrator:** The Deputy Administrator, National Preparedness Directorate, formally requested in October 2008 that the FEMA Administrator appoint the Assistant Administrator for the National Integration Center as the administrator of the Homeland Security Education Program. In the request memorandum, the Deputy Administrator stated that because the majority of the resources for the program are managed by the National Integration Center, the Assistant Administrator of the center would be best positioned for the appointment. The FEMA Administrator approved the appointment on October 20, 2008. § 845(a).
- **Leveraging of Existing Resources**: The Center for Homeland Defense and Security has two campuses for the Homeland Security Master's Degree Program. The accredited Master's degree program in the NCR is a reproduction of a degree program, based out of Monterey, California. The DHS Chief Learning Officer stated that DHS had previously reviewed and approved the Naval Postgraduate School Homeland Security Master's Degree Program for the Monterey cohort, which has

been in place since 2003. The DHS Chief Learning Officer told us the recently established NCR Homeland Security Master's Degree Program uses the already approved program and curricula. He also told us the program employs adjunct faculty from universities and colleges across the United States. He said that the program leveraged the curricula already in use by the adjunct faculty at their home institutions and incorporated them into the program's curriculum. § 845(b).

- **Student Enrollment Sources:** The NCR student body has a greater percentage of DHS and federal officials than state and local officials, while the program in Monterey has more state and local than federal officials. § 845(c)(1).
- **Enrollment Priorities and Selection Criteria:** The Master's Program is open to DHS employees at the GS-13, GS-14, GS-15, and exceptional GS-12 levels, as well as other federal and nonfederal employees. Applicants must have a minimum 3.0 GPA and an undergraduate degree from an accredited college or university, or been awarded a graduate degree, and have relevant work experiences and qualifications. § 845(c)(2).
- **Service Commitment:** DHS has established an interim service commitment agreement for employees who receive training and educational opportunities that specifies that the employee will continue in service to the agency for at least three times the length of the training period, and states that if the employee leaves DHS prior to that time, he or she will pay back expenses. § 845(d).

    Areas to Be Addressed:

- **Diversity:** In a Comptroller General opinion dated December 20, 2007, we reported that FEMA had not yet taken measures to ensure diversity within the Homeland Security Education Program. Although FEMA reported that it was following existing laws prohibiting discrimination, FEMA stated that DHS's Office of the Chief Learning Officer and the Training Leaders Council were in the process of developing guidelines to support diversity.[34] FEMA officials have not provided any updated information during this review about how the FEMA Administrator is ensuring racial, gender, and ethnic diversity in the graduate degree program. § 845(c)(3).
- **Service Commitment:** DHS's interim service commitment agreement is not specific to the Homeland Security Education Program. Under the statute, before any employee selected for the program may be assigned to participate, the employee must agree in writing to continue in the service of the sponsoring agency for 2 years following the end of the program and to repay his or her educational expenses on a pro rata basis if the employee voluntarily separates from service before the end of the commitment. DHS's interim agreement requires its employees to remain in service for three times the length of their training—amounting to 4-1/2 years in the case of the Homeland Security Education Program—which would appear to expose DHS employees to repayment liability for longer than the 2-year statutory service commitment. Further, because DHS has not developed a service commitment agreement specific to the Homeland Security Education Program, other agencies do not have such an agreement available to execute with their own employees. § 845(d).

---

[34] GAO, *Presidential Signing Statements—Agency Implementation of Ten Provisions of Law*, B-309928, Dec. 20, 2007.

Challenges FEMA and DHS Officials Identified:

- The Branch Chief for FEMA's Human Capital Division stated that it is a challenge for some FEMA applicants to be competitive for programs that preference graduate school education, as many FEMA officials have moved up the ranks as police officers, fire fighters, and emergency managers without graduate education.
- The Branch Chief for FEMA's Human Capital Division said that the Federal Coordinating Officers' participation in the executive management training is a challenge because their professional development must be paid for with disaster funds.

Post-Katrina Act § 624, Surge Capacity Force

Requires the FEMA Administrator to prepare and submit to Congress a plan to establish and implement a Surge Capacity Force for deployment to disasters, including catastrophic incidents. Requires the plan to include procedures for designation of staff from other DHS components and executive agencies to serve on the Surge Capacity Force. Procedures must be developed as soon as practicable. The plan must also ensure the Surge Capacity Force includes a sufficient number of appropriately credentialed individuals capable of deploying to disasters after being activated, as well as full-time, highly trained, credentialed individuals to lead and manage. Individuals in the Surge Capacity Force are to be trained and deployed in accordance with the Stafford Act, unless the FEMA Administrator reports to Congress that additional statutory authorities are necessary.

Actions Taken:

- **Disaster Reserve Workforce/Surge Capacity:** The Director of FEMA's Disaster Reserve Workforce explained that unlike in the military model, FEMA's disaster reservists are the primary resource for disaster response and recovery positions, filling 70-80 percent of all Joint Field Office positions. FEMA has interpreted Surge Capacity Force to include its Disaster Reserve Workforce of 5,000-6,000 reserve Disaster Assistance Employees, who are full-time-staff and contract staff who are organized in 23 cadres. If additional capacity is necessary, another approximately 2,000 Disaster Assistance Employees are available to perform immediate, nontechnical functions that require large numbers of staff. Other sources FEMA has identified include local hires—additional staff hired from the affected area to perform the same functions as disaster reservists; contract support for activities that require specialized skill sets and for general disaster assistance functions; other full-time FEMA staff detailed to perform disaster assistance work; and other resources—particularly employees from other DHS components—detailed to perform disaster assistance work. For example, the Director of FEMA's Disaster Reserve Workforce gave us information regarding the deployment of Disaster Assistance Employees and full-time FEMA employees for the summer of 2008. She told us that between July and September 2008, FEMA had, on average, 4,067 Disaster Assistance Employees at 22 Joint Field Office disaster locations, compared to 1,364 full time FEMA staff working at those locations.§ 624(a).
- **Disaster Reserve Workforce/Surge Capacity Planning:** FEMA contracted Booz Allen Hamilton to perform a baseline assessment and preliminary design for professionalizing the Disaster Reserve Workforce and its supporting program management function, including FEMA's Surge Capacity Force planning. Booz

Allen Hamilton developed a preliminary design for the Disaster Reserve Workforce, which includes an organizational concept, workforce size and composition, concept of operations, and a policy framework. One of Booz Allen Hamilton's recommendations was to establish a central office for the development, management, and deployment of the Disaster Reserve Workforce. The office, the Disaster Reserve Workforce Division, was stood up on March 31, 2008. According to the Director of the Disaster Reserve Workforce Division, the Branch Chief responsible for Surge Capacity Force planning joined FEMA on June 22, 2008. The Director also told us that FEMA now has an interim Surge Capacity Force Plan under internal review. § 624(a).

- **DHS Employees Designated to Serve**: The Interim Surge Capacity Force Plan was announced in a meeting of the DHS Human Capital Council in March 2008 and communicated to the heads of DHS components in a May 2008 memorandum from the FEMA Administrator. In the May 2008 memorandum, FEMA sent a listing of job titles and positions needed in the Surge Capacity Force to all DHS Human Capital Officers and asked them to identify approximately 900 employees throughout DHS for the Surge Capacity Force. § 624(a)-(b),(g).

- **Credentialing**: The Director of the Disaster Reserve Workforce Division reported that the Surge Capacity Force is being credentialed by the National Preparedness Directorate's NIMS credentialing program, which is the administrative process for validating the qualifications of personnel, assessing their background, and authorizing their access to incidents involving mutual aid between states.[35] NIMS credentialing guidelines are to provide a process for the Disaster Reserve Workforce to receive physical "smartcards" for establishing credentials for access to an incident. The Director of the Disaster Reserve Workforce Division told us that FEMA's Security Office is currently engaged in acquiring the enrollment stations and cards to execute this activity agencywide over a period of time. The director also told us that the division has a separate credentialing program aimed at establishing more-substantive qualifications. According to the director, the NIMS credentialing guidelines do not address the knowledge, skills, and abilities, or core competencies required to meet the qualification standards for FEMA job-titled positions that deliver FEMA programs and services. Therefore, according to the director, the Disaster Reserve Workforce Division, in partnership with FEMA's Emergency Management Institute, recently began the process of developing standardized credentialing plans, which will incorporate existing position task books for the Disaster Assistance Employee workforce (a total of 230 positions organized in 23 cadres). For example, the External Affairs Officer position task book was revised in April 2008. She said that these task books will provide the basis for building the credentialing plans. § 624(c).

    Areas to Be Addressed:

- **Surge Capacity Plan:** Despite the initial actions FEMA has taken to assess its baseline capabilities and draft an interim Surge Capacity Force Plan, according to the Director of the Disaster Workforce Division, as of May 2008, FEMA had not yet provided Congress with a plan for establishing and implementing a Surge Capacity

---

[35]As noted earlier in this enclosure, DHS published the NIMS Draft Guideline for the Credentialing of Personnel in August 2008 in response to section 510 of the Homeland Security Act, as amended by the Post-Katrina Act.

Force. The director stated that her goal is to submit a plan to implement surge capacity force by summer 2009 with timelines and information on select—but not all—positions in the disaster reserve workforce. § 624(a).

- **Employees Designated to Serve:** Although the FEMA Administrator had taken action to begin identifying DHS personnel to serve in the Surge Capacity Force, as of May 2008, DHS has not designated members to the Surge Capacity Force, according to the Director of the Disaster Reserve Workforce Division. She told us the initial DHS Agency Surge Capacity designation lists were submitted in June 2008. Upon review, the Director of the Disaster Reserve Workforce Division said there were inconsistencies with the different agencies' interpretation of requirements for personnel, training, and skill sets. A Surge Capacity Force Working Group met to review surge staffing requirements and to develop a timeline for the development of processes and a Concept of Operations Plan. Agency participants in the working group include FEMA, the Transportation Security Administration, and U.S. Citizenship and Immigration Services. The Director of the Disaster Reserve Workforce Division told us that a final draft is expected to be complete by December 2008, with a full plan for implementation expected by summer 2009. § 624(b), (g).

- **Additional Authorities Necessary**: According to officials in the Disaster Reserve Workforce Division, FEMA has identified additional authorities desired, which are designed to support recruiting for the disaster reserve workforce. These include access to healthcare and retirement benefits for disaster reservists; mandatory annual training and drilling requirements for reserve members; authority for retirees serving as disaster reservists to continue receiving their government retirement benefits; and the ability to offer credit for disaster reserve experience to be used in consideration for future full-time, permanent FEMA employment. The Disaster Reserve Workforce Director told us that FEMA submitted the legislative package to DHS for consideration on July 9, 2008. The House Committee on Transportation and Infrastructure recently considered a bill that would allow all temporary personnel performing Stafford Act services (of which disaster reservists are a subset) to be eligible for federal employee health benefits.[36] § 624(a)(2).

- **Sufficient Number of Credentialed and Trained Individuals**: According to officials in FEMA's Disaster Reserve Workforce Division, FEMA does not yet have a standardized credentialing program in place for its Disaster Reserve Workforce, but does have an effort under way to develop one, as described above. FEMA plans to continue pilot testing position task books in summer 2008. It expects to complete the development of credentialing plans for all cadres and positions by 2010, depending on funding. Disaster Reserve Workforce Division officials explained that development of the credentialing plans in conjunction with the position task books will highlight gaps in the training curriculum that will assist in prioritizing curriculum development. FEMA also plans to hold training and briefings for the DHS employees designated to serve in the Surge Capacity Force, but had not implemented these as of May 2008. § 624(c)-(d).

---

[36]H.R. 6658, 110th Cong. § 103 (2008).

Challenges FEMA and DHS Officials Identified:

- The Disaster Reserve Workforce Division is a nascent office, which was not established until nearly 2 years after the initial surge capacity plan was to be provided to Congress. Officials in the office stated that before a division was established specifically for the Disaster Reserve Workforce, disaster workforce and surge capacity planning had to compete with other priorities and did not get the attention it needed. Now, according to the director, the new office has limited capabilities and resources. As of May 2008, in addition to a small legacy staff, it had only two employees—the Director and a Deputy Director for one of the three divisions the office planned to establish. According to the Director, the division has since advertised 16 new positions and is conducting interviews, with several selections and offers in progress.
- According to the Director of the Disaster Reserve Workforce Division, the Surge Capacity Force Plan and full surge capability is a long-term goal, which will take time to develop. She stated that Booz Allen Hamilton estimated that it will take FEMA 5 years to fully implement the eight recommendations that FEMA had chosen as priorities from the baseline assessment.

For Further Reading:

- Government Accountability Office. Comptroller General of the United States. *Presidential Signing Statements —Agency Implementation of Ten Provisions of Law.* B-309928. December 20, 2007.
- U.S. Congress. Senate. Committee on Homeland Security and Governmental Affairs. *Statement of Richard L. Skinner, Inspector General, U. S. Department of Homeland Security.* April 3, 2008.
- U.S. Department of Homeland Security. "Rotational Assignments Program Report to Congress." June 2008.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Combined Report: Use of Recruitment and Retention Bonuses: Fiscal Year 2007 Report to Congress." December 2007.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Strategic Human Capital Plan 2008-2012: FEMA P-692." May 2008.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Quarterly Vacancy Report: Through 2nd Quarter Fiscal Year 2007 Report to Congress." August 2007.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Quarterly Vacancy Report: 4th Quarter Fiscal Year 2007 Report to Congress." May 2008.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Quarterly Vacancy Report: 1st Quarter Fiscal Year 2008 Report to Congress." May 2008.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Quarterly Vacancy Report: 2nd Quarter Fiscal Year 2008 Report to Congress." May 2008.
- U.S. Department of Homeland Security. Naval Post-Graduate School. "The Center for Homeland Defense and Security Master's Degree Program." http://www.chds.us/?masters/overview (accessed on Sept. 5, 2008).

**Enclosure XI: Applying Specific Expertise to Disaster Planning, Response, and Recovery Activities**

Post-Katrina Act § 611 (Homeland Security Act § 511), National Infrastructure Simulation and Analysis Center

Requires the National Infrastructure Simulation and Analysis Center (NISAC) to model, simulate, and analyze the systems and assets constituting critical infrastructure, in order to enhance preparedness, protection, response, recovery, and mitigation activities. Requires each federal agency and department with critical infrastructure responsibility under Homeland Security Presidential Directive-7 (HSPD-7) to establish a formal relationship with the NISAC, which must include an agreement on information sharing.

Actions Taken:

- **NISAC Modeling, Simulation, and Analysis Support**: The Deputy Director of the Department of Homeland Security's (DHS) Infrastructure Analysis and Strategy Division (IASD), who manages the NISAC, said that the requirements of the Post-Katrina Act were reflected in the NISAC's preexisting mission and therefore the Post-Katrina Act did not substantially change any of the NISAC's work activities. The NISAC has taken actions to simulate and analyze the systems and assets comprising critical infrastructure in order to enhance preparedness, protection, response, recovery, and mitigation activities, according to the IASD Deputy Director. We identified 22 major simulation, modeling, and analysis activities in 2008 and 26 major activities in 2007. For example, as part of its support to DHS, the NISAC conducted an infrastructure consequence analysis of a Category 3 hurricane making landfall in Rhode Island for use in the Ardent Sentry Northern Edge 2007 exercise. § 511.

Areas to Be Addressed:

- **Coordination**: NISAC has not established any formal interagency agreements, including an agreement regarding information sharing, with federal agencies and departments that have critical infrastructure responsibilities under HSPD-7. According to the IASD Deputy Director, the National Infrastructure Protection Plan, which provides the framework for the nation's efforts to protect critical infrastructure and is signed by 15 federal departments and agencies, meets the intent of the Post-Katrina Act's requirement on the establishment of formal interagency agreements. The IASD Deputy Director said that structured processes conducted under the National Infrastructure Protection Plan framework, including the NISAC annual report and work plan, are the primary mechanisms for coordinating with agencies given critical infrastructure responsibilities under HSPD-7. § 511(b)(2).

Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 611 (Homeland Security Act § 513), Disability Coordinator

Requires the Federal Emergency Management Agency (FEMA) Administrator to appoint a Disability Coordinator who is to report directly to the FEMA Administrator to ensure that the needs of individuals with disabilities are addressed in emergency preparedness and disaster relief and specifies responsibilities of the Disability Coordinator.

Actions Taken:

- **Appointment**: The FEMA Administrator appointed the Disability Coordinator in July 2007. § 513(a).
- **Reporting Relationship**: FEMA officials told us in an e-mail shortly before we published this document that, although the Disability Coordinator is colocated with the Office of Equal Rights for administrative support purposes, the position reports directly to the Administrator. However, they did not provide documentation of the reporting relationship with their e-mail. § 513(a).
- **Consulting with Other Organizations**: The Disability Coordinator said that she consulted with three main organizations that represent the interests and rights of individuals with disabilities in emergency planning requirements and relief efforts in the event of a disaster. The three organizations are the National Council on Disability (NCD), the Inter-Agency Coordinating Council (ICC) on Preparedness and Individuals with Disabilities, and the National Advisory Council (NAC). In addition, the Disability Coordinator said that she has consulted with several disability advocacy groups including the National Association for the Blind, the National Association for the Deaf and Hard of Hearing, and the American Association of Retired Persons. § 513(b)(2)–(3).
- **Training Materials:** As of May 2008, FEMA completed approximately 30 training sessions for emergency managers regarding how to help people with disabilities, according to the Disability Coordinator. § 513(b)(5).
- **Promoting and Ensuring the Accessibility of Information:** The Disability Coordinator said that FEMA's Web site is compliant with section 508 of the Rehabilitation Act,[37] as is the agency's emergency related video programming. She also said that she works with state and local governments and local cable networks during disaster periods to help ensure that disaster information is accessible in multiple formats. § 513(b)(6)–(7).
- **Ensuring Rights Are Respected**: According to the Disability Coordinator, FEMA included, as part of its disability training sessions to emergency-response providers, information to ensure that the rights and wishes of individuals with disabilities regarding postevacuation residency and relocation are respected. FEMA is also developing a handbook for field use for federal, state, and local officials to accommodate those with disabilities. § 513(b)(9).
- **Ensuring the Needs of Individuals with Disabilities Are Included in the National Preparedness System**: The Disability Coordinator said that she has provided input into components of the National Preparedness System developed by

---

[37]In general, under section 508 of the Rehabilitation Act of 1973, as amended, federal agencies must ensure that their electronic and information technology allows for information and data to be accessible to individuals with disabilities.  29 U.S.C. § 794d.

FEMA and provided input into exercises conducted under the National Exercise Program. § 513(b)(10).

Areas to be Addressed:

- **Disseminating Best Practices**: FEMA is still in the process of developing and implementing best practices and model evacuation plans for individuals with disabilities. The Disability Coordinator said that as a best practice FEMA is developing "go kits" for people with developmental impairments, the hearing impaired, and the blind, which will be distributed in an emergency. The go kits will contain visual and hearing devices. For example, the go kit for the hearing impaired will include a teletypewriter, a keyboard with headphones, and a clipboard with sound capabilities. The go kits will be stored in the regions and will include a list of their contents and directions for use. Another best practice, according to the Disability Coordinator, is FEMA's development of a handbook for field use for federal, state, and local officials to accommodate those with disabilities. FEMA is also in the process of developing model evacuation plans for people with disabilities. § 513(b)(4).
- **Ensuring the Accessibility of Information**: FEMA has not yet fully developed and implemented alternative formats for alerts and warning signals issued by the agency for people with disabilities, but officials said that they are working with the National Oceanic and Atmospheric Administration to develop them. § 513(b)(7).
- **Ensuring the Availability of Accessible Transportation:** According to the Disability Coordinator, FEMA has begun to work with state emergency managers to help develop evacuation plans that include accessible transportation options. This official also said that FEMA is working with states to develop paratransit options as well as to coordinate the use of accessible vans for hospitals and nursing homes. § 513(b)(8).

Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 689, Individuals with Disabilities

Requires that the FEMA Administrator, in coordination with the NAC, the NCD, the ICC on Preparedness and Individuals with Disabilities, and the Disability Coordinator, develop guidelines to accommodate individuals with disabilities.

Actions Taken:

- **Initial Guidelines and Coordination**: According to FEMA officials, FEMA coordinated with the ICC on Preparedness and Individuals with Disabilities and the NCD to publish a reference guide titled "Accommodating Individuals with Disabilities in the Provisions of Disaster Mass Care, Housing, and Human Services." The reference guide describes existing legal requirements and standards relating to access for people with disabilities, with a focus on equal access requirements related to Emergency Support Function 6 (Disaster Mass Care, Housing, and Human Services). The reference guide states that it is not intended to satisfy all of the guideline requirements contained in section 689 of the Post-Katrina Act. FEMA officials said that they could not coordinate with FEMA's Disability Coordinator during the guide's development as she had yet to be hired. §689(a).

- **Additional Interim Guidelines**: In addition to the above reference guide, an "Interim Emergency Management Planning Guide for Special Needs Populations" was released for state and local emergency managers and planners and is out for public comment. This interim guidance, dated August 15, 2008, is available on FEMA's Web site at http://www.fema.gov/news/newsrelease.fema?id=45435. The interim guidance addresses some of the requirements contained in section 689 such as access to shelters and portable toilets and access to emergency communications and public information. § 689(a).

    Areas to be Addressed:

- **Complete Guidelines and Coordination**: Although FEMA's "Interim Management Planning Guide for Special Needs Populations" addresses some of the guideline requirements contained in section 689, it does not address others, such as access to first-aid stations and mass-feeding areas. Also, the interim guide does not reflect whether FEMA coordinated with the NAC or the NCD in its development. § 689(a).

    Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

<u>Post-Katrina Act § 689g (Stafford Act § 326), Designation of Small State and Rural Advocate</u>
Requires that the President establish in FEMA a Small State and Rural Advocate to advocate for fair treatment of small states and rural communities in the provision of Stafford Act assistance, and this section enumerates the duties of the advocate.

    Actions Taken:

- **Designation of Advocate:** The FEMA Small State and Rural Advocate assumed his position in August 2007. § 326(a).
- **Participation in the Declaration Process**: According to officials from FEMA's National Preparedness Directorate, as of October 2008, the Small State and Rural Advocate has reviewed more than 100 declaration requests and appeals. § 326(c)(1).
- **Reporting Requirement**: FEMA submitted a report to Congress in February 2007 detailing the extent to which disaster declaration regulations meet the particular needs of states with populations of less than 1,500,000 individuals and comply with statutory restrictions on the use of arithmetical formulas and sliding scales based on income or population, as required by the Post-Katrina Act. § 689g(b).

    Areas to be Addressed:

- **Assistance with Declaration Request Preparation**: The Small State and Rural Advocate stated that he has not assisted small population states in the preparation of any requests for declarations. § 326(c)(2).

Challenges DHS and FEMA Officials Identified:

- According to the Small State and Rural Advocate, there is some concern at FEMA over whether or not his role in reviewing declaration requests might conflict with his responsibility to help small population states prepare such requests.

For Further Reading:

- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Accommodating Individuals with Disabilities in the Provision of Disaster Mass Care, Housing, and Human Services: Reference Guide." http://www.fema.gov/oer/reference/index.shtm (accessed Sept. 10, 2008).
- U.S. Department of Homeland Security. Federal Emergency Management Agency and DHS Office for Civil Rights and Civil Liberties. "Interim Emergency Management Planning Guide for Special Needs Populations, Version 1.0." August 15, 2008.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Report to Congress: Small State and Rural Advocate Report on Disaster Declaration Regulations." February 2008.

**Enclosure XII: Implementing Controls to Prevent Waste, Fraud, and Abuse**

<u>Post-Katrina Act § 693, Oversight and Accountability of Federal Disaster Expenditures</u>
Authorizes the FEMA Administrator to designate up to 1 percent of the total amount of a mission assignment to be used by the recipient agency to perform oversight activities.

Areas to Be Addressed:
- **Oversight Tasking of Mission-Assigned Agencies:** FEMA officials stated that they have not exercised this authority. In addition, FEMA officials said that the agency has not established a mechanism for exercising this authority, such as modifying their mission assignment form to allow for designating funds to task an agency to perform oversight activities. § 693(a).

Challenges DHS and FEMA Officials Identified:
- Agency officials did not identify any challenges for this section.

<u>Post-Katrina Act § 696 (Stafford Act § 408), Fraud, Waste, and Abuse Controls</u>
Requires the Federal Emergency Management Agency (FEMA) Administrator to ensure that all FEMA programs administering federal disaster-relief assistance develop and maintain proper internal management controls to prevent and detect fraud, waste, and abuse; to adapt FEMA databases to include specific internal controls; and to ensure that the Inspector General reviews FEMA databases for the existence and implementation of the required internal controls. Also amends the Stafford Act to require the development of a system, including an electronic database, to counter improper payments in the provision of assistance to individuals and households.

Actions Taken:
- **Verification Procedures in the Individuals and Households Program (IHP):** According to FEMA, the agency established identity verification processes, which include verifying that the applicant's social security number is valid, matches the applicant's name, and does not belong to a deceased individual. Further, FEMA reported that it has implemented procedures to validate that the address an applicant reports as damaged was the applicant's primary residence during the time of the disaster and that the address is located within the disaster-affected area. This validation is done by transmitting the damaged address to a service that accesses several publicly available databases to confirm the applicant-provided information, according to FEMA officials. § 408(i)(1).
- **Actions to Minimize the Risk of Making Duplicative IHP Payments:** According to DHS's *Fiscal Year 2007 Annual Financial Report*, FEMA's internal controls and processes to prevent and detect duplicate and improper payments for the IHP needed improvement. The report listed eight corrective actions scheduled to be completed by June 2008. FEMA officials in the Disaster Assistance Directorate provided the following information about five of the eight corrective actions that it considers to be complete:

- Complete the expedited assistance policy: FEMA issued an interim critical needs assessment policy, the new name for the expedited assistance policy, in September 2008. FEMA's expedited assistance program, instituted in response to Hurricanes Katrina and Rita, authorized $2,000 in fast track assistance to eligible IHP applicants to help with immediate, emergency needs for food, shelter, clothing, and personal necessities. We reported in February 2006 that weak or nonexistent internal controls in processing applications left the government vulnerable to fraud and abuse, such as duplicative payments.[38] Under FEMA's new policy, a state must request, and FEMA must approve, critcal needs assistance based on an assessment that the disaster has caused extended displacement and unusual financial burdens on individuals and households. The new policy, among other things, reduces the amount of assistance from $2,000 to $500 per payment; limits the period of eligibility to 60 days; and requires identity and occupancy verification. The policy also states that FEMA will coordinate with agencies offering monetary assistance for critical needs to prevent duplication of assistance.

- Put in place a contract for data verification and prepopulation of verified data: According to officials in the Disaster Assistance Directorate, FEMA implemented database modifications in July 2008 that enabled it to prepopulate its individual assistance records with verified applicant data. These officials said that this was accomplished through a Systems Change Request to its National Emergency Management Information System (NEMIS), which performs numerous disaster-related activities, including providing disaster assistance to individuals. According to the Disaster Assistance Directorate officials, the prepopulation of data fields now occurs when the applicant's social security number is entered in the registration intake module, using data supplied by FEMA's data verification contractor, including the applicant's damaged property address, mailing address, and phone number.

- Develop IHP applicant recertification guidelines: FEMA amended its recertification processing guidance, which sets forth FEMA's procedures for processing applications for continued rental assistance, in August 2008. According to officials in FEMA's Disaster Assistance Directorate, its National Processing Service Center staff have been trained to implement the new procedures.[39]

- Develop a process for approving policy and guidance: To implement this corrective action, FEMA finalized a Rulemaking, Policy, and Federal Register Notice Approval Procedural Manual in April 2008.

- Develop a process to ensure consistent application of all disaster-specific policy: Officials from FEMA's Disaster Assistance Directorate reported that the FEMA National Processing Service Centers have taken the following actions to help ensure that employees are consistently applying disaster-specific policy:

---

[38]See GAO, *Expedited Assistance for Victims of Hurricanes Katrina and Rita: FEMA's Control Weaknesses Exposed the Government to Significant Fraud and Abuse*, GAO-06-403T (Washington, D.C.: Feb. 13, 2008).

[39]FEMA's National Processing Service Centers provide centralized disaster application service to FEMA customers and help coordinate with other assistance programs. The centers are to provide an automated "teleregistration" service—a toll-free phone bank through which disaster victims apply for IHP assistance and through which their applications are processed and their questions answered.

- After employees are trained on new policy and their corresponding procedures, they are tested using an automated survey tool to verify that they understand the new procedures. Real case examples are included in the assessments so that the actual application of their knowledge is verified prior to assigning employees to work cases.
- The National Processing Service Centers have established a weekly video teleconference schedule with Applicant Services Managers and Program Specialists to ensure that personnel understand all policy and procedural changes.
- The National Processing Service Centers have established the National Coordination Team Assistance Group, an in-house call group staffed by IHP subject-matter experts who are available to answer questions from front-line workers to help ensure that assistance applications are processed correctly and consistently.
- The National Processing Service Center Quality Control has expanded its function through an accelerated review of cases involving disaster-specific or new procedures. Reviewing such cases on a near real-time basis, the group's goal is to ensure caseworkers are applying procedures consistently and to make recommendations for improving training guidelines when problems are identified. § 408(i)(1)-(2).

- **Procedures to Minimize and Collect Duplicate IHP Payments:** FEMA established a process to identify and collect duplicative IHP payments. This process includes, among other things, FEMA's disaster assistance database automatically checking specific data fields in every applicant record for potentially duplicate applications, having a FEMA caseworker and a supervisor review potentially duplicate applications to determine if FEMA is entitled to collect a payment already made, and notifying the applicant of FEMA's decision to collect a duplicate payment while providing an appeal process for the applicant. § 408(i)(2)–(3), (5).
- **Instructions Regarding the Proper Use of IHP Assistance and How to Appeal Decisions:** After the submission of an IHP application, FEMA provides applicants with a copy of its application and a program guide, *Help after a Disaster: Applicant's Guide to the Individuals and Households Program*. Updated and reissued in July 2008, this guide provides applicants with information regarding the proper use of IHP payments. It also notifies applicants of FEMA's appeal process and the steps an applicant should take to have FEMA review any assistance-related decision such as requiring the applicant to state in writing why he or she believes that FEMA's decision was incorrect. § 408(i)(4)-(5).
- **Audits of Databases That Administer Federal Disaster Assistance**: Shortly before we published this document, FEMA officials told us that a contract is about to be awarded to perform an internal audit of FEMA's federal disaster relief assistance applications and databases. They told us the contract will support the statutorily required review by the Office of Inspector General, which is to determine if these applications and databases include the proper level of internal controls to prevent and detect fraud, waste, and abuse in FEMA's disaster relief programs, but they did not provide documentation of this contract. § 696(b).

Areas to Be Addressed:

- **Database Integration to Highlight Ineligible Applications:** According to FEMA's Information Technology Report submitted to Congress in September 2007 under section 640 of the Post-Katrina Act, FEMA uses NEMIS to perform numerous disaster-related activities, including providing disaster assistance to individuals and communities. Although NEMIS interfaces with FEMA's financial accounting system through a special module, FEMA has not yet taken action to ensure that applicant information collected in NEMIS is integrated with disbursement and payment records to determine ineligible applicants. § 696(a)(2)–(a)(4).

- **Actions to Minimize the Risk of Making Duplicative IHP Payments:** FEMA officials in the Disaster Assistance Directorate provided the following information about three of the eight corrective actions from DHS's *Fiscal Year 2007 Annual Financial Report* that are not complete:

  - Enhance training to assist FEMA personnel with the Lodging Expense Reimbursement System: According to officials from FEMA's Disaster Assistance Directorate, FEMA's National Processing Service Centers initiated a recredentialing training plan for all of its Human Service Specialists during fiscal year 2008. They stated that the curriculum included additional training in processing Lodging Expense Reimbursement. However, according to the Disaster Assistance Directorate Officials, the training plan was interrupted on several occasions due to other workload priorities and approximately 2/3 of the training plan, including the Lodging Expense Reimbursements training, was not completed. These officials said that National Processing Service Center staff will receive training in Lodging Expense Reimbursement prior to being assigned to work cases in the Lodging Expense Reimbursement queue for Hurricanes Gustav and Ike.

  - Award a contract to make available 6,000 call center agents: According to officials from FEMA's Disaster Assistance Directorate, FEMA reviewed the costs associated with a contract of this magnitude and determined it was prohibitively expensive. They said that the National Processing Service Centers are using other means to address their surge staffing needs.

  - Clarify and define the Separated Households Policy: According to officials for FEMA's Disaster Assistance Directorate, this corrective action is in progress. The officials told us that FEMA has developed a draft policy to clarify the circumstances in which FEMA will authorize separate applications and provide temporary housing assistance to more than one disaster applicant from a single household. § 408(i)(2).

Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

Post-Katrina Act § 698, Fraud Prevention Training Program

Requires the FEMA Administrator to develop and implement a program to provide training on the identification and prevention of waste, fraud, and abuse of federal disaster relief assistance.

Areas to Be Addressed:

- **Establishment of Program:** FEMA officials said that while the agency provides training to National Processing Service Center employees on how to identify potentially fraudulent practices on the part of the disaster assistance applicant, FEMA has yet to develop an overall policy on waste, fraud, and abuse. Once this overall policy is established, FEMA's Office of the Chief Counsel will have the lead for developing a training program, according to FEMA officials. § 698.

Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

For Further Reading:

- U.S. Department of Homeland Security. *Financial Annual Report, Fiscal Year 2007*. Washington D.C.: November 15, 2007.
- U.S. Department of Homeland Security. Federal Emergency Management Agency. *Help After a Disaster: Applicant's Guide to the Individuals and Households Program*. http://www.fema.gov/assistance/process/guide.shtm (accessed Sept. 10, 2008).

**GAO-09-59R Actions to Implement the Post-Katrina Act**

**Enclosure XIII: Managing Recovery from Hurricanes Katrina and Rita in the Gulf Coast Region**

Post-Katrina Act § 638, Hurricane Katrina and Hurricane Rita Recovery Offices

Requires the Federal Emergency Management Agency (FEMA) Administrator to establish recovery offices to provide all eligible federal assistance to individuals and state, local, and tribal governments affected by Hurricanes Katrina or Rita. Authorizes recovery offices in each of the following states, Mississippi, Louisiana, Alabama, and Texas, which shall terminate at the FEMA Administrator's discretion.

Actions Taken:

- **Establishment of Recovery Offices:** FEMA established Transitional Recovery Offices (TRO) in Mississippi, Louisiana, Alabama, and Texas. According to officials in FEMA's Gulf Coast Recovery Office, both the Mississippi and Louisiana TROs have a main office and two area field offices while the Alabama TRO is closed and remaining mission requirements are being transitioned to FEMA's Atlanta regional office. At the time of our work, FEMA officials in the Gulf Coast Recovery Office said that the Texas TRO was not yet closed but was in the process of transitioning the remaining mission requirements to the FEMA regional office in Denton, Texas. § 638(a).
- **Senior Leadership at Recovery Offices:** The four TROs are led by a Director with a supporting senior management team. § 638(b).
- **Staff at Recovery Offices:** FEMA officials in the Gulf Coast Recovery Office stated that when the TROs began initial operations, FEMA relied on temporary personnel, such as local hires and Disaster Assistance Employees, to meet staffing needs. The TROs then transitioned from these initial temporary personnel to personnel from the Cadre of Response Employees who were staffed for appointments of 2 years, according to FEMA officials. § 638(d)(1).
- **Staffing Levels:** FEMA officials in the Gulf Coast Recovery Office stated that individual TROs are responsible for assessing their own staffing needs. Officials from the TROs in Texas, Mississippi, and Louisiana reported using different mechanisms to evaluate staffing levels. For example, the Mississippi TRO officials reported reviewing staffing periodically. The office conducted a review earlier in 2008 of Individual Assistance staff to project the number of positions to be released by October 2008, according to FEMA officials. Louisiana TRO officials stated that they conducted a full vacancy analysis as well as two internal and external hiring cycles in an attempt to completely fill the identified vacancies. § 638(d)(2).
- **Assistance Provided**: According to officials in the Gulf Coast Recovery Office, FEMA established the office following Hurricanes Katrina and Rita to provide a single, unified point of contact for its multistate recovery efforts in Alabama, Louisiana, Mississippi, and Texas. A FEMA publication outlining TRO accomplishments in the 3 years since their establishment reports the following Gulf Coast recovery assistance:
  - FEMA has provided more than $7.8 billion to individuals and families through FEMA's Housing and Other Needs Assistance to address disaster-related personal property replacement, transportation assistance, healthcare, and other expenses related to moving and storage.

- o More than 143,000 families were provided with temporary housing units throughout the Gulf Coast, and FEMA has moved over 127,000 households out of temporary housing units into long-term housing solutions.
- o More than $11 billion has been obligated in Public-Assistance grants for emergency work and permanent repairs for infrastructure, including schools, hospitals, criminal justice facilities, and utilities.
- o FEMA's Hazard Mitigation Grant Program has allocated approximately $467 million. § 638(c).
- **Performance Measures:** Performance information for Public Assistance Program activities is posted on the Gulf Coast Recovery Office's Web site, http://www.fema.gov/hazard/hurricane/2005katrina/weekly.shtm, and is updated weekly. The Post-Katrina Act requires two specific performance measures—public assistance project worksheet completion rates and public assistance reimbursement times. Although the latter does not appear on the reports posted on the Web site and the former is not clearly stated in those reports, FEMA officials reported using both measures.
  - o <u>Project Worksheet Completion Rates</u>: The Web site posts reports containing information on various public assistance efforts in Alabama, Louisiana, Mississippi, and Texas as well as Gulf-wide. According to FEMA officials, the project worksheet completion rates are tracked on these reports. The officials said that the Joint Field Office tracks project worksheet completion rates daily by calculating the ratio of completed worksheets to worksheets anticipated to be completed. The reports show two project worksheet ratios. One ratio is based on worksheets obligated (the point at which funds are to be available to states) and the other ratio is for worksheets that have been entered into FEMA's National Emergency Management Information System. However, these officials did not explain the basis for these ratios (i.e., how completion is defined or how the anticipated number of worksheets is forecast).
  - o <u>Public Assistance Reimbursement Times</u>: According to officials in the Gulf Coast Recovery Office, FEMA has established a standard of 48 hours from the time the funds are approved in FEMA's system until the funds are made available to the states through the Department of Health and Human Services payment management system. Although a measure of reimbursement times does not appear in the reports on the Web site, these officials said that FEMA's Office of Chief Financial Officer tracks public assistance funds that do not meet the 48 hour standard and refers them to the FEMA finance center for resolution. § 638(e).

  Areas to Be Addressed:

- **Public Assistance Closeout Incentives:** Officials in FEMA's Disaster Assistance Directorate said that there is nothing that the agency can do to provide incentives for the closeout of public assistance projects without additional statutory authority to provide funds. However, FEMA officials commented that good management practices can expedite the closeout process. § 638(f).

  Challenges DHS and FEMA Officials Identified:

- Agency officials did not identify any challenges for this section.

For Further Reading:

- U.S. Department of Homeland Security. Federal Emergency Management Agency. "Gulf Coast Recovery Office Public Assistance Weekly Updates." http://www.fema.gov/hazard/hurricane/2005katrina/weekly.shtm (accessed on Sept. 5, 2008).
- U.S. Department of Homeland Security. Federal Emergency Management Agency. "3 Years Later: Recovery Continues along the Gulf Coast." http://www.fema.gov/hazard/hurricane/2005katrina/3years.shtm (accessed on Sept. 5, 2008).

**Enclosure XIV: Crosswalk between Post-Katrina Act Provisions & Enclosures**

| Section[40] | Provision Title | Location in Enclosures |
|---|---|---|
| § 601 | Short Title | Not Specifically Addressed—Operative Terms[41] |
| § 602 | Definitions | Not Specifically Addressed—Operative Terms |
| § 611 (Homeland Security Act (HSA) § 501) | Definitions | Not Specifically Addressed—Operative Terms |
| § 611 (HSA § 503) | Federal Emergency Management Agency (FEMA) | Enclosure II: Implementing Organizational Structures, Roles, and Authorities to Prepare for, Respond to, and Recover from Disasters |
| § 611 (HSA § 504) | Authority and Responsibilities | Enclosure II: Implementing Organizational Structures, Roles, and Authorities to Prepare for, Respond to, and Recover from Disasters |
| § 611 (HSA § 505) | Functions Transferred | Enclosure II: Implementing Organizational Structures, Roles, and Authorities to Prepare for, Respond to, and Recover from Disasters |
| § 611 (HSA § 506) | Preserving FEMA | Enclosure II: Implementing Organizational Structures, Roles, and Authorities to Prepare for, Respond to, and Recover from Disasters |
| § 611 (HSA § 507) | Regional Offices | Enclosure VI: Supporting Regional Preparedness and Cooperation |
| § 611 (HSA § 508) | National Advisory Council | Enclosure II: Implementing Organizational Structures, Roles, and Authorities to Prepare for, Respond to, and Recover from Disasters |
| § 611 (HSA § 509) | National Integration Center | Enclosure II: Implementing Organizational Structures, Roles, and Authorities to Prepare for, Respond to, and Recover from Disasters |
| § 611 (HSA § 510) | Credentialing and Typing | Enclosure X: Ensuring a Well-Trained, Professional Workforce to Prepare for, Respond to, and Recover from Disasters |
| § 611 (HSA § 511) | National Infrastructure | Enclosure XI: Applying Specific Expertise to |

[40]This crosswalk includes citations to each section of the Post-Katrina Act and identifies the enclosure to this letter in which we discuss a given section. In some instances, a section of the Post-Katrina Act amends another statute, principally the Homeland Security Act of 2002 (HSA) or the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act). In such instances, we include both the Post-Katrina Act section and, parenthetically, the section of the amended statute, for example the HSA or the Stafford Act.

[41]"Operative Terms" include such things as effective dates, definitional provisions, savings clauses, coverage changes, authorizations for appropriations, and technical and conforming amendments of the Post-Katrina Act. Because the provisions in this category are of a technical legal nature, we will not be able to address their implementation as free-standing provisions. Although we do not present stand-alone materials with respect to "operative terms," we may refer to them as we address related provisions in other categories.

| | Simulation & Analysis Center | Disaster Planning, Response, and Recovery Activities |
|---|---|---|
| § 611 (HSA § 512) | Evacuation Plans & Exercises | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 611 (HSA § 513) | Disability Coordinator | Enclosure XI: Applying Specific Expertise to Disaster Planning, Response, and Recovery Activities |
| § 611 (HSA § 514) | Department and Agency Officials | Enclosure II: Implementing Organizational Structures, Roles, and Authorities to Prepare for, Respond to, and Recover from Disasters |
| § 611 (HSA § 515) | National Operations Center | Enclosure II: Implementing Organizational Structures, Roles, and Authorities to Prepare for, Respond to, and Recover from Disasters |
| § 611 (HSA § 516) | Chief Medical Officer | Enclosure II: Implementing Organizational Structures, Roles, and Authorities to Prepare for, Respond to, and Recover from Disasters |
| § 612 | Technical and Conforming Amendments | Not Specifically Addressed—Operative Terms |
| § 613 | National Weather Service | Not Specifically Addressed—Operative Terms |
| § 614 | Effective Date | Not Specifically Addressed—Operative Terms |
| § 621 (5 USC § 10101) | Definitions | Not Specifically Addressed—Operative Terms |
| § 621 (5 USC § 10102) | Strategic human capital plan | Enclosure X: Ensuring a Well-Trained, Professional Workforce to Prepare for, Respond to, and Recover from Disasters |
| § 621 (5 USC § 10103) | Career paths | Enclosure X: Ensuring a Well-Trained, Professional Workforce to Prepare for, Respond to, and Recover from Disasters |
| § 621 (5 USC § 10104) | Recruitment bonuses | Enclosure X: Ensuring a Well-Trained, Professional Workforce to Prepare for, Respond to, and Recover from Disasters |
| § 621 (5 USC § 10105) | Retention bonuses | Enclosure X: Ensuring a Well-Trained, Professional Workforce to Prepare for, Respond to, and Recover from Disasters |
| § 621 (5 USC § 10106) | Quarterly report on vacancy rate in employee positions | Enclosure X: Ensuring a Well-Trained, Professional Workforce to Prepare for, Respond to, and Recover from Disasters |
| § 622 (HSA § 844) | Homeland Security Rotation Program | Enclosure X: Ensuring a Well-Trained, Professional Workforce to Prepare for, Respond to, and Recover from Disasters |
| § 623 (HSA § 845) | Homeland Security Education Program | Enclosure X: Ensuring a Well-Trained, Professional Workforce to Prepare for, Respond to, and Recover from Disasters |

| § 624 | Surge Capacity Force | Enclosure X: Ensuring a Well-Trained, Professional Workforce to Prepare for, Respond to, and Recover from Disasters |
|---|---|---|
| § 631 (Stafford § 613) | State Catastrophic Incident Annex | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 632 | Evacuation Preparedness Technical Assistance | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 633 (Stafford § 303) | Emergency Support and Response Teams | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 634 | Urban Search and Rescue Response System | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 635 | Metropolitan Medical Response Grant System | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 636 | Logistics | Enclosure VII: Improving Timely Delivery of Goods and Services in Disaster Events |
| § 637 | Prepositioned Equipment Program | Enclosure VII: Improving Timely Delivery of Goods and Services in Disaster Events |
| § 638 | Hurricane Katrina and Hurricane Rita Recovery Offices | Enclosure XIII: Managing Recovery from Hurricanes Katrina and Rita in the Gulf Coast Region |
| § 639 | Basic Life Supporting First Aid and Education | Enclosure IV: Providing Assistance to Disaster-Affected Areas and Populations |
| § 640 | Improvements to Information Technology Systems | Enclosure IX: Improving Information Technology Systems to Support Compatibility, Accessibility, and Tracking |
| § 640a | Disclosure of Certain Information to Law Enforcement Agencies | Enclosure IV: Providing Assistance to Disaster-Affected Areas and Populations |
| § 641 | Definitions | Not Specifically Addressed—Operative Terms |
| § 642 | National Preparedness | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 643 | National Preparedness Goal | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 644 | Establishment of National Preparedness System | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 645 | National Planning Scenarios | Enclosure V: Implementing the Components of the National Preparedness System and Other |

| | | Preparedness Activities |
|---|---|---|
| § 646 | Target Capabilities and Preparedness Priorities | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 647 | Equipment and Training Standards | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 648 | Training and Exercises | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 649 | Comprehensive Assessment System | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 650 | Remedial Action Management Program | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 651 | Federal Response Capability Inventory | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 652 | Reporting Requirements | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 653 | Federal Preparedness | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 654 | Use of Existing Resources | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 661 | Emergency Management Assistance Compact Grants | Enclosure VI: Supporting Regional Preparedness and Cooperation |
| § 662 | Emergency Management Performance Grants | Not Specifically Addressed—Operative Terms |
| § 663 | Transfer of Noble Training Center | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 664 | National Exercise Simulation Center | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 671 | Short Title | Not Specifically Addressed—Operative Terms |
| § 671 (HSA § 1801) | Office of Emergency Communications | Enclosure III: Supporting and Enhancing Emergency Communications |
| § 671 (HSA § 1802) | National Emergency Communications Plan | Enclosure V: Implementing the Components of the National Preparedness System and Other |

| | | Preparedness Activities |
|---|---|---|
| § 671 (HSA § 1803) | Assessments and Reports | Enclosure III: Supporting and Enhancing Emergency Communications |
| § 671 (HSA § 1804) | Coordination of Department Emergency Communications Grant Programs | Enclosure III: Supporting and Enhancing Emergency Communications |
| § 671 (HSA § 1805) | Regional Emergency Communications Coordination | Enclosure VI: Supporting Regional Preparedness and Cooperation |
| § 671 (HSA § 1806) | Emergency Communications Preparedness Center | Enclosure III: Supporting and Enhancing Emergency Communications |
| § 671 (HSA § 1807) | Urban and Other High Risk Area Communications Capabilities | Enclosure VI: Supporting Regional Preparedness and Cooperation |
| § 671 (HSA § 1808) | Definition | Not Specifically Addressed—Operative Terms |
| § 672 (HSA § 314) | Office for Interoperability and Compatibility | Enclosure III: Supporting and Enhancing Emergency Communications |
| § 673 (HSA § 315) | Emergency Communications Interoperability Research and Development | Enclosure III: Supporting and Enhancing Emergency Communications |
| § 674 | 911 and E911 Services Report | Enclosure III: Supporting and Enhancing Emergency Communications |
| § 675 | Savings Clause | Not Specifically Addressed—Operative Terms |
| § 681 (Stafford §§ 402, 502) | General Federal Assistance | Enclosure VII: Improving Timely Delivery of Goods and Services in Disaster Events |
| § 682 | National Disaster Recovery Strategy | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 683 | National Disaster Housing Strategy | Enclosure V: Implementing the Components of the National Preparedness System and Other Preparedness Activities |
| § 684 (Stafford § 404(a)) | Hazard Mitigation Grant Formula | Not Specifically Addressed—Operative Terms |
| § 685 (Stafford § 408(c)(4)) | Housing Assistance | Not Specifically Addressed—Operative Terms |
| § 686 (Stafford § 408(c)) | Maximum Amount Under Individual Assistance Programs | Not Specifically Addressed—Operative Terms |
| § 687 (Stafford § 302) | Coordinating Officers | Enclosure II: Implementing Organizational |

**GAO-09-59R Actions to Implement the Post-Katrina Act**

| | | Structures, Roles, and Authorities to Prepare for, Respond to, and Recover from Disasters |
|---|---|---|
| § 688 (Stafford § 102) | Definitions | Not Specifically Addressed—Operative Terms |
| § 689 | Individuals With Disabilities | Enclosure XI: Applying Specific Expertise to Disaster Planning, Response, and Recovery Activities |
| § 689a (Stafford § 308(a)) | Nondiscrimination in Disaster Assistance | Not Specifically Addressed—Operative Terms |
| § 689b | Reunification | Enclosure IV: Providing Assistance to Disaster-Affected Areas and Populations |
| § 689c | National Emergency Family Registry and Locator System | Enclosure IV: Providing Assistance to Disaster-Affected Areas and Populations |
| § 689d (Stafford § 408(c)(1)(A)) | Federal Assistance to Individuals and Households | Not Specifically Addressed—Operative Terms |
| § 689e (Stafford § 616) | Disaster Related Information Services | Enclosure IV: Providing Assistance to Disaster-Affected Areas and Populations |
| § 689f (Stafford § 425) | Transportation Assistance to Individuals and Households | Enclosure IV: Providing Assistance to Disaster-Affected Areas and Populations |
| § 689f (Stafford § 426) | Case Management Services | Enclosure IV: Providing Assistance to Disaster-Affected Areas and Populations |
| § 689g (Stafford § 326) | Designation of Small State and Rural Advocate | Enclosure XI: Applying Specific Expertise to Disaster Planning, Response, and Recovery Activities |
| § 689h (Stafford § 406(a)(3)(B)) | Repair, Restoration, and Replacement of Damaged Private Nonprofit Educational Facilities | Not Specifically Addressed—Operative Terms |
| § 689i | Individuals and Households Pilot Program | Enclosure IV: Providing Assistance to Disaster-Affected Areas and Populations |
| § 689j | Public Assistance Pilot Program | Enclosure IV: Providing Assistance to Disaster-Affected Areas and Populations |
| § 689k | Disposal of Unused Temporary Housing Units | Enclosure IV: Providing Assistance to Disaster-Affected Areas and Populations |
| § 691 | Advance Contracting | Enclosure VIII: Changing Contracting Practices to Enhance Preparedness and Strengthen Accountability |
| § 692 | Limitations on Tiering of Subcontractors | Enclosure VIII: Changing Contracting Practices to Enhance Preparedness and Strengthen |

| | | Accountability |
|---|---|---|
| § 693 | Oversight and Accountability of Federal Disaster Expenditures | Enclosure XII: Implementing Controls to Prevent Waste, Fraud, and Abuse |
| § 694 (Stafford § 307) | Use of Local Firms and Individuals | Enclosure VIII: Changing Contracting Practices to Enhance Preparedness and Strengthen Accountability |
| § 695 | Limitation on Length of Certain Noncompetitive Contracts | Enclosure VIII: Changing Contracting Practices to Enhance Preparedness and Strengthen Accountability |
| § 696 | Fraud, Waste and Abuse Controls | Enclosure XII: Implementing Controls to Prevent Waste, Fraud, and Abuse |
| § 697 | Registry of Disaster Response Contractors | Enclosure VIII: Changing Contracting Practices to Enhance Preparedness and Strengthen Accountability |
| § 698 | Fraud Prevention Training Program | Enclosure XII: Implementing Controls to Prevent Waste, Fraud, and Abuse |
| § 699 | Authorization of Appropriations | Not Specifically Addressed—Operative Terms |

Source: GAO Analysis

**Enclosure XV: Comments from FEMA**



U.S. Department of Homeland Security
Washington, DC  20472

November 14, 2008

Mr. William O. Jenkins
Director Homeland Security and Justice
Government Accountability Office
Washington, D. C.  20548

Dear Mr. Jenkins:

Thank you for providing the Department of Homeland Security (DHS) and specifically the Federal Emergency Management Agency (FEMA) the opportunity to review and comment on the draft Government Accountability Office (GAO) report, GAO-09-59R, *Actions to Implement the Post-Katrina Act* (PKEMRA).

PKEMRA contained over two hundred and fifty distinct requirements. As the GAO has noted in its draft report, DHS, and FEMA in particular, has been working to implement these requirements, and has completed or made substantial progress on virtually all provisions.

In this engagement, GAO sought to catalog what DHS had accomplished by August 1, 2008 in targeted sections of PKEMRA. While DHS and GAO collaborated in assembling a substantial amount of information, this report only briefly describes the substantive improvements in the wake of Hurricane Katrina. Time was not available for a more thorough review and substantive report.

Recent experiences, particularly in Hurricanes Gustav and Ike, show the positive result of FEMA and DHS improvements. Gustav and Ike have also highlighted areas where work remains to be done at all levels of government, particularly with disaster housing. All of these activities related to Gustav and Ike took place after August 1, 2008, and are therefore not covered in this report.

Below is an overview of improvements and a discussion of how these improvements have affected recent disaster response operations.

**Overview of Improvements**

Earlier this year, FEMA released the *National Response Framework (NRF)*. The NRF provides a clear picture of the resources and assets available through the Federal government and clarifies the agencies and programs engaged in disaster response and their role in support of state and local officials.

FEMA has worked with states to identify gaps and areas where they will most need support, recognizing that one size does not fit all and that any response will be tailored to an individual state's needs. Additionally, FEMA has developed teams that actively exercise and interface with states and local governments in advance of disaster events and can be pre-staged in a notice event, or stand ready to be deployed to the disaster area, arriving on the ground within hours of a storm or other disaster striking. These teams provide real-time situational awareness and visibility on issues and serve as an initial point of contact for state officials to communicate their need for Federal resources to FEMA.

1 of 6

FEMA has improved its ability to deliver assistance. This is reflected in alliances with logistics partners within the Federal family and with the private sector, clarified guidance to states on emergency life sustaining needs, and a strengthened ability to manage the logistics pipeline and get needed supplies and resources to a disaster site more quickly and efficiently.

Additionally, FEMA is focused on providing assistance in an easily accessible and coordinated manner through simple and effective delivery mechanisms. FEMA expanded its capability to register those in need of aid and to have mobile registration centers that can be on hand to help those without access to phones or computers. At the same time, FEMA strengthened its ability to detect and limit waste, fraud, and abuse of its assistance programs. FEMA continues to work with Federal, state, local, and voluntary partners to build a robust system for evacuation, sheltering, and housing, including our collaboration with the American Red Cross to implement the National Shelter System. FEMA established a National Emergency Family Registry and Locator System and a National Emergency Child Locator Center to help those displaced find their loved ones. FEMA also instituted a new policy to help those with pets safely evacuate a disaster area.

FEMA recognizes the need to have a comprehensive disaster housing framework, which can serve as a cornerstone for disaster recovery. PKEMRA called for a *National Disaster Housing Strategy (NDHS)* and provided FEMA with the opportunity to describe how the Nation provides housing to those affected by disasters. More importantly, it charts a new direction to better understand and meet the housing needs of disaster victims and communities. The *Strategy* captures lessons learned from Hurricane Katrina and subsequent disasters, embraces the larger issues of disaster victims beyond simply providing a structure, and seeks innovative and creative housing options. It elevates issues of safety, security and access to those with disabilities, emphasizes again and again the value of planning, and differentiates the catastrophe above all other disasters. For the first time in any single document, it addresses all forms of disaster housing and suggests that these issues merit full time, national attention. On July 23, 2008, FEMA published the draft NDHS for public comment and has been working closely with key stakeholders to finalize seven annexes to the NDHS that address specific issues in PKEMRA. FEMA is revising the Strategy now based on those comments and expects to release the final Strategy and annexes this December.

**Discussion of How these Improvements Affected Disaster Response Operations**

Beginning with the Midwest floods of May 2008, through the 2008 Hurricane Season, DHS and FEMA have responded to thirty-one major disaster declarations affecting 23 states and territories. The most notable disasters were Hurricanes Gustav and Ike. These storms, both projected at one time in their lifespan to be Category III or stronger storms at landfall, both had the capacity to impose catastrophic damage simultaneously to multiple states along the Gulf Coast. These storms were the most strenuous test of national, state, local and individual preparedness since Hurricanes Katrina and Rita. The response, and thus far the recovery to these storms provides evidence of increased preparedness, decisiveness by elected and appointed officials at every level of government, as well as by citizens who elected to evacuate in record numbers. Below are specific examples of improved or expanded response capabilities:

2 of 6

- In the response to Hurricane Gustav, nine Urban Search and Rescue (US&R) Task Forces were deployed to support Texas and Louisiana and eight Task Forces were deployed to support Georgia, Florida, Alabama, and Mississippi.

- For Hurricane Ike, nine Task Forces were deployed to Texas and six to Louisiana. The US&R Task Forces supported the states in critical search and rescue operations.

- During these disasters, the new FEMA Operational Planners:

  - Provided improved planning capability in the areas of current and future planning;
  - Facilitated extensive evacuation coordination/planning between the Regions and the states;
  - Synchronized interagency operational planning with the DHS Incident Management Planning Team, U.S. Northern Command, and other Departments and Agencies;
  - Supported responses to the Midwest Floods by projecting population impacts and needs before the flood wave struck;
  - Provided current and future operational planning analyses to inform decision makers by focusing more closely on performance metrics; and
  - Developed and implemented innovative planning strategies to address issues such as the Regional Planning Strategy used to respond to Hurricanes Gustav and Hanna concurrently.

- For Hurricane Gustav, FEMA and Federal, state, and local partners executed the Gulf Coast evacuation plan, developed over the past two years in coordination with the State of Louisiana, and evacuated more than 2 million people in 48 hours to multiple receiving states using multi-modal evacuation sources including air, train, and bus.

- Greater emphasis has been placed on the Mission Assignment (MA) process to include development of Pre-Scripted Mission Assignments (PSMAs), a mechanism used to facilitate rapid response. FEMA has increased the number of PSMAs in place to 236 with 33 agencies. This support ranges from heavy-lift helicopters from DoD, to generators from the USACE, to Disaster Medical Assistance Teams from HHS, to Emergency Road Clearing Teams from the U.S. Forest Service. The expanded catalog of PSMAs was put to good use during Gustav and Ike.

- FEMA Mobile Emergency Response Support System (MERS) assets continued to provide communications support to states/locals, as well as our response teams and other interagency response teams. For example, during Hurricanes Gustav and Ike, MERS:

  - Provided mobile emergency communications infrastructure to the Mayor of Galveston to support continuity of local government.
  - Supported maintenance and repair of communications equipment for local first responders on Galveston Island.
  - Repaired a main repeater at the Houston Reliance Center to sustain communications capabilities for the Texas Highway Patrol.

3 of 6

- Supported Texas Task Force Ike with land mobile radio communications to link the Task Force with the Interagency Working Group`.
- Provided command and control support to government of Houma, Louisiana.
- Supported communications capabilities for the Louisiana State Police by providing a 700 MHz radio system.
- Supported Terrebonne Parish in Louisiana with a 800 MHz radio system tower providing communications connection for the Parish.

- In October 2008, there were 3,837 FEMA reservists deployed in support of disaster response and recovery throughout the United States. In the Gulf Coast and other hurricane affected areas, there are 1,831 reservists serving in response to the tremendous need.

- In FY 08, FEMA competed an estimated 80% of its procurement dollars thereby exceeding its annual competitive obligations goal by 4 percentage points. In addition, FEMA has awarded an estimated $393 million to small businesses so far this fiscal year.

- Our efforts and improvements in service delivery of FEMA's recovery programs on behalf of disaster victims include:

  - **Housing Inspections** – Prior to declaration, housing inspectors are mobilized; they arrive in the affected areas immediately after the declaration and inspections began immediately following the disasters.
  - **Registration Intake** – Special Needs scenarios were added to FEMA's registration intake script beginning in 2008. The Special Needs questions are designed to obtain information from applicants about any loss of support required for mobility, sight, hearing or taking care of themselves or members of their household as a result of the disaster. The information about applicants' special needs is transmitted to the JFOs for appropriate follow-up.
  - **National Processing Servicing Center (NPSC) Operations** – The NPSC have the capability to expand operations to support 24/7 staffing immediately upon a declaration.
  - **Joint Housing Solutions Group and the Development of Comprehensive Housing Plan** - FEMA's Joint Housing Solutions Group partnered with Federal, state and local governments, and voluntary agencies, to develop a comprehensive housing plan that includes identifying the most heavily impacted areas, on-the-spot registration of shelter populations, analyzing shelter and mass care operations, transitioning applicants to temporary housing, individual case management for applicants with major damage to their primary residences, identifying available rental resources, assessing and assisting special need populations, and working with local voluntary agencies to identify additional assistance resources available to residents.

4 of 6

- **National Emergency Family Registry and Locator System (NEFRLS) and the National Emergency Child Locator Center (NECLC)** – These systems are activated immediately following disaster declarations, facilitating the reunification of displaced family members. These services help local and tribal governments and law enforcement agencies track and locate children who have become separated from their parents or guardians.

- **Mass Care Deployment to State Operations Center** – In advance of disaster declarations, FEMA has deployed a mass care staff member to the State Operations Center to promote situational awareness and enhance coordination with the American Red Cross and reporting of shelter statistics. Additionally, FEMA deployed **mass care and donations management specialists** in support of state and local sheltering operations, implementation of the National Shelter System, donations management, and delivery of mass care services.

- To provide technical assistance to the JFO, FEMA deployed the **FEMA Disabilities Coordinator** to different disasters this year. The Disabilities Coordinator has been invaluable advising mass care as well as the Disaster Mobile Home Program (DHOP) regarding unique issues and concerns facing those disaster victims with special needs.

- All affected states utilized the web-based volunteer and donations management application that was developed by **Aidmatrix** Foundation. This new resource tool was built to support state emergency management and FEMA's voluntary agency partners. The Aidmatrix system was very instrumental in helping the donations group acquire and disburse items.

- In April 2007, as part of the FEMA's reorganization, the Logistics Branch was elevated to Directorate level within the Agency. The Logistics Management Directorate (LMD) is FEMA's major program office responsible for policy, guidance, standards, execution and governance of logistics support, services and operations. Since that time, LMD has strengthened its business practices by enhancing its relationships with logistics partners for a more coordinated logistics response operation. Examples include:

  - In September 2007, LMD established a Distribution Management Strategy Working Group, comprised of its Federal, private and non-governmental organizations logistics partners, to conduct a comprehensive analysis and develop a comprehensive distribution and supply chain management strategy. Partners in this group include GSA, DOD (USNORTHCOM)/DLA, HHS, USACE, USDA USFS, and Mass Care (ESF6). The Resource Management Group, a sub-working group, has been established to assist in resourcing disaster requests for Logistics supplies and services.
  - LMD has established hundreds of mission-essential standby contracts and Inter-agency Agreements (IAAs) to enable more timely response.

5 of 6

**Summary**

DHS and FEMA continue to implement the remaining PKEMRA provisions, and apply lessons learned from this summer's hurricane season to all of disaster related activities. We look forward to continuing our cooperation with the GAO as we continue to improve the service DHS and FEMA offer to our country.

Sincerely,

Marko Bourne
Director, Office of Policy and Program Analysis

6 of 6

**Enclosure XVI: Contact and Acknowledgements:**

**Contact**
William Jenkins, (202) 512-8957 or jenkinswo@gao.gov

**Acknowledgements**
In addition to the contact named above, Leyla Kazaz, Assistant Director; and Kathryn Godfrey, Analyst-in-Charge, managed this assignment. Patrick Bernard, Gilbert Kim, David Lysy, and Rebecca Makar made significant contributions to the work. Christine Davis and Janet Temko also made significant contributions to the report by providing extensive legal support and a number of related contributions. David Alexander assisted with design and methodology. Lara Kaskie contributed communications expertise. Other contributors to the work include: Joel Aldape, Jack Bagnulo, Carrisa Bryant, Tony DeFrank, Christopher Keisling, Brian Lipman, P.J. Lusk, Deborah Sebastian, and Candice Wright.

**Related GAO Products**

*Emergency Management: Observations on DHS's Preparedness for Catastrophic Disasters*. GAO-08-868T. Washington, D.C.: June 11, 2008.

*National Response Framework: FEMA Needs Policies and Procedures to Better Integrate Non-Federal Stakeholders in the Revision Process*. GAO-08-768. Washington, D.C.: June 11, 2008.

*Homeland Security: DHS Improved its Risk-Based Grant Programs' Allocation and Management Methods, but Measuring Programs' Impact on National Capabilities Remains a Challenge*. GAO-08-488T. Washington, D.C.: March 11, 2008.

*National Disaster Response: FEMA Should Take Action to Improve Capacity and Coordination between Government and Voluntary Sectors*. GAO-08-369. Washington, D.C.: February 27, 2008.

*Hurricane Katrina: Ineffective FEMA Oversight of Housing Maintenance Contracts in Mississippi Resulted in Millions of Dollars of Waste and Potential Fraud*. GAO-08-106. Washington, D.C.: November 16, 2007.

*Information Technology: DHS's Human Capital Plan Is Largely Consistent with Relevant Guidance, but Improvements and Implementation Steps Are Still Needed*. GAO-07-425. Washington, D.C.: September 10, 2007.

*Disaster Housing: Implementation of FEMA's Alternative Housing Pilot Program Provides Lessons for Improving Future Competitions*. GAO-07-1143R. Washington, D.C.: August 31, 2007.

*Homeland Security: Observations on DHS and FEMA Efforts to Prepare for and Respond to Major and Catastrophic Disasters and Address Related Recommendations and Legislation*. GAO-07-1142T. Washington, D.C.: July 31, 2007.

*Emergency Management Assistance Compact: Enhancing EMAC's Collaborative and Administrative Capacity Should Improve National Disaster Response*. GAO-07-854. Washington, D.C.: June 29, 2007.

*Preliminary Information on Rebuilding Efforts in the Gulf Coast*. GAO-07-809R. Washington, D.C.: June 29, 2007.

*Homeland Security: Guidance from Operations Directorate Will Enhance Collaboration among Departmental Operations Centers*. GAO-07-683T. Washington, D.C.: June 20, 2007.

*Emergency Management: Most School Districts Have Developed Emergency Management Plans, but Would Benefit from Additional Federal Guidance*. GAO-07-609. Washington, D.C.: June 12, 2007.

*Homeland Security: Observations on DHS and FEMA Efforts to Prepare for and Respond to Major and Catastrophic Disasters and Address Related Recommendations and Legislation.* GAO-07-835T. Washington, D.C.: May 15, 2007.

*Child Welfare: Additional Federal Action Could Help States Address Challenges in Providing Services to Children and Families.* GAO-07-850T. Washington, D.C.: May 15, 2007.

*Homeland Security: Management and Programmatic Challenges Facing the Department of Homeland Security.* GAO-07-833T. Washington, D.C.: May 10, 2007.

*Gulf Coast Rebuilding: Preliminary Observations on Progress to Date and Challenges for the Future.* GAO-07-574T. Washington, D.C.: April 12, 2007.

*Department of Homeland Security: Progress Made in Implementation of Management Functions, but More Work Remains.* GAO-08-646T. Washington, D.C.: April 9, 2008.

*First Responders: Much Work Remains to Improve Communications Interoperability.* GAO-07-301. Washington, D.C.: April 2, 2007.

*Emergency Preparedness: Current Emergency Alert System Has Limitations, and Development of a New Integrated System Will Be Challenging.* GAO-07-411. Washington, D.C.: March 30, 2007.

*Disaster Preparedness: Better Planning Would Improve OSHA's Efforts to Protect Workers' Safety and Health in Disasters.* GAO-07-193. Washington, D.C.: March 28, 2007.

*Public Health and Hospital Emergency Preparedness Programs: Evolution of Performance Measurement Systems to Measure Progress.* GAO-07-485R. Washington, D.C.: March 23, 2007.

*Coastal Barrier Resources System: Status of Development That Has Occurred and Financial Assistance Provided by Federal Agencies.* GAO-07-356. Washington, D.C.: March 19, 2007.

*Hurricanes Katrina and Rita Disaster Relief: Continued Findings of Fraud, Waste, and Abuse.* GAO-07-300. Washington, D.C.: March 15, 2007.

*Homeland Security: Preparing for and Responding to Disasters.* GAO-07-395T. Washington, D.C.: March 9, 2007.

*Hurricane Katrina: Agency Contracting Data Should Be More Complete Regarding Subcontracting Opportunities for Small Businesses.* GAO-07-205. Washington, D.C.: March 1, 2007.

*Hurricane Katrina: Allocation and Use of $2 Billion for Medicaid and Other Health Care Needs.* GAO-07-67. Washington, D.C.: February 28, 2007.

*Disaster Assistance: Better Planning Needed for Housing Victims of Catastrophic Disasters.* GAO-07-88. Washington, D.C.: February 28, 2007.

*Highway Emergency Relief: Reexamination Needed to Address Fiscal Imbalance and Long-term Sustainability.* GAO-07-245. Washington, D.C.: February 23, 2007.

*Small Business Administration: Additional Steps Needed to Enhance Agency Preparedness for Future Disasters.* GAO-07-114. Washington, D.C.: February 14, 2007.

*Small Business Administration: Response to the Gulf Coast Hurricanes Highlights Need for Enhanced Disaster Preparedness.* GAO-07-484T. Washington, D.C.: February 14, 2007.

*Hurricanes Katrina and Rita: Federal Actions Could Enhance Preparedness of Certain State-Administered Federal Support Programs.* GAO-07-219. Washington, D.C.: February 7, 2007.

*Homeland Security Grants: Observations on Process DHS Used to Allocate Funds to Selected Urban Areas.* GAO-07-381R. Washington, D.C.: February 7, 2007.

*Homeland Security: Management and Programmatic Challenges Facing the Department of Homeland Security.* GAO-07-452T. Washington, D.C.: February 7, 2007.

*Homeland Security: Applying Risk Management Principles to Guide Federal Investments.* GAO-07-386T. Washington, D.C.: February 7, 2007.

*Hurricanes Katrina and Rita Disaster Relief: Prevention Is the Key to Minimizing Fraud, Waste, and Abuse in Recovery Efforts.* GAO-07-418T. Washington, D.C.: January 29, 2007.

*Reserve Forces: Actions Needed to Identify National Guard Domestic Equipment Requirements and Readiness.* GAO-07-60. Washington, D.C.: January 26, 2007.

*Budget Issues: FEMA Needs Adequate Data, Plans, and Systems to Effectively Manage Resources for Day-to-Day Operations.* GAO-07-139. Washington, D.C.: January 19, 2007.

*Transportation-Disadvantaged Populations: Actions Needed to Clarify Responsibilities and Increase Preparedness for Evacuations.* GAO-07-44. Washington, D.C.: December 22, 2006.

*Hurricanes Katrina and Rita: Continued Findings of Fraud, Waste, and Abuse.* GAO-07-252T. Washington, D.C.: December 6, 2006.

*Suggested Areas for Oversight for the 110th Congress.* GAO-07-235R. Washington, D.C.: November 17, 2006.

*Hurricanes Katrina and Rita: Unprecedented Challenges Exposed the Individuals and Households Program to Fraud and Abuse; Actions Needed to Reduce Such Problems in Future.* GAO-06-1013. Washington, D.C.: September 27, 2006.

*Catastrophic Disasters: Enhanced Leadership, Capabilities, and Accountability Controls Will Improve the Effectiveness of the Nation's Preparedness, Response, and Recovery System.* GAO-06-618. Washington, D.C.: September 6, 2006.

*Disaster Relief: Governmentwide Framework Needed to Collect and Consolidate Information to Report on Billions in Federal Funding for the 2005 Gulf Coast Hurricanes.* GAO-06-834. Washington, D.C.: September 6, 2006.

*Child Welfare: Federal Action Needed to Ensure States Have Plans to Safeguard Children in the Child Welfare System Displaced by Disasters.* GAO-06-944. Washington, D.C.: July 28, 2006.

*Small Business Administration: Actions Needed to Provide More Timely Disaster Assistance.* GAO-06-860. Washington, D.C.: July 28, 2006.

*Disaster Preparedness: Limitations in Federal Evacuation Assistance for Health Facilities Should Be Addressed.* GAO-06-826. Washington, D.C.: July 20, 2006.

*Individual Disaster Assistance Programs: Framework for Fraud Prevention, Detection, and Prosecution.* GAO-06-954T. Washington, D.C.: July 12, 2006.

*Expedited Assistance for Victims of Hurricanes Katrina and Rita: FEMA's Control Weaknesses Exposed the Government to Significant Fraud and Abuse.* GAO-06-655. Washington, D.C.:  June 16, 2006.

*Hurricanes Katrina and Rita: Improper and Potentially Fraudulent Individual Assistance Payments Estimated to Be between $600 Million and $1.4 Billion.* GAO-06-844T. Washington, D.C.: June 14, 2006.

*Hurricanes Katrina and Rita: Coordination between FEMA and the Red Cross Should Be Improved for the 2006 Hurricane Season.* GAO-06-712. Washington, D.C.: June 8, 2006.

*Disaster Preparedness: Preliminary Observations on the Evacuation of Vulnerable Populations due to Hurricanes and Other Disasters.* GAO-06-790T. Washington, D.C.: May 18, 2006.

*Lessons Learned for Protecting and Educating Children after the Gulf Coast Hurricanes.* GAO-06-680R. Washington, D.C.: May 11, 2006.

*Federal Emergency Management Agency: Factors for Future Success and Issues to Consider for Organizational Placement.* GAO-06-746T. Washington, D.C.: May 9, 2006.

*Hurricane Katrina: Planning for and Management of Federal Disaster Recovery Contracts.* GAO-06-622T. Washington, D.C.: April 10, 2006.

*Agency Management of Contractors Responding to Hurricanes Katrina and Rita.* GAO-06-461R. Washington, D.C.: March 15, 2006.

*Hurricane Katrina: GAO's Preliminary Observations Regarding Preparedness, Response, and Recovery.* GAO-06-442T. Washington, D.C.: March 8, 2006.

*Emergency Preparedness and Response: Some Issues and Challenges Associated with Major Emergency Incidents.* GAO-06-467T. Washington, D.C.: February 23, 2006.

*Disaster Preparedness: Preliminary Observations on the Evacuation of Hospitals and Nursing Homes Due to Hurricanes.* GAO-06-443R. Washington, D.C.: February 16, 2006.

*Expedited Assistance for Victims of Hurricanes Katrina and Rita: FEMA's Control Weaknesses Exposed the Government to Significant Fraud and Abuse.* GAO-06-403T. Washington, D.C.: February 13, 2006.

*Statement by Comptroller General David M. Walker on GAO's Preliminary Observations Regarding Preparedness and Response to Hurricanes Katrina and Rita.* GAO-06-365R. Washington, D.C.: February 1, 2006.

*Homeland Security: DHS' Efforts to Enhance First Responders' All-Hazards Capabilities Continue to Evolve.* GAO-05-652. Washington, D.C.: July 11, 2005.

*Continuity of Operations: Agency Plans Have Improved, but Better Oversight Could Assist Agencies in Preparing for Emergencies.* GAO-05-577. Washington, D.C.: April 28, 2005.

*Project SAFECOM: Key Cross-Agency Emergency Communications Effort Requires Stronger Collaboration.* GAO-04-494. Washington, D.C.: April 16, 2004.

**(440711)**

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: <br><br> Web site: www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7125 <br> Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7149 <br> Washington, DC 20548 |

Exhibit H



**United States Government Accountability Office**

Report to Congressional Requesters

**May 2023**

# FEMA DISASTER WORKFORCE

# Actions Needed to Improve Hiring Data and Address Staffing Gaps



# GAO Highlights

Highlights of GAO-23-105663, a report to congressional requesters

**May 2023**

# FEMA DISASTER WORKFORCE

## Actions Needed to Improve Hiring Data and Address Staffing Gaps

## Why GAO Did This Study

FEMA manages and coordinates the federal response and recovery efforts to disasters and other emergencies. In 2022, FEMA awarded $1.7 billion in disaster grants to survivors. Additionally, FEMA has been tasked with new responsibilities, including a key role in the federal response to the COVID-19 pandemic. In recent years, GAO has reported on workforce management challenges, such as staffing shortages, within FEMA.

GAO was asked to review FEMA's hiring process and staffing gaps. This report assesses 1) FEMA's authorities and processes for hiring and related challenges, and 2) FEMA's disaster workforce staffing gaps and the extent to which FEMA is monitoring and evaluating its efforts to fill these gaps through hiring.

GAO reviewed FEMA documentation on hiring processes and efforts, and interviewed officials from FEMA on efforts to increase staff and challenges with the hiring process. GAO also analyzed data from fiscal years 2019 through 2022 on FEMA staffing gaps and time frames for hiring.

## What GAO Recommends

GAO recommends that FEMA (1) document clear and consistent procedures to collect and calculate time-to-hire information; (2) document plans to monitor and evaluate the agency's progress on hiring efforts to address staffing gaps; and (3) develop performance measures that monitor and evaluate progress towards goals, including net growth targets for cadres to achieve FEMA's long-term disaster workforce staffing goal. FEMA concurred with the recommendations.

View GAO-23-105663. For more information, contact Chris Currie at (404) 679-1875 or CurrieC@gao.gov

## What GAO Found

The Federal Emergency Management Agency (FEMA) uses different processes under various statutory authorities to hire employees by type, such as permanent full-time employees and temporary reservists. Additionally, FEMA uses hiring flexibilities to hire employees for critical positions and augments its workforce if a disaster or emergency exceeds FEMA's capacity, such as with local hires and contractors, among others. FEMA also reports its time frames for hiring employees, known as time-to-hire, on a quarterly basis to the Department of Homeland Security (DHS). However, GAO found FEMA has challenges calculating and reporting consistent and accurate timeframes for hiring to DHS. Documenting consistent methods would help FEMA accurately calculate its timeframes for hiring and use more reliable information to determine potential workforce changes needed to better prepare for future emergencies.

As of the beginning of fiscal year 2022, FEMA had approximately 11,400 disaster employees on board and a staffing goal of 17,670, creating an overall staffing gap of approximately 6,200 staff (35 percent) across different positions. FEMA officials attributed recent staffing gaps to multiple factors. These included additional responsibilities due to COVID-19 and managing the rising disaster activity during the year, which increased burnout and employee attrition.



Staffing Gaps for the Federal Emergency Management Agency's (FEMA's) Disaster Workforce, Fiscal Years 2019 through 2022

Source: GAO analysis of FEMA data. | GAO-23-105663

Starting in 2019, FEMA initiated several efforts, including hiring events and use of contractors, to increase its disaster workforce and reduce these gaps. While FEMA is taking steps to address staffing gaps, GAO found that it is unclear if these efforts are effective. FEMA lacks documented plans and performance measures to monitor and evaluate its hiring progress within cadres (workforce groups) toward the larger disaster workforce goal. Without documented plans and measures, such as cadre net growth targets, it is difficult for FEMA to determine how effective hiring efforts are at closing staffing gaps and prioritizing hiring efforts within the disaster workforce accordingly.

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 4 |
| | FEMA Uses Various Hiring Authorities and Processes, but Has Challenges Calculating Consistent and Accurate Hiring Time Frames | 10 |
| | FEMA Has Taken Steps to Address Staffing Gaps, but Opportunities Exist to Better Monitor and Evaluate Hiring Efforts | 17 |
| | Conclusions | 25 |
| | Recommendations for Executive Action | 25 |
| | Agency Comments | 25 |
| Appendix I | Comments from the Federal Emergency Management Agency | 27 |
| Appendix II | GAO Contacts and Staff Acknowledgments | 31 |
| Figures | | |
| | Figure 1: Summary of Employee Types in the Federal Emergency Management Agency's (FEMA) Disaster Workforce | 5 |
| | Figure 2: Federal Emergency Management Agency's (FEMA) Workforce by Employee Type, Beginning of Fiscal Year 2022 | 6 |
| | Figure 3: Federal Emergency Management Agency's (FEMA) Disaster Workforce by Cadre, Beginning of Fiscal Year 2022 | 8 |
| | Figure 4: Federal Emergency Management Agency's (FEMA) Competitive and Non-Competitive Hiring Steps | 12 |
| | Figure 5: Overall Staffing Gaps for the Federal Emergency Management Agency's (FEMA's) Disaster Workforce, Fiscal Years 2019-2022 | 18 |
| | Figure 6: Federal Emergency Management Agency's (FEMA) Force Capacity by Cadre | 20 |

**Abbreviations**

| | |
|---|---|
| CORE | Cadre of On-Call Response and Recovery Employees |
| COVID-19 | Coronavirus Disease 2019 |
| DHS | Department of Homeland Security |
| FEMA | Federal Emergency Management Agency |
| OPM | Office of Personnel Management |
| Stafford Act | Robert T. Stafford Disaster Relief and Emergency Assistance Act |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



441 G St. N.W.
Washington, DC 20548

May 2, 2023

The Honorable Bennie G. Thompson
Ranking Member
Committee on Homeland Security
House of Representatives

The Honorable Troy A. Carter, Sr.
Ranking Member
Subcommittee on Emergency Management and Technology
Committee on Homeland Security
House of Representatives

The Federal Emergency Management Agency (FEMA) leads our nation's efforts to prepare for, protect against, respond to, recover from, and mitigate against the risk of disasters. Each year FEMA responds and provides support to a significant number of disasters and emergencies. In 2022, FEMA reported providing assistance for 57 major disaster and emergency declarations, such as Hurricane Ian and Hurricane Fiona, 34 fire incidents, and awarded approximately $1.7 billion in grants to disaster survivors. According to the National Oceanic and Atmospheric Administration, in 2021, there were 20 weather and climate-related disaster events with losses exceeding $1 billion each in the United States.[1] In 2020, FEMA responded and provided support to 230 presidentially declared emergencies and major disasters, an all-time high. According to FEMA, more frequent, severe, and complex disasters, including the COVID-19 pandemic, have created an unprecedented demand for FEMA's workforce.

FEMA provides assistance in responding to a disaster when effective response and recovery are beyond the capabilities of state and local governments. As of April 2022, FEMA employed over 22,000 individuals to manage its disaster response. In recent years, we have reported on workforce management challenges within FEMA, such as challenges related to staffing shortages, workforce qualifications, and staff

---

[1]The National Oceanic and Atmospheric Administration and its centers manage archives of atmospheric, coastal, geophysical, and oceanic research in the world, including environmental data. NOAA National Centers for Environmental Information (NCEI) *U.S. Billion-Dollar Weather and Climate Disasters* (2023), accessed February 2023, https://www.ncei.noaa.gov/access/billions/.

development, and their impact. For example, we reported in May 2020 that FEMA faced staffing shortages across over half of its cadres when disasters made landfall or began during the 2017 and 2018 disaster seasons, resulting in fewer staff available to deploy for disasters or emergencies.[2] Cadres are groups organized by operational or programmatic functions.

In addition to its responsibilities responding to the rising number of disasters and other emergencies, prior and current administrations have tasked FEMA with new responsibilities, including playing a key role in the federal response to the COVID-19 pandemic. For example, it established mass vaccination sites and provided funeral assistance to families, the scope of which was unprecedented for the agency. Prior to the COVID-19 pandemic, FEMA's Disaster Relief Fund—the primary source of federal disaster assistance for state, local, tribal, and territorial governments, as well as individuals—had never been used during a nationwide public health emergency. As of December 2022, FEMA had obligated nearly $110 billion from the Disaster Relief Fund to respond to COVID-19, according to FEMA's January 2023 *Disaster Relief Fund: Monthly Report to Congress*.[3] FEMA also assisted in the Afghan refugee resettlement efforts and helped provide shelter and emergency supplies for unaccompanied children at the southwest border.

In light of concerns about FEMA's human capital needs, you asked us to review issues related to FEMA's hiring process and staffing gaps. This report examines: (1) FEMA's authorities and processes for hiring and related challenges, and (2) FEMA's disaster workforce staffing gaps and the extent to which FEMA is monitoring and evaluating its efforts to fill these gaps through hiring.

To examine what FEMA's hiring processes are and any related challenges, we collected and reviewed FEMA documentation related to hiring, such as policies and guidance for hiring different FEMA employee types. We also met with officials from FEMA's Human Capital Office and Field Operations Directorate to further understand the different processes for hiring under statutory authorities, as well as the challenges FEMA

---

[2]GAO, *FEMA Disaster Workforce: Actions Needed to Address Deployment and Staff Development Challenges,* GAO-20-360 (Washington, D.C.: May 4, 2020).

[3]Federal Emergency Management Agency, *Disaster Relief Fund: Monthly Report to Congress as of December 31, 2022* (January 11, 2023).

faces when hiring.[4] We collected hiring data from the most recent fiscal years, fiscal years 2019 through 2022, on FEMA's time frames for hiring, which FEMA uses to report to the Department of Homeland Security and inform management about hiring decision-making. We assessed the hiring processes against internal control principles related to documentation and quality information in the *Standards for Internal Control in the Federal Government* for the purposes of calculating and reporting hiring time frames.[5]

To determine the reliability of data related to hiring time frames (also known as time-to-hire), we interviewed knowledgeable FEMA officials and conducted basic electronic testing on the data.[6] When asked about potential limitations of the data, FEMA officials cited challenges with its data system and potential data integrity issues. We also identified inconsistencies in how FEMA calculated its time frames for hiring. As a result, we determined FEMA's hiring data were not sufficiently reliable for the purposes of reporting FEMA time frames for hiring, overall or by other aspects, such as by employee type or hiring steps, as discussed later in the report.

To identify FEMA's staffing gaps and the extent to which FEMA is monitoring and evaluating efforts to fill these staffing gaps through hiring, we collected and reviewed FEMA documentation related to hiring, such as internal reports and results of FEMA's efforts to hire more staff. We also met with officials from FEMA's Human Capital Office and Field Operations Directorate to further understand FEMA's different hiring efforts to fill staffing gaps, as well as the challenges FEMA faces when hiring disaster staff. We assessed FEMA's hiring efforts against internal control principles related to documentation and monitoring in the *Standards for Internal Control in the Federal Government*, as well as

---

[4]FEMA's Human Capital Office and Field Operations Directorate are FEMA's key offices responsible for hiring and staffing, as discussed later in the report.

[5]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: Sept. 2014).

[6]FEMA uses the Office of Personnel Management's definitions of time-to-hire, which state agencies will report time-to-hire with two distinct end dates – from the time the hiring need is validated by a hiring manager to (1) the applicant's acceptance of a tentative offer, and (2) the day of the new employee enters on duty (i.e., starts work).

monitoring and evaluation principles in the *Key Principles for Effective Strategic Workforce Planning*.[7]

We collected and analyzed hiring and staffing data from the most recent fiscal years, from fiscal years 2019 to 2022, on FEMA's staffing targets and actual on-boarded staff. We used the number of staff as our unit of measurement in this report, as opposed to full-time equivalents, because FEMA officials told us they use this method to measure staffing gaps and prioritize hiring for specific positions. To determine the reliability of the staffing targets data, we interviewed FEMA officials about their methodology for developing the staffing targets. We discussed their disaster workforce review process, including statistical modeling methods, outputs, and field feedback, as well as any potential limitations with the data. We also reviewed related documentation and discussed the use of the statistical modeling process to identify staffing gaps with FEMA's subject matter experts. We determined that the data were sufficiently reliable for purposes of reporting FEMA's identified staffing gaps among its disaster workforce.

We conducted this performance audit from January 2022 to May 2023 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## Overview of FEMA's Disaster Workforce

The federal disaster workforce is designed to scale up or down depending on the timing and magnitude of disasters. Specifically, under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act), FEMA has the authority to augment its permanent full-time staff with temporary personnel and deploy non-FEMA staff members when needed.[8] FEMA has historically relied on both permanent and temporary staff members to respond to presidentially declared disasters. FEMA has several different employee types, as shown in figure 1, that operate out of

[7]GAO-14-704G; GAO, *Key Principles for Effective Strategic Workforce Planning*, GAO-04-39 (Washington, D.C.: Dec. 11, 2003).

[8]See 42 U.S.C. § 5149.

the agency's national headquarters, regional offices, and joint field offices at specific disaster locations.

**Figure 1: Summary of Employee Types in the Federal Emergency Management Agency's (FEMA) Disaster Workforce**

| Stafford Act employees[a] | | Title 5 employees[b] |
|---|---|---|
| **Reservists** | **Cadre of On-Call Response/Recovery Employees (CORE)** | **Permanent** |
| Staff that work on an intermittent basis and are deployed as needed to fulfill incident management (disaster) roles. Deployments to the field may last up to a maximum of 50 consecutive weeks. | Temporary employees who support disaster-related activities and have 2 to 4-year appointments, which can be renewed. | Full-time or part-time employees who make up FEMA's day-to-day workforce responsible for administering the agency's ongoing program activities in headquarters and regional offices. During disasters, FEMA can deploy these employees as needed. |

**Other**

FEMA may hire local residents on a temporary basis for disaster support, to include working at fixed facilities, such as FEMA call centers or regional offices. FEMA also augments its workforce needs through the Department of Homeland (DHS) Surge Capacity Force and FEMA Corps members. The DHS Surge Capacity Force is comprised of DHS and other federal employees who volunteer to deploy for disaster operations. FEMA Corps members are members of AmeriCorps National Civilian Community Corps who work under the supervision of FEMA staff.

Source: GAO summary of FEMA documents. | GAO-23-105663

[a]The Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act) generally defines the federal government's role during response and recovery after a presidential major disaster or emergency declaration and provides that FEMA may hire temporary personnel as may be necessary, without regard to the provisions of title 5 governing appointments in competitive service. 42 U.S.C. § 5149.

[b]Title 5 refers to the title of the United States Code that generally establishes the law for managing human resources in the federal government. Title 5 employees can be hired on a permanent or temporary, full- or part-time basis.

As shown in figure 2, the Cadre of On-Call Response and Recovery Employees (CORE) made up the largest portion of FEMA's workforce at the beginning of fiscal year 2022, followed by reservists, permanent full-time and part-time employees, and other employees, such as local hires.

**Figure 2: Federal Emergency Management Agency's (FEMA) Workforce by Employee Type, Beginning of Fiscal Year 2022**



Source: GAO analysis of FEMA data.  |  GAO-23-105663

Note: Permanent full-time employees are federal employees that support FEMA's mission areas and operations on a daily basis. Reservists are temporary not-to-exceed 2-year appointments who work intermittently as required during incident management operations and must be available to deploy as needed. Cadre of On-Call Response/Recovery Employees (CORE) are a type of temporary full-time employee hired to directly support response and recovery efforts related to disasters. Other includes local hires (830), temporary employees (132), Senior Executive Service and Schedule C employees (95) and a Presidential appointment requiring Senate confirmation (1). Percentages may not add to 100 percent due to rounding.

Every FEMA employee is assigned to one or more of four position categories. Staff assigned to incident management positions deploy to disaster sites to administer federal emergency response and recovery programs. Staff assigned to the other three position categories—incident support, ancillary support, and mission essential—provide support services to deployed incident management staff, as well as to FEMA more generally.

## FEMA Cadres

FEMA's incident management workforce, or disaster workforce, is organized into 23 cadres.[9] Cadres are groups of FEMA employees organized by type of work (organizational or programmatic function). These groups are based on skills and experience and generally deploy to an incident at varying points in the response and recovery phases, depending on their functions. For example, the Public Assistance cadre administers assistance to state, local, tribal, and territorial governments, as well as certain types of private non-profit organizations, for debris removal, implementation of emergency protective measures, and permanent restoration of infrastructure.

FEMA's five largest cadres – (1) Public Assistance; (2) Individual Assistance; (3) Logistics; (4) Hazard Mitigation; and (5) Disaster Survivor Assistance – represented two-thirds of their incident management workforce (just over 10,000 employees) at the beginning of fiscal year 2022, as shown in figure 3. The other 18 cadres represent the other third of their disaster workforce (just over 5,000 employees).

---

[9]FEMA's cadre program areas are: Acquisitions, Alternative Dispute Resolution, Civil Rights, Disability Integration, Disaster Emergency Communications, Disaster Field Training Operations, Disaster Survivor Assistance, Environmental Historic Preservation, External Affairs, Field Leadership, Financial Management, Hazard Mitigation, Human Resources, Individual Assistance, Information Technology, Logistics, Interagency Recovery Coordination, Office of Chief Counsel, Operations, Planning, Public Assistance, Safety, and Security.



**Figure 3: Federal Emergency Management Agency's (FEMA) Disaster Workforce by Cadre, Beginning of Fiscal Year 2022**

Source: GAO analysis of FEMA data. | GAO-23-105663

Note: Cadres are FEMA groups of employees organized by type of work. These groups are based on skills and experience and generally deploy to an incident at varying points in the response and recovery phases, depending on their functions. The 18 other cadres are: Acquisitions, Alternative Dispute Resolution, Civil Rights, Disability Integration, Disaster Emergency Communications, Disaster Field Training Operations, Environmental Historic Preservation, External Affairs, Field Leadership, Financial Management, Human Resources, Information Technology, Interagency Recovery Coordination, Office of Chief Counsel, Operations, Planning, Safety, and Security. Percentages may not add to 100 percent due to rounding.

FEMA employees' roles and responsibilities vary depending on their employee type, position category, and credentials, among other considerations. For example, a permanent staff employee may work day-to-day in a FEMA headquarters office, such as FEMA's Office of Policy and Program Analysis, but may also serve as a Logistics Specialist in FEMA's Logistics cadre if the employee is certified with a cadre skill, task or experience.[10]

## FEMA Offices Responsible for Hiring and Staffing

FEMA's Office of the Chief Human Capital Officer is the lead entity responsible for recruitment, hiring, and retention within FEMA. For the purposes of this report, we refer to this office as FEMA Human Capital. FEMA Human Capital also collects and reports information related to the

---

[10]FEMA's Office of Policy and Program Analysis is responsible for policy coordination, analysis, and driving linkages between strategy, budget execution, performance integration and accountability, among other things.

agency's time frames for hiring employees, known as time-to-hire, to the Department of Homeland Security (DHS). FEMA Human Capital uses the Office of Personnel Management's (OPM) definitions of time-to-hire, which state agencies will report time-to-hire with two distinct end dates – from the time the hiring need is validated by a hiring manager[11] to (1) the applicant's acceptance of a tentative offer, and (2) the day of the new employee enters on duty (i.e., starts work).

FEMA's Field Operations Directorate is the lead entity responsible for setting incident management (disaster) staffing targets and deploying staff to disaster sites. In addition, the Field Operations Directorate organizes the disaster workforce, and ensures training and qualifications of the incident workforce. This component is also responsible for providing disaster-related training to the disaster workforce.

FEMA Human Capital works with the Field Operations Directorate to understand FEMA's disaster requirements, set staffing targets, and hire the individuals the cadres select. For example, officials told us FEMA Human Capital and Field Operations Directorate work together during the annual review of FEMA's disaster workforce to establish staffing targets and identify gaps, as discussed in more detail later in this report.

---

[11]FEMA officials are to take multiple steps prior to validate a hiring need, such as identifying the vacancy within an office, ensuring funding for salary and benefits is available, discussing position duties, and discussing recruitment options, among others.

# FEMA Uses Various Hiring Authorities and Processes, but Has Challenges Calculating Consistent and Accurate Hiring Time Frames

## FEMA Hiring Processes and Authorities Depend on Employee Type

FEMA uses different processes under Title 5 and the Stafford Act to hire its employees.[12] In addition, FEMA uses hiring flexibilities to quickly hire employees to meet critical position needs and augments additional workforce needs through the DHS Surge Capacity Force, the AmeriCorps' FEMA Corps, and contractors.

**Title 5 (Competitive hiring).** Under Title 5, FEMA hires permanent employees generally through a competitive process that requires various steps, such as posting a job announcement for open competition and applying preferences for veteran applicants, among others. Permanent employees make up FEMA's workforce that is responsible for supporting FEMA's mission areas and operations on a daily basis, and administering programs in the headquarters and regional offices. Under the Title 5 competitive process, FEMA identifies and validates there is a hiring need to fill a vacancy and FEMA Human Capital drafts a job announcement in coordination with the corresponding FEMA Program or Regional Office.

Once finalized, FEMA Human Capital posts the job announcement on the USAJOBS website.[13] After the announcement closes, FEMA Human

---

[12]Under Title 5, which is the title of the United States Code that generally establishes the law for managing human resources in the federal government, employees can be hired on either a full- or part-time basis. The Stafford Act generally defines the federal government's role during response and recovery after a presidential major disaster or emergency declaration and provides that FEMA may hire temporary personnel as may be necessary, without regard to the provisions of title 5 governing appointments in competitive service. 42 U.S.C. § 5149.

[13]Since 1996, USAJOBS has helped agencies fill civil service job vacancies by informing job seekers about job openings they may be eligible for and how to apply for them. Office of Personnel Management, accessed February 2023, https://www.usajobs.gov/.

Capital staff review applicants for minimum qualifications and select eligible candidates for further review (known as a selection certificate or certificate of eligibles). The Program or Regional Office reviews the certificate, conducts interviews, and makes selections. FEMA Human Capital extends a tentative job offer to the selected candidate or candidates. FEMA then initiates a background investigation for security. Once completed, FEMA Human Capital may then extend a final job offer to the selected candidates. If accepted, FEMA and the candidate negotiate an entry-on-duty date, among other details.

**Stafford Act (Non-competitive hiring).** Under the Stafford Act, FEMA hires temporary personnel to carry out disaster-related activities who are exempt from provisions of Title 5 governing the competitive service, including competitive examination, rating and ranking, among others. As such, although FEMA may post job announcements on USAJOBS for Stafford Act positions, FEMA may also hire individuals through a noncompetitive process referred to as a 'name request'. Name requests are alternative hiring procedures by which FEMA solicits candidates through venues other than the USAJOBS website. For example, FEMA may solicit and hire candidates via employee referrals. According to FEMA officials, current FEMA employees may send names of persons, friends or family members they believe may be suitable to FEMA workforce.

FEMA may also solicit and hire candidates via other venues, such as referrals from state and local partners, recruitment events, and internal announcements. FEMA guidance for name requests states program offices must submit a justification in writing that describes the qualifications of an individual referred and that a division chief must approve it. FEMA's Human Capital Office also determines if the person referred meets minimum qualifications. Additionally, FEMA guidance states that FEMA must also interview individuals referred via name requests, check references, and follow job offer procedures. FEMA's Stafford Act employee types include Cadre of On-Call Response Employees (CORE) employees and reservists. See figure 4 for more information on FEMA's competitive and non-competitive hiring steps under Title 5 and the Stafford Act.

**Figure 4: Federal Emergency Management Agency's (FEMA) Competitive and Non-Competitive Hiring Steps**

**Competitive** (Title 5)

1. Validate hiring need
2. Draft job announcement and confirm hiring strategy
3. Generally post job announcement on USAJobs.gov
4. Receive applications, notify applicants, and close job announcement
5. Evaluate applications
6. Review eligible candidates, conduct interviews, and make selection(s)
7. Make tentative job offer
8. Initiate security check
9. Make final offer
10. Enter on duty

**Non-competitive** (Stafford Act)

1. Validate hiring need
2. Receive employee, state, or local partner referral, or post a job announcement on USAJobs.gov or other platforms (name request)
3. Obtain justification in writing and approval by Division chief or higher
4. Review minimum qualifications and approval by human capital
5. Review references, conduct interviews, make selection, and initiate security check
6. Make final offer and enter on duty

Source: GAO summary of FEMA documents. | GAO-23-105663

Note: Under Title 5, which is the title of the United States Code that generally establishes the law for managing human resources in the federal government, employees can be hired on either a full- or part-time basis. The Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act) generally defines the federal government's role during response and recovery after a presidential major disaster or emergency declaration and provides that FEMA may hire temporary personnel as may be necessary, without regard to the provisions of title 5 governing appointments in competitive service. 42 U.S.C. § 5149.

FEMA officials stated that hiring managers use Title 5 or Stafford Act processes to hire employees based on the type of position. They noted that for CORE, which are Stafford Act positions, they follow OPM qualification standards that state applicants must have 1 year of specialized experience at the next lower position level to qualify and be hired for that position. However, that is not a rule for Stafford Act reservist or local hires. Additionally, if a position requires more FEMA-specific disaster experience, a hiring manager may choose to look inward and hire through a name request under the Stafford Act.

**Hiring flexibilities.** In addition to its traditional hiring authorities, FEMA officials told us they use hiring flexibilities to quickly hire qualified

candidates for critical positions. FEMA officials stated there are many hiring flexibilities, and hiring managers can appoint individuals under hiring authorities without posting a job announcement. However, even if FEMA posts a job announcement for a position, FEMA still also has flexibilities that allow it to hire non-competitive eligible applicants.[14] In fiscal year 2021 through mid-April 2022, FEMA primarily used 11 hiring flexibilities under Title 5 to hire qualified candidates for critical positions. Half of the 11 hiring flexibilities FEMA used accounted for over 92 percent of the combined fiscal year 2021 and 2022 appointments using hiring flexibilities (401 appointments).[15]

**Other staff for FEMA workforce augmentation**. FEMA also has the authority to augment its disaster workforce in various ways. Local hires are local residents who FEMA hires on a temporary basis for disaster support, to include working at fixed facilities, such as FEMA call centers or regional offices.[16] The Secretary of Homeland Security can also activate members of the DHS Surge Capacity Force if a disaster or emergency exceeds the capacity of the FEMA disaster workforce.[17]

---

[14]Non-competitive eligible applicants include veterans who meet Veterans Recruitment Appointment (VRA) (if applicable due to grade level) or Veterans Employment Opportunity Act (VEOA) requirements; military spouses; individuals with disabilities; certain current or former land and base management employees; family members of overseas federal employees or uniformed service members; current and former Peace Corps/AmeriCorps Vista employee and/or volunteers; and any applicant eligible under a special hiring authority outlined by the Office of Personnel Management.

[15]Specifically, FEMA primarily used the following hiring flexibilities in fiscal year 2021 and through mid-April 2022: (1) Veteran with a Service-Connected Disability of 30% or More Appointments; (2) Direct Hire Appointments; (3) Schedule A Disability Related Appointments; (4) Schedule A Non-Disability Related Appointments; and (5) Schedule D Appointments - Intern Program. The remaining hiring flexibilities accounted for 7 percent of the overall appointments — (6) Experts/Consultants Appointments; (7) Military Spouse appointments; (8) Peace Corps/VISTA appointments; (9) Schedule C (Presidential or Head of Agency) appointments; (10) Schedule D appointments (Presidential Management Fellows Program); and (11) Schedule D appointments (Recent Graduates Program). Generally, FEMA's use of hiring flexibilities is comparable to other federal agencies. We previously found that federal agencies used a relatively small number of the hiring flexibilities available to them. For more information, see GAO, *Federal Hiring: OPM Needs to Improve Management and Oversight of Hiring Authorities*, GAO-16-521 (Washington, D.C.: Aug. 2, 2016).

[16]Local hires are hired for 120 days, and their term of employment may be extended in increments of 120 days.

[17]Surge Capacity Force members can deploy up to 45 days. The Secretary of Homeland Security can also request to extend deployments for members from DHS component agencies.

FEMA Corps are members of AmeriCorps National Civilian Community Corps who work under supervision of FEMA staff.[18] Additionally, FEMA can augment its workforce with technical assistance contractors, who are specialized contractors hired to perform specific responsibilities.

## FEMA Lacks Consistent Procedures and Documentation for Accurately Calculating its Time Frames for Hiring

FEMA has regularly reported its time frames for hiring employees, also known as time-to-hire, on a quarterly basis to DHS.[19] As of 2021, FEMA prepares these quarterly reports using hiring data compiled from various reports from its hiring case management system. FEMA Human Capital tracks the dates applicants go through various steps of the hiring process in the system, and officials said the agency uses this information to inform management decisions about staffing and hiring. For example, FEMA officials said they use time-to-hire information to determine if FEMA is hiring in a timely manner. Additionally, they stated that they analyze time-to-hire for specific positions and hiring phases to identify pain points or bottlenecking in the hiring process, and adjust as needed.

However, we found that FEMA does not consistently and accurately calculate time-to-hire it reports to DHS and internal management due to system challenges and a lack of documented procedures. Our analysis of FEMA hiring data showed inconsistencies in how FEMA calculated its time frames for hiring, such as different methodologies and fields used to calculate time-to-hire. For instance, we found:

- **FEMA uses inconsistent methods to calculate and report time-to-hire.** In different quarters within fiscal year 2021, FEMA used a 'Total Duration' field to report the time-to-hire from when it validated the hiring need to either the applicant's acceptance of a tentative offer or the applicant's entrance on duty day.[20] When we asked FEMA officials how this field was calculated, officials stated that it was inaccurate to use the 'Total Duration' field for any time-to-hire calculations because it did not accurately capture time-to-hire, and they mistakenly used it in prior reports. For example, in the third quarter of fiscal year 2021, we found that FEMA underreported the average days it took for applicants to complete the hiring process and

---

[18]FEMA Corps members serve 10-month terms.

[19]According to FEMA officials, they report time-to-hire information to DHS and DHS reports the information to OPM.

[20]As previously mentioned, agencies are supposed to report time-to-hire with two distinct end dates – from the time the hiring need is validated by a hiring manager to (1) the applicant's acceptance of a tentative offer and (2) the day the new employee's entrance on duty.

enter on duty to DHS. Specifically, they underreported the time-to-hire by 16 days because they mistakenly used the 'Total Duration' field. In other quarters, FEMA officials used various combinations of fields to calculate the two definitions of time-to-hire, such as different starting points in the hiring process, which FEMA officials said they sometimes did because of missing or inaccurate data in the case management system.

- **FEMA uses different groups of hiring cases to calculate time-to-hire.** FEMA officials said they removed some hiring cases from time-to-hire calculations and not others because of misinterpretations of direction from leadership for reporting time-to-hire. For example, for one quarter in fiscal year 2021, FEMA officials said they removed hiring cases that did not begin and end in the same quarter. However, they subsequently realized this resulted in the exclusion of some hiring cases from any of its reports to DHS. FEMA also used local hire cases in some of its time-to-hire calculations, which FEMA officials said were errors and should never be included, because they skew the time-to-hire results (i.e., make the results appear shorter). FEMA officials also stated if Human Resource specialists accidentally failed to enter one key date in the system, such as the date an applicant enters on duty, they would exclude the case from their time-to-hire calculations entirely, further skewing the results.[21]

FEMA also does not have documented guidance or procedures outlining the steps it takes to collect and calculate time-to-hire. Prior to 2021, FEMA officials said they collected information and calculated time-to-hire manually based on data fields discussed among FEMA Human Capital staff and using their professional judgment. Since they began using the hiring case management system in 2021, FEMA officials said they have been discussing how to ensure they use more complete, consistent, and accurate fields to calculate and report time-to-hire. For instance, FEMA officials stated they are striving to use the same starting point to calculate time-to-hire. Additionally, FEMA officials said they discussed with DHS and OPM officials which data fields they should use from FEMA's system to meet reporting requirements that align with OPM hiring steps. However, FEMA did not document these decisions. FEMA officials described steps they take to calculate time-to-hire over a series of conversations with us. However, as of December 2022, FEMA still lacked clear documentation on how it collects and assesses its time-to-hire,

---

[21]FEMA officials stated they have ongoing efforts to flag missing dates and manually enter the correct dates during the review process. However, officials stated that since they are reporting averages, not every case is checked for missing dates.

which led to FEMA's inability to accurately know how long it takes for FEMA to hire, and inconsistent reporting to DHS.

FEMA officials stated that the data system they use is not designed for reporting time frames for hiring and as a result, their process for collecting and analyzing the information on time-to-hire is piecemeal. FEMA officials acknowledged that data system challenges, such as needing to merge different data from the case management system to calculate time-to-hire, may create data integrity issues. However, they noted no off-the-shelf system meets FEMA's unique hiring needs, and creating such a system would be cost prohibitive. They said they are doing the best they can with the system they have within the budget they have. While we understand FEMA's budget constraints, FEMA could help enhance the reliability of what it reports within the system it uses by documenting its decisions and steps for calculating time-to-hire. Additionally, they said the various steps FEMA officials must take to modify and assess the time-to-hire data using the current system make it difficult to document steps and procedures, though they have some documentation in emails. Instead, the officials said they rely on multiple FEMA staff to prepare the time-to-hire data analyses and perform quality checks.

*Standards for Internal Controls in the Federal Government* state management should use quality information to achieve the entity's objectives.[22] Quality information is appropriate, current, complete, accurate, accessible, and provided on a timely basis. The standards also call for documentation to demonstrate the design, implementation, and operating effectiveness of an entity's internal control system. The standards state that documentation provides a means to retain organizational knowledge and mitigate the risk of having that knowledge limited to a few personnel, as well as a means to communicate that knowledge, as needed, to external parties. For example, documenting the steps for collecting and analyzing time-to-hire in a standard operating procedure rather than individuals' emails would help FEMA retain and institutionalize its processes (if employees responsible for the analysis currently are no longer with the agency in the future) and also ensure its methods are consistent over time.

As FEMA officials discuss and determine the best way to collect and analyze time-to-hire information, documenting the decisions and steps they take would help ensure they collect the information they need in a

[22]GAO-14-704G

timely manner and use a consistent methodology to calculate time-to-hire. For example, documenting steps, such as which population of hiring cases to include or exclude, and which fields and formulas to use, would help ensure consistent calculations and reporting to DHS, OPM, and internal management. Documenting its methods would also help FEMA mitigate potential misinterpretations of direction from leadership and ensure knowledge and methods are passed on to new or other FEMA staff doing time-to-hire analyses.

More broadly, documented procedures will also help ensure the time-to-hire information FEMA is using to make decisions is reliable, and help FEMA officials target potential areas for improvement. With consistent methods for collecting key dates and calculating time-to-hire, FEMA can more accurately and reliably use this information to quantify the extent to which different steps in the hiring process versus other factors, such as a candidate's responsiveness to agency inquiries, impact their time-to-hire. Furthermore, these steps could improve FEMA management's ability to oversee and make decisions on the workforce planning and the implementation of preparedness actions vis-à-vis future potential emergencies overall.

# FEMA Has Taken Steps to Address Staffing Gaps, but Opportunities Exist to Better Monitor and Evaluate Hiring Efforts

## FEMA's Staffing Gaps Vary by Year and Cadre

FEMA officials stated they conduct annual reviews of its disaster workforce to establish staffing targets and identify gaps, known as the Force Structure Modification Process. During this process, FEMA uses statistical modeling methods to estimate a baseline of the number of staff it needs. With the model outputs, FEMA officials stated that management also receives feedback from the cadres to determine where to target staffing and makes adjustments, as needed. FEMA officials stated management considers the model outputs and cadre feedback, and then approves final staffing targets, known as the force structure. FEMA officials then compare its force structure targets with its force strength, or

the actual number of on-boarded employees in each cadre position, to determine staffing gaps.

In recent years, FEMA determined it needed to increase its disaster workforce given the increase in its responsibilities and disasters. In May 2019, FEMA used statistical modeling and cadre feedback to develop an overall force structure (staffing) target of 17,670 disaster employees across all cadres. FEMA aimed to reach this target by fiscal year 2024, but has since pushed it out to fiscal year 2026, due to setbacks and additional responsibilities associated with the COVID-19 pandemic. As of the beginning of fiscal year 2022, FEMA had a disaster force strength of approximately 11,400 employees, creating an overall staffing gap of approximately 6,200 staff (35 percent) across different positions and cadres. See figure 5 for more information on FEMA overall staffing gaps from fiscal years 2019 through 2022.

**Figure 5: Overall Staffing Gaps for the Federal Emergency Management Agency's (FEMA's) Disaster Workforce, Fiscal Years 2019-2022**



Source: GAO analysis of FEMA data.  |  GAO-23-105663

While we found FEMA's disaster workforce was operating at approximately 65 percent capacity at the beginning of fiscal year 2022, the force capacities varied widely across the cadres. Force capacity (also referred to as a fill rate) indicates the rate by which FEMA fills or makes progress toward its estimated force structure targets with its actual force strength. For example, one of FEMA's largest cadres, the Individual Assistance cadre, was operating at a force capacity of approximately 89 percent at the beginning of fiscal year 2022. The Individual Assistance cadre provides individuals and families affected by disasters access to a range of FEMA programs and information. Additionally, other cadres, such as the Acquisitions cadre, which negotiates contracts between the agency and outside entities for goods and services, exceeded their staffing targets in fiscal year 2022. On the other hand, other large cadres, Public Assistance, Hazard Mitigation, and Logistics, generally had lower force capacities, between 44 and 60 percent at the beginning of fiscal year 2022. These cadres serve important functions including administering assistance to state and local governments, creating safer communities by managing risk reduction activities, and coordinating all aspects of resource planning and movement during a disaster. See figure 6 for more information about cadres' force capacity.



**Figure 6: Federal Emergency Management Agency's (FEMA) Force Capacity by Cadre**

Source: GAO analysis of FEMA data.  |  GAO-23-105663

Note: Force capacity (also referred to as a fill rate) indicates the rate by which FEMA fills or makes progress toward its estimated force structure targets with its actual force strength. We based the ranges for force capacity in this figure on ranges FEMA used in its documentation.

FEMA's staffing gaps were partly due to an increase in force structure targets, which FEMA officials attributed to the growing number of disaster staff needed, as identified during the disaster workforce review in May 2019. Certain cadres had significant changes in their force structure targets between fiscal years 2020 and 2021, including the two of the largest cadres— the Public Assistance and Logistics cadres— that contributed to the growing gap. For example, in the Public Assistance cadre, force structure targets increased by almost 130 percent (from about 1,780 staff to over 4,000 staff) and the Logistics cadre also increased force structure targets by approximately 26 percent (from approximately 1,600 staff to over 2,000 staff).

FEMA officials also attributed recent staffing gaps to the loss of staff due to the year-round pace caused by the COVID-19 pandemic and increasing number of disasters. FEMA initially increased its disaster workforce by almost 1,600 staff (or 13 percent) from over 12,000 in fiscal year 2019 to over 13,600 in fiscal year 2020. However, during fiscal year 2020, which included the beginning of the COVID-19 pandemic, the disaster workforce lost 20 percent of its staff (over 2,600 employees). These losses resulted in staffing gaps in certain positions, and an overall decline in force strength. For example, the Public Assistance cadre lost over 400 staff (approximately 16 percent) in fiscal year 2020. With the increase in staffing targets and reduction in staff, the Public Assistance cadre's force capacity decreased from over 100 percent to about 55 percent. Starting in March 2020, officials stated that they faced additional responsibilities due to COVID, while also managing the traditional seasonal peaks of disaster activity during the year, which created burnout for many employees and increased employee attrition.

During fiscal year 2021, FEMA officials stated they overcame the most difficult operational period of the COVID-19 pandemic, and cadres were better positioned to focus on increasing their capacity. As a result, FEMA's disaster workforce started rebounding, gaining over 300 employees, or 3 percent in fiscal year 2021. Additionally, certain cadres made significant gains in their force strength. For example, the Civil Rights cadre increased its force strength by 37 percent during fiscal year 2021, although it remained the cadre with the lowest capacity. Despite the growth, FEMA's disaster workforce has not reached its previous peak of over 13,500 employees by the end of fiscal year 2019. FEMA officials acknowledged that staffing shortages continue to be a challenge when responding to disasters, and have taken steps to address the gaps.

## FEMA Has Hiring Efforts to Address Gaps, but Has Not Evaluated its Progress

Starting in 2019, FEMA initiated several efforts to augment its disaster workforce and reduce staffing gaps through hiring. However, FEMA officials stated that not all staffing gaps are resolved by hiring new staff. For example, some staffing gaps may be filled through promoting staff from within, converting one position to another, or training staff to fulfill a staffing need. As a result, FEMA developed various efforts focused on hiring to partially address staffing gaps among their disaster workforce. More specifically:

- **Harness hiring program:** In September 2019, FEMA developed the Harness hiring program, which aimed to support growth in the disaster workforce, improve the retention of employees, and identify the chokepoints in the hiring process, among other efforts. FEMA officials stated that their Harness program created more collaboration between FEMA's Human Capital Office and the field, and as a result, they ended the Harness program and absorbed the program efforts into their respective offices as of April 2022.

- **Bulk hiring events:** FEMA conducted bulk hiring events for specific positions across cadres. During these events, FEMA Human Capital and cadre management recruited applicants for entry-level cadre positons, held phone interviews, and extended offers to suitable candidates. According to FEMA officials, having Human Capital staff primarily administer various hiring steps and make the selection decisions (in conjunction with cadre management) expedited the hiring process and increased the number of individuals hired for these positions.

- **Contracts and partnerships:** FEMA sought additional support from contractors and other federal agencies, such as OPM and the Department of Labor, to support efforts to increase staff and expand recruitment. For example, contractors reviewed applicant resumes to support FEMA hiring specialists. Additionally, FEMA entered into an interagency agreement with OPM to provide similar support for hiring critical positions. FEMA also entered into a partnership with the Department of Labor's Job Corps to increase disaster staff.[23] According to FEMA officials, the use of contractors and interagency agreements helped increase customer satisfaction and provide more support for FEMA Human Capital in their efforts to hire more people.

---

[23]According to the Department of Labor, Job Corps is a residential career training program through the Department of Labor that helps eligible young people complete their high school education, trains them for meaningful careers, and assists them with obtaining employment.

While FEMA is taking steps to address staffing gaps through hiring, it is unclear if those efforts are effective due to a lack of documented plans to monitor and evaluate their progress. More specifically, FEMA lacks documented plans on how it will monitor and evaluate efforts to close staffing gaps in cadres. Instead, FEMA officials stated they are discussing a range of strategies informally, referred to as cadre growth discussions. FEMA officials stated they are transitioning to cadre growth discussions because of the end of the Harness program, and changes in human capital needs and leadership. However, without documenting these discussions about cadre hiring strategies, it is difficult for FEMA to monitor and evaluate how effective efforts are in closing staffing gaps and prioritize hiring efforts accordingly.

FEMA has annual force structure (staffing) targets, but does not have measures to monitor and evaluate cadres' progress toward its targets. FEMA previously developed staffing targets for specific cadres and positions within the disaster workforce, creating a clear path for how they planned to achieve their long-term goal of 17,670 by fiscal year 2026. However, with the end of the Harness hiring program, FEMA officials stated they will no longer be developing staffing targets for cadres, and only developing an annual target for the entire disaster workforce.[24]

Without staffing targets for cadres, FEMA will no longer be able to determine which cadres are in need of staff and focus its hiring efforts accordingly. For example, FEMA aims to reach 13,485 employees in its disaster workforce by the end of fiscal year 2023, but does not have staffing targets for specific cadres or positions to ensure it is on track to meet its annual staffing target. FEMA officials believed that cadre net growth targets—measuring employee gains versus employee losses against a target by cadre— would be beneficial. However, as of January 2023, officials had not yet developed or established net growth targets for the cadres within the disaster workforce.

Additionally, FEMA has not established performance measures to monitor and evaluate other hiring activities' contributions toward achieving their overall targets. FEMA has data on other aspects of its hiring processes, such as the number of applications it receives, applicants referred, and applicants hired. However, it does not have performance measures to

---

[24]FEMA developed annual force structure targets for fiscal years 2022 through 2026 under its Government Performance and Results Act of 1993 reporting. See Pub. L. No. 103-62, 107 Stat. 205. However, these targets are not broken down by specific cadre and position.

assess these other aspects, such as calculating the percentage of applicants who successfully complete the hiring process and enter on duty, to determine if changes to hiring are needed. FEMA officials stated they do not measure other aspects of hiring because they are not required to do so.

GAO's *Key Principles for Effective Strategic Workforce Planning* states that agencies should develop performance measures to monitor and evaluate whether the agency achieved its program goals and the link between human capital and program results.[25] This includes developing performance measures that measure:

1. Progress toward reaching human capital goals

2. Contribution of human capital activities toward achieving programmatic goals

Additionally, The *Standards for Internal Control* state that management should document plans to continuously monitor and evaluate identified internal control deficiencies on a timely basis.[26] The standards also state that management should document actions to remediate internal control deficiencies on a timely basis by evaluating and reporting issues and developing corrective actions. The lack of documented plans, interim targets and other measures makes it difficult to evaluate FEMA's progress and develop corrective actions, as needed.

According to FEMA's strategic and human capital plans, FEMA must grow its disaster workforce to meet the rising demand of disasters.[27] While FEMA made gains in certain cadres and positions, it still had an overall staffing gap of 35 percent (6,200 staff) as of fiscal year 2022. FEMA could benefit from documented plans and performance measures, including net growth targets, to monitor progress toward force structure goals, identify root cause issues, and adjust hiring efforts as needed. By developing plans for cadres, FEMA will be able to better monitor progress

---

[25]Performance goals are the specific results an agency expects its program to achieve in the near term. FEMA sets both long-term and annual force structure (staffing) targets as part of its performance goal to expand its disaster workforce. Performance measures are concrete, objective, observable conditions that permit the assessment of progress made toward the agency's goals. GAO-04-39

[26]GAO-14-704G

[27]Federal Emergency Management Agency, *2022–2026 FEMA Strategic Plan*, (last updated February 3, 2023).  Federal Emergency Management Agency, *Human Capital Operating Plan Fiscal Year 2020-2021.*

and ensure it is on track to meet the 17,670 staff target by fiscal year 2026. Additionally, by having performance measures that assess human capital activities, FEMA will be able to focus hiring efforts on specific cadre needs and assess the overall effectiveness of its hiring efforts over time.

## Conclusions

FEMA currently faces an all-time high in disasters and an unparalleled demand on its workforce. As the main agency managing the response to disasters and administering billions of dollars in assistance, efforts to reduce FEMA's overall staffing gap are essential to meeting the needs of survivors. While FEMA has taken steps to address staffing gaps through hiring, including using hiring flexibilities and other programs to increase hiring, opportunities exist to better monitor and evaluate its efforts and hiring process. FEMA inconsistently and inaccurately calculates how long it takes to hire staff of all positions, making it difficult to identify and address pain points in the hiring process. Additionally, FEMA lacks plans and performance measures to evaluate how effective its hiring efforts are reducing staffing gaps within cadres. By developing and documenting plans and performance measures to meet staffing targets, FEMA could better ensure it has the capacity to respond to current and emergent threats.

## Recommendations for Executive Action

We are making the following three recommendations to FEMA:

The FEMA administrator should establish and document clear and consistent procedures to collect and calculate accurate time-to-hire information. (Recommendation 1)

The FEMA administrator should document plans to monitor and evaluate the agency's hiring efforts to address staffing gaps in the disaster workforce. (Recommendation 2)

The FEMA administrator should develop performance measures to monitor and evaluate progress toward human capital goals, including net growth targets for cadres to achieve FEMA's long-term disaster workforce staffing goal. (Recommendation 3)

## Agency Comments

We provided a draft of this report to DHS and FEMA for comment. In its comments, reproduced in appendix I, DHS concurred with our three recommendations and described actions taken and planned to address them. FEMA also provided technical comments, which we incorporated, as appropriate.

We are sending this report to the appropriate congressional committees, the Secretary of Homeland Security, and the Administrator of FEMA. In addition, this report is available at no cost on the GAO website at http://www.gao.gov/.

If you or your staff members have any questions about this report, please contact Chris Currie at (404) 679-1875 or curriec@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix II.

Chris P. Currie
Director, Homeland Security and Justice

# Appendix I: Comments from the Federal Emergency Management Agency

U.S. Department of Homeland Security
Washington, DC 20528



April 12, 2023

Chris Currie
Director, Homeland Security and Justice
U.S. Government Accountability Office
441 G Street, NW
Washington, DC 20548

Re:   Management Response to Draft Report GAO-23-105663, "FEMA Disaster
      Workforce:  Actions Needed to Improve Hiring Data and Address Staffing Gaps"

Dear Mr. Currie,

Thank you for the opportunity to comment on this draft report.  The U.S. Department of
Homeland Security (DHS or the Department) appreciates the U.S. Government
Accountability Office's (GAO) work in planning and conducting its review and issuing
this report.

DHS leadership is pleased to note GAO's recognition that the Federal Emergency
Management Agency (FEMA) "currently faces an all-time high in disasters and an
unparalleled demand on its workforce."  GAO also acknowledged that FEMA has taken
steps to address staffing gaps through hiring, including using hiring flexibilities to hire
employees for critical positions and to augment its workforce if a disaster or emergency
exceeds FEMA's capacity, such as with local hires and contractors, among others.
FEMA remains committed to hiring qualified candidates whenever needed to assist in
meeting its mission of helping people before, during and after disasters.

It is also important to more specifically highlight several recent initiatives designed to
strengthen FEMA's disaster workforce.  For example, on September 29, 2022, the
President signed the "Civilian Reservist Emergency Workforce Act of 2021," (Pub. Law
No. 117-178)[1] providing "Uniformed Services Employment and Reemployment Rights
Act" protections to FEMA reservists.  By maximizing the use of these new protections as
a recruiting and retention tool, FEMA will continue to expand this critical disaster
workforce component.  Additionally, in November 2022, FEMA published the "2022-
2026 FEMA Strategic Recruitment Plan" (Recruitment Plan), the first plan of this scale,

---

[1] https://www.congress.gov/117/plaws/publ178/PLAW-117publ178.pdf

which outlines FEMA's priority of building a more diverse workforce that offers
promising practices and unique perspectives in the face of complexity and adversity.

The draft report contained three recommendations, with which the Department concurs.
Enclosed find our detailed response to each recommendation.  DHS previously submitted
technical comments addressing several accuracy and other issues under a separate cover
for GAO's consideration.

Again, thank you for the opportunity to review and comment on this draft report.  Please
feel free to contact me if you have any questions.  We look forward to working with you
again in the future.

Sincerely,

JIM H CRUMPACKER    Digitally signed by JIM H
                    CRUMPACKER
                    Date: 2023.04.12 07:54:22 -04'00'

JIM H. CRUMPACKER, CIA, CFE
Director
Departmental GAO-OIG Liaison Office

Enclosure

2

**Enclosure:  Management Response to Recommendations
Contained in GAO-23-105663**

GAO recommended that the FEMA Administrator:

**Recommendation 1:**  Establish and document clear and consistent procedures to collect
and calculate accurate time-to-hire information.

**Response:**  Concur.  FEMA's Office of the Chief Component Human Capital
Officer (CCHCO) Talent, Recruitment and Acquisition Division (TRAD) will
create a time-to-hire job aid with specific data fields identified and train additional
human resources (HR) employees to accurately pull time-to-hire data, which will
address this recommendation and prepare the agency to meet its future mission
requirements.  Specifically, FEMA CCHCO TRAD will:
- Create a formal job aid to communicate the time-to-hire process with specific
  fields identified to use for accurate time-to-hire calculations by July 28, 2023.
- Train additional HR professionals to calculate time-to-hire to ensure redundancy
  and continuity of data across all reports by September 30, 2023.

When complete, these efforts will position FEMA to develop and maintain an ongoing,
iterative process for continuous time-to-hire reporting with high data integrity.  This
improved reporting will provide FEMA with a dynamic process that will support, justify,
and influence human capital decision-making reflective of the ever-changing workforce
needed to meet FEMA's mission.  Estimated Completion Date (ECD):  September 29,
2023.

**Recommendation 2:**  Document plans to monitor and evaluate the agency's hiring
efforts to address staffing gaps in the disaster workforce.

**Response:**  Concur.  FEMA is already taking actions that align with this
recommendation and plans to take more in the future.  For example, in November
2022, FEMA published its Recruitment Plan to achieve the agency's strategic
priority of building a more diverse workforce that offers promising practices and
unique perspectives in the face of complexity and adversity.  This plan established
four cross-agency goals to improve the agency's strategic recruitment efforts:
- Goal 1:  Develop an enterprise-wide framework for recruitment and targeted
  outreach.
- Goal 2:  Advance equitable and inclusive hiring practices.
- Goal 3:  Invest in marketing and branding to educate the public of FEMA's
  mission, opportunities, and the benefits FEMA offers as an employer.

3

- Goal 4:  Enhance FEMA's capability to conduct effective and adaptive recruitment.

FEMA's CCHCO is also developing an implementation plan to accompany the Recruitment Plan.  This plan will provide additional details regarding how FEMA will achieve the goals and objectives set forth in the Recruitment Plan and document activities for monitoring and evaluating the agency's hiring efforts to address staffing gaps in the disaster workforce.  ECD:  September 29, 2023.

**Recommendation 3:**  Develop performance measures to monitor and evaluate progress towards human capital goals, including net growth targets for cadres to achieve FEMA's long-term disaster workforce staffing goal.

**Response:**  Concur.  FEMA concurs with the importance of monitoring and evaluating progress toward achieving incident management workforce goals and has taken steps to do this.  For example, subsequent to the issuance of the November 2022 Recruitment Plan, in 2023, FEMA's Field Operations Directorate and FEMA's 23 cadres finalized net growth targets for fiscal years (FY) 2023 through 2026 that reflect the force strength goal for each FY factoring in anticipated gains (hiring and progression) minus anticipated losses (attrition and progression) for each position in every cadre.  These targets aim to map how each cadre should achieve force structure by the end of FY 2026, including setting hiring goals and informing succession planning so that the Agency can meet the conditions of its Government Performance and Results Act measure.

FEMA requests this recommendation be considered resolved and closed, as implemented.

4

# Appendix II: GAO Contacts and Staff Acknowledgments

| GAO Contact | Chris Currie, (404) 679-1875 or curriec@gao.gov |
|---|---|
| Staff Acknowledgments | In addition to the contact named above, Joel Aldape (Assistant Director), Kelsey Hawley (Analyst-in-Charge), Koffi Dogbevi, Taylor Gauthier, Nasreen Badat, Melinda Cordero, Lijia Guo, Elizabeth Dretsch, Eric Hauswirth, Tracey King, and Jared Smith made significant contributions to this report. |

| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. <br> Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. <br> Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet: <br><br> Website: https://www.gao.gov/about/what-gao-does/fraudnet <br><br> Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7149 <br> Washington, DC 20548 |
| **Strategic Planning and External Liaison** | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7814, <br> Washington, DC 20548 |



Please Print on Recycled Paper.

Exhibit I

# GAO

**U.S. Government Accountability Office**

# Disaster Assistance High-Risk Series: Federal Response Workforce Readiness

GAO-25-108598
Report to Congressional Addressees
September 2, 2025

## Why This Matters

In recent years, natural disasters have become more frequent, increasing costs and requiring higher levels of federal support. According to the National Oceanic and Atmospheric Administration, the number of disasters costing more than $1 billion in total economic damages in the U.S. nearly doubled between 2018 and 2024—from 14 to 27. Recent disasters further demonstrate the need for government-wide action to deliver assistance efficiently and effectively and reduce the federal government's fiscal exposure. As such, we added *Improving the Delivery of Federal Disaster Assistance* to our High-Risk List in February 2025.[1]

Recent disasters, such as Hurricanes Helene and Milton, which affected the southeast less than 2 weeks apart in 2024, as well as federal workforce reductions and challenges highlight concerns over federal disaster workforce readiness. More recently, flash flooding in Texas killed more than 130 people over the 2025 July 4 weekend; reporting indicated a summer's worth of rain fell across the region in a matter of hours. As we have previously reported, the Federal Emergency Management Agency (FEMA)—the lead agency for federal disaster response—has long-standing workforce management issues that make supporting response and recovery difficult.[2] For example, following Helene and Milton, only 4 percent of FEMA's incident management workforce—the agency's primary field support for disasters—was available to deploy as of November 1, 2024.

We were asked to review long-standing challenges and emerging issues in federal response efforts for recent disasters, including Hurricanes Helene and

---

[1]GAO, *High-Risk Series: Heightened Attention Could Save Billions More and Improve Government Efficiency and Effectiveness*, GAO-25-107743 (Washington, D.C.: Feb. 25, 2025).

[2]6 U.S.C. § 313 (providing that FEMA is to lead the nation's efforts to prepare for, protect against, respond to, recover from, and mitigate against the risk of natural disasters, acts of terrorism, and other man-made disasters, including catastrophic incidents). GAO, *FEMA Disaster Workforce: Actions Needed to Improve Hiring Data and Address Staffing Gaps*, GAO-23-105663 (Washington, D.C.: May 2, 2023); *FEMA Workforce: Long-Standing and New Challenges Could Affect Mission Success*, GAO-22-105631 (Washington, D.C.: Jan. 20, 2022). We have made recommendations over the years to improve FEMA's workforce management issues, which the agency has addressed, but challenges remain.

Milton and the 2025 Los Angeles wildfires.[3] This report, the first in a series, provides information on the support selected federal agencies provided, workforce challenges that arose during recent disaster response efforts, and recent workforce changes and implications for future disasters.

## Key Takeaways

Recent disasters, including Hurricanes Helene and Milton and the 2025 Los Angeles wildfires, highlight key challenges for the federal disaster response workforce. Additionally, changes to the workforce, including staff reductions, could pose additional challenges for future disasters.

- Within the first 3 months of each of these disasters, FEMA's reported obligations exceeded $11 billion in total assistance across all three events. FEMA, the U.S. Army Corps of Engineers (USACE), and the Environmental Protection Agency (EPA), as well as other federal agencies, deployed thousands of personnel to respond.

- The concurrent nature of these disasters, limited disaster workforce capacity, and undertrained surge responders posed challenges to federal agencies responding to these disasters.

- Recent workforce reductions may exacerbate existing workforce challenges and impact federal agencies' capacity to respond to future high-impact disasters. For example, between January 1 and June 1, 2025, the number of active FEMA employees decreased from about 25,800 to 23,350, according to agency data. This includes employees who separated for any reason, such as the 1,465 employees who participated in a voluntary workforce reduction program.

## Overview of Recent Disasters

### Hurricanes Helene and Milton and the 2025 Los Angeles Wildfires Caused Devastation to Local Communities

**Hurricanes Helene and Milton.** Helene and Milton made landfall in the U.S. in late September and early October 2024, respectively, directly impacting multiple states. Helene made landfall in Florida as a category 4 hurricane on September 26. As shown in figure 1, the storm included catastrophic inland flooding, extreme winds, a deadly storm surge, and numerous tornadoes that devastated portions of the southeastern U.S. and southern Appalachians.[4] The President approved major disaster declarations in eight states for Helene—Florida, Georgia, Kentucky, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia.

---

[3]GAO conducted this review in response to the American Relief Act, 2025, and requests from Congressional members. The American Relief Act, 2025, included a provision for GAO to conduct audits and investigations related to Hurricanes Helene and Milton, and other disasters declared pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act) in calendar years 2023 and 2024. Pub. L. No. 118-158, 138 Stat. 1723, 1754 (2024).

[4]Hagen, Andrew et al, National Hurricane Center, *Hurricane Helene*, (April 8, 2025).

**Figure 1: Satellite Imagery of Bat Cave, North Carolina Before and After Hurricane Helene**



Source: U.S. Department of Agriculture and National Oceanic and Atmospheric Administration.  |  GAO-25-108598

Less than 2 weeks later, Hurricane Milton made landfall in Florida as a category 3 hurricane on October 9, 2024. Milton also caused a significant tornado outbreak over southern and central Florida.[5] The hurricane's damage was concentrated in Florida and the President approved major disaster declarations for Florida and the Seminole Tribe of Florida. Together, these two disasters resulted in over 290 deaths, directly or indirectly, according to the National Hurricane Center.

**2025 Los Angeles wildfires.** Starting January 7, 2025, a series of catastrophic wildfires developed in Los Angeles County, California. The wildfires killed more than two dozen people, destroyed more than 15,000 homes and businesses and created unhealthy air quality for millions of people.[6] Figure 2 shows satellite imagery in the city of Altadena in Los Angeles County before and after the 2025 wildfires. The wildfires were unprecedented in their size, scope, and the damage they caused. On January 8, the President approved a major disaster declaration for the wildfires.

**Figure 2: Satellite Imagery of Altadena, California Before and After 2025 Los Angeles Wildfires**



Source: U.S. Department of Agriculture and National Oceanic and Atmospheric Administration.  |  GAO-25-108598

| Federal Role in Disaster Response | FEMA and Other Federal Agencies Have Roles Under the National Response Framework |
|---|---|

Disaster response can involve federal, state, local, tribal, and territorial governments as well as private sector and nongovernmental entities. The

---

[5]Beven, John et al., National Hurricane Center, *Hurricane Milton*, (March 31, 2025).

[6]Lindsey, Rebecca, National Oceanic and Atmospheric Administration, *The Weather and Climate Influences on the January 2025 Fires Around Los Angeles*, (Feb. 19, 2025).

*National Response Framework* describes the responsibilities of these entities and guides response activities.[7] For example, responsibility for responding to a disaster generally begins at the local level, and state, tribal, and territorial governments supplement as necessary.[8] When an incident occurs that exceeds or is anticipated to exceed their capabilities, the federal government may provide assistance. The *National Response Framework* provides a coordinating structure for federal interagency support and certain federal agencies have primary responsibilities for core response areas, known as emergency support functions.[9]

The Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act) authorizes the President to provide financial and other assistance in response to a disaster. Under the Stafford Act, the President may declare a major disaster in response to a request by the governor of a state or territory or the chief executive of a tribal government.[10] The request is to be based on a finding that the disaster is of such severity and magnitude that effective response and recovery are beyond state and local capabilities and that federal assistance is necessary. When a major disaster is declared, FEMA—within the Department of Homeland Security—is the lead agency for coordinating response efforts. One way FEMA coordinates disaster response is through mission assignments. These are work orders it issues to other federal agencies, such as those with emergency support function responsibilities, to use their authorities and resources in support of direct assistance to state and local governments. Agencies may have primary responsibility for certain emergency support functions and serve as support agencies for other emergency support functions. For example,

- USACE coordinates and is the primary agency for the Public Works and Engineering emergency support function, which includes debris removal and emergency repair of damaged public infrastructure. For Hurricane Helene, for example, USACE's mission assignments included establishing temporary emergency power, debris removal, and water system assessments and emergency repairs.

- EPA coordinates and is a primary agency for the Oil and Hazardous Materials Response emergency support function, which includes household hazardous materials removal. EPA is also a support agency for the emergency support function focusing on the drinking water and wastewater systems sector and conducts sampling and analysis of contaminated water. Following the 2025 Los Angeles wildfires, for example, EPA cleared hazardous materials from over 9,000 properties and disposed of more than 500 tons of lithium-ion battery material, according to officials.

---

[7]Department of Homeland Security, *National Response Framework*, 4th ed. (Oct. 28, 2019).

[8]For the purposes of this report, we refer to state, local, tribal, and territorial governments collectively as "state and local governments."

[9]The *National Response Framework* includes 15 emergency support functions—transportation; communications; public works and engineering; firefighting; information and planning; mass care, emergency assistance, temporary housing, and human services; logistics; public health and medical services; search and rescue; oil and hazardous materials response; agriculture and natural resources; energy; public safety and security; cross-sector business and infrastructure; and external affairs.

[10]42 U.S.C. § 5171. The President can also declare an emergency, which authorizes more limited types of assistance. 42 U.S.C. § 5190.

**Federal Response and Associated Challenges**

**Federal Agencies Provided Significant Support After Recent Disasters, but Workforce Challenges Impacted Response Efforts**

### FEMA and Other Federal Agency Support for Recent Disasters

In response to Hurricanes Helene and Milton and the 2025 Los Angeles wildfires, FEMA and other federal agencies—including USACE and EPA—provided support across nine states and the Seminole Tribe of Florida. This included federal financial assistance, deployed staff, and other life-saving resources.

FEMA's reported obligations within the first 3 months of each of these disasters exceeded $11 billion in total assistance from the Disaster Relief Fund (see fig. 3).[11] The Disaster Relief Fund is the primary source of federal disaster assistance and funds eligible response and recovery efforts associated with major disaster and emergency declarations. This can include direct and financial assistance for state, local, tribal, and territorial governments—as well as individuals and households.[12]

**Figure 3: FEMA Obligations in the First 3 Months After Hurricanes Helene and Milton and the 2025 Los Angeles Wildfires and Total Estimated Obligations for Fiscal Year (FY) 2025**



Source: GAO summary of Federal Emergency Management Agency (FEMA) data.  |  GAO-25-108598

Note: FEMA reported prior obligations and the agency's estimated FY2025 obligations for these disasters in its report on the Disaster Relief Fund as of July 31, 2025. The Disaster Relief Fund is the primary source of federal disaster assistance and funds eligible response and recovery efforts associated with major disaster and emergency declarations. This includes disaster assistance for state, local, tribal, and territorial governments, as well as individuals and households. FEMA will likely continue to obligate funds for recovery from these disasters for years, based on recovery timeframes for previous disasters.

**Hurricanes Helene and Milton.** Multiple federal agencies deployed personnel in response to Hurricanes Helene and Milton, and FEMA provided significant financial assistance to support response efforts. FEMA officials stated the agency reached the highest level of deployed staff in agency history in response to these hurricanes.

---

[11]FEMA will likely continue to make obligations for recovery from these disasters for years, based on recovery timeframes for previous disasters. For example, according to the July 2025 Disaster Relief Fund report, FEMA estimates obligating an additional $527 million in fiscal year 2025 for Hurricane Sandy, which occurred in 2012, primarily through Public Assistance, which funds projects to restore community infrastructure, among other things.

[12]FEMA may also reimburse other agencies from the Disaster Relief Fund for mission assignments.

By October 7, 2024, 11 days after Helene made landfall, FEMA reported it approved more than $208 million in disaster assistance and the federal government deployed nearly 7,000 personnel. In North Carolina, the response included more than $32 million in disaster assistance, 800 FEMA staff on the ground, and over 1,200 urban search and rescue personnel within the first 10 days.[13] According to FEMA's July 2025 Disaster Relief Fund report, the agency estimates providing about $11.2 billion in disaster assistance for Hurricane Helene in fiscal year 2025, with more than half of that obligated in the first 3 months of the disaster.[14]

FEMA obligations from the Disaster Relief Fund included those for mission assignments to other federal agencies and related personnel deployments to support the relevant emergency support functions. For example, USACE reported that, by about a month after Helene, the agency had deployed approximately 360 personnel to assist with a variety of mission assignments. These include temporary emergency power, debris removal, and assessments and emergency repairs of water systems.

Following Hurricane Milton, FEMA provided additional assistance to some of the same areas of the southeastern U.S. that were affected by Hurricane Helene. By October 13, 2024, 4 days after Milton made landfall, FEMA reported it had deployed more than 8,500 people to help with response and recovery for both Hurricanes Helene and Milton. According to FEMA's July 2025 Disaster Relief Fund report, the agency estimates obligating a total of $4.4 billion in disaster assistance for Milton in fiscal year 2025 to Florida and the Seminole Tribe of Florida, with more than half of that obligated in the first 3 months of the disaster.[15]

**2025 Los Angeles wildfires.** FEMA and other federal agencies were key response contributors following the 2025 Los Angeles wildfires. For example, within 1 week of the disaster, FEMA reported deploying 475 staff to support response. FEMA estimates obligating a total of $2.8 billion in disaster assistance in fiscal year 2025 for the wildfires, with more than 95 percent of that obligated within the first 3 months of the disaster, according to its July 2025 Disaster Relief Fund report. EPA also provided significant support for hazardous materials removal following the wildfires. As of February 17, the agency reported deploying 121 teams—a total of approximately 1,600 personnel—to remove lithium-ion batteries and to survey, remove, and dispose of hazardous materials.[16]

---

[13]FEMA response staff have a variety of responsibilities. For example, the agency's Incident Management Assistance Teams consist of staff with expertise in particular response functions—such as operations, logistics, and planning—that rapidly deploy to lead and coordinate federal response to incidents. GAO, *2017 Hurricanes and Wildfires: Initial Observations on the Federal Response and Key Recovery Challenges*, GAO-18-472 (Washington, D.C.: Sept. 4, 2018).

[14]Appropriations acts have generally required that the FEMA Administrator provide monthly reports on the Disaster Relief Fund. See Pub. L. No. 114-4, 129 Stat. 39, 55-57 (2015) (requiring monthly reports on the Disaster Relief Fund); Pub. L. No. 118-47, div. C, § 306, 138 Stat. 460, 610 (2024) (requiring the reporting requirements for the Disaster Relief Fund in the Department of Homeland Security Appropriations Act, 2025 (Pub. L. No. 114-4) to apply in fiscal year 2024). Department of Homeland Security, Federal Emergency Management Agency, *Disaster Relief Fund: Monthly Report as of July 31, 2025* (August 11, 2025).

[15]Department of Homeland Security, *Disaster Relief Fund: Monthly Report as of July 31, 2025.*

[16]Environmental Protection Agency, *EPA Hits 75% Complete Milestone in Agency's Largest Ever Wildfire Cleanup* (Feb. 17, 2025).

**Concurrent Disasters, Disaster Workforce Capacity, and Training Gaps Amplified Existing Workforce Challenges**

FEMA and other federal agencies faced workforce challenges related to the concurrent nature of the disasters, disaster workforce capacity, and training gaps during Hurricanes Helene and Milton and the 2025 Los Angeles wildfires. Further, these recent disasters exacerbated long-standing FEMA workforce management issues. We previously reported that FEMA had an overall staffing gap—the difference between its on-boarded staff and its staffing target—of approximately 35 percent across different positions at the beginning of fiscal year 2022. We also found that FEMA fell short of its yearly staffing target between 2019 and 2022, and that gap continues to grow.[17]

**Concurrent disasters.** The concurrent nature of recent disasters put additional strain on the federal response workforce. FEMA officials noted that major disaster declarations and resulting staff deployments occurred in the same general timeframe and same region as Hurricanes Helene and Milton. For example, Helene and Milton shortly followed Hurricane Debby, which made landfall in August 2024 in Florida. The president approved major disaster declarations for Hurricane Debby in five states including Florida, Georgia, and South Carolina.

According to agency operations briefs, FEMA started the 2024 hurricane season (beginning June 1, 2024) with only 17 percent of its incident management workforce available, primarily because staff were already in the field supporting over 80 major disaster and emergency declarations across the country, as shown in figure 4.[18] This percentage is lower than in the prior 3 years entering hurricane season. Specifically, FEMA had 24 percent of its incident management workforce available entering hurricane season in 2023, 34 percent in 2022, and 31 percent in 2021. FEMA's low staff availability in June 2024 continued in January 2025 leading into the Los Angeles wildfires. In July 2025, a month into the 2025 hurricane season, flash flooding affected central Texas. As of July 4, when the deadly floods began, FEMA reported 15 percent of its incident management workforce was available.[19]

---

[17]GAO-23-105663, GAO-25-107743. We are currently reviewing FEMA's workforce size and composition since fiscal year 2023, the extent to which FEMA is addressing existing and future workforce staffing needs, and how FEMA allocates and prioritizes staffing resources when responding to multiple or concurrent disasters.

[18]FEMA's incident management workforce is composed of positions that lead, manage, and deliver response and recovery operations and generally deploy to field sites.

[19]Due to the timing of this review, we plan to include more information about the Texas response mission in subsequent products in this series.



**Figure 4: Percentage of FEMA Incident Management Workforce Available and Major Disaster and Emergency Declarations with Field Support, January 1, 2024 to August 1, 2025**

Source: GAO summary of Federal Emergency Management Agency (FEMA) data. | GAO-25-108598

Note: This graphic reflects the date the events began, or the date the hurricanes made landfall in the U.S., as applicable.

[a]In May 2024, a severe weather outbreak included tornadoes in 23 states, and a storm with 100 mile per hour winds in Houston, Texas.

FEMA officials confirmed that the concurrent disasters in 2024 challenged response efforts. Officials from FEMA Region 4—which covers most of the states impacted by Hurricanes Helene and Milton—stated that the multi-state impacts of two hurricanes occurring within weeks of each other required the agency to deploy additional staff from FEMA headquarters and other FEMA regions to respond.[20] Officials stated that they had not previously experienced that level of reliance on responders from outside their region. FEMA officials also noted that the agency was already short-staffed heading into the 2024 hurricane season due to the number of other disasters declared in the months prior.

USACE officials stated that the concurrent and increasing number of catastrophic disasters has required the agency to maintain a high level of disaster response effort for longer periods of time, further draining its staffing resources. According to officials, USACE had over 1,030 personnel in the field in April 2025 supporting multiple disasters simultaneously. For instance, USACE officials stated they still had staff supporting the 2023 Maui wildfire recovery efforts in August 2025 and anticipated having staff in North Carolina until at least the fall of 2025 and in Los Angeles until early 2026.

**Disaster workforce capacity.** FEMA, USACE, and EPA have different workforce structures and levels of scalability, and each agency relies on a limited number of permanent staff and on-call disaster responders. Recent disasters strained each agency's staff capacity, including exhausting the number of available staff for key response functions and longer-term response missions. In some cases, response efforts required staff to put their primary responsibilities on hold.

---

[20]FEMA has 10 Regional offices located across the United States. Region 4 is responsible for Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, and Tennessee.

- **FEMA.** FEMA reported employing 23,620 total staff as of June 1, 2024, including almost 5,100 permanent full-time staff who support FEMA's mission areas and operations on a daily basis. FEMA's workforce also consists of other categories of employees, including term-limited positions in its cadre of on-call response and recovery employees and those employed intermittently as reservists. FEMA can also deploy its Surge Capacity Force—volunteers from the Department of Homeland Security and other federal agencies—as needed to assist with response and recovery for disasters. For example, FEMA activated about 1,290 Surge Capacity Force volunteers to respond to Hurricanes Helene and Milton in 2024, according to agency officials. Additionally, the agency uses contracts for goods and services to respond to natural disasters.[21]

  Following Hurricanes Helene and Milton, only 4 percent of FEMA's incident management workforce was available to deploy according to the agency's November 1, 2024, operations briefing. In addition, several incident management cadres with critical responsibilities in early response had even lower availability.[22] On November 1, 2024, for example, the Individual Assistance cadre had 0.3 percent (9 of 2,585) available. This cadre is responsible for helping survivors understand and apply for FEMA assistance. On the same date, the Logistics cadre had 0.8 percent (13 of 1,637) available. This cadre is responsible for ensuring FEMA has supplies and equipment in the right place at the right time to respond to disasters.

- **USACE.** According to USACE officials, the agency has about 15 full-time staff who are dedicated to supporting the federal response to emergency and major disaster declarations under the *National Response Framework* Public Works and Engineering emergency support function. USACE supplements these staff with volunteers from within the agency and has contracts for services such as debris removal and monitoring.

  Additionally, USACE officials stated that since 2017, their employees have encountered challenges associated with reaching their annual cap on premium pay.[23] Once an employee reaches the annual cap, that employee can no longer earn premium pay that calendar year. In May 2025, USACE officials estimated that going into the 2025 hurricane season, 10 percent of the agency's response workforce will have already reached their annual cap on premium pay. As a result, the agency cannot provide premium pay for overtime to those employees, as well as additional employees that reach the annual cap during the hurricane season. This could affect USACE and other federal responders' capacity to support response and recovery for the remainder of disasters that occur in the 2025 calendar year.

- **EPA.** EPA officials told us they do not have any employees dedicated solely to natural disaster response. Instead, the agency relies on their force of about 210-260 on-scene coordinators to respond to disasters. EPA officials said

[21]GAO, *Disaster Contracting: Opportunities Exist for FEMA to Improve Oversight*, GAO-25-107136 (Washington, D.C.: Feb. 6, 2025).

[22]FEMA's incident management workforce is organized into 23 cadres by type of work (organizational or programmatic function). These cadres are based on skills and experience and generally deploy to an incident at varying points in the response and recovery phases, depending on their functions.

[23]Title 5 federal employees whose work is performed in connection with an emergency are generally subject to an annual cap on premium pay, which is additional pay provided to employees for working certain types of hours, such as overtime. If the annual cap on premium pay is reached, the employee may not receive any more premium pay that calendar year. 5 U.S.C. § 5547; 5 C.F.R. § 550.106.

that deploying the agency's on-scene coordinators for disaster response leads to backlogs in these coordinators' primary responsibilities related to oil and hazardous material spills. Additionally, EPA has a surge volunteer force of other EPA employees that the agency can field when necessary and uses contractors to supplement disaster response.

EPA officials also cited the fast pace of its response mission for the 2025 Los Angeles wildfires and related strain on its workforce capacity as challenging. On January 26, 2025, FEMA directed the EPA to complete household hazardous materials removal for the wildfires within 30 days,[24] while EPA officials stated that a mission this size would typically take 2 to 4 months. EPA met this accelerated timeframe, but officials stated the consequences of doing so included staff burnout and a significant percentage of their response workforce hitting their annual caps on earning premium pay only months into the calendar year.

**Training gaps.** In part due to these disaster workforce capacity limitations, agencies deployed surge staff with limited disaster-specific expertise or training. FEMA officials told us that following Hurricane Helene, for example, the agency deployed employees who were not fully trained for response and recovery activities.

FEMA officials said the agency deployed grant management employees, although these staff do not normally work on disaster response. As such, they stated it was a challenge to prepare these staff effectively. Shortages of experienced staff affected the delivery of FEMA programs such as Individual Assistance. For example, FEMA deployed staff to its Disaster Recovery Centers to help survivors apply for assistance. Officials stated that staff who deployed with lower levels of training and expertise were more likely to encounter difficulty in helping survivors apply for assistance and contributed to frustration among survivors. They also often needed to escalate applications to more experienced colleagues, increasing the workload of those staff and creating delays in the application process. FEMA officials stated that, in December 2024, the agency had a backlog of about 500,000 such applications.

In response to the challenge of training gaps, FEMA is re-emphasizing its "Every Employee is an Emergency Manager" policy, which assigns almost every FEMA employee an incident management or incident support position and requires employees to complete necessary training.[25]

Similarly, officials from USACE stated their Planning and Response Teams sometimes do not have the technical expertise or training to assist with certain FEMA mission assignments.[26] According to officials, the agency has experienced an increase in non-standard mission assignments outside of those for which its Planning and Response Teams train and prepare. In these instances, officials stated they have deployed other USACE employees to assist with these assignments. USACE officials noted this requires more of their staffing resources.

---

[24]According to FEMA officials, the accelerated timeframe came from the White House, although FEMA was responsible for directing the EPA to implement it.

[25]Department of Homeland Security, Federal Emergency Management Agency, *Every Employee is an Emergency Manager,* Memorandum (April 29, 2025).

[26]USACE uses Planning and Response Teams to provide public works and engineering related support during natural and manmade emergencies. Each team is organized by mission area, such as debris removal or temporary emergency power, and is comprised of USACE employees who volunteer and undergo special response training.

| Implications for Future Disasters | **Long-Standing Challenges, Increasing Demand, and Workforce Reductions May Impact Response Readiness** |

### Long-Standing Challenges and Increasing Demand on Federal Disaster Workforce

The federal response to Hurricanes Helene and Milton and the 2025 Los Angeles wildfires demonstrated agencies' abilities to mobilize responders and commit substantial resources to protect lives and property during a period of high demand. However, we have previously reported on challenges with FEMA's workforce capacity and in February 2025 added *Improving the Delivery of Federal Disaster Assistance* to our High-Risk List in part due to long-standing challenges in this area.[27] For example, in May 2023, we found that FEMA had a growing need for disaster staff, but faced challenges with attrition and increased employee burnout.[28] FEMA attributed this in part to the year-round pace caused by the COVID-19 pandemic and increasing number of disasters. In addition, FEMA and its federal partners, including USACE and EPA, have been called upon more often to help communities respond to and recover from disasters, further stretching their workforces.

According to FEMA operations briefs, the agency started the 2025 hurricane season on June 1 with 12 percent of its incident management workforce available to respond to disasters. At the same time, the agency had 710 open major disaster and emergency declarations still receiving some kind of federal support, 91 with support in the field.[29] This is an increase from 495 open major disaster and emergency declarations just three years prior in July 2022.[30] When new disasters hit and these staff are redeployed to respond to them, it diverts resources and potentially delays efforts on open disasters. For example, FEMA Region 3 officials said they deployed 75 percent of the region's employees to Virginia for Hurricane Helene, requiring them to pull staff from response and recovery efforts for other ongoing disasters.

USACE and EPA also face workforce capacity challenges with the increasing number of disasters and officials noted concerns over the availability of responders. USACE officials stated the number of disasters to which USACE responds each year has increased, especially after 2017. Specifically, they reported responding to 36 disaster incidents in 2024, compared to 25 in 2017. Additionally, EPA officials stated that disaster response has become a 365-days-a-year responsibility for the agency, which places a burden on the agency and responders.

### Workforce Reductions May Impact Readiness for Future Disasters

With above normal hurricane and wildfire seasons expected this year, recent reductions in the federal workforce, including the loss of experienced emergency

---

[27]GAO-25-107743.

[28]GAO-23-105663.

[29]FEMA can also issue Fire Management Assistance Grant declarations when a wildfire burns on public or private land and threatens to become a major disaster. 42 U.S.C. § 5187(a). As of June 1, 2025, FEMA reported there were 338 open Fire Management Assistance Grant declarations, in addition to the 710 major disaster and emergency declarations.

[30]GAO, *Disaster Recovery: Actions Needed to Improve the Federal Approach*, GAO-23-104956 (Washington, D.C.: Nov. 15, 2022).

managers, may exacerbate existing challenges and impact the federal government's readiness to respond to future disasters. Both Congress and the President have signaled an interest in broader reforms to FEMA's scope and mission, including transitioning roles to state and local governments. However, as of this report, these efforts have not changed FEMA's disaster response role under the Stafford Act or the *National Response Framework*. FEMA officials stated that changes to their mission and expectations are happening in real time but were not able to provide details on changes to the federal response role.

In January 2025, the President established a FEMA Review Council to produce a report that, among other things, is to assess FEMA disaster response efforts in the previous 4 years—including the sufficiency of staffing—and make reform recommendations.[31] The President also signed an Executive Order stating the policy of the U.S. is that state and local governments and individuals play a more active and significant role in national resilience and preparedness. The order requires review and revision of response and preparedness policies, among other things.[32] Additionally, Members of Congress have introduced legislation that would change how FEMA and other federal disaster programs operate, such as by requiring a unified intake process and system for applicants for disaster assistance.[33]

At the same time, since January 2025, the Executive Branch has taken several steps to reduce the size of its workforce. Specifically, agencies have offered eligible federal employees early retirement, voluntary separation pay, or deferred resignations. Additionally, the President directed an Executive Branch-wide hiring freeze of civilian positions through October 15, 2025.[34] Officials at FEMA, USACE, and EPA noted reductions in their workforce and shared concerns about meeting disaster response mission capabilities.

FEMA experienced reductions across its workforce, including the loss of veteran leadership and within its pool of surge support volunteers. According to FEMA data, the number of active FEMA employees decreased from about 25,800 as of January 1 to about 23,350 as of June 1, 2025. This decrease of 2,446 includes the 1,465 employees who participated in a workforce reduction program as of June 1, 2025, and employees who left the agency for any other reason, as

---

[31]Exec. Order No. 14,180, *Council to Assess the Federal Emergency Management Agency*, 90 Fed. Reg. 8743 (Jan. 31, 2025).

[32]Exec. Order No. 14,239, *Achieving Efficiency Through State and Local Preparedness*, 90 Fed. Reg. 13,267 (March 21, 2025). The second product in this series will focus on state and local preparedness and effects on response.

[33]See, e.g., H.R.152, 119th Cong. (2025), H.R. 1245, 119th Cong. (2025), H.R. 2342. 119th Cong. (2025). H.R. 316. 119th Cong. (2025); S. 861, 119th Cong. (2025).

[34]The memorandum does not apply to military personnel of the armed forces or positions related to immigration enforcement, national security, or public safety. The White House Memorandum, *Hiring Freeze,* 90 Fed. Reg. 8247 (Jan. 28, 2025); The White House Memorandum, *Memorandum on Extension of Hiring Freeze* (April 17, 2025); The White House Memorandum, *Ensuring Accountability and Prioritizing Public Safety in Federal Hiring* (July 7, 2025).

shown in figure 5. Agency data indicates about 950 permanent, full-time employees participated in one of these programs.[35]



Figure 5: FEMA by the Numbers: Entering the 2025 Hurricane Season (June 2025)

Source: GAO summary of Federal Emergency Management Agency (FEMA) data; Icons-Studio/stock.adobe.com. | GAO-25-108598

[a]This is the percent decrease in the number of active FEMA employees, according to agency data. The decrease of 2,446 active employees includes FEMA employees who separated from the agency for any reason, as well as those placed on administrative leave as part of a deferred resignation program.

[b]Both the Office of Personnel Management and the Department of Homeland Security have offered participation in voluntary workforce reduction programs to eligible FEMA employees. This number represents the number of FEMA employees who participated in one of these programs as of June 1, 2025, according to the agency.

[c]According to FEMA data, 24 Senior Executive Service-level employees departed the agency by the end of May 2025, including 20 who participated in a workforce reduction program. In the prior 3 fiscal years, the agency averaged just under 13 Senior Executive Service-level departures per year.

[d]As of June 1, 2025, FEMA reported there were 710 open major disaster and emergency declarations still receiving some kind of federal support.

[e]FEMA's incident management workforce includes employees who lead, manage, and deliver response and recovery operations and generally deploy to traditional field or related sites. As of June 1, 2025, the agency reported that 12 percent of these employees were available to deploy to a disaster.

FEMA officials noted it is challenging to lose staff with experience and expertise and that the agency now faces significant skills gaps in its leadership cadre. According to agency data, 24 Senior Executive Service employees had departed the agency between January 25 and June 1, 2025, just before the start of the hurricane season. Of these, 20 departed as part of a workforce reduction program. By contrast, in the prior 3 fiscal years, the agency reported averaging just under 13 Senior Executive Service-level departures per year. According to agency officials, FEMA's Senior Executive Service Cadre was staffed at 50 percent as of mid-June 2025.[36] Agency communications indicate the senior leaders who departed in recent months generally had experience managing

---

[35]Both the Office of Personnel Management and the Department of Homeland Security have offered such programs to eligible FEMA employees. Full-time permanent and Senior Executive Service employees were eligible for both programs, and Cadre of On-call Response/Recovery Employees were eligible for the Office of Personnel Management program. Intermittent staff that are on call to respond to disasters, such as reservists and local hires, were not eligible for either program. The Department of Homeland Security also offered Voluntary Early Retirement Authority and Voluntary Separation Incentive Payment for eligible employees. We have ongoing work examining workforce reductions at the Department of Homeland Security and other federal agencies.

[36]In fiscal years 2023 and 2024, the agency reported employing about 100 Senior Executive Service employees on average.

complicated disasters. For example, one had been deployed to over 210 events and was described as one of the most experienced field leaders in the nation. Another had managed over 100 disaster and emergency declarations and $9.4 billion in disaster obligations.

Workforce reductions have impacts beyond FEMA's leadership cadre or permanent employees. FEMA officials stated that the agency plans to leverage staff augmentation strategies such as the surge capacity force to fill agency gaps this year in light of workforce reductions. As stated above, almost 1,300 surge capacity volunteers deployed to Hurricanes Helene and Milton alone in 2024. However, officials also stated that, entering hurricane season 2025, the agency anticipates having the capacity to deploy 600 surge capacity volunteers total due in part to federal workforce reductions at other federal agencies that provide surge staff.

FEMA officials also stated the agency's capacity to train staff may be reduced in light of recent workforce reductions. FEMA's Field Operations Directorate has documented gaps in the agency's ability to train and qualify the workforce at the rate needed to adequately respond to catastrophic and/or concurrent disasters since 2023. Due to recent losses in staff, including training staff, the agency acknowledged a potential loss of institutional knowledge that may impact its ability to provide qualified subject matter experts.

Officials at USACE and EPA shared similar concerns about meeting disaster response mission responsibilities:

- **USACE.** In May 2025, USACE officials estimated that about 10 percent of their agency's staff had already departed or would soon depart the agency. Officials were determining what actions the agency would need to take to meet disaster needs with the hiring freeze in place and the start of hurricane season. Officials stated they may be able to supplement their workforce with contractors, although contractors may be limited in the tasks they can perform.[37] In August 2025, USACE officials stated that they anticipated there would be impacts to their disaster response efforts from workforce reductions but were still determining the magnitude of such impacts. The agency did not have data available at that time on the exact number of employees participating in workforce reduction programs.

- **EPA.** In May 2025, EPA officials stated they expected to lose some on-scene coordinators—the employees they deploy for disaster response due to workforce changes. Officials also stated that it takes years to train these employees to reach a basic functional level, let alone build expertise. In August 2025, EPA officials told us that about 2,300 agency employees had participated in a deferred resignation program so far, including five on-scene coordinators. However, officials stated that a third round of the deferred resignation program was in process and the final numbers remain pending. Reductions in EPA's workforce combined with the hiring freeze have the potential to impact the agency's ability to respond to future disasters, according to EPA officials.

Given continued demands on the federal response workforce and recent staff reductions, the federal government will likely need to meet its disaster response mission with fewer available resources this year. Should the U.S. experience a similarly catastrophic peak hurricane season in September and October 2025, as

---

[37]For example, according to the Federal Acquisition Regulation, contracts are not to be used for inherently governmental functions. Inherently governmental functions include the direction and control of federal employees. 48 C.F.R. § 7.503.

it did in 2024, meeting response needs could be a major challenge. Moreover, no concrete changes to disaster response roles have yet been made. FEMA and other federal agencies spreading a reduced number of staff across the same or higher number of disasters nationwide could reduce effectiveness of federal disaster response for upcoming disasters. We will continue to monitor developments in this area as part of our ongoing work.

## Agency Comments

We provided a draft of this report to the Department of Homeland Security, the Environmental Protection Agency, and the Secretary of Defense, the Assistant Secretary of the Army for Civil Works, and the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers for review and comment. All three agencies provided technical comments, which we incorporated as appropriate.

## How GAO Did This Study

This product focuses on federal response workforce readiness and federal response efforts and challenges during Hurricanes Helene and Milton and the 2025 Los Angeles wildfires. It also reports on recent changes to the response workforce and implications for future disasters.

To describe the support provided and the challenges related to the federal response workforce, we reviewed laws and disaster response frameworks outlining roles and authorities, and incident specific plans and briefs to describe activities and challenges related to specific disasters. We reviewed data on available personnel and resources from 2021 through 2025. This included incident management workforce availability data from FEMA's Daily Operations Briefs and Senior Leadership Briefs, as well as data from agencies' press releases and other documentation, as applicable.

Additionally, we conducted site visits to areas in North Carolina, Florida, and California affected by Hurricanes Helene and Milton and the 2025 Los Angeles wildfires. We interviewed federal, state, and local officials to gather additional information on the response efforts and associated challenges. For example, we interviewed USACE and EPA officials and FEMA headquarters and regional officials from regions affected by Hurricanes Helene and Milton and the 2025 Los Angeles wildfires.

To identify recent changes related to the federal responder workforce that may affect future disaster response, we reviewed Executive Orders and public communications such as White House Memoranda, as well as department and agency communications. We also interviewed or reviewed written responses from federal officials and obtained summary data from FEMA about its workforce changes. These summary data came from National Finance Center payroll information and an internal agency tracker for the number of personnel participating in workforce reduction programs.

To assess the reliability of FEMA's National Finance Center payroll data and Disaster Relief Fund obligations data, we used information collected for our prior work, including interviews or written responses with agency officials and reviews of database documentation. To assess the reliability of FEMA's workforce reduction data and data from the agency's Daily Operations and Senior Leadership Briefs, we interviewed or obtained written responses from knowledgeable officials. Based on these steps, we determined that the data presented in this report were sufficiently reliable for our purposes.

We conducted this performance audit from June 2025 to September 2025 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and

conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

**List of Addressees**

The Honorable Charles E. Schumer
Minority Leader
United States Senate

The Honorable Rand Paul, M.D.
Chairman
The Honorable Gary C. Peters
Ranking Member
Committee on Homeland Security and Governmental Affairs
United States Senate

The Honorable Andy Kim
Ranking Member
Subcommittee on Disaster Management, District of Columbia and the Census
Committee on Homeland Security and Governmental Affairs
United States Senate

The Honorable Katie Britt
Chair
The Honorable Chris Murphy
Ranking Member
Subcommittee on Homeland Security
Committee on Appropriations
United States Senate

The Honorable Andrew Garbarino
Chairman
The Honorable Bennie G. Thompson
Ranking Member
Committee on Homeland Security
House of Representatives

The Honorable Sam Graves
Chairman
The Honorable Rick Larsen
Ranking Member
Committee on Transportation and Infrastructure
House of Representatives

The Honorable Mark Amodei
Chairman
The Honorable Lauren Underwood
Acting Ranking Member
Subcommittee on Homeland Security
Committee on Appropriations
House of Representatives

The Honorable Thom Tillis
United States Senate

The Honorable Greg Casar
House of Representatives

The Honorable Joaquin Castro
House of Representatives

The Honorable Jasmine Crockett
House of Representatives

The Honorable Lloyd Doggett
House of Representatives

The Honorable Veronica Escobar
House of Representatives

The Honorable Lizzie Fletcher
House of Representatives

The Honorable Sylvia Garcia
House of Representatives

The Honorable Vicente Gonzalez
House of Representatives

The Honorable Al Green
House of Representatives

The Honorable Julie Johnson
House of Representatives

The Honorable Marc Veasey
House of Representatives

We are sending copies of this report to the appropriate congressional committees, the Department of Homeland Security, the Environmental Protection Agency, and the Secretary of Defense, the Assistant Secretary of the Army for Civil Works, and the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers. In addition, the report is available at no charge on the GAO website at https://www.gao.gov.

## GAO Contact Information

For more information, contact: Chris Currie, Director, Homeland Security and Justice, CurrieC@gao.gov.

Public Affairs: Sarah Kaczmarek, Managing Director, Media@gao.gov.

Congressional Relations: A. Nicole Clowers, Managing Director, CongRel@gao.gov.

**Staff Acknowledgments:** Lauri Barnes, Holland Freeman Casenhiser, Haley Dunn, Eric Hauswirth, Tracey King, Amelia Koby, Caryn Kuebler, Katie Minch, Hadley Nobles, and Amanda Panko.

Source (cover photo): Federal Emergency Management Agency/FEMA.gov

Connect with GAO on Facebook, X, LinkedIn, Instagram, and YouTube. Subscribe to our Email Updates. Listen to our Podcasts.

Visit GAO on the web at https://www.gao.gov.

This is a work of the U.S. government but may include copyrighted material. For details, see https://www.gao.gov/copyright.

Exhibit J



# GAO
**U.S. Government Accountability Office**

# Disaster Assistance High-Risk Series: State and Local Response Capabilities

GAO-26-108599
Report to Congressional Addressees
December 18, 2025

## Why This Matters

Twenty years after Hurricane Katrina, the Federal Emergency Management Agency (FEMA)—the lead agency for federal disaster response—and state and local governments continue to face challenges preparing for and responding to large-scale disasters. Responsibility for responding to a disaster generally begins at the state and local level, with the federal government providing assistance for incidents that exceed state and local ability to respond.

The Post-Katrina Emergency Management Reform Act of 2006 (Post-Katrina Act) required the development of a national preparedness system to enable the nation to achieve a target level of preparedness for disasters.[1] Recent disasters such as Hurricanes Helene and Milton in 2024, the Los Angeles wildfires in early 2025, and the July 2025 flooding in Texas demonstrate the need for government-wide action to deliver assistance effectively. Given this, we added *Improving the Delivery of Federal Disaster Assistance* to GAO's High-Risk List in February 2025.[2]

Congress and the President have signaled an interest in reforms to FEMA. For example, in January 2025, the President established a FEMA Review Council to assess FEMA's disaster response efforts and recommend improvements to the agency. We were asked to review long-standing challenges and emerging issues in federal response efforts for recent disasters.[3] This report, the second in a series, provides information on federal disaster preparedness and response assistance provided before and during recent disasters, variation in state and local response capabilities, and considerations for potential changes to disaster response roles.[4]

---

[1]6 U.S.C. § 744.

[2]GAO, *High-Risk Series: Heightened Attention Could Save Billions More and Improve Government Efficiency and Effectiveness*, GAO-25-107743 (Washington, D.C.: Feb. 25, 2025).

[3]GAO conducted this review in response to the American Relief Act, 2025, and requests from congressional members. The American Relief Act, 2025, included a provision for GAO to conduct audits and investigations related to Hurricanes Helene and Milton, and other disasters declared pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act) in calendar years 2023 and 2024. Pub. L. No. 118-158, 138 Stat. 1723, 1754 (2024).

[4]The first report in this series focused on the federal disaster response workforce, including workforce challenges during recent disasters and potential implications of recent workforce changes. See GAO, *Disaster Assistance High-Risk Series: Federal Response Workforce Readiness*, GAO-25-108598 (Washington, D.C.: Sept. 2, 2025).

## Key Takeaways

- State and local governments rely extensively on assistance from FEMA and other federal agencies to prepare for and respond to major disasters. This assistance can include preparedness grants, training and technical support, and response support, such as direct federal assistance for debris removal, power restoration, and water system assessments.

- State and local disaster response capabilities vary widely across the country, including among states and within states at the local level. Our analysis of selected state preparedness assessments found wide variation in the extent to which states met their response targets—i.e., their ability to conduct critical response activities, such as restoration of water and power services. We found the percentage of targets these states reported they could meet varied widely, ranging from 12 percent to 90 percent of targets.

- Congress and the President have demonstrated an interest in reforms to FEMA. For example, the President has signaled support for transitioning more disaster response functions to state and local governments. According to federal and state officials, to the extent such changes occur, considerations for policymakers include (1) clear communication and guidance on potential changes, (2) sufficient time for state and local governments to prepare, (3) support needs for catastrophic or widespread disasters, and (4) FEMA's role in federal response coordination.

## Disaster Preparedness and Response Assistance

### The Federal Government Provides Extensive Support for State and Local Disaster Preparedness and Response

#### National Preparedness and Response Roles

Enacted after the preparedness and response failures associated with Hurricane Katrina in 2005, the Post-Katrina Act requires FEMA to develop the national preparedness system.[5] The national preparedness system includes, among other elements, the *National Response Framework*. The Act also directs FEMA to establish a comprehensive system to assess the nation's overall preparedness, including at the state and local level.[6]

The national preparedness system helps guide the efforts at all levels of government to build and sustain 32 core capabilities across the five mission areas of prevention, protection, mitigation, response and recovery. Eleven of these capabilities focus specifically on response functions, such as mass search and rescue and logistics and supply chain management. Additionally, one capability crosses the response and recovery mission areas, and three capabilities extend across all five mission areas.[7] For the purposes of this report, we refer to these 15 capabilities collectively as "response capabilities." FEMA

---

[5]6 U.S.C. § 744

[6]6 U.S.C. § 749.

[7]The 11 capabilities focused on response include (1) critical transportation; (2) environmental response/health and safety; (3) fatality management services; (4) fire management and suppression; (5) logistics and supply chain management; (6) mass care services; (7) mass search and rescue operations; (8) on-scene security, protection, and law enforcement; (9) operational communications; (10) public health, healthcare, and emergency medical services; and (11) situational assessment. Additionally, infrastructure systems is a cross-cutting capability that extends across both response and recovery. The three capabilities that extend across all five mission areas are planning, public information and warning, and operational coordination.

requires that state and local governments annually assess their preparedness for these response capabilities to receive certain FEMA grants.

The *National Response Framework* describes roles and responsibilities of governmental and non-governmental entities involved in disaster response and guides these activities.[8] For example, the responsibility for responding to a disaster generally begins at the local level, and tribal, state, and territorial governments supplement as necessary.

When an incident occurs that exceeds or is anticipated to exceed their capabilities, the federal government may provide assistance through a major disaster or emergency declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act).[9] When a major disaster or emergency is declared, FEMA is the lead agency for coordinating response efforts and works with state and local governments to address gaps in their response capabilities.

FEMA coordinates and delivers federal disaster response assistance through several mechanisms, including

- direct assistance, such as meals, water, and tarps;

- mission assignments—i.e., work orders—to other federal agencies, such as for debris removal, power restoration, or water systems assessment and related emergency repairs;

- interagency agreements to acquire supplies or services directly from other government agencies; and

- contracts for supplies and services, such as for housing inspections.

FEMA also provides recovery grants to state and local governments to repair and rebuild public infrastructure and grants directly to individuals for housing and other needs.

### Federal Support for Disaster Preparedness and Response

FEMA and other federal agencies provide extensive support to state and local governments for disaster preparedness and response, including through mechanisms developed in response to Post-Katrina Act requirements. For example, FEMA provides preparedness grants as well as training and technical support to strengthen state and local disaster response capabilities. Additionally, FEMA and other federal agencies, such as the U.S. Army Corps of Engineers (USACE) and the Environmental Protection Agency (EPA), supplement state and local efforts during disaster response.

**Preparedness grants.** FEMA administers a suite of preparedness grants designed to improve the nation's readiness in preventing, protecting against, responding to, recovering from, and mitigating terrorist attacks and other disasters. FEMA has traditionally provided three primary preparedness grants that jurisdictions can use to strengthen their emergency management core capabilities. These include the Emergency Management Performance Grant (EMPG) program, the State Homeland Security Program, and the Urban Area

---

[8]Department of Homeland Security, *National Response Framework*, 4th ed. (Oct. 28, 2019).

[9]42 U.S.C. §§ 5170, 5191. Under the Stafford Act, the President may declare a major disaster or emergency in response to a request by the governor of a state or territory or the chief executive of a tribal government. The request is to be based on a finding that the disaster is of such severity and magnitude that effective response and recovery are beyond state and local capabilities and that federal assistance is necessary. An emergency declaration authorizes more limited types of assistance.

Security Initiative.[10] The EMPG program, codified by the Post-Katrina Act, is the federal government's primary source of support for developing and maintaining emergency management expertise.[11] For example, the grants can be used to support state and local emergency management personnel costs, among other things.

The State Homeland Security Program and the Urban Area Security Initiative, on the other hand, were established by the Implementing Recommendations of the 9/11 Commission Act and are intended to help state and local governments prevent, prepare for, protect against, and respond to acts of terrorism.[12] Grants from these programs may also be used in a manner that enhances preparedness for disasters unrelated to acts of terrorism, as long as they also support the primary goals of preventing, preparing for, protecting against, or responding to acts of terrorism. According to FEMA officials, some of the projects funded by these anti-terrorism grants can also enhance response capabilities required to respond to natural disasters. For example, a recipient could use the grant to purchase a mobile command center that could be used for coordinating response to a flood or wildfire.

FEMA awarded almost $15 billion through these three preparedness grant programs in fiscal years 2014 through 2024, as shown in table 1.[13] Additionally, we analyzed information for the 10 states impacted by Hurricanes Helene and Milton, the 2025 Los Angeles wildfires, and the July 2025 Texas floods.[14] Each of these states reported relying on these grant programs to sustain their response capabilities in their annual preparedness assessments, identifying at least one FEMA preparedness grant as a funding source for at least one response capability.[15]

---

[10]See 6 U.S.C. §§ 604, 605, 762. FEMA also provides other grants to jurisdictions that could help enhance national preparedness—such as fire safety grants that fund resources to equip and train emergency personnel, enhance efficiencies, and support community resilience. See 15 U.S.C. §§ 2229, 2229a. For more information about the EMPG program, the State Homeland Security Program, and the Urban Area Security Initiative, see GAO, *National Preparedness: Additional Actions Needed to Address Gaps in the Nation's Emergency Management Capabilities*, GAO-20-297 (Washington, D.C.: May 4, 2020).

[11]6 U.S.C. § 762.

[12]6 U.S.C. §§ 604, 605.

[13]This total represents award amounts for the fiscal years 2014 through 2024 funding cycles, as of July 2025. FEMA receives appropriations for these three programs as part of the annual appropriations cycle. See, e.g., Pub. L. No. 118-47, 138 Stat. 460, 608 (2024). This total also includes grants awarded through the EMPG program based on supplemental appropriations in the American Rescue Plan Act of 2021. Pub. L. No. 117-2, § 4014, 135 Stat. 4, 80.

[14]We analyzed annual preparedness assessments for the 10 states that received major disaster declarations for these disasters: California, Florida, Georgia, Kentucky, North Carolina, South Carolina, Tennessee, Texas, Virginia, and West Virginia.

[15]In these assessments, states identify whether certain FEMA preparedness grant programs, including the EMPG program, the State Homeland Security Program, and the Urban Area Security Initiative, are an additional or primary funding source, or not a source of funding for each capability.

**Table 1: Amounts Awarded for Selected FEMA Preparedness Grant Programs, Fiscal Years 2014-2024**

| Fiscal Year | Emergency Management Performance Grant | State Homeland Security Program | Urban Area Security Initiative | Total (all programs) |
|---|---|---|---|---|
| Total awarded by program, 2014-2024 | $4,035,000,000 | $4,438,000,000 | $6,494,000,000 | $14,967,000,000 |

Source: GAO summary of Federal Emergency Management Agency (FEMA) data.  |  GAO-26-108599

Notes: amounts awarded are rounded to the nearest million. This total represents award amounts for the fiscal years 2014 through 2024 funding cycles as of July 2025, including grants awarded through the Emergency Management Performance Grant program based on supplemental appropriations in the American Rescue Plan Act of 2021. Pub. L. No. 117-2, § 4014, 135 Stat. 4, 80.

Federal, state, and local officials described the importance of FEMA grants for state and local level emergency management activities more broadly, providing examples of how state and local governments use FEMA grants.[16] For example:

- FEMA headquarters officials stated that generally, about half of EMPG awards support state and local emergency management personnel costs.

- Six states affected by recent disasters reported funding from 42 to 74 percent of their emergency management workforce with FEMA grants.[17]

- A local government official mentioned using preparedness grants to maintain its Emergency Operations Center, in addition to supporting personnel costs.

- Officials from one FEMA region stated state and local governments use the agency's preparedness grants to fund staff, conduct exercises, and carry out preparedness and mitigation projects.[18]

**Training and technical support.** FEMA also provides extensive training and technical support to state and local governments to improve their ability to respond to disasters. FEMA developed a national training program and the National Exercise Program in response to requirements in the Post-Katrina Act.[19] As part of this, FEMA sponsors exercises with state and local governments to help them assess their emergency management capabilities. According to a FEMA report, the agency supported 71 exercises at the federal, regional, state, and local levels in 2024 to strengthen preparedness and coordination among agencies and provide critical learning and development initiatives.[20] In addition to these response exercises, FEMA

---

[16]For this report, we analyzed information from 56 interviews with and written responses from federal agencies involved in disaster response, such as FEMA, USACE, and EPA; and state and local governments impacted by disasters in recent years. We collected this information as part of this review and for other recent and ongoing GAO reviews of related topics.

[17]We asked the 10 states that received major disaster declarations for Hurricanes Helene and Milton, the 2025 Los Angeles wildfires, and the July 2025 Texas floods about federal preparedness and response support they received and response challenges in recent disasters, among other things. We received responses from six of the 10 states. See How GAO Did This Study at the end of this report for more information.

[18]FEMA has 10 regional offices located across the U.S.

[19]6 U.S.C. § 748.

[20]FEMA, *Resilience Rising: 2024 Year in Review* (Washington, D.C.: Jan. 2025).

- provides training and education for first responders and emergency managers, such as in-person multi-day training on incident management, mass casualty response, and emergency response to a catastrophic natural disaster or terrorist act;

- manages the National Emergency Training Center, including the Emergency Management Institute; and

- posts on-demand webinars and other online courses and materials.

Some federal and state officials we spoke with emphasized the importance of FEMA's training and technical support, including for relationship building with federal, state, and local partners and in setting a national and professional standard for emergency management. For example:

- FEMA officials told us that these trainings and exercises are also a forum for emergency managers to come together and share expertise and provide an opportunity for relationship building between FEMA, state, and local governments. According to officials, these relationships improve coordination and response after disasters because FEMA and the state and local governments better understand each other's capabilities and priorities.

- Officials from one FEMA region explained that while some states have robust training programs, many depend on FEMA for critical professional training to implement effective emergency management programs.

- Officials from one state said FEMA's training provides nation-wide best practices and foundational skillsets for emergency management and other state officials. FEMA regional officials also underscored the importance of consistency in training for emergency response. For example, officials from one region stated that FEMA's training ensures access, quality, consistency, and coverage regionally and nationwide.

Officials from another state discussed the potential consequences of any reduction in this support. Specifically, they said that losing access to FEMA's subject-matter expertise would require a complete redevelopment of the state's training curriculum, straining resources and diminishing instructional capacity. Reducing FEMA's training programs would lead to preparedness gaps at the state and local level, the officials continued.

**Disaster response support.** When disasters exceed state and local capacity to respond, FEMA coordinates federal support, including through mission assignments directing other federal agencies to support response efforts. During recent disasters, such as Hurricanes Helene and Milton and the 2025 Los Angeles wildfires, FEMA and other federal partners provided significant response support.[21] According to its September Disaster Relief Fund report, FEMA reported obligating over $16.6 billion for Hurricanes Helene and Milton and the 2025 Los Angeles wildfires in fiscal year 2025 alone.[22]

Additionally, federal agencies such as FEMA, USACE, and EPA deployed thousands of personnel to assist response efforts for these disasters. For

---

[21]GAO-25-108598.

[22]The September Disaster Relief Fund Report includes data as of September 30, 2025. The report does not include data for the July 2025 Texas floods. The Disaster Relief Fund is the primary source of federal disaster assistance and funds eligible response and recovery efforts associated with major disaster declarations. This can include direct federal assistance, reimbursement for mission assignments to other federal agencies; and disaster assistance for tribal, state, local, and territorial governments and individuals and households. FEMA will likely continue to obligate funds for recovery from these disasters for years, based on recovery timeframes for previous disasters.

example, federal agencies provided federal assistance through about 1,300 mission assignments for these disasters, as of August 1, 2025. The Hurricane Helene response alone involved 1,017 of these mission assignments, such as assigning USACE for debris removal and EPA for water quality testing. USACE reported being reimbursed over $338 million for conducting 34 FEMA mission assignments for Hurricane Helene as of October 25, 2024, about a month after the disaster.[23] Local officials also stated that they could not have achieved the same pace of debris removal following the 2025 Los Angeles wildfires without USACE leading the operation. Figure 1 shows USACE debris removal efforts after the Los Angeles wildfires.

**Figure 1: U.S. Army Corps of Engineers Debris Removal Efforts After the 2025 Los Angeles Wildfires, May 2025**

 

Source: GAO. | GAO-26-108599

Six states also described how they used federal response resources from FEMA and other federal agencies. Some of the types of federal resources they reported using included

- specialized technical assistance and capabilities, such as disaster mortuary support, meteorological expertise, and technical support for dams;

- search and rescue;

- incident management and coordination, such as through embedded FEMA staff and FEMA's Incident Management Assistance Teams;[24]

- goods and services, such as meals and bottled water; and

- aerial disaster assessments and imagery.

States emphasized the importance of these federal resources in helping with disaster response. For example, officials from one state said that the state does not have the resources or programs necessary to carry out the same level of coordinated incident management activities as FEMA does. Another state that described itself as having a high capacity for disaster response said it still uses FEMA's ambulances and search and rescue support to supplement state efforts. Lastly, officials from a third state said access to federal support and this

---

[23]FEMA generally reimburses agencies from the Disaster Relief Fund for work performed as part of mission assignments. See 42 U.S.C. §§ 5147, 5170a, 5192.

[24]FEMA's Incident Management Assistance Teams consist of staff with expertise in particular response functions—such as operations, logistics, and planning—that rapidly deploy to lead and coordinate federal response to incidents.

specialized technical assistance remains essential for responding to catastrophic disasters.

| State and Local Government Disaster Capabilities | State and Local Governments' Disaster Response Capabilities Vary Widely |
|---|---|

### State Preparedness Assessments Show Variation in Response Capabilities

Our analysis of selected states' preparedness assessments found that states had different levels of response capabilities and did not always meet their capability targets. States create targets for each of the 32 capabilities established under the national preparedness system, including the 15 response capabilities we reviewed, as shown in figure 2.[25]

**Figure 2: Selected National Preparedness Core Capabilities Related to Disaster Response**

| Prevention | Protection | Mitigation | Response | Recovery |
|---|---|---|---|---|
| | | | Planning | |
| | | | Public Information and Warning | |
| | | | Operational Coordination | |
| | | | Infrastructure Systems | |
| | | | Critical Transportation / Mass Search and Rescue Operations | |
| | | | Environmental Response/Health and Safety / On-scene Security, Protection, and Law Enforcement | |
| | | | Fatality Management Services / Operational Communications | |
| | | | Fire Management and Suppression / Public Health, Healthcare, and Emergency Medical Services | |
| | | | Logistics and Supply Chain Management / Situational Assessment | |
| | | | Mass Care Services | |

Source: GAO summary of Department of Homeland Security documentation. | GAO-26-108599

States identify and assess the threats and hazards that concern them most and determine the level of capability the state should have to address them. They do so using standardized language FEMA developed for creating targets for each response capability. The capability targets provide a measurable and quantifiable indicator of a state's ability to complete activities in managing a threat or hazard. Some capabilities have multiple targets. For example, the Environmental Response/Health and Safety response capability has two targets describing its

---

[25]We assessed the 2024 self-assessments for the 10 states that received major disaster declarations for Hurricanes Helene and Milton, the 2025 Los Angeles wildfires, and the July 2025 Texas floods. The information in the states' assessments is self-reported, and states assess themselves against self-determined targets. Not all states provided information for all response capability targets. Additionally, the results presented for the states in our sample are not generalizable to all 50 states.

activities, one for hazardous materials clean-up and one for decontamination, as shown in table 2.

**Table 2: Notional State Environmental Response/Health and Safety Capability Targets, Estimated Current Capabilities, and Estimated Capability Levels**

| Activity | FEMA standardized target language | State capability target | State estimated current capability | State estimated capability level |
|---|---|---|---|---|
| Hazardous materials (hazmat) clean-up | Within ___ of an incident, assess, contain, and begin cleaning up hazardous material releases from ___ hazmat release sites | Within **1 week** of an incident, assess, contain, and begin cleaning up hazardous material releases from **1,000** hazmat release sites | Within **1 week** of an incident, assess, contain, and begin cleaning up hazardous material releases from **600** hazmat release sites | 60 percent (600/1,000) |
| Decontamination | Within ___ of a hazmat incident, complete decontamination procedures for ___ exposed individuals (hazmat-related incidents). | Within **1 week** of a hazmat incident, complete decontamination procedures for **400,000** exposed individuals (hazmat-related incidents). | Within **1 week** of a hazmat incident, complete decontamination procedures for **300,000** exposed individuals (hazmat-related incidents). | 75 percent (300,000/400,000) |

Source: GAO notional example based on state annual preparedness assessments. | GAO-26-108599

Note: Some capabilities have multiple targets. States set their own targets and assess their abilities to meet those targets.

We found states varied in their estimated capability levels, or how close they came to fully meeting their response capability targets, as shown below in figure 3. Additionally, some states also reported variation between the response capabilities—assessing themselves higher in some capabilities than others.

**Figure 3: Range in Estimated Response Capability Levels, Reported by Selected States in 2024**

| Capability | Activity | Estimated capability level (i.e., percentage of target met) |
|---|---|---|
| Planning | Updating emergency operations plans to define roles of partner organizations[a] | |
| | Updating emergency operations plans across affected jurisdictions[a] | |
| Public Information and Warning | Delivering information | |
| | Delivering information to people with access needs | |
| | Delivering information to people with limited English proficiency | |
| Operational Coordination | Establishing coordinated operational structure across jurisdictions affected | |
| | Establishing coordinated operational structure with partner organizations | |
| Infrastructure Systems | Restoring communication service to customers | |
| | Restoring power service to customers | |
| | Restoring wastewater service to customers | |
| | Restoring water service to customers | |
| Critical Transportation | Establishing road access, including debris removal | |
| | Evacuating affected people | |
| | Evacuating affected people with access needs | |
| Environmental Response/ Health and Safety | Hazardous materials (hazmat) site clean-up | |
| | Decontamination of hazmat-exposed individuals[a] | |
| Fatality Management Services | Body recovery, mortuary services, and victim identification | |
| Fire Management and Suppression | Structural firefighting | |
| Logistics and Supply Chain Management | Identifying and mobilizing shelter resources | |
| | Identifying and mobilizing food and water resources | |
| Mass Care Services | Moving people to temporary housing | |
| | Moving people with access needs to temporary housing | |
| | Providing emergency shelter | |
| | Providing food and water | |
| | Providing emergency shelter to people with access needs | |
| | Providing food and water to people with access needs | |
| | Providing shelter, food, and water to animals | |
| Mass Search and Rescue Operations | Conducting search and rescue operations | |
| On-scene Security, Protection, and Law Enforcement | Providing security and law enforcement protection for response | |
| Operational Communications | Establishing interoperable response communications between jurisdictions | |
| | Establishing interoperable response communications between partner organizations | |
| Public Health, Healthcare, and Emergency Medical Services | Triage and medical treatment | |
| Situational Assessment | Delivering situation reports to leadership and partner organizations[a] | |

Percentage scale: 0   20   40   60   80   100

**Legend**

Minimum → | ←Maximum

Median →●

Source: GAO summary of selected state preparedness assessments. | GAO-26-108599

Notes: We analyzed 2024 state preparedness assessments for the 10 states that received major disaster declarations for Hurricanes Helene and Milton, the 2025 Los Angeles wildfires, and the July 2025 Texas floods: California, Florida, Georgia, Kentucky, North Carolina, South Carolina, Tennessee, Texas, Virginia, and West Virginia. States set their own targets for each capability and assess their ability to meet those targets, i.e. estimated capability levels. We analyzed information for 11 response-related capabilities, one capability that extends across the response and recovery mission areas, and three capabilities extend across the five mission areas of prevention, protection, mitigation, response and recovery. There are 33 targets for these capabilities, but some states did not provide data for all targets.

ªNot all states in our sample included this target in their assessments.

As shown above, there was wide variation in how states assessed their capabilities in some areas. For example:

- **Mass Search and Rescue.** For this capability, states set targets for search and rescue operations for a specific number of people within a certain timeframe of the disaster. There were noticeable differences in the estimated capability levels for the 10 states in our analysis, which ranged from 10 to 100 percent. Three states estimated their capability levels between 90 to 100 percent, two at 57 and 60 percent, respectively, and five at 33 percent or below.

- **Public Information and Warning.** This response capability covers delivering prompt and reliable information to the public and has three associated targets, including public alerts and warnings for certain populations. States in our sample also varied on this capability, estimating capability levels from 25 to 100 percent of their targets for all affected people. For the two targets related to reaching people with access needs and limited English proficiency, the lowest estimated capability levels states reported dropped to 10 and 20 percent, respectively.

The 15 response capabilities have a total of 33 targets, and states varied in how many of these targets they estimated they could meet (i.e., their estimated current capability reached 100 percent of their capability target). All 10 states impacted by recent disasters estimated falling short of at least one target. As shown in Figure 4, the percentage of targets these states reported they could meet varied widely, ranging from 12 percent to 90 percent of targets.

**Figure 4: Variation in Percentage of Disaster Response Targets Selected States Reported They Could Meet**



● State impacted by Hurricanes Helene and Milton, the 2025 Los Angeles wildfires, or the July 2025 Texas floods
Source: GAO summary of selected state preparedness assessments. | GAO-26-108599

Notes: We analyzed 2024 state preparedness assessments for the 10 states that received major disaster declarations for Hurricanes Helene and Milton, the 2025 Los Angeles wildfires, and the July 2025 Texas floods: California, Florida, Georgia, Kentucky, North Carolina, South Carolina, Tennessee, Texas, Virginia, and West Virginia. We did not identify the states in the figure because the individual state assessments are for official use only. States set their own targets for each capability and assess their ability to meet those targets, i.e. estimated capability levels. We analyzed information for 11 response-related capabilities, one capability that extends across the response and recovery mission areas, and three capabilities extend across the five mission areas of prevention, protection, mitigation, response and recovery. There are 33 targets for these capabilities, but some states did not provide data for all targets. To calculate the percentage of response capability targets met, we only considered targets for which states provided information.

## Officials Described Variation in State and Local Disaster Response Capabilities

Federal, state, and local officials described factors that can contribute to differences in state and local disaster response capabilities, including between states and within states at the local level. FEMA regional officials stated that response capabilities are not evenly distributed across states. For example, during a previous review, FEMA officials told us that a limited number of states

participated in a disaster housing pilot program due to a lack of resources.[26] FEMA regional officials named several factors that may help increase state and local disaster response capabilities, including financial, personnel, and equipment resources. They also stated that staff continuity, experience with disasters, mutual aid agreements—i.e., emergency assistance agreements, and a focus on preparedness during "blue skies" improve response capabilities.

Officials also discussed variation at the local level, such as challenges for rural or less-resourced jurisdictions. These challenges can apply even for jurisdictions within a well-resourced state. Local emergency management departments in small or rural areas may only have one or two employees, and those employees may be fulfilling multiple roles. Additionally, such communities may have smaller tax bases and budgets for emergency management. Officials stated this can affect funds and personnel available for training and disaster response and recovery, among other things. We have previously reported that rural areas' sparse populations, fewer or limited local resources, and great distances to critical infrastructure can underscore the need for federal assistance.[27]

Officials indicated that past experience with disasters can also help an area prepare for and respond to future disasters. Officials from local governments who experienced a high volume of disasters described steps they took to prepare, such as a city acquiring advance (i.e., pre-disaster) debris removal contracts, and how past experience helped response move more efficiently. However, some recent disasters have affected areas that may not have historically experienced them. For example, according to Texas state and local officials, the major disaster declaration in Kerr County in July 2025 was the county's first. Additionally, North Carolina and federal officials stated that the impacts in the western part of the state from Helene were unexpected for that area.

## Implications for Future Disasters

### Considerations for Changes to Disaster Roles in Light of State and Local Reliance on Federal Support

As previously reported, Congress and the President have demonstrated an interest in reforms to FEMA.[28] For example, the President has signaled support for transitioning more disaster response functions to state and local governments. In January 2025, he signed an Executive Order that established a FEMA Review Council to assess FEMA's disaster response efforts, recommend improvements to the agency, and review existing reform proposals.[29] Additionally, the President signed an Executive Order in March 2025, that requires review and revision of response and preparedness policies to reformulate the process and metrics for federal responsibility.[30]

---

[26]GAO, *Wildfires: Additional Actions Needed to Address FEMA Assistance Challenges*, GAO-25-106862 (Washington, D.C.: Dec. 18, 2024).

[27]GAO, *Disaster Assistance: Updated FEMA Guidance Could Better Help Communities Apply for Individual Assistance*, GAO-25-106768 (Washington, D.C.: May 14, 2025).

[28]GAO-25-108598. See, e.g., H.R.152, 119th Cong. (2025), H.R. 316, 119th Cong. (2025), H.R. 1245, 119th Cong. (2025), H.R. 2342, 119th Cong. (2025), H.R. 4669, 119th Cong. (2025), S. 861, 119th Cong. (2025).

[29]Exec. Order No. 14,180, *Council to Assess the Federal Emergency Management Agency*, 90 Fed. Reg 8743 (Jan. 31, 2025).

[30]Exec. Order No. 14,239, *Achieving Efficiency Through State and Local Preparedness*, 90 Fed. Reg 13,267 (March 21, 2025).

GAO has previously reported on challenges with FEMA and other federal agencies' disaster assistance, including challenges state and local officials have raised with administrative burdens and timeliness of assistance.[31] We added *Improving the Delivery of Disaster Assistance* to GAO's High-Risk list in February 2025 to highlight the recommendations we have made to improve federal disaster efforts.[32] Implementing our recommendations would help improve federal assistance to state and local governments after a disaster.[33]

Broader reform of FEMA's mission, structure, or operations may also address long-standing challenges with federal disaster efforts. Given the current levels of federal support and wide variation in state and local response capabilities, officials at the federal and state levels provided the following considerations for policymakers for communicating and implementing any such changes:

**Clear communication and guidance.** State officials raised concerns about the uncertainty of the future of FEMA's role. Officials from one state described preparing contingency plans, including for potential reductions in federal assistance. Officials from two other states responded that it is challenging to plan in the absence of clear, consistent, and accurate guidance and emphasized the importance of consistent messaging about any changes, including to technical assistance and training.

We have previously reported on the importance of clear communication about roles and responsibilities in disaster preparedness and response. For example, our work on the response to Hurricane Katrina indicated that the lack of clarity in leadership roles and responsibilities resulted in disjointed efforts of many federal agencies involved in the response. As a result, there were a myriad of approaches and processes for requesting and providing assistance and confusion about who should be advised of requests and what resources would be provided within specific time frames.[34] We emphasized that leadership roles, responsibilities, and lines of authority must be clearly defined and effectively communicated to facilitate rapid and effective incident response.[35] To the extent there are changes to FEMA's role and responsibilities that involve a greater reliance on state capacity to prepare and respond to disasters, and to continue to benefit from lessons learned from disasters like Hurricane Katrina, states will need clear communication and guidance from the federal government.

**Time to prepare.** Federal and state officials emphasized the need for adequate time for state and local governments to prepare for any changes in disaster

---

[31]See, e.g., GAO, *Tornadoes: Agencies Promote Resilience but Actions Needed to Improve Access to FEMA Assistance*, GAO-25-107384 (Washington, D.C.: Sept. 2, 2025); GAO-25-106862; *Disaster Recovery: Additional Actions Needed to Identify and Address Potential Recovery Barriers*, GAO-22-104039, (Washington, D.C.: Dec. 15, 2021); *Disaster Resilience: FEMA Should Take Additional Steps to Streamline Hazard Mitigation Grants and Assess Program Effects*, GAO-21-140 (Washington, D.C.: Feb. 2, 2021).

[32]GAO-25-107743.

[33]For example, in November 2022, we recommended that Congress should consider establishing an independent commission to recommend reforms to the federal approach to disaster recovery. GAO, *Disaster Recovery: Actions Needed to Improve the Federal Approach*, GAO-23-104956 (Washington, D.C.: Nov. 15, 2022). See GAO-25-107743 for more discussion of GAO's past recommendations in this area.

[34]GAO, *Catastrophic Disasters: Enhanced Leadership, Capabilities, and Accountability Controls Will Improve the Effectiveness of the Nation's Preparedness, Response, and Recovery System*, GAO-06-618 (Washington, D.C.: Sept. 6, 2006).

[35]GAO, *Hurricane Katrina: GAO's Preliminary Observations Regarding Preparedness, Response, and Recovery*, GAO-06-442T (Washington, D.C.: Mar. 8, 2006).

response roles since they currently rely on significant federal disaster support. For example, the National Emergency Management Association reported that many states do not have their own programs to help survivors or rebuild public infrastructure.[36]

Additionally, FEMA regional officials identified post-disaster housing as an area where states often rely on FEMA to fill the need. FEMA officials also stated that implementation strategies for changes to disaster response roles should set states up for success by incentivizing them to build their own capacity and develop feasible plans prior to removing FEMA or federal support.

In 2012, we recommended that FEMA re-assess one of its criteria for evaluating a state's request for an emergency or major disaster declaration to ensure the federal government was not providing assistance for disasters that states have the capacity to handle.[37] As part of this recommendation, we stated that FEMA should change the relevant criterion over time to give jurisdictions time to prepare for the change. As of September 2025, FEMA has not yet completed actions to address this recommendation.

State officials described the importance of an implementation timeline that would allow time for states to adjust and prepare. One state cautioned that a reduction in federal assistance, particularly if done hastily, would have significant negative impacts, as states need time to prepare and budget to take on some of the assistance the federal government has provided in the past. Another state agreed, stating that it would require sufficient time to plan, develop, and implement alternative funding models. A third state noted that establishing a state-level individual assistance program, for example, would require funding, rulemaking, and policy efforts.

**Catastrophic or widespread disasters.** FEMA regional officials underscored that there will always be catastrophic disasters for which even the most well-equipped states would require some level of federal financial or other support. Additionally, officials stated that regional events impacting multiple states simultaneously and nationwide events could also pose challenges for state and local governments to manage effectively.

Recent disasters demonstrate that even states with higher levels of disaster capacity can rely on federal support for particularly catastrophic incidents. For example, the 2025 Los Angeles wildfires represented the first time since 2017 that California requested direct federal assistance for debris removal. According to state officials, the state did so because of the size and scope of the disaster— over 13,000 impacted properties—and because they had five other state-led debris removal missions ongoing at the time of the disaster.

North Carolina also used federal assistance to resolve challenges responding to Hurricane Helene, such as water testing and treatment. The city of Asheville, for example, experienced high levels of sediment in its water systems and broken supply lines after the hurricane. This left residents without safe drinking water for

---

[36]The National Emergency Management Association's 2024 biennial report states that 27 states have a public assistance program, 16 have an individual assistance program, and eight have an assistance program strictly for unmet needs. See National Emergency Management Association, *Biennial Report 2024,* (Lexington, KY: 2024).

[37]GAO recommended that FEMA 1) develop and implement a methodology that provides a more comprehensive assessment of a jurisdiction's response and recovery capabilities, including its fiscal capacity, and 2) adjust its measure of fiscal capacity for inflation by raising the indicator in steps over several years. GAO, *Federal Disaster Assistance: Improved Criteria Needed to Assess a Jurisdiction's Capability to Respond and Recover on Its Own*, GAO-12-838 (Washington, D.C.: Sept. 12, 2012).

nearly two months. FEMA mission assigned both USACE and EPA to assist with restoring this critical resource, including for water testing and filtration.

Officials from one FEMA region stated that state and local capacities can be rapidly exceeded in multi-state events like Helene, even in states with existing mutual aid agreements. Other FEMA regional officials stated that FEMA is the only agency scalable enough to mobilize enough responders in the event of a disaster with nationwide impacts. For example, FEMA took over leading the federal response to the COVID-19 pandemic from the Department of Health and Human Services due to the agency's unique role in coordinating federal government-wide relief efforts.

**Federal-level coordination.** FEMA also plays a vital role as the coordinating agency for the federal response to disasters. As we have previously reported, many federal agencies provide assistance for disasters, with FEMA as the lead agency for federal disaster response and recovery.[38] Additionally, through the mission assignment process, FEMA has the statutory authority to assign other federal agencies to perform disaster response tasks that those agencies might not otherwise have authority to perform independent of the Stafford Act.[39] For example, EPA officials said that the mission assignment process provides EPA more flexibility to address certain types of hazardous materials during natural disaster response, such as appliances and household hazardous materials, that they may not be able to address under EPA's authorities alone.

Additionally, FEMA's role as the focal point in the federal government that can request assistance from other agencies for specific challenges is more efficient than contacting multiple federal agencies individually, according to officials from one state. For example, there were technical issues with the public alerting system during the response to the 2025 Los Angeles wildfires. As a result, people received incorrect or out-of-date alerts, such as when reconnecting to cell towers after a lapse in service. As the lead for federal response, FEMA contacted the Federal Communications Commission to work with the relevant cellular service providers to address these issues. California officials stated that it would be more difficult for the state to resolve these types of response challenges without FEMA's support as the touchpoint for other federal agencies.

We found that state and local governments currently rely on extensive federal support for disaster preparedness and response. Additionally, disaster response capabilities vary at the state and local levels. To the extent any changes are made to disaster response roles that would shift responsibility to state and local governments, states with high levels of experience that already dedicate significant resources to building and sustaining response capabilities may have an easier time stepping into a more prominent role. Regardless, as federal and state officials noted, states would need to understand what changes, if any, are made and have adequate time to adjust and build capacity.

Moreover, even more experienced, well-resourced states can have smaller communities that experience challenges preparing for and responding to disasters. With an increase in the frequency of natural disasters and disasters affecting areas that have not historically experienced major disasters, officials underscored the importance of ensuring that federal, state, and local entities have a clear understanding of their roles in disaster response. We will continue to monitor developments in this area as part of our ongoing work.

---

[38] GAO-23-104956.

[39] 42 U.S.C. §§ 5170a, 5192.

**Agency Comments**

We provided a draft of this report to the Department of Homeland Security, the Environmental Protection Agency, and the Department of Defense for review and comment. The Department of Homeland Security provided technical comments, which we incorporated as appropriate. The Environmental Protection Agency and the Department of Defense did not provide comments on our draft report.

**How GAO Did This Study**

This report focuses on federal disaster preparedness and response assistance provided before and during recent disasters, variation in state and local response capabilities, and considerations for potential changes to disaster response roles.

For information on federal disaster preparedness and response assistance provided during recent disasters, we summarized data from FEMA's September Disaster Relief Fund report, which contains data on obligations through September 30, 2025. Additionally, we obtained summary-level data from FEMA on amounts awarded through its preparedness grant programs for the fiscal years 2014 through 2024 funding cycles.

To provide information on the federal support provided through mission assignments, we obtained and analyzed data from FEMA's web-based Emergency Operations Command. To assess the reliability of these data, we used information collected for prior and ongoing GAO work, including interviews with agency officials and reviews of database documentation. Based on these steps, we determined that the data presented in this report were sufficiently reliable for our purposes.

To provide context for variation in state capabilities, we analyzed states' 2024 assessments of their response capabilities for the 10 states that received major disaster declarations for Hurricanes Helene and Milton, the 2025 Los Angeles wildfires, and the July 2025 Texas floods: California, Florida, Georgia, Kentucky, North Carolina, South Carolina, Tennessee, Texas, Virginia, and West Virginia. As noted in the report, the information in the states' assessments is self-reported and states assess themselves against targets they set. Additionally, the results presented for the states in our sample are not generalizable to all 50 states.

We also analyzed information from 56 interviews with and written responses from federal agencies involved in disaster response, such as FEMA, USACE, and EPA; and state and local governments impacted by disasters in recent years. We collected this information as part of this review and for other recent and ongoing GAO reviews of related topics.

Additionally, we asked all 10 states listed above about FEMA preparedness and response support they received and response challenges in recent disasters, among other things. We received responses from six of the 10 states. Information from these interviews and written responses is intended to provide illustrative examples and perspectives on the topics of this report but is not generalizable.

To identify changes proposed to disaster response roles, we reviewed Executive Orders and relevant proposed legislation.

We conducted this performance audit from June 2025 to December 2025 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

**List of Addressees**

The Honorable Charles E. Schumer
Minority Leader
United States Senate

The Honorable Rand Paul, M.D.
Chairman
The Honorable Gary C. Peters
Ranking Member
Committee on Homeland Security and Governmental Affairs
United States Senate

The Honorable Andy Kim
Ranking Member
Subcommittee on Disaster Management, District of Columbia and the Census
Committee on Homeland Security and Governmental Affairs
United States Senate

The Honorable Katie Britt
Chair
The Honorable Chris Murphy
Ranking Member
Subcommittee on Homeland Security
Committee on Appropriations
United States Senate

The Honorable Andrew Garbarino
Chairman
The Honorable Bennie G. Thompson
Ranking Member
Committee on Homeland Security
House of Representatives

The Honorable Sam Graves
Chairman
The Honorable Rick Larsen
Ranking Member
Committee on Transportation and Infrastructure
House of Representatives

The Honorable Mark Amodei
Chairman
The Honorable Lauren Underwood
Acting Ranking Member
Subcommittee on Homeland Security
Committee on Appropriations
House of Representatives

The Honorable Thom Tillis
United States Senate

The Honorable Greg Casar
House of Representatives

The Honorable Joaquin Castro
House of Representatives

The Honorable Jasmine Crockett
House of Representatives

The Honorable Henry Cuellar
House of Representatives

The Honorable Lloyd Doggett
House of Representatives

The Honorable Veronica Escobar
House of Representatives

The Honorable Lizzie Fletcher
House of Representatives

The Honorable Sylvia R. Garcia
House of Representatives

The Honorable Vicente Gonzalez
House of Representatives

The Honorable Al Green
House of Representatives

The Honorable Julie Johnson
House of Representatives

The Honorable Marc A. Veasey
House of Representatives

We are sending copies of this report to the appropriate congressional committees, the Department of Homeland Security, the Environmental Protection Agency, and the Secretary of Defense, the Assistant Secretary of the Army for Civil Works, and the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers. In addition, the report is available at no charge on the GAO website at https://www.gao.gov.

**GAO Contact Information**

For more information, contact: Chris Currie, Director, Homeland Security and Justice, CurrieC@gao.gov.

Public Affairs: Sarah Kaczmarek, Managing Director, Media@gao.gov.

Congressional Relations: A. Nicole Clowers, Managing Director, CongRel@gao.gov.

**Staff Acknowledgments:** Aditi Archer, Lauri Barnes, Haley Dunn, Eric Hauswirth, Tracey King, Amelia Koby, Caryn Kuebler, Daniel Kuhn, Katie Minch, Amanda Panko, and Breana Stevens.

Source (cover photo): Federal Emergency Management Agency photo by Patrick Moore/FEMA.gov

Connect with GAO on Facebook, X, LinkedIn, Instagram, and YouTube. Subscribe to our Email Updates. Listen to our Podcasts.

Visit GAO on the web at https://www.gao.gov.

This is a work of the U.S. government but may include copyrighted material. For details, see https://www.gao.gov/copyright.

Exhibit K



# Deployable Federal Assets Supporting Domestic Disaster Response Operations: Summary and Considerations for Congress

Updated May 13, 2015

**Congressional Research Service**

https://crsreports.congress.gov

R43560

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Summary

For most disasters across the nation, the affected local, state, or tribal governments have sufficient capabilities to respond to the incident. However, for disasters with consequences that require unique capabilities or that overwhelm the existing capabilities of a respective state or tribal government, Congress has authorized and appropriated a suite of deployable federal assets to support domestic disaster response operations. This report reviews several key concepts about these federal assets, and highlights possible issues Congress may consider when evaluating their authorization and appropriation.

In this report, a *deployable federal asset* generally means sets of specially trained federal employees whose mission is to provide on-scene assistance to communities by supporting their disaster response. Deployable federal assets can be described as the federal government's "first responders" to a disaster. They typically only provide assistance at the request of states or tribes and in circumstances where the capabilities of non-federal government entities are insufficient. The federal government also scopes its assistance to provide only the assets that are required by the situation. The maximum disaster consequences that the federal government is prepared to address with its full set of response capabilities is largely unknown.

Given the diversity of deployable federal assets, there are many legal authorities and executive branch policies that guide their use in response operations. Some of the most notable authorities are the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. §5121 et seq.), Title XXVIII of the Public Health Service Act, the Homeland Security Act of 2002 (6 U.S.C. §101 et seq.), and the Posse Comitatus Act (18 U.S.C. §1385 et seq.). Some primary federal policies guiding the use of deployable federal assets include the National Response Framework (NRF) and accompanying Federal Interagency Operational Plan (FIOP), the National Incident Management System (NIMS), and the Defense Support for Civilian Authorities (DSCA).

Congress may consider several policy issues as it evaluates the future authorization and appropriations for deployable federal assets, and in its oversight of the assets' response capabilities. There may be theoretical benefits gained by the provision of deployable federal assets, including the pooling of disaster risk across the nation and greater efficiency in the supply of response capabilities. There may also be theoretical disadvantages, including that the provision of deployable federal assets creates a moral hazard resulting in greater disaster risk for the nation, and that federal investment may crowd out the investment of non-federal entities in similar response capabilities. Congress may also assess the various models for staffing these assets, including the benefits and costs of conditional employments, dedicated staffing versus multiuse staffing, and "federalizing" staff into temporary federal employment for response operations. Congress may evaluate whether the provision of deployable federal assets should grant federal officials greater decision-making authority in the management of response operations. Finally, there are a number of challenges that may inhibit congressional oversight, such as the small sample size of incidents available to evaluate the effectiveness of deployable federal assets and the lack of specificity in many of the authorizations and appropriations for these assets.

This report also provides brief summaries of examples of deployable federal assets. These assets are managed, either solely or jointly, by a variety of federal departments and agencies, including components of the Departments of Agriculture, Defense, Homeland Security, and Health and Human Services; the Environmental Protection Agency; the National Transportation Safety Board; and others. A synopsis of these assets is provided in **Table 1**.

# Contents

Introduction ............................................................................................................ 1
Key Concepts ......................................................................................................... 1
What is a deployable federal asset?.................................................................... 1
When does the federal government provide support to response operations? .......................... 3
What level of support is the federal government prepared to provide and for how
catastrophic a disaster?......................................................................... 4
What principal legal authorities permit, and what key executive branch policies guide
the use of deployable federal assets? ............................................................ 6
Authorities ............................................................................................... 6
Policies.................................................................................................... 7
Considerations for Congress......................................................................................... 8
Policy Benefits and Disadvantages of Deployable Federal Assets ........................................ 8
Benefits .................................................................................................. 9
Disadvantages .......................................................................................... 9
Cost-Effectiveness of Various Models for Staffing Federal Assets....................................... 10
Financing the Deployment of Federal Response Assets ..................................................11
Federalism and Operational Control ............................................................... 14
Challenges in Monitoring and Evaluating Deployable Federal Assets ................................. 14
Brief Summaries of Sample Federal Assets ........................................................................ 16
Department of Homeland Security Assets ......................................................... 21
Federal Incident Management Assistance Teams (IMATs)............................................... 21
Federal Coordinating Officers (FCOs) and Federal Disaster Recovery
Coordinators (FDRCs)............................................................................. 22
National Urban Search and Rescue (US&R) Response System Task Forces ................. 24
Visible Intermodal Prevention and Response (VIPR) Teams ........................................ 27
Protective Security Advisors (PSAs) ........................................................... 28
Department of Health and Human Services ....................................................... 30
U.S. Public Health Service Commissioned Corps ..................................................... 30
Strategic National Stockpile .................................................................... 31
U.S. Department of Agriculture .................................................................. 33
Forest Service Firefighting Assets ............................................................ 33
Department of Defense .............................................................................. 36
General Purpose Forces ........................................................................... 37
Chemical, Biological, Radiological, and Nuclear (CBRN) Response Forces ................. 40
U.S. Army Corps of Engineers Assets .......................................................... 44
Planning and Response Teams ................................................................... 44
249th Engineer Battalion (Prime Power) ....................................................... 46
Department of Energy .............................................................................. 47
Nuclear Counterterrorism and Incident Response (NCTIR) Program ............................. 47
National Transportation Safety Board Disaster Assistance ............................................. 49
Jointly Operated Assets ............................................................................. 50
National Response System for Oil and Chemical Spills............................................... 50
National Disaster Medical System (NDMS)........................................................ 53

## Figures

Figure 1. Location of National US&R Task Force Teams ............................................................. 25

## Tables

Table 1. Synopsis of Examples of Deployable Federal Assets ....................................................... 18
Table 2. Strategic National Stockpile Appropriations, FY2010-FY2015 .................................... 33
Table 3. NDMS Administrative Funding, FY2011-FY2015 ........................................................ 55

## Contacts

Author Information ....................................................................................................................... 57

# Introduction

Natural, accidental, or intentional hazards[1] produce disasters of varying severity and consequence in the nation every day. Local, state, or tribal governments respond to the significant majority of these disasters without support from the federal government. This is especially true in the initial phase of disaster response—often generalized as the first 72 hours after the originating incident. However, on an as-needed basis, the federal government can provide significant assistance to support the local, state,[2] or tribal response operation through deployable federal assets.

This report examines a variety of deployable federal assets that can support a disaster response operation. These assets may be able to support the response to certain types of consequences from certain disasters (e.g., radiological exposure from a nuclear incident) or consequences common to all disasters (e.g., command and control support, or communications assistance). This report provides a general analysis of key concepts involving deployable federal assets, including

- what it means to be a deployable federal asset;
- when the assets will be used to support response operations;
- what the main authorities and policies are that guide the use of assets; and
- what level of support the federal government is prepared to provide for response operations.

This report also examines several issues Congress may wish to consider as it evaluates the future authorization and funding for various deployable federal assets. Issues examined in the report include the potential policy benefits and disadvantages of federal investment in deployable federal assets, the cost-effectiveness of different staffing models for the assets, the methods for financing the deployment of the assets, whether federal assets should have greater operational control in response operations, and the challenges Congress may face in its oversight of the use of the assets. This report concludes by providing summaries of examples of deployable federal assets, including available information on their authorization, funding, and past uses in disasters. Brief information on the selected assets is condensed and presented in **Table 1**.

# Key Concepts[3]

## What is a deployable federal asset?

A *deployable federal asset* is not a generally recognized term in the field of domestic emergency management, but rather is a term developed for the purposes of this report to characterize a broad

---

[1] Using the Department of Homeland Security's risk lexicon, a natural hazard is a "source of harm or difficulty created by a meteorological, environmental, or geological phenomenon or combination of phenomena" (e.g., an earthquake or hurricane); an accidental hazard is a "source of harm or difficulty created by negligence, error, or unintended failure" (e.g., an oil spill, train derailment, or dam failure); and an intentional hazard is a "source of harm, duress, or difficulty created by a deliberate action or a planned course of action" (e.g., a terrorist attack, cyber-attack, or other criminal incident). See Department of Homeland Security, *DHS Risk Lexicon: 2010 Edition*, September 2010, at http://www.dhs.gov/dhs-risk-lexicon.

[2] As used in this report, "state" generally includes "any State of the United States, the District of Columbia, Puerto Rico, the [U.S.] Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands" as defined by the Sec. 102(4) of the Stafford Act, 42 U.S.C. §5122(4).

[3] For more background on how the nation responds to disasters and on federal emergency management, see CRS Report R41981, *Congressional Primer on Responding to Major Disasters and Emergencies*, by Francis X. McCarthy

swath of federal resources. The term is used to classify sets of specially trained federal employees whose mission, though not necessarily exclusive mission, is to provide on-scene assistance to communities by supporting their disaster response.[4] To aid a community, these deployable federal assets may provide unique capabilities not frequently available at a local, state or tribal level;[5] or they may be able to supplement existing capabilities that have been overwhelmed in significant disasters.[6] A *capability*, as defined in federal law, is "the ability to provide the means to accomplish one or more tasks under specific conditions and to specific performance standards. A capability may be achieved with any combination of properly planned, organized, equipped, trained, and exercised personnel that achieves the intended outcome."[7] In combination with specialized personnel and capabilities, a deployable federal asset may provide federally owned commodities, such as power generation or telecommunications equipment. A deployable federal asset also operates on an "alert" status so that they can deploy to a no-notice incident in a community expeditiously, often within the first 24 hours or less. Colloquially, deployable federal assets can be described as the federal government's "first responders" to a disaster. However, even within the confines described above, some of the deployable federal assets summarized later in the report do not comply with one of the defining elements. For example, the National Urban Search and Rescue (US&R) Task Forces are not federal employees, though they can be deployed in a federal capacity at the direction of the Federal Emergency Management Agency (FEMA) and receive significant funding to maintain national response capabilities.

This report does **not** discuss, and the term deployable federal asset does **not** include, other forms of federal assistance that can be used to support a domestic disaster response, including

- financial assistance, such as numerous grant and loan programs;[8]

- logistics assistance, such as aiding in the delivery of water, food, and medical commodities;[9] and

- technical assistance, such as legal counsel, engineering expertise for infrastructure damage assessments, or scientific expertise on natural hazards.[10]

---

and Jared T. Brown and CRS Report R42845, *Federal Emergency Management: A Brief Introduction*, coordinated by Bruce R. Lindsay.

[4] Response is defined as "actions to save lives, protect property and the environment, stabilize communities, and meet basic human needs following an incident." See U.S. Department of Homeland Security, *National Response Framework*, Second Edition, May 2013, p. 1, at http://www.fema.gov/library/viewRecord.do?id=7371.

[5] Examples discussed later in the report include the 249th Engineer Battalion (Prime Power) and the National Transportation Safety Board Disaster Assistance.

[6] Examples discussed later in the report include the Federal Incident Management Assistance Teams (IMATs) and the Visible Intermodal Prevention and Response (VIPR) Teams.

[7] Section 641(1) of the Post-Katrina Emergency Reform Act of 2006 (Title VI of P.L. 109-295, 6 U.S.C. §741).

[8] For a summary of some of these financial assistance programs, see CRS Report RL31734, *Federal Disaster Assistance Response and Recovery Programs: Brief Summaries*, by Carolyn V. Torsell and Jared C. Nagel. There are also numerous CRS reports available that discuss federal financial assistance programs in greater detail. Tax relief may also be available following disasters. For information on relief provided through the Internal Revenue Code (IRC), see CRS Report R42839, *Tax Provisions to Assist with Disaster Recovery*, by Erika K. Lunder, Carol A. Pettit, and Jennifer Teefy.

[9] For example, the Logistics Management Directorate of FEMA can provide extensive logistics capabilities in support of national disaster response operations. For more, see the Logistics Management Directorate's website at http://www.fema.gov/logistics-management-directorate.

[10] For example, the National Weather Service provides technical expertise on meteorological natural hazards, to include predictions on the path and magnitude of hurricanes and potential tornado-producing weather systems. Likewise, the Centers for Disease Control and Prevention's (CDC's) National Center for Environmental Health, Health Studies Branch, studies the epidemiology of disasters, provides a rapid health needs assessment tool to be used by communities

The term deployable federal asset also does not include the significant number of federal government personnel that are already permanently "deployed" throughout the nation. These federal personnel may support a local, state, or tribal government through their normally authorized activities, in both normal and disaster situations. For example, Federal Aviation Administration (FAA) air traffic controllers provide a daily public service to a community, and they strive to continue that service in disasters to support the community. Likewise, the Department of Homeland Security's (DHS's) field personnel, such as Custom and Border Protection agents, Immigration and Customs Enforcement agents, and Secret Service agents, perform essential homeland security and emergency management duties on a regular basis in communities across the nation. In particular, the U.S. Coast Guard provides significant emergency management and homeland security capabilities through regionally based personnel throughout the nation, in fulfillment of its maritime security and safety missions.[11] The field personnel of scientific government agencies can also provide on-scene technical expertise to support disaster response operations, such as personnel from the U.S. Geological Survey (USGS)[12] and the National Oceanic and Atmospheric Administration (NOAA).

## When does the federal government provide support to response operations?

When a hazard produces a disaster in a community, the assets and resources needed to address the consequences of the incident are generally provided by local, state, or tribal governments. This complies with general principles of federalism found in emergency management policy, and the often repeated truism that "all disasters are local." However, due to the magnitude of the disaster, a local, state, or tribal government may (a) be unable to respond to the unique consequences of a disaster (e.g., it lacks a capability to eliminate a certain biological contaminant), or (b) have its capability to respond become overwhelmed by the scale of consequences (e.g., there are too many survivors requiring temporary shelter assistance). In either circumstance, the community may first request assistance through an Emergency Management Assistance Compact (EMAC) or similar mutual-aid agreement with a neighboring jurisdiction.[13] These mutual-aid agreements allow communities to leverage the resources of the surrounding region before requesting assistance from a higher level of government, such as how neighboring fire departments may be called upon to assist during particularly challenging incidents.

In general, to obtain federal assistance to address unmet needs arising from the disaster, an official request must be made through the jurisdictional chain relevant to the community (i.e., from a city to county, county to state, and then state to federal; or from a mayor to county executive, a county executive to a governor, and a governor to the President). Generally, tribal

---

responding to a disaster, and, upon request, provides expertise in disaster epidemiology to local, state, federal, and international public health partners to help them prepare for and respond to natural and man-made hazards. For more, see, respectively, the website for the NWS at http://www.weather.gov/, and the website for the CDC HSB at http://www.cdc.gov/nceh/hsb/disaster/default.htm.

[11] For examples of the Coast Guard's capabilities, see a description of "2014 Performance Highlights" in U.S. Coast Guard, *2016 Budget in Brief*, February 2, 2015, at http://www.uscg.mil/budget/docs/2016_Budget_in_Brief.pdf.

[12] For a brief description of how the USGS supports disaster response, see U.S. Geological Survey, *USGS Emergency Response Resources*, Fact Sheet 2011-3079, September 2013, at http://pubs.usgs.gov/fs/2011/3079/pdf/fs2011-3079.pdf.

[13] The EMAC is a congressionally ratified compact that provides a legal structure by which states affected by a disaster may request emergency assistance and aid from other states. The legal model has been replicated by local and tribal government jurisdictions. The EMAC was ratified in P.L. 104-321. For more on EMAC, see http://www.emacweb.org/.

governments may appeal for assistance directly to the federal government, but may also seek the assistance of a relevant state or other local government first. There are many federal laws and regulations that prescribe how a request for assistance may be made, but the most prominent is the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. §5721 et seq.; henceforth the Stafford Act).[14]

The federal government may also provide assistance without a request in more limited circumstances. For example, a request does not need to be made by a state or tribal government when the primary responsibility for the response rests with the federal government. This most frequently occurs because the incident involves an issue or hazard for which, under the Constitution or a federal law, the President or other federal authority has exclusive or preeminent responsibility and authority.[15] Likewise, there are situations when the federal government or a federal asset will provide immediate assistance, primarily to prevent the direct loss of life or significant property damage, without the request rising through the "normal" request procedures.[16] For instance, the Department of Defense (DOD), through its Defense Support of Civil Authorities (DSCA) regulations and policies, authorizes local DOD officials to provide immediate assistance without a formal request rising through the state and lead federal officials. Called the "immediate response authority," regulations state that

> In response a request for assistance from a civil authority, under imminently serious conditions and if time does not permit approval from higher authority, DOD officials may provide an immediate response by temporarily employing the resources under their control, subject to any supplemental direction provided by higher headquarters, to save lives, prevent human suffering, or mitigate great property damage within the United States.[17]

## What level of support is the federal government prepared to provide and for how catastrophic a disaster?

For many reasons, the federal government attempts to scale its support for any disaster response operation appropriately. Most obviously, the federal government scales its support so as not to waste federal resources, but also to avoid overwhelming the community with excess assets and inhibiting an efficient response. This scalability of support by the federal government can include denying the requests of local, state, and tribal governments for more commitment of resources. For example, a duly authorized federal official receiving a request may determine that the use of an asset is not required by the conditions in the relevant incident. Under the Stafford Act process, this can mean the denial of a request for a major or emergency disaster declaration, or the provision of certain types of direct federal assistance and not others under a major disaster declaration. The federal government may also provide a different type of asset than the one requested to address an unmet need.

---

[14] For more on how requests are managed through the Stafford Act declaration process, see CRS Report R43784, *FEMA's Disaster Declaration Process: A Primer*, by Francis X. McCarthy.

[15] See, primarily, Sec. 501(b) of the Stafford Act, 42 U.S.C. §5191(b). Most notably, this situation arises when the area affected by the disaster is on federal property (in national waters, lands, parks, or military installations, etc.) or when the Federal Bureau of Investigation becomes the lead federal law enforcement agency in response to a terrorism incident.

[16] See, primarily, Sec. 502(a)(8) of the Stafford Act, 42 U.S.C. §5192(a)(8). This authority allows the federal assistance to be provided "where necessary to save lives, prevent human suffering, or mitigate severe damage, which may be provided in the absence of a specific request.... "

[17] 32 C.F.R. §185.4(g).

In theory, in the most extreme of catastrophic disasters,[18] all applicable resources of the federal government could be directed to support response operations under the authority of the Stafford Act.[19] The full resources of the DOD could also be used to support a disaster response under what DOD claims is its "inherent emergency power."[20] An exemption in the Antideficiency Act relating to "emergencies involving the safety of human life or the protection of property" may also allow the use of federal resources, to include deployable assets, without sufficient funding having been previously provided by Congress.[21]

It is difficult, if not impossible, to project the magnitude of consequences that the full resources of the federal government would be able to respond to sufficiently. Additionally, government plans that provide detailed assessments of a maximum response capacity are likely to be classified, given the sensitivity of that information for national security. That said, some public information is available that illustrates the potential magnitude of consequences the federal government is conceivably planning to address. For example, in a 2011 draft of the National Preparedness Goal, FEMA described a "meta-scenario" that was used to define the national—not just federal[22]—capabilities needed for response and recovery. The meta-scenario was described as

> a no-notice event impacting a population of seven million within a 25 thousand square mile area. The impacted area includes several states across multiple regions. Severe damage is projected to critical infrastructure including essential transportation infrastructure. Ingress and egress options are severely limited. The projected number of fatalities is 195,000 during the initial hours of the event. It is projected that 265,000 survivors will require emergency medical attention. At least 25 percent of the impacted population will require mass care, emergency sheltering, and housing assistance.[23]

This meta-scenario was not mentioned directly in the final version of the National Preparedness Goal, and appears to have been simplified in text to a "no-notice, cascading incident."[24] Other

---

[18] Possible scenarios range from the impact of a meteor or comet, an attack by a foreign or domestic adversary using a weapon(s) of mass destruction, a series of catastrophic earthquakes and subsequent tsunamis, or the eruption of a supervolcano.

[19] See Sec. 402(1) of the Stafford Act, 42 U.S.C. §5170a(1), which authorizes the President, in any major disaster, to "direct any Federal agency, with or without reimbursement, to utilize its authorities and the resources granted to it under Federal law (including personnel, equipment, supplies, facilities, and managerial, technical, and advisory services) in support of State and local assistance response and recovery efforts, including precautionary evacuations." The legal definition of a *major disaster* in the Stafford Act confines the types of hazards that can result in a major disaster declaration, but it is difficult to imagine a scenario where a truly catastrophic disaster would not result in one or more major disaster declarations. Even if the provoking hazard is not specifically included in the major disaster definition—such as a terrorist attack or cyber incident—the consequences of the hazard requiring response capabilities are likely to fall into the scope of the definition. See Sec. 102(2) of the Stafford Act, 42 U.S.C. §5122(2) for the definition of a *major disaster*. Some legislative consideration has been given to establishing a formal process in the Stafford Act to declare a "catastrophic" disaster; for more on that issue see CRS Report R41884, *Considerations for a Catastrophic Declaration: Issues and Analysis*, by Bruce R. Lindsay and Francis X. McCarthy.

[20] For more information on the DOD's inherent emergency power and other authorizations for the use of federal military in disaster response, see CRS Report RS22266, *The Use of Federal Troops for Disaster Assistance: Legal Issues*, by Jennifer K. Elsea and R. Chuck Mason.

[21] 31 U.S.C. §1342. For more information on the Antideficiency Act (31 U.S.C. §§1341-1342, §§1511-1519) and this "emergency" and other exemptions, see CRS Report RL34680, *Shutdown of the Federal Government: Causes, Processes, and Effects*, coordinated by Clinton T. Brass.

[22] National capabilities mean the capabilities of the whole of community, including available assets from local, state, tribal governments, and the private and nonprofit sectors.

[23] See Federal Emergency Management Agency, *National Preparedness Goal*, National Review Draft, p.6, August 2011.

[24] Department of Homeland Security, *National Preparedness Goal*, First Edition, September 2011, p. 4, at

planning and exercise scenarios, especially the National Level Exercise 2011,[25] provide further extreme examples of potential capacity requirements.[26] Both FEMA and the DOD are currently developing and revising national and regional catastrophic plans that may improve future understanding of the maximum capacity to respond to a disaster or series of disasters.[27]

# What principal legal authorities permit, and what key executive branch policies guide the use of deployable federal assets?

As there is a wide array of deployable federal assets throughout many federal departments and agencies, this section of the report does not provide a comprehensive list of every authority or policy that guides the use of the assets for disaster response operations. However, the following section does discuss a broad legal authority for the provision of federal assistance and executive branch policies guiding that assistance.

## Authorities

The specific authority for each example of a deployable federal asset is discussed later in the report. Of general importance to all deployable federal assets is the *essential assistance* authority provided by the Stafford Act. This authority allows any federal agency, at the approval of the President, to provide "assistance essential to meeting immediate threats to life and property resulting from a major disaster."[28] Though federal essential assistance is only available during Stafford Act declared major disasters, the federal government is also allowed to provide considerable assistance during Stafford Act declared emergencies.[29] A Stafford Act emergency can be declared in "any occasion or instance for which, in the determination of the President, Federal assistance is needed to supplement State and local efforts and capabilities to save lives and to protect property and public health and safety, or to lessen or avert the threat of a catastrophe in any part of the United States."[30] These provisions, and others of the Stafford Act, may provide sufficient legal justification for the use of federal resources, including those established under more general authority without specific direction on their use in disasters, to support response operations.

---

http://www.fema.gov/pdf/prepared/npg.pdf.

[25] In 2011, emergency managers and stakeholders across the nation participated in the annual "National Level Exercise" (NLE) using the scenario of a catastrophic earthquake in the New Madrid Seismic Zone. The annual NLE is the centerpiece of FEMA's National Exercise Program. The National Exercise Program is established to test, evaluate, and improve national capabilities to prepare for disasters. For more on NLE 2011, see Federal Emergency Management Agency, *National Level Exercise 2011 (NLE): Quick Look Report*, June 14, 2011, at https://www.llis.dhs.gov/sites/default/files/nle11_quick_look_report.pdf.

[26] Numerous other documents provide some indications about the maximum response capabilities of the federal government, including documents that were produced under a previous version of the National Response Framework, and the "National Planning Scenarios" developed pursuant to a now-obsolete presidential directive, Homeland Security Presidential Directive 8 (HSPD-8). For example, see the Department of Homeland Security, *Catastrophic Incident Supplement to the National Response Framework*, For Official Use Only.

[27] For more on these planning efforts, see U.S. Government Accountability Office, *Civil Support: Actions Are Needed to Improve DOD's Planning for a Complex Catastrophe*, GAO-13-763, September 2013, at http://www.gao.gov/assets/660/658406.pdf.

[28] Sec. 403 of the Stafford Act, 42 U.S.C. §5170b.

[29] Sec. 502 of the Stafford Act, 42 U.S.C. §5192.

[30] Sec. 102(1) of the Stafford Act, 42 U.S.C. §5122(1).

CRS also has a number of available reports that analyze federal authorities for disaster assistance, including the authorizing legislation for deployable federal assets.[31]

## Policies

The National Response Framework (NRF) is the foremost policy that guides "how the Nation responds to all types of disasters and emergencies ... [and] describes specific authorities and best practices for managing incidents that range from the serious but purely local to large-scale terrorist attacks or catastrophic natural disasters."[32] As a *national* policy, it is intended to guide not just federal response operations, but also local, state, and tribal government response operations, and the response operations of the private and non-profit sectors. The NRF also establishes 14 different Emergency Support Functions (ESFs) to organize the response capabilities of the nation.[33] Mainly through supplementary documents to the NRF, including a Federal Interagency Operational Plan (FIOP), ESF annexes, incident annexes, and other support annexes, the NRF sets out specific responsibilities of federal agencies involved in the response operations. At the more detailed level of the Response FIOP, the response requirements and capabilities of the federal government are identified through a generalized concept of operations.[34] Varying levels of specific information on *how* the requirements and capabilities will be fulfilled, often by deployable federal assets, are further discussed in the Annexes to the FIOP.[35] Although the NRF is often closely linked with the Stafford Act, the NRF is always in effect and does not require a formal Stafford Act declaration to be used. Any disaster requiring federal

---

[31] As examples among others, see

- CRS Report RL33053, *Federal Stafford Act Disaster Assistance: Presidential Declarations, Eligible Activities, and Funding*, by Francis X. McCarthy;

- CRS Report R43990, *FEMA's Public Assistance Grant Program: Background and Considerations for Congress*, by Jared T. Brown and Daniel J. Richardson.

- CRS Report R43251, *Oil and Chemical Spills: Federal Emergency Response Framework*, by David M. Bearden and Jonathan L. Ramseur;

- CRS Report RL33579, *The Public Health and Medical Response to Disasters: Federal Authority and Funding*, by Sarah A. Lister;

- CRS Report R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law*, by Charles Doyle and Jennifer K. Elsea; and

- CRS Report R42114, *Federal Laws Relating to Cybersecurity: Overview of Major Issues, Current Laws, and Proposed Legislation*, by Eric A. Fischer

[32] See U.S. Department of Homeland Security, *National Response Framework*, Second Edition, May 2013, p. 1, at http://www.fema.gov/library/viewRecord.do?id=7371. For extensive support documents and presentations on the NRF, see http://www.fema.gov/nrf/.

[33] ESFs group agencies with pertinent authorities, resources, and expertise to accomplish a set of capabilities needed in disaster response, regardless of disaster type. For instance, ESF #9 is "Search and Rescue," which unifies agencies with the appropriate resources and authorities to conduct search and rescue operations following an incident. Each ESF has a coordinating agency, typically several different primary agencies, and a larger number of support agencies. There were originally 15 ESFs in earlier versions of the NRF, but one, ESF #14—Long-term Community Recovery, was replaced by the National Disaster Recovery Framework.

[34] Department of Homeland Security, *Response Federal Interagency Operational Plan*, July 2014, at https://www.fema.gov/media-library/assets/documents/97362.

[35] For example, see Annex C: Operational Coordination of the FIOP, which has multiple sub-appendixes on key core capabilities, such as Appendix 4 to Annex C: Fatality Management Services. In this particular appendix, the role of deployable federal assets of the National Disaster Medical System (NDMS) are identified and explained. See Department of Homeland Security, Response Federal Interagency Operational Plan, Appendix 4 to Annex C, July 2014, at https://www.fema.gov/media-library/assets/documents/97362.

coordination, including those declared under other federal authorities, arguably can be managed through the NRF.

A central guideline of the NRF is the National Incident Management System (NIMS).[36] Originally conceived of in Homeland Security Presidential Directive 5 (HSPD-5),[37] NIMS is now mandated in law for the federal government and strongly encouraged for state and local governments through requirements to grant assistance.[38] NIMS is a preparedness and response management model that incorporates the Incident Command System (ICS). ICS is a command and control system and structure originally developed by firefighters as a means of providing cohesive response to multijurisdictional (or multidepartment) incidents. ICS standardizes response operations by using similar terminology, communication systems, and organizational structures to eliminate or reduce confusion during a unified response.[39] NIMS uses ICS concepts to establish a response structure that is scalable (capable of growing as more organizations come together to respond to the incident) and that can be used by all jurisdictions, agencies, and organizations to ensure a unified response to complex events.

Another significant federal policy is set forth by Defense Support for Civilian Authorities (DSCA) regulations and DOD directives.[40] DSCA guides the use of DOD deployable federal assets in accordance with the Constitution and other legal requirements. There are also many incident-specific planning guidelines, such as the National Strategy for Pandemic Influenza,[41] which provide critical guidance on the use of deployable federal assets for those incidents.

# Considerations for Congress

There are several policy issues that Congress may consider when evaluating future authorization and funding for various deployable federal assets. Though each deployable federal asset has unique oversight issues, the following sections of this report discuss cross-cutting matters related to oversight of these assets as a whole.

## Policy Benefits and Disadvantages of Deployable Federal Assets

There are several theoretical policy benefits and disadvantages that may result from authorization and appropriation of deployable federal assets by Congress. In the following section, several of these salient benefits and disadvantages, rooted in macroeconomic and social science theory, are

---

[36] Extensive information about NIMS is available from FEMA on its website at http://www.fema.gov/national-incident-management-system.

[37] Executive Office of the President, *Homeland Security Presidential Directive-5: Management of Domestic Incidents*, February 28, 2003, at https://www.dhs.gov/publication/homeland-security-presidential-directive-5.

[38] See, among others, 6 U.S.C. §314(a)(2)(b). The requirement for NIMS adoption and training is embedded in both the Homeland Security Grant Program and Emergency Management Performance Grant program.

[39] For example, prior to ICS, a police and fire department responding to the same incident might use different command structures and communicate with different terms. For instance, a "code blue" for one department might mean something else for another. The organization's structure might also be different, as a "chief" in one department might have a different role and responsibility in another. ICS (and NIMS) is therefore an attempt to eliminate potential confusion caused by these differences.

[40] DOD regulatory guidance for DSCA is contained in DOD Directive 3025.18, *Defense Support of Civil Authorities*, December 29, 2010 (incorporating change 1, September 21, 2012), at http://www.dtic.mil/whs/directives/corres/pdf/302518p.pdf. The joint doctrinal publication on this topic is Joint Publication 3-28, *Defense Support of Civil Authorities*, July 31, 2013, at http://www.dtic.mil/doctrine/new_pubs/jp3_28.pdf.

[41] Executive Office of the President, Homeland Security Council, *National Strategy for Pandemic Influenza*, November 2005, at http://www.flu.gov/planning-preparedness/federal/pandemic-influenza-strategy-2005.pdf.

discussed briefly. These benefits and disadvantages are largely a result of the federalism structure of the nation, and may also apply to the provision of deployable assets by states. In other words, to a different degree, the authorization and appropriation of deployable assets by state legislatures may result in similar benefits and disadvantages.

## Benefits

The authority and funding for deployable federal assets can be considered a form of risk pooling. It allows the nation, as a whole, to combine or "pool" uncorrelated hazard risk (such as from earthquakes and terrorist attacks), and the response capability requirements associated with those risks (such as mass care and power generation capabilities). Essentially, not every local, state, or tribal government may use the response capabilities provided by a certain deployable asset within a given time frame (a year, or decade), but each may be attempting to manage the risk of needing such an asset from a variety of hazards. For example, consider the federal government's resourcing of DOD Chemical, Biological, Radiological, and Nuclear Response (CBRN) Forces. Every community in the nation faces some low level of risk (though not uniform) that a hazard will produce consequences that these assets have a capability to address. If communities are able to pool their risk through the centralized federal capability, each may be able to ensure they have access to the capability when required without maintaining the asset wholly on its own. Risk pooling also occurs at a local, state, and tribal government level through emergency management mutual-aid agreements.

An associated benefit of this risk pooling is that the federal government may be able to provide the response capabilities of deployable federal assets at a lower cost than smaller governments, due to economies of scale.[42] For example, the per unit "production" cost of the capabilities provided by U.S. Army Corps of Engineers Planning and Response Teams may be significantly less at the federal level than at a state or local level. Reductions in the cost of production may occur because the federal government gains efficiencies in the costs of training and equipping the larger number of units the nation requires instead of the one or two units that might be required at the state or local level.

## Disadvantages

There are also possible disadvantages with the establishment of deployable federal assets. The mere existence and use of federal response capabilities provided by deployable federal assets may produce a type of moral hazard.[43] The moral hazard may occur if and when non-federal actors, including other government entities and private citizens, increase their risk exposure to hazards under the reasonable expectation that the federal government will provide sufficient response capabilities when needed to address disaster consequences. Observers have argued that moral hazard may result from most forms of federal disaster assistance, especially financial assistance.[44] In the context of deployable federal assets, for example, the establishment of federal firefighting

---

[42] An *economy of scale* is "A situation in which the average cost of production decreases as production increases." See *Dictionary of the Social Sciences*, ed. Craig Calhoun (New York, NY: Oxford University Press, 2002).

[43] A *moral hazard* "refers to the possibility that policies or decisions may create incentives for undesirable behavior. Moral hazards often arise where the monitoring of contracts is difficult or where policies diminish the risks associated with certain kinds of behavior." See *Dictionary of the Social Sciences*, ed. Craig Calhoun (New York, NY: Oxford University Press, 2002).

[44] See, for example, discussion of the potential moral hazard of disaster assistance at Raymond J. Burby, "Hurricane Katrina and the Paradoxes of Government Disaster Policy: Bringing about Wise Governmental Decisions for Hazardous Areas," *Annals of the American Academy of Political and Social Science*, vol. 604 (March 2006).

capabilities may deter other governmental actors and private individuals from mitigating their wildfire risk, or encourage potentially risky development in the wildland-urban interface.[45]

Another theoretical disadvantage is that federal provision of response capabilities may crowd out[46] investment in those same capabilities by other actors, including the private sector. As such, other actors may be less likely, or even unable, to develop their own response capabilities due to federal investments. For example, the federal government's investment in the capabilities provided by the 249th Engineer Battalion (Prime Power) may raise the cost of similar energy-related response capabilities for non-federal actors. Or, the federal government's investment in Federal Incident Management Assistance Teams (IMATs) may crowd out the investment of other actors in highly trained and skilled emergency managers, because the federal government is both dominating the supply of a potentially limited resource and driving up its cost to other potential purchasers. The crowding out may be less problematic if it only decreases the investment of non-federal government entities, but does not reduce the investment from the private sector or individual citizens. If true, local governments may be simply transferring the financial responsibility to the federal government for the investment in a capability, though such commitment is still coming from the national tax base. However, if the government's spending crowds out private sector investment (e.g., critical infrastructure owners and operators) in response capabilities, it may be more problematic for the nation's risk profile as the investment may reduce the nation's aggregate supply of capabilities and increase the taxpayer's proportional burden for providing those capabilities. For example, if the private sector provides less of a capability because of the crowd-out effect, the nation may have less of the capability in total. To compensate for the loss of private sector investment, either partially or entirely, the resulting government expenditure on the capability may increase, thus increasing taxpayer costs.

## Cost-Effectiveness of Various Models for Staffing Federal Assets

As deployable assets continue to be resourced, Congress may wish to evaluate the cost-effectiveness of various models of staffing deployable federal assets. These models are not mutually exclusive. Even within the selection of samples of deployable federal assets covered in this report, there is considerable diversity in how personnel are employed by the federal government—if they are employed by the government directly at all. Below are a few short examples of how deployable assets are staffed.

- **Conditional employment**: In this model, assets are significantly staffed by federal employees on term-limited, seasonal, or reserve appointments. For example, personnel of Forest Service Firefighting Assets are often seasonal employees, typically only working as temporary agency employees during the length of the fire season. This conditional employment model may accrue savings in salaries and benefits, but may decrease the effectiveness of the capability by reducing the available training time for employees or discouraging highly qualified employees from continuing their service. It may also generate a higher turnover employment ratio in the asset.

- **Dedicated versus multiuse staffing**: A *dedicated* staffing model means that the sole mission and job description of the employee revolves around their participation and responsibilities with the deployable federal asset. A *multiuse*

---

[45] For more on wildfire protection, see CRS Report RS21880, *Wildfire Protection in the Wildland-Urban Interface*, by Katie Hoover and Kelsi Bracmort.

[46] *Crowding out* is "the fall in private consumption or investment resulting from a rise in government expenditure." See *Dictionary of the Social Sciences*, ed. Craig Calhoun (New York, NY: Oxford University Press, 2002).

staffing model means the employee has one or more additional responsibilities, and is only dedicated to the mission of the deployable asset during activations or trainings. As examples, personnel of the Transportation Security Administration's (TSA's) Visible Intermodal Prevention and Response (VIPR) Teams may be multiuse staff, as the team may be comprised of various different DHS/TSA staff elements with other, primary assigned duties, such as Federal Air Marshals. In contrast, Federal Coordinating Officers (FCOs) and Federal Disaster Recovery Coordinators (FDRCs) are full-time employees dedicated exclusively to their deployable mission. Much of the assessment on cost-effectiveness of the two models has to do with frequency of use for the capabilities of the asset, and the level of specialized training that is required to maintain their operational readiness. An additional disadvantage that should be considered when evaluating the multiuse model is the impact deployments have on the execution of their alternate missions, and whether those missions could continue to be performed if the employees were deployed at greater than expected lengths of time.

- **"Federalization" or "Activation" employment model:** This staffing model generally means that a majority or all of the employees of a deployable federal asset are not regularly employed or paid by the federal government. Rather, the employees may be public employees of other government entities (e.g., state or local agencies), or even private citizens with specialized skills (e.g., physicians). The President or other federal government official has the authority to "federalize" or "activate" the asset, and in doing so, may pay the salaries of the employees while deployed, and grant the employee many of the benefits and protections afforded to permanent federal employees. Typically, these assets also receive some level of regular federal funding for training, equipment, and other needs. The National Urban Search and Rescue (US&R) Task Forces and components of the National Disaster Medical System (NDMS) use variations of this staffing model. Benefits of this model include that it may leverage non-federal expertise in national response operations from citizens that otherwise would not be interested or incentivized to join the federal government. This model may also be the most cost-effective, as it may limit federal expenditures when the asset is not being used nationally. However, disadvantages of this model include a restricted ability to manage the quality of training and capabilities of personnel staffing in the asset, and greater challenges integrating the asset into the ICS structure with other assets.

## Financing the Deployment of Federal Response Assets

In general, costs to maintain a deployable federal response asset—such as rostering and training of personnel and maintenance of equipment—are predictable, and are provided through a standing funding mechanism, typically the annual appropriation to the responsible agency. Deployment costs, or those costs related to using the asset to provide direct assistance to a community, may not have regular funding mechanisms. For some types of incidents and deployable assets, Congress has provided, or agencies have developed, various mechanisms to bear the largely unpredictable costs of deployments. For other types of incidents and deployable assets, there is no such established mechanism. In these cases, Congress may provide supplemental appropriations, or responsible agencies must bear deployment costs through other funds available in their annual budgets. Specific mechanisms to fund maintenance and management costs are discussed in the summaries of specific deployable assets later in this

report. Selected types of funding mechanisms and challenges in funding deployments are discussed in general below.

The Disaster Relief Fund (DRF) is a common source of deployment funding for direct federal assistance authorized by the Stafford Act.[47] When an emergency or major disaster is declared under the Stafford Act, FEMA officials, through the delegated authorities of the President, may direct other federal agencies to provide assistance to the affected communities through *mission assignments*. Mission assignments are formal work orders for specific activities and/or assets under Stafford Act authority. Typically, mission assignments are provided to federal agencies with the promise of reimbursement of costs through the DRF.[48] Depending on the details of the disaster declaration, some of these costs may be shared by the state or tribal government, with a minimum of 75% of the cost being covered by the federal government.[49]

Although the DRF, via mission assignments, is a significant source of funding for many deployable federal assets, not all federal activities during Stafford Act declared incidents may be paid for through the DRF. In practice, FEMA generally avoids paying for the deployment of assets through the DRF when the capability of the asset is a normally authorized activity of the agency, or when the agency has a more specific authority to provide emergency assistance for a particular disaster consequence than is written in the Stafford Act. For example, FEMA, as a matter of policy, has determined that it generally will not provide funding to the U.S. Army Corps of Engineers or the Natural Resources Conservation Service to provide emergency protective measures[50] related to the rehabilitation of levees and other flood control works.[51] Therefore, in such circumstances, federal agencies may require another source of funding to pay for these activities during deployment in Stafford Act declared incidents.

There are also many types of incidents where a Stafford Act declaration is not made and certain federal response assets may still be deployed. This most regularly occurs when assets are deployed in a preventive or precautionary role at National Special Security Events (NSSEs), such as presidential inaugurations and major sporting events. Although these events are predictable and, barring an incident, deployment costs may be modest, NSSEs do not trigger assistance through the Stafford Act and do not have any other blanket funding mechanism to cover asset deployment costs.[52] Often the responsible agencies cover deployment costs through the administrative budgets for the specific assets.

---

[47] For more on the DRF, see CRS Report R43537, *FEMA's Disaster Relief Fund: Overview and Selected Issues*, by Bruce R. Lindsay.

[48] Mission assignments rely on the President's authority to direct federal agencies to support disaster response and recovery operations, namely found at Sec. 402, 403, and 502 of the Stafford Act (42 U.S.C. §§5170a, 5170b, and 5192). See Federal Emergency Management Agency, *Financial Management Support Annex, National Response Framework*, May 2013, at http://www.fema.gov/media-library/assets/documents/32264?id=7387. Specific examples of mission assignments are available through daily mission assignment activity reports published on FEMA's website at http://www.fema.gov/media-library/assets/documents/30824?id=6984.

[49] See, primarily, Sec. 403(c)(4) of the Stafford Act, (42 U.S.C. §5170b(c)(4). For more on disaster cost-shares in Stafford Act declarations, see CRS Report R41101, *FEMA Disaster Cost-Shares: Evolution and Analysis*, by Francis X. McCarthy.

[50] Emergency protective measures is generally defined by FEMA as activities necessary to "eliminate or reduce an immediate threat to life, public health, or safety; or eliminate or reduce an immediate threat of significant damage to improved public or private property through cost-effective measures." See Federal Emergency Management Agency, *Public Assistance Guide*, FEMA 322, 2007, p. 71, at http://www.fema.gov/public-assistance-policy-and-guidance.

[51] Federal Emergency Management Agency, *Rehabilitation Assistance for Levees and other Flood Control Works*, RP9524.3, September 23, 2011, p. 2, at https://www.fema.gov/pdf/government/grant/pa/9524_3.pdf.

[52] For more on NSSEs, see CRS Report R43522, *National Special Security Events: Fact Sheet*, by Shawn Reese.

Generally, federal agencies are not allowed to augment their funding from outside sources unless specifically authorized by Congress. These issues are covered by the general area of law called augmentation of appropriations,[53] and can inhibit federal agencies from using any source of funding other than direct appropriations from Congress to pay for the cost of deployments. Absent statutory authorization, federal agencies are generally restricted from accepting private funding to pay for the deployment of federal assets or other federal activities (e.g., accepting money from a private company for the use of an asset to restore electrical power to the company's facilities).[54] Federal agencies are also generally restricted from receiving unreimbursed assistance from employees of deployable federal assets, or from receiving the volunteer assistance of the general public to serve in any official federal capacity.[55]

As an example of how Congress may address these funding challenges, consider the 2009 influenza pandemic. When an incident results in a Stafford Act declaration, reimbursement is often available through the DRF to reimburse agencies for many activities carried out as part of ESF #8—Public Health and Medical Services, coordinated by the Department of Health and Human Services (HHS).[56] However, a Stafford Act declaration was not made in response to the 2009 influenza pandemic, and there is no precedent for a major disaster declaration in response to an infectious disease incident, whether naturally occurring, or bioterrorism.[57] Furthermore, there is no standing federal mechanism to cover the costs of health care that is provided as part of a disaster response. Congress provided supplemental appropriations to fund the response to the 2009 influenza pandemic,[58] and to cover unreimbursed healthcare costs associated with the response to Hurricane Katrina in 2005.[59]

Congress has also established two dedicated trust funds—managed by the U.S. Coast Guard and the Environmental Protection Agency respectively—to finance the costs of a federal response to a discharge of oil or release of a hazardous substance, pollutant, or contaminant. Each agency is responsible for disbursing monies from these trust funds to other federal departments and agencies, states, and local entities that may be involved in a federal response. The federal government may recover its response costs from the liable party (or parties) and may use these funds to replenish the respective trust fund, with the exception of the costs of responding to pollutant or contaminant incidents for which liability is not established. These funding mechanisms are discussed further in the "National Response System for Oil and Chemical Spills" section of this report.

---

[53] For a full discussion of augmentation of appropriations, see U.S. Government Accountability Office, *Principles of Federal Appropriations Law, Third Edition, Volume II*, GAO-06-382SP, February 2006, at http://www.gao.gov/assets/210/202819.pdf.

[54] 31 U.S.C. §3302.

[55] 31 U.S.C. §1342.

[56] Even when there is a Stafford Act declaration, FEMA does not reimburse for health care costs except for such care required to provide immediate emergency care, evacuation, and stabilization. See FEMA Recovery Policy 9525.4, "Emergency Medical Care and Medical Evacuations," February 3, 2014, at http://www.fema.gov/9500-series-policy-publications.

[57] CRS Report RL34724, *Would an Influenza Pandemic Qualify as a Major Disaster Under the Stafford Act?*, by Edward C. Liu.

[58] See the Supplemental Appropriations Act, FY2009 (P.L. 111-32). For discussion of the supplement funding required and the overall H1N1 incident, see CRS Report R40554, *The 2009 Influenza Pandemic: An Overview*, by Sarah A. Lister and C. Stephen Redhead.

[59] For discussion, see U.S. Government Accountability Office, *Hurricane Katrina: Allocation and Use of $2 Billion for Medicaid and Other Health Care Needs*, GAO-07-67, February 28, 2007, at http://www.gao.gov/products/GAO-07-67.

## Federalism and Operational Control

As previously discussed, the federal government generally provides disaster assistance, including deployable federal assets, at the request of a state or tribal government. In addition, the federal government almost always operates in a support role in the affected communities. While federal assets, especially federal troops, generally remain in the control of the federal officials, the set of unmet needs they are tasked with addressing is largely dictated by the incident commanders at the local or state level. In other words, federal resources are provided at the discretion of the affected entities, in deference to federalism principles, with a lesser degree of executive decision-making on their use being made by federal officials.

This can create situations where the federal government is providing considerable support with limited authority to direct the overall management of the incident. For example, this could result in disagreements over tactical decisions such as where to prioritize search and rescue operations, the best way to triage and manage mass care requirements of survivors, and what critical services should or can be restored before other services. Congress may wish to consider whether the provision of federal assistance should grant the federal government more decision-making power if disagreements arise in the incident management. On the positive side of the argument, greater federal authority may more easily allow the application of lessons learned from other disasters to the current incident if the state or local incident command has less experience to draw on. It may also increase regional coordination of a response by allowing federal officials to influence decisions across a unified command structure. Further, federal assets may be able to place greater priority on addressing the consequences of a disaster that have national implications versus more localized implications.[60] On the negative side, any changes to federal authority that allow the federal government to have greater operational control over state and local response management may dissuade such entities from requesting assistance in the first place. Further, local knowledge and expertise on the unmet needs of the affected population may be sidelined or underappreciated by federal officials, to the detriment of the survivors. Also, the possibility that the federal government could "overrule" a local command decision may lead to breakdowns in the NIMS structure that would have negative impacts on all response operations.

## Challenges in Monitoring and Evaluating Deployable Federal Assets

In Congress's oversight of federal operations, Congress may face numerous challenges when attempting to monitor and evaluate the benefits of deployable federal assets in supporting response operations.

These challenges include the following.

- The use of deployable federal assets is a relatively rare occurrence, though some are used much more frequently than others.[61] Also, reporting by the federal

---

[60] For example, federal assets may be more likely to restore nodes of critical infrastructure systems needed to avoid or remediate cascading impacts outside the immediately affected area (e.g., pipelines transporting natural gas through the affected region that do not provide service to the immediate area, or a local dam that provides regional power generation) instead of focusing on the restoration of critical infrastructure providing end service of the community (e.g., power transmission lines to residential or commercial areas, or reducing flooding in local transportation hubs).

[61] Some assets, such as Federal Coordinating Officers (FCOs) and Federal Disaster Recovery Coordinators (FDRCs) are used far more frequently than others, such as the Department of Defense Chemical, Biological, Radiological, and Nuclear (CBRN) Response Forces.

government on the use of its assets, even in raw numbers, is limited,[62] making it difficult to assess the percentage of incidents that result in the provision of one or more deployable federal assets.[63]

- Analyzing the benefits of deployable federal assets based on a roughly comparable counterfactual scenario[64] may be difficult because of the uniqueness of each disaster and the particular capabilities of each local government.[65]

- The authorizations and appropriations for many deployable federal assets have a low degree of specification. For example, many assets draw their authority from broadly worded provisions in statute,[66] and others are appropriated by Congress in large, unspecific accounts.[67] Without a higher degree of specification in authorization or appropriation, the existence and use of the deployable asset may not generate significant oversight attention. This may also lead to limited reporting by the executive branch on the activities of the asset through the annual budgeting and appropriation process, to include a lack of detailed information in documents like agency budget justifications.

Thus, in general, the limited use of deployable federal assets and the unique circumstances of each disaster result in a small sample size that Congress and others can use to evaluate the benefits of the capabilities provided by the asset. This sample size may be expanded, however, when it includes numerous national, regional, and local discussions-based and operations-based response exercises.[68]

---

[62] As an example statistic on usage, National Disaster Medical System (NDMS) assets have been used more than 300 times since 1984. However, it is unclear what incidents provoked these deployments, what kinds of NDMS assets were deployed, for how long, and where the assets deployed. As another example, it is clear that for every emergency or major disaster declaration under the Stafford Act, a Federal Coordinating Officer (FCO) and Federal Disaster Recovery Coordinator (FDRC) will deploy. However, it is unclear how many times, and for what circumstances, a Federal Disaster Recovery Coordinator (FDRC) will deploy.

[63] Further, in order to calculate a percentage of incidents resulting in the assistance of a deployable federal asset, one must be able to determine the number of incidents that non-federal government entities respond to and manage without such support. For example, one might argue that all multi-car accidents should be counted as incidents, or that every five alarm fire is an incident, etc. Depending on where the consequence threshold is set for what constitutes an incident, the percentage of incidents that involve federal assets will change significantly.

[64] In other words, evaluating the benefit of a federal asset by comparing the results of incidents where federal assistance was provided versus incidents where assistance was not provided.

[65] For example, consider the following hypothetical scenarios. Incident A, where federal assets were deployed, involves a tornado that destroyed public infrastructure including schools and hospitals in a community but had limited impact on residential areas. Incident B involves another tornado of relatively equal magnitude that hit a residential area resulting in greater casualties and housing needs but less damage to public infrastructure. The Incident A community has significant pre-existing capabilities for mass care of survivors, but limited capabilities for essential infrastructure restoration; and in Incident B, the community had the reverse strengths and capabilities. Evaluating the effectiveness of using deployable federal assets in Incident A by comparing the results of not using the assets in Incident B would involve controlling for the divergence in both the consequences of the "comparable" tornados and the pre-existing community capabilities.

[66] For example, most of the deployable federal asset assistance provided by the U.S. Army Corps of Engineers is broadly authorized by the Flood Control and Coastal Emergency Act, P.L. 84-99 (33 U.S.C. §701n), which may obscure the full scope and importance of the assets to domestic emergency management.

[67] For example, Incident Management Assistance Teams are explicitly authorized in law (42 U.S.C. §5144), but receive funding through the Disaster Relief Fund account at FEMA. No specific information regarding their budgetary cost was included in any of the agency's FY2015 budget justification documents.

[68] As defined by the Homeland Security Exercise and Evaluation Program (HSEEP), discussion-based exercises include "seminars, workshops, tabletop exercises (TTXs), and games. These types of exercises can be used to familiarize players with, or develop new, plans, policies, agreements, and procedures. Discussion-based exercises focus

Given the above challenges, the recommendations of after-action reports (AARs) and the implementation of subsequent after-action report improvement plans (AAR-IPs), for both real incidents and exercises, may help inform Congress in its oversight of the use of deployable federal assets. AARs and AAR-IPs are generally developed by both the respective state and federal governments after significant real-world incidents and full-scale exercises, and frequently by the affected local governments as well. However, these evaluations often tend to be produced by the responding or exercising agency—either directly or by contract to a third party—and therefore may lack independent objectivity. Further, the Government Accountability Office (GAO) has identified that opportunities exist to enhance the oversight, primarily provided by DHS and FEMA, of how capability gaps identified in selected exercises, real-world incidents, and other assessments are resolved.[69] In other words, though problems are regularly identified in AARs and AAR-IPs, how and if those problems have been resolved is not always tracked.

However, through after action reviews, Congress may discover general thematic issues that limit the effectiveness of deployable federal assets, or be able to highlight shortcomings with the capabilities of a particular asset. For example, following Hurricane Sandy, both FEMA and the White House produced AARs that highlighted federal challenges requiring improvement, including some on the use of deployable federal assets.[70] Of note, Congress's ability to use AARs and AAR-IPs in its oversight may be hindered—but not stopped—by the security classification of some documents, given their sensitivity to national security.[71]

# Brief Summaries of Sample Federal Assets

This section of the report provides brief summaries of **examples** of deployable federal assets that can support disaster response operations. This section of the report is not comprehensive, and does not provide an exhaustive list of every federal asset that may be used to address a multitude of unique needs that can arise when responding to the plethora of hazards facing the nation. For instance, this section does not contain summaries of an array of specialized, law enforcement response assets provided by the Department of Justice or the Department of Homeland Security to respond to the consequences of intentional hazards, such as the Federal Bureau of Investigation's

---

on strategic, policy-oriented issues." Operations-based exercises "include drills, functional exercises (FEs), and full-scale exercises (FSEs). These exercises can be used to validate plans, policies, agreements, and procedures; clarify roles and responsibilities; and identify resource gaps. Operations-based exercises are characterized by actual reaction to an exercise scenario, such as initiating communications or mobilizing personnel and resources." See the Department of Homeland Security, *Homeland Security Exercise and Evaluation Program (HSEEP)*, April 2013, pp. 2-4 and 2-5, at https://www.llis.dhs.gov/HSEEP/Documents/homeland-security-exercise-and-evaluation-program-hseep.

[69] U.S. Government Accountability Office, *Opportunities Exist to Strengthen Interagency Assessments and Accountability for Closing Capability Gaps*, GAO-15-20, November 2014, at http://www.gao.gov/products/GAO-15-20.

[70] For example, in a FEMA-specific AAR for Hurricane Sandy, it was noted that the deployment of so many FEMA employees to the response had a negative impact on the ability of many FEMA components to continue their normal functions (and could have had a worse impact if another incident arose). Thus, FEMA noted it needed to incorporate the impact of deploying federal personnel has on its continuity of operation plans. Likewise, an interagency AAR led by the White House made a number of recommendations on how the federal response to future disasters could be improved based on lessons learned during Hurricane Sandy. Respectively, see Federal Emergency Management Agency, *Hurricane Sandy FEMA After-Action Report*, July 1, 2013, p. 34, at http://www.fema.gov/media-library/assets/documents/33772; and Executive Office of the President, Federal Interagency Sandy After-Action Review Team, *The Federal Response to Hurricane Sandy After-Action Report*, For Official Use Only, June 1, 2013.

[71] This is especially true for documents related to intentional hazards (e.g., terrorist attacks).

Critical Incident Response Group (CIRG).[72] Also, cyber-related response teams, such as DHS's United States Computer Emergency Readiness Team (US-CERT) are not summarized below.[73]

**Table 1** reviews the basic information provided in each summary of sample deployable federal assets. Each summary begins with the contact information of the relevant CRS expert available to answer further questions from Congress on the asset. Additional CRS expertise is available to address questions on other assets not summarized in the report.[74]

---

[72] For more information on the Critical Incident Response Group, see the FBI's website at http://www.fbi.gov/about-us/cirg.

[73] Given the nature of a cyber-related hazard and disaster, the US-CERT and other federal assets may not, but potentially could, physically "deploy" but instead support response operations remotely. For more information on the United States Computer Emergency Readiness Team, see DHS's website at http://www.us-cert.gov/.

[74] Requests can be directed to the coordinator of this report for any unlisted asset.

**Table 1. Synopsis of Examples of Deployable Federal Assets**

| Example of Asset | Managing Department(s)/ Agency(s) | Primary Authority | Brief Description of Duties |
|---|---|---|---|
| Incident Management Assistance Teams (IMATs) | DHS/FEMA | 42 U.S.C. §5144 | Provide on-scene incident command capabilities and identify and satisfy initial requirements for federal assistance. Serve in core responsibilities in ICS structure for federal assistance to local disasters and for federally led incidents. |
| Federal Coordinating Officers (FCOs) | DHS/FEMA | 42 U.S.C. §5143 | Coordinate all federal assistance to affected state(s)/tribe(s) in Stafford Act declared emergencies or disasters. |
| Urban Search and Rescue (US&R) Teams | DHS/FEMA | 6 U.S.C. §722 | Provide specialized assistance locating and rescuing victims after buildings or other structures collapse, or in response to natural hazards such as landsides or earthquakes. |
| Visible Intermodal Prevention and Response (VIPR) Teams | DHS/TSA | 6 U.S.C. §1112 | Deploys transportation security assets (e.g. security inspectors, air marshals, and canine teams) to specific locations and events as needed. |
| Protective Security Advisors (PSAs) | DHS/NPPD | 6 U.S.C. §121(d)(6) | Anticipate and assess damage to the area's critical infrastructure assets, including assessing the potential for cascading effects due to interdependencies among those assets. They also can help prioritize re-entry and recovery efforts related to critical infrastructure. |
| U.S. Public Health Service Commissioned Corps | HHS/ASH | 42 U.S.C. §§202-233 | Provide medical and public health workforce surge capacity in response to mass casualty incidents and other public health emergencies. |
| Strategic National Stockpile | HHS/CDC | 42 U.S.C. §247d-6b | Provide medicine and medical supplies when a public health emergency has overwhelmed local supplies. Also contains unique supplies to respond to certain chemical, biological, radiological, and nuclear agents. |
| Forest Service Firefighting Assets | USDA/FS | 16 U.S.C. §551 | Response assistance can be delivered in many forms, including firefighting support, fire suppression and assistance planning, command and control support, emergency road clearing, logistics facility support, radio/communications system support, and cache support for mass care shelters. |

| Example of Asset | Managing Department(s)/ Agency(s) | Primary Authority | Brief Description of Duties |
|---|---|---|---|
| General Purpose Forces | DOD | Title 10 and Title 32 of the U.S. Code | Units of the Armed Forces possess capabilities that can be used during disaster response missions, such as transportation, medical, communications, engineering, and logistics units. |
| Chemical, Biological, Radiological, and Nuclear (CBRN) Response Forces | DOD/National Guard | Title 10 and Title 32 of the U.S. Code, generally, plus 50 U.S.C. §2314, and other provisions of law. | Provide specialized response capabilities to major domestic CBRN incidents. |
| Planning and Response Teams (PRTs) | DOD/USACE | 33 U.S.C. §701n | Perform Army Corps emergency response functions, which include: provision of ice, water, emergency power, debris removal, temporary housing, temporary roofing, and structural safety assessments. |
| 249th Engineer Battalion (Prime Power) | DOD/USACE | 33 U.S.C. §701n | Provide technical expertise and operational assistance in all aspects of power and electrical systems generation and distribution in support of contingency and emergency response operations to assist with power emergencies especially for life-saving and life-sustaining facilities like hospitals, shelters, water and sewer facilities, and police and fire stations. |
| Nuclear Counterterrorism and Incident Response (NCTIR) Program | DOE/NNSA | 50 U.S.C. §2404 | Provide rapid response in the event of a radiological or nuclear incident, whether predetonation or postdetonation, as well as technical support for other first responders. |
| National Transportation Safety Board Disaster Assistance | NTSB | 49 U.S.C. §1136 and §1139 | Provide assistance to families of passengers involved in major aviation and passenger rail disasters. |
| National Response System assets (for oil spills and releases of hazardous substances, pollutants, or contaminants) | EPA, DHS/USCG | 33 U.S.C §1321(j); 33 U.S.C. §2701 et seq.; and 42 U.S.C. §9601 et seq. | Coordinate federal actions and deployment of federal assets to respond to discharges of oil into U.S. waters and adjoining shorelines, and releases of hazardous substances, pollutants, or contaminants into the environment. The Environmental Protection Agency (EPA) serves as the lead federal agency in the inland zone, and the U.S. Coast Guard serves as the lead federal agency in the coastal zone. The lead federal agency also coordinates participation of state and local governments, and non-governmental entities, including the party (or parties) liable for the incident. |

| Example of Asset | Managing Department(s)/ Agency(s) | Primary Authority | Brief Description of Duties |
|---|---|---|---|
| National Disaster Medical System assets | HHS, DOD, and VA | 42. U.S.C. §300hh-11 | Provide on-scene and local medical care, patient evacuation, and definitive medical care in response to mass casualty incidents. |

**Source:** CRS.

# Department of Homeland Security Assets

## Federal Incident Management Assistance Teams (IMATs)

Jared T. Brown, Analyst in Homeland Security and Emergency Management Policy.

### Purpose and Responsibilities

Federal Incident Management Assistance Teams (IMATs) are a relatively new federal asset managed by FEMA, though they evolved from a previous deployable federal asset called Emergency Response Teams (ERTs). The IMATs' primary mission is to provide on-scene incident command capabilities and to work with the affected community to identify and satisfy initial requirements for federal assistance. In practice, IMATs form the core command structure guiding and managing federal assistance to the response operation. In doing so, an IMAT is able to assist the state and local management of a response operation. FEMA also trains IMATs in the management of chemical, biological, radiological, nuclear, and explosives (CBRNE) incidents.[75] In addition to major disasters and emergencies declared under the Stafford Act, IMATs may deploy in advance of an incident (e.g., before landfall of a hurricane), for special events (e.g., a Super Bowl or national political convention), and for national level exercises.

The structure and concept of operations for IMATS are currently being revised by FEMA, and thus are subject to change in the future. The new revisions to the design of IMATs have been made, in part, because of lessons learned from the large-scale deployment during Hurricane Sandy.[76] As currently envisioned by FEMA, there will be 3 national IMATs and 13 regional IMATs. Each national IMAT will have an Incident Command System (ICS) structure filled by 33 term-appointed FEMA employees[77] and will be led by a member of the Senior Executive Service (SES, who could possibly be a current or former Federal Coordinating Officer, described below). FEMA is also seeking one team member each from nine different departments/agencies.[78] Each of the regional IMATs will be staffed by 12 term-appointed FEMA employees. All personnel will have specialized training and experience in the key areas of an ICS structure, to include operations, planning, and logistics. IMATs are being designed to deploy within 2 hours and arrive at an incident within 12 hours to support the response operation. The revised IMAT structure has

---

[75] Department of Homeland Security, Federal Emergency Management Agency, *Disaster Relief Fund Fiscal Year 2015 Congressional Budget Justification*, p. 8. The full DHS Congressional budget justification is available at http://www.dhs.gov/sites/default/files/publications/DHS-Congressional-Budget-Justification-FY2015.pdf.

[76] Executive Office of the President, Federal Interagency Sandy After-Action Review Team, *The Federal Response to Hurricane Sandy After-Action Report*, For Official Use Only, June 1, 2013.

[77] These employees are called "CORE" employees, which stands for Cadre of On-Call Response/Recovery Employees. According to FEMA, these employees "are hired to work for a specific, limited period, between two to four years. These positions may be renewed if there is ongoing disaster work and funding is available.... " and "are generally eligible for the same benefits as [full-time] employees, but do not gain competitive status nor career tenure during their term." See FEMA's website on employment options, at http://www.fema.gov/career-paths-fema.

[78] In their capacity as Emergency Support Function (ESF) coordinators under the NRF, FEMA is seeking representatives from the U.S. Army Corps of Engineers (ESF #3—Public Works and Engineering), the Department of Health and Human Services (ESF #8—Public Health and Medical Services), the Environmental Protection Agency (ESF #10—Oil and Hazardous Materials), and the Department of Energy (ESF #12—Energy). In addition, FEMA is seeking the expertise of representatives from the U.S. Coast Guard and the Office of Infrastructure Protection in DHS, the National Weather Service, the American Red Cross, and a Department of Defense Planning Officer. It is unclear whether and how these additional departments and agencies have committed employees to the national IMATs.

been implemented for several of the teams, including two national teams and approximately six regional teams, and is projected to be fully implemented by FY2016.

### Authorization and Appropriations

National and regional IMATs are designed to fulfill the roles of specifically authorized assets called, in statute, an "Emergency Response Team"[79] and "regional office strike team," respectively.[80] Both of these named assets were authorized by the Post-Katrina Emergency Management Reform Act (PKEMRA, Title VI of P.L. 109-295), which added the underlying authorizing language for the concept of IMATs to both the Stafford Act and the Homeland Security Act of 2002.

Maintenance and operational funding for the salaries of IMAT staff derive from appropriations made to the Disaster Relief Fund (DRF), also administered by FEMA. The DRF is the primary source of funds for Stafford Act response and recovery operations.[81] Current, specific budget figures from the DRF appropriation for the IMATs are not publically available, though they have been available in prior years.[82] However, when the new IMAT structure is fully implemented in FY2016, FEMA estimates that the recurring annual costs of maintaining the IMATs will be about $31.6 million, with an additional, cumulative $19 million in spending as one-time capital costs in their development.[83]

### Examples of Past Use in Disaster Response Operations

During Hurricane Sandy, FEMA deployed all three national IMATs and nine of the regional IMATs to support incident management in the large geographic area of affected states and communities. However, the IMATs used during Hurricane Sandy were constructed and staffed differently than is currently being designed by FEMA. Since Hurricane Sandy, FEMA has deployed some of the newly constructed IMATs, especially regional IMATs, to incidents across the nation. For example, a national IMAT was deployed to assist in the response to the Washington State, Snohomish County mudslide in March 2014.

## Federal Coordinating Officers (FCOs) and Federal Disaster Recovery Coordinators (FDRCs)

Jared T. Brown, Analyst in Homeland Security and Emergency Management Policy.

### Purpose and Responsibilities

A Federal Coordinating Officer (FCO) is responsible for the overall coordination and management of all federal resources and assistance being provided to support a disaster response operation. In a fashion, the FCO is the "leader" of the federal government's response and is

---

[79] See Sec. 303 of the Stafford Act, 42 U.S.C. §5144; as added by Sec. 633 of PKEMRA, 120 Stat. 1421.

[80] See Sec. 507 of the HSA of 2002, 6 U.S.C. §317(f); as added by Sec. 611 of PKEMRA, 120 Stat. 1402.

[81] For more on the DRF, see CRS Report R43537, *FEMA's Disaster Relief Fund: Overview and Selected Issues*, by Bruce R. Lindsay.

[82] For example, the Administration requested a total of $13.8 million and 102 positions (95 full time equivalents) for IMATs in FY2011. See U.S. Department of Homeland Security, *FY2011 Congressional Justification*, Federal Emergency Management Agency, Operations, Management and Administration, 2010, p. 26.

[83] Telephone consultation and email correspondence with the Response Directorate, Federal Emergency Management Agency, April 17, 2014.

tasked with efficiently facilitating the delivery of assistance from a wide array of federal departments and agencies, including other deployable federal assets. If there are defense assets involved in the response, DOD may use a Defense Coordinating Element (DCE) led by a Defense Coordinating Official (DCO) to support the FCO's coordination of all federal assets. A formal cadre of FCOs was first established in 1999. Prior to that, FCOs, or officials acting in a similar capacity to the FCO, were assigned to disasters on an ad hoc basis. There are now approximately 40 FCOs, each of whom is a full time employee of FEMA.[84]

The role of the FCO has considerable history relative to the more recently established position of the Federal Disaster Recovery Coordinator (FDRC), which was first established by policy in the National Disaster Recovery Framework.[85] The FDRC may serve as a deputy under the FCO when in the response phase of a disaster, but serves a similar coordinating purpose as the FCO relating to the provision of federal disaster recovery assistance in the long-term recovery process. There are approximately 10 FDRCs, each of whom is a full time employee of FEMA.

### *Authorization and Appropriations*

FCOs are directly authorized by the Stafford Act.[86] By statute, the President must appoint an FCO for every Stafford Act emergency and major disaster declaration.[87] This requirement does not apply to FDRCs, who are deployed more selectively based on long-term disaster recovery needs of the community. FCOs have also been delegated many of the authorities of the President in the Stafford Act, namely those relating to the coordination of federal resources. Any state or tribe receiving a Stafford Act declaration is also encouraged, but not required, to appoint a Coordinating Officer to fulfill similar roles and duties as the FCO, but at the state/tribal level. For multi-state/tribal incidents producing more than one Stafford Act declaration, the President may appoint a single FCO and deputy FCOs for affected states/tribes, or appoint one FCO to each state/tribe.[88]

The cost of maintaining and deploying FCOs and FDRCs is funded by appropriations to the DRF. For FY2016, FEMA is requesting funding sufficient for 55 full-time equivalent FCOs/FDRCs through the DRF. As with IMATs, current, specific budget figures for the FCOs/FDRCs have not been publically reported by FEMA in recent congressional justification documents. However, FEMA estimates that the cost of maintaining and deploying 55 FCOs/FDRCs is approximately $12.9 million in a fiscal year.[89] The FCOs and FDRCs are also supported by an Office of the Federal Disaster Coordinating Officer (OFDC) in FEMA, which is responsible for hiring, training, equipping, managing and evaluating the FCOs/FDRCs. FEMA estimates that the OFDC will cost $5.9 million in FY2016.[90]

---

[84] FCOs and FDRCs are hired as Schedule A, Excepted Service appointments. For a description of this authority, see 5 C.F.R. §213.3101.

[85] Department of Homeland Security, *National Disaster Recovery Framework*, September 2011, at http://www.fema.gov/national-disaster-recovery-framework.

[86] See Sec. 302 of the Stafford Act, 42 U.S.C. §5143. The role is further described in 44 C.F.R. §206.42.

[87] FCOs may also be used in non-Stafford Act declared incidents to assist communities and coordinate other federal assistance, but in such situations they would not be vested with the authorities of the Stafford Act.

[88] See Sec. 302(c) and (d) of the Stafford Act, 42 U.S.C. §5143.

[89] Telephone consultation and email correspondence with the Response Directorate, Federal Emergency Management Agency, April 17, 2014.

[90] Department of Homeland Security, Federal Emergency Management Agency, *Disaster Relief Fund Fiscal Year 2016 Congressional Budget Justification*, p. 17. The full DHS Congressional budget justification for FY2016 is available at http://www.dhs.gov/dhs-budget.

### *Examples of Past Use in Disaster Response Operations*

As an FCO is assigned to every Stafford Act declaration, they regularly support disaster response operations across the nation. In addition, when an IMAT is deployed to support a response operation, the FCO will serve as the lead of that team (or the leader of the IMAT will serve in the capacity of the FCO). However, FCOs may not deploy when an incident first occurs, rather they may only arrive on-scene, at least in official capacity, after a declaration is made. However, significant incidents often precipitate Stafford Act disaster declarations by a few hours or a day, and therefore the FCO cadre is prepared to respond and deploy to a disaster promptly.

## National Urban Search and Rescue (US&R) Response System Task Forces

Jared T. Brown, Analyst in Homeland Security and Emergency Management Policy.

### *Purpose and Responsibilities*

National Urban Search and Rescue (US&R) Responses System Task Forces are designated and administered by FEMA to provide specialized assistance locating survivors after buildings or other structures collapse, or in response to hazards such as landsides, earthquakes, or terrorist attacks. Maritime search and rescue capabilities are generally provided by the U.S. Coast Guard.

Although the national US&R Task Forces are formally state or local government entities, they are a deployable federal asset that receives funding, training, and accreditation from the federal government to provide a national capability. In general, when deployed, national US&R Task Forces work to: stabilize damaged structures; identify risks of additional collapses; locate, extricate, and provide medical care for survivors; and meet other needs at disaster sites. Task Forces deploy as necessary and on request to support the response to disasters, and may be pre-positioned for certain incidents (such as hurricanes). National US&R Task Forces may integrate and work in conjunction with other federal and local search and rescue teams/operations. National US&R Task Forces are designed to be ready for deployment in 4 to 6 hours, and on-scene in a significant portion of the continental United States in 16 hours.

There are currently 28 national US&R Task Forces throughout the United States (see **Figure 1**). Each Task Force can deploy as either a Type I configuration (with 70 personnel, with an additional 10 support personnel) or Type III configuration (with 28 personnel, with up to 4 support personnel). However, to ensure that a full Type I team can deploy on short notice, each Task Force is encouraged to maintain a full roster of 210 personnel (a three-deep roster for a 70-person Type I team configuration). Each Task Force has unit members with expertise and training in a variety of skillsets, including engineering, emergency medicine, canine handling, firefighting, hazardous material handling, communications, logistics, and other areas. There are also three national Incident Support Teams (ISTs) that are comprised of highly qualified specialists readily available for rapid assembly and deployment to a disaster area. ISTs provide advice, management and logistics assistance, and coordination of US&R Task Forces, to the on-scene incident command. The Task Forces also include specially trained canine units. When activated by FEMA, Task Force members are appointed as temporary excepted federal volunteers, which is a designation intended to provide them with liability protection and worker's compensation.[91]

---

[91] 44 C.F.R. §208.11.

**Figure 1. Location of National US&R Task Force Teams**



**Source:** CRS adaptation of FEMA figures on the locations of Task Forces in the National Urban Search and Rescue Response System.

**Note:** There are no National US&R Task Forces outside the contiguous United States.

## *Authorization*

The federal role in urban search and rescue efforts has developed slowly over time. Its roots may be traced to congressional enactment of the Earthquake Hazards Reduction Act of 1977 (P.L. 95-124) to stimulate research and planning related to preparation for, and response to, the devastation of earthquakes. Following establishment of the FEMA in 1979, Congress amended the 1977 statute to require FEMA to serve as lead agency for the National Earthquake Hazards Reduction Program (NEHRP).[92]

As a consequence of the Loma Prieta earthquake of 1989, Congress and FEMA revisited the scope of the NEHRP. FEMA established the National Urban Search and Rescue Response System that same year. Also, in the aftermath of that earthquake, Congress passed the National Earthquake Hazards Reduction Program Reauthorization Act of 1990.[93] These amendments to the 1977 statute expanded the federal response authority to include the following charge:

> develop, and coordinate the execution of, federal interagency plans to respond to an
> earthquake, with specific plans for each high-risk area which ensure the availability of

---

[92] 94 Stat. 2257.

[93] 104 Stat. 3231-3243.

adequate emergency medical resources, search and rescue personnel and equipment, and emergency broadcast capability.[94]

In 2006, Congress formally authorized the establishment of the Urban Search and Rescue Response System in FEMA.[95] Under this authority the FEMA Administrator, and delegates, coordinate the activities of US&R Task Forces when called into federal service.

## *Appropriations*

Task Forces are funded both by the federal government and their respective sponsoring agency (either a state or local government entity, most commonly a city fire department). In order to participate, each of the Task Forces is required to have both a Preparedness and a Response Cooperative Agreement with DHS/FEMA that govern the responsibilities and reimbursement of expenses for the Task Force. In general, the federal government and sponsoring agencies of national Task Forces share the cost of maintaining the capability, though the exact terms of compensation are subject to the Preparedness Cooperative Agreement negotiated by FEMA and the sponsoring agency.[96] FEMA also provides funding for costs incurred when Task Forces are deployed to respond to disasters, as negotiated in the Response Cooperative Agreement.[97] Federal funding for the deployment of the Task Forces in response to Stafford Act declared major disasters or emergencies is provided through the DRF.

The federal funding to maintain the National US&R Response System and the Task Forces is generally directly designated in appropriation bills for the Salaries and Expenses account in FEMA. Congress appropriated approximately $41.3 million in FY2012,[98] and $35.2 million each in FY2013, FY2014, and FY2015 for the National US&R Response System and Task Forces.[99] For FY2016, FEMA has requested approximately $27.5 million.[100] However, deployment costs for Task Force teams are not accounted for in these amounts, as these costs are generally provided through the Disaster Relief Fund when applicable for a Stafford Act declaration.

## *Examples of Past Use in Disaster Response Operations*

National US&R Task Forces have deployed after the bombing of the Alfred P. Murrah Federal Building in Oklahoma City in 1995, the terrorist attacks of 2001, Hurricane Katrina, the Haiti Earthquake, and Hurricane Sandy, among many other notable disasters. National US&R Task Forces responded to an estimated 53 incidents between 1992 and 2010, accounting for over 316 individual Task Force deployments in both Type I and III configurations during the time period.[101]

---

[94] 104 Stat. 3234, 42 U.S.C. §7704(b)(2)(A)(iv).

[95] Section 634, P.L. 109-295, 120 Stat. 1421, 6 U.S.C. §722.

[96] 44 C.F.R. §208, Subpart B on Preparedness Cooperative Agreements outlines the allowable expenses covered by FEMA for maintaining the Task Force.

[97] 44 C.F.R. §208, Subpart C on Response Cooperative Agreements outlines the allowable expenses covered by FEMA for various stages of deployment.

[98]  P.L. 112-74, 125 Stat. 959.

[99] See P.L. 113-6, 127 Stat. 357 for FY2013; P.L. 113-76, 128 Stat. 60 for FY2014; and P.L. 114-4, 129 Stat .53 for FY2015.

[100] Department of Homeland Security, *FY2016 Congressional Budget Justification*, Federal Emergency Management Agency, Salaries and Expenses, Budget Request and Supporting Information, p. 37, at http://www.dhs.gov/dhs-budget.

[101] Federal Emergency Management Agency, *Review of the National Urban Search and Rescue (US&R) Response System*, For Official Use Only, March 2012.

## Visible Intermodal Prevention and Response (VIPR) Teams

Bart Elias, Specialist in Aviation Policy.

### Purpose and Responsibilities

Responding to the 2005 terrorist train bombings in Madrid, Spain, the Transportation Security Administration (TSA) developed the Visible Intermodal Prevention and Response (VIPR) team program. The VIPR program is intended to enhance security across all modes of transportation by providing TSA assets and capabilities to augment federal, state, and local law enforcement and security agencies in protecting national assets, critical infrastructure, and facilities in the transportation domain. VIPR teams may include various combinations of DHS assets including surface transportation security inspectors, explosives detection canine teams, Federal Air Marshals, and TSA screeners and behavior detection officers. The Domestic Nuclear Detection Office (DNDO) may provide these teams with nuclear and radiological detection equipment. In FY2015, TSA realigned the VIPR program with Surface Transportation Security Inspectors. VIPR deployments are coordinated through TSA's joint coordination center, located at TSA headquarters in Arlington, VA. The VIPR program uses threat and vulnerability assessments of transportation infrastructure developed by TSA's Office of Transportation Sector Network Management as guidance to inform VIPR field operations regarding the prioritization and scheduling of deployments.

### Authorization and Appropriation

Initially, VIPR teams were deployed under TSA's broad general authority promulgated in the Aviation and Transportation Security Act (P.L. 107-71) to protect against threats to all modes of transportation. Subsequently, the VIPR teams were specifically authorized under the Implementing the 9/11 Commission Recommendations Act of 2007 (P.L. 110-53). Section 1303 of the act allowed TSA to develop and deploy VIPR teams to augment the security of any mode of transportation at any location within the United States at times and for durations determined by TSA.[102] Under the legislation, TSA must consult with local security and law enforcement officials in jurisdictions where the VIPR teams deploy to agree upon operational protocols and collaborate on mission information as appropriate. Additionally, TSA must consult with all transportation entities affected by the deployment, including railroad carriers, air carriers, airports, bus and motor carrier operators, maritime vessel owners and operators, public transportation agencies, and transportation facility owners and operators.

According to DHS, Congress appropriated $89.7 million in FY2013, and $77.2 million in FY2014, for 37 VIPR teams. DHS requested $60.6 million for the VIPR program in FY2015, with plans to reduce the number of VIPR teams to 33 through the consolidation of previous teams.[103] Under the realignment plan, TSA proposed to transfer 257 full-time equivalent positions from Aviation Security and the Federal Air Marshals Service to Surface Transportation Security in a move to consolidate Surface Inspectors and multi-modal VIPR teams under one program. The FY2015 appropriation (see P.L. 114-4) for surface transportation security inspectors was set

---

[102] 6 U.S.C. §1112.

[103] DHS is also proposing to consolidate funding for the VIPR program under TSA's Surface Transportation Security appropriation, whereas it had previously been funded from three different sources, the Federal Air Marshals (FAMS), Aviation Security, and Surface Transportation appropriations. See, Department of Homeland Security, *FY2015 Congressional Budget Justification*, Transportation Security Administration, Surface Transportation Security, Budget Request and Supporting Information, pp. 23-25, at http://www.dhs.gov/publication/congressional-budget-justification-fy-2015.

at $3 million less than the request and TSA was directed to further reduce the number of VIPR teams to 31.

### *Examples of Past Use in Disaster Response Operations*

VIPR teams are often deployed to specific high-profile events that may be targeted by terrorist groups and to key transportation facilities based on threat assessments and through random targeting in order to provide an element of unpredictability to potentially disrupt terrorist activities. VIPR teams thus are intended to operate primarily as a deterrent rather than a critical incident response resource. DHS estimates that the teams conducted over 15,260 actual operations in FY2013, though almost entirely as a deterrent—not as a response to real incidents.[104]

In the context of disaster response operations, the VIPR teams may provide DHS with a coordinated, targeted surge capability to respond to escalating threats or specific incidents, including natural disasters and terrorist attacks, by deploying law enforcement and security screening assets to transportation facilities.

Historically, VIPR teams have concentrated on surface modes, particularly transit systems and intercity rail. TSA estimated that more than 10,000 of the FY2013 operations were in surface modes of transportation, of which about 9,000 were in mass transit. Following the November 2013 shooting incident at LAX, however, TSA modified its VIPR deployment strategy to split deployments roughly evenly between surface and aviation modes. Subsequently, the realignment of VIPR teams in FY2015 has resulted in a formal split between aviation operations and other modes, with the VIPR program formally aligned with surface transportation security. Moving forward, this would suggest that VIPR teams would continue to support non-aviation modes, while FAMS, in coordination with airport law enforcement authorities, would provide critical incident response for aviation.

## Protective Security Advisors (PSAs)

John D. Moteff, Specialist in Science and Technology Policy.

Protective Security Advisors (PSAs) are field operatives that interact with state Homeland Security Advisors, state and local law enforcement officials, the owner/operators of critical infrastructure assets, and other critical infrastructure stakeholders in their district of responsibility. PSAs are part of the Office of Infrastructure Protection, in the National Protection and Programs Directorate, of DHS. As of 2015, there were 94 advisors in the field, with at least one advisor for each state and one in Puerto Rico, and 7 additional advisors at DHS headquarters.[105] In addition to establishing relationships with these stakeholders, PSAs help to inventory and evaluate critical infrastructure assets and provide DHS with situational awareness as it relates to critical infrastructure.

### *Purpose and Responsibilities*

PSAs have three primary responsibilities—to help enhance the security of critical infrastructure assets (primarily by coordinating stakeholder requests for DHS training, grants, and vulnerability assessments), to provide advice and expertise in response to an emergency or disaster, and to

---

[104] Ibid.

[105] Department of Homeland Security, *FY2016 Congressional Budget Justification*, National Protection and Programs Directorate, Infrastructure Protection and Information Security, Budget Request and Supporting Information, p. 24, at http://www.dhs.gov/publication/congressional-budget-justification-fy-2016.

facilitate information sharing between state and local stakeholders and DHS. The PSA role in disaster response operations is to act as the Infrastructure Liaison between the state/local emergency operations center(s) and FEMA's Joint Field Office. In this role, PSAs can help anticipate and assess damage to the area's critical infrastructure assets, including assessing the potential for cascading effects due to interdependencies among those assets. They also can help prioritize re-entry and recovery efforts related to critical infrastructure.

### Authorization and Appropriations

The Protective Security Advisors program is broadly authorized by the Homeland Security Act of 2002 (P.L. 107-296) which gave DHS the authority, among others, to "recommend measures necessary to protect the key resources and critical infrastructures of the United States in coordination with State and local government agencies and authorities, the private sector, and other entities." In addition, Presidential Policy Directive 21—Critical Infrastructure Security and Resilience*, which updated and replaced the earlier Homeland Security Presidential Directive 7, assigns the Secretary of Homeland Security the responsibility of coordinating the national effort to promote the security and resilience of the nation's critical infrastructure.[106] According to DHS, the anticipated cost of the PSA program, to include the salaries and expenses of the PSAs themselves, is $33.3 million in FY2015.[107]

### Examples of Past or Potential Use in Disaster Response Operations

Examples of how PSAs have been used to support disaster response operations include assisting the U.S. Army Corps of Engineers to prioritize private sector requests for generators to allow critical assets to be brought back on line more quickly, and working with Custom and Border Protection officials to organize helicopter flights to assess damage to power transmission lines. During Hurricane Sandy, 34 PSAs deployed to federal, state, and local emergency operations centers in the Northeast region to assist in the communication with critical infrastructure owners and operators, as well as to help prioritize and coordinate the restoration of critical infrastructure.[108] In general, PSAs may apply their expertise to reduce or prevent damages to critical infrastructure, thereby enabling the rapid restoration of critical systems during response operations.

---

[106] Executive Office of the President, *Presidential Policy Directive 21—Critical Infrastructure Security and Resilience*, February 12, 2013, at http://www.whitehouse.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil.

[107] Email correspondence with NPPD budget staff, May 1, 2015. Annual budget justification documents from DHS do not provide the salaries and benefits costs specifically for the PSAs, but instead provide those costs for the all "regional field operations." Thus, the line item programmatic costs for PSAs presented in budget documents do not include an isolated cost of salaries and expenses for the PSAs. See Department of Homeland Security, *FY2016 Congressional Budget Justification*, National Protection and Programs Directorate, Infrastructure Protection and Information Security, Budget Request and Supporting Information, pp. 21-25, at http://www.dhs.gov/publication/congressional-budget-justification-fy-2016.

[108] U.S. Congress, House Committee on Appropriations, Subcommittee on Homeland Security, *Department of Homeland Security Appropriations for 2014, Part 2*, 113th Cong., 1st sess., March 20, 2013, 82-379 (Washington: GPO, 2013), p. 661.

# Department of Health and Human Services

## U.S. Public Health Service Commissioned Corps[109]

Sarah A. Lister, Specialist in Public Health and Epidemiology.

### Purpose and Responsibilities

The U.S. Public Health Service (USPHS) Commissioned Corps is a branch of the U.S. uniformed services, but is not one of the armed services.[110] The Corps is based in HHS under the authority of the U.S. Surgeon General (SG), who is, in turn, under the Assistant Secretary for Health (ASH). USPHS commissioned officers are physicians, nurses, pharmacists, engineers, and other public health professionals who serve in federal agencies, or as detailees to state or international agencies, to support a variety of public health activities. Officers may, for example, conduct biomedical research at the National Institutes of Health or the Environmental Protection Agency. They may provide healthcare services at Indian Health Service facilities, or at DHS Immigration and Customs Enforcement facilities. Founded more than 200 years ago, the Corps now employs more than 6,500 health professionals.

In addition to their routine postings, Corps officers may also participate in short- or long-term deployments in support of a variety of public health activities. These activities may include domestic or international disease outbreak response, public health campaigns such as the global vaccination effort to eradicate polio, and domestic and international disaster response.[111]

A portion of USPHS commissioned officers are predesignated to participate in incident response teams under the USPHS Office of Force Readiness and Deployment.[112] These teams provide rapid deployment, incident support, applied public health, mental health, and additional capabilities.

### Authorization and Appropriations

Authority for the Corps is found in Title II of the Public Health Service Act.[113] As uniformed services officers of the United States, Corps officers are subject to more stringent requirements than are civil service employees. For example, they are considered to be on call 24 hours a day, 7 days per week, unless on leave. They can be reassigned and relocated as needed, and are subject to involuntary deployment. They may be required to meet certain fitness standards, and to accept medical treatments and immunizations to assure their continued fitness. Although they are sometimes deployed to provide public health support for combat operations, they can also be armed by order of the President to serve in war or an emergency.[114] Militarization occurred most

---

[109] Unless otherwise noted, information in this section is drawn from HHS, USPHS Commissioned Corps, at http://www.usphs.gov/default.aspx.

[110] 5 U.S.C. §2101.

[111] Such deployments are not generally limited to USPHS commissioned officers, although some may be. HHS employees in civil service positions also typically participate in such deployments.

[112] USPHS Office of Force Readiness and Deployment, at http://ccrf.hhs.gov/ccrf/.

[113] Public Health Service Act Secs. 201-224, 42 U.S.C. §§202-233.

[114] Public Health Service Act Sec. 216, 42 U.S.C. §217.

recently during World War II.[115] USPHS commissioned officers are entitled to many military and veterans benefits.

Salaries and benefits for commissioned officers are paid by employing agencies. Additional costs for deployments, such as travel expenses, may be borne by HHS or may be reimbursed by another responsible party. For example, deployment costs are generally reimbursed from the DRF if Corps officers are deployed due to a FEMA mission assignment under authority of the Stafford Act.

When USPHS commissioned officers are deployed for the response to an incident, they become unavailable to carry out their routine duties. To remedy this, Congress has provided authority to establish a USPHS "Ready Reserve Corps," similar to the Armed Forces reserves; that is, individuals who are not necessarily federal employees, but who can be "federalized" as members of the Corps in order to augment existing personnel.[116] The HHS Secretary has not received appropriations for this purpose and to date has not established this reserve component.

### Examples of Past or Potential Use in Disaster Response Operations

Deployment of Corps officers in response to disasters is common, usually but not exclusively involving teams with the Office of Force Readiness and Deployment. For example, in 2005, more than 2,400 officers were deployed for the responses to Hurricanes Katrina and Rita, for which they set up and staffed field hospitals, treated sick and injured evacuees, and conducted disease surveillance, among other tasks.[117] In 2014, Corps officers set up and ran a treatment center for Ebola patients in Liberia.[118]

## Strategic National Stockpile

Frank Gottron, Specialist in Science and Technology Policy.

### Purpose and Responsibilities

The federal government maintains a supply of medicine and medical supplies to respond to a public health emergency (e.g., a terrorist attack, flu outbreak, or earthquake) severe enough to deplete local supplies. This supply, known as the Strategic National Stockpile (SNS),[119] includes antibiotics, intravenous fluids, and other medical supplies. Additionally, the SNS contains some medicines, such as anthrax and smallpox vaccines and treatments, which may not be otherwise available for public use. The SNS contains assets valued in excess of $6.3 billion.[120] The Centers

---

[115] Executive Order 9575, "Declaring the Commissioned Corps of the Public Health Service To Be a Military Service and Prescribing Regulations," 10 *Federal Register* 7895, June 29, 1945. See also John Parascandola, "History of the Militarization of the PHS Commissioned Corps," *Commissioned Corps Bulletin*, vol. XV, no. 10 (October 2001), p. 5, at http://dcp.psc.gov/ccbulletin/articles/CCBulletin_02_2014.aspx.

[116] Public Health Service Act Sec. 203, 42 U.S.C. §204. This authority was provided in the Patient Protection and Affordable Care Act (ACA), the health reform law, P.L. 111-148, as amended, section 5210, March 23, 2010.

[117] Commissioned Corps of the U.S. Public Health Service, "Commissioned Corps in Action," at http://www.usphs.gov/newsroom/features/action/default.aspx.

[118] Gregg Zoroya, "U.S. Uniformed Officers to Treat Ebola Patients in Liberia," *USA Today*, November 6, 2014.

[119] Unless otherwise cited, information in this section is available at Centers for Disease Control and Prevention, Strategic National Stockpile, at http://www.cdc.gov/phpr/stockpile/stockpile.htm.

[120] Centers for Disease Control and Prevention, *Justification of Estimates for Appropriation Committees Fiscal Year 2016*, p. 368, at http://www.cdc.gov/fmo/.

for Disease Control and Prevention (CDC) in the Department of Health and Human Services (HHS) manages the stockpile.

By statute, both the Secretary of HHS and the Secretary of Homeland Security may deploy the SNS.[121] CDC guidelines allow governors or their representatives to request supplies from the SNS.[122] The CDC intends the initial deliveries from the SNS to arrive in the affected area within 12 hours of the decision to deploy, with additional deliveries following later as needed.

Critical to the successful use and deployment of the SNS commodities is the CDC's Stockpile Service Advance Group (SSAG) and other federal personnel devoted to managing current supplies and procuring future resources. The CDC's SSAG is a team of technical experts that helps state and local authorities properly use and maintain the commodities for the incident.[123] Once delivered, local authorities assume stewardship of the supplies, although the federal government retains ownership. The SNS supplies are provided free of charge; however, local authorities must pay for costs associated with storing locally, distributing, and dispensing of the supplies.

### Authorization and Appropriations

In 1999, Congress required the CDC to create a pharmaceutical and vaccine stockpile.[124] The Public Health Security and Bioterrorism Preparedness and Response Act of 2002 (P.L. 107-188) changed the name of the stockpile from the National Pharmaceutical Stockpile to the current SNS. This act also further defined the contents and purpose of that stockpile to include

> drugs, vaccines and other biological products, medical devices, and other supplies in such numbers, types, and amounts as are determined by the [HHS] Secretary to be appropriate and practicable, taking into account other available sources, to provide for the emergency health security of the United States, including the emergency health security of children and other vulnerable populations, in the event of a bioterrorist attack or other public health emergency.[125]

The Homeland Security Act of 2002 (P.L. 107-296) transferred budget authority for the SNS to the Department of Homeland Security (DHS). The Project BioShield Act of 2004 (P.L. 108-276) transferred this authority back to HHS. The Pandemic and All-Hazards Preparedness Reauthorization Act of 2013 (P.L. 113-5) reauthorized the SNS through FY2018. Currently, the Division of the Strategic National Stockpile in the CDC Office of Public Health Preparedness administers the stockpile program.[126] Funding levels for the SNS reflect maintenance costs as well as procurements, for which annual needs vary. **Table 2** displays recent SNS funding.

---

[121] 42 U.S.C. §247d-6b(a)(2)(F) and 42 U.S.C. §247d-6b(a)(2)(G).

[122] Todd Piester, Branch Chief, Division of Strategic National Stockpile, CDC, "Strategic National Stockpile Overview," CDC Clinician Outreach and Communication Activity conference call, July 1, 2008, at http://www.bt.cdc.gov/coca/summaries/SNS070108.asp.

[123] In addition, CDC has a Receiving, Staging and Storing (RSS) Task Force available to assist in the transportation and logistical processing of the SNS, and Federal Medical Station (FMS) Strike Team to help community officials re-supply and recover medical commodities after an incident.

[124] H.Rept. 105-825, to accompany Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999 (P.L. 105-277).

[125] Public Health Security and Bioterrorism Preparedness and Response Act of 2002 §121 (P.L. 107-188).

[126] Department of Health and Human Services, Centers for Disease Control and Prevention, "Strategic National Stockpile," at http://www.cdc.gov/phpr/stockpile.htm.

**Table 2. Strategic National Stockpile Appropriations,
FY2010-FY2015**

(in millions of dollars)

| FY2010 | FY2011 | FY2012 | FY2013 | FY2014 | FY2015 |
|---------|---------|---------|---------|---------|---------|
| $595.661 | $591.001 | $533.792 | $477.577 | $549.343 | $534.343 |

**Source:** CDC, *Justification of Estimates for Appropriation Committees Fiscal Year 2016*, p. 354, at
http://www.cdc.gov/fmo/.

**Notes:** The FY2013 amount reflects rescission and sequestration. Amounts for FY2013 and later reflect a CDC
budget accounting change and thus are not directly comparable to amounts in earlier fiscal years.

### Examples of Past or Potential Use in Disaster Response Operations

The SNS is configured to be deployed in a flexible manner. Some of the stockpile is held in
ready-to-transport containers called Push Packs. These contain pharmaceuticals, antidotes, and
medical supplies designed to respond rapidly to a wide variety of needs in the early hours of an
event when the precise nature of the emergency may still not be known. Push Packs are
positioned in strategically located, secure warehouses ready for immediate deployment to a
designated site within 12 hours of the federal decision to deploy SNS assets.

Other parts of the stockpile are designed to arrive between 24 and 36 hours after a request and can
be specifically tailored to respond to a defined need or to supplement deployed Push Packs. Some
of these assets are maintained as vendor-managed inventory, that is, caches of commercial
products maintained in rotation by the manufacturers, in order to assure freshness. Products with
limited markets may be stored and maintained in federal caches.

The SNS is often deployed in response to major disasters, and SNS assets may be pre-positioned
for National Special Security Events and hurricanes. For example, the CDC deployed assets from
the SNS to help 62 jurisdictions respond to the 2009 H1N1 influenza pandemic. The stockpile
was able to replenish critically short local supplies of antiviral medication and N95 respirators.[127]
In response to the 2014 Ebola outbreak, the SNS increased its supply of personal protective
clothing that could be rapidly deployed to hospitals caring for Ebola patients.[128]

# U.S. Department of Agriculture

## Forest Service Firefighting Assets

Katie Hoover, Analyst in Natural Resources Policy.

### Purpose and Responsibilities

The Forest Service (FS)—an agency of the U.S. Department of Agriculture (USDA)—may assist
federal and state efforts during and following a disaster.[129] Many times, this assistance stems from
the agency's wildland fire management expertise. FS emergency response assistance is delivered

---

[127] Centers for Disease Control and Prevention, *Justification of Estimates for Appropriation Committees Fiscal Year
2011*, p. 295.

[128] http://www.cdc.gov/media/releases/2014/p1107-ebola-ppe.html.

[129] The FS is granted such authority under the Stafford Act (42 U.S.C. §5121 et seq.), upon a request from FEMA.
Disaster assistance as discussed in this report should not be confused with emergency wildfire assistance, which the
federal government also provides.

in many forms, including firefighting support, fire suppression and assistance planning, command and control support, emergency road clearing, logistics facility support, radio/communications system support, and cache support for mass care shelters.

FS disaster response assistance may be carried out with the use of wildfire suppression crews and Incident Management Teams (IMT), among other means. A wildfire suppression crew generally consists of 18-20 career or temporary agency employees trained as professional wildland firefighters. There are five different levels of wildfire suppression crews: Type 1 Interagency Hotshot Crews (IHC), Type 1, Type 2-Initial Attack (IA), Type 2, and Type 3. A Type 1 IHC is the most intensively trained crew, with the highest level of expertise and fitness than the other types of crews, and are generally placed in the most rugged terrain on the most active and difficult areas on wildfires.[130] There are 113 Interagency Hotshot Crews, with the Forest Service sponsoring the largest number of crews (89), although the Bureau of Land Management, the Bureau of Indian Affairs, and the National Park Service also have Interagency Hotshot Crews.[131] IHCs are a "national shared resource," meaning that they may be assigned to work outside of their sponsoring agency and are coordinated through the National Interagency Fire Center.[132] There are a small number of crews that are nonfederal, including crews operated by states and local governments. All crews, federal and nonfederal, must meet the standard for interagency hotshot crew operations and be certified in order to be recognized as an IHC.[133] In addition to IHCs, the other suppression crew levels may also be sent to provide disaster assistance.

An IMT provides qualified personnel to manage serious, complex, and costly incidents. Management entails coordinating the personnel, equipment, and supplies necessary to address significant incidents, and providing information to the media and the public. Similar to the IHCs, there are different levels of federally-sponsored IMTs: Type 1 IMTs, Type 2 IMTs, and the National Incident Management Organization (NIMO) IMTs.[134]

### Authorization and Appropriations

Under the National Response Framework (NRF), the FS serves as the co-coordinator and primary agency for Emergency Support Function (ESF) #4—firefighting.[135] ESF #4 provides federal support for the detection and suppression of wildland, rural, and urban fires resulting from, or occurring coincidentally with, an all-hazard incident requiring a coordinated national response for assistance.[136] As the ESF #4 primary agency, the FS coordinates federal firefighting activities, and

---

[130] U.S. Forest Service, *Fire and Aviation Management: About Handcrews*, at http://www.fs.fed.us/fire/people/handcrews/about_handcrews.html.

[131] A list of National Interagency Hotshot Crews is available at http://www.fs.fed.us/fire/people/hotshots/IHC_index.html

[132] Department of the Interior, Department of Agriculture, *Standards for Interagency Hotshot Crew Operations*, February 14, 2011.

[133] Department of the Interior, Department of Agriculture, *Standards for Interagency Hotshot Crew Operations*, February 14, 2011.

[134] For more information on IMTs and a proposal that could alter how wildfire incidents are managed, see National Wildfire Coordinating Group (NWCG), *Evolving Incident Management: A Recommendation for the Future*, October 17, 2011. The NWCG reported on September 23, 2013, that there will be a multi-year transition from Type 1 IMTs and Type 2 IMTs to Complex IMTs.

[135] The other co-coordinator for ESF#4 is the U.S. Fire Administration.

[136] U.S. Department of Homeland Security, *National Response Framework*, May 2013; U.S. Forest Service, U.S. Department of the Interior, and U.S. Fire Administration, *Reference Guide Emergency Support Function #4 Firefighting*, December 2013.

provides personnel, equipment, and supplies in support of local, state, tribal, territorial, and insular area agencies involved in wildland, rural, and urban firefighting operations.[137] The FS works closely with at least six other federal agencies. For instance, the Environmental Protection Agency identifies critical water systems that require priority restoration for firefighting. Further, the State Department occasionally coordinates with foreign governments to identify and transfer firefighting assistance assets and resources to the United States. Expenditures made by the FS to respond to such disasters is dependent on the size and type of disaster.

The FS has several broad authorities that allow it to manage wildfires on federal, state, and private lands, regardless of whether the agency is responding to a disaster declaration. One of the primary statutes authorizing the FS to manage wildfires on National Forest System (NFS) lands is the Organic Administration Act of 1897.[138] Further, the FS has a number of cooperative agreements with states and other countries (e.g., Canada, Mexico, Australia, and New Zealand) that allow the agency to provide wildfire protection,[139] to perform approved severity activities, and to respond to states of emergency or disaster under FEMA authorities. Additionally, the FS—as outlined in an MOU with the USDA Farm Service Agency—assists with the Emergency Forest Restoration Program (EFRP), to help the owners of non-industrial private forests restore forest conditions after damage caused by natural disasters.[140] The FS received wildfire management appropriations of more than $2 billion dollars for each of the last five years.[141]

### *Examples of Past or Potential Use in Disaster Response Operations*

In addition to being used regularly to fight fires, these assets also support the response to other hazards. For example, following Hurricane Sandy, the FS sent 10 IMTs and 41 interagency wildfire suppression crews to assist with emergency response.[142] Approximately 1,100 personnel, 950 of which were FS employees, were stationed throughout five states in the northeast that were affected by the hurricane. Two of the primary activities carried out by the FS were emergency road clearing and support for power restoration. The FS deployed more than 100 chainsaw crew teams to storm-affected states to assist with debris removal and road clearance, clearing fallen trees from more than 900 miles of road for power personnel and search and rescue missions.[143] Other tasks included assisting at FEMA logistics facilities that provide water and other commodities needed to sustain life, providing communications equipment and support to local

---

[137] U.S. Forest Service, *Fire and Aviation Management Briefing Paper*, May 6, 2013.

[138] 16 U.S.C. §551.

[139] The agreements are available in chapter 40 of the National Interagency Coordination Center 2014 National Mobilization Guide.

[140] EFRP is codified in 16 U.S.C. Section 2206 and is permanently authorized subject to appropriations. For more information on EFRP, see CRS Report R42854, *Emergency Assistance for Agricultural Land Rehabilitation*, by Megan Stubbs.

[141] For more information, see CRS Report R43077, *Wildfire Management: Federal Funding and Related Statistics*, by Katie Hoover and Kelsi Bracmort. In addition to annual WFM appropriations, the FS may also receive supplemental appropriations for WFM.

[142] U.S. Forest Service, "US Forest Service Wildland Firefighters and Interagency Crews Mobilized to Assist with Hurricane Sandy Response," press release, November 1, 2012, and update November 7, 2012; U.S. Forest Service, "Update: US Forest Service Wildland Firefighters and Interagency Crews Mobilized to Assist with Hurricane Sandy Response," press release, November 7, 2012; and email correspondence with the U.S. Forest Service, June 20, 2013.

[143] Federal Emergency Management Agency, *Hurricane Sandy: Timeline*, at http://www.fema.gov/hurricane-sandy-timeline; and email correspondence with the U.S. Forest Service, June 20, 2013.

emergency response agencies, and supporting command and control operations for emergency response agencies.[144]

# Department of Defense

The Department of Defense (DOD) has a broad range of capabilities that can be deployed in support of civil authorities in emergency situations, including transportation assets, medical personnel and supplies, security forces, and communications equipment. The National Response Framework (NRF) and DOD refer to this type of assistance as Defense Support of Civil Authorities (DSCA).[145] DSCA is defined by DOD as

> Support provided by US Federal military forces, Department of Defense civilians, Department of Defense contract personnel, Department of Defense component assets, and National Guard forces (when the Secretary of Defense, in coordination with the governors of the affected states, elects and requests to use those forces in Title 32, United States Code, status) in response to requests for assistance from civil authorities for domestic emergencies, law enforcement support, and other domestic activities, or from qualifying entities for special events.[146]

DOD does not provide assets in response to requests from civil authorities in all cases. For example, DOD might decline to provide certain assets if doing so would degrade its ability to fulfill the department's national security obligations. Before providing assets to support civil authorities, DOD evaluates each request based on the following six criteria:

> (1) Legality (compliance with laws);
>
> (2) Lethality (potential use of lethal force by or against DoD Forces);
>
> (3) Risk (safety of DoD Forces);
>
> (4) Cost (including the source of funding and the effect on the DoD budget);
>
> (5) Appropriateness (whether providing the requested support is in the interest of the Department); and
>
> (6) Readiness (impact on the Department of Defense's ability to perform its other primary missions).[147]

The U.S. Army Corps of Engineers, an agency within the Department of Defense, is discussed later in this report.

---

[144] National Interagency Fire Center, "Firefighters Mobilize to Assist with Hurricane Sandy Response," press release, October 31, 2012.

[145] In the past, DOD referred to DSCA by other names including Civil Support (CS) and Military Assistance to Civil Authorities (MACA). DOD regulatory guidance for DSCA is contained in DOD Directive 3025.18, *Defense Support of Civil Authorities*, December 29, 2010 (incorporating change 1, September 21, 2012), at http://www.dtic.mil/whs/ directives/corres/pdf/302518p.pdf, and the joint doctrinal publication on this topic is Joint Publication 3-28, *Defense Support of Civil Authorities*, July 31, 2013, at http://www.dtic.mil/doctrine/new_pubs/jp3_28.pdf.

[146] Joint Publication 1-02, *Department of Defense Dictionary of Military and Associated Terms*, as amended through February 15, 2014, at http://www.dtic.mil/doctrine/new_pubs/jp1_02.pdf.

[147] DOD Directive 3025.18, *Defense Support of Civil Authorities*, December 29, 2010 (incorporating change 1, September 21, 2012), paragraph 4(e), at http://www.dtic.mil/whs/directives/corres/pdf/302518p.pdf.

## General Purpose Forces

Lawrence Kapp, Specialist in Military Manpower Policy.

### Purpose and Responsibilities

The Armed Forces are organized, trained, and equipped primarily to conduct prompt and sustained combat operations on land, sea, and air;[148] and this is, in practice, the way in which they are principally employed. However, many units of the Armed Forces possess capabilities that can be of use during disaster response missions. For example, military aircraft that transport soldiers, rations, and ammunition during combat operations can also transport doctors, food, and medical supplies to a disaster zone.

### Authorization

The U.S. Armed Forces, including the Reserve Components, are governed by Title 10 of the U.S. Code. The sections of Title 10 most relevant to the organization and employment of U.S. military forces are Chapter 2 (Department of Defense), Chapter 5 (Joint Chiefs of Staff), Chapter 6 (Combatant Commands), Chapter 303 (Department of the Army), Chapter 503 (Department of the Navy), and Chapter 801 (Department of the Air Force). Due to its unique status as both a federal reserve component and the organized militia of the states, additional statutory authority for the National Guard is codified in Title 32 of the U.S. Code.

All active component units are organized, trained, equipped, and employed under the authorities contained in Title 10. These forces are always under the operational control of the President of the United States. The chain of command for active component forces extends down through the Secretary of Defense, to the Combatant Commander (for example, the Commander of United States Northern Command or USNORTHCOM), to the Joint Task Force Commander (for example, the Commander of Joint Task Force—Civil Support, a subordinate to USNORTHCOM), and then to lower echelon commanders.

Reserve component forces other than the National Guard are also governed exclusively by the provisions of Title 10 and are organized to meet the requirements of the military service to which they belong (for example, Army Reserve units are designed to meet the requirements of the Army). These forces are always under the operational control of the President of the United States as well.

National Guard forces are part of the organized militia of their respective state or territory. Simultaneously, they constitute a reserve component of the Army or Air Force and are "organized, armed, and equipped wholly or partly at federal expense."[149] They are structured to meet the requirements of the Department of the Army, in the case of the Army National Guard, and the Department of the Air Force, in the case of the Air National Guard. Owing to this unique aspect of the National Guard as both a state and a federal organization,[150] it may be employed under state law, under Title 10 of the U.S. Code, or under Title 32 of the U.S. Code.

---

[148] See 10 U.S.C. §§3062, 5063, and 5062.

[149] 10 U.S.C §§101(c)(2)(C) and (c)(4)(C); 32 U.S.C. §§101(4)(C) and (6)(C).

[150] The National Guard of the United States is made up of 54 separate National Guard organizations: one for each state, and one each for Puerto Rico, Guam, the U.S. Virgin Islands, and the District of Columbia. While the District of Columbia National Guard is an exclusively federal organization and operates under federal control (Title 10) at all times, the other 53 National Guards operate as state or territorial organizations most of the time. In this capacity, each of these 53 organizations is identified by its state or territorial name (e.g., the California National Guard or the Puerto Rico National Guard), and is controlled by its respective governor.

- As members of the militia of their state or territory, National Guardsmen can be called up by their governor for full-time duty. When employed in this capacity, referred to as *state active duty* (SAD), National Guardsmen are considered state or territorial employees, not active duty military. Typical missions performed under SAD include responding to disasters and civil disorders.

- As members of the Reserve Component, National Guardsmen can be called to *federal active duty*, also referred to as *Title 10 status*. When this happens, control of the affected units and personnel passes from the governor to the President of the United States. When in federal service, Guard units and personnel typically perform military training or participate in military operations.

- A third form of duty for National Guardsmen involves duty under state control but with pay and benefits provided by the federal government. This is sometimes referred to as *Title 32 status* in reference to the relevant part of the U.S. Code. Title 32 (T32) status is typically used for training, but it can also be used for other duties, including disaster response.

Thus, a distinctive feature of National Guard units is that, while organized and largely funded by the federal government, they can be employed by either governors or the President. Typically, the chain of command for National Guard forces in SAD or T32 status extends from the Governor to the Adjutant General (the highest ranking National Guard officer in the state or territory) to lower echelon National Guard commanders. While under the control of a governor, National Guard personnel are not subject to the restrictions of the Posse Comitatus Act (that is, they can perform law enforcement functions). If National Guard forces are ordered to federal active duty (Title 10), control is transferred from the governor to the President and they then become subject to the restrictions of the Posse Comitatus Act.

## Examples of Past or Potential Use in Disaster Response Operations

The most notable use of the Armed Forces to respond to a disaster occurred as a result of Hurricane Katrina in 2005. Roughly 72,000 military personnel participated in the response, including about 50,000 National Guard personnel serving in a Title 32 status. Some of the major activities conducted by these forces included search and rescue; evacuations from flooded areas and evacuations to medical treatment facilities; transportation and distribution of water, ice, food, and fuel; crowd control; local security; debris removal; medical treatment; and restoration of flood control systems. More recently, the Armed Forces assisted with the response to Hurricane Sandy. Some of the major activities conducted by active, reserve, and National Guard personnel in response to Sandy included removal of water from flooded areas and buildings; transportation and distribution of water, food, and fuel; search and rescue; security; provision of temporary shelter and blankets; generation and restoration of power; and debris removal.

Based on the tasks contained in the National Response Framework's Emergency Support Function Annexes, potential uses of DOD assets in disaster response operations are listed in the text box below.

## Some Potential Uses of DOD Assets Under the National Response Framework[151]

- **Transportation:** Providing military transportation capacity to move essential resources; providing assets to complement temporarily degraded or disrupted air navigation services; providing support in the emergency operation and restoration of inland waterways, ports, and harbors, including dredging operations; restoring transportation infrastructure.

- **Communications:** Providing communications resources and capabilities.

- **Public Works and Engineering:** Providing expertise and construction management resources and support; conducting specialized salvage/wreck removal operations.

- **Firefighting:** Conducting firefighting activities on DOD installations and supporting firefighting operations on nonmilitary lands with personnel, equipment, and supplies; assisting urban and rural firefighting forces to obtain heavy equipment and/or demolition services as needed to suppress incident-related fires.

- **Mass Care, Emergency Assistance, Temporary Housing:** Providing construction, engineering, and project management expertise and support for temporary housing and sheltering; inspecting mass care shelter sites to ensure suitability and accessibility of facilities; constructing temporary shelter facilities in the affected area.

- **Logistics:** Providing planning support, subsistence, administrative supply, petroleum product, engineering and construction supply, water and mobile units, medical material, telecommunications management, and transportation management support; providing bottled and bulk drinking water, construction materials, and engineering services; providing commodities distribution assistance and expertise to include, points of distribution training and state-level project management support for commodities missions; hauling, installing, operating, and maintaining generators for critical public facilities.

- **Public Health and Medical Services:** Conducting medical evacuations; coordinating patient reception, tracking, and management of patients evacuated on DOD assets; deploying medical, surgical, and behavioral health personnel for casualty clearing and staging, patient management, and treatment; augmenting civilian hospital staff and deployable federal teams; deploying chemical, biological, radiological, and nuclear medical subject matter experts for technical consultation and medical support; providing epidemiological and occupational health support, telemedicine, and other specialized medical support; providing military medical personnel to assist in the protection of public health; providing available DOD medical supplies and materiel for use at points of distribution, hospitals or clinics, or medical care locations; assisting local, state, tribal, territorial, and insular area officials in the provision of emergency medical, surgical, and behavioral healthcare; providing public health and medical surveillance, laboratory diagnostics, and confirmatory testing.

- **Search and Rescue (SAR):** Coordinating facilities, resources, and special capabilities to conduct and support air, land, and maritime SAR; coordinating and managing the satellite imagery; providing expert analysis of imagery; deploying specially trained and equipped structural engineers during structural collapse incidents and other disaster response missions; providing technical support and advice to assess damage, mitigate hazards, and enable rescue and lifesaving operations.

- **Oil and Hazardous Materials Response:** Providing response assistance for incidents involving contaminated debris, including waste sampling, classification, packaging, transportation, treatment, demolition, storm water management, and disposal; providing technical, operational, and emergency support in the ocean engineering disciplines of marine salvage, pollution abatement, and diving services.

- **Agriculture and Natural Resources:** Providing military specialists trained in foreign animal disease diagnosis, epidemiology, microbiology, immunology, entomology, pathology, and public health.

- **Energy:** Conducting power system stabilization and reestablishment activities.

---

[151] The text in this shaded box is an edited version of DOD "Actions" and "Functions" listed in the National Response Framework Emergency Support Function Annexes 1 through 12, all of which are available here: http://www.fema.gov/ national-preparedness-resource-library. Some of the listed actions and functions are the responsibility of the Army Corps of Engineers, discussed in a separate section of this report.

## Chemical, Biological, Radiological, and Nuclear (CBRN) Response Forces[152]

Lawrence Kapp, Specialist in Military Manpower Policy.

### *Purpose and Responsibilities*

The Department of Defense has forces organized, trained, and equipped to respond to major domestic CBRN incidents, as well as general purpose forces assigned to support CBRN response efforts. These units make up the DOD CBRN Response Enterprise (CRE). The CRE includes the Defense CBRN Response Force (DCRF), two Command and Control CBRN Response Elements (C2CRE), and 10 regionally based National Guard Homeland Response Forces (HRFs), which are built around state-based National Guard CBRN Enhanced Response Force Packages (CERFPs) and Weapons of Mass Destruction Civil Support Teams (WMD-CSTs).[153] Additionally, other units within DOD have significant CBRN response capabilities, such as the Marine Corps' Chemical Biological Incident Response Force (some elements of which are part of the DCRF), the Defense Threat Reduction Agency's Consequence Management Advisory Teams, and the U.S. Army's CBRNE Command. All of these units are discussed below. All of these units can be used for disaster response missions other than CBRN-related ones if the situation warrants.

### Defense CBRN Response Force (DCRF)

The DCRF is composed of various military units, which together have approximately 5,200 active component personnel. When activated, its capabilities include command and control, CBRN assessment, search and rescue, decontamination, emergency medical care, security, engineering, logistics, transportation, aviation lift, and air and ground medical evacuation. On order, it deploys in phases, with the first "force package" of approximately 2,100 personnel meant to begin deployment within 24 hours of notification and the second force package of approximately 3,100 personnel meant to begin deployment within 48 hours of notification. If activated, the DCRF would include elements of the Marine Corps' Chemical Biological Incident Response Force (CBIRF), discussed below.

---

[152] The acronym CBRN is used today, although previously the acronym CBRNE was used in relation to many of these units. The additional "E" stands for high yield explosives. CBRNE Command, discussed later, has retained the "E" in its name because it includes explosive ordnance disposal units.

[153] DOD's CBRN response structure was changed in 2011-2012 in an attempt to address gaps in capabilities that were identified prior to and during the 2010 Quadrennial Defense Review. Prior to the change there were three overarching constructs for DOD CBRN response forces: CBRN Consequence Management Response Forces (CCMRF), National Guard CBRN Enhanced Response Force Packages (CERFPs), and National Guard Civil Support Teams (CST). The previous organizations were assessed to be less than ideal in terms of response time, lifesaving capabilities in the early arriving forces, and the ability to respond to a catastrophic event or multiple simultaneous events. The Quadrennial Defense Review Report explained this restructuring as follows:

> [T]he Department will begin restructuring the original CBRNE Consequence Management Response Force (CCMRF), to increase its ability to respond more rapidly to an event here at home. To address the potential for multiple, simultaneous disasters, the second and third CCMRFs will be replaced with smaller units focused on providing command and control and communications capabilities for Title 10 follow-on forces. Complementing the evolution of the first CCMRF, the Department also will draw on existing National Guard forces to build a Homeland Response Force (HRF) in each of the ten Federal Emergency Management Agency (FEMA) regions. These ten HRFs will provide a regional response capability; focus on planning, training and exercising; and forge strong links between the federal level and state and local authorities.

Department of Defense, *Quadrennial Defense Review Report*, February 2010, p. 19, at http://www.defense.gov/qdr/images/QDR_as_of_12Feb10_1000.pdf.

**Command and Control CBRN Response Elements (C2CRE)**

Each C2CRE has approximately 1,500 personnel. In addition to having a core element that can provide immediate response capabilities, it is designed to provide command and control and logistical support for up to 20,000 follow-on forces. The intent of this is to allow it to provide additional support to the DCRF for a single catastrophic event, or to be used separately in the case of multiple events. It is meant to begin deployment within 96 hours of notification, although its posture can be adjusted by the commander of U.S. Northern Command.

**Homeland Response Force (HRF)**

The 10 HRFs are regionally oriented National Guard units aligned with each of the 10 FEMA regions. Each HRF is made up of about 577 National Guard personnel and is made up of a command and control element (180 personnel), a CBRN Assistance and Support Element (CASE; 200 personnel), and a task force element (197 personnel). The command and control element can control additional National Guard CERFPs and WMD-CSTs. The CASE provides site security, force protection, and assistance with the movement of casualties. The task force element has the same structure and capabilities as a CERFP, discussed below. HRFs are expected to be ready to deploy six hours after notification.

**CBRNE Enhanced Response Force Package (CERFP)[154]**

National Guard CERFPs provide the following capabilities: "... incident site search of collapsed buildings and structures, conducting rescue tasks to extract trapped casualties, providing mass decontamination, performing medical triage and initial treatment to stabilize patients for transport to medical facilities ... and the recovery of CBRN incident fatalities."[155] At present, there are 17 CERFPs. Each CERFP is made up of 197 personnel, drawn from existing National Guard units, who are assigned to one of five teams within the CERFP: command and control, search and extraction, decontamination, medical, and fatalities search and recovery. They are meant to begin deployment within six hours of notification.

**Weapons of Mass Destruction—Civil Support Teams (WMD-CST)**

The mission of the National Guard WMD-CSTs (sometimes referred to as Civil Support Teams or CSTs) is

> To support civil authorities at a domestic site during specified events, which include use or threatened use of a weapon of mass destruction; terrorist attack or threatened terrorist attack; intentional or unintentional release of nuclear, biological, radiological, or toxic or poisonous chemicals; natural or manmade disasters in the United States that result, or could result, in the catastrophic loss of life or property by identifying hazards, assessing current and projected consequences, advising on response measures, and assisting with appropriate requests for additional support.[156]

At present there are 57 WMD-CSTs, each made up of 22 National Guard personnel who serve on full-time duty under Title 32. Each team is divided into six sections: command, operations, communications, administration/logistics, medical/analytical, and survey. Team members receive over 600 hours of specialized training and are all certified as hazardous materials technicians. WMD-CSTs are required to deploy within 90 minutes of notification and can conduct continuous

---

[154] See footnote 152. While the official title still includes the acronym CBRNE (rather than CBRN), CERFPs do not have explosive ordnance disposal capabilities. They can identify chemical precursors of explosives.

[155] National Guard Fact Sheet at http://www.nationalguard.mil/Portals/31/Features/Resources/Fact%20Sheets/pdf/CBRNE-CERFP%20-%20March2013.pdf.

[156] According to National Guard Bureau staff, this mission statement has been formally approved and will be published shortly in a new manual, Army Techniques Publication 3-11.46. See also 10 USC 12310(c).

operations for 72 hours without additional support. Each WMD-CST deploys with vehicles equipped with sophisticated communications capabilities and laboratory equipment to facilitate analysis of chemical, biological, and radiological hazards.

**Marine Corps' Chemical Biological Incident Response Force (CBIRF)**

The CBIRF has a mission to "respond to a credible threat of a Chemical, Biological, Radiological, Nuclear, or High Yield explosive (CBRNE) incident in order to assist local, state, or federal agencies and Unified Combat Commanders in the conduct of consequence management operations,"[157] and consists of about 500 Marines. Its capabilities include command and control, detection and identification, search and extraction, personnel decontamination, technical rescue (for example, collapsed structure or vehicle rescue), medical, explosive ordnance disposal, and logistics. The CBIRF has a 12-person assessment team on standby to begin deployment within one hour of notification, a 130-person team that is expected to begin deployment within two hours, and another 130-person team that is meant to begin deployment within six hours. Elements of the CBIRF would fall under the DCRF if it were activated.

**Defense Threat Reduction Agency Consequence Management Advisory Teams (CMAT)**

The Defense Threat Reduction Agency (DTRA) has approximately a dozen CMATs. These CMATs "provide task-organized, deployable, and technical expertise support, advice, and hazard prediction assistance for the U.S. Department of Defense and other Federal agencies during all phases of accidents or incidents of a chemical, biological, radiological or nuclear nature."[158] They may also have specialists with expertise in other areas, such as radiobiology. When needed, CMATs augment the DCRF.

**U.S. Army CBRNE Command**

CBRNE Command, formerly called the 20th Support Command (CBRNE), is a subordinate element of the U.S. Army's Forces Command. Its mission is to provide "highly-trained, properly-equipped, disciplined and well led forces to counter the entire range of chemical, biological, radiological, nuclear, and explosive ordnance hazards for our nation. It consolidates command and control of chemical, biological, radiological, nuclear, and high-yield explosive assets under one operational headquarters"[159] and contains three major subordinate organizations: the 48th Chemical Brigade, 52nd Ordnance Group (Explosive Ordnance Disposal), and the 71st Ordnance Group (Explosive Ordnance Disposal). The 20th Support Command capabilities include the ability to "operate in a variety of environments, from urban areas to austere sites across the spectrum of military operations. CBRNE operations detect, identify, assess, render-safe, dismantle, transfer, and dispose of unexploded ordnance, improvised explosive devices, and other CBRNE hazards."[160] The 20th Support Command is not a part of the DCRF. However, in the event of a significant CBRN incident, it could be tasked to provide support to a DCRF or other CBRN response unit.

## *Authorization*

In general, DOD's CBRN response forces do not operate under special statutory authority, but under the general statutory authority for the organization, training, and employment of military

---

[157] Chemical Biological Incident Response Force website, at http://www.cbirf.marines.mil/.

[158] Defense Threat Reduction Agency website, at http://www.dtra.mil/Missions/ConsequenceManagement/ ConsequenceManagementHome.aspx.

[159] U.S. Army webpage for the 20th Support Command, at http://www.army.mil/20thcbrne.

[160] Ibid.

forces found in Title 10 of the U.S. Code and, for National Guard forces, under the provisions of Title 32 and state law (see previous section on general purpose forces). However, there are two exceptions to this. Specific statutory provisions are tied to both the Marine Corps Chemical Biological Incident Response Force (now part of the DCRF) and the National Guard WMD-CSTs.

**Marine Corps Chemical Biological Incident Response Force**

Section 2314 of Title 50, enacted in 1996, directed the Department of Defense to establish at least one CBRN rapid response team. Subsection (a) of this statute originally stated:

> Department of Defense Rapid Response Team—The Secretary of Defense shall develop and maintain at least one domestic terrorism rapid response team composed of members of the Armed Forces and employees of the Department of Defense who are capable of aiding Federal, State, and local officials in the detection, neutralization, containment, dismantlement, and disposal of weapons of mass destruction containing chemical, biological, or related materials.[161]

This statute was fulfilled by the Marine Corps Chemical Biological Incident Response Force, which became operational in 1996. A subsequent amendment replaced the phrase "or related materials" with "radiological, nuclear, and high-yield explosives."[162]

**National Guard WMD-CSTs**

The National Guard's WMD-CSTs originated as part of a DOD proposal to enhance domestic preparedness against weapons of mass destruction, but Congress has provided statutory language to expand the number of teams and specify their location.

In 1998, DOD requested funding from Congress to establish 10 National Guard Rapid Assessment and Initial Detection (RAID) teams, the forerunners of WMD-CSTs. This funding was provided in P.L. 105-277, the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999. The conference report accompanying the act provided that the funds were to be used to establish the teams and to "establish and equip small organizations in each of the 44 states not receiving an initial RAID element in 1999 to provide limited chemical/biological response capabilities…."[163] The following year, the conference report accompanying the FY2000 Defense Appropriations Act noted that "The conferees support the establishment of 17 Rapid Assessment and Initial Detection (RAID) teams. Accordingly, the conferees provided funding for an additional 198 Army National Guard and 66 Air National Guard full-time (AGR) personnel to facilitate this mission."[164]

The next year, RAID teams were renamed Weapons of Mass Destruction Civil Support Teams. H.Rept. 106-644, the Appropriations Committee report on the Defense Appropriations Act for FY2001, used this new terminology when it stated "The Department of Defense has currently fielded 10 Weapons of Mass Destruction Civil Support Teams. Last year, the Congress directed

---

[161] P.L. 104-201, section 1414.

[162] P.L. 109-163, section 1033.

[163] U.S. Congress, House Committee on Appropriations, *Making Omnibus Consolidated and Emergency Supplemental Appropriations for Fiscal Year 1999*, Conference Report to Accompany H.R. 4328, 105th Cong., 2nd sess., October 19, 1998, pp. 1527-8.

[164] U.S. Congress, House Committee on Appropriations, *Making Appropriations for the Department of Defense for the Fiscal Year Ending September 30, 2000 and for Other Purposes*, Conference Report to Accompany H.R. 2561, 106th Cong., 1st sess., October 8, 1999, pp. 96-97.

the establishment and organization of an additional 17 teams, for a total of 27 teams."[165] Subsequently, the National Defense Authorization Act for FY2001 included a provision in law that specified, "During fiscal year 2001, the Secretary of Defense shall establish five additional teams designated as Weapons of Mass Destruction Civil Support Teams (for a total of 32 such teams)."[166] Two years later, in the National Defense Authorization Act for FY2003, Congress again directed the expansion of the WMD-CSTs with the following statutory language: "The Secretary of Defense shall: (1) establish 23 additional teams designated as Weapons of Mass Destruction Civil Support Teams, for a total of 55 such teams; and (2) ensure that of such 55 teams, there is at least one team established in each State and territory."[167] Funding for two additional teams was provided in the 2007 Defense Appropriations Act, bringing the total to 57.[168]

### *Examples of Past or Potential Use in Disaster Response Operations*

DOD's CBRN response elements have been used to respond to a variety of disasters. The Marine Corps CBIRF responded to the presence of anthrax and ricin on Capitol Hill in 2001 and 2004, respectively. It has also supported major events such as the Olympics, political conventions, and presidential inaugurations.[169] WMD-CSTs have also responded to CBRN events. For example, in 2014 a major chemical leak contaminated the Elk River in West Virginia. Seven WMD-CSTs supported the response effort by analyzing water samples and assessing the scope of the incident. In 2013, a WMD-CST provided analytical support to the FBI and other law enforcement agencies investigating a ricin letter in Spokane, WA, while another WMD-CST provided air toxicology testing and assessments in the aftermath of an ammonium nitrate explosion that occurred in West, TX. Perhaps most visibly, several WMD-CSTs were at the Boston Marathon in 2013 providing on-site monitoring. In the aftermath of the terrorist attack there, they assisted with command and control of the response.[170]

The potential uses of DOD CBRN response forces include command and control; communications; CBRN monitoring, detection, assessment, and identification; decontamination; search and rescue; explosive ordnance disposal; emergency medical care; transportation, including medical evacuation; security; and logistics. These units can be used for disaster response missions other than CBRN response if the situation warrants. For example, four WMD-CSTs provided communications support to the Hurricane Sandy response (2012), and CERFP search and extraction elements provided support during a flood evacuation in Colorado (2013) and a mudslide in Washington (2014).

## U.S. Army Corps of Engineers Assets

## Planning and Response Teams

Nicole T. Carter, Specialist in Natural Resources Policy.

---

[165] U.S. Congress, House Committee on Appropriations, *Department of Defense Appropriations Bill, 2001*, Report of the Committee of Appropriations to Accompany H.R. 4576, 106th Cong., 2nd sess., June 1, 2001, p. 41. Note that this language specifies that the previous year Congress had directed 17 *additional* teams, rather than a total of 17 teams.

[166] P.L. 106-398, section 1032.

[167] P.L. 107-314, section 1403.

[168] H.Rept. 109-676, p. 89.

[169] Examples of CBIRF usage taken from CBIRF website, at http://www.cbirf.marines.mil/About/History.aspx.

[170] Examples of CST usage provided by staff at the National Guard Bureau in an email correspondence, March 18, 2014.

## Purpose and Responsibilities

The U.S. Army Corps of Engineers performs its emergency response activities through more than 40 planning and response teams (PRTs). These deployable teams have been specifically trained to perform Corps emergency response functions, including provision of ice, water, emergency power, debris removal, temporary housing, temporary roofing, and structural safety assessments. The Corps also has between 15 and 20 deployable tactical operating systems; these function as mobile command, control, and communication team and equipment units during a disaster. Training includes the use of exercises simulating responses to different disasters; Corps simulations have included dam failures and floods, earthquakes, hurricanes, pandemic, and terrorist attacks.

## Authorization, Appropriations

Under the National Response Framework, the Army Corps of Engineers coordinates emergency support for public works and engineering. This includes technical assistance, engineering, and construction management, emergency contracting, and repair of power systems, public water and wastewater, and solid waste facilities. The Corps also assists in monitoring and stabilizing damaged structures and demolishing structures designated as immediate hazards to public health and safety. It also provides technical assistance in clearing, removing, and disposing of contaminated and uncontaminated debris from public property, and establishing ground and water routes into affected areas. Contaminated debris management is coordinated with the U.S. Environmental Protection Agency. Implementation of Corps emergency activities also typically requires close coordination with FEMA. The Corps' funding for these activities is provided through FEMA appropriations, often through supplemental appropriations. The annual funding level highly depends on the scale and nature of the disaster. For a larger disaster, these Corps assignments can reach billions of dollars.

In addition to work performed as part of the National Response Framework, Congress has given the Corps its own emergency response authority. This authority is commonly referred to as the Corps' P.L. 84-99 authority, based on the act in which it was originally authorized, the Flood Control and Coastal Emergency Act, P.L. 84-99 (33 U.S.C. §701n). This law authorizes the Corps to perform disaster preparedness, advance measures, emergency operations (disaster response and post-flood response), rehabilitation of flood control works threatened by floods, protection or repair of federally authorized shore protection works threatened by coastal storms, emergency dredging, and flood-related rescue operations. These activities are limited to actions to save lives and protect improved property (public facilities/services and residential or commercial developments). Most of the disaster response work performed under this authority generally is funded through supplemental appropriations provided directly to the Corps. Until supplemental appropriations are available, Congress has provided the Corps with authority to transfer money from ongoing Corps projects to emergency operations. The emergency response activities performed under this authority rarely exceed $1 billion except for the largest of flood disasters. In recent years, emergency appropriations for these activities were provided through supplemental appropriations in FY2010 ($20 million under P.L. 111-212), FY2012 ($388 million under P.L. 112-77), and FY2013 ($1.01 billion in emergency funding for Hurricane Sandy response and recovery under P.L. 113-2). There was no supplemental appropriations for these activities in FY2014. Funding for preparedness to support these activities has occasionally been provided during regular appropriations. While funding for preparedness was not provided in enacted appropriations bills from FY2008 to FY2011, it was provided in FY2012 at $112 million, FY2013 at $25.6 million, FY2014 at $28 million, and FY2015 at $28 million. The Administration has requested $34 million for FY2016.

### Examples of Use in Disaster Response Operations

After Hurricane Sandy, the Corps delivered 8.9 million liters of water over a three week period (or enough water for 2.5 million people), refurbished 115 housing units, and provided more than 218,000 sandbags and cold-weather gear to local first responders. The Corps also teamed with federal, state, city, and regional agencies to provide temporary power and unwater flooded areas. For example, almost 500 million gallons of seawater were trapped in New York City's mass transit system after the storm. The Corps' relevant PRTs were organized into an Unwatering Task Force which had pumps of various types and sizes sent to points around the transit system, including the Brooklyn Battery Tunnel, World Trade Center/PATH Train, and South Ferry Subway Station. The pumps relatively quickly removed about 116,000 gallons of saltwater per minute and in nine days, 475 million gallons of saltwater had been drained from the city's subways and tunnels.

In addition to supporting FEMA-assigned missions throughout the region, the Corps' New York and Philadelphia districts also carried out their own regular missions following the storm, including work under P.L. 84-99. These included helping the port of New York and New Jersey reopen, closing barrier island breaches in Long Island, and assessing damages to federally authorized and constructed shoreline projects while developing short-, mid-, and long-term alternatives for coastal storm damage risk management.

## 249th Engineer Battalion (Prime Power)

Nicole T. Carter, Specialist in Natural Resources Policy.

### Purpose and Responsibilities

The 249th Engineer Battalion (Prime Power) can rapidly deploy and provide technical expertise and operational assistance in all aspects of power and electrical systems generation and distribution in support of contingency and emergency response operations. While this battalion performs military functions for the U.S. Army abroad and assists in international disaster relief, the Corps can deploy the battalion domestically to assist with power emergencies. It focuses its emergency activities in restoring power to life-saving and life-sustaining facilities like hospitals, shelters, water and sewer facilities, police and fire stations, command centers, fueling stations, and public housing developments. The focus of the battalion, which was created in 1994 by consolidating existing Army detachments, focuses on low to medium voltage electricity. One of the battalion's companies generally is standing ready to respond to domestic disasters under the National Response Framework.

### Appropriations

Under the National Response Framework, the Army Corps of Engineers coordinates emergency support for public works and engineering. This includes repair of power to public infrastructure. The battalion is funded primarily through Department of Defense appropriations, with its domestic response mission assignments funded through FEMA. The annual funding level highly depends on the scale and nature of the disaster.

### Examples of Use in Disaster Response Operations

The battalion and the Corps' power-related PRTs often work together in response to power emergencies. In response to Hurricane Sandy, the battalion and power PRTs helped restore the regional power systems and priority facilities in the 13 affected states, completed 567 power

assessments, and installed 211 generators. They provided power to a wide range of facilities including mass transit systems like the Hudson ferry, New Jersey's PATH trains, and the Long Island railroad as well as petroleum terminals critical to regional fuel availability. The battalion also was deployed in response to Hurricane Katrina in 2005 and Hurricane Irene in 2011.

# Department of Energy

## Nuclear Counterterrorism and Incident Response (NCTIR) Program

Jonathan E. Medalia, Specialist in Nuclear Weapons Policy.

### *Purpose and Responsibilities*

This program provides rapid response in the event of a radiological or nuclear incident, whether predetonation or postdetonation, as well as technical support for other first responders. It draws on the technical expertise resident in the nuclear weapons complex. The FY2016 request for the National Nuclear Security Administration (NNSA), a separately-organized component of the Department of Energy, proposed moving this program from its Weapons Activities account, which manages the U.S. nuclear weapons program, to the Defense Nuclear Nonproliferation account, which handles programs dealing with nonproliferation, counterproliferation, materials security, arms control, and counterterrorism. NCTIR has many subprograms and capabilities, such as the following:

The Nuclear Emergency Support Team (NEST) provides technical teams to the FBI, DoD, and DHS in the event of radiological or nuclear threats or incidents. NEST, in turn, has several specialized teams, including the Accident Response Group, Radiological Assistance Program, Nuclear-Radiological Advisory Team, and Joint Technical Operations Team. The mission of these teams is to "search for, identify, characterize, render safe, and dispose of any nuclear or radiological device." NCTIR also provides training and exercises to federal, state, and local agencies for responding to radiological or nuclear emergencies.

Forensics—determining the provenance and design of a radiological or nuclear device—whether before or after detonation is crucial for directing a U.S. military or other response to an event and for improving U.S. ability to detect and disarm similar devices in the future. National Technical Nuclear Forensics (NTNF) provides technical support, including training, equipment, response teams, and capability to analyze radioactive samples in support of this mission.

NNSA describes its Office of Emergency Operations as "the United States government's primary capability for radiological and nuclear emergency response and for providing security to the nation from the threat of nuclear terrorism."[171] It focuses on radiological search, "making sure a nuclear device is safe if such a device is found," and consequence management.[172]

NNSA's Atmospheric Release Advisory Capability is hosted by the National Atmospheric Release Advisory Center (NARAC) at NNSA's Lawrence Livermore National Laboratory. Livermore provides the following description: "NARAC is a national resource for predicting the spread of hazardous materials released, accidentally or intentionally, into the atmosphere. NARAC provides plume predictions within minutes of a release for emergency managers to use

---

[171] U.S. Department of Energy. National Nuclear Security Administration. "Emergency Response," at http://nnsa.energy.gov/aboutus/ourprograms/emergencyoperationscounterterrorism.

[172] Ibid.

in response to myriad disasters, from industrial fires in the wake of Hurricane Katrina, to the Chernobyl and Fukushima nuclear power plant releases to volcanic eruptions in the Philippines and Hawaii."[173]

## Authorization and Appropriations

The National Nuclear Security Administration Act, Title XXXII of the FY2000 National Defense Authorization Act, S. 1059, P.L. 106-65 (October 5, 1999), which established NNSA, gave the NNSA Administrator authority over, and responsibility for, all NNSA programs, including emergency management. This act gave the Deputy Administrator for Defense Programs several duties, including "directing, managing, and overseeing assets to respond to incidents involving nuclear weapons and materials."[174]

Funds for NNSA are authorized by the armed services committees and appropriated by the energy and water development subcommittees of the appropriations committees. The FY2016 budget request for Nuclear Counterterrorism and Incident Response Programs was $234.390 million.

## Examples of Past Use in Disaster Response Operations

According to NNSA, "NNSA teams are deployed more than 100 times a year mainly within the U.S. and most are radiological search deployments. The deployments are intelligence driven, support of law enforcement, and planned events such as the Super Bowl, presidential inaugurations or political conventions."[175] These deployments may be considered disaster preparedness and prevention operations.

In response to the Fukushima accident, NNSA sent its Consequence Management Response Teams, Aerial Monitoring System assets, ground radiation detectors, and other equipment to Japan. The teams conducted aerial measurements and ground samples and analyzed the resulting data for radiation.[176] To make the data widely accessible, DOE posted the data on its website.[177]

NNSA's assets are not limited to radiological or nuclear events. NARAC has responded to many other types of atmospheric releases.[178] As one example, on August 19, 2004, there was a large fire at a barrel recycling facility at the Queen City Barrel Company in Cincinnati. According to a NARAC report, the city's health department "was particularly concerned about the health effects associated with the combustion of unknown, organic chemicals potentially contained in the barrels." The department contacted NARAC, which provided four sets of plume models to the city's emergency response departments. These models included "Initial (Smoke) Projections,

---

[173] Lawrence Livermore National Laboratory, "Unique Facilities and Centers," p. 1, at https://www.llnl.gov/sites/default/files/fc_sheet_08-02-13.pdf. For further information, see the NARAC website at https://narac.llnl.gov/.

[174] 50 U.S.C. §2404(b)(2)

[175] U.S. Department of Energy. National Nuclear Security Administration. "Emergency Response," at http://nnsa.energy.gov/aboutus/ourprograms/emergencyoperationscounterterrorism.

[176] U.S. Department of Energy. "U.S. Department of Energy Releases Radiation Monitoring Data from Fukushima Area," March 22, 2011, at http://energy.gov/articles/us-department-energy-releases-radiation-monitoring-data-fukushima-area.

[177] U.S. Department of Energy. "The Situation in Japan (Updated 1/25/13)," at http://energy.gov/situation-japan-updated-12513.

[178] For documents on many such responses, see Lawrence Livermore National Laboratory, "NARAC Publications," section "Applications and Incident Responses," at https://narac.llnl.gov/documents.html#5.

Initial Fire Plume Health Effect Estimate, Post-Analysis of the Fire Plume, and Initial Smoldering Ember Health Effect Estimate."[179]

# National Transportation Safety Board Disaster Assistance

Bart Elias, Specialist in Aviation Policy.

## *Purpose, Responsibilities, and Authorization*

The National Transportation Safety Board (NTSB) serves primarily as an independent federal investigative agency in the aftermath of transportation disasters.[180] NTSB accident investigators are not directly involved in disaster assistance, and in fact must remain impartial to disaster response activities that may come under investigative scrutiny. However, NTSB was mandated under the Aviation Disaster Family Assistance Act of 1996 (Title VII of P.L. 104-264; 49 U.S.C. §1136) to coordinate disaster resources to provide information and assistance to victims' families[181] in the aftermath of major air carrier accidents. The Rail Safety Improvement Act of 2008 (P.L. 110-432; 49 U.S.C. §1139) expanded the NTSB role to include coordination of family assistance following rail passenger accidents resulting in major loss of life. Although not formally mandated to do so, NTSB may also provide support to family, friends, and survivors of certain general aviation accidents, commuter rail and transit accidents, mass casualty highway accidents, marine accidents, and pipeline disasters that are investigated by NTSB. While the NTSB often participates in investigations of overseas transportation accidents, particularly major aviation accidents, the U.S. Department of State's Office of American Citizen Services and Crisis Management coordinates crises and emergency situations, including transportation disasters, involving large numbers of U.S. citizens traveling abroad.

## *Examples of Use in Disaster Response Operations*

Statutorily, NTSB has primary federal responsibility for facilitating the recovery and identification of fatally injured passengers and communicating with the families of passengers involved in major airline and passenger rail accidents. The NTSB Transportation Disaster Assistance division functions in the capacity of a facilitator to coordinate federal, state, local, and volunteer agency assets following major airline and passenger rail disasters. In this capacity, it establishes family assistance centers near accident sites. Major functions of the disaster assistance division and the family assistance centers include dissemination of accident and accident investigation information to family, friends, and survivors; coordination of victim identification; management and reclamation of personal effects; coordination of crisis counseling resources; and arrangement of a memorial service in coordination with the families. NTSB statutory responsibility includes the requirement to designate an independent nonprofit organization with experience in post-trauma communications with families to have primary responsibility for coordinating the emotional care and support of victim's families. NTSB coordinates with the

---

[179] M.B. Dillon et al., "LINC Modeling of August 19, 2004 Queen City Barrel Company Fire in Cincinnati, OH," Lawrence Livermore National Laboratory, UCRL-TR-206580, September 15, 2004, pp. 1-2, at https://narac.llnl.gov/uploads/LINC-QCB-Fire.pdf.

[180] The Chemical Safety and Hazard Investigation Board (Chemical Safety Board or CSB) is the complementary investigative federal agency that examines root causes of incidents at stationary sources involving "accidental releases" of regulated substances into the ambient air. For more information, see the CSB website at http://www.csb.gov/.

[181] In regulation and policy, NTSB has generally broadened the scope of "family" to include the family members and close friends of victims and the survivors of transportation disasters falling under the scope NTSB's statutory responsibility.

American Red Cross to provide this capability by working through its local chapters to partner with mental health providers trained in disaster response.

# Jointly Operated Assets

## National Response System for Oil and Chemical Spills

David M. Bearden, Specialist in Environmental Policy.
Jonathan L. Ramseur, Specialist in Environmental Policy.

### *Purpose and Responsibilities*

The National Oil and Hazardous Substances Pollution Contingency Plan, commonly referred to as the National Contingency Plan (NCP), is the federal government's principal plan for responding to oil spills and releases of hazardous substances, pollutants, or contaminants. The NCP delegates federal authorities for responding to such incidents to the Environmental Protection Agency (EPA), the U.S. Coast Guard (USCG), and numerous other federal departments and agencies with relevant expertise. It provides the framework for coordinating the federal, state, and local roles in responding to such incidents and notifying the relevant departments and agencies.

The NCP is authorized in three federal statutes, the Oil Pollution Act of 1990 (OPA),[182] the Clean Water Act (CWA),[183] and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, often referred to as Superfund).[184] The NCP is codified in federal regulation at 40 C.F.R. Part 300. Unlike many other federal emergency response plans that are administrative in nature, NCP regulations have the force of law and are binding and enforceable. The NCP most often is applied as a stand-alone regulatory authority, but also may be invoked as the operable response plan under the National Response Framework as part of a larger federal response.

The NCP established a coordinated National Response System (NRS) that uses a multi-tiered, top-down framework.[185] Key components of the NRS include

- National Response Team (NRT): composed of representatives from 15 federal departments and agencies with duties assigned in the NCP. A USCG official chairs the NRT for federal responses in the coastal zone, and an EPA official chairs the NRT for federal responses in the inland zone and during non-response activities. As defined in the NCP, the coastal zone includes U.S. waters and adjoining shorelines, the Great Lakes, and specified ports and harbors on inland rivers, and the inland zone conversely is the environment inland of the coastal zone.[186]

---

[182] 33 U.S.C. §2701 et. seq.

[183] 33 U.S.C. §1321.

[184] 42 U.S.C. §9601 et. seq.

[185] As a practical matter, local emergency teams (e.g., fire departments) are often the first to respond to an incident. The NCP regulations envision that state and local officials typically would initiate public safety measures (40 C.F.R. §300.180(f)) in the earliest stage of a response. However, once an incident is elevated for federal attention, a designated federal official would oversee the federal response pursuant to the NCP and would be responsible for making ultimate decisions about the use of federal resources to carry out the response.

[186] 40 C.F.R. §300.5.

- Regional Response Teams (RRTs): composed of regional representatives of each NRT member agency, state governments, and local governments. The Coast Guard leads each RRT for federal responses in the coastal zone; EPA leads each RRT for federal responses in the inland zone.

- Area Committees (ACs): includes qualified personnel from federal, state, and local agencies. The primary function of each AC is to prepare an Area Contingency Plan (ACP) for its designated area.

- On-Scene Coordinator (OSC): directs federal response efforts and coordinates all other related federal efforts at the scene. The OSC is a USCG official in the coastal zone[187] and an EPA official in the inland zone. The OSC is broadly empowered to direct and coordinate all response and recovery activities of federal departments and agencies that are members of the NRT, and state, local, and private entities that may participate in a federal response (including the parties responsible for the incident). When an incident occurs, the OSC may draw upon the resources identified in the appropriate ACPs and RRTs.

The framework of the NCP primarily uses existing resources of the federal departments and agencies that are members of the NRT to call upon those resources as needed when an incident occurs. The resources that may be needed to respond to any one specific incident would depend upon the scope and nature of the incident and the associated hazards. Some of the resources may be maintained specifically for response purposes, whereas others more broadly are associated with a department or agency's primary mission. Many of the federal departments and agencies on the NRT also maintain specialized resources to respond to incidents at federal facilities or vessels under their own jurisdiction, such as the Department of Defense or Department of Energy. These departments and agencies may be called upon to contribute their respective resources to participate in a federal response to an oil spill or a hazardous substance, pollutant, or contaminant incident at a non-federal facility or vessel. Much of the work performed under a federal response also may be accomplished through private contracting to augment federal assets.

As co-chairs of the NRT, EPA and the Coast Guard also maintain certain dedicated response resources to fulfill their respective roles in leading federal responses to oil spills and hazardous substance, pollutant, or contaminant incidents. Under the Superfund program, EPA maintains an array of specialized personnel and other emergency response resources across its 10 regional offices. The Coast Guard National Strike Force Coordination Center (NSFCC) maintains a comprehensive list of Coast Guard-owned oil spill response equipment. Some of these assets also may be used to respond to releases of hazardous substances, pollutants, or contaminants in the coastal zone. The NSFCC also maintains the Response Resource Inventory (RRI), which includes equipment inventories maintained by the private sector that may be drawn upon through contracting. According to the Coast Guard,[188] it maintains the following assets:

- 9 District Response Advisory Teams, which typically comprise between 3 and 6 personnel;

- 3 National Strike Force Strike Teams, comprised of approximately 40 active duty/civilian and 40 reserve personnel; and

- specialized spill response personnel and equipment in each Coast Guard Sector office.

---

[187] In general, Coast Guard Captains of the Port serve as OSCs for their particular area.

[188] Email correspondence with the U.S. Coast Guard Office of Congressional Affairs, April 16, 2015.

## Authorization and Appropriations

Congress has authorized two dedicated trust funds to finance the costs of a federal response to a discharge of oil or release of a hazardous substance, pollutant, or contaminant.[189] Through its National Pollution Funds Center, the U.S. Coast Guard administers the Oil Spill Liability Trust Fund (OSLTF) to finance the costs of responding to a discharge of oil.[190] EPA administers the Hazardous Substance Superfund Trust Fund to finance the costs of responding to a release of a hazardous substance, pollutant, or contaminant.[191] Respectively, each agency is responsible for disbursing monies from these trust funds to other federal departments and agencies, states, and local entities that may be involved in a federal response taken under the NCP.

A limited amount of funding from the OSLTF is available each fiscal year (up to $150 million) as mandatory (i.e., permanent) appropriations that are directly available for obligation and are not subject to discretionary appropriations.[192] In addition, the OSLTF is subject to a cap of $1 billion on total expenditures per incident.[193] Monies from the Hazardous Substance Superfund Trust Fund are subject to discretionary appropriations before they are available to respond to an incident. To enable emergency response capabilities, Congress annually appropriates monies out of this trust fund to EPA's Superfund account, and reserves a portion of these funds for emergency response actions. These funds remain available indefinitely until they are expended.

In contrast to natural disaster responses, oil spills and hazardous substance, pollutant, or contaminant incidents may involve one or more entities who caused or contributed to the incident, referred to as the responsible parties. These parties are liable for federal response (i.e., cleanup) costs and related damages within certain limitations. OPA established liability for response costs, natural resource damages, and certain categories of economic or property damages.[194] The scope of liability for releases of hazardous substances under CERCLA includes both response costs and natural resource damages, but not other economic or property damages.[195] Such other damages stemming from releases of hazardous substances generally may be pursued under tort law instead. Although CERCLA authorizes federal actions to respond to pollutant or contaminant incidents, it does not establish liability for the costs of responding to these incidents.

---

[189] Neither of these trust funds is available to cover the costs of responding to a discharge of oil or a release of a hazardous substance, pollutant, or contaminant from a federal facility or vessel. Congress appropriates separate funding directly to the departments or agencies with jurisdiction, custody, or control over the facility or vessel from which the discharge or release occurred to pay the response costs of the federal government.

[190] 26 U.S.C. §9509. The vast majority of the revenues for the Oil Spill Liability Trust Fund are derived from a dedicated eight cents per-barrel tax on domestic and imported oil. The tax is scheduled to terminate at the end of 2017. See the "Federal Funding for the Oil Spill Liability Trust Fund" section in CRS Report RL33705, *Oil Spills in U.S. Coastal Waters: Background and Governance*, by Jonathan L. Ramseur.

[191] 26 U.S.C. §9507. The Hazardous Substance Superfund Trust Fund is financed mostly with revenues transferred from the General Fund of the U.S. Treasury, since the taxes on domestic and imported oil, chemical feedstocks, and corporate income that once financed this trust fund expired at the end of 1995. See the "Hazardous Substance Superfund Trust Fund" section in CRS Report R41039, *Comprehensive Environmental Response, Compensation, and Liability Act: A Summary of Superfund Cleanup Authorities and Related Provisions of the Act*, by David M. Bearden.

[192] 33 U.S.C. §2752. The U.S. Coast Guard may "advance" (i.e. withdraw) up to $150 million each fiscal year from the Oil Spill Liability Trust Fund to respond to discharges of oil. Once advanced, the monies remain available until expended.

[193] 26 U.S.C. §9509(c)(2).

[194] 33 U.S.C. §2702.

[195] 42 U.S.C. §9607(a). Liability under CERCLA also includes the costs of federal public health studies.

Under the liability provisions of OPA and CERCLA, the federal government may recover its response costs from the responsible parties (with the exception of pollutant or contaminant incidents noted above), which are to be deposited back into the respective trust fund that financed the federal response.[196] Responsible parties also are often directly involved with federal response efforts to help satisfy their liability, and may use or obtain their own resources for these purposes. In such instances, the OSC is responsible for directing and overseeing response actions taken by a responsible party to ensure that applicable requirements are met. For incidents at federal facilities or vessels, the federal department or agency with jurisdiction over the facility or vessel serves as the responsible party on behalf of the United States.

### Examples of Use in Incident Response

Thousands of oil and chemical spills of varying size, magnitude, and impact occur in the United States each year. State and local governments may respond to many of these spills using their own authorities and resources, with little or no federal involvement. As a practical matter, the level of federal involvement of the National Response Team under the NCP depends in large part upon the desire of state and local governments for federal resources to carry out a response or to enforce the liability of the parties responsible for a spill.

For example, West Virginia requested federal assistance from EPA and other federal agencies under the NCP in responding to a spill of 4-methylcyclohexane methanol into the Elk River in early January 2014. This chemical spill had led to a temporary shutdown of a public water supply in Charleston, WV, and illustrates the potential magnitude of such incidents that can have broad impacts on local populations. At the request of the governor of West Virginia, the President also had declared a state of emergency under the Stafford Act, under which FEMA provided alternative water supplies when the public water supplies were not in operation.

The 2010 *Deepwater Horizon* incident in the Gulf of Mexico offers an example of an oil spill of broad magnitude and impact for which federal resources were deployed under the NCP. The subsurface oil discharge continued for 87 days, resulting in the largest oil spill in U.S. waters. During the height of the response, approximately 47,000 people from federal, state, and local governments, and the responsible parties and their contractors, were conducting response operations in the Gulf. Pursuant to the NCP, an OSC from the Coast Guard directed these activities. The spill was classified as a Spill of National Significance and a National Incident Commander was appointed—both first-time events under the NCP—to facilitate collaboration and coordination among federal, state, and local emergency response officials.[197]

### National Disaster Medical System (NDMS)[198]

Sarah A. Lister, Specialist in Public Health and Epidemiology.

---

[196] The Internal Revenue Code directs recovered costs to be deposited back into the Hazardous Substance Superfund Trust Fund (26 U.S.C. §9507) or the Oil Spill Liability Trust Fund (26 U.S.C. §9509), respectively.

[197] For more details on this incident, see CRS Report R42942, *Deepwater Horizon Oil Spill: Recent Activities and Ongoing Developments*, by Jonathan L. Ramseur.

[198] Unless otherwise cited, information in this section is from the HHS Assistant Secretary for Preparedness and Response (ASPR) NDMS website at http://www.phe.gov/Preparedness/responders/ndms; and HHS, *Fiscal Year 2016 Justification of Estimates for Appropriations Committees, Public Health and Social Services Emergency Fund,* NDMS narrative, pp. 41 ff., at http://www.hhs.gov/budget/.

## Purpose and Responsibilities

The National Disaster Medical System (NDMS) is a nationwide cadre of medical and public health personnel who can be "federalized" in pre-trained teams for the response to mass casualty incidents and/or the loss of local healthcare infrastructure. It is a partnership of HHS with the Department of Defense (DOD) and the Department of Veterans Affairs (VA). The system leverages federal and non-federal resources to support two general missions; first, to respond to requests for medical assistance from states or other federal agencies, and second, to assist the DOD medical system in the event of a large-scale wartime conflict. To date, NDMS has not been called upon to serve the latter mission. NDMS provides three capabilities:

- *Medical, mortuary, and veterinary response*, which includes needs assessment, primary and emergency medical care, equipment and supplies, victim identification, and other services. HHS is responsible for this component, which is composed of more than 5,000 members across more than 80 teams. Teams include Disaster Medical Assistance Teams (DMATs), Disaster Mortuary Operational Response Teams (DMORTs), National Veterinary Response Teams (NVRTs), and International Medical/Surgical Response Teams (IMSURTs).

- *Patient movement* from the disaster area to facilities where patients can receive definitive medical care. This includes communication with federal, state, and local authorities; medical transportation; patient tracking; and medical care during evacuation. DOD is responsible for this component, in coordination with HHS.

- *Definitive medical care*, that is, medical care provided by NDMS-affiliated federal and non-federal hospitals for conditions that result directly from the incident, or for pre-existing conditions for which care cannot be deferred. This component is managed by Federal Coordinating Centers (FCCs), a nationwide network of DOD and VA hospitals. Non-federal hospital participation is voluntary.

## Authorization, Appropriations, and Contributing Departments/Agencies

NDMS was begun administratively in 1984. It was first explicitly authorized in the Public Health Security and Bioterrorism Preparedness and Response Act of 2002 (P.L. 107-188).[199] This authority was most recently revised and extended through FY2018 in the Pandemic and All-Hazards Preparedness Reauthorization Act of 2013 (PAHPRA, P.L. 113-5).

PAHPRA also extended VA's responsibility to maintain readiness to coordinate the NDMS definitive medical care component.[200] In addition, VA is allowed, during specified emergencies, to provide medical care in its facilities to NDMS patients who are not eligible veterans.[201] VA is authorized to seek reimbursement for these services.

NDMS is not explicitly mentioned in DOD's statutory authorities. However, DOD policy regarding Defense Support of Civil Authorities (DSCA), discussed elsewhere in this report, states

---

[199] Section 2812 of the Public Health Service Act; 42. U.S.C. §300hh-11.

[200] 38 U.S.C §8117.

[201] 38 U.S.C §1785; and 38 C.F.R. §17.86. These emergencies include major disasters declared under the Stafford Act or when the NDMS is activated by the Secretary of HHS for public health emergencies.

that DOD assets (such as vehicles for emergency medical transport) may be provided to assist in the response to emergencies. DOD normally seeks reimbursement for the costs of deployment.[202]

The Secretary of HHS has broad latitude in her authority to deploy NDMS components. No specific statutory trigger or threshold is required. Generally, NDMS operates in support of two Emergency Support Functions (ESFs) in the National Response Framework (NRF), which are ESF #8—Public Health and Medical Services, coordinated by HHS, and ESF #6—Mass Care, Emergency Assistance, Temporary Housing and Human Services, coordinated by FEMA.

While deployed, NDMS personnel are designated as intermittent federal employees, and are to be paid for their service by the federal government. They are also entitled to three statutory protections. They are protected from liability for their official actions (except in cases of negligence);[203] they are eligible for compensation for work injuries;[204] and they are protected from loss of employment and benefits.[205] The HHS Assistant Secretary for Preparedness and Response (ASPR) has testified, however, that NDMS personnel were not deployed into "harm's way" in response to the Ebola outbreak because the law does not clearly assure disability and death benefits should they get sick or injured in service.[206] Proposed language to amend the law was included in the FY2016 budget request.[207]

Administrative costs for the NDMS program are provided in HHS appropriations to the Assistant Secretary for Preparedness and Response (ASPR). **Table 3** presents recent funding levels. DOD and VA budgets do not present specific information for NDMS administrative costs.

**Table 3. NDMS Administrative Funding, FY2011-FY2015**

Dollars in millions. Does not include deployment costs.

| FY2011 | FY2012 | FY2013[a] | FY2014 | FY2015 | FY2016 request |
|--------|--------|-----------|--------|--------|----------------|
| $52.4  | $52.7  | $49.7     | $50.1  | $50.1  | $49.9          |

**Source:** HHS, Fiscal Year 2015 and FY2016 Justifications of Estimates for Appropriations Committees, Public Health and Social Services Emergency Fund, NDMS narratives, at http://www.hhs.gov/budget/.

a.  Amount reflects across-the-board-rescission and sequestration.

Some NDMS deployment costs may be paid by the federal entity that is chiefly responsible for the costs of the federal response to the specific incident. For example, for emergencies or major disasters declared under the Stafford Act, HHS, VA, or DOD may receive reimbursement for

---

[202] DOD Directive 3025.18, *Defense Support of Civil Authorities*, December 29, 2010 (incorporating change 1, September 21, 2012), at http://www.dtic.mil/whs/directives/corres/pdf/302518p.pdf.

[203] By reference to such protections under the Federal Tort Claims Act or other law for employees of the U.S. Public Health Service, Section 224 of the Public Health Service Act, 42 U.S.C. §233.

[204] By reference to 5 U.S.C. Ch. 81, the Federal Employees' Compensation Act (FECA). See CRS Report R42107, *The Federal Employees' Compensation Act (FECA): Workers' Compensation for Federal Employees*, by Scott D. Szymendera.

[205] By reference to 38 U.S.C. Ch. 43, the Uniformed Services Employment and Reemployment Rights Act (USERRA). See Department of Labor, USERRA, at http://www.dol.gov/compliance/laws/comp-userra.htm.

[206] Statement of Nicole Lurie, Assistant Secretary for Preparedness and Response, HHS, hearing "Medical and Public Health Preparedness and Response: Are We Ready for Future Threats?" U.S. Congress, Senate Committee on Health, Education, Labor, and Pensions, 114th Cong., 1st sess., February 26, 2015.

[207] HHS, proposed general appropriations provisions, Sec. 519, *Fiscal Year 2016 Justification of Estimates for Appropriations Committees, General Departmental Management,* pp. 17-18 (pdf pp. 349-350), at http://www.hhs.gov/budget/.

certain deployment activities through the FEMA Disaster Relief Fund. For international deployments, HHS, VA, or DOD may receive reimbursement from the Department of State or the U.S. Agency for International Development (USAID). For some other situations, such as National Special Security Events (NSSEs) or other public health responses that do not involve a Stafford Act declaration,[208] HHS must assume the costs of deployment of NDMS response teams. The ASPR budget request for FY2016 seeks $110 million for an emergency reserve fund to cover unreimbursed incident response costs, including costs for NDMS deployment.[209] HHS has not previously had such a fund.

The NDMS definitive medical care component, which is rarely activated, relies on participating hospitals (principally non-federal) that volunteer to accept NDMS disaster evacuees on a space-available basis. Participating hospitals receive reimbursement for services they provide at 110% of the usual Medicare rate for such services. Reimbursement for specific incidents is time-limited, and does not extend beyond hospital care to longer-term services such as rehabilitation or outpatient care. FEMA policies implementing the Stafford Act do not allow assistance for medical care costs except for such care required to provide immediate emergency care, evacuation, and stabilization;[210] and no other routine federal mechanism exists to pay disaster-related hospital costs. As a result, when the NDMS definitive medical care component was activated for the responses to Hurricane Katrina in 2005 and the Haiti earthquake in 2010, Congress provided supplemental appropriations to reimburse hospitals.[211]

## Examples of Use in Disaster Response Operations

NDMS has deployed one or more of its three components more than 300 times since the system's launch in 1984, for a variety of types of incidents. Deployment of the medical response component is the most common, and is often used for the response to major disasters declared pursuant to the Stafford Act. For example, approximately 2,300 NDMS personnel, representing 26 DMAT teams, were deployed for the response to Hurricane Sandy in 2012.[212] The medical response component also may be deployed for non-Stafford domestic public health incidents (e.g., the H1N1 influenza pandemic in 2009 and the Sandy Hook Elementary School shootings in Connecticut in 2012) and for international aid missions, as well as for NSSEs and other incidents for which there is a risk of a public health emergency.

The NDMS patient movement and definitive medical care components are deployed less often. All three components, including all DMAT teams (87 at the time), were deployed in response to Hurricane Katrina in 2005.[213]

---

[208] The Stafford Act major disaster authority has not been invoked for infectious disease incidents (e.g., the 2001 anthrax attacks and the 2009 influenza pandemic). See CRS Report RL34724, *Would an Influenza Pandemic Qualify as a Major Disaster Under the Stafford Act?*, by Edward C. Liu.

[209] HHS, *Fiscal Year 2016 Justification of Estimates for Appropriations Committees, Public Health and Social Services Emergency Fund,* NDMS narrative, pp. 115-116 at http://www.hhs.gov/budget/.

[210] FEMA Recovery Policy 9525.4, "Emergency Medical Care and Medical Evacuations," February 3, 2014, at http://www.fema.gov/9500-series-policy-publications.

[211] For more information, see CRS Report RL33579, *The Public Health and Medical Response to Disasters: Federal Authority and Funding*, by Sarah A. Lister.

[212] HHS, Fiscal Year 2014 Justification of Estimates for Appropriations Committees, Public Health and Social Services Emergency Fund, p. 35, at http://www.hhs.gov/budget/.

[213] CRS Report RL33096, *2005 Gulf Coast Hurricanes: The Public Health and Medical Response*, by Sarah A. Lister.

# Author Information

Jared T. Brown, Coordinator
Analyst in Emergency Management and Homeland
Security Policy

David M. Bearden
Specialist in Environmental Policy

Nicole T. Carter
Specialist in Natural Resources Policy

Bart Elias
Specialist in Aviation Policy

Frank Gottron
Specialist in Science and Technology Policy

Katie Hoover
Analyst in Natural Resources Policy

Lawrence Kapp
Specialist in Military Manpower Policy

Sarah A. Lister
Specialist in Public Health and Epidemiology

Jonathan E. Medalia
Specialist in Nuclear Weapons Policy

John D. Moteff
Specialist in Science and Technology Policy

Jonathan L. Ramseur
Specialist in Environmental Policy

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

Exhibit L



**Congressional Research Service**
Informing the legislative debate since 1914

**IN FOCUS**

Updated January 2, 2025

# FEMA: Increased Demand and Capacity Strains

## Introduction

Disasters in the United States have become more frequent, severe, and expensive in recent years. Government agencies and scientific experts expect these trends to continue due to climate change and increased development and population in areas vulnerable to hazards. These factors have intensified demands on the resources, programs, and personnel of the Federal Emergency Management Agency (FEMA)—the agency responsible for leading federal disaster preparedness, response, recovery, and mitigation efforts and administering assistance under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act, P.L. 93, 288, as amended). Consequences include attrition and staffing shortages, strained operational efforts, and insufficient disaster relief funds.

As FEMA faces growing demand for its assistance and related challenges, Congress may consider the scope of FEMA's mission, the appropriate role of the federal government in emergency management, and how to shore up FEMA's workforce.

## Growing Demands on FEMA

### Stafford Act Declaration Trends

The average number of Stafford Act major disaster declarations has increased from an average of 39 per fiscal year in the first decade after its enactment (FY1988-1997) to an average of 63 in the most recent ten fiscal years—an increase of 61%. That increase grows to approximately 150% when comparing to the first decade of FEMA's existence (FY1979-1988), which averaged 25 major disaster declarations per fiscal year (**Figure 1**).

### Figure 1. Stafford Act Major Disasters Declared
By Fiscal Year, Since Establishment of FEMA



**Sources:** CRS analysis of OpenFEMA, "Declarations Summaries," as of 10/01/2024, and FEMA, Disaster Relief Fund: Monthly Reports.

Additionally, more counties experienced a greater number of declaration activity in the past 10 years than in the first decade of FEMA's existence (see **Figure 2**).

### Figure 2. Number of Disaster Declarations by County



**Source:** CRS analysis of OpenFEMA, "Declarations Summaries," as of 10/23/2024.
**Notes:** Excludes declarations for the COVID-19 pandemic and approximately 1.5% of declarations that lack associated county FIPS code digits.

In recent years, the number of declarations with Disaster Relief Fund (DRF) obligations over $1 billion has increased, driving an overall increase in DRF obligations (see **Figure 3**). Since 2020, annual DRF obligations have consistently exceeded nearly $40 billion—a level never reached prior to FY2020.

### Figure 3. DRF Obligations vs Disaster Declarations
By Fiscal Year



**Sources:** CRS analysis of OpenFEMA, "Declarations Summaries," as of 10/01/2024, and FEMA, Disaster Relief Fund: Monthly Reports.

## Staffing Constraints

The Government Accountability Office (GAO) and FEMA have identified staffing gaps within FEMA's disaster workforce. In FY2022, FEMA missed its target staffing level of 17,670 by 6,200 personnel (35%). Actual gaps are likely higher, as the agency's staffing targets were developed in 2019, prior to the COVID-19 pandemic (which created significant demands on FEMA). Staffing gaps in particular specialties (or cadres), such as logistics and planning, vary. FEMA's permanent employee numbers have remained largely stable over the past decade, and overall staffing (including reservists) has increased since FY2017. However, these staffing increases do not reflect the FY2020 spike in or subsequent higher level of obligations.

**Figure 4. DRF Obligations vs. FEMA Staffing**

By Fiscal Year (nominal $billions)



**Source:** CRS analysis of Fedscope and Obligations from DRF Monthly Reports as of 10/01/2024, in nominal dollars.

**Notes:** Employee counts are as of September. Total employees reflect hires under all available authorities. Full-time employees (FTEs) refer those hired under Title 5 of the *U.S. Code*.

## Expanding Mission

Presidents have recently used the Stafford Act to respond to incidents of unusual complexity, sometimes in novel ways. For instance, the Stafford Act emergency declaration for the COVID-19 pandemic was the first unilateral, nationwide declaration and the first major disaster declaration for an infectious disease incident. In addition, uncommon missions, like those for public health incidents, have increased the burden on the agency.

FEMA's non-declaration activity has also evolved. Since Hurricane Katrina in 2005, Congress has expanded FEMA's authorities to provide assistance for preparedness and mitigation against all hazards, and FEMA has assumed an active role in interagency efforts to address climate change. Beginning in 2019, Congress expanded FEMA's Emergency Food and Shelter Program to provide assistance for localities coping with increased migration activity. FEMA has also executed limited operations to assist with unaccompanied migrant children and Afghan refugees, which has raised concerns among some Members of Congress that the agency has been activated for incidents beyond its mission and capacity.

## Policy Options

### Meet Demands Through Increased Appropriations

Congress could further increase appropriations for FEMA operations and staffing in response to demands on the agency. Congress has, in recent years, provided more funding to FEMA's DRF: total appropriations for the DRF since FY2017 have generally dwarfed those of earlier years.

### Narrow Scope of FEMA's Mission

Elected officials, emergency managers, and other stakeholders have long debated exactly what constitutes a disaster that should receive federal assistance. FEMA and GAO have both recommended that the agency increase the thresholds used to evaluate requests for Stafford Act major disaster declarations. This could reduce disaster spending, reduce demands on FEMA's workforce, and enhance the availability of FEMA resources for the most catastrophic incidents. Additionally, FEMA has argued that reducing declarations for smaller incidents could incentivize nonfederal investments in disaster resiliency, as states will not expect as much federal disaster assistance. Many nonfederal stakeholders have criticized this approach, arguing that it simply shifts costs to nonfederal entities, whose disaster spending has also increased.

### Further Incentivize Mitigation and Preparedness

According to one analysis, FEMA obligates $7 or more on response and recovery for every dollar obligated for mitigation. This imbalance—and an expectation of ample relief funds—may disincentivize resiliency, thereby increasing long-terms demands on FEMA.

Implementing more mitigation projects could reduce the burdens on FEMA response and recovery operations in the long term. A National Institute of Building Sciences study concludes that federal mitigation grants save $6 for every $1 spent, in addition to saving lives and preventing disruption; the same study estimates that FEMA saves approximately $700 million annually (in 2018 dollars) as a result of mitigation investments. Since 2020, Congress and FEMA have made available historic amounts of funding for mitigation—but much of it remains unspent. Insufficient capacity and reluctance to execute certain measures (e.g., elevating or removing structures in hazard zones) may both contribute to this hesitancy.

### Strengthen the Federal Disaster Workforce

FEMA's workforce has experienced high turnover and attrition in recent years. Reports of morale differ, though some indicate morale declines due to increased workloads and prolonged disaster deployments, among other factors. Recent reports of threats to FEMA personnel may exacerbate morale challenges.

Some recent analysis shows that FEMA has made progress in addressing some workplace issues, like harassment and employee development. Congress could further address concerns about staff retention and recruitment by augmenting FEMA appropriations for hiring, shortening deployment terms, and further enhancing employee development and training. FEMA could also consider proposals to launch a new disaster corps to enhance nonfederal emergency management and economic capacity.

**Erica A. Lee**, Specialist in Emergency Management and Disaster Recovery

**Daniela E. Lacalle**, Research Assistant

**William L. Painter**, Acting Section Research Manager

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

Exhibit M



# Disaster Relief Fund State of Play: In Brief

Updated April 9, 2025

**Congressional Research Service**

https://crsreports.congress.gov

R47676

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Contents

Introduction ............................................................................................................................. 3

What Is the DRF Used For? ...................................................................................................... 3

   DRF Structure ...................................................................................................................... 3

      Major Disasters Category ............................................................................. 4

      DRF Base Category ....................................................................................... 4

DRF Appropriations ................................................................................................................ 5

   Historical Appropriations Levels ........................................................................................ 6

      Continuing Resolutions................................................................................. 7

      Obligations and Balances.............................................................................. 8

When the DRF Runs Low ........................................................................................................ 9

   FY2017.............................................................................................................................. 10

   FY2023-FY2024 ............................................................................................................... 10

   The Projected DRF Shortfall in FY2025............................................................................11

   Why Does the DRF Run Low? .......................................................................................... 12

## Figures

Figure 1. DRF Obligations FY2015-FY2024..................................................................... 5

Figure 2. DRF Appropriations, FY1985-FY2025 (part year)........................................... 7

Figure 3. DRF (Major Disasters) Unobligated Balances and Obligations, Showing
  COVID-19 Obligations, FY2013-FY2024 ...................................................................... 9

Figure 4. COVID-19 DRF Obligations: Projected, Estimated, and Actual .................................. 14

## Tables

Table A-1. Unobligated Balances In and Obligations from the DRF, FY2013-FY2024............... 15

## Appendixes

Appendix. Data Tables .................................................................................................. 15

## Contacts

Author Information......................................................................................................... 15

# Introduction

The Disaster Relief Fund (DRF) is one of the most-tracked single accounts funded by Congress each year. It is the primary source of funding for the federal government's domestic general disaster relief programs.

The DRF frequently receives appropriations in excess of the annually requested level through annual and supplemental appropriations due to changing disaster needs. Even so, at the beginning of each fiscal year since 2023, the Federal Emergency Management Agency (FEMA) has projected that their available resources would be inadequate to pay the year's major disaster costs.[1]

This report summarizes

- what the DRF is used for, and how its structure reflects its use;
- how the DRF is funded through annual and supplemental appropriations;
- the DRF's recent funding history; and
- why the DRF remains reliant on supplemental appropriations even when its budget request is met or exceeded, as has occurred each year since FY2023.

More detailed history of and policy discussion on the DRF can be found in CRS Report R45484, *The Disaster Relief Fund: Overview and Issues*.

# What Is the DRF Used For?

The DRF funds disaster activity pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act, as amended (Stafford Act; 42 U.S.C. §§5121 et seq.). It pays for several key disaster response, recovery, and mitigation programs that provide assistance to communities impacted by presidentially-declared emergencies and major disasters.[2]

The DRF does not fund all federal disaster assistance. Many federal agencies other than FEMA have specific authorities and resources to support certain disaster response and recovery efforts (such as the U.S. Department of Agriculture and the Small Business Administration). However, the DRF does provide *most* of the federal government's support for immediate disaster response. This is done through FEMA's own capabilities, and through the mission assignment process, whereby FEMA reimburses agencies it calls into action that do not have independent authority or funding for disaster recovery operations.[3]

## DRF Structure

Since 2012, the DRF essentially has been split into two categories of funds: "major disasters," and the DRF "base."

---

[1] Since FY2014, the only other fiscal year for which FEMA's first monthly report on the balance in the DRF showed inadequate balances to cover the costs of major disasters for the coming year was FY2017.

[2] For more details on disaster declarations, see CRS Report R41981, *Congressional Primer on Responding to and Recovering from Major Disasters and Emergencies*, by Elizabeth M. Webster and Bruce R. Lindsay.

[3] For details on how this process, known as "mission assignments," works, see https://www.fema.gov/partnerships/mission-assignments.

## Major Disasters Category

The DRF "major disasters" category is for costs pursuant to individual presidentially-declared major disasters.

This category funds several different Stafford Act programs identified by FEMA as "Direct Disaster Programs":

- Individual Assistance (IA);[4]
- Public Assistance (PA);[5] and
- Hazard Mitigation Grant Program (HMGP).[6]

Through the Disaster Recovery Reform Act of 2018,[7] Congress also created a set-aside within the major disasters category for pre-disaster mitigation grants. FEMA used this set-aside funding for a new program, which they called the Building Resilient Infrastructure and Communities (BRIC) grant program.[8] On April 4, 2025, FEMA announced that it was "ending" the BRIC program.[9]

In recent years, the major disasters category has represented more than 95% of DRF obligations (see **Figure 1**).

## DRF Base Category

The smaller category, known as the DRF "base," covers most other Stafford Act-related costs including

- pre-disaster surge activities;
- activity pursuant to federal emergency declarations;
- Fire Management Assistance Grants; and
- Disaster Readiness and Support Activities.

Base funding for the DRF cannot be used for the costs of major disasters. Under appropriations law, providing a specific amount for an activity in statute means other resources not specifically designated for that activity cannot be applied to it without specific statutory direction.[10]

---

[4] For more detail, see CRS In Focus IF11298, *A Brief Overview of FEMA's Individual Assistance Program*, by Elizabeth M. Webster.

[5] For more detail, see CRS In Focus IF11529, *A Brief Overview of FEMA's Public Assistance Program*, by Erica A. Lee.

[6] For more detail, see CRS Insight IN11187, *Federal Emergency Management Agency (FEMA) Hazard Mitigation Assistance*, by Diane P. Horn.

[7] Section 1234 of the Disaster Recovery Reform Act of 2018 (P.L. 115-254, Division D).

[8] While the funding is "set aside" for the Building Resilient Infrastructure and Communities (BRIC) grant program, it remains available for broader use for other activities within the major disasters category in the event the DRF runs low on budget authority. For more information on the BRIC program, see CRS Insight IN11515, *FEMA Pre-Disaster Mitigation: The Building Resilient Infrastructure and Communities (BRIC) Program*, by Diane P. Horn.

[9] FEMA, "FEMA Ends Wasteful, Politicized Grant Program, Returning Agency to Core Mission of Helping Americans Recovering from Natural Disasters," press release HQ-25-40, April 4, 2025. While the program is authorized in law, the language of the set-aside that funds it appears to be permissive, indicating the President "*may* set aside" funds for it (emphasis added).

[10] See "Augmentation of Appropriations," in Government Accountability Office, *Principles of Appropriations Law* (aka the "Red Book"), Third Edition, Volume II, pp. 6-162 et seq., https://www.gao.gov/legal/appropriations-law/red-book.

**Figure 1. DRF Obligations FY2015-FY2024**



**Source:** CRS analysis of DRF monthly reports.

# DRF Appropriations

The DRF receives an annual appropriation under FEMA within the Department of Homeland Security Appropriations Act. The DRF appropriation is atypical in that its appropriations do not expire at the end of a given fiscal year, but are available for obligation until expended. Historically, Administrations and Congresses have generally operated on a nonpartisan basis to provide supplemental appropriations to ensure adequate DRF resources are available.

Until 2012, the DRF appropriation was generally a single undifferentiated account. Although there were periodically transfers out for disaster loan programs and oversight, FEMA could exercise a great deal of flexibility in how the appropriation was put to use within the scope of Stafford Act programs. Under the Budget Control Act of 2011 (BCA),[11] Congress made a special accommodation specifically for costs incurred pursuant to Stafford Act major disaster declarations, allowing a limited amount of such congressionally-designated appropriations to not

---

[11] P.L. 112-25.

count against discretionary spending limits.[12] Therefore, that spending had to be specifically identified, and the distinction between "major disasters" and the DRF "base" emerged.[13]

The FY2019 DRF appropriation illustrates how the split has been typically implemented:

> For necessary expenses in carrying out the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), $12,558,000,000, to remain available until expended…
>
> Provided, That of the amount provided under this heading, $12,000,000,000 shall be for major disasters declared pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.) and is designated by the Congress as being for disaster relief pursuant to section 251(b)(2)(D) of the Balanced Budget and Emergency Deficit Control Act of 1985:…

For FY2019, of the $12.558 billion appropriation, $12 billion was specifically designated for the costs of major disasters. No language in the bill affirmatively defined $558 million as funding for the DRF base. Instead, the base is defined by the lack of that specific purpose: it is for necessary expenses under the Stafford Act except for those created by presidentially-declared major disasters.

Most public discussion about "the DRF running out of money" is not about the whole DRF: it is discussion about depletion of the unobligated balance of the major disasters category of funding in the DRF—not including the BRIC set-aside. While it is possible for the DRF base to be depleted as well, this tends to draw less public attention.

---

**Another Kind of Mitigation**

In recent years, FEMA has indicated in its monthly reporting on DRF balances that funding set aside for the Building Resilient Infrastructure and Communities (BRIC) program could be redirected to help cover the costs of immediate response and recovery needs for major disasters if the DRF major disasters subaccount is otherwise depleted—though such a redirection has yet to occur.

---

# Historical Appropriations Levels

Often, the annual appropriations request for the DRF covers only a portion of what is actually needed. The DRF budget justification notes, and has noted for many years, that in the event of a disaster resulting in more than $500 million in spending from the DRF (termed by FEMA as a "catastrophic disaster"), supplemental appropriations would be needed to fund response and recovery. The costs of new events of that scale are not otherwise included in FEMA's formula for developing the annual budget request.[14]

As **Figure 2** indicates, while the DRF may be consistently funded through annual appropriations, the majority of its resources have flowed through the supplemental appropriations process.

---

[12] For more detail, see CRS Report R45778, *Exceptions to the Budget Control Act's Discretionary Spending Limits*, by Megan S. Lynch; and CRS In Focus IF10720, *Calculation and Use of the Disaster Relief Allowable Adjustment*, by William L. Painter.

[13] Previously, disaster appropriations were exempted from spending limits by a broader exception for emergency needs. This was usually applied to supplemental appropriations.

[14] See, for example, FEMA, "Disaster Relief Fund: Fiscal Year 2019 Funding Requirements," Fiscal Year 2018 Report to Congress, p. 4, https://www.fema.gov/sites/default/files/2020-07/disaster-relief-funding-requirements_fy-2019.pdf.

**Figure 2. DRF Appropriations, FY1985-FY2025 (part year)**



**Source:** CRS analysis of appropriations legislation. Does not show the impacts of rescissions, transfers, or reprogrammings.

**Note:** FY2025 values not adjusted to FY2024 dollars.

As noted above, the BCA created a limited adjustment to discretionary spending limits specifically to accommodate the costs of major disasters. This "allowable adjustment" for disaster relief was first used for FY2012 supplemental appropriations, and first was implemented in the annual appropriations process for FY2013. That implementation allowed annual appropriations to cover a much larger proportion of actual DRF spending than before.[15] While a handful of other disaster-related appropriations have periodically used the disaster-related flexibility, the DRF has exercised more than 95% of the available disaster relief adjustment since its inception.[16]

## Continuing Resolutions

If annual appropriations for the coming fiscal year are not enacted prior to the end of the current fiscal year, Congress typically passes an interim continuing resolution (CR) to provide temporary budget authority so that federal government agencies can continue to operate until annual appropriations are finalized. This temporary funding is provided at a rate for operations, which is usually based on the prior year annual appropriation (with some adjustments or exceptions), and is usually provided for a limited period of time. In most cases, when an interim CR is in place for an agency, budget authority is gradually apportioned to it, as the final level of annual appropriations has not yet been set. Spending too large a proportion of an as-yet determined annual budget early on may create challenges later in the fiscal year. This is because the temporary budget authority of the interim CR will ultimately be replaced by the budget authority provided through the completion of the annual appropriations process, and sometimes supplemental appropriations.[17]

---

[15] For the underlying analysis, see CRS Report R45484, *The Disaster Relief Fund: Overview and Issues*, by William L. Painter.

[16] See CRS In Focus IF10720, *Calculation and Use of the Disaster Relief Allowable Adjustment*, by William L. Painter.

[17] Such completion may take the form of an enacted annual appropriations bill, or a continuing resolution stretching through the end of the fiscal year.

If obligations already made for the fiscal year exceed the funded amount, budget authority to meet those obligations has to be found elsewhere in the funded budget to make up the difference. Since FY2018, every interim continuing resolution that has funded the Department of Homeland Security has included a provision that allows the temporary budget authority for the DRF to "be apportioned at a rate for operations necessary to carry out response and recovery activities under the Stafford Act."[18] This anomaly ensures that budget authority would be available as needed in the event the DRF's existing carryover balances are spent down while the CR is in effect—rather than being slowly apportioned like typical interim continuing appropriations. The anomaly essentially allows the temporary budget authority of the CR to act as a temporary supplemental appropriation.

P.L. 119-4, Division A—the current CR—is what is known as a "full-year continuing resolution," which means that the budget authority it provides extends through the end of the fiscal year. The law allows the budget authority provided to have the same period of availability as the FY2024 appropriation—in the case of the DRF, the same no-year designation—so the funding behaves more like an annual appropriation than the funding provided under an interim CR. Congress provided $22.5 billion through the year-ending continuing resolution, and had already provided $29 billion ($28 billion of which was for the costs of major disasters) through a supplemental appropriation attached to P.L. 118-158.

## Obligations and Balances

**Figure 3** shows the year-ending level of obligations and unobligated balance in the major disasters portion of the DRF. Yellow bars indicate obligations for COVID-19 disaster declarations, blue bars indicate obligations for all other disasters. The orange line is the unobligated balance in the major disasters portion of the DRF. All data is based on the end of the fiscal year.

Starting in FY2020, the high levels of total obligations relative to unobligated balances in four of five years suggest that DRF appropriations may be struggling to keep pace with the costs incurred by current disaster activity. These costs include disaster response, long-term recovery, and mitigation programs. The unobligated balances remaining at the end of FY2017, FY2023, and FY2024 are the result of FEMA restricting obligations for long-term recovery and mitigation projects to preserve resources for immediate response needs. Maintaining regular operations of existing programs while ensuring adequate resources are available for responses to unexpected events would have required a higher level of appropriations in those years.

---

[18] Most recently, P.L. 118-15, Division A, Section 128.

**Figure 3. DRF (Major Disasters) Unobligated Balances and Obligations, Showing COVID-19 Obligations, FY2013-FY2024**

(nominal budget authority, as recorded at the end of the fiscal year)



**Source:** CRS analysis of FEMA monthly DRF reports. Data available in **Table A-1**.

**Notes:** As "obligated" is not an end-state for budget authority, obligated funding levels rise and fall for a variety of reasons. This figure depicts snapshots in time of how things stood after closeout of the financial records for each fiscal year, as reflected in Appendix A of FEMA's monthly reports on DRF activity. FY20 includes roughly $42 billion in obligations from the DRF for the Lost Wages Initiative, which provided grants to states from the DRF to support additional unemployment assistance during the COVID-19 pandemic.

# When the DRF Runs Low

In previous years, Stafford Act programs have been somewhat protected from the effects of a lapse in appropriations because carryover balances in the DRF have been available to fund continued operations. However, this is not always the case, and at several points in recent years the unobligated balance in the DRF has fallen to levels that risked impacting disaster response operations. When this occurs, FEMA implements "Immediate Needs Funding" (INF) restrictions, which allow FEMA to limit obligation of funds from the DRF to "life-safety and life sustaining efforts," prioritizing them over long-term recovery and mitigation efforts.

In 2023 and 2024, FEMA indicated that under INF, it would pause new Public Assistance and Hazard Mitigation obligations that are not essential for lifesaving and life-sustaining activities. It further indicated that it would continue

Individual Assistance payments directly to survivors for critical needs and housing;

Public Assistance for states, tribes and territories essential for lifesaving and life-sustaining activities;

State management costs;

Mission assignments of federal partners for critical response activities;

Fire Management Assistance grants; and

Essential ongoing disaster operations, including salaries of FEMA field staff (Stafford Act employees).[19]

In the first decade of the 21st century, implementations of INF restrictions were frequent: INF restrictions were put in place each year from 2003 through 2006, as well as each year from 2009 through 2011.[20] After FY2011, when the DRF came close to depletion, FEMA changed the internal processes of DRF obligations in order to maintain unobligated balances longer over the course of regular operations.[21]

## FY2017

Immediate Needs Funding restrictions were put in place again in August 2017, when Hurricane Harvey hit Texas, and Hurricane Irma was anticipated to strike U.S. interests. FEMA initiated these restrictions on August 28, 2017, as the unobligated balance in the DRF fell below $2.8 billion in the middle of responses to multiple major disasters. FEMA later lifted the INF restrictions on October 2, 2017, when the DRF was replenished by the release of additional temporary budget authority pursuant to a continuing resolution[22] and a $7.4 billion supplemental appropriation[23] enacted in a consolidated measure on September 8, 2017.

## FY2023-FY2024

On August 29, 2023, FEMA announced the implementation of INF restrictions, noting that while FEMA "had intended to provide ten full days [sic] notice, the current disaster environment with a major fire and multiple hurricanes make it necessary to implement INF immediately."[24] The unobligated balance in the DRF was $3.4 billion that morning.

On October 2, 2023, after enactment of a continuing resolution[25] that provided up to $19.95 billion in temporary budget authority for the DRF through November 17, 2023, and a $16 billion supplemental appropriation ($15.50 billion for the costs of major disasters, and $500 million for

---

[19] FEMA, "Immediate Needs Funding Fact Sheet," Office of External Affairs email attachment, August 29, 2023. According to FEMA, "The implementation of INF does not impact or change the delivery of IA [Individual Assistance] programs authorized by the Stafford Act. Assistance authorized under the Individuals and Households Program, Disaster Case Management Program, Crisis Counseling Assistance and Training Program, Disaster Unemployment Assistance, and Disaster Legal Services will remain available" (email from FEMA Congressional Affairs Division to CRS, September 1, 2023).

[20] FEMA, "Immediate Needs Funding Fact Sheet," Office of External Affairs email attachment, August 29, 2023.

[21] This reformed approach, known as Strategic Funds Management, obligates certain recovery projects costing more than $1 million on a rolling basis. For details, see FEMA, "Recovery Standard Operating Procedure 9570.24: Strategic Funds Management—Implementation Procedures for the Public Assistance Program," December 21, 2012, https://www.fema.gov/sites/default/files/2020-07/fema_9570.24_startegic-funds-mgmt_SOP_12-21-2012.pdf.

[22] P.L. 115-56, Division D, §129.

[23] P.L. 115-56, Division B.

[24] FEMA, "FEMA Advisory: FEMA Announces Implementation of Immediate Needs Funding," Office of External Affairs email, August 29, 2003.

[25] P.L. 118-15.

the DRF base),[26] FEMA announced the lifting of the INF restriction.[27] The INF restrictions pushed roughly $8 billion in obligations for long-term recovery and mitigation projects from FY2023 into FY2024.[28]

Three weeks later, the Biden Administration requested a $9 billion in supplemental appropriation for the DRF. This was intended, in part, to cover higher-than-expected reimbursements to states for COVID-19 costs and new catastrophic disasters. The supplemental appropriation would have also restored a $2 billion reserve intended to pay immediate response costs from an otherwise unanticipated large incident. However, it was also required in order to cover the delayed FY2023 obligations noted above. Congress did not address this request for supplemental funding in FY2024.

Once the annual level of FY2024 DRF appropriations was set in March 2024, FEMA reported a projected shortfall of nearly $7.4 billion for the DRF major disasters subaccount, with the subaccount being depleted in August 2024.[29] On August 7, 2024, FEMA again announced the implementation of INF restrictions.[30] With the enactment of a continuing resolution (CR) on September 26, 2024, $20.261 billion in temporary budget authority became available on October 1, and the restrictions were lifted.[31] Implementation of INF restrictions for that 55-day period had delayed roughly $9.5 billion in obligations, allowing FEMA to meet the immediate needs stemming from major disasters through the end of the fiscal year, and carry over $2.03 billion into FY2025.[32]

## The Projected DRF Shortfall in FY2025

As a result, on October 1, 2024, the major disaster portion of the DRF had $22.25 billion in unobligated balances available for the costs of major disasters. However, these resources dwindled to $3.61 billion by the end of November 2025.[33] When the August INF restrictions were lifted, the delayed recovery and mitigation projects proceeded with their obligations. Hurricanes Helene (which had struck in late September) and Milton (early October) were also drawing on the DRF for response and recovery resources. FEMA projected in early November that unless additional resources were provided, or INF restrictions reimplemented, the major disasters

---

[26] P.L. 118-15, §129.

[27] FEMA, "Continuing Resolution Allows FEMA to Lift Restrictions on Disaster Relief Funding," October 3, 2023, press release (FEMA Release Number HQ-23-205), https://www.fema.gov/press-release/20231003/continuing-resolution-allows-fema-lift-restrictions-disaster-relief-funding.

[28] CRS analysis of FEMA, *Disaster Relief Fund: Monthly Report as of September 30, 2023*, October 10, 2023, Appendix F.

[29] FEMA, *Disaster Relief Fund: Monthly Report as of March 31, 2024*, April 9, 2024, p. 4.

[30] FEMA, "FEMA Announces Implementation of Immediate Needs Funding," FEMA Advisory, August 7, 2024, https://content.govdelivery.com/attachments/USDHSFEMA/2023/08/29/file_attachments/2597953/FEMA%20Advisory%20FEMA%20Announces%20Implementation%20of%20Immediate%20Needs%20Funding%2020230829.pdf.

[31] The Continuing Appropriations and Extensions Act, 2025 (CR; P.L. 118-83) and the associated temporary budget authority would have expired on December 20, 2024. For more details on the CR and its provisions, see CRS Report R48214, *Overview of Continuing Appropriations for FY2025 (Division A of P.L. 118-83)*, by Drew C. Aherne.

[32] CRS analysis of DRF monthly reports, and FEMA, *Disaster Relief Fund Monthly Report as of November 30, 2024*, p. 4.

[33] FEMA, *Disaster Relief Fund: Monthly Report as of October 31, 2024*, November 15, 2024, p. 4; FEMA, *Disaster Relief Fund: Monthly Report as of November 30, 2024*, December 9, 2024, p. 4.

portion of the DRF would be exhausted in January.[34] This potential shortfall anticipated more than $57 billion in obligations over the course of the fiscal year.

On November 18, 2024, the Biden Administration requested $40 billion in supplemental appropriations for the DRF, as part of a nearly $100 billion supplemental appropriations request for a variety of unmet needs.[35] As a part of a consolidated appropriations measure responding to this request and an extension of the existing CR through March 14, 2025 (The American Relief Act, 2025; P.L. 118-158), a supplemental appropriation of $29 billion was provided for the DRF, with $28 billion being specifically for the costs of major disasters.[36]

As a result of this additional funding, FEMA projected in January 2025 that the exhaustion of the major disasters portion of the DRF would be delayed until early July 2025.[37]

P.L. 119-4, the year-long CR that resolved the annual discretionary appropriations for the federal government for FY2025, contained $22.51 billion for the DRF, $118 million more than had been requested in annual appropriations by the Biden Administration. This replaced the $20.6 billion in interim budget authority provided by the CR in P.L. 118-83, and was a $2.25 billion increase from the original CR baseline. FEMA had released its latest projections for DRF spend down the week the bill was under consideration by Congress: even with the additional resources added to FEMA's projections, the major disasters portion of the DRF was expected to be depleted in June 2025, unless INF restrictions are again put in place.[38]

## Why Does the DRF Run Low?

In recent history, three structural factors have contributed to the need for frequent supplemental appropriations for the DRF:

1.  **The formula for calculating the requirement for the DRF does not include "new" catastrophic disasters:** FEMA uses a combination of cost estimates from past catastrophic disasters where recovery is ongoing, and a 10-year rolling average of non-catastrophic disaster obligations to develop the annual budget request for the "major disasters" element of the DRF. The formula does not include funding for any "new" catastrophic incidents—neither those occurring in the year the request is made, nor those potentially occurring in the year the request covers. FEMA tracked three new catastrophic incidents over the four-year period covering FY2013 to FY2016. For the four-year period from FY2021 to FY2024, FEMA tracked twelve such new catastrophic incidents. With more new catastrophic incidents, there is greater demand that has not been accounted for in the assessment of annual DRF requirements. Since the FY2012 request, the DRF has included a reserve for initial response to a "significant event," but still notes

---

[34] FEMA, *Disaster Relief Fund: Monthly Report as of October 31, 2024*, November 15, 2024, p. 15.

[35] Letter from President Joseph R. Biden, Jr. to The Honorable Michael Johnson, Speaker of the House, November 18, 2024, https://www.whitehouse.gov/wp-content/uploads/2024/11/Letter-regarding-critical-disaster-funding-needs.pdf.

[36] P.L. 118-158, Division B, Title IV. $4 million of that amount is to be transferred to the DHS Office of Inspector General for oversight.

[37] FEMA, *Disaster Relief Fund: Monthly Report as of December 31, 2024*, January 10, 2025, p. 15.

[38] FEMA, *Disaster Relief Fund: Monthly Report as of February 28, 2025*, March 12, 2025, p. 15. The additional funds provided in the new CR did not exceed the $3.69 billion shortfall anticipated for June 2025.

that the budget assumes supplemental appropriations would be provided to cover the costs of additional catastrophic events.[39]

2. **The volatility of post-disaster needs:** The request for the major disasters portion of the DRF relies heavily on bottom-up cost estimates developed at the state level to project the need for a given fiscal year. The estimates used to develop the request are not necessarily congruent with the spending plans in place at the beginning of the funded fiscal year, and the timing of actual obligations is subject to clearance and approval processes on both the federal side and recipient side. For instance, projecting obligations for the COVID-19 pandemic response, with its unprecedented scope and application of the Stafford Act, has proven difficult for FEMA and its state-level partners.

3. **The timing of the budget process:** The request for annual appropriations for the DRF (usually made in February) is based on data finalized in December, roughly nine months before that fiscal year starts. During these intervening months lie most of the wildfire and hurricane seasons. This gap impairs the ability of the request to be fully responsive to the existing disaster landscape when the fiscal year begins. In each of the last eight fiscal years, the first public reporting on projections for DRF major disaster obligations, released just after the start of the fiscal year, has shown a significant increase from the original estimate of what funding would be required.

Two factors have exacerbated this situation in recent years:

1. **Delayed obligations:** In both FY2023 and FY2024, FEMA implemented INF restrictions on the DRF, pausing obligations for long-term recovery and mitigation projects to preserve its resources for needs of immediate response and recovery efforts in the immediate aftermath of an incident. When INF restrictions are implemented, those paused obligations do not go away—they are usually pushed into the next fiscal year. In FY2024 and FY2025, roughly $8 billion and $9 billion in delayed obligations from previous years, respectively, contributed to projected shortfalls in DRF major disaster funding.

2. **COVID-19 reimbursements:** COVID-19 response obligations represented 45% of total DRF major disaster obligations for FY2022-FY2024. Projecting these obligations has been a challenge. **Figure 4** compares FEMA's projected COVID-19 obligations at the time of the budget request, at the beginning of the budgeted fiscal year, and the obligations recorded at the end of the fiscal year.

---

[39] In the FY2025 request, there was a $2 billion reserve for catastrophic incidents, and $1 billion for BRIC mitigation funding. FEMA, *Disaster Relief Fund Annual Report: Fiscal Year 2025 Funding Requirements*, May 6, 2024, pp. 4, 7. https://www.fema.gov/sites/default/files/documents/fema_disaster-relief-fund-funding-requirements_fy25.pdf.

**Figure 4. COVID-19 DRF Obligations: Projected, Estimated, and Actual**



**Source:** CRS analysis of FEMA monthly report data.

A new factor arose in the Biden Administration's FY2025 request for the DRF. Rather than basing its request for major disasters on the formula it has relied on in recent years, the Administration chose to limit its official FY2025 request for DRF major disaster funding to the size of the allowable adjustment to budget limits to cover the costs associated with major disasters. According to FEMA's annual statement of the requirements for the DRF for FY2025, this reduced the request by more than $5.2 billion.[40]

These factors contribute to an increased likelihood of the DRF being underfunded by the annual appropriations measure. However, given the unpredictability of catastrophic incidents, Congress may find itself weighing which of these options is preferable:

- providing larger annual appropriations for the DRF in anticipation of events which may not occur,
- continuing to rely on a limited reserve and faster-moving supplemental appropriations, or
- making significant changes to the disaster relief programs under the Stafford Act that drive these costs.

For further discussion, see CRS In Focus IF12822, *The Disaster Relief Fund: Requests Versus Reality*, and CRS Report R45484, *The Disaster Relief Fund: Overview and Issues*, by William L. Painter.

---

[40] FEMA, *Disaster Relief Fund Annual Report: Fiscal Year 2025 Funding Requirements*, May 6, 2024, p. 7. https://www.fema.gov/sites/default/files/documents/fema_disaster-relief-fund-funding-requirements_fy25.pdf.

# Appendix. Data Tables

This table provides the data behind **Figure 3**.

**Table A-1. Unobligated Balances In and Obligations from the DRF, FY2013-FY2024**

($millions of nominal budget authority)

| Fiscal Year | Unobligated Balances—Major Disasters | Obligations | | |
| --- | --- | --- | --- | --- |
| | | Total—Major Disasters | Non-COVID-19 | COVID-19 |
| 2013 | 6,682 | 10,435 | 10,435 | |
| 2014 | 4,968 | 7,754 | 7,754 | |
| 2015 | 3,133 | 8,545 | 8,545 | |
| 2016 | 85 | 9,954 | 9,954 | |
| 2017* | 2,966 | 12,562 | 12,562 | |
| 2018 | 27,500 | 25,932 | 25,932 | |
| 2019 | 28,470 | 12,943 | 12,943 | |
| 2020 | 10,347 | 76,598 | 23,917 | 52,681 |
| 2021 | 28,327 | 57,870 | 14,345 | 43,525 |
| 2022 | 9,110 | 41,987 | 15,706 | 26,281 |
| 2023* | 2,547 | 37,126 | 21,975 | 15,151 |
| 2024* | 2,033 | 38,136 | 23,171 | 14,965 |

**Source:** CRS analysis of FEMA monthly DRF reports.

**Note:** Information provided reflects data as shown in FEMA's monthly reports, and do not reflect reprogrammings, transfers, or rescissions. As "obligated" is not an end-state for budget authority, obligated funding levels rise and fall for a variety of reasons. This table depicts snapshots in time of how things stood after closeout of the financial records for that fiscal year, as reflected in Appendix A of the monthly reports.

# Author Information

William L. Painter
Specialist in Homeland Security and Appropriations

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

Exhibit N

# Department of Homeland Security

## *Federal Emergency Management Agency*
### *Budget Overview*



**Fiscal Year 2025**

**Congressional Justification**

**Department of Homeland Security**                              **Federal Emergency Management Agency**

# Table of Contents

*Federal Emergency Management Agency* ................................................................................................1

Appropriation Organization Structure ...................................................................................................3

Budget Comparison and Adjustments ....................................................................................................6

Personnel Compensation and Benefits...................................................................................................12

Non Pay Budget Exhibits .......................................................................................................................14

Supplemental Budget Justification Exhibits ..........................................................................................16

Department of Homeland Security                                                    Federal Emergency Management Agency

# Federal Emergency Management Agency
## Appropriation Organization Structure

|  | Level | Fund Type (* Includes Defense Funding) |
|---|---|---|
| Federal Emergency Management Agency | Component |  |
| Operations and Support | Appropriation |  |
| Mission Support | PPA | Discretionary - Appropriation |
| Regional Operations | PPA | Discretionary - Appropriation |
| Mitigation | PPA | Discretionary - Appropriation |
| Preparedness and Protection | PPA | Discretionary - Appropriation* |
| Response and Recovery | PPA |  |
| Response | PPA Level II | Discretionary - Appropriation |
| Recovery | PPA Level II | Discretionary - Appropriation |
| Procurement, Construction, and Improvements | Appropriation |  |
| Operational Communications/Information Technology | PPA |  |
| Integrated Public Alert and Warning System (IPAWS) | PPA Level II | Discretionary - Appropriation* |
| National Continuity Program Strategic Partner Program | PPA Level II | Discretionary - Appropriation* |
| National Warning System (NAWAS) | PPA Level II | Discretionary - Appropriation |
| National Fire Incident Reporting System | PPA Level II | Discretionary - Appropriation |
| Construction and Facility Improvements | PPA |  |
| Mt. Weather Facilities | Investment,PPA Level II | Discretionary - Appropriation* |
| Center for Domestic Preparedness (CDP) | Investment,PPA Level II | Discretionary - Appropriation |
| National Emergency Training Center (NETC) | Investment,PPA Level II | Discretionary - Appropriation |
| Regional Facilities | Investment,PPA Level II | Discretionary - Appropriation |
| Mission Support Assets and Infrastructure | PPA |  |
| Grants Management Modernization | Investment,PPA Level II | Discretionary - Appropriation |
| Financial Systems Modernization | Investment,PPA Level II | Discretionary - Appropriation |
| Enterprise Data & Analytics Modernization | Investment,PPA Level II | Discretionary - Appropriation |
| IT Acquisition Programs | Investment,PPA Level II | Discretionary - Appropriation |
| Identity Access Control Systems Operations | Investment,PPA Level II | Discretionary - Appropriation |

**Department of Homeland Security**                    **Federal Emergency Management Agency**

| Federal Assistance | Appropriation | |
|---|---|---|
| Grants | PPA | |
| State Homeland Security Grant Program | PPA Level II | Discretionary - Appropriation |
| Urban Area Security Initiative | PPA Level II | Discretionary - Appropriation |
| Public Transportation Security Assistance | PPA Level II | Discretionary - Appropriation |
| Port Security Grants | PPA Level II | Discretionary - Appropriation |
| Presidential Residence Protection Assistance | PPA Level II | Discretionary - Appropriation |
| Assistance to Firefighters Grants | PPA Level II | Discretionary - Appropriation |
| Staffing for Adequate Fire and Emergency Response (SAFER) Grants | PPA Level II | Discretionary - Appropriation |
| Emergency Management Performance Grants | PPA Level II | Discretionary - Appropriation |
| Nonprofit Security Grant Program | PPA Level II | Discretionary - Appropriation |
| Tribal Homeland Security Grant Program | PPA Level II | Discretionary - Appropriation |
| Flood Hazard Mapping and Risk Analysis Program (RiskMAP) | PPA Level II | Discretionary - Appropriation |
| Regional Catastrophic Preparedness | PPA Level II | Discretionary - Appropriation |
| Emergency Food and Shelter | PPA Level II | Discretionary - Appropriation |
| Next Generation Warning System | PPA Level II | Discretionary - Appropriation* |
| Community Project Funding | PPA Level II | Discretionary - Appropriation |
| Education, Training, and Exercises | PPA | |
| Center for Domestic Preparedness | PPA Level II | Discretionary - Appropriation |
| Center for Homeland Defense and Security | PPA Level II | Discretionary - Appropriation |
| Emergency Management Institute | PPA Level II | Discretionary - Appropriation |
| U.S. Fire Administration | PPA Level II | Discretionary - Appropriation |
| National Domestic Preparedness Consortium | PPA Level II | Discretionary - Appropriation |
| Continuing Training Grants | PPA Level II | Discretionary - Appropriation |
| National Exercise Program | PPA Level II | Discretionary - Appropriation |
| **Disaster Relief Fund** | **Appropriation** | |
| Base Disaster Relief | PPA | Discretionary - Appropriation |
| Major Disaster Allocation | PPA | Discretionary - Major Disasters (DRF) |
| **National Flood Insurance Program** | **Appropriation** | |
| Mission Support | PPA | Discretionary - Offsetting Fee |

**Department of Homeland Security**                    **Federal Emergency Management Agency**

| | | |
|---|---|---|
| Floodplain Management and Flood Mapping | PPA | Discretionary - Offsetting Fee |
| National Flood Insurance Fund - Mandatory | PPA | Mandatory - Fee |
| National Flood Insurance Reserve Fund | PPA | Mandatory - Fee |
| **Radiological Emergency Preparedness Program** | **Appropriation** | Discretionary - Appropriation |

Department of Homeland Security                                    Federal Emergency Management Agency

# Federal Emergency Management Agency
## Budget Comparison and Adjustments
## Appropriation and PPA Summary
*(Dollars in Thousands)*

| | FY 2023 Enacted | FY 2024 Annualized CR | FY 2025 President's Budget |
|---|---|---|---|
| **Operations and Support** | **$1,379,680** | **$1,379,680** | **$1,573,442** |
| Mission Support | $586,196 | $586,196 | $655,225 |
| Regional Operations | $196,759 | $196,759 | $228,544 |
| Mitigation | $71,353 | $71,353 | $73,885 |
| Preparedness and Protection | $240,815 | $240,815 | $326,555 |
| Response and Recovery | $284,557 | $284,557 | $289,233 |
| Response | $222,496 | $222,496 | $237,439 |
| Recovery | $62,061 | $62,061 | $51,794 |
| **Procurement, Construction, and Improvements** | **$207,730** | **$207,730** | **$110,387** |
| Operational Communications/Information Technology | $15,902 | $15,902 | $27,600 |
| Integrated Public Alert and Warning System (IPAWS) | $12,902 | $12,902 | $10,600 |
| National Continuity Program Strategic Partner Program | - | - | $15,000 |
| National Warning System (NAWAS) | $3,000 | $3,000 | - |
| National Fire Incident Reporting System | - | - | $2,000 |
| Construction and Facility Improvements | $77,305 | $77,305 | $69,237 |
| Mt. Weather Facilities | $63,411 | $63,411 | $53,000 |
| Center for Domestic Preparedness (CDP) | $8,000 | $8,000 | |
| National Emergency Training Center (NETC) | $2,156 | $2,156 | $11,500 |
| Regional Facilities | $3,738 | $3,738 | $4,737 |
| Mission Support Assets and Infrastructure | $114,523 | $114,523 | $13,550 |
| Grants Management Modernization | $51,054 | $51,054 | |
| Financial Systems Modernization | $12,025 | $12,025 | $13,550 |
| Enterprise Data & Analytics Modernization | $33,544 | $33,544 | - |
| IT Acquisition Programs | $14,000 | $14,000 | - |
| Identity Access Control Systems Operations | $3,900 | $3,900 | - |
| **Federal Assistance** | **$3,888,014** | **$3,888,014** | **$3,522,541** |
| Grants | $3,571,895 | $3,571,895 | $3,202,750 |

**Department of Homeland Security**                                          **Federal Emergency Management Agency**

| | | | |
|---|---|---|---|
| State Homeland Security Grant Program | $520,000 | $520,000 | $421,000 |
| Urban Area Security Initiative | $615,000 | $615,000 | $531,000 |
| Public Transportation Security Assistance | $105,000 | $105,000 | $100,000 |
| Port Security Grants | $100,000 | $100,000 | $100,000 |
| Presidential Residence Protection Assistance | $3,000 | $3,000 | - |
| Assistance to Firefighters Grants | $360,000 | $360,000 | $385,000 |
| Staffing for Adequate Fire and Emergency Response (SAFER) Grants | $360,000 | $360,000 | $385,000 |
| Emergency Management Performance Grants | $355,000 | $355,000 | $375,000 |
| Nonprofit Security Grant Program | $305,000 | $305,000 | $385,000 |
| Tribal Homeland Security Grant Program | - | - | $15,000 |
| Flood Hazard Mapping and Risk Analysis Program (RiskMAP) | $312,750 | $312,750 | $363,750 |
| Regional Catastrophic Preparedness | $12,000 | $12,000 | $12,000 |
| Emergency Food and Shelter | $130,000 | $130,000 | $130,000 |
| Next Generation Warning System | $56,000 | $56,000 | - |
| Community Project Funding | $338,145 | $338,145 | - |
| Education, Training, and Exercises | $316,119 | $316,119 | $319,791 |
| Center for Domestic Preparedness | $71,031 | $71,031 | $70,890 |
| Center for Homeland Defense and Security | $18,000 | $18,000 | $18,000 |
| Emergency Management Institute | $30,777 | $30,777 | $32,042 |
| U.S. Fire Administration | $58,287 | $58,287 | $65,114 |
| National Domestic Preparedness Consortium | $101,000 | $101,000 | $101,000 |
| Continuing Training Grants | $16,000 | $16,000 | $12,000 |
| National Exercise Program | $21,024 | $21,024 | $20,745 |
| **Disaster Relief Fund** | **$19,945,000** | **$19,945,000** | **$22,708,000** |
| Major Disaster Allocation | $19,945,000 | $19,945,000 | $22,708,000 |
| **National Flood Insurance Program** | **$4,718,753** | **$5,125,722** | **$5,174,858** |
| Mission Support | $13,753 | $18,917 | $14,578 |
| Floodplain Management and Flood Mapping | $206,500 | $221,066 | $225,207 |
| National Flood Insurance Fund - Mandatory | $3,542,955 | $3,699,847 | $3,999,265 |
| National Flood Insurance Reserve Fund | $955,545 | $1,185,892 | $935,808 |
| **Total** | **$30,139,177** | **$30,546,146** | **$33,089,228** |

Department of Homeland Security                                    Federal Emergency Management Agency

# Federal Emergency Management Agency
## Comparison of Budget Authority and Request
### *(Dollars in Thousands)*

| | FY 2023 Enacted | | | FY 2024 Annualized CR | | | FY 2025 President's Budget | | | FY 2024 to FY 2025 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Operations and Support | 4,852 | 3,997 | $1,379,680 | 4,852 | 3,997 | $1,379,680 | 4,921 | 4,396 | $1,573,442 | 69 | 399 | $193,762 |
| Procurement, Construction, and Improvements | - | - | $207,730 | - | - | $207,730 | - | - | $110,387 | - | - | ($97,343) |
| Federal Assistance | 399 | 383 | $3,888,014 | 399 | 383 | $3,888,014 | 380 | 369 | $3,522,541 | (19) | (14) | ($365,473) |
| Disaster Relief Fund | - | 9,501 | $19,945,000 | - | 9,501 | $19,945,000 | - | 11,726 | $22,708,000 | - | 2,225 | $2,763,000 |
| National Flood Insurance Program | 647 | 589 | $4,718,753 | 729 | 680 | $5,125,722 | 729 | 696 | $5,174,858 | - | 16 | $49,136 |
| Radiological Emergency Preparedness Program | 156 | 137 | - | 156 | 141 | - | 156 | 141 | - | - | - | - |
| **Total** | **6,054** | **14,607** | **$30,139,177** | **6,136** | **14,702** | **$30,546,146** | **6,186** | **17,328** | **$33,089,228** | **50** | **2,626** | **$2,543,082** |
| Subtotal Discretionary - Appropriation | 5,407 | 5,008 | $5,475,424 | 5,407 | 5,012 | $5,475,424 | 5,457 | 5,862 | $5,206,370 | 50 | 850 | ($269,054) |
| Subtotal Discretionary - Offsetting Fee | 424 | 379 | $220,253 | 450 | 421 | $239,983 | 435 | 419 | $239,785 | (15) | (2) | ($198) |
| Subtotal Discretionary - Major Disasters (DRF) | - | 9,010 | $19,945,000 | - | 9,010 | $19,945,000 | - | 10,770 | $22,708,000 | - | 1,760 | $2,763,000 |
| Subtotal Mandatory - Fee | 223 | 210 | $4,498,500 | 279 | 259 | $4,885,739 | 294 | 277 | $4,935,073 | 15 | 18 | $49,334 |

## Component Budget Overview

The FY 2025 Budget includes $33.1B in total gross budget authority; 6,186 positions; and 17,328 full-time equivalents (FTE) for the Federal Emergency Management Agency (FEMA). This funding level represents an increase of $2.5B above the continuing appropriations act for Fiscal Year 2024.

FEMA's mission of helping people before, during, and after disasters continues through supporting communities across the Nation when responding to natural hazards and emergencies. Effective emergency management is a shared responsibility among the whole community, where disaster operations are Federally supported, State managed, and locally executed. The FY 2025 Budget advances priorities established by the Administration and continues to support our work in equity, climate resilience, and preparedness which are in alignment with the Agency's strategic plan:

- Instill Equity as a Foundation of Emergency Management
  - Cultivate a FEMA that prioritizes and harnesses a diverse workforce
  - Remove barriers to FEMA programs through a people first approach
  - Achieve equitable outcomes for those we serve

- Lead Whole of Community in Climate Resilience
  - Increase climate literacy among the emergency management community
  - Build a climate resilient Nation
  - Empower risk-informed decision-making
- Promote and Sustain a Ready FEMA and Prepared Nation
  - Strengthen the emergency management workforce
  - Posture FEMA to meet current and emergent threats
  - Unify coordination and delivery of Federal assistance

The FY 2025 Budget will support and implement these goals, as well as help close capability and performance gaps, which is paramount to FEMA successfully meeting its mission. As the nation continues to face an unprecedented number of complex and catastrophic disasters, the field of emergency management has never been more critical. FEMA must be ready to act at any moment. Now, more than any previous time in history, emergency managers must be adaptable and ready to execute the fundamentals of emergency management as the disaster mission evolves. Concurrently, the agency must continue to assess its programs and resources to ensure they are meeting the needs of our citizens. The FY 2025 Budget supports and strengthens FEMA's commitment to that end.

**Performance**

There are various performance measures to support the program change based on the requirements and activities absorbed by FEMA. For the technical refresh, ONCP aims to ensure a 25.0 percent refresh rate, which DCD is not currently resourced to meet, although it is the industry standard.  Further, FEMA's performance in achieving its goal will be assessed by: The number Emergency Relocation Plans (ERPs) developed for S1 and S2 domestic travel support; the number of Foreign Travel Guides (FTGs) developed for S1 and S2 international travel support; the number of S1 successors and critical support personnel who have completed an annual continuity training and relocation exercises, and FEMA's enhanced capability and readiness to execute a no-notice emergency relocation for all successors of S1 successors.

## Program Change 9 – Disaster Workforce Readiness

| ($ in thousands) | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | 9 | 9 | $1,674 |
| Program Change | 12 | 12 | $2,685 |

**Description**

The Office of Response and Recovery (ORR) requires an increase in staffing to provide training and education enhancements for our Incident Management Assistance Team (IMAT) and Federal Coordinating Officer (FCO) cadres. The staffing increase is for critical and highly specialized positions, closing capability gaps and ensuring the Agency is ready to respond to disasters of increasing frequency and impacts and meet the need of survivors. An additional $4.1M is included in the Disaster Relief Fund to support this initiative.

**Justification**

Federal Coordinating Officers (FCOs) & Incident Management Assistance Teams (IMATs) Development and Operation Support: requires 12 positions to provide professional development and operational support to FCOs and IMATs, including the following:

- Ten positions to support the development and implementation of field leadership development programs across both the FCO and IMAT programs. This includes:
  o Field Leadership Program: Four positions in total with two positions to develop and implement professional development programs for the FCO program; One position to develop/maintain guidance for FCO performance management, operational effectiveness, and professional development; One position to provide executive officer support to the Field Leadership program
  o IMAT Program: Six positions in total with three positions to oversee, implement, and manage the Operational Readiness Evaluation program; Two positions to implement the team and cohort-based elements of the IMAT training program; One position to manage the development and implementation of a recurring IMAT Leadership Academy
- Two positions to effectively support FCO and IMAT operations in the field support. This includes:
  o Field Leadership Program: Two positions operational and analytical support

Laws such as the Post Katrina Emergency Management Reform Act, the Post Sandy Recovery Act, and the Homeland Security Act of 2002 have set requirements for FEMA to gain and maintain capabilities to not only coordinate the Federal family's ability to provide lifesaving and life sustaining resources and activities during disasters, but to also be the industry leader in training and education of the emergency management field across all levels of society. Government Accountability Office (GAO) and Office of the Inspector General (OIG) reports and findings have identified where FEMA has experienced successes, shortcomings, and gaps in mission delivery and have provided recommendations on how and where to apply resources to address shortfall. This includes FEMA's ability to execute the requirements established in Section 302 (Coordinating Officers) and Section 303 (Emergency Support and Response Teams) of the Stafford Act. Developing and maintaining professional development programs for FCOs and IMATs is necessary to advance the Administrator's stated goals for the management and support of FEMA's field leaders. Addressing shortfalls in operational support to FCOs and IMATs is equally important, and necessary to improve the operational effectiveness of FEMA's field leaders.

The Field Leadership Directorate currently lacks the program staff to effectively implement training and professional development requirements for FCOs and IMATs established by the Administrator in the revised FCO and IMAT program directives. The GAO has found that the IMAT program lacks both a comprehensive training and development program that considers both FQS and IMAT-specific requirements, as well as a consistent team assessment process. The ORE cycle now required by the IMAT Directive is consistent with that used by the National Urban Search & Rescue System and recognized by the GAO as a best practice. An internal assessment has also found that IMAT member satisfaction decreases (and attrition risk increases) once members reach FQS qualification due to lack of IMAT specific career progression and development opportunities.

These requirements, both new and with enhancements to existing programs, will enhance the readiness of FEMA's FCO and IMAT cadres and will enable increased Field Leadership capabilities. FEMA has earned and maintained its reputation as a leading learning organization based on many years of identifying and acting upon lessons learned to improve its mission capabilities.

**Performance**

This investment will provide the resources necessary to effectively train, equip, and deploy FCO and IMAT cadres in support of disaster activities, leading to better field performance and lower attrition. GAO has found that IMAT attrition and turnover can "have a negative impact on IMAT performance, relationships with State and other partners, and team cohesion, and it may limit the return on investment of hiring and training new CORE staff." Achieving the intended outcome is necessary to advance two FEMA Strategic Plan objectives: Objective 3.1, *Strengthen the Emergency Management Workforce*; and Objective 3.2, *Posture FEMA to Meet Current and Emergent Threats*.

## Program Change 10 – Enterprise Cloud Authentication

| (*$ in thousands*) | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | 52 | 49 | $62,649 |
| Program Change | - | - | $3,146 |

## Program Change 27 – Support for the IM Workforce

| ($ in thousands) | Pos | FTE | Amount |
|---|---|---|---|
| Base: Current Services & Transfers | 83 | 46 | $75,700 |
| Program Change | 25 | 25 | $4,582 |

**Description**
The FY 2025 Budget includes an increase to support FEMA's Incident Management (IM) Workforce staffing and readiness to enable the Agency to achieve its force structure targets as reflected in its Government Performance and Results Act (GPRA) performance measure. Specifically, this program change supports the costs of recruiting, hiring, training, and sustaining/supporting these additional employees.

**Justification**
The 2018 IM Workforce Review (IMWR) calculated that the Agency must have a total of 17,670 IM Workforce employees to be capable of managing disaster operations for 90 percent of routine disaster risk and 60 percent of extreme disaster risk. The Agency's current IM Workforce strength is approximately 11,900 employees. The result is a nearly 33 percent gap of approximately 5,700 IM Workforce employees, creating operational performance risk. This could result in FEMA's inability to meet its expectations for the speed and scope of the disaster response and recovery operations it is responsible for leading and supporting.

Growth of the IM Workforce was slower than desired between FY 2020 and 2021, largely because of the impacts of the COVID-19 pandemic on the labor force as well as limited cadre management staff to process recruitment and hiring actions. FEMA has brought on additional cadre management staff to handle greater hiring volume. This staff will also maintain more frequent contact with non-deployed Reservists with the goal of increasing employee engagement and reducing attrition.

Additionally, FEMA continues to manage historic disaster activity as compared to the same time in 2016 and has been called upon to lead the Federal government's efforts in COVID-19 response and vaccination efforts. The Agency also supports non-Stafford Act events such as Southwest Border operations and Operation Allies Welcome. This sustained strain and seven years of historic activity threatens staff burnout, subject matter expert attrition, and imperils readiness against future disasters as well as negative impacts on steady-state roles.

**Performance**
The FY 2025 Budget supports FEMA's disaster response efforts by increasing staffing to support the IM Workforce. This will alleviate some of the pressure on current IM Workforce staff since there will be a better distribution of work with increased staffing numbers, which will support FEMA's drive to achieve its force structure target.

# EXHIBIT O

# Department of Homeland Security

## *Federal Emergency Management Agency*
### *Budget Overview*



### Fiscal Year 2026

### Congressional Justification

**Department of Homeland Security**

**Federal Emergency Management Agency**

## Table of Contents

*Federal Emergency Management Agency* ........................................................................1

Appropriation Organization Structure .............................................................................3

Budget Comparison and Adjustments ..............................................................................5

Personnel Compensation and Benefits..............................................................................9

Non Pay Budget Exhibits....................................................................................................11

Supplemental Budget Justification Exhibits ...................................................................13

Department of Homeland Security                                    Federal Emergency Management Agency

# Federal Emergency Management Agency
## Appropriation Organization Structure

|  | Level | Fund Type (* Includes Defense Funding) |
|---|---|---|
| Federal Emergency Management Agency | Component | |
| Operations and Support | Appropriation | |
| Mission Support | PPA | Discretionary - Appropriation |
| Regional Operations | PPA | Discretionary - Appropriation |
| Mitigation | PPA | Discretionary - Appropriation |
| Preparedness and Protection | PPA | Discretionary - Appropriation* |
| Response and Recovery | PPA | |
| Response | PPA Level II | Discretionary - Appropriation |
| Recovery | PPA Level II | Discretionary - Appropriation |
| Procurement, Construction, and Improvements | Appropriation | |
| Operational Communications/Information Technology | PPA | |
| Integrated Public Alert and Warning System (IPAWS) | PPA Level II | Discretionary - Appropriation* |
| National Continuity Program Strategic Partner Program | PPA Level II | Discretionary - Appropriation* |
| National Fire Incident Reporting System | PPA Level II | Discretionary - Appropriation |
| Construction and Facility Improvements | PPA | |
| Mt. Weather Facilities | Investment,PPA Level II | Discretionary - Appropriation* |
| National Emergency Training Center (NETC) | Investment,PPA Level II | Discretionary - Appropriation |
| Mission Support Assets and Infrastructure | PPA | |
| Grants Management Modernization | Investment,PPA Level II | Discretionary - Appropriation |
| Financial Systems Modernization | Investment,PPA Level II | Discretionary - Appropriation |
| Enterprise Data & Analytics Modernization | Investment,PPA Level II | Discretionary - Appropriation |
| IT Acquisition Programs | Investment,PPA Level II | Discretionary - Appropriation |
| Federal Assistance | Appropriation | |
| Grants | PPA | |
| State Homeland Security Grant Program | PPA Level II | Discretionary - Appropriation |
| Urban Area Security Initiative | PPA Level II | Discretionary - Appropriation |

**Department of Homeland Security**                                      **Federal Emergency Management Agency**

| | | |
|---|---|---|
| Public Transportation Security Assistance | PPA Level II | Discretionary - Appropriation |
| Port Security Grants | PPA Level II | Discretionary - Appropriation |
| Presidential Residence Protection Assistance | PPA Level II | Discretionary - Appropriation |
| Assistance to Firefighters Grants | PPA Level II | Discretionary - Appropriation |
| Staffing for Adequate Fire and Emergency Response (SAFER) Grants | PPA Level II | Discretionary - Appropriation |
| Emergency Management Performance Grants | PPA Level II | Discretionary - Appropriation |
| Nonprofit Security Grant Program | PPA Level II | Discretionary - Appropriation |
| Flood Hazard Mapping and Risk Analysis Program (RiskMAP) | PPA Level II | Discretionary - Appropriation |
| Regional Catastrophic Preparedness | PPA Level II | Discretionary - Appropriation |
| Emergency Food and Shelter | PPA Level II | Discretionary - Appropriation |
| Next Generation Warning System | PPA Level II | Discretionary - Appropriation* |
| Community Project Funding | PPA Level II | Discretionary - Appropriation |
| Education, Training, and Exercises | PPA | |
| Center for Domestic Preparedness | PPA Level II | Discretionary - Appropriation |
| Center for Homeland Defense and Security | PPA Level II | Discretionary - Appropriation |
| Emergency Management Institute | PPA Level II | Discretionary - Appropriation |
| U.S. Fire Administration | PPA Level II | Discretionary - Appropriation |
| National Domestic Preparedness Consortium | PPA Level II | Discretionary - Appropriation |
| Continuing Training Grants | PPA Level II | Discretionary - Appropriation |
| National Exercise Program | PPA Level II | Discretionary - Appropriation |
| **Disaster Relief Fund** | **Appropriation** | |
| Base Disaster Relief | PPA | Discretionary - Appropriation |
| Major Disaster Allocation | PPA | Discretionary - Major Disasters (DRF) |
| **National Flood Insurance Program** | **Appropriation** | |
| Mission Support | PPA | Discretionary - Offsetting Fee |
| Floodplain Management and Flood Mapping | PPA | Discretionary - Offsetting Fee |
| National Flood Insurance Fund - Mandatory | PPA | Mandatory - Fee |
| National Flood Insurance Reserve Fund | PPA | Mandatory - Fee |
| **Radiological Emergency Preparedness Program** | **Appropriation** | Discretionary - Appropriation |

Department of Homeland Security                                    Federal Emergency Management Agency

# Federal Emergency Management Agency
## Budget Comparison and Adjustments
## Appropriation and PPA Summary
*(Dollars in Thousands)*

| | FY 2024 Enacted | FY 2025 Full-Year CR | FY 2026 President's Budget |
|---|---|---|---|
| **Operations and Support** | **$1,483,990** | **$1,483,990** | **$1,499,955** |
| Mission Support | $624,962 | $624,962 | $605,306 |
| Regional Operations | $210,095 | $210,095 | $210,835 |
| Mitigation | $75,594 | $75,594 | $51,943 |
| Preparedness and Protection | $278,940 | $278,940 | $338,705 |
| Response and Recovery | $294,399 | $294,399 | $293,166 |
| Response | $236,868 | $236,868 | $238,639 |
| Recovery | $57,531 | $57,531 | $54,527 |
| **Procurement, Construction, and Improvements** | **$99,528** | **$99,528** | **$156,419** |
| Operational Communications/Information Technology | $21,900 | $21,900 | $64,375 |
| Integrated Public Alert and Warning System (IPAWS) | $11,900 | $11,900 | $12,000 |
| National Continuity Program Strategic Partner Program | - | - | $52,375 |
| National Fire Incident Reporting System | $10,000 | $10,000 | - |
| Construction and Facility Improvements | $36,250 | $36,250 | $63,625 |
| Mt. Weather Facilities | $35,000 | $35,000 | $63,625 |
| National Emergency Training Center (NETC) | $1,250 | $1,250 | - |
| Mission Support Assets and Infrastructure | $41,378 | $41,378 | $28,419 |
| Grants Management Modernization | $14,500 | $14,500 | - |
| Financial Systems Modernization | $8,520 | $8,520 | $12,284 |
| Enterprise Data & Analytics Modernization | $14,858 | $14,858 | $16,135 |
| IT Acquisition Programs | $3,500 | $3,500 | - |
| **Federal Assistance** | **$3,497,019** | **$3,203,262** | **$2,593,517** |
| Grants | $3,191,032 | $2,897,275 | $2,389,975 |
| State Homeland Security Grant Program | $468,000 | $468,000 | $351,000 |
| Urban Area Security Initiative | $553,500 | $553,500 | $415,500 |
| Public Transportation Security Assistance | $94,500 | $94,500 | $50,000 |
| Port Security Grants | $90,000 | $90,000 | $50,000 |

**Department of Homeland Security**                                    **Federal Emergency Management Agency**

| | | | |
|---|---:|---:|---:|
| Assistance to Firefighters Grants | $324,000 | $324,000 | $324,000 |
| Staffing for Adequate Fire and Emergency Response (SAFER) Grants | $324,000 | $324,000 | $324,000 |
| Emergency Management Performance Grants | $319,500 | $319,500 | $319,500 |
| Nonprofit Security Grant Program | $274,500 | $274,500 | $274,500 |
| Flood Hazard Mapping and Risk Analysis Program (RiskMAP) | $281,475 | $281,475 | $281,475 |
| Regional Catastrophic Preparedness | $10,800 | $10,800 | - |
| Emergency Food and Shelter | $117,000 | $117,000 | - |
| Next Generation Warning System | $40,000 | $40,000 | - |
| Community Project Funding | $293,757 | - | - |
| Education, Training, and Exercises | $305,987 | $305,987 | $203,542 |
| Center for Domestic Preparedness | $71,352 | $71,352 | $72,490 |
| Center for Homeland Defense and Security | $16,200 | $16,200 | $16,200 |
| Emergency Management Institute | $32,240 | $32,240 | $30,805 |
| U.S. Fire Administration | $59,975 | $59,975 | $64,166 |
| National Domestic Preparedness Consortium | $90,900 | $90,900 | - |
| Continuing Training Grants | $14,400 | $14,400 | - |
| National Exercise Program | $20,920 | $20,920 | $19,881 |
| **Disaster Relief Fund** | **$20,261,000** | **$22,510,000** | **$26,474,000** |
| Major Disaster Allocation | $20,261,000 | $22,510,000 | $26,474,000 |
| **National Flood Insurance Program** | **$5,110,151** | **$4,983,885** | **$5,501,012** |
| Mission Support | $18,917 | $18,917 | $14,578 |
| Floodplain Management and Flood Mapping | $221,066 | $187,960 | $187,522 |
| National Flood Insurance Fund - Mandatory | $3,697,429 | $4,036,820 | $4,362,243 |
| National Flood Insurance Reserve Fund | $1,172,739 | $740,188 | $936,669 |
| **Total** | **$30,451,688** | **$32,280,665** | **$36,224,903** |

Department of Homeland Security                                    Federal Emergency Management Agency

# Federal Emergency Management Agency
## Comparison of Budget Authority and Request
*(Dollars in Thousands)*

| | FY 2024 Enacted | | | FY 2025 Full-Year CR | | | FY 2026 President's Budget | | | FY 2025 to FY 2026 Total Changes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount | Pos. | FTE | Amount |
| Operations and Support | 4,954 | 4,287 | $1,483,990 | 4,954 | 4,287 | $1,483,990 | 4,407 | 3,769 | $1,499,955 | (547) | (518) | $15,965 |
| Procurement, Construction, and Improvements | - | - | $99,528 | - | - | $99,528 | - | - | $156,419 | - | - | $56,891 |
| Federal Assistance | 401 | 387 | $3,497,019 | 401 | 387 | $3,203,262 | 351 | 340 | $2,593,517 | (50) | (47) | ($609,745) |
| Disaster Relief Fund | - | 10,509 | $20,261,000 | - | 10,509 | $22,510,000 | - | 12,354 | $26,474,000 | - | 1,845 | $3,964,000 |
| National Flood Insurance Program | 729 | 680 | $5,110,151 | 729 | 680 | $4,983,885 | 729 | 680 | $5,501,012 | - | - | $517,127 |
| Radiological Emergency Preparedness Program | 156 | 141 | | 156 | 115 | | 156 | 132 | - | - | 17 | |
| **Total** | **6,240** | **16,004** | **$30,451,688** | **6,240** | **15,978** | **$32,280,665** | **5,643** | **17,275** | **$36,224,903** | **(597)** | **1,297** | **$3,944,238** |
| Subtotal Discretionary - Appropriation | 5,511 | 5,318 | $5,080,537 | 5,511 | 5,292 | $4,786,780 | 4,914 | 4,878 | $4,249,891 | (597) | (414) | ($536,889) |
| Subtotal Discretionary - Offsetting Fee | 450 | 421 | $239,983 | 450 | 421 | $206,877 | 450 | 421 | $202,100 | - | - | ($4,777) |
| Subtotal Discretionary - Major Disasters (DRF) | - | 10,006 | $20,261,000 | - | 10,006 | $22,510,000 | - | 11,717 | $26,474,000 | - | 1,711 | $3,964,000 |
| Subtotal Mandatory - Fee | 279 | 259 | $4,870,168 | 279 | 259 | $4,777,008 | 279 | 259 | $5,298,912 | - | - | $521,904 |

## Component Budget Overview

The FY 2026 Budget includes $36.2B in total gross budget authority; 5,643 positions; and 17,129 full-time equivalents (FTE) for the Federal Emergency Management Agency (FEMA). This funding level represents an increase of $3.9B above the FY 2025 Full-Year CR.

FEMA's mission of helping people before, during, and after disasters continues through supporting communities across the Nation when responding to natural hazards and emergencies. Effective emergency management is a shared responsibility among the whole community, where disaster operations are Federally supported, State managed and locally executed. The FY 2026 Budget advances priorities established by the Administration and eliminates programs not aligned to those priorities. The Administration's reconciliation request complements the FY 2026 Budget.

The FY 2026 Budget will help close capability and performance gaps, which are essential for FEMA to successfully meet its mission. As the nation continues to face an unprecedented number of complex and catastrophic disasters, emergency management has never been more critical. FEMA must be ready to act at any moment to support States in disaster recovery. Concurrently, the agency must continue to assess its programs and resources to ensure they are meeting the needs of our citizens. The FY 2026 Budget supports and strengthens FEMA's commitment to that end.

**Department of Homeland Security**                                    **Federal Emergency Management Agency**

The FY 2026 Budget also includes an increase for improvements in incident management planning, assessment, and policy development for capabilities and preparedness efforts for World Cup 2026. Funding will support improvements in FEMA's ability to augment U.S. national security requirements, use Federal programs to adhere to U.S. World Cup commitments, and strengthen host city capabilities.

Exhibit P

FUEL THE FIGHT! Donate now.                                                    ✕

All About SUFS  Take Action
Resources  In The News  SUFS Blog
Merch Shop  Press



**DONATE NOW!**

# THE FEMA KATRINA DECLARATION



**In response to the Trump administration's dismantling cuts and devastating attacks on FEMA programs and missions, we are proud to host and publish their *Katrina Declaration* below.**

Please read their *Declaration* below and join with us all by adding your name to our **Statement of Solidarity and Support** for the brave dissenters of the *FEMA Katrina Declaration* here

**ADD YOUR NAME TO OUR STATEMENT OF SOLIDARITY AND SUPPORT HERE**

---

## KATRINA DECLARATION AND PETITION TO CONGRESS

TO: Members of Federal Emergency Management Agency Review Council

CC: U.S. House Committee on Transportation and Infrastructure; U.S. House Committee on Homeland Security; U.S. House Committee on Oversight and Government Reform; U.S. House Committee on Appropriations; U.S. Senate Committee on Homeland Security and Governmental Affairs; U.S. Senate Committee on Appropriations; Members of Congress

Twenty years ago, Hurricane Katrina made landfall along the Gulf Coast as a Category 3 hurricane, claiming an estimated 1,833 lives, leaving millions homeless, and causing approximately $161 billion in damage. Hurricane Katrina was not just a natural disaster, but a man-made one: the inexperience of senior leaders and the profound failure by the federal government to deliver timely, unified, and effective aid to those in need left survivors to fend for themselves for days, and highlighted how Black, Indigenous, and low-income communities are disproportionally affected by disasters. These failures prompted Congress to pass the Post-Katrina Emergency Management Reform Act of 2006 (PKEMRA), which introduced safeguards to ensure such shortcomings of disaster preparation and response would not be repeated. However, two decades later, FEMA is enacting processes and leadership structures that echo the conditions PKEMRA was designed to prevent.

Since January 2025, FEMA has been under the leadership of individuals lacking legal qualifications, Senate approval, and the demonstrated background required of a FEMA Administrator. Decisions made by FEMA's Senior Official Performing the Duties of the Administrator (SOPDA) David Richardson, Former SOPDA Cameron Hamilton, and Secretary of Homeland Security Kristi Noem erode the capacity of FEMA and our State, Local, Tribal, and Territorial (SLTT) partners, hinder the swift execution of our mission, and dismiss experienced staff whose institutional knowledge and relationships are vital to ensure effective emergency management.

The agency's current trajectory reflects a clear departure from the intent of PKEMRA. Our shared commitment to our country, our oaths of office, and our mission of helping people before, during, and after disasters compel us to warn Congress and the American people of the cascading effects of decisions made by the current administration. We the undersigned — current and former FEMA workers — have come together to sound the alarm to our administrators, the US Congress, and the American people so that we can continue to lawfully uphold our individual oaths of office and serve our country as our mission dictates.

The following are our Six Statements of Opposition from FEMA's workforce and our Petition to Congress, which we hope come in time to prevent not only another national catastrophe like Hurricane Katrina, but the effective dissolution of FEMA itself and the abandonment of the American people such an event would represent:

**1) We oppose the reduction in capability of FEMA to perform its missions.**

Secretary Noem has impounded agency funds by requiring a personal review and approval of all contracts, grants and mission assignments over $100,000 which **reduces FEMA's authorities and capabilities to swiftly deliver our mission**. Consequences of this manual review became tragically clear during the July 2025 floods in Kerrville, Texas, when mission assignments were delayed up to 72 hours; FEMA's Urban Search and Rescue Branch Chief resigned, citing these delays as cause.

PKEMRA § 506 (6 USC § 316) states: "*the Agency shall be maintained as a distinct entity within the Department*" and the "*Secretary may not substantially or significantly reduce the authorities, responsibilities, or functions of the Agency or the capability of the Agency to perform those missions, authorities, responsibilities.*" Noem's review of contracts is superfluous, given that FEMA is already required to develop "pre-scripted mission

assignments", per PKEMRA § 653 (6 USC § 753), in conjunction with federal partners that also have legal responsibilities to ensure rapid federal disaster response.

Additionally, PKEMRA § 506 (6 USC § 316) states that transfers of assets are prohibited, "*except for details or assignments that do not reduce the capability of the Agency to perform its missions*." Despite this prohibition FEMA employees have been detailed and reassigned to U.S. Immigration and Customs Enforcement (ICE) when the agency is already operating at reduced capacity due to staff losses through deferred resignation and voluntary retirement. Any who refuse the transfer to ICE are threatened with termination.

**2) We oppose the ongoing failure to appoint a qualified FEMA administrator, as required by law.**

Since January 2025, there have now been two individuals placed in charge of FEMA who lack proper qualifications and the authority to lead this agency. ***Hurricane season has begun, yet FEMA continues to lack an appointed Administrator with the mandated qualifications to fulfill this role.***

The dangers of unqualified leadership were a significant lesson learned from Hurricane Katrina. PKEMRA § 503 (6 USC § 313) requires that: "*The Administrator shall be appointed by the President, by and with the advice and consent of the Senate. The Administrator shall be appointed from among individuals who have a demonstrated ability in and knowledge of emergency management and homeland security; and not less than 5 years of executive leadership and management experience in the public or private sector.*"

**3) We oppose the elimination of life- and cost-saving risk reduction programs.**

Mitigation reduces the costs of future disasters, saves lives, protects critical infrastructure, and reduces future response and recovery needs. As disasters grow more frequent and costly, removing mitigation initiatives is fiscally irresponsible and puts American lives and property at unnecessary risk. ***On average, mitigation grants save $6 for every $1 invested and are among the most effective tools to limit future destruction and bolster our national resilience.***

The Stafford Act § 203 (42 USC § 5133) authorizes pre-disaster mitigation and § 404 (42 USC § 5170c) a post-disaster hazard mitigation grant program (HMGP) for "*cost-effective measures to reduce injuries, loss of life, and property damage and to increase resilience of individuals and communities to future damage from disasters.*" Yet, the Agency terminated the pre-disaster mitigation program, Building Resilient Infrastructure and Communities (BRIC), without public notice, terminating current awards already appropriated by Congress. Furthermore, this administration has not authorized funds through the HMGP for almost all Presidentially Declared Major Disasters since February 2025. If allowed to continue our State, Local, Tribal & Territorial (SLTT) partners will have future increased response and recovery costs, and increased loss of life. ***These actions undermine FEMA's legal authority and responsibility.***

**4) We oppose interference with preparedness programs that build capacity for our SLTT partners.**

The federal response failures during Hurricane Katrina highlighted that SLTT partners cannot succeed without federal support through sustained training, technical assistance and coordinated planning efforts. Cuts to these programs prioritize the *appearance* of cost reduction and empowerment of SLTT partners but will result in an opposite outcome. **When we cannot work directly with our SLTT partners in providing training and technical assistance, we lose critical opportunities to maintain trust, strengthen systems, improve**

preparedness, and serve the American communities we swore an oath to protect at the moments of their most dire need.

PKEMRA § 503 (6 USC § 313) states "*the Administrator shall provide funding, training, exercises, technical assistance, planning, and other assistance to build tribal, local, State, regional, and national capabilities (including communications capabilities), necessary to respond to a natural disaster, act of terrorism, or other man-made disaster.*" Interference with community preparedness programs, while presented as a cost-cutting measure, is weakening the ability of our SLTT partners to respond to disasters. For example,

● The Community Emergency Response Team (CERT) program has educated and mobilized volunteers, including teenagers and adults, for local disaster readiness and response for almost four decades. The HQ portion of the program has been eliminated without notice to stakeholders.

● The National Fire Academy, which provides education and training opportunities for local and state firefighters and non-federal responders, was paused for an extended period this spring, cutting off access to critical training.

● Until it was cancelled without notice, the Youth Preparedness Council (YPC) brought together young leaders interested in supporting disaster preparedness and making a difference in their communities. Through the YPC, FEMA demonstrated commitment to involving America's youth in preparedness-related activities by engaging with young people and soliciting their perspectives, feedback, and opinions.

**5) We oppose the censorship of climate science, environmental protection, and efforts to ensure all communities have access to information, resources, and support.**

Decades of empirical evidence shows the effects of climate change on disasters and how disasters exacerbate existing inequities, especially in Black, Brown, Indigenous, rural, and low-income communities. **This administration's decision to ignore and disregard the facts pertaining to climate science in disasters shows a blatant disregard for the safety and security of our Nation's people and all American communities regardless of their geographic, economic or ethnic diversity.**

Beginning in February 2025, FEMA employees were tasked with removing climate change related information from both public-facing and internal documents. The Community Disaster Resilience Zones Act of 2022 requires the President to maintain a program that shows where natural disasters are most likely to strike and which communities are most socially vulnerable — like those with fewer resources to prepare or recover. That information must be shared publicly so people can see the risks in their own neighborhoods. In February of 2025, the Future Risk Index was removed from FEMA's website, significantly decreasing the nation's ability to properly prepare for and mitigate against the risks of tomorrow and support underserved communities. **This action represents increased risk for communities and an incalculable waste of time, information, and taxpayer dollars.**

6) We oppose the reduction of FEMA's disaster workforce.

FEMA's current capacities have been significantly limited due to a loss of personnel through programs designed to incentivize our workforce to leave federal service, ongoing hiring freezes, and the cancellation of critical support contracts. **One-third of FEMA's full-time staff have departed the agency this year, leading to the loss of irreplaceable institutional knowledge and long-built relationships.**

Multiple federal partner agencies play a role in disaster preparedness, mitigation, response,

and recovery. The diminished response and recovery capacities of partner agencies due to this administration has cascading effects that reduce FEMA's ability to carry out its mission.

We find ourselves — on the 20th anniversary of a disaster that reshaped the nature of emergency management — only two months removed from a mass casualty flooding event in Kerrville, Texas, which proved the inefficiencies, ineffectiveness, and dangers of the processes and decisions put forth by the current administration. **As that disaster unfolded, FEMA's mission to provide critical support was obstructed by leadership who not only question the agency's existence but place uninformed cost-cutting above serving the American people and  the communities our oath compels us to serve.**

**Our Petition for Action to the United States Congress**

As provided under the Lloyd-La Follette Act (5 USC § 7211), the signatories respectfully petition Congress to:

1.   Establish FEMA as a cabinet-level independent agency in the executive branch.

2.   Defend the agency from further interference from DHS, including illegal impoundments of appropriated funding; ensuring FEMA retains its full authority, responsibilities, functions, and capabilities to perform its missions.

3.   Protect FEMA employees from politically motivated firings and ensure continued protection under merit-based personnel systems.

4.   Demand transparency from OMB, DOGE, and FEMA leadership regarding internal employment policies and future agency reductions.

**Who We Are**

The signatories of this letter are FEMA employees from across the United States who are dedicated to helping people before, during, and after disasters, and who are members of the communities we seek to support. In addition to named signatories, we include anonymous signatories who share our concerns but choose not to identify themselves due to the culture of fear and suppression cultivated by this administration.

We stand in solidarity with our colleagues and public servants at the NIH, EPA, NASA, NSF and CDC who have released similar declarations concerning the administration's actions at their respective agencies. **We dedicate this Katrina Declaration and Petition to 1) every life lost from disasters, 2) to the survivors who endured and rebuilt, 3) to every first responder and public servant who places service above self, and 4) to all the federal partners who serve alongside us to deliver our mission. Their sacrifices and courage**

      **NUMBER OF UNLISTED SIGNATORIES: 154**

      **TOTAL NUMBER OF SIGNATORIES: 192**

**PUBLIC SIGNATORIES**

1. Jennifer Forester
2. Elizabeth Corrigan
3. Anne Ginzkey
4. Nicholas Dorochoff
5. Jeremy Edwards
6. Katherine Landers
7. Blair Bordelon
8. James Stroud
9. Linda BLANK
10. Willa Rowan
11. Jon Jack
12. Angela McComb
13. Beth Janbergs
14. Douglas Owens
15. Ted Litty
16. Kehla West
17. Elizabeth Gibson
18. Michael Coen
19. Christopher Frommann
20. Jodi Hershey
21. Wendy Couchman
22. Laurie Kuypers
23. Maureen Kelly
24. Stuart Rifkind
25. Robert Scoggin
26. Phoenix Gibson
27. Karole Johns
28. Veronica Chabert
29. Abby McIlraith      Click here to download a printer friendly PDF of the Declaration
30. Virginia Case
31. Declan Crowe
32. Jon Ordog
33. Monica McMillan      **READ AND ADD YOUR NAME TO OUR STATEMENT OF SOLIDARITY AND SUPPORT**
34. Thomas Thompson
35. Victoria Salinas

**EXPLORE THE GROWING LIST OF SUPPORTERS AND ENDORSERS HERE**

**Get BREAKING NEWS from the battlefront in the fight to save science & democracy!**

Email

Zip Code

**SIGN UP NOW!**



All About SUFS                    Press

Resources                         In The News

Take Action                       Blog

Merch                             Privacy Policy

   

Contact Us: info@StandUpForScience.net

Stand Up For Science is a registered 501(c)(4) social welfare organization. The Stand Up for Science Foundation is a registered, tax-exempt 501(c)(3) charitable organization.

Exhibit Q

# THE FEDERAL RESPONSE TO

# HURRICANE KATRINA

## LESSONS LEARNED



## FEBRUARY 2006


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

# THE FEDERAL RESPONSE TO

# HURRICANE KATRINA

## LESSONS LEARNED



FEBRUARY 2006

## THE WHITE HOUSE

### WASHINGTON

February 23, 2006

The President of the United States
The White House
Washington, DC  20500

Dear Mr. President:

Pursuant to your direction, I most respectfully submit for your consideration: *The Federal Response to Hurricane Katrina: Lessons Learned.*

You often remind us that your most solemn obligation as President is to protect the American people. And every day and night, millions of men and women throughout the Federal government—both civilian and military—work to achieve that objective. Given the dangerous world in which we live, they do an outstanding job.

Despite all we do, however, Hurricane Katrina was a deadly reminder that we can and must do better, and we will. This is the first and foremost lesson we learned from the death and devastation caused by our country's most destructive natural disaster: No matter how prepared we think we are, we must work every day to improve.

When you addressed the Nation from Jackson Square, New Orleans, on the evening of September 15, 2005, you ordered a comprehensive review of the Federal response to Hurricane Katrina so we as a Nation could make the necessary changes to be "better prepared for any challenge of nature or act of evil men that could threaten our people." At your direction, we assembled a team of experienced professionals dedicated to this mission. In addition, we enjoyed a tremendous partnership with each of your Cabinet Secretaries; without their commitment to this process the Report would not have been possible.

As part of the review, we visited the hurricane-ravaged Gulf Coast during mid November 2005. We met with government officials, business and community leaders, and volunteers amidst the rubble of what had been their homes, schools, and places of worship. Their courage and fortitude in the face of tragedy was inspirational. And while we were determined to learn the lessons to improve our future disaster response, it was clear that for residents of the Gulf Coast, survival and hope still came a day at a time. We were struck by the decency and compassion of those we met and moved by their continuing emotion and pain. As you know, it is hard for those who have not witnessed first hand the hurricane's destruction and its human toll to fully comprehend the importance of your charge that we prepare to respond more effectively to our fellow citizens in their times of greatest need.

This Report then is a tribute to those who have served and those who have suffered. We remember those who lost their lives and all still affected by this tragedy. Though we can never replace their unfathomable losses, we have an obligation to continue helping those still suffering to recover and rebuild their lives.

Though there will be tragedies we cannot prevent, we can improve our preparedness and response to reduce future loss and preserve life. And while we will work diligently to implement immediate improvements, it is important to recognize that the true transformation envisioned in this Report will require a sustained commitment over time by the Federal government as well as by State and local governments that have essential duties in responding to disasters. The Report and recommendations are submitted in the hope of ensuring that the harsh lessons of Hurricane Katrina need never be learned again.

Thank you for the privilege and the honor of leading this review.

Sincerely,

Frances Fragos Townsend
Assistant to the President for Homeland Security
and Counterterrorism

## TABLE OF CONTENTS

FOREWORD ............................................................................................................................................................. 1

CHAPTER ONE: KATRINA IN PERSPECTIVE .................................................................................................................. 5

CHAPTER TWO: NATIONAL PREPAREDNESS — A PRIMER ............................................................................................ 11

CHAPTER THREE: HURRICANE KATRINA — PRE-LANDFALL .......................................................................................... 21

CHAPTER FOUR: A WEEK OF CRISIS — AUGUST 29 – SEPTEMBER 5 ............................................................................ 33

CHAPTER FIVE: LESSONS LEARNED ........................................................................................................................... 51

CHAPTER SIX: TRANSFORMING NATIONAL PREPAREDNESS ........................................................................................... 65

CHAPTER SEVEN: EPILOGUE ...................................................................................................................................... 83

APPENDICES ............................................................................................................................................................. 85

      Appendix A – Recommendations ....................................................................................................... 87
      Appendix B – What Went Right ........................................................................................................ 125
      Appendix C – List of Acronyms ....................................................................................................... 145
      Appendix D – Staff Page .................................................................................................................. 149
      Appendix E – Endnotes .................................................................................................................... 151

# FOREWORD

On August 23, 2005, Hurricane Katrina formed as a tropical storm off the coast of the Bahamas.  Over the next seven days, the tropical storm grew into a catastrophic hurricane that made landfall first in Florida and then along the Gulf Coast in Mississippi, Louisiana, and Alabama, leaving a trail of heartbreaking devastation and human suffering.  Katrina wreaked staggering physical destruction along its path, flooded the historic city of New Orleans, ultimately killed over 1,300 people, and became the most destructive natural disaster in American history.

Awakening to reports of Katrina's landfall on the Gulf Coast the morning of Monday, August 29, American citizens watched events unfold with an initial curiosity that soon turned to concern and sorrow.  The awe that viewers held for the sheer ferocity of nature was soon matched with disappointment and frustration at the seeming inability of the "government"—local, State, and Federal—to respond effectively to the crisis.  Hurricane Katrina and the subsequent sustained flooding of New Orleans exposed significant flaws in Federal, State, and local preparedness for catastrophic events and our capacity to respond to them.  Emergency plans at all levels of government, from small town plans to the 600-page National Response Plan—the Federal government's plan to coordinate all its departments and agencies and integrate them with State, local, and private sector partners—were put to the ultimate test, and came up short.  Millions of Americans were reminded of the need to protect themselves and their families.

Even as parts of New Orleans were still under water, President Bush spoke to the Nation from the city's historic Jackson Square.  He stated unequivocally, that "[f]our years after the frightening experience of September the 11th, Americans have every right to expect a more effective response in a time of emergency.  When the federal government fails to meet such an obligation, I, as President, am responsible for the problem, and for the solution."[1]

In his address, the President ordered a comprehensive review of the Federal response to Hurricane Katrina so we as a Nation could make the necessary changes to be "better prepared for any challenge of nature or act of evil men that could threaten our people."[2]  The President's charge has resulted in the material and conclusions of this Report—*The Federal Response to Hurricane Katrina: Lessons Learned*.

## WHAT WENT WRONG

In general terms, the challenges to our collective response to Hurricane Katrina are not difficult to identify.  Hurricane Katrina, its 115-130 mph winds, and the accompanying storm surge it created as high as 27 feet along a stretch of the Northern Gulf Coast from Mobile, Alabama, to New Orleans, impacted nearly 93,000 square miles of our Nation—roughly an area the size of Great Britain.  The disaster was not isolated to one town or city, or even one State.  Individual local and State plans, as well as relatively new plans created by the Federal government since the terrorist attacks on September 11, 2001, failed to adequately account for widespread or simultaneous catastrophes.

We were confronted by the pictures of destroyed towns and cities, each with their own needs.  Smaller cities like Waveland, Mississippi, were completely devastated by Hurricane Katrina and required smaller scale yet immediate search and rescue efforts as well as large volumes of life saving and sustaining commodities.  New Orleans, the largest affected city—which dominated much of what Americans saw on their televisions—suffered first from the initial impact of Katrina and then from the subsequent flood caused by breaches in its 350 mile levee system.  Over

an estimated eighteen-hour period, approximately 80 percent of the city flooded with six to twenty feet of water, necessitating one of the largest search and rescue operations in our Nation's history.

## SCOPE AND METHODOLOGY

The President made clear that we must do better in the future. The objective of this Report is to identify and establish a roadmap on how to do that, and lay the groundwork for transforming how this Nation—from every level of government to the private sector to individual citizens and communities—pursues a real and lasting vision of preparedness. To get there will require significant change to the status quo, to include adjustments to policy, structure, and mindset.

While the Report notes that disaster preparedness and response to most incidents remains a State and local responsibility, this review did not include an assessment of State and local responses. The President specifically requested that we review the response of the Federal government. Where actions at the State and local level had bearing on Federal decisions or operations, they are included in order to provide full context. We note that although incident response remains a State and local responsibility, we must strengthen Federal support for their efforts and be better prepared for the Federal response to a catastrophic event. Furthermore, we were mindful of how simple and lucid a situation can appear with the clarity of hindsight. And so, judging in retrospect the decisions made and actions taken in the midst of a major disaster, without consideration of that fuller context, would have been a disservice to all. The scope of the review did not focus on recovery operations that continue to this day. Those important efforts are ongoing and require our continued commitment. Instead, the review's emphasis centers on identifying systemic vulnerabilities and gaps in our response and "fixing government."

The Report is organized in a manner to give the reader the most comprehensive and clear understanding possible of what happened during the Federal response to Hurricane Katrina. It begins with a discussion of the magnitude and complexity of the response challenge by discussing "Katrina in Perspective"—providing an historical comparison both of the hurricane itself and the resultant flood. Only by understanding what the storm was, and was not, can an appropriate and measured assessment of the response take place. A National Preparedness "Primer" on the current Federal framework is then provided to give the reader an understanding of how the current system was supposed to function. This chapter points out some fundamental confusion in the Federal planning and identifies potential shortcomings in the applicability of our plans to catastrophic widespread incidents.

Two major chapters of the Report follow with an analytical, narrative chronology that provides a detailed account of Hurricane Katrina. The first discusses the storm's development in the days "Pre-Landfall," and the next chronicles both the "Week of Crisis" from August 29 through September 5, and concludes with the transition from response to recovery. We note for the reader that the narrative is not meant to be a comprehensive, definitive account of all that transpired, and future information inevitably will shed additional light. We then present a detailed chapter on "Lessons Learned." Here, we describe the seventeen most critical challenges that were problematic before, during, and after Hurricane Katrina's landfall.

We conclude with the most important chapter: "Transforming National Preparedness." It describes the imperative and remedies for fixing the problems that Hurricane Katrina exposed. The foundations of the recommended reforms result in two immediate priorities: We must institutionalize a comprehensive National Preparedness System and concurrently foster a new, robust Culture of Preparedness.

The Report also contains several appendices, including 125 specific recommendations distilled from a four-month review. These recommendations are written for policy makers and emergency managers and contain more technical information not appropriate for the narrative. We have also included some stories of successes and heroic efforts we encountered by responders, volunteers, agencies, and public officials that must not be overlooked.

## CONCLUSION

During a visit to the Gulf Coast, President Bush put our efforts in perspective, saying, "[o]ne of the lessons of this storm is the decency of people, the decency of men and women who care a lot about their fellow citizens, whether they be elected officials or just folks on the ground…trying to make somebody else's life even better than it was

before.  So we learned some lessons about how to respond, and we're going to change.  But some of the lessons shouldn't change, and that is the decency and character of the American people."

Hurricane Katrina prompted an extraordinary national response that included all levels of government—Federal, State, and local—the private sector, faith-based and charitable organizations, foreign countries, and individual citizens.  People and resources rushed to the Gulf Coast region to aid the emergency response and meet victims' needs.  Their actions saved lives and provided critical assistance to Hurricane Katrina survivors.  Despite these efforts, the response to Hurricane Katrina fell far short of the seamless, coordinated effort that had been envisioned by President Bush when he ordered the creation of a National Response Plan in February 2003.[3]

Yet Katrina creates an opportunity—indeed an imperative—for a national dialogue about true national preparedness, especially as it pertains to catastrophic events.  We are not as prepared as we need to be at all levels within the country:  Federal, State, local, and individual.  Hurricane Katrina obligates us to re-examine how we are organized and resourced to address the full range of catastrophic events—both natural and man-made.  The storm and its aftermath provide us with the mandate to design and build such a system.

We hope that this Report marks the beginning of a truly transformational state of preparedness throughout all levels of our Nation.  Hurricane Katrina will undoubtedly be regarded by history as one of the most destructive, costly, and tragic events our Nation has ever endured.  Yet with collective determination, unity of effort, and effective organizational change, the true legacy of Katrina can be that of a catalyst that triggered a real and lasting improvement to our national preparedness.

# CHAPTER ONE: KATRINA IN PERSPECTIVE

*Hurricane Katrina was one of the worst natural disasters in our Nation's history and has caused unimaginable devastation and heartbreak throughout the Gulf Coast Region.  A vast coastline of towns and communities has been decimated.*

**—President George W. Bush, September 8, 2005**[1]

Terrorists still plot their evil deeds, and nature's unyielding power will continue.  We know with certainty that there will be tragedies in our future.  Our obligation is to work to prevent the acts of evil men; reduce America's vulnerability to both the acts of terrorists and the wrath of nature; and prepare ourselves to respond to and recover from the man-made and natural catastrophes that do occur.  The magnitude of Hurricane Katrina does not excuse our inadequate preparedness and response, but rather it must serve as a catalyst for far-reaching reform and transformation.  To do this, we must understand Hurricane Katrina in its proper context.

## HURRICANE KATRINA AMONG OTHER DISASTERS

Hurricane Katrina was the most destructive natural disaster in U.S. history.[2]  The overall destruction wrought by Hurricane Katrina, which was both a large and powerful hurricane as well as a catastrophic flood, vastly exceeded that of any other major disaster, such as the Chicago Fire of 1871, the San Francisco Earthquake and Fire of 1906, and Hurricane Andrew in 1992.[3]

Hurricane Katrina's devastating effects were felt before the storm even reached the Gulf Coast on August 29, 2005.  In the Gulf of Mexico, Hurricane Katrina battered the offshore energy infrastructure and forced the evacuation of more than 75 percent of the Gulf's 819 manned oil platforms.[4]  Two days before landfall, U.S. energy companies estimated that the approaching storm had already reduced Gulf of Mexico oil production by more than a third.[5]

Seventy-five hurricanes of Katrina's strength at landfall—a Category 3—have hit the mainland United States since 1851, roughly once every two years.[6]  Yet Katrina was anything but a "normal" hurricane.  First, Katrina was larger than most.  Hurricane Camille, a Category 5 storm that devastated the Gulf Coast in 1969,[7] had top wind speeds that exceeded those of Katrina upon landfall, but Camille's hurricane force winds only extended seventy-five miles from its center,[8] whereas Katrina's extended 103 miles from its center.[9]  As a result, Hurricane Katrina's storm surge affected a larger area than did Hurricane Camille's.[10]  In all, Hurricane Katrina impacted nearly 93,000 square miles across 138 parishes and counties.[11]  The extreme intensity that Hurricane Katrina reached before landfall on the Gulf Coast, as well as its size, meant that its storm surge was consistent with a more powerful storm.  In fact, the National Hurricane Center concluded that the height of Hurricane Katrina and Camille's respective storm surges were comparable to each other.[12]

CHAPTER ONE: KATRINA IN PERSPECTIVE

Hurricane Katrina's winds and a storm surge that crested up to twenty-seven feet high dealt a ferocious blow to homes, businesses, and property on the coast and for many miles inland.[13]  This storm surge overwhelmed levees all along the lowest reaches of the Mississippi River and the edges of Lake Pontchartrain.[14]  The consequences for New Orleans, which sits mostly below sea level, were dire.  Significant levee failures occurred on the 17th Street Canal, the Industrial Canal, and the London Avenue Canal.  Approximately 80 percent of the city was flooded.[15]

The flooding destroyed New Orleans, the Nation's thirty-fifth largest city.[16]  Much as the fire that burned Chicago in 1871 and the earthquake and fire that leveled San Francisco in 1906 destroyed the economic and cultural centers of an entire region, so too did Hurricane Katrina destroy what many considered to be the heart of the Gulf Coast.  The destruction also called to mind the Galveston Hurricane of 1900, which thoroughly devastated the town of Galveston, Texas.  At the time, Galveston was an economic and cultural center of Texas and was the State's fourth largest city.[17]

Even beyond New Orleans, Katrina's span of destruction was widespread.  Indeed, one of the gravest challenges presented by this particular disaster was the vast geographic distribution of the damage.  Towns and cities, small and large, were destroyed or heavily damaged up and down the Gulf Coast and miles inland.  From Morgan City, Louisiana, to Biloxi, Mississippi, to Mobile, Alabama, Hurricane Katrina's wind, rain, and storm surge demolished homes and businesses.  Large parts of the coastal areas of these States were devastated.  As Mississippi Governor Haley Barbour stated, "The 80 miles across the Mississippi Gulf Coast is largely destroyed.  A town like Waveland, Mississippi, has no inhabitable structures—none."[18]

Hurricane Katrina contradicts one side of an important two-part trend.  For at least a century, America's most severe natural disasters have become steadily *less* deadly and *more* destructive of property (adjusted for inflation).[19]  Figure 1.1 depicts this trend.  Yet, Hurricane Katrina not only damaged far more property than any previous natural disaster, it was also the deadliest natural disaster in the United States since Hurricane San Felipe in 1928.  The dark blue bars in the figure below show the decreasing number of deaths caused by natural disasters in the period from 1900 – 2005.  The light blue bars show the increasing amount of damage caused by these same natural disasters adjusted to third quarter 2005 dollars.[20]

**Figure 1.1  U.S. Natural Disasters that Caused the Most Death and Damage to Property in Each Decade, 1900-2005, with 2004 Major Hurricanes Added[21]Damage in Third Quarter 2005 Dollars**



**MEASURING HURRICANE KATRINA: THE PATH OF DESTRUCTION**

Estimating disaster damage is not an exact science, and, in the case of Hurricane Katrina, it is further complicated by ongoing recovery efforts. Estimates vary but, considering property damage alone, Hurricane Katrina is America's first disaster—natural or man-made—to approach the $100 billion mark (See Table 1.1).[22]

**Table 1.1 Estimated damage from Hurricane Katrina and the New Orleans Flood**[23]

| Housing | $67 billion |
|---|---|
| Consumer durable goods | $7 billion |
| Business property | $20 billion |
| Government property | $3 billion |
| **Total** | **$96 billion** |

Hurricane Katrina devastated far more residential property than had any other recent hurricane, completely destroying or making uninhabitable an estimated 300,000 homes.[24]

This far surpasses the residential damage of Hurricane Andrew, which destroyed or damaged approximately 80,000 homes in 1992.[25] It even exceeds the combined damage of the four major 2004 hurricanes, Charley, Frances, Ivan, and Jeanne, which together destroyed or damaged approximately 85,000 homes.[26] Figure 1.2 charts the effects of Hurricane Katrina against other major hurricanes in recent U.S. history, comparing homes damaged or destroyed, property damage, and deaths.

**Figure 1.2: Hurricane Katrina Compared to Hurricanes Ivan, Andrew, and Camille**[27]



Hurricane Katrina's damage was extensive. The storm destroyed so many homes, buildings, forests, and green spaces that an extraordinary amount of debris was left behind—118 million cubic yards all told.[28] In comparison, Hurricane Andrew created 20 million cubic yards of debris.[29] The debris from Katrina, if stacked onto the space of a football field, would reach over ten and a half miles high.[30]

Hurricane Katrina's effects on the economy have yet to be fully reckoned. The worst consequences were local: between August and September, the unemployment rate doubled from 6 to 12 percent in the most affected areas of Louisiana and Mississippi.[31] In Louisiana, Mississippi, and Alabama, salaries and wages fell by an estimated $1.2 billion in the third quarter of 2005.[32] But short-term, economic ripples reached the entire country through the rising cost of gasoline. The approach of the storm forced the temporary shutdown of most crude oil and natural gas production in the Gulf of Mexico. In the immediate wake of Hurricane Katrina, gasoline prices rose sharply nationwide.[33] The combined effects of Hurricane Katrina and Hurricane Rita, which made landfall on the border between Texas and Louisiana early on September 24, 2005, were such that, between August 26, 2005, and January 11, 2006, 114 million barrels of oil production capacity were left unused, equivalent to over one-fifth of yearly output in the Gulf of Mexico.[34]

The storm devastated the regional power infrastructure. In Louisiana, Mississippi, and Alabama, approximately 2.5 million power customers reported outages.[35] By contrast, Hurricane Ivan denied 1.8 million customers power.[36]

Communications suffered as well. The storm crippled thirty-eight 911 call centers, disrupting local emergency services,[37] and knocked out more than 3 million customer phone lines in Louisiana, Mississippi, and Alabama.[38] Broadcast communications were likewise severely affected, as 50 percent of area radio stations and 44 percent of area television stations went off the air.[39]

Much more than any other hurricane, Katrina's wrath went far beyond wind and water damage. In fact, Hurricane Katrina caused at least ten oil spills, releasing the same quantity of oil as some of the worst oil spills in U.S. history. Louisiana reported at least six major spills of over 100,000 gallons and four medium spills of over 10,000 gallons.[40] All told, more than 7.4 million gallons poured into the Gulf Coast region's waterways, over two thirds of the amount that spilled out during America's worst oil disaster, the rupturing of the *Exxon Valdez* tanker off the Alaskan coast in 1989.[41]

The wave of destruction created environmental and health hazards across the affected region, including standing water, oil pollution, sewage, household and industrial chemicals, and both human and animal remains. The storm surge struck 466 facilities that handle large amounts of dangerous chemicals, thirty-one hazardous waste sites, and sixteen Superfund toxic waste sites, three of which flooded. The surge also destroyed or compromised 170 drinking water facilities and dozens of wastewater treatment facilities.[42]

Most terrible of all and most difficult to measure, however, were Hurricane Katrina's human effects.

## MEASURING THE IMMEASURABLE: THE HUMAN TOLL

When the winds and floods of Hurricane Katrina subsided, an estimated 1,330 people were dead as a result of the storm.[43] The vast majority of the fatalities—an estimated 80 percent—came from the New Orleans metropolitan area; Mississippi suffered greatly as well, with 231 fatalities.[44] Many of the dead were elderly or infirm. In Louisiana, approximately 71 percent of the victims were older than sixty, and 47 percent of those were over seventy-five.[45] At least sixty-eight were found in nursing homes, some of whom were allegedly abandoned by their caretakers.[46] Of the total known fatalities, there are almost two hundred unclaimed bodies remaining at the Victim Identification Center in Carville, Louisiana.[47] As awful as these horrifying statistics are, unfortunately they are not the end of the story. As of February 17, 2006, there were still 2,096 people from the Gulf Coast area reported missing.[48]

For the survivors, the aftermath of Hurricane Katrina has been characterized by a mixture of grief, anxiety, and frustration. Around 770,000 people were displaced—the largest since the Dust Bowl migration from the southern Great Plains region in the 1930s.[49] After Hurricane Katrina, housing options often arrived slowly to those who could not return to their ruined homes; by the end of October, there were still more than 4,500 people staying in

shelters. The numbers of evacuees residing in such transient emergency shelters had dropped significantly by January 2006, and families have slowly begun to find permanent housing.[50]

Moreover, many victims found it difficult to reconstruct their shattered lives. In many cases, they had either lost or forgotten basic documents, such as insurance information, birth certificates, and marriage licenses, which would later prove essential to rebuilding their lives.[51] Most of the evacuees did not have access to their medical records, which increased the risk of complications when receiving medical treatment.[52] For those who returned to their homes in the Gulf region, basic services were still wanting. By January, 85 percent of public schools in Orleans parish had still not reopened; in the metropolitan area, approximately two-thirds of the retail food establishments, half of the bus routes, and half of the major hospitals remained closed.[53] For Katrina's victims, a sense of "back to normal" still seems far away.

Of the 1.1 million people over the age of sixteen who evacuated in August 2005, approximately 500,000 of those evacuees had not returned home by late December. For the evacuees who have not returned to their homes, jobs have been scarce. Their unemployment rate was just below 28 percent in November and over 20 percent in December. The former evacuees who did return to their homes in the Gulf region had better access to work with an unemployment rate of 12.5 percent in November, which fell to 5.6 percent in December.[54] In July, before Katrina hit, the unemployment rate in the most affected areas of Louisiana and Mississippi had been 6 percent.[55]

By any measure, Hurricane Katrina was a national catastrophe. Similar to the images of grief and destruction on September 11, 2001, the images of suffering and despair from Hurricane Katrina are forever seared into the hearts and memories of all Americans. Those painful images must be the catalyst for change.

# CHAPTER TWO: NATIONAL PREPAREDNESS — A PRIMER

Disaster response in America traditionally has been handled by State and local governments, with the Federal government playing a supporting role.  Limits on the Federal government's role in disaster response are deeply rooted in American tradition.  State and local governments—who know the unique requirements of their citizens and geography and are best positioned to respond to incidents in their own jurisdictions—will always play a large role in disaster response.  The Federal government's supporting role respects these practical points and the sovereignty of the States as well as the power of governors to direct activities and coordinate efforts within their States.  While we remain faithful to basic constitutional doctrine and time tested principles, we must likewise accept that events such as Hurricane Katrina and the terrorist attacks of September 11, 2001, require us to tailor the application of these principles to the threats we confront in the 21st Century.  In later chapters, as we discuss the breakdowns in delivering Federal support and capabilities in response to Hurricane Katrina, the need for a flexible Federal response and a larger Federal role in catastrophic contingency planning becomes clear.[1]

## FEDERALISM

The Founders created a constitutional framework in which each State, upon ratification of the Constitution, ceded some of its powers to the Federal government to create one united yet limited central government.[2]  The Constitution sets forth the specific and delegated powers that delineate Federal and State roles.  It tells us which branches and offices will be part of the Federal government, what powers they may exercise, and what limitations constrain them.[3]  The Constitution also respects State powers by reserving those powers not given to the Federal government to the States or to the people.[4]  Our Federal system provides a structure to enable coordination between the United States government and State governments to create a balance that respects the sovereignty of both entities.

The United States has long operated on the general premise that governments exist to do those things that individuals, alone or in free and voluntary association (*e.g.*, families and charities), are not best positioned to do for themselves, such as ensuring public safety and providing law enforcement.  Following these principles, the Founders created the Federal government to do those things that States cannot or should not do individually, such as defending the Nation, conducting foreign relations, and ensuring open and free interstate commerce.[5]

Accordingly, State and local governments assume the first and foremost line of defense against civil disturbance and threats to public safety.  The Federal government guarantees its assistance to protect the States in their existence as representative republican governments from the external threat of invasion or attack, and against internal subversion or rebellion.[6]  Federal laws reinforce the concept that the Federal government should respect State sovereignty.  For example, section 331 of the Insurrection Act requires the State legislature or, in its absence, the State governor, to make a formal request of the Federal government before the President may send in Federal troops to assist State efforts to restore order.[7]

The role of the Federal government in disaster response has evolved significantly throughout the past 200 years.[8]  In 1803, in what is widely seen as the first instance of Federal intervention in a disaster scenario, Congress approved the use of Federal resources to assist the recovery of Portsmouth, New Hampshire, following a devastating urban fire.[9]  Between 1803 and 1950, the Federal government intervened in over 100 incidents (earthquakes, fires, floods, and tornados), making Federal resources available to affected jurisdictions.[10]  These interventions were limited and were delivered in an *ad hoc* manner without an established Federal role or coordinated response plan.[11]  The Federal

government also quickly recognized the role that private non-profit organizations can play. In 1905, Congress chartered the American Red Cross as a charitable organization to provide disaster relief support during crises. The value of this decision was demonstrated a year later, when the Red Cross provided key assistance during the San Francisco Earthquake and Fire of 1906.[12]

During the Great Depression, the approach of the Federal government became more proactive. For example, Congress endowed the Bureau of Public Roads with the authority to provide continuous grants to States for the repair of disaster-damaged infrastructure and charged the Army Corps of Engineers with the task of mitigating flood-related threats.[13] This piecemeal legislative approach was eventually replaced by the Civil Defense Act of 1950—the first comprehensive legislation pertaining to Federal disaster relief.[14]

In 1952, President Truman issued Executive Order 10427, which emphasized that Federal disaster assistance was intended to supplement, not supplant, the resources of State, local, and private sector organizations.[15] This theme was echoed two decades later in President Nixon's 1973 report, "New Approaches to Federal Disaster Preparedness and Assistance." The report clearly stated that, "Federal disaster assistance is intended to supplement individual, local and state resources."[16]

Today, the centerpiece legislation for providing Federal aid in disaster relief, the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act), reinforces the principle that response efforts should first utilize State and local resources.[17] The Stafford Act establishes a process for State governors to request assistance from the Federal government when an incident overwhelms State and local resources.[18] To provide and coordinate Federal aid to the people and the State and local governments impacted by a disaster using all Federal agencies, the Act authorizes the President to issue major disaster or emergency declarations, and to appoint a Federal Coordinating Officer (FCO) to coordinate the administration of Federal relief. The Stafford Act is frequently invoked in disaster and emergency response. Since 1974, an average of thirty-eight major disasters have been declared annually. In 2004, a near record disaster season, the President issued sixty-eight major disaster declarations and seven emergency declarations.[19]

In a 21st Century world marked by catastrophic terrorism and natural disasters, the Federal government must build upon our foundation of disaster relief and prepare for the larger role we will be called upon to play in response to a catastrophic event.

**DISASTER RESPONSE STRUCTURE**

After the terrorist attacks on September 11, 2001, the Federal government realized that additional measures were needed to ensure effective coordination with State and local governments and took steps to alter how it responds to emergencies. In the *National Strategy for Homeland Security*, issued in July 2002, President Bush called for a major initiative to build a national system for incident management and to integrate separate Federal response plans into a single, all-discipline[20] incident management plan. The President proposed that the initiative be led by the yet-to-be-created Department of Homeland Security (DHS).[21] In creating DHS in November 2002, Congress included the initiative as part of the Secretary of Homeland Security's responsibilities.[22] The Homeland Security Act was officially signed into law by the President on November 25, 2002.[23] On March 1, 2003, DHS assumed operational control of the nearly 180,000 employees from portions of 22 departments, agencies, and offices that were combined to constitute the newly created Department.[24]

In February 2003, the President issued Homeland Security Presidential Directive 5 (HSPD-5). Homeland Security Presidential Directives are presidential orders that establish national policies, priorities, and guidelines to strengthen U.S. homeland security. In HSPD-5, the President specifically directed the Secretary of Homeland Security to: (a) create a comprehensive National Incident Management System (NIMS) to provide a consistent nationwide approach for Federal, State, and local governments to work effectively together to prepare for, respond to, and recover from domestic incidents, regardless of cause, size, or complexity, and; (b) develop and administer an integrated *National Response Plan* (NRP), using the NIMS, to provide the structure and mechanisms for national level policy and operational direction for Federal support to State and local incident managers.[25]

HSPD-5 further directed the heads of all Federal departments and agencies to adopt the NIMS, use it in their individual domestic incident management activities, participate in the NRP, and assist the Secretary of Homeland Security in its development and maintenance.[26]  The NIMS and the NRP were completed in 2004 and provide the foundation for how the Federal government organizes itself when responding to all disasters, including Hurricane Katrina.

### *The National Incident Management System*

The *National Incident Management System* (NIMS) establishes standardized incident management protocols and procedures that all responders—Federal, State, and local—should use to conduct and coordinate response actions.  It sets forth a "core set of doctrine, concepts, principles, terminology and organizational processes to enable effective, efficient, and collaborative incident management at all levels" of government.[27]  The NIMS provides a common, flexible framework within which government and private entities at all levels can work together to manage domestic incidents of any magnitude.[28]  In March 2004, the Secretary of Homeland Security approved the NIMS and sent a memorandum to officials at all levels of the government asking for continued cooperation and assistance in further developing and implementing the NIMS.

The central component of the NIMS is the Incident Command System (ICS).  The ICS was developed and refined over many years by incident commanders at the Federal, State, and local levels and was being successfully implemented throughout the country prior to being included in the NIMS. [29]  The ICS provides a means to coordinate the efforts of individual responders and agencies as they respond to and help manage an incident.  The ICS organization, the structure and size of which can be tailored to the complexity and size of any given incident, comprises five major functional areas—Command, Planning, Operations, Logistics, and Finance/Administration.[30]  This system grew out of the challenges of interagency coordination experienced when fighting wildfires in western states.

ICS requires that a command system be established from the onset of incident operations, thereby ensuring a unified command and the efficient coordination of multi-agency and multi-jurisdictional efforts.[32]     Recognizing that most incidents are managed locally,  the command function under ICS is set up at the lowest level of the response, and grows to encompass other agencies and jurisdictions as they arrive.  Some incidents that begin with a single response discipline (e.g., fire or police department) within a single jurisdiction may rapidly expand to multi-discipline, multi-jurisdictional incidents requiring significant additional resources and

> **Unity of Command vs. Unified Command [31]**
>
> Unity of command:  The concept by which each person within an organization reports to one and only one designated person.  The purpose of unity of command is to ensure unity of effort under one responsible commander for every objective.
>
> Unified command:  An application of the Incident Command System used when there is more than one agency with incident jurisdiction or when incidents cross political jurisdictions.  Agencies work together through the designated members of the Unified Command, often the senior person from agencies and/or disciplines participating in the Unified Command, to establish a common set of objectives and strategies and a single incident action plan.

operational support.[33]  The concept of unified command is both more important and more complicated when local, State, and Federal commanders are required to coordinate their efforts.  ICS clarifies reporting relationships and eliminates confusion caused by multiple, and potentially conflicting, directions and actions.  The *National Response Plan* requires senior officials from multiple levels of government to come together at a single location to establish a common set of objectives and a single incident plan.  This group, referred to as the "Unified Command," provides for and enables joint decisions on objectives, strategies, plans, priorities, and public communications.[34]

### *The National Response Plan*

Adopted by the Federal government in December 2004, the NRP is an all-hazards plan that establishes a single, comprehensive framework for managing domestic incidents across all levels of government and across a spectrum of activities that includes prevention, preparedness, response, and recovery.[35]  It provides the structure and

mechanisms for coordinating Federal support to State and local incident managers and for exercising Federal authorities and responsibilities incorporating the NIMS structure.

The NRP is based on a number of fundamental precepts. Consistent with the traditions and customs that have developed under American federalism, the NRP is built on the premise that incidents are generally handled at the lowest jurisdictional level possible.[36] Local authorities provide the initial response capabilities to every incident, including man-made and natural disasters, and when overwhelmed, request assistance from neighboring jurisdictions. When incidents are of such a magnitude that these resources are overwhelmed, resources are requested from the State, which draws on its own internal emergency response capabilities or requests assistance from neighboring States through mutual-aid agreements. Many large and devastating events are handled this way without any Federal assistance.[37] When Federal response assistance is required, the NRP employs a systematic and coordinated approach to incident management at the field, regional, and Federal agency headquarters levels, establishing protocols for such activities as reporting incidents, issuing alerts and notification, coordinating response actions, and mobilizing resources.[38] Though the NRP generally seeks to preserve the primary role of State and local bodies as first responders, it does recognize some events will be so catastrophic that they will require a greater proactive Federal government response (as discussed in further detail in the "Planning a Proactive Federal Response" section of this chapter).[39] However, while the NRP recognized the need for a proactive Federal response in a catastrophe, no final plan has been put in place to make this operational.

### What Triggers the NRP

The NRP "covers the full range of complex and constantly changing requirements in anticipation of or in response to threats or acts of terrorism, major disasters, and other emergencies."[40] It applies to "all Federal departments and agencies that may be requested to provide assistance or conduct operations in the context of actual or potential Incidents of National Significance."[41] The NRP is also designed to be flexible and scalable: "Consistent with the model provided in the NIMS, the NRP can be partially or fully implemented in the context of a threat, anticipation of a significant event, or the response to a significant event."[42] The NRP can be used to selectively implement specific components in unique situations or can be fully implemented to bring to bear the full efforts and resources of the Federal government.

However, the specific triggers for the *National Response Plan* and its various components are unclear. In HSPD-5, the President instructed the Secretary of Homeland Security to coordinate the Federal government's resources utilized in response to or recovery from terrorist attacks, major disasters, or other emergencies *if and when any one of the following four conditions applies*:

    (1) A Federal department or agency acting under its own authority has requested the assistance of the Secretary;

    (2) The resources of State and local authorities are overwhelmed and Federal assistance has been requested by the appropriate State and local authorities;

    (3) More than one Federal department or agency has become substantially involved in responding to the incident; or

    (4) The Secretary has been directed to assume responsibility for managing the domestic incident by the President.[43]

The NRP bases the definition of Incidents of National Significance (INS) "on situations related to" these HSPD-5 criteria.[44] However, the NRP lacks sufficient clarity regarding when and how an event becomes an INS. There are two dimensions to this issue. First, it is unclear whether satisfaction of one or more of the stated criteria is sufficient for an INS to exist, or whether additional considerations must apply. Second, the NRP is unclear as to whether the Secretary must formally declare an INS or, alternatively, whether an INS is triggered automatically when one or more of these criteria are satisfied, including when the President declares a disaster or emergency under the Stafford Act. With respect to Hurricane Katrina, when the Secretary of Homeland Security formally declared the event to be an INS on Tuesday, August 30, 2005, arguably an INS already existed, because two of the four HSPD-5 criteria noted above had already been satisfied.[45]

The lack of clarity on the second issue is illustrated by two seemingly inconsistent NRP provisions; the Scope and Applicability section states that the Secretary is responsible for declaring an INS,[46] which supports an interpretation that an INS cannot be in effect without a declaration by the Secretary, while the Planning Assumptions section states that "all Presidentially declared disasters and emergencies under the Stafford Act are considered Incidents of National Significance,"[47] which supports a conclusion that the President's issuance of an emergency declaration for Louisiana on August 27, 2005, put an INS into effect.

Most importantly, however, regardless of how an INS is defined or whether an INS must be formally declared by the Secretary or not, the NRP fails to articulate clearly which specific actions should be taken and what components should be utilized under the NRP as a result of an INS coming into effect. As a practical matter, many of the NRP's functions and structures were already being utilized at the time that the Secretary declared an INS.[48]

Since the NRP was adopted in December 2004, many parts of the Plan had been used to various degrees and magnitudes for thirty declared Stafford Act events to coordinate Federal assistance.[49] Yet, an INS had never formally been declared prior to Tuesday, August 30, 2005—during the Hurricane Katrina response. The lack of clarity discussed above caused confusion. The process and the operational consequences of declaring an INS should be further defined and clarified.[50]

### NRP Concept of Operations

When applied together, the components of the NRP should provide for a unified command structure to serve as the local, multi-agency coordination center for the effective and efficient coordination of Federal, State, local, tribal, nongovernmental, and private-sector organizations with primary responsibility for incident-related prevention, response and recovery actions.[51] In many cases, this takes place at a Joint Field Office (JFO). The JFO co-locates the Principal Federal Official (PFO) and Federal Coordinating Officer (FCO) in situations not involving multiple FCOs.[52] In HSPD-5, the President designated the Secretary of Homeland Security as the "principal Federal official for domestic incident management."[53] The NRP allows the Secretary to delegate his responsibility, defining a PFO "as the Federal official designated by the Secretary of Homeland Security to act as his/her representative locally to oversee, coordinate, and execute the Secretary's incident management responsibilities under HSPD-5 for Incidents of National Significance."[54] The FCO, a position created by the Stafford Act, manages Federal resource support activities and is responsible for coordinating the timely delivery of Federal disaster assistance resources to affected State and local governments, individual victims, and the private sector.[55] At the regional level, a Regional Response Coordination Center (RRCC) coordinates disaster response activities until a JFO can be established.[56]

At DHS headquarters, the Homeland Security Operations Center (HSOC) coordinates "incident information-sharing, operational planning, and deployment of Federal resources" together with its component element at the Federal Emergency Management Agency (FEMA) headquarters, the National Response Coordination Center (NRCC), a "multiagency center that provides overall Federal response coordination for Incidents of National Significance and emergency management program implementation."[57] Strategic-level coordination and resolution of resource conflicts unresolved by the NRCC occurs at the Interagency Incident Management Group (IIMG), an interagency body housed at DHS headquarters.[58]

The coordination of the Federal response—to include capabilities and resources—occurs at the field, regional, and Federal agency headquarters levels through the Emergency Support Function (ESF) framework. ESFs are organized groups of government and private sector entities that provide support, resources, and services. An ESF is staffed by specialists from multiple Federal departments, agencies, and the private sector. The purpose of the ESFs is to integrate skills and capabilities that reside in disparate organizations to coordinate support to State and local response agencies, including both physical resources and staff. The ESFs are structured so that resources and capabilities that are required to assist State and local officials in response and recovery operations can be handled by the appropriate Federal agency. A detailed break-down of each ESF by function and the primary Federal department or agency charged with leading each ESF can be found in Table 2.1.[59]

**Table 2.1  Emergency Support Functions**

|  | ESF | Primary Department or Agency |
|---|---|---|
| ESF #1 | Transportation | DOT |
| ESF #2 | Communications | DHS (IAIP/NCS) |
| ESF #3 | Public Works and Engineering | DOD (USACE) and DHS (FEMA) |
| ESF #4 | Firefighting | USDA (Forest Service) |
| ESF #5 | Emergency Management | DHS (FEMA) |
| ESF #6 | Mass Care, Housing, and Human Services | DHS (FEMA) and American Red Cross |
| ESF #7 | Resource Support | GSA |
| ESF #8 | Public Health and Medical Services | HHS |
| ESF #9 | Urban Search and Rescue | DHS (FEMA) |
| ESF #10 | Oil and Hazardous Materials Response | EPA and DHS (U.S. Coast Guard) |
| ESF #11 | Agriculture and Natural Resources | USDA and DOI |
| ESF #12 | Energy | DOE |
| ESF #13 | Public Safety and Security | DHS and DOJ |
| ESF #14 | Long-Term Community Recovery and Mitigation | USDA, DOC, DHS (FEMA), HUD, Treas, and SBA |
| ESF #15 | External Affairs | DHS (FEMA) |

## FEDERAL EMERGENCY MANAGEMENT AGENCY

President Carter created FEMA through a 1978 reorganization plan that merged several elements of the Federal response into one agency.[60]  In 2003, FEMA became a component of the newly created Department of Homeland Security.  Within the Department, FEMA is the primary agency charged with coordinating Federal assistance during disasters.[61]  Pursuant to its responsibilities under the NRP, FEMA has primary responsibility for emergency response and recovery coordination.[62]  It maintains the NRCC and, as the Federal government's chief steward of disaster response, FEMA also continuously monitors for potential disasters and mobilizes resources when it anticipates Federal assistance will be requested.  This occurs frequently during the hurricane season.



FEMA is not, however, the operational provider of most Federal response support.  It is a small organization that primarily manages the operational response, relief, and recovery efforts of the rest of the Federal government.

FEMA does not, for instance, provide mass care or transportation after a disaster. Instead, pursuant to the NRP structure, FEMA tasks the Departments of Health and Human Services, Defense, and Transportation, as well as the American Red Cross, to perform these operations. Generally, State and local officials and first responders identify necessary missions and required commodities which FEMA—through its organizational structure, coordination practices, and administrative support—will assign to a Federal department or secure from the private sector. The organization exists primarily to coordinate other Federal agencies and departments during emergency response and recovery—acting as an honest broker between departments and agencies, providing a command structure, and serving as the single point of entry for State and local officials into the Federal government. It does not have its own critical response assets, such as buses, trucks, and ambulances.

The operational teams that FEMA is responsible for administering, such as the Urban Search and Rescue (US&R) teams, are State and local first responders from around the country that volunteer to be activated, deployed, and reimbursed by FEMA for their help during response activities. FEMA enforces standards, certifications, and qualifications for participation in such programs and provides funding for equipment and training.

To handle national needs, FEMA operates ten regional offices and two area offices that work directly with States in planning for disasters, developing mitigation programs, and meeting needs when disasters occur (see Figure 2.1).[63] Each of the offices maintains full-time staff who work with Federal, State, and local partners year-round. Additionally, each office can draw upon civilian reservist personnel to support the response when a Presidential major disaster or emergency declaration is issued.[64] When State governments request Federal assistance, FEMA deploys personnel to the appropriate regional office and the incident area. Also, the regional office controls the RRCC, from which FEMA coordinates its assistance.[65] Because Hurricane Katrina was advancing toward Louisiana (Region VI), and Florida, Mississippi, and Alabama (Region IV), both FEMA regions conducted response and recovery operations.[66]

**PLANNING A PROACTIVE FEDERAL RESPONSE**

Under the Stafford Act, requests for major disaster declarations must be made by the Governor of the affected State. The Governor's request must be based on "a finding that the disaster is of such severity and magnitude that effective response is beyond the capabilities of the State and the affected local governments and that Federal assistance is necessary."[67] Emergency declarations can be made in the same manner or, in limited circumstances, can be made by the President unilaterally.[68]

The system for providing Stafford Act assistance, set forth in the NRP and FEMA regulations, reflects the American system of federalism, allocating roles and responsibilities between levels of government by utilizing a layered system that requires local governments to first request assistance from their State. States, in turn, must use their own resources, if available, before requesting Federal assistance. As a prerequisite to major disaster assistance under the Stafford Act, a requesting Governor must "take appropriate response action under State law and direct execution of the State's emergency plan."[69] Similarly, State emergency operations plans are based on this layered system. For example, the State of Louisiana Emergency Operations Plan states that "[t]he initial actions . . . are conducted by local government. Local authorities will exhaust their resources, and then use mutual aid agreements with volunteer groups, the private sector and/or neighboring parishes."[70]When local and State governments require additional resources, they generally call upon neighboring jurisdictions and other States through mutual assistance agreements and through the Emergency Management Assistance Compact (EMAC), a Congressionally ratified agreement[71] that provides form and structure to interstate mutual aid, and through which States make available to each other in time of crisis their emergency response assets, such as National Guard troops.[72]

Traditionally, it is only after local, State, and mutual assistance resources are depleted, or prove insufficient, that the Federal government is requested to help. The Louisiana Emergency Operations Plan further explains that, "State assistance will supplement local efforts and federal assistance will supplement State and local efforts when it is clearly demonstrated that it is beyond local and State capability to cope with the emergency/disaster."[73] Should State and affected local governments become overwhelmed, the President may declare either a major disaster or emergency through his authorities under the Stafford Act.

After a Stafford Act declaration, FEMA, on behalf of the Federal government, receives State requests for assistance and fulfills them by tasking other Federal departments or agencies with the appropriate expertise or resources to meet the specific needs. This is often referred to as a "pull" system for Federal assistance because local and State governments must identify needs and make specific requests for assistance before the Federal government can deliver—they "pull" assistance from the Federal government. Equally important to understanding the current "pull" system is the method in which Federal assistance is delivered to those in need—relying on the State as an intermediary between the Federal government and any other entity. In many cases, the Federal government will satisfy a State request by providing commodities or assets to the State. In so doing, the Federal government is helping the State meet the needs of their local governments and first responders, as well as various operational components of the State. The Federal government does not always directly deliver its assistance to local governments or others in need. The State's role has been compared to retail sales in terms of organization, delivery, and management. Under this description, the Federal government's role is comparable to wholesale. This generally works well and should continue in the majority of instances.

However, in some instances the State and local governments will be overwhelmed beyond their ability to satisfy their traditional roles in this system. Indeed, in some instances, State and local governments and responders may become victims themselves, prohibiting their ability to identify, request, receive, or deliver assistance. This is the moment of catastrophic crisis—the moment when 911 calls are no longer answered; the moment when hurricane victims can no longer be timely evacuated or evacuees can no longer find shelter; the moment when police no longer patrol the streets, and the rule of law begins to break down.

> **Emergency vs. Major Disaster:** Under the Stafford Act, the President can designate an incident either as an "emergency" or a "major disaster." Both authorize the Federal government to provide essential assistance to meet immediate threats to life and property, as well as additional disaster relief assistance. The President may, in certain circumstances, declare an "emergency" unilaterally, but may only declare a "major disaster" at the request of a Governor that certifies the State and affected local governments are overwhelmed. Under an "emergency," assistance is limited in scope and may not exceed $5 million without Presidential approval and notification to Congress. In contrast, for a major disaster, the full complement of Stafford Act programs can be authorized, including long term public infrastructure recovery assistance and consequence management.

During the development of the NRP, such a catastrophic scenario was considered and planning for such an eventuality began. The NRP includes a Catastrophic Incident Annex which "establishes the context and overarching strategy for implementing and coordinating an accelerated, proactive national response to a catastrophic incident."[74] The intent behind this Annex was to plan for a case in which the Federal response posture would switch, upon a declaration by the Secretary of Homeland Security of a *catastrophic incident*, from the traditional "pull" system to one that includes a proactive "push" system, moving assets to the affected areas without waiting for State requests. Under the current Catastrophic Incident Annex, however, the general operating presumption is that Federal pre-deployed resources remain at staging areas until requested by the State and local incident command authorities. Thus, this Annex provides for proactive deployment of resources to the area, but the actual employment of the resources depends to a good degree on requests from State or local authorities and very often their participation in delivering the aid to those in need.

The *National Response Plan* defines a *catastrophic incident* as:

> Any natural or man-made incident, including terrorism, that results in extraordinary levels of mass casualties, damage, or disruption severely affecting the population, infrastructure, environment, economy, national morale, and/or government functions. A catastrophic event could result in sustained national impacts over a prolonged period of time; almost immediately exceeds resources normally available to State, local, tribal, and private sector authorities in the impacted area; and significantly interrupts governmental operations and emergency services to such an extent that national security could be threatened.[75]

Because it was recognized that a proactive Federal response can create strains on Federal resources and presents practical challenges for Federal responders not familiar with the terrain or infrastructure in a disaster area, the NRP Catastrophic Incident Annex required that a "more detailed and operationally specific NRP Catastrophic Incident Supplement . . . be approved and published independently of the NRP Base Plan and annexes."[76] The Catastrophic

Incident Supplement (CIS) is meant to address the "resource and procedural implications of catastrophic events to ensure the rapid and efficient delivery of resources and assets, including special teams, equipment, and supplies that provide critical life-saving support and incident containment capabilities."[77]  The draft CIS by its current terms only applies to short notice or no notice events.  On August 29, at the time Hurricane Katrina hammered into the Gulf Coast, the draft CIS had not been finalized and promulgated.  It began final circulation for approval as part of the regular Federal staffing process shortly after Katrina made landfall.[78]

Ultimately, when a *catastrophic incident* occurs, regardless of whether the catastrophe has been a warned or is a surprise event, the Federal government should not rely on the traditional layered approach and instead should proactively provide, or "push," its capabilities and assistance directly to those in need.  When the affected State's incident response capability is incapacitated and the situation has reached catastrophic proportions, the Federal government alone has the resources and capabilities to respond, restore order, and begin the process of recovery.  This is a responsibility that must be more explicitly acknowledged and planned for in the NRP, and we must resource, train, and equip to meet this obligation when such a contingency arises.  It is also important that we work with State and local governments to ensure they are better prepared to respond immediately, until Federal resources can arrive.

## MOVING FORWARD

Hurricane Katrina was the most destructive natural disaster in U.S. history.  However, there is no question that the Nation's current incident management plans and procedures fell short of what was needed and that improved operational plans could have better mitigated the Hurricane's tragic effects.  As President Bush acknowledged from Jackson Square in New Orleans, "the system, at every level of government, was not well-coordinated, and was overwhelmed in the first few days."[79]  A true national preparedness system should ensure that all levels of government effectively work together to keep the American people safe and secure at home.

# CHAPTER THREE: HURRICANE KATRINA — PRE-LANDFALL

*Hurricane Katrina is now designated a category five hurricane. We cannot stress enough the danger this hurricane poses to Gulf Coast communities. I urge all citizens to put their own safety and the safety of their families first by moving to safe ground.*

**—President George W. Bush, August 28, 2005[1]**

## HURRICANE SEASON FORECAST

On May 16, 2005, Brigadier General David L. Johnson (ret.), Director of the National Oceanic & Atmospheric Administration (NOAA), National Weather Service (NWS), released the 2005 Atlantic hurricane outlook to kick off National Hurricane Preparedness Week. In its report, NOAA assessed a 70 percent chance of an above-average hurricane season, predicting twelve to fifteen Atlantic tropical storms, with seven to nine becoming hurricanes and three to five of those becoming major hurricanes (equivalent to Categories 3, 4, and 5 on the Saffir-Simpson scale). [2]  NOAA also noted that the previous year had been "extremely active," with fifteen Atlantic tropical storms, including nine that developed into hurricanes.[3] That same day, Max Mayfield, Director of the National Hurricane Center (NHC), cautioned, "[l]ast year's hurricane season provided a reminder that planning and preparation for a hurricane do make a difference. Residents in hurricane vulnerable areas who had a plan, and took individual responsibility for acting on those plans, faired [*sic*] far better than those who did not."[4]

> **Hurricane Season:** The official Atlantic hurricane season takes place each year between June 1 and November 30, with peak hurricane activity generally occurring between mid-August and mid-October.
>
> In an average year, ten tropical storms develop in the Gulf of Mexico, Caribbean Sea, or Atlantic Ocean; six of these storms become hurricanes. In a typical three-year span, five hurricanes hit the United States mainland; two are designated major (Category 3 – 5) hurricanes. The southeastern United States is the region most vulnerable to a hurricane strike. The States most likely to be hit by a major hurricane are Florida, Texas, and Louisiana.
>
> —National Oceanic and Atmospheric Administration, *Hurricanes: Unleashing Nature's Fury* and *U.S. Mainland Hurricane Strikes by State*

The first two months of the 2005 hurricane season confirmed NOAA's predictions, with a record seven Atlantic tropical storms developing in June and July.[5] Two of these storms developed into major hurricanes, including Hurricane Dennis, "an unusually strong July major hurricane that left a trail of destruction from the Caribbean Sea to the northern coast of the Gulf of Mexico."[6] Dennis prompted mandatory evacuations in the lower Florida Keys and major disaster declarations in Alabama, Florida, and Mississippi.[7]  Louisiana Governor Blanco declared a state of emergency.[8] While Cuba ultimately received the worst of the damage inflicted by Dennis, the NHC still estimated U.S. damages in excess of two billion dollars.[9]

On August 2, 2005, NOAA released an updated 2005 Atlantic hurricane season outlook that projected the formation of an additional eleven to fourteen tropical storms, with seven to nine becoming hurricanes, including three to five major hurricanes. Based on the developments in June and July, NOAA revised its assessment to a "95 to 100

| *Saffir-Simpson Hurricane Scale* | |
|---|---|
| **Category** | **Winds** |
| 1 | 74 – 95 mph |
| 2 | 96 – 110 mph |
| 3 | 111 – 130 mph |
| 4 | 131 – 155 mph |
| 5 | Greater than 155 mph |

\* To be a Tropical Storm, winds must be between 39-73 mph.

percent" chance of an above-normal 2005 Atlantic Hurricane season. It reported that "the atmospheric and oceanic conditions favoring hurricane formation that were predicted in May are now in place. These conditions, combined with the high levels of activity already seen, make an above-normal season nearly certain." Moreover, while there already had been "considerable early season activity," NOAA emphasized that the next three months constituted the peak of hurricane season.[10] NHC Director Mayfield explained, "Knowing precisely where a hurricane will strike and at what intensity cannot be determined even a few days in advance." He urged that "residents and government agencies of coastal and near-coastal regions should embrace hurricane preparedness efforts and should be ready well before a tropical storm or hurricane watch is posted."[11] With four more months remaining in hurricane season, the NOAA outlook proved an ominous forecast.

## KATRINA'S BEGINNINGS

### *August 23, 2005*

On Tuesday, August 23, the NWS reported Tropical Depression Twelve had formed over the Bahamas from the remnants of Tropical Depression Ten.[12] The NHC released the first in what would be a series of sixty-one advisories over the next seven days reporting on and tracking the development of the storm.[13]

The Federal government began monitoring the storm as a potential hurricane shortly after the NWS announced Tropical Depression Twelve had formed. Federal department and agency Emergency Operation Centers (EOC)—bases used to coordinate and direct response activity—began to closely monitor NWS bulletins and incorporate them into their own updates and situation reports.

The U.S. Northern Command (USNORTHCOM), the military command charged with defending the U.S. homeland and providing military support to civil authorities, also began monitoring the Tropical Depression at its Operations Center in Colorado Springs, Colorado, on August 23.[14]

### *August 24, 2005*

On Wednesday, August 24, the Tropical Depression strengthened into a Tropical Storm and was given the name Katrina, the eleventh named storm of the 2005 hurricane season.[15] The Federal Emergency Management Agency (FEMA) activated its Hurricane Liaison Team (HLT), consisting of FEMA, NWS, and State and local officials. The HLT deploys to the National Hurricane Center to assist in the coordination of advisories with Federal, State, and local emergency management agencies, providing forecast updates and technical advice.[16] FEMA Region IX was notified to prepare for possible back-up should Mississippi or Georgia be affected. USNORTHCOM also issued a Warning Order for supporting commands to prepare for requests for Department of Defense (DOD) assets should the need arise.[17]

### *August 25, 2005*

Katrina continued to gain strength throughout the day on Thursday, as it approached the southeastern coast of Florida.[18] At 3:30 PM EDT, Katrina was upgraded to a Category 1 hurricane and forecast to make landfall in Florida.

Meanwhile, advisories issued by the NWS Tropical Prediction Center (TPC) and the NHC predicted Katrina would turn toward the Alabama-Florida panhandle area after it crossed Florida and entered the Gulf of Mexico.[19] At 6:30

PM EDT, Hurricane Katrina made landfall in south Florida near the Miami-Dade and Broward County line, with sustained winds of up to 80 miles per hour and dropping as much as 14-16 inches of rain in some regions.[20] The Florida landfall resulted in more than a dozen deaths,[21] over 1.4 million power outages,[22] and pockets of severe flooding. Damage costs in south Florida amounted to just under $2 billion,[23] with an estimated $400 million in agricultural losses.[24]

Gulf Coast States and localities began hurricane preparations on Thursday, August 25, even as the storm approached its first landfall in Florida, by activating their emergency response elements, issuing emergency declarations, pre-positioning response assets, and planning for evacuations and sheltering. Because NWS advisories predicted Katrina would enter the Gulf and make landfall on the Northern Gulf Coast area, Alabama and Mississippi activated their Emergency Operations Centers (EOCs) to coordinate information and their State's resources for emergency response operations.[25]

In preparation for Florida landfall, FEMA delivered 100 truckloads of ice to staging areas in Georgia, and thirty-five truckloads of food and seventy trucks of water to Palmetto, Georgia. Also, anticipating a potential second Gulf Coast landfall, FEMA pre-staged over 400 truckloads of ice, more than 500 truckloads of water, and nearly 200 truckloads of food at logistics centers in Alabama, Louisiana, Georgia, Texas, and South Carolina.[26] This was the beginning of the pre-staging efforts that increased to the largest pre-positioning of Federal assets in history by the time Hurricane Katrina made its second landfall on August 29, 2005.[27] At this time, FEMA placed Rapid Needs Assessment and Emergency Response Teams – Advance Elements (ERT-As) on alert. An ERT-A is "the portion of the Emergency Response Team (ERT) that is the first group deployed to the field to respond to a disaster incident."[28] FEMA also conducted their first video teleconference, a call held each day at noon from August 25 until well after landfall. These video teleconferences helped synchronize Federal, State, and local responders and were a means of defining and coordinating assistance and support needs.[29]

Numerous private sector entities took action as well. Norfolk Southern Railroad, for example, recognized the potential impact of the loss of certain key bridges and pre-staged repair barges in order to be able to move in quickly to make repairs after the hurricane made landfall. The Cargill Corporation, an agricultural products and services company, also pre-positioned freighters offshore so that it could continue shipping grain internationally immediately after landfall.

## KATRINA ENTERS THE GULF OF MEXICO

### *August 26, 2005*

Katrina briefly weakened to a Tropical Storm as it passed over Florida in the early hours of Friday, August 26, but by 5:00 AM EDT, the NHC reported that the storm had once again strengthened to a Category 1 hurricane.[30] The hurricane continued moving further west, intensifying over the warm waters of the Gulf, rather than north toward the Alabama-Florida panhandle area as NWS had originally predicted.[31] This westward direction enabled the storm to strengthen first to a Category 1 and then intensify to a Category 2 hurricane over the course of the day.

In the afternoon of August 26, the NHC released a track forecasting the eye of Hurricane Katrina would pass just east of New Orleans on Monday, August



29.[32]  This forecast and all subsequent NHC forecasts projected Hurricane Katrina would make its second landfall as a Category 4 or 5 storm along the Gulf Coast, in the Mississippi-Louisiana region.[33]  The Center also forecasted that the accompanying coastal storm surge would cause flooding fifteen to twenty feet above normal tide levels where the eye of the hurricane would make landfall.[34]  National Weather Service Director Johnson later testified before Congress that "forecasts of where Katrina would go were more accurate than usual, with all of the forecast tracks during the last forty-eight hours lining up almost directly on top of the actual track."[35]  The last NHC Hurricane Katrina forecast on Friday, August 26, as the storm intensified in the Gulf of Mexico, gave Federal, State, local, and private sector officials, in hindsight, approximately fifty-six hours advance notice that the hurricane would make landfall near the City of New Orleans.[36]

Preparations took on a greater urgency on Friday, August 26, due to Hurricane Katrina's continuing intensification and west-southwest track from Florida into the Gulf of Mexico.  Louisiana Governor Kathleen Blanco and Mississippi Governor Haley Barbour declared states of emergency for their respective States.[37]  Gulf Coast States and localities expanded their EOC staffing and operations schedules in anticipation of Hurricane Katrina.[38]  The Alabama, Louisiana, and Mississippi State EOCs soon were activated to their highest levels.[39]

State agencies began putting their response plans into action.  The Louisiana State Police notified personnel assigned to the Traffic Control Center that they should report to the State EOC the following day, at 6:00 AM CDT, to prepare for emergency response operations.[40]  The Louisiana National Guard began mobilizing 2,000 personnel while the Joint Forces headquarters-Louisiana National Guard activated its Joint Operations Center (JOC) at Jackson Barracks in New Orleans to coordinate their emergency response operations.[41]  Governor Barbour issued an Executive Order that directed Major General Harold Cross, Adjutant General of the Mississippi National Guard, to prepare to use the Mississippi National Guard for disaster relief operations.[42]  The Mississippi National Guard alerted military police and engineers, activated 750 personnel, and activated its EOC in Jackson.[43]

***Worst Case Scenario***

  A catastrophic hurricane striking Southeast Louisiana has been considered a worst-case scenario that the region and many experts had known and feared for years.  Much of Southeast Louisiana is at or below sea level, and experience had shown Gulf Coast hurricanes to be deadly.  At the turn of the 20th Century, an unnamed Category 4 hurricane made landfall on September 8, 1900, in Galveston, Texas.  With storm surges higher than fifteen feet and winds stronger than 130 mph, over 8,000 people perished—making it the deadliest disaster in American history.[44]  Sixty-five years later, on September 9, 1965, Hurricane Betsy made its second landfall near Grand Isle, Louisiana, as a strong Category 3 storm.  As an omen of things to come, Hurricane Betsy's storm surge and high winds hit Lake Pontchartrain just north of New Orleans, overtopping levees and flooding the city.  Breaching the Florida Avenue levee, flood waters consumed the Lower 9th Ward of New Orleans, drowning many in their attics as they tried to escape.  In total, seventy-five people were killed and over 160,000 homes were flooded.[45]  Only four years later, Hurricane Camille, a Category 5 hurricane, struck the mouth of the Mississippi River on the night of August 17, 1969.  Storm surges measuring over twenty-five feet, combined with winds estimated close to 200 mph, caused an estimated 335 deaths, destroyed or damaged 22,008 homes, and injured thousands in Louisiana, Mississippi, and Virginia.[46]  In the decades that followed, experts attempted to model the likely impact of future hurricanes to improve protection in the Gulf Coast region.[47]  In 2000, the U.S. Army Corps of Engineers' (USACE) modeled the effects of a slow moving Category 4 or any Category 5 hurricane on the region.[48]  According to the Corps, New Orleans would be inundated by over twenty feet of water if such a hurricane took a "critical path" towards the city.[49]  A weaker, slow moving hurricane can be as dangerous as a more powerful, faster moving storm because it can generate as much or more flooding by dropping more rainfall.[50]  Vice Admiral Conrad C. Lautenbacher, Jr., Undersecretary of Commerce for Oceans and Atmosphere, stated in 2002 that the overtopping of the levees and subsequent flooding of the city could occur during slow moving Category 3, 4 or 5 storms.[51]  Recognizing that current Federal, State, and local disaster response capabilities overall needed to be enhanced to better address possible effects of catastrophic disasters, FEMA provided funding for a ***Southeast Louisiana Catastrophic Hurricane Planning Project***, which brought together responders and decision makers from all levels of government and the American Red Cross to identify, analyze, and address the overwhelming operational complexities that would be involved in responding to a catastrophic hurricane striking southeast Louisiana.[52]  (*continued next page*)

(*continued from previous page*) Planning workshops using a hypothetical catastrophic hurricane scenario (Hurricane Pam) to frame the discussions were used to identify and qualify the scale of requirements needed to build a plan for responding to a catastrophic hurricane. The initial planning group meeting was held between July 16 and July 23 in 2004 and included as many as 300 Federal, State, and local emergency response officials.[53] The results of this exercise revealed to the Louisiana Office of Homeland Security and Emergency Preparedness (LOHSEP) and FEMA the shortfalls in existing plans and were to be used to inform future development of State and Federal plans to address this potential catastrophe. At the first session, LOHSEP and Federal representatives identified a list of planning topics as the most urgent or complex topics needing discussion, including pre-landfall issues, search and rescue, and medical care, as well as mass sheltering and housing. Subsequent after-action review workshops did not reconvene until late July 2005, mere weeks before Hurricane Katrina made landfall. Although they failed to generate a comprehensive, integrated, and actionable plan in time for Hurricane Katrina, these workshops did have some positive impact. To quote one official: "the workshops and planning process— knowledge of inter-jurisdictional relationships and capabilities, identification of issues, and rudimentary concepts for handling the consequences—have been beneficial to all involved in the hurricane response."[54]

FEMA headquarters in Washington, DC, conducted the daily video teleconference from their National Response Coordination Center (NRCC) to exchange information and reconcile response activities among the FEMA Regions, the NHC, liaisons from various Federal agencies and departments responsible for disaster support, representatives from the States projected to be affected by the storm, and States monitoring and providing mutual aid to support their neighbors.[55]

***August 27, 2005***

Hurricane Katrina strengthened to a Category 3 storm before dawn on Saturday, August 27, and nearly doubled in size over the course of the day; tropical storm-force winds extended 85 miles from the storm's center at 2:00 AM EDT and 160 miles from the storm's center at 9:00 PM CDT.[56] National Hurricane Center forecasts warned the storm could continue to intensify and was expected to become a Category 4 storm,[57] pushing a powerful storm surge ahead of its path.[58] The Center issued updated hurricane watches and warnings throughout Saturday, with a hurricane watch eventually extending across the North Central Gulf Coast from Intra-coastal City, Louisiana, to the Florida-Alabama border.[59]

Despite hurricane watches and warnings throughout the day, it appeared many people along the Gulf Coast either remained unaware or unconcerned about the storm that would soon ravage their communities. For instance, according to Governor Blanco, State Representative Cedric Richmond called the Louisiana Governor on Saturday after visiting a ballpark where "approximately 700 people were present, and [he] learned that some people had not paid attention to the weekend news and did not realize the severity of the hurricane aiming at New Orleans." She recalled that he worried "many may have thought the hurricane was still targeting the Florida panhandle, as reported by the National Hurricane Center up until late Friday afternoon."[60]

As the storm strengthened, Louisiana and Mississippi State officials took steps to begin the evacuation of areas threatened by Hurricane Katrina throughout Friday evening and into Saturday morning. Early Saturday morning, Louisiana State Police Superintendent Colonel Henry Whitehorn and Louisiana Department of Transportation and Development Secretary Johnny Bradberry recommended to Governor Blanco that she implement the State's contra-flow plan. Governor Blanco and her staff had determined that a major evacuation of coastal Louisiana and New Orleans would be required. She and Governor Barbour discussed implementing their respective contra-flow plans on Saturday for interstate highways and other major roadways; the plans would reverse the flow of traffic on inbound lanes to facilitate the evacuation of the New Orleans metropolitan area.[61] Shortly thereafter, Louisiana Department of Transportation and Development officials informed Mississippi Department of Transportation officials that contra-flow in Louisiana would begin later that afternoon.[62] Louisiana State agencies also began implementing Phase I of the Louisiana Emergency Evacuation Plan, which included public communications, staging of assets, and other activities.[63] Louisiana and Mississippi implemented contra-flow plans on major highways at 4:00 PM CDT.[64] State law enforcement officers were deployed along the routes and in communities to assist evacuation operations. Louisiana established a Traffic Control Center (TCC) within the State EOC and began monitoring traffic volume and rate of flow.[65] Traffic increased throughout the day. By 7:00 PM CDT, traffic had

begun to back up at the Louisiana-Texas border.[66]  Louisiana and Mississippi had jointly revised their respective evacuation plans after encountering problems during Hurricane Ivan in 2004.[67]

Still, State and local officials knew that tens of thousands of Gulf Coast residents either could not or would not evacuate.  A large number of residents who did not own a vehicle depended on relatives, neighbors, charitable organizations, or public transportation to evacuate; New Orleans hurricane plans estimated that over 100,000 residents did not own an automobile.[68]  Evacuation also presented particular risks to the special needs population, which includes older adults and individuals with a disability.  Individual and institutional caregivers faced the difficult choice between the dangers of evacuation and attempting to ride out the hurricane.[69]

In an effort to reach as many citizens as possible, Governor Blanco and her staff contacted clergy throughout Saturday night and early Sunday morning to ask them to urge their parishioners to evacuate immediately.[70]  In addition, Louisiana churches had implemented "Operation Brother's Keeper," a program developed to help evacuate those who lacked transportation, but only four congregations were participating in the pilot program when Hurricane Katrina made landfall.[71]

Local governments across the northern Gulf Coast issued evacuation orders throughout Saturday.  Voluntary evacuations for areas in Louisiana outside the levee protection district began in the morning.  Lafourche, Plaquemines, St. Charles, and parts of St. Tammany Parishes ordered mandatory evacuations for their citizens during the day.[72]  Mandatory evacuation orders were also issued for parts of Jefferson Parish.  In New Orleans, Mayor Ray Nagin hosted a press conference that afternoon, during which he recommended evacuations of Algiers, the Lower Ninth Ward, and low-lying areas of the City.[73]  Later, at 5:00 PM CDT, he formally called for voluntary evacuations of the City.[74]  He also declared a state of emergency for New Orleans, which advised residents to undertake several precautionary measures such as stocking up on bottled water, batteries, and non-perishable food.[75]  In a joint press conference with Governor Blanco, Nagin warned residents, saying "this is not a test.  This is the real deal."  By late afternoon, Mississippi's three vulnerable coastal counties—Hancock, Harrison, and Jackson—had also begun urging residents to evacuate, especially those living in low-lying areas and mobile homes.[76]

Many Gulf Coast residents had become so accustomed to hurricanes and tropical storms that they refused to evacuate despite the warnings.[77]  As Hurricane Katrina approached Louisiana, Governor Blanco was concerned "that many people would play a familiar game of 'hurricane roulette'—tempting fate and staying home in a gamble that this storm would be no worse than the last one they weathered in their home." [78]

Hurricane Katrina's impending landfall required massive shelter operations in order to temporarily house thousands of people fleeing the Gulf Coast.  On Saturday, August 27, shelters began opening throughout the region.  In Mississippi, the American Red Cross opened shelters in schools and churches.[79]  It also established an information center to direct evacuees to shelters in the Jackson area.[80]  By 4:00 PM CDT, Louisiana's Office of Emergency Preparedness reported that four special needs shelters were open in Alexandria, Baton Rouge, Bossier City and Monroe, with four more scheduled to open at 8:00 PM CDT that evening.[81]  Mayor Nagin also announced that the New Orleans Superdome would be open to City residents with special needs.[82]  A special needs shelter "is intended for individuals who have no other resources and who need assistance that cannot be guaranteed in a regular shelter, i.e. medication that requires refrigeration, oxygen equipment, etc."  However, it is not intended for patients who need substantial or constant medical care. [83]  Texas officials also opened shelters on Saturday, including a 1,000 person capacity shelter at the Ford Center in Jefferson County.[84]

Louisiana and Mississippi State agencies deployed personnel and pre-positioned resources in the final two days before Hurricane Katrina's second landfall.  The Mississippi Emergency Management Agency also deployed six area coordinators to six Gulf Coast counties to serve as liaisons with their EOCs.[85]  Mississippi's State Emergency Response Team (ERT) deployed to Camp Shelby while National Guard emergency rescue assets were deployed to three coastal counties.[86]  The Louisiana National Guard deployed liaison officers to the thirteen southernmost parishes projected to suffer the greatest impact from the storm.[87]  Alabama officials began pre-positioning supplies at staging areas and other locations throughout the State.[88]  Alabama National Guard troops were positioned in Mobile and Baldwin Counties in preparation for landfall, and Governor Bob Riley of Alabama, after being informed that Louisiana and Mississippi would suffer the brunt of the storm, offered Governors Blanco and Barbour whatever assistance his State could provide.[89]  The Texas Governor's Division of Emergency Management deployed one

Regional Liaison Officer to Baton Rouge "to assist, coordinate, and monitor any requests for assistance that may develop as evacuations begin."[90]

As State and local governments were preparing their response and initiating evacuations, the Federal government was continuing preparations to support State and local responders. On the morning of August 27, forty-eight hours before Hurricane Katrina's second landfall, FEMA headquarters commenced Level 1 operations, requiring full staffing on a round-the-clock, seven-days-a-week basis.[91] FEMA was now at its highest alert. FEMA's regional headquarters for Regions IV (Atlanta, Georgia) and VI (Denton, Texas) went to Level 1 activation at Noon EDT and 11:00 AM CDT respectively.[92] At this point, all fifteen National Response Plan (NRP) Emergency Support Functions (ESFs) had been activated as well.[93]

With the regional and national headquarters at full alert, FEMA held another daily video teleconference at 12:00 PM EDT. "FEMA Region VI announced that its Mobile Emergency Response Support (MERS) detachment was en route to Camp Beauregard, Louisiana, to provide communications and operational and logistical support. It also announced that it had requested the deployment of the Denver MERS unit to Region VI headquarters in Denton to serve as a backup."[94] In addition, Region VI had staged at Camp Beauregard 270,000 liters of water, 680,000 pounds of ice, 15,120 tarps, and 328,320 Meals Ready to Eat (MRE).[95] By 5:00 PM EDT, the quantity of water stored at Camp Beauregard had doubled to 540,000 liters.[96] More commodities were pre-staged elsewhere in Region VI. The FEMA Logistics Representative reported that 102 trailers were "uploaded with water and MREs" at the FEMA Logistics Center in Ft. Worth, Texas.[97] Also at Noon that day, the ERT-N Blue Team was activated and deployed to Baton Rouge.[98] The ERT-A Blue Team is one of the Nation's three standing ERT-N teams. One of three teams—code-named Red, White, and Blue—is on call every month.[99] The ERT-N teams are the scalable principal inter-agency units that staff the JFO "for large-scale, high-impact events."

FEMA was working to pre-stage supplies in Region IV, too. At 1:15 PM EDT, FEMA issued its first Mission Assignment to USNORTHCOM "to provide NAS Meridian [Mississippi] as a FEMA operational Staging Base for pre-staging of FEMA supplies prior to landfall."[100] USNORTHCOM granted this request later that afternoon, releasing an Execute Order making Naval Air Station Meridian available to FEMA.[101]

Additionally, FEMA began activating the National Disaster Medical System (NDMS), Disaster Medical Assistance Teams (DMATs), and Urban Search and Rescue (US&R) teams[102] The DMATs are mobile self-contained medical teams with equipment and medical professionals trained and certified to provide emergency medical care to disaster victims. These teams are comprised of professionals from around the country organized and deployed by FEMA to support disaster response activities. The Urban Search and Rescue teams are similarly structured, but comprised of emergency responders, firefighters, and law enforcement personnel from around the country.

That evening, President Bush signed a Federal emergency declaration for the State of Louisiana, following a request from Governor Blanco earlier that day. President Bush issued additional emergency declarations for Mississippi and Alabama the following day, after requests from the governors of those States.[103] These declarations authorized Federal expenditures to assist State and local governments by providing resources and making other preparations to save lives and property from Hurricane Katrina's imminent impact.[104] These decisions were particularly important as they allowed delivery of pre-deployed Federal assistance. The issuance of a Presidential emergency declaration before landfall is extremely rare, and indicative of the recognition that Katrina had the potential to be particularly devastating. Since 1990, only one such incident, Hurricane Floyd in 1999, resulted in declarations before landfall.[105] By declaring emergencies in these three States, the President directed the Federal government to provide its full assistance to the area to save lives and property from Hurricane Katrina's imminent impact.[106]

On the evening of August 27, William Lokey, the ERT-N team leader, arrived in Baton Rouge, Louisiana, and was appointed Federal Coordinating Officer (FCO). As the senior Federal official in charge of supporting the State of Louisiana, he immediately began coordinating efforts with the Louisiana Office of Homeland Security and Emergency Preparedness.[107]

Hurricane Katrina's growing intensity on Saturday led NHC Director Mayfield to make personal calls to State and local officials in the region that evening to emphasize the threat posed by the storm. He warned Jefferson Parish officials that this could be the "big one." That evening, Director Mayfield briefed Governor Blanco, Governor

Barbour, Mayor Nagin, and Alabama Emergency Management Agency Chief of Operations Bill Filter about Hurricane Katrina's magnitude and the potential storm impacts.[108]  Director Mayfield testified before Congress that he had only made such a call to warn a governor once before in his thirty-six year career.[109]  Mayfield stated that "I just wanted to be able to go to sleep that night knowing that I did all I could do."[110]

At FEMA headquarters, the FEMA Director shared Mayfield's concern.  Closing the noon video teleconference with his FEMA regional staff and the State EOCs, Michael Brown urged them to be vigilant, saying, "I know I'm preaching to the choir on this one, but I've learned over the past four and a half, five years, to go with my gut on a lot of things, and I've got to tell you my gut hurts with this one.  It hurts. . . .  So we need to take this one very, very seriously. . . . I want you guys to lean forward as far as possible. . . .  Why is this important?  Because I worry about the people in New Orleans, Louisiana, and Mississippi right now, and they're going to need our help . . ."[111]

### *August 28, 2005*

Hurricane Katrina developed from a Category 4 to a Category 5 storm over a six-hour period on Sunday, August 28.[112]  The storm had become "not only extremely intense but also exceptionally large."[113]  The National Weather Service office in Slidell, Louisiana, issued a detailed, urgent warning of Hurricane Katrina's impending devastating impact on the Gulf Coast.  The warning stated, "The majority of industrial buildings will become non-functional . . . High-rise office and apartment buildings will sway dangerously—a few to the point of total collapse.  All windows will blow out.  Airborne debris will be widespread—and may include heavy items such as household appliances and even light vehicles . . . Persons—pets—and livestock exposed to the winds will face certain death if struck."[114]  The NHC issued advisories that warned the levees in New Orleans could be overtopped by Lake Pontchartrain and that significant destruction would likely be experienced far away from the hurricane's center.[115]  The warning continued, "[m]ost of the area will be uninhabitable for weeks . . . Perhaps longer . . . Power outages will last for weeks . . . Water shortages will make human suffering incredible by modern standards."[116]

Prior to Hurricane Katrina's landfall, State and local officials did not use the Emergency Alert System (EAS) in Louisiana, Mississippi, or Alabama.  However, the National Hurricane Center (NHC) disseminated warnings and forecasts via NOAA Radio and the internet, operating in conjunction with the EAS.[117]  Initially, these reports were issued every six hours; however, as the storm neared landfall they were updated with increasing frequency.[118]  In accordance with NOAA policy, local weather offices took over responsibility for these broadcasts shortly after Hurricane Katrina made landfall.  At this time, Weather Service offices like the one in Slidell, Louisiana, began to transmit real-time hazard information using both NOAA Radio and the EAS.  These reports were distributed to all area media outlets as well as local emergency management personnel.  When the severity of the storm finally forced the Slidell weather office offline, operations were successfully transferred to weather centers in Mobile and Baton Rouge.

Taking heed of the continual warnings, most citizens evacuated, others showed up at a "shelter of last resort" and some hunkered down in their homes and would soon be struggling to survive the destructive forces of Katrina.  For the region and its residents, Hurricane Katrina would bring devastation and the incredible human suffering that the NHC had predicted.

By early morning on Sunday, three State Liaison Officers (SLOs) had been deployed to Alabama, Florida, and Mississippi.[119]  The U.S. Coast Guard, in preparation for anticipated operations, placed Disaster Assistance Response Teams (DARTs) on standby for deployment to Southeast Louisiana and evacuated its District 8 New Orleans Command Center to Integrated Support Command, Saint Louis, Missouri.[120]

Also early that morning, President Bush called Governor Blanco to urge that mandatory evacuation orders be issued for New Orleans.[121]  After receiving a call from President Bush, Governor Blanco and Mayor Nagin held a joint press conference during which the Mayor ordered a mandatory evacuation of New Orleans.[122]  Later that day, the President also participated in FEMA's daily video teleconference with DHS headquarters, FEMA headquarters, FEMA's regional offices, the National Hurricane Center, and representatives from Alabama, Florida, Georgia, Louisiana, Mississippi, Tennessee, Texas, and West Virginia.  The President personally encouraged State and local officials to take all precautions and get word out to their citizens; he offered the full support and resources of the Federal government.[123]  The President "received regular briefings, had countless conversations with Federal, State,

and local officials, and took extraordinary steps prior to landfall."[124] The Louisiana EOC reported that evacuations were going well, that it had no unmet needs, and that FEMA was "leaning forward" as far as possible. The Mississippi EOC similarly reported that "FEMA has been great" and that, after a slow start, evacuations were going well.[125] Despite State assurances, the FEMA Director told all those on the call to be prepared for the impending requests for emergency aid from the States, expressed concern about the evacuation progress and the Superdome as a shelter of last resort, and echoed his previous day's comments about the need to remain vigilant.[126] Secretary Chertoff inquired into DOD's level of engagement with FEMA, to ensure coordination of DOD support should it become necessary, and was assured by Director Brown that DOD was fully engaged.[127] Following the video teleconference on Sunday, FEMA Director Michael Brown deployed from Washington to Baton Rouge.[128]

After the video teleconference, Homeland Security Secretary Michael Chertoff spoke with the participating State governors to ensure that their needs were being met. He later explained, "[m]y concern then was to talk off-line to the governors, to make sure the governors weren't going to tell me something privately that maybe they didn't want to share publicly, and they seemed satisfied at that point with the help they were getting."[129]

The President also issued a public statement, saying "[w]e cannot stress enough the danger this hurricane poses to Gulf Coast communities. I urge all citizens to put their own safety and the safety of their families first by moving to safe ground. Please listen carefully to instructions provided by State and local officials."[130]

By afternoon on August 28, States and localities across the Gulf Coast had just hours before tropical storm-force winds would curtail their contra-flow and other pre-landfall preparations. State and local officials in Alabama and Mississippi issued evacuation orders for low-lying areas vulnerable to Hurricane Katrina's storm surge and encouraged people in other areas to evacuate as well.[131]

The Gulf Coast States' planning and the contra-flow operations facilitated the safe evacuation of hundreds of thousands of people on Sunday, August 28.[132] However, by the late afternoon, Hurricane Katrina began to affect evacuations even though landfall remained over twelve hours away. Increasing winds around New Orleans' Louis Armstrong International Airport caused air carriers to begin reevaluating their plans and canceling flights. The last passenger flight departed at 4:30 PM CDT and the airport was officially closed at 6:43 PM CDT.[133] Contra-flow operations throughout the region ceased at 5:00 PM CDT due to high winds from Hurricane Katrina. Louisiana and Mississippi State officials continued to encourage people to evacuate even after contra-flow operations ceased. Governor Blanco later estimated that 1.2 million people, 92 percent of the affected population, evacuated prior to Hurricane Katrina's second landfall.[134] Still, tens of thousands, many of them the region's most vulnerable, remained in areas most threatened by the approaching hurricane.

By Sunday evening, shelter operations that had begun the previous day were in full force. Thousands of people displaced by Katrina were in shelters across the region. Federal, State, and local governments worked with the American Red Cross and other non-profit organizations to establish at least 114 shelters for over 28,000 people.[135] Texas had opened or placed on standby thirty-one shelters with room for 7,275 evacuees and established "shelter welcome centers" along I-20 and I-10 "to provide shelter information to evacuees."[136] The City of New Orleans, which had previously provided the Superdome as a shelter only for the special needs population, now opened it as a "shelter of last resort" for the general population.[137] Additional supplies were brought in to support the growing Superdome population despite increasingly worsening conditions.[138] It was estimated that there were 10,000 – 12,000 people at the Superdome by midnight, including 300-500 special needs evacuees.[139]

As Hurricane Katrina drew nearer, the requests for Federal assistance increased. The day before landfall, FEMA received numerous requests for resources from Alabama, Louisiana, and Mississippi.[140] Some last minute Louisiana requests were not met due to deteriorating weather conditions. For example, at noon on August 28, Louisiana requested 180,000 liters of water and 109,440 MREs for the Superdome. However, FEMA was only able to supply 90,000 liters of water and 43,776 MREs before the storm struck or high winds forced other trucks to turn back before they could reach the stadium.[141] Officials at all levels were unsure of who and how many people would come to the Dome and were modifying their special needs and commodities requests throughout the day. The American Red Cross determined the Superdome did not meet their safety criteria and refused to put their staff in harm's way, choosing rather to deliver any necessary aid to the Dome as soon as the storm had passed.[142]

During a press conference, in response to a question about the Superdome, the Mayor asserted that "the Superdome can probably accommodate 50,000, 60,000, 70,000 people." He advised that anyone seeking shelter there should "come with enough food, [non] perishable items to last for three to five days. Come with blankets, with pillows. No weapons, no alcohol, no drugs."[143]

The Louisiana National Guard also pre-positioned some supplies at the Superdome. Approximately 10,000 MREs and over 13,000 bottles of water were brought in on Saturday, when the stadium was opened as a special needs shelter for evacuees with heightened care requirements.[144] In addition to stocking the Superdome with food and water, the Louisiana National Guard sent additional personnel to the Superdome throughout the day on Sunday, August 28. The National Guard's Special Reaction Team, a unit "highly trained in Law Enforcement missions," arrived at 7:00 AM CDT with forty-six members.[145] The team "began conducting Law and Order/Area Security missions."[146] More National Guard forces got to the Dome in the early afternoon. By 3:00 PM CDT, the 527th Ready Reaction Forces had arrived in the Superdome with 220 personnel, and had as their principal mission crowd control.[147] The 225th Engineer Group joined that evening with 220 soldiers "to assist with security operations." Another 100 personnel from the 159th Fighter Wing came to help out with security.[148] Medical personnel arrived at the Superdome from the Louisiana National Guard contingent as well. "Five physicians, four nurses, six NCOs and twenty medics" deployed to the Superdome on August 28.[149] In all, "the total medical complement at the Superdome totaled 71 medical personnel."[150]

In addition to the mandatory evacuation order, Mayor Nagin announced Sunday that he had authorized New Orleans Police Department members and other City officials to commandeer private property for evacuation and shelter purposes, if necessary. Mayor Nagin said, "[t]he storm surge most likely will topple our levee system. So we are preparing to deal with that also."[151] The Louisiana State Police reported that one of its 800 MHz communications towers had been rendered inoperable and some troopers had been forced to seek shelter at hospitals.[152] Additionally, by August 28, fifteen of Louisiana's sixty-four parishes had issued mandatory, recommended, or precautionary evacuation orders.[153]

**Hurricane Katrina: Federal Commodities on Hand Pre-Landfall (as of August 29, 2005)**



Pre-deployed assets were placed throughout the region to encircle the forecasted impact area. The amount of space required to house the large volumes of commodities and people required large industrial and military staging areas—often filling entire runways with hundreds of trailers—accessible to heavy equipment and aircraft. The staging areas were dispersed outside the projected path of the storm to avoid destruction of critical commodities and to maximize the ability to deploy to affected areas in the wake of the hurricane. On Sunday, FEMA opened a Federal logistics mobilization center at Barksdale Air Force Base in Louisiana,[154] quickly placing a MERS team there with a mobile communication command vehicle.[155] MERS assets were also deployed on-site into Mississippi, Florida, Georgia, and Texas, and other parts of Louisiana to support response operations."[156] Other Federally deployed teams in the region included seven Urban Search and Rescue Task Forces and thirty-three National Disaster Medical System teams, including Disaster Medical Assistance Teams, medical Strike Teams, a National Medical Response Team, Disaster Mortuary Operational Response Teams, and Veterinary Medical Assistance Teams. As of pre-landfall on the next day, a total of 43,776 MREs and 90,000 liters of water had been staged at the Superdome. Throughout the region there were pre-staged over 3.7 million liters of water, 4.6 million pounds of ice—with 13 million additional pounds of ice in cold storage ready to be deployed— and over 1.86 million MREs. Another 2.1 million MREs were positioned in Logistics Centers outside the region ready to be distributed (see Federal Commodities Map).[157]

**THE STORM APPROACHES**

As the sun set on Sunday, August 28, rain began to fall and the Gulf Coast had already started to feel Hurricane Katrina's effects.[158] The storm's high winds and hail forced public safety agencies across the Gulf Coast to curtail their operations. Traffic remained heavy on some highways as people tried to escape the storm in the final hours before second landfall. In shelters, hospitals, nursing homes, and residences across the Gulf Coast, people held their breath, hoping that Hurricane Katrina's impact would not be catastrophic. Federal, State, and local governments were poised to continue emergency activities as soon as Hurricane Katrina had passed. State and local governments, supported by the Federal government and FEMA, had carried out unprecedented preparations in comparison to those made for previous, "average" hurricanes. But Hurricane Katrina was not average, as would soon become vividly clear—it was a fierce hurricane with high wind speeds and a near-record storm surge that was heading directly toward a densely-populated urban area, much of which lay below sea level—six feet below on average across the city.[159] In less than twenty-four hours, Hurricane Katrina would change the region, its people, and the Nation.

## CHAPTER FOUR: A WEEK OF CRISIS — AUGUST 29 – SEPTEMBER 5

*Eastward from Lake Pontchartrain, across the Mississippi coast, to Alabama into Florida, millions of lives were changed in a day by a cruel and wasteful storm.*

**—President George W. Bush, September 15, 2005[1]**

This chapter examines the response to Hurricane Katrina during the first week after landfall. The storm overwhelmed and, in some cases, incapacitated State and local emergency capabilities across the Gulf Coast, requiring an unprecedented Federal response to help evacuate, rescue, shelter, care for, and safeguard Hurricane Katrina's victims. The chapter discusses some of the extraordinary efforts taken by Federal departments and agencies in concert with our partners from the State and local governments, non-governmental organizations, and the private sector to respond to the storm's devastating impact. It also identifies deficiencies in actions taken and highlights actions we must take to improve our collective efforts in the future.

### LANDFALL

Hurricane Katrina made landfall as a powerful Category 3 storm at 6:10 AM CDT on Monday, August 29 in Plaquemines Parish, Louisiana. The massive storm continued to move north, rolling over portions of the Louisiana coast before its eye came ashore near the mouth of the Pearl River in Mississippi. At the time, Hurricane Katrina had sustained winds over 115 mph and reported gusts as high as 130 mph.[2] The storm rapidly lost strength as it pushed inland through southern and central Mississippi; by 1:00 PM CDT, it had weakened to a Category 1 hurricane.[3] Six hours later, as it passed northwest of Meridian, Mississippi, Hurricane Katrina was further downgraded to a tropical storm.[4]

Hurricane Katrina generated violent waves and a massive storm surge before colliding with the Gulf Coast.[5] According to the National Oceanic and Atmospheric Administration (NOAA), Hurricane Katrina produced a storm surge as high as twenty-seven feet in Louisiana and Mississippi. Surge waters flooded over six miles inland in many parts of coastal Mississippi and up to twelve miles inland along rivers and bays. Hurricane Katrina also produced "very significant" storm surges approximately ten feet high as far east as Mobile, Alabama, where it caused flooding several miles inland along Mobile Bay.[6]

#### Disaster in the Gulf Coast

Hurricane Katrina's powerful winds, storm surge, and subsequent flooding destroyed communities and infrastructure along the Gulf Coast. The storm inflicted a terrible toll of human suffering, killing at least 1,330 and injuring thousands.[7] The Nation empathized with the harrowing stories of survival, loss, and family separation. President George W. Bush described this hurricane as "one of the worst natural disasters in our Nation's history."[8]

The nightmare scenario that some had predicted prior to Hurricane Katrina's landfall became a reality as those on the ground saw the devastation for the first time. According to NOAA, "entire coastal communities were obliterated, some left with little more than the foundations upon which homes, businesses, government facilities, and other historical buildings once stood."[9] Destroyed homes, beached vessels, collapsed bridges, uprooted trees, and

other debris littered the ground and blocked waterways.  After surveying the region from the air on August 30, Mississippi Governor Haley Barbour likened the scene to that of a nuclear detonation, stating, "I can only imagine that this is what Hiroshima looked like sixty years ago."[10]

Mississippi suffered extensive damage in all counties south of Interstate 20 and east of Interstate 55.[11]  The city of Biloxi was "decimated," according to municipal government spokesman Vincent Creel.  "It looks like a bomb hit it."[12]  Major east-west highways in southern Mississippi became impassable due to storm debris: US-90 closed across the entire state and I-10 east-bound closed to the public, with only one west-bound lane open for emergency responders.[13]  Hurricane Katrina left the downtown streets of Gulfport, Mississippi, under ten feet of water[14] and structures flooded for miles inland.[15]  A Department of Homeland Security (DHS) report described the communications infrastructure in Biloxi and Gulfport as "non-existent."[16]  In the words of Transportation Secretary Norman Mineta: "The Port of Gulfport, Mississippi was left with virtually nothing and must rebuild almost from scratch."[17]  The storm devastated Waveland, Mississippi, wiping out all the local resources, including those that municipal officials had staged ten miles north of town.[18]  Ninety-five percent of Waveland's residential and commercial structures were severely damaged.[19]  Testifying before Congress a week after landfall, Governor Barbour lamented: "The 80 miles across the Mississippi Gulf Coast is largely destroyed.  A town like Waveland Mississippi has no inhabitable structures—none."[20]  Alabama suffered significant damage as well.  For example, large amounts of debris necessitated the closure of Mobile's port.[21]

Hurricane Katrina inflicted devastating damage upon the region's energy and communications infrastructures.  The Department of Energy (DOE) reported "unprecedented damage" to the U.S. energy sector[22] and noted that 2.5 million customers in Alabama, Louisiana, and Mississippi reported power outages.[23]  Hurricane Katrina devastated communications infrastructure across the Gulf Coast, incapacitating telephone service, police and fire dispatch centers, and emergency radio systems.  Almost three million customer phone lines were knocked out, telephone switching centers were seriously damaged, and 1,477 cell towers were incapacitated.[24]  Most of the radio stations and many television stations in the New Orleans area were knocked off the air.[25]  Paul McHale, the Assistant Secretary of Defense for Homeland Defense, summarized the damage by stating, "The magnitude of the storm was such that the local communications system wasn't simply degraded; it was, at least for a period of time, destroyed."[26]

The Gulf Coast region's health care infrastructure sustained extraordinary damage.[27]  Such damage was particularly evident in New Orleans, where Hurricane Katrina destroyed several large hospitals, rendered many others inoperable, and forced the closure of nearly all other health care facilities.  The region's most vulnerable residents and those individuals with special needs suffered terribly from Hurricane Katrina's impact and inadequate or nonexistent evacuation operations.[28]  In addition, the storm stranded hundreds of hospital patients inside dark and flooded facilities that lacked basic supplies.[29]  Some patients succumbed to the horrible conditions before they could be evacuated.[30]  At St. Rita's Nursing Home in St. Bernard Parish, Louisiana, thirty-four nursing home residents drowned in the floods resulting from Hurricane Katrina.[31]

### New Orleans

New Orleans sustained extensive damage as Hurricane Katrina passed to its east on the morning of August 29.  Many high-rise buildings suffered blown out windows, while roof sections of the Louisiana Superdome—where over ten thousand people were sheltered—were stripped away.  Mayor Ray Nagin later reported that in New Orleans, "primary and secondary power sources, sewerage and draining systems and communication and power lines were incapacitated."[32]

The storm surge, extreme amounts of rain, and high winds stressed the city's complex 350 mile levee system to its breaking point.[33]  Several of the levees and floodwalls were overtopped, and some were breached throughout the day of landfall.  It was these overtoppings and breaches of the levee system that led to the catastrophic flooding of New Orleans.  In addition to the levee and floodwall breaches, many of the pumping stations—which would have otherwise removed water from the city and prevented some of the flooding—stopped working due to power outages and flooded pumping equipment.

On the day of landfall, authoritative reporting from the field was extremely difficult to obtain because of the widespread destruction of communications infrastructure, the incapacitation of many State and local responders, and the lack of Federal representatives in the city. As a result, local, State, and Federal officials were forced to depend on a variety of conflicting reports from a combination of media, government and private sources, many of which continued to provide inaccurate or incomplete information throughout the day, further clouding the understanding of what was occurring in New Orleans. In fact, some uncertainty about the specific causes and times of the breaches and overtoppings persists to this day.

**The New Orleans Flood and Hurricane Protection System**

Much of New Orleans is located below sea level; with the Mississippi River to the south, Lake Pontchartrain to the north, and Lake Borgne to the east, the area is prone to flooding from the river, the lakes, and the Gulf of Mexico. Development of a system to protect the city from flooding began when the city was founded in the early 1700s and has grown with the increase in population and expanded into additional flood prone areas. The New Orleans Flood and Hurricane Protection System is complex and massive, consisting of 350 miles of levees, which are embankments, usually earthen, that serve as flood barriers. The System also includes floodwalls, hundreds of bridges, closable gates, culverts and canals that facilitate transportation in and out of the system. It is comprised of a series of four main compartmentalized basins designed to limit the flooding impacts on the entire system resulting from individual failures of levees and floodwalls. In addition, large pump stations are used to pump out and redirect water from the city. These pumps are designed to mitigate flooding that results from significant rainfall and can, over time, remove water from moderate overtoppings.

Currently, the levees offer protection ranging from eleven up to approximately seventeen and a half feet above sea level. The current system was designed to withstand a Mississippi River flood the size of the Flood of 1927 and a hurricane with wind conditions similar to a very strong Category 2 hurricane.

**Breaching and Overtopping**

Overtopping is a term used to describe the situation where the water level rises above the height of the levee or floodwall and consequently overtops, or flows over the structure. A breach is a break in the levee or floodwall. A prolonged overtopping can actually cause a levee or floodwall breach. In general, a breach can lead to more significant flooding than an overtopping since breaches take time to repair and until repaired continue to allow water to flow until the water level has receded below the height of the breach. Overtopping, on the other hand, will stop as soon as the water level recedes below the top of the levee or floodwall. Although the consequences are significantly different, from outward appearances, it is often difficult to differentiate a breach from an overtopping.

In addition to the dearth of reliable reporting regarding the situation in New Orleans, there was widespread confusion and misuse of the terms 'breach' and 'overtopping' by observers and reporters who did not fully understand the distinction between the two terms, or whose observations were not sufficient to enable differentiation of one from the other. Some overtopping of the levees was expected due to the intensity of the storm, which would result in localized flooding.[34] However, such overtopping would not have led to the catastrophic effects that occurred due to the levee and floodwall breaches. Further, the New Orleans Flood and Hurricane Protection System is designed so that individual breaches will not lead to catastrophic flooding. The compartmentalized design, with four main basins, is intended to minimize the threat of flood to the entire system.[35] Thus, had only one basin experienced serious overtopping or a breach, it would have been possible to avoid the catastrophic flooding New Orleans experienced.

Since some flooding was expected and severe flooding feared, the most important priority of local, State, and Federal officials was search and rescue. In anticipation of the storm on Sunday night and Monday morning, emergency responders were standing by to begin search and rescue as soon as it was safe to proceed.[36] This emphasis on search and rescue continued throughout Monday evening, with officials encouraging those who had evacuated prior to landfall to stay away so they did not impede emergency responders' efforts.[37] By Tuesday morning when the breaches of the levees had been confirmed, Federal, State, and local officials were already fully

engaged in search and rescue efforts.[38]  Regardless of the cause of the flooding, search and rescue had been and continued to be the first response priority.

As early as 9:12 AM EDT on August 29, the National Weather Service (NWS) received a report of a levee breach and shortly thereafter issued a flash flood warning, stating, "A levee breech [sic] occurred along the Industrial Canal at Tennessee Street.  Three to eight feet of water is expected due to the breach."[39]  However, as late as 6:00 PM EDT that day, the DHS Homeland Security Operations Center (HSOC) reported to senior DHS and White House officials that, "Preliminary reports indicate the levees in New Orleans have not been breached, however an assessment is still pending."[40]

A sampling of additional reporting follows.

The first DHS HSOC report that referenced potential levee issues was distributed at 10:50 AM EDT on August 29, and stated, "Some levees in the greater New Orleans area could be overtopped."[41]  At 11:32 AM EDT, a DHS HSOC report stated that, after a call with State and Parish officials, "Major General Landreneau [Adjutant General for Louisiana] said that emergency personnel stationed at Jackson Barracks have confirmed that the waters are rising, although he could not say whether the cause was a levee breach or overtopping."[42]   At a Noon FEMA teleconference, local officials gave spotty reporting to participating State and Federal officials.   As DHS summarized the reports, "Some of the LA Parishes have 8 to 10 feet of water. . . .  Some levee leakage, but no reported failures to date . . . levee in New Orleans is overflowing."[43]

Mid-afternoon on August 29, the U.S. Army Corps of Engineers (USACE) notified DHS of a reported levee overtopping in St. Bernard's Parish, a reported levee breach in the West Bank, and a small breach in Orleans Parish reported by local firefighters.[44]

At 6 PM EDT aboard a U.S. Coast Guard helicopter, Marty Bahamonde, a FEMA Public Affairs Official, observed the extent of the flooding and was "struck by how accurate" the earlier local reporting was of the levee breaches.[45]  He then called FEMA Director Michael Brown and other FEMA officials with his eyewitness account at approximately 8 PM EDT that day.[46]  Director Brown has testified that he subsequently called the White House to report the flooding information he received from Bahamonde.[47]  Following the calls, Mr. Bahamonde arranged a conference call with State, regional, and FEMA officials to recount what he had seen.[48]  An HSOC report marked 10:30 PM EDT, but not received at the White House until 12:02 AM EDT the next day, summarized the conference call and reported Mr. Bahamonde's observations on the extent of flooding throughout New Orleans.[49]

By morning light and with the passage of the storm, the extent of the flooding was apparent.  At 6 AM EDT on August 30, the HSOC issued a report describing levee breaches at the Industrial Canal, 17th Street, and at Lake Ponchatrain.[50]

Throughout the morning and early afternoon on August 30, the USACE continued to determine the extent of the damage and assess whether the levees could be repaired.[51]  At Governor Blanco's 3 PM EDT press conference on August 30, FEMA Director Michael Brown stated that no resources in fixing the levees would be spared, and that the USACE was diligently working on a repair plan.[52]  The USACE worked throughout the remainder of Tuesday but despite best efforts, by Wednesday morning, it was becoming clear that the repairs could take weeks or months.

*LESSON LEARNED RECOMMENDATION 15:* Establish a National Operations Center to coordinate the National response and provide situational awareness and a common operating picture for the entire Federal government.

New Orleans flooded as the levees and floodwalls gave way and the pumping stations stopped operating; at its height, approximately 80 percent of New Orleans was filled with water up to twenty feet deep.[53]  This unprecedented flooding transformed Hurricane Katrina into a "catastrophe within a catastrophe"[54] as the storm shattered the lives of countless residents and presented State and local officials with challenges far exceeding their capabilities.

*Hurricane Katrina's Impact on State and Local Response*

Many State and local public safety agencies suffered extensive damage to their facilities and equipment. The Grand Isle (Louisiana) Fire Department suffered "total destruction."[55] Fire departments in the Mississippi cities of Biloxi and Gulfport experienced similar fates, while Slidell, Louisiana, had to close over half its stations.[56] The Pascagoula (Mississippi) Police Department lost one-third of its vehicles. Some emergency personnel did not report to work. Warren J. Riley, Superintendent of the New Orleans Police Department, testified before Congress that, "Much has been said about officers abandoning their position during the storm, and it is true that about 147 officers abandoned their positions. However, they are no longer a part of the New Orleans Police Department."[57] Flooding in New Orleans on August 30 forced the closure of the Orleans Parish Emergency Operations Center (EOC).[58] In fact, the New Orleans Mayor's Office operated out of a Hyatt Hotel for several days after Hurricane Katrina's landfall, unable to establish reliable communications with anyone outside the hotel for nearly forty-eight hours.[59] This meant that the Mayor was neither able to effectively command the local efforts, nor was he able to guide the State and Federal support for two days following the storm.

The complete devastation of the communications infrastructure left responders without a reliable network to use for coordinating emergency response operations. Flooding blocked access to the police and fire dispatch centers in New Orleans; neither 911 service nor public safety radio communications functioned sufficiently.[60] In addition, the State of Louisiana's 800 MHz radio system, designed to be the backbone of mutual aid communications, ceased functioning, and repairs were delayed for several days.[61] Louisiana State Senator Robert Barham, chairman of the State Senate's homeland security committee, summed up the situation in Louisiana by stating, "People could not communicate. It got to the point that people were literally writing messages on paper, putting them in bottles and dropping them from helicopters to other people on the ground."[62]

Local emergency response officials found it difficult or impossible to establish functioning incident command structures in these conditions. Such structures would have better enabled local response officials to direct operations, manage assets, obtain situational awareness, and generate requests for assistance to State authorities. Without an incident command structure, it was difficult for local leaders to guide the local response efforts, much less command them. Members of the Hammond (Louisiana) Fire Department reported receiving "a lot of 'I don't knows' from [local] government officials"; another Louisiana firefighter stated, "the command structure broke down—we were literally left to our own devices."[63]

> **LESSON LEARNED:** The Department of Homeland Security, in coordination with the Environmental Protection Agency, should oversee efforts to improve the Federal government's capability to quickly gather environmental data and to provide the public and emergency responders the most accurate information available, to determine whether it is safe to operate in a disaster environment or to return after evacuation. In addition, the Department of Homeland Security should work with its State and local homeland security partners to plan and to coordinate an integrated approach to debris removal during and after a disaster.

State and local emergency responders throughout the affected region struggled to perform urgent response missions, including emergency medical services, firefighting, law enforcement, search and rescue, and support to shelters. Emergency responders operated in an environment involving extreme heat, chemicals, contaminated mud, downed power lines, and standing water.[64] The storm's surge flooded three Superfund[65] toxic waste sites in the New Orleans area, and destroyed or compromised at least 170 drinking water facilities and forty-seven wastewater treatment works along the Gulf Coast.[66] Emergency responders repeatedly exposed themselves to floodwater, chemicals, bacteria, and debris to perform life-saving missions.[67] Their willingness to work in these hazardous conditions is a powerful testament to their bravery and professionalism.

Governors Barbour and Blanco requested additional National Guard assets from other states through the Emergency Management Assistance Compact (EMAC) to assist State and local emergency responders.[68] National Guard forces continued to deploy to the region as States responded in the days following landfall.[69]

*Search and Rescue*

Hurricane Katrina's storm surge and subsequent flooding necessitated one of the largest search and rescue operations in the Nation's history. Thousands of firefighters, police officers, and medical personnel across all levels of government, together with citizen volunteers, braved life-threatening conditions to rescue people and animals from flooded buildings. Search and rescue missions were most urgent in New Orleans, where thousands needed to be plucked from rooftops and attics after the levee system failed. As Mayor Ray Nagin stated: "Thousands of people were stranded on their rooftops, or in attics, needing to be rescued. . . . Our first responders were jumping into the water to rescue people as 911 operators were consumed with traumatic calls for rescue. They received thousand upon thousands of frantic and desperate calls."[70]

Federal search and rescue assets from the Coast Guard, FEMA Urban Search and Rescue (US&R) Task Forces,[71] the Department of Defense (DOD),[72] and other Federal agencies worked in concert with State and local responders to rescue tens of thousands of people. Coast Guard teams alone ultimately rescued and evacuated over 33,000 people—over six times the number in an average year—[73]earning themselves the name the "New Orleans Saints."[74] Immediately following Hurricane Katrina's second landfall, Coast Guard assets began conducting rescue operations throughout the Gulf Region. Governor Barbour later testified that, "The night Katrina struck, Coast Guard helicopter crews from Mobile conducted search and rescue operations on the Coast. These fearless young men, who hung from helicopters on ropes, dangling through the air in the dark that first night, pulled people off of roofs and out of trees."[75] FEMA US&R teams also performed exceptionally well, ultimately rescuing over 6,500 people.[76] Within four hours of landfall, Army National Guard helicopters were airborne and actively performing rescue missions, with other National Guard personnel joining the effort on the ground.[77]

Despite these successes, search and rescue efforts revealed the need for greater coordination between the two constituent components of search and rescue: Urban Search and Rescue (US&R) and civil search and rescue (SAR). US&R refers to the specialized mission of rescuing victims trapped in collapsed structures.[78] In contrast, SAR constitutes all other missions, such as maritime, aeronautical, and land rescues.[79] However, there is no overarching plan that incorporates both aspects of search and rescue. The absence of such a plan led to coordination problems between US&R teams and SAR teams. Some teams displayed their own initiative to fill the gap in unified command, determining their own rescue priorities, areas to be searched, and locations to drop off the people they rescued.[80] Unfortunately, in some cases, rescuers were forced to leave people on highways where they were exposed to the elements and in continuing need of transportation, food, and water.[81]

Under the NRP, FEMA is authorized as the primary agency to coordinate US&R through Emergency Support Function-9 (ESF-9).[82] However, because the NRP focuses only on urban search and rescue, combined with the fact that US&R teams are neither adequately nor

> **LESSON LEARNED:** The Department of Homeland Security should lead an interagency review of current policies and procedures to ensure effective integration of all Federal search and rescue

consistently trained or equipped to perform rescues in a water environment, the NRP failed to anticipate, plan for, and ultimately integrate all of the Federal government's search and rescue assets during Katrina. For example, the Department of Interior (DOI) has valuable expertise in operating watercraft and conducting civil search and rescue operations. Unfortunately, because DOI is not formally considered a part of ESF-9, DOI's offers to deploy shallow-water rescue boats during the response apparently never reached the operational level. Had DOI been considered a supporting agency under ESF-9, its water assets would likely have been effectively integrated into response operations.

*Post-Landfall Evacuations in New Orleans*

As conditions in New Orleans worsened on August 30, due to the massive flooding, State and local officials began organizing a mass evacuation of the city. Since neither the Louisiana nor the New Orleans evacuation plans addressed evacuation protocols for post-landfall,[83] State and local officials worked with FEMA, DOD, and the Department of Transportation (DOT) to conduct the post-landfall evacuation.[84]

The Superdome presented the most immediate concern to officials. The population at the stadium continued to grow as thousands of people migrated there from their flooded homes.[85] The high floodwaters cut off access to the

Superdome, which made re-supply, evacuations, and other operations extremely difficult.[86] The facility had lost power during the storm, leaving only dim lighting from emergency generators.  Louisiana National Guard personnel worked to protect the stadium's emergency generators from rising floodwaters.[87]  The Louisiana National Guard later reported that, "The vast majority of the sheltered evacuees were good people who were trapped in a bad situation."[88]  Conditions at the stadium became increasingly difficult due to the large numbers and the lack of air conditioning or running water. [89]  On the morning of August 30, the U.S. Department of Health and Human Services (HHS) assessed the Superdome as "uninhabitable."[90]

Governor Blanco visited the Superdome on August 30 and concluded the stadium needed to be evacuated "as soon as possible."[91]  Louisiana State and local officials could not manage a post-landfall evacuation operation of this magnitude without additional support.  Shortly thereafter, FEMA personnel at the Superdome requested that FEMA headquarters provide buses to transport evacuees from the stadium.  Within an hour of receiving the call, FEMA tasked the Department of Transportation—as coordinator of ESF-1, Transportation—to support the evacuation operations.  DOT began assembling a bus fleet of over 1,100 vehicles, equal in size to some of the largest transit agencies in the Nation to evacuate thousands of persons from the Superdome and other parts of New Orleans.

Louisiana and Federal officials began contacting other States to relocate evacuees to their cities.[92]  They worked together to develop plans to transport the people in the Superdome to out-of-state shelters.  By the morning of August 31, Governor Blanco reached an agreement with Texas Governor Rick Perry to evacuate the thousands at the Superdome to the Houston Astrodome.[93]  Significant numbers of federally-contracted buses began to arrive at the Superdome the evening of August 31.[94]  Initially, evacuees were loaded onto buses and driven all the way to Houston.  As the Houston Astrodome began to fill, however, Federal and State officials identified alternative destinations in multiple States and the District of Columbia.[95]

Both DOD and DOT worked with State and local officials to deliver food and water as well as develop plans to evacuate people from three other locations in the city:  Algiers Point, the Convention Center, and the Interstate-10 (I-10) cloverleaf.[96]  The Governor's office received reports of the crowds at the Ernest N. Morial Memorial Convention Center and the I-10 cloverleaf on August 31.[97]  Reports began to arrive that large crowds had gathered at the Convention Center even though city officials had never intended it to be a shelter.[98]  Without strong public messaging to inform them otherwise, many of these people had simply assumed that the Convention Center—as a large public building on high ground—would be a safe gathering place.[99]  No food or water was pre-staged there because the facility was neither a shelter nor a designated evacuation point.[100]

In addition, large numbers of people gathered or were deposited by search and rescue teams—who were conducting boat and helicopter rescue operations with neither a coordinated plan nor a unified command structure—atop raised surfaces, such as the I-10 cloverleaf downtown.  People brought to the raised surfaces as they transitioned to safety had little shelter from the sun and were in ninety-eight degree heat.[101]  Faced with this increasingly dire situation, Governor Blanco used her executive authority to commandeer private school buses as evacuation assets, since many of the city's buses had been parked in lots that had flooded.[102]  The Governor directed school buses to ferry the people atop the I-10 cloverleaf to safety outside of the city.[103]

By the morning of September 2, approximately fifteen thousand people had been evacuated from the Superdome, leaving approximately 5,500 remaining.  Reports on exact numbers vary because the Superdome and Convention Center populations swelled after landfall, as additional evacuees continued to arrive while the evacuation was underway.  "The last 300 [people] in the Superdome climbed aboard buses Saturday…  Evacuations of the last remaining [people] at the arena were halted before dawn Saturday as authorities diverted buses to help some 25,000 refugees at the New Orleans Convention Center… The Texas Air National Guard estimated that between 2,000 and 5,000 people remained at the Superdome early on Saturday…"  On Saturday, September 3, a representative of the State "Office of Emergency Preparedness put the figure at 2,000, and said [people] had recently begun flocking there not for shelter, but to escape New Orleans after they heard buses were arriving."[104]

Except for the ill or injured, no one was evacuated from the overcrowded Convention Center until Saturday, September 3.[105]  By that point, however, over 35,000 people had been evacuated from New Orleans, including all the ill or injured at the Superdome.[106]  As the evacuation progressed, the situation at the Convention Center and the Superdome stabilized, with food, water, and medical supplies available at both locations.[107]  By September 4, DHS

reported that the "Superdome and Convention Center have been evacuated; however, displaced persons continue to migrate to these sites and [will be] evacuated as required."[108]

In addition to ground operations, a joint DHS, DOT, and DOD airlift successfully evacuated over 24,000 people, constituting the largest domestic civilian airlift on U.S. soil in history.[109] Federal departments and agencies worked with State, local, and private sector officials to coordinate the operation. After the Federal Aviation Administration restored traffic control and runway operations at New Orleans's Louis Armstrong International Airport, DOT coordinated with private air carriers and the Department of Defense's Transportation Command (USTRANSCOM) to begin the massive airlift. DOT invited the Air Transport Association, the trade organization of principal U.S. airlines, to come to the NRCC to help coordinate with air carriers volunteering their services. In addition to these civilian flights, the Department of Defense simultaneously conducted a major medical airlift from the airport.[110] The DHS Transportation Security Administration (TSA) provided screeners and Federal Air Marshals to maintain security. Search and rescue helicopters brought people directly to the airport, while Federal Protective Service personnel escorted busloads of evacuees from the Superdome.[111] The TSA and other security personnel confiscated hundreds of weapons from evacuees at the airport, including ninety in the first three days of the airlift.[112]

Federal transportation coordinators had little situational awareness regarding the movement of evacuees due to the complete breakdown of the region's communications infrastructure. Specifically, Federal and State officials often had difficulty coordinating the departures and destinations of the large number of buses, trains, and aircraft involved in the evacuations. In one case, a fully provisioned train with room for six hundred evacuees left the city with fewer

> **LESSON LEARNED**: The Department of Transportation, in coordination with other appropriate departments of the Executive Branch, must also be prepared to conduct mass evacuation operations when disasters overwhelm or incapacitate State and local governments.

than one hundred passengers.[113] Buses and flights of evacuees were sometimes diverted, while en route, to new destinations without the knowledge of officials at either the original or new destinations. Without prior notice of the evacuees' arrival times, States sometimes had difficulty accommodating the enormous influx of people. In addition, some passengers reported that they had not been informed of their destinations when they boarded the evacuating flights and had no idea where they were when their flights landed. Speaking about the evacuees, Arkansas Governor Mike Huckabee relayed, "They have been treated like boxes, in many cases, warehoused."[114]

### *Public Safety and Security*

Law enforcement agencies across the Gulf Coast region faced countless challenges in the aftermath of Hurricane Katrina. People began looting in some areas as soon as the storm relented.[115] Violent crimes were committed against law enforcement officers and other emergency response personnel.[116] The storm's damage to equipment, facilities, communications, and jails limited the ability of authorities to respond to calls for help and to combat lawlessness.[117] It is clear that violent crime was less prevalent than initially reported, although reliable crime statistics are unavailable. Exaggerated, unconfirmed claims of violent crimes and lawlessness took on a life of their own in the absence of effective public information to counter them.[118]

Security problems in the Gulf Coast, both actual and perceived, obstructed the speed and efficiency of the Federal response and in some cases temporarily halted relief efforts.[119] Security concerns suspended search and rescue missions,[120] delayed the restoration of communications infrastructure,[121] and impeded medical support missions.[122] On August 31, most of the New Orleans police force was redirected from search and rescue missions to respond to the looting, detracting from the priority mission of saving lives. The lawlessness also delayed restoration of essential private sector services such as power, water, and telecommunications.[123] Federal officials attempted to have law enforcement officers protect emergency responders against security threats.[124] However, due to a lack of planning, arranging this support took several days, during which the situation grew worse.

A limited number of Federal law enforcement personnel were already assigned to local offices in New Orleans following the storm and immediately began organizing efforts to restore law and order, but additional Federal assistance was clearly needed. The Secretary of Homeland Security and the U.S. Attorney General directed their respective departments to send Federal law enforcement officers to assist the beleaguered city.[125] By September 3,

over 1,600 Federal law enforcement officers were in New Orleans.[126]  The Louisiana Governor submitted a request to the Attorney General on September 4, formally seeking assistance from the Department of Justice (DOJ) pursuant to the Emergency Federal Law Enforcement Assistance Act.  After coordinating with the Secretary of Homeland Security, the Attorney General granted the request the same day.  Two days later, Governor Blanco sent a similar request to the Secretary, requesting DHS law enforcement support.  The Secretary granted the request and sent additional DHS law enforcement officers to Louisiana.[127]

By September 5, the Department of Homeland Security had provided 1,444 officers and the Department of Justice had deployed 566 officers.[128]  The numbers of Federal law enforcement officers continued to grow as the Department of Agriculture (USDA), Department of Interior, the Department of Treasury, the Department of Veterans' Affairs, the Environmental Protection Agency (EPA), and the U.S. Postal Inspection Service deployed personnel to the Gulf Coast.[129] Federal law enforcement officers performed such missions as protecting Federal property, conducting search and rescue missions, and assisting local law enforcement, particularly in New Orleans.  However, several departments and agencies noted that they were impeded in their ability to provide immediate assistance due to the need for deputization to enforce State or Federal laws.[130]  Federal planning should have anticipated the need for such deputization procedures.

Hurricane Katrina also crippled the region's criminal justice system.  The exodus of the Gulf Coast population resulted in a significant loss of accountability of many persons under law enforcement supervision (*e.g.*, registered sex offenders, probationers).[131]  The court systems in the disaster area ceased to function, causing a backlog of criminal prosecutions.[132]  Prisoners were often hastily evacuated which created significant challenges for recordkeeping associated with prisoner movement.  There was some initial confusion in the process of identifying and relocating prisoners; however, each eventually was accounted for.[133]  The

> **LESSON LEARNED**: The Department of Justice, in coordination with the Department of Homeland Security, should examine Federal responsibilities for support to State and local law enforcement and criminal justice systems during emergencies and then build operational plans, procedures, and policies to ensure an effective Federal law enforcement response.

strain on the criminal justice system is largely attributable to the absence of contingency plans for these problems at all levels of government.  While these issues remain foreseeable consequences of any major disaster, disaster plans did not adequately address the response necessary to prevent the problems encountered during the aftermath of Katrina.

### *Federal Incident Management*

The magnitude of the storm's destruction presented three immediate challenges for the Federal government.  First, the sheer amount of destruction over such a large area created an enormous demand for emergency assistance such as fuel, medical supplies, food, shelter, and water.  This demand, coupled with the austere conditions throughout the Gulf Coast following Katrina's landfall, exceeded FEMA's standard disaster delivery capabilities and processes.  Mr. Scott Wells, who served as Deputy Federal Coordinating Officer (FCO) in Louisiana, later testified to Congress that "the response was not robust; it was not enough for the catastrophe at hand."[134]  Second, localities needed assistance to perform emergency response operations and re-establish incident command.  However, Hurricane Katrina's impact across the Gulf Coast region limited the use of normal mutual aid agreements, which rely on neighboring cities and counties for assistance.  In this case, the neighboring jurisdictions were overwhelmed themselves and unable to provide assistance elsewhere.  Assistance had to come from States outside the region and from the Federal government.  This requirement for an active Federal role in emergency response operations was most pronounced in New Orleans.  Finally, the communications problems had a debilitating effect on response efforts in the region and the overall national effort.  Officials from national leaders to emergency responders on the ground lacked the level of situational awareness necessary for a prompt and effective response to the catastrophe.  This was a recipe for an inefficient and ineffective Federal response.

On August 30, Secretary Chertoff declared Hurricane Katrina to be an Incident of National Significance (INS), the first ever formal declaration of this designation.[135]  On the same day, he also appointed FEMA Director Michael Brown as the Principal Federal Official (PFO) for the Hurricane Katrina response.[136]  A PFO is designated to facilitate Federal support to the unified command structure and coordinate overall Federal incident management.  The PFO also provides a primary point of contact and situational awareness locally for the Secretary of Homeland

Security.  However, according to the NRP, "The PFO does not direct or replace the incident command structure established at the incident, nor does the PFO have directive authority over the [Senior Federal Law Enforcement Official], FCO, or other Federal and State officials." [137]  The FCO retains his authorities to coordinate Federal response activities under the Stafford Act.[138]  As PFO, Brown had no authority over the FCOs.  However, as the Director of FEMA, Brown was vested with the authority to directly oversee the FCOs,[139] thereby mitigating the PFO limitations.  His subsequent PFO replacement had no such authority to work around this impediment, and as a result, was eventually made FCO as well.  The multiple Federal coordinators with varying authorities frustrated State and local officials in the region.[140]

Also on August 30, DHS initiated a virtual National Joint Information Center (JIC)[141] and conducted the first of what would become daily National Incident Communications Conference Line (NICCL) calls with other Federal departments and agencies.

An important limiting factor of the Federal response, as discussed in the *Primer* chapter, is that the Federal response is predicated on an incident being handled at the lowest jurisdictional level possible.  A base assumption to this approach is that, even in cases where State and local governments are overwhelmed, they would maintain the necessary incident command structure to direct Federal assets to where they are most needed.  In the case of Katrina, the local government had been destroyed and the State government was incapacitated, and thus the Federal government had to take on the additional roles of performing incident command and other functions it would normally rely upon the State and local governments to provide.

> **LESSON LEARNED:** The Federal government should work with its homeland security partners in revising existing plans, ensuring a functional operational structure—including within regions— and establishing a clear, accountable process for all National preparedness efforts.

The Joint Field Office (JFO), which builds upon the State and local incident command structure, provides a single location for all Federal departments and agencies to acquire situational awareness, direction, mission assignments, and a forum to interface with other agencies.[142]  It is essential for ensuring that all Federal response elements possess a common operating picture and synchronize their response operations and resources.  However, in the case of Hurricane Katrina, the JFO was not established at the outset, and did not function as envisioned when it was established.  Key PFO staff positions had not been identified prior to landfall, which forced Director Brown to assemble his staff in the midst of the disaster.[143]  Brown was still working on a PFO organizational chart on the evening of August 31, almost sixty hours after landfall. Key components of the Baton Rouge JFO were still being assembled in the two weeks that followed.[144]

The JFO was located in Baton Rouge, Louisiana, near the State of Louisiana Emergency Operations Center (EOC). A Federal coordination center was not immediately established in New Orleans.  The NRP does not contemplate subordinate structures to the JFO to coordinate Federal response actions in the event of multiple or geographically widespread catastrophes (i.e., multiple "ground zeros").[145]  In the absence of a command center near the major incident sites and a fully functioning JFO, agencies independently deployed resources, operated autonomously, and generated disparate reporting streams back to Federal authorities locally and in Washington.[146]  This resulted in an often inconsistent and inaccurate operating picture of the disaster area for senior decision makers, duplication of efforts, gaps in addressing requests for assistance, and the inefficient allocation of resources.

### *Military Assistance*

Active duty military and National Guard personnel provided critical emergency response and security support to the Gulf Coast during the height of the crisis.  State active duty and Title 32 National Guard forces that deployed to Louisiana and Mississippi operated under the command of their respective Governors.[147]  Title 10 active duty forces, on the other hand, fell under the command of the President and had more limited civil response authority.[148]  On August 30, Deputy Secretary of Defense Gordon England authorized U.S. Northern Command (USNORTHCOM) and the Joint Chiefs of Staff to take all appropriate measures to plan and conduct disaster relief operations in support of FEMA.[149]  USNORTHCOM established Joint Task Force Katrina (JTF-Katrina) at Camp Shelby to coordinate the growing military response to the disaster.[150]

By September 1, JTF-Katrina, commanded by LTG Honoré, included approximately 3,000 active duty personnel in the disaster area; within four days, that number climbed to 14,232 active duty personnel. LTG Honoré's leadership, combined with the Department of Defense's resources, manpower, and advanced planning, contributed to the military's success in the Federal response, especially in areas such as search and rescue, security, and logistical support. Two C-130 firefighting aircraft and seven helicopters supported firefighting operations in New Orleans.[151] By September 5, military helicopters had performed 963 search and rescue, evacuation, and supply delivery missions.[152]   Military personnel also assisted Federal, State and local agencies with other needs as well.  For example, DOD aircraft flew mosquito abatement aerial spraying missions over 2 million acres to prevent the spread of mosquito- and water-borne diseases.[153]  Military personnel also performed such missions as salvage, sewage restoration, relief worker billeting, air traffic control, and fuel distribution.

The standard National Guard deployment coordination between State Adjutants General (TAGs) was effective during the initial response but was insufficient for such a large-scale and sustained operation.[154]   To address this shortfall, LTG Blum, Chief of the National Guard Bureau, held a conference call on August 31with all fifty-four TAGs to distribute requests for forces and equipment to all TAGs.[155]

> **LESSON LEARNED:** The Departments of Homeland Security and Defense should jointly plan for the Department of Defense's support of Federal response activities as well as those extraordinary circumstances when it is appropriate for the Department of Defense to lead the Federal response. In addition, the Department of Defense should ensure the transformation of the National Guard is focused on increased integration with active duty forces for homeland security plans and activities.

Guardsmen performed a range of missions, including search and rescue, security, evacuations, and distribution of food and water.  In Mississippi, National Guard forces prepared Camp Shelby as a staging point for incoming forces and also engaged in law enforcement support, debris removal, shelter support and other vital operations.[156] Guardsmen from Texas and Pennsylvania supplied satellite phone communications to the response.  [157]  When a group of Pennsylvania Guardsmen arrived to fix a Louisiana woman's roof, she told the group: "That's a long way to come to help us.  We're really grateful … you boys are going to heaven, I tell you."[158] By August 29, sixty-five National Guard helicopters were positioned throughout the Gulf Coast.[159]  By September 2, nearly 22,000 National Guard soldiers and airmen had deployed to the region —including 6,500 in New Orleans alone[160]—breaking the National Guard's previous record for the largest response to a domestic emergency.[161]  Eventually, over 50,000 National Guard members from fifty-four States, Territories, and the District of Columbia deployed to the Gulf Coast, providing critical response assistance during this week of crisis.[162]  The robust active duty and National Guard response played a crucial role in the effort to bring stability to the areas ravaged by Hurricane Katrina.

A fragmented deployment system and lack of an integrated command structure for both active duty and National Guard forces exacerbated communications and coordination issues during the initial response.  Deployments for Title 32 (National Guard) forces were coordinated State-to-State through EMAC agreements and also by the National Guard Bureau.  Title 10 (active duty) force deployments were coordinated through USNORTHCOM. Once forces arrived in the Joint Operations Area, they fell under separate command structures, rather than one single command.  The separate commands divided the area of operations geographically and supported response efforts separately, with the exception of the evacuations of the Superdome and the Convention Center in New Orleans.[163] Equipment interoperability problems further hindered an integrated response.  Similar issues of bifurcated operations and interoperability challenges were also present between the military and civilian leadership.[164]   This lack of interoperable communications was apparent at the tactical level, resulting from the fact that emergency responders, National Guard, and active duty military use different equipment.[165]

### *Federal Communications Assistance*

Although the Federal government pushed assets into the Gulf Coast region to fill communication gaps created by Hurricane Katrina we could have and should have done more.  FEMA had pre-positioned two of their five Mobile Emergency Response Support (MERS) detachments in the Gulf and quickly moved them to the affected areas in Louisiana and Mississippi soon after landfall.[166]  MERS detachments consist of an array of vehicles and trained personnel and provide mobile communications, operational support, and logistical power generation assets—

including satellite communications, dozens of phone and data lines, heating and air conditioning, power generation, fuel, potable water, and office functionality— to support the operations of Federal, State, and local authorities.[167] Because MERS is a system of divisible assets and not a rigid unit, a single MERS detachment can provide limited support to multiple field operating sites within the disaster area simultaneously.[168]

> **LESSON LEARNED**: The Department of Homeland Security should review our current laws, policies, plans, and strategies relevant to communications. Upon the conclusion of this review, the Homeland Security Council, with support from the Office of Science and Technology Policy, should develop a National Emergency Communications Strategy that supports communications operability and interoperability.

The Federal government must keep some MERS detachments at locations outside the incident area in case there is another catastrophe or event, but additional MERS support should have been deployed to the Gulf when it became apparent that those pre-positioned were insufficient for an incident of Katrina's magnitude. At the time, some key Federal officials both on the ground and back in Washington did not know that there were additional MERS available.

To augment FEMA's efforts, DOD deployed available communications assets to the affected areas, such as its Deployable Joint Command and Control System.[169] On August 31, National Guard Bureau Chief LTG Blum reported that DOD was "pushing every communications asset that we have."[170] Further, the National Interagency Fire Center provided 3,200 radios, thirty-eight satellite systems, and several other communication modules in order to supplement the Gulf region's damaged communication networks.

The DHS National Communications System (NCS) also contributed to communications recovery efforts following Hurricane Katrina. NCS linked the telecommunications industry with the relevant government agencies through the National Coordinating Center (NCC).[171] The NCC coordinated with MCI and AT&T, as well as USNORTHCOM to identify and deploy mobile communication assets to the Gulf region both prior to, and following, landfall.[172] Further, due to the destruction of the communications infrastructure, the NCS was required to perform new functions, such as providing interim Land Mobile Radio systems, used to connect two-way radio users to a central dispatcher, to first responders in devastated Louisiana parishes.[173] By September 1, mobile communications systems were beginning to provide much needed telephone and two-way radio communications in Louisiana and Mississippi with additional systems en route to support the entire affected area.[174]

### Federal Resource Challenges

The aftermath of Hurricane Katrina left the Gulf Coast in desperate need of resources and assistance. Nearly a quarter of a million people in shelters relied on shipments of ice, food, and water to meet their basic needs.[175] Hospitals, shelters, and other critical facilities required diesel fuel to run their back-up generators. Many evacuees lacked access to medical providers and supplies. Emergency responders conducting life-saving operations demanded additional supplies and fuel. FEMA's pre-positioned supplies proved inadequate to meet these demands throughout the region after landfall.[176] To fill this gap, the Federal government sent more resources to Louisiana in the first two weeks after Hurricane Katrina than it had sent to Florida for all of the previous year's hurricanes combined.[177]

As Hurricane Katrina made landfall, Director Brown provided public assurances that FEMA was prepared to act to meet the logistical challenge.[178] FEMA personnel soon discovered, however, that the quantity of material requested post-landfall outstripped their logistical capabilities. FEMA simply could not procure enough resources to match the rate at which commodities were being consumed. The agency's contracts with private companies, though sufficient for smaller disasters, were incapable of supplying

> **LESSON LEARNED:** The Department of Homeland Security, in coordination with State and local governments and the private sector, should develop a modern, flexible, and transparent logistics system. This system should be based on established contracts for stockpiling commodities at the local level for emergencies and the provision of goods and services during emergencies. The Federal government must develop the capacity to conduct large-scale logistical operations that supplement and, if necessary, replace State and local logistical systems by leveraging resources within both the public sector and the private sector.

the enormous quantities of resources needed.[179]  As a result, shortages plagued the affected area.  In Mississippi, FEMA personnel were unable to meet requirements submitted by staging areas.[180]  William Carwile, the FCO for Mississippi, recalled that there was a huge gap "between what we required on the ground and what they were sending us."[181]  In some areas, local officials who requested high-demand resources, such as generators, received no shipments of those supplies from FEMA until weeks after landfall.[182]

Ineffective communications between FEMA and other Federal departments and agencies prevented available Federal resources from being effectively used for response operations.  The USDA observed that its personnel "had difficulty in getting FEMA to take advantage of the resources available to them because of the unfamiliarity of some FEMA employees with USDA programs.  Likewise, many USDA employees were unfamiliar with FEMA programs and procedures."  The Department of Interior also offered valuable assistance.  In the aftermath of the hurricane, DOI delivered a comprehensive list of its deployable assets that were immediately available for humanitarian and emergency assistance, including such items as 300 dump trucks and other vehicles, 119 pieces of heavy equipment, 300 boats, eleven aircraft, fifty to seventy-five maintenance crews. Although DOI repeatedly attempted to provide these assets through the process established by the NRP, there was no effective mechanism for efficiently integrating and deploying these resources.  DOI offered 500 rooms and other sites for shelters or housing.  The Departments of Veterans Affairs (VA), Housing and Urban Development (HUD), and Agriculture (USDA) also offered thousands of housing units nationwide to FEMA for temporary assignment to evacuees.  FEMA officials said that the need to negotiate conditional requirements in some cases prevented them from accepting some Federal agencies' offers of housing resources.  Most of the thousands of housing units made available by other Federal agencies were not offered to evacuees and were never used.

The private sector too met roadblocks in its efforts to coordinate with the Federal government during the response.  For example, the American Bus Association spent an entire day trying to find a point of contact at FEMA to coordinate bus deployment without success.[183]  Federal procurement officers also neglected to draw upon retailers' supply lines to get the resources that victims needed.  To this end, despite an acute shortage of blue tarps to cover damaged roofs, Federal officials were slow to draw upon the corporate supply chains that deliver tarps to the stores that sell them.  For example, one private sector company had 600,000 tarps available.

> **LESSON LEARNED:** The Department of Homeland Security, working collaboratively with the private sector, should revise the National Response Plan and finalize the Interim National Infrastructure Protection Plan to be able to rapidly assess the impact of a disaster on critical infrastructure.  We must use this knowledge to inform Federal response and prioritization decisions and to support infrastructure restoration in order to save lives and mitigate the impact of the disaster on the Nation.

Throughout the weeks following Hurricane Katrina, the Department of Commerce worked to close the gap between the private and the public sector.  The Department set up an informational website and hotline to provide businesses with a one-stop source of information on contracting opportunities.[184]  The Department also granted certain companies prioritized access to the raw materials needed to restore the region's crippled infrastructure, even when the resources had previously been contracted to other parties.[185]

As logistics problems were now obvious to all, FEMA turned to DOD for major support in this area.[186]  On September 3, Secretary Rumsfeld directed USNORTHCOM to execute greater logistical support operations in both Louisiana and Mississippi.[187]

### *Offers of Charitable Assistance*

FEMA could neither efficiently accept nor manage the deluge of charitable donations.[188]  Private sector companies also encountered problems when attempting to donate their goods and services to FEMA for Hurricane Katrina response efforts.

Other countries made generous offers of assistance that the Federal government had difficulty integrating into the ongoing response operations.  Absent an implementation plan for the management of foreign material assistance, valuable resources often went unused, which frustrated many donor countries.  Inadequate planning delayed the overall process of accepting and receiving disaster aid from abroad.  For example, after Switzerland had loaded

relief supplies onto an aircraft, FEMA requested that the country send only the portion FEMA required to meet response needs. As the generous contribution of supplies could not be unloaded quickly and repackaged into the smaller quantities in a timely manner, the U.S. Embassy in Bern and the Government of Switzerland cancelled the entire flight.[189] A German company offered the use of a $3 million integrated satellite and cellular telephone system capable of handling 5,000 calls at once, only to wait five days for a written deployment order from USNORTHCOM.

The same was true of foreign financial assistance. There was no means of accepting, allocating and disbursing funds that would also ensure transparency and acknowledgement of donors. The Federal government eventually developed a process to accept financial gifts from foreign countries,[190] but because there was no pre-established plan, implementation

> **LESSON LEARNED:** The Department of State, in coordination with the Department of Homeland Security, should review and revise policies, plans, and procedures for the management of foreign disaster assistance.  In addition, this review should clarify responsibilities and procedures for handling inquiries

was a slow and often frustrating process.  The U.S. Agency for International Development (USAID) sent liaisons to FEMA field locations on September 2 to coordinate the delivery of foreign disaster relief.[191]  However, it took several days for the international aid staging area at Little Rock Air Force Base, Arkansas, to become operational.[192] Before this staging area was established, foreign aid could not be efficiently unloaded and distributed.  The Federal government's inability to utilize its own resources, or those offered to it, caused great concern for the American public.

### *Federal Health and Medical Support*

The public health and medical situation throughout the Gulf Coast required substantial Federal resources to prevent even further loss of life.  On August 31, HHS Secretary Leavitt declared a Federal Public Health Emergency for the Gulf Coast region.  This emergency declaration allowed HHS to waive certain requirements for such programs as Medicare, Medicaid, and the State Children's Health Insurance Program.  It also allowed HHS to make grants and enter into contracts more expeditiously.[193]  Immediate public health and medical support challenges included the identification, triage, and treatment of acutely sick and injured patients; the management of chronic medical conditions in large numbers of evacuees with special health care needs; the assessment, communication, and mitigation of public health risks; mortuary support; and the provision of assistance to State and local health officials to quickly reestablish health care delivery systems and public health infrastructures.[194]

Federal departments and agencies worked together to attempt to meet these challenges, beginning before Hurricane Katrina's landfall and continuing long after.  HHS and DOD health officials collaborated with State and local health officials, maintained situational awareness for their respective agencies, and hastened the direction of medical and public health assets.  National Disaster Medical System (NDMS) teams also formed an integral component of the medical response to Hurricane Katrina, collectively treating over 100,000 patients.[195]  Several agencies assigned responsibilities in the NRP under ESF-8, Public Health and Medical Services, sent liaisons to the HHS Operations Center in Washington, D.C., and the HHS Secretary's Emergency Response Teams (SERTs) in the affected States. The Department of Veterans Affairs (VA) used its extensive resources to deliver care to evacuees and veterans from the affected region.

HHS deployed medical supplies and personnel to bolster State and local public health capacity in the region.  It provided pharmaceuticals and other medical supplies from the Strategic National Stockpile (SNS) beginning with pre-landfall deliveries to the Superdome.  By September 3, HHS had delivered 100 tons of medical supplies from the SNS to Louisiana.  HHS also deployed twenty-four public health teams that included epidemiology, food safety, sanitation, and toxicology experts.

Medical and public health assets provided excellent care to thousands of displaced patients with both acute injuries and with chronic medical conditions, many of whom had multiple complex medical requirements.  According to the Governors from the Gulf Region, medical and public health professionals were true heroes of the Hurricane Katrina response.  They often had to improvise and use their own initiative because the system was slow to deploy them from staging areas or failed to adequately supply them. A member of an American Red Cross inspection team, Dr. Hilarie H. Cranmer, wrote, "[i]n a little over four days, our multidisciplinary and interagency teams assessed more

than 200 shelters housing nearly 30,000 people. Amazingly, in a majority of cases, the basic public health needs were being met."[196] Federal, State, local, private sector, and volunteer health care providers across the Gulf Coast took the initiative to overcome the inefficiencies of the medical support system and meet their patients' needs.[197] Louisiana State University worked with the State Office of Emergency Preparedness, Federal personnel, and responders from outside the region to turn its Pete Maravich Assembly Center into an acute care medical facility. Within a week, the facility processed approximately 6,000 patients and more than a thousand prescriptions.[198]

HHS struggled in its NRP role as coordinating agency for ESF-8. HHS lacked control over vital medical assets, over-relied on departmental routines, and did not have adequate disaster plans. FEMA compounded HHS coordination difficulties. FEMA deployed NDMS teams without HHS's oversight or knowledge. FEMA administrative delays in issuing mission assignments exacerbated the lack of coordination within ESF-8 and created additional inefficiencies. In order to respond swiftly, HHS felt compelled to take emergency response actions without mission assignments, bypassing FEMA. While this may have pushed additional assets to the region, it also had a deleterious effect on the Federal government's situational awareness of its deployed assets.

> *LESSON LEARNED:* In coordination with the Department of Homeland Security and other homeland security partners, the Department of Health and Human Services should strengthen the Federal government's capability to provide public health and medical support during a crisis. This will require the improvement of command and control of public health resources, the development of deliberate plans, an additional investment in deployable operational resources, and an acceleration of the initiative to foster the widespread use of interoperable electronic health records systems.

## FROM RESPONSE TO RECOVERY

### *Federal Coordination*

After a week of crisis, Federal, State, and local officials began transitioning to a more organized and sustained response. As requirements eased and material flowed into the region, Federal departments addressed those problems that had afflicted their response during its first week. The establishment of JFOs in several States across the Gulf Coast in the following weeks enhanced the Federal response by providing the coordination and management that had been largely absent.[199] On September 5, Secretary Chertoff appointed Vice Admiral (VADM) Thad Allen to the position of Deputy PFO. At that time, the Louisiana JFO was still a temporary office near the Louisiana Emergency Operations Center in Baton Rouge, almost eighty miles from New Orleans. However, to gain greater visibility of the disaster area, VADM Allen stood up a "PFO-Forward Headquarters" in New Orleans on the *USS Iwo Jima* on September 7.[200] The PFO-Forward rapidly increased the effectiveness of the Federal response by providing a Federal unified command close to the disaster scene. On September 9, Secretary Chertoff appointed VADM Allen to replace Michael Brown as PFO for Hurricane Katrina.[201] Director Brown returned to Washington to assume his duties as FEMA Director, rather than managing the field operations for Katrina.[202] On September 21, VADM Allen was given additional authorities when he was appointed FCO, in addition to PFO.[203] VADM Allen's appointments ultimately proved critical for energizing the JFO and the entire Federal response to Hurricane Katrina.[204]

The formation of Federal coordination entities also improved law enforcement operations. On September 6, the two Senior Federal Law Enforcement Officials (SFLEOs)[205] each representing the DOJ and DHS, respectively, established a Law Enforcement Coordination Center (LECC)[206] in New Orleans to help coordinate law enforcement personnel operating in the city and surrounding parishes. For the first time during the hurricane response, New Orleans now had a unified command for law enforcement comprised of the New Orleans Police Department, the Louisiana State Police, the National Guard, and all Federal law enforcement personnel.[207] Improved coordination, combined with increased Federal law enforcement assistance, strengthened public safety and security in New Orleans. On September 12, the DOD stated that there was "[v]ery little criminal activity" in New Orleans, and that the "military presence deters criminals before damage can be done."[208] By September 13, the City of New Orleans reported law enforcement and military personnel had successfully reestablished security in the City.[209]

Improved security and the deployment of additional Federal personnel also facilitated search and rescue operations, particularly in New Orleans. By this point, most of the people stranded on rooftops had been rescued, so operations focused more on door-to-door searches. Rescue teams completed primary ground searches in New Orleans on

September 12, and spent the next two weeks entering buildings to locate trapped survivors and deceased victims. [210] FEMA Urban Search and Rescue teams completed all Mississippi assignments on September 10 and ended all operations in Louisiana twenty days later. [211]

The DHS Public Affairs Office established a Joint Information Center (JIC) in Baton Rouge on Wednesday, September 6, to provide accurate and timely information on the Federal response and relief efforts as well as to counter misinformation. [212] The formation of a second facility in New Orleans three days later improved the flow

> **LESSON LEARNED:** The Department of Homeland Security should develop an integrated public communications plan to better inform, guide, and reassure the American public before, during, and after a catastrophe. The Department of Homeland Security should enable this plan with operational capabilities to deploy coordinated public affairs teams during a crisis.

of accurate information back to the Baton Rouge JIC. These JICs helped to stem the spread of rumors and unsubstantiated reports that had plagued public information efforts during the first week after landfall.

Federal and State officials struggled to locate, recover, and identify the hundreds of deceased victims. While mortuary affairs is generally a State and local responsibility, the NRP is unclear about the appropriate Federal role, leading to substantial confusion. [213] FEMA established body collection points at Gulfport, Mississippi, and St. Gabriel, Louisiana, in the days following Hurricane Katrina's landfall. [214] From August 31 to September 4, FEMA also deployed ten Disaster Mortuary Operational Response Teams (DMORTs) and both of its Disaster Portable Morgue Units (DPMU) to help State and local personnel identify and process bodies at those collection points. [215] On September 1, FEMA reached a verbal agreement with Kenyon International Emergency Services, a disaster management contractor, to retrieve and transport bodies. [216] However, difficulties finalizing the agreement with Kenyon hindered body recovery efforts on the ground. [217] Frustrated Kenyon executives withdrew from their agreement with FEMA; this led FEMA to request that DOD take over the body recovery effort until another contractor could be found. [218]

Disagreement between Federal and State officials over body recovery responsibilities continued for weeks after landfall. Federal officials maintained that body recovery was ultimately a State responsibility with the Federal government providing support only. [219] In a September 13 press conference, Governor Blanco expressed her dismay and blamed FEMA for failing to "break through the bureaucracy" to finalize a contact with Kenyon International. On September 13, Governor Blanco directed the Louisiana Department of Health and Hospitals to sign its own written contract with Kenyon, even though the Governor believed that "recovery of bodies is a FEMA responsibility." [220] The deployed DMORTs performed well in extraordinarily difficult circumstances. Though they found themselves in the midst of a catastrophic disaster and caught in a public political dispute, they carried out their mission with great professionalism and compassion.

### Meeting Victims' Needs

The national effort to meet the needs of Hurricane Katrina victims expanded in the weeks after landfall. Government, private sector, faith-based, non-profit, and other volunteer personnel collaborated in innovative ways to provide medical, financial, and housing assistance. For example, former Presidents George H.W. Bush and Bill Clinton are distributing over $90 million they raised following Hurricane Katrina to Gulf Coast higher education institutions, local and regional faith-based organizations, and the States of Louisiana, Mississippi and Alabama. [221] At the National Book Festival in September attendees collected donated books to help Gulf Coast schools and libraries replace the books that were destroyed by the hurricane. [222]

Federal responders overcame many of the initial public health challenges as increasing numbers of medical personnel and supplies flowed into the region. The continuing efforts of medical personnel to vaccinate Hurricane Katrina evacuees prevented most communicable diseases from spreading in the densely populated shelters. [223] By mid-September, the HHS's public health response transitioned focus from acute public health issues to include less imminent concerns, such as child care support, mental health services, and treatment services for substance abuse. [224]

On September 7, FEMA announced that it had instituted the Expedited Assistance Program to speed the delivery of assistance to Hurricane Katrina victims. [225] This enabled registrations to grow from 261,946 on September 5 to over

one million ten days later.[226]  FEMA delivered over $1 billion in assistance to evacuees in all fifty States and the District of Columbia by September 17—less than three weeks after landfall.[227]  However, this extraordinary and unprecedented effort was frequently overshadowed by problems encountered by evacuees in their attempts to register for or receive assistance.  For example, FEMA established Disaster Recovery Centers (DRCs) in the Gulf Coast region that were not structured to process disaster assistance registrations.[228]  The DRCs also were not set up to assist victims in obtaining the other Federal assistance that they were already receiving before Katrina, such as Social Security and Veteran's Benefits.  Staff at the DRCs directed victims to register by telephone or via the Internet.[229]  Since many households in Hurricane Katrina-affected areas were without power or telephone service, such instructions left many without the means to file their registrations.[230]  In addition, FEMA had not determined the capacity of existing Federal agency call centers and telephone banks to handle increased call volumes.  Consequently, victims registering for assistance via telephone repeatedly encountered long delays and disconnected calls.[231]

> **LESSON LEARNED:**  The Department of Health and Human Services should coordinate with other departments of the Executive Branch, as well as State governments and non-governmental organizations, to develop a robust, comprehensive, and integrated system to deliver human services during disasters so that victims are able to receive Federal and State assistance in a simple and seamless manner.  In particular, this system should be designed to provide victims a consumer oriented, simple, effective and single encounter from which they can receive assistance.

At times, FEMA public statements regarding the provision of assistance were confusing or incomplete.  For example, FEMA announced that it was making $2,000 cash payments to qualified/registered disaster victims and that these funds would be provided through various means, including by debit card.[232]  However, it made this announcement before the debit cards were widely available and did not provide detailed guidance on distribution procedures.[233]  This led to widespread confusion and frustration.  Security personnel had to lock down the Houston Astrodome during the distribution of debit cards due to unrest among evacuees.[234]

Faith-based, non-profit, and other non-government and volunteer organizations continued to provide essential support to Hurricane Katrina victims.  For example, in Harris County, Texas, the Citizen Corps Council—a volunteer organization under the auspices of DHS—coordinated private sector contributions and the mobilization of 60,000 volunteers.[235]  The Citizen Corps volunteers created an evacuee "city," which at its peak sheltered more than 27,000 people at the Reliant Center, Reliant Arena, and the Astrodome.[236]  The Southern Baptist Convention of the North American Mission Board and other faith-based organizations provided food and shelter to many evacuees and helped them find temporary and permanent housing.[237]

However, faith-based and non-governmental groups were not adequately integrated into the response effort.[238]  These groups often encountered difficulties coordinating their efforts with Federal, State and local governments, due to a failure to adequately address their role in the NRP.[239]  Major Todd Hawks of the Salvation Army testified to Congress that the Salvation Army, "wasn't permitted to have a liaison officer in the State's Emergency Operations Center (EOC).  As a result,

> **LESSON LEARNED:**  The Federal response should better integrate the contributions of volunteers and non-governmental organizations into the broader national effort.  This integration would be best achieved at the State and local levels, prior to future incidents.  In particular, State and local governments must engage NGOs in the planning process, credential their personnel, and provide them the necessary resource support for their involvement in a joint response.

we had to obtain critical information second-hand through Voluntary Organizations Active in a Disaster (VOAD)— if we received the information at all."  Hawks stated this situation further complicated the Salvation Army's relief effort.[240]  Reverend Larry Snyder, President of Catholic Charities USA, remarked, "In spite of Catholic Charities having available FEMA trained and certified disaster response staff, we were not always allowed admittance to FEMA operations and the local EOCs. This significantly impaired a more coordinated response by all of us."  These groups succeeded in their missions, mitigated suffering and helped victims survive mostly in spite of, not because of, the government.  These groups deserve better next time.  Jim Towey, Director of the White House Office of Faith-Based and Community Initiatives, said these folks were the foot soldiers and armies of compassion that victims of Katrina so desperately needed.

CHAPTER FOUR: A WEEK OF CRISIS — AUGUST 29 – SEPTEMBER 5

> **LESSON LEARNED:** Using established Federal core competencies and all available resources, the Department of Housing and Urban Development, in coordination with other departments of the Executive Branch with housing stock, should develop integrated plans and bolstered capabilities for the temporary and long-term housing of evacuees. The American Red Cross and the Department of Homeland Security should retain responsibility and improve the process of mass care and sheltering during disasters.

Locating temporary or long-term housing for Hurricane Katrina evacuees presented significant challenges for Federal officials. The supply of temporary housing in the disaster area, such as hotels and apartments, was quickly depleted, while FEMA's effort to provide trailers to evacuees foundered due to inadequate planning and poor coordination.[241] Moving evacuees into trailers was delayed because of FEMA's failure to plan for the provision of delivery transportation and infrastructure support such as water and electrical hook-up.[242] The shelter population plummeted from nearly 273,000 on September 5 to about 135,000 on September 10 as evacuees found temporary or other housing opportunities.[243] Although FEMA had planned to place all evacuees into temporary housing by October 1,[244] nearly 16,000 victims of Hurricane Katrina and Hurricane Rita, which made landfall near the Texas-Louisiana border on September 24, still remained in shelters in mid-October.[245] FEMA also did not provide expedited direct rental assistance to individuals until late September.[246] Those out of shelters were mostly placed in hotels, which only delayed the permanent housing problem. Further, the uncertainty of relocation fostered constant anxiety in the already traumatized victims of Katrina.

Housing and other assistance issues persisted even as response operations gave way to recovery and rebuilding efforts. They are critical for determining whether the region will retain its people and their unique culture. These remain central issues for Donald Powell, appointed by President Bush on November 1, 2005, to serve as the Coordinator of Federal Support for the Gulf Coast's Recovery and Rebuilding.[247]

**CONCLUSION**

Hurricane Katrina necessitated a national response that Federal, State, and local officials were unprepared to provide. The methods that had been employed successfully for the 243 previous major disaster declarations since January 2001 proved inadequate for Hurricane Katrina's magnitude.[248] The Federal response suffered from significant organization and coordination problems during this week of crisis. The lack of communications and situational awareness had a debilitating effect on the Federal response. Even after coordinating elements were in place, Federal departments and agencies continued to have difficulty adapting their standard procedures to this catastrophic incident. The Federal government's problems responding to Hurricane Katrina illustrate greater systemic weaknesses inherent in our current national preparedness system: the lack of expertise in the areas of response, recovery, and reconstruction. Insufficient planning, training, and interagency coordination are not problems that began and ended with Hurricane Katrina. The storm demonstrated the need for greater integration and synchronization of preparedness efforts, not only throughout the Federal government, but also with the State and local governments and the private and non-profit sectors as well.

# CHAPTER FIVE: LESSONS LEARNED

*This government will learn the lessons of Hurricane Katrina. We are going to review every action and make necessary changes so that we are better prepared for any challenge of nature, or act of evil men, that could threaten our people.*

**—President George W. Bush, September 15, 2005[1]**

The preceding chapters described the dynamics of the response to Hurricane Katrina. While there were numerous stories of great professionalism, courage, and compassion by Americans from all walks of life, our task here is to identify the critical challenges that undermined and prevented a more efficient and effective Federal response. In short, what were the key failures during the Federal response to Hurricane Katrina?

We ask this question not to affix blame. Rather, we endeavor to find the answers in order to identify systemic gaps and improve our preparedness for the next disaster – natural or man-made. We must move promptly to understand precisely what went wrong and determine how we are going to fix it.

After reviewing and analyzing the response to Hurricane Katrina, we identified seventeen specific lessons the Federal government has learned. These lessons, which flow from the critical challenges we encountered, are depicted in the accompanying text box. Fourteen of these critical challenges were highlighted in the preceding Week of Crisis section and range from high-level policy and planning issues (e.g., the Integrated Use of Military Capabilities) to operational matters (e.g., Search and Rescue).[2] Three other challenges – Training, Exercises, and Lessons Learned; Homeland Security Professional Development and Education; and Citizen and Community Preparedness –

**Hurricane Katrina Critical Challenges**
1. National Preparedness
2. Integrated Use of Military Capabilities
3. Communications
4. Logistics and Evacuations
5. Search and Rescue
6. Public Safety and Security
7. Public Health and Medical Support
8. Human Services
9. Mass Care and Housing
10. Public Communications
11. Critical Infrastructure and Impact Assessment
12. Environmental Hazards and Debris Removal
13. Foreign Assistance
14. Non-Governmental Aid
15. Training, Exercises, and Lessons Learned
16. Homeland Security Professional Development and Education
17. Citizen and Community Preparedness

are interconnected to the others but reflect measures and institutions that improve our preparedness more broadly. These three will be discussed in the Report's last chapter, *Transforming National Preparedness*.

Some of these seventeen critical challenges affected all aspects of the Federal response. Others had an impact on a specific, discrete operational capability. Yet each, particularly when taken in aggregate, directly affected the overall efficiency and effectiveness of our efforts. This chapter summarizes the challenges that ultimately led to the lessons we have learned. Over one hundred recommendations for corrective action flow from these lessons and are outlined in detail in Appendix A of the Report.

**Critical Challenge: National Preparedness**

Our current system for homeland security does not provide the necessary framework to manage the challenges posed by 21st Century catastrophic threats.  But to be clear, it is unrealistic to think that even the strongest framework can perfectly anticipate and overcome all challenges in a crisis.  While we have built a response system that ably handles the demands of a typical hurricane season, wildfires, and other limited natural and man-made disasters, the system clearly has structural flaws for addressing catastrophic events.  During the Federal response to Katrina[3], four critical flaws in our national preparedness became evident:  Our processes for unified management of the national response; command and control structures within the Federal government; knowledge of our preparedness plans; and regional planning and coordination.  A discussion of each follows below.

*Unified Management of the National Response*

Effective incident management of catastrophic events requires coordination of a wide range of organizations and activities, public and private.  Under the current response framework, the Federal government merely "coordinates" resources to meet the needs of local and State governments based upon their requests for assistance.  Pursuant to the National Incident Management System (NIMS) and the National Response Plan (NRP), Federal and State agencies build their command and coordination structures to support the local command and coordination structures during an emergency.  Yet this framework does not address the conditions of a catastrophic event with large scale competing needs, insufficient resources, and the absence of functioning local governments.  These limitations proved to be major inhibitors to the effective marshalling of Federal, State, and local resources to respond to Katrina.

Soon after Katrina made landfall, State and local authorities understood the devastation was serious but, due to the destruction of infrastructure and response capabilities, lacked the ability to communicate with each other and coordinate a response.  Federal officials struggled to perform responsibilities generally conducted by State and local authorities, such as the rescue of citizens stranded by the rising floodwaters, provision of law enforcement, and evacuation of the remaining population of New Orleans, all without the benefit of prior planning or a functioning State/local incident command structure to guide their efforts.

The Federal government cannot and should not be the Nation's first responder. State and local governments are best positioned to address incidents in their jurisdictions and will always play a large role in disaster response. But Americans have the right to expect that the Federal government will effectively respond to a catastrophic incident. When local and State governments are overwhelmed or incapacitated by an event that has reached catastrophic proportions, only the Federal government has the resources and capabilities to respond.  The Federal government must therefore plan, train, and equip to meet the requirements for responding to a catastrophic event.

*Command and Control Within the Federal Government*

In terms of the management of the Federal response, our architecture of command and control mechanisms as well as our existing structure of plans did not serve us well.  Command centers in the Department of Homeland Security (DHS) and elsewhere in the Federal government had unclear, and often overlapping, roles and responsibilities that were exposed as flawed during this disaster.  The Secretary of Homeland Security, is the President's principal Federal official for domestic incident management, but he had difficulty coordinating the disparate activities of Federal departments and agencies.  The Secretary lacked real-time, accurate situational awareness of both the facts from the disaster area as well as the on-going response activities of the Federal, State, and local players.

The National Response Plan's Mission Assignment process proved to be far too bureaucratic to support the response to a catastrophe. Melvin Holden, Mayor-President of Baton Rouge, Louisiana, noted that, "requirements for paper work and form completions hindered immediate action and deployment of people and materials to assist in rescue and recovery efforts."[4]  Far too often, the process required numerous time consuming approval signatures and data processing steps prior to any action, delaying the response.  As a result, many agencies took action under their own independent authorities while also responding to mission assignments from the Federal Emergency Management Agency (FEMA), creating further process confusion and potential duplication of efforts.

This lack of coordination at the Federal headquarters-level reflected confusing organizational structures in the field. As noted in the *Week of Crisis* chapter, because the Principal Federal Official (PFO) has coordination authority but lacks statutory authority over the Federal Coordinating Officer (FCO), inefficiencies resulted when the second PFO was appointed. The first PFO appointed for Katrina did not have this problem because, as the Director of FEMA, he was able to directly oversee the FCOs because they fell under his supervisory authority.[5] Future plans should ensure that the PFO has the authority required to execute these responsibilities.

Moreover, DHS did not establish its NRP-specified disaster site multi-agency coordination center—the Joint Field Office (JFO)—until after the height of the crisis.[6] Further, without subordinate JFO structures to coordinate Federal response actions near the major incident sites, Federal response efforts in New Orleans were not initially well-coordinated.[7]

Lastly, the Emergency Support Functions (ESFs) did not function as envisioned in the NRP. First, since the ESFs do not easily integrate into the NIMS Incident Command System (ICS) structure, competing systems were implemented in the field – one based on the ESF structure and a second based on the ICS. Compounding the coordination problem, the agencies assigned ESF responsibilities did not respect the role of the PFO. As VADM Thad Allen stated, "The ESF structure currently prevents us from coordinating effectively because if agencies responsible for their respective ESFs do not like the instructions they are receiving from the PFO at the field level, they go to their headquarters in Washington to get decisions reversed. This is convoluted, inefficient, and inappropriate during emergency conditions. Time equals lives saved."

### *Knowledge and Practice in the Plans*

At the most fundamental level, part of the explanation for why the response to Katrina did not go as planned is that key decision-makers at all levels simply were not familiar with the plans. The NRP was relatively new to many at the Federal, State, and local levels before the events of Hurricane Katrina.[8] This lack of understanding of the "National" plan not surprisingly resulted in ineffective coordination of the Federal, State, and local response. Additionally, the NRP itself provides only the 'base plan' outlining the overall elements of a response: Federal departments and agencies were required to develop supporting operational plans and standard operating procedures (SOPs) to integrate their activities into the national response.[9] In almost all cases, the integrating SOPs were either non-existent or still under development when Hurricane Katrina hit. Consequently, some of the specific procedures and processes of the NRP were not properly implemented, and Federal partners had to operate without any prescribed guidelines or chains of command.

Furthermore, the JFO staff and other deployed Federal personnel often lacked a working knowledge of NIMS or even a basic understanding of ICS principles. As a result, valuable time and resources were diverted to provide on-the-job ICS training to Federal personnel assigned to the JFO. This inability to place trained personnel in the JFO had a detrimental effect on operations, as there were not enough qualified persons to staff all of the required positions. We must require all incident management personnel to have a working knowledge of NIMS and ICS principles.

### *Insufficient Regional Planning and Coordination*

The final structural flaw in our current system for national preparedness is the weakness of our regional planning and coordination structures. Guidance to governments at all levels is essential to ensure adequate preparedness for major disasters across the Nation. To this end, the Interim National Preparedness Goal (NPG) and Target Capabilities List (TCL) can assist Federal, State, and local governments to: identify and define required capabilities and what levels of those capabilities are needed; establish priorities within a resource-constrained environment; clarify and understand roles and responsibilities in the national network of homeland security capabilities; and develop mutual aid agreements.

Since incorporating FEMA in March 2003, DHS has spread FEMA's planning and coordination capabilities and responsibilities among DHS's other offices and bureaus. DHS also did not maintain the personnel and resources of FEMA's regional offices.[10] FEMA's ten regional offices are responsible for assisting multiple States and planning for disasters, developing mitigation programs, and meeting their needs when major disasters occur. During Katrina,

eight out of the ten FEMA Regional Directors were serving in an acting capacity and four of the six FEMA headquarters operational division directors were serving in an acting capacity. While qualified acting directors filled in, it placed extra burdens on a staff that was already stretched to meet the needs left by the vacancies.

Additionally, many FEMA programs that were operated out of the FEMA regions, such as the State and local liaison program and all grant programs, have moved to DHS headquarters in Washington. When programs operate out of regional offices, closer relationships are developed among all levels of government, providing for stronger relationships at all levels. By the same token, regional personnel must remember that they represent the interests of the Federal government and must be cautioned against losing objectivity or becoming mere advocates of State and local interests. However, these relationships are critical when a crisis situation develops, because individuals who have worked and trained together daily will work together more effectively during a crisis.

> ***LESSON LEARNED:*** The Federal government should work with its homeland security partners in revising existing plans, ensuring a functional operational structure—including within regions—and establishing a clear, accountable process for all National preparedness efforts. In doing so, the Federal government must:
> - Ensure that Executive Branch agencies are organized, trained, and equipped to perform their response roles.
> - Finalize and implement the National Preparedness Goal.

### <u>Critical Challenge</u>: Integrated Use of Military Capabilities

The Federal response to Hurricane Katrina demonstrates that the Department of Defense (DOD) has the capability to play a critical role in the Nation's response to catastrophic events. During the Katrina response, DOD – both National Guard and active duty forces – demonstrated that along with the Coast Guard it was one of the only Federal departments that possessed real operational capabilities to translate Presidential decisions into prompt, effective action on the ground. In addition to possessing operational personnel in large numbers that have been trained and equipped for their missions, DOD brought robust communications infrastructure, logistics, and planning capabilities. Since DOD, first and foremost, has its critical overseas mission, the solution to improving the Federal response to future catastrophes cannot simply be "*let the Department of Defense do it.*" Yet DOD capabilities must be better identified and integrated into the Nation's response plans.

The Federal response to Hurricane Katrina highlighted various challenges in the use of military capabilities during domestic incidents. For instance, limitations under Federal law and DOD policy caused the active duty military to be dependent on requests for assistance. These limitations resulted in a slowed application of DOD resources during the initial response. Further, active duty military and National Guard operations were not coordinated and served two different bosses, one the President and the other the Governor.

#### *Limitations to Department of Defense Response Authority*

For Federal domestic disaster relief operations, DOD currently uses a "pull" system that provides support to civil authorities based upon specific requests from local, State, or Federal authorities.[11] This process can be slow and bureaucratic. Assigning active duty military forces or capabilities to support disaster relief efforts usually requires a request from FEMA,[12] an assessment by DOD on whether the request can be supported, approval by the Secretary of Defense or his designated representative, and a mission assignment for the military forces or capabilities to provide the requested support. From the time a request is initiated until the military force or capability is delivered to the disaster site requires a 21-step process.[13] While this overly bureaucratic approach has been adequate for most disasters, in a catastrophic event like Hurricane Katrina the delays inherent in this "pull" system of responding to requests resulted in critical needs not being met.[14] One could imagine a situation in which a catastrophic event is of such a magnitude that it would require an even greater role for the Department of Defense. For these reasons, we should both expedite the mission assignment request and the approval process, but also define the circumstances under which we will push resources to State and local governments absent a request.

### *Unity of Effort among Active Duty Forces and the National Guard*

In the overall response to Hurricane Katrina, separate command structures for active duty military and the National Guard hindered their unity of effort. U.S. Northern Command (USNORTHCOM) commanded active duty forces, while each State government commanded its National Guard forces. For the first two days of Katrina response operations, USNORTHCOM did not have situational awareness of what forces the National Guard had on the ground. Joint Task Force Katrina (JTF-Katrina) simply could not operate at full efficiency when it lacked visibility of over half the military forces in the disaster area.[15] Neither the Louisiana National Guard nor JTF-Katrina had a good sense for where each other's forces were located or what they were doing. For example, the JTF-Katrina Engineering Directorate had not been able to coordinate with National Guard forces in the New Orleans area. As a result, some units were not immediately assigned missions matched to on-the-ground requirements. Further, FEMA requested assistance from DOD without knowing what State National Guard forces had already deployed to fill the same needs.[16]

Also, the Commanding General of JTF-Katrina and the Adjutant Generals (TAGs) of Louisiana and Mississippi had only a coordinating relationship, with no formal command relationship established. This resulted in confusion over roles and responsibilities between National Guard and Federal forces and highlights the need for a more unified command structure.[17]

### *Structure and Resources of the National Guard*

As demonstrated during the Hurricane Katrina response, the National Guard Bureau (NGB) is a significant joint force provider for homeland security missions. Throughout the response, the NGB provided continuous and integrated reporting of all National Guard assets deployed in both a Federal and non-Federal status to USNORTHCOM, Joint Forces Command, Pacific Command, and the Assistant Secretary of Defense for Homeland Defense. This is an important step toward achieving unity of effort. However, NGB's role in homeland security is not yet clearly defined. The Chief of the NGB has made a recommendation to the Secretary of Defense that NGB be chartered as a joint activity of the DOD.[18] Achieving these efforts will serve as the foundation for National Guard transformation and provide a total joint force capability for homeland security missions.[19]

> ***LESSON LEARNED:*** The Departments of Homeland Security and Defense should jointly plan for the Department of Defense's support of Federal response activities as well as those extraordinary circumstances when it is appropriate for the Department of Defense to lead the Federal response. In addition, the Department of Defense should ensure the transformation of the National Guard is focused on increased integration with active duty forces for homeland security plans and activities.

### <u>Critical Challenge</u>: Communications

Hurricane Katrina destroyed an unprecedented portion of the core communications infrastructure throughout the Gulf Coast region. As described earlier in the Report, the storm debilitated 911 emergency call centers, disrupting local emergency services.[20] Nearly three million customers lost telephone service. Broadcast communications, including 50 percent of area radio stations and 44 percent of area television stations, similarly were affected.[21] More than 50,000 utility poles were toppled in Mississippi alone, meaning that even if telephone call centers and electricity generation capabilities were functioning, the connections to the customers were broken.[22] Accordingly, the communications challenges across the Gulf Coast region in Hurricane Katrina's wake were more a problem of basic *operability,[23]* than one of equipment or system *interoperability*.[24] The complete devastation of the communications infrastructure left emergency responders and citizens without a reliable network across which they could coordinate.[25]

Although Federal, State, and local agencies had communications plans and assets in place, these plans and assets were neither sufficient nor adequately integrated to respond effectively to the disaster.[26] Many available communications assets were not utilized fully because there was no national, State-wide, or regional communications plan to incorporate them. For example, despite their contributions to the response effort, the U.S. Department of Agriculture (USDA) Forest Service's radio cache—the largest civilian cache of radios in the United States—had additional radios available that were not utilized.[27]

Federal, State, and local governments have not yet completed a comprehensive strategy to improve operability and interoperability to meet the needs of emergency responders.[28] This inability to connect multiple communications plans and architectures clearly impeded coordination and communication at the Federal, State, and local levels. A comprehensive, national emergency communications strategy is needed to confront the challenges of incorporating existing equipment and practices into a constantly changing technological and cultural environment.[29]

> **LESSON LEARNED:** The Department of Homeland Security should review our current laws, policies, plans, and strategies relevant to communications. Upon the conclusion of this review, the Homeland Security Council, with support from the Office of Science and Technology Policy, should develop a National Emergency Communications Strategy that supports communications operability and interoperability.

## Critical Challenge: Logistics and Evacuation

The scope of Hurricane Katrina's devastation, the effects on critical infrastructure in the region, and the debilitation of State and local response capabilities combined to produce a massive requirement for Federal resources. The existing planning and operational structure for delivering critical resources and humanitarian aid clearly proved to be inadequate to the task. The highly bureaucratic supply processes of the Federal government were not sufficiently flexible and efficient, and failed to leverage the private sector and 21st Century advances in supply chain management.

Throughout the response, Federal resource managers had great difficulty determining what resources were needed, what resources were available, and where those resources were at any given point in time. Even when Federal resource managers had a clear understanding of what was needed, they often could not readily determine whether the Federal government had that asset, or what alternative sources might be able to provide it. As discussed in the *Week of Crisis* chapter, even when an agency came directly to FEMA with a list of available resources that would be useful during the response, there was no effective mechanism for efficiently integrating and deploying these resources. Nor was there an easy way to find out whether an alternative source, such as the private sector or a charity, might be able to better fill the need. Finally, FEMA's lack of a real-time asset-tracking system – a necessity for successful 21st Century businesses – left Federal managers in the dark regarding the status of resources once they were shipped.[30]

Our logistics system for the 21st Century should be a fully transparent, four-tiered system. First, we must encourage and ultimately require State and local governments to pre-contract for resources and commodities that will be critical for responding to all hazards. Second, if these arrangements fail, affected State governments should ask for additional resources from other States through the Emergency Management Assistance Compact (EMAC) process. Third, if such interstate mutual aid proves insufficient, the Federal government, having the benefit of full transparency, must be able to assist State and local governments to move commodities regionally. But in the end, FEMA must be able to supplement and, in catastrophic incidents, supplant State and local systems with a fully modern approach to commodity management.

> **LESSON LEARNED:** The Department of Homeland Security, in coordination with State and local governments and the private sector, should develop a modern, flexible, and transparent logistics system. This system should be based on established contracts for stockpiling commodities at the local level for emergencies and the provision of goods and services during emergencies. The Federal government must develop the capacity to conduct large-scale logistical operations that supplement and, if necessary, replace State and local logistical systems by leveraging resources within both the public sector and the private sector.

With respect to evacuation—fundamentally a State and local responsibility—the Hurricane Katrina experience demonstrates that the Federal government must be prepared to fulfill the mission if State and local efforts fail. Unfortunately, a lack of prior planning combined with poor operational coordination generated a weak Federal performance in supporting the evacuation of those most vulnerable in New Orleans and throughout the Gulf Coast following Katrina's landfall. The Federal effort lacked critical elements of prior planning, such as evacuation routes, communications, transportation assets, evacuee processing, and coordination with State, local, and non-governmental officials receiving and sheltering the evacuees. Because of poor situational awareness and

communications throughout the evacuation operation, FEMA had difficulty providing buses through ESF-1, Transportation, (with the Department of Transportation as the coordinating agency).[31] FEMA also had difficulty delivering food, water, and other critical commodities to people waiting to be evacuated, most significantly at the Superdome.[32]

> *LESSON LEARNED:* The Department of Transportation, in coordination with other appropriate departments of the Executive Branch, must also be prepared to conduct mass evacuation operations when disasters overwhelm or incapacitate State and local governments.

### Critical Challenge: Search and Rescue

After Hurricane Katrina made landfall, rising floodwaters stranded thousands in New Orleans on rooftops, requiring a massive civil search and rescue operation. The Coast Guard, FEMA Urban Search and Rescue (US&R) Task Forces,33 and DOD forces,[34] in concert with State and local emergency responders from across the country, courageously combined to rescue tens of thousands of people. With extraordinary ingenuity and tenacity, Federal, State, and local emergency responders plucked people from rooftops while avoiding urban hazards not normally encountered during waterborne rescue.[35]

Yet many of these courageous lifesavers were put at unnecessary risk by a structure that failed to support them effectively. The overall search and rescue effort demonstrated the need for greater coordination between US&R, the Coast Guard, and military responders who, because of their very different missions, train and operate in very different ways. For example, Urban Search and Rescue (US&R) teams had a particularly challenging situation since they are neither trained nor equipped to perform water rescue. Thus they could not immediately rescue people trapped by the flood waters.[36]

Furthermore, lacking an integrated search and rescue incident command, the various agencies were unable to effectively coordinate their operations.[37] This meant that multiple rescue teams were sent to the same areas, while leaving others uncovered.[38] When successful rescues were made, there was no formal direction on where to take those rescued.[39] Too often rescuers had to leave victims at drop-off points and landing zones that had insufficient logistics, medical, and communications resources, such as atop the I-10 cloverleaf near the Superdome.[40]

> *LESSON LEARNED:* The Department of Homeland Security should lead an interagency review of current policies and procedures to ensure effective integration of all Federal search and rescue assets during disaster response.

### Critical Challenge: Public Safety and Security

State and local governments have a fundamental responsibility to provide for the public safety and security of their residents. During disasters, the Federal government provides law enforcement assistance only when those resources are overwhelmed or depleted.[41] Almost immediately following Hurricane Katrina's landfall, law and order began to deteriorate in New Orleans. The city's overwhelmed police force–70 percent of which were themselves victims of the disaster—did not have the capacity to arrest every person witnessed committing a crime, and many more crimes were undoubtedly neither observed by police nor reported. The resulting lawlessness in New Orleans significantly impeded—and in some cases temporarily halted—relief efforts and delayed restoration of essential private sector services such as power, water, and telecommunications.[42]

The Federal law enforcement response to Hurricane Katrina was a crucial enabler to the reconstitution of the New Orleans Police Department's command structure as well as the larger criminal justice system. Joint leadership from the Department of Justice and the Department of Homeland Security integrated the available Federal assets into the remaining local police structure and divided the Federal law enforcement agencies into corresponding New Orleans Police Department districts.

While the deployment of Federal law enforcement capability to New Orleans in a dangerous and chaotic environment significantly contributed to the restoration of law and order, pre-event collaborative planning between

Federal, State, and local officials would have improved the response. Indeed, Federal, State, and local law enforcement officials performed admirably in spite of a system that should have better supported them. Local, State, and Federal law enforcement were ill-prepared and ill-positioned to respond efficiently and effectively to the crisis.

In the end, it was clear that Federal law enforcement support to State and local officials required greater coordination, unity of command, collaborative planning and training with State and local law enforcement, as well as detailed implementation guidance. For example, the Federal law enforcement response effort did not take advantage of all law enforcement assets embedded across Federal departments and agencies. Several departments promptly offered their assistance, but their law enforcement assets were incorporated only after weeks had passed, or not at all.[43]

Coordination challenges arose even after Federal law enforcement personnel arrived in New Orleans. For example, several departments and agencies reported that the procedures for becoming deputized to enforce State law were cumbersome and inefficient. In Louisiana, a State Police attorney had to physically be present to swear in Federal agents. Many Federal law enforcement agencies also had to complete a cumbersome Federal deputization process.[44] New Orleans was then confronted with a rapid influx of law enforcement officers from a multitude of States and jurisdictions—each with their own policies and procedures, uniforms, and rules on the use of force—which created the need for a command structure to coordinate their efforts.[45]

Hurricane Katrina also crippled the region's criminal justice system. Problems such as a significant loss of accountability of many persons under law enforcement supervision,[46] closure of the court systems in the disaster,[47] and hasty evacuation of prisoners[48] were largely attributable to the absence of contingency plans at all levels of government.

> **LESSON LEARNED:** The Department of Justice, in coordination with the Department of Homeland Security, should examine Federal responsibilities for support to State and local law enforcement and criminal justice systems during emergencies and then build operational plans, procedures, and policies to ensure an effective Federal law enforcement response.

## Critical Challenge: Public Health and Medical Support

Hurricane Katrina created enormous public health and medical challenges, especially in Louisiana and Mississippi—States with public health infrastructures that ranked 49th and 50th in the Nation, respectively.[49] But it was the subsequent flooding of New Orleans that imposed catastrophic public health conditions on the people of southern Louisiana and forced an unprecedented mobilization of Federal public health and medical assets. Tens of thousands of people required medical care. Over 200,000 people with chronic medical conditions, displaced by the storm and isolated by the flooding, found themselves without access to their usual medications and sources of medical care. Several large hospitals were totally destroyed and many others were rendered inoperable. Nearly all smaller health care facilities were shut down. Although public health and medical support efforts restored the capabilities of many of these facilities, the region's health care infrastructure sustained extraordinary damage.[50]

Most local and State public health and medical assets were overwhelmed by these conditions, placing even greater responsibility on federally deployed personnel. Immediate challenges included the identification, triage and treatment of acutely sick and injured patients; the management of chronic medical conditions in large numbers of evacuees with special health care needs; the assessment, communication and mitigation of public health risk; and the provision of assistance to State and local health officials to quickly reestablish health care delivery systems and public health infrastructures.[51]

Despite the success of Federal, State, and local personnel in meeting this enormous challenge, obstacles at all levels reduced the reach and efficiency of public health and medical support efforts. In addition, the coordination of Federal assets within and across agencies was poor. The cumbersome process for the authorization of reimbursement for medical and public health services provided by Federal agencies created substantial delays and frustration among health care providers, patients and the general public.[52] In some cases, significant delays slowed the arrival of Federal assets to critical locations.[53] In other cases, large numbers of Federal assets were deployed, only to be grossly underutilized.[54] Thousands of medical volunteers were sought by the Department of Health and

Human Services (HHS), and though they were informed that they would likely not be needed unless notified otherwise, many volunteers reported that they received no message to that effect.[55] These inefficiencies were the products of a fragmented command structure for medical response; inadequate evacuation of patients; weak State and local public health infrastructures;[56] insufficient pre-storm risk communication to the public;[57] and the absence of a uniform electronic health record system.

> **LESSON LEARNED:** In coordination with the Department of Homeland Security and other homeland security partners, the Department of Health and Human Services should strengthen the Federal government's capability to provide public health and medical support during a crisis. This will require the improvement of command and control of public health resources, the development of deliberate plans, an additional investment in deployable operational resources, and an acceleration of the initiative to foster the widespread use of interoperable electronic health records systems.

## Critical Challenge: Human Services

Disasters—especially those of catastrophic proportions—produce many victims whose needs exceed the capacity of State and local resources. These victims who depend on the Federal government for assistance fit into one of two categories: (1) those who need Federal disaster-related assistance, and (2) those who need continuation of government assistance they were receiving before the disaster, plus additional disaster-related assistance. Hurricane Katrina produced many thousands of both categories of victims.[58]

The Federal government maintains a wide array of human service programs to provide assistance to special-needs populations, including disaster victims.[59] Collectively, these programs provide a safety net to particularly vulnerable populations.

The Emergency Support Function 6 (ESF-6) Annex to the NRP assigns responsibility for the emergency delivery of human services to FEMA. While FEMA is the coordinator of ESF-6, it shares primary agency responsibility with the American Red Cross.[60] The Red Cross focuses on mass care (*e.g.* care for people in shelters), and FEMA continues the human services components for ESF-6 as the mass care effort transitions from the response to the recovery phase.[61] The human services provided under ESF-6 include: counseling; special-needs population support; immediate and short-term assistance for individuals, households, and groups dealing with the aftermath of a disaster; and expedited processing of applications for Federal benefits.[62] The NRP calls for "reducing duplication of effort and benefits, to the extent possible," to include "streamlining assistance as appropriate."[63]

Prior to Katrina's landfall along the Gulf Coast and during the subsequent several weeks, Federal preparation for distributing individual assistance proved frustrating and inadequate. Because the NRP did not mandate a single Federal point of contact for all assistance and required FEMA to merely coordinate assistance delivery, disaster victims confronted an enormously bureaucratic, inefficient, and frustrating process that failed to effectively meet their needs. The Federal government's system for distribution of human services was not sufficiently responsive to the circumstances of a large number of victims—many of whom were particularly vulnerable—who were forced to navigate a series of complex processes to obtain critical services in a time of extreme duress. As mentioned in the preceding chapter, the Disaster Recovery Centers (DRCs) did not provide victims single-point access to apply for the wide array of Federal assistance programs.

> **LESSON LEARNED:** The Department of Health and Human Services should coordinate with other departments of the Executive Branch, as well as State governments and non-governmental organizations, to develop a robust, comprehensive, and integrated system to deliver human services during disasters so that victims are able to receive Federal and State assistance in a simple and seamless manner. In particular, this system should be designed to provide victims a consumer oriented, simple, effective, and single encounter from which they can receive assistance.

## Critical Challenge: Mass Care and Housing

Hurricane Katrina resulted in the largest national housing crisis since the Dust Bowl of the 1930s. The impact of this massive displacement was felt throughout the country, with Gulf residents relocating to all fifty States and the

District of Columbia.[64]  Prior to the storm's landfall, an exodus of people fled its projected path, creating an urgent need for suitable shelters.  Those with the willingness and ability to evacuate generally found temporary shelter or housing. However, the thousands of people in New Orleans who were either unable to move due to health reasons or lack of transportation, or who simply did not choose to comply with the mandatory evacuation order, had significant difficulty finding suitable shelter after the hurricane had devastated the city.[65]

Overall, Federal, State, and local plans were inadequate for a catastrophe that had been anticipated for years. Despite the vast shortcomings of the Superdome and other shelters, State and local officials had no choice but to direct thousands of individuals to such sites immediately after the hurricane struck.  Furthermore, the Federal government's capability to provide housing solutions to the displaced Gulf Coast population has proved to be far too slow, bureaucratic, and inefficient.

The Federal shortfall resulted from a lack of interagency coordination to relocate and house people.  FEMA's actions often were inconsistent with evacuees' needs and preferences.  Despite offers from the Departments of Veterans Affairs (VA), Housing and Urban Development (HUD) and Agriculture (USDA) as well as the private sector to provide thousands of housing units nationwide, FEMA focused its housing efforts on cruise ships and trailers, which were expensive and perceived by some to be a means to force evacuees to return to New Orleans.[66] HUD, with extensive expertise and perspective on large-scale housing challenges and its nation-wide relationships with State public housing authorities, was not substantially engaged by FEMA in the housing process until late in the effort. [67]  FEMA's temporary and long-term housing efforts also suffered from the failure to pre-identify workable sites and available land and the inability to take advantage of housing units available with other Federal agencies.

> **LESSON LEARNED:** Using established Federal core competencies and all available resources, the Department of Housing and Urban Development, in coordination with other departments of the Executive Branch with housing stock, should develop integrated plans and bolstered capabilities for the temporary and long-term housing of evacuees.  The American Red Cross and the Department of Homeland Security should retain responsibility and improve the process of mass care and sheltering during disasters.

### Critical Challenge: Public Communications

The Federal government's dissemination of essential public information prior to Hurricane Katrina's Gulf landfall is one of the positive lessons learned.  The many professionals at the National Oceanic and Atmospheric Administration (NOAA) and the National Hurricane Center worked with diligence and determination in disseminating weather reports and hurricane track predictions as described in the *Pre-landfall* chapter.  This includes disseminating warnings and forecasts via NOAA Radio and the internet, which operates in conjunction with the Emergency Alert System (EAS).[68] We can be certain that their efforts saved lives.

However, more could have been done by officials at all levels of government. For example, the EAS—a mechanism for Federal, State and local officials to communicate disaster information and instructions—was not utilized by State and local officials in Louisiana, Mississippi or Alabama prior to Katrina's landfall.[69]

Further, without timely, accurate information or the ability to communicate, public affairs officers at all levels could not provide updates to the media and to the public.  It took several weeks before public affairs structures, such as the Joint Information Centers, were adequately resourced and operating at full capacity.  In the meantime, Federal, State, and local officials gave contradictory messages to the public, creating confusion and feeding the perception that government sources lacked credibility.  On September 1, conflicting views of New Orleans emerged with positive statements by some Federal officials that contradicted a more desperate picture painted by reporters in the streets. [70]  The media, operating 24/7, gathered and aired uncorroborated information which interfered with ongoing emergency response efforts.[71]  The Federal public communications and public affairs response proved inadequate and ineffective.

> **LESSON LEARNED:** The Department of Homeland Security should develop an integrated public communications plan to better inform, guide, and reassure the American public before, during, and after a catastrophe.  The Department of Homeland Security should enable this plan with operational capabilities to deploy coordinated public affairs teams during a crisis.

**Critical Challenge: Critical Infrastructure and Impact Assessment**

Hurricane Katrina had a significant impact on many sectors of the region's "critical infrastructure," especially the energy sector.[72] The Hurricane temporarily caused the shutdown of most crude oil and natural gas production in the Gulf of Mexico as well as much of the refining capacity in Louisiana, Mississippi, and Alabama.  "[M]ore than ten percent of the Nation's imported crude oil enters through the Louisiana Offshore Oil Port"[73] adding to the impact on the energy sector.  Additionally, eleven petroleum refineries, or one-sixth of the Nation's refining capacity, were shut down.[74]  Across the region more than 2.5 million customers suffered power outages across Louisiana, Mississippi, and Alabama.[75]

While there were successes, the Federal government's ability to protect and restore the operation of priority national critical infrastructure was hindered by four interconnected problems. First, the NRP-guided response did not account for the need to coordinate critical infrastructure protection and restoration efforts across the Emergency Support Functions (ESFs). The NRP designates the protection and restoration of critical infrastructure as essential objectives of five ESFs: Transportation; Communications; Public Works and Engineering; Agriculture; and Energy.[76]  Although these critical infrastructures are necessary to assist in all other response and restoration efforts, there are seventeen critical infrastructure and key resource sectors whose needs must be coordinated across virtually every ESF during response and recovery.[77]  Second, the Federal government did not adequately coordinate its actions with State and local protection and restoration efforts. In fact, the Federal government created confusion by responding to individualized requests in an inconsistent manner.[78]  Third, Federal, State, and local officials responded to Hurricane Katrina without a comprehensive understanding of the interdependencies of the critical infrastructure sectors in each geographic area and the potential national impact of their decisions. For example, an energy company arranged to have generators shipped to facilities where they were needed to restore the flow of oil to the entire mid-Atlantic United States.  However, FEMA regional representatives diverted these generators to hospitals. While lifesaving efforts are always the first priority, there was no overall awareness of the competing important needs of the two requests.  Fourth, the Federal government lacked the timely, accurate, and relevant ground-truth information necessary to evaluate which critical infrastructures were damaged, inoperative, or both. The FEMA teams that were deployed to assess damage to the regions did not focus on critical infrastructure and did not have the expertise necessary to evaluate protection and restoration needs.[79]

The Interim National Infrastructure Protection Plan (NIPP) provides strategic-level guidance for all Federal, State, and local entities to use in prioritizing infrastructure for protection.[80]  However, there is no supporting implementation plan to execute these actions during a natural disaster.  Federal, State, and local officials need an implementation plan for critical infrastructure protection and restoration that can be shared across the Federal government, State and local governments, and with the private sector, to provide them with the necessary background to make informed preparedness decisions with limited resources.

*LESSON LEARNED:* The Department of Homeland Security, working collaboratively with the private sector, should revise the National Response Plan and finalize the Interim National Infrastructure Protection Plan to be able to rapidly assess the impact of a disaster on critical infrastructure.  We must use this knowledge to inform Federal response and prioritization decisions and to support infrastructure restoration in order to save lives and mitigate the impact of the disaster on the Nation.

**Critical Challenge: Environmental Hazards and Debris Removal**

The Federal clean-up effort for Hurricane Katrina was an immense undertaking.  The storm impact caused the spill of over seven million gallons of oil into Gulf Coast waterways.  Additionally, it flooded three Superfund[81] sites in the New Orleans area, and destroyed or compromised numerous drinking water facilities and wastewater treatment plants along the Gulf Coast.[82]  The storm's collective environmental damage, while not creating the "toxic soup" portrayed in the media, nonetheless did create a potentially hazardous environment for emergency responders and the general public.[83]  In response, the Environmental Protection Agency (EPA) and the Coast Guard jointly led an interagency environmental assessment and recovery effort, cleaning up the seven million gallons of oil and resolving over 2,300 reported cases of pollution.[84]

While this response effort was commendable, Federal officials could have improved the identification of environmental hazards and communication of appropriate warnings to emergency responders and the public. For example, the relatively small number of personnel available during the critical week after landfall were unable to conduct a rapid and comprehensive environmental assessment of the approximately 80 square miles flooded in New Orleans, let alone the nearly 93,000 square miles affected by the hurricane.[85]

Competing priorities hampered efforts to assess the environment. Moreover, although the process used to identify environmental hazards provides accurate results, these results are not prompt enough to provide meaningful information to responders. Furthermore, there must be a comprehensive plan to accurately and quickly communicate this critical information to the emergency responders and area residents who need it.[86] Had such a plan existed, the mixed messages from Federal, State, and local officials on the reentry into New Orleans could have been avoided.

### Debris Removal

State and local governments are normally responsible for debris removal. However, in the event of a disaster in which State and local governments are overwhelmed and request assistance, the Federal government can provide two forms of assistance: debris removal by the U.S. Army Corps of Engineers (USACE) or other Federal agencies, or reimbursement for locally contracted debris removal.[87]

Hurricane Katrina created an estimated 118 million cubic yards of debris. In just five months, 71 million cubic yards of debris have been removed from Louisiana, Mississippi, and Alabama. In comparison, it took six months to remove the estimated 20 million cubic yards of debris created by Hurricane Andrew.[88]

However, the unnecessarily complicated rules for removing debris from private property hampered the response.[89] In addition, greater collaboration among Federal, State, and local officials as well as an enhanced public communication program could have improved the effectiveness of the Federal response.

> **LESSON LEARNED:** The Department of Homeland Security, in coordination with the Environmental Protection Agency, should oversee efforts to improve the Federal government's capability to quickly gather environmental data and to provide the public and emergency responders the most accurate information available, to determine whether it is safe to operate in a disaster environment or to return after evacuation. In addition, the Department of Homeland Security should work with its State and local homeland security partners to plan and to coordinate an integrated approach to debris removal during and after a disaster.

### Critical Challenge: Managing Offers of Foreign Assistance and Inquiries Regarding Affected Foreign Nationals

Our experience with the tragedies of September 11th and Hurricane Katrina underscored that our domestic crises have international implications. Soon after the extent of Hurricane Katrina's damage became known, the United States became the beneficiary of an incredible international outpouring of assistance. One hundred fifty-one (151) nations and international organizations offered financial or material assistance to support relief efforts.[90] Also, we found that among the victims were foreign nationals who were in the country on business, vacation, or as residents. Not surprisingly, foreign governments sought information regarding the safety of their citizens.

We were not prepared to make the best use of foreign support. Some foreign governments sought to contribute aid that the United States could not accept or did not require. In other cases, needed resources were tied up by bureaucratic red tape.[91] But more broadly, we lacked the capability to prioritize and integrate such a large quantity of foreign assistance into the ongoing response. Absent an implementation plan for the prioritization and integration of foreign material assistance, valuable resources went unused, and many donor countries became frustrated.[92] While we ultimately overcame these obstacles amidst the crisis, our experience underscores the need for pre-crisis planning.

Nor did we have the mechanisms in place to provide foreign governments with whatever knowledge we had regarding the status of their nationals. Despite the fact that many victims of the September 11, 2001, tragedy were foreign nationals, the NRP does not take into account foreign populations (*e.g.* long-term residents, students, businessmen, tourists, and foreign government officials) affected by a domestic catastrophe. In addition, Federal, State, and local emergency response officials have not included assistance to foreign nationals in their response planning.

Many foreign governments, as well as the family and friends of foreign nationals, looked to the Department of State for information regarding the safety and location of their citizens after Hurricane Katrina. The absence of a central system to manage and promptly respond to inquires about affected foreign nationals led to confusion.[93]

> **LESSON LEARNED:** The Department of State, in coordination with the Department of Homeland Security, should review and revise policies, plans, and procedures for the management of foreign disaster assistance. In addition, this review should clarify responsibilities and procedures for handling inquiries regarding affected foreign nationals.

## Critical Challenge: Non-governmental Aid

Over the course of the Hurricane Katrina response, a significant capability for response resided in organizations outside of the government. Non-governmental and faith-based organizations, as well as the private sector all made substantial contributions. Unfortunately, the Nation did not always make effective use of these contributions because we had not effectively planned for integrating them into the overall response effort.

Even in the best of circumstances, government alone cannot deliver all disaster relief. Often, non-governmental organizations (NGOs) are the quickest means of providing local relief, but perhaps most importantly, they provide a compassionate, human face to relief efforts. We must recognize that NGOs play a fundamental role in response and recovery efforts and will contribute in ways that are, in many cases, more efficient and effective than the Federal government's response. We must plan for their participation and treat them as valued and necessary partners.

The number of volunteer, non-profit, faith-based, and private sector entities that aided in the Hurricane Katrina relief effort was truly extraordinary. Nearly every national, regional, and local charitable organization in the United States, and many from abroad, contributed aid to the victims of the storm. Trained volunteers from member organizations of the National Volunteer Organizations Active in Disaster (NVOAD), the American Red Cross, Medical Reserve Corps (MRC), Community Emergency Response Team (CERT), as well as untrained volunteers from across the United States, deployed to Louisiana, Mississippi, and Alabama.

Government sponsored volunteer organizations also played a critical role in providing relief and assistance. For example, the USA Freedom Corps persuaded numerous non-profit organizations and the Governor's State Service Commissions to list their hurricane relief volunteer opportunities in the USA Freedom Corps volunteer search engine. The USA Freedom Corps also worked with the Corporation for National and Community Service, which helped to create a new, people-driven "Katrina Resource Center" to help volunteers connect their resources with needs on the ground.[94] In addition, 14,000 Citizen Corps volunteers supported response and recovery efforts around the country.[95] This achievement demonstrates that seamless coordination among government agencies and volunteer organizations is possible when they build cooperative relationships and conduct joint planning and exercises before an incident occurs.[96]

Faith-based organizations also provided extraordinary services. For example, more than 9,000 Southern Baptist Convention of the North American Mission Board volunteers from forty-one states served in Texas, Louisiana, Mississippi, Alabama, and Georgia. These volunteers ran mobile kitchens and recovery sites.[97] Many smaller, faith-based organizations, such as the Set Free Indeed Ministry in Baton Rouge, Louisiana, brought comfort and offered shelter to the survivors. They used their facilities and volunteers to distribute donated supplies to displaced persons and to meet their immediate needs.[98] Local churches independently established hundreds of "pop-up" shelters to house storm victims.[99]

More often than not, NGOs successfully contributed to the relief effort in spite of government obstacles and with almost no government support or direction. Time and again, government agencies did not effectively coordinate relief operations with NGOs. Often, government agencies failed to match relief needs with NGO and private sector capabilities. Even when agencies matched non-governmental aid with an identified need, there were problems moving goods, equipment, and people into the disaster area. For example, the government relief effort was unprepared to meet the fundamental food, housing, and operational needs of the surge volunteer force.

*LESSON LEARNED:* The Federal response should better integrate the contributions of volunteers and non-governmental organizations into the broader national effort. This integration would be best achieved at the State and local levels, prior to future incidents. In particular, State and local governments must engage NGOs in the planning process, credential their personnel, and provide them the necessary resource support for their involvement in a joint response.

## CHAPTER SIX: TRANSFORMING NATIONAL PREPAREDNESS

Hurricane Katrina was an extraordinary storm that caused destruction on a scale never before seen from a natural disaster in the United States. The continuing Federal response—the largest disaster relief and recovery effort in our Nation's history—likewise has been unprecedented and extraordinary. But what we owe the people of the Gulf Coast, and all Americans, is the best possible response.

We must expect more catastrophes like Hurricane Katrina—and possibly even worse. In fact, we will have compounded the tragedy if we fail to learn the lessons—good and bad—it has taught us and strengthen our system of preparedness and response. We cannot undo the mistakes of the past, but there is much we can do to learn from them and to be better prepared for the future. This is our duty.

The preceding chapter outlined in detail fourteen of the seventeen specific lessons the Federal government has learned from our response to Hurricane Katrina; the remaining three will be discussed more fully here. These seventeen lessons, and the 125 recommendations that flow from them, represent specific challenges for corrective action. But we also recognize that to overcome these challenges and fully accomplish the intent of the attendant recommendations, we require a *transformation* of our homeland security architecture.

In the aftermath of another American catastrophe—the terrorist attacks of September 11—we transformed our government architecture, policies, and strategies in a comprehensive effort to defeat terrorism and better protect and defend the homeland. With the creation of the Department of Homeland Security, the post of Director of National Intelligence, the passage of the USA PATRIOT Act, and the codification of both the National Counterterrorism Center and the National Counterproliferation Center, we have undertaken the most extensive reorganization of the Federal government since 1947.[1] We have created top-level policy guidance through the *National Security Strategy*, the *National Strategy for Homeland Security* and the *National Strategy for Combating Terrorism*, all of which identify strategic objectives to secure the United States, its citizens and interests from terrorist attacks.[2] Most important, we have pursued our policies and objectives through concrete action. In concert with our coalition partners, we have been on the offense, waging an unremitting campaign of direct and continuous action against our terrorist enemies and the deadly scourge of terror and intimidation more broadly. These actions, combined with an array of defensive measures at home and abroad, have enhanced the safety and security of the American people.

Preparedness is inextricably intertwined with our national security, counterterrorism, and homeland security strategies. As discussed throughout this report, we have taken essential steps over the past five years—through plans, policies, and guidelines such as the *National Response Plan*, the *National Incident Management System*, the *Interim National Infrastructure Protection Plan*, and the *Interim National Preparedness Goal*—to strengthen our ability to prepare for, protect against, respond to, and recover from the natural and man-made disasters that will occur.[3]

But we must go further. We must continue to build upon the foundation of national and homeland security we have established since 9/11 to improve our preparedness capabilities. Our response to Hurricane Katrina demonstrated the imperative to integrate and synchronize our policies, strategies, and plans—among all Federal, State, local, private sector, and community efforts and across all partners in the professions of prevention, protection, response,

and recovery—into a unified system for homeland security. This unifying system will ensure *National Preparedness*.

> **National Preparedness** involves a continuous cycle of activity to develop the elements (e.g., plans, procedures, policies, training, and equipment) necessary to maximize the capability to prevent, protect against, respond to, and recover from domestic incidents, especially major events that require coordination among an appropriate combination of Federal, State, local, tribal, private sector, and non-governmental entities, in order to minimize the impact on lives, property, and the economy.
>
> *—Interim National Preparedness Goal*, March 2005[4]

Today there is a national consensus that we must be better prepared to respond to events like Hurricane Katrina. While we have constructed a system that effectively handles the demands of routine, limited natural and man-made disasters, our system clearly has structural flaws for addressing catastrophic incidents. But we as a Nation—Federal, State, and local governments; the private sector; as well as communities and individual citizens—have not developed a shared vision of or commitment to *preparedness*: what we must do to prevent (when possible), protect against, respond to, and recover from the next catastrophe. Without a shared vision that is acted upon by all levels of our Nation and encompasses the full range of our preparedness and response capabilities, we will not achieve a truly transformational *national* state of preparedness.

There are two immediate priorities for this transformation:

1. Define and implement a comprehensive National Preparedness System; and
2. Foster a new, robust Culture of Preparedness.

## A NATIONAL PREPAREDNESS SYSTEM

Shortfalls in the Federal response to Hurricane Katrina highlight that our current homeland security architecture—to include policies, authorities, plans, doctrine, operational concepts, and resources at the Federal, State, local, private sector, and community levels—must be strengthened and transformed. At the most fundamental level, the current system fails to define Federal responsibility for national preparedness in catastrophic events. Nor does it establish clear, comprehensive goals along with an integrated means to measure their progress and achievement. Instead, the United States currently has guidelines and individual plans, across multiple agencies and levels of government that do not yet constitute an *integrated* national system that ensures unity of effort.[5]

In addition, as described in the narrative section of this report, the response to Hurricane Katrina demonstrated that our current system is too reactive in orientation. Our decades-old system, built on the precepts of federalism, has been based on a model whereby local and State governments wait to reach their limits and exhaust their resources before requesting Federal assistance. Federal agencies could and did take steps to prepare to extend support and assistance, but tended to provide little without a prior and specific request. In other words, the system was biased toward requests and the concept of "pull" rather than toward anticipatory actions and the proactive "push" of Federal resources.

While this approach has worked well in the majority of disasters and emergencies, catastrophic events like Hurricane Katrina are a different matter. The current homeland security environment—with the continuing threat of mass casualty terrorism and the constant risk of natural disasters—now demands that the Federal government actively prepare and encourage the Nation as a whole to plan, equip, train, and cooperate for all types of future emergencies, including the most catastrophic.

A useful model for our approach to homeland security is the Nation's approach to *national security*. Over the past six decades, we have created a highly successful national security system. This system is built on deliberate planning that assesses threats and risks, develops policies and strategies to manage them, identifies specific missions

and supporting tasks, and matches the forces or capabilities to execute them. Operationally organized, it stresses the importance of unity of command from the President down to the commander in the field.

Perhaps most important, the national security system emphasizes feedback and periodic reassessment. Programs and forces are assessed for readiness and the degree to which they support their assigned missions and strategies on a continuing basis. Top level decision-makers periodically revisit their assessments of threats and risks, review their strategies and guidance, and revise their missions, plans, and budgets accordingly.[6]

This national security system was not created overnight. It has taken almost sixty years to build and refine. Beginning with the National Security Act of 1947-mandated creation of the Department of Defense, the Central Intelligence Agency, and the National Security Council (NSC), this system has evolved substantially through the years.[7] It has taken time to create a strong NSC that has integrated interagency policies and efforts. Similarly, it took decades to build first the Office of the Secretary of Defense and then the Joint Staff as the central management elements for the Department of Defense. We did not accomplish the complete intent of the 1947 reforms for national security system until Congress passed the *Goldwater-Nichols* defense reorganization legislation in 1986, and the Federal government put those reforms in place in following years.[8]

The lessons of the national security system's evolution will help us to transform our five-year old homeland security system. Of course, homeland security demands are complex. While responsibility for national security rests with the Federal government working with its international partners, the precepts of federalism make every level of government and region of the country both a contributor to, and responsible for, homeland security.

There are significant institutional and intergovernmental challenges to information and resource sharing as well as operational cooperation. These barriers stem from a multitude of factors—different cultures, lack of communication between departments and agencies, and varying procedures and working patterns among departments and agencies. Equally problematic, there is uneven coordination in pre-incident planning among State and local governments. For example, our States and territories developed fifty-six unique homeland security strategies, as have fifty high-threat, high-density urban areas.[9] Although each State and territory certainly confronts unique challenges, without coordination this planning approach makes the identification of common or national solutions difficult. Furthermore, our current approach to response planning does not sufficiently acknowledge how adjoining communities and regions can and do support each other. For example, there is wide disparity in emergency response capabilities across the country's many local jurisdictions. Yet we currently lack the means to assess and track what these disparities are and, consequently, how we must plan to account for them in a crisis.

The remainder of this section describes the key elements of the National Preparedness System. These include the guiding vision for preparedness as well as clarification of the Federal government's central role in organizing the national efforts of our homeland security partners. The section also explains the essential importance of building operational capabilities in the Federal government by: a) Strengthening the operational management capacity of the Department of Homeland Security and strengthening its field elements; b) Reinforcing the DHS role as incident manager for the Federal response; and c) Strengthening the response capabilities of other departments and agencies in the Federal government. This section also highlights the essential roles for training, education, and exercises as well as the importance of feedback—through readiness assessment and lessons learned—and processes for undertaking corrective actions. The section concludes with a discussion of the essential role of Congress in supporting the National Preparedness System and related transformation.

### *A Preparedness Vision*

A National Preparedness System must begin with a common vision for preparedness—what end-state are we seeking to achieve and how do we plan to get there? In Homeland Security Presidential Directive 8 (HSPD-8), the President called for the creation of a comprehensive national preparedness system, starting with a "national domestic all-hazards preparedness goal." [10] This Goal was to outline key preparedness priorities, objectives, targets, and desired outcomes. In response to HSPD-8, DHS has developed an *Interim National Preparedness Goal* that reflects the Department's progress to date to develop each of those elements in coordination with other entities.[11] It will remain in effect until superseded by the final National Preparedness Goal, which awaits completion.

We must now translate this Goal into a robust preparedness system that includes integrated plans, procedures, policies, training, and capabilities at all levels of government. The System must also incorporate the private sector, non-governmental organizations, faith-based groups, and communities, including individual citizens. The desired end-state of our National Preparedness System must be to achieve and sustain risk-based target levels of capability to prevent, protect against, respond to, and recover from major events in order to minimize the impact on lives, property, and the economy.

The *Homeland Security Strategy* and HSPD-8 provide the framework for the National Preparedness System. From this guidance comes the requirement for risk-based capabilities at the Federal, State and local levels that must enable the Nation to respond to a range of disasters—both man-made and natural. The required capabilities determine readiness targets for organizations at all levels. A unified effort from all homeland security stakeholders to commit the requisite resources, training, and exercising must support these targets and asset requirements.

Our National Preparedness System must also have appropriate feedback and assessment mechanisms to ensure that progress is made and that our goals are being realized. As called for in the *Interim National Preparedness Goal*, we must establish a readiness baseline for capabilities at the Federal, State, and local levels. This baseline should include an inventory of our preparedness assets as well as a metrics-based assessment of current capabilities. Thereafter, we must assess the gap between our present and target levels of capability. Over time, we must track our progress in closing these gaps.

Finally, the National Preparedness System must emphasize preparedness for *all hazards*. Most of the capabilities necessary for responding to natural disasters are also vital for responding to terrorist incidents. Yet for a variety of reasons, much of the Federal government, Congress, and the Nation at large have continued to think about terrorism and natural disasters as if they are competing priorities rather than two elements of the larger homeland security challenge. The lessons of 9/11 and Hurricane Katrina are that we cannot choose one or the other type of disaster. We must be prepared for all hazards.

### The Federal Government's Role in the "National" System

Building upon the President's *Homeland Security Strategy*, Homeland Security Presidential Directives, and the *Interim National Preparedness Goal*, the Federal government must clearly articulate national preparedness goals and objectives; it must create the infrastructure—through the definition of common strategies and interoperable capabilities—for ensuring unity of effort; and it must manage the system for measuring effectiveness and assessing preparedness at all levels of government. Put another way, the Federal government must develop common doctrine and ensure alignment of preparedness plans, budgets, grants, training, exercises, and equipment.

While each State will have its own strategy and a multitude of local capabilities to meet the needs of its citizens, the Federal government—through the Department of Homeland Security—must work with State, local, and regional entities to develop strategies and plans that define how each State manages disasters within their borders as well as regionally, beginning at the local level. DHS must also identify how State, local, regional, and private-sector preparedness activities support the national strategy.

### Transformation Within the Federal Government: Building Operational Capability

The creation of an effective National Preparedness System will require the Federal government to transform the way it does business. The most important objective of this Federal transformation must be to build and integrate *operational capability*. Each Federal department or agency with homeland security responsibilities needs operational capability—or the capacity to get things done—to translate executive management direction promptly into results on the ground. It includes the personnel to make and communicate decisions; organizational structures that are assigned, trained, and exercised for their missions; sufficient physical resources; and the command, control, and communication channels to make, monitor, and communicate decisions.

As described in the preceding narrative, the response to Hurricane Katrina required that the Federal government both support State and local efforts while conducting response operations in the field, in addition to making policy or implementing programs. With the exceptions of the Department of Defense and the Coast Guard—two

organizations with considerable operational capabilities—the Federal government was at times slow and ineffective in responding to the massive operational demands of the catastrophe.

These shortfalls were not due to the absence of top level plans such as the *National Response Plan* and the *National Incident Management System*. Rather, the problem is that these plans lack clarity on key aspects and have operational gaps, as discussed in previous chapters, and have not been effectively integrated and translated into action. Prior training, exercising, and equipping proved inadequate to the task of effectively responding to Hurricane Katrina. There is a difference between a plan (saying "this is what we need to do") and a trained, resourced set of defined missions (saying "this is what we are going to do, and this is how we are going to organize, train, exercise, and equip to do it"). For any plan to work, it must first be broken down into its component parts. Next, the plan's requirements should be matched to the human and physical assets of each responsible department, agency, or organization.

The imperative, therefore, is to organize coherent, proactive management of responses to catastrophic events. Virtually all elements of the Federal government must be operational—to respond to catastrophic events with unified effort. There are three principal requirements to achieve this transformational goal:

1. Strengthening DHS institutions to manage the Federal response as well as enhancing DHS regional and field elements.

2. Reinforcing the Secretary of Homeland Security's position as the President's manager of the Federal response; and

3. Strengthening the response capabilities—management and field resources—of other Federal departments and agencies.

<u>The Department of Homeland Security</u>

Since the Department was created in January 2003, the management and personnel of the Department of Homeland Security have undertaken their responsibilities with energy and professionalism. Their courage and commitment to their mission have improved the security of all Americans.

But the Federal response to Hurricane Katrina demonstrated that the energy and professionalism of DHS personnel was not enough to support the Department's role as the manager of the Federal response. In particular, DHS lacked both the requisite headquarters management institutions and sufficient field capabilities to organize a fully successful Federal response effort. Within the Department, therefore, it is essential to strengthen the DHS headquarters elements to *direct* the Federal response while also providing appropriate resources to DHS field elements so that they can make an impact on the ground.

In order to strengthen DHS's operational management capabilities, we must structure the Department's headquarters elements to support the Secretary's incident management responsibilities. First and most important, Federal government response organizations must be co-located and strengthened to manage catastrophes in a new *National Operations Center (NOC)*. The mission of the NOC must be to coordinate and integrate the national response and provide a common operating picture for the entire Federal government. This interagency center should ensure National-level coordination of Federal, State, and local response to major domestic incidents. It must combine and co-locate the situational awareness mission of the Homeland Security Operations Center (HSOC), the operational mission of the National Response Coordination Center (NRCC), and the strategic role currently assigned to the Interagency Incident Management Group (IIMG). During an incident, all department and agency command centers, as well as the Joint Field Office (JFO) at the disaster site, must provide information to the NOC, which develops a National common operating picture capable of being exported in real time to other Federal operations centers.

The NOC must be staffed by an experienced, well-trained, and resourced cadre of personnel who are prepared to provide expert strategic and operational management of Federal responses to catastrophic incidents. For example, these personnel must include logistical experts with the management tools to track moving resources anywhere across the Nation and ensure timely delivery of aid to affected areas. This staff must also include operations experts who understand how to combine existing resources into effective response packages for any scenario. In addition to

a robust permanent staff, the NOC must include a "battle roster" of personnel who will surge to expand and sustain the NOC's capacity during a crisis.

The DHS headquarters must also possess a robust capability for deliberate operational planning. Rather than waiting for the next disaster, DHS planners must apply lessons learned as well as develop detailed operational plans that anticipate the requirements of future responses and what capabilities can be matched to them in what timeframe. Using these operational plans and capability inventories as baseline data, the Headquarters planning staff can conduct national readiness assessments, highlighting priorities for subsequent preparedness investments, training, and exercising.

Below the headquarters level within DHS, we must build up the Department's regional structures. As noted above, the integration of State and local strategies and capabilities on a regional basis is a homeland security priority. Homeland security regional offices should be the means to foster State, local and private sector integration. Furthermore, DHS regional structures are ideally positioned to pre-identify, organize, train, and exercise future Principal Federal Officials and Joint Field Office staffs. Each DHS regional organization should possess the capacity to establish a self-sufficient, initial JFO on short notice anywhere in its region.

More broadly, the Department of Homeland Security must possess field personnel with the necessary resources, training, and national support. As a start, we must improve and emphasize plans that stress a proactive DHS role—in particular, the *Catastrophic Incident Annex* and *Catastrophic Incident Supplement* of the *NRP*. But DHS must also have available operational funds so that it can "lean forward" in future crises, to take anticipatory actions without budgetary concern or risk of subsequent criticism for a false alarm. In the event of a surprise contingency, battlefield commanders should not have to wait for the release of funds to execute their pre-assigned missions. The same flexibility should be afforded to our Federal homeland security responders.[12]

### *Managing the Interagency Process in Homeland Security Response*

In order to create robust homeland security response capabilities, we must also transform our Federal interagency processes. Most important, we must eliminate the extraordinary red tape and resulting delays in the process of requests for assistance in response efforts. Too often during the Hurricane Katrina response we found that the Federal government did not effectively use assets at the ready because the necessary requests were being "coordinated" somewhere in the bureaucracy. The solution is to enshrine in the Federal government one of the central tenets of the *National Incident Management System*—Unified Command. We must transform our approach for catastrophic incidents from one of bureaucratic *coordination* to proactive unified command that creates true unity of effort. As set forth in *NIMS*, "In a [Unified Command] structure, the individuals designated by their jurisdictional authorities . . . must jointly determine objectives, strategies, plans, and priorities and work together to execute integrated incident operations and maximize the use of assigned resources."[13]

At the Federal level, the most urgent step in creating unity of effort will be to reinforce the Secretary of Homeland Security as the Federal government's preparedness and incident manager. In order to create unity of effort at the Federal level, the Department should manage and orchestrate the specialized efforts of other Federal departments and agencies within their core competencies. Although DHS by Presidential directive has this mission,[14] its internal structures and relationships across the

| **Advantages of Using Unified Command**[13] |
|---|
| ▪ A single set of objectives is developed for the entire incident. |
| ▪ A collective approach is used to develop strategies to achieve incident objectives. |
| ▪ Information flow and coordination is improved between all jurisdictions and agencies involved in the incident |
| ▪ All agencies with responsibility for the incident have an understanding of joint priorities and restrictions. |
| ▪ No agency's legal authorities will be compromised or neglected. |
| ▪ The combined efforts of all agencies are optimized as they perform their respective assignments under a single Incident Action Plan. |

Federal government do not position it to fully succeed. The current arrangements are an awkward mix of the traditional, FEMA-led, approach to interagency coordination and the Homeland Security Act's creation of a powerful Department of Homeland Security.

One model for the command and control structure for the Federal response in the new National Preparedness System is our successful defense and national security statutory framework. In that framework, there is a clear line of authority that stretches from the President, through the Secretary of Defense, to the Combatant Commander in the field. When a contingency arises, the Combatant Commander in that region executes the missions assigned by the Secretary of Defense and the President. Although the Combatant Commander might not "own" or control forces on a day-to-day basis, during a military operation he controls all military forces in his theater: he exercises the command authority and has access to resources needed to affect outcomes on the ground.

Figure 6.1 portrays the structure for command and control of defense operations. Unity of command is established in a chain of command from the President through the Secretary of Defense to the Combatant Commander. The Combatant Commander possesses operational control over forces and resources provided by the armed services. The Intelligence Community additionally provides essential information—warning and situational awareness—to the commander in the field. The system makes a clear distinction between operations—in which the Combatant Commander is the center of activity—and the provision of operational resources. In the latter case, the Armed Services are responsible for the training and equipping of forces.

**Figure 6.1: Command and Control of Defense Operations**



The model somewhat parallels the original conception of the Federal homeland security response. In particular, the President directs the Secretary of Homeland Security, who coordinates interagency actions at the senior level while supervising the field commander for the Federal response—the Principal Federal Official (PFO). The PFO, in turn, is supported with resources provided by DHS and other interagency departments and agencies.

As described in HSPD-5, Cabinet members are to support the Secretary of Homeland Security as the President's incident manager directing and coordinating the Federal response.[15] At the PFO level, this can be accomplished by

ensuring that the Federal Coordinating Officer (FCO)—who possesses authority over resources—works for the PFO.[16]

However, the comparison between the homeland security and defense operations models breaks down in two significant ways. First, the Federal commander only manages *Federal* resources in homeland security. In almost every circumstance, State and local governments maintain operational control over their own resources. Second, the Secretary of Homeland Security and the PFO must request Federal assets from other departments and agencies; they do not command the resources of other departments and agencies. HSPD-5 makes clear that one Cabinet member cannot alter or impede the ability to carry out the authorities of Federal departments and agencies to perform their responsibilities under law.[17] Rather, HSPD-5 anticipates that future events will necessarily involve a joint approach given that several departments and agencies have distinct statutory authorities (e.g., the Attorney General for criminal investigation of terrorist acts, the Secretary of Defense for command over our military forces, and so forth).

In this vein, we must similarly transform the existing system of Emergency Support Functions (ESFs). A vestige of the 1992 *Federal Response Plan*,[18] the precursor to the *NRP*, these capability-specific coordination mechanisms, at a minimum, must be reconciled to the *NIMS* as well as responsive to the orders of the Principal Federal Official. More fundamentally, we must examine whether we should reorganize and, in some cases, redefine the ESF structures, while building DHS command and control mechanisms.[19]

These interagency management changes recognize that Federal response to catastrophic events—potential or actual—must be both efficient and effective in meeting the needs of the victims. Without infringing upon the statutory responsibilities of the Cabinet departments and agencies, we must ensure that the President's incident manager is able to call upon the full range of the Federal government's response assets, and to aggressively orchestrate, lead, and coordinate their use in response operations.

### *Operational Capabilities in Other Federal Departments/Agencies*

Beyond changes to DHS and the structure of Federal response, there is still a compelling need to strengthen operational capabilities across the Federal government. Those departments and agencies that have a responsibility to participate in a catastrophic response must build up their crisis deployable capabilities as well as their effective operational management.

To start, all Federal departments and agencies should have operational command and control structures that comply with the *National Incident Management System*. Secretaries and directors throughout the government must operate jointly, using the same systems, doctrine, and terminology. Similarly, in support of crisis operational capability, each department and agency must develop a deliberate planning capability. Planning should include not only the response plans themselves but also, both personnel and funding to train professional planners.

With these new operational planning functions, Federal departments and agencies must build the detailed supporting plans, concepts, and staffing to execute their *NRP* and emergency response missions. During Hurricane Katrina, it became clear that most Federal departments and agencies had not developed—much less exercised—standard operating procedures for their response.

An additional imperative is for all Federal departments and agencies to develop "battle rosters" of trained personnel who should deploy when their organization is called upon to support a Federal response to a catastrophic event. The development of these rosters must coincide with the implementation of training certification programs that ensure that personnel are trained and skilled to a high, uniform standard.

### **Homeland Security Training, Education, and Exercising**

An effective National Preparedness System requires that management and response personnel, especially those in the field, are well versed in their missions. At all levels of government, we must build a leadership corps that is fully educated, trained, and exercised in our plans and doctrine. Training is not nearly as costly as the mistakes made in a crisis. Equally important, this corps must be populated by *leaders* who are prepared to exhibit innovation and take the initiative during extremely trying circumstances.

As discussed in the narrative, the response to Hurricane Katrina revealed a lack of familiarity with incident management, the planning discipline, legal authorities, capabilities, and field-level crisis leadership. Many Federal, State, and local officials lacked a fundamental understanding of the *National Response Plan*, the *NIMS*, and State and local response plans. The first priority for training is to ensure that our emergency managers fully understand our preparedness and response plans and doctrine. To that end, we must train all emergency managers with responsibility for the Federal response in the *National Response Plan* and the *National Incident Management System*. At the same time, the Department of Homeland Security must continue to condition its State assistance grants on all relevant State and local emergency response personnel being *NIMS* and *NRP* trained and capable.[20] DHS and its Federal partners should develop and deploy mobile training teams to support this effort.

Beyond current plans and doctrine, we require a more systematic and institutional program for homeland security professional development and education. While such a program will center on the Department of Homeland Security, it should extend to personnel throughout all levels of government having responsibility for preventing, preparing for, responding to, and recovering from natural and man-made disasters. For example, DHS should establish a National Homeland Security University (NHSU)—analogous to the National Defense University—for senior homeland security personnel as the capstone for homeland security training and education opportunities. [21] The NHSU, in turn, should integrate homeland security personnel from State and local jurisdictions as well as other Federal departments and agencies.

Over the long term, our professional development and education programs must break down interagency barriers to build a unified team across the Federal government. Just as the Department of Defense succeeded in building a joint leadership cadre, so the rest of the Federal government must make familiarity with other departments and agencies a requirement for career advancement.[22]

> **LESSON LEARNED:** The Department of Homeland Security should develop a comprehensive program for the professional development and education of the Nation's homeland security personnel, including Federal, State and local employees as well as emergency management persons within the private sector, non-governmental organizations, as well as faith-based and community groups. This program should foster a "joint" Federal Interagency, State, local, and civilian team.

Where practicable, interagency and intergovernmental assignments for Federal personnel must build trust and familiarity among diverse homeland security professionals. These assignments will break down organizational stovepipes, advancing the exchange of ideas and practices. At a minimum, we should build joint training and educational institutions for our senior managers in homeland security-related departments and agencies.

These Federal professional development and education programs must integrate participants from other homeland security partners—namely, State and local governments as well as the private sector, non-governmental organizations, and faith-based organizations. As in every homeland crisis, it is inevitable that Federal, State, and local homeland security officials will come together to respond, and so it is important that we recognize the value in the old military adage that we must "train as you fight; fight as you train."

Pursuant to HSPD-8, the National Preparedness System should include a robust program of homeland security exercises at all levels of government and across all disciplines.[23] The Department of Homeland Security should serve as the President's executive agent in developing and managing a National Exercise and Evaluation Program (NEEP). The NEEP should consolidate all existing interagency homeland security-related exercise programs at the Federal level with existing DHS National Exercise Program and Homeland Security Exercise and Evaluation Program (HSEEP) through common doctrine, objectives, and management.[24] The NEEP should sponsor an aggressive program of joint exercises that involve all levels of government, as well as problem-specific exercises at particular levels of government. NEEP planning, moreover, must be integrated with a robust national homeland security training program. Moreover, the Program must emphasize intelligence-driven, threat-based scenarios that stress the system. In particular, we should not shy away from exercising worst case scenarios that "break" our homeland security system. Arguably, those scenarios will provide us the most meaningful, if sobering, lessons.

### *Assessments, Lessons Learned, and Corrective Actions*

The success of the National Preparedness System over time will depend upon the quality of its metrics-based assessment and feedback mechanisms. In particular, the System must possess the means to measure progress

towards strategic goals and capability objectives. It must systematically identify best practices and lessons learned in order to share them with our homeland security partners throughout the Nation. It must also have an effective process for conducting corrective or remedial actions when a system challenge is identified.

With common goals and performance metrics, the new National Preparedness System must first provide us with the capacity to create a national preparedness baseline that, at a minimum, serves as an inventory of our capabilities. More importantly, the baseline will tell us how prepared we are *today* in each of our jurisdictions and nationally. Reviewed at the Federal level and compared against the National Preparedness Goal, the System must also identify gaps in our national capabilities. These gaps can then serve as

> *LESSON LEARNED:* The Department of Homeland Security should establish specific requirements for training, exercise, and lessons learned programs linked through a comprehensive system and common supporting methodology throughout the Federal, State and local governments. Furthermore, assessments of training and exercises should be based on clear and consistent performance measures. DHS should require all Federal and State entities with operational homeland security responsibilities to have a lessons learned capability, and DHS should ensure all entities are accountable for the timely implementation of remedial actions in response to lessons learned.

the priority targets for the homeland security grant process. In turn, the grant process must be tied to performance metrics that assess progress toward meeting national objectives. The President's Management Agenda has proven an effective tool applied to Federal department and agency performance that has recently, as a result of this review, been extended to include State and local homeland security programs that are federally funded.[25]

Furthermore, this National Preparedness System must be dynamic. Like the national security system described above, we must routinely revisit our plans and reassess our capabilities in order to account for evolving risks, improvements in technological capabilities, and preparedness innovations.

An integrated National Preparedness System must identify and share lessons learned and best practices both within departments and agencies and across jurisdictions. We understand that for many aspects of homeland security there is no single, best way of doing business. Our National Preparedness organization should systematically investigate and seek out innovative approaches being applied in the various localities, States, departments, agencies, and the private sector. The system should circulate the most promising of these practices, as well as any lessons—positive *and* negative—on a continuous basis, so that we never stop improving our security.

Finally, we must ensure that problems identified in our training, exercises, and lessons learned programs are corrected. Too often, after-action reports for exercises and real-world incidents highlight the same problems that do not get fixed—the need for interoperable communications, for example. Thus, the circle of the National Preparedness System must be closed by a Remedial Action Management Program (RAMP) that is led by DHS and coordinated by the Homeland Security Council but is resident in and executed by individual departments and agencies. Department and agency RAMPs must translate findings of homeland security gaps and vulnerabilities into concrete programs for corrective action. Then the RAMPs must track that the appropriate corrective actions are fully implemented in a timely fashion.

### *The Role of Congress*

The challenges of transformation are not limited to the Executive Branch of government. Despite previous calls for transformation from national commissions, the U.S. Congress has not fully transformed itself for homeland security.[26] The numerous congressional committees in both houses that authorize and appropriate funds for homeland security inevitably produce competing initiatives and requirements. For example, the Secretary of Homeland Security and his leadership team were required to testify at 166 hearings before 61 full committees and subcommittees in the Senate and House of Representatives and provided over 2,000 briefings during 2005 as of October 14, 2005.[27] At best, the many priorities distract us from the true, *top priorities*. At worst, the many priorities and requirements can contradict each other.

Moreover, Congress has not yet embraced a purely risk-based funding approach to homeland security priorities. Although the U.S. House of Representatives and U.S. Senate have passed several forms of grant reform legislation

that would permit DHS to increase the prioritization of homeland security spending on the basis of risk, the two bodies have failed to reconcile their differences.[28]  Until we as a Nation agree to a solely risk-based approach, we are in danger of allocating our limited resources in ways that do not prioritize funding to meet national homeland security goals and objectives.

Finally, our experience in building an effective national security system demonstrates that Congress will be an essential partner as we continue to transform our homeland security system.  Implementing the Goldwater-Nichols defense reform, for example, required legislation, and the durability of our homeland security reforms and the new National Preparedness System will require comparable support and participation from our Congressional partners.

### *How Much is Enough?*

An age-old question for national security and, now, homeland security planning is *how much is enough?*  In particular, at what level of preparedness do we feel confident that we have adequately accounted for the threats we face, our vulnerabilities, and the means we have to manage them?  Recognizing that the future is uncertain and that we cannot anticipate every threat, we as a Nation must rely on a capabilities-based planning approach[29] to answering these questions: we must set levels of capabilities—at Federal, State, and local levels as among our other homeland security partners—that we conclude are appropriate to meet the range of risks that we may confront in the future.

In order to help identify the range of future plausible risks, the Department of Homeland Security has produced a set of fifteen *National Planning Scenarios* (see Figure 6.2).  The Scenarios were designed to illustrate a myriad of tasks and capabilities that are required to prepare for and respond to a range of potential terrorist attacks and natural disasters that our Nation may confront.  They identify the potential scale, scope, and complexity of fifteen incidents that would severely harm our Nation's citizens, infrastructure, economy, and threaten our way of life.  Examples include an outbreak of pandemic influenza on U.S. soil, a major earthquake in a U.S. city, and the detonation of a ten-kiloton nuclear device in a large U.S. metropolitan area.  The Scenarios also include a Category 5 hurricane hitting a major metropolitan area.[30]

**Figure 6.2.  U.S. Natural Disasters that Caused the Most Death and Damage to Property in Each Decade, 1900-2005, with 2004 Major Hurricanes, September 11th Terrorist Attacks, and Selected National Planning Scenarios[31] Damage in Third Quarter 2005 dollars**



CHAPTER SIX: TRANSFORMING NATIONAL PREPAREDNESS

The Scenarios, which were meant to be illustrative of a wide variety of hazards, generally do not specify a geographic location, and the impacts are meant to be scalable for a variety of population considerations. Ultimately, they give homeland security planners a tool that allows for the flexible and adaptive development of capabilities as well as the identification of needed capability levels to meet the National Preparedness Goal.

While the National Planning Scenarios have been effective tools for generating dialogue on response capabilities, they do not fully anticipate some of the worst disaster scenarios. Scenario 10, for example, depicts the effects of a Category 5 hurricane hitting a major metropolitan area in the United States. However, in the Scenario, the Category 5 hurricane actually causes fewer deaths and less destruction than did Hurricane Katrina, a Category 3, because the Scenario only characterizes the destruction caused to a metropolitan area, while a storm like Hurricane Katrina may span three or more States. Further, although the Scenario acknowledges potential delays and difficulties in evacuation, realistic circumstances such as Katrina may be worse, where more than 100,000 residents did not evacuate.[32]

Scenario 1, the detonation of a ten-kiloton nuclear device in an American city by a terrorist group, suffers from similar limitations and fails to fully challenge our plans and preparation skills. Although devastating in terms of both death and destruction, a ten-kiloton bomb is a relatively small nuclear device. Moreover, the Scenario does not anticipate one of the most demanding characteristics of past al-Qaida operations: multiple, simultaneous attacks. How much more taxing would it be to respond to multiple and simultaneous nuclear, chemical, or biological incidents? If the purpose of the National Planning Scenarios is to provide a foundation for identifying the capabilities required to meet all hazards, the Scenarios must press us to confront the most destructive challenges.

Hurricane Katrina severely stressed our current national response capabilities. However, as depicted in Figure 6.2, three other National Planning Scenarios—an act of nuclear terrorism (Scenario 1), an outbreak of pandemic influenza (Scenario 3), and a 7.5 magnitude earthquake striking a major city (Scenario 9)—are more daunting still. Compared with the deaths and economic chaos a nuclear detonation or influenza outbreak could unleash, Hurricane Katrina was small. But even these scenarios do not go far enough to challenge us to improve our level of preparedness. Until we can meet the standard set by the most demanding scenarios, we should not consider ourselves adequately prepared.

The most recent Top Officials ("TOPOFF") exercise in April 2005 revealed the Federal government's lack of progress in addressing a number of preparedness deficiencies, many of which had been identified in previous exercises. This lack of progress reflects, in part, the absence of a remedial action program to systematically address lessons learned from exercises. To ensure appropriate priority and accountability are being applied to address these continuing deficiencies, the Assistant to the President for Homeland Security and Counterterrorism now annually conducts four Cabinet-level exercises with catastrophic scenarios. To date, a catastrophic exercise with a pandemic scenario was conducted in December 2005; the next exercise is scheduled for this March.

While the National Planning Scenarios represent a good start for our national process of capabilities-based planning for homeland security, we must orient the National Preparedness System towards still greater challenges. We must not shy away from creating planning scenarios that stress the current system of response to the breaking point and challenge our Nation in ways that we wish we did not have to imagine. To that end, we must revise the planning scenarios to make them more challenging. Among other characteristics, they must reflect both what we know and what we can imagine about the ways our enemies think—that they will not hit us hard just once, but that they will seek to cause us damage on significant scale in multiple locations simultaneously. We must not again find ourselves vulnerable to the charge that we suffered a "'failure of imagination' and a mind-set that dismissed possibilities."[33]

### *Envisioning a National Preparedness System*

Figure 6.3 provides an illustration of how our existing homeland security strategy, doctrine, and capabilities can be unified into a single National Preparedness System. The graphic ties together the priorities described throughout this section into a new transformational construct. The strengths of this System include first and foremost *integration* of strategy, doctrine, capabilities, response activities, and exercises, as well as assessment and evaluation. The graphic also highlights the feedback mechanisms that must be built into the System. In particular, as described above, the System must include routine reporting and assessment of program performance metrics, the

readiness of particular capabilities, as well as best practices and lessons learned from exercises and activities.  These assessments and findings must be reported back, as appropriate, to inform key components throughout the System.

The National Preparedness System graphic additionally highlights the constituent elements of operational capabilities: deliberate planning, resources, logistics, training, and education.  Moreover, the graphic notes the importance of unity of effort in exercises and the conduct of response activities in incidents.

As described above, the National Preparedness System must be dynamic, flexible, and responsive to new developments.  Like our national security system, the strategy, doctrine, and capabilities of the System should be reviewed periodically to determine their continued relevance to current challenges.  Similarly, periodic reviews must assess the continued internal consistency of the System—e.g., do the doctrine and capabilities support the strategy?

Key inputs to the System include the current national vision for preparedness, laws, and policies and the use of capability-based planning that prioritizes investments to fill gaps identified by needs assessments.  An equally important input is the current assessment of risks—what threats does the Nation currently confront, what are our current vulnerabilities, and what are the consequences?  Against the current assessment of risks, we must continually evaluate our capability to respond effectively.

Finally, our planning and operational documents should define the critical roles played by all of our homeland security partners in the Preparedness System.  Federal, State, and local governments play prominent roles throughout the System—from strategy development to assessment and lessons learned.  Additionally, the private sector, NGOs, faith-based groups, communities, and individuals play important roles in operational capabilities as well as response activities.

CHAPTER SIX: TRANSFORMING NATIONAL PREPAREDNESS

**Figure 6.3: A Shared Vision of Preparedness**



**CREATING A CULTURE OF PREPAREDNESS**

The second element of our continuing transformation for homeland security perhaps will be the most profound and enduring—the creation of a Culture of Preparedness. A new preparedness culture must emphasize that the entire Nation—Federal, State, and local governments; the private sector; communities; and individual citizens—shares common goals and responsibilities for homeland security. In other words, our homeland security is built upon a foundation of partnerships. And these partnerships must include shared understanding of at least four concepts:

- The certainty of future catastrophes;
- The importance of initiative;
- The roles of citizens and other homeland security stakeholders in preparedness; and
- The roles of each level of government and the private sector in creating a prepared Nation.

*Future Challenges*

The first principle for a Culture of Preparedness must be a shared acknowledgement that creating a prepared Nation will be a continuing challenge. Optimism is fundamental to the American character. While it always energizes us, it also grounds us in times of tragedy and loss. We must guard against our optimism leading us to a dangerous sense of complacency. Complacency of our citizens presents a great challenge. We are fortunate that, because of the courage and self-sacrifice of public servants across all levels of government, we have not suffered another terrorist attack on our homeland since 2001. But we are a Nation at war, and we have a responsibility to be prepared. We must temper our optimism with sober recognition of the certainty of future catastrophes. We cannot prevent natural disasters. And though we work tirelessly against them, we cannot anticipate nor prevent every type of terrorist attack against the homeland. As the Irish Republican Army once warned British Prime Minister Margaret Thatcher after narrowly missing her in an assassination attempt: terrorists only need to be successful once; but we, their targets, must be successful everyday.[34] We know that our enemies plot further attacks against us. We must continue to prevent them and, if necessary, respond. Regrettably, lives will be lost, citizens displaced, and property destroyed.

The certainty of future challenges should inform our national expectations. As a Nation, we will prepare ourselves in the most effective ways we know. Our Culture of Preparedness, therefore, must emphasize the importance of flexibility and readiness to cope with an uncertain future. While we cannot predict the future to our satisfaction, we can build capabilities that prepare us for a broad range of challenges. Perhaps equally important, we can ensure that our preparedness plans, thinking, and "imagination" do not become so rigid that we cannot rapidly adapt to unforeseen challenges.[35]

*Initiative*

Despite reforms that encourage a proactive, anticipatory approach to the management of incidents, the culture of our response community has a fundamental bias towards *reaction* rather than *initiative*. As a result, our national efforts too often emphasize response and clean-up efforts at the expense of potentially more cost-effective anticipatory actions that might prevent or mitigate damage.

The need for anticipatory response is a pillar of the National Response Plan. A list of Key Concepts in the *National Response Plan* places it second only to "systematic and coordinated incident management." Specifically, the *NRP* calls for:

> Proactive notification and deployment of Federal resources in anticipation of or in response to catastrophic events in coordination and collaboration with State, local, and tribal governments and private entities when possible.[36]

Similarly, our Culture of Preparedness must stress initiative at all levels. Fundamentally, our Preparedness System and Culture must encourage and reward innovation. To do so, we must build a system and approach that better

aligns authority and responsibility—those who are responsible for a mission or task must have the authority to *act*. In the same vein, an alignment of authority and responsibility provides us the ability to assess our performance—collectively and individually. Performance assessment and accountability, however, must not be *blame*.[37] Our current culture of blame threatens both individual and institutional initiative, resourcefulness, and enterprise across the homeland security, law enforcement, and intelligence fields. It is time that Congress, the Executive Branch, and all of our homeland security partners develop a consensus regarding a reasonable balance of accountability, responsibility, and authority at all levels. Otherwise, the culture of blame and its related acrimony will debilitate us.

### *Citizen Preparedness*

Our preparedness culture must also emphasize the importance of citizen and community preparedness. Citizen and community preparedness are among the most effective means of preventing terrorist attacks as well as protecting against, mitigating, responding to, and recovering from all hazards.[38] For example, the Citizen Corps in Harris County, Texas, brought together over 50,000 volunteers to support American Red Cross efforts and staff evacuation centers throughout Houston. As a joint team, they created an actual working city (with its own zip code) for Hurricane Katrina victims sheltering in the Astrodome.[39]

Thus, citizens and communities can help themselves by becoming more prepared. If every family maintained the resources to live in their homes without electricity and running water for three days, we could allocate more Federal, State, and local response resources to saving lives. Similarly, if every family developed their own emergency preparedness plan, they almost certainly would reduce the demand for outside emergency resources. As the 9/11 Commission Report states, "One clear lesson of September 11 is that individual civilians need to take responsibility for maximizing the probability that they will survive, should disaster strike."[40]

*LESSON LEARNED:* The Federal government, working with State, local, NGO, and private sector partners, should combine the various disparate citizen preparedness programs into a single national campaign to promote and strengthen citizen and community preparedness. This campaign should be developed in a manner that appeals to the American people, incorporates the endorsement and support of prominent national figures, focuses on the importance of individual and community responsibility for all-hazard disaster preparedness, provides meaningful and comprehensive education, training and exercise opportunities applicable to all facets of the American population, and establishes specialized preparedness programs for those less able to provide for themselves during disasters such as children, the ill, the disabled, and the elderly.

Leadership at all levels will be essential in helping to transform citizen preparedness. First, responsible public officials at the Federal, State, and local levels as well as prominent national figures should begin a public dialogue that emphasizes common themes regarding the importance of citizen preparedness. DHS should continue to build upon those programs and institutions that already work, such as Department of Education elementary and secondary school programs; Citizen Corps; State and local government training programs; and Federal cooperation with the National Governors Association. Nongovernmental organizations can also play a key role in this area. DHS has made some important progress in this area with its *Ready.gov* initiative and its public service announcements program with the Ad Council.[41] But more needs to be done. Encouraging preparedness awareness and activity is a shared responsibility across all levels of government that we must make a priority. Preparedness today will save lives tomorrow.

In addition, DHS and other Federal agencies should identify both the individual skills and capabilities that would help citizens in a disaster as well as the types of messages from trusted leaders that would encourage citizens to be better prepared. Public awareness messaging must shift to include more substantive information, as opposed to just telling our citizens that they need to "do something." For example, the "Stop, Drop, and Roll" campaign used so successfully in fire safety as part of the "Learn Not to Burn"[42] program provided citizens with specific steps to take. Other successful campaigns include the National Highway Traffic Safety Administration's "Buckle Up America" campaign,[43] which prescribes proper use of seat belt and child safety seats. As with so many of these successful campaigns, the Nation's children can help lead the way.[44]

### Other Homeland Security Stakeholders and Preparedness

We must build upon our initial successful efforts to partner with other homeland security stakeholders—namely the private sector, non-governmental organizations, and faith-based groups.[45] Each of these groups plays a critical role in preparedness. To the extent that we can incorporate them into the National effort, we will be reducing the burden on other response resources so that Federal, State, and local responders can concentrate our energies on those with the greatest need.

Private sector companies own and operate 85 percent of our Nation's critical infrastructure.[46] Transportation, electricity, banking, telecommunications, food supply, and clean water are examples of services relying on infrastructure that have become basic aspects of our daily lives. Yet, these services are often only noticed when they are disrupted and when the American public expects speedy restoration. In fact, the Nation relies on "critical infrastructure" to maintain its defense, continuity of government, economic prosperity, and quality of life. The services provided by these interconnected systems are so vital that their disruption will have a debilitating impact on national security, the economy, or public health and safety.

Companies are responsible for protecting their systems, which comprise the majority of critical infrastructure. Because of this, private sector preparation and response is vital to mitigating the national impact of disasters. Government actions in response to a disaster can help or hamper private sector efforts. However, governments cannot plan to adequately respond unless the private sector helps them understand what infrastructure truly is critical. Likewise, businesses cannot develop contingency plans without understanding how governments will respond. To maximize the Nation's preparedness, Federal, State, and local governments must join with the private sector to collaboratively develop plans to respond to major disasters. There are important initiatives in this area already underway by the Business Round Table (BRT) and Business Executives for National Security (BENS) project.[47] We must encourage and build upon these efforts. The private sector must be an explicit partner in and fully integrated across all levels of response—Federal, State, and local.

Non-governmental organizations play essential roles in preparedness by complementing and supporting preparedness efforts. In times of crisis, NGOs—especially community groups, faith-based organizations, places of worship, and relief organizations—provide essential human faces, helping hands, compassion, and comfort to all American people, whether or not they are victims of an incident. As such, they fill an essential need in the response system in ways far beyond the capacity of the Government. Thus, their contributions must be fully integrated at all levels—Federal, State, and local.

### The Role of Each Level of Government in a Culture of Preparedness

Today, we operate under two guiding principles: a) that incident management should begin at the lowest jurisdictional level possible, and b) that, for most incidents, the Federal government will generally play a supporting role to State and local efforts.[48] While these principles suffice for the vast majority of incidents, they impede the Federal response to severe catastrophes. In a catastrophic scenario that overwhelms or incapacitates local and State incident command structures, the Federal government must be prepared to assume incident command and get assistance directly to those in need until State and local authorities are reconstituted.

The National Preparedness System must also recognize the role of the Federal government for monitoring and guiding national preparedness efforts. In particular, the system must ensure that the Federal government assesses the preparedness of localities across the country with an eye towards identifying the Federal response requirement for each. In addition, Federal, State, local, and private sector partners must agree on a system in which the Federal government responds more actively and effectively while respecting the role of State and local governments.

The new culture of preparedness must stress *partnership* among all levels of government. Local governments will continue to have responsibility for providing the immediate response capabilities for the vast majority of incidents while State governors will continue to have sovereign responsibilities to protect their residents. Yet preparedness must emphasize the shared nature of these responsibilities in a catastrophic event. State governments must work with their local jurisdictions to ensure that they have developed plans and capabilities that are appropriate for the

homeland security challenges confronting them.  Both State and local governments must also reach out to their citizens, private sector, and community groups to promote their preparedness efforts.

Furthermore, in the new culture of preparedness, State and local governments must continually seek to work with their neighboring jurisdictions.  Building upon the successes of interstate cooperation programs such as the Emergency Management Assistance Compact (EMAC),[49] the Federal government must take an active role in encouraging and facilitating these partnerships.  Regional collaboration at the State and local levels will help the Nation to reduce overlapping or redundant capabilities as well as to minimize capability gaps.  Moreover, active regional collaboration will likewise be a means for identifying and sharing homeland security lessons learned and best practices.

Finally, in our new Culture of Preparedness, all required response assets and resources of the Federal government must integrate and synchronize to ensure an effective national response to a crisis.  In practical terms, this entails stepping away from the bureaucratic view of a particular department or agency's institutional interests.  Instead, we must continually build preparedness partnerships across the Federal government as well as with State and local governments.

**FOSTERING TRANSFORMATION**

Our continuing transformation is not a choice but an absolute necessity.  We must begin a national dialogue on shared responsibilities and expectations for preparedness.  As highlighted throughout this report, the American concept of federalism requires that any transformation must involve and accommodate all levels of government and communities across the Nation.

The objectives of this dialogue must be first to establish reasonable expectations of what government can and cannot do in response to catastrophes.  Our citizens need to know what to expect from their government, in order to make sure they do everything possible at their level to protect themselves and their loved ones.

Second, this dialogue must develop a shared understanding of the need for active Federal management of the National Preparedness System, to include:

- Setting metrics for State, local, community, and individual preparedness;
- Developing and implementing a system to assess that preparedness as well as to establish clear responsibilities and accountability; and
- Identifying the circumstances under which the Federal government will push capabilities independent of request.

Finally, this dialogue must result in a shared understanding of roles and responsibilities in preparedness for catastrophic events, to include those of:

- The Federal government;
- State governments;
- Local governments;
- The private sector (including non-governmental organizations and faith-based organizations); and
- Communities and individual citizens.

## CHAPTER SEVEN: EPILOGUE

Each morning as the sun rises over the Gulf Coast, determined residents of Louisiana, Mississippi, and Alabama begin another day in the long trial of reviving their communities and rebuilding their lives. They continue to grieve for those who were lost. For all of them, Katrina and its aftermath remain a painful, challenging, and ever-present reality.

These human dimensions and their indelible images of despair and destruction must remain sharply in focus as we address the lessons we have learned from our Federal response to Hurricane Katrina. The seventeen specific lessons we have identified resulted in 125 recommendations, which have been reviewed by all relevant Federal departments and agencies. They soon will enter a review process, which will help to refine the recommendations, as necessary, as well as develop implementation plans and attendant timelines.

These recommendations for corrective action are substantial, and the task to implement them will be a weighty one. Arriving at sound policy decisions is difficult enough, but the path to effectuating significant, transformational change within bureaucracies can be a lengthy process. But if the lessons of Katrina really are to be learned, this change is imperative.

The 2006 hurricane season is just over three months away. Even while the homeland security policy community undertakes the deliberative process to implement the lessons we have learned from Katrina, there are specific actions we can and should undertake now – in parallel with the policy process – to be better prepared for future emergencies. We propose to undertake the following activities before June 1:

- Ensure that, in the event of another disaster, we are able to co-locate relevant Federal, State, and local decision-makers, including leaders of State National Guards, to enhance unity of effort

- For events preceded by warning, ensure we are prepared to pre-position a fully resourced and integrated interagency Federal Joint Field Office (JFO) to coordinate and, if necessary, direct Federal support to the disaster

- Ensure situational awareness by establishing rapid deployable communications as well as instituting a structure for consolidated Federal operational reporting to the Department of Homeland Security

- In order to enhance coordination of military resources supporting the response, co-locate a single Department of Defense point of contact at the JFO and current FEMA regional offices

- To ensure the most effective employment of Federal disaster relief personnel and assets, designate locations throughout the country for receiving, staging, moving, and integrating them

- Identify and develop rosters of Federal, State, and local government personnel who are prepared to assist in disaster relief

- Employ all available 21st Century technologies both to update and utilize the national Emergency Alert System in order to provide the general public with advanced notification of and instruction for disasters and emergencies

- Encourage States to pre-contract with service providers for key disaster relief efforts, such as debris removal and the provision of critical commodities

- Enhance the mechanism for providing Federal funds to States for preparations upon warning of an imminent emergency

- Improve delivery of assistance to disaster victims by streamlining registration, expediting eligibility decisions, tracking movements of displaced victims, and incorporating safeguards against fraud

- Enhance on-going review of State evacuation plans and incorporate planning for Continuity of Government to ensure continuation of essential and emergency services

We have already begun collaborating with the Department of Homeland Security to implement many of these steps. The completion of the tasks above will better position the Federal government to respond to natural and man-made disasters more effectively and efficiently in the near-term.  And as the Federal government works to implement these steps and the full 125 recommendations contained in this Report, we encourage State and local governments, all facets of the private sector as well as the media to undertake a review of their own respective roles and responsibilities in both preparing for and responding to catastrophic events.  In the end, what we require for a fully successful national response to all 21st Century hazards is to build upon the national and homeland security foundations we have established since 9/11 and implement a unified system of National Preparedness.

We are confident that the lessons we have learned from Hurricane Katrina and the accompanying recommendations we propose will yield preparedness dividends that transcend Federal, State, and local boundaries.  Their full implementation will help the Nation – all levels of government, the private sector, and communities and individual citizens – achieve a shared commitment to preparedness.   Together, we will strengthen our ability to prepare for, protect against, respond to, and recover from a wide range of catastrophic possibilities that are as varied as the mind of a terrorist and as random as the weather.  There is no greater mission, and no greater tribute to the victims of Hurricane Katrina.

## APPENDICES

**Appendix A – Recommendations**

**Appendix B – What Went Right**

**Appendix C – List of Acronyms**

**Appendix D – Staff Page**

**Appendix E – Endnotes**

## APPENDIX A – RECOMMENDATIONS

| | |
|---|---|
| **1.  National Preparedness** | (Recommendations 1 – 21) |
| **2.  Integrated Use of Military Capabilities** | (Recommendations 22 – 32) |
| **3.  Communications** | (Recommendations 33 – 37) |
| **4.  Logistics and Evacuation** | (Recommendations 38 – 43) |
| **5.  Search and Rescue** | (Recommendations 44 – 48) |
| **6.  Public Safety and Security** | (Recommendations 49 – 56) |
| **7.  Public Health and Medical Support** | (Recommendations 57 – 62) |
| **8.  Human Services** | (Recommendations 63 – 67) |
| **9.  Mass Care and Housing** | (Recommendations 68 – 72) |
| **10.  Public Communications** | (Recommendations 73 – 77) |
| **11.  Critical Infrastructure and Impact Assessment** | (Recommendations 78 – 85) |
| **12.  Environmental Hazards and Debris Removal** | (Recommendations 86 – 88) |
| **13.  Foreign Assistance** | (Recommendations 89 – 97) |
| **14.  Non-Governmental Aid** | (Recommendations 98 – 103) |
| **15.  Training, Exercises, and Lessons Learned** | (Recommendations 104 – 111) |
| **16.  Homeland Security Professional Development and Education** | (Recommendations 112 – 118) |
| **17.  Citizen and Community Preparedness** | (Recommendations 119 – 125) |

APPENDIX A – RECOMMENDATIONS

**Critical Challenge:  National Preparedness**

**Lesson Learned:  The Federal government should work with its homeland security partners in revising existing plans, ensuring a functional operational structure—including within regions—and establishing a clear, accountable process for all National preparedness efforts.  In doing so, the Federal government must:**
- **Ensure that Executive Branch agencies are organized, trained, and equipped to perform their response roles.**
- **Finalize and implement the National Preparedness Goal.**

**Recommendations:**

**National Response Plan and the National Incident Management System**

1. **DHS should establish an interagency team of senior planners with appropriate emergency management experience to conduct a comprehensive, 90-day review of the NRP and the NIMS.**  One of the main goals of this review will be to provide a cross-walk between the NIMS and the NRP to ensure that the two plans are properly integrated and clearly explained.  Using feedback and lessons learned from the Hurricane Katrina response, including addressing relevant recommendations from the Katrina Lessons Learned Review Group, the interagency group led by DHS and overseen by HSC will develop findings and recommendations for changes to the NRP and request detailed comments and feedback from all agencies.  Before changes are finalized, the group will test the recommended changes through tabletop exercises to ensure the suggested changes are clear and improve the NRP.  Revisions should include the development and promulgation of guidance on the purpose and procedures for declaring Incidents of National Significance and the development of a streamlined, standardized mission assignment process and clearly delineate the consequences of an INS declaration.  A second, independent group of subject-matter experts from across the State and local emergency response and homeland security community and the private sector should then review and validate the group's recommendations.  Following the completion of the 90 day review, the recommended modifications to the NRP will be expeditiously reviewed through the HSC interagency policy process.

   a. **Revise the NRP to address situations that render State and local governments incapable of an effective response.**  The NRP does not adequately anticipate that the Federal government may need to temporarily assume some inherently State and local responsibilities and augment State and local incident command staff during a catastrophic incident.   The Federal government should develop plans to build and temporarily command the ICS until the local or State authorities are able to recover from the initial impact of the catastrophic incident and perform their roles under ICS.  These plans should utilize any available State or local assets that may remain operational and necessarily require collaborative planning between Federal, State, and local authorities.  These revisions should also be incorporated into the NRP-CIA and CIS.  This effort should be part of the 90 day interagency review effort.

   b. **Realign ESFs to NIMS structure.** Although the NRP base plan was predicated on the NIMS incident command system, the Emergency Support Functions (ESFs) were taken from the old Federal Response Plan and were not adequately realigned to fit within the NIMS structure.  The ESFs should be realigned to fit within the NIMS structure to ensure coordination and efficiency.  Rather than having each ESF function independently undertaking common functions (i.e., operations, planning, logistics, finance/administration), the ESF structure should be realigned to separate operational elements from common support requirements.

   c. **Require agencies to develop integrated operational plans, procedures and capabilities for their support to the base NRP and all ESFs and Support Annexes.**  The NRP required each ESF primary agency to "develop standard operating procedures (SOPs) and notification protocols."  Each primary department or agency for each ESF and support annex should develop a detailed operations plan on how they will become operational and coordinate with other annexes and ESFs during a major incident.  These operational plans should conform to NIMS and be consistent with the recommended reconfiguration of the ESF structure.  These plans should be exercised yearly through either National,

departmental, or agency exercises.  It should be recognized that these plans will take time to create and will need to be developed in collaboration with State and local officials.

**d.    All Federal departments and agencies should align their response structures to NIMS.**    In accordance with this alignment, the entire Federal response structure should be NIMS based, reporting through one unified command using the same terminology and basic organizational structure.  Although ICS is a field command structure, developing an understanding of the ICS at all levels will eliminate confusion, standardize operations throughout the government, and limit unnecessary interference with field command.  DHS should lead a review of all Federal department and agency response operations plans to guarantee conformance with NIMS and the NRP, from response teams to command post operations.

1)    DHS should establish performance measures and metrics to allow an objective assessment of NRP and NIMS implementation status for all departments and agencies, and state and local governments.

2)    After the establishment of the performance metrics, all departments and agencies will report to the President through the Homeland Security Council (HSC) within 60 days on all NRP/NIMS implementation efforts to date and on whether they have met the guidance goals established in HSPD-5.  The HSC will assess the progress of NIMS implementation for each department and agency.

3)    To ensure that State and local governments fully implement NIMS requirements to be eligible for Homeland Security Grant Program funding in fiscal year 2007 and thereafter, DHS should formally review all NIMS compliance certifications through a peer review process, in addition to a self-certification process.  The peer review process should: (1) verify the satisfaction of training, planning, exercising, and other NIMS metrics; and (2) promote the sharing of lessons learned and best practices for institutionalizing the NIMS.

**2.    DHS should institute a formal training program on the NIMS and NRP for all department and agency personnel with incident management responsibilities.**  The key to the implementation of ICS is training.  All departments and agencies should undertake an aggressive ICS training program for all personnel who may deploy during a disaster.  It is essential that personnel have a working knowledge of ICS before a disaster occurs.  Adequate training will be a component of the NRP/NIMS assessment.    In order to effectively implement the NRP and NIMS, senior officials at departments and agencies must also be familiar with the requirements for their ESF roles, increased participation for specific scenarios, how to request and assign assets, how to work within a JFO structure, and the level of representation and participation coordinating entities require.  DHS should therefore develop and deliver detailed briefings and instructions on the NIMS and NRP to all relevant Federal decision-makers including each Cabinet Secretary and their emergency response staff.  Additionally, DHS should develop and deliver similar briefings and instructions tailored to relevant state and local decision makers, the private sector and Non-Governmental Organizations.

**3.    DHS should lead an interagency effort to develop and resource a deliberative, integrated and Federal planning and execution system to meet the requirements of the revised NRP.**  Departments and agencies should have both personnel and funds to be able to train, exercise, plan and detail staff to disaster response activities to enable better execution of their roles and responsibilities.  Specific contingency plans must be integrated so that capabilities and gaps are identified and addressed.

Departments and agencies should develop and resource "Force Packages" of rapidly deployable operational capabilities that meet the re-organized ESF requirements within 90 days of completing the revised NRP.

**The Department of Homeland Security: A Regional Structure for Preparedness**

**4.    DHS should develop and implement Homeland Security Regions that are fully staffed, trained, and equipped to manage and coordinate all preparedness activities and any emergency that may require a substantial Federal response.**  Homeland Security Regions should be created and each region should be

staffed with a preparedness group populated by subject matter experts from across the Federal government. Special consideration should be given to developing a separate National Capital Region due to the unique requirements associated with enduring constitutional government. The group's goal within each region should be to prepare for disasters, conduct training, coordinate and integrate planning, measure capability and preparedness, and respond to a disaster if one occurs. The group should also help to ensure that Federal spending in the region is spent to bolster capabilities as outlined in the National Preparedness Goal. The size of the preparedness group should be determined by the size of the region, propensity of the region to experience a natural disaster or terrorist attack, risks within the region and general State and local preparedness measured against the National Preparedness Goal.

5.  **Each Regional Director should have significant expertise and experience, core competency in emergency preparedness and incident management, and demonstrated leadership ability.** The Regional Director should have full situational awareness of all events, risks, and response capabilities within the region. When an event occurs in the region, the Regional Director should be ready to become the PFO and should coordinate or direct as appropriate the Federal response assets deployed within the operational area. The Regional Director as PFO should establish and direct the Regional Response Coordination Center (RRCC). These Regional Directors will comprise the professional PFO cadre and receive initial and on-going PFO training.

6.  **The PFO should have the authority to execute responsibilities and coordinate Federal response assets.** The PFO should have the same authority as an FCO to manage and coordinate the Federal response to a disaster. The PFO should have the authority to make any operational decisions necessary, within the law, without having to obtain approval from headquarters. Giving the PFO this authority could be accomplished without a change to the Stafford Act by simply designating the PFO as an FCO. Alternatively, the Secretary of Homeland Security or the FEMA Director could delegate their authority to oversee FCO to the PFO. This action does not require demoting FCO's within a particular region to Deputy FCOs. The FCO will retain all current authorities under the Stafford Act and will report through the PFO. An incident covering multiple states will require multiple FCOs operating concurrently under the command of the PFO.

7.  **Each Homeland Security Region must be able to establish a self-sufficient, initial JFO anywhere within the region.** The rapid establishment of a JFO is the keystone to effective Federal emergency response. It is critical that each Region have the resources, equipment, and personnel to establish a JFO after a major disaster. This JFO should be built using available State, local, and/or National Guard infrastructure. It should also be built in such a way that Federal officials can collaborate with their State and local counterparts and thereby better complement their response operations. The JFO must also be completely self-sufficient, with food, water, power, communications equipment, and housing for personnel, to enable deployment to areas where critical infrastructure are damaged or destroyed. To the extent possible for an anticipated event, the organization of the JFO should begin before the event. For a no-notice event, each region should have the ability to establish an initial JFO within 12 hours. To assist in this effort, each region should pre-identify JFO locations in areas with large populations. The ability to establish a JFO after a major disaster directly enhances the Federal government's ability to maintain continuity of operations (COOP). Each regional JFO should also identify and conduct exercises at their respective COOP sites.

8.  **Each region must be able to establish and resource rapidly deployable, self-sustaining incident management teams (IMT) to execute the functions of the JFO and subordinate area commands that are specified in the NRP and NIMS.** The regional headquarters should create IMT's that can rapidly respond to a disaster with robust, deployable communication packages and assist in establishing the command and control structures required in NIMS and the NRP. IMTs should be composed of experts in ICS who can establish a command for the Federal response to connect with State and local response structures during disasters and large scale events. IMTs should maintain certification in all levels of ICS for each ICS command element.

9.  **DHS should establish several strategic-level, standby, rapidly deployable interagency task forces capable of managing the national response for catastrophic incidents that span more than one Homeland Security Region.** These Joint Interagency Headquarters should be led by a senior official from a

14. **HSC should lead an interagency review to update or modify as necessary Executive Order 12656, dealing with updated national security emergency preparedness policies and strategies to ensure that continuity planning is expanded to include all hazards.** This order directs the head of each Federal department and agency to "assist State, local, and private sector entities in developing plans for mitigating the effects of National security emergencies and for providing services that are essential to a National response" (*Sec. 201 (9))*. DHS should implement the order through an aggressive program designed to assist State and local governments in developing continuity of operations (COOP) plans. The order states that the Secretary of Homeland Security is responsible to "guide and assist State and local governments and private sector organizations in achieving preparedness for National security emergencies, including development of plans and procedures for assuring continuity of government, and support planning for prompt and coordinated Federal assistance to States and localities in responding to National security emergencies." Investments in planning may be funded through Federal homeland security grants in conformance with the National Preparedness Goal. All Federal Agencies must have COOP plans at the headquarters, regional, and local level and should follow the guidance set forth in Federal Preparedness Circular 65 (FPC65) *Federal Executive Branch Continuity of Operations (COOP)*, June 15, 2004.

15. **Establish a National Operations Center to coordinate the National response and provide situational awareness and a common operating picture for the entire Federal government.** This interagency center will allow for National-level coordination of Federal/State/local response to major domestic incidents. This center will combine, co-locate, and replace the situational awareness mission of the Homeland Security Operations Center (HSOC), the operational mission of the National Response Coordination Center (NRCC) and the role of the IIMG, and be staffed with full time detailed employees assigned to a planning cell from relevant departments and agencies. Staffed and managed by interagency officials, it will also provide situational awareness and a common operating picture on a real-time basis during a domestic emergency for the White House and all agencies. All department and agency command centers will provide information to the National Operations Center (NOC), which will develop a National common operating picture capable of being exported to the White House Situation Room and other Federal operations centers as necessary. The National Operations Center should be located and designed to meet the requirements of Enduring Constitutional Government. DHS will serve as the Executive Agent for the NOC and it will function as a true interagency command center.

16. **Establish a National Information and Knowledge Management System.** Departments and agencies, working with the NOC and the Program Manager for Information Sharing, should develop a national system of information management to provide a common operating picture which allows for the processing and timely provisioning of interagency information sources (*e.g.* DOD National Military Command System, National Counterterrorism Center, FBI Strategic Information Operations Center). These information sources should be viewable at all Federal operation centers utilizing compatible geo-spatial information systems, and should operate on both classified (SIPRNET) and unclassified systems to allow State and local emergency management interface and integration.

17. **Establish a National Reporting System.** Departments and agencies, through the NOC, should establish a single reporting system to establish a uniform information flow to senior decision makers. A single reporting system should be used to provision relevant information for the right decision maker, at the right time, and in a usable format. This reporting system should incorporate the existing uniform reports utilized in the ICS.

18. **Establish National Information Requirements and a National Information Reporting Chain.** Departments and agencies, through the NOC, should develop information requirements at each level of the incident command structure to ensure that valuable, accurate information is reported in a timely manner. A national reporting chain should be established to ensure a standard information flow through all levels of the incident command structure.

19. **Establish the Disaster Response Group (DRG).** The HSC should establish the DRG to create a forum where strategic policy and interagency coordination and deconfliction can take place. These decisions would then be implemented through the NOC. This HSC-chaired group would address issues that cannot be resolved at lower levels, and either resolve them or develop decision recommendations for Deputies and Principals.

The group would function in a manner analogous to the Counterterrorism Security Group (CSG).  As such it would meet on a regular basis on preparedness and response policy and implementation issues and then more frequently as required during a crisis.

**National Preparedness System**

**20.     Future preparedness of the Federal, State, and local authorities should be based on the risk, capabilities and needs structure of the National Preparedness Goal (NPG)**.  Before an effective response plan can be created and an effective response implemented, gaps or shortfalls in required capability must be identified. Pursuant to HSPD-8, DHS should develop a system to assess the level of national preparedness by assessing the levels of capability identified in the NPG through performance metrics outlined in the Target Capabilities List (TCL).  DHS should assess the Nation's preparedness yearly and should, in conjunction with the interagency, recommend appropriate adjustments to the NPG, TCL and yearly priorities for Homeland Security Grants.   This will enable organizations across the Nation to identify capabilities that need improvement and develop and maintain capabilities at levels needed to manage major events using the NRP and NIMS.  The deficiencies in Federal, State, and local response to Hurricane Katrina highlight the need for a more efficient National preparedness system.  For example, States should utilize their licensing authorities to require providers of essential services and commodities, such as gas stations, pharmacies, and cell tower operators to equip their facilities with generators to enable them to operate in an emergency where central power is lost. Federal, State and local departments and agencies all share the responsibility for protecting and responding to their citizens and should use the NPG and TCL as a planning tool to:

a.  Define required capabilities and what levels of those capabilities are needed.  DHS should also lead a process to determine what capabilities articulated in the NPG are within the purview of the Federal government, what levels of those capabilities are required, and finally which Departments and Agencies should develop and maintain those levels of capability.  The information should be included in the NPG;

b.  Revise the NPG as appropriate to define appropriate support roles for Federal and State employees to perform as emergency staff when an emergency prevents them from performing their regular duties.

c.  Strategies for meeting the NPG required levels of capability should be developed that prioritize investments on the basis of risk, need and National priorities in HSPD-8;

d.  Establish priorities within a resource-constrained environment;

e.  Clarify and understand roles and responsibilities in the National network of homeland security capabilities and revise the NPG as appropriate;

f.  Develop mutual aid agreements and Emergency Management Assistance Compacts that are informed by the requirements in the NPG and are synchronized in a manner to deliver the right capability at the right time to the right place to meet the right need; and

g.  Establish a program to measure and assess the effectiveness of preparedness capabilities across the Nation using the President's Management Agenda Score Card tool, and tie performance results to Homeland Security Grant Program funding.

**21.     DHS should develop and maintain a National inventory of Federal capabilities**.  Effective response plans cannot be developed absent a consideration of resources and capabilities.  The Federal capabilities and corresponding assets and resources should be inventoried and placed into a database, per HSPD-8, by DHS.  Key to this real-time inventory will be awareness of which assets are available during a disaster and of their deployment timeline from notification.  Furthermore, DHS was required to establish a National inventory of Federal assets by Section 7406 of the Intelligence Reform and Terrorism Prevention Act of 2004.

a. **DHS should coordinate with other Federal agencies and States to identify physical locations around the country that could be used as crisis support centers or bases for receiving, staging and integrating emergency management resources during disasters.**

**Critical Challenge: Integrated Use of Military Capabilities**

**Lesson Learned:**  **The Departments of Homeland Security and Defense should jointly plan for the Department of Defense's support of Federal response activities as well as those extraordinary circumstances when it is appropriate for the Department of Defense to lead the Federal response. In addition, the Department of Defense should ensure the transformation of the National Guard is focused on increased integration with active duty forces for homeland security plans and activities.**

**Recommendations:**

22.  **DOD and DHS should develop recommendations for revision of the NRP to delineate the circumstances, objectives, and limitations of when DOD might temporarily assume the lead for the Federal response to a catastrophic incident.**  Katrina demonstrated the importance of prior planning for rapid and complex response efforts.   DOD should develop plans to lead the Federal response for events of extraordinary scope and nature (*e.g.,* nuclear incident or multiple simultaneous terrorist attacks causing a breakdown in civil society).

23.  **DOD should revise its Immediate Response Authority (IRA) policy to allow commanders, in appropriate circumstances, to exercise IRA even without a request from local authorities.**  DOD should work with DHS and State officials to improve integration of military response capabilities.

24.  **DOD and DHS should plan and prepare for a significant DOD supporting role during a catastrophic event.**  DOD's joint operational response doctrine is an integral part of the national effort and must be fully integrated into the national response at all levels of government.  DOD should have a contingency role and a requirement to assist DHS with expertise in logistics, planning, and total asset visibility.   DOD should coordinate with DHS and DOT to identify DOD's contingency role in airport operations and evacuations, and the planning and use of Ready Reserve Fleet vessels for housing, evacuation, communications, command, control, and logistics.  The NRP and Catastrophic Incident Supplement (CIS) should specify the specific requirements for DOD resources based on the magnitude and type of a catastrophic event.

25.  **DOD should provide support from the National Geospatial Intelligence Agency (NGA) and the National Security Agency (NSA) as part of overall DOD support to DHS under the NRP to provide technical skills, situational awareness, imagery support, analysis and assessment for responding to catastrophic events.  Requests for situational awareness capabilities should follow DOD processes for asset allocation.  DOD will ensure requests for assistance are identified and satisfied for access to NGA, NSA and other Combat Support Agency's capabilities.**  NGA and NSA have significant technical capabilities that should be integrated into the Nation's preparation and response efforts.  NGA and NSA have the capability to rapidly provide situational awareness and analysis.  The response to Hurricane Katrina highlighted that NGA and NSA possess unique capabilities that can be utilized in homeland missions, to include severe weather events.  The NSA was instrumental in matching up missing family members, and the NGA provided valuable overhead imagery of the disaster site.  Defined roles in homeland security missions will allow for these capabilities to be better budgeted, developed, and ultimately leveraged.  In support of missions in the homeland where DHS is the Primary Federal Agency, DHS should levy tasking requirements. These agencies have established relationships with governmental and private/commercial entities, which can be integrated as part of a larger national response effort.  NGA and NSA roles and support to the homeland security mission should be added into the agencies' core mission statements.  NGA and NSA support should be coordinated with civil agencies providing geospatial support and analysis, including the U.S. Geological Survey.  These agencies need resources to perform homeland security functions.  In order to meet these new mission requirements these agencies need to expand from a legacy focus of being a producer to a broader role as a service provider.

**26.    Set standards for "pushing" the pre-positioning of Federal assets to States and locals, in the case of an imminent catastrophe.**  DHS should create a civil operational planning capability to push assets that is robust, agile, and deployable; otherwise, the response will rely heavily on DOD capabilities.  Factors slowing delivery of commodities require review and solutions adapted prior to future disasters.  DHS should include much better planning efforts between State and Federal emergency management logisticians and operations personnel, the assistance and advice of DOD strategic logistics planners, and more robust private sector partnerships.  DHS should mandate the use of pre-competed private sector contracts for capabilities ranging from airlift to advanced communications and life support and have available a rapid response capability similar to DOD.  Federal funding should be predicated on States entering into their own contractual agreements, pre-crisis, with the private sector for procurement and delivery of commodities.

**27.    In addition to the National Guard, the other Reserve Components of the military services should modify their organization and training to include a priority mission to prepare and deploy in support of homeland security missions.**  Reserve components historically have focused on military and war fighting missions, which will continue; however, we should recognize that the Reserve components are too valuable a skilled and available resource at home not to be ready to incorporate them in any Federal response planning and effort.  Additionally, efforts should be made to leverage Reserve civilian skills in disaster relief efforts.

**28.    DOD should consider fully resourcing the JTF State Headquarters to address capabilities gaps and to enhance readiness.**  Enhance National Guard capabilities by resourcing and fully implementing Joint Force Headquarters (JFHQ) State.  JFHQ-State transformation is key to rapid deployment of National Guard forces in response to a catastrophe.

The transformation of JFHQ-State and other National Guard capabilities for homeland security missions will ensure response forces are available in each DHS region.  These capabilities should support NRP requirements including:  security, maintenance, aviation, engineer, medical, communications, transportation, and logistics.  The National Guard should develop rapid reaction forces capable of responding to an incident within 24 hours.  This is vital to future rapid deployment of National Guard forces in response to a catastrophe.  This transformation, as it nears completion, must continue to take root within DOD.

JFHQ State will provide the command structure in which to lead and direct arriving Federal response capabilities, forming the backbone of State Incident Command System (ICS) and, as a result, the Federal Joint Field Office (JFO).  It will facilitate unity of effort and provide the situational awareness needed for an effective response. To that end, the Command, Control, Communications, and Information (C3I) structure must be interoperable and satisfy a common set of mission essential tasks.

**29.    Develop the capability to rapidly activate a JTF-State for contingencies.**  JTF-State is a forward deployed command group that can stage assets (by conducting reception, staging, onward movement, and integration); provide situational awareness and initial command and control for both State governors (for National Guard troops) and USNORTHCOM (for Federal active duty troops); and provide State level components to a Federal active duty JTF, should one be required.  JTF-State coordinates with USNORTHCOM and State authorities to ensure the application of the full capability of the Joint Force for domestic response missions. A key component of the JTF-State should be the State's WMD CSTs.  The option to expanding the role of the CSTs to an all-hazards response team should be explored.  This may require additional resources, but would improve situational awareness and command and control capabilities at the State level.

A JTF-State model streamlines the command structure exercising command and control over all assigned forces supporting civil authorities.  The JTF command and control architecture should provide a wide network to build a single common operating picture that increases situational awareness and redundancy.  The JTF should assume command and control of Federal active duty forces and National Guard forces from other States.  As part of the JFHQ State, the JTF maintains and provides trained and equipped forces and capabilities.  If and when necessary, this JTF model enables a National Guard Commander familiar with State and local area of operations to serve both in a Federal and State status providing both unity of effort and unity of command for Federal and State forces.

**30. DOD should consider assigning additional personnel (to include General officers) from the National Guard and the reserves of the military services to USNORTHCOM to achieve enhanced integration of Active and reserve component forces for homeland security missions.**

**31. DOD should support DHS development of an analysis and operational planning capability to enable DHS to predict detailed requirements and plan for specific actions needed to respond to future disasters**.  This DOD/DHS element should assess past catastrophic disasters and the successes and failures of the overall responses to those events.  This information should inform detailed planning for future disaster response, and allow determination of specific decision points to aid rapid decision making.   Ultimately a fully mature DHS planning capability should have additional utility by deploying during future catastrophic events and translating initial damage assessments into accurate needs assessments for local, State and Federal authorities.

**32. DOD should consider chartering the NGB as a joint activity of the DOD.  Responsibilities should include:**

   a.  Serve as the focal point in developing, managing, and integrating employment of joint National Guard capabilities for the Joint Staff and the Departments of the Army and Air Force in support of the Combatant Commands.

   b.  Act as the DOD channel of communication to and from the National Guard of the States and Territories.

   c.  Support all Combatant Commanders in developing joint operational requirements for contingency and response plans.  Specifically support U.S. Joint Forces Command (USJFCOM), USNORTHCOM, U.S. Pacific Command (USPACOM), U.S. Southern Command (USSOUTHCOM), U.S. Strategic Command (USSTRATCOM) and the States and Territories in developing strategy and contingency plans for homeland defense missions.

   d.  Administer Army and Air Force programs; acquire, distribute, and manage resources; plan, coordinate, and provide situational awareness and other support to the Combatant Commanders.

**Critical Challenge:  Communications**

**Lesson Learned:  The Department of Homeland Security should review our current laws, policies, plans, and strategies relevant to communications.  Upon the conclusion of this review, the Homeland Security Council, with support from the Office of Science and Technology Policy, should develop a National Emergency Communications Strategy that supports communications operability and interoperability.**

**Recommendations:**

**33. DHS should complete the review of National Security and Emergency Preparedness (NS/EP) communications policy by April 30, 2006.**  As requested by the Homeland Security Council and the National Security Council, DHS should conduct this review to provide a preliminary strategic "plan for integrating communications for all levels of crisis in light of evolving threats and new and converging technologies, and for organizational and policy changes."  This review and resulting strategic plan will advance communications capability planning for the Nation's response posture.

**34. HSC and OSTP should lead an interagency review of all current policies, laws, plans, and strategies that address communications and integrate them into a National Emergency Communications Strategy.**  The review should include:

   a.  The development of an overarching National Emergency Communications Strategy should address a full range of hazards;

b.  A national emergency communications strategy should consider the direction of the telecommunications industry and supporting recommendations of the President's National Security Telecommunications Advisory Council;

c.  State and local emergency prevention, preparedness, and response personnel must maximize the resources provided by, and implement the procedures contained in, the Homeland Security Grant Program;

d.  Federal, State, and local entities should use the Target Capabilities List (TCL) as a reference to develop emergency communications strategies.  The resulting strategies will enhance operability and support future interoperable emergency communications capabilities. State and local standards and performance measures for achieving for interoperability should be tied to Homeland Security Grant Program funding criteria;

e.  By March 1, 2006, HSC and OSTP should organize an interagency group to begin the development of a national emergency communications strategy.  An interim strategy, to be completed May 31, 2006, should provide sufficient guidance and direction to address the deficiencies identified in the Hurricane Katrina response.

35. **DHS should revise the NRP to conform to the new National Emergency Communications Strategy.** The NRP should include sufficient guidance on communications operations when responding to a disaster.  This guidance should address the full spectrum of possible effects to the Nation's communications system from disasters and detail the required responses.  It should also ensure that response operations employ all available communications assets to support operability and interoperability.  The following areas should be addressed as part of the revision of the NRP:

a.  Communications procedures and guidelines need to be defined, implemented, and practiced through simulations and exercises.  Measurement of progress to increase overall crisis communications capability will be graded against the President's Management Agenda criteria;

b.  Updated communications guidance must also emphasize the ability of emergency responders and private security officials to share information and use available communication systems to connect with authorities at all levels of government. Planning needs to cover not only system connectivity, but also operating practices, business processes, and initial data sets to make the system work;

c.  The NRP's ESF-2 must direct the integration of all available Federal, State, local, and private communications assets.  The full integration of communications capability requires an assessment of Federal assets and an inventory of available capability.  During emergencies, ESF-2 must have the authority to implement, resource, and restore communications;

d.  State and local first responders must satisfy the requirements of the Target Capabilities List, in order to receive Federal funding.

36. **DHS should develop and maintain a national crisis communication system to support information exchange from the President, across the Federal government, and down to the State level.**

37. **DHS should establish and maintain a deployable communications capability, to quickly gain and retain situational awareness when responding to catastrophic incidents.**  To restore operability and achieve interoperability, there is a strong need for rapidly deployable, interoperable, commercial, off-the-shelf equipment that can provide a framework for connectivity among Federal, State, and local authorities.  A deployable capability to "reach-back" to "large headquarters units capable of providing superior support to deployed elements from their home stations where they have better facilities, resources and access to information," can achieve initial operability.  This transformational capability should ensure decision makers at all levels of government have accurate and complete data to assess courses of action.  Inadequate situational awareness during the response to Hurricane Katrina resulted in decision makers relying on

incorrect and incomplete information.  DHS progress in this regard is essential to ensure adequate situational awareness.  It must therefore set measurable goals and use the President's Management Agenda initiatives to encourage progress and accountability toward achieving them.  Available technologies can provide short-term operability and support long-term interoperability for emergency responders.  However, to keep pace with technology changes, DHS should consider commercial, off-the-shelf solutions.

**Critical Challenge:  Logistics and Evacuation**

**Lesson Learned:  The Department of Homeland Security, in coordination with State and local governments and the private sector, should develop a modern, flexible and transparent logistics system.  This system should be based on established contracts for stockpiling commodities at the local level for emergencies and the provision of goods and services during emergencies.  The Federal government must develop the capacity to conduct large-scale logistical operations that supplement and, if necessary, replace State and local logistical systems by leveraging resources within both the public sector and the private sector.  The Department of Transportation, in coordination with other appropriate departments of the Executive Branch, must also be prepared to conduct mass evacuation operations when disasters overwhelm or incapacitate State and local governments.**

**Recommendations:**

38. **DHS should partner with State and local governments, other Federal agencies and the private sector to develop an efficient, transparent and flexible logistics system for the procurement and delivery of goods and services during emergencies.  DHS should develop a logistics system, utilizing an integrated supply chain management approach, capable of supporting large-scale disaster operations by leveraging resources within both the public sector and the private sector.**

    a. **DHS should identify private sector resources that can be leveraged to supplement and provide surge capacity to the Federal support to disaster operations, execute direct vendor delivery contingency contracts with these sources prior to disasters, and encourage State and local governments to do the same.**  Such contracting practices would eliminate time-consuming and inefficient negotiations during emergencies.  By utilizing direct vendor delivery contracts, shipments are sent directly to the customer from the supplier, bypassing unnecessary storage points.  Participating State governments would identify their anticipated requirements and coordinate with DHS to ensure that contingency contracts are executed to meet those needs.

    b. **DHS should require that local and State governments establish contracts with private sector vendors for disaster relief supplies in advance of an emergency with the assurance of reimbursement should these contracts be activated in a post disaster declaration environment.**

    c. **Federal government should allocate strategic goods and services or conduct re-supply operations during a catastrophic disaster when shortfalls occur in local and State resources.**  The new logistics system developed in concert with State and local governments, and the private sector should be transparent to all managers within the system (Federal, State and local governments and the private sector).  The system should be comprehensive so that the full range of logistical requirements and the flow of goods and services can be tracked from provider to receiver.  The system should take into account all the sources of logistical provisions such as mutual aid agreements within States, EMAC agreements between States, contracts between the private sector and Federal and State governments, and agreements between non-governmental, community, faith-based and volunteer organizations and Federal and State governments.  The system should be designed to allow all Federal, State and local logistics managers to monitor the execution of mutual aid agreements between Federal homeland security regions, and to allow Federal prioritization of strategic logistics resources in circumstances where State and/or regional resources are depleted.

    d.   **DHS should improve planning and coordination with State and local partners, non-governmental organizations, and the private sector.** DHS should ensure that its logistics system leverages the capabilities within local and State governments and all other potential reliable and credible resources. DHS should work with the National Emergency Management Association to ensure the full coordination of Federal logistical support, provided under the Stafford Act, with State logistical support provided under EMAC. The use of commercial logistics best practices in supply chain management should be used to minimize the need for the Federal government to stockpile materials. Charities and faith based organizations should be fully integrated into resource planning and be incorporated into the supply chain in their local areas. Federal, State, and local logistical planners should use the best practices from successful large private sector companies as well as from DOD as the standard to develop improved operational capabilities and coordination procedures in the new logistics system.

    e.   **DHS, in cooperation with other departments and agencies, should develop the capability to identify sources of assets within the Federal government, and to track the movement of supplies during a disaster.** This information would be extremely useful to resource managers at all levels of government during disasters.

    f.   **DHS should establish a Chief Logistics Officer to oversee all logistics operations across multiple support functions.** The Chief Logistics Officer (CLO) would be responsible for developing and maintaining an integrated supply chain management system. This system should be structured in ways that are compatible with the structure of the National Incident Management System. The CLO would guide and assist those Federal, State and local organizations that manage emergency response assets and commodities, enabling them to procure and deliver supplies for emergency operations. The CLO would be responsible for logistics technology and software solutions that allow emergency managers to have visibility of all assets in the supply chain and to be able to access those supplies. A CLO should also be established in each homeland security regional office.

    g.   **DOD should detail logistics planners to DHS to assist in developing this logistics system. DOD and DHS should review and consider supply chain management best practices in developing the DHS logistics system. DOD should assist DHS in developing its logistics system; train DHS personnel in logistics management; exercise the DHS logistics system; and assist operating DHS' logistics management system until a fully mature capability exists.**

39.   **DHS should streamline its procedures for issuing mission assignments to other departments and agencies. These mission assignments will be identified in advance of an emergency so that logisticians can operationalize assets and provide resource support rapidly. In addition, other departments and agencies should establish procedures for promptly executing mission assignments.** The goal of these efforts is to minimize the delays observed during Hurricane Katrina when departments or agencies were slow to act because they either had not received a FEMA mission assignment, or did not have an effective system for executing the mission assignment once received.

40.   **The Office of Management and Budget (OMB) should consider the efficacy of the Executive Branch and departments and agencies having the flexibility to transfer funds across accounts in advance of supplemental funding for immediate use during catastrophes in order to execute the departments' and agencies' respective missions under the National Response Plan.** Transferred funds would not supplant the Disaster Relief Fund that is controlled and dispersed by DHS through the mission assignment process. Rather, it would provide the flexibility to use all sources of funds to fund emergency response actions in the aftermath of a catastrophic event in circumstances where the DHS mission assignment process is insufficient or inappropriate to handle the requirements of responding to the disaster.

41.   **Designate DOT as the primary federal agency responsible for developing the Federal government's capability to conduct mass evacuations when disasters overwhelm State and local governments. DOT should, in coordination with HHS, DOD, VA, DHS and the American Red Cross (ARC) plan, train and conduct exercises for the timely evacuation of patients and transportation of medical supplies and personnel.** DOT, which is the primary agency for ESF-1, is best positioned to develop the capability to

conduct and coordinate mass evacuation and associated critical tasks. DOT should identify, prioritize, and approve plans to: transport patients to and from all Federal medical treatment facilities, and; assemble and pre-deploy caches of medical supplies to strategic locations. Such proactive efforts should improve the ability of Federal agencies to conduct patient evacuations when State and local agencies are unable to do so in a timely or effective manner. DOT should coordinate directly with HHS, DOD, VA, USDA, DHS and ARC, as well as State and local agencies, to plan, train and exercise for mass evacuations. In addition to assisting States in planning and preparing for mass evacuations, ESF-1 would conduct evacuation operations when State and local governments are unable to do so. ESF-8 would retain primary responsibility for coordinating the evacuation of seriously ill or injured persons. In addition, USDA (one of the primary agencies for ESF-11: Agriculture and Natural Resources) would plan and manage the evacuation of animals. It should be understood that the development of these capabilities will take time and in most cases will be grown to full capacity incrementally.

**42.     DHS should require State and local governments, as a condition for receiving Homeland Security grants, to develop, implement, and exercise emergency evacuation plans and to cooperate fully with all Federal evacuation activities.** DHS has commendably incorporated a similar requirement in its FY 2006 Homeland Security Grant Program. State and local governments should use the National Preparedness Goal's Target Capabilities List (TCL) as a standard for the development of these evacuation plans. In addition to those TCL capabilities, State and local evacuation plans should specify procedures to address the pre-positioning of food, medical and fuel supplies. These plans should address establishing first-aid stations, tracking and coordinating movements of evacuees, evacuating pets, unaccompanied minors, the elderly, and evacuating people who lack the means to leave voluntarily. Each State, starting in FY 07, should receive an annual evacuation readiness status report. This report will be in the form of an evacuation readiness "report card" that will grade the ability of the State to conduct evacuation operations. The report card will be based on exercises, training, effective use of Federal grant monies, and other relevant criteria as a condition of further grant funding. Much like the President's Management Agenda, States will be given the expected results which they need to accomplish with their grant funding. This assessment would not only classify each State on its level of evacuation readiness, but also track how well homeland security grant funds are spent for evacuation planning. States that do not use their grant funds effectively would have their grant funds reduced or terminated.

**43.     DHS should, in coordination with DOT, evaluate all State evacuation plans as well as the evacuation plans of the 75 largest urban areas.** As the President declared when he addressed the Nation from Jackson Square in New Orleans, "Our cities must have clear and up-to-date plans for . . . evacuating large numbers of people in an emergency." DHS reviewed State catastrophic planning, including evacuation planning, and submitted a Congressionally mandated report to Congress on February 10, 2006. In addition, DHS and DOT are jointly reviewing evacuation plans for the Gulf Region, their findings due to Congress on June 1, 2006. These two departments should report their findings to the President through the Assistant to the President for Homeland Security and Counterterrorism concurrently with their submission to Congress. These reviews should specifically address special needs populations, people who lack the means to evacuate voluntarily, and the evacuation of animals, as well as other aspects of evacuation planning mentioned in Recommendation 5 above.

**a.     Consideration should be given to revising the Stafford Act to restrict reimbursement eligibility to only those States that have met basic performance requirements for critical functions such as mass evacuation.**

**Critical Challenge**: **Search and Rescue**

**Lesson Learned: The Department of Homeland Security should lead an interagency review of current policies and procedures to ensure effective integration of all Federal search and rescue assets during disaster response.**

**Recommendations:**

44. **DHS should lead an interagency team to review and revise the NRP to ensure the integration of all Federal search and rescue assets. This review should:**

    a. **Expand ESF-9 to ensure the coordination of all Federal search and rescue operations, not just urban search and rescue.** Under this new construct, both the urban and civil search and rescue coordinators would report to the Operations Section Chief under the Incident Commander. This structure is consistent with the National Search and Rescue Plan (NSP) requirement for the civil search and rescue coordinator to serve as the search and rescue representative to the Incident Commander, as well as with NIMS and ICS principles that place both urban search and rescue and civil search and rescue under the Operations Section.  It would allow both coordinators to support each other and share resources, depending on the nature of the incident. Ideally, the ESF-9 coordinator in the Joint Field Office (JFO) should have extensive training and education in both urban search and rescue and civil search and rescue**.**

    b. **Require coordination throughout Incident Command to ensure continuity of care for those rescued.** The ESF-9 coordinator should work with the logistics section under ESF-5: Emergency Management and the other ESF's grouped under the Emergency Services Branch (including ESF-8: Public Health and Medical Services) to ensure victims receive medical care and are transported to an adequate housing shelter.

    c. **ESF-9 must include the United States Forest Service's (USFS), DOI and EPA capabilities to perform search and rescue operations**. USFS is given the role as primary agency under ESF-4: Firefighting and as supporting agency under ESF-9. DOI is a principal partner with USFS in carrying out ESF-4 functions. As firefighters make up a large percentage of FEMA Urban Search and Rescue teams, their expertise and capabilities should also contribute to search and rescue operations. Under ESF-9, the mission statements of USFS and DOI should include the availability of firefighting personnel, not just equipment and supplies, for use in search and rescue operations. ESF-9 must include the capabilities of all participants in the National Search and Rescue Committee.

45. **The National Search and Rescue Committee should revise the National Search and Rescue Plan (NSP) to include disaster response operations**. The NRP references the NSP as a supporting operational document. However, the NSP is confusing because it specifically states that it does not cover overall response to disaster operations, as called for in the NRP. The NSP should therefore be revised to clarify its role in disaster response operations. The revision should specifically address air traffic control and coordination.

46. **Each State and major city should incorporate Search and Rescue and US&R annexes into their overall disaster response plans.** Federal grant assistance should require each State, under the State Homeland Security Grant Program, and urban area under the Urban Areas Security Initiative, develop a search and rescue annex within its specific disaster response plan, as part of its concept of operations. This search and rescue annex should be scalable, modular, organized along ICS principles, and be all-hazards in scope. It should also specifically delineate which agencies have primary responsibility for each aspect of search and rescue. The plan should specify in what order Federal assistance assets or State-to-State mutual aid assets (through the Emergency Management Assistance Compact) will be requested and detail how search and rescue coordination will be integrated into incident command. These search and rescue annexes should identify where victims are to be taken in the event Federal, State, and local logistical support to the victims is required. Representatives of National Search and Rescue committee organizations should assist the development of State and local search and rescue plans.

47.  **DHS should expand the National Preparedness Goal's Target Capabilities List (TCL) Capability: Urban Search and Rescue to require Federal Urban Search and Rescue teams and State and local entities to train, equip, and exercise for civil search and rescue missions.**  Currently, this capability only focuses on urban search and rescue and does not include any of the types of civil search and rescue, such as maritime rescue.  An expanded capability should use the NSP as the guide for including civil search and rescue performance standards.  State and local entities not currently in the national civil search and rescue community could then use the expanded search and rescue capability as a reference to plan, train, and exercise for both urban search and rescue and civil search and rescue missions.  Funding for urban search and rescue teams should reserve a portion of their funding allocated to train and equip FEMA Urban Search and Rescue Task Force members for civil search and rescue operations.

48.  **DHS should create a national search and rescue volunteer certification program**.  This national certification should be used to verify the identity and the level of skills and training of search and rescue volunteers.  Volunteers could report to "reception centers," which should be established along the perimeter of any impacted area to receive spontaneous volunteers.  A national certification program would speed the incorporation of these individuals into the unified search and rescue command structure and greatly increase the effectiveness of the response.  Voluntary organizations such as the National Association of Search and Rescue (NASAR) should be requested to assist with such a certification program.

Critical Challenge:  **Public Safety and Security**

Lesson Learned:  **The Department of Justice, in coordination with the Department of Homeland Security, should examine Federal responsibilities for support to State and local law enforcement and criminal justice systems during emergencies and then build operational plans, procedures, and policies to ensure an effective Federal law enforcement response.**

Recommendations:

**Law Enforcement**

49.  **DHS should, in coordination with DOJ, revise the National Response Plan to provide more effective coordination of the law enforcement response to a disaster by clarifying and expanding the role and mission of the Public Safety and Security support function and the Senior Federal Law Enforcement Officer.  The revised NRP should:**

     a.  **Designate DOJ as the primary agency responsible for the ESF-13 Public Safety and Security function.**  The NRP designates DHS and DOJ to serve jointly as primary agencies for the ESF-13 function.  This diffusion of responsibility creates unnecessary confusion at the scene of the crisis and violates the principle of unity of command.  We recognize that DHS has significant law enforcement assets, both in Washington DC and in field offices throughout the country.  However, the Attorney General is, by law, the President's primary law enforcement officer.  DOJ's long experience and recognized public law enforcement responsibility for prosecuting Federal crimes, in addition to its existing ties with the State and local law enforcement communities, make it best positioned to assume the lead role, though it still must continue to work in partnership with DHS.  Through its United States Attorneys Offices in all 50 states and through the FBI's 100 Joint Terrorism Task Forces, DOJ has the capability to leverage these important relationships with State and local law enforcement.  We also consider DOJ to have greater traditional law enforcement experience, whereas DHS's law enforcement programs are more specialized, focusing on areas such as border control, aviation security, and protective services.  In addition, giving DOJ responsibility for leading the Public Safety and Security support function will let DHS focus on its overall coordination of emergency response mission.

     b.  **Finalize the drafting of Public Safety and Security policies and procedures.**  The Public Safety and Security (ESF-13) Annex of the NRP required primary and support agencies to define their functions and develop policies and procedures by April 2005, four months after the NRP was issued.  While drafts

exist, this effort needs immediate completion to provide clarity to the organization and functions of the Public Safety and Security support function.

**c.  Specify that the Attorney General will, in consultation with the Secretary of Homeland Security, designate the SFLEO.**  When the Secretary of Homeland Security declares an Incident of National Significance (INS), the Attorney General should promptly designate the SFLEO; during a non-INS event, the Attorney General may appoint an SFLEO if needed.  Also, the NRP should give the Attorney General the authority to designate a Deputy SFLEO from a department other than that of the SFLEO.  In recognition of the Secretary of Homeland Security's role in coordinating the Federal response under HSPD-5, the Attorney General should consult with the Secretary prior to designating the SFLEO.

**d.  Include a new position designated as the "Senior Civilian Representative of the Attorney General" (SCRAG).**  As with the SFLEO, the Attorney General should immediately appoint the SCRAG to serve as the Attorney General's representative for issues requiring senior-level involvement of a DOJ official.  Whereas the SFLEO is responsible for managing the operational aspects of the Federal law enforcement response, the SCRAG will assist as needed in resolving any significant law enforcement policy issues that might arise with State or local officials, or between Federal official.

**e.  Require the establishment of a law enforcement coordination center within the Joint Field Office (JFO) to coordinate the Federal, State, and local law enforcement response during all types of emergencies.**  While the NRP includes such an entity for a terrorist-related incident or a National Special Security Event, it does not clearly set forth how Federal law enforcement coordinates with its State and local counterparts during other incidents.

**50.  DOJ should lead the development of the capability to surge Federal law enforcement resources in the immediate aftermath of a disaster.**  As outlined by the NRP, law enforcement personnel should be drawn from the following sources, in this order:  1)  Civilian law enforcement and National Guard from affected State; 2)  Civilian law enforcement and National Guard from other States;  and 3)  Civilian law enforcement from Federal agencies.  To maximize the availability of law enforcement assets from each of these categories, the following should be done:

**a.  DOJ should establish a program to review State and local plans for continuity of operations for law enforcement and the criminal justice system during a crisis.**

**b.  DOJ should develop a program to increase States' awareness of the procedures for requesting Federal law enforcement assistance under the Emergency Federal Law Enforcement Assistance Act.**

**c.  DOJ should lead an interagency effort to catalogue the Federal law enforcement assets within the Executive Branch.**  This effort will serve as the basis for developing a database of assets available for use during an INS, in order to ensure appropriate use of all available Federal law enforcement assets.

**d.  DOJ and DHS should each develop, in coordination with the other, the capability to rapidly deploy a contingent of Federal law enforcement officers to prevent and respond to civil disorder.**  Consistent with the principle that law enforcement is the responsibility of local and State governments, this force should deploy only in the event that State authorities request Federal assistance pursuant to the Emergency Federal Law Enforcement Assistance Act, or as otherwise directed by the President.  However, the NRP should make clear that where, as in this case, the need for additional law enforcement resources is manifest and obvious, it should be the Attorney General's responsibility, after notifying the Secretary of Homeland Security, to make an offer of Federal law enforcement support to the affected Governor.

**51.  DOJ should develop procedures for streamlined deputization of qualified Federal law enforcement officers.**  This effort should address circumstances where Federal law enforcement personnel require *Federal* deputization to enforce Federal laws outside their jurisdiction, or *State* deputization to enforce State laws.

DOJ should work together with the States' Attorneys General to develop agreements whereby a State requesting Federal law enforcement assistance agrees in advance to grant limited State law enforcement authority to Federal agents for the duration of the emergency.

**52. DOJ should, in coordination with DHS, further incorporate force protection into Federal response planning, to prevent disruption of Federal agencies' operations and to protect Federal personnel and property.** While the Public Safety and Security annex of the NRP designates force protection as an ESF-13 responsibility, further response planning is required on this issue in light of the problems encountered during Hurricane Katrina.

**Criminal Justice**

**53. DOJ should, in coordination with the Administrative Office of the U.S. Courts, develop a program to ensure the continuity of the Federal criminal justice system and to provide assistance to States in developing complementary plans.** While the operation and continuity of the court system falls under the purview of the Judicial Branch, the Department of Justice should ensure that adequate plans exist to ensure the continuity of its critical prosecutorial functions. Components of DOJ such as the U.S. Marshals Service and the Bureau of Prisons are critical to the operations of the Federal court system and must be incorporated into the contingency planning.

**54. DOJ should develop plans to improve the accountability for persons under supervision by the Federal criminal justice system, and to provide assistance to States in developing complementary plans.**

**55. DOJ, in coordination with DHS, should establish a program to provide oversight and technical assistance for States' emergency plans for evacuating prisoners in the event of a disaster.** Although evacuation of State and local prisoners is primarily a State and local responsibility, prisoners are protected by Federal civil rights laws and thus the Federal government has an interest in ensuring that such evacuations are appropriately planned and implemented.

**56. DHS and DOJ should coordinate their respective grant and assistance funding programs to States and local governments to establish uniform standards and conditions of awards in furtherance of the above recommendations.** If both departments should determine a need for legislation to remedy the disparate standards or criteria for different grant sources, OMB should consult with the departments to draft proposed legislation.

**Critical Challenge: Public Health and Medical Support**

**Lesson Learned: In coordination with the Department of Homeland Security and other homeland security partners, the Department of Health and Human Services should strengthen the Federal government's capability to provide public health and medical support during a crisis. This will require the improvement of command and control of public health resources, the development of deliberate plans, an additional investment in deployable operational resources, and an acceleration of the initiative to foster the widespread use of interoperable electronic health records systems.**

**Recommendations:**

**57. HHS should lead a unified and strengthened public health and medical command for Federal disaster response.**

    **a. HHS should develop a comprehensive plan to identify, deploy and track Federal public health and medical assets (human, fixed and materiel) for use during a catastrophic event.** HHS should assume primary control of the public health and medical support effort, coordinating the activities of supporting agencies from a central location. The Secretary of HHS should be aware of, and in charge of coordinating, all Federal medical and public health assets available for use. All Federal departments

must support and facilitate HHS in the execution of its responsibilities to coordinate all Federal public health and medical assets. Medical operations are highly dependent on efficient inter-agency cooperation and the successful completion of tasks is dependent on a fully integrated Federal effort.

**b.** **HHS in coordination with OMB and DHS should draft proposed legislation for submission to Congress, to transfer NDMS from DHS to HHS.** As the agency charged in HSPD-5 with the overall coordination of disaster response in America, DHS should clearly articulate the operational requirements for disaster medical assistance. HHS should then be responsible for building and maintaining the appropriate operational capability: it should guide, direct, and develop the NDMS and integrate it into other HHS operational elements. NDMS is a critical component to the success of any Federal disaster response requiring medical support. As such, public health professionals and emergency medical responses should be managed and overseen by HHS which has the greatest health experience and expertise. Thus, NDMS should be returned to the direct command of HHS. It should be understood that the development of these capabilities will take time and in most cases will be grown to full capacity incrementally.

**c.** **HHS should organize, train, equip, and roster medical and public health professionals in pre-configured and deployable teams**. These personnel should be comprised of officers of the Commissioned Corps of the U.S. Public Health Service, the Medical Reserve Corps (MRC), the NDMS, health care providers within DOD and the VA, and volunteer health professionals from the private sector. This is consistent with the HHS efforts to enhance the medical and public health response to meet future challenges by transforming the United States Public Health Service Commissioned Corps. This will enable a critical emergency response resource to address public health challenges more quickly and efficiently. The Commissioned Corps will increase its ranks, streamline its assignment and deployment process, and increase its ability to recruit the best and the brightest to defend the Nation's public health. HHS announced administrative steps toward this end. HHS has also drafted legislation in this area and forwarded it to OMB for Administration review and clearance. HHS should be given appropriate authorities to carry out this responsibility and should establish and test a system to quickly and efficiently identify, credential and assign personnel to missions.

**58.** **HHS should ensure coordination and oversight of emergency, bioterrorism, and ongoing public health preparedness needs**. In a public health emergency, the Secretary of HHS should have the integrated support of the public health and public health emergency preparedness programs. Within HHS, two Staff Division and seven Operating Division Assistant Secretary level positions oversee some aspect of public health programs, many of which have overlapping functions in an emergency response. The Secretary of HHS should review this issue and determine how best to ensure the integration of all relevant HHS information and functions during a public health emergency.

**59.** **The Surgeon General should routinely communicate public health, as well as individual and community preparedness guidance to the general population.** While there are other prominent and capable Federal health officials, the Surgeon General's stature and credibility should be used to repeatedly and proactively deliver a consistent public health preparedness message to the public. This will not only help to increase personal, community and national disaster preparedness, it will also make the Surgeon General a more effective and credible source of guidance during public health emergencies.

**60.** **Create and maintain a dedicated, full time, and equipped response team composed of Commissioned Corps officers of the U.S. Public Health Service.** The size of this team would be determined by the Corps' senior leadership, and be sufficient to meet the response needs as set forth by the Secretary. This team, overseen by the Surgeon General, could rapidly and effectively deploy to any event requiring medical and public health expertise and remain on station as long as needed. Other Corps officers, NDMS, the MRC, and the private sector could augment the team under the Surgeon General's command as required.

**61.** **DHS and HHS should look for the means to increase the capacities and capabilities of local and State health infrastructures.** Local and State health departments are the foundation upon which the National public health preparedness rests. HHS and DHS provide Federal grants to local and State health departments,

but additional funding is needed in view of the threats to the Nation from: weapons of mass destruction; biological agents; pandemic influenza and natural disasters.  Grant funds from HHS and DHS should be synchronized to maximize the benefit to local and State health departments.  Furthermore, all grant funding must be targeted toward increasing needed capabilities and then be reviewed to grade State and local performance according to the Presidential Management Agenda.

**62.    Accelerate the HHS initiative to foster widespread use of interoperable electronic health (EHR) records systems, to achieve development and certification of systems for emergency responders within the next 12 months**. The adoption of interoperable EHR systems will support first responders and health providers and dramatically improve the quality and efficacy of care to displaced patients across a population.  The President signed an Executive Order, *Incentives for the Use of Health Information Technology and Establishing the Position of the National Health Information Technology Coordinator,* on April 27, 2004, that provides guidance for the development of a nationwide interoperable health information technology.

## Critical Challenge:  Human Services

**Lesson Learned:  The Department of Health and Human Services should coordinate with other departments of the Executive Branch, as well as State governments and non-governmental organizations, to develop a robust, comprehensive, and integrated system to deliver human services during disasters so that victims are able to receive Federal and State assistance in a simple and seamless manner.  In particular, this system should be designed to provide victims a consumer oriented, simple, effective, and single encounter from which they can receive assistance.**

## Recommendations:

**63.    Assign HHS the responsibility for coordinating the provision of human services during disasters.**  HHS should serve as the single Federal coordinating agency, with full situational awareness across agencies, and manage the delivery of services by other Federal departments.  HHS working with DHS should review and, as appropriate, amend the NRP to ensure a single point of contact for victims to access all applicable Federal human services in an emergency and a capable deployment plan to enable this effort.

   **a.    Federal agencies with an ongoing role in delivering human services should be prepared to do so in a disaster environment.**  In addition to HHS, other Federal agencies have responsibility for providing human services.  All Federal agencies responsible for the administration of human service programs should plan and prepare for the delivery of services in a disaster environment, with HHS coordinating and authorizing reimbursement for their respective disaster-related expenditures.  Federal agencies that routinely deliver human services should build on established relationships with State and local agencies and private sector organizations, but also create contingency plans to assure the independent delivery of Federal assistance when necessary.

**64.    HHS should inventory all Federal human services**.  **As part of this effort HHS should:**

   **a.    Inventory the range of human services programs of the Federal government.**  There are thousands of human service programs across the interagency, many of which are jointly administered by State and local agencies.  A catalogue of available programs will facilitate the prioritization and delivery of services, especially during emergency situations.

   **b.    Identify current statutory authorities that permit the waiver of impediments to the delivery of services during an emergency.**  Knowing which regulations can be waived will help responding agencies to more efficiently deliver services in emergency settings when speed is a high priority.  Agencies should identify current waiver authority and impediments to service delivery and should provide HHS with suggested threshold criteria for triggering waiver authority.  Agencies should also identify current authority for reimbursing disaster-related administrative costs and related impediments to reimbursing service providers for legitimate costs.

**65.** **HHS should develop a simple, comprehensive, and efficient means for disaster victims to enroll for all available human services at a single encounter.** Many important human service programs have wide variation in eligibility requirements. HHS' coordination and integration role is vital in helping to simplify access to complex and varied human service programs. Upon completion of the inventory of programs and available Federal facilities, HHS should prioritize the delivery of human service programs and develop plans to establish "one-stop" centers where disaster victims would enroll in Federal, State, local, and non-governmental human assistance programs. These "one stop" centers should complement the continued and expanded use of simplified telephone and internet-based registration modalities. The goal should be for the victim to go to one physical location, encounter one person who gathers all the necessary data and inputs it into a database that is shared and transparent among all human service providers at the Federal, State and local level as required. This will likely increase efficiency, reduce frustration of evacuees and expedite the delivery of services for eligible recipients.

    **a.** **Task the appropriate Federal agencies to develop processes to assess disaster victims' needs and process their applications for assistance within consolidated "one-stop" centers.** These processes should avoid duplication of effort, employ streamlined in-take and case management strategies and foster the interagency administration of human services in a disaster area.

    **b.** **HHS working with DHS should work to include faith-based, community, and non-profit organizations in the emergency planning, preparedness, and delivery of human services.** These private sector organizations contributed greatly to the Hurricane Katrina response. They should actively participate in all phases of a Federal disaster response and HHS should specifically facilitate access to their services in all "one-stop" centers.

    **c.** **HHS in coordination with DHS should oversee the development of deployable interagency teams to assess human service needs and deliver assistance.** Created before the disaster, these teams can be deployed immediately to the disaster area to begin coordinating access to human services. These teams should be composed of knowledgeable and experienced Federal employees as well as personnel from State and local agencies and the private sector, as appropriate. They should serve in the "one stop" centers and also visit shelters and other locations necessary to facilitate the deliver of human services.

    **d.** **HHS working with DHS and the Department of Labor should inventory existing Federal infrastructure and resources which could be utilized for provisions of consolidated services to affected areas.** Contingency plans should be developed for the utilization of Federal facilities, equipment such as phones, computers, and personnel on short-notice to provide consolidated services in response to a crisis. These plans should be exercised and evaluated on a routine basis.

**66.** **HHS and DHS should jointly work with the private sector to encourage the development of a capacity to voluntarily store and retrieve personal identifying information.** Encourage the private sector development of a capability for individuals to voluntarily submit their personal identifying information for virtual storage that citizens and their families could access during emergencies. The capability is best thought of as a 21st century version of a bank vault, with virtual safe deposit boxes for information. Disaster victims could access the virtually stored data to apply for Federal assistance, medical treatment, or insurance benefits. Because of the sensitivity of the personal data stored, strict privacy limitations and protections would be required. HHS should consider how their experience with Electronic Health Records (EHR) might inform such an effort.

**67.** **Existing Federal sources of information should be identified which might assist Federal authorities upon an emergency or disaster declaration by the President**. While numerous current Federal information sources exist (such as those maintained by SSA, DHS, VA, Treasury and the Department of Defense), they are not designed to identify or track individuals. Limited emergency access to existing Federal information sources should be considered and evaluated for their potential value in improving the Federal response. The development and deployment process must account for privacy, security, scalability, and compatibility

**Critical Challenge: Mass Care and Housing**

**Lesson Learned:  Using established Federal core competencies and all available resources, the Department of Housing and Urban Development, in coordination with other departments of the Executive Branch with housing stock, should develop integrated plans and bolstered capabilities for the temporary and long-term housing of evacuees.  The American Red Cross and the Department of Homeland Security should retain responsibility and improve the process of mass care and sheltering during disasters.**

**Recommendations:**

68.    **ARC and DHS should retain the mass care and sheltering responsibility during disasters.**  With long-standing experience providing mass care and shelters during disasters, ARC is a highly valued national asset: it must be a primary agency, along with DHS**.**  ARC has extensive experience with mass care and sheltering during disasters, however, their status as a non-government organization limits their access to Federal planning meetings.  DHS and ARC should strengthen their planning and operational relationships with HUD.  HUD's expertise lies in the provision of mid- and long-term housing.  To assure the appropriate expertise is brought to bear in all phases of a disaster (preparation, response, recovery and rebuilding) and a seamless integration of care for disaster victims, HUD, DHS and ARC must develop a close working relationship, not just during crises.  During non-emergency times, they must jointly plan for mass care and housing during disasters.  In conjunction with other Federal agencies, they must train for disasters and conduct exercises to evaluate the response readiness of the Federal government.

69.    **Designate HUD as the lead Federal agency for the provision of temporary housing**.  HUD, with extensive experience providing housing resources for those in need, must use its extensive network of regional offices and State and local housing agencies, to prepare for potential relocation emergencies.  While there will always be a need for some victims to remain on their property while rebuilding their homes, the provision of trailers should not be the default means of temporary housing offered to all evacuees leaving shelters.  HUD, rather than DHS, should be the lead Federal agency for housing and HUD should devote resources to gain this competency with support from ARC, and other Federal agencies.  HUD must create a professional staff to augment its current housing capacity in order to create the ability to arrange housing for disaster victims and adequately train, exercise and resource this capability.  But, DHS should retain its vital coordinating function for the entire disaster response.  It should be understood that the development of these capabilities will take time and in most cases will be grown to full capacity incrementally.

70.    **Assist States and municipalities in developing mass relocation plans for each major metropolitan area and inventories of existing shelters and shelter sites.**  Such plans must match mass evacuation plans developed for metropolitan areas and should include the pre-identification of sites suitable for the establishment of shelters. Plans should also include appropriate guidelines regarding suitable shelters and thorough inventories of shelters already in existence.  HUD should receive the lead role in relocation planning and inventorying shelters, with DOT, DOI and USDA assuming supporting roles.  HUD can combine data from Federal, State, and local sources to compile inventories and establish the frequency of inventory updates.  Federal grant money should be predicated on States and municipalities periodically updating their relocation plans and shelter inventories.

71.    **DHS should develop a system to maintain awareness of the movement of shelter and temporary housing residents**.  Local, State, and Federal officials in charge of sheltering evacuees must know the number and type (*e.g.,* number of disabled, number of minors) of evacuees in addition to their names and personal identifying data as they move between shelters and from shelters to temporary housing.  This will improve allocation of resources to shelters (such as food and water), as well as the reunion of separated family members.  Such a system must complement other systems to register evacuees for available social services.

72.    **DHS should review and revise the Federal regulations under the Stafford Act to emphasize "location-independent" housing assistance**.  Current regulations allow payment of rental subsidies to disaster victims, but not the routine payment of security deposits or utility fees.  Reimbursement for repairs to existing

available housing units are also not authorized, effectively precluding the use of a large supply of federally controlled units that may only need minor repairs in order to be occupied. These restrictions effectively push many people to trailers and other manufactured housing units, while leaving other available housing vacant. Revising these housing regulations would allow greater flexibility in meeting urgent housing needs in the aftermath of a disaster.

**Critical Challenge: Public Communications**

**Lesson Learned: The Department of Homeland Security should develop an integrated public communications plan to better inform, guide, and reassure the American public before, during, and after a catastrophe. The Department of Homeland Security should enable this plan with operational capabilities to deploy coordinated public affairs teams during a crisis.**

**Recommendations:**

73. **DHS should revise the NRP to improve the Public Affairs Support and External Affairs annexes to ensure a better coordinated, more effective response.**

    a. DHS should revise standing operating procedures, command relationships, training, organizational structure, and communications between Federal Public Affairs Offices (PAOs) and their State and local counterparts.

    b. DHS should revise the NRP to delineate clearly when National and Incident JICs should be required to activate and deactivate. This guidance should also determine the proper location and number of JICs to be established in response to catastrophes.

    c. DHS should revise the NRP to delineate a clear structure for a fully coordinated, integrated, and synchronized public communications strategy, across the Federal government and with State and locals.

74. **DHS should establish rapidly deployable Public Affairs teams, able to operate self-sufficiently, in austere conditions. These deployable Public Affairs teams should be established across all Federal departments and agencies with key Homeland Security responsibilities.** These teams should be capable of providing Public Affairs assistance within hours to incident locations. These teams could be used to form the Incident JIC. All Federal departments and agencies with domestic operational responsibilities should establish programs to use embedded media where appropriate.

75. **DHS should expand Federal partnership programs with State and local Public Affairs Officials (PAO).**

    a. DHS should strengthen its relationship with groups such as the National Governors Association to provide joint incident communications training programs for State governments.

    b. DHS should also strengthen relationships with the Defense Information School, Navy Post Graduate School, National Defense University, and other academic institutions. These Federal partners can assist in providing training and certification to State and local emergency management and the PAOs of key DHS organizations (*e.g.,* DHS, FEMA, U.S. Coast Guard) and personnel such as PFO and Federal Coordinating Officer candidates. Such training would help to improve incident communications efforts.

76. **Develop a Public Communications Coordination capability for crisis communications at the White House.** Designate a senior White House Communications official to be responsible for the Homeland Security Council and crisis communications portfolio. In close collaboration with DHS' Office of Public Affairs, this official would be responsible for:

a.  Coordination of public communications and public affairs within the homeland across all relevant Federal departments and agencies;

b.  Establishing a permanent strategic communications capability, to facilitate messages to the public, the media, and all departments and agencies;

c.  Developing a national public communications and public affairs strategic plan;

d.  Develop "Risk Communications" to communicate pre-incident expectations to private citizens.  This may be carried out by identifying credible spokespersons who can frequently update the public on preparedness, current threats and crisis communications.

**77.  DHS should establish an integrated public alert and warning system in coordination with all relevant departments and agencies.**

a.  The system, building on the Emergency Alert System (EAS), must leverage advanced communication technologies and existing Federal, State, and local systems.

b.  Federal, State and local levels of government must have the means to communicate essential and accurate emergency information to the public prior to, during and after a catastrophe.

c.  Use the National Preparedness Goal's Target Capabilities List as a reference to build and sustain the system.

**Critical Challenge:  Critical Infrastructure and Impact Assessment**

**Lesson Learned:  The Department of Homeland Security, working collaboratively with the private sector, should revise the National Response Plan and finalize the Interim National Infrastructure Protection Plan to be able to rapidly assess the impact of a disaster on critical infrastructure.  We must use this knowledge to inform Federal response and prioritization decisions and to support infrastructure restoration in order to save lives and mitigate the impact of the disaster on the Nation.**

**Recommendations:**

**78.  DHS should revise the National Response Plan to:**

a.  **Provide for a stronger Infrastructure Support Branch in the National Operations Center.**  The Infrastructure Support Branch will coordinate among the appropriate ESF's to ensure that the guidance developed by the Critical Infrastructure Policy Coordinating Committee is followed for infrastructure protection and restoration after an event.  In addition, this branch will coordinate with critical infrastructure sectors, provide senior leaders with a summary of reports and modeling, and develop recommended preemptive and responsive actions to remediate or mitigate the impact of the loss of critical infrastructure.  These optional actions will be based on reports from the Impact Assessment Working Group, the National Infrastructure Simulation and Analysis Center (NISAC), Sector Coordinating Councils, and consultation with DHS/IP.

b.  **Strengthen the role and responsibility of the Infrastructure Liaison.**  Currently, the Infrastructure Liaison is designated by DHS/IP, to serve as the principal advisor to the JFO Coordination Group regarding all national and regional level critical infrastructure and key resource incident-related issues. This role should be more clearly defined, and have greater responsibility which should include a designated group of trained critical infrastructure staff from Federal departments and agencies including DHS staff versed in infrastructure protection that are available for immediate deployment to the JFO to fill the role of the expanded Infrastructure Liaison group. The liaison should: (1) Gather and fuse relevant data about private infrastructure operational status; (2) Coordinate overall Federal response efforts for

infrastructure restoration and recovery; and (3) Strengthen direct communications with private infrastructure owners and operators.  This expanded Infrastructure Liaison will incorporate the Private Sector Liaisons to ensure unity of effort.

**Policy and Planning**

**79.** **DHS should revise the National Preparedness Goal to require the collaborative development of regional disaster plans (such as those required by the DHS Urban Area Security Initiative) with the private sector.**  This activity will not only prepare the Federal government to respond, but will set private sector expectations of specific actions the government will take in response to a disaster.

**80.** **Set basic criteria for private sector preparedness against which these regional plans can be measured.** There is a lack of a clear and agreed upon prioritized implementation plan to address the coordinated restoration and protection of critical infrastructure during times of limited resources and competing demands. Basic levels of private sector preparation similar to those outlined in the National Preparedness Goal should be set and used to measure progress in restoration planning.

**81.** **DHS should review, revise, and finalize the Interim NIPP within 90 days to:**

   **a.** **Standardize Federal government policy to link the prioritization of both protection and restoration.**  Linking prioritization for protection to prioritization for restoration will motivate private sector participation in the effort to prioritize critical infrastructure and to develop disaster response plans.

   **b.** **Require the use of a systems and resiliency approach to determine the global consequence of the loss of each asset.**  Using a systems approach will clearly identify the assets in each region whose loss has the greatest potential to cause a national impact.

   **c.** **Address cross sector dependencies in the systems approach.** As outlined in the National Strategy for the Physical Protection of Critical Infrastructures and Key Assets, critical infrastructure restoration and protection efforts should take into account the five cross-sector security priorities.

   **d.** **Add an annex to the interim NIPP to describe how those policy considerations that are learned in the prioritization for protection will be used to develop restoration priorities.** The Federal government can develop priorities for restoring critical infrastructure using much of the same information used to prioritize protecting it.  Having restoration priorities will allow the Federal government to make crisis decisions informed by clearly established restoration priorities.

**Information**

**82.** **DHS should expand the National Infrastructure Simulation and Analysis Center's (NISAC) Modeling and Analysis capability to allow more robust and accurate systems modeling.**  Sector specific agencies should provide the NISAC with any modeling available to their department for their assigned sector, and all NISAC analyses should in turn be shared with sector specific agencies.  In addition, as directed in HSPD-7 the Department of Homeland Security will work with other appropriate Federal departments and agencies to geospatially map, image and analyze critical infrastructure.

**83.** **The National Economic Council should form an Impact Assessment Working Group to provide an overall economic impact assessment of major disasters, including the Departments of Homeland Security, Treasury, Commerce, Energy (Energy Information Administration) and Labor as well as the President's Council of Economic Advisers.**  Since Hurricane Katrina, NISAC has significantly improved their capability to provide reports detailing the cascading impact of major disasters on the Nation's infrastructure but it does not include a robust assessment of the economic impacts.  The various economic modeling expertise of the members of the Impact Assessment Working Group should be incorporated into the NISAC models.

**84.     The Department of Commerce should lead, in cooperation with the Department of Treasury, Homeland Security, and other sector specific agencies as appropriate, the development of a proposal to the Department of Homeland Security for incentives and other mechanisms to motivate private sector cooperation and participation in efforts to prioritize infrastructure protection.**     This group should review the Defense Production Act, the Protected Critical Infrastructure Information Act, as well as financial incentives.  These incentives should then be incorporated into the articulation of a business case for private sector participation in infrastructure protection.  This business case should discuss protection and prioritized restoration as well as encourage private sector infrastructure resiliency and redundancy.  In addition, States are encouraged to share best practices regarding financial incentives to motivate private sector cooperation and participation in infrastructure protection and restoration efforts.

**85.     DHS should share the plans and policy for Federal response and delineated roles and responsibilities with the private sector**.  The National Response Plan urges businesses to develop disaster contingency plans. Businesses have been unable to develop completely effective contingency plans without understanding the actions Federal, State, and local governments will take in response to a disaster. Furthermore, the Federal government has been unable to develop agreed upon response plans for prioritized restoration. The first step to establishing a collaborative planning and exercise program with the private sector is to, with appropriate protections, share relevant sections of the NRP with key private sector partners.

**Critical Challenge:  Environmental Hazards and Debris Removal**

**Lesson Learned:  The Department of Homeland Security, in coordination with the Environmental Protection Agency, should oversee efforts to improve the Federal government's capability to quickly gather environmental data and to provide the public and emergency responders the most accurate information available, to determine whether it is safe to operate in a disaster environment or to return after evacuation. In addition, the Department of Homeland Security should work with its State and local homeland security partners to plan and to coordinate an integrated approach to debris removal during and after a disaster.**

**Recommendations:**

**86.     DHS, in coordination with EPA, DOL/OSHA, HHS, DOC/NOAA**, **and  DOD/USACE, should:**

   **a.    DHS should enhance the Emergency Response Team (ERT) capability to conduct initial environmental assessments and communicate warnings to the general public and emergency responders by adding HHS and DOL/OSHA members.  DHS should lead the collaborative development of detailed plans to guide initial environmental assessment operations under the NRP.**

   **b.    DOL/OSHA should lead the development of operational procedures for Worker Health and Safety.**  Planning must include pre-disaster identification of potential hazards to inform out-of-area responders.

**87.     DHS, in coordination with EPA, HHS, OSHA, and DOE should develop an integrated plan to quickly gather environmental data and provide the public and emergency responders the most accurate information available to decide whether it is safe to operate in a disaster environment or return after evacuation.**  This plan should address how to best communicate risk, as well as determine who is accountable for making the determination that an area is safe.  It should also address the need for adequate laboratory capacity to support response to all hazards.  The plan should be completed in 180 days.

**88.     DHS should jointly lead DOD/USACE, DOI, USDA, and EPA to address and coordinate debris removal issues as part of ESF operational procedures.  The procedures should include an integrated public communication approach for debris removal, especially as it applies to private property.**

**Critical Challenge: Managing Offers of Foreign Assistance and Inquiries Regarding Affected Foreign Nationals**

**Lesson Learned:  The Department of State, in coordination with the Department of Homeland Security, should review and revise policies, plans, and procedures for the management of foreign disaster assistance. In addition, this review should clarify responsibilities and procedures for handling inquiries regarding affected foreign nationals.**

**Recommendations:**

89.     **DOS should lead the revision of the International Coordination Support Annex to the NRP, clarifying responsibilities of DOS, the Department of Homeland Security (DHS), DOD, and other supporting agencies in response to domestic incidents**.  This revision should begin immediately.

90.     **Prior to June 1, 2006, DOS and DHS should lead an interagency effort that will quickly develop procedures to review, accept or reject any offers of international assistance for a domestic catastrophic incident.  This should include an appropriate mechanism, led by DHS and supported by DOS and Treasury, to receive, disburse, and audit any cash assistance received in support of victim needs.  These operating procedures should include**:

   a.  A coordination process among Federal agencies and non-governmental partners to solicit, accept, receive, integrate and distribute foreign assistance;

   b.  An expedited review process for international aid that addresses both critical needs and legitimate foreign policy objectives;

   c.  The inclusion of a USAID representative to the Joint Field Office (JFO);

   d.  The inclusion of a representative from USAID/OFDA on the State Department Task Force and a DOS representative on USAID/OFDA's Response Management Team to improve interagency coordination; also the addition of a DHS representative to both task forces to provide more efficient information sharing about assistance needs on the ground.

91.     **DHS should lead an interagency effort to create and routinely update a prioritized list of anticipated disaster needs for foreign assistance and a list of items that cannot be accepted.  These lists should be completed before June 1, 2006.**  These lists would be based upon notional planning scenarios, State/local emergency managers' anticipated requirements, and current legal impediments on prohibited forms of aid.  Once complete, DHS should distribute these lists to all appropriate agencies, to include regulatory agencies, in order to address regulatory barriers in advance.

92.     **DOS should establish, before June 1, 2006, an interagency process to:  determine appropriate uses of international cash donations; to ensure timely use of these funds in a transparent and accountable manner; to meet internal Federal government accounting requirements; and to communicate to donors how their funds were used.**

93.     **Public and Diplomatic Communications during domestic emergencies should both encourage cash donations -- preferably to recognized nonprofit voluntary organizations with relevant experience -- and emphasize that donations of equipment or personnel should address disaster needs.**  Financial contributions provide emergency managers maximum flexibility to meet requirements in crises and avoid regulatory challenges.  In a catastrophe, rapid, proactive communication of requirements reduces the potential for the refusal of assistance.  The Department of State should have domestic crisis communications procedures in place before June 1, 2006.

94.    **The Department of State and the Department of Homeland Security should, before June 1, 2006, jointly develop procedures to ensure that the needs of foreign missions are included in domestic plans for tracking inquires regarding persons who are unaccounted for in a disaster zone.**

    a.    During a crisis, DOS and USAID should provide DHS with personnel who have technical expertise in humanitarian and disaster management issues, to include population displacement.

    b.    In improving their strategies for providing faster information and assistance to American citizens, Federal, State, and local emergency management officials should include provisions covering the needs of affected foreign nationals. To ensure these provisions meet U.S. legal obligations under the Vienna Convention on Consular Relations, these officials should work with DOS. DOS in turn should inform foreign missions about these provisions. This should be accomplished through changes to the NRP, and through refinement of agencies' NRP implementation plans.

95.    **DHS and DOS should revise the NRP to include DOD and USDA-Food Safety Inspection Service as cooperating agencies to the International Coordination Support Annex.** Including DOD more directly in foreign assistance management would leverage existing relationships with partner military establishments and help to ensure that staging areas for the acceptance of foreign aid are preplanned and quickly available.

96.    **DHS should include DOS and foreign assistance management in domestic interagency training and exercise events. Inclusion in the new National Exercise Program (NEP) should occur before the end of FY06.**

97.    **DHS should provide daily disaster response situational updates through the Secretary of State to all Chiefs of Mission or Chargés d'Affaires.** These updates should improve situational awareness and provide information to address host government concerns or questions.

<u>Critical Challenge</u>: **Non-governmental Aid**

<u>Lesson Learned</u>: **The Federal response should better integrate the contributions of volunteers and non-governmental organizations into the broader national effort. This integration would be best achieved at the State and local levels, prior to future incidents. In particular, State and local governments must engage NGOs in the planning process, credential their personnel, and provide them the necessary resource support for their involvement in a joint response.**

<u>Recommendations</u>:

98.    **DHS should revise the NRP to designate responsibility for coordinating non-governmental assistance, including faith-based organizations, during emergencies.** These responsibilities should fully address the following:

    a.    Improve communication of requirements from the incident site;

    b.    Pre-identify and catalogue non-governmental goods and build a process to deploy these goods to specific regions for catastrophic events;

    c.    Develop a statewide support function for volunteers (both pre-trained and spontaneous) in each State to assist local emergency managers and NGOs to prepare for, respond to, and recover from disasters;

    d.    Recruit, train and identify National Incident Management System (NIMS) trained volunteers;

    e.    Incorporate NGOs into the planning, training, and exercising process; and

    f.    Ensure there is a mechanism to coordinate spontaneous, unaffiliated volunteers.

99.     **DHS should establish an office with responsibility for integrating non-governmental and other volunteer resources into Federal, State, and local emergency response plans and mutual aid agreements.  Further, DHS should establish a distinct organizational element to assist faith-based organizations.**  There is no single office within DHS that is responsible for integrating non-governmental and faith-based assistance into emergency response planning.  By establishing such an office, DHS can foster an integrated planning process through which government at all levels can identify and communicate their requirements to NGOs during response and recovery operations.  This office should also study and recommend improvements to the process to deploy resources and personnel to specific regions for catastrophic events, through emergency assistance compacts or other mechanisms.

The responsibilities of the office should include, but not be limited to the following:

a.   Increasing relationship-building to include conducting a national conference for NGOs and the private sector on emergency preparedness and response where they can share best practices;

b.   Identifying potential donation sources; and

c.   Identifying and eliminating difficulties pre-incident that NGOs encounter with the Federal government when delivering services.

d.   Inventory, develop partnerships with and promote the best practices of successful Faith-Based disaster relief programs such as the United States Emergency Chaplains Corps.

100.    **DHS should condition State and local grants, under the Homeland Security Grant program, on incorporating NGOs and the private sector into their emergency planning, training, exercises, and disaster relief efforts.**  These revised plans should include the following:

a.   Participation of NGOs, including small regional and local groups, in planning for disaster response and recovery efforts; and

b.   Pre-determined roles and responsibilities for volunteer organizations, which identify their mission, capabilities, training, and certification.

An improved plan to incorporate and connect volunteers and private sector assets with emergency management officials would have enabled the better use of NGO contributions.  Some states have improved how NGOs respond to incidents by creating a volunteer and social service infrastructure.  In Florida and North Carolina, NGOs and emergency managers have formalized their relationships at the State and local level by including a volunteer coordinator in the State EOC.  As a result, their State and local emergency managers better understand what non-governmental assistance is available before, during, and after a disaster.

Federal, State, and local officials should use the National Preparedness Goal's *Target Capabilities List: Volunteer Management and Donations* as the standard to improve capabilities.  The next version of the Target Capabilities List should expand the explanation of the roles and responsibilities of volunteer organizations and include establishing their role in staffing State emergency operations centers.

101.    **DHS should improve access to, and awareness of, private sector and non-governmental resources available for use during emergency response operations.**  This process should include the following:

a.   Pre-arranged and contingency contracting;

b.   Provision of requirements estimates to NGOs and private sector organizations that are willing to provide resources during catastrophic events;

c.   Consistent, accurate, and timely messaging of resource needs to NGOs;

d.   Providing NGOs and private sector organizations with information on reimbursement and access to Federal aid;

e.   Development of robust donations and volunteer management software system standards;

f.   Completing the development of a credentialing system, already being created by FEMA's NIMS Integration Center, to allow authorized volunteers and workers restoring critical infrastructure access to relief sites; and

g.   Identification of what Federal, State, or local support NGOs will need to sustain operations (sanitation, electricity, food, and water).

The Federal government cannot comprehensively plan and coordinate how NGOs and private sector entities will respond locally or regionally in a catastrophic disaster.  State and local officials must take the lead in planning the best use of non-governmental resources at the local level.  All States should consider existing models to coordinate and integrate non-governmental resources in disaster planning and response, recognizing that business-government partnerships require a level of trust and agility most easily built at the regional level.  One such model which has proven successful is the Business Executives for National Security (BENS) Business Force project.  Business Force partnerships of regional, State, and local officials, together with businesses and NGOs, have been successful in emergency response planning and using private sector resources and volunteers to fill gaps in preparedness and response capabilities.  The BENS model also includes a web-based catalogue of private sector resources.  The Federal government should recognize that the private/non-government sectors often perform certain functions more efficiently and effectively than government because of their expertise and experience in applying successful business models.  These public-private partnerships should be facilitated, recognized, and funded.

Additionally, integrating regional partnerships and resource databases (like the ones created by BENS) with national databases and response capabilities gives incident commanders full visibility of supply and volunteer sources.  The capability to draw on these resources should inform and be part of Federal, State, and local logistics systems and response plans.

**102.   Legal and liability impediments to the use and coordination of non-governmental and private sector resources during a catastrophic event should be removed.**   Measures that should be implemented include:

a.   DHS should lead an interagency effort to remove Federal legal and liability impediments to the use and coordination of non-governmental and private sector resources during a catastrophic event. Encourage the passage and enactment of S.1747, currently pending in the 109th Congress, a Bill to limit liability for volunteers and those providing goods and services for disaster relief.

b.   Recommending uniform provisions for State law similar to the Non-Liability of Federal Government provision in the Stafford Act, to ease State and local government fear of legal liability;

c.   Recommending uniform State "good Samaritan" laws to protect organizations donating goods and services from legal liability;

d.   Revision of the two-year maximum service rule for national service programs, such as AmeriCorps, to allow experienced volunteers to continue serving after two years; and

e.   Simplification and clarification of Federal auditing and oversight procedures during a disaster.  We should allow trusted organizations (those with established Federal relationships) to respond quickly during a disaster and wait to review their activities post-disaster.

**103. DHS should encourage NGOs and the private sector to plan their giving streams at the local level in order to provide comprehensive support to affected local areas during an emergency and prevent duplication of relief efforts.** By improving the integration of planning among voluntary organizations at the local level, these organizations will be better positioned to serve citizens during an emergency. FEMA should authorize local voluntary organizations to accept gifts and donations of cash, goods, and services pledged to FEMA at the local level.

<u>Critical Challenge</u>:  **Training, Exercises, and Lessons Learned**

<u>Lesson Learned</u>:  **The Department of Homeland Security (DHS) should establish specific requirements for training, exercise, and lessons learned programs linked through a comprehensive system and common supporting methodology throughout the Federal, State and local governments.  Furthermore, assessments of training and exercises should be based on clear and consistent performance measures.  DHS should require all Federal and State entities with operational Homeland Security responsibilities to have a lessons learned capability, and DHS should ensure all entities are accountable for the timely implementation of remedial actions in response to lessons learned.**

<u>Recommendations</u>:

**104. DHS should finalize the Target Capabilities List (TCL).**  DHS should finalize the TCL by the end of Second Quarter, FY06 with input from Federal, State, local and professional entities in order to evaluate preparedness.  The TCL should define performance-based standards and outcomes grounded in capabilities which can be used to assess a State's ability to properly execute a desired mission.  Without the TCL, training and exercises have no goal against which to measure their performance.  Consequently, lessons are not learned or incorporated into the capabilities-based planning process.

**105. Strengthen Homeland Security Council (HSC) coordination of Federal emergency training, exercises and lessons learned.**  Homeland Security Council should designate a Senior Director of Education, Training, Exercises, and Lessons Learned.  The most recent Top Officials ("TOPOFF") exercise in April 2005 revealed the Federal government's lack of progress in addressing a number of preparedness deficiencies, many of which had been identified in previous exercises.  This lack of progress reflects, in part, the absence of a remedial action program to systematically address lessons learned from exercises.  To ensure appropriate priority and accountability are being applied to address these continuing deficiencies, the Assistant to the President for Homeland Security and Counterterrorism now annually conducts four Cabinet-level exercises with catastrophic scenarios.  The HSC, weighing a variety of factors, should:

   a.  Establish the National goals of what should be trained and exercised for the coming year and make recommendations for follow-on goals;

   b.  Ensure the establishment of a Remedial Action Management Program (RAMP) to ensure agencies are enacting lessons learned to improve response capabilities.  The RAMP would provide the basis for systematically identifying, analyzing, and monitoring the implementation of initiatives aimed at resolving deficiencies uncovered in exercises, training events, real-world events, and policy discussions.  Equally important, the RAMP would conduct remedial action tracking and long-term trend analysis, ensuring that remedial actions are completed and inform the cycle of preparedness activities.  This program will provide the Federal Interagency with the means of overcoming the perennial problem of observing the same issues repeatedly characterized as "lessons learned" in reports compiled following major events;

   c.  Review Senior Official exercise priorities to ensure more challenging scenarios based on the most catastrophic threats (natural and man-made) that exercise the National Goals and the use of Federal resources; and

d. Ensure all Cabinet Secretary, Deputy Secretary, Under Secretary and other appropriate personnel, especially those who are identified as primary or supporting agencies of Essential Support Functions, train and exercise on their respective roles for catastrophic events. This will help to meet the Interim National Preparedness Goal Overarching Priorities to "Implement the National Incident Management System and National Response Plan" through the use of Senior Official Exercises (SOEs).

106. **All agencies with operational components should establish and fund Remedial Action Management Programs (RAMPs).** All agencies with operational components should establish and fund RAMPs to identify and incorporate lessons learned by the end of FY06. This program will enable Federal agencies to overcome the perennial problem of observing recurring problems in AARs. To assist in this effort, DOD should work closely with DHS to establish the overall program, using the current DOD model as a basis.

107. **DHS should conduct State and local officials training and exercises.** Key State and local officials should participate in training and exercises to ensure Governors and their cabinets attend a training course on their roles and responsibilities during a disaster and be exercised annually. The same will hold true for mayors of UASI cities and their Urban Area Working Group. These steps will help the Nation meet the Interim National Preparedness Goal, Overarching Priorities to "Implement the National Incident Management System and National Response Plan" and "Expand Regional Collaboration." Lack of coordination should be taken into consideration for future grant funding.

108. **DHS should restructure the TOPOFF Exercise Series.** DHS should restructure the scope and scale of the TOPOFF exercise series to provide maximum effectiveness for its participants before execution of the FY07 Full-Scale Exercise. Though the intention of TOPOFF was to utilize terrorist based scenarios, further scenarios should encompass all-hazards and be HSC-vetted. Scenarios for future exercises should include recovery issues that explore the role of the private sector and non-governmental agencies, including faith based organizations.

These restructured TOPOFF exercises should use a variety of exercise types, as outlined in the NEEP. Rather than simply conducting full-scale exercises every two years, the TOPOFF structure should execute a series of exercises every year identify lessons learned from those exercises in a timelier manner and issue an AAR that identifies the remedial actions to be taken with a deadline for implementation.

109. **DHS should develop an Exercise Series to Evaluate Nationwide Preparedness Utilizing the Final TCL.** DHS should provide a series of exercises to all Urban Area Security Initiative cities and State capitals. The purpose of these exercises should be to evaluate and provide a baseline for the Nation's overall preparedness. These exercises should be provided through G&T's Direct Support program. Once a current baseline of preparedness measures at the State level has been identified, each State, starting in FY 07, should get an annual level of preparedness status report. This report will be in the form of a comprehensive preparedness "report card" that will grade capabilities, exercises, training, effective use of federal grant monies, and other relevant criteria as a condition of further grant funding. Much like the President's Management Agenda, States will be given the expected results which they need to accomplish with their grant funding. This "report card" would not only classify each State on their level of preparedness, but also track how well homeland security grant dollars are spent. States that do not use their grant dollars effectively would have their grant dollars reduced or terminated.

110. **DHS should consolidate the DHS Training and Exercise Structure.** DHS should consolidate homeland security related training and exercise assets in a new Office of Training, Exercises and Lessons Learned (TELL) during FY06. This office should reside under the Preparedness Directorate and reflect the continuing transformation within DHS. DHS should separate training and exercise components currently within the G&T and place those assets within the new TELL. Key components should include, but not be limited to: Noble Training Center, Center for Domestic Preparedness, National Emergency Training Center, National Exercise and Evaluation Program.

111. **DHS should establish a National Exercise and Evaluation Program (NEEP).** Building on the existing NEP, DHS should coordinate the establishment of a NEEP for homeland security related exercises by the end

of FY06. As currently constructed the NEP does not include and coordinate the full range of National homeland security exercise programs. DHS should provide a "National Exercise Strategy" as prescribed by HSPD-8. The NEEP should designate HSEEP as the common exercise methodology across all levels of government, so all exercises are using the same doctrine. The NEEP should also include domestic and international exercises that enable Federal, State and local governments to improve interagency coordination across all types of crises. DHS should provide, on a periodic basis, consolidated Federal homeland security training and exercise schedule and a status report on lessons learned and appropriate follow-up from completed exercises to the HSC's Director of Training, Exercises, and Lessons Learned. DOD's Chairman's Exercise Program and the joint Exercise Program) should not fall under DHS domain, but appropriate exercises should be coordinated with DHS and incorporated in the NEP/NEEP.

To assist Federal, State and local collaboration, DHS should develop and fund a National Exercise Simulation Center (SIMCEN), similar to the Department of Defense's Joint Warfighting Center. The SIMCEN would act as a tool to simulate the Federal role in emergency response and be capable of working with State and local exercises. This SIMCEN should be designed to mirror the National operations center and provide a learning environment for Federal agencies. Agencies should be appropriately resourced, so that they are able to provide personnel to attend training and operate at the SIMCEN. DHS should support the use of simulation and modeling to assist in the development of operational procedures and exercises (particularly those based on catastrophic incidents) and as a resource to assist in responding to catastrophic incidents. Simulations of this type should be run out of the SIMCEN.

**Critical Challenge: Homeland Security Professional Development and Education**

**Lesson Learned: The Department of Homeland Security should develop a comprehensive program for the professional development and education of the Nation's homeland security personnel including Federal, State and local employees as well as emergency management persons within the private sector, non-governmental organizations, as well as faith-based and community groups. This program should foster a "joint" Federal Interagency, State, local, and civilian team.**

**Recommendations:**

112. **Each Federal department and agency assigned specific homeland security roles should establish a homeland security professional development program that encompasses career assignments, education, exercises, and training.** All departments and agencies assigned specific homeland security roles should establish professional development programs to insure they have the skilled personnel necessary to execute these responsibilities. These personnel must have the requisite professional credentials and experiences, knowledge of their organization's emergency responsibilities, and understanding of other organizations' related emergency responsibilities. Homeland security professional development programs should include *interagency* and *intergovernmental* (*i.e.*, Federal, State, and local governments) perspectives. Further, the scope of homeland security requires that these programs focus on all hazards: terrorism, natural disasters, accidents, and other disasters. Departments and agencies must determine which offices are assigned homeland security roles and responsibilities, and should also determine the education, training, and technical expertise required for homeland security senior leaders and crisis managers. Each should establish education, exercise, and training requirements for personnel assigned to offices with homeland security responsibilities throughout all levels of government.

113. **OPM should establish, and Federal Departments and agencies should implement a career development process that mandates interagency and intergovernmental assignments as well as professional education.** These career development processes must require and reward interagency and intergovernmental homeland security assignments. Such assignments will enable homeland security professionals to understand the roles, responsibilities, and cultures of other organizations and disciplines. Interagency and intergovernmental assignments will build trust and familiarity among homeland security professionals from differing perspectives. These assignments will also break down barriers between organizations, thus

enhancing the exchange of ideas and practices. The need for intergovernmental assignments should be determined on a case-by-case basis.

a. **Each career development program should require that homeland security personnel complete interagency or intergovernmental assignments, and professional education, prior to assignment to senior managerial positions, including the Senior Executive Service (SES).** Interagency and intergovernmental assignments should be designed to build a cadre of homeland security professionals across all levels of government who possess common knowledge of operational roles and responsibilities. Career development programs must reward strong academic performance in professional education programs.

b. **Departments and agencies should establish fellowships that allow State and local homeland security professionals to serve in a related Federal department or agency for a limited period of time.** This can promote the development of a common planning culture and foster collaboration among Federal, State, and local governments. Further, these fellowships can enhance partnerships that result in more effective and efficient emergency responses.

c. **The White House should consider if legislative or regulatory changes are required to facilitate interagency and intergovernmental assignments.** The Goldwater-Nichols Act of 1986 transformed the Department of Defense (DOD) into a truly integrated department by requiring an assignment in another branch of the Armed Forces as a prerequisite for promotion to flag or general officer. Similar legislation should be considered for the Federal government to achieve the same sort of integration across Executive Branch departments and agencies.

114. **The Department of Homeland Security should establish an interagency working group to establish specific goals with objective standards against which Department and Agency progress toward full implementation of effective professional development programs can be measured**. The interagency working group should ensure consistency and uniformity among Federal homeland security professional development programs. The interagency working group should provide quarterly reports to the Secretary of Homeland Security and the Assistant to the President for Homeland Security and Counterterrorism on the status of Federal homeland security professional development programs.

115. **DHS should provide training, technical, and other assistance in support of other departments' and agencies' homeland security professional development programs**. DHS should expand its use of innovative techniques and technologies to enhance the quality and dissemination of homeland security education and training. This may include the use of distance learning programs and interactive computer methodologies. DHS must expand its efforts to promote awareness and implementation of the NIMS and the NRP throughout Federal, State, and local governments, and private sector.

116. **DHS should establish a National Homeland Security University (NHSU) for senior officials that serves as a capstone to other educational and training opportunities**. An NHSU should be established to provide a strategic perspective of homeland security and counterterrorism that transcends organizations, levels of government, response disciplines, and the private sector. This requires that the NHSU faculty and student body include interagency, intergovernmental, and private sector representatives. NHSU programs should prepare officials for senior homeland security and counterterrorism assignments in Federal, State, and local governments. To achieve this, the NHSU curriculum should focus on all hazards and all phases of emergency preparedness and response. It should expand students' understanding of the strategic aspects of homeland security and counterterrorism planning, policy development, incident management, and support functions, among other topics. NHSU educational programs must be scalable and portable in order to reach the widest audiences. NHSU should offer traditional in-residence courses in Washington, DC. It should also offer regional and virtual educational programs, and utilize innovative educational methodologies, such as simulation centers, for use by faculty, students, and government officials. The NHSU should serve as a center of homeland security and counterterrorism strategic thought and expertise for the nation. DHS should consider leveraging the infrastructure and expertise at the National Defense University by partnering with

DOD to have the NHSU be a joint DHS/DOD initiative that focuses on both Homeland Security and Homeland Defense.

117.    **Federal departments and agencies should strengthen their existing homeland security educational and training programs.**  The Emergency Management Institute, the Naval Postgraduate School, the National Defense University, and other university programs are critical national resources for developing skilled and knowledgeable homeland security professionals.  Departments and agencies should ensure that these and other similar homeland security educational programs have the greatest impact.  This should include requiring State and local participation in such programs through Federal fellowships.  This will provide the Nation with a cadre of trained homeland security professionals.  DHS should support these educational and training programs by providing them with curricula and other technical assistance.  DHS should pursue opportunities to replicate innovative educational programs, such as the joint New York City Fire Department-U.S. Military Academy's Counterterrorism Leadership Program.

118.    **The White House should consider establishing a Presidential Board to review the national security, homeland security, and counterterrorism professional development programs of Federal departments and agencies to identify opportunities for further integration.**  The Nation can no longer view national security, homeland security, and counterterrorism independently.  Federal professional development programs must recognize the interdependencies among all three and adjust their respective career assignments, education, exercises, and training accordingly.  The Board should provide a roadmap for uniting the efforts of DHS, DOD, and other departments and agencies in educating, training and preparing our leaders for their crucial roles in safeguarding the Nation.  Further, this review should promote the establishment of a common security paradigm that integrates national security, homeland security, and counterterrorism.  This review should also identify opportunities for greater collaboration and integration.  Importantly, this vision is not to eliminate the departments' own professional development programs, each of which serves an important role and is tailored to meet the needs of their respective organizations.

**Critical Challenge:  Citizen and Community Preparedness**

**Lesson Learned:  The Federal government, working with State, local, NGO, and private sector partners, should combine the various disparate citizen preparedness programs into a single national campaign to promote and strengthen citizen and community preparedness.  This campaign should be developed in a manner that appeals to the American people, incorporates the endorsement and support of prominent national figures, focuses on the importance of individual and community responsibility for all-hazard disaster preparedness, provides meaningful and comprehensive education, training and exercise opportunities applicable to all facets of the American population, and establishes specialized preparedness programs for those less able to provide for themselves during disasters such as children, the ill, the disabled, and the elderly.**

**Recommendations:**

119.    **DHS should make citizen and community preparedness a National priority.    To facilitate this initiative, Cabinet Secretaries and other prominent National public figures (*e.g.* the Surgeon General) should serve as spokespersons to promote citizen and community preparedness.**  The Secretary of Homeland Security, Secretary of Education, United States Surgeon General, and other National public figures, should publicize the importance of the community and individual preparedness.  The goal of this effort should be to have citizens better understand the role and limitations of government and to encourage individual preparedness.

        a.    In addition, DHS should continue to research means to lower the barriers to personal preparedness and adapt outreach and instructional materials to address the findings.  Public awareness messaging should shift to include more substantive information within the message, as opposed to telling citizens they need to "do" something.  For example, the "Stop, Drop, and Roll" campaign used so successfully in fire safety as part of the "Learn Not to Burn" program embedded the message and provided citizens with an action.

Other successful campaigns include the National Highway Traffic Safety Administration's "Click It or Ticket" program which fines drivers for not wearing their seatbelt, and the "Buckle Up America" campaign which prescribes proper use of seat belt and child safety seats.

b.   DHS should leverage the success of public education conducted by fire departments nationwide which has reduced the loss of lives and property by fire. The Citizen Corps public education effort should be integrated with the DHS's United States Fire Administration so that preparedness efforts of local fire departments can be expanded to include citizen and community preparedness. Additionally, DHS should leverage the success of the USAonwatch program to form a National Network of Community Watches comprised of citizen volunteers to develop best practices, a common doctrine and metrics for all-hazards community preparedness.

c.   The newly created Office of Public and Community Preparedness should continue to assist with implementing National strategies for citizen preparedness and communities. However, this office should be removed from the Office of Grants and Training, so as to focus solely on homeland security policies, plans, strategies, and guidance at the Federal, State, and local levels which highlight citizen and community preparedness.

120. **DHS should consider increasing grant funding for citizen and community preparedness programs and where program metrics demonstrate effectiveness, DHS should consider allowing greater use of Federal funds for Citizen Corps Council staff positions at the State and local level within the FY07 grant program**. State and local governments generally do not have full time staff assigned to support this critical component of community preparedness. The availability of full-time positions at the State and local level for the Citizen Corps to coordinate the government and community planning is critical. Locations with full-time staff assigned to this tend to have developed robust plans. While Citizen Corps has existed since 2002, funding for the program has not been consistent.

121. **DHS should build baseline skills and capabilities needed by all citizens and communities.** DHS needs to establish a comprehensive list of skills and capabilities to assess how well citizens are prepared utilizing resources such as the Rand Corporations "Individual Preparedness and Response to Chemical, Radiological, Nuclear, and Biological Terrorist Attacks." These baseline skills include assembling preparedness kits, developing communications plans, training in basic first aid, and learning how to react to a variety of hazards and disasters. Additionally, the DHS should develop a process to evaluate national progress toward improved citizen preparedness capabilities through the use of the Target Capabilities List and established metrics, evaluated annually as a condition of receiving Homeland Security grant funding.

122. **DHS should develop tools for State and local governments to use in order to prepare, train, exercise, and engage citizens and communities in all areas of preparedness in FY06.** Special consideration should be given to persons with disabilities, health problems, language barriers, income barriers, and unaccompanied minors. Planning also needs to contemplate household pets and other animals. Developing these tools at the National level, in partnership with non-governmental organizations, private sector, emergency responders, and experts on vulnerable populations, will achieve economies of scale. Providing tools, such as instructor guides and participant handbooks for classroom based instruction, identified standardized skills and capabilities, and strategic planning guidance, will elevate National preparedness without depleting scarce resources at the local level.

Although DHS and other organizations already have established websites to assist with community preparedness (*e.g.*,www.ready.gov, www.prepare.org), there is no measure to evaluate if they have increased overall citizen preparedness.

123. **The Department of Education (DOEd), working with DHS, should include individual and community preparedness into current elementary and secondary educational programs.** The DOEd should recommend funding to better student preparedness initiatives and disseminate teaching materials. Schools should use materials and curricula developed by DHS and the American Red Cross to prepare students.

Students should be required to take courses in first aid, disaster preparedness or other related topics as a part of their curriculum starting in FY07.

School programs on littering, recycling, anti-smoking and seat belt safety have demonstrated their effectiveness at helping to achieve National community goals beyond just students. We should build on these successful initiatives to educate and prepare our children and their families for the threats of the 21st Century.

**124. DHS should immediately highlight preparedness best practices through the DHS Lessons Learned and Information Sharing website (*www.llis.gov*) and the Citizen Corps Council's National conference**. By identifying best practices during exercises and audits, Citizen Corps Councils will be able to keep abreast of the emerging trends in citizen preparedness.

**125. Working with the National Governors Association, DHS should encourage the establishment of State tax relief holidays throughout the year to allow citizens to purchase disaster preparedness supplies**. Providing periodic tax breaks throughout the year would encourage people to purchase emergency supplies. These tax holidays should consider the State of Florida's model in defining what types of supplies would qualify. The government should also work closely with the private sector to build "preparedness packs" in various sizes (individual through family size) for sale at low cost, much as the American Red Cross has done.

## APPENDIX B – WHAT WENT RIGHT

*But there are lessons learned that we don't need to change: the lesson of courage…the determination of our citizens…the compassion of our fellow citizens…the decency of men and women.*

**—President George W. Bush, January 12, 2006[1]**

The devastation of Hurricane Katrina will forever be seared into our country's memory. Visions of our citizens stranded on highway overpasses, of debris-filled plots where grand houses once stood, and of babies being hoisted onto roofs to avoid the surging water, continue to haunt us to this day. But there are other stories from Katrina, stories that may only be known by a few, but that are appreciated deeply by those involved. These are the stories of the men and women of our military, our law enforcement and fire departments, our private citizens, non-government organizations and our faith based groups. These are the stories of the human side of Katrina. It is important that we do not let the horror of the storm overshadow the true courage, determination, compassion and decency of the American people. Although many efforts are described below, what follows is at best only a partial representation of the enormity of the American spirit.

### Preparation and Response to Katrina

We have identified numerous areas in which the Federal, State and local governments could have better prepared for, responded to, and recovered from the storm, but it is also important to acknowledge that we pre-staged more assets and pre-deployed more personnel than we have for any other storm in American history. And we have tried to include throughout the review some examples of the many good lessons of courage, compassion, and initiative that saved lives and reduced suffering.

In 1992, Hurricane Andrew struck densely populated urban areas in southeastern Florida as a Category 5 storm and provides the closest comparison to Hurricane Katrina. They were two of the most destructive storms ever to strike the United States, but Katrina affected an area three times as large, caused two to six times the economic damage, and killed up to twenty times as many people—this was partially due to Katrina's large wind field and the high storm surge, which proved far more damaging than the more compact Andrew.

Prior to both hurricanes, the National Weather Service provided repeated and accurate warnings, but local populations did not fully evacuate—greatly magnifying human suffering in the wake of the storm. Andrew and Katrina both overwhelmed State and local responders, but the Federal response to Katrina was greatly improved due to better preparations prior to landfall.

### Non-governmental Organizations

The number of volunteer and non-profit organizations providing support to the Hurricane Katrina relief effort was truly extraordinary. Virtually every national, regional and local charitable organization in the U.S., and many from abroad, contributed aid to the victims of Hurricane Katrina. To assist in the coordination of these offers of assistance, the ***USA Freedom Corps*** (Freedom Corps) and the ***Governor's State Service Commissions*** rallied non-

profit organizations to list volunteer opportunities in the Freedom Corps volunteer search engine.  The Freedom Corps also worked with the ***Corporation for National and Community Service*** to create a Katrina Resource Center that helped groups of volunteers connect their resources with needs on the ground.[2]

The ***Citizen Corps*** coordinated volunteer efforts throughout the country, with more than 14,000 Citizen Corps volunteers from all 50 states and the District of Columbia actively involved in response and recovery efforts across America.  The Harris County, Texas, Citizen Corps Council brought together an enormous number of volunteers to support the American Red Cross and staffed evacuation centers throughout Houston.  They processed over 8,000 volunteers in one day, and an average of 3,500 per day overall.  These volunteers allowed for the creation of an actual city (with its own zip code) for nearly 25,000 Louisiana evacuees sheltering in the Houston Reliant Astrodome.  They were successful because they had coordinated ahead of time with local businesses and volunteer groups, and because they were familiar with and implemented elements of the Incident Command System.[3]

Faith-based organizations supported the relief effort as well.  For example, 6,000 ***Southern Baptist Relief*** volunteers from 36 state conventions served in Louisiana, Mississippi, Alabama, Georgia, and Texas following the hurricane and flood.  These volunteers ran mobile kitchens, and recovery sites.[4]  They also established hundreds of "pop-up" shelters created by churches or other agencies.[5]  ***Operation Blessing***, comprised of a network of faith-based partners and resources, provided food and shelter to help those in need and transported food and other supplies with their own fleet of trucks.[6]  They also made over $4 million in Fast Cash Grants available to church and smaller relief groups throughout the affected region.[7]  Members of the ***Salvation Army*** came from across the nation and served over one million meals, sheltered more than 31,000 people in seven states, and provided aid to displaced citizens in thirty states.[8]  The Salvation Army not only strengthened the social service infrastructure in those states directly impacted by the hurricane and flood—they did so nationwide.  The Salvation Army's network alone fielded more than 60,000 health and welfare inquiries and helped to locate 25,508 people to date.[9]  These and many other faith-based organizations filled the gaps that other private and public sector organizations could not.  ***Christ in Action***, an inter-denominational non-profit organization from Manassas, Virginia deployed volunteers and mobile kitchens to Gulfport, MS and began feeding people on September 1.  After 115 days of operations, Christ in Action served over 420,000 meals and repaired over 500 houses in time for families to reoccupy their homes by Christmas.  Based upon lessons learned from this experience, Dr. Denny Nissley, the Director of Christ in Action, is organizing a Coalition of Faith-Based First Responders from around the Nation to be prepared for the next major disaster.  This Coalition will perform disaster relief training for volunteers and will maintain a current roster of thousands of volunteers who can be quickly called upon to provide support during the next major disaster.

Private citizens also provided assistance and resources in the aftermath of the storm.  Dr. Carrie Oliver from Texas, operating independently, arrived with three RVs pulling 16-foot trailers driven by herself, her husband and friends to Baton Rouge shortly after the storm hit.  The RVs were full of medical supplies, food, and water.  Back in Texas, Dr. Oliver runs a large clinic, and she had brought all available medical supplies and had purchased the vehicles, trailers, and other supplies with her own money.

Dr. Oliver initially planned on heading directly to New Orleans, but officials in Livingston Parish did not think it was safe.  Instead Dr. Oliver was incorporated into responding to other parishes.  The supplies and personnel were divided into three teams, and with the assistance of a helicopter procured from the Louisiana Office of Homeland Security and Emergency Preparedness, Dr. Oliver flew ahead to different parish localities, and had the three teams follow by ground.  Besides initially helping in Livingston Parish shelters, the teams visited different areas in Washington, St. Tammany, Tangipahoa, and Jefferson Parishes, and set up walk-in clinics operating out of the RVs.

Later, the RVs were used to set up a mobile hospital unit and decontamination clinic at the Children's Hospital in the City of New Orleans 2nd Precinct to take care of injured soldiers, police, and other responders who could not otherwise get medical care.

After three days, Dr. Oliver returned to Texas, but left everything she had brought with her.  She signed over the titles to the vehicles, trailers and supplies.  Livingston Parish officials continued to use the RVs and supplies for relief missions to surrounding parishes and New Orleans, as well as for longer trips, such as one to distribute equipment to police officers in Mississippi.[10]

Other organizations worked tirelessly to assist emergency responders that, due to the storm, did not have the equipment and means to effectively carry out their duties. Amateur Radio Operators from both the *Amateur Radio Emergency Service* and the *American Radio Relay League,* monitored distress calls and rerouted emergency requests for assistance throughout the U.S. until messages were received by emergency response personnel. A distress call made from a cell phone on a rooftop in New Orleans to Baton Rouge was relayed, via ham radio, from Louisiana to Oregon, then Utah, and finally back to emergency personnel in Louisiana, who rescued the 15 stranded victims.[11] Ham radio operators voluntarily manned the amateur radio stations at sites such as the National Hurricane Center, Hurricane Watch Net, Waterway Net, Skywarn and the Salvation Army Team Emergency Radio Network.[12]

### State Governments Support Other Critical Services

Other State Governments volunteered to provide non-response related critical services that the States of Louisiana and Mississippi could no longer provide. Multiple State Public Health Laboratories volunteered to assist the devastated Louisiana and Mississippi State Public Health Laboratories. Florida sent a mobile drinking water lab and personnel to Mississippi, helping to prevent people from getting sick from contaminated water. Iowa personnel performed 12,000 newborn screening tests, critical to the health of our youngest citizens, as they must be performed quickly in order to provide immediate treatment. The efforts to shoulder some of the burden were and continue to be coordinated through the non-profit organization representing these laboratories, the *Association of Public Health Laboratories*, and the State laboratories themselves.[13]

### Local Officials

Many of those called upon to do the toughest work were those that had lost the most. Members of local fire departments, police departments, and emergency service units worked tirelessly despite being victims themselves. Many lost their homes, cars, and possessions. Others lost their families and loved ones. Yet these very people returned to work to protect and serve the people to whom they had made a commitment. They often worked their shifts without knowledge of where there family was, or where they would sleep that night. Despite these obstacles, they continued to perform their duties.

Some members of the Waveland, MS Police Department stayed at their police station during the storm. There came a point when the flooding from the storm surge became so great that they clung desperately to a bush located in the front yard of the station for five hours. When the surge subsided, the men returned to their duties, rescuing and saving those that remained in the 7,000 person town.

When the officers of the Waveland Police Department wanted to return to their duty, a few problems arose. Cars, equipment, radios, they had lost it all. The State of Florida, which was leaning forward with their State Emergency Response Team (SERT), immediately responded following the storm. The State of Florida deployed personnel, equipment and commodities to Mississippi to aid response and recovery from the devastating impact of Hurricane Katrina. In the hours and days after the catastrophic storm, Governor Jeb Bush pledged the support of Florida to Mississippi Governor Haley Barbour. Resources from Florida were mobilized through the Emergency Management Assistance Compact. These efforts represent Florida's largest state-to-state assistance in history. Law Enforcement officers who are an integral part of the Florida SERT assisted the Waveland, MS Police Department by providing relief so police officers could return to their homes and account for their families.

Other cities and states sent their police and fire departments to help their fellow departments that were crippled by the storm. *The Fire Department of New York City* (FDNY) and the *New York City Police Department (NYPD),* two organizations that themselves suffered a devastating loss four years prior, deployed staff and equipment to assist in the recovery effort. FDNY sent over 660 fire department staff, including firefighters, fire officers, emergency medical technicians, paramedics, counselors, physicians, and communications personnel to assist the crippled New Orleans Fire Department.[14] NYPD sent more than 300 officers to support the effort to restore order. Additionally, the State of New York sent more than 100 officers and the Department of Corrections sent more than 250 officers. The City's Urban Search and Rescue Team (New York Task Force One - NYTF-1), which is made up of NYPD, FDNY, and Office of Emergency Management personnel, was deployed to Mississippi at FEMA's request to support rescue efforts along the Gulf Coast. Fire trucks, police cruisers, school buses, transit buses, and other equipment and goods, bearing the seal of the State or City of New York were abundant during the response.

In Louisiana, the *Livingston Parish Office of Homeland Security and Emergency Preparedness* conducted search and rescue missions in the City of New Orleans, for 16 days after the storm with the *Arizona National Guard 855th Military Police*, at great personal expense and risk.  To Livingston's credit, they augmented the New Orleans 2nd District Police Department (NO 2nd PD), at their request, to perform these missions.  At one point the NO 2nd PD ammunition was down to "the rounds on their belts" and their uniforms were starting to rot off their bodies.  Livingston Parish provided supplies and medical care, and provided means of communication to the NO 2nd PD via the Parishes radios and satellite phones as the NO 2nd PD had no communications devices that worked.

The Parish also provided a critically important security function, escorting medical assets to and from hospitals trying to care for injured and sick, and providing cover for New Orleans Police personnel during their operations.  The primary resource that responded to this request was the Sheriff's Department Special Response Team (SRT) who ran missions and provided security escorts.  The SRT was specifically requested because of their outstanding skill, having won several State SRT competitions.

The Parish exceeded its duty by responding into the State of Mississippi, surrounding Parishes, and the City of New Orleans.  The Parish procured large amounts of supplies, out of their own operating budget, without knowing whether they would be reimbursed, and ultimately became a critical component in the flow of goods to help the devastated region.  As this aid was not forthcoming from other sources, Livingston Parish personnel saved many lives during this disaster.

### *Private Sector Organizations*

Private sector organizations provided commodities, services, expert advice, financial donations and volunteer groups to assist in the relief efforts.  *FedEx* facilitated equipment and supply distribution, particularly for the American Red Cross.[15]  *Dell, Home Depot, IBM, Lenovo, Pfizer, Wal-Mart*, and other corporations gave millions of dollars in cash and in-kind donations to support immediate relief and recovery efforts as well as long-term rebuilding.[16]

*Vanguard Technologies, Inc.*, "showed up the day after the storm and provided communications when we had none," said St. Bernard's Parish officials.  Vanguard Technologies, a small Louisiana business, provided Saint Bernard and Plaquemines parishes with innovative internet protocol (IP) network solutions and utilized a Point of Presence (POP) internet connectivity, that remained fully operational during Katrina, when no other company, big or small, was able to restore crucial communications in this devastated area.  Vanguard also deployed a fully operational, redundant, broadband, wireless IP network, covering more than 100 square miles, within five days of Katrina's Gulf Coast landfall.  The networks supported:  Voice-over-Internet Protocol (VoIP) telephony; Video surveillance over IP; mobile video surveillance; high speed World Wide Web internet access; email communications via simple mail transfer protocol (SMTP); and web mail services.  Vanguard, to date, continues servicing the parishes with critical communications access linking key government services and facilities.

Private companies also worked hard to mitigate the economic damage that Hurricane Katrina was sure to bring.  *Norfolk Southern Railroad* recognized the potential impact of the loss of certain key bridges, and pre-staged repair barges just outside the hurricane impact area.  After the Hurricane passed, the barges moved in and quickly repaired the bridges to minimize the impact on the flow of commerce.  By pre-positioning freighters offshore and swiftly returning their grain transport facilities to operational status, the *Cargill Corporation* started shipping grain internationally almost immediately after landfall.  With over half of all U.S. grain exports flowing through ports affected by Hurricane Katrina from 17 different states[17] this single action had a significantly positive national economic impact.

*Academic institutions* across the country accepted students who had been displaced from their universities and provided them with financial assistance.  For example, the Office of Student Aid and Scholarships at *Louisiana State University* (LSU) administered a Hurricane Katrina/Rita Student Relief Fund to assist students who had lost financial support or were displaced by the hurricane and flood.  In addition, the LSU campus hosted one of the largest peacetime triage operations in the history of the United States.

While State and local governments, non-governmental organizations, private companies and even individual citizens were pulling together to provide services for the victims of the storm and assistance for the public services that were

overwhelmed or incapacitated, the departments and agencies of the U.S. Federal government pulled its resources and personnel to mitigate the devastation that Katrina would bring.

### *The Department of Homeland Security*

Almost 6,000 **U.S. Coast Guard** personnel (active duty, Reserve, Auxiliary, and civilian members) from throughout the country conducted one of the largest search and rescue missions in its history as part of an even larger multi-agency, multi-level search and rescue effort. They retrieved more than 33,000 people along the Gulf Coast, including more than 12,000 by air, and 11,000 by surface, plus 9,403 evacuated from hospitals. Almost one-third of the Coast Guard's entire fleet was dedicated to rescue efforts. Coast Guard personnel also worked tirelessly in multi-agency teams to reconstitute waterways and conduct environmental assessments. They restored hundreds of buoys and channel markers that were missing or destroyed in the hurricane. Their efforts to restore these and other navigational aids and waterways, allowed maritime industry in the area to return to normal faster.

> Having evacuated with boats on trailers prior to the storm, Petty Officer Jessica Guidroz, a coxswain at the Coast Guard Station New Orleans, could not return to the station by road after the hurricane passed. She and her crew launched their boat and headed toward the station. Finding the station occupied by rescued victims already, she established order at the station and then piloted a twenty-five foot boat through Metairie and Lakeview, banging on roofs and yelling, scanning for open attic windows, and convincing reluctant evacuees to leave. Learning of a large number of trapped residents, she proceeded to lead a squadron of eight boats and crews in the evacuation of approximately 2,000 people from the campus of the University of New Orleans. Like most of the station crew, she lived nearby and lost all her personal possessions to the storm, yet put her duty first. After several days piloting a boat into devastated neighborhoods, ferrying thousands of people to safety, and seeing destruction on a scale so vast that it seemed surreal, Guidroz was moved when she saw an image on television. She had been haunted by the memory of a young mother who had almost been trampled during the evacuation. She remembered how "the baby was wearing this diaper that you know hadn't been changed in days." That night, a news channel showed images from the Houston Astrodome, and there she was – the lady with the baby. "She was in Houston now, and she looked like she'd showered and her kid had on clean clothes. That moment is when it clicked," Guidroz said. "Here was someone we had actually helped, and it fell into place that we were doing something that really mattered, something really good."

> Petty Officer Moises Rivera-Carrion of the Coast Guard served as a rescue swimmer aboard Coast Guard HH-60J helicopters responding to the devastation caused by Hurricane Katrina. During almost three days of operations in an urban setting with hazards including unlit towers, downed power lines, and contaminated floodwaters, Petty Officer Rivera-Carrion tested the limits of his skill and endurance while rescuing 269 survivors trapped on rooftops and balconies throughout New Orleans and southwest Louisiana.

> With 50 plus knot winds blowing debris, Petty Officer Rodney L. Gordon landed in the first aircraft to return to New Orleans and immediately began a series of complex electrical and mechanical repairs vital to sustaining what quickly grew into the largest air rescue operation in Coast Guard history. Scrambling to locate and cannibalize broken and non-essential equipment until supply lines could be restored, he repaired failed and failing emergency generators, power lines, and dozens of destroyed components. He restored power to vital operations and communications facilities, including the Naval Air Station control tower, enabling the successful control and dispatch of thousands of military and Coast Guard aircraft sorties on rescue and evacuation missions. Most critically, the viability of the entire joint service air rescue operation was jeopardized by the electrical failure of the base's enormous aviation fuel distribution plant. He took charge and single-handedly performed a complex rewiring of its emergency generators, enabling hundreds of aircraft to continue lifesaving missions.

The heroics of Petty Officer Guidroz, Petty Officer Rivera-Carrion and Petty Officer Rodney L. Gordon are only a few of the multiple USCG stories from Katrina. However, their stories, and many more are the reason that the Coast Guard was soon given the moniker, in a New Orleans Newspaper, of the "New Orleans Saints."

Responsible for more than 180,000 employees, the Department of Homeland Security was duly praised for the efforts of the United States Coast Guard. However, additional DHS units brought many other life-saving and order-restoring employees and talents to the preparation, response and recovery operations.

DHS *Customs and Border Protection* and DHS *Immigration and Customs Enforcement* leaders sought to match their resources with the needs of the affected populations in Louisiana, Mississippi, and Alabama. They took clothing, toys, linens and other useful items seized and forfeited at U.S. ports of entry for violations of federal law— more than 100,000 pieces as of this writing—and delivered them directly to the victims of the hurricane and flood.[18] They filled the needs of people who had lost these basic items at minimal cost to the government, using goods that they had seized during the course of everyday operations. Their practical and innovative thinking and actions helped these victims directly, returning to them some possessions, as well as the sense of security such possessions convey.

> On September 5, 2005 Immigration and Customs Enforcement (ICE) / Federal Protection Service (FPS) Sergeant Matthew Pinardi was securing the FEMA morgue detail near Interstates 10 and 610 in New Orleans. He observed a young male riding a bike across the overpass and witnessed the man hit the retaining wall. The young man flipped over the railing and landed some fifty feet below in water over his head. Sergeant Pinardi called for additional assistance, traversed the embankment and at great personal peril entered flood waters to rescue the young man. The man was pulled to safety and transported by emergency medical services to a FEMA National Disaster Medical System medical clinic.

Staff within the *Federal Emergency Management Agency* (FEMA) worked hard to deliver aid and services to those affected by the hurricane and flood. Drawing upon their previous experiences with natural and manmade disasters, FEMA staff distributed more than $5 billion in federal aid to more than 1.7 million households in the affected region by February 1, 2006.[19] FEMA also mobilized elements of the National Disaster Medical System (NDMS), such as Disaster Medical Assistance Teams (DMATs), deploying them to the Gulf States to assist with emergency health care delivery. For example, a DMAT stationed in Florida was deployed to Mississippi, where it set up operations in an abandoned medical center that had been put out of service by the flood. Over a two week period, this DMAT treated more than 3,000 patients that were able to make it to the medical center, and treated another 2,000 by sending teams of their own personnel out into the surrounding area.[20]

Also part of the National Disaster Medical System, the Disaster Mortuary Operational Response Teams (DMORTs) created a large, temporary morgue in St. Gabriel, Louisiana, to support the entire state,[21] and supplemented and otherwise provided mortuary services in Louisiana and Mississippi. DMORT members deployed from throughout the Nation to assist. These specialists worked with local medical, mortuary, and forensic professionals, and provided needed mortuary services, equipment, and personnel. Especially important were the services that trained personnel provided in identifying the dead. They worked with x-rays and DNA samples and communicated information with compassion to families waiting to hear news of their loved ones. Despite some primitive conditions (e.g., with only a roof and intermittent power), team members helped to identify not only those killed by the hurricane and flood, but also those bodies that were unearthed from cemeteries and mausoleums. Their duties were made even more challenging by the destruction of medical, dental and other records, and the inability of many people to accurately determine whether those people they sought were dead or missing. They drew upon both technical expertise and personal empathy to address the needs of both the dead and the living. [22]

### *Department of Defense*

Well before Hurricane Katrina struck the Gulf Coast, the Department of Defense (DOD) prepared for the 2005 hurricane season. Based on prior assistance for hurricane recovery operations, on August 19th the Secretary of Defense approved a standing order to prepare and organize for severe weather disaster operations. This order expedited the pre-positioning of senior military representatives known as Defense Coordinating Officers, to act as liaisons with other governmental organizations in the projected disaster area prior to an event. The order also authorized the use of DOD installations as logistical staging areas for FEMA. U.S. Northern Command directed a number of emergency deployment readiness exercises prior to FEMA requests, spending training funds to pre-position response capability. Once officially activated and deployed, DOD provided logistics support to FEMA, helping the Agency to track items in motion.[23]

The U.S. ***Army Corps of Engineers*** led the removal of 224 billion gallons of water from New Orleans in 43 days, enabling recovery and repair operations. By improving their pumping capacity and efficiency, adding pumps, creating intentional breaches, and developing other on-the-spot workarounds, they were able to reduce the estimated time to clear New Orleans of water by approximately 50 percent.[24]

***U.S. Army*** soldiers provided a number of services in support of Local, State, Federal, and private-sector activities, including medical treatment (e.g., thousands of immunizations), debris clearing, evacuation, planning, and performance of search and rescue missions.[25]  The ***U.S. Marine Corps*** helped local governments reinvigorate their infrastructures[26] and augmented search and rescue operations.  In one particularly noteworthy case, two Marines using a borrowed boat rescued 150 people in 36 hours.[27]  The Mississippi ***National Guard***, supported with Guard members from many other States, performed superbly throughout the response, carrying out a number of duties, including clearing key roads, search and rescue, and getting supplies into the hands of victims as quickly as possible.[28]  The ***U.S. Navy*** mobilized more than 10,000 naval personnel to the affected Gulf coast region, as well as 68 aircraft, and 16 ships,[29] including amphibious construction equipment and mobile diving salvage units, particularly useful in flood conditions.[30]

> Prior to Katrina's landfall, twenty-one Seabees from Naval Mobile Construction Battalion 133 and Naval Mobile Construction Battalion 7, led by a Navy Chief Warrant Officer answered the call to vigilantly support the staff and residents of the Armed Forces Retirement Home in Gulfport, Mississippi. Located about two hundred yards from the Gulf of Mexico, the home had evacuated all but fifty patients in anticipation of Hurricane Katrina.  Seabees postured themselves on the ground floor of the building, and began bracing the structure against a thirty foot tidal surge and winds recorded in excess of 120 miles per hour.  When the storm surge forced its way into the building, generator power was lost, and in the darkness, amidst rushing water, tidal pull and life-threatening debris, these Seabees as young as 18 years old and hailing from every area of the country, evacuated fifty bed-ridden and wheel-chair bound retirees and numerous staff members, as well as all medical oxygen tanks, to the upper floors of the building.  Their actions saved lives and helped prevent the home from succumbing to total physical devastation.

The 53rd Weather Reconnaissance Squadron (also known as the Hurricane Hunters), of the 403rd Wing, is composed of ***U.S. Air Force*** Reservists.  Flying out of Keesler Air Force Base in Biloxi, Mississippi, it is the only military unit flying into hurricanes and tropical storms.[31]  The unit followed Hurricane Katrina from inception to landfall, and provided critical reconnaissance information to the National Hurricane Center throughout the event.[32]  They maintained daily hurricane vigilance.  Other Air Force personnel supported recovery and relief operations, including transportation of more than 13,000 people, air traffic control, and aerial lift, refueling, photography, search and rescue, and medical evacuation.[33]

The ***National Geospatial-Intelligence Agency*** (NGA) started collecting key infrastructure-related information (i.e. on airports, hospitals, police stations, emergency operations centers, highways, schools, etc.) well in advance of landfall and got this information into the hands of Federal, State, and local first responders in the affected region. As the storm was tracked, NGA pre-deployed analysts and mobile systems to the affected areas that provided expertise and information on the ground and facilitated the delivery of additional information from NGA offices elsewhere.  Because they had assets in place and focused on the region, NGA provided the first comprehensive overview of the damage resulting from the hurricane and flood.  NGA merged imagery with other information, creating hundreds of intelligence products per day that could be used and applied by response professionals to aid in decision-making.  NGA assessments were multi-dimensional, timely, relevant, and continuous.  They addressed many issues, including but not limited to: recovery planning and operations, transportation infrastructure, critical and catastrophic damage, dike stability and breaches, industry damage, and hazard spills.  The NGA World Wide Navigational Warning Service also provided navigation information to the U.S. Navy, Merchant Marine, and Coast Guard, and relayed messages from the National Weather Service to people at sea.  NGA also aided in the location and recovery of oil platforms.  The imagery activities of NGA were essential to the restoration of critical infrastructure.[34]

*Department of Justice*

The **Bureau of Prisons** provided extensive support to the Hurricane Katrina relief efforts. Some of those accomplishments included transporting 4,000 Louisiana Department of Corrections inmates out of New Orleans jails. Busses staffed by Bureau personnel from both within and outside of the region were dispatched to assist with this operation. The agency also transported fifty-five inmates from the St. Charles Parish Jail to the Federal Detention Center in Houston, Texas at the request of the U.S. Marshals Service, as well as seventy inmates from Harrison and Pearl River Counties, Mississippi to the northern part of that state. In addition to moving inmates, Bureau of Prisons staff provided supplies to the storm ravaged region. Specifically, staff from the U.S. Penitentiary in Atlanta, Georgia and the Federal Prison Camp in Montgomery, Alabama delivered to New Orleans toothpaste, toothbrushes, soap, shampoo, mouthwash, disposable personal sanitation packs, 600 Meals Ready to Eat (MRE), 600 hot trays of potato dinners, 600 cans of orange juice, eighty cases of water bottles, sheets, linen and pillows.

The **Federal Bureau of Investigation** recognized that there was a lack of unified law enforcement leadership, and no central coordination for law enforcement in New Orleans, and created a Law Enforcement Coordination Center (LECC).[35] Once the LECC was established, all law enforcement personnel and agencies (including those provided by the National Guard) had a unified command structure. This allowed every law enforcement agency operating in the New Orleans area to coordinate with other agencies.[36] Additionally, senior federal law enforcement officials from the FBI and DHS not only coordinated the response of the Federal law enforcement agencies, they also brought the New Orleans Police Department command element together for the first time since the hurricane struck. Further, they integrated Federal law enforcement assets and personnel into the remaining local police structure.

> FBI Special Agent in Charge Michael Wolf and U.S. Immigration and Customs Enforcement (ICE) Assistant Director Michael Vanacore, were appointed to serve as the Co-Senior Federal Law Enforcement Officials (SFLEO) under the NRP. Within a day of their appointment and for the first time since Katrina made landfall, the SFLEOs brought together all the Federal law enforcement agencies operating in the New Orleans area with the State police to coordinate efforts. The SFLEOs established a Law Enforcement Coordination Center (LECC) first in Baton Rouge and subsequently in New Orleans modeled after the FBI's Joint Operations Center. The LECC coordinated all law enforcement activities in the New Orleans area, bringing together Federal, State, and local law enforcement to including National Guard and DOD military police to provide assistance and support to the New Orleans Police Department. The rapid establishment of the LECC led to the rapid coordination of law enforcement activities and the restoration of law and order in New Orleans.

The **United States Attorney's Office** for the Eastern District of Louisiana supported law enforcement operations during the first week following Hurricane Katrina's impact. They were required to quickly set up two completely new offices in Baton Rouge and Houma, Louisiana. A large portion of their employees worked hard to accomplish this. However, certain members of their staff particularly distinguished themselves during the initial period when their operations were being conducted out of the U.S. Attorney's Office for the Middle District of Louisiana. Despite being dislocated from their homes and having the option of administrative leave, many of these employees went to Baton Rouge on their own to become involved in operations. Other essential employees came in to perform necessary tasks without any assurance that they would have a place to stay.

> Assistant United States Attorney (AUSA) Michael Magner evacuated to Baton Rouge, Louisiana where he arranged for his own lodging. He was one of the first AUSAs to report for duty and coordinated the manning of the regional jail facility established at the New Orleans bus station, personally performing several twenty-four hour shifts. He also supervised the handling of complaints and judicial appearances in cases involving persons arrested on criminal charges during that initial period. AUSA Stephen Higginson moved in with a friend in Baton Rouge while his family evacuated to Boston, Massachusetts. He immediately began handling a number of thorny legal issues that had arisen while at the same time performing twenty-four hour shifts at the bus station. AUSA Brian Marcelle, while providing for his wife and two infant children, voluntarily performed twenty-four hour shifts at the bus station, handled complaints, and made judicial appearances in cases involving persons arrested on criminal charges during that initial period.

On September 4, 2005, the **Bureau of Alcohol, Tobacco, Firearms and Explosives** (ATF) received a tip from a resident regarding gunfire in a New Orleans neighborhood. ATF Special Response Team (SRT) members responded, equipped with night vision goggles, and witnessed two individuals shooting at a helicopter as it flew overhead. The two men fled to a residence, and the SRT personnel entered the location and seized two handguns. One of the subjects, a convicted felon, gave a statement regarding the incident and was the first person federally arrested by any agency in the aftermath of Hurricane Katrina.

ATF agents also provided critical supplies on numerous occasions (including food, water, clothing, protective equipment, and ammunition) to the New Orleans Police Department (NOPD). On September 1, an ATF agent responded to New Orleans to provide assistance and emergency provisions to an NOPD Task Force Officer conducting post-storm operations. On September 2, upon arriving in New Orleans and setting up camp at a post office in the Algiers neighborhood, ATF SRT agents offered assistance to the NOPD SWAT team and 4th district officers. The police officers advised they had not seen or heard from any federal agency and were glad to see the ATF personnel, as they were running low on ammunition, food and water. The ATF SRT provided the NOPD with these supplies and immediately began assisting with law enforcement missions.

On September 3, ATF New Orleans Field Division agents provided security at a Mandeville, Louisiana hospital to which a large number of evacuees were being airlifted. Due to aircraft coming under fire, the hospital requested that ATF provide armed support for a rescue mission into the city to evacuate patients and personnel from Tulane University Hospital. Two agents assisted on this mission resulting in the rescue/evacuation of fourteen people. Agents also provided an armed escort for a transport shipment of emergency medical supplies from the New Orleans Airport to the Mandeville hospital.

Beginning on September 8, ATF SRT responded on several occasions with NOPD to clear the Fisher Housing Development after receiving reports of sniper fire. Several firearms were recovered, but the reports of sniper fire continued. On September 10, ATF SRT, acting on a tip, deployed to the Fisher Housing Development and found an AK-47 assault weapon with a 100 round magazine. It is believed that this was the weapon used during the reported sniper shootings in the area. After seizing the weapon, no more sniper reports were made.

ATF SRT personnel also established a medical facility to provide medicine and prescription drugs (e.g., insulin) to individuals in need and living in the area of the SRT base at the Algiers post office. ATF SRT personnel went to residences and nursing homes to provide food, water, and much-needed medical attention to people who could not or would not leave their homes. On September 4, with the assistance of the Louisiana Department of Wildlife and Fisheries, ATF personnel rescued at least twenty-three people, including one ATF employee, who were trapped in their homes.

Throughout the response to Hurricane Katrina, ATF continued to reach out to the sick and elderly citizens in the New Orleans area. On September 13, as Hurricane Rita was headed toward the Gulf Coast, SRT personnel went to all of the sick and elderly people known to them in the New Orleans area and attempted to convince them to evacuate. The many people that chose to remain in their homes were provided with food and water. Additionally, ATF agents rescued scores of domesticated animals throughout the response to the hurricane.

In response to the housing shortage, New Orleans ATF Field Division agents opened their residences to provide lodging to coworkers who were displaced from their homes and to other ATF agents on detail from other parts of the country. Agents assisted in the cutting and clearing of fallen trees at the residences of a number of field division personnel, and assisted many division personnel in returning to their residences in severely damaged areas to conduct damage assessments and retrieve personal effects. New Orleans Field Division agents provided personal security for Assistant United States Attorneys for the Eastern District of Louisiana returning to their offices and residences to retrieve important case information.

Deputy United States Marshal (DUSM) Justin Vickers of the New Orleans **U.S. Marshals Service** office found out there was a stranded elderly lady (in her 80s) in an apartment complex. Although she was able to

call out by telephone; she was confused and unable to provide her apartment number and street address. DUSM Vickers was able to locate the complex and find her. He not only rescued her from the abandoned complex but also found her suitable care in a family's home located in Baton Rouge.

### Department of Health and Human Services

The *Agency for Healthcare Research and Quality* (AHRQ), part of the Department of Health and Human Services (HHS) quickly identified the need for specific guidance on how to get hospitals in the region affected by the hurricane and flood reopened and running again. The Agency developed easy to read information, and checklists regarding supplies, medications, staffing, patient transport, reopening evaluation, and management.[37] AHRQ developed this information and got it into the hands of the State and Local leaders responsible for making hospitals function again.

The *Centers for Disease Control and Prevention* (CDC) deployed approximately 200 personnel to the affected region, including the following specialties: public health nursing, occupational, laboratory, medical, epidemiology, sanitation, environmental health, disease surveillance, public information and health risk communication. CDC led and/or assisted with a variety of emergency public health programs.[38] CDC immunization experts helped to provide vaccines and vaccinate children displaced by Hurricane Katrina, especially those staying in evacuation centers. Most importantly, they determined which diseases would result from the hurricane and flood, and not only monitored the region for them, they also communicated information on these diseases and others the public might be worried about, helping to allay public fears.[39] They helped to fill gaps in the public health infrastructure, prevented disease from gaining a foothold in the already devastated region, and communicated health-related information to the public.

Many victims of the hurricane and flood took charge of their own medical care to the extent that they could. In response to their demands for more information, for two weeks immediately after the hurricane and flood, the *National Institutes of Health* (NIH) expanded their program for medical consultation to not only help health care providers throughout the Nation, but also specifically assist patients and the worried well in the affected region. Working with their partners in academic medical centers and professional medical societies, NIH opened and manned phone lines all day every day to answer questions about a variety of diseases and cases involving complicated medical treatment. NIH immediately recognized that they were in the best position to match medical experts with health care providers and patients in need of answers – providing both groups with the information they needed to better manage health care concerns in the midst of the crisis. [40]

> The *U.S. Public Health Service* staff from the Bureau of Prisons Federal Medical Center in Carswell, Texas provided support in response to Hurricane Katrina in a number of ways. For example, Lieutenant Commander Christopher L. McGee, Social Worker, was deployed for two weeks serving in a special needs shelter for elderly, wounded, and cognitively-impaired persons. While on a mission to locate a missing shelter resident, he and two National Guards members found a man lying on the ground surrounded by several other men that were hitting and kicking him. Specialists Christopher L. Horne and Mark D. Miller from the 528th Engineering unit, and Lieutenant Commander McGee intervened and stopped the assault, and then provided emergency care to the victim. While awaiting emergency medical response, the victim became combative and had to be restrained until paramedics arrived. After treatment, the man was safely returned to his family in Arizona the next day. During his tour, Lieutenant Commander McGee and his team, were able to locate and reunite approximately 296 shelter residents with family or community support systems. Additionally, Commander William Resto-Rivera and his medical team provided treatment and services to more than 130 elderly nursing home residents who had been displaced, and then prepared them for immediate movement. Captain Barbara J. Jenkins, Nurse Manager of Carswell's Mental Health Inpatient Unit, also performed brief mental health assessments for over 250 soldiers and civilians, both responders and victims.

### Department of Energy

Colonial and Plantation Pipelines, major suppliers of fuel for the eastern US, were not operating due to lack of power at their pumping stations in Mississippi and Louisiana due to effects of Hurricane Katrina. The Department

of Energy (DOE) persuaded Entergy and Mississippi Power to elevate the electrical restoration of these pumping stations to near the top of the priority list. Mississippi Power elevated restoration of Collins, Mississippi to their number one priority. Unfortunately, the assessments of the electrical grid revealed damage to multiple transmission lines. Entergy also had responsibility for restoring power to several of the pump stations. Entergy raised the pump stations in their priority list and were able to restore power to some of the lesser damaged facilities quickly. As a result of the lengthy restoration time, Colonial contracted for some generators. After these initial contracts were superseded by FEMA for use on lifesaving activities**,** The Department of Transportation, as the lead for Emergency Support Function 1 (ESF-1) under the NRP, coordinated transport and delivery of large emergency generators to petroleum and natural gas industry sites that lacked power following the hurricanes. At FEMA's request, ESF-1 also obtained the needed waivers so that these generators could be moved by road and rail. Colonial worked with DOE to request that FEMA recognize Colonial Pipeline as critical infrastructure and part of the necessary emergency response, providing critical fuel to the recovery effort. DOE worked with FEMA to get emergency responder identification for Colonial contractors and staff to expedite their travel through the police barricades and into the disaster area. DOE worked with Mississippi Highway Patrol to provide the company the information they needed to get into the disaster areas and checked road availability at the pumping stations. As Colonial attempted to restore power and deliver generators to these sites, their crews reported criminal activity and gunshots. Colonial stated they needed protection or would have to cease work and depart. DOE arranged with the Mississippi Highway Patrol to provide police protection to three of the Colonial pumping stations.

DOE provided a situation brief and recommendations regarding getting electricity back on at the water pumps at Lake Livingston Pumping Station. This pumping station supplies Houston with water. After speaking to all parties, it was determined that four different groups were preparing four different solutions involving portable generation. DOE, as the lead for ESF-12, pulled CenterPoint Energy, Entergy, Army Corps of Engineers, City of Houston, and the Coastal Water Authority (who ran the pumping station) together on a conference call to discuss the situation (note there was not a lot of communication between CenterPoint Energy and Entergy up to this point). CenterPoint Energy suggested energizing an open link between CenterPoint Energy and Entergy and letting CenterPoint Energy repair three lines between Entergy substations and to serve the pump station load from CenterPoint. ESF-12 strongly recommended to the PFO that this become the number one solution since this would provide a more stable source of power for the pumping stations. Late night on Sunday September 25, CenterPoint Energy contacted the DOE Emergency Operations Center to ask for permission to make the connection. Within minutes of that call, ESF-12 at the Austin JFO gave the verbal go-ahead to CenterPoint to proceed with its work on getting the pump station up. The work was completed two days later and the pump station came back on line just as the water supply was down to about a one day supply.

ESF-12 in Alabama was asked to contact an Alabama pole-making company (Cahaba) and attempt to get them fuel so they could continue their pole-making/treating (they make 4000 poles per day). The Governor of Alabama was made aware of the plight of Cahaba which was producing poles for Entergy and Mississippi Power (ESF-12 at the Mississippi EOC confirmed with Entergy and Mississippi Power that this pole supply was critical) and ESF-12 was tasked with getting them fuel. ESF-12 spoke with all parties with involved (Hunt Oil, Stephens Oil Distributor, and Cahaba) and got Hunt Oil to release the needed fuel beginning the following day, the day that Cahaba was going to have to shutdown their pole-making due to lack of fuel. ESF-12 personnel drafted a letter to Hunt Oil that was signed by the FCO and sent out a half hour later. Six pole-making companies in MS had shut down and the utilities were using the poles as fast as they were produced. Cahaba made 4000 poles per day and is the largest pole making company in the world. Without these poles, restoration would have severely been affected.

The Louisiana Offshore Oil Port was also partially damaged and initially shut down by Hurricane Katrina. This facility is the only US facility capable of offloading ultra large tankers and pumps about 1 million barrels of oil a day. DOE facilitated their access to emergency communications; worked with the local utilities to prioritize their restoration of commercial power; assisted in getting delivery of food and water to the on-site crew; and facilitated their communication with the U.S. Coast Guard to get their shipping lanes surveyed, which resulted in a U.S. Navy minesweeper being deployed to the area.

### Department of Transportation

The Department of Transportation (DOT) successfully coordinated one of the largest airlifts in its history to support the emergency evacuation of more than 66,000 citizens from New Orleans.  This large and complex operation involved three federal Departments and a fleet of private sector and military aircraft.[41]  Additionally, the DOT *Federal Aviation Administration* quickly restored air traffic control and runway operations at the Louis Armstrong International Airport in New Orleans. This not only facilitated the delivery of relief supplies into the area, but also enabled federal authorities to execute a massive airlift of New Orleans evacuees. The Air Transport Association also coordinated forty domestic flights with continual DOD and civilian flights to evacuate a total of 24,000 people.

As a member of the DOT Region Ten Emergency ESF-1 response cadre, John Calvin was deployed for a period of over five weeks to the Louisiana State EOC and to the JFO in Baton Rouge.  Working more than eighteen hours each day as part of the FEMA Emergency Response Team-Advance (ERT-A) he played a crucial role in post-landfall evacuation operations. Using ESF-1 controlled helicopters, he personally coordinated and led the evacuation of over 200 patients and staff, many of whom were non-ambulatory, from the rooftop of the flooded Louisiana State University hospital in downtown New Orleans. This dangerous but urgent lifesaving mission was undertaken voluntarily on John Calvin's part and at considerable risk, despite the fact that helicopter evacuations are not part of the traditional ESF-1 function. Additionally, John Calvin worked almost constantly, often on less than three hours sleep, coordinating military and ESF-1 buses and aircraft during the early phases of the evacuation. His personal efforts were instrumental in moving 210,000 people from New Orleans to shelters

### Department of Housing and Urban Development

Working with the U.S. Conference of Mayors and the National Association of Counties, the Department of Housing and Urban Development (HUD) coordinated the identification of housing opportunities for hurricane victims.  As a result, numerous cities, counties, and Indian Tribes offered housing and transportation to displaced persons. For example, the cities of Detroit and Philadelphia offered housing for over 1,000 displaced individuals. Allegheny County, Pennsylvania also offered to house 1,000 persons. HUD then worked with FEMA to match displaced individuals with vacant housing.  HUD also sent personnel to Disaster Recovery Centers in states that were directly affected by the hurricane and flood, as well as in Arkansas, Florida, North Carolina, Tennessee, and Texas to meet with people displaced from their homes, and personally help them find temporary and permanent housing in host cities.[42]  HUD used key interpersonal skills and relationships it had developed over the years, successfully matching the newly homeless with homes.

### Department of Agriculture

Prior to Katrina making landfall, the *Food and Nutrition Service* (FNS) had proactively pre-positioned food in warehouses in Louisiana and Texas, making the food readily available for disaster meal service programs.  FNS continued its efforts to ensure adequate supplies of food were on hand or nearby by airlifting initial supplies of infant formula and baby food products to Louisiana, Texas, Alabama and Mississippi and then following up with additional baby food supplies for delivery via land transportation (this amounted to approximately two million pounds). Additional commodities (approximately twenty million pounds), that included fruits, juices, vegetables, meats and grains, were also procured and/or diverted from existing USDA and other state sources to assist with congregate meal service and provide families with food packages until the Disaster Food Stamp Program could provide food relief (certain locations in the hardest hit areas could not operate the Disaster Food Stamp Program because there were no retail outlets available).  Additionally, schools outside the devastated areas were granted waivers which permitted the service of free meals to children who had fled the devastated areas and began attending school elsewhere.  FNS also promptly implemented the Food Stamp Program's first National Evacuee Policies that enabled State agencies that were not affected by the hurricane or that were not administering a disaster program to immediately issue disaster benefits to individuals and families who evacuated to their States.  FNS approved over seventy waivers to affected States to issue benefits under the disaster authority.   FNS also expanded the range of foods that could be purchased with food stamps in Louisiana, Mississippi, Florida, Alabama, and Texas, and approved alternate procedures for use and replacement of food stamp benefit cards to improve a household's ability to purchase food.

About 3,000 members of the ***Forest Service*** also deployed to the region to support response efforts. Arriving in Mississippi, Louisiana, Florida, and Alabama, Forest Service personnel established support camps, provided aviation assistance, and transported desperately needed supplies to relief workers. The base camps they established were capable of supporting 1,000 emergency responders at each site. They bolstered the destroyed aircraft infrastructure in the region with their own fixed wing planes and helicopters. They also helped navigate the Federal procurement system and successfully obtained needed emergency response supplies. These activities allowed local and state emergency response personnel to focus on response rather than worrying about the supplies and other support they needed.[43]

> Many organizations and agencies that responded to Hurricane Katrina and the ensuing flood arrived in the region without much experience with or knowledge of the affected States and their geography. National Guard member Ronnie Davis – also of the USDA ***National Resources Conservation Service*** (NRCS) – utilized the organization's digital data (ordinarily used to produce conservation plans and generated in Texas) and its Digital Topographic Support System to create the much needed maps of the affected regions of Mississippi. Davis and his team set up the system on an airport runway, and using a National Guard generator, managed to produce over 800 maps to support sector operations. In addition to hand-delivering these maps to National Guard units, the team also delivered maps to local police, law enforcement officers arriving from other States, and FEMA. According to Davis, his "…work for NCRCS just transitioned into what was needed to help with Hurricane Katrina relief in Mississippi and to support the local governments."[44]

The ***Animal and Plant Health Inspection Service*** (APHIS) sent fifty veterinarians and wildlife experts to the region to rescue animals – pets, zoo animals, and livestock. They augmented and provided veterinary services in Louisiana and Mississippi, saving more than 10,000 animals from the flooding of New Orleans. They delivered fresh water and bales of hay to starving cattle. They also successfully rescued mice that were part of Tulane University's cancer research program. APHIS helped many animals survive until they could be reunited with their owners, reduce the economic impact of further agricultural losses, and maintain research continuity.[45]

Through its Emergency Conservation Program, the ***Farm Service Agency*** (FSA) provided funding to help farmers and ranchers rehabilitate farmland damaged by the hurricane and flood. Administered by FSA state and county committees, this program provided the additional resources needed to remove debris from farmland, and restore farm-related infrastructure (e.g., fencing). FSA also decided to change its policy for those affected by the disaster, allowing eligible producers to receive 100% cost-share assistance in implementing an approved practice (instead of the usual 75%).[46]

The USDA program for ***Rural Development*** did not wait to be asked and instead, reached out to those displaced by the hurricane and flood. It offered direct loan borrowers a "no-questions-asked" moratorium on their mortgage payments, while simultaneously working with guaranteed lenders to prevent any liquidation actions and offer payment forbearance. The program also actively looked to fill the housing gaps that could not be addressed by FEMA and the Small Business Administration by finding alternative lodging for those that had been displaced, and making these victims a higher priority for Rural Development housing. For example, the program arranged to let tenants use vacant seasonal labor housing units while repairs were being made to their own homes. Rural Development looked for ways to make its own activities bend to meet the housing needs generated by this catastrophe, while continuing to meet their ongoing commitments to rural communities throughout the Nation.[47]

Many scientific federal organizations worked with scientists in the affected region to continue their research. For example, the ***Agricultural Research Service*** (ARS), the in-house research arm of the U.S. Department of Agriculture (USDA), did not allow the hurricane to derail important ongoing agricultural research throughout the Nation. When the USDA Southern Regional Research Center in New Orleans was severely damaged by Hurricane Katrina, ARS quickly relocated some of the scientists, support staff, and their families to the U.S. Plant, Soil and Nutrition Laboratory in New York. ARS provided support to these families, facilitated the continuation of their research, and gave them the opportunity to collaborate with other scientists from the Cornell University Departments of Plant Pathology and Animal Science.[48] ARS and other federal agencies, such as the ***Department of Commerce National Institute of Standards and Technology*** and the ***Department of Energy Office of Science*** provided scientists with the resources and support they needed to continue their research in spite of the hurricane and flood.[49]

### Department of Commerce

Clearly understanding the impact of the hurricane and flood on businesses in the region, the **Minority Business Development Agency** of the Department of Commerce (DOC) sent business development specialists to the region to provide on-the-ground assistance to the owners of the more than 59,000 minority firms in Louisiana, Mississippi, and Alabama, as well those that temporarily relocated to Texas. MBDA established a minority business development center in Houston to assist with loan applications, business plans, insurance claims, reconstruction of business records, and business administration. Instead of letting these businesses slide, MBDA helped get owners back on their feet quickly.[50]

Elements of the **National Oceanic and Atmospheric Administration** (NOAA) were proactive and vigilant. The National Hurricane Center (part of the NOAA National Weather Service) accurately predicted and tracked the size, scale, and path of Hurricane Katrina. Further, Max Mayfield, Director of the National Hurricane Center, personally made phone calls to local, State and Federal leaders to apprise them of the situation, aggressively contacting officials in the affected areas to warn them.[51] Members of the National Weather Service knew that the time would come to issue warnings, and they developed them ahead of time, evaluating data and basing the warning language on various scenarios, so that when certain criteria were met (as with Hurricane Katrina), they did not have to waste time creating statements—they could issue them immediately.

The National Weather Service also correctly realized that the levees were breaching and issued a flash flood warning at 8:14 AM Monday, August 29, saying, "A levee breach occurred along the industrial canal at Tennessee Street. Three to eight feet of water is expected due to the breach."[52] These organizations correctly characterized the situation, identified the danger, and got the word out clearly and promptly.

During the response to Hurricane Katrina, the DOC **National Telecommunications and Information Administration** (NTIA) correctly and immediately identified the need for additional communications bandwidth, and allocated more than 1,100 frequencies to nine Federal agencies which allowed them to operate their land mobile, aeronautical, maritime, and satellite communications. NTIA also coordinated with the Federal Communications Commission to temporarily authorize the use of private sector satellite, ultrawideband, and microwave communication services. In addition to these response efforts, NTIA also provided financial support to reestablish the communications infrastructure in Louisiana, helping the state to take an initial and important step toward recovery.[53]

### Department of the Interior

The **Bureau of Indian Affairs** (BIA) of the Department of the Interior (DOI) focused their efforts on assisting tribes in the Gulf region to address their public safety, emergency access, and emergency services needs.[54] They maintained communications before hurricane landfall and coordinated directly with Tribal governments, such as the Mississippi Choctaw Tribal government.[55] BIA waited until Tribal governments made requests before sending assistance, but started preparing and moving assets ahead of time, so that when the requests for assistance did come, they were already responding.

BIA had responded to seven hurricanes previously and knew exactly what to do when the time and requests came. The Bureau arranged for fresh water to be delivered from other States, replaced spoiled food, cleared debris from roadways, brought in necessary supplies, ensured continuity of education for children attending BIA-funded schools, and improved public safety infrastructure by assigning Bureau law enforcement personnel to the area. The Bureau also correctly assumed that those Tribes near the affected regions would take in other members that were victims of the hurricane and flood, and worked to provide financial and other assistance, helping the Tribes take care of each other.[56]

Federal land-managing agencies, such as the **Bureau of Land Management** (BLM), as well as their state counterparts sent hundreds of employees to help restore public health and safety in the devastated region. They also deployed to the Mississippi-Louisiana border to clear roadways and power lines of damaged and fallen trees that had cut off those in the coastal communities, so that first responders could gain access to the victims and help restore

power.  BLM personnel also skillfully applied their experience with planning, logistical support and tracking (gained from years of managing wildland fires) to the situation in the Gulf region. [57]

Coordinating with FEMA, the U.S. Army Corps of Engineers and their sister organizations within the DOI, the *Bureau of Reclamation* mobilized equipment and staff in response to the hurricane and flood.  Recognizing the need to purify drinking water, the Bureau of Reclamation sent an expeditionary water purification unit to Mississippi, purifying both contaminated and salt water to levels that not only met, but exceeded, EPA drinking water standards.  The unit produced 100,000 to 200,000 gallons of purified water per day.  The Bureau also deployed employees to assist with debris removal and install temporary roofing.  They had equipment and trained personnel who were well acquainted with the rigors and requirements of water purification and other missions in contaminated and disaster-driven conditions.[58]

Scientists from the *Geological Survey* worked with the Louisiana Department of Environmental Quality to monitor water quality in the state following the hurricane and flood.  Using a mobile laboratory, they collected and analyzed water samples from 22 sites in and around Lake Pontchartrain, a major recreational area and fishery, for three weeks to determine levels of contamination, and whether this contamination extended into the Mississippi Sound.[59]  They applied sound scientific research practices and attention to detail to the problem of contaminated water in the region.

Volunteers from the DOI *Office of Surface Mining* (OSM) deployed to Texas and worked at 13 different debris-disposal sites, dealing with more than one million cubic yards of debris.  Additionally, OSM personnel conducted safety training, handled equipment inventory, purchasing and other administrative requirements.  They applied their vast experience with clearing large amounts of debris to the situation, moving debris out as efficiently and effectively after the disaster as they do for surface mining.[60]

### Department of Labor

Recognizing that getting back to work and starting new jobs would be critical for those affected, whether they returned to their home states or chose to live elsewhere in the U.S., the Department of Labor established a "Pathways to Employment" initiative.  Using the Department's network of over 3,500 career centers nationwide, the initiative helps evacuees and survivors find jobs.  The Department sent numerous personnel directly to the affected region to provide job counseling to evacuees (including tailored assistance to the disabled looking for employment), and help all in need of jobs use the expanded resources provided by this initiative.  Additionally, the Department expedited and increased its Job Corps offerings, providing over 4,000 scholarships to economically disadvantaged young adults (aged 16-24).[61]

### Department of Education

The Department of Education established an innovative website to help provide assistance to those schools that had accepted students displaced by Hurricane Katrina and the flood.  At this site schools list the needs of these students (e.g. books, clothes, school supplies, computers – even counseling) and donors list what they can provide.  Schools and donors have access to one another's information, and are then encouraged to contact each other directly, and hundreds of matches have been made.[62]  The Department of Education also worked with the *Defense Logistics Agency*, the *General Services Administration*, and the *Federal Emergency Management Agency* to pool federal resources and quickly provide thousands of pieces of furniture, computers and other equipment from the federal surplus to schools in need.[63]

### Department of State

Using the recently developed Employee Profile Plus database, managers in the State Department rapidly located current and former employees with skills in about 300 specific areas. The web-based system was deployed during the Department's tsunami relief efforts in late 2004 and again following the hurricane and flood.  They quickly found employees with required language, area and disaster relief expertise in a matter of minutes, rather than days or weeks.[64]  These skilled personnel were critical in communicating information to those that primarily or solely spoke foreign languages.

### *Department of the Treasury*

The **Bureau of Public Debt** immediately realized that there would be a great need for money in the devastated region, but that ordinary access to cash would be limited at the banks. The Bureau expedited both the replacement of savings bonds that had been destroyed, as well as the redemption of Series EE and I savings bonds that were less than one year old.[65] Other organizations in the Department of the Treasury, such as the **Financial Management Service** (FMS), immediately issued guidance to financial institutions to help them confirm the identify of people trying to redeem Treasury checks – to help the institutions prevent fraud and help the victims obtain needed funds.[66] The **Internal Revenue Service** also took action to advise taxpayers in the affected region of recent changes in tax law that under certain conditions would allow them to withdraw funds early from retirement plans, without the usual penalties.[67] Although Treasury checks, savings bonds, and of course, retirement plans, are often considered long-term investments, the Department of the Treasury allowed investors to turn them into sources of cash in this emergency, understanding that without the cash to address immediate needs, there would be no long-term future for these victims.

> The Administrative Resource Center within Treasury's Bureau of the Public Debt, provides administrative services to many Federal agencies. The Armed Forces Retirement Home, with residences for elderly veterans in Gulfport, MS and Washington, DC, is one of its customers. As soon as the Administrative Resource Center procurement staff was informed, late on August 29, 2005, of the decision to evacuate approximately 400 residents and essential staff from the flooded Gulfport home to the Washington, DC facility, they set about applying their procurement skills to orchestrate a safe and rapid evacuation and relocation. This included arranging for the rental of buses along with procuring necessary nursing services, lodging, and meals for the several-day journey. The frailest of residents were either redirected to Maxwell Air Force Base, for faster and less stressful transport to Washington, DC, or, in extreme cases, were found places in a nearby nursing home. While the Gulfport residents were in transit to Washington, the Center also quickly procured a host of goods and services to prepare the facilities at the Washington, DC campus for the huge and sudden influx of new residents. This included procuring beds, linens, furniture, air conditioners, and extra support services, such as medical, food, transportation and custodial services. Within eight days of Katrina making landfall, the last busload of Gulfport residents arrived safely at the Washington, DC campus.

> While working on the phones for FEMA, Dionne Lewis, a four-year IRS employee for Atlanta Accounts Management, received a call from a distressed person in Texas who was living in the Houston Astrodome. This person had been displaced by Hurricane Katrina and was in desperate need of help. Thrilled to have reached someone with such compassion, the person wanted to know if Ms. Lewis could also help the next person in line there at the Astrodome. She agreed, but little did she know that the call would last throughout her entire shift as one person after another came to the phone to find what help the IRS could offer. There was little time for breaks. Ms. Lewis did not let the magnitude of the calls or the prospect of being on the phone for nearly eight hours keep her from being professional, assuring that each person was informed of their Privacy Act rights, and then affording them an opportunity to tell their story and receive what assistance the IRS could offer. These and other all day long marathon calls occurred quite frequently and became known as the Delta calls. IRS employees answered well over 760,000 registration calls for FEMA and more than 30,000 calls on the special IRS toll-free line for affected taxpayers.

> Internal Revenue Service, Portland call site assistor Jon Fredericks, received a call from an eighty-one year-old woman outside of a New Orleans home needing urgent help. She was sitting in the sweltering heat, without power, waiting for someone to evacuate her. She had tried to call several help lines, but had not reached anyone so far except the IRS. Mr. Fredericks told her to stay on the line and with the help of coworker Jim McMahan, contacted city emergency services and alerted them to her situation and location. Within a short time, the rescue team arrived at her home.

### *The Department of Veterans Affairs*

The Department of Veterans Affairs (VA) took a hard look at their resources, missions, assets and personnel, and redirected them to fill the needs of the victims of the hurricane and flood, while maintaining service to America's veterans. The VA not only provided medical services, hospital beds, and medications in accordance with its standing emergency health care mission,[68] it also removed VA properties for sale from the market in eleven states to use them instead to fill housing needs for those displaced,[69] and worked with veterans to replace their benefit checks.[70] The VA cared for many victims of the hurricane and flood, while also continuing to care for the soldiers who have borne the battle, and for their families.

> Jack Myers, Maintenance and Repair Foreman, Wayne Brown, Air Conditioning Shop Foreman, and James Ware, Plumbing Shop Foreman, had taken shelter from Hurricane Katrina in a building on the north side of the Gulfport Veterans Affairs campus leaving their vehicles and their office on the more dangerous south side. That afternoon, the three men went to check on their vehicles. They found a five-year-old boy alone under a four-foot tall pile of debris that minutes before had been part of an apartment complex. The men took him back to their shelter. There, they dried him off, fed him and clothed him with an oversized uniform crudely tailored to fit his small frame. Fortunately, he suffered only minor cuts and scratches. "He's a very smart boy," said Brown. "He knew his name and his school and his teacher's name. He told us his momma had given him a Pop Tart and told him to go upstairs." The boy just continued to clutch that wet Pop Tart, remembered Brown, and was eventually reunited with his mother and brother.

> By Friday, Sept. 2, all patients, employees, and family members had been safely evacuated from the VA in New Orleans using boats, military trucks, and military transport planes. Nine veterans, however, remained in the hospital morgue. Lynn Ryan, chief financial officer with the South Central VA Health Care Network, was determined to make sure everyone was evacuated. He searched and found a local company that had a refrigerated tractor-trailer and a willing driver. The following day, the truck driver, Ryan, co-worker Ceagus Reed, a human resources coordinator, and VA Police Officers Charlie Donelson and Reginald Finch, both with the G.V. (Sonny) Montgomery VA Medical Center in Jackson, Mississippi, made it through all the roadblocks and to the outskirts of downtown New Orleans. Four feet high floodwaters and the approaching evening hours forced them to take shelter for the night, sleeping in their vehicles at a toll plaza where law enforcement officers had set up a temporary station. On Sunday, two additional colleagues arrived to help—Steve Jones, an engineer, and Steve Morris, occupational safety and health manager. The team made it to downtown New Orleans but the refrigerated tractor-trailer couldn't make it through the flooded streets to the hospital's loading dock. Ryan flagged down a five-ton military transport truck that helped ferry the bodies from the hospital to the refrigerated trailer. At the loading dock, Ryan, Reed, Morris, and Jones donned biohazard gear and climbed the three flights of stairs to the hospital morgue. One at a time, they carried the bodies out. They returned to Jackson and notified the next of kin and made burial arrangements, including some at the VA's national cemetery in Natchez.

> Phil Boogaerts, chief engineer at the New Orleans VA Medical Center, single-handedly kept the hospital supplied with necessary power and utilities to ensure adequate care for patents, employees and their families for four days prior to their evacuation. As a direct result of his actions, VA staff was able to provide adequate care to patients and successfully evacuate all patients, families, and employees, including nine ventilator-dependent patients. In addition, Mr. Boogaerts videotaped the facility before, during, and after the storm providing valuable documentation that assisted with the assessment of damages to the physical plant as a result of the storm. Finally, Boogaerts voluntarily remained at the hospital after it was evacuated to continue maintenance of the facility. For several days, Boogaerts lived at the hospital in isolation, without air conditioning, running water, or prepared meals.

> After evacuating the VA Medical Center, employees donated all of their food, 300 cases of water, all their medical supplies, and needed medication to Charity Hospital, a neighboring hospital that was still operating and had yet to completely evacuate. Employees delivered the provisions by boat, making their way through the murky waters of flooded downtown New Orleans. Among the medicines Charity needed and donated by the VA, were medicines for ant bites and snake bites.

### Environmental Protection Agency

The Environmental Protection Agency (EPA) worked with their partners in the Louisiana Department of Environmental Quality and other local officials to help remove hazardous household and other materials. They created a "curbside pickup" program to collect the materials from the houses, instead of making already overwhelmed victims deliver hazardous materials to another location.[71] They also identified the potential hazards returning victims would face, and distributed information to people in affected areas regarding a range of hazards, from asbestos to septic systems.[72] They collected and removed many hazardous materials, including electronics, batteries, computer hardware, paint, solvents, lawn and garden products. They enabled people to reestablish clean and safe environments in their houses and for their families. Without EPA assistance, this would not have occurred. Additionally, the EPA also waived national sulfur emissions standards for diesel fuel for a short period so that fuel produced for non-road uses could be legally used in highway vehicles.[73]

> The success of the Incident Command System (ICS) was clearly demonstrated in Hancock County, considered to be the most devastated area within Mississippi. Carter Williamson led a team during the early stages of EPA's response effort to protect the citizens of Hancock County from releases of hazardous materials. Under adverse conditions, working sixteen-hour days every day, Mr. Williamson motivated the team members who were living under severe conditions, where basic support services such as electricity, shelter, running water, and telephones were, if available, very limited. In a demonstration of leadership, Carter remained in a variety of primitive shelters throughout the entire hurricane response, embedded with the team in the impacted community. His efforts resulted in the team's ability to provide more effective service and helped his team to empathize with the plight of the community. Whereas most other EPA employees rotated in and out of the work area on a two week basis, Mr. Williamson chose to remain in the community, despite having a wife and children back home, because he believed the consistency of leadership would be beneficial to the response effort. Although the magnitude of the task was overwhelming and the working conditions were poor, the quality of the response effort lead by Mr. Williamson was outstanding.

> With Hurricane Katrina approaching, Nancy Jones was preparing to implement a Hurricane Debris Management Plan, like the one she had drafted for the US Army Corps of Engineers (USACE) while participating in the "Hurricane Pam" planning workshops. Because of this experience, the USACE specifically requested that Ms. Jones be deployed to assist the USACE in handling the debris collection and segregation of the hazardous materials resulting from Hurricane Katrina. She was instrumental in setting up the collection and debris management plan in many of the eastern Parishes including the City of New Orleans. Her coordination with the USACE made the response to the hurricane more efficient and effective. The Parish Officials and the City of New Orleans have developed trust and respect for the EPA because of her efforts. Ms. Veronica White with the City of New Orleans sums up Nancy's efforts well. "She is excellent and thorough. She has answered every question we (the City of New Orleans) have had. If she didn't know the answer right off, she got back to us with a response very quickly." Ms. White asked that the EPA keep Ms. Jones on the project through completion. She stated that they did not want to lose her.

### Federal Energy Regulatory Commission

In another effort to get needed resources in the region freed up for use by the victims and responders there, as well by citizens throughout the Nation, the Federal Energy Regulatory Commission took immediate steps to reconstruct the natural gas infrastructure of the region, and reduce the disruption in the natural gas supply. [74] Because the Commission approved temporary waivers and expanded eligibility standards they were able to help natural gas companies restore service and deliver additional gas to the market.

### Federal Communications Commission

The Commission acted quickly to facilitate the resumption of communications services in the affected areas and to authorize the use of temporary communications services for use by emergency personnel and evacuees in shelters. First, the Commission operated twenty-four hours a day every day of the week to assist industry efforts to restore

communications.  The Commission streamlined procedures to approve requests for special temporary authority (STA), which would in turn expedite industry recovery efforts.  The Commission quickly granted more than ninety STA requests and 100 temporary frequency authorizations that telecommunications companies and broadcasters needed to get service restored.  The Commission also contacted each segment of the communications industry to help match their needs with resources (such as such as emergency generators and fuel) around the nation.  Additionally, the Commission used its High Frequency Direction Finding Capability Center to remotely assess the damage done to radio stations in the areas struck by Hurricane Katrina and to monitor the progress of restoration activity.  Further, the Commission assisted telecommunication carriers by helping their repair crews to secure the transportation and credentials recognized by local authorities to gain access to damaged sites.

***Office of Management and Budget***

Recognizing that recipients of federal grants in those areas affected by Hurricane Katrina and its ensuing flood either would have to stop grant-related activities or be unable to perform as well as usual, the Office of Management and Budget (OMB) worked with the Federal agencies and the Office of Science and Technology Policy (OSTP) to assist these grantees in resuming operations.  OMB directed federal agencies and OSTP to: (1) provide greater flexibility with grant application deadlines, (2) approve no-cost extensions on expiring awards for up to 12 months, (3) accept short written requests for project continuation, (4) allow grantees to continue to charge salaries and benefits to current grants, as well as costs to resume project activities, (5) waive some requirements for prior federal approval for re-budgeting and automatic carryover of unspent funds, (6) extend deadlines for reports, (7) continue already approved indirect cost rates for up to a year, (8) delay submitting financial and other reports to close out projects, and (9) help grantees reconstruct their records by allowing them to substitute copies for original records and providing copies of what had already been submitted.[75]  OMB relieved short-term administrative and financial management requirements without compromising accountability.

## APPENDIX C – LIST OF ACRONYMS

| | |
|---|---|
| **AAR** | After Action Review |
| **ABA** | American Bus Association |
| **AHRQ** | Agency for Healthcare Research and Quality |
| **APHIS** | Animal and Plant Health Inspection Service |
| **ARC** | American Red Cross |
| **ARS** | Agricultural Research Service |
| **ASD (HD)** | Assistant Secretary of Defense, Homeland Defense |
| **ATF** | Bureau of Alcohol, Tobacco, Firearms and Explosives |
| **ATF SRT** | Bureau of Alcohol, Tobacco, Firearms and Explosives Special Response Team |
| **AUSA** | Assistant United States Attorney |
| **BENS** | Business Executives for National Security |
| **BIA** | Bureau of Indian Affairs |
| **BLM** | Bureau of Land Management |
| **BRT** | Business Round Table |
| **C3I** | Command, Control, Communications, Information |
| **CDC** | Centers for Disease Control and Prevention |
| **CERT** | Community Emergency Response Team |
| **CIS** | Catastrophic Incident Supplement |
| **CLO** | Chief Logistics Officer |
| **CNGB** | Chief of the National Guard Bureau |
| **CONOPS** | Concept of Operations |
| **COOP** | Continuity of Operations |
| **CRWG** | Hurricane Katrina Comprehensive Review Working Group |
| **CSG** | Counterterrorism Security Group |
| **CST** | Civil Support Team |
| **BEA** | Bureau of Economic Analysis |
| **DART** | Disaster Assistance Response Team |
| **DHS** | Department of Homeland Security |
| **DMAT** | Disaster Medical Assistance Team |
| **DMORT** | Disaster Mortuary Operational Response Team |
| **DoD** | Department of Defense |
| **DOE** | Department of Energy |
| **DOEd** | Department of Education |
| **DOI** | Department of the Interior |
| **DOJ** | Department of Justice |
| **DOL** | Department of Labor |
| **DOL/OSHA** | Department of Labor Occupational Safety and Health Administration |
| **DOS** | Department of State |
| **DOT** | Department of Transportation |
| **DPMU** | Disaster Portable Morgue Unit |
| **DRC** | Disaster Recovery Center |

| | |
|---|---|
| **DRG** | Disaster Response Group |
| **DUSM** | Deputy United States Marshal |
| **EAS** | Emergency Alert System |
| **EBS** | Emergency Broadcast System |
| **EHR** | Electronic Health Records |
| **EOC** | Emergency Operations Center |
| **EPA** | Environmental Protection Agency |
| **EMAC** | Emergency Management Assistance Compact |
| **EMS** | Emergency Medical Services |
| **ERT** | Emergency Response Team |
| **ERT-A** | Emergency Response Team-Advanced |
| **ERT-N** | Emergency Response Team-National |
| **ESF** | Emergency Support Function |
| **FAA** | Federal Aviation Administration |
| **FBI** | Federal Bureau of Investigation |
| **FEMA** | Federal Emergency Management Agency |
| **FCO** | Federal Coordinating Officer |
| **FNS** | Food and Nutrition Service |
| **FPS** | Federal Protection Service |
| **FRP** | Federal Response Plan |
| **FSA** | Farm Service Agency |
| **HHS** | Department of Health and Human Services |
| **HHS SERT** | Health and Human Services Secretary's Emergency Response Teams |
| **HLT** | Hurricane Liaison Team |
| **HSC** | Homeland Security Council |
| **HSOC** | Homeland Security Operations Center |
| **HSPD** | Homeland Security Presidential Directive |
| **HUD** | Department of Housing and Urban Development |
| **ICE** | Immigration and Customs Enforcement |
| **ICS** | Incident Command System |
| **IIMG** | Interagency Incident Management Group |
| **IMT** | Incident Management Team |
| **INS** | Incident of National Significance |
| **IRA** | Immediate Response Authority |
| **IRS** | Internal Revenue Services |
| **JFHQ-State** | Joint Force Headquarters-State |
| **JFO** | Joint Field Office |
| **JIC** | Joint Information Center |
| **JTF-Katrina** | Joint Task Force-Katrina |
| **JTF-State** | Joint Task Force-State |
| **LECC** | Law Enforcement Coordination Center |
| **LSU** | Louisiana State University |
| **LTG** | Lieutenant General |
| **MERS** | Mobile Emergency Response System |
| **MOB center** | Mobilization center |
| **MRC** | Medical Reserve Corps |
| **MRE** | Meals-Ready-To-Eat |
| **NASAR** | National Association of Search and Rescue |
| **NCC** | National Coordinating Center |
| **NCS** | National Communications System |
| **NDMS** | National Disaster Medical System |
| **NEEP** | National Exercise and Evaluation Program |
| **NEMA** | National Emergency Management Association |
| **NEP** | National Exercise Program |
| **NGA** | National Geospatial Intelligence Agency |

| | |
|---|---|
| **NGB** | National Guard Bureau |
| **NGO** | Non-Governmental Organization |
| **NHC** | National Hurricane Center |
| **NHSU** | National Homeland Security University |
| **NICCL** | National Incident Communications Conference Line |
| **NIFC** | National Interagency Fire Center |
| **NIH** | National Institutes of Health |
| **NIMS** | National Incident Management System |
| **NIPP** | National Infrastructure Protection Plan |
| **NISAC** | National Infrastructure Simulation & Analysis Center |
| **NOAA** | National Oceanic and Atmospheric Administration |
| **NOC** | National Operations Center |
| **NOFD** | New Orleans Fire Department |
| **NOPD** | New Orleans Police Department |
| **NPG** | National Preparedness Goal |
| **NPS** | National Park Service |
| **NRCC** | National Response Coordination Center |
| **NRP** | National Response Plan |
| **NRP-CIS** | National Response Plan Catastrophic Incident Supplement |
| **NSA** | National Security Agency |
| **NSC** | National Security Council |
| **NS/EP** | National Security and Emergency Preparedness |
| **NTIA** | National Telecommunications and Information Administration |
| **NVOAD** | National Volunteer Organizations Active in Disaster |
| **NWR** | NOAA Weather Radio |
| **NWS** | National Weather Services |
| **OFDA** | Office of Foreign Disaster Assistance |
| **OMB** | Office of Management and Budget |
| **OSD-HD** | Office of the Secretary of Defense for Homeland Defense |
| **OSM** | Office of Surface Mining |
| **OSTP** | Office of Science and Technology Policy |
| **PAO** | Public Affairs Office |
| **PAO** | Public Affairs Official |
| **PFO** | Principal Federal Officer |
| **PHS** | Public Health Service |
| **RAMP** | Remedial Action Management Program |
| **RRCC** | Regional Response Coordination Center |
| **RSOI** | Reception, Staging, Onward movement, and Integration |
| **SAR** | Search and Rescue |
| **SCRAG** | Senior Civilian Representative of the Attorney General |
| **SES** | Senior Executive Service |
| **SFLEO** | Senior Federal Law Enforcement Official |
| **SIMCEN** | National Exercise Simulation Center |
| **SLO** | State Liaison Officer |
| **SNS** | Strategic National Stockpile |
| **SOE** | Senior Official Exercise |
| **SOP** | Standard Operational Procedures |
| **SSA** | Social Security Administration |
| **STA** | Special Temporary Authority |
| **SWAT** | Special Weapons and Training |
| **TAG** | Adjutant General |
| **TCC** | Traffic Control Center |
| **TCL** | Target Capabilities List |
| **TELL** | Office of Training, Exercises, and Lessons Learned |
| **TPC** | Tropical Prediction Center |

APPENDIX C – LIST OF ACRONYMS

| | |
|---|---|
| **TSA** | Transportation Security Administration |
| **USACE** | United States Army Corps of Engineers |
| **USAID** | United States Agency for International Development |
| **USCG** | United States Coast Guard |
| **USDA** | United States Department of Agriculture |
| **USFS** | United States Forest Service |
| **USJFCOM** | United States Joint Forces Command |
| **USMS** | Unites States Marshals Service |
| **USNORTHCOM** | United States Northern Command |
| **USPACOM** | United States Pacific Command |
| **USSOUTHCOM** | United States Southern Command |
| **USSTRATCOM** | United States Strategic Command |
| **USTRANSCOM** | United States Transportation Command |
| **US&R** | Urban Search and Rescue |
| **VOAD** | Volunteer Organizations Active in a Disaster |
| **VA** | Department of Veteran Affairs |
| **VADM** | Vice Admiral |

## APPENDIX D – STAFF PAGE

**Hurricane Katrina Lessons Learned Staff**

Special thanks go to the dedicated team of tireless professionals—working with colleagues across the country at all levels of government—who have contributed to this Report.  For the past four months, they have reviewed the Federal government's role and performance in preparing for, responding to, and recovering from Hurricane Katrina.

White House Staff
Frances Fragos Townsend, Assistant to the President for Homeland Security
 and Counterterrorism
Kenneth P. Rapuano, Deputy Assistant to the President for Homeland Security
Joel B. Bagnal, Special Assistant to the President for Homeland Security
Michele L. Malvesti, Senior Director, National Security Council
Kirstjen M. Nielsen, Special Assistant to the President for Homeland Security
Thomas P. Bossert, Policy Director, Homeland Security Council
Daniel J. Kaniewski, Policy Director, Homeland Security Council
Marie O'Neill Sciarrone, Policy Director, Homeland Security Council
Joshua C. Dozor, Policy Director, Homeland Security Council
Michael J. Taylor, Executive Assistant, Homeland Security Council

Katrina Lessons Learned Review Group
Stuart G. Baker, Department of Homeland Security
Richard W. Brancato, Department of Transportation
Donovan E. Bryan, Department of Defense
Christopher Combs, Federal Bureau of Investigation
Theodore M. Cooperstein, Department of Justice
William T. Dolan, Colonel, United States Army
Michael O. Forgy, Department of Homeland Security
Douglas J. Morrison, Colonel, United States Army
Richard L. Mourey, Commander, United States Coast Guard
David C. Rutstein, Captain, United States Public Health Service

## APPENDIX E – ENDNOTES

### FOREWORD

[1] President George W. Bush, Jackson Square, New Orleans, September 15, 2005.

[2] President George W. Bush, Jackson Square, New Orleans, September 15, 2005.

[3] The White House, *Homeland Security Presidential Directive-5: Management of Domestic Incidents* (Washington, D.C., February 28, 2003); see also, U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), Preface.

### CHAPTER ONE: KATRINA IN PERSPECTIVE

[1] The White House, "Proclamation by the President: National Day of Prayer and Remembrance for the Victims of Hurricane Katrina," news release, September 8, 2005, http://www.whitehouse.gov/news/releases/2005/09/print/20050908-12.html.

[2] As measured by damage to property. Measuring destructiveness in terms of damage to property rather than loss of life is a useful way to compare disasters. Loss of life reflects both the magnitude of the disaster, as well as the quality of the response, while property destruction correlates more directly to the magnitude of the disaster alone.

[3] In 1871, Chicago was the fifth largest city in the United States, with a population of almost 300,000. The fire killed 300 people, made one-third of the city homeless, and destroyed a third of the city's property. For Chicago Fire deaths and population displacement, see Lawrence J. Vale and Thomas J. Campanella, eds., *The Resilient City: How Modern Cities Recover from Disaster* ["*Resilient City*"] (New York: Oxford University Press, 2005), 28; U.S. Census Bureau, "Table 10. Population of the 100 Largest Urban Places: 1870," June 15, 1998, http://www.census.gov/population/ documentation/twps0027/tab10.txt. For all other Chicago Fire statistics, see Chicago Historical Society, "The Great Chicago Fire," http://www.chicagohs.org/fire/intro/gcf-index.html; *The Chicago Fire and the Fire Insurance Companies* (New York: J.H. and C.M. Goodsell, 1871); and *Insurance Year Book* (1874). (Note that statistics for disasters can vary significantly depending on the source consulted, both due to variances in how terms are defined and the lack of consistent historical records.)
  For statistics on the San Francisco Earthquake/Fire and Hurricane Andrew, see Figure 1.1 and accompanying notes.

[4] Rebecca Watson, Assistant Secretary for Land and Minerals Management, U.S. Department of the Interior, written statement for a hearing on Global Oil Demand/Gasoline Prices, on September 6, 2005, submitted to the Senate Committee on Energy and Natural Resources, 109th Congress, 1st session.

[5] U.S. Department of Energy, Office of Electricity Delivery and Energy Reliability, "Hurricane Katrina Situation Report #6," August 28, 2005.

[6] Evidence suggests that Hurricane Katrina reached Category 3 intensity as it made second landfall, but that only winds to the east of the eye sustained Category 3 speeds. New Orleans probably experienced Category 2 wind speeds at most. See Richard D. Knabb, Jamie R. Rhome, and Daniel P. Brown, *Tropical Cyclone Report: Hurricane Katrina, August 23-30, 2005* ["*Katrina Tropical Cyclone Report*"], prepared for the National Hurricane Center (Miami, Florida, December 20, 2005), 8. Under the Saffir-Simpson scale, Category 3 hurricanes are characterized by winds of 111—130 miles per hour. For an explanation of the Saffir-Simpson scale, see U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, "The Saffir-Simpson

Hurricane Scale," ["*NHC Saffir-Simpson Scale*"] http://www.nhc.noaa.gov/aboutsshs.shtml.  During the same period (1851—2005), eighteen Category 4 and three Category 5 hurricanes hit the United States.  For hurricane statistics through 2004, see Eric S. Blake et al., *The Deadliest, Costliest, and Most Intense United States Tropical Cyclones from 1851 to 2004 (And Other Frequently Requested Hurricane Facts)* ["*United States Tropical Cyclones*"], NOAA Technical Memorandum NWS TPC-4 (Miami, Florida, August 2005), 12,
http://www.nhc.noaa.gov/Deadliest_Costliest.shtml.  For 2005 hurricane data, see U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, "2005 Atlantic Hurricane Season Tropical Cyclone Reports," http://www.nhc.noaa.gov/2005atlan.shtml; U.S. Department of Commerce, National Climatic Data Center and National Oceanic and Atmospheric Administration Satellite Information Service, "Climate of 2005 Atlantic Hurricane Season," http://www.ncdc.noaa.gov/oa/climate/research/2005/hurricanes05.html.

[7] Hurricane Camille is a useful point of comparison—until the 2005 hurricane season, it was the second most intense hurricane of record ever to strike the United States.  U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, "Hurricane History—Hurricane Camille, 1969," ["*Hurricane History—Hurricane Camille*"], http://www.nhc.noaa.gov/HAW2/english/history.shtml#camille.  Under the Saffir-Simpson scale, Category 5 hurricanes are characterized by winds greater than 155 miles per hour.  See *NHC Saffir-Simpson Scale*.

[8] Axel Graumann et al., *Hurricane Katrina: A Climatological Perspective: Preliminary Report* ["*Climatological Perspective*"], Technical Report 2005-01, prepared for the National Climatic Data Center, (Asheville, NC, January 2006), 21, http://www.ncdc.noaa.gov/oa/reports/tech-report-200501z.pdf.  For Hurricane Camille's strength on landfall, see *Hurricane History—Hurricane Camille.*

[9] *Climatological Perspective*, 21.  Hurricane force winds are defined as those 64 knots (74 miles per hour) or above lasting for one minute at ten meters above ground with unobstructed exposure.  For Hurricane Katrina, the radius was 103.5 miles in the northeast and southeast quadrants, and 69 miles in the northwest and southwest quadrants.  Northern moving systems like Katrina typically have stronger winds to the east, as the storm's clockwise rotation results in greater centrifugal force, and therefore force, in that direction.  *Katrina Tropical Cyclone Report*, 3.

[10] *Katrina Tropical Cyclone Report*, 9.  The report states: "Even though Hurricane Camille (1969) was more intense than Katrina at landfall while following a similar track, Camille was far more compact and produced comparably high storm surge values along a much narrower swath."  See U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, "Preliminary Report on Hurricane Camille: August 14-22, 1969," ftp://ftp.nhc.noaa.gov/pub/storm_archives/atlantic/prelimat/atl1969/camille/prelim06.gif.  See U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Weather Service, "Preliminary Storm Report: Hurricane Katrina," September 6, 2005, http://www.srh.noaa.gov/tlh/tropical/PSHTAE_Katrina.txt.

[11] Estimates on the total affected area vary according to the criteria selected.  The estimate of 93,000 square miles was derived by adding the areas of the 138 parishes and counties first declared Major Disaster areas and made eligible for Individual Assistance or Public Assistance, Categories C – G (31 in Louisiana, 74 in Mississippi, 22 in Alabama, and 11 in Florida).  The exact sum is 92,930 square miles.  See also U.S. Department of Homeland Security, "United States Government Response to the Aftermath of Hurricane Katrina," news release, September 1, 2005, http://www.dhs.gov/dhspublic/display?content=4777.

[12] *Katrina Tropical Cyclone Report*, 8-9.

[13] *Katrina Tropical Cyclone Report*, 8-9.

[14] Louisiana Department of Transportation and Development, "DOTD's 'Louisiana Team' to Collect Data on Levee Failures," news release, October 10, 2005, http://www.dotd.louisiana.gov/press/pressrelease .asp?nRelease=545.  See also Dr. Ivor van Heerden, written statement for a hearing on Hurricane Katrina: Performance of the Flood Control System, on November 2, 2005, submitted to the Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 1st session.

[15] See *Katrina Tropical Cyclone Report*, 9.

[16] U.S. Census Bureau, "Annual Estimates of the Population for Incorporated Places over 100,000, Ranked by July 1, 2004 Population: April 1, 2000 to July 1, 2004," *Cities & Towns: Places over 1,000: 2000 to 2004*, http://www.census.gov/popest/cities/SUB-EST2004.html.  The estimate of the population of New Orleans on July 1, 2004 was 462,269.

[17] The Galveston Hurricane was a tremendous human tragedy.  At least 8,000 people lost their lives in this storm.  See *United States Tropical Cyclones*, 12, http://www.nhc.noaa.gov/Deadliest_Costliest.shtml (estimating 8,000—12,000 deaths); U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, "Hurricane History—Galveston Hurricane, 1900,"

http://www.nhc.noaa.gov/HAW2/english/history.shtml#galveston (estimating 6,000—12,000 deaths); Erik Larson, *Isaac's Storm: A Man, a Time, and the Deadliest Hurricane in History* (New York: Random House, 1999), 264-265 (estimating 6,000—10,000 deaths); and Galveston Historical Foundation, "Galveston History," http://www.galvestonhistory.org/history.htm (estimating over 6,000 deaths and stating that Galveston was the fourth largest city in Texas at the time).

   [18] Haley Barbour, Governor of Mississippi, testimony before a hearing on Hurricane Katrina: Recovering from Hurricane Katrina, on September 7, 2005, House Committee on Energy and Commerce, 109th Congress, 1st session; Haley Barbour as quoted on the Public Broadcasting Service, "Storm-Ravaged Mississippi," *NewsHour with Jim Lehrer*, September 7, 2005, http://www.pbs.org/newshour/bb/weather/july-dec05/miss_9-7.html.

   [19] See Dr. Robert C. Sheets, former Director of the National Hurricane Center, testimony before a hearing on Rebuilding FEMA: Preparing for the Next Disaster, on May 18, 1993, Senate Committee on Governmental Affairs, 103rd Congress, 1st session.

   [20] Unless otherwise specified, all damage estimates in this chapter are in third-quarter 2005 dollars.

   [21] Figure 1.1 includes both the most deadly and the most destructive natural disaster from each decade in the period 1900 to 2005. Often, these are the same disaster. The four major Atlantic hurricanes of 2004, while neither the most deadly nor most destructive of the decade, are also included to provide context on recent hurricane activity. They are grouped because they struck overlapping areas, in rapid succession, and together constituted the most damaging U.S. hurricane season on record until Hurricane Katrina struck in August 2005. The disasters included in the chart are discrete, violent natural disasters in the United States. They do not include terrorist events, technological failures (e.g., dams breaking or ferries sinking), or protracted, non-destructive natural events such as deadly heat waves or epidemics, which are difficult to compare to discrete, violent events. Where multiple death estimates are available, the highest credible estimate is shown, capturing deaths caused both directly and indirectly by the event. Where multiple damage estimates are available, the lowest credible estimate is shown, excluding local post-disaster inflation effects and effects on the national economy.

   The chart does not reflect the enormous loss of life due to the pandemic influenza—sometimes known as the "Spanish Flu"—outbreak of 1918—1919, which claimed the lives of approximately 500,000 Americans and over 20 million people worldwide. U.S. Department of Health and Human Services, National Vaccine Program Office, "Pandemics and Pandemic Scares in the 20th Century," last revised February 12, 2004, http://www.hhs.gov/nvpo/pandemics/flu3.htm. See generally Alfred W. Crosby, *America's Forgotten Pandemic: The Influenza of 1918* (New York: Cambridge University Press, 2003).

   Table 1.2, below, contains the data used in Figure 1.1

**Table 1.2  Worst Natural Disasters in the United States, 1900-2005[21]**
**Damage in Third Quarter 2005 dollars**

| Top Disasters | Estimated deaths | Estimated damage |
|---|---|---|
| Galveston Hurricane (1900) | 8,000 | < $1 billion |
| San Francisco Earthquake and Fire (1906) | 5,000 | $6 billion |
| Atlantic-Gulf Hurricane (1919) | 600 | < $1 billion |
| Mississippi Floods (1927) | 246 | $2 billion |
| Hurricane San Felipe and the Okeechobee Flood (1928) | 2,750 | < $1 billion |
| New England Hurricane (1938) | 600 | $4 billion |
| Northeast Hurricane (1944) | 390 | < $1 billion |
| Hurricane Diane (1955) | 184 | $5 billion |
| Hurricane Audrey (1957) | 390 | < $1 billion |
| Hurricane Betsy (1965) | 75 | $7 billion |
| Hurricane Camille (1969) | 335 | $6 billion |
| Hurricane Agnes (1972) | 122 | $8 billion |
| Hurricane Hugo (1989) | 86 | $11 billion |
| Hurricane Andrew (1992) | 61 | $33 billion |
| East Coast Blizzard (1993) | 270 | $4 billion |
| Major 2004 Hurricanes (Charley, Frances, Ivan, Jeanne) | 167 | $46 billion |
| Hurricane Katrina (2005) | 1,330 | $96 billion |

Note that statistics for disasters can vary significantly depending on the source consulted, both due to variances in how terms are defined and the lack of consistent historical records.

For statistics on those hurricanes not listed separately below, see *United States Tropical Cyclones*; U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, "Hurricane History," http://www.nhc.noaa.gov/HAW2/english/history.shtml; U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Weather Service, "Memorial Web Page for the 1928 Okeechobee Hurricane," http://www.srh.noaa.gov/mfl/newpage/Okeechobee.html; Russell L. Pfost, "Reassessing the Impact of Two Historical Florida Hurricanes" (American Meteorological Society, Boston 2003), 1367; and U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, "NHC/TPC Archive of Past Hurricane Seasons," http://www.nhc.noaa.gov/pastall.shtml.

For the Galveston Hurricane, see note 17.

For the 1906 San Francisco Earthquake and Fire, see *Resilient City*, 28 (estimating 5,000 deaths); Harry Chase Brearley, *Fifty Years of a Civilizing Force: An Historical and Critical Study of the Work of the National Board of Fire Underwriters* (New York: Frederick A. Stokes Company, 1916), 98-100 (estimating $6 billion in property damage); U.S. Geological Survey, "Casualties and damage after the 1906 Earthquake," http://quake.wr.usgs.gov/info/1906/casualties.html (estimating more than 3,000 deaths and $7 billion in property damage). See generally Rutherford H. Platt, "The Bay Area: One Disaster After Another," in Rutherford H. Platt, ed., *Disasters and Democracy: The Politics of Extreme Natural Events* (Washington, DC: Island Press, 1999), 245-247; Virtual Museum of the City of San Francisco, "The Great 1906 Earthquake And Fire," http://www.sfmuseum.org/1906/06.html.

For the 1927 Mississippi floods, see Paul S. Trotter et al., "Floods on the Lower Mississippi: An Historical Economic Overview," technical attachment prepared for the National Weather Service, http://www.srh.noaa.gov/topics/attach/html/ssd98-9.htm (estimating 246 deaths and $2 billion in property damage); Miriam Gradie Anderson and Rutherford H. Platt, "St. Charles County, Missouri: Federal Dollars and the 1993 Flood," in Platt, *Disasters and Democracy: The Politics of Extreme Natural Events* (Washington, DC: Island Press, 1999), 215-216 (estimating 245-500 deaths).

For Hurricane Camille, see Ernest Zebrowski and Judith A. Howard, *Category 5: The Story of Camille* ["*The Story of Camille*"] (Ann Arbor, MI: University of Michigan Press, 2005), 266 (reporting 335 deaths); Roger A. Pielke, Jr., Chantal Simonpietri, and Jennifer Oxelson, *Thirty Years After Hurricane Camille: Lessons Learned, Lessons Lost* (Boulder, Colorado, July 1999) (estimating more than 200 deaths); *Hurricane History—Hurricane Camille* (reporting 256 deaths and $6 billion in damage).

For Hurricanes Hugo and Andrew, the East Coast Blizzard, and the major 2004 hurricanes, see U.S. Department of Commerce, National Oceanic and Atmospheric Administration Satellite and Information Service and National Climatic Data Center, "1980-2003 Billion Dollar U.S. Disasters," in *A Climatology of 1980-2003 Extreme Weather and Climate Events*, Technical Report 2003-01 ["*Billion Dollar U.S. Disasters*"] (Asheville, NC, December 2003), http://www.ncdc.noaa.gov/oa/reports/billionz.html; Ed Rappaport, "Preliminary Report: Hurricane Andrew, 16 - 28 August, 1992, prepared for the National Hurricane Center" ["*Preliminary Report: Hurricane Andrew*"](Miami, Florida, December 1993), http://www.nhc.noaa.gov/1992andrew.html; U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, "Hurricane History," http://www.nhc.noaa.gov/HAW2/english/history.shtml.

For Hurricane Katrina deaths, see Louisiana Department of Health and Hospitals, "Reports of Missing and Deceased" ["*Louisiana Missing and Deceased*"], February 17, 2006, http://www.dhh.louisiana.gov/offices/page.asp?ID=192&Detail=5248; *Katrina Tropical Cyclone Report*. For property damage, see U.S. Department of Commerce, Bureau of Economic Analysis, "Damages and Insurance Settlements from the Third-quarter Hurricanes," http://www.bea.gov/bea/faq/national/2005q3hurricanes.pdf (estimates reflect data as of December 21, 2005); U.S. Department of Commerce, Bureau of Economic Analysis, "Estimated Damage and Insurance Settlements Effects from Hurricanes Katrina, Rita, and Wilma on Monthly Personal Income," ["*Estimated Damage and Insurance Settlements Effects from Hurricanes Katrina, Rita, and Wilma*"] http://www.bea.gov/bea/faq/national/oct2005hurricane.pdf (accessed on January 20, 2006).

For GDP deflation, see U.S. Department of Commerce, Bureau of Economic Analysis, "Gross Domestic Product and Corporate Profits: Third Quarter 2005 'final' estimates," news release, December 21, 2005, http://www.bea.gov/newsrelarchive/2005/gdp305f.htm; and Louis D. Johnston and Samuel H. Williamson, "The Annual Real and Nominal GDP for the United States, 1790—Present," *Economic History Services*, October 2005, http://www.eh.net/hmit/gdp.

[22] The three next most costly natural disasters are Hurricane Andrew, which hit south Florida in 1992 ($33 billion), the Midwest Floods of 1993 ($27 billion), and the Northridge Earthquake, which hit southern California in 1994 ($25 billion). By comparison, the direct damages caused by the 9/11 terrorist attacks totaled $18 billion. See Robert Looney, "Economic Costs to the United States Stemming From the 9/11 Attacks," *Strategic Insights* 1, no. 6 (Monterey, CA, August 2002), http://www.ccc.nps.navy.mil/si/aug02/homeland.asp. Damages are in 2005 dollars. For Hurricane Andrew, see note 21, above. For the Midwest Floods, see *Billion Dollar U.S. Disasters.* For the Northridge Earthquake, see U.S. Geological Survey, *USGS Response to an Urban Earthquake – Northridge '94* (n.d., ca. 1996), http://pubs.usgs.gov/of/1996/ofr-96-0263/introduc.htm#impacts.

[23] Numbers do not equal sum due to rounding. Estimate derived from the U.S. Department of Commerce, Bureau of Economic Analysis, "Damages and Insurance Settlements from the Third-quarter Hurricanes," http://www.bea.gov/bea/faq/national/2005q3hurricanes.pdf (estimates reflect data as of December 21, 2005); *Estimated Damage and Insurance Settlements Effects from Hurricanes Katrina, Rita, and Wilma*.

[24] Michael Chertoff, Secretary of the Department of Homeland Security, prepared written statement for a hearing on Hurricane Katrina: The Homeland Security Department's Preparation and Response, on February 15, 2006, submitted to the Senate Homeland Security and Governmental Affairs Committee, 109th Congress, 2nd session. Depending on the definition of "damaged and destroyed homes," this number could be considerably higher or lower than the figure cited.

[25] Damage to homes includes major but not minor damage. Stanley K. Smith and Christopher McCarty, *Demographic Effects of Natural Disasters: A Case Study of Hurricane Andrew* ["*Demographic Effects of Natural Disasters*"], Demography, Vol. 33, No. 2 (May, 1996), 266 (repeating results of American Red Cross survey). Note that the authors of the case study provide a higher estimate of 144,100 houses destroyed or suffering major damage.

[26] American Red Cross, "Hurricane Season 2004," http://www.redcross.org/sponsors/drf/h2004-stewardreport.html.

[27] Damage to homes includes major but not minor damage. For statistics on Hurricane Camille, see *The Story of Camille*, 226 (reporting 335 deaths); Roger A. Pielke, Jr., Chantal Simonpietri, and Jennifer Oxelson, *Thirty Years After Hurricane Camille: Lessons Learned, Lessons Lost* (Boulder, Colorado, July 1999) (estimating more than 200 deaths and 22,008 homes destroyed or damaged); *Hurricane History—Hurricane Camille* (reporting 256 deaths and $6 billion in damage). For statistics on Hurricane Andrew, see *Preliminary Report: Hurricane Andrew* (reporting 61 deaths and $25 billion in damage); *Demographic Effects of Natural Disasters* (reporting 15 deaths and $22 billion in damage). For statistics on Hurricane Ivan, see *Billion Dollar U.S. Disasters*, Technical Report 2003-01 (Asheville, NC, December 2003), http://www.ncdc.noaa.gov/oa/reports/billionz.html (reporting 57 deaths); American Red Cross, "Hurricane Season 2004," http://www.redcross.org/sponsors/drf/h2004-stewardreport.html (reporting 63 deaths). For statistics on Hurricane Katrina, see note 21.

[28] Michael Chertoff, Secretary of the Department of Homeland Security, written statement submitted for a hearing on Hurricane Katrina: The Homeland Security Department's Preparation and Response, on February 15, 2006, to the Senate Homeland Security and Governmental Affairs Committee, 109th Congress, 2nd session.

[29] Michael Chertoff, Secretary of the Department of Homeland Security, written statement for a hearing on "Hurricane Katrina: The Homeland Security Department's Preparation and Response," on February 15, 2006, submitted to the Senate Homeland Security and Governmental Affairs Committee, 109th Congress, 2nd session.

[30] A football field is 120 yards long by 53 yards wide. End-zones are included in this calculation. National Football League, "Beginner's Guide to Football," http://www.nfl.com/fans/rules/basics. Based upon this, the height of debris is calculated by finding the volume of the debris stacked on the football field. This is done by dividing 118,000,000 by the product of 120 and 53: 118,000,000 / 6360 = 18,553 yards. There are 1760 yards in a mile, so the number of miles high is then calculated by dividing 18,553 by 1760: 18,553 / 1760 = 10.5. So the debris, if stacked onto the space of a football field, would reach ten and a half miles high.

[31] The methodology and time period examined by the Bureau of Labor Statistics in developing these statistics for "most affected areas" differ from those used to develop the estimate of areas "impacted" by Hurricane Katrina included in note 11. First, the Bureau of Labor Statistics defines "most affected areas" as the thirty-four parishes in Louisiana and forty-seven counties in Mississippi that FEMA designated for both individual and public disaster assistance. This Report defines areas "impacted" by Hurricane Katrina as those parishes and counties designated for individual assistance and/or public assistance, categories C-G (reimbursement for rebuilding and/or replacing disaster-damaged public facilities such as roads, bridges, and public buildings). Second, the Bureau of Labor Statistics includes all counties designated for assistance as of September 30, 2005, thereby including the areas affected by Hurricane Rita in addition to those affected by Katrina. By contrast, this Report's methodology on this

point only includes those counties and parishes designated for assistance as of August 29, 2005, thereby counting only those counties that were affected by Katrina.  U.S. Department of Labor, Bureau of Labor Statistics, "Labor Market Statistics for Areas Affected by Hurricanes Katrina and Rita: September and October 2005," http://www.bls.gov/katrina/data_after.htm; U.S. Department of Labor, Bureau of Labor Statistics, "Labor Market Statistics Prior to Disaster for Areas Affected by Hurricanes Katrina and Rita," http://www.bls.gov/katrina/data.htm#2.

[32] U.S. Department of Commerce, Bureau of Economic Analysis, "State Personal Income: Third Quarter 2005," news release, December 20, 2005, 4, http://www.bea.gov/bea/newsrelarchive/2005/spi1205.pdf.

[33] Nationwide all grade conventional retail prices increased from $2.28 per gallon on August 1 and $2.62 on August 29, to peak at $3.08 on September 5.  U.S. Department of Energy, Energy Information Administration, "Retail Gasoline Historical Prices, Worksheet for U.S. All Grades Conventional Retail Gas Prices (Cent Per Gallon)," All Grades spreadsheet, http://www.eia.doe.gov/oil_gas/petroleum/data_publications/ wrgp/mogas_history.html.  While gas prices had risen steadily throughout 2005 due to increasing global demand for crude oil, the temporary shutdown of major oil refineries and pipelines in the Gulf region as a direct result of Hurricane Katrina spurred a sharp and sudden drop in domestic supply that further exacerbated this price incline.  See U.S. Department of Energy, Energy Information Administration, "A Primer on Gasoline Prices," http://www.eia.doe.gov/pub/oil_gas/petroleum/analysis_publications/primer_on_gasoline_prices/html/petbro.html (accessed February 6, 2006).

[34] U.S. Department of the Interior, Minerals Management Service, "Hurricane Katrina/Hurricane Rita Evacuation and Production Shut-in Statistics Report," news release, January 11, 2006, http://www.mms.gov/ooc/press/ 2006/press0111.htm.

[35] U.S. Department of Energy, Office of Electricity Delivery and Energy Reliability, "Hurricane Katrina Situation Report #10," August 30, 2005.

[36] Stacy R. Stewart, *Tropical Cyclone Report: Hurricane Ivan, 2-24 September 2004*, prepared for the National Hurricane Center (Miami, Florida, May 2005), http://www.nhc.noaa.gov/2004ivan.shtml.

[37] Kenneth Moran, Director of the Office of Homeland Security, Enforcement Bureau, Federal Communications Commission, testimony before a hearing on Ensuring Operability During Catastrophic Events, House Committee on Homeland Security, Subcommittee on Emergency Preparedness, Science, and Technology, October 26, 2005, 109th Congress, 1st session.

[38] Kenneth Moran, Director of the Office of Homeland Security, Enforcement Bureau, Federal Communications Commission, written statement for a hearing on Hurricane Katrina and Communications Interoperability, on September 29, 2005, submitted to the Senate Committee on Commerce, Science and Transportation, 109th Congress, 1st session.

[39] Kevin J. Martin, Chairman, Federal Communications Commission, written statement provided for a hearing on Public Safety Communications from 9/11 to Katrina: Critical Public Policy Lessons, submitted to Subcommittee on Telecommunications and the Internet, Committee on Energy and Commerce, U.S. House of Representatives September 29, 2005.

[40] Louisiana Hurricane Recovery Resources, "Energy, Oil, and Gas," http://www.laseagrant.org/hurricane/oil.htm (accessed January 11, 2006); U.S. Department of Energy, Office of Electricity Delivery and Energy Reliability, "Gulf Coast Hurricanes Situation Report #31," October 31, 2005.

[41] The ten major to medium spills caused by Katrina accounted for 7,359,990 gallons.  Given that 134 spills of less than 10,000 gallons have not been assessed in detail, the actual oil spill figure for Hurricane Katrina is likely higher than 7.4 million gallons.  Louisiana Hurricane Recovery Resource, "Energy, Oil, and Gas," http://www.laseagrant.org/hurricane/oil.htm (accessed January 11, 2006).  The Exxon Valdez spilled about 10.8 million gallons into the waters off of Alaska.  See Exxon Valdez Oil Spill Trustee Council, "Excerpt from the Official Report on the 1989 Exxon Valdez Oil Spill," http://www.evostc.state.ak.us/History/excerpt.htm (accessed January 11, 2006).

[42] *Gulf Coast Hurricane Emergency Environmental Protection Act of 2005*, H. Res. 4139, 109th Congress, 1st session (October 25, 2005).

[43] As of the time of writing, Louisiana has recovered 1,103 bodies, 23 of which were not storm related, for 1,080 storm related deaths.  See *Louisiana Missing and Deceased*.  There were 231 deaths in Mississippi, fifteen in Florida, two in Alabama, and two in Georgia.  See *Katrina Tropical Cyclone Report*, 10.  Since there are still at least 2,096 people from the Gulf Coast area missing, it is likely that the death toll numbers will increase.

[44]  For the number of dead in other states, see *Katrina Tropical Cyclone Report*, 10.  For the definition of the New Orleans metropolitan area, see The White House, Office of Management and Budget, "Updates of Statistical Area Definitions and Guidance on Their Uses," *OMB Bulletin 06 – 01*, December 5, 2005, 42, http://www.whitehouse.gov/omb/bulletins/fy2006/b06-01.pdf.

[45]  These numbers were extrapolated from data on 754 released bodies of known age, of which 183 were between the ages of sixty-one and seventy-five and 355 were over the age of seventy-five.  Louisiana Department of Health and Hospitals, "Vital Statistics of All Bodies at St. Gabriel Morgue," January 18, 2006, www.dhh.state.la.us/offices/publications/pubs-192/5796.pdf.

[46] Louisiana Department of Health and Hospitals, "Deceased Katrina Victims Released to Families 11-4-2005," news release, November 4, 2005, http://www.dhh.louisiana.gov/news.asp?ID=145&Detail=728&Arch=2005.

[47] As of February 17, 2006, 191 victims were unclaimed.  *Louisiana Missing and Deceased*.

[48] *Louisiana Missing and Deceased*.  In the immediate wake of the hurricane, the Department of Justice requested that the National Center for Missing and Exploited Children (NCMEC) establish a hotline to accept reports of missing children and adults related to both Hurricanes Katrina and Rita.  As of February 13, 2006, 97 percent of the 5,071 missing children cases reported to the NCMEC for Hurricane Katrina had been resolved, with the majority of the unresolved cases in Louisiana.  The NCMEC received 12,514 reports of missing adults, all of which were referred to the National Center for Missing Adults (NCMA).  National Center for Missing and Exploited Children, "Katrina/Rita Missing Persons Hotline: Update on calls/cases," report through February 13, 2006, http://www.missingkids.com/en_US/documents/KatrinaHotlineUpdate.pdf.

[49] Michael Chertoff, Secretary of the Department of Homeland Security, testimony before a hearing on Hurricane Katrina: The Homeland Security Department's Preparation and Response, on February 15, 2006, Senate Homeland Security and Governmental Affairs Committee, 109th Congress, 2nd session.  In the first half of the 1930s, almost one million people left the plains, and after 1935, 2.5 million left.  Not all of this migration, however, was due to the Dust Bowl, as drought and changing economic conditions played a factor as well.  Donald Worster, *Dust Bowl: The Southern Plains in the 1930s* (New York: Oxford University Press, 1979), 49.

[50] By January 13, only 82 individuals still resided in transient shelters in Louisiana, representing those few who were ineligible for housing programs or had refused other housing options.  Scott Wells, Deputy Federal Coordinating Officer for Louisiana, testimony before a hearing on Housing Needs after Hurricanes Katrina and Rita, on January 13, 2006, House Financial Services Committee, Subcommittee on Housing and Community Opportunity, 109th Congress, 2nd session.

[51] U.S. Department of Health and Human Services, "Secretary Leavitt To Gulf Region: Announces Streamlines Access to Benefits for Hurricane Katrina Victims," news release, September 13, 2005.  See also Arizona Department of Health Services, "Hurricane Evacuees Find Lost Records-And More-Through Arizona's Office of Vital Records," news release, September 23, 2005, http://www.azdhs.gov/news/2005all/katrina _vrecords.htm; District of Columbia Office of the Mayor, "Mayor Williams Introduces Legislation to Aid Katrina Victims," September 20, 2005, http://dc.gov/mayor/news/release.asp?id=763&mon=200509.

[52] HHS Secretary Mike Leavitt said that most of those displaced by Katrina did not have access to their medical records.  Sarah A. Lister, *Hurricane Katrina: The Public Health and Medical Response*, Congressional Research Service Report for Congress RL33096 (Washington, DC, September 21, 2005).

[53] Bruce Katz, Matt Fellowes, and Mia Mabanta, *Katrina Index: Tracking Variables of Post-Katrina Reconstruction* (Washington, DC: Brookings Institute, February 2006,), 24, 38, 40, 44.

[54] U.S. Department of Commerce, Economics and Statistics Administration, "Addendum: Revisions/Updates to the Dec. 15 Katrina Economic Impact Report," December 2005.  In total, Katrina, combined with Hurricanes Rita and Wilma, forced about 600,000 into unemployment.  This is measured by the number of jobless claims benefits with the hurricanes listed as the primary reason.

[55] U.S. Department of Labor, Bureau of Labor Statistics, "Labor Market Statistics Prior to Disaster for Areas Affected by Hurricane Katrina," September and October 2005, http://www.bls.gov/katrina/data_archived.htm.

## CHAPTER TWO: NATIONAL PREPAREDNESS — A PRIMER

[1] Homeland Security Presidential Directive 5, Domestic Incident Management, states "[t]he Federal Government recognizes the roles and responsibilities of State and local authorities in domestic incident management.  Initial

responsibility for managing domestic incidents generally falls on State and local authorities. The Federal Government will assist State and local authorities when their resources are overwhelmed, or when Federal interests are involved. The Secretary will coordinate with State and local governments to ensure adequate planning, equipment, training, and exercise activities. The Secretary will also provide assistance to State and local governments to develop all-hazards plans and capabilities, including those of greatest importance to the security of the United States, and will ensure that State, local, and Federal plans are compatible." The White House, *Homeland Security Presidential Directive-5* ["*HSPD-5*"] (Washington, DC, February 2003), § 6.

² "The powers delegated by the proposed Constitution to the federal government, are few and defined. Those which are to remain in the State governments are numerous and indefinite." The Federalist No. 45.

³ U.S. Constitution art. 1, sec. 10; U.S. Constitution art. 4, sec. 2; *United States v. Lopez*, 514 U.S. 549, 552 (1995) ("The Constitution creates a Federal Government of enumerated powers"); *McCulloch v. Maryland*, 17 U.S. 316 (1819); The Federalist No. 45. "It must never be forgotten that the Federal government is one of enumerated powers and that it does not possess a general police power," Ronald D. Rotunda and John E. Novak, *Treatise on Constitutional Law*, 3rd ed. (Minnesota: West Group Publishing, 1999), 346.

⁴ U.S. Constitution, amend. 10.

⁵ U.S. Constitution, art. 1, sec. 8; art. 2, sec. 2.

⁶ U.S. Constitution, art. 4, sec. 4.

⁷ 10 U.S.C. § 331 (2005). The other two sections of the Insurrection Act permit Presidential action independent of State requests. The President may send in Federal military forces or federalize a State's National Guard troops without a request from the Governor in those situations where the President finds it necessary to enforce Federal laws, judicial decisions, or protect Federal rights. 10 U.S.C. §§ 332, 333 (2005).

⁸ See generally, Thomas E. Drabek and Gerard J. Hoetmer ["*Drabek & Hoetmer*"], *Emergency Management: Principles and Practice for Local Government* (Washington, DC: International City Management Association, 1991), 3-29.

⁹ National Academy of Public Administration, *Coping With Catastrophe: Building an Emergency Management System to Meet People's Needs in Natural and Manmade Disasters* ["*NAPA Report*"] (Washington, DC: National Academy of Public Administration, 1993), 10.

¹⁰ *NAPA Report*, 10.

¹¹ See *Drabek & Hoetmer*, 6-7; *NAPA Report*, 10-11.

The Federal Emergency Management Agency—a former independent agency that became part of the new Department of Homeland Security in March 2003—is tasked with responding to, planning for, recovering from and mitigating against disasters. FEMA can trace its beginnings to the Congressional Act of 1803, generally considered the first piece of disaster legislation. In the century that followed, *ad hoc* legislation was passed more than 100 times in response to hurricanes, earthquakes, floods and other natural disasters.

By the 1930s, when the Federal approach to problems became popular, the Reconstruction Finance Corporation was given authority to make disaster loans for repair and reconstruction of certain public facilities following an earthquake, and later, other types of disasters. In 1934, the Bureau of Public Roads was given authority to provide funding for highways and bridges damaged by natural disasters. The Flood Control Act, which gave the U.S. Army Corps of Engineers greater authority to implement flood control projects, was also passed. This piecemeal approach to disaster assistance was problematic and it prompted legislation that required greater cooperation between Federal agencies and authorized the President to coordinate these activities.

The 1960s and early 1970s brought massive disasters requiring major Federal response and recovery operations by the Federal Disaster Assistance Administration, established within the Department of Housing and Urban Development (HUD). Hurricane Carla struck in 1962, Hurricane Betsy in 1965, Hurricane Camille in 1969 and Hurricane Agnes in 1972. The Alaskan Earthquake hit in 1964 and the San Fernando Earthquake rocked Southern California in 1971. These events served to focus attention on the issue of natural disasters and brought about increased legislation. In 1968, the National Flood Insurance Act offered new flood protection to homeowners, and in 1974 the Disaster Relief Act firmly established the process of Presidential disaster declarations.

However, emergency and disaster activities were still fragmented. When hazards associated with nuclear power plants and the transportation of hazardous substances were added to natural disasters, more than 100 Federal agencies were involved in some aspect of disasters, hazards and emergencies. Many parallel programs and policies existed at the State and local level, compounding the complexity of Federal disaster relief efforts. The National Governor's Association sought to decrease the many agencies with whom State and local governments were forced to work. They asked President Jimmy Carter to centralize Federal emergency functions.

President Carter's 1979 executive order merged many of the separate disaster-related responsibilities into a new Federal Emergency Management Agency (FEMA).  Among other agencies, FEMA absorbed: the Federal Insurance Administration, the National Fire Prevention and Control Administration, the National Weather Service Community Preparedness Program, the Federal Preparedness Agency of the General Services Administration and the Federal Disaster Assistance Administration activities from HUD.  Civil defense responsibilities were also transferred to the new agency from the Defense Department's Defense Civil Preparedness Agency.  See U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA History," http://www.fema.gov/about/history.

[12] The Red Cross had originally been chartered in 1900, but its re-chartering in 1905 significantly expanded its role in responding to disasters.  See Brien R. Williams, "The Federal Charter of the American Red Cross," American Red Cross Museum, April 2005, http://www.redcross.org/museum/history/charter.asp; and American Red Cross, "A Brief History of the American Red Cross 2001," http://www.redcross.org/museum/briefarc.html.  In response to the San Francisco earthquake and fire of 1906, President Theodore Roosevelt announced that all Federal aid was to be channeled through the American Red Cross.  Federal troops were sent to the city in order to provide security and the Federal government established tent camps where those affected by the disaster were provided with shelter and food.  *NAPA Report*, 10.

[13] *NAPA Report*, 11.

[14] *NAPA Report*, 11; *Federal Civil Defense Act of 1950*, as amended, Public Law 920, 81st Congress, 2nd session (January 12, 1951).

[15] The order stated, "Federal disaster relief provided under the [Federal Civil Defense Act of 1950] shall be deemed to be supplementary to relief afforded by state, local, or private agencies and not in substitution therefor. . ." Executive Order no. 10427, 18 Fed. Reg. 407 (1953).

[16] *NAPA Report*, 11 (citing Message from the President of the United States transmitting a report on "New Approaches to Federal Disaster Preparedness and Assistance," May 14, 1973).

[17] *The Robert T. Stafford Disaster Relief and Emergency Assistance Act*, Pub. L. No. 100-707, § 5170, 102 Stat. 4689 (1988) (amended 2000) ["*Stafford Act*"].

[18] *Stafford Act*, 42 U.S.C. § 5170 and § 5191 (2005) require the Governor's request as a condition for Presidential declaration of a major disaster.  Robert Theodore Stafford served in Congress as a Representative and a Senator from Vermont.  Prior to his Congressional career, Stafford served in the United States Navy during both World War II and during the Korean conflict.  He was the Governor of Vermont from 1959-1961.  While in the Senate, he led the passage of the Stafford Act, which was the amended version of the 1974 Disaster Relief Act (*Disaster Relief Act of 1974,* Pub. L. No. 93-288, § 401, 88 Stat. 143).  For additional information, "Stafford, Robert Theodore," *Biographical Directory of the United States Congress*, http://bioguide.congress.gov/scripts/biodisplay.pl?index=S000776.

[19] This figure represents an average since the Disaster Relief Act was enacted in 1974.  U.S. Department of Homeland Security, Federal Emergency Management Agency, "Annual Major Disaster Declaration Totals," http://www.fema.gov/news/disaster_totals_annual.fema.  U.S. Department of Homeland Security, Federal Emergency Management Agency, "2004 Federal Disaster Declarations," http://www.fema.gov/news/disasters.fema?year=2004.

[20] "Discipline" refers to the various emergency response fields (e.g., police, medical, firefighters).

[21] The White House, Office of Homeland Security, *National Strategy for Homeland Security* (Washington, DC, July 2002), 42.

[22] 6 U.S.C. § 312 (2005) (requiring the Secretary to execute these responsibilities through the Under Secretary for Emergency Preparedness and Response).

[23] The White House, "President Bush signs Homeland Security Act," news release, November 25, 2002, http://www.whitehouse.gov/news/releases/2002/11/20021125-6.html.

[24] U.S. Department of Homeland Security, "Department of Homeland Security Facts for March 1, 2003," February 28, 2003, http://www.dhs.gov/dhspublic/display?content=817. See also The White House, "Ridge Sworn In as Secretary of Homeland Security," news release, January 24, 2003, http://www.whitehouse.gov/news/releases/2003/01/print/20030124-5.html.  Before becoming Secretary of Homeland Security, Thomas Joseph Ridge was the first Homeland Security Advisor to the President of the United States and Director of the White House Office of Homeland Security, the precursor to the current Homeland Security Council.  Prior to his service to the President, Secretary Ridge was the governor of Pennsylvania.  The White House, "Biography of Secretary Tom Ridge," http://www.whitehouse.gov/homeland/ridgebio.html.

APPENDIX E – ENDNOTES

[25] *HSPD-5*, § 4.

[26] *HSPD-5*, § 18.

[27] U.S. Department of Homeland Security, *National Incident Management System* ["*National Incident Management System*"] (Washington, DC, 2004), ix.

[28] *National Incident Management System*, 2.

[29] U.S. Department of Homeland Security, Federal Emergency Management Agency, "NIMS and the Incident Command System," http://www.fema.gov/txt/nims/nims_ics_position_paper.txt. The 9/11 Commission found that the September 11, 2001, attacks demonstrated the need for nationwide adoption of the ICS. See National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* (New York: WW Norton and Company), 397. After President Bush issued HSPD-5 on February 28, 2003, the Department of Homeland Security worked with State and local governments, the emergency management community, the private sector and other key stakeholders to develop the *National Incident Management System*.

[30] *National Incident Management System*, 7.

[31] *National Incident Management System*, 138.

[32] *National Incident Management System*, 11.

[33] *National Incident Management System*, 7.

[34] *National Incident Management System*, 14-16.

[35] The President directed the development of a National Response Plan to align Federal coordination structures, capabilities, and resources into a unified, all-discipline, and all-hazards approach to domestic incident management. See HSPD-5. The development of the NRP included extensive vetting and coordination with Federal, State, local, and tribal agencies, nongovernmental organizations, private-sector entities, and the first-responder and emergency management communities. For a list of the signatories of the NRP, see U.S. Department of Homeland Security, *National Response Plan* ["*National Response Plan*"] (Washington, DC, December 2004), iii-viii.

[36] *National Response Plan*, 15.

[37] States and locals, using mutual aid agreements, are frequently able to respond without Federal assistance. In addition, many requests by Governors for Federal assistance are made that do not result in a disaster declaration but are nevertheless significant.

[38] See generally, *National Response Plan*.

[39] The *Catastrophic Incident Annex* is an integral part of the *National Response Plan*. It lays out the "context and overarching strategy" for response to catastrophic incidents. It also presages the publication of the *Catastrophic Incident Supplement*—"a more detailed and operationally specific" plan for catastrophic incident response. U.S. Department of Homeland Security, "Catastrophic Incident Annex," in *National Response Plan*, pg. "CAT-1." As of February 2006, the *Catastrophic Incident Supplement* exists in draft form only, and has not been officially released. A *catastrophic incident* is defined as "Any natural or manmade incident, including terrorism, that results in extraordinary levels of mass casualties, damage, or disruption severely affecting the population, infrastructure, environment, economy, national morale, and/or government functions. . . ." *National Response Plan*, 63. Although the *National Response Plan* by virtue of the *Catastrophic Incident Annex* did anticipate the need for a more robust Federal response to a catastrophic incident, that is all it did. Without the *Catastrophic Incident Supplement*, that acknowledgement was not made operational and thus had no practical effect.

[40] *National Response Plan*, 3.

[41] *National Response Plan*, 3.

[42] *National Response Plan*, 1.

[43] *HSPD-5*, § 4.

[44] *National Response Plan*, 4.

[45] Governor Blanco's letter to the President requesting Federal assistance in the form of an emergency declaration seems to have satisfied the second criterion, while the substantial involvement of multiple Federal departments and agencies seems to have satisfied the third. On August 27, 2005, Governor Kathleen Blanco sent a letter to President Bush requesting an emergency declaration for the State of Louisiana. The letter stated, "I have determined that this incident is of such severity and magnitude that effective response is beyond the capabilities of the State and affected local governments, and that supplementary Federal assistance is necessary to save lives, protect property, public health, and safety, or to lessen or avert the threat of a disaster." Kathleen Blanco, Governor of Louisiana, "Letter to President Bush requesting that he declare an emergency for the State of Louisiana due to Hurricane Katrina" (Baton Rouge, August 27, 2005). That same day President Bush declared a state of emergency in Louisiana, stating, "I have determined that the emergency conditions in certain areas of the State of Louisiana, resulting from Hurricane

Katrina beginning on August 26, 2005, and continuing is of sufficient severity and magnitude to warrant an emergency declaration…" For complete text of declaration, see 70 Fed. Reg. 53238 (Sept. 7, 2005).

[46] *National Response Plan*, 4.

[47] *National Response Plan*, 7.

[48] Prior to Katrina's landfall on the Gulf Coast, all of the lead agencies responsible for various support activities had already deployed liaisons to FEMA headquarters or field locations, and the Federal and State coordinating officers had co-located in Baton Rouge to begin establishing a unified command.  Upon declaring an INS, the Secretary designated a PFO.  NRP actions that had not yet been taken at this time included standup of the Interagency Incident Management Group and establishment of a fully functional Joint Field Office.   U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #4," August 27, 2005, 11-15, indicates all ESFs have been activated. Former Federal Coordinating Officer of Louisiana, William Lokey, states, "On Saturday morning, August 27, 2005, I was assigned to respond with the ERT-N to Louisiana as FCO for Katrina Operations. I arrived in Baton Rouge late in the afternoon. After checking in with FEMA staff who had been working in New Orleans on a previously declared disaster and who had evacuated to Baton Rouge, I went to the Louisiana State Emergency Operations Center. There, I met with FEMA staff from Region VI that had responded as the Advance Emergency Response Team (ERT-A), other members of the ERT-N who were arriving, and Colonel Jeff Smith (State Coordinating Officer), my primary counterpart for State of Louisiana operations.  My first priority was to work with Jeff Smith to identify the State's priorities, then to organize my staff to start planning and working with our State counterparts to identify tasks and objectives to meet those priorities.  The State was heavily involved in the ongoing evacuation efforts but did begin working with us on such issues as search and rescue, commodity distribution, and medical needs.  We worked late into the night and began again early on Sunday morning . . . Other ERT members from the Emergency Support Functions (ESF) had arrived and began discussions with their counterparts.  These included but were not limited to people from ESF-1 Transportation, ESF-8 Health and Medical, and the Defense Coordinating Officer.  We worked on identifying distribution sites; sending food and water to the Superdome; coordinating with health officials in New Orleans and the State; and planning with State and Federal agencies on potential search and rescue efforts."  William Lokey, Federal Coordinating Officer for Louisiana, testimony before a hearing on Hurricane Katrina Preparedness and Response by the State of Louisiana, on December 14, 2005, House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[49] FEMA has used the NRP during all major disasters since the NRP was adopted.  *National Response Plan*, Appendix 5.  http://www.fema.gov/news/disasters.fema?year=2005.

[50] Operationally, the Federal government was utilizing the NRP before landfall and prior to the declaration of an INS.

[51] The Joint Field Office (JFO) structure and Principal Federal Official (PFO) position can be implemented without an INS declaration by the Secretary of Homeland Security.  *National Response Plan*, 28-33.  The NRP states, "During actual or *potential* Incidents of National Significance, the overall coordination of Federal incident management activities is executed through the Secretary of Homeland Security" (emphasis added). *National Response Plan*, 15.  This suggests that the Secretary can create the structures found in the NRP, such as JFO and PFO, even if there is only the potential for an INS, and an INS has not yet been declared.

[52] *National Response Plan*, 28-33.

[53] *HSPD-5*, § 5.

[54] *National Response Plan*, 71.

[55] 42 U.S.C. § 5143 (2005) ; *National Response Plan*, 65.  The delineation of roles and responsibilities between the statutorily empowered FCO and the policy constructed PFO are unclear.  Section 5143 of the Stafford Act expressly requires the President, immediately upon his declaration of a major disaster or emergency, to appoint a FCO to conduct response and recovery operations in the affected area.  The President has also formally delegated his response and recovery powers granted him in the Stafford Act to the Secretary of Homeland Security.  The Stafford Act of 1974 gave this authority (to direct other departments) to the President; Executive Order 12148 delegated this authority in 1979 to the FEMA Director; and Executive Order 13286 subsequently transferred the authority in 2003 to the Secretary of Homeland Security.  See Executive Order no. 12148, 44 Fed. Reg. 43239 (1979); Executive Order no. 13286, 68 Fed. Reg. 10619 (2003).  This delegation of authority is consistent with the Secretary's designation as PFO for incident management in HSPD-5.  However, the Secretary has delegated his Stafford Act authority to the FEMA Director and according to the NRP can name a third and separate individual PFO for an Incident of National Significance.

[56] *National Response Plan*, 16.  See also note 65.

[57] *National Response Plan*, 15, 25.

[58] *National Response Plan*, 15.

[59] See "Emergency Support Function Annexes" in *National Response Plan,* pgs. "ESF-i" et seq.

[60] *Reorganization Plan no. 3 of 1978*, 43 Fed.. Reg. 41943 (June 19, 1978).  The organization of FEMA was further defined in Executive Order no. 12,127, 44 Fed. Reg. 19367 (March 31,1979) and Executive Order no. 12148, 44 Fed. Reg. 43239 (July 20, 1979).

[61] *Homeland Security Act of 2002* ["*Homeland Security Act*"], Public Law 296, 107th Congress, 2nd session (November 25, 2002) § 501, codified at 6 U.S.C. § 312 (2005).

[62] *National Response Plan*, pg. "ESF 5-1."  See also *Homeland Security Act*, § 507, codified at 6 U.S.C. § 317 (2005).

[63] U.S. Department of Homeland Security, Federal Emergency Management Agency, "Regional and Area Offices," http://www.fema.gov/regions.

[64] FEMA Disaster Assistance Employees (DAEs) are on-call personnel, not carried on the permanent payroll, activated to augment the full time employee pool when a surge capacity is required to respond to a disaster.  Many have years of experience, while others may have little to no prior disaster or emergency response experience.  These employees are only used to assist in the aftermath of specific disasters and emergencies.  The reservists are trained to fulfill specific disaster response staffing needs, including key program, technical, and administrative functions.

[65] The RRCC is a standing facility operated by FEMA that is activated to coordinate regional response efforts, establish Federal priorities, and implement local Federal support until a JFO is established in the field and/or the PFO, FCO, or Federal Resource Coordinator (FRC) can assume their NRP coordination responsibilities.  The RRCC establishes communications with the affected State emergency management agency and the National Response Coordination Center (NRCC) coordinates deployment of the Emergency Response Team–Advance Element (ERT-A) to field locations, assesses damage information, develops situation reports, and issues initial mission assignments.  *National Response Plan*, 27.

[66] These regions have two of the largest regional staffs within FEMA: Region VI has 100 employees and over 300 reservists, and Region VI has 115 employees and over 550 reservists.  See U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA: Region VI – About Region VI," http://www.fema.gov/regions/vi/about.shtm (last updated March 3, 2005); U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA: Region IV," http://www.fema.gov/regions/iv/index.shtm (last updated October 22, 2004).  The NRCC and the RRCC in Region IV began monitoring Hurricane Katrina as early as Tuesday, August 23. On Thursday, August 25, the NRCC activated to Level 2—partial activation—at 7:00 am, and the Region IV RRCC activated to Level 2 at 12:30 pm.  On Saturday, August 27, the NRCC went to Level 1—full activation—at 7:00 am, and Region IV and Region VI RRCCs went to Level 1 activation at 12:00 pm.  U.S. Department of Homeland Security, Federal Emergency Management Agency, "Hurricane Katrina Response Timeline," September 10, 2005.  FEMA employs more than 2,600 full-time staff, about 1,000 of them in its ten regional offices, and nearly 4,000 disaster reservists.  FEMA disaster reservists, officially known as Disaster Assistance Employees, serve as a surge force for rapidly increasing the pool of Federal response personnel during a major disaster.  The program recruits and trains citizen volunteers to become full Federal employees when a major disaster exceeds the capacity of FEMA's permanent staff.  The agency has access to this collective pool of human resources, but does not have its own critical response assets, such as buses, trucks, and ambulances.

[67] *Stafford Act*, 42 U.S.C. § 5170 (2005).

[68] *Stafford Act*, 42 U.S.C. § 5191 (2005).

[69] *Stafford Act*, 42 U.S.C. § 5170 (2005).

[70] Louisiana Office of Homeland Security and Emergency Preparedness, *Emergency Operations Plan* (Baton Rouge, April 5, 2005), 3.

[71] The Constitution requires that "[n]o State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State . . . ." U.S. Constitution, art.1, sec.10.

[72] EMAC was developed in the 1990s and officially ratified by Congress as an organization with thirteen member States in 1996.  *Emergency Management Assistance Compact*, Public Law 104-321, 104th Congress, 2nd session, (October 19, 1996).  As of October 2005, 49 States, the District of Columbia, the U.S. Virgin Islands, and Puerto Rico had enacted EMAC legislation.  National Emergency Management Association, "EMAC Overview," December 2005, http://www.emacweb.org/?323.  EMAC is administered by the National Emergency Management

Association (NEMA).  During an emergency, NEMA's staff works with EMAC member states to coordinate the EMAC system.

[73] Louisiana Office of Homeland Security and Emergency Preparedness, *Emergency Operations Plan* (Baton Rouge, April 5, 2005), 3.

[74] U.S. Department of Homeland Security, *Catastrophic Incident Annex* ["*Catastrophic Incident Annex*"], in *National Response Plan*, pg. "CAT-1."

[75] *National Response Plan*, 63.

[76] *Catastrophic Incident Annex*, pg. *"*CAT-1."

[77] *National Response Plan*, 44.

[78] Given its draft status, the *Catastrophic Incident Supplement* has never been part of incident planning or exercises nor had it been widely disseminated, and as a result is not a part of current operational plans for incident management.  Furthermore, our experience in Hurricane Katrina suggests it must now be reconsidered to make it more robust in ensuring that Federal assistance arrives as soon as possible.

[79] The White House, "President Discusses Hurricane Relief in Address to the Nation," news release, September 15, 2005, http://www.whitehouse.gov/news/releases/2005/09/20050915-8.html.

### CHAPTER THREE: HURRICANE KATRINA — PRE-LANDFALL

[1] The White House, "President Discusses Hurricane Katrina, Congratulates Iraqis on Draft Constitution," news release, August 28, 2005.

[2] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Atlantic Oceanographic and Meteorological Laboratory, Hurricane Research Division, "Frequently Asked Questions," http://www.aoml.noaa.gov/hrd/tcfaq/A3.html.  The National Hurricane Center defines "major hurricanes" as hurricanes that reach maximum sustained 1-minute surface winds of at least 111 mph.

[3] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, "NOAA: 2005 Atlantic Hurricane Season Outlook," May 16, 2005.  In 2004, the hurricane season had been particularly devastating.  Twenty seven disasters were declared in fifteen States and two U.S. Territories.  The season was especially difficult for Florida, which took a direct hit from four hurricanes and one tropical storm in six weeks.  Together, Hurricanes Charlie, Frances, Ivan, and Jeanne, directly or indirectly resulted in over 150 U.S. deaths and approximately forty-six billion dollars in damage.  Richard J. Pasch, Daniel P. Brown, and Eric S. Blake, *Tropical Cyclone Report: Hurricane Charlie*,  prepared for the National Hurricane Center, National Oceanic and Atmospheric Administration (Miami, Florida, October 18, 2004), (updated January 5, 2005); Jack Beven II, *Tropical Cyclone Report: Hurricane Frances*, prepared for National Hurricane Center, National Oceanic and Atmospheric Administration (Miami, Florida, December 17, 2004); Stacy R. Stewart, *Tropical Cyclone Report: Hurricane Ivan*, prepared for the National Hurricane Center, National Oceanic and Atmospheric Administration (Miami, Florida, December 16, 2004), (updated May 27, 2005); Miles B. Lawrence and Hugh D. Cobb, *Tropical Cyclone Report: Hurricane Jeanne*, prepared for the National Hurricane Center, National Oceanic and Atmospheric Administration (Miami, Florida, November 22, 2004), (updated January 7, 2005).

[4] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, "NOAA Issues 2005 Atlantic Hurricane Season Outlook: Another Above Normal Season Expected," news release, May 16, 2005.

[5] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Weather Service, "New Weather Forecast Office in Key West Hoists Hurricane Flags for Wilma," news release, October 24, 2005: "Hurricane Wilma is part of a hurricane season replete with "firsts": . . . a record of seven named storms had formed by the end of July."

[6] Jack Beven II, *Tropical Cyclone Report: Hurricane Dennis*, prepared for the National Hurricane Center, National Oceanic and Atmospheric Administration (Miami, Florida, November 22, 2005) (updated December 16, 2005).

[7] Monroe County, Key West Florida, "Emergency News Hurricane Dennis," July 8, 2005, http://www.monroecounty-fl.gov/Pages/MonroeCoFL_EmerNews/EmergencyArchives/S00633CB7.  Evacuations were ordered in the Florida Keys for "all non-residents" and "all residents west of the Seven Mile Bridge."  For information on major disaster declarations, see *Federal Register*. U.S. Department of Homeland Security, "Alabama; Major Disaster and Related Determinations," July 10, 2005,

http://www.fema.gov/news/dfrn.fema?id=4284; U.S. Department of Homeland Security, "Mississippi; Major Disaster and Related Determinations," July 10, 2005, http://www.fema.gov/news/dfrn.fema?id=4285; U.S. Department of Homeland Security, "Florida; Major Disaster and Related Determinations," July 10, 2005, http://www.fema.gov/news/dfrn.fema?id=4286. In preparation for Hurricane Dennis, FEMA activated its Regional Response Coordination Center (RRCC) in Atlanta at the highest operational level. FEMA conducted coordination calls between Federal, State and local officials, positioned liaison officers at State Emergency Operations Centers, pre-staged emergency supplies and response teams at various locations, and requested the activation of the First U.S. Army's crisis action team. See U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA Regional Center at Highest Level in Preparation for Hurricane Dennis," news release, July 9, 2005; Department of Defense, First U.S. Army, "First U.S. Army Stands up Crisis Action Team for Hurricane Dennis," news release, July 9, 2005. Other military preparations for Hurricane Dennis included the alert of National Guardsmen in Florida, Mississippi, Alabama, Louisiana and Georgia. See U.S. Department of Defense, "Military Taking Precautions as Hurricane Dennis Approaches," news release, July 8, 2005.

[8] State of Louisiana, Office of the Governor, "Governor Blanco Declares State of Emergency Regarding Hurricane Dennis," news release, July 8, 2005,
http://gov.louisiana.gov/index.cfm?md=newsroom&tmp=detail&articleID=717.

[9] Jack Beven II, *Tropical Cyclone Report: Hurricane Dennis*, prepared for the National Hurricane Center, National Oceanic and Atmospheric Administration (Miami, Florida, November 22, 2005), (updated December 16, 2005).

[10] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, *August 2005 Update to Atlantic Hurricane Season Outlook: Bulk of This Season's Storms Still to Come* (Washington, D.C, August 2, 2005).

[11] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, "NOAA Raises the 2005 Atlantic Hurricane Season Outlook," August 2, 2005, http://www.noaanews.noaa.gov/stories2005/s2484.htm.

[12] Richard D. Knabb, Jamie R. Rhome, and Daniel Brown, *Tropical Cyclone Report: Hurricane Katrina, August 23-30, 2005*, prepared for the National Hurricane Center, National Oceanic and Atmospheric Administration (Miami, Florida, December 2005), 1. Excerpt from this text: "The complex genesis of Katrina involved the interaction of a tropical wave, the middle tropospheric remnants of Tropical Depression Ten, and an upper tropospheric trough. This trough, located over the western Atlantic and the Bahamas, produced strong westerly shear across Tropical Depression Ten, causing it to degenerate on 14 August approximately 825 n. mi. east of Barbados. The low-level circulation gradually weakened while continuing westward, and it eventually dissipated on 21 August in the vicinity of Cuba. Meanwhile, a middle tropospheric circulation originating from Tropical Depression Ten lagged behind and passed north of the Leeward Islands on 18-19 August. A tropical wave moved through the Leeward Islands and merged with the middle tropospheric remnants of Tropical Depression Ten on 19 August, forming a large area of showers and thunderstorms north of Puerto Rico. This activity continued to move slowly northwestward, passing north of Hispaniola and then consolidating just east of the Turks and Caicos during the afternoon of 22 August. Dvorak satellite classifications from the Tropical Analysis and Forecast Branch (TAFB) of the Tropical Prediction Center (TPC) began at 1800 UTC that day. The upper tropospheric trough weakened as it moved westward toward Florida, and the shear relaxed enough to allow the system to develop into a tropical depression by 1800 UTC 23 August over the southeastern Bahamas about 175 n. mi. southeast of Nassau. The depression was designated Tropical Depression Twelve rather than "Ten" because a separate tropical wave appeared to be partially responsible for the cyclogenesis, and, more importantly, the low-level circulation of Tropical Depression Ten was clearly not involved."

[13] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, *Hurricane Katrina Advisory #1* (Miami, Florida, August 23, 2005). National Hurricane Center Katrina Advisories were released every several hours beginning at 5:00 PM EDT on August 23 and ending at 10:00 AM CDT on August 30. Advisories were typically issued at 5:00 AM, 11:00 AM, 5:00 PM, and 11:00 PM EDT each day. The advisories are numbered sequentially from 1 to 31. Most of the advisories were updated with supplemental advisories—for example, Hurricane Katrina Advisory 1 was released at 5:00 PM EDT and Advisory 1a was released at 8:00 PM EDT. Advisory 2 was released at 11:00 PM EDT. The official publication time zone switched from Eastern Daylight Time to Central Daylight Time with Advisory #17, released at 10:00 AM CDT, August 27, 2005. All Hurricane Katrina Advisories are available from the National Hurricane Center. See U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, "Hurricane Katrina Advisory Archive," http://www.nhc.noaa.gov/archive/2005/KATRINA.shtml?.

[14] Admiral Timothy J. Keating, Commander North American Aerospace Defense Command and U.S. Northern Command, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi, and Alabama, on October 27, 2005, submitted to the House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[15] "Based on aircraft reconnaissance flight-level wind data, the cyclone became Katrina, the 11th tropical storm of the 2005 Atlantic hurricane season, at 1200 UTC 24 August when it was centered over the central Bahamas about 65 n. mi. east-southeast of Nassau." Richard D. Knabb, Jamie R. Rhome, and Daniel Brown, *Tropical Cyclone Report: Hurricane Katrina, August 23-30, 2005*, prepared for the National Hurricane Center, National Oceanic and Atmospheric Administration (Miami, Florida, December 20, 2005), 1.

[16] FEMA's Hurricane Liaison Team became operational at 7:00 AM EDT on August 24, 2005. The HLT had begun monitoring the storm the previous evening. FEMA Tropical Storm Katrina Briefing, August 25, 2005.

[17] U.S. Department of Defense, OASD HD, Hurricane Katrina/Rita/Ophelia Interim Timeline (Aug. – Sept. 2005), November 2, 2005, 2.

[18] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, *Tropical Storm Katrina Advisory 4* (Washington, D.C., August 24, 2005).

[19] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Weather Service Tropical Prediction Center and National Hurricane Center, "Hurricane Katrina Discussion Number 9," August 25, 2005; U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Weather Service Tropical Prediction Center and National Hurricane Center, "Tropical Storm Katrina Discussion Number 8," August 25, 2005.

[20] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Weather Service, Miami-South Florida Forecast Office, "Hurricane Katrina Storm Report," September 1, 2005, http://www.srh.noaa.gov/mfl/events/?id=katrina.

[21] Richard D. Knabb, Jamie R. Rhome, and Daniel P. Brown, *Tropical Cyclone Report: Hurricane Katrina*, *23-30 August 2005*, prepared for the National Hurricane Center (Miami, Florida, August 2005), 10.

[22] Florida Power & Light, Company, "FPL begins assessment process following Hurricane Katrina," news release, August 26, 2005, http://www.fpl.com/news/2005/contents/05101.shtml.

[23] National Aeronautics and Space Administration, Remote Sensing Tutorial, "Hurricanes Katrina, Rita, and Wilma," http://rst.gsfc.nasa.gov/Sect14/Sect14_10a.html.

[24] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Weather Service, Miami-South Florida Forecast Office, "Hurricane Katrina Storm Report," September 1, 2005, http://www.srh.noaa.gov/mfl/events/?id=katrina; and Florida Department of Agriculture and Consumer Services, "Bronson to Assess Hurricane Katrina Damage to South Florida Agriculture," news release, August 29, 2005, http://www.doacs.state.fl.us/press/2005/08292005.html.

[25] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP # 1," August 25, 2005. The Emergency Operations Center is the physical location at which the coordination of information and resources to support domestic incident management activities normally takes place. An EOC may be a temporary facility or may be located in a more central or permanently established facility. See U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), 64.

[26] Hurricane Katrina DHS SITREP #1, August 25, 2005.

[27] "Despite all of our efforts and despite the fact that we pre-positioned more commodities and staged more rescue and medical teams than ever before in our agency's history, our initial response was overwhelmed." William Lokey, Federal Coordinating Officer, Baton Rouge, written statement for a hearing on Hurricane Katrina Response in Louisiana, on December 14, 2005, submitted to the House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[28] On August 25, FEMA began to identify ERT-A teams for deployment to Florida and Alabama. FEMA Tropical Storm Katrina Briefing, August 25, 2005. For definition of ERT-A, see U.S. Department of Homeland Security, Federal Emergency Management Agency, "Glossary," http://training.fema.gov/EMIWeb/IS/is14/glossary.htm#E.

[29] U.S. Department of Homeland Security, Federal Emergency Management Agency, "National Situation Update," August 26, 2005, http://www.fema.gov/emanagers/2005/nat082605.shtm. Throughout this Report, note that events were occurring in different time zones. Times referenced as Central Daylight Time (CDT) reflect the local time events took place in Louisiana. All Noon FEMA video teleconferences took place at 12:00 PM Eastern

APPENDIX E – ENDNOTES

Daylight Time (EDT), which was 11:00 AM in Louisiana and Mississippi.  Throughout the report, times are
referenced in accordance with the source material supporting the text.

[30] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center,
*Hurricane Katrina Advisory #11* (Washington, D.C., August 26, 2005).

[31] Richard D. Knabb, Jamie R. Rhome, and Daniel Brown, *Tropical Cyclone Report: Hurricane Katrina (23-30
August 2005)*, prepared for the National Hurricane Center, National Oceanic and Atmospheric Administration
(Miami, Florida, December 2005), 2-3.

[32] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center,
*Hurricane Katrina Intermediate Advisory # 14* (Miami, Florida, August 26, 2005); U.S. Department of Homeland
Security, Federal Emergency Management Agency, "National Situation Update," August 26, 2005.

[33] See National Weather Service Tropical Prediction Center and National Hurricane Center Hurricane Katrina
Advisories 15 through 26, covering a period from August 26, 2005, 11:00 PM EDT to August 29, 2005, 6:00 AM CDT.
These advisories are available at the U.S. Department of Commerce, National Oceanic and Atmospheric
Administration, National Weather Service Tropical Prediction Center and National Hurricane Center, "Hurricane
Katrina Advisory Archive," http://www.nhc.noaa.gov/archive/2005/KATRINA.shtml?.

[34] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center,
"Hurricane Katrina Forecast Timeline," n.d., ca. 2005.

[35] Brigadier General David L. Johnson (USAF, Ret.), Director of the National Weather Service, National Oceanic
and Atmospheric Administration, U.S. Department of Commerce, written statement for a hearing on NOAA
Hurricane Forecasting, on October 7, 2005, submitted to the House Committee on Science, 109th Congress, 1st
session, 2.

[36] The last National Hurricane Center Advisory on August 26 was issued at 11:00 PM EDT.  Katrina made landfall
at 6:10 AM CDT on August 29, fifty-six hours later.  U.S. Department of Commerce, National Oceanic and
Atmospheric Administration, National Hurricane Center, *Hurricane Katrina Advisory # 15* (Miami, Florida, August
26, 2005).

[37] State of Louisiana, Executive Department, *Proclamation No. 48 KBB 2005: State of Emergency—Hurricane
Katrina* (Baton Rouge,  August 26, 2005); State of Alabama, Office of the Governor, *State of Emergency
Proclamation* (Jackson, August 26, 2005).

[38] Brent Warr, Mayor of Gulfport, Mississippi, written statement for a hearing on Hurricane Katrina: Preparedness
and Response by the State of Mississippi, on December 7, 2005, submitted to the Select Bipartisan Committee to
Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[39] Department of Homeland Security SITREP #4, August 27, 2005.  See generally, Robert R. Latham Jr.,
Executive Director of the Mississippi Emergency Management Agency, written statement for a hearing on
Hurricane Katrina: Preparedness and Response by the State of Mississippi, on December 7, 2005, submitted to the
House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th
Congress, 1st session.

[40] Louisiana State Police, "LSP Timeline of Events," n.d., ca. 2005, 2.

[41] Louisiana National Guard, Task Force Pelican, "Hurricane Katrina Overview of Significant Events," November
28, 2005, 4.

[42] State of Alabama, Office of the Governor, *Executive Order No. 939* (Jackson, August 26, 2005).

[43] U.S. Department of Defense, "Mississippi Guard Provide Relief to State," *Armed Forces Press Service*,
September 8, 2005, http://www.defenselink.mil/news/Sep2005/20050908_2648.html.

[44] "More than 8,000 people perished September 8, 1900 when the category 4 hurricane barreled into
Galveston…," U.S. Department of Commerce, National Oceanic and Atmospheric Administration, "The Galveston
Storm of 1900 – The Deadliest Disaster in History," http://www.noaa.gov/galveston1900/.  See also Erik Larson,
*Isaac's Storm: A Man, a Time, and the Deadliest Hurricane in History* (New York: Random House, 1999), 264-265.
Note that statistics for disasters can vary significantly depending on the source consulted, due to both variances in
how terms are defined and the difficulty of confirming specific data in the aftermath of a devastating event.

[45] The Saffir-Simpson scale for measuring hurricane strength had not been developed until 1969—four years after
Hurricane Betsy made landfall on the Louisiana coast.  The classification of Hurricane Betsy as a Category 3 storm
was made retroactively based on wind speed readings.  For general information on Hurricane Betsy, see U.S. Army
Corps of Engineers, "Historical Records of the U.S. Army Corps of Engineers' Response to Recent Hurricanes,"
http://www.hq.usace.army.mil/history/Hurricane_files/ Hurricane.htm.  For deaths, see Eric S. Blake et al., *The
Deadliest, Costliest, and Most Intense United States Tropical Cyclones from 1851 to 2004 (And Other Frequently*

*Requested Hurricane Facts)*, NOAA Technical Memorandum NWS TPC-4 (Miami, Florida, August 2005), 7, http://www.nhc.noaa.gov/Deadliest_Costliest.shtml; compare to U.S. Army Corps of Engineers, "How Safe is New Orleans from Flooding?" September 11, 2003, http://www.usace.army.mil/inet/functions/cw/ hot_topics/11sep_msy.htm (reporting 81 deaths). For extent of flooding by parish see, Joseph A. Towers, former Attorney for the Army Corps of Engineers, testimony before the Task Force on Updating the National Environmental Policy Act, Congressional Resources Committee, 109th Congress, 1st session, 2005, http://resourcescommittee.house.gov/nepataskforce/archives/josephtowers.htm.

[46] "Damaged homes" include those with major damage, but not those with minor damage. For deaths, see Ernest Zebrowski and Judith A. Howard, *Category 5: The Story of Camille* (Ann Arbor, MI: University of Michigan Press, 2005); For homes damaged or destroyed, see Roger A. Pielke, Jr., Chantal Simonpietri, and Jennifer Oxelson, *Thirty Years After Hurricane Camille: Lessons Learned, Lessons Lost* (Boulder, Colorado, July 1999). For other information, see U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, "Hurricane History – Hurricane Camille, 1969," http://www.nhc.noaa.gov/HAW2/english/history.shtml#camille.

[47] See Greg Brouwer "The Creeping Storm," *Civil Engineering Magazine*, June, 2003, http://www.pubs.asce.org/ceonline/ceonline03/0603feat.html. See also U.S. Army Corps of Engineers, "Morganza to the Gulf of Mexico Hurricane Protection Project," http://www.mvn.usace.army.mil/prj/mtog/. It is important to note that the levees protecting New Orleans were designed in advance of the Saffir-Simpson model. Although it is often reported that New Orleans levees were constructed to protect against a Category 3 storm, the levee system was actually designed to withstand a Standard Project Hurricane (SPH)—a theoretical hybrid of many different storms. The central pressure for an SPH is in the Category 4 range, the highest wind speed is that of a high strength Category 2, and the surge is similar to that of a Category 3. Al Naomi (Senior Project Manager, U.S. Army Corps of Engineers), "Talkback," *Riverside* (a publication of the U.S. Army Corps of Engineers), January, 2005, 8, http://www.mvn.usace.army.mil/pao/Riverside/ Jan_05_Riv.pdf.

[48] In 1999, the Senate of the State of Louisiana issued a resolution "to authorize and to urge the governor of … Louisiana to support the development of the 'Comprehensive Hurricane Protection Plan for Coastal Louisiana' by the U.S. Army Corps of Engineers to provide continuous hurricane protection from Morgan City to the Mississippi border." Senate of the State of Louisiana, *House Concurrent Resolution No. 142* (Baton Rouge, June 18, 1999). The Comprehensive Hurricane Protection Plan for Coastal Louisiana by the New Orleans District U.S. Army Corps of Engineers was released in June 2000. U.S. Army Corps of Engineers, *Comprehensive Hurricane Protection Plan for Coastal Louisiana* (New Orleans, June 2000).

[49] U.S. Army Corps of Engineers, *Comprehensive Hurricane Protection Plan for Coastal Louisiana* (New Orleans, June 2000).

[50] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Weather Service, Southern Region headquarters, "Tropical Cyclone Hazards: Inland Flooding," July 27, 2004, http://www.srh.noaa.gov/srh/tropicalwx/awareness/flooding.htm: "It is common to think the stronger the storm the greater the potential for flooding. However, this is not always the case. A weak, slow moving tropical storm can cause more damage due to flooding than a more powerful fast moving hurricane." See also, U.S. Army Corps of Engineers, *Comprehensive Hurricane Protection Plan for Coastal Louisiana* ( New Orleans, June 2000).

[51] Statement of Vice Admiral Conrad C. Lautenbacher, Jr (Undersecretary of Commerce for Oceans and Atmosphere.), before 31st AMS Broadcasters Conference 200-300 Broadcast Meteorologists/Private Sector and Industry, June 26, 2002, http://www.noaa.gov/lautenbacher/ams-broadcasters.htm

[52] The origins of the Southeast Louisiana Catastrophic Hurricane Planning Project can be traced back to 1998 when, in the wake of Hurricane Georges, the Louisiana Office of Homeland Security and Emergency Preparedness recognized the need for more comprehensive hurricane planning. After an initial period of development, the State of Louisiana submitted planning proposals to FEMA for approval. FEMA granted the State funding in 2001, but was forced to withdraw those funds a year later, due to budgetary constraints. Despite this setback, the need for catastrophic hurricane planning in Louisiana continued to be recognized at both the Federal and State level. On March 17, 2004, FEMA awarded funding to the State of Louisiana for what would become the Southeast Louisiana Catastrophic Hurricane Planning Project. See Sean E. Fontenot, Former Chief, Planning Division, Louisiana Office of Homeland Security and Emergency Preparedness, written statement submitted for a hearing on Preparing for Catastrophe: The Hurricane Pam Exercise, on January 24, 2006, before the Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 2nd session, 10.

<sup>53</sup> U.S. Department of Homeland Security, Federal Emergency Management Agency, "Hurricane PAM Exercise Concludes," July 23, 2004.  The Hurricane PAM exercise included participants from thirteen southeast Louisiana Parishes: Ascension, Assumption, Jefferson, Lafourche, Orleans, Plaquemines, St. Bernard, St. Charles, St. James, St. John, St. Tammany, Tangipahoa, and Terrebonne.  See also Senator Susan Collins (R-Maine), statement at a hearing on Preparing for a Catastrophe: The Hurricane Pam Exercise, on January 24, 2006, to the Senate Committee Homeland Security and Governmental Affairs, 109th Congress, 2nd session.

<sup>54</sup> Wayne Fairley, Chief, Response Operation Branch, Response and Recovery Division, FEMA Region IV, written statement submitted for a hearing on Preparing for a Catastrophe: The Hurricane Pam Exercise, on January 24, 2006, before the Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 2nd session, 9.

<sup>55</sup> U.S. Department of Homeland Security, Federal Emergency Management Agency, National Response Coordination Center, video teleconference, August 27, 2005.

<sup>56</sup> Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, *Hurricane Katrina Advisory # 15A* (Washington, D.C., August 27, 2005); Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, *Hurricane Katrina Advisory # 19* (Washington, D.C., August 27, 2005).  As noted previously, times are referenced in accordance with the time zone—Eastern Daylight Time or Central Daylight Time—listed on the source material supporting the text.

<sup>57</sup> U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Weather Service Tropical Prediction Center and National Hurricane Center, *Hurricane Katrina Advisory # 19* (Miami, Florida, August 27, 2005).

<sup>58</sup> NHC's Bill Reeve warned that the storm was headed toward "the worst possible locations for storm surge" and would produce a surge typical of a Category 4 or Category 5 hurricane.  See U.S. Department of Homeland Security, Federal Emergency Management Agency, National Response Coordination Center, video teleconference, August 27, 2005.

<sup>59</sup> Richard D. Knabb, Jamie R. Rhome, and Daniel Brown, *Tropical Cyclone Report: Hurricane Katrina: August 23-30, 2005*, prepared for the National Hurricane Center, National Oceanic and Atmospheric Administration (Miami, Florida, December 2005).  See also U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Weather Service Tropical Prediction Center and National Hurricane Center, *Hurricane Katrina Intermediate Advisory # 18A*, (Miami, Florida, August 27, 2005).

<sup>60</sup> Louisiana Office of the Governor, Response to U.S. Senate Committee on Homeland Security and Governmental Affairs and Information Request Dated October 7, 2005 (Baton Rouge, December 2005),  4. State Representative Cedric Richmond called Governor Blanco on Saturday afternoon after visiting a ballpark where hundreds were in attendance.  Representative Richmond "learned that some people had not paid attention to the weekend news and did not realize the severity of the hurricane aiming at New Orleans.  He worries that many may have thought that the hurricane was still targeting the Florida panhandle…."

<sup>61</sup> Louisiana Office of the Governor, Response to U.S. Senate Committee on Homeland Security and Governmental Affairs and Information Request Dated October 7, 2005 (Baton Rouge, December 2005), 4.

<sup>62</sup> Louisiana Department of Transportation and Development, "Timeline for Hurricane Katrina," n.d., ca. 2005, 2.

<sup>63</sup> In Phase I or the Precautionary Phase, "The Plan prescribes that during the Precautionary phase, the location of staging areas for people who need transportation will be announced and that public transportation will concentrate on moving people from the staging areas to safety in host parishes with priority given to people with special needs.  Furthermore, during the Precautionary stage the Plan directs that nursing homes and other custodial care organizations in the risk areas should be contacted to ensure that they are prepared to evacuate their residents."  Louisiana Office of Homeland Security and Emergency Preparedness, "Southeast Louisiana Hurricane Evacuation and Sheltering Plan," in *State of Louisiana Emergency Operations Plan Supplement 1A* (Baton Rouge, January 2000); Louisiana State Police, "LSP Timeline of Events," n.d., ca. 2005, 2.  On Saturday August 27, 2005, representatives of the Louisiana Nursing Home Association (LNHA), sitting at the Louisiana State EOC, started calling and emailing all the at-risk nursing homes in Louisiana, checking on their preparedness for the storm and determining if they were planning to evacuate or shelter-in-place.  They were able to reach most of the nursing homes. They learned that the State EOP was also calling nursing homes, as were the local parish sheriffs.  By Sunday morning, some nursing homes that intended to shelter-in-place had decided to evacuate.  They had previously been told that buses were available but, by the time they decided to evacuate, drivers were not available.  At that point the LNHA made formal requests for bus drivers, but none materialized prior to landfall.  In all, prior to the storm, twenty-one nursing homes evacuated and sixty-eight sheltered-in-place.  See generally, Joseph A. Donchess, Executive Director of the Louisiana Nursing Home Association, written statement for a hearing on

APPENDIX E – ENDNOTES

Challenges in a Catastrophe: Evacuating New Orleans in Advance of Hurricane Katrina, on January 31, 2006, submitted to the Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 2nd session.

[64] Mississippi State officials estimated that approximately 400,000 people used U.S. 49 and Interstates 55 and 59 to evacuate during the 2004 hurricane season.

[65] The TCC received traffic reports from Louisiana State Police troops, LA DOTD traffic counters, and other sources. Louisiana State Police, "LSP Timeline of Events," n.d., ca. 2005, 2-4.

[66] Louisiana State Police, "LSP Timeline of Events," n.d., ca. 2005, 4; State of Mississippi, Mississippi Emergency Management Agency, "Highway Evacuation Advisory," news release, August 27, 2005.

[67] According to Robert Latham Jr., Executive Director of MEMA, "During the 2004 hurricane season, culminating with Hurricane Ivan on September 13, 2004, the contra-flow plan was never executed, but major congestion in and around Hattiesburg, Mississippi resulted in a comprehensive review of our evacuation plan . . .  As a result of these problems, Governor Barbour asked Mississippi Public Safety Commissioner George Phillips to develop a plan that would provide additional law enforcement officers to support evacuations, especially in the Hattiesburg area.  This plan was completed prior to this year's hurricane season and executed flawlessly for the evacuation, including execution of contra-flowing both Interstates 55 and 59 from Louisiana to Mississippi."  Robert R. Latham Jr., Executive Director of the Mississippi Emergency Management Agency, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi, on December 7, 2005, submitted to the House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session; Louisiana Office of the Governor, Response to U.S. Senate Committee on Homeland Security and Governmental Affairs and Information Request Dated October 7, 2005 (Baton Rouge, December 2005).

[68] City of New Orleans, Office of Emergency Preparedness, *Hurricanes Annex--Part Three: Sheltering* (New Orleans, n.d.).

[69] Erin Fowler of the Department of Health and Human Services Regional Emergency Coordination Program Office spoke with Dr. Roseanne Pratts, Director of Emergency Preparedness for the Louisiana Department of Health, on August 27, "and inquired if federal HHS assistance was needed for patient movement or evacuation, or anything else.  [Dr. Pratts] responded no, that they do not require anything at this time, and they would be in touch if and when they needed assistance."  Senators Susan Collins and Joseph Lieberman, statements during a hearing on Challenges in a Catastrophe: Evacuating New Orleans in Advance of Hurricane Katrina, on January 31, 2006, Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 2nd session.  HHS also offered assistance to New Orleans health officials on August 27, 2005.   See generally, Joseph A. Donchess, Executive Director of the Louisiana Nursing Home Association, written statement for a hearing on Challenges in a Catastrophe: Evacuating New Orleans in Advance of Hurricane Katrina, on January 31, 2006, submitted to the Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 2nd session.

[70] Louisiana Office of the Governor, Response to U.S. Senate Committee on Homeland Security and Governmental Affairs and Information Request Dated October 7, 2005 (Baton Rouge, December 2005).

[71] Liability concerns may have constrained the development of this program.  Nicholas Riccardi and James Rainey, "Katrina's Aftermath," *Los Angeles Times*, September 13, 2005 ; Bruce Nolan, "In Storm, N.O. Wants No One Left Behind," *The Times-Picayune*, July 24, 2005.

[72] Louisiana Office of the Governor, Response to U.S. Senate Committee on Homeland Security and Governmental Affairs and Information Request Dated October 7, 2005 (Baton Rouge, December 2005).

[73] For the notice on recommended evacuations of Algiers, the Lower Ninth Ward, and low-lying areas, see City of New Orleans, "Mayor Nagin Urges Citizens to Prepare for Hurricane Katrina," news release, August 27, 2005.  The Louisiana evacuation plan called for New Orleans to begin evacuations thirty hours prior to projected landfall.  This delay was designed to enable residents of coastal areas to evacuate, see Mayor's Office of Communications, City of New Orleans, "Mayor Nagin Urges Citizens to Prepare for Hurricane Katrina," news release, August 27, 2005; "Mayor Urges Storm Preparations," *NOLA.com: Times Picayune Breaking News Weblog*, August 27, 2005

[74] Bruce Nolan, "Katrina Takes Aim," *The New Orleans Times-Picayune*, August 28, 2005: "New Orleans Mayor Ray Nagin followed at 5:00 PM, issuing a voluntary evacuation."

[75] City of New Orleans, Mayor's Office of Communications, "Mayor Nagin Urges Citizens to Prepare for Hurricane Katrina," news release, August 27, 2005.

[76] State of Mississippi, Mississippi Emergency Management Agency, "Evacuation Traffic Expected to Increase on Interstates**,**" news release, August 27, 2005; U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, "Hurricane Katrina Forecast Timeline," n.d., ca. 2005.  See also U.S. Department of Homeland Security, Federal Emergency Management Agency, National Response Coordination

Center, video teleconference, August 27, 2005, (Mississippi EOC reporting voluntary evacuations being encouraged along coastal counties).

[77] In an interview with *Frontline*, New Orleans Mayor Ray Nagin described the difficulty completing a mandatory evacuation: "But keep in mind the last time a hurricane event happened is 1965. Most people ride out these storms—they're Category 2s or whatever, and it's no big deal. The storm before Katrina a couple of weeks earlier—another Parish official made this huge declaration to mandatorily evacuate in spite of what everyone else was saying. So public confidence was a little low at the time . . . I think regardless of what we do in this town, some people will stay." Ray Nagin, Mayor of New Orleans, interview by Public Broadcasting Service, *Frontline*, November 22, 2005.

[78] Louisiana Office of the Governor, Response to U.S. Senate Committee on Homeland Security and Governmental Affairs and Information Request Dated October 7, 2005 (Baton Rouge, December 2005).

[79] American Red Cross, "Gulf Coast States Prepare for Hurricane Katrina," news release, August 27, 2005, http://www.redcross.org/article/ 0,1072,0_332_4467,00.html

[80] State of Mississippi, Mississippi Emergency Management Agency, "Evacuation Traffic Expected to Increase on Interstates," news release, August 27, 2005.

[81] Louisiana Office of Emergency Preparedness, "Situation Report Executive Summary: Hurricane Katrina," August 27, 2005.

[82] The declaration of the Superdome as a "special needs shelter" was an element of the State's Emergency Operations Plan. According to the plan, the Superdome serves as the Category II special needs shelter for Jefferson, Plaquemines, Orleans, and St. Bernard parishes. "Category II" facilities are for patients whose conditions are "less serious and less likely to undergo a severe deterioration." State of Louisiana, *Emergency Operations Plan, Supplement 1C: Louisiana Shelter Operations Plan* (Baton Rouge, April 2005), Annex X "Special Needs Plan," 5, 10, Appendix 2. The Superdome had also been used as "a shelter of last resort" in previous hurricanes. The Superdome was first used in this capacity in 1998 when people sought refuge from Hurricane Georges. U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Weather Service Forecast Office, "Top Weather Events of the 20th Century within the NWSFO New Orleans/Baton Rouge Service Area," December 8, 2005, http://www.srh.noaa.gov/lix/html/top10.htm. The State of Louisiana Emergency Operations Plan defines a shelter of last resort as "a place for persons to be protected from the high winds and heavy rains from the storm. Unlike a shelter, there may be little or no water or food and possibly no utilities. A Last Resort Refuge is intended to provide best available survival protection for the duration of the hurricane only." Louisiana Office of Homeland Security and Emergency Preparedness, *State of Louisiana Emergency Operations Plan: Supplement 1A* (Baton Rouge, January 2000), 29.

[83] City of New Orleans, "Comprehensive Emergency Management Plan: Special Needs Shelter Plan," http://www.cityofno.com/portal.aspx?portal=46&tabid=28. The Plan states: "[I]t is not appropriate to admit individuals to this shelter who require constant care or who require constant electricity to support machines necessary to maintain their life. Dialysis will not be available. Persons who are acutely ill will be evaluated and referred to local hospitals for definitive care. On a daily basis, every person with a chronic medical problem should have a viable plan that has been discussed with their primary physician so that when a disaster occurs, they will have an action plan established which can be put into effect."

[84] State of Texas, Texas State Operations Center, "Situation Report #8," August 27, 2005.

[85] State of Mississippi, Mississippi Emergency Management Agency, "Mississippi to Reverse Lane Interstates 55 and 59," news release, August 27, 2005.

[86] Robert R. Latham Jr., Executive Director of the Mississippi Emergency Management Agency, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi, on December 7, 2005, submitted to the House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[87] Louisiana National Guard, Task Force Pelican, "Hurricane Katrina Overview of Significant Events," November 28, 2005, 5.

[88] State of Alabama, Office of the Governor, "Governor Riley Says Supplies Ready to Assist Hurricane Victims," news release, August 28, 2005: "Alabama has pre-positioned supplies . . . Governor Riley said the state already has 290,000 bags of ice, more than 250,000 gallons of water, 652,000 MREs (meals ready to eat), and 110,000 tarps measuring 20 feet by 25 feet."

[89] Office of the Governor of Alabama, "Governor Riley Briefed on State's Hurricane Preparations," news release, August 27, 2005; State of Alabama, Office of the Governor, "Governor Riley Says Supplies Ready to Assist Hurricane Victims," news release, August 28, 2005.

[90] State of Texas, State Operations Center, "Situation Report #8," August 27, 2005.

[91] Level 1 operations began at 7:00 AM EDT. U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP # 4," August 27, 2005, 11.

[92] Hurricane Katrina DHS Situation Report #4, 27 Aug 05, 1800 hrs.

[93] See U.S. Department of Homeland Security, Federal Emergency Management Agency, National Response Coordination Center, video teleconference, August 27, 2005, 16.

[94] See U.S. Department of Homeland Security, Federal Emergency Management Agency, National Response Coordination Center, video teleconference, August 27, 2005, 16 – 17.

[95] See U.S. Department of Homeland Security, Federal Emergency Management Agency, National Response Coordination Center, video teleconference, August 27, 2005, 16-18. The figures for liters of water, pounds of ice, and number of MREs and tarps were converted using FEMA conversion factors of 18,000 liters of water, 40,000 pounds of ice, 2,520 tarps, and 21,888 MREs per truckload. FEMA Office of Legislative Affairs, Hurricane Katrina Response Fact Sheet.

[96] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP # 4," August 27, 2005.

[97] See U.S. Department of Homeland Security, Federal Emergency Management Agency, National Response Coordination Center, video teleconference, August 27, 2005, 22.

[98] Colonel Jeff Smith, Acting Deputy Director, Louisiana Office of Homeland Security and Emergency Preparedness, testimony at hearing on the Hurricane Katrina Response in Louisiana, on December 14, 2005, before the House Select Committee to Investigate the Preparation and Response to Hurricane Katrina, 109th Congress, 2nd session. See also transcript of August 27, 2005, NRCC Video Teleconference. The Emergency Response Team-National is a national "on-call" team that is ready to deploy to large disasters such as Category 3 or 4 hurricanes. See also, U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP # 4," August 27, 2005. For definition of ERT-N, see U.S. Department of Homeland Security, Federal Emergency Management Agency. See also FEMA National Situation Update, August 28, 2005, http://www.fema.gov/emanagers/2005/nat082805.shtm. "Glossary," http://training.fema.gov/EMIWeb/IS/is14/glossary.htm#E.

[99] U.S. Department of Homeland Security, *National Response Plan* (Washington, DC, December 2004), 40. See also Dan Bement, "FEMA Operations," prepared for the U.S. Department of Transportation, Federal Highway Administration, http://www.fhwa.dot.gov/modiv/fema.htm.

[100] U.S. Department of Defense, "Hurricane Katrina Timeline," August 29, 2005..

[101] U.S. Department of Defense, "Hurricane Katrina Timeline," August 29, 2005.

[102] See U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #4," August 27, 2005.

[103] The emergency declaration for Mississippi was requested by Governor Barbour on Saturday, August, 27, 2005; the emergency declaration for Alabama was requested by Governor Riley on Sunday, August 28, 2005. Presidential states of emergency were declared for both States on August 28. 70 Fed. Reg. 53239 (Aug. 28, 2005) (Mississippi); 70 Fed. Reg. 54061-62 (Aug. 28, 2005) (Alabama).

[104] President Bush authorized FEMA ". . . to identify, mobilize, and provide at its discretion, equipment and resources necessary to alleviate the impacts of the emergency" for the parishes of Allen, Avoyelles, Beauregard, Bienville, Bossier, Caddo, Caldwell, Claiborne, Catahoula, Concordia, De Soto, East Baton Rouge, East Carroll, East Feliciana, Evangeline, Franklin, Grant, Jackson, LaSalle, Lincoln, Livingston, Madison, Morehouse, Natchitoches, Pointe Coupee, Ouachita, Rapides, Red River, Richland, Sabine, St. Helena, St. Landry, Tensas, Union, Vernon, Webster, West Carroll, West Feliciana, and Winn. The White House, "Statement on Emergency Assistance for Louisiana," news release, August 27, 2005. See also, *Robert T. Stafford Disaster Relief and Emergency Assistance Act*, Public Law 93-288, as amended ["*Stafford Act*"], § 502(a)(b).

[105] Data on pre-landfall disaster declarations compiled from: Department of Homeland Security, Federal Emergency Management Agency, "Federally Declared Disasters by Calendar Year," Library, http://www.fema.gov/library/drcys.shtm. Hurricane Floyd did not make landfall until 6:30 AM on September 16, 1999, but the storm caused significant coastal damage as it passed offshore Florida, Georgia, and the Carolinas; as a result, President Clinton issued emergency declarations for Florida and Georgia on September 14. He did the same for the Carolinas the following day. For more information, see: U.S. Department of Homeland Security, Federal Emergency Management Agency, "Emergency Aid Ordered For Florida Hurricane Response," news release, September 14, 1999, http://www.fema.gov/news/newsrelease.fema?id=8554; U.S. Department of Homeland

Security, Federal Emergency Management Agency, "Emergency Aid Ordered For Georgia Hurricane Response," news release, September 14, 1999, http://www.fema.gov/news/newsrelease.fema?id=8553; U.S. Department of Homeland Security, Federal Emergency Management Agency, "Emergency Aid Ordered For South Carolina Hurricane Response," news release, September 15, 1999, http://www.fema.gov/news/newsrelease.fema?id=8552 and U.S. Department of Homeland Security, Federal Emergency Management Agency, "Emergency Aid Ordered For North Carolina Hurricane Response," news release, September 15, 1999, http://www.fema.gov/news/newsrelease.fema?id=8551.

[106] On August 27, 2005, Governor Kathleen Blanco sent a letter to President Bush requesting an emergency declaration for the State of Louisiana. The letter stated, "I have determined that this incident is of such severity and magnitude that effective response is beyond the capabilities of the State and affected local governments, and that supplementary Federal assistance is necessary to save lives, protect property, public health, and safety, or to lessen or avert the threat of a disaster." The letter contained a list of "State and local resources that have been or will be used to alleviate the conditions of this emergency." It also certified that "the State and local governments will assume all applicable non-Federal share of costs required by the Stafford Act." Governor Blanco specifically requested "emergency protective measures, direct Federal Assistance, Individual and Household Program (IHP) assistance, Special Needs Program assistance, and debris removal" for all affected areas. She defined the affected areas as "all the southeastern parishes including the New Orleans Metropolitan area and the mid-state Interstate I-49 corridor and northern parishes along the I-20 corridor that are accepting the thousands of citizens evacuating . . . ," Kathleen Blanco, Governor of Louisiana, Letter to President Bush requesting that he declare an emergency for the State of Louisiana due to Hurricane Katrina (Baton Rouge, August 27, 2005). That same day President Bush declared a state of emergency in Louisiana. 70 Fed. Reg. 53238 (August 27, 2005).

[107] William Lokey, Federal Coordinating Officer for Baton Rouge, written statement for a hearing on Louisiana Hurricane Katrina Response and Recovery, on December 14, 2005, submitted to the House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[108] Louisiana Office of the Governor, Response to U.S. Senate Committee on Homeland Security and Governmental Affairs and Information Request Dated October 7, 2005 (Baton Rouge, December 2005); U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, "Hurricane Katrina Forecast Timeline," n.d., ca. 2005.

[109] Max Mayfield, testimony before a hearing on "The Lifesaving Role of Accurate Hurricane Prediction**,"** Disaster Prevention and Prediction Hearing, U.S. Senate Committee on Commerce, Science, and Transportation, on September 20, 2005, 109th Congress, 1st session, 11. Mayfield said: "Yes Sir, I called. I don't do that very often. But I—in fact, I have only done that only one other time for Hurricane Lili in the— when it was a Category 4 Hurricane in the Gulf of Mexico. I called the former Governor of Louisiana in 2002. And this was Saturday night around 8:30 or 9 o'clock eastern time and I called the—I got hold of the Governor of Louisiana, the Governor of Mississippi and Governor Blanco in Louisiana suggested I call Mayor Nagin in New Orleans. I called him and left a message and he called me right back and I have—a lot of people have asked me what I said and I, you know, with the hundreds of briefings that we did, I don't remember exactly. But the whole purpose of that was just to be absolutely sure that they understood the severity of the situation and I do remember telling all three of them that I want to leave the National Hurricane Center that night and be able to go home and sleep knowing that I had done everything that I could do."

[110] Max Mayfield, testimony before a hearing on "The Lifesaving Role of Accurate Hurricane Prediction**,"** Disaster Prevention and Prediction , U.S. Senate Committee on Commerce, Science, and Transportation, on September 20, 2005, 109th Congress, 1st session, 11.

[111] See U.S. Department of Homeland Security, Federal Emergency Management Agency, National Response Coordination Center, video teleconference, August 27, 2005.

[112] Brigadier General David L. Johnson, Director, National Oceanographic and Atmospheric Administration, National Weather Service, testimony before a hearing on "Predicting Hurricanes: What We Knew About Katrina," U.S. House Select Committee on Hurricane Katrina, on September 22, 2005, 109th Congress, 1st session, 43 (testifying that Hurricane Katrina became a Category 4 storm at 12:40 AM on Sunday, August 28, and became a Category 5 storm at 6:15 AM that same day).

[113] Richard D. Knabb, Jamie R. Rhome, and Daniel Brown, *Tropical Cyclone Report: Hurricane Katrina: August 23-30, 2005*, National Hurricane Center, National Oceanic and Atmospheric Administration (Miami, Florida, December 2005), 3.

[114] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Weather Service, New Orleans/Baton Rouge Forecast Office, Slidell, Louisiana, "Urgent Weather Message," August 28, 2005.

[115] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, *Hurricane Katrina Advisory # 25*, (Miami, Florida, August 28, 2005).

[116] U.S. Department of Commerce, U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Weather Service, New Orleans/Baton Rouge Forecast Office, Slidell, LA, "Urgent Weather Message," August 28, 2005.

[117] The Emergency Alert System (EAS) is a mechanism for public officials—Federal, State, and local—to communicate disaster information and instructions rapidly and widely. The system aims to reach the broadest possible audience by disseminating emergency updates on existing radio and television stations, including via digital and satellite networks. Federal Communications Commission, FCC Consumer Facts: The Emergency Alert System (Washington, DC, 2005), 1. See also State of California, "What Is EAS?," http://eas.oes.ca.gov/Pages/whatseas.htm. The new EAS system is the direct descendent of the Emergency Broadcast System (EBS), the Nation's alert system from 1963 until the advent of EAS. EAS was officially launched on January 1, 1997 (for radio stations) and December 31, 1998 (for television). Federal Emergency Management Agency, "Background on the Emergency Alert System," October 23, 2004, http://www.fema.gov/rrr/rep/easrep.shtm. While EAS fulfills the same function as EBS, it differs in that it takes advantage of digital technology to permit automation of transmission. Federal Emergency Management Agency, "Background on the Emergency Alert System," October 23, 2004, http://www.fema.gov/rrr/rep/easrep.shtm. The Emergency Broadcast System and its EAS successor were originally designed for the President to speak to the Nation during an emergency, particularly following catastrophic nuclear attacks. But the system was made available to State and local officials in 1963, and since then has been used primarily for weather emergencies. "There are two contexts in which the EAS will be used—Presidentially-initiated alerts and messages and those initiated by State and local governments in concert with the broadcast industry." Federal Emergency Management Agency, "Background on the Emergency Alert System," October 23, 2004, http://www.fema.gov/rrr/rep/easrep.shtm. See also, Federal Communications Commission, *FCC Consumer Facts: The Emergency Alert System* (Washington, DC, 2005), 2. The document states: "a state emergency manager may use the system to send out a public warning by broadcasting that warning from one or more major radio stations in a particular state." EAS was not activated prior to landfall aside from NOAA hurricane warnings and advisories. "The Emergency Alert System was never activated by the White House or by State or local governments during Katrina." Ken Kerschbaumer, "Broadcasters Seek Better Emergency Alert System," *Broadcasting and Cable*, September 12, 2005.

[118] National Oceanic and Atmospheric Administration, National Weather Service, "NOAA Weather Radio All Hazards," January 31, 2006, http://www.weather.gov/nwr/. The Federal Communication Commission's EAS Primary Entry Point (PEP) station in New Orleans (station WWL) was one of the few radio stations in the area to provide continuous service to the New Orleans area. The NOAA Weather Radio (NWR) is a national network of radio stations that continuously broadcast weather and hazard information from local Weather Service offices. Operating in close conjunction with EAS, NOAA Weather Radio comprises an "all hazards" radio network that acts as a "single source for comprehensive weather and emergency information." National Oceanic and Atmospheric Administration, National Weather Service, "NOAA Weather Radio All Hazards," January 31, 2006, http://www.weather.gov/nwr.

[119] Transcript of August 27, 2005, NRCC Video Teleconference.

[120] U.S. Department of Homeland Security, Coast Guard, *Hurricane Katrina: The U.S. Coast Guard at its Best* (Washington, D.C., 2005), 15.

[121] "New Orleans Mayor, Louisiana Governor Hold Press Conference," *CNN*, August 28, 2005, http://transcripts.cnn.com/TRANSCRIPTS/0508/28/bn.04.html.

[122] "New Orleans Mayor, Louisiana Governor Hold Press Conference," *CNN*, August 28, 2005, http://transcripts.cnn.com/TRANSCRIPTS/0508/28/bn.04.html . Louisiana law provides the parish presidents with the authority to issue mandatory evacuation orders. The law allows the Parish President to "Direct and compel the evacuation of all or part of the population from any stricken or threatened area within the boundaries of the parish if he deems this action necessary for mitigation, response, or recovery measures." The law declares the penalty for violating such an order to be a fine not more than five hundred dollars, or confinement in the parish jail for not more than six months, or both. *Louisiana Homeland Security and Emergency Assistance and Disaster Act,* La. Rev. Stat. 29-727. Although a State responsibility, it is unclear how the State or Parish law enforcement authorities intended to enforce this order. The Mayor ordered a mandatory evacuation for the entire Parish of Orleans, with the

exceptions of essential personnel of the Federal government, State of Louisiana and City of New Orleans, as well as essential personnel of regulated utilities and mass transportation services, hospitals and their patients, essential media, Orleans Parish Criminal Sheriff's office and its inmates, and the essential personnel of operating hotels and their patrons. The Mayor ordered every person not exempt to immediately evacuate the City of New Orleans, or if no other alternative was available, to immediately move to one of the facilities within the City that would be designated a refuge of last resort.

[123] U.S. Department of Homeland Security, National Response Coordination Center, video teleconference, August 28, 2005.

[124] Frances Fragos Townsend, Assistant to the President for Homeland Security and Counterterrorism, remarks to the National Emergency Management Association's 2006 mid-year conference, February 13, 2006.

[125] See U.S. Department of Homeland Security, National Response Coordination Center, video teleconference, August 28, 2005.

[126] See U.S. Department of Homeland Security, National Response Coordination Center, video teleconference, August 28, 2005.

[127] Secretary Chertoff asked, "…are there any DOD assets that might be available. Have we reached out to them, and have we I guess made any kind of arrangement in case we need some additional help from them?" Director Brown responded, "We have DOD assets over here at the EOC. They are fully engaged, and we are having those discussions with them now." U.S. Department of Homeland Security, Federal Emergency Management Agency, National Response Coordination Center, video teleconference, August 28, 2005.

[128] Michael Chertoff, Secretary, Department of Homeland Security, testimony on the Department of Homeland Security Relief Response, on October 19, 2005, before the House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress 1st session, 48. Secretary Chertoff testified, "it is correct that under the declaration there's an FCO appointed. It was Lokey in Louisiana and Carwile in Mississippi. But Brown went down as their supervisor with direct authority over them to be on the ground in charge of the entire Gulf Coast response. In other words, he went down on Sunday. He was—on Saturday he was in FEMA in Washington running the operation with each of the support function representatives, including DOD literally sitting at the table with him at FEMA headquarters. He then moved himself—after the Sunday VTC, down to Baton Rouge and operated using his authority over the FCOs as the head of the whole agency. He was in charge of this thing on the ground from his arrival on Sunday through the end. The designation as a PFO, I guess, was a kind of formal recognition of that."

[129] Michael Chertoff, Secretary of the Department of Homeland Security, written statement for a hearing on the Department of Homeland Security's Hurricane Relief Response, on October 19, 2005, submitted to the House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session, 14.

[130] The White House, "President Discusses Hurricane Katrina, Congratulates Iraqis on Draft Constitution," news release, August 28, 2005.

[131] By Sunday afternoon, Mississippi ordered mandatory or voluntary evacuation orders for six counties. Alabama Governor Bob Riley issued evacuation orders for Mobile and Baldwin counties. State of Mississippi, Mississippi Emergency Management Agency, "Mississippians Urged to Take Precautions for Hurricane Katrina," news release, August 28, 2005; State of Alabama, Office of the Governor, "Governor Riley Orders Evacuation of Parts of Mobile and Baldwin Counties," news release, August 28, 2005; Leigh Ann Ryals, Director of the Baldwin County Emergency Management Agency, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the State of Alabama, on November 9, 2005, House Committee on Government Reform on the State of Alabama's Preparation for and Response to Hurricane Katrina,109th Congress, 1st session.

[132] "Before Katrina came, I developed a new evacuation plan that includes contra-flow, where both sides of the interstates are used for outbound traffic. I am proud that we rapidly moved over 1.2 million people - some 92% of the population - to safety without gridlock or undue delay prior to Katrina." Governor Kathleen Blanco, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, submitted to the U.S. House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session. See also, Johnny Bradberry, Secretary of the Louisiana Department of Transportation and Development, testimony before a hearing on the Evacuation of New Orleans, Senate Homeland Security and Governmental Affairs Committee, January 31, 2006, 109th Congress, 2nd session.

¹³³ U.S. Department of Transportation, "Hurricane Katrina - Situation Report Five," August 29, 2005; Louis Armstrong New Orleans International Airport, "Hurricane Katrina from the Airport's Point of View," http://www.flymsy.com/.

¹³⁴ Governor Kathleen Blanco, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, submitted to the U.S. House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109ᵗʰ Congress, 1ˢᵗ session. The Louisiana DOTD estimated that 500,000 vehicles evacuated during Phase 3 operations, see Louisiana State Police, "LSP Timeline of Events," n.d., ca. 2005, 5.

¹³⁵ U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #6," August 29, 2005, 12.

¹³⁶ State of Texas, State Operations Center, "Situation Report #9," August 28, 2005.

¹³⁷ Ray Nagin, Mayor of New Orleans, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, U.S. House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109ᵗʰ Congress, 1ˢᵗ session, "After a Sunday morning statewide conference call, I announced the first ever in our almost 300-year history a citywide mandatory evacuation order, which followed the evacuation orders, I might add, of some of the other low-lying parishes that also were encouraging their citizens to evacuate post haste. We opened the Superdome as our refuge of last resort, and we staged buses throughout the city to transport people to the Superdome, and set a curfew for dusk. The city also evacuated 400 special needs residents to the state shelter and then opened the Superdome at 8 a.m. that morning for the remaining special needs populations. There were thousands of residents that did not leave, including those with means who would choose to ride out the storm like their parents had done during Hurricane Betsy. When reality set in for many of them on Sunday, they made their way to the refuge of last resort, the Superdome."

Louisiana National Guard personnel on-scene reported no evacuees at the Superdome until after noon. Louisiana National Guard, Task Force Pelican, "Hurricane Katrina Overview of Significant Events," November 28, 2005, 5-6.

¹³⁸ Major General Bennett Landreneau, Louisiana National Guard, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi, and Alabama, on October 27, 2005, House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109ᵗʰ Congress, 1ˢᵗ session. A shelter of last resort is intended to serve only as a location to ride out the winds of a storm. Under the State of Louisiana Emergency Operations Plan, it could "be located either inside or outside of the Hurricane Risk" and did not have to meet American Red Cross shelter standards. It is required to be "wind resistant" and "located outside of the flood zone or [provide the] ability to locate on floors." Louisiana Office of Emergency Preparedness, *State of Louisiana Emergency Operations Plan Supplement 1C: Louisiana Shelter Operations Plan* (Baton Rouge, as revised July 2000), Annex M.

¹³⁹ Marty Bahamonde, Regional Director for External Affairs, Region One, FEMA, written statement for a hearing on Hurricane Katrina in New Orleans, A Flooded City, A Chaotic Response, on October 20, 2005, submitted to the Senate Committee on Homeland Security and Governmental Affairs, 109ᵗʰ Cong., 1ˢᵗ session, 2, stating, "Later that night after most of the 12,000 evacuees entered the Superdome, I returned to the EOC around midnight to ride out the storm." Although estimates put the Superdome population at between 20,000 and 40,000 by Friday, September 2, when evacuations of the Superdome began, Louisiana officials have stated that this increase took place after landfall on the Gulf Coast. Colonel Jeff Smith, Acting Deputy Director, Louisiana Office of Homeland Security and Emergency Preparedness, testimony before a hearing on the Hurricane Katrina Response in Louisiana, on December 14, 2005, House Select Committee to Investigate the Preparation and Response to Hurricane Katrina, 109ᵗʰ Congress, 2ⁿᵈ session. Jeff Smith had recently taken the job of Acting Deputy Director of the Louisiana Office of Homeland Security and Emergency Preparedness. On November 29, 2004, a Federal grand jury had indicted Michael L. Brown, the former Deputy Director of the Louisiana Office of Homeland Security and Emergency Preparedness (LOHSEP) and the State official responsible for overall management of Louisiana's Hazardous Mitigation Grants from FEMA, on charges of obstructing a Federal audit. This grant program funds mitigation projects to prevent flood losses or flood claims made upon the National Flood Insurance Program. Two other LOHSEP officials were indicted with him. U.S. Department of Justice, Three State Officials Indicted for Obstructing Federal Audit, press release, November 29, 2004, http://www.usdoj.gov/usao/law/news/wdl20041129.html; Ken Silverstein and Josh Meyer, "Katrina's Aftermath: Louisiana Officials Indicted Before Katrina Hit," Los Angeles Times, September 17, 2005, 17.

¹⁴⁰ For example, the State of Alabama made a request on August 28 for shuttle trucks and tarps to be delivered to Maxwell Air Force Base. Alabama also requested the transport and delivery of two 50-man Joint Field Office kits

to Montgomery.  Mississippi requested the pre-positioning of 30 trucks of water with tractors at Meridian NAS and two helicopters to transport response personnel.

[141]  FEMA Office of Legislative Affairs, Hurricane Katrina Response Fact Sheet.

[142] Speaking before the House Ways and Means Committee, Joseph C. Becke, Senior Vice President, American Red Cross, stated "It has been the policy of the Red Cross that there are no safe areas south of the I-10/I-12 corridor for a large-scale hurricane . . .  We do not establish shelters in facilities that do not meet our criteria for safety during landfall."  In saying this, Mr. Becke clearly implies that the Superdome is considered by the Red Cross to be an "unsafe" shelter.  See Joseph C. Becke, Senior Vice President of Preparedness and Response, American Red Cross, written statement for a hearing on the Response of Charities to Hurricane Katrina, on December 13, 2005, before the House Ways and Means Committee, 109th Congress 1st session.  However, the Red Cross was not against the use of the Superdome as a shelter of last resort.  In a "frequently asked questions" portion of the official Red Cross website the organization states, "the original plan was to evacuate all the residents of New Orleans to safe places outside the city.  With the hurricane bearing down, the city government decided to open a shelter of last resort in the Superdome downtown.  *We applaud this decision and believe it saved a significant number of lives*." See American Red Cross, "Frequently Asked Questions," http://www.redcross.org/faq/ 0,1096,0_682_4524,00.html (emphasis added).  Thus, the Superdome, while it did not meet the Red Cross' safety requirements, served a valuable purpose as a shelter of last resort.  Although the Red Cross's own policies prevented it from directly staffing the Superdome, the organization claims that it was willing to supply the shelter with essential commodities after Katrina made landfall.  According to the "Frequently Asked Questions" statement on its website, the organization was prevented from carrying out this mission by the National Guard and local authorities.

[143] "New Orleans Mayor, Louisiana Governor Hold Press Conference," *CNN Breaking News,* August 28, 2005, http://transcripts.cnn.com/transcripts/0508/28/bn.04.html.

[144] Major General Bennett Landreneau, Adjutant General, State of Louisiana, testimony before a hearing on Military Disaster Relief, on October 27, 2005, House Select Bipartisan Committee to Investigate the Preparation for and response to Hurricane Katrina, 109th Congress, 1st session.

[145] Louisiana National Guard, Task Force Pelican, "Hurricane Katrina Overview of Significant Events," November 28, 2005, 3, 5.

[146] Louisiana National Guard, Task Force Pelican, "Hurricane Katrina Overview of Significant Events," November 28, 2005, 6.

[147] Louisiana National Guard, Task Force Pelican, "Hurricane Katrina Overview of Significant Events," November 28, 2005, 6.

[148] Louisiana National Guard, Task Force Pelican, "Hurricane Katrina Overview of Significant Events," November 28, 2005, 7.

[149] Louisiana National Guard, Task Force Pelican, "Hurricane Katrina Overview of Significant Events," November 28, 2005, 7.

[150] Louisiana National Guard, Task Force Pelican, "Hurricane Katrina Overview of Significant Events," November 28, 2005, 7-8.  U.S. Department of Health and Human Services (HHS) contacted the Director of Emergency Preparedness for the Louisiana Health Department.  The State declined assistance.

[151] "New Orleans Mayor, Louisiana Governor Hold Press Conference*,*" *CNN*, August 28, 2005, http://transcripts.cnn.com/TRANSCRIPTS/0508/28/bn.04.html.

[152] Louisiana State Police, "LSP Timeline of Events," n.d., ca. 2005. 5.  The storm forced Troop B of the Louisiana State Police to relocate from their barracks to the Kenner Police Department's headquarters.

[153] Parish officials declared mandatory evacuations for Lafourche, Orleans, Plaquemines, St. Bernard, St. Charles and St. John the Baptist parishes.  Officials declared mandatory evacuations for limited geographical or flood-prone areas of the following parishes: Jefferson, St. James, Livingston, Tangipahoa, St. Tammany and Terrebone.  Parish officials recommended evacuations in Ascension, Assumption and Washington parishes.  See Louisiana State Police, "Southeast Louisiana Evacuations Continue," news release, August 28, 2005; Louisiana State Police, "Hurricane Evacuations: Livingston Parish," news release, August 28, 2005; Louisiana State Police, "Hurricane Evacuations: St. Tammany Parish," news release, August 28, 2005; Louisiana State Police, "Hurricane Evacuations: Washington Parish," news release, August 28, 2005.

[154] U.S. Department of Homeland Security, Federal Emergency Management Agency, Tropical Storm Katrina Briefing, August 25, 2005.

[155] Mobile Emergency Response Support (MERS) detachments consist of trained personnel and mobile response assets.  FEMA has five MERS detachments strategically placed across the country.  MERS detachments

are designed to provide communications capabilities and operational and logistical support to first responders. Each MERS detachment has a suite of vehicle assets to provide support. Because its diverse asserts are housed on a number of different trucks, a single MERS detachment "can concurrently support a large Disaster Field Office and multiple field operating sites within the disaster area." Thus, the deployment of one MERS unit is not married to a single location. The communications component of MERS capabilities consists of Ku-band satellite, International Maritime Satellite (INMARSAT) and American Mobile Satellite Corporation (AMSC) satellite terminals, line of sight microwave transmission, and high frequency, very high frequency, and ultra high frequency radio. MERS logistics support includes power, heating, ventilation, and cooling (HVAC), fuel, and [potable] water." A MERS detachment can provide "generators to supply the power generation requirements of one or more facilities or locations within the disaster area," and "heating, ventilation, and cooling requirements for a large office building." A MERS detachment also provides personnel experienced in facility management, acquisition support, warehouse operation, transportation management, and property accountability." Further, "the MERS Detachments have resources that can provide temporary office or operational space." The Denton, Texas MERS team operates FEMA's *Emergency Operations Vehicle* (EOV), an "82 foot long expandable trailer providing office workstations and conference space for 20-25 people." The EOV also has kitchen, power generation, and communications facilities. MERS detachments also have rapid response teams to provide initial support immediately following a disaster. The Quick Reaction System (QRS) consists of "13 people with 4-wheel drive vehicles and support equipment for 72 hours that provide the initial damage assessment." This unit also has "an INMARSAT and AMSC satellite terminal, cellular telephones and laptop computers, VHF and HF radios, life support (water, food, batteries, etc.), and generators." Finally, ERTA and ERTS units are "preloaded trucks with food, water, clothing, first aid items, safety equipment, sleeping bags, hygiene items, office equipment, tools, and lumber." These trucks can support "100 people for 10 days." For a detailed assessment of MERS capabilities, see U.S. Department of Homeland Security, Federal Emergency Management Agency, *Response and Recovery: Mobile Operations Capability Guide for Emergency Managers and Planners,* October 23, 2004, http://www.fema.gov/rrr/mers01.shtm.

[156] U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA National Situation Update," August 29, 2005, 3.

[157] U.S. Department of Homeland Security, Federal Emergency Management Agency, Office of Legislative Affairs, *Hurricane Katrina Response Fact Sheet*.

[158] National Aeronautics and Space Administration, Goddard Space Flight Center, "Hurricane Katrina from TRMM: August 28, 2005," http://svs.gsfc.nasa.gov/vis/a000000/a003200/a003218/ (data from NASA spacecraft).

[159] "New Orleans Mayor, Louisiana Governor Hold Press Conference*," CNN*, August 28, 2005, http://transcripts.cnn.com/TRANSCRIPTS/0508/28/bn.04.html.

## CHAPTER FOUR: A WEEK OF CRISIS — AUGUST 29 – SEPTEMBER 5

[1] The White House, "President Discusses Hurricane Relief in Address to the Nation," news release, September 15, 2005, http://www.whitehouse.gov/news/releases/2005/09/20050915-8.html.

[2] These wind gusts were reported in Poplarville, Mississippi, at the Pearl River County Emergency Operations Center. See Richard D. Knabb, Jamie R. Rhome, and Daniel P. Brown, *Tropical Cyclone Report: Hurricane Katrina, 23-30 August 2005*, prepared for the National Hurricane Center (Miami, Florida, December 20, 2005), 3, 8.

[3] Hurricane Katrina was downgraded to Category 1 on the Saffir-Simpson scale at 6:00 PM UTC on August 29. Richard D. Knabb, Jamie R. Rhome, and Daniel P. Brown, *Tropical Cyclone Report: Hurricane Katrina, 23-30 August 2005*, prepared for the National Hurricane Center (Miami, Florida, December 20, 2005), 4.

[4] Richard D. Knabb, Jamie R. Rhome, and Daniel P. Brown, *Tropical Cyclone Report: Hurricane Katrina, 23-30 August 2005*, prepared for the National Hurricane Center (Miami, Florida, December 20, 2005), 4.

[5] Richard D. Knabb, Jamie R. Rhome, and Daniel P. Brown, *Tropical Cyclone Report: Hurricane Katrina, 23-30 August 2005*, prepared for the National Hurricane Center (Miami, Florida, December 20, 2005). A National Data Buoy Center (NDBC) buoy located 64 nautical miles south of Dauphin Island, Alabama, measured a peak significant wave height of 55 feet on August 28, matching the record for "the largest significant wave height ever measured by a NDBC buoy."

[6] Richard D. Knabb, Jamie R. Rhome, and Daniel P. Brown, *Tropical Cyclone Report: Hurricane Katrina, 23-30 August 2005*, prepared for the National Hurricane Center (Miami, Florida, December 20, 2005), 8-9.

[7] As of the time of this writing, Louisiana had counted 1,103 deaths, twenty-three of which were not storm related, for 1,080 storm related deaths. See Louisiana Department of Health and Hospitals, "Reports of Missing and Deceased," February 17, 2006, http://www.dhh.louisiana.gov/offices/page.asp?ID=192&Detail=5248 (accessed February 17, 2006). There were 231 deaths in Mississippi, fifteen in Florida, two in Alabama, and two in Georgia. See Richard D. Knabb, Jamie R. Rhome, and Daniel P. Brown, *Tropical Cyclone Report: Hurricane Katrina, 23-30 August 2005,* prepared for the National Hurricane Center (Miami, Florida, December 20, 2005), 10. Since there are still 2,096 people from the Gulf Coast area missing, it is likely that the death toll numbers will increase. See also U.S. Department of Commerce, National Oceanic and Atmospheric Administration Satellite and Information Service and National Climatic Data Center, *2005 Annual Climate Review: U.S. Summary* (Asheville, NC, January 2006), http://www.ncdc.noaa.gov/oa/climate/research/2005/ann/us-summary.html; and Ray Nagin, Mayor of New Orleans, testimony before a hearing on Hurricane Katrina: Managing the Crisis and Evacuating New Orleans, on February 1, 2006, Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 2nd session.

[8] The White House, "President Outlines Hurricane Katrina Relief Efforts," news release, August 31, 2005.

[9] Richard D. Knabb, Jamie R. Rhome, and Daniel P. Brown, *Tropical Cyclone Report: Hurricane Katrina, 23-30 August 2005*, prepared for the National Hurricane Center (Miami, Florida, December 20, 2005), 11.

[10] Brett Martel, "'What Hiroshima looked like' - Katrina's full wrath still being felt, death toll soars past 100," Associated Press, August 31, 2005.

[11] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #8," August 30, 2005. See also American Red Cross, "Hurricane Katrina Damage Assessments," http://www.msema.org/redcrossassessments.htm (accessed February 13, 2006).

[12] Guy Gugliotta and Peter Whoriskey, "Floods Ravage New Orleans; Two Levees Give Way; in Mississippi, Death Toll Estimated at 110," *Washington Post*, August 31, 2005.

[13] "The eastbound lanes of Interstate 10 between Gulfport and Biloxi were impassable because of storm debris." "Katrina kills 50 in one Mississippi county," *CNN.com*, August 30, 2005, http://www.cnn.com/2005/WEATHER/08/29/hurricane.katrina.

[14] "Katrina kills 50 in one Mississippi county," *CNN.com*, August 30, 2005, http://www.cnn.com/2005/WEATHER/08/29/hurricane.katrina. See also U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #8," August 30, 2005, 3 ("Widespread flooding has also been reported across coastal Mississippi and Alabama").

[15] U.S. Department of Commerce, National Oceanic and Atmospheric Administration Satellite and Information Service and National Climatic Data Center, "Hazards/Climate Extremes," http://www.ncdc.noaa.gov/oa/climate/research/2005/aug/hazards.html; and Richard D. Knabb, Jamie R. Rhome, and Daniel P. Brown, *Tropical Cyclone Report: Hurricane Katrina, 23-30 August 2005*, prepared for the National Hurricane Center (Miami, Florida, December 20, 2005), 8-9, 10.

[16] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #14," September 2, 2005.

[17] Norman Mineta, Secretary of the Department of Transportation, written statement for a hearing on the Department of Transportation (Hurricane Katrina), on October 6, 2005, submitted to the House Committee on Appropriations, Subcommittee on Transportation, Treasury, Housing and Urban Development, the Judiciary, District of Columbia, and Independent Agencies, 109th Congress, 1st session.

[18] Tommy Longo, Mayor of Waveland, Mississippi, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi, on December 7, 2005, House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session, 51.

[19] Tommy Longo, Mayor of Waveland, Mississippi, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi, on December 7, 2005, House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session. See also U.S. Department of the Interior, U.S. Geological Survey, Coastal & Marine Geology Program, "Before and After Photo Comparisons: Mainland Mississippi," *Hurricane Katrina Impact Studies*, August 31, 2005, http://coastal.er.usgs.gov/hurricanes/katrina/photo-comparisons/mainmississippi.html.

[20] Haley Barbour, Governor of Mississippi, testimony via video teleconference before a hearing on Hurricane Katrina: Recovering from Hurricane Katrina, on September 7, 2005, House Committee on Energy and Commerce, 109th Congress, 1st session.

[21] U.S. Department of Homeland Security, Homeland Security Operations Center, "Hurricane Katrina Update," August 30, 2005, 12.

[22] U.S. Department of Energy, "Department of Energy's Hurricane Response Chronology, as Referred to by Secretary Bodman at Today's Senate Energy and Natural Resources Committee Hearing," news release, October 27, 2005, http://energy.gov/news/2404.htm.

[23] U.S. Department of Energy, Office of Electricity Delivery and Energy Reliability, "Hurricane Katrina Situation Report #10," August 30, 2005, 1; and U.S. Department of Energy, "Department of Energy's Hurricane Response Chronology, as Referred to by Secretary Bodman at Today's Senate Energy and Natural Resources Committee Hearing," news release, October 27, 2005, http://energy.gov/news/2404.htm.

[24] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #36," September 13, 2005, 7. "The wireline telecommunications network sustained enormous damage both to the switching centers that route calls and to the lines used to connect buildings and customers to the network." Kenneth Moran, Director of the Office of Homeland Security, Enforcement Bureau, Federal Communications Commission, written statement for a hearing on Hurricane Katrina and Communications Interoperability, on September 29, 2005, submitted to the Senate Committee on Commerce, Science and Transportation, 109th Congress, 1st session.

[25] Nearly one hundred radio and television stations remained off the air a month after Hurricane Katrina's landfall. Kenneth Moran, Director of the Office of Homeland Security, Enforcement Bureau, Federal Communications Commission, written statement for a hearing on Hurricane Katrina and Communications Interoperability, on September 29, 2005, submitted to the Senate Committee on Commerce, Science, and Transportation, 109th Congress, 1st session.

[26] Paul McHale, Assistant Secretary of Defense for Homeland Defense, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi, and Alabama, on October 27, 2005, House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session, 74.

[27] "The public health and health care delivery infrastructures have been either completely destroyed or have sustained significant damage across the affected Gulf Coast. Existing facilities that are operational are under extreme stress as they assume even greater responsibilities to fill the gaps created by the loss of so many facilities. Physician offices, cancer, imaging, dialysis and rehabilitation centers, hospitals, clinics, long-term care facilities, pharmacies, laboratories, etc., need to be rebuilt or repaired, not to mention re-supplied, with information technology systems, equipment and inventory." Ardis D. Hoven, Member of the American Medical Association Board of Trustees, written statement for a hearing on Assessing Public Health and the Delivery of Care in the Wake of Hurricane Katrina, on September 22, 2005, submitted to the House Energy and Commerce Committee, Subcommittees on Health and Oversight and Investigations, 109th Congress, 1st session.

[28] "Nursing homes and hospitals were not a priority during the rescue process. For the first two days, [the Louisiana Nursing Home Association] was on its own to improvise and find ways to rescue the elderly in nursing homes." Joseph A. Donchess, Executive Director of the Louisiana Nursing Home Association, written statement for a hearing on Challenges in a Catastrophe: Evacuating New Orleans in Advance of Hurricane Katrina, on January 31, 2006, submitted to the Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 2nd session. "Only a third of nursing homes in the New Orleans area evacuated before Katrina, according to state and industry officials. In hard-hit Orleans and Jefferson parishes, eight of forty-one nursing homes removed residents before the storm." Roma Khanna, "Katrina's toll on the sick, elderly emerges," *Houston Chronicle*, November 28, 2005. Fatality statistics illustrate Hurricane Katrina's heavy toll on older Louisiana residents. For example, 71% of the dead at St. Gabriel Morgue whose age could be determined were more than sixty years old. See Louisiana Department of Health and Hospitals, "Vital Statistics of All Bodies at St. Gabriel Morgue," January 4, 2006, http://www.dhh.louisiana.gov/publications
.asp?ID=192&Detail=878.

[29] For example, Dr. Mark Peters of East Jefferson General Hospital in Metairie, Louisiana, stated that, "A day or two after the storm, we ran low on food. We always were able to feed our patients, and there were only two days when the staff had to eat once a day, and in small amounts. After that, we were able to contact various businesses and vendors to replenish our supplies and food." Dr. Mark Peters, President and Chief Executive Officer of East Jefferson General Hospital, written statement for a hearing on Assessing Public Health and Delivery of Care in the Wake of Hurricane Katrina, on September 22, 2005, submitted to the House Committee on Energy and Commerce, Subcommittee on Health and Subcommittee on Oversight and Investigations, 109th Congress, 1st session. Also see U.S. Department of Health and Human Services, "Secretary's Operations Center Flash Report #8--Hurricane

Katrina," August 31, 2005, 1-2; and U.S. Department of Health and Human Services, "Secretary's Operations Center Flash Report #9--Hurricane Katrina," August 31, 2005, 1.

[30] For example, six or seven patients at the Bethany Home, a nursing facility in New Orleans, succumbed to the conditions as they awaited evacuation.  See Joseph A. Donchess, Executive Director of the Louisiana Nursing Home Association, testimony before a hearing on Challenges in a Catastrophe: Evacuating New Orleans in Advance of Hurricane Katrina, on January 31, 2006, Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 2nd session.  See also Roma Khanna, "Katrina's Aftermath," *Houston Chronicle*, November 27, 2005.

[31] The Louisiana State Attorney General subsequently charged the nursing home's owners with thirty-four counts of negligent homicide.  Louisiana Office of the Attorney General, "Nursing Home Owners Surrender to Medicaid Fraud Control Unit Investigators," news release, September 14, 2005, http://www.ag.state.la.us/ViewPressRel.aspx?RelID=420.

[32] Ray Nagin, Mayor of New Orleans, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session, 3.

[33] Richard D. Knabb, Jamie R. Rhome, and Daniel P. Brown, *Tropical Cyclone Report: Hurricane Katrina, 23-30 August 2005,* prepared for the National Hurricane Center (Miami, Florida, December 20, 2005), 9.

[34] U.S. Department of Homeland Security, "Hurricane Katrina SITREP #6," August 29, 2005.

[35] R.B. Seed, P.G. Nicholson, R.A. Dalrymple, et al., *Preliminary Report on the Performance of the New Orleans Levee Systems in Hurricane Katrina on August 29, 2005,* November 17, 2005.

[36] U.S. Department of Homeland Security, Federal Emergency Management Agency, "Urban Search and Rescue Operations Completed: Hurricane Katrina Urban Search and Rescue Teams Are Due to Return Home," news release, September 30, 2005, http://www.fema.gov/news/newsrelease.fema?id=19320.html

[37] Governor Kathleen Blanco, Michael Brown, Senator Mary Landrieu, Bill Lokey, and Senator David Vitter, "Governor Kathleen Blanco (D-LA) Hold a News Conference Regarding Hurricane Katrina," Congressional Quarterly Transcription, August 30, 2005.

[38] FEMA Urban Search and Rescue teams "helped 6,582 people reach safety in the hours and days immediately following Hurricane Katrina.  U.S. Department of Homeland Security, Federal Emergency Management Agency, "Urban Search and Rescue Operations Completed: Hurricane Katrina Urban Search and Rescue Teams Are Due to Return Home," September 30, 2005, http://www.fema.gov/news/newsrelease.fema?id=19320.html. National Guard forces were engaged in search and rescue operations within four hours after landfall.  Lieutenant General H. Steven Blum, written statement for a hearing on Responding to Catastrophic Events: The Role of the Military and National Guard in Disaster Response, on October 20, 2005, submitted to the House Committee on Government Reform, 109th Congress, 1st session. Early search and rescue actions of local first responders: Ray Nagin, Mayor of New Orleans, written statement submitted for a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, to the House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1[st] session, 1.

[39] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Weather Service, *Flash Flood Warning for Louisiana, August 29, 2005* (New Orleans, LA, August 2005).

[40] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #7," August 29, 2005.

[41] U.S. Department of Homeland Security, Homeland Security Operations Center, "FEMA National Sitrep 2005 Aug 29," August 29, 2005.

[42] U.S. Department of Homeland Security, Homeland Security Operations Center, "HSOC#4317-05: HC Katrina Update- 11:30hrs," August 29, 2005.

[43] U.S. Department of Homeland Security, Homeland Security Operations Center, "HSOC#4317-05: VTC NOTES 29 AUG 05."

[44] It was not until 7:30 PM that the HSOC developed a spot report that described the USACE report, but it is unclear if this spot report was distributed outside of the HSOC.

[45] Marty Bahamonde, Regional Director for External Affairs, Region One, Federal Emergency Management Agency, testimony before a hearing on Hurricane Katrina in New Orleans, A Flooded City, A Chaotic Response, on October 20, 2005, Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 1st session.

[46] Marty Bahamonde, Regional Director for External Affairs, Region One, Federal Emergency Management Agency, testimony before a hearing on Hurricane Katrina in New Orleans, A Flooded City, A Chaotic Response, on October 20, 2005, Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 1st session.

[47] Michael Brown, former Director of the Federal Emergency Management Agency, testimony before a hearing on Hurricane Katrina: Hurricane Preparedness, on February 10, 2006, Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 2nd session.

[48] Marty Bahamonde, Regional Director for External Affairs, Region One, Federal Emergency Management Agency, testimony before a hearing on Hurricane Katrina in New Orleans, A Flooded City, A Chaotic Response, on October 20, 2005, Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 1st session.

[49] U.S. Department of Homeland Security, Homeland Security Operations Center, "HSOC Spot Rep #13," August 29, 2005).

[50] U.S. Department of Homeland Security, "Hurricane Katrina DHS Sit Rep #8," August 30, 2005.

[51] U.S. Department of Homeland Security, Homeland Security Operations Center, "HSOC #4217-05: HC Katrina—NO 200 Ft Breached Levee Update," August 30, 2005; U.S. Department of Homeland Security, Homeland Security Operations Center, "HSOC #4317-05: HC Katrina – NO 200 Ft of Levee  Breached," August 30, 2005; and U.S. Department of Homeland Security, Homeland Security Operations Center, "HSOC Spot Rep FW: US Army Corps of Engineers Spot Rep," August 30, 2005.

[52] Governor Kathleen Blanco, Michael Brown, Senator Mary Landrieu, Bill Lokey, and Senator David Vitter, "Governor Kathleen Blanco (D-LA) Hold a News Conference Regarding Hurricane Katrina," Congressional Quarterly Transcription, August 30, 2005.

[53] Richard D. Knabb, Jamie R. Rhome, and Daniel P. Brown, *Tropical Cyclone Report: Hurricane Katrina, 23-30 August 2005*, prepared for the National Hurricane Center (Miami, Florida, December 20, 2005); and Ray Nagin, Mayor of New Orleans, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session. In contrast, Raymond B. Seed, prepared statement for a hearing on Hurricane Katrina: Performance of the Flood Control System, on November 2, 2005, submitted to the Senate Committee on Homeland Security and Government Affairs, 109th Congress, 1st session, 2, http://hsgac.senate.gov/_files/110205Seed.pdf. Both sources report that eighty percent of New Orleans experienced some amount of flooding.

[54] Michael Brown, former Director of the Federal Emergency Management Agency, testimony before a hearing on Hurricane Katrina: Hurricane Preparedness, on February 10, 2006, Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 2nd session.

[55] International Association of Firefighters, "Reports from the Hurricane Frontlines: Katrina (August 29-September 6)," August 30, 2005, http://daily.iaff.org/Katrina/Katrina.htm?c=report1.

[56] International Association of Firefighters, "Reports from the Hurricane Frontlines: Katrina (September 7-September 13)," September 10, 2005, http://daily.iaff.org/Katrina/Katrina.htm?c=report2.

[57] Warren J. Riley, Superintendent of the New Orleans Police Department, written statement for a hearing on Hurricane Katrina: Managing Law Enforcement and Communications in a Catastrophe, on February 6, 2006, submitted to the Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 2nd session.
In contrast, see Ray Nagin, Mayor of New Orleans, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session ("Pre-Katrina, we had 1,668 officers.  Post-Katrina, we're at 1,506 -- so we're down 162 officers.  We've had about 133 officers that have either been terminated, resigned, you know, are under investigation or resigned for personal reasons.").

[58] Louisiana State Police, "Hurricane Katrina Timeline of Events," n.d.,ca. 2005.

[59] Christopher Rhoads, "Cut Off: At Center of Crisis, City Officials faced struggle to keep in touch," *Wall Street Journal*, September 9, 2005.

[60] Willis Carter, Chief of Communications, Shreveport, Louisiana Fire Department, written statement for a hearing on Communications Interoperability, on September 29, 2005, submitted to the Senate Committee on Commerce, Science and Transportation, 109th Congress, 1st session.

[61] Louisiana State Police, "Hurricane Katrina Timeline of Events," n.d., ca. 2005.

[62] Senator Robert Barham, quoted in Joby Warrick, "Crisis Communications Remain Flawed," *Washington Post*, December 10, 2005.

[63] Nick Felton, New Orleans Local 632 President, quoted in International Association of Firefighters, "Reports from the Hurricane Frontlines: Katrina (September 7-September 13)," September 13, 2005, http://daily.iaff.org/Katrina/Katrina.htm?c=report2.

APPENDIX E – ENDNOTES

⁶⁴ Lieutenant Colonel Keith LaCaze, Louisiana Department of Wildlife and Fisheries, Enforcement Division, *Activity Report on Hurricane Katrina* (Baton Rouge, 2005), 2; Massachusetts Urban Search and Rescue Task Force One, *Hurricane Katrina: National Urban Search and Rescue Response System Issue Statements and Recommendations* (Beverly, MA, 2005), 7; and Ceci Connolly, '"I Don't Think I've Ever Had a More Surreal Experience'; Veteran Rescue Workers Surprised by Challenges in Louisiana," *Washington Post*, September 12, 2005.

⁶⁵ Juliet Eilperin, "Flooded Toxic Waste Sites Are Potential Health Threat," *Washington Post*, September 10, 2005. "A Superfund site is any land in the United States that has been contaminated by hazardous waste and identified by the Environmental Protection Agency (EPA) as a candidate for cleanup because it poses a risk to human health and/or the environment." See U.S. Environmental Protection Agency, "About Superfund," http://www.epa.gov/superfund/about.htm (accessed January 28, 2005).

⁶⁶ *Gulf Coast Hurricane Emergency Environmental Protection Act of 2005*, HR Res. 4139, section 102 (c), 109ᵗʰ Congress, 1ˢᵗ session (October 25, 2005). See also U.S. Department of Homeland Security, "Hurricane Katrina: What Government is Doing," http://www.dhs.gov/interweb/assetlibrary/katrina.htm (accessed February 10, 2006).

⁶⁷ For first-hand accounts of these conditions, see Lieutenant Colonel Keith LaCaze, Louisiana Department of Wildlife and Fisheries, Enforcement Division, *Activity Report on Hurricane Katrina* (Baton Rouge, 2005), 2; Massachusetts Urban Search and Rescue Task Force One, *Hurricane Katrina: National Urban Search and Rescue Response System Issue Statements and Recommendations* (Beverly, MA, 2005), 7; and Ceci Connolly, '"I Don't Think I've Ever Had a More Surreal Experience'; Veteran Rescue Workers Surprised by Challenges in Louisiana," *Washington Post*, September 12, 2005. For details on the contaminants found in tested floodwaters, see U.S. Environmental Protection Agency, "Environmental Assessment Summary for Areas of Jefferson, Orleans, St. Bernard, and Plaquemines Parishes Flooded as a Result of Hurricane Katrina," December 6, 2005, http://www.epa.gov/katrina/testresults/katrina_env_assessment_summary.htm.

⁶⁸ For example, see Governor Kathleen Babineaux Blanco, letter to Governor Bill Owens, entitled "Calling Certain Elements of the Colorado National Guard to Active Duty to Assist with Emergency Response Efforts Related to Hurricane Katrina," September 1, 2005. Governor Blanco signed similar memoranda with fifteen other States on the same date.

EMAC was established to provide form and structure to interstate mutual aid. Approved by Congress in 1996 (Public Law 104-321), the EMAC membership has since grown to include 49 States, the District of Columbia, Puerto Rico and the Virgin Islands. Through EMAC, a disaster-struck member State may request and receive assistance from other member States quickly and efficiently, facilitated by the Compact's legal foundation. Once the conditions for providing assistance to a requesting State have been set, the terms constitute a legally binding contractual agreement that obligates States for reimbursement. See Emergency Management Assistance Compact, "About EMAC," http://www.emacweb.org.

⁶⁹ U.S. Department of Defense, National Guard Bureau, *After Action Review: Hurricane Response September 2005,* December 21, 2005, 57.

⁷⁰ Ray Nagin, Mayor of New Orleans, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, submitted to the House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109ᵗʰ Congress, 1ˢᵗ session, 1.

⁷¹ U.S. Department of Homeland Security, Federal Emergency Management Agency, "Urban Search and Rescue Operations Completed: Hurricane Katrina Urban Search and Rescue Teams Are Due to Return Home," news release, September 30, 2005, http://www.fema.gov/news/newsrelease.fema?id=19320.html. FEMA pre-positioned US&R teams to the region and eventually deployed all twenty-eight National US&R teams within the first week after Hurricane Katrina's second landfall. FEMA US&R Task Forces, in conjunction with USCG, DOD, other Federal agencies, and State and local first responders, rescued over 6,500 people.

⁷² Donna Miles, "Military Support to Katrina Relief Effort Continues to Grow," American Forces Information Service, August 31, 2005, http://www.defenselink.mil/news/Aug2005/20050831_2576.html.

⁷³ U.S. Department of Homeland Security, Coast Guard, *Hurricane Katrina: The U.S. Coast Guard at its Best* (Washington, D.C., 2005), 7, 47. See also U.S. Department of Homeland Security, Coast Guard, "Coast Guard Response to Hurricane Katrina," *Coast Guard Fact File*, http://www.uscg.mil/hq/g-cp/comrel/factfile/index.htm (accessed February 10, 2006); and U.S. Department of Homeland Security, "Hurricane Katrina: What Government is Doing," http://www.dhs.gov/interweb/assetlibrary/katrina.htm (accessed February 10, 2006).

⁷⁴ John Sherffius, cartoon, reproduced by the U.S. Department of Homeland Security, Coast Guard Aviation Association, September 2005, http://www.aoptero.org/images/nola%20st.gif (accessed February 7, 2006).

[75] Haley Barbour, Governor of Mississippi, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi, on December 7, 2005, submitted to the House Select Bipartisan Committee to Investigate the Preparation and Response to Hurricane Katrina, 109th Congress, 1st session, 2-3.

[76] U.S. Department of Homeland Security, Federal Emergency Management Agency, "Urban Search and Rescue Operations Completed: Hurricane Katrina Urban Search and Rescue Teams Are Due to Return Home," September 30, 2005, http://www.fema.gov/news/newsrelease.fema?id=19320.html.

[77] Lieutenant General H. Steven Blum, written statement for a hearing on Responding to Catastrophic Events: The Role of the Military and National Guard in Disaster Response, on October 20, 2005, submitted to the House Committee on Government Reform, 109th Congress, 1st session.

[78] "US&R activities include locating, extricating, and providing onsite medical treatment to victims trapped in collapsed structures." U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), ESF #9-1.

[79] National Search and Rescue Committee, *National Search and Rescue Plan* (Washington, D.C., 1999), 8-9.

[80] East Baton Rouge Parish, *Draft After-Action Report for Hurricanes Katrina and Rita* (Baton Rouge, 2005), 37-38.

[81] Louisiana Office of the Governor, *Response to U.S Senate Committee on Homeland Security and Governmental Affairs Document and Information Request Dated October 7, 2005 and to the U.S House of Representatives Select Committee to Investigate the Preparation for and Response to Hurricane Katrina* (Baton Rouge, December 2, 2005), 11; and Lieutenant Colonel Keith LaCaze, Louisiana Department of Wildlife and Fisheries, Enforcement Division, *Activity Report on Hurricane Katrina* (Baton Rouge, 2005).

[82] U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), ESF #9-1.

[83] Louisiana Office of Emergency Preparedness, *Emergency Operations Plan Supplement 1A: Southeast Louisiana Hurricane Evacuation and Sheltering Plan* (Baton Rouge, January 2000), Parts I, II, VI. The City of New Orleans had drafted a hurricane annex to its emergency management plan that outlined the responsibilities of municipal organizations for executing the City's evacuation. See New Orleans Office of Emergency Preparedness, *City of New Orleans Comprehensive Emergency Management Plan: Hurricanes Annex* (New Orleans, n.d.).

[84] William Lokey, Federal Coordinating Officer for Louisiana, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, submitted to the House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session, 93 ; Brigadier General Mark Graham, Deputy Commanding General, Fifth U.S. Army, written statement for a hearing on Hurricane Katrina: Managing the Crisis and Evacuating New Orleans, on February 1, 2006, submitted to the Senate Homeland Security and Governmental Affairs Committee, 109th Congress, 2nd session; and Vince Pearce, National Response Program Manager, Department of Transportation, written statement for a hearing on Hurricane Katrina: Managing the Crisis and Evacuating New Orleans, on February 1, 2006, submitted to the Senate Committee on Homeland Security and Government Affairs, 109th Congress, 2nd session, 1-2.

[85] On August 29, the population of evacuees at the facility was estimated to be between 10,000 and 12,000. Marty J. Bahamonde, Office of Public Affairs, Federal Emergency Management Agency, testimony before the Senate Homeland Security Committee and Governmental Affairs, October 20, 2005, 2; Louisiana Office of the Governor, *Response to U.S. Senate Committee on Homeland Security and Governmental Affairs and Information Request Dated October 7, 2005 and to the U.S. House of Representatives Select Committee to Investigate the Preparation for and Response to Hurricane Katrina,* (Baton Rouge, December 2, 2005), 7; and Louisiana National Guard, Task Force Pelican, "Hurricane Katrina: Overview of Significant Events," November 28, 2005, 14. An inaccurate estimate of 25,000 general population evacuees at the Superdome was reported by DHS on August 29. U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #6," August 29, 2005, 13.

FEMA estimated the Superdome population at 20,000 people on August 29. The Louisiana National Guard estimates that the crowd grew to 35,000 over the course of the next three days. See Louisiana National Guard, Task Force Pelican, "Hurricane Katrina: Overview of Significant Events," November 28, 2005, 13, 15-17.

[86] Louisiana National Guard, Task Force Pelican, "Hurricane Katrina: Overview of Significant Events," November 28, 2005, 16, 17.

[87] Major General Bennett Landreneau, Adjutant General for the State of Louisiana, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the Department of Defense, on October 27, 2005, House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[88] Louisiana National Guard, Task Force Pelican, "Hurricane Katrina: Overview of Significant Events," November 28, 2005, 17.

APPENDIX E – ENDNOTES

[89] Louisiana National Guard, Task Force Pelican, "Hurricane Katrina: Overview of Significant Events," November 28, 2005, 15-17; Marty Bahamonde, Regional Director for External Affairs, Region One, Federal Emergency Management Agency, written statement for a hearing on Hurricane Katrina in New Orleans: A Flooded City, a Chaotic Response, on October 20, 2005, submitted to the Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 1st session.

[90] U.S. Department of Health and Human Services, "Secretary's Operations Center Flash Report #6,"August 30, 2005.

[91] Louisiana Office of the Governor, *Response to U.S Senate Committee on Homeland Security and Governmental Affairs Document and Information Request Dated October 7, 2005 and to the U.S House of Representatives Select Committee to Investigate the Preparation for and Response to Hurricane Katrina* (Baton Rouge, December 2, 2005), 9.

[92] FEMA requested of the Governors of a number of States that their States accept and temporarily house evacuees. See, e.g., Arizona Department of Housing, "Arizona to Accept Evacuees from Gulf Coast," news release, n.d., ca. 2005, http://www.housingaz.com/evacuees.asp.; Oregon Office of the Governor, "Questions and Answers on Relief Efforts," http://governor.oregon.gov/Gov/hurricane_qa.shtml.  The Governor of Louisiana and her staff also made direct requests to States.  See Louisiana Office of the Governor, *Response to U.S Senate Committee on Homeland Security and Governmental Affairs Document and Information Request Dated October 7, 2005 and to the U.S House of Representatives Select Committee to Investigate the Preparation for and Response to Hurricane Katrina* (Baton Rouge, December 2, 2005), 9-10.

[93] Louisiana Office of the Governor, *Response to U.S Senate Committee on Homeland Security and Governmental Affairs Document and Information Request Dated October 7, 2005 and to the U.S House of Representatives Select Committee to Investigate the Preparation for and Response to Hurricane Katrina* (Baton Rouge, December 2, 2005), 10.

[94] The provision of buses occurred through ESF-1, which is led by the Department of Transportation.  Vincent Pearce, National Response Program Manager for the Department of Transportation, written statement submitted for a hearing on Hurricane Katrina: Managing the Crisis and Evacuating New Orleans, on February 1, 2006, to the Senate Homeland Security and Governmental Affairs Committee; and U.S. Department of  Transportation, "Actions for Hurricane Katrina: Annotated Chronology of Significant Events," October 6, 2005, 4.

[95] FEMA directly requested that several States receive and house evacuees.  For examples, see Arizona Department of Housing, "Arizona to Accept Evacuees from Gulf Coast," news release, n.d., ca. 2005, http://www.housingaz.com/evacuees.asp.; and Oregon Office of the Governor, "Questions and Answers on Relief Efforts," http://governor.oregon.gov/Gov/hurricane_qa.shtml.  In other cases, such requests were made by one State's governor to another.  For example, see District of Columbia Office of the Mayor, "Mayor Williams Announces Airlift of Several Hundred Hurricane Evacuees to DC Armory," news release, September 5, 2005, http://dc.gov/mayor/news/release.asp?id=758&mon=200509; and New York Office of the Governor, "Governor: NY Stands Ready to Welcome Hurricane Katrina Evacuees, news release, September 7, 2005, http://www.ny.gov/governor/press/05/sep7_05.htm.

[96] I-10 is a major interstate cutting east-west through New Orleans.  Near the Superdome, I-10 features an elevated four-way interchange, called a cloverleaf due to its distinctive shape.  Evacuees gathered atop this interchange to escape Hurricane Katrina's floodwaters.  Brigadier General Mark A. Graham, Deputy Commanding General, Fifth U.S. Army, written statement for a hearing on Hurricane Katrina: Managing the Crisis and Evacuating New Orleans, on February 1, 2006, submitted to the Senate Homeland Security and Government Affairs Committee, 109th Congress, 2nd session, 2, 3-4; and William Lokey, Federal Coordinating Officer for Louisiana, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, submitted to the House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session, 5, 7, 92.

[97] Louisiana Office of the Governor, *Response to U.S Senate Committee on Homeland Security and Governmental Affairs Document and Information Request Dated October 7, 2005 and to the U.S House of Representatives Select Committee to Investigate the Preparation for and Response to Hurricane Katrina* (Baton Rouge, December 2, 2005), 10.

[98] Louisiana National Guard, Task Force Pelican, "Hurricane Katrina: Overview of Significant Events," November 28, 2005, 23, 24. Ray Nagin, Mayor of New Orleans, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, submitted to the House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[99] Louisiana National Guard, Task Force Pelican, "Hurricane Katrina: Overview of Significant Events," November 28, 2005, 23.

[100] Louisiana National Guard, Task Force Pelican, "Hurricane Katrina: Overview of Significant Events," November 28, 2005, 23; Ray Nagin, Mayor of New Orleans, written statement for a hearing on Managing the Crisis: Evacuating New Orleans, on February 1, 2006, submitted to the Senate Homeland Security and Governmental Affairs Committee, 109th Congress, 2nd session; and Louisiana Office of the Governor, *Response to U.S Senate Committee on Homeland Security and Governmental Affairs Document and Information Request Dated October 7, 2005 and to the U.S House of Representatives Select Committee to Investigate the Preparation for and Response to Hurricane Katrina* (Baton Rouge, December 2, 2005), 10.

[101] Louisiana Office of the Governor, *Response to U.S Senate Committee on Homeland Security and Governmental Affairs Document and Information Request Dated October 7, 2005 and to the U.S House of Representatives Select Committee to Investigate the Preparation for and Response to Hurricane Katrina* (Baton Rouge, December 2, 2005), 11. Also see Kathleen Blanco, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, submitted to the House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session, 68.

[102] "The buses that the city of New Orleans controls are basically Regional Transit Authority. And those buses were always staged, or has been staged in an area that has been high and dry throughout every storm that has ever hit the city of New Orleans. And we expected the same for this event. Unfortunately, those buses flooded also because 80 percent of the city went underwater." Ray Nagin, Mayor of New Orleans, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, submitted to the House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session, 99.

[103] Louisiana Office of the Governor, *Response to U.S Senate Committee on Homeland Security and Governmental Affairs Document and Information Request Dated October 7, 2005 and to the U.S House of Representatives Select Committee to Investigate the Preparation for and Response to Hurricane Katrina* (Baton Rouge, December 2, 2005), 11.

[104] "About 20,000 people were in the dome when efforts began, and that number swelled as people poured in to get a ride out of town, Capt. John Pollard said." The Associated Press, "Superdome Evacuation Completed," September 3, 2005. http://www.msnbc.msn.com/id/9175611/

[105] Medical evacuations from the Convention Center began on September 2, as well. U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #14," September 2, 2005, 1; and Louisiana National Guard, Task Force Pelican, "Hurricane Katrina: Overview of Significant Events," November 28, 2005, 23-24. Louisiana National Guard, Task Force Pelican, "Hurricane Katrina: Overview of Significant Events," November 28, 2005, 23-24. U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #16," September 3, 2005, 1.

[106] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #17," September 3, 2005, 1.

[107] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #16," September 3, 2005, 1.

[108] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #18," September 4, 2005, 1.

[109] The next three largest U.S. domestic airlifts were: Hurricane Andrew in 1992 (13,500 people), the Mariel Boatlift (12,000 people by helicopter), and Hurricane Rita (9,000 people). U.S. Department of Transportation, "Largest Airlift in U.S. History to Get Over 10,000 People Out of New Orleans by End of Today," news release, September 3, 2005, http://www.dot.gov/affairs/dot12005.htm; National Museum of the U.S. Air Force, "Year by Year Events: 1990-1997," http://www.pafb.af.mil/museum/50th/event90.htm.

[110] In addition, the U.S. Army provided ground support at the airport, including physically assisting in loading passengers up airplane stairs and into aircraft. See also U.S. Department of Transportation, "Hurricane Katrina – Situation Report Fifteen," September 3, 2005, 2; U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #14," September 2, 2005 ("Coordinated major airlift of evacuees to begin 8:00 AM CDT, September 2, 2005. Evacuees will depart New Orleans Superdome by bus, and be flown at a rate of 4-5 planes per hour from New Orleans Airport to Lackland Air Force Base, TX for reception and housing at Kelly AFB"); U.S. Department of Transportation, *In re: Foreign Air Carriers: Facilitation of Air Services in Support of Hurricane Katrina Relief Efforts,* Docket OST-2005-22395 (September 2, 2005), 3; and James C. May, President and Chief Executive Officer of Air Transport Association of America, testimony before a hearing on Review of the Impact of Hurricane Katrina on the Aviation Industry, on September 14, 2005, Senate Committee on Commerce, Science, and Transportation, Subcommittee on Aviation, 109th Congress, 1st session, 8.

[111] U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA VIP Briefing," slide presentation, September 2, 2005.

[112] U.S. Department of Defense, "Hurricane Katrina Update," September 8, 2005, 4; U.S. Department of Homeland Security, Federal Emergency Management Agency, Region VI Regional Response Coordinating Center, "SITREP #10," September 4, 2005, 1; and Bryon Okada, "Screeners kept flights moving," *Dallas Fort-Worth Star Telegram*, September 12, 2005, as reprinted by the Transportation Security Administration, *What Others Are Saying About TSA,* http://www.tsa.gov/public/display?theme=204&content=090005198016ab96.

[113] The Department of Transportation had arranged for Amtrak to transport evacuees from New Orleans to Lafayette on a twice-daily run. The trains had enough food and water to sustain the passengers during the two to four hour ride.  The first Amtrak train arrived at Avondale Station in New Orleans at 4:30 AM on September 3.  The train could have accommodated 600 passengers, but only ninety-six were at the station because of a bus problem in New Orleans.  See U.S. Department of Transportation, "Hurricane Katrina – Situation Report Fifteen," September 3, 2005, 10.  In contrast, however, see Ray Nagin, Mayor of New Orleans, testimony before a hearing on Hurricane Katrina: Managing the Crisis and Evacuating New Orleans, on February 1, 2006, Senate Homeland Security and Governmental Affairs Committee, 109th Congress, 2nd session.

[114] CNN, "Rita Now a Monster Category-Five Storm," transcript, September 22, 2005.
http://transcripts.cnn.com/TRANSCRIPTS/0509/22/lad.04.html

[115] For examples, see Mississippi Emergency Management Agency, "Hurricane Katrina Situation Report 24," September 1, 2005, 11; For examples of media reports on the looting, see Walt Philbin, "Widespread looting hits abandoned businesses; Lack of police after storm leaves stores vulnerable," *New Orleans Times-Picayune*, August 30, 2005;   "Katrina kills 50 in one Mississippi county," *CNN.com*, August 30, 2005,
http://www.cnn.com/2005/WEATHER/08/29/hurricane.katrina.

[116] In one notable example, on August 30, a New Orleans Police officer was shot in the head by looters.  See Louisiana State Police, "Hurricane Katrina Timeline of Events," n.d., ca. 2005, 8.  Also in New Orleans, a man was arrested by Federal agents for firing at a U.S. military helicopter on a search and rescue mission.  U.S. Attorney's Office for the Eastern District of Louisiana, news release, October 8, 2005.  The reported target of the gunfire was a U.S. military helicopter on a search and rescue mission.  While the gunfire did not hit the helicopter, the incident was widely reported and contributed to the perception of lawlessness in New Orleans.  See, e.g., "ATF Makes First Federal Arrest in New Orleans," *US Fed News,* September 6, 2005; "US authorities arrest New Orleans man accused of firing on helicopter," Agence France Presse*,* September 7, 2005; "Federal agents start post-storm arrests; Algiers man accused of shooting at copter," *New Orleans Times-Picayune,* September 7, 2005.

[117] For examples, see U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #7," August 29, 2005, 5; U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #11," August 31, 2005, 4.  Additionally, without functioning jails in New Orleans, law enforcement officers initially had no choice but to release those that they arrested for minor crimes.

[118] Reports on general lawlessness in New Orleans, were later found to be embellished or completely false.  Brian Thevenot and Gordon Russel, "Rape. Murder. Gunfights," *New Orleans Times-Picayune*, September 26, 2005; Robert E. Pierre and Ann Gerhart, "News of Pandemonium May Have Slowed Aid," *Washington Post*, October 5, 2005; and Michelle Roberts, "Reports of rape, murder at Katrina shelters were probably exaggerated, officials now say," Associated Press, September 27, 2005.

[119] U.S. Department of Homeland Security, Federal Emergency Management Agency, "Hurricane Katrina Response Brief," September 1, 2005.  The brief reported that security and lawlessness were becoming a "very critical concern" and were hindering relief efforts.  See also U.S. Department of Homeland Security, Federal Emergency Management Agency, "VIP Katrina Briefing," slide presentation, September 1, 2005.

[120] U.S. Department of Homeland Security, Coast Guard District Eight, internal message from August 31, 2005; U.S. Department of Homeland Security, Homeland Security Operations Center, "HSOC SPOT REP #53," September 1, 2005; and U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #13," September 1, 2005.

[121] U.S. Department of Homeland Security, Federal Emergency Management Agency, Region VI Regional Response Coordination Center, "1603-DR-LA SitRep #7," September 1, 2005; U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #13," September 13, 2005; and U.S. Department of Defense, "CJCS Katrina Update," draft, September 6, 2005.

[122] U.S. Department of Health and Human Services, "Secretary's Operations Center Flash Report #10 – Hurricane Katrina," September 1, 2005; and U.S. Department of Health and Human Services, "Secretary's Operations Center Flash Report #12 – Hurricane Katrina," September 2, 2005.

[123] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #15," September 2, 2005; U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #19," September 4, 2005; U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #18," September 4, 2005; U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #29," September 9, 2005.

[124] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #13," September 1, 2005, 4, 10, 12; U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #15," September 2, 2005, 5, 13, 14; U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #16," September 3, 2005, 10; U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #18," September 4, 2005, 1; U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #19," September 4, 2005, 11; U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #21," September 5, 2005, 11; U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #22," September 6, 2005, 9.

[125] The Department of Homeland Security's law enforcement response began on August 29, when Immigration and Customs Enforcement (ICE) deployed officers from the Federal Protective Service to protect critical Federal facilities and to assist FEMA where needed. From August 30 to September 1, DHS deployed additional ICE personnel to the region to perform public safety and security missions. The U.S. Coast Guard also deployed personnel to conduct security and law enforcement missions. By August 30, Customs & Border Protection (CBP) deployed a site survey team and Special Operations Division agents to the hurricane area; CBP air and maritime assets also joined in conducting law enforcement operations. On August 31, the Secret Service deployed personnel to implement its Continuity of Operations Plan (COOP) and Restoration of Operations, Personnel and Equipment (ROPE) mission assignments.

On September 1, the Office of the Attorney General directed ATF, DEA, FBI, and the U.S. Marshals Service to identify personnel, assets, and other resource for immediate deployment to areas impacted by Hurricane Katrina. On September 2, having received the inventory of assets and personnel available for deployment, the Attorney General issued a memorandum to the same agencies directing the Federal Bureau of Investigation to continue to deploy agents (including SWAT agents) and tactical assets (including helicopters, boats, and technical/communications assets) to the affected area; the Drug Enforcement Administration to prepare to deploy Mobile Enforcement Teams, special agents, and tactical assets (including helicopters and other aircraft) to the affected area; the Bureau of Alcohol, Tobacco, Firearms, and Explosives to establish a Violent Crime Impact Team (VCIT) in Baton Rouge, Louisiana, with related VCIT personnel and assets, to address any rise in criminal activity in that city; and the United States Marshals Service to continue to deploy Deputy U.S. Marshals and Court Security Officers to conduct prisoner transport operations and provide additional court security and to prepare to utilize the Justice Prisoner and Alien Transportation (JPATS) to deploy law enforcement personnel to airports around the country as needed.

[126] In the first week following Hurricane Katrina's landfall, DHS and DOJ deployed the following numbers of law enforcement personnel to New Orleans to assist in restoring order. Other departments contributed significant numbers of law enforcement personnel as well.

| Date | DHS | DOJ |
|------|-----|-----|
| Aug 29 | 66 | 268 |
| Aug 30 | 74 | 292 |
| Aug 31 | 196 | 326 |
| Sep 1 | 162 | 443 |
| Sep 2 | 381 | 547 |
| Sep 3 | 1033 | 645 |
| Sep 4 | 1230 | 690 |

[127] 42 U.S.C. § 10501 *et seq*. See also letter from Governor Kathleen Babineaux Blanco to Attorney General Alberto Gonzales, dated September 3, 2005 [letter is dated September 3, 2005, but was received via facsimile on the following day]; letter from Attorney General Gonzales to Governor Blanco, dated September 4, 2005 (approving request); letter from Governor Blanco to Attorney General Gonzales and Secretary Chertoff, dated September 6, 2005 (requesting additional support); letter from Attorney General Gonzales to Governor Blanco, dated September 7, 2005 (approving request); letter from Secretary Chertoff to Governor Blanco, dated September 7, 2005

(approving request).  Governor Barbour of Mississippi made a similar request on September 3, which was granted pursuant to an order by the Attorney General on that date.

[128] DHS deployed law enforcement officers from Customs and Border Protection, the Federal Air Marshals Service, the Federal Protective Service, and Immigration and Customs Enforcement.  DOJ deployed officers from the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Drug Enforcement Agency, the Federal Bureau of Investigation, and the U.S. Marshals Service.  U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #21," September 5, 2005.

[129] By September 8, the Department of Interior deployed 175 law enforcement officers from the U.S. Fish and Wildlife Service, the National Park Service, the Bureau of Indian Affairs, and the Tribal Police.  The Department of the Treasury and the Department of Veteran Affairs deployed thirty-four and thirty-three law enforcement officers, respectively.  The Environmental Protection Agency sent seventeen officers to the region, and the U.S. Postal Inspection Service deployed a total of 117 law enforcement personnel.  U.S. Department of Homeland Security, "Federal Law Enforcement Deployed to Region," September 8, 2005. In addition, USDA's Forest Service deployed approximately 300-350 law enforcement officers to the affected area as members of ESF-4 Incident Management Teams. Eventually, over 3,500 Federal law enforcement officers were deployed to the region.

[130] In Louisiana, for example, a State Police attorney had to physically be present to swear in Federal agents. Additionally, law enforcement personnel from the Department of the Interior (DOI) had to be sworn in as Deputy U.S. Marshals to give them Federal law enforcement authority beyond their statutory DOI jurisdiction.

[131] For additional information on the disarray of the New Orleans criminal justice system in Hurricane Katrina's aftermath, see Melinda Deslatte, "Prisons in New Orleans empty as temporary booking facility up and running," Associated Press, September 3, 2005; Ann Woolner, "A Legal System in Chaos: New Orleans Struggles," *Fulton County Daily Report,* October 4, 2005; and Chuck Crumbo, "Evacuation leaves Louisiana prison system in chaos," *The State (Columbia, SC),* October 5, 2005.

[132] On September 3, the Associated Press reported that "computer logs still hadn't been retrieved from the criminal district court in New Orleans…[and] tracking down witnesses, finding court records and trial transcripts and organizing a temporary court" would remain challenges to the reestablishment of the city's criminal justice system.  Melinda Deslatte, "Prisons in New Orleans empty as temporary booking facility up and running," Associated Press, September 3, 2005; Ann Woolner, "A Legal System in Chaos: New Orleans Struggles," *Fulton County Daily Report,* October 4, 2005; and Chuck Crumbo, "Evacuation leaves Louisiana prison system in chaos," *The State (Columbia, SC),* October 5, 2005. Both State and Federal courts closed their doors.  Supreme Court of Louisiana, Order by Justice Catherine D. Kimball, September 2, 2005, Baton Rouge, Louisiana; Supreme Court of Mississippi, Order by Justice James W. Smith, Jr., September 7, 2005; U.S. District Court for the Eastern District of Louisiana, Order by Chief Judge Helen G. Berrigan, September 4, 2005, accessed from http://katrinalaw.org/dokuphp?id=louisiana_eastern_district_court on February 17, 2006; U.S. Bankruptcy Court for the Eastern District of Louisiana, September 2, 2005, accessed from http://katrinalaw.org/dokuphp?id=louisiana_eastern_bankruptcy_court on February 17, 2006; Fourth Circuit Court of Appeal, State of Louisiana, Order by Justice Max N. Tobias, Jr., September 2, 2005, accessed from http://katrinalaw.org/dokuphp?id=fourth_circuit_court_of_appeal on February 17, 2006; Fifth Circuit Court of Appeal, State of Louisiana, Order by Justice Walter J. Rothschild, September 2, 2005, accessed from: http://katrinalaw.org/dokuphp?id= fifth_circuit_court_of_appeal, accessed on February 17, 2006; Civil District Court, Parish of Orleans, State of Louisiana, Order by Chief Justice Robin M. Giarrusso, September 2, 2005, accessed from http://katrinalaw.org/dokuphp?id= orleans_parish_civil_district_court, accessed on February 17, 2006.

[133] The DOJ's Bureau of Prisons moved or facilitated movement of a large number of prisoners incarcerated in Louisiana facilities during the first week of the disaster.  The Bureau noted that no major difficulties or issues were encountered during the actual transport of the prisoners, though both the Bureau and the U.S. Marshals Service noted flaws in the decision making process and a general failure on the part of State and local prison authorities to be proactive in evacuating their incarcerated populations.

[134] Scott Wells, Deputy Federal Coordinating Officer for Louisiana, written statement for a hearing on Hurricane Katrina: Perspectives of FEMA's Operations Professionals, on December 8, 2005, submitted to the Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 1st session.

[135] Michael Chertoff, Secretary of the Department of Homeland Security, memorandum for distribution entitled "Designation of Principal Federal Official for Hurricane Katrina," August 30, 2005, 1.

An INS was arguably in effect since President Bush earlier issued his Emergency Declarations and Major Disaster Declarations. See the *National Preparedness—A Primer* chapter for a detailed discussion of this issue, as well as U.S. Government Accountability Office, *Preliminary Observations on Hurricane Response* (Washington, DC, February 2006, 4).

[136] Though Secretary Chertoff subsequently testified that Director Brown had the authority to manage the incident even prior to his formal designation as PFO, "…when he went down on Sunday it was with the understanding that he was going to manage this thing as the battlefield commander, you know, with the authority he had as the director of FEMA, which put him in supervisory authority over the federal coordinating officers." Secretary Chertoff added, "When I actually formally designated him the PFO, it was essentially formalizing something that had occurred in practice." Michael Chertoff, testimony before a hearing on "Hurricane Katrina: The Role of the Department of Homeland Security," on October 19, 2005, House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[137] U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), 33.

[138] According to the NRP, the FCO is "The Federal officer who is appointed to manage Federal resource support activities related to Stafford Act disasters and emergencies. The FCO is responsible for coordinating the timely delivery of Federal disaster assistance resources and programs to the affected State and local governments, individual victims, and the private sector." *National Response Plan*, p. 65.

[139] "[Director Brown] was going to manage this thing as the battlefield commander, you know, with the authority he had as the director of FEMA, which put him in supervisory authority over the federal coordinating officers." Michael Chertoff, testimony before a hearing on Hurricane Katrina: The Role of the Department of Homeland Security, on October 19, 2005, House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session. See also *Robert T. Stafford Disaster Relief and Emergency Assistance Act ["Stafford Act"]*, as amended by Public Law 106-390 (October 30, 2000).

[140] Colonel Jeff Smith, Deputy Director of the Louisiana Office of Homeland Security and Emergency Preparedness, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, submitted to the House Select Committee to Investigate the Preparation and Response to Hurricane Katrina, 109th Congress, 1st session.

[141] A virtual National JIC "links all participants through technological means (secure or nonsecure) when geographical restrictions, incident management requirements, and other limitations preclude physical attendance by public affairs leadership at a central location." U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), PUB-3.

[142] U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), 28.

[143] Some of this lack of planning can be attributed to the failure to finalize the JFO Standing Operating Procedures prior to Katrina, as required by the National Response Plan.

[144] U.S. Department of Homeland Security, "Hurricane Katrina DHS Sitrep #20," September 5, 2005, 1; U.S. Department of Homeland Security, "Hurricane Katrina DHS Sitrep #23," September 6, 2005, 1; U.S. Department of Homeland Security, Federal Emergency Management Agency, Daily Conference Call on Hurricane Katrina, September 7, 2005, 1; U.S. Department of Homeland Security, "Hurricane Katrina DHS Sitrep #27," September 8, 2005, 1; U.S. Department of Homeland Security, Federal Emergency Management Agency, "Region VI Regional Response Coordinating Center Sitrep #15," September 9, 2005, 1; U.S. Department of Homeland Security, "Hurricane Katrina DHS Sitrep #20," September 5, 2005, 1; U.S. Department of Health and Human Services, "Secretary's Operations Center Flash Report #32—Hurricane Katrina," September 12, 2005, 2, 3; U.S. Department of Health and Human Services, "Secretary's Operations Center Flash Report #32—Hurricane Katrina," September 12, 2005, 2; U.S. Department of Homeland Security, "Emergency Response Issues," September 11, 2005, 10; Robert B. Stephan, Assistant Secretary for Infrastructure Protection, U.S. Department of Homeland Security, prepared statement for a hearing on "Hurricane Katrina: The Roles of DHS and FEMA Leadership," on February 10, 2006, submitted to the Committee on Homeland Security and Governmental Affairs, U.S. Senate, 109th Congress, 2nd session, pgs. 7-8.

[145] Federal officials recognized the need for a presence in New Orleans to effectively coordinate the efforts to stabilize the City, so a "forward PFO" in New Orleans was eventually established. The JFO remained in Baton Rouge.

[146] Although the JFO in Baton Rouge was located in close proximity to the Louisiana State Emergency Operations Center, the vast majority of the response operations in the early stages of the incident occurred in the greater New Orleans area. It quickly became apparent that the JFO was too far away to coordinate operational activities in New

THE FEDERAL RESPONSE TO HURRICANE KATRINA: LESSONS LEARNED

-189-

Orleans. For this reason, the Law Enforcement Coordination Center (LECC) was initially established in Baton Rouge and then moved to New Orleans to coordinate law enforcement activities. The Department of Defense (DOD) set up its Katrina Task Force HQ in Mississippi. New Orleans officials established the New Orleans Emergency Operations Center downtown, with no connectivity to the JFO.

[147] U.S. Department of Defense, National Guard Bureau, Office of Legislative Liaison, "National Guard Status Comparison Chart," n.d., http://www.ngb.army.mil/ll/statuscomparison.asp. State active duty and Title 32 forces are not subject to *posse comitatus* restrictions, see 18 U.S.C. § 1385 (Military forces generally may not perform domestic law enforcement), which bar Federal military forces from enforcing civil law. Thus, while serving in State active duty status or Title 32 status (which allows for Federal pay while under state command and control), the Army National Guard and the Air National Guard can directly assist civil authorities in maintaining peace and order. Lieutenant General Steven H. Blum, "A Vision for the National Guard," *Joint Force Quarterly*, December 2004, 36.

[148] U.S. Department of Defense, Under Secretary of Defense for Policy, *Manual 3025.1-M, Manual for Civil Emergencies* (Washington, D.C., June 1994), para. C2.2. Active duty forces are authorized to perform critical functions such as rescue, evacuation, and emergency treatment of casualties; emergency restoration of power; debris removal; food distribution; roadway control, and emergency communications.

[149] Chairman of the Joint Chiefs of Staff, Execution Order, August 30, 2005.

[150] JTF-Katrina was established at Camp Shelby on August 28 and activated three days later on August 31. It served as U.S. Northern Command's forward joint command element for integrating the military component of the Federal response.

[151] Donald H. Rumsfeld, Secretary of the Department of Defense, and General Richard Myers, Chairman of the Joint Chiefs of Staff, "Defense Department Operational Update Briefing," Tuesday, September 6, 2005. http://www.defenselink.mil/news/Sep2005/d20050906slide.pdf

[152] Department of Defense, *DOD Support to Hurricane Katrina, Executive Summary OASD(HD),* September 5, 2005.

[153] "DOD aircraft have flown mosquito abatement aerial spraying missions covering more than two million acres." Paul McHale, Assistant Secretary of Defense for Homeland Defense, written statement for a hearing on Responding to Catastrophic Events: The Role of the Military and National Guard in Disaster Response, on November 9, 2005, submitted to the House Committee on Armed Services, Subcommittee on Terrorism, Unconventional Threats, and Capabilities jointly with the House Committee on Homeland Security, Subcommittee on Emergency Preparedness, Science, and Technology, 109th Congress, 1st session.

[154] U.S. Department of Defense, National Guard Bureau, "After Action Review: Hurricane Response September 2005," December 21, 2005, 6.

[155] U.S. Department of Defense, National Guard Bureau, "After Action Review: Hurricane Response September 2005," December 21, 2005, 14.

[156] U.S. Department of Defense, National Guard Bureau, "After Action Review: Hurricane Response September 2005," December 21, 2005.

[157] U.S. Department of Defense, National Guard Bureau, "After Action Review: Hurricane Response September 2005," December 21, 2005, 57.

[158] President George W. Bush, "President Discusses Progress in War on Terror to National Guard," February 9, 2006.

[159] U.S. Department of Defense, National Guard Bureau, "After Action Review: Hurricane Response September 2005," December 21, 2005, 57.

[160] U.S. Department of Defense, National Guard Bureau, "After Action Review: Hurricane Response September 2005," December 21, 2005, 20; Lieutenant General H. Steven Blum, Chief of the National Guard Bureau, written statement submitted for a hearing on Responding to Catastrophic Events: The Role of the Military and National Guard in Disaster Response, on October 20, 2005, for the House Committee on Government Reform, 109th Congress, 1st session.

[161] 16,599 National Guard forces were deployed in 1989-90 following the San Francisco Loma Prieta earthquake. U.S. Department of Defense, National Guard Bureau, "After Action Review: Hurricane Response September 2005," December 21, 2005.

[162] U.S. Department of Defense, Office of the Assistant Secretary of Defense for Homeland Defense, "DoD Support to Hurricane Katrina, OASD(HD) Executive Summary," September 5, 2005; U.S. Department of Defense, National Guard Bureau, "After Action Review: Hurricane Response September 2005," NGB J7, December 21, 2005; Lieutenant General H. Steven Blum, testimony on Hurricane Katrina: Preparedness and Response by the

APPENDIX E – ENDNOTES

Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi, and Alabama, before the House Bipartisan Select Committee on Hurricane Katrina, United States House of Representatives, 109th Congress,1[st] Session, October 27, 2005.

[163] U.S. Department of Defense, National Guard Bureau, "After Action Review: Hurricane Response September 2005," NGB J7, December 21, 2005, 146.

[164] U.S. Department of Defense, National Guard Bureau, "After Action Review: Hurricane Response September 2005," NGB J7, December 21, 2005, 6.

[165] Paul McHale, Assistant Secretary of Defense for Homeland Defense, testimony before a hearing on Responding to Catastrophic Events: The Role of the Military and National Guard in Disaster Response, on November 9, 2005, Emergency Preparedness, Science, and Technology Subcommittee, House Homeland Security Committee, 109th Congress, 1st session, 14. According to Assistant Secretary McHale, a police officer is likely to be carrying a handheld Motorola while an active duty military officer is likely to use a secure SINCGARS radio; these two radios cannot easily talk to one another.

[166] The two deployed MERS detachments were the Region IV detachment from Thomasville, Georgia and the Region VI detachment from Denton, Texas. U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA National Situation Report," August 29, 2005, 3; and Michael Brown, former Director of the Federal Emergency Management Agency, testimony before a hearing on Hurricane Katrina: The Role of the Federal Emergency Management Agency, on September 27, 2005, House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

Each MERS detachment has a suite of assets that were also deployed to Florida, Georgia, and Texas. U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA National Situation Report," August 29, 2005, 3.

[167] U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), ESF #15-5.

[168] U.S. Department of Homeland Security, Federal Emergency Management Agency, "Response and Recovery: Available Support," October 23, 2004, http://www.fema.gov/rrr/mers02.shtm.

[169] Rear Admiral Joe Kilkenny, Joint Force Maritime Component Commander and Commander of Carrier Strike Group Ten, U.S. Fleet Forces, Joint Task Force Katrina, *Hurricanes Katrina and Rita: Providing Rescue and Civil Support Relief from the Sea, Air, and Land,* (November 1, 2005). The DJC2 is a standardized, integrated, rapidly deployable, modular, scaleable, command and control (C2) capability that provides a military commander with a planning, operating, and collaborating capability. Lt. Col. Roarke Anderson, JS J6, *Deployable Joint Command and Control (DJC2): DJC2 Program Overview,* (n.d.), 2.

[170] U.S. Department of Defense, Office of the Assistant Secretary of Defense, "Defense Department Briefing on DoD Response to Hurricane Katrina," news release on briefing by Lieutenant General H. Steven Blum, August 31, 2005.

[171] The National Coordinating Center (NCC) for Telecommunications is defined in the NRP as "A joint telecommunications industry–Federal Government operation established to assist in the initiation, coordination, restoration, and reconstitution of [National Security/Emergency Preparedness] telecommunications services and facilities." U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), 69. For a discussion on NCC, see Dr. Peter M. Fonash, Deputy Manager of the National Communications System, Preparedness Directorate, U.S. Department of Homeland Security, written statement for a hearing on Ensuring Operability during Catastrophic Events, on October 26, 2005, submitted to the House Committee on Homeland Security, Subcommittee on Emergency Preparedness, Science and Technology, 109th Congress, 1st session, 2.

[172] Dr. Peter M. Fonash, Deputy Manager of the National Communications System, Preparedness Directorate, U.S. Department of Homeland Security, written statement for a hearing on Ensuring Operability during Catastrophic Events, on October 26, 2005, submitted to the House Committee on Homeland Security, Subcommittee on Emergency Preparedness, Science and Technology, 109th Congress, 1st session.

[173] Dr. Peter M. Fonash, Deputy Manager of the National Communications System, Preparedness Directorate, U.S. Department of Homeland Security, written statement for a hearing on Ensuring Operability during Catastrophic Events, on October 26, 2005, submitted to the House Committee on Homeland Security, Subcommittee on Emergency Preparedness, Science and Technology, 109th Congress, 1st session; and Chad Hart, *A Research Note On: Land Mobile Radio and Public Safety Communications*, prepared for the Venture Development Corporation, Datacom and Telecom Practice (Natick, MA, November 2005), http://www.vdc-corp.com/telecom/research/05_lmr_rn.pdf.

[174] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #13," September 1, 2005.

[175] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #21," September 5, 2005.

[176] For examples, see Ardis D. Hoven, Member of the American Medical Association Board of Trustees, testimony before a hearing on Assessing Public Health and the Delivery of Care in the Wake of Katrina, on September 22, 2005, House Energy and Commerce Committee, Subcommittees on Health and Oversight and Investigations, 109th Congress, 1st session, 3; and Robert Latham, Director, Mississippi Emergency Management Agency, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi, on December 7, 2005, House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[177] William Lokey, Federal Coordinating Officer for Louisiana, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, submitted to the House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session, 51.

[178] In an interview with CNN, FEMA Director Michael Brown stated "we've got enough people and commodities in place right now for a three to five day surge capacity.  But what I've ordered my folks to do is to jam that supply line as far back as Fort Worth and as far back as Atlanta so as those supplies begin to run out, we can continue to feed those in here as long as it takes."  "Hurricane Katrina," *CNN Breaking News*, August 29, 2005.

[179] Michael Brown, former Director of the Federal Emergency Management Agency, testimony before a hearing on Hurricane Katrina: The Role of the Federal Emergency Management Agency, on September 27, 2005, House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session, 49-50.

[180] Congressman Tom Davis (R-VA), written opening statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi, on December 7, 2005, House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session; and William Carwile, Federal Coordinating Officer for Mississippi, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi, on December 7, 2005, House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[181] William Carwile, Federal Coordinating Officer for Mississippi, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi, on December 7, 2005, House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session, 45.

[182] Tommy Longo, Mayor of Waveland, Mississippi, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the State of Mississippi, on December 7, 2005, House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session, 51; and Ray Nagin, Mayor of New Orleans, written statement for a hearing on Hurricane Katrina: Managing the Crisis and Evacuating New Orleans, on February 1, 2006, submitted to the Senate Committee on Homeland Security, 109th Congress, 2nd session, 3-5.

[183] Congressman William Jefferson (D-LA), during a hearing on Hurricane Katrina: The Role of the Federal Emergency Management Agency, on September 27, 2005, House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session, 93.

[184] U.S. Department of Commerce, "Gutierrez Announces Hurricane Contracting Information Center: One-Stop Shop to Help U.S. Businesses Participate in Hurricane Rebuilding Efforts," news release, October 11, 2005.  Also see U.S. Department of Commerce, "Hurricane Contracting Information Center," http://www.rebuildingthegulfcoast.gov.

[185] "Under Title I of the Defense Production Act of 1950, as amended (DPA), the President is authorized to require preferential acceptance and performance of contracts or orders supporting certain approved national defense and energy programs, and to allocate materials, services, and facilities in such a manner as to promote these approved programs.  Additional priorities authority is found in Section 18 of the Selective Service Act of 1948, in 10 U.S.C. § 2538, and in 50 U.S.C. § 82. The DPA priorities and allocations authority has also been extended to support emergency preparedness activities under Title VI of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act)." […] "The Department of Commerce is delegated authority to implement these priorities and allocations provisions for industrial resources. The Bureau of Industry and Security's Office of Strategic Industries and Economic Security (SIES) administers this authority through the Defense Priorities and Allocations System (DPAS) regulation (15 CFR Part 700).  The purpose of the DPAS is to (1) assure the timely availability of industrial resources to meet current national defense and emergency preparedness program requirements; and (2) provide an operating system to support rapid industrial response in a national emergency."

U.S. Department of Commerce, Bureau of Industry and Security, "Defense Priorities and Allocations System Program (DPAS)," https://www.bis.doc.gov/defenseindustrialbaseprograms/OSIES/DPAS/Default.htm. As an example of how this authority was used in the response to Hurricane Katrina, Norfolk Southern Railway used a DPAS rated contract to procure switch equipment and generators so that it could repair railway automated signals.

[186] FEMA issued a mission assignment on the morning of September 3 that stated "FEMA requests that DOD provide planning and execution for transportation and distribution of ice, water, food and medical supplies in support of the Katrina disaster in Louisiana and Mississippi." U.S. Department of Homeland Security, Federal Emergency Management Agency, "1604DR-MS-DOD-19, Amendment 1," September 3, 2005.

[187] Paul McHale, Assistant Secretary of Defense for Homeland Defense, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi, and Alabama, on October 27, 2005, House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session, 70-71.

[188] In developing the NRP, it was envisioned that additional and specific planning would be needed for logistics, international coordination, private sector coordination and donations management. In fact, each issue has its own support annex in the NRP. The annexes, however, provide little detail or operational direction and do not provide clear responsibility for the various roles and tasks referred to in the annexes.

[189] The Swiss offer was received September 5, 2005 and not fully vetted by FEMA until September 14. As another example, a C-130 aircraft traveling from Sweden with a water purification system and a cellular network waited four days for flight clearance from the U.S.

[190] An estimated $854.5 million in donations have been pledged to the U.S.

[191] USAID Liaisons were sent throughout the region: FEMA RRCCs – Atlanta, GA, Denton, TX, Tucker, AL; JFOs – Baton Rouge, LA, Montgomery, AL, Jackson, MS, New Orleans, LA;  JTF – Shreveport, LA, JTF Camp Shelby – Hattiesburg, MS; JTF Forward – USS Iwo Jima,  National Guard Forward Deployment – New Orleans, LA, Dobbins AFB – GA; FEMA Disaster Recovery Center – Mobile, AL; NORTHCOM – Colorado Springs, CO; Dobbins AFB – Little Rock, AK. The first four were deployed on September 2 – two went to FEMA HQ and two went to the State Task Force. On September 3, the State Department started sending people to the FEMA call-center, and on September 4 to the RRCC in Atlanta, the JTF at Camp Shelby, and Dobbins AFB in Georgia. On September 5, personnel were deployed to Shreveport, Little Rock, and Denton.

[192] U.S Department of Homeland Security, "Hurricane Katrina DHS SITREP #21," September 5, 2005; and United States Agency for International Development, "Agency Channels Foreign Aid for Hurricane Katrina Victims," Front Lines, October 2005.

[193] It applied to Alabama, Louisiana, and Mississippi since August 29 and to Florida since August 24—after Hurricane Katrina's first landfall. U.S. Department of Health and Human Services, "HHS Designates First Medical Shelters and Provides Vital Medical Supplies and Medical Assistance," news release, September 2, 2005, http://www.hhs.gov/news/press/2005pres/20050902.html.

[194] Sarah A. Lister, Hurricane Katrina: The Public Health and Medical Response, Congressional Research Service Report for Congress RL33096 (Washington, D.C., September 2005), summary and CRS-11.

[195] "19 NDMS DMATs and other NDMS teams were pre-staged for Katrina, and as the storm passed, they along with the US&R Task Forces, began moving, into the impact areas. By the day after the storm, teams were providing medical care and continue to do so today. The mission is still ongoing, with personnel staffing hospitals and clinics destroyed or rendered inoperable by the storms as we speak." Dr. Roy L. Alson, Associate Professor of Emergency Medicine at Wake Forest University School of Medicine and Commander of Disaster Medical Assistance Team NC-1, written statement for a hearing on Mitigating Catastrophic Events Through Effective Medical Response, on October 20, 2005, submitted to the House Committee on Homeland Security, Subcommittee on Prevention of Nuclear and Biological Attack, 109th Congress, 1st session. According to an attachment Dr. Alson provided with his testimony, 16,477 patients were treated by NDMS personnel in FEMA region IV through 13 October 2005, and 40,995 patients were treated and 59,917 individuals immunized by NDMS personnel in FEMA region VI through 13 October 2005.

[196] Hilarie H. Cranmer, "Hurricane Katrina: Volunteer Work – Logistics First," New England Journal of Medicine 353(15), no. 13, October, 2005. Dr. Cranmer was a member of the American Red Cross team that had been deployed "to perform the critical-needs assessments that would help define the public health response to Hurricane Katrina." Dr. Thomas Kirsch, Medical Director for Disaster Health Services for the American Red Cross, written statement for a hearing on Assessing Public Health and the Delivery of Care in the Wake of Katrina, on September 22, 2005, submitted to the House Energy and Commerce Committee, Subcommittees on Health and Oversight and

Investigations, 109th Congress, 1st session.  See Ardis D. Hoven, Member of the American Medical Association Board of Trustees, written statement for a hearing on Assessing Public Health and the Delivery of Care in the Wake of Katrina, on September 22, 2005, submitted to the House Energy and Commerce Committee, Subcommittees on Health and Oversight and Investigations, 109th Congress, 1st session.  Dr. Kirsch said he took a team to Louisiana to assess nineteen Red Cross shelters and three very large state shelters: "Every shelter had good access to medical care either through local physicians providing care in the shelter, visiting medical teams, DMAT teams or relationships with local hospitals."  Moreover, "[w]ith flooding widespread across the region and power and communications networks out, physicians and other health care professionals in hospitals desperately tried to keep patients alive, and appear to have mostly succeeded, even when their back-up generators failed."

[197] Louisiana Nursing Home Association staff lacked means to communicate with key decision makers early in the crisis.  The Association "set up our own rescue missions."  Joseph A. Donchess, Executive Director of the Louisiana Nursing Home Association, written statement for a hearing on Challenges in a Catastrophe:  Evacuating New Orleans in Advance of Hurricane Katrina, on January 31, 2006, submitted to the Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 2nd session.  Dr. Clyde Martin told *Government Executive* magazine that he joined a private relief effort in Louisiana after waiting for several days for Federal or State agencies to deploy him in their medical response.  Justin Rood, "Medical Catastrophe," *GOVEXEC.com*, November 1, 2005, http://www.govexec.com/features/1105-01/1105-01s1.htm (accessed February 6, 2006).

[198] Louisiana State University, Office of University Relations, "LSU is Site of Largest Acute-Care Field Hospital in U.S. History," news release, September 6, 2005; and Elizabeth M. Duke, Health Resources Services Administrator, Department of Health and Human Services, "Remarks to the National Association of Community Health Centers' 2005 Annual Convention and Community Health Institute," September 19, 2005, http://newsroom.hrsa.gov/speeches/2005/NACHC-Sept.htm (accessed February 10, 2006).

[199] Separate JFOs were set up and became fully operational in: Mobile, Alabama on September 1; Denver, Colorado on September 6; Montgomery, Alabama (supplanting the Mobile facility) and Oklahoma (State) on September 10; Austin, Texas on September 11; Baton Rouge and New Orleans, Louisiana on September 12; Little Rock, Arkansas on September 13;  and Jackson, Mississippi on September 16. U.S. Department of Homeland Security, Federal Emergency Management Agency, "Federal Concept of Operations Matrix," September 18, 2005; U.S. Department of Homeland Security, Federal Emergency Management Agency, Region IV Regional Response Coordinating Center, "Situation Report 9," September 11, 2005; U.S. Department of Health and Human Services, "Secretary's Operations Center Flash Report #32 – Hurricane Katrina," September 12, 2005; U.S. Department of Homeland Security, Federal Emergency Management Agency/Arkansas Joint Field Office, "Situation Report 11," September 13, 2005; U.S. Department of Homeland Security, Federal Emergency Management Agency, "Executive Briefing," slide presentation, September 17, 2005.

[200] Preliminary steps were taken toward establishing the JTF-Forward on September 6, but the facility was not fully established until later on the 7th.  U.S. Department of Defense, Office of the Assistant Secretary of Defense for Homeland Defense, "Hurricane Katrina Timeline," October 16, 2005, 13; and U.S. Department of Health and Human Services, "Secretary's Operations Center Flash Report #23—Hurricane Katrina," September 7, 2005.  This temporary site was supplanted by the physical facility established on September 12, as referenced above.

[201] Regarding the timing of the appointment of VADM Allen, Secretary Chertoff testified that on "Saturday [September 3] I identified Admiral Allen as a person that I wanted to consider putting into place. I spoke to the Commandant over the weekend, made sure that Admiral Allen was free to come down, had him come down with the intention of having him take over at least the Louisiana piece of this in order to make sure we had that under control. And then ultimately on Friday [September 9] I made the determination that I would put Admiral Allen in control of the entire operation." Michael Chertoff, testimony before a hearing on Hurricane Katrina: The Role of the Department of Homeland Security, on October 19, 2005, House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[202] U.S. Department of Homeland Security, "Statement by Homeland Security Secretary Michael Chertoff," news release, September 9, 2005.

[203] The FCO "is appointed to manage Federal resource support activities … [and] is responsible for coordinating the timely delivery of Federal disaster assistance resources and programs to the affected State and local governments, individual victims, and the private sector."  Whereas the PFO is an invention of HSPD-5 and the NRP, the FCO position was created by the Stafford Act, and empowered with statutory authority to perform assigned responsibilities.  U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December

2004), 65.  VADM Allen's appointments:  70 Fed. Reg. 56929 (Sep. 29, 2005) (Louisiana); 70 Fed. Reg. 57308 (Sep. 30, 2005) (Alabama); 70 Fed. Reg. 57309 (Sep. 30, 2005) (Mississippi).

[204] When Secretary Chertoff designated VADM Allen as the FCO (in addition to his earlier appointment as PFO), Allen gained statutory authority that enabled him to more efficiently coordinate Federal disaster assistance.

[205] "The SFLEO is the senior law enforcement official from the agency with primary jurisdictional responsibility as directed by statute, Presidential directive, existing Federal policies, and/or the Attorney General.  The SFLEO directs intelligence/investigative law enforcement operations related to the incident and supports the law enforcement component of the Unified Command on-scene. In the event of a terrorist incident, this official will normally be the FBI SAC."  U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), 35.

[206] U.S. Department of Justice, Federal Bureau of Investigation*,* "FBI Hurricane Timeline," October 21, 2005, 3.  The LECC is a construct familiar to law enforcement personnel, integrating the Federal, State, and local law enforcement communities, but is not a term currently incorporated into the NRP.

[207] The LECC was built on a modified FBI Joint Operations Center construct.  It coordinated a plan to answer thousands of 911 calls in New Orleans that had gone unresolved and provided the conduit for coordination between civilian law enforcement and the National Guard and Title 10 U.S. Army forces operating in New Orleans.  The LECC not only provided a facility for all Federal law enforcement, but built a separate headquarters for the New Orleans Police adjacent to it since the NOPD's headquarters had been destroyed.

[208] U.S. Department of Defense, "CJCS Hurricane Katrina Update," September 12, 2005.

[209] New Orleans Mayor's Office of Communications, "Updated Situation Report for New Orleans," September 13, 2005.

[210] Search and rescue teams in New Orleans carried out primary and secondary searches.  Primary searches were visual, with hailing calls as searchers moved through a certain area.  Forced entry into a building was not conducted without probable cause.  Secondary searches were conducted door to door in areas where flooding had occurred higher than 5.5 feet above the floor.  Damage incurred by access into a building was kept to a minimum and the building was re-secured after the search.  New Orleans Police Department officers were on site for all the searches conducted.  U.S. Department of Homeland Security, Federal Emergency Management Agency, "Urban Search and Rescue Operations Completed: Hurricane Katrina Urban Search and Rescue Teams are due to Return Home," news release, September 30, 2005.

[211] Mike Tamillow, Section Chief, Federal Emergency Management Agency Urban Search and Rescue, to Ed Buikema, Director, Region V, Federal Emergency Management Agency, memorandum on "US&R Section – Hurricane Katrina Update," September 10, 2005.  Also see U.S. Department of Homeland Security, Federal Emergency Management Agency, "Urban Search and Rescue Operations Completed: Hurricane Katrina Urban Search and Rescue Teams Are Due to Return Home," news release, September 30, 2005, http://www.fema.gov/news/newsrelease.fema?id=19320.

[212] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #23," September 6, 2005; and U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #29," September 9, 2005.

[213] HHS serves as the coordinator of NRP Emergency Support Function #8 ("Public Health and Medical Services"), which includes mortuary affairs.  However, FEMA's NDMS has responsibilities for victim identification and mortuary services through its DMORTs.  Consequently, HHS must request assistance from FEMA NDMS to deploy Disaster Mortuary Operational Response Teams to an incident site.  U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), ESF #8-6.

[214] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #18," September 4, 2005; and U.S. Department of Defense, "Hurricane Katrina Update," September 8, 2005, 20.

[215] Louisiana requested DMORT and DPMU support on August 29.  Mississippi requested a DMORT assessment team on August 30.  The first DMORT team was reported as engaged in Louisiana on August 31.  By September 4, DMORT 1, DMORT 2, DMORT 4, DMORT 5, and DMORT Family Assistance Center (east), along with one DPMU, were deployed to Gulfport-Biloxi Municipal Airport.  DMORT 6, DMORT 7, DMORT 8, DMORT WMD, and DMORT Family Assistance Center (west), along with one DPMU, were deployed to St. Gabriel, Louisiana.  U.S. Department of Health and Human Services, "Secretary's Operations Center Flash Report #5—Hurricane Katrina," August 29, 2005, 2; U.S. Department of Health and Human Services, "Secretary's Operations Center: Flash Report # 6—Hurricane Katrina," August 30, 2005, 2; U.S. Department of Health and Human Services, "Secretary's Operations Center: Flash Report #8—Hurricane Katrina," August 31, 2005, 5-7; U.S. Department of

Health and Human Services, "Secretary's Operations Center Flash Report #17—Hurricane Katrina," September 4, 2005, 7-9.

[216] Kenyon International Management Services, "Hurricane Katrina Update: Kenyon International Activates Emergency Team for Hurricane Katrina Response," news release, http://www.kenyoninternational.com; Thomas Fitzgerald and Joyce Tsai, "Louisiana Governor Blasts FEMA Over Recovery of Bodies," Knight Ridder News Service, September 14, 2005; and Mark Hosenball and Keith Naughton, "Cash and 'Cat 5' Chaos," Newsweek, September 26, 2005.

[217] As Louisiana Governor Kathleen Blanco described it, "While Kenyon International of Houston has been and still is on the ground, working each day along with DMORT teams, they have not added enough personnel to do the work because of the lack of proper support or a contract." Louisiana Office of the Governor, "Statement by Governor Kathleen Babineaux Blanco on Body Removal Process in Southeast Louisiana," news release, September 13, 2005, http://www.gov.state.la.us/index.cfm?md=newsroom&tmp=detail&articleID=832.

[218] On September 9, the U.S. Department of Health and Human Services reported: "It is unclear as to the future resources for this mission as we heard the contractor Kenyon International may be in default of their verbal contract." U.S. Department of Defense, "Hurricane Katrina Update," slide presentation, September 8, 2005, 20; and U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #37," September 13, 2005, 18.

[219] On September 9, White House spokesman Scott McClellan stated: "Mortuary affairs efforts on the ground – the State has the responsibility for overseeing the plan, implementing the plan and the federal government through the military and other ways, we're supporting those efforts with teams in the region, as well." The White House, "Press Briefing by Scott McClellan," news release, September 9, 2005, http://www.whitehouse.gov/news/releases/2005/09/print/20050909-3.html. FEMA spokeswoman Nicol Andrews made the same point in October, arguing that "Body retrieval is a state responsibility." Renae Merle and Griff Witte, "Lack of Contracts Hampered FEMA: Dealing With Disaster on the Fly Proved Costly," *Washington Post*, October 10, 2005.

[220] Louisiana Office of the Governor, "Statement by Governor Kathleen Babineaux Blanco on Body Removal Process in Southeast Louisiana," news release, September 13, 2005, http://www.gov.state.la.us/index.cfm?md=newsroom&tmp=detail&articleID=832.

[221] Bush-Clinton Katrina Fund, "Bush-Clinton Katrina Fund Announces Allocations for Louisiana, Mississippi and Alabama," news release, January 19, 2006, http://www.bushclintonkatrinafund.org/index.php?src=news&submenu=Media&prid=20&category=Press%20Releases.

[222] The National Book Festival is an annual event organized and sponsored by the Library of Congress and hosted by First Lady Laura Bush. White House website, "Mrs. Bush's Remarks at the National Book Festival Author's Breakfast," September 24, 2005, http://www.whitehouse.gov/news/releases/2005/09/20050924-2.html.

[223] "Despite the massive migration of evacuees and their subsequent placement in evacuation centers, only one known outbreak of communicable disease (norovirus) requiring unusual mobilization of public health resources had been reported as of September 23." U.S. Centers for Disease Control, "Infectious Disease and Dermatologic Conditions in Evacuees and Rescue Workers After Hurricane Katrina – Multiple States, August-September, 2005," as reprinted in the *Journal of the American Medical Association* 294, no. 17, November 2, 2005, 2159.

[224] U.S. Department of Health and Human Services, "Estimates Show More Than 40% of Hurricane Evacuees Now Receiving HHS Benefits or Services," news release, September 29, 2005.

[225] Expedited Assistance is FEMA's program to provide $2,000 in "an initial emergency first installment" of assistance, prior to a completed inspection of a victim's home, to help pay for food, shelter, clothing, personal necessities and medical needs. Eligible evacuees could also get additional FEMA assistance for a total up to $26,500 per household. U.S. Department of Homeland Security, Federal Emergency Management Agency, "Emergency Assistance Flowing to Gulf Coast," news release, September 9, 2005; and U.S. Department of Homeland Security, Federal Emergency Management Agency, "Disaster Assistance Frequently Asked Questions," http://www.fema.gov/rrr/dafaq.shtm (accessed February 3, 2006).

[226] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #21," September 5, 2005; and U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #41," September 15, 2005.

[227] U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA VIP Briefing," slide presentation, September 12, 2005, 6:00 PM; U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #44," September 17, 2005; U.S. Department of Homeland Security, Federal Emergency Management Agency, "Nearly $690 Million in Assistance Helping More Than 330,000 Families Displaced by Katrina," news release, September 10, 2005.

[228] However, the NRP inconsistently describes the role and purpose of DRCs. The NRP states a DRC "is a central facility where individuals affected by a disaster can *obtain information* on disaster recovery assistance programs from various Federal, State, local, tribal, private-sector, and voluntary organizations." However, the NRP also states the DRC is "[a] facility established in a centralized location within or near the disaster area at which disaster victims (individuals, families, or businesses) *apply for* disaster aid." NRP, p.64. (Emphasis added).

[229] U.S. Department of Homeland Security, Federal Emergency Management Agency, "Disaster Assistance Frequently Asked Questions," news release, September 13, 2005. FEMA's "Disaster Assistance Frequently Asked Questions" stated, "You cannot register for assistance at a DRC, you must register by calling 1-800-621-FEMA … or apply on line at www.FEMA.gov."

[230] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #34," September 12, 2005, 3. Approximately one-third of Louisiana households were without power or telephone service as of September 12.

[231] U.S. Department of Homeland Security, Federal Emergency Management Agency/State of Alabama Joint Field Office, "FEMA-1605-DR-AL-SITREP #08," September 4, 2005.  On September 4, the FEMA/State of Alabama JFO reported, "The Helpline number is currently unavailable. Due to the large number of teleregistration calls, all lines are being made available for registration." This is an indication that the FEMA phone system lacked the capacity to sustain the demand for service on both the teleregistration line and Helpline, at least at that time for some customers.

[232] U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA Getting Assistance to Individuals," news release, September 7, 2005; U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA VIP Briefing," slide presentation, September 7, 2005, 6:00 PM, 7; U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA VIP Briefing," slide presentation, September 9, 2005, 6:00 PM, 2; and U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA VIP Briefing," slide presentation, September 10, 2005, 6:00 AM, 3. "Currently, the amount of money being distributed through the expedited assistance program is $2,000 per household. … This emergency assistance is provided to help with disaster needs such as transportation, clothing, rental housing, other housing accommodations, and food, and is included in the calculation of total benefits for which victims are eligible."

[233] Government Accountability Office, *Expedited Assistance for Victims of Hurricanes Katrina and Rita: FEMA's Control Weaknesses Exposed the Government to Significant Fraud and Abuse*, GAO-06-403T, February 13, 2006, 18-19, http://www.gao.gov/new.items/d06403t.pdf.

[234] U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA VIP Briefing," slide presentation, September 8, 2005; and Lisa Rein and Christopher Lee, "Debit Card Giveaway Goes Awry in Houston," *Washington Post*, September 9, 2005.  FEMA individual assistance programs suffered from other problems.  Accounting and verification problems prompted an investigation by the DHS Office of the Inspector General.  "In a November 1, 2005, report on expedited assistance overpayment, DHS OIG attempted to identify the events that resulted in a married couple receiving duplicate payments for expedited assistance and determine why internal controls did not prevent the duplicate payment from being issued and why the applicants were not provided adequate information to return the excess funds. It was found that for a short time, the National Emergency Management Information System was not configured with system controls to prevent more than one payment per household.  FEMA officials ... have identified more than 5,000 potentially duplicated payments."  Executive Council on Integrity and Efficiency, *Oversight of Gulf Coast Hurricane Recovery: A 90-Day Progress Report to Congress* (Washington, D.C., December 2005), 33.

[235] U.S. Department of Homeland Security, "Good Story: Harris County, Texas Citizen Corps' Response to Hurricane Katrina," *Lessons Learned Information Sharing (LLIS.gov) database*, November 17, 2005, http://www.llis.gov; Harris County Joint Information Center, "Mission Fulfilled, Command stands Down," news release, September 20, 2005, http://www.hcjic.org/news_release.asp?p=62&intRelease_ID=2078&intAcc_ID=62.

[236] Harris County Joint Information Center, "Mission Fulfilled, Command stands Down," news release, September 20, 2005, http://www.hcjic.org/news_release.asp?p=62&intRelease_ID=2078&intAcc_ID=62.

[237] T. Yarbrough, "'Baptists' 10.5 Million Meals shatters Prior Disaster Relief Record," *North American Mission Board*, http://www.namb.net/site/apps/nl/content2.asp?c=9qKILUOzEpH&b=227361&ct=1568907 (accessed January 13, 2006).  For other examples, see Liz Szabo, "Grass-roots groups pitch in to find shelter for evacuees," *USA Today*, September 8, 2005.

[238] This despite the NRP Volunteer and Donations Management Support Annex, which describes this process.

[239] The NRP Volunteer and Donations Management Support Annex focuses on managing unaffiliated volunteers and unsolicited donated goods.  It does not provide guidelines for coordinating private sector and NGO relief efforts. U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), VOL-1.

[240] Major Todd Hawks, Public Affairs Secretary for the Salvation Army of America, testimony before a hearing on the Response of Charities to Hurricane Katrina, on December 13, 2005, House Committee on Ways and Means, Subcommittee on Oversight, 109th Congress, 1st session.

[241] David Roberson, President and CEO of Cavalier Homes, Inc., testimony before a hearing on Emergency Housing Needs in the Aftermath of Hurricane Katrina, on September 15, 2005, House Committee on Financial Services, Subcommittee on Housing and Community Opportunity, 109th Congress, 1st session.  Also see Laura Maggi, "Hotel Rooms Sought For Shelter Occupants; Other Housing Options Appear Slow To Arrive," *New Orleans Times-Picayune*, September 21, 2005; and Shankar Vedantam and Dean Starkman, "Lack of Cohesion Bedevils Recovery," *Washington Post*, September 18, 2005.

[242] James N. Russo, Federal Coordinating Officer for Mississippi Recovery Operations, Federal Emergency Management Agency, testimony before a hearing on Housing Options in the Aftermath of Hurricanes Katrina and Rita, on January 14, 2006, House Committee on Financial Services, Subcommittee on Housing and Community Opportunity, 109th Congress, 2nd session; David Roberson, representing the Manufactured Housing Institute and the Manufactured Housing Association for Regulatory Reform, testimony before a hearing on Emergency Housing Needs Following Hurricane Katrina, on September 15, 2005, House Committee on Financial Services, Subcommittee on Housing and Community Opportunity, 109th Congress, 1st session.

[243] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #20," September 5, 2005; and U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #31," September 10, 2005.

[244] U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA Executive Briefing," slide presentation, September 14, 2005, 6:00 AM.

[245] A complicating factor was that as Hurricane Rita approached the Gulf Coast, individuals in shelters from Hurricane Katrina had to be evacuated from their original shelter sites and moved to new ones.  U.S. Department of Homeland Security, "Gulf Coast Hurricane Katrina (85) and Rita (37) Response and Recovery DHS SITREP," October 14, 2005.

[246] U.S. Department of Homeland Security, "U.S. Government Announces a Comprehensive Transitional Housing Assistance Program for Katrina Evacuees," news release, September 23, 2005; U.S. Department of Homeland Security, "Fact Sheet: Transitional Housing Assistance for Hurricane Katrina Evacuees," September 23, 2005; and U.S. Department of Homeland Security,  "Press Briefing by Homeland Security Secretary Michael Chertoff and Secretary of Housing and Urban Development Alphonso Jackson," news release, September 24, 2005.

[247] Mr. Powell serves as the primary Federal contact for Congress, State, local and private leaders in supporting "mid and long term recovery and rebuilding plans."  U.S. Department of Homeland Security, "Coordinator Named to Lead Federal Recovery and Rebuilding Activities in the Gulf Coast Region," news release, November 1, 2005.

[248] U.S. Department of Homeland Security, Federal Emergency Management Agency, "Federally Declared Disasters By Calendar Year," http://www.fema.gov/library/drcys.shtm.  Forty emergency declarations were issued in the period from January 20, 2001 to Hurricane Katrina.

## CHAPTER FIVE: LESSONS LEARNED

[1] The White House, "President Discusses Hurricane Relief in Address to the Nation," news release, September 15, 2005, http://www.whitehouse.gov/news/releases/2005/09/20050915-8.html.

[2] The critical challenges described here include and go beyond those identified in other evaluations of the national response to Hurricane Katrina.  See, for example, David M. Walker, Comptroller General, *Statement by Comptroller General David M. Walker on GAO's Preliminary Observations Regarding Preparedness and Response to Hurricanes Katrina and Rita*, prepared for the U.S. Government Accountability Office, GAO-06-365R, (Washington, D.C., February 1, 2006).

[3] Though State and local preparedness is critical to the success of overall National preparedness and response efforts, this Report is not intended to assess State and local efforts.

⁴ Melvin "Kip" Holden, Mayor-President of Baton Rouge, Louisiana, written statement for a hearing on Recovering from Hurricane Katrina: Responding to the Immediate Needs of Its Victims, on September 28, 2005, submitted to the Senate Homeland Security and Governmental Affairs Committee, 109ᵗʰ Congress, 1ˢᵗ session.

⁵ The DHS Secretary designates a Principal Federal Official (PFO).  See U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), 71.  The Federal Coordinating Officer (FCO) "is appointed to manage Federal resource support activities … [and] is responsible for coordinating the timely delivery of Federal disaster assistance resources and programs to the affected State and local governments, individual victims, and the private sector."  Whereas the PFO derives from HSPD-5 and the NRP, the FCO position was created by the Stafford Act (*Robert T. Stafford Disaster Relief and Emergency Assistance Act* ["*Stafford Act*"], as amended by Public Law 106-390, October 30, 2000).  U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), 65.

⁶ U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #20," September 5, 2005, 1; U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #23," September 6, 2005, 1; U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA Daily Conference Call on Hurricane Katrina," September 7, 2005, 1; U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #27," September 8, 2005, 1; U.S. Department of Homeland Security, Federal Emergency Management Agency, "Region VI Regional Response Coordinating Center SitRep #15," September 9, 2005, 1; U.S. Department of Health and Human Services, "Secretary's Operations Center Flash Report #32—Hurricane Katrina," September 12, 2005, 2, 3; U.S. Department of Homeland Security, "Emergency Response Issues," September 11, 2005, 10; Robert B. Stephan, Assistant Secretary for Infrastructure Protection, U.S. Department of Homeland Security, prepared statement for a hearing on "Hurricane Katrina: The Roles of DHS and FEMA Leadership," on February 10, 2006, submitted to the Senate Committee on Homeland Security and Governmental Affairs, 109ᵗʰ Congress, 2ⁿᵈ session, 7-8.

⁷ Federal officials recognized the need for a presence in New Orleans to effectively coordinate the efforts to stabilize the City, so a "forward PFO" in New Orleans was eventually established.  The JFO remained in Baton Rouge.  U.S. Department of Health and Human Services, "Secretary's Operations Center Flash Report #23," September 7, 2005; U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA Executive Briefing," slide presentation, September 17, 2005, 6 ᴀᴍ.

⁸ Only eight months had elapsed between the unveiling of the NRP and its implementation for the worst natural disaster in U.S. history.  U.S. Department of Homeland Security, *National Response Plan* (Washington, DC: December 2004).

⁹ The NRP requires all of the supporting Federal Departments and Agencies to modify existing interagency incident management and emergency response plans and protocols to incorporate linkages to and be consistent with NIMS, the NRP and its coordinating mechanisms.  The NRP also requires that detailed standard operational procedures be developed for the HSOC, NRCC, IIMG, the JFO and each ESF Annex.  These plans are meant to clearly define the functions of each organization and describe how the organization interfaces with the rest of the emergency response effort.  See U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), Letter of Instruction, ix.

¹⁰ Starting after the 2002 Salt Lake City Olympics, money and resources that were once dedicated to training and exercising the National Emergency Response Teams (ERT-N) have been diverted from the ERT program to other programs.  See William Carwile, Federal Coordinating Officer for Mississippi, Federal Emergency Management Agency, testimony before a hearing on the Preparation for and Response to Hurricane Katrina, on December 8, 2005, Senate Committee on Homeland Security and Governmental Affairs.  ERT-N deploys for large-scale, high impact events, to coordinate the plans with other Federal agencies within FEMA regions.  See U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), 40.  ERT-Ns also provide assistance to the smaller ERT deployed by the FEMA regions.  The loss of funding has resulted in ERT-N teams that are not fully equipped nor train or exercise together.  William Carwile, Federal Coordinating Officer for Mississippi, Federal Emergency Management Agency, testimony before a hearing on the Preparation for and Response to Hurricane Katrina, on December 8, 2005, Senate Committee on Homeland Security and Governmental Affairs.  Scott Wells, the Deputy Federal Coordinating Officer for Louisiana, stated that FEMA lacked "the people, we did not have the expertise; we did not have the operational training folks that we needed to do our missions."  He also stated generally that the staff level in the regional office is "woefully inadequate" to set up a Regional Response Coordination Center (RRCC) required for a disaster, and staff an ERT to go to the scene of a disaster.  Wells describes FEMA staffing in disasters as robbing "Peter to pay Paul."  Scott Wells, Deputy Federal Coordinating Officer for Louisiana, testimony before a hearing on Hurricane Katrina: Perspectives of FEMA's Operation

Professionals, on December 8, 2005, Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 1st session.

[11] A DHS request to DOD on September 2 that "DOD provide the support, planning, and execution of the full logistical support to the Katrina disaster in all declared states in coordination with FEMA" was initially denied because the request did not come from the Secretary of DHS to the Secretary of Defense. The Secretary of DHS immediately resubmitted the request to the Secretary of Defense which was then granted. Ultimately, DOD (OSD & Joint Staff) worked with the FEMA Response Division to meet this requirement. The Joint Staff and the Office of the Secretary of Defense (OSD) worked throughout the weekend of September 3-5 to meet this Mission Assignment. U.S. Department of Homeland Security, Federal Emergency Management Agency, "Mission Assignment, Program Code/Event #: 1604DR-MS: HURRICANE KATRINA, Action Request #:1509-32760," September 3, 2005; U.S. Department of Defense, "Hurricane Katrina/Rita/Ophelia Interim Timeline (August – September 2005)," November 2, 2005, 1, 8, 10-11; and "Hurricane Katrina: Preparedness and Response by the Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi and Alabama, October 27, 2005, hearing before the Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1[st] session (Congressman Tom Davis, quoting from Ken Burris, email to Mathew Broderick et al., Subject: request, September 2, 2005.)

[12] U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), p. 41. According to the NRP, the Local Chief Executive Officer "Requests State and, if necessary, Federal assistance through the Governor of the State when the jurisdiction's capabilities have been exceeded or exhausted" and the Governor "Requests Federal assistance when it becomes clear that State or tribal capabilities will be insufficient or have been exceeded or exhausted." According to the Louisiana *Emergency Operations Plan*, "The initial actions . . . are conducted by local government. Local authorities will exhaust their resources, and then use mutual aid agreements with volunteer groups, the private sector and/or neighboring parishes." The plan also states that "State assistance will supplement local efforts and Federal assistance will supplement State and local efforts when it is clearly demonstrated that it is beyond local and State capability to cope with the emergency/disaster." Louisiana Office of Homeland Security and Emergency Preparedness, *Emergency Operations Plan* (Baton Rouge, April 2005).

[13] U.S. Department of Defense, Joint Center for Operational Analysis, "Incident Command Request Briefing," November 1, 2005. However, Secretary of Defense Donald Rumsfeld verbally approved some requests. See also Paul McHale, Assistant Secretary of Defense for Homeland Defense, testimony before a hearing on Hurricane Katrina: The Defense Department's Role in the Response, on February 9, 2006, Senate Homeland Security and Governmental Affairs Committee, 109th Congress, 2nd session.

[14] Melvin "Kip" Holden, Mayor-President of Baton Rouge, Louisiana, noted that requirements for paperwork and form completions hindered immediate action and deployment of people and material to assist in rescue and recovery efforts. Melvin "Kip" Holden, written statement submitted for a hearing on Recovering from Hurricane Katrina: Responding to the Immediate Needs of Its Victims, on September 28, 2005, Senate Homeland Security and Governmental Affairs Committee, 109th Congress, 1st session.

[15] As noted in U.S. Department of Defense, National Guard Bureau (NGB J7), *After Action Review: Hurricane Response September 2005* (December 21, 2005), 146, 168.

[16] U.S. Department of Defense, *Hurricane Katrina Initial Observations and Lessons Learned* (n.d., ca. 2005). These deployments occurred under the EMAC system.

[17] U.S. Department of Defense, National Guard Bureau (NGB J7), After Action Review: Hurricane Katrina Response September 2005 (December 21, 2005).

[18] If chartered as a joint DOD activity, the NGB would become a member of the Joint Staff, rather than only having a reporting relationship with the Secretary of the Army and the Secretary of the Air Force. Lieutenant General H. Steven Blum, "A Vision for the National Guard," *Joint Forces Quarterly*, issue 36 (December 2004), 24-29.

[19] U.S. Department of Defense, National Guard Bureau (NGB J5), *Draft Baseline Capabilities for Joint Task Force-State (JTF-State)*, n.d., ca. 2005. The National Guard Bureau can provide overarching situational awareness and an integrated common, relevant operating picture regarding the employment of Army and Air Guard troops in each of the 54 States, Territories and the District of Columbia. This demonstrates the essential role of the National Guard Bureau as the channel of communications between the several States and the combatant commanders, the Joint Staff and the Departments of Defense, Army and Air Force. Given the current national security environment, the necessity to continue providing this kind of data will continue to grow. Capabilities include Joint Force Joint Operations Centers (JF JOC). This is a network composed of the NGB Joint Operations Center and a Joint

Operations Center in each of the States, Territories, and the District of Columbia.  Each JF JOC has redundant communications connectivity to include:  DOD unclassified (NIPR) and classified (SIPR) computer networks; a High Frequency network with high and low-side voice and data information; and commercial systems.  The network provides DOD and interagency connectivity and situational awareness to deliberate planning and to emerging and on-going contingency operations in any State or Territory.  The National Guard has successfully established a Joint CONUS Communications Support Environment (JCCSE) nationwide.  Each JFHQ has established Homeland Security Information Network (HSIN) linkages.  The HSIN is an unsecured collection of Department of Homeland Security systems designed to facilitate information sharing and collaboration.

[20] Colonel F. G. Dowden, Regional Liaison, New Orleans Department of Homeland Security and Public Safety, written statement for a hearing on Hurricane Katrina: Managing Law Enforcement and Communications in a Catastrophe, on February 6, 2006, submitted to the Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 2nd session.

[21] Kevin J. Martin, Chairman, Federal Communications Commission, written statement for a hearing on Public Safety Communications from 9/11 to Katrina: Critical Public Policy Lessons, submitted to Subcommittee on Telecommunications and the Internet, House Committee on Energy and Commerce, on September 29, 2005, 109th Congress, 1st session.

[22] U.S. Department of Energy, Office of Electricity Delivery and Energy Reliability, "Hurricane Katrina Situation Report #20," September 4, 2005.

[23] Communications "operability" refers to whether a basic communications network is functioning at all. Operability will fail when the underlying infrastructure is destroyed or otherwise fails (e.g. through loss of power).

[24] Communications "interoperability" refers to the ability to communicate across different, operable communication systems.

[25] Congressman Bill Pascrell, Jr., hearing on Government Operability during Catastrophic Events, on October 26, 2005, House Committee on Homeland Security, Subcommittee on Emergency Preparedness, Science and Technology, 109th Congress, 1st session.

[26] For example, FEMA had pre-positioned two of their five Mobile Emergency Response Support (MERS) detachments in the Gulf and quickly moved them to the affected areas in Louisiana and Mississippi soon after landfall, but additional MERS support should have been deployed to the Gulf when it became apparent that those pre-positioned were insufficient for an incident of Katrina's magnitude.  U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA National Situation Report," August 29, 2005, 3; and Michael Brown, former Director of the Federal Emergency Management Agency, testimony before a hearing on Hurricane Katrina: The Role of the Federal Emergency Management Agency, on September 27, 2005, to House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[27] Mark Rey, Under Secretary for Natural Resources and Environment, U.S Department of Agriculture, testimony before a hearing on Ensuring Operability during Catastrophic Events, on October 26, 2005, House Committee on Homeland Security, Subcommittee on Emergency Preparedness, Science and Technology, 109th Congress, 1st session.

[28] Dr. David G. Boyd, Director of the Office for Interoperability and Compatibility, Department of Homeland Security, written statement for a hearing on Ensuring Operability during Catastrophic Events, on October 26, 2005, House Committee on Homeland Security, Subcommittee on Emergency Preparedness, Science and Technology, 109th Congress, 1st session.  As a first step, as required by the Fiscal Year 2005 and 2006 homeland security grant guidance, States and urban areas are to develop Tactical Interoperable Communication Plans to address means of improving communications operability and interoperability.  See U.S. Department of Homeland Security, *Fiscal Year 2006 Homeland Security Grant Program Guidance: Program Guidance and Application Kit* (Washington, D.C., December 2005).  Although not an issue during Hurricane Katrina, first responders still require more radio spectrum to effectively communicate during their missions.  Public Law 109-171, enacted recently, provides first responders with more radio spectrum in the 700 megahertz band, starting April 7, 2009.  The bill calls for auctioning off some of the radio spectrum relinquished by broadcasters.  Some of that revenue would pay for upgrades to first responders' equipment.  This transition for the 700 megahertz radio spectrum is considered a critical component in improving communications between police, fire, and other emergency agencies.

[29] Dr. David G. Boyd, Director of the Office for Interoperability and Compatibility, Department of Homeland Security, written statement for a hearing on Ensuring Operability during Catastrophic Events, on October 26, 2005, to House Committee on Homeland Security, Subcommittee on Emergency Preparedness, Science and Technology, House Homeland Security Committee, 109th Congress, 1st session.

APPENDIX E – ENDNOTES

[30] Private sector companies manage sophisticated supply and delivery chains using the most efficient means available to handle goods as few times as possible between the supplier and the customer.

[31] Vincent Pearce, National Response Program Manager for the Department of Transportation, testimony before a hearing on Hurricane Katrina: Managing the Crisis and Evacuating New Orleans, on February 1, 2006, Senate Homeland Security and Governmental Affairs Committee, 109th Congress, 2nd session.

[32] For example, a contractor arrived at an evacuation staging site at Zephyr Field stadium in New Orleans with 37,500 meals, as requested, only to discover that the evacuees had already left.

[33] FEMA US&R Task Forces, in conjunction with USCG, DOD, other federal agencies, and State and local first responders, rescued over 6,500 people.  See U.S. Department of Homeland Security, Federal Emergency Management Agency, "Urban Search and Rescue Operations Completed: Hurricane Katrina Urban Search and Rescue Teams Are Due to Return Home," news release, September 30, 2005, http://www.fema.gov/news/newsrelease.fema?id=19320.html.

[34] Donna Miles, "Military Providing Full-Scale Response to Hurricane Relief Effort," American Forces Press Service, August 31, 2005, http://www.defenselink.mil/news/Aug2005/20050831_2576.html.

[35] "Some of the problems we encountered were low visibility at night, a lot of downed power lines, a lot of underwater obstructions, vehicles that were underwater, debris that was everywhere, and large numbers of people shouting for help from the house."  Louisiana Department of Wildlife and Fisheries, "Department Timelines Chronology 3," *Activity Report on Hurricane Katrina* (Baton Rouge, 2005), 2.

[36] East Baton Rouge Parish, *Draft After-Action Report for Hurricanes Katrina and Rita* (Baton Rouge, 2005), 38.

[37] Scott Wells, testimony before a hearing on Hurricane Katrina: Perspectives of FEMA's Operations Professionals, on December 8, 2005, Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 1st session.

[38] Massachusetts Urban Search and Rescue Task Force-1, *Hurricane Katrina After-Action Report: August 30, 2005 through September 8, 2005* (Beverly, MA, 2005), 6.

[39] East Baton Rouge Parish, *Draft After-Action Report for Hurricanes Katrina and Rita* (Baton Rouge, 2005), 38.

[40] Louisiana Office of the Governor, *Response to U.S. Senate Committee on Homeland Security and Governmental Affairs* (Baton Rouge, December 2005), 11.  See also Kathleen Babineaux Blanco, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, to the House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session, 68. Louisiana Department of Wildlife and Fisheries, "Department Timelines Chronology 3," *Activity Report on Hurricane Katrina* (Baton Rouge, 2005), 7.  http://www.nola.com/katrina/view.ssf.html; Newsweek, "The Lost City", September 12, 2005.

[41] U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), 8, 43; and *National Response Plan ESF #13 Annex*, pg. 13-1.

[42] On August 31, most of the New Orleans police force was redirected from search and rescue missions to respond to the looting, detracting from the priority mission of saving lives.  Homeland Security Operations Center Spot Report #33, 31 Aug 05, 1123 hrs. (recording that "on August 31, CEO Akerman of Bell South contacted [a DHS official] and requests immediate security assistance, relating that the Bell South Main Central Office was being overrun by mob during attempted evacuation of site and that its employees may be in physical danger"); U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #15," September 2, 2005 (reporting that security concerns were prohibiting all operations in many grain industry facilities); U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #18," September 4, 2005 (reporting that fuel and security for deliveries are a concern); U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #19," September 4, 2005 (reporting that security remained a major concern for agriculture, food processing, distribution, services, and retail; access to service and retail facilities for re-stocking remains restricted in many areas; security for all infrastructures remained a major concern, with employers reluctant to restart businesses; safety of their employees is a priority); U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #29," September 9, 2005 (reporting that security remained the top priority for the industry; contract security and other security sources were being coordinated with other Emergency Support Functions).

[43] Both the Department of the Interior and the Department of Commerce reported that their organic law enforcement assets were available for use in the Gulf Coast region and attempted to lend their assistance by contacting the Interagency Incident Management Group in Washington, D.C., but received no response.  The Department of the Interior has 4,400 law enforcement officers—including hundreds of officers immediately deployable in the Gulf Coast area—trained to work in harsh environments, conduct search and rescue, emergency

medical services, and evacuation, yet these assets were not called upon to assist under the NRP until late September, when DOI contacted the LECC in New Orleans. The Department of Commerce's National Oceanic and Atmospheric Administration (NOAA) Office of Law Enforcement (OLE) also attempted to lend its law enforcement assistance to the Federal response effort, but received no response through the ESF-13 process.

[44] For example, the Department of Interior law enforcement personnel had to be sworn in as Deputy U.S. Marshals to give them Federal law enforcement authority beyond their statutory DOI jurisdiction.

[45] While some law enforcement officers provided by States under the EMAC readily accepted direction from Louisiana and Federal law enforcement officials, others operated in New Orleans with little coordination or supervision.

[46] According to the U.S. Marshals Service, this was "a critical issue" in both New Orleans and Southern Mississippi. The Marshals Service and the DOJ Office of Legal Policy have offered recommendations for more comprehensive monitoring of persons under law enforcement supervision. For additional information on the disarray of the New Orleans criminal justice system in Hurricane Katrina's aftermath, see Melinda Deslatte, "Prisons in New Orleans empty as temporary booking facility up and running," Associated Press, September 3, 2005; Ann Woolner, "A Legal System in Chaos: New Orleans Struggles," *Fulton County Daily Report*, October 4, 2005; and Chuck Crumbo, "Evacuation leaves Louisiana prison system in chaos," *The State (Columbia, SC)*, October 5, 2005.

[47] On September 3, the Associated Press reported that "computer logs still hadn't been retrieved from the criminal district court in New Orleans…[and] tracking down witnesses, finding court records and trial transcripts and organizing a temporary court" would remain challenges to the reestablishment of the city's criminal justice system. Melinda Deslatte, "Prisons in New Orleans empty as temporary booking facility up and running," Associated Press, September 3, 2005; Ann Woolner, "A Legal System in Chaos: New Orleans Struggles," *Fulton County Daily Report*, October 4, 2005; and Chuck Crumbo, "Evacuation leaves Louisiana prison system in chaos," *The State (Columbia, SC)*, October 5, 2005.

Both State and Federal courts closed their doors. Supreme Court of Louisiana, Order by Justice Catherine D. Kimball, September 2, 2005, Baton Rouge, Louisiana; Supreme Court of Mississippi, Order by Justice James W. Smith, Jr., September 7, 2005; U.S. District Court for the Eastern District of Louisiana, Order by Chief Judge Helen G. Berrigan, September 4, 2005, accessed from http://katrinalaw.org/dokuphp?id=louisiana_eastern_district_court on February 17, 2006; U.S. Bankruptcy Court for the Eastern District of Louisiana, September 2, 2005, accessed from http://katrinalaw.org/dokuphp?id=louisiana_eastern_bankruptcy_court on February 17, 2006; Fourth Circuit Court of Appeal, State of Louisiana, Order by Justice Max N. Tobias, Jr., September 2, 2005, accessed from http://katrinalaw.org/dokuphp?id=fourth_circuit_court_of_appeal on February 17, 2006; Fifth Circuit Court of Appeal, State of Louisiana, Order by Justice Walter J. Rothschild, September 2, 2005, accessed from: http://katrinalaw.org/dokuphp?id= fifth_circuit_court_of_appeal, accessed on February 17, 2006; Civil District Court, Parish of Orleans, State of Louisiana, Order by Chief Justice Robin M. Giarrusso, September 2, 2005, accessed from http://katrinalaw.org/dokuphp?id= orleans_parish_civil_district_court, accessed on February 17, 2006.

[48] The DOJ's Bureau of Prisons moved, or facilitated movement of, a large number of prisoners incarcerated in Louisiana facilities during the first week of the disaster. Though there were no major difficulties or issues encountered during the actual transport of the prisoners, there were flaws in the decision making process and a general failure on the part of State and local prison authorities to be proactive in evacuating their incarcerated populations.

[49] United Health Foundation, *America's Health Rankings--2005 Edition* (St. Paul, MN: Arundel Street Consulting, Inc., 2005), http://www.unitedhealthfoundation.org/shr2005/survey.asp (accessed January 25, 2006), 13.

[50] "The public health and health care delivery infrastructures have been either completely destroyed or have sustained significant damage across the affected Gulf Coast. Existing facilities that are operational are under extreme stress as they assume even greater responsibilities to fill the gaps created by the loss of so many facilities. Physician offices, cancer, imaging, dialysis and rehabilitation centers, hospitals, clinics, long-term care facilities, pharmacies, laboratories, etc., need to be rebuilt or repaired, not to mention re-supplied, with information technology systems, equipment and inventory." Dr. Ardis D. Hoven, Member of the American Medical Association Board of Trustees, written statement for a hearing on Assessing Public Health and the Delivery of Care in the Wake of Hurricane Katrina, on September 22, 2005, submitted to the House Committee on Energy and Commerce, Subcommittees on Health and Oversight and Investigations, 109th Congress, 1st session.

[51] Sarah A. Lister, *Hurricane Katrina: The Public Health and Medical Response*, Congressional Research Service Report for Congress RL33096, (Washington, D.C., September 21, 2005), Summary, CRS 1, CRS 6-7, CRS 11.

[52] "Our situations are urgent.  Unless we find financial relief within the next seven to ten days, we will be forced to make some very tough decisions.  We are committed to our patients, our hospital staff and our community.  However, we can't continue to care for our patients and community – many of whom hopefully will return soon from the evacuation – unless we have immediate financial assistance. … The Centers for Medicare & Medicaid Services already has eased some of its regulations governing Medicare and Medicaid.  There are, however, additional measures that can be taken.  The AHA suggests immediate federal coverage for the uninsured people affected by the hurricane.  So that access can be granted as quickly as possible, additional relief from Medicare and Medicaid red tape is needed. … The AHA also asks that [FEMA] funds be available for all types of community hospitals affected by the storm."  Dr. Mark Peters, President & CEO, East Jefferson Memorial Hospital, Metairie, Louisiana, on behalf of the American Hospital Association, written statement for a hearing on Assessing Public Health and the Delivery of Care in the Wake of Katrina, on September 22, 2005, submitted to the House Committee on Energy and Commerce, Subcommittees on Health and Oversight and Investigations, 109th Congress, 1st session.

[53] In several instances, HHS had pre-positioned medical, public health and pharmaceutical assets in Louisiana and had them ready to deploy where needed as soon as they received a go-ahead from State decision-makers. In some cases, security and logistics may have been issues, but delays in 'on the ground' decision-making by local and State officials resulted in delays in the delivery of assets and services when and where they were needed.

[54] One key example: "Dr. Laurence Grummer-Strawn, a Centers for Disease Control and Prevention researcher and an HHS Public Health Service member, was deployed to central Louisiana with a team of 125 medical personnel to construct a temporary 1,000-bed hospital.  The plan, Grummer-Strawn understood, was for that facility to treat 'overflow patients' transferred from hospitals in the southern part of the state.  Arriving Saturday, Sept. 3, six days after Katrina hit, his team spent two days setting up the hospital before they were told they weren't needed there.  The team left Alexandria, La., Wednesday - it took a day to pack up the beds and equipment - and fanned out to conduct needs assessments at shelters across the state."  Justin Rood, "Medical Catastrophe," *Government Executive Magazine*, November 1, 2005, http://www.govexec.com/features/1105-01/1105-01s1.htm.

[55] "Almost 34,000 volunteer health professionals registered through HHS's toll-free telephone number or through the website established for this purpose.  Of these, only 1,400 were deployed, based on the tasking requirements from FEMA. By the end of the first week following Katrina's landfall, it became clear that the majority of the volunteers would not be urgently needed in the Gulf Coast. Though HHS announced this fact, this message did not reach many volunteers, who expressed frustration that their services were not being accepted or efficiently utilized. [M]any well-intentioned clinicians and health care organizations simply self-deployed and traveled to Louisiana, where their arrival compounded the overall disorganization of the effort to provide health care … Lacking an assigned role within a properly planned framework, many found themselves sitting on their hands, doing nothing for which they had been trained."  Hilarie H. Cranmer, "Hurricane Katrina: Volunteer Work – Logistics First," *New England Journal of Medicine* 353(15), no. (October 13, 2005).

[56] Irwin Redlener, Dennis Johnson, David A. Berman and Roy Grant, "Follow-Up 2005: Where the American Public Stands on Terrorism and Preparedness after Hurricanes Katrina and Rita," http://www.ncdp.mailman.columbia.edu/research.htm (accessed January 25, 2006).

[57] Sarah A. Lister, *Hurricane Katrina: The Public Health and Medical Response*, Congressional Research Service for Congress RL33096, (Washington, D.C., September 21, 2005), 22.

[58] As of September 11, 2005, 14 days after Katrina made landfall, FEMA had received 699,207 Louisiana, Alabama and Mississippi household registrations for assistance under the Individuals and Households Program (IHP); 393,294 had been approved for assistance; 366,370 households had been funded; and $818,939,600 in assistance had been released.  U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #35," September 12, 2005, 11.  By late September, "an estimated more than 20 percent of all those affected by the storms and who have filed for FEMA assistance are now receiving HHS benefits and services.  Furthermore, 41 percent of the 857,000 evacuees living in a different zip code from the damaged areas are receiving help from HHS."  U.S. Department of Health and Human Services, "Estimates Show More Than 40 Percent of Hurricane Evacuees Now Receiving HHS Benefits or Services," news release, September 29, 2005.

[59] Examples include: health insurance for elderly and disabled Americans (Medicare) and health insurance for low-income people (Medicaid); financial assistance for low-income families; pre-school education and services (Head Start); Social Security benefits; veterans benefits; and unemployment benefits.

[60] U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), ESF #6-1.

[61] U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), ESF #6-5. "Mass care" includes overall coordination of the shelter, feeding and other activities to support the emergency needs of victims.

[62] U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), ESF #6-3. "Human services" refer to the provision of resources, the processing of new Federal benefit claims, compensation claims and other supportive services.

[63] U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), ESF #6-2.

[64] Based on the locations reported by those who applied for FEMA assistance as a result of the impact of Hurricanes Katrina and Rita. U.S. Department of Homeland Security, Federal Emergency Management Agency, "Reported Locations of Katrina/Rita Applicants," January 20, 2006,
http://www.fema.gov/pdf/press/katrina_after/metro_stats.pdf (accessed January 25, 2006).

[65] Michael Chertoff, Secretary of the Department of Homeland Security, written statement for a hearing on Hurricane Katrina: The Homeland Security Department's Preparation and Response, on February 15, 2006, submitted to the Senate Homeland Security and Governmental Affairs Committee, 109th Congress, 2nd session.

Governor Kathleen Blanco estimates that 8 percent of the New Orleans population stayed behind. Governor Kathleen Babineaux Blanco, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, submitted to the U.S. House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

Mayor Nagin testified to Congress that "thousands of residents" did not leave, even after he issued the mandatory evacuation order. Ray Nagin, Mayor of New Orleans, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, submitted to the House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[66] Ronald D. Utt, "After Weeks of Confusion, the Right Course for Evacuee Housing Assistance," *WebMemo #866*, prepared for The Heritage Foundation, September 28, 2005.

[67] "Had HUD staff been more closely involved in FEMA planning, the cost and delay of relearning 50 years of lessons could have been avoided." Ronald D. Utt, "After Weeks of Confusion, the Right Course for Evacuee Housing Assistance," *WebMemo #866*, prepared for The Heritage Foundation, September 28, 2005. HUD played a key role facilitating the identification of available housing resources and placement of Katrina evacuees in housing.

[68] National Oceanic and Atmospheric Administration, National Weather Service, "NOAA Weather Radio All Hazards," January 31, 2006, http://www.weather.gov/nwr/. The Federal Communication Commission's EAS Primary Entry Point (PEP) station in New Orleans (station WWL) was one of the few radio stations in the area to provide continuous service to the New Orleans area. The NOAA Weather Radio (NWR) is a national network of radio stations that continuously broadcast weather and hazard information from local Weather Service offices. Operating in close conjunction with EAS, NOAA Weather Radio comprises an "all hazards" radio network that acts as a "single source for comprehensive weather and emergency information." National Oceanic and Atmospheric Administration, National Weather Service, "NOAA Weather Radio All Hazards," January 31, 2006, http://www.weather.gov/nwr/.

[69] The Emergency Alert System (EAS) is a mechanism for public officials—Federal, State, and local—to communicate disaster information and instructions rapidly and widely. The system aims to reach the broadest possible audience by disseminating emergency updates on existing radio and television stations, including via digital and satellite networks. Federal Communications Commission, *FCC Consumer Facts: The Emergency Alert System* (Washington, DC, 2005), 1. See also State of California, "What Is EAS?,"
http://eas.oes.ca.gov/Pages/whatseas.htm. The new EAS system is the direct descendant of the Emergency Broadcast System (EBS), the Nation's alert system from 1963 until the advent of EAS. EAS was officially launched on January 1, 1997 (for radio stations) and December 31, 1998 (for television). Federal Emergency Management Agency, "Background on the Emergency Alert System," October 23, 2004,
http://www.fema.gov/rrr/rep/easrep.shtm. While EAS fulfills the same function as EBS, it differs in that it takes advantage of digital technology to permit automation of transmission. Federal Emergency Management Agency, "Background on the Emergency Alert System," October 23, 2004, http://www.fema.gov/rrr/rep/easrep.shtm. The Emergency Broadcast System and its EAS successor were originally designed for the President to speak to the Nation during an emergency, particularly following catastrophic nuclear attacks. But the system was made available to State and local officials in 1963, and since then has been used primarily for weather emergencies. "There are two contexts in which the EAS will be used—Presidentially-initiated alerts and messages and those initiated by State and

APPENDIX E – ENDNOTES

local governments in concert with the broadcast industry." Federal Emergency Management Agency, "Background on the Emergency Alert System," October 23, 2004, http://www.fema.gov/rrr/rep/easrep.shtm. See also, Federal Communications Commission, *FCC Consumer Facts: The Emergency Alert System* (Washington, DC, 2005), 2. The document states: "a state emergency manager may use the system to send out a public warning by broadcasting that warning from one or more major radio stations in a particular state." EAS was not activated prior to landfall aside from NOAA hurricane warnings and advisories. "The Emergency Alert System was never activated by the White House or by State or local governments during Katrina." Ken Kerschbaumer, "Broadcasters Seek Better Emergency Alert System," *Broadcasting and Cable*, September 12, 2005.

[70] "The Big Disconnect on New Orleans," *CNN.com*, September 2, 2005, http://www.cnn.com/2005/US/09/02/katrina.response.

[71] In testimony before the House Select Bipartisan Committee to Investigate the Preparation and Response to Hurricane Katrina, Mr. Phil Parr, Deputy Federal Coordinating Officer, FEMA, and Mr. Terry Ebert, Director of the Louisiana Office of Homeland Security, of the City of New Orleans, both testified that exaggerated media reports impeded rescue efforts (December 14, 2005).

[72] The Nation relies on interdependent systems known as "critical infrastructure" to maintain its defense, continuity of government, economic prosperity, and quality of life. The term critical infrastructure means "systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters." See, e.g., *USA Patriot Act of 2001*, Section 1016(e), Public Law 107-56, 107th Congress, 1st session (October 26, 2001), 115 Stat. 401; *Critical Infrastructure Protection Act of 2001*, 42 U.S.C. § 5195c(e).

Transportation, electricity, banking, telecommunications, food supply, and clean water are examples of critical infrastructure services that have become basic aspects of our daily lives. These services are often only noticed when they are disrupted, and the American public expects speedy restoration of them. Private sector companies own and operate 85 percent of our Nation's critical infrastructure and are responsible for protecting their facilities and restoring operations following an incident. U.S. Department of Homeland Security, *Interim National Infrastructure Protection Plan* (Washington, DC). Response planning must also recognize the unique Federal responsibility to support private sector efforts and assist in the restoration of critical infrastructures imperative to the National economy or integral to larger cascading systems or supply chains.

[73] U.S. Department of Energy, Energy Information Administration, *Hurricane Katrina's Impact on the U.S. Oil and Natural Gas Markets*, September 6, 2005.

[74] Samuel Bodman, Secretary of the Department of Energy, written statement for a hearing on Hurricane Recovery Efforts, on October 27, 2005, submitted to the Senate Committee on Energy and Natural Resources, 109th Congress, 1st session.

[75] U.S. Department of Energy, Office of Electricity Delivery and Energy Reliability, "Hurricane Katrina Situation Report #10," August 30, 2005.

[76] U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C., December 2004), 12.

[77] Sectors include: Agriculture and Food, Banking and Finance, Chemical, Commercial Facilities, Dams, Defense Industrial Base, Emergency Services, Energy, Government Facilities, Information Technology, National Monuments and Icons, Nuclear Reactors, Material and Waste, Postal and Shipping, Public Health and Healthcare, Telecommunications, Transportation, Water. The White House, *The National Strategy for the Physical Protection of Critical Infrastructures and Key Assets* (Washington, D.C., February 2003), 9.

[78] Industries with critical infrastructure contacted various Federal departments and agencies and requested assistance to protect or to restore their facilities. These requests were inconsistently coordinated across sectors and responded to in an ad hoc fashion.

[79] "The Regional Response Coordination Center (RRCC) initially deploys a DHS/Emergency Preparedness & Response (EPR)/FEMA-led Emergency Response Team Advance (ERT-A), including rapid needs assessment personnel and appropriate ESF representatives, to State operating facilities and incident sites to assess the impact of the situation, collect damage information, gauge immediate Federal support requirements, and make preliminary arrangements to set up Federal field facilities." U.S. Department of Homeland Security, *National Response Plan* (Washington, D.C. December 2004), 51. "Infrastructure Specialist (representing ESF #3)-assesses the status of transportation." In addition, they did not have expertise in the critical infrastructure in the region. U.S. Department of Homeland Security, Federal Emergency Management Agency, "FEMA Rapid Needs Assessment Form," April

2001, http://www.fema.gov/preparednesss/resources/em_mgt/rapid_needs_assessment_team.htm (accessed on January 17, 2005).[79]

[80] U.S. Department of Homeland Security, *Interim National Infrastructure Protection Plan* (Washington, D.C.).

[81] A Superfund site is a hazardous waste site that is part of the U.S. Environmental Protection Agency's (EPA's) Superfund Program. Years ago, before people became aware of the public health and environmental dangers of dumping chemical wastes, thousands of properties became uncontrolled or abandoned hazardous waste sites. Examples include abandoned warehouses or landfills.  Concern about this problem led Congress to establish in 1980 the Superfund Program to locate, investigate and clean up the worst sites nationwide.  The EPA administers the Superfund Program in cooperation with individual states and tribal governments. EPA, "About Superfund," http://www.epa.gov/superfund/about.htm, accessed February 15, 2006.

[82] *Gulf Coast Hurricane Emergency Environmental Protection Act of 2005*, HR 4139, 109th Congress, 1st session, (October 25, 2005), 3.

[83] U.S. Environmental Protection Agency, "Environmental Assessment Summary," December 6, 2005, http://www.epa.gov/katrina/testresults/katrina_env
_assessment_summary.htm, (accessed January 18, 2006).

[84] "As of Oct. 4, 22 multi-agency environmental assessment and recovery teams had: conducted shoreline and waterway assessments throughout Mississippi and Alabama; resolved 2,315 of 2,380 cases reported to the Coast Guard and EPA; assessed a total of 504 vessels grounded or deposited inland along coastal areas for potential oil discharges; collected more than 10,000 hazardous materials such as drums, tanks, cylinders, containers and batteries throughout the Mississippi counties of Hancock, Harrison and Jackson as well as the Alabama counties of Baldwin and Mobile; recovered about 43,000 gallons of fuel; and assessed more than 200 facilities." U.S. Department of Homeland Security, Coast Guard, "Coast Guard Response to Hurricane Katrina," U.S. Coast Guard Fact File, September 11, 2005, http://www.uscg.mil/hq/g-cp/comrel/factfile/Factcards/Hurricane_Katrina.htm.

[85] The graph shown on the referenced website displays the estimated volume and surface area of the flood waters at one foot increments. Note that the volume and area estimates are only for the areas shown as inundated on the above graphic. The depths are relative to the water surface as of the afternoon of Friday, September 2, 2005.  U.S. Geological Survey, "Hurricane Katrina: Science," http://eros.usgs.gov/katrina/science.html (accessed January 23, 2006).  "The affected area was home to 2.3 million people, (0.8 percent of the U.S. population), and covers 90,000 square miles, (2.5 percent of the U.S. surface area).  At the time Katrina hit, New Orleans was the 35[th] largest U.S. city by population."  See House Committee on Ways and Means, "Economic Update: Hurricane Katrina," news release, September 8, 2005, http://waysandmeans.house
.gov/media/pdf/taxdocs/090805katrina.pdf.

[86] Even after assessments were conducted, a number of Federal agencies reported that their personnel did not receive information or warnings concerning environmental hazards.

[87] *Stafford Act,* 42 U.S.C. § 5173.

[88] Michael Chertoff, Secretary of the Department of Homeland Security, written statement for a hearing on "Hurricane Katrina: The Homeland Security Department's Preparation and Response," on February 15, 2006, submitted to the Senate Homeland Security and Governmental Affairs Committee, 109th Congress, 2nd session.

[89] Debris on private property can only be removed with the owner's consent or with a State or local government request to the Federal government that must meet several conditions.   This was a difficult process because many owners had evacuated the area and could not be located.  U.S. Department of Homeland Security, Federal Emergency Management Agency; and Eric Cramer, "Waveland: A Case Study in Community Restoration," *Mississippi Valley Division News,* http://www.mvd.usace.army.mil/hurricane/mvk/news/waveland.pdf.

[90] The Department of State lists 151 countries, political entities and international organizations that offered assistance.  Two additional countries offered assistance but wished no public recognition, for a total of 153.  Of those, 139 were countries and the balance (14) were either political entities or international organizations.  Note that of the fourteen, five different United Nations organizations are included.  Pledges totaled $854 million.  Of the $854 million pledged, $400 million was in commodity for cash assistance (oil to be sold and then cash value considered). Of the remaining $454 million, $126.4 million has been received so far.  The other $328 million plus the $400 million in oil, has not been received, for a total of $728 million.  (As of October 12, the foreign countries had pledged $854 million in financial contributions, and of this amount the USG had received $118.9 million (the latter figure had increased to $126.4 million by January 9).  On October 20, 2005, after interagency consensus, $66 million of the foreign funds received by the U.S. was transferred to FEMA for a case management program.  The

Federal government expects the balance of the foreign funds received to be allocated shortly.  This accounts for all $854 million pledged.

[91] A German company offering a $3 million integrated satellite and cellular telephone system capable of handling 5,000 calls at once waited five days for a written deployment order from USNORTHCOM.

[92] Joel Brinkley and Craig S. Smith, "Score of nations offer their help," *International Herald Tribune*, September 8, 2005; and Sean McCormack, "Daily Press Briefing," US Department of State, September 7, 2005.

[93] The State Department made contact with all New Orleans-based consulates, facilitated visits by various consular officials, as well as monitored the arrival and distribution of in-kind assistance and held regular press briefings. There is no tracking of Green Card holders or tourists.

[94] U.S. Department of Homeland Security, "Emergencies and Disasters," http://www.dhs.gov/interweb/ assetlibrary/katrina.html (accessed January 13, 2006).

[95] U.S. Citizen Corps, "Citizen Corps Support for Hurricane Katrina Response & Recovery Efforts," http://www.citizencorps.gov/doc/cc_Support_Katrina_1005.doc (accessed January 13, 2006).

[96] Long before Hurricane Katrina ever made landfall, the Harris County Citizen Corps laid the groundwork for success with its pre-incident organization and its partnerships with local volunteer groups and area businesses. These two factors allowed the Harris County Citizen Corps to mobilize and organize its resources quickly and efficiently to serve the thousands of evacuees sheltered in Houston-area sites.  According to emergency responders on the scene, Citizen Corps members previously trained in the National Incident Management System (NIMS) and the Incident Command System (ICS) were of great value to the hurricane response.  Due to their pre-incident training, many Citizen Corps volunteers were already familiar with NIMS/ICS terminology (e.g., Joint Information Center, Joint Operations Center, IC, etc.) and understood the responsibilities of emergency responders at the incident site.  Information available at U.S. Department of Homeland Security, *Lessons Learned Information Sharing (LLIS.gov) website*, https://www.llis.dhs.gov/member/secure/detail.cfm?content_id=14990.

[97] Tim Yarbrough, "Baptists' 10.5 Million Meals shatters Prior Disaster Relief Record," *North American Mission Board*, http://www.namb.net/site/apps/nl/content2.asp?c=9qKILUOzEpH&b=227361&ct=1568907 (accessed January 13, 2006).

[98] The White House, Office of National Drug Control Policy, "Director Walters visits Baton Rouge, LA," September 30, 2005, http://www.pushingback.com/archives/05sep.html (accessed January 13, 2006). See also, Set Free Indeed Ministry, "Hurricane Katrina: Set Free Indeed Offering Recovery & Relief," http://www.setfreeindeedministry.com/katrina.html (accessed February 15, 2005).

[99] Melvin "Kip" Holden, Mayor of Baton Rouge, interview by Wolf Blitzer, *CNN Late Edition with Wolf Blitzer*, September 11, 2005, http://transcripts.cnn.com/TRANSCRIPTS/0509/11/le.01.html.

## CHAPTER SIX: TRANSFORMING NATIONAL PREPAREDNESS

[1] The National Security Act of 1947 mandated a major reorganization of the foreign policy and military establishments of the U.S. Government.  The act created many of the institutions that Presidents found useful when formulating and implementing foreign policy, including the National Security Council (NSC).  The Council itself included the President, Vice President, Secretary of State, Secretary of Defense, and other members (such as the Director of Central Intelligence), who met at the White House to discuss both long-term problems and more immediate national security crises.  A small NSC staff was hired to coordinate foreign policy materials from other agencies for the President.  Beginning in 1953, the President's Assistant for National Security Affairs directed this staff.

The act also established the Central Intelligence Agency (CIA), which grew out of World War II era Office of Strategic Services and small post-war intelligence organizations.  The CIA served as the primary civilian intelligence-gathering organization in the government.  Later, the Defense Intelligence Agency became the main military intelligence body.  The 1947 law also caused far-reaching changes in the military establishment.  The War Department and Navy Department merged into a single Department of Defense under the Secretary of Defense, who also directed the newly created Department of the Air Force.  However, each of the three branches maintained their own service secretaries.  In 1949 the act was amended to give the Secretary of Defense more power over the individual services and their secretaries.

See generally *National Security Act of 1947*, 61 Stat. 495, codified at 50 U.S.C. §§  401—403-3 (2005).

---

² The White House, *The National Security Strategy of the United States of America* (Washington, DC, September 2002); The White House, Office of Homeland Security, *National Strategy for Homeland Security* (Washington, DC, July 2002); and The White House, *National Strategy for Combating Terrorism* (Washington, DC, February 2003).

³ See U.S. Department of Homeland Security, *National Response Plan* (Washington, DC, December 2004); U.S. Department of Homeland Security, *National Incident Management System* (Washington, DC, March 1, 2004); U.S. Department of Homeland Security, *Interim National Preparedness Goal* (Washington, DC, March 31, 2005); and U.S. Department of Homeland Security, *Interim National Infrastructure Protection Plan* (Washington, DC, February 2005).

⁴ *Interim National Preparedness Goal*, 3.

⁵ Homeland Security Presidential Directive-8 (HSPD-8) establishes policy that all Federal departments and agencies will cooperate to issue relevant State and local financial assistance, program announcements, solicitations, application instructions, and other guidance documents in a manner that is consistent with the National Preparedness Goal. The White House, *Homeland Security Presidential Directive-8: National Preparedness* ["*HSPD-8*"] (Washington, DC, December 17, 2003).

⁶ Congress requires the Secretary of Defense to conduct a comprehensive examination every four years (known as the "Quadrennial Defense Review") of the national defense strategy, force structure, force modernization plans, infrastructure, budget plan, and other elements of the defense program and policies of the United States with a view toward determining and expressing the defense strategy of the United States and establishing a defense program for the next twenty years. See 10 U.S.C. § 118 (2005).

⁷ See note 2.

⁸ Among other reforms, the *Goldwater-Nichols* legislation clarified the chain of command from the President to the Secretary of Defense to the Combatant Commander. It also elevated the Chairman of the Joint Chiefs of Staff to be the President's principal military adviser and strengthened the Joint Staff as a truly "Joint" organization that works for the Chairman, not the armed services. *Goldwater-Nichols Act of 1986,* Public Law 99-433, 99th Congress, 2nd session, 101 Stat. 992 (October 1, 1986).

⁹ Eligibility to receive State Homeland Security Grant Program funding is dependent upon DHS approval of statewide, territory, or regional homeland security strategies that adopt capability-based planning and a prioritization of assets based on risks and need in conformance with the National Preparedness Goal. The Urban Area Security Initiative is a subset of the State Homeland Security Grant Program, providing funds to address the unique planning, equipment, training, and exercise needs of high threat, high-density urban areas, and assist them in building an enhanced and sustainable capacity to prevent, protect against, respond to, and recover from acts of terrorism. U.S. Department of Homeland Security, FY 2006 Homeland Security Grant Program (Washington, DC, December 2005).

¹⁰ *HSPD-8*, § 1.

¹¹ See generally *Interim National Preparedness Goal*.

¹² In particular, DHS would benefit from sufficient funds to permit the Department to deploy additional assets and resources upon warning of a catastrophic event. Furthermore, we as a Nation must not penalize DHS and other Federal responders when they undertake anticipatory actions for false alarms. To use medical terms, a *false negative* is unacceptable while we should be willing to accept some *false positives.*

¹³ As described in the *National Incident Management System*, the command function may be exercised in two general ways: 1) through a "Single Command" structure led by an Incident Commander (IC), or through a "Unified Command." In a Single Command structure, the IC is solely responsible for establishing incident management objectives and strategies and for ensuring that all functional area activities are directed toward accomplishment of the strategy. In a Unified Command structure, the individuals designated by their jurisdictional authorities jointly determine objectives, strategies, plans, and priorities and work together to execute integrated incident operations and maximize the use of assigned resources. *National Incident Management System*, 12-16.

¹⁴ The White House, *Homeland Security Presidential Directive-5: Management of Domestic Incidents* (Washington, DC, February 28, 2003). See also *Homeland Security Act of 2002* ["*Homeland Security Act*"], Public Law 296, 107th Congress, 2nd session (November 22, 2005), § 101, codified at 6 U.S.C. § 111 (2002).

¹⁵ *HSPD-5*, § 14.

¹⁶ There is no reason to eliminate the FCO role in the Stafford Act as there is a wide-range of incidents that are not nationally significant—such as most wildfires—where an FCO is essential to coordinate the Federal response, but a PFO is not necessary.

¹⁷ *HSPD-5*, § 5.

---

<sup>18</sup> First issued in 1992, the *Federal Response Plan* (FRP) outlined how the Federal Government implemented the Stafford Act to assist State and local governments when a major disaster or emergency overwhelmed their ability to respond effectively to save lives; protect public health, safety, and property; and restore communities. The FRP outlined policies, planning assumptions, concept of operations, response and recovery actions, and responsibilities of twenty-five Federal departments and agencies and the American Red Cross, that guided Federal operations following a Presidential declaration of a major disaster or emergency.  An interim edition of the FRP was released in 2003 to reflect the passage of the Homeland Security Act of 2002 and the establishment of DHS.  *Federal Response Plan (Interim)*, January 2003.

<sup>19</sup> See generally *National Response Plan*, pg. ESF-i et seq.  Under current arrangements, the *NRP* Emergency Support Functions (ESF) do not cleanly connect to the ICS structure required by *NIMS*, thus causing at time dueling systems or organizations to be created—one based on the ESF structure and one based on the ICS system.  The Incident Command System (ICS) adopted by *NIMS* has five major sections (Command, Operations, Planning, Logistics, and Finance/Administration), each with their own subordinate groups that are modular and scalable to account for situations of various size and nature.  See *National Incident Management System*, 7.

<sup>20</sup> An eligibility requirement for States, territories, and regions to receive State Homeland Security Grant Program and Urban Areas Security Initiative grant funds is compliance with the phased implementation of *NIMS*.  U.S. Department of Homeland Security, *FY 2006 Homeland Security Grant Program* ["*FY 2006 Homeland Security Grant Program*"] (Washington, DC, December 2005).  The implementation of the *National Incident Management System* is also one of seven priorities for spending Federal homeland security assistance as outlined in the NPG.  *Interim National Preparedness Goal*, 10.

<sup>21</sup> The National Defense University, located at Fort McNair in Washington, DC, prepares military and civilian leaders from the United States and other countries to address national and international security challenges, through multi-disciplinary educational programs, research, professional exchanges, and outreach.  For additional information, see www.ndu.edu.

<sup>22</sup> See *Goldwater-Nichols Act of 1986,* Public Law 99-433, 99th Congress, 2nd session (October 1, 1986), § 401-406.

<sup>23</sup> HSPD-8 directs the Secretary of Homeland Security to establish a national program and a multi-year planning system to conduct homeland security preparedness-related exercises in coordination with other appropriate Federal departments and agencies.  See generally *HSPD-8*.

<sup>24</sup> The *National Strategy for Homeland Security* directed the establishment of a National Exercise Strategy.  *HSPD-8* directed Secretary Tom Ridge to establish a "National Exercise Program" (NEP).  Secretary Ridge charged the DHS Office of Domestic Preparedness to develop a program that identifies and integrates national level exercise activities to ensure those activities serve the broadest community of learning.  In addition to full scale, integrated National level exercises—the NEP provides for tailored exercise activities that serve as the Department's primary vehicle for training national leaders and staff.  The NEP enhances the collaboration among partners at all levels of government for assigned homeland security missions.  National-level exercises provide the means to conduct "full-scale, full system tests" of collective preparedness, interoperability, and collaboration across all levels of government and the private sector.  The program also incorporates elements to allow us to identify the implications of changes to homeland security strategies, plans, technologies, policies, and procedures.  The cornerstone of national performance-based exercises is the Top Officials (TOPOFF), biennial exercise series.  TOPOFF included a functional exercise in 2000 (TOPOFF I) and a full-scale exercise in 2003 (TOPOFF II).  For additional information, see http://www.ojp.usdoj.gov/odp.  The "Homeland Security Exercise and Evaluation Program" (HSEEP) is both doctrine and policy for designing, developing, conducting and evaluating exercises.  HSEEP is a threat- and performance-based exercise program that includes a cycle, mix and range of exercise activities of varying degrees of complexity and interaction.

HSEEP includes a series of four reference manuals to help states and local jurisdictions establish exercise programs and design, develop, conduct, and evaluate exercises.  For additional information, see http://www.ojp.usdoj.gov/odp/docs/hseep.htm.http://www.hseep.dhs.gov

<sup>25</sup> Office of Management and Budget, *The President's Management Agenda* (Washington, DC, 2001).  See also *FY 2006 Homeland Security Grant Program*.

<sup>26</sup> U.S. Commission on the Intelligence Capabilities of the United States Regarding Weapons of Mass Destruction, *Report to the President of the United States* ["*WMD Report*"](Washington, DC, March 31, 2005), 337-341; National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report:  Final Report of the National Commission on Terrorist Attacks Upon the United States* ["*9/11 Report*"] (New York: WW Norton and Company, July 22, 2004), 420-421.

[27] Prior to the 109th Congress, the Department was subject to the oversight of eighty-eight different Congressional committees and sub-committees. See 9/11 Public Discourse project, "Fact Sheet on Congressional Reform" (Washington, DC, July 11, 2005), http://www.9-11pdp.org/ua/2005-07-11_factsheet.pdf. Subsequently, the committee structure has been changed to attempt a consolidation of homeland security oversight through the formation of a Senate Committee on Homeland Security and Government Affairs and a House Committee on Homeland Security.

[28] For example, using a risk-based formula, the Urban Area Security Initiative is funded for FY06 at $765 million. This compares to the $950 million of FY06 funding allocated in both equal distributions and risk-based justifications across the States and territories through the State Homeland Security Grant Program and the Law Enforcement Terrorism Prevention Program. Moreover, when other "all-hazards" grant programs (e.g., Firefighter Assistance Grants and Emergency Management Performance Grants) are added to the equation, risk-based grants account for less than 30 percent of homeland security grants for preparedness and other responder needs. *Department of Homeland Security Appropriations Act of 2006,* Public Law 90, 109th Congress, 1st session (October 18, 2005). See also Shawn Reese, "Risk-Based Funding in Homeland Security Grant Legislation: Analysis of Issues for the 109th Congress," CRS Report # 33050, August 29, 2005.

[29] The *Interim National Preparedness Goal* defines capabilities-based planning as "planning, under uncertainty, to provide capabilities suitable for a wide range of threats and hazards while working within an economic framework that necessitates prioritization and choice." *Interim National Preparedness Goal*, 4.

[30] U.S. Department of Homeland Security, *National Planning Scenarios, Draft Version 20.1* ["*National Planning Scenarios*"] (Washington, DC, April 2005).

[31] Figure 2 duplicates Figure 1.1 in the previous "Katrina in Perspective" chapter, with the addition of the September 11th terrorist attacks and National Planning Scenarios 1, 3, and 9. For sources for these additions, see *9/11 Report*, Executive Summary, 1-2; Robert Looney, "Economic Costs to the United States Stemming From the 9/11 Attacks," *Strategic Insights* 1, no. 6 (Monterey, CA, August 2002), http://www.ccc.nps.navy.mil/si/aug02/homeland.asp; and *National Planning Scenarios*. Table 4, below, contains the data used in Figure 2.

**Table 1.  Worst Natural Disasters in the United States, 1900-2005, with**
**September 11th Terrorist Attacks and Selected National Planning Scenarios**
**Damage in Third Quarter 2005 dollars**

| Top Disasters | Estimated deaths | Estimated damage |
|---|---|---|
| Galveston Hurricane (1900) | 8,000 | < $1 billion |
| San Francisco Earthquake and Fire (1906) | 5,000 | $6 billion |
| Atlantic-Gulf Hurricane (1919) | 600 | < $1 billion |
| Mississippi Floods (1927) | 246 | $2 billion |
| Hurricane San Felipe and the Okeechobee Flood (1928) | 2,750 | < $1 billion |
| New England Hurricane (1938) | 600 | $4 billion |
| Northeast Hurricane (1944) | 390 | < $1 billion |
| Hurricane Diane (1955) | 184 | $5 billion |
| Hurricane Audrey (1957) | 390 | < $1 billion |
| Hurricane Betsy (1965) | 75 | $7 billion |
| Hurricane Camille (1969) | 335 | $6 billion |
| Hurricane Agnes (1972) | 122 | $8 billion |
| Hurricane Hugo (1989) | 86 | $11 billion |
| Hurricane Andrew (1992) | 61 | $33 billion |
| East Coast Blizzard (1993) | 270 | $4 billion |
| September 11, 2001 | 2981 | $18 billion |
| Major 2004 Hurricanes (Charley, Frances, Ivan, Jeanne) | 167 | $46 billion |
| Hurricane Katrina (2005) | 1,330 | $96 billion |
| **National Planning Scenarios** | | |

APPENDIX E – ENDNOTES

| #1. 10-kt Improvised Nuclear Device | Hundreds of thousands | Hundreds of billions of dollars |
|---|---|---|
| #3. Pandemic Influenza | 87,000 | $87 billion (low estimate) |
| #9. Major Earthquake | 1,400 | Hundreds of billions of dollars |

[32] Governor Kathleen Blanco estimates that 8 percent of the New Orleans population stayed behind: "Hurricane Ivan threatened us last year. Our evacuation looked like Houston's—not very pretty. Before Katrina came, I developed a new evacuation plan that includes contra-flow, where both sides of the interstates are used for outbound traffic. I am proud that we rapidly moved over 1.2 million people—some 92% of the population—to safety without gridlock or undue delay prior to Katrina." Governor Kathleen Babineaux Blanco, written statement for a hearing on Hurricane Katrina: Preparedness and Response by the State of Louisiana, on December 14, 2005, submitted to the U.S. House Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[33] 9/11 Report, 336 (quoting then-Deputy Secretary of Defense Paul Wolfowitz).

[34] "1984: Tory Cabinet in Brighton bomb blast," BBC.co.uk, October 12, 1984, http://newssearch.bbc.co.uk/onthisday/hi/dates/stories/october/12/newsid_2531000/2531583.stm.

[35] The 9/11 Commission report describes the 9/11 attacks resulting partly from a failure in imagination. In particular, the Commission report highlights the importance of institutionalizing imagination in our methods for detecting and warning of surprise attacks. See 9/11 Report, 336, 339-348.

[36] National Response Plan, 5.

[37] See also Frances Fragos Townsend, Remarks at the National Emergency Management Association's 2006 Mid-Year Conference, February 13, 2006, available at www.lexis.com.

[38] Current programs aimed at increasing the preparedness of individual citizens and communities include Citizen Corps, the Community Emergency Response Team (CERT) program, the Fire Corps, the Neighborhood Watch Program, the Medical Reserve Corps Program, as well as Volunteers in Police Service. For summaries of these programs, see U.S. Citizen Corps, "Partners and Programs," http://www.citizencorps.gov/programs/.

[39] U.S. Department of Homeland Security, "Good Story: Harris County, Texas Citizen Corps' Response to Hurricane Katrina," Lessons Learned Information Sharing (LLIS.gov) database, November 17, 2005, http://www.llis.gov.

[40] 9/11 Report, 318.

[41] "The Ad Council has declared Ready one of the most successful campaigns in its more than 60-year history. Since its launch the Ready campaign has generated more than $466 million in donated media support and its website has received more than 1.9 billion hits and 22 million unique visitors. The U.S. Department of Homeland Security promotes individual emergency preparedness through the Ready campaign and Citizen Corps as part of a broader national effort conducted by the Department's Preparedness Directorate. Ready is a national public service advertising campaign created by The Advertising Council in partnership with Homeland Security. The Ready campaign is designed to educate and empower Americans to prepare for and respond to emergencies, including natural disasters and potential terrorist attacks." U.S. Department of Homeland Security, "Homeland Security and the Advertising Council Provide Parents and Teachers with Resources to Educate Children about Emergency Preparedness," news release, February 2, 2006, http://www.dhs.gov/dhspublic/interapp/press_release/press_release_0848.xml. See also www.ready.gov.

[42] The "Learn Not to Burn" curriculum, first released in 1979, teaches twenty-two key fire safety behaviors and is organized in three learning levels. The curriculum is intended for use by teachers in planning classroom activities and can be re-used from year to year. "Learn Not to Burn" incorporates fire safety behaviors into regular school subjects, so children absorb life-saving information while developing skills in reading, math, art, history, and science. National Fire Protection Association, "Learn Not to Burn," http://www.nfpa.org

[43] A 2004 study by the National Highway Traffic Safety Administration reported a record 80 percent of Americans wear their safety belts while driving or riding in their vehicles. Transportation Secretary Norman Y. Mineta said the 80 percent safety belt usage will save 15,200 lives and $50 billion in economic costs associated with traffic related crashes, injuries, and deaths every year. Donna Glassbrenner, "Safety Belt Use in 2004—Overall Results, Traffic Safety Facts," prepared for the National Center for Statistics and Analysis (September 2004). See

also U.S. Department of Transportation, National Highway Traffic Safety Administration, "Safety belt use jumps to record 80%," news release, September 16, 2004.

[44] Additional advertising campaigns that were successful in helping to change citizen behavior include efforts to stop the use of drugs through the 'Just Say No' message created by First Lady Nancy Reagan and 'Drug Abuse Resistance Education' (D.A.R.E.); prevent drunk driving originating with Mothers Against Drunk Driving (MADD); help quit smoking through the Surgeon General's campaign to educate people on health risks and the American Cancer Society's Great 'American Smoke Out'; and stop littering through the 'Keep America Beautiful' message promoted by First Lady Claudia 'Lady Bird' Johnson.

[45] For example, the development of the *Interim National Infrastructure Protection Plan* has developed upon a close partnership between governments at all levels and the private sector owners of the Nation's Critical Infrastructure and Key Resources. Our national efforts to improve air transportation security, furthermore, have depended upon unprecedented partnership between DHS's Transportation Security Administration and the airline industry. See generally, *Interim National Infrastructure Protection Plan* (Washington, DC, February 2005).

[46] *National Strategy for Homeland Security*, viii.

[47] For information on BRT, see Business Round Table letter to President George W. Bush, January 31, 2006, and http://www.businessroundtable.org/. For information on BENS, see www.bens.org. The BENS "Business Force" project partnerships of regional, State, and local officials, together with businesses and NGOs, have been successful in emergency response planning and using private sector resources and volunteers to fill gaps in preparedness and response capabilities.

[48] "A basic premise of the *NRP* is that incidents are generally handled at the lowest jurisdictional level possible. Police, fire, public health and medical, emergency management, and other personnel are responsible for incident management at the local level . . . In the vast majority of incidents, State and local resources and interstate mutual aid normally provide the first line of emergency response and incident management support. When an incident or potential incident is of such severity, magnitude, and/or complexity that it is considered an Incident of National Significance according to the criteria established in this plan, the Secretary of Homeland Security, in coordination with other Federal departments and agencies, initiates actions to prevent, prepare for, respond to, and recover from the incident." *National Response Plan*, 15.

[49] EMAC was developed in the 1990s and officially ratified by Congress as an organization with thirteen member States in 1996. *Emergency Management Assistance Compact*, Public Law 104-321, 104th Congress, 2nd session, (October 19, 1996). As of October 2005, 49 States, the District of Columbia, the U.S. Virgin Islands, and Puerto Rico had enacted EMAC legislation. National Emergency Management Association, "EMAC Overview," December 2005, http://www.emacweb.org/?323. EMAC is administered by the National Emergency Management Association (NEMA). During an emergency, NEMA staff works with EMAC member states to coordinate ensure information passes easily through the EMAC system.

## APPENDIX B – WHAT WENT RIGHT

[1] The White House, "President Visits Mississippi, Discusses Gulf Coast Reconstruction," January 12, 2006, http://www.whitehouse.gov/news/releases/2006/01/20060112-3.html.

[2] U.S. Department of Homeland Security, "Hurricane Katrina: What Government is Doing," http://www.dhs.gov/katrina.htm.

[3] U.S. Department of Homeland Security, "Good Story: Harris County, Texas Citizen Corps' Response to Hurricane Katrina," *Lessons Learned Information Sharing (LLIS.gov) database*, November 17, 2005, http://www.LLIS.gov.

[4] North American Mission Board, Southern Baptist Convention, "Disaster Relief: Generosity Fatigue Nowhere in Sight," news release, September 23, 2005.

[5] Kip Holden, Mayor of Baton Rouge, Louisiana, interview by Wolf Blitzer, *CNN Late Edition with Wolf Blitzer*, September 11, 2005, http://transcripts.cnn.com/TRANSCRIPTS/0509/11/le.01.html; Set Free Indeed Ministry, "Hurricane Katrina Set Free Indeed Offering Recovery and Relief," http://setfreeindeedministry.com/katrina.html (accessed February 8, 2006); and Bethany World Prayer Center website, "Hurricane Relief. Hurricane Katrina (Timeline)," http://www.bethany.com/katrina_relief.php (accessed February 8, 2006).

[6] Operation Blessing, "Hurricane Relief: Hurricane Relief by State," http://www.ob.org/projects/hurricane_relief/

index.asp.

[7] Operation Blessing, "Hurricane Relief Activities in the Gulf Coast," http://www.ob.org/projects/hurricane_relief/relief_log.asp?NP_ID=1772.

[8] The Salvation Army, "Across the Nation the Salvation Army is Providing Aid to Survivors of Hurricane Katrina," news release, September 13, 2005.

[9] The Salvation Army, "Katrina Update 1-20-06," January 20, 2006, http://www.satern.org/response.html.

[10] Livingston Parish, "After Action Report," February 2006.

[11] Gary Krakow, "Ham Radio Operators to the Rescue after Katrina: Amateur Radio Networks Help Victims of the Hurricane," *MSNBC*, September 6, 2005, http://www.msnbc.msn.com/id/9228945/; American Radio Relay League (ARRL), "Amateur Radio Volunteers Involved in Katrina Recovery," news release, August 31, 2005, http://www.arrl.org/news/stories/2005/08/30/1/?nc=1; Ben Joplin, interview by National Public Radio, *All Things Considered*, August 30, 2005, http://www.npr.org/templates/story/story.php?storyId=4824598.

[12] American Radio Relay League (ARRL), "President Urges Orderly Amateur Radio Response in Katrina Recovery," news release, September 1, 2005, http://www.arrl.org/news/stories/2005/09/01/2/; American Radio Relay League (ARRL), "Amateur Radio Volunteers Involved in Katrina Recovery," news release, August 31, 2005, http://www.arrl.org/news/stories/2005/08/30/1/.

[13] Association of State Public Health Laboratories, "APHL Response to Hurricane Katrina 2005," http://www.aphl.org/article.cfm?ArticleID=98; U.S. Environmental Protection Agency, Region 4, "Response to Hurricane Katrina," September 5, 2005, http://epa.gov/region4/Katrina/response_20050905.htm; University of Iowa, "UI Hurricane Katrina Relief Includes Expertise, Enrollment, Supplies, Space," news release, September 2, 2005, http://www.uiowa.edu/~ournews/2005/september/090205katrina-relief.html; Iowa Office of the Governor, "Iowans continue to aid survivors of Hurricane Katrina: State agencies stand ready to aid victims of Hurricane Rita," news release, September 22, 2005, http://www.iowahomelandsecurity.org/asp/hurricane_katrina/IA_efforts_update.doc; and email from Association of State Public Health Laboratories.

[14] New York City Fire Department, "Update on FDNY Hurricane Katrina Relief Efforts," news release, September 26, 2005, http://www.nyc.gov/html/fdny/html/pr/2005/092605_alert_01.shtml.

[15] Federal Express, "FedEx Support of Relief Efforts in Areas Affected by Hurricane Katrina," news release, September 7, 2005, http://www.fedex.com/us/about/responsibility/katrina.html?link=4.

[16] Rich Karlgaard, "Wonderful Wealth," *Forbes* 176, no. 7 (October 10, 2005), 43; Dell USA, "Helping Those in Need," http://www1.us.dell.com/content/topics/segtopic.aspx/brand/katrina_relief?c=us&cs=19&l=en&s=gen (accessed February 8, 2006); Home Depot, "Hurricane Katrina: Relief and Rebuilding Efforts," http://www.homedepot.com (accessed February 8, 2006); IBM, "IBM Response Gains Ground in Aftermath of Katrina," http://www.ibm.com/news/us/en/2005/09/2005_09_06.html (accessed February 8, 2006); Lenovo, "Lenovo Responds to Hurricane Katrina Tragedy," September 2, 2006, http://www.pc.ibm.com/us/lenovo/about/hurricane.html (accessed February 8, 2006); Pfizer, "Pfizer Expands Hurricane Katrina Relief Effort," September 21, 2006, http://www.pfizer.com/pfizer/are/news_releases/2005pr/mn_2005_0921a.jsp (accessed February 8, 2006); and Wal-Mart, "Wal-Mart Commits Additional $15 Million to Katrina Relief," September 1, 2006, http://walmartstores.com/GlobalWMStoresWeb/navigate.do?catg=26&contId=4856 (accessed February 8, 2006).

[17] Gary P. LaGrange, President and Chief Executive Officer of the Port of New Orleans, testimony before a hearing on Revitalizing the Economy of South Louisiana, on November 7, 2005, to the Senate Committee on Commerce, Science, and Transportation, 109th Congress, 1st session.

[18] U.S. Department of Homeland Security, Customs and Border Protection, "U.S. Customs and Border Protection Donates More Than 100,000 Pieces of Seized Goods for Hurricane Katrina Evacuees in Mississippi," news release, September 12, 2005.

[19] U.S. Department of Homeland Security, Federal Emergency Management Agency, "Hurricane Katrina Information," news release, February 1, 2006, http://www.fema.gov/press/2005/resources_katrina.

[20] U.S. Department of Homeland Security, Federal Emergency Management Agency, National Disaster Medical System Section, FloridaOne Disaster Medical Assistance Team, "Hurricane Katrina Deployment," http://dev.floridaonedmat.com/index.cfm/m/1/m/88.

[21] U.S. Department of Homeland Security, "Hurricane Katrina DHS SITREP #18," September 4, 2005, 2.

[22] U.S. Department of Homeland Security, Federal Emergency Management Agency, "Executive Briefing," (September 17, 2005), 9.

[23] Paul McHale, Assistant Defense Secretary for Homeland Defense, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi, and Alabama, on October 27, 2005, House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session; Lieutenant Colonel Richard Chavez, Chief of the Homeland Security Readiness Branch, testimony before a hearing on Hurricane Katrina: Preparedness and Response by the Department of Defense, the Coast Guard, and the National Guard of Louisiana, Mississippi, and Alabama, on October 27, 2005, to the House Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, 109th Congress, 1st session.

[24] U.S. Department of Defense, Army Corps of Engineers, Mississippi Valley Division, Louisiana Recovery Field Office, "New Orleans: Unwatered," news release, October 11, 2005.

[25] Donna Miles, "Military Hurricane Relief Focuses on Saving Lives, Reducing Suffering," American Forces Press Service, September 1, 2005, http://www.defenselink.mil/news/Sep2005/20050901_2590.html.

[26] U.S. Marine Corps, "Beirut Battalion Concludes Contribution to Hurricane Relief," *Marine Corps News*, October 1, 2005.

[27] U.S. Marine Corps, "Marine Recruiters Save 150 Lives after Hurricane Katrina," *Marine Corps News*, September 28, 2005.

[28] William Carwile, Federal Coordinating Officer for Mississippi, Federal Emergency Management Agency, written statement for a hearing on Hurricane Katrina: Perspectives on FEMA's Operations Professionals, on December 8, 2005, submitted to the Senate Committee on Homeland Security and Governmental Affairs, 109th Congress, 1st session.

[29] Katy Glassborow, "US Navy joins disaster-relief effort in wake of Hurricane Katrina," *Jane's Navy International*, September 9, 2005. See also Paul McHale, Assistant Secretary of Defense for Homeland Defense, testimony before a hearing on the Role of the Military and National Guard in Disaster Response, on November 9, 2005, House Committee on Homeland Security, Subcommittee on Emergency Preparedness, Science, and Technology, 109th Congress, 1st session.

[30] U.S. Department of Defense, Navy, Commander of the 2nd Fleet Public Affairs, "Norfolk Ships Deploy to Support Hurricane Katrina Relief Efforts," *Navy Newsstand*, August 31, 2005.

[31] U.S. Department of Defense, Air Force Reserve, 53rd Weather Reconnaissance Squadron, "The Hurricane Hunters," http://www.hurricanehunters.com/welcome.htm (accessed February 2, 2006) ; U.S. Department of Defense, Air Force Reserve, 53rd Weather Reconnaissance Squadron, "Eye to Eye with Hurricane Katrina," http://www.hurricanehunters.com/katrina.htm (accessed January 25, 2006).

[32] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Hurricane Center, "NHC/TPC Hurricane Reconnaissance Data Archive," ftp://ftp.nhc.noaa.gov/pub/products/nhc/recon; and U.S. Department of Defense, Air Force Reserve, 53rd Weather Reconnaissance Squadron, "Eye to Eye with Hurricane Katrina," http://www.hurricanehunters.com/katrina.htm (accessed January 25, 2006).

[33] U.S. Department of Defense, Air Force, "Air Force Support of Hurricane Katrina Continues," *Air Force Link*, September 4, 2005.

[34] U.S. National Geospatial Intelligence Agency, "Geospatial Intelligence Aids Hurricane Recovery Efforts," news release, September 7, 2005.

[35] The LECC is DOJ construct integrating the Federal, State, and local law enforcement communities, but is not a term currently incorporated into the NRP. See, e.g., U.S. Department of Justice, United States Attorney's Office, Northern District of Georgia, "LECC," http://www.usdoj.gov/usao/gan/lecc.html (accessed January 31, 2006).

[36] The LECC was built on a modified FBI Joint Operations Center construct. The LECC coordinated a plan to answer thousands of 911 calls in New Orleans that had gone unresolved. The LECC provided the conduit for coordination between civilian law enforcement and the National Guard and Title 10 U.S. Army forces operating in New Orleans. The LECC not only provided a facility for all Federal law enforcement, but built a separate headquarters for the New Orleans Police adjacent to the LECC, since their headquarters had been destroyed.

[37] Agency for Healthcare Research and Quality, *Use of Former("Shuttered") Hospitals to Expand Surge Capacity* (Gaithersburg, MD, August 2005).

[38] U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, "Update on CDC's Response to Hurricane Katrina," September 16, 2005, http://www.cdc.gov/od/katrina/09-16-05.htm.

[39] Jennifer Thew and Phyllis Class, "Shelter from the Storm," *Nursing Spectrum*, October 1, 2005, http://www.nursingspectrum.com/Katrina/ShelterFromTheStorm.cfm; and U.S. Department of Health and Human

Services, Centers for Disease Control, "Update on CDC's Response to Hurricane Katrina," September 6, 2005, http://www.cdc.gov/od/katrina/09-06-05.htm.

[40] U.S. Department of Health and Human Services, National Institutes of Health, "NIH Opens Up Medical Consultation Line to Patients Affected by Hurricane Katrina," news release, September 14, 2005.

[41] U.S. Department of Transportation, "DOT Activities in Support of Federal Response to Hurricane Katrina," news release, September 5, 2005.

[42] U.S. Department of Housing and Urban Development, "HUD's Response to Hurricanes Katrina and Rita." http://www.hud.gov/news/katrina05response.cfm (accessed December 14, 2005).

[43] Ann Westling, "Tahoe National Forest Service Employees – Some Back from Hurricane Katrina," *YubaNet*, October 15, 2005, http://yubanet.com/artman/publish/article_26436.shtml; U.S. Department of Agriculture, "USDA Assists with Hurricane Katrina Relief Efforts," news release, September 5, 2005.

[44] U.S. Department of Agriculture, National Resources Conservation Service, Emergency Watershed Program, "Digital Data Provides Maps for Hurricane Relief," news release, September 23, 2005.

[45] U.S. Department of Agriculture, "USDA Prepares for Hurricane Rita: USDA Highlights Assistance to Regions Affected by Hurricane Katrina," news release, September 22, 2005, http://www.usda.gov/wps.

[46] U.S. Department of Agriculture, Farm Service Agency, "100% Cost Share Assistance Available to Farmers in FSA's Emergency Conservation Program," news release, *FSA Online*, September 15, 2005, http://www.fsa.usda.gov/ms/news0101.htm.

[47] U.S. Department of Agriculture, Rural Development, "Hurricane Katrina Recovery Resources from Rural Development," http://www.rurdev.usda.gov/rd/disasters/katrina.html.

[48] U.S. Department of Agriculture, Agricultural Research Service, "Plant Protection Research Unit News and Events," news release, November 14, 2005.

[49] U.S. Department of Energy, Office of Science, "DOE's Office of Science Responds to Hurricane Katrina," news release, September 8, 2005, http://www.sc.doe.gov/Sub/Newsroom/News_Releases/DOE-SC/2005/Hurricane/Hurricane.htm.

[50] U.S. Department of Commerce, Minority Business Development Agency, "MBDA to Assist with Rebuilding Minority Business Enterprises Hit by Hurricane Katrina," news release, September 9, 2005.

[51] Max Mayfield, Director of the National Hurricane Center, written statement for a hearing on the Lifesaving Role of Accurate Hurricane Prediction, on September 20, 2005, submitted to the U.S. Senate Committee on Commerce, Science, and Transportation, Subcommittee on Disaster Prevention and Prediction, 109th Congress, 1st session.

[52] U.S. Department of Commerce, National Oceanic and Atmospheric Administration, National Weather Service, *Flash Flood Warning*, (New Orleans, LA, August 29, 2005, 8:14 AM).

[53] U.S. Department of Commerce, National Telecommunications and Information Administration, "Commerce Department Awards $283,320 to Louisiana Educational Television Authority," news release, September 27, 2005.

[54] U.S. Department of the Interior, "Cason Announces Initial BIA Response to Aid Tribal Victims of Hurricane Katrina," news release, September 1, 2005.

[55] U.S. Department of the Interior, "Ragsdale Tours Mississippi Choctaw Reservation Impacted by Hurricane Katrina," news release, September 9, 2005.

[56] U.S. Department of the Interior, "Ragsdale Tours Mississippi Choctaw reservation Impacted by Hurricane Katrina," news release, September 9, 2005.

[57] U.S. Department of the Interior, Bureau of Land Management, "BLM, Other Federal Agencies Send Employees to Help with Katrina Relief Effort," news release, September 2, 2005.

[58] U.S. Department of the Interior, Bureau of Reclamation, "Reclamation Continues to Mobilize Response for Hurricane Katrina Disaster," news release, September 2, 2005.

[59] Donald M. Stoeckel et al., *Bacteriological Water Quality in the Lake Pontchartrain Basin, Louisiana, Following Hurricanes Katrina and Rita*, data series 143, prepared for the U.S. Department of the Interior and U.S. Geological Survey (September 2005).

[60] U.S. Department of the Interior, Office of Surface Mining, "OSM Volunteers Aid Hurricane Recovery," news release, December 19, 2005.

[61] U.S. Department of Labor, "U.S. Department of Labor Launches 'Pathways to Employment' Initiative, Expanding Employment Services for Hurricane Survivors," news release, September 30, 2005.

[62] U.S. Department of Education, "Hurricane Help for Schools," http://hurricanehelpforschools.gov/ thanksto.html (accessed February 10, 2006).

[63] U.S. Department of Education, "Hurricane-Affected Schools Receive Federal Surplus Property," news release, November 1, 2005.

[64] Jenny Mandel, "Three Agencies Honored with Top Management Awards," *Government Executive Magazine*, December 14, 2005, http://govexec.com/dailyfed/1205/121405m1.htm; and Ambassador W. Robert Pearson, "Accomplishments and Challenges," *State Magazine*, January 2006, 2.

[65] U.S. Department of the Treasury, Bureau of the Public Debt, "Bureau of the Public Debt Aids Savings Bonds Owners Battered by Hurricane Katrina," news release, August 29, 2005.

[66] U.S. Department of the Treasury, Financial Management Service, *Special Notice for Depository Institutions: Update to U.S. Treasury Guidance on Cashing FEMA Disaster Assistance Checks and Government Benefit Checks Issued by the U.S. Treasury* (Washington, D.C., September 14, 2005).

[67] U.S. Department of the Treasury, Internal Revenue Service, "Tax Favored Treatment for Early Distributions from IRAs and other Retirement Plans for Victims of Hurricane Katrina," news release, October 17, 2005.

[68] U.S. Department of Veterans Affairs, Veterans Integrated Service Network, "Hurricanes: VA/VISN 4 Update #2," September 27, 2005.

[69] U.S. Department of Veterans Affairs, "web site bulletin," http://www.vba.va.gov/ro/central/stpau/Pages/Katrina.html.

[70] U.S. Department of Veterans Affairs, "VA Creates Procedures for Benefits in Wake of Hurricane Katrina," news release, September 14, 2005.

[71] U.S. Environmental Protection Agency, "Curbside Pickup of Household Hazardous Waste Planned in Plaquemines Parish," news release, September 25, 2005.

[72] U.S. Environmental Protection Agency, "Hurricane Response 2005: Public Outreach Materials," http://www.epa.gov/katrina/outreach; U.S. Environmental Protection Agency, "EPA and Federal Partners Warn of Potential Environmental Health Hazards When Returning to Homes and Businesses after Hurricane Katrina," news release, September 14, 2004.

[73] Lawrence Kumins and Robert Bamberger, *Oil and Gas Disruption from Hurricanes Katrina and Rita*, Congressional Research Service Report for Congress RL33124 (Washington, D.C., October 21, 2005), 7-8.

[74] Federal Energy Regulatory Commission, "Commission Temporarily Eases Natural Gas Construction Rules to Speed Recovery from Hurricanes," news release, November 17, 2005.

[75] White House Office of Management and Budget to the Chief Financial Officers and Grant Policy Officials, memorandum entitled "Administrative Relief for Grantees Impacted by Hurricanes Katrina and Rita," September 30, 2005.

Exhibit R

# United States Senate
### WASHINGTON, DC 20510

June 9, 2025

President Donald J. Trump
The White House
1600 Pennsylvania Avenue NW
Washington, D.C. 20500

Dear President Trump,

As peak disaster season approaches, we write with serious concern about the ongoing absence of a Senate-confirmed FEMA Administrator and steps your administration has taken to weaken and destabilize the agency.

To date, you have failed to nominate an Administrator or, in the absence of such an official, appoint someone who satisfies the qualifications specified for that role in statute.[1] The abrupt termination of Cameron Hamilton as the Senior Official Performing the Duties of FEMA Administrator last month injected further instability into an agency already struggling to navigate mass reductions in force.

Mr. Hamilton's termination came just one day after his appearance in front of the House Appropriations Committee, at which he testified, "I do not believe it is in the best interests of the American people to eliminate the Federal Emergency Management Agency."[2]

We share Mr. Hamilton's concerns. In recent months, your administration has reduced FEMA staff by roughly 30 percent, rescinded grant funding local communities rely on to recover from disasters, and significantly scaled back emergency management training for state officials.[3] Taken together, these actions have impeded ongoing recovery efforts and undermined the national response to future natural disasters.

Mr. Hamilton's departure leaves a vacuum of leadership at FEMA. David Richardson—Mr. Hamilton's replacement as the Senior Official Performing the Duties of FEMA Administrator— told agency staff last week that he did not know the United States has a hurricane season.[4] Mr. Richardson will head the federal response to any hurricanes that hit our shores this season.

---

[1] 6 U.S.C. § 313(c).

[2] *Leader of FEMA is Dismissed as Trump Administration Takes Aim at the Agency*, New York Times (May 8, 2025) (online at https://www.politico.com/news/2025/05/08/fema-chief-fired-cameron-hamilton-00335840).

[3] *FEMA Cuts Emergency Management Training Under Trump as Hurricane Season Looms*, Reuters (May 11, 2025) (online at https://www.reuters.com/business/environment/fema-cuts-emergency-training-hurricane-season-looms-2025-05-11/).

[4] *Acting FEMA Chief Told Staff He Didn't Know About U.S. Hurricane Season*, New York Times (June 2, 2025) (online at https://www.nytimes.com/2025/06/02/us/politics/fema-david-richardson-hurricane-season.html).

The Honorable Donald J. Trump
Page 2

We agree that FEMA can do better and needs reform. But dismantling the agency and weakening its leadership will only leave states and localities stranded when disaster strikes.[5]

To preserve the long-term integrity of FEMA and ensure our nation's preparedness for future disasters, we urge you to nominate a qualified Administrator that will restore confidence in the agency as soon as possible.

Sincerely,

Peter Welch
United States Senator

Angus S. King, Jr.
United States Senator

Sheldon Whitehouse
United States Senator

Mazie K. Hirono
United States Senator

Jack Reed
United States Senator

Richard Blumenthal
United States Senator

Jeanne Shaheen
United States Senator

Margaret Wood Hassan
United States Senator

cc:    The Honorable Kristi Noem
       Secretary of Homeland Security

cc:    Mr. David Richardson
       Senior Official Performing the Duties of FEMA Administrator

---

[5] 6 U.S.C. § 313.

Exhibit S



# We Are FEMA

Helping People Before, During, and
After Disasters



Publication 1

## Purpose

Publication 1 (Pub 1) is our capstone doctrine. It helps us as Federal Emergency Management Agency (FEMA) employees understand our role in the emergency management community and provides direction for how we conduct ourselves and make decisions each day. It explains:

- **Who We Are:** An understanding of our identity and foundational beliefs

- **Why We Are Here:** A story of pivotal moments in history that have built and shaped our Agency

- **What We Face:** How we manage unpredictable and ever-evolving threats and hazards

- **What We Do:** An explanation of how we help people before, during, and after disasters

- **How We Do It:** An understanding of the principles that guide the work we do

The intent of our Pub 1 is to promote innovation, flexibility, and performance in achieving our mission. It promotes unity of purpose, guides professional judgment, and enables each of us to fulfill our responsibilities.

## Audience

This document is for every FEMA employee. Whether you have just joined us or have been with the Agency for many years, this document serves to remind us why we all choose to be a part of the FEMA family. Our organization includes many different offices, programs, and roles that are all committed to helping people. Everyone plays a role in achieving our mission.

We also invite and welcome the whole community to read Pub 1 to help individuals and organizations across the Nation better understand FEMA's mission and role as we work together to carry out an effective system of emergency management.

---

*"Once you are a part of the FEMA family, you are always a part of the family."*

**Larry Hall**
**Former FEMA Employee**

---

We Are FEMA

# TABLE OF CONTENTS



Who We Are — Page 5

Why We Are Here — Page 14

What We Face — Page 29

What We Do — Page 33

How We Do It — Page 47

4

# 1

## Who We Are: We Are FEMA

We are the Federal Emergency Management Agency (FEMA). We are a team of Federal leaders who support the people and communities of our Nation by providing experience, perspective, and resources in emergency management. Each of us finds strength and value from our role at FEMA, whether we are helping others in the office or in the field. We live our core values of Compassion, Fairness, Integrity, and Respect every day to help people and support the Nation's disaster and emergency management needs.

*"Each time I go out to the field, I'm reminded of how much living out our mission and core values can and is making a difference in the lives of survivors. We exist to help people before, during, and after disasters. This is our mission."*

David Maurstad
FEMA Executive

5

## We Are FEMA: Helping People Before, During, and After Disasters

### FEMA's Fundamental Role

> Leadership is a process of social influence, which maximizes the efforts of others towards the achievement of a goal.

We have a distinct role as Federal leaders. Our Administrator is the principal advisor to the President, the Homeland Security Council, and the Secretary of Homeland Security for all matters relating to emergency management in the United States (U.S.). This unique role is what fuels us as leaders to create an environment where partners work together to make a difference in communities before, during, and after disasters.

Our Agency is one player on a large team collaborating to build a more resilient Nation. We provide a platform for people to build relationships, gather and share information, and think holistically about disasters. We lead by supporting, coordinating, and managing personnel, assets, and information. We also offer tools, guidance, and resources to help individuals and communities review, build, and continuously improve their own capabilities.

In our emergency management role, we:

- Raise risk awareness; educate in risk reduction options; and help to take action **before disasters**
- Alert, warn, and message; coordinate the Federal response; and apply and manage resources **during disasters**
- Coordinate Federal recovery efforts; provide resources; and apply insight to future risk **after disasters**

---

*"Every FEMA employee is an owner of our mission and a defender of our Core Values."*

**Joel Doolin**
**FEMA Executive**

---

Who We Are

Publication 1

## Your Role as a FEMA Employee

We are a team. Every FEMA employee contributes to our mission and has an impact on the Agency. Whether you are supporting human resources, information technology, policy and program work, deploying to a disaster, engaging directly with survivors, or performing any other function within our Agency, we all play a critical role in building a prepared and resilient Nation.

As a family we take care of each other so we are best positioned to help others. Responding to increasingly frequent and complex disasters requires us to become more skilled, agile, informed, and innovative as emergency management professionals. We foster a culture of innovation in our Agency by encouraging new ideas and accepting creative thought. We are curious and disciplined, constantly seeking ways to learn, develop, and grow. We also offer training, education, and professional development opportunities so every employee feels knowledgeable, empowered, and ready to take action in any work setting.

Fulfilling FEMA's mission is also dependent on our personal credibility and preparedness. We offer training to our employees on individual and financial preparedness, emergency procedures, and continuity of operations planning. We lead by example by preparing ourselves, just as we want others to do for themselves and their communities.

As we face an ever-changing disaster landscape, one thing will always remain constant – we are a diverse and inclusive team making a difference in the lives of others. We are a dynamic workforce with different backgrounds and identities that strengthen our ability to help, relate, and support others during adversity. We work together to lead and support in service of the Nation. We believe we have the best mission in the Federal Government: helping people before, during, and after disasters. As a FEMA employee you are a part of this mission and we expect you to make a mark on the Agency and a difference in the lives of others!

*"Every employee at FEMA is a critical part of the team that comes together to help people before, during, and after disasters. Whether you are pulling network cable, ordering supplies, standing in the rain at a staging area, processing a grant award for a survivor or their community, working the night shift in an operations center, or filling in for your deployed teammates YOU are what makes FEMA able to deliver to the American people when they need us most."*

**MaryAnn Tierney**
**FEMA Executive**

Who We Are

Publication 1

**Who We Are**

## We Are One FEMA

There are many different types of FEMA employees that work together to create One FEMA. In addition to permanent full-time employees, FEMA's workforce includes: a Cadre of On-Call Response/Recovery Employees (CORE) who contribute directly to open disasters; Reservists who support disaster operations in affected communities; and FEMA Corps members who spend ten months completing FEMA-related service projects throughout the country. Additionally, FEMA can hire locally to augment the disaster workforce, providing a way for individuals to help their community in the recovery process and support their local economy.

Our diverse perspectives and experiences position us to respect that every community is unique and to help others in their time of need. We work together to deliver solutions. The dedication and commitment of our workforce extends beyond our normal duties, especially when our mission requires us to deploy around the country when disaster strikes.






Publication 1

## What We Believe

We believe in honoring and practicing our ethos and core values every day. They are the essence of our identity and the force that drives us. They give us purpose to keep going and guide each decision we make. They define who we are and set expectations for our employees. We embody our ethos when we demonstrate our core values in all our interactions – both in our professional and personal lives – and treat others with Compassion, Fairness, Integrity, and Respect.

### Ethos

An ethos describes the character, tone, or collective reputation of an institution and conveys the underlying sentiment that informs a particular organization's belief.

Stemming from our belief that we help people, our commitment to public service distinguishes us as an organization and defines our ethos. An ethos is the feeling created within a group that drives the work it does. Our ethos is the pride we have in our work as public servants. It motivates and inspires us as an organization to work diligently for ourselves and others.

We are also a team of colleagues who respect and care about one another. The sum of our people, programs, and dedication to helping others defines our strength as an Agency.

### Core Values

Core values are the accepted standards of an organization that are the foundation for which work is performed and conducted.

Our core values are Compassion, Fairness, Integrity, and Respect. They are the heart of what our Agency and our employees stand for and represent. These values form the foundation of who we are, what we believe, and who we want to be. We are committed to these core values, which apply to our interactions with everyone – survivors, colleagues, partners – every single day.

*"Helping people before, during, and after disasters means helping all impacted people – including those who speak different languages, have mental or physical disabilities, are low income, are older, etc. Our best is needed by everyone, in every corner of every community; there are no second class citizens in our work."*

**Jo Linda Johnson**
**FEMA Executive**

Who We Are

9

**Who We Are**

# Compassion



***Compassion** is the expression of our care for others.* We are understanding, empathetic, and inclusive as we support fellow employees, partner organizations, individuals, and communities.

## Compassion in Action



- Showing empathy to a disaster survivor, and providing relevant information and direction

- Supporting a colleague by listening or assisting with a project, or when they are coping with a personal or family emergency

- Exercising patience when explaining our processes to one of our partners

10

# Fairness



***Fairness*** *is treating everyone impartially, offering unbiased and consistent assistance, and ensuring equal access to resources and tools.* We are consistent in our commitment to help others.

## Fairness in Action



- Providing programs and services that ensure equal access for survivors with disabilities

- Treating all colleagues equitably, professionally, and consistently

- Creating a standardized review process for stakeholder requests that ensure all applicants are considered equally

11

**Who We Are**

# Integrity



*Integrity* encompasses our responsibility as stewards of Federal resources, services, and programs, and our conduct as trusted professionals. We earn trust by being accountable, present, honest, and dependable. Because we are the face of FEMA, our conduct – both on and off duty – matters.

## Integrity in Action



- Applying the highest levels of honesty and transparency in everything we deliver to those we serve

- Acting and standing up for our colleagues when we see something wrong by doing what is necessary and appropriate to make it right

- Holding ourselves accountable so that our partners can rely on us to be truthful and to follow through

Publication 1

# Respect



***Respect*** *is the practice of acknowledging the value of the people we work with and serve.* We are committed to active listening and welcome diversity of thought, opinion, and background. Together, we are stronger**.**

## Respect in Action



- Treating each survivor with dignity and allowing them to maintain their personal autonomy and self determination

- Fostering a healthy, safe, and positive environment where managers and staff enjoy working together

- Building trusted relationships with partners in which we value different points of view and listen to one another

Who We Are

13



# Why We Are Here: Becoming FEMA – The History of Our Agency

Our history provides the foundation for our identity as leaders today. It is rooted in the story of a Nation committed to finding strength in the face of unpredictable and devastating disasters. FEMA's creation in 1979 was the first step in unifying Federal emergency management activity and building a comprehensive approach to national emergency management. We continue to learn, grow, and improve as we work to build a more resilient Nation. We are proud of our Agency's evolution and the people who have made that progress possible.

*"I'm not 'Old FEMA' or 'New FEMA,' I'm 'Successful FEMA.'"*

Delois "Ruby" Champ
FEMA Employee

14



Our Nation's Need for FEMA

Why We Are Here

Our Nation is built on the willingness and ability of its people to help one another in times of need. In early years, emergency managers reacted to each disaster, providing inconsistent assistance to those impacted. Over time, we realized the need for a more clearly defined approach to managing these disasters and providing consistent Federal support. This realization ultimately led to the creation of FEMA.

## Initial Federal Role (1802 – 1949)

The first legislative act of Federal disaster relief in U.S. history followed a devastating fire in Portsmouth, New Hampshire in December 1802. The destruction of large areas of the city's seaport threatened commerce in the newly founded Nation. In 1803, acting from the new national seat of government in Washington, D.C., the U.S. Congress provided relief to affected Portsmouth merchants by suspending bond payments for several months.

Destructive disasters such as the Chicago, Illinois Fire of 1871 and the Johnstown, Pennsylvania Flood of 1889 further revealed a need for greater Federal involvement and response to major disasters. As the Nation moved into the early twentieth century, advancements in science also enabled a better understanding of hazard risk and mitigation methods to reduce vulnerability and



*The American Red Cross relief efforts for the 1927 Mississippi Valley Flood victims in New York, NY.*

impacts of disasters. For example, the Federal Government played a role following the Great Mississippi Flood of 1927 in expanding the development of flood control systems. While the Federal Government generally did not have a significant role in disaster response operations during this time, it supported the American Red Cross in its capacity to organize relief efforts for affected communities.

## Broadening Emergency Management (1950 – 1977)

World War II and the Cold War brought a new national focus on civil defense and continuity operations. Emergency management began to evolve from a term that primarily referred to the Federal role in mobilizing the Nation for war to a more holistic definition to include both natural hazards and man-made incidents.

From 1803 to 1950, Congress passed 128 separate laws relating to disaster relief. A lack of comprehensive legislation led to a cumbersome system that required Congress to pass a law following each disaster to provide support. Thus, Congress enacted an untitled Federal disaster relief act in 1950 that enabled a state government to request Federal assistance through the President and empowered the President to declare a major disaster. This legislation was foundational in establishing the philosophy that Federal disaster assistance would supplement the efforts and available resources of state and local governments. Congress also passed the *Federal Civil Defense Act of 1950* that created a parallel nationwide system of civil defense authorities. These two statutes began to lead the U.S. towards comprehensive national emergency management.

In 1965, Hurricane Betsy caused major damage across southern Florida and Louisiana. In the aftermath, Congress passed the *National Flood Insurance Act of 1968* that made flood insurance coverage available to homeowners and

16

established a national program for flood risk reduction. Congress also enacted reforms that authorized Federal loans and tax assistance to individuals and Federal funds to repair and replace public facilities, created the first program to provide direct assistance to individuals and households, and strengthened Federal support in risk reduction from fires and earthquakes. Though FEMA had not yet been established, the legislative changes made in the 1960s and 1970s are the backbone of our programs today.

## Creation of FEMA and Expanding Authorities (1978 – 1989)

By 1978, more than 100 separate Federal agencies had jurisdiction over aspects of emergency management. The National Governors Association championed a request from state governments seeking a national-level disaster management organization capable of handling both natural and man-made disasters.
In response, on June 19, 1978, President Carter submitted a proposal to Congress that would consolidate emergency preparedness, mitigation, and response activities into one Federal emergency management agency.

In late March of 1979, a partial meltdown at the Three Mile Island Nuclear Generating Station in Harrisburg, Pennsylvania required more than 100 entities to coordinate response efforts. Unfortunately, the disaster response effort was inefficient and fragmented, once again reinforcing the need for a coordinated emergency management agency. President Carter signed Executive Order 12127, effective April 1, 1979, establishing FEMA and activating his reorganization plan. Shortly after, in signing Executive Order 12148 on July 20, 1979, President Carter gave our Agency the dual mission of emergency management and civil defense. This brought together additional agencies such



*This image shows a FEMA employee representing the U.S. at the North Atlantic Treaty Organization (NATO). Our engagement with the international community expanded in 1988, when President H.W. Bush issued an executive order giving our Agency a role at the U.S. Mission to NATO. The executive order assigned FEMA lead responsibility to assist the Secretary of State in coordinating the formulation and implementation of U.S. policy for NATO civil emergency planning.*

Why We Are Here

17

*"President Carter has honored me in requesting that I assume the responsibility as the first director of the Federal Emergency Management Agency (FEMA)...*
*I believe that the five agencies that are brought together under the leadership of that single executive have a high degree of program compatibility and that through their merger greater effectiveness and efficiency can be achieved in the performance of the Federal Government's role."*

**John Macy**
**First FEMA Director**
**August 1979 - January 1981**

as the Defense Civil Preparedness Agency (from the Department of Defense), the Federal Disaster Assistance Administration (from the Department of Housing and Urban Development), and the Federal Preparedness Agency (from the General Services Administration).

Our Agency's authorities were further defined and expanded by the *Disaster Relief and Emergency Assistance Amendments of 1988*, which amended the *Disaster Relief Act of 1974* and renamed it the *Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act)*.

## Requesting Federal Assistance

The *Stafford Act* provides clear direction for our role in emergency management and establishes the current statutory framework for disaster response and recovery through Presidential disaster declarations. When resources exceed the capabilities of the state, local, tribal, or territorial government, a declaration request may be submitted by the Governor or Tribal Chief Executive to receive supplemental Federal assistance.

For necessary expenses in carrying out the *Stafford Act*, Congress makes appropriations to the Disaster Relief Fund (DRF), which enables us to direct, coordinate, manage, and fund eligible response and recovery efforts associated with domestic major disasters and emergencies that overwhelm state, local, tribal, or territorial resources. The *Stafford Act* remains the formal and legal foundation for our role as leaders in emergency management.

Why We Are Here

## FEMA's Ten Regional Offices

In 1974, the Office of Management and Budget (OMB) required all Federal departments and agencies to establish a consistent and compatible Federal field structure to provide more opportunities for intergovernmental coordination. Five years later in 1979 when FEMA was established, we mirrored our regional structure to meet this requirement.



*Construction of Federal Regional Center for Region VI in Denton, TX on August 31, 1962.*

Our FEMA regions are:

- Region I (Boston, MA): Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont

- Region II (New York City, NY): New Jersey, New York, Puerto Rico, U.S. Virgin Islands

- Region III (Philadelphia, PA): Delaware, District of Columbia, Maryland, Pennsylvania, Virginia, West Virginia

- Region IV (Atlanta, GA): Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee

- Region V (Chicago, IL): Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin

- Region VI (Denton, TX): Arkansas, Louisiana, New Mexico, Oklahoma, Texas

- Region VII (Kansas City, MO): Iowa, Kansas, Missouri, Nebraska

- Region VIII (Denver, CO): Colorado, Montana, North Dakota, South Dakota, Utah, Wyoming

- Region IX (Oakland, CA): Arizona, California, Hawaii, Nevada, Pacific territories*

- Region X (Bothell, WA): Alaska, Idaho, Oregon, Washington

Facilities from legacy agencies, such as the Defense Civil Preparedness Agency and the Federal Disaster Assistance Administration, contributed to our initial regional offices. For example, in the 1960s the Federal Government built five Federal Regional Centers in Maynard, MA; Denton, TX; Thomasville, GA; Denver, CO; and Bothell, WA. These centers were originally constructed for continuity of operations in the event of an attack during the Cold War. Over time, we were given funding to expand and relocate. Today, some of our regional offices still use the original Federal Regional Centers as coordination centers, office space, or warehouses. FEMA also shares the U.S. government's unique nation-to-nation relationship with Federally recognized tribes. Tribal governments and their members are an essential part of our Nation's emergency management team. Our regional offices serve as invaluable conduits to reach, connect, and better communicate with people in all communities in their day-to-day lives.

*\*The Pacific territories are Guam, the Commonwealth of the Northern Mariana Islands, and American Samoa. Region IX also has the unique responsibility to coordinate with the U.S. Agency for International Development (USAID) to support the Federal Government's long-standing relationship and treaty obligations with the Compact Nations of the Federated States of Micronesia and the Republic of the Marshall Islands.*

Why We Are Here



Once organized as one FEMA, the decades following our creation were pivotal in defining what we do and how we can do it better. The triumph of our Nation following major disasters in the 1990s and early 2000s provided opportunities for us to learn from our mistakes, grow together, and continue to define our mission.

## Expanding Mitigation and Preparedness (1990 – 2000)

As the Cold War ended and the threat of nuclear war faded, our Agency began to shift away from civil defense activities. In 1992, we brought together 27 Federal agencies and departments, as well as the American Red Cross, to publish the first Federal Response Plan. This plan was the first step in formalizing how we coordinate Federal resources to assist state and local governments in responding to disasters.

In August 1992, the Nation witnessed Hurricane Andrew destroy swaths of infrastructure across Florida and Louisiana, leaving tens of thousands of people without homes. Congress enacted reforms through the *Stafford Act* to streamline Federal relief and recovery operations and prioritize service delivery, emergency preparedness, and mitigation measures.

The Great Midwest Floods of 1993 and the Northridge Earthquake of 1994 tested these new reforms. We successfully leveraged innovations in technology to create service centers that enabled survivors to apply for Federal assistance over the phone rather than in person. Furthermore, as the value of risk-based hazard mitigation became apparent, we encouraged communities to adopt better building practices and increased outreach programs focused on building disaster-resistant communities.



*A firefighter surveys the Murrah Building following the Oklahoma City bombing in Oklahoma City, OK on April 19, 1995.*

The 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City, OK shook the Nation with the emerging threat of domestic terrorism. In 1996, Congress passed the *Defense Against Weapons of Mass Destruction Act* that reshaped the role of our Agency and other entities to further protect the public from terrorists. Earlier that year, President Clinton also raised our FEMA Director to cabinet-level status, signaling the importance of our disaster authority and responsibilities in response and recovery.

With the threat and hazard landscape continuing to evolve, Congress also passed legislative reform to further advance disaster risk reduction. The *Disaster Mitigation Act of 2000* marked the first time in history that disaster management legislation placed a requirement on state and local governments to assess risk and plan for mitigation efforts as a condition of receiving Federal mitigation grant assistance.

---

*"Disasters have a way of making us stronger in the broken places."*

**James Lee Witt**
**Former FEMA Director**
**April 1993 - January 2001**

---

21

Publication 1

## Securing the Nation (2001 – 2003)

The terrorist attacks of September 11, 2001 changed America forever, resulting in the loss of nearly 3,000 lives, billions of dollars in property, an untold number of jobs, and the displacement of many individuals and businesses. In a time of unanswered questions, confusion, and uncertainty, we immediately went into action supporting New York, Virginia, and Pennsylvania officials in managing the consequences of the attacks. We deployed Urban Search and Rescue teams, mobile communication equipment, and thousands of staff. The Agency helped fund extensive debris removal operations and the rebuilding of major infrastructure in lower Manhattan to include the modernization of the mass transportation system. We pushed our authorities to bring the financial resources that communities needed to recover.

*FEMA Region VIII Urban Search and Rescue team leader and the Colorado Lieutenant Governor inspect the recovery operations underway at Ground Zero, the site of the World Trade Center collapse.*



The attacks changed the face of homeland security and emergency management, and drove major statute and policy changes to reorganize the Federal Government. In 2002, President W. Bush signed the *Homeland Security Act*, leading to the creation of the U.S. Department of Homeland Security (DHS). The new organization stood up on March 1, 2003 and united our Agency and 21 other organizations into one Department. The FEMA Director title was renamed to the FEMA Administrator. Shortly after the formation of DHS, most of our terrorism-related preparedness programs were consolidated with other counterterrorism activities to refocus our Agency's efforts primarily on natural disasters.

*"I watched our rescue teams join New York City's finest and Virginia's finest, working shoulder to shoulder around the clock to find their brothers and sisters and fellow citizens. These sites are truly hallowed ground. Now our rescue teams have gone home and we are fully engaged in the recovery process."*

**Joe Allbaugh**
**Former FEMA Director**
**February 2001 - March 2003**

Why We Are Here

## Large Scale Disasters, Major Reforms (2004 – 2010)

The response to the September 11th attacks involved thousands of emergency responders from across the Nation and highlighted the need for a common planning process and incident management structure. In 2004, the National Response Plan was published, replacing the Federal Response Plan and breaking new ground in integrating all levels of government in a common incident management framework.



*FEMA and the Alabama Emergency Response Team at the state's Emergency Operation Center monitor Hurricane Katrina as it makes landfall on the Gulf Coast.*

Large-scale natural disasters in 2004 and 2005 once again led to the reform and evolution of our Agency's role in serving the Nation. The rapid succession of Hurricanes Charley, Frances, Ivan, and Jeanne in 2004 left significant damage to Florida, marking our Agency's first large-scale, sustained response effort. The following year brought Hurricanes Katrina and Rita.



*If an incident exceeds the capacity of our disaster workforce, the Secretary of Homeland Security is authorized to activate the DHS Surge Capacity Force (SCF) to augment the Federal response efforts. Pictured, SCF members canvass neighborhoods to reach those who might not have registered for assistance.*

Why We Are Here

The historic Hurricane Katrina made landfall in Mississippi, causing large-scale devastation along the Gulf Coast, leaving more than 1,800 people dead, displacing families to all 50 states, and resulting in billions in losses to infrastructure and the economy. The Federal Government's response to the extensive and disruptive impacts of Hurricane Katrina faced criticism, which caused a significant reevaluation of the execution of Federal disaster response efforts and resource allocation. As a result, Congress passed the *Post-Katrina Emergency Management Reform Act of 2006*.

<div style="border:1px solid">

## Post-Katrina Emergency Management Reform Act (PKEMRA)

The *Post-Katrina Emergency Management Reform Act of 2006* established us as a distinct Agency within DHS, defined our primary mission, and designated our FEMA Administrator as the principal advisor to the President, the Homeland Security Council, and the Secretary of Homeland Security for all matters relating to emergency management in the U.S. This Act also codified into law the key principle that FEMA may provide accelerated Federal assistance and support where necessary in the absence of a specific request by a state to save lives and prevent suffering.

*"The primary mission of the Agency is to reduce the loss of life and property and protect the Nation from all hazards, including natural disasters, acts of terrorism, and other man-made disasters, by leading and supporting the Nation in a risk-based, comprehensive emergency management system of preparedness, protection, response, recovery, and mitigation."*

**The Post-Katrina Emergency Management Reform Act of 2006**

</div>

Recognizing our shortfalls has helped empower our Agency to improve. In the years following, we continued to build capability and capacity, nearly doubling our full-time workforce and cadre of disaster reservists, to include staff dedicated to ensuring our programs and services are available to people with disabilities. DHS transferred preparedness programs back to us, and we began enhancing our regional offices, professionalizing our disaster workforce, increasing our logistics capabilities, and building stronger relationships across the whole community.

24



To be successful in executing our mission, every member of the community must understand their important and indispensable role in emergency management. The ability of our Nation to be truly ready depends on everyone understanding their part in our collective resilience. We need to continue to build our capabilities together as a community to address an evolving landscape of threats and hazards.

## Coordinating the Federal Family (Early 2010s)

In 2011, President Obama signed *Presidential Policy Directive 8: National Preparedness* which called for the development of a national preparedness goal and a national preparedness system. This direction was exciting for our Agency because it allowed us to lead an integrated whole community approach to preparedness.

Our Federal capabilities were tested once again in 2012 when Hurricane Sandy affected the entire East Coast from Florida to Maine, as well as states as far inland as West Virginia, Ohio, and Indiana. The storm's effects were extensive, leaving millions without power, destroying hundreds of thousands of homes, and causing tens of billions in damages. Hard-working team members of a coordinated Federal, state, and local response worked around the clock to restore power, public transportation, critical infrastructure, and services. We also leveraged the DHS Surge Capacity Force as a force multiplier to ensure a comprehensive

response in aiding those impacted. Subsequently, Congress passed the *Sandy Recovery Improvement Act of 2013* to streamline the recovery of public infrastructure and to allow Federally recognized tribes to directly request a Presidential declaration.



*A FEMA worker surveys damage from a fire caused by a gas leak during Hurricane Sandy at Breezy Point, NY in November 2012.*

As an example of our growth in Federal leadership, our Agency has also been directed by the White House and DHS to support response operations outside of traditional coordination authorities. In 2014, for example, we provided incident management advice and support to other DHS components and Federal agencies for matters such as the influx of unaccompanied children across the Southwest border, Ebola responses, and water contamination in Flint, Michigan.

### Unique Response Coordination Efforts in Our History

*Cuban Refugee Crisis – 1980:* FEMA was tasked to help process more than 100,000 refugees arriving on Florida's shores.

*Space Shuttle Columbia Disaster – 2003:* FEMA coordinated the collection of debris from the shuttle accident across Texas and Louisiana.

*Bam, Iran Earthquake – 2003:* At the request of the Iranian Government, FEMA sent two International Medical Surgical Response Teams to set up a temporary field hospital.

*Haiti Earthquake – 2010:* Supporting USAID, FEMA established a Joint Information Center on the island. FEMA also sent search and rescue teams, communications equipment, and staff from the Mobile Emergency Response Support system.

*Increase in Arrivals of Unaccompanied Children – 2014:* FEMA coordinated a government-wide response to address the needs of an influx of unaccompanied children crossing into the U.S. along the southwest border. Over 57,000 children crossed the border, many in need of food, water, shelter, and social and medical services.

*Ebola Virus – 2014:* FEMA collaborated with over a dozen Federal agencies, states, the private sector, and other nations in combatting the spread of Ebola domestically and overseas.

Publication 1

*"We know that there are many challenges ahead and that recovery will not happen overnight. Many survivors without power, and many are finding themselves without shelter. FEMA will remain in support of our state, tribal, and local partners, 24 hours a day, seven days a week. Even as television cameras turn to other stories, we will be on the ground to support the survivors."*

**Craig Fugate**
**Former FEMA Administrator**
**May 2009 - January 2017**

## Sharing Responsibility Across the Nation (Late 2010s)

In 2017, the Nation faced a historic Atlantic hurricane season and extreme wildfire disasters. The effects from consecutive Hurricanes Harvey, Irma, and Maria were widespread, causing long-lasting damage across the southern continental U.S. and surrounding islands, as well as Puerto Rico and the U.S. Virgin Islands. Our Agency brought together the community in a way it had never done before. We leveraged our skilled workforce to manage the coordination of resources across multiple locations during consecutive storms and deployed large numbers of Federal personnel before and after the storms' landfall to provide assistance to survivors and communities. Hurricane Maria will be one of the largest post-disaster humanitarian and reconstruction efforts in our history.

In addition to the devastating 2017 hurricane season, in October of the same year, communities in Northern California were ravaged by fast-moving wildfires. The unprecedented and rapid succession of disasters transformed the way we look at emergency management and focused our efforts to build a culture of preparedness, ready the Nation for catastrophic disasters, and reduce our Agency's complexity – because together, we share this responsibility.

Congress provided us with expanded authorities to further these goals by enacting the *Disaster Recovery Reform Act of 2018 (DRRA)*. The *DRRA* is a landmark law that highlights the Federal Government's commitment to increasing investments in mitigation and building the capabilities of our state, local, tribal, and territorial partners. With this expanded assistance, communities will be able to plan and execute programs to assist with community recovery and help reduce disaster risk in the future. The *DRRA* also provides better opportunities for the Agency to retain and promote an experienced and talented workforce, as well as work even better with our interagency partners.

Why We Are Here

27

Publication 1



*Passengers board chartered buses leaving each morning to take FEMA employees to Disaster Recovery Centers (DRCs) in Butte County, CA to assist Camp Fire survivors in their recovery.*

## An Evolving Agency

Our Agency emerged from the Nation's need for a comprehensive emergency management entity. We are an organization that is ever-changing and continuously learning. Our history has shown us that we can meet and overcome adversity. We are strong and we are resilient. We are one team united by our shared privilege and responsibility to lead and support the Nation through its worst disasters. We all contribute to FEMA's history.

---

*"FEMA's best assets are its people...The 2017 hurricane season provided many opportunities for FEMA's programmatic staff to support response and recovery efforts. This experience is invaluable and will help FEMA deliver better services and support in future disasters."*

**Brock Long**
**Former FEMA Administrator**
**June 2017 - March 2019**

---

Why We Are Here



# What We Face: The Nature of Emergency Management

History has shown us that our Nation faces an evolving disaster landscape. Known and unknown threats and hazards require that we all take part in implementing policies, developing plans, and executing processes that reduce risk and mitigate the loss of life and property. In doing so, it is important to recognize that disasters impact individuals and communities differently. It is critical that everyone understand their role in the system of emergency management. By everyone doing their part, we can better achieve our vision of a more prepared and resilient Nation.

*"Change has been constant, but one thing remains the same: It's the dedication of FEMA's workforce that makes the difference...I truly love my job to this day!"*

Josie Arcurio
FEMA employee

29

## What We Face as A Nation

Our Nation experiences a diverse range of disasters. A disaster is defined as an adverse condition or occurrence that requires coordinated action across multiple entities to resolve. Disasters include all types of emergencies and hazards, and can come in all forms and magnitudes to include both natural and man-made incidents.

We consider many factors when preparing and planning for disasters. From the climate to new threats, alongside things like demographics and technology, many factors must be taken into consideration on our path to becoming more resilient. We prepare for natural hazards such as heatwaves, heavy precipitation, storm surges, droughts, floods, wildfires, hurricanes, tornadoes, or earthquakes. We also prepare for man-made incidents such as acts of terrorism and war. As a Nation we need to be more prepared than ever to face a spectrum of disasters.

     

Severe Storm    Power Outage    Tornado    Earthquake    Wildfire    Winter Storm

Our operating environment is also shaped by the individuals and communities we serve. Through experience, we have seen disasters have disproportionate impacts on people with disabilities, people with specific medical requirements, older adults, individuals with limited English proficiency, and people with low income, among others. We recognize and account for diversity to help reduce barriers to resources and opportunities for those individuals and communities.

As we work towards a prepared and resilient Nation, we face the challenge in balancing disaster preparedness and mitigation with competing priorities. For example, economic goals and consumer choices can influence decisions and resource allocation, even when the risks these choices present are well known.

> *"To implement effective emergency management, you have to acknowledge both mother nature and human nature."*
>
> **Billy Wagner**
> **Former FEMA Employee**

30

Publication 1

## Nature of Emergency Management

Our Agency is only one member of a larger team that shares responsibility for emergency management and national preparedness. Most disasters begin and end locally. Local officials best understand the unique needs, opportunities, and risks their communities face. As such, it is our philosophy that local officials are best positioned to prepare their communities and execute disaster response and recovery efforts. The larger or more complex the disaster, the greater the number and variety of partners that must be involved to support local officials.

Emergency management is collaborative and tiered. It is a system reflective of a continuous cycle, with no definitive beginning or end. Our efforts often overlap and carry over from one phase to the next. It is designed to continuously increase our Nation's resilience to all hazards. Preparedness efforts with partners at all levels are fundamental to increase the effectiveness of this type of cooperation.

Local level disasters require a unified approach from local agencies, the private sector, and nongovernmental organizations. Some may require additional support from neighboring jurisdictions or state, tribal, or territorial governments. As a disaster increases in scale or scope, so does the level of support. States, tribes, and territories play a critical role in coordinating planning, mitigation, and response activities, while also serving as a critical conduit between Federal resources and local needs. The Federal Government's support before, during, and after disasters builds on, and is affected by, the capacity of state, local, tribal, and territorial governments, as well as the business community and nongovernmental organizations. When those capacities are overwhelmed and assistance is requested, the Federal Government can then begin coordinating and collaborating with the governments of the impacted area.

What We Face

---

*"The mission success of FEMA happens through the work of many coming together. Our employees are selfless, empathetic, and passionate – working long, tiring hours in unison to support survivors and communities."*

**Elizabeth Zimmerman**
**Former FEMA Executive**

---

31

Publication 1

## Managing an Emergency – A Tiered Approach

Disaster: A residential flood

A local emergency manager is leading the response. Firefighters and police are on scene providing traffic control and aid in evacuations. Emergency medical services personnel are triaging, transporting, and redistributing injured to local hospitals. A local nonprofit or voluntary organization (e.g., American Red Cross, Salvation Army) may be on hand to assist displaced residents. The scope of the impacted area quickly changes when a dam is breached as a result of the flooding, and surrounding communities are compromised, lives are at risk, and property is damaged. The complexity of the situation has increased as others – such as states or tribes and, ultimately, the Federal Government – become involved. Businesses, voluntary organizations, and other elements of the private sector are also key stakeholders providing essential services that must be restored to stabilize the community.

We have a distinct role shaped by unpredictable, ever-evolving threats and hazards and the diverse communities we serve. Experience has taught us that emergency management includes the collective efforts of everyone – all levels of government, individuals, communities, businesses, and nonprofit organizations. As FEMA employees, we are a part of that larger community. Whether before the first snow of the year, during the midst of hurricane season, or after a tornado damages a community – we are here helping people.

*"...as patients poured in, there was no confusion, no panicking, no question over who was in charge of what. The medical center was ready for this, officials said. In October, it had participated in a citywide disaster training: a simulated mass shooter incident at the El Paso airport."*

**University Medical Center of El Paso prepared to save lives during a real active shooter incident after training with FEMA for mass casualty scenario**

**El Paso Mass Shooting**
**August 3, 2019**

What We Face

32

# 4

## What We Do: Helping People Before, During, and After Disasters

Given the scope of our mission, it is helpful to describe what we do in a framework of "before," "during," and "after" a disaster. While categorized separately, many of the things we do are activities that occur simultaneously and are not exclusive to a particular phase of a disaster. Understanding what our Agency does helps you recognize the critical part you play in FEMA's success. You, our FEMA employees, make our mission possible every day.

*"U.S. Northern Command's close partnership with FEMA is vital. Whether for natural disasters or the nefarious actions of bad actors, we work together to manage the catastrophic consequences and keep Americans safe during their time of greatest need."*

General Terrence J. O'Shaughnessy
Commander of U.S. Northern Command

33



**We help people understand risks to life and property and motivate them to take action – individually and collectively – to reduce these risks, build capabilities, and prepare for disasters.** We support national preparedness and self-sufficiency by helping everyone understand their disaster risk. We provide resources and guidance to help communities train, exercise, and build capabilities to reduce their disaster risk, and prepare for disasters should they occur. By educating, we empower the whole community to take action.

*"There is so much about emergencies and disasters – and life, really – that we can't control, and that's scary. What we can do is prepare to help ourselves and others, just in case. We can save a little from each paycheck, we can learn first aid, and, most importantly, we can be active members of our community. All three are worthwhile, with or without a disaster."*

**Katie Fox**
**Former FEMA Executive**

34

## Raise Risk Awareness

*We help identify and assess risks to life and property, and then collaborate with a wide range of partners to communicate risk information.*

Risk awareness is identifying and understanding different threats and hazards in an environment. Whether you are clarifying risk for yourself or your community, understanding different types of disasters and potential impacts is a critical first step in preparedness. Part of risk awareness is also assessing community vulnerabilities and gaps in capabilities to create a comprehensive picture of the risk environment. Our success in risk awareness is rooted in the diversity of our workforce, ensuring all perspectives are included in the identification and communication of risk.

Information is power and having information on local risks is invaluable. We work to ensure risk information is accessible, relevant, and actionable. We consider all stakeholders, including people with disabilities, people with limited English proficiency, people without computer access, among others, to ensure that we identify and assess the varying needs for all communities. While communities cannot completely control all risk, those that better understand their risks can make informed choices about where to prioritize action.

## Educate in Risk Reduction Options

*We educate individuals, communities, and the public to understand different options for reducing risk.*

Individuals and communities need to be aware that there are options for reducing risk. Through programs, tools, and outreach, we engage the public at an individual level to help educate in risk reduction options. We champion preparedness activities across communities, organizations, and businesses. Using media campaigns, we reach millions of people and engage the public in a variety of activities and events. We provide personnel and resources to support those preparedness events across the country. Our regional offices serve as a conduit to reach even more people in their day-to-day lives. We are focused on providing risk reduction education for all. Our programs and resources are for a variety of audiences, such as underserved and youth populations.

We provide best-practice guidance, technical assistance, and planning support to our partners to help them understand how they can plan for and mitigate risks in

What We Do

35

their local community. We issue planning guidance. Risk-informed planning and decision-making helps planners examine a hazard or threat and produce integrated, coordinated, and synchronized plans. We also encourage the adoption and implementation of current codes and standards. Codes and standards are one of the Nation's strongest defenses against natural disasters and are a cost-effective way of protecting important investments, like homes or businesses.

## Help to Take Action

*We help individuals, communities, and organizations take action to mitigate, reduce risk, and build capabilities to prepare for disasters.*

Individuals need to take action to address their risk. We offer resources and tools to help translate risk reduction options into tangible actions such as helpful checklists, communication plans, and risk management and mitigation opportunities. We also provide hands-on expertise and guidance in capability-building, to include training and exercises.

We work with individuals, organizations, communities, and governments to plan for the continuity of critical services when those normal services and functions are disrupted. As we guide our partners in taking coordinated action, we emphasize the shared responsibility of planning and preparing for disasters. We offer programs and services that allow communities to access Federal funds before a disaster strikes to train staff, purchase equipment, develop projects and plans, and mitigate future losses. These programs are made available as Federal assistance to states, territories, and tribes. Additionally, we offer flood insurance products in partnership with private sector providers.

---

*"The most important thing I've learned as a member of FEMA's Youth Preparedness Council, is that everyone, including youth, can contribute to community resilience. It's a team effort and by working together we can get it done!"*

**Nyla Howell
FEMA Youth Preparedness Council Representative**

---

36

**What We Do**

## FEMA In Action: Before













What We Do



**We message, mobilize, and coordinate to support state, local, tribal, and territorial response efforts to stabilize communities.** By law, we are the primary coordination mechanism of the Federal Government for every presidentially declared disaster under the *Stafford Act.* Our responsibility during disasters is to coordinate and position the Federal interagency to apply and manage our Federal resources for immediate lifesaving and life-sustaining operations.

Disaster response should be managed at the lowest level possible. We actively engage our community partners at the local, regional, and national levels to effectively communicate an impacted community's needs and identify resources to rapidly fill those gaps. This is where the relationships and partnerships we have built prior to a disaster are most visible and most critical. Through a bottom-up approach, our field staff request resources and provide ground truth information up to the regional and national levels. That communication continues to the Federal interagency and private sector partners for coordination to help fill resource gaps and provide verified situational awareness for senior leadership decision-making. We use this information to provide the right resources to the right places at the right time.

> "Disaster response is a fascinating ballet of chaos. FEMA helps us get our steps a little straighter and our work a little more organized by bringing a massive amount of resources and knowledge to the table."
>
> **Kimberly Stout**
> **American Red Cross Liaison**

38

## Alert, Warn, and Message

*We bring valuable insight to our partners during a disaster using our national-level perspective.*

During and immediately following a disaster, our priority is to stabilize critical services within a community to alleviate immediate threats to human health, safety, and economic security. A large part of this stabilization is ensuring individuals and communities have access to lifesaving and life-sustaining information. Communicating directly with the public can be difficult during a disaster when standard forms of communications are compromised or inaccessible.

Individuals should always look first for information from their local officials. Using alert and warning systems, FEMA helps amplify local messaging by communicating critical information to disaster survivors and response officials. Timely, accessible, and actionable emergency alert and warning messages build resilience by providing individuals with information to make decisions and take action to effectively reduce the impact of a disaster. The former one-way flow of warnings, information, and updates to the affected public has become a two-way system that includes many partners, sources, and systems.

## Coordinate the Federal Response

*We organize ourselves and others to coordinate the Federal emergency response community.*

We bring together departments and agencies that have responsibilities, authorities, or expertise in a functional area. We have a unique authority to assign and fund other Federal agencies to support Federal response during *Stafford Act* disasters. Many of the arrangements by which departments and agencies participate are determined and formalized in pre-disaster planning efforts. Relevant stakeholders and experts are also brought together to identify and address needs, issues, and challenges. Effective response begins with a variety of preparedness activities such as planning, exercising, training, and constant communication between partners on capability gaps.

We work to establish a unified group that coordinates with the impacted state, territory, or tribe to etablish shared priorities and objectives. This ensures unity of effort and shared situational awareness so Federal resources are employed to support and augment the disaster response requirements. In some larger or unique disasters, we mobilize the Federal Government's emergency response

*What We Do*

39

teams, systems, and capabilities to support FEMA's incident management personnel with information and operational support. We also coordinate with the international community, nonprofit organizations, and the private sector to meet the needs of impacted communities.

## Apply and Manage Resources

*We bring together and deploy Federal resources that supplement state, local, tribal, and territorial capabilities to stabilize the disaster.*

We receive and process requests to source and deploy various resources to the field for distribution. Federal resources can include commodities, equipment, or personnel. We aim to deliver Federal assistance that is timely, efficient, effective, and accessible. Our regional offices play a critical role in delivering these resources. We receive resource requests from our governmental partners in the field who have firsthand knowledge of the needs required to stabilize the community. Through this process, we work with our partners to determine the most effective and efficient ways to fulfill their requests.

We analyze all sourcing options by examining internal and external capabilities. Effective management of resources requires robust coordination and synchronization with governmental and nongovernmental partners on the ground. To be useful, resources must be physically delivered through the last mile when and where they are needed. We recognize we are only one member of the emergency management community; thus, communication is key to ensure we are not hindering one another in achieving the same goal.

---

*"I believe one measure of our Agency's significance is the mass care resources our Agency provides for survivors to take their first steps into recovery. Whether it be a meal, a shelter, or a friendly face assuring survivors that they will pull through, mass care delivers hope to survivors and their loved ones."*

**Jessica Bettinger**
**FEMA Employee**

---

## FEMA In Action: During













What We Do

41

Publication 1



**We help individuals and communities recover after a disaster and build back stronger.** Following a disaster, affected individuals and communities seek resources to address their short-, intermediate-, and long-term needs. These recovery activities must be accessible to survivors with disabilities and survivors with limited English proficiency, among others. Ultimately, outcomes for survivors extend beyond lifesaving and life-sustaining activities. Recovery includes the continuation or restoration of services critical to support the physical, emotional, and financial well-being of impacted community members.

The stabilization, restoration, and strengthening of government functions, community infrastructure, and critical business is also essential to the economic stability, vitality, and long-term sustainability of communities themselves. Following a Presidential disaster declaration, we can initiate various post-disaster recovery programs under the *Stafford Act.* We provide coordination, technical assistance, subject matter expertise, and funding mechanisms. We also stand ready to assist flood insurance policy holders in their recovery.

> *"I built our house in 1998. After all these years of paying for flood insurance, it paid off. We would be out on the street right now if it wasn't for the flood insurance. That's a dollar well spent, it's an investment really."*
>
> **Flood Survivor**
> **Hurricane Florence 2018**

42

## Coordinate Federal Recovery Efforts

*We help facilitate problem-solving, improve access to resources, integrate principles of resilience, sustainability, and mitigation, and foster coordination among our partners after a disaster.*

The Federal Government's supporting role is especially important during the early weeks after a large-scale disaster, when many communities are overwhelmed with response and short-term recovery efforts. We work to understand the needs and requirements of communities after a disaster, then bring together appropriate resources and partners to take well-informed actions to help meet those needs.

Each partner supports disasters in a different way. Many Federal agencies directly or indirectly contribute to meeting recovery needs by delivering assistance provided under their normal authorities. The duration and extent of Federal support is determined in part by the scale and enduring impacts of the disaster and on the ability of a community to sustain recovery efforts on its own. Our job is to provide expertise that enables communities to implement solutions that leverage both FEMA's and other Federal agencies' resources.

## Provide Resources

*We provide financial support and direct services to individuals, communities, governments, and nonprofit organizations to aid in their recovery.*

Along with our Federal partners, we also play an important role in providing accessible information to the public and all stakeholders involved in recovery, including information about grants and loans. Continuing to inform stakeholders throughout recovery enables awareness of the process and informs realistic expectations.

We directly assist survivors in getting back on their feet by providing financial assistance or direct services to eligible individuals. We support survivors and their families by providing resources to support needs such as housing, medical, dental, and funeral expenses, child care, crisis counseling, legal services, unemployment, and case management. Housing assistance helps to cover costs like rent and home repairs and offers survivors direct services in the form of temporary housing. Following a flood, we work with our flood insurance policyholders to settle their claims.

What We Do

Publication 1

We support communities in providing supplemental Federal disaster grant assistance for essential recovery initiatives, such as debris removal. We also support the repair, replacement, or restoration of disaster-damaged publicly-owned facilities, and the facilities of certain private nonprofit organizations such as schools and hospitals. We encourage protection of these damaged facilities from future disasters by providing resources for mitigation measures during the recovery process.

## Apply Insight to Reduce Future Risk

*We offer insight, standards, resources, and tools for communities, businesses, and individuals to build back stronger.*

Disasters can bring awareness to gaps in plans and capabilities as well as risks to infrastructure or the environment. Following a disaster, individuals, businesses, and communities may use this opportunity to take action that reduces or eliminates long-term risk to people and property so that they mitigate future impacts. There are opportunities to enhance plans and procedures, train and equip staff, and strengthen infrastructure. For example, preparedness resources available to ready families, planning guidance to develop continuity of operations plans for businesses, or grant opportunities to enhance communities' emergency management capabilities continue to be available to our stakeholders. It is important that we work to continuously improve ourselves and our communities as we strive to achieve a more resilient Nation.

Using our national-level experience, we share best practices and lessons learned to help communities reduce future risks. We encourage communities to incorporate mitigation, resilience, and sustainability into short- and long-term recovery goals to systematically address risk and enable a faster recovery against future disasters. Our mitigation resources following a disaster help rebuild or replace damaged facilities so that losses are avoided or reduced in the future. In addition, our mitigation resources can be used to invest in larger community-wide mitigation projects. Communities with mitigation plans in place prior to a disaster can use this opportunity to access funding that allows them to complete some of their priority projects.

## FEMA In Action: After












What We Do

Publication 1

## We Help People Before, During, and After Disasters

The work we do is challenging. We help one another find the courage to take action against these challenges every day. Individually we have specific roles within the Agency. It is the summation of all our work that helps us move closer to our shared goal of building a prepared and resilient Nation. When we act together, tiny drops can grow into ripples of change.

For many of us, emergency management is a movement or a calling. We pursue this calling by helping people before, during, and after disasters. Our success as an Agency depends on every single one of us working diligently on the task at hand with Compassion, Fairness, Integrity, and Respect.

*"A huge wildfire consumed the forest where the hummingbird lived, and as the fire raged, all the animals left the forest and stood watching, transfixed and overwhelmed. They all felt so overwhelmed that they did not do anything, but the hummingbird decided, 'I am going to do something about the fire.' So it flew to the nearest stream, got a drop of water in its beak, and dropped it on the fire. Then it went back again, and again, dropping water on the fire as fast as it could. The other animals mocked the hummingbird, saying, 'What are you doing? You are too small, your wings are too small, and the fire is huge.' The hummingbird turned to them and said, 'I am doing the best I can.'"*

**Wangari Maathai**
**2004 Nobel Peace Prize Recipient**



46

# 5

## How We Do It: Principles to Guide the Work We Do

As Federal leaders supporting the Nation in emergency management, our guiding principles deliver our mission. Our principles inspire confidence in FEMA and in one another. We follow clear policies and procedures that prescribe FEMA's role in the emergency management community. Whether we are operating in steady state or responding to a wide-scale disaster, living by our principles aligns us with our values and our mission. We employ our guiding principles, in accordance with our core values, in everything we do.

*"The professionalism, dedication, and genuine helpfulness of FEMA staff have been an impressive experience for us – and a profound inspiration."*

Henning Thiesen,
Danish Emergency
Management Agency
Director General

47

How We Do It

## Guiding Principles

> Principles are rules that have been woven into the way an organization delivers its business. They serve as a guide on how to operate and deliver an organization's core values.

To be successful in our mission, we have a set of guiding principles that direct how we interact, approach our work, and provide outstanding service. Our nine guiding principles are: Accessibility, Accountability, Empowerment, Engagement, Flexibility, Getting Results, Preparation, Stewardship, and Teamwork. These principles provide a framework and a lens for how we think through accomplishing typical day-to-day activities as well as how we solve more complex issues and challenges.



Accessibility

***Accessibility*** *is being easily reached, understood, or used by the whole community regardless of functional capabilities, disability, age, race, income level, or language.* We will only be effective if the people we serve can find the information and assistance they need, when they need it. Accessibility and equal access are woven into our every program and service from the beginning and are vital to serving all survivors in times of need.

In Action:

- Incorporating principles of universal design to make our products and programs accessible from the beginning for communities

- Seeking to understand and mitigate our biases in the office and not intentionally leaving anyone out

- Making things easier for partners to understand and access by providing reasonable accommodations and recognizing diverse needs

48



**Accountability** *is meeting expectations set by our colleagues, supervisors, and those we serve.* Serving as Federal leaders in emergency management requires us to be trusted stewards of taxpayer dollars, follow ethical guidelines, protect and promote the civil rights of all disaster survivors, and provide the highest level of service to support our partners. Having a workforce that is dependable means that our Agency is productive and reliable when called on.

In Action:

- Promoting fair and equitable treament of all disaster survivors

- Adhering to ethical standards in the workplace and always striving to be effective and efficient in accomplishing our tasks and meeting our goals

- Engaging with DHS, the White House, and Members of Congress on policy and resource decisions and program oversight



**Empowerment** *is enabling an individual or group to have influence over decisions.* We believe we are most successful when our own employees apply their varying experience and skills. Trusting our staff and colleagues to make informed decisions encourages them to continue to take initiative and drive change. This also rings true for our partners – locals know their own communities best and must feel empowered to lead disaster activities.

In Action:

- Understanding the unique needs of each community and providing the right tools for them to be self-sufficient and stable in the event of an emergency

- Encouraging employees to participate in professional development opportunities

- Promoting and rewarding innovative solutions at all levels of government that improve the way we operate together

How We Do It

49

Publication 1



**Engagement** *is actively participating in dialogue with internal and external stakeholders to build partnerships and gather feedback on our programs and services.* Practicing active listening and being present in the conversation enables us to effectively understand and address needs. We must also be trusted to deliver accurate and accessible information.

In Action:

- Providing the best available information to disaster survivors early and often
- Building consensus among Agency senior leadership when developing options and making critical decisions on strategy, policy, or resources
- Consulting with a wide range of internal and external stakeholders on program implementation and policy development



**Flexibility** *is rapidly adjusting to ever-changing environments and a wide variety of tasks and circumstances both at the office and in the field.* Emergency management is rooted in uncertainty. We are expected to be able to adjust to new activities, quickly adapt to our surroundings, and embrace opportunities for continuous improvement.

In Action:

- Adapting our programs to a broad range of needs, whether they are for individual survivors, impacted communities, or partner organizations
- Pivoting to new roles and responsibilities when necessary because of a change in leadership direction, information, or environmental constraints
- Expanding our engagement efforts to include non-traditional partners to solve complex issues

50



**Getting results** *is working towards a clearly defined outcome.* Measuring against desired outcomes for both individual employees and the Agency at large helps to drive progress and hold us accountable. Assessing how we achieve our desired outcome enables us to improve our delivery of assistance.

In Action:

- Supporting survivors by being innovative and persistent when faced with roadblocks and working to fill gaps where there are opportunities

- Holding everyone accountable – from the larger Agency to individual staff members – for achieving progress against our strategic priorities and annual performance plans

- Assisting state, local, tribal, and territorial partners in filling capability gaps through grant funding, guidance, training, and exercises



**Preparation** *is taking preventative action to better withstand unpredictable moments.* Emergencies can happen at any time and help is not always nearby. Preparedness is the cornerstone of building strong, resilient communities that are better positioned to withstand and recover rapidly from disruption.

In Action:

- Pre-positioning essential items needed in disaster response to be readily available when needed by affected communities

- Encouraging conversations about individual and family preparedness – especially amongst our own employees – and motivating people to build emergency kits, learn CPR, and develop personal financial plans

- Promoting preparedness through planning, training, exercising, assessing, and engaging with our governmental and nongovernmental partners

How We Do It



***Stewardship*** *is administering high-quality programs and services required by statute, regulation, and policy.* As stewards of taxpayer dollars, we routinely assess our programs, policies, and actions to ensure that we operate effectively and efficiently to meet the needs and interests of our stakeholders. We are an Agency of trusted individuals that the Nation can turn to during its time of need.

In Action:

- Providing individuals and communities timely and appropriate Federal assistance following a disaster

- Creating and sustaining a workplace environment of continuous improvement in which we leverage data, best practices, and innovative ideas to better manage our programs and services with limited resources

- Encouraging risk reduction and risk management practices of government partners so that our Nation is better prepared and more resilient, ultimately saving lives and protecting property and the environment



***Teamwork*** *is bringing together colleagues and stakeholders to accomplish a common goal.* Collaboration early on can help achieve success. Working together better positions us to tackle disaster challenges when the Nation needs us the most.

In Action:

- Recognizing we are part of a larger emergency management community that must work together to meet the needs of all survivors

- Tapping into the valuable expertise beyond our own team by engaging another colleague from across the Agency

- Bringing together diverse stakeholders to approach simple and complex challenges in different work environments

How We Do It

# We face the unknown.

We have a distinct role shaped by unpredictable
and ever-evolving threats and hazards.

# We are a team.

We unite to make a difference in the lives
of others.

# We are leaders.

We are Federal leaders and together we help
people before, during, and after disasters.

# We are FEMA.



Photo Sources from Cover:
First row (from left to right): 1) Disaster Survivor Assistance team member canvasses areas to speak with residents impacted by flooding of the Arkansas River. Lavaca, AR. June 15, 2016. Source: Jocelyn Augustino / FEMA. 2) FEMA employee works in the National Response Coordination Center. October 3, 2019. Source: Rudy Marshall / FEMA. 3) FEMA local hire as an applicant service specialist. Source: FEMA Instagram. 4) FEMA Corps member works with Mitigation on the Colorado flood. Denver, CO. November 8, 2013. Source: Michael Rieger / FEMA. 5) A FEMA Disaster Survivor Assistance member in Humacao, PR. January 6, 2017. Source: Andrew Bajanda / FEMA.

Second row (from left to right): 1) FEMA employee speaks with a survivor. Source: FEMA Facebook. 2) A FEMA Disaster Survivor Assistance representative helps a survivor register for assistance following Hurricane Michael. Panama City Beach, FL. October 17, 2018. Source: Jacklyn Farias / CAISE. 3) A FEMA employee smiles at the camera. Source: FEMA Media Library 4) Disaster Survivor Assistance team member canvasses areas to speak with residents impacted by flooding of the Arkansas River. Lavaca, AR. June 15, 2016. Source: Jocelyn Augustino / FEMA. 5) The North Carolina Insurance Commissioner Office hosts an Insurance Camp event after the flooding from Hurricane Florence. New Bern, NC. September 26, 2018. Source: Mai Shintani / FEMA.

Third row (from left to right): 1) A FEMA Application Services Program specialist in Daytona Beach, FL smiles at a FEMA Disaster Recovery Center. October 31, 2016. Source: Steve Zumwalt / FEMA Media Library. 2) Disaster Survivor Assistance team member canvasses areas to speak with residents impacted by flooding of the Arkansas River, Fort Smith, AR. June 15, 2016. Source: Jocelyn Augustino / FEMA. 3) FEMA employee smiles with a disaster survivor after providing keys to a temporary home. Source: FEMA Media Library. 4) A FEMA employee speaks with a survivor. Source: FEMA Facebook. 5) FEMA Applicant Service Crew Leader in Detroit, MI shakes hands with a survivor after providing registration assistance. October 9, 2014. Source: Christopher Mardorf / FEMA Media Library.

Fourth row (from left to right): 1) FEMA employee in Boston, MA educates attendees at an America's PrepareAthon event. September 3, 2014. Source: Eilis Maynard / DHS Media Library. 2) FEMA Corps member canvasses areas to speak with residents impacted by flooding of the Arkansas River. Lavaca, AR. June 15, 2016. Source: Jocelyn Augustino / FEMA. 3) FEMA Community Relations officer canvasses a Long Island neighborhood to check on Hurricane Sandy survivors. Long Beach, NY. November 19, 2012. Source: Andrea Booher / FEMA. 4) FEMA Corps member in Denver, CO works alongside mitigation experts during the Colorado Flood. November 8, 2013. Source: Michael Rieger / FEMA. 5) FEMA employee Minh Phan (right) talks with state officials about how the community is recovering from the devastation left behind by Hurricane Michael in Blakely, GA. November 1, 2018. Source: Luisa Rivera / FEMA.

Table of Contents:
P4: (From top to bottom) 1) Members of FEMA Corps embrace. Source: FEMA Facebook. 2) Flood waters remain high throughout neighborhoods in Kinston, NC as the result of Hurricane Matthew. October 14, 2016. Source: Jocelyn Augustino / FEMA. 3) Virgin Islands Territory Emergency Management Agency (VITEMA) Deputy Director in St. Thomas, U.S. Virgin Islands gives a situation briefing to FEMA and VITEMA emergency workers in the Virgin Islands Emergency Operation Center. August 30, 2010. Source: Andrea Booher / FEMA Media Library. 4) FEMA leadership team in Guam discuss how best to support Guam and CMNI in assessing damages from Typhoon Dolphin. May 17, 2015. Source: FEMA Media Library. 5) A FEMA Representative in Cypress, TX signs in survivors at a Mobile Disaster Recovery Center. October 7, 2017 Source: Steve Zumwalt / FEMA.

Chapter 1: Who We Are
P8: (First row, from left) 1) Survivor from Loíza receives orientation by a FEMA staff during event in Parcelas Suárez Community. Loíza, PR. June 6, 2019. Source: Eduardo Martinez / FEMA. 2) FEMA employee assists a survivor in a local store. Source: FEMA Facebook. (Second row, from left): 1) A FEMA Recovery Center manager answers disaster questions at the Glenville Recovery Center in Glenville, DE. October 1, 1999. Source: Andrea Booher / FEMA. 2) FEMA Corps employees embrace. Source: FEMA Facebook.
P10 Compassion: Disaster Survivor Assistance specialist gets a hug from a survivor in Apalachicola, FL, after Hurricane Michael. November 3, 2018. Source: FEMA Facebook.
P11 Fairness: The Mayor of Tinian registers for FEMA Assistance after Super Typhoon Yutu damaged his home. Tinian, Commonwealth of the Northern Mariana Islands, November 14, 2018. Source: Grace Simoneau / FEMA
P12 Integrity: A FEMA Federal Coordinating Officer swears in the first group of local hires at the FEMA offices in Durham, NC, October 25, 2018. Source: Liz Roll / FEMA.
P13 Respect: FEMA Disaster Survivor Assistant Specialists replace an American flag damaged by flood waters in late June, with a new one at a local church. Clendenin, WV. July 5, 2016. Source: Steve Zumwalt / FEMA.

Chapter 2: Why We Are Here
P15: A flag flies in front of a heavily damaged neighborhood in Panama City, FL from Hurricane Michael. Source: FEMA Facebook.
P16: American Red Cross fund drive for relief of the 1927 Mississippi Valley Flood victims, New York, NY. April 1927. Source: American Red Cross.
P17: FEMA representative at NATO, representing the U.S. on NATO's Civil Emergency Planning Committee. Source: George Hadrick and Joleen Jubela / FEMA.
P19: Federal Regional Center construction for Region VI in Denton, TX. August 31, 1962. Source: FEMA Region VI / FEMA Photo Library.
P20: Two FEMA employees canvass a neighborhood to register survivors for Individual Assistance. Source: FEMA Facebook.
P21: The Murrah Building following the Oklahoma City bombing in Oklahoma City, OK. April 26, 1995. Source:FEMA Photo Library.
P22: FEMA Region VIII Urban Search and Rescue team leader and Colorado Lieutenant Governor inspect the recovery operations underway at Ground Zero, the site of the World Trade Center collapse. Source: FEMA Media Library.
P23: (From top to bottom) 1): FEMA and the Alabama Emergency Response Team at the state's Emergency Operation Center monitor Hurricane Katrina as it makes landfall on the Gulf Coast.Source: FEMA Media Library. 2) Department of Homeland Security employees, who volunteer for FEMA community relation positions, inform Hurricane Sandy survivors at Rockaway Beach, N.Y. of how to register for FEMA assistance. New York, NY. November 19, 2012. Source: Mass Communication Specialist 3rd Class Patrick Ratcliff, USN/Released.
P25: Assistant External Affairs Officer for Community Relations speaks with teams prior to deploying for Tropical Storm Irene. Hartford, CT. September 6, 2011. Source: Jocelyn Augustino / FEMA.
P26: FEMA worker surveys damage from a fire caused by a gas leak during Hurricane Sandy in Breezy Point, NY. November 1, 2012. Source: FEMA Media Library.
P28: Passengers board one of three chartered buses leaving each morning to take FEMA employees to Disaster Recovery Centers in Butte County, CA to assist Camp Fire survivors in their recovery. Source: FEMA Media Library.

Chapter 4: What We Do

P34: FEMA employees wear blue FEMA vests discuss mitigation options with survivors. Source: FEMA Media Library

P37: (First row): FEMA employees collaborate in a breakout group during a workshop. Source: FEMA Facebook. (Second row, from left): 1) FEMA employee educates a commuter about disaster preparation during National Preparedness month at an America's PrepareAthon event in Boston's South Station. September 3, 2014. Source: Ellis Maynard / FEMA Library. 2) Community Relations Team Leader in Lowland, NC reviews the areas where teams will go door-to-door in Pamlico Country to reach survivors after Hurricane Irene. September 20, 2011. Source: Marilee Caliendo / FEMA News Photo. (Third row, from left): 1) Local volunteers load sandbags on a truck as they prepare to help efforts at levees in Winfield, MO, June 18th, 2008. Source: FEMA Media Library. 2) Pueblo, CO Fire Department runs decontamination drill. Source: FEMA Facebook. (Fourth row): FEMA Corps member working with community member. Source: FEMA Media Library.

P38: Helicopter combats California wildfires with water. Source: FEMA Media Library.

P41: (First row, from left): 1) FEMA phone application distributes updates on weather and other emergency events. Source: FEMA Media Library. 2) Virginia Task Force 1 in St. Croix, U.S, Virgin Islands. September 23, 2017. Source: FEMA Media Library. (Second row): Region VIII Geographic Operations Branch work together in the aftermath of Hurricane Florence. 2018. Source: Daniel R. Green. (Third row): FEMA Logistics specialist and Army staff at Dobbin Reserve Airforce Base. Atlanta, GA. September 16, 1999. Source: Andrea Booher / FEMA. (Fourth row, from left): 1) Members of FEMA's Urban Search and Rescue Nebraska Task Force One rescue people and pets. Source: FEMA Facebook. 2) A rescue squad prepares to help disaster survivors out of a helicopter and into waiting wheelchairs. Source: FEMA Facebook.

P42: A FEMA staff member surveys damage to several houses from a hurricane. Source: FEMA Facebook.

P45: (First row): FEMA-Ogala Sioux signing ceremony for DR-4237 in Pine Ridge, SD. 2015. Source: Christopher Mardorf. (Second row, from left): 1) A Disaster Survivor Assistance crew member takes down survivor information using a tablet. Source: FEMA Facebook. 2) FEMA Russian linguist and community relations specialists begin to canvass a neighborhood with a large Russian population in the aftermath of Hurricane Sandy. New York, NY. December 20, 2012. Source: Ed Edahl. (Third row, from left): 1) FEMA mitigation specialists at a local home improvement stores in Louisiana answering questions and providing tips to rebuild safer and stronger. Source: FEMA Facebook. 2) Mitigation team leader answers questions from a local TV news reporter in Dothan, AL, January 6, 2001. Source: Jason Pack / FEMA. (Fourth row, from left): 1) Roofing contractors apply and affix FEMA supplied blue tarp sheets onto a local home in Naples, FL. September 16, 2017. Source: Kenneth Bolton. 2) FEMA Region II Community Planning and Capacity Building Regional Coordinator is speaking with a community stakeholder to solicit ideas for the development of an island-wide recovery plan for St. Croix. Christiansted, St. Croix. April 18, 2018. Source: Matthew Campbell / FEMA CPCB Recovery Support Function.

P46: A sign thanks FEMA employees for their work. Source: FEMA Media Library.

Chapter 5: Guiding Principles

P48 Accessibility: A FEMA Application Services Program specialist speaks with a survivor using an assisted listening device at a FEMA Disaster Recovery Center. Source: FEMA Media Library.

P49 Accountability: First Cadre of Response Employees at the Transitional Recovery Office in Biloxi, MS take their oath before working in a range of long-term Hurricane Katrina recovery jobs throughout the coastal area. Source: FEMA Media Library. Empowerment: Earthquake simulator in Cordova, AK. Source: FEMA Facebook.

P50 Engagement: FEMA staff in West Virginia host a community town hall to ask questions about aid programs and recovery plans. Source: FEMA Media Library. Flexibility: Members of Indiana Task Force 1 search a neighborhood impacted by Hurricane Ike. 2008. Source: FEMA Media Library.

P51 Getting Results: FEMA Evacuation Team member in Washington, DC looks over Mt. Weather Fire and Rescue HAZMAT 21 truck on display at FEMA Headquarters during National Fire Prevention Week. October 5 - 11, 2008. Source: Barry Bahler / FEMA. Preparation: FEMA Staff reviews dates on a whiteboard for disaster planning. Source: FEMA Twitter.

P52 Stewardship: FEMA executive testifies to Congress on a hearing for the Agency's Integrated Public Alert and Warning System. Source: FEMA Media Library. Teamwork: FEMA personnel in Washington, DC at the National Response Coordination Center work side-by-side with other Federal agencies to help manage preparations for Hurricane Irene in 2016. Source: FEMA Media Library.

Images and content may be subject to copyright, and rights vary by jurisdiction.
Please contact FEMA for permission to use.



FEMA No. FP112-01
(FP-FEMA Policy)
Catalog No. 10314-1

Exhibit T



# Individual Assistance Program and Policy Guide (IAPPG)

## Version 1.1

## FP 104-009-03| May 2021



This page is intentionally blank.

# Table of Contents

Individual Assistance Program and Policy Guide (IAPPG) ...................................................................1

Version 1.1 ..........................................................................................................................................1

Chapter 1: Introduction .......................................................................................................................3

   I.      Presidential Declarations .............................................................................................................3

      A. Types of Assistance ................................................................................................................3

      B. Federal Cost Share ..................................................................................................................5

      C. Type of Incident ......................................................................................................................5

      D. Incident Period ........................................................................................................................5

      E. Designated Areas .....................................................................................................................5

      F. FEMA-State/Territory/Tribe Agreement ..................................................................................5

   II.     Individual Assistance Programs Overview ...................................................................................6

      A. Chapter 2: Mass Care/Emergency Assistance .........................................................................6

      B. Chapter 3: Individuals and Households Program Assistance ....................................................6

      C. Chapter 4: Disaster Case Management (DCM) ........................................................................8

      D. Chapter 5: Crisis Counseling Assistance and Training Program (CCP) ...................................8

      E. Chapter 6: Disaster Legal Services (DLS) ...............................................................................8

      F. Chapter 7: Disaster Unemployment Assistance(DUA) .............................................................9

      G. Chapter 8: Voluntary Agency Coordination ............................................................................9

   III.    Sequence of Delivery ................................................................................................................10

   IV.    Federal Requirements for IA Programs ......................................................................................12

      A. Reasonable Accommodations ................................................................................................12

      B. Privacy Act ...........................................................................................................................12

      C. Nondiscrimination Requirements under the Stafford Act and Federal Civil Rights Authorities .........12

      D. Environmental Planning and Historic Preservation ................................................................13

      E. Program Delivery Considerations ..........................................................................................13

Chapter 2: Mass Care/Emergency Assistance ....................................................................................16

   I.      Overview ..................................................................................................................................16

      A. Period of Assistance ..............................................................................................................16

      B. Types of Assistance ...............................................................................................................17

      C. General Eligibility Requirements ...........................................................................................17

      D. Delivering Mass Care and Emergency Assistance MC/EA ....................................................17

   II.     Sheltering Support ....................................................................................................................19

      A. Description of Assistance .......................................................................................................19

      B. Partner Organizations ............................................................................................................19

      C. Triggers for Implementation ..................................................................................................19

      D. Delivery of Assistance ...........................................................................................................20

   III.    Feeding Support .......................................................................................................................22

A. Description of Assistance ................................................................................................22

B. Partner Organizations ....................................................................................................22

C. Triggers for Implementation ..........................................................................................22

D. Delivery of Assistance ...................................................................................................22

IV.    Distribution of Emergency Supplies Support ..................................................................25

A. Description of Assistance ................................................................................................25

B. Partner Organizations ....................................................................................................25

C. Triggers for Implementation ..........................................................................................26

D. Delivery of Assistance ...................................................................................................26

V.    Disability, Access, and Functional Needs Support ..........................................................28

A. Description of Assistance ................................................................................................28

B. Partner Organizations ....................................................................................................28

C. Triggers for Implementation ..........................................................................................28

D. Delivery of Assistance ...................................................................................................28

E. Personal Assistance Services ..........................................................................................29

VI.    Reunification Services .....................................................................................................31

C. Triggers for Implementation ..........................................................................................31

D. Delivery of Assistance ...................................................................................................31

E. National Emergency Child Locator Center .....................................................................33

VII. Household Pets, Service Animals, and Assistance Animals ...............................................34

A. Description of Assistance ................................................................................................34

B. Partner Organizations ....................................................................................................34

C. Triggers for Implementation ..........................................................................................34

D. Delivery of Assistance ...................................................................................................34

VIII.    Mass Evacuee Support ..................................................................................................36

A. Description of Assistance ................................................................................................36

B. Partner Organizations ....................................................................................................36

C. Triggers for Implementation ..........................................................................................36

D. Delivery of Assistance ...................................................................................................36

IX.    Transitional Sheltering Assistance ..................................................................................38

A. Description of Assistance ................................................................................................38

X.    Rapid Temporary Repair (Operation Blue Roof) Program .............................................39

A. Description of Assistance ................................................................................................39

B. Partner Organizations .....................................................................................................39

C. Eligibility Considerations ...............................................................................................39

D. Delivery of Assistance ...................................................................................................39

XI.    National Mass Care Exercise .........................................................................................40

A. Description of Exercise ...................................................................................................40

B. Application Process .........................................................................................................40

C. Implementation of Exercise ................................................................................................40

**Chapter 3: Individuals and Households Program** .................................................................41

I.     Individuals and Households Program Overview ...............................................41

    A. Period of IHP Assistance ..............................................................................................41

    B. Amount of IHP Assistance ............................................................................................41

    C. Types of IHP Assistance ...............................................................................................43

II.    Individuals and Households Program Eligibility ..............................................46

    A. General IHP Eligibility .................................................................................................46

    B. Additional Eligibility Considerations ...........................................................................55

    C. Appeal Process ..............................................................................................................66

III.    Delivering Individuals and Households Program Assistance ...........................69

    A. Applying for FEMA IHP Assistance ............................................................................69

    &bull;   Internet or Smartphone Application: ..........................................................................69

    &bull;   Extensions of the Registration Period: .......................................................................70

    B. Verifying Losses ...........................................................................................................72

    C. Applicant Communication .............................................................................................75

IV.    Housing Assistance (Financial) ........................................................................78

    A. Lodging Expense Reimbursement .................................................................................78

    B. Rental Assistance ..........................................................................................................80

    C. Continued Temporary Housing Assistance ...................................................................81

    D. Rental Assistance Rate Increase ...................................................................................85

    E. Home Repair Assistance ...............................................................................................85

    F. Privately-Owned Access Routes ...................................................................................89

    G. Home Replacement Assistance .....................................................................................91

V.    Housing Assistance (Direct) .............................................................................93

    A. Direct Housing Assessment ..........................................................................................93

    B. Direct Temporary Housing Assistance Request and Approval .....................................94

    C. Direct Temporary Housing Assistance Conditions of Eligibility .................................96

    D. Direct Temporary Housing Assistance Terms and Conditions .....................................98

    E. Multi-Family Lease and Repair ..................................................................................107

    F. Transportable Temporary Housing Units and Site Types ...........................................112

    G. Disposing of TTHUs through Sales to Occupants and Donations ..............................119

    Determining the Price of the Unit: ...................................................................................120

    H. Direct Lease .................................................................................................................124

    I.    Permanent Housing Construction ..............................................................................127

VI.    Other Needs Assistance ..................................................................................145

    A. ONA Options and Cost Shares ...................................................................................145

    B. Non-Small Business Administration-Dependent ........................................................149

    C. SBA-Dependent ..........................................................................................................166

VII.    Recovery of Program Funds ...........................................................................176
   A. Reasons for Recovery of Funds ..............................................................178
   B. Identifying and Verifying Potential Debts ..............................................178
   C. Notice of Potential Debt and Appeal Process .........................................179
   D. Debt Compromise, Suspension, or Termination .....................................180
   E. Transfer of Debt to Treasury ..................................................................182
   F. Statute of Limitations .............................................................................182

Chapter 4: Disaster Case Management .......................................................................183
  I.    Overview ...............................................................................................183
   A. Overview of Services to Survivors ..........................................................183
   B. Program Types .........................................................................................185
   C. Waivers to Existing Program Policy ........................................................185
   D. Authorities ...............................................................................................185
  II.    Immediate Disaster Case Management ....................................................186
   A. IDCM Period of Assistance .....................................................................186
   B. Transition to Non-Federal Entity DCM Federal Award Program .............186
   C. Congressional Notification Process .........................................................187
  III.    Disaster Case Management Program .......................................................188
   A. Period of Assistance ................................................................................188
   B. General Conditions of Eligibility for a DCM Federal award ....................188
   C. DCM Award Roles and Responsibilities ..................................................189
   D. Pre-Award Requirements for DCM ..........................................................191
   E. Notice of Award (NOA) ...........................................................................196
   F. Post-Award Requirements for DCM .........................................................197

Chapter 5: Crisis Counseling Assistance and Training Program .................................203
  I.    Overview ...............................................................................................203
   A. Overview of Services to Survivors ..........................................................203
   B. Crisis Counseling vs. Traditional Mental Health Treatment ....................205
   C. Services Funded Through the CCP ..........................................................206
   D. General Conditions of Eligibility for a Federal CCP Award .....................207
   E. Waivers to Existing Policy ......................................................................207
   F. Authorities ...............................................................................................207
   G. Partner Organizations .............................................................................207
   H. Types of Assistance .................................................................................208
  II.    Immediate Services Program ..................................................................209
   A. Period of Assistance for ISP ....................................................................209
   B. Pre-Award Assessment and Application ..................................................209
   C. Approval Process for ISP .........................................................................214
   D. Notice of Award (NOA) for ISP ..............................................................215

E. Post-Award Requirements ..................................................................................... 215

F. Closeout and Records Retention .......................................................................... 217

III.    Regular Services Program ................................................................................. 218

A. Period of Assistance for RSP ............................................................................... 218

B. Pre-Award Assessment and Application ............................................................. 218

C. Approval Process for RSP .................................................................................... 222

D. Notice of Award (NOA) for RSP ......................................................................... 223

E. Post-Award Requirements ................................................................................... 224

F. Closeout and Records Retention .......................................................................... 226

IV.    Considerations for Implementation of ISP and RSP ........................................ 228

A. Main Components of a Program Management Plan ............................................. 228

B. Media and Marketing the CCP ............................................................................. 228

C. Staffing of the CCP .............................................................................................. 229

D. Data Collection, Evaluation, and Reporting ....................................................... 230

E. Quality Assurance ................................................................................................ 230

F. General Provisions ............................................................................................... 231

G. Modifications to Budget and Program Plans ...................................................... 232

H. Appeals ................................................................................................................ 233

I.    Procurement Requirements under a Federal Award ........................................ 233

Chapter 6: Disaster Legal Services ................................................................................ 235

I.    Overview ............................................................................................................ 235

A. Period of Assistance ............................................................................................ 235

B. Types of Assistance ............................................................................................. 235

C. Authorities ........................................................................................................... 236

D. Partner Organizations .......................................................................................... 236

E. Conditions of Eligibility ...................................................................................... 236

II.    Delivery of Services .......................................................................................... 237

A. Program Approval Process ................................................................................... 237

Chapter 7: Disaster Unemployment Assistance ............................................................ 239

I.    Overview ............................................................................................................ 239

A. Period of Assistance ............................................................................................ 239

B. Types of Assistance ............................................................................................. 239

C. Application Process .............................................................................................. 239

D. Congressional Notification Process ..................................................................... 240

E. Conditions of Eligibility ...................................................................................... 241

II.    Delivery of Services .......................................................................................... 243

Chapter 8: Voluntary Agency Coordination .................................................................. 244

I.    Overview ............................................................................................................ 244

A. Voluntary Agency Coordination .......................................................................... 244

II.     Responsibilities of FEMA Voluntary Agency Liaisons .................................................245

   A. National Response Coordination Center .................................................................245

   B. Non-Declared Disasters ..........................................................................................245

   C. Emergency Declarations and Public Assistance .....................................................245

   D. Volunteer and Donations Management ...................................................................246

Appendix A: Section 425 Transportation Assistance ...........................................................248

   I.     Authorizing Section 425 Transportation Assistance ...............................................248

   A. Conditions of Eligibility .........................................................................................248

   B. Eligible Expenses ....................................................................................................249

   C. Limitations and Exclusions .....................................................................................249

Appendix B: Individual Assistance Program and Assistance Approvals ..............................250

Appendix C: Individual Assistance Policy Supersession ......................................................254

Appendix D: Federal Civil Rights Authorities Applicable to Recipients of Federal Financial Assistance....................255

Appendix E: DCM - Allowable and Unallowable Costs .......................................................258

Appendix F: CCP – Allowable and Unallowable Costs ........................................................259

Appendix G: Environmental Planning and Historic Preservation Compliance .....................266

Appendix H: Definitions ........................................................................................................270

Appendix I: Abbreviations and Acronyms ............................................................................274

   Endnotes ..............................................................................................................................282

# Foreword

On behalf of the Federal Emergency Management Agency (FEMA), I am pleased to present Version 1.1 of the *Individual Assistance Program and Policy Guide* (IAPPG). The IAPPG consolidates information on Individual Assistance (IA) programs offered by FEMA to a state, local, territorial, or tribal government jurisdiction affected by a disaster.

The IAPPG will:

- Supersede IAPPG Version 1.0 and the policy changes to the Individuals and Households Program resulting from the Disaster Recovery Reform Act of 2018, Section 1212 Memorandum, dated March 25, 2019;

- Provide an updated guide to programs and activities available to an affected state, local, territorial, or tribal government following a disaster; and

- Increase consistency in implementation, collaboration in planning, and the sharing of knowledge between state, local, territorial, or tribal governments, FEMA, and other Federal and non-Federal entities who assist disaster survivors.

The IAPPG will not replace the existing National Emergency Management Information System (NEMIS) business rules or internal technical manuals, as these describe FEMA's internal processes and business rules for FEMA staff.

FEMA has archived the policy, program guide, and activity documents listed in Appendix C. These policy and guidance documents remain in effect for incidents declared prior to May 26, 2021. The policies reflected in this guide are effective for incidents declared on or after May 26, 2021. Any waivers to policy contained in this document must be submitted, with justification, to the IA Division Director for consideration and approval.

IAPPG Version 1.1 incorporates the following substantive updates:

### List of Major Changes and Clarifications Grouped by General Topic

| Administrative |
| --- |
| Added Stafford Act requirement regarding **distribution of supplies** |
| Removed the **National Mass Evacuation Tracking System** (NMETS) section since it was decommissioned in September 2020 |
| Updated **Request for Federal Assistance** (SF-424) definition to include the required **signatories** (*Figure 42: RSP Application Required Information and Documents*) |
| Added **Assurances** for **Non-Construction Programs** (SF-424B) (*Figure 42: RSP Application Required Information and Documents*) |
| Updated Delegation of IA Authorities to include the **Crisis Counseling Program** (CCP) **Immediate Services Program** (ISP) (*Figure 44: Delegation of IA Authorities*) |
| Clarified language to specify that FEMA Regional Administrators (RAs) may **further delegate** some of their **approval authority** to Federal Coordinating Officers (FCOs), with the exception of Transitional Sheltering Assistance, Crisis Counseling Program, Disaster Case Management, and Disaster Unemployment Assistance (*Appendix B: Individual Assistance Program and Assistance Approvals*) |
| Added *Appendix G: Environmental Planning and Historic Preservation Compliance* |

Foreword

## Incorporation of Disaster Recovery Reform Act of 2018

Added reference to the **separate financial assistance maximum** award amounts for Housing Assistance and Other Needs Assistance (*Chapter 3: I.B. Amount of IHP Assistance*)

Added reference to specific **disaster-damaged accessibility real property** items that can be paid in addition to the financial assistance maximum award amount for Housing Assistance (*Chapter 3: IV.E. Home Repair Assistance*)

Updated **Multi-Family Lease and Repair** property **eligibility requirements** to include those located in an undeclared county/jurisdiction in the event MLR properties are not available within areas designated for IA (*Chapter 3: V.E.1. Multi-Family Lease and Repair*)

Added reference to updated **two-tier approval** process for determining cost-effectiveness of **Multi-Family Lease and Repair** properties (*Chapter 3: V.E.2. Multi-Family Lease and Repair*)

Added reference to specific **disaster-damaged accessibility personal property** items that can be paid in addition to the financial assistance maximum award amount for Other Needs Assistance (*Chapter 3: VI.A.1. Amount of Assistance*)

Added reference to the **increase** of the **Group Flood Insurance Policy premium** to $2,400 for all policies issues for an emergency or major disaster on or after August 1, 2019 (*Chapter 3: VI.C.3. Group Flood Insurance Policy*)

Incorporated language on FEMA's **waiver authority for debts** that meet specific criteria (*Chapter 3: VII. Recovery of Funds*)

## Mass Care/Emergency Assistance

Added **service animal guidance** for shelter operators (*Chapter 2: II.D. Delivery of Assistance*)

Adjusted **declaration language** under **Sheltering** section to specify that local governments cannot request declarations. Declarations may only be requested by states, tribes, and territories. (*Chapter 2: II.D. Delivery of Assistance*)

## Individuals and Households Program

Clarified that owners living in **Limited Liability Company** owned properties may be eligible for Home Repair Assistance or Home Replacement Assistance if they provide appropriate documentation (*Chapter 3: II.B.2. Limited Liability Company*)

Updated definition for **non-traditional housing** (*Chapter 3: II.B.10. Non-Traditional Housing*)

Delegated approval authority for **Rental Assistance rate increases** above 125% to the Individual Assistance Division Director (*Chapter 3: IV.D. Rental Assistance Rate Increase*)

Updated the **real property verified loss threshold** to $12 per square foot (*Chapter 3: V.C.1. Direct Temporary Housing Assistance Conditions of Eligibility*)

Expanded alternative **documentation required** for a **direct housing major violation** to allow other documented health and safety concerns (*Chapter 3: V.D.6. Direct Temporary Housing Assistance Terms and Conditions*)

Established the **requirement** that the applicant is responsible for any **existing pad rental costs** when FEMA provides a **Temporary Housing Unit** (TTHU) on the same site as an applicant's pre-disaster mobile home (*Chapter 3: V.F.2. Transportable Temporary Housing Units and Site Types*)

Foreword

| Individuals and Households Program |
|---|
| Established the **requirement** that FEMA will factor reasonable **eviction costs** into the **Direct Lease** contract (Chapter 3: V.H.2. *Direct Lease*) |
| Expanded **eligibility for chainsaw** reimbursement under Assistance for Miscellaneous Items (Chapter 3: VI.B.4. *Assistance for Miscellaneous Items*) |
| Updated **Moving and Storage Assistance** to a **non-Small Business Administration-dependent** category of Other Needs Assistance (Chapter 3: VI.B.5. *Moving and Storage Assistance*) |
| Expanded **Critical Needs Assistance eligibility** to include applicants who indicate at registration they need assistance to temporarily shelter elsewhere but have not yet left their home and other minor changes (Chapter 3: VI.B.6. *Critical Needs Assistance*) |
| Established a standard award of **$550** for **Clean and Removal Assistance** (Chapter 3: VI.B.7. *Clean and Removal Assistance*) |
| Updated **documentation required** to receive **Transportation Assistance** for a destroyed vehicle (Chapter 3: VI.C.2. *Transportation Assistance*) |

| Disaster Case Management |
|---|
| Included a timeframe of "within **60 days of receipt** of packet" for FEMA to respond to a non-federal entity's **Disaster Case Management** (DCM) application determination or request for clarifying information (Chapter 4: III.D.4. *Federal and Congressional Review Process*) |

| Crisis Counseling Assistance and Training Program |
|---|
| Updated **CCP eligibility** language to reflect that the state, tribal, or territorial government and FEMA must execute a FEMA-state/territorial/tribal agreement (Chapter 5: I.D. *General Conditions of Eligibility for a Federal CCP Award*) |
| Clarified **CCP ISP denial specifications** by indicating an application must be received within 14 days from the date IA was authorized in the major disaster declaration (Chapter 5: I.D. *General Conditions of Eligibility for a Federal CCP Award*) |
| Rephrased **CCP ISP** language to reflect **continuation** instead of extension (Chapter 5: II.E.3. *ISP Extension of the Period of Performance*) |
| Added and clarified language within **CCP ISP** and **Regular Service Program** (RSP) regarding **records retention and reporting** (Chapter 5: II.F.2. *Closeout and Records Retention*) |

| Voluntary Agency Coordination, and Community Services Changes |
|---|
| Clarified language describing the **Voluntary Agency Liaison's** (VAL's) **role** in supporting Long-Term Recovery Groups (LTRGs) through technical assistance (Chapter 1: II.G.2. *Voluntary Agency Coordination*) |

The preceding list is not inclusive of all changes to the document.

Additionally, on August 13, 2020, the Office of Management and Budget issued revisions to 2 C.F.R., including to the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards found at Part 200. Most of the updates were effective November 12, 2020, and are applicable to Stafford Act declarations made on or after November 12, 2020. The following updated regulations were effective August 13, 2020, and are applicable to Stafford Act declarations as follows:

- System for Award Management (SAM) registration requirements at 2 C.F.R. § 25.200 (applicable to declarations made on or after August 13, 2020);

- Covered telecommunications equipment and services at 2 C.F.R. § 200.216 (applicable to all open awards; declaration date not relevant);

- Termination at 2 C.F.R. § 200.340 (applicable to declarations made on or after August 13, 2020);

- Indirect cost rates at 2 C.F.R. § 200.110(b) (allows current rates to stay in effect until they expire; declaration date not relevant); and

- New regulations on indirect costs in 2 C.F.R. Part 200, Subpart E and applicable appendices (applies to new proposals or requests made on or after August 13, 2020; declaration date not applicable).

FEMA is undertaking an extensive review of FEMA-issued grant policies and guidance documents requiring updates due to the 2 C.F.R. revisions. However, it was not possible to incorporate relevant provisions into IAPPG Version 1.1, some guidance in this document will not reflect the most recent 2 C.F.R. revisions. Where policy guidance provided in this document contradicts 2 C.F.R., 2 C.F.R. must be followed (see Electronic Code of Federal Regulations).

FEMA will conduct a comprehensive review no less than every three years. If FEMA determines it necessary to publish new or updated policy language before the next scheduled update, FEMA will update the electronic version of this document, issue a memorandum describing the additions or updates, and post both documents at www.fema.gov.

Keith Turi

Assistant Administrator, Recovery

This page is intentionally left blank.

# Chapter 1: Introduction

The *Individual Assistance Program and Policy Guide* (IAPPG) consolidates information on all of FEMA's Individual Assistance (IA) programs and activities and provides a comprehensive policy resource for state,[1] local,[2] tribal,[3] and territorial (SLTT) governments, non-governmental organization partners, and entities that participate in or support the recovery of disaster survivors.

The Robert T. Stafford Disaster Relief and Emergency Assistance Act, as amended, (Stafford Act), Public Law 93-288, 42 U.S.C. § 5121 et seq.,[4] authorizes the President to provide Federal assistance when the magnitude of an incident or threat of an incident exceeds the affected SLTT government's capability to respond or recover.

## I. Presidential Declarations

When an STT government determines an incident has exceeded their capability to respond, the Governor or Tribal Chief Executive[5] may request a declaration from the President through FEMA. They must request the declaration within 30 days of the end of the incident. FEMA may extend the deadline if the Governor or Tribal Chief Executive submits a written time extension request within 30 days of the incident stipulating the reason for the delay.[6]

For FEMA to provide assistance, the President must declare that an emergency or major disaster exists. A declaration establishes the following:

- Types of assistance
- Federal cost share
- Type of incident
- Incident period
- Designated areas

*Images of flood-damaged homes.*

### A. Types of Assistance

The declaration designates the types of Federal programs and assistance available. The types of assistance approved vary based on disaster needs. Assistance may be made available to SLTT governments, certain types of Private Nonprofit (PNP) organizations and faith-based organizations, or to individuals and households. The types of programs and assistance made available for emergency and major disaster declarations include those of FEMA and other Federal agencies.

FEMA provides recovery assistance through IA, Public Assistance (PA), and the Hazard Mitigation Grant Program (HMGP). Through IA programs, FEMA provides assistance to individuals and households, as well as SLTT governments to support individual survivors.

Through PA programs, FEMA provides grants to SLTT governments and certain PNP organizations to assist them with disaster response and recovery, including debris removal, emergency protective measures, and permanent restoration of facilities. FEMA provides HMGP to SLTT governments after a disaster declaration to protect eligible public or private property through various mitigation measures. For more information on PA programs and HMGP, see the Public Assistance Program and Policy Guide (PAPPG), FP 104-009-2, Version 4, effective June 2020, and the Hazard Mitigation Assistance Grants Guidance.



*Above: A disaster-destroyed home.*
*Below: Volunteers repair a home.*

Programs are authorized based on the need of the disaster. IA programs made available under emergency declarations are limited to supplemental emergency assistance to the affected state, territory, or tribal (STT) government to provide immediate and short-term assistance essential to save lives, protect public property, health, and safety, or to lessen or avert the threat of a catastrophe. IA's Mass Care and Emergency Assistance program is always made available under an emergency declaration. Although rare, Individuals and Households Program (IHP) assistance under Section 408 of the Stafford Act may be made available under an emergency declaration.

All IA programs may be authorized once a major disaster has been declared by the President.[7] The approval of IA under a major disaster declaration may also activate assistance programs provided by other Federal agencies based on specific disaster needs. *Figure 1* displays the IA programs that may be provided under emergency declarations and major disaster declarations.

| Figure 1: Available IA Programs for Emergency and Major Disaster Declarations | | |
|---|---|---|
| **Individual Assistance Program** | **Emergency Declaration** | **Major Disaster Declaration** |
| Mass Care/Emergency Services | ✓ | ✓ |
| Individuals and Households Program | ✓ | ✓ |
| Disaster Case Management | | ✓ |
| Crisis Counseling Assistance and Training Program | | ✓ |
| Disaster Legal Services | | ✓ |
| Disaster Unemployment Assistance | | ✓ |
| Voluntary Agency Coordination[8] | ✓ | ✓ |

## B. Federal Cost Share

The assistance FEMA provides through its PA program and some types of IA are subject to a cost share. For IA, FEMA provides 100% of IHP Housing Assistance, Disaster Case Management (DCM), Disaster Unemployment Assistance (DUA), Disaster Legal Services (DLS), and Crisis Counseling and Training Program (CCP) costs.[9] However, IHP Other Needs Assistance (ONA) and Transitional Sheltering Assistance (TSA)[10] are subject to a cost share between FEMA and the STT government. FEMA covers 75% of eligible ONA and TSA costs, and the STT government is responsible for the remaining 25%. ONA cost share is fixed by statute. The TSA cost share adjustment may be approved by the President[11] on an individual disaster basis.

## C. Type of Incident

The declaration designates the type of incident (e.g., hurricane, tsunami, earthquake, etc.). An emergency declaration[12] is any instance the President determines warrants supplemental emergency assistance to the STT government to save lives and protect property, public health, and safety, or to lessen or avert the threat of a catastrophe.

A major disaster declaration is any natural catastrophe (e.g., earthquake, hurricane, flood, tornado, volcanic eruption, severe winter weather, storm surge, tsunami, wildfires, landslide, mudslide, extreme winter weather, snowstorm, high winds, ice storm, straight line winds, drought) or man-made hazards (e.g., fire, explosion, technological failure), regardless of cause, that produces damage of sufficient severity and magnitude in the President's determination to warrant supplemental assistance to an STT government.[13] Major disaster declarations may include a combination of incident types, including man-made and natural.

## D. Incident Period

The incident period[14] is established by FEMA in the FEMA-State/Territory/Tribe Agreement[15] and published in the Federal Register.[16] The incident period is the time interval during which the Presidentially-declared incident occurs, causing losses and/or damage. This period varies in length, depending on the incident.

## E. Designated Areas

The declaration designates which counties, parishes, tribes or tribal lands, municipalities, villages, or districts[17] are eligible to receive Federal assistance. The Governor, Governor's Authorized Representative (GAR), Tribal Chief Executive, or Tribal Chief Executive's Authorized Representative (TAR) may request the designation of additional areas within 30 days of the declaration or the end of the incident period, whichever is later.

## F. FEMA-State/Territory/Tribe Agreement

After every declaration, FEMA and the STT government enter into an agreement documenting the understanding, commitments, and conditions under which FEMA will provide assistance (FEMA-State/Territory/Tribe Agreement).[18] FEMA and the Governor or Tribal Chief Executive must sign this agreement before FEMA provides Other Needs Assistance.

The FEMA-State/Territory/Tribe Agreement incorporates the DHS Standard Terms and Conditions in effect on the date the event was declared. Among the DHS Standard Terms and Conditions are federal civil rights obligations applicable to recipients of federal financial assistance.[19] See Appendix D: Federal Civil Rights Authorities Applicable to Recipients of Federal Financial Assistance.

## II.    Individual Assistance Programs Overview

### A. Chapter 2: Mass Care/Emergency Assistance

#### 1. Overview

Mass Care and Emergency Assistance (MC/EA) is the provision of life-sustaining services to disaster survivors as defined in the National Response Framework. MC/EA services are provided immediately before a potential incident, during the immediate response to an incident, and during the beginning of the post-disaster recovery effort. To provide more effective coordination, FEMA may deploy MC/EA staff and resources to the National Response Coordination Center (NRCC), Regional Response Coordination Center (RRCC), FEMA Joint Field Office (JFO), and/or SLTT Emergency Operations Centers (EOC).

In the event of a Presidentially-declared disaster, all impacted survivors are eligible to receive MC/EA services.

#### 2. Types of Services and Delivery

MC/EA comprises seven services known as activities. Activities include: sheltering; feeding; distribution of emergency supplies; support for individuals with disabilities and others with access and functional needs; reunification services for adults and children; support for household pets, service animals, and assistance animals (HPSA); and mass evacuee support. In addition to these seven activities, MC/EA also supports the National Mass Care Exercise (NMCE) training program and offers partnerships through the Blue Roof Program and Transitional Sheltering Assistance (TSA).

MC/EA supports the whole community approach to emergency management. By engaging state, territorial, and tribal governments, National Voluntary Organizations Active in Disaster (National VOAD), and other various entities involved in delivering post-disaster aid, MC/EA increases capacity to meet the life-sustaining needs of survivors in catastrophic disasters. MC/EA coordinates the delivery of assistance for both pre-disaster preparedness and post-disaster emergency support to individuals. Pre-disaster technical assistance is provided to organizations critical in supporting mass care, including: FEMA's Response, Recovery, and Logistic Management Directorates; the National Preparedness Directorate; SLTT governments; FEMA Regions; and other Federal agencies.

### B. Chapter 3: Individuals and Households Program Assistance

#### 1. Overview

IHP assistance provides financial assistance and direct services to eligible individuals and households who have uninsured or underinsured necessary expenses and serious needs as a result of a Presidentially-declared disaster. IHP assistance is not a substitute for insurance and cannot compensate for all losses caused by a disaster; it is intended to meet basic needs and supplement disaster recovery efforts. IHP assistance is not considered income[20] or a resource when determining eligibility for welfare, income assistance, or income-tested benefit programs that the Federal Government funds, such as Social Security benefits or disability income. IHP assistance is also exempt from garnishment or seizure[21], but this exception does not apply to assistance recovered by FEMA after being received in error or fraud.

## 2. Types of Services and Delivery

IHP assistance comprises two provisions, Housing Assistance and Other Needs Assistance (ONA)[22]. Housing Assistance may be provided in the form of financial assistance (funds provided to an applicant) or direct assistance (housing provided to the applicant by FEMA). Examples of financial assistance include Lodging Expense Reimbursement (LER), Rental Assistance, Home Repair Assistance, and Home Replacement Assistance. Examples of direct assistance[23] include Multi-Family Lease and Repair (MLR); Transportable Temporary Housing Units (TTHUs), such as Recreational Vehicles (RVs) or Manufactured Housing Units (MHUs); Direct Lease; and Permanent Housing Construction (PHC).



Some types of ONA may only be provided if an applicant does not qualify for a disaster loan from the U.S. Small Business Administration (SBA)[24]; these are known as SBA-dependent types of ONA and include Personal Property Assistance, Transportation Assistance, and Group Flood Insurance Policy (GFIP). Non-SBA-dependent ONA includes Funeral Assistance, Medical and Dental Assistance, Child Care Assistance, Assistance for Miscellaneous Items, Moving and Storage Assistance, Critical Needs Assistance, and Clean and Removal Assistance.

*FEMA disaster assistance staff provide applicants information on FEMA programs.*

IHP assistance is limited to 18 months following the date of the Presidential disaster declaration;[25] however, FEMA may extend the period of assistance due to extraordinary circumstances.

## C. Chapter 4: Disaster Case Management (DCM)

### 1. Overview

DCM is a time-limited process that promotes partnership between a case manager and a disaster survivor in order to assess and address a survivor's verified disaster-caused unmet needs through a disaster recovery plan[26]. This disaster recovery plan includes resources, decision-making priorities, guidance, and tools to assist disaster survivors.

### 2. Types of Services and Delivery

FEMA is authorized to provide case management services, to include financial assistance, to SLTT government agencies or qualified private organizations (non-Federal entities), so that they may provide case management services to survivors in order to identify and address disaster-caused unmet needs.

## D. Chapter 5: Crisis Counseling Assistance and Training Program (CCP)

### 1. Overview

CCP[27] provides supplemental funding to eligible SLTT governments and non-governmental organizations to assist disaster-impacted individuals and communities in recovering from the major disasters through the provision of community-based outreach and psycho-educational services. The goal is to aid survivors in recovering from the adverse reactions to disasters and to begin to rebuild their lives.

### 2. Types of Service and Delivery

CCP services include funding for supportive crisis counseling, psycho-education, development of coping skills, and linkages to appropriate resources. CCP services are separated into two categories: primary and secondary. Primary services are high-intensity and include crisis counseling, public education, and community support. Secondary services are those that have a broader scope. These include the development and distribution of educational material as well as media and public service announcements.

CCP services are available through the Immediate Services Program (ISP) and the Regular Services Program (RSP). ISP provides funding for up to 60 days following a major disaster declaration with IA. RSP provides longer-term funding for up to nine months from the notice of award.

## E. Chapter 6: Disaster Legal Services (DLS)

### 1. Overview

DLS[28] provides legal aid to low income survivors affected by a Presidentially-declared major disaster through an agreement with the Young Lawyers Division (YLD) of the American Bar Association.

### 2. Types of Services and Delivery

DLS is limited to cases that would not normally incur legal fees. Typically, the types of legal assistance offered include help with insurance claims (e.g., health, property, or life), recovery or reproduction of legal documents lost in the disaster, help with home repairs and disputes with contractors and/or landlords, the preparation of powers of attorney and guardianship materials, and FEMA appeals.

## F. Chapter 7: Disaster Unemployment Assistance (DUA)

### 1. Overview

DUA[29] provides unemployment benefits and re-employment assistance services to survivors affected by a Presidentially-declared major disaster. These services are under the responsibility of the U.S. Department of Labor and administered by the SLTT government emergency management officials of the affected area(s). DUA is only available to those survivors who are not eligible for regular state unemployment insurance (UI).

### 2. Types of Services and Delivery

State law determines the amount of disaster unemployment assistance a survivor may receive, so the amount of assistance varies state-to-state and disaster-to-disaster. DUA is a finite assistance tool: benefits are usually paid for up to 26 weeks after the disaster declaration. The continuation of assistance is dependent upon the survivor's period of unemployment as a direct result of the disaster.

## G. Chapter 8: Voluntary Agency Coordination

### 1. Overview

Voluntary agencies are among the first to provide survivor support services post-disaster and continue throughout the recovery period; they complement Federally-provided assistance and may support gaps in coverage. FEMA's Voluntary Agency Coordination Section is staffed by personnel known as Voluntary Agency Liaisons (VALs). VALs establish and maintain relationships among Federal and SLTT governments, as well as voluntary, faith-based and community organizations active in preparedness, response, and recovery; coordinate with Voluntary Organizations Active in Disaster (VOAD) at the national, state, territorial, tribal, and local levels; assist with translating and navigating Federal programs for their stakeholders; provide technical guidance and support with donations, unaffiliated and spontaneous volunteer management; and collaborate with and support non-government organizations (NGOs) that deliver an array of disaster relief services to affected jurisdictions.

VALs are not a program-based function, thereby affording the flexibility to respond to Stafford Act declarations for Individual Assistance and Public Assistance, as well as non-Stafford Act events whereby technical expertise in convening social service organizations is needed to support other Federal agencies in times of crisis.

### 2. Types of Services and Delivery

FEMA VALs play a variety of roles in all types of disasters—IA disaster declarations, PA disaster declarations, and non-Presidentially-declared disasters—since these events are local and voluntary agencies are so often both the first and the last to provide assistance to survivors with immediate and unmet needs, FEMA VALs may support differently throughout the disaster lifecycle. They work to support this process by providing advice, perspective, and other forms of technical assistance to form and re-form Long-Term Recovery Groups (LTRGs) and helping to identify community-based, faith-based, voluntary, and private sector organizations to help fill gaps. They also gather, evaluate, and distribute information including damage assessments and other situational awareness that helps identify and predict needs, resources, stakeholders, community leaders, and organizations to support the long-term recovery process.

## III.  Sequence of Delivery

The sequence of delivery establishes the order in which disaster relief agencies and organizations provide assistance to disaster survivors.[30] A clear sequence of delivery prevents duplication of benefits, maximizes available resources, and organizes efforts to help disaster survivors navigate the recovery process.

*Figure 2* shows the sequence of delivery after a disaster.

**Figure 2: Disaster Assistance Sequence of Delivery**

*\*Eligibility for Federal assistance is based on each applicant's individual circumstances as they relate to each program's conditions of eligibility. Not all applicants will be eligible for all forms of Federal assistance.*

*Figure 3* shows a timeline of IA programs.

**Figure 3: Timeline of Individual Assistance Programs**



**Mass Care and Emergency Assistance (MC/EA)**

**1** The seven MC/EA activities begin immediately before or immediately after a disaster incident.

**2** Blue Roof Program provides a free temporary roof from USACE to provide survivors short-term relief until the homeowner can make permanent repairs.

**3** Transitional Sheltering Assistance may be authorized by the Assistant Administrator (AA) for Recovery up to 180 days from the date of Declaration.

**Individuals and Households Program (IHP)**

**1** Initial Registration for IHP Assistance starts on the date Individual Assistance was designated for the declaration and runs for 60 days.

**2** The Regional Administrator (RA) may extend the initial registration period.

**3** FEMA will accept late registrations for IHP for an additional 60 days after the initial registration period with extenuating circumstances.

**4** IHP Assistance lasts for a period of up to 18 months.

**Disaster Case Management (DCM)**

**1** Application deadline no later than 90 days after the IA declaration.

**2** DCM funding may continue for up to 24 months from the date of the major disaster declaration.

**Presidential Disaster Declaration**

Steady State
Emergency Response
Short-Term Recovery
Long-Term Recovery

**Crisis Counseling Assistance and Training Program (CCP)**

**1** Immediate Service Program (ISP) Application deadline is 14 days from the date of the major disaster declaration with IA.

**2** ISP services last up to 60 days from the date of the major disaster declaration with IA.

**3** Regular Service Program (RSP) application is due no later than 60 days after the date of declaration.

**4** RSP services last up to 9 months from the date of the notice of award.

**Disaster Legal Services (DLS)**

**1** DLS may be available to survivors after a major disaster declaration with IA.

**Disaster Unemployment Assistance (DUA)**

**1** Applications for DUA begin after a disaster declaration and close 30 days from the date of the public announcement of DUA availability.

**2** Applicants have 21 calendar days from the time a claim is filed to provide proof of employment.

**3** DUA benefits may be paid for no longer than 26 weeks beginning the first week following a major disaster declaration with IA.

**Voluntary Agency Coordination**

**1** Voluntary Agencies are the first support services immediately before or directly after a disaster and continue throughout the response and recovery phases.

**2** Voluntary Agencies provide support after Federal and State services have ended.

# IV.    Federal Requirements for IA Programs

## A. Reasonable Accommodations

FEMA makes reasonable accommodations to policies, practices, and procedures to ensure physical, programmatic, and effective communication access to FEMA disaster assistance. For example, FEMA may provide technologies and services to ensure effective communication with applicants with limited English proficiency (LEP), qualified applicants with disabilities, and others with access and functional needs.
For additional information, see Chapter 1, IV. E.

### Reasonable Accommodations

Applicants may request reasonable accommodations to access FEMA programs and services at any time, including during registration, inspection, community meetings, briefings, or any other event when FEMA is present.

## B. Privacy Act

Determining eligibility for FEMA assistance requires applicants to provide personal information, such as a Social Security Number (SSN), home address, and household income.

The Privacy Act of 1974 regulates how FEMA collects, uses, and discloses an applicant's personal information in order to protect the privacy of the applicant. For example, FEMA employees and contractors will always verify an applicant's identity before discussing eligibility or potential assistance.

All FEMA staff and contractors will present an identification badge to ensure applicants know they are providing private information to a trusted FEMA representative.

### Privacy Act

The Privacy Act of 1974 protects the applicant's rights as to how FEMA uses and shares personal information. The Stafford Act and other authorities allow FEMA to collect personal information to determine eligibility and administer FEMA disaster assistance as a result of an Emergency or a Presidentially-declared disaster. Information shared with other Federal agencies will not be used for any purpose other than assisting the applicant's recovery, preventing duplication of benefits, or informing other disaster recovery programs.

FEMA may share the applicant's information outside of FEMA with entities such as state, territorial, tribal, and local governments, voluntary organizations, and other organizations in accordance with published routine uses identified in *DHS/FEMA-008 Disaster Recovery Assistance Files System of Records Notice*. FEMA shares this information to enable the applicant to receive additional disaster assistance, prevent a duplication of benefits, and prevent future disaster losses.

## C. Nondiscrimination Requirements under the Stafford Act and Federal Civil Rights Authorities

Sections 308 and 309 of the Stafford Act, and Section 504 of the Rehabilitation Act of 1973[31] have nondiscrimination provisions applicable to FEMA programs and prohibit discrimination on the grounds of race, color, religion, [national origin], sex, age, disability, English proficiency, or economic status. FEMA also has civil rights obligations under Executive Order 13166, "Improving Access to Services for Persons with Limited English Proficiency," and Executive Order 12898, "Environmental Justice in Minority and Low-Income Populations." Additionally, Title VI of the Civil Rights Act, Section 504 of the Rehabilitation Act, Title IX of the Education Amendments Act, and the Age Discrimination Act have similar nondiscrimination provisions applicable to FEMA recipients.

Section 504 of the Rehabilitation Act requires that FEMA and FEMA recipients, including SLTT partners, ensure nondiscrimination for individuals with disabilities by providing equal access to programs, physical accessibility of facilities, effective communications, and reasonable accommodations. Non-federal recipients of financial assistance from FEMA have an obligation to take reasonable steps to provide meaningful access to persons with limited English proficiency, as required by Title VI of the Civil Rights Act of 1964 and FEMA's implementing regulations. This requirement is similar to FEMA's obligation under Executive Order 13166 to individuals with limited English proficiency.

## D. Environmental Planning and Historic Preservation

Federal Environmental Planning and Historic Preservation (EHP) laws, regulations, and executive orders (EOs) establish requirements to protect the environment and preserve historical and cultural resources. Federally-funded IA grants and programs are subject to compliance with EHP compliance requirements, including but not limited to, the National Environmental Policy Act; EO 11988 Floodplain Management; EO 11990, Protection of Wetlands; Endangered Species Act; and the National Historic Preservation Act.

FEMA addresses EHP compliance requirements early in the project scoping and development stages to minimize delays and additional costs. In addition, FEMA works with other Federal agencies and SLTT governments to identify opportunities for implementing measures for the conservation of threatened and endangered species, as well as their designated critical habitat, when appropriate and feasible. EHP compliance may require modification to a project's scope of work, consideration of alternate site locations, and obtainment of applicable permits. See Appendix G: Environmental Planning and Historic Preservation for a description of common EHP laws, regulations, and EOs.

## E. Program Delivery Considerations

FEMA is responsible for addressing and fulfilling requests for disability access and language access from applicants, including during housing inspections, in an effective and timely manner.

> **Definitions**
>
> The terms "Individual with a Disability" and "Access and Functional Needs" are not synonymous and should not be used interchangeably. The terms have the following meaning:
>
> **Individual with a Disability**: Individual who has a physical or mental impairment that substantially limits one or more major life activities (an "actual disability"), or a record of a physical or mental impairment that substantially limits a major life activity ("record of"), or an actual or perceived impairment, whether or not the impairment limits or is perceived to limit a major life activity, that is not both transitory and minor ("regarded as"). Individuals with disabilities have civil rights protections that may not be waived under any circumstances, including throughout emergencies and disasters.
>
> **Access and Functional Needs**: Individuals having access and functional needs may include, but are not limited to, people with disabilities, older adults, and individuals with limited English proficiency, limited access to transportation, and/or limited access to financial resources to prepare for, respond to, and recover from the emergency. Federal civil rights law and policy require nondiscrimination, including on the basis of race, color, national origin, religion, sex, age, disability, English proficiency, and economic status. Many individuals with access and functional needs are protected by these provisions.

## 1. Applicants with Disabilities

Under Section 504 of the Rehabilitation Act of 1973 and Section 308 of the Stafford Act[32], FEMA is required to provide reasonable accommodations or modifications, to policies, practices, and procedures to ensure equal access to qualified applicants with disabilities. Reasonable accommodations may include the provision of technologies and services to ensure equal access to disaster assistance.

Disaster survivors with disabilities have a right to equal access to FEMA programs and activities, including FEMA's registration process and housing inspections, physical access to facilities, and effective communication. FEMA provides reasonable accommodations or program modifications to provide access to qualified individuals with disabilities under Section 504 of the Rehabilitation Act and under Section 308 of the Stafford Act. When providing a modification to ensure effective communication with and between qualified individuals with disabilities, FEMA will give primary consideration to the auxiliary aid requested by each individual with the disability.

FEMA may also provide effective communication access to applicants with disabilities. Effective communication access and program access may include, but is not limited to:

- American Sign Language (ASL) interpreter

- Video Relay Interpreting (VRI)

- Assistive listening devices

- Assistive reading devices

- Braille/large print documents

- Reading assistance services

- Accessible DRCs that comply with the Architectural Barriers Act and Section 504 of the Rehabilitation Act, to include: wheelchair accessibility into the facility, accessible restrooms, and accessible paths of travel from the parking lot and throughout the facility, as well as technology to provide effective communication access to individuals with disabilities

- ASL interpreters and/or Communication Access Real-time Translation (CART) at DRCs and public/community outreach events, upon request, and field staff equipped with tablet computers that can access VRI for applicants who use ASL Assistance and program modification for applicants having difficulty understanding the registration process, denial letters, or the appeal process

## 2. Applicants with Limited English Proficiency

FEMA ensures all applicants receive critical, accessible, and understandable disaster assistance communications, regardless of language proficiency. Under Sections 308 and 616 of the Stafford Act and Executive Order 13166, "Improving Access to Services for Persons with Limited English Proficiency," FEMA must provide applicants with limited English proficiency (LEP) meaningful access to its programs and services.[33]

Applicants with LEP are entitled to communicate with FEMA and receive information from FEMA in a language other than English.

To best assist applicants with LEP, FEMA provides all the following:

- Disaster information and multi-lingual signage in languages identified through demographic analysis of the impacted area;

- Translation and interpretation services (provided by qualified translators and interpreters) available in 250 languages to assist non-English-speaking disaster survivors;

- Staff to identify language needs and connect disaster survivors to applicable translation services by qualified translators;

- Appropriate referrals for applicants with disabilities and others with access and functional needs who also have LEP; and

- Spanish language instructions through https://www.disasterassistance.gov/es where individuals can register for assistance.

# Chapter 2: Mass Care/Emergency Assistance

## I. Overview

FEMA Mass Care/Emergency Assistance (MC/EA) provides coordination and support to state, local, tribal, and territorial (SLTT) governments and/or jurisdictions for the provision and/or direct delivery of life-sustaining services to disaster survivors as defined in the National Response Framework, Emergency Support Function #6 (ESF #6).[34] The National Mass Care Strategy—the strategy which underlies capacity development for and deployment of MC/EA services—was developed in partnership with the American Red Cross and other mass care practitioners and serves as a Federal guide for the provision of national mass care capability. FEMA is committed to supporting the further development and implementation of the strategy and its goals by:

- Providing technical assistance such as planning support, subject matter expertise, etc.;

- Financing invitational travel and supporting National Mass Care Exercises;

- Hosting webinars;

- Co-branding guidance documents and tools; and

- Serving as the convener and facilitating the engagement of the public and private sector in the creation of multi-agency guidance and templates.

In support of its mission, MC/EA may deploy staff and resources to the National Response Coordination Center (NRCC), Regional Response Coordination Center (RRCC), FEMA Interim Operation Facility (IOF), FEMA Joint Field Office (JFO), FEMA Area Field Office (AFO), SLTT government Emergency Operations Center (EOC), and/or other field assignment settings.

During Presidentially-declared disasters, most MC/EA services are funded under the Stafford Act Section 403[35] subject to the applicable cost share. Section 403 assistance for MC/EA services may be provided via Direct Federal Assistance (DFA).

### A. Period of Assistance

MC/EA services may be provided before a potential incident, during the immediate response to an incident, and during the recovery phase after a disaster or incident.



*FEMA Mass Care Specialist and Southern Baptist Disaster Relief nurse place donated respirators in a storage unit in Moore, Oklahoma following tornados.*

## B. Types of Assistance

FEMA MC/EA is responsible for the coordination of seven activities or services detailed under the MC/EA functions of ESF #6 and has a unique partnership with the American Red Cross as the co-lead agency for the Mass Care component of ESF #6. The seven activities included are:

- Sheltering (congregate and non-congregate);

- Feeding;

- Distribution of emergency supplies (including but not limited to, medications, baby diapers and formula, clothing from donation management, Commonly Used Shelter Items (CUSI), mobile feeding, meal preparation kits, and other commodities);

- Support to individuals with disabilities and others with access and functional needs;

- Reunification services for adults and children;

- Support to HPSA; and

- Mass evacuee support.



In addition to these seven activities, FEMA MC/EA supports training and exercises, like the National Mass Care Exercise (NMCE) and also provides partnered assistance through:

- Transitional Sheltering Assistance (TSA)

- Blue Roof program (United States Army Corps of Engineers [USACE])

*US Army Corps of Engineers' Blue Roof Program helps to prevent further damage to structures as a result of Hurricane Katrina in Biloxi, Mississippi.*

## C. General Eligibility Requirements

All survivors impacted by a disaster are eligible to receive MC/EA services. There is no application process for MC/EA services as these are most often life sustaining. These programs will be delivered directly to disaster survivors and impacted communities typically through SLTT partners and nonprofits with technical assistance and resource support from FEMA. Two notable exceptions to this general rule are the TSA (See Chapter 2, IX) and the Blue Roof Program (See Chapter 2, X), which do have specific eligibility criteria.

## D. Delivering Mass Care and Emergency Assistance MC/EA

FEMA MC/EA coordinates and supports assistance for both pre-disaster preparedness and post-disaster emergency support to individuals through other FEMA divisions, Federal agencies, partner SLTT governments, and non-governmental organizations (NGOs).

Pre-disaster technical assistance is provided to:

- FEMA's Response, Recovery, and Logistics Management Directorates in the development of national and regional response and recovery operational plans, catastrophic plans, and other critical operational planning documents and activities;

- The National Preparedness Directorate in the development and implementation of FEMA doctrine, Planning Guidance, the Resource Typing initiative, the National Exercise Program, and the National Preparedness Report as well as fulfillment of Presidential Policy Directive 8 (PPD-8) requirements; and

- SLTT governments, FEMA Regions, and other Federal agencies including, but not limited to USACE, Corporation for National and Community Service (CNCS), General Services Administration (GSA), the Department of Health and Human Services (HHS), the United States Department of Agriculture (USDA), the United States Department of Veterans Affairs (VA), and the Department of Defense (DOD).

FEMA is committed to the whole community approach to emergency management and works through the FEMA Regions to engage SLTT community experts to identify capabilities, capacities, anticipated shortfalls, and gaps. FEMA MC/EA works with government agencies, voluntary, community, faith-based organizations, and social services providers that advocate on behalf of –or support– individuals with disabilities, individuals with limited English proficiency, low-income populations, underserved communities, and diverse faith communities to secure the development of multi-agency guidance, planning templates, training, and other resources through pre-scripted mission assignments (PSMAs), interagency agreements (IAAs), and memoranda of agreement (MOAs) to expedite the ability to meet anticipated needs. Resources and services provided via PSMA, IAA, and MOA include but are not limited to, staffing for NRCC/RRCC/State EOC, Blue Roof program mission for USACE, shelter support, AmeriCorps assistance from CNCS, Retired and Senior Volunteer Program (RSVP) under CNCS, activation of National Disaster Medical System (NDMS), etc.



**Tools and Resources**

CUSI: Includes durable medical equipment (DME) items, consumable medical supplies (CMS) items, hygiene kits, and other relevant items. Information resources available at:

- National Mass Care Strategy Website

- Federal, SLTT government software systems (e.g., WebEOC)

- Multi-Agency Distribution of Emergency Supplies Plan Template

## II.  Sheltering Support

### A. Description of Assistance

FEMA MC/EA deploys equipment, materials, supplies, and personnel to support disaster- affected jurisdictions in providing life-sustaining services in congregate and non-congregate facilities that provide a secure and sanitary environment for displaced survivors. This support includes providing a safe, sanitary, and secure place for evacuees and disaster survivors to stay while displaced from their homes and requires the cooperation and coordination of multiple agencies and organizations. MC/EA also coordinates support to survivors sheltering in place, people with disabilities and others with access and functional needs, dietary restrictions, HPSA, and survivors in ESF #8 medical shelters.

People with disabilities and others with access and functional needs are to be accommodated in general population shelters. If requested, MC/EA can assist with durable medical equipment (DME), consumable medical supplies (CMS), personal assistance services (PAS), etc. to provide a basic level of care in congregate shelters and thus ensure that only survivors with acute medical needs are referred to ESF #8 medical shelters. FEMA can provide needed resources through in-house capabilities, mission assignments, and/or contract capabilities.

During Presidentially-declared disasters, most MC/EA services are direct Federal assistance (DFA), which are funded under the Stafford Act Section 403 (a)(3)(B) (commonly referred to as Category B) of a major disaster or emergency declaration, and the Federal share of assistance shall be not less than 75% of eligible cost. Some examples of DFA include non-congregate sheltering through TSA, feeding through Individual Assistance-Support Contracts (IASC), and reunification services under the National Center for Missing and Exploited Children.[36]

### B. Partner Organizations

MC/EA works with multiple partners in sheltering support efforts including: the American Red Cross, the CNCS, Adventist Community Services (ACS), the Salvation Army, Send Relief, National Animal Rescue and Sheltering Coalition (NARSC), National Coalition for the Homeless, Convoy of Hope, Feeding America, other National Voluntary Organizations Active in Disaster (National VOAD), and many others.

### C. Triggers for Implementation

In the event of a natural or manmade disaster, sheltering support services are triggered by an emergency declaration or a major disaster declaration authorizing Public Assistance (Category B) when requested by STT governments. There is no individual application process required for survivors.

## D. Delivery of Assistance

Pre-disaster responsibilities include preparedness activities and other forms of technical assistance that do not require Category B funding such as:



- Providing technical assistance for the development of multi-agency sheltering templates; Federal, STT government plans; training materials; exercises; and other tools to strengthen and enhance the nation's capacity to support sheltering activities;

- Analyzing and incorporating best practices and lessons learned into preparedness activities, including reminding shelter operators that service animals are permitted in general population shelters and should not be separated from their handlers;

*FEMA coordinates with partners, like the American Red Cross, to provide temporary sheltering support for disaster evacuees.*

- Developing contracts, PSMAs, agreements, and other mechanisms to provide resources, programs, and services for sheltering during disaster response activities;

- Expanding national capabilities beyond the traditional MC/EA shelter providers to meet Federal Interagency Operational Planning (FIOP) - Response metrics;

- Providing technical assistance for the establishment of STT sheltering task forces;

- Providing training to whole community shelter providers;

- Providing technical assistance for implementation of FEMA data systems, including the National Shelter System, which supports STT governments with MC/EA planning, data analysis, and mapping and reporting; and

- Providing subject matter expertise to internal partners, including, Response, Recovery, Logistics and National Preparedness Directorates, PA, Office of Disability Integration and Coordination, and the National Processing Service Center.

Once a disaster has been declared, FEMA MC/EA provides post-disaster support, such as:

- Coordinating with other Federal agencies; STT governments; NGOs; and other partners to analyze and validate the need for human and material resources, programs, and services for sheltering;

- Providing subject matter expertise/technical assistance in the NRCC, RRCC, FEMA JFO, Initial Operating Facility (IOF), State EOC, and/or other field settings;

- Assisting the state in the implementation of a coordinated and integrated sheltering mission that meets the disaster-caused needs of evacuees and survivors;

- Providing resource support through FEMA Logistics, including equipment, material, supplies, facilities, shelf-stable meals, water, cots, blankets, and personnel, to support STT sheltering operations through mission assignments, contracts, and other mechanisms;

- Monitoring activity, analyzing data, validating information, and reporting on sheltering activities;

- Identifying resource requirements, shortfalls, and limiting factors;

- Providing tools and resources to assist the SLTT government in the implementation of integrated strategies and processes for coordinated sheltering operations;

- Monitoring, analyzing, validating, and supporting state requirements, as requested, in order to provide a safe, sanitary, and secure environment for shelter residents;

- Facilitating the fulfillment of requests by ensuring that the sequence for obtaining resources is followed;

- Providing evacuee and survivor support to SLTT governments through the activation of pre-negotiated blanket purchase agreements (BPAs) and indefinite delivery indefinite quantity (IDIQ) contracts for food and food supplies, DME, CMS, and other needed commodities;

- Supporting SLTT governments during a disaster when sheltering operations needs exceed SLTT government capabilities as outlined in the National Response Framework ESF #6 Annex;

- Providing the necessary tools and resources to develop an integrated strategy and process for implementing coordinated sheltering operations by the FEMA JFO and the STT government coordinator for carrying out mass care activities, limiting duplication of efforts, and maximizing resources within any STT government that has requested Federal assistance;

- Facilitating FEMA staff's access to congregate care facilities to assist in the registration of disaster survivors for Federal disaster assistance;

- Providing staff support to state for Sheltering Task Forces, Multi-agency Sheltering Transition Teams, or other teams that advise and assist shelter managers with shortfalls and other concerns that may fall outside their area of expertise (e.g., functional needs support and Americans with Disabilities Act [ADA] compliance). See http://www.nationalmasscarestrategy.org for more information;

- Providing technical assistance for the ESF #6 Support System, which can support the state with congregate care planning, data analysis, mapping, and reporting;

- Providing support for the collection of shelter information, including data entry (upon request);

- Issuing mission assignments to other Federal agencies, including but not limited to: CNCS to provide AmeriCorps, Senior Corps, and/or Volunteers in Service to America (VISTA) members to augment congregate care points of distribution and other operational staffing requirements; HHS for shelter assessment team staff support; USDA for subject matter expertise and technical assistance on HPSA support activities; and USACE for human and material resources, such as facility inspection teams;

- Providing NGOs and other partners with travel funds to support the ESF #6 functions with essential technical assistance through invitational travel; Requesting other federal agencies and individuals to support the mission of MC/EA and augment the leadership team with agency expertise; and

- Activating IASC, which can provide a full range of congregate care management and support resources. As IASC services are subject to STT government cost-share, activation of the IASC is generally considered the last option.

# III. Feeding Support

## A. Description of Assistance

FEMA MC/EA Section deploys equipment, materials, supplies, and personnel to support SLTT governmental feeding services to evacuees, disaster survivors and their HPSA, and, in some cases, emergency workers. FEMA and Red Cross (ESF #6 Mass Care Federal Co-Leads) coordinate feeding activities with other Federal agencies, NGOs, and private sector agencies and organizations.[37]

MC/EA provides resources and technical assistance to SLTT governments before, during, and after a disaster to meet the feeding needs of evacuees. A component of feeding also includes meeting the basic needs of infants, toddlers, children, and people with dietary restrictions and/or culturally appropriate dietary needs.

## B. Partner Organizations

MC/EA works with multiple partners in feeding support efforts, including but not limited to: CNCS, USDA, DOD, USACE, American Red Cross, the National VOAD and its member organizations (e.g., Feeding America, the Salvation Army, Southern Baptist Disaster Relief (SBDR), and Greater Good / Rescue Bank).

## C. Triggers for Implementation

In the event of a natural or manmade disaster, feeding support services are triggered by an emergency declaration or a major disaster declaration for PA (Category B) with the request
of SLTT governments. There is no individual application process required for survivors. However, a major disaster declaration for Individual Assistance is required for the Disaster Supplemental Nutrition Assistance Program (D-SNAP), a program which can be authorized by the USDA upon request.



**Tools and Resources**

- National Mass Care Strategy Multi-Agency Feeding Plan Template

- Feeding Support Task Force and Feeding Assessment Team

- FEMA Emergency Support Function (ESF) #6 Support Systems (ESF6-SS), which tracks and supports Geographic Information System (GIS) mapping of shelter locations, and other Federal systems that support feeding activities.

## D. Delivery of Assistance

FEMA MC/EA provides support to both pre-disaster and post-disaster feeding activities. Pre-disaster responsibilities include:

- Providing technical assistance for the development of multi-agency feeding templates, Federal, SLTT government plans, training materials, exercises, and other tools to strengthen and enhance the nation's capacity to support feeding activities;

- Analyzing and incorporating best practices and lessons learned into preparedness activities;

- Developing contracts, PSMAs, agreements, and other mechanisms to provide resources, programs, and services for feeding during disaster response activities;

- Expanding national capabilities beyond the traditional MC/EA service providers to meet Federal Interagency Operational Planning-Response metrics;

- Providing technical assistance for the establishment of SLTT government feeding task forces;

- Providing subject matter expertise to internal partners, including Response, Recovery, Logistics and National Preparedness Directorates, PA, Office of Disability Integration and Coordination, and the National Processing Service Center; and

- Providing technical assistance and subject matter expertise to government agencies, NGOs, and the private sector to expand national feeding capability.

Once a disaster is declared, FEMA MC/EA provides post-disaster support, such as:

- Coordinating with other Federal agencies, the affected STT governments, NGOs, and other partners to analyze and validate the need for human and material resources, programs, and services for feeding;

- Providing subject matter expertise/technical assistance in the NRCC, RRCC, FEMA JFO, IOF, STT government EOC, and/or other field settings;

- Assisting the SLTT government in the implementation of a coordinated and integrated feeding mission that meets the disaster-caused needs of evacuees and survivors;

- Providing resource support, including equipment, material, supplies, facilities, and personnel, to support SLTT government jurisdictions and their partners with feeding operations through mission assignments, contracts, and other mechanisms;

- Coordinating with FEMA Logistics to acquire, store, transport, and/or distribute resources to support feeding operations;

- Providing tools and resources to assist the SLTT government jurisdictions and their partners with the implementation of integrated strategies and processes for coordinated feeding operations; and

- Monitoring activity, analyzing data, validating information, and reporting on feeding activities; identifying resource requirements, shortfalls, and limiting factors; providing information to FEMA, other Federal agencies, SLTT governments, NGOs, and private sector partners.

**Whole Community**

Whole Community is an approach to emergency management that reinforces the fact that FEMA is only one part of our nation's emergency management team; that we must leverage all of the resources of our collective team in preparing for, protecting against, responding to, recovering from, and mitigating all hazards; and that collectively we must meet the needs of the entire community in each of these areas.

Whole community contributors include children; older adults; individuals with disabilities and others with access and functional needs; those from religious, racial, and ethnically diverse backgrounds; people with limited English proficiency; and owners of animals, including household pets and service animals.

This larger collective emergency management team includes not only FEMA and its partners at the Federal level, but also SLTT government partners; non-governmental organizations like faith-based and nonprofit groups and private sector industry; and individuals, families, and communities, who continue to be the nation's most important assets as first responders during a disaster. Both the composition of the community and the individual needs of community members, regardless of age, economics, or accessibility requirements, must be accounted for when planning and implementing disaster strategies.

# IV.  Distribution of Emergency Supplies Support

## A. Description of Assistance

Upon request from an SLTT government, FEMA MC/EA staff works with FEMA and SLTT logistics managers to provide support and ensure emergency supplies needed are identified and coordinated with ESF #6. Such support may include: technical assistance and, if required, resource support through internal logistics and contracted capabilities. FEMA VALs work with state volunteer and donations managers regarding the management and distribution of unsolicited donations. See Chapter 8 for more information.

Under this activity, FEMA MC/EA coordinates with Logistics to organize the targeted acquisition, storage, delivery, and provision of life-sustaining resources, hygiene items, and clean-up items to meet the immediate, basic needs of evacuees and disaster survivors, and their HPSA. Additional support can include transportation, warehousing, equipment, technical assistance, staff, and other mission-critical services.[38]

Organizations engaged in the distribution of supplies and other relief and assistance activities shall accomplish these activities in an equitable and impartial manner, without discrimination on the grounds of race, color, religion, national origin, sex, age, disability, English proficiency, or economic status.[39]

There are four categories of emergency supplies:

- Life-sustaining, such as food, water, non-prescription medicine, cooking kits, and supplies for HPSA.

- Comfort, such as hygiene kits (including supplies like toothpaste, towels, washcloths, soaps, and toothbrushes), sleeping bags, tents, cots, and blankets.

- Clean-up, such as shovels, rakes, bleach, gloves, cleaning detergents, buckets, mops, trash bags, chlorine bleach, garden hose/nozzle, and hand sanitizer.



*Evacuee gathers food and necessities at the Chalmette Recovery Center following devastating Hurricane Katrina.*

- Other essential supplies, such as first aid kits and other items unique to specific disaster.

## B. Partner Organizations

MC/EA works with multiple partners in the distribution of emergency supplies, including: other Federal agencies; American Logistics Aid Network (ALAN); Volunteer and Donations Managers at the state and local level; state VALs; the private sector; the National VOAD and its member organizations, such as the American Red Cross, Adventist Community Services, the Salvation Army, Convoy of Hope, Send Relief; and many others.

## C. Triggers for Implementation

In the event of a natural or manmade disaster, the distribution of emergency supplies is triggered by an emergency declaration or a major disaster declaration for PA (Category B) at the request of the STT government. There is no individual application process required for survivors.



**Tools and Resources**

- CUSI includes DME, CMS, hygiene kits, and other relevant information resources, available on the National Mass Care Strategy website.

- FEMA ESF #6 Support System, which tracks and maps distribution site locations.

- FEMA MC/EA Resource Support tool, which enables users to develop estimates for MC/EA requirements based on multiple variables, quantify available resources that meet requirements, and identify shortfalls.

- National Voluntary Organizations Active in Disaster, which provides facilities, equipment, supplies, and personnel. See the Multi-Agency Distribution of Emergency Supplies Plan Template for a list of National VOAD organizations involved in the distribution of emergency supplies.

- ESF #6 Support Contract, which provides for facilities, equipment, supplies, and personnel.

- Corporation for National and Community Service, which provides personnel.

## D. Delivery of Assistance

FEMA MC/EA provides support to both pre-disaster and post-disaster emergency supplies distribution efforts. Pre-disaster responsibilities include:

- Providing technical assistance in the development and maintenance of: a multi-agency distribution of emergency supplies planning template; Federal and SLTT government plans; training materials; and other tools that strengthen and enhance the nation's capacity to coordinate and distribute emergency supplies;

- Incorporating best practices and lessons learned for the distribution of emergency supplies;

- Developing contracts, PSMAs, MOAs, and Memoranda of Understanding (MOUs), and other mechanisms to acquire, store, and distribute emergency supplies during a disaster response;

- Coordinating with outside partners, including other Federal agencies; SLTT government entities; NGOs; and public and private sectors to develop and maintain integrated processes and mechanisms to increase SLTT government distribution of emergency supplies resource capabilities; and

- Providing subject matter expertise to internal FEMA partners, including the Response, Recovery, Logistics and National Preparedness Directorates, PA, the Office of Disability Integration and Coordination, and the National Processing Service Centers.

Once a disaster has been declared, MC/EA coordinates with state government and NGO partners to analyze anticipated resource shortfalls to provide commodities to impacted areas. As a last resort, MC/EA has the capability to utilize contracts to support resource shortfalls. NGOs provide support, which includes:

- Coordinating with internal and external partners, monitoring activity, analyzing data and validating information to provide support to the states for services and human and material resources;

- Providing subject matter expertise/technical assistance in the NRCC, RRCC, FEMA JFO, IOF, STT EOC, and/or other field settings;

- Assisting jurisdictions in the implementation of a coordinated and integrated whole community distribution system that meets the disaster-caused needs of evacuees and survivors;

- Providing resource support, including equipment, material, supplies, facilities, and personnel, to support the SLTT distribution operation through mission assignments, contracts, and other means;

- Monitoring activity, analyzing data, and validating information on and requests for resource support;

- Identifying resource requirements, shortfalls, and limiting factors; and

- Communicating information to partners.

# V.  Disability, Access, and Functional Needs Support

## A. Description of Assistance

FEMA MC/EA coordinates with and supports SLTT governments in the provision of services and resources to people with disabilities and others with access and functional needs. The MC/EA Section ensures that the needs of evacuees and disaster survivors with access and functional needs are met in congregate and non-congregate facilities, including general population shelters, embarkation and disembarkation sites, reception centers, and other settings, through the coordination, procurement, transportation, and provision of resources. These services should be integrated into all MC/EA activities.[40]

## B. Partner Organizations

MC/EA works with multiple partners in efforts supporting individuals with disabilities and others with access and functional needs, including, but not limited to: the HHS Preparedness and Response (Personnel/Disaster Medical Assistance Teams/Emergency Prescription Assistance Program), VA, the American Red Cross, the National Council on Independent Living (NCIL), the National Disability Rights Network (NDRN), Pass It On Center, Friends of Disabled Adults and Children (FODAC), Partnership of Inclusive Disaster Strategies and Portlight Inclusive Disaster Strategies, the Salvation Army, DOD, and others.

## C. Triggers for Implementation

In the event of a natural or manmade disaster, disability and access and functional needs support is triggered by an emergency declaration or a Presidential disaster declaration for PA (Category B). There is no individual application process required for survivors.

## D. Delivery of Assistance

FEMA MC/EA provides support to individuals with disabilities and others with access and functional needs in both the pre-disaster and post-disaster phases. Pre-disaster responsibilities include:

- Developing plans, templates, guidance, training courses, and tools for MC/EA providers at the SLTT government and NGO levels to ensure access and functional needs support services are integrated into operational plans;

- Developing contracting requirements, pre-scripted mission assignments, interagency agreements, and other mechanisms to provide resources and services to people with disabilities and others with access and functional needs during disaster response activities; and

- Coordinating with FEMA's Office of Disability Integration and Coordination and Office of Equal Rights, the American Red Cross, HHS, and other agencies and organizations to identify and develop strategies and processes to expand support to people with disabilities and others with access and functional needs.

Once a disaster has been declared, FEMA MC/EA provides post-disaster support, such as:

- Coordinating with Federal agencies, NGOs, and other partners to support the state in monitoring, analyzing, and validating the need for human and material resources, programs, and services;

- Acquiring and deploying DME, CMS, assistive technology, accessible hygienic stations, portable ramps, enhanced cots, and bariatric equipment and provide accessible communication support (i.e., American Sign Language [ASL] interpreters, Text Telephone [TTY], and Section 508 compliant communication);

- Activating contracts under IASC for Personal Assistance Services (PAS);

- Retrofit facilities to meet ADA and other accessibility requirements;

- Coordinating with other Federal agencies and non-governmental veterinary and animal welfare organizations to support life-sustaining resources for service and assistance animals, including food, hydration, and veterinary medical care and treatment;

- Providing subject matter expertise/technical assistance in the NRCC, RRCC, FEMA JFO, IOF, STT EOC, and/or other field settings; and

- Providing subject matter expertise to the Multi-agency Sheltering Transition Team, which is responsible for identifying resources for survivors to maintain independence in congregate and non-congregate settings.

## E. Personal Assistance Services

FEMA MC/EA, upon request from the STT government, contracts with PAS providers to augment the ability of SLTT governments to support individuals with disabilities in maintaining their health, safety, and independence in congregate and non-congregate shelter facilities, in the most integrated setting, to meet their needs during a Presidentially-declared disaster event, as required under the Americans with Disabilities Act or other applicable federal civil rights laws.



**Personal Assistance Services (PAS)**

PAS augments disaster-affected jurisdictions in their ability to support disaster survivors with disabilities to maintain their health, safety, and independence.

PAS may be required to support people whose usual means of assistance are not available due to circumstances associated with a disaster. PAS workers are sometimes referred to as home health aides, Certified Nursing Assistants, or caregivers. The services are defined as formal and informal services provided by paid personal attendants, friends, family members, and/or volunteers that enable individuals with disabilities to maintain their routine level of independence while in an emergency shelter. FEMA may provide PAS support to meet assistance with the activities of daily living and other identified care requirements upon request of the impacted SLTT government jurisdiction.

FEMA MC/EA provides subject matter expertise to internal and external partners, including the Office of Response and Recovery, Office of Disability Integration and Coordination, American Red Cross, FEMA Regions, and other agencies. They coordinate with FEMA acquisitions, and Contract Management Section to develop, maintain, manage, and implement contracts. They also maintain a list of Frequently Asked Questions (FAQ) to ensure the SLTT government and NGOs have access to current information regarding PAS program requirements.

Once a disaster has been declared, FEMA MC/EA coordinates with other Federal agencies, the Office of Disability Integration and Coordination, FEMA Logistics, NGOs, and other partners to monitor activity, analyze data, validate information and provide support to the states on the need for PAS. This includes potentially deploying subject matter expertise



**Tools and Resources**

- FEMA: *Guidance on Planning for the Integration of Functional Needs Support Services in General Population Shelters*

and technical assistance in the NRCC, RRCC, FEMA JFO, SLTT government EOCs, and other field offices in order to acquire, deploy, and provide PAS as requested by the SLTT government.

In order to provide monitoring, analysis, and validation support to an STT government on functional needs support activities, FEMA MC/EA identifies resource requirements, shortfalls, and limiting factors and exchange information with FEMA, other Federal agencies, SLTT governments, and NGO and Private Sector agencies and organizations. FEMA MC/EA also participates in the task forces and work groups staffed by individuals from multiple agencies and organizations and created to identify shortfalls and provide the support needed to maintain independence during congregate care.

# VI.  Reunification Services

## A. Description of Assistance

Reunification Services is one of the MC/EA activities where FEMA has a statutorily mandated role in providing services directly to disaster survivors to facilitate the reunification of unaccompanied minors with their custodial parents/legal guardians, as well as the voluntary reunification of adults with their families, during declared emergencies or major disasters.[41]

FEMA works to coordinate this statutory requirement directly with the impacted SLTT jurisdiction(s), and collaborates with whole community partners to develop procedures, identify best practices, and provide resources to strengthen reunification services. MC/EA facilitates partner agreements and identifies and develops new resources and tools, including training and exercises, in support of SLTT governmental reunification planning and operations. FEMA also coordinates deployment of national reunification resources—both human and material—to support state-, territory-, or tribe-led reunification task forces as well as field operations.[42]

## B. Partner Organizations

MC/EA works with multiple partners in reunification efforts, including: the National Center for Missing and Exploited Children, the CNCS, the Department of Justice (DOJ), HHS, and the American Red Cross.

## C. Triggers for Implementation

In the event of a natural or manmade disaster, reunification services are triggered by an emergency declaration or a major disaster declaration for PA (Category B). Once an event is declared as an emergency or major disaster, and emergency protective measures (such as Reunification) are being performed, an individual only has to be affected by the declared incident to qualify for Reunification Assistance; there is no additional application process required for the individual or household.

## D. Delivery of Assistance

FEMA MC/EA provides support to both pre-disaster and post-disaster reunification activities. Pre-disaster responsibilities include:

- Providing technical assistance for the development of Federal and STT government reunification plans, training materials, exercises, and other tools to strengthen and enhance the nation's capacity to support reunification activities;

- Analyzing and incorporating best practices and lessons learned into preparedness activities, including anticipating and establishing practical approaches to address the communication access needs of people who are deaf or hard of hearing, people without speech, people with cognitive or intellectual disabilities, and people who speak languages other than English;

- Developing contracts, pre-scripted mission assignments, agreements, and other mechanisms to provide resources, programs, and services for reunification during disaster response activities for FEMA to meet our statutory obligations;

- Providing technical assistance for the establishment of STT government reunification task forces;

- Providing subject matter expertise to internal partners, including Response, Recovery, Logistics and National Preparedness Directorates; PA; Office of Disability Integration and Coordination; External Affairs; Office of the Senior Law Enforcement Advisor; and the National Processing Service Centers;

- Providing technical assistance and subject matter expertise to and coordinating planning efforts with government agencies, NGOs, and the private sector to expand national reunification capability;

- Identifying communication mechanisms, which include but are not limited to, new reunification systems, current and emerging social media tools and communication technologies, and private/public communications equipment;

- Developing agreements and procedures to utilize or coordinate the use of these communication mechanisms; and

- Incorporating these resources into plans and procedures in order to provide access for disaster survivors to a wide range of communications methods in a timely manner.

Once a disaster has been declared, FEMA MC/EA provides post-disaster support such as:

- Coordinating with other Federal agencies; STT governments; NGOs; and other partners to monitor, analyze, validate, and provide human and material resource support, programs, and services for reunification;

- Providing subject matter expertise/technical assistance in the NRCC, RRCC, FEMA JFO, IOF, STT government EOC, and/or other field settings;

- Providing staff and resources to support field operations, STT-led reunification task forces, and related task forces, such as a Children and Youth Task Force;

- Assisting the STT government in the implementation of coordinated and integrated reunification services system for evacuees and survivors, including evacuees and survivors who are deaf or hard of hearing, evacuees and survivor without speech, evacuees and survivor with cognitive or intellectual disabilities, and evacuees and survivors who speak languages other than English;

- Providing resources, including equipment, material, supplies, facilities, and personnel, to support STT government operations through mission assignments, contracts, and other mechanisms;

- Providing tools and resources to assist the STT government in the implementation of integrated strategies and processes for coordinated reunification operations;

- Monitoring activity, analyzing data, and validating information on reunification activities;

- Identifying resource requirements, shortfalls, and limiting factors;

- Coordinating public messaging with reunification partners and FEMA External Affairs;

- Activating resources of the National Center for Missing and Exploited Children, via the current procurement process, to stand up the National Emergency Child Locator Center (NECLC) and deploy Team Adam (a staff resource to assist with identification and reunification of children) upon request from the declared STT government; and

- Providing support to law enforcement missing persons operations and agencies tasked with child reunification during response and transition to recovery as needed and requested.

## E. National Emergency Child Locator Center

FEMA also utilizes NECLC, which is operated out of the National Center for Missing and Exploited Children. In collaboration with National Center for Missing and Exploited Children, FEMA supports SLTT governments and law enforcement agencies in the tracking, locating, and reunification of children who have become separated from their parents or guardians as a result of a Presidentially-declared disaster.



**National Emergency Child Locator Center (NECLC)**

Phone: 800-843-5678

Website: http://www.missingkids.com/home

# VII. Household Pets, Service Animals, and Assistance Animals

**A. Description of Assistance**

FEMA MC/EA, in consultation with FEMA Regions and SLTT government jurisdictions provides coordination and support for the rescue, transportation, shelter, reunification, essential needs, and care of HPSA during preparedness and response and recovery operations to ensure their safety and well-being of owners and their HPSA. Upon request from the SLTT government jurisdictions, FEMA MC/EA supports HPSA activities with the provision of technical assistance and resource support through Federal, SLTT government, NGO, and private sector partners.[43] FEMA's engagement on HPSA issues falls under the relevant statutory requirements of the Robert T. Stafford Disaster Relief and Recovery Act and under other statutory and/or regulatory requirements related to service and assistance animals (e.g., the Americans with Disabilities Act, Fair Housing Act).

**B. Partner Organizations**

MC/EA works with multiple partners in HPSA support efforts, including: DOD, USDA, and HHS Assistant Secretary for Preparedness and Response (ASPR) National Veterinary Response Teams; the American Red Cross, the National Alliance of State Animal and Agricultural Emergency Programs (NASAAEP), the NARSC, GreaterGood.org, and National VOAD.



*Flood survivor holds his cat inside of his gutted residence in Denham Springs; the home was damaged by severe flooding in Louisiana during 2016.*

**C. Triggers for Implementation**

In the event of a natural or manmade disaster, HPSA support services are triggered by an emergency declaration or a major disaster declaration for PA (Category B) with a request from STT governments. There is no individual application process required for survivors.

**D. Delivery of Assistance**

FEMA MC/EA provides support for HPSA in both the pre-disaster and response phases. Pre-disaster responsibilities include:

- Providing technical assistance for the development of multi-agency HPSA templates, Federal response and recovery), and SLTT government emergency operations plans (EOPs), training materials, and other tools to strengthen and enhance the nation's capacity to support HPSA disaster activities;

- Analyzing and incorporating best practices and lessons learned into preparedness activities;

- Developing methods of procurement, pre-scripted mission assignments, other agreements and mechanisms to provide resources, coordinating, and supporting programs and services for owners and their HPSA during disaster response activities;

- Coordinating with government agencies, NGOs, and the private sector to develop integrated processes and mechanisms to augment national, regional, state, and local HPSA capabilities; and

- Providing subject matter expertise to internal FEMA partners, including Response, Recovery, Logistics and National Preparedness Directorates, PA, Office of Disability Integration and Coordination, and Office of External Affairs.

Once a disaster has been declared, FEMA MC/EA provides post-disaster support, such as:

- Coordinating with other Federal agencies, STT governments (related to Stafford Act authorities), FEMA Logistics, NGOs, and other partners to analyze and validate the need for support with human and material resources, programs, and services;

- Providing subject matter expertise/technical assistance in the NRCC, RRCC, FEMA JFO, IOF, STT government EOCs, and/or other field settings;

- Assisting the STT government in the implementation of coordinated and integrated HPSA response and recovery activities that meet the disaster-caused needs of evacuees, survivors, and their HPSA;

- Providing resource support, including equipment, materials, supplies, facilities, veterinary services, specialized transportation, and personnel to support the rescue, transportation, sheltering, and care of HPSA through mission assignments, contracts, and other mechanisms;

- Collecting, analyzing, validating, and reporting information on HPSA activities; identifying resource requirements, shortfalls, and limiting factors; and providing information to FEMA, other Federal agencies, SLTT governments, NGOs, and private sector partners; and

- Coordinating with other Federal agencies and NGOs at the NRCC/RRCC/EOC/IOF on transportation coordination issues, logistics, response, and evacuation issues to:

  o Encourage the inclusion of HPSA food and supplies, mobile feeding, and distribution operations;

  o Encourage the inclusion of HPSA included in the reunification plans and activities; and

  o Monitor information on the status of HPSA sheltering activities to update situational awareness.



**Tools and Resources**

- Public Assistance Program and Policy Guide (PAPPG)

- Multi-agency coordination support and/or multi-agency support task force, and Federal and state software systems that support HPSA activities

- FEMA ESF #6 Support System, which manages data and supports GIS products related to emergency household pet shelter locations

- FEMA MC/EA Resource Management Tool

# VIII. Mass Evacuee Support

## A. Description of Assistance

FEMA MC/EA may support disaster-affected and host-state governments by providing life-sustaining services and resources to disaster survivors/evacuees and their HPSA during mass evacuation incidents. MC/EA provides pre-incident support in the form of technical assistance, coordination and communication, and identified resources. At the time of an incident response, FEMA MC/EA staff will work in collaboration with the STT government to determine if Mass Evacuee Support is required or if it will conduct such activities at the direction of the President.[44]

## B. Partner Organizations

MC/EA works with multiple partners in mass evacuee support efforts, including but not limited to: the American Red Cross, National VOAD, USDA, and DOD.

## C. Triggers for Implementation

In the event of a natural or manmade disaster, mass evacuee support services are triggered by an emergency declaration or major disaster declaration for PA (Category B), and a request from the SLTT government. There is no individual application process required for survivors.

## D. Delivery of Assistance

FEMA MC/EA provides support to both pre-disaster and post-disaster mass evacuee efforts. Pre-disaster responsibilities include:

- Providing technical assistance for the development of multi-agency mass evacuee support templates; Federal and SLTT government plans; training materials; and other tools to strengthen and enhance the nation's capacity to support transportation-assisted evacuees;

- Analyzing and incorporating best practices and lessons learned into preparedness activities for evacuee support, including accessible and multilingual messaging in plain language or using pictograms and identifying accessible transportation assets for older adults and people with mobility disabilities;

- Developing contracts, pre-scripted mission assignments, agreements, and other mechanisms to provide resources, programs, and services to support mass evacuees;

- Coordinating with government agencies, NGOs, and the private sector to develop integrated processes and mechanisms to augment national, regional, SLTT government capabilities for mass evacuee support;

- Supporting implementation of Host State Agreements (a state agrees to provide evacuation and/or sheltering support to individuals from the Presidentially-declared impact state);

- Providing training and facilitating exercises with other Federal, SLTT governments and NGO partners; and

- Providing subject matter expertise to internal partners, including, Response, Recovery, Logistics and National Preparedness Directorates, PA, Office of Disability Integration and Coordination, and the National Processing Service Center.

Once a disaster has been declared, FEMA MC/EA provides post-disaster support, such as:

- Coordinating with other Federal agencies, declared and host SLTT governments, FEMA Logistics, NGOs, and other partners to monitor, analyze, validate the need for, and provide support to SLTT governments for human and material resources, programs, and services;

- Providing subject matter expertise/technical assistance in the NRCC, RRCC, FEMA JFO, IOF, STT government EOC, and/or other field settings;

- Providing resources, including equipment, material, supplies, facilities, and personnel to support mass evacuees through mission assignments, contracts, and other mechanisms;

- Identifying resource requirements, shortfalls, and limiting factors, and providing information to FEMA, other Federal agencies, SLTT governments, NGOs, and private sector partners.

# IX. Transitional Sheltering Assistance

**A. Description of Assistance**

The guidelines for TSA are currently under review in order to incorporate changes resulting from the 2017 Hurricane Season. Due to the publication date of the IAPPG, the updated guidelines could not be included. The new guidelines will be published as soon as they are available. At this time, the operation of TSA will be determined on a disaster-specific basis.

TSA is a short-term non-congregate sheltering form of assistance for displaced disaster survivors taking refuge in emergency shelter locations other than their pre-disaster primary residence. The intent of TSA is to provide temporary sheltering for survivors as they transition from emergency shelters to temporary or permanent housing solutions.

FEMA may provide TSA at the request of a declared STT government. When authorized, TSA provides assistance under Sections 403 or 502 of the Stafford Act, as amended, and is implemented under Section 408.[45] TSA does not count toward the applicants' financial Housing Assistance or Other Needs Assistance maximum award. TSA is funded under Section 403 of the Stafford Act and is subject to PA regulations on cost-share. For more information on PA, see *Public Assistance Program and Guide, FP 104-009-2*.

Additional program guidance and implementation information and tools will be made available to non-Federal entities by FEMA MC/EA through interim and final policy guidance.

# X.  Rapid Temporary Repair (Operation Blue Roof) Program

## A. Description of Assistance

The Operation Blue Roof Program provides a free temporary roof for residential structures, schools, daycares, and some publicly-owned facilities. These temporary roofs provide short-term relief until the owner can make permanent repairs. They also prevent additional damage from occurring to the building and its contents. Plastic covering and tarps are temporary fixes designed to provide protection from the elements until the homeowner can make permanent repairs with a qualified professional. The authority governing the Rapid Temporary Repair program is the Stafford Act Section 403.

## B. Partner Organizations

USACE staffs and operates Right of Entry (ROE) centers for disaster-affected areas. ROE centers are used to collect the ROE form from homeowners

## C. Eligibility Considerations

In order for a structure to qualify for Operation Blue Roof, damage to the roof must be less than 50%, and the area to be covered must be structurally sound for a crew to work on. Additionally, homeowners must complete a ROE form to allow government and contractor employees on their property.



**Tools and Resources**

ROE centers for affected areas are staffed by USACE employees.

To contact the nearest center, call 888-766-3258.

## D. Delivery of Assistance

Once eligibility is determined, homeowners must complete a ROE form before government and contractor employees will begin installing a blue roof. Homeowners may also cover their roofs with free tarps provided by FEMA and issued through their local governments. Survivors should contact their local officials and/or monitor social media for updates on where to pick up these tarps.

# XI.  National Mass Care Exercise

## A. Description of Exercise

The goal of the NMCE is to support the development of an STT government's mass care capacity and capabilities through partnership, coordination, and collaboration. The NMCE can serve to validate an STT government's mass care services delivery or support plan. The NMCE should be adapted to suit the unique needs of the STT government hosting the exercise. This may include incorporating mass care as a main focus of a larger, existing state exercise or by developing a standalone mass care exercise. The exercises are valuable for enhancing the nation's Mass Care Services core capability by utilizing a Whole Community Emergency Management approach to ensure that the needs of disaster survivors are met and contributing lessons learned and best practices.

## B. Application Process

States, territories, and tribes interested in applying to host the National Mass Care Exercise are encouraged to contact their FEMA Regional MC/EA Point of Contact for detailed information. Host entities are selected in the last quarter of the calendar year and typically conduct the exercise two to three years after selection.

## C. Implementation of Exercise

FEMA Headquarters MC/EA will be designated as the lead to coordinate or directly provide additional support to the FEMA Region, as requested. The MC/EA Headquarters Lead is responsible for not only supporting the Region/Host State but also in ensuring that national MC/EA concepts and capabilities are continuously being tested and that national best practices are captured and updated. The Headquarters MC/EA lead can also provide access to past exercise expertise and tools. The FEMA MC/EA Section may also provide additional support through the sponsorship of invitational travel for a limited number of additional state Mass Care Coordinators (or their equivalent) from across the country, generally including the state Mass Care Coordinator for the following year's NMCE.



**Tools and Resources**

o  National Mass Care Strategy

o  Mass Care Multi-Agency Planning Templates

o  Applicant/Host Toolkit

o  After Action Reports of Past Exercises

o  FEMA Regional Mass Care/Emergency Assistance Points of Contact (POCs)

o  FEMA Regional Exercise Officers

o  National Preparedness Goal (NPG)

# Chapter 3: Individuals and Households Program

## I.  Individuals and Households Program Overview

Individuals and Households Program (IHP) assistance provides financial assistance and direct services to eligible individuals and households who have uninsured or underinsured necessary expenses and serious needs. IHP assistance is not a substitute for insurance and cannot compensate for all losses caused by a disaster; it is intended to meet basic needs and supplement disaster recovery efforts.

IHP assistance is not considered income[46] or a resource when determining eligibility for welfare, income assistance, or income-tested benefit programs that the Federal government funds, such as Social Security benefits or disability income.[47] IHP assistance is also exempt from garnishment or seizure, but this exception does not apply to FEMA recovering assistance received in error or fraud.[48]

### A. Period of IHP Assistance

IHP assistance is limited to 18 months following the date of the disaster declaration.[49] The period of assistance begins at the date of the Presidential disaster declaration and not the date on which the disaster is designated for Individual Assistance (IA).[50] The President may extend the period of assistance due to extraordinary circumstances if an extension would be in the public interest.

Through the delegation of authority, the Assistant Administrator (AA) for Recovery may, at the written request of an STT government, extend the period of assistance.[51] Should extraordinary circumstances exist, the AA for Recovery may extend the period of assistance for Direct Temporary Housing Assistance (See Chapter 3, V.C.4) or financial assistance. The affected STT government should request an extension in writing at least 90 days before the end of the current period of assistance.

### B. Amount of IHP Assistance

The amount of financial assistance an individual or household may receive under IHP is limited. Financial Housing Assistance and Other Needs Assistance (ONA) have independent and equal financial maximums. FEMA adjusts these maximum awards each fiscal year based on the Department of Labor Consumer Price Index.[52] FEMA informs the public of changes to the financial Housing Assistance and ONA maximums each year by publishing a notice in the Federal Register.

As shown in *Figure 4*, the financial Housing Assistance[53] maximum applies to Home Repair Assistance and Home Replacement Assistance. Temporary Housing Assistance, including Lodging Expense Reimbursement, Rental Assistance, and Continued Temporary Housing Assistance are not counted toward the financial Housing Assistance maximum award.

Disaster-caused losses to accessibility-related real and personal property for qualified applicants with a disability or other access and functional need are not subject to a financial assistance maximum.

- The U.S. Small Business Administration disaster loan referral limitations still apply.

- This applies to accessibility items currently awarded under Home Repair Assistance and Personal Property Assistance.

Eligible individuals or households receiving IHP assistance may not necessarily be awarded the maximum amount of financial assistance for their disaster-caused losses.

| Figure 4: Types of Financial Assistance and Financial Maximum Awards | | |
|---|---|---|
| IHP Assistance Maximum | Type of Assistance | Maximum |
| Financial Housing Assistance Maximum | Home Repair Assistance | Adjusted annually by Consumer Price Index |
| | Home Replacement Assistance | |
| Financial Other Needs Assistance Maximum | Personal Property Assistance | Adjusted annually by Consumer Price Index |
| | Transportation Assistance | |
| | Moving and Storage Assistance | |
| | Medical and Dental Assistance | |
| | Funeral Assistance | |
| | Child Care Assistance | |
| | Assistance for Miscellaneous Items | |
| | Critical Needs Assistance | |
| | Clean and Removal Assistance | |
| | Group Flood Insurance Policy | |
| No Maximum Applicable | Lodging Expense Reimbursement | Award amount based on receipts, Fair Market Rent rates, or line item amounts established by FEMA |
| | Rental Assistance | |
| | Continued Temporary Housing Assistance | |
| | Home Repair Assistance accessibility items | |
| | Personal Property accessibility items | |

Although minimal damage may cause some inconvenience, it is expected that individuals or households will address those losses without Federal assistance. Therefore, FEMA will only provide assistance when the total initial IHP award amount is a minimum of $50.[54] There is no minimum amount for subsequent awards.

Other Federal programs and voluntary organizations may provide additional financial assistance for unmet needs.

## C. Types of IHP Assistance

There are two categories of IHP assistance: Housing Assistance and Other Needs Assistance (ONA).

### *1. Housing Assistance*

Individuals and households may receive more than one type of Housing Assistance, including a combination of financial assistance and direct services (see *Figure 5*).[55]

FEMA determines the appropriate types of Housing Assistance for which an individual or household may be eligible based on disaster-caused losses, access to life-sustaining services, cost-effectiveness, and other factors.[56]

FEMA provides financial Housing Assistance through funds paid directly to eligible individuals and households. Financial Housing Assistance may include the following types of assistance:

- **Lodging Expense Reimbursement (LER):** Financial assistance to reimburse for hotels, motels, or other short-term lodging while an applicant is displaced from their primary residence.

- **Rental Assistance:** Financial assistance to rent alternate housing[57] accommodations while an applicant is displaced from their primary residence.[58]

- **Home Repair Assistance:** Financial assistance to repair an owner-occupied primary residence, utilities, and residential infrastructure, including privately-owned access routes (i.e., driveways, roads, or bridges), to a safe and sanitary living or functioning condition.[59]

- **Home Replacement Assistance:** Financial assistance to help replace an owner-occupied primary residence when the residence is destroyed.[60]

**IHP Assistance Scenario**

An applicant's FEMA inspection recorded $900 in real property damage and $25 in personal property damage. The applicant's insurance settlement totaled $875 for real property, which left an unmet need of $25 in real property and $25 in personal property. In this scenario, the applicant is eligible for the total IHP award of $50, which is a combined total of Home Repair Assistance and Personal Property Assistance.



**Primary Residence**

Primary residence refers to:

- The home where the applicant normally lives during the major portion of the calendar year, **or**

- The home that is required because of proximity to employment, including agricultural activities that provide 50% of the household's income.

FEMA may provide Direct Housing Assistance[61] when applicants are unable to use Rental Assistance due to a lack of available housing resources. Direct Housing Assistance does not count toward the financial Housing Assistance maximum award and may include:

- **Multi-Family Lease and Repair (MLR):** Allows FEMA to enter into lease agreements with owners of multi-family rental property located within or near declared areas to make repairs or improvements that provide temporary housing to applicants.[62]

- **Transportable Temporary Housing Units (TTHUs):** A readily fabricated dwelling (i.e., a Recreational Vehicle [RV] or a Manufactured Housing Unit [MHU]), purchased or leased by FEMA and provided to eligible applicants for use as temporary housing for a limited period of time.

- **Direct Lease:** Existing ready-for-occupancy residential property leased for eligible applicants and, if necessary, modified or improved to provide a reasonable accommodation for an eligible applicant with a disability, for use as temporary housing.

- **Permanent Housing Construction (PHC):** Home repair and/or construction services provided in insular areas outside the continental U.S. and in other locations where no alternative housing resources are available; and where types of housing assistance FEMA normally provides, such as Rental Assistance or other forms of direct assistance, are unavailable, infeasible, or not cost-effective.[63]

| Figure 5: Housing Assistance | |
|---|---|
| Financial Assistance | • Lodging Expense Reimbursement<br>• Rental Assistance<br>• Repair Assistance<br>• Replacement Assistance |
| Direct Assistance | • Multi-Family Lease and Repair<br>• Transportable Temporary Housing Units<br>• Direct Lease<br>• Permanent Housing Construction |

## *2. Other Needs Assistance*

Applicants may receive financial assistance for other disaster-caused expenses and serious needs.[64] The types of ONA are divided into two categories that are either dependent or non-dependent on the applicant's ability to secure a U.S. Small Business Administration (SBA) disaster loan. The SBA may provide low-interest, long-term loans to help applicants with transportation losses, as well as repair/replacement funds for real and personal property damage caused by the disaster.

Only applicants who do not qualify for a loan from the SBA may be eligible for assistance for the SBA-dependent category. SBA-dependent ONA includes Personal Property Assistance, Transportation Assistance, and Group Flood Insurance Policy (GFIP). Non-SBA-dependent types of ONA may be awarded regardless of the applicant's SBA status and may include Funeral Assistance, Medical and Dental Assistance, Child Care Assistance, Assistance for Miscellaneous Items, Moving and Storage Assistance, Critical Needs Assistance, and Clean and Removal Assistance.



*FEMA and SBA conduct inspections along the Yukon River for applicants residing in fishing camps who were affected by severe flooding in Fort Yukon, Alaska.*

## II.  Individuals and Households Program Eligibility

While each type of IHP assistance has specific conditions of eligibility and documentation requirements, this chapter describes the basic conditions of eligibility that apply to all FEMA IHP assistance. Specific situations and living arrangements that require clarification are also addressed. This chapter also provides information on the appeal process for applicants who disagree with FEMA's eligibility determination.

### A. General IHP Eligibility

These general conditions must be met for an applicant to be eligible to receive IHP assistance:

- The applicant must be a U.S. citizen, non-citizen national, or qualified alien.

- FEMA must be able to verify the applicant's identity.[65]

- The applicant's insurance, or other forms of disaster assistance received, cannot meet their disaster-caused needs.[66]

- The applicant's necessary expenses and serious needs are directly caused by a declared disaster.[67]

The process FEMA uses to verify that necessary expenses and serious needs are directly caused by a declared disaster is described in Chapter 3, III.

In order to receive some forms of Housing Assistance and ONA, applicants must also satisfy occupancy and ownership requirements.

The estate of a deceased applicant is not eligible for IHP assistance. However, a surviving pre-disaster resident of the household may receive assistance if they meet all IHP eligibility criteria.

#### *1. U.S. Citizenship*

Only U.S. citizens, non-citizen nationals, or qualified aliens may be eligible for IHP assistance.

During the disaster assistance registration process or on a *Declaration and Release form (FEMA Form 009-0-3),* applicants self-certify their citizenship status and declare, under penalty of perjury, they fit one of the statuses indicated in *Figure 6.*

**Welfare Reform Act**

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, commonly known as the Welfare Reform Act, provides that aliens who are not qualified aliens are not eligible for Federal public benefits.

Federal public benefits include any retirement, welfare, health disability, public or assisted housing, post-secondary education, food assistance, unemployment benefits, or any similar benefits for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the U.S. or by appropriated funds of the U.S.

| Figure 6: U.S. Citizenship and Resident Aliens | |
|---|---|
| Status | Definitions |
| U.S. Citizen | A person born in one of the 50 United States, the District of Columbia, Puerto Rico, Guam, the U.S. Virgin Islands, or the Northern Mariana Islands; a person born outside of the U.S. to at least one U.S. parent; or naturalized citizen. |
| Non-Citizen National | A person born in an outlying possession of the U.S. (e.g., American Samoa or Swain's Island) on or after the date the U.S. acquired the possession, or a person whose parents are U.S. non-citizen nationals. All U.S. citizens are U.S. nationals; however, not every U.S. national is a U.S. citizen. |
| Qualified Alien | • Legal permanent resident ("green card" holder)<br>• An asylee, refugee, or an alien whose deportation is being withheld<br>• Alien paroled into the U.S. for at least one year<br>• Alien granted conditional entry (per law in effect prior to April 1, 1980)<br>• Cuban/Haitian entrant<br>• Aliens in the U.S. who have been abused, subject to battery or extreme cruelty by a spouse or other family/ household member, or have been a victim of a severe form of human trafficking<br>• Aliens whose children have been abused and alien children whose parent has been abused who fit certain criteria |

If an applicant does not meet the criteria identified in *Figure 6*, the household may still apply for and be considered for IHP assistance if:

- Another adult household member meets the eligibility criteria and certifies their citizenship status during the registration process or signs the *Declaration and Release* form; or

- The parent or guardian of a minor child who is a U.S. citizen, non-citizen national, or a qualified alien applies for assistance on behalf of the child, as long as they live in the same household. The parent or legal guardian must register as the co-applicant, and the minor child must be under age 18 at the time the disaster occurred.

There are several categories of aliens lawfully present in the U.S. who are not eligible for IHP assistance. These include, but are not limited to:

- Temporary tourist visa holders

- Foreign students

- Temporary work visa holders

- Habitual residents such as citizens of the Federated States of Micronesia and the Republic of the Marshall Islands

Regardless of citizenship status, disaster survivors may be eligible for the following programs:

- Chapter 2: Mass Care/Emergency Assistance (search and rescue, medical care, shelter, food, and water, and reducing threats to life, property, and public health or safety)

- Chapter 5: Crisis Counseling Assistance and Training Program (CCP)

- Chapter 4: Disaster Case Management (DCM)

- Chapter 6: Disaster Legal Services (DLS)

- Disaster Food Stamps (*Disaster Supplemental Nutrition Assistance Program, or D-SNAP*), which is administered by the U.S. Department of Agriculture; the STT government can request the Federal government to initiate D-SNAP only after a Presidential disaster declaration approving Individual Assistance.

### *2. Identity Verification*

FEMA must be able to verify an applicant's identity with a valid Social Security Number (SSN) before considering their eligibility for disaster assistance. By verifying identity, FEMA prevents fraud and ensures applicants receive the disaster assistance intended for them.[68]

FEMA typically verifies an applicant's identity at the time of registration:

- Through an automated public records search; and

- Through a series of questions associated with the applicant's credit file or public records.

Applicants who do not successfully respond to the series of questions will not be eligible for expedited forms of assistance prior to receiving an inspection or submitting identity verification documents.

When FEMA is unable to verify an applicant's identity through the automated public records search or the applicant answers identity-verifying questions incorrectly, the applicant may be asked to submit a copy of one of the documents described in *Figure 7*.

| Figure 7: Acceptable Documentation to Verify Identity | |
|---|---|
| Documentation to verify name/SSN: | • Documentation from the Social Security Administration (SSA), or other Federal entity, containing full or last four digits of SSN<br>• Social Security card if accompanied by Federal or state-issued identification<br>• Employer's payroll document containing full or last four digits of the SSN<br>• Military identification<br>• Proof of name change:<br>   o Name change court order<br>   o Marriage, civil union, or domestic partnership certificate<br>   o Divorce or annulment decree<br>   o Certificate of citizenship or naturalization<br>   o U.S. Tribal government document<br>   o U.S. amended/corrected birth certificate<br>   o If the applicant still fails identity verification using their previous name, the applicant will be required to submit one of the other forms of acceptable identity verification<br>• U.S. passport<br>• On a case-by-case basis, FEMA may allow applicants residing in U.S. territories to submit specific identity verification documents, such as voter registration cards, etc. |
| Documentation - applying for assistance on behalf of a minor child: | • Any of the documents listed above, if in the child's name<br>• Child's birth certificate and a copy of the child's Social Security card or documentation from the SSA, or other Federal entity, containing the full or last four digits of the child's SSN |

FEMA does not accept the following documents as proof of an applicant's identity:

- Internal Revenue Service forms (IRS)

- Notarized statements or affidavits from applicants or any third parties

- Applications for a marriage license or assistance from a Federal entity

### 3. Insurance

FEMA provides IHP assistance to applicants for their uninsured or underinsured disaster-caused expenses and serious needs (see *Figure 8* for eligibility examples). Applicants are required to inform FEMA of all insurance (flood, homeowners, vehicle, mobile home, medical, burial, etc.) coverage that may be available to them to meet their disaster- caused needs. Insured applicants must provide documentation that identifies their insurance settlements or benefits before FEMA will consider their eligibility for categories of assistance that may be covered by private insurance.

**Figure 8. Insurance Eligibility Examples**

When the net settlement amount is equal to or exceeds the loss amount verified by FEMA or the amount of IHP assistance available to meet that need, FEMA determines the applicant's need has been met by insurance and will not provide assistance for that need.

**Example 1**

| Maximum Financial Housing Assistance: | $35,500 |
| FEMA Verified Loss (FVL): | $35,500 |
| Gross Settlement: | $50,000 |
| Deductible: | - 5,000 |
| Net Settlement: | $45,000 |
| **FEMA Review** | |
| FVL | $35,500 |
| Net Settlement | - 45,000 |
| Not Eligible for Financial Housing Assistance = ($9,500) | |

When the net settlement amount from insurance is less than the loss amount verified by FEMA the applicant may receive the difference up to the maximum amount of assistance available for that type of IHP assistance to meet that need.

**Example 2**

| Maximum Financial Housing Assistance: | $35,500 |
| FEMA Verified Loss (FVL): | $30,000 |
| Gross Settlement: | $25,000 |
| Deductible: | - 5,000 |
| Net Settlement: | $20,000 |
| **FEMA Review** | |
| FVL | $30,000 |
| Net Settlement | - 20,000 |
| Eligible for Financial Housing Assistance = $10,000 | |

When the insured disaster-caused damage is less than the deductible, FEMA may provide assistance to help meet an applicant's needs.

Damages must affect the habitability of the primary residence to be eligible for IHP assistance.

**Example 3**

| Maximum Financial Housing Assistance: | $35,500 |
| FEMA Verified Loss (FVL): | $2,500 |
| Insurance Verified Loss: | $3,000 |
| Deductible: | - 5,000 |
| Net Settlement: | $0.00 |
| **FEMA Review** | |
| FVL | $2,500 |
| Net Settlement | - 0.00 |
| Eligible for Financial Housing Assistance = $2,500 | |

**Insurance Deductible**

In an insurance policy, the deductible is the amount that the policyholder agreed to pay out of pocket before an insurance company pays any benefits. This amount is subtracted from the total amount paid by the insurance company. Insurance premiums are typically more affordable when they involve higher deductibles.

**FEMA-Verified Loss (FVL)**

The total dollar amount of IHP eligible disaster-caused damage to real and personal property as verified by FEMA.

The FVL represents the total potentially eligible damage, but due to insurance coverage, the financial Housing Assistance maximum, and other eligibility factors an applicant may not ultimately receive assistance for their full FVL.

After an applicant submits their insurance settlement information, FEMA compares the net settlement amount received for each loss to the maximum amount of assistance available for that type of IHP assistance.

FEMA only considers insurance coverage which includes the peril(s) (e.g., flood, wind, wind-driven rain, tornado, fire, etc.) listed as a cause of damage identified for the disaster when determining eligibility for assistance. For example, an applicant is not required to submit flood insurance documents for a wind-only disaster. When applicants are impacted by multiple perils, FEMA compares insurance benefits and verified loss amount separately for each peril.

**Exceptions:**

- **Uninsurable Items:** Insured applicants may receive assistance for items not typically covered by homeowners or flood insurance, such as wells, septic systems, access roads, etc., regardless of the type of disaster-caused damage or the applicant's insurance coverage.

- **Delayed Settlement:** While FEMA cannot provide assistance for disaster-caused needs covered by insurance benefits, FEMA may provide assistance to help meet an applicant's immediate needs when their insurance benefits are delayed.[69] Two important conditions for receiving this form of FEMA assistance are:

  o Applicants who demonstrate their insurance settlement has been significantly delayed (30 days or more from the date a claim was filed) through no fault of their own, may be considered for initial Rental Assistance.[70]

  o Applicants accepting assistance in advance of receiving their insurance settlement must agree to repay FEMA upon receiving their insurance settlement.

### 4. Occupancy

Applicants (both owners and renters) must be able to prove they occupied the disaster-damaged primary residence before receiving Housing Assistance and some types of ONA (i.e., Personal Property Assistance and Moving and Storage Assistance). Certain types of ONA do not require verification of occupancy of a primary residence; these include Transportation Assistance, Funeral Assistance, Medical and Dental Assistance, and Child Care Assistance.

All household members at the time of the disaster are considered occupants. Occupant means a resident of the housing unit.[71] FEMA verifies occupancy through an automated public records search or submitted documents. In locations where automated verification of public records is limited, FEMA may partner with applicable authorities from the SLTT government to verify occupancy.

**Occupancy Documentation:**

When FEMA is unable to verify an applicant's occupancy of their disaster-damaged primary residence, the applicant may provide FEMA with any of the documents listed below for verification. FEMA will request additional documents from the list in *Figure 9* to prove occupancy in cases where the name reflected on utility bills and the name of the primary occupant conflict or when additional documentation is needed to clarify other conflicting information.

| Figure 9 : Documentation to Verify Occupancy | |
|---|---|
| Document and Description | Acceptable Document Dates |
| **Utility Bills:** Electric, gas, oil, trash, water/sewer bills that reflect the name of the applicant or co-applicant and the disaster-damaged residence address. | Utility bills must be dated within 3 months prior to the incident period. Utility bills showing no usage, or only service charges, are not sufficient occupancy verification documents. |
| **Merchant's Statement:** Bank or credit card statement, phone bill, cable/satellite bill, etc. that reflect the name of the applicant or co-applicant and the disaster-damaged residence address. | Merchant statements must be dated within 3 months prior to the incident period. |
| **Employer's Statement:** Pay stubs and similar documents that reflect the name of the applicant or co-applicant and the disaster-damaged residence address. | Employer's statements must be dated within 3 months prior to the incident period. |
| **Lease/Housing Agreement:** Copy of a written lease, housing agreement, or landlord's written statement that includes the name of the applicant or co-applicant, the landlord contact information, the basic terms of tenancy including the location of the pre-disaster unit, amount of rent, and duration of the lease confirming that the applicant lived there at the time of the disaster; and signatures from both the landlord and applicant/co-applicant. | These documents must be issued and dated prior to the incident start date and current (not expired) at the time of the disaster. |
| **Rent Receipts:** Copy of a rent receipt or bank statement (with image of the cancelled check) that reflects the name of the applicant or co-applicant, the landlord's contact information, the location of the pre-disaster unit, the amount of rent, and the landlord's signature. | Rent receipts must be dated within 3 months prior to the incident period. |
| **Public Official's Statement:** Public official's (e.g., Police Chief, Mayor, Postmaster) written statement that includes the name of the applicant or co-applicant, the disaster-damaged residence address, the period of occupation, and the name and telephone number of the individual providing the verification. | Public official's statements must be dated within the 18-month period of assistance or extended period of assistance. |
| Driver's license, state-issued ID card, voter registration card that reflect the name of the applicant or co-applicant and the disaster-damaged residence address. | Identification documents must be issued and dated prior to the incident start date and current (not expired) at the time of the disaster. |

**Document Exceptions:**

- Proof of Occupancy: If the listed documentation is unavailable, FEMA may accept a written self-declarative statement as a last resort, only from the applicants living in insular areas, islands, and tribal lands. The statement must also include how long the applicant lived in the disaster-damaged residence prior to the Presidential disaster declaration, an explanation of the circumstances that prevent standard occupancy verification, and the applicant's signature. The self-declarative statement may be written post-disaster.

- Intent to Occupy Statement: Applicants not occupying the residence at the time of the disaster may still receive consideration for IHP assistance if they submit a written statement along with supporting verifiable documentation, such as a utility deposit or a pre-dated lease that contains the applicant/co-applicant's name and the residence address. Supporting documentation must be dated on or before the first day of the incident period.

  o Example 1: An applicant who recently purchased a home that was destroyed while the applicant was in the process of moving in may be eligible based on intent to occupy. Such applicants not occupying the residence at the time of the disaster may still be eligible if they submit documentation showing their intent to occupy the home as their primary residence.

  o Example 2: In addition to meeting general eligibility criteria (see Chapter 3, II.), incarcerated applicants must submit documentation verifying they will be released prior to the end of the assistance period, such as official documentation from the correctional facility or detention center, or information (e.g., name of incarcerated individual, city and state of the facility, etc.) necessary to complete an online search of the facility's online database to determine the release date, if available.

- If an incarcerated applicant is not released prior to the inspection, and cannot be present for an inspection, they must designate a third party 18-years or older to meet with the inspector on their behalf.

**Citizenship and Occupancy:** To meet the occupancy requirement, the applicant (or co-applicant) must prove occupancy and meet FEMA's citizenship requirement. If the applicant is a minor child, the co-applicant must be the child's parent or legal guardian, and prove they occupied the disaster-damaged residence at the time of the disaster.

**Student Occupancy:** Applicants who lived in housing provided by an educational facility (e.g., college dormitory) may be eligible for IHP assistance if the student housing was their primary residence. For additional information on student eligibility for disaster assistance, see Chapter 3, II.B.

### 5. Ownership

FEMA verifies ownership through an automated public records search or submitted documents. In locations where automated verification of public records is limited, FEMA may partner with applicable authorities from the SLTT government to verify ownership.

When an applicant's ownership of their pre-disaster primary residence has been verified, they may be considered for Home Repair Assistance, Home Replacement Assistance, or PHC Assistance.

FEMA defines an owner-occupied residence[72] as one where the applicant:

- Is the legal owner who permanently resides at the disaster-damaged residence; or

- Does not hold a formal title to the residence and pays no rent, but is responsible for the payment of taxes or maintenance of the residence; or

- Has lifetime occupancy rights with formal title vested in another (see *Figure 10* for required documentation).

**Ownership Documentation:** When FEMA is unable to verify an applicant's ownership of their primary residence, the applicant may provide FEMA with documentation to prove ownership. Applicants may provide additional documents from the list in *Figure 10*.

| Figure 10: Documentation to Verify Ownership | |
|---|---|
| Document and Description | Acceptable Document Date |
| **Deed or Official Record:** Original deed or deed of trust to the property. | Deed must be current/effective during the disaster incident period. |
| **Mortgage Documentation:** Mortgage statement or escrow analysis. | The most recent mortgage statements available should be submitted (within three months of the disaster incident period) and escrow documents should be from the last quarter. |
| Real property* insurance document, bill, payment record, or structural insurance documentation.<br><br>*Buildings or other structures permanently attached to land, and the land itself. Includes items that are structural components of the buildings or structures.* | Within three months of the disaster incident period |
| Property tax receipt or property tax bill | Current and/or effective during the disaster incident period. |
| Manufactured home certificate of title | |
| Real Estate Provision | |
| Contract for Deed | |
| Land Installment Contract | |
| Quitclaim Deed | |
| Bill of Sale or Bond for Title | |
| Will or Affidavit of Heirship naming the applicant heir to the property and a death certificate | |

The document provided must reflect:

- The name of the applicant or co-applicant registering for assistance;
  - If the applicant is a minor child, documentation must be in the parent/guardian co-applicant's name
  - If ownership is proven by an Affidavit of Heirship or a will, documentation must reflect the deceased owner's name, date of death, and evidence of the applicant's heirship. The will or Affidavit of Heirship documentation must comply with state law.
- The address of the disaster-damaged primary residence; and
- A date prior to the disaster incident period.

**Document Exceptions:** If the listed documentation is unavailable, FEMA may accept:

- A written self-declarative statement as a last resort, only from applicants living in insular areas, islands, and tribal lands. The statement must include the address of the disaster-damaged primary residence, how long the applicant lived in the disaster-damaged primary residence prior to the Presidential disaster declaration, an explanation of the circumstances that prevent standard ownership verification, and the applicant's signature. The self-declarative statement may be written post-disaster; however, FEMA will not accept a declarative statement of ownership for pre-disaster squatters.
- Evidence the applicant is financially responsible for major repairs to the primary residence. Evidence may include receipts that show the applicant was responsible for major repairs or maintenance (e.g., roof, furnace, plumbing, structural component repair or replacement).

**Citizenship and Ownership:** To meet the ownership requirement, the applicant or co-applicant must prove ownership and meet FEMA's citizenship requirements. If applying on behalf of a minor child, the applicant must be the owner of the home and the child's parent or legal guardian.

## B. Additional Eligibility Considerations

Although general eligibility considerations apply to all IHP applicants, certain situations and living arrangements require additional clarification.

### 1. Condominiums and Cooperatives

FEMA may provide Housing Assistance and ONA to condominium (condo) owner-occupants and cooperative (co-op) owner-occupants for eligible disaster-caused damage they are responsible for within their unit (see *Figure 11*).

The owner of a condo or co-op unit is generally responsible for the fixtures, installations, and additions within the interior surfaces of the unit's perimeter walls, floors, and ceilings. This includes interior partitions, plumbing, appliances, and the exterior heating and cooling units from the point of supply into the unit. FEMA generally does not provide assistance for disaster-caused damage to structural elements (e.g., roof, exterior walls, chimneys, and shared foundation) and common areas shared by all residents such as recreational facilities, outdoor space, parking, landscaping, fences, laundry rooms, and all other jointly-used space.

The condo or co-op association's master insurance policy generally covers damage to common areas and structural elements of the building that are shared by all residents. If the condo or co-op association does not hold an insurance policy for a particular peril and the association is responsible for the item, FEMA will not assist with the expenses related to any damage or the assessment fees resulting from the disaster due to the item being a shared common area expense.

**Condominium vs. Cooperative**

A **condominium residence** generally is a type of housing where each resident owns their individual unit in a multi-unit building and shares the costs of maintaining the structural elements and common areas (i.e., roof, hallway, HVAC, walkways).

A **cooperative residence** is generally a type of housing wherein residents are shareholders of a corporation that owns the building and/or property where they reside. The share entitles each resident exclusive use of the unit they live in.

| Figure 11: Condo and Co-op Assistance | | | |
|---|---|---|---|
| Building Portion | Responsible Party | Insurance Policy Type | Eligible for IHP |
| Condo or co-op unit, walls in | Unit owner | Unit owner's policy | Yes, if uninsured or underinsured losses |
| Damaged structural elements and common areas shared by all residents | Condo or co-op association | Condo or co-op association's master policy | No, unless applicant submits documentation indicating individual responsibility |

Individual condo or co-op owners who claim responsibility for damaged structural elements (e.g., roof, exterior walls, chimneys, and shared foundation) or damaged items in common areas need to submit verifiable documentation to FEMA indicating individual responsibility, including the master policy or bylaws, in order to be considered for assistance.

### 2. Limited Liability Company

Individuals or households living in properties owned by a Limited Liability Company (LLC) or time-share properties are considered renters and generally are not eligible for Home Repair Assistance or Home Replacement Assistance. However, an applicant occupying a dwelling owned by an LLC or other similar legal entity may be eligible for Home Repair Assistance or Home Replacement Assistance if they provide documentation that proves:

- The applicant occupies the dwelling as their primary residence;
- The legal entity does not have commercial purposes, such as ownership of more than one dwelling;
- The applicant or member of the household is the sole member of the legal entity;
- The dwelling is uninsured or underinsured; and
- All other Conditions of Eligibility are satisfied.

Applicants who own a dwelling on LLC-owned land may also be eligible for Home Repair Assistance or Home Replacement Assistance if they prove ownership of the home. FEMA may request additional documents to prove ownership when additional information is needed or to clarify conflicting information.

Applicants living in dwellings owned by an LLC or other similar legal entity will remain eligible for all categories of assistance that do not require ownership verification.

### 3. Separated Households

FEMA may provide Rental Assistance and/or LER to members of a family or household who were separated during a disaster through no fault of their own, such as those who were evacuated to different locations. Once the separated household members reunite, any eligible Continued Temporary Housing Assistance (see Chapter 3, IV.C.) will continue under the head of household's application to ensure no duplication of benefits (DOB). Rental Assistance provided to the previously separated household members will cease to ensure no DOB. Each application's total number of months and total amount of Rental Assistance and LER awarded is compared to the 18-month assistance period separately. Generally, FEMA provides all eligible IHP awards under only the head of household's application to assist all members of the pre-disaster household. Only the head of household will be eligible for additional categories of IHP assistance.

### 4. Roommates and Boarders

FEMA defines roommates as household members with an independent financial responsibility for the housing unit that are not dependents of each other and are not married, such as renters whose names are on a lease.

FEMA considers boarders as individuals or families in a private commercial relationship with the landlord. Boarders may reside in a housing unit with the landlord/head of household or in a separate housing unit within the structure.

FEMA defines a commercial relationship as a formal agreement to rent a portion of a residence from the owner.

**Housing Unit**

Housing unit is defined as a house, apartment, manufactured home, recreational vehicle, readily-fabricated dwelling, houseboat, or any other distinctly-separated living space. A living space may qualify as a housing unit if it includes facilities for cooking, eating, and sanitation. It must be directly accessible from an outer door or through an interior door in a shared hallway rather than by walking through another household's living space.

Chapter 3: Individuals and Households Program

| Figure 12: Assistance for Roommates and Boarders | | |
|---|---|---|
| Type of Assistance | Eligible Party | Limitations |
| Personal Property Assistance | Each roommate and boarder with individually-owned items | Combined applications for same housing unit cannot exceed a specific line item maximum quantity limit |
| Medical and Dental Assistance<br><br>Funeral Assistance<br><br>Child Care Assistance<br><br>Moving and Storage Assistance<br><br>Miscellaneous Items<br><br>Transportation Assistance<br><br>Group Flood Insurance Policy | Each roommate and boarder | Standard criteria |
| Rental Assistance | First roommate who applies, unless roommates are unable to relocate together due to extenuating circumstances<br><br>Boarders residing in the same housing unit as the landlord/head of household, if unable to relocate together due to extenuating circumstances<br><br>Boarders residing in a separate housing unit within the structure may be eligible for Rental Assistance separate from the landlord | FEMA expects all household members residing in the same housing unit to relocate together |



*A FEMA inspector verifies wildfire damage at a severely impacted home site in Texas.*

Roommates and boarders must be able to demonstrate a formal agreement or financial responsibility to the household. A pre-disaster financial responsibility or formal agreement can be supported by one of the following:

- Pre-disaster rent receipts, cancelled checks, or money orders for the disaster-damaged primary residence;

- Pre-disaster lease, landlord's written or verbal statement, or rental agreement for the disaster-damaged primary residence; or

- Pre-disaster major utility bills (water, electricity, or gas) in the roommate's or boarder's name for service at the disaster-damaged primary residence.

Roommates and boarders may be eligible for individually-owned ONA personal property items and identified miscellaneous line items on the *ONA Administrative Option Selection Form*. They will be considered under separate applications, but all the applications combined cannot exceed what FEMA identifies as the maximum quantity limit for a specific line item for a housing unit. FEMA awards assistance to the landlord/head of household or the first roommate that applies. Subsequent applicants designated as roommates or boarders will only receive assistance for non-duplicative line items; however, this limitation excludes boarders residing in a separate housing unit. Designation as a roommate or boarder does not impact an applicant's eligibility for Medical and Dental Assistance, Funeral Assistance, Child Care Assistance, Moving and Storage Assistance, Transportation Assistance, or GFIP under ONA.

Generally, FEMA awards Rental Assistance under one household member application for the housing unit, with the expectation that the household will relocate together. In some instances, Rental Assistance may be provided to individual roommates or boarders when they are unable to relocate with the household due to extenuating circumstances. In order for FEMA to process Rental Assistance, the individual roommate or boarder must submit a written statement explaining the extenuating circumstances that prevented the household from relocating together along with supporting documentation, if applicable.

### 5. Military Personnel

FEMA may provide assistance to eligible active duty military and civilian military employees if the assistance is not duplicated from available assistance from the military such as the Military Personnel and Civilian Employees' Claim Act.

FEMA does not automatically provide Rental Assistance for applicants who live in military-provided housing that received disaster-caused damage. However, applicants living in military housing may receive FEMA Rental Assistance if they provide documentation showing they are not receiving housing assistance from another source.

**Military Personnel**

The *Military Personnel and Civilian Employees' Claim Act* provides assistance to active duty military personnel and military civilian employees in military housing for personal property (including vehicles) as a result of disaster-caused damage or loss.

The *Safe Haven Allowance* from the Department of Defense (DOD), assists military personnel and their families with disaster-caused housing costs.

Active duty military members who can satisfy occupancy and ownership conditions of eligibility for their privately-owned pre-disaster primary residence may be eligible for all categories of assistance. Active duty military members are ineligible for assistance if they are not occupying their privately-owned residence at the time of the disaster or cannot prove their intent to occupy the residence within the period of assistance. Active duty military personnel stationed outside of the country can authorize a third party to be present for inspection of their primary residence within the declared area. All military personnel, regardless of residence type or military status, may be eligible for ONA if the items are not covered by the Military Personnel and Civil Employees' Claim Act.

### 6. Students

FEMA may provide assistance to students who have disaster-caused damage or losses. Students living in housing provided by an educational facility may be eligible for Housing Assistance. FEMA determines eligibility for Rental Assistance based on whether the student applicant is "dependent" or "independent" and whether the housing is their primary residence. Independent students living in college dormitories may be eligible for Rental Assistance; dependent students are not eligible for Rental Assistance.



**Students**

Eligible student applicants may receive Medical and Dental Assistance, Funeral Assistance, Moving and Storage Assistance, Transportation Assistance, Assistance for Miscellaneous Items, and Child Care Assistance under ONA regardless of their residence type or dependent status.

Personal Property Assistance is available for uninsured damaged items regardless of the student's residence type or dependent status. Personal Property Assistance is limited to student-owned items recorded during FEMA inspection. This excludes items provided by the institution or covered by an insurance policy.

**Independent**

The term "Independent" refers to students who are financially independent from parent(s) or guardian(s) and:

- Do not have a primary residence elsewhere and are responsible for their own living expenses;
- Are at least age 24 by December 31 of the award year;
- Were married prior to the disaster;
- Are in a masters or doctorate program;
- Have legal dependents;
- Are an orphan or ward of the court;
- Are on active military duty or are a military veteran; or
- Have documented determination of independent status by a financial aid administrator.

### 7. Pre-Disaster U.S. Department of Housing and Urban Development (HUD) Applicants

FEMA works closely with HUD to ensure applicants who were pre-disaster recipients of HUD assistance receive the appropriate form of FEMA Temporary Housing Assistance after a disaster.

Because FEMA may not duplicate assistance with any other Federal program, insurance, voluntary organization, or other entity, the applicant, FEMA, and HUD must work closely to determine the appropriate responsibility for the applicant's disaster housing needs. FEMA's Joint Field Office (JFO) will work with HUD counterparts at the SLTT government levels to determine which applicants were assisted by HUD prior to the disaster. Applicants' eligibility for FEMA Temporary Housing Assistance will be based on the availability of HUD assistance for the applicants after the disaster.

Once HUD assistance is available and offered to the applicant by HUD, the applicant will no longer be eligible for FEMA Temporary Housing Assistance. At this time, if they refuse to receive HUD assistance, they will no longer be eligible for continued disaster-related HUD assistance. For limitations and exclusions, see Chapter 3, IV.A.3.

### 8. Residents of Assisted Living Facilities

Applicants whose primary residence is an assisted living facility may receive assistance for housing, personal property, and other disaster-caused needs not covered by the assisted living facility. Assisted living facilities are usually responsible for relocating their residents to temporary housing, if necessary. In some instances, certain furnishings in the residence may belong to the assisted living facility.

FEMA provides assistance to applicants living temporarily in a hospice, hospital, nursing home facility, or similar facility at the time of the disaster, and who have a primary residence in the declared area. The applicant must demonstrate their current living situation is temporary, they intend to relocate back to their damaged primary residence, and their housing needs are not being met by the temporary living facility.

Applicants living in assisted living facilities may still be eligible for certain ONA types, such as Personal Property Assistance and Moving and Storage Assistance.

### 9. Homeless

FEMA does not provide Housing Assistance (Rental Assistance, direct assistance, Home Repair Assistance, or Home Replacement Assistance) to applicants experiencing homelessness because the need for housing was not caused by the disaster.

Applicants experiencing homelessness pre-disaster may be eligible for certain types of ONA (Transportation Assistance, Medical and Dental Assistance, Funeral Assistance, and Child Care Assistance).

**Definition of Homeless**

An applicant experiencing homelessness is an individual whose pre-disaster living arrangements were transient in nature and void of any form of structural ownership. Examples of homeless living situations may include rent-free shelters, bridges, underpasses, or streets.

### 10. Residents of Non-Traditional Housing

FEMA may provide initial Rental Assistance and ONA to applicants who resided in non-traditional forms of housing (e.g., tents and certain types of huts and lean-to structures) pre-disaster.



**Definition of Non-Traditional Housing**

Non-traditional housing is a form of dwelling void of structural floor, structural walls, and structural roof.

Non-traditional housing may be more prevalent in certain areas, such as tribal communities, territories, and insular areas. Occupancy must be verified by a credible or official source (e.g., tribal council, public official, homeless outreach advocate) at the time of inspection. Applicants may also verify occupancy by submitting any document listed in Chapter 3, II.A.4, or a signed, written statement from a credible or official source, which includes the applicant's name, location of residence, dates of occupancy pre-disaster, and the source's name, title, and contact information.

If pre-disaster occupancy cannot be verified, applicants may only be eligible for types of ONA that do not require occupancy verification (Transportation Assistance, Medical and Dental Assistance, Funeral Assistance, and Child Care Assistance). FEMA does not provide direct assistance, Home Repair Assistance, Home Replacement Assistance, or Continued Temporary Housing Assistance to residents of non-traditional housing.

| Figure 13: Assistance for Residents of Non-Traditional Housing | | |
|---|---|---|
| Eligible Party | Type of Assistance | Limitations |
| Applicants who resided in non-traditional housing who are unable to verify occupancy | • Transportation<br>• Medical and Dental<br>• Funeral<br>• Child Care | • Ineligible for all forms of Housing Assistance<br>• Ineligible for forms of ONA that require successful verification of occupancy (Personal Property, CNA, and Moving and Storage) |
| Applicants who resided in non-traditional housing (i.e., tents, etc.) who are able to verify occupancy | • Initial Rental Assistance<br>• LER<br>• All types of ONA | • Ineligible for Continued Temporary Housing Assistance or direct assistance<br>• Ineligible for Home Repair or Replacement Assistance |

### *11. Flood Zones and Protected Areas*

Restrictions and conditions apply to the IHP assistance FEMA provides in Special Flood Hazard Areas (SFHAs), sanctioned communities, Coastal Barrier Resources System (CBRS) units, and otherwise protected areas (OPAs).

### *National Flood Insurance Reform Act (NFIRA)*

NFIRA and FEMA regulations require applicants who receive Federal financial assistance to purchase flood insurance for future flood damage to any insurable property for acquisition or construction purposes. This requirement applies only to real and personal property that is, or will be, in a designated SFHA and can be insured under the National Flood Insurance Program (NFIP). For purposes of IHP, Federal financial assistance means assistance in the form of Home Repair Assistance, Home Replacement Assistance, PHC, or Personal Property Assistance. Therefore, applicants who live in a designated SFHA and receive IHP assistance for Home Repair Assistance, Home Replacement Assistance, PHC, or Personal Property Assistance must obtain and maintain flood insurance coverage for at least the amount of disaster assistance they receive from FEMA for NFIP-insurable items real or personal property. Applicants may satisfy the insurance requirement by purchasing private insurance or a policy through the NFIP.

Applicants who do not obtain and maintain flood insurance will be ineligible for IHP assistance for flood-damaged real or personal property in future disasters with flood-related damage.

A dwelling may be insurable by the NFIP if it meets the NFIP definition of a building, which is defined as "a structure with two or more outside rigid walls and a fully secured roof, that is affixed to a permanent site."[73] If an applicant is provided IHP assistance for flood-damaged real property and the dwelling is uninsurable through NFIP, the applicant will not be eligible for flood-damaged real property losses in future disasters with flood-related damage.

The NFIP was created to reduce the impact of flooding on private and public structures by providing affordable insurance to property owners and by encouraging communities to adopt and enforce floodplain management regulations. If a property is later remapped and no longer determined to be in a designated SFHA, the flood insurance requirement will no longer apply.

### *Coastal Barrier Resources Act (CBRA)*

CBRA protects coastal areas from development by limiting Federal financial assistance for development-related activities in designated CBRS areas. CBRS areas are coastal areas that protect valuable habitat for fish and wildlife and are subject to wave, wind, and tidal forces; these areas are mapped by the U.S. Fish and Wildlife Service. The CBRS contains two types of coastal barrier areas: CBRS Units and OPAs.

An eligible applicant whose pre-disaster primary residence is located within a CBRS Unit may not be considered for Home Repair Assistance, Home Replacement Assistance, PHC, or certain types of ONA.

An eligible applicant may be considered for Rental Assistance and the following types of ONA:

- Funeral Assistance
- Medical and Dental Assistance
- Child Care Assistance
- Critical Needs Assistance

- Clean and Removal Assistance

- Assistance for Miscellaneous Items

  - Financial assistance may not be considered for items obtained after the start of the incident period that are typically used to rebuild the pre-disaster residence.[74] However, assistance may be awarded for expenses to purchase or rent items required to power life-sustaining medical equipment (e.g., generators; see Chapter 3, VI.B.4).

FEMA may not provide Direct Temporary Housing Assistance in the forms of MLR or TTHUs within a CBRS Unit. However, an applicant may be eligible to receive these forms of assistance provided in locations outside of the CBRS Unit.

An eligible applicant whose pre-disaster primary residence is located within an OPA may be considered for all forms of IHP assistance; however, the residence is also subject to NFIRA requirements for sanctioned communities and SFHAs, if applicable (see Chapter 3, II.B.10). Federal flood insurance through the NFIP is not available in CBRS Units or OPAs.

### *Sanctioned Communities*

Sanctioned community means a community in which FEMA has identified SFHAs on a Flood Insurance Rate Map (FIRM) and the community has failed to join the NFIP within one year of the FIRM being published. Although a community's participation in the NFIP is voluntary, participation is required for purchase of Federal flood insurance within the community and requires the community to adopt and enforce a flood damage prevention ordinance. A suspended community is a community in which FEMA has identified SFHAs on a FIRM, but FEMA has suspended the community from the NFIP for failure to enforce a flood damage prevention ordinance in compliance with the NFIP.

Applicants who have disaster-caused flood damage to their primary residence in a sanctioned community are not eligible to receive assistance for NFIP-insurable real and personal property items damaged by flooding.[75] However, the individual or household may be eligible,[76] if the community in which the damaged property is located qualifies for and enters the NFIP during the 6-month period following the declaration.

Applicants who fail to obtain and maintain flood insurance, or live in sanctioned communities may be eligible for all the following, if general IHP conditions of eligibility are met:

- Medical and Dental Assistance, Funeral Assistance, Assistance for Miscellaneous Items, Child Care Assistance, Moving and Storage Assistance costs over $1,000 (NFIP covers the first $1,000 of moving expenses), Transportation Assistance, and CNA;

- Rental Assistance or Direct Temporary Housing Assistance in the form of Multi-Family Lease and Repair, TTHUs, or Direct Lease;

- Real and Personal Property items not damaged by flooding; and

- Uninsurable damaged items, such as wells and septic systems.

| Figure 14: Flood Insurance Requirements for Homeowners and Renters | |
|---|---|
| Owners | Flood insurance coverage must be maintained at the address for as long as the address exists and for at least the assistance amount awarded for flood-damaged, NFIP-insurable losses. If the home is sold or otherwise becomes owned by someone else, the requirement to purchase and maintain flood insurance carries over to any subsequent owner. |
| Renters | Flood insurance coverage must be maintained on the contents for at least the IHP assistance amount awarded for flood-damaged, NFIP-insurable personal property, as long as the applicant lives at the flood-damaged rental property address. The requirement is lifted once the applicant permanently moves from the rental unit.<br><br>Subsequent renters will not be required to maintain flood insurance for their personal property unless they previously received IHP assistance for flood-damaged, NFIP-insurable personal property while residing at the same address.<br><br>Note: If a pre-disaster renter becomes an owner by purchasing the rental property at which they received IHP assistance for their flood-damaged, NFIP-insurable personal property losses, but fails to maintain the flood insurance on their personal property, they may receive IHP assistance for flood-damaged real property losses; however, they will not be eligible for Personal Property Assistance. |
| *44 C.F.R. § 206.110(k)(3)(i)(A)* | |

Applicants may also receive Mass Care and Emergency Assistance (MC/EA), including congregate sheltering (Chapter 2, II.) and Transitional Sheltering Assistance (TSA) (Chapter 2, IX.), Crisis Counseling (Chapter 5), Disaster Unemployment Assistance (DUA) (Chapter 7), Disaster Legal Services (Chapter 6), and Disaster Case Management (Chapter 4).

***Flood Insurance Requirement for Recreational Vehicles***

Recreational Vehicles (RVs) may include motorized vehicles (i.e., Class A, B, or C vehicles, or motorhomes) and travel trailers (e.g., fifth wheel, pop-up camper, etc.).

Generally, motorized vehicles are not insurable as property by the NFIP. Applicants whose primary residence is a motorized vehicle are exempt from the requirement to obtain and maintain flood insurance and may be eligible for IHP assistance, even if they received IHP assistance for flood-damaged personal property in a previous disaster.

RVs without wheels, built on a chassis, and affixed to a permanent foundation (referred to as "travel trailers")[77] are insurable under the NFIP. Applicants located in an SFHA, who previously accepted IHP assistance for a flooding incident and whose primary residence is a travel trailer,[78] are required to obtain and maintain flood insurance for as long as the address exists for at least the amount of flood-damaged IHP assistance received for real and/or personal property.

Applicants with a NFIRA requirement, who fail to affix a travel trailer to a permanent foundation and/or to properly elevate the travel trailer in compliance with the community's floodplain management requirements, rendering the unit uninsurable under NFIP, will be ineligible to receive any Federal assistance for flood-damaged real or personal property[79] in a future disaster.[80]

### *30-Day Period for Applicants to Decline Financial Assistance*

An applicant has 30 days to decline financial assistance that would trigger the flood insurance obtain and maintain requirement. Applicants who do not wish to obtain and maintain flood insurance must return all disaster assistance they receive for NFIP-insurable real and personal property to FEMA no later than 30 days from the date of the award determination letter from FEMA.

## C. Appeal Process

### *1. Timeline for Appeal*

Applicants must appeal initial eligibility determinations[81] within 60 days of the date on their eligibility notification letter.[82]

### *2. Determinations that May be Appealed*

Applicants may submit a written appeal if they disagree with any FEMA determination. An applicant may appeal:

- Initial eligibility determinations for Housing Assistance and ONA, including:
    - The amount or type of Housing Assistance and ONA an applicant received;
    - The decision to withdraw an application for FEMA disaster assistance;
    - The recovery of funds improperly awarded to an applicant (see Chapter 3, VII); or
    - The denial of a late application request for assistance.
- A denial for Continued Temporary Housing Assistance.
- Direct Housing Assistance determinations, including:
    - The termination of eligibility to remain in a temporary housing unit;
    - FEMA's intent to collect rent or the amount of rent collected from occupants of a FEMA-provided temporary housing unit;
    - A denial of a request to purchase a FEMA-provided MHU;
    - The sales price of a FEMA-provided MHU the applicant may want to purchase; or
    - Any Individual Assistance eligibility or participation-related determination, action or inaction.

When ONA is administered under the Joint or State Option described in ONA Cost Share and Administration (see Chapter 3, VI.A.2), the applicant must submit their appeal to the STT government. FEMA does not accept multiple appeals for the same reason, but may request additional information and conduct additional reviews as new information is received.

### 3. Requests for Copies of IHP Assistance File

Applicants may submit a written, signed request for a copy of FEMA's records related to their application for IHP assistance. The request must be in writing and specifically state what information the applicant would like to receive (e.g., entire file copy, copy of all correspondence from FEMA, etc.) and who is to receive the requested information (e.g., self, attorney, friend, etc.). If the file copy is to be provided to a third party, the full name and address of the third party must be included in the request.

The request must include the following for identity verification purposes:

- Applicant's full name

- Applicant's FEMA Application Number and Disaster Number

- Damaged property address and current mailing address, if different

- Applicant's date and place of birth

- Applicant's signature with one of the following:

    o Notary stamp or seal; or

    o The statement "I hereby declare under penalty of perjury that the foregoing is true and correct."

Written requests can be mailed or faxed using the information below.

- **Mailing Address:** Individuals and Households Program, National Processing Service Center; P.O. Box 10055; Hyattsville, MD 20782-8055

- **Fax Number:** 800-827-8112

If a Disaster Assistance Center account has been created, applicants can also upload documents through the Upload Center in their online account.

### 4. Appeal Submission

The applicant's appeal letter must explain the reason(s) for appeal and must be signed by the applicant or person who the applicant authorizes to act on their behalf.

The appeal submission should also include the following information:

- Applicant's full name

- Applicant's FEMA Application Number and Disaster Number

- Address of the applicant's pre-disaster primary residence

- Applicant's current phone number and address

**Figure 15: Sample Appeal Letter**

<div style="border:1px solid">

Applicant Name
Application Number
Disaster number
Street Address
City, State, Zip
Phone number

Dear FEMA,

On February 17, 2016, I received a letter from you stating that I am ineligible for assistance because I have insurance. I would like to appeal your decision, as my insurance company will not cover the damage.

Enclosed please find my insurance denial letter showing that I do not have insurance coverage for the damage to my home and personal property located at 123 Main Street, Everytown, Virginia.

Please review the enclosed information and reconsider your decision.

Thank you,

Applicant
[Signature]

</div>

If someone other than the applicant files the appeal, the applicant must also submit a signed statement giving that person authority to represent the applicant.[83] See Written Consent (Chapter 3, II.C.1) for more information. The appeal letter should be accompanied by documentation to support the appeal request, such as repair estimates, contractor estimates, or other supporting documentation.

## *5. Appeal Determination*

After FEMA receives the appeal, a caseworker with no prior involvement in the case reviews the appeal and file to determine if there is sufficient documentation to change FEMA's determination. If more information is needed in order to make a determination, FEMA takes one or more of the following actions:

- Calls the applicant and sends a letter requesting additional information with a deadline of 30 days to submit the additional information

- Contacts a third party, such as a contractor, insurance company, or mechanic in order to verify submitted information

- Schedules an appeal inspection

FEMA notifies applicants in writing about the appeal decision within 90 days of the receipt of the appeal letter.[84] FEMA's appeal decision represents the final agency determination and cannot be appealed again.[85]

# III. Delivering Individuals and Households Program Assistance

This section discusses the disaster assistance registration process, FEMA's process for verifying disaster-caused losses, and communication with applicants, as well as considerations for successfully providing equal access and delivering IHP assistance to all disaster survivors without discrimination. An applicant for IHP assistance will not be denied benefits or Federal financial assistance on the grounds of race, color, religion, nationality, sex, age, disability, English proficiency, or economic status, pursuant to Section 308 of the Stafford Act[86] and 44 C.F.R. Part 7.

## A. Applying for FEMA IHP Assistance

After the President declares a major disaster or emergency, FEMA coordinates with the respective STT government to determine the area designated for IA, establish a registration period, and provide multiple channels for disaster survivors to apply for IHP assistance.

### 1. Application Methods

FEMA offers disaster survivors multiple options to apply for IHP assistance and to receive updates on their application. Information on resources for non-English speakers can be found in Chapter 1.



*Access FEMA via smartphone through the application at www.fema.gov.*

- **Internet or Smartphone Application:**
  Disaster survivors may apply for IHP assistance or check their status at www.disasterassistance.gov. Disaster survivors may access FEMA via smartphone by visiting www.disasterassistance.gov or by downloading the FEMA application from www.fema.gov or through their mobile provider's application store.

- **Toll-free Helpline:** Disaster survivors may call FEMA toll-free at 800-621-3362 to register for assistance or check their application status. Disaster survivors who are deaf, hard of hearing, or have a speech disability and use a Text Telephone (TTY) may call 800-462-7585. Disaster survivors who use 711 or VRS (Video Relay Service) may call 800-621-3362.

- **Disaster Recovery Centers (DRCs):** Disaster survivors may apply for assistance in person at a DRC in or near their communities. FEMA and applicable STT governments and communities work together to quickly establish DRCs in convenient locations within an area impacted by a disaster. The variety of services available at DRCs give survivors the ability to "one-stop shop" for disaster related programs and receive help in navigating the path toward recovery. DRCs

are usually opened quickly after a disaster for a limited period of time. They are accessible and equipped to accommodate disaster survivors who need disability-related communication aids. FEMA staff can assist with completing registrations or checking their application status.

- **Disaster Survivor Assistance (DSA) Teams:** FEMA may send staff into the affected communities to help disaster survivors apply for IHP assistance. FEMA may also coordinate with the SLTT government to send staff into emergency shelters to assist survivors. FEMA staff are equipped with computers or similar devices to assist survivors with registering for IHP assistance or providing them referrals to other resources.

### *2. Registration Period*

Disaster survivors may apply for assistance after the start of the registration period. The application process begins with disaster survivors completing a registration with FEMA through any of the channels described above.

**Figure 16: Registration Period**

Date of Presidential Declaration → Initial Registration Period → Extension of Registration Period if Requested and Approved → Late Application Period

(60 Days between Date of Presidential Declaration and Extension; 60 Days before Late Application Period)

- **Initial Period:** The standard FEMA registration period is 60 days following the date the President declares a disaster for the designated area. The 60-day registration period starts on the date IA was designated for the declaration.[87]

- **Extensions of the Registration Period:** FEMA may extend the registration period when the STT government requests more time to collect registrations from the affected population. Examples of situations when an extension may be warranted include, but are not limited to when:

  o Necessary to establish the same registration deadline for subsequently designated contiguous areas;

  o There is a continued high volume of registrations; and/or

  o There are significant barriers to registration (i.e., extended loss of electricity).



**Subsequently Designated Areas**

For individuals in areas subsequently designated for IA after the date of declaration, the registration deadline is still 60 days after the date of declaration, not 60 days from the day the county or parish was designated for IA, unless extended.

Extensions may be approved as follows:

- o  The Regional Administrator, or their designee, may extend the initial registration period up to 60 days.

- o  Any subsequent extensions must be approved by the IA Division Director (IADD).

- **Late Application:** After the end of the registration period, FEMA will accept late applications for an additional 60 days. FEMA will not allow applications after the 60-day grace period, however, in order for FEMA to process late applications, the applicant must submit a letter to FEMA that explains the extenuating circumstances that prevented them from applying for assistance in a timely manner and signed by the applicant or person who the applicant authorizes to act on their behalf.[88] The letter should also include documentation justifying the extenuating circumstances. The documentation provided must be dated immediately prior to or within the FEMA registration period. Acceptable documentation may include:

  - o  Record of hospitalization, illness, or disability of the applicant or an immediate family member;

  - o  Record of death for an immediate family member; or

  - o  Proof of personal or business travel that kept the applicant out of the area for the full application period.

### *3. Information Needed to Complete Application*

FEMA requires all individuals registering for disaster assistance to self-certify and declare, under penalty of perjury, that they are a U.S. citizen, non-citizen national, a qualified alien, or the parent or guardian of a minor who is a U.S. citizen, non-citizen national, or qualified alien, and acknowledge the terms of the Privacy Act and Declaration of Eligibility Statement (*see Figure 17* for an excerpt of the statement).

**Figure 17: Privacy Act Statement and Declaration of Eligibility**



In addition, applicants must also provide all the following information to complete their application:

- Name and SSN of the primary applicant

- Name and SSN of secondary/co-applicant (encouraged but not required)

- Current and pre-disaster address

- Names of all occupants of the pre-disaster household

- Current contact information

- Types of insurance held by the household

- Household pre-disaster annual gross income

- Losses caused by the disaster

- Banking information for direct deposit of financial assistance, if requested

## B. Verifying Losses

Once disaster survivors register for assistance, FEMA is required to verify losses to determine their eligibility for IHP assistance. FEMA uses multiple loss verification methods, including:

- Onsite inspection

- Geospatial inspection

- Documentation

*A FEMA inspector speaks with a resident of a home damaged by Hurricane Sandy during an on-site inspection in New Jersey.*

FEMA's standard loss verification method for initial eligibility determination is an on-site inspection by a FEMA inspector.

FEMA may, at its discretion, determine other methods of verification (i.e., geospatial inspection) that will be used to help verify loss and deliver assistance. FEMA may also review and verify documentation such as medical bills or auto repair receipts for disaster-caused losses that cannot be verified through on-site or geospatial inspections.

### 1. Onsite Inspection

FEMA inspectors typically schedule an on-site inspection with the applicant within two weeks after the applicant has registered for disaster assistance. FEMA inspectors are typically hired contractors, must pass a background check prior to working with FEMA, and are issued a badge identifying them as a FEMA contractor.

The FEMA inspector does not determine the applicant's eligibility for disaster assistance. During the inspection, the FEMA inspector assesses damage to the disaster-damaged primary residence and personal property such as furniture,



*A FEMA inspector arrives for an on-site inspection and shakes hands with a tornado survivor in Oklahoma.*

appliances, vehicles, and essential equipment for daily household needs. IHP assistance may be awarded if, during inspection, the inspector determines the damage was caused by the disaster and affects the functionality of the home. FEMA inspectors will not physically inspect areas it is unsafe for them to access. Specifically, the FEMA inspector will:

- Verify the applicant's name, address, contact information, and insurance;

- If required for a specific disaster, collect the applicant's signature on the *Declaration and Release form (FEMA Form 009-0-3)* certifying the applicant's citizenship or eligible immigration status;

- Confirm individuals living in the disaster-damaged residence; bedrooms occupied; clothing, medical, dental, transportation, or miscellaneous losses; and items purchased as a result of the disaster (e.g., chainsaw, dehumidifier);

- Assess the pre-disaster residence's structure, furniture, and appliances for damage caused by the disaster, as well as undamaged items;

- Document the pre-disaster residence's square footage, foundation, and structural type (e.g., one or multiple stories). Record the cause of damage, applicable water levels, impacted utilities, and accessibility features; and

- Confirm with the applicant all damage has been viewed, describe next steps in the FEMA process, and advise the applicant to contact FEMA's Helpline (800-621-3362) to request information such as status updates, types and amount of assistance awarded, required documentation, and/or general questions about IHP assistance.

Applicants who cannot meet the inspector on-site may write to FEMA authorizing a third party over the age of 18 (e.g., neighbor, landlord) to attend the inspection on their behalf. Applicants whose pre-disaster residence is inaccessible may meet the FEMA inspector at an alternate location.

Applicants with limited English proficiency, or those who are deaf or hard of hearing, can request translation services, a qualified sign language interpreter, or other accommodations for inspections.

Applicants may request accommodations by contacting FEMA's Helpline, visiting a DRC, or speaking with a DSA Team. Once the inspection is complete, the inspector will submit the inspection record to FEMA, which will consider the information when determining eligibility for IHP assistance.

In some cases, FEMA may conduct another inspection to validate losses if, for example, areas of the residence are initially inaccessible, or in cases where the applicant appeals FEMA eligibility determinations. Inspectors do not perform inspections on residences they have previously evaluated; appeal inspections are conducted by a different inspector to ensure a fair and impartial assessment.

### 2. Geospatial Inspection

FEMA may use geospatial inspections to verify losses. Geospatial inspections can be instrumental in FEMA's ability to quickly determine eligibility for a large number of communities and expedite delivery of initial assistance to eligible applicants.



FEMA uses a variety of techniques and technologies to conduct geospatial inspections. This includes using aerial and satellite photography and remote sensing technologies. FEMA's evaluation of pre-disaster data includes information on the area's demographics and population density, property parcels, building and infrastructure types, and pre-disaster images.

*FEMA inspectors use an airplane to inspect homes damaged by flooding in remote Alaskan villages.*

### 3. Documentation of Losses

In some cases, FEMA needs documentation from applicants such as receipts, bills, or estimates to verify losses. Examples of documentation include, but are not limited to:

- Receipts or estimates for medical or dental services, prescriptions, durable medical equipment (DME), assistive technology devices

- Receipts or contracts for child care services

- Receipts for moving and storage services

- Mechanic's statement, estimate, or receipt for vehicle repair

- Contractor's statement, estimate, or receipt for damage to wells, septic, or furnace system
  For additional information on assistance for these losses and documentation requirements, see Chapter 3, VI.

## C. Applicant Communication

FEMA communicates with each applicant throughout the IHP process to gather information, inform them of their eligibility for assistance, refer them to other sources of assistance, and guide them on the proper use of IHP funds.

### 1. Written Consent

FEMA generally communicates directly with each applicant to protect their private information. The Privacy Act requires FEMA to obtain written consent from the applicant in order to share their disaster assistance records with a third party.

The written consent must:

- Be in writing (handwritten or typed);

- Include the applicant's identity verification information (full name, current address, date and place of birth);

- Be dated and signed by the applicant;

- Be notarized or include the statement, "I hereby declare under penalty of perjury that the foregoing is true and correct.";

- Include an individual identifier. Examples are: the FEMA Application Number, current mailing address, current phone number;

- Specify what information can be released to the third party (e.g., the entire case file, the current contact information, the amount of disaster assistance received); and

- Include a third-party designation. The individual must designate the individuals, entities, or organizations to which the disclosure is being consented.

FEMA may accept a Power of Attorney, Guardianship, or Conservatorship documentation from an applicant's assigned third party if it meets the state law requirements where the applicant resides. Since these instruments have different restrictions, authorizations, or purposes than the Privacy Act, the submitted information must be coordinated further for program review and FEMA's Office of Chief Counsel review and validation prior to sharing information or access to the applicant's file with the third party.

### 2. Letters

FEMA also communicates with applicants through electronic notification via email, online through www.disasterassistance.gov, or letters sent through the U.S. Postal Service. If the applicant needs letters in an alternative format or needs assistance understanding the letters, they may contact FEMA's Helpline or visit a DRC. All FEMA letters sent to applicants are written in plain language. Letters may include:

- **Eligibility Notifications:** This letter informs the applicant of the types of assistance FEMA has determined they are eligible or ineligible to receive, the amounts of assistance FEMA is providing for each eligible need, the reasons an applicant is ineligible for the applicable types of assistance, an explanation of the appeals process, and other key information regarding disaster assistance, including proper use of disaster assistance funds.

- o **Use of Funds:** Applicants are advised on appropriate use of disaster assistance funds in their notification letter from FEMA. Applicants should document how they used disaster funds and retain these records (e.g., receipts, invoices) for at least three years to ensure they are prepared if FEMA identifies their case for an audit.

- o **Appeals Process:** Applicants who disagree with a FEMA eligibility decision may appeal the decision. FEMA reviews the applicant's written appeal and documentation received from the applicant supporting the appeal. Upon review, FEMA either provides a written decision to the applicant or requests more information from the applicant. If FEMA upholds a decision on an appeal, FEMA's decision is considered final and will generally not be reconsidered.

- **Request for Information:** If FEMA requires more information to process an applicant's request, an applicant may receive a letter requesting additional information.

### 3. Insular and Remote Areas

FEMA has unique considerations for delivering Federal assistance in insular areas (i.e., Guam, the Commonwealth of the Northern Mariana Islands, American Samoa, and the U.S. Virgin Islands) or otherwise remote areas such as the interior of Alaska. In some cases, the lack of building materials and skilled local labor, high transportation costs, and/or subsistence lifestyles require tailoring FEMA program delivery. FEMA works to immediately identify any potential obstacles to effectively deliver IHP assistance and determine what guidelines or procedures may need to be modified based on the needs of the impacted area.



*A FEMA inspector with a disaster survivor surveying damage from severe flooding and ice jams in the remote areas of the Koyukuk River, Alaska.*

Depending on the situation, FEMA may:

- Develop alternate means of identifying properties (e.g., using Global Positioning System coordinates if the area does not have or use a street naming or numbering system).

- Deploy registration and inspection teams to enable FEMA to gather information and verify losses in areas with unique logistical requirements.

- Consider additional personal property items necessary for climate-appropriate survival in insular areas, in coordination with the STT government. These items may include detached communal cooking facilities, food caches, smoke houses, or steam bath houses.

- Manually review applicant cases to determine eligibility instead of using an automated process. A manual determination process can better accommodate unique situations falling outside of standard IHP guidelines (e.g., verifying property ownership based on local official statements in areas where properties are handed down to families and few written records exist).

- Provide FEMA disaster assistance for increased shipping costs of materials to insular areas in order to make repair or replacement feasible.

### 4. Tribal Governments

FEMA recognizes the sovereign rights, authority, and unique status of tribal governments and is committed to working in partnership with tribal governments on a nation-to-nation basis. Tribal government refers to any Native American tribe, band, nation, pueblo, village, or community in the continental U.S. and Alaska that is listed as a tribe under the Federally Recognized Native American Tribe List Act of 1994.



Federally-recognized tribal governments may choose to request a disaster declaration from the President directly or be considered as part of their respective state's declaration request. Additionally, tribal governments may choose to receive one form of assistance (i.e., IA, PA, and HMGP) under a state declaration and another form of assistance through a direct disaster declaration as long as the assistance programs are different and there is no duplication of benefits. IA cost share[89] and other regulations apply for tribal governments as they do for state governments.

*Tribal village members gather at a local school to register with FEMA.*

FEMA works closely with the tribal government's assigned representatives to immediately identify issues and potential obstacles and determine what standard guidelines or procedures may need to be modified based on the needs of the impacted area.

Depending on the needs of the tribal government, FEMA may use alternative processes, services, and tools–such as those described above for insular and remote areas–to better serve and ensure expedited access to FEMA programs and assistance.



Overall, FEMA assists and coordinates with the tribal governments in accordance with the following principles:

- Consult with the tribal governments before taking a proposed FEMA action that would have a substantial direct effect on one or more tribes, the relationship between the Federal government and tribes, or the distribution of power and responsibilities between the Federal government and tribes.

*Members of the Shingle Springs Band of Miwok Indians hosted the California Tribal Historic Preservation Officers State Historic Preservation Summit.*

- Evaluate the impact of policies, programs, and activities on tribal trust resources and consider the rights and concerns of tribal governments in its decision-making, including impacts on individuals with disabilities and others with access and functional needs.

- Assist tribal governments, should they seek assistance, in setting priorities for the interests of their community members as related to FEMA programs.

## IV.  Housing Assistance (Financial)

The Housing Assistance provision of the IHP, authorized by Section 408(c) of the Stafford Act, provides financial and direct assistance for disaster-caused housing needs not covered by insurance or provided by any other source. Financial Housing Assistance refers to funds provided to eligible applicants for temporary lodging expenses, rental of temporary housing, or repair or replacement of a damaged primary residence.



*A road is severely damaged by flooding in Manitou Spring, Colorado, 2013.*

FEMA assistance may be provided when the disaster has caused damage that affects the habitability of the home. FEMA defines "uninhabitable" as a dwelling that is not safe, sanitary, or fit to occupy. "Safe" refers to being secure from disaster-caused hazards or threats to occupants and "sanitary" refers to being free of disaster- caused health hazards. FEMA also requires that disaster-damaged components were functional prior to the disaster. "Functional" refers to an item or home capable of being used for its intended purpose.[90] Applicants may provide FEMA with documentation about their disabilities that could potentially impact the habitability determination.

In addition, the applicant must agree to return funds to FEMA when the assistance provided by FEMA duplicates assistance from another source, was provided in error, was spent on expenses inappropriately, or was obtained through fraudulent means.

### A. Lodging Expense Reimbursement

FEMA may provide LER for applicants who incur out-of-pocket temporary lodging expenses[91] due to damage that affects the habitability of their primary residence as a result of a Presidentially-declared disaster.[92] Eligible lodging expenses may include the cost of the room and taxes charged by a hotel or other lodging provider. As a type of Temporary Housing Assistance, LER does not count toward the financial Housing Assistance maximum award an applicant may receive (see Chapter 3, I).

> **Lodging Expenses**
>
> Lodging expense means expenses for reasonable short-term accommodations that individuals or households incur in the immediate aftermath of a disaster.

#### 1. Conditions of Eligibility

LER may be awarded from the start date of the incident, up to and not to exceed seven days from the approved date of any initial Rental Assistance (Chapter 3, IV.B.) award, unless FEMA authorizes an extension. In addition to general conditions of eligibility (see Chapter 3, II.), applicants must meet the following conditions in order to receive LER:

- FEMA verifies, as a result of the disaster, the pre-disaster residence is:
  - Uninhabitable, meaning the dwelling is not safe, sanitary, or fit to occupy,[93] or requires repairs to make the residence habitable; or
  - Inaccessible, meaning the applicant's disaster-damaged primary residence cannot be entered due to access impediments (e.g., fallen trees, downed power lines, damaged access ramps) or restrictions placed by Federal, SLTT government officials.

- The applicant incurred temporary lodging expenses on or after the incident period start date.

- The applicant is not covered by insurance (e.g., Additional Living Expense [ALE], Loss of Use [LOU] coverage) or has insufficient insurance coverage to meet their temporary lodging needs.

- The applicant has not received lodging assistance from any other source (e.g., voluntary organization, etc.) for the same dates the applicant is requesting LER.

### *2. Required Documentation*

To be considered for LER, applicants must submit verifiable lodging receipts or itemized statements, including:

- The applicant or co-applicant's name

- The name, address, and phone number of the accommodation

- Dates of occupancy

- The amount of expenses incurred

**Acceptable Lodging Receipts**

FEMA may accept lodging receipts in the name of an individual not listed as a household member if the applicant submits proof they have reimbursed the third party for the charges.

Appropriate documentation may include a copy of the canceled check or receipt for the reimbursement of the charges made.

### *3. Limitations and Exclusions*

- LER does not include costs associated with:
    - Phone
    - Laundry
    - Internet
    - Movies
    - Food
    - Pet charges

- Lodging expenses incurred while residing at the home of family or friends will not be reimbursed.

- FEMA will not reimburse lodging expenses for dates an applicant was receiving Transitional Sheltering Assistance. (see Chapter 2, IX.).

- Expenses incurred during mandatory evacuation will not be reimbursed unless an inspection reports the applicant's home as uninhabitable, inaccessible, or affected by an extended disaster-caused utility outage.

- For applicants affected by inaccessibility or utility outage, LER is limited to the dates their residence was inaccessible or had an extended utility outage.

- For applicants whose primary residence is determined uninhabitable who do not choose to relocate, LER is limited to the period from the incident date to the inspection date when the applicant states they do not intend to relocate and are ineligible for Rental

Assistance.

## B. Rental Assistance

FEMA may provide financial assistance to pre-disaster homeowners or renters to rent alternate temporary housing if they are displaced from their primary residence as a result of a Presidentially-declared disaster.[94]

FEMA awards eligible applicants initial Rental Assistance based on the Fair Market Rent (FMR)[95] established by HUD for the county, parish, tribal land, municipality, village, or district where the pre-disaster residence is located and the number of bedrooms the household requires.[96]

Rental Assistance is intended to cover the monthly rent amount (including lot rent, if applicable) and cost of essential utilities (i.e., gas, electric, water, oil, trash, and sewer), excluding telephone, cable, TV, or internet service for the housing unit.[97]

FEMA may provide Rental Assistance, including initial and continued assistance awards, up to 18 months or the end of the 18-month period of assistance, whichever comes first. FEMA will also award applicants one additional month of rent when utilized for a security deposit. If the 18-month financial period of assistance is extended, the number of eligible months of Rental Assistance will also be extended.

**Figure 18. FEMA Rental Assistance Overview**

| Initial Rental Assistance | Continued Temporary Housing Assistance | Assistance Limits |
|---|---|---|
| • FEMA may provide up to 2 months of initial Rental Assistance for applicants at FMR | • Applicants who need Continued Temporary Housing Assistance submit paperwork that demonstrates a disaster-related and financial need. | • FEMA may provide Rental Assistance, including initial Rental Assistance and Continued Temporary Housing Assistance, for a total of up to 18 months or until the end of the 18-month period of assistance, whichever comes first, plus a security deposit. |

As a type of Temporary Housing Assistance, Rental Assistance does not count toward the financial Housing Assistance maximum award.

### 1. Conditions of Eligibility

In addition to meeting general conditions of eligibility (see Chapter 3, II), applicants must meet the following conditions in order to receive Rental Assistance:

- FEMA verifies, as a result of the disaster, the pre-disaster residence is:

  o Uninhabitable and requires repairs to make the residence habitable; or

  o Inaccessible and cannot be entered due to access impediments (e.g., fallen trees, downed power lines, damaged access ramps) or restrictions placed by Federal, SLTT government officials; or

  o Affected by utility outages that disrupt functionality of the residence; or

  o Unavailable due to forced relocation, such as the property owner restricting access to the property due to disaster damage or the owner taking possession of the

property for their own disaster housing.

- Applicant is not insured or has insufficient coverage to meet temporary housing needs (e.g., ALE, LOU coverage).

- Applicant is willing to relocate while repairs are being made to their pre-disaster residence. FEMA will not provide Rental Assistance to applicants who choose not to relocate.

- Applicant does not have access to adequate rent-free housing, or own a secondary or vacation home[98] within a reasonable commuting distance[99], or own an available rental property that meets their temporary housing needs.[100]

FEMA generally provides only one Rental Assistance award per household to assist all members of the pre-disaster household. FEMA will provide assistance to rent one housing unit per application, unless the size or nature of the applicant's household requires assistance to rent more than one housing unit (see Chapter 3, II).[101]

> **Reasonable Commuting Distance**
>
> Reasonable commuting distance means a distance that does not place undue hardship on an applicant. It also takes into consideration travel time involved due to road conditions (e.g., mountainous regions or bridges out) and the normal commuting patterns of the area.

## C. Continued Temporary Housing Assistance

FEMA may provide Continued Temporary Housing Assistance to eligible applicants based on need and generally only when adequate, alternate housing is not available, or when the applicant's permanent housing plan has not been fulfilled through no fault of the applicant.[102] The continued temporary housing need must be documented and the applicant must continue to work toward obtaining permanent housing to remain eligible for Continued Temporary Housing Assistance.

> **Permanent Housing Plan**
>
> Permanent housing plan means a realistic plan that within a reasonable time frame, puts the disaster survivor back into permanent housing that is similar to the pre-disaster housing situation. A reasonable time frame includes sufficient time for securing funds, locating a permanent dwelling, and moving into the dwelling.

FEMA generally expects that pre-disaster renters will use their initial Rental Assistance to obtain permanent housing[103] and that all recipients of financial assistance will obtain and occupy permanent housing at the earliest possible time.

Continued Temporary Housing Assistance is based on the HUD FMR for the county, parish, tribal land, municipality, village, or district in which the post-disaster housing unit is located. Award amounts are based on actual rent costs plus a utility allowance determined by HUD, not to exceed the HUD FMR unless a Rental Assistance rate increase has been authorized.[104]

As a type of Temporary Housing Assistance, Continued Temporary Housing Assistance does not count toward the financial Housing Assistance maximum award. FEMA may provide Temporary Housing Assistance up to 18 months or the end of the 18-month period of assistance, whichever comes first, plus one additional month of rent when utilized for a security deposit. Initial Rental Assistance and Continued Temporary Housing Assistance count toward the 18-month limit. If the 18-month financial period of assistance is extended, the number of eligible months of Rental Assistance will also be extended.

### 1. Conditions of Eligibility

Applicants must meet the following conditions to receive Continued Temporary Housing Assistance:

- Applicant was awarded initial Rental Assistance.

- Applicant exhausted previously awarded Rental Assistance for its intended use.

- Applicant is unable to return to their pre-disaster residence because it is uninhabitable, inaccessible, or not available due to the disaster.

- Applicant does not have the financial ability to obtain housing without assistance.[105]

- Applicant is not receiving assistance from any other source for temporary housing.

> **Maximum Rental Assistance**
>
> The maximum amount of Continued Temporary Housing Assistance available under IHP is 18 months of assistance plus the security deposit.
> If the 18-month financial period of assistance is extended, the number of eligible months of Rental Assistance will also be extended.

### 2. Required Documentation

Applicants in need of Continued Temporary Housing Assistance may request additional assistance by completing *FEMA Form FF-104-FY-21-115: Application for Continued Temporary Housing Assistance* (see *Figure 19* for an excerpt of the form), and return it to FEMA along with supporting documentation.[106] The form can also be found online by searching on [www.FEMA.gov](http://www.FEMA.gov).

- **Homeowners**: if the applicant's FEMA-verified Real Property Loss exceeds the amount of initial Rental Assistance awarded, the *Application for Continued Temporary Housing Assistance* will automatically be mailed after the initial Rental Assistance award.

  o If the recorded FEMA-verified Real Property Loss does not exceed the amount of initial Rental Assistance awarded, the applicant must call FEMA's Helpline to request an *Application for Continued Temporary Housing Assistance*.

- **Renters**: the applicant must call FEMA's Helpline to request an *Application for Continued Temporary Housing Assistance*.

FEMA uses the information collected on *Application for Continued Temporary Housing Assistance* to verify an applicant continues to have a disaster-caused need for Continued Temporary Housing Assistance and determine how much Rental Assistance the applicant may be eligible to receive.



*A FEMA Program Specialist provides service to a flood survivor in Melbourne, FL.*

**Figure 19: Excerpt of FEMA Form FF-104-FY-21-115: Application for Continued Temporary Housing Assistance**

DEPARTMENT OF HOMELAND SECURITY
Federal Emergency Management Agency

OMB No. 1660-0061
Expires January 31, 2024

## INDIVIDUALS AND HOUSEHOLDS PROGRAM
## APPLICATION FOR CONTINUED TEMPORARY HOUSING ASSISTANCE

### Instructions for Completing Your Application for Continued Temporary Housing Assistance

Please read these instructions prior to filling out your "Application for Continued Temporary Housing Assistance".

STEP ONE: Fill out the form. NOTE: After your initial "Application for Continued Temporary Housing Assistance" is approved, the "Pre-Disaster or Prior Reported" column on the form will be filled-in for you, using the information provided by you in your previously approved request.

Items 1-6

Items 1 through 6 will be filled-in for you, using the information provided by you at registration. If the information supplied on the form is correct, you may move on to Item 7: "Housing Costs." However, if the information is incorrect, please check the box that is incorrect and provide the updated information.

Current Mailing Address is the address you want FEMA to send you disaster assistance information, such as letters regarding your eligibility for continued temporary housing assistance.

Current Phone is the phone number that FEMA can use to contact you about your application for continued temporary housing assistance and other disaster assistance.

Item 7

You will need to supply the dollar amount of both pre-disaster and current expenses that are applicable to your household.

Next to the appropriate "Expense" enter the dollar amount of your bill or payment.

You must submit a copy of each document to prove the dollar amount included as a "Housing Cost." This would include documents such as your mortgage statement, rent receipts and utility bills. Shade in the circle next to the "Expense" indicating that you have attached the document to your application. You must submit documentation that can be verified; otherwise the amount will not be accepted.

Under "Payment Cycle", shade in the circle indicating how you are billed for the housing expense.

| | | | | 7. Housing Costs (See Instructions for Definitions of Expenses) | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Payment Cycle (How You Are Billed) | | | |
| Expense | Pre Disaster or Prior Reported | Current | Shade if Document is Attached | Monthly (1) | Quarterly (4) | Bi-Annual (6) | Annual (12) | Other |
| Mortgage | $1495.00 | $1495.00 | ● | ● | ○ | ○ | ○ | ○ |

Definitions for certain expenses have been provided below.

Home Insurance means typical homeowners, renters, flood, or earthquake insurance policy or any other type of insurance policy or rider for the dwelling.

Housing Cost means the rent and/or mortgage payments (including principal, interest, and real estate taxes), real property insurance, and utility costs (not to include cable television, internet, and telephone service).

Housing Unit means a house, apartment, a manufactured home, recreational vehicle, or other readily fabricated dwelling. A room or group of rooms in an occupied dwelling may qualify as a housing unit if the room(s) in which the applicant and household live are separate from any other persons in the dwelling/building, and are generally available to be rented by the public.

Item 8

In addition to providing a copy of your written and signed lease, you will have to provide the name and phone number of the landlord. The lease must be signed by the applicant or co-applicant and the landlord.

### QUESTIONS OR NEED ASSISTANCE?

If you have any questions about completing this document, you should call the FEMA Disaster Helpline at 1-800-621-FEMA (3362) (hearing/speech impaired only: 1-800-462-7585) as soon as possible.

FEMA Form FF-104-FY-21-115 (formerly 010-0-12)
(3/21)

Page 1 of 4

*Figure 20* lists supporting documentation that must be submitted to FEMA, as outlined in the *Application for Continued Temporary Housing Assistance*.[107]

| Figure 20: Continued Temporary Housing Assistance Documentation | |
|---|---|
| Type of Documentation | Description of Documentation |
| Copy of current lease or rental agreement signed by the landlord and tenant | The lease or rental agreement should include location of the unit, amount of rent, duration of lease, and number of occupants. |
| Proof of prior Rental Assistance provided by FEMA has been used for temporary housing | • Rent receipts showing date, location of rental unit, and time period for which the payment applies.<br>• If separate from the rent, receipts showing payment of essential utilities. Essential utilities are gas, electric, water, oil, trash, and sewer.<br>• If applicable, receipt showing payment of security deposit for up to one month's rent.<br>• In instances where rent receipts are not available, the lease or rental agreement may serve as proof of use of prior Rental Assistance.<br>• Hotel/motel receipts showing date, address of hotel/motel, and time period for which payment applies. Only the cost of the room and taxes charged by the hotel will be considered toward acceptable exhaustion of Rental Assistance. |
| Proof of pre-disaster housing costs, as identified on the *Application for Continued Temporary Housing Assistance* | • Mortgage statement or lease/rental agreement for the disaster-damaged primary residence.<br>• Real estate tax statement and homeowners or renters' insurance statement, if paid separately from the mortgage.<br>• Essential utility bill(s) for the disaster-damaged primary residence: gas, electric, oil, trash, water, and sewer. |
| Proof of pre-disaster and current post-disaster income for all members of the household 18 years and older | Examples include, but are not limited to:<br><br>• Recent pay stubs.<br>• W-2 forms or tax returns from most recent tax year.<br>• Documentation of self-employment, if applicable.<br>• Documentation of government assistance, including Social Security. |

Upon subsequent requests for Continued Temporary Housing Assistance, applicants will only be required to submit supporting documentation if the household's income or rent has changed.

### 3. Limitations and Exclusions

- Applicants must request Continued Temporary Housing Assistance within the period of assistance.

- When an applicant first requests Continued Temporary Housing Assistance and submits documentation that does not demonstrate full exhaustion of the initial Rental Assistance award, the first Continued Temporary Housing Assistance award will be reduced by the remaining amount of initial Rental Assistance.

- Applicants residing in non-traditional housing are not eligible for Continued Temporary Housing Assistance.

## D. Rental Assistance Rate Increase

FEMA evaluates the need for a Rental Assistance rate increase by comparing U.S. Census Bureau American Community Survey statistics on housing inventory and vacancy rates to the best available data on disaster-caused housing impacts in declared disaster areas.

The STT government may request a Rental Assistance rate increase by submitting other reliable sources of these data elements for FEMA to use. The FMR Calculator allows FEMA to rapidly evaluate the need for a Rental Assistance rate increase based on pre-disaster housing stock data, the amount of housing impacted by the disaster, and the post-disaster vacancy rate for each impacted county.

**Pre-Disaster HUD Applications**

Prior to reviewing a pre-disaster HUD applicant's file for Continued Temporary Housing Assistance, FEMA will coordinate with HUD to determine if the pre-disaster housing unit is available to the applicant. Once the pre-disaster housing unit is available, or HUD is able to provide housing, FEMA will stop providing Continued Temporary Housing Assistance.

FEMA may authorize Rental Assistance rate increases when the FMR Calculator demonstrates available housing for the area is insufficient to meet the disaster-caused housing need, or when elevated housing market rates adversely impact eligible applicants' ability to obtain rental resources.

The Regional Administrator (RA) or the Federal Coordinating Officer (FCO), if the RA has delegated authority to the FCO, may approve Rental Assistance rate increases for designated counties (or equivalent) when the FMR Calculator result indicates an increase above 100%. The increase may not exceed the amount indicated by the FMR Calculator, or 125% of the HUD FMR, whichever is lower. The RA or FCO must provide a written notification of the Rental Assistance rate increase and a copy of the FMR Calculator to the IADD.

The IADD may authorize Rental Assistance rate increases above 125% of the HUD FMR for individual counties (or equivalent) when the FMR Calculator indicates an increase to 125% of the published FMR and additional justification demonstrates a further increase is needed to meet the disaster-caused housing need. Only the IADD may authorize statewide Rental Assistance rate increases. The IADD may approve Rental Assistance rate increases for undeclared areas when housing availability is demonstrated to be insufficient to meet the disaster-caused housing need or when elevated housing market rates adversely impact eligible applicants' ability to obtain rental resources.

FEMA only applies Rental Assistance rate increases to Continued Temporary Housing Assistance awards. If an applicant relocates to a temporary housing unit outside of the area approved for a Rental Assistance rate increase, they are no longer eligible for Continued Temporary Housing Assistance awards above the published HUD FMR.

## E. Home Repair Assistance

FEMA may provide financial assistance to repair an owner-occupied primary residence, utilities, and residential infrastructure, including private access routes damaged as a result of a Presidentially-declared disaster up to the financial Housing Assistance maximum award.[108] Home Repair Assistance is intended to make the damaged home safe, sanitary, or functional. It is not intended to return the home to its pre-disaster condition. Home Repair Assistance counts towards the financial Housing Assistance maximum award an applicant may receive (see Chapter 3, I).

Home Repair Assistance for specific disaster-damaged accessibility items is not limited by a financial maximum award. The following accessibility items are eligible under Home Repair Assistance:

- Access ramp

- Grab bars

FEMA may provide financial assistance for the repair of real property components, including, but not limited to:

- Structural components of a home (e.g., foundation, exterior walls, roof)

- Windows, doors, floors, walls, ceilings, and cabinetry

- Heating, ventilation, and air conditioning system (HVAC)

- Access and egress, including privately-owned roads, privately-owned bridges, and privately-owned docks

- Blocking, leveling, and anchoring of a mobile home, and reconnecting or resetting its sewer, water, electrical, oil, and fuel lines and tanks

- Line items to restore a houseboat to a habitable state, not necessarily to return the houseboat to seaworthiness

- Utility systems, including electrical, gas, water, oil, and septic/sewage systems

> **Wells, Furnaces, and Septic Systems**
>
> For wells, furnaces, and septic systems, FEMA may provide assistance or reimbursement for the cost of a licensed technician's professional assessment associated with the repair or replacement of those components.
>
> Additionally, when verifiable receipts or estimates are submitted on appeal, FEMA may pay up to the actual cost of the receipt or estimate for wells, furnaces, and septic systems.

Certain items or services determined to be eligible hazard mitigation measures, which reduce the likelihood of future damage to the residence, utilities, or infrastructure, may be eligible for Home Repair Assistance.

*Figure 21* shows examples of disaster-caused damage that may be eligible for Home Repair Assistance, and also damage not covered by FEMA's IHP, and therefore, not eligible for Home Repair Assistance.

| Figure 21: Types of Potentially Eligible Disaster-Caused Home Damage ||
|---|---|
| *May be eligible for Home Repair Assistance:* | *Not eligible for Home Repair Assistance:* |
| Roof | Garage |
| Windows | Pool |
| Foundation | Fences |
| Walls | Landscaping |

### *1. Conditions of Eligibility*

In addition to meeting general conditions of eligibility (see Chapter 3, II), the following conditions must be met to receive Home Repair Assistance:

- A FEMA inspection determines the repair of the component is necessary to ensure the safety or health of the occupant or to make the component or residence functional.

- The real property components were functional immediately before the declared disaster.

- The component was damaged, and the damage was caused by the disaster.

- The damage to the component is not covered by insurance.

**Components**

Components or residences that were fully or partially functional immediately before the declared disaster, despite their need for maintenance, may be eligible for Home Repair Assistance if they ceased to function as a result of the disaster.

### *2. Limitations and Exclusions*

- Hazard mitigation may be awarded as part of Home Repair Assistance for real property components that existed, and were functional, prior to the disaster.

- Home Repair Assistance is not available for non-traditional forms of housing (e.g., tents and certain types of huts and lean-to structures).

- Home Repair Assistance is not available to landlords who do not permanently reside in the damaged dwelling. In addition, any available assistance is limited to the owner-occupied unit and not common areas.

- Applicants whose pre-disaster residence was a houseboat will not be required to obtain and maintain flood insurance for NFIP-insurable items, as these structures are uninsurable under NFIP.

- An applicant with insurance for a covered peril will be ineligible for Home Repair Assistance for insured real property components when the applicant fails to file a claim with their insurance company.

- Home Repair Assistance for flood-damaged real property in basements is limited to damaged items that result in living conditions affecting the safety, sanitation, and functionality of the home.[109]

**Basements**

FEMA defines a basement as an area of the home with its floor below grade (below ground level) on all sides.

Disaster-caused damage in a basement affecting the safety, sanitation, and functionality of the home may include:

- o Damage to the structural components (e.g., foundation) of the home

- o Damage to critical utilities that support the overall function of the home (e.g., furnace, water heater)

- o Damage to the structure's interior (e.g., doors, floor covering); limited to rooms required for the occupancy of the dwelling (e.g., occupied bedrooms, a bathroom required for the occupied bedroom, a sole kitchen or living room); and no other room in another part of the dwelling meets that need

- o Damage presenting a hazard (e.g., wet or moldy drywall, carpet, or cabinets) in non-essential living areas (for removal only)

- Home Repair Assistance award amounts are based on repair or replacement of components that are of average quality, size, or capacity.

- Home Repair Assistance will not be provided to make improvements to a component's pre-disaster condition unless required by current SLTT government building codes or ordinances, similar products are no longer feasible or available in the marketplace, or for reasonable hazard mitigation measures.

## F. Privately-Owned Access Routes

FEMA may provide financial assistance to repair privately-owned access routes (i.e., driveways, roads, or bridges) damaged as a result of a Presidentially-declared disaster.[110] Assistance for privately-owned access routes is intended to restore access to the owner's primary residence. In instances where multiple households share a privately-owned access route, assistance is shared between applicants, requiring additional coordination and documentation between FEMA and the applicants.

### 1. Conditions of Eligibility

In addition to meeting general conditions of eligibility (see Chapter 3, II.), the following conditions must be met to receive Home Repair Assistance for privately-owned access routes:

- A FEMA inspection determines repairs are necessary to provide drivable access to the primary residence.

> **Privately-Owned Access Route**
>
> If multiple households use a privately-owned access route, FEMA will make several attempts to encourage all households to apply for assistance in order to meet the needs of all affected households. Additionally, access of emergency vehicles should only be considered if access was available prior to the disaster.

- The applicant is responsible (or shares responsibility with other homeowners) for maintaining the privately-owned access route to their primary residence.

- The privately-owned access route is the only access to the applicant's primary residence or repair or replacement of a secondary access is necessary for practical use (e.g., it is impossible to access the residence without a bridge or road) or the safety of the occupants or the residence would be adversely affected because SLTT government emergency equipment could not reach the residence.

- Docks only:

    o A FEMA inspection will be required to determine whether the dock was functional prior to the Presidentially-declared disaster and whether repair is necessary.

    o The dock must be the applicant's sole means to access the primary residence.

    o Dock maintenance and repairs must be the applicant's responsibility.

- If multiple households share the access route, FEMA also requires:

    o Written consent from all applicants as pertains to the shared privately-owned access route.

    o A declarative statement affirming any assistance FEMA provides will be used to make repairs to the access route and the applicant understands they are responsible for securing permits and complying with local codes and ordinances.

    o The applicants do not have an established Homeowner's Association or Covenant responsible for repair of the access route, or the established Homeowner's Association or Covenant is unable to receive assistance from the SBA or private insurance to repair the access route.

### 2. Limitations and Exclusions

- FEMA will provide other types of IHP assistance before considering providing Home Repair Assistance for an applicant's private access route.

  o For eligible applicants who have sole responsibility to repair the access route to their home, FEMA will provide Rental Assistance, then consider eligibility for Home Repair Assistance for an applicant's private access route.

  o For eligible applicants who share responsibility with other eligible applicants to repair the access route, FEMA will provide Rental Assistance, Home Repair Assistance for items that do not affect the access route, ONA, then consider eligibility for Home Repair Assistance for an applicant's private access route.

- The Home Repair Assistance award amount is based on repair items (e.g., decking, guardrails, and handrails) that are of average quality, size, and capacity.

  o Repair awards will not include improvements to the access route's pre-disaster condition unless improvements are required by current SLTT government building codes or ordinances.

  o An applicant with access and functional needs that requires access for a particular vehicle may be approved for additional funds to improve the access if required for safe passage.

- FEMA will verify whether the SLTT government has taken or plans to take any emergency actions to repair the route to provide access for emergency service providers or to remove immediate threats to public health and safety. Eligible activities for the repair of privately-owned access routes are subject to Federal Environmental Planning and Historic Preservation (EHP) compliance review requirements.

  o Eligible applicants are responsible for complying with any conditions developed as a result of the EHP compliance review process and for obtaining any applicable Federal or SLTT government permits prior to conducting work.

> **EHP Compliance Review**
>
> The EHP compliance review process considers the effects of Federal funding on resources such as endangered species, floodplains and wetlands, and historic properties. FEMA is required to ensure that Federal funding complies with applicable Federal EHP laws, regulations, and executive orders (EOs) prior to providing assistance.

- If multiple families share an access route, individuals who do not apply or do not meet all eligibility requirements will not receive assistance and will not be considered when determining the amount an eligible applicant will receive.

## G. Home Replacement Assistance

FEMA may provide financial assistance to owners whose primary residences were destroyed as a result of a Presidentially-declared disaster. Home Replacement Assistance may be applied toward purchasing a new permanent residence even if the new residence's cost is greater than the financial Housing Assistance maximum award.

FEMA calculates the replacement award amount according to the consumer price index data for the types of housing in the area where the damage occurred. FEMA establishes award amounts based on whether the pre-disaster home was a manufactured home, travel trailer, houseboat, or residential construction (e.g., single-family home). However, the award amount cannot exceed the financial Housing Assistance maximum award (see Chapter 3, I.).

### 1. Conditions of Eligibility

In order to qualify for Home Replacement Assistance, applicants must meet general conditions of eligibility (see Chapter 3, II.) and the following:

- The residence was functional immediately before the disaster.

- A FEMA inspection confirms the residence was destroyed, and the damage was caused by the disaster. FEMA considers a residence destroyed when:

  > **Functional**
  >
  > Functional means a "component" or residence capable of being used for its intended purpose, or an item or home capable of being used for its intended purpose.

  o Disaster-caused damage necessitates the replacement of the majority of two or more major structural components (e.g., basement walls/foundation, load-bearing walls, or roof assembly have collapsed);

  o The disaster has completely removed the above-grade structure and only the foundation remains;

  o Flood waters have reached the roof, inundating the majority of the structure's living area;

  o The dwelling is in imminent threat of collapse because of disaster-caused damages;

  o In the case of mobile homes and or travel trailers, when the frame is visibly bent or twisted and releveling is not possible; or

  o Repair is not feasible, and replacement is necessary to ensure the safety or health of the occupant or make the residence functional.

- The damage to the residence is not covered by insurance.

*2. Limitations and Exclusions*

- Home Replacement Assistance is not available for non-traditional forms of housing (e.g., tents, certain types of huts, and lean-to structures).

- Home Replacement Assistance is not available for other residence types (e.g., yurts and shipping containers or railroad cars converted into living quarters).

- Home Replacement Assistance is not available to landlords who do not permanently reside in the damaged dwelling. In addition, any available assistance is limited to the owner-occupied unit and not common areas.

*3. Appeal Considerations*

If FEMA determines the residence was not destroyed by the disaster, the applicant may appeal by submitting supporting documentation from governing authorities giving notice of condemnation, substantial damage, or demolition.

- FEMA will not automatically determine an applicant eligible for Home Replacement Assistance based on submitted documentation, because local authority determinations could be based on non-disaster-caused circumstances.

- After receiving appeal documentation from the applicant, FEMA will review the request to determine if another inspection is necessary in order to verify if the residence was destroyed due to disaster-caused damage.

# V. Housing Assistance (Direct)

The Housing Assistance provision of the IHP, authorized by Section 408(c) of the Stafford Act, provides assistance for disaster-caused housing needs not covered by insurance or provided by any other source. FEMA may provide Direct Housing Assistance in two forms: Direct Temporary Housing Assistance and PHC. These types of assistance do not count toward the financial Housing Assistance maximum award.[111]

FEMA may only provide Direct Temporary Housing Assistance when eligible applicants are unable to use Rental Assistance to secure temporary housing. Direct Temporary Housing Assistance includes providing Temporary Housing Units (THUs) through MLR or Direct Lease, or placing TTHUs on private, commercial, or group sites.[112]

FEMA may only provide PHC in insular areas and other locations when other housing options are not available and Temporary Housing Assistance (i.e., Rental Assistance or Direct Temporary Housing Assistance) is not feasible, available, or cost-effective. PHC may be delivered in the form of repairs and new construction.[113]

> **THU and TTHU**
>
> **Temporary Housing Unit (THU):** A house, apartment, cooperative, condominium, manufactured home, or other dwelling acquired by FEMA and made available to eligible applicants for a limited period of time. The term "THU" includes TTHUs where used in this guidance, except where specifically stated otherwise.
>
> **Transportable Temporary Housing Unit (TTHU):** A readily-fabricated dwelling (i.e., a Recreational Vehicle [RV] or Manufactured Housing Unit [MHU]) purchased or leased by FEMA and provided to eligible applicants for use as temporary housing for a limited period of time.

## A. Direct Housing Assessment

When there appears to be a lack of available housing resources within the HUD FMR or the approved Rental Assistance rate for the disaster to support the potential need for housing due to the disaster, FEMA will partner with the affected STT government to perform a comprehensive analysis of the disaster-caused housing needs and available resources. This assessment is comprised of local housing information, U.S. Census Bureau American Community Survey Statistics on housing inventory and vacancy rates, registration projections, and other data to determine if the disaster-caused housing needs significantly exceed available resources in declared disaster areas.

For National Response Coordination Center (NRCC) Level 1 events with major disaster declarations authorizing IA (and some Level 2s), the FCO or RA may request a Sheltering and Housing Field Team (SHFT) deploy to provide subject matter expert planning support in addition to the assessment described above. This request will be approved or denied by the IA Division Director. Once the SHFTs are established, rostered teams made up of FEMA HQ and Regional staff will support the JFO staff in outlining a streamlined suite of sheltering and housing solutions as well as case management services that promote effective and efficient housing recovery outcomes. In the event that a SHFT is not deployed, a Sheltering and Housing Strategy should be developed for any disaster where multiple sheltering and housing options may be needed to support the needs of disaster survivors.

FEMA expects states to maintain a State-Led Disaster Housing Task Force (SLDHTF), which will examine the scope of disaster-caused housing needs, to explore available rental resources and feasible alternatives, and to develop housing solutions.

Other duties of the SLDHTF include:

- Coordinating with federal and SLTT government, non-governmental organizations, and private sector expertise to identify, evaluate, and deliver available programs, resources, and capabilities to disaster survivors; and

- Providing federal and non-Federal supported assistance through agencies other than FEMA, including case management, administration of the HUD Community Development Block Grant – Disaster Recovery Program and organization of the mission.

FEMA will coordinate with the SLDHTF to identify all applicable compliance requirements for providing Direct Temporary Housing Assistance, if needed, including Federal, SLTT government ordinances, the currently-adopted building code, zoning, permitting process and requirements, and any impediments and requirements that may impact the delivery of Direct Temporary Housing Assistance. Other related requirements may include:

- SFHA and wetland identification;
- EHP compliance requirements, including those related to any Federally-listed threatened or endangered species and designated critical habitat or historic properties; and
- A comprehensive procurement approach, including market research and independent government cost estimates.

## B. Direct Temporary Housing Assistance Request and Approval

FEMA will only authorize Direct Temporary Housing Assistance in response to a written request from the State, Territorial, or Tribal Coordinating Officer (SCO/TCO) or Governor's Authorized Representative (GAR) or Tribal Chief Executive's Authorized Representative (TAR).

FEMA's AA for Recovery has the authority to approve Direct Temporary Housing Assistance and to specify relevant conditions for implementation. The AA for Recovery will evaluate the Direct Temporary Housing Assistance request from the STT government using information obtained from the Sheltering and Housing Strategy and the RA or FCO's/TCO's recommendation and provide approval if all the following have been verified:

- Eligible applicants are unable to make use of Rental Assistance due to a lack of available housing resources.[114]

- Increasing the Rental Assistance rate to 125% of the HUD FMR will not be sufficient to meet the disaster-caused housing needs.

- Assistance from other providers, including other Federal agencies, STT government, and voluntary organizations is insufficient to meet the disaster-caused temporary housing needs of eligible applicants.

In the event the preceding criteria is verified by the Region and the Disaster Housing Unit (DHU), the AA for Recovery may authorize the Initial Direct Temporary Housing Assistance Approval in the form of TTHUs on private and commercial sites and MLR.

The RA will review the Sheltering and Housing Strategy to determine which forms of Direct Temporary Housing Assistance to implement based on locations and numbers of eligible applicants and the availability, feasibility, and cost-effectiveness of each option. The RA may delegate this authority to the FCO. In addition, the RA may approve the implementation of group site(s) if the approved Direct Temporary Housing Assistance options are not feasible. The RA must notify the AA for Recovery in writing prior to approving and implementing any TTHU Group Site(s).

A separate written request from the FCO to the AA for Recovery is required for the approval of Direct Lease. The request should demonstrate that other forms of housing assistance have been evaluated and delivered in sequential order and are not sufficient to meet the disaster-caused housing need; housing needs exceed the capacity to provide MLR units or TTHUs in a timely manner; and when one or more properties have been identified that meet the criteria identified in the Direct Lease (see Chapter 3, V.G) section of this chapter.

After Direct Temporary Housing Assistance has been approved and the forms of assistance being provided have been determined, the FCO will coordinate with the STT government to execute an addendum to the agreement between FEMA and the STT government that describes the responsibilities of each party. FEMA will use the most cost-effective forms of available Direct Temporary Housing Assistance to meet the disaster-caused housing needs. In general, FEMA, in coordination with the STT government and based on disaster-specific requirements, will prioritize the types of Direct Temporary Housing Assistance as depicted in *Figure 22*.

PHC may be considered when no alternative housing resources are available and all forms of Direct Temporary Housing Assistance are unavailable, infeasible, or not cost-effective.

**Figure 22: General Sequence of FEMA Direct Housing Assistance Options**



## C. Direct Temporary Housing Assistance Conditions of Eligibility

This section describes the additional conditions FEMA uses to determine an applicant's eligibility for Direct Temporary Housing Assistance and to select the appropriate size and type of THU to meet the household's needs.



**Direct Temporary Housing Assistance**

Applicants who are ineligible for Home Repair Assistance or Home Replacement Assistance because they failed to maintain flood insurance required as a condition of accepting financial assistance in a previous disaster may still be eligible for Direct Temporary Housing Assistance.

### *1. Conditions of Eligibility*

Applicants who may be eligible for Direct Temporary Housing Assistance must:

- Meet all the conditions of eligibility found in IHP Eligibility (see Chapter 3, II.).

- Be verified by FEMA through the on-site inspection conducted following an applicant's registration as:

  o An owner of a disaster-damaged primary residence with real property verified loss amount of at least $12 per square foot (see examples in *Figure 23*);[115] or

  o A renter with a disaster-damaged primary residence that was destroyed or received major damage as a result of the disaster.

| Figure 23: Three examples of the $12 per square foot Real Property Verified Loss Amount | |
|---|---|
| Square Footage of Disaster-Damaged Primary Residence | Real Property Verified Loss Amount at $12 per square foot. |
| *Disaster-damaged primary residence sq.ft. X $12 = FVL* | |
| 750 square feet | $9,000 |
| 2,000 square feet | $24,000 |
| 5,000 square feet | $60,000 |

- Not be receiving Continued Temporary Housing Assistance and Direct Temporary Housing Assistance for the same months.

**Limitations and Exclusions**

- Applicants who are receiving Continued Temporary Housing Assistance for a rental resource outside of reasonable commuting distance of their disaster-damaged residence may be considered for Direct Temporary Housing Assistance.

FEMA contacts applicants to obtain information about their household's unmet temporary housing needs. During the contact, typically by phone, FEMA refers eligible applicants to other adequate, accessible, alternate housing units, if available, prior to discussing Direct Temporary Housing Assistance. FEMA expects applicants to accept the first offer of available alternate housing that meets their household's needs; applicants who refuse available housing that meets their household's needs may become ineligible for Direct Temporary Housing Assistance. FEMA determines no housing resources are available or available alternate housing resources are not adequate for the applicant's household because of one of the following:

**Recording Property Loss**

FEMA inspectors do not record real property losses for renters, as renters are not responsible for repairs to their pre-disaster residence. Therefore, the threshold for renters is based on a general level of damage rather than a specific dollar amount of real property damage.

- Housing resources are not within reasonable commuting distance.

- Housing resources exceed the applicant's financial ability, defined as no more than 30% of the household's income.

- The applicant's household includes children attending school (not including post-secondary education) and transportation to school is not available from any of the available alternate housing resources.

- Housing resources are not accessible to one or more members of the applicant's household who have a disability.

- Housing resources are not in reasonable distance to accessible public transportation and the household includes one or more persons with a disability who requires accessible public transportation.

- The applicant's primary residence is a working agricultural interest generating at least 50% of the household's pre-disaster income.

- A member of the applicant's household needs in-home health care services, or provides such services to a friend, neighbor, or relative, and would be unable to receive or provide these services if relocated to an alternate housing resource.

- The applicant is able to provide verifiable documentation that demonstrates:

  o The landlord or leasing agent will not agree to a lease of less than one year; or

  o The applicant is unable to use Rental Assistance due to adverse credit history or criminal background. However, FEMA will coordinate with voluntary agencies and other organizations to assist in housing applicants in this situation prior to considering Direct Temporary Housing Assistance.

### 2. Temporary Housing Unit (THU) Selection Considerations

FEMA determines the size of the THU to provide an applicant based on the required number of bedrooms recorded during the FEMA inspection. FEMA generally provides one bedroom for every two persons in the applicant's household.[116]

- FEMA may provide an additional bedroom based on the age, sex, and relationship of household members or as a reasonable accommodation for a household member with a disability.

- FEMA may provide an additional unit when the size of the applicant's household exceeds the capacity of a single available unit; however, FEMA will not provide more than one unit when the household has only one member over the age of 18.

## D. Direct Temporary Housing Assistance Terms and Conditions

FEMA provides Direct Temporary Housing Assistance for up to 18 months from the date of the declaration when adequate, alternate housing is unavailable, and the occupants cannot fulfill their permanent housing plan (PHP) through no fault of their own.

FEMA re-evaluates the occupant's eligibility on a periodic basis through recertification visits, usually monthly, and the Direct Temporary Housing Assistance eligibility for the entire period of assistance is subject to the occupant continuing to meet recertification requirements. All occupants must agree to comply with FEMA's rules, terms, and conditions for occupying the THUs before they move in by signing a Temporary Housing Agreement or Revocable License. The Revocable License documents the applicant's acceptance of government property for temporary housing based on FEMA's terms and conditions included in the license.

Occupants must demonstrate a continued housing assistance need, actively participate in the FEMA recertification process, and show progress towards achieving their PHP to remain eligible to stay in the THU. When applicants fail to comply with FEMA's rules, terms, and conditions, FEMA may terminate their eligibility to remain in the THU.[117] Applicants who have been deemed ineligible by FEMA and refuse to vacate the THU will be subject to a monthly penalty fee. If an applicant refuses to surrender possession of the THU, legal and/or other appropriate actions may be taken.[118]

### 1. Occupant Responsibilities

All THU primary occupants must sign and abide by the terms and conditions of the Temporary Housing Agreement or Revocable License, which specifies the household's obligations to:

**Primary Occupant**

Primary Occupant means the applicant, co-applicant, or other household member over the age of 18 who signs the Temporary Housing Agreement or Revocable License. The primary occupant is responsible for any monthly rent or additional charges related to the Temporary Housing Unit.

- Comply with THU Rules of Use, such as maintaining the unit, its furnishings, and the surrounding area in a clean and orderly condition; paying applicable utility charges; and not damaging or making unauthorized modifications to the THU and its contents;

- For THUs not owned by FEMA (i.e., MLR property) or located on sites not owned by FEMA or the occupant (e.g., commercial parks), the occupant will be required to comply with the terms of the owner's lease or terms of use;

- Act to secure adequate, alternate housing at the earliest possible time within the period of assistance;

- Comply with all rules for a group site or commercial park and comply with all relevant local ordinances;

- Refrain from conduct which adversely affects FEMA's property interest in the THU or the rights of other THU occupants to enjoy safe, secure, and functional temporary housing; and

- Meet the recertification requirements identified in continued Direct Temporary Housing Assistance.

FEMA will notify insured THU occupants that DOB may occur if an insured member of their household receives ALE or LOU benefits to rent alternate housing. When this occurs, the primary occupant must:

- Pay an amount equal to the ALE or LOU benefit to FEMA starting from the date the occupant signed the Temporary Housing Agreement or Revocable License. The amount of the monthly DOB payment to FEMA will not exceed FMR; and

- Continue to make the ALE or LOU payment to FEMA until the total amount of the insurance benefit for ALE or LOU has been exhausted or the occupant vacates the THU, whichever is first.

### 2. Direct Temporary Housing Assistance Recertification

FEMA requires all THU occupants to actively participate in the recertification process. Occupants are responsible for achieving their PHP at the earliest possible time within the period of assistance and providing verifiable information of their progress towards their PHP to FEMA in order to receive continued Direct Temporary Housing Assistance.

FEMA requires the THU primary occupant to establish a realistic PHP for their household no later than the first recertification. An acceptable PHP may demonstrate one of the following:

- A pre-disaster owner is able to repair or rebuild the pre-disaster residence.

- A pre-disaster owner is able to purchase a new residence.

- A pre-disaster owner or renter is able to find and lease an available rental unit.
  - FEMA expects owners who cannot demonstrate the ability to repair or rebuild their pre-disaster residence or purchase a new residence within the period of assistance to move into an available rental resource.

FEMA will regularly review the primary occupant's PHP to ensure the plan is realistic and achievable within the period of assistance. A PHP is realistic and achievable when:

- The primary occupant demonstrates sufficient financial resources or other viable means for achieving the PHP within the period of assistance. Sufficient resources include funds or a verifiable commitment of non-financial assistance, such as voluntary agency labor; and

- The primary occupant shows documented progress towards the PHP (e.g., acquired permits, contracts for repairs).

Primary occupants who have not made progress toward their PHP must demonstrate it is due to no fault of their own (e.g., a contractor failure to obtain the required building permits, or a delay in the rental unit move-in date) and update their PHP to ensure they are realistic within the period of assistance.

---

**Disaster Case Management Program (DCM)**

SLTT governments may request the FEMA DCM Program if the Presidential disaster declaration includes IA. DCM provides disaster survivors with a single point of contact to facilitate access to a broad range of resources.

The case manager verifies the survivor's disaster-caused unmet needs, and works with the survivor to develop a goal-oriented plan that outlines the steps necessary to achieve recovery.

The case manager also organizes and coordinates information on available resources that match the survivor's disaster-caused need, monitors progress toward reaching recovery plan goals, and advocates for the survivor as needed. DCM is a critical resource for THU occupants with disaster-caused needs. More information on DCM is available in Chapter 4.

---

### 3. Health and Safety Concerns of THU Occupants

When an occupant reports a health and safety concern about the living environment in the THU, FEMA will investigate to identify or verify the cause and obtain professional, expert recommendations for addressing the concern. If this investigation determines that testing and/or remediation is necessary, FEMA may require the occupant to vacate the unit. FEMA may offer alternate accommodations and moving and storage of personal property for occupants displaced due to any THU testing and/or remediation requirements.

### 4. Extension of Direct Temporary Housing Assistance

FEMA may extend Direct Temporary Housing Assistance beyond the 18-month period of assistance when the affected STT government requests an extension in writing.[119] Consistent with the terms and conditions of the FEMA-State/Territory/Tribe Agreement , the affected STT government should request an extension at least 90 days before the end of the current period of assistance. The AA for Recovery will consider the request for approval. When the period of assistance is extended, FEMA will begin monthly rent collection from eligible occupants of FEMA TTHUs.[120]

- FEMA may authorize extensions to the initial 18-month period of assistance due to extraordinary circumstances when doing so is in the public interest.

- FEMA will typically not consider extending the period of assistance without a written request from the SCO/TCO or GAR/TAR. However, FEMA may extend the period of assistance at its sole discretion; extensions to the period of assistance will only be considered in situations where the remaining disaster-caused temporary housing need exceeds the capabilities of the STT government, or the affected communities to support and there remains a lack of available resources. The request should include supporting documents demonstrating this housing need.

- The AA for Recovery may consider extending the period of assistance when:

  o Adequate, alternate housing is not available in the affected area; and

  o Accessible housing units for occupants with disabilities are not available or are not within a reasonable commuting distance of essential services (e.g., accessible public transportation, grocery, medical facilities, banking, child care, schools, or place of employment).

- If an extension is approved, the affected STT government must execute an amendment to the FEMA-State/Territory/Tribe Agreement .

### 5. Rent Collection for FEMA Temporary Housing Unit

After the period of assistance has been extended, FEMA charges the primary occupant a monthly rent for each month any occupant remains in or maintains possession of a THU.[121] The monthly THU rent is based on the locally applicable FMR.

**Establishing Rent Amount:** FEMA calculates each occupant's monthly rent by applying the FMR based on the number of bedrooms in the THU and the THU location for the fiscal year in which Direct Housing Assistance is extended. Monthly rent begins accruing on the first day of the first full month after the extended assistance period begins.[122] The primary occupant will be required to pay monthly rent due on the first day of each month after the date rent begins to accrue.[123]

**Extra Bedroom**

If FEMA provided the occupant with an extra bedroom as a reasonable accommodation, the extra bedroom will not be included in the monthly rent calculation. Reasonable accommodations are part of the cost of doing business, and no surcharges will be passed on to the occupants to pay for them. See Title II of the Americans with Disabilities Act for further information.

Prior to the end of the period of assistance, FEMA provides a 30-day written notice of the requirement to pay monthly rent to occupants who remain in a FEMA THU after the initial 18-month period of assistance.

FEMA does not prorate rent or reimburse the primary occupant when any occupant remains in or maintains possession of the THU on or after the first day of the month. If any occupant remains in the THU on or after the first day of the month, the primary occupant is required to pay full rent for that month.

**Appeal of Rent:** If the primary occupant is unable to pay the amount of rent established by FEMA, they may appeal FEMA's rent determination within 60 days of receiving FEMA's notice of the requirement to pay monthly rent. Appeals must include documentation demonstrating the applicant does not have the financial ability to pay the established rent. Specifically, FEMA requires both of the following information:

- Pre-disaster versus post-disaster monthly gross income of all household occupants age 18 or older; and

- Pre-disaster versus post-disaster monthly housing costs, such as mortgage payments on the pre-disaster residence while it is being repaired.

FEMA may adjust the amount of rent using the following criteria:

- If the total monthly adjusted gross income amount of all occupants 18 years of age and older remained the same subsequent to the disaster, FEMA will consider the primary occupant capable of paying the same monthly amount for housing costs paid before the disaster or 30% of their household income, whichever is greater, but not to exceed the FMR.

> **Minimum Rent Amount**
>
> FEMA uses 30% of the total monthly adjusted gross income of all household members' income based on the formula used by HUD to determine the Total Tenant Payment (TTP). HUD allows a minimum rent amount to be set in the TTP formula of up to $50. FEMA established $50 as the minimum rent amount.

- If the total monthly gross adjusted income amount of all occupants 18 years of age and older increased or decreased as a result of the disaster, FEMA will consider the primary occupant capable of paying a monthly amount for housing costs equal to 30% of their household income or the FMR, whichever is greater, but not to exceed the FMR.

- FEMA will subtract post-disaster monthly housing costs from the amount FEMA considers the primary occupant is capable of paying for housing costs to determine the FEMA adjusted rent amount to be charged, up to the applicable FMR. Housing costs may include rent and/or mortgage payments (including principal, interest, and real estate taxes) on the pre-disaster primary residence, real property insurance, and utility costs (not to include cable television, internet, and telephone service).

- FEMA will not charge any primary occupant more than the FMR for monthly rent.

- FEMA will not charge any primary occupant less than the FEMA minimum monthly rent amount of $50.

Rent for a THU will continue to accrue each month while FEMA is considering the appeal, which may take up to 90 days.

- If the appeal is denied, the primary occupant must pay the originally established rent in total within 30 days of the date of the appeal decision, including any rent not paid while FEMA was considering the appeal; or

- If the appeal is granted, the primary occupant must pay the adjusted rent in total within 30 days of the date of the appeal decision:

  - If the primary occupant paid the originally established rent amount while FEMA considered the appeal, FEMA will reimburse any overpayment based upon the amount of the adjusted rent.

### 6. Reasons for Terminating Direct Temporary Housing Assistance

The occupant's eligibility to live in a FEMA THU automatically expires at the end of the period of assistance, unless the period of assistance has been extended. FEMA may terminate an occupant's Direct Temporary Housing Assistance prior to the end of the period of assistance for the following reasons:[124]

**Program Eligibility Violations**

- Occupants are not actively participating in the recertification process (e.g., not being available to meet with FEMA recertification staff on a regular basis).

- Occupants are not taking all actions necessary to achieve their PHP in a reasonable time frame.

**Conduct Violations**

In some cases, an occupant who committed a violation may be removed from the THU and other occupants may remain in the unit.

- Major Violations: Occupants engaging in conduct violations involving criminal activity in violation of federal, STT government law, or other actions which present an imminent threat to the health and safety of the occupant, other THU occupants, or persons in the surrounding area. Major violations must be supported by an arrest, police report or other documented health and safety concern and occur in the vicinity of the TTHU or be an immediate threat to one or more occupants of the TTHU or other persons in the surrounding area; however, FEMA does not have to wait for a conviction before terminating assistance. Examples of major violations include, but are not limited to:

  - Assault, battery, rape, domestic violence, child abuse, or sexual assault

  - The use, sale, possession, or manufacture of illegal drugs

  - Destruction or theft of property owned or leased by FEMA (including the THU), other THU occupants (including their guests), and contractors performing work for FEMA.

**General Violations**

Occupants engaging in conduct violations involving the breaking of rules established by the commercial park or other temporary housing site management rules included within the Temporary Housing Agreement or Revocable License. Examples of general violations include, but are not limited to:

- Excessive noise or disturbance of peace

- Unleashed or unattended pets outside of the THU

- Damage to the THU beyond normal wear and tear

- Failure to maintain reasonably clean and sanitary conditions both inside and outside the THU

- Failure to pay rent, after receiving a warning, and when rent has been assessed following the end of the period of assistance

**Figure 24: FEMA Notification of Occupant Violations**



**7. Process for Terminating Direct Temporary Housing Assistance**

FEMA will follow the process outlined below to afford each occupant due process and ensure sufficient justification exists for termination.

- **Warning Notice:** After becoming aware of a program eligibility or general conduct violation, FEMA will notify the primary occupant through a 15-day warning notice, delivered in-person or through certified mail. This notice will outline the actions the occupant must take to resolve the violation and remain eligible for FEMA Direct Temporary Housing Assistance. FEMA will not issue a warning notice for Major Violations or the end of the period of assistance.

- **Notice of Revocation:** If the occupant fails to remedy the violation as outlined in the 15-day warning notice or commits a Major Violation, FEMA will issue the primary occupant a Notice of Revocation (NOR) explaining the reason(s) for terminating Direct Temporary Housing Assistance, instructions for submitting an appeal, and that assistance is terminated as of the date of the letter.

- **Notice to Surrender Possession:** If an occupant fails to vacate or prevents FEMA from reclaiming the THU, FEMA will issue the primary occupant a Notice to Surrender Possession prior to referring the case to U.S. Department of Justice.

- **Appeal Rights:** Occupants can appeal the termination decision within 60 days after receiving the NOR. However, filing an appeal does not relieve the occupant of the responsibility to vacate the THU by the deadline established in the NOR. Also, the occupant cannot appeal a NOR received due to the end of the period of assistance.

### *8. Penalty Fees*

After the period of assistance has ended or an occupant is determined ineligible for continued assistance, primary occupants who fail to surrender the THU by the established deadline are subject to a monthly penalty fee for as long as any occupant remains in or maintains possession of the THU. FEMA may also charge the primary occupant a penalty fee when they fail to pay monthly rent when charged by FEMA or fail to relocate or assume financial responsibility for a TTHU purchased from FEMA as agreed to in the Acknowledgement of Conditions of Sale (see Chapter 3, V.F.).

> **Example of Penalty**
>
> If a homeowner fails to complete repairs or construction on their primary residence within the additional 90 days provided, FEMA will require the homeowner to pay the full, unreduced penalty fee for the length of time the homeowner or any occupant remains in or maintains possession of the THU.

Paying the penalty fee does not entitle an occupant to remain in a THU nor does it prevent FEMA from taking legal action to remove the occupant from the unit. A penalty fee is equivalent to the FMR plus a flat rate fee of $550 or FMR plus FEMA's actual monthly costs for the THU, whichever is higher. The flat rate of $550 is based on the average actual monthly cost per unit for occupied TTHUs from years 2011 to 2015. *Figure 25* offers two examples of the penalty fee.

| Figure 25: Example of a Penalty Fee | | | | |
|---|---|---|---|---|
| Examples | FMR | Monthly Cost for THU | Flat Rate Fee | Penalty Fee |
| Example 1 | $1,000* | $475 | $550* | $1,550 |
| Example 2 | $1,000* | $1,350* | $550 | $2,350 |
| *Asterisks indicate which columns are used to calculate each example penalty fee.* | | | | |

FEMA may consider reducing the penalty fee to the FMR if occupants meet all the following conditions:

- Primary occupants who are pre-disaster homeowners:
  - o Have a PHP to repair or rebuild their primary residence;
  - o Have not achieved their PHP through no fault of their own;
  - o Need up to an additional 90 days beyond the end of the initial or extended period of assistance to complete the repairs or construction;
  - o Have previously declined to purchase their TTHU after the Sales Program was implemented; and
  - o Paid monthly rent to FEMA during an extended period of assistance, if applicable (see Chapter 3, V.C.); applicants who were charged rent by FEMA during an extended period of assistance but did not pay will not be considered for a reduced penalty fee.

- Primary occupants who are pre-disaster homeowners and renters:
  - o Have a TTHU sale or donation pending beyond the initial or extended period of assistance through no fault of their own; and
  - o Pay monthly rent to FEMA during an extended period of assistance, if applicable; applicants who were charged rent by FEMA during an extended period of assistance but did not pay will not be considered for a reduced penalty fee.

Primary occupants may appeal FEMA's decision to terminate assistance; however, the penalty fee may not be appealed. If FEMA accepts the appeal, overturns the termination, and reinstates Direct Temporary Housing Assistance, the occupant will not be required to pay a penalty fee. FEMA will refund the applicant any penalty fees the applicant paid during the appeal period.

Primary occupants who have not paid their penalty fee in full within 120 days of the date of receiving the bill will be referred to the U.S. Department of the Treasury for debt collection.



*A FEMA staff member helps a disaster survivor apply for FEMA assistance*

## E. Multi-Family Lease and Repair

FEMA may provide Direct Temporary Housing
Assistance in the form of repairs or improvements to existing, vacant multi-family housing units (e.g., apartments).[125] FEMA may utilize units repaired or improved under MLR as temporary housing for eligible applicants who are unable to use Rental Assistance due to a lack of available resources. MLR is not intended to repair or improve individual units to re-house existing tenants.

### 1. Property Eligibility Requirements

Properties eligible for MLR must be located in a county/jurisdiction designated for Individual Assistance. In the event no properties are available or properties in the designated area have been exhausted, FEMA may utilize properties located in an undeclared county/jurisdiction in the same state or territory.

Properties located outside of the declared county/jurisdiction must be within reasonable commuting distance of the declared area and must have been impacted by a major disaster. Prior to utilizing a property in an undeclared county/jurisdiction, FEMA must determine that eligible applicants are unable to use financial rental assistance due to a lack of rental resources in the undeclared county/jurisdiction and that MLR properties would be a cost-effective option to other forms of direct temporary housing assistance in the undeclared county/jurisdiction.

> **Multi-Family Rental Housing**
>
> Multi-family rental housing is defined as a rental property that contains three or more dwelling units, each such unit providing complete and independent living facilities for one or more persons, including permanent provisions for living, sleeping, cooking, and sanitation.

In addition to the criteria described above and in Direct Temporary Housing Assistance Request and Approval (see Chapter 3, V.A.), FEMA must verify that one or more properties meet the following conditions of eligibility to authorize MLR:

- The property must have previously been used as multi-family rental housing;

- The property must be located in an area designated for IA under a major disaster declaration; or, if impacted by a major disaster, the property may be located in an undeclared county within reasonable commuting distance of an IA designated area;

- The property must be located within the same state or territory that received a major disaster declaration for the same incident;

- The property must be located within reasonable access to community and wrap-around services such as accessible public transportation, schools, fire and emergency services, grocery stores, etc.;

- The property must be available to be leased to FEMA allowing FEMA's exclusive use as temporary housing for eligible applicants for a term of no less than 18 months from the date of declaration;

- The property owner must agree to allow FEMA to make reasonable accommodation and/or modification repairs or improvements during the term of the lease agreement without requiring FEMA to remove the improvements at the end of the lease agreement; and

- The property owner must provide all property management services, including building maintenance, except where the property is leased or contracted from another government entity, in which case FEMA may directly provide such services.

In the event MLR properties are not available within areas designated for IA, FEMA may utilize properties impacted by the disaster in undeclared areas specifically, for the purpose of implementing MLR, providing:

- There are insufficient properties within already-designated areas to meet the housing need under MLR;

- The undeclared area is within the same state or territory as the area designated for IA;

- The properties in the undeclared areas were also impacted by the same incident;

- FEMA has identified suitable properties within areas proposed to be designated for MLR;

- The properties are necessary to provide temporary housing to eligible applicants within a reasonable commuting distance; and

- The Governor/Tribal Chief Executive or GAR/TAR submits a written request to add the areas to the major disaster declaration and the Associate Administrator for Response and Recovery approves the request.



*Rental units in Louisiana being repaired under Multi-Family Lease and Repair to house eligible applicants.*



**Lease Agreement**

Lease Agreement is defined as a lease or contract between FEMA and a property owner for use, and to allow for repairs or improvements to a multi-family rental property. It includes the terms and conditions associated with the use and repairs or improvements being made, and the authorized expenditures to be paid by FEMA to the property owner.

## *2. Approving Properties*

Under the terms of any lease agreement for potential MLR property, the value of the improvements or repairs shall be deducted from the value of the lease agreement. Any repairs or improvements will not take more than four months to complete. To determine the cost-effectiveness of a potential MLR property, compared to other forms of Direct Temporary Housing Assistance, FEMA will take the following actions:

- Determine the estimated cost of repairs or improvements by performing an independent government cost estimate for the necessary repairs and improvements or receive an estimated cost for repairs and improvements from a building contractor.

- Determine the estimated cost of repairs or improvements to make at least one unit per lease agreement, per the Fair Housing Act or other applicable requirements, accessible to applicants with disabilities, including costs to provide marked and signed accessible parking, access to the unit, and accessible common areas.

> **Fair Market Rent (FMR)**
>
> FMR is defined as housing market-wide estimates of rents that provide opportunities to rent standard quality housing throughout the geographic area in which rental housing units are in competition.
>
> The fair market rent rates applied are those identified by HUD as being adequate for existing rental housing in a particular area. FEMA uses the applicable rate based upon the location of the housing unit, the number of bedrooms in the housing unit, and the fiscal year in which the major disaster declaration was issued.

- Determine the value of the lease agreement by multiplying the approved monthly Rental Assistance rate by the number of units, and then multiplying the number of months remaining between the date the repairs are completed and the end of the 18-month period of assistance.

- Deduct the estimated cost of repairs and improvements from the value of the lease agreement by using a two-tier approval process based on RV and MHU acquisition costs.

### Tier 1 Approval

- The RA or the FCO, if the RA has delegated the authority to the FCO, may approve MLR property repairs with a unit cost up to $40,000, the average per unit acquisition cost of an Express MHU. An Express MHU is the smallest MHU in FEMA's inventory.

### Tier 2 Approval

- MLR property repairs with a unit cost that exceeds the Tier 1 acquisition cost, will require the RA or the FCO, if the RA has delegated the authority to the FCO, to request approval from the IADD. The RA or FCO must provide a written request that includes:

  o Justification for why increasing MLR property costs above the per unit acquisition cost of an Express MHU is a more feasible, cost-effective, and survivor-centric solution; and

  o The requested increase MLR unit cost.

3cfd48db7bfb792e

### 3. Prioritizing Properties

When multiple approved MLR properties exist, FEMA will evaluate properties according to the following factors:

- Cost to the Federal Government;

- Time to complete repairs;

- Landlord's demonstrated ability to manage and/or provide maintenance services;

- Proximity to wrap-around services; and

- Accessibility.

When selecting available properties for use, FEMA will prioritize properties that:

- Make at least one unit accessible.

- Are in proximity to accessible public transportation.

FEMA will consider the specific needs of applicants with disabilities and others with access and functional needs. FEMA will prioritize accessible units for applicants whose household includes one or more persons with a disability. FEMA may only consider placing other eligible applicants in accessible units when all households with accessibility needs have been adequately housed.

> **Payment Scenarios for an MLR Property Owner**
>
> FEMA may, in some scenarios, make payments to an MLR property owner in addition to the costs for the repairs. FEMA may:
>
> - Provide monthly rent to the property owner when the total estimated cost of repairs is less than the FMR value of the lease. The total amount of monthly rent payments may not exceed the difference between the total estimated cost of repairs and the FMR value of the lease. FEMA will not pay monthly rent when total projected cost of all necessary repairs and improvements equals or exceeds the FMR value of the lease.
>
> - Provide a per-unit monthly maintenance fee for servicing repairs while FEMA utilizes the unit for temporary housing.
>
> - Provide a per-unit security deposit payment to the landlord not to exceed one month of FMR based on the location and number of bedrooms.

### 4. Property Repair or Improvement Service Contracting

Once approved, FEMA has two options for repairing or improving an eligible MLR property. At its discretion, FEMA may either:

- Enter into a contract with the property owner for the property owner to perform necessary repairs and improvements to housing units to be provided for FEMA's exclusive use as temporary housing during the term of the lease agreement; or

- Enter into a contract with a third party to perform the repairs or improvements to the housing units and enter into a lease agreement with the property owner.

FEMA will only authorize repairs and improvements that:

- Make a property safe, habitable, accessible, and functional for temporary housing;

- Use materials of average quality, size, and capacity ("builder grade"), in accordance with Federal EHP laws, regulations, EOs, and local codes and ordinances, or minimum construction industry standards where no codes and ordinances apply;

- Promote living environments that are usable by the broadest spectrum of people, regardless of ability, without the need for adaptation or specialized design; and

- Are performed in compliance with local building codes, standards, permitting, inspection requirements, and all applicable EHP compliance requirements.

When repairs or improvements are made to provide accessibility features, contractors will be guided by the Americans with Disabilities Act Accessibility Guidelines (ADAAG)[126] and HUD's Design Details for Accessible Disaster Relief Housing.[127] FEMA will include the following accessibility features when repairs or improvements are required to these elements:

- Bathrooms:

    o Reinforcements to allow later installation of grab bars around toilet, tub, shower stall and shower seat, where such facilities are provided

    o Americans with Disabilities Act (ADA)-compliant toilets

- Faucets: Single-lever faucet controls

- Door knobs/handles: Lever-type handles

- Door locks: Single-push locks

- Drawers and Cabinets: D-loop or other easy-to-use handle pulls

- Flooring: Low-pile carpet or smooth anti-slip flooring

If FEMA identifies an MLR-eligible applicant with a disability whose housing needs cannot be met by an available unit, FEMA will make the necessary modifications as a reasonable accommodation and/or modification so the applicant receives a habitable, safe, accessible, and functional housing unit. FEMA will prioritize units that can be modified in the most time- and cost-efficient manner and best meet the requirements of the applicant. FEMA will incur all costs related to making the necessary repairs or improvements.

If construction costs begin to exceed the repair estimate at any time during the repairs, the project may need to be re-evaluated to ensure it still complies with the Stafford Act requirements. This will be a case-by-case determination based on the facts specific to the situation, based on the reason for the cost overruns, the extent to which they are directly in FEMA's control, and whether the increased costs cause the project to no longer be cost-effective.

### 5. Leasing Properties

The property owner must agree to incorporate a lease addendum containing MLR program conditions of eligibility and termination of tenancy between the property owner and the occupant. The property owner acknowledges responsibility for evicting applicants whose assistance is terminated. Property owners may receive reimbursement for reasonable costs associated with the eviction process if included in the contract.

FEMA may provide a per-unit security deposit payment to the landlord not to exceed one month of the FMR, based on location and number of bedrooms. Unused portions of each security deposit must be returned to FEMA upon release of the unit. If the security deposit amount does not cover the amount of damage to the unit, the occupant will be responsible to the property owner for the additional funds. FEMA will not pay for background checks, credit checks, application fees, or pet deposits.[128] FEMA will provide payment for utilities as part of the monthly rent only when utilities are included in the rent as an established practice by the property owner. Occupants are responsible for the payment of utility services when utilities are not included as part of the monthly rent.

The lease agreement between FEMA and the property owner must include the option to extend the lease if an extension beyond the standard 18-month period of assistance is approved. FEMA may release the unit to the owner and cease all monthly payments for the unit if the unit becomes vacant during the term of the contract and FEMA has not identified another eligible applicant to occupy the unit.

### 6. Limitations and Exclusions

Hotels, hospitals, nursing homes, etc. are not considered residential properties and are not authorized for MLR.

FEMA will not approve additional increases beyond the FMR approved by the AA for Recovery for the disaster.

## F. Transportable Temporary Housing Units and Site Types

FEMA may provide Direct Temporary Housing Assistance in the form of TTHUs on sites with utility access that meet the needs of the household and comply with applicable SLTT government ordinances. Approved sites must also meet Federal floodplain management and EHP compliance requirements. FEMA selects locations based on the cost-effectiveness, timeliness, and suitability of each potential site. Sites may include private, commercial, and group sites.

### 1. Unit Types

TTHUs may be provided in the form of RVs or MHUs. FEMA determines whether an RV, MHU, or other form of temporary housing will be provided based on the applicant's household composition, the amount of time the applicant expects to require temporary housing, as well as the feasibility and cost of the available temporary housing options. FEMA prioritizes RVs for eligible applicants who are projected to have a temporary housing need of six months or less. For those with a projected need of longer than six months, FEMA will generally utilize another form of Direct Temporary Housing Assistance.

### Recreational Vehicles

FEMA provides RVs that are certified to comply with the Recreation Vehicle Industry Association standards and meet California Air Resources Board (CARB) standards or are certified compliant with the Toxic Substances Control Act Title VI requirements for formaldehyde emissions from composite wood products found in RVs.

RVs may not be a suitable temporary housing solution for applicants with disabilities and others with access and functional needs. FEMA notifies applicants with a disability and others with access and functional needs who request an RV that a reasonable modification may be available upon request.

If a reasonable accommodation is requested but not available, FEMA works with applicants on a case-by-case basis to see if an acceptable alternative will effectively address the applicant's accessibility-related needs.

For eligible applicants who are unable to occupy an RV, FEMA will provide an MHU that complies with Uniform Federal Accessibility Standards (UFAS) or an available THU.

**Manufactured Housing Units (MHUs)**

FEMA provides MHUs constructed in accordance with HUD regulations.[129] FEMA MHUs are equipped with residential fire sprinklers, which can help save lives and prevent injuries. Residential fire sprinklers require a tank and pump system (TPS) to operate.

FEMA provides MHUs built to UFAS, including UFAS-compliant platform steps or ramps, and path of travel from the parking lot throughout the facility, to eligible applicants with a disability.

> **RV and MHU**
>
> **Recreational Vehicle (RV):** An RV is a vehicle designed as temporary living quarters for recreational, camping, travel, or seasonal use purchased or leased by FEMA and provided to eligible applicants for use as temporary housing for a limited period of time.
>
> **Manufactured Housing Unit (MHU):** A manufactured home purchased or leased by FEMA and provided to eligible applicants for use as temporary housing for a limited period of time.

**Utilities**

Occupants are responsible for the payment of utility services regardless of the unit or site type when utilities are not included as part of the monthly rent or pad rent for the unit. FEMA may authorize payment for utilities that are included in the monthly rent as an established practice by the property owner prior to the disaster.

## 2. Site Types

**Private Sites:** Private sites are sites provided by an applicant at no cost to FEMA, typically on their property near their pre-disaster residence. FEMA inspects each potential private site to determine if the site is feasible for placing the size and type of unit that will meet the household's needs. FEMA may provide TTHUs on private sites under the following conditions:

- The owner of the private site must certify that they are the landowner and that FEMA has permission to access the site to deliver, install, maintain, repair, and remove the TTHU.

- The site has sufficient access to allow FEMA to safely deliver, install, and remove the TTHU and meets local zoning requirements for a TTHU.

- The site is sufficiently clear of debris and other obstacles for placement of a TTHU and accessories (including steps or UFAS-compliant steps or ramps) in accordance with local setback or lot boundary requirements and the household's needs.

- Sanitation, including public sewer or a private septic system, is available and functional at the site. FEMA will not perform any repairs to components of the site eligible for Home Repair Assistance (such as wells and septic tanks) in order to make the site feasible for a TTHU.



- Electrical service is available and functional and a temporary power pole and meter panel for providing electrical service to the TTHU can safely be installed by the local power company. FEMA will not connect electrical service for the TTHU to the applicant's pre-disaster residence.

- Potable water service is available and functional at the site.

*MHU sits next to a residence in Zachary, Louisiana after flooding*

**Commercial Sites:** FEMA may provide TTHUs on commercial sites when the rules of the commercial site do not violate the Fair Housing Act.

Commercial sites are existing manufactured home parks with available pads that FEMA may lease for the purpose of providing Direct Temporary Housing Assistance.

- FEMA will prioritize locations within reasonable commuting distance of and access to community and wrap-around services.

- FEMA, to the extent possible, leases commercial sites at a fair market price in the affected area based upon the pre-disaster pad lease rates.

- When FEMA provides a TTHU on the same site as an applicant's pre-disaster mobile home, the applicant is responsible for any existing pad rental costs.

- FEMA only authorizes reasonable and cost-effective repairs or improvements necessary to make the site functional (such as an electrical service upgrade), including those necessary to meet reasonable accommodation requests for qualified individuals with disabilities.



- FEMA will not pay additional costs for utilities, grounds maintenance, trash removal, snow removal, or any other costs unless such costs were typically included in leases and lease amount prior to the disaster and the utilities in question are not metered separately by the utility provider.

*Manufactured housing units to be used as temporary housing for eligible applicants in a FEMA Staging Area in South Dakota.*

- FEMA will prioritize commercial sites with existing usable pads before considering sites which require improvement or expansion. FEMA will only consider expanding or improving existing commercial sites as a cost-effective alternative to building a group site. FEMA will deduct the total cost of expansion or improvements to commercial sites from the value of the lease agreement between FEMA and the park owner.

**Group Sites:** Group sites are not automatically included as part of the Direct Temporary Housing Assistance approval. FEMA only considers group sites when the temporary housing need cannot be met by other direct temporary housing options. Group sites provided by the SLTT government may include publicly-owned park land with adequate available utilities. The RA will only approve group sites when the below conditions have been met:

> **Fair Housing Act**
>
> Title VIII of the Civil Rights Act of 1968 (Fair Housing Act) protects people from discrimination when they are renting, buying, or securing financing for any housing. The prohibitions specifically cover discrimination because of race, color, national origin, religion, sex, disability, and the presence of children.

- The FCO must certify the need for each group site in writing and provide a copy of the certification to the RA before initiating the final design. The FCO's certification of need for a group site must include:

  o A request from the SLTT government for the specific group site and an assurance that the SLTT government has exhausted all other housing options in the area;

  o An analysis demonstrating insufficient rental resources exist within a reasonable commuting distance of the proposed group site location to meet the needs of eligible applicants;

  o An assessment demonstrating an increase in the Rental Assistance rate (see Chapter 3, IV.D.) within the county or parish where the group site will be located will not be sufficient to meet the needs of eligible applicants;

  o Identification of any restrictions for placing TTHUs on private sites within the county or parish where the group site will be located, accompanied by:

    ▪ Documentation of the FEMA JFO's efforts to negotiate waivers or otherwise seek relief from these restrictions to provide temporary housing for eligible applicants;

    ▪ An analysis demonstrating that the group site would still be required if applicants whose private sites are infeasible solely because of the local restrictions were removed from consideration;

  o Identification of the efforts taken to identify commercial sites for placement of TTHUs; and

  o Identification of the efforts taken to identify MLR and Direct Lease properties within the county or parish where the group site will be located. This should include data to support the need versus the number of MLR and Direct Lease properties and units available.

The RA will provide justification for the approval of a group site, in writing, to the AA for Recovery.

Group sites will be implemented according to the following considerations:

- FEMA will partner with the affected SLTT government to identify and select group site locations. FEMA will prioritize sites provided by the SLTT government at no cost before leasing a site from a private party.

- FEMA only develops group site locations within reasonable access to community and wrap-around services (e.g., schools, fire and emergency services, grocery stores, etc.). FEMA, as a lead coordinator, engages external stakeholders who may be able to assist in implementing wrap-around services in and around group site areas. FEMA ensures all  common-use areas of the group sites, including accessible paths of travel from the parking lot and throughout the site, are designed and built in accordance with UFAS. At least 15% of the pads in a group site and at least 5% of the TTHUs installed will comply with UFAS.

- FEMA will incorporate separate green spaces into group sites to accommodate households with children or pets.

- FEMA will make every attempt to design and build group sites in such a manner that playgrounds or other recreational equipment may be installed within or adjacent to the group site.

- FEMA must re-evaluate the need for group sites as the housing mission progresses (e.g., post-design and during all phases of construction). If at any time during the process applicants are able to be placed into other available direct housing options, the FEMA JFO will prioritize their placement into these other options instead of continuing to develop the group site.

### *3. Wrap-around Services*

FEMA does not provide wrap-around services; however, FEMA will not provide Direct Temporary Housing Assistance in locations where disaster survivors will not have access to wrap-around services.

> **Wrap-around Services**
>
> Wrap-around services address the support eligible applicants need while living in the TTHU. Wrap-around services may include basic social services, access to transportation, police/fire protection, emergency/health care services, communications, utilities, grocery stores, child care, and educational institutions.

### *4. Floodplain Management and EHP Considerations*

FEMA complies with EHP laws, regulations, and EOs when installing TTHUs. FEMA will not install TTHUs within areas which can result in loss of human life or will have adverse impacts on historic properties or endangered or threatened species or designated critical habitat. FEMA reviews each potential TTHU site for floodplain management concerns[130] and will not place TTHUs within a one percent annual chance floodplain unless no practical alternative exists.

When placing TTHUs on private and commercial sites, FEMA shall apply the abbreviated eight-step decision-making process for any proposed action that may occur in or may impact a floodplain or wetland.[131] The decision-making process includes the following considerations:

- FEMA will identify if the potential TTHU site is located in an SFHA as identified on the available flood hazard information or a potential flooding area as identified on the Advisory Flood Hazard Information.

- FEMA will not place TTHUs within a floodway or coastal high hazard area (V zone), even under the eight-step process. FEMA will not place RVs in high flood risk areas with rapid rates of rise or flash flooding.

> **Historic Property**
>
> The term "historic property" is defined in the National Historic Preservation Act as "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register, including artifacts, records, and material remains relating to the district, site, building, structure, or object" (54 U.S.C. § 300.308). An archaeological site may be considered a historic property under the law.

- When deciding whether a potential TTHU site in the floodplain is the only practicable alternative, FEMA considers the following factors: speedy provision of temporary housing; potential flood risk to the temporary housing occupants; cost-effectiveness; social and neighborhood patterns; timely availability of other housing resources; and potential harm to the floodplain or wetland.

- When FEMA determines that placing TTHUs within an SFHA is necessary for providing temporary housing for eligible applicants, FEMA will prioritize MHUs over RVs for sites within the floodplain. FEMA considers the availability of each type of unit, based on the number of MHUs available from FEMA's inventory, off the lot purchases, and additional production from manufacturers to determine when providing RVs within an SFHA may be necessary for providing expedient temporary housing in an SFHA.

- Placement of TTHUs will be made in accordance with NFIP criteria or any more restrictive Federal, SLTT government floodplain management standard. Such standards may require anchoring and elevation to the base flood elevation in absence of a variance. FEMA will take into account seasonal variations in flood risk and flood depth when evaluating potential sites for TTHU placement.

- Units will be elevated to the highest level practicable and will be anchored to prevent movement. Actual elevation levels will be based on the manufacturers' specifications and agency guidance. RVs may be installed on their chassis but must also be adequately anchored. FEMA will coordinate with STT governments and local floodplain administrators to permit the installation of TTHUs.

- FEMA will provide applicants with information and advisories on the flood risk, including information relating to health and safety, evacuation, right of entry, and personal property, and contact information for the local emergency manager. FEMA will obtain acknowledgement from TTHU occupants that they have been provided this information.



**Expedited EHP Compliance Review**

Understanding the critical need for the placement of TTHUs following a disaster, FEMA has streamlining measures in place to ensure an EHP compliance review is completed in a timely manner. FEMA will complete the appropriate level of analysis depending upon the action. This could involve the simple application of a Categorical Exclusion (an action that has been documented to have little potential impact on the environment).

FEMA conducts appropriate EHP compliance analyses on potential group site locations and when expanding or improving commercial sites. Whenever possible, FEMA will avoid placement in locations where EHP compliance review has identified hazards or concerns related to environmental, historic, or cultural resources. EHP compliance reviews may require consultation with other Federal agencies and SLTT government resource agencies before work can begin.

FEMA may conduct additional EHP compliance review for private sites when they are found to have archeological resources, Federally-listed endangered or threatened species, designated critical habitat, or known hazardous substance contamination.

Consultations undertaken pursuant to the Endangered Species Act (ESA) will typically focus on ensuring ESA compliance by addressing a project's adverse effects to threatened and endangered species, as well as their designated critical habitat. However, consultations may result in the requirement to incorporate conservation measures for affected species and their designated critical habitat. FEMA will address environmental planning early in project scoping and project development stages to minimize delays and additional costs at the EHP compliance stage and to identify opportunities for implementing measures for the conservation of species.

## G. Disposing of TTHUs through Sales to Occupants and Donations

FEMA is authorized to dispose[132] of occupied TTHUs through sales to occupants or donations to qualified government agencies or voluntary organizations within the period of assistance.[133] Sales and donations are means to dispose of TTHUs, not forms of housing assistance. An occupant's participation in TTHUs sales or donations is voluntary. An occupant's decision not to participate does not affect their eligibility for Direct Temporary Housing Assistance during the period of assistance.

### 1.    Authorizing Disposal through Sales and Donations

FEMA may dispose of occupied TTHUs by sale or donation in response to a written request from the STT government. The RA or FCO, if the RA has delegated the authority to the FCO, may implement TTHU sales and donations when:

- Rental resources are not expected to support those currently residing in FEMA-provided TTHUs within the period of assistance for the disaster declaration;

- Applicants' completion of repair or replacement of their disaster-damaged residences will not be possible within the period of assistance;

- Disposing of TTHUs is not expected to adversely affect local rental housing and manufactured housing markets;

- Disposing of TTHUs is expected to be in the best interest of the Federal government; and

- Disposing of TTHUs will not cause a significant impact on FEMA's ability to maintain necessary TTHU inventory.

Once approved, FEMA may sell occupied TTHUs to pre-disaster homeowners immediately following the implementation of Direct Temporary Housing Assistance. After determining that adequate, alternate housing has not returned to the housing market, and is not expected to return, the earliest FEMA will implement sales of occupied units to pre-disaster renters is six months following the date of declaration.

FEMA will not initiate or approve TTHU donations independent of TTHU sales to occupants. FEMA will only consider donation after all TTHU sales to occupants have been completed. Each TTHU Donation Agreement must be approved by the RA or FCO. For additional information, see Chapter 3, V.G.

### 2. TTHU Sales to Occupants

FEMA may dispose of occupied TTHUs by selling them directly to the occupant if that individual or household lacks permanent housing through no fault of their own.[134] FEMA will sell a unit at a price that is fair and equitable. When an applicant purchases a unit from FEMA, they must agree to assume responsibility for it. Upon selling the unit to the occupant, FEMA will notify the residence tax office.

**Purchaser's Conditions of Eligibility:** Only the primary occupant may request and complete the purchase of the TTHU.

The primary occupant must meet the following criteria to purchase the TTHU:

- Comply with all conditions and rules under Direct Temporary Housing Assistance (see Chapter 3, V.D.) and the Revocable License or Temporary Housing Agreement;

- Lack permanent housing and be unable to fulfill a PHP within the period of assistance through no fault of the occupant;

- Respond to the FEMA Sales Notice expressing interest in purchasing the unit;

- Demonstrate the household's financial ability (e.g., proof of income, insurance payout, personal savings, or external assistance from non-FEMA sources) to complete the purchase within the time frame required, typically 30 days after FEMA tenders the final sales offer; and



- Demonstrate they have obtained any or all permits or inspections required by the SLTT government for the sale and location of a TTHU.

*One of several MHUs provided by FEMA in Crestwood, New Jersey following Hurricane Sandy.*

A household that qualified for and received a TTHU through the citizenship or qualified alien status of a minor child member of the household may be eligible for a TTHU sale for the benefit of the child. FEMA staff will consult the Office of Chief Counsel to ensure the necessary legal requirements to complete the sale are met.

**Determining the Price of the Unit:**

**MHU:** FEMA will offer to sell the MHU to the primary occupant at the Adjusted Fair Market Value (AFMV), which is the Fair Market Value (FMV) minus a standard deduction of FEMA's average deactivation cost.

**RV:** FEMA will determine the FMV of the RV using the National Automobile Dealers Association (NADA) pricing guide and subtract FEMA's average deactivation cost to determine the AFMV.

FEMA may lower the sales price based upon the occupant's financial ability but will not reduce the sales price to less than 25% of the AFMV.[135] If the occupant feels they cannot afford to purchase the unit at the AFMV, the occupant may appeal FEMA's determination and petition for a reduced sales price.

- At the time FEMA calculates the reduced sales price, FEMA will consider the income and assets for all occupants over the age of 18 listed on the Temporary Housing Agreement.

- In order to purchase the TTHU at the reduced sales price, the primary occupant will be required to:

  o Apply toward the cost of purchasing the unit all Home Repair Assistance or Home Replacement Assistance for which the primary occupant cannot produce a receipt or other documentation showing it was used for its intended purpose;

  o Contribute 30% of the gross monthly income of all occupants 18 years of age or older toward the cost of purchasing the TTHU; and

  o Contribute 40% of the cumulative assets of all occupants 18 years of age or older toward the cost of purchasing the TTHU.

- FEMA's decision on an occupant's reduced sales price based on their appeal is a final Agency determination and not subject to further appeal.

- Individuals and households who are non-compliant with the NFIRA requirement to purchase and maintain flood insurance are not eligible for a reduced sales price.[136]

**Conditions of Sale:** FEMA does not permit substitutions or exchanges of TTHUs. The primary occupant must agree to purchase the TTHU they currently occupy "as is" and "where is." This includes all modifications and accessories in place at the time of sale, including those provided as accommodations for occupants with disabilities. All of the following exceptions apply to "as is" and "where is:"

- Where necessary, FEMA may perform minimum repairs needed to protect health and safety.

- When the TTHU being sold is located in a FEMA group site or a FEMA-leased commercial site, the primary occupant must:



**Occupant Option at Commercial Sites**

For commercial sites, the primary occupant may choose to assume the pad lease.

  o Secure an alternate location that complies with all applicable Federal, SLTT government laws, codes, and ordinances;

  o Be able to move the unit within 30 days of sale; or

  o Assume the commercial site pad lease after the sale, if applicable.

- FEMA will not sell units for use in a floodplain or wetland unless the sale fully complies with the 8-step process.[137]

- o MHUs in a floodplain must be elevated at least to the level of the 100-year flood prior to sale. FEMA will not pay to elevate an MHU above manufacturer specifications and agency guidance, which reflect the highest level practicable at installation.

- o MHUs that are not elevated to the required height cannot be sold.

- o FEMA will not sell RVs located within an SFHA.

The primary occupant acknowledges all terms of the sale on the Acknowledgment of Conditions of Sale document, including:

- Agreeing to maintain hazard and flood insurance on the unit, regardless of whether the TTHU is or will be located in an SFHA.

- Responsibility for all maintenance and utilities associated with the TTHU after completing the sale.

- RVs are not designated for use as a permanent dwelling but as temporary living quarters for recreational, camping, travel, or seasonal use.

FEMA will provide the primary occupant with an SF-97 Form, U.S. Government Certificate to Obtain Title to a Vehicle, signed by FEMA as the Transferor, upon collection of full payment and completion of the Acknowledgement of Condition of Sale. Payment must be made using a certified check or money order. After the sale is completed, the primary occupant and members of the occupant's household will no longer be eligible to receive FEMA Direct Temporary Housing Assistance for that disaster declaration.

### 3. TTHU Donations to Qualified Public Agencies and Private Organizations

FEMA may donate occupied TTHUs "as is" and "where is" to an SLTT government agency or a voluntary organization for the purpose of continuing to provide temporary housing to eligible occupants who cannot afford to purchase the TTHU at the lowest price FEMA will offer.[138] FEMA cannot donate directly to a TTHU occupant.[139]

**Eligible Recipient Entities or Organizations:** FEMA must identify eligible recipient entities or organizations interested in receiving donated TTHUs. FEMA will give priority to SLTT government agencies for receiving TTHU donations before considering donating TTHUs to voluntary organizations. If government agencies are unavailable, FEMA will give priority to voluntary organizations that have been in existence for at least one year and have a history and demonstrated capability of assisting disaster survivors.

After identifying an eligible recipient entity or organization, FEMA must identify occupants who are eligible to participate.

**Conditions of Eligibility for Occupants:** Occupants may be considered for inclusion in TTHU donations when the following criteria are all met:

- The primary occupant satisfies all families coping with an emergency or a major conditions of eligibility under TTHU Sales to Occupants (see Chapter 3, V.F.2.) but does not have the financial ability to purchase a TTHU at the reduced sales price.

- The primary occupant lacks permanent housing and has not fulfilled a PHP through no fault of their own.

- The primary occupant continues to have a disaster-caused temporary housing need.

- The primary occupant indicates interest in participating in TTHU donations by replying to the Notice of Interest Letter with the required information.

  o If selected to participate in TTHU donations, the primary occupant must return the Acknowledgment Letter sent by FEMA, agreeing to be housed by the entity/organization approved to receive and manage the TTHU.

**Conditions of Donation:** FEMA will not donate any TTHU without a TTHU Donation Agreement signed by FEMA and the recipient entity/organization. The TTHU Donation Agreement will require the recipient entity/organization to:

- Use the occupied TTHU for the sole purpose of providing temporary housing to a FEMA-eligible occupant until the end of the period of assistance or for a minimum of one year, whichever is longer, unless:

  o The eligible occupant secures permanent housing earlier; and

  o FEMA is unable to identify another eligible applicant to occupy the unit for the remainder of this time period.

- Ensure the site where each TTHU is to be occupied complies with local codes, ordinances, 44 C.F.R. Part 9, and other EHP compliance procedures detailed in *FEMA Instruction 108-1-1*.

> **Voluntary Organization**
>
> A voluntary organization is any chartered or otherwise duly recognized 501(c)(3) tax-exempt which has provided or may provide needed services, in cooperation and partnership with SLTT or other government agencies, to individuals and households.

- Obtain and maintain hazard and flood insurance on the unit,[140] regardless whether the unit is or will be located within an SFHA.

- Not impose a rent or usage fee on an eligible occupant until after FEMA's initial period of assistance has ended.

- Acknowledge in writing, acceptance of any potential expenses (e.g., permit costs, insurance) related to the donation.

- Comply with the nondiscrimination provisions of the Stafford Act.[141]

- Notify occupants that RVs are not designated for use as a permanent dwelling but as temporary living quarters for recreational, camping, travel, or seasonal use.

**Approval of Recipient Entities or Organizations:** The RA or FCO must approve and sign all Donation of Temporary Housing Units Agreements when all the above criteria and documentation requirements have been met. Transfer of ownership is complete once the SF-97 Form, *U.S. Government Certificate to Obtain Title to a Vehicle*, is sent to the entity/organization. Upon approval, FEMA sends a Final Notification letter to participating occupants, stating that FEMA has approved the donation and giving the date of transfer of responsibility for providing temporary housing to the occupant.

Case 3:25-cv-03698-SI    Document 303    Filed 02/10/26    Page 776 of 1522

Chapter 3: Individuals and Households Program

### 4. Effect of TTHU Donations on FEMA Disaster Assistance

- During the period of assistance, an occupant's decision not to participate in a TTHU sale or donation does not affect their eligibility for continued Direct Temporary Housing Assistance.

- If an eligible occupant decides to participate in TTHU donation, upon the completion of the donation, the occupant will no longer be eligible to receive Direct Temporary Housing Assistance for that disaster declaration unless:

  o The recipient entity/organization fails to comply with the TTHU Donation Agreement;

  o The entity/organization's non-compliance creates an unmet disaster-caused temporary housing need for the eligible occupant during the period of assistance; and

  o The period of assistance remains open.

## H. Direct Lease

Direct Lease is a form of Direct Temporary Housing Assistance where FEMA may lease existing residential properties for eligible applicants to use as temporary housing.[142] FEMA will only authorize Direct Lease when the verified disaster-caused housing need cannot be met with other Direct Temporary Housing Assistance options.

### 1. Authorizing Direct Lease

In addition to the criteria described in Chapter 3, V.A., FEMA will consider Direct Lease when Direct Temporary Housing Assistance has already been approved and:

- Other forms of Temporary Housing Assistance (i.e., Rental Assistance, Multi-Family Lease and Repair, and TTHUs) have been evaluated and delivered in sequential order based on program criteria.

- Housing needs exceed FEMA's capacity to provide MLR units or TTHUs in a timely manner.

- FEMA has identified one or more properties that meet the criteria identified in Property Eligibility Criteria (see Chapter 3, V.E.2.).

- FEMA will not authorize Direct Lease:

  o For the sole purpose of providing temporary housing to applicants who are unable to pass a background and/or credit check; or

  o On the sole basis that Direct Lease is more cost-effective than providing TTHUs.

- The FCO must submit a written request to the AA for Recovery demonstrating Direct Lease is needed as a result of a Presidentially-declared disaster based on the criteria provided above. The AA for Recovery will review the request and make a final determination regarding approval of Direct Lease. Once Direct Lease has been approved, FEMA will contract with a property management company to locate, acquire, and manage properties for FEMA.

## 2. Approving Properties

FEMA must identify one or more properties, provided by the contracted property management company, that meet the following conditions of eligibility:

- The property must be an existing residential property, not typically available to the general public (i.e., corporate apartments, vacation rentals, and second homes), for use as temporary housing;

  o Units that may be obtained by applicants using Rental Assistance will not be acquired for Direct Lease;

  o Hotels, motels, and other transient accommodations will not be acquired for Direct Lease;

- The property must be currently available to rent for housing up to 200% of the HUD FMR, unless a greater amount has been approved by the AA for Recovery;

- The property must comply with Housing Quality Standards (HQS) established by HUD, and all utilities, appliances, and other furnishings must be functional;

- Each individual unit must provide complete living facilities, including provisions for cooking, eating, and sanitation within the unit;

- The property must be located in an area designated for IA included in a major disaster declaration; and

- The property must be located within reasonable access to community and wrap-around services, such as accessible public transportation, schools, fire and emergency services, grocery stores, etc.

The property owner must agree to include provisions within the lease agreement granting FEMA the following:

- Exclusive use of the housing units and sole discretion to identify and select occupants during the term of the lease agreement;

- The option to extend the lease if FEMA extends the period of assistance beyond 18 months;

- The option of releasing the unit to the owner and ceasing all monthly payments for the unit at any time by providing thirty days' notice;

- The ability to make permanent modifications or improvements to the property (at FEMA's expense) to provide a reasonable accommodation for an eligible applicant with a disability; and

- The property owner's agreement to modify any lease between the property owner and the occupant to incorporate FEMA's program conditions of eligibility and termination of tenancy. The property owner acknowledges responsibility for evicting applicants whose assistance is terminated. FEMA will factor reasonable eviction costs into the Direct Lease contract so that property owners may receive reimbursement for reasonable costs associated with the eviction process.

### *3. Prioritizing and Leasing Properties*

Before leasing a property, FEMA will inspect the property to ensure compliance with HUD HQS, and verify the property owner's capacity to provide all property management services. This includes building maintenance, except where the property is leased or contracted from another government entity, in which case FEMA may directly obtain such services. Leasing actions, including any modifications or improvements, are subject to EHP and floodplain management compliance requirements. When more eligible Direct Lease properties have been identified than are required for temporary housing, FEMA will use the following factors to prioritize:

- Cost to the Federal Government:
  - o The RA or FCO, if the RA has delegated this authority to the FCO, is authorized to approve properties up to 200% of the FMR, if:
    - Lower cost units are unavailable or already used; and
    - A housing market analysis supports the approved increase.
  - o The AA for Recovery must approve Direct Lease costs above 200% of FMR.
- Landlord's demonstrated ability to manage and provide maintenance services;
- Proximity to wrap-around services; and
- Accessibility: when selecting available properties, FEMA will prioritize properties that are already accessible, include accessibility features, or can be easily made accessible; and/or are in proximity to accessible public transportation.

FEMA will prioritize accessible units for applicants whose household includes one or more persons with a disability and others with access and functional needs. FEMA may only consider placing other eligible applicants in accessible units when all households with accessibility needs have been housed. FEMA may authorize a one-time payment of security deposits for each unit based on FMR. Unused portions of each security deposit must be returned to FEMA upon release of the unit. If the security deposit amount does not cover the amount of damage to the unit, the occupant will be responsible to the property owner for the additional funds. FEMA may authorize payment for utilities that are included in the monthly rent as an established practice by the property owner prior to the disaster; however, FEMA will not pay for background checks, credit checks, pet deposits,[143] or application fees. Occupants are responsible for the payment of utility services when utilities are not included as part of the monthly rent.

## I. Permanent Housing Construction

FEMA may provide financial assistance or direct assistance to individuals and households to construct permanent or semi-permanent housing in insular areas outside the continental U.S. FEMA may also consider providing such assistance in other locations where no alternative housing resources are available, and other types of Temporary Housing Assistance are unavailable, infeasible or not cost-effective.[144] PHC may be provided in the form of direct assistance such as repairs or new home construction.

Repairs and new construction provided under PHC are limited to real property components eligible under FEMA Housing Assistance such as HVAC, walls, floors, ceilings, etc. Under PHC, FEMA will not repair or replace items eligible under Personal Property Assistance, such as furnishings and appliances.



**Unavailable, Infeasible, and Not Cost-Effective**

**Unavailable:** Temporary housing options do not exist for any reasonable cost or in any reasonable time. Rental housing is not available and other forms of temporary housing cannot be constructed and deployed in sufficient numbers.

**Infeasible:** Rental Assistance cannot be used because there are no available rental resources, or other forms of Direct Temporary Housing Assistance cannot be utilized because of terrain, distance, physical barriers, or time delays, that with reasonable means, FEMA cannot overcome.

**Not Cost-Effective:** The cost of providing another form of direct temporary housing option (MLR, TTHUs, and Direct Lease) is higher than providing PHC.

### 1. PHC Request and Approval

FEMA will only authorize PHC in response to a written request from the State, Territorial, or Tribal Coordinating Officer or the Governor/GAR or the Tribal Chief Executive/TAR. In order to recommend the use of PHC, the Sheltering and Housing Strategy must demonstrate that Temporary Housing options are unavailable, infeasible, or not cost-effective, including MLR, MHUs, RVs, and Direct Lease.

- The request must also identify all Federal, SLTT government compliance requirements, including:
  - The status and requirements of the currently-adopted building code, zoning, permitting process and requirements, and any impediments and requirements that may impact the delivery of PHC;
  - Cultural and climate considerations; and
  - Standard types of housing used in the area.
- Identify useful studies, projects, and reports, including Mitigation Assessment Reports, if available, that address the performance of buildings and essential facilities in the declared STT government, with specific recommendations for improving performance.

- The PHC request must include the following:
  - PHC Repair:
    - Analysis of the estimated associated costs, based on real property line items;
    - Availability of sources of repair labor other than FEMA, such as contractors or voluntary agencies; and
    - A disaster-specific financial cost cap recommendation for each type of PHC approved. The cost cap amount will be set through data collected through the Sheltering and Housing Strategy based on the square footage and pre-disaster market value of an average home in the declared area.
  - PHC New Construction:
    - Identification of potential new construction options appropriate for the culture, climate, and environmental requirements within the affected areas;
    - A comparative analysis of the timeliness, cost, feasibility, and suitability of each new construction option; and
    - A review of hazard mitigation measures (e.g., incorporation of seismic resistance in design and construction) and construction methods to be applied to ensure new construction provided by FEMA is resilient towards future hazards.
- Within PHC, FEMA will prioritize the use of PHC to repair existing homes before constructing new homes.
  - Before authorizing PHC, FEMA will develop a Business Case, to include:
    - Contract requirements, procurement strategy, project management plan, resource sourcing methods, and a comparative analysis of the available construction options, including the cost, speed, and feasibility of each.
- FEMA may also include the shipment of construction materials in the PHC authorization.
- The AA for Recovery will evaluate the PHC request using information obtained through the Direct Housing Assessment in order to approve PHC. If the request clearly demonstrates a need for PHC, the AA for Recovery will specify relevant conditions for implementation, such as establishing a disaster-specific financial cap for PHC Repairs.

Upon receipt of the authorization to implement PHC, FEMA will require the affected STT government to execute an amendment to the FEMA-State/Territory/Tribe Agreement.

**Figure 26: Conditions for PHC Repair or New Construction**

| Applicants may be considered for **PHC Repairs** to their pre-disaster residence when: | Applicants may be considered for **PHC New Home Construction** when: |
|---|---|
| • The real property verified loss amount is over $12 per square foot but not above the disaster specific cap, and not destroyed; or<br>• The applicant demonstrates on appeal they are not able to use Home Repair Assistance to make their home safe, sanitary, and functional; and<br>• Repairs to the pre-disaster residence are more cost-effective than new construction; and<br>• The repairs are estimated to be completed within 90 days or less from the start of the repair work; and<br>• The cost of repairs will not exceed 50% of the pre-disaster primary residence's pre-disaster market value. | • FEMA determines the pre-disaster residence has been destroyed as a result of the disaster, or<br>• The real property verified loss amount is over $12 per square foot and the pre-disaster residence is repairable, but FEMA has determined that new construction is more cost-effective than repair; and<br>• If structural elements of the pre-disaster primary residence, (e.g. foundation, frame), or other components of the home require architectural or engineering services in order to be habitable. |

## *2. Conditions of Eligibility*

FEMA may authorize PHC for pre-disaster homeowners. Similar to other forms of Direct Housing Assistance, FEMA prioritizes applicants with a real property verified loss of at least $12 per square foot. Applicants who have less than $12 per square foot in FEMA-verified losses may submit an appeal (see Chapter 3, II.C) with documentation that demonstrates they are not able to use FEMA financial assistance to secure temporary housing or afford repairs to make their home safe, sanitary, and functional. In addition to meeting general conditions of eligibility (see Chapter 3, II.), applicants must meet the following conditions in order to receive PHC:

- Applicants are unable to use Temporary Housing Assistance.

- Applicants are not receiving Continued Temporary Housing Assistance or Direct Temporary Housing Assistance.

  o Applicants will become ineligible for PHC if they receive Continued Temporary Housing Assistance or Direct Temporary Housing Assistance.

- Applicants do not have insurance for repair or replacement.

- Applicants must disclose to FEMA all grants and assistance received, including SBA disaster home loans for real property damages, and return any funds determined to be a DOB to FEMA prior to construction including previously awarded Home Repair Assistance or Home Replacement Assistance.

- Applicants have not accepted a disaster home loan from the SBA.
  - Applicants who have accepted an SBA disaster home loan for real property damages may be eligible for PHC if they cancel their SBA disaster home loan prior to disbursement.
  - Applicants who have accepted and received disbursement of an SBA disaster home loan for real property damages are not able to return those funds or cancel the loan in order to be considered for PHC.

### 3. PHC Repair

FEMA will only perform repairs necessary to restore the pre-disaster residence to a habitable condition. The components that may be deemed eligible for Home Repair Assistance, and the type of repairs authorized, will vary depending upon the nature of the disaster.

In order for the household to be eligible for PHC Repair, FEMA must determine that the repairs necessary to make the home safe, sanitary, and functional can be completed within 90 days and under the disaster-specific approved cost maximum.

The following components may be repaired or replaced:[145]

- The structure's interior, including walls, ceilings, doors, and cabinetry;
- Interior floors, when buckling or deterioration creates a safety hazard;
- Interior walls, limited to what is necessary to maintain the structural integrity of the home;
- Exterior walls, doors, and windows, limited to what is necessary to maintain the structural integrity of the home and meet local codes;
- Roof, when the damage affects the essential living area or are necessary to prevent additional damage;
- Plumbing system, including fixtures providing service to the kitchen and bathroom(s), and flushing and/or purifying the water well;
- Electrical system and essential fixtures necessary to ensure the home can safely receive electrical service;
- Sewerage system;
- HVAC, and integral fuel and electrical systems; and
- Pre-existing accessibility features and accessible routes.

All repairs shall be made using materials of average quality, size, and capacity ("builder grade"), in accordance with Federal EHP laws, regulations, EOs, and local codes and ordinances, or minimum construction industry standards where no codes and ordinances apply. Repairs to accessibility features and accessible routes will be guided by the ADAAG and the HUD's Design Details for Accessible Disaster Relief Housing.

### 4. PHC New Construction

FEMA will only complete PHC New Construction when an applicant's pre-disaster primary residence is determined to be destroyed or determined to be infeasible for PHC Repair because the home requires repairs which exceed the scope of PHC Repair Assistance. New construction shall be provided in accordance with EHP laws, regulations, EOs, and local codes and ordinances, or minimum construction industry standards where no codes and ordinances apply, using materials of average quality for the lowest price ("builder grade"), taking into consideration the accessibility needs of the occupant.

- FEMA partners with the affected SLTT government to select the type of construction and architectural design that meet SLTT government construction restrictions and EHP compliance regulations based on cultural and climate considerations, and standard type of housing used in the area. In addition, FEMA EHP staff will work with other Federal agencies and SLTT governments to determine if there are opportunities to incorporate conservation measures that would benefit Federally-listed threatened and endangered species and their designated critical habitat in the project area.

- New construction for households requiring accessibility features and accessible routes will be provided in accordance with UFAS.

- New construction shall be provided using mitigation practices to reduce the risk of damage from future disasters.

- FEMA and the affected SLTT government shall coordinate to ensure any PHC new construction complies with floodplain management regulations. New construction in an SFHA must comply with the full eight-step process and be installed in compliance with all applicable National Flood Insurance Program (NFIP) standards and local floodplain management codes, ordinances, and standards.

- The land/property where the new single-family dwelling will be constructed must be owned by the eligible applicant. In limited circumstances, FEMA will evaluate providing PHC on land provided by the SLTT government at no cost to FEMA (e.g., insular areas, islands, or tribal lands where land ownership may vary; for instance, communal land or land held in trust by the STT government).

Labor and materials costs for PHC New Construction will be capped at a pre-determined amount for each declared disaster. The FEMA JFO may submit a request to increase the authorized labor and materials costs for PHC New Construction, supported by a business case demonstrating the requested increase is necessary to construct adequate housing and the additional expenses are fair and reasonable.

### 5. PHC Terms and Conditions

Prior to FEMA providing PHC, applicants must:

- Acknowledge they understand and accept FEMA's terms and conditions for PHC assistance.

- Agree to obtain and maintain flood insurance coverage on the PHC home for at least the value of the PHC residence if the home is located in an SFHA and the applicant incurred damage to their pre-disaster residence as a result of a flood.[146] FEMA will not contribute to the cost of flood insurance premiums for PHC residences. If the applicant fails to maintain flood insurance, they may be deemed ineligible for flood-insurable losses in future disasters.

- Choose between receiving FEMA financial Housing Assistance (LER, Rental Assistance, Home Repair Assistance, and Home Replacement Assistance) or PHC.

- Return any previously-provided financial Home Repair Assistance and Home Replacement Assistance that has not been used for eligible repair or replacement line items to FEMA.

- Grant right of access and entry upon their property to FEMA and other participating U.S. Government agencies, including their agents, employees, contractors, and subcontractors for all activities necessary for providing PHC.

- Accept all responsibility and liability for the PHC dwelling upon completion including but not limited to recording fees and other costs associated with obtaining the title.

- Indemnify and hold harmless FEMA and other participating U.S. Government agencies, including their agents, employees, contractors, and subcontractors, from any complaints, losses, and damage of sorts, directly or indirectly related to any program-related activity on the real property site.

# VI. Other Needs Assistance[i]

The ONA provision of the IHP, authorized by Section 408(e) of the Stafford Act,[147] provides financial assistance for disaster-related necessary expenses and serious needs that are not covered by insurance or provided by any other source. Unlike Housing Assistance, ONA is subject to a cost share between FEMA and the STT government.[148] FEMA, in coordination with the STT government pre-determines ONA-eligible items and amounts to be awarded.

**Necessary Expense and Serious Needs**

A "necessary expense" means the cost associated with acquiring an item, obtaining a service, or paying for any other activity that meets a serious need.

A "serious need" means the requirement for an item or service that is essential to an applicant's ability to prevent, mitigate, or overcome a disaster-caused hardship, injury, or adverse condition.

## A. ONA Options and Cost Shares

FEMA collaborates with the SBA in determining applicant eligibility for some types of ONA. The Small Business Act authorizes the SBA to provide low-interest disaster loans to applicants who have sustained damage in a disaster. An applicant must meet a minimum income test, which the SBA establishes, to be considered for a loan. FEMA refers the applicant's information to SBA if the applicant's income meets SBA minimum guidelines. FEMA and SBA coordinate to ensure that ONA and SBA disaster loans do not cause a duplication of benefits for the same type of assistance.[149]

**Figure 27: SBA Disaster Loan Application Process**



*The SBA Disaster Loan application process only applies to SBA-Dependent ONA. FEMA does not require the applicant to apply for an SBA loan before being considered for Non-SBA-Dependent ONA or Housing Assistance.

---

[i] OMB revised the regulations that govern federal grants and cooperative agreements, please refer to Title 2 of the Code of Federal Regulations for more details. See Electronic Code of Federal Regulations.

Each type of ONA has specific conditions of eligibility applicants must satisfy prior to being considered for assistance. These conditions are described in the appropriate sections of this chapter.

| Figure 28: Other Needs Assistance, Non-SBA-Dependent and SBA-Dependent | |
|---|---|
| Category of ONA | Type of ONA Assistance |
| **Non-SBA Dependent ONA**<br><br>FEMA provides assistance for these items without regard to whether an applicant may obtain an SBA loan. | • Funeral Assistance<br>• Medical and Dental Assistance<br>• Child Care Assistance<br>• Assistance for Miscellaneous Items<br>• Moving and Storage Assistance<br>• Critical Needs Assistance<br>• Clean and Removal Assistance |
| **SBA-Dependent ONA**<br><br>The applicant must first apply to the SBA for a loan for these expenses or serious needs. | • Personal Property Assistance<br>• Transportation Assistance<br>• Group Flood Insurance Policy |

### 1. Amount of Assistance

Assistance for an eligible applicant will not exceed the financial ONA maximum award pursuant to Section 408(h) of the Stafford Act.[150] However, Personal Property Assistance for specific disaster-damaged accessibility items is not limited by a financial maximum award. The following accessibility items are eligible under Personal Property Assistance:

- Computer, if used as the sole means of communication for a household member

- Raised toilet seat

- Washer (front-loading), if a member of the household uses a wheelchair or has a similar mobility limitation

- Refrigerator (side-by-side), if a member of the household uses a wheelchair or has a similar mobility limitation

- Bed (hospital type)

- Walker

- Wheelchair

- Shower Chair

- Smoke Alarm (specialty), if a member of the household is sight or hearing-impaired

- TTY/ TDY Telephone

For some specific categories of ONA, the affected STT government will establish the maximum amount of financial assistance that may be awarded as part of their yearly submission of *FEMA Form FF-104-FY-21-114, ONA Administrative Option Selection*.[151]

**Figure 29: Excerpt of FEMA Form FF-104-FY-21-114: ONA Administrative Option Selection**

## 2. ONA Cost Share and Administration

As outlined in Section 408(g)(2) of the Stafford Act, FEMA is responsible for 75% of ONA, and the STT government is responsible for the remaining 25% of ONA.

The STT government may select from the following three options for the administration of the ONA (see *Figure 30*):

- **FEMA Option:** FEMA is responsible for all tasks associated with the administration of ONA: registration intake, inspection services, the processing system, disbursing awards, staffing, recovery of funds, case processing, mail processing, accessible forms of communication, appeals, and preparing closeout material. FEMA utilizes the National Emergency Management Information System (NEMIS) for processing all IHP assistance, including ONA. FEMA provides assistance to applicants, and the STT government is responsible for reimbursing FEMA for their portion of the cost share.[152]

> **Federal Share**
>
> Section 408(g)(2) of the Stafford Act explicitly provides that the Federal share shall be 75%, giving FEMA no authority to adjust the Federal cost share for ONA. However, 48 U.S.C. § 1469a(a) allows FEMA to waive or adjust the cost share for disaster grants in insular areas such as the Virgin Islands, Guam, American Samoa, and the Northern Mariana Islands.

- **Joint Option:** The STT government administers ONA jointly with FEMA. FEMA is responsible for registration intake, inspection services, the processing system, mail processing, and accessible forms of communication. The STT government is responsible for manually processing awards, staffing, recovery of funds, case processing, appeals, and preparing closeout material. The respective STT government uses NEMIS for ONA processing, but may utilize their own system of record for other program administration functions, such as disbursing awards.[153] The STT government provides assistance to applicants, and FEMA is responsible for reimbursing the STT government, for its portion of the cost share. The STT government may utilize 5% of the grant toward administrative costs.

- **State, Territorial, or Tribal Government Option:** FEMA provides ONA as a grant to the STT government; therefore, the STT government administers ONA. The STT government is responsible for all tasks associated with the administration of ONA. The respective STT government receives a grant to process ONA outside of NEMIS. The STT government provides assistance to applicants, and FEMA is responsible for reimbursing the STT government for its portion of the cost share. The STT government may utilize 5% of the grant toward administrative costs.[154]

| Figure 30: ONA Administrative Option Responsibility | | | |
|---|---|---|---|
| Process | FEMA Option | Joint Option | State, Tribal, Territorial Option |
| Registration Intake | FEMA | FEMA | State* |
| Inspection Services | FEMA | FEMA | State |
| Processing System | FEMA | FEMA | State |
| Disbursing Awards | FEMA | State | State |
| Staffing and Helpline | FEMA | State | State |
| Recovery of Funds | FEMA | State | State |
| Case Processing | FEMA | State | State |
| Mail Processing | FEMA | FEMA | State |
| Appeal Processing | FEMA | State | State |
| Preparing Closeout | FEMA | State | State |

*Note: The references to "State" include applicable tribal governments and territories.*

### 3. ONA Administrative Option Selection Form

Regardless of the administrative option selected, all STT governments must indicate their option selection every year using the ONA Administrative Option Selection Form, which must be completed and provided to FEMA by November 30 of each year.[155]

The STT government also uses the ONA Administrative Option Selection Form to identify limits for specific ONA items and establish maximum award amounts for Transportation Assistance, Funeral Assistance, and Child Care Assistance. Additional line items, other than those on FEMA's *Standard Personal Property Line Items* list, may be requested when submitting or updating the ONA Administrative Option Selection Form.

**ONA Administrative Option**

The ONA Administrative Option Selection Form must be completed and submitted to the FEMA RA by November 30th each year. FEMA must have a current, approved SAP on file before any assistance can be provided.

The *Standard Personal Property Line Items* list identifies all ONA-eligible personal property and miscellaneous items, as well as the maximum number of items each individual or household may receive. The STT may obtain a copy of the most current *Standard Personal Property Line Items* list from their respective FEMA Region.

The STT government submits the applicable forms to the RA, who reviews and approves the documentation.[156] FEMA Headquarters also reviews the documentation to ensure consistency across disasters and for implementation.

STT governments, which select the Joint or the State, Territorial, or Tribal Government Option, must also submit a State Administrative Plan (SAP) every three years.[157] The SAP describes the procedures the STT government will use to administer ONA.[158] The RA must review and approve the SAP prior to submitting the documentation to FEMA Headquarters for coordination of implementation.[159]

**State Administrative Plan**

References to "State Administration Plan" in this document also include "Tribal Administration Plan" and "Territorial Administration Plan," as appropriate. The requirements found in 44 C.F.R. § 206.120(c) for State Administrative Plans also apply to tribal governments and territories.

The ONA Administrative Option Selection Form and the SAP may be changed during any non-disaster time period or within three days of a major disaster declaration.[160] However, in order for an STT government to change to the Joint Option or State/Territory/Tribe Option, they must submit an SAP.

## B. Non-Small Business Administration-Dependent

The types of assistance described in this section are non-SBA-dependent, meaning FEMA does not require the applicant to apply for an SBA loan before being considered for these types of ONA. FEMA may award applicants Funeral Assistance and Child Care Assistance up to the limits established by the STT government in the ONA Administrative Option Selection Form, rather than paying fixed amounts based on FEMA inspection verification.

### *1. Funeral Assistance*

FEMA provides financial assistance under the ONA provision of the IHP to individuals and households with disaster-caused funeral expenses.[161] Unlike most other forms of IHP assistance, an applicant seeking Funeral Assistance does not need to live in the Presidentially-declared disaster area to be considered for the assistance. An individual who incurs or will incur expenses related to a death or disinterment attributed directly or indirectly to a declared emergency or major disaster may apply for and, if eligible, receive Funeral Assistance. Multiple registrations for the same deceased are not allowed. The affected STT government establishes the maximum amount of Funeral Assistance that may be awarded per death or per household as part of the ONA Administrative Option Selection Form.



**Funeral Assistance Key Terms**

**Interment:** The placement of cremated remains or deceased human bodies in the ground, a cremation urn, or other burial facility such as a columbarium. A columbarium is a place where urns holding a deceased's cremated remains are stored and memorialized.

**Disinterment:** The unearthing of cremated remains or deceased human bodies from the ground, a cremation urn, or other burial facility such as a columbarium.

**Reinterment:** The replacement of cremated remains or deceased human bodies in the ground, a cremation urn, or other burial facility such as a columbarium.

**Funeral Services:** Services to care for and prepare deceased human bodies and services to arrange, supervise, or conduct the funeral ceremony. Services may include preparation of the deceased (e.g., embalming, cremation); use of facilities; staff for viewing; funeral ceremony or memorial service; use of equipment; staff for graveside service or committal service; use of hearse/funeral coach; etc.

### Conditions of Eligibility

In addition to meeting general conditions of eligibility (see Chapter 3, II.), applicants must meet the following conditions in order to receive Funeral Assistance:

- A medical examiner, coroner, or other certifier has attributed the death to the emergency or disaster, either directly or indirectly.

  o The medical examiner, coroner, or other certifier may reference the guidance set forth by the Centers for Disease Control and Prevention (CDC) regarding death certifications in the event of natural, human-induced, or chemical/radiological disasters.[162]

  o Documentation stating the death "may have been caused by" or "was likely a result of" the emergency or disaster is not considered sufficient attribution

- The applicant incurred or will incur eligible funeral expenses not covered by other sources. Other sources may include burial insurance or financial assistance from voluntary agencies, applicable government programs/agencies, or other entities.

  - The following items are eligible expenses for interment or reinterment:

    - Transfer of remains;

    - Casket or urn;

    - Burial plot or cremation niche;

    - Marker or headstone; and/or

    - Additional expenses mandated by any applicable SLTT government laws or ordinances.

  - The following items are eligible expenses only for interment:

    - Transportation for up to two individuals to identify the deceased, if such identification is required by SLTT government authorities;

    - Interment;

    - Funeral services;

    - Clergy or officiant services; and/or

    - Costs associated with producing and certifying up to five death certificates.

  - The following items are eligible expenses only for reinterment:

    - Cost of identifying disinterred human remains

    - Reinterment (including costs for preparing and transporting the remains);

    - Funeral services (limited to the preparation and use of facilities to prepare the remains for reinterment)

**Required Documentation**

An applicant must submit:

- An official death certificate that clearly indicates the death was attributed to the emergency or disaster, or a signed statement from a medical examiner, coroner, or other certifier, attributing the death to the emergency or disaster, either directly or indirectly.

  - A death is directly attributed to a disaster if caused by the forces of the disaster or the direct consequences of the forces, including but not limited to structural collapse, flying debris, or radiation exposure.

  - A death is indirectly attributed to a disaster if it occurs as a result of unsafe or unhealthy conditions present during any phase of the disaster (i.e., pre-disaster preparations, during the actual disaster, or post-disaster during cleanup after a disaster), including disaster-caused exacerbation of pre-existing conditions.

- o FEMA staff may coordinate with the SLTT government to obtain the required signed statement.

- o FEMA staff will not share the applicant's personally identifiable information (PII) when obtaining documentation on the deceased.

- o When FEMA receives a signed statement from a medical examiner, coroner, or other certifier that does not clearly state the disinterment, death, or underlying injury causing the death was attributed either directly or indirectly to the emergency or disaster, FEMA will work to obtain clearer certification.

- Receipts or verifiable estimates indicating the applicant incurred or will incur eligible interment, reinterment, or funeral expenses.

- Documentation of burial insurance and/or any forms of funeral assistance received from voluntary agencies, government agencies, or other entities.

- For reinterment only, documentation proving that the disinterment occurred in a privately-owned, licensed cemetery or burial facility (such as an association or community cemetery or burial facility) and the cemetery or burial facility is not responsible for reinterring displaced remains.

  - o In the event of disinterment, FEMA will consider requests that include a funeral home representative or cemetery representative statement indicating that the cause of disinterment was a direct result of the disaster.

  - o FEMA may coordinate with the SLTT government to obtain required documentation.

## Limitations and Exclusions

- FEMA may provide assistance to the applicant only up to the Funeral Assistance amount established by the STT government.

- For multiple family member deaths, FEMA may provide assistance up to the Funeral Assistance amount established by the STT government on the ONA Administrative Option Selection Form. The STT government may set the assistance amount per death or per household. FEMA may provide assistance to the applicant up to the financial ONA maximum award for the fiscal year in which the disaster was declared.

- FEMA will not provide assistance for any of the following:

  - o Obituaries

  - o Flowers

  - o Printed materials such as banners, programs, or register books

  - o Catering services, including food

  - o Transporting applicant or others to site(s) of funeral services, interment, or reinterment

  - o Gratuities

## *2. Medical and Dental Assistance*

FEMA provides financial assistance under the ONA provision of the IHP to individuals and households with medical or dental expenses caused by a disaster.[163] Unlike most other forms of IHP assistance, an applicant seeking Medical and Dental Assistance does not need to live in the Presidentially-declared disaster area to be considered for the assistance. Any person who incurs disaster-caused medical or dental expenses may apply for and, if eligible, receive Medical and Dental Assistance.

### Conditions of Eligibility

In addition to meeting general conditions of eligibility (see Chapter 3, II.), applicants must meet the following conditions in order to receive Medical and Dental Assistance:

- The medical or dental injury or expense must be a direct result of the disaster, as verified by a written and signed statement by the applicant, medical provider, or dental provider.

  o Eligible expenses include costs associated with:

    ▪ Injury or illness caused by the disaster.

    ▪ Pre-existing injury, disability, or medical condition aggravated by the disaster.

    ▪ Replacement of prescribed medication.

    ▪ Loss or damage of personal medical or dental equipment.

    ▪ Medical or dental insurance deductibles and co-payments for eligible expenses.

    ▪ Loss or injury of a service animal.

- Medical or dental expenses will not be eligible for FEMA reimbursement if they are covered by insurance or any other source.

- Expenses related to the loss or injury of a service animal must be a direct result of the disaster. Eligible expenses may include costs associated with:

  o Veterinary expenses for disaster-caused injuries.

  o Replacement and/or training costs.

  o Lost or damaged equipment that enables the service animal to fulfill its function (e.g., specialized leash, harness, or vest).

> **Disability**
>
> The term "disability" means, with respect to an individual: (A) A physical or mental impairment that substantially limits one or more major life activities of such individual; (B) A record of such impairment; or (C) Being regarded as having such an impairment.
>
> Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.
>
> (Source: 42 U.S.C. § 12102)

## Required Documentation

Required documentation must indicate the expense was caused by the disaster, is medically-required, and includes the amount of expense.

Disaster-caused injury or illness documentation includes both of the following:

**Medical and Dental Providers**

Medical or dental provider may include audiologists, rehabilitation specialists, or state-based agencies who can verify an applicant's disability and need for a device or equipment.

- Itemized bills, receipts, or estimates from the medical or dental provider or pharmacy;

- A written and signed statement from a medical or dental provider, including the date of disaster-caused injury and expenses necessary for recovery

Replacement of prescribed medication documentation includes all the following:

- A written and signed statement by the applicant or the applicant's medical or dental provider verifying the loss was caused by the disaster;

- A written and signed statement from a medical or dental provider verifying the prescription is required and was previously prescribed to the applicant or a household member; and

- Receipts or other verifiable documentation from the pharmacy showing the replacement cost of the prescribed medication

Loss or damage of medical or dental equipment documentation includes all the following:

- A written and signed statement by the applicant or the medical or dental provider verifying the loss was caused by the disaster;

- A written and signed statement from a medical or dental provider verifying the applicant or household member required the medical or dental equipment prior to the disaster; and

- Itemized bills, receipts, or estimates showing repair or replacement cost of the medical or dental equipment

Required documentation verifying the loss or injury of a service animal includes all the following:

- A written and signed statement by the applicant, medical provider, or veterinary provider verifying the service animal's loss or injury was caused by the disaster;

- A written and signed statement from a medical provider verifying the applicant or household member required the service animal for a disability prior to the disaster;

- A statement from the applicant, medical provider, or other representative explaining the type of task or work performed by the service animal; and

- Itemized bills, receipts, or estimates showing expenses related to the service animal's loss or injury

Medical or dental insurance settlements must be provided if the applicant has medical or dental insurance.

**Limitations and Exclusions**

- Medically-required generators purchased or rented to power equipment necessary for an existing medical condition may be considered under Assistance for Miscellaneous Items rather than Medical and Dental Assistance. For additional information, see Chapter 3, VI.B.4.

- IHP assistance for replacing lost or damaged medical or dental equipment is limited to items of similar quality and function as the item being replaced.

- IHP assistance for medical and dental services does not include medically unnecessary procedures (e.g., procedures designed to enhance appearance, such as teeth whitening).

- A limited number of accessible items are available for qualified applicants with disabilities under Personal Property Assistance. To be eligible, these items must have been owned prior to the disaster and sustained disaster-caused damage or loss. For additional information, see Chapter 3, VI.C.1.

- IHP assistance for service animals is limited to service dogs and miniature horses that perform a qualified task for a person with a disability, as defined by the ADA of 1990 (ADA, as amended, 2008). The ADA defines service animal as "any dog [or miniature horse] that is individually trained to do work or perform tasks for the benefit of an individual with a disability."

- A service animal must be required because of a disability and perform a functional task for the applicant or a member of the household.

- IHP assistance is not available for therapy animals or emotional support animals.

### 3. Child Care Assistance

FEMA provides financial assistance under the ONA provision of the IHP to eligible individuals and households who have a disaster-caused increased financial burden for child care.[164] FEMA will award payment for Child Care Assistance for the household's increased financial burden for up to eight cumulative weeks of child care, plus any eligible expenses, or the maximum amount of assistance for Child Care Assistance identified by the STT government, whichever is less.

FEMA may provide financial assistance to address increased disaster-caused child care expenses for eligible households with:

- Children aged 13 and under; and/or

- Children with a disability, as defined by Federal law,[165] up to age 21, who need assistance with activities of daily living.

**Activities of Daily Living (ADL)**

Activities of daily living are routine activities that people tend to do every day without needing assistance. There are six basic ADLs: eating, bathing, dressing, toileting, transferring (walking), and continence.

The respective STT government must establish the maximum amount of Child Care Assistance on a per-child or per-household basis as part of the annual ONA Administrative Option Selection process.

**Conditions of Eligibility**

In addition to meeting general conditions of eligibility (see Chapter 3, II.), applicants must have a disaster-caused increase in financial burden for child care, regardless of whether child care expenses were required prior to the disaster, because:

- The applicant's gross household income has decreased as a direct result of the disaster; or

- The applicant's child care expenses have increased as a result of the disaster.

Applicants must certify they cannot utilize child care services provided by any other source (e.g., other Federal assistance for child care, private employer child care services) in order to qualify for Child Care Assistance.

For applicants with child care expenses prior to the disaster, FEMA compares the percentage of the household's gross income spent for child care expenses before the disaster to the percentage spent following the disaster to determine if the post-disaster child care costs create a financial burden. For example, if the household's pre-disaster income was $3,500 per week and pre-disaster child care costs were $750 per week, child care costs were 21.4% of the household's income pre-disaster. If the post-disaster income is $3,500 per week and post-disaster child care costs are $1,000 per week, child care costs are now 28.6% of the household's income post-disaster.

**Figure 31: Example - Comparison of Pre- and Post-Disaster Child Care Costs**

If the percentage of household gross income spent on child care post-disaster is higher than the percentage of household gross income spent on child care pre-disaster, the household has an increased financial burden for child care and may be eligible for assistance to cover the increase. In the example above, the percentage of the household's gross income spent on child care is 7.2% higher than the percentage of the household's gross income spent on child care pre-disaster. This household may be eligible to receive the difference in pre- and post-disaster household income spent on child care.

The applicant's post-disaster child care provider must be licensed, regulated, or registered under applicable SLTT government law to qualify for assistance.

The following items are eligible expenses for Child Care Assistance:

- Standard child care service fees, including personal assistance services that support activities of daily living for children with disabilities.

- Registration and health inventory fees may be eligible expenses only for applicants who require a new child care service provider.

> **Registration Fee**
>
> A registration fee is a one-time fee when registering an eligible child at an authorized child care provider. A health inventory fee is a medical office fee for processing required medical paperwork as part of the registration process.

### Required Documentation

Details regarding information that must be included on each type of documentation are listed in *Figure 32*.

For FEMA to determine a disaster-caused need for Child Care Assistance, an applicant who had child care expenses pre-disaster must submit:

- Pre- and post-disaster gross household income documentation.

- Pre-disaster receipts, contract, or signed letter from the child care provider for child care expenses, if receipts or contract cannot be located.

> **IEPs and 504 Plans**
>
> **IEP:** A document developed for each public-school child who needs special education. An IEP defines the individualized objectives of a child who has been determined to have a disability, as defined by Federal regulations. As long as a student qualifies for special education, the IEP is mandated to be regularly maintained and updated up to the point of high school graduation, or prior to the 21st birthday.
>
> **504 Plan:** This type of plan falls under Section 504 of the Rehabilitation Act of 1973. A 504 plan outlines how a child's specific needs are met with accommodations, modifications and other services. These measures "remove barriers" to learning.

- Post-disaster receipts or estimates for child care fees, registration, and/or health inventory fees.

- A post-disaster child care contract or agreement.

- A post-disaster child care provider's license, if the information cannot be located within a respective SLTT government's licensed provider database.

- Individualized Educational Plan (IEP), 504 plan,[166] or medical professional's statements, if applicable, to verify disability for children up to age 21 who need assistance with activities of daily living.

- A signed, written statement from the applicant affirming:

  o The applicant is not receiving assistance for child care expenses from any other source; and

  o The expected length of time the applicant will have a disaster-caused need for Child Care Assistance.

An applicant who did not have child care expenses pre-disaster, and has incurred or will incur child care expenses as a result of the disaster, must submit:

- Post-disaster receipts or estimates for child care fees, registration, and/or health inventory fees.

- A post-disaster child care contract or agreement.

- A post-disaster child care provider's license, if the information cannot be located within a respective SLTT government's licensed provider database.

- IEP, 504 plan, or medical professional's statements, if applicable, to verify disability for children up to age 21 who need assistance with activities of daily living.

- A signed, written statement from the applicant affirming:

  o The applicant is not receiving assistance for child care expenses from any other source; and

  o The expected length of time the applicant will have a disaster-caused need for Child Care Assistance.

| Figure 32: Child Care Assistance Documentation | |
|---|---|
| Type of Documentation | Documentation Requirements |
| Pre-disaster child care expense receipts, contract, or signed letter from child care provider, if receipts or contract cannot be located. | • The name of the child/ren receiving care.<br>• Provider's name, address, and telephone number.<br>• Time period covered and total child care expenses for that time period.<br>• Signature of child care provider and applicant. |
| Proof of pre-disaster and current post-disaster income for the individual(s) responsible for child care expenses | Examples include, but are not limited to:<br>• Recent pay stubs.<br>• W-2 forms or tax returns from most recent tax year.<br>• Documentation of self-employment, if applicable.<br>• Documentation of government assistance, including Social Security. |
| Verification of the child care provider's license | Applicant does not need to submit if the information can be located within a respective STT government's licensed provider database. |
| Individual Educational Program Plan, 504 plan, or medical professional's statement | Verifies a disability for children up to age 21 who require assistance with activities of daily living. If a child with a disability has not graduated from high school, they are eligible for education services under the Individuals with Disabilities Education Act (IDEA) until age 21. A child eligible under IDEA will have an IEP that documents the educational services. Children who are not eligible for an IEP, but still need some educational support, may have a 504 plan. |

**Limitations and Exclusions**

- FEMA limits Child Care Assistance to up to eight cumulative weeks per child or per household or the maximum amount of assistance established by the STT government, whichever is less.

- FEMA will only provide Child Care Assistance to one applicant on behalf of the child(ren).

- If a child is a member of multiple households, FEMA will only award assistance to the primary custodial parent/guardian responsible for child care costs after the disaster.

- FEMA will not provide assistance for any of the following:

  o Fees for extra-curricular activities and additional services (e.g., school photographs, field trips)

  o Fees not directly related to the day-to-day child care services provided to the eligible child (e.g., prepared lunches, snacks, facility-provided linens, etc.)

  o Fuel expenses related to transporting the child to and from the child care provider (e.g., school bus service)

  o Education services (e.g., after-school tutoring)

  o Medical care or services

  o Recreational camps or clubs (e.g., after-school clubs, overnight camps)

### 4. Assistance for Miscellaneous Items

FEMA provides financial assistance under the ONA provision of the IHP to individuals and households with certain disaster-caused miscellaneous expenses.[167] Eligible items must be purchased or rented after the incident to assist with the applicant's disaster recovery, such as gaining access to the property or assisting with cleaning efforts. Items damaged by the disaster that were owned prior to the disaster will be considered under Personal Property Assistance. STT governments, in consultation with FEMA, have identified standard miscellaneous line items. However, the STT government may elect not to include all these items as eligible for reimbursement:

- Carbon Monoxide Detector

- Chainsaw

- Dehumidifier

- Generator (see Chapter 3, VI.B.4) under this section's Limitations and Exclusions)

- Humidifier

- Smoke Detector

- Weather Radio

STT governments may request additional miscellaneous line items on the ONA Administrative Option Selection Form, during any non-disaster time period or within 72 hours of a major disaster declaration.[168]

**Conditions of Eligibility**

In addition to meeting general conditions of eligibility (see Chapter 3, II.), applicants must meet the following conditions in order to receive Assistance for Miscellaneous Items:

- The expense must be a direct result of the disaster.

- The item must have been purchased or rented within 30 days after the incident start date or up to the last day of the incident period, whichever is greater.

- Generator exception: The reimbursement period starts the day the Governor or Tribal Chief Executive declares a State of Emergency and ends at the incident period closure date identified by FEMA in the Federal Register, or if warranted due to extraordinary circumstances, the date commercial power is restored to the applicant's primary residence as verified by the FEMA JFO or commercial power provider.

- Applicants must provide an itemized receipt or equipment rental agreement for eligible expenses.

- The expense must not be covered by insurance or provided by any other source.

**Limitations and Exclusions**

- Prior to the disaster, if the applicant owned the eligible miscellaneous item and the item was damaged by the disaster, the item will be considered under Personal Property Assistance.

- Assistance for Miscellaneous Items is limited to the quantity established for the item by the STT government on the ONA Administrative Option Selection Form.



*Power lines in NY damaged by Hurricane Irene and Tropical Storm Lee.*

- If the pre-disaster primary residence is located within a CBRS Unit, the applicant may not be considered for Assistance for Miscellaneous Items except for expenses to purchase or rent items required to power life-sustaining medical equipment (e.g., generators).

- Generator expenses only:

  o The generator must be purchased or rented to power a medically-required piece of equipment, including medically-required refrigerators.

  o The generator must be purchased or rented due to a disruption in electrical utility service as a result of the disaster.

  o The applicant must submit a statement from a medical services provider, indicating the equipment is medically necessary.

- o The allowable award amount for generators is limited to the prevailing retail or rental rate for a 5.5 kw-sized generator, as identified by FEMA.

- o The IA Division Director may waive one or more conditions of eligibility during extraordinary circumstances (e.g., sustained power outage during a period of sub-freezing temperatures) when determined to be in the public's interest.



- Chainsaw expenses only:

  - o The chainsaw must be purchased or rented to gain access to and/or remove hazards from the home.

*A home in Arkansas is damaged by a fallen tree.*

### 5. Moving and Storage Assistance

FEMA may provide financial assistance under the ONA provision of the IHP to individuals and households for moving and storage expenses incurred on or after the incident period start date to avoid additional disaster damage.[169] Generally, these expenses include those related to: (1) storage of personal property in a storage unit or temporary housing unit while repairs are being made to the primary residence and returning the property to the applicant's primary residence, or (2) moving the items to the individual's or household's new primary residence.[170]

FEMA may provide assistance with eligible moving and storage expenses through the period of assistance or up to the financial ONA maximum award, whichever comes first.

### Conditions of Eligibility

In addition to meeting general conditions of IHP eligibility (see Chapter 3, II.), applicants must meet the following conditions in order to receive Moving and Storage Assistance:

- The applicant's primary residence was rendered uninhabitable due to the disaster.

- The property being moved and/or stored is considered as essential personal property and/or household goods (such as appliances and furniture).

- The applicant is moving and/or storing essential household goods to prevent additional damage and returning the items to the individual's or household's primary residence or moving the items to the individual's or household's new primary residence.

**Eligible Expenses:** Moving and Storage Assistance may be provided for, but is not limited to, all of the following expenses:

- Costs for commercial moving labor

- Moving truck rental fee

- Fuel for the rental vehicle

- Costs for tape and boxes

- Commercial storage unit fees

- Associated sales taxes

**Ineligible Expenses:** All the following expenses are ineligible:

- Moving and storage of recreational items (e.g., fishing gear, canoes, jet skis)

- Costs incurred for the moving and storage of items as a preventative measure prior to the disaster

- Costs covered by another source (e.g., insurance, SBA disaster loan)

- Expenses for essential personal property that is permanently moved out of the damaged pre-disaster residence and will not be returned to the applicant's primary residence or to the applicant's new primary residence.

- Optional insurance and security deposits listed on applicant's receipts, bills, or estimates

**Required Documentation**

Applicants must submit:

- Receipts, bills, or estimates with associated dates for the moving expenses.

- Receipts or bills with associated dates for storage expenses.

- Statements with all the following:

    o The reason(s) moving and storage expenses were required

    o A description of the essential household goods being stored

    o Information indicating the essential household goods are being stored while repairs to the primary residence are being made

    o Information indicating the essential household goods will be returned to the primary residence or to the individual's or household's new primary residence

**Flood Insurance Policies**

Many flood insurance policies provide up to $1,000 in moving expenses. As FEMA is unable to duplicate assistance from other sources, applicants who have flood insurance will have to submit documentation to show they have exhausted funds allocated under their policy for moving expenses prior to being considered for FEMA's Moving and Storage Assistance.

**Limitations and Exclusions**

When the cause of damage is flooding and the applicant failed to maintain flood insurance as required as a condition of receiving previous Federal assistance, FEMA is unable to provide assistance for the first $1,000 of moving expenses.

### *6. Critical Needs Assistance*

FEMA may provide financial assistance under the ONA provision of the IHP to applicants who have immediate or critical needs because they are displaced from their primary residence or to applicants who need assistance in order to leave their pre-disaster primary residence to temporarily shelter elsewhere. Immediate or critical needs are life-saving and life-sustaining items including, but not limited to: water, food, first aid, prescriptions, infant formula, diapers, CMS, DME, personal hygiene items, and fuel for transportation.

**Program Request and Approval**

FEMA's IADD may authorize CNA when the affected STT government submits a written request with justification, to implement CNA. The request must be submitted within 14 days from the date of the Presidential disaster declaration. This form of assistance may be considered for specific geographic areas (i.e., counties or ZIP codes), identified by the STT government, within the declared disaster when the request demonstrates:

- Applicants are displaced due to restrictions placed by the SLTT government officials (e.g., evacuation advisory, inaccessibility);

- Shelters in the area do not meet the needs of the displaced population; and

- Community and life-sustaining services within a reasonable distance from the area are limited due to the disaster-caused impact.

Based on the affected STT government's request, the IA Division Director may authorize a CNA eligibility period of up to 30 days from the Presidential disaster declaration. When necessary based on applicant need, the IA Division Director may extend the CNA eligibility period if requested by the affected STT government.

**Conditions of Eligibility**

Applicants will be considered for assistance if all the following apply:

- They register for FEMA assistance within the CNA eligibility period established for the declared disaster;

- They pass FEMA's identity and occupancy verification process;
  - The IADD may waive occupancy verification in locations where automated verification of public records is limited.

- They are displaced from their pre-disaster primary residence as a result of the disaster, or they are sheltering in their pre-disaster residence and report a need to shelter elsewhere at registration;

- At registration, they assert that they have critical needs and request financial assistance for those needs and expenses; and

- Their pre-disaster primary residence is located in the designated geographic area requested by the STT government and approved by the IADD for CNA.

- They report damage that may impact the habitability of their home.

**Limitations and Exclusions**

- Applicants temporarily residing in correctional facilities or secondary residences are not eligible for CNA.

- Applicants will not receive CNA if there are any unresolved high-risk fraud indicators associated with their registration.

- Applicants who apply during the eligible period and resolve all issues impacting eligibility prior to the end of the registration period and any approved extensions may receive CNA. Applicants that resolve ineligibility issues after the close of the registration period will not receive a CNA payment.

- Unless otherwise authorized by the IA Division Director and the respective STT government, CNA is limited to $500 per eligible household and will be awarded as a one-time award. This amount is based on the reasonably prudent cost of life-saving and life-sustaining items that a household may need immediately upon displacement from their home.

### 7. Clean and Removal Assistance

FEMA may provide a limited amount of financial assistance to homeowners with disaster-caused real property damage who do not qualify for Home Repair Assistance because the damage did not render the home uninhabitable. Clean and Removal Assistance (CRA) is intended to ensure contamination from floodwaters is addressed in a timely manner to prevent additional losses and potential health and safety concerns. Individual property owners will be responsible for performing or contracting for services to remove contaminants and disinfect surface areas of their homes that have been affected by floodwater.

**Program Request and Approval**

An affected STT government must submit a written request to FEMA to implement CRA. The GAR or TAR must submit a written request for CRA to the FCO. CRA may only be requested in disasters where "flood" is listed as an incident type. CRA must be approved by the RA prior to implementation. The eligibility period for CRA will correspond to the standard FEMA registration period of 60 days, but will not include extension periods unless specifically authorized by the RA.

**Conditions of Eligibility**

In addition to meeting general conditions of eligibility (see Chapter 3, II.), applicants must meet the following conditions in order to receive CRA:

- The pre-disaster primary residence is located in an area designated for Individual Assistance.

- The applicant has at least one real property line item recorded during inspection as flood-damaged.

- The pre-disaster primary residence is not covered by insurance for flood damage, including flood or mobile home insurance, at the time of the disaster.

- The applicant receives a denial indicating the disaster-damaged primary residence was safe to occupy.

**Limitations and Exclusions**

- CRA is limited to $550 per eligible household. This amount is based on the average historical cost of cleaning, sanitizing, and removing floor covering after a flood.

- CRA will be awarded as a one-time payment.

- The CRA award will be deducted from any subsequent Home Repair Assistance award.

- If FEMA determines that the subsequent Home Repair Assistance award would be less than the $550 CRA award, the applicant will not receive additional funds.

## C. SBA-Dependent

The types of assistance described in this section are SBA-dependent. Applicants who were referred to the SBA but who did not qualify for an SBA loan, or who were approved for a partial loan but the amount of the loan was insufficient to meet the applicant's disaster expenses or serious needs, may be referred back to FEMA to determine their eligibility for Personal Property Assistance, Transportation Assistance, and a Group Flood Insurance Policy (GFIP) certificate.



*A woman helps her neighbor clean out a flood damaged home in Cedar Rapids, Iowa.*

Applicants who withdraw from the process or decline a loan from the SBA will not be referred back to FEMA for assistance with SBA-Dependent ONA.

### 1. Personal Property Assistance

FEMA may provide financial assistance under the ONA provision of the IHP to repair or replace personal property damaged or destroyed due to a disaster.[171] The *ONA Administrative Option Selection Form* includes a list of eligible items, also known as the Standard Personal Property Line Items list that may be considered for assistance. The affected STT government has the ability to request that items be added to or removed from the list within 72 hours of an IA declaration.

FEMA and the affected STT government establish a maximum quantity that may be awarded for each personal property item. FEMA calculates the award amount for each item according to the consumer price index data for items of average quality, size, and capacity in the area where the damage occurred. The assistance is intended to meet the basic needs of the household, not to restore all personal property items to a pre-disaster condition.

When applicants reside in the same damaged pre-disaster residence and are not classified by FEMA as roommates or boarders, the owner or head of household will be considered responsible for the personal property in the common living areas up to the quantity limit. However, a household member could be eligible if the owner, head of household, or landlord has not met the item quantity limit. The household members may be awarded the minimum amount of assistance to meet the household needs, not to exceed the quantity limit. For more information about roommates and boarders see Chapter 3, II.

FEMA will record personal property as being unaffected or needing repair or replacement during inspection of the applicant's damaged primary residence. FEMA assistance to repair and replace personal property falls within the following categories:

- **Appliances:** Includes standard household appliances, such as a refrigerator, washing machine, etc.

- **Clothing:** Essential clothing needed due to overall loss, damage, or contamination.

- **Room furnishings:** Standard furnishings found in a bedroom, kitchen, bathroom, and living room.

- **Essential Tools:** Tools and equipment required by an employer as a condition of employment and items required as a condition of an applicant's or household member's education.

> **Non-Typical Appliances**
>
> For processing purposes, FEMA identifies certain items as "appliances" that may not be considered a typical appliance to the general public. Items that fall into this category include:
>
> - Children's strollers and toys
> - Everyday dining tables
> - Twin beds
> - Property for applicants with access or functional needs, such as accessible toilet seats, beds, etc.

**Conditions of Eligibility**

In addition to meeting general conditions of eligibility (see Chapter 3, II.), applicants must meet the following conditions in order to receive Personal Property Assistance:

- The item needs to be repaired or replaced due to disaster damage.

- The occupants of the household have an unmet disaster-related need for the damaged item. FEMA may not provide assistance if the applicant can meet that need with another similar item in their possession or available to the household.

- The item was owned and being used by occupants of the household.

  o FEMA does not provide assistance for furnishings and/or appliances provided by a landlord.

- o Items used by guests and relatives who were not members of the pre-disaster household are not eligible for assistance.

Applicants must also meet specific eligibility requirements for each category of item for which they are requesting Personal Property Assistance. These include:

- **Appliances:** Assistance is based on the number and type of household appliances in need of repair or replacement. Applicants may receive assistance for two appliances that serve a similar purpose or function (e.g., a range and a microwave).

- **Clothing:** Assistance is based on a set dollar amount per person (intended to provide funds for up to seven days of clothing needs) and the number of household members requiring clothing, as recorded during FEMA inspection. FEMA may provide assistance for clothing when existing clothing has been destroyed, is physically gone (e.g., blown away), or contaminated by chemicals or sewer backup as a result of disaster. FEMA expects applicants to clean clothing soaked by wind-driven rain, seepage, or flood waters. Stored clothing is generally not eligible for assistance.



*FEMA inspector records disaster damage at a survivor's home.*

- **Room Furnishings:** Assistance is based on the level of damage to furnishings within specific rooms of the residence as recorded during FEMA inspection. The rooms must be one of the four types required to meet the needs of a typical household: kitchen, living room, bathroom, or bedroom.

- **Essential Tools:** Assistance is based on a need to replace disaster-damaged essential tools, supplies, equipment, items required by an employer as a condition of employment, or required for education. This includes disaster-damaged tools and equipment, or other items required for a specific trade or profession, not provided or supplied by the employer. Tools, uniforms, computers, supplies, or other items used for self-employment are not eligible for IHP assistance.

Eligible essential tool items are listed below:

- o Schoolbooks/Supplies: Equipment and supplies required to be provided by the applicant for educational courses or schooling, including home schooling, college, and trade school courses.

- o Uniforms: Required for school or work when the applicant is responsible for replacement of the uniforms.

- o Computers: Required by a school or an employer when the applicant is responsible for the replacement of the computer.

- o Occupational Tools: Essential tools and equipment, not provided or supplied by an employer, and required by an employer as a condition of employment.

- Applicants may be asked to provide the following documentation for essential tools:
  - o A statement from the employer on company letterhead documenting the applicant is required to provide their own tools or computer as a condition of employment.
  - o A statement on school letterhead documenting a computer is required as a condition of education and the school does not provide access to computers to use outside of class, such as a school computer lab.
  - o An itemized list of the tools required by the employer, also on company letterhead.
  - o An itemized list of each tool required and a verifiable statement, estimate, or bill from the place of the potential purchase stating that the damage was caused by the disaster.

- **Accessible Items:** FEMA also provides assistance for damaged personal property items required for qualified applicants with disabilities. The list includes accessible beds, raised toilet seats, accessible refrigerators, accessible washers, and computers or adaptive technology when utilized as the sole means of communication for a household member with a disability. Motorized and non-motorized wheelchairs, shower chairs, visual/vibrating fire signals, and walkers, are also eligible items.
  - o If an applicant has additional assistive devices not included in the list above, they may request assistance to replace those items under the Medical and Dental Assistance category of ONA (see Chapter 3, VI.B.2.).
  - o If the cost to repair or replace an ADA Personal Property item exceeds the award amount, applicants may request assistance for the additional amount by providing the following:
    - ▪ A written or signed statement from a medical provider verifying the applicant or household member required the item prior to the disaster; and
    - ▪ An itemized bill, receipt, or estimate showing the repair or replacement cost of the item.

**Limitations and Exclusions**

- Applicants incarcerated at the time of the disaster who incur disaster-caused damage to their personal property within their unit at the correctional facility or detention center are ineligible for IHP assistance. Prisoners are legally entrusted to the corrections institute which is responsible for safeguarding their persons and providing for their needs.

- Financial assistance for flood-damaged personal property in basements is limited to both of the following:
  - o Washers and dryers
  - o Essential personal property in rooms required for the occupation of the dwelling (for example, occupied bedrooms, a bathroom required for the occupied bedroom, a sole kitchen or living room).

### 2. Transportation Assistance

FEMA may provide financial assistance under the ONA provision of the IHP to individuals and households with disaster-caused vehicle repair or replacement expenses.[172] Unlike most other forms of IHP assistance, an applicant seeking Transportation Assistance does not need to live in the Presidentially-declared disaster area to be considered for the assistance.



*A car is surrounded by floodwaters.*

The affected STT government uses the ONA Administrative Option Selection Form to establish the maximum amount of Transportation Assistance (i.e., Transportation Repair and Transportation Replacement) that may be awarded. The amount of Transportation Repair and Replacement Assistance awarded is based on the degree of damage and the STT government's repair and replacement maximum.

**Conditions of Eligibility**

In addition to meeting general conditions of eligibility (see Chapter 3, II.), applicants must meet the following conditions in order to receive Transportation Assistance:

- The vehicle sustained disaster-caused damage, and the damage occurred within the Presidentially-declared disaster area.

- The damaged vehicle is an approved vehicle type; eligible vehicles include but may not be limited to vans, trucks, sport utility vehicles, and cars.

  o Other modes of transportation may be added to the ONA Administrative Option Selection Form by the STT government during any non-disaster time period or within three days of a major disaster declaration. This may include boats, motorcycles, golf carts, or other non-standard modes of primary transportation.

- The damaged vehicle is in compliance with its STT government's registration and insurance requirements at the time of the disaster.

- The damaged vehicle is owned or leased (i.e., not a rental vehicle) by the applicant, co-applicant, or household member.



**Vehicle Damage Levels**

**Destroyed Vehicle** is a vehicle declared a total loss due to disaster-caused damages (e.g., flood water covered the engine, vehicle was crushed by a fallen tree or was burned).

**Repairable Vehicle** is a vehicle that sustained disaster-caused damage affecting the drivability or safety of the vehicle (e.g., broken windshield, window glass, mirror, or headlight assembly; minor mechanical repairs; medically-required repairs).

**Vehicle with Cosmetic Damage** is a vehicle with disaster-caused damage that does not affect the drivability or safety of the vehicle in any way (e.g., minor dents, scratches, and other similarly low

**Required Documentation**

Generally, FEMA will verify vehicle damage during an on-site inspection and record it as repairable or destroyed. If the vehicle is not available at the time of inspection, the vehicle was recorded destroyed by the on-site inspector, or if the applicant does not receive an on-site inspection, the applicant must submit:

- A copy of the vehicle registration valid at the time of the disaster for the damaged vehicle(s);

- A list of all vehicle(s) owned (year, make, and model) and a brief description of damage for each vehicle;

- Proof of insurance policy showing type of coverage or proof the vehicle meets the STT's minimum insurance requirement;

- Insurance settlement, denial, or statement that insurance coverage does not exist;

- **For vehicle repair**: a verifiable bill, receipt, or estimate from a mechanic that:

    - Confirms the damage is disaster-caused;

    - Identifies repair or replacement costs (e.g., parts, service, and labor); and

    - Includes the mechanic's contact information.

- **For vehicle replacement:** documentation from an SLTT government confirming the vehicle was salvaged due to the disaster.

> **Vehicle Repair Expenses**
>
> Eligible repair expenses based on bills, receipts, and estimates may include but are not limited to:
>
> - Costs for labor
>
> - Service fees (e.g., battery recharge or wheel re-alignment)
>
> - Repair estimates and vehicle towing expenses
>
> - The repair/replacement of vehicle parts when repairs for drivability and safety are required (includes paint and/or body work and carpet)
>
> - Medically-required modifications (e.g., ramp, lift, hand controls)

- If the damaged vehicle included medically-required modifications that exceed the Transportation Assistance maximum repair or replacement amount, as applicable, the applicant may request assistance for those modifications under the Medical and Dental Assistance category of ONA (see Chapter 3, VI.B.2.). Applicants must provide the following documentation related to any medically-required vehicle modifications and the repair or replacement cost of those items, as appropriate, including:

    - A written or signed statement from a medical provider verifying the applicant or household member required the item prior to the disaster; and

    - An itemized bill, receipt, or estimate showing the repair or replacement cost of the component or modified vehicle, as appropriate.

**Limitations and Exclusions**

- FEMA will not award assistance to repair or replace an operational vehicle. An operational vehicle is defined as a vehicle that may need cosmetic repairs or incurred minimal damage but is in compliance with its STT government's registration and insurance requirements at the time of the disaster and can be legally driven.

- Assistance is usually limited to one vehicle. However, in instances where any additional unaffected and operational vehicles owned by members of the household are not sufficient to meet the needs of the household, FEMA may award assistance to repair or replace a second damaged vehicle. Any additional vehicles would be required to meet all applicable conditions of eligibility, as referenced above. Additionally, the applicant must certify in writing that the damaged vehicle is essential for the household's daily usage, outline the relevant circumstances, and explain the serious need for a second vehicle.

### *3. Group Flood Insurance Policy*

The Group Flood Insurance Policy[173] refers to a flood insurance policy established under the NFIP regulations.[174] As part of the effort to reduce future expenses from floods, FEMA directly purchases GFIP certificated on behalf of applicants who are required to purchase and maintain flood but who may not otherwise be able to purchase a policy.

In Joint and State Option disasters, the STT government directly purchases the GFIP as part of their administration of ONA. The premium for a three-year certificate of coverage is $2,400[175] and counts towards an applicant's ONA financial maximum award.[176] The GFIP is a policy that is established for each disaster declaration that results from flooding and authorizes the provision of IA.



**GFIP Overview**

- GFIP certificates provide up to three years of flood insurance coverage for real property and personal property items insurable under the NFIP.

- The master GFIP policy term is for 36 months and begins 60 days after the date of the Presidential disaster declaration. However, individual coverage becomes effective after a 30-day waiting period, which starts on the day NFIP receives the applicant's name and premium payment from either the SLTT government or FEMA.

- The coverage amount of the GFIP policy is equal to the combined value of the Housing Assistance and ONA financial maximum awards.

**Conditions of Eligibility**

In addition to meeting general conditions of eligibility (see Chapter 3, II.), applicants must meet the following conditions in order to be considered for a GFIP certificate:

- FEMA verifies that damage to the applicant's property is caused by flooding and the damaged items are insurable under NFIP.

- The applicant's damaged residence is located in an SFHA.

- The applicant's damaged residence is not located in a sanctioned community, CBRS area, or OPA.

- The applicant does not have a previous requirement to maintain flood insurance as a condition of receiving IHP assistance.

  - If a subsequent disaster occurs during the 30-day waiting period for the purchased flood insurance to become effective, the applicant is considered compliant and eligible for IHP assistance.

- The applicant is referred to FEMA for SBA-dependent ONA.

  - Applicants who accept an SBA loan during the disaster in which a flood insurance requirement is set will not be considered for a FEMA-purchased GFIP certificate.

  - Applicants who were referred to the SBA, did not qualify for an SBA loan, and were referred back to FEMA may be considered for a FEMA-purchased GFIP certificate.

- The applicant is eligible for Home Repair Assistance, Home Replacement Assistance, or Personal Property Assistance, prompting the requirement to maintain flood insurance on the damaged residence and initiating the GFIP.

- An eligible applicant whose pre-disaster primary residence is located within an OPA and an SFHA may only be considered for a GFIP certificate if they also meet the following conditions:

  - A legally valid building permit for the construction of the applicant's pre-disaster primary residence was issued prior to November 16, 1991; and

  - The applicant's pre-disaster primary residence was built (walled and roofed) no later than November 16, 1991; and

  - The applicant's pre-disaster primary residence was not substantially improved or substantially damaged on or after November 16, 1991.

**Applicant Notification and Response**

- Pre-disaster owners included in the GFIP receive notification from FEMA stating they have been included in the policy as well as a "Certificate of Flood Insurance;" applicants do not receive a copy of the actual policy. Applicants do not have the ability to decline the GFIP.

- Pre-disaster renters will only receive a GFIP certificate if they notify FEMA within six months of receiving a GFIP notification letter that they have moved back or intend to move back to their pre-disaster residence.

  o GFIP certificates are not transferable to a new renter of a rental unit and are not transferable to a new rental address.

- FEMA gives applicants a 60-day notice of policy expiration and a final notice of termination of coverage. When the GFIP expires, the applicant is responsible for purchasing and maintaining flood insurance on their own. Failure to maintain flood insurance will affect applicant eligibility for future disaster assistance.

**Limitations and Exclusions**

- If the cost of a GFIP policy exceeds the remaining amount of IHP assistance available to the applicant, then FEMA will not purchase a policy. The applicant will still be responsible for purchasing a policy on their own.

- Applicants who own or rent travel trailers on non-permanent foundations are not eligible for GFIP.[177]

- Applicants whose pre-disaster primary residence is located within an OPA and SFHA must submit the following documentation in order to receive consideration for a GFIP certificate:

  o A legally valid building permit for the construction of the applicant's pre-disaster primary residence issued prior to November 16, 1991; or if the building permit was lost or destroyed, a written statement to this effect signed by the community official responsible for the building permits demonstrating the construction of the applicant's pre-disaster primary residence permitted prior to November 16, 1991.

  o A written statement by a responsible community official that:

    ▪ The applicant's pre-disaster primary residence was built (walled and roofed) no later than November 16, 1991; and

    ▪ The building was not substantially improved or substantially damaged on or after November 16, 1991.

o Additional forms of documentation to demonstrate a pre-disaster residence's eligibility for NFIP coverage may include:

- First mortgage financing records;

- Property tax records;

- Electrical permit records;

- On-site septic or sewer system records;

- State Coastal Zone Management Agency Records;

- State Wetlands Program Permit Record

# VII. Recovery of Program Funds

Federal agencies are required to take action to identify and recover improper payments, whether made in error or obtained by fraud, per the following Federal laws:

- Debt Collection Improvement Act of 1996 (DCIA)

- Improper Payments and Information Act of 2002 (IPIA)

- Improper Payments Elimination and Recovery Act of 2010 (IPERA)

- Improper Payments Elimination and Recovery Improvement Act of 2012 (IPERIA)

**Eligibility of Applicant with a FEMA Debt**

An applicant who has a FEMA debt from a current or previous disaster may be eligible for IHP assistance in a subsequent disaster, except in cases where the debt is a result of the applicant obtaining assistance through fraudulent means.

In addition, the applicant must agree to return funds to FEMA when the assistance provided by FEMA duplicates assistance from another source,[178] was provided in error, was spent on expenses inappropriately, or was obtained through fraudulent means.

After every disaster, FEMA is required to review disaster assistance payments to ensure taxpayer dollars were properly spent. Those reviews often show a small percentage of specific cases where disaster assistance was given to applicants who were not eligible for some or all the money they received. FEMA collects these overpayments through a process called "recoupment."

FEMA employs a deliberative process to identify and verify payments that must be recouped and established as debts. This process involves multiple levels of FEMA staff and management review and validation before a debt is established. When FEMA determines assistance was given to applicants who were not eligible for some or all the money received, FEMA IA program staff notifies the applicant in writing of their potential debt and their right to appeal the decision.

**Fraud**

Fraud is the intentional deception, concealment, or use of documents intended to mislead FEMA in order to wrongfully obtain IHP assistance an applicant is not eligible to receive. FEMA staff are required to report suspected fraud to the Department of Homeland Security (DHS) Office of Inspector General (OIG). The OIG investigates potential fraud cases and, when appropriate, refers them to the Department of Justice (DOJ) for appropriate legal action. FEMA may not establish or collect debts related to fraud unless the OIG or DOJ declines to pursue legal action and instructs FEMA to proceed.

**Significant Enforcement Principle**

FEMA will consider initiating collection of a potential debt, regardless of debt value, when it is necessary to aggressively pursue recoupment of any assistance obtained through fraudulent means.

After the applicant exhausts their appeal rights or the period to appeal the debt expires, a debt is officially established. The FEMA Finance Center (FFC) will send a letter to the applicant to provide information on repayment options.

FEMA considers expenses associated with the time and resources required to prepare and follow up on a potential debt to determine if the costs of recovering the potential debt will exceed the amount owed. FEMA will not initiate recoupment activity for any potential debt valued less than $250.00 unless a significant enforcement principle is at stake.

| Figure 33: FEMA Process for Identifying and Validating Debt Payments | |
|---|---|
| Steps | Process |
| Identifying Potential Debt | FEMA staff review cases to identify potential debts and submit the case for additional review and validation. |
| Verifying Potential Debt | Each case is assigned to another FEMA staff member who reviews to ensure the decision to request an applicant return funds to FEMA is absolutely necessary. All reasonable efforts are made to identify assistance the applicant was eligible to receive and does not need to be returned. FEMA may contact applicants at this stage to give them an opportunity to provide additional documentation to resolve the issue. |
| Potential Debt Notification and Appeal | Multiple FEMA managers are required to review each case and concur on the type and amount of assistance that must be returned. FEMA managers also review the case to ensure all appropriate steps to resolve the issue were taken. When FEMA managers determine the assistance must be returned, a written notice is sent to the applicant notifying them of their potential debt, the reason the applicant is not eligible for the assistance provided, and information regarding how they may appeal and/or request an oral hearing. |
| Appealing a Potential Debt | Applicants may submit a written appeal within 60 days of receiving written notice of their potential debt. |
| Establishing Debt | If an applicant does not appeal the decision or their appeal is not granted, the debt becomes final and is forwarded to the FFC to continue debt collection activities. |
| Debt Compromise, Suspension, and Termination | Once a debt has been established, applicants may work with the FFC to make payment arrangements. In limited circumstances, the FFC may suspend or terminate debt collection. |
| Transfer of Debt to Treasury | If the applicant has not repaid the debt or has not entered into a repayment plan within 120 days of FFC's letter, FEMA refers the debt to Treasury for collection. Significant additional costs will be incurred as a result of referral to Treasury. |

## A. Reasons for Recovery of Funds

FEMA must recover IHP assistance when there is evidence of:

- Duplication of Benefits (DOB),[179] which occurs when FEMA provides funds that were also previously received or available from another source, such as insurance or another Federal agency. A DOB may also occur when multiple applicants in a household receive an award for the same item or type of assistance.

- Assistance provided in error, which occurs when FEMA determines assistance was provided to the applicant for which they are not eligible.

- Misuse of funds, which occurs when FEMA determines the applicant spent the funds inappropriately (e.g., using assistance to pay off credit card debt).

- Fraud, which occurs when FEMA determines the applicant obtained the assistance through false means (e.g., false address, submitting false or altered documents, misrepresenting insurance coverage).

## B. Identifying and Verifying Potential Debts

FEMA must ensure IHP assistance is provided only to eligible applicants, and when it is determined assistance was provided in error or for which the applicant is not otherwise entitled, recoupment actions are mandatory.[180] FEMA identifies potential debts through routine internal reviews, information provided by the applicant, reports from other agencies, audits conducted by the Government Accountability Office, FEMA fraud investigators, or the Department of Homeland Security Office of Inspector General (OIG). When FEMA identifies that funds may need to be returned, at least two FEMA employees perform an initial review of the applicant's case to determine whether an erroneous payment has been made. Each FEMA employee compares the assistance provided to the amount the applicant was eligible for during the review process.

In reviewing for error, FEMA may identity more than one applicant who may be liable for the same potential debt and choose to pursue simultaneous notification and collection against all potentially-liable applicants. When one of the potentially-liable applicants was a minor at the time they applied for assistance, FEMA will pursue collection against a co-applicant or legal guardian. If the sole applicant was a minor at the time they applied for assistance, FEMA will only pursue funds awarded in error in limited circumstances, such as the applicant received assistance through fraud, or was legally emancipated or living outside their household in order to attend an institution for higher education when they received assistance.



*A FEMA staff member explains disaster assistance programs to an applicant at a Disaster Recovery Center (DRC) in Washington.*

When the case reviews indicate an error was made, FEMA will, whenever possible, attempt to obtain additional information that may demonstrate that the funds do not need to be repaid by contacting the applicant, contractors, landlords, insurance companies, or other third parties. After the additional information has been obtained, FEMA may determine that the funds were properly awarded and close the review. When the review confirms that an error or improper payment has been made, the case is provided to a senior manager within the IHP program office at FEMA Headquarters for a final review.

FEMA does not initiate debt collection on cases of fraud until they have been investigated by FEMA fraud investigators and/or OIG. FEMA investigators and the Office of Chief Counsel will coordinate on the appropriate debt collection activities.

## C. Notice of Potential Debt and Appeal Process

Once FEMA has determined that the applicant was awarded more assistance than they were eligible for, the applicant is sent a Notice of Potential Debt Letter (NPDL) identifying all the following:

- The amount of assistance the applicant received for which FEMA has determined the applicant is ineligible

- The reason(s) the applicant is not eligible for the assistance provided

- The process for appealing the decision, including the process for requesting an oral hearing

- The documentation required to dispute the ineligibility determination

- The notice that a final determination will be provided to the applicant informing them whether a debt is owed

Applicants who disagree with the potential debt amount or reason may submit a written appeal or request for an oral hearing within 60 days of the date on the FEMA potential debt notification letter (for more information about appeals, (see Chapter 3, II.). When an applicant submits an appeal, FEMA will evaluate their case, including any new information submitted, to determine whether the potential debt stands in whole or in part.

### 1. Oral Hearings

Applicants may request an oral hearing as part of their written appeal. FEMA will only grant oral hearings in limited cases, when there is an issue of identity theft, credibility, or truthfulness, and the case cannot be decided solely on the review of documents. The Alternate Dispute Resolution Division within FEMA's Office of Chief Counsel conducts the hearing. If the Oral Hearing Officer decides not to grant an oral hearing, that decision is final and cannot be appealed.

The Oral Hearing Officer reviews all the information regarding the case before the hearing. If the case was previously investigated for potential fraud, the Oral Hearing Officer's review will include reports and information gathered during the investigation. During oral hearings, applicants are permitted to present information and witness statements to support their claim(s), and FEMA staff represent the Agency's position. If a potential fraud investigation is conducted, a representative from the Fraud Investigation and Prevention Branch will present information about the investigation and report during the oral hearing. Oral hearing decisions are considered final agency determinations that cannot be appealed, and a decision letter drafted by the Oral Hearing Officer is mailed to the applicant.

*2. FEMA Appeal Determination*

FEMA evaluates an applicant's case and their appeal and makes a final written decision within 90 days after receiving the appeal, or 45 days after concluding the oral hearing.

- Based on a review of the applicant's appeal, FEMA may grant an appeal challenging the reason for the potential debt or the amount of the potential debt.

  o When FEMA grants an appeal for the reason for the potential debt, FEMA will terminate the debt and return any money the applicant paid to FEMA.

  o When FEMA grants an appeal for any amount of the potential debt, FEMA will adjust the amount of the debt based on the appeal decision when:

    ▪ An applicant already paid the debt. FEMA will return any money to the applicant that was in excess of the final debt amount based on the appeal.

    ▪ The final debt amount based on the appeal was more than the amount the applicant already paid. FEMA will continue to collect any remaining portion of the reduced debt.

    ▪ The applicant has not made any payments to FEMA for the debt. FEMA will continue debt collection activities.

- Based on a review of the applicant's appeal, FEMA may deny an appeal challenging the reason or amount for the potential debt. If FEMA denies the appeal, FEMA's decision is considered a final agency determination and may not be appealed again.

FEMA establishes the debt amount after the appeal period expires and all decisions are rendered on any appeals received, and forwards the debt to the FFC for continued debt collection activities.

As part of the debt collection activities, the FFC will provide each applicant the opportunity to make payment arrangements.

## D. Debt Compromise, Suspension, or Termination

Once the appellate process is complete and a debt has been established, the FEMA Finance Center (FFC) sends a written "Notice and Debt Letter" (NDL) to applicants to inform them that the debt has become final, that interest and penalties that will start to accrue on the debt if it is not paid, and of their rights to request payment arrangements, compromise, and request a debt waiver. FFC considers an applicant's request to compromise, suspend, or waive a debt.

### 1. Payment Arrangements and Compromise

When an applicant requests a payment plan or compromise, FFC may request financial information in order to determine whether the applicant has the ability to pay the debt in one lump sum or in monthly payments. If the FFC determines that the applicant does not have the ability to pay the entire debt, it may agree to a compromise by accepting less than the full amount owed to satisfy the debt. If the applicant's financial situation does not warrant a compromise of the debt or is otherwise not qualified due to a substantiated finding of fraud, the FFC will notify the applicant.



**Compromise**

Compromise means an agreement to accept less than the full amount owed to satisfy the debt.

### 2. Debt Waiver

If the debtor does not qualify for a full compromise and the debt results from a major disaster or emergency declared on or after October 28, 2012, the FFC may – upon written request from the debtor – waive a debt, in whole or part, where the erroneous payment was based on FEMA error, there is no debtor fault, and the collection of the debt would be against equity and good conscience. Debt waivers are discretionary and will not be granted retroactively. The applicant has the burden of demonstrating that a waiver is appropriate.

### 3. Debt Suspension

FEMA may suspend debt collection activities at any time during the collection process for various reasons, to include: when the debt is uncollectible due to the applicant's current financial inability to pay but the applicant has the future potential to reinstate payments.

### 4. Debt Termination

FEMA may terminate debt collection efforts in accordance with the criteria established in the Federal Claim Collection Standards where such collection is not economically worthwhile or collection is otherwise inappropriate, including when:

- FEMA is unable to collect any substantial amount through its own efforts or through the efforts of others.

- FEMA is unable to locate the debtor.

- The debt is legally without merit or enforcement of the debt is barred by any applicable statute of limitations.

- The debt has been successfully discharged in bankruptcy.

- Costs of collection are anticipated to exceed the amount recoverable.

- The applicant is deceased; no assets remain in the estate sufficient to cover some portion of the established debt, and no co-applicant or co-debtor exists.

- A debt is returned by Treasury to FEMA as uncollectable.

## E. Transfer of Debt to Treasury

The FFC refers the unpaid debt to Treasury for collection if a debt is not paid in full, the debt is not being paid on schedule when there is an established payment plan, or the debt was not compromised, suspended, or terminated. Delinquent debts may be referred to Treasury as early as 61 days after FFC notifies the applicant of delinquency, but no later than 120 days after FFC notifies the applicant. In addition, documents which substantiate the debt are provided to Treasury at the time of referral. When the debt is referred to Treasury, interest and penalties continue to accrue on the unpaid debt, and Treasury may add substantial additional fees and administrative charges to the debt. Once a debt has been referred to Treasury for collection, FEMA will not recall the debt unless the applicant is able to prove the notices were sent to an outdated address.

During the debt collection process, Treasury will offset any eligible Federal payments by the debt amount. Treasury is not required to notify the debtor prior to the offset. Federal payments eligible for offset include: income tax refunds; Federal/state salary pay, including military pay; Federal/state retirement, including military retirement pay; contractor vendor payments; and certain Federal benefit payments.[181]

Treasury provides FEMA all applicant requests for disputes, Proof of Debt (POD), and/or Administrative Wage Garnishment (AWG) hearings. FEMA works with Treasury and processes every hearing request in which new information is provided or a new issue is raised that was not previously addressed in a hearing. When Treasury submits an AWG hearing to FEMA, any debt related to the case is administratively suspended while awaiting the decision (i.e., collections cease); however, during POD and dispute reviews, the debts are not suspended and collections continue unless the FFC specifically recalls the debt.

## F. Statute of Limitations

Starting October 2018, FEMA must notify applicants of any potential debt owed within three years of the date the assistance was received for debts arising from major disasters or emergencies declared on or after October 28, 2012. However, if civil or criminal fraud is suspected, FEMA will initiate actions to recover assistance, regardless of the time that has passed between the award and debt notification.

# Chapter 4: Disaster Case Management[ii]

## I. Overview

Disaster case management (DCM) is a time-limited process that involves a partnership between a disaster case manager and a disaster survivor (also known as a "client") to develop and carry out an individual disaster recovery plan. This partnership provides the client with a single point of contact to facilitate access to a broad range of available resources. The goal of the DCM program is to assist individuals and families through the recovery process with finding resources to meet their disaster caused unmet needs.

**Disaster Caused Unmet Need**

Any un-resourced item, support, or assistance that has been assessed and verified as necessary for a survivor to recover from disaster. This may include food, clothing, shelter, first aid, emotional and spiritual care, household items, temporary housing, home repair, or rebuilding.

FEMA may provide DCM services or financial assistance to SLTT government agencies, or qualified private organizations (collectively, non- Federal entities), to identify and address disaster caused unmet needs following a major disaster declaration.[182]

FEMA's DCM is intended to augment, not to replace, existing case management capabilities in the impacted area. Following a major disaster declaration, the non-Federal entity must submit an application to FEMA for review and be approved for Federal assistance. There is no non-Federal cost share.

### A. Overview of Services to Survivors

Services are provided at no cost and are available to any survivor that has been impacted by the disaster, regardless of eligibility for FEMA IHP or other Federal assistance. DCM must be accessible to people regardless of race, color, national origin, sex, age, disability, English proficiency, or economic status. In particular, providers of DCM must plan to meet the needs of people with limited English proficiency and people with disabilities, such as people who are deaf or hard of hearing who may use sign language or captioning.

The DCM process is described in *Figure 34*.

**Qualified Private Organization**

A qualified private organization is defined as any non-governmental organization or entity that currently has an effective ruling letter from the U.S. Internal Revenue Service, granting tax exemption under Sections 501(c) of Internal Revenue Code of 1954, or satisfactory evidence from the state, territorial, or tribal government that the nonrevenue producing organization or entity is a nonprofit one organized or doing business under state, territorial, or tribal government law and that has experience providing case management services.

---

[ii] OMB revised the regulations that govern federal grants and cooperative agreements, please refer to Title 2 of the Code of Federal Regulations for more details. See Electronic Code of Federal Regulations.

| Figure 34: DCM Process | |
|---|---|
| **Service** | **Definition** |
| Define Eligible Clients | Individuals and families whose primary residence or place of employment was in the impacted area and have a verifiable disaster-caused unmet need that has not been met through other assistance. Clients do not have to be registered with FEMA to receive Federal Disaster Case Management assistance. |
| Client Outreach | In coordination with the Joint Field Office (JFO), other Federal partners, non-Federal entities, local and community leaders, providers will perform outreach to connect with clients who could benefit from Federal Disaster Case Management services. |
| Triage Needs | The primary purpose of triage is to assign a priority level to a case based on the client's severity of need and ability to recover. It requires regular reassessment, particularly as the client transitions into long-term disaster case management. |
| Screen and Assess | After clients are identified through outreach and triaged, the disaster case manager will conduct a screening, gathering necessary information such as pre- and post-disaster contact information, the number of impacted individuals in the household, whether the client rented or owned their pre-disaster residence, and copies of documents needed to verify clients residence or employment in the declared area. Case managers may also use available FEMA registrant data to inform this step and avoid asking survivors for duplicate information. |
| Information and Referral (I&R) | Based on clients' identified needs, the disaster case manager will provide information and referral to short term, immediate available resources and work with the survivor to develop an individually tailored disaster recovery plan that includes next steps and goals. A survivor may not require full DCM services, but may have immediate needs that can be resolved through I&R. |
| Development of Recovery Plan | The disaster case manager and the client will develop a preliminary recovery plan based on the client's identified unmet needs. The plan may be revised as necessary. During the assessment process, the disaster case manager seeks to establish a baseline of pre-disaster functioning. |
| Advocacy and Referral | Both the disaster case manager and the client are responsible for advocating for the services needed to move toward recovery. The disaster case manager will provide referrals to available resources to help meet the client's needs. |
| Monitor Recovery Plan | A disaster case manager will monitor a client's progress toward achieving goals defined in their disaster recovery plan by providing regular client contact and case file reviews that may result in adjustments to the client's disaster plan. |

## B. Program Types

FEMA's DCM is comprised of two programs, Immediate Disaster Case Management (IDCM) and the Disaster Case Management (DCM) program. IDCM is not a prerequisite for DCM, nor is DCM required if IDCM has been approved. Both programs require the event to be a Presidentially-declared disaster.

### 1. Immediate Disaster Case Management

IDCM provides short-term, limited services to address immediate disaster caused unmet needs and make referrals for disaster survivors. IDCM may have a period of performance not to exceed 180 days, at which time cases will be transferred to the longer-term DCM program to local social service organizations. Under extraordinary circumstances, extensions may be considered. The size of the impacted population and the scope of the disaster, as well as the ability of local resources to adequately meet the immediate disaster-caused unmet needs of survivors, may be factors in determining whether or not IDCM is required.

### 2. Disaster Case Management Program

The DCM program is a FEMA-funded supplemental program that generally provides financial assistance to SLTT government agencies, or qualified private organizations, through a Federal award. This program may be implemented through a grant or a cooperative agreement. FEMA shall make the determination of which funding instrument to use in administering the award. Typically, a grant agreement is used when no substantive involvement by FEMA is anticipated. If substantial FEMA involvement is anticipated, a cooperative agreement may be utilized. The DCM Federal award, when approved, enables non-Federal entities to provide services or contract with local providers familiar with disaster case management and the impacted communities.

## C. Waivers to Existing Program Policy

Any waivers to this policy guidance must be submitted in writing, with justification, to the FEMA IA Division Director (IADD) for consideration and a determination.

## D. Authorities

FEMA is authorized to provide case management services, including financial assistance, to SLTT governments or qualified private organizations to provide such services to survivors of major disasters to identify and address disaster caused unmet needs under Section 426 of the Stafford Act.

Regulations within the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards found in 2 C.F.R. Part 200 are applicable to all DCM Federal awards implemented as grants or cooperative agreements.

## II.  Immediate Disaster Case Management

IDCM provides short-term, limited services to address immediate disaster caused unmet needs and make referrals for disaster survivors. IDCM may have a period of performance of 90-180 days, at which time cases will be transferred to the longer-term DCM program to local social service organizations. The size of the impacted population and the scope of the disaster, as well as the ability of local resources to adequately meet the immediate disaster-caused unmet needs of survivors, may be factors in determining whether or not to request IDCM services. IDCM is not a prerequisite of the DCM program. An SLTT government or qualified non-Federal entity may apply for DCM even if no IDCM is implemented. IDCM staff provide the same case management services as the DCM Federal award, but are generally focused on the early steps in the DCM process – outreach, triage, information and referral, and development of an individual recovery plan. The goal of IDCM is to address the immediate unmet needs of disaster survivors and prepare their cases to be transferred to long-term case management services if additional support is needed.

IDCM funding is not awarded to the SLTT; it is directly implemented, administered, and overseen by FEMA, in coordination with the STT government. IDCM may be implemented through:

- a mission assignment to other Federal agencies to provide case management services
- invitational travel to support travel for voluntary agency personnel experienced in case management
- an interagency agreement with national-level partners experienced in case management
- direct hiring of case managers to work with FEMA personnel
- an existing FEMA contract with an experienced case management entity

FEMA will assess the alternatives, in coordination with the impacted STT government and determine the best approach to implementing IDCM based on the needs of the impacted community.

### A. IDCM Period of Assistance

Implementation of IDCM typically begins within 14-30 days of the declaration date. The period of assistance for IDCM will not exceed 180 days. In extraordinary circumstances, such as catastrophic events, the program may be extended by the Federal Coordinating Officer (FCO).

### B. Transition to Non-Federal Entity DCM Federal Award Program

At the conclusion of IDCM, cases will be transitioned either to a DCM program or, if the non-Federal entity elects not to apply for a DCM Federal award or is not approved, to local providers (i.e., SLTT government agencies, nonprofits). Planning for the transition, particularly of survivor data should begin early to ensure smooth and efficient transition of information and to streamline the access to services for survivors.

Transition from IDCM will require collaboration between the non-Federal entity, FEMA, and IDCM program or technical staff to identify the most effective approach to transfer files, including a process both for information sharing and the actual transfer of cases. The timing of actual transition may be fluid due to the non-Federal entity DCM program Federal award application and award process.

The transition plan must include an ability to securely transfer hard copy and electronic case files to the DCM program or local service providers, as directed by the non-Federal entity. Service providers shall not disclose applicant contact information to other parties outside of FEMA in accordance with the Privacy Act of 1974.

## C. Congressional Notification Process

Department of Homeland Security Appropriations Act, Sec. 507, requires FEMA to notify the Congressional Appropriations Committee at least three full business days in advance of making or awarding a grant allocation, grant, contract, or other transaction agreement exceeding $1,000,000. This process may add weeks to the timeline before obligating the Federal award.

## III. Disaster Case Management Program

The DCM program is a FEMA-funded supplemental program that provides financial assistance to SLTT government agencies, or qualified private organizations, through a Federal award. This program may be implemented through a grant or a cooperative agreement. The DCM Federal award, when approved, enables non-Federal entities (also known in this context as recipients) to provide services or contract with local providers familiar with disaster case management and the impacted communities.

### A. Period of Assistance

DCM Federal awards may be awarded for a period of performance up to 24 months from the date of declaration. If necessitated and justified, the recipient may submit a request in writing to the appropriate FEMA Regional Administrator (RA) for a 90-day extension to the period of performance. These written requests must be submitted no later than 90 days prior to the end of the period of performance. Extension requests will be evaluated based on the progress made during the initial period of performance and the justification of ongoing need.

**DCM Federal Award Toolkit**

FEMA has developed an online toolkit containing required documents and tools to complement this guidance and assist stakeholders in preparing, assessing, applying, implementing, managing, and closing a DCM Federal award program. FEMA updates the toolkit regularly to incorporate best practices and lessons learned, thus, non-Federal entities should refer to the most current documents in the DCM Toolkit prior to applying for a Federal award.

In some instances, due to the exigency of the need in the impacted area and in order to expedite award of the funding, the non-Federal entity may apply for and FEMA may approve an initial award with a shorter period of performance, less than 24 months. In these instances, the recipient will have the option to request, in writing, an extension to the period of performance up to the full 24-month period of performance. Extension requests will be evaluated based on the progress made during the initial period of performance and the justification of ongoing need.

### B. General Conditions of Eligibility for a DCM Federal award

All the following conditions must be met for a non-Federal entity to be considered by FEMA for a DCM Federal award:

- The President must declare a major disaster.

- The need for disaster case management services must be beyond the capabilities of the SLTT government to provide due to the severity and magnitude of the disaster.

- The non-Federal entity must submit a complete DCM Federal award package (see Chapter 4, III.D.) within 90 days of the date of declaration of the Presidentially-declared major disaster.

- The DCM Federal award packet must be signed by the Governor or Governor's Authorized Representative (GAR); the Tribal Chief Executive or Tribal Chief Executive Authorized Representative (TAR); or the non-Federal entity must be authorized to directly receive the award in the FEMA-State/Territory/Tribe Agreement.

## C. DCM Award Roles and Responsibilities

### 1. FEMA

As the Federal awarding agency, FEMA's primary responsibility is to ensure the DCM program is implemented in accordance with this guidance, the Federal award articles of agreement, the requirements of the financial award as noted in the NOA, and 2 C.F.R. Part 200. FEMA provides quality assurance and monitors the non-Federal entity in meeting Federal award requirements, use of the Federal award funding, and meeting the audit requirements of the program. FEMA will maintain a toolkit accessible by the non-Federal entity; this toolkit will include application information, forms, templates, and job aids for preparation, application, and implementation of the program. FEMA will also provide two Federal officers to support the non-Federal entity in overseeing the Federal award, the Grants Management Officer (GMO) and the Program Officer (PO).

The GMO is primarily responsible for receiving and acting on requests for prior approval or for changes in the terms and conditions of the award as well as for monitoring the drawdown of funding to ensure it is consistent with allowable and unallowable cost. The GMO is the primary point of contact for receiving and processing non-Federal entity requests for changes to the terms and conditions of the award. The PO provides regular technical assistance and programmatic coordination with the non-Federal entity.

*Figure 35* details the GMO and PO responsibilities associated with the Federal award.

| Figure 35: Fiscal and Program Officer Responsibilities | |
|---|---|
| Grants Management Officer | Program Officer |
| <ul><li>Evaluating Federal award applications for administrative content and compliance with statutes, regulations, and guidelines.</li><li>Making site visits to monitor the progress of the Federal award.</li></ul> | |
| <ul><li>Negotiating awards.</li><li>Providing consultation and technical assistance to applicants and recipients, including interpretation of grants administration policies and provisions.</li><li>Administering and closing out Federal awards.</li></ul> | <ul><li>Providing programmatic technical assistance.</li><li>Determine the frequency of conference calls, site visits, and programmatic performance reports within Federal guidelines.</li><li>Monitoring performance of the program, including reviewing progress reports.</li></ul> |

### 2. Non-Federal Entity

The non-Federal entity is responsible for assessing the DCM needs, applying, and overseeing the DCM award in accordance with all applicable Federal award requirements, state regulations, and this guidance. In addition, they are responsible for:

- Formulating the program, budget, and project design in a manner that meets minimum reporting and monitoring requirements, as well as the Federal award agreement;

- Maintaining clear control of program operations and ensure response to emergent issues in a timely manner;

- Reporting aggregate data on program activities to FEMA, and with FEMA's prior approval, to determine how personally identifiable information (PII) will be shared with service providers following The Privacy Act of 1974, 5 U.S.C. § 552a;

- Standardizing services among DCM service providers with overall quality assurance, including budget requirements, staffing, program planning, reporting, training, and technology for tracking and resource sharing; and

- Developing a plan that outlines their collaborative process with SLTT voluntary organizations, including, if applicable Voluntary Organizations Active in Disasters (VOAD), as well as the Emergency Management agency, and Long-Term Recovery Groups.

## D. Pre-Award Requirements for DCM

### 1. DCM Needs Assessment

The DCM needs assessment is the responsibility of the non-Federal entity and should be submitted with the DCM Federal award application. The assessment evaluates the current capacity to provide disaster case management services and identifies the specific populations that will be served by the supplemental program. A capacity survey to support the non-Federal entity in this step is available in the DCM toolkit. Information from this survey and any additional information regarding needs of the impacted community should be included in the overall justification when applying for DCM.



**Tailoring the Program to the Population**

When assessing the needs of the affected population, it is important to consider the proportion and effect on older adults, people with disabilities and others with access and functional needs, children, people with lower incomes, and people with limited English proficiency. The program may be tailored to meet the needs of the specific community. For instance, if a high proportion of children were impacted, adding a children's coordinator in your staffing plan may be beneficial.

### 2. DCM Award Application

After a Presidential disaster declaration, a non-Federal entity may apply for a DCM Federal award. The DCM application package must be submitted to FEMA no later than 90 days after the IA declaration. In extraordinary circumstances, such as catastrophic events, the non-Federal entity may apply for an extension to this deadline in writing to the applicable FEMA RA; this request must document the extraordinary circumstances and what the additional time will allow them to accomplish. The non-Federal entity must submit this request within 60 days of disaster declaration. Extension requests not submitted within this timeframe will not be considered.

**Shortened DCM Awards**

The non-Federal entity may apply for, and FEMA may approve, an initial award with a shorter period of performance less than 24 months. This shortened application may be submitted at any point prior to the DCM deadline. If approved, the non-Federal entity may request an extension up to the total 24 months consistent with extension requirements.

**Application Process and Delegation of Authority**

DCM Federal awards are generally applied for by an STT government agency. However, the STT government may request that FEMA provide an opportunity for a local government agency or qualified private organization to apply for a Federal award. This request should be made in writing, accompanied by an assessment justifying the need for a DCM program, signed by the Governor or GAR or Tribal Chief Executive or TAR, and submitted with the application. FEMA will review the documentation and make a determination on the best alternative to address the needs.

Cover letters for the DCM Federal award application packet should be addressed to the applicable FEMA RA. Applications for DCM will be reviewed and approved or denied by the FEMA RAs. Note that the Disaster Recovery Manager (DRM) authority does not carry the delegation of the DCM determination (delegation of authority is separate from the delegation of DRM authority).

**Approval or Denial of Application**

The RA may approve or deny the Disaster Case Management program award. The program may be approved if:

- A complete application is received no later than 90 days from the date of declaration; and

- There is a need for the program clearly articulated in the application.

If approved, the RA will send a signed approval memo with reason for approving to the FCO and Regional Grants Management Division (GMD) Director for processing of the Federal financial award, as a grant or cooperative agreement. The RA or their designee will issue the Notice of Award to the non-Federal entity receiving the award.

The program may be denied if:

- A complete application is not received within 90 days from the date of declaration; or

- The application lacks sufficient information to justify the need for the program.

If denied, the RA must submit a written denial with justification to the non-Federal entity.

**Required Information**

A complete DCM Federal award application must include the information found in *Figure 36* and documentation to be considered for an award:

| Figure 36 : DCM Application Required Information and Documents | |
|---|---|
| **Information** | • The geographical areas within the designated disaster area for which services will be provided; <br><br> • An estimate of the number of disaster survivors requiring assistance; <br><br> • A description of the SLTT resources and capabilities, and an explanation of why these resources cannot meet the need; <br><br> • A description of activities from the date of the disaster incident to the date of application; <br><br> • A plan of services to be provided to meet the identified needs; and <br><br> • A detailed budget, showing the cost of proposed services separately from the cost of reimbursement for any eligible services provided prior to the application. |
| Request for Federal Assistance (SF-424) | A Federal form that OMB requires for Federal award applications. All entities that apply for DCM funds must submit a completed SF-424 signed by the Governor or GAR, or Tribal Chief Executive or TAR. |
| Budget Information for Non-Construction Programs (SF-424A) | A Federal form OMB required for Federal award applications. |
| Assurances for Non-Construction Programs (SF-424B) | A Governor, GAR, Tribal Chief Executive, or TAR signature is required. |
| **Budget Narrative** | The budget narrative should include a detailed justification for all cost categories requested in the SF-424A. Refer to the DCM toolkit for additional instructions on completing the Budget Narrative. |
| **Lobbying Forms** | SF-LLL and the Grants.gov Lobbying Certification Form must be on file with FEMA. The STT government must acknowledge that the forms are in compliance with the FEMA-State/Territory/Tribe Agreement and the most current Department of Homeland Security (DHS) Standard Terms and Conditions. |

### *3. Budget*

The DCM budget narrative must justify the proposed budget for the non-Federal entity, subrecipients of a Federal award, and each individual service provider. The narrative must provide a justification of the costs and an itemization for each line of the budget. When filling out the DCM award application, applicants must adhere to the following budget limitations:

**Allowable Costs**

- **Pre-Award Costs—**Pre-award costs are those which are incurred prior to the start date of the period of performance (2 C.F.R. § 200.209). The period of performance for an approved DCM Federal award typically starts on the date of the disaster declaration. Costs accrued prior to the disaster declaration are not allowable. If exigent circumstances occur and the period of performance starts later than the declaration date and prior to the notice of award, such costs may be allowable only to the extent that they would have been allowable if incurred after the date of the Federal award and only with written approval of the FEMA Regional Administrator.[183]

- **Salaries and Wages:** Salary compensation must be reasonable in amount and in alignment with local prevailing rates for the position funded.

- **Fringe Benefits:** Fringe benefits may be charged directly to the Federal award. Claimed costs must be reasonable and conform to established policies for the STT government.
  Use of a pre-established provisional rate requires allocation to total salary costs. Rates must be adjusted to actuals at the year-end and rates should be reviewed at least once annually.

- **Equipment:** The non-Federal entity obtains title to equipment acquired under the DCM award and is subject to the conditions outlined in 2 C.F.R. § 200.313, including these requirements:

  - To use the equipment for the authorized purposes of the project until funding for the project ceases, or until the property is no longer needed for the purposes of the project;

  - To not encumber the property without approval of FEMA;

  - To use and dispose of the property in accordance with guidelines for states and non-states as set forth in 2 C.F.R. § 200.313; and

  - To use in a manner consistent with the purposes of the award and to benefit the beneficiaries of the project.

- **Supplies:** FEMA retains an interest in any unused supplies exceeding $5,000 in total aggregate value upon termination or completion of the award if they are not needed for any other Federal award. The STT government must compensate FEMA for its share of the supplies in compliance with 2 C.F.R. § 200.314. As long as FEMA retains an interest in supplies, the STT government must not use the supplies to provide services to other organizations for a fee that is less than private companies charge for equivalent services.

- **Travel:** Travel must be included in the budget for preapproval as part of the application process. During implementation, travel costs must be supported by travel expense reports detailing employee name, the reason for the trip, and itemized expenses claimed. Claimed costs should be charged according to the award recipient's travel policy, which requires prior approval from FEMA and must comply with OMB cost principles and provide expenditure limitations. Major items of expense (e.g., airfare, lodging) must be supported by receipts.

- **Other:** The budget may identify costs that are unique to the disaster and area impacted but do not fall into one of the prescribed cost categories listed above. Costs must be supported by adequate documentation (invoices, receipts, etc.). Consult with the FEMA Grants and Program Officer to determine which costs are allowable under this cost category and to confirm what items may require prior approval.

- **Contractual Costs:** The non-Federal entity must follow the applicable Federal procurement requirements at 2 C.F.R. § 200.317 through § 200.326. Per 2 C.F.R. § 200.317, STT governments must follow the same policies and procedures they normally use, as well as comply with the requirements for procurement of recovered materials (§ 200.322) and including required contract provisions (§ 200.326). For all other non- Federal entities, they must follow all the requirements at 2 C.F.R. § 200.318 through §200.326. As part of these requirements, non-STT government entities must use their own documented procurement procedures that reflect applicable STT government laws and regulations provided that the procurements comply with Federal law and procurement regulations.

**Unallowable Costs**

- **Indirect Costs—Unallowable:** FEMA does not authorize the use of funds for indirect costs. Indirect costs, including management costs, are defined as costs not directly chargeable to a specific project. Please note that even if an indirect cost rate is established, it is subject to statutory and administrative limitations. A DCM award recipient or provider is not entitled to an established rate for services provided under the DCM award. The program's statutes, regulations, and policy govern whether any indirect costs are eligible. Section 324 of the Stafford Act requires FEMA to establish management cost rates through regulations. At this time, FEMA does not have regulations that govern the eligibility of indirect costs for the DCM.

Please refer to Appendix E for more information on allowable and unallowable costs.

### 4. Federal and Congressional Review Process

Once submitted, the non-Federal entity's DCM application will go through a review by FEMA Joint Field Office (JFO), FEMA Region, and FEMA HQ staff for completeness, cost-effectiveness, and feasibility of the non-Federal entity's DCM application. FEMA will respond to the non-federal entity with an application determination or a request for additional/clarifying information within 60 days of receipt of packet. The FEMA RA will issue a determination.

Under the Department of Homeland Security Appropriations Act, Sec. 507, FEMA is required to provide 72 hours advance Congressional notification when awarding a grant or contract in excess of $1,000,000. Notification is routed to the Congressional Appropriations Committee for advanced notification review, after review and clearance by DHS and OMB. This process may add multiple weeks to the timeline before FEMA may issue the Notice of the Federal award to the non-Federal entity.

## E. Notice of Award (NOA)

The NOA is the official Federal award document notifying the recipient and others that an award has been made. The NOA contains all terms and conditions of the Federal award and provides the support documentation for recording the obligation of Federal funds in the non-Federal entity's accounting system.

Critical information included in the NOA:

- The start and end dates for the period of performance
- The award amount
- Name of FEMA grants officer
- Name of FEMA program officer
- Reporting requirements

FEMA will schedule a post-award call with the non-Federal entity to review the NOA, Conditions of Award, program expectations, reporting requirements, the funding process, and the monitoring schedule.

### 1. Conditions of Award

FEMA's Regional Grants Management Division will generate an NOA letter that details all conditions the non-Federal entity must satisfy within the timeframe designated in the letter.

The non-Federal entity is responsible for the accounting and expenditures, cash management, maintenance of financial records, and refunding expenditures disallowed by audits. The non-Federal entity must establish a Payment Management System (PMS) account prior to allocation and obligation of funds to transfer funds from FEMA to the non-Federal entity.

Additional information on the funding process is available in the DCM Toolkit.

## F. Post-Award Requirements for DCM

### 1. Multiple DCM Programs within the Geographic Area

#### Multiple DCM Programs

Occasionally, multiple DCM programs are awarded for the same area that is affected by overlapping Presidentially-declared disasters. If multiple DCM programs are operating concurrently, the non-Federal entity must ensure there is a mechanism in place to identify and mitigate the risk of duplication of services for clients impacted by the multiple disasters. The non-Federal entity must develop internal controls and provide its strategy for operating multiple programs for the same affected population and identifying the programmatic, financial, and management components of each program.[184] This strategy must be included as part of the application. Budget and programmatic reporting must remain distinct and separate between programs and highlight the number of cases transferred between disasters.

A client will have one open case at a time. If a client has identified needs from multiple disasters, and there are multiple DCM programs operational concurrently, the state must outline the process for coordination between DCM programs to ensure that services provided are disaster- specific and not duplicated for clients impacted by multiple disasters.

### 2. Procurement Requirements under a Federal Award

Federal award recipients shall ensure that the process of soliciting DCM services is fair and transparent. Recipients must follow the same policies and procedures when procuring property and services under a Federal award that they follow for procurement from non-Federal funds. Recipients must ensure that any contract provisions as required by 2 C.F.R. § 200.326 Contract Provisions are included on all purchase orders or contracts that draw from Federal funds, and states must follow the state procurement requirements as described in 2 C.F.R. § 200.317. All other recipients, including subrecipients of an STT government will follow the General procurement standards as required by 2 C.F.R. § 200.318 through § 200.326.

### 3. Appeals and Modifications to Award

#### Appeal for Denied Federal Award Application or Extension

The non-Federal entity may appeal the FEMA RA's decision. This appeal must be submitted to the IA Division Director (IADD), in writing, within 60 days of the date of the application decision.[185] The appeal must include new justifying information not included in the original Federal award application, including a new budget and associated training and implementation plans if applicable.[186] See the DCM Toolkit for additional information.

#### Appeals of Remedies for Noncompliance

The non-Federal entity may submit a written appeal letter with supporting documentation, signed by the Governor or GAR, Tribal Chief Executive or TAR, or applicable authorized representative of the non-Federal entity to the appropriate FEMA RA within 15 days of the date of notification of the remedial action. The FEMA RA will make an appeal determination in writing to the applicant.

**Objections/Appeals of Decisions Regarding Allowable Costs**

The non-Federal entity may submit a written appeal letter with supporting documentation, signed by the Governor or GAR, Tribal Chief Executive, or applicable authorized representative of the non-Federal entity to the FEMA RA within 15 days of the date of notification of the disallowed cost. The FEMA RA will make an appeal determination, in writing to the applicant.

**Appeal of Termination or Suspension**

In order to appeal termination, the non-Federal entity must include a letter acknowledging receipt of notice of termination as well as a termination appeal letter, unless otherwise specified. If the non-Federal entity decides to terminate their approved DCM prior to the end of the period of performance or withdraw their submitted DCM application, then a signed letter should be sent to the FEMA RA indicating the desire to withdraw the application or terminate the program. The official notification must be signed by the Governor or GAR, Tribal Chief Executive or TAR, or applicable authorized representative of the non-Federal entity. The termination or withdrawal will become effective on the date of the official acknowledgement from FEMA and will not be subject to an appeal should the non-Federal entity choose to reverse the decision.[187]

All closeout and reconciliation documents must be submitted in accordance with the timeframes indicated in the DCM Toolkit unless otherwise specified.

**Award Modifications or Extensions**

- If initial award was for less than the full 24-month Period of Performance (POP):

  o If awarded funding for a period of performance less than 24 months from the date of declaration, the non-Federal entity may request, in writing, an extension to the period of performance up to the full 24-month period of performance.

  o An extension request must be submitted in writing no later than 90 days prior to the end of the current POP.

  o An extension request must include the progress made during the initial period of performance and a justification of ongoing need.

  o The official written request must be submitted to the FEMA RA for determination.

- If the initial award is for the maximum 24-month POP:

  o The POP for DCM is a maximum of 24 months from the date of the major declaration. However, a request for an additional 90-day extension to the POP may be considered when requested in writing with adequate justification to the FEMA RA.

  o A program extension request must be submitted in writing at least 90 days prior to the end of the current POP.

  o All financial and programmatic reports must be current and complete at the time of request or the request will not be processed.

  o The official written request must be submitted to the FEMA RA for determination.

- Supplemental Funding

  o A request for supplemental funding may be considered under extenuating circumstances when sufficient justification is submitted.

  o Written requests for supplemental funding may be requested at least 90 days before the end of the period of performance.

  o Financial and performance status reports must be current and complete.

  o The decision to approve/deny the supplemental funding request will be made by the FEMA RA.

 **Requests for Supplemental Funding Must Include:**

- An explanation of why current funding is insufficient.

- An updated DCM work plan.

- All pertinent statistical information regarding current cases.

### *4. Monitoring and Reporting*

**Monitoring**

- **FEMA monitoring responsibilities**: FEMA must ensure that the Federal award recipient adheres to all laws, regulations, and policy guidance in all aspects of the DCM program. To do this, they will monitor the non-Federal entity operations and activity. This is done through regularly scheduled monitoring calls, reviewing and analyzing non-Federal entity reporting, and on-site visits. A minimum of three on-site visits is required for each DCM award, more if required in the Conditions of Award if the size, complexity, or scope of the award poses elevated risks. Additional on-site visits, as well as the frequency of the monitoring calls, will be determined by FEMA based on the program needs and may be added during the POP if a need is identified.

- **Non-Federal entity monitoring responsibilities:** The non-Federal entity is responsible for oversight of the entire operations and all supported activities pertaining to the Federal award. As a recipient of a Federal award, the non-Federal entity is responsible for being compliant with all applicable provisions under 2 C.F.R. Part 200, refer to *Figure 37* for some key provisions of 2 C.F.R. Part 200. They must monitor the activities under the awards to ensure compliance with applicable Federal requirements and to ensure performance expectations are being achieved. Monitoring by the non-Federal entity must cover each program, function, and activity.

### Reporting Requirements

The non-Federal entity must submit performance reports at the interval required by the Federal awarding agency or pass-through entity to inform status of achieving program outcomes and ensuring compliance with laws, regulations, and policies applicable to the program. Intervals must be no less frequent than annually nor more frequent than quarterly except in unusual circumstances, e.g., where more frequent reporting is necessary for the effective monitoring of the Federal award or could significantly affect program outcomes.[188] Annual reports must be submitted 90 calendar days after the reporting period; quarterly or semiannual reports must be submitted 30 calendar days after the reporting period. Alternatively, the Federal awarding agency or pass-through entity may require annual reports before the anniversary dates of multiple year Federal awards.

**Programmatic Reports**

Monthly programmatic reports are required. Reports should be submitted to the FEMA Project Officer, and should include the following data, as well as anything else requested by FEMA:

- Number of cases opened
  - o Include how many cases are at each tier/priority level
- Number of cases with completed needs assessments
- Number of cases with developed recovery plans
- Number of cases closed
  - o Number of cases closed without a completed recovery plan (resource unavailable)
  - o Number of cases closed after completing the recovery plan (needs met)
  - o Number of cases withdrawn by survivor
  - o Other
- Number of survivors on a waitlist for services
- Top 3-5 identified unmet needs

Reported numbers should include a monthly total and a cumulative total for the program. Refer to the DCM Toolkit for templates and additional instructions for assistance.

**Financial Reports**

The non-Federal entity submits the Federal Financial Report (SF-425) to the FEMA Grants Management Officer within 30 days of the end of each reporting period.[189] The non-Federal entity submits the SF-425 for every quarter of the period of performance, including partial calendar quarters during the life cycle, regardless of the level of activity in that quarter. This requirement continues until the end of the period of performance.

Reporting periods are as follows:

- Quarter 1: October 1-December 31; Due January 30
- Quarter 2: January 1-March 31; Due April 30
- Quarter 3: April 1-June 30; Due July 30
- Quarter 4: July 1-September 30; Due October 30

**Budget and Fiscal Management**

The non-Federal entity is responsible for accounting, including expenditures, cash management, maintenance of adequate financial records, and the refund of expenditures disallowed by audits. The non-Federal entity and DCM providers must comply with Federal Regulations at 2 C.F.R. Part 200.

A non-Federal entity can only charge allowable costs incurred during the POP. Any costs incurred after the POP, including during the 90-day closeout timeframe for submitting all financial and performance reports, are not allowable.[190]

Chapter 4: Disaster Case Management

| Figure 37: 2 C.F.R. Part 200 Compliance | |
|---|---|
| Item | References and Details |
| Uniform Administrative Requirements | • 2 C.F.R. Part 200<br>    o Subpart A: Acronyms and Definitions<br>    o Subpart B: General Provisions<br>    o Subpart C: Pre-Federal Award Requirements and Contents of Federal Awards<br>    o Subpart D: Post Federal Award Requirements |
| Cost Principles | 2 C.F.R. Part 200, Subpart E |
| Audit Requirements | 2 C.F.R. Part 200, Subpart F |

### 5. DCM Award Closeout and Record Retention

**Closeout**

Within 90 days of the end of the period of performance, the non-Federal entity must submit a final SF-425 with a final narrative, detailing all accomplishments of the program, to both the FEMA GMO and Project Officer. The non-Federal entity must also liquidate all obligations within 90 days of the end of the period of performance as stated in 2 C.F.R § 200.343. After FEMA reviews the final reports, the closeout process will begin. The closeout process will include an accounting of any remaining funds that must be obligated and will address the maintenance of Federal award records. Additional tools and resources for award closeout will be available in the online DCM Toolkit.

**Record Retention**

All recipients and subrecipients are subject to audit by FEMA and the Office of Inspector General personnel. Financial records, supporting documents, statistical records, and all other non-Federal entity records pertinent to a Federal award generally must be retained for at least three years from the date the final financial report is submitted.[191] Further, if the recipient does not submit a final financial report and the award is administratively closed, FEMA issues the date of administrative closeout as the start of the general record retention period.

The record retention period may be longer than three years or have a different start date in certain cases. These include:

- Records for real property and equipment acquired with Federal funds must be retained for three years after final disposition of the property.[192]

- If any litigation, claim, or audit is started before the expiration of the 3-year period, the records must be retained until all litigation, claims, or audit findings involving the records have been resolved and final action taken.[193]

- The record retention period will be extended if the recipient is notified in writing of the extension by DHS/FEMA, the cognizant or oversight agency for audit, or the cognizant or oversight agency for audit, or the cognizant agency for indirect costs.[194]

- Where DHS/FEMA requires recipients to report program income after the period of performance ends, the program income record retention period begins at the end of the recipient's fiscal year in which program income is earned.[195]

- For indirect cost rate proposals, cost allocation plans, or other rate computations records, the start of the record retention period depends on whether the indirect cost rate documents were submitted for negotiation.

    - If the indirect cost rate documents were submitted for negotiation, the record retention period begins from the date those documents were submitted for negotiation.

    - If indirect cost rate documents were not submitted for negotiation, the record retention period begins at the end of the recipient's fiscal year or other accounting period covered by that indirect cost rate.[196]

The non-Federal entity is responsible for returning any funds that are drawn down but remain unliquidated on non-Federal entity financial records.

# Chapter 5: Crisis Counseling Assistance and Training Program[iii]

## I. Overview

The Crisis Counseling Assistance and Training Program (CCP) is a Federally- funded supplemental program that provides financial assistance to state, local, territorial, or tribal (SLTT) government agencies through a grant or cooperative agreement. The CCP award enables SLTT government agencies to provide crisis counseling services or contract with local mental health service providers familiar with the affected communities to provide services.

**Crisis Counseling**

Crisis Counseling means the application of individual and group support designed to help alleviate the mental and emotional crises and their subsequent psychological and behavioral conditions resulting from a major disaster or its aftermath.

The intent of the CCP award is to augment, not replace, current mental health and training activities in order to assist disaster survivors. This program is only available after a Presidentially-declared disaster that includes Individual Assistance (IA), and a non-Federal entity has submitted an approved Federal award application. There is no cost-share.

The goal of the CCP services is to reach a large number of disaster survivors in a short period of time to prevent or mitigate adverse psychological effects caused or aggravated by a major disaster.

**A. Overview of Services to Survivors**

Services are provided at no cost and are available to any survivor, regardless of FEMA IHP applicant eligibility, who has been impacted by the disaster. These services are provided in accessible locations, including survivor homes, shelters, temporary living sites, and places of worship; they may even be provided virtually through a helpline. Services can be provided in a group setting or one-on-one and include supportive crisis counseling, education, development of coping skills, and linkage to appropriate resources.

CCP must be accessible to people regardless of race, color, national origin, sex, age, disability, English proficiency, or economic status. In particular, providers of CCP must plan to meet the needs of people with limited English proficiency and people with disabilities, such as people who are deaf or hard of hearing who may use sign language or captioning.

Characteristics of the program are described in *Figure 38*.

---

[iii] OMB revised the regulations that govern federal grants and cooperative agreements, please refer to Title 2 of the Code of Federal Regulations for more details. See Electronic Code of Federal Regulations.

| Figure 38 : Characteristics of CCP | |
|---|---|
| Characteristic | Description |
| Strengths-based | Crisis counselors instill resilience in individuals and communities, and promote independence rather than dependence on the CCP, other people, or organizations. Crisis counselors help survivors regain a sense of control. |
| Outreach-oriented | Crisis counselors take services into the communities rather than wait for survivors to come to them. |
| More practical than psychological in nature | Crisis counseling is designed to prevent or mitigate adverse repercussions of disasters rather than to treat them. Crisis counselors provide support and education, listen to survivors, and accept the content at face value. Crisis counselors help survivors to develop a plan to address self-identified needs and suggest connections with other individuals or organizations that can assist them. |
| Diagnosis-free | Crisis counselors do not classify, label, or diagnose people; they keep no records or case files. The CCP does not provide mental health or substance use treatment, or critical incident stress debriefing. Services are supportive and educational in nature. |
| Conducted in non-traditional settings | Survivors can reach out to crisis counselors staffing helplines, or crisis counselors may make contact with survivors in their homes and communities, not in clinical office settings. |
| Culturally-aware | The CCP embraces cultural and spiritual diversity. |
| Designed to strengthen existing community support systems | Crisis counselors support, but do not organize or manage, community recovery activities. Likewise, the CCP supplements, but does not supplant or replace, existing community systems. |
| Provided in ways that promote a consistent program identity | Crisis counselors should work together early to establish a unified identity. The CCP strives to be a single, easily identifiable program, with services delivered by various local agencies. |

## B. Crisis Counseling vs. Traditional Mental Health Treatment

Mental health treatment, as typically defined within the professional community, implies the provision of assistance to individuals for a diagnosable disorder. In contrast, crisis counseling seeks to prevent the onset of diagnosable disorders by helping the majority of survivors understand that they are experiencing common reactions to extraordinarily uncommon occurrences.

A mental health professional often will engage a client in short or long-term recovery treatment, committing the person to a set number of sessions. The crisis counselor should treat each encounter as if it will be the only one, assisting the survivor with identifying needs and goals. Finally, while a traditional mental health professional will make a diagnosis and treat mental illnesses, the crisis counselor will avoid classifying, labeling, or diagnosing people in any way. The crisis counselor keeps no formal individual records or case files.

Differences between traditional mental health and the CCP services can be seen in *Figure 39*.

| Figure 39: Mental Health vs Crisis Counseling Services | |
| --- | --- |
| Traditional Mental Health | Crisis Counseling |
| Office based | Home and community based |
| Diagnoses and treats mental illnesses | Assesses strengths and coping skills |
| Focuses on personality and functioning | Seeks to restore or improve functioning |
| Examines content | Accepts content at face value |
| Explores past experiences and their influence on current problems | Validates common reactions and experiences |
| Has psychotherapeutic focus | Has psycho-educational focus |
| Keeps records, charts, case files, etc. | Does not collect any identifying information |
| Makes reoccurring appointments | Treats each encounter as if it is the only one |

## C. Services Funded Through the CCP

The CCP award funds primary and secondary services. Primary services are high-intensity and include crisis counseling, public education, and community support. Secondary services are those that have a broader scope and are less intense and include development and distribution of psycho-educational material and public service announcements. Services that the program funds are described in *Figure 40*:

| Figure 40: Services Funded through the CCP | |
|---|---|
| Services | Description |
| Individual crisis counseling | Helps survivors understand their reactions, improve coping strategies, reviews their options, and connect with other individuals in agencies that may assist them. |
| Basic supportive or educational contact | General support and information on resources and services available to disaster survivors. |
| Group crisis counseling | Group sessions led by trained crisis counselors who offer skills to help survivors cope with their situations and reactions. |
| Public education | Information and education about typical reactions, helpful coping strategies, and available disaster related resources. |
| Community networking and support | Relationship building with community resource organizations, faith-based groups, and local agencies. |
| Assessment, referral, and resource linkage | Adult and child needs assessment and referral to additional disaster relief services, mental health, or substance abuse treatment. |
| Development and distribution of educational materials | Flyers, brochures, tip sheets, educational materials, and website information developed by a non-Federal entity and distributed by the CCP staff. |
| Media and public services announcements | Media activities and public messaging in partnership with local media outlets, SLTT government, charitable organizations, or other community brokers. |

## D. General Conditions of Eligibility for a Federal CCP Award

All the following conditions must be met for an entity to be considered by FEMA and Substance Abuse and Mental Health Services Administration (SAMHSA) for a Federal CCP award:[197]

- The President must declare a major disaster approved for IA.

- The need for crisis counseling services must be beyond the capabilities of the SLTT government to provide due to the severity and magnitude of the major disaster.

- The STT government and FEMA must execute a FEMA-State/Territory/Tribe Agreement.

- A CCP needs assessment must be initiated within 10 days of the date that IA was approved on the major disaster.

- The SLTT government mental health agency must be designated by the Governor, Governor's Authorized Representative (GAR), the Tribal Chief Executive, or the Tribal Chief Executive's Authorized Representative (TAR).

- The Federal award packet must be complete and submitted by the appropriate program application deadline.
  - Immediate Services Program (ISP): Application is due no later than 14 days from the date that IA was approved on the major disaster declaration.
  - Regular Services Program (RSP): Application is due no later than 60 days from the date that IA was approved on the major disaster declaration.



**Eligible CCP Recipients**

The definition of a Recipient, as per this guidance, is an STT government mental health agency, or other local or private mental health organization designated by the Governor, GAR, Tribal Chief Executive, or TAR, to receive funds under Section 416 of the Stafford Act.

This definition aligns with the program specific definition of a grantee, as per 44 C.F.R. § 206.171 (b)(5), and the Federal award definition of a recipient, as per 2 C.F.R. § 200.86.

The CCP application deadlines are set by regulation and cannot be waived or extended.

## E. Waivers to Existing Policy

Any waivers to this CCP Guidance must be requested in writing, with justification, to the FEMA IA Division Director for consideration and a determination.

## F. Authorities

FEMA is authorized to fund mental health assistance and training activities for survivors impacted by a Presidentially-declared disaster approved for IA under Section 416 of the Stafford Act,[198] [199] implementing regulations found in 44 C.F.R. § 206.171, and Federal award regulations found in 2 C.F.R. Part 200.

## G. Partner Organizations

The Center for Mental Health Services (CMHS), within the SAMHSA, works in partnership with FEMA through an interagency agreement to provide technical assistance, consultation, award administration, program oversight, and training for STT government mental health authorities.

## H. Types of Assistance

The CCP comprises two separate Federal award programs, the Immediate Services Program (ISP) and the Regular Services Program (RSP). An ISP is not a prerequisite for an RSP, nor is an RSP required if an ISP has been approved; however, separate Federal award applications and needs assessments must be completed for both programs, if both are requested. For more information on the ISP, see Chapter 5, II. For more information on the RSP, see Chapter 5, III. For additional information on staffing, stress management, data collection, and quality assurance, please see Chapter 5, IV.

## II. Immediate Services Program

### A. Period of Assistance for ISP

The ISP provides funds for up to 60 days of services immediately following the date IA was approved on the major disaster declaration. ISP funding may continue for up to 60 additional days if an RSP award application is submitted to allow time for FEMA and SAMHSA to review the application. Notification must be provided, in writing, signed by the GAR or TAR, to FEMA no later than 45 days from the date of declaration if the STT government plans to submit an RSP application to receive an extension and ensure that there are no gaps in services. If extenuating circumstances exist, the FEMA RA may authorize an additional 30 days and/or supplemental funding, if needed, while the RSP application remains under review with FEMA.[200]

### B. Pre-Award Assessment and Application

This section covers the pre-award considerations and process of applying for an ISP.

#### 1. Needs Assessment

The purpose of the needs assessment is to provide an estimate of the size and cost of the program needed and to determine if supplemental Federal assistance is required. The factors of the needs assessment must include:

- An estimate of the number of disaster survivors requiring assistance;

- A description of the SLTT government resources and capabilities; and

- Justification of why the SLTT government cannot meet the needs.

#### 2. Applying for the Federal ISP Award

The cover letter for the ISP application should be addressed to the applicable Federal Coordinating Officer (FCO). The RA may delegate decision-making authority for the ISP to the FCO through the Disaster Recovery Manager (DRM) authority.

After the President declares a major disaster that includes IA, the applicable STT government may apply for the ISP. An ISP application package must be submitted to FEMA and SAMHSA within 14 days of the date IA was approved on the disaster. This application deadline is set by regulation and cannot be waived or extended.



**Tailoring the Program to the Population**

When assessing the needs of the affected population, it is important to consider the proportion and effect on the whole community, including older adults, people with disabilities and others with access and functional needs, children, and those with limited English proficiency. The program can be tailored to meet the needs of the specific community. For instance, if a high proportion of children were impacted, adding a children's coordinator in your staffing plan may be beneficial.



**ISP Application Assistance**

A completed and signed application and Federal forms are required to apply for the ISP. For application assistance, call SAMHSA DTAC at 800-308-3515.

An ISP application package represents the Governor or Tribal Chief Executive's agreement and/or certification:

- That the requirements are beyond the SLTT governments' capabilities;

- That the program, if approved, will be implemented according to the plan contained in the application approved by the applicable RA;

- To maintain close coordination with and provide reports to the RA, FEMA JFO and FEMA HQ staff, and SAMHSA Project Officer; and

- To include mental health disaster planning in the STT government's emergency plan prepared under Title II of the Stafford Act.

The application must contain the following information and documentation to be considered for an award (see CCP Online Toolkit):

| Figure 41: ISP Application Required Information and Documents | |
|---|---|
| Information | • The geographical areas within the designated disaster area for which services will be provided;<br><br>• An estimate of the number of disaster survivors requiring assistance;<br><br>• A description of the SLTT government resources and capabilities, and an explanation of why these resources cannot meet the need;<br><br>• A description of activities from the date of the disaster incident to the date of application;<br><br>• A plan of services to be provided to meet the identified needs; and<br><br>• A detailed budget, showing the cost of proposed services separately from the cost of reimbursement for any eligible services provided prior to the application. |
| ISP Application | The OMB approved ISP Application (1660-0085) must be completed and signed by the Governor or Tribal Chief Executive, or their Authorized Representative. |
| Request for Federal Assistance (SF-424) | A Federal form that OMB requires for Federal award applications. All entities that apply for CCP funds must submit a completed SF-424 signed by the Governor or GAR, or the Tribal Chief Executive or TAR. |
| Budget Information for Non-Construction Programs (SF-424A) | A Federal form OMB requires for Federal award applications. Complete "Section B—Budget Categories," column one only, for the total CCP budget. |
| Assurances for Non-Construction Programs (SF-424B) | A Governor, GAR, Tribal Chief Executive, or TAR signature is required. |
| Budget Narrative | The budget narrative should include a detailed justification for all cost categories requested in the SF-424A. |
| Lobbying Forms | SF-LLL and the Grants.gov Lobbying Certification Form must be on file with FEMA. The STT government must acknowledge that the forms are in compliance with the FEMA-State/Territory/Tribe Agreement and the most current *Department of Homeland Security (DHS) Standard Terms and Conditions*. |

### 3. Instructions for Submission of the ISP Application Package

Prior to the 14-day application deadline, the STT government must submit the completed ISP application packet to the applicable Federal Coordinating Officer. In order to expedite the review process, it is helpful if the STT government submits an electronic copy of the application to the applicable FEMA Joint Field Office (JFO), FEMA Headquarters (HQ), and SAMHSA staff. Once received, the FEMA Human Services Group Supervisor at the FEMA JFO, FEMA Community Services Specialist at FEMA HQ, and the SAMHSA Project Officer will review the application to ensure all required documentation meet the minimum eligibility requirements per 44 C.F.R. § 206.171 and the General Terms and Conditions outlined in 2 C.F.R. § 200.210.

### 4. Budget

The ISP budget narrative must justify the proposed budget for the STT government and subrecipients and each individual service provider's budget. The narrative must provide a justification of the costs and an itemization for each line of the budgets.

**Pre-Award Costs—Allowable:** Pre-award costs are those which are: a) incurred prior to the effective date of the Federal award, and b) directly pursuant to the negotiation and in anticipation of the Federal award where such costs are necessary for efficient and timely performance of the scope of work. Such costs are allowable under the ISP award only to the extent that they would have been allowable if incurred after the date of the Federal award and only with written approval of the Federal Coordinating Officer (FCO).[201]

The STT government may seek reimbursement for pre-award costs associated with crisis counseling services provided from the date of the disaster incident to the date of major disaster declaration. The STT government must document the crisis counseling services provided and justify the costs.

Documentation should include the following:

- Types of crisis counseling services provided

- Location of service provision

- Types of staff who provided the services

- Hourly rates of staff who provided the services

- Number of hours that staff worked

- Number of disaster survivors who received services and types of services provided

The STT government may seek reimbursement only for crisis counseling services and not for any other type of behavioral health response. Crisis counseling services are typically provided during the immediate disaster response phase to survivors and their families, first responders, and other individuals directly affected by the disaster. Typical locations of service provision in the immediate disaster response include shelters, family assistance centers, homes, or other community settings.

Services often are provided by behavioral health agency staff, local behavioral health service provider staff, or members of disaster behavioral health response groups. Reimbursement for staff costs is allowable if it can be clearly demonstrated that the normal duties of the staff (if employed by the STT government during the disaster) were back-filled during the disaster response.

**Indirect Costs—Unallowable:** FEMA does not authorize the use of funds for indirect costs. Indirect costs, including management costs, are defined as costs not directly chargeable to a specific project. Please note that even if an indirect cost rate is established, it is subject to statutory and administrative limitations. A CCP award recipient or provider is not entitled to an established rate for services provided under the CCP award. The program's statutes, regulations, and policy govern whether any indirect costs are eligible. Section 324 of the Stafford Act requires FEMA to establish management cost rates through regulations. At this time, FEMA does not have regulations that govern the eligibility of indirect costs for the CCP.

**Salaries and Wages:** Salary compensation must be reasonable in amount and in alignment with local prevailing rates for the position funded.

**Fringe Benefits:** Fringe benefits may be charged directly to the grant. Claimed costs must be reasonable and confirm to established policies for the STT government. Use of a pre-established provisional rate requires allocation to total salary costs. Rates must be adjusted to actuals at the year-end and rates and should be reviewed at least once annually.

**Consultant Costs:** Consultant costs must be supported by a consulting agreement that documents the service to be performed, cost, and applicable time periods. Documentation to support need, reasonable rates, and consultant expertise must be maintained, together with evidence of work product.

**Equipment:** The STT government obtains title to equipment acquired under the CCP award and is subject to the conditions outlined in 2 C.F.R. § 200.313, including these requirements:

- To use the equipment for the authorized purposes of the project until funding for the project ceases, or until the property is no longer needed for the purposes of the project.

- To not encumber the property without approval of FEMA.

- To use and dispose of the property in accordance with 2 C.F.R. § 200.313.

- To use the equipment in a manner consistent with the purposes of the CCP award and to benefit the beneficiaries of the CCP project.

**Supplies:** FEMA retains an interest in any unused supplies exceeding $5,000 in total aggregate value upon termination or completion of the CCP if they are not needed for any other Federal award. The STT government must compensate FEMA for its share of the supplies in compliance with 2 C.F.R. § 200.313 and § 200.314. As long as FEMA retains an interest in supplies, the STT government must not use the supplies to provide services to other organizations for a fee that is less than private companies charge for equivalent services.

**Travel:** Travel must be included in the budget for preapproval as part of the application process. During implementation, travel costs must be supported by travel expense reports detailing employee name, the reason for the trip, and itemized expenses claimed. Claimed costs should be charged according to the award recipient's travel policy, which requires prior approval from FEMA and SAMHSA, compliance with OMB cost principles, and provides expenditure limitations. Major items of expense (e.g., airfare, lodging) must be supported by receipts.

**Other:** The budget may identify costs that are unique to the disaster and area impacted but do not fall into one of the prescribed cost categories listed above. Costs must be supported by adequate documentation (invoices, receipts, etc.). Consult with the FEMA specialists or the SAMHSA Program Officer to determine which costs are allowable under this cost category.

**Contractual Costs:** The non-Federal entity must follow the applicable Federal procurement requirements at 2 C.F.R. § 200.317 through § 200.326. Per 2 C.F.R. § 200.317, states must follow the same policies and procedures they normally use as well as comply with the requirements for procurement of recovered materials (§ 200.322) and including required contract provisions (§ 200.326). For all other non-Federal entities, including tribes, they must follow all of the requirements at 2 C.F.R. § 200.318 through §200.326. As part of these requirements, non-state entities must use their own documented procurement procedures that reflect applicable state, local, and tribal laws and regulations provided that the procurements comply with Federal law and the Federal procurement regulations. As a note, hiring of consultants falls under the procurement requirements, so non-Federal entities must follow applicable procurement regulations at 2 C.F.R. § 200.317 – 200.326.

For more information on allowable and unallowable costs, refer to the Appendix F.

## C. Approval Process for ISP

The FCO may approve or deny the ISP in coordination with SAMHSA. The program may be approved for a period of performance of 60 days from the date IA was authorized in the major disaster declaration if:

- A complete application is received no later than 14 days from the date of declaration; and

- There is a need for the program clearly articulated in the application.

If approved, the FCO will submit a written approval with justification to the STT government agency receiving the award.

The program may be denied if:

- A complete application is not received within 14 days from the date IA was authorized in the major disaster declaration; or

- The application lacks sufficient information to justify the need for the program.

If denied, the FCO must submit a written denial with justification to the STT government agency that applied for the award and the Governor, GAR, Tribal Chief Executive, or TAR.

### 1. Federal and Congressional Review Process for ISP

Once submitted, the non-Federal entity's CCP application will go through a review by FEMA HQ, FEMA JFO, and FEMA Region staff for completeness, cost-effectiveness, and feasibility of the non-Federal entity's CCP application. The FEMA FCO will issue a determination.

All Federal awards greater than $1,000,000 must be routed to the Congressional Appropriations Committee for advanced notification review. This process may add multiple weeks to the timeline before obligating the Federal award. Once the notification process is complete, the FEMA FCO is notified that the funds can be released and the FCO may issue the notice of award to the recipient after the mandatory 72 hour waiting period.

## D. Notice of Award (NOA) for ISP

When the non-Federal entity has been approved for a Federal CCP award, they will receive a Notice of Award (NOA). The NOA is the official document notifying the recipient and others that a Federal award has been made. The recipient will receive an NOA from the applicable FEMA RA. The NOA contains all terms and conditions of the Federal award and supporting documentation for recording the obligation of Federal fund in the recipients accounting system. Important information included in the NOA:

- The start and end dates for the program's period of performance

- The award amount

- Name of the FEMA and SAMHSA program officers

- Reporting requirements

### 1. Conditions of Award

Conditions of Award, or Terms and Conditions and/or Special Conditions, are requirements that the recipient must satisfy within the timeframe specified in the NOA. Failure to comply with all terms and conditions of a Federal award may result in funding restrictions, award termination, and/or denial of any future funding.

## E. Post-Award Requirements

This section covers the post-award requirements of the Immediate Services Program, including training requirements, reporting requirements, and extensions.

### 1. Training

Training materials and recommendations for qualified trainers are provided by SAMHSA and through SAMHSA Disaster Technical Assistance Center (DTAC). Often, personnel from other assistance and disaster relief agencies are invited to attend.

The required standard CCP trainings are organized into modules that are provided to recipients by SAMHSA DTAC once a CCP is approved. Required trainings include:

- **Core Content Training:** This is the basic CCP skills-building training and includes administrative procedures and data collection information specific to the program. The course takes place in two days, during which time crisis counselors are provided with critical information and skills related to individual, group, and community outreach strategies. This training is conducted during the first few weeks of the ISP. However, ongoing training must be provided to ensure all new crisis counselors receive the Core Content Training prior to working independently within the program.

## 2. Reporting Requirements for the ISP

The recipient must submit to the appropriate FEMA FCO:[202]

- A mid-program report only when an RSP award application is being prepared and submitted. This report will be included as part of the RSP Federal award application;

- A final program report; and

- A financial status report.

This documentation is due no more than 90 days after the last day of immediate services funding.

## 3. Extensions

### ISP Extension of the Period of Performance

ISP funding may continue for up to 60 additional days if an RSP award application is submitted to allow time for FEMA and SAMHSA to review the application. Notification must be provided, in writing, to FEMA and SAMHSA no later than 45 days from the date of declaration if the STT government plans to submit an RSP application to receive a continuation and ensure there are no gaps in services. If extenuating circumstances exist, the FEMA RA may authorize an additional 30 days and/or supplemental funding, if needed, while the RSP application remains under review with FEMA.

During the ISP period of performance, the STT government must notify FEMA program officer and SAMHSA program officer, no later than 45 days from the date of declaration, if they are planning to submit an application for the RSP award.[203]

### ISP No-Cost Administrative Extension

All costs associated with finalizing the program and financial reports are allowable costs, as long as those costs are included in the approved ISP budget. In order for these costs to be covered, the STT government must request for a no-cost administrative extension to the ISP award period of performance. The STT government must submit the written extension request to their FEMA Regional office prior to the end of the period of performance. A no-cost administrative extension can be granted for up to 30 days when requested in writing and approved by the FCO. In exceptional circumstances, an additional 30-day no-cost administrative extension may be approved by FEMA if the submitted written request demonstrates sufficient need.

Any programmatic or service activities (not related to the ISP final report) conducted after the period of performance will not be funded under the CCP award. Any extension granted for the ISP once the RSP is awarded is only for work associated with finalizing the program and financial reports of providers to the recipient.

## F. Closeout and Records Retention

### 1. ISP Closeout

The final ISP program narrative and fiscal report (*Federal Financial Report SF-425*) are due to the FCO, no later than 90 calendar days after the last day of the ISP award's period of performance. The STT government must liquidate all obligated balances, and show the exact balance of funds and total expenditures, which must be consistent with the line-item report. The final SF-425 must show the total Federal award amount, total Federal expenditures, and the unobligated balance. The reported total Federal expenditures reflected on the SF-425 report must be consistent with the line-item expenditures reflected in the program report.

### 2. ISP Record Retention

Financial records, supporting documents, statistical records, and all other non-Federal entity records pertinent to a Federal award generally must be retained for at least three years from the date the final financial report is submitted.[204] Further, if the recipient does not submit a final financial report and the award is administratively closed, FEMA sees the date of administrative closeout as the start of the general record retention period.

The record retention period may be longer than three years or have a different start date in certain cases. These include:

- Records for real property and equipment acquired with Federal funds must be retained for three years after final disposition of the property.[205]

- If any litigation, claim, or audit is started before the expiration of the three-year period, the records must be retained until all litigation, claims, or audit findings involving the records have been resolved and final action taken.[206]

- The record retention period will be extended if the recipient is notified in writing of the extension by DHS/FEMA, the cognizant or oversight agency for audit, or the cognizant or oversight agency for audit, or the cognizant agency for indirect costs.[207]

- Where DHS/FEMA requires recipients to report program income after the period of performance ends, the program income record retention period begins at the end of the recipient's fiscal year in which program income is earned.[208]

- For indirect cost rate proposals, cost allocation plans, or other rate computations records, the start of the record retention period depends on whether the indirect cost rate documents were submitted for negotiation.

  - If the indirect cost rate documents were submitted for negotiation, the record retention period begins from the date those documents were submitted for negotiation.

  - If indirect cost rate documents were not submitted for negotiation, the record retention period begins at the end of the recipient's fiscal year or other accounting period covered by that indirect cost rate.[209]

The non-Federal entity is responsible for returning any funds that are drawn down but remain unliquidated on non-Federal entity financial records.

# III. Regular Services Program

## A. Period of Assistance for RSP

The RSP provides funds for up to nine months of services immediately following the date of the Notice of Award. If needed, STT government may request up to a 90-day extension to the period of performance in writing to the appropriate FEMA Regional Administrator (RA). This request must document the extraordinary circumstances and what the additional time will allow them to accomplish. In limited circumstances, such as disasters of catastrophic nature, the FEMA RA may extend the period of performance for more than 90 days when they deem it to be in the public interest.[210]

## B. Pre-Award Assessment and Application

This section covers the pre-award requirements and process of applying for a Regular Services Program.

### 1. Needs Assessment

The purpose of the needs assessment is to provide an estimate of the size and cost of the program needed and to determine if supplemental Federal assistance is required. The factors of the needs assessment must include:

- An estimate of the number of disaster survivors requiring assistance;

- A description of the SLTT government resources and capabilities; and

- Justification of why the SLTT government cannot meet the needs.



**Tailoring the Program to the Population**

When assessing the needs of the affected population, it is important to consider the proportion and effect on the whole community, including older adults, people with disabilities and others with access and functional needs, children, and those with limited English proficiency. The program may be tailored to meet the needs of the specific community. For instance, if a high proportion of children were impacted, adding a children's coordinator in your staffing plan may be beneficial.

## 2. Applying for the Federal RSP Award

The cover letter for the RSP application should be addressed to the applicable FEMA RA. As per the 2018 Delegation of Authority, the FEMA RAs have the authority to approve or disapprove an application for the RSP. Note that the Disaster Recovery Manager authority does not carry the delegation of the RSP determination.

After the President declares a major disaster that includes IA, the applicable STT government may apply for the RSP. The RSP application package must be submitted to FEMA and SAMHSA no later than 60 days following the date IA was approved on the disaster. This application deadline is set by regulation and cannot be waived or extended.

An RSP application package represents the Governor or Tribal Chief Executive's agreement and/or certification:

- That the requirements are beyond the SLTT government's capabilities;

- That the program, if approved, will be implemented according to the plan contained in the application approved by the applicable FEMA RA;

- To maintain close coordination with and provide reports to the applicable FEMA RA, FEMA HQ, and FEMA JFO staff, and SAMHSA Project Officer and Grants Officer; and

- To include mental health disaster planning in the STT government's emergency plan prepared under Title II of the Stafford Act.

The application must contain the information and documentation found in *Figure 42* to be considered for an RSP award (see CCP Toolkit):

| Figure 42: RSP Application Required Information and Documents | |
|---|---|
| Information | • The geographical areas within the designated disaster area for which services will be provided;<br>• An estimate of the number of disaster survivors requiring assistance;<br>• A description of the SLTT government resources and capabilities, and an explanation of why these resources cannot meet the need;<br>• A description of activities from the date of the disaster incident to the date of application;<br>• A plan of services to be provided to meet the identified needs; and<br>• A detailed budget, showing the cost of proposed services separately from the cost of reimbursement for any eligible services provided prior to the application. |
| RSP Application | The OMB approved RSP Application (1660-0085) must be completed and signed by the Governor or Tribal Chief Executive, or their Authorized Representatives. |
| Request for Federal Assistance (SF-424) | A Federal form OMB requires for Federal award applications. All entities that apply for CCP funds must submit a completed SF-424 signed by the authorized representative of the non-Federal entity receiving funds. |
| Budget Information for Non-Construction Programs (SF-424A) | A Federal form OMB requires for Federal award applications. Complete "Section B-Budget Categories," Column 1 only for the total CCP budget. |
| Assurances for Non-Construction Programs (SF-424B) | A signature from the authorized representative of the non-Federal entity receiving the funds is required. |
| Budget Narrative | The budget narrative must include a detailed justification for all cost categories requested in the SF-424A. Refer to Appendix F for additional instructions on completing the budget narrative. |
| Health and Human Services (HHS) Checklist | A required form for an RSP that ensures pertinent documents, information, certifications, and assurances are included in the application, to include acknowledgement by the STT government that the forms are in compliance with the most current DHS Standard Terms and Conditions. |
| Disclosure of Lobbying Activities (SF-LLL) | A required form for the CCP RSP. The STT government may indicate "N/A" on the form if it is not applicable. |
| Project/Performance Site Locations | A Federal form required for the CCP RSP. The STT government should complete a form for each site where providers will perform project work. |

### 3. Instructions for Submission of the RSP Application Package

Prior to the 60-day application deadline, the STT government must submit the completed RSP application package to the applicable FEMA RA. In order to expedite the review process, it is helpful if the STT government submits an electronic copy of the application to the applicable FEMA JFO Human Services Group Supervisor, FEMA HQ Community Services Program Specialist, and SAMHSA Project Officer. Once received, the FEMA Human Services Group Supervisor at the FEMA JFO, FEMA Community Services Specialist at FEMA HQ, and the SAMHSA Project Officer and Grants Officer will review the application to ensure all required documentation meets the minimum eligibility requirements per 44 C.F.R. § 206.171 and the General Terms and Conditions outlined in 2 C.F.R. § 200.210.

### 4. Budget

The RSP budget narrative must justify the proposed budget for the STT government and subrecipients and each individual service provider's budget. The narrative must provide a justification of the costs and an itemization for each line of the budgets.

**Indirect Costs—Unallowable:** FEMA does not authorize the use of funds for indirect costs. Indirect costs, including management costs, are defined as costs not directly chargeable to a specific project. Please note that even if an indirect cost rate is established, it is subject to statutory and administrative limitations. A CCP award recipient or provider is not entitled to an established rate for services provided under the CCP award. The program's statutes, regulations, and policy govern whether any indirect costs are eligible. Section 324 of the Stafford Act requires FEMA to establish management cost rates through regulations. At this time, FEMA does not have regulations that govern the eligibility of indirect costs for the CCP.

**Salaries and Wages:** Salary compensation must be reasonable in amount and in alignment with local prevailing rates for the position funded.

**Fringe Benefits:** Fringe benefits may be charged directly to the grant. Claimed costs must be reasonable and confirm to established policies for the STT government. Use of a pre-established provisional rate requires allocation to total salary costs. Rates must be adjusted to actuals at the year-end and rates and should be reviewed at least once annually.

**Consultant Costs:** Consultant costs must be supported by a consulting agreement that documents the service to be performed, cost, and applicable time periods. Documentation to support need, reasonable rates, and consultant expertise must be maintained, together with evidence of work product.

**Equipment:** The STT government obtains title to equipment acquired under the CCP award and is subject to the conditions outlined in 2 C.F.R. § 200.313, including these requirements:

- To use the equipment for the authorized purposes of the project until funding for the project ceases, or until the property is no longer needed for the purposes of the project.

- To not encumber the property without approval of FEMA.

- To use and dispose of the property in accordance with 2 C.F.R. § 200.313.

- To use the equipment in a manner consistent with the purposes of the CCP award and to benefit the beneficiaries of the CCP project.

**Supplies:** FEMA retains an interest in any unused supplies exceeding $5,000 in total aggregate value upon termination or completion of the CCP if they are not needed for any other Federal award. The STT government must compensate FEMA for its share of the supplies in compliance with 2 C.F.R. § 200.313 and § 200.314.

As long as FEMA retains an interest in supplies, the STT government must not use the supplies to provide services to other organizations for a fee that is less than private companies charge for equivalent services.

**Travel:** Travel must be included in the budget for preapproval as part of the application process. During implementation, travel costs must be supported by travel expense reports detailing employee name, the reason for the trip, and itemized expenses claimed. Claimed costs should be charged according to the award recipient's travel policy, which requires prior approval from FEMA and SAMHSA, compliance with OMB cost principles, and provides expenditure limitations. Major items of expense (e.g., airfare, lodging) must be supported by receipts.

**Other:** The budget may identify costs that are unique to the disaster and area impacted but do not fall into one of the prescribed cost categories listed above. Costs must be supported by adequate documentation (invoices, receipts, etc.). Consult with the FEMA Specialists or SAMHSA Program Officer to determine which costs are allowable under this cost category.

**Contractual Costs:** The STT government will follow its established policies and procedures used for procurements from non-Federal funds when procuring property and services under a Federal award. All other states, territories or tribes will follow the requirements in 2 C.F.R. § 200.318, General Procurement Standards, through § 200.326, Contract Provisions. All states, territories or tribes should review the procurement standards outlined in 2 C.F.R. § 200.317 through § 200.326.

For more information on allowable and unallowable costs, refer to Appendix F.

## C. Approval Process for RSP

The RA may approve or deny the RSP in coordination with SAMHSA. The program may be approved for a period of performance of nine months from the date of award if:

- A complete application is received no later than 60 days from the date of declaration; and

- There is a need for the program clearly articulated in the application.

If approved, the RA must submit a written approval with justification to the Chief of the Emergency Mental Health and Traumatic Stress Services Branch at SAMHSA for processing and award of the grant to the STT government agency receiving the award.

The program may be denied if:

- A complete application is not received by 60 days from the date of declaration; or

- The application lacks sufficient information to justify the need for the program.

If denied, the RA must submit a written denial with justification to the applicant agency and GAR/TAR.

Under the 2018 Delegation of Authority, the FEMA RAs have authority to approve or deny an application for the RSP. This authority is not delegated with the DRM authority.

### 1. Federal and Congressional Review Process for RSP

> **CCP Toolkit**
>
> SAMHSA and the SAMHSA Disaster Technical Assistance Center (DTAC), in collaboration with FEMA, have established and maintain an online CCP Toolkit containing required documents and tools to assist stakeholders in preparing, applying, implementing, managing, and closing out a CCP.
>
> If you would like to speak with a SAMHSA Project Officer, please email SAMHSA DTAC at DTAC@samhsa.hhs.gov or call 800-308-3515 (Monday-Friday 9 A.M. to 5 P.M. Eastern time) and a staff member will forward your request to the appropriate project officer.

Once the RSP application is submitted, the non-Federal entity's RSP application will go through a review by SAMHSA, FEMA HQ, FEMA JFO, and FEMA Region staff for completeness, cost-effectiveness, and feasibility of the non-Federal entity's RSP application. The FEMA RA will issue a determination.

All Federal awards greater than $1,000,000 must be routed to the Congressional Appropriations Committee for advanced notification review. This process may add multiple weeks to the timeline before obligating the Federal award. Once the notification process is complete, the FEMA RA is notified that funds can be released and the RA may notify SAMHSA, in writing, that they may issue the notice of award to the recipient after a minimum of 72 hours.

## D. Notice of Award (NOA) for RSP

When the non-Federal entity has been approved for a Federal CCP award, they will receive a Notice of Award (NOA). The NOA is the official Federal award document notifying the award recipient and others that an award has been made. The recipient will receive an NOA from SAMHSA. The NOA contains all terms and conditions of the Federal award and supporting documentation for recording the obligation of Federal fund in the recipients accounting system. Important information included in the NOA:

- The start and end dates for the program's period of performance

- The award amount

- Name of the FEMA and SAMHSA Program Officers

- Name of the SAMHSA Grants Management Officer

- Reporting requirements

### *1. Conditions of Award*

Conditions of Award, or Terms and Conditions and/or Special Conditions, are requirements that the recipient must satisfy within the timeframe specified in the NOA. Failure to comply with all terms and conditions of a Federal award may result in funding restrictions, award termination, and/or denial of any future funding.

## E. Post-Award Requirements

This section covers the post-award requirements for a Regular Services Program, including training, reporting requirements, and extensions.

### *1. Training*

Training materials and recommendations for qualified trainers are provided by SAMHSA and through SAMHSA DTAC. Often, personnel from other assistance and disaster relief agencies are invited to attend

The required standard CCP trainings are organized into modules that are provided to recipients by SAMHSA DTAC once a CCP is approved. Required trainings include:

- **Core Content Training:** This is the basic CCP skills-building training and includes administrative procedures and data collection information specific to the program. The course takes place over two days, during which time crisis counselors are provided with critical information and skills related to individual, group, and community outreach strategies. This training is conducted during the first few weeks of the ISP; however, if no ISP is implemented, the training will need to be conducted during the RSP. However, ongoing training must be provided to ensure all new crisis counselors receive the Core Content Training prior to working independently within the program.

- **Transition to RSP Training:** During this course, existing and newly hired CCP staff review key concepts related to crisis counseling skills, with an emphasis on longer-term service provision. This curriculum highlights how the needs of disaster survivors and communities evolve in the RSP and differ from those encountered in the immediate disaster response. If the STT government applied for the RSP only, it should begin with the Core Content Training. This training usually takes place as soon as formal RSP grant funding is awarded.

- **RSP Mid-Program Training:** This training typically is held 3-6 months into the RSP. Issues of staff morale and stress management for subrecipients are addressed. A focus is maintained on how crisis counselors will continue to provide services under difficult circumstances. This training includes problem-solving techniques for specific issues commonly encountered in the CCP such as emerging substance use or significant mental health needs. It also begins to address the subject of program phasedown.

- **Disaster Anniversary Training:** This training is held several weeks before the first anniversary of the disaster event. Crisis counselors are taught expected anniversary reactions and intervention strategies. This training can be paired with the Mid-program Training or the Phasedown Training, depending on the anniversary date.

- **RSP Phasedown Training:** This training should take place six–eight weeks prior to the scheduled phasedown of the CCP. All CCP administrative and outreach staff attend. Topics in this training include staff stress management and future planning, assisting the program and its staff to document the event, planning to leave a legacy for the community, resource linkage and referrals, and continuity of service via community partnerships.

The CCP training plan is not limited to providing required trainings. The STT government should identify and deliver additional trainings based on specific disaster and staff needs. Additional recommended training areas include more in-depth learning about specific crisis counseling interventions, as well as cultural competence, working with children, and mental health or substance use assessment and referral.

To promote community partnerships, the CCP leadership is encouraged to share training opportunities with other disaster and community providers. In quarterly reports, programs should document training sessions held, describe the content of the sessions, and note the number of people who attended. As highlighted in the training section of this document, required training takes place throughout the program period and should be planned in a proactive manner.

Optional training may take place, as deemed appropriate by the STT government.

### 2. Reporting Requirements for the RSP

For the RSP, quarterly reports, including documentation on financial expenditures, must be submitted to the FEMA Headquarters Program Specialist; the FEMA JFO Specialist (or Regional Specialist if the FEMA JFO is demobilized); and the SAMHSA Project Officer. Quarterly reports are due 30 calendar days after the end of each three-month reporting period (refer to the NOA for specific due dates). The quarterly report must include a budget expenditure report for the STT government and any subrecipients, showing:

- The approved budget;

- Costs incurred and obligated expenditures;

- Approved budget modifications; and

- Remaining balance of unspent funds.

The report should be consistent with the cost categories and budget line items listed in the approved budget. If only a portion of award funding is disbursed at the start of the RSP, the STT government must submit a letter of request for the second allotment of funds with the first quarterly RSP report.

### 3. Extensions

**RSP Extension of the Period of Performance**

The RSP provides funds for up to nine months of services immediately following the date of the NOA. If needed, the STT government may request supplemental funding and/or up to a 90-day extension to the period of performance in writing to the appropriate FEMA RA; this request must document the extraordinary circumstances and what the additional funding and/or time will allow them to accomplish. In limited circumstances, such as disasters of catastrophic nature, the FEMA RA may extend the period of performance for more than 90 days where they deem it to be in the public interest.[211]

**RSP No-Cost Administrative Extension**

All costs associated with finalizing the program and financial reports are allowable costs, as long as those costs are included in the approved RSP budget. In order for these costs to be covered, the STT government must request for a 90-day no-cost administrative extension to the RSP award period of performance. The STT government must submit the written extension request to SAMHSA and FEMA no later than one month prior to the end of the period of performance. Any programmatic or service activities (not related to the RSP closeout) conducted after the period of performance will not be funded under the CCP award.

When an STT government provides a subaward to a subrecipient, the STT government must include the start and end dates of the period of performance in the subaward document.

## F. Closeout and Records Retention

### 1. RSP Closeout

The final RSP program report and the Federal Financial Report SF-425 form (OMB form number 0348-0061) are due to FEMA and SAMHSA 90 calendar days after the end of the period of performance. Note that the reported total Federal expenditures reflected on the SF-425 report must be consistent with the line-item expenditures reflected in the program report.

### 2. RSP Record Retention

Financial records, supporting documents, statistical records, and all other non-Federal entity records pertinent to a Federal award generally must be retained for at least three years from the date the final financial report is submitted.[212] Further, if the recipient does not submit a final financial report and the award is administratively closed, FEMA sees the date of administrative closeout as the start of the general record retention period.

The record retention period may be longer than three years or have a different start date in certain cases. These include:

- Records for real property and equipment acquired with Federal funds must be retained for three years after final disposition of the property.[213]

- If any litigation, claim, or audit is started before the expiration of the three-year period, the records must be retained until all litigation, claims, or audit findings involving the records have been resolved and final action taken.[214]

- The record retention period will be extended if the recipient is notified in writing of the extension by DHS/FEMA, the cognizant or oversight agency for audit, or the cognizant or oversight agency for audit, or the cognizant agency for indirect costs.[215]

- Where DHS/FEMA requires recipients to report program income after the period of performance ends, the program income record retention period begins at the end of the recipient's fiscal year in which program income is earned.[216]

- For indirect cost rate proposals, cost allocation plans, or other rate computations records, the start of the record retention period depends on whether the indirect cost rate documents were submitted for negotiation.

- o If the indirect cost rate documents were submitted for negotiation, the record retention period begins from the date those documents were submitted for negotiation.

- o If indirect cost rate documents were not submitted for negotiation, the record retention period begins at the end of the recipient's fiscal year or other accounting period covered by that indirect cost rate.[217]

The non-Federal entity is responsible for returning any funds that are drawn down but remain unliquidated on non-Federal entity financial records.

# IV. Considerations for Implementation of ISP and RSP

This section provides information regarding staffing a CCP, collecting data, modifying budget and program plans, and appealing various decisions regarding both an ISP and an RSP.

## A. Main Components of a Program Management Plan

The recipient is responsible for developing a program management plan. The components of the program management plan may vary given the needs of the non-Federal entity and the scope of the disaster. Typical components include the following:

- Performing ongoing needs assessment

- Developing and effecting outreach strategies to identify and serve affected individuals, groups, and the community, including distinct outreach strategies for different populations, as well as accessibility to all survivors.

- Ensuring supervision and quality assurance at the STT government and subrecipient levels

- Identifying and tracking resource referrals.

- Employing program media and marketing strategies

- Recruiting and hiring staff

- Providing training

- Providing staff stress management

- Ensuring effective fiscal management

- Accomplishing program evaluation

## B. Media and Marketing the CCP

It is important for the recipient to select a name in order to develop a cohesive identity among the sub-recipients. All CCP staff need to share a group identity. This is achieved through training and use of media and marketing strategies that define program services and inform the community about the CCP. Strategies to build a program identity and to market services include the following:

- **Developing a brand for the program**: Establishing a clearly recognizable program name and logo or design elements that appear on all program materials. Staff members are provided with items, such as t-shirts, with the specific program name and logo.

- **Using media outlets**: Recipients may develop public service announcements, interviews, articles, advertisements, letters to the editor, or educational material.

- **Establishing toll-free numbers or hotlines**: A toll-free line may be established purely for informational purposes, or a hotline that provides counseling via phone may be incorporated into the CCP program.

- **Establishing program websites**: Recipients may establish a program website that explains the CCP services and links to other disaster-related resources whenever possible.

- **Developing and revising outreach and psycho-educational materials**: Recipients may develop materials that are tailored to address the unique characteristics of a specific disaster or CCP.

- **Promoting word-of-mouth promulgation**: Outreach workers may encourage people to spread the word about CCP.

## C. Staffing of the CCP

The needs assessment will inform required CCP staff roles and the number of individuals needed for each position to be included in the staffing plan. The non-Federal entity determines how staff members are deployed to meet the needs of disaster survivors and at-risk groups. For safety and efficacy, crisis counselors typically are deployed in teams. Team deployment is linked with the CCP outreach strategy in order to target services to those individuals and groups identified to be in the greatest need. In its essential staffing, the CCP should reflect the cultural demographics of the affected area and use paraprofessionals with prior training and experience in the mental health and substance use fields. For additional information on training, refer to the CCP Toolkit.

### 1. Staff Stress Management

Many staff members of a CCP are also survivors of the disaster. Interacting with disaster survivors is rewarding but may also produce strong levels of anxiety, frustration, anger, or depression in some workers. Sustained service provision can become debilitating when coupled with a staff member's personal experience of loss. It is, therefore, critical that ongoing staff stress management is integrated into the CCP at all levels of the program. All standard CCP trainings provided by SAMHSA include content on individual staff stress management. The program management plan developed by the recipient must include provisions for organizational stress management. Elements of an organizational stress management plan are as follows:

- A clearly defined management and supervision structure

- Defined purpose and goals

- Functionally defined roles reinforced through effective supervision

- Sound clinical consultation, support, and supervision

- Supportive peer relationships

- Active stress management program

- Comprehensive training plan

## D. Data Collection, Evaluation, and Reporting

Consistent and timely data collection and evaluation are necessary to measure success of outreach efforts and the changing needs of disaster survivors. The recipient's program management plan should include mechanisms to collect, examine, and react to immediate and changing needs encountered by crisis counselors. Frequent analysis of both CCP data and feedback provided by staff allows the program to evolve to meet needs as they arise. The process improves the program's behavioral health disaster response, documents the program's accomplishments, and provides accountability information to stakeholders. SAMHSA and FEMA also use data to justify program efforts, as well as to make modifications to the CCP model and program service delivery. The recipient is required to submit a summary of up-to-date program data with their programmatic quarterly and final reports.

Procedures for data collection and evaluation include the following:

- Establishment of quality control and assurance processes is necessary for data collection and analysis. Typical quality control procedures include management review of forms for completeness prior to approval; staff review for consistency and accuracy, and giving feedback to the subrecipient-level supervisors; and staff developing ways to resolve errors in collected data forms.

- All CCP administrators and managers should carefully review evaluation and reporting requirements.

- The CCP award conditions require collecting information on specific forms in specific formats. This should not limit the STT government and subrecipients in collecting additional information that will assist in both program improvement and process. The specific required forms are detailed in the NOA.

- The Federal CCP award conditions require database development and data delivery to SAMHSA upon submission of each quarterly report and with the final report.

- Data on service delivery must be collected using the Individual/Family Crisis Counseling Services Encounter Log, Group Encounter Log, Weekly Tally Sheet, and the Child/Youth and Adult Assessment and Referral Tools, each a part of the standard FEMA CCP Toolkit as approved by the OMB (OMB No. 0930–0270). The Participant Feedback Survey and Service Provider Feedback Survey are also included in the CCP Toolkit.

## E. Quality Assurance

The CCP is a time-limited program that must identify and address emergent issues related to both disaster survivor needs and operational realities, while developing and implementing solutions to improve program services. Quality assurance and quality improvement activities are developed even before the program begins and assist the STT government in reporting program highlights and issues to SAMHSA and FEMA through regular program monitoring and reporting. Activities related to quality assurance include the following:

- Regular onsite supervision, training, and consistent communication between CCP management and workers providing services

- Weekly meetings and regular submission of data collection forms to the SAMHSA Program Officer and FEMA Specialist

- Phone and email communication whenever workers have questions or concerns

- Collecting and organizing programmatic materials and data to continue to improve service provision and educational materials

- Identifying problems or gaps in service through data and informant feedback

- Redirecting resources and modifying the service plan

- Conducting ongoing needs assessment

- Providing information to workers to improve services

## F. General Provisions

### 1. Conflicts of Interest in the Administration of Federal Awards or Subaward

Recipients and pass-through entities must disclose, in writing, any real or potential conflicts of interest that may arise during the administration of the Federal award, as defined by the Federal or SLTT statues or regulations or their own existing policies, to the FEMA Specialist and SAMHSA Program Officer within 15 days of learning of the conflict of interest. Additionally, to eliminate and reduce the impact of conflicts of interest int eh subaward process, recipients and pass-through entities must follow their own policies and procedures regarding the elimination or reduction of conflicts of interest when making subawards. Recipients and pass-through entities are also required to follow any applicable Federal and SLTT statutes or regulations governing conflicts of interest in the making of subawards.

Similarly, sub-recipients, whether acting as subrecipients or pass-through entities, must also disclose any real or potential conflict of interest to the pass-through entity as required by the pass-through entity's conflict of interest policies, or any applicable Federal or STT government statutes or regulations.

Conflicts of interest may arise during the process of FEMA and SAMHSA making a Federal award in situations where an employee, officer, or agent, any members of their immediate family, or their partner has a close personal relationship, a business relationship, or a professional relationship with an STT government provider entity, recipient, subrecipient, or FEMA employee.

### 2. Mandatory Disclosures

All violations of Federal criminal law involving fraud, bribery, or gratuity violations potentially affecting the Federal award must be submitted in writing to the FEMA Specialist and SAMHSA Program Officer at the time of the application, or if the violation occurs after the time of application, no later than 15 days after confirmation that such a violation occurred.[218]

## G. Modifications to Budget and Program Plans

The STT government is required to report deviations from the approved budget or project scope and request prior approval from the SAMHSA Project Officer and FEMA Specialist for budget and program plan revisions, in accordance with 2 C.F.R. § 200.308. The STT government must request prior approval for the following:

- Change in scope or the objective of the project or program.

- Change in key personnel specified in the application or Federal award.

- The disengagement from the project for more than three months, or 25% reduction in time devoted to the project, by the approved project director or principal investigator.

- Unless described in the application and funded in the approved Federal award, the sub-awarding, transferring, or contracting out of any work under a Federal award. This provision does not apply to the acquisition of supplies, material, equipment, or general support services.

- Incurrence of project costs 90 calendar days before the Federal awarding agency makes the Federal award. The Federal awarding agency is under no obligation to reimburse such costs if for any reason the STT government does not receive a Federal award or if the Federal award is less than anticipated and inadequate to cover such costs. (See also section on pre-award costs.)

The Federal awarding agency may, at its option, restrict the transfer of funds among direct cost categories or programs, functions, and activities for Federal awards in which the Federal share of the project exceeds the Simplified Acquisition Threshold and the cumulative amount of such transfers exceeds or is expected to exceed 10% of the total budget as last approved by the Federal awarding agency.

Changes to the program plan based on the evolving needs assessment may require that funding be moved from one line item to another or from one provider to another. The STT government has the authority to move funds, up to a cumulative 10% of the total budget, from one line item to another without requesting approval.

Any budget adjustments that move a cumulative 11–25% of funds must be submitted in writing and approved by the FEMA Specialist, in collaboration with the SAMHSA Project Officer. Any budget adjustments that exceed a cumulative 25% of the total budget must be submitted in writing and approved by FEMA and the SAMHSA Project Officer and Grants Management Officer.

Budget adjustments or modifications should be discussed with FEMA Specialist and SAMHSA Project Officer prior to submitting a request for additional funds. Use a Request for Budget Adjustment letter template available online at CCP Toolkit.

The FEMA RA, in coordination with the SAMHSA Project Officer, is responsible for providing technical assistance to the STT government regarding budget adjustments. The RA approves any budget adjustment requests for the ISP or those up to 25% for the RSP. If the requested budget adjustment for an RSP exceeds 25%, the responsibility for approval belongs to the SAMHSA Grants Management Officer.

## H. Appeals

### 1. Appealing a Denial Determination

A Federal award applicant may appeal FEMA's decision. This appeal must be submitted to the FEMA Individual Assistance Division Director (IADD), in writing, within 60 days of the date of the application decision.[219] The appeal must include additional information justifying a reversal of the previous decision. The FEMA IADD shall review the material submitted, and after consultation with SAMHSA, notify the applicant within 15 days, in writing, of their decision.

### 2. Appeals of Remedies for Noncompliance

The STT government may submit a written appeal letter (including supporting documentation), signed by the Governor, GAR, or Tribal Chief Executive, to the appropriate FEMA RA and SAMHSA within 15 days of the date of notification of the remedial action. The FEMA RA, after consultation with SAMHSA and FEMA HQ, will make an appeal determination within 15 days, in writing to the applicant.

### 3. Objections/Appeals of Decisions Regarding Allowable Costs

The STT government may submit a written appeal letter (including supporting documentation), signed by the Governor, GAR, or Tribal Chief Executive, to the FEMA RA and SAMHSA within 15 days of the date of notification of the disallowed cost. The FEMA RA, after consultation with SAMHSA and FEMA HQ, will make an appeal determination within 15 days, in writing to the applicant.

### 4. Objections/Appeals of Termination or Suspension

The STT government may submit a written appeal letter (including supporting documentation), signed by the Governor, GAR, or Tribal Chief Executive, to the FEMA RA and SAMHSA within 15 days of the date of notification of the suspension or termination action. The FEMA RA, after consultation with SAMHSA and FEMA HQ, will make an appeal determination within 15 days, in writing to the applicant.

## I. Procurement Requirements under a Federal Award

Federal award recipients shall ensure that the process of soliciting CCP services is fair and transparent. Recipients must follow the same policies and procedures when procuring property and services under a Federal award that they follow for procurement from non-Federal funds. Recipients must ensure that any contract provisions as required by 2 C.F.R. § 200.326 *Contract provisions* are included on all purchase orders or contracts that draw from Federal funds. All other recipients, including subrecipients of an STT government will follow the *General procurement standards* as required by 2 C.F.R. § 200.318 through § 200.326.

# Chapter 6: Disaster Legal Services

## I. Overview

When the President declares a major disaster that is approved for Individual Assistance (IA), FEMA, through an agreement with the Young Lawyers Division (YLD) of the American Bar Association, provides free legal help for survivors of that disaster through a request from the state, local, territorial, or tribal (SLTT) government. Disaster Legal Services (DLS) provides confidential legal assistance to low-income individuals who are unable to secure legal services to meet their unmet disaster-caused needs without a cost-share.

### A. Period of Assistance

DLS can be authorized immediately following the IA declaration and continue until FEMA, in coordination with the legal representatives and the state, territorial, or tribal (STT) government determine that the hotline and services are no longer needed.

> **Fee-Generating Case**
>
> For the purposes of this section, a fee-generating case is one which would not ordinarily be rejected by local lawyers as a result of its lack of potential remunerative value.

### B. Types of Assistance

DLS is limited to cases that will not generate a fee for the survivor. Typically, local lawyers provide the following types of disaster legal services:

- Help with insurance claims for doctors and hospital bills, loss of property, loss of life, etc.;

- Drawing up new wills and other legal papers lost in the disaster;

- Estate administration, including guardianships and conservatorships;

- Consumer protection matters, remedies, and procedures;

- Help with home repair contracts and contractors;

- Counseling and advice about landlords/tenants;

- Preparing power of attorney and guardianship materials; and

- FEMA appeals and other disaster-related actions against the government.



*A Legal Aid representative helps a resident at a Disaster Recovery Center (DRC).*

DLS must be accessible to people regardless of race, color, national origin, sex, age, disability, English proficiency, or economic status. In particular, providers of DLS must plan to meet the needs of people with limited English proficiency and people with disabilities, such as people who are deaf or hard of hearing who may use sign language or captioning.

DLS cases that may generate a fee (such as lawsuits) are not covered by this service and may be referred to private lawyers through existing lawyer referral services in the affected area. It is important to note that DLS provides legal advice and not cash assistance.

## C. Authorities

The FEMA DLS program is authorized under Section 415[220] of the Stafford Act and implementing regulations found in 44 C.F.R. § 206.164.

## D. Partner Organizations

FEMA partners with the YLD of the American Bar Association to provide DLS through a memorandum of agreement. YLD coordinates with participating attorneys, law firms, nonprofit legal services providers, Legal Services Corporation recipients, state and local bar associations, and pro bono organizations to provide legal assistance under the DLS Program. The disaster operation will pay for representatives from the American Bar Association overseeing the DLS program to travel to the disaster (FEMA JFO, DRC, etc.) to review and audit the program in progress at least once during the period of performance (POP) for that specific program.

## E. Conditions of Eligibility

An individual is eligible for disaster legal services if they were directly affected by a Presidentially-declared disaster, meet the definition of low-income, and do not have the means to hire an attorney.

### *1. Definition of low-income*

For the purpose of defining eligibility for Disaster Legal Services assistance, low-income is used to refer to those disaster survivors who have insufficient resources to secure adequate legal services, whether the insufficiency existed prior to or resulted from the major disaster.



**Tools and Resources**

For more information, an individual may visit the American Bar Association's website at:

- American Bar Association Committee on Disaster Response and Preparedness

- Disaster Legal Services Program

An individual may also visit their local FEMA Disaster Recovery Center (DRC) for further referral information.

## II. Delivery of Services

Once FEMA has authorized the DLS program, the ABA YLD will establish a local toll-free hotline to receive calls and provide free legal assistance services. In addition to the local hotline, individuals can visit FEMA Disaster Recovery Centers (DRCs) where DLS representatives may be located. Attorneys seeking to volunteer their time can visit the YLD's Disaster Relief Portal at https://aba.joinpaladin.com/aba-disaster-relief/, where they can seek local or national opportunities to assist low income disaster survivors.

**A. Program Approval Process**

The impacted STT government can request the DLS program through the Request for Presidential Disaster Declaration (FEMA Form 010-0-13).

For individuals seeking DLS, there is no formal application process. Individuals can access these services by contacting the toll-free number established once the program has been authorized.

This page is intentionally blank.

# Chapter 7: Disaster Unemployment Assistance[iv]

## I. Overview

The Disaster Unemployment Assistance (DUA) program may be available to STT governments to provide temporary benefits to individuals whose employment or self-employment has been lost or interrupted as a direct result of a major disaster and who are not eligible for regular unemployment insurance (UI). DUA is available when the President declares a major disaster and Individual Assistance (IA) is approved. Individuals may also receive re-employment services administered by the STT government; there is no cost share.

The DUA program is authorized under Section 410 of the Stafford Act. The U.S. Department of Labor[221] oversees the DUA program and coordinates with the Federal Emergency Management Agency (FEMA). DUA is administered by the respective state or territory UI agency acting as agents of the Federal Government. When DUA is approved under a direct tribal declaration, the program is administered through the state UI of the state in which the tribal headquarters is located. FEMA provides the funding for DUA payments and state administrative costs. DUA payments are made by the respective state or territory UI agencies, under agreements with the Secretary of Labor, to eligible individuals unemployed as a direct result of the disaster. The Department of Labor implementing regulations for DUA are found at 20 C.F.R. § 625. More information is available in the current UI DUA Handbook.

### A. Period of Assistance

DUA benefits are generally paid for up to 26 weeks beginning with the first week following the date the major disaster began, and ending with the 26th week following the date the major disaster is declared by the President. DUA will not be paid for any period of unemployment that occurs prior to the date of the start of the incident period nor for any period of unemployment which begins subsequent to the end of the disaster assistance period.



*FEMA employee discusses how to file a claim for disaster unemployment.*

### B. Types of Assistance

DUA provides temporary financial assistance and reemployment services to eligible individuals. The weekly DUA benefit amount will be based on the gross wages of the individual. If the individual is self-employed, the weekly benefit amount will be based on the net earnings (income) from self-employment. Generally, benefits are calculated using the same formula used for state UI benefits. However, the minimum weekly benefit amount payable can be no less than half (50%) of the average UI benefit amount in the state,[222] with certain exceptions for part-time workers.

### C. Application Process

Individuals seeking DUA must file a claim within 30 days of the public announcement of the availability of DUA in the STT government. Individuals must follow the instructions in the announcement and apply for DUA based on the filing method used by the respective state or territory UI agency (i.e., in person, online, or by mail or telephone).

---

[iv] OMB revised the regulations that govern federal grants and cooperative agreements, please refer to Title 2 of the Code of Federal Regulations for more details. See Electronic Code of Federal Regulations.

Individuals who moved or evacuated to another STT government should contact the affected STT government for claim filing instructions. Individuals can also contact the respective state or territory UI agency in the state or territory where they are currently residing for claim filing assistance.

Individuals are required to substantiate employment or self-employment or to substantiate work that was to begin on or after the first day of the incident period for the disaster. If proof of employment cannot be provided at the time the claim is filed, individuals have 21 calendar days from that time to meet this requirement.[223] Failure to submit this documentation within the 21 days will result in a denial of DUA, and any benefits already paid will be considered overpaid. Individuals are required to repay any benefits overpaid. Individuals are also required to submit proof of wages or income within 21 days of filing the DUA claim.

The RA may approve or deny requests for funding to support the DUA program in coordination with the U.S. Department of Labor.

 **Tools and Resources**

For additional information concerning the DUA program, individuals may contact the U.S. Department of Labor at:

**Website:** https://workforcesecurity.doleta.gov/

**Phone**: 866-487-2365

An individual may also contact their state UI agency for state-specific information:

**Website:** https://www.careeronestop.org/

**Phone:** 877-872-5627

The state or territory workforce agency will submit the funding request to the RA through the Regional Department of Labor; the tribal government will work with the state workforce agency to submit the funding request in the same way. The program may be funded for up to 26 weeks of benefits and subsequent administrative costs if:

- A complete state workforce agency funding request and Regional Department of Labor recommendation is received;

- The funding amount request provides reasonable justification for the key assumptions leading to the cost estimate; and

- There is sufficient explanation for unusually high cost estimates, to include administrative costs exceeding 15%.

If approved, the RA must submit a written approval with justification to the U.S. Department of Labor Comptroller for processing of the funds to the state or territory workforce agency.

If denied, the RA must submit a written denial with justification to the state or territory workforce agency.

## D. Congressional Notification Process

Department of Homeland Security Appropriations Act, Sec. 507, requires FEMA to notify the Congressional Appropriations Committee at least three full business days in advance of making or awarding a grant allocation, grant, contract, or other transaction agreement exceeding $1,000,000. This process may add weeks to the timeline before obligating the Federal award.

## E. Conditions of Eligibility

### 1. General Requirements

These general conditions must be met for an applicant to be eligible for DUA. Requested documents to establish the proof of these conditions may vary by state or territory. A disaster survivor must:

- Provide proof of identity;

- Be a U.S. citizen, non-citizen national, or qualified alien;

- Be ineligible for regular UI;

- Be unemployed or partially unemployed as a direct result of the major disaster;

- Be able and available for work, unless injured as a direct result of the disaster;

- File an application for DUA within 30 days of the date of the public announcement of availability of DUA; and

- Have not refused an offer of employment in a suitable position.

### 2. Conditions of Unemployment

In addition to general requirements to receive DUA, an individual must meet one of several conditions of unemployment or inability to perform services in self-employment as a direct result of the disaster. Requested documents to establish the proof of these conditions may vary by state or territory. These conditions are:[224]

- The individual has had a week of unemployment following the date the major disaster began;

- The individual is unable to reach their place of employment;

- The individual was scheduled to start work and the job no longer exists or the individual was unable to reach the job;

- The individual became the major support of the household because the head of the household died as a direct result of the disaster; or

- The individual cannot work because of an injury caused as a direct result of the major disaster

### 3. Frequency of Filed Claims

The individual must continue to file weekly or biweekly claims for DUA benefits according to the instructions given by the state or territory agency when the DUA application is filed.

**How to File a Claim**

To file a claim, individuals who are unemployed as a direct result of the disaster should contact their state or territory UI agency

**Website:** https://www.careeronestop.org/

## II.  Delivery of Services

After the President declares a major disaster, the affected STT government can apply for funding for the DUA program. DUA is administered by the state or territory UI agency, which issues a public announcement throughout the declared disaster area notifying individuals in the affected area at the time of the disaster that they may be eligible for DUA compensation if they apply within the 30-day application period starting on the first public announcement date for the designated area. Under a direct tribal declaration, this public announcement would be issued by the state or territory workforce agency in conjunction with the tribal government. If the Presidential disaster declaration is later amended to include additional areas, another release should be prepared that allows for a separate 30-day application period for affected employment in the newly designated areas.

# Chapter 8: Voluntary Agency Coordination

## I. Overview

Voluntary agencies are the first and the last organizations to provide survivor support services in a community before and after a disaster. Agencies in the community begin providing services prior to a disaster and continue throughout the long-term recovery period after a disaster. The FEMA Voluntary Agency Coordination Section provides technical assistance, coordination and subject matter expertise to partners who are addressing gaps in resources, providing financial support and additional support to survivors after government assistance is exhausted. This assistance is provided through FEMA's Voluntary Agency Liaison (VAL) staff.

**A. Voluntary Agency Coordination**

The mission of FEMA VALs is to establish, foster, and maintain relationships among government, voluntary, faith-based, and community partners. Through these relationships, the VALs support the delivery of inclusive and equitable services and empower and strengthen capabilities of communities to address disaster-caused unmet needs.

A function of the VAL staff is the coordination of voluntary activities between internal FEMA partners, local, state and federal government entities and state and National VOAD.

FEMA VALs work with state VALs and voluntary agencies at all levels. Some examples of voluntary agencies supported by VALs include: National VOAD, state VOADs, Domestic Hunger Relief Organizations, Long-Term Recovery Groups, and other NGOs in local communities.

During disaster operations, VALs provide additional support by organizing and building the capability of disaster recovery for current and future disasters.[225] Additionally, FEMA VALs continue to support ongoing community recovery activities even after the period of assistance has ended.



*The Calvary Chapel Relief volunteers, an organization, works tirelessly to remove damaged boards from the Asbury Park boardwalk after Hurricane Sandy.*

## II.   Responsibilities of FEMA Voluntary Agency Liaisons

The VALs provide expertise to FEMA offices concerning the voluntary agency sector's participation in prevention, protection, response, recovery, and mitigation. The VALs also keep the Voluntary Organizations Active in Disaster and other partners informed about programs, policies, trends, reports, services and plans. Additionally, VALs host and attend quarterly meetings, provide trainings and briefings with primary responsible voluntary agencies, community-based and faith-based organizations, and the private sector organizations independent from state and local VOADs. Some of the FEMA VAL activities may include:

### A. National Response Coordination Center

The FEMA National Response Coordination Center (NRCC) is a resource the Federal Government employs to bring multi-agency resources, both government and NGO, together during major disasters. VALs in the NRCC, as well as the RRCCs, support the Regions and coordinate with voluntary organizations to identify gaps in services to survivors and communicate available resources to meet them. Resources may also include donated goods.

### B. Non-Declared Disasters

FEMA VALs may provide support to communities that do not receive a Presidential disaster declaration. This shifts more duties to voluntary agencies without the Individual Assistance structure administered by FEMA and public support often engendered by a Presidential disaster declaration. In these instances, the complex challenge of survivor recovery is addressed by voluntary agencies working to assist in the impacted areas. VALs may provide subject matter expertise to an STT government to help coordinate agencies and improve service delivery. VALs may also be called upon to help conduct a preliminary damage assessment, prior to a declaration, to gauge the level of voluntary agency activity, as well as support the development of long-term recovery efforts. VALs may also be requested to support non-Stafford Act events where subject matter expertise for community convening, volunteer and donations management, and other emergency management functions assist other Federal agencies, international incidences, and private sector disaster activities.

### C. Emergency Declarations and Public Assistance

VALs may be requested to assist during emergency declarations and major disaster declarations that have only been approved for Public Assistance (PA). While FEMA PA programs are focused on infrastructure repair, there may be individual households impacted by the disaster that will not receive government disaster assistance. VALs work with the community to develop voluntary agency capacity to provide assistance to impacted survivors. Examples of these types of activities can be seen in *Figure 43*.

| Figure 43: VAL Coordination during Non-Declared Emergencies and PA-Only Declarations | | | | |
|---|---|---|---|---|
| Operation | Month/Year | Location | Declaration Type | Activities |
| Miwok Tribe Structure Fire Tribal Headquarters destroyed | April 2015 | CA | N/A | Provided volunteer coordination, technical assistance, and information for philanthropic grant opportunities. |
| Okanogan, WA Floods/Wildfires | August 2014 | WA | PA | Assisted in developing Long-Term Recovery Groups, identified recovery resources for disaster survivors, and coordinated assistance efforts among government and NGO service providers. |
| West Virginia Flood Recovery | April 2015 | WV | PA | Coordinated Bridge Committee resources and assisted with developing pilot program for bridge construction by Voluntary Agencies. |

## D. Volunteer and Donations Management

Individuals and organizations often donate resources to SLTT governments to assist with response and recovery. A donated resource may be in the form of materials, equipment, financial contributions, services or supplies. In an effort to efficiently manage the donated goods and services to SLTT governments, or voluntary agencies, FEMA VALs may provide logistical support by coordinating donations and working with the state to develop warehouse solutions. The *Volunteer and Donations Management Support Annex to the National Response Framework* describes the coordination process of unaffiliated volunteers, unaffiliated organizations, and unsolicited donated goods.[226]

FEMA provides assistance through:

- Volunteer and donations management training;

- Volunteer and donations messaging; and

- Technical assistance on volunteer and donations management.

Donations management training is provided through the Emergency Management Institute (EMI), for Federal, SLTT government, nonprofit and private sector partners. Additional trainings are delivered through Independent Study, attendance at a classroom offering at the National Emergency Training Center (NETC), or through a field-based classroom offering at a FEMA Joint Field Office (JFO) which can be accessed at the FEMA Emergency Management Institute website.

FEMA donations messaging regarding the appropriate method for the public to donate can be found at the *FEMA Volunteer and Donate Responsibly* website. Financial contributions are the most efficient method of donating. Funds allow the most flexibility in obtaining the needed resources, at the correct time and moves money into the local economy to help businesses recover. The site also provides information on accepted methods for unaffiliated volunteers to get connected.

More information and technical assistance on volunteer and donations management may be found through the following resources:

- National Voluntary Organizations Active in Disaster;

- National Association of State Emergency Volunteer and Donations Coordinators (NASEDoVoC);

- The American Logistics Aid Network (ALAN); and

- FEMA also uses the International Assistance System (IAS) Concept of Operations as the mechanism to accept/reject offers of donations from countries outside the United States of America.

# Appendix A: Section 425 Transportation Assistance

Section 425 of the Stafford Act authorizes FEMA to provide assistance to relocate individuals displaced from their pre-disaster primary residences as a result of a major disaster or emergency or otherwise transported from their pre-disaster primary residence under Section 403(a)(3) or Section 502 of the Stafford Act, to and from alternative locations for short or long-term accommodation or to return an individual or household to their pre-disaster primary residence or alternative location.

## I. Authorizing Section 425 Transportation Assistance

FEMA's AA for Recovery has the authority to approve Section 425 Transportation Assistance at the request of the affected STT government. This form of assistance may be considered for specific areas within the declared disaster when:

- The scale and magnitude of the declared incident results in an extended displacement of disaster survivors;

- Temporary housing options within a reasonable distance from the disaster area are limited; and

- A concurrent lack of infrastructure exists within the affected area.

**A. Conditions of Eligibility**

Section 425 Transportation Assistance does not count toward an applicant's financial Housing Assistance maximum award or the Other Needs Assistance maximum award. To be considered for Section 425 Transportation Assistance, the applicant must:

- Register for FEMA assistance within the registration period;

- Confirm their pre-disaster primary residence is in the declared disaster area;

- Be significantly displaced from their pre-disaster residence due to the disaster, factoring in distance to include travel time and mileage;

- Be able to secure temporary housing (excluding hotels/motels) in the alternative location;

- Pass identity verification;

- Pass citizenship requirements; and

- Not have assistance available for transportation expenses from any other source.

All household members who will travel under Section 425 Transportation Assistance must be listed on the FEMA application.[227] Applicants may call FEMA to add pre-disaster household members to the application if they were not listed at the time of registration.

## B. Eligible Expenses

Eligible expenses may include expenses for:

- Domestic airfare, via commercial flight, at the equivalent of economy/coach class; however, FEMA may approve increased airfare costs for seat upgrades, when necessary, to accommodate household member(s) with an access or functional need.
    - o Individuals and households are eligible for one round trip for all pre-disaster household members and HPSA.
    - o Individuals and households who have already evacuated, whether by assistance from FEMA or of their own accord, may be eligible for a one-way return trip, for all household members and HPSA.
- Passenger baggage fees up to $100 per pre-disaster household member.
- Transporting HPSA that may be transported via a commercial airline.
    - o Interstate requirements pertaining to inbound animal clearances and all costs not included in the standard airfare cost of transporting animals will be the responsibility of the passenger.

## C. Limitations and Exclusions

- Travel for unaccompanied minors is not an eligible expense. Minors must travel with at least one adult household member.
- The maximum time limit for Section 425 Transportation Assistance is the period of assistance for the IHP. FEMA may further limit the timeframe of availability for Section 425 Transportation Assistance for specific populations of applicants based on the progress of their permanent housing plan.
- Section 425 Transportation Assistance is limited to relocation to U.S. states, territories, and possessions; no international destinations will be included.
- Meals, ground transportation, and additional costs for the applicant, household, or HPSA beyond the cost of the flight are not eligible costs under Transportation Assistance.
- Travelers must have a government-issued photo ID in order to clear Transportation Security Administration airline security. The household is responsible for establishing and maintaining required travel documents.
    - o It is the responsibility of travelers to ensure they have all necessary travel documentation and identification required. Travelers may also be required to have an available credit card for baggage fees.
- Section 425 Transportation Assistance is limited to travel arranged under this policy; applicants are not eligible for reimbursement of expenses for travel that has already occurred or is booked outside of this program.
- Costs for reasonable accommodations, baggage, and travel of pets and service animals must be identified when airfare is booked. Additional travel expenses incurred at the time of travel are not eligible for reimbursement.

# Appendix B: Individual Assistance Program and Assistance Approvals

Not all Individual Assistance programs and types of assistance are automatically implemented when a disaster is declared for Individual Assistance.

When requested by the STT government, FEMA officials at various levels throughout the Agency may approve the below Individual Assistance programs and types of assistance.

*Figure 44* outlines who may approve each program or type of assistance: the Assistant Administrator for Recovery, the Individual Assistance Division Director, the Regional Administrator (RA), or the Federal Coordinating Officer (FCO).

FEMA RAs may further delegate some approval authority to Federal Coordinating Officers, with the exception of Transitional Sheltering Assistance, Crisis Counseling Program, Disaster Case Management, and Disaster Unemployment Assistance.

| Figure 44: Delegation of IA Authorities | | | |
|---|---|---|---|
| Program Area | Recovery AA | IADD | RA |
| **Mass Care and Community Services** | | | |
| **Transitional Sheltering Assistance** | | | |
| - Initial Approval | | X | |
| - Extensions<br><br>*FCO may approve individual case exceptions | | | X |
| **Crisis Counseling Assistance and Training Program—Regular Services Program** | | | |
| - Initial Approval | | | X |
| - Approval Appeals | | X | |
| **Crisis Counseling Assistance and Training Program—Immediate Services Program** | | | |
| - Initial Approval | | | X<br>(or DRM) |
| - Approval Appeals | | | X |
| - Second Appeals | | X | |
| - Policy Waivers | | X | |
| - Extensions | | | X<br>(or DRM) |
| **Disaster Case Management** | | | |
| - Initial Approval<br><br>*FCO approves Immediate Disaster Case Management | | | X |
| - Approval Appeals | | X | |
| - Extensions | | | X |
| - Extension Appeals | | X | |

Appendix B: Individual Assistance Program and Assistance Approvals

| Figure 44: Delegation of IA Authorities | | | |
|---|---|---|---|
| Program Area | Recovery AA | IADD | RA |
| **Disaster Unemployment Assistance** | | | |
|   - Initial Approval | | | X |
|   - Appeals | | X | |
| **IAPPG Policy Waivers** | | X | |
| **Individuals and Households Program** | | | |
| **18-Month Period of Assistance Extension** | X | | |
| **Registration Period** | | | |
|   - Extensions up to 60 days | | | X |
|   - Additional extensions past 60 days | | X | |
| **Section 425 Transportation Assistance** | X | | |
| **Geospatial Inspections** | | X | |
| **FMR Rental Assistance Rate Increase** | | | |
|   - Up to 125% | | | X |
|   - More than 125% | | X | |
| **ONA Administrative Option Selection Form and State Administrative Plan** | | | X |
| **Critical Needs Assistance** | | X | |
| **Clean and Removal Assistance** | | | X |
| **Direct Temporary Housing Assistance** | X | | |
| **Forms of Direct Housing (includes TTHU/MLR)** | | | X |
| **Direct Lease** | X | | |

Appendix B: Individual Assistance Program and Assistance Approvals

| Figure 44: Delegation of IA Authorities | | | |
|---|---|---|---|
| Program Area | Recovery AA | IADD | RA |
| **Direct Lease FMR Increase** | | | |
|   - Up to 200% | | | X |
|   - More than 200% | | X | |
| **Multi-Family Lease and Repair FMR Increase** | FMR will be consistent with Rental Assistance Rate Increase approvals | | |
| **MHU/RV Group Sites** | | | X |
| **Permanent Housing Construction** | X | | |
| **Disposal of MHUs/RVs via Sales/Donations** | | | X |

# Appendix C: Individual Assistance Policy Supersession

These policies have been superseded by IAPPG 1.1:

| Figure 45: Individual Assistance Policy Supersession | |
|---|---|
| Document Number | Document Name |
| FP 104-009-03 | Individual Assistance Program and Policy Guide – March 2019 |
| | Policy Changes to the Individuals and Households Program resulting from the Disaster Recovery Reform Act of 2018, Section 1212 – March 2019 |
| | |
| | |
| | |
| | |
| | |
| | |

# Appendix D: Federal Civil Rights Authorities Applicable to Recipients of Federal Financial Assistance

All recipients of Federal financial assistance, including but not limited to non-Federal entities such as SLTT government and their subrecipients, and providers of disaster-related assistance must abide by the nondiscrimination provisions in Section 308 of the Stafford Act stating the provision of disaster-related assistance shall be accomplished in an equitable and impartial manner, without discrimination on the grounds of race, color, religion, nationality, sex, age, disability, English proficiency, or economic status.

Recipients of Federal financial assistance must also comply with other Federal civil rights laws and regulations.[228] Specifically, the recipient is required to provide assurances about compliance with Federal civil rights laws and regulations as a condition for receipt of Federal funds.

The FEMA-State/Territory/Tribe Agreement contains a link to the DHS Standard Terms and Conditions.

Among the provisions within the DHS Standard Terms and Conditions for grants, cooperative agreements, fixed amount awards, and other types of Federal financial assistance are the following civil rights-related obligations:

Recipients of Federal financial assistance from DHS must complete the DHS Civil Rights Evaluation Tool within thirty days of receipt of the Notice of Award or, for State Administering Agencies, thirty days from receipt of the DHS Civil Rights Evaluation Tool from DHS or its awarding component agency. Recipients are required to provide this information once every two years, not every time an award is made. After the initial submission, recipients are only required to submit updates. Recipients should submit the completed tool, including supporting materials to CivilRightsEvaluation@hq.dhs.gov. This tool clarifies the civil rights obligations and related reporting requirements contained in the DHS Standard Terms and Conditions. Subrecipients are not required to complete and submit this tool to DHS. The evaluation tool can be found at https://www.dhs.gov/evaluation-tool.

Age Discrimination Act of 1975: Recipients must comply with the requirements of the Age Discrimination Act of 1975 (Title 42 U.S.C. § 6101 et seq.), which prohibits discrimination on the basis of age in any program or activity receiving Federal financial assistance.

Americans with Disabilities Act of 1990: Recipients must comply with the requirements of Titles I, II, and III of the Americans with Disabilities Act, which prohibit recipients from discriminating on the basis of disability in employment, the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities. (42 U.S.C. § 12101–12213).

Title VI of the Civil Rights Act of 1964: Recipients must comply with the requirements of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), which provides that no person in the United States will, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. DHS implementing regulations for the Act are found at 6 C.F.R. § 21 and 44 C.F.R. § 7.

Appendix D: Federal Civil Rights Authorities Applicable to Recipients of Federal Financial Assistance

Limited English proficiency (LEP) (Title VI of the Civil Rights Act of 1964): Recipients must comply with the Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.) prohibition against discrimination on the basis of national origin, which requires that recipients of Federal financial assistance take reasonable steps to provide meaningful access to persons with LEP to their programs and services. For additional assistance and information regarding language access obligations, please refer to the DHS Recipient Guidance https://www.dhs.gov/meaningful-access and additional resources on http://www.lep.gov.

Title VIII of the Civil Rights Act of 1968: Recipients must comply with the requirements of Title VIII of the Civil Rights Act of 1968, which prohibits recipients from discriminating in the sale, rental, financing, and advertising of dwellings, or in the provision of services in connection therewith, on the basis of race, color, national origin, religion, disability, familial status, and sex[229], as implemented by the Department of Housing and Urban Development at 24 C.F.R. § 100. The prohibition on disability discrimination includes the requirement that new multifamily housing with four or more dwelling units—i.e., the public and common use areas and individual apartment units (all units in buildings with elevators and ground-floor units in buildings without elevators)—be designed and constructed with certain accessible features.[230]

Title IX of the Education Amendments of 1972 (Equal Opportunity in Education Act): Recipients must comply with the requirements of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), which provide that no person in the United States will, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance. DHS implementing regulations are codified at 6 C.F.R. § 17 and 44 C.F.R. § 19.

Section 504 of the Rehabilitation Act of 1973: Recipients must comply with the requirements of Section 504 of the Rehabilitation Act of 1973, (29 U.S.C. § 794), as amended, which provides that no otherwise qualified individual with a disability in the United States will, solely by reason of the disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

In addition, the United States has the right to seek judicial enforcement of these obligations.

Members of the public have the right to file a civil rights complaint if they believe they have been discriminated against by a recipient of Federal financial assistance. Please contact FEMA's Office of Equal Rights for more information: (202) 212-3535 or FEMA-CivilRightsOffice@fema.dhs.gov.

# Appendix E: DCM - Allowable and Unallowable Costs

| Figure 46: DCM—Allowable and Unallowable Costs | | |
| --- | --- | --- |
| Budget Category | Allowable Expenses | Unallowable Expenses |
| Personnel | Salaries and wages for DCM Positions must be justified. Below is a list of some of the positions DCM allows:<br><br>• Program Director<br><br>• Finance Director<br><br>• Finance Manager<br><br>• Administrative Assistant<br><br>• Monitoring/Data Management<br><br>• Data Entry Specialist<br><br>• Construction Cost Analyst<br><br>• Case Management Supervisor<br><br>• Case Manager | Supplanting of existing non-Federal entity or provider positions |
| Fringe Benefits | Fringe benefit costs at the usual and customary fringe benefit rate for SLTT providers | Fringe benefit costs above the customary fringe benefit rate for temporary SLTT provider staff |
| Travel | • Mileage reimbursement for Case Managers travel to and from disaster survivor locations or trainings if provided outside of the base office location<br>• All travel costs must be in accordance with non-Federal entity travel policy Guidelines | • Providing transportation for survivors<br>• Out-of-state travel for DCM personnel except in exceptional circumstances with prior FEMA approval<br>• Rental or leasing of vehicles |
| Equipment | Equipment means an article of nonexpendable, tangible personal property having a useful life of more than one year and an acquisition cost which equals or exceeds the lesser of the capitalization level established by the governmental unit for financial statement purposes, or $5,000.<br><br>Pre-approval for equipment is required by FEMA | N/A |

Appendix E: DCM – Allowable and Unallowable Costs

| Budget Category | Allowable Expenses | Unallowable Expenses |
|---|---|---|
| Contractual | Contracted consulted maximum FEMA reimbursement rate is $750 per day, which includes equipment, supplies, lodging, and travel costs | Consultant costs exceeding $750 a day |
| Supplies | <ul><li>Supplies include materials that are expendable/consumed during the course of the project and less than $5000</li><li>Basic office equipment, such as computers, mobile phones, printers/copiers, etc.</li></ul> | <ul><li>Food and beverages</li><li>Refreshments for meetings/trainings</li><li>Video cameras, video recording equipment, televisions, and other types of video production equipment</li><li>Supplies or swag given to survivors other than training or disaster case management support documentation</li></ul> |
| Other | The budget may identify costs that are unique to the declared disaster area, but do not fall into one of the budget sub-categories. Note: Costs must not be identified as miscellaneous (i.e., they must be described in detail).<ul><li>Advertising costs associated with the recruitment of personnel required for the DCM program</li><li>Rental office space</li><li>Telephone and utility costs directly billed to the DCM Program</li><li>Background checks for case managers</li><li>FEMA will pay licensing fee for technology platform</li><li>Hotline and/or call center utilized for resource collection and/or referral services may be considered with sufficient justification</li></ul> | <ul><li>Direct financial assistance for survivors</li><li>Telephone and utility charges not directly related to the DCM program</li><li>FEMA will not provide funding for a media campaign</li></ul> |
| Indirect Costs | N/A | Indirect costs, including management costs, are defined as costs not directly chargeable to a specific project. Section 324 of the Stafford Act requires FEMA to establish management cost rates in program regulations. Since DCM does not have regulations under 44 C.F.R., they are unallowable per statute |

# Appendix F: CCP – Allowable and Unallowable Costs

| | Figure 47: CCP—Allowable and Unallowable Costs | | |
|---|---|---|---|
| **Budget Category** | Fundable Expenses | Non-Fundable Expenses (items apply to all budget categories) | Typical In-Kind Contributions |
| Salaries and Wages | • Salaries and wages for typical CCP positions:<br>  o Crisis Counselor<br>  o Team Leader (Supervisor)<br>  o Administrative Assistant<br>  o Data Evaluation Specialist<br>  o Consultant/Trainer (listed in personnel only if a direct SLTT or provider employee)<br>  o Fiscal Specialist<br>  o SLTT CCP Program Manager/Director<br>  o Provider Project Manager<br>  o Community Liaison/Resource Linkage Coordinator<br>  o Media Liaison<br>  o Child/Senior Care Specialist<br>  o Disability Specialist / Communications Access Specialist | • Longer term, more formal mental health services, and mental health professionals providing these services (e.g., diagnosis and therapy)<br>• Longer-term, more formal substance use treatment, and para professionals providing these services<br>• Advocacy<br>• Formal critical incident stress debriefing (CISD) services or critical incident stress management (CISM) training<br>• Reimbursement for uncollected revenue (e.g., if mental health workers respond to the disaster and it results in fewer Medicaid billings, the state will not be reimbursed for these lost Medicaid billings)<br>• Supplanting of existing SLTT or provider positions | Salaries and wages of existing SLTT and local staff, such as the SLTT Disaster Behavioral Health Coordinator and local area provider agency managers who dedicate a percentage of time to the CCP in addition to their existing duties |
| Fringe Benefits | Fringe benefit costs at the usual and customary fringe benefit rate for SLTT and local providers | Fringe benefit costs above the customary fringe benefit rate for temporary SLTT and local provider staff | N/A |

Appendix F: CCP - Allowable and Unallowable Costs

| Figure 47: CCP—Allowable and Unallowable Costs | | | |
|---|---|---|---|
| Travel | • Mileage reimbursement for crisis counselor travel to deliver services in survivor homes, meet with community groups or agency personnel, and conduct/receive training<br><br>• The standard motor-pool cost if SLTT cars are used | • Out-of-state/area travel for CCP personnel<br><br>• Transportation for survivors<br><br>• Rental/leasing of vehicles except in unusual circumstances that indicate personal vehicles are not a reasonable option | The SLTT may offer to use the motor-pool as an in-kind contribution |
| Equipment | Equipment purchases of more than $5,000 per individual item<br><br>*Consult with FEMA and CMHS Project Officer prior to developing the budget for this category.* | Consult with FEMA and CMHS Project Officer for specific non- fundable expenses | N/A |
| Consultants / Trainers | • CMHS-approved, qualified consultants providing technical assistance or consultation to SLTT project staff on program development and project management<br><br>• CMHS-approved, qualified trainers providing standardized CCP training or training concerning unique disaster-related issues (e.g., cultural competence, working with children, working with special populations)<br><br>• Travel costs, lodging, and per diem for consultants<br><br>*For contracted consultants, the maximum FEMA reimbursement rate is $750 per day, which includes preparation, materials, and travel time* | • Consultants or trainers not approved by CMHS<br><br>• Consultant charges exceeding $750 per day<br><br>• Conferences or workshops not directly related to the project<br><br>• Out-of-state/territory training<br><br>• Disaster preparedness training<br><br>• CISD or CISM training | Costs and time associated with the use of SLTT in- house consultants |

Appendix F: CCP - Allowable and Unallowable Costs

| Figure 47: CCP—Allowable and Unallowable Costs | | | |
|---|---|---|---|
| Supplies | • Basic office equipment, such as computers, mobile phones, printers, pagers, fax machines, or photocopiers<br><br>• One phone per two crisis counselors when providing door-to-door outreach | • Food and beverages<br><br>• Refreshments for meetings and trainings<br><br>• Medications<br><br>• Toys or playground items for recreational programs<br><br>• Disaster kits<br><br>• Video cameras and recording equipment, televisions, and other video production equipment<br><br>• Supplies or swag given to survivors other than training or crisis counseling support documentation<br><br>• Using personal phones or providing stipends for personal phones to make anonymous calls<br><br>• More than one smart technology device per two crisis counselors or one helpline staff unless the need is required in which to provide services<br><br>• MiFis or additional hotspot devices other than phones | • Use of existing equipment, such as office furniture, computers, fax machines, printers, or photocopiers<br><br>• Food and beverages<br><br>• Toys and recreational items |

| Figure 47: CCP—Allowable and Unallowable Costs | | |
|---|---|---|
| Media / Public Information | • Advertisements to recruit crisis counselors<br><br>• Educational materials, pamphlets, and handouts<br><br>• Flyers or other materials to promote access to CCP services<br><br>• Staff identification items, such as t-shirts or name badges<br><br>• Media messaging and public service announcements<br><br>• Staff identification items, such as t-shirts, with the STT's CCP brand and/or name badges<br><br>• Duplication of existing materials, such as FEMA and CMHS disaster behavioral health materials<br><br>*Video and multimedia product development may be funded only if it is carefully justified and the following three criteria are met:*<br><br>• No comparable resource is available from another CCP, any Federal or SLTT government agency, or any private entity<br><br>• The SLTT government has provided a comprehensive description of the objectives and format of the product, and has demonstrated the disaster mental health expertise to develop a quality product<br><br>• The product can be completed to be used as an educational or training tool during the CCP | • Items/activities not included as part of the Federal award application program plan or not approved by the FEMA and CMHS project officers<br><br>• Disaster preparedness materials<br><br>• Expensive print, television, or radio advertisements<br><br>• Video cameras, video recording equipment, televisions, and other types of video production equipment<br><br>• Shirts, hats, and other clothing intended to be worn by CCP staff and/or any advertisement that does not have the STT's specific CCP project brand will be considered self-promoting for the non-Federal entity and providers and is unallowable as per 2 C.F.R. § 200.421 | For print advertisements and broadcast time, FEMA and CMHS advise that programs seek donations as a public service for space and airtime announcements.<br><br>If this is not possible, list these media costs as a budget item, and provide ample justification in the narrative. |

| Figure 47: CCP—Allowable and Unallowable Costs | | | |
|---|---|---|---|
| Provider / Contractual Costs | • Provider costs and any other contractual costs must be itemized. The itemization should include costs associated with salaries, fringe, travel, per diem, and training. These costs must be justified in the budget narrative. | • Items or activities not included as part of the Federal award application program plan or not approved by the FEMA and CMHS Project Officers<br>• Transportation of survivors<br>• Mental health treatment | • Office space<br>• Additional trainings<br>• Equipment (copiers, printers, fax)<br>• Human resources |
| Other | *The budget may identify costs that are unique to the disaster and area affected but do not fall into one of the prescribed categories. Costs must not be identified as miscellaneous (i.e., they must be described in detail)*<br><br>Categories typically listed as Other:<br>• Rental Office Space<br>  o Office space for the management and administration of the program.<br>  o Appropriate telephone and utility costs for CCP operations when not located within existing SLTT mental health authority or provider space<br>  o Telephone and Utilities<br>  o Additional costs to conduct CCP evaluation and data collection in compliance with program guidance | • Facility renovation, repair, or construction<br>• Transportation for survivors<br>• Child care<br>• Case management<br>• Diagnostic testing<br>• Toys or recreational equipment or activities<br>• Food and beverages<br>• Video or multimedia recording equipment<br>• Long-term mental health services<br>• Financial assistance for survivors<br>• Fundraising activities<br>• Disaster preparedness<br>• Facility renovation, repair, or construction<br>• Telephone and utility charges not directly related to CCP operations<br>• Evaluation activities outside program guidance | • Office space within the SLTT government mental health authority and CCP provider facilities<br>• Utilities such as heat, water, or electricity |

# Appendix G: Environmental Planning and Historic Preservation Compliance

Federal Environmental Planning and Historic Preservation (EHP) laws, regulations, and executive orders (EOs) establish requirements to protect the environment and preserve historic and cultural resources. Federally-funded IA grants and programs must comply with EHP requirements, including but not limited to the following:

## National Historic Preservation Act

Section 106 of the National Historic Preservation Act requires FEMA to consider the effects a project will have on historic properties and provide the Advisory Council on Historic Preservation the opportunity to comment on the effects of the project.[231] Historic properties include buildings or groups of buildings (districts), structures, objects, landscapes, archaeological sites, and traditional cultural properties included in, or eligible for inclusion in, the National Register of Historic Places.[232]

## National Environmental Policy Act

Section 102 of the National Environmental Policy Act (NEPA) requires Federal agencies to integrate environmental values into their decision-making processes by considering the environmental impacts of their proposed actions and reasonable alternatives to those actions. The White House Council on Environmental Quality (CEQ) publishes NEPA regulations at Title 40 of the Code of Federal Regulations Parts 1500–1508. The U.S. Department of Homeland Security (DHS) Directive 023-01 Rev 01 and the Instruction Manual 023-01-001-01 Rev 01 establish DHS policy and procedures for compliance with NEPA and CEQ regulations for implementing the procedural provisions of NEPA. FEMA's Directive 108-1 and Instruction 108-1-1 detail FEMA's roles, responsibilities, authorities, and procedures to ensure all FEMA's actions comply with Federal EHP statutes and Executive orders. These documents tier off of and serve as component supplementary instructions for DHS's Directive and Instruction. The process ensures consideration of environmental consequences of the project and informs the general public.

## Endangered Species Act

Section 7 of the Endangered Species Act requires Federal agencies to use their authorities to conserve Federally-listed threatened and endangered species (listed species) and their designated critical habitat. FEMA must consult with the U.S. Fish and Wildlife Service (USFWS) and the National Oceanic and Atmospheric Administration Fisheries, also known as the National Marine Fisheries Service (NMFS) to ensure that proposed projects will not jeopardize the continued existence of any listed species or result in the destruction or adverse modification of designated critical habitat for listed species.[233]

## Clean Water Act

The Clean Water Act (CWA) establishes the basic structure for regulating discharges of pollutants in the waters of the United States (e.g., rivers and streams, lakes and ponds, coastlines, wetlands, estuaries). The CWA makes it unlawful to discharge any pollutant from a specific source into navigable waters without the appropriate CWA permits from the U.S. Army Corps of

Engineers (USACE) or state regulatory agency. If a proposed project is located in one of these regulated features, FEMA must review the action for compliance with CWA and may have to consult with the USACE or state regulatory agency.[234]

## Clean Air Act

The Clean Air Act protects the Nation's air through the reduction of smog and atmospheric pollution. Except for activities in non-attainment areas (defined as those areas that do not meet national standards for air quality and, therefore, require more rigorous compliance measures), air quality compliance often requires certain measures be implemented, such as dust abatement, vehicle emissions control, fuel storage, and distribution procedures.[235]

## Coastal Barrier Resources Act

The Coastal Barrier Resources Act (CBRA)[236] established the John H. Chafee Coastal Barrier Resources System (CBRS), which consists of relatively undeveloped coastal barriers along the Atlantic, Gulf, and Great Lakes coasts. CBRA minimizes adverse impacts to these areas by restricting Federal assistance that encourages development within the CBRS. USFWS publishes maps designating these areas.[237] FEMA must consult with USFWS prior to providing IA funding for work within the CBRS, when applicable.[238]

## Migratory Bird Treaty Act

The Migratory Bird Treaty Act makes it unlawful to pursue, hunt, take, capture, kill, or sell migratory birds listed in the statute without a take permit from USFWS.[239] FEMA consults with USFWS regarding projects likely to trigger compliance with this Act.

## Resource Conservation and Recovery Act

The Resource Conservation and Recovery Act (RCRA) establishes a framework for Federal, state, territorial, and local cooperation for controlling the management of hazardous and non-hazardous solid waste. The U.S. Environmental Protection Agency's (EPA's) establishes minimum regulatory standards for compliance, usually implemented by the states, and provides technical assistance. RCRA requires the safe disposal of waste materials, promotes the recycling of waste materials, and encourages cooperation with local agencies. Proposed Group Sites may require an Environmental Site Assessment to establish any potential site contamination prior to construction.[240]

## Coastal Zone Management Act

The Coastal Zone Management Act (CZMA) provides for the management of the Nation's coastal resources. The CZMA establishes a voluntary partnership between the Federal Government and coastal and great lakes states and territories. It requires participating states to develop State coastal zone management plans. IA projects located in, or near, established coastal zone management areas must be consistent with the enforceable policies of the state's Federally-approved coastal zone management plan.[241] Before approving a project in a coastal zone management area, FEMA consults with the state agency overseeing the implementation of the CZMA plan to ensure the project is consistent with the plan's provisions.

## Farmland Protection Policy Act

The Farmland Protection Policy Act minimizes the extent to which Federal programs contribute to the conversion of prime or unique farmland, or land of statewide or local importance, to non-agricultural uses and to ensure that Federal programs are administered in a manner that, to the extent practicable, will be compatible with state, territorial, local, and private programs and policies to protect farmland. The Farmland Protection Policy Act and U.S. Department of Agriculture (USDA) implementing procedures require FEMA to evaluate projects for adverse effects to such farmland and to consider alternative actions that could avoid adverse effects. For projects that have the potential to affect such farmland, FEMA must consult with the USDA Natural Resources Conservation Service to identify potential impacts to that farmland.[242]

## Fish and Wildlife Coordination Act

The Fish and Wildlife Coordination Act protects fish and wildlife when Federal actions result in the control or modification of a natural stream or body of water. The Fish and Wildlife Coordination Act requires Federal agencies to determine whether a proposed action will result in the control or modification of a body of water. Projects involving the control or modification of any water body require Federal agencies to consult with USFWS and NMFS (as appropriate) and state wildlife agencies to develop measures to protect, develop, and improve fish and wildlife conditions.[243]

## Wild and Scenic Rivers Act

The Wild and Scenic Rivers Act preserves the free-flowing state of rivers that are listed in the National Wild and Scenic Rivers System (System) or are under study for inclusion in the System because of their scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values. If a proposed project is located on a river included in the System, FEMA must review it for compliance with the Wild and Scenic Rivers Act and consult with the managing agency for the affected designated river.[244]

## Magnuson-Stevens Fishery Conservation and Management Act

The Magnuson-Stevens Fishery Conservation and Management Act is the primary law for managing and maintaining sustainable fisheries in waters of the United States. The Magnuson-Stevens Fishery Conservation and Management Act protects essential fish habitat, which includes the waters and substrate necessary to maintain healthy fisheries. FEMA must consult with NMFS when any proposed IA project could have an adverse effect on essential fish habitat.[245]

## Native American Graves Protection and Repatriation Act (NAGPRA)

All Federal authorizations to carry out land use activities on Federal lands or tribal lands, including all leases and permits, must include a requirement for the holder of the authorization to notify the appropriate Federal or tribal official immediately upon the discovery of human remains, funerary objects, sacred objects, or objects of cultural patrimony.[246]

## Executive Order 11988, Floodplain Management

EO 11988, Floodplain Management, requires Federal agencies to minimize or avoid activity that adversely affects floodplains. It requires Federal agencies to use a systematic decision-making process to evaluate the potential effects of projects located in, or affecting, floodplains; document each step of the process; and involve the public in the decision-making process. This process is designed to:

- o Reduce flood loss risks;
- o Minimize the impacts of floods on human safety, health, and welfare; and
- o Restore and preserve the natural and beneficial functions of floodplains.

FEMA publishes its implementing regulations for EO 11988 at 44 Code of Federal Regulations Part 9, Floodplain Management and Protection of the Wetlands. These regulations set forth the policy, procedures, and responsibilities to implement and enforce the EO, including the decision-making process, which is referred to as the 8-step process.[247]

## Executive Order 11990, Protection of Wetlands

EO 11990, Protection of Wetlands, requires Federal agencies to minimize or avoid activity that adversely affects wetlands and to encourage the preservation and enhancement of the beneficial functions of wetlands. To meet these objectives, EO 11990 requires Federal agencies to use a systematic decision-making process to evaluate the potential effects of projects in, or affecting, wetlands; document each step of the process; and involve the public in the decision-making process.

FEMA publishes its implementing regulations for EO 11990, Protection of Wetlands at 44 C.F.R. Part 9, Floodplain Management and Protection of the Wetlands. These regulations set forth the policy, procedures, and responsibilities to implement and enforce the EO, including the decision-making process, which is referred to as the 8-step process.

## Executive Order 12898, Environmental Justice

EO 12898, Environmental Justice, requires Federal agencies to identify and address any disproportionately high and adverse human health or environmental effects on minority and low-income populations as a result of their actions.

# Appendix H: Definitions

Terms may have different meanings when applied to other FEMA, non-Federal entity, non-governmental organizations (NGOs), or local programs.

**Access and Functional Needs:** Circumstances that are met for providing physical, programmatic, and effective communication access to the whole community by accommodating individual requirements through universal accessibility and/or specific actions or modifications which includes assistance, accommodation or modification for mobility, communication, transportation, safety, health maintenance, etc.; need for assistance, accommodation or modification due to any situation (temporary or permanent) that limits an individual's ability to take action in an emergency.

When physical, programmatic, and effective communication access is not universally available, individuals may require additional assistance in order to take protective measures to escape to and/or from, access either refuge and/or safety in an emergency or disaster, and/or may need other assistance, accommodations or modifications in an emergency or disaster. This is accomplished through pre-planning by emergency management, first response agencies and other stakeholders or in sheltering or other situations, from notification and evacuation, to sheltering, to return to pre-disaster level of independence.

Individuals having access and functional needs may include, but are not limited to, individuals with disabilities, older adults, and individuals with limited English proficiency, limited access to transportation, and/or limited access to financial resources to prepare for, respond to, and recover from the emergency.

Federal civil rights law and policy require nondiscrimination, including on the basis of race, color, national origin, religion, sex, age, disability, English proficiency, and economic status. Many individuals with access and functional needs are protected by these provisions.[248]

**Allowable Costs:** For programs administered via a contract, like DLS, allowable costs are defined in the FAR as costs that are reasonable and chargeable to the contract. (See FAR 31.201-2). Although this is a broad definition, FAR Section 31 specifically addresses many types of costs a recipient/contractor may incur.

Under a grant program, like state-administered ONA, DCM, CCP, and DUA, allowable costs as defined by 2 C.F.R. § 200.403 must be necessary, reasonable, and allocable; conform to any limitations or exclusions set forth by the applicable cost principles or the Federal award; be consistent with policies and procedures that apply uniformly to both Federally-financed and other activities of the non-Federal entity; be treated consistently as either indirect or direct costs; and be adequately documented, among other factors identified by 2 C.F.R. § 200.403.

**Appeal:** Applicants will have the opportunity to appeal a denial of initial program award or extension requests within 60 days of receipt of the written notice of determination. The appeal will be submitted to the IADD for review and determination.

**Appeals (DUA Definition):** The state workforce agency will have the opportunity to appeal a denial of initial program award or supplemental funding requests within 60 days of receipt of the written notice of determination. First level appeals will be submitted to the RA for review and determination and second level appeals will be submitted to the IADD for review and determination.

Appendix H: Definitions

**Client:** A disaster survivor enrolled in a Disaster Case Management (DCM) program that is receiving case management services.

**Closeout:** The process by which FEMA or the pass-through entity determines that all applicable administrative actions and all required work of the Federal award have been completed and takes actions as described in 2 C.F.R. § 200.343.

**Conditions of Award:** The legal requirements imposed on a grant by FEMA, whether based on statute, regulation, policy, or other document referenced in the grant award, or specified by the Notice of Grant Award. It may include standard and/or special conditions, as necessary to attain the grant's objectives.[249]

**Contract:** A legal instrument by which an STT government purchases property or services needed to carry out the project or program under a Federal award. The term as used in this part does not include a legal instrument, even if the STT government considers it a contract, when the substance of the transaction meets the definition of a Federal award or subaward.

**Congressional Notification:** In compliance with Section 507 of the Appropriations Act, for all awards greater than or equal to one million dollars, the RA will be required to submit advance Congressional notification and summary of award through the External Coordination Unit, Office of the Chief Financial Officer at FEMA Headquarters.

**Disaster Case Management (DCM):** A time-limited process involving a partnership between a disaster case manager and a disaster survivor (also known as a "client") to develop and carry out an individualized disaster recovery plan. This partnership provides the client with a single point of contact to facilitate access to a broad range of resources. The process involves an assessment of the client's verified disaster-caused unmet needs; development of a goal-oriented plan that outlines the steps necessary to achieve recovery; organization and coordination of information on available resources that match the disaster-caused unmet needs; the monitoring of progress toward reaching the recovery plan goals; and when necessary, client advocacy.

**Disaster-Caused Unmet Needs:** Any un-resourced item, support, or assistance that has been assessed and verified as necessary for a survivor to recover from disaster. This may include food, clothing, shelter, first aid, emotional and spiritual care, household items, home repair, or rebuilding.

**Disaster Recovery Plan:** A formal, written plan developed to accomplish the recovery goals identified by the client, with support from the disaster case manager. The plan is developed following a comprehensive disaster-impact assessment conducted by the disaster case manager, in close collaboration with the client, and should be updated regularly throughout the recovery process. The Disaster Recovery Plan includes specific goals and objectives that link with the client's disaster-caused unmet needs.

**Extensions and additional funding:** Additional funding and/or requests for extensions to the period of performance, closeout reporting, appeal deadline, or liquidation deadline may be approved by the RA. Requests for additional time may be approved for up to 90 days. Extensions and/or additional funding may be approved if sufficient justification is provided. If sufficient need is not provided, the RA may deny the request for extension and/or additional funding.

**Federal award:** The Federal financial assistance that an STT government receives directly from a Federal awarding agency or indirectly from a pass-through entity.

**Federal awarding agency:** The Federal agency that provides a Federal award directly to an STT government.

**Household:** All persons (adults and children) who lived in the pre-disaster residence, as well as any persons, such as infants, spouses, or part-time residents who were not present at the time of the disaster, but who are expected to return during the assistance period.[250]

**Information and Referral (I&R):** The provision of disaster-related resource information provided to disaster survivors to meet immediate unmet needs. Referrals may include those for temporary shelter, food, clothing, and medical assistance. I&R also refers to the ongoing process by which case managers facilitate a disaster survivor's access to needed services throughout the DCM life cycle.

**Long-Term Recovery Group:** A cooperative body that is made up of representatives from faith-based, nonprofit, government, business, and other organizations moving within a community to assist individuals and families as they recover from disaster.[251]

**Non-Federal entity:** An SLTT government, or a private organization that carries out a Federal award as a recipient or subrecipient, or as referenced in previous guidance, a grantee or sub-grantee.

**Nonprofit organization:** Nonprofit organization means any corporation, trust, association, cooperative, or other organization, not including Institutes of Higher Education, that is operated primarily for scientific, educational, service, charitable, or similar purposes in the public interest, is not organized primarily for profit and uses net proceeds to maintain, improve, or expand the operations of the organization.

**Pass-through entity:** An STT government that provides a subaward to a subrecipient to carry out part of a Federal program.

**Performance goal:** A target level of performance expressed as a tangible, measurable objective, against which actual achievement can be compared, including a goal expressed as a quantitative standard, value, or rate. In some instances (e.g., discretionary research awards), this may be limited to the requirement to submit technical performance reports (to be evaluated in accordance with agency policy).

**Period of Performance:** Per 2 C.F.R. § 200.77, period of performance for a Federal award means the time during which the non-Federal entity may incur new obligations to carry-out the work authorized under the Federal Award.

**Pre-Award Costs:** Per 2 C.F.R. § 200.209, pre-award costs for a Federal award are costs incurred by the applicant prior to the start date of the period of performance.

**Reasonable Accommodations or Modifications:** Under Section 504 of the Rehabilitation Act of 1973 and Section 308 of the Stafford Act, FEMA is required to provide reasonable accommodations or modifications to policies, practices, and procedures to ensure equal access to qualified applicants with disabilities. Reasonable accommodations may include the provision of technologies and services to ensure equal access to disaster assistance. Disaster survivors with disabilities have a right to equal access to FEMA programs and activities, including FEMA's registration process and housing inspections, physical access to facilities, and effective communication.

**Recipient:** An STT government mental health agency, or other local or private mental health organization which is designated by the Governor, Governor's Authorized Representative (GAR), or Tribal Chief Executive, or Tribal Chief Executive's Authorized Representative (TAR) to receive funds under Section 416 of the Stafford Act. This definition aligns with the program specific definition of a grantee, as per 44 C.F.R. § 200.171 (b)(5), and the Federal award definition of a recipient, as per 2 C.F.R. § 200.86.

**Service Providers:** Any entity providing DCM services at the local level. These agencies include, but are not limited to, nonprofit, voluntary, faith-based, and/or private not-for-profit organizations that provide DCM services to disaster survivors.

**Subaward:** An award provided by a pass-through entity to a subrecipient for the subrecipient to carry out part of a Federal award received by the pass-through entity. It does not include payments to a contractor or payments to an individual that is a beneficiary of a Federal program.
A subaward may be provided through any form of legal agreement, including an agreement that the pass-through entity considers a contract.

**Subrecipient:** An STT government that receives a subaward from a pass-through entity to carry out part of a Federal program; does not include an individual that is a beneficiary of such program.

**Supplant:** STT governments may not use Crisis Counseling Assistance and Training Program (CCP) funds to take the place of or serve as a substitute for previously existing state or local activities.

**Supplemental**: If sufficient justification is provided by the state workforce agency, requests for supplemental funding may be approved by the RA.

# Appendix I: Abbreviations and Acronyms

| Abbreviation/Acronyms | Definition |
|---|---|
| AA | Assistant Administrator |
| ABFE | Advisory Base Flood Elevation |
| ACS | Adventist Community Services |
| ADA | Americans with Disabilities Act |
| ADAAG | Americans with Disabilities Act Accessibility Guidelines |
| ADL | Activities of Daily Living |
| AFHI | Advisory Flood Hazard Information |
| AFMV | Adjusted Fair Market Value |
| ALAN | American Logistics Aid Network |
| ALE | Additional Living Expense |
| ASL | American Sign Language |
| ASPR | Assistant Secretary for Preparedness and Response |
| AT | Advanced Technology |
| AWG | Administrative Wage Garnishment |
| BFE | Base Flood Elevation |
| BPA | Blanket Purchase Agreements |
| CARB | California Air Resources Board |
| CART | Communication Access Real-time Translation |
| CBRA | Coastal Barrier Resources Act |
| CBRS | Coastal Barrier Resources System |
| CCP | Crisis Counseling Assistance and Training Program |
| CDC | Centers for Disease Control and Prevention |
| C.F.R. | Code of Federal Regulations |
| CMHS | Center for Mental Health Services |

Appendix I: Abbreviations and Acronyms

| Abbreviation/Acronyms | Definition |
|:---:|:---|
| CMS | Consumable Medical Supplies |
| CNA | Critical Needs Assistance |
| CNCS | Corporation for National and Community Service |
| CRA | Clean and Removal Assistance |
| CTN | Critical Transportation Needs |
| CUSI | Commonly Used Shelter Items |
| DCIA | Debt Collection Improvement Act |
| DCM | Disaster Case Management |
| DFA | Direct Federal Assistance |
| DHAP | Disaster Housing Assistance Program |
| DHAT | Direct Housing Assessment Team |
| DHS | Department of Homeland Security |
| DHTF | Disaster Housing Task Force |
| DLS | Disaster Legal Services |
| DME | Durable Medical Equipment |
| DOB | Duplication of Benefits |
| DOD | Department of Defense |
| DOJ | Department of Justice |
| DOL | Department of Labor |
| DRC | Disaster Recovery Center |
| DSA | Disaster Survivor Assistance |
| D-SNAP | Disaster Supplemental Nutrition Assistance Program |
| DTAC | Disaster Technical Assistance Center |
| DUA | Disaster Unemployment Assistance |
| EHP | Environmental Planning and Historic Preservation |
| EMI | Emergency Management Institute |
| EOC | Emergency Operations Center |

Appendix I: Abbreviations and Acronyms

| Abbreviation/Acronyms | Definition |
|---|---|
| EOP | Emergency Operations Plan |
| EOs | Executive Orders |
| ESF | Emergency Support Function |
| ESF6-SS | Emergency Support Function #6-Support Systems |
| FAQ | Frequently Asked Questions |
| FAR | Federal Acquisition Regulation |
| FCO | Federal Coordinating Officer |
| FEMA | Federal Emergency Management Agency |
| FFC | FEMA Finance Center |
| FIID | Fraud and Internal Investigations Division |
| FIOP | Federal Interagency Operational Plan |
| FIRM | Flood Insurance Rate Map |
| FMR | Fair Market Rent |
| FODAC | Friends of Disabled Adults and Children |
| FOIA | Freedom of Information Act |
| FVL | FEMA-Verified Loss |
| GAO | Government Accountability Office |
| GAR | Governor's Authorized Representative |
| GFIP | Group Flood Insurance Policy |
| GIS | Geographic Information System |
| GMO | Grants Management Officer |
| GSA | General Services Administration |
| HA | Housing Assistance |
| HHS | Health and Human Services |
| HPSA | Household Pets and Service and Assistance Animals |
| HQ | Headquarters |
| HQS | Housing Quality Standards |

Appendix I: Abbreviations and Acronyms

| Abbreviation/Acronyms | Definition |
|---|---|
| HUD | Department of Housing and Urban Development |
| HVAC | Heating, Ventilation, and Air Conditioning |
| IA | Individual Assistance |
| IAA | Interagency Agreement |
| IADD | IA Division Director |
| IAPPG | Individual Assistance Program and Policy Guide |
| IAS | International Assistance System |
| IASC | Individual Assistance Support Contracts |
| IDCM | Immediate Disaster Case Management |
| IDEA | Individuals with Disabilities Education Act |
| IDIQ | Indefinite Delivery Indefinite Quantity |
| IEP | Individualized Educational Plan |
| IHP | Individuals and Households Program |
| IOF | Initial Operating Facility |
| IPERA | Improper Payments Elimination and Recovery Act |
| IPERIA | Improper Payments Elimination and Recovery Improvement Act |
| IPIA | Improper Payments and Information Act |
| I&R | Information and Referral |
| ISP | Immediate Services Program |
| JFO | Joint Field Office |
| LEP | Limited English Proficiency |
| LER | Lodging Expense Reimbursement |
| LOU | Loss of Use |
| MASTF | Multi-agency Sheltering Task Force |
| MC/EA | Mass Care/Emergency Assistance |
| MHU | Manufactured Housing Unit |
| MLR | Multi-Family Lease and Repair |

Appendix I: Abbreviations and Acronyms

| Abbreviation/Acronyms | Definition |
|---|---|
| MOA | Memorandum of Agreement |
| MOU | Memorandum of Understanding |
| N/A | Not Applicable |
| NAMB | North American Mission Board |
| NARSC | National Animal Rescue and Sheltering Coalition |
| NASAAEP | National Alliance of State Animal and Agriculture Emergency Programs |
| NASEDoVoC | National Association of State Emergency Donations and Volunteer Coordinators |
| NCIL | National Council on Independent Living |
| NDL | Notice and Demand Letter |
| NDMS | National Disaster Medical System |
| NDRF | National Disaster Recovery Framework |
| NDRN | National Disability Rights Network |
| NECLC | National Emergency Child Locator Center |
| NEMIS | National Emergency Management Information System |
| NETC | National Emergency Training Center |
| NFIP | National Flood Insurance Program |
| NFIRA | National Flood Insurance Reform Act |
| NGO | Non-Governmental Organization |
| NMCE | National Mass Care Exercise |
| NOA | Notice of Award |
| NOR | Notice of Revocation |
| NPG | National Preparedness Goal |
| NRCC | National Response Coordination Center |
| OIG | Office of Inspector General |
| OMB | Office of Management and Budget |

Appendix I: Abbreviations and Acronyms

| Abbreviation/Acronyms | Definition |
|---|---|
| ONA | Other Needs Assistance |
| OPA | Otherwise Protected Area |
| PA | Public Assistance |
| PAPPG | Public Assistance Policy and Program Guide |
| PAS | Personal Assistance Services |
| PHC | Permanent Housing Construction |
| PHP | Permanent Housing Plan |
| PII | Personally Identifiable Information |
| PKEMRA | Post-Katrina Emergency Management Reform Act |
| PMS | Payment Management System |
| PNP | Private Non-Profit |
| PO | Program Officer |
| POD | Proof of Debt |
| POP | Period of Performance |
| PPD | Presidential Policy Directive |
| PSMA | Pre-Scripted Mission Assignments |
| RA | Regional Administrator |
| ROE | Right of Entry |
| RRCC | Regional Response Coordination Center |
| RSF | Recovery Support Function |
| RSP | Regular Services Program |
| RSVP | Retired and Senior Volunteer Program |
| RV | Recreational Vehicle |
| SAMHSA | Substance Abuse and Mental Health Services Administration |
| SAP | State Administrative Plan |
| SBA | U.S. Small Business Administration |
| SBDR | Southern Baptist Disaster Relief |

Appendix I: Abbreviations and Acronyms

| Abbreviation/Acronyms | Definition |
|---|---|
| SCO/TCO | State or Territorial Coordinating Officer |
| SFHA | Special Flood Hazard Area |
| SLTT | State, local, territorial, or tribal |
| SME | Subject Matter Expert |
| SPOC | Single Point of Contact |
| SSA | Social Security Administration |
| SSN | Social Security Number |
| STT | State, territorial, or tribal |
| THU | Temporary Housing Unit |
| TPS | Tank and Pump System |
| TSA | Transitional Sheltering Assistance |
| TTHU | Transportable Temporary Housing Unit |
| TTY | Text Telephone |
| UFAS | Uniform Federal Accessibility Standards |
| UI | Unemployment Insurance |
| UMR | Unaccompanied Minor Registry |
| USACE | United States Army Corps of Engineers |
| USDA | United States Department of Agriculture |
| VA | Department of Veterans Affairs |
| VAL | Voluntary Agency Liaison |
| VISTA | Volunteers in Service to America |
| VOAD | Voluntary Organizations Active in Disasters |
| VRI | Video Remote Interpreting |
| VRS | Video Relay Service |
| YLD | Young Lawyers Division |

This page is intentionally blank.

# Endnotes

1 Stafford Act § 102(4), 42 U.S.C. § 5122 and Title 44 of the Code of Federal Regulations (C.F.R.) § 206.2(a)(22), state governments include the District of Columbia, American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, and the U.S. Virgin Islands.

2 Stafford Act § 102(8), 42 U.S.C. § 5122, and 44 C.F.R. § 206.2.(a)(16), local governments include counties or parishes, municipalities, cities, towns, townships, local public authorities, school districts, special districts established under state law, intrastate districts, councils of governments (regardless of whether the council of governments is included as a nonprofit corporation under State law), regional or interstate government entities, agencies or instrumentalities of a local government; state- recognized tribes; and rural communities, unincorporated towns or villages, or other public entities, for which an application for assistance is made by a state or political subdivision of a state.

3 Stafford Act § 102(6), 42 U.S.C. § 5112, and 44 C.F.R. § 206.201(i), a Tribal Government refers to any Native American tribe, band, nation, pueblo, village, or community in the continental U.S. and Alaska that is listed as a tribe under the Federal Recognized Native American Tribe List Act of 1994.

4 See Robert T. Stafford Disaster Relief and Emergency Assistance Act.

5 Stafford Act § 102(12), 42 U.S.C. § 5122

6 44 C.F.R. § 206.35(a) and 206.36(a)

7 44 C.F.R. § 206.110(c)

8 Voluntary Agency Coordination may take place prior to and during Emergency Declarations and Major Disaster Declarations.

9 Stafford Act § 408(g), 42 U.S.C. § 5174(g) and 44 C.F.R. § 206.110(i).

10 TSA is authorized under Sections 403 or 502 of the Stafford Act and implemented under Section 408.

11 Id.

12 Stafford Act Section 102(1), 42 U.S.C. § 5122

13 Stafford Act § 102(1), 42 U.S.C. § 5122, and 44 C.F.R. § 206.2(a)(17)

14 44 C.F.R. § 206.32(d)

15 44 C.F.R. § 206.44

16 44 C.F.R. § 206.32(f)

17 44 C.F.R. § 206.2(a)(6)

18 44 C.F.R. § 206.32(d)

19 See also 44 C.F.R. § 206.11(c) (requiring organizations or governments receiving assistance under the Stafford Act to provide a written assurance of their intent to comply with regulations relating to nondiscrimination).

20 44 C.F.R. § 206.110(f)

21 44 C.F.R. § 206.110(g)

22 44 C.F.R. § 206.119(b)

23 44 C.F.R. § 206.117(b)(ii)

24 44 C.F.R. § 206.119(a)

25 44 C.F.R. § 206.110(e)

26 Stafford Act Section 426, 42 U.S.C. § 5189d

27 Stafford Act Section 416, 42 U.S.C. § 5183; 44 C.F.R. § 206.171

28 Stafford Act Section 415, 42 U.S.C. § 5182, 44 C.F.R. § 206.164

29 Stafford Act Section 410, U.S.C. § 5177, 44 C.F.R. § 206.141

30 44 C.F.R. § 206.191(d)(2)

31 29 U.S.C § 701 et seq.

32 29 U.S.C. § 794 and 42 U.S.C. § 5151, respectively

33 Stafford Act, codified at 42 U.S.C. § 5151; Executive Order 13166, Improving Access to Services for Persons with Limited English Proficiency, August 11, 2000

34 Mass Care/Emergency Assistance is authorized under Sections 402, 403, and 502 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, Public Law 93-288, as amended; 42 U.S.C. § 5121 (Stafford Act); and Title 6 U.S.C. § 774 and 775

35 Section 402 (a)(3)(j) authorizes the provision of rescue, care, shelter and essential needs…for individuals and their household pets, service animals, and assistance animals.

36 The authorities governing the declaration of a disaster and the ensuing sheltering support by FEMA MC/EA are the Stafford Act (Sections 309, 402, 403, 502, 775).

37 The authorities governing the declaration of a disaster and the emergency feeding support by FEMA MC/EA are the Stafford Act (Sections 309, 402, 403, 412, 413, and 502).

38 The authority governing the declaration of a disaster and the ensuing distribution of emergency supplies by FEMA MC/EA is the Stafford Act (Sections 309, 402, 403, 502).

39 Section 308 of the Stafford Act, 42 U.S.C. § 5151

40 The authorities governing the declaration of a disaster and the Personal Assistance Services support by FEMA MC/EA are the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Sections 402, 403, 502), The Rehabilitation Act of 1973 (Provisions of 504 and 508), ADA of 1990 (and as amended in 2008), Architectural Barriers Act of 1968, Fair Housing Act of 1968 (and as amended in 1988), Air Carrier

Access Act of 1986, and the UFAS of 1984. FEMA personal assistance contracts are governed by Section 3(2) of the ADA of 1990 (42 U.S.C. 12102(2) and the Stafford Act (Public Law 93-288).

[41] Support to children in disasters was added in the June 2016 (version 3) of the ESF6 Annex.

[42] The authorities governing the declaration of a disaster and the ensuing deployment of reunification services by FEMA MC/EA are the Stafford Act (Section 403), and Title 6 U.S.C. § 774. NECLC is authorized under the Stafford Act (Sections 403 and 774).

[43] The authorities governing the declaration of a disaster and the ensuing household pets, service animals, and assistance animals support by FEMA MC/EA are the Stafford Act (Sections 309, 402, 403, 502, 611, and 613).

[44] The authorities governing the declaration of a disaster and the ensuing deployment of mass evacuee assistance by FEMA MC/EA are the Stafford Act (Sections 309, 402, 403, 502), and Title 6 U.S.C. § 774 and 775.

[45] Section 403, 42 U.S.C. § 5170b, Essential Assistance; Section 408, 42 U.S.C. § 5174, Federal Assistance to Individuals and Households; and Section 502, 42 U.S.C. § 5192, Federal Emergency Assistance, of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, as amended.

[46] IRC Section 61(a), and Sections 139(a),(b)(1), (b)(4), (c)(2), (c)(4), and (h)

[47] 44 C.F.R. § 206.110(f)

[48] 44 C.F.R. § 206.110(g)

[49] Stafford Act § 408(c)(1)(B)(iii), 42 U.S.C. § 5174(c)(1)(B)(iii) and 44 C.F.R. § 206.110(e).

[50] 44 C.F.R. § 206.110(e).

[51] 44 C.F.R. § 206.110(e)

[52] Stafford Act § 408(h), 42 U.S.C. § 5174(h) and 44 C.F.R. § 206.110(b)

[53] The Disaster Recovery Reform Act (DRRA) of 2018 amends the Stafford Act 408(h) to remove Temporary Housing Assistance from any financial maximum and separates Other Needs Assistance (ONA) so ONA and Home Repair Assistance/Home Replacement Assistance have equal, independent financial maximums.

[54] This minimum is only limited to initial IHP awards. There is no minimum award amount for secondary awards.

[55] Stafford Act § 408(b)(2)(B), 42 U.S.C. § 5174(b)(2)(B) and § 206.110(c)

[56] Stafford Act § 408(h), 42 U.S.C. § 5174(h) and 44 C.F.R. § 206.110(b)

[57] Stafford Act § 408(c)(1)(A)(i), 42 U.S.C. 5174 (c)(1)(A)(i) and 44 C.F.R. 206.117(b)(1)(i)

[58] Id.; 44 § C.F.R. 206.111

[59] Stafford Act § 408(c)(2), 42 U.S.C. § 5174 (c)(2) and 44 C.F.R. § 206.117(b)(2)

[60] Stafford Act § 408(c)(3), 42 U.S.C. § 5174(c)(2) and 44 C.F.R. § 206.117(b)(3)

[61] Stafford Act § 408(c)(1)(B)(i), 42 U.S.C. § 5174(c)(1)(B)(i) and 44 C.F.R. § 206.117(b)(1)(ii)

[62] Stafford Act § 408(c)(1)(B)(ii), 42 U.S.C. § 5174(c)(1)(B)(ii)

[63] Stafford Act § 408(c)(4), 42 U.S.C. § 5174(c)(4) and 44 C.F.R. § 206(b)(4)

[64] Stafford Act § 408(e), 42 U.S.C. § 5174(e) and 44 C.F.R. § 206.119

[65] 42 U.S.C. § 5174(i)

[66] Stafford Act § 408(a)(1), 42 U.S.C. § 5174(a)(1). Disaster Operations Legal Reference, Version 2.0, Department of Homeland Security, June 1, 2013

[67] Id.

[68] Stafford Act § 408(i), 42 U.S.C. § 5174(i)

[69] 44 C.F.R. § 206.113(a)(3)

[70] 44 C.F.R. § 206.113(a)(3)

[71] 44 C.F.R. § 206.111

[72] 44 C.F.R. § 206.111

[73] National Flood Insurance Program, Dwelling Form: Standard Flood Insurance Policy. F-122. October 2015.

[74] 16 U.S.C. § 3504

[75] 44 C.F.R. § 206.113(b)(7)

[76] 44 C.F.R. § 206.113(b)(7)

[77] 44 C.F.R. § 61, Appendix A(1) and A(3)

[78] 44 C.F.R. § 61

[79] 44 C.F.R. § 206.110(k)(3)

[80] 44 C.F.R. § 61.17 Appendix A.III.6

[81] 44 C.F.R. § 206.115

[82] 44 C.F.R. § 206.115(a)

[83] 44 C.F.R. § 206.115(b)

[84] 44 C.F.R. § 206.115(f)

[85] Id

[86] 42 U.S.C. § 5151(a); 44 C.F.R. § 7

[87] 44 C.F.R. § 206.112(a)

[88] 44 C.F.R. § 206.112(c)

[89] 44 C.F.R. § 206.110(i)

[90] 44 C.F.R. § 206.111

Endnotes

[91] 44 C.F.R. § 206.110

[92] 44 C.F.R. § 206.117(b)(1)(i)

[93] 44 C.F.R. § 206.110

[94] 42 U.S.C. § 5174(c)(1)(A)(i) and 44 C.F.R. § 206.117(b)(1)(i)

[95] 44 C.F.R. § 206.111

[96] 44 C.F.R. § 206.117(b)(1)(i)(B)

[97] 44 C.F.R. § 206.117(b)(1)(i)(C)

[98] 44 C.F.R. § 206.113(b)(2)

[99] 44 C.F.R. § 206.111

[100] 44 C.F.R. § 206.113(b)(3)

[101] 44 C.F.R. § 206.117(b)(1)(i)(A)

[102] 44 C.F.R. § 206.114(a)

[103] 44 C.F.R. § 206.114(b)(3)

[104] 44 C.F.R. § 206.111

[105] 44 C.F.R. § 206.111

[106] 44 C.F.R. § 206.114(b)(2)

[107] 44 C.F.R. § 206.114(b)(2)

[108] 42 U.S.C. § 5174(c)(2) and 44 C.F.R. § 206.114(b)(2)

[109] The definition of the term 'basement' comes from 44 C.F.R. § 59.1

[110] 44 C.F.R. § 206.117(b)(2)(ii)(F)

[111] PHC does not count towards the financial Housing Assistance maximum award, but an applicant is not eligible for financial Home Repair or Home Replacement Assistance if they choose PHC. If accepting PHC, the applicant must disclose and return any funds determined to be a duplication of benefits to FEMA prior to construction, if already awarded Home Repair or Home Replacement Assistance

[112] 42 U.S.C. § 5174(c)(1)(B) and 44 C.F.R. § 206.117(b)(1)(ii)

[113] 42 U.S.C. § 5174(c)(4) and 44 C.F.R. § 206.117(b)(4)

[114] Stafford Act, codified at 42 U.S.C. § 5174, 408(c)(B)(1)

[115] This threshold is based on a 2019 statistical analysis of FEMA direct housing operations from 2011 to 2018.

[116] Resource: Department of Housing and Urban Development (HUD) – Housing Quality Standards.

[117] 44 C.F.R. § 206.117(b)(1)(ii)(G)

[118] 44 C.F.R. § 206.117(b)(1)(ii)(H)

[119] 42 U.S.C. § 5174(c)(1)(B)(iii)

[120] 44 C.F.R. § 206.117(b)(1)(ii)(F)

[121] 44 C.F.R. § 206.117(b)(1)(ii)(F)

[122] For example, if the original period of assistance ends on March 24, 2016, and the extension is granted, rent will begin to accrue on April 1, 2016

[123] For example, if rent begins to accrue on April 1, 2016, the primary occupant's first monthly rent payment will be due on May 1, 2016

[124] 44 C.F.R. § 206.117(b)(1)(ii)(G)

[125] 42 U.S.C. § 5174(c) (1)(B)(ii)

[126] https://www.access-board.gov/guidelines-and-standards/buildings-and-sites/about-the-ada-standards/background/adaag

[127] https://www.huduser.gov/portal/publications/destech/design_details.html

[128] Landlords may not prohibit service animals or charge "pet rent" or a pet deposit for service animals (Fair Housing Act, 42 U.S.C. § 3601 – 3619)

[129] 24 C.F.R. § 3280, Manufactured Home Construction and Safety Standards.

[130] In accordance with 44 C.F.R. § 9.13

[131] 44 C.F.R. § 9.13, Executive Order 11988 - Floodplain Management, Executive Order 11990 - Protection of Wetlands, and FEMA Instruction 108-1-1.

[132] Dispose means to release a unit from FEMA's inventory

[133] 42 U.S.C. § 5174(d)(2)(B); 44 C.F.R. § 206.118

[134] 42 U.S.C. § 5174(d)(2)(A)(i); 44 C.F.R. § 206.118(a)(1)(i)

[135] FEMA will use the MHU Depreciation Calculator to identify the AFMV of a unit.

[136] 42 U.S.C. § 4012(a)

[137] 44 C.F.R. § 9.6

[138] 42 U.S.C. § 5174(d)(2)(B)(ii); 44 C.F.R. § 206.118(a)(2)(i)

[139] 42 U.S.C. § 5174(d)(2)(B)(ii); 44 C.F.R. § 206.118(a)(2)(i)

[140] 42 U.S.C. § 5174(d)(2)(B)(ii)(b); 44 C.F.R. § 206.118(a)(2)(i)(B)

[141] 42 U.S.C. § 5151; 44 C.F.R. § 206.118(a)(2)(i)(A)

[142] 42 U.S.C. § 5174(c)(1)(B)(i)

[143] Landlords may not prohibit service animals or charge "pet rent" or a pet deposit for service animals. (Fair Housing Act, 42 U.S.C. § 3601 – 3619)

[144] 42 U.S.C. § 5174(c)(4) and 44 C.F.R. § 206.117(b)(4)

[145] 44 C.F.R. § 206.117(2)(ii)

[146] 44 C.F.R § 206.110(k)(3)

[147] 42 U.S.C. § 5174(e)

[148] 42 U.S.C. § 5174(g)

[149] Refer to *Chapter 1: Introduction*, for further information on the relationship between IHP and other forms of assistance, including SBA.

[150] 42 U.S.C. § 5174(h)

[151] 44 C.F.R. § 206.120(b)

[152] 44 C.F.R. § 206.120(a) and (b)

[153] 44 C.F.R. § 206.120(d)

[154] 44 C.F.R. § 206.120(a)

[155] 44 C.F.R. § 206.120(c)(1)

[156] 44 C.F.R. § 206.120(b)

[157] 44 C.F.R. § 206.120(c)(1).

[158] 44 C.F.R. § 206.120(c) and (d)

[159] Id

[160] 44 C.F.R. § 206.120(c)(3)(i) and 44 C.F.R. § 206.120(c)(3)(ii)

[161] 44 C.F.R. § 206.119(c)(4)

[162] https://www.cdc.gov/nchs/data/nvss/vsrg/vsrg01.pdf.

[163] 44 C.F.R. § 206.119(c)(3)(i) and (ii)

[164] 42 U.S.C. § 5174 (e)(1)

[165] 42 U.S.C. § 12102(1) defines disability to mean, "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; and (C) being regarded as having such an impairment…"

[166] 34 C.F.R. § 104.

[167] 44 C.F.R. § 206.119(c)(6)(ii)

[168] 44 C.F.R. § 206.120(c)(3)(i) and (ii)

[169] 44 C.F.R. § 206.119(c)(5)

[170] Id

[171] 44 C.F.R. § 206.119(c)(1)

[172] 44 C.F.R. § 206.119(c)(2)

[173] 44 C.F.R. § 206.119(c)(6)(ii)

[174] 44 C.F.R. § 206.119(d) and 44 C.F.R. § 61.17

[175] 44 C.F.R. 61.17(b)

[176] 44 C.F.R. § 206.119(c)(6)(i) and (d)(2)

[177] 44 C.F.R. § 61, Appendix A (1)

[178] Section 312(c) of the Stafford Act, 42 U.S.C. § 5155(c) and 44 C.F.R. § 206.191

[179] Stafford Act § 312, 42 U.S.C. § 5155

[180] 44 C.F.R. § 206.116

[181] Examples of "Certain Federal benefit payments" include Social Security (other than Supplemental Security Income), Railroad Retirement (other than tier 2), and Black Lung (part B) benefits, and other Federal payments including certain loans that are not exempt from offset.

[182] Section 426 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5189d.

[183] 2 C.F.R. § 200.458

[184] 2 C.F.R. § 200.303

[185] Section 423 of the Stafford Act (42 U.S.C. § 5189(a))

[186] 42 U.S.C. § 5189(a)

[187] 2 C.F.R. § 200.339

[188] 2 C.F.R. § 200.327-328

[189] 2 C.F.R. § 200.327

[190] 2 C.F.R. § 200.343 and 200.309

[191] 2 C.F.R. § 200.333

[192] 2 C.F.R. § 200.333(c)

[193] 2 C.F.R. § 200.333(a)

[194] 2 C.F.R. § 200.333(b)

[195] 2 C.F.R. § 200.333(e)

[196] 2 C.F.R. § 200.333(f)

[197] 44 C.F.R. § 206.171

[198] Section 416 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5183.

[199] 44 C.F.R. § 206.171

[200] 44 C.F.R. § 206.171 (f)(1)(i)(ii)

[201] 2 C.F.R. § 200.458

[202] 44 C.F.R. § 206.171(f)(3)

[203] 44 C.F.R. § 206.171(f)(3)

[204] 2 C.F.R. § 200.333

[205] 2 C.F.R. § 200.333(c)

[206] 2 C.F.R. § 200.333(a)

[207] 2 C.F.R. § 200.333(b)

[208] 2 C.F.R. § 200.333(e)

[209] 2 C.F.R. § 200.333(f)

[210] 44 C.F.R. § 206.171 (g)(4)(i)

[211] 44 C.F.R. § 206.171 (g)(4)(i)

[212] 2 C.F.R. § 200.333

[213] 2 C.F.R. § 200.333(c)

[214] 2 C.F.R. § 200.333(a)

[215] 2 C.F.R. § 200.333(b)

[216] 2 C.F.R. § 200.333(e)

[217] 2 C.F.R. § 200.333(f)

[218] 2 C.F.R. § 200.113; see also 2 C.F.R. § 180.335, 180.350

[219] Section 423, Stafford Act (42 U.S.C. § 5189a)

[220] 42 U.S.C. § 5182

[221] 42 U.S.C. § 5177

[222] Published weekly by DOL

[223] 20 C.F.R. § 625.6

[224] 20 C.F.R. § 625.4 Eligibility requirements for Disaster Unemployment Assistance.

[225] The Americans with Disabilities Act of 1990 prohibits applicable recipients from discriminating on the basis of disability in employment, the operation of public entities, public and private transportation systems, places of public accommodation, and certain testing entities. In order to ensure compliance, recipients must provide program access, ensure effective communication, and provide physical access for persons with disabilities in developing budgets and in conducting programs and activities.

[226] https://www.fema.gov/media-library/assets/documents/32282

[227] 44 C.F.R. § 206.111

[228] FEMA itself has similar civil rights responsibilities for the public-facing programs and activities it conducts, such as providing disaster assistance, temporary housing, home inspections, National Flood Insurance Program and Flood Insurance Advocate, public messaging and information, training to state, territorial, and tribal officials, among others. See, e.g., 44 C.F.R. § 16.

[229] 42 U.S.C. § 3601 et seq.

[230] 24 C.F.R. § 100.201

[231] 16 U.S.C. § 470f

[232] http://nps.gov/nr/

[233] 16 U.S.C. § 1531, Section 7

[234] 33 U.S.C. § 1251 et seq.

[235] 42 U.S.C. § 7401 et seq.

[236] 16 U.S.C. § 3501 et seq.

[237] 16 U.S.C. § 3501 and 3503. CBRS maps: www.fws.gov/ecological-services/habitatconservation/cbra/Maps/index.html.

[238] 16 U.S.C. § 3505

[239] 16 U.S.C. § 703–712

[240] 42 U.S.C. § 6901 et seq.

[241] 16 U.S.C. § 1451 et seq.

[242] 7 U.S.C. § 4201 et seq.

[243] 16 U.S.C. § 661–667e

[244] 16 U.S.C. § 1271 et seq.

[245] 16 U.S.C. § 1801–1884

[246] 43 C.F.R. § 10.4(g)

[247] 44 C.F.R. § 9.6, Decision-making process.

[248] PPD-8 Access and Functional Needs Working Group 2014

[249] 2 C.F.R. § 200.300

[250] 44 C.F.R. § 206.111

[251] http://www.nvoad.org/wp-content/uploads/2014/05/long_term_recovery_guide_-_final_2012.pdf

Exhibit U



# Public Assistance Program and Policy Guide

Version 5.0 *Amended, Effective January 6, 2025*

*(FP 104-009-2)*



PAPPG v5

This page intentionally left blank

PAPPG v5

PAPPG Version 5.0 has been amended to reflect the issuance of Executive Orders on and after January 20, 2025. Amendments are reflected in the following: Chapters 4, 6, 8, 10, Appendices A, B, C, D, G, & the removal of the option for an independent expert panel cost estimate review for projects with a federal cost share greater than $5 million.

# Foreword

On behalf of the Federal Emergency Management Agency (FEMA), I am pleased to issue the fifth edition (Version 5.0 Amended) of the "Public Assistance Program and Policy Guide" (PAPPG). This version applies to incidents declared on or after January 6, 2025 and supersedes Version 4.[1] As with prior versions, FEMA has archived previous editions for reference, and Version 5.0 Amended serves as the comprehensive, consolidated resource for Public Assistance (PA) Program policies throughout the disaster recovery lifecycle.

The PAPPG provides a robust and streamlined guide for evaluating eligibility under the PA Program. It consolidates relevant policies into a single document, while also referencing external FEMA policies and resources to support stakeholders involved in the implementation of each recovery step. The release of Version 5.0 Amended reflects FEMA's continued commitment to improving access to the PA Program, reducing the documentation burden on our customers, and promoting fair and timely recovery efforts. By integrating cost-effective hazard mitigation measures, Version 5.0 also helps facilitate resilient rebuilding in communities affected by disasters.

Significant updates in this edition include policy changes related to Tribal Nations, resilience and mitigation, and adjustments based on Title 2 Code of Federal Regulations (C.F.R.) updates that took effect on October 1, 2024. FEMA will continue to prioritize further updates to PA guidance to ensure continued alignment with emerging needs in disaster recovery and Administration priorities.

We are confident that Version 5.0 Amended of the PAPPG will further enhance the effectiveness, accessibility, and resilience of the PA Program as it supports the recovery of communities across the nation. We look forward to your feedback to help inform the next version. All recommendations for the PAPPG can be sent to FEMA-Recovery-PA-Policy@fema.dhs.gov.

Paul Judson
Acting Assistant Administrator
Recovery Directorate

---

[1] For previous editions of the PAPPG, refer to: Archives: FEMA Public Assistance Policy | FEMA.gov.

# Table of Contents

Foreword ................................................................................................................................. 5

    Summary of Changes.................................................................................................... 21

    Policy and Guidance Documents Incorporated and Superseded................................... 23

Introduction........................................................................................................................ 25

    I.    Document Scope, Purpose, and Use................................................................ 25

    II.   Applicability .................................................................................................... 25

    III.  Document Management and Maintenance ...................................................... 25

    IV.  Public Assistance Program Overview .............................................................. 25

    V.   Authorities ..................................................................................................... 26

         A.     Statutes .............................................................................................. 26

             1.    Stafford Act................................................................................ 26

             2.    Other Statutes............................................................................ 27

         B.     Regulations ......................................................................................... 27

             1.    Title 44 of the Code of Federal Regulations................................ 27

             2.    Title 2 of the Code of Federal Regulations.................................. 28

             3.    Other C.F.R. ............................................................................... 28

         C.     Policy ................................................................................................. 28

         D.     Public Assistance Web-Based Grants System ...................................... 29

Chapter 1: Declarations and Planning................................................................................ 30

    I.    Damage Assessments...................................................................................... 30

    II.   Declaration Request......................................................................................... 31

    III.  Declaration Evaluation .................................................................................... 31

         A.     State and Territorial Governments....................................................... 32

         B.     Tribal Nations ..................................................................................... 32

    IV.  Declaration Determinations ............................................................................ 33

         A.     Incident Type ...................................................................................... 33

         B.     Incident Period ................................................................................... 34

         C.     Designated Areas ............................................................................... 34

PAPPG v5

D.     Types of Assistance ................................................................................................. 34

E.     Federal Cost Share .................................................................................................. 35

F.     Declaration-Related Appeals ................................................................................. 35

G.     Recipient Administrative Requirements ............................................................... 36

H.     Application for Federal Assistance ........................................................................ 36

I.      FEMA-State/Tribal Nation Agreement ................................................................. 36

J.      Payment Management System .............................................................................. 37

K.     Public Assistance Administrative Plan .................................................................. 37

L.     Hazard Mitigation Plan .......................................................................................... 38

M.     Recipient-Led Public Assistance ........................................................................... 38

**Chapter 2: Coordination and Appeal Rights** ............................................................ **40**

I.      **PA Eligibility** ............................................................................................................ **40**

A.     Simplified Procedures ............................................................................................ 41

B.     Sampling Procedures .............................................................................................. 41

C.     Facilitated Discussions ........................................................................................... 41

D.     Requests for Information ........................................................................................ 42

E.     Notification of an Ineligibility Determination ...................................................... 42

F.     Appeal Rights and Requirements .......................................................................... 42

G.     Appeal Deadlines .................................................................................................... 43

H.     Appeal Review and Decisions ................................................................................ 43

I.      Arbitration ............................................................................................................... 44

**Chapter 3: Applying for Public Assistance and Applicant Eligibility** ....................... **45**

I.      **Applicant Eligibility** .............................................................................................. **45**

II.     **Applicant Briefing** ................................................................................................. **45**

III.    **Request for Public Assistance** ............................................................................. **45**

IV.    **Applicant Eligibility: State, Local, Tribal Nation, and Territorial Government Entities** .......... **46**

A.     State and Territorial Governments ........................................................................ 46

B.     Tribal Nations .......................................................................................................... 46

C.     Local Governments ................................................................................................. 47

V.    Applicant Eligibility: Private Nonprofit Organizations ................................................................ 47

   A.    Organization Eligibility ................................................................................ 48

   B.    For-Profit Entities ...................................................................................... 48

   C.    Facility Eligibility ....................................................................................... 48

   D.    Multiple Facilities ...................................................................................... 50

   E.    Mixed-Use Facility ..................................................................................... 50

   F.    Mixed-Use Space ....................................................................................... 50

   G.    Multiple Services ....................................................................................... 51

   H.    Use by Multiple Entities.............................................................................. 51

   I.    Leased Facilities ........................................................................................ 51

   J.    Small Business Administration Loan Requirement.......................................... 51

          1.    Small Business Loan Eligibility.......................................................52

   K.    Private Nonprofit Services .......................................................................... 53

Chapter 4: General Facility and Work Eligibility .............................................................. 60

I.    Facility Eligibility .............................................................................................. 60

   A.    Public Facility ........................................................................................... 60

   B.    Inactive or Partially Inactive Facility ............................................................ 61

   C.    Facility Scheduled for Repair or Replacement ............................................... 61

II.   General Work Eligibility...................................................................................... 62

   A.    Emergency Work vs. Permanent Work.......................................................... 62

   B.    Minimum Work Eligibility Criteria ................................................................ 62

          1.    Result of Declared Incident ...........................................................63

                 i.     Documentation and Information to Support Cause of Impacts and Damage .........64

                 ii.    Protecting Tribal Sensitive Locations ...........................................................64

          2.    Within Designated Area ................................................................65

                 i.     Documentation and Information to Support Within Declared Area ......................66

          3.    Legal Responsibility .....................................................................66

                 i.     Documentation and Information to Support Legal Responsibility ..........................67

                 ii.    Facilities Under Contract for Construction....................................................67

                 iii.   Leased Facilities...................................................................................67

                 iv.    Federal Facilities ..................................................................................68

                 v.     Jurisdiction Over an Area .......................................................................68

                 vi.    Conducting Activities on Private Property ....................................................68

PAPPG v5

vii.    *Work Under the Authority of Other Federal Agencies*............................68
viii.   *Environmental and Historic Preservation Requirements*.......................69
ix.     *Policy Implementation Considerations*..................................69
x.      *Resilience Considerations* ...........................................69

**Chapter 5: Damage and Impact Information**...........................................**70**

I.    **Impact List**............................................................**70**
    A.    Impact List Submission Deadline ...................................... 70
    B.    Inundated and Submerged Roads ...................................... 71

II.   **Grouping Impacts into Projects** ......................................... **71**
    A.    Initial Debris Removal Grouping (Category A)........................... 71
    B.    Initial Emergency Protective Measures Grouping (Category B)................. 72
    C.    Initial Permanent Work Grouping (Categories C-G)...................... 72
        1.    Transportation ................................................ 72
        2.    Water Control ................................................ 72
        3.    Education .................................................... 72
        4.    Housing...................................................... 72
        5.    Health ....................................................... 72
        6.    Emergency Service Facilities ................................... 72
        7.    Other Government Facilities ................................... 72
        8.    Energy....................................................... 72
        9.    Water/Wastewater ............................................ 73
        10.   Communications/Information Technology ........................ 73
        11.   Natural and Cultural Resources................................. 73
    D.    Final Grouping .................................................... 73
    E.    Building Code and Floodplain Management Administration and Enforcement
          Activities Grouping (Category I) ..................................... 74
    F.    Grant Management Activities Grouping (Category Z)....................... 74

**Chapter 6: Cost Eligibility** ...................................................... **75**

I.    **Eligibility Requirements**................................................ **75**

II.   **Reasonable Costs**...................................................... **75**
    A.    Reasonable Cost Analysis ........................................... 76

III.  **Applicant (Force Account) Labor** ....................................... **78**
    A.    Labor Policies .................................................... 80

4

PAPPG v5

B.  Eligibility Criteria for Reimbursement of Employee Labor Costs ............................... 80
    1.  Reassigned Employees ................................................................................. 81
    2.  Reassigned Employees Funded from an External Source ........................... 82
    3.  Backfill Employees ....................................................................................... 82
    4.  Essential Employees Called Back from Furlough ....................................... 82
    5.  Supervisors .................................................................................................. 83
    6.  Other ............................................................................................................ 83
    7.  Standby Time ............................................................................................... 83

IV.  Applicant-Owned and Purchased Equipment ........................................................ 84
    A.  FEMA Rates ......................................................................................................... 85
    B.  State, Tribal Nation, or Territorial Rates ............................................................. 85
    C.  Local Rates .......................................................................................................... 86
    D.  Equipment with No Established Rate .................................................................. 86
    E.  Telecommunications Equipment Purchase ......................................................... 86

V.  Rented or Leased Equipment ................................................................................. 87

VI.  Supplies .................................................................................................................. 88

VII.  Disposition of Equipment and Supplies ................................................................. 89
    A.  Disposition of Purchased Equipment ................................................................. 90
    B.  Disposition of Purchased Supplies .................................................................... 90

VIII.  Disposition for Small Projects ................................................................................ 91

IX.  Disposition of Real Property ................................................................................... 91

X.  Procurement and Contracting Requirements ......................................................... 91
    A.  Procurement and Contracting Requirements for State and Territorial Government and Tribal Nation Entities ............................................................................................. 92
        1.  Procurement ................................................................................................ 92
        2.  Contracting .................................................................................................. 92
    B.  Procurement and Contracting Requirements for Local Government Agencies and Private Nonprofit Organizations ............................................................................... 93
        1.  Pre-Procurement Considerations ............................................................... 93
        2.  General Federal Procurement Requirements ............................................. 94
        3.  Procurement Methods ................................................................................. 96
    C.  Noncompetitive Procurement ............................................................................. 96
        1.  Contract Types ............................................................................................ 98

PAPPG v5

D.    Time-and-Materials Contracts ................................................................. 98
        1.    Cost-Plus-Percentage-of-Cost or Percentage-of-Construction .................. 98
        2.    Additional Contracting Considerations ................................................. 99
                i.    Pre-Positioned Contracts.......................................................... 99
                ii.   Cooperative Purchasing........................................................... 99
    E.    Required Documentation and Information for Procurement and Contracting......... 99

XI.    Mutual Aid ................................................................................................. 100
    A.    Post-Incident Agreements.................................................................... 101
    B.    Eligibility .......................................................................................... 102
    C.    Emergency Management Assistance Compact.......................................... 102
    D.    Required Documentation and Information for Mutual Aid ...................... 103

XII.   Prisoners ................................................................................................... 104

XIII.  National Guard ........................................................................................... 104

XIV.   Direct Federal Assistance............................................................................ 104

XV.    Increased Federal Cost Share for a Limited Timeframe ................................. 105

XVI.   Donated Resources ..................................................................................... 105
    A.    Offset Amounts................................................................................... 107
    B.    Required Documentation and Information for Donated Resources ...................... 108

XVII.  Project Management and Design Services ..................................................... 109

XVIII.      Grant Management and Administration .................................................. 109

XIX.   Surveys to Assess or Locate Damage or Debris Impacts................................. 110

XX.    Duplication of Benefits................................................................................ 110
    A.    Insurance Proceeds ............................................................................ 110
    B.    Non-Federal Grants and Cash Donations................................................ 112
    C.    Third-Party Liability ............................................................................ 112
    D.    Other Federal Awards.......................................................................... 113

XXI.   Duplication of Funding Between FEMA Programs.......................................... 113

XXII.  Interest on Loans ....................................................................................... 113

XXIII.      Ineligible Costs .................................................................................... 113
    A.    Loss of Revenue .................................................................................. 113
    B.    Loss of Useful Service Life.................................................................... 113

C.    Tax Assessments ................................................................................ 114

D.    Increased Operating Costs ................................................................. 114

# Chapter 7: Emergency Work Eligibility ................................................115

XI.    Eligibility Considerations for Emergency Work ................................. 115

XII.   Debris Removal (Category A).............................................................. 117

    A.    Hazardous Limbs, Trees, and Stumps ............................................ 120

        1.    Hazardous Limb or Branch Removal ...........................................121

        2.    Hazardous Tree Removal .............................................................121

        3.    Hazardous Stump Removal...........................................................122

            i.    *Contracted Stump Removal*.......................................................... *122*

            ii.   *Documentation Requirements for Hazardous Limbs, Trees, and Stumps* .......... *122*

    B.    Waterways........................................................................................ 123

        1.    Navigable Waterways....................................................................123

        2.    Non-Navigable Waterways, Including Flood Control Works and Natural Waterways ................................................................................123

        3.    Identifying Debris Impact Locations .............................................124

    C.    Privately-Owned Vehicles and Vessels on Public Property ............. 124

    D.    Disposal ........................................................................................... 125

        1.    Recycling Revenue.......................................................................125

        2.    Temporary Staging Sites..............................................................125

        3.    Hand-Loaded Trucks and Trailers ...............................................125

        4.    Landfills and Tipping Fees............................................................126

    E.    Monitoring Contracted Debris Removal Operations ................................. 126

    F.    Private Property Debris Removal....................................................... 127

        1.    PPDR Eligibility Determination Process ......................................127

            i.    *Public Interest*............................................................................... *128*

        2.    Debris Removal from Private Roads .............................................129

        3.    Debris Removal from Private Non-Commercial Property................129

        4.    Debris Removal from Private Commercial Property........................129

        5.    Duplication of Benefits in Private Property Debris Removal .................130

XIII.  Emergency Protective Measures (Category B) .................................. 130

    A.    Saving Lives and Protecting Public Health and Safety ................... 130

    B.    Protecting Improved Property .......................................................... 131

    C.    Emergency Protective Measures on Private Property...................... 132

D.    Emergency Protective Measures Conducted by Private Nonprofit Organizations.. 133

E.    Pre-Positioning Resources ........................................................................ 133

F.    Increased Operating Costs ........................................................................ 134

G.    Emergency Public Transportation and Communication (DFA Only) ...................... 134

H.    Flood Fighting ........................................................................................ 135

I.    Emergency Operations Centers .................................................................. 135

J.    Emergency Access .................................................................................. 135

K.    Hazardous Materials ................................................................................ 136

L.    Supplies and Commodities ........................................................................ 137

M.    Meals .................................................................................................. 137

N.    Emergency Medical Care .......................................................................... 138

O.    Evacuation and Sheltering ........................................................................ 140

    1.    Evacuation ................................................................................. 140

    2.    Sheltering ................................................................................. 142

        i.    Congregate Sheltering ......................................................... 142

            a.    Congregate Shelter Facility Costs ................................. 142

            b.    Congregate Shelter Staff Costs ................................... 143

            c.    Congregate Shelter Supplies and Commodities ................ 143

            d.    Congregate Shelter Services ...................................... 144

        ii.    Non-Congregate Sheltering .................................................... 145

            a.    Requests for Non-Congregate Sheltering ........................ 146

            b.    Eligible Costs for Non-Congregate Sheltering ................. 147

            c.    Ineligible Costs for Non-Congregate Sheltering .............. 147

            d.    Survivor Insurance and Non-Congregate Sheltering .......... 148

            e.    Time Extensions for Non-Congregate Sheltering .............. 148

            f.    NCS Work Eligibility Requirements ............................... 148

            g.    Data Collection, Management, and Reporting During NCS Operations ........................ 149

    3.    Host-State or Host-Tribe Evacuation and Sheltering ............................... 150

    4.    Childcare Services ....................................................................... 152

P.    Infectious Disease Incident ....................................................................... 152

Q.    Mosquito Abatement ............................................................................... 153

R.    Safety Inspections .................................................................................. 153

S.    Animal Carcasses ................................................................................... 153

T.    Demolition of Private Structures ................................................................ 154

    1.    Conditions of Eligibility for Demolition .............................................. 154

2.    Commercially Owned Structures ................................................... 155
3.    Eligible Demolition Work ........................................................... 155
4.    Ineligible Work ...................................................................... 156
U.    Temporary Relocation of Essential Services .................................... 156
1.    Eligible for Temporary Relocation ............................................. 156
2.    Ineligible for Temporary Relocation ........................................... 156
3.    Determining Eligibility of Temporary Relocation .......................... 157
4.    Lease, Purchase, or Construct ................................................. 157
5.    Safe Rooms for Temporary School Facilities ................................ 158
6.    Temporary Relocation Costs ................................................... 158
7.    Time Limitations .................................................................. 159
i.    Conditions When Temporary Facility Funding is Limited ...................... 159
a.    Improved Project .................................................. 159
b.    Alternate Project .................................................. 160
c.    Alternative Procedures Project ................................. 160
8.    Disposition Requirements ...................................................... 160
V.    Snow-Related Activities ............................................................ 160
1.    Limited Time Period ............................................................. 161
2.    Eligible Work ...................................................................... 161
W.    Emergency Repair or Stabilization ............................................... 161
1.    Operation Blue Roof (DFA Only) ............................................. 162
2.    Slope Stabilization .............................................................. 162
3.    Mold Remediation ............................................................... 163
4.    Emergency Berms on Beaches ................................................ 164
X.    Elections and Polling Activities ................................................... 165
XIV. Damage Caused During Performance of Emergency Work ................................. 166

Chapter 8: Permanent Work Eligibility (Categories C-G) ............................. 167
I.    Facility Restoration (Categories C-G) .......................................... 167
II.   Codes and Standards .............................................................. 168
A.    Consensus-Based Codes, Specifications, and Standards ..................... 168
1.    Identification Requirements .................................................... 169
2.    Verification Requirements ...................................................... 170
3.    Additional Eligible Work and Costs ........................................... 170
4.    Other Considerations ........................................................... 170
B.    Locally Adopted Codes and Standards ........................................ 171

PAPPG v5

C.       Codes and Standards Eligibility Criteria ................................................................ 171
         1.       Applies to the Type of Restoration Required ................................................ 171
         2.       Appropriate to Pre-Disaster Use .................................................................. 173
         3.       Reasonable .................................................................................................. 173
         4.       Written, Formally Adopted, and Implemented.............................................. 174
         5.       Applies Uniformly ........................................................................................ 174
         6.       Enforced ...................................................................................................... 175

D.       Ineligible Upgrades ................................................................................................ 175

E.       Accessibility for Individuals with Disabilities ......................................................... 176

F.       Path of Travel......................................................................................................... 176

G.       Permit Requirements .............................................................................................. 177

H.       Additional Resources ............................................................................................ 178

III.   Hazard Mitigation ................................................................................................................ 178

A.       Eligibility Criteria ................................................................................................... 178

B.       Future Damage Reduction ..................................................................................... 179
         1.       Cost Effectiveness ...................................................................................... 180
         2.       Compliance with Legal Requirements .......................................................... 180
         3.       Proposing PA Hazard Mitigation ................................................................. 181
         4.       Reduce Adverse impacts ............................................................................ 182
         5.       Post-Repair Hazard Mitigation .................................................................... 182
         6.       Completed Hazard Mitigation Eligibility ...................................................... 182

C.       Historic Preservation Compliance .......................................................................... 182
         1.       Federal Requirement ................................................................................... 182
         2.       State, Tribal Nation, or Territorial Government Requirement ......................... 182

D.       Public Assistance Mitigation Funds for Capped Projects ....................................... 183
         1.       Improved Project .......................................................................................... 183
         2.       Alternate Project ......................................................................................... 183

E.       Construction Method............................................................................................... 183

F.       Pre-Existing Site Conditions .................................................................................. 183

IV.    Flexible Restoration (Capped Projects) ............................................................................... 183

A.       Processing Projects with Capped Funding............................................................... 183

B.       Improved Project .................................................................................................... 184
         1.       Use of Improved Project Funds .................................................................... 184

PAPPG v5

C.     Alternate Project ........................................................................................ 185

      1.     Use of Alternate Project Funds .......................................................... 185

**V.     Eligibility Considerations by Facility ............................................................ 186**

A.     Roads and Bridges (Category C) .................................................................. 186

      1.     Components .................................................................................... 186

      2.     Road and Bridge Eligibility for Permanent Work ................................ 187

      3.     Types of Damage ............................................................................ 188

            *i.     Deterioration, Deferred Maintenance, Negligence* ............................. 188

            *ii.     Scour and Erosion* ........................................................................ 188

      4.     Inundated and Submerged Roads ...................................................... 189

            *i.     Inundated Roads with Visible Damage* ............................................. 189

                 a.     Documentation to Support Claimed Damage ..................................... 189

            *ii.     Inundated Roads without Visible Surface Damage* ............................. 190

                 a.     Projected Loss of Useful Service Life ................................................ 190

            *iii.     Surface Damage Resulting from Reopening Roads Prematurely* ........... 191

            *iv.     Closed Basin Flooding* .................................................................. 191

                 a.     Documentation to Support Claimed Damage for Closed Basin Flooding ................... 192

            *v.     Gravel Roads* ............................................................................... 192

                 a.     Documentation and Information to Support Gravel Loss ...................... 193

                 b.     Documentation and Information to Support Gravel Road Rutting .......... 193

      5.     Demonstrating Disaster-Related Damage ........................................... 194

B.     Water Control Facilities (Category D) ........................................................... 194

      1.     Restoring the Capacity of Channels, Basins, and Reservoirs .................. 195

      2.     Flood Control Works ........................................................................ 195

C.     Buildings and Equipment (Category E) ......................................................... 195

      1.     Buildings ........................................................................................ 195

            *i.     Earthquake Damage to Welded Steel Moment Frame Buildings* ........... 196

      2.     Contents and Supplies ..................................................................... 196

            *i.     Files* ............................................................................................ 196

            *ii.     Library Books and Publications* ....................................................... 197

            *iii.     Irreplaceable Collections and Individual Objects* ............................... 197

            *iv.     Research-Related Contents* ............................................................. 199

            *v.     Animals* ...................................................................................... 199

      3.     Equipment ..................................................................................... 201

      4.     Vehicles ......................................................................................... 201

D.     Utilities (Category F) .................................................................................. 201

      1.     Power Restoration ........................................................................... 201

PAPPG v5

2. Right-of-Way Clearance.................................................................202

3. Power: Transmission and Distribution System Conductor Replacement ...............202

E. Parks, Recreational, Other (Category G) .......................................... 204

1. Beaches...............................................................................205

F. Landslides and Slope Stabilization ................................................. 207

VI. Repair vs. Replacement ......................................................................... 207

A. Calculation ............................................................................. 208

B. Request for Replacement ............................................................. 209

C. Eligible Funding ....................................................................... 210

D. Replacement of Components of a Facility or System ............................. 211

VII. Relocation ........................................................................................ 212

A. FEMA-Directed Relocation .......................................................... 212

B. Applicant-Driven: Repair vs. Replacement ...................................... 213

C. Code-Driven: Part 9 and Other Code and Standard Relocations ............ 213

D. Eligible Work and Funding .......................................................... 213

E. Sale or Lease of Property at Original Site ......................................... 214

VIII. Environmental and Historic Preservation Requirements ............................ 214

A. Floodplain Management and Wetland Protection ................................ 214

1. Critical Actions.....................................................................216

.......................................................................................216

i. *Potential Critical Actions* ............................................ 216

ii. **Non-Critical Actions** ............................................. 216

2. Coastal High Hazard Areas.....................................................216

3. Requirement for Communities Participating in the National Flood Insurance Program. ...........................................................................217

IX. Facility Located in or Impacting a Floodplain .......................................... 217

A. 8-Step Decision-making Process.................................................... 218

B. Hydrologic and Hydraulic Studies.................................................. 218

C. Facility Located in a Special Flood Hazard Area .................................. 219

1. National Flood Insurance Program .............................................219

X. Requirement to Obtain and Maintain Insurance......................................... 220

A. Failure to Obtain and Maintain Insurance ........................................ 221

XI.   Building Code and Floodplain Management Administration and Enforcement (Category I)
......................................................................................................................... 221

    A.   General Requirements ........................................................................ 222

    B.   Eligible Work .................................................................................... 223

        1.   Building Code Administration ..................................................223

        2.   Code Enforcement ....................................................................223

        3.   Floodplain Management Ordinance and Enforcement....................224

        4.   Substantial Damage Determinations .........................................224

    C.   Ineligible Work ................................................................................ 225

    D.   Required Documentation and Information for Category I Work ............. 225

**Chapter 9: Scoping, Costing, and Final Reviews** ...................................................227

    I.   Scope of Work Development........................................................................ 227

    A.   Traditional Tribal Residential and Ceremonial Structures – Inspecting, Scoping, & Estimating........................................................................ 227

    II.   Cost Development .................................................................................... 228

    A.   Project Thresholds............................................................................ 228

    B.   Expedited Projects for Emergency Work............................................. 229

    C.   Costs for Projects with All Work Completed........................................ 230

    D.   Estimating Emergency Work Projects with Work to be Completed ......... 231

    E.   Estimating Permanent Work Projects with Work to be Completed ......... 231

        1.   Projects Requiring Engineering Analysis ...................................232

        2.   Applicant Estimates ................................................................232

        3.   FEMA Estimates ......................................................................232

        4.   Insurance Reductions ..............................................................232

    III.   Compliance Reviews ............................................................................... 233

    IV.   Obligation .............................................................................................. 233

    A.   Obtaining Funds .............................................................................. 233

    B.   Strategic Funds Management ............................................................ 233

**Chapter 10: Environmental and Historic Preservation** ..........................................234

    I.   EHP Compliance....................................................................................... 234

    A.   EHP Compliance Review ................................................................... 235

        1.   Required Information and Documentation....................................235

B.     Projects that Qualify for Streamlined EHP Review ................................................ 236

C.     Projects Requiring Complex EHP Review ............................................................. 236

    1.     Emergency Work (Categories A and B) ........................................................238

    2.     Debris Removal (Category A)........................................................................238

    3.     Emergency Protective Measures (Category B) .............................................238

    4.     Permanent Work (Categories C-G) ..............................................................239

        i.     *Disposition of Original Facility* .......................................................... 239

D.     Navigating the EHP Compliance Process............................................................. 240

E.     Understanding EHP Laws and Executive Orders ................................................. 241

    1.     National Environmental Policy Act ...............................................................241

    2.     National Historic Preservation Act ...............................................................242

    3.     Endangered Species Act..............................................................................242

    4.     Executive Orders 11988 & 11990: Floodplain Management and Wetlands Protection............................................................................................................242

    5.     Coastal Barrier Resources Act.....................................................................243

    6.     Clean Water Act............................................................................................243

F.     Coordination with Other Federal Agencies .......................................................... 244

    1.     Unified Federal Review ................................................................................245

G.     Partnerships and Resources ............................................................................... 245

    1.     Heritage Emergency National Task Force ....................................................245

H.     Resource Links .................................................................................................... 245

**Chapter 11: Project Monitoring and Amendments .................................................................246**

**I.     Post Award Change in Scope of Work .............................................................................. 246**

**II.     Work Completion Deadlines ............................................................................................. 247**

A.     Project Schedule .................................................................................................. 248

**III.     Large Project Quarterly Progress Reports ....................................................................... 248**

**IV.     Financial Status Reports ................................................................................................. 250**

**V.     Federal Funding Accountability and Transparency Act ..................................................... 250**

**VI.     Audits............................................................................................................................... 250**

A.     Single Audits ........................................................................................................ 250

B.     Government Accountability Office ........................................................................ 250

C.     Office of the Inspector General ............................................................................ 251

    1.     Report Fraud .................................................................................................251

PAPPG v5

D.   FEMA Office of Civil Rights ...................................................................... 251

E.   Recovery of Improper Payments ............................................................. 251

## Chapter 12: Final Reconciliation and Closeout ...................................................253

I.   Project Reconciliation and Closeout ............................................................. 253

A.   Small Projects .............................................................................................. 253

1.   Net Small Project Overrun Appeal Request ..................................254

2.   Small Project Closeout ........................................................................254

B.   Large Projects .............................................................................................. 254

C.   Subrecipients ............................................................................................... 257

II.   Stafford Act Section 705 ................................................................................. 257

III.   Public Assistance Award Closeout ................................................................ 257

IV.   Documentation Retention Requirements .................................................... 258

## Appendix A. References and Resources ...................................................................259

I.   Public Assistance Program References ......................................................... 259

II.   Public Assistance Forms and Templates ...................................................... 260

III.   Statutes ............................................................................................................... 260

IV.   Code of Federal Regulations .......................................................................... 260

V.   Environmental Protection Laws ..................................................................... 260

VI.   Executive Orders ............................................................................................... 261

VII.   Historic Preservation Laws and Tools .......................................................... 261

VIII.   Federal Emergency Management Agency References .............................. 261

IX.   Other Federal Agencies ................................................................................... 262

## Appendix B. Acronyms .................................................................................................263

## Appendix C. Terms and Definitions ...........................................................................267

## Appendix D: Environmental and Historic Preservation Compliance ...................275

I.   National Environmental Policy Act ................................................................ 275

II.   National Historic Preservation Act ................................................................ 275

III.   Endangered Species Act .................................................................................. 276

PAPPG v5

IV.   Clean Water Act.............................................................................................................. 276

V.    Rivers and Harbors Act..................................................................................................... 276

VI.   Safe Drinking Water Act .................................................................................................. 277

VII.  Clean Air Act ................................................................................................................... 277

VIII. Coastal Barrier Resources Act......................................................................................... 277

IX.   Migratory Bird Treaty Act ............................................................................................... 277

X.    Bald and Golden Eagle Protection Act............................................................................ 278

XI.   Magnuson-Stevens Fishery Conservation and Management Act..................................... 278

XII.  Marine Mammal Protection Act....................................................................................... 278

XIII. National Marine Sanctuaries Act..................................................................................... 278

XIV.  Coastal Zone Management Act ....................................................................................... 279

XV.   Farmland Protection Policy Act....................................................................................... 279

XVI.  Wild and Scenic Rivers Act ............................................................................................ 279

XVII. Resource Conservation and Recovery Act....................................................................... 279

XVIII.      Comprehensive Environmental Response, Compensation and Liability Act ............. 280

XIX.  Executive Order 11988, Floodplain Management ............................................................ 280

XX.   Executive Order 11990, Protection of Wetlands............................................................. 280

XXI.  Executive Order 13112, Invasive Species ...................................................................... 281

Appendix E: Private Nonprofit Facility Eligibility Examples ....................................................282

I.    Facility Owned by PNP – PNP Leases Portion of Facility to For-Profit Service ................... 282

II.   PNP Recreational Center Providing Eligible Services ....................................................... 282

III.  Support Facility Owned by PNP ...................................................................................... 282

IV.   Facilities Owned by PNP Homeowners' Association......................................................... 283

V.    Recreational Center – Primarily Athletic Services............................................................ 283

VI.   Mixed Use Community Center – Nominal Fee.................................................................. 284

VII.  School Operated by a Religious Institution ..................................................................... 284

VIII. Religious Institution with a Dock, a Church, and a Pastor's Residence............................ 285

Appendix F: Mosquito Abatement................................................................................................286

Appendix G: Alternative Procedures for Permanent Work.........................................................289

PAPPG v5

I.    Differences Between Standard and Alternative Procedures.................................. 289

II.    Fixed Cost Estimate.................................................................................................. 290

    A.    Architectural, Engineering, Environmental Review, and Design Fees .................. 290

    B.    Construction and Other Restoration Costs................................................... 290

    C.    Expert Panel Cost Estimate Review ........................................................... 291

    D.    Public Assistance Hazard Mitigation.......................................................... 291

III.    Fixed Cost Offer ...................................................................................................... 291

    A.    Fixed Cost Offer Deadlines .......................................................................... 292

IV.    Use of Funding ........................................................................................................ 292

    A.    Excess Funds ................................................................................................ 293

III.    Scope of Work Changes .......................................................................................... 294

IV.    Closeout Requirements ........................................................................................... 295

V.    Other Considerations.............................................................................................. 295

    A.    Requirement to Obtain and Maintain Insurance......................................... 295

    B.    Appeals for Alternative Procedures Projects ............................................... 296

    C.    Office of the Inspector General .................................................................... 296

Appendix H: Mold Remediation................................................................................297

I.    Mold Remediation Methods .................................................................................. 297

II.    Application of Remediation Methods .................................................................... 297

Appendix I: Work Eligibility Considerations by Type of Facility.............................299

I.    General Work Eligibility Considerations for Facilities.......................................... 299

II.    Work Eligibility Considerations for Roads and Bridges ....................................... 300

III.    Work Eligibility Considerations for Water Control Facilities................................ 301

IV.    Work Eligibility Considerations for Buildings, Equipment, and Vehicles ............ 304

V.    Work Eligibility Considerations for Contents ....................................................... 307

VI.    Work Eligibility Considerations for Utilities.......................................................... 308

VII.    Work Eligibility Considerations for Parks, Recreation, and Other ...................... 310

Appendix J: Cost-Effective Public Assistance Hazard Mitigation Measures .........312

I.    Drainage Structures ............................................................................................... 312

PAPPG v5

II.   Transportation Facilities .................................................................................... 313

III.  Mechanical, Electrical, Plumbing Components .................................................. 314

IV.   Pipes ................................................................................................................. 314

V.    Water/Wastewater ............................................................................................ 314

VI.   Electric Power Systems ..................................................................................... 314

VII.  Storage Tanks ................................................................................................... 315

VIII. Buildings and Structures ................................................................................... 315

IX.   Signage .............................................................................................................. 316

**Appendix K: Snow Declarations ......................................................................... 317**

I.    Record or Near-Record Snowfall ....................................................................... 317

II.   Winter Storm or Snowstorm Declaration Requests .......................................... 318

**Appendix L: Validation of Applicant-Provided Cost Estimates ............................... 319**

**Appendix M. Consensus-Based Codes, Specifications, and Standards ................... 322**

18

PAPPG v5

# Tables

Table 1. List of Changes and Clarifications Grouped by General Topic ................................................. 21
Table 2. SBA Loan Requirements ........................................................................................................... 52
Table 3. PNP Eligible Critical Services .................................................................................................... 53
Table 4. PNP Eligible Noncritical, Essential Social Services  .................................................................. 55
Table 5. PNP Ineligible Services.............................................................................................................. 57
Table 6. Required Documentation and Information for PNP RPA............................................................. 57
Table 7. Documentation and Information to Support Cause of Impacts and Damage........................ 64
Table 8. Required Documentation and Information to Support Within Declared Area ...................... 66
Table 9. Required Documentation and Information to Support Legal Responsibility ......................... 67
Table 10. Required Documentation and Information for Labor Costs .................................................. 79
Table 11. Emergency Work Labor Eligibility ........................................................................................ 81
Table 12. Required Documentation and Information for Applicant-Owned or Purchased Equipment
Costs ....................................................................................................................................................... 85
Table 13. Required Documentation and Information for Rented or Leased Equipment Costs........... 88
Table 14. Required Documentation and Information for Materials and Supplies Costs .................... 89
Table 15. Required Documentation and Information for Contract Costs ............................................ 100
Table 16. Required Documentation and Information for Mutual Aid Costs......................................... 103
Table 17. Required Documentation and Information for Prison Labor Costs....................................... 104
Table 18. Required Documentation and Information for Offset Values for Donated Resources ...... 108
Table 19. Required Documentation and Information for Insurance Proceeds.................................... 111
Table 20. Required Documentation and Information for Work Eligibility............................................. 117
Table 21. Required Documentation and Information for Debris Removal and Disposal.................. 118
Table 22. Required Documentation and Information for PPDR............................................................ 128
Table 23. Required Documentation and Information to Support Damage to Inundated or Submerged
Roads...................................................................................................................................................... 190
Table 24. Required Information to Support Damage Resulting from Reopening Roads Prematurely
................................................................................................................................................................. 191
Table 25. Required Documentation and Information to Support Closed Basin Flooding................. 192
Table 26. Required Documentation and Information to Support Gravel Loss.................................... 193
Table 27. Required Documentation and Information to Support Gravel Road Rutting .................... 193
Table 28. Required Documentation and Information to Support Pre-Incident Capacity of Channels,
Basins, and Reservoirs .......................................................................................................................... 195
Table 29. Required Documentation and Information to Support Pre-Disaster Conductor Condition204
Table 30. Required Documentation and Information for Category I Work........................................... 226
Table 31. Required Documentation and Information to Support Scope of Work Changes .............. 247
Table 32. Deadlines for Submitting Quarterly Progress Reports ........................................................ 249
Table 33. Required Documentation and Information for Quarterly Progress Reports ...................... 249
Table 34. Required Documentation and Information to Support a Large Project Closeout Request255
Table 35. Differences Between Standard and Alternative Procedures................................................. 289
Table 36. Eligible Work and Costs for Use of Fixed Cost and Excess Funds....................................... 293
Table 37. Mold Remediation Methods  ................................................................................................. 297
Table 38. Application of Mold Remediation Methods  .......................................................................... 298
Table 39. Work Eligibility Considerations: All Facilities ...................................................................... 299
Table 40. Work Eligibility Considerations: Roads and Bridges ........................................................... 300
Table 41. Work Eligibility Considerations: Water Control Facilities ................................................... 302
Table 42. Work Eligibility Considerations: Buildings, Equipment, and Vehicles ................................ 304
Table 43. Work Eligibility Considerations: Contents............................................................................. 307
Table 44. Work Eligibility Considerations: Utilities.............................................................................. 309
Table 45. Work Eligibility Considerations: Parks, Recreation, and Other........................................... 310

PAPPG v5

Table 46. Standard Setting Organization and Consensus-Based Codes, Specifications, and Standards by Facility Type .................................................................................................................................. 323

## Figures

Figure 1. 44 C.F.R. .................................................................................................................. 27
Figure 2. PA Eligibility Pyramid ............................................................................................. 40
Figure 3. Applicant Eligibility ................................................................................................. 45
Figure 4. PNP Eligibility ......................................................................................................... 48
Figure 5. SBA Loan Outcomes .............................................................................................. 53
Figure 6. Facility Eligibility ..................................................................................................... 60
Figure 7. Categories of Work .................................................................................................. 62
Figure 8. Cost Eligibility .......................................................................................................... 75
Figure 9. Emergency Work Eligibility ................................................................................... 115
Figure 10. Immediate Threats .............................................................................................. 115
Figure 11. Debris on Public Property ................................................................................... 127
Figure 12. Distribution of Supplies ...................................................................................... 137
Figure 13. Staging Area with Ambulances .......................................................................... 141
Figure 14. Evacuees Boarding a Bus .................................................................................. 151
Figure 15. Determining Eligibility of Emergency Berms on Beaches ................................. 165
Figure 16. Permanent Work Eligibility .................................................................................. 167
Figure 17. Path of Travel ...................................................................................................... 176
Figure 18. PA Hazard Mitigation Process Flowchart ........................................................... 181
Figure 19. Typical Beach Profile .......................................................................................... 206
Figure 20. Category I Work Eligibility ................................................................................... 223
Figure 21. Work Completion Deadlines ................................................................................ 247

PAPPG v5

# Summary of Changes

This PAPPG version incorporates the following changes:

**Table 1. List of Changes and Clarifications Grouped by General Topic**

| Topic | Highlighted V5 Improvements |
|---|---|
| Tribal Nations | ▪ To support the protection of tribal significant artifacts, culturally sensitive landscapes and sites, cultural resources, and human remains; clarified that FEMA will not require photos, site maps, and specific location details (such as GPS coordinates) for locations where these cultural artifacts are located;<br><br>▪ Clarified that FEMA will accept a Tribal Nation's certified damage assessment, scope of work for restoration, and estimated costs for traditional tribal residences or tribal ceremonial buildings;<br><br>▪ Clarified that for locations where only tribal members are allowed, site inspections by FEMA staff are not permitted;<br><br>▪ Clarified that mutual aid agreements or memoranda of understanding are available resources for Tribal Nations and provided guidance on reimbursement when there is no pre-existing written agreement; and,<br><br>▪ Clarified that if a Tribal Nation received funding from the Bureau of Indian Affairs or Federal Highway Administration for construction or maintenance of tribal roads, those roads are still eligible for FEMA PA funding under a presidentially declared disaster. |
| Resilience | ▪ Included language about resilience considerations throughout;<br><br>▪ Clarified that PA mitigation measures can be implemented for all hazards, not just the hazard that caused the damage;<br><br>▪ Added information and reference to the benefit-cost analysis (BCA) Toolkit;<br><br>▪ Increased opportunities to mitigate improved projects involving facility replacement or relocation; and,<br><br>▪ Expanded Appendix J to include additional measures, with two measures focused on wildfire<br><br>▪ |
| Simplification | ▪ As a result of stakeholder feedback, removed non-regulatory processes for inclusion in other PA guidance;<br><br>▪ Where possible, removed "may" and "should," and replaced with "must" to clarify requirements; and,<br><br>▪ Redefined acronyms at the beginning of each chapter and reduced acronym use. |

PAPPG v5

| Topic | Highlighted V5 Improvements |
|---|---|
| Documentation and Requirements | ▪ Clarified documentation and information requirements for small projects and large projects;<br>▪ Reduced documentation and information requirements for small projects;<br>▪ Incorporated PA's sampling procedures;<br>▪ Clarified that maintenance records are not always required to substantiate damage;<br>▪ Included more options for documentation to support legal responsibility; and,<br>▪ Removed requirement for pre-approval prior to completing private property debris removal. |
| Added Content | ▪ Incorporated Validated as You Go (VAYGo) content and resources;<br>▪ Added subsection titled "Telecommunications Equipment Purchase;"<br>▪ Added "self-insurance or self-insured retention" to list of insurance types; and,<br>▪ Included insurance commitment opportunities which benefit applicants experiencing subsequent disasters. |
| Clarifications | ▪ Clarified road damage from damage caused by submerged and inundated as distinct types of damage;<br>▪ Clarified that snow assistance is not authorized for emergency declarations; and,<br>▪ Conveyed FEMA's support to report suspicious activities as well as who and how to report. |
| Private Non-Profit (PNP) | ▪ Consolidated private non-profit information into one section;<br>▪ Explained for-profit entities' ineligibility; and,<br>▪ Clarified that Houses of Worship and faith-based organizations are considered private nonprofit organizations. |
| Sheltering | ▪ Removed pre-approval requirement for non-congregate sheltering activities in traditional settings (i.e., hotels/motels, dormitories, etc.);<br>▪ Removed childcare services as a standalone emergency protective measure and is now only eligible when associated with emergency sheltering; and,<br>▪ Expanded emergency sheltering eligibility to include survivors' "household pets, service animals, assistance animals" and removed requirement for pet owners to be sheltered for pet sheltering to be eligible. |

PAPPG v5

| Topic | Highlighted V5 Improvements |
|---|---|
| Environmental and Historic Preservation (EHP) | ▪ Explained and provided examples of projects that have potential to impact EHP resources; <br> ▪ Provided guidance on navigating the EHP compliance process; <br> ▪ Clarified documentation requirements for streamlined EHP reviews and complex EHP reviews; <br> ▪ Provided EHP considerations by category of work; and, <br> ▪ Provided examples of project types that may have impacts to natural and cultural resources. |
| Statutory and Regulatory Updates | ▪ Incorporated the revision to 2 C.F.R. Part 200 which integrates Office of Management and Budget (OMB)'s policy priorities and strives to reduce agency and recipient burden; <br> ▪ Updated guidance from the Payment Integrity Information Act, which supersedes the Improper Payments Elimination and Recovery Improvement Act; and, <br> ▪ Added compliance with EO 14148, Initial Recissions of Harmful Executive Orders and Actions |

# Policy and Guidance Documents Incorporated and Superseded

▪ *Building Code and Floodplain Management Administration and Enforcement* (FEMA Policy 204-079-01)

▪ "Combining Wildfires Under a Major Disaster Declaration" Memo (August 21, 2021)

▪ *Consensus-Based Codes, Specifications, and Standards for Public Assistance* (FEMA Recovery Interim Policy 104-009-11 Version 2)

▪ "Emergency NCS" Memo (June 28, 2022)

▪ *Mission Assignments* (FEMA Policy 104-010-3)

▪ *Public Assistance Appeals and Arbitration* (FEMA Policy 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)

▪ *Public Assistance Guidance on Inundated and Submerged Roads* (FEMA Policy 104-009-13)

▪ *Public Assistance Simplified Procedures* (FEMA Policy 104-23-001)

▪ "Recovery Program Enhancements to Support Tribal Nations" Memo (November 22, 2023)

▪ "Simplifying the PA Management Costs" Memo (March 01, 2023)

▪ "Simplifying the PA Program 1" Memo (March 28, 2022)

▪ "Simplifying the PA Program 2" Memo (September 6, 2022)

▪ "Wildfire Policy Guidance" Memo (October 17, 2022)

▪ *Tribal Declarations Interim Guidance* (FP 104-009025-001)

PAPPG v5

(For a list of guidance documents summarized and referenced, please see the Appendix A: References and Resources list.)

PAPPG v5

# Introduction

## I.     Document Scope, Purpose, and Use

The Federal Emergency Management Agency's (FEMA's) "Public Assistance Program Policy Guide" (PAPPG) contains consolidated Public Assistance (PA) Program policies and procedural requirements for the entire program delivery life cycle. The PAPPG provides comprehensive PA policy to use when evaluating eligibility. The PAPPG references and provides links to other FEMA policies and documents such as standard operating procedures and fact sheets that provide guidance for those involved with implementing each of the various steps.

Based on extensive feedback from internal and external stakeholders, this version of the PAPPG no longer includes content focused on FEMA's internal processes. Instead, a new companion document for FEMA staff known as the "Public Assistance Program Delivery Guide"[2] provides an overview of how FEMA implements the PA Program.

## II.     Applicability

FEMA applies Version 5 of the PAPPG to incidents declared on or after January 6, 2025. Individuals who have responsibilities managing, implementing, or relating to the PA Program should refer to the PAPPG for PA policy and regulatory procedural requirements.

## III.     Document Management and Maintenance

FEMA generally publishes proposed PA policy language for public comment prior to publishing in the PAPPG.[3] When the policy is deemed economically significant,[4] FEMA generally publishes it in the Federal Register. Additionally, FEMA is committed to strengthening its nation-to-nation relationship and will consult with tribal officials on actions that have tribal implications.[5] FEMA conducts a comprehensive review of this publication no less than every three years. All recommendations for the PAPPG should be sent to FEMA-Recovery-PA-Policy@fema.dhs.gov.

## IV.     Public Assistance Program Overview

The mission of FEMA's PA Program is to provide assistance to state, local, Tribal Nation, and territorial (SLTT) governments and certain types of private nonprofit (PNP) organizations so that communities can quickly respond to and recover from major disasters or emergencies. Through the PA Program, FEMA provides supplemental federal grant assistance for debris removal, emergency protective measures, and the restoration of disaster-damaged, publicly owned facilities, and specific facilities of certain PNP organizations. The PA Program also encourages protection of these damaged facilities from future incidents by providing

---

[2] For more information, refer to: *Public Assistance Program Delivery Guide*.
[3] Stafford Act § 325; 42 United States Code (U.S.C.) § 5165c.
[4] EO 12866, Regulatory Planning and Review.
[5] FEMA Tribal Consultation Policy FEMA Policy #101-002-02.

PAPPG v5

assistance for hazard mitigation measures and code compliance. FEMA provides this assistance based on the authority granted in statutes, executive orders (EOs), regulations, and policies.

Along with the PAPPG, there are many resources that help navigate the PA Program. References, including EOs, policies, regulations, and laws are available in the Appendix A: References and Resources. The Public Assistance Resource Library [6] contains general program guidance that focuses on restoring communities affected by major disasters or emergencies. The "Public Assistance Program Delivery Guide" [7] also contains additional process information and context for the PA Program; while its primary audience is FEMA staff, SLTT partners may find it a useful resource. Lastly, definitions for terms used throughout this document can be found in Appendix C. Terms and Definitions.

# V.    Authorities

FEMA provides assistance based on authorities defined in statutes and regulations. These authorities specify requirements that must be met by both FEMA and the communities it serves.

## A.    Statutes

Statutes are federal laws passed by the U.S. Congress and signed by the president. All PA Program assistance must comply with all applicable statutes. The Robert T. Stafford Disaster Relief and Emergency Assistance Act, as amended (Stafford Act), Title 42 of the United States Code (U.S.C.) § 5121 et seq. authorizes FEMA to provide assistance under the PA Program.

### 1.    STAFFORD ACT

Stafford Act sections that apply to the assistance FEMA provides under the PA Program include:

- Title I – Findings, Declarations and Definitions
- Title III – Major Disaster and Emergency Assistance Administration
    - Sec. 308. Nondiscrimination in Disaster Assistance
    - Sec. 311. Insurance
    - Sec. 312. Duplication of Benefits
    - Sec. 316. Protection of Environment
    - Sec. 323. Minimum Standards for Public and Private Structures
    - Sec. 324. Management Costs
- Title IV – Major Disaster Assistance Programs (applies to Major Disaster Declarations)
    - Sec. 403. Essential Assistance
    - Sec. 406. Repair, Restoration, and Replacement of Damaged Facilities
    - Sec. 407. Debris Removal

---

[6] For more information, refer to: Public Assistance Resource Library | FEMA.gov.
[7] For more information, refer to: *Public Assistance Program Delivery Guide*.

PAPPG v5

- o Sec. 422. Simplified Procedures
- o Sec. 428. Public Assistance Program Alternative Procedures
- ▪ Title V – Emergency Assistance Programs (applies to Emergency Declarations)
  - o Sec. 502. Federal Emergency Assistance
- ▪ Title VII – Miscellaneous
  - o Sec. 705. Disaster Grant Closeout Procedures

## 2.      OTHER STATUTES

- ▪ Americans with Disabilities Act of 1990
- ▪ Sections 504 and 508 of the Rehabilitation Act of 1973
- ▪ Civil Rights Act of 1964
- ▪ Federally Recognized Tribe List Act of 1994
- ▪ Environmental and Historic Preservation Acts
- ▪ Payment Integrity Information Act of 2019
- ▪ Executive Order 13175, Consultation and Coordination with Indian Tribal Governments
- ▪
- ▪ Presidential Memorandum of November 5, 2009, Tribal Consultation
- ▪ Federally Recognized Tribe List Act of 1994
- ▪ Fair Labor Standards Act

## B.      Regulations

Regulations[8] are federal rules with the force and effect of law that implement a statute based on a federal agency's interpretation of that statute.[9] FEMA and any entity receiving PA assistance must comply with all applicable federal regulations.[10]

### 1.      TITLE 44 OF THE CODE OF FEDERAL REGULATIONS

FEMA published PA Program rules in the following parts of Title 44 of the Code of Federal Regulations (C.F.R.), Emergency Management and Assistance:[11]

- ▪ Part 206 Subpart G, Public Assistance Project Administration;
- ▪ Part 206 Subpart H, Public Assistance Eligibility; and
- ▪ Part 206 Subpart I, Public Assistance Insurance Requirements.



**Figure 1. 44 C.F.R.**

---

[8] For the electronic version for the C.F.R., refer to: eCFR.
[9] Stafford Act § 321; 42 U.S.C. § 5164.
[10] 44 C.F.R. § 206.200(b).
[11] Stafford Act § 325; 42 U.S.C. § 5165c; 44 C.F.R. § 1.4.

PAPPG v5

Additional regulations that must be adhered to when receiving funding through the PA Program:

- Part 7 Subpart A, Nondiscrimination in FEMA-Assisted Programs – General
- Part 7 Subpart E, Nondiscrimination on the Basis of Age in Programs or Activities Receiving Federal Financial Assistance from FEMA
- Part 9, Floodplain Management and Protection of Wetlands
- Part 201, Mitigation Planning
- Part 204, Fire Management Assistance Grant (FMAG) Program
- Part 206, Federal Disaster Assistance

## 2.     TITLE 2 OF THE CODE OF FEDERAL REGULATIONS

The Office of Management and Budget published 2 C.F.R. Part 200, Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards to establish uniform rules for federal awards, including but not limited to:

- Subpart C – Pre-Federal Award Requirements and Contents of Federal Awards
- Subpart E – Cost Principles
- Subpart F – Audit requirements
- Subpart D – Post Federal Award Requirements
- Appendix II - Contract provisions for non-federal entity contract under federal awards, and
- Appendix VI - PA Cost Allocation Plans

## 3.     OTHER C.F.R.

- 7 C.F.R. § 1730.25, Corrective action (Rural Utilities Service [RUS] borrowers only)
- 15 C.F.R. Part 774, The Commerce Control List
- 22 C.F.R. Part 121, The United States Munitions List
- 40 C.F.R. Part 261, Identification and Listing of Hazardous Waste
- 48 C.F.R. Subpart 2.1, Federal Acquisition Regulation

## C.     Policy

FEMA issues policy to articulate the Agency's intent and direction in applying statutory and regulatory authority to achieve desired outcomes. The purpose of the PAPPG is to define FEMA's PA Program policy and procedural requirements. Separate FEMA policies and guidance documents that apply to the PA Program are referenced in the PAPPG where applicable and listed in the Appendix A: References and Resources section. PA funding must comply with these requirements. Only the Associate Administrator of Recovery at FEMA Headquarters has the authority to modify or waive PA policy.

28

PAPPG v5

## D.      Public Assistance Web-Based Grants System

FEMA uses web-based systems to promote transparency and manage project information. Recipients and applicants use PA Grants Portal [12] to submit documentation and information, review all aspects of Public PA project applications, and track the progress of their applications. FEMA uses PA Grants Manager [13] to review Requests for Public Assistance (RPA), oversee the development and review of project applications, track application progress, and receive necessary information from recipients and applicants.

---

[12] For more information, refer to: Grants Portal.
[13] For more information, refer to: Grants Manager.

PAPPG v5

# Chapter 1: Declarations and Planning

The Stafford Act authorizes the president to provide federal assistance when the magnitude of an incident or threatened incident exceeds the affected state, [14] local, [15] Tribal Nation, [16] and territorial (SLTT) government capabilities to respond and recover. This chapter explains requirements for damage assessments, declaration requests and FEMA's evaluation criteria, the contents of the declaration, and the initial administrative requirements for a state, Tribal Nation, and territorial (STT) government to receive assistance.

## I.    Damage Assessments

After an incident causes widespread damage, the STT government conducts an initial damage assessment before requesting a joint Preliminary Damage Assessment (PDA) to confirm the need for federal assistance. [17] When the STT government determines that the incident exceeds its ability to respond, it requests a joint PDA with FEMA. This initial damage assessment should identify affected jurisdictions, damaged infrastructure, and provide preliminary cost estimates for response and recovery efforts. Additionally, the STT collects data to assess the need for federal assistance, including evaluating local resource capacity to support ongoing response and recovery.

During a joint PDA, FEMA, SLTT governments, and certain private nonprofit (PNP) organization officials work together to estimate and document the impact and magnitude of the incident. [18] Accurate and comprehensive PDAs are critical to enabling efficient response and recovery. FEMA's "Preliminary Damage Assessment Guide" [19] provides detailed information to assist staff involved with damage assessments and describes how FEMA utilizes the information when preparing requests for major disaster declarations. For example, applicants must provide insurance policies when requested during a PDA as FEMA only considers costs that would be eligible for reimbursement through the PA Program in its declaration determination. The Regional Administrator consults with the STT to determine if the requirement for a joint PDA may be waived based on the severity and magnitude of the incident. [20]

 **Terminology**

When an entity applies for PA funding, it is an **applicant**. Once an applicant receives funding, it is a **subrecipient**. For simplicity, FEMA uses the term "applicant" throughout this document when referring to the responsible entity for a project rather than making distinctions between an entity as the

---

[14] Stafford Act § 102(4); 42 U.S.C. § 5122; 44 Code of Federal Regulations (C.F.R.) § 206.2(a)(22).
[15] Stafford Act § 102(8); 42 U.S.C. § 5122; 44 C.F.R. § 206.2(a)(16).
[16] Stafford Act § 102(6); 42 U.S.C. § 5122; 44 C.F.R. § 206.201(h),
[17] 44 C.F.R. § 206.33(a).
[18] 44 C.F.R. § 206.33(b).
[19] For more information, refer to: *Preliminary Damage Assessment Guide*.
[20] 44 C.F.R. § 206.33(d).

PAPPG v5

applicant, recipient or subrecipient. FEMA uses the terms "recipient" and "subrecipient" when necessary to differentiate between the two entities.

# II.  Declaration Request

The governor[21] or tribal chief executive[22] requests a declaration from the president through FEMA.[23] A Tribal Nation may elect to be a recipient[24] or a subrecipient[25] under a state or territorial declaration or request its own declaration as a recipient. A Tribal Nation may seek different types of assistance through Tribal Nation and state declarations; for example, a Tribal Nation may seek PA and the Hazard Mitigation Grant Program (HMGP) through the state, while seeking Individual Assistance (IA) through a tribal declaration. The Tribal Nation, however, cannot receive the same type of assistance (e.g., PA, IA, and HMGP) through both tribal and state declarations for the same incident. This is necessary to ensure that FEMA does not provide duplicative benefits.[26]

For state and territorial declaration requests, the governor must submit the request no later than 30 days after the incident occurs. FEMA extends the deadline if the governor submits a written time extension request within 30 days of the incident, providing reasonable justification for the delay.[27] If the Tribal Nation wishes to be its own recipient, additional guidance for this process is detailed in the Tribal Declarations Interim Guidance.[28] When a severe or catastrophic incident occurs, the governor or tribal chief executive may submit a declaration request prior to completion of the PDA.[29] This process is referred to as an expedited declaration request. In such circumstances, assistance is limited to that which would address immediate needs (lifesaving or life-sustaining items) based on rapid assessments until the PDA is completed.

# III.  Declaration Evaluation

Generally, FEMA uses PDA information to evaluate the need for assistance under the PA Program as follows:

- For emergency declarations, FEMA evaluates whether available resources and authorities are adequate and whether federal assistance under Section 502 of the Stafford Act is necessary to supplement SLTT efforts to save lives, protect property, and public health and safety, or to lessen or avert the threat of a catastrophe.[30]

- For major disaster declarations, FEMA reviews facility impacts and cost information to ensure the estimated amounts do not include costs for ineligible items, costs covered by insurance, or costs above

---

[21] Stafford Act § 102(5); 42 U.S.C. § 5122; 44 C.F.R. § 206.2(12). For more information, refer to: Request For Presidential Disaster Declaration | fema.gov.
[22] Stafford Act § 102(12); 42 U.S.C. § 5122. For more information, refer to: How to Request a Federal Disaster Declaration for Tribal Nations | fema.gov.
[23] Stafford Act §§ 401 and 501; 42 U.S.C. §§ 5170 and 5191; 44 C.F.R. §§ 206.35 and 206.36.
[24] 44 C.F.R. § 200.201.
[25] 44 C.F.R. § 200.201.
[26] FEMA-Tribal-Declarations-Interim-Guidance_508_FINAL
.
[27] 44 C.F.R. §§ 206.35(a) and 206.36(a).
[28] Stafford Act § 312; 42 U.S.C. § 5155.
[29] 44 C.F.R. § 206.33(d).
[30] 44 C.F.R. § 206.37(c)2.

31

and beyond what is necessary to restore the facility to pre-disaster design and capacity (e.g., resiliency/mitigation measures), or facilities under authority of another federal agency. FEMA evaluates the estimated cost of assistance and other factors when making a recommendation to the president for whether assistance is warranted.[31] The factors for state and territorial governments differ from Tribal Nation factors. FEMA will only provide authorization for snow assistance under a major disaster declaration when specifically requested. Requests for snow assistance are only eligible for major disaster declarations and must be submitted with a winter storm or snowstorm declaration request. Additional information is available in Appendix K: Snow Declarations.

## A.    State and Territorial Governments

For state and territorial governments, FEMA's evaluation for a major disaster declaration is based on six primary factors:

- Estimated cost of assistance;
- Localized impacts;
- Existing insurance coverage;
- Previous mitigation efforts;
- Recent multiple disasters; and,
- Other federal agency programs.

FEMA compares the estimated eligible amounts to the established annual per capita indicators. To account for localized impacts when the statewide per capita impact is low, FEMA evaluates whether there are extraordinary concentrations of damage resulting in significantly high per capita impacts at the local government level.

To encourage hazard mitigation, FEMA considers whether SLTT government mitigation measures taken prior to the incident likely reduced the damage impacts, especially if such mitigation averted damage that would have increased the estimated eligible cost above the per capita indicator.

Understanding that the effects of multiple disasters in a confined period of time can affect response and recovery capabilities, FEMA also evaluates the overall impacts of federal and STT declarations that have occurred within the past 12 months and the extent to which the STT government has expended their funds. If there were disasters prior to the 12-month period that still have substantial impacts on SLTT governments, FEMA also considers impacts from these disasters.

## B.    Tribal Nations

FEMA will consider a declaration request from a federally recognized Tribal Nation if the estimated PA-eligible damage or costs meet or exceed the threshold for the minimum damage amount[32] per the Tribal Declarations Interim Guidance. FEMA evaluates Tribal Nation requests for a major disaster declaration based on the following factors:

- Types and amounts of damage;

---

[31] 44 C.F.R. § 206.48(a).
[32] For more information, refer to: Tribal Declarations Interim Guidance | fema.gov.

PAPPG v5

- Economic impact of the incident;

- Tribal Nation resources;

- Demographics;

- 24-month disaster history;

- Previous mitigation efforts;

- Other federal agency programs.

- Insurance;

- Unique conditions that affect Tribal Nations; and,

- Other relevant information.

The Tribal Declarations Interim Guidance[33] is a comprehensive resource for Tribal Nations on Stafford Act declarations, disaster assistance, and related requirements, including the criteria FEMA will use to evaluate declaration requests. Tribal Nations may request—at no cost—technical assistance. At any time prior to, during, and after a Tribal Declaration request, Tribal Nations may request from the FEMA the deployment of a Tribal Liaison Officer (TLNO), when available, to provide direct, onsite technical assistance. See Tribal Declarations Interim Guidance[34] for available resources and guidance on requesting technical assistance.

# IV.  Declaration Determinations

For FEMA to provide assistance, the president must declare that an emergency or major disaster exists.[35] The declaration establishes the:

- Type of incident;

- Incident period;

- Designated areas;

- Types of assistance;

- Federal cost share; and,

- Federal coordinating officer (FCO).

## A.  Incident Type

The declaration designates the type of incident (e.g., hurricane, wildfire, or earthquake). For emergency declarations, an incident is any instance determined by the president that warrants supplemental emergency assistance to save lives, protect property, and public health and safety, or to lessen or avert the threat of a catastrophe.[36] For major disaster declarations, an incident is any natural catastrophe (including any hurricane, tornado, storm, high water, wind driven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm, or drought) or, regardless of cause, any fire, flood, or explosion.[37]

---

[33] *Ibid*.
[34] Ibid.
[35] For more information, refer to: Disaster Information | fema.gov.
[36] Stafford Act § 102(1); 42 U.S.C. § 5122; 44 C.F.R. §§ 206.2(a)(9) and 206.35.
[37] Stafford Act § 102(2); 42 U.S.C. § 5122; 44 C.F.R. § 206.2(a)(17).

33

PAPPG v5

Major disaster declarations may include a combination of incident types, such as severe storms and landslides.

## B.    Incident Period

The declaration designates the incident period. The incident period is the span of time during which the federally declared incident occurred.[38] This period varies in duration, depending on the incident. The declaration includes an incident start date and typically includes an end date to the incident period. In some cases, the end date may be designated as "continuing."

## C.    Designated Areas

The declaration specifies which areas (e.g., county, parish, city, or tribe) are eligible to receive federal assistance, referred to as the "declared area."[39] FEMA may add additional areas after the initial designation. To request an addition, the governor or the governor's authorized representative (GAR)[40], or for Tribal Nation declarations, the tribal chief executive or tribal authorized representative (TAR), must submit the request within 30 days of the declaration date or the end of the incident period, whichever is later. FEMA will extend the deadline if the governor or GAR or, for tribal declarations, the tribal chief executive or TAR submits a written extension request within the 30-day window, providing justification for the delay.[41]

## D.    Types of Assistance

The declaration designates the types of federal assistance authorized.[42] The types of assistance authorized differs between emergency and major disaster declarations and may vary among declared areas. For emergency declarations, the president may authorize limited immediate and short-term assistance essential to save lives, protect property, and public health and safety, or to lessen or avert the threat of catastrophe.[43] For major disaster declarations, the president may authorize Individual Assistance (IA), Hazard Mitigation Programs, and PA. Through IA's Individuals and Households Program (IHP), FEMA provides assistance to eligible individuals and households. FEMA provides risk management resources to identify, assess, and prioritize possible risk reduction and minimize potential loss of life and property from future disasters through its Hazard Mitigation Grant Program (HMGP).

FEMA Regional Administrators[44] have the authority to issue Fire Management Assistance Grant (FMAG) declarations for wildfires that threaten to cause such destruction that would constitute a major disaster.[45] The FMAG Program is separate and distinct from the PA Program. The "Fire Management Assistance Grant

---

[38] 44 C.F.R. § 206.32(f).
[39] 44 C.F.R. §§ 206.2(a)(6) and 206.40(b).
[40] 44 C.F.R. §§ 206.2(a)(13) and 206.41(d).
[41] 44 C.F.R. § 206.40(c-d).
[42] 44 C.F.R. § 206.40(a).
[43] 44 C.F.R. § 206.63.
[44] 44 C.F.R. § 206.2(a)(21).
[45] Stafford Act § 420; 42 U.S.C. § 5187; 44 C.F.R. § 204.

34

PAPPG v5

Program and Policy Guide"[46] describes the declaration criteria, eligibility, and procedures of the FMAG program.

# E.     Federal Cost Share

The assistance FEMA provides through its PA Program is subject to a federal cost share, which means that FEMA provides funding for a portion of the project and the recipient or applicant is responsible for the remaining portion.[47] The federal cost share ensures local interest and involvement through financial participation. The federal cost share is not less than 75 percent of the eligible costs.[48] FEMA recommends an increase up to 90 percent if actual federal obligations, excluding administrative costs, meet or exceed a qualifying threshold.[49] For debris removal and emergency protective measures specifically, the federal cost share may be increased in certain circumstances, and for limited periods of time, if warranted.[50] See Increased Federal Cost Share for a Limited Timeframe in Chapter 6 for details on how FEMA applies the increased federal cost share.

Applicants may only apply other federal award funds toward the PA non-federal cost share if the other federal agency has specific statutory authority allowing its funds to be used to meet cost-share requirements.[51] For example, the U.S. Department of Housing and Urban Development's (HUD's) Community Development Block Grant (CDBG) Program may be used toward the non-federal cost share on PA projects if certain requirements are met.[52] FEMA applies the federal cost share at the project level. Therefore, any other agency's federal funds must be applied at the project level and cannot be used across multiple projects (except for permanent work alternative procedure projects as described in Appendix G: Alternative Procedures for Permanent Work). Further, if an applicant uses funds from another federal agency to meet the non-federal cost share, it must meet all requirements of the other agency as well as all PA Program requirements. Applicants cannot apply PA funds toward the non-federal cost share of other federal agency awards.

# F.     Declaration-Related Appeals

For states and territories, if FEMA denies a declaration, types of assistance, or areas, the governor may submit an appeal through the Regional Administrator. The appeal and any justification or additional information must be submitted within 30 days of the denial letter date. If additional time is needed to submit a declaration-related appeal, a time extension request citing the reason for delay must be submitted within 30 days of the denial letter.

---

[46] For more information, refer to: Fire Management Assistance Grants | fema.gov.
[47] 44 C.F.R. § 206.203(b).
[48] Stafford Act §§ 403(b), 406(b), 407(d), and 503(a); 42 U.S.C. §§ 5170b, 5172, 5173, 5193; 44 C.F.R. §§ 206.47(a) and 206.65.
[49] 44 C.F.R. § 206.47(b).
[50] 44 C.F.R. § 206.47(d).
[51] Stafford Act § 312; 42 U.S.C. § 5155; 2 C.F.R. § 200.306(b)(5).
[52] For more information, refer to: FEMA-HUD CDBG-DR Flexible Match Implementation Guide.

PAPPG v5

For Tribal Nations, if certain types of assistance or certain areas requested to be authorized in the declaration are denied, the tribal chief executive may submit an appeal per the Tribal Declarations Interim Guidance.

The governor or tribal chief executive, GAR, or TAR may appeal, or request time extensions to appeal, a denial of the types of assistance or areas. However, only the governor or tribal chief executive may appeal, or request a time extension to appeal, a declaration denial. FEMA's Assistant Administrator for the Recovery Directorate at FEMA Headquarters approves time extensions when there is a justified reason for the delay.[53]

## G.    Recipient Administrative Requirements

There are several administrative requirements recipients must fulfill before FEMA obligates funds, detailed in the following sections.

FEMA provides funding to cover administrative costs related to managing grants and offers technical assistance at no extra cost to support recipients' success. For new recipients, the "FEMA New Recipients of Disaster Grants Guide"[54] provides additional information.

## H.    Application for Federal Assistance

The declared state, Tribal Nation, or territory must complete and submit the following Standard Forms (SFs)[55] before FEMA provides assistance:

- "Application for Federal Assistance" (SF-424);
- "Budget Information for Non-Construction Programs" (SF-424A);
- "Assurances for Non-Construction Programs" (SF-424B);
- "Budget Information for Construction Programs" (SF-424C); and,
- "Assurances for Construction Programs" (SF-424D).

The SF-424 includes the period of performance (POP) for the PA award (referred to as the prime award). The prime award POP begins on the first day of the incident period and initially extends four years from the declaration date.

## I.    FEMA-State/Tribal Nation Agreement

After every declaration, FEMA and the applicable STT government enter into a FEMA-state agreement (FSA) or FEMA-Tribal Nation agreement (FTA) that defines the understanding, commitments, and conditions under which FEMA provides assistance. FEMA and the governor or tribal chief executive must sign this agreement before FEMA provides assistance. If necessary, because of exigent circumstances, FEMA may authorize essential emergency services or housing assistance under the Individuals and Households Program while the agreement is in process for signature.[56]

---

[53] 44 C.F.R. § 206.46.
[54] For more information, refer to: *FEMA New Recipients of Disaster Grants Guide*.
[55] 44 C.F.R. § 206.202(e). The SF-424 forms are available at: SF-424 Forms.
[56] 44 C.F.R. § 206.44(a).

PAPPG v5

## J.        Payment Management System

FEMA provides PA funding to recipients via the U.S. Department of Health and Human Services (HHS) Payment Management System. Therefore, if an entity is a recipient for the first time, it must request access to the Payment Management System and complete the "Direct Deposit Form" (SF-1199A) to obtain a FEMA-specific account before FEMA can provide funding.[57]

## K.        Public Assistance Administrative Plan

Recipients must have a FEMA-approved administrative plan[58] that describes how it intends to administer the PA Program before FEMA provides PA funding for any project. At a minimum, the administrative plan must include:[59]

- The agencies responsible for program administration;
- Identification of staffing functions, the source of staff to fill the functions, the management and oversight responsibilities of each function; and
- Procedures for:
  - o   Notifying potential applicants of the availability of the PA Program;
  - o   Conducting applicant briefings;
  - o   Assisting FEMA in determining applicant eligibility;
  - o   Participating with FEMA in conducting preliminary damage assessments;
  - o   Participating with FEMA in establishing PA mitigation and insurance requirements;
  - o   Processing appeals, time extension requests, and other project-related correspondence;
  - o   Complying with administrative requirements of 2 Code of Federal Regulations (C.F.R.) § 200 and 3002 and 44 C.F.R. § 206;
  - o   Complying with audit requirements of 2 C.F.R. § 200 and 3002;
  - o   Processing requests for advances of funds and reimbursement;
  - o   Determining staffing and budgeting requirements; and,
  - o   Determining the pass-through funds for management costs provided under 44 C.F.R. § 207.

State and territorial recipients must submit their administrative plan to FEMA annually. Additionally, an amendment is required for each disaster declaration to address the specifics of the new incident. The recipient must incorporate the approved administrative plan into its emergency plan. Tribal Nations submit their PA administrative plan for each declared disaster in which they are a recipient. For further guidance see Tribal Declarations Interim Guidance.[60] Subrecipients do not require PA administrative plans.

---

[57] The *Payment Management System Access Form* and the SF-1199A are available at: Payment Management Services | psc.gov.
[58] Templates for administrative plans are available at: Public Assistance Project Templates and Forms.
[59] 44 C.F.R. § 206.207(b).
[60] For more information, refer to: Tribal Declarations Interim Guidance | fema.gov.

PAPPG v5

## L.     Hazard Mitigation Plan

Hazard mitigation is most effective when implemented under a comprehensive, long-term mitigation plan that considers future conditions. Communities engage in mitigation planning to identify risks and vulnerabilities to develop long-term strategies for protecting people and property from future incidents. Recipients must have a FEMA-approved hazard mitigation plan[61] before FEMA can provide PA funding for any permanent work.[62] A recipient must show in its plan how it intends to reduce risks from natural hazards. Recipients are required to update the plan every 5 years.

## M.     Recipient-Led Public Assistance

FEMA has found that recovery efforts are most successful when locally executed, state or Tribal Nation managed, and federally supported. Local county or parish officials are best equipped to understand the unique needs of their communities, while Tribal Nations know what is most important to their people and how to effectively guide their recovery. Disaster recovery progresses at different rates for each locality and involving the right mix of local subject matter experts early in the process ensures that environmental, historic, sustainability, and resilience factors are considered from project formulation through implementation.

This approach forms the basis of recipient-led PA operations. While it may not be suitable for widespread disasters that could overwhelm local, state, or Tribal Nation resources, recipient-led PA events offer opportunities to build local capacity and capability while addressing the specific needs of the recovering community.

In recipient-led PA events, recipients can lead any of the following key PA functions in lieu of FEMA:

- Customer service;
- Site inspections; and,
- Scoping and costing.

In addition to any support requested by recipients, FEMA maintains the following responsibilities:

- Oversight of the PA operation;
- Quality control reviews;
- Law, regulation, and EO compliance reviews; and,
- Final eligibility determination and obligation authority.

FEMA and the recipient discuss whether a recipient-led PA operation is appropriate given the recipient's current capacity. These discussions may begin before an incident when the recipient is assessing its capability to lead a future PA operation or after a declaration request. FEMA and the recipient examine the recipient's capacity at the time of the disaster and incident-specific characteristics to determine the feasibility of recipient-led PA. Typically, the best candidates for recipient-led PA are recipients with the following factors:

---

[61] For more information, refer to: Hazard Mitigation Planning | fema.gov.
[62] 44 C.F.R. § 201.3(c)(1) and (e)(1).

PAPPG v5

- Recent disaster experience;

- Adequate recipient staff or staff augmentation mechanisms;

- A fiscal accounting system tracks specific projects, withstands audit, and may be used to evaluate appeals; and,

- Established record of meeting deadlines for PA grant management activities.

To opt in to recipient-led PA, the Regional Administrator and the governor or the GAR[63], or for Tribal Nation declarations, the tribal chief executive or TAR must enter into an operational agreement, as an addendum to the FEMA-state agreement (FSA) or FEMA-Tribal Nation agreement (FTA), that delineates roles and responsibilities. After signing, recipients have 72 hours to sign the operational agreement. The Regional Administrator may approve requests to participate in recipient-led PA after the 72 hours at its discretion. The "State-Led Public Assistance Guide"[64] provides additional guidance on the processes, resources, and capabilities required.

---

[63] 44 C.F.R. §§ 206.2(a)(13) and 206.41(d).
[64] For more information, refer to: _State-led Public Assistance Guide_.

39

# Chapter 2: Coordination and Appeal Rights

FEMA and recipients work in partnership to administer the PA Program and provide customer service to each applicant. This chapter defines how FEMA documents its eligibility determinations and explains applicants' rights to appeal decisions by FEMA.

## I.    PA Eligibility

The four basic components of PA eligibility are:

- Applicant;
- Facility;
- Work; and,
- Cost.



**Figure 2. PA Eligibility Pyramid**

FEMA refers to these components as the building blocks of the eligibility pyramid. FEMA evaluates each building block to determine eligibility, starting at the foundation (applicant) and working up to cost at the top of the pyramid (see Figure 2. PA Eligibility Pyramid).

There are two exceptions to the standard eligibility pyramid review process:

- For state, local, Tribal Nation, and territorial (SLTT) government applicants, evaluating facility eligibility is not a necessary step for debris removal or most emergency protective measures, as described in Chapter 7: Emergency Work Eligibility.
- For private nonprofit (PNP) organizations, FEMA must determine whether the PNP owns or operates a facility that provides an eligible service to determine whether the applicant is eligible. See Applicant Eligibility: Private Nonprofit Organizations in Chapter 3 for additional information and a pyramid specific to PNP eligibility.

FEMA understands the importance of providing timely and effective support for recovery efforts. To ensure eligibility for assistance, FEMA follows a comprehensive process based on specific information and documentation submitted by applicants, as outlined in the PAPPG. FEMA works closely with recipients and applicants, reviewing the details carefully to verify eligibility. This includes the "who, what, when, where, why, and how much" needed to support each claim.

While FEMA is committed to assisting applicants through this process, it's important to note that providing adequate documentation is essential. If an applicant cannot demonstrate eligibility for any of the components—whether the applicant, facility, work, or cost—FEMA will not be able to approve PA funding. To make the process smoother, documentation and information requirements have been simplified. Simplified Procedures[65] streamlines the application process for small projects and reduces the administrative burden of providing all documentation prior to FEMA obligating funds. Tables have been incorporated throughout the PAPPG to provide clear guidance on documentation and information requirements.

---

[65] For more information, refer to: Simplified Procedures in Chapter 2.I.A.

PAPPG v5

FEMA's ability to reimburse assistance is governed by legal authorities set forth in statutes and regulations, which outline certain criteria that must be followed. The PAPPG highlights the mandatory nature of these requirements by using terms like "must" or "required," emphasizing their legally binding status. Non-compliance with these requirements could jeopardize an applicant's PA funding, so adhering to these guidelines is crucial to ensure successful outcomes. FEMA is here to support applicants every step of the way, but meeting these requirements is necessary to move forward.

## A.  Simplified Procedures

Section 422 of the Robert T. Stafford Act allows simplified procedures for small projects. Through this provision FEMA can support the fair delivery of assistance to communities and enable faster recovery for all communities by reducing the administrative burden associated with providing supporting documentation. This is achieved by allowing applicants to submit summary documentation and self-certify rather than providing a burdensome amount of documentation to support eligibility. Applicants must continue to retain all source documentation, including project eligibility records and financial records, for 3 years after the date the recipient submits the certification of completion for the applicant's last small project to FEMA. Throughout the document, the PAPPG lists both documentation and information required for submission to FEMA and records that must be retained by the applicant.

## B.  Sampling Procedures

FEMA adopted the Government Accountability Office (GAO) approach to sampling as an initiative to increase the efficiency of the PA Program. Sampling is the process of selecting and evaluating a few items in a group to learn something about the whole group or similar, unobserved items, such as when 20 line items are selected from a group of 100 line items. When applicants have a significant number of documents to support claims for assistance, applicants may submit a summary of the documentation, and FEMA will select a representative sample to review. Additionally, if an applicant submits a significant number of damaged sites, in lieu of FEMA inspections at all sites, the applicant may submit damage information and documentation for FEMA to validate using this sampling methodology.[66] The sampling procedure is meant to be flexible in situations where a significant amount of information is submitted (e.g. PDAs, site inspections, documentation review, or closeout).

## C.  Facilitated Discussions

Most PA projects are free of eligibility disputes; if eligibility issues arise, the intent is that they are quickly resolved. In some cases, eligibility issues may arise from a lack of mutual understanding. Clear, open lines of communication can often resolve misconceptions and provide a path forward. When such discussions reach an impasse, PA staff may offer the opportunity to participate in a facilitated discussion led by a FEMA alternative dispute resolution specialist. These types of informal discussions, led by a trained facilitator, can provide clarity to participants with different perspectives, as well as possible avenues for resolution.

---

[66] For more information, refer to: *Public Assistance Sampling Procedure*.

PAPPG v5

## D.  Requests for Information

During the PA process, if FEMA needs additional information to understand information provided by the applicant, FEMA requests the information or documentation by submitting a request for information (RFI). Responses to RFIs are due by the deadline specified in the RFI. FEMA establishes the deadline based on the nature of the request and in consideration of the type and volume of information or documentation requested, with a minimum of 15 days to respond to the RFI. Therefore, the amount of time allowed may vary. If an applicant fails to meet the deadline and does not request and receive FEMA approval for a time extension to submit the required information, FEMA will deny assistance for the applicant, facility, work, or costs that cannot be verified due to the missing information. Applicants should coordinate with the Recipient and FEMA if there are any questions about the RFI.

## E.  Notification of an Ineligibility Determination

If FEMA determines that the applicant, facility, work, or cost is ineligible, FEMA provides electronic notice through a determination memorandum or letter that includes:

- An explanation of what assistance FEMA denied and, as applicable, the amount of assistance denied for each item;

- The basis for FEMA's denial, including the provisions of law, regulation, or policy that support the determination; and,

- Information regarding the applicant's rights and procedures to appeal.

FEMA sends the letter or determination memo electronically to both the recipient and applicant. This serves as the formal notification of FEMA's determination and explains the applicant's appeal rights.

A determination could result from any portion of the project application including a Validate as You Go (VAYGo) audit finding. For more information about the VAYGo process, see Recovery of Improper Payments in Chapter 11.

## F.  Appeal Rights and Requirements

Applicants may appeal any FEMA determination related to an application for the provision of assistance under the PA Program.[67] This includes, but is not limited to, eligibility denials pertaining to an applicant, facility, work, or costs, or time extension denials.

FEMA provides applicants with opportunities to appeal a determination:

- Applicants must submit the first appeal through the recipient to the Regional Administrator.[68]

- If the Regional Administrator partially or fully denies the first appeal, applicants may submit a second appeal through the recipient to the Assistant Administrator for the Recovery Directorate at FEMA Headquarters.[69]

---

[67] Stafford Act § 423; 42 United States Code (U.S.C.) § 5189a; 44 Code of Federal Regulations (C.F.R.) § 206.206.
[68] 44 C.F.R. § 206.206(b)(1).
[69] 44 C.F.R. § 206.206(b)(2).

PAPPG v5

All appeals must be in writing and submitted electronically. Recipients must submit all appeals to FEMA via Grants Portal. In an appeal, the applicant must include:

- Documented justification supporting its position;
- The specific funding amount (or amounts if there are multiple issues on appeal) in dispute, as applicable; and,
- Specify the provisions of law, regulation, or policy (applicable to the respective disaster) with which the applicant believes FEMA's determination was inconsistent. [70]

At any point in the appeal process, the applicant may withdraw its appeal by submitting a written request simultaneously to the recipient and FEMA. FEMA sends a written acknowledgment of the withdrawal request simultaneously to the recipient and applicant.

## G. Appeal Deadlines

Applicants must submit an appeal to the recipient within 60 days from the date FEMA transmits an eligibility determination or first appeal decision to the applicant and recipient. [71] The recipient must forward the appeal with its written recommendation to FEMA within 120 days from the date FEMA transmits its eligibility determination or first appeal decision. [72] If the respective 60th or 120th day is a Saturday, Sunday, or federal holiday, FEMA accepts it as timely if received by the first business day after the deadline. [73] If either the applicant or recipient does not meet the respective deadline, FEMA denies the appeal as untimely.

## H. Appeal Review and Decisions

Upon receipt of the appeal, FEMA reviews the appeal content and uses the administrative record and the laws, regulations, and policies applicable to the respective incident to analyze the appeal. FEMA may request additional information via an RFI, submit the appeal to an independent expert or experts for technical review and recommendations, or make its decision based on the documentation and information provided at the time of appeal submission. [74] FEMA may identify and review new eligibility issues that were not previously raised or addressed in the prior determination.

 **Terminology**

The **administrative record** may include, but is not limited to, project application (all versions); supporting documentation, including photographs and technical reports; and all written correspondence, including eligibility determinations.

---

[70] 44 C.F.R. § 206.206(b)(1)(i) and (b)(2)(i).
[71] 44 C.F.R. § 206.206(b)(1)(ii)(A) and (b)(2)(ii)(A).
[72] 44 C.F.R. § 206.206(b)(1)(ii)(A) and (b)(2)(ii)(A).
[73] Federal holidays are defined by the Office of Personnel Management and listed at: Federal Holidays | opm.gov.
[74] 44 C.F.R. § 206.206(b)(1)(ii) and (iii) and (b)(2)(ii) and (iii).

Within 90 days of receiving the appeal, FEMA provides its appeal decision simultaneously to the recipient and applicant.[75] In cases where FEMA has requested information or technical review, it will issue the response within 90 days of receiving the information (or within 90 days of the expiration of the deadline to respond) or the technical review recommendations.[76]

For second appeals, all decisions represent the Agency's final administrative decision on the matter.[77] Additionally, if an applicant does not appeal an eligibility determination or first appeal decision by the deadline, the respective decision represents the Agency's final administrative decision.[78]

## I. Arbitration

Applicants also have the option to submit a request for arbitration if all the following apply:[79]

- The amount in dispute[80] is greater than $500,000, or greater than $100,000 for an applicant requesting assistance in a rural area[81];
- The applicant and recipient submitted a first appeal to FEMA by the first appeal deadline;[82] and
- FEMA denied the first appeal or did not issue a decision within 180 days of receiving the appeal.

Applicants request arbitration by emailing the recipient, Civilian Board of Contract Appeals (CBCA), and FEMA simultaneously.[83] Applicants must file a request for arbitration within 60 calendar days from the date FEMA transmits its first appeal decision. If FEMA has not rendered a first appeal decision within 180 calendar days of receiving the appeal, applicants can request arbitration instead. Applicants must withdraw their first appeal and then submit a request for arbitration to the recipient, CBCA, and FEMA within 30 days of the withdrawal.

Applicants may submit a second appeal or a request for arbitration, but not both.[84] When applicants request arbitration in lieu of appeal, the CBCA decision constitutes the final decision.

The CBCA arbitrates at no cost to the parties. However, each party is directly responsible for all other expenses it incurs in the arbitration process.[85] This includes, but is not limited to, attorney's fees, representative fees, copying costs, and costs associated with attending hearings. These costs are not eligible for FEMA funding.

---

[75] 44 C.F.R. § 206.206(b)(1)(ii)(C) and (b)(2)(ii)(C).
[76] 44 C.F.R. § 206.206(b)(1)(ii) and (iii) and (b)(2)(ii) and (iii).
[77] 44 C.F.R. § 206.206(c).
[78] 44 C.F.R. § 206.206(a).
[79] 44 C.F.R. § 206.206(b)(3).
[80] 44 C.F.R. § 206.206(a).
[81] 44 C.F.R. § 206.206(a).
[82] 44 C.F.R. § 206.206(b)(1)(ii).
[83] 44 C.F.R. § 206.206(b)(3)(iii)(A).
[84] 44 C.F.R. § 206.206(b)(3)(ii).
[85] For more information, refer to: *Public Assistance Appeals and Arbitration (FP 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)* and *PA Arbitration Fact Sheet*.

PAPPG v5

# Chapter 3: Applying for Public Assistance and Applicant Eligibility

This chapter defines the process to request assistance for PA, starting with the request for public assistance (RPA). It provides information relating to organizations that can benefit from the Public Assistance (PA) Program, requirements to substantiate eligibility, and important steps that take place following a presidential declaration. The "Public Assistance Program Delivery Guide" [86] provides an overview of these process steps.

## I.    Applicant Eligibility

FEMA provides assistance to eligible applicants, which are defined below. As shown in Figure 3. Applicant Eligibility, FEMA must first determine whether an applicant is eligible before evaluating the applicant's claim. FEMA and the recipient review the RPA to determine whether an applicant is eligible for assistance. [87] This section provides FEMA's policy on applicant eligibility.

There are two types of applicants that may apply for the PA Program:

- State, local, Tribal Nation, and territorial (SLTT) entities; [88] and,
- Private nonprofit (PNP) organizations, including houses of worship and other faith-based organizations. [89]

## II.    Applicant Briefing

As soon as possible following the president's declaration, a recipient conducts briefings for all potential applicants. Recipients are responsible for notifying potential applicants of the date, time, and location of the applicant briefing. [90]



**Figure 3. Applicant Eligibility**

## III.    Request for Public Assistance

The RPA [91] is an application for the PA Program. If an SLTT government entity or PNP wishes to request reimbursement for costs related to damage and impacts from a presidential declaration, it must submit an RPA to FEMA via PA Grants Portal within 30 days after the respective area is designated. [92] Recipients must also submit an RPA to be eligible to request funding through the PA Program. Once an RPA is approved, the SLTT government entity or PNP becomes an applicant and is eligible to submit projects to request funding.

---

[86] For more information, refer to: *Public Assistance Program Delivery Guide*.
[87] 44 Code of Federal Regulations (C.F.R.) § 206.207(b)(1)(iii)(C).
[88] See Applicant Eligibility: State, Local, Tribal, and Territorial Government Entities in this chapter for additional information on eligibility criteria.
[89] See Applicant Eligibility: Private Nonprofit Organizations in this chapter for additional information on eligibility criteria.
[90] 44 C.F.R. § 206.207(b)(1)(iii)(B).
[91] For more information, refer to: How to Apply for Public Assistance | fema.gov.
[92] 44 C.F.R. § 206.202(c).

PAPPG v5

FEMA extends the deadline for submitting an RPA if a recipient submits a request in writing with justification based on extenuating circumstances beyond an applicant's or recipient's control. The following are examples of extenuating circumstances that FEMA considers to be beyond an applicant's or recipient's control:[93]

- The applicant is only claiming categories of work that were not authorized for the respective area in the initial declaration.
- Delays were due to slow responses or other issues caused by FEMA.
- FEMA's Grants Portal was offline or otherwise unavailable on the date the applicant tried to submit the RPA and it was the same day as the deadline.
- Communication systems were down for such an extended time period that applicants in the area were unable to receive or send information.

The recipient reviews each RPA to determine if the entity meets the criteria of an eligible applicant, provides an assessment of the applicant's risk of noncompliance as required by 2 C.F.R. § 200.332(c), and recommends whether FEMA should approve the RPA.

# IV.   Applicant Eligibility: State, Local, Tribal Nation, and Territorial Government Entities

## A.  State and Territorial Governments

State and territorial governments, including the District of Columbia, American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, and the U.S. Virgin Islands, are eligible applicants. This includes any agency or instrumentality thereof, exclusive of local governments.[94] The state or territorial government designates one of its agencies (usually the emergency management agency) as the recipient. The recipient serves as the pass-through entity to the other agencies, which are subrecipients.

 **Terminology**

**Pass-through entity** - A non-federal entity that provides a subaward to a subrecipient to carry out part of a federal program.

**Subaward** - An award provided by a pass-through entity to a subrecipient for the subrecipient to carry out part of a federal award received by the pass-through entity. It does not include payments to a contractor or payments to an individual that is a beneficiary of a federal program.

## B.  Tribal Nations

Federally recognized Indian Tribal Nations, including Alaska Native villages and organizations, are eligible applicants. A searchable list of federally recognized Tribal Nations is available through the Bureau of Indian

---

[93] 44 C.F.R. § 206.202(f)(2).
[94] Stafford Act § 102(4); 42 United States Code (U.S.C.) § 5122; 44 C.F.R. §§ 206.2(a)(22) and 206.222(a); 2 C.F.R. § 200.1.

PAPPG v5

Affairs (BIA).[95] Alaska Native Corporations are ineligible to apply for assistance as they are privately owned.[96] When a federally recognized Tribal Nation receives a presidential emergency or major disaster declaration, they do not need to designate a separate department or agency to act as the recipient.

While state recognized Tribal Nations that are not federally recognized cannot request a presidential declaration, they are eligible to receive PA, as are heritage groups.

## C. Local Governments

The following types of local governments are eligible applicants:[97]

- Counties and parishes;
- Municipalities, cities, towns, boroughs, and townships;
- Local public authorities;
- School districts;
- Intrastate districts;
- Councils of governments (regardless of whether incorporated as nonprofit corporations under state law);
- Regional and interstate government entities;
- Agencies or instrumentalities of local governments;
- State recognized Tribal Nations; and,
- Special districts established under state law.
  - o Community development districts are special districts that finance, plan, establish, acquire, construct, or reconstruct, operate, and maintain systems, facilities, and basic infrastructure within their community development. The district must own and be legally responsible for maintenance, and operation of an eligible facility that is open to and serves the general public.[98] Community development districts generally meet the requirement of serving the public based on the same criteria used for PNPs under Applicant Eligibility: Private Nonprofit Organizations in this chapter.

The state or a political subdivision of the state may submit applications on behalf of rural communities, unincorporated towns or villages, and other public entities not listed above.[99]

# V.     Applicant Eligibility: Private Nonprofit Organizations

FEMA evaluates a PNP's organization status, and the services provided in each facility owned or operated by the PNP to determine whether it is eligible.

---

[95] For more information, refer to: Tribal Leader Directory | geoplatform.gov.
[96] Stafford Act § 102(6); 42 U.S.C. § 5122; 44 C.F.R. §§ 206.201(i) and 206.222(c); 2 C.F.R. § 200.1.
[97] Stafford Act § 102(8); 42 U.S.C. § 5122; 44 C.F.R. §§ 206.2(a)(16) and 206.222(a); 2 C.F.R. § 200.1(h).
[98] Community Development Districts generally meet the requirement of serving the public based on the same criteria used for PNPs in Chapter 3.V: Applicant Eligibility: Private Nonprofit Organizations.
[99] Stafford Act § 102(8)(c); 42 U.S.C. § 5122; 44 C.F.R. § 206.2(a)(16)(iii).

PAPPG v5

To be eligible, a PNP must have been an established PNP organization,[100] have owned or operated an eligible PNP facility at the time of the incident period, and ensured that the facility is one that provides an eligible service, which is categorized as either (1) critical services, or (2) noncritical, but essential social services (see Figure 4. PNP Eligibility).[101] All three criteria must be met to be an eligible applicant.



**Figure 4. PNP Eligibility**

## A.  Organization Eligibility

For an organization to demonstrate its qualifications as a PNP, it must provide a ruling letter from the U.S. Internal Revenue Service that was in effect as of the declaration date and granted tax exemption under sections 501(c), (d), or (e) of the Internal Revenue Code; or documentation from the state substantiating it is a non-revenue producing, nonprofit entity organized or doing business under state law.[102] For a list of documentation needed to demonstrate these requirements, see Table 6. Required Documentation and Information for PNP RPA.

If the organization is not required to obtain 501(c)(3) status or tax-exempt status under applicable state law, it must provide articles of association, bylaws, or other documents indicating that it is an organized entity, and a certification that it is compliant with Internal Revenue Code section 501(c)(3) and state law requirements.

## B.  For-Profit Entities

For-profit entities are not eligible applicants for assistance from FEMA under the PA Program. However, SLTT government entities may contract with private entities, including for-profit entities, to carry out eligible emergency protective measures. In these cases, FEMA will reimburse the eligible applicant for the cost of eligible work, and the applicant may then compensate the private entity for the provision of goods or services.

## C.  Facility Eligibility

Prior to determining whether a PNP is an eligible applicant, FEMA must first determine whether the PNP owns or operates an eligible facility that provides an eligible service.

A facility owned or operated by a PNP that provides a critical service defined as education, utility, emergency, or emergency medical care is eligible (see Table 3. PNP Eligible Critical Services). Administrative and support facilities essential to the provision of a PNP critical service are also eligible facilities. Administrative and support facilities may include, but are not limited to laundry facilities, kitchens, dining areas, dormitories,

---

[100] 44 C.F.R. § 206.221(f).
[101] 44 C.F.R. § 206.222(b).
[102] 44 C.F.R. § 206.221(f).

48

PAPPG v5

storage, record keeping areas, parking lots, access roads or bridges, administrative offices, school gyms, and school playgrounds.

A facility owned or operated by a PNP that provides a noncritical, but essential social service and provides those services to the general public is eligible (see Table 4. PNP Eligible Noncritical, Essential Social Services). PNP facilities meet the requirement of serving the general public if all the following conditions are met:

- Facility use is not limited to any of the following:
  - A certain number of individuals;
  - A defined group of individuals who have a financial interest in the facility, such as a condominium association;
  - Certain classes of individuals; or
  - An unreasonably restrictive geographical area, such as a neighborhood within a community.
- Facility access is not limited to a specific population (such as facilities with gates or other security systems intended to restrict public access); and,
- Any membership fees meet all of the following criteria:
  - Are nominal;
  - Are waived when an individual can show inability to pay the fee;
  - Are not of such magnitude to preclude use by a significant portion of the community; and,
  - Do not exceed what is appropriate based on other facilities used for similar services.

In cases where a PNP is leasing a facility to another entity that is providing eligible PNP services, FEMA reviews any fees the lessee charges individuals for the services. FEMA does not review the cost of the lease to determine if the facility is serving the general public.

Certain types of facilities that restrict access in a manner clearly related to the nature of the facility, such as senior centers, center-based childcare, custodial care, rehabilitation, or educational facilities; or houses of worship (HOW) that limit membership in the organization to individuals who share a religious faith or practice, are still considered to provide essential social services to the general public.

 **Terminology**

The Stafford Act references both rehabilitational facilities and rehabilitation facilities.

- **Rehabilitational facilities** are those that provide social services or counseling support for drug or alcohol dependency treatments.
- **Rehabilitation facilities** are those that provide rehabilitation services after physical injury.

Facilities established or primarily used for political, athletic, or recreational activities, vocational, conferences, retreats, or similar activities are ineligible for PA funding (see Table 5. PNP Ineligible Services).

PAPPG v5

PNPs that own or operate facilities that only provide noncritical services must also apply for a disaster loan for facility restoration from the U.S. Small Business Administration (SBA) (see Small Business Administration Loan Requirement in this chapter).

## D.  Multiple Facilities

If a PNP operates multiple facilities, or a single facility composed of more than one building, FEMA must evaluate each building independently, even if all are located on the same grounds. Structures that are part of a complex that includes outdoor facilities (e.g., swimming pools, athletic fields, or tennis courts) are not evaluated separately from the rest of the complex when determining eligibility of the building. Support facilities are evaluated based on the purpose of the facility they support. See Appendix E: Private Nonprofit Facility Eligibility Examples for examples of PNP facilities and corresponding eligibility determinations.

## E.  Mixed-Use Facility

Eligibility for PNP facilities that provide multiple services (mixed-use facilities) is dependent on the primary use of the facility. Primary use is determined by the amount of physical space dedicated to eligible versus ineligible services. Primary use is the use for which more than 50 percent of the physical space in the facility is dedicated. FEMA evaluates the entire structure when determining primary use; it does not separately address individual areas, such as floors, basements, or wings. Common space, such as bathrooms, hallways, lobbies, closets, stairways, and elevators are not included when calculating mixed-use space.

If FEMA determines that 50 percent or more of physical space is dedicated to ineligible services, the entire facility is ineligible. If the facility is eligible, FEMA prorates funding based on the percentage of physical space dedicated to eligible services. Depending on the specifics of the scenario, FEMA either prorates funding for debris removal and emergency protective measures or limits such funding to what is eligible, necessary, and reasonable. The applicant is responsible for the balance of restoration costs and must restore the entire facility to receive funding for repairs to the eligible-use portions of the facility.

Eligible PNP irrigation and PNP public broadcasting facilities are exempt from primary use requirements. For PNP irrigation facilities, FEMA will evaluate whether the facility was designed to provide eligible irrigation and whether it has ever been used for that purpose. If the facility was not designed for an eligible irrigation purpose, and has never been utilized for that purpose, it is not eligible.

## F.  Mixed-Use Space

In cases where a single PNP facility provides both critical and eligible non-critical services, FEMA does not perform a calculation to determine whether the primary use is for critical or non-critical services. FEMA only performs this calculation to determine whether a facility is primarily used for eligible services.

See Appendix E: Private Nonprofit Facility Eligibility Examples for examples of PNP facilities and corresponding eligibility determinations.

In cases where the same physical space is used for both eligible and ineligible services, the primary use is the use for which more than 50 percent of the operating time is dedicated in that shared physical space. If

PAPPG v5

space is available for use, but the applicant cannot support that it is used for eligible services for more than 50 of the percent of the operating time, this criterion is not met.

If FEMA determines that 50 percent or more of the operating time in the shared physical space is dedicated to ineligible services, then FEMA does not include that physical space when evaluating primary use.

## G. Multiple Services

In cases where the facility provides multiple services, such as a community center, FEMA reviews additional items to determine the primary service that facility provides, such as:

- U.S. Internal Revenue Service documentation;
- Pre-disaster charter, bylaws, and amendments; and,
- Evidence of longstanding, routine (day-to-day) use (e.g., a calendar of activities).

## H. Use by Multiple Entities

In cases where a PNP shares use of a facility, the facility is only eligible if it is primarily owned by the PNP applicant. FEMA prorates funding for these facilities based on the percentage of physical space that the applicant owns and dedicates to eligible services. The following guidelines are used to determine the eligibility of such facilities:

- If the eligible PNP owns the entire facility and leases a portion of it to another entity, the facility is eligible provided that the PNP dedicates more than 50 percent of the facility for eligible services. If the PNP leases 50 percent or more of the facility to an ineligible applicant, or for ineligible services, then the facility is ineligible.
- If the eligible PNP only owns a portion of the facility, it is eligible provided that the PNP owns more than 50 percent of the facility and dedicates more than 50 percent of physical space for eligible services.

## I. Leased Facilities

If an eligible PNP leases a facility to another eligible PNP that provides an eligible service in that facility, the facility is eligible. Even though the lessee does not own the facility, it may be the eligible applicant because it operates the facility. Whichever PNP (the owner or the lessee) has the legal responsibility to maintain the facility is the eligible applicant.

## J. Small Business Administration Loan Requirement

Following a major disaster declaration, the SBA provides loans to individuals and businesses for facility restoration.[103] For PNPs with facilities that provide noncritical, essential social services, FEMA provides PA funding for eligible debris removal and emergency protective measures associated with the eligible facilities. However, FEMA only provides funding for permanent work costs that an SBA loan will not cover. Therefore, PNPs that do not provide any critical services must also apply for a disaster loan from the SBA[104] and receive a determination for permanent work on facilities that:

---

[103] For more information, refer to: Small Business Administration | sba.gov. For additional assistance with the application process, applicants should contact the SBA Disaster Customer Service Center at 1-800-659-2955.
[104] Stafford Act § 406(a)(3)(A)(ii); 44 C.F.R. § 206.226(c)(2).

PAPPG v5

- Provide noncritical services; or
- Are mixed-use facilities and the damaged portion of the facility provides services that are entirely noncritical.

PNPs do not need to apply for an SBA loan for any facilities that provide critical services (even if the facility also provides non-critical services).

**Table 2. SBA Loan Requirements**

| Type of Services Provided | Emergency Work | Permanent Work |
|---|---|---|
| Critical Services | SBA loan application **not** required | SBA loan application **not** required |
| Non-critical but Essential Social Services | SBA loan application **not** required | SBA loan application **is** required |

FEMA and SBA cannot provide disaster assistance funding that duplicates insurance proceeds. Applicants must pursue claims to recover insurance proceeds that they are entitled to receive from their insurer(s).

## 1.    SMALL BUSINESS LOAN ELIGIBILITY

SBA disaster loans are available up to $2 million to qualified businesses and most private nonprofit organizations. SBA loans cover disaster losses not fully covered by insurance or other sources. If an applicant is required to apply insurance proceeds to an outstanding mortgage on the damaged property, that amount can be included in the disaster loan application. Any proceeds from insurance coverage on business property may be deducted from the eligible loan amount.

SBA disaster loan funds may not be used to upgrade or expand a business, except as required by building codes. Mitigation assistance to make improvements that help reduce the risk of future property damage caused by a disaster is available up to a 20 percent loan amount increase above the facilities damage, if approved by the SBA.

Both FEMA and the SBA have application deadlines. Applying to both agencies as soon as possible ensures meeting both application deadlines. If the PNP misses the SBA application deadline, including any SBA approved extension, permanent work is ineligible for PA funding. If the PNP declines an SBA loan, PA funding is limited to the costs that the loan would not have otherwise covered. This applies even when the PNP cannot accept the terms of the loan by, for example not meeting a collateral requirement, and the SBA therefore denies the loan. Possible outcomes are shown in Figure 5. SBA Loan Outcomes.



**Figure 5. SBA Loan Outcomes**

# K.  Private Nonprofit Services

Facilities that provide critical services or noncritical but essential social services that are provided to the general public are eligible for assistance. Please see Table 3. PNP Eligible Critical Services, Table 4. PNP Eligible Noncritical, Essential Social Services, Table 5. PNP Ineligible Services, and Table 6. Required Documentation and Information for PNP RPA.

**Table 3. PNP Eligible Critical Services**

| Type | Critical Services - Activities and Establishments |
|------|---------------------------------------------------|
| Education | <ul><li>Primary or secondary education as determined under state law; OR</li><li>Higher-education institutions that meet all of the following criteria:<ul><li>Admit students or persons having a high school diploma or equivalent;</li><li>Are legally authorized to provide education beyond a secondary level;</li><li>Award a bachelor's degree or 2-year degree that is acceptable as full credit toward a bachelor's degree or provides at least a 1-year training program to prepare students for gainful employment in a recognized occupation; and,</li><li>Are accredited by a nationally recognized agency or association (as determined by the Secretary of Education).</li></ul></li><li>Educational facilities that meet the above criteria are eligible without regard to religious character or use for religious instruction.</li></ul> |

PAPPG v5

| Type | Critical Services - Activities and Establishments |
|---|---|
| Emergency Medical | ▪ Medical care (diagnosis or treatment of mental or physical injury or disease). These types of services are often provided in:<br><br>  ○ Clinics;<br><br>  ○ Dialysis facilities;<br><br>  ○ Facilities that provide in-patient care for convalescent or chronic disease patients;<br><br>  ○ Hospices and nursing homes;<br><br>  ○ Hospitals and related facilities, including:<br><br>    - Central service facilities operated in connection with hospitals;<br>    - Extended-care facilities;<br>    - Facilities related to programs for home-health services;<br>    - Laboratories;<br>    - Self-care units; and,<br>    - Storage, administration, and record areas<br><br>  ○ Long-term care facilities;<br><br>  ○ Outpatient facilities; and,<br><br>  ○ Rehabilitation centers. |
| Utility | ▪ Communications transmission and switching, and distribution of telecommunications traffic;<br><br>▪ Electric power generation, transmission, and distribution;[105]<br><br>▪ Irrigation to provide water for drinking water supply, fire suppression, or electricity generation;<br><br>▪ Sewer and wastewater collection, transmission, and treatment; and,<br><br>▪ Water treatment, transmission, and distribution by a water company supplying municipal water. |
| Emergency Services | ▪ Ambulance;<br><br>▪ Fire protection;<br><br>▪ Rescue; and,<br><br>▪ Public broadcasting that monitors, receives, and distributes communication from the Emergency Alert System to the public. |

---

[105] FEMA encourages restoration of these facilities with the use of low-carbon power generation sources.

PAPPG v5

**Table 4. PNP Eligible Noncritical, Essential Social Services**[106]

| Type | Noncritical, Essential Social Services – Activities and Establishments |
|------|----------------------------------------------------------------------|
| Community centers or other facilities established and primarily used for similar services | ▪ Art services authorized by a SLTT government, including, but not limited to: arts administration, art classes, management of public arts festivals, and performing arts classes;<br>▪ Educational enrichment activities;<br>▪ Multi-purpose arts programming;<br>▪ Senior citizen projects, rehabilitation programs, community clean-up projects, blood drives, local government meetings, and similar activities;<br>▪ Services and activities intended to provide support for communities, provided the facility is otherwise available to the public on a non-discriminatory basis;<br>▪ Social activities to pursue items of mutual interest or concern, such as: community board meetings, neighborhood barbecues, various social functions of community groups, and youth and senior citizen group meetings; and,<br>▪ Performing arts centers with a primary purpose of producing, facilitating, or presenting live performances, including: construction of production materials, creation of artistic works or productions, design, professional training, public education, and rehearsals. |
| Facilities that do not provide medical care, but provide related services | ▪ Alcohol and drug treatment and other rehabilitation services;<br>▪ Assisted living;<br>▪ Custodial care, even if the service is not provided to the general public (including essential administration and support facilities);<br>▪ Center-based childcare, even if not provided to the public;<br>▪ Day care for individuals with disabilities or access and functional needs (for example, those with Alzheimer's disease, autism, muscular dystrophy);<br>▪ Food assistance programs, including food banks and storage of food for food programs;<br>▪ Health and safety services, including animal control services;<br>▪ Low-income housing (as defined by federal or SLTT law or regulation);<br>▪ Religious instruction;<br>▪ Residential and other services for families of domestic abuse;<br>▪ Residential services for individuals with disabilities; and,<br>▪ Shelter workshops that create products using the skills of individuals with disabilities. |

---

[106] With exception of custodial care facilities and museums, administrative and support facilities essential to the provision of PNP noncritical service are ineligible facilities.

55

PAPPG v5

| Type | Noncritical, Essential Social Services – Activities and Establishments |
|---|---|
| Facilities providing other noncritical, essential social services | <ul><li>Homeless shelters;</li><li>Houses of worship and faith-based organizations (e.g., churches, synagogues, mosques, and temples);</li><li>Libraries;</li><li>Museums;<ul><li>Constructed, manufactured, or converted with a primary purpose of preserving and exhibiting a documented collection of artistic, historic, scientific, or other objects;</li><li>Buildings, associated facilities, fixed facilities, and equipment primarily used for the preservation or exhibition of the collection, including:</li><li>Permanent infrastructure, such as walkways and driveways of outdoor museum-type exhibition areas;</li><li>Historic buildings, such as barns and other outbuildings, intended for the preservation and exhibition of historical artifacts within a defined area;</li><li>Permanent facilities and equipment that are part of arboretums and botanical gardens;</li><li>Infrastructure, such as utilities, and administrative facilities necessary for support;</li><li>Senior citizen centers; and,</li><li>Zoos.</li></ul></li></ul> |

PAPPG v5

**Table 5. PNP Ineligible Services**

| Private Nonprofit Ineligible Services |
|---|
| ▪ Community meetings or activities for only a brief period, or at irregular intervals; |
| ▪ Athletic training; |
| ▪ Political education and activities; |
| ▪ Advocacy or lobbying groups not directly providing health services; |
| ▪ Conferences; |
| ▪ Flood control (e.g., levees, berms, dunes) not under the legal responsibility of a PNP; |
| ▪ Land reclamation; |
| ▪ Irrigation solely for agricultural purposes;[107] |
| ▪ Day care services not included in previous table of eligible services; |
| ▪ Job counseling; |
| ▪ Public housing, other than low-income housing; |
| ▪ Recreation; |
| ▪ Residential services not included in previous table of eligible services (e.g., cabins or other overnight accommodations); |
| ▪ Cemeteries; |
| ▪ Docks, piers; |
| ▪ Camps; |
| ▪ Retreats; |
| ▪ Grounds at museums and historic sites; and, |
| ▪ Open natural areas or features, or facilities that promote the preservation or conservation of such areas. |

**Table 6. Required Documentation and Information for PNP RPA**

| Type | Required Documentation and Information for PNP RPA |
|---|---|
| All PNP Applicants | ▪ A ruling letter from the Internal Revenue Service that was in effect on the declaration date and granted tax exemption under sections 501(c), (d), or (e) of the Internal Revenue Code; or<br><br>▪ Documentation from the state substantiating it is a non-revenue producing, nonprofit entity organized or doing business under state law; or<br><br>▪ If exempt from both the requirement to apply for 501(c)(3) status and tax-exempt status under state law, the organization must provide articles of association, bylaws, or other documents indicating that it is an organized entity and a certification that it is compliant with Internal Revenue Code section 501(c)(3) and state law requirements. |

---

[107] 44 C.F.R. § 206.221(e)(3).

57

PAPPG v5

| Type | Required Documentation and Information for PNP RPA |
|---|---|
| Legal Responsibility | ▪ If the applicant owns the damaged facility, proof of ownership (e.g., deed, title, bill of sale or land contract, reoccurring mortgage payments or booklet, property tax receipt or property tax bill, or a real property structure insurance policy). <br><br> ▪ If the applicant leases the damaged facility, proof of legal responsibility to repair the incident-related damage (e.g., lease contract/agreement). |
| Services | ▪ List of services provided in the damaged facility, when, and to whom. |
| Membership Organization | ▪ Who is allowed membership; <br><br> ▪ Fee policy or description of fees charged; and, <br><br> ▪ Policy regarding waiving memberships. |
| Child Care Facility | ▪ Proof that the State Department of Children and Family Services, Department of Human Services, or similar agency, recognizes it as a licensed childcare facility. |
| Education | ▪ Proof that the school is accredited or recognized by the State Department of Education. State regulations for private schools vary and some states do not require accreditation. A PNP school must demonstrate that it is recognized by the state as providing elementary or secondary education. Depending on state requirements, documentation may include, but is not limited to, the following: <br><br> ▪ Accreditation documents; <br><br> ▪ Certification from the State Department of Education that the applicant operated the facility as a PNP school at the time of the incident; <br><br> ▪ Documentation demonstrating compliance with the state's compulsory attendance laws; <br><br> ▪ School-year calendar; <br><br> ▪ School budget; <br><br> ▪ Number of students and faculty; <br><br> ▪ Complete list of educational instruction property and equipment owned by the PNP; <br><br> ▪ Tax records; <br><br> ▪ Documents reflecting school curriculum, transcripts, health and safety, or code of conduct; <br><br> ▪ Tuition receipts; <br><br> ▪ Financial statements; <br><br> ▪ Commencement documents; <br><br> ▪ Inclusion in the U.S. Department of Education's National Center for Education Statistics Private School Universe Survey data;[108] and, <br><br> ▪ State Department of Education electronic and paper homeschool declaration or registration forms. |

---

[108] For more information, refer to: The Private School Universe Survey electronic search tool.

PAPPG v5

| Type | Required Documentation and Information for PNP RPA |
|------|-----------------------------------------------------|
| Mixed-Use Facility | ▪ Proof of the established purpose of the facility with documentation, such as:<br><br>  ○ U.S. Internal Revenue Service documentation;<br><br>  ○ Pre-incident charter, bylaws, and amendments; or<br><br>  ○ Evidence of longstanding, routine (day-to-day) use (e.g., a calendar of activities). |

# Chapter 4: General Facility and Work Eligibility

FEMA processes PA grant funding according to the type of work an applicant undertakes. For work to be eligible, it must be required as a result of the declared incident, be located in the designated area, be the legal responsibility of the applicant, and be undertaken at a reasonable cost. This chapter provides important information relating to PA facility eligibility and general requirements for work to be eligible.

## I.    Facility Eligibility

In general, a facility must be determined eligible for work to be eligible. There are exceptions for some emergency protective measures as shown in Figure 6. Facility Eligibility and discussed in Chapter 7: Emergency Work Eligibility.



For PNPs, the facility must be eligible in order for the work to be eligible.

For State, Territorial, Tribal, and local governments, the facility must be eligible in order for Permanent Work, temporary repairs, or mold remediation to be eligible. Facility eligibility is not applicable to other Emergency Work.

**Figure 6. Facility Eligibility**

## A.  Public Facility

An eligible public facility is one that a state, local, Tribal Nation, or territorial (SLTT) government owns or has legal responsibility for maintaining. A facility includes any:

- System including flood control, navigation, irrigation, reclamation, public power, sewage treatment and collection, water supply and distribution, or watershed development;[109]

- Building, such as maintenance and storage sheds, restroom facilities, bath houses, or outbuildings including ancillary facilities;

- Non-federal-aid street, road, or highway;[110] ramps, or access roads[111];

- Public buildings, structure, or system, including those used for educational, recreational, or cultural purposes;

- Airport facility[112] including runways;

- Park[113] including piers, docks, trails, benches, picnic tables, swimming pools, golf courses, or ball fields; or

- Other public facilities including pumping stations, communication towers and antennas, contents, supplies, equipment, vehicles, fences, parking lots, stairs, signage, lighting, sidewalks, gutters, ditches, guard rails, integral ground, catch basins, or outfall structures.

A natural feature is improved and maintained if it meets all of the following conditions:

---

[109] Stafford Act § 102(10); 42 United States Code (U.S.C.) 5122; 44 Code of Federal Regulations (C.F.R.) § 206.221(h).
[110] Ibid.
[111] BIA roads are an exception but must meet certain criteria.
[112] Stafford Act § 102(10); 42 U.S.C. 5122; 44 C.F.R. § 206.221(h).
[113] Ibid.

PAPPG v5

- The natural feature has a designed and constructed improvement to its natural characteristics, such as a terraced slope or realigned channel;

- The constructed improvement enhances the function of the unimproved natural feature; and,

- The applicant maintains the improvement on a regular schedule to ensure that the improvement performs as designed.

Only the section of a natural feature that meets the criteria above is eligible. For example, if only 150 linear feet of a natural channel bank is armored with rip rap and maintained, the eligible facility would be limited to that 150-linear-foot section.

The following are ineligible facilities:

- Unimproved property that is not enhanced or maintained (e.g., a hillside or slope, forest, or natural channel bank); and,

- Land used for agricultural purposes. [114]

When a facility maintained by a community development district is not open to the general public or does not provide a service to the general public, the facility is ineligible.

## B.  Inactive or Partially Inactive Facility

To be eligible, a facility must have been in active use at the start of the incident period. Inactive or partially inactive facilities are ineligible, unless one of the following conditions is met:

- The facility was only temporarily inactive for repairs or remodeling (provided a contractor is not responsible for the repair of disaster-related damage);

- The applicant established future active use in an approved budget or plans; or

- The applicant can clearly demonstrate its intent to begin use within a reasonable amount of time. [115]

For facilities that are partially occupied and therefore partially inactive at the start of the incident, the inactive portions would not be eligible unless one of the above stated conditions apply. In all cases, the facility in question must have been eligible for assistance during the time it was in use. When the eligible repairs would benefit a non-active area, the assistance will be prorated according to the percentage of the facility that was in active use. For example, if the roof of a partially used building is destroyed, FEMA limits the eligible cost to a prorated amount of the total cost to replace the roof based on the percentage of the building that was in active use.

For private nonprofit (PNP) mixed-use facilities to be eligible, more than 50 percent of the facility had to be in active use for an eligible purpose at the time of the incident.

## C.  Facility Scheduled for Repair or Replacement

Facilities that are not yet under contract but are scheduled for repair or replacement using non-federal funds are eligible provided that the claimed damage did not exist prior to the incident (FEMA reviews procurement

---

[114] 44 C.F.R. § 206.221(d).
[115] 44 C.F.R. § 206.226(k)(2).

PAPPG v5

and contract documents to validate). If damage existed prior to the incident, only the repair of damage caused by the incident is eligible.

# II.    General Work Eligibility

Through the PA Program, FEMA provides grant funding for:

- Debris removal (emergency work);

- Emergency protective measures (emergency work);

- Permanent restoration of damaged facilities, including cost-effective hazard mitigation to protect the facilities from future damage (permanent work); and,

- Building code and floodplain management administration and enforcement activities (permanent work).

If an entity does not comply with all applicable statutes, executive orders (EOs), regulations, and policies, FEMA may take one of several actions including disallowing all or part of the cost of the project not in compliance.[116]

## A. Emergency Work vs. Permanent Work

Emergency work addresses an immediate threat. Permanent work includes the restoration of a damaged facility or building code and floodplain management administration and enforcement activities. To facilitate the processing of PA funding, FEMA further separates both emergency work and permanent work into categories. These categories are shown in Figure 7. Categories of Work.



**Figure 7. Categories of Work**

## B. Minimum Work Eligibility Criteria

At a minimum, work must meet each of the following three general criteria to be eligible:

- Be required as a result of the declared incident;

- Be located within the declared area; and,

- Be the legal responsibility of an eligible applicant.[117]

Work eligibility is discussed in detail in Chapter 7: Emergency Work Eligibility and Chapter 8: Permanent Work Eligibility (Categories C-G).

---

[116] 2 C.F.R. § 200.339.
[117] 44 C.F.R. § 206.223(a).

PAPPG v5

## 1.    RESULT OF DECLARED INCIDENT

Applicants must be able to demonstrate that any claimed impacts and damage occurred during the declared incident period, were caused directly by the declared incident, and that the work claimed is required to address the incident-related impacts and damage as follows:

- For debris removal, applicants must be able to demonstrate that the debris claimed was generated by the declared incident, during the declared incident period, and that removal of the debris addresses an immediate threat resulting from the declared incident.

- For emergency protective measures, applicants must be able to demonstrate that the work addresses an immediate threat resulting from the declared incident.

- For permanent work, temporary repairs, and mold remediation, applicants must demonstrate that the work addresses damage caused by the declared incident.

Applicants must clearly define impacts and damage caused by the declared incident and separate them from any impacts or damage not caused by the declared incident. Applicants must also separate any work or costs associated with addressing impacts or damage not caused by the declared incident.

 **Examples: Impacts or Damage Not Caused by the Declared Incident**

Examples of impacts or damage not caused by the declared incident include:

- Previously existing damage or debris;

- Impacts or damage resulting from a different incident even if it occurred during the incident period of the declared incident;

- Impacts or damage that occur after the incident period and prior to conducting incident-related repairs;

- Deterioration (wear and tear);

- Deferred maintenance;

- Impacts or damage due to failure to take measures to protect a facility from further damage in a timely manner; or

- Impacts or damage due to negligence. [118]

---

[118] 44 C.F.R. § 206.223(e).

PAPPG v5

#### i.      Documentation and Information to Support Cause of Impacts and Damage

**Table 7. Documentation and Information to Support Cause of Impacts and Damage**

| For Small Projects | For Large Projects |
|---|---|
| ▪ Applicants must certify, in lieu of providing documentation, to the following:<br><br>   ○ Debris removal: The debris was generated by the declared incident, during the declared incident period, and that removal of the debris addresses an immediate threat resulting from the declared incident;<br><br>   ○ Emergency protective measures: The immediate threat resulted from the declared incident; and,<br><br>   ○ Permanent work: The damage was caused directly by the declared incident and did not result from a lack of maintenance. | ▪ If necessary to validate that the impacts or damage was caused by the declared event, applicants will be required to provide:<br><br>   ○ Pre-incident photographs and/or video of the impacted site or facility; and/or,<br><br>   ○ Documentation supporting pre-disaster condition of the facility (e.g., facility maintenance records or inspection/safety reports). |

Not every large project requires documentation to substantiate the impacts and damage caused by the event. Frequently, during site inspections, it is evident that the claimed damage, as explained by the applicant, is a direct result of the specific event, as indicated by the effects of the event in the vicinity of the damage. In such instances, the applicant is not required to furnish pre-incident images, records of maintenance, or reports on inspections and safety measures. For instance, in scenarios where an entire bridge or section of road is washed away during flooding or a building is consumed by fire, there is no requirement for maintenance records to validate that the incident caused the damage. This applies even if there are signs that the bridge or road surface had not been consistently maintained (e.g., visible fatigue cracks on the road surface in nearby sections). In these cases, maintenance records are not needed to support the overall failure caused by the event when it is evident that the disaster caused the damage due to the structure being completely destroyed as a result of the incident.

Certain project types (e.g., the restoration of well-maintained natural features and beaches) do mandate the submission of maintenance records and/or photographs. These requirements are elaborated upon in subsequent sections of this document.

If a facility was functioning prior to the disaster and the disaster caused damage that rendered the facility non-functional, the facility may be eligible, provided the pre-disaster condition was not a significant contributing factor in the cause of failure.

#### ii.      Protecting Tribal Sensitive Locations

Each Tribal Nation is unique, with cultures and governments deeply rooted in their history, customs, and sacred sites. FEMA recognizes the importance of protecting these locations for several reasons. First, many sensitive tribal locations are sacred. Non-tribal members sharing information about or accessing these locations may be seen as disrespectful or a violation of tribal and/or federal law. Protecting the sanctity of

PAPPG v5

these sites is essential to maintaining the religious, cultural, and governmental integrity of the Tribal Nation.[119] Some Tribal Nations utilize sensitive tribal locations not only for ceremonial activities, but also as vital locations to execute governmental functions, such as selecting their next leaders or making final decisions on complex matters that will impact their Nation for generations to come.

Second, pottery, jewelry, regalia, clothing, weapons, sacred objects, and even human remains found on tribal lands have been historically (and continue to be) targeted by individuals looking to collect or sell them.[120] These items must be protected before, during, and after disasters. They are integral to the identity, spirituality, and governing bodies of tribal communities. Protecting these resources is about preserving the sanctity and reverence of the Tribal Nation's culture and their sovereignty as a government. Despite the efforts of federal agencies to protect these invaluable resources, there are individuals who continue to engage in illegal activities, such as theft and damage, with devastating effects on Tribal Nations and their communities.

Finally, protecting tribal sensitive locations is a fundamental responsibility. It is an affirmation of the respect and recognition of the unique cultures, traditions, practices, and government autonomy of Tribal Nations. These locations are the living repositories of Tribal Nations and Alaska Native heritage and vital to supporting tribal government functions. Safeguarding them is a collective duty that FEMA must uphold.[121]

For locations that are sacred to a Tribal Nation[122] where non-tribal members are not allowed, site inspections by FEMA staff are not permitted. Instead, FEMA will accept a Tribal Nation's certified damage assessment as a valid alternative to requiring FEMA staff to document and validate damage at these sacred sites. Additionally, to support the protection of tribally significant artifacts and human remains, FEMA will not require photos, site maps, and specific location details (such as GPS coordinates) for locations where tribal artifacts are located. This ensures that culturally sensitive data remains protected, that the Tribal Nation's cultural heritage is safeguarded, and its governmental sovereignty is strengthened.

## 2.    WITHIN DESIGNATED AREA

To be eligible, the facility must be located, and work must be performed, in a designated area defined by the incident (except for sheltering, evacuation, and Emergency Operations Center (EOC) activities). Sheltering, evacuation, and EOC activities may occur outside of a designated area but must be used for activities resulting from the designated area.[123] Work performed on a facility located outside of a designated area is ineligible. This is true even if an eligible applicant is legally responsible for the work, including work performed outside the designated area to protect a facility within the designated area.

Tribal Nations do not always have geographical boundaries (e.g., counties, parishes or other) and some have boundaries that cross state lines. Therefore, tribal declarations do not usually define specific declared

---

[119] For more information, refer to: Executive Order 13007: Indian Sacred Sites.
[120] For more information, refer to: Native American Graves Protection and Repatriation Act | nps.gov.
[121] Federal Indian trust responsibility is a legal obligation under which the United States "has charged itself with moral obligations of the highest responsibility and trust" toward Indian tribes (Seminole Nation v. United States, 1942).
[122] American Indian Religious Freedom Act (1978).
[123] 44 C.F.R. § 206.223(a)(2).

PAPPG v5

geographical areas for Tribal Nations. For Tribal Nations, FEMA determines eligibility based on legal responsibility and whether the work is required due to the declared incident.

i.      Documentation and Information to Support Within Declared Area

**Table 8. Required Documentation and Information to Support Within Declared Area**

| For Small and Large Projects |
|---|
| ▪ Facility location (e.g. address or global positioning system (GPS) coordinates; or |
| ▪ Certification that the facility and subsequent work is located within the designated areas. |

## 3.      LEGAL RESPONSIBILITY

To be eligible, work must be the legal responsibility of the applicant requesting assistance. [124] To determine legal responsibility for debris removal and emergency protective measures, FEMA evaluates whether the applicant requesting the assistance either had jurisdiction over the area or the legal authority to conduct the work related to the request at the time of the incident.

To determine legal responsibility for permanent work, FEMA evaluates whether the applicant claiming the costs had legal responsibility for disaster-related restoration of the facility at the time of the incident based on ownership and the terms of any written agreements (such as for facilities under construction, leased facilities, and facilities owned by a federal agency). Ownership of a facility is usually sufficient to establish the applicant's legal responsibility to restore the facility, provided it is not under construction by a contractor or leased to another entity at the time of the incident.

---

[124] 44 C.F.R. § 206.223(a)(3).

PAPPG v5

## i.    Documentation and Information to Support Legal Responsibility

**Table 9. Required Documentation and Information to Support Legal Responsibility**

| For Small Projects | For Large Projects |
|---|---|
| ▪ Certification that the facility and work are the applicant's legal responsibility. | ▪ If necessary to validate legal responsibility, applicants must provide one or more of the following documents:<br><br>○ Deed;<br><br>○ Title;<br><br>○ Lease agreement (required for leased facilities);<br><br>○ Bill of sale;<br><br>○ Land contract;<br><br>○ Mortgage booklet or reoccurring mortgage payments;<br><br>○ Property tax receipt or property tax bill;<br><br>○ Real property structured insurance policy; and/or,<br><br>○ Contract (required for facilities under construction at the time of the incident). |

## ii.    Facilities Under Contract for Construction

If a construction contract was in place for the facility at the time of the incident, FEMA reviews the contract to determine whether the applicant is legally responsible for the repair of the damage caused by the incident.[125] At a minimum, FEMA evaluates the contract to determine if it:

▪ Identifies the contractor or owner as being responsible for disaster-related repairs;

▪ Requires a builder's risk policy for losses that occur while the contractor has control of the facility;

▪ Has a *force majeure* provision, which is a clause that relieves the contractor from responsibility for damage beyond its reasonable control, such as natural disasters (often referred to as "acts of God") or acts of war; or,

▪ Has a provision that identifies the point at which the contractor transfers legal responsibility for the facility, or portions of the facility, back to the owner.

## iii.    Leased Facilities

An applicant may own a facility and lease it to a tenant, or an applicant may lease a facility owned by another party. In either case, FEMA reviews the lease agreement to determine legal responsibility for repair of

---

[125] Stafford Act § 406(e)(2); 42 U.S.C. § 5172.

PAPPG v5

damage caused by the incident. If the lease does not specify either party as responsible, FEMA considers the owner of the facility legally responsible for the costs to restore the facility.

If the lease is between two eligible applicants, FEMA provides PA funding to the applicant legally responsible for the restoration.

### iv.    Federal Facilities

Facilities owned and maintained by federal agencies are ineligible. There are instances when a federal agency constructed a facility and formally designated the applicant as the legally responsible entity for facility operation, maintenance, and repairs. FEMA reviews the other federal agency's authority and agreement between the federal agency and the applicant to confirm the legally responsible entity.

### v.    Jurisdiction Over an Area

In general, an applicant only has legal responsibility to conduct activities within its jurisdiction. If an applicant conducts activities outside its jurisdiction, it must demonstrate and document its legal basis and responsibility to conduct those activities.

### vi.    Conducting Activities on Private Property

Work on private property is the legal responsibility of the property owner and generally ineligible for PA funding. In rare cases, FEMA may provide PA funding for specific limited activities. In such cases, at a minimum, the applicant must have legal authority to conduct the activity. To determine whether a SLTT government has legal authority to conduct activities on private property, FEMA reviews the applicant's legal basis and specific authority to conduct the activities. See Private Property Debris Removal (PPDR) and Emergency Protective Measures on Private Property in Chapter 7 for additional eligibility requirements.

### vii.    Work Under the Authority of Other Federal Agencies

Other federal agencies (OFAs) have authority to conduct work that may overlap with FEMA's authority. FEMA's authority is broad, and most OFA authorities are more specific than FEMA's authorities. FEMA evaluates its authorities against OFA authorities.

Some of the factors that FEMA considers when evaluating whether an OFA has more specific authority are whether the OFA's authority is specifically and exclusively:

- Available for a particular type of facility, work, or activity;
- Applicable to a presidential declaration under the Stafford Act;
- Specific to an incident or type of incident; or,
- Delineated under direction by Congress.

In such cases, FEMA does not provide assistance for the facilities or work even if that OFA does not provide funding for the facility or work.[126] This restriction includes any activities or costs related to the work that falls

---

[126] 44 C.F.R. § 206.226(a).

PAPPG v5

under OFA authorities as the costs are not related to eligible work. Applicants should apply to the respective agency for assistance with a facility or work under that agency's authority.

### viii.    Environmental and Historic Preservation Requirements

Several laws, executive orders (EOs), and regulations establish requirements to protect the environment and preserve the Nation's historic and archaeological resources. FEMA reviews each PA project to ensure the work complies with applicable federal EHP laws and implementing regulations, and applicable EOs. [127] The applicant is responsible for complying with applicable federal, state, Tribal Nation, or territorial EHP laws even if FEMA is not providing PA funding for all the work. See Chapter 10: Environmental and Historic Preservation for more information on EHP review and considerations. See Appendix D: Environmental and Historic Preservation Compliance for a description of common EHP laws, regulations, and EOs.

FEMA provides technical support to applicants throughout the recovery process to help ensure compliance with all EHP laws, regulations, and EOs, as well as to identify opportunities to incorporate conservation and/or mitigation measures in the project area for the protection and preservation of environmental or historic resources.

### ix.    Policy Implementation Considerations

Disaster impacts can vary for communities and  are often influenced by a complex interplay of geographical, demographic, political, historical, and cultural factors..

To disrupt this detrimental pattern and foster a more resilient nation, FEMA is focused on ensuring our core values of compassion, fairness, integrity, and respect are present as fundamental principles during recovery operations. Recognizing and addressing the distinct requirements of impacted communities is crucial. This principle aligns with the Stafford Act intent which mandates that FEMA assistance be administered without discrimination based on race, color, religion, nationality, sex, age, disability, English proficiency or economic status.

In this endeavor, FEMA commits to integrating our core values throughout our mission and transformative changes across our workforce, programs, and the broader emergency management community. This objective emphasizes the necessity of viewing compassion, fairness, integrity, and respect not as isolated notions, but as integral components woven into the fabric of PA. Through these objectives, PA aims to forge a path towards a more resilient nation, where all communities can effectively withstand and recover from the impact of disasters.

### x.    Resilience Considerations

As our nation continues to witness devastating disaster activity year after year, it is imperative that FEMA invest in building a more resilient nation. The PA Program and policies must protect communities and the economy from the worst impacts of natural disasters before they occur. PA continues to develop new initiatives through its existing authorities and responsibilities.

---

[127] 2 C.F.R. § 200.300.

PAPPG v5

# Chapter 5: Damage and Impact Information

The Public Assistance (PA) Program provides reimbursement to address damage, debris impacts, and emergency protective measures necessary as a direct result of the declared incident. This chapter provides information on determining what damage and impacts are eligible, identifying damage and impacts, finalizing the list of impacts, and logically grouping into project applications.[128] The "Public Assistance Program Delivery Guide"[129] provides an overview of these process steps.

## I.    Impact List

Applicants must submit a list that includes each facility damaged, each debris impacted site, and each overarching emergency protective measure taken to address immediate threats to the general public. Applicants must also identify whether they are claiming management costs or work and costs for building code, floodplain management administration, or enforcement activities. An applicant lists the information by location with a rough estimate of the associated cost. The list does not include detailed descriptions of impacts, damaged components within a facility, or a final estimate of costs. FEMA does not use this information to determine the monetary assistance available for the applicant.

Each activity and impacted site in the impact list must include the following:

- Facility name or unique identifier (e.g., campus name or site);
- Facility type (e.g., building, road, or system);
- Specific location (e.g., address or global positioning system (GPS) coordinates) of debris impacts or facility damage (required);
- General description of damage, emergency protective measures, or approximate type and quantities of debris;
- Approximate cost;
- Status of work;
- Date of original facility construction; and,
- Project priority level.

## A.    Impact List Submission Deadline

Applicants are required to identify and report all incident-related impacts and damage to FEMA within 60 days of attending a recovery scoping meeting.[130] FEMA may extend the deadline to identify and report the impacts if an applicant submits a request with justification based on extenuating circumstances beyond the

---

[128] 44 Code of Federal Regulations (C.F.R.) § 206.201(l).
[129] For more information, refer to: *Public Assistance Program Delivery Guide*.
[130] 44 C.F.R. § 206.202 (d)(1)(ii).

PAPPG v5

recipient's or applicant's control. [131] For example, FEMA extends the deadline for an inaccessible site or when an applicant is in an area where FEMA approved additional categories of work after the recovery scoping meeting.

## B. Inundated and Submerged Roads

Inundated and submerged roads should not be assessed until flood waters have receded to ensure safety and allow time for saturated soil to dry out. Allowing adequate time for saturated soil to dry out is necessary to effectively determine if eligible surface damage has occurred. If the waters have not receded prior to the deadline, FEMA may approve a time extension for those sites if it is feasible to wait until flood waters recede to assess potential damage safely and effectively. Applicants must inform FEMA if there are roadways that experience inundation from closed basin flooding that may be submerged indefinitely due to water not being able to drain (see Closed Basin Flooding in Chapter 8 for additional information).

# II.    Grouping Impacts into Projects

This section defines logical grouping of work and damage. [132] FEMA and the recipient work with the applicant to identify impacts, facilities, and sites that can be combined into one project. This is a two-step process: 1) create groups based on categories of work and facility types and 2) identify sites or facilities that should be formulated into separate projects.

Facilities under the authority of other federal agencies or those that are ineligible for PA (e.g., facilities not in use at the time of the incident in accordance with Inactive or Partially Inactive Facility in Chapter 4) must not be formulated in a project. Applicants can either withdraw these sites and facilities from its impact list or FEMA will issue an ineligibility determination. Logical grouping should never be based on project size or grant administration considerations.

## A. Initial Debris Removal Grouping (Category A)

The bullets below identify debris removal that FEMA initially groups together (each bullet stands for one initial grouping):

- All debris removal from public property;

- All debris removal from waterways;

- All debris removal from private non-commercial property;

- All debris removal from commercial property; and,

- All debris removal from private roads.

---

[131] 44 C.F.R. § 206.202 (f)(2).
[132] 44 C.F.R. § 206.201(k).

PAPPG v5

## B. Initial Emergency Protective Measures Grouping (Category B)

The bullets below identify emergency protective measures that FEMA initially groups together. Each bullet stands for one initial grouping:

- All private property demolition;
- All emergency response activities (except those conducted on private property);
- Any emergency protective measures performed on private property;
- All emergency protective measures that involve facility construction or repairs; and,
- Each individual temporary facility.

## C. Initial Permanent Work Grouping (Categories C-G)

The bullets below identify damaged facilities that FEMA initially groups together. Each bullet stands for one initial grouping. The list is based on infrastructure categories.

1. **TRANSPORTATION**
- All roads, bridges, low water crossings, and culverts;
- All mass transit facilities, such as subways and railways;
- All airports; and,
- All ports and harbors.

2. **WATER CONTROL**
- All dams and reservoirs;
- All canals, drainage channels, ditches, acequias and aqueducts;
- All stormwater retention and detention basins; and,
- All shoreline protection facilities (levees, berms, seawalls, sand revetments, etc.).

3. **EDUCATION**
- All school campuses.

4. **HOUSING**
- All public housing campuses.

5. **HEALTH**
- All hospital campuses and medical facilities.

6. **EMERGENCY SERVICE FACILITIES**
- All police, fire, emergency operations centers, etc.

7. **OTHER GOVERNMENT FACILITIES**
- All courthouses, prisons, administrative buildings, and other non-emergency buildings.

8. **ENERGY**
- All power generation facilities and plants, including all wind turbines, generators, substations, and other facilities within the confines of the plant;

72

PAPPG v5

- Entire power transmission and distribution system; and,
- Entire natural gas transmission and distribution system.

## 9.    WATER/WASTEWATER

- All water and wastewater treatment plants;
- Entire water distribution system;
- Entire wastewater collection system; and,
- Entire irrigation system.

## 10.    COMMUNICATIONS/INFORMATION TECHNOLOGY

- All communication systems.

## 11.    NATURAL AND CULTURAL RESOURCES

- All parks, golf courses, and fish hatcheries;
- All beaches;
- All cemeteries, tribal burial grounds, and sacred sites; and,
- All libraries, museums, and art galleries.

FEMA includes administrative and support facilities at a site in the same project as the primary facility. Applicants must provide each damaged facility as a separate impact, whether ancillary or primary. FEMA groups administrative and support facilities with the primary facility using the site identifier and other information provided by the applicant in the impact list. Administrative and support facilities may include but are not limited to: buildings, outside structures (e.g., maintenance and storage sheds, restroom facilities, bath houses, pumping stations), communication towers and antennas, contents, supplies, equipment, vehicles, fences, parking lots, stairs, ramps, access roads, runways, signage, lighting, sidewalks, gutters, ditches, guard rails, integral ground, catch basins, outfall structures, piers, docks, trails, benches, picnic tables, swimming pools, golf courses, ball fields, etc. Note that for private nonprofits (PNPs), not all support facilities are eligible. See Facility Eligibility in Chapter 3 for additional information on evaluating PNP facility eligibility.

## D. Final Grouping

After initially grouping sites and facilities into one project, FEMA identifies sites or facilities that need to be separated from the initial grouping and formulated into separate projects. Sites or facilities that need to be separated include those that:

- Are anticipated to require complex Environmental and Historic Preservation (EHP) reviews (see Chapter 10: Environmental and Historic Preservation for more information on EHP review and considerations);
- Are in a special flood hazard area (SFHA);
- Need funding for architectural/engineering design or studies to determine the method of restoration for the facility. In these cases, FEMA amends the project with the facility scope of work (SOW) and cost once the repair is determined so the facility is not captured on a separate project; and.
- Have 100 percent of all the work completed. Work items on the same facility may not be separated even if some of the work is complete and other work is not complete. Only a facility for which all work is complete should be separated from a facility that does not have all work complete;

73

PAPPG v5

- Are complex and require specialized technical support for project formulation, such as significantly damaged wastewater treatment plants, dams, hospitals, or schools;

- Potentially have ineligible work;

- Would make a project too burdensome to review due to the number of sites and facilities combined (consider separating into two projects or creating separate projects based on geographical locations); and/or,

- The applicant and FEMA agree there are specific circumstances that make it illogical to combine a site or facility with other sites or facilities.

PNP applicants should also separate critical service facilities into separate projects from noncritical service facilities so that projects with critical service facilities are not delayed pending the U.S. Small Business Administration (SBA) determination described under Small Business Administration Loan Requirement in Chapter 3.

## E.  Building Code and Floodplain Management Administration and Enforcement Activities Grouping (Category I)

All activities eligible under the Disaster Recovery Reform Act (DRRA) Section 1206, building code and floodplain management ordinance administration and enforcement should be grouped within a project.

## F.  Grant Management Activities Grouping (Category Z)

All activities eligible under the Disaster Recovery Reform Act (DRRA) Section 1215 [133] and FEMA's Public Assistance Management Costs (Interim) policy, [134] should be grouped within a project.

---

[133] For more information, refer to: Section 1215 | Management Costs.
[134] For more information, refer to: Public Assistance Management Costs (Interim) (FEMA Recovery Policy FP 104-11-2).

PAPPG v5

# Chapter 6: Cost Eligibility

This chapter provides information relating to PA cost eligibility. Not all costs arising from the incident are eligible for reimbursement through the PA Program. To be eligible, costs must meet the criteria described in this chapter. Additionally, applicants must retain cost, financial, procurement information, real property and equipment records, programmatic records, supporting documents, and all other records that are considered pertinent to the grant, for a period of three years from the date the final expenditure of funds is documented. In the case of litigation, an audit, or any other claim that would cause action is started before the 3-year period expires, the records must be retained until a resolution is reached and final action taken.

## I.    Eligibility Requirements

Costs are the final component evaluated for eligibility, as shown in <u>Figure 8. Cost Eligibility</u>, this criteria applies to all costs claimed. Not all costs incurred as a result of the incident are eligible. To be eligible, costs must be:



**Figure 8. Cost Eligibility**

- Directly tied to the performance of eligible work;

- Adequately documented, substantiated, or certified;[135]

- Reduced by all applicable credits, such as insurance proceeds and salvage values;[136]

- Authorized and not prohibited under federal or state, local, Tribal Nation, and territorial (SLTT) government laws or regulations;

- Consistent with the applicant's internal policies, regulations, and procedures that apply uniformly to both federal awards and other activities of the applicant; and,

- Necessary and reasonable to accomplish the work properly and efficiently.[137]

## II.    Reasonable Costs

A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time an applicant makes the decision to incur the cost.[138]

For projects completed with contracted resources, FEMA conducts a reasonable cost analysis as described below if applicants submit cost claims based on non-competitive bids or contracts, time-and-materials contracts, or cost-plus-percentage-of-cost or percentage-of-construction contracts. For large projects, FEMA also conducts a reasonable cost analysis when the contract selection was noncompliant with the applicable procurement requirements, even though there may have been price competition. For projects completed

---

[135] 2 Code of Federal Regulations (C.F.R.) § 200.403(g).
[136] Stafford Act § 312; 42 United States Code (U.S.C.) § 5155; 2 C.F.R. § 200.406.
[137] 2 C.F.R. § 200.403.
[138] 2 C.F.R. § 200.404.

PAPPG v5

with an applicant's own resources (force account), FEMA only conducts a reasonable cost analysis for large projects.

## A. Reasonable Cost Analysis

FEMA performs a preliminary review of an applicant's information and documentation to assess the complexity of the project and expertise required to complete a reasonable cost analysis. If specialized expertise is required, a subject matter expert with the appropriate specialized skills, knowledge, experience, or capability in the appropriate field, such as engineering, architecture, or cost estimating conducts the analysis.

FEMA determines reasonableness by evaluating whether:

- The cost is of a type generally recognized as ordinary and necessary for the type of facility or work. [139]

  o FEMA evaluates the skill level and level of effort necessary to complete the required activity. If the type of employee or skill level is not appropriate for the specific task, FEMA limits PA funding to a rate based on the appropriate employee type or skill level.

  o For complex projects that require staff with a higher level of technical proficiency and experience, FEMA determines PA funding appropriately. If the level of effort exceeds that necessary to complete a specific task, FEMA limits PA funding based on an appropriate level of effort.

- The cost is reasonable and necessary for the type of work being performed. FEMA determines whether the number of hours claimed are reasonable and necessary by evaluating:

  o The severity of the incident;

  o Whether the work was performed at a time when it was necessary to work extraordinary hours based on the circumstances of the incident;

  o The function of the employee for which the hours are claimed; and,

  o The number of consecutive hours the employee worked.

- The applicant participated in sound business practices and arm's length bargaining, ensuring parties to a transaction are independent of each other, without familial ties or shared interests and on equal footing without one party having control over the other. [140]

- The individuals concerned acted with prudence under the circumstances considering its responsibility to the applicant, its employees, its students or membership, the public, and the federal government. [141] If exigent or emergency circumstances existed, FEMA evaluates the period costs were incurred relative to the reasonable duration of the special circumstances.

- The applicant deviated from its established practices and policies. [142]

  o FEMA generally considers the applicant's own labor, equipment, and supply costs reasonable provided the costs are consistent with the entity's policies including, but not limited to, pay rates, labor policies, and cost schedules utilized during its normal operations.

- The applicant complied with procurement requirements (see Procurement and Contracting Requirements in this chapter). FEMA considers contract costs reasonable when the applicant adheres to

---

[139] 2 C.F.R. § 200.404(a).
[140] 2 C.F.R. § 200.404(b).
[141] 2 C.F.R. § 200.404(d).
[142] 2 C.F.R. § 200.404(e).

full and open competition under applicable federal procurement requirements, and the scope of services or work in the contract and level of effort is consistent with respect to the eligible scope of work (SOW).

- o Cost or price analysis: The cost or price analysis is one component of documentation that FEMA reviews as part of its evaluation of reasonable costs. If the applicant does not submit a cost or price analysis, FEMA evaluates the elements that would have been part of such analysis. [143]

- o Selection criteria: FEMA also evaluates whether the applicant selected the lowest responsible bidder based on the selection criteria to determine reasonableness. If the applicant selected a contractor with a higher bid than others, it must substantiate its selection based on the selection criteria set forth in its request for proposal (RFP).

- ■ The cost is comparable to the current market price for similar goods or services in the same geographical area. [144]

  - o FEMA makes its determination based on one or more of the following:

    - – Historical documentation (previous contracts, invoices, or other documentation);

      - • FEMA may compare costs to the applicant's historical costs for similar SOW or items. FEMA considers inflation and other factors, such as code or standard changes, availability of in-kind construction material, quantity, delivery schedules, and the economy. FEMA's Cost Estimating Format (CEF) employs a nationally recognized economic inflation factor;

    - – Average costs in the area;

      - • Weighted average unit pricing: FEMA may determine the average costs in the area using weighted average unit prices. These are comprised of the average costs of historical bid tabulations and related specifications from competitive bid pricing solicitations respective to the area and usually includes all factors required to bid public works projects, such as performance bonds, bid bonds, overhead and profit, and general conditions. The applicant or respective state, territorial, or regional agency, such as the state's department of transportation, may provide weighted average unit pricing and related specifications for FEMA's review.

      - • Other applicants' project costs: FEMA may compare the costs with other applicants' projects, of similar SOW and similar circumstances, such as event impacts, magnitude, comparable shortages, market factors, and any other unique circumstances that may impact either of the costs.

    - – Published unit costs from national cost estimating databases. When using this method, FEMA confirms that the cost publication is current and prepares the estimate using its CEF and the appropriate locality adjustment factor.

      - • Industry cost estimating resources: When appropriate local data cannot be developed or obtained, FEMA uses industry standard construction cost estimating resources to prepare an estimate against which to evaluate reasonableness of the applicant's actual costs. These costing methods include, but may not be limited to, RS Means, BNi Costbooks, Marshall and Swift, and "Sweet's Unit Cost Guide", which are widely accepted in the industry and available for nationwide use.

      - • Federal, state, or territorial unit costs: When industry standard construction cost estimating resources do not provide work items that are appropriate or applicable to the construction

---

[143] For more information, refer to: *FEMA's Procurement Disaster Assistance Team (PDAT) Field Manual*. Chapter 9: Scoping, Costing, and Final Reviews also provides information on how to conduct a cost or price analysis.
[144] 2 C.F.R. § 200.404(c).

activities required to complete the project, FEMA considers local cost data from other federal agencies (OFA) or state or territorial agencies responsible for construction of similar facilities in or near the locality.

- FEMA cost codes: FEMA maintains regional and national unit prices (cost codes). FEMA cost codes may be used when a cost is not found in other published unit costs or if the cost codes are otherwise more applicable than other published costs, such as for force account equipment.

o If FEMA finds the costs claimed are not reasonable, FEMA may disallow all or part of the costs associated with the project by adjusting eligible funding based on what costs (if any) are deemed reasonable. [145] When determining the reasonable amount, FEMA may use the least-cost alternative, the lowest bid received by the applicant, the pricing of another applicant's properly procured and selected contractor, or a FEMA-developed cost estimate based on industry standard cost estimating resources.

- The following factors or other extenuating circumstances existed and caused escalation in costs:

  o Shortages in equipment, materials, supplies, labor, or contractors: When escalating costs are due to shortages, FEMA considers whether the applicant's work continued beyond the period of shortages and whether there was an opportunity for the applicant to obtain more reasonable pricing.

  o Project-specific complexities: Complexities may include environmental or historic preservation compliance requirements, remote access or location, provision of a unique service with few providers, or elements requiring an extraordinary level of effort.

  o Economy of scale: FEMA considers the amount of work that may impact the unit price (for example, smaller projects may have higher rates and larger projects may have lower rates due to various efficiencies that are realized with larger projects. Additionally, when hauling is involved, such as with debris projects, some projects may have longer haul routes due to disposal site locations or detours for obstacles like road blockages).

  o Extraordinary labor costs: FEMA evaluates whether increased labor costs were required under the circumstances of the incident. FEMA looks at the severity of the incident, the magnitude and the difficulty of the work, the labor hours claimed for the employees performing the work, and the function of the employees performing the labor, against the circumstances of the incident to determine if all labor costs were necessary to complete the work and if the costs charged for the labor were reasonable.

  o Applicant's justification: When a reasonable cost analysis has been conducted and costs appear high for a project, FEMA reviews the applicant's justification to determine whether there are any additional factors that justify the higher cost as a reasonable amount.

# III.   Applicant (Force Account) Labor

FEMA refers to an applicant's personnel as "force account." FEMA reimburses force account labor based on actual hourly rates plus the cost of the employee's actual fringe benefits. FEMA calculates the fringe benefit cost based on a percentage of the hourly pay rate. Because certain items in a benefit package are not dependent on hours worked (e.g., health insurance), the percentage for overtime is usually different than the percentage for straight-time pay. Fringe benefits provided under established written policies may include:

- Holiday leave;

---

[145] 2 C.F.R. § 200.339.

PAPPG v5

- Accrued sick and vacation leave;
- Social security matching;
- Medicare matching;
- Unemployment insurance;
- Workers' compensation;
- Retirement;
- Health, life, and disability insurance; and,
- Administrative leave.

 **Terminology**

**Fringe benefits** - A percentage of the actual wages that pays for employee benefits.

Applicants must submit the following to support claims for labor costs:

**Table 10. Required Documentation and Information for Labor Costs**

| For Small Projects | For Large Projects[146] |
|---|---|
| <ul><li>Itemized cost summary including actual or estimated costs:</li><ul><li>Number of employees;[147]</li><li>Total budgeted hours;</li><li>Total unbudgeted hours;</li><li>Average straight-time pay rate with fringe benefits;[148] and,</li><li>Average overtime pay rates with fringe benefits.[149]</li></ul></ul> | <ul><li>Pay policy;</li><li>Itemized cost summary including estimated costs, or actual costs for completed work, for each employee:</li><ul><li>Name</li><li>Job title and function;</li><li>Type of employee (e.g., full-time exempt, full-time non-exempt, part-time, temporary);</li><li>Date and hours worked;</li><li>Pay rate and fringe benefit rate;</li><li>Description of work performed with daily logs/activity reports;</li><li>Timesheets; and,</li><li>Fringe benefit calculations.[150]</li></ul></ul> |

---

[146] FEMA utilizes an attribute-based sampling approach, following the *GAO Financial Audit Manual*, for verifying supporting documentation for PA projects; therefore, FEMA may select a representative sample rather than reviewing all documentation. For more information, refer to: *Public Assistance Sampling Procedure*.
[147] Estimates may be calculated based on actual or estimated total number of staff and total hours with average pay rates. Average rates may only be used for employees at similar pay grades and same category of employee (e.g., permanent full-time vs. part-time vs. temporary hire).
[148] Fringe benefits are calculated based on a percentage of the hourly pay rate.
[149] Fringe benefits are calculated based on a percentage of the hourly pay rate.
[150] Fringe benefits are calculated based on a percentage of the hourly pay rate.

PAPPG v5

## A. Labor Policies

FEMA determines the eligibility of employee labor costs based on the applicant's pre-disaster written labor policy, provided the policy:

- Does not include a contingency clause that payment is subject to federal funding;
- Is applied uniformly regardless of a presidential declaration; and,
- Has set non-discretionary criteria for when the applicant activates various pay types.

If these requirements are not met, FEMA limits PA funding to the applicant's non-discretionary, uniformly applied pay rates. Labor cost eligibility is tied to the labor policy in effect prior to the start date of the incident period. "Pre-disaster" means "prior to the incident start date identified in the approved presidential disaster declaration" in the context of all PA Program authorities and guidance, not just labor policies.

## B. Eligibility Criteria for Reimbursement of Employee Labor Costs

FEMA's criteria for reimbursing employee labor costs differ based on the category of work the employee performed, whether the employee's pay rate is straight time or overtime, and whether an applicant's employee labor costs are budgeted or unbudgeted. Note that costs associated with the salary and benefits of an employee on leave, regardless of the nature of the leave (e.g., sick leave) and regardless of whether the employee has leave to use, are ineligible. Administrative leave or similar labor costs incurred for employees sent home or told not to report due to emergency conditions are ineligible.

 **Terminology**

**Permanent (labor)** - A full-time or part-time employee working on a permanent and ongoing basis, as set by an applicant's written labor or pay policy.

**Full-time** and **part-time** refer to the normal number of hours worked by an employee per pay period, as set by an applicant's [1] eligible pre-disaster written labor policy or [2] non-discretionary, uniformly applied pay rates.

Pay rates are set by an applicant's [1] eligible pre-disaster written labor policy or [2] non-discretionary, uniformly applied pay rates. **Exempt** employees are not subject to the overtime pay requirements set forth in the Fair Labor Standards Act. **Non-exempt** employees are subject to the overtime pay requirements set forth in the Fair Labor Standards Act.

For permanent work, categories C-G, straight-time and overtime pay are eligible for budgeted and unbudgeted employee labor costs.[151] For category I, straight-time pay is limited to extra hires, while overtime is eligible.[152]

---

[151] Stafford Act § 406(a)(2)(C); 42 U.S.C. § 5172; 44 C.F.R. § 206.228(a)(2)(i).
[152] Stafford Act § 406(a)(2)(c); 42 U.S.C. § 5172.

PAPPG v5

For emergency work, categories A-B, straight-time labor costs for budgeted employees are generally ineligible, while overtime labor costs are eligible. [153] However, straight time labor costs for budgeted employees are eligible pursuant to alternative procedures for debris removal, where the employee is performing eligible category A debris removal work. [154] For unbudgeted employees performing emergency work, costs for both straight-time and overtime labor hours are eligible.

**Table 11. Emergency Work Labor Eligibility**

| Labor Classification | Type of Employee Hours | Eligible Overtime? | Eligible Straight-Time? |
|---|---|---|---|
| Budgeted Employee Hours (Debris Removal) | Permanent employee | Yes | Yes |
| Budgeted Employee Hours (Debris Removal) | Part-time or seasonal employee working during normal hours or season of employment | Yes | Yes |
| Budgeted Employee Hours (Emergency Protective Measures) | Permanent employee | Yes | No |
| Budgeted Employee Hours (Emergency Protective Measures) | Part-time or seasonal employee working during normal hours or season of employment | Yes | No |
| Unbudgeted Employee Hours (Debris & Emergency Protective Measures) | Reassigned employee funded from external source | Yes | Yes |
| Unbudgeted Employee Hours (Debris & Emergency Protective Measures) | Essential employee called back from furlough | Yes | Yes |
| Unbudgeted Employee Hours (Debris & Emergency Protective Measures) | Temporary employee hired to perform eligible work | Yes | Yes |
| Unbudgeted Employee Hours (Debris & Emergency Protective Measures) | Part-time or seasonal employee working outside normal hours or season of employment | Yes | Yes |

1.    REASSIGNED EMPLOYEES

Costs for employees reassigned to perform work that is not part of the employee's normal job functions are eligible. For example, a police officer may clear debris which FEMA provides PA funding based on the

[153] 44 C.F.R. § 206.228(a)(2)(iii)
[154] Stafford Act § 428(e)(2)(D); 42 U.S.C. § 5189f.

81

reassigned employee's normal pay rate, not the pay level appropriate to the work, because the applicant's incurred cost is the employee's normal pay rate.

## 2.    REASSIGNED EMPLOYEES FUNDED FROM AN EXTERNAL SOURCE

Costs for straight-time hours of an employee funded from an external source (such as a grant from a federal agency or statutorily dedicated funds) are eligible if the employee is reassigned to perform eligible emergency work that the external source does not fund. FEMA must confirm that no duplication of benefits exists prior to approval.

## 3.    BACKFILL EMPLOYEES

The applicant may need to temporarily replace an employee who is responding to the incident. If an employee is unable to perform normal duties due to performing eligible emergency work, certain costs associated with backfilling the employee are eligible, even though the backfilling employee is not performing eligible work. The eligibility of labor costs for a backfill employee is tied to an employee unable to perform normal duties because they are performing eligible emergency work, not because they are unable to work (e.g., on leave, furloughed).

Only costs for overtime hours worked by the backfill employee are eligible in the following scenarios:

▪   Backfill employee is budgeted; or

▪   Backfill employee is called in from scheduled leave.

Costs for straight-time hours worked by the backfill employee in the scenarios above are not eligible, even as a short-term increased operating expense.

If the backfill employee is not a budgeted employee, costs for straight-time hours worked by the backfill employee are eligible if the employee is a:

▪   Contracted or temporary employee; or

▪   Permanent employee called in on a normally scheduled day off (weekend or other off day).

Costs from backfilling labor are only eligible if:

▪   Costs are for a limited period of time based on the exigency of the circumstances; and,

▪   The applicant tracks and documents the additional costs.

## 4.    ESSENTIAL EMPLOYEES CALLED BACK FROM FURLOUGH

Costs for straight-time hours of essential employees called back to work from a budget-related furlough due to the declared incident is eligible if the costs are not budgeted.

PAPPG v5

## 5.    SUPERVISORS

Second-level supervisors and above (e.g., commissioners, mayors, department directors, police, and fire chiefs) are usually exempt from the overtime pay requirements set forth in the Fair Labor Standards Act. [155] Therefore, overtime costs related to these types of employees are ineligible, unless the applicant:

- Demonstrates that the employee was directly involved with a specific project;
- Normally charges that individual's time to specific projects regardless of federal funding; and,
- Incurs overtime costs for the employee in accordance with a labor policy that meets the criteria under Labor Policies in this chapter.

## 6.    OTHER

FEMA may provide PA funding for extraordinary costs paid on an hourly basis (such as call-back pay, night-time and weekend differential pay, and hazardous duty pay) for essential employees to perform eligible emergency work if costs are paid in accordance with a pre-disaster written labor policy that meets the criteria above. All other PA Program eligibility requirements must be met.

FEMA considers bonuses and incentive pay to be discretionary rewards for an employee's performance rather than premium pay associated with and required for the actual hours worked. Bonuses and incentive pay are not eligible even when related to hazardous situations caused by the declared incident as those payments are not directly tied to and necessary for the performance of eligible work.

## 7.    STANDBY TIME

FEMA provides PA funding for labor costs related to intermittent standby time for staff conducting eligible evacuation or sheltering, search and rescue, or emergency medical care. All of the following criteria must be met:

- Standby use and pay are consistent with the applicant's labor policy (or contractual obligation based on a labor agreement) and consistent with its practice in non-federally declared incidents OR a contract or union agreement that requires payment for standby time;
- The standby time occurred when it was necessary to have resources available to conduct the respective life-saving action;
- The number of hours and individuals were reasonable and necessary based on the number of resources required;
- The employee was conducting the respective life-saving action; and,
- All other labor cost eligibility criteria were met.

Examples of when FEMA may reimburse labor costs for standby time include, but are not limited to:

- When bus drivers are deployed to transport evacuees;
- When first responders are deployed for the purpose of evacuating or providing emergency medical care to survivors in order to save lives; and,

---

[155] For more information, refer to: U.S. Department of Labor Overtime Pay | dol.gov.

PAPPG v5

- When a contract or union agreement requires payment for standby time.

Additionally, the applicant may be required to pay firefighter costs from portal-to-portal, which may result in paying for 24-hour shifts with periods of rest. FEMA will reimburse costs based on such requirements. In these instances, FEMA limits its reimbursement to costs and timeframes that are reasonable and necessary, not to exceed 14 calendar days from the start of the incident period. The applicant must provide documentation to support the need for, and provision of, continuous support.

Standby time is separate and distinct from pre-positioning resources, which is addressed under Pre-Positioning Resources in Chapter 7.

# IV.   Applicant-Owned and Purchased Equipment

FEMA provides PA funding for the use of applicant-owned (force account) equipment, including permanently mounted generators, based on hourly equipment rates.[156] FEMA may provide PA funding based on mileage for vehicles, if the mileage is documented and less costly than hourly rates.

There are instances when applicants do not have sufficient equipment to effectively respond to an incident. If an applicant purchases equipment that it justifiably needs to respond effectively to the incident, FEMA provides PA funding for both the purchase price (subject to disposition requirements as specified under Disposition of Equipment and Supplies in this chapter) and either:

- The use of the equipment based on equipment rates; or
- The actual fuel and maintenance costs.

FEMA only applies equipment rates to the time an applicant is operating the equipment. Although costs associated with transporting equipment (e.g., labor and equipment costs used to transport equipment) to an eligible site are eligible, costs for standby time (time spent on hold or in reserve) are ineligible unless the equipment operator uses the equipment intermittently for more than half of the working hours for a given day. In this case the intermittent standby time is eligible.

Applicants must submit the following to support claims for applicant-owned or purchased equipment costs:

---

[156] 44 C.F.R. § 206.228(a)(1).

PAPPG v5

**Table 12. Required Documentation and Information for Applicant-Owned or Purchased Equipment Costs**

| Equipment Type | For Small Projects | For Large Projects[157] |
|---|---|---|
| Applicant-owned equipment | ▪ Itemized cost summary of actual or estimated costs broken out by type of equipment:<br><br>○ Total usage hours; and,<br>○ Total cost. | ▪ Itemized cost summary including actual costs, or estimated costs for completed work, broken out by type of equipment:<br><br>○ Type of equipment and attachments used, including year, make, model, size, capacity, horsepower, and wattage (as applicable);<br>○ Location(s) or site(s) used;<br>○ Equipment code (if using FEMA rates);<br>○ Schedule of rates, including rate components (if not using FEMA rates); and,<br>○ Operator name with date and hours used each day. |
| Purchased equipment | ▪ Itemized cost summary including actual or estimated costs broken out by type of equipment:<br><br>○ Total cost. | ▪ Itemized cost summary including actual or estimated costs broken out by type of equipment:<br><br>○ Invoices or receipts. |

FEMA provides PA funding for force account equipment usage based on FEMA or SLTT equipment rates in accordance with the specific criteria noted below.

## A. FEMA Rates

FEMA publishes equipment rates applicable on a national basis.[158] FEMA's rate schedule includes any item powered by fuel or attached to any item powered by fuel. FEMA develops equipment rates based on all costs associated with ownership and operation of equipment (except for operator labor). FEMA equipment rate components include depreciation, overhead, equipment overhaul (labor, parts, and supplies), maintenance (labor, parts, and supplies), lubrication, tires, ground engaging component (if applicable), and fuel. Because the rates include maintenance costs, a mechanic's labor costs to maintain applicant-owned equipment are ineligible. Similarly, because the rates include fuel costs, an applicant cannot claim fuel costs in addition to FEMA equipment rates.

## B. State, Tribal Nation, or Territorial Rates

State, Tribal Nation, and territorial (STT) rates are established under STT guidelines for use in normal day-to-day operations. FEMA provides PA funding based on STT rates up to $75 per hour.[159] FEMA only provides PA

---

[157] FEMA utilizes an attribute-based sampling approach, following the *GAO Financial Audit Manual*, for verifying supporting documentation for PA projects; therefore, FEMA may select a representative sample rather than reviewing all documentation. For more information, refer to: *Public Assistance Sampling Procedure*.
[158] For more information, refer to: Schedule of Equipment Rates | fema.gov.
[159] 44 C.F.R. § 206.228(a)(1)(i).

funding for a rate above $75 per hour if the applicant demonstrates that each of the components of the rate is comparable to current market prices.[160]

## C.  Local Rates

Local rates are those developed under local government guidelines for use in normal day-to-day operations. FEMA generally provides PA funding for equipment usage based on the lower of either the local rate or the FEMA rate. However, if the local rate is lower, and the applicant certifies that the rate does not reflect all actual costs associated with operating the equipment, FEMA may provide PA funding based on the higher FEMA rate. FEMA may request that applicants provide documentation for the basis of its rate. Additionally, if the local rate is higher, applicants must document the basis for that rate and obtain approval from FEMA for the higher rate.[161]

If determining the lowest rate for each piece of equipment is overly burdensome because of the number of different types of equipment used, or if the applicant prefers, FEMA will reimburse all equipment use based on the lower of the two rate schedules, rather than based on a comparison of each individual rate. In these cases, the PA Division at FEMA Headquarters determines which schedule of rates is lower.

## D.  Equipment with No Established Rate

If applicants use equipment that has no established SLTT rate, FEMA reimburses that equipment based on the FEMA rate.[162] If FEMA does not have a rate established for the equipment, applicants may either submit a rate for approval or request that FEMA provide a rate. If an applicant submits a rate, it must include documentation demonstrating that each component of the rate is comparable to current market prices. The rate cannot be based on rental rates as such rates may include cost components, such as profit, that are above and beyond what is necessary to operate and maintain force account equipment.

## E.  Telecommunications Equipment Purchase

Applicants may not obligate or expend any FEMA awards, including any new, renewed, or extended purchase orders, contracts, subcontracts, or similar acquisitions on prohibited systems identified in the National Defense Authorization Act[163] to:

- Procure or obtain any equipment, system, or service that uses covered telecommunications equipment or services[164] as a substantial or essential component of any system, or as critical technology of any system;

- Enter into, extend, or renew a contract to procure or obtain any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology of any system; or

---

[160] Ibid.
[161] 44 C.F.R. § 206.228(a)(1)(ii).
[162] 44 C.F.R. § 206.228(a)(1)(iii).
[163] 2 C.F.R. § 200.216.
[164] Entities added to this list will be incorporated into the excluded parties list in the System for Award Management | sam.gov. When a user conducts a search of the excluded parties list, a record will appear describing the nature of the exclusion for any entity identified as covered by this prohibition.

PAPPG v5

- Enter into, extend, or renew contracts with entities that use covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system.[165]

Applicants may use PA funding to purchase replacement equipment, systems, or services.

 **Terminology**

**Covered telecommunications equipment** includes telecom or video surveillance equipment or services produced or provided by an entity reasonably believed to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country.

# V.    Rented or Leased Equipment

When applicants rent or lease equipment, FEMA provides PA funding based on the terms of the agreement. Rental and leasing costs are eligible if:

- The applicant performed an analysis of the cost of rented or leasing versus purchasing the equipment;[166] and,
- The total rental or leasing costs do not exceed the cost of purchasing and maintaining equipment during the life of the eligible project.

If the rental or leasing costs exceed the cost of purchasing and maintaining the equipment, FEMA determines the amount of eligible costs based on an evaluation of the reasonableness of the costs claimed, including whether the applicant acted with prudence under the circumstances at the time it rented or leased the equipment.

If an applicant has a rent-to-own or lease-purchase agreement and obtains ownership during completion of eligible work, FEMA provides PA funding for the equipment use based on the hourly equipment rate, as described under Applicant-Owned and Purchased Equipment in this chapter. If the applicant completes the eligible work prior to obtaining ownership, FEMA provides PA funding based on the cost to rent or lease the equipment.

Applicants must submit the following to support claims for rented or leased equipment costs:

---

[165] Entities added to this list will be incorporated into the excluded parties list in the System for Award Management | sam.gov. When a user conducts a search of the excluded parties list, a record will appear describing the nature of the exclusion for any entity identified as covered by this prohibition.
[166] 2 C.F.R. § 200.318(d).

PAPPG v5

**Table 13. Required Documentation and Information for Rented or Leased Equipment Costs**

| For Small Projects | For Large Projects[167] |
|---|---|
| ▪ Itemized cost summary of actual or estimated costs for leased equipment:<br>  ○ Total usage days or hours; and,<br>  ○ Total cost. | ▪ Itemized cost summary including actual costs, or estimated costs for completed work, broken out by type of equipment or each piece of leased equipment:<br>  ○ Type of equipment, including make, model, size, capacity, horsepower, and wattage (as applicable);<br>  ○ Location or site used;<br>  ○ Dates and hours used (required if lease agreement charges hourly rates);<br>  ○ Rates and total cost;<br>  ○ Vendor and invoice number;<br>  ○ Amount of fuel used (if not included in rental cost);<br>  ○ Lease agreement; and,<br>  ○ Invoices or receipts. |

# VI.  Supplies

The cost of supplies, including materials, is eligible if:

▪ Purchased and justifiably needed to effectively respond to and/or recover from the incident; or

▪ Taken from the applicant's stock and used for the incident.

Applicants must track items taken from stock with inventory withdrawal and usage records.

FEMA provides PA funding for these items based on invoices, if available. If invoices are not available for items used from stock, FEMA provides PA funding based on the applicant's established method of pricing inventory.[168] If an applicant does not have an established method, FEMA provides PA funding based on historical data or prices from area vendors.

FEMA consults with the U.S. Department of Homeland Security Office of Inspector General Emergency Management Oversight Team in cases where it has difficulty determining a reasonable value.

Applicants must submit the following to support claims for materials and supplies costs:

---

[167] FEMA utilizes an attribute-based sampling approach, following the *GAO Financial Audit Manual*, for verifying supporting documentation for PA projects; therefore, FEMA may select a representative sample rather than reviewing all documentation. For more information, refer to: *Public Assistance Sampling Procedure*.
[168] 2 C.F.R. § 200.453(b).

PAPPG v5

**Table 14. Required Documentation and Information for Materials and Supplies Costs**

| For Small Projects | For Large Projects [169] |
|---|---|
| ▪ Itemized cost summary including actual or estimated costs for materials and supplies:<br>  ○ Type and quantity; and,<br>  ○ Total cost. | ▪ Itemized cost summary including estimated costs, or actual costs for completed work, for materials and supplies:<br>  ○ From stock:<br>    – Cost documentation, such as original invoices or other historical cost records;<br>    – Inventory records;<br>    – Type of supplies and quantities used; and<br>    – Location used.<br>  ○ Purchased:<br>    – Receipts or invoices;<br>    – Quantities used; and,<br>    – Justification (required if supplies were not used). |

# VII.  Disposition of Equipment and Supplies

This section describes disposition requirements when purchased equipment or supplies (including materials) are no longer needed for federally funded projects.

In the context of disposition, equipment is any tangible personal property (including information technology systems) having a useful life of more than one year and a per-unit acquisition cost that equals or exceeds the lesser of the capitalization level established by an applicant for financial statement purposes, or $10,000. [170] Tangible personal property that does not fall under this definition of equipment is a supply. [171]



**Terminology**

**Acquisition cost** - The net invoice price of equipment including the cost of modifications, attachments, accessories, or auxiliary apparatus necessary to make it usable for the purpose it was acquired. Other charges such as the cost of installation, transportation, taxes, duty, or protective in-transit insurance, shall be included or excluded from the unit acquisition cost in accordance with a recipient's regular accounting practices.

**Personal property** means property other than real property.

---

[169] FEMA utilizes an attribute-based sampling approach, following the *GAO Financial Audit Manual*, for verifying supporting documentation for PA projects; therefore, FEMA may select a representative sample rather than reviewing all documentation. For more information, refer to: *Public Assistance Sampling Procedure*.
[170] 2 C.F.R. § 200.1.
[171] Ibid.

PAPPG v5

## A. Disposition of Purchased Equipment

In accordance with federal regulations, state and territorial government applicants dispose of equipment in accordance with state and territorial laws and procedures. Tribal Nations must use, manage, and dispose of equipment acquired under a federal award in accordance with tribal laws and procedures. If such laws and procedures do not exist, Tribal Nations must follow the guidance in 2 C.F.R. 200.313(c)-(e). [172] When allowable pursuant to its own laws and procedures, state, Tribal Nation, and territorial applicants may not be required to compensate FEMA for its share of the original purchase.

When equipment purchased with PA funding is no longer needed for response to or recovery from the incident, local governments, and private nonprofit (PNP) applicants may use the items for other federally funded programs or projects, provided the applicant informs FEMA. [173]

When an individual item of equipment is no longer needed for federally funded programs or projects, local governments, and PNP applicants must calculate the current fair market value of the individual item of equipment. Applicants must provide the current fair market value for items that have a current fair market value of $10,000 or more and compensate FEMA for its share of the original purchase, based on the cost share. FEMA applies the requirement by reducing funding by the applicable amount. [174] If the individual item of equipment has a current fair market value less than $10,000, FEMA does not reduce the eligible funding. [175]

## B. Disposition of Purchased Supplies

When supplies are no longer needed for federally funded programs or projects, all applicants, including state and territorial government and Tribal Nation applicants, must calculate the current fair market value of any unused residual supplies (including materials) that FEMA funded for any of its projects and determine the aggregate total.

Applicants must provide the current fair market value if the aggregate total of unused residual supplies is greater than $10,000 and compensate FEMA for its share of the original purchase, based on the cost share. FEMA applies this requirement by reducing funding by the applicable amount. [176] If the aggregate total of unused residual supplies is less than $10,000, FEMA does not reduce the eligible funding.

 **Examples: Equipment vs. Supplies**

- Examples of **equipment** include: durable medical equipment, hospital beds, ventilators, refrigerator trucks, coolers, freezers, and information technology systems (which are different than iPads/laptops).

---

[172] 2 C.F.R. § 200.313(b).
[173] 2 C.F.R. § 200.313(c).
[174] 2 C.F.R. § 200.313(e)(2).
[175] 2 C.F.R. § 200.313(e)(1).
[176] 2 C.F.R. § 200.314(a).

PAPPG v5

> ▪ Examples of **supplies** include: iPads/laptops, personal protective equipment (PPE), such as N95 and other filtering respirators, surgical masks, gloves, protective eyewear, face shields, protective clothing, sharps containers, and dry ice.

# VIII. Disposition for Small Projects

For small projects, fair market value and the associated reduction are addressed during project formulation. To calculate depreciation of fair market value for equipment, the date used to determine when equipment is no longer needed is based on the work completion deadline. No reduction is taken for disposition of supplies for small projects because the quantity of supplies for which funding is eligible is an amount that is necessary and reasonable, and the estimate is based on the aggregate unused supplies not exceeding $10,000.

# IX.   Disposition of Real Property

If an applicant acquires or improves real property with PA funds, disposition and reporting requirements apply when acquired or improved real property is no longer needed for the originally authorized purpose.[177] Recipients and applicants must obtain specific disposition instructions from FEMA.[178]

# X.   Procurement and Contracting Requirements

FEMA provides PA funding for contract costs based on the terms of the contract or purchase agreement if an applicant meets federal procurement and contracting requirements. Federal procurement and contracting requirements for state and territorial government agencies and Tribal Nations are different than those for local government agencies and PNPs.

If an applicant does not comply with federal procurement requirements, FEMA applies an appropriate remedy in accordance with its authorities.[179] FEMA has determined an appropriate remedy under these circumstances is to either deny all costs associated with the contract or, if sufficient information is provided to substantiate a reasonable amount for the eligible work completed, FEMA only reimburses the portion of the costs it determines are reasonable and allowable based on all available information and documentation provided. For more information, please refer to Reasonable Cost Analysis in this chapter. In addition to monetary remedies, FEMA may also take non-monetary actions against the applicant as authorized by 2 C.F.R. §§ 200.208 and 200.339.

FEMA's Procurement Guidance for Recipients and Subrecipients Under 2 C.F.R. Part 200 (Uniform Rules)[180] provides additional details regarding federal procurement and contracting requirements.

---

[177] 2 C.F.R. §§ 200.311 and 200.330.
[178] 2 C.F.R. § 200.311(d).
[179] 2 C.F.R. § 200.339.
[180] For more information, refer to: Procurement Guidance for Recipients and Subrecipients Under 2 C.F.R. Part 200 (Uniform Rules).

PAPPG v5

# A. Procurement and Contracting Requirements for State and Territorial Government and Tribal Nation Entities

Applicants must comply with federal procurement requirements as a condition of receiving PA funding for contract costs for eligible work.

## 1.    PROCUREMENT

State and territorial government applicants,[181] as well as Tribal Nations, must comply with federal procurement procedures at 2 C.F.R. § 200.317, which include:

- Following the same policies and procedures they would use for procurements with non-federal funds; and,

- Complying with the Environmental Protection Agency (EPA) guidelines in 2 C.F.R. § 200.322, Procurement of recovered materials.

FEMA reviews state, Tribal Nation, or territorial procurement policies or procedures or requests that a state, Tribal Nation, or territorial attorney certify in writing whether the applicant complied with the state's, Tribal Nation's, or territory's procurement policies and procedures.

## 2.    CONTRACTING

State and territorial government applicants, as well as Tribal Nations, must include required provisions detailed in 2 C.F.R. § 200.327 in all contracts awarded.[182] Some provisions are based on sound contracting practices while others are required by federal law, EOs, and regulations. Some provisions do not apply under the PA Program (e.g., Davis Bacon Act[183] and Rights to Inventions Clause) while others require verbatim language.

Required contract provisions include:

- Remedies Clause;

- Termination for Cause and Convenience;

- Equal Employment Opportunity;

- Contract Work Hours and Safety Standards Act;

- The Clean Air Act (CAA) and the Federal Water Pollution Control Act;

- Debarment and Suspension;

- Byrd Anti-Lobbying Amendment Clause;

- Byrd Anti-Lobbying Amendment Certification;

- Procurement of Recovered Materials;

- Prohibition on Contracting for Covered Telecommunications Equipment or Services; and,

---

[181] See Applicant Eligibility: State, Local, Tribal Nation, and Territorial Government Entities for a description of each type of applicant.
[182] 2 C.F.R. § 200.327.
[183] The Davis Bacon Act requires "prevailing wage" payment to contracted workers based on the local union wage scale defined by the U.S. Department of Labors. If the applicant incorporates prevailing wage rates as part of its normal practice for all contracts regardless of the funding source, then those rates are eligible.

PAPPG v5

- Domestic Preference for Procurements.

In addition to the required provisions, FEMA also recommends the following contract provisions be included in all contract awards:

- Changes Clause;
- Access to Records;
- Department of Homeland Security Seal, Logo, and Flags;
- Compliance with Federal Law, Regulations, and EOs Clauses;
- No Obligation by Federal Government;
- Program Fraud and False or Fraudulent Statements or Related Acts;
- 
- Copyright; and,
- Providing Good, Safe Jobs to Workers.

The FEMA "Contract Provisions Guide"[184] provides the exact language for the provisions that require verbatim language and provides sample language for some of the other provisions.

Although time-and-material (T&M) contracts without a ceiling price and cost-plus-percentage-of-cost or percentage-of-construction contracts may be allowed by a state, Tribal Nation, or territorial government, their use carries high risk of noncompliance with the requirement that all costs be reasonable.[185]

## B. Procurement and Contracting Requirements for Local Government Agencies and Private Nonprofit Organizations

Local governments and PNPs[186] must comply with:

- Their own documented procurement procedures;
- Applicable SLTT government laws and regulations; and,
- Applicable federal laws and regulations.[187]

If there is a conflict among these procurement rules and procedures, the local government or PNP must use the more restrictive requirement. Additionally, territorial governments should consult their legal counsel when a project involves a public building or public works facility as the Buy American Act may apply to the procurement process.

## 1.     PRE-PROCUREMENT CONSIDERATIONS

FEMA encourages local governments and PNPs to:

---

[184] For more information, refer to: *FEMA Contract Provisions Guide*.
[185] 2 C.F.R. § 200.403(a).
[186] See Applicant Eligibility: State, Local, Tribal Nation, and Territorial Government Entities and Applicant Eligibility: Private Nonprofit Organizations in Chapter 3 for a description of which applicants are local governments or PNPs.
[187] 2 C.F.R. § 200.318(a).

PAPPG v5

- Establish or update written procurement procedures that reflect applicable SLTT laws and regulations;[188] and,

- Maintain required written standards of conduct covering conflicts of interest and governing the performance of employees who engage in the selection, award, and administration of contracts.[189]

Local governments and PNPs should also create a prequalified list of responsible contractors identified to possess the qualifications and technical abilities to satisfy the applicant's potential requirement.[190] Although not a contract, many entities have prequalified lists that serve as contract research.

A prequalified contractor is one that an applicant evaluated and determined to be qualified to perform the work based on capabilities, such as technical and management skills, prior experience, past performance, and availability. A prequalified contractor is not entitled to a "standby" contract. Applicants must still conduct full and open competition. The applicant cannot exclude potential bidders or offerors from qualifying during the solicitation period, even if they were not on the prequalified list.[191]

## 2.    GENERAL FEDERAL PROCUREMENT REQUIREMENTS

Federal procurement requirements for local governments and PNPs are found at 2 C.F.R. § 200.318 through 200.327. The requirements include, but are not limited to:

- Providing full and open competition;[192]
  - Tribal Nation applicants may provide preference to Indian organizations or Indian-owned economic enterprises[193] if the applicant substantiates that it met the Indian Self-Determination and Education Act requirements.

- Conducting the following steps to ensure the use of small and minority businesses, women's business enterprises, veteran-owned businesses, and labor surplus area firms when possible:[194]
  - Place such organizations that are qualified on solicitation lists;
  - Ensure such organizations are solicited whenever they are potential sources;
  - Divide total requirements, when economically feasible, into smaller tasks or quantities;
  - Establish delivery schedules, where the requirement permits, encouraging its participation;
  - Use the services and assistance, as appropriate, of the U.S. Small Business Administration (SBA) and the Minority Business Development Agency of the Department of Commerce; and,
  - Require prime contractor to conduct the above steps if subcontracting.

---

[188] Ibid.
[189] 2 C.F.R. § 200.318(c)(1).
[190] 2 C.F.R. § 200.319(e).
[191] Ibid.
[192] 2 C.F.R. § 200.319(a).
[193] Per the Indian Financing Act of 1974, Pub. L. No. 93-262, § 2(e), 88 Stat 77 (codified as amended at 25 U.S.C. § 1452(f)), an Indian organization is the governing body of any federally-recognized Tribal Nation, or an entity established or recognized by the governing body. An Indian-owned economic enterprise is any commercial, industrial, or business activity established or organized by a member of a federally-recognized Tribal Nation for the purpose of profit, provided that such Indian ownership constitutes 51 percent or more of the enterprise.
[194] 2 C.F.R. § 200.321.

94

PAPPG v5

- Performing a cost or price analysis in connection with every procurement action above the simplified acquisition threshold,[195] including contract modifications;
  - o   Applicants must make independent estimates before receiving bids or proposals.[196]

- Evaluating and documenting the contractor's integrity, compliance with public policy, record of past performance, and financial and technical resources;[197]

- Ensuring that the contractor was not suspended or debarred;[198]

- Excluding contractors that develop or draft specifications, requirements, statements of work, or invitations for bids or requests for proposals from competing for such procurements to ensure objective contractor performance and eliminate unfair competitive advantage;[199] and,

- Maintaining records to detail the history of the procurement including, but are not limited to:
  - o   Rationale for the method of procurement;
  - o   Selection of contract type;
  - o   Contractor selection or rejection; and,
  - o   The basis for the contract price.[200]

 **Terminology**

**Simplified acquisition threshold -** The dollar amount below which a non-federal entity may purchase property or services using small purchase methods. The simplified acquisition threshold is set by the Federal Acquisition Regulation at 48 C.F.R. Subpart 2.1 (Definitions) and in accordance with 41 U.S.C. 1908. As of the publication of this part, the simplified acquisition threshold is $250,000, but this threshold is periodically adjusted for inflation.

**Micro-purchase:** purchase of supplies or services where the total cost does not exceed the micro-purchase threshold set by the Federal Acquisition Regulation at 48 C.F.R. Subpart 2.1.

**Simplified acquisitions procedure:** relatively simple and informal procurement method for securing services, supplies, or other property that do not cost more than the simplified acquisition threshold set by the Federal Acquisition Regulation at 48 C.F.R. Subpart 2.1.

**Sealed bid:** publicly solicited bid awarded via a firm fixed-price contract to the lowest responsive and responsible bidder.

**Proposal:** normally conducted with more than one source submitting an offer and generally used when conditions are not appropriate for the use of sealed bids.

---

[195] The simplified acquisition threshold is set by the Federal Acquisition Regulation at 48 C.F.R. § 2.101. The threshold is adjusted periodically for inflation.
[196] 2 C.F.R. § 200.324(a).
[197] 2 C.F.R. § 200.318(h).
[198] 2 C.F.R. § 200.214.
[199] 2 C.F.R. § 200.319(b).
[200] 2 C.F.R. § 200.318(i).

> **Noncompetitive procurement:** solicitation of a proposal from only one source. See 2 C.F.R. § 200.320 for federal rules that apply to each individual method.
>
> **Procurement of real property:** The purchase or lease of real property is a unique transaction that might not readily allow use of one of the competitive methods of procurement. If an applicant is unable to conduct a competitive procurement, it may use a noncompetitive method in accordance with the requirements in this section. The appropriate method will depend on the facts and circumstances of each procurement.

## 3.    PROCUREMENT METHODS

Local governments, and PNPs must use one of the following procurement methods:[201]

- Micro-purchase;

- Small purchase procedure;

- Sealed bid (formal advertising);

- Competitive proposal; or,

- Noncompetitive proposal (sole-sourcing).

## C. Noncompetitive Procurement

FEMA reimburses reasonable costs incurred under a contract procured through a noncompetitive proposal, also referred to as sole-source, only when one or more of the following circumstances apply:

- The item is only available from one source;

- The public exigency or emergency for the requirement will not permit a delay resulting from competitive solicitation (this exception to competitive procurement is only for work specifically related to the circumstance and only while the circumstances exist. Therefore, applicants need to immediately begin the process of competitively procuring similar goods and services and transition to a competitively procured contract as soon as the circumstances cease to exist);

- FEMA or the recipient expressly authorizes a noncompetitive proposal in response to a written request from the applicant; or,

- After solicitation of several sources, competition is determined inadequate.[202]

In instances where applicants submit cost claims based on noncompetitive bids or contracts, time-and-materials contracts, or cost-plus-percentage-of-cost or percentage-of-construction contracts, FEMA will review the project for reasonable cost and procurement and contracting compliance.

For large projects with costs based on noncompetitive procurement, applicants must identify which of the four circumstances listed above apply and provide all of the following information, documentation, and justification:

---

[201] 2 C.F.R. § 200.320.
[202] 2 C.F.R. § 200.320(f).

PAPPG v5

- A brief description of the product or service being procured, including the expected amount of the procurement;

- Explanation of why a noncompetitive procurement is necessary;

  o If there was a public exigency or emergency, the justification should explain the specific conditions and circumstances that clearly illustrate why competitive procurement would cause unacceptable delay in addressing the public exigency or emergency. (Failure to plan for transition to competitive procurement cannot be the basis for continued use of noncompetitive procurement based on public exigency or emergency.)

- Length of time the noncompetitive contract will be used for the defined SOW, and the impact on that SOW should the noncompetitively procured contract not be available for that amount of time (e.g., how long does the applicant anticipate the exigency or emergency circumstances to continue; how long it will take to identify requirements and award a contract that complies with all procurement requirements; or how long it would take another contractor to reach the same level of competence);

- The specific steps taken to determine that the applicant could not have used, or did not use, full and open competition for the SOW (e.g., research conducted to determine that there were limited qualified resources available that could meet the contract provisions);

- Any known conflicts of interest and any efforts that the applicant made to identify potential conflicts of interest before the noncompetitive procurement occurred (and if the applicant made no efforts, explain why); and,

- Any other justification that applies.

If FEMA determines that none of the allowable circumstances existed or did not preclude the applicant from adhering to competitive procurement requirements, FEMA will work with the recipient to identify remedies for non-compliance. However, if FEMA or the recipient determine that non-compliance cannot be remedied by imposing additional conditions, FEMA will disallow all or part of the associated costs.[203]

 **Examples: Exigent vs. Emergency Situations**

- **Exigent Situation**: A tornado impacts a city in June and causes widespread and catastrophic damage, including damage to a city school. The city wants to repair the school and have it ready for use by the beginning of the school year in September. The city estimates, based on experience, that awarding a contract using a sealed bidding process would require at least 90 days, and the city's engineer estimates that the repair work would last another 60 days. This would extend the project beyond the beginning of the school year. Rather than conducting a sealed bidding process, the city—in compliance with state and local law—wants to sole source with a contractor it has contracted with previously.

- **Emergency Situation**: Severe weather impacts a city and causes widespread and catastrophic damage, including loss of life, widespread flooding, loss of power, damage to public and private structures, and millions of cubic yards of debris across the city, leaving majority of the jurisdiction inaccessible. The city needs to begin debris removal activities immediately to restore access to the community, support search and rescue operations, power restoration, and address health and safety concerns.

---

[203] 2 C.F.R. § 200.339.

PAPPG v5

## 1.    CONTRACT TYPES

FEMA reimburses costs incurred by local governments and PNPs using three types of contract payment obligations: fixed price, cost-reimbursement, and, to a limited extent, T&M. [204]

Local governments, and PNPs must maintain oversight on all contracts to ensure contractors perform according to the conditions and specifications of the contract and any purchase orders. [205]

## D. Time-and-Materials Contracts

Time-and-material (T&M) contracts do not provide incentives to the contractor for cost control or labor efficiency. Therefore, use of T&M contracts is only allowed if all of the following apply:

- No other contract type was suitable;
- The contract has a ceiling price that the contractor exceeds at its own risk; and,
- The applicant maintains a high degree of oversight to obtain reasonable assurance that the contractor is using efficient methods and effective cost controls. [206]

FEMA generally limits the use of T&M contracts to a reasonable timeframe based on the circumstances during which an applicant could not define a clear SOW. Therefore, applicants should define the SOW as soon as possible to enable procurement of a more acceptable type of contract.

Some entities, such as rural electrical cooperatives, provide the materials necessary to restore the facilities and refer to such contracts as time-and-equipment (T&E) contracts. The limitations and requirements that apply to T&M contracts also apply to T&E contracts.

## 1.    COST-PLUS-PERCENTAGE-OF-COST OR PERCENTAGE-OF-CONSTRUCTION

In addition to limiting reimbursement to costs that can be determined to be reasonable, FEMA does not reimburse the increased cost associated with the percentage on a cost-plus-percentage-of-cost calculation or percentage-of-construction cost method. [207] This type of contract billing is prohibited as it does not provide incentive to contractors to control costs because the contractor's profit increases as the costs of performance increase. Instead, it provides a financial interest to the contractor to increase costs so that its profit increases. FEMA identifies these cost methods by determining whether:

- Payment is on a predetermined percentage rate;
- The predetermined percentage rate is applied to actual performance costs;
- The contractor's total payment amount is uncertain at the time of contracting; and,
- The contractor's payment increases commensurately with increased performance costs.

---

[204] For additional information on these contract types and other procurement requirements, refer to: Contracting with Federal Funds for Goods and Services Before, During and After Disasters | FEMA.gov
[205] 2 C.F.R. § 200.318(b).
[206] 2 C.F.R. § 200.318(j).
[207] 2 C.F.R. § 200.324(c).

2.    ADDITIONAL CONTRACTING CONSIDERATIONS

## i.    Pre-Positioned Contracts

Some applicants have pre-positioned contracts, which are contracts awarded before an incident occurs for the potential performance of work. These contracts are also referred to as advance or standby contracts. FEMA reimburses reasonable costs under a pre-positioned contract if:

- It was originally procured in compliance with federal procurement requirements;
- The SOW was adequate to cover the work performed;
- The work performed was eligible; and
- The contract term covers time when work was performed.

## ii.    Cooperative Purchasing

A cooperative purchasing program is a cooperative arrangement for acquiring goods or services that involves aggregating the demand of two or more entities to obtain a more economical purchase.[208] Program membership may provide entities with access to lists of agreements or contracts for goods and services at pre-negotiated rates or prices. Typically, the member then purchases the goods or services by negotiating with participating vendors and placing purchase orders or entering into contracts based on the pre-negotiated rates or prices. FEMA advises against the use of cooperative purchasing programs due to frequent compliance issues with federal procurement requirements. FEMA provides tools to assist with Cooperative Purchasing Programs[209] and provides additional information to assist with compliance issues for procurements above the simplified acquisition threshold. Applicants must document and explain how its use of the program complied with all procurement requirements.

Piggyback contracting is a type of cooperative purchasing and occurs when one entity assigns the contractual rights it has in a contract to another entity. FEMA advises against the use of piggyback contracts. Piggyback contracts are usually not compliant with federal procurement requirements as the SOW pertains to the needs of a different entity.

# E.  Required Documentation and Information for Procurement and Contracting

Applicants must submit the following to support claims for contract costs:

---

[208] Cooperative purchasing programs are distinguishable from joint procurements. A joint procurement is a method of contracting in which two or more purchasers agree from the outset to use a single solicitation and enter into a single contract with a vendor for the delivery of goods or services. Joint procurements must still comply with federal procurement requirements. However, FEMA sees fewer compliance issues with joint procurements.
[209] For more information, refer to: Cooperative Purchasing Programs | fema.gov.

**Table 15. Required Documentation and Information for Contract Costs**

| For Small Projects[210] | For Large Projects[211] |
|---|---|
| ▪ Itemized cost summary including actual or estimated costs for each contractor:<br>  ○ Procurement method:<br>    – Competitive; or<br>    – Non-competitive;<br>  ○ Type of contract:<br>    – Fixed;<br>    – Time-and-materials;<br>    – Cost-plus-percentage or percentage of construction; or<br>    – Other; and,<br>  ○ Total contract award. | ▪ Itemized cost summary including estimated costs, or actual costs for completed work, for each contractor:<br>  ○ Contractor name;<br>  ○ Dates worked;<br>  ○ Billing or invoice number;<br>  ○ Amount; and,<br>  ○ Description of work performed;<br>▪ Procurement documents, including:<br>  ○ Requests for proposals;<br>  ○ Bids;<br>  ○ Selection process;<br>  ○ Procurement policy;<br>  ○ Cost or price analysis;<br>  ○ Contracts and change orders; and,<br>  ○ Invoices; and,<br>▪ Documentation that substantiates a high degree of contractor oversight (required for T&M contracts), including:<br>  ○ Daily or weekly logs; or<br>  ○ Records of performance meetings. |

# XI.  Mutual Aid

When an applicant does not have enough resources to respond to an incident, it may request resources from another agency, organization, or jurisdiction through a "mutual aid" agreement. FEMA refers to the entity requesting resources as the requesting entity. FEMA refers to the entity providing the requested resource as the assisting entity.

---

[210] All small projects must comply with procurement and contracting laws and regulations. In instances where applicants submit cost claims based on non-competitive bids or contracts, time and materials contracts, or cost-plus-percentage-of-cost or percentage-of-construction contracts, FEMA will review the project for reasonable cost and procurement and contracting compliance.

[211] FEMA utilizes an attribute-based sampling approach, following the *GAO Financial Audit Manual*, for verifying supporting documentation for PA projects; therefore, FEMA may select a representative sample rather than reviewing all documentation. For more information, refer to: *Public Assistance Sampling Procedure*.

 **Terminology**

**Requesting entity** - An entity that requests mutual aid assistance from an assisting entity for work resulting from a declared fire, emergency, or major disaster within its legal jurisdiction.

**Assisting entity** - The entity providing mutual aid assistance to a requesting entity pursuant to a local or statewide mutual aid agreement.

FEMA provides PA funding to the requesting entity as it is legally responsible for the work. FEMA does not provide PA funding directly to the assisting entity. For the work to be eligible, the requesting entity must have requested the resources provided.

Some states have a statewide mutual aid agreement that designates the state as being responsible for reimbursing mutual aid costs. In these states, the assisting entity may request funding directly from the state, with prior consent of the requesting entity, in accordance with applicable state laws and procedures. If the requesting entity and the state approve the request and the state pays the assisting entity, FEMA provides PA funding to the state. The requesting entity may be responsible for reimbursing the state for any non-federal local cost share, depending on specific state requirements.

The requesting entity or state, if applicable, must provide a description of the services requested and received, along with documentation of associated costs (e.g., labor, equipment, supplies, or materials) to FEMA in support of a request for PA funding.

## A. Post-Incident Agreements

When the requesting and assisting entities do not have a written agreement or, where such an agreement exists but is silent on reimbursement, they are not precluded from engaging in mutual aid activities eligible for reimbursement through PA. In such situations, these entities can enter into a verbal agreement to define the resources to be provided and to establish the terms, conditions, and costs of the assistance to be rendered. This allows flexibility in responding to the incident's specific needs.

The agreement should be consistent with past practices for mutual aid between the entities. For example, if the requesting entity does not normally reimburse an assisting entity for its costs, it should not agree to do so specifically for the declared incident.

Prior to funding, the verbal agreement, or agreement otherwise not defined in writing, must be codified in writing, and formally adopted by officials from both entities. This written record should outline the specifics of the agreement, including the resources requested/provided, the terms, conditions, and cost arrangements. Once the verbal agreement is documented and executed, it should be submitted with the project application in which the requesting entity is seeking reimbursement through FEMA. The requesting entity should submit documentation to support the costs claimed under the mutual aid agreement. The mutual aid documentation provided in this section is not exhaustive and therefore FEMA is clarifying that any documentation that provides details of services requested and received,

information about labor, equipment, and supplies may be used to support this requirement for eligibility. Some examples include letters, memos, written agreements, meeting minutes, emails, purchase orders, and invoices certifying to work and costs.

## B. Eligibility

Mutual aid resources are eligible when used for emergency protective measures, emergency utility restoration (regardless of whether it is deemed category B or F), building code and floodplain management administration and enforcement, or grant management activities. Labor expenses for the assisting entity will be treated as contract labor, with regular time and overtime wages and certain benefits eligible, provided labor rates are reasonable. Costs to transport the assisting entity's equipment and personnel to the declared area are eligible.


### Examples: Ineligible Work Performed by an Assisting Entity

Ineligible work performed by an assisting entity includes, but is not limited to:

- Preparing to deploy;
- Dispatch operations outside the receiving state, Tribal Nation, or territory;
- Training and exercises; and,
- Support for long-term recovery and mitigation operations.

The assisting entity's straight-time and overtime labor are eligible, including fringe benefits. When the requesting entity is an SLTT government and the assisting entity is another division within the same SLTT government, straight-time for budgeted employees of the assisting entity is ineligible.

If the assisting entity backfills deployed personnel, overtime for backfill personnel is eligible even if they are not performing eligible work. However, straight-time for backfill personnel is ineligible.

FEMA reimburses the use of equipment provided to a requesting entity based on either the terms of the agreement or equipment rates (detailed under Applicant-Owned and Purchased Equipment in this chapter). FEMA provides PA funding to repair damage to this equipment the same way as it provides PA funding to repair damage to applicant-owned equipment (detailed under Damage Caused During Performance of Emergency Work in Chapter 7).

## C. Emergency Management Assistance Compact

The Emergency Management Assistance Compact (EMAC) is a national interstate mutual aid agreement that enables states and territories to share resources in response to an incident. Work performed outside the receiving state or territory that is associated with the operation of EMAC, including tracking of resources, is ineligible unless the work is associated with the receiving state's or territory's emergency operations for the incident. FEMA does not perform a reasonable cost analysis of work performed through EMAC, as long as the project followed established EMAC rules.

PAPPG v5

## D. Required Documentation and Information for Mutual Aid

Applicants must submit the following to support claims for mutual aid costs:

**Table 16. Required Documentation and Information for Mutual Aid Costs**

| Mutual Aid Type | For Small Projects | For Large Projects[212] |
|---|---|---|
| EMAC[213] | <ul><li>The EMAC Resource Support Agreement signed by all parties (required at project obligation);</li><li>"Interstate Reimbursement Summary" (R-1) form (required at project closeout);</li><li>"Associated Intrastate Reimbursement Summary" (R-2) forms (required at project closeout); and,</li><li>Proof of payment by the requesting entity to the assisting entity (required at project closeout).</li></ul> | <ul><li>The EMAC Resource Support Agreement signed by all parties (required at project obligation);</li><li>"Interstate Reimbursement Summary" (R-1) form (required at project closeout);</li><li>"Associated Intrastate Reimbursement Summary" (R-2) forms (required at project closeout); and,</li><li>Proof of payment by the requesting entity to the assisting entity (required at project closeout).</li></ul> |
| Non-EMAC | <ul><li>Itemized cost summary including actual or estimated costs:<ul><li>Services requested and received; and,</li><li>Total cost.</li></ul></li></ul> | <ul><li>Written agreement;</li><li>Services requested and received;</li><li>Itemized cost summary including actual costs for completed work. For each assisting entity:<ul><li>Dates worked;</li><li>Entity name;</li><li>Description of work performed; and,</li><li>Total cost.</li></ul></li><li>Same information and documentation for labor, equipment, and supplies (as applicable); and,</li><li>Invoices.</li></ul> |

---

[212] FEMA utilizes an attribute-based sampling approach, following the *GAO Financial Audit Manual*, for verifying supporting documentation for PA projects; therefore, FEMA may select a representative sample rather than reviewing all documentation. For more information, refer to: *Public Assistance Sampling Procedure*.
[213] All forms referenced are contained within *the EMAC Operations Manual v.4.5, May 2023.*

103

PAPPG v5

# XII.  Prisoners

FEMA provides PA funding for prisoner labor costs based on the rate that the applicant normally pays prisoners. FEMA also provides PA funding for prisoner transportation to and from the worksite and extraordinary costs of security guards, food, and lodging.[214]

Applicants must submit the following to support claims for prison labor costs:

**Table 17. Required Documentation and Information for Prison Labor Costs**

| For Small Projects | For Large Projects[215] |
|---|---|
| ▪ Itemized cost summary including actual or estimated costs:<br>　○ Number of individuals;<br>　○ Pay rate; and,<br>　○ Total cost. | ▪ Prison's labor policy;<br>▪ Estimated hours and pay rate for work to be completed;<br>▪ Itemized cost summary including actual costs for completed work. For each individual:<br>　○ Name and location worked;<br>　○ Date and hours worked; and,<br>　○ Pay rate; and,<br>▪ Description of work performed with daily logs/activity reports. |

# XIII. National Guard

The Governor may activate National Guard personnel to State Active Duty in response to an incident. Labor costs and per diem, if applicable, are eligible for State Active-Duty personnel performing eligible work. Both straight-time and overtime are eligible, including fringe benefits.

The U.S. Department of Defense funds National Guard personnel activated under Full-Time National Guard Duty (Title 32) or Active Duty (Title 10). Therefore, Title 32 and Title 10 personnel costs, and any other costs funded by the U.S. Department of Defense, such as training, are ineligible.

# XIV. Direct Federal Assistance

When the impact of an incident is so severe that the SLTT governments lack the capability to perform or contract eligible emergency protective measures, recipients may request that the federal government provide this assistance directly.[216] FEMA may task another federal agency to perform or contract the work

---

[214] Stafford Act § 406(a)(2)(B); 42 U.S.C. § 5172.
[215] FEMA utilizes an attribute-based sampling approach, following the *GAO Financial Audit Manual*, for verifying supporting documentation for PA projects; therefore, FEMA may select a representative sample rather than reviewing all documentation. For more information, refer to: *Public Assistance Sampling Procedure*.
[216] 44 C.F.R. § 206.208(a).

provided it is an eligible activity under Chapter 7: Emergency Work Eligibility unless the work falls under the authority of another federal agency.[217] FEMA issues a "Mission Assignment" to task the work and refers to it as direct federal assistance (DFA).[218] DFA has the same cost-share provisions applicable to the declaration (as described under Federal Cost Share in Chapter 1).

# XV.  Increased Federal Cost Share for a Limited Timeframe

When the president authorizes an increased federal cost share for a limited timeframe, FEMA applies it to all eligible costs related to work performed through 11:59 p.m., in the time zone where the work took place, on the date of expiration. Therefore, the applicant needs to delineate costs for work performed prior to the deadline versus costs for work performed after the deadline. FEMA applies the increased federal cost share according to the following criteria:

- Employees: Costs for hours worked up to the date and time of expiration.

- Purchased material and equipment: Cost to purchase each item that the applicant needed and used to perform eligible work during the increased funding period. In this case, FEMA also applies the increased federal cost share to the usage cost up to the date and time of expiration.

- Leased equipment and facilities: Costs to lease each item up to the date and time of expiration. FEMA calculates the cost based on a proration of time. For example, if a facility is leased for six months based on a monthly rate and the period for the increased federal cost share expired 45 days from the start of the lease, FEMA applies the increased federal cost share to the cost to lease the facility for 45 days based on a proration of the monthly rate.

- Contract costs: Costs for work performed up to the date and time of expiration. If costs cannot be distinguished by date performed, FEMA prorates costs based on the percentage of work completed prior to the deadline versus the percentage of work remaining. However, applicants should work with contractors to delineate dates associated with work.

# XVI. Donated Resources

Individuals and organizations often donate resources to assist with response activities. FEMA does not provide PA funding for the value of donated resources; the value of the resources is used only as an offset for the non-federal share of eligible work and costs. However, FEMA allows the applicant to use the value of donated resources (non-cash contributions of property or services)[219] related to eligible emergency protective measures and debris removal to offset the non-federal cost share of its eligible emergency protective measure and debris removal projects and DFA. FEMA also allows applicants to use the value of donated resources related to eligible work on a permanent work project to offset the non-federal cost share of that specific permanent work project. FEMA applies the offsets regardless of the cost share arrangements between a recipient and its subrecipients.

For emergency protective measures and debris removal specifically, if there is a time-limited 100 percent federal cost share period (see Increased Federal Cost Share for a Limited Timeframe in this chapter) and the

---

[217] 44 C.F.R. § 206.208(c)(2).
[218] 44 C.F.R. § 206.208(c)(1).
[219] 2 C.F.R. § 200.1.

applicant uses resources donated during this time period, it may use the value of those donated resources to offset the non-federal cost share incurred after the 100 percent federal cost share period expires. If the applicant uses resources from its stock that were donated during a previous incident or timeframe, it may use the value of those donated resources to offset its non-federal cost share if the applicant has not claimed the resources as an offset in a previous incident.

The applicant may apply the offset if all of the following conditions are met:

- The donated resource is from a third party (e.g. private entities or individuals, including individuals that are normally paid employees of the applicant or federal, state, Tribal Nation, or territorial government, but are volunteering as unpaid individuals and not on behalf of the employer);
- The donated resource is necessary and reasonable;[220]
- The applicant uses the resource in the performance of eligible work[221] and within the respective project's period of performance;[222] and,
- The applicant or volunteer organization tracks the resources and work performed, including description, specific locations, and hours.[223] The applicant must track the donated resources for permanent work to the specific project for which it is associated.

FEMA considers unpaid individuals who volunteer its labor to the applicant to be third-party even if they are officially members or employees of the applicant organization (e.g., volunteer fire fighters at a PNP volunteer fire department performing eligible emergency protective measures).

Resources donated to the applicant by an organization that would normally provide the same resources under its mission, such as the American Red Cross, are eligible as an offset if the organization is not federally funded. Additionally, if a mutual aid agreement provides for assistance at no cost to the applicant, the applicant may use the value of that assistance to offset its non-federal cost share.

The value of a donated resource is ineligible as an offset toward the non-federal cost share if the resource is:

- Donated by a federal agency;
- Donated by another federally funded source;
- Funded through a federal award;[224]
- Used as an offset to any other federal award;[225] or,
- Used for ineligible work.

---

[220] 2 C.F.R. § 200.306(b)(3).
[221] Applicants may not use the value of standby time as a donated resource as no work is being performed.
[222] 2 C.F.R. § 200.309. For emergency protective measures, the end of the period of performance is equal to the latest emergency protective measures project's period of performance.
[223] 2 C.F.R. §§ 200.434(d) and 306(b)(1).
[224] 2 C.F.R. § 200.306(b)(5).
[225] 2 C.F.R. § 200.306(b)(2).

PAPPG v5

Requesting donated resources from contractors during the solicitation phase of a procurement may violate federal procurement rules as it may be considered overly burdensome or restrictive of competition.[226] To remain compliant, applicants can do the following:

- Accept unsolicited donated resources from contractors;

- Maintain a list of donors; and,

- Ask contractors that are donating resources to work with other organizations.

If an applicant accepts donated resources from contractors, it must not do any of the following:

- Solicit donations in its requests for proposals or solicitations for bids;

- Directly solicit donations or requests for proposals from contractors who are actively bidding on its contracts;

- Grant an award to a contractor which has donated resources for the specific work covered by the contract;

- Show favoritism or give the appearance of showing favoritism to a contractor who has donated resources; and,

- Limit competition among contractors based on donated resources, especially for smaller contractors (including women or minority owned businesses) that might not be able to afford to donate resources.

## A. Offset Amounts

FEMA applies values to donated resources as follows:

- Volunteer labor: The offset is based on the same straight-time hourly labor rate, and fringe benefits, as a similarly qualified person in the applicant's organization who normally performs similar work. FEMA does not offset volunteer labor based on overtime or premium rates. If the applicant does not have employees performing similar work, FEMA credits the non-federal share based on a rate consistent with those ordinarily performing the work in the same labor market that the applicant would otherwise compete for that type of work.[227]

- Equipment: The offset is based on equipment rates and must not exceed the fair rental value (if loaned) or the fair market value of equipment that is in similar age and condition at the time of donation (if donated with a transfer of title). See Applicant-Owned and Purchased Equipment in this chapter for information on equipment rates.[228]

- Supplies or materials: The offset is based on current commercial rates, which FEMA validates based on invoices from previous purchases or information available from vendors in the area. The amount must not exceed the fair market value at the time of donation.[229]

- Buildings or land: For buildings or land donated permanently (i.e., with a transfer of ownership), the offset is based on the fair market value at the time of donation as established by an independent appraisal and certified by the applicant.

---

[226] 2 C.F.R. § 200.319.
[227] 2 C.F.R. § 200.306(e) and (f).
[228] 2 C.F.R. § 200.306(g), (h), and (i).
[229] 2 C.F.R. § 200.306(g).

- Space: For building or land space donated for temporary use, the offset is based on the fair rental value of comparable privately-owned space in the same locality as established by an independent appraisal. [230]

- Logistical support: Reasonable logistical support for volunteers doing eligible work, such as donations warehousing and management related to eligible work, may be eligible either for funding (if the applicant provides the logistical support) or as a donated resource offset (if a third party provides the logistical support), subject to approval by FEMA.

FEMA applies the donated resource offset against the combined non-federal cost share for all the applicant's emergency protective measure and debris removal projects (category A and B) under the declared incident. The offset may not exceed the total out-of-pocket costs and is capped at the total non-federal cost share of these projects. FEMA prepares the category A and B donated resource project as a category B project separate from all other category A and B projects for the applicant's incurred costs. FEMA does not obligate the donated resource project until after it obligates all emergency protective measure and debris removal projects for the applicant.

For permanent work, FEMA applies the donated resource offset against the non-federal cost share of the specific permanent work project for which the resources were donated. The offset may not exceed the total out-of-pocket costs. FEMA caps the offset at the non-federal cost share of that specific permanent work project. The type and amount of resources donated must directly correlate to, and may not exceed, the type and amount approved in the SOW of the permanent work project (e.g., if the approved SOW includes replacement of 10 chairs and 15 chairs are donated, the donated resource offset is limited to 10 chairs). FEMA adjusts the Permanent Work project to capture any donated resource offsets related to the project upon receipt of the donated resource information and no later than closeout.

## B. Required Documentation and Information for Donated Resources

Applicants must submit the following to support the offset value for donated resources:

**Table 18. Required Documentation and Information for Offset Values for Donated Resources**

| Labor | Equipment | Supplies or Materials |
|---|---|---|
| ▪ Sign-in sheet; and,<br>▪ For each individual:<br>  ○ Name;<br>  ○ Title and function (for professional services);<br>  ○ Date and hours worked;<br>  ○ Location; and,<br>  ○ Description of work performed. | ▪ For each piece of equipment:<br>  ○ Name of donor;<br>  ○ Type of equipment, including make, model, size, capacity, horsepower, and wattage (as applicable);<br>  ○ Location or site used; and,<br>  ○ Dates and hours used. | ▪ For each supply or material:<br>  ○ Name of donor;<br>  ○ Description and quantity;<br>  ○ Location used; and,<br>  ○ Documentation to validate claimed value, including invoices, or historical cost records. |

[230] 2 C.F.R. § 200.306(i)(3).

PAPPG v5

# XVII. Project Management and Design Services

FEMA provides PA funding for costs related to project management and design activities as part of the project. Project management includes activities performed to manage the actual project. These are activities that would be required regardless of whether the entity is receiving PA funding and differ from management costs, which are costs for activities related to the receipt and administration of PA funding.

Project management activities may include procurement actions, legal review of contracts, monitoring contractor work, construction oversight and inspections, environmental and historic preservation technical studies/surveys, permits, best management practices as recommended by regulatory agencies, and completing load tickets for debris operations. These activities are eligible provided they are tracked, documented, and directly related to a specific, eligible project.

Architectural, engineering, and design services for the approved SOWs, including PA hazard mitigation, are also eligible provided the services are reasonable. Some projects do not need these services or require only basic services, while others require specialized engineering and design.

When evaluating the eligibility of project management and design services, FEMA considers whether the project includes improvements that are ineligible for funding (costs for management and design services associated with improvements or other ineligible work are ineligible). Additional architectural and engineering services related to the improvements for Improved Projects are ineligible.

# XVIII.  Grant Management and Administration

FEMA provides contributions for management costs that a recipient or subrecipient incurs in administering and managing PA awards under a major disaster or emergency declaration. Eligible activities include any indirect cost, direct administrative cost, and other administrative expense associated with developing and managing eligible PA projects under a major disaster or emergency. For recipients, FEMA provides PA funding for management costs based on actual costs incurred up to 7 percent of the total award amount. For subrecipients, FEMA provides PA funding for management costs based on actual costs incurred up to 5 percent of a subrecipient's total award amount. Additional information is available in FEMA's interim policy.[231]

 **Terminology**

**Indirect cost** - A cost incurred for a common or joint purpose benefiting more than one cost objective that is not readily assignable to the cost objectives specifically benefited.

In support of a claim for management costs, applicants must provide a summary of the work performed and costs claimed, including the number of employees, a list of equipment used and the equipment rates, total

---

[231] For more information, refer to: *PA Management Costs Interim Policy (FEMA Recovery Policy FP 104-11-2)* and *PA Management Costs Standard Operating Procedures*.

PAPPG v5

labor and equipment hours (or miles for vehicles) during the time frame, total labor and equipment costs, and general description of all tasks performed by individuals during the time frame. If FEMA has questions or concerns based on a review of the cost summary submitted, it may request additional documentation in support of an applicant's claim. All claims must be associated with eligible facilities, work, and costs.

# XIX. Surveys to Assess or Locate Damage or Debris Impacts

Applicants are responsible for identifying locations of incident-related damage or debris impacts. Costs related to assessing overall impacts of an incident, locating damage or debris impacts, and conducting preliminary damages assessments (PDAs) are not eligible project costs. However, these costs are eligible as management costs if the costs meet the requirements discussed under Grant Management and Administration in this chapter.

If, during a survey after the declaration, an applicant identifies incident-related damage to a facility, the costs related to the inspection of that facility are eligible as management costs provided the facility is eligible.

Further detailed inspections of that damage to determine the extent of damage or quantity of debris and method of repair or removal, including professional evaluations, are eligible as part of the work to restore the facility or work to remove the debris. If an applicant performs a detailed inspection of a partially damaged system, eligible costs are based on the percentage of the system that was damaged. For example, if after inspecting 500 linear feet of sewer line, the applicant identified 100 linear feet of line damaged by the incident, only one-fifth of the inspection costs are eligible.

FEMA has specific eligibility criteria for inspecting earthquake damage to buildings constructed with welded steel-moment frames.[232]

# XX.  Duplication of Benefits

FEMA is legally prohibited from duplicating benefits from other sources. If applicants receive financial assistance from another program, from insurance, or from any other source for the same work that FEMA funded, FEMA reduces the eligible cost or deobligates funding to prevent a duplication of benefits.[233]

## A. Insurance Proceeds

FEMA cannot provide PA funding that duplicates insurance proceeds.[234] Consequently, FEMA reduces eligible costs by the amount of:

▪ Actual insurance proceeds, if known;[235] or

---

[232] For more information, refer to: *Recommended Post Earthquake Evaluation and Repair Criteria for Welded Steel Moment-Frame Buildings (FEMA-P-352)*.
[233] Stafford Act § 312; 42 U.S.C. § 5155; 2 C.F.R. § 200.406.
[234] Stafford Act § 312; 42 U.S.C. § 5155; 2 C.F.R. § 200.406.
[235] 44 C.F.R. §§ 206.252(c) and 253(a).

PAPPG v5

- Anticipated insurance proceeds based on the applicant's insurance policy if the amount of actual insurance proceeds is unknown. FEMA subsequently adjusts the eligible costs based on the actual amount of insurance proceeds that the applicant receives.

FEMA requires applicants to take reasonable efforts to pursue claims to recover insurance proceeds that it is entitled to receive from its insurer(s). FEMA limits funding if the insurance policy provides coverage that should be pursued. If an applicant expends costs to pursue its insurance claim, FEMA offsets the insurance reduction with the applicant's reasonable costs to pursue the claim if:

- The incurred cost resulted from pursuing insurance proceeds for FEMA-eligible work; and,
- The applicant can provide documentation to show that the incurred cost was attributed to pursuing more insurance proceeds than the initial settlement amount.

If applicants receive insurance proceeds for ineligible losses (e.g., business interruption), FEMA calculates a relative apportionment of insurance proceeds to determine the insurance reduction based on:

- The proceeds received per type of loss as specified by the insurance policy or settlement documentation;
- Policy limits for categories of loss as specified in the insurance policy; or
- The ratio of total eligible losses to total ineligible losses.

FEMA Recovery Policy (FP) 206-086-1, Public Assistance Policy on Insurance,[236] describes insurance reductions in detail.

Applicants must submit the following to support insurance proceeds:

**Table 19. Required Documentation and Information for Insurance Proceeds**

| Type | Including (As Applicable) |
| --- | --- |
| Insurance Policies | <ul><li>Property insurance;</li><li>Auto insurance;</li><li>Flood insurance;</li><li>Wind insurance; and</li><li>Self-insurance or self-insured retention.</li></ul> |
| Insurance Policy documentation | <ul><li>Property policy declaration pages;</li><li>Schedule of covered locations;</li><li>Property policy forms and endorsements;</li><li>Inland marine coverage section; and</li><li>Equipment breakdown section.</li></ul> |

---

[236] For more information, refer to: *Public Assistance Policy on Insurance (FEMA Recovery Policy 206-086-1)*.

PAPPG v5

| Type | Including (As Applicable) |
|------|---------------------------|
| Insurance Settlement Information (as soon as available) | ▪ Final statement of loss;<br>▪ Adjuster's estimates;<br>▪ Settlement checks or documentation to support total insurance proceeds;<br>▪ Correspondence explaining the settlement amount and allocation; and,<br>▪ Letter of denial. |

## B.  Non-Federal Grants and Cash Donations

Grants and cash donations from non-federal sources are subject to the following criteria based on whether the funds are provided toward a specific purpose and whether that specific purpose is otherwise eligible for PA funding.

- If the funds are designated for the same purpose as eligible work, the following apply:
  - The applicant may use the funds toward its non-federal cost share.
  - If the funds are not used toward the non-federal cost share, FEMA considers the donation or non-federal grant a duplication of benefits and reduces eligible costs by the duplicated amount.
  - If the funds exceed the amount of the non-federal cost share, FEMA reduces eligible costs by the excess amount.
- If the funds are designated for non-specific purposes, FEMA does not consider the funds a duplication of benefits. Applicants may use the funds toward their non-federal cost share. If the funds exceed the amount of the non-federal share, applicants can apply the excess amount toward ineligible work.
- If the funds are designated for a specific purpose that is ineligible, FEMA does not allow applicants to apply the funds toward their non-federal cost share.

## C.  Third-Party Liability

A third party is a private entity or individual that is not involved in the federal award, i.e., not the applicant or federal, state, Tribal Nation, or territorial government. When a third party causes damage or increases the cost of repair or cleanup and an applicant requests FEMA funding for the costs, FEMA requires the applicant to make reasonable efforts to pursue claims to recover costs it is entitled to receive from the third party.

If the costs recovered are not adequate despite the applicant's good faith effort, FEMA reduces eligible costs based on the recovered amount. If the applicant receives funds from the third party for eligible and ineligible work or losses, FEMA determines the offset amount based on:

- The proceeds received for eligible losses as specified by the settlement documentation; or
- The ratio of total eligible losses to total ineligible losses.

PAPPG v5

## D. Other Federal Awards

If applicants receive funds from another federal agency for the same purpose as PA funding, it is a duplication of benefits. FEMA cannot duplicate funds provided by another federal agency.

# XXI. Duplication of Funding Between FEMA Programs

FEMA provides assistance under other programs, such as its Individual Assistance (IA) programs and Hazard Mitigation Grant Program (HMGP), that could duplicate assistance that is available under the PA Program. FEMA must ensure it does not duplicate funds in areas where its programs have the same or similar eligible costs. Applicants must certify that no work or costs being claimed are covered by another funding source.

# XXII.    Interest on Loans

Applicants may need to obtain a loan to complete work. Financing costs for a loan are only eligible when they meet the conditions established in 2 C.F.R. § 200.449.

# XXIII.    Ineligible Costs

The Stafford Act authorizes FEMA to provide PA funding for specific work performed as a result of the incident. It does not authorize FEMA to provide PA funding for all losses or costs resulting from the incident. The following costs are ineligible because the Stafford Act does not authorize FEMA to provide PA funding for these items.

## A. Loss of Revenue

FEMA cannot provide PA funding for revenue lost due to the incident. The following are examples of when loss of revenue may occur because of an incident:

- Hospitals release noncritical patients to make room for survivors;
- Hospitals sustain damage that reduces pre-disaster existing capacity;
- Waiving toll fees on a toll road, even if for evacuation purposes;
- Waiving the normal fee for ferry service to encourage alternate transportation;
- Waiving tipping fees;
- A utility system is shut down; or
- Events are cancelled due to an entity using a venue for incident-related activities, such as sheltering.

## B. Loss of Useful Service Life

FEMA cannot provide PA funding for the projected loss of useful service life of a facility. For example, if a road has been inundated by flood waters for an extended timeframe, FEMA cannot provide PA funding for the value of the projected loss of useful life of the road due to the long-term effects the inundation might have on the road. Similarly, FEMA cannot fund the value of the loss of landfill capacity due to incident-related debris.

113

## C.  Tax Assessments

SLTT governments may conduct tax assessments to re-assess real property values after an incident. Costs related to conducting these assessments are ineligible because the assessments are neither essential to addressing an immediate threat to life or improved property, nor connected with the permanent restoration of eligible facilities.

## D.  Increased Operating Costs

Increased costs related to operating a facility or providing a service due to an increased demand for the services the facility provides are generally ineligible, even when directly related to the incident. However, short-term increased costs that are directly related to accomplishing specific emergency health and safety tasks as part of emergency protective measures are eligible if the costs meet the requirements discussed under Increased Operating Costs in Chapter 7. An example of a potentially eligible increased operating costs includes fuel for increased use of a pumping station. This limited allowance is separate from and does not include loss of revenue.

PAPPG v5

# Chapter 7: Emergency Work Eligibility

PA provides assistance for two types of emergency work following a presidential declaration which are crucial to disaster response and recovery efforts. Financial assistance and technical support are available to ensure the efficient and effective execution of debris removal and emergency protective measures. The goal is to minimize the negative impacts of disasters and promote a swift recovery for affected communities. Proper implementation of these components is essential for communities to regain stability, ensure public safety, and restore essential services following a disaster.

## XI.   Eligibility Considerations for Emergency Work

FEMA is authorized to provide PA funding for emergency work,[237] including category A: debris removal and category B: emergency protective measures. This chapter includes PA policy for emergency work, which is work that must be done immediately to:



**Figure 9. Emergency Work Eligibility**

- Save lives;
- Protect public health and safety;
- Protect improved property;[238] or
- Eliminate[239] or lessen an immediate threat of additional impacts and damage.[240]

"Immediate threat" is defined as the threat of additional damage or destruction from an incident that can reasonably be expected to occur within five years of the declared incident.[241]

The declared incident must have caused the immediate threat to exist. However, the threat itself can be from any type of incident; it is not limited to the type of incident that caused the initial impact or threat. For example, post-fire rainfall may trigger debris flows in an area affected by a presidentially declared wildfire and may pose an immediate threat to life, public health and safety, or improved property. Therefore, under a wildfire declaration, emergency work to



**Figure 10. Immediate Threats**

---

[237] 44 Code of Federal Regulations (C.F.R.) § 206.201(b).
[238] 44 C.F.R. § 206.221(d)
[239] While the regulatory definition of the term "emergency work" includes the term "avert," the regulatory language used for the specific eligibility criteria for debris removal and emergency protective measures includes the term "eliminate," not "avert."
[240] In addition to addressing immediate threats to life, health and safety, and improved property, debris removal may be authorized to ensure economic recovery of the affected community.
[241] 44 C.F.R. § 206.221(c).

115

address an immediate threat of additional damage or destruction from a rain event that could reasonably be expected to occur within five years could be eligible.

 **Example: Emergency Work**

> Tornadic winds damage an eligible facility's roof. The applicant can be reimbursed for emergency work, which is usually work that is temporary in nature. If the legally responsible PA applicant demonstrates that the condition of the roof is such that another incident would cause it to collapse, causing an immediate threat to life, public health and safety, or improved public or private property, FEMA provides funding to temporarily stabilize and make temporary repairs to the roof as a category B emergency work emergency protective measure until the applicant can make more lasting repairs to their facility; reference Emergency Repair or Stabilization in this chapter.

The deadline to complete emergency work is six months from the declaration date unless the recipient or FEMA authorizes an extension.[242] Although federal regulations allow six months to complete emergency work, FEMA considers the urgency with which applicants proceed with work when evaluating eligibility. Applicants should not delay when taking actions to address threats to life, public health and safety, and improved property.

To be eligible, work must be the legal responsibility of an eligible applicant.[243] Emergency response is a governmental function. As a result, for private nonprofit (PNP) applicants, eligible emergency work is generally limited to that associated with an eligible PNP facility as follows:

- Debris removal from the facility property; and,
- Emergency protective measures to prevent damage to the facility and its contents.

In limited circumstances, other types of emergency work for PNPs is eligible when essential components of a facility are urgently needed to save lives or protect public health and safety. If a PNP provides emergency services at the request of, certified by, and documented in a written agreement or contract between the legally responsible government entity, FEMA provides PA funding through that government entity as the eligible applicant.

For state, local, Tribal Nation, and territorial (SLTT) applicants, evaluating facility eligibility is not necessary for most emergency work. For these applicants, eligibility of emergency work is primarily based on the evaluation of an immediate threat and the legal authority to perform the work. Applicants must submit the following to support work eligibility:

---

[242] 44 C.F.R. §§ 206.204(c) and (d).
[243] 44 C.F.R. § 206.223(a)(3).

PAPPG v5

**Table 20. Required Documentation and Information for Work Eligibility**

| For Small Projects | For Large Projects[244] |
|---|---|
| ▪ Detailed description of work performed; and,<br><br>▪ Applicants can certify to the following requirements to support eligibility in lieu of providing documentation to support that:<br><br>   ○ The work is as a result of immediate threat;<br><br>   ○ Activities are required as a result of the declared incident;<br><br>   ○ Work is located on improved property and in a declared area; and,<br><br>   ○ The applicant is legally responsible for conducting the work. | ▪ Detailed description of work performed;<br><br>▪ Description of immediate threat; and,<br><br>▪ Records demonstrating presence of immediate threat (e.g., technical reports, safety inspector reports, photographs), if an immediate threat is not apparent based on the descriptions provided. |

# XII.  Debris Removal (Category A)

Debris removal activities, such as clearance, removal, recycling, and disposal are eligible under category A if the removal is in the public interest, based on whether the work is necessary to:

▪ Eliminate immediate threats to life, public and safety; or

▪ Eliminate immediate threats of significant damage to improved[245] public or private property; or

▪ Ensure economic recovery of the affected community to the benefit of the community-at-large;[246] or

▪ Reduce or limit the risk to life and property by removing substantially damaged structures and associated ancillary facilities as needed to convert property acquired using Hazard Mitigation Grant Program (HMGP) funds for uses compatible with open space, recreation, or wetlands management practices. Such removal must be completed within two years of the declaration date unless extended by the Assistant Administrator of the Recovery Directorate at FEMA Headquarters.[247]

Debris includes, but is not limited to, vegetative debris, construction and demolition debris, sand, mud, silt, gravel, rocks, boulders, white goods, and vehicle and vessel wreckage. Snow-related activities including road clearing are not considered debris operations, as snow is not considered a form of debris.

---

[244] FEMA utilizes an attribute-based sampling approach, following the *GAO Financial Audit Manual*, for verifying supporting documentation for PA projects; therefore, FEMA may select a representative sample rather than reviewing all documentation. For more information, refer to: *Public Assistance Sampling Procedure*.
[245] 44 C.F.R. § 206.221(d).
[246] This condition is generally restricted to debris removal from large commercial areas when a significant percentage of the commercial sector of a community is impacted and coordinated debris removal is necessary to expedite restoration of the economic viability of the affected community.
[247] Stafford Act § 407; 42 United States Code (U.S.C.) § 5173; 44 C.F.R. § 206.224(a).

PAPPG v5

For a PNP applicant, eligible debris removal is limited to that associated with an eligible facility, including debris on the property of the eligible facility.

 **Terminology**

**Federal-aid roads** are highways on the federal-aid highway system and all other public roads not classified as local roads or rural minor collectors. The federal-aid highway system means the National Highway System and the Dwight D. Eisenhower National System of Interstate and Defense Highways (the Interstate System).

Debris left by the declared incident on improved public property and public rights-of-way (ROWs), including federal-aid roads, is eligible for removal. If state, local, Tribal Nation, or territorial (SLTT) governments authorize residents to move incident-related debris from residential, non-commercial properties to public ROWs, the removal of this debris is also eligible. However, commercial debris placed on the ROW is not eligible. FEMA provides Public Assistance (PA) funding to cover the removal of debris from ROWs for a limited period.

Applicants must monitor contracted debris removal operations and document work and costs that may be eligible for reimbursement through the PA Program. Monitoring debris removal operations requires observation and documentation of all work from the point of debris collection to the final disposal.

**Table 21. Required Documentation and Information for Debris Removal and Disposal**

| For Small Projects | For Large Projects[248] |
|---|---|
| <ul><li>Estimated or actual debris quantities removed, reduced, disposed, and recycled by type;<ul><li>If debris removal is contracted, documentation to substantiate monitoring was conducted.</li></ul></li><li>Location of temporary debris staging and reduction sites (TDSRs) and permanent or final disposal sites;</li><li>Type of disposal site (e.g., municipal, private, or commercial);<ul><li>If commercial, name of vendor.</li></ul></li><li>Copies of permits and authorization for reduction and disposal sites;</li></ul> | <ul><li>Estimated or actual debris quantities removed, reduced, disposed, and recycled by type;</li><li>Load tickets;</li><li>Photographs of debris impacts;</li><li>If debris removal is contracted:<ul><li>Proof of monitoring; and</li><li>Tower logs.</li></ul></li><li>Location of temporary debris staging and reduction sites (TDSRs) and permanent or final disposal sites;</li><li>Type of disposal site (e.g., municipal, private, or commercial);<ul><li>If commercial, name of vendor.</li></ul></li></ul> |

---

[248] FEMA utilizes an attribute-based sampling approach, following the *GAO Financial Audit Manual*, for verifying supporting documentation for PA projects; therefore, FEMA may select a representative sample rather than reviewing all documentation. For more information, refer to: *Public Assistance Sampling Procedure*.

PAPPG v5

| For Small Projects | For Large Projects[248] |
|---|---|
| ▪ Documentation to substantiate debris is not pre-existing for waterway debris removal;<br><br>▪ Documentation to substantiate coordination with other regulatory or federal agencies; and,<br><br>▪ If removing vegetative debris in an invasive species quarantine area:<br>  ○ Name of quarantine area;<br>  ○ Method of disposal; and<br>  ○ Confirmation that the debris was disposed of according to quarantine requirements. | ▪ Copies of permits and authorization for reduction and disposal sites;<br><br>▪ Documentation to substantiate debris is not pre-existing for waterway debris removal;<br><br>▪ If removing vegetative debris in an invasive species quarantine area:<br>  ○ Name of quarantine area;<br>  ○ Method of disposal; and<br>  ○ Confirmation that the debris was disposed of according to quarantine requirements.<br><br>▪ Documentation to substantiate coordination with other regulatory or federal agencies; and,<br><br>▪ If removing hazardous trees, limbs and stumps, documentation supporting the specifics of the immediate threat with the location and photos. |

To support removal of hazardous trees, limbs, and stumps FEMA requires that applicants retain documentation supporting the specifics of the immediate threat with the location and photograph or video documentation. However, for small projects, this doesn't have to be provided with the project when submitted. As will all project documentation, the information should be retained and can be requested.

Removal of debris placed on the public ROWs from commercial properties is ineligible unless FEMA provides an exception for very limited, extraordinary circumstances (see Debris Removal from Private Commercial Property in this chapter). Additionally, removal of materials related to the construction, repair, or renovation of either private non-commercial or commercial structures is ineligible.

Removal and disposal of pollutants and hazardous substances are generally eligible under category B; however, they may be eligible as category A debris removal when conducted as part of the overall debris operations. Otherwise, removal of hazardous materials is category B work in accordance with the Hazardous Materials section in this chapter.

Debris removal from the following is ineligible:

▪ Federally maintained navigable channels and waterways (usually under the authority of the U.S. Coast Guard (USCG) or USACE[249]);

---

[249] The U.S. Army Corps of Engineers (USACE) has primary responsibility for the removal of debris from federally-maintained navigable channels and waterways. Section 202 of the Water Resources Development Act of 1976 (PL 94-587) authorizes USACE to remove debris from federally-maintained commercial harbors and water areas immediately adjacent thereto. Sections 15, 19 and 20 of the River and Harbor Act of 1899, as amended, authorize USACE to remove sunken vessels or other obstructions from navigable waterways under emergency conditions. A navigable waterway is one that has been authorized by Congress and which USACE operates and maintains for general (including commercial and recreational) navigation. USACE's policy is to oversee removal of

119

PAPPG v5

- ▪ Agricultural land; and
- ▪ Natural, unimproved land, such as heavily wooded areas and unused areas. [250]

Removing debris to restore the pre-disaster capacity of engineered facilities is eligible as permanent work if the applicant can substantiate the pre-disaster capacity and maintenance of that facility as described under Restoring the Capacity of Channels, Basins, and Reservoirs in Chapter 8.

Removal and disposal of pollutants and hazardous substances are eligible either as category A debris removal when conducted as part of the overall debris operations or as category B work in accordance with the Hazardous Materials section in this chapter.

## A. Hazardous Limbs, Trees, and Stumps

Eligible vegetative debris includes tree limbs, branches, stumps, or trees that are still in place, but damaged to the extent they pose an immediate threat to life, public health and safety, or significant damage to improved property. These items are ineligible if the hazard existed prior to the incident, or if the item is in a natural area and does not extend over or otherwise threaten improved property or public-use areas, such as trails, sidewalks, or playgrounds.

Contractors typically charge debris removal based on a unit price for volume (cubic yards) or weight (tons). A hazardous tree or stump may be collected individually. When these items are collected individually, contractors often charge a price per tree or stump based on its size. FEMA encourages applicants to procure branch or limb removal from trees on a one-time charge per tree basis as opposed to a unit price per limb or branch to facilitate more cost-effective operations. FEMA has specific eligibility criteria and information or documentation requirements for funding these items.

 **Terminology**

**Hazardous tree** - A hazardous tree is a standing tree that presents a hazard to the public due to conditions such as, but not limited to, deterioration or physical damage to the root system, trunk, stem or limbs, and the direction and lean of the tree per 43 U.S. Code § 1772.

Bracing a tree is eligible as category B work. FEMA encourages applicants to work with a registered professional forester, an individual with a Tree Risk Assessment Qualification (TRAQ), or a certified arborist to perform hazard tree assessments to determine those trees that can be saved by bracing without causing a public health and safety concern.

Pruning, maintenance, trimming, and landscaping are ineligible.

---

sunken vessels by an identifiable owner, operator or lessee if the sunken vessel is in or likely to be moved into a federal navigation channel. USACE will remove a vessel using its emergency authorities only if the owner, operator or lessee cannot be identified or they cannot affect removal in a timely and safe manner.
[250] 44 C.F.R. § 206.224(b)).

## 1.    HAZARDOUS LIMB OR BRANCH REMOVAL

Removal of broken limbs or branches that pose an immediate threat is eligible. For example, a broken limb or branch hanging over improved property or public-use areas, such as trails, sidewalks, or playgrounds, poses an immediate threat of falling and causing injury to the public or damage to improved property.

FEMA does not fund removal of broken limbs or branches located on private property unless:

- The limbs or branches extend over the public right-of-way (ROW);
- The limbs or branches pose an immediate threat; and
- The applicant removes the hazard from the public ROW (without entering private property).

Note: Only the minimum cut necessary to remove the hazard is eligible. For example, cutting a branch at the trunk is ineligible if the threat can be eliminated by cutting it at the closest main branch junction.

## 2.    HAZARDOUS TREE REMOVAL

FEMA considers incident-damaged trees to be hazardous and eligible for removal if the tree presents a hazard to the public due to conditions including, but not limited to:

- Deterioration or physical damage to the root system, trunk, stem, or limbs;[251] or
- The direction and lean of the tree per the Occupational Safety and Health Standards.[252]

For hazardous trees that have 50 percent or more of the root-ball exposed, removal of the tree and root-ball and filling the root-ball hole are eligible. For contracted removal of a tree with an exposed root-ball, FEMA will not reimburse two separate unit costs to remove the tree and its root-ball.

For hazardous trees that have less than 50 percent of the root-ball exposed, FEMA only provides PA funding to flush cut the item at ground level and dispose of the cut portion based on volume or weight. Grinding any residual stump after cutting the tree is ineligible.

The removal of hazardous trees that pose an immediate threat to life, public health and safety, or significant damage to improved public or private[253] property, as assessed by the authority having jurisdiction, in coordination with a qualified individual[254] is eligible.

When estimating or calculating costs for tree removal, applicants may utilize a cost per parcel of land approach or a cost per tree. Applicants must clearly state which method they have selected when requesting reimbursement for eligible work. Only those trees that pose an immediate threat to public health and safety

---

[251] 29 C.F.R. § 1910.266(c).
[252] Forest Health Protection Technical Report Revised: March 2022 (FHP Report # RO-22-01).
[253] Removal from private property subject to the policy language regarding Private Property Debris Removal (PPDR) in this chapter.
[254] According to the International Society of Arboriculture, only a registered professional forester, an individual with a Tree Risk Assessment Qualification (TRAQ), or a certified arborist may perform hazard tree assessment; however, the authority having jurisdiction of the geographic location, will make the determination regarding recognition of individuals qualified to make the determination.

PAPPG v5

or improved property are eligible under either approach. The applicant must provide sufficient documentation to validate the approach was cost-effective.

## 3.    HAZARDOUS STUMP REMOVAL

For stumps that have 50 percent or more of the root-ball exposed, removal of the stump and filling the root-ball hole are eligible. If grinding a stump in-place is less costly than extraction, grinding the stump in-place is eligible.

Stump removal in areas with known or high potential for archaeological resources requires that FEMA Environmental and Historic Preservation (EHP) further evaluate and consult with the state historic preservation officer (SHPO) and/or tribal historic preservation officer (THPO). If an applicant discovers any potential archeological resources during stump removal, the applicant must immediately stop work and notify FEMA. For highly sensitive areas, such as cemeteries or Tribal Nation lands, FEMA will determine if a qualified monitor[255] is required.

### i.    Contracted Stump Removal

FEMA only reimburses contracted costs charged on a per-stump basis if extraction is required as part of the removal. Applicants need to ensure the price for stump removal includes extraction, transport, disposal, and filling the root-ball hole.

For stumps that have less than 50 percent of the root-ball exposed, FEMA only provides PA funding to flush cut the item at ground level and dispose of the cut portion. Grinding any residual stump is ineligible.

For stumps that do not require extraction, FEMA only provides PA funding based on volume or weight as removal of these stumps does not require special equipment.

If an applicant incurs additional costs in picking up stumps that the contractor did not extract, it should present information or documentation to substantiate the costs as reasonable based on the equipment required to perform the work.

### ii.    Documentation Requirements for Hazardous Limbs, Trees, and Stumps

In addition to the general documentation required for debris removal operations, applicants must provide all of the following documentation to support the eligibility of work to remove tree limbs, branches, stumps, or trees that are still in place:

- Quantity removed;
- Quantity, location, and source of material to fill root-ball holes; and,
- Description of equipment used to perform the work.

---

[255] A qualified monitor is an individual meeting the Secretary of the Interior's Professional Qualification Standards in archaeology in accordance with Archeology and Historic Preservation; Secretary of the Interior's Standards and Guidelines | nps.gov.

PAPPG v5

## B. Waterways

Debris removal from waterways that is necessary to eliminate an immediate threat to life, public health and safety, or improved property is eligible. Removal of debris in a waterway that does not meet this criterion is ineligible, even if the debris is deposited by the incident.

Certain federal agencies hold specific authority for debris removal in waterways. For effective coordination and to respect their areas of responsibility, agencies like the EPA and USCG should be consulted before debris removal begins. The EPA and USCG have specific authority over the removal of hazardous materials: the EPA handles hazardous material removal in most inland water areas, while the USCG is responsible for coastal waters, navigable lakes, and rivers outside of inland zones. Debris removal from waterways usually requires coordination with the U.S. Army Corps of Engineers (USACE) for the use of a nationwide permit and with the National Marine Fisheries Service (NMFS) and U.S. Fish and Wildlife Service (USFWS) to ensure compliance with Section 7 of the Endangered Species Act (ESA).

### 1.    NAVIGABLE WATERWAYS

If an applicant has the legal responsibility to maintain a navigable waterway, removal and disposal of incident-related debris that obstructs the passage of vessels is eligible. Debris removal is eligible to a maximum depth of 2 feet below the low-tide draft of the largest vessel that utilized the waterway prior to the incident. Any debris below this zone is ineligible unless it is necessary to remove debris extending upward into an eligible zone.

If a tree is still rooted to an embankment and is floating or submerged, the cost to cut the tree at the water's edge is eligible.

Debris removal from federally maintained navigable waterways is ineligible. The USCG and the USACE have specific authorities for removal of hazardous substances, vessels, and other obstructions from federally maintained navigable waterways.[256]

### 2.    NON-NAVIGABLE WATERWAYS, INCLUDING FLOOD CONTROL WORKS AND NATURAL WATERWAYS

Debris deposited by the incident may obstruct a natural waterway that is not improved or maintained or a constructed channel, including flood control works. In these cases, removal of the debris from the channel is eligible if the debris poses an immediate threat to improved facilities/properties, such as when the debris:

- Obstructs, or could obstruct, intake structures;
- Could cause damage to structures, such as bridges and culverts; or
- Is causing, or could cause, flooding to improved public or private property during the occurrence of a flood that has a 20 percent chance of occurring in any given year (5-year flood).

Removal of the obstruction may be eligible in streams where debris removal might also be eligible under the Natural Resources Conservation Service (NRCS) Emergency Watershed Protection Program (EWP)[257]. Each

---

[256] For more information, refer to: Mission Assignments (FP 104-010-3) | fema.gov.
[257] For more information, refer to: Emergency Watershed Protection | Natural Resources Conservation Service | usda.gov.

PAPPG v5

agency has different program eligibility requirements; therefore, FEMA, the recipient, and the applicant need to coordinate with NRCS prior to conducting work to maximize funding and ensure there is no duplication of benefits.

Debris removal from flood control works that were installed under the specific authority of NRCS and Public Law 83-566 (The Watershed & Flood Prevention Operations Program (WFPO), or Section 216 of Public Law 81-516, 33, U.S. Section 701b-1. is ineligible for PA funding, even if NRCS does not have sufficient funding or does not provide assistance.

Flood control works under the specific authority of NRCS are those that are part of the WFPO Program under PL 83-566WFPO Program.[258]

For flood control works that are eligible for the USACE Rehabilitation and Inspection Program (RIP),[259] debris removal is eligible for PA funding. USACE does not reimburse applicants for debris removal but conducts this activity when necessary.

## 3.    IDENTIFYING DEBRIS IMPACT LOCATIONS

Applicants are responsible for identifying debris deposited by the incident that poses an immediate threat. Random surveys to look for debris, including surveys performed using side scan sonar, are ineligible. Satellite imagery or waterway soundings/bathymetric surveys showing the waterway pre-and post-disaster can substantiate that debris was deposited by the incident and was not pre-existing. If an applicant identifies an area of debris impacts and demonstrates the need for a survey to identify a specific immediate threat, PA funding for the survey in that location, including the use of side scan sonar, is eligible.

## C. Privately-Owned Vehicles and Vessels on Public Property

Removal of privately-owned vehicles and vessels from public property is eligible if all of the following conditions are met:

- The vehicle or vessel blocks access to a public-use area;
- The vehicle or vessel is abandoned;
- The applicant follows applicable SLTT government ordinances or laws for private vehicle or vessel removal; and,
- The applicant documents the handling of the vehicle or vessel.

Applicants need to provide documentation to support it met these criteria.

A limited timeframe for vehicle and vessel storage is eligible if it is necessary to remove the item prior to being able to identify the owner. If the owner is identified, the applicant should work with private property owners to pursue and recover storage and removal costs and credit FEMA the federal share of any funds received.

---

[258] For more information, refer to: Watershed and Flood Prevention Operations (WFPO) Program | Natural Resources Conservation Service | usda.gov.
[259] For more information, refer to: Rehabilitation and Inspection Program | USACE.army.mil.

PAPPG v5

# D.  Disposal

FEMA provides PA funding for various costs related to disposing of debris. Applicants should dispose of debris in an efficient and cost-effective manner.

Vegetative debris is bulky and can consume a significant volume of landfill space. To minimize the use of landfill space, FEMA encourages applicants to reduce the volume of vegetative debris. Costs to reduce vegetative debris using methods, such as mulching, grinding, or burning are eligible. Reducing and/or recycling debris has financial and environmental advantages.

When removing sand, disposal of sand spoils on a public beach is eligible as part of the debris removal project when it is the most cost-effective method of disposal.

Certain types of construction and demolition debris are reusable or recyclable. Applicants should conserve landfill space by separating materials for reuse or recycling.

## 1.    RECYCLING REVENUE

If an applicant receives revenue from recycling debris, FEMA reduces PA funding by the amount of revenue received. Applicants may deduct costs for administering and marketing the sale of the salvageable materials from the fair market value.

If a contract allows the contractor to take possession of salvageable material and benefit from its sale to lower bid prices, there is no salvage value to be recovered at the end of the project. Therefore, the applicant has no further obligation to FEMA.

## 2.    TEMPORARY STAGING SITES

Establishing and operating a temporary staging site necessary for debris separation and reduction is eligible. The cost to lease property is eligible. Additionally, if the terms of the lease require that an applicant restore the leased property back to its condition prior to the applicant's use, the costs related to that restoration are also eligible as part of the category A project. If leased, applicants must provide the lease agreement.

## 3.    HAND-LOADED TRUCKS AND TRAILERS

FEMA has determined that, for vegetative debris, hand-loaded trucks and trailers achieve approximately half the compaction level of mechanically loaded trucks and trailers. Therefore, FEMA only provides PA funding for 50 percent of the debris monitor's observed capacity of hand-loaded trucks and trailers carrying vegetative debris.

Similarly, trucks without solid tailgates cannot be compacted to full capacity. Therefore, FEMA only funds up to a maximum of 85 percent of the certified capacity for trucks without solid tailgates and would apply a 15 percent reduction to the total debris quantity.

Applicants must document the types and total quantity of hand-loaded debris, and the types and total quantity of debris hauled in trucks without solid tailgates and provide this information to FEMA to ensure appropriate reductions are taken for this debris.

125

PAPPG v5

### 4.    LANDFILLS AND TIPPING FEES

Landfill tipping fees usually include fixed and variable costs, along with special taxes or fees assessed by the jurisdiction in which the landfill is located. Eligible tipping fee costs are limited to the variable and fixed costs that are directly related to landfill operations, such as recycling tax.

Eligible fixed costs for tipping fees include:

- Equipment;
- Construction;
- Permits;
- Landfill closure;
- Post-closure activities; and,
- Amortized costs for facilities that support the landfill.

Eligible variable costs for tipping fees include:

- Labor;
- Supplies;
- Maintenance; and,
- Operation of utilities.

The components of tipping fees that are not directly related to landfill operations, such as special taxes or fees related to other government services or public infrastructure, are ineligible as part of the tipping fee. When providing PA funding for tipping fees, FEMA removes any ineligible components.

Applicants may use a significant portion of the available capacity of a landfill to dispose of incident-related debris. Although FEMA provides PA funding for tipping fees, it cannot provide PA funding for the value of the loss of landfill capacity due to incident-related debris.

## E.  Monitoring Contracted Debris Removal Operations

Applicants must monitor all contracted debris removal operations to ensure that the quantities and work claimed are accurate and eligible. This includes documenting debris quantities by types, quantities reduced, reduction methods, and pickup and disposal locations.

Applicants may use force account resources (including temporary hires), contractors, or a combination of these for monitoring. It is not necessary, or cost-effective, to have professional engineers or other certified professionals perform debris monitoring duties. FEMA considers costs unreasonable when associated with the use of staff that are more highly qualified than necessary for the associated work. If an applicant uses staff with professional qualifications to conduct debris monitoring, it must document the reason it needed staff with those higher qualifications.

FEMA provides training to an applicant's force account debris monitors (including its temporary hires) upon request.

126

PAPPG v5

Eligible activities associated with debris monitoring include, but are not limited to:

- Field supervisory oversight;

- Monitoring contracted debris removal at both the loading and disposal sites;

- Compiling documentation, such as load tickets and monitor reports, to substantiate eligible debris; and,

- Training debris monitors on debris removal operations, monitoring responsibilities and documentation processes, and FEMA debris eligibility criteria.

The "Public Assistance Debris Monitoring Guide"[260] provides in depth guidance for monitoring debris removal operations, including eligibility, roles, resources, and activities.

## F.  Private Property Debris Removal

Debris removal from private property (e.g., privately-owned roads, privately-owned non-commercial property, or commercial property) is the responsibility of the property owner and is usually ineligible under the PA Program. In limited circumstances, based on the severity of the impact of an incident and whether debris on private property is so widespread that it threatens public health and safety or the economic recovery of the community, FEMA may determine that private property debris removal (PPDR) is eligible under the PA Program. In such cases, FEMA works with the SLTT governments to designate specific areas where PPDR, including private waterways, is eligible. The debris removal must be in the public interest, not merely benefiting an individual or a limited group of



**Figure 11. Debris on Public Property**

individuals. Figure 11. Debris on Public Property is an example of the level of debris impacts that may warrant FEMA assistance for PPDR.

## 1.      PPDR ELIGIBILITY DETERMINATION PROCESS

Pre-approval from FEMA is not required for applicants to begin PPDR work (including on privately-owned roads, privately-owned non-commercial, and commercial property). However, applicants must notify FEMA that PPDR is being conducted and identify the type of property on which the PPDR is being conducted (e.g., privately-owned roads, privately-owned non-commercial, or commercial property) so FEMA can ensure notifications are made to the necessary FEMA components, (including EHP), and federal partners. Given the limited eligibility of and the additional requirements related to PPDR on both non-commercial and commercial property, although not required, applicants are encouraged to obtain preliminary approval for the activity from FEMA prior to starting work.

For FEMA to evaluate eligibility of PPDR funding requests, applicants must submit written documentation to FEMA identifying the specific properties or areas of properties where PPDR activities occurred. Before FEMA will provide PA funding, the applicant must provide confirmation that it satisfied all legal processes, described below and obtained permission requirements from the property owners (rights-of-entry)

---

[260] For more information, refer to: *Public Assistance Debris Monitoring Guide*.

PAPPG v5

agreements to indemnify and hold harmless the Federal government. Additionally, the applicant must provide documentation to support that it obtained all necessary permits and complied with EHP requirements. FEMA only approves PA funding for PPDR if an applicant demonstrates all the following with sufficient documentation:

**Table 22. Required Documentation and Information for PPDR**

| For Small and Large Projects |
| --- |
| ▪ Written documentation identifying the specific properties or areas of properties where PPDR occurred; |
| ▪ A written statement from an authorized applicant official that: |
|     ○ Certifies the applicant has legal authority and responsibility to remove debris from private property; |
|     ○ Cites all applicable sources of authority (law, ordinance, code, contract, etc.); and, |
|     ○ Indemnifies the federal government for any claim arising from the debris removal. |
| ▪ Documentation to show the work is eligible for PA funding. |

These requirements are in addition to the guidance regarding debris-related documentation under Table 21. Required Documentation and Information for Debris Removal and Disposal.

## i.    Public Interest

Applicants must demonstrate that the PPDR was in the public interest.[261] This includes:

▪ The basis for the assertion that removing the debris from the private property locations requested was in the public interest. The assertion must be made by the state, Tribal Nation, territorial, county, or municipal government's public health authority or other public entity that has legal authority to assert that disaster-generated debris on private property constitutes an immediate threat to life, public health, or safety, or to the economic recovery of the community at large.

▪ The established, specific legal requirements for declaring the existence of a threat to public health and safety.



### Terminology

**Public entity** - An organization formed for a public purpose whose direction and funding are provided by one or more political subdivisions of the state.

FEMA evaluates the submission to determine if PPDR is in the public interest for any properties or area of properties for which an applicant has requested funding for debris removal. When evaluating PPDR funding requests, FEMA considers if the incident generated debris in quantities and/or types on non-commercial or commercial private property that is so widespread or of such magnitude that it creates a threat to public health, safety, or improved property. FEMA also considers factors, such as  the percentage of homes

---

[261] Stafford Act § 407; 42 U.S.C. § 5173; 44 C.F.R. § 206.224(b).

PAPPG v5

destroyed in the community or census designated area, community density, watershed exposure, the fire hazard severity zone (FHSZ) of the area, and the cost of hazardous debris removal.

## 2.    DEBRIS REMOVAL FROM PRIVATE ROADS

Private roads are those that are not owned by, or operated by, or otherwise the legal responsibility of a public entity, such as orphan roads, roads in gated communities, or homeowners' association roads.

If the public has unrestricted access (e.g., no locks, gates, or guards) and frequently uses the private road, then removal and disposal of the debris is demonstrably in the public interest. This work includes debris placed at the curbside by residents. The applicant is generally not required to submit additional documentation demonstrating the debris removal is in the public interest.

If the public has restricted road access (e.g., behind locks, gates, or guards) or the private roads are unrestricted but rarely used by the public, then the applicant must demonstrate that such debris removal is in the public interest. FEMA has the authority to determine whether such debris removal is eligible.

Debris removal from private roads does not include debris on private driveways or parking lots. Debris clearance (e.g., push or cut and toss) for emergency access is eligible as category B work if it meets the criteria under the Emergency Access section in this chapter.

## 3.    DEBRIS REMOVAL FROM PRIVATE NON-COMMERCIAL PROPERTY

Debris removal from private non-commercial property is usually not in the public interest because the debris does not typically represent an immediate threat to public health and safety.[262] If the incident generates debris quantities and/or types of debris on non-commercial property that is so widespread or of such magnitude that it creates an immediate threat to public health and safety, debris removal may be in the public interest. To determine if removal of debris from private residential property is in the public interest, FEMA evaluates the public health determination, and will consider:

- Whether the debris is located in open areas accessible to the public (e.g., in a yard with no fence or barrier next to a public sidewalk), located in maintained areas, or creating a health and safety hazard, such as a rodent infestation;
- Volume of debris;
- Height of debris;
- Number of houses and blocks with large volumes of debris; and,
- Amount of the public population affected.

## 4.    DEBRIS REMOVAL FROM PRIVATE COMMERCIAL PROPERTY

Debris removal from commercial property is typically ineligible, as commercial businesses are expected to have insurance covering this. Applicants are advised to obtain written pre-approval from FEMA for any debris removal from commercial properties before starting work.

---

[262] 44 C.F.R. § 206.224.

129

PAPPG v5

In rare and exceptional cases, such as when critical facilities are involved, restoration costs for damaged infrastructure in a small area are exceptionally high, or debris is heavily concentrated, the FEMA Regional Administrator may grant an exception. In these cases, applicants must meet the stated requirements.

Commercial property owners are not allowed to move or place debris from their properties onto public rights-of-way. Debris on public rights-of-way from the incident itself is eligible for removal, but debris deliberately moved there from commercial properties is not eligible.

### 5.    DUPLICATION OF BENEFITS IN PRIVATE PROPERTY DEBRIS REMOVAL

Applicants must work with private property owners to pursue and recover insurance proceeds and credit FEMA the federal share of any insurance proceeds received.[263] In some circumstances, FEMA may provide Individual Assistance (IA) to individuals for debris removal; consequently, FEMA PA staff coordinates closely with IA staff to ensure FEMA does not fund the same work under both programs.

# XIII. Emergency Protective Measures (Category B)

Emergency protective measures conducted before, during, and after an incident are eligible if the measures:

- Eliminate or lessen immediate threats to lives, public health or safety; or
- Eliminate or lessen immediate threats of significant additional damage to improved public or private property in a cost-effective manner.[264]

FEMA may require certification by federal or SLTT government officials that a threat exists, including:

- Identification and evaluation of the threat; and
- Recommendations of the work necessary to cope with the threat.[265]

## A.  Saving Lives and Protecting Public Health and Safety

Emergency protective measures save lives or protect public health and safety. Eligible emergency protective measures include, but are not limited to:

- Transporting and pre-positioning equipment and other resources for response;
- Flood fighting;
- Emergency Operations Center (EOC);
- Provision of emergency access;
- Provision of supplies and commodities;
- Medical care and transport;
- Evacuation and sheltering, including that provided by another state or Tribal Nation;
- Childcare services provided in support of emergency sheltering;

---

[263] Stafford Act § 312; 42 U.S.C. § 5155.
[264] 44 C.F.R. § 206.225(a)(3).
[265] 44 C.F.R. § 206.225(a)(2).

PAPPG v5

- Building safety inspections;
- Animal carcass removal;[266]
- Demolition of structures;[267]
- Debris clearance and removal;[268]
- Search and rescue to locate survivors, household pets, and service animals requiring assistance;
- Firefighting;
- Security, such as barricades, fencing, or law enforcement;
- Use or lease of temporary generators for facilities that provide essential community services;
- Dissemination of information to the public in an accessible and effective manner to provide warnings and guidance about health and safety hazards using various strategies, such as flyers, public service announcements, or newspaper campaigns;
- Searching to locate and recover human remains;
- Storage and interment of unidentified human remains; and,
- Mass mortuary services.[269]

The following are eligible under limited circumstances based on specific criteria described in each of the referenced sections:

- Increased costs related to operating a facility or providing a service as a result of the incident because of an increased demand for the services the facility provides;[270]
- Mosquito abatement;[271]
- Temporary relocation of essential services;[272] and,
- Snow-related activities[273] when specifically authorized in the declaration.

## B. Protecting Improved Property

Eligible emergency protective measures to protect improved property include, but are not limited to:

- Constructing emergency berms or temporary levees to provide protection from floodwaters or landslides;
- Emergency repairs necessary to prevent further damage, such as covering a damaged roof to prevent infiltration of rainwater;
- Buttressing, shoring, or bracing facilities to stabilize them or prevent collapse;

---

[266] FEMA funds the removal of animal carcasses as category A if the removal is part of the applicant's overall debris disposal operation as opposed to a separate and distinct emergency protective measure operation under category B.
[267] FEMA usually reimburses demolition of a public structure as part of the permanent work project to replace the facility.
[268] Stafford Act 403(a)(3)(A).
[269] FEMA provides PA assistance for mass casualty management, including mass mortuary services, as part of recovery from an incident generating a large number of casualties. However, PA does not cover individual burial or funeral services. FEMA's Individual Assistance (IA) Funeral Assistance Program, if activated, may provide limited assistance to individuals and households.
[270] For more information, refer to Increased Operating Costs in Chapter 6.
[271] For more information, refer to Mosquito Abatement in this chapter.
[272] For more information, refer to Temporary Relocation of Essential Services in this chapter.
[273] For more information, refer to Snow-Related Activities in this chapter and Appendix K: Snow Declarations.

131

PAPPG v5

- Emergency slope stabilization to eliminate a threat of significant additional damage to improved public or private property;[274]
- Mold remediation to prevent further damage to the facility and its contents, such as removal of water damaged building materials;
- Removal and storage of contents from eligible facilities for the purpose of minimizing additional damage;
- Extracting water and clearing mud, silt, or other accumulated debris from eligible facilities if the work is conducted expeditiously for the purpose of addressing an immediate threat;[275] and,
- Taking actions to save the lives of animals that are eligible for replacement.[276]

## C. Emergency Protective Measures on Private Property

In limited circumstances, FEMA may determine that emergency protective measures conducted on private property are eligible under the PA Program if:

- The immediate threat is widespread, affecting numerous homes and businesses such that it is a threat to the health and safety of the general public;
- The applicant has legal authority to perform the work; and,
- The applicant obtained rights-of-entry and agreements to indemnify and hold harmless the federal government.

Situations where this may occur are generally limited to:

- Demolition of unsafe private structures that endanger the public;[277]
- Animal carcasses removal;
- Installation of fiber-reinforced sheeting to cover damaged roofs, commonly referred to as Operation Blue Roof[278] (direct federal assistance only);
- Provision of emergency access;[279]
- Pumping of septic tanks or decontamination of wells causing a pollution threat;[280]
- Building safety inspections);[281] and,
- Stabilizing a slope.[282]

Upon submittal of its claim, an applicant must include the following support documentation for the work to be eligible:

- A detailed explanation documenting the applicant's legal authority and responsibility to enter private property;
- The basis for the determination that a threat exists to the general public; and,

---

[274] 44 C.F.R. § 206.225(a)(3).
[275] If the work is only necessary to restore the facility, it is permanent work, not emergency work.
[276] For more information, refer to Animals in Chapter 8.
[277] For more information, refer to Demolition of Private Structures in this chapter.
[278] For more information, refer to Operation Blue Roof (DFA Only) in this chapter.
[279] For more information, refer to Emergency Access in this chapter.
[280] For more information, refer to Hazardous Materials in this chapter.
[281] For more information, refer to Safety Inspections in this chapter.
[282] For more information, refer to Slope Stabilization in this chapter.

- Copies of the rights-of-entry and agreements to indemnify and hold harmless the federal government.

If the above criteria are not met, the private property owner may be eligible for assistance under FEMA's Individual Assistance (IA) Program. FEMA PA and IA staff will coordinate closely to ensure FEMA does not fund the same work under both programs.

## D.    Emergency Protective Measures Conducted by Private Nonprofit Organizations

For eligible PNPs, emergency protective measures are generally limited to activities associated with preventing damage to an eligible facility and its contents.

Emergency services are the responsibility of SLTT governments. Therefore, PNPs are generally not legally responsible for those services and FEMA does not provide PA funding to PNPs for the costs associated with providing those services. However, when a PNP provides emergency services at the request of, and certified (e.g. in a written agreement or contract) by, the legally responsible SLTT government entity, FEMA provides PA funding through that government entity as the eligible applicant. These services include:

- Fire and rescue activities;
- Animal control;
- Emergency ambulance service for evacuation;
- 211 call services, if tracked and related to eligible work; and,
- Other similarly urgent governmental services.

PNPs that own or operate a medical or custodial care facility are eligible for direct reimbursement of costs related to patient evacuation. In limited circumstances, FEMA may also reimburse a PNP directly when essential components of a facility are urgently needed to save lives or protect health and safety, such as an emergency room of a PNP hospital or a PNP sewage or water treatment plant.

FEMA reimburses a PNP volunteer fire department directly as an eligible applicant, if:

- The PNP volunteer fire department operates based on an established agreement with an SLTT government; and,
- The agreement certifies the PNP volunteer fire department is legally authorized to provide emergency services in areas of coverage specifically designated by the SLTT government.

## E.  Pre-Positioning Resources

Costs related to pre-positioning of resources, specifically equipment and supplies, for the declared incident are eligible if the resources are used in the performance of eligible emergency work. For more information regarding pre-positioning of labor, see Applicant (Force Account) Labor in Chapter 6.

Additionally, costs related to pre-positioning equipment and supplies outside of the declared area are eligible when related to conducting search and rescue, evacuation, sheltering, or providing emergency medical care during the evacuation period (such as ambulances and buses) provided the resources were ultimately used for the declared area.

PAPPG v5

## F.  Increased Operating Costs

Applicants may incur increased costs related to operating a facility or providing a service as a result of the incident because of an increased demand for the services the facility provides.

These additional costs are only eligible if:

- The services are specifically related to eligible emergency actions to save lives or protect public health and safety or improved property in response to the declared incident;

- The costs are for a limited timeframe based on the emergency or exigency of the circumstances; and,

- The applicant tracks and documents the additional costs.

Increased operating costs that are eligible for a limited time, include but are not limited to, costs for:

- Water testing and treatment, including supplies, in the immediate aftermath of the incident to counter a specific threat; and,

- Fuel for increased use of pumps (e.g., pumping station) which may include electricity utility fees for pumps operated by electric motors. Eligibility is subject to policy regarding applicant-owned and purchased equipment (see Chapter 6: Cost Eligibility).

Increased operating costs that are ineligible, even for a limited time, include but are not limited to, costs for:

- Patient care, except as noted under Emergency Medical Care in this chapter;

- Administrative activities;

- Provision of food, except as noted under Supplies and Commodities and Meals in this chapter;

- Costs related to staff that were retained to work additional hours, but did not perform eligible emergency work (e.g., staff working additional shifts due to other staff's inability to get to work);

- Obtaining electrical power from an alternate source;

- Obtaining water from an alternate source;

- School make-up days, including contracted costs for bus service for make-up days;

- Provision of school bus service including fuel or mileage for transporting students from alternate locations or to alternate schools or temporary facilities; and,

- Modification or construction of a new landfill to add landfill capacity.

For PNPs, operating costs are generally ineligible even if the services are emergency services, unless the PNP performs an emergency service at the request of and certified by the legally responsible government entity. In such case, FEMA provides PA funding through that government entity as the eligible applicant.

## G.  Emergency Public Transportation and Communication (DFA Only)

An SLTT government may provide emergency communication services and public transportation when existing systems are damaged to the extent vital functions of community life or incident response are disrupted. The costs of these services are ineligible for reimbursement. However, FEMA may provide short-

134

PAPPG v5

term DFA for these services.[283] Transportation costs for the purpose of evacuation are eligible for reimbursement as described under Evacuation and Sheltering in this chapter.

## H. Flood Fighting

Flood fighting activities may include, but are not limited to, sandbagging, dewatering behind a levee by breaching or pumping, or increasing the height of a levee. These activities are eligible if necessary to reduce an immediate threat to life, public health and safety, or improved property. These activities are eligible even if they are associated with a facility that is eligible for the USACE RIP, as USACE cannot reimburse applicants for flood fighting.

The repair of deliberate breaches made by the applicant to accomplish dewatering is eligible as part of the emergency work project.

Dewatering agricultural and natural areas behind levees and other water control structures is ineligible.

## I. Emergency Operations Centers

An applicant may use its EOC to direct and coordinate resources and response activities for a period of time. Response activities conducted at EOCs are eligible provided they are associated with eligible work. Costs associated with operating the EOC[284] are also eligible, including, but not limited to:

- Increased utility costs;
- Costs to lease a facility;
- Supply costs; and,
- Meal costs, as described under Meals in this chapter.

## J. Emergency Access

There are times when the declared incident causes damage or debris blockage to access routes to an essential community service, or to a community with survivors. If the extent of damage or blockage makes these areas cut off or isolated, work related to providing access is eligible. This includes clearing debris from or conducting emergency repairs to an access facility, such as a road or bridge. Eligible work is limited to what is necessary for the access to remain passable. Any debris removal or additional debris clearance is category A and funded based on the criteria under Debris Removal (Category A) in this chapter.

Private roads are those that are not owned or operated by or otherwise the legal responsibility of a local, county, tribal, territorial, state, or federal entity. Emergency road clearance includes pushing or clearing debris from private roads, including orphan roads, roads in gated communities, homeowners' association roads, etc. Debris clearance must be in the public interest and is eligible if the debris impairs emergency access by local emergency responders, ambulances, fire, and police. For example, downed trees may be cut and moved off the roadway. Eligible work is limited to that necessary for roads to remain passable but might

---

[283] Stafford Act §§ 418 and 419; 42 U.S.C. §§ 5185 and 5186; 44 C.F.R. § 206.225(c) and (d).
[284] Additional information regarding the function and requirements of an EOC may be accessed at: NIMS Components - Guidance and Tools | fema.gov.

include removal and disposal during the initial pass as necessary to ensure emergency access. Applicants are not required to submit documentation demonstrating that debris clearance is in the public interest.

Applicants must complete all necessary legal processes or obtain rights-of-entry and agreements to indemnify and hold harmless the federal government.

Emergency repairs to privately-owned roads, including those within gated communities, are eligible only when all of the following conditions are met:

- There is no other access point;
- Repair of the damage economically eliminates the need for temporary housing and sheltering; and,
- The applicant completes all legal processes and obtains rights-of-entry and agreements to indemnify and hold harmless the federal government.

## K. Hazardous Materials

Removal and disposal of pollutants and hazardous substances are eligible. Eligible activities include:

- Separation of hazardous materials from other debris;
- Specialized procedures for handling and disposing of hazardous materials;
- Control or stabilization of the hazardous materials;
- Pumping water contaminated with the hazardous materials; and,
- Clean-up and disposal of the hazardous materials.

Short-term testing for contaminants in water, air, or soil necessary to ensure elimination of the immediate threat is eligible; however, testing for the purpose of long-term cleanup actions is ineligible.

Applicants must comply with federal and SLTT government environmental requirements for handling hazardous materials. Before handling or disposing of hazardous materials, applicants should contact the appropriate federal or SLTT agency to obtain required permits, notify proper agencies of hazardous materials storage, and coordinate the creation of any required facility specific emergency response plans for spills, safety, and proper handling. Additionally, appropriate certified hazardous waste specialists should handle, capture, recycle, reuse, or dispose of hazardous materials. When providing PA funding for work involving the handling of hazardous materials, FEMA must ensure compliance with the Resource Conservation and Recovery Act (RCRA).[285]

Additionally, the Comprehensive Environmental Response Compensation and Liability Act (CERCLA)[286] authorizes the federal government to respond directly to releases or threatened releases of hazardous substances that may endanger public health or the environment. Under CERCLA and the Clean Water Act (CWA),[287] EPA and the USCG have the authority to respond to actual or potential discharges of oil, hazardous substances, pollutants, and contaminants that may present an imminent and substantial danger to public

[285] For more information, refer to: Resource Conservation and Recovery Act | epa.gov.
[286] For more information, refer to: Comprehensive Environmental Response, Compensation, and Liability Act and Federal Facilities | epa.gov.
[287] For more information, refer to: Clean Water Act | epa.gov.

health or welfare. EPA has responsibility for responses in the inland zone and the USCG has responsibility for responses in the coastal zone.[288] Response actions may include containment, stabilization, decontamination, collection (e.g., orphan tanks, drums), and disposal.

Terminology

**Inland zone** is the environment inland of the coastal zone, excluding the Great Lakes and specified ports and harbors on inland rivers. Precise boundaries are identified in federal regional contingency plans.

## L. Supplies and Commodities

Costs related to applicants purchasing supplies or using their own stock to perform emergency work are eligible and reimbursed in accordance with the Supplies section in Chapter 6. Examples include, but are not limited to, safety equipment, personal protective equipment, radios, power tools, sand, and tarps.

Purchasing and packaging lifesaving and life-sustaining supplies and commodities and providing them to the impacted community are eligible. Examples of such commodities include, but are not limited to, food, water, ice, personal hygiene items, cots, blankets, tarps, plastic sheeting for roof damage, and generators, as well as food, water, bowls, and containment for household pets and service animals. The cost of delivering these same commodities to unsheltered residents in communities where conditions constitute a level of severity such that these items are not easily accessible for purchase is also eligible. Provision of mass care, emergency feeding operations by SLTT or PNP organizations are eligible in the context of distributing supplies and commodities. This includes food and water for household pets.

**Figure 12. Distribution of Supplies**

The cost of leasing distribution and storage space for the commodities is also eligible. Supplies and equipment purchased to provide emergency protective measures may be subject to disposition requirements in accordance with the Disposition of Equipment and Supplies section in Chapter 6.

## M. Meals

Applicants often provide meals for emergency workers. Provision of meals, including beverages and meal supplies, for employees and volunteers engaged in eligible emergency work, including those at EOCs, is eligible provided the individuals are not receiving per diem and one of the following circumstances apply:

[288] For more information, refer to: *FEMA POLICY: Mission Assignments FEMA Policy #104-010-3*.

PAPPG v5

- Meals are required based on a labor policy or written agreement that meets the requirements under Chapter 6: Cost Eligibility;

- Conditions constitute a level of severity that requires employees to work abnormal, extended work hours without a reasonable amount of time to provide for their own meals; or

- Food or water is not reasonably available for employees to purchase.

FEMA only reimburses the cost of meals that are brought to the work location and purchased in a cost-effective and reasonable manner, such as bulk meals. FEMA does not reimburse costs related to group outings at restaurants or individual meals. FEMA reimburses meal costs as part of a contract in accordance with the contract terms provided it meets the requirements under Procurement and Contracting Requirements in Chapter 6.

## N. Emergency Medical Care

When the emergency medical delivery system within a declared area is destroyed, severely compromised, or overwhelmed, FEMA funds extraordinary costs associated with operating emergency rooms and with providing temporary facilities for emergency medical care of survivors. Costs associated with emergency medical care should be customary for the emergency medical services provided. Costs are eligible for up to 30 days from the declaration date unless the applicant obtains FEMA approval for any time extension, which should include a detailed justification for the continued need and an analysis of options for providing care, including the costs for each option. The Assistant Administrator for the Recovery Directorate at FEMA Headquarters has the authority to approve this policy exception.

Eligible emergency medical care includes, but is not limited to:

- Triage and medically necessary tests and diagnosis;

- Treatment, stabilization, and monitoring;

- Patient assessment and provision of first aid;

- A one-time 30-day supply of prescriptions for acute conditions or to replace maintenance prescriptions;

- Vaccinations for survivors and emergency workers to prevent outbreaks of infectious and communicable diseases;

- Durable medical equipment;

- Consumable medical supplies;

- Temporary facilities, such as tents or portable buildings for treatment of survivors;

- Leased or purchased equipment for use in temporary medical care facilities;

- Security for temporary medical care facilities; and,

- Use of ambulances for distributing immunizations and setting up mobile medical units.

PAPPG v5

 **Terminology**

The following types of equipment and supplies are intended for the treatment of an illness or injury, to prevent a patient's further deterioration, or for the functional needs support of persons living with disabilities.

**Durable medical equipment** is reusable medical equipment including, but not limited to:

- Oxygen equipment;
- Wheelchairs;
- Walkers;
- Hospital beds; and,
- Crutches,

**Consumable medical supplies** are medical supplies generally for one-time use only, including, but not limited to:

- Medications (may include Naloxone [Narcan]);
- Diapers;
- Adult incontinence briefs; and,
- Bandages.

FEMA determines the reasonableness of these costs based on Medicare's cost-to-charge ratio.

FEMA does not provide PA funding for these costs if underwritten by private insurance, Medicare, Medicaid, a pre-existing private payment agreement or otherwise covered by another funding source.[289] Applicants must take reasonable steps to provide documentation on a patient-by-patient basis verifying that insurance coverage or any other source funding, including private insurance, Medicaid, or Medicare, has been pursued and does not exist for the costs associated with emergency medical care and emergency medical evacuations.

 **Terminology**

**Cost-to-charge ratio** - A ratio established by Medicare to estimate a medical service provider's actual cost in relation to its charges.

Ineligible costs include:

- Medical care costs incurred once a survivor is admitted to a medical facility on an inpatient basis;

---

[289] Stafford Act § 312; 42 U.S.C. § 5155.

139

PAPPG v5

- Medical care costs incurred beyond immediate emergency medical care, such as those associated with follow-up treatment or long-term medical treatment; and,
- Administrative costs associated with the treatment of survivors.

## O. Evacuation and Sheltering

### 1.    EVACUATION

Transportation to evacuate (and subsequently return) survivors, household pets,[290] service animals,[291] assistance animals,[292] luggage, and durable medical equipment is eligible. This includes emergency medical transportation and evacuation. The mode of transportation should be customary and appropriate for the work required. Evacuation of exhibition or agricultural/livestock animals and reptiles, except turtles, is not eligible.

 **Terminology**

**Household pets** are domesticated animals that:

- Are traditionally kept in the home for pleasure rather than for commercial purposes;
- Can be transported through commercial carriers; and,
- Can be housed in temporary facilities.

Examples are dogs, cats, birds, rabbits, rodents, and turtles.

Household pets do not include reptiles (except turtles), amphibians, fish, insects, arachnids, farm animals (including horses), or animals kept for racing purposes.

Under the Americans with Disabilities Act (ADA), a **service animal** is defined as a dog that has been individually trained to do work or perform tasks for an individual with a disability. The task(s) performed by the dog must be directly related to the person's disability.

**Assistance animals** are animals that work, provide assistance, or perform tasks for the benefit of a person with a disability, or provide emotional support that alleviates identified symptoms or effects of a person's disability. Although dogs are the most common type of assistance animal, other animals can also be assistance animals.

Eligible activities include, but are not limited to:

---

[290] The definition of household pets was developed by PA for the purpose of determining eligibility of work and costs under the PA grant program and does not impose restrictions on what animals a jurisdiction may choose to evacuate and/or shelter.
[291] Service animals are defined by the Department of Justice (DOJ) and more information may be accessed at ADA 2010 Revised Requirements: Service Animals; "In addition to the provisions about service dogs, the Department's ADA regulations have a separate provision about miniature horses that have been individually trained to do work or perform tasks for people with disabilities."
[292] The definition for assistance animals was developed based on information from U.S. Department of Housing and Urban Development (HUD).

140

PAPPG v5

- Transferring patients from inoperable, compromised, or overwhelmed eligible medical or custodial care facilities to another medical facility or to an appropriate shelter facility;

- Transferring patients back to original medical or custodial care facility, when appropriate;

- Transporting survivors, including sheltered survivors, who require emergency medical care to and from the nearest existing or temporary medical care facility equipped to adequately treat the medical emergency. Transport may include emergency air, sea, or ground ambulance services if necessary;

- Use of equipment, such as buses, trucks, or other vehicles (including accessible vehicles) to provide one-time transportation to evacuate survivors and their household pets and service and assistance animals to evacuation facilities or emergency shelters from pre-established pick-up locations. This includes standby time for drivers and contracted equipment while waiting to transport survivors;

- Paratransit transportation services, such as vans, minibuses, and buses (including accessible vehicles) to transport senior citizens, individuals with disabilities (including mobility disabilities) or access and functional needs, individuals in nursing homes and assisted-living facilities, and homebound individuals impacted by the incident;

- Tracking of evacuees, household pets, service animals, luggage, and durable medical equipment. This includes the use of animal microchips GPS tags, and other electronic means for the purpose of tracking and reunification of evacuated animals;

- Provision of food and hydration during transport;

- Provision of emergency medical care during transport, including emergency medical personnel and supply costs;

- Stabilization of individuals injured during evacuation; and,

- Preparation necessary in advance of an incident for evacuations in threatened areas including mobilization of ambulances and other transport equipment.



**Figure 13. Staging Area with Ambulances**

Contracts for staging ambulance services must be part of the state, territorial, Tribal Nation, or regional evacuation plan. Costs of staging ambulances are eligible even if the incident does not impact the area normally served by those ambulances. PA funding for activating, staging, and using ambulance services ends when any of the following occurs:

- FEMA and the state, Tribal Nation, or territory determines that the incident did not impact the area where it staged ambulances;

- Evacuation and return of medical patients and individuals with disabilities or access and functional needs is complete; or

- The immediate threat caused by the incident has been eliminated or lessened and the demand for services has returned to normal operation levels.

FEMA does not provide funding for costs related to:

- Ambulance services that are covered by private insurance, Medicare, Medicaid, or a pre-existing private payment agreement;[293] and,

---

[293] Stafford Act § 312, 42 U.S.C. § 5155.

141

PAPPG v5

- Self-evacuee transportation.

## 2.      SHELTERING

FEMA provides PA funding to SLTT government applicants for costs related to emergency sheltering for survivors, and their household pets,[294] service animals,[295] and assistance animals. Although SLTT governments may contract with other sheltering providers for such services, FEMA only provides PA funding directly to the SLTT government as it is legally responsible for the work.

Emergency sheltering is meant to provide disaster survivors with safe, sanitary, and secure shelter during emergencies in facilities that are intended to provide temporary refuge for all members of the community, including children and adults requiring functional needs' support services. Typically, emergency sheltering is congregate. Congregate sheltering may provide overnight accommodation operating 24/hours a day or operate during limited hours to provide relief from extreme temperature weather events and provide shelter as either a cooling or warming center.

### i.      Congregate Sheltering

Congregate shelter funding includes reimbursement for eligible costs related to the shelter facility, shelter staff, shelter supplies and commodities, and shelter services. These eligible costs for congregate sheltering are based on the type of shelter and the specific needs of the sheltered survivors.

Eligible costs for congregate sheltering are covered in more detail within the following subsections. If any of the items listed are donated, including labor, applicants may offset the non-federal cost share of their eligible emergency work projects in accordance with Donated Resources in Chapter 6. Eligible costs are only reimbursed for the time the facility is actively used to shelter disaster victims.

Congregate sheltering costs not listed in the four groupings below may be eligible for reimbursement on an incident specific basis. Applicants should consult FEMA PA staff for guidance if items not listed below need to be considered for eligibility.

### a.      *Congregate Shelter Facility Costs*

Eligible congregate shelter facility costs include:

- Facility lease or rent, including space for food preparation;
- Utilities, such as power, water, telephone, and internet service;
- Minor facility modifications if necessary to make the facility:
  - Habitable,

---

[294] The definition of household pets was developed by PA for the purpose of determining eligibility of work and costs under the PA grant program and does not impose restrictions on what animals a jurisdiction may choose to evacuate and/or shelter.
[295] Service animals are defined by the Department of Justice (DOJ), and more information may be accessed at ADA 2010 Revised Requirements: Service Animals; "In addition to the provisions about service dogs, the Department's ADA regulations have a separate provision about miniature horses that have been individually trained to do work or perform tasks for people with disabilities."

PAPPG v5

- o   Compliant with the Americans with Disabilities Act (ADA),[296]
- o   Functional to support ancillary services, such as a childcare facility; or
- o   Functional as a household pet shelter;
- ▪   Restoration to return the facility to its condition prior to use;[297]
- ▪   Generator costs; and,
- ▪   Secure storage space for medical supplies.

If an eligible SLTT government applicant owns or leases the shelter facility, and a volunteer agency operates the shelter, the facility costs described above are eligible. However, the labor costs for the volunteer agency's workers are ineligible (except as a donated resource in accordance with the criteria under Donated Resources in Chapter 6).

**b.      *Congregate Shelter Staff Costs***

Eligible shelter staff costs for congregate facilities include:

- ▪   Medical staff;
- ▪   Personal assistance service staff;
- ▪   Veterinary and animal care staff;
- ▪   Public information officer;
- ▪   Social workers (for crisis intervention/psychological first aid, and/or possibly to support transition out of the shelter for acute care);
- ▪   Food service workers;
- ▪   Custodial and facilities staff; and,
- ▪   National Guard personnel.[298]

**c.      *Congregate Shelter Supplies and Commodities***

Eligible items are those needed for, and used directly on, the declared incident and are reasonable in both cost and need. Eligible supplies and commodities for congregate shelters include:

- ▪   Hot and cold meals, snacks, beverages, and related supplies for survivors;
- ▪   Cooking and serving supplies;
- ▪   Food, water, and bowls for household pets and service and assistance animals;
- ▪   Durable medical equipment;
- ▪   Consumable medical supplies;
- ▪   Medication for animal decontamination and parasite control;
- ▪   Infant formula, breast feeding/chest feeding support items, baby food, and diapers;

---

[296] The applicant should ensure that the facility is in compliance with the ADA standards.
[297] If more than cleaning and minor repairs to the building are needed, applicants should consult FEMA regarding work eligibility.
[298] For more information, refer to the National Guard section in Chapter 6.

- Refrigerators, microwaves, and crock pots;
- Cots, cribs, linens, blankets, pillows, tables, and chairs;
- Crates, cages, leashes, and animal transport carriers;
- Personal hygiene kits with items, such as shampoo, soap, toothpaste, a toothbrush, towels, and washcloths;
- Animal cleaning tables and supplies;
- Televisions or radios (one per 50 sheltered survivors);
- Basic cable service;
- Computers (one per 25 shelterees);
- Internet service, including wi-fi;
- Washers and dryers (one of each per 50 shelterees); and,
- Toys and books.

*d.*     *Congregate Shelter Services*

Shelter services are only eligible for the time the facility is actively used to shelter survivors. Eligible shelter services for congregate facilities include:

- Shelter management;
- Supervision of paid and volunteer staff;
- Cleaning the shelter, linens, and animal crates;
- Shelter safety and security;
- Use of equipment, such as ambulances, buses, trucks, or other vehicles, to provide sheltering support;
- Phone banks and Internet access for survivors;
- Care for survivors with disabilities or access and functional needs, including the provision of the following personal assistance services:
  o Grooming, eating/feeding, walking, bathing, toileting, dressing, and undressing;
  o Transferring (e.g., movement between a cot and wheelchair or wheelchair to restroom facilities);
  o Maintaining health and safety, including serving as accessible cooling or warming center;
  o Assisting with self-administering medications; and
  o Communicating or accessing programs and services (e.g., translation and interpretation services for individuals with limited English proficiency or accessible communication services for individuals with disabilities).
- Emergency medical, crisis intervention/psychological first aid, and veterinary services for sheltered survivors, household pets, and service and assistance animals, including:
  o Emergency and immediate life stabilizing care, including necessary prescriptions (not to exceed a 30-day supply);
  o Triage, medically necessary tests, diagnosis, treatment, stabilization, and monitoring;
  o Patient assessment;

144

PAPPG v5

- o   Provision of first aid, health information, and referral to acute care facilities as necessary;

- o   Care for evacuees with chronic conditions;

- o   Administering vaccinations to sheltered survivors and workers for transmissible or contagious diseases, including, but not limited to, tetanus and hepatitis;

- o   Administering vaccinations to household pets, and service and assistance animals, for transmissible or contagious diseases, including, but not limited to, Bordetella (kennel cough). The vaccinations need to be effective while the animal is in the shelter;

- o   Provision of durable medical equipment (DME) and consumable medical supplies (CMS) to support shelter residents;[299]

- o   Provision of crisis intervention/psychological first aid in support of emotional distress, and referral to other behavioral health and substance use health care services and facilities outside the congregate shelter environment as necessary; and,

- o   Medical waste disposal.

- ▪   Outpatient costs for sheltered survivors requiring emergency life-sustaining treatment not available at the shelter for the period of time that a survivor is housed in the shelter. Eligible outpatient services are limited to:

  - o   Physician services in a hospital outpatient department, urgent care center, or physician's office;

  - o   Related outpatient hospital services and supplies, including X-rays, laboratory and pathology services, and machine diagnostic tests; and,

  - o   Local professional transport services to and from the nearest hospital equipped to adequately treat the emergency.

- ▪   Sheltering self-evacuees (self-evacuee transportation costs are ineligible); and,

- ▪   Costs paid to the American Red Cross (ARC) or other non-governmental organizations (NGOs) to operate shelters under a written agreement. Costs that ARC or other NGOs incur under their own organizational mission (i.e., independent of any federal or SLTT request) are ineligible for reimbursement.

Note: Transportation of shelter residents to and from (other than for the medical purpose referenced above) the shelter is not an eligible sheltering activity. Additionally, costs incurred in the provision of disaster case management and/or mental/behavioral health services are ineligible unless the mental/behavioral health services are provided as an accommodation to survivors with disabilities, services in the NCS environment beyond "crisis intervention/psychological first aid" would require referral or transfer to a medical facility for treatment of an acute condition.

## ii.     Non-Congregate Sheltering

FEMA may reimburse costs related to emergency sheltering provided in non-congregate environments under limited and exigent circumstances. Non-congregate sheltering does not require pre-approval when conducted in traditionally operated facilities limited to hotels, motels, dormitories, and retreat camps, which offer an increased level of privacy over congregate sheltering. NCS activity in any other facility (e.g., recreation vehicles, including travel trailers; condominiums; short-term rentals, including Airbnb; ships)

---

[299] Reference the list of DME & CMS located under Emergency Medical Care in this chapter.

PAPPG v5

requires FEMA pre-approval by the Assistant Administrator for the Recovery Directorate at FEMA Headquarters.

Applicants are required to notify FEMA Headquarters and their Regional Administrator, through the recipient, within five days of initiating NCS operations for a declared incident. If sheltering is conducted prior to a federal declaration, then the notification requirement applies as five days post declaration.

 **Examples: Exigent Circumstances where NCS may be Considered**

NCS will be considered for approval in limited, exigent circumstances, such as when congregate shelter facilities are:

- Not available due to the nature of the incident (e.g., identified shelter facilities were damaged by the incident);

- Insufficient to meet the need for sheltering; or,

- No longer available for use if owners of facilities used as congregate shelters require their return to their routine purpose or use, resulting in cessation of shelter operations.

When providing NCS, as a condition of assistance, recipients and applicants must comply with all statutes, regulations, and EOs, including those that require impartial and fair delivery of FEMA funding to all communities. FEMA monitors compliance with these laws when granting assistance. Failure to adhere to these laws may result in the termination of or refusal to grant or continue providing federal financial assistance.

*a.       Requests for Non-Congregate Sheltering*

Applicants must submit written requests for work and costs related to NCS in non-traditionally operated facilities (e.g., recreation vehicles, including travel trailers; condominiums; short-term rentals, including Airbnb; ships) through the recipient and obtain FEMA approval prior to sheltering survivors. At a minimum, an applicant should include the following information in its request:

- Justification for the necessity of non-congregate sheltering;

- Whether the state, Tribal Nation, or territorial government has requested the Transitional Sheltering Assistance (TSA) from FEMA's Individual Assistance (IA) Program; [300]

- The type of non-congregate sheltering available and which type the applicant intends to use;

- An analysis of the available options with the associated costs of each option; and

- The timeframe requested (i.e., date of activation and length of time projected for NCS operations).

---

[300] FEMA's Transitional Sheltering Assistance provides short-term sheltering for survivors transitioning from emergency shelters to temporary or permanent housing solutions. Additional information is available in FEMA's *Individual Assistance Program and Policy Guide*.

While selecting the location of NCS facilities, applicants are encouraged to consider community demographics to ensure all populations have ready access to sheltering.

To establish and conduct NCS in non-traditional facilities, such as recreational vehicles (RVs), applicants must request this specifically. Such requests must be approved by the Assistant Administrator for the Recovery Directorate at FEMA Headquarters. NCS provided in any setting other than traditional facilities (i.e., hotels/motels, dormitories, and retreat camps) will be subject to additional disaster-specific requirements and guidance issued by FEMA.

FEMA limits any NCS approval to that which is reasonable and necessary to address the needs of the incident. FEMA determines the eligible costs based on the contractual agreement, including reimbursement for repairing damage if it is the applicant's legal responsibility based on the facility use agreement or lodging services contract.

If FEMA approves the request, recipients must provide sufficient data and documentation to establish eligibility (including the need for NCS resulting from the disaster, reasonableness, and costs).

### b.    Eligible Costs for Non-Congregate Sheltering

NCS costs are based on a per night, per room amount. Unlike congregate sheltering, funding for NCS does not include separate reimbursement for facility, staff, service, or supply costs. Costs for items or services associated with NCS are eligible if included within the NCS per night, per room charges.

Generally, feeding support and shelter support services are limited to the initial 30 days of NCS operations. These support services are only eligible for a longer period of time when routine access to food, other essential supplies and commodities, and support services are disrupted by the disaster incident, and clearly documented when an applicant seeks reimbursement.

Limited funding for casework in support of disaster survivor's transition to temporary or long-term housing options may be eligible.

If applicants are uncertain whether specific NCS-related costs would be considered eligible, they are encouraged to seek guidance from FEMA PA regional staff before incurring such costs.

### c.    Ineligible Costs for Non-Congregate Sheltering

Ineligible costs include:

- Costs associated with ancillary services (e.g., room service, pay-per-view movies, parking fees, or other costs for *à la carte* amenities);
- Costs related to reserving rooms or deploying facilities (e.g., RVs as NCS) that go unoccupied by an identified, displaced disaster survivor individual or household requiring sheltering assistance;
- Costs related to any expense beyond a traditional per night, per room charge when providing NCS via hotel, motel, dormitory, or retreat camp (this includes damages to the facility by the disaster survivors); and
- Costs incurred in the provision of disaster case management and/or mental/behavioral health services.

147

*d.      Survivor Insurance and Non-Congregate Sheltering*

Survivors being sheltered in NCS facilities may have homeowner's insurance coverage. Such coverage does not constitute a duplication of benefits even if the individual's or household's insurance includes additional living expenses or loss of use coverage for their home. This is based on NCS being an emergency protective measure to protect the health and safety of the public at large, as opposed to being a benefit directly to an individual or household. Further, homeowners' insurance policies typically include additional living expenses as an expense that overall insurance proceeds may cover, as opposed to a specific line item dedicated to that specific expense.

*e.      Time Extensions for Non-Congregate Sheltering*

When applicants anticipate that the need for NCS will exceed the approved time period, they must obtain FEMA approval for any time extensions. These time extensions are granted in 30-day increments. NCS conducted for more than 30 days is subject to the criteria in the NCS Work Eligibility Requirements section below.

Applicants must submit a written time extension request through the recipient to the FEMA Regional Administrator. This request should include a detailed justification for the continued need and a revised analysis of options, including the costs for each option. Applicants should submit time extension requests at least seven calendar days before the expiration date of the currently approved NCS period of performance.

The Regional Administrator has the authority to approve time extensions for traditional and non-traditional NCS for up to 6 months from the date of declaration. All NCS activities beyond the initial 6 months require approval by the Assistant Administrator of Recovery at FEMA Headquarters.

*f.      NCS Work Eligibility Requirements*

If applicants request an extension of NCS activities beyond the initial period of performance, NCS work eligibility will be determined based on the criteria detailed below. For NCS conducted for more than 30 days, recipients and applicants are required to use data regarding the individuals and households sheltered to ensure that only individuals and households with a demonstrated need for continued emergency sheltering remain in NCS facilities.

Only non-congregate sheltering that is provided to individuals and households who align with the following criteria is considered PA eligible work beyond the initial period of performance. To be eligible for NCS beyond the first 30 days, each household must:

- Be in an area (county or parish) designated for both the Individual Assistance (IA) and PA Programs;
- Be registered with IA for disaster assistance;
- Have not requested to withdraw its IA registration;
- Be able to document pre-disaster status as an owner or renter of the primary residence; and
- Have their primary residence determined to be uninhabitable due to incident-caused damage or inaccessible due to the ongoing incident.

PAPPG v5

Applicants may determine a household's habitability status using IA information, home assessment information, or a habitability assessment process developed by the applicant. Applicants must submit the habitability determination method with the time extension request. Additionally, applicants should maintain information about the basic habitability for each household in NCS during the period for which they are requesting a time extension.

g.      *Data Collection, Management, and Reporting During NCS Operations*

To effectively manage NCS operations and ensure that only individuals and households with a demonstrated need for continued emergency sheltering remain in NCS facilities, applicants are required to collect, compile, and report on information from disaster survivors housed in NCS. Applicants conducting NCS activities must establish and maintain a reporting system that captures the following data elements to ensure eligibility of the work and associated costs:

- FEMA IA Registration ID (if available);
- Head of household first and last name and phone number (mobile or other);
- Number of disaster survivor households and individuals sheltered in NCS by county;
- Damaged dwelling street address, city, state, zip code;
- Pre-incident primary-residence habitability status
- Number of rooms/NCS shelter units occupied by disaster survivors by county;
- Number of rooms
- NCS shelter check in and out date;
- Shelter site identification (number or name); and,
- The counties in which NCS is being conducted.

Applicants should inform individuals and households that the above collected information will be shared with FEMA.

FEMA PA staff will not collect the data on behalf of the recipient or applicant. FEMA expects recipients to ensure applicants are prepared to provide information substantiating eligibility and submit the defined data elements to FEMA on a weekly basis.

Applicants are expected to provide recipients with data reporting the first week of NCS operations and weekly thereafter until the NCS operations have concluded. This reporting supports project management and facilitates the transition of disaster survivors to longer-term housing solutions or out of NCS. Applicants may opt to provide more frequent reporting and should provide an updated report with any time extension requests.

Recipients are required to submit this weekly report information to the FEMA Data Sharing Support Box [301]. FEMA's Recovery Reporting and Analytics Division (RRAD) utilizes these data points and cross-checks them against disaster survivors receiving Individual Assistance to: 1) ensure the continued need for sheltering

---

[301] The FEMA Data Sharing Support Box can be reached at: fema-recovery-rad-data-sharing-support@fema.dhs.gov.

PAPPG v5

services; and 2) prevent duplication of benefits between the PA and IA programs. RRAD provides reports based on this information back to recipients, PA, and IA to enable effective management of the NCS population. Aggregated information, excluding personally identifiable information (PII), is also provided to PA senior staff upon request for inclusion as support for NCS projects.

The recipient and applicant must comply with the above described NCS data reporting requirements to determine eligibility and to help prevent fraud, waste, or abuse. FEMA, the applicant, and the recipient (including its contractors) may need to enter into information sharing access agreements (ISAAs) to coordinate data sharing of PII between the recipient, applicant, and FEMA. The recipient, applicant, and their contractors must abide by all terms and conditions of any relevant ISAA or data sharing addendum (DSA) to the FEMA state/Tribal Nation/territory agreement.

## 3.    HOST-STATE OR HOST-TRIBE EVACUATION AND SHELTERING

If the impacted state or Tribal Nation (impact-state or impact-tribe) has evacuation and congregate sheltering needs beyond its ability to address within its jurisdictional area, it may request assistance either from another state or Tribal Nation (host-state or host-tribe) through mutual aid agreements, such as EMAC, or from FEMA. Only congregate sheltering by the host-state/tribe is eligible for PA funding.



### Terminology

**Impact-state** or **impact-tribe** means the state or Tribal Nation for which the president declared an emergency or major disaster and requested FEMA assistance because of a need to evacuate and/or shelter affected individuals outside the state or tribal lands.

**Host-state** or **host-tribe** means a state or Tribal Nation that by agreement with FEMA provides sheltering or evacuation support to evacuees from an impact-state or impact-tribe.

If the impact-state/tribe requests assistance directly from another state or Tribal Nation, FEMA reimburses costs based on the mutual aid agreement as described under Mutual Aid in Chapter 6. FEMA may also provide PA funding to the host-state/tribe directly, even if the impact-state/tribe already requested assistance directly from that host-state/tribe, provided that:

- The impact-state/tribe requested the assistance;

- The host-state/tribe agrees to accept evacuees based on need—without restriction;

- An authorized official from the host-state/tribe transmits a written agreement to FEMA; and,

- The governor or tribal chief executive of the host-state/tribe signs the FEMA/host-state or FEMA/host-tribe agreement pursuant to the terms and conditions in 44 C.F.R. § 206.44, FEMA-state agreements, to establish the host-state/tribe as the recipient. [302]

If the impact-state/tribe requests assistance from FEMA, FEMA determines whether potential host-states/tribes have sufficient capability to meet some or all of the sheltering and evacuation needs of the

---

[302] 44 C.F.R. § 206.202(f)(1)(i).

PAPPG v5

impact-state/tribe. If FEMA determines a host-state/tribe has sufficient capability and the host-state/tribe meets the four conditions described above, FEMA provides PA funding to the host-state/tribe directly. [303]

When FEMA provides PA funding directly to the host-state/tribe, FEMA reimburses 100 percent of the host-state/tribe's eligible costs, including straight-time and benefits of the host-state/tribe's permanent employees[304] so that it does not have any out-of-pocket costs. In these cases, the impact-state/tribe is responsible for the non-federal cost share and must subsequently reimburse FEMA for the non-federal cost share of the eligible costs incurred by the host-state/tribe. The non-federal cost share is based on the category B cost-share amount designated in the declaration. The impact-state/tribe cannot offset its non-federal cost share with the host-state/tribe's volunteer labor.



**Figure 14. Evacuees Boarding a Bus**

In addition to the other eligible evacuation and sheltering costs described in this chapter, FEMA also reimburses the host-state/tribe for the following:

- Straight-time and benefits of entities' employees that provide assistance under a mutual aid agreement or a contract with the host-state/tribe, such as a local government or PNP;

- Costs to provide the requested shelter capacity, even if the shelter was underused or not used at all;

- Costs related to arrest and incarceration of evacuees who commit unlawful acts in the host-state/tribe congregate shelter, including costs incurred by on-duty law enforcement officers in order to detain, take into custody, or make an arrest (costs of chemical tests, processing, charging, booking, and holding such persons are ineligible costs). Costs to transport a detainee back to the shelter is eligible if the individual was not charged;

- When patients in hospitals in the impact-state/tribe are evacuated, transported, and admitted into hospitals in the host-state/tribe through mission assignment with U.S. Department of Health and Human Services (HHS), and the patients are treated and discharged but require follow-on care while awaiting transport, and shelters are not available, the costs that the host-state/tribe's hospital incurs for hotel rooms during patients' follow-on care until the patients can be transported back to the impact-state/tribe, provided that Medicare, Medicaid, or private insurance does not cover these costs;

- Bus or shuttle transport to pick up evacuees at the airport, train station, or bus terminal when the expected plane, train, or bus is re-routed, canceled, or rescheduled;

- Ambulance costs for hospital-to-hospital transfers, provided it is a transfer within the host-state/tribe;

- When the impact-state/tribe determines that it is safe for re-entry, it coordinates with the host-state/tribe and FEMA to return evacuees, household pets, and service and assistance animals to the impact-state/tribe by air, rail, or bus. Return transportation costs are eligible along with food, water, and security during transport;

---

[303] 44 C.F.R. § 206.208(c)(3).
[304] 44 C.F.R. § 206.202(f)(1)(ii).

PAPPG v5

- Return transportation costs for family members of the impact-state/tribe evacuee who were admitted to a hospital after the congregate shelters close;

- When evacuees are discharged from a hospital after all congregate shelters have closed and transportation cannot be arranged for departure on the same day discharged, FEMA reimburses up to 5 nights of hotel lodging while awaiting return transport; and,

- FEMA reimburses a state agency from the impact-state/tribe for transportation costs and related expenses to transport the evacuated decedent's remains and accompanying family members to the impact-state/tribe. The cost of the state/tribe-mandated embalming or cremation of the body prior to return are also eligible.

The host-state/tribe must determine whether any ambulance or medical service costs are covered by a patient's private insurance, Medicare, Medicaid, or a pre-existing private payment agreement as FEMA deducts this amount from the host-state/tribe's eligible cost.

Fees that the host-state/tribe waives for the use of state parks by self-evacuees with recreational vehicles (RVs) are ineligible. Additionally, purchase and distribution of gas cards, bus passes, cash vouchers, debit cards, food vouchers, or direct payments to evacuees are ineligible.

## 4.    CHILDCARE SERVICES

FEMA reimburses SLTT governments for the cost of providing licensed childcare services to support sheltered populations. This includes the cost of the labor, facility, supplies, and commodities. Childcare services can be eligible in support of both congregate and non-congregate sheltering.

Childcare includes services, such as:

- Day care for children; and,
- Before- and after-school care.

Applicants may provide these services within a shelter facility or in a separate facility, as appropriate. FEMA PA and IA staff will coordinate to ensure no duplication with IHP assistance.

## P. Infectious Disease Incident

The HHS Centers for Disease Control and Prevention (CDC) has primary authority to enable support and assistance to SLTT governments in response to an infectious disease incident. In response to a Stafford Act declaration request, FEMA will formulate a recommendation based on all available information to include whether emergency protective measures and/or DFA (e.g., personnel, equipment, and supplies) is needed to meet critical emergency protective requirements that are beyond the capability or capacity of the state, Tribal Nation, or territory. However, the president retains sole authority to approve all declaration requests, regardless of any FEMA recommendation.

In the event of an emergency or major disaster declaration, FEMA may provide assistance for the evacuation and movement of persons; movement of supplies; and care, shelter, and other essential needs of affected human populations directly related to the declared incident. Any assistance provided by FEMA in response to an infectious disease incident or pandemic is done in coordination with the CDC. When FEMA engages with and supports work and costs related to a specific infectious disease incident or pandemic, FEMA will issue

disaster-specific guidance (DSG) to identify what emergency protective measures will be considered as necessary and therefore eligible work for the incident.

## Q. Mosquito Abatement

Mosquito abatement measures are eligible when an SLTT government public health official validates in writing that a mosquito population poses a specific health threat as discussed further in Appendix F: Mosquito Abatement. FEMA consults with the CDC to determine the eligibility of mosquito abatement activities. FEMA only provides PA funding for the increased cost of mosquito abatement. The eligible costs are calculated by deducting the average mosquito abatement expenses from the most recent three non-disaster years from the disaster-related costs.

## R. Safety Inspections

Building department officials typically conduct post-incident safety inspections to determine whether a building has sustained damage that results in a hazardous condition.[305] Post-incident safety inspections to determine whether the facility is safe for entry, occupancy, and lawful use for public and private facilities are eligible; this includes posting appropriate placards (e.g., "red-tagging" a building that is unsafe).

Applicants must clearly substantiate that the purpose of the inspection was for safety and not to assess damage, such as building inspections.

## S. Animal Carcasses

Removal and disposal of animal carcasses, including interim processing,[306] is eligible. If the removal and disposal is conducted as part of the overall debris removal efforts, the work may be funded as category A.

FEMA may require certification from the SLTT government health department, HHS, or the U.S. Department of Agriculture (USDA) that a threat to public health and safety exists.

Smaller animal carcasses (e.g., rodents, skunks, or possums) do not usually pose an immediate threat to public health or safety. Removal and disposal of these carcasses is ineligible unless the appropriate public health official determines a threat to public health or safety exists.

FEMA does not provide PA funding when another federal agency has authority to provide assistance for carcass removal and disposal. The NRCS has authority for the removal of animal carcasses if it determines that the measure is eligible as debris removal. The USDA's Farm Service Agency may provide assistance for farmland debris cleanup. EPA and USCG have authority to provide technical assistance and to remove animal carcasses contaminated with oil, hazardous substances, pollutants, or contaminants.[307]

---

[305] For more information, refer to: *Post-Disaster Building Safety Evaluation Guidance* (FEMA P-2055).
[306] Interim processing may include burning, incinerating, rendering, mounding, composting, or other pre-processing activities.
[307] For more information, refer to: FEMA POLICY: Mission Assignments FEMA Policy #104-010-3.

# T. Demolition of Private Structures

Emergency demolition of structures located on private property (e.g., privately-owned non-commercial or commercial property) are eligible when partial or complete collapse is imminent, and that collapse poses an immediate threat to the general public. FEMA accepts determinations that a structure is destroyed and/or in immediate danger of collapsing made by the authority having jurisdiction in coordination with a qualified individual.[308]

In some instances, restricting public access to an unsafe structure and the surrounding area, such as securing the area with a fence, is sufficient to alleviate the immediate threat and is more cost-effective than demolition. In these cases, demolition is ineligible. If a structure is condemned prior to the incident, emergency protective measures related to that structure are ineligible.

## 1.    CONDITIONS OF ELIGIBILITY FOR DEMOLITION

Approval from FEMA prior to demolition work is not required; however, for an applicant to receive PA funding, FEMA must determine that the work is eligible. For demolition to be eligible, applicants must:

- Notify FEMA that demolition of private structures will be conducted and identify the type of property on which the demolition work is being conducted (e.g., privately-owned non-commercial or commercial property) so FEMA can ensure notifications are made to the necessary FEMA components and federal partners;

- Certify that the structures are unsafe and pose an immediate threat to lives or public health and safety as determined by the authority having jurisdiction, in coordination with a qualified individual;

- Provide documentation to confirm its legal authority and responsibility to enter private property and demolish privately-owned unsafe structures, including:

  o Citation of the law, ordinance, code, or emergency powers for which it is exercising its legal authority to demolish privately-owned unsafe structures. The authority cited must be applicable to the structural condition representing the immediate threat and not merely the applicant's uniform level of services.

  o Confirmation that a legally authorized official of the applicant has ordered the exercise of public emergency powers or other appropriate authority to enter onto private property in the declared area in order to demolish privately-owned unsafe structures and remove the resulting debris.

- Indemnify the federal government and its employees, agents, and contractors from any claims arising from the demolition of privately-owned unsafe structures and removal of the resulting debris; and,

- Obtain all necessary permits and comply with all federal and SLTT applicable laws, regulations, and EOs.

Before FEMA will provide PA funding, applicants must provide confirmation that it satisfied all legal processes and obtained permission requirements from the property owners (rights-of-entry) and agreements to indemnify and hold harmless the federal government. Additionally, applicants must provide documentation to support that it obtained all necessary permits and complied with EHP requirements.

---

[308] Only a licensed engineer or architect or an individual that the jurisdiction authorized can make such decisions.

PAPPG v5

Given the limited eligibility of and the additional requirements related to demolition of private structures, applicants are encouraged to obtain preliminary approval for the activity from FEMA prior to starting work.

## 2.    COMMERCIALLY OWNED STRUCTURES

Demolition of structures owned by commercial enterprises, including businesses, apartments, condominiums, and mobile homes in commercial trailer parks are generally ineligible as it is expected that the commercial enterprises retain insurance that cover the cost of demolition. In very limited, extraordinary circumstances, the FEMA Regional Administrator may provide an exception. In such cases, applicants must meet the requirements outlined under Private Property Debris Removal (PPDR) in this chapter.

## 3.    ELIGIBLE DEMOLITION WORK

Eligible work associated with the demolition includes, but is not limited to:

- Capping wells;
- Pumping and capping septic tanks;
- Filling open below-grade structures, such as basements and swimming pools;
- Testing for hazardous materials;
- Securing utilities;
- Obtaining permits and licenses; and,
- Performing title searches.

Fees for permits, licenses, and titles issued directly by an applicant are ineligible unless the applicant demonstrates that the fees are above and beyond its normal administrative costs for similar non-disaster demolition work. Overtime labor directly related to issuing these permits, licenses, and titles for facilities that are eligible for demolition is eligible.

The following work is also eligible and may be funded as category A if the removal and disposal is conducted as part of the overall debris removal operations:

- Removing demolition debris, including personal effects; and
- Removing hazardous materials, such as asbestos and household hazardous waste (in accordance with federal and SLTT requirements for handling hazardous materials).

Applicants should work with the property owner to pursue and recover insurance proceeds and credit FEMA the federal share of any insurance proceeds recovered. In some circumstances, the property owner may be eligible for IA funding. FEMA PA and IA staff will coordinate closely to ensure FEMA does not fund the same work under both programs.

 **Example: Eligibility of Demolition Debris**

For demolition, FEMA will accept determinations that a structure is destroyed and/or in immediate danger of collapsing made by the authority having jurisdiction in coordination with a qualified individual. Certain demolition work and costs may be funded as category A if the removal and disposal

155

PAPPG v5

is conducted as part of the overall debris removal operations. Demolition is subject to additional requirements and must comply with Demolition of Private Structures in this chapter.

## 4.    INELIGIBLE WORK

Ineligible work associated with the demolition of private structures includes, but is not limited to:

- Removal or covering of concrete pads and driveways except for structures in a FEMA-funded buyout program; and,
- Removal of slabs or foundations that do not present a health or safety hazard, except for structures in a FEMA-funded buyout program through the Hazard Mitigation Grant Program (HMGP).

The placement of debris resulting from demolition of a structure in or on the public right-of-way is ineligible work.

## U.  Temporary Relocation of Essential Services

If an applicant provides essential community services at a facility that is unsafe, inaccessible, or destroyed as a result of the incident, temporary relocation of these services to another facility is eligible. [309] Essential community services are those services of a governmental nature that are necessary to save lives, protect property and the public, and preserve the proper function and health of the community at large. These services differ from the list of eligible PNP essential social services. FEMA evaluates the criticality of the service and safety of the facility to determine the need for temporary relocation.

## 1.    ELIGIBLE FOR TEMPORARY RELOCATION

Facilities that provide essential community services provided by an eligible applicant are eligible for temporary relocation. These include facilities for education, election and polling, emergency services (including police, fire, and rescue) emergency medical care, homeless and domestic violence shelters, prison, utilities, and other facilities that provide public health and safety services of a governmental nature.

Services provided in administrative and support facilities essential to the provision of the essential community service are also eligible for temporary relocation. These include administration buildings, student housing, hospital and prison laundry and cooking facilities, parking, and storage if items are needed on-site. Athletic, play, and recreational equipment is eligible, within reason.

If an applicant provides the service at a leased, private facility prior to the incident, the service is still eligible to be temporarily relocated.

## 2.    INELIGIBLE FOR TEMPORARY RELOCATION

Facilities that do not provide essential community services are ineligible for temporary relocation. These include facilities and services, such as museums, zoos, community centers, shelter workshops, performing arts centers, recreation and parking, athletic stadiums, houses of worship, housing and residential services, custodial care, assisted living facility, senior citizen centers, alcohol and drug rehabilitation, childcare,

---

[309] Stafford Act § 403(a)(3)(D); 42 U.S.C. § 5170b.

156

PAPPG v5

libraries, research and warehouse facilities, burial, vocational, academic, athletic, political training, and student union buildings.

## 3.      DETERMINING ELIGIBILITY OF TEMPORARY RELOCATION

In addition to all other eligibility requirements that must be met, FEMA determines the eligibility of temporarily relocating services to another facility based on the safety of the damaged facility as follows:

- If the facility can be made usable with the performance of emergency protective measures or minor repairs, a temporary facility is not eligible.

- If the damage is to the extent that it cannot be occupied safely, and restoration cannot be completed without suspending operations of the facility for an unacceptable period of time, then a temporary facility is eligible.

- If the facility is not damaged but lacks a critical utility or operational item, such as potable water, electricity, or road access, and a temporary facility will restore services to the community before the restoration of the disrupted critical utility or operational item at the current site, then a temporary facility is eligible.

The capacity of the temporary facility must not exceed the pre-disaster capacity of the facility that housed the displaced services unless that is the least costly practical option. Applicants must use the temporary facility to provide the eligible service to the same extent and manner as was provided prior to the incident.

Relocation to a site that requires ground disturbance or alteration of an existing property requires EHP review before an applicant implements the action. See Chapter 10: Environmental and Historic Preservation for more information on EHP review and considerations.

FEMA does not require applicants to obtain and maintain insurance for temporary facilities.

If an applicant has a facility that does not meet eligibility requirements for temporary relocation and the facility's damage is to such an extent that the contents are at risk, PA funding for temporary space to store the contents as an emergency protective measure is eligible if the space is:

- Limited to an area necessary to store the contents;

- Used solely for storage; and,

- Not intended for public access, alternate office space, exhibits, or other purposes.

FEMA is not responsible for damage that may occur to contents in temporary storage.

## 4.      LEASE, PURCHASE, OR CONSTRUCT

When deciding whether to rent or purchase space and equipment, applicants should choose the most economical option that meets its needs. Applicants must provide FEMA with a cost analysis,[310] which should include at least three options with cost estimates based on the timeline to restore the original facility. Cost estimates for leasing a facility must account for the entire timeline of the project. Cost estimates must include an itemized list of project costs.[311] FEMA generally reimburses the least costly option of leasing,

---

[310] 2 C.F.R. § 200.318(d).
[311] For more information, refer to: Cost Estimating Tools | fema.gov.

157

PAPPG v5

purchasing, or constructing a temporary facility. However, FEMA also considers whether the least costly option is practical when determining eligibility (e.g., if the least costly option for a temporary school is to lease a building in another county, and the next least costly option is to install modular buildings on the current campus, FEMA reimburses the cost of installing the modular buildings).

If an applicant relocates a service from a facility it owns, the lease costs of a temporary facility are eligible if leasing is the least costly option. If the applicant was leasing the damaged facility and had to temporarily relocate to another leased facility, the increase in rent is eligible.

Purchasing or constructing a temporary facility is eligible if FEMA confirms that it is the least costly option. With exception of modular or manufactured units, the applicant must obtain FEMA approval prior to purchasing or constructing the temporary facility.

## 5.    SAFE ROOMS FOR TEMPORARY SCHOOL FACILITIES

Funding for accessible safe rooms as part of a temporary school facility is if the damaged school contained a safe room or other space that served as a storm shelter and there are no other cost-effective, reasonable alternatives available to address the safety needs of the students and faculty.

If an applicant wishes to seek funding for a safe room as part of a temporary school facility, it must obtain prior approval from FEMA. The request needs to include:

- A description of the safe room or safe space that was used as a storm shelter prior to the incident;
- The population of students and faculty that need access to the safe room;
- Verification that no other cost-effective reasonable alternatives are within proximity that can be used as a safe space for the school population; and,
- An indication that the applicant will have the safe room installed and operational when school resumes and students occupy the temporary classroom space.

If approved, the safe room capacity is based on student population and the number of faculty who are expected to use the temporary school facility. The capacity of the safe room cannot exceed the pre-disaster capacity of the safe room in the damaged school. The safe room should be available no later than the opening day of classes at the temporary facility. The timeframe for providing PA funding for the temporary safe room space coincides with the approved timeframe for providing PA funding for the temporary school facility.

Safe rooms provided as part of a temporary school facility must comply with the requirements of *Safe Rooms for Tornadoes and Hurricanes* (FEMA P-361).[312]

## 6.    TEMPORARY RELOCATION COSTS

Eligible work or costs associated with the provision of temporary facilities include, but are not limited to:

---

[312] For more information, refer to: *Safe Rooms for Tornadoes and Hurricanes (FEMA P-361)*.

158

PAPPG v5

- Rental or purchase equipment and furniture necessary to continue the services in the temporary facility if the equipment and furniture was destroyed by the event (FEMA will provide a one-time purchase to replace destroyed equipment and furniture);

- Reasonable alterations of the temporary facility, if required to make the space functional based on the pre-disaster use of the damaged facility;

- Restoration of the temporary facility to its pre-disaster condition when no longer needed;

- Moving expenses to and from the temporary facility;

- Minimal life-safety or other building upgrades required by an applicable code or standard and in effect at the time the temporary facility is purchased or leased (e.g., a "change in use" could trigger the need for such work); and,

- Public outreach and messaging costs necessary to inform the public that the service will temporarily be provided at a different location.

FEMA does not provide PA funding for utility, maintenance, or operating costs in a temporary facility, even if these costs increase.

## 7.    TIME LIMITATIONS

The regulatory time limitation for temporary facilities (emergency work) is 6 months from the declaration date.[313]

Depending on the extent of damage to the facility, applicants may be unable to restore the facility to its pre-disaster design and function within 6 months. 44 C.F.R. provides recipients the authority to extend the deadline for emergency work for up to 6 additional months.[314] However, for temporary facilities, only FEMA has authority to approve any time extensions to the project deadline.

FEMA considers the timeframe necessary to restore the damaged facility when evaluating time extensions for temporary facilities. If an applicant requests funding for a temporary facility and knows at that time that the restoration of the original facility will exceed 6 months, FEMA may approve additional time and funding up to 12 months. If the applicant needs additional time beyond this 12-month deadline, it must submit a written time extension request that includes the status of the restoration work and timeline for completion in accordance with 44 C.F.R. § 206.204(2)(d).

FEMA only approves additional time if the applicant begins construction on the damaged facility within 12 months of the declaration date unless circumstances beyond the control of the applicant prevented starting the construction within this 12-month timeframe.

## i.    Conditions When Temporary Facility Funding is Limited

### a.    *Improved Project*

If FEMA approves an improved project for the permanent repair or restoration of a facility for which it also approved temporary relocation of the essential community services to a temporary facility, the temporary

---

[313] 44 C.F.R. § 206.204(c)(1).
[314] 44 C.F.R. § 206.204(c)(2)(ii).

PAPPG v5

facility is only eligible for PA funding for the estimated amount of time necessary to restore the facility to its pre-disaster design and function. If the actual time to restore the facility with the improvements extends beyond this timeframe and causes the applicant to continue its use of the temporary facility, FEMA does not reimburse any cost associated with that continued use. However, FEMA may reimburse costs associated with relocating its services back into the original, damaged facility as part of the approved temporary facility project.

### b.    Alternate Project

If FEMA approves an alternate project for the permanent repair, restoration, or replacement of a facility for which it also approved temporary relocation of the essential community services to a temporary facility, FEMA does not reimburse any temporary facility costs incurred after the date the applicant requests that alternate project.

### c.    Alternative Procedures Project

If FEMA approves an alternative procedures project for the permanent repair or restoration of a facility for which it also approved temporary relocation of the essential community services to a temporary facility, continued PA funding for the temporary facility is dependent upon the scope of work (SOW) of the alternative procedures project. Additional information about alternative procedures projects can be found in Appendix G: Alternative Procedures for Permanent Work.

## 8.    DISPOSITION REQUIREMENTS

If an applicant purchased or constructed a temporary facility, it must return to FEMA the federal share of the equity in the facility. Applicants must report the equity to FEMA when the approved deadline has expired or when the facility is no longer needed for the authorized purpose, whichever occurs first.

If FEMA only funded a portion of the cost of the facility, applicants must return to FEMA the federal share of FEMA's proportionate equity in the facility. The amount due to FEMA is computed by applying FEMA's percentage of participation in the cost of the purchase or construction to the fair market value or sale proceeds, taking into consideration reasonable out-of-pocket costs related to the sale.

Applicants may either retain the facility or sell it. If the applicant disposes of real property (land or structures) acquired with PA funding and acquires replacement real property using funds from the same PA project, it may use the net proceeds of the sale to offset the cost of the replacement property.

# V.  Snow-Related Activities

When the president declares an incident as a snowstorm or specifically authorizes snow assistance in a declaration for a severe winter storm, FEMA provides PA funding for impacts related to snow, but the assistance is limited.[315] The request for a major disaster declaration for a winter storm or snowstorm, must

---

[315] 44 C.F.R. § 206.227.

PAPPG v5

include a request for snow assistance to be approved in the declaration. See [Appendix K: Snow Declarations](#) for detailed information. FEMA does not authorize snow assistance for emergency declarations.

## 1.    LIMITED TIME PERIOD

Snow-related activities are eligible for a continuous 48-hour period to address the most critical emergency needs.[316] Each applicant designates the beginning of its 48-hour period. However, a state or territorial agency that conducts snow-related activities in multiple locations throughout the state or territory, such as a Department of Transportation, may use different 48-hour periods for different locations. Once FEMA approves a project for an applicant's designated 48-hour period, the applicant cannot change its selected period. If an applicant awards a contract for periods greater than the 48-hour period, PA funding is limited to the costs incurred during the designated 48-hour period. The FEMA Assistant Administrator of the Recovery Directorate may extend the eligible period by 24 hours in counties, parishes, or Tribal Nation areas where the snowfall exceeds the historical record snowfall by at least 50 percent. The applicant should submit a written request for the additional 24-hour time extension.

## 2.    ELIGIBLE WORK

Eligible work includes:

- Snow-related activities (for limited time as discussed above):
  - De-icing;
  - Salting;
  - Sanding of roads and other eligible facilities;
  - Snow dumps; and,
  - Snow removal;
- Other emergency protective measures including, but not limited to search and rescue and sheltering conducted during a declared incident that includes snow related activities. These emergency protective measures are not restricted to the 48 hours designated for snow related activities.

Limited snow-related activities necessary to carry out emergency protective measures, such as clearing snow in the immediate area of a downed power line, are eligible outside of the limited time period and in counties declared but not designated for snow assistance.

For severe winter storm declarations that do not specifically authorize snow assistance, FEMA only provides PA funding for limited snow-related activities that are necessary to perform otherwise eligible work. For example, snow removal necessary to repair downed power lines is eligible, while normal snow removal from roads (including salting and sanding) is ineligible.

## W. Emergency Repair or Stabilization

Emergency repair or stabilization of an eligible facility is eligible as emergency work if it eliminates or lessens an immediate threat.[317] To be eligible as category B eligible emergency repair or stabilization, work must be

---

[316] Ibid.
[317] 44 C.F.R. § 206.201(b).

temporary in nature. Emergency repair or stabilization work performed under an exigent circumstance that restores the pre-disaster design and function of the facility in accordance with codes and standards is permanent work,[318] not emergency work, with one exception – work to restore power (see Power Restoration in Chapter 8).

Emergency repair of a facility is ineligible if another federal agency has the specific authority to provide assistance for the facility (even if the repair is temporary),[319] such as for:

- Federal-aid highways – Federal Highway Administration (FHWA);
- Flood control works – U.S. Army Corps of Engineers (USACE); or
- Watershed structures – Natural Resource Conservation Service (NRCS).

For Tribal Nations specifically, although the Bureau of Indian Affairs (BIA) or FHWA may have authority to provide temporary emergency repairs of tribal roads, such roads are eligible for PA funding provided the Tribal Nation does not receive funding from BIA or FHWA for the work.

## 1. OPERATION BLUE ROOF (DFA ONLY)

Operation Blue Roof provides homeowners with plastic sheeting to cover damaged roofs until arrangements can be made for permanent repairs through contracts administered by USACE. The purpose of Operation Blue Roof is to protect property, reduce temporary housing costs, and allow residents to remain in their homes while recovering from the incident. Therefore, only dwellings that can be safely occupied after blue roof installation are eligible. The costs of these services are ineligible for reimbursement. However, FEMA may provide DFA for these services.[320]

## 2. SLOPE STABILIZATION

If a landslide or other slope instability is triggered by the incident and poses an immediate threat to life, public health and safety, or improved public or private property, emergency protective measures to stabilize the slope is eligible.

FEMA only provides PA funding for the least costly option necessary to alleviate the threat. FEMA limits eligible stabilization measures to the area of the immediate threat, not the entire slope. Work must be reasonable relative to the size and scope of the area of instability.

If slope instability is triggered by the incident and it is not apparent that the instability creates an unsafe condition that poses an immediate threat, PA funding for post-disaster inspections and limited geotechnical investigations is eligible to determine if an immediate threat exists.

Eligible emergency protective measures include, but are not limited to:

- Emergency drainage measures;
- Emergency ground protection to better stabilize the mass (rip rap, sheeting);

---

[318] 44 C.F.R. § 206.201(j).
[319] 44 C.F.R. § 206.226(a).
[320] For more information, refer to: USACE Temporary Roofing Fact Sheet.

PAPPG v5

- Partial excavation at the head of a sliding mass to reduce its driving force;
- Backfilling or buttressing at the toe of a sliding mass using measures, such as gabions, rock toes, cribwalls, binwalls, and soldier pile walls; and,
- Installation of barriers to redirect debris flow.

## 3.    MOLD REMEDIATION

The incident may cause facilities to be inundated or exposed to wet and humid weather conditions for extended periods of time. These conditions may cause growth and spreading of mold in structures and on contents, causing threats to public health and increasing the repair cost.

The following remediation activities are eligible as emergency protective measures:

- Wet vacuuming, damp wiping, or vacuuming with high-efficiency particulate air (HEPA) equipment of the interior space;
- Removal of contaminated gypsum board, plaster (or similar wall finishes), carpet or floor finishes, and ceilings or permanent light fixtures; and,
- Cleaning of contaminated heating and ventilation (including ductwork), plumbing, and air conditioning systems or other mechanical equipment.

Applicants may use a variety of mold cleanup methods to remediate mold damage based on the extent of damage and type of damaged material. Appendix H: Mold Remediation provides information for consideration when developing a SOW for mold remediation. Applicants must follow applicable SLTT government guidelines for mold sampling and remediation.

Note: Pre-remediation mold sampling is only eligible when the sampling reveals the presence of mold. Post-remediation sampling is eligible to confirm that remediation is complete.

FEMA only provides PA funding for mold sampling performed by an indoor environmental professional, such as a certified industrial hygienist, certified indoor environmental consultant, or certified microbial consultant. The indoor environmental professional should not be employed by the remediation company to avoid a conflict of interest. FEMA considers technical evaluations performed by licensed professionals when determining the eligibility of mold remediation.

For mold remediation to be eligible, mold must not be a result of poor facility maintenance or failure to take protective measures to prevent the spread of mold in a reasonable time after the incident. If an applicant can document and justify why it did not take measures to prevent further contamination, or why measures taken were insufficient to prevent further damage, mold remediation is eligible. Examples of extenuating circumstances include:

- Disruption of power;
- Facility is underwater;
- Facility is inaccessible;
- Heating, ventilation, and air conditioning (HVAC) equipment is damaged; and,
- Insufficient resources to remediate the entire facility.

PAPPG v5

FEMA evaluates whether the facility had pre-existing water infiltration conditions when determining whether mold remediation is eligible. For this evaluation, FEMA considers whether there is evidence of pre-existing damage or deferred maintenance, such as:

- Improperly sealed windows or exterior vents;

- Standing water against an exterior wall;

- Poorly maintained drains or gutters with rust or vegetative growth; and,

- Leaking and or water-stained ceiling tiles.

## 4. EMERGENCY BERMS ON BEACHES

If a natural or engineered beach has eroded to a point where flooding from a storm that has a 20 percent chance of occurring in any given year (5-year storm) could damage improved property, cost-effective emergency protective measures on the beach that protect the improved property against damage from that 5-year storm are eligible.

Eligible measures typically include the construction of emergency sand berms to protect against additional damage from a storm that has a 20 percent chance of occurring in any given year. Emergency sand berms are not intended to permanently restore the beach; they are intended only to provide protection from immediate threats. Applicants may construct emergency berms with sand recovered from the beach or with imported sand. If an applicant constructs the berms with imported sand, FEMA will only provide PA funding if the sand is from a source that meets applicable environmental regulations and one of the following circumstances exists:

- Recoverable quantities are insufficient; or

- SLTT government regulations prohibit placement of the recovered sand.

To show that flooding from a storm that has a 20 percent chance of occurring in any given year could damage improved property, applicants must demonstrate that the still water level plus wave runup elevation for a 5-year storm exceeds the post-incident elevation of the primary dune.

The 5-year still water level (SWL) is equal to the average water surface elevation of the rise in seawater level (surge) resulting from a storm that has a 20 percent chance of occurring in any given year, plus wave setup and the astronomical tide. The 5-year total water level (TWL) is equal to the elevation of the wave runup predicted for a storm that has a 20 percent chance of occurring in any given year plus the SWL. Locations where the elevation of the post-incident profile is less than the TWL are eligible for placement of an emergency berm to protect improved property. See Figure 15. Determining Eligibility of Emergency Berms on Beaches below.

PAPPG v5



**Figure 15. Determining Eligibility of Emergency Berms on Beaches**

Based on the average expected erosion for a storm that has a 20 percent chance of occurring in any given year, FEMA only provides PA funding for emergency berms constructed with up to 6 cubic yards per linear foot of sand above the 5-year stillwater level or the berm's pre-incident profile, whichever is less. In some cases, placing sand below the 5-year stillwater level may be necessary to provide a base for berm. The placement of that sand is also eligible as part of the emergency protective measure.

Placement of dune grass on an emergency dune or berm is only eligible if it is required by permit and is an established, enforced, uniform practice that applies to the construction of all emergency berms within an applicant's jurisdiction, regardless of the circumstance. If dune grass is required, the applicant must include the grass placement cost in the dune or berm construction cost when evaluating cost-effectiveness. Any maintenance of the dune grass after the initial installation is ineligible.

For berms located on natural beaches, or improved beaches which do not qualify as category G-eligible facilities, the category B work will not result in a dune eligible under category G in future disasters. If an applicant chooses to construct engineered dunes, the eligible work and costs are limited to that necessary for addressing the immediate threat.

Applying eligible sand volumes to an aggregate total as the result of several disasters, to be used in a work-to-be-completed project, is not allowable for emergency berm sand since category B, by definition, addresses an immediate threat.

## X.  Elections and Polling Activities

Public Assistance may fund election-related work, as these services are essential to ensuring the continued function of communities. Disasters can damage or destroy the facilities that host these activities or render them unusable due to power outages. These facilities are often located in public buildings, such as schools or community centers, which may also be needed for disaster response and recovery efforts, like sheltering, potentially disrupting election activities.

165

If disaster-related damage impacts election facilities or voting equipment, Public Assistance is available to support work and costs, subject to cost-sharing requirements.

# XIV. Damage Caused During Performance of Emergency Work

Applicants may damage improved property, supplies, or equipment during the performance of eligible emergency response activities or debris removal operations.

The repair of damage to public property, supplies, or equipment is eligible as part of the respective emergency work (category A or B) project[321] if the damage was:

- Due to severe conditions resulting from the incident;
- Unavoidable; and
- Not due to improper or excessive use.

Replacement of damaged trees, shrubs, or other ground cover is ineligible as part of the repair work when damaged during eligible emergency work activities. Reasonable cost standards as outlined in Chapter 6: Cost Eligibility still apply. Crops and agriculture are not eligible for replacement.

For equipment damage, FEMA requires maintenance records to demonstrate that the equipment was regularly maintained and in good operational order prior to the incident, and details regarding when, where, and how the damage occurred.

Repair of damage to private property is only eligible if the above criteria is met and either:

- The property is an easement, and the applicant is legally responsible for repairing the damage it causes to the easement; or
- The applicant leased the property either for sheltering or for a temporary debris staging site, and the lease agreement establishes that the applicant is legally responsible for the repair.

Damage caused by snow-related activities conducted outside of the authorized period, as described under Snow-Related Activities in Chapter 7 is ineligible.

---

[321] Although the repairs may be permanent work, FEMA includes it on the emergency work project as damage resulting from the emergency work.

PAPPG v5

# Chapter 8: Permanent Work Eligibility (Categories C-G)

Section 406 of the Stafford Act authorizes FEMA to provide assistance for both permanent work (categories C-G) and building code and floodplain management administration and enforcement activities (category I). Permanent work is subject to insurance obtain and maintain requirements to protect facilities against future loss. This requirement applies to insurable facilities or property (buildings, contents, equipment, and vehicles). Work must also comply with all applicable environmental and historic preservation laws, executive orders, and regulations.

## I.     Facility Restoration (Categories C-G)

Permanent work (categories C–G) is work required to restore a facility to its pre-disaster design (size and capacity) and function in accordance with applicable codes and standards. [322] Categories C-G work is subject to the eligibility of the facility as described under the Facility Eligibility section in Chapter 4 and shown in Figure 16. Permanent Work Eligibility.



**Figure 16. Permanent Work Eligibility**

Pre-disaster design means the size or capacity of a facility as originally constructed or subsequently modified. It does not mean the capacity at which an applicant was using the facility at the time of the incident if different from the most recent designed capacity. [323]

Pre-disaster function is the function for which the facility was originally designed or subsequently modified. For example, if an applicant designed and constructed an administrative building, but later altered it in accordance with applicable construction codes or standards to use as a school, the pre-disaster function would be a school. If the facility was serving an alternate function at the time of the incident, but was not altered to provide that function, FEMA provides PA funding to restore the facility either to the original pre-disaster function, or pre-disaster alternate function, whichever costs less. [324]

---

[322] 44 Code of Federal Regulations (C.F.R.) § 206.201(i). Although this section of 44 C.F.R. does not reference function as part of the definition of permanent work, 44 C.F.R. § 206.203(d)(2) states that if the applicant does not restore the function, it is an alternate project. See Public Assistance Mitigation Funds for Capped Projects in Chapter 8 for discussion on alternate projects.
[323] 44 C.F.R. § 206.201(j).
[324] 44 C.F.R. § 206.226(k)(1).

167

PAPPG v5



**Examples: Restoring to Pre-Disaster Design and Pre-Disaster Function**

- ▪ <u>Restoring to Pre-Disaster Design</u>: If a school designed for a capacity of 100 students is damaged beyond repair, the eligible funding for the replacement facility is limited to that necessary for 100 students, even if more than 100 students were attending the school prior to the incident.
- ▪ <u>Restoring to Pre-Disaster Function</u>: If the applicant is using an office building as a storage facility at the time of an incident, and it is less costly to restore the facility as a storage facility, only those repairs necessary to restore it as a storage facility are eligible.

# II.   Codes and Standards

To promote resiliency and reduce future risk in the repair and replacement of disaster damaged facilities funded by the PA Program, FEMA requires the application of codes and standards throughout project development.[325] FEMA has a framework and requirements for consistent and appropriate implementation of consensus-based design, construction, and codes, specifications, and standards for PA to promote resiliency and achieve risk reduction ("consensus-based codes, specifications, and standards"). Applicants must incorporate these consensus-based codes, specifications, and standards in the planning, design, and execution of eligible repair, replacement, or new construction[326] projects, as feasible. Locally adopted codes, specifications, or standards may also apply or exceed FEMA's requirements as detailed under the Locally Adopted Codes and Standards section below.

## A. Consensus-Based Codes, Specifications, and Standards

FEMA's consensus-based codes, specifications, and standards are intended to improve the resilience of PA-funded projects by establishing guidelines and standards to use as a benchmark. PA funding for eligible facilities must be in conformity with the latest published editions of relevant consensus-based codes, specifications, and standards that incorporate the latest hazard-resistant design provisions. These represent the minimum design criteria in cases where an applicant either has no code for the type of repair or restoration required, or the code's hazard resistance provisions are insufficient.

FEMA's consensus-based codes, specifications, and standards apply to permanent work projects for buildings, electric power facilities, roads, bridges, potable water facilities, and wastewater facilities. These codes apply when triggered by the type of repair or restoration required. However, the costs associated with ongoing operations and maintenance are not eligible under this policy.

Applicants are required to restore facilities in conformity with both local codes and FEMA's consensus-based codes, specifications, and standards. It is possible that applicants may have adopted a similar code to the one being required by the FEMA's consensus-based codes, specifications, and standards.[327] In these cases,

---

[325] For more information, refer to: Section 1235(b) | Consensus-Based Codes and Standards | FEMA.gov.
[326] This includes improved and alternate projects. Per 44 C.F.R. § 206.203(d), funding for improved and alternate projects is capped at the cost to restore the facility to its pre-disaster design and function in accordance with codes and standards, including the required codes and standards referenced in this section, that would otherwise be applicable to the facility if rebuilt as it existed.
[327] For more information, refer to the Locally Adopted Codes and Standards section in this chapter.

PAPPG v5

PA funds the use of these locally-adopted codes if the applicant can demonstrate their eligibility under FEMA's regulatory requirements discussed in more detail under Codes and Standards Eligibility Criteria in this chapter. State, local, Tribal Nation, and territorial (SLTT) codes or standards apply if they are equal to or more stringent or relate to facilities not covered by FEMA's consensus-based codes, specifications, and standards requirements, such as dams or levees.

Failure to include the required codes, specifications, and standards in eligible PA project restoration will result in denial or deobligation of project funding. However, there are situations where applicants are not required to follow FEMA's consensus-based codes, specifications, and standards, such as when:

- The jurisdiction has adopted codes that comply with 44 C.F.R. § 206.226(d) and have hazard-resistant elements that are the same or greater than those listed as FEMA's requirements;
- Implementing the required consensus-based codes, specifications, and standards would be technically infeasible;
- It would create an extraordinary burden on the applicant; or
- It would otherwise be inappropriate for the facility (such as adversely affecting a facility that is listed or is eligible to be listed on the National Register of Historic Places).

If any of the above conditions apply, Applicants may request a waiver for the incorporation of codes, specifications, and standards with approval from the Regional Administrator.

## 1.    IDENTIFICATION REQUIREMENTS

Applicants are responsible for identifying which of the consensus-based codes, specifications, and standards are applicable for each damaged facility, element, or component.

Applicable consensus-based codes, specifications and standards outlined in Appendix M. Consensus-Based Codes, Specifications, and Standards are the minimum design criteria for eligible projects. Once these applicable codes, specifications, and standards are identified, applicants should develop a description of the work required to comply with those standards. The description should:

- Identify specific elements or components affected and describe how each code, specification, or standard applies (include damage inventory line item numbers);
- Describe the work related to the codes, specifications, and standards and provide design drawings, component lists, or other similar documentation;
- Include dimensions and quantities for all components; and,
- Describe the direct relationship between disaster-related damage and any upgrades to undamaged elements.

In addition, applicants must use the following criteria when implementing any of the consensus-based codes, specifications, and standards:

- The consensus-based codes, specifications, and standards apply to the damaged facility, element, or component, as appropriate, based on the type of repair or restoration required to restore the facility to pre-disaster capacity and function.

169

- If the applicant elects to rebuild to an alternate or improved project that alters the pre-disaster function or capacity of the facility, the applicant must incorporate any applicable consensus-based codes, specifications and standards to the new capacity or function of the facility.

- In the case where the consensus-based codes, specifications, and standards are being applied and require an upgrade to an entire structural facility, including undamaged elements/components, the upgrade is only eligible for PA funding if there is a direct relationship between the upgrade work and eligible damage.

When the consensus-based code, specification, or standard allows for discretion or for variances in the facility design to be appropriate for the facility's location, these adjustments need to be identified, documented and submitted to FEMA for approval.

## 2.    VERIFICATION REQUIREMENTS

Compliance with the consensus-based codes, specifications, and standards requirements must be established by the applicant and will be validated by FEMA.

Upon completion of the project, the applicant must provide proof of compliance. Acceptable forms of proof include but are not limited to written certification by a registered engineer, design professional, or other qualified individual that the project was designed and constructed in compliance with the applicable consensus-based codes, specifications, and standards identified.

Failure to include these consensus-based codes, specifications, and standards or their equivalent in the planning, design and construction of eligible PA projects will result in the denial or deobligation of FEMA project funding.

## 3.    ADDITIONAL ELIGIBLE WORK AND COSTS

- FEMA may approve PA funding as part of a project for technical assistance support, which may include architectural and engineering design (A&E), at the applicable cost-share of the project, to assist communities that lack the necessary subject matter expertise to implement the required codes, specifications, and standards.

- Applicants may include the cost for purchasing a code, specification, or standard on a specific project in the engineering and design expenses for the project. This is a one-time purchase per disaster where the applicant can use the code, specification, or standard for similar projects.

- Funding for capped projects will be based on the estimated amount to restore the facility to its pre-disaster capacity and function including any eligible work such as work required by the consensus-based codes, specifications, and standards.

- The scope of work will be based on pre-disaster capacity unless the adopted code or standard requires an increase to that capacity.

## 4.    OTHER CONSIDERATIONS

- When evaluating whether a facility is eligible for replacement under 44 C.F.R. § 206.226(f), upgrades to meet the identified required consensus-based codes, specifications, and standards will be treated in the same manner as locally adopted codes, specifications, and standards for the purposes of calculating repair and replacement costs.

PAPPG v5

- When a consensus-based code, specification, or standard offers discretion in design, FEMA will fund the least expensive alternative unless FEMA determines, after demonstration by the applicant's engineer, design professional, or other qualified individual that another alternative provides greater hazard risk reduction to the facility. In making a determination, FEMA will consider the additional risk reduction, the additional cost, technical feasibility, and whether the alternative is better achieved through other programmatic options, such as mitigation funding.

## B.  Locally Adopted Codes and Standards

SLTT governments may have their own codes and standards that are required in the local jurisdiction as opposed to those required by the federal government as a condition of the grant. FEMA provides PA funding to restore facilities based on pre-disaster design and function in conformity with all current applicable codes, specifications, and standards. [328] Applicants must provide documentation to support the eligibility of facility upgrades required by codes or standards.

If the applicant identifies different locally adopted codes, specifications or standards that are the equivalent to or more stringent than the consensus-based codes, specifications, and standards, FEMA requires the applicant's engineer, design professional, or other qualified individual to justify that the hazard-resistant design criteria in the locally adopted code, specification, or standard is equivalent to or more stringent than those approved under FEMA's consensus-based codes, specifications, and standards. If the local code meets or exceeds the specifications of those in FEMA's requirements, FEMA will provide funding to meet that code if it also meets the criteria in the Codes and Standards Eligibility Criteria section below.

## C.  Codes and Standards Eligibility Criteria

Facility repairs and new construction may "trigger" upgrade requirements established by codes or standards. Upgrades required by federal or SLTT repair or replacement codes or standards are eligible only if the code or standard meets the criteria [329] below:

- Applies to the type of repair or restoration required;

- Is appropriate to the pre-disaster use of the facility;

- Is reasonable, in writing, formally adopted and implemented by the SLTT government on or before the declaration date, or is a legal federal requirement applicable to the type of restoration;

- Applies uniformly; and,

- Was enforced during the time it was in effect.

Details about each of these criteria are discussed in the following sections.

### 1.    APPLIES TO THE TYPE OF RESTORATION REQUIRED

Codes and standards must apply to the type of restoration required. Codes and standards for new construction are often different than codes and standards for repair work. If FEMA determines a facility is eligible for replacement, compliance with current codes and standards for new construction is eligible. If

---

[328] Stafford Act § 406(e); 42 U.S.C. § 5172(e); 44 C.F.R. § 206.226(d); 44 C.F.R. 206.221(i).
[329] 44 C.F.R. 206.226(d).

PAPPG v5

FEMA determines a facility is ineligible for replacement, only code-required upgrades applicable to repairs are eligible.

Depending on the type of restoration work, a code or standard may require:

▪ Upgrades to all structural components; or
▪ In addition to upgrades to all structural components, upgrading the non-structural components into conformance with current codes or standards for new construction.

 **Example: Code-Required Upgrade Triggering Further Upgrades**

One example of a code-required upgrade triggering further upgrades to additional undamaged structural components may be damages primarily caused by wind and seismic effects to a building resulting in substantial structural damage (SSD) of the gravity load-carrying elements of the facility. This triggers the professional evaluation of the lateral force-resisting elements of the facility and upgrades if the evaluation shows those structural components do not meet International Existing Building Code (IEBC) criteria. SSD, gravity load-carrying elements, and lateral force-resisting elements are defined in the International Existing Building code in terms of capacity loss. Only an evaluation by a licensed professional in compliance with IEBC criteria can determine SSD.

If an upgrade to an entire structural or non-structural system within a building is triggered by an eligible code or standard, the upgrade is only eligible if there is a direct relationship between the upgrade and the eligible work.[330] Eligibility is limited to code compliance for discrete elements within the system that was damaged.

 **Terminology**

**Substantial structural damage** is defined in the International Existing Building Code in terms of capacity loss and requires evaluation by a licensed engineer and/or retrofitting of certain structural elements beyond the damaged components.

FEMA evaluates the eligibility of the work to upgrade or change the configuration of damaged systems for reasonableness with respect to the type and extent of damage.

 **Examples: Codes or Standards that Do Not Apply to the Restoration Required**

▪ An applicant requests PA funding for the repair of a damaged building and the construction of a parking garage. The applicant states that while there was no parking garage prior to the incident, zoning codes and other local ordinances now require one. Because parking improvements have no relationship to the disaster-related repairs, they do not apply to the type of restoration required and are ineligible.

---

[330] 44 C.F.R. § 206.223(a)(1).

172

PAPPG v5

> ▪ An applicant requests PA funding for a project involving repairs to discrete damaged portions of a road's shoulders. The applicant states that a code or standard that applies to new construction, or the rehabilitation of an entire road, requires the construction of paved shoulders, drainage swales, and berms. Because the improvements, such as drainage swales and berms have no relationship to discrete damaged portions of a road's shoulders, the construction of these improvements is ineligible.

## 2.    APPROPRIATE TO PRE-DISASTER USE

Codes and standards must be appropriate to the pre-disaster use of the facility. FEMA determines the eligibility of code-required upgrades based on the facility's pre-disaster design or actual use at the time of the disaster. The least costly of the following is eligible:

- ▪ Pre-disaster use of the facility, if serving the same function for which it was originally designed; or
- ▪ Alternate use of the facility, if serving an alternate function at the time of the incident.

 **Example: Code or Standard Not Appropriate to the Pre-Disaster Facility Use**

The original design of a facility was a warehouse; however, the applicant was using the facility as a classroom before the incident. Restoring the facility as a classroom in conformance with classroom codes or standards would not be eligible if it would cost more than restoring the facility as a warehouse in accordance with code or standards applicable to a warehouse. It would be eligible if it would cost the same or less than restoring the facility as a warehouse in accordance with codes or standards applicable to a warehouse.

## 3.    REASONABLE

Codes and standards must be reasonable. FEMA evaluates the eligibility of the work to upgrade or change the configuration of damaged systems for reasonableness with respect to the type and extent of damage. When determining reasonableness, FEMA:

- ▪ Examines the general reasonableness of the code or standard and the trigger for application of the code or standard;
- ▪ Determines whether the upgrade and trigger relate to the type of restoration required by the damage and whether the upgrade and trigger are justified based on the extent of damage;
- ▪ Considers whether the upgrade and the trigger are technically defensible from an engineering perspective; and,
- ▪ Determines whether the cost of the upgrade is reasonable.

FEMA may determine a very large upgrade based on a very low trigger to be unreasonable.

PAPPG v5

## 4.    WRITTEN, FORMALLY ADOPTED, AND IMPLEMENTED

Codes and standards must be in writing, formally adopted by the SLTT government, and implemented by the applicant on or before the declaration date, or be a legal federal requirement, such as an Americans with Disabilities Act (ADA)[331] or seismic safety requirement. The authority that has jurisdiction must:

- Approve the code or standard;
- Make it a matter of public record; and,
- Formally incorporate it into the building code or other applicable ordinance.

The code or standard must apply to the facility in question. For example, if a state has jurisdiction over a particular type of work and formally adopts a code or standard related to that work, a Tribal Nation or local government in that state does not necessarily have to formally adopt the code or standard for it to apply to its facility. The Tribal Nation or local government meets the above requirement if it shows that it has a history of enforcing the code or standard since it was adopted.

FEMA does not recognize codes or standards adopted by a private nonprofit (PNP) specifically for its facilities when determining whether compliance with codes or standards is eligible. FEMA also does not accept codes or standards adopted by agencies or divisions of SLTT governments that are not authorized to set codes or standards within the broad governmental jurisdiction of the SLTT government.

 **Example: A Standard that is Not in Writing, Formally Adopted, and Implemented**

FEMA approves funding to replace a culvert that was washed out by a flood. The state natural resources department denies the applicant's permit application for replacing the culvert and recommends the applicant to construct a bridge instead. The decision of the permitting officials is discretionary and not based on a written and formally adopted code or standard; therefore, the bridge construction is ineligible.

## 5.    APPLIES UNIFORMLY

Codes and standards must apply uniformly to all similar types of facilities, whether private or public, eligible or ineligible, in the applicant's jurisdiction or (if applicable) in a particular hazard zone within its jurisdiction.

For FEMA to find that a code or standard is uniformly applied, the code or standard must meet all of the following conditions. The code or standard must:

- Provide for uniform accountability in the event of noncompliance;
- Not be subject to discretionary enforcement by building or permitting officials; and,
- Not allow for selective application.

A code or standard must meet three tests to demonstrate that it is not selectively applied:

- The upgrade is generally triggered regardless of the cause of damage and is also triggered for renovations or improvements;

---

[331] For more information, refer to the Accessibility for Individuals with Disabilities section in this chapter.

174

PAPPG v5

- The code or standard is applied regardless of the source of funding for the work; and,
- The code or standard is not applied selectively based on the availability of funds.

 **Example: A Standard that Does Not Apply Uniformly**

A local jurisdiction has authority over all facilities, both public and private. A statewide code or standard imposes seismic retrofit requirements for all public buildings, but not for privately-owned buildings. The seismic retrofitting is ineligible as it does not apply uniformly to all similar types of facilities within the applicant's jurisdiction.

## 6.     ENFORCED

The code or standard must have been enforced during the time it was in effect. FEMA provides PA funding for costs related to an upgrade based on confirmation of previous enforcement and in reliance on continued enforcement. If the local jurisdiction subsequently violates this criterion, any additional work to comply with the code or standard is ineligible within the local jurisdiction.

If FEMA determines a jurisdiction has had no reasonable opportunity to enforce the code or standard, the upgrade is eligible with justification. A reasonable opportunity to enforce may be lacking when a code or standard is new or when a facility affected by the code or standard has not been damaged during the time the code or standard was in effect.

 **Example: A Code or Standard that was Not Enforced While in Effect**

A city's building code requires foundation upgrades when installing new or repairing old portable buildings. Prior to the incident, the city allowed for the installation of several new portable buildings without the code-required foundation upgrades. After the incident, the applicant requests funding to upgrade the foundation of several publicly owned portable buildings that have been damaged by the incident, citing the city's building code. The upgrades to the foundation of the damaged portable buildings are ineligible because the applicant had not been enforcing the standard.

## D. Ineligible Upgrades

Upgrades recommended by design standards, guidelines, policies, industry practices, or other non-mandatory provisions are ineligible if the provisions do not meet all of the criteria noted in FEMA's consensus-based codes, specifications, and standards or under Codes and Standards Eligibility Criteria in this chapter. Ineligible upgrades include those based on non-mandatory or non-prescriptive standards.

Upgrades FEMA initially deems ineligible but enhance a facility's ability to resist damage in a future incident may be eligible for funding as PA mitigation (see Hazard Mitigation in this chapter) or through FEMA's Hazard Mitigation Grant Program (HMGP)[332].

---

[332] For more information, refer to: Hazard Mitigation Grant Program (HMGP) | fema.gov.

**175**

Additional capacity necessary due to increased population or use of a building, even if required by code, is ineligible.

## E. Accessibility for Individuals with Disabilities

The ADA[333] and other disability rights laws, such as the Architectural Barriers Act (ABA), require that all newly constructed facilities be accessible to and usable by individuals with disabilities and that repairs that might affect the ability of individuals with disabilities to use the facility comply with accessibility standards.[334] In some circumstances, FEMA provides PA funding for accessibility compliance requirements. FEMA funded activities and programs must be physically accessible to people with disabilities and access and functional needs.[335] [336]

FEMA provides PA funding regardless of whether the facility was in compliance prior to the incident, provided the applicant was not cited for a violation. If the applicant was notified of being in violation of a requirement prior to the incident and did not bring the facility into compliance, then accessibility requirements related to the violation are ineligible.

Some exceptions apply when ADA requirements threaten or destroy the historic significance of qualified historic buildings and facilities.[337] FEMA addresses these provisions during its consultation with the state historic preservation officer (SHPO) and/or tribal historic preservation officer (THPO) and incorporates them into the agreement regarding the repairs to the building.

FEMA may also provide PA funding for additional SLTT government ADA requirements that meet the eligibility criteria for codes or standards, as described under Locally Adopted Codes and Standards in this chapter.

## F. Path of Travel

If the primary function area sustained disaster damage and the path of travel to the primary function area has not sustained damage (or has sustained less damage), FEMA may provide PA funding for reasonable changes required by an eligible code or standard. The purpose is to increase accessibility to undamaged elements that serve the primary function area. These changes may include accessible entrances, accessible path of travel to the primary function area (by ingress and egress), accessible parking, equal access to services (interior routes), and an accessible approach to public areas,



**Figure 17. Path of Travel**

---

[333] For more information, refer to: Guide to the ADA Accessibility Standards | access-board.gov.
[334] 42 U.S.C. § 12147(a); 28 C.F.R. § 35.151(b).
[335] Stafford Act, § 308; 42 U.S.C. § 5151.
[336] Section 504 of the Rehabilitation Act of 1973.
[337] 28 C.F.R. § 36.405.

176

PAPPG v5

such as restrooms, water fountains, and emergency/evacuation routes.

FEMA may provide PA funding when the code-required alterations have a reasonable and technically supportable relationship to the damaged elements of the facility (e.g., installing grab bars, enlarging toilet stalls, insulating pipes, or installing accessible faucet controls).[338] Applicants are not limited in the amount that they may fund for ADA improvements for their path of travel access, but the PA funding cannot exceed 20 percent[339] of its total funding to restore the primary function area.[340] If the costs for ADA upgrades exceed the 20 percent threshold, the applicant must prioritize elements that will provide the greatest access.[341]

If an applicant engages in repairs that are ineligible for PA funding, the cost of requirements triggered by those repairs are ineligible.

 **Terminology**

A **primary function area** is the area where a major activity occurs for which the facility is intended. Examples include the dining area of a cafeteria, meeting rooms of a conference center, and public offices providing governmental services to the public.

**Path of travel** includes a continuous, unobstructed way of pedestrian passage to the primary function area. This includes interior and exterior approaches, such as hallways, doorways, sidewalks, streets, parking areas, and public transit drop points. See Figure 17. Path of Travel.

**Service facilities** to the primary function area include restrooms, telephones, and drinking fountains.

## G. Permit Requirements

If a federal or SLTT government permitting agency requires additional work based on a code or standard that does not meet the criteria under Codes and Standards Eligibility Criteria in this chapter, the cost of the additional work is only eligible if the work:

- Does not change the pre-disaster size, capacity, or function of the facility;
- Applies to the type of repair or restoration required;
- Is reasonable based on the type and extent of damage; and,
- Is an established, enforced, uniform practice that applies to all similar types of facilities within the applicant's jurisdiction, regardless of the circumstance.

---

[338] 28 C.F.R. § 35.151(b)(4)(iii)(B)(2).
[339] For calculation purposes, the total costs of the primary function area repair include the repair costs of the roof, heating, ventilation, and air conditioning (HVAC) systems, mechanical rooms, janitorial closets, locker rooms, and private offices directly associated with the repair of the primary function area.
[340] 28 C.F.R. § 35.151(b)(4)(iii)(A).
[341] 28 C.F.R. § 36.403 (g)(2).

177

PAPPG v5

## H. Additional Resources

Applicants are encouraged to visit FEMA's Building Science Resource Library[342] for additional information on the contents and potential applicability of select building codes that FEMA supports. These include appropriate building codes, standards, specifications, and national or local floodplain management ordinance compliance. If a community has adopted and enforces local building codes, floodplain management requirements must be met for all construction located in a special flood hazard area. Compliance with the minimum codes and standards do not always guarantee compliance with national or local floodplain management ordinances.

# III.    Hazard Mitigation

Additional funding to protect an applicant's facilities may be eligible as PA hazard mitigation.[343] Hazard mitigation[344] measures are those taken to help avoid repetitive damage from multiple disasters, reduce the potential for future damage to an eligible facility, and provide long-term solutions to the increasing frequency and severity of natural hazards. PA hazard mitigation allows work beyond code and standard requirements. In cases where the proposed resilience measure(s) exceed a code or standard requirement, eligibility is evaluated based on the work that is above and beyond the code requirements. Upgrades required to meet applicable codes and standards are not mitigation measures because these measures are part of eligible restoration work.

Approved PA hazard mitigation measures are considered part of the total eligible cost of repair, restoration, or reconstruction of a facility. In cases where the eligible repair costs are fully covered by insurance, the PA hazard mitigation may still be eligible if the "total eligible project cost," including mitigation, meets or exceeds the minimum project threshold.

## A. Eligibility Criteria

FEMA evaluates proposed PA mitigation measures for eligibility, cost-effectiveness, technical feasibility and effectiveness, and compliance with Environmental and Historic Preservation (EHP) laws, regulations, and executive orders (EOs). In addition, FEMA ensures that the mitigation does not negatively impact the facility's operation or surrounding areas or create susceptibility to damage from another hazard. FEMA provides PA funding for engineering analysis and design services, including surveys, to develop a potential hazard mitigation proposal (HMP) if the work is included in the approved mitigation scope of work (SOW) and the work has been completed.

To be eligible for PA hazard mitigation funding, measures must directly reduce potential for future damage to the damaged portion(s) of the facility, meet cost-effectiveness criteria, and comply with all other federal,

---

[342] For more information, refer to: FEMA Building Science Resource Library | fema.gov.

[343] FEMA also refers to PA hazard mitigation as 406 mitigation. Section 406 of the Stafford Act provides funding for cost-effective measures that increase the resilience of disaster damaged facilities against future incidents.

[344] 44 C.F.R. § 206.2(a)(14).

PAPPG v5

state, local, tribal, and territorial legal requirements. PA hazard mitigation may only be included in facility restoration permanent work (categories C-G) projects, not emergency work projects.

Details about each of these requirements are discussed in the following paragraphs.

## B. Future Damage Reduction

To ensure protection of the disaster-damaged facility, FEMA evaluates proposed measures to determine feasibility and the capability of the mitigation measure to protect against disaster damages, regardless of hazard type.

Generally, eligible PA mitigation measures are those that applicants perform on damaged portion(s) of a facility. PA mitigation measures protecting damaged portion(s) of a facility may also protect other portions of the facility. If an applicant proposes mitigation measures that are distinct and separate from the damaged portion(s) of the facility, FEMA evaluates the proposal and determines eligibility based on how the measures protect the damaged portion(s) of the facility.

 **Examples: Potentially Eligible Hazard Mitigation Measures That are Not Applied Directly to the Damaged Portion of the Facility**

Examples of eligible PA hazard mitigation measures that may be separate and distinct from the damaged portion(s) of a facility include, but are not limited to:

- Constructing floodwalls or vegetated swales around damaged facilities;
- Installing new drainage structures (including culverts or permeable pavements) along a damaged road;
- Applying fire-resistant materials and/or creating defensible space around eligible facilities; and,
- Dry floodproofing both damaged and undamaged buildings that contain components of a system that are functionally interdependent (i.e., when the entire system is jeopardized if any one component of the system fails).

If FEMA determines that mitigation measures are ineligible as PA hazard mitigation (e.g., the mitigation measures do not protect the damaged portions of the facility against future risk), applicants may request to use hazard mitigation funding under FEMA's Hazard Mitigation Grant Program (HMGP). This provides protection to undamaged portions, while utilizing PA mitigation funds to provide protection to damaged portions.[345] Applicants may use both PA hazard mitigation and HMGP mitigation funds to implement mitigation measures on the same facility, but not for the same work.

If FEMA approves PA funding for mitigation and the applicant does not complete the PA mitigation work, FEMA will deobligate the PA mitigation funds.

---

[345] For more information, refer to: Hazard Mitigation Grant Program (HMGP) | fema.gov.

# 1.    COST EFFECTIVENESS

To be eligible for PA hazard mitigation funding, mitigation measures must be cost effective.[346] FEMA considers PA hazard mitigation measures to be cost-effective if any of the following criteria are met:

- The cost for the mitigation measure does not exceed 15 percent of the total eligible repair cost (prior to any insurance reductions) of the facility or facilities for which the mitigation measure applies; or

- The mitigation measure is specifically listed in Appendix J: Cost-Effective Public Assistance Hazard Mitigation Measures and the cost of the mitigation measure does not exceed 100 percent of the eligible repair cost (prior to any insurance reductions) of the facility or facilities for which the mitigation measure applies; or

- The recipient or applicant demonstrates through an acceptable benefit-cost analysis (BCA) methodology that the measure is cost-effective, including FEMA's list of mitigation measures pre-determined to be cost-effective, using the FEMA BCA Toolkit.[347]

  o  Hazard mitigation measures that do not meet the first two requirements above may prove to be cost-effective based on a BCA. If the hazard mitigation measure is not cost-effective based on the first two criteria, FEMA and the applicant will work together to develop a BCA to determine whether it is cost effective.

A BCA is based on a comparison of the total estimated cost for the PA hazard mitigation measure to the total value of expected benefits to society. FEMA's BCA methodology considers common project benefits, which include reductions in the magnitude or frequency of:

- Damage to the facility and its contents;

- The need for emergency protective measures;

- The need for temporary facilities;

- Loss of function;

- Casualties (typically included only for earthquake, tornado, and wildfire mitigation); and,

- Previous impacts regardless of whether the impacts occurred in federal disaster declarations (only if documented).

FEMA's BCA methodology also considers additional social, environmental, and other benefits that do not directly impact hazard mitigation.

# 2.    COMPLIANCE WITH LEGAL REQUIREMENTS

To be eligible for PA hazard mitigation funding, mitigation measures must comply with applicable laws, regulations, and EOs as well as any federal or SLTT requirements. These may be different from an applicant's usual construction project compliance items.

Compliance with codes and standards may be required. FEMA evaluates the project's SOW under all codes and standards requirements to determine eligibility (see Codes and Standards in this chapter). Resilience measures that are more stringent than codes and standards are implemented as PA hazard mitigation. If an applicant identifies different locally adopted codes, specifications or standards that are the equivalent to or

---

[346] 44 C.F.R. § 206.226(e).
[347] For more information, refer to: FEMA BCA Toolkit | fema.gov.

more stringent than the consensus-based codes, specifications and standards, FEMA requires the applicant's engineer, design professional, or other qualified individual to demonstrate that the hazard-resistant design criteria in the locally adopted code, specification or standard is equivalent to or more stringent than those approved under FEMA's consensus-based codes, specifications, and standards.[348]

## 3.    PROPOSING PA HAZARD MITIGATION

An applicant, recipient, or FEMA may recommend that PA hazard mitigation measures be included in a project. Figure 18. PA Hazard Mitigation Process Flowchart provides an overview of the steps in the PA hazard mitigation process.



**Figure 18. PA Hazard Mitigation Process Flowchart**

Applicants may request assistance from FEMA hazard mitigation staff to identify and develop proposed hazard mitigation measures for their facility. These hazard mitigation measures are included in PA permanent work projects via hazard mitigation proposals (HMPs).

---

[348] For more information, refer to Consensus-Based Codes, Specifications, and Standards in this chapter.

## 4.    REDUCE ADVERSE IMPACTS

To reduce risk, applicants should design hazard mitigation measures to reduce susceptibility to another hazard, adverse impacts to facility operation, and adverse impacts to surrounding areas.

## 5.    POST-REPAIR HAZARD MITIGATION

PA hazard mitigation opportunities usually present themselves during facility repair. However, in cases where applicants need to repair a facility in an expedited manner, an applicant may miss an opportunity to implement hazard mitigation measures during repair. If an applicant implements hazard mitigation measures on a completed PA-funded repair, the mitigation work may still be eligible for PA funding; however, FEMA will not provide PA funding for any duplicative work triggered by the subsequent hazard mitigation.

## 6.    COMPLETED HAZARD MITIGATION ELIGIBILITY

In some instances, applicants may implement hazard mitigation measures after the incident occurs but before the incident is declared or before FEMA can evaluate the measure for eligibility. In these cases, the hazard mitigation work may still be eligible for PA funding if it is cost effective and FEMA confirms compliance with applicable EHP laws, regulations, and executive orders (EOs).

# C.  Historic Preservation Compliance

## 1.    FEDERAL REQUIREMENT

If the facility is listed in, or meets the criteria to be listed in, the National Register of Historic Places, and an applicable code or standard requires repair in a certain manner, costs associated with work to comply with that code or standard are eligible, even if repair costs exceed replacement costs. This is an exception to the regulatory requirement that when a facility is eligible for replacement, FEMA limits eligible costs to the less expensive of repairs or replacement (see Repair vs. Replacement in this chapter).[349]

## 2.    STATE, TRIBAL NATION, OR TERRITORIAL GOVERNMENT REQUIREMENT

If a state and territorial historic building code or standard requires specific work be performed, FEMA evaluates the code or standard using the eligibility criteria provided under the Codes and Standards section in this chapter. Most state historic building codes and standards encourage code officials to allow *less* intrusive alternatives to requirements of the prevailing codes or standards, but do not require any particular work be performed. As a result, the codes and standards usually fail to meet the eligibility criteria.

Tribal Nation historic preservation allows tribes to protect and identify historic places in ways that align with tribal values. These duties can include enforcing preservation laws, identifying and nominating historic places, and preserving traditional cultural properties.

---

[349] 44 C.F.R. § 206.226(f)(2) and (3).

PAPPG v5

## D. Public Assistance Mitigation Funds for Capped Projects

### 1.    IMPROVED PROJECT

Improved projects that involve facility replacement or relocation can include mitigation funding. If the capped amount for an improved project includes PA mitigation funds and the applicant either does not complete the PA mitigation work, or replaces or relocates the original facility, FEMA deobligates the PA mitigation funds.

### 2.    ALTERNATE PROJECT

If the SOW to restore a facility includes PA mitigation, and the applicant elects to proceed with an alternate project, FEMA does not include costs related to the PA mitigation in the capped amount for the alternate project.

## E. Construction Method

FEMA considers changes to the pre-disaster design or construction method (including materials) and can approve them if the changes are required due to access or accessibility issues, site conditions, or to tie into existing infrastructure. The changes must not impact the capacity or function of the facility. Applicants must show that the changes are reasonable based on the type and extent of restoration and are consistent with their general construction practices and legal requirements. Codes and standards may also require changes to pre-disaster design or construction methods.

## F. Pre-Existing Site Conditions

In cases where unrepaired, pre-existing conditions may compromise repair of disaster damage, FEMA provides PA funding to repair disaster damage contingent upon the applicant repairing the pre-existing damage. The costs associated with repairing the pre-existing damage are the responsibility of the applicant. For example, FEMA may determine that repairs to a damaged bridge deck are eligible. However, the deck cannot be repaired unless the applicant replaces the rotting timbers that support the deck.

# IV.   Flexible Restoration (Capped Projects)

FEMA offers flexible options that allow applicants to use PA funding for permanent work in ways other than restoring a facility to its pre-disaster design and function. For these options, FEMA limits (or "caps") the PA funding to the amount it would cost to repair or rebuild the facility as it was before the disaster, including costs for meeting current eligible codes and standards, as outlined in the Codes and Standards section of this chapter. Temporary facility funds are not included in fixed-cost projects. The three capped project options are: improved projects, alternate projects, and alternative procedures projects (see Appendix G: Alternative Procedures).

## A. Processing Projects with Capped Funding

Sometimes during the development of the SOW, applicants realize that restoring a damaged facility to its original condition may not be the best choice for the community's recovery. If this decision is made before the project is formulated, a best practice is to submit the project without adding additional damages or

183

PAPPG v5

scopes of work. This ensures that the project can be reviewed and processed more smoothly, without interference from other faster-moving project reviews in the PA process.

However, in many cases, the decision to pursue an alternative to restoring the facility or improving the facility (beyond codes and standards upgrades and mitigation measures) may be made after the project is formulated and obligated. In such situations, only the site opting for an alternate or improved project will have its funding capped. Other sites within the project will follow the standard process for small or large projects, based on the total project cost after any reductions. Applicants choosing a capped project must first obtain approval from their recipient before moving forward.

## B. Improved Project

Applicants may wish to make improvements to a damaged facility that are not required by eligible codes or standards, such as adding a new gymnasium to a school building or relocating a building outside a flood-prone area. An improved project is a project that restores the pre-disaster function of a facility and incorporates improvements or changes (including capacity changes) to the pre-disaster design. These changes may also include a facility replacement and/or hazard mitigation.

FEMA limits PA funding for an improved project to the lesser of the following:

- The federal share of the approved estimate to restore the damaged facility to its pre-disaster design and function; or
- The federal share of the actual costs of completing the improved project.

FEMA only increases eligible funding for an improved project if the applicant identifies an error or omission in the original scope of work or cost estimate related to restoring the facility to its pre-disaster design and function.

### 1.    USE OF IMPROVED PROJECT FUNDS

Applicants may use improved project funds to improve the damaged facility. The facility must have the same function that existed immediately prior to the disaster. An applicant must obtain approval from their recipient before proceeding with an improved project.[350] The following are examples of improved projects:

- Laying asphalt on a gravel road;
- Replacing a firehouse that originally had two bays with a firehouse that has three bays;
- Incorporating requirements dictated by a code or standard that does not meet PA eligibility criteria; and,
- Relocating a facility when FEMA is not requiring the relocation.

The funding available for PA hazard mitigation for an improved project is limited to the amount that would have been available if the facility had been restored to its pre-disaster design. If the capped amount for an improved project includes PA mitigation funds and the applicant either does not complete the PA mitigation work or replaces or relocates the original facility, FEMA deobligates the PA mitigation funds.

---

[350] 44 C.F.R. § 206.203(d)(1).

PAPPG v5

Applicants can combine PA funds with funding from another federal agency to construct the improved project. However, FEMA cannot duplicate funds provided by another federal agency for the same work. In addition, applicants cannot use funding from another federal agency toward the non-federal cost share of the PA-funded project, with few exceptions. U.S. Department of Housing and Urban Development's (HUD) Community Development Block Grant – Disaster Recovery Program (CDBG-DR) is an example of a federal program that, in certain circumstances, may be used to meet the non-federal share of FEMA's PA program.[351]

If the improved project significantly changes the pre-disaster configuration of the facility, the recipient must forward the request to FEMA to ensure that the improved project complies with appropriate EHP laws, regulations, and EOs.

## C. Alternate Project

Applicants may determine that the public welfare is not best served by restoring the pre-disaster function of the damaged facility. When this occurs, the applicant must obtain FEMA's approval to apply PA funding toward a different facility (or facilities). FEMA refers to this as an alternate project. The alternate project must be a permanent work project that benefits the general public, serving the same general area that was being served by the original facility. See Chapter 10: Environmental and Historic Preservation for more information on the limitations and requirements for the disposition of the original facility.

FEMA limits federal funding for an alternate project to the lesser of:

- The federal share of the approved estimate to restore the damaged facility to its pre-disaster design and function; or
- The federal share of the actual cost of completing the alternate project.[352]

### 1.    USE OF ALTERNATE PROJECT FUNDS

Applicants may use alternate project funds toward a project that does not restore the pre-disaster function of the damaged facility. This includes the ability to:

- Repair, expand, mitigate, or construct a facility that would otherwise be an eligible facility under the PA Program;[353]
- Demolish facilities;
- Purchase capital equipment that has a useful life of at least 1 year and is equal to, or greater than, $10,000 per unit;
- Fund project shortfalls due to mandatory flood insurance reductions[354] taken from PA Program funding for repairs to buildings in special flood hazard areas (SFHAs);
- Supplement funds for an improved project; and,

---

[351] For more information, refer to: *FEMA-HUD CDBG-DR Flexible Match Implementation Guide*.
[352] 44 C.F.R. § 206.203(d)(2)(ii) and (iii).
[353] 44 C.F.R. § 206.203(d)(2)(iv).
[354] For more information, refer to the National Flood Insurance Program section in this chapter.

- Conduct cost-effective hazard mitigation measures, regardless of whether the facility was damaged by the incident and whether the measures reduce the risk of future damage from the same type of incident or of the same type of damage caused by the incident.

Alternate project funds may be used for hazard mitigation provided that:

- Funding does not duplicate other FEMA mitigation funding; and,
- Measures reduce the risk of future damage to a facility that is otherwise eligible either under the PA or Hazard Mitigation Assistance (HMA) programs. If the measures are the same type as those eligible for HMA funding, they must meet a need for governmental services and functions or eligible PNP services and functions in the area affected by the incident.

If an alternate project involves construction, the applicant must obtain FEMA approval prior to the start of construction as FEMA must ensure that it complies with appropriate EHP laws, regulations, and EOs.[355] If the SOW to restore a facility includes PA mitigation, and the applicant elects to proceed with an alternate project, FEMA does not include costs related to the PA mitigation in the capped amount for the alternate project.

Applicants may not use alternate project funds to:

- Meet budget shortfalls;
- Create a new community plan;
- Landscape;
- Pay for operating expenses;[356]
- Purchase supplies, furniture, or equipment costing less than $10,000 per unit;
- Pay the non-federal share of any PA project;[357]
- Fund buyouts for mitigation, such as acquisition of flood-prone property to create open space;
- Supplement funds on projects that utilize other federal agency grants; or
- Fund a project located in a FEMA-designated floodway.

# V.    Eligibility Considerations by Facility

This section details the types of facilities captured within each category (C-G) of permanent work along with specific eligibility criteria related to one or more of the facilities within each category. See Appendix I: Work Eligibility Considerations by Type of Facility for a summary of eligibility by facility type.

## A. Roads and Bridges (Category C)

### 1.        COMPONENTS

Roads may be paved, gravel, or dirt. Road components include, but may not be limited to:

---

[355] 44 C.F.R. § 206.203(d)(2)(v).
[356] Ibid.
[357] 44 C.F.R. § 206.203(d)(2)(v).

PAPPG v5

- Surfaces;

- Bases;

- Shoulders;

- Ditches;

- Drainage structures, such as culverts, vegetated swales, and water bars,

- Low water crossings, inlets, outfalls, swales; and,

- Associated facilities, such as lighting, sidewalks, guardrails, and signs.

Bridge components include, but may not be limited to:

- Decking;

- Guardrails;

- Girders;

- Pavement;

- Abutments;

- Piers;

- Slope protection;

- Approaches; and,

- Associated facilities, such as lighting, sidewalks, and signs.

## 2.    ROAD AND BRIDGE ELIGIBILITY FOR PERMANENT WORK

Public roads are any publicly-owned, non-federal aid street, road, or highway for which an eligible applicant has legal responsibility. Some private non-profit applicants may have eligible roads and sidewalks, such as on a school campus.

FEMA is prohibited from providing PA funding when another federal agency has specific authority to restore facilities damaged or destroyed by an event which receives a major disaster declaration. However, if a Tribal Nation has received funding from the Bureau of Indian Affairs (BIA) or FHWA for construction or maintenance of their roads, those roads are still eligible for PA funding under presidentially declared major disasters for debris removal, emergency protective measures and permanent restoration, if they meet the other eligibility requirements. Tribal roads that receive FHWA Emergency Relief (ER) Program[358] funding continue to be ineligible for PA funding for permanent restoration. Additionally, roads owned by a Tribal Nation are eligible for PA even if they are not open to the general public.

FHWA has authority to restore public roads and bridges under the Emergency Relief (ER) Program. Roads and bridges that are eligible for ER assistance are identified as federal-aid routes, which include highways on the federal-aid highway system and all other public roads not classified as local roads or rural minor

---

[358] For more information, refer to: Emergency Relief Program - Federal Highway Administration | dot.gov.

187

collectors and includes all elements within the cross section of a highway that are damaged as a direct result of a qualifying disaster.

The ER Program is activated separately from presidential declarations under the Stafford Act and may not be activated for all incidents. Federal-aid routes and ancillary facilities are ineligible for permanent work even if the ER Program is not activated or if the program is activated but FHWA does not provide funding for the work. FHWA also has authority to assist with restoration of transportation facilities under the Emergency Relief for Federally Owned Roads (ERFO) Program, including tribal transportation facilities, federal land transportation facilities, and other federally owned roads open to public travel under the ERFO program. [359]

Private roads are those that are not owned or operated by or otherwise the legal responsibility of a federal or SLTT entity (including orphan roads, roads in gated communities, homeowners' association roads, etc.). These roads are ineligible.

## 3.    TYPES OF DAMAGE

The repair of damage to eligible roads and bridges caused by the disaster event is eligible under the PA Program.

The incident may cause minor damage to roads that results in damage similar to that which may occur over time from other causes, such as the age of the road, traffic flow, and frequent rain. Costs related to maintenance of roads are ineligible. Work to repair potholes or fatigue cracking is usually ineligible as this type of damage is rarely caused directly by one incident. Different types of damage to roads caused by flooding are discussed below.

### i.    Deterioration, Deferred Maintenance, Negligence

FEMA does not provide PA funding for repair of damage caused by deterioration, deferred maintenance, the applicant's failure to take measures to protect a facility from further damage, or negligence. When evaluating eligibility of reported road damage, in addition to evaluating how the incident caused the damage, FEMA reviews maintenance records or documentation establishing that the applicant has a routine maintenance program. In the absence of maintenance records, FEMA reviews material purchase invoices and activity logs and inspects other sections of the applicant's road system to confirm the performance of regular maintenance activities. More information on maintenance documentation requirements is available in Chapter 4: General Facility and Work Eligibility.

### ii.    Scour and Erosion

Work to repair scour and erosion damage to a channel or stream bank is only eligible if the repair is necessary to restore the integral ground of an eligible road, bridge, culvert, or drainage structure. Earthwork in a channel or stream embankment that is not related to restoring the structural integrity of an eligible facility is ineligible.

---

[359] For more information, refer to: Emergency Relief for Federally Owned Roads (ERFO) | dot.gov.

PAPPG v5

Work which involves replacing or upsizing drainage structures or culverts, or may have an adverse impact upstream or downstream, or on critical habitats, will require coordination with PA, EHP, and PA hazard mitigation staff to determine whether a hydrologic and hydraulic (H&H) study is needed. H&H studies are part of eligible permanent work projects and project costs (see Facility Located in or Impacting a Floodplain in this chapter).

## 4.    INUNDATED AND SUBMERGED ROADS

Restoration of sections of road with disaster-related surface damage will follow the guidance described above for roads and bridges. The guidance provided in this section explains the eligibility of funding for roads for which disaster damage is due to flood water inundation as a direct result of a federally declared major disaster. A submerged or inundated road is defined as a section of road that is covered by flood waters for any period of time. The inundation must have occurred as a direct result of a federally declared major disaster. When roads are inundated or submerged from flooding, driving on them can compromise the integrity of the road. When damage occurs on roads that have been inundated by flood water, FEMA provides funding for the repair when an applicant can substantiate the following conditions:

- The road is a public road;
- The road has visible (after flood waters have receded) and quantifiable damage that is a direct result of the major disaster, such as washouts, collapses, and slips; and,
- Traffic-induced surface damage is the result of emergency vehicles performing eligible emergency work or the road is a single-access road that is required to be reopened due to lack of detour/alternate routes.

### i.    Inundated Roads with Visible Damage

Work to repair road surface damage caused by the declared event (including damage from saturation and flood water inundation) that is visible and quantifiable during inspection once flood waters have receded, and directly attributed to the declared event is eligible for PA funding.

Examples of major visible and quantifiable surface damage caused by the declared event includes, but is not limited to, major erosion, washouts, collapses, and slips. Minor surface damage to roads caused by the declared event is often similar to damage that may occur over time from other causes, such as the age of the road, traffic volume, and frequent rain.

Distinguishing between pre-existing damage and minor damage caused by the declared event may be difficult. Distress evident on the surface, such as potholes or fatigue cracking is generally ineligible for repair as this type of damage is rarely caused directly by one incident.

When evaluating whether eligibility of reported damage to a road that was inundated or submerged was caused by the declared event, FEMA will evaluate the pre-disaster condition of the road and how the incident caused the damage.

### a.    Documentation to Support Claimed Damage

The minimum documentation to support damage to inundated or submerged roads includes:

189

PAPPG v5

**Table 23. Required Documentation and Information to Support Damage to Inundated or Submerged Roads**

| For Small and Large Projects |
|---|
| ▪ Pre-disaster and post-event photos or videos of impacted sections of road, or other documentation to demonstrate pre- and post-event surface condition. |
| ▪ Maintenance records or other documentation establishing that the applicant has a routine maintenance program. These maintenance records may include, if applicable: bridge inspection reports, public meeting or contract work records, documentation of a pavement evaluation program or pavement management system (e.g., a regular documented pavement inspection using standards found in Distress Identification Manual for the Long-Term Pavement Performance Program)*; [360] and, |
| ▪ Documentation of any repairs following pre-disaster assessment, specific to each section of road claimed and/or documentation of any post-disaster repair work already completed, specific to each section of road claimed. |

In the absence of those records, FEMA reviews material purchase invoices and activity logs (and whatever documentation is available) to determine if the damage was caused by the event. FEMA may review specific other sections of an applicant's road system to confirm the performance of regular maintenance activities and to assist in making an informed decision on the condition of the road at the time the disaster occurred.

FEMA does not provide PA funding for repair of damage caused by deterioration, deferred maintenance, an applicant's failure to take measures to protect a facility from further damage, or negligence.

## ii.    Inundated Roads without Visible Surface Damage

Restoration work for roads that have experienced inundation by flood waters as a direct result of a declared event is only eligible for PA funding if surface damage is visible and quantifiable during an inspection after the flood waters have receded. Claims of subsurface damage based on the findings of an inspection for sections of road without visible and quantifiable surface damage will not be considered eligible for PA funding. Accordingly, costs associated with methods of inspection on sections of road without visible and quantifiable surface damage are not eligible for PA reimbursement. This includes destructive and non-destructive methods of inspection, such as ground-penetrating radar, core sampling, soil boring, and falling weight deflectometers.

### a.    Projected Loss of Useful Service Life

Restoration work based on a projected loss of useful service life (that is the potential reduction in the road's remaining service life) is ineligible because it is not damage caused by the major disaster event. Service life is part of the design of roadways. Loss of useful service life is based on aging and use of the roadway. [361] For example, if an applicant is claiming subsurface deterioration of a section of road that has experienced

---

[360] For more information, refer to: DOT's *Distress Identification Manual for the Long-Term Pavement Performance Program (Fifth Revised Edition)*.
[361] See Loss of Useful Service Life in Chapter 6.

PAPPG v5

inundation based on the findings of an inspection,[362] this alone does not constitute disaster-related damage eligible for PA funding since such deterioration is not caused by a single incident but is the result of the use of the road and normal weather conditions over time.

### iii.    Surface Damage Resulting from Reopening Roads Prematurely

To help avoid damage to roads that have been inundated or had underlying layers saturated, applicants should allow time for saturated underlying layers and soil to dry out prior to reopening roads to normal traffic. If saturated roads are re-opened prematurely, they may sustain traffic-induced damage. This damage is not a direct result of the disaster and may constitute negligence. Therefore, it is not usually eligible for PA funding.[363]

Exceptions include:

- Surface damage caused by vehicles performing eligible debris removal or other emergency work under PA necessary as a result of the declared event, or

- Single-access roads that an applicant determined were required to be reopened for emergency response purposes due to lack of detour/alternate routes.

In such cases, the applicant must provide documentation to justify reopening the road prematurely as described below:

**Table 24. Required Information to Support Damage Resulting from Reopening Roads Prematurely**

| For Small and Large Projects |
|---|
| An explanation/justification for reopening the road prior to allowing saturated soil to dry (such as emergency response, the performance of eligible PA emergency protective measures, or emergency access); |
| For emergency response traffic, documentation of emergency call logs and a map showing the route taken by the emergency vehicle(s); or |
| If claiming surface damage from normal traffic loads due to reopening a single-access road immediately following the declared event or once flood waters have receded, documentation to support that no detour or alternate route was available, and the road was required to reopen for emergency access. |

### iv.    Closed Basin Flooding

Closed basin flooding[364] can result in roads that remain submerged indefinitely as water is not able to drain from closed basin areas. In such cases, waiting for flood waters to recede may not be feasible to assess potential damage and provide time extensions safely and effectively. PA funding may be used to raise the

---

[362] Including destructive and non-destructive methods of inspection, such as ground-penetrating radar, core sampling, soil boring, and falling weight deflectometers.
[363] See 44 C.F.R. §§206.223(a)(1) and (e).
[364] For more information, refer to: FHWA Emergency Relief Manual | dot.gov.

grades of eligible sections of road faced with long-term loss of use due to an unprecedented rise in closed basin water level when closed basin flooding is directly attributed to the declared event.

PA funding is generally limited to grade raises of highways and bridges of critical routes projected to experience long-term loss of use due to closed basin flooding, as demonstrated by an applicant. Only those routes that are critical to restoring traffic service are eligible for grade raises. Factors to evaluate whether individual routes are critical include: functional classification; provision of critical or essential community services (such as access for emergency response, schools, and mail/delivery vehicles); and availability of alternate routes and/or detours. FEMA, in coordination with the recipient and applicant, will determine if the claimed roadway is a critical route and eligible for grade raises based on the applicant's request for impacted sections of roads in closed basin flooding areas. It is not the intent of the PA Program to raise the grades in dips or other low spots along roadways that suffer inundation from chronic flooding problems.

If requested by an applicant, FEMA will also consider permanent reroutes to move roadways outside of closed basin flooding areas instead of grade raises if the applicant can demonstrate that a permanent reroute is more cost effective than grade raises. Reroutes are subject to relocation requirements as well as EHP review and approval to ensure the reroute does not have adverse impacts.

*a.    Documentation to Support Claimed Damage for Closed Basin Flooding*

Permanent work, including raising the grade of the roadway, is only eligible if an applicant can demonstrate all of the following for closed basin flooding:

**Table 25. Required Documentation and Information to Support Closed Basin Flooding**

| For Small and Large Projects |
|---|
| ▪ Information to support that the submerged section of road is in a closed basin flooding area; |
| ▪ Information to support the closed basin flooding was directly attributed to the declared major disaster event and the long-term loss of use of critical routes; |
| ▪ For long-term loss of use of critical routes, information demonstrating the length of time the roadway has been closed to traffic and is projected to remain closed to traffic based on the basin water level elevations that occurred as a direct result of the declared major disaster event; and |
| ▪ For closed basin flooding as a direct result of the declared major disaster event:<br>   o  Information showing that the water elevation in the closed basin has reached historically high levels;<br>   o  The rise in the water level occurred during the designated incident period;<br>   o  Historic water level elevation and rainfall intensity records; and/or,<br>   o  Maintenance reports or other information that provides some historical perspective on events and water levels within the closed basin. |

## v.    Gravel Roads

Gravel surface loss from damage or inundation is not assumed and cannot be based on projected or estimated loss. Applicants must be able to demonstrate actual gravel surface loss. This includes documentation indicating gravel loss directly attributed to the declared event (such as work logs and

PAPPG v5

material invoices quantifying the amount of aggregate gravel placed in the damaged section within 12 months of the start of the incident period) and/or photographs or video of the field of displaced gravel.

If an applicant chooses to lay gravel on a longer section of the road, FEMA only reimburses for the portion of the road that was disaster damaged. Gravel laid on non-disaster damaged sections of the road are not eligible.

Corrugation of gravel roads is not eligible for repair or restoration. Corrugation (or "wash boarding") is associated with traffic in dry conditions and not attributable to inundation.

 **Terminology**

**Corrugation** or "washboarding" comprises a series of ripples which occur with the passage of wheels rolling over unpaved roads at speeds sufficient to cause bouncing of the wheel on the initially unrippled surface.

**Rutting** of a roadway is a depression or groove worn into the surface of the road due to heavy traffic loads or wear over time. For gravel roads, rutting is generally removed by re-grading the road surface.

Any post event rutting of gravel roads may be the result of premature opening of the road. Consequently, the rutting is not eligible except under the limited circumstances outlined below.

*a.    Documentation and Information to Support Gravel Loss*

**Table 26. Required Documentation and Information to Support Gravel Loss**

| For Small and Large Projects |
|---|
| ▪ Documentation indicating gravel loss directly attributed to the declared event (e.g., work logs and material invoices quantifying the amount of aggregate gravel placed in the damaged section within 12 months of the start of the incident period); and, |
| ▪ Photographs or video of the field of displaced gravel. |

*b.    Documentation and Information to Support Gravel Road Rutting*

**Table 27. Required Documentation and Information to Support Gravel Road Rutting**

| For Small and Large Projects |
|---|
| ▪ For emergency response traffic, documentation of emergency call logs and a map showing the route taken by the emergency vehicle(s); and, |
| ▪ If claiming rutting from normal traffic loads due to reopening a single-access road immediately following the declared event or once flood waters have receded, documentation, such as a work log, indicating that the rutted section of road was graded, and surface aggregate applied prior to the event. |

193

PAPPG v5

5.    DEMONSTRATING DISASTER-RELATED DAMAGE

Submerged roads should only be assessed for visible and quantifiable surface damage after flood waters have receded to avoid additional damage. Applicants must substantiate surface damage claims with supporting documentation as described below. FEMA will not accept a damage report simply based on a claim that a section of road has experienced inundation without demonstrating any resulting surface damage. Similarly, damage repair to an inundated or submerged road is not assumed to be eligible simply because estimated repair costs were included in a joint preliminary damage assessment.

## B.    Water Control Facilities (Category D)

Water control facilities are those facilities built for the following purposes:

- Channel alignment;
- Recreation;
- Navigation;
- Land reclamation;
- Irrigation;
- Maintenance of fish and wildlife habitat;
- Interior drainage;
- Erosion prevention;
- Flood control; or
- Storm water management.

They include:

- Dams and reservoirs;
- Levees and floodwalls;
- Lined and unlined engineered drainage channels;
- Canals;
- Aqueducts;
- Acequias
- Sediment and debris basins;
- Storm water retention and detention basins;
- Urban stormwater management infrastructure;
- Coastal shoreline protective devices;
- Irrigation facilities;
- Pumping facilities; and,
- Navigational waterways and shipping channels.

194

PAPPG v5

## 1.    RESTORING THE CAPACITY OF CHANNELS, BASINS, AND RESERVOIRS

Restoring the pre-disaster carrying or storage capacity of engineered channels, debris and sediment basins, storm water detention and retention basins, and reservoirs is eligible, if the facilities were not constructed by a federal agency and if the applicant provides documentation to establish the following (see Table 28. Required Documentation and Information to Support Pre-Incident Capacity of Channels, Basins, and Reservoirs).

**Table 28. Required Documentation and Information to Support Pre-Incident Capacity of Channels, Basins, and Reservoirs**

| For Small and Large Projects |
|---|
| ▪ The pre-disaster capacity of the facility;[365] and, |
| ▪ That the applicant maintains the facility on a regular schedule. |
|    ○ Documentation supporting regular maintenance would be a written maintenance plan and/or activity logs documenting regular intervals of activity. Applicant logs documenting clearance of blockages in response to resident complaints are not sufficient to substantiate a regular maintenance schedule. |

If the applicant chooses to remove non-incident-related material along with that deposited as a result of the incident, the project is considered an improved project.

## 2.    FLOOD CONTROL WORKS

Flood control works are those structures such as levees, flood walls, flood control channels, and water control structures designed and constructed to have appreciable effects in preventing damage by irregular and unusual rises in water levels.

Restoration of damaged flood control works that are under the authority of another federal agency are ineligible. Secondary levees riverward of a primary levee are ineligible unless the secondary levee protects human life. See Appendix I. Work Eligibility Considerations by Type of Facility. for more information.

## C.    Buildings and Equipment (Category E)

Facilities under category E include buildings, contents, equipment, and vehicles. Specific to category E, insurance is generally available for buildings, contents, equipment, and vehicles, for most perils such as flood, wind, and fire; therefore, insurance should be the primary source of recovery for PA applicants.

## 1.    BUILDINGS

Buildings include all structural and non-structural components, including mechanical, electrical, and plumbing systems.

For buildings and building systems, distinguishing between damage caused by the incident and pre-existing damage may be difficult. Before making an eligibility determination, FEMA considers each of the following:

---

[365] Survey data that is either recent or covers a multi-year period to substantiate the amount of new material reasonably attributable to the incident can be used to support pre-disaster capacity claims.

195

- Evidence of regular maintenance as described in Chapter 4: General Facility and Work Eligibility;
- Evidence of pre-disaster condition, such as interior water stains from a leaky roof (in such cases, FEMA evaluates whether the roof was repaired prior to the incident);
- The severity and impacts of the incident; and,
- Whether the applicant took prudent actions to prevent additional damage.

Mold remediation and removal of mud, silt, or other accumulated debris is eligible as permanent work when conducted in conjunction with restoration of the facility.

A public housing authority facility is only eligible for permanent work if Congress does not appropriate funds to the U.S. Department of Housing and Urban Development (HUD) for the facility's emergency capital needs.

### i.     Earthquake Damage to Welded Steel Moment Frame Buildings

FEMA has specific eligibility criteria for evaluating and repairing earthquake damage to buildings constructed with welded steel moment frames. For details, see Safety Inspections in Chapter 7. Generally, detailed analytical or experimental studies or Level 2 evaluations as described in Recommended Post-Earthquake Evaluation and Repair Criteria for Welded Steel Moment-Frame Buildings (FEMA-P-352),[366] are ineligible unless FEMA provides approval before the applicant initiates the work. Repairs consistent with applicable International Existing Building Code[367] are eligible for reimbursement.

## 2.     CONTENTS AND SUPPLIES

Building contents include furnishings, equipment, consumable or other supplies, files, records, research-related contents, animals, irreplaceable collections and individual objects, library books, publications and specialized items related to the function of the building and the service it provides. Contents can also include equipment on the property rather than within the building. Replacing destroyed supplies with the same number of comparable items is eligible. Applicants may replace supplies with different items used for the same general purpose and FEMA caps the eligible cost at the estimated amount for items comparable to those damaged. Contents damaged as a result of the disaster are eligible even if the building housing the contents is not damaged (e.g. basement flooding which does not result in structural damage, rain driven through open windows or vents). More information about contents eligibility is available in Appendix I. Work Eligibility Considerations for Contents.

### i.     Files

Eligible activities associated with the recovery of files include, but are not limited to:

- Recovery of damaged hard copies;
- Stabilizing the damaged hard copies;
- Sanitizing damaged hard copies;
- Photocopying or scanning damaged hard copies to re-establish files; and,

[366] For more information, refer to: *Recommended Post-Earthquake Evaluation and Repair Criteria for Welded Steel Moment-Frame Buildings (FEMA-P-352)*.
[367] For more information, refer to: International Existing Building Code (IEBC) | iccsafe.org.

- Recovering data from water-damaged computer hard drives and portable or external drives.

Recovery of damaged hard copies includes labor and materials, such as bags, boxes, and containers. Stabilizing damaged hard copies includes freeze-drying. Photocopying or scanning includes labor and materials such as new folders and paper.

Not all activities are eligible. Examples of ineligible activities include:

- Establishing new information databases;
- Manually entering data that was lost in damaged computers;
- Scanning re-established hardcopy files into computers to create digital files; and,
- Deciphering photocopies of damaged hard copies.

### ii.    Library Books and Publications

Replacement of damaged or destroyed library books and publications is eligible based on the pre-disaster inventory of the quantities of the books and publications. Re-shelving, cataloging, and other work incidental to the replacement of library books and publications is also eligible.

However, special library collections, including rare books, manuscripts, and other fragile materials, are only eligible for treatment, not replacement.

### iii.    Irreplaceable Collections and Individual Objects

Collections and individual objects are artifacts, specimens, artworks, archives, public records, and other items that are often considered irreplaceable because of their artistic, educational, historic, legal, scientific, or social significance. They are nonliving and, therefore, do not include animals or plant material, and are usually one-of-a-kind. Eligible collections and individual objects may be in storage or on display in a public or PNP facility and may include items located outdoors, such as sculptures and public art installations. Documentation of collections and individual objects generally include accession, catalog, and inventories.

Stabilization of damaged collections or individual objects is eligible. Stabilization is a series of treatment measures to maintain the integrity of a collection or object and to minimize deterioration. Stabilization involves taking the minimum steps necessary to return a collection or object to a condition in which it can function in the same capacity as it did prior to the incident. This includes:

- Treating damaged items utilizing environmental controls to achieve proper temperature and humidity; and,
- Chemical or mechanical cleaning to stabilize items to prolong their existence, maintain their integrity, and minimize further deterioration from the damaging effects of the incident.

Additional treatment beyond stabilization is eligible if it is necessary to maintain the integrity of the collection or object and return it to its pre-disaster function.

197

PAPPG v5

 **Terminology**

**Archives** are materials created or received by a person, family, or organization, public or private, and preserved because of the enduring value they contain, or as evidence of the functions and responsibilities of their creator, especially those materials maintained using the principles of provenance, original order, and collective control.

**Accession** is a formal process used to legally accept and record a specimen or artifact as a collection item.

A **catalog** is a full record of information specific to an item and cross-referenced to other records and files, including identification and documentation of the material.

**Stabilization** is a series of treatment measures intended to maintain the integrity of a collection or object and to minimize deterioration. It involves the minimum steps necessary to return a collection or object to a condition in which it can function in the same capacity as it did prior to the disaster.

**Special library collections** include unique, rare, printed books, first editions (often author-signed), manuscripts, archives, artifacts, photos, engravings, graphics, music, and ephemera, as well as limited edition print runs of special collections of maps or other important topics.

In some cases, costs associated with restoring an item to pre-disaster condition as a result of the incident is eligible; however, restoring an item to original condition is ineligible. For example, repairing a tear in a painting that was a direct result of the incident may be eligible, whereas costs to remove signs of pre-disaster aging, such as layers of old varnish, are ineligible.

Costs associated with the development of a treatment plan for a damaged collection or individual object are eligible. Treatment needs to be conducted by a qualified conservation professional with the appropriate specialty and in accordance with the American Institute for Conservation Code of Ethics and Guidelines for Practice.[368] FEMA, in consultation with the recipient and applicant, may recommend no treatment when non-intervention best serves to promote the preservation of damaged items.

Replacement of destroyed irreplaceable collections or objects is ineligible. Collections and individual objects damaged to the extent that stabilization is not practicable or possible are considered destroyed.

Restoring materials, equipment, and exhibition furnishings associated with the storage, display, preservation, or exhibition of collections and individual objects is eligible. These may include, but are not limited to:

- Equipment regulating temperature or humidity;
- Exhibit panels;

---

[368] For more information, refer to: Code of Ethics and Guidelines for Practice | culturalheritage.org.

198

PAPPG v5

- ▪ Models; and,
- ▪ Video and audio equipment.

## iv.    Research-Related Contents

Reagents and specimen collections are eligible for replacement based on the following criteria:

The number of reagent units eligible for replacement will be equal to the number lost or the number needed to restore basic research activities, whichever is lower. FEMA reimburses the purchase price based on the cost from either commercial sources or other institutions, using the lesser of the two. However, reagents that are unique and considered outcomes of a research program are not eligible for replacement. In terms of specimen collections, replacing a representative portion, though not necessarily the entire collection, may be eligible. To qualify for replacement, the specimen types must be available for purchase from commercial sources or other institutions and support an ongoing eligible educational or medical program.

 **Terminology**

A **reagent** is a substance used in a chemical reaction to detect, measure, examine, or produce other substances. Some reagents are very common and available for purchase from commercial sources.

A **specimen** is a portion or quantity of material for use in testing, examination, or study, including blood plasma and flesh tissue.

A **specimen collection** is a repository of specimens related to biomedical, marine, or agricultural research.

## v.    Animals

Animals housed or exhibited in an eligible facility are eligible for replacement with the same number of comparable animals if they are:

- ▪ Injured to the extent they are no longer able to function for the intended purpose;
- ▪ Killed;
- ▪ A destroyed specimen; or
- ▪ A damaged specimen that is not recoverable.

An animal is ineligible for replacement if a comparable animal is not available for purchase, or the applicant is unable to obtain a comparable one at a reasonable cost.

The replacement of animals on loan to an eligible facility at the time they are destroyed is eligible if the applicant substantiates legal responsibility.

Additionally, FEMA may provide PA funding for actions taken to save the lives of these animals as a category B emergency protective measure.

PAPPG v5

 **Examples: Animals Eligible for Replacement**

Eligible animals may include, but are not limited to:

- Police animals;
- Trained and certified rescue dogs;
- Animals in museums, zoos, or publicly owned nature centers;
- Fish in fish hatcheries;
- Taxidermy specimens (animals preserved and mounted in lifelike representations);
- Animals used by rehabilitation facilities as part of diagnosis or treatment; and,
- Laboratory animals used in an active research program.

**Determining Costs**

The estimated cost to replace an animal is usually determined through market surveys. Costs associated with acquiring donated, loaned, or wild animals as replacement animals are eligible if they do not exceed the estimated cost of purchasing a comparable animal.

If a destroyed animal is replaced through a donation or loan of a comparable animal, the costs associated with purchasing a replacement comparable animal, will then become ineligible.

For laboratory animals, eligible costs associated with replacement include, but are not limited to, the replacement cost of a laboratory animal that is as genetically close as possible to, but does not exceed, the genetic progression of the lost animal AND can be reasonably procured commercially. If an identically genetic animal is not available, the eligible cost is based on a readily procured animal that is as genetically close as possible to the original animal. The applicant, using its scientific research staff, an independent member of the scientific community, or a certified expert, needs to make reasonable decisions on the genetic likeness of the replacement lab animals.

Ineligible costs associated with replacing laboratory animals include:

- The cost of reproducing a new animal with all the characteristics of the lost animal to re-establish research;
- The cost of using a laboratory to perform a breeding program to advance benchmark stock to the genetic changes lost because of the incident;
- The cost associated with surgery required to replace a surgically altered animal; and,
- The cost associated with the replacement of a laboratory animal when an animal of similar genetic characteristics can be obtained at no cost from other researchers or institutions.

If an applicant requests, and the recipient approves, other than in-kind and exact number of replacement animals, FEMA caps the federal share based on the estimated in-kind replacement costs.

200

PAPPG v5

## 3.    EQUIPMENT

Equipment includes vehicles or standalone machinery as well as construction or heavy equipment. Repairing damaged or replacing destroyed equipment with the same number of comparable items is eligible. [369] Comparable items are similar in age, condition, and capacity. Applicants may replace equipment with different items used for the same general purpose. This may include instances when a similar item is not reasonably available. However, when a used item (within a reasonable cost, time, or distance) is not available or does not meet applicable national consensus standards, the purchase of a new item with similar capacity is eligible. FEMA caps the eligible cost at the estimated amount for items comparable to those damaged.

 **Terminology**

**National consensus standards** are voluntary codes, specifications and standards that incorporate the latest hazard-resistant designs. [370] For a full list of FEMA's consensus-based codes, specifications, and standards, refer to Appendix M. Consensus-Based Codes, Specifications, and Standards.

If the cost to replace the item is less than the cost to repair it, FEMA limits PA funding to the replacement cost.

## 4.    VEHICLES

Vehicles include motorized on-road licensed vehicles and non-highway or off-road driven wheeled vehicles. When vehicles are not repairable, FEMA uses "blue book" values or similar price guides to estimate the eligible cost.

## D.    Utilities (Category F)

Utilities include:

- Water storage facilities, treatment plants, and delivery systems;
- Power generation, transmission, distribution, and storage facilities, including, but not limited to, wind turbines, generators, substations, anaerobic digestors, solar power installations, and power lines;
- Natural gas transmission and distribution facilities;
- Sewage collection systems and treatment plants; and,
- Communication systems.

## 1.    POWER RESTORATION

For power restoration projects that meet both emergency work and the permanent work eligibility criteria (i.e., being necessary to reduce or eliminate an immediate threat to life, health or safety and restoring the facility in accordance with applicable codes, standards and EHP requirements) applicants may either claim

---

[369] 44 C.F.R. § 206.226(h).
[370] For more information, refer to: Section 1235(b) | Consensus-Based Codes and Standards | FEMA.gov.

the work as an emergency protective measure (category B) or as permanent work (category F). However, straight-time force account labor for budgeted employees is not eligible for reimbursement when power restoration is claimed under category B. Additionally, funding for PA hazard mitigation is only available when power restoration is claimed as category F permanent work.

## 2.    RIGHT-OF-WAY CLEARANCE

It is the applicant's responsibility to maintain its right-of-way (ROW). However, FEMA may fund limited clearance of incident-related debris from the ROW to enable the applicant or emergency workers to obtain access to the facility. Additionally, if trees in the vicinity of the facility were damaged by the incident and an arborist confirms that the trees cause an immediate threat of further damage to the facility (e.g., overhead power lines), FEMA may provide PA funding to remove those trees. Any further clearance of debris in the ROW is ineligible for FEMA funding.

## 3.    POWER: TRANSMISSION AND DISTRIBUTION SYSTEM CONDUCTOR REPLACEMENT

For electrical transmission or distribution systems, determining the disaster-related damage to some components, such as poles, guys, and cross-arms, can usually be accomplished by visual inspection. However, determining the full extent of disaster-related damage to conductors is more challenging, particularly with older systems. A conductor is eligible for replacement when it is stretched beyond the point where it can be effectively repaired and re-sagged to meet appropriate clearances, sag, and tension, and to meet pre-disaster reliability.

 **Example: Conductor Spans**

The number of conductor spans is calculated by multiplying the number of conductors per span by the number of spans.

For example, a three-phase line section with three spans has 12 conductor spans:

- 4 conductors x 3 spans = 12

If a single conductor span has damage in more than one location, it only counts as one damaged conductor span. Similarly, if more than one conductor is damaged, it still only counts as one damaged span.

A conductor is only eligible for replacement (reconductoring) when an applicant cannot effectively repair it because one of the following exists within a line section:

- Twenty-five percent or more of the conductor spans have visible damage, such as broken strands, splices, or sleeves (installed as a result of the incident) or severe pitting, burns, or kinks;

- Thirty percent or more of the line spans are visually stretched (out of sag), or do not meet clearance requirements such as conductor-to-conductor or conductor-to–ground clearance;

- Forty percent or more of the supporting poles need to be replaced or plumbed (straightened). A pole is considered to be in need of straightening if it is leaning such that it is unsafe to climb;

- Forty percent or more of the supporting structures (other than poles) have damage such as broken cross-arms, braces, ties, insulators, guys, pulled anchors, or bent pins. If more than one element of the

PAPPG v5

support structure is damaged, it still only counts as one damaged support structure. If a pole is counted under the previous bullet, FEMA does not count the supporting structure under this criterion;

▪ Sixty-five percent or more of any combination of the damage described in the bullets above; or

▪ Evidence provided by a licensed professional engineer that demonstrates the conductor is damaged beyond repair.

If the applicant provides sufficient documentation establishing the pre-disaster condition and a line section of its system meets one of the six criteria above, that line section is eligible to be reconductored.

 **Terminology**

A **line section** is a group of contiguous spans selected for evaluation. A span is the distance between two poles or structures.

The applicant has flexibility in defining a line section. A line section can be:

▪ A single span

▪ All the spans between two dead-end structures

▪ All the spans on a feeder

▪ All the spans on a tap; or

▪ Any other group of contiguous spans that are evaluated together.

The use of #2 Aluminum Conductor Steel Reinforced (ACSR) is considered a lower cost alternative to replacing conductor with equal or lesser amperage capacity such as copper weld conductor, hard and soft drawn copper wire, smaller ACSR, and Amerductor. Therefore, if a conductor with equal or lesser amperage capacity to #2 ACSR is eligible for reconductoring, the line section is eligible to be replaced with #2 ACSR. When an applicant replaces conductor with #2 ACSR, adjustments to other components of the electric distribution and transmission systems to accommodate #2 ACSR, including, but not limited to, adjusting span lengths between utility poles, and increasing pole heights and standards to meet appropriate design requirements are eligible. Applicants do not need to cite a code or standard for this additional work even though the appropriate design requirements may come from federal or SLTT codes or standards, including National Electrical Safety Code or Rural Utilities Service (RUS) standards.

The use of advanced conductors or other technologies that improve the resilience of power generation, transmission, and distribution facilities may also be eligible for reconductoring when the community has adopted applicable electrical codes and standards, as referenced in the Codes and Standards section of this chapter. Additionally, even where the community has not adopted applicable codes and standards, advanced conductors or other resilient technologies are eligible as an upgrade through PA mitigation where the community requests the upgrade and it meets the benefit-cost analysis (BCA), or through an improved project. The Department of Energy (DOE) has developed resources to support a more resilient nation and an

203

improved awareness of advanced transmission technologies. [371] If the damage does not meet the criteria for replacement, only the repair of the damaged line section(s) is eligible.

To document the pre-disaster condition of a conductor, applicants must provide the following information:

**Table 29. Required Documentation and Information to Support Pre-Disaster Conductor Condition**

| For Small and Large Projects |
|---|
| ▪ A signed, dated, and stamped letter from a licensed professional engineer who has direct experience with the damaged electrical transmission or distribution system certifying the pre-disaster capacity and condition of the conductor along with records providing satisfactory evidence of the pre-disaster capacity and condition of the conductor;<br><br>   ○ Records may include, but are not limited to, maintenance records, contract documents, work orders, inspection logs, or a description of past inspection and maintenance activities certified by a licensed professional engineer.<br><br>▪ If available, copies of construction work plans demonstrating the utility's past practices, as well as current and future projects;<br><br>▪ If required by RUS, a copy of any corrective action plans submitted to RUS in compliance with 7 C.F.R. §1730.25, Corrective action (RUS borrowers only); and,<br><br>▪ Staking sheets. |

If an applicant provides the information above, FEMA does not require further documentation to establish pre-disaster condition. Applicants are not precluded from substantiating the pre-disaster condition with other documentation if they are unable to provide the documentation described above.

# E.    Parks, Recreational, Other (Category G)

Examples of eligible publicly owned facilities in this category include:

▪ Mass transit facilities such as railways;

▪ Beaches;

▪ Parks;

▪ Playground equipment;

▪ Swimming pools;

▪ Bath houses;

▪ Tennis courts;

▪ Boat docks;

▪ Picnic tables;

▪ Golf courses;

▪ Ball fields;

---

[371] For more information, refer to: *Department of Energy Advanced Transmission Technologies, December 2020.*



- Fish hatcheries;
- Ports and harbors;
- Piers; and,
- Other facilities that do not fit in categories C–F.

Unimproved natural features are ineligible. For more information and examples, see the Facility Eligibility section in Chapter 4.

Grass and sod replacement are eligible if it is an integral part of the restoration of an eligible recreational facility. Vegetation replacement is also eligible if necessary to restore the function of the eligible facility (e.g., if vegetation is a component of a sewage filtration system).

Plantings required to mitigate environmental impacts, such as those required to address impacts to wetlands or endangered species habitat, are eligible when required by a federal or SLTT codes, standards, or permit that meets the criteria described under the Permit Requirements section in this chapter.

Long-term monitoring to ensure vegetative growth is ineligible even if it meets the requirements above.

Replacement of damaged trees, shrubs and other vegetation during site restoration is ineligible. Replacement of damaged crops, agricultural land, or other vegetation not at the site of an eligible facility is ineligible.

### 1. BEACHES

Replacement of sand on beaches is only eligible under certain conditions.[372] A beach is considered an eligible facility when all the following conditions exist:

- The beach was not constructed under the specific authority of USACE;[373]
- The beach was constructed by the placement of imported sand—of proper grain size—to a designated elevation, width, and slope;[374] and,
- The applicant has established and adhered to a maintenance program involving periodic renourishment with imported sand to preserve the original design or a specific engineered design, which is clearly justified and outlined in the maintenance program.[375] Placement of sand under the following circumstances does not meet this requirement:
  - Emergency or “one-time” nourishment, even if to a design;
  - Emergency or “as-needed” renourishments when the beach has eroded to a critical condition where all original nourishment is gone;
  - Partial renourishments or “hot-spot” nourishments; or
  - Renourishment using material from a channel maintenance project when dredge spoils do not meet compatibility design criteria and the amount placed is dependent on the amount dredged, not the beach design.

[372] 44 C.F.R. §§ 206.226(j) and 206.201(c).
[373] 44 C.F.R. § 206.226(a).
[374] 44 C.F.R. § 206.226(j)(2)(i).
[375] 44 C.F.R. § 206.226(j)(2)(ii).

**Figure 19. Typical Beach Profile**

Sand replenishment for beaches under the specific authority of the USACE is not eligible for PA funding.

The amount of sand eligible for replacement is limited to the amount lost due to the incident. The applicant needs to substantiate the amount of sand claimed with pre-and post-incident profiles that extend at least to the seaward edge of the sub-aqueous nearshore zone (Depth of Closure) (see Figure 19. Typical Beach Profile). If pre-storm profiles are not available, documentation may include design documents and renourishment history. Applicants need to adjust quantities to account for any erosion that occurred between the pre- and post-incident profiles.

Replacing sand that eroded prior to the incident is ineligible. However, FEMA encourages applicants to renourish the project to maintain and achieve the design profile.

To document eligibility of a beach as a designed and maintained facility, applicants must provide the following information:

- Design studies, plans, construction documents, and as-builts for the original nourishment;
- Documentation and details of the maintenance plan, including how the need for renourishment is determined and funded; and,
- Renourishment history, design studies, and as-builts for every renourishment, including construction documents if applicable.

FEMA may request only a portion of this information if the beach was previously determined eligible.

Beach access crossover structures are eligible facilities for repair or replacement. Sand placement adequate for covering crossover footings is eligible, unrelated to eligible beach sand replacement.

PAPPG v5

## F.      Landslides and Slope Stabilization

If an eligible facility is located on a slope and is damaged as a result of a landslide or slope instability triggered by the incident, FEMA determines the stability of the slope that supports the facility before it approves PA funding to restore the facility. Restoration of the integral ground that supports the facility may also be eligible. The impact of slope stability on eligibility is as follows:

- If the site is stable, permanent restoration of the facility and its integral ground is eligible.
- If the site is unstable and there is no evidence of pre-disaster instability after the facility was constructed, permanent restoration of the facility and its integral ground is eligible, including measures to stabilize the integral ground.
- If the site is unstable and there is evidence of pre-disaster instability after the facility was constructed, restoration of the facility's integral ground is ineligible. Restoration of the facility is eligible only upon the applicant stabilizing the site and restoring the integral ground.

If permanent restoration of the facility is eligible based on above determination, additional funding to protect the facility from future damage is eligible as PA hazard mitigation as outlined in this chapter.

Site inspections and limited geotechnical assessments are eligible if they aim to determine site stability and to obtain a technical opinion of the cause of the slope failure. This is applicable when an eligible facility located on a slope is impacted due to a landslide or slope instability triggered by a declared incident.

Permanent repair to stabilize natural ground that is not integral to the function of an eligible facility or does not support an eligible facility is not eligible for funding. However, there are limited circumstances where a qualified individual may determine that the upslope makes a facility vulnerable to repetitive damage. In such cases, these repairs may be considered eligible. FEMA may approve permanent relocation of the facility if the facility is subject to repetitive heavy damage and relocation is cost effective. Eligible costs for relocation are described under the Relocation section in this chapter.

Applicants may request an alternate project if restoration of the facility is not feasible because of soil instability.

# VI.   Repair vs. Replacement

When evaluating whether a damaged facility is eligible for replacement, FEMA compares the estimated repair cost with the estimated replacement cost and evaluates the feasibility of repairing the facility. [376]

A facility is considered repairable when:

- The cost to repair the disaster-related damage does not exceed 50 percent of the cost to replace the facility based on its pre-disaster size, capacity, and function; and,
- It is feasible to repair the facility so that it can perform the pre-disaster function as well as it did prior to the incident. [377]

---

[376] 44 C.F.R. § 206.226(f).
[377] 44 C.F.R. § 206.226(f)(1).

207

PAPPG v5

The comparison of the repair cost to the replacement cost results in a fraction that expresses repair as a percentage of replacement. The percentage is calculated with the estimated repair cost as the numerator and the estimated replacement cost as the denominator. FEMA refers to this as the "50 percent rule."

The purpose of the 50 percent rule is to make an early determination on whether it is more prudent to repair or replace a facility. It is not intended to be a full calculation of all eligible project costs. FEMA does not perform the calculation when it is not feasible to restore the facility so that it can perform its pre-disaster function as well as it did before. If the restoration of the facility is not feasible, replacement is eligible.

The feasibility evaluation criteria is crucial in evaluating whether it is practical and technically feasible to repair a facility so it can perform to the same pre-disaster function from an engineering standpoint. Qualified professionals, such as professionally licensed individuals, qualified cost estimators, construction managers, and staff with other technical expertise, as necessary review feasibility studies and ancillary information provided to FEMA when a facility is not considered technically repairable under 44 C.F.R § 206.226(f)(2).

A floodplain manager's substantial damage determination is part of the NFIP eligibility process and is separate and distinct from the PA eligibility process for determining whether a facility is eligible for replacement or relocation. FEMA determines whether replacement costs are eligible for PA funding based on the 50 percent rule. The substantial damage[378] determination is used to determine whether certain floodplain management requirements are triggered in communities participating in the NFIP.

## A.    Calculation

The repair cost estimate (numerator) is the estimated cost of repairing disaster-related damage only and includes costs related to compliance with codes and standards that apply to the repair of the damaged elements only.[379] The numerator does not include costs associated with:

- Upgrades of non-damaged elements which are not directly associated with the method of repair of the damaged element, even if required by codes or standards (e.g., elevation of an entire facility triggered by repair);
- Selective demolition beyond that which is essential to repair the damaged elements;
- Site work;
- Soft costs;
- Contents;
- Hazard mitigation measures; or
- Emergency work.

 **Terminology**

**Site work** is any exterior work at the site. Examples include:

---

[378] For more information, refer to: Substantial Damage Quick Guide | fema.gov.
[379] This includes consensus-based codes, specifications, and standards.

PAPPG v5

- Excavation;

- Backfill;

- Erosion control;

- Utility installation; and,

- Paving.

The replacement cost estimate (denominator) is the estimated cost of replacing the facility based on its pre-disaster design (size and capacity) and function in accordance with applicable codes or standards. The denominator does not include costs associated with:

- Demolition;

- Site work;

- Soft costs;

- Contents;

- Hazard mitigation measures; or

- Emergency work.

In order to support timely replacement determinations, rapid recovery, and streamline the process for 50 percent rule calculations, FEMA provides the option to not use higher consensus-based codes, specifications and standards in 50 percent rule calculations. Costs associated with compliance to meet existing federal, state, local, tribal, and territorial codes and standards must still be included in the calculation When applicable, consensus-based codes, specifications, and standards will be applied in the same manner as locally adopted codes, specifications, and standards for the purpose of calculating the 50 percent rule. Although certain costs are not included in the 50 percent rule calculation to determine whether the facility is eligible for replacement, the costs may be eligible for PA funding subjeft to all other eligibility requirements.

## B.    Request for Replacement

Applicants should submit their requests for replacement within one year of the declaration. The request should include both repair and replacement cost estimates with supporting documentation, prepared in accordance with the requirements described under the Applicant Estimates section in Chapter 9.

FEMA's professionally licensed engineers and architects, qualified cost estimators, construction managers, and staff with other technical expertise, as necessary, develop or review and validate the estimates used in the 50 percent rule calculations. Re-running the calculation is appropriate if there is an error in the initial calculation, or if costs associated with applicable codes and standards need to be added.

For any replacement requests over $5 million, FEMA submits the estimates to an independent third-party for an additional review of the estimates. FEMA considers the results of the third-party review prior to approving replacement.

**209**

PAPPG v5

## C.    Eligible Funding

If replacement is eligible either because it is not feasible to restore the facility so that it can perform its pre-disaster function as well as it did before or based on the 50 percent rule, the actual replacement cost is eligible. Alternatively, applicants may elect to repair the facility in conformance with applicable codes and standards. In this case, FEMA limits the eligible cost to the estimated cost of repair or replacement, whichever is less.[380]

Because the repair vs. replacement determination is made based on a subset of the total costs of what it would take to repair or replace a facility (see excluded costs above), it is possible that replacement would not be eligible under the repair vs. replacement determination even though the total cost to repair the facility would be greater than the total cost to replace it (once all costs were considered). In this case, FEMA would limit funding to the replacement cost since it is less than the cost to repair.

.

The costs to comply with a local floodplain management ordinance that requires elevation or floodproofing of a substantially damaged facility in an SFHA are eligible for PA funding.  These costs are not included in the repair cost of the 50 percent rule calculation but are included in the replacement cost of the calculation. Therefore, the repair cost for the 50 percent rule calculation is estimated without regard to whether the facility receives a substantial damage determination or whether the facility contains a critical action. A floodplain manager's substantial damage determination is part of the NFIP eligibility process and is separate and distinct from the PA eligibility process for determining whether a facility is eligible for replacement or relocation. FEMA determines whether replacement costs are eligible for PA Program according to the criteria specified in the Repair vs. Replacement section within this chapter. FEMA determines whether relocation costs are eligible for PA funding based on the criteria under the Relocation and Hazard Mitigation sections in this chapter. Facilities eligible for replacement are subject to Federal Flood Risk Management Standard requirements, and compliance costs are eligible for PA funding.

Relocation is only eligible for PA funding if it meets the requirements under the Relocation section in this chapter. If compliance with a code or standard is not feasible without relocating a facility and relocation is not eligible for PA funding, FEMA caps the funding without including the costs related to relocation and considers it an improved project.

Costs associated with demolition of a facility that is eligible for replacement are eligible as part of the permanent work project to replace the facility. Eligible costs include removal, recycling, and disposition of the associated demolition debris.

PA mitigation can be applied to replacement projects. Specifically, cost-effective PA hazard mitigation funding will be eligible for inclusion on replacement projects (including improved projects involving relocation). The total eligible project cost is determined after PA hazard mitigation costs are added and all reductions are accounted for. In cases where the eligible repair costs for a replacement project are fully

---

[380] 44 C.F.R. § 206.226(f)(2).

PAPPG v5

covered by insurance, the PA hazard mitigation may still be eligible if the "total eligible project cost," including mitigation, meets or exceeds the minimum project threshold.

As discussed in Chapter 10: Environmental and Historic Preservation, if an applicable code or standard requires that a historic facility be restored in a certain manner and does not allow other options, the cost to restore the facility in accordance with the code or standard is eligible and may exceed the estimated replacement cost.[381] A historic facility is defined as one listed in, or eligible for listing in, the National Register of Historic Places.[382]

## D.    Replacement of Components of a Facility or System

FEMA does not apply the 50 percent rule to a facility's structural or mechanical components (e.g., windows; roofs; heating, ventilation, and air conditioning (HVAC); electrical; plumbing). For example, FEMA does not apply the 50 percent rule to a damaged HVAC system to determine whether the system should be repaired or replaced because it is a component of a building. If the HVAC system is repairable, as determined by an inspector or engineer with appropriate technical expertise, FEMA limits its funding to the repair of the system.

For facilities that are systems composed of multiple, easily segregated components, FEMA applies the 50 percent rule to individual components of the system, rather than the entire system.

 **Examples: FEMA's Application of the 50% Rule**

The following are examples of facilities that are systems to which FEMA applies the 50% rule calculation to **individual components**:

- Drainage channel or irrigation system: A section from damaged node to damaged node, which is where there are intersections or connecting points.

- Water or sewer line system: A section of piping from damaged manhole to damaged manhole, a lift station, or a manhole structure.

- Water or wastewater treatment plant: A control building, clarifier, or sedimentation pond.

- Electrical distribution systems are evaluated for replacement based on the criteria under Power: Transmission and Distribution System Conductor Replacement in this chapter.

The following are examples of facilities to which FEMA applies the 50% rule to the **entire facility**:

- Bridges;

- Culverts;

- Buildings;

---

[381] 44 C.F.R. § 206.226(f)(3).
[382] For more information, refer to: National Register of Historic Places | nps.gov.

- Pumping stations;
- Piers;
- Pools, including integral pumping;
- Equipment; and,
- Lighting structures.

# VII.  Relocation

There are opportunities for relocating a facility utilizing PA funding.

## A.     FEMA-Directed Relocation

The Regional Administrator may approve funding for and require restoration of a destroyed facility at a new location when all of the following conditions apply:

- The facility is subject to repetitive heavy damage because of its location. For example, facilities located in a SFHA or wildland-urban interface and subject to repetitive heavy flood or fire damage;
- Project approval is not barred by other regulations; and,
- The overall project, including all costs, is cost-effective.
  - o  If the cost to relocate the facility is less than the eligible cost to replace the facility at its original location (the value of the land at the original site is not included as part of this evaluation) then the project is cost effective. In instances where the cost of relocation exceeds the cost to replace the facility at its original location FEMA uses its BCA process and software[383] to determine cost effectiveness.[384]

 **Terminology**

The **wildland-urban interface (WUI)** is the area between wildland and urban land.

If the Regional Administrator requires an applicant to relocate, and the applicant does not feel that relocating would be in the best interest to the community it serves, the applicant can choose to use the flexibility of an alternate project.[385] An alternate project allows eligible funding to be used to repair or expand other public facilities, purchase capital equipment, or perform hazard mitigation measures unrelated to the original facility. For more information, see the Flexible Restoration (Capped Projects) section in this chapter. If relocation of a facility is not feasible or cost effective, the Regional Administrator shall disapprove federal

---

[383] For more information, refer to: Benefit-Cost Analysis.
[384] 44 C.F.R. § 206.226(g)(1).
[385] 44 C.F.R. § 206.226(g)(4).

funding for the original location when it is determined that restoration in the original location is not allowed. In such cases, an applicant may apply for an alternate project.[386]

## B.    Applicant-Driven: Repair vs. Replacement

When an applicant's facility is destroyed (i.e., eligible for replacement) and the Regional Administrator does not require the facility to be relocated, the applicant can request the facility be built at a different location through an improved project.

When an applicant's facility is repairable, the applicant can choose to relocate the facility through an improved project. The eligible funding will be capped based on the repair costs.

## C.    Code-Driven: Part 9 and Other Code and Standard Relocations

An applicable federal or SLTT code or standard, such as a floodplain management regulation, may also require that a damaged facility be relocated away from a hazardous area (e.g., floodway). If compliance with a code or standard is not feasible without relocating a facility and relocation is not eligible for PA funding, FEMA caps the funding for the cost to repair, without including the costs related to relocation, and considers it an improved project.

Cost-effective PA hazard mitigation funding is allowable on replacement projects (including improved projects involving relocations). Where relocation is not required by an applicable code or standard, an applicant can request FEMA fund a relocation as a mitigation measure if it meets the requirements identified in the Hazard Mitigation section of this chapter. In this case, FEMA evaluates the cost effectiveness using its BCA tool.

## D.    Eligible Work and Funding

Eligible work associated with relocation includes land acquisition and construction of necessary support facilities, such as roads, parking lots, and utilities. Demolition and removal of the original facility including costs for deconstruction and reuse of materials are also eligible if deemed necessary.[387] FEMA limits PA funding to the amount necessary to make the relocated facility and its associated components operational.

FEMA considers the proximity of the new site to utilities (water, sewer, and electric) and approves the least costly solution. Construction of an off-site support facility is only eligible if it is a utility that would serve the relocated facility exclusively.

For land acquisition, if the facility was located on 10 acres of land at the time of the incident, and FEMA determines that 10 acres is not necessary for the operation of the facility, FEMA limits PA funding to the necessary amount of land.

---

[386] 44 C.F.R. § 206.226(g)(5).
[387] 44 C.F.R. § 206.226(g)(2).

PAPPG v5

In situations where the applicant owns the facility, but not the land or the support facilities at the original location, the cost to purchase the land or build support facilities is ineligible.

When FEMA requires relocation, FEMA does not provide future PA funding for repair or replacement of the original facility or for other facilities at the original site unless the facility facilitates an open space use. [388] For example, if the applicant converts the original site to a park, FEMA may provide PA funding in the future for park components, such as benches, tables, restrooms, or gravel roads.

## E.      Sale or Lease of Property at Original Site

Applicants may sell or lease the original facility or the land on which a relocated facility was originally located. Applicants must inform the purchaser of the property that FEMA will not provide future PA funding for repair or replacement of the original facility or for other facilities at the original site unless the facility facilitates an open space use.

The property which the facility is relocated to, and the relocated facility itself, are subject to the real property provisions of 2 C.F.R. Part 200 including disposition and reporting requirements under 2 C.F.R. §§ 200.311 and 329, respectively.

For PA funds to be used for the original site, FEMA must complete an EHP review before an applicant can take a specific action, such as demolition.

# VIII. Environmental and Historic Preservation Requirements

Applicants need to make every effort to afford FEMA the opportunity to perform environmental and historic preservation (EHP) reviews prior to starting any work that has the potential to impact the environment or historic properties. This includes, but is not limited to, demolition work, site preparation, and ground disturbing activities. Prompt compliance with EHP requirements can facilitate the processing of a PA project. Permanent work projects that restore a damaged facility to pre-disaster design are generally excluded from some EHP review. Projects that involve changes in location, footprint, alignment, or size of a facility may not fall under these exclusions. For more information on the EHP program, see Chapter 10: Environmental and Historic Preservation.

## A.      Floodplain Management and Wetland Protection

FEMA has a responsibility to consider and safeguard the benefits of floodplains and wetlands [389] when providing federal assistance. When providing PA funding for a project in or impacting a floodplain or wetland, several requirements apply.

Projects may not be located in a floodplain or wetland if there are other options that avoid construction in or disturbance to the floodplain or wetland. Applicants are responsible for securing and complying with any

---

[388] 44 C.F.R. § 206.226(g)(3).
[389] EO 11990, "Protection of Wetlands"; EO 11988, "Floodplain Management."

PAPPG v5

required permits[390] for work in areas designated as wetlands by the U.S. Army Corps of Engineers. Failure to do so may result in denial or deobligation of funding. New construction is not allowed in coastal high hazard areas unless the project helps manage natural areas like parks or low-impact recreational paths. New construction and substantial improvements are also not allowed in floodways. [391] These types of activities can result in continuing vulnerability to flood damage.

 **Terminology**

**Floodplain:** The lowland and relatively flat areas adjoining inland and coastal waters including flood prone areas of offshore islands, including at a minimum, that area subject to a 1% or greater chance of flooding in any given year.

**Coastal high hazard area (CHHA):** An area of flood hazard extending from offshore to the inland limit of a primary frontal dune along an open coast and any other area subject to high velocity wave action from storms or seismic sources.

**Substantial improvement:** Any repair, reconstruction, or other improvement of a structure or facility, which has been damaged in excess of, or the cost of which equals or exceeds, 50% of the market value of the structure or replacement cost of the facility.

Flood risk reduction requirements apply to PA-funded projects that:

- Are located in floodplains or wetlands;
- May affect floodplains or wetlands; and/or,
- Have the potential to be affected by floodplains or wetlands.

FEMA may also require other measures based on its 8-step decision-making process (see the 8-Step Decision-making Process section in this chapter).  For additional information on floodplain management and wetland protection authorities that guide PA work in and around these areas, see 44 CFR part 9.

 **Terminology**

**1 percent Annual Chance Floodplain:** The land area having a 1% chance of flooding in a given year (This area may change over time.) This term is often used interchangeably with the terms "base flood" or "100-year flood."

**Base Flood:** A flood which has a 1% chance of being equaled or exceeded in any given year. This term is used in the National Flood Insurance Program (NFIP) to indicate the minimum level of flooding to be

---

[390] Section 404 of the Clean Water Act; 33 U.S.C. § 1344.
[391] 44 C.F.R. § 9.11(d)(1).

used by a community in its floodplain management. This is often used interchangeably with the terms "1% annual-chance flood," or "100-year flood."

**Base Flood Elevation (BFE):** The computed elevation to which floodwater is anticipated to rise during the base flood. The BFE is also known as the 1% annual chance flood elevation or 100-year flood elevation.

## 1.    CRITICAL ACTIONS

The minimum floodplain level for critical actions that do not involve substantial damage, substantial improvement, or new construction is the 0.2 percent annual chance floodplain (500-year floodplain).

### i.    *Potential Critical Actions*

If an action is not specified as a critical action in 44 C.F.R. § 9.4, FEMA determines whether a proposed action is deemed a critical action [392] by considering the following:

- The potential for additional impacts if the proposed project is flooded in a future incident (e.g., the structure or other facility contains volatile or toxic materials);
- The ability for occupants of buildings such as hospitals, schools, and nursing homes to evacuate in time to avoid loss of life and injury given the flood warning lead-time available in a future incident; and,
- The potential for emergency services and utilities to become inoperative, or essential and irreplaceable records to be lost if a facility is flooded in a future incident.

### ii.    Non-Critical Actions

For non-critical actions that do not involve repairs to substantial damage, substantial improvement, or new construction, the minimum floodplain for consideration is the 100-year or 1 percent annual chance floodplain.

## 2.    COASTAL HIGH HAZARD AREAS

New construction is prohibited in coastal high hazard areas except for projects that help with the management of natural areas like parks or other less-developed recreational areas. If the structure was substantially damaged, is substantially improved, or undergoes new construction in a coastal high hazard area, the applicant must elevate or floodproof the structure in accordance with the requirements summarized above. In coastal high hazard areas, structures must be elevated on open works (walls, columns, piers, piles, etc.) and anchored properly. [393]

---

[392] For more information, refer to: *Guidelines for Implementing EO 11988 | fema.gov.*
[393] 44 C.F.R. § 9.11(d)(2) and (7).

216

PAPPG v5

### 3.    REQUIREMENT FOR COMMUNITIES PARTICIPATING IN THE NATIONAL FLOOD INSURANCE PROGRAM.

FEMA manages the National Flood Insurance Program (NFIP),[394] which provides flood insurance that helps property owners, renters, and businesses recover faster. The NFIP works with communities required to adopt and enforce floodplain management regulations that help mitigate flooding effects.

A community that participates in the NFIP must adopt and enforce a floodplain management ordinance that meets or exceeds the minimum NFIP requirements.[395] This ordinance must contain requirements for new construction or substantial improvement of buildings located in an area with a 1 percent chance of flooding in any given year (also known as a special flood hazard area or "SFHA"). In addition to other requirements, the ordinance must require that new or substantially improved buildings be elevated so that the lowest floor is at or above the BFE or floodproofed to a level equal to or above the BFE.

Some communities have more restrictive ordinances that require elevation or floodproofing to greater levels. The requirements that a community adopts in order to participate in the NFIP may be different than FEMA's requirements. PA will fund the stricter requirements.

Building upgrades required for compliance with the floodplain ordinance are eligible as long as:

- The ordinance meets the eligibility criteria for codes and standards; and,
- The substantial improvements are disaster-related repairs.

Based on the floodplain ordinance, if the cost to repair a facility is greater than the cost to replace the facility, the eligible cost is capped at the replacement cost. There is an exception for facilities eligible for or on the National Register of Historic Places.[396]

# IX.    Facility Located in or Impacting a Floodplain

FEMA actions must comply with the regulations set forth in 44. C.F.R. Part 9 if they have the potential to affect floodplains or wetlands, or if they are subject to potential harm by location in floodplains. This includes funding of permanent restorations. When FEMA provides PA funding for restoration of a facility located in, or impacting a floodplain, FEMA must:

- Determine if an action is critical or non-critical; and,
- Require mitigating actions aligning with any minimization standards that apply.

FEMA may create more stringent requirements than the current regulatory standards in order to minimize harm to or within the floodplain. PA-funded projects may also be required to demonstrate compliance with SLTT floodplain regulations in cases where a uniformly-applied SLTT code or standard is more stringent than the federal requirements.

---

[394] For more information, refer to: Flood Insurance | FEMA.gov.
[395] 44 C.F.R. § 60.3.
[396] 44 CFR Part 206.226(f)(3).

PAPPG v5

## A.    8-Step Decision-making Process

FEMA determines whether a PA project will have a negative impact on the floodplain.[397] To make this determination, FEMA uses the 8-step decision-making process defined in 44 C.F.R. § 9.6. This process is not required for projects where the repair cost is less than $18,000.[398]

Using the 8-step process, FEMA evaluates the impacts the project may have on the floodplain. FEMA also looks at viable alternatives for environmental, social, economic, technical, and legal factors.[399] It is possible for alternatives to be ineligible for PA funding. FEMA considers whether each alternative is eligible for PA funding and, if not, whether the applicant has economic or legal limitations[400]. Projects in the floodplain are only eligible if FEMA is unable to identify a viable alternative to restoring the facility in its current location.

 **Example: 8-Step Process Identified Alternatives**

Some alternatives may not be eligible for PA funding. The 8-step review process may identify relocation of a facility as a viable alternative to repairing it. However, if the facility is ineligible for relocation as described under the Relocation section in this chapter, costs associated with relocating the facility are ineligible for PA funding.

For projects located within or that may affect a floodplain or wetland, FEMA must consider the following alternatives to meet regulatory requirements:

- No action;
- Alternative locations; and,
- Alternative actions, including ones that use natural features..

.

## B.    Hydrologic and Hydraulic Studies

Hydrologic and hydraulic (H&H) studies can help identify whether facilities located in a floodplain are likely to have an adverse impact upstream or downstream. Generally, an H&H study is necessary when:

- The facility is in a special flood hazard area;
- There is a potential adverse impact to the floodplain;
- There is a potential adverse impact to a federally listed threatened or endangered species, critical habitat, or essential fish habitat; or
- It is required to demonstrate compliance with the Clean Water Act (CWA).

PA, EHP, and PA hazard mitigation staff coordinate to determine whether an H&H study is needed. If so, FEMA requests the applicant retain a licensed civil, environmental, or hydrologic engineer to prepare the

---

[397] 1 percent annual chance floodplain, 0.2 percent annual chance floodplain.
[398] 44 C.F.R. § 9.5(c)(9).
[399] 44 C.F.R. § 9.9.
[400] Ibid.

PAPPG v5

H&H study. FEMA staff can provide guidance on the general contents for such studies. H&H studies are eligible as part of the overall project.

These studies identify upstream and downstream impacts (such as stage, velocity, duration) of alterations to the floodplain by the proposed work. H&H studies are often requested when there will be new construction or alterations to bridges or culverts. These alterations include changes to the length, diameter, number of culverts, or modifications to exits and entrances (such as head walls, wing walls, rounding, grouted riprap).

H&H studies are not required:

- If water at a stormwater drainage or conveyance structure does not flow regularly or flows only seasonally; or
- If the project will return the facility back to its exact pre-disaster condition (in length, diameter, material, number of culverts, exit and entrance conditions), and stream morphology has not significantly changed.

## C.    Facility Located in a Special Flood Hazard Area

Special flood hazard areas (SFHAs)[401] are areas that are subject to inundation during a 1 percent annual chance flood (also known as the 100-year floodplain).

### 1.    NATIONAL FLOOD INSURANCE PROGRAM

For a National Flood Insurance Program (NFIP) insurable facility located in an SFHA, FEMA must reduce PA funding when the facility is:

- Located in an area that FEMA has identified as an SFHA for more than 1 year;
- Damaged by flooding; and,
- Uninsured for flood loss.

If an applicant believes that its property is incorrectly identified on a flood insurance rate map (FIRM) as being located within the SFHA, it may request a letter of map amendment or letter of map revision from FEMA within 6 months of the disaster declaration. If the applicant's request is approved and FEMA determines that the property is not located in an SFHA, FEMA may reinstate PA funding. Costs incurred in pursuit of a letter of map amendment or letter of map revision are ineligible for PA funding.

Pursuant to Stafford Act section 406(d)(2), if an applicant does not have flood insurance for the facility or carries inadequate flood insurance for the insurable facility, FEMA reduces eligible project costs by the lesser of:

- The maximum amount of insurance proceeds that could have been obtained from an NFIP standard flood insurance policy for the building and its contents;[402] or
- The value of the building and its contents at the time of the incident.

---

[401] 44 C.F.R. § 206.251(e). Special flood hazard areas have special flood, mudslide, and/or flood-related erosion hazards, and shown on a flood hazard boundary map (FHBM) or the flood insurance rate map (FIRM) issued by FEMA as Zone A, AO, A1-30, AE, A99, AH, VO, V1-30, VE, V, M, or E. "Special flood hazard area" is synonymous with "special hazard area," as defined in 44 C.F.R. Part 59.
[402] 44 C.F.R. § 206.252(a).

219

FEMA does not apply this reduction to PNP facilities in communities that do not participate in the NFIP.[403] However, for FEMA to provide PA funding for the PNP facility, the community where the facility is located must agree to participate in the NFIP within 6 months of the declaration. Additionally, the PNP must purchase the required flood insurance; or the PNP must obtain and maintain flood insurance from another source.[404]

# X.    Requirement to Obtain and Maintain Insurance

Applicants that receive PA funding for permanent work to replace, repair, reconstruct, or construct a facility must obtain and maintain insurance to protect the facility against future loss.[405] Applicants must comply with this requirement as a condition of FEMA assistance. This requirement applies to insurable facilities or property (buildings, contents, equipment, and vehicles), including those funded as an alternate or improved project.[406] FP 206-086-1 Public Assistance Policy on Insurance[407] describes these requirements in detail.

Applicants must obtain and maintain insurance on damaged facilities with the types and extent of insurance reasonably available, adequate, and necessary to protect against future loss to the property. Recipients must provide assurance that the required insurance coverage will be maintained for the anticipated life of the restorative work or the insured facility, whichever is shorter.[408] The type of insurance refers to the hazard(s) that caused the damage and extent refers to the amount of insurance required, which is calculated based on the eligible costs prior to any reductions (including the non-federal share reduction).

The requirements of Stafford Act Section 311 are waived when eligible costs for an insurable facility do not exceed $5,000.[409]

Applicants may request that FEMA modify the insurance requirement when:

- The required insurance is not reasonably available; and,
- The required insurance is not necessary to protect against future loss to the property.

Additionally, FEMA does not require greater types and amounts of insurance than those certified as reasonably available, adequate, or necessary by the appropriate state or territorial insurance commissioner.[410] The state or territorial insurance commissioner cannot waive federal insurance requirements but may certify the types and extent of insurance reasonable to protect against future loss to an insurable facility.[411]

---

[403] 44 C.F.R. § 206.252(b).
[404] Ibid.
[405] Stafford Act § 311; 42 U.S.C. § 5154; 44 C.F.R. § 206 Subpart I; 2 C.F.R. 200.310.
[406] 44 C.F.R. § 206.203(d).
[407] For more information, refer to: Public Assistance Policy on Insurance (FP 206-086-1) | fema.gov.
[408] Stafford Act § 311; 42 U.S.C. § 5154; 44 C.F.R. § 206.253(e).
[409] 44 C.F.R. § 206.253(d).
[410] 44 C.F.R. § 206.253(c).
[411] 44 C.F.R. §§ 206.252(d) and 206.253(c).

Applicants may comply with the insurance requirement for both flood and non-flood hazards with coverage available through commercial property insurance, which may include blanket insurance policies, standard flood insurance policies, insurance pools, or a combination of these sources.[412] In some cases, with FEMA approval, the applicant may comply with the insurance requirement using a self-insurance plan.[413]

## A.    Failure to Obtain and Maintain Insurance

If an applicant does not comply with the requirement to obtain and maintain insurance, FEMA will deny or deobligate PA funds related to the noncompliance from the current disaster. Additionally, the facilities for which the applicant failed to comply are ineligible for future PA funding.

If an applicant cannot insure a facility prior to grant approval (for example, if a building is being reconstructed), the applicant may provide a letter of commitment (LOC) stating that they agree to the insurance requirement and will obtain the types and extent of insurance required, followed at a later date by proof of insurance once it is obtained. If a facility is damaged in a subsequent disaster prior to work being completed from a previous disaster, the LOC for the O&M requirement allows the first disaster projects to remain open and allows the facility damaged in a subsequent disaster to be eligible for funding and proceed with the project formulation and insurance review process.

# XI.    Building Code and Floodplain Management Administration and Enforcement (Category I)

After a disaster, recovering communities face an increase of administration and enforcement work to ensure that repair and replacement of damaged facilities and infrastructure meet adopted regulatory requirements, such as those set forth in floodplain management regulations and building codes. Additional resources are spent reviewing permits, inspecting repair work, and enforcing adopted regulations.

The Disaster Recovery Reform Act (DRRA) of 2018 amended Sections 402 and 406 of the Stafford Act to authorize FEMA to provide communities PA funding to effectively administer and enforce building codes and floodplain management ordinances for a period of no longer than 180 days after the date of the major disaster declaration. FEMA reimburses costs for eligible work starting on the first day of the incident period and up to 180 days following the date the major disaster declaration is amended to authorize PA permanent work. FEMA will not extend assistance beyond 180 days for these activities.

All communities that participate in the National Flood Insurance Program must adopt and enforce regulations that meet or exceed the minimum standards for participation. These standards apply in the community's regulated floodplain. All development in this area must be reviewed for compliance and approved by the local floodplain administrator. These regulations can be found in a variety of places, including stand-alone ordinances, zoning codes, sanitary and sewer regulations, and building codes.

---

[412] 44 C.F.R. § 206.253(b)(2).
[413] Stafford Act § 311(c); 42 U.S.C. § 5154(c); 44 C.F.R. Part 75.

PAPPG v5

In communities that have adopted building codes, the codes apply to the construction, repair, and rehabilitation of all structures in the community, not just those within the regulated floodplain.

In both cases, local officials review development, construction, and repair proposals for completeness and compliance and issue permits. It is the local official's responsibility to ensure that the developments are compliant through inspections and the receipt of final compliance documentation.

The principles of the DRRA Section 1206 amendments are:

1. Increase the overall speed of recovery by providing assistance to conduct building inspections, review disaster-related development in the floodplain, review applications for permits, and issue permits to adequately administer and enforce adopted building codes and floodplain ordinances.

2. Enhance compliance with state and local building codes and floodplain management ordinances by providing state, local, Tribal Nation, and territorial governments additional resources to carry out required activities after a disaster.

Communities that are suspended from or have been sanctioned for not participating in the National Flood Insurance Program (NFIP) are ineligible for category I activities. The *NFIP Community Status Book*[414] contains the current "NFIP status" of a community in the declared counties.

## A.    General Requirements

To be eligible, building code and floodplain management administration and enforcement field activities must be:

- Conducted in the designated areas as identified in the major disaster declaration;
- Within the applicant's jurisdiction;[415] and,
- Related to the repair, replacement, retrofit, or relocation of disaster damaged facilities. This may include public, private, and residential structures.

Activities to administer and enforce building code and floodplain management ordinances are eligible regardless of whether the building code or floodplain management ordinance in question meets PA's regulatory eligibility criteria for facility restoration.

 Example: Building Code Administration

After a disaster is declared, a community decides to update its building code to require a four-foot freeboard for all buildings in the special flood hazard area. Work associated with administering and enforcing the four-foot freeboard for disaster-damaged buildings in the community is eligible under this policy. However, PA would not fund the physical repairs to a school building to meet the new four-foot freeboard requirement since the code was adopted after the date of the disaster declaration and therefore ineligible according to PA regulation and policy (FEMA would fund the repair work to meet the

---

[414] For more information, refer to: Community Status Book | fema.gov.
[415] 44 C.F.R. § 206.223.

minimum code requirements as described in Chapter 8: Permanent Work Eligibility (Categories C-G) and 44 C.F.R. Part 9.11).

Work that is eligible under category I cannot:

- Be used as the basis for an alternate project;[416] or

- Have an associated hazard mitigation proposal (HMP).

## B.    Eligible Work

The activities below are eligible under category I. Activities not specifically listed here will be evaluated on a case-by-case basis for eligibility.



Figure 20. Category I Work Eligibility

### 1.    BUILDING CODE ADMINISTRATION

- Review and process applications for the following:

  o  Building permits;

  o  Certificates of occupancy;

  o  Certificates of compliance; and,

  o  Associated plans, specifications, and construction documents for compliance with federal, state, and municipal building, housing, and life-safety codes and standards applicable to disaster-related repair, replacement, or retrofit.

- Process requests for building code variances;

- Collect fees;

- Hire, train, supervise, certify, and license staff, as required to conduct eligible activities;

- Contract for services (e.g., contract planning, initiation, solicitation, evaluation, and award);

- Provide training and information to staff, contractors, and the public on unique considerations for repair of disaster-damaged historic buildings;

- Provide training and outreach to the public on building code and building permit requirements applicable to the repair, replacement, or retrofit of disaster-damaged buildings;

- Establish construction plan reviews and inspection processes, procedures, and instructions for permit holders;

- Monitor impacted areas for unpermitted construction activities; and,

- Coordinate building code administration and enforcement with floodplain management ordinance administration and enforcement, as appropriate.

### 2.    CODE ENFORCEMENT

- Inspect structures under construction for compliance with approved plans, specifications, and all requirements of applicable codes, laws, and ordinances;

---

[416] Stafford Act Section 406(c); 42 U.S.C. § 5172; 44 C.F.R. § 206.203(d)(2).

PAPPG v5

- Identify and carry out corrective action in cases where construction, design, and occupancy do not comply with codes and/or ordinances;

- Conduct and process condemnation determinations;

- Review and issue elevation certificates; and,

- Investigate complaints and assist in preparation of materials for abating violations of building codes and related ordinances.

## 3.    FLOODPLAIN MANAGEMENT ORDINANCE AND ENFORCEMENT

- Enforce or administer standards for development according to community floodplain management regulations;

- Determine whether proposed disaster-related development activities are in areas regulated by the community's floodplain management ordinance or building code;

- Hire, train, supervise, certify, and license staff, as required to conduct eligible activities;

- Contract for services (e.g., contract planning, initiation, solicitation, evaluation, and award);

- Provide training and outreach to the public on floodplain permit requirements applicable to the repair, replacement, or retrofit of disaster-damaged buildings;

- Provide training and information to staff, contractors, and the public on unique considerations for repair of disaster-damaged historic buildings;

- Review disaster-related development proposals to ensure compliance with the requirements of applicable floodplain management ordinances;

- Process permits for disaster-related development in the floodplain associated with the declared disaster;

- Inspect all disaster-related development in the applicable jurisdiction;

- Monitor impacted areas for unpermitted construction activities;

- Process requests for floodplain management ordinance variances;

- Process, maintain, and track temporary occupancy permits and inspect temporary occupancy buildings;

- Provide information on flood hazards, floodplain map data, advisory flood data, and compliance to residents and property owners;

- Conduct inspections to ensure the removal of temporary fill and related materials used in flood fighting;

- Take corrective action necessary to ensure compliance with federal, state, and local floodplain regulations; and,

- Coordinate floodplain management ordinance administration and enforcement with building code administration and enforcement, as appropriate.

## 4.    SUBSTANTIAL DAMAGE DETERMINATIONS

- Conduct initial field surveys to determine extent of damage;

- Establish damage trends to identify areas to focus building-specific assessment efforts;

- Prepare cost information on repairs and pre-disaster market value estimates for substantial damage estimates;

- Hire, train, supervise, certify, and license staff, as required to conduct eligible activities;

- Collect field data for damage assessments;

PAPPG v5

- Enter damage inventory administrative data into the Substantial Damage Estimator or comparable data collection software;

- Track cumulative substantial damage and repetitive loss for communities, if required;

- Conduct damage inventory of structures;

- Inform property owners of damage determination and provide compliance requirements;

- Perform inspections to ensure compliance with repair and substantial damage construction requirements;

- Determine whether proposed improvements are substantial improvements and trigger requirements for compliance, including a building permit;

- Determine if damaged structures have been designated as historic or that may be eligible for such designation; and,

- Review, adjudicate, and resolve substantial damage determination appeals.

## C.    Ineligible Work

Funding is limited to work that is required as result of the declared incident. The following are ineligible:

- Activities associated with non-disaster damaged structures or non-disaster-related development; and,

- Activities to update a community's laws, rules, procedures, or requirements, such as:

  - Adopting new or updating current building codes or floodplain management ordinances;

  - Adopting or updating zoning laws and requirements; and,

  - Developing new land use plans or requirements.

For category I activities, only overtime costs are eligible for budgeted labor. Straight-time and overtime costs are eligible for unbudgeted labor.

## D.    Required Documentation and Information for Category I Work

Applicants must submit the following to support claims for category I projects:

225

**Table 30. Required Documentation and Information for Category I Work**

| For Small Projects | For Large Projects |
|---|---|
| ▪ List of activities performed; and, <br> ▪ Number of locations where activities took place (if applicable). | ▪ List of activities performed; <br> ▪ Documentation necessary to demonstrate work completed, such as activity logs or sign in sheets; <br> ▪ Number of locations where activities took place (if applicable); <br> ▪ Locations where activities were conducted, including addresses or GPS coordinates (if applicable); and, <br> ▪ Copies of the rights-of-entry and agreements to indemnify and hold harmless the federal government (if applicable). |

PAPPG v5

# Chapter 9: Scoping, Costing, and Final Reviews

Damage and impact information is the foundation of the project because the scope of work (SOW) and cost eligibility are tied to the eligible damage. FEMA and the applicant should work together to reach an agreement on the disaster-related damage description and dimensions (DDD), emergency protective measures, and debris impacts before proceeding with SOW development. FEMA reviews applicant-provided information to develop or validate the SOW and cost estimate for each project, develop PA Hazard Mitigation Proposals (HMPs), and ensure compliance with applicable requirements. The "Public Assistance Program Delivery Guide"[417] provides an overview of these process steps. For cost estimate reviews, FEMA uses the checklist provided in Appendix L: Validation of Applicant-Provided Cost Estimates.

# I.    Scope of Work Development

The scope of work describes the method of repair of damaged elements. The method of repair refers to the specific approach or technique used to restore, replace, or repair damaged facilities or infrastructure. The scope of work necessary to repair the damage or address the impacts must be completely described and correspond directly to the cause of damage. Descriptions of repair work should be specific to elements of damage and defined in quantifiable (e.g., length, width, depth, and capacity) and descriptive terminology (e.g., brick, wood, asphalt, timber deck bridge).

---

 **Examples: Information to Provide for Scope of Work Development**

To develop the scope of work, applicants should also provide the following for each site (not an all-inclusive list):

- Percentage of work completed;
- Who performed, or will perform, the work (e.g., force account, contract, mutual aid);
- Proposed or completed scope of work, including PA hazard mitigation measures, and identified consensus-based codes, specifications, and standards requirements; and,
- Technical studies, reports, and assessments.

---

## A.    Traditional Tribal Residential and Ceremonial Structures – Inspecting, Scoping, & Estimating

PA has well-established processes for determining damage along with scoping and estimating work to restore infrastructure for a wide range of facility types. These guidelines are often based on national standards and best practices. While the primary focus of PA is on public infrastructure like roads, bridges, schools, and utilities, it has provisions that extend to tribal-owned residential structures and tribal ceremonial buildings. Although PA can fund restoration to tribal-owned residential structures and tribal

---

[417] For more information, refer to: *Public Assistance Program Delivery Guide*.

ceremonial buildings, there are no PA processes that take into account traditional tribal structures that must be built in a manner consistent with maintaining their cultural, historical, governmental, or ceremonial construct, which can be traditionally made of adobe, mud, earth, clay, rock, and wood.

To address this disparity, FEMA will accept a Tribal Nation's certified damage assessment, scope of work for restoration, and estimated costs for traditional tribal residences or tribal ceremonial buildings. Additionally, PA supports Tribal Nations' ability to build back stronger by identifying available codes and standards applicable for traditional residential structures that Tribal Nations can consider adopting and that can be incorporated into restoration scopes of work in future disasters. Further, cost effective mitigation measures for traditional tribal residential structures and ceremonial buildings will be provided to tribal applicants and recipients to preserve the homes of indigenous people.

# II.    Cost Development

While FEMA or the recipient may assist the applicant with preparing project applications based on actual or estimated costs, the applicant is ultimately responsible for developing and documenting all costs.

## A.    Project Thresholds

FEMA establishes a minimum project threshold for each federal fiscal year. If a project application totals less than the minimum threshold, the project is ineligible for FEMA funding.[418] The project application total includes hazard mitigation costs and accounts for insurance proceeds and other reductions to avoid duplication of benefits. The threshold applies to incidents declared within that fiscal year and is based on the Consumer Price Index.[419]

The minimum threshold applies to each project application, not to each damage line item. FEMA does not combine work among several sites into one project application for the sole purpose of reaching the minimum threshold. Additionally, FEMA does not process project applications under the minimum threshold unless the applicant intends to appeal disputed scope of work or costs that would increase the project amount to *at least* the minimum threshold. The minimum threshold does not apply to donated resources or management costs; however, these projects are only eligible when the donated resources or management costs are related to an eligible project that meets the minimum threshold.

FEMA also establishes a dollar threshold[420] each federal fiscal year for the implementation of simplified procedures under Section 422 of the Stafford Act. This threshold defines a project as large or small.[421]

- A large project has costs equal to or greater than the threshold.
- A small project has costs below the threshold.[422]

---

[418] 44 Code of Federal Regulations (C.F.R.) § 206.202(d)(2).
[419] The project threshold amount is available at: Per Capita Impact Indicator and Project Thresholds | fema.gov.
[420] The project threshold amount is available at: Per Capita Impact and Project Thresholds | fema.gov.
[421] 44 C.F.R. § 206.203(c).
[422] Stafford Act § 422; 42 United States Code (U.S.C.) § 5189; 44 C.F.R. § 206.203(c).

228

PAPPG v5

FEMA administers funding for large and small projects differently. For large projects that are not capped, FEMA adjusts any estimated costs to the actual incurred amount so that the final approved funding is based on actual costs.[423] For small projects, FEMA does not adjust estimated costs to the actual incurred amount.[424] FEMA determines whether a project is large or small based on the final approved amount of eligible costs after any cost adjustments, including insurance reductions.

## B.     Expedited Projects for Emergency Work

FEMA may provide expedited funding for emergency work projects (category A or B) that meet or exceed the large project threshold. FEMA funds expedited projects at 50 percent of the federal share of the estimated project cost. Requests for expedited projects must be submitted to FEMA within 60 days of an applicant's recovery scoping meeting. To support its request, an applicant must provide enough information for FEMA to validate that the work and costs are eligible. FEMA will work to obligate funding within 90 days of receipt of the request.

FEMA's obligation of an expedited project is not an authorization for a recipient to advance funds without the documentation to support the drawn funds. Expedited advance payments are limited to the "minimum amounts needed" and for payments to be timed based on the "actual, immediate cash requirements" to perform the eligible work.

For the development and obligation of an expedited project, an applicant needs to provide the following, broken down by the applicant's monthly (or bi-weekly) operational periods:

- A detailed description of the work and documentation to substantiate that the work is eligible, including:
  - Description of immediate threat;
  - Detailed description of work activities performed or plans to perform;
  - Work locations; and,
  - For debris: estimated quantities by type of debris.
- The total estimated cost must be reasonable, supported by documentation and include the following:
  - Itemized cost estimate with basis for estimate (e.g., actual costs, historical unit costs, average costs for similar work in the area, or contractor or vendor quotes including pre-qualified contracts);
  - Insurance policies;
  - Labor including mutual aid:
    - Budgeted employees: Total regular and overtime hours with average rate for each type of employee;
    - Unbudgeted employees: Total regular and overtime hours with average rate for each type of employee;
    - Mutual aid: Total regular and overtime hours with average rate for each type of employee (e.g., mutual aid, National Guard, or prison labor); and,

---

[423] 44 C.F.R. § 206.205(b).
[424] 44 C.F.R. § 206.205(a); Stafford Act § 422; 42 U.S.C. § 5121.

229

- — Mutual aid agreement, memorandum of understanding or other written agreement.
- o Equipment:
  - — Applicants own equipment: Equipment type, usage, and rate for each type of equipment;
  - — Purchased equipment: Equipment type and cost; and,
  - — Rented or leased equipment: Equipment type and rate for each type of equipment.
- o Supplies:
  - — Purchased: Type, quantity, and cost for each type; and,
  - — From stock: Type, quantity, and cost for each type;
- o For contract work:
  - — Documentation to support the estimate (e.g., request for proposal(s), bid documents, or contracts including pre-qualified contracts).
- ▪ Debris monitoring information; and,
- ▪ Other emergency work costs:
  - o Travel: Number of individuals, purpose, duration, and average rate;
  - o Meals: Number of individuals, purpose, duration, and average rate; and,
  - o Miscellaneous: Quantity, purpose, duration, and average rate.

If category A or B has an increased federal cost share for a limited timeframe, applicants need to separate work anticipated to be completed within the increased cost share timeframe from that to be completed after the increased cost share period (see Increased Federal Cost Share for a Limited Timeframe in Chapter 6).

FEMA estimates the cost of the work based on cost information provided by applicants. If an applicant does not provide sufficient cost information, FEMA may use average historical pricing. For contracted work, FEMA uses the unit cost from the contract if it determines the costs are reasonable; however, this is only for the purpose of expediting funding based on an estimate. FEMA reviews the applicant's procurement and contracting for compliance and addresses any noncompliance prior to or at final reconciliation and closeout of the project.

FEMA provides the federal cost share for the remaining 50 percent of the project cost once an applicant provides all documentation required to support the estimated project cost for a non-expedited project.

## C.    Costs for Projects with All Work Completed

For projects with all work complete, FEMA works with applicants to:

- ▪ Verify and collect programmatic, insurance, and hazard mitigation information;
- ▪ Ensure Environmental and Historic Preservation (EHP) grant conditions are met;
- ▪ Ensure  communities are not negatively impacted by the work completed;
- ▪ Verify information and documentation requirements; and,
- ▪ Address contextual information needed for supporting the applicant's claim for completed work.

PAPPG v5

When work for a large project is 100 percent complete, FEMA will provide funding based on actual costs. FEMA reviews the documentation submitted by the applicant and will make its eligibility determination based on the documentation received. FEMA will deny assistance for costs that are not supported by documentation. If actual cost documentation is not readily available and the applicant has provided sufficient documentation to define the scope of work completed, FEMA will provide funding for completed work based on a cost estimate.

There may be cases where, during review of the documentation submitted, FEMA determines additional information or explanation is required. In these instances, FEMA may generate a request for information (RFI) specifying a deadline for response. After a time determined appropriate by the Regional Administrator or Federal Coordinating Officer, a determination memorandum (DM) will be issued if documentation is not provided to fully support eligibility. For more information about the process, see Appeal Rights and Requirements in Chapter 2.

For small projects, FEMA may accept certification in lieu of documentation to support costs claimed and may process the project(s) based on estimated costs even if all work is completed if the applicant has provided sufficient documentation to define the completed scope of work. [425]

However, with exception of the scenarios listed under Small Projects in Chapter 12, small project estimates are not subsequently adjusted to reflect actual costs. Applicants must still retain documentation to request a net small project overrun appeal.

## D.    Estimating Emergency Work Projects with Work to be Completed

With the exception of debris removal and emergency repair projects, emergency work is often difficult to estimate due to the type of work conducted. Unlike permanent work, where a detailed scope of work is usually determined and estimated based on the damage, the detailed scope of work to address emergency response activities is often unknown and therefore difficult to estimate in advance. Additionally, emergency response activities generally do not have established unit pricing and other variables, which can impact pricing. If an applicant provides sufficient information, FEMA may process emergency work projects based on estimates.

## E.    Estimating Permanent Work Projects with Work to be Completed

When work is not yet complete, FEMA determines the amount of PA funding based on the estimated cost to restore the damaged facility to its pre-disaster design and function, including eligible codes and standards. The amount may include a reasonable amount of anticipated soft costs but does not include costs that are only related to, or only triggered by, changes to the pre-disaster design or function of the damaged facility. These include, but are not limited to, costs related to.

- Engineering and design;
- EHP compliance; and,

---

[425] Stafford Act § 422; 42 U.S.C. § 5189; 44 C.F.R. § 206.205(a).

PAPPG v5

- Work required by codes or standards identified by the applicant and verified by FEMA.

If FEMA develops the scope of work, it will also develop the associated cost estimate.

## 1.    PROJECTS REQUIRING ENGINEERING ANALYSIS

Some projects may require an engineering analysis to determine the method of repair. In these cases, FEMA will provide PA funding for engineering and design services if requested by an applicant.

## 2.    APPLICANT ESTIMATES

FEMA accepts an applicant-submitted cost estimate if the estimate:

- Is prepared by a licensed professional engineer or other estimating professional, such as a licensed architect or certified professional cost estimator who certifies that the estimate was prepared in accordance with industry standards;
- Includes certification that the estimated cost directly corresponds to the repair of the agreed upon damage;
- Is based on unit costs for each component of the scope of work and not a lump sum amount;
- Contains a level of detail sufficient for FEMA to validate that all components correspond with the agreed-upon scope of work;
- Is based on the current phase of design or construction inclusive of any known costs;
- Includes actual costs for work completed at the time the cost estimate is developed; and,
- Is reasonable.

Any foreseeable contingency costs such as security, staging, etc. should be included in an applicant-submitted cost estimate. FEMA evaluates applicant-submitted estimates for reasonableness based on the criteria under Reasonable Costs in Chapter 6.

## 3.    FEMA ESTIMATES

When FEMA develops cost estimates for sites with permanent work that are less than 90 percent complete and total costs are expected to meet or exceed the large project threshold, FEMA uses the Cost Estimating Format (CEF) in accordance with the "CEF Instructional Guide."[426] The "CEF Instructional Guide" defines various factors and the range of percentage values that FEMA may apply to projects. In rare cases, a factor may need to be reviewed or adjusted. FEMA Headquarters has access to technical assistance to review the appropriate ranges for factors. Only FEMA Headquarters has the authority to approve the use of factors that exceed the CEF specified range or approve additional factors. However, for capped projects (improved and alternate projects), FEMA only includes the CEF contingency factor "Applicant Reserve for Change Orders" and does not include any additional factors or risk premiums.

## 4.    INSURANCE REDUCTIONS

FEMA reduces the estimate to account for insurance coverage based on:

- Actual insurance proceeds, if known; or

---

[426] For more information, refer to: Cost for Large Projects Instructional Guide, Version 2.1 | fema.gov.

232

PAPPG v5

- Anticipated insurance proceeds based on the applicant's insurance policy if the amount of actual proceeds is unknown.

# III.    Compliance Reviews

FEMA conducts a series of reviews to ensure program compliance. FEMA reviews projects for quality assurance, insurance requirements, PA hazard mitigation eligibility, and EHP compliance.

# IV.    Obligation

FEMA obligates funding to recipients and transitions recovery roles and responsibilities.

## A.    Obtaining Funds

FEMA obligates the federal share of the eligible project cost to a recipient.[427] Once obligated, the project constitutes the official record of the approved scope of work. FEMA's authority to provide funding for small projects as one lump sum based on an estimate does not require recipients to obligate funding in the same manner. Recipients must expend and account for the federal award in accordance with its laws and procedures for expending and accounting for the state, Tribal Nation, or territory's own funds.[428]

## B.    Strategic Funds Management

Strategic funds management is FEMA's process for obligating PA funding based on an applicant's schedule to execute the work. If a permanent work project is greater than $1 million and the applicant does not need funds for more than 180 days from the time the project is ready for obligation, FEMA obligates funds based on the project completion schedule. FEMA's Strategic Funds Management Instruction (FEMA SOP 9570.24) addresses this obligation process in detail.[429]

The recipient is responsible for notifying the applicant that funds are available[430] and for distributing the funds to the appropriate subrecipient.[431] Funds that FEMA has obligated are available to recipients to pass through to the appropriate subrecipient.[432]

---

[427] 44 C.F.R. § 206.202(e).
[428] 2 C.F.R. § 200.302.
[429] For more information, refer to: *Strategic Funds Management Instruction (FEMA SOP 9570.24)*.
[430] 44 C.F.R. § 206.200(b)(2)(i).
[431] 44 C.F.R. § 206.202(a).
[432] 44 C.F.R. § 206.200(b)(2)(ii).

PAPPG v5

# Chapter 10: Environmental and Historic Preservation

All federally funded projects are required to undergo a review process to assess potential impacts and compliance with applicable federal laws, regulations, and executive orders (EOs). This chapter is designed to inform applicants on the requirements and expectations of the environmental and historic preservation (EHP) compliance review process to ensure smooth communication and efficient progress throughout the PA Grant Lifecycle.

## I.    EHP Compliance

PA funded projects must comply with FEMA Directive 108-1, Environmental Planning and Historic Preservation Responsibilities and Program Requirements. [433] Additionally these projects must comply with all applicable EHP laws, implementing regulations, and EOs and address adverse impacts to environmental and historic resources through avoidance, minimization, or compensatory measures. These EHP requirements aim to protect various resources such as water, air, coastal areas, wildlife, land, agriculture, historic facilities, cultural resources, and minimize adverse effects on low-income and minority populations. When PA provides funding to applicants, these grants must comply with laws and regulations designed to protect natural, cultural, and historic resources. A greensheet is a tool, prepared by EHP at the beginning of each declaration, which discusses EHP information specific to the disaster declaration designated area(s).

EHP specialists assist applicants by providing technical expertise throughout the PA Program delivery process. They inform applicants of the legal requirements associated with their grant funding, such as:

- Acquisition of permits and letters of exemption;
- Contact information for local, state, and federal regulatory agencies; and,
- Simplified guidance on how to understand and meet any project-specific conditions of the record of environmental consideration (REC).

Applicants play a critical role in the EHP review by communicating any concerns and questions to the assigned PA and EHP specialist teams early and often. By providing complete and accurate information and addressing any potential changes to the scope of work, applicants can facilitate the project compliance review and reduce the amount of time for project obligation.

 **Terminology**

A **record of environmental consideration (REC)** is a FEMA administrative document that records the application of a categorical exclusion (CATEX) or statutory exclusion (STATEX) to a specific proposed action (scope of work) and captures the compliance determinations made for all applicable EHP laws

---

[433] For more information refer to: *EHP Directive & Instruction (FEMA Directive 108-1 & Instruction 108-1-1).*

and EOs. The REC is also used to convey any conditions for compliance that have been placed on the project.

# A.  EHP Compliance Review

FEMA's goal is to assist applicants in their efforts to recover from a devastating incident and ensure all recovery work protects resources and minimizes adverse effects. To accomplish this, all PA funded projects are required to undergo an EHP review. EHP specialists need information about the work to determine what requirements apply to a project to complete the review. EHP specialists review an applicant's scope of work (SOW) and supporting documentation to understand what the applicant proposes to do, the locations of the work including equipment and material staging locations, and what natural or cultural resources may be impacted. See Chapter 9: Scoping, Costing, and Final Reviews for more information on how to create a complete SOW which includes all the necessary details for EHP to complete their review. During the review, EHP evaluates the potential impacts of the project on the natural and built environment. The findings are documented in a REC which is included in every project. An EHP specialist will inform the applicant of any consultation(s) with regulatory agencies needed and all project-specific compliance conditions.

For completed or partially completed work, applicants are required to provide all documentation and evidence to demonstrate compliance with any project-specific conditions. Documentation associated with the EHP review process may include items such as permits, certification of compliance with applicable conditions, post-construction surveys, etc. See Chapter 12: Final Reconciliation and Closeout for more information.

EHP review timeframes can vary depending on the complexity of the scope of work, resources affected, public notice requirements, and consultation with regulatory agencies. [434]

## 1.  REQUIRED INFORMATION AND DOCUMENTATION

FEMA requires the applicant to provide information about the scope of work to support the EHP review. Applicants can support a smooth review process by providing the following commonly triggered information and documentation requirements during the project formulation process:

- Physical address, if applicable, and global positioning system (GPS) coordinates for specific work sites (e.g., equipment and material staging locations, ground disturbance locations, material fill source locations);
- Dimensions of all ground disturbance (area: length, width, and depth);
- Repair or restoration details (including type and quantity of materials, equipment, and supplies used);
- Original date of facility construction and subsequent renovations;
- Equipment and materials staging information;
- Temporary and final disposal site information for debris;

---

[434] For more information, refer to: Environmental Planning and Historic Preservation | fema.gov.

PAPPG v5

- Timeframe of work performed;

- Source of fill material;

- Maps or photographs to support the SOW;

- Plans, drawings, and/or blueprints to explain the SOW;

- Studies and surveys, if requested; and,

- Applicable permits, authorizations, and correspondence with regulatory agencies.

FEMA generates a request for information (RFI) for clarification or additional documentation if more information is needed to support EHP compliance review. See the Requests for Information section in Chapter 2 to learn more about the RFI Process.

## B.    Projects that Qualify for Streamlined EHP Review

All projects are subject to an EHP compliance review, however the timeframes for this review vary depending on the type of project. FEMA EHP collaborates closely with regulatory partners to create streamlined procedures and processes, such as programmatic agreements or consultations. These programmatic documents contain predetermined compliance decisions based on reviews that assess the potential impacts of projects or actions that are carried out repeatedly and are likely to have similar effects that can be assessed on a broader scale. These tools enable EHP specialists to make compliance determinations quickly, without the need for consultations with various multiple parties or regulatory agencies.

 **Examples: PA Projects that Qualify for Streamlined EHP Review**

- Projects intended to restore the facility back to pre-disaster condition using in-kind or like materials;

- Projects with codes and standards upgrades;

- Projects involving replacement of contents, supplies, or equipment; and,

- Projects with minor repair, restoration, or construction on buildings or structures less than 45 years old and that are not listed or eligible for listing in the National Register of Historic Places.

## C.    Projects Requiring Complex EHP Review

Projects that have potential for impacts to natural and cultural resources will require more detailed information and longer compliance review time. These types of projects often require consultations or coordination with other resources or regulatory agencies, including:

- U.S. Fish and Wildlife Service (USFWS);[435]

- U.S. Environmental Protection Agency (EPA);[436]

- National Marine Fisheries Service (NMFS);[437]

---

[435] For more information, refer to: U.S. Fish and Wildlife Service (USFWS) | fws.gov.
[436] For more information, refer to: U.S. Environmental Protection Agency (EPA) | epa.gov.
[437] For more information, refer to: National Marine Fisheries Service (NMFS) | noaa.gov.

PAPPG v5

- U.S. Army Corps of Engineers (USACE); [438]
- State Historic Preservation Offices (SHPO); [439]
- Tribal Historic Preservation Offices (THPO); [440] and,
- Other applicable local, state, and territorial regulatory agencies.

Regulatory agencies have the authority to evaluate and approve projects through consultations or permitting decisions. When a project requires FEMA to consult with a regulatory agency, the estimated timelines are established by the responsible regulatory federal, state, and Tribal Nation resource agencies. See the Understanding EHP Laws and Executive Orders in this chapter for more information.

 **Examples: Projects with the Potential to Impact Natural and Cultural Resources**

Examples of projects with the potential to impact natural and cultural resources include:

- New construction or changes in the location, footprint, or size of a facility;
- An increase in the size, alignment, or location of a road, bridge, or culvert;
- Hazard mitigation and codes and standards upgrades;
- Work affecting buildings, structures, sites, objects, or districts that are 45 years or older, historic landmarks of any age, and any work resulting in soil movement or change to the pre-disaster footprint;
- Work near or within a special flood hazard area (regulatory floodway or the 1% annual chance floodplain zone (100-year), or, for critical actions, in the 0.2% annual chance floodplain zone (500-year); [441]
- Work in or near environmentally sensitive areas such as barrier islands, conservation easements, fish hatcheries, preserves, state and national parks, and wildlife management areas;
- Work in or near beaches, canals, lakes, rivers, streams, wetlands, or other bodies of water including fishing piers;
- Staging and disposal (or recycling) of debris including, but not limited to, vegetative, construction and demolition (C&D), and hazardous materials as a result of either the disaster event or the project work; and,

Projects requiring complex EHP review are broken out by PA project type in the paragraphs below.

---

[438] For more information, refer to: U.S. Army Corps of Engineers (USACE) | USACE.army.mil.
[439] For more information, refer to: State Historic Preservation Offices (SHPO) | nps.gov.
[440] For more information, refer to: Tribal Historic Preservation Offices (THPO) | nps.gov.
[441] For more information, refer to: Floodplain Management and Wetland Protection.

PAPPG v5

## 1.    EMERGENCY WORK (CATEGORIES A AND B)

While FEMA's statutory exclusions under Section 316 of the Stafford Act exempt most emergency actions from review under the National Environmental Policy Act (NEPA), compliance with other laws, such as the Endangered Species Act (ESA), the National Historic Preservation Act (NHPA), the Resource Conservation and Recovery Act (RCRA), the State Solid Waste Laws, the Clean Air Act (CAA), the Clean Water Act (CWA), and Executive Orders 11988 (Floodplain Management), and 13112 (Invasive Species), is still required.

## 2.    DEBRIS REMOVAL (CATEGORY A)

Although debris removal is usually statutorily excluded from the NEPA review, FEMA must ensure compliance with other EHP-related federal laws, regulations, and EOs prior to funding the work. Accordingly, FEMA must ensure that the applicant's debris removal operations avoid impacts to such resources as floodplains, wetlands, federally listed threatened and endangered species and their critical habitats, and historic properties (including maritime or underwater archaeological resources if waterways are impacted). Additionally, debris removal operations must avoid impacts that contribute to hazardous gas release and water supply contamination. Applicants must ensure they follow conditions established by state, local, Tribal Nation, and territorial authorities and must stage debris at a safe distance from property boundaries, surface water, floodplains, wetlands, structures, wells, and septic tanks with leach fields. Additional coordination may be necessary for debris removal from waterways, stump removal, and use of fill.

Applicants are responsible for permits and compliance with federal, state, Tribal Nation, and territorial requirements. The applicant needs to work with the disaster EHP staff to gain clarity on compliance requirements and permits for debris-related operations. Upon completion of debris removal, recycling, and disposal, site remediation may be necessary at staging sites and other impacted areas.

## 3.    EMERGENCY PROTECTIVE MEASURES (CATEGORY B)

Although emergency protective measures are usually statutorily excluded from NEPA review, FEMA must ensure compliance with other EHP-related federal laws, regulations, and EOs prior to funding the work. Accordingly, FEMA must ensure that the applicant's emergency protective measures, where possible: 1) avoid impacts to resources such as federally listed threatened and endangered species and their critical habitats, and historic properties; and 2) consider impacts to and from floodplains and wetlands.

For emergency work that occurs in or near impacted areas that have natural and cultural resources, FEMA encourages applicants to coordinate prior to conducting work to front-load any applicable EHP considerations in a timely manner. For work that is complete at the time the project application is submitted to FEMA, documentation is still needed to facilitate the EHP review of emergency work projects and to demonstrate EHP compliance even if it is after-the-fact. See Chapter 12: Final Reconciliation and Closeout for more information.

 **Examples: Emergency Work Projects that have the Potential to Impact EHP Resources**

Examples of emergency work projects that have the potential to impact EHP resources include:
- Burning of debris;

238

PAPPG v5

- Debris removal from waterways and shorelines;
- Mold remediation;
- Mosquito abatement;
- Construction of temporary access roads, levees, and emergency berms;
- Demolition of unsafe structures;
- Purchase or construction of temporary facilities for essential community services; and,
- Temporary actions in coastal areas.

## 4.    PERMANENT WORK (CATEGORIES C-G)

Permanent work projects that involve changes in location, footprint, alignment, or size of a facility or that occur in or affect natural and cultural resources often require a more intensive EHP review and trigger more compliance requirements. These projects often include alternate or improved projects, projects that involve significant changes to the pre-disaster configuration or the relocation of a facility, projects that incorporate codes and standards upgrades, or projects that incorporate hazard mitigation. It is important to understand EHP requirements for these types of permanent work projects.

 **Examples: Permanent Work Projects that have the Potential to Impact EHP Resources**

Examples of permanent work projects that have the potential to impact EHP resources include:
- Upsizing culverts and redesigning water conveyance structures;
- Replacing or relocating of a bridge;
- Modifying to the interior or exterior of a historic building;
- Reconstructing of a waterfront boardwalk or pier;
- Relocating and/or burying utility lines;
- Beach renourishment projects;
- The relocation of facilities to undisturbed areas;
- Repairs to substantially damaged structures within the floodplain; and,
- New structures or facilities.

### i.    Disposition of Original Facility

For alternate and alternative procedures projects, if the applicant does not repair, replace, or sell the damaged facility for which the capped project funding was based, and that facility is unsafe if not repaired, the applicant must render the facility safe and secure (e.g., by restricting access, locking doors and windows,

239

constructing a fence around the property) or demolish it and provide the necessary assurances to document compliance with special requirements.[442]

If an applicant receives funds for salvaged components of the facility, FEMA adjusts the capped project funding by the value or anticipated fair market value of salvaged materials less the estimated costs necessary to demolish the facility, grade the site, or make the facility safe and secure.

For any work proposed by an applicant using PA funds at the original site, such as making the damaged facility safe and secure or demolishing it, FEMA must conduct EHP compliance review. When no PA funding is used for work proposed at the original site, FEMA will require the applicant, as a condition of the grant funding for alternate and alternative procedure projects, to coordinate with necessary agencies including the state historic preservation officer or tribal historic preservation officer (SHPO/THPO), U.S. Fish and Wildlife Service, National Marine Fisheries Service, or the U.S. Army Corps of Engineers, to determine if the proposed work will adversely affect any historic properties and/or natural resources, and consider any measures recommended by the agencies to avoid, minimize, treat, or otherwise address adverse effects identified. The applicant must provide FEMA with documentation of its coordination with the agencies, and any agreed upon measures to address adverse effects. The applicant is responsible for all costs associated with said coordination and agreed upon measures unless they are directly related to the restoration of disaster-related damage. See Appendix D: Environmental and Historic Preservation Compliance for a description of common EHP laws, regulations, and executive orders (EOs).

If an applicant opts to keep a damaged facility for a later use, the facility is eligible for PA funding in future incidents, provided the applicant repaired the facility in accordance with current codes and standards, and completed any mitigation measures, or other requirements that FEMA included in the original SOW prior to the incident. The applicant must also maintain and obtain insurance according to the requirement placed on the original project.

## D.    Navigating the EHP Compliance Process

While FEMA EHP provides technical assistance and guidance to applicants in each step of the application process, there are some things applicants can do to help ensure a timely and efficient EHP review. Below are some guidelines to help applicants navigate the EHP compliance process:

- Provide detailed information for assessing potential impacts, including a complete and clear scope of work to minimize requests for clarification and information.
- Provide maps or sketches of work details, photographs, site plans, and area descriptions of pre-disaster conditions and proposed or completed work to reduce requests for information from EHP.
- Obtain any necessary permits and/or authorizations prior to construction.
- Provide any pre-existing permits and/or authorizations. FEMA may be able to expedite the EHP compliance review based upon existing and applicable permit and/or authorization documentation.

---

[442] 44 C.F.R. § 206.203.

- Document and keep copies of any correspondence with federal or state agencies regarding permits and/or authorizations. Attach those copies to the grant application.

- Adhere to permit and/or authorization conditions for implementing work and utilize identified best management practices as specified by regulatory agencies. Verify conditions were met if work is completed.

## E.    Understanding EHP Laws and Executive Orders

The most commonly encountered federal laws FEMA reviews for EHP compliance include: the National Environmental Policy Act, the National Historic Preservation Act, the Endangered Species Act, Executive Order 11988 Floodplain Management, Executive Order 11990 Wetlands Protection, the Coastal Barrier Resources Act, and the Clean Water Act (CWA). More information about these laws is provided in the sections below.

Depending on the project location and type of work, compliance with other laws, such as the Coastal Zone Management Act (CZMA), the Resource Conservation and Recovery Act, or the Marine Mammal Protection Act may be required. See Appendix D: Environmental and Historic Preservation Compliance for descriptions of additional EHP laws and Executive Orders (EOs) that are not covered in this section.

### 1.    NATIONAL ENVIRONMENTAL POLICY ACT

The purpose of NEPA is to ensure that environmental factors are weighted equally when compared to other factors in the decision-making process undertaken by federal agencies. NEPA requires that the effects of proposed actions and alternatives on the human environment be shared with the public and considered by an agency before deciding on the proposed action. The human environment includes the natural and physical environment and the relationship of people within that environment.

EHP considers the statutory necessity and likelihood of environmental consequences of a proposed action or connected actions when determining the appropriate level of NEPA review:

- **Statutory exclusion (STATEX)** means the work (proposed action) is exempt from NEPA review because actions covered by STATEX are required in the aftermath of a disaster to return facilities to their pre-disaster condition and therefore have little or no impact on the environment.

- **Categorical exclusion (CATEX)** is a form of NEPA compliance that applies to actions that do not need to undergo a detailed NEPA review because the agency has evaluated and demonstrated that these types of work (actions) do not normally have the potential to have a significant effect upon the environment. Moreover, CATEXs are applied to projects that have no extraordinary circumstances present, which would require a more detailed NEPA review (environmental assessment or environmental impact statement).

- **Environmental assessments** are prepared for projects that do not fall under a STATEX or CATEX and when it is unlikely or unknown whether the proposed project would cause significant environmental and/or historic impacts. This is a more detailed examination of the project and requires an evaluation of alternatives and public involvement component. Environmental assessments can result in the following:

  o  A **finding of no significant impact** means the action will not have significant impacts and is not highly controversial in terms of environmental impacts.

- o A **notice of intent (NOI)** to prepare an environmental impact statement (EIS) means that the action may have significant impacts or controversy in terms of environmental impacts, and an EIS that results in a record of decision should be prepared.

- ▪ **Environmental impact statement (EIS)** examines a major federal action that significantly affects the quality of the human and natural environment. It is a detailed impact study that requires extensive agency and public coordination.

## 2.    NATIONAL HISTORIC PRESERVATION ACT

Emergency protective measures, debris removal, and permanent work to repair, restore, or replace disaster-damaged facilities may impact historic properties, including buildings, structures, sites, including archaeological resources, objects, and districts. Section 106 of the National Historic Preservation Act (NHPA)[443] requires FEMA to assess if PA-eligible work will affect such properties and consult with the state historic preservation officer (SHPO) and/or tribal historic preservation officer (THPO), and other consulting parties, including the applicant and recipient, to resolve any adverse effects to identified properties through avoidance, minimization, or compensation measures. Through the execution of programmatic agreements with the SHPO/THPO and recipient, FEMA ensures streamlining of the Section 106 compliance process while integrating historic preservation considerations into the formulation and implementation of PA projects.

## 3.    ENDANGERED SPECIES ACT

Under the Endangered Species Act (ESA), the federal government (including FEMA) has the responsibility to protect endangered species (species that are likely to become extinct throughout all or a large portion of their range), threatened species (species that are likely to become endangered in the near future) and critical habitat (areas vital to the survival of endangered or threatened species). Under Section 7 of the ESA, all federal agencies including FEMA are required to review their actions or funded actions, including PA projects, for potential effects to federally-listed species or critical habitat. If FEMA determines there will be an effect to species or their critical habitat, they must consult with the U.S. Fish and Wildlife Service and/or National Marine Fisheries Service on that action. The consultation may be informal or formal depending on the level of effects to species or critical habitat. Consultation may result in the application of project-specific conditions such as timing restrictions or construction best practices that an applicant must follow in order to be compliant with the ESA.[444]

## 4.    EXECUTIVE ORDERS 11988 & 11990: FLOODPLAIN MANAGEMENT AND WETLANDS PROTECTION

FEMA actions, including PA projects, must conform to 44 Code of Federal Regulations (C.F.R.) Part 9, which incorporates the requirements of EO 11988, as amended, and EO 11990. Applicants must review all proposed actions to determine whether they are in the floodplain or wetland. In accordance with EO 11988, as amended, and EO 11990, FEMA must complete an 8-step decision-making process for proposed actions located in the floodplain or wetland, as well as proposed actions that have the potential to affect or be

---

[443] For more information, refer to: National Historic Preservation Act | fema.gov.
[444] For more information, refer to Endangered Species Act | fws.gov.

PAPPG v5

affected by a floodplain or wetland. The applicable floodplain for the action is determined by the type and criticality of the action.

As part of the eight-step decision-making process, FEMA must consider alternative locations and actions, to determine whether the floodplain or wetland is the only practicable location for that action. Applicants should document alternatives considered as part of their application process to assist FEMA in facilitating this decision-making process. If the floodplain or wetland is the only practicable location, applicants must avoid or must minimize adverse impacts to the floodplain or wetland and also be in compliance with any more restrictive federal, state, or local floodplain management standards.[445]

See the Environmental and Historic Preservation Requirements section in Chapter 8 for more information.

## 5.    COASTAL BARRIER RESOURCES ACT

In accordance with the Coastal Barrier Resources Act (CBRA), FEMA may assist projects in otherwise protected areas if they do not require flood insurance after project completion.[446] The CBRA designates relatively undeveloped land along the Atlantic and Gulf Coast as part of the John H. Chafee Coastal Barrier Resources System (CBRS) that are ineligible for most new federal assistance. Projects in a John H. Chafee CBRS unit are eligible only if they qualify for one of the exceptions in Section 6 of the CBRA[447] and comply with FEMA's CBRA regulations that provide further information on the restrictions for funding specific to disaster recovery.[448]



**Terminology**

**Otherwise, protected areas** consist of conservation or recreation areas such as national wildlife refuges, state and national parks, local conservation areas, and private conservation areas, although they may also contain private areas that are not for conservation.

All projects that occur in or adjacent to CBRS units must meet one of the CBRA exceptions and require that FEMA consult with the appropriate U.S. Fish and Wildlife Service Ecological Services field office.

Proposed actions carried out within or adjacent to an "otherwise protected area" do not require consultation with the U.S. Fish and Wildlife Service.

## 6.    CLEAN WATER ACT

The Clean Water Act (CWA) establishes the basic structure for regulating discharges of pollutants into Waters of the United States (WOTUS) and regulating the quality of surface waters. Together with the Rivers and

---

[445] 44 C.F.R. § 9.11(d).
[446] Congress reauthorized the Coastal Barrier Resources Act with the Coastal Barrier Improvement Act of 1990 (Public Law 101-591 [Nov. 16, 1990], expanding the CBRS to include undeveloped costal barriers along the Florida Keys, Great Lakes, Puerto Rico, and the U.S. Virgin Islands. It also added a new category of undeveloped barriers called Otherwise Protected Areas.
[447] 16 United States Code (U.S.C.) § 3505.
[448] 44 C.F.R. § 206 Subpart J.

PAPPG v5

Harbors Act (RHA) of 1899, the CWA helps define the federal government's jurisdiction over, and approach to, managing waters under its jurisdiction. These laws give the U.S. Army Corps of Engineers (USACE), U.S. Coast Guard, U.S. Environmental Protection Agency (EPA), and other agencies permitting authority over certain activities affecting "navigable waters of the United States" subject to federal jurisdiction under the RHA and "navigable waters" subject to federal jurisdiction under the CWA, which are defined as "waters of the United States."

It is the responsibility of an applicant to obtain any required CWA Section 401 water quality certification and CWA Section 402 National Pollutant Discharge Elimination System permits whenever there is the work in waterways or the potential for discharge of wastewater pollutants (including sediment) to surface waters (e.g., wetlands, ponds, lakes, streams, and rivers). FEMA typically conditions grant approval upon an applicant obtaining all relevant certifications and permits required for the project.

CWA Section 404 establishes a program to regulate the discharge of dredged or fill material into WOTUS, including wetlands. Section 404 requires that a permit be obtained before dredged or fill material may be discharged into WOTUS, unless the activity is exempt from Section 404 regulation. It is the responsibility of an applicant to obtain a Section 404 permit, declare the use of a non-reporting nationwide permit (NWP), or provide documentation that no permit is required.

 **Examples: Projects That Can Trigger CWA Section 404 Permitting Requirements**

Examples of projects that can trigger CWA Section 404 permitting requirements include:

- Dredging wetlands or placement of fill in wetlands;
- Culvert or bridge replacements in WOTUS;
- Shoreline revetments;
- Embankment armoring;
- Repair or replacement of docks and piers; and,
- Beach renourishment.

## F.        Coordination with Other Federal Agencies

When multiple federal agencies are conducting, supporting (including funding), or permitting projects in the same geographic area, early coordination is essential to avoid the potential for conflicting EHP standards being applied within the same geographic area or on the same project. Accordingly, when FEMA is funding an action with or in the same area as another federal agency, FEMA will coordinate with the applicable federal agencies as early in the planning process as possible to promote streamlining of EHP compliance reviews. For example, public housing agencies (PHAs) are eligible to receive PA funding for projects involving their public housing portfolio. When public housing receives PA funding, FEMA EHP will reach out to the U.S. Department of Housing and Urban Development (HUD) to coordinate on the environmental and historic preservation review process.

244

PAPPG v5

1.    UNIFIED FEDERAL REVIEW

FEMA has committed to expediting and unifying environmental reviews. The Unified Federal Review (UFR) process [449] offers additional coordination opportunities for FEMA and other federal agencies. The UFR allows for higher-level resolution in instances where agreement on a common approach reaches an impasse.

## G.    Partnerships and Resources

### 1.    HERITAGE EMERGENCY NATIONAL TASK FORCE

The Heritage Emergency National Task Force (HENTF), [450] a partnership between FEMA's Office of Environmental Planning and Historic Preservation (OEHP) and the Smithsonian Cultural Rescue Initiative (SCRI), strives to protect state, local, Tribal Nation, and territorial (SLTT) cultural and historic resources from the damaging effects of disasters. HENTF supports the Natural & Cultural Resources (NCR) Recovery Support Function (RSF) in developing recovery needs assessments by identifying issues, impacts, and unmet needs of private nonprofit cultural institutions such as museums, libraries, historical societies, city/town clerk offices, and performing arts organizations.

HENTF's 60-plus members – federal agencies and private nonprofit national service organizations – represent expertise in the arts, culture, historic preservation, emergency management, and tribal affairs. HENTF can serve as a technical assistance resource for field staff to address issues specific to applicants in the arts and culture sector, by identifying resources, advising on conservators and allied professionals, and evaluating scopes of work for treatment of objects.

HENTF actions during disaster operations include:

- Coordinating the collection and sharing of incident-specific information to support the federal response;
- Coordinating with its members, state cultural agencies, state, and regional library/archives/museum/arts associations, and SLTT cultural heritage emergency networks for situational awareness; and,
- Aiding in dissemination of PA information and updates via HENTF network to reach stakeholders at the local level.

## H.    Resource Links

- Environmental & Historic Preservation Grant Preparation Resources
- EHP Tools for Practitioners
- The Heritage Emergency National Task Force (HENTF) | FEMA.gov

---

[449] For more information, refer to: Unified Federal Environmental and Historic Preservation Review | fema.gov.
[450] For more information, refer to: Heritage Emergency National Task Force (HENTF) | culturalrescue.si.edu.

PAPPG v5

# Chapter 11: Project Monitoring and Amendments

Post award project monitoring includes managing projects, ensuring subrecipients use funds in alignment with the approved scope of work (SOW), adhering to set deadlines, and meeting compliance requirements. Recipients are responsible for assessing the risk of non-compliance for each subrecipient and, if necessary, imposing additional conditions or requirements. Monitoring subrecipients is essential to ensure compliance with federal regulations and the achievement of performance goals, which includes reviewing financial and progress reports.

PA staff support recipients and track the overall progress of disaster operations. PA staff also manage requests for changes in scope, time extensions, project closeouts, appeals, audits, and arbitration. The "Public Assistance Program Delivery Guide" [451] provides an overview of these process steps.

## I.    Post Award Change in Scope of Work

Subrecipients must ensure PA funding is used exclusively for eligible work specified in the approved project. If a change to the SOW becomes necessary, subrecipients should promptly consult with both the recipient and FEMA to allow sufficient time for FEMA to review the proposed changes for eligibility.

To request a change, subrecipients must submit a written request to the recipient, including both a detailed justification why the change is necessary and supporting documentation for FEMA to substantiate the eligibility of the proposed revision. [452] Subrecipients should include the information outlined in Table 31. Required Documentation and Information to Support Scope of Work Changes to facilitate FEMA's evaluation. If the request involves previously unreported damage, subrecipients must also provide documentation linking the work to the disaster. The recipient then forwards the request and its recommendation to FEMA for review.

Commonly eligible reasons for SOW changes include:

- Alternate repair method is more cost-effective than the original proposed repair method;
- Original repair method is no longer technically feasible;
- Upgrades needed per codes and standards; [453]
- Increase in previously approved quantities due to errors or omissions;
- Discovery of hidden incident-related damage during construction; or
- The subrecipient wishes to pursue an improved or alternate project.

---

[451] For more information, refer to: *Public Assistance Program Delivery Guide*.
[452] 44 C.F.R. § 206.204(e); 2 C.F.R. § 200.308.
[453] For more information, refer to Codes and Standards in Chapter 8.

246

PAPPG v5

**Table 31. Required Documentation and Information to Support Scope of Work Changes**

| Required Documentation and Information to Support Scope of Work Changes for Small and Large Projects |
|---|
| ▪ Detailed change(s) to scope of work; |
| ▪ Cost estimate; |
| ▪ Reason for changes: |
|    ○ Cost estimate if more cost-effective repair method; |
|    ○ If the original scope of work is not feasible, supporting documentation such as technical reports or surveys; |
|    ○ If hidden damage (must be found during performance of eligible work): |
|       – Documentation substantiating the damage is related to the declared incident; and, |
|       – Photographs documenting damage. |
| ▪ Construction timeline/project schedule: |
|    ○ Time extension if scope of work change will result in a project delay causing work to be conducted outside the approved period of performance. |

# II.    Work Completion Deadlines

FEMA provides PA funding only for work completed and costs incurred [454] within specified regulatory deadlines (see Figure 21. Work Completion Deadlines). For emergency work, the deadline is six months from the disaster declaration date. [455] For most permanent work, the deadline is 18 months, except for category I projects, which have a 180-day limit. FEMA considers these timelines as the approved period of performance (POP) for a project, defining work completion as fulfilling all tasks in the approved SOW and meeting compliance requirements. This does not include payments for invoices, warranty periods, or grant management activities, such as submitting closeout documentation, reconciling finances, or requesting payment. If additional time is needed, subrecipients must submit a written request to the recipient for a time extension, with the following information:

| Deadlines for Completion of Work | |
|---|---|
| **Type of Work** | **Timeframe** |
| Emergency Work | 6 Months |
| Permanent Work | |
| *Categories C-G* | 18 Months |
| *Category I* | 180 Days |

**Figure 21. Work Completion Deadlines**

▪ Dates and justification for all previous time extensions; [456] and,

▪ A detailed justification for the delay. [457]

---

[454] 2 C.F.R. § 200.309; 44 C.F.R. § 206.204(d)(2).
[455] 44 C.F.R. § 206.204(c)(1).
[456] Ibid.
[457] 44 C.F.R. § 206.204(c)(1).

247

PAPPG v5

Recipients have authority to grant time extensions due to extenuating circumstances. Recipients may extend emergency work up to an additional six months and permanent work up to 30 months on a project-by-project basis, with the exception of temporary relocation and category I projects. Any extensions beyond these limits require FEMA approval, and recipients must notify FEMA of approved extensions either through the Grants Portal system or official correspondence. FEMA has authority to grant further extensions if justified by extenuating circumstances,[458] which generally include delays caused by permitting or Environmental and Historic Preservation (EHP) requirements, atypical limitations like narrow construction windows, adverse weather preventing site access, or shortages of materials, equipment, or contractors. However, FEMA does not consider circumstances such as delayed permit requests, lack of funding, administrative changes, or cost documentation compilation as valid reasons for time extensions.

## A.    Project Schedule

Creating and following a well-structured project schedule is critical for managing projects effectively and ensuring that work is completed within the period of performance or for identifying when a time extension is necessary. Scheduling serves as the backbone of project management, particularly in construction, by systematically planning, organizing, and controlling the allocation of resources, tasks, and activities. An effective schedule improves time management by defining and sequencing work tasks, ensures that resources such as time, budget, and staffing are appropriately allocated, and supports risk management by identifying potential roadblocks and delays early on. It also enables monitoring of project progress, making budgeting more predictable and manageable. Without a clear schedule, projects are more vulnerable to delays and cost overruns.

# III.    Large Project Quarterly Progress Reports

Funding for PA large projects is based on estimated costs, contracted costs, or a combination of both for an approved scope of work, with grant funds obligated accordingly. Since actual costs become clear only upon project completion, they often vary from initial estimates. To ensure responsible management of public funds, regular reviews, and timely identification of any changes in project costs are essential.

The large project Quarterly Progress Report (QPR) is a tool for tracking project expenditures relative to completion percentage, comparing completed work costs against obligated funding, monitoring the drawdown of funds by recipients, and assessing whether a project is underfunded or overfunded. The QPR also includes the status of projects pending final federal payment and highlights any issues that could lead to noncompliance with grant conditions. Quarterly reporting is not required for small projects.

FEMA requires recipients to report on the status of all open large projects each quarter.[459] Subrecipients and recipients must meet specific reporting requirements outlined in Table 33. Required Documentation and Information for Quarterly Progress Reports. Recipients must submit QPRs to FEMA within 30 days of each

---

[458] 44 C.F.R. § 206.204(d).
[459] 44 Code of Federal Regulations (C.F.R.) § 206.204(f).

248

PAPPG v5

fiscal quarter's end. The Regional Administrator and recipient negotiate the date for submission of the first report.[460]

**Table 32. Deadlines for Submitting Quarterly Progress Reports**

| Quarter | Dates | Report Due Date |
|---|---|---|
| 1 | October 1 – December 31 | January 30 |
| 2 | January 1 – March 31 | April 30 |
| 3 | April 1 – June 30 | July 30 |
| 4 | July 1 – September 30 | October 30 |

**Table 33. Required Documentation and Information for Quarterly Progress Reports**

| Responsible Point of Contact | Project Type | Required Documentation |
|---|---|---|
| Subrecipient | Large Projects with an Incomplete Scope of Work (Work is Still In-Progress) | ▪ A brief description of known problems or circumstances that are expected to cause a deviation from the approved scope of work, cost, delay project completion or delay project closeout;<br>▪ Status of the project (either construction phase or percent complete);<br>▪ Whether the work is complete (per definition under Work Completion Deadlines in this chapter);<br>▪ Project period of performance end date;<br>▪ Projected completion date per definition under Work Completion Deadlines in this chapter); and,<br>▪ Status of time extension, if applicable. |
| Subrecipient | Large Projects with Complete Scope of Work (Work is Completed) | ▪ Date work was completed; and,<br>▪ Entity responsible for the action in the closeout process (FEMA, recipient, subrecipient). |
| Recipient | Large Projects with Complete Scope of Work (Work is Completed) | ▪ Total amount disbursed to the subrecipient;<br>▪ Whether final payment was made;<br>▪ Whether time extensions were approved; and,<br>▪ Latest approved work completion deadline. |

---

[460] 44 C.F.R. § 206.204 Project performance.

PAPPG v5

# IV.   Financial Status Reports

Recipients submit the *Federal Financial Report* (SF-425) quarterly to the respective FEMA Regional Office.[461] The reports provide the status of funds for the prime award, the recipient's expenditure drawdowns, and whether the recipient is meeting its cost-share requirements.

# V.   Federal Funding Accountability and Transparency Act

The Federal Funding Accountability and Transparency Act (FFATA) requires that FEMA manage and administer awards in a manner so as to ensure that federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, federal law, and public policy requirements. These requirements include, but are not limited to those protecting free speech, religious liberty, public welfare, the environment, and prohibiting discrimination. FEMA must communicate to recipients all relevant public policy requirements, including those in general appropriations provisions, and incorporate them either directly or by reference in the terms and conditions of the award.[462]

Recipients are responsible for complying with all requirements of the award. For all federal awards, this includes the provisions of FFATA, which includes requirements on executive compensation, and also requirements implementing the Act for the non-federal entity at 2 C.F.R. Parts 25 and 170.[463]

FFATA requires recipients to register in the FFATA Subaward Reporting System[464] and report on all awards and subawards equal to or greater than $30,000.

# VI.   Audits

Recipients and subrecipients are subject to federal and non-federal audits. Records are subject to audit by state or territorial government auditors, FEMA, the U.S. Department of Homeland Security Office of Inspector General (OIG), and the U.S. Government Accountability Office (GAO) or any of their authorized representatives.[465] FEMA may adjust project funding due to audit findings.

## A.  Single Audits

A recipient or subrecipient that expends $1 million or more in federal funds during its fiscal year must perform a single or program-specific audit.[466]

## B.  Government Accountability Office

The Government Accountability Office (GAO) is the investigatory arm of Congress and is under the direction of the Comptroller General of the United States. GAO is an independent, nonpartisan agency that investigates how the federal government spends taxpayer dollars. Its mission is to help improve the

---

[461] 2 C.F.R. § 200.328.
[462] 2 C.F.R. § 200.300(a).
[463] 2 C.F.R. § 200.300(b).
[464] For more information, refer to: Federal Funding Accountability and Transparency Act Subaward Reporting System | fsrs.gov.
[465] 2 C.F.R. § 200.337.
[466] 2 C.F.R. § 200.501.

performance and accountability of the federal government. Although the GAO usually audits FEMA programs, it has authority to audit any project.

## C. Office of the Inspector General

The Department of Homeland Security's Office of Inspector General (OIG) conducts independent audits and investigations on FEMA programs, operations, activities, and functions; how recipients and subrecipients expend federal funds; and oversight of non-federal audits such as single audits. The OIG evaluates activities to identify, deter, and address fraud, waste, and abuse. The OIG has authority to audit any project.

### 1.    REPORT FRAUD

FEMA award recipients and subrecipients play a critical role in helping to identify fraud and are highly encouraged to report suspicious activities at any time during the procurement process by contacting the FEMA Fraud and Investigation Division,[467] the DHS OIG Hotline,[468] FEMA Suspension and Debarment [469].and the U.S. Department Justice National Center for Disaster Fraud.[470]

## D. FEMA Office of Civil Rights

FEMA's Office of Civil Rights (OCR) has the authority to conduct investigations and compliance reviews based on discrimination. OCR has the authority to request and review documentation related to programs receiving FEMA financial assistance and FEMA programs and has monitoring and oversight requirements in connection with recipient compliance with federal civil rights laws. OCR conducts investigations on complaints received from the public alleging civil rights violations from FEMA, FEMA programs, and recipients of FEMA financial assistance.[471] OCR may conduct a full investigation and render a decision on the complaint, or they may refer the complaint to another agency. OCR conducts compliance reviews of FEMA programs and recipients of FEMA financial assistance to ensure compliance with civil rights before, during, and after disasters. Prior to conducting a compliance review, OCR seeks to provide technical assistance related to civil rights, as its mission is to fully integrate civil rights into all aspects of FEMA's culture and work.

## E. Recovery of Improper Payments

FEMA conducts audit assessments on drawdowns to recover payments identified as improper in accordance with the Payment Integrity Information Act.[472] In 2019, FEMA implemented the Validate as You Go (VAYGo) review process for several major disaster declarations in an effort to comply with improper payment reporting requirements and to reduce project closeout documentation requirements for recipients with proven effective internal control processes. In December 2020, FEMA expanded VAYGo to all PA and Fire Management Assistance Grant (FMAG) disasters. The goal of VAYGo is to improve internal control processes

---

[467] The FEMA Fraud and Investigation Division can be reached at: FEMA-OCSO-Tipline@fema.dhs.gov or 1-866-223-0814.
[468] The DHS OIG Hotline can be reached at: DHS OIG Hotline Complaint Form or 1-800-323-8603.
[469] FEMA Suspension and Debarment can be reached at: femas&d@fema.dhs.gov.
[470] The U.S. Department Justice National Center for Disaster Fraud can be reached at: National Center for Disaster Fraud or 1-866-223-0814.
[471] Information on filing a complaint with the Office of Civil Rights can be found at: Filing a Complaint | fema.gov.
[472] For more information, refer to: Payment Integrity Information Act of 2019 | congress.gov.

PAPPG v5

by consistently assessing payment error rates to identify potential payment integrity issues. FEMA's "Validate as You Go (VAYGo) Guide"[473] provides guidance on the implementation and delivery of the FEMA VAYGo grant payment review process.

---

[473] For more information, refer to: Validate As You Go Guide | fema.gov.

PAPPG v5

# Chapter 12: Final Reconciliation and Closeout

## I.    Project Reconciliation and Closeout

FEMA requires timely and complete project-level information from a recipient as work is completed to facilitate efficient and effective closeout of the recipient's prime award. This section defines requirements for project-level closeout. To initiate project-level closeout, subrecipients must inform the recipient that their project is complete and the date the work was completed. The "Public Assistance Program Delivery Guide" [474] provides an overview of these process steps.

### A. Small Projects

Under simplified procedures, [475] FEMA bases awards for small projects on cost estimates rather than final accounting. This approach streamlines project closeout and expedites FEMA's processing of PA grant funding by reducing the administrative burden typically associated with large projects. Simplified procedures save both time and resources on small projects, while still providing financial oversight for the bulk of PA funding. Recipients without statutory audit requirements also benefit from these efficiencies in managing PA grants.

For small projects, FEMA obligates funds based on available information when the project is documented, whether based on estimated, actual costs, or a combination. To close these projects, recipients must submit a small project completion certification, confirming that:

- The subrecipient completed the approved scopes of work (SOW) for all small projects in compliance with the FEMA-state/territory/tribe agreement, and
- The recipient has issued all payments according to this agreement.

Once a small project is obligated, FEMA does not adjust the funding amount unless specific conditions are met, such as:

- The subrecipient did not complete the approved scope of work;
- FEMA approves a change in SOW, including additional hazard mitigation;
- The subrecipient received funding not previously deducted to prevent a duplication of benefits (e.g., when actual insurance proceeds exceed the estimated amount deducted);
- When actual insurance proceeds are less than the estimated amount deducted;
- Errors or omissions;
- Hidden damage;
- Non-compliance with applicable laws, regulations, and executive orders; or

---

[474] For more information, refer to: *Public Assistance Program Delivery Guide*.

[475] Congress enacted Section 422 of the Stafford Act to enhance the administrative efficiency of the PA Program. This section authorizes simplified procedures for projects that fall under the large project threshold. For more information, refer to Simplified Procedures in Chapter 2.

253

PAPPG v5

- Fraud, waste, or abuse.

In these cases, FEMA only adjusts the specific cost items affected.

## 1.    NET SMALL PROJECT OVERRUN APPEAL REQUEST

Subrecipients can request additional funding if the combined actual cost of all their small projects exceeds the total amount obligated for all their small projects. FEMA refers to this as a net small project overrun (NSPO) appeal request. Subrecipients must submit a request through the appeal process, described under Appeal Rights and Requirements in Chapter 2, within 60 days of the latest work completion date of all its small projects.[476] If all of a subrecipient's small projects have not been obligated at that time, then the subrecipient has 60 days from the date FEMA obligated its last small project to submit an appeal. The appeal must include actual cost documentation for all approved small projects.[477] For more information regarding the NSPO appeal, see Appeal Rights and Requirements in Chapter 2.

## 2.    SMALL PROJECT CLOSEOUT

If a subrecipient is not requesting an NSPO, the subrecipient must submit a certification of completion for all small projects to the recipient within 90 days of the last small project completion date, or the last approved completion deadline for all of its small projects, whichever is sooner. If work on the last small project was completed prior to obligation, the 90-day timeline begins on the date of obligation.

A recipient must submit certification of completion of its own small projects within 90 days of the latest small project work completion date, or the approved deadline of its last small project, whichever is sooner. If work on the last small project was completed prior to obligation, the 90-day deadline begins on the date of obligation.

## B. Large Projects

With exception of capped projects, the final eligible amount for a large project is the actual documented cost incurred to complete the approved scope of work.[478] Subrecipients must provide documentation to support the actual costs within 90 days of work completion.[479] If work on the project was completed prior to obligation, the 90-day timeline begins on the date of obligation. Recipients must submit a large project expenditure report and completion certification and must certify that:[480]

- All incurred costs are associated with the approved scope of work;
- The subrecipient completed all work in compliance with the FEMA-state/territory/tribe agreement and any relevant policies or regulations; and,
- It made all payments in accordance with 2 C.F.R. § 200.305.

A recipient must submit its certification of a subrecipient's completion of each large project with the final claim for PA funding for the project and supporting documentation to FEMA within 180 days of the work

---

[476] 44 C.F.R. § 206.204(e)(2).
[477] 44 C.F.R. § 206.204(e).
[478] 44 C.F.R. § 206.205(b).
[479] 44 C.F.R. § 206.205(b)(1).
[480] 44 C.F.R. § 206.205(b)(1).

completion date or the project completion deadline, whichever occurs first. If work on the project was completed prior to obligation, the 180-day deadline begins on the date of obligation. The recipient must submit its certification for each of its own large projects within 180 days of the work completion date or the project completion deadline, whichever occurs first. If work on a large project is complete prior to obligation, a recipient's certification and final payment of claim is due within 180-days from the date of obligation.

At a minimum, large project closeout packages must include all applicable documentation to support the work and costs including:

**Table 34. Required Documentation and Information to Support a Large Project Closeout Request**

| Required Documentation and Information to Support a Large Project Closeout Request |
|---|
| ▪ Final inspection report; |
| ▪ Summary of scope of work performed; |
| ▪ Summary of expenditures; |
| ▪ Project-related documents to support claimed costs (invoices, timesheets, work orders, trip tickets, etc.), if not previously provided, including: |
|     ○ Force account labor; |
|     ○ Force account equipment; |
|     ○ Materials and supplies; and, |
|     ○ Contracted work. |
| ▪ Procurement documentation, if applicable (e.g., advertisements, bid tabulations, evaluation); |
| ▪ Mutual aid agreements; |
| ▪ Insurance documentation (final statement of loss); |
| ▪ Project-related correspondence with regulatory agencies; |
| ▪ Change orders; |
| ▪ Personnel pay policies; |
| ▪ All codes and standards incorporated into the scope of work; |
| ▪ Documentation to substantiate compliance with all terms and conditions of the award (e.g., Environmental and Historic Preservation (EHP) compliance documentation, impartial delivery to communities' requirements, and any funding that may duplicate benefits); and, |
| ▪ Photos of completed project, required for categories C-G. |

Prior to closing large projects, FEMA:

▪ Verifies there are no outstanding appeals, audits, or arbitration cases;

▪ Reviews invoices and other documentation related to the work performed to validate it was consistent with the approved SOW, including completion of any approved PA hazard mitigation (not required at closeout if project was obligated at 100 percent complete based on actual costs);

▪ Determines whether the subrecipient completed the work within the approved deadline (FEMA limits reimbursement to costs incurred within the deadline);

▪ Ensures no duplication of funding exists (e.g., with insurance or costs in any other related projects);

PAPPG v5

- Validates compliance with cost principles, including, but not limited to:
  - o Equipment and property disposition;
  - o Procurement and contracting (not required at closeout if project was obligated at 100 percent complete based on actual costs); and,
  - o Reasonableness of costs.
- Validates compliance with all terms and conditions of the award, including, but not limited to:
  - o Code and standard requirements;
  - o EHP requirements;
  - o Civil rights requirements; and,
  - o Insurance obtain and maintain requirements.

If the work is 100 percent complete at the time the project is obligated, the following compliance reviews do not need to be repeated during closeout:

- Determining whether the subrecipient completed the work within the approved deadline;
- Procurement and contracting;
- Reasonableness of costs;
- Code and standard requirements; and,
- EHP requirements.

If FEMA obligated the project at 100 percent complete based on actual costs, the reviews were completed prior to obligation and therefore the reviews do not need to be repeated at closeout. If the project was not 100 percent complete at obligation, FEMA reviews and verifies the accuracy of the actual costs and evaluates and reconciles any cost overruns or underruns. FEMA uses the Public Assistance Sampling Procedure to review documentation supporting claims at closeout. For projects with funding changes, FEMA prepares a project amendment and obligates additional funds or reduces funding based on actual costs to complete the eligible SOW.[481]

FEMA does not re-evaluate the cost-effectiveness of PA mitigation based on the final actual costs of the project and approved PA mitigation measures. If the subrecipient did not complete any of the mitigation SOW, FEMA designates the project as an improved project, reviews the project for compliance, and depending on the evaluation result, either deobligates or caps funding for only the repair/restoration SOW.[482]

For capped projects, subrecipients must provide documentation to support that they used the funds in accordance with the eligibility criteria described under Flexible Restoration (Capped Projects) in Chapter 8.

---

[481] 44 C.F.R. § 206.205(b)(2).
[482] 44 C.F.R. § 206.203(d)(1).

PAPPG v5

If a subrecipient did not comply with any of the conditions of the grant, FEMA may deobligate either all or a portion of the funding. Once FEMA completes its review and funding adjustments, FEMA closes the project and notifies the recipient in writing.

## C. Subrecipients

Recipients request that FEMA close each subrecipient once all of its respective projects have been completed and closed for the disaster. Recipients may either request this in the same submittal as a subrecipient's last project closeout request or may submit a separate request. The request should include a project completion certification report listing all of the subrecipient's projects.

If all of a subrecipient's projects are closed and there are no outstanding audits, FEMA closes the subrecipient and notifies the recipient in writing.

# II.    Stafford Act Section 705

Stafford Act Section 705 imposes a 3-year limit on FEMA's authority to recover payments made to state, local, Tribal Nation, and territorial (SLTT) government recipients and subrecipients unless there is evidence of fraud.[483] FEMA must provide notice of intent to recover payments within 3 years from the date that the recipient submitted the certification of project completion to FEMA. Section 705 does not apply to private nonprofits (PNPs). Section 705 also prohibits FEMA from recovering payments for a project within the 3-year statute of limitations if the recipient or subrecipient meet certain criteria.[484] To ensure consistent application of the provisions contained in Section 705, FEMA issued the *Stafford Act Section 705, Disaster Grant Closeout Procedures* policy,[485] which describes the limitations and requirements in detail.

# III.    Public Assistance Award Closeout

A recipient must submit its final *Federal Financial Report* (SF-425) with a written request to close the PA award. FEMA and the recipient certify that all work was completed, all eligible costs have been reimbursed and financially reconciled. The PA award is programmatically closed when FEMA ensures that all PA projects awarded for the incident met statutory and regulatory requirements. For FEMA to close the PA award, the following conditions must be met:

- FEMA has issued final determinations on all appeals;
- FEMA has obligated all eligible PA funding;
- All recipient and subrecipient projects are closed;
- The recipient has passed through all obligated funds appropriately and submitted its final expenditure report to FEMA;
- FEMA has adjusted the funding level for the program, as appropriate; and,
- Both FEMA and the recipient have completed all administrative actions related to the PA Program.

---

[483] Stafford Act § 705(a)(1)(2); 42 U.S.C. § 5205.
[484] Stafford Act § 705(c)(1)(2)(3); 42 U.S.C. § 5205.
[485] For more information, refer to: Stafford Act Section 705, Disaster Grant Closeout Procedures (FP 205-081-2 Version 2) | fema.gov.

PAPPG v5

Recipients must liquidate all obligations within 120 days of the end of the prime award period of performance. FEMA extends the deadline if the recipient submits a written time extension and provides a reasonable justification for the delay.[486]

 **Terminology**

**Final expenditure report** - The report a recipient submits to FEMA for all of a subrecipient's projects, certifying that the grant terms and conditions have been met and project costs are reconciled.

# IV.   Documentation Retention Requirements

Subrecipients  must maintain all source documentation for each project[487] for 3 years after the date of transmission of the final expenditure report for project completion as certified by the recipient.[488] A recipient must keep all financial and program documentation for 3 years after the date it submits the final SF-425. There are several exceptions to this timeframe that may require longer retention periods, including exceptions relating to real property and equipment disposition, audits, and litigation.[489] Additionally, SLTT government laws may require longer retention periods.

---

[486] 44 C.F.R. § 200.344(c).
[487] 2 C.F.R. § 200.302.
[488] For more information, refer to: *Public Assistance Policy on Stafford Act Section 705, Disaster Grant Closeout Procedures | fema.gov*.
[489] 2 C.F.R. § 200.334.

PAPPG v5

# Appendix A. References and Resources

## I.    Public Assistance Program References

- [Assistance for Governments and Private Non-Profits After a Disaster](#)
- [Archived Policy Documents](#)
- [Archived Publications](#)

- *[Cost Estimating Format (CEF) for Large Projects Standard Operating Procedure (FEMA SOP 9570.8)](#)*
- *[Preliminary Damage Assessment Guide](#)*
- *[Debris Estimating Field Guide (FEMA 329)](#)*
- *[Direct Reimbursement for Host-State Evacuation and Sheltering Costs (FEMA SOP 9570.1)](#)*
- *[Environmental and Historic Preservation Directive (FEMA Directive 108-1)](#)*
- *[Environmental and Historic Preservation Instruction (FEMA Instruction 108-1-1)](#)*
- *[Environmental and Historic Preservation (EHP) Fact Sheet for Debris Removal Activities](#)*
- [Equipment Rates](#)

- *[Infectious Disease Event Fact Sheet (FP 104-009-001)](#)*
- *[FEMA Recovery Policy, Public Assistance Management Costs (Interim) (FP 104-11-2)](#)*
- *[Field Manual (Procurement Information for FEMA Public Assistance Award Recipients and Subrecipients)](#)*
- *[Mission Assignments for ESF #10 (FEMA 9523.8)](#)*
- [Small Business Administration Loans](#)
- *[Recipient-Led Public Assistance Guide](#)*
- *[Strategic Funds Management (FEMA SOP 9570.24)](#)*
- *[Public Assistance Building Back Better Fact Sheet](#)*
- *[Public Assistance Management Costs Interim Policy Fact Sheet](#)*
- *[Public Assistance Management Costs Standard Operating Procedures](#)*
- *[Public Assistance Policy on Insurance (FP 206-086-1)](#)*
- *[Public Assistance Policy, Stafford Act Section 705, Disaster Grant Closeout Procedures (FP 205-081-2)](#)*
- *[Public Assistance Recovery of Improper Payments Standard Operating Procedures (FEMA SOP 9570.16)](#)*
- *[Recommended Post Earthquake Evaluation and Repair Criteria for Welded Steel Moment Frame Buildings (FEMA 352)](#)*
- *[Safe Rooms for Tornadoes and Hurricanes, Guidance for Community and Residential Safe Rooms (FEMA P-361)](#)*

PAPPG v5

# II.    Public Assistance Forms and Templates

- Public Assistance FEMA Forms (FF)
- *Application for Federal Assistance and Assurances (SF-424)*
- *Federal Financial Report (SF-425)*

# III.    Statutes

- The Robert T. Stafford Disaster Relief and Emergency Assistance Act, as Amended (Stafford Act)
- Americans with Disabilities Act (ADA)

# IV.    Code of Federal Regulations

- 2 C.F.R. Part 200, Uniform Administrative Requirements, Cost Principles, and Audit
- 7 C.F.R. § 1730.25, Corrective action (Rural Utilities Service [RUS] borrowers only)
- 15 C.F.R. Part 774, The Commerce Control List
- 22 C.F.R. Part 121, The United States Munitions List
- 40 C.F.R. Part 261, Identification and Listing of Hazardous Waste
- 44 C.F.R. Emergency Management and Assistance
- 44 C.F.R. Part 9, Floodplain Management and Protection of Wetlands
- 44 C.F.R. Part 201, Mitigation Planning
- 44 C.F.R. Part 204, Fire Management Assistance Grant (FMAG) Program
- 44 C.F.R. Part 206, Federal Disaster Assistance
- 48 C.F.R. Subpart 2.1, Federal Acquisition Regulation

# V.    Environmental Protection Laws

- Clean Air Act (CAA)
- Clean Water Act (CWA)
- Coastal Barrier Resources Act (CBRA)
- John H. Chafee Coastal Barrier Resources System (CBRS)
- Coastal Zone Management Act (CZMA)
- Comprehensive Environmental Response Compensation and Liability Act (CERCLA)
- Endangered Species Act (ESA)
- Farmland Protection Policy Act (FPPA)
- Fish and Wildlife Coordination Act
- Magnuson-Stevens Fishery Conservation and Management Act
- Migratory Bird Treaty Act

PAPPG v5

- National Environmental Policy Act (NEPA)
- Resource Conservation and Recovery Act (RCRA)
- Wild and Scenic Rivers Act

# VI.  Executive Orders

- EO 11988, Floodplain Management
- EO 11990, Protection of Wetlands

- EO 13717, Establishing a Federal Earthquake Risk Management Standard
  EO 14148, Initial Recissions of Harmful Executive Orders and Actions

# VII.  Historic Preservation Laws and Tools

- Advisory Council on Historic Preservation
- American Institute for Conservation Code of Ethics and Guidelines for Practice
  Heritage Emergency National Task Force (HENTF)
- National Historic Preservation Act (NHPA)
- National Register of Historic Places

# VIII.  Federal Emergency Management Agency References

- FEMA
- *FEMA Stafford Act Declaration Process Fact Sheet*
- Fire Management Assistance Grants (FMAG) Program
- *FMAG Program Guide* (FEMA P-954)
- Federal Insurance and Mitigation Administration (FIMA)
  - National Flood Insurance Program (NFIP)
  - Hazard Mitigation Assistance (HMA) Programs
  - HMA Guidance
  - Hazard Mitigation Grant Program (HMGP)
  - State Hazard Mitigation Officer
- Individual Assistance (IA) Programs
  - Individuals and Households Program (IHP)
- National Disaster Recovery Framework (NDRF)
- National Response Framework (NRF)
- Tribal Affairs

261

# IX.   Other Federal Agencies

- Bureau of Indian Affairs (BIA)
- Federal Highway Administration (FHWA)
- FHWA Emergency Relief Program (ERP)
- National Oceanic and Atmospheric Administration (NOAA)
- National Marine Fisheries Service (NMFS)
- National Centers for Environmental Information (NCEI), formerly known as the National Climatic Data Center (NCDC)
- Natural Resources Conservation Service (NRCS)
- NRCS Emergency Watershed Protection Program (EWP)
- National Weather Service (NWS)
- NWS Cooperative Network Stations
- U.S. Army Corps of Engineers (USACE)
- USACE Rehabilitation and Inspection Program (RIP)
- U.S. Coast Guard (USCG)
- U.S. Department of Agriculture (USDA)
- Farm Service Agency
- U.S. Department of Health and Human Services (HHS)
- Centers for Disease Control and Prevention (CDC)
- U.S. Department of Homeland Security (DHS)
- DHS Office of Inspector General (OIG)
- U.S. Department of Housing and Urban Development (HUD)
- Community Development Block Grant Program (CDBG)
- U.S. Department of Labor
- U.S. Environmental Protection Agency (EPA)
- U.S. Fish and Wildlife Service (USFWS)
- U.S. Government Accountability Office (GAO)

PAPPG v5

# Appendix B. Acronyms

| | |
|---|---|
| ABA | Architectural Barriers Act |
| ACSR | Aluminum Conductor Steel Reinforced |
| ADA | Americans with Disabilities Act |
| ARC | American Red Cross |
| BCA | Benefit-Cost Analysis |
| BFE | Base Flood Elevation |
| BIA | Bureau of Indian Affairs |
| CAA | Clean Air Act |
| CATEX | Categorical Exclusion |
| CBCA | Civilian Board of Contract Appeals |
| CBRA | Coastal Barrier Resources Act |
| CBRS | Coastal Barrier Resource System |
| CDBG | Community Development Block Grant |
| CDC | Centers for Disease Control and Prevention |
| CEF | Cost Estimating Format |
| CERCLA | Comprehensive Environmental Response Compensation and Liability Act |
| C.F.R. | Code of Federal Regulations |
| CMS | Consumable Medical Supplies |
| CWA | Clean Water Act |
| CZMA | Coastal Zone Management Act |
| DDD | Damage Description and Dimensions |
| DFA | Direct Federal Assistance |
| DM | Determination Memorandum |
| DME | Durable Medical Equipment |
| DOE | Department of Energy |
| DOJ | Department of Justice |
| DRRA | Disaster Recovery Reform Act |
| DSA | Data Sharing Addendum |
| EHP | Environmental and Historic Preservation |
| EIS | Environmental Impact Statement |
| EMAC | Emergency Management Assistance Compact |
| EO | Executive Order |

PAPPG v5

| | |
|---|---|
| EOC | Emergency Operations Center |
| EPA | U.S. Environmental Protection Agency |
| ER | Emergency Relief (Program) |
| ERFO | Emergency Relief for Federally Owned Roads (Program) |
| ESA | Endangered Species Act |
| ESF | Emergency Support Function |
| EWP | Emergency Watershed Protection Program |
| FCO | Federal Coordinating Officer |
| FEMA | Federal Emergency Management Agency |
| FFATA | Federal Funding Accountability and Transparency Act |
| FHSZ | Fire Hazard Severity Zone |
| FHWA | Federal Highway Administration |
| FIRM | Flood Insurance Rate Map |
| FMAG | Fire Management Assistance Grant |
| FSA | FEMA-State Agreement |
| FTA | FEMA-Tribal Nation Agreement |
| GAO | Government Accountability Office |
| GAR | Governor Authorized Representative |
| GPS | Global Positioning System |
| HEPA | High-Efficiency Particulate Air |
| HENTF | Heritage Emergency National Task Force |
| HHS | U.S. Department of Health and Human Services |
| HMA | Hazard Mitigation Assistance |
| HMGP | Hazard Mitigation Grant Program |
| HMP | Hazard Mitigation Proposal |
| HOW | Houses of Worship |
| HUD | U.S. Department of Housing and Urban Development |
| HVAC | Heating, Ventilation, and Air Conditioning |
| ISAA | Information Sharing Access Agreement |
| IA | Individual Assistance |
| IEBC | International Existing Building Code |
| IHP | Individuals and Households Program |
| LOC | Letter of Commitment |
| NCEI | National Centers for Environmental Information |
| NCR | Natural & Cultural Resources |

PAPPG v5

| | |
|---|---|
| NCS | Non-Congregate Sheltering |
| NDRF | National Disaster Recovery Framework |
| NEPA | National Environmental Policy Act |
| NFIP | National Flood Insurance Program |
| NGO | Non-governmental Organization |
| NHPA | National Historic Preservation Act |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| NRCS | Natural Resources Conservation Service |
| NRF | National Response Framework |
| NWS | National Weather Service |
| NWP | Nationwide Permits |
| OCR | Office of Civil Rights |
| OFA | Other Federal Agencies |
| OIG | U.S. Department of Homeland Security Office of Inspector General |
| O&M | Obtain and Maintain |
| PA | Public Assistance |
| PAPPG | Public Assistance Program and Policy Guide |
| PDA | Preliminary Damage Assessment |
| PDG | Program Delivery Guide |
| PHA | Public Housing Agency |
| PNP | Private Nonprofit |
| PDMG | Program Delivery Manager |
| PII | Personally Identifiable Information |
| PL | Public Law |
| POP | Period of Performance |
| PPDR | Private Property Debris Removal |
| PPE | Personal Protective Equipment |
| RA | Regional Administrator |
| REC | Record of Environmental Consideration |
| RCRA | Resource Conservation and Recovery Act |
| RHA | Rivers and Harbors Act |
| RIP | Rehabilitation and Inspection Program |
| RFI | Request for Information |
| RFP | Request for Proposal |

PAPPG v5

| | |
|---|---|
| ROW | Right-of-Way |
| RPA | Request for Public Assistance |
| RSF | Recovery Support Function |
| RUS | Rural Utilities Service |
| RV | Recreational Vehicle |
| SBA | U.S. Small Business Administration |
| SCRI | Smithsonian Cultural Rescue Initiative |
| SF | Standard Form |
| SFHA | Special Flood Hazard Area |
| SHPO | State Historic Preservation Officer |
| SLTT | State, Local, Tribal Nation, and Territorial |
| SOP | Standard Operating Procedure |
| SOW | Scope of Work |
| STATEX | Statutory Exclusion |
| SSD | Substantial Structural Damage |
| SWL | Stillwater Level |
| STT | State, Tribal Nation, and Territory |
| T&E | Time-and-Equipment |
| T&M | Time-and-Materials |
| TAR | Tribal Authorized Representative |
| THPO | Tribal Historic Preservation Officer |
| TRAQ | Tree Risk Assessment Qualification |
| TSA | Transitional Sheltering Assistance |
| TWL | Total Water Level |
| UFR | Unified Federal Review |
| USACE | U.S. Army Corps of Engineers |
| U.S.C. | United States Code |
| USCG | U.S. Coast Guard |
| USDA | U.S. Department of Agriculture |
| USFWS | U.S. Fish and Wildlife Service |
| VAYGo | Validate as You Go |
| WFPO | Watershed and Flood Prevention Operations |
| WOTUS | Waters of the United States |
| WUI | Wildland-Urban Interface |

PAPPG v5

# Appendix C. Terms and Definitions

**Alternate project -** A project where an applicant determines that the public welfare is not best served by restoring the function of the damaged facility and request FEMA's approval to apply PA funding toward a different facility (or facilities).

**Animal -** Any living or dead member of the animal kingdom, including any mammal, fish, bird, amphibian, reptile, mollusk, crustacean, arthropod, or other invertebrate or any part thereof.

**Applicant -** A non-federal entity submitting an application for assistance under a recipient's federal award.

**Assistance animal -** An animal that works, provides assistance, or performs tasks for the benefit of a person with a disability, or provides emotional support that alleviates identified symptoms or effects of a person's disability. Although dogs are the most common type of assistance animal, other animals can also be assistance animals.

**Award (federal) -** The financial assistance that a non-federal entity receives either directly from a federal awarding agency or indirectly from a pass-through entity; or the cost-reimbursement contract under the Federal Acquisition Regulation that a non-federal entity receives directly from a federal awarding agency or indirectly from a pass-through entity.

**Budgeted (labor) -** Employee labor costs an applicant budgets for and incurs regardless of a disaster occurring.

**Coastal zone -** The coastal waters (including the lands therein and thereunder) and the adjacent shorelands (including the waters therein and thereunder), strongly influenced by each other and in proximity to the shorelines of coastal states, including islands, transitional and intertidal areas, salt marshes, wetlands, and beaches. This includes areas in Great Lakes waters per 16 U.S.C. § 1453.

**Commercial property -** Any property, structure, or portion of a structure, used for the purpose of conducting commerce or as a rental unit (e.g., industrial parks, golf courses, cemeteries, apartments, condominiums, or trailer parks).

**Consensus-based codes, specifications, and standards** – National or international voluntary codes, specifications and standards that incorporate the latest hazard-resistant designs.

**Conservation -** The preservation of a collection or object for the future. Conservation activities include examination, documentation, treatment, and preventive care, supported by research (e.g., scholarly and technological, x-rays, paint sampling) and education.

**Critical action -** An action for which even a slight chance of flooding is too great. The minimum floodplain of concern for critical actions is the 0.2 percent annual chance floodplain (also referred to as the critical action floodplain).

**Current fair market value -** The value of equipment and supplies determined by selling them in a competitive market or by researching advertised prices for similar items on the used market.

**Duplication of benefits -** Funding received from two sources for the same item of work.

**Durable medical equipment -** Reusable medical equipment including, but not limited to: oxygen equipment, wheelchairs, walkers, hospital beds, and crutches.

**Educational institution -** Any elementary school as defined by section 801(c) of the Elementary and Secondary Education Act of 1965; any secondary school as defined by section 801(h) of the Elementary and Secondary Education Act of 1965; or any institution of higher education as defined by section 1201 of the Higher Education Act of 1965.

**Emergency -** Any occasion or instance for which the president determines federal assistance is needed to supplement SLTT efforts and capabilities to save lives and to protect property and public health and safety, or to lessen or avert the threat of a catastrophe in any part of the United States.

**Emergency protective measure -** An action taken by a community before, during, and after an incident to save lives, protect public health and safety, and prevent damage to improved public and private property.

**Emergency work -** Work that must be done immediately to save lives, protect improved property, protect public health and safety, or avert or lessen the threat of a major disaster.

**Equipment -** Tangible personal property, including information technology systems, having a useful life of more than 1 year and a per-unit acquisition cost that equals or exceeds the lesser of the capitalization level established by the non-federal entity for financial statement purposes, or $10,000.

**Exigency -** The existence of a need to avoid, prevent or alleviate serious harm or injury, financial or otherwise, to an applicant.

**Facility -** Any publicly or privately-owned building, works, system or equipment—built or manufactured—or an improved and maintained natural feature. Land used for agricultural purposes is not a facility.

**Federal agency -** Any department, independent establishment, government corporation, or other agency of the executive branch of the federal government, including the United States Postal Service, but not including the American National Red Cross.

**Federal share -** The portion of the total project costs that are paid by federal funds.

**Flood control work -** A structure such as a levee, flood wall, flood control channel, or water control structure that was designed and constructed to have appreciable effects in preventing damage by irregular and unusual rises in water level.

**Flood fighting -** An activity or measure (e.g., sandbagging, buttressing) intended to prevent or stop flooding, at levels above flood stage, or to prevent structural failure.

268

**Force account -** An applicant's own labor forces and equipment.

**Hazard** - An emergency or disaster resulting from a natural disaster or an accidental or man-caused event.

**Hazard mitigation -** Any cost-effective measure that will reduce the potential for damage to a facility from a disaster event.

**Hazard-resistant** – Designs which take into account the probability of occurrence of hazards, within a reasonable recurrence interval, to decrease vulnerabilities.

**Immediate threat -** The threat of additional damage or destruction from an event that can reasonably be expected to occur within 5 years.

**Improved project -** A project that restores the pre-disaster function of a facility and incorporates improvements or changes to the pre-disaster design.

**Improved property -** A structure, facility, or item of equipment that was built, constructed, or manufactured. Land used for agricultural purposes is not improved property.

**Incident** - Any condition which meets the definition of major disaster or emergency which causes damage or hardship that may result in a presidential declaration of a major disaster or an emergency.

**Incident period -** The time span during which the disaster-causing incident occurs.

**Integral ground** - The ground necessary to physically support a facility. Integral ground may be natural or improved ground upon which an eligible facility is located and that is essential to support the structural integrity and utility of the facility.

**Large project -** A project for which the final obligated (federal and non-federal) amount is equal to or *greater* than the annually adjusted cost threshold for small project grants.

**Local government -** A county, municipality, city, town, township, local public authority, school district, special district, intrastate district, council of governments(regardless of whether the council of governments is incorporated as a nonprofit corporation under state law), regional or interstate government entity, or agency or instrumentality of a local government; an Indian tribe or authorized tribal organization, or Alaska Native village or organization that does not meet the definition of Indian Tribal Nation; or a rural community, unincorporated town or village, or other public entity, for which an application for assistance is made by a state or political subdivision of a state.

**Major disaster -** Any natural catastrophe (including any hurricane, tornado, storm, high water, wind-driven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm, or drought), or, regardless of cause, any fire, flood, or explosion, in any part of the United States, for which the president determines causes damage of sufficient severity and magnitude to warrant major disaster assistance under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, as Amended to supplement the efforts

269

and available resources of SLTT governments and disaster relief organizations in alleviating the damage, loss, hardship, or suffering caused thereby.

**Management cost -** Any indirect cost, any direct administrative cost, and any other administrative expense associated with a specific project under a major disaster or emergency.

**Museum -** A facility that preserves and exhibits a documented collection of artistic, historic, scientific, or other objects.

**Mutual aid agreement** - A written or oral agreement between and among agencies/organizations and/or jurisdictions that provides a mechanism to quickly obtain assistance in the form of personnel, equipment, materials, and other associated services. The primary objective is to facilitate the rapid, short-term deployment of support prior to, during, and/or after an incident.

**Natural disaster -** Any hurricane, tornado, storm, flood, high water, wind-driven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm, drought, fire, or other catastrophe in any part of the United States which causes, or which may cause, substantial damage or injury to civilian property or persons.

**Natural features -** Characteristics of a particular environment (e.g., barrier islands, sand dunes, wetlands) that are created by physical, geological, biological, and chemical processes and exist in dynamic equilibrium. Natural features are self-sustaining parts of the landscape that require little or no maintenance to continue providing their ecosystem services (functions) (44 CFR § 9.4). .

**Non-commercial property** - A property, structure, or portion of a structure, used by the property owner as their primary residence, such as a house or condominium unit in which the owner resides.

**Non-federal entity** - An institution of higher education, nonprofit organization, local government, Indian tribe, or state that carries out a federal award as a recipient or subrecipient.

**Orphan road** – A road that an applicant or public entity does not have the legal responsibility to maintain.

**Overtime (labor) -** Time worked beyond an employee's scheduled working hours, as set by an applicant's pre-disaster written labor or pay policy.

**Period of performance -** The time during which the non-federal entity may incur new obligations to carry out the work authorized under the federal award.

**Permanent work -** Restorative work that must be performed through repairs or replacement to restore an eligible facility on the basis of its pre-disaster design and current applicable codes and standards.

**Pet (household) -** A domesticated animal that is traditionally kept in the home for pleasure rather than for commercial purposes, can travel in a commercial carrier, and can be housed in a temporary facility. Examples are dogs, cats, birds, rabbits, rodents, and turtles. Household pets do not include reptiles (except

turtles), amphibians, fish, insects, arachnids, farm animals (including horses), or animals kept for racing purposes.

**Pre-disaster -** In effect prior to the incident start date identified in the approved presidential disaster declaration.

**Pre-disaster design -** The size or capacity of a facility as originally designed and constructed or subsequently modified by changes or additions to the original design. It does not mean the capacity at which the facility was being used at the time the major disaster occurred if different from the most recent designed capacity.

**Pre-disaster function -** The function the facility was performing immediately prior to the disaster.

**Private nonprofit organization (PNP) -** Any nongovernmental agency or entity that currently has an effective ruling letter from the U.S. Internal Revenue Service, granting tax exemption under Sections 501(c), (d), or (e) of the Internal Revenue Code, or satisfactory evidence from the State that the nonrevenue producing organization or entity is a nonprofit one organized or doing business under State law.

**Private roads -** Roads that are not owned or operated by or otherwise the legal responsibility of a federal or SLTT entity (including orphan roads, roads in gated communities, homeowners' association roads, etc.).

**PNP custodial care facility -** A building, structure, or system, including those for essential administration and support, that is used to provide institutional care for persons who require close supervision and some physical constraints on their daily activities for their self-protection, but do not require day-to-day medical care.

**PNP educational facility -** Classrooms plus related supplies, equipment, machinery, and utilities of an educational institution necessary or appropriate for instructional, administrative, and support purposes.

**PNP emergency facility -** A building, structure, equipment, or system used to provide emergency services, such as fire protection, ambulance, or rescue, to the general public, including the administrative and support facilities essential to the operation of such emergency facilities, even if not contiguous.

**PNP medical facility -** A hospital, outpatient facility, rehabilitation facility, or facility for long-term care as such terms are defined in Section 645 of the Public Health Service Act (42 U.S.C. § 291o) and any similar facility offering diagnosis or treatment of mental or physical injury or disease, including the administrative and support facilities essential to the operation of such medical facilities even if not contiguous.

**Project -** A logical grouping of work required as a result of the declared major disaster or emergency.

**Public facility -** Any of the following facilities owned by an SLTT government: any flood control, navigation, irrigation, reclamation, public power, sewage treatment and collection, water supply and distribution, watershed development, or airport facility; any non-federal aid, street, road, or highway; and any other public building, structure, or system, including those used for educational, recreational, or cultural purposes; or any park.

PAPPG v5

**Real property -** Land, including land improvements, structures, and appurtenances thereto, but excludes moveable machinery and equipment.

**Recipient -** A non-federal entity that receives a federal award directly from a federal awarding agency to carry out an activity under a federal program.

**Reasonable cost -** A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. In other words, a reasonable cost is a cost that is both fair and equitable for the type of work being performed.

**Rehabilitation facility -** A facility that primarily provides diagnosis and treatment for rehabilitation of injuries, disabilities, or illness. (Consistent with the definition of "comprehensive outpatient rehabilitation facility" in 42 U.S.C. § 1395x(cc)(2)).

**Regulatory floodway -** The area regulated by federal, state or local requirements to provide for the discharge of the base flood so the cumulative increase rise in water surface elevation is no more than a designated amount (not to exceed one foot as set by the National Flood Insurance Program) above the base flood elevation.

**Request for public assistance -** The form a public entity or PNP organization uses to apply for assistance under the Public Assistance Program.

**Retreat -** Establishments that promote health and wellbeing by providing services for the preservation and maintenance of physical, mental, and emotional health.

**Resilience -** The ability to prepare for threats and hazards, adapt to changing conditions and withstand and recover rapidly from disruptions.

**Scope of work -** A description of the eligible work necessary to be done immediately to address an immediate threat or to restore a facility to its pre-disaster design, function, and capacity and to current applicable standards, documented in the project and reflecting the damage description and dimensions. A scope of work may also be documented for an alternate or improved project or with a PA Hazard Mitigation Proposal.

**Service animal -** A dog that is individually trained to do work or perform tasks for people with disabilities or access and functional needs. The task(s) performed by the dog must be directly related to the person's disability.

**Site -** An individual building, structure, or system section. Examples include: an individual building or structure inclusive of its contents and supplies; a beach or park inclusive of equipment and other items within the area that are not structures or buildings, such as benches or playground equipment; a lift or pump station; a dam; and a section of roadway that has damage within a reasonable distance throughout that section.

**Small project -** A project for which the final obligated (federal and non-federal) amount is less than the annually adjusted cost threshold for small project grants.

**Soft costs -** Costs that are not considered as direct construction costs, including: architectural costs, engineering costs, project management costs, financing, and legal fees.

**Special flood hazard area -** The land area subject to inundation during a flood having a 1 percent chance of being equaled or exceeded in a given year (also referred to as the base flood or 100-year flood). Special flood hazard areas are shown on FIRMs published by FEMA.

**State -** Any state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, U.S. Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.

**Straight-time (labor) -** An employee's regular pay rate when working normal hours.

**Subaward -** An award provided by a pass-through entity to a subrecipient for the subrecipient to carry out part of a federal award received by the pass-through entity. It does not include payments to a contractor or payments to an individual that is a beneficiary of a federal program.

**Subrecipient -** A non-federal entity that receives a subaward from a pass-through entity to carry out part of a federal program. It does not include an individual that is a beneficiary of such program. A subrecipient may also be a recipient of other federal awards directly from a federal awarding agency.

**Substantial damage -** Damage of any origin sustained by a structure whereby the cost of restoring the structure to its before damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred.

**Supply -** Any tangible personal property other than that meeting the definition of equipment.

**Temporary (labor) -** A full-time or part-time employee working on a permanent and ongoing basis, as set by an applicant's written labor or pay policy.

**Tribal Nation -** Any federally recognized governing body of an Indian or Alaska Native tribe, band, nation, pueblo, village, or community that the Secretary of the Interior acknowledges to exist as an Indian tribe under the Federally Recognized Tribe List Act of 1994, Title 25 of the U.S. Code (U.S.C.) 479a. This does not include Alaska Native corporations, the ownership of which is vested in private individuals.

**Trust land -** Land, the title to which is held by the United States in trust for an Indian tribe or individual, or which is held by an Indian tribe or individual subject to a restriction by the United States against alienation. "Trust or restricted interest in land" or "trust or restricted interest in a parcel of land" means an interest in trust land. Collectively referred to as "trust lands."

**Unbudgeted (labor) –** The employee labor costs an applicant does not budget for and incurs only as the direct result of a disaster.

PAPPG v5

**Wetland -** An area that is saturated by water with a frequency sufficient to support or, under normal hydrologic conditions would support, a prevalence of vegetation or aquatic life typically adapted to saturated or seasonally saturated soil conditions (e.g., swamp, fresh and saltwater marsh, bog, fen).

**Work completion date** - The date the applicant completes all work associated with the approved SOW including meeting all compliance requirements. It does not include invoice payments, warranty periods, or grant management activities (e.g., compiling and submitting documentation, financial reconciliation, requesting payment).

**Zoo -** Any facility maintained under the care of a Doctor of Veterinary Medicine, in which live animal(s) are kept for public exhibition or education. Aquariums and wildlife or zoological parks may meet this definition.

PAPPG v5

# Appendix D: Environmental and Historic Preservation Compliance

The following laws and Executive Orders (EOs) are commonly encountered federal requirements that were established to help protect the environment and preserve the Nation's historic and archaeological resources. FEMA reviews each PA project to ensure the work complies with applicable federal environmental and historic preservation (EHP) laws, their implementing regulations, and applicable EOs. Compliance with all federal and state, local, Tribal Nation, and territorial (SLTT) laws is a requirement of every FEMA award. SLTT laws, such as hazardous material management laws, vary by location and are not included in this appendix.

FEMA prepares a greensheet at the beginning of each emergency or disaster declaration with specific information relevant to each state and area. These greensheets are FEMA's disaster-specific guidance for applicants about key aspects of EHP reviews. Greensheets briefly discuss the relevant laws and project types that might trigger application of those laws and informs applicants of federal and SLTT laws that must be followed.

## I.     National Environmental Policy Act

Section 102 of the National Environmental Policy Act (NEPA) requires federal agencies to integrate environmental values into their decision-making processes by considering the environmental impacts of their proposed actions and reasonable alternatives to those actions.[490] The White House Council on Environmental Quality publishes its NEPA regulations in Title 40 of the Code of Federal Regulations (C.F.R.) Parts 1500–1508. The U.S. Department of Homeland Security publishes policies and procedures for implementing NEPA and provides specific processes that FEMA must follow before funding a project. The NEPA process ensures consideration of environmental consequences of the project before decisions are made and involves the public. Effective April 11, 2025, interim final rule removed the implementation of NEPA regulations. For more information related to the interim rule, published at Federal Register: Removal of National Environmental Policy Act Implementing Regulations.

## II.     National Historic Preservation Act

Section 106 of the National Historic Preservation Act (NHPA)[491] requires FEMA to consider the effects an undertaking will have on historic properties and provide the Advisory Council on Historic Preservation the opportunity to comment on the effects of the undertaking.[492] Historic properties include buildings, structures, sites, including archaeological resources, objects, and districts included in, or eligible for inclusion in, the National Register of Historic Places.[493] FEMA fulfills its Section 106 responsibilities through

---

[490] 42 United States Code (U.S.C.) § 4332.
[491] For more information, refer to: National Historic Preservation Act
[492] 16 U.S.C. § 470f.
[493] For more information, refer to: National Register of Historic Places (U.S. National Park Service).

275

consultation with outreach to the State Historic Preservation Office (SHPO), Tribal Historic Preservation Office (THPO), and other consulting parties, including the subrecipient and recipient, and in many cases FEMA is able to streamline and accelerate the compliance process through utilizing programmatic agreements executed with the SHPO/THPO and the recipient. When FEMA funded undertakings result in adverse effects to historic properties, Section 106 of NHPA requires FEMA to consult with the SHPO/THPO and other consulting parties to resolve the adverse effects through avoidance, minimization, or compensation measures.

# III.   Endangered Species Act

The Endangered Species Act (ESA) requires federal agencies to use their authorities to conserve federally listed threatened and endangered species (listed species) and critical habitats. FEMA must also consult with the U.S. Fish and Wildlife Service (USFWS) and the National Oceanic and Atmospheric Administration's (NOAA's) National Marine Fisheries Service (NMFS), also known as NOAA Fisheries, to ensure that proposed projects will not jeopardize the continued existence of any listed species or result in the destruction or adverse modification of critical habitat for listed species.[494]

# IV.   Clean Water Act

The Clean Water Act (CWA) establishes the basic structure for regulating discharges of pollutants in the waters of the United States (e.g., rivers and streams, lakes and ponds, coastlines, wetlands, estuaries) and sets quality standards for surface waters. The CWA makes it unlawful to discharge any pollutant from a specific source into navigable waters without the appropriate CWA permits from the U.S. Army Corps of Engineers (USACE) or state regulatory agency.[495] In addition, the CWA requires authorization for dredging or filling in waters (including disposal of dredged material). Applicants must ensure applicable permits are acquired prior to beginning work. Documentation of this must be provided to FEMA and may include statements of compliance with nationwide permits (NWPs) or Individual Section 404 permits. Common work activities that may require permits under the Clean Water Act include those that involve the repair of bridges, stream crossings, docks, piers, and/or marinas.

# V.   Rivers and Harbors Act

The Rivers and Harbors Act requires that authorization be obtained from USACE to construct any structure in or over any navigable water, including authorization for projects involving constructing or modifying bridges and causeways over navigable waters or constructing any dam or dike in a navigable water. Typically, requests for this type of authorization are handled together with requests for authorization of projects under Section 404 of the CWA. Common work activities that may require permits under the Rivers and Harbors Act include those that involve the repair of docks, piers, and/or marinas.

---

[494] 16 U.S.C. § 1536; Endangered Species Act Section 7.
[495] 33 U.S.C. § 1251 et seq.

PAPPG v5

# VI.  Safe Drinking Water Act

The purpose of the Safe Drinking Water Act is to protect public health by ensuring the quality of drinking water. The law authorizes the U.S. Environmental Protection Agency (EPA) to, among other things, set standards for the levels of individual contaminants allowed in drinking water. Additionally, it allows the EPA to designate as aquifers that serve as the sole or principal source of drinking water for a particular area as "sole source aquifers". For any financial assistance project that has the potential to contaminate an aquifer and that is located in the identified review area for a "sole source aquifer", FEMA must consult with EPA before funding the project.

# VII.  Clean Air Act

The Clean Air Act (CAA) protects the Nation's air through the reduction of smog and atmospheric pollution. Air quality compliance often requires specific measures to be implemented, such as dust abatement, vehicle emissions control, fuel storage, and distribution procedures. There may be additional requirements in "nonattainment areas" (defined as those areas that do not meet national standards for air quality and, therefore, require more rigorous compliance measures).[496] For projects where there is an impact to air quality, applicants should coordinate with and obtain any permits from applicable state or local environmental agencies approving the action.

# VIII.  Coastal Barrier Resources Act

The Coastal Barrier Resources Act (CBRA)[497] established the John H. Chafee Coastal Barrier Resources System (CBRS), which consists of relatively undeveloped coastal barriers along the Atlantic, Gulf, Great Lakes, and Caribbean coasts. CBRA minimizes adverse impacts to these areas by restricting federal assistance that encourages development within the CBRS. USFWS publishes maps designating these areas.[498] FEMA must consult with USFWS prior to providing PA funding for work within the CBRS.[499]

# IX.  Migratory Bird Treaty Act

The Migratory Bird Treaty Act makes it unlawful to pursue, hunt, take, capture, kill, or sell migratory birds listed in the statute without a waiver from USFWS.[500] The statute does not discriminate between live or dead birds and also grants full protection to any bird parts including feathers, eggs, and nests. FEMA consults with USFWS regarding projects likely to trigger compliance with this Act.

---

[496] 42 U.S.C. § 7401 et seq.
[497] 16 U.S.C. § 3501 et seq.
[498] 16 U.S.C. §§ 3501 and 3503. The U.S. Fish and Wildlife Service publishes Coastal Barrier Resource System maps at: http://www.fws.gov/.
[499] 16 U.S.C. § 3505.
[500] 16 U.S.C. §§ 703–712.

PAPPG v5

# X.    Bald and Golden Eagle Protection Act

The Bald and Golden Eagle Protection Act prohibits any person from pursuing, capturing, killing, wounding, disturbing, or otherwise taking bald eagles or golden eagles, including their parts (e.g., feathers), nests, or eggs, unless authorized by a permit from the USFWS. The prohibition on disturbance applies to nests and previously used nest sites when eagles are not present, if, an eagle were to return, such alterations would lead to injury, death, or nest abandonment. FEMA consults with the USFWS regarding projects where impacts to bald or golden eagles may occur.

# XI.    Magnuson-Stevens Fishery Conservation and Management Act

The Magnuson-Stevens Fishery Conservation and Management Act is the primary law for managing and maintaining sustainable fisheries in waters of the United States. The Magnuson-Stevens Fishery Conservation and Management Act protects essential fish habitat, which includes the waters and substrate necessary to maintain healthy fisheries. FEMA must consult with NMFS when any proposed PA project could have an adverse effect on "essential fish habitat" (defined as any impact that reduces quality or quantity of essential fish habitat).[501]

# XII.    Marine Mammal Protection Act

The Marine Mammal Protection Act prohibits, with certain exceptions, the "take" of marine mammals in U.S. waters or by U.S. citizens on the high seas. The law prohibits attempts to hunt, capture, kill, or harass any marine mammals. The law authorizes NMFS or USFWS (depending on the species in question) to issue incidental take permits and incidental harassment authorizations. FEMA will consult with the USFWS/NMFS regarding projects where impacts to marine mammals may occur.

# XIII. National Marine Sanctuaries Act

The National Marine Sanctuaries Act (NMSA), which is part of the Marine Protection, Research and Sanctuaries Act, authorizes the Secretary of Commerce to designate and manage areas of the marine environment as National Marine Sanctuaries (NMS), which NOAA administers. Activities within each NMS are governed by regulations. A "sanctuary resource" is defined as any living or nonliving resource of a NMS that contributes to the conservation, recreational, ecological, historical, educational, cultural, archeological, scientific, or aesthetic value of the sanctuary. The National Marine Sanctuaries Act prohibits destroying, injuring, or causing the loss of any "sanctuary resource". A permit is required to conduct any activity within a sanctuary that is otherwise prohibited.

---

[501] 16 U.S.C. §§ 1801–1884.

278

# XIV. Coastal Zone Management Act

The Coastal Zone Management Act (CZMA) provides for the management of the Nation's coastal resources. The CZMA establishes a voluntary partnership between the federal government and coastal and Great Lakes states. It requires participating states to develop state coastal zone management plans. PA projects located in, or near, established coastal zone management areas must be consistent with the enforceable policies of the state's federally approved coastal zone management program.[502] Before approving a project in a coastal zone management area, FEMA consults with the state agency overseeing the implementation of the CZMA plan to ensure the project is consistent with the program's provisions.

# XV.  Farmland Protection Policy Act

The Farmland Protection Policy Act is intended to minimize the extent to which federal programs contribute to the conversion of prime or unique farmland, or land of statewide or local importance, to nonagricultural uses and to ensure that federal programs are administered in a manner that, to the extent practicable, will be compatible with state, local, and private programs and policies to protect farmland. The Farmland Protection Policy Act and U.S. Department of Agriculture (USDA) implementing procedures require FEMA to evaluate whether projects it funds irreversibly convert such farmland to nonagricultural uses and to consider alternative actions that could avoid adverse effects. For projects that have the potential to irreversibly convert such farmland, FEMA must consult with the USDA Natural Resources Conservation Service (NRCS) to identify potential impacts to that farmland.[503]

# XVI. Wild and Scenic Rivers Act

The Wild and Scenic Rivers Act protects the free-flowing condition of rivers and tributaries that are part of the National Wild and Scenic Rivers System (System) or are under study for inclusion in the System because of their scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values. Note: the rivers and tributaries under study are listed on the Nationwide Rivers Inventory or have been formally identified as Study Rivers. If a proposed project is located on a river or tributary covered by the Wild and Scenic Rivers Act whether as a designated river, a Study River, or a river on the Nationwide Rivers Inventory, FEMA must review it for compliance with the Wild and Scenic Rivers Act and consult with the managing agency for the affected designated river or tributary.[504]

# XVII. Resource Conservation and Recovery Act

The Resource Conservation and Recovery Act (RCRA) established a framework for federal, state, and local cooperation for controlling the management of hazardous and non-hazardous solid waste. EPA's role is to establish minimum regulatory standards, usually implemented by the states, which can establish their own requirements for solid waste management. RCRA requires the safe disposal of waste materials, promotes

---

[502] 16 U.S.C. § 1451 et seq.
[503] 7 U.S.C. § 4201 et seq.
[504] 16 U.S.C. § 1271 et seq.

the recycling of waste materials, and encourages cooperation with local agencies.[505] FEMA may require proof of compliant disposition in the form of state debris management permits/forms, landfill permit information, written statements from appropriate authorities, or project specific permits and plans.

# XVIII.    Comprehensive Environmental Response, Compensation and Liability Act

The Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), also known as Superfund, authorizes the federal government to respond to releases or threatened releases of hazardous substances into the environment through short-term removals and long-term remedial response actions. Superfund also triggered the development of the National Priorities List, a list of national priorities among the sites with known or threatened releases of hazardous contaminants. The 1986 amendments to CERCLA included the Emergency Planning and Community Right-to-Know Act (EPCRA) which, among other things, creates mechanisms to help local communities plan for chemical emergencies. FEMA will consult with EPA on projects affected by a Superfund site.

# XIX. Executive Order 11988, Floodplain Management

EO 11988 requires federal agencies to minimize or avoid, to the extent possible, the long- and short-term adverse impacts associated with occupancy and modifications of floodplain and to avoid direct and indirect support of floodplain development wherever there is a practicable alternative. It requires federal agencies to use a systematic decision-making process to evaluate the potential effects of projects located in, or affecting, floodplains; document each step of the process; and involve the public in the decision-making process. This process is designed to:

- Reduce flood loss risks;
- Minimize the impacts of floods on human safety, health, and welfare; and,
- Restore and preserve the natural and beneficial functions of floodplains.

FEMA publishes its implementing regulations for EO 11988 in 44 C.F.R. Part 9, Floodplain Management and Protection of the Wetlands. These regulations set forth the policy, procedures, and responsibilities to implement and enforce the EO, including the decision-making process, which is referred to as the 8-step process.[506]

# XX.  Executive Order 11990, Protection of Wetlands

EO 11990 requires federal agencies to avoid to the extent possible, the long- and short-term adverse impacts associated with the destruction or modification of wetlands and to avoid direct or indirect support of new construction in wetlands wherever there is a practicable alternative. To meet these objectives, EO 11990 requires federal agencies to use a systematic decision-making process to evaluate the potential

---

[505] 42 U.S.C. § 6901 et seq.
[506] 44 C.F.R. § 9.6.

PAPPG v5

effects of projects in, or affecting, wetlands; document each step of the process; and involve the public in the decision-making process.

FEMA publishes its implementing regulations for EO 11990, Protection of Wetlands in 44 C.F.R. Part 9, Floodplain Management and Protection of the Wetlands. These regulations set forth the policy, procedures, and responsibilities to implement and enforce the EO, including the decision-making process, which is referred to as the 8-step process.

# XXI. Executive Order 13112, Invasive Species

EO 13112 requires agencies to use their programs and authorities to help prevent the introduction, establishment, and spread of invasive species; respond to invasive species outbreaks; restore native species in areas invaded by invasive species; promote public education related to invasive species control; and avoid authorizing, funding, or carrying out activities that promote the introduction, establishment, or spread of invasive species. FEMA will consult with state and local environmental and debris management agencies to ensure projects are in compliance with EO 13112.

PAPPG v5

# Appendix E: Private Nonprofit Facility Eligibility Examples

Below are examples of private nonprofit (PNP) facility eligibility determinations.

## I.    Facility Owned by PNP – PNP Leases Portion of Facility to For-Profit Service

Parkland Hospital is an eligible PNP that owns a medical office building and leases a portion of it to doctors and laboratories that are providing for-profit services. The for-profit leases are for 70 percent of the floor space, excluding the common area floor space, as defined in this policy.

 **Analysis**

The building is ineligible because more than 50% of the building space is leased to an ineligible applicant.

## II.    PNP Recreational Center Providing Eligible Services

The PNP Springtown Recreation Center claims that it provides eligible essential social services in addition to its recreation activities and should be eligible for assistance. The organization claims that its services now include day care for elderly adults, senior citizen center programs, programs for families of domestic abuse, and shelter workshops. These programs are provided by the recreation center staff and offered 5 days a week. Recreation activities are limited to evenings and weekends. The entire center is used for the eligible services.

 **Analysis**

The organization would not appear to be eligible based upon its name and presumed mission. A detailed examination is necessary to determine the eligibility of the organization and its facility based upon the eligible services provided. In cases where space is not dedicated to any specific activity, the amount of time dedicated to eligible purposes in such spaces determines eligibility and the level of assistance. Therefore, even though the entire facility is used for eligible purposes, FEMA prorates PA funding based on the proportion of the total time it is used for eligible services.

## III.    Support Facility Owned by PNP

A parking garage is owned by an eligible PNP hospital to support its nearby hospital facility. The ground floor is leased to retail businesses and totals 15 percent of the total space of the garage.

282

PAPPG v5


**Analysis**

Title 44 of the Code of Federal Regulations (C.F.R.) § 206.221(e), Private nonprofit facility, authorizes assistance for administrative and support facilities essential to the operation of medical facilities and emergency facilities, which in this example includes the parking garage. Because the hospital uses more than 50% of the parking garage, the facility is eligible based on primary use. FEMA assistance would be prorated based on the percentage of space used for the eligible parking purpose. The parking garage is eligible only because of its association with the hospital.

## IV.  Facilities Owned by PNP Homeowners' Association

The Woodlands Homeowners' Association is a PNP organization responsible for providing certain services for a 200-home development. The Homeowners' Association is responsible for the local neighborhood streets, water system, sewage system, fire station, medical clinic, neighborhood park, community center, and a recreational lake and dam.


**Analysis**

The Homeowners' Association provides eligible critical services and therefore is an eligible PNP. The eligibility of each service is considered separately. The lake, dam, and park are not eligible PNP facilities because they provide primarily recreational services. The water and sewage systems meet the definition of a utility and are eligible for assistance. The fire station and medical clinic are eligible as emergency and medical facilities. The streets which support provision of any critical services directly by the PNP are eligible facilities. However, the eligibility of street-related work depends on whether the streets have restricted access and the type of work involved. The community center is considered more closely. If it is primarily used as a gathering place for a variety of social, educational enrichment, and community service activities, it is eligible because it provides noncritical but essential social services. To be eligible, it must serve the general public outside the Homeowners' Association community.

## V.  Recreational Center – Primarily Athletic Services

Westover Recreation Center sponsors a variety of activities. The center is available for rental on Friday, Saturday, and Sunday evenings to companies, religious groups, clubs, and civic organizations. It is offered as a location for league parties, office parties, seminars, conferences, and holiday celebrations. The center has rooms set aside for seniors' bridge and other card games, along with occasional workshops for photography, pottery and ceramics, and art. However, the center is primarily oriented to athletics, as exemplified by a large indoor pool and locker room, a half dozen squash/racquetball courts, a weight/exercise room, and a 9,200-square-foot gymnasium/basketball court.

PAPPG v5

 **Analysis**

Although Westover Recreation Center offers some eligible noncritical essential social services, it is, first and foremost, a recreation center. In contrast to the definition of an eligible community center, it is neither established nor primarily used as a gathering place for a variety of social, educational enrichment, and community service activities, even though it does offer some of these.
Facilities established or primarily used for athletic (or) recreational activities are ineligible community centers. The Articles of Incorporation filed with the state verify that Westover was established for recreational purposes. It is not necessary to calculate the percentage of time or space devoted to community activities versus athletic and recreational activities, because Westover is on its face overwhelmingly athletic and recreational. For these reasons, a PNP facility similar to Westover would not be eligible.

# VI.   Mixed Use Community Center – Nominal Fee

Somerset Community Center consists of several meeting rooms, a lending library, social services room, health services room, dining room, activity area with games and a wide-screen TV, darkroom, pianos for practice, ceramics lab, woodshop, computer room, sewing machines, exercise room, and a large foyer. Outside are a fitness trail, garden plots, an outdoor basketball court and softball field, a gazebo, and picnic area.

A nominal membership fee is charged. Classes are offered in piano, bridge, arts and crafts, and cooking. The center sponsors numerous seniors' activities, which include trips, luncheons, and recreational and educational activities. A lunch program is offered for seniors and their spouses. Some exercise classes are also offered. Health screenings and immunizations are regularly offered. Door-to-door transportation is provided to those who need it.

 **Analysis**

By virtue of the wide range of eligible community center activities, Somerset Community Center would be an eligible community center. Although it does offer athletic and recreational activities, these are minimal in the time and space allocated to them; therefore, it is not a recreational center. As the fee is nominal, it is open to the public.

# VII.  School Operated by a Religious Institution

The Community Church operates a state-certified private school offering first through eighth grades. The teaching curriculum includes math, science, English, history, physical education, and religious doctrine. The school has an average attendance of 500 students. The campus consists of three buildings: one used primarily for the secular curriculum, one used primarily for religious instruction, and a chapel primarily used for religious worship. Admissions to the school are restricted to members of Community Church.

PAPPG v5

 **Analysis**

Evaluate the three buildings separately. The two buildings used, respectively, for secular and religious education are eligible as educational facilities. As educational facilities, they are considered to provide critical services and therefore Community Church does not need to apply to SBA to receive funding for permanent work on those buildings. The chapel is eligible as a house of worship. Houses of worship provide noncritical services, so Community Church is required to apply for an SBA loan for the chapel. The restricted admissions process does not affect eligibility. Pursuant to Stafford Act Section 102(11)(B), no PNP facility is excluded from eligibility because leadership or membership in the organization is limited to people that share a religious faith or practice.

## VIII. Religious Institution with a Dock, a Church, and a Pastor's Residence

A religious institution owns multiple structures within its campus. One of the structures is a dock primarily used for recreation. The buildings include a church that provides worship services and a pastoral residence.

 **Analysis**

Evaluate the structures separately. The dock is ineligible because its use is primarily recreational, which is an ineligible service. The church is eligible because its primary use is as a house of worship. The residence is not eligible because a private residence is not an eligible PNP service. The applicant must apply for an SBA loan for repairs to the church as it provides a noncritical service.

285

PAPPG v5

# Appendix F: Mosquito Abatement

FEMA provides reimbursement for mosquito abatement measures at the written request of the state, local, Tribal Nation, and territorial (SLTT) public health officials after FEMA consults with the Centers for Disease Control and Prevention (CDC), based on any of the following:

- Evidence of:
  - Higher levels of disease transmitting mosquitoes in the impacted area following the incident;
  - A significant number of disease-carrying mosquitoes in the area due to the increase in incident-related standing water; or
  - The potential for disease transmission and human exposure to disease carrying mosquitoes based on the detection of arboviral diseases in sentinel organisms (poultry, wild birds, mosquito pools) in the impacted area prior to the incident, discovered during surveillance as part of mosquito abatement activities, or reported human cases in which transmission occurred prior to the incident.
- A determination that a significant increase in the mosquito population and/or the change of biting mosquito species poses a threat to emergency workers who are required to work out-of-doors, thereby significantly hampering response and recovery efforts or represent a threat to public health and safety.
- Such evidence may include an abnormal rise in landing rates or trap counts, significant changes in species composition or estimate of infection rates, when compared to pre-incident surveillance results.
- Verification from medical facilities within the affected area that an increase in the general public's exposure to mosquitoes has directly resulted in secondary infections, especially among those with weakened immune systems such as the elderly, the very young, or the sick. This may occur when increased numbers of residents in impacted areas with extended power outages are forced to open buildings for air circulation.

 **Terminology**

- An **arbovirus** is a virus utilizing arthropods as vectors and is transmitted via their feeding to a definitive host.
- The **landing rate**, expressed as number of mosquitoes landing per minute, is used as an adult mosquito surveillance measure utilizing human volunteers as bait.
- **Methoprene briquettes** are formulated with methoprene (compound that mimics the action of an insect growth-regulating hormone and prevents the normal maturation of insect larvae) growth inhibitor and a timed-release carrier that resembles a charcoal briquette.
- A **sentinel organism** is an organism, usually fowl, purposely exposed to mosquito bites outdoors to monitor pathogen transmission by mosquitoes.
- **Seroconversion** is the development of detectable antibodies in the blood of a sentinel organism directed against an infectious agent.
- **Trap count** is the number of female mosquitoes captured in a trap receptacle each night the traps are set.

286

PAPPG v5

Where possible, a determination of the need for vector control measures should be based on surveillance data provided by local agencies, or on surveillance conducted as a component of the emergency response. Similarly, termination of control efforts should be based on mosquito density and disease transmission monitoring, and on the degree of exposure to mosquitoes of residents and responders. Information useful in determining the need for emergency mosquito control measures includes:

- The local jurisdiction's mosquito population density estimates pre- and post-disaster, including information about species composition;

- Arbovirus transmission activity indices, including information about the location of surveillance activities; indices may consist of:

    o Infection rates in mosquitoes;

    o Seroconversion in sentinel chickens;

    o Equine cases; or

    o Human cases.

- The amount and type of flooding (e.g., saltwater/freshwater, coastal/inland);

- The extent and location of damage to housing;

- The extent, location, and anticipated duration of power interruption;

- The anticipated extent and duration of cleanup and recovery operations; and,

- A description of the type of mosquito management required (e.g., aerial or ground- based adulticide applications, larvicide applications), and duration of application to reduce the threat and the areas where the interventions are needed and cost estimates to justify the chosen mosquito management option is necessary and reasonable.

To be eligible for PA funding, insecticide formulations must be among those approved and registered by the U.S. Environmental Protection Agency for use in urban areas for mosquito control and must be applied according to label directions and precautions by appropriately trained and certified applicators. Furthermore, mosquito abatement measures must comply with all federal and SLTT laws, ordinances, and regulations concerning vector control and align with CDC.gov guidance for mosquito abatement measures. Mosquito abatement measures include, but are not limited to: adulticiding, larviciding, and breeding habitat removal or alteration.

 **Terminology**

**Adulticiding** – The ground or aerial spraying of insecticides to kill adult mosquitoes.

**Larviciding** – The application of chemicals, including methoprene briquettes, by ground or air to kill mosquito larvae or pupae.

**Breeding habitat removal or alteration** – The modification of potential breeding habitat to make it unsuitable for mosquito breeding or to facilitate larval control, including:

- Draining or removing standing water in close proximity to homes, schools, sheltering facilities, and businesses;

287

- Increased dewatering through the pumping of existing drainage systems; and,

- Dissemination of information in an accessible and effective manner (e.g., inserting flyers with resident's water bills, public service announcements, newspaper campaigns) to direct residents to remove the mosquito breeding habitat.

# Appendix G: Alternative Procedures for Permanent Work

Alternative procedures offer applicants maximum flexibility in how they use PA funds to restore damaged facilities. Under standard procedures, applicants receive PA funding based on the pre-disaster size, capacity, and function of a damaged facility. However, Section 428 of the Stafford Act authorizes FEMA to award PA funding based on estimates which are "fixed" or capped for large permanent work projects through alternative procedures. These procedures can only be applied to large projects.

Alternative procedures projects enable applicants to actively shape their recovery outcomes by considering the community's hazards, risks, exposure, and vulnerability and how they can be mitigated. There are several benefits for applicants when they choose alternative procedures, including less itemized cost tracking and increased flexibility of funding and restoration. This structure allows applicants to focus on long-term recovery, make strategic use of available funds, and maximize opportunities for hazard mitigation and resilience improvements.

## I.    Differences Between Standard and Alternative Procedures

**Table 35. Differences Between Standard and Alternative Procedures**

| Consideration | Standard Procedures | Alternative Procedures |
|---|---|---|
| Funds | <ul><li>Actual cost project. No retention of excess funds associated with the approved project; and,</li><li>Can only use funds toward the specific work identified in each specific project.</li></ul> | <ul><li>Fixed-cost project with use of excess funds; and,</li><li>May use funds across all alternative procedures projects.</li></ul> |
| Tracking | <ul><li>Must track costs specific to each work item within each individual project; and,</li><li>Must track all work specific to each individual project.</li></ul> | <ul><li>Do not need to track costs to specific work items. Only need to track the total costs associated with the alternative procedures projects; and</li><li>Do not need to track work to specific projects. Only need to substantiate that the work is related to the approved scope of work (SOW) covered in the alternative procedures projects.</li></ul> |

PAPPG v5

| Consideration | Standard Procedures | Alternative Procedures |
|---|---|---|
| Amendments | <ul><li>After FEMA approves a SOW, FEMA requires approval for any change to the SOW; and,</li><li>Must track costs associated with all changes to the SOW.</li></ul> | <ul><li>After FEMA approves a SOW, FEMA only requires approval for changes that involve buildings or structures that are 45 years or older, ground disturbing activities, or work in or near water; and,</li><li>Do not need to track costs associated with changes to the SOW.</li></ul> |

# II.    Fixed Cost Estimate

Under alternative procedures for permanent work, FEMA funds large projects based on a fixed cost estimate instead of the actual costs reconciled at closeout. FEMA, recipients, and applicants must agree to the damage description and dimensions (DDD), Scope of Work (SOW), and resilience initiatives through hazard mitigation for a project before the fixed cost estimate is developed either by FEMA or provided by the applicant.

FEMA caps PA funding for an alternative procedures permanent work project based on the aggregate federal share of the approved estimated cost:

- To restore the damaged facilities to pre-disaster design and function in accordance with eligible codes and standards; and,
- For cost-effective PA mitigation measures associated with the actual restoration SOW that the applicant will perform.

The following are allowable costs for the cost estimate.

## A. Architectural, Engineering, Environmental Review, and Design Fees

FEMA provides funding to support the development of complex projects that require an architectural, engineering, or environmental design. FEMA develops a project that includes the description, parameters, and cost estimate of the required design which is ultimately included in the fixed cost estimate for the associated project. FEMA also includes any design fees for services necessary to complete the restoration project SOW in the cost estimate.

## B. Construction and Other Restoration Costs

FEMA includes all eligible construction costs or other costs necessary to complete the eligible SOW, including:

- Required permitting fees;
- Costs for necessary project and/or construction management services;
- Funding required for:

PAPPG v5

- o  Codes, specifications, and/or standards or industry standards;[507]

- o  Any applicable consensus-based code, specification; and/or standard that the applicant identifies for the facility; and/or,

- o  Any approved industry standard as applicable under the Bipartisan Budget Act[508].

## C. Expert Panel Cost Estimate Review

A FEMA-funded, independent third-party panel of cost estimating experts may review project estimates. FEMA does not use this panel for appeals. The review is limited to issues pertaining to the estimated cost and the panel does not make decisions related to the eligibility of work. However, it may make determinations about whether cost elements are required to execute the SOW. The panel may review cost documentation for completed work, if necessary. [509]

- ▪  FEMA may request the independent panel review for any cost estimate.

- ▪  The Applicant may request the panel review the estimate for any project with an estimated Federal share of at least $5 million.

## D. Public Assistance Hazard Mitigation

PA hazard mitigation funds can be added to project funding for repairs on disaster-damaged facilities to help prevent future damage. When applicants repair the function of a facility but adjust its pre-disaster capacity, the proposed PA mitigation SOW is based on the actual work being done. However, cost-effectiveness is assessed according to the fixed amount set for restoring the facility to its pre-disaster condition. If the facility's capacity is increased, the mitigation SOW and costs are limited to what is needed to protect the facility at its original, pre-disaster capacity.

Approved mitigation proposals are included as a separate fixed cost amount within the subaward and must align with the actual recovery work planned. This hazard mitigation SOW and cost estimate are separate from the repair project itself. If the approved PA mitigation is not completed, FEMA will reduce the fixed cost amount by the portion intended for hazard mitigation.

# III.   Fixed Cost Offer

To develop the fixed cost offer FEMA engages with qualified engineers and architects, cost estimators, construction managers, and other technical experts as necessary to develop or validate cost estimates for large permanent work projects.

FEMA transmits the cost estimate as a fixed cost offer to the applicant via PA Grants Manager/Grants Portal for consideration. If applicants accept the fixed cost offer, the project is considered an alternative

---

[507] For more information, refer to Codes and Standards in Chapter 8.
[508] For more information, refer to: BBA Policy (September 2018).
[509] For more information, refer to: Stafford Act § 428, 42 U.S.C. § 5189

PAPPG v5

procedures project. The deadline for accepting the fixed cost offers is described below under Fixed Cost Offer Deadlines.

FEMA considers the fixed cost amount reasonable and eligible if there is no evidence of fraud and the applicant complies with federal grant conditions, including procurement requirements. Fixed cost estimates must also be reduced by all applicable credits, such as insurance proceeds and salvage values.[510] Obligation of the project constitutes FEMA's acceptance of the fixed cost amount. Once an applicant accepts a fixed cost offer, the project cannot revert to standard procedures.

Once FEMA, the recipient, and the applicant agree to the fixed cost estimate for the subaward, there will be no further adjustment, except for insurance adjustments and adjustments for approved SOW changes associated with hazard mitigation. FEMA's cost estimating format includes contingency factors for hidden damage, unforeseen environmental and permitting requirements, and other unidentified circumstances.

If the final actual costs are more than the approved fixed cost award, FEMA will not approve additional funds. If the final actual costs are less than the subaward, the applicant may use the excess funds as described below under the Excess Funds section of this appendix.

## A. Fixed Cost Offer Deadlines

FEMA, the recipient, and the applicant must reach a fixed cost agreement within 18 months of the declaration date. Recipients and applicants have a combined total of 30 days to accept fixed cost offers from the date of FEMA's transmittal. If fixed cost offers are not accepted within 30 days, If the applicant does not accept the fixed cost offer, the project is processed utilizing standard procedures and final funding will be based on actual costs. The flexible use of funds and the use of excess funds are not available under standard procedures.

Any time extensions to accept fixed cost offers must be approved by FEMA's Assistant Administrator for Recovery before the deadline. If an applicant is requesting a project for only architecture and engineering (A&E), it must determine the actual SOW to be performed before a fixed cost offer is transmitted.

# IV.   Use of Funding

Applicants may share funds from the fixed cost subaward across all alternative procedures for permanent work projects for:

- Repair, restoration, or replacement of disaster-damaged facilities and equipment;
- Construction of new facilities to include land acquisition;
- Purchase of equipment; or
- Cost effective hazard mitigation measures that reduce future risk.

---

[510] Stafford Act § 312, 42 U.S.C. § 5155, and 2 C.F.R. § 200.406.

PAPPG v5

If funds for PA hazard mitigation are included in the fixed cost subaward, applicants must complete the approved scope of work of the hazard mitigation in order to retain the mitigation funding. If an applicant is considering abandoning or demolition of the original facility see Chapter 10: Environmental and Historic Preservation for more information on the limitations and requirements.

## A. Excess Funds

Applicants request to use the funds for designated activities in the "Eligible with Fixed Cost Funds" column in Table. Eligible Work and Costs for Use of Fixed and Excess Funds below. Once FEMA approves – and applicants complete – the SOW associated with these activities, applicants may use any excess funds for the expanded list of eligible activities listed under the "Eligible with Excess Funds" column.

Any excess funds remaining after the approved SOW is complete may be used for cost-effective activities that reduce the risk of future damage, hardship, or suffering from a major disaster, and activities that improve future PA operations or planning. Applicants must submit a proposed SOW for use of any excess funds, along with a project timeline, to the recipient within 90 days of completing its last alternative procedures project. Recipients must forward the request to FEMA within 180 days of date the last alternative procedures project was completed. Applicants can submit a request for a time extension to this deadline to FEMA for consideration.

FEMA evaluates the proposed use of excess funds for reasonableness to ensure prudent use of funds. FEMA also evaluates the submitted project timeline and approves an appropriate deadline for work completion, not to exceed the overall disaster period of performance.

The following table lists examples of eligible and ineligible types of work and costs when using fixed cost funds and excess funds. All work must otherwise be eligible for PA.

Category I projects cannot be included in an alternative procedures for permanent work project.

**Table 36. Eligible Work and Costs for Use of Fixed Cost and Excess Funds**

| Type of Work or Cost | Eligible with Fixed Cost Funds? | Eligible with Excess Funds? |
|---|---|---|
| Restoration of disaster-damaged facilities and equipment | Yes | Yes |
| Alternate projects (e.g., purchasing equipment, constructing new facilities, improvements to undamaged facilities such as shelters and emergency operation centers) in declared areas | Yes | Yes |
| Cost-effective hazard mitigation measures for undamaged facilities | No | Yes |
| Covering future insurance premiums, including meeting obtain and maintain (O&M) insurance requirements, on damaged or undamaged facilities | No | Yes |

293

| Type of Work or Cost | Eligible with Fixed Cost Funds? | Eligible with Excess Funds? |
|---|---|---|
| Work on facilities that are ineligible due to a failure to meet previous O&M requirements | No | No |
| Conducting or participating in training for response or recovery activities, including federal grants management or procurement courses | No | Yes |
| Planning for future disaster response and recovery operations, such as developing or updating plans (e.g., debris management plans, hazard mitigation plans, pre-disaster recovery plans, emergency management plans), integrating these plans into other plans, preparedness activities, exercises, and outreach | No | Yes |
| Salaries for PA or emergency management staff (e.g., staff performing PA award or subaward administration, monitoring, and closeout activities for other PA disaster awards, and staff developing or updating disaster plans) | No | Yes |
| Paying down debts | No | No |
| Covering operating expenses | No | No |
| Covering budget shortfalls | No | No |
| Covering the non-federal cost share of FEMA projects or other federal awards | No | No |

# III.   Scope of Work Changes

Once the scope of work is approved and a fixed cost offer is accepted, applicants must notify FEMA prior to making scope of work changes that involve:

- Buildings or structures that are 45 years of age or older;
- Ground disturbing activities; or
- Work in or near waterways.

With exception of buildings or structures that are 45 years of age or older, applicants do not need to notify FEMA when they intend to make changes that substantially conform to the approved scope of work. Changes that substantially conform include items, such as:

- Substitutions in material type (e.g., pre-cast concrete vs. steel beam, stainless steel vs galvanized fasteners); or
- Interior floor plan reconfigurations (e.g., adding, moving, or removing rooms/features).

PAPPG v5

If applicants wish to change the scope of work to the extent that it changes the hazard mitigation or if the scope of work of the hazard mitigation requires an adjustment for any other reason, such changes must be approved within the 18-month deadline and the fixed cost offer amount will be adjusted to reflect the cost of the revised hazard mitigation scope of work.

# IV.    Closeout Requirements

Work must be completed by the end of the approved alternative procedures project work completion deadline and the recipient must certify that all incurred costs are associated with the approved SOW. Additionally, recipients must certify that subrecipients have completed all work in accordance with FEMA regulations and policies. Recipients must submit their certifications to FEMA within 180 days of the subrecipient completing its last alternative procedures project or the latest alternative procedure project deadline, whichever occurs first, for the subrecipient to retain and use any excess funds.

The closeout certification must include a final report of alternative procedures project costs and documentation to support the following:

- Summary of actual work completed;
- Mitigation measures achieved, if applicable;
- Compliance with EHP requirements;
- Compliance with civil rights requirements;
- Compliance with the obtain and maintain insurance requirement;
- Summary of total actual costs to complete the alternative procedure projects;
- Compliance with federal procurement procedures; and,
- Actual insurance proceeds received.

Subrecipients do not need to track costs to specific work line items. Subrecipients only need to substantiate and certify that all claimed costs are related to the overall work deemed eligible for the alternative procedure projects.

# V.    Other Considerations

## A.  Requirement to Obtain and Maintain Insurance

Applicants that receive PA funding for permanent work to replace, repair, reconstruct, or construct a facility must obtain and maintain insurance to protect the facility against future loss. [511] Applicants must comply with this requirement as a condition of FEMA assistance. This requirement applies to insurable facilities or property (buildings, contents, equipment, and vehicles), including those funded as an alternative procedures

---

[511] Stafford Act § 311; 42 U.S.C. § 5154; 44 Code of Federal Regulations (C.F.R.) § 206 Subpart I; 2 C.F.R 200.310.

PAPPG v5

for permanent work project.[512] FP 206-086-1 Public Assistance Policy on Insurance[513] describes these requirements in detail.

## B. Appeals for Alternative Procedures Projects

FEMA does not grant appeals on alternative procedures permanent work projects, except in cases of a cost adjustment after the fixed-cost offer has been accepted (such as adjustments related to insurance, noncompliance, or audits). Any disagreements regarding damage, SOW, or costs must be resolved before the applicant accepts the fixed cost offer. Additionally, FEMA does not grant appeals on denied time extensions to accept fixed cost offers for alternative procedures permanent work projects.

## C. Office of the Inspector General

The Department of Homeland Security's Office of Inspector General (OIG) conducts independent audits and investigations on FEMA programs, operations, activities, and functions; how recipients and subrecipients expend federal funds; and oversight of non-federal audits such as single audits. The OIG evaluates activities to identify, deter, and address fraud, waste, and abuse. The OIG has authority to audit any project, including alternative procedures projects.

---

[512] 44 C.F.R. § 206.203(d).
[513] For more information, refer to: Public Assistance Policy on Insurance (FP 206-086-1) | fema.gov.

PAPPG v5

# Appendix H: Mold Remediation

## I.    Mold Remediation Methods

The following table describes common mold remediation methods.

**Table 37. Mold Remediation Methods** [514]

| Method | Application |
|---|---|
| Wet Vacuum | ▪ Use when materials are wet;<br>▪ Use where water has accumulated, such as on floors, carpets and hard surfaces; and,<br>▪ Do not use when sufficient liquid is not present. |
| Damp Wipe | ▪ Wipe or scrub non-porous (hard) surfaces with water and detergent; and,<br>▪ Follow instructions listed on the product label. |
| High-Efficiency Particulate (HEPA) Vacuum | ▪ Final clean-up after thoroughly dry and contaminated materials are removed;<br>▪ Recommended for cleanup of dust outside of the remediation area.<br>▪ Properly seal HEPA filter; and,<br>▪ Personal protection equipment is highly recommended; filter and contents must be disposed of in well-sealed bags. |
| Discard | ▪ Use for building materials and furnishings that cannot be remediated;<br>▪ Seal contents in two bags using 6-mil polyethylene sheeting;<br>▪ Cover large items in polyethylene sheeting and seal with duct tape; and,<br>▪ Sealing of materials must be within containment area to limit further contamination. |

## II.    Application of Remediation Methods

The following table outlines typical mold remediation actions.

---

[514] Summarized from Indoor Environments Division of the U.S. Environmental Protection Agency, "Mold Remediation in Schools and Commercial Buildings."

PAPPG v5

**Table 38. Application of Mold Remediation Methods**[515]

| Water Damaged Material | Action |
|---|---|
| Books and paper | <ul><li>Non-valuable items: discard;</li><li>Valuable/important: photocopy and discard originals; and,</li><li>Invaluable items: freeze in frost-free freezer or meat locker or freeze dry.</li></ul> |
| Carpet and backing | <ul><li>Wet vacuum;</li><li>Reduce ambient humidity levels with dehumidifier; and,</li><li>Accelerate drying process with fans.</li></ul> |
| Ceiling tiles | <ul><li>Discard and replace. (Replacement is only eligible as permanent work.)</li></ul> |
| Cellulose insulation | <ul><li>Discard and replace. (Replacement is only eligible as permanent work.)</li></ul> |
| Concrete or cinder block surfaces | <ul><li>Wet vacuum; and,</li><li>Accelerate drying process with dehumidifiers, fans, and/or heaters.</li></ul> |
| Fiberglass Insulation | <ul><li>Discard and replace. (Replacement is only eligible as permanent work.)</li></ul> |
| Hard surfaces, porous floorings (linoleum, ceramic tile, vinyl) | <ul><li>Vacuum or damp wipe with water and mild detergent;</li><li>Scrubbing may be necessary; and,</li><li>Allow to dry.</li></ul> |
| Upholstered furniture | <ul><li>Wet vacuum; and,</li><li>Accelerate drying process with dehumidifiers, fans, and/or heaters.</li></ul> |
| Wallboard (drywall and gypsum board) | <ul><li>If obvious swelling and seams are not intact: discard;</li><li>If no obvious swelling and seams are intact: may be dried in place; and,</li><li>Ventilate wall cavity. (May include removal of wallboard up to 12-16 inches above the waterline.)</li></ul> |
| Window drapes | <ul><li>Launder or clean according to manufacturer's instructions.</li></ul> |
| Wood surfaces | <ul><li>Remove water with wet vacuum;</li><li>Accelerate drying process with dehumidifiers, fans, and/or heaters; and,</li><li>Wet paneling: discard and ventilate wall cavity.</li></ul> |

---

[515] Summarized from the U.S. Environmental Protection Agency's Mold Remediation in Schools and Commercial Buildings | epa.gov.

298

# Appendix I: Work Eligibility Considerations by Type of Facility

## I.    General Work Eligibility Considerations for Facilities

**Table 39. Work Eligibility Considerations: All Facilities**

| PAPPG Reference | Topic | Applicability |
|---|---|---|
| Ch. 4: Facility Eligibility | Facility Eligibility | All permanent work. |
| Ch. 4: General Work Eligibility | General Work Eligibility | All work. |
| Ch. 6: Cost Eligibility | Cost Eligibility | All eligible work. |
| Ch. 7: Emergency Work Eligibility | Emergency Work Eligibility | All emergency work, including debris removal (category A) and emergency protective measures (category B). |
| Ch. 7: Debris Removal | Debris Removal Eligibility | All debris removal work. |
| Ch. 10: Environmental and Historic Preservation; Appendix A | Environmental and Historic Preservation (EHP) Compliance | All work (including ground disturbance for any staging areas, access roads, parking, landscaping, grading, or utilities). |
| Ch. 8: Codes and Standards | Codes and Standards | Upgrades to pre-disaster design required by codes or standards. |
| Ch. 8: Hazard Mitigation; Appendix J | Hazard Mitigation | Hazard mitigation is any cost-effective measure which will reduce the potential for damage to a facility from a disaster event.[516] |
| Ch. 8: Repair vs. Replacement | Replacement | The purpose of the 50% rule is to make an early determination on whether it is more prudent to repair or replace a facility. It is not intended to be a full calculation of all eligible project costs. |
| Ch. 8: Relocation | Permanent Relocation | FEMA may approve funding for and require restoration of an applicant's destroyed (i.e., eligible for replacement) facility at a new location. |
| Ch. 8: Facility Located in or Impacting a Floodplain | Floodplain Considerations | All permanent work in or impacting the floodplain. |
| Ch. 8: Landslides and Slope Stabilization | Landslides and Slope Stabilization | Facilities damaged due to a landslide or slope instability triggered by the incident. |
| Ch. 8: Building Code and Floodplain Management | Disaster Recovery Reform Act Section 1206 | FEMA will provide resources needed to effectively administer and enforce building |

---

[516] 44 Code of Federal Regulations (C.F.R.) § 206.201(e).

PAPPG v5

| PAPPG Reference | Topic | Applicability |
|---|---|---|
| Administration and Enforcement | | codes and floodplain management regulations (e.g., substantial damage assessments or determinations, permitting) and enhancing National Flood Insurance Program (NFIP) compliance. |
| Ch. 7: Temporary Relocation of Essential Services | Temporary Relocation | Certain essential community service facilities. |

# II.    Work Eligibility Considerations for Roads and Bridges

The following work eligibility considerations apply to:

- Roads (including, but not limited to: surface, base, shoulders, roadside ditches, guardrails, lighting, signage, sidewalks);
- Drainage structures (including, but not limited to culvert, low-water crossing); and,
- Bridges (including, but not limited to, decking, pavement, piers, girders, abutments, slope protection, approaches, guardrails, lighting, signage, sidewalks).

EHP laws, regulations, and EOs that frequently apply: NEPA; NHPA, ESA, CWA, CAA, EOs 11988 and 11990. In addition, projects involving work in waterways usually require Section 404 permits, which are issued by the USACE as required by the CWA and also for local NFIP requirements.

Policy waiver for any ineligible work requires approval from Assistant Administrator of Recovery.

**Table 40. Work Eligibility Considerations: Roads and Bridges**

| PAPPG Reference | Category | Eligible Work (including but not limited to) | Ineligible Work and Costs | Other Considerations |
|---|---|---|---|---|
| Ch. 7 | A | <ul><li>Debris removal and disposal to eliminate an immediate threat.</li></ul> | <ul><li>Removal of debris placed on public ROWs from commercial properties unless approved by FEMA.</li><li>Removal of materials related to the construction, repair, or renovation of either residential or commercial structures.</li></ul> | <ul><li>Must distinguish between incident-related debris versus debris generated by other recent events, and household waste.</li></ul> |
| Ch. 7 | B | <ul><li>Emergency access</li><li>The extent of damage or blockage makes areas inaccessible.</li></ul> | <ul><li>Removal of debris from a privately-owned access facility <u>unless</u> no other access point exists, and damage or</li></ul> | <ul><li>Must acquire and retain all necessary legal processes or obtains rights-of-entry and agreements to indemnify and hold</li></ul> |

300

PAPPG v5

| PAPPG Reference | Category | Eligible Work (including but not limited to) | Ineligible Work and Costs | Other Considerations |
|---|---|---|---|---|
| | | ▪ Clearing debris from or conducting emergency repairs to an access facility, such as a road or bridge.<br>▪ Limited to work necessary for the access to remain passable.<br>▪ Includes construction of strictly temporary access. | debris impedes emergency access.<br>▪ Emergency repairs to privately-owned roads <u>unless</u> no other access point exists, damage impedes emergency access, and repair eliminates temporary housing needs. | harmless the federal government. |
| Ch. 7 | B | ▪ Emergency repairs to address an immediate threat. | ▪ Emergency repair of federal-aid highways (under FHWA authority). | ▪ None. |
| Ch. 6 & 8 | C | ▪ Restoration (permanent repair or replacement). | ▪ Loss of useful service life<br>▪ Loss of toll revenue<br>▪ Construction of additional lanes even if required by a code or standard, except when code requires changing a one lane bridge to two lanes.<br>▪ Costs related to maintenance of roads.<br>▪ Repair of disaster-caused federal-aid highways (under FHWA authority). Does not apply to Tribal Nations. | ▪ Must distinguish between minor incident-related damage and damage related to age of the road, traffic flow, and frequent rain events.<br>▪ Need date of construction for culvert and any nearby structures that may be altered or affected by the project.<br>▪ Hydrologic and hydraulic (H&H) studies to evaluate upstream and downstream impacts are necessary if replacing culvert with differently sized cross drain structure. |

# III.   Work Eligibility Considerations for Water Control Facilities

The following work eligibility considerations apply to:

▪ Dams or reservoirs;

▪ Irrigation and water conveyances (including canals, pipelines, laterals, pump stations, siphons);

PAPPG v5

- Aqueducts;

- Drainage channels;

- Sediment and debris basins;

- Stormwater retention and detention basins;

- Coastal shoreline protection facilities (including seawalls and revetments);

- Flood control works (including levees, floodwalls, flood control channels, dams or basins, and other structures primarily used for flood control);

- Navigational waterways; and,

- Shipping channels.

Construction of storm water drainage facilities associated with road projects (inside the ROW) are instead considered eligible work under category C.

EHP laws, regulations, and EOs that frequently apply to work eligibility for water control facilities include NEPA, NHPA, ESA, CWA, EOs 11988 and 11990. Projects involving work in waterways usually require Section 404 permits, which are issued by the USACE as required by the CWA and to include potential local NFIP requirements.

Policy waiver for any ineligible work requires approval from Assistant Administrator of Recovery.

**Table 41. Work Eligibility Considerations: Water Control Facilities**

| PAPPG Reference | Category | Eligible Work (including but not limited to) | Ineligible Work and Costs | Other Considerations |
|---|---|---|---|---|
| Ch. 7 | A | - Debris removal and disposal (from natural feature or engineered facility) to eliminate an immediate threat.<br>- Debris removal eligibility requirements are different for navigable vs. non-navigable waterways | - Removal of debris to eliminate a threat of flooding to agricultural land.<br>- Surveys to look for debris.<br>- Debris removal from flood control works that are under the specific authority of another federal agency.<br>- Removal of debris from federally maintained navigable waterways. | - Must distinguish between incident-related debris versus pre-existing debris and debris generated by other incidents. |
| Ch. 7 | B | - Flood-fighting (on natural feature or engineered facility) or emergency repairs (engineered and maintained facility only) | - Emergency protective measures to reduce the threat of flooding to agricultural land.<br>- Emergency repair of flood control works that are under the authority | - USACE can conduct flood fighting activities.<br>- USACE cannot reimburse applicants for flood fighting efforts. |

302

| PAPPG Reference | Category | Eligible Work (including but not limited to) | Ineligible Work and Costs | Other Considerations |
|---|---|---|---|---|
| | | to address an immediate threat:<br>▪ Includes the repair of deliberate breaches or removal of flood-fighting measures as part of the category B emergency protective measure project. | of another federal agency.<br>▪ Permanently increasing height or capacity of a flood control work.<br>▪ De-watering of flooded areas primarily for the purpose of drying land.<br>▪ Emergency repair of a secondary levee riverward of a primary levee.<br>▪ Emergency repairs of flood control works under the authority of another federal agency and of federally constructed coastal shoreline protective features under the authority of another federal agency. | |
| Ch. 8 | D | ▪ Debris and silt removal required to restore capacity (engineered and maintained facilities only). | ▪ Restoration of flood control works under the authority of USACE. | ▪ None. |
| Ch. 8 | D | ▪ Restoration (permanent repair or replacement)<br>▪ Includes PNP irrigation facilities only if they provide water for essential services of a governmental nature to the general public for water for drinking water supply, fire suppression, or electricity generation | ▪ Restoration of natural channels, lakes, and shorelines (any feature that is not improved and maintained)<br>▪ Restoration of PNP irrigation systems that provide water solely for agricultural purposes.<br>▪ Restoration of federally constructed coastal shoreline protective features | ▪ None. |

# IV.   Work Eligibility Considerations for Buildings, Equipment, and Vehicles

EHP laws, regulations, and EOs that frequently apply to work eligibility considerations for buildings, equipment, and vehicles include NEPA, NHPA, CAA, ESA and EOs 11988 and 11990.

**Table 42. Work Eligibility Considerations: Buildings, Equipment, and Vehicles**

| PAPPG Reference | Category | Eligible Work (including but not limited to) | Ineligible Work and Costs | Other Considerations |
|---|---|---|---|---|
| Ch. 7 | B | ▪ Extracting water and clearing mud, silt, or other accumulated debris from eligible facilities; ▪ Requires the work to be conducted expeditiously for the purpose of addressing an immediate threat; and ▪ Work necessary to restore the facility is permanent work, not emergency work (see category E below). | ▪ Conducted on private property unless FEMA approves the work because: ▪ The immediate threat is widespread, affecting numerous homes and businesses such that it is a threat to the health and safety of the general public; ▪ The applicant has legal authority to perform the work; and ▪ The applicant obtained rights-of-entry and agreements to indemnify and hold harmless the federal government. | ▪ None. |
| Ch. 8 | E | ▪ Removal of mud, silt, or other accumulated debris; and, ▪ Must be conducted in conjunction with restoration of the facility. | ▪ None. | ▪ None. |
| Ch. 7 | B | ▪ Mold remediation to address immediate threat of additional damage; and, ▪ Includes post-remediation sampling to confirm remediation is complete. | ▪ Mold remediation required as a result of poor facility maintenance or failure to take protective measures in a reasonable amount of time following the incident. | ▪ Pre-remediation mold sampling is only eligible when sampling reveals presence of mold. |

PAPPG v5

| PAPPG Reference | Category | Eligible Work (including but not limited to) | Ineligible Work and Costs | Other Considerations |
|---|---|---|---|---|
| Ch. 8 | E | ▪ Mold remediation when conducted in conjunction with restoring the facility; and, ▪ Includes post-remediation sampling to confirm remediation is complete. | ▪ Mold remediation required as a result of poor facility maintenance or failure to take protective measures in a reasonable amount of time following the incident. | ▪ Pre-remediation mold sampling is only eligible when sampling reveals presence of mold. |
| Ch. 7 | B | ▪ Emergency protective measures to address an immediate threat; ▪ Includes buttressing, bracing, or shoring; barricading and safety fencing; and flood protection, such as sandbagging; and ▪ Includes emergency repairs to prevent further damage. | ▪ None. | ▪ None. |
| Ch. 7 | B | ▪ Demolition to address an immediate threat; and ▪ May include demolition of private structures when collapse is imminent, and an immediate threat exists to the general public (subject to additional requirements). | ▪ Removal of slabs or foundations that do not present a health or safety hazard (except structures in a buyout program funded by FEMA through HMGP); and, ▪ Removal or covering of concrete pads and driveways (except structures in a buyout program funded by FEMA through HMGP). | ▪ If securing an unsafe structure and the surrounding area to prevent access is sufficient to alleviate the threat to public safety, demolition may not be necessary or eligible. |
| Ch. 7 & 8 | B & I | ▪ Safety inspections; ▪ Must be intended to establish whether a building is safe for entry, occupancy, and lawful use, as well as posting appropriate placards; and, | ▪ Inspections associated with: ▪ A determination of whether the building needs to be elevated or relocated; ▪ Ensuring repairs are completed in accordance with | ▪ None. |

PAPPG v5

| PAPPG Reference | Category | Eligible Work (including but not limited to) | Ineligible Work and Costs | Other Considerations |
|---|---|---|---|---|
| | | ▪ Applies to both public and private buildings. | applicable building codes and standards;<br>▪ Inspections for substantial damage compliance;<br>▪ Building inspections to ensure the removal of temporary fill and related materials used in flood fighting; and,<br>▪ inspections to ensure compliance with repair and substantial damage construction requirements. | |
| Ch. 6 & 8 | E | ▪ Post-earthquake inspection and evaluation of welded steel moment frames in buildings; and<br>▪ Must be intended to determine the level of disaster-related damage requiring repair. | ▪ Preliminary assessment to determine which buildings are likely to have sustained damage to welded steel moment frame connections;<br>▪ Detailed analytical or experimental studies; and<br>▪ Inspections that do not yield discovery of significant connection damage attributable to the earthquake. | ▪ The repair of the damaged frame connections to pre-earthquake design in accordance with FEMA 352, Chapter 6, is eligible, but only if FEMA approves a specific SOW for the repairs prior to the applicant performing the work; and<br>▪ Repair of the architectural finishes and fire retardants removed in the area of the damage are also eligible. |
| Ch. 6 & 8 | E | ▪ Restoration (permanent repair or replacement);<br>▪ Repair or replacement of buildings (to achieve pre-disaster design, capacity, and / or function); and,<br>▪ Repair or replacement of building components, vehicles or equipment with | ▪ Tax assessments;<br>▪ Additional capacity necessary due to increased population or use, even if required by code; and,<br>▪ Americans Disabilities Act (ADA), if the applicant was notified of being in violation of a requirement prior to the incident and did | ▪ Need date(s) of construction of all facilities in the project area;<br>▪ Check National Register of Historic Places or a State historic register;<br>▪ Identify whether the building is located in the 1% annual chance floodplain (0.2% |

| PAPPG Reference | Category | Eligible Work (including but not limited to) | Ineligible Work and Costs | Other Considerations |
|---|---|---|---|---|
| | | items similar in age, condition, and capacity. | not bring the facility into compliance, then accessibility requirements related to the violation are ineligible. | annual chance floodplain for critical actions);<br><br>▪ Public housing authority facility(s) is only eligible for permanent work if Congress does not appropriate funds to HUD for emergency capital needs for the facility;<br><br>▪ Must consider the age of the building, roof, and building systems; evidence of regular maintenance; severity and impacts of incident when distinguishing between incident-related damage and pre-existing damage; and,<br><br>▪ Comply with federally required codes and standards when repairing or replacing building. |

# V.    Work Eligibility Considerations for Contents

Contents includes furnishings, equipment, consumable supplies, files, records, research-related contents, animals, irreplaceable collections and individual objects, library books, and publications.

**Table 43. Work Eligibility Considerations: Contents**

| PAPPG Reference | Category | Eligible Work (including but not limited to) | Ineligible Work and Costs | Other Considerations |
|---|---|---|---|---|
| Ch. 7 | B | ▪ Address an immediate threat; and,<br><br>▪ Includes removal and storage of contents to minimize additional damage. | ▪ None. | ▪ None. |

PAPPG v5

| PAPPG Reference | Category | Eligible Work (including but not limited to) | Ineligible Work and Costs | Other Considerations |
|---|---|---|---|---|
| Ch. 8 | E | ■ Restoration (permanent repair or replacement);<br><br>■ Replacement of destroyed contents with items similar in age, condition, and capacity;<br><br>■ Condition assessment, stabilization, and treatment and treatment of irreplaceable items;<br><br>■ Recovering and stabilizing records; and,<br><br>■ Re-shelving, cataloging, and other work incidental to the replacement of library books and publications. | ■ Replacing used items with new items, unless a used replacement item is not reasonably available;<br><br>■ Establishing new information databases;<br><br>■ Manually re-entering data into new computers;<br><br>■ Scanning re-established hardcopy files into computers to create digital files;<br><br>■ Deciphering photocopies of damaged hard copies;<br><br>■ Research-related contents and animal replacement, if a comparable item/animal is not available for purchase at a reasonable cost; and<br><br>■ Replacement of rare books, collections, or objects. | ■ Contents may be replaced with different items used for the same general purpose; and,<br><br>■ Eligible funding is capped at the estimated cost for equivalent items. |

# VI.   Work Eligibility Considerations for Utilities

The following work eligibility considerations apply to:

■ Water storage, treatment plants, and delivery systems;

■ Power generation, transmission, distribution, and storage facilities (including, but not limited to, natural gas systems, wind turbines, generators, substations, and power lines);

■ Sewage collection systems and treatment plants; and,

■ Communication systems.

EHP laws, regulations, and EOs that frequently apply to work eligibility for utilities include NEPA, NHPA, ESA, CAA, CWA, and EOs 11988 and 11990 and to include potential local NFIP requirements.

**Table 44. Work Eligibility Considerations: Utilities**

| PAPPG Reference | Category | Eligible Work (including but not limited to) | Ineligible Work and Costs | Other Considerations |
|---|---|---|---|---|
| Ch. 6 & 7 | B | ▪ Emergency protective measures to address an immediate threat:<br>○ Includes buttressing, bracing, or shoring; barricading and safety fencing; and flood protection, such as sandbagging; and,<br>○ Includes emergency repairs to prevent further damage. | ▪ Revenue lost due to shutdown of a utility; and,<br>▪ Increased operating costs, such as increased costs for obtaining an alternative source of power because of the shutdown of a power generation plant. | ▪ Limited ROW clearance required to access a damaged facility may be eligible;<br>▪ For debris removal and permanent work, straight-time and overtime costs are eligible for both budgeted and unbudgeted labor; and,<br>▪ For emergency protective measures, only overtime costs are eligible for budgeted labor; for unbudgeted labor, both straight-time and overtime costs are eligible. |
| Ch. 6 & 8 | F | ▪ Restoration (permanent repair or replacement).<br>○ Includes components of the system, including buildings, structures, or systems, even if not contiguous;<br>○ Electrical conductor replacement subject to specific criteria;<br>○ Includes inspection or assessment of damaged components of a system; and,<br>○ May include inspection or assessment of an inaccessible structure or component of a system, but only when there is | ▪ General post-disaster surveys, inspections, and assessments, such as video inspection of sewer lines. | ▪ Eligible for mitigation and codes and standards upgrades. |

PAPPG v5

| PAPPG Reference | Category | Eligible Work (including but not limited to) | Ineligible Work and Costs | Other Considerations |
|---|---|---|---|---|
| | | evidence of damage, such as when sunken ground appears above a water pipeline. | | |

# VII.  Work Eligibility Considerations for Parks, Recreation, and Other

EHP laws, regulations, and EOs that frequently apply to work eligibility for parks, recreation, and other include NEPA, NHPA, CZMA, CBRA, ESA, CWA, and EOs 11988 and 11990 and to include potential local NFIP requirements.

**Table 45. Work Eligibility Considerations: Parks, Recreation, and Other**

| PAPPG Reference | Category | Eligible Work (including but not limited to) | Ineligible Work and Costs | Other Considerations |
|---|---|---|---|---|
| Ch. 7 | B | ▪ Emergency protective measures to address an immediate threat:<br>○ Includes buttressing, bracing, or shoring; barricading and safety fencing; and flood protection, such as sandbagging; and<br>○ Includes emergency repairs or stabilization to eliminate or lessen an immediate threat. | ▪ Work performed under an exigent circumstance that restores the pre-disaster design and function of the facility in accordance with codes and standards is permanent work, not emergency work. | ▪ None. |
| Ch. 8 | G | | ▪ Restoration of federally constructed beaches or shoreline protection facilities;<br>▪ Restoration of PNP parks and recreational facilities, including supporting facilities | ▪ Restoration of engineered beaches is subject to specific eligibility criteria. |

PAPPG v5

| PAPPG Reference | Category | Eligible Work (including but not limited to) | Ineligible Work and Costs | Other Considerations |
|---|---|---|---|---|
| | | | such as roads, buildings, and utilities; | |
| | | | ▪ Restoration of natural, unimproved features; | |
| | | | ▪ Replacement of destroyed crops; and, | |
| | | | ▪ Restoration of private and homeowners' association beaches or dunes, | |

311

# Appendix J: Cost-Effective Public Assistance Hazard Mitigation Measures

FEMA considers the following mitigation measures to be cost-effective PA mitigation if the measures do not exceed 100 percent of the eligible repair cost (prior to any insurance reductions). The mitigation measures must meet all eligibility requirements described under the Hazard Mitigation section in Chapter 8. There may be instances where these measures are required by codes or standards[517] (see the Codes and Standards section in Chapter 8). In these cases, the work is completed as part of the PA repair project and requires no additional cost-effectiveness evaluation. Resilience beyond that which is required by codes and standards is implemented as PA mitigation. All mitigation measures are subject to general eligibility requirements, including compliance with Environmental and Historic Preservation (EHP) laws, regulations, and EOs.

## I.    Drainage Structures

For Sections I.A and I.B (below), PA and EHP staff coordinate to determine whether a hydrologic and hydraulic (H&H) study is needed. Applicants must submit an H&H study to determine the appropriate culvert size with no adverse up or downstream impacts and National Flood Insurance Program regulations when:

- The facility is in a special flood hazard area;

- There is a potential adverse impact to the floodplain;[518]

- There is a potential adverse impact to a federally listed threatened or endangered species, critical habitat, or essential fish habitat;[519] or

- It is required to demonstrate compliance with the Clean Water Act.

A.    Replace the structure with multiple structures or a larger structure. Applicants may use existing SLTT drainage criteria for sizing replacement culverts. Applicants must consider replacement structures with regard to the total drainage system.

B.    For the purpose of erosion control, add properly designed entrance and exit structures, such as a headwall, wingwalls, flared aprons, or energy dissipation measures to increase efficiency and help to minimize scour and erosion. Depending on the severity of erosion, solutions for bank protection may include gabion baskets, rip rap, cast-in-place concrete, crushed stone or rock, grouted rip rap,[520] sheet-piling, geotextile fabric (for roads that were paved prior to the event), or similar measures to control erosion. Additionally, the use of vegetation or a combination of vegetation and construction materials such as live fascines, vegetated geogrids, live crib walls, brush mattresses, root wads, or similar

---

[517] 44 Code of Federal Regulations (C.F.R.) § 206.226(d).
[518] 44 C.F.R. §§ 9.11(d)(4) and 60.3(b)(7), (c)(10), and (d)(3).
[519] Endangered Species Act 16 U.S.C. §§ 1531-1544 and Magnuson-Stevens Fishery Conservation and Management Act.
[520] Projects involving grouted rip rap may be subject to an environmental assessment and may not be allowable in all instances.

PAPPG v5

measures are eligible. Applicants should consider using eligible solutions such as bioswales, bioretention, rain gardens, and similar techniques that may be used in public drainage systems.

C. Culverts

1. Where the alignment of a culvert is inconsistent with existing water flow, realign the culvert vertically or horizontally or relocate the culvert to improve hydraulics and minimize erosion and scour. Applicants must consider realignment of structures with regard to the total drainage system.

2. Extend the culvert discharge to mitigate erosion and scour by extending the discharge end beyond the toe of the embankment.

3. Install a debris barrier to prevent debris blockage or fins designed to orient floating debris for passage through the culvert.

4. Install a debris barrier riser to allow debris to float up with the rising floodwaters without blocking flow into the culvert.

 **Example: Relief Culvert**

Adding a relief culvert located at the same crossing site as a damaged culvert and in the embankment above the flow line of the primary culvert or located upstream of the main culvert. A relief culvert provides an alternate route for the flow if the main culvert is over capacity or gets plugged and prevents sedimentation through the high-flow scouring action.

# II.    Transportation Facilities

A. Bridges

1. Where traffic counts are low, replace with low-water crossings.

2. Install cables to restrain a bridge from being knocked off piers or abutments during floods or earthquakes.

3. Install girder and deck uplift tie-downs to prevent their displacement from the substructure.

4. Install Longitudinal Peaked Stone Toe Protection with nature planting, upstream of a failed abutment, to provide a stable floodplain bench for the protection of the abutment and the adjoining bridge approach. Consider other relevant solutions, such as engineered logjams, log vanes or log bendway weir.

B. Marine pier ramps: If attached to decking, install open decking or floating decking with uplift-resistant tie-downs and fasteners.

C. Roadways and railways: Where shoulders are susceptible to overflow from adjacent water courses, stabilize shoulders and embankments with geotextile fabric (such as an erosion control blanket/rolled erosion control product (RECP) or a turf reinforcement mat) and revetments.

D. Roadways: Use geotextile drainage blankets between the pavement section and subbase to strengthen subgrade.

# III.    Mechanical, Electrical, Plumbing Components

A.  Provide seismic bracing for electrical lines, conduit, piping, ductwork, water heaters, and other mechanical, electrical, plumbing (MEP) equipment.

B.  Roof-mounted equipment: Secure to roof top via a continuous load path, using tie-downs, straps, or other anchoring systems that will resist expected wind forces.

C.  Elevate or dry floodproof components or systems vulnerable to flood damage, including equipment controls, electrical panels; heating, ventilation, and air conditioning/machinery rooms; emergency generators; and fuel tanks. When wiring cannot be elevated, replace with equipment suitable for submerged applications.

D.  Install switches, circuit isolation and/or quick connect capability to facilitate rapid connection of backup power for any damaged or susceptible mechanical and electrical components.

E.  Install camlocks, transfer switches, and electrical panels to facilitate the connection of portable emergency generators.

# IV.    Pipes

A.  Install pipe joint restraints, flexible piping at pipe/conduit connections, or replace pipes with more ductile material.

B.  Install continuous lining or encasement to prevent infiltration or structural collapse.

C.  Underground Pipes: Install shut-off valves so that damaged sections of pipe can be isolated.

# V.    Water/Wastewater

A.  Pumps: If pumps and their attached motors are damaged by stormwater inundation, replace them with submersible or inline pumps as appropriate.

B.  Sewer access covers: Elevate to the hydraulic grade line. When elevation is not feasible or practicable, install devices to prevent infiltration into access holes such as cast-iron watertight frames and covers.

C.  Well systems: Seal exposed portions of well casing or raise the elevation of the well head to prevent infiltration of flood waters.

D.  Raw water intakes: Install buttressing to prevent damage from erosion, scour, and flood debris.

# VI.    Electric Power Systems

A.  Provide looped distribution service or other redundancies in the electrical service to critical facilities, such as hospitals and fire stations. This measure does not entail overall power grid capacity expansion.

B.  Install surge suppressors and lightning arrestors.

C.  Transformers:

   1.  Elevate pad transformers above the base flood elevation.

   2.  Support pole-mounted transformers with multiple poles.

D.  Power poles:

1. Replace damaged poles with higher-rated poles (preferably two classes stronger) of the same or different material. When replacing poles with higher-rated poles, install guys and anchors to provide lateral support for poles supporting pole-mounted transformers, regulators, capacitor banks, reclosers, air-break switches, or other electrical distribution equipment.

2. Add cross-bracing to H-frame poles to provide additional strength.

3. Power lines: Add guy-wires or additional support.

# VII. Storage Tanks

A. Anchor or otherwise protect from movement by strengthening or stiffening base connections.

B. Install self-initiating disconnects and shut-off values between tanks and distribution lines to minimize damage and leaks.

# VIII. Buildings and Structures

A. For small support buildings subject to uplift or rollover from high winds, securely anchor the buildings to foundations to prevent toppling or becoming missile hazards.

B. Elevate, wet floodproof, or dry floodproof buildings. Dry floodproofing may include installing flood barriers. Wet or dry floodproofing may include  solutions such as rain gardens, bioswales, constructed or restored wetlands that reduce flood risk.

C. Footings: Where spread footings have been undercut by scour, underpin footings.

D. Siding: Replace with a stronger siding to prevent future disaster damage (e.g., wind, wildfire) with stronger attachments to the wall sheathing and structure.

E. Vents: Replace with water-resistant vents.

F. Non-structural building components: Brace interior walls, partitions, parapets, anchor veneer or cladding, suspended light features, drop ceilings, soffits, and other non-structural elements that could collapse and cause injury or block safe exit of a building during an earthquake or high-wind event.

G. Furnishings: Provide seismic ties, straps, or clips to secure replaced furniture, cabinets, computers, bookcases, and other furnishings.

H. For buildings and structures outside of the wildland-urban interface (where FEMA building code policy already requires these mitigation measures), create defensible space around facilities or structures with wildfire risk by removing or reducing the volume of flammable vegetation. The volume of vegetation should be minimized (e.g., hardscaping) by thinning or replacing flammable vegetation with less flammable, non-invasive species. Less flammable vegetation includes high-moisture plants, trees with low sap or resin content, plants with thick leaves, and drought tolerant vegetation. Native species are preferable as non-native options are less likely to withstand weather conditions, creating a fire risk.

I. For buildings and structures outside of the wildland-urban interface (where FEMA building code policy already requires these mitigation measures), non-combustible construction materials: Replace and upgrade construction materials with non-combustible alternatives for facilities with wildfire risk.

J. Roofs:

1. Install hurricane clips, fasteners, anchors, straps, and connectors that are compatible with the roof system and corrosion-resistant in coastal areas.

2. Strengthen the high-wind pressure areas (e.g., corner zones, roof soffits, overhangs).

   3.  Strengthen roof openings, such as hatches and skylights.

   4.  Low slope roofs: Replace and upgrade materials for entire roof covering with a fully adhered roof covering, such as a modified bitumen membrane roof. FEMA does not provide PA mitigation funding for loose laid insulation or membranes as punctures can cause large amounts of water intrusion. Additionally, FEMA does not provide PA mitigation funding for loose laid roof membranes with loose ballast stones as the stones can become projectiles in high winds and cause damage.

   5.  Gable roofs: Replace and upgrade materials for the gable-end framing with hipped roof framing to reduce wind forces (lower edge pressure; reduced projected wind area) and strengthen the roof framing.

   6.  Gutters and downspouts: Upgrade to direct water away from the structure to prevent interior or basement water damage.

K.  Doors and Windows:

   1.  Upgrade the weather stripping to prevent water infiltration.

   2.  Replace doors, door frames, hinges, and hardware with wind-resistant units.

   3.  Strengthen windows.

   4.  Replace glass with impact-resistant material.

   5.  Install shutters on windows:

      a.  Of critical facilities, such as hospitals.

      b.  On the lower floors of noncritical facilities most likely to be struck by debris.

      c.  Of buildings with very high-value contents that can be damaged by water (such as libraries and document centers).

      d.  Of buildings when failure of roofing materials or other portions of nearby structures could create impact hazards.

L.  Replace impervious paved surfaces with permeable pavement alternatives. Alternatives include permeable concrete, porous asphalt, permeable interlocking pavers, plastic grid pavers, or other systems that enable water infiltration while maintaining structural integrity. Permeable pavement projects should include aggregate and geotextile fabric layers to meet project-specific requirements such as desired storage capacity, pavement strength, or subgrade composition. [521]

M.  Construct new or install pre-fabricated tornado or hurricane safe room. Safe rooms must be part of the footprint of the facility that is being repaired due to damage caused by the declared incident. Safe Rooms should provide life safety protection and be designed to meet the design and construction criteria in *Safe Rooms for Tornadoes and Hurricanes* (FEMA P-361) [522].

# IX.  Signage

A.  Replace sign panels and their supports with a stronger type of system of supports and panels. Consider using multiple support posts and stronger panels and fasteners.

---

[521] For more information, refer to: Stormwater Best Management Practice, Permeable Pavements | epa.gov.
[522] For more information, refer to: *Safe Rooms for Tornadoes and Hurricanes (FEMA P-361)*.

# Appendix K: Snow Declarations

For eligibility to be considered, the STT must request and be issued a major disaster declaration that must include a request for snow assistance as part of that declaration. Snow related activities are not eligible under Emergency Declarations. Snow-related activities, including snow removal, de-icing, salting, snow dumps, and sanding of roads and other eligible facilities, is only an eligible emergency protective measure when a winter storm results in record or near-record snowfall.[523] FEMA considers near record as being within 10 percent of the record snowfall. FEMA authorizes snow assistance by county based on a finding that the county received record or near-record snowfall or meets the contiguous county criteria as described below. FEMA evaluates Tribal Nation lands either as part of a requested county or separately.

## I.    Record or Near-Record Snowfall

FEMA utilizes data collected by the National Oceanic and Atmospheric Administration's National Centers for Environmental Information (NCEI) to identify the historical 1-, 2-, and 3-day snowfall records for each county. For current event snowfall, FEMA relies primarily on snowfall measurements taken at National Weather Service (NWS) Cooperative Network Stations but accepts measurements from other sources if those measurements are verified as reasonable and accurate by the NWS. Historical 1-, 2-, and 3-day snowfall records by county[524] and daily snowfall reports by county[525] are available on the NCEI Snow Climatology Database (SCDB). FEMA follows the following process to determine record or near-record snowfalls:

- Compare current snowfall amounts with the historical record snowfall amounts for a like number of days without regard for the month in which the record snowfall or current event occurred.

- For multiple-day snowstorms, counties or Tribal Nation lands that meet the 1-day record or near-record requirement on any 1 day, or the 2-day record or near record over 2 consecutive days, or the 3-day record or near record over 3 consecutive days, etc., meets the record or near-record criteria for that county or tribal lands.

- FEMA relies on the NWS to determine the duration of the snowstorm.

- When data from multiple NWS-verified sources exist within a county or Tribal Nation lands, FEMA compares the highest current event snowfall reported by the NWS within that county or Tribal Nation land with the highest historical record snowfall for that county or Tribal Nation land. In counties with multiple recording stations, the observed/recorded snowfall measurements demonstrating a record or near record storm must correspond to a single reporting station not an average or combination of measurement across multiple reporting stations within a county.

- For counties or Tribal Nation lands that do not have NCEI or NWS historical record snowfall data, use the historical record from the nearest NWS Cooperative Network Station in an adjacent county or Tribal Nation land, even if located in an adjacent state, for determining historical snowfall records.

---

[523] 44 Code of Federal Regulations (C.F.R.) § 206.227.
[524] For more information, refer to: Snowfall Extremes | National Centers for Environmental Information (NCEI) | noaa.gov.
[525] For more information, refer to: Daily U.S. Snowfall and Snow Depth | National Centers for Environmental Information (NCEI) | noaa.gov.

PAPPG v5

- If current event snowfall data are not available from the NWS for a county or Tribal Nation land, use the nearest NWS Cooperative Network Station data from an adjacent county, even if located in an adjacent state.

- FEMA may designate a county or Tribal Nation land that does not receive a record or near-record snowfall but is contiguous to a county (generally referred to as a "core county") that does receive a record or near-record snowfall, for snow assistance if the county or Tribal Nation land has current event snowfall that meets or exceeds the current event snowfall of the core county, to which it is contiguous. Base this comparison on the highest current event snowfall received by each county as reported by the NWS.

- Consider counties or Tribal Nation areas that experience snowfalls occurring over a period exceeding 3 consecutive days that do not reach record or near-record snowfalls during a 3-day period, and for which there are no historical snowfall records for a period exceeding 3 days with NCEI or NWS, on a case-by-case basis.

 **Terminology**

A **core county** is a county that has a record or near record snowfall with PA costs that exceed the annually established countywide per capita impact indicator and is designated for snow assistance under a major disaster declaration.

A **contiguous county** is a county in the same state that shares a common border with a core county without geographic separation other than by a minor body of water, typically not exceeding one mile between the land areas of such counties.

# II.    Winter Storm or Snowstorm Declaration Requests

The request for a major disaster declaration must include a request for snow assistance as part of that declaration. All such requests are subject to the requirements and processes established in the Stafford Act and FEMA regulations.[526] In addition to the information required in every declaration request, requests for snow assistance must include the following information:

- Identification of core and contiguous counties for which a snowstorm declaration is requested;

- Duration of snowfall, as identified or confirmed by the NWS; and,

- For each requested county or tribal land, daily snowfall totals from NWS stations or NWS-verified sources and historical record snowfall data from the NCEI.

Generally, the current event weather and snowfall information is included in a statement or report from the NWS describing the event. FEMA only includes costs related to snow activities as part of the preliminary damage assessment data for counties or tribal lands that meet the record or near-record criteria or qualify as contiguous counties. Other categories of work, including permanent work, may be authorized for snowstorm or winter storm declarations as appropriate.

---

[526] 44 C.F.R. § 206 Subpart B (206.31–48).

# Appendix L: Validation of Applicant-Provided Cost Estimates

This appendix provides a checklist that FEMA PA staff must use to review and validate cost estimates submitted to FEMA for large permanent work projects. FEMA staff may also use relevant portions of this checklist for emergency work.

The steps for validating applicant-provided cost estimates are as follows:

1.      **Verify that the estimate:**

☐  Is prepared by a licensed professional engineer or other estimating professional, such as a licensed architect or certified professional cost estimator[527] who certifies that the estimate was prepared in accordance with industry standards;

☐  Includes certification that the estimated cost directly corresponds to the repair of the agreed upon damage;

☐  Is based on unit costs for each component of the scope of work and not a lump sum amount; and,

☐  Contains a level of detail sufficient for FEMA to validate that all components correspond with the agreed-upon scope of work.

2.      **Review the scope of work and cost estimate to verify only eligible items are included.**

☐  The scope of work items in the cost estimate are required based on the agreed-upon damage description and dimensions.

☐  The scope of work included ineligible items, and FEMA has removed the ineligible components from the estimate. Documentation detailing the components removed and reason for removal is attached.

☐  The scope of work included ineligible items, and FEMA is returning the estimate to the applicant to revise.

3.      **Determine whether unit costs are from an approved source of industry standard information and whether current cost data publications were used.[528]**

☐  The applicant used the following appropriate cost estimating resource(s):

     ☐  Industry standard construction cost estimating resource(s):

---

[527] In lieu of a license or certification, an individual with professional experience and proficiency in the field of cost estimating may prepare and sign the cost estimate.
[528] There are numerous sources that may be used in the preparation of cost estimates.

    ☐ RSMeans

    ☐ XActimate

    ☐ BNi Costbooks

    ☐ Marshall & Swift

    ☐ "Sweet's Unit Cost Guide"

    ☐ Other_____

☐ Local cost data from_____

☐ Contract unit costs from recently completed projects.

☐ Other: _____

☐ FEMA returned the estimate to the applicant to revise as the applicant did not use an appropriate cost estimate resource.

**4.    Determine the components of unit costs.**[529]

☐ The estimate contained sufficient information related to the components of the unit costs:

    ☐ Each unit cost represented a complete and in-place cost that included all labor, equipment, materials, small tools, incidentals, and hauling costs necessary to complete that element of work.

    ☐ Unit costs were analyzed to determine if general contractor overhead and profit were included in the unit costs:

        ☐ Both general contractor and subcontractor overhead and profit are included in the unit costs and these costs are not duplicated elsewhere in the estimate or in the Cost Estimating Format (CEF).

        ☐ Overhead and profit are not included in the unit costs.

        ☐ Overhead and profit are duplicated in the estimate.

        ☐ Costs for surveying, construction inspection, and permit compliance fees are not duplicated (i.e., not included within a unit cost and separately in the estimate).

---

[529] Ensure that the components that make up the unit costs are fully understood. The purpose of this review is to ensure that components of the unit costs are not duplicated elsewhere in the cost estimate.

PAPPG v5

☐ The estimate did not contain sufficient information related to the components of the unit costs. FEMA requested additional information from the applicant.

**5.      Validate the cost estimate for completeness and reasonableness.**

☐ The costs of work items are reasonable based on a representative sample.

☐ FEMA has determined costs for items of work in the estimate to be unreasonable (see attached). Therefore, the estimate was returned to applicant to revise.

☐ All items of work included in the cost estimate are eligible.

☐ FEMA has removed ineligible items of work from the cost estimate (see attached).

☐ All work activities required to complete the work are quantified with unit costs.

☐ The cost estimate included lump sum amounts for work activities that need to be adjusted to unit prices. FEMA has returned the estimate to the applicant for revision.

☐ The appropriate locality adjustment factor from the cost estimating publication is used for each line item, as applicable. Where historical costs were used, a locality adjustment was not applied, but cost escalation factors were added.

☐ The appropriate locality adjustment factor from the cost estimating publication was not used (see attached) or, as historical costs were used, a locality adjustment was inappropriately applied.

☐ The following cost items are each within 10 percent of either 1) the local average weighted unit prices or 2) industry standard construction cost data:

    ☐ At least six of the ten largest cost items (or all cost items if there are less than ten), reviewed individually; and,

    ☐ At least 25 percent of the remaining cost items.

☐ Cost items checked are not within 10 percent of the local average weighted unit prices or industry standard construction cost data; therefore, the estimate was returned to applicant to revise.

Date Review Completed _____

Date of Information Requests to Applicant _____

Name of Reviewer _____

Reviewer Signature _____

# Appendix M. Consensus-Based Codes, Specifications, and Standards

The most recent edition of codes, specifications, and standards from the following organizations, as published at the time of the disaster declaration, will be applied to the design and construction of certain facilities (currently limited to buildings, electrical power, roads, bridges, drinking water, and wastewater). FEMA may issue updates to these codes in a separate document before the version 6 release of the "Public Assistance Program and Policy Guide" (PAPPG).

These codes, specifications, and standards apply only to the repair and replacement of disaster-damaged elements and facilities. This appendix does not make costs for regular operations and maintenance eligible for assistance.

Eligible building projects that involve substantial improvement or new construction in flood hazard areas must meet the minimum floodproofing or elevation standards set out in 44 C.F.R. § 9.11(d), or the standards of the International Code Council (e.g., International Building Code, International Existing Building Code, International Energy Conservation Code, or International Residential Code), whichever requirement is stricter.

When triggered by these FEMA-identified codes, specifications, and standards, applicants must include the latest applicable criteria, including but not limited to the following:

- In areas where tornado shelter design wind speeds are 250 mph or greater, the Applicant must incorporate a storm shelter or safe room (designed to International Code Council (ICC) 500 standards) for elementary and secondary schools with an occupant load of 50 or more, Emergency Operations Centers (EOCs), 911 call stations, fire stations, rescue stations, ambulance stations, and police stations.
- Concerning requirements for wind, seismic, flood, temperature, ice and snow, and wildfire the Applicant must incorporate applicable design and construction standards contained in the International Building Code (IBC), International Existing Building Code (IEBC), International Residential Code (IRC) and their referenced standards [e.g., American Society of Civil Engineers (ASCE)/Structural Engineering Institute (SEI) 7; 24 and 41], and International Wildland-Urban Interface Code (IWUIC).

Quick reference tables covering the application of codes, specifications, and standards to structural building components (Table 1) and non-structural building components (Table 2) can be found in the *Consensus-Based Codes, Specifications and Standards for Public Assistance* Frequently Asked Questions,[530] along with a table of the NFIP technical bulletins and their areas of applicability (Table 3). The FAQs also contain reference tables specific to potable water facilities, wastewater facilities, roads and bridges and electric power facilities.

---

[530] For more information, refer to: Section 1235(b) | Consensus-Based Codes and Standards | FEMA.gov.

**Table 46. Standard Setting Organization and Consensus-Based Codes, Specifications, and Standards by Facility Type**

| Facility Type | Standard Setting Organization and Consensus-Based Codes, Specifications and Standards |
|---|---|
| Buildings | ▪ **American Concrete Institute (ACI):** ACI 318-19, "Building Code Requirements for Reinforced Concrete; ACI 301 Specifications for Concrete Construction; ACI 318, Building Code Requirements for Structural Concrete and Commentary<br><br>▪ **American Institute of Steel Construction (AISC):** AISC 325, Steel Construction Manual; ANSI/AISC 303, Code of Standard Practice for Steel Buildings and Bridges; ANSI/AISC 360, Specification for Structural Steel Buildings; ANSI/AISC 341, Seismic Provisions for Structural Steel Buildings<br><br>▪ **American Iron and Steel Institute (AISI):** AISI S100, North American Specification for the Design of Cold-formed Steel Structural Members<br><br>▪ **American National Standards Institute and FM Approvals (ANSI/FM Approvals):** ANSI/FM Approvals 2510-2020, American National Standard for Flood Mitigation Equipment<br><br>▪ **American Society of Civil Engineers (ASCE):** ASCE 24, Flood Resistant Design and Construction; ASCE 41, Seismic Evaluation and Retrofit of Existing Buildings; ASCE/SEI 7, Minimum Design Loads and Associated Criteria for Buildings and Other Structures; ASCE 8, Standard Specification for the Design of Cold-formed Stainless-Steel Structural Members; ASCE 49, Wind Tunnel Testing for Buildings and Other Structures<br><br>▪ **American Society Mechanical Engineers (ASME):** ASME/A17.1/CSA B44-16, Safety Code for Elevators and Escalators<br><br>▪ **American Society of Testing and Materials (ASTM):** ASTM E1886, Standard Test Method for Performance of Exterior Windows, Curtain Walls, Doors and Impact Protective Systems Impacted by Missile(s) and Exposed to Cyclic Pressure Differentials; ASTM E1996, Specification for Performance of Exterior Windows, Curtain Walls, Doors and Impact Protective Systems Impacted by Windborne Debris in Hurricanes<br><br>▪ **American Wood Council (AWC):** NDS, National Design Specification (NOS) for Wood Construction-with NOS Supplement<br><br>▪ **American Welding Society (AWS):** AWS D1.4/D1.4M Structural Welding Code-Reinforcing Steel<br><br>▪ **Facilities Guideline Institute (FGI):** (FGI), Guidelines for Design and Construction of Hospitals/Outpatient<br><br>▪ **International Association of Plumbing and Mechanical Officials (IAPMO):** IAPMO UMC Uniform Plumbing Code, UPC Uniform Mechanical Code<br><br>▪ **International Code Council (ICC):** International Building Code (IBC); International Existing Building Code (IEBC); International Residential Code (IRC); International Energy Conservation Code (IECC); International Wildland-Urban Interface Code (IWUIC); International Plumbing Code (IPC); International Mechanical Code (IMC); International Fire Code (IFC); ICC 500, International Fire Code (IFC); ICC A117.1, ICC/NSSA Standard on the Design and Construction of Storm Shelters; ICC 600, Standard for Residential Construction in High-wind Regions |

PAPPG v5

| Facility Type | Standard Setting Organization and Consensus-Based Codes, Specifications and Standards |
|---|---|
| | ▪ **National Association of Architectural Metal Manufacturers (NAAMM):** NAAMM FP 1001, Guide Specifications for Design of Metal Flag Poles |
| | ▪ **National Fire Protection Association (NFPA):** NFPA 70, National Electrical Code (NEC); NFPA 1142, Standard on Water Supplies for Suburban and Rural Firefighting; NFPA 1144, Standard for Reducing Structure Ignition Hazards from Wildland Fire |
| | ▪ **Steel Joist Institute (SJI):** SJI 100 Standard Specification Load Tables and Weight Tables for Steel Joists and Joist Girders K-Series, Series, DHL-Series, Joist Girders; SJI 200, Standard Specification for Composite Steel Joists, CJ-Series |
| | ▪ **The Aluminum Association (TAA):** ADM1, Aluminum Design Manual, Part 1 - A Specification for Aluminum Structures |
| | ▪ **The Masonry Society (TMS):** TMS 402, Building Code for Masonry Structures; TMS 602, Specification for Masonry Structures |
| | ▪ **Timber Piling Council (TPC):** TPC, Timber Pile Construction |
| Electric Power | ▪ **American Society of Civil Engineers (ASCE):** ASCE MOP 74 Guidelines for Electrical Transmission Line Structural Loading; ASCE 48 Design of Steel Transmission Pole Structures |
| | ▪ **Institute of Electrical and Electronics Engineers:** IEEE 1527, Recommended Practice for the Design of Busywork Located in Seismic Active Areas; IEEE 693 Recommended Practice for Seismic Design of Substations |
| | ▪ **U.S. Department of Agriculture Rural Electric Service (RUS):** RUS Bulletins Transmission - 1724E-200, 1724E-204, 1724E-206, 1724E-214, 1724E-216, 1724E-224, 1724E-226, 1724E-300, 1728F-803, 1728F-804, 1728F-806, 1728F-810, 1728F-811, 1728H-701 |
| Roads and Bridges | ▪ **American Association of State Highway and Transportation Officials (AASHTO):** A Policy on Geometric Design of Highways and Streets; Standard Specifications for Highway Bridges; LRFD Bridge Construction Specifications; LRFD Bridge Design Specifications; LRFD Movable Highway Bridge Design Specifications; AASHTO/AWS D1.5M/D1.5 Bridge Welding Code,; LRFD Guide Specifications for Accelerated Bridge Construction; Guide Specifications for LFRD Seismic Bridge Design; Guide Specifications for Design of Bonded FRP Systems for Repair or Strengthening of Concrete Bridge Elements; Guide Specifications for Design and Construction of Segmental Concrete Bridges, Guide Specifications for Wind Loads on Bridges During Construction; Guidelines for Geometric Design of Low-Volume Local Roads; M288 Standard Specifications for Geosynthetic Specifications for Highway Applications; Manual on Uniform Traffic Control (MUTCD) |
| | ▪ **American Concrete Institute (ACI):** ACI-548.10Specification for Type MMS (Methyl Methacrylate Slurry) Polymer Overlays for Bridge and Parking Garage Decks; ACI-548.8 - Specification for Type EM (Epoxy Multi-Layer) Polymer Overlay for Bridge and Parking Garage Decks; ACI-548.9 - Specification for Type ES (Epoxy Slurry) Polymer Overlays for Bridge and Parking Garage Decks |
| | ▪ **FAA AC150/5300 Airport Design** |

324

PAPPG v5

| Facility Type | Standard Setting Organization and Consensus-Based Codes, Specifications and Standards |
|---|---|
| Potable Water | ▪ **American Society of Testing and Materials (ASTM):** ASTM-F-480-17, Standard Specification for Thermoplastic Well Casing Pipe and Couplings Made in Standard Dimension Ratios (SDR)<br><br>▪ **National Fire Protection Association (NFPA):** 1141 Standard for Fire Protection for Land Development in Wildland, Rural, and Suburban Areas<br><br>▪ **National Standards Foundation (NSF):** NSF Standard 14, Plastic Piping System Components and Related Materials. NSF Standard 61, Drinking Water System Components – Health Effects<br><br>▪ **Great Lakes Upper Mississippi River Board of Provincial Public Health and Environmental Managers:** Recommended Standards for Water Works |
| Wastewater | ▪ **American Society of Testing and Materials (ASTM):** ASTM D-2321-18, Standard Practice for Underground Installation of Thermoplastic Pipe for Sewers and Other Gravity Flow Installations; ASTM F-1417, Standard Practice for Installation Acceptance of Plastic Gravity Sewer Lines Using Low-Pressure Air; ASTM C-12, Standard Practice for Installing Vitrified Clay Pipe Lines; ASTM C- 828, Standard Test Method for Low Pressure Air Test of Vitrified Clay Pipe Lines; ASTM C-478, Standard Specification for Circular Precast Reinforced Manhole Sections; ASTM C-1244, Standard Test Method for Concrete Sewer Manholes Negative Air Pressure (Vacuum) Test Prior to Backfill<br><br>▪ **Great Lakes Upper Mississippi River Board of Provincial Public Health and Environmental Managers:** Recommended Standards for Wastewater Facilities |

325

Exhibit V



# FEMA Cadre Management Guide

October 2014



FEMA

# Table of Contents

Chapter 1: Introduction ................................................................................................. 1

   Authorities and Foundational Documents .................................................................. 2

   Purpose and Scope ..................................................................................................... 3

Chapter 2: The FEMA Cadre Management Framework ................................................ 4

   FEMA Cadres .............................................................................................................. 4

      Title V Employees (5 U.S. Code) ............................................................................ 4

      Stafford Act Employee ............................................................................................. 5

   Cadre Management ....................................................................................................... 6

      Certifying Authority ................................................................................................. 8

      Certifying Official ..................................................................................................... 8

      Cadre Coordinator .................................................................................................... 9

      Cadre Training Manager .......................................................................................... 10

      Reservist Program Manager .................................................................................... 11

      FTE Coordinator ..................................................................................................... 12

      IM CORE Program Manager .................................................................................. 12

      Regional Incident Workforce Management Liaison Team ....................................... 13

   Cadre Management Oversight .................................................................................... 15

      Incident Workforce Executive Steering Committee ................................................ 15

      Cadre Coordinators Working Group ........................................................................ 16

   Cadre Management Support ........................................................................................ 17

      Incident Workforce Management Division .............................................................. 17

      Office of Equal Rights ............................................................................................. 18

      Office of the Chief Component Human Capital Officer .......................................... 19

      Office of the Chief Financial Officer ...................................................................... 19

      Office of the Chief Information Officer ................................................................... 19

      Logistics Management Directorate .......................................................................... 20

      Office of the Chief Counsel ..................................................................................... 20

Chapter 3: Staffing Force Structure ............................................................................. 21

   Principles of FEMA's Force Structure Model ............................................................ 21

Staffing a Cadre .................................................................................................................... 22

    Force Structure versus Actuals Report ................................................................................ 22

    Filling Vacant Force Structure Positions ............................................................................ 24

    Interagency Augmentation to a Cadre's Force Structure..................................................... 25

Availability ............................................................................................................................ 25

    Special Considerations for Managing Availability.............................................................. 26

    Support to Cadres for Staffing Force Structure .................................................................. 29

Chapter 4: Educating and Training Members of a Cadre ........................................................... 31

  Cadre Responsibilities in FQS ............................................................................................... 32

  Types of Training ................................................................................................................... 34

  FEMA's Training Philosophy ................................................................................................ 35

  FEMA's Training Mandate .................................................................................................... 35

  Principles of Training ............................................................................................................ 35

    Train for Operations ........................................................................................................... 36

    Require Leadership Involvement and Ownership................................................................ 36

    Train to Standards .............................................................................................................. 36

    Use Performance-Oriented Training ................................................................................... 37

    Promote Team Operations .................................................................................................. 37

    Challenge Employees ......................................................................................................... 37

  A Mission Essential Task List Approach to Cadre Training Development ............................. 37

    Mission Essential Task List Fundamentals ......................................................................... 37

    Mission Essential Task List Development............................................................................ 38

    Training Standards .............................................................................................................. 38

    Training Assessment ........................................................................................................... 38

  Required (FQS) Training ....................................................................................................... 39

    Enrollment for Scheduled FQS Courses ............................................................................ 40

  Mandatory Training............................................................................................................... 41

  Programmatic Updates .......................................................................................................... 42

Chapter 5: Qualifying Members of a Cadre .............................................................................. 43

  FQS Documentation .............................................................................................................. 43

    Revisions to FQS Documentation....................................................................................... 44

Managing the Paperwork .................................................................................... 44

Assignment of an Initial Position Title ............................................................. 45

Initial Assignment ......................................................................................... 45

Subordinates Titles......................................................................................... 48

Issuance of Position Task Books........................................................................ 49

Issuance Policy................................................................................................ 49

Position Task Book Issuance Form.................................................................. 50

Time Limits for Completion of PTBs ............................................................. 50

PTB Completion/Submission Process ............................................................ 50

Candidate Selection for Advancement............................................................ 50

Certifying Qualification of a Position Title....................................................... 51

Certification and Recertification Processes .................................................... 51

Decertification Process ................................................................................... 52

Reconsideration Process ................................................................................. 52

Specialties............................................................................................................ 52

Chapter 6: Performance Management .................................................................... 54

Principles of Performance Management ............................................................. 54

Individual Incident Performance Evaluation...................................................... 54

Chapter 7: Equipping Members of a Cadre ........................................................... 56

Principles for Equipping Members of a Cadre ................................................... 58

Primary Responsibilities for Equipping a Cadre................................................ 58

Cadre Coordinators ........................................................................................ 58

Reservist Program Manager and IM CORE Program Manager ..................... 59

Office of the Chief Information Officer........................................................... 59

Office of the Chief Security Officer................................................................ 60

Incident Workforce Management Division ..................................................... 60

Federal Coordinating Officers ....................................................................... 60

Logistics Management Directorate ................................................................. 60

Processes for Equipping Cadre Members .......................................................... 61

Information Technology Equipment................................................................ 61

FEMA Branded Clothing................................................................................ 63

Government Issued Charge Card ................................................................................. 63

Badging Information ................................................................................................... 63

Cadre Specific Equipment .......................................................................................... 64

Reasonable Accommodations ..................................................................................... 64

Support in Equipping a Cadre .................................................................................... 64

Chapter 8: Cadre Readiness Assessment .......................................................................... 66

Principles of Cadre Readiness Assessment .................................................................... 66

Readiness Scores ......................................................................................................... 67

Assessment Methodology ........................................................................................... 67

Chapter 9: Communication and Coordination .................................................................. 68

Principles of Communication ......................................................................................... 68

Data Sharing ................................................................................................................ 68

Cross Cadre Collaboration .......................................................................................... 69

Coordination/Communication with Cadre Members ..................................................... 70

Annual Individual Readiness Cadre Call ..................................................................... 70

Quarterly Cadre Coordination Call ............................................................................. 71

Annex 1: Acronyms .......................................................................................................... 73

Annex 2: Glossary ............................................................................................................. 76

Appendix A: Guidance for Working at the Residence of Record or at an Alternate Location when on Temporary Duty ....................................................................................................... 80

Appendix B: Systems Approach to Training ..................................................................... 83

A Systems Approach to Training Management .............................................................. 83

System Phases .............................................................................................................. 84

Appendix C: Entry Employee Request Form .................................................................... 87

Appendix D: QRB Employee Request Form ..................................................................... 89

Appendix E: Transmittal Log Form .................................................................................. 92

Appendix F: New Specialty Request Form ........................................................................ 93

Appendix G: Processes for Assignment of a FQS Job Title .............................................. 94

Initial Assignment ........................................................................................................... 94

Reservist ....................................................................................................................... 94

IM CORE ...................................................................................................................... 94

FTE .......................................................................................................................... 95

Appendix H: PTB Issuance Form ........................................................................................ 97

Appendix I: Reservist Equipment Guidance........................................................................ 98

    Malfunctioning Equipment Guidance for Reservists ....................................................... 98

        Reservist at Home with Malfunctioning Equipment (Laptop) ............................................ 98

        Reservist at Home with Malfunctioning Equipment (Phone)............................................. 99

        Reservist at FEMA Location with Malfunctioning Equipment (Laptop, Phone)................ 99

Appendix J: List and Description of FEMA Cadres ........................................................... 100

    Purpose of Each Cadre .................................................................................................. 101

Appendix K: Positions and Responsibilities...................................................................... 104

Appendix L: Administrative Processes .............................................................................. 111

Appendix M: Cadre Coordinator's Resource List .............................................................. 112

Appendix N: Travel Authorization and Information Email Template....................................... 113

Appendix H: Staffing a Force Structure Vacancy ............................................................. 115

Appendix O: Certification/Decertification Process ........................................................... 120

    Certification Process ...................................................................................................... 120

    Decertification Process .................................................................................................. 121

Appendix P: Cadre Coordinator Role in QRB Review ....................................................... 123

Appendix Q: Employee Self – Certification Health and Safety Checklist ................................ 125

Appendix R: Telework Application and Agreement ........................................................... 126

Appendix S: Workforce Analysis ...................................................................................... 128

Appendix T: Office of Chief Counsel................................................................................. 129

## List of Figures

Figure 1: Cadre Management Structure................................................................................ 8

Figure 2: Regional Coordination Structure........................................................................ 14

Figure 3: Communication and Coordination among Cadre Management Elements ................... 17

Figure 4: Process for Equipping a New Reservist and IM CORE: FIWA.................................. 62

Figure 5: Process for Equipping a New Reservist and IM CORE: Deployment to a JFO .......... 62

Figure 6: Process for Equipping a New PFT and New CORE .................................................... 63

Figure 7: Process for Equipment Replacement.................................................................... 63

Figure 13: SAT Process ........................................................................................... 84

Figure 8: Staffing a Force Structure Vacancy for a FTE - Initial Assignment of Title, Non-Supervisory ........................................................................................... 115

Figure 9: Staffing a Force Structure Vacancy for a FTE - Initial Assignment of Title, Supervisory ........................................................................................... 116

Figure 10: Staffing a Force Structure Vacancy for a FTE – Hiring............................................ 117

Figure 11: Staffing a Force Structure Vacancy for a Reservist - Hiring and Initial Assignment of Title........................................................................................... 118

Figure 12: Staffing a Force Structure Vacancy for an IM CORE - Hiring and Initial Assignment of Title........................................................................................... 119

## List of Tables

Table 1: Positions and Responsibilities within Cadres ........................................................... 7

Table 2: Incident Workforce Executive Steering Committee Structure ...................................... 16

Table 3: Cadre Coordinator Working Group Structure ............................................................. 17

Table 4: Example Force Structure vs. Actuals Report............................................................. 23

Table 5: Hiring Process Steps........................................................................................... 24

Table 6: Deployment Availability Requirements by Employee Type........................................... 26

Table 7: Staffing Force Structure Roles and Responsibilities .................................................. 29

Table 8: Training Roles and Responsibilities ....................................................................... 32

Table 9: Training Descriptions ......................................................................................... 34

Table 10: Initial Assignment of Title Process Step for FTE, Non-Supervisory ........................... 47

Table 11: Initial Assignment of Title Process Step for FTE, Supervisory ................................... 48

Table 12: Certification/Recertification Process .................................................................... 51

Table 13: Decertification Process ..................................................................................... 52

Table 14: FQS Support Roles .......................................................................................... 53

Table 15: Performance Management Support Roles .............................................................. 55

Table 16: Roles and Responsibilities for Equipping Cadre Members......................................... 57

Table 17: Cadre Equipping Support Roles .......................................................................... 65

Table 19: FEMA Cadres ................................................................................................ 100

Table 18: Cadre Management Positions and Responsibilities................................................... 104

Table 20: Cadre Coordinator's Resource List ..................................................................... 112

1

# CHAPTER 1: INTRODUCTION

The Federal Emergency Management Agency's (FEMA) workforce has one central goal – to ensure the Agency builds, sustains, and continuously improves upon its capability to prepare for, protect against, respond to, recover from, and mitigate all hazards. During an incident, the Agency's entire workforce supports this goal, despite their job series, grade, or employee type. To achieve this goal successfully, FEMA trains, qualifies, equips, and evaluates its workforce to provide rapid, expeditionary support to fulfill statutory requirements. The incident workforce is committed to FEMA's core values of compassion, fairness, integrity, and respect as outlined in FEMA Publication 1.

FEMA actively engages in programs and partnerships to manage, enhance, augment, support, and deploy the Agency's workforce. Overall management of the workforce requires an agency-wide collaborative approach and clear definitions of roles and responsibilities to ensure that FEMA is able to meet its statutory requirements.

To ensure an effective and organized incident response, the workforce is categorized into four categories:

- Incident Management – positions at the incident level that support the Initial Operating Facility, Joint Field Office (JFO), Area Field Office, or other locations
- Incident Support – positions during incident operations at the regional or national level in either the Regional Response Coordination Center (RRCC) or the National Response Coordination Center (NRCC)
- Ancillary Support – positions that, in both their steady-state and/or incident roles, support the NRCC and/or RRCC and incident field offices
- Mission Essential – positions at headquarters, the regional offices, and other designated offices that must be filled to maintain basic Agency operations (e.g., payroll, information technology, and maintenance). Mission essential functions must always be performed, but may require less than the full complement of staff at any one time. As a result, holding a mission essential function may not exclude an employee from deployment. The Emergency Relocation Group is part of mission essential. Emergency Relocation Group personnel report to a pre-selected continuity site to perform essential functions or other tasks related to continuity operations

Because of what FEMA asks of its incident workforce, and what they will experience conducting response and recovery operations, it is imperative that they are fully supported in gaining and maintaining optimum operational readiness. Operational readiness is how FEMA works to prepare their incident workforce for an activation and deployment. Readiness is achieved through a constant cycle of planning, equipping, training, exercising, monitoring, and evaluating to ensure the workforce is ready at a moment's notice. At FEMA, this is accomplished through sound cadre management. FEMA's incident workforce cadres are the initial operational

1

mechanism essential to maintain a supporting presence to both satisfy the Agency's statutory requirements and honor its national commitments. As such, a standardized, agency-wide cadre management system is vital.

## Authorities and Foundational Documents

- Section 503(b) of the Homeland Security Act of 2002, Pub. L. No. 107-296 as amended by the Post-Katrina Emergency Management Reform Act (PKEMRA), Pub. L. No. 109-295 (Oct. 4, 2006) (codified at 6 U.S.C. § 313(b)(2)(C)) assigned FEMA the mission to "develop a Federal response capability that, when necessary and appropriate, can act effectively and rapidly to deliver assistance essential to saving lives or protecting or preserving property or public health and safety in a natural disaster, act of terrorism, or other man-made disaster."
- Section 510 of the Homeland Security Act of 2002, Pub. L. No. 107-296, as amended by PKEMRA, Pub. L. No. 109-295 (codified at 6 U.S.C. § 320) requires that FEMA collaborate with its emergency management partners to develop standards for deployment capabilities, including on credentialing of personnel and typing of resources necessary to respond to natural disasters, acts of terrorism, and other man-made disasters.
- FEMA Incident Management and Support Keystone, January 2011
- FEMA Incident Workforce Management Manual, working draft, March 10, 2014
- FEMA Qualification System Guide, October 3, 2012
- FEMA Directive FD010-6, Revision Number 01, FEMA Reservist Program, June 14, 2012
- FEMA Directive FD010-7, National Incident Management Assistance Team (IMAT) Pilot Directive, April 19, 2013
- FEMA Directive FD010-8, FEMA Incident Workforce Deployment, January 29, 2014
- FEMA Directive FD010-9, Cadre Management Directive, June 9, 2014
- FEMA Directive FD119-7 REV: 02, Federal Personal Property Management, September 24, 2013
- FEMA Manual 119-7-1, Federal Personal Property Management Manual, April 13, 2011
- FEMA Directive FD141-1, Records Management Program, March 6, 2014
- FEMA Manual 119-7-1, Federal Personal Property Management Manual, April 13, 2011
- FEMA Manual 123-9-1, FEMA Telework Policy, January 9, 2013
- FEMA Manual 1430.1, Reasonable Accommodations for the Federal Emergency Management Agency — Change 1, December 3, 2002
- "Compensation for FEMA Reservist Coordination and Training Requirements," Assistant Administrator for Response's Memorandum, June 27, 2013

2

# Purpose and Scope

The purpose of this guide is to describe the composition, governance, and principles of the FEMA cadre management system. It is specifically designed for FEMA Cadre Coordinators and their subordinate staff. It will expand upon the responsibilities outlined in the Cadre Management Directive, outlining resources, providing required information, and explaining processes and procedures to successfully manage an operational incident workforce cadre. The scope of this guide is limited to incident management positions.

# CHAPTER 2: THE FEMA CADRE MANAGEMENT FRAMEWORK

FEMA's cadre management framework is designed to effectively maintain a cadre's operational readiness on both the individual and collective level. Effective cadre management equates to optimum operational readiness allowing the Agency to satisfy its requirements in the mitigation, response, and recovery mission areas.

FEMA's vision of a ready workforce is one that is adequately staffed, available, trained, qualified, and equipped to conduct its mission and is continuously monitored on performance to ensure accountability in mission accomplishment and facilitate constant improvement. The cadre management framework detailed in this chapter provides organizational mechanisms for cadre management, oversight, and support. The framework underscores the importance that each individual employee increases our readiness and facilitates the execution of FEMA's missions.

## FEMA Cadres

A cadre is defined as a group of FEMA full-time equivalent (FTE) and intermittent (Reservist) employees organized by operational or programmatic functions and are assigned incident management FEMA Qualification System (FQS) positions (either primary or subordinate) that perform incident-related duties during FEMA incident operations. Cadres are grouped organizationally by program area within corresponding directorates and offices throughout the Agency. A cadre is the operational mechanism the Agency maintains to effectively deliver FEMA programs in support of our National Preparedness Goal. These cadres are composed of two types of FEMA employees hired under Title V and the Stafford Act hiring authorities.

### Title V Employees (5 U.S. Code)

Employees hired under 5 U.S. Code, or Title V, make up FEMA's permanent workforce, which is responsible for achieving the Agency's mission and administering programs in the headquarters and regional offices. In keeping with the concept outlined in the January 20, 2012, memorandum from the Deputy Administrator, "Every Employee is an Emergency Manager," and consistent with the FEMA Force structure implementation, FEMA qualifies Title V employees to fill incident roles. By utilizing their varied incident experience, the Agency is able to enhance its ability to respond to, recover from, and mitigate all types of incidents.

Title V employees are eligible to hold positions in any of the FEMA incident categories (incident management, incident support, ancillary support, and mission essential). These employees are compensated out of FEMA's operating budget and not the Stafford Act.

FEMA is composed of the Title V categories listed below:

- Permanent Full Time (PFT)
- Temporary Full Time (TFT)

## Stafford Act Employee

The Stafford Act gives FEMA the authority to establish a temporary workforce that is not subject to Title V hiring in support of incidents.[1] These employees must provide support to Stafford Act activities. These employees are a major component of FEMA's incident workforce at headquarters, regional offices, and incident-level facilities to respond effectively and rapidly to deliver assistance essential to disaster survivors.

Stafford Act employees include those in the following categories:

- Cadre of On-call Response Employees (CORE)
- Incident Management (IM) CORE
- Reservist
- Local Hire

### Cadre of On-call Response Employees

COREs are full-time employees that support Stafford Act activities. They can be deployed to fulfill any role specifically related to the incident for which they were hired.

### Incident Management CORE

IM COREs are Stafford Act COREs whose primary job is to perform an FQS incident management position. FEMA IM COREs are deployed to the greatest extent possible.

### Reservists

Reservists work on an intermittent basis and are deployed as needed to fulfill incident management roles within their cadre function. This can include interviewing disaster survivors; conducting and verifying damage assessments; providing administrative, financial, and logistical support; and performing a wide variety of other tasks as identified by staffing needs and operational requirements.[2]

---

[1] "In performing any services under this act, any Federal agency is authorized to appoint and fix the compensation of such temporary personnel as may be necessary, without regard to the provisions of Title V governing appointments in competitive service." – Robert T. Stafford Disaster Relief and Emergency Assistance Act, Section 306 (b) (Public Law 93-288, 108 as amended, 42 U.S.C. 5149)

[2] FEMA Directive FD010-6, FEMA Reservist Program, June 14, 2012.

# Cadre Management

Cadre management is the effective administration, coordination, and professional development of a FEMA Cadre ensuring the individual and collective operational readiness to perform incident-related duties.

The primary function of cadre management is to ensure optimum operational readiness. Inherent in maintaining optimum operational readiness for a FEMA cadre involves five operating principles – Staffing Force Structure; Educating and Training Cadre Members; Qualifying Cadre Members; Equipping Cadre Members; and Performance Management. These principles are equally critical to the collective operational readiness of teams and to the individual cadre member.

Each incident workforce cadre will establish and maintain a management structure, based on cadre size, employee composition, and other extenuating factors deemed necessary through human capital staffing analysis, to effectively perform cadre management functions and maintain optimum operational readiness. At a minimum, a cadre's workforce structure will consist of a Certifying Authority (CA), Certifying Official (CO), and Cadre Coordinator, which make up the cadre leadership. To ensure an effective and efficient management structure, cadre leadership will tailor their structure based on administrative needs, complexity of the incident mission, and training requirements. This can include a Cadre Training Manager, Reservist Program Manager (RPM), FTE Coordinator, IM CORE Program Manager, Assistant RPMs, and FTE Specialists as required. Assistant RPMs and FTE Specialists, when needed, support the RPM and FTE Coordinator respectively. When these positions are filled, they are full-time responsibilities. For cadres who do not warrant additional personnel beyond the CA, CO, and Cadre Coordinator, these responsibilities will be shared amongst existing cadre management personnel. Table 1 outlines the required and potential positions for each incident workforce cadre.

**Table 1: Positions and Responsibilities within Cadres**

| | Position | Responsibilities |
|---|---|---|
| **All Cadres** | Certifying Authority | A CA serves as the highest-ranking FEMA official —Assistant Administrator equivalent or higher— for each of the incident workforce cadres. |
| | Certifying Official | A CO is designated by the CA to manage FQS for a specific incident workforce cadre. |
| | Cadre Coordinator | A Cadre Coordinator manages each incident workforce cadre. This individual has delegated authority from the CA and CO to oversee all aspects of day-to-day cadre management including staffing, equipping, training, qualifying, and performance of the cadre and its members. |
| **Dependent on size and composition** | Cadre Training Manager | A Cadre Training Manager reports to the Cadre Coordinator, serves as the cadre's primary point of contact for the development and delivery of all FQS related training, and oversees the prioritization of all training within the cadre. |
| | Reservist Program Manager | An RPM reports to the Cadre Coordinator and serves as the supervisor of record for the cadre's Reservist population. Assistant RPMs may also be assigned based on the size of the cadre's Reservist force structure in accordance with established Agency hiring procedures. |
| | FTE Coordinator | An FTE Coordinator reports to the Cadre Coordinator and facilitates cadre requirements for headquarters' FTE cadre members and their supervisors of record, and coordinates regional FTE requirements with Regional Incident Workforce Management (IWM) Liaison Teams. This position may also serve as the IM CORE Program Manager for smaller cadres. FTE Program Specialists may be assigned based on the size of the cadre's FTE force structure. |
| | IM CORE Program Manager | An IM CORE Program Manager reports to the Cadre Coordinator and serves as the supervisor of record for IM CORE cadre members. Assistant IM CORE Program Managers may be assigned based on the size of the cadre's IM CORE force structure. The position of IM CORE Program Manager may be staffed by an IM CORE within the cadre for up to a two-year appointment. This is particularly important for IM CORE positions that have a required deployment threshold of 300 days per year. |

Figure 1 identifies the cadre management structure. It is a standardized, scalable structure that is used to manage each FEMA cadre. Cadre management will be a centrally controlled, but de-centrally managed function. Cadre management personnel do not need to be located at headquarters. In this guide, actions for cadre management refer to the positions in table 1.

7



**Figure 1: Cadre Management Structure**

The following task lists for the cadre management framework are provided as a reference for cadre management personnel and should be used as the basis for developing and coordinating cadre management activities and procedures.

## Certifying Authority

- Ensures cadre has available, trained, qualified, and equipped staff to meet force structure requirements and to effectively perform incident duties
- Certifies that employees are qualified for FQS positions within the cadre in accordance with the FQS guide
- Provides information related to cadre readiness as defined and directed by the Incident Workforce Executive Steering Committee (IWESC)
- Serves as senior-ranking official with oversight of a cadre and retains accountability for its readiness and performance
- Establishes performance metrics for cadre

## Certifying Official

- Ensures readiness requirements established by the IWESC, or the program, are conveyed to and met by the cadre

- Administers FQS for all cadre members in accordance with the FQS Guide or superseding doctrine
- Serves as the supervisor of record for the Cadre Coordinator
- Ensures performance metrics are communicated to and met by the cadre
- Ensures coach evaluators are available within the cadre

## Cadre Coordinator

- Oversees the staffing, equipping, training, qualifying, availability, and overall readiness and performance of an incident workforce cadre
- Serves as the supervisor of record to Cadre Training Managers, RPMs, IM CORE Program Managers, and FTE Coordinators assigned to the cadre
- Coordinates changes to the cadre's force structure in accordance with policy established by the IWESC
- Recruits and selects individuals to fill vacancies in the cadre's force structure based on cadre vacancies
- Maintains the accuracy and currency of the cadre's FQS elements in compliance with the FQS Guide or superseding doctrine
- Recommends candidates for FQS progression and qualification to the CO
- Oversees the development and performs final review of Qualification Packages for FQS Qualification Review Boards (QRBs) in coordination with the Regional IWM Teams, as required, and present candidates for qualification to the QRB
- Recommends decertification of cadre members as needed to the CA and CO
- Coordinates with the Office of the Chief Component Human Capital Officer (OCCHCO) regarding hiring, termination, and resignations of Reservists or IM COREs within the cadre
- Ensures budget allocation for training and other needs are properly executed within the cadre
- Ensures the equipment needs of cadres are properly sourced and fulfilled and that all cadre members maintain access to fully functional, position-appropriate equipment to achieve readiness for assigned incident duties
- Identifies required FQS training in coordination with the Cadre Training Manager, the Incident Workforce Management Division (IWMD), and the Emergency Management Institute (EMI)
- Oversees administrative responsibilities for IM CORE and Reservist members of the cadre
- In consultation with the Office of Equal Rights (OER), the Disability Employment Program Manager, and the applicable employee, expeditiously makes decisions in accordance with existing FEMA reasonable accommodation policy guidance on reasonable accommodation requests made under Section 501 of the Rehabilitation Act from employees under their supervision

9

- Coordinates with the Regional IWM Liaison Teams regarding cadre implementation for regional FTEs
- Ensures quality control over all internal cadre communications to ensure that all cadre members receive supportive customer service, (e.g., phone calls, e-mails, cadre coordination calls, newsletters, etc.)
- Ensures cadre members have access to program-specific information that is required to perform effectively during incident operations
- Assists with the development of force packages in coordination with the regions and IWMD
- Provides input for incident workforce policy and doctrine
- Initiates personnel actions, when appropriate, against employees for whom he/she is the supervisor of record, including discipline or termination for misconduct or poor performance. Prior to affecting any personnel actions, the Cadre Coordinator must consult with OCCHCO Employee Relations to ensure that any such actions are consistent with Merit Systems (only for Title V employees) and Equal Employment Opportunity principles as well as FEMA policy
- Serves as a second-line supervisor of record to any Program Specialists or Assistant Program Managers assigned to the cadre
- Manages the performance of FTE employees in accordance with FEMA Manual 255-1-1, Employee Performance Management Program
- Coordinates with IWMD FEMA Corps Branch on FEMA Corps team projects and incident support
- Performs the functions of the Cadre Training Manager, FTE Coordinator, RPM, and IM CORE Program Manager when the cadre's population does not support additional staff for those positions
- Coordinates with IWMD FEMA Corps Team Training on cadre related training content
- Coordinates with IWMD Surge Capacity Force (SCF) on Department of Homeland Security (DHS) Surge Training on cadre related training

## Cadre Training Manager

- Facilitates development, revision, and delivery of FQS training for each cadre position and serves as cadre's point of contact to the IWMD FQS Branch
- Ensures FQS required training is consistently delivered to meet force structure requirements for qualified individuals within the cadre
- Ensures program priorities and budget allocation for training development and delivery requirements are met and properly executed within the cadre
- Identifies FQS and mandatory training requirements in coordination with IWMD, EMI Course Managers, and other partners as required
- Identifies cadre training needs and develop strategies to eliminate shortfalls

- Coordinates with programs and appropriate course managers regarding development and revisions of curriculum and training materials
- Identifies instructors to coordinate delivery of accurate and timely training
- Facilitates cadre participation in exercises as required
- Coordinates with other Cadre Training Managers to maintain awareness of curriculum changes that may impact FQS within their own cadre of responsibility

## Reservist Program Manager

- Serves as the supervisor of record for Reservists in the cadre
- Recruits Reservists based on vacancies within the cadre's force structure
- Assists, tracks, and provides guidance on FQS progression for Reservists
- Identifies appropriate staff for FQS training courses through the Cadre Coordinator or Cadre Training Manager for coordination with the IWMD FQS Branch
- Prepares Reservist Qualification Packages for QRBs
- Implements the Cadre Coordinator's quality control responsibilities over internal communications for all Reservist cadre members to ensure they receive supportive customer service and coordinate with the Cadre Coordinator and other cadre management staff to ensure communications are consistent throughout the cadre
- Monitors and actively tracks Reservist availability
- Recommends FQS decertification of Reservists as needed and forwards to the Cadre Coordinator for decision by the CO and CA
- Collects and maintains incident performance evaluations of Reservists from temporary duty supervisors after every deployment equal to or greater than 20 days and collects and maintains all other documents related to performance and/or conduct of employees for whom they are the supervisor of record in accordance with FD141-1, Records Management Program
- In consultation with OER, the Disability Employment Program Manager, and the applicable employee expeditiously makes decisions in accordance with existing FEMA reasonable accommodation policy guidance on reasonable accommodation requests made under Section 501 of the Rehabilitation Act from employees under their supervision
- Initiates personnel actions, when appropriate, against Reservists or other employees for whom the RPM is the supervisor of record, to include discipline or termination for poor performance and misconduct after consulting with OCCHCO, ensuring that the reasons for any such action are documented, and that the action and documentation are forwarded to OCCHCO for further action
- In coordination with the Cadre Coordinator, terminates or renews the appointments of Reservists and other employees under direct supervision as required based on lack of work or other mission-related needs
- Serves as supervisor of record for any Assistant RPMs assigned to the cadre

## FTE Coordinator

- Supports FTEs with FQS job titles assigned to the cadre in meeting FQS and cadre requirements
- Coordinates with Regional IWM Liaison Teams and headquarters components to recruit FTEs for appropriate cadre vacancies
- Assists, tracks, and provides guidance on FQS training and qualification progress for FTEs
- Implements the Cadre Coordinator's quality control responsibilities over internal cadre communications for all FTE cadre members to ensure they receive supportive customer service and coordinates with the Cadre Coordinator and other cadre management staff to ensure communications are consistent throughout the cadre
- Identifies appropriate staff for FQS training courses through the Cadre Coordinator or Cadre Training Manager for coordination with the IWMD FQS Branch
- Provides support in identifying FQS required assignments and training opportunities in coordination with the Cadre Training Manager, Regional IWM Liaison Teams, and IWMD
- Reviews FTE Qualification Packages for approval by CA/CO to present to the QRB
- Monitors and actively tracks FTE availability in coordination with Regional IWM Liaison Teams and IWMD
- Recommends FQS decertification of FTEs as needed and forwards to the Cadre Coordinator for decision by the CO and CA
- Performs the functions of the IM CORE Program Manager when the cadre's IM CORE population does not require this function as a full-time position
- Responds to FTE requests for cadre vacancy information
- Coordinates with OCCHCO and IWMD during the onboarding of FTE personnel designated to hold an incident management title and identify those who require additional entry-level incident training

## IM CORE Program Manager

- Serves as the supervisor of record for IM COREs in the cadre
- Recruits IM COREs based on vacancies within the cadre's force structure
- Assists, tracks, and provides guidance on FQS progression for IM COREs
- Identifies appropriate staff for FQS training through the Cadre Coordinator or Training Manager for coordination with the IWMD FQS Branch
- Reviews and coordinates IM CORE Qualification Packages for QRBs
- Implements the Cadre Coordinator's quality control responsibilities over internal communications to IM CORE cadre members to ensure they receive supportive customer service and coordinates with the Cadre Coordinator and other staff to ensure communications are consistent throughout the cadre
- Monitors and actively tracks IM CORE availability

12

- Recommends FQS decertification of IM COREs as needed and forwards to the Cadre Coordinator for decision by the CO and CA
- Collects and maintains incident performance evaluations of IM COREs from temporary duty supervisors after every deployment equal to or greater than 20 days and collects and maintains all other documents related to performance and/or conduct of employees for whom they are the supervisor of record in accordance with FD141-1, Records Management Program. All documentation must be submitted to the supervisor of record
- In consultation with the OER, the Disability Employment Program Manager, and the applicable employee expeditiously makes decisions in accordance with existing FEMA reasonable accommodation policy guidance on reasonable accommodation requests made under Section 501 of the Rehabilitation Act from employees under their supervision
- When appropriate, initiates adverse personnel actions against IM COREs or other employees for whom they are the supervisor of record, to include discipline or termination for poor performance and misconduct after consulting with OCCHCO, ensuring that the reasons for any such action are documented, and that the action and documentation are forwarded to OCCHCO for further action
- In coordination with the Cadre Coordinator, terminates or renews the appointments of IM COREs and other employees under direct supervision as required based on lack of work or other mission-related needs
- Serves as supervisor of record for any Assistant IM CORE Program Managers assigned to the cadre
- Manages the performance of all IM COREs in accordance with FEMA Manual 255-1-1, Employee Performance Management Program
- Coordinates with Regional IWM Liaison Team for assistance in placing available IM COREs in regional JFOs and/or regional program areas during steady-state periods

## Regional Incident Workforce Management Liaison Team

FEMA regions will institute a Regional IWM Liaison Team in lieu of the former IWMD Liaison. Each FEMA region is required to maintain a Regional IWM Liaison Team to support regional readiness through implementation and maintenance of incident workforce initiatives for regional incident operations.

The Regional IWM Liaison Team reports to the Regional Administrator (RA) or his/her delegate and supports implementation and maintenance of incident workforce initiatives in regional incident operations. The team maintains incident workforce subject matter expertise, provides assistance to regional staff, facilitates monitoring of regional incident workforce readiness, and supports regional implementation of FQS.

Figure 2 depicts the Regional coordination structure.



**Figure 2: Regional Coordination Structure**

Staffing the Regional IWM Liaison Team is based on regional operational requirements as determined by the respective RA. The IWM Liaison Team:

- Provides incident workforce subject matter expertise and conveys incident workforce related policy and readiness standards
- Supports the recruitment of FTE cadre members by ensuring that individuals within the region who do not hold an FQS position, but are eligible for an IM or IS title, are identified and coordinate with Cadre Coordinators, FTE Coordinators, and FTE supervisors of record to obtain appropriate FQS assignment
- Coordinates with IWMD and headquarters cadre management offices, regional supervisors, and employees to facilitate cadre readiness, training, qualification, and availability during non-deployment for all regional FTEs, PFTs, TFTs, and COREs
- Assists the FTE Coordinator in preparing regional FTE Qualification Packages for QRBs
- Supports regional implementation of FQS with the Cadre Coordinators and assist, track, and provide guidance on FQS progression of Regional FTEs in coordination with the cadre's FTE Coordinator
- Identifies regional FTE cadre-specific training requirements and staff for FQS training course in coordination with the cadre's FTE Program Coordinator and Training Manager
- Monitors readiness of regional FTEs for deployment in coordination with the cadre FTE Coordinator
- Assists with development of force packages in coordination with the Cadre Coordinator

During an incident, the IWM Liaison Team:

- Coordinates with cadres and IWMD Deployment Unit on ensuring all information is provided to cadre management so that they are able to make informed decisions regarding deployment requests
- Conducts demobilization interview with cadre members to capture best practices and lessons learned

- Provides liaison support to FEMA Corps
- Provides liaison support to SCF when activated by providing assistance with Receiving, Staging, Onward Movement, and Integration
- Communicates with Cadre Coordinators on incident workforce initiatives

# Cadre Management Oversight

Two bodies provide general oversight to ensure effective and appropriate standardization in cadre management. The senior body is the IWESC. The IWESC provides executive oversight for the development, maintenance, and revision of all policy and doctrine for FEMA's incident workforce. The second body is the Cadre Coordinators Working Group (CCWG), an action-oriented working group that raises policy-level issues and recommendations to the IWESC for decision, and supports the IWESC through the operationalization of their executive decisions.

## Incident Workforce Executive Steering Committee

The IWESC is a group that meets at least twice per year to make policy, doctrine, and other pertinent decisions pertaining to the incident workforce. The IWESC is necessary to integrate stakeholder input from across the Agency. The IWESC establishes the framework, prioritizes criteria for, and resolves conflicts related to budgeting for the incident workforce; and maintains oversight of the CCWG. Table 2 depicts the IWESC structure.

**Table 2: Incident Workforce Executive Steering Committee Structure**

| Incident Workforce Executive Steering Committee | Role |
|---|---|
| Director of Disaster Operations | Chair |
| Associate Administrator, Federal Insurance and Mitigation Administration | Permanent Member |
| Associate Administrator, Office of Policy, Program Analysis, and International Affairs | Permanent Member |
| Associate Administrator Office of Response and Recovery | Permanent Member |
| Associate Administrator, Mission Support | Permanent Member |
| Chief Financial Officer | Permanent Member |
| Chief Component Human Capital Officer | Permanent Member |
| Director, External Affairs | Permanent Member |
| Director, Equal Rights | Permanent Member |
| Director, Office of Federal Disaster Coordination | Permanent Member |
| Reservist Ombudsman | Permanent Member |
| Chief Counsel | Permanent Member |
| Superintendent, Emergency Management Institute | Permanent Member |
| Director, IWMD | Permanent Member and Executive Secretary |
| Regional Administrator (x2)[3] | Rotating Member |
| Cadre Coordinator[4] | Rotating Member |

## Cadre Coordinators Working Group

The CCWG is a group chaired and coordinated by the Director of IWMD, and consists of all designated Cadre Coordinators and Regional IWM Liaison Teams. The CCWG supports the development, implementation, and maintenance of incident workforce initiatives; discusses and addresses challenges associated with staffing, equipping, training, qualifying, and managing the performance of the incident workforce; and develops consistent processes for recruiting and appointing new members into cadre vacancies.

While the CCWG is not a decision-making body, it is a critical action arm of the IWESC as discussions in the group can identify policy-level issues to be raised to the IWESC for resolution. The CCWG will meet as required but at least twice per year in coordination with the IWESC meetings.

Table 3 depicts the CCWG structure.

---

[3] Two RA representatives will be appointed in writing by the Director of Disaster Operations (DDO) for a term of two years. These two positions will rotate among RAs and will be staggered, so only one RA representative changes each year.

[4] This position will be nominated by the CCWG as a representative for the working group to be confirmed by the DDO and rotates on an annual basis.

16

**Table 3: Cadre Coordinator Working Group Structure**

| Incident Workforce Executive Steering Committee | Role |
|---|---|
| Director, IWMD | Chair |
| Regional IWM Liaison Team | Member |
| Cadre Coordinator | Member |

Figure 3 shows the coordination that occurs between all of the cadre management elements both within and across cadres.



**Figure 3: Communication and Coordination among Cadre Management Elements**

# Cadre Management Support

The following organizations maintain key responsibilities in supporting the Agency's operational cadres and should be considered critical components of FEMA's Cadre Management Framework.

## Incident Workforce Management Division

The IWMD supports FEMA's operational cadres through the management and administration of the FQS, maintaining the Agency's force structure, coordinating and executing deployments, and providing critical data and information on cadre readiness.

17

The IWMD is responsible for:

- Coordinating and managing the programs, processes, and procedures required to develop, organize, deploy, and sustain a professional incident workforce, to include supplemental programs such as DHS Surge and FEMA Corps
- Monitoring and assessment of the mission capability pursuant to readiness requirements and any related performance measures established by the IWESC
- Providing funding for approved reasonable accommodation equipment and services
- Planning and executing the budget for incident workforce programs to ensure operational readiness
- Overseeing the FQS program

## Pasadena Call Center

The Pasadena Call Center is a support component of the IWMD, Response Directorate at FEMA Headquarters. The Pasadena Call Center operates as the principal point of communications between Agency employees and IWMD by providing answers to questions on workforce transformation initiatives for accurate dissemination of employee information. The key responsibilities of the Pasadena Call Center include:

- Serving as coordination element between Reservists and the Cadre Coordinators
- Providing personnel notification and correspondence on FQS actions (initial and subsequent notifications) for all Agency employees
- Communicating workforce trends and analysis to IWMD based on feedback and information gathered through communications with Agency employees
- Serving as a coordination element on FQS sponsored training
- Serving as coordination element with Cadre Coordinators on employee issuance of Position Task Books (PTBs), Qualification sheets, and updated program information dissemination

## Office of Equal Rights

Responsibilities for cadre management include:

- Providing technical resource information about reasonable accommodation to employees, applicants for employment, incident personnel, temporary duty supervisors, Cadre Coordinators, and supervisors of record, in accordance with existing FEMA reasonable accommodation policy guidance
- Providing civil rights, equal employment opportunity (EEO), sexual harassment, diversity, and other EEO-related training to cadre members
- Maintain adjudicated reasonable accommodation documents and files for recordkeeping and reporting purposes

18

- Ensuring fairness in hiring, training, qualification processes, and terms and conditions of employment for the incident workforce

## Office of the Chief Component Human Capital Officer

Responsibilities for cadre management include:

- Validating incident workforce hiring requests with IWMD and Cadre Coordinators to ensure such requests are based on force structure vacancies
- Ensuring timely classification of incident workforce positions for FEMA job announcements, offers, and hiring actions, so that the FEMA incident workforce has sufficient personnel to meet force structure requirements
- Establishing policies and procedures for incident performance evaluations
- Providing direct support to temporary duty supervisors regarding how to properly document poor performance and misconduct and to provide support to the supervisor of record regarding what disciplinary action to take
- Advising the Federal Coordinating Officer (FCO)/Federal Disaster Recovery Coordinator (FDRC)/Office Director, after coordinating with the temporary duty supervisor and the supervisor of record, as to whether the release of an individual from an incident is appropriate due to misconduct or poor performance
- Providing direct support to incident personnel with respect to individual issues requiring action in connection with the administration of pay, benefits, and other personnel matters

## Office of the Chief Financial Officer

Responsibilities for cadre management include:

- Ensuring timely review of position justifications and decisions on funding approval for CORE and IM CORE positions
- Adjudicating issues related to incident workforce budget and funding

## Office of the Chief Information Officer

Responsibilities for cadre management include:

- Reviewing and approving the development of IT systems required to support the incident workforce, including training and deployment systems
- Informing IWMD and Logistics Management Directorate (LMD) on the information technology equipment FEMA has approved for procurement to support equipping the incident workforce

## Logistics Management Directorate

Responsibilities for cadre management include:

- Ensuring, in coordination with Office of the Chief Information Officer (OCIO) and Office of the Chief Administrative Officer (OCAO), the effective tracking of equipment assigned to the incident workforce
- Ensuring, in coordination with OCIO and OCAO, Cadre Coordinators have access to data to track equipment issued to cadre member
- Managing a lifecycle maintenance program for equipment assigned to members of the incident workforce

## Office of the Chief Counsel

Responsibilities for cadre management include:

- Supporting IWMD leadership and cadre management with solution-oriented, articulate, legally sufficient, and timely counsel
- In coordination with OCCHCO and OER, supporting IWMD and cadre management in the development of incident workforce policy and doctrine
- Providing all new employees with initial ethics orientation and annual ethics training
- Designating ethics attorneys to provide ethics advice to incident workforce members

# CHAPTER 3: STAFFING FORCE STRUCTURE

This chapter discusses the role of cadre management in staffing force structure and provides the Cadre Coordinator with information on the steps required to staff force structure. It will provide background information on the Agency's force structure model, as well as discuss the requirements of availability, and outline available support to the cadres as they navigate the processes and procedures.

## Principles of FEMA's Force Structure Model

The FEMA force structure is a model that establishes incident personnel staffing requirements. The force structure model establishes the staffing requirements that enable FEMA to support State, local, tribal, and territorial, (SLTT) governments during simultaneous events. The FEMA Incident Management and Support Keystone defines three levels of disasters: Level I, II, and III, with Level I being the most severe, and Level III the least. The force structure model modifies these levels by dividing Level I into two levels for more accurate planning. The FEMA incident workforce levels are: Catastrophic Level I, Level I, Level II, and Level III. These force structure levels guide the identification of appropriate FEMA incident workforce staffing required to adequately respond to potential or actual incidents. When generating the force structure data, it is assumed that the FEMA incident workforce structure requires the ability to respond to the following:

- one catastrophic event
- three Level I events; two of which are concurrent
- 28 Level II events; 20 of which are concurrent
- 70 Level III events with the capability to support 30 Level III teams

The development of force structure requires a comprehensive analysis of the workforce, organized by FQS job title. This workforce analysis looks at what positions are required for FEMA to conduct its response, recovery, and mitigation missions. This analysis is based on a thorough mission analysis, which delineates the essential tasks of each position within each cadre. It incorporates a review of historic and current incident workforce data and considers the impact of technological advances, improvements in FEMA's qualification systems, and the impact of mitigation efforts.

The IWESC will determine policy and criteria for establishing and updating FEMA's incident force structure. The CCWG establishes procedures in support of this policy which include mechanisms to ensure consideration of force structure recommendations from programs, cadres, and regions. IWMD, on behalf of the Director of Disaster Operations (DDO), coordinates the day-to-day implementation of force structure policy and procedures.

The force structure model is reevaluated not less than every three years as outlined in FD010-6. This reevaluation includes a comprehensive examination of historic and current force structure data, FTE deployment patterns, redevelopment and reorganization of force packages and cadre force structure by FQS position, as required. A number of FEMA offices participate in and support this review, to include Office of Policy and Program Analysis (OPPA), Office of the Chief Financial Officer (OCFO), Mission Support, and Regional Leadership. Cadre leadership should continually assess operational requirements in the field to recommend modifications to FEMA force structure and related policies and procedures to IWMD.

## Staffing a Cadre

Staffing a cadre is a shared effort between various organizations and supporting personnel within FEMA. The roles and responsibilities of these varying organizations and supporting personnel are delineated in table 4. Although this activity is a shared effort, ensuring effective and optimal staffing of a cadre is the responsibility of the Cadre Coordinator.

IWMD distributes to cadre personnel bi-weekly the force structure vs. actuals report (FS vs. actuals as table 5 shows). This report enables the reader to determine if there is force structure availability within an FQS job title, as well as within a specific employee type.

### Force Structure versus Actuals Report

Table 5 is an illustrative example of a force structure versus actuals report. The table shows staffing of the positions against a specific FQS job title is reflected by employee type (Reservist, IM CORE, or FTE) and by cumulative position force strength. "ADAD FQS Identifier," within the ADR Cadre, reflects when fully staffed at optimal levels, there are 40 Reservists ("RSV FS"). However, the number in the "RSV Actual 4/14/14" column demonstrates only 32 Reservists are currently holding the position title. Therefore, the cadre needs 8 people, which is shown in the "RSV Left to Fill" column, to be at force strength for Reservists in this position. The following is a description of the column titles for each employee type:

- **RSV FS/IM CORE FS/FTE FS:** The total number of positions allocated to an FQS job title, based upon employee type (i.e. RSV, IM CORE, or FTE). This is the cadre's force structure for a specific position per employee type.
- **RSV Actual/IM CORE Actual/FTE Actual (Date)**: Data from the IWMD Deployment Branch and the National Finance Center is used to determine the number of persons actually holding the FQS job title as of the date the report was run. This is the cadre's force strength for a specific position.
- **RSV Left to Fill/IM CORE Left to Fill/FTE Left to Fill:** The difference between the force structure and actuals results in a number of positions that are "left to fill". These positions are available to be staffed by the cadre.
- **Total FEMA Workforce:** This is the total force structure for the cadre when fully staffed. A Cadre Coordinator may staff a force structure vacancy.

23

Table 4: Example Force Structure vs. Actuals Report

| FQS Identifiers | Cadre | FQS Position | KEY | RSV FS | RSV Actual 04/14/14 | RSV Left to Fill | IM CORE FS | IM CORE Actual 04/14/14 | IM CORE Left to Fill | FTE FS | FTE Actual 04/14/14 | FTE Left to Fill | Total FEMA Workforce (PFT/TFT/CORE/RSV) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ADAD | ADR | ADV Advisor | ADV | 40 | 32 | 8 | 5 | 0 | 5 | 0 | 20 | -20 | 45 |
| ADSP | HM | HM Administrative Specialist | SP | 48 | 22 | 26 | 0 | 0 | 0 | 15 | 28 | -13 | 63 |
| AEAC | EA | EA Assistant External Affairs Officer – Congressional Affairs | MG | 3 | 5 | -2 | 2 | 0 | 2 | 12 | 12 | 0 | 17 |
| AEIC | EA | EA Assistant External Affairs Officer – Joint Information Center | MG | 4 | 9 | -5 | 5 | 0 | 5 | 12 | 4 | 8 | 21 |
| AEIG | EA | EA Assistant External Affairs Officer – Intergovernmental | MG | 4 | 5 | -1 | 4 | 4 | 0 | 12 | 3 | 9 | 20 |

## Filling Vacant Force Structure Positions

When a vacancy in force structure has been identified, the Cadre Coordinator is responsible for filling the force structure vacancy. Table 5 describes the process by which an individual, depending upon employee type, is hired into the Agency and is able to achieve initial FQS qualifications.

Intrinsic to the concept of "Every Employee is an Emergency Manager," is that every FEMA employee will be trained and qualified to respond to an incident. To bring this initiative into fruition, there must be an impetus on the cadre level to recruit employees to get FQS qualified in their respective cadres. Not only will this help readiness on a cadre level, but also will aid the entire Agency's goal of maintaining a robust, qualified workforce.

Recruitment to a cadre can take many forms: from organizational events such as FQS Job Fairs down to the individual recruitment level. Cadre leadership are encouraged to coordinate with Regional IWM Liaison Teams and FTEs who do not have an FQS position to help achieve FEMA's overarching goals, as well as striving toward achieving optimal cadre readiness levels.

**Table 5: Hiring Process Steps**

| | Responsible Party (by employee type) | |
| --- | --- | --- |
| | Reservist | IM CORE |
| 1. Force structure vacancy identified | Cadre Coordinator | Cadre Coordinator |
| 2. Submit SF-52 | Cadre Coordinator | Cadre Coordinator |
| 3. Coordinate SF-52 package within Directorate and budget, forward to Human Capital Division | n/a | n/a |
| 4. Review SF-52 to determine appropriate action for processing | Human Capital Division | Human Capital Division |
| 5. Review and approve draft vacancy announcement* | Cadre Coordinator | Cadre Coordinator |
| 6. Advertise vacancy, prepare CERT* | Human Capital Division | Human Capital Division |
| 7. Review CERT* | n/a | n/a |
| 8. Make a Selection based on the CERT* | Cadre Coordinator | Cadre Coordinator |
| 9. Once favorable clearance is received, sets Entry on Duty date | Human Capital Division | Human Capital Division |
| 10. Create profile in training tracking system. | Pasadena Call Center | Pasadena Call Center |
| 11. Notify employee and data management team | Pasadena Call Center | Pasadena Call Center |
| 12. Enter FQS data and inform deployment branch for entry into the deployment system | FQS Data Management Team | FQS Data Management Team |

**\* Steps 5-8 are optional for CORE, Reservist, or other excepted service.**

## Interagency Augmentation to a Cadre's Force Structure

FEMA also utilizes other personnel resources that are not FEMA employees to supplement the incident workforce. These include FEMA Corps members and volunteers from other Federal agencies that are part of the SCF. Supplemental workforce personnel hold FQS position titles, but do not count toward a Cadre's force structure.

Cadre Coordinators are responsible for coordinating with the IWMD FEMA Corps Unit and with the IWMD SCF to ensure they understand the support that can be provided by these programs and are prepared to facilitate coordination for their support during disaster operations. While these entities augment the incident workforce, they do not count against a cadre's force structure.

### FEMA Corps

FEMA Corps is a FEMA-funded component within the AmeriCorps National Civilian Community Corps (NCCC). While FEMA Corps is not deployed through FEMA's deployment system, its members must provide updated information on location, activities, etc., and update the system for tracking and accountability purposes. Traditionally, FEMA Corps teams are required to check-in with the Deployment Unit within seventy two hours after receipt of an emergency deployment notice or pursuant to the timeline requested for less urgent assignments.

At the start of their appointment, FEMA Corps members complete approximately one month of NCCC based training, one week of FEMA training, and two weeks of FQS-specific training. Excluding team leaders, FEMA Corps members may be issued a PTB for their FQS position, but they are not counted against force structure numbers. FEMA Corps teams can be comprised of one or mixed FQS positions. FEMA Corps members are pre-funded response workforce assets that can be requested by regions, field offices, program areas, or cadre leadership to complete any Stafford Act authorized work.

### Surge Capacity Force

The SCF is comprised of volunteers from non-FEMA DHS components and other Federal agencies who receive just-in-time training to support, but are not limited to, the following FEMA program areas: logistics, DSA, Individual Assistance, and Public Assistance. In an effort to increase enrollment across DHS and other Federal agencies, cadre leadership with SCF opportunities are encouraged to support recruitment efforts of any permanent full or part-time Federal employee, who is not credentialed in any disaster specific skill, and offer education and/or guidance about joining FEMA in a SCF role. To the greatest extent possible, FEMA SCF staff use the job series of each volunteer in order to assign them to missions in their area of expertise based on the needs of the FCO/FDRC and operational requirements.

## Availability

"Available" is the status of a FEMA incident workforce member who can readily deploy in support of an incident in either an incident management or incident support role. If on leave, an

employee must ensure his or her availability status is updated in the deployment tracking system. Upon receipt of the notification to deploy, personnel may be unable to deploy for their assigned incident position for a variety of reasons (e.g., approved annual or sick leave, Leave Without Pay, Family Medical Leave Act, etc.). Employees are responsible for ensuring their availability status and accurate contact information is maintained and up-to-date in FEMA's deployment tracking system, and that availability status is approved by the supervisor of record.

Supervisors of record, in coordination with their employees who are members of the incident workforce, are responsible for monitoring and ensuring their individual availability is reported in accordance with FD010-8, FEMA Incident Workforce Deployment, Section VII.B or superseding policy. Cadre Coordinators or RPMs, if applicable, are the supervisors of record for their Reservist cadre members and are responsible for monitoring the availability status of all categories of employees that constitute the cadre. Each type of employee has requirements that govern their required amount of availability. Table 6 lists these responsibilities.

**Table 6: Deployment Availability Requirements by Employee Type**

| Type of Employee | Availability to Deploy |
|---|---|
| IM CORE | • Must be available for a minimum of 300 days a year<br>• Must coordinate with supervisor of record and update the deployment system if unavailable for deployment |
| PFT, TFT, CORE | • Must coordinate with supervisor of record and update the deployment system if unavailable for deployment |
| Reservist | • Must be available except if on Pre-Approved Non-Availability (PANA) or other approved leave per FD010-6<br>• Must coordinate with supervisor of record and update the deployment system if unavailable for deployment |

## Special Considerations for Managing Availability

### Pre-Approved Non-Availability (PANA)

Reservists may take up to 60 days per calendar year of PANA when not deployed. Unexpended PANA may not be carried over from one calendar year to a subsequent calendar year. PANA may be used for any purpose and Reservists shall request PANA in writing from their Cadre Coordinators. Cadre Coordinators shall grant PANA for periods of not fewer than 15 days per request, and may not approve leave requests made in response to an activation request. When on PANA, a Reservist is not available to deploy on demand and the IWMD will not place them in rotation for deployment.

### Workers' Compensation for Deployed Employees

A FEMA employee who sustains an injury or illness while in the performance of duty may be eligible for benefits under the Federal Employees' Compensation Act. Once an incident occurs, it is imperative that the employee notifies his/her temporary duty supervisor, supervisor of record, and the Safety Officer from the Safety, Health, and Medical Readiness Division and

26

completes the requisite forms found at:
http://on.fema.net/components/msb/OCCHCO/es/Pages/WrkCmp.aspx.

Employees injured on the job are responsible for keeping the Agency informed of any changes to their medical condition. Fully recovered or partially disabled employees who have debilitating medical conditions as the result of on-the-job injuries are obligated to seek suitable employment and accept suitable offers of employment when medically feasible. The Agency has an obligation to restore an employee injured on the job to his/her former position or a comparable position.

An employee in a worker's compensation status will be marked "not available" in the deployment system; once cleared for deployment, their status will be updated to "available." Once ready to return, the employee will be offered the opportunity to return to work in a comparable role if there is a staffing need for the FQS position he/she holds. The Cadre Coordinator, in coordination with the Agency's Workers' Compensation Program, will be responsible for reintegrating the employee into the workforce in an appropriate capacity (light/alternate duty or regular duty). In the case of a Reservist, the Cadre Coordinator may need to assist in the creation of a position to satisfy the minimum return time of 90 days for a temporary, intermittent employee.

## Declinations

Per FD010-8, all FTE employees listed as available within the Deployment System may be deployed without further supervisory approval. IWMD will regularly report declination trends of FEMA HQ component and Regional Offices to FEMA senior leadership. FTE employees who wish to have a declination deemed a "reasonable cause declination" must submit a narrative explanation to the appropriate CO and CA for adjudication. Cadre Coordinators should monitor FTE declinations and, in coordination with the employee's supervisor of record, the regional IWM Liaison Team, the CO, and CA decertify or reclassify the employee as mission essential, incident support, or ancillary support as applicable.

If a Reservist declines three deployments within one calendar year while in "available" status, and without reasonable cause for doing so, the Cadre Coordinator shall direct OCCHCO to terminate the Reservist's appointment. IWMD will document the declinations in the deployment system and maintain deployment records in accordance with applicable records retention policies. Cadre Coordinators and/or Reservist Program Managers should routinely run reports from the deployment system and thoroughly review reasons for declinations to check on the status of Reservists. Further guidance on what constitutes reasonable cause for an excused

declination can be found in the FD010-6 Reservist Program Directive and the FEMA Deployment Guide.[5]

## Remote Work

FEMA has specific guidance for when employees may work from their residence of record or at an alternate location when on temporary duty. This guidance may include Reservists or IM CORES in specific situations. All employees who are deployed are on official travel, which is excluded from the definition of "telework" in the Telework Enhancement Act, OPM guidance and FEMA Manual 123-9-1 *FEMA Telework Policy*. Even though employees who are deployed are not considered to be teleworking, there are specific reasons an employee may be approved to work from an alternate location. Details related to when remote work is acceptable can be found in appendix A.

## Annuitants

Annuitants are retirees from Federal service who are receiving a Federal retirement annuity ("annuitants") and become reemployed by the Federal government. They differ from other incident employees because there are certain parameters that affect their pay. Annuitants will have their salaries reduced ("offset") by the amount of the annuity they are entitled to receive during their period of reemployment.

The Office of Personnel Management (OPM) has authority to waive annuity-offset requirements on a case-by-case basis. This salary offset can be waived individually by FEMA's OCCHCO for the first 120 days of a Presidentially Declared Disaster. It is important to note that FEMA has not received the authority to apply this waiver to emergencies or for Other Duty Travel (e.g., training, exercises, meetings, course development). Waiver requests for employment exceeding the first 120 days of a Presidentially Declared Disaster must be forwarded to DHS for further transmittal to OPM per 5 U.S.C. § 8344(i).

---

[5] Reasonable cause for declining a deployment request includes, but is not limited to the following scenarios: An annuitant who receives a deployment to a specific incident site whose salary offset will not be waived at the time of deployment; a Reservist who submitted a timely request for approved leave to their Cadre Coordinator prior to the deployment request and whose request would have otherwise made them unavailable to deploy on the date of the deployment request; there is a spontaneous life event, as determined by the Cadre Coordinator, that qualifies for ERL and/or FMLA or receives military activation orders but was reasonably not able to notify their Cadre Coordinator of the life event or activation orders to obtain approved unavailability; a Reservist who has requested or is otherwise engaged in the reasonable accommodation process pursuant to Section 501 of the Rehabilitation Act of 1973 and cannot deploy without that accommodation or whose previously-agreed upon accommodation prevents them from accepting the deployment request; a Reservist who has already declined one deployment on the date of the deployment request; a Reservist who has already received activation orders for a separate deployment; a Reservist has a jury summons; a Reservist who declines a deployment immediately subsequent to their demobilization from another deployment, such that the Reservist was not provided one day of unavailability for every month of deployment that did not contain rotational travel; or deployment request occurred on the basis of an administrative error not already listed above.

## Support to Cadres for Staffing Force Structure

Table 7 illustrates the crosswalk between cadre personnel and their responsibilities for the categories described above. Specific tasks are listed below.

**Table 7: Staffing Force Structure Roles and Responsibilities**

| | Workforce Analysis | Staffing/ Hiring | Augmentation | Availability | Policies and Procedures |
|---|---|---|---|---|---|
| **Cadre Management** | | | | | |
| Certifying Authority | | ● | | | |
| Certifying Official | | ● | | | |
| Cadre Coordinator | ● | ● | | ● | |
| **Cadre Support** | | | | | |
| IWMD | ● | | | | ● |
| Office of Equal Rights | | | | | ● |
| OCCHCO | ● | ● | | | ● |
| Office of the Chief Financial Officer | ● | | | | |
| FEMA Corps | | | ● | | |
| Surge Capacity Force | | | ● | | |
| Supervisor of Record | | | | ● | |
| Office of the Chief Counsel (OCC) | | | | | ● |

## Incident Workforce Management Division

- In coordination with the Cadre Coordinators, determines the necessary number of incident workforce personnel in each FQS position based on force structure to meet FEMA mission requirements articulated by RAs, FCOs, FDRCs, and Office Directors
- In consultation with OCCHCO, Office of Chief Counsel, OER, the Office of Policy and Program Analysis, and cadre management, establishes and disseminates incident workforce policies and procedures to recruit, select, appoint, re-appoint, deploy, and evaluate FEMA personnel fairly, transparently, and efficiently
- In coordination with OCCHCO, administers the policies for recruiting, selecting, hiring, activating, onboarding, re-appointing, and terminating FEMA personnel

## OCCHCO

- In coordination with IWMD, develops and administers FEMA personnel recruiting, hiring, and performance management processes
- Provides direct support to employees with respect to individual issues requiring action in connection with the administration of pay, benefits, and other personnel matters
- Maintains records of all FEMA personnel actions – including but not limited to selection, appointment, re-appointment, termination, and resignation processing, as required by applicable records retention policies

- Provides direct support to the temporary duty supervisor regarding how to properly document poor performance and/or misconduct and to the Cadre Coordinator regarding what disciplinary action to take

## Office of the Chief Financial Officer

- Manages the processing and maintenance of government credit cards for FEMA personnel
- Develops, implements, and communicates the travel policies for the incident workforce
- Maintains the CORE Position Identification Number for each respective cadre and provides budget oversight and support to fund force structure

## Equal Rights Office

- Provides technical resource information about reasonable accommodation to employees, applicants for employment, incident personnel, temporary duty supervisors, cadre coordinators, reservist program managers, and other supervisors of record, in accordance with existing FEMA reasonable accommodation policy guidance
- Provides civil rights, equal employment opportunity, sexual harassment, diversity, and information on processing complaints of discrimination involving affirmative employment, a discrimination-free workplace, and equal access to FEMA programs and benefits in accordance with Agency policy. All OER resources are available at http://www.fema.gov/oer/
- Provides guidance and technical assistance regarding the interpretation and application of the Agency's non-discrimination policies, Robert T. Stafford Disaster Relief and Emergency Assistance Act non-discrimination elements, and Federal non-discrimination laws (including Title VI of the Civil Rights Act of 1964), regulations (including 44 CFR), and executive orders

# CHAPTER 4: EDUCATING AND TRAINING MEMBERS OF A CADRE

As discussed in the previous chapter, staffing force structure is one of the most important responsibilities for cadre management. Once this critical step is complete, the cadre's personnel must be set up for success in an incident environment. Cadre members must be afforded an effective continuum of education and training that effectively prepares them for the challenges they will face. They must have a solid foundation in FEMA programs and the Agency's means of support, as well as an extensive working knowledge in their program area's operations. Like staffing, these are shared efforts undertaken by a number of offices and organizations across the Agency as table 8 depicts. It is the responsibility of the Cadre Coordinator to ensure that the cadre's training program is mission appropriate, effective, and successful. As Cadre Coordinators develop their training plans and programs, they must do so in the manner in which they intend to operate during a catastrophic incident.

Accordingly, this chapter is designed to be a working reference for Cadre Coordinators and focuses on developing and administering education and training programs for their cadre to include required and mandatory training, elective training and professional development. The chapter also includes descriptions of the coordination functions that the Cadre Coordinators have with other FEMA offices responsible for varying segments of education, training, and professional development. Additional information regarding a systems approach to training can be found in appendix B.

**Table 8: Training Roles and Responsibilities**

| | Establish Mission Essential Tasks | Training Strategy | Training Standards | Training Development | Training Assessment | Training Delivery | Funding |
|---|---|---|---|---|---|---|---|
| **Cadre Management** | | | | | | | |
| Certifying Authority | ● | ● | ● | | ● | | |
| Certifying Official | ● | ● | ● | ● | ● | | |
| Cadre Coordinator | ● | ● | ● | ● | ● | ● | |
| FTE Coordinator | ● | | | | | ● | |
| Reservist Program Manager | ● | | | ● | | ● | |
| IM CORE Program Manager | ● | | | | | ● | |
| Cadre Training Manager | ● | ● | ● | ● | ● | ● | ● |
| **Cadre Support** | | | | | | | |
| IWMD | | | | | ● | ● | ● |
| Emergency Management Institute | | ● | ● | ● | ● | ● | ● |
| Pasadena Call Center | | | | | | ● | |

# Cadre Responsibilities in FQS

FEMA must be the most prepared when our nation is least prepared to respond to, recover from, and mitigate a catastrophic man-made or natural disaster. Success in an incident demands that an organization be led by well-educated, trained, and competent leaders to ensure that their cadre is prepared through thorough training. Such training ranges from individual training and readiness, to comprehensive team training and exercises. The following section outlines the cadre responsibilities in FQS.

**Certifying Authority**: The CA has delegated authority from the FEMA Administrator to certify that employees are qualified for FQS positions within that cadre. The CA may delegate FQS authority (in accordance with the FQS Guide) and cadre management authorities to the CO and/or Cadre Coordinator, but ultimately bears responsibility for the effective management and performance of the cadre, specifically:

- Reviewing recommendations
- Approving or disapproving the recommendations beyond the authority delegated to the CO
- Signing supervisory certification documents (FQS transmittal log/FQS decision letter) for employee notification process
- Ensuring that employees receive communication on requests for certification within 60 days

**Certifying Official**: The CO is designated by the CA to manage the day-to-day operation of FQS for a specific incident workforce cadre, including having the authority from the CA to issue PTBs and certify individuals for specific FQS positions. The CO cannot delegate this authority.

**Cadre Coordinator**: The Cadre Coordinator maintains the accuracy and currency of the cadre's FQS elements in compliance with the FQS Guide or superseding doctrine. The Cadre Coordinator recommends candidates for FQS progression and qualification to the CO and oversees the development and performs final review of Qualification Packages for FQS QRBs in coordination with the Regional IWM Liaison Teams as required, and presents candidates for qualification to the QRB. The Cadre Coordinator will also recommend decertification of cadre members as needed to the CA and CO.

**Cadre Training Manager (if applicable)**: The Cadre Training Manager serves as the cadre's primary point of contact for coordinating development and delivery of all FQS related training and oversees prioritization of all training within the cadre.

**Coach Evaluator:** The coach-evaluator holds one of the most important roles in FQS. The coach-evaluator mentors the trainee/candidate and verifies that he or she is capable and qualified to perform a task and ultimately perform his or her job.

Coach-evaluators:

- Are selected and approved by the senior cadre management
- Are qualified and certified under FQS in the position being evaluated as a primary or subordinate position
- Have completed "FQS Evaluator Training" (E/L/B 823) and "Overview of the FEMA Qualification System and Qualification Review Boards" (IS-207)

The evaluator's signature certifies competency in each task in the PTB. The evaluator must demonstrate the highest level of integrity when evaluating a trainee/candidate. An evaluator's authority can be revoked if it is misused. For additional guidance, see the FQS Evaluator's Guide.

# Types of Training

Table 9 describes the four types of training and education recognized by FEMA that are used to train cadre members. In accordance with OCCHCO guidance on employee training, integration and workforce development, the four forms of training and education follow: required training (of which FQS training is the major source for the incident management/incident support workforce), mandatory training (DHS and FEMA training for all employees), elective training, and professional development education. Below are the definitions of each type of training. The remainder of this chapter will focus primarily on required training (requirements for certification in FQS) and mandatory training for Reservists.

**Table 9: Training Descriptions**

| Training Type | Description |
|---|---|
| Required Training | Required training is for a specific employee as a condition of their job/position or duty station (e.g., FQS training, Contract Officer Representative training, supervisor training, etc.). Required training is identified to maintain a prescribed level of proficiency by Federal statute, Federal regulation, the DHS Secretary, the FEMA Administrator and/or the chief of a FEMA Component Organization. FQS-required training can be found in the position title qualification sheet (see Chapter 5: Qualifying). Cadre Coordinators, Training Managers, and the employee type managers (FTE, IM CORE, and Reservist) completely manage every aspect of this training for their cadre. |
| Mandatory Training | Mandatory training is required for all FEMA employees, regardless of job/position or duty station (e.g., Ethics training, Equal Rights and Civil Rights training, Computer Security training, etc.). Mandatory training is established by Federal statute, Federal regulation, the DHS Secretary and/or the FEMA Administrator. Cadres are NOT required to track and manage mandatory training for full-time employees. The supervisors of record for the FTE's steady-state position will retain this responsibility. The supervisor of record, dependent of cadre structure either the Cadre Coordinator, RPMs, or IM CORE Coordinator, must track mandatory training for Reservists and/or IM CORE. |
| Elective Training | Elective training is training that is taken voluntarily (neither required nor mandatory) by an employee (e.g., advanced Microsoft Excel skills, Senior Executive Staff Candidate Development Program, etc.) to improve their Agency job and/or mission related proficiencies and that requires coordination with and/or approval by their supervisor because Agency resources are used and/or participation occurs during an employee's work hours. FTEs will request elective training through their steady-state supervisor. Reservist requests will process through the cadre's RPM. |
| Professional Development (FTE Only) | In workplaces, professional development refers to the acquisition of skills and knowledge, both for personal development and for career advancement. Professional development encompasses all types of facilitated learning opportunities, ranging from college degrees to formal coursework, conferences, and informal learning opportunities situated in practice. It has been described as intensive and collaborative, ideally incorporating an evaluative stage. OPM standards and regulations can be found here: https://www.opm.gov/policy-data-oversight/human-capital-management/reference-materials/leadership-knowledge-management/developmenttraining.pdf<br>OPM defines professional development as: professional development programs |

| Training Type | Description |
|---|---|
| | provide technical and general knowledge and experience to career employees. Agencies may also establish leadership development programs to ensure leaders continue to develop and "grow" the knowledge and skill necessary to effectively lead the organization. |

Training encompasses the full range of duties, responsibilities, and missions required of FEMA's incident workforce, and it must be embedded in all that the cadre does. Deploying personnel, operating equipment, communicating information, maintaining vehicles, and providing logistical support are all critical skills mastered only through training. Training provides the ability to follow procedures, to execute techniques, to apply tactics, and to integrate the capabilities of skills and services.

# FEMA's Training Philosophy

Effective training directly correlates to success in performance and mission. Successful organizations train as they intend to operate and operate as they were trained. A cadre's training program needs to be based on this philosophy for cadre members to achieve future success during an incident. FEMA's mandate to lead the nation in preparing for, protecting from, responding to, recovering from, and mitigating incidents as well as its obligation to ensure a professional workforce capable of executing this mission, necessitate this approach.

# FEMA's Training Mandate

FEMA's mandate for training is simple and compelling: FEMA must be the most prepared when our nation is least prepared to respond to, recover from, and mitigate a catastrophic man-made or natural disaster. Catastrophic incidents place rigorous physical, psychological, and moral demands on emergency managers and the environment. These demands during an incident require substantial dedication, perseverance, and motivation to ensure the highest possible chance of success. Since FEMA must be prepared to meet the challenges posed by these incidents, catastrophic events determine training directions and goals.

Success in the field/at the incident level during an incident also demands that an organization be led by well-educated, trained, and competent leaders to ensure that their cadre is mentally and physically prepared through thorough training. Such training ranges from individual training and readiness to comprehensive team-training and exercises. Pursuit of the highest possible quality training must become a professional imperative and second nature for FEMA.

# Principles of Training

Cadre training philosophy has its roots in six fundamental principles:

1. Train for Operations
2. Require Leadership Involvement and Ownership

35

3. Train to Standards
4. Use Performance-Oriented Training
5. Promote Team Operations
6. Challenge Employees

All cadre managers must understand and apply these principles at every level of training. These principles provide sound and proven direction; they are flexible enough to accommodate the demands of local conditions and the judgment of individual leaders and other trainers. These principles are not inclusive, nor do they guarantee success. They are guides that all can use to design and assess organizational training programs.

## Train for Operations

A catastrophic incident is the ultimate test of training. All FEMA training is fundamentally based on training employees on how to operate during a catastrophic incident. Therefore, all steady-state training must reflect the requirements levied on a cadre during a catastrophic event.

All FEMA leaders must ensure that individual cadre members receive realistic training that simulates, to the greatest extent possible, the conditions of a catastrophic incident. Training should prepare cadre members to perform their tasks and meet operational standards during the complex, stressful, and dangerous situations they will encounter during a catastrophic incident. FEMA's philosophy is to train well in steady-state so that it can perform well during a catastrophic incident.

## Require Leadership Involvement and Ownership

Leaders at all levels are responsible for the training and performance of their personnel and organization. They do more than manage training. The leaders' personal presence and involvement demonstrate to all that training is the number one priority. Senior leaders personally train each direct report; COs train their Cadre Coordinators; Cadre Coordinators train their cadre management staff, and so on. This simple but practical approach allows for standardization from above, for flexibility at the trainer's level, and for a clear progression of skills and understanding.

## Train to Standards

Standards-based training is the use of common procedures and uniform operational methods to create a common perspective within FEMA. Training standards are currently published as individual training core competencies for each incident management job title and will be published as mission performance standards for each organized team/unit. All training must conform to these standards as they allow the incident workforce to train, and operate from a common perspective and provide cadre managers/leaders with a firm foundation upon which to request needed resources to support the training. This method of training will be further reflected in FEMA doctrine, processes, and procedures.

36

## Use Performance-Oriented Training

All members of a cadre must be proficient in the basic skills required to perform their jobs during an incident, and all FEMA leaders need to believe in the ability of the workforce to perform with a high level of skill and competency. To achieve this objective and increase confidence in employee proficiency, all training must be performance-oriented. All cadre members will be trained to meet published standards, not merely to occupy the time designated for training. To successfully complete and receive credit for training, students need to demonstrate a propensity to execute program tasks. Cadre members will then refine these skills through experience as a "trainee" prior to attaining qualification.

## Promote Team Operations

FEMA operates as one team during an incident despite distribution of operations across geographical locations. Because of this, intra- and inter-cadre teams must train together on a regular basis. To support this, routine employment of the full spectrum of cadre functions must be practiced regularly.

## Challenge Employees

Training must be challenging and develop new skills in order to build competence and confidence. The pride and satisfaction gained by meeting training challenges instills loyalty and dedication. It inspires excellence by fostering initiative, enthusiasm, and eagerness to learn.

# A Mission Essential Task List Approach to Cadre Training Development

To obtain maximum benefits, all cadre training programs derive from a mission analysis. The mission analysis provides a careful assessment of possible missions, identifies specified and implied tasks, and is the foundation for the development of a mission essential task list (METL). A cadre's mission is the basis for the development and execution standards of the tasks. A cadre should not train for tasks that are not dictated by their mission during an incident. Cadres, units, and teams will be taught these tasks according to prescribed collective and individual training standards set forth in individual training core competencies or mission performance standards.

## Mission Essential Task List Fundamentals

The METL is derived from the cadre's mission statement, doctrinal employment, incident missions, and other related tasks. All cadres in FEMA will prepare METLs that are approved by the cadre's CA. Each cadre's METL is approved by the next higher organization in the operational chain of command (e.g., DSA Team METL is approved by the DSA Cadre Manager). Each cadre's METL must support and complement the METLs of organizations above them in the chain of command (e.g., the METLs for a DSA team must support and compliment the METLs of the DSA Cadre). In similar organizations, mission-essential tasks may vary significantly because of different incident missions or geographical locations.

The availability of resources does not affect METL development. The METL is an unconstrained statement of the tasks required to accomplish incident missions. Since the METL forms the basis for the funding and resourcing of a cadre's training plans, it is stabilized once approved. The METL is normally modified only if changes occur in the organization's missions. Since incident plans are used as critical input to the METL development process, every effort should be made to solidify/stabilize incident missions in every plan. A significant revision of an organization's mission can result in major changes to its METL and require subsequent major modifications to training plans and limited funding.

The CA in coordination with their COs and Cadre Coordinators have the responsibility for developing a training strategy that maintains cadre proficiency for all tasks designated as mission essential. There should be no attempt to prioritize tasks within the METL. By definition, all METL tasks are equally essential to ensure mission accomplishment. CAs, COs, and Cadre Coordinators should involve members of their cadre in METL development to create a team approach to mission-oriented training. Cadre member participation develops a common understanding of the organization's critical mission requirements so that METLs throughout the cadre are mutually supporting.

After the collective mission-essential tasks required to accomplish the organization's mission have been designated, individual tasks that support mission-essential tasks can be identified and documented in organizational training publication, handbooks, and FQS PTBs.

## Mission Essential Task List Development

The Cadre Coordinator should review and identify those tasks essential to the accomplishment of the cadre's incident mission for training priority. The objective is to establish training for these essential tasks to achieve proficiency. The cadre can train for all other tasks as resources allow. This process concentrates the organization's steady-state training efforts on the most important collective training tasks required to accomplish the incident mission. This selection process reduces the number of training tasks because a cadre cannot achieve and sustain proficiency on every possible task.

## Training Standards

After mission-essential tasks have been identified, Cadre Coordinators must extract supporting conditions and evaluation criteria for each task. The Cadre Coordinator will then set and maintain clear standards for training performance.

## Training Assessment

The training assessment compares the cadre's current level of training proficiency with the desired level of incident proficiency. The desired level of incident proficiency is defined in training standards. Training assessments will be conducted by a training assessment team, which will consist of the CO, the Cadre Coordinator, and the Cadre Training Manager, if applicable, of

a specific cadre in coordination with and assistance from IWMD. Training assessment will be conducted on a regular basis for each cadre.

The training assessment team will determine current training proficiency levels of a cadre by reviewing all available training evaluations as well as incident performance evaluations. Each evaluation applies only to a portion of the total proficiency of an organization at a specific time. Therefore, the training assessment team will have access to all available evaluation data to develop an assessment of the organization's overall capability to accomplish each task in the METL. In addition to past training evaluations, future events could influence the assessment.

## Required (FQS) Training

FEMA will train and certify all cadre members in accordance with guidelines established in the FQS Guide and Chapter 5: *Qualifying Members of a Cadre*. All cadres will carry out FQS required training development, scheduling, and delivery in accordance with the *FEMA Qualification System Guide for Incident Management and Incident Support Positions* (available at http://www.fema.gov/about/employees/fqs.shtml) and other authorized FQS supporting documentation. The point of contact for FQS funding, scheduling, course development, and delivery is fema-iwmd-curriculumdelivery@fema.dhs.gov.

Funding for FQS training is centralized within IWMD and must be considered separate from mandatory training. Each Cadre Coordinator, and Cadre Training Manager, if applicable, is responsible for tracking their allocated budget for FQS training. Training provided through FEMA's Federal Incident Workforce Academy (FIWA) is funded and sourced by IWMD. FIWA training is offered to all incident workforce employees, regardless of cadre, providing the first course required to achieve a FQS qualification and preparing employees for both follow-on program specific training and deployment activity. IWMD will coordinate with the Cadre Coordinator regarding available funding for the development of appropriate training, delivery, and prioritization of all FQS training needs within the allocated budget. All FQS required training, other than FIWA, is allocated based on the cadre's force structure size for the cadres to manage. All development and course delivery costs should be planned and scheduled in the out-years with this funding target, based on a per-capita allotment, in mind. IWMD recognizes this as a target, not a red-line. Therefore, funding is negotiable based on demonstrated need.

Scheduling courses, projecting current course revisions and modifications, and course development is ultimately the responsibility of the cadres and their Training Manager. IWMD manages the scheduling and out-year cost projection process, but it cannot do the work of course determination or modification for the cadre. Training priorities for the incident workforce, including course development and delivery, will be determined by each Cadre Coordinator based on policy and doctrine, FQS requirements, and other position-specific training requirements. Cadre Training Managers, if applicable, or a single designee will serve as the cadre's primary

point of contact for the development and delivery of all FQS related training, and oversee the prioritization of all training within the cadre.

For this reason, the cadre management team must keep detailed records on what training their employees have and have not completed, using FQS data tools and National Emergency Training Center transcripts to validate their records. Each summer, at the start of that year's fourth quarter (Q4), IWMD will publish a memorandum instructing Certifying Authorities and Officials to begin preparation for requesting courses in the "out-year" defined as October of the following year (i.e., instructions issued in July 2014 for scheduling in FY16). Along with this memorandum, IWMD will provide each cadre with their FQS Required Training budget as well as a list of employees that require each course. It is important to note that the FQS data has inherent time lags and may not represent reality with 100% accuracy. Further, the cadre will train some of these employees during training in that quarter and the next fiscal year. Therefore, when preparing an out-year schedule, the training manager must also account for training that is already scheduled to occur in the current and next FY. To that end, each cadre should use the following inputs when preparing out-year FQS schedules: FQS budget, force structure and current force strength, planned hiring, scheduled training, course development needs, and course need as determined by those with open PTBs. Once the Cadre Coordinator and Training Manager build a case for their out-year schedule, they should gain approval from their CO and submit the requests to their IWMD FQS Point of Contact no later than 31 August. Once vetted by IWMD against existing qualification data and negotiated between IWMD and the cadre management team, the request will be stamped and submitted to EMI for scheduling and location determination no later than 15 October, twelve months from the start of the next FY. When the cadre identifies a course need that is not currently offered by FEMA or an outside certification agency, the cadre management team, its associated EMI course manager, and the FQS branch will work with the cadre to generate a contract and fund course development, and then validate that new course through pilots and focus groups. In December, EMI will publish a training calendar for the next FY, identifying what courses it was able to schedule at EMI and which courses they will have to hold at off sites such as Center for Domestic Preparedness (CDP), Federal Law Enforcement Training Centers (FLETC), or within a region.

## Enrollment for Scheduled FQS Courses

The process of enrolling employees in FQS courses through course completion involves five main organizations: 1) Cadre Management Teams, 2) EMI Course Managers, 3) FQS Curriculum Delivery and Development Teams, 4) IWMD and Business Management Division budget offices, and 5) the Pasadena Call Center. The following are the impacts to cadres as they ensure that employees attend and complete the training required on their qualification sheet.

- Prior to a given course, the FQS Branch will provide the course manager with a pre-approved list of those employees with open PTBs who require that course. The Course Manager will then "announce" the course to this population, taking care to carbon copy

the affected Cadre Coordinators, cadre training managers, regional training managers, and regional IWMD liaisons.

- The sponsoring cadre will coordinate with the assigned EMI Course Manager 6-12 weeks prior to a course to identify all pertinent travel requirements and special instructions for a course. This information submitted to IWMD to generate a blank group travel authorization (TA) for a given scheduled course.
- Cadre Coordinators in conjunction with Cadre Managers will then identify those within their population who can attend the course and will compare it to the data provided by IWMD (FQS Branch). Cadre Coordinators and Course Managers will agree upon an initial roster of employees six weeks prior to a course.
- Following a course invitation from National Emergency Training Center, Course Managers will publish, via email, the course details to the Cadre Coordinators impacted as well as all employees on the initial roster no earlier than four weeks from the start of a course. That course announcement will include a standardized notification as well as details specific to the course such as the TA and travel details. Any late additions to the course will receive all required information as soon as they are identified by the Course Manager as attending the course.
- FQS Branch, through the Pasadena Call Center, will ensure that all attendees are added in the Integrated Financial Management Information System to the corresponding course travel authorization for payment purposes.
- The Pasadena Call Center is responsible for coordinating with the OCFO for increasing all government travel card limits prior to IWMD training related travel.
- The Pasadena Call Center processes requests for IWMD sponsored training for Reservists by activating and validating their WebTA account, processing deployment requests for FQS courses or pilots, and processing travel vouchers.
- FTEs shall process all travel and time and attendance through their steady-state supervisor of record.
- Cadre Coordinators and their training manager should have a mechanism in place to audit the official FEMA transcript system to ensure that the course certificates and credits are annotated accurately on individual transcripts.

## Mandatory Training

Mandatory training is required for all FEMA employees, regardless of job/position or duty station. Mandatory training includes training that is necessary to introduce, reinforce, or clarify law to improve the function of the government, protect the safety of our employees, communicate FEMA core values, or to improve the function of FEMA. Mandatory training may be required by Federal statutes, Federal regulations, DHS policy, or FEMA policy. For instance, all employees receive training in fraud protection and prevention, equal rights, privacy, and security. Additionally, OCC Ethics shall provide all new employees with initial orientation and annual ethics training.

The default method of delivery for mandatory training will be distribution via web-based content or e-learning content. The training may also be available in the field for deployed personnel. For FTEs, it is the supervisor of record who is responsible for the cadre members' mandatory training, not the Cadre Coordinator. For Reservists and IM CORE cadre members, Cadre Coordinators or Cadre Training Managers, if applicable, will ensure maintenance of mandatory training records. The FEMA/DHS learning management systems of record are the appropriate tools for proof-of-course completion and the location for certificates and transcripts. For Reservists, Cadre Coordinators or Cadre Training Managers, if applicable, will ensure that Reservist cadre members are taking the available mandatory training and are receiving appropriate compensation.

The Assistant Administrator for Response's June 27, 2013, memorandum on "Compensation for FEMA Reservist Coordination and Training Requirements" governs the process for compensation for mandatory training. Mandatory training and its associated pay processing must be properly documented as the entire process is subject to annual audit. IWMD will provide the funding for Reservists to take mandatory training.

Annually, IWMD will re-publish the latest mandatory training list for Reservists. With this guidance, cadre management teams will ensure completion according to the pre-determined list of approved mandatory courses, which are not to exceed 40 total hours in a given calendar year.

## Programmatic Updates

Cadre Coordinators will provide regular and timely communication to all cadre members and Regional IWM Liaison Teams on programmatic and administrative changes and/or issues. The Cadre Coordinator ensures cadre members have access to program-specific information that is required to perform effectively during incident operations. Programmatic updates and cadre-specific training may be accomplished through cadre calls. For more information regarding the process used for programmatic updates and cadre calls, refer to Chapter 9: Communication and Coordination.

# CHAPTER 5: QUALIFYING MEMBERS OF A CADRE

This chapter is designed to provide the Cadre Coordinators a working reference focused on administering the aspects of FQS. The application of all qualification processes, the general principles of equal employment opportunity and non-discrimination apply. The FQS Guide, Qualification Review Guide, and FQS Evaluator's Guide are the reference documents that prescribe the functionality of the qualification and credentialing system and determine the requirements that the following topic areas address. There are three elements to qualification that an employee must do:

1. **Experience** - Complete the required FQS experience
2. **Training** - Complete the required training identified on the position's qualification sheet
3. **Demonstrated Performance** - Complete an assigned PTB by demonstrated performance (in accordance with Coach-Evaluator program)

## FQS Documentation

A qualification sheet and PTB are developed for each FQS position and a progression flowchart is created for each cadre. The qualification sheet lists the required FQS experience, training, and certifications needed to be considered for certification in a position title. The PTB outlines the technical competencies and general competencies that must be performed and validated to be considered for certification. The progression flowchart maps a path for career advancement for each FQS position. In addition, there is a qualification sheet that lists training required for all Command and General Staff positions based upon tier level.

The IWMD FQS Branch manages the publication of a cadre's qualification sheets, PTBs, and progression flowcharts. It is important to ensure that any position-related training changes, including course numbers, are accurately reflected on the position qualification sheets. The qualification sheets are the basis for the FQS Curriculum Delivery team's determination of appropriate student requisite training needs. Additionally, where competencies can be migrated from a classroom delivery into a PTB determined task, cadres should enhance the PTB thereby reducing classroom training time and focusing on demonstrating the performance in the field.

- **Qualification Sheets** – The qualification sheets are used as a basis for formal training, certifications, and experience requirements for each position. Specific courses must be listed on a qualification sheet before they can be scheduled for delivery.
- **Position Task Books** – PTBs are designed to be a guide to on-the-job training as well as a formal record of performance evaluation. The behaviors and activities listed in the PTBs are not all inclusive to the actual requirements of a position; they are intended to reflect the spirit and intent of the position. Only designated evaluators are authorized to validate completion of tasks in an employee's PTB.

- **Progression Flowcharts** – The progression flowchart diagrams the organizational structure of a cadre.

## Revisions to FQS Documentation

Revisions and changes to qualification sheets, PTBs, and progression flowcharts must be based on identified deficiencies and mission essential needs. To request revisions, cadre management should submit change requests to the FQS Branch by email to fema-fqs-program@fema.dhs.gov with "FQS Documentation Revision" in the subject line. Some changes may require CCWG and/or IWESC approval before implementation. At a minimum, the request should include the following information:

- Cadre
- Positions affected
- Specific changes
- Justification of changes

# Managing the Paperwork

This section will provide the background and support necessary to assign a title, issue a PTB, manage the programs' coach-evaluator responsibilities, certify that an employee is qualified, and assist with other cadre responsibilities related to FQS. These processes often rely on specific forms completed by either cadre administrators or the employee. Supporting business rules and the forms (containing their detailed instructions for completion) are provided in appendices C-F.

Frequently used forms include:

- **FQS Transmittal Log (FTL)** – The official form to document employee certification actions
- **Candidate Position Task Book Issuance Form** – The official form to document the issuance of a PTB to a candidate
- **Employee Request Form (ERF)** – Form used to request qualification review for non-supervisory positions
- **ERF – QRB** – Form used to request qualification review for supervisory positions

Letter templates can be used as guides for employee communications. These letters can include:

- **Certification Letter** – used to notify an employee of certification
- **Decertification Letter** – used to notify an employee of decertification
- **Non-acceptance Letter** – used to notify an employee they do not meet the standards of qualification

# Assignment of an Initial Position Title

## Initial Assignment

An initial FQS job title is assigned to employees who have never held an FQS job title. This designation allows an employee to deploy to an incident operation in an incident management position and to be enrolled in position specific training. In addition to a specific title, employees will be assigned a proficiency level in the FQS system:

- **Trainee** – assigned a PTB, but not yet qualified
- **Qualified** – qualified in the FQS position designated by the cadre
- **Candidate** – qualified in an FQS position and also issued a PTB for a different position

Programs will consider a number of factors to determine qualification including:

- Number and length of deployments
- PTB or verification of position held on deployment (i.e., Incident Action Plan organization chart, letter from incident leadership or section chief, or ICS 204 form with assignment)
- Variety of incidents worked (e.g., floods, tornadoes, hurricanes), their size and complexity, and the number of assignments
- Other related non-FEMA experience that equates to experience gained in FEMA functional areas OR from other agencies/organizations that equate to the FEMA-based knowledge and skill requirements for the position
- Required training or accepted equivalency training for FQS positions; course equivalency may not be used to certify employees for Type I positions
- Incident performance evaluations (performance evaluations not applicable)

The process for obtaining an initial FQS job title varies slightly depending upon the type of employee. All requests, regardless of employee type, will receive a decision or some communication from the cadre within 60 days of receipt.

**Reservist:** Reservists are hired directly into an FQS job title. The cadre management team will determine the employee's FQS job title and proficiency and ensure the information is entered into the FEMA deployment and qualification tracking system.

**IM CORE:** IM COREs are hired to fulfill an incident management title. The cadre management team will determine the employee's initial FQS job title and proficiency and ensure the information is entered into the FEMA deployment and qualification tracking system. IM CORE employees will begin the next level of certification, as needed to reach certification for hired title.

**IMAT:** IMAT members are hired to fulfill an incident management title for a specific position on a national or regional IMAT. The cadre management team will determine the employee's initial proficiency and ensure the information is entered into the FEMA deployment and qualification tracking system. IMAT members will complete an IMAT Academy that provides the required training and exercises to validate proficiency and begin the next level of certification as needed.

**Full Time Employee (PFT, TFT, and CORE)**: FTEs can be assigned to various roles in support of FEMA's mission. Employees should consider their personal goals and abilities prior to requesting an FQS job title. Additionally, employees and their supervisors should determine which support role best suits the employee, their supervisor, and the Agency.

Each FTE will fulfill one of four roles in support of disaster survivors:

- Incident Management – incident field operations staff
- Incident Support – NRCC or RRCC staff
- Mission Essential – staff required to maintain mission essential functions
- Ancillary Support – staff deployed at their normal duty station to support incident operations

To request an initial title, FTEs will complete an ERF (for non-supervisory positions) or ERF – QRB (for supervisory positions). Table 10 lists the process for non-supervisory positions, and table 11 lists the steps in the process for supervisory positions.

46

**Table 10: Initial Assignment of Title Process Step for FTE, Non-Supervisory**

| | Responsible Entity |
|---|---|
| 1.  Force Structure vacancy confirmed with IWMD Regional Liaison Team or Cadre Coordinator | Program Office |
| 2.  Employee completes the appropriate ERF and forwards it to the Pasadena Call Center | Employee |
| 3.  Pasadena Call Center conducts a quality assurance review on the submission package | Pasadena Call Center |
| 4.  Package reviewed, evaluated for recommendation to CO on transmittal log with decision letter | Cadre Coordinator |
| 5.  Recommendation is either approved or disapproved, transmittal log is signed, date recorded, and decision letter is returned to Pasadena Call Center | Certifying Official |
| 6.  Decision letter and transmittal letter emailed to FQS Program Inbox | Cadre Coordinator |
| 7.  Qualification letter mailed to employee | Pasadena Call Center |
| 8.  Information forwarded to the FQS Data Team | Pasadena Call Center |
| 9.  Data entered in into qualification management system | Pasadena Call Center |
| 10. Data coordinated for entry into the deployment system | Pasadena Call Center |

**Table 11: Initial Assignment of Title Process Step for FTE, Supervisory**

| | Responsible Entity |
|---|---|
| 1. Force Structure vacancy confirmed with IWMD Regional Liaison Team or Cadre Coordinator | Program Office |
| 2. Employee completes the appropriate ERF and forwards it to the Pasadena Call Center | Employee |
| 3. Pasadena Call Center conducts a quality assurance review on the submission package | Pasadena Call Center |
| 4. Package reviewed and evaluated for recommendation to CO on transmittal log | Cadre Coordinator |
| 5. Package reviewed and forwarded to the QRB chair for recommendation with transmittal log | Certifying Official |
| 6. Certification package reviewed | QRB Chair |
| 7. QRB deliberated and recommendation determined for certification, and decision letter prepared | QRB |
| 8. Recommendation is either approved or disapproved, transmittal log is signed, date recorded, and decision letter is returned to QRB Coordinator | Certifying Authority |
| 9. Qualification letter is mailed to employee | Pasadena Call Center |
| 10. Information forwarded to the FQS Data Team | Pasadena Call Center |
| 11. Data entered in into qualification management system | Pasadena Call Center |
| 12. Data coordinated for entry in the qualification management system | Pasadena Call Center |

Detailed processes for completing initial assignment for each employee type can be found in appendix G.

## Subordinates Titles

All employees will hold one primary classification – incident management, incident support, mission essential, or ancillary support. Employees classified as incident management or incident support will hold a primary job title and may have up to three subordinate titles. Employees classified as ancillary support and mission essential support incident operation through their day-to-day role within FEMA. As such, they may not hold primary incident management or incident support job titles. If ancillary support and mission essential employees also hold current incident management or incident support titles, they will be listed as subordinate titles to their ancillary support and mission essential role within FQS. Subordinate titles do not count against force structure limitations.

Subordinate incident management titles represent proficiencies from positions within their progression path or other relevant positions within their cadre. For example, an Operations Section Chief Type I would hold that title as their primary FQS job title. Operations Section Chief Type II, Operations Section Chief Type III, and depending on the career progression of the

48

individual (progression could have been from Operations Branch Director, Public Assistance Branch Director, or Individual Assistance Branch Director), the qualification held by the individual could be listed as the third subordinate title held. Not all individuals will hold three subordinate titles. Qualifications for personnel who have transferred from outside the program may be assigned based upon the cadre's desires. An employee can have a subordinate title in another cadre, and acceptance of a subordinate title in a different cadre can result in the individual being deployed under that experience/qualification.

### FQS Business Rules for Subordinate Titles

- An individual may be assigned up to three subordinate titles; these titles should be a direct progression per the Cadre Progression Chart.[6]
- Subordinate titles should be the highest ranking positions the individual is personally qualified to perform.
- Subordinate title proficiency level should always be qualified.
  - o IM CORE New Hires may temporarily be assigned Trainee subordinate titles for the purpose of training.
- As directed in FD010-8, an employee can only be deployed in a subordinate job title if no one with the requested title is available in the deployment system.
- The employee's CO approves the subordinate titles if not identified on the Qualification Letter.
- The IWMD Deployment Unit enters, changes, or updates subordinate titles upon receipt of signed memo from the CO, the Cadre Coordinator. This information may also be included on the transmittal log/decision letter when there is a change in qualification.
- If QRB recommends an FQS job title for an employee, they should establish the recommended subordinate titles at the same time.
- An employee selected and qualified as an evaluator can only evaluate their primary and identified subordinate job titles.
- Subordinate titles are subject to four year recertification and are automatically renewed if the primary title is retained.

## Issuance of Position Task Books

### Issuance Policy

Employees may request a PTB for the next position in their progression with approval from their supervisor of record if they are certified in their current position. The employee requests to open a PTB through the Cadre Coordinator; their CO may also provide authorization. All requests will receive a communication from the cadre coordinator within 60 days concerning the decision of

---

[6] Subordinates CAN be carried for other programs at the discretion of the cadre issuing the primary FQS job title – for those cadres with positions that crossover.

whether or not to issue a PTB. (See appendix G for more information.) If approved, the PTB will be issued using the PTB Issuance Form. Although an employee may attend requisite training, gain experience, and demonstrate performance, the qualification of an employee may not be granted until a Force Structure opening becomes available. The cadre will then utilize the Subject Matter Expert (SME) panel process for selection of an employee and submission within the existing qualification/credentialing process.

## Position Task Book Issuance Form

The Position Task Book Issuance Form must be completed and sent to the Pasadena Call Center (FEMA-FQS-Program@fema.dhs.gov) for processing to ensure the employee is denoted as having an open PTB in the qualification tracking system. This process allows the IWMD Curriculum Delivery Team to maintain awareness with respect to the requisite training the candidate may now be scheduled to attend.

## Time Limits for Completion of PTBs

A trainee/candidate must complete an assigned PTB within four years, beginning with documentation of the trainee/candidate's first completion of a task in the PTB. If the trainee/candidate does not complete the PTB within four years, the PTB will no longer be valid. If a new PTB is initiated, all current qualification standards will apply.

## PTB Completion/Submission Process

Submission of the completed PTB or individual task sign offs are a responsibility of the employee.

## Candidate Selection for Advancement

For employee advancement and higher-level qualification, an employee must complete the requisite training, complete the cadre issued PTB, and accumulate the necessary experience for the higher level position. The process begins with the issuance of the PTB for the position within the progression path.

When a vacant position needs to be filled, an SME panel (FQS-qualified at or above the position being reviewed) may be convened to evaluate and select the best candidate from all the candidates who have completed the PTB. The SME panel is required for supervisory positions. The panel will recommend their selection for CO certification or for sending to the QRB (supervisory position). Completing a PTB does not guarantee progression into the next position.

Once a completed request package for certification is received, the Cadre Coordinator is required to provide communication back to the employee within 60 days. Communication can be a certification decision or information regarding the delay (such as referred to an SME panel or the QRB).

# Certifying Qualification of a Position Title

## Certification and Recertification Processes

Table 12 outlines the roles and responsibilities of each individual in the process, where a CA certifies an employee as "qualified" for an incident management or incident support position. When an employee is decertified for any reason, he or she must be recertified to be considered fully qualified.

**Table 12: Certification/Recertification Process**

| | Responsible Entity |
|---|---|
| 1.  Prepares and submits certification package to FEMA-FQS-Program@fema.dhs.gov | Employee |
| 2.  Provides initial review of certification package for completeness | Cadre Coordinator/ Data Entry Group |
| 3.  Verifies that all documents are recorded in the qualification tracking system database | Cadre Coordinator/ Data Entry Group |
| 4.  Forwards complete packages to the Cadre Coordinator and incomplete packages to employee | Cadre Coordinator/ Data Entry Group |
| 5.  Evaluates the package for a recommendation to the CO on an FTL and prepares a decision letter | Cadre Coordinator/ Data Entry Group |
| 6.  Reviews certification package for qualification determination | Certifying Official |
| 7.  **Non-supervisory positions**—elects to approve or disapprove for certification | Certifying Official |
| a.  Signs transmittal Log and Decision Letter and sends to FEMA-FQS-Program@fema.dhs.gov, employee and enters information into the deployment and qualification tracking systems | Certifying Official |
| 8.  **Supervisory positions**—Forwards FTL to QRB Chair for review and recommendation | Certifying Official |
| a.  QRB Chair reviews package prior to convening the QRB | Qualification Review Board |
| b.  Evaluates certification package | Qualification Review Board |
| c.  Determines recommendation for certification | Qualification Review Board |
| d.  Prepares decision letter for CA | Qualification Review Board |
| 9.  Reviews recommendation and approves or disapproves | Certifying Authority |
| 10. Signs transmittal log and decision letter | Certifying Authority |
| 11. Sends signed documents to the Pasadena Call Center (FEMA-FQS-Program@fema.dhs.gov) for processing and data entry into the qualification management system, as well as the employee | Cadre Coordinator |
| 12. Maintains all decision letters and transmittal logs in the employee's file | Cadre Coordinator |

## Decertification Process

If a qualified employee fails to meet any of the requirements to maintain qualification, he or she will be decertified. Table 13 lists the steps in the decertification process.

**Table 13: Decertification Process**

| | | Responsible Entity |
|---|---|---|
| 1. | Forwards an FTL and decision letter to the CO for decertification action | Cadre Coordinator |
| 2. | Prepares and forwards a notification letter for CA signature | Certifying Official |
| 3. | Reviews and signs decertification letter | Certifying Authority |
| 4. | Returns signed letter and transmittal log to Cadre Coordinator | Certifying Authority |
| 5. | Send decertification letter and transmittal log to FEMA-FQS-Program@fema.dhs.gov to enter information into the deployment and qualification tracking systems, as well as to the employee | Cadre Coordinator |
| 6. | Maintains letter and FTL in employee file for record keeping | Cadre Coordinator |

## Reconsideration Process

Reconsideration is a process that begins with an employee requesting consideration of a decision by a CA with the intent of reversing or modifying the current incident qualification decision.

An employee may request reconsideration of a qualification decision by submitting a written request within 60 days after receipt of a decision. The request should include supporting documentation that clarifies or amplifies documents originally submitted and/or any new documentation that supports the employee's claim of competency for the targeted position.

The CO or the QRB will review the request for reconsideration. (COs will only review non-supervisory positions. A QRB will review all other positions.) The CA will make the final decision.

The reconsideration process is the same as the certification process outlined in this section. Employees will receive a response to their reconsideration request within 60 days of receipt. A reconsideration decision by a CA is final.

# Specialties

A specialty is a category used to identify a specific and measured (documented or credentialed) skill, task, experience, or certification based on recognized standards. A specialty is necessary to enhance performance of an associated incident management position. It must be distinct, empirically derived and not a general credentialing requirement for an FQS position.

All requests for new specialties will be reviewed and approved by the CCWG and will be considered using consistent standards.

- Specialties are generally program area specific.
- Specialties must be held by a sufficient number of employees and not be used to target a narrow group of employees repeatedly for deployment.

- Specialties must not be the same as a requirement of a current FQS position.
- Specialties must be validated and approved by CO.

Assigning and managing specialties:

- The Cadre Coordinator will approve and assign a specialty to a specific employee.
- The requirements to maintain a specialty will be managed by the cadre management.
- The Deployment Unit will maintain employee records in the deployment database.

When approved to add a cadre specific specialty (by CCWG), the Specialty Confirmation form is completed and routed via the CCWG Chairperson who will then forward it to the Deployment Unit for incorporation into the deployment tracking system. Cadre leadership is responsible for the maintenance and currency of the personnel and the associated specialty qualification/requalification requirements.

Table 14 lists the offices that support the FQS process and the roles they play in the process.

**Table 14: FQS Support Roles**

| Who | What |
|---|---|
| IWMD | Coordinates with OCCHCO to ensure individual incident performance evaluations are being completed throughout the cadres |
| OCCHCO | Ensures guidance and processes for performance management are implemented |
| FCO/FDRC/ Office Director | Coordinates with Human Resources Specialists to ensure the completion of individual incident performance evaluation forms |
| Pasadena Call Center | Responds to inquiries, acts as the collection point for FQS qualification information, and aids the workforce in understanding the qualification/certification, and QRB processes. The Pasadena Call Center also conducts preliminary reviews of FQS qualification documentation, processes in place, provides notification to employees of decisions related to their qualifications, and follows up on inquiries. |

# CHAPTER 6: PERFORMANCE MANAGEMENT

One of the main functions of FEMA's cadre management system is to ensure that all members of the workforce are able to perform and continue to perform optimally in an incident environment. This demands that the employee's leadership conduct recurring analysis and assessment of the employee's performance. This is effectively accomplished through a sound deployment performance evaluation methodology. Employees, regardless of employee type, must receive a comprehensive performance evaluation at the conclusion of their deployment. For FTE employees, their deployed performance appraisal may factor into their annual appraisal performed by their designated supervisor of record.

This chapter is designed to provide Cadre Coordinators with an overview of the value of performance management for ensuring effective operational readiness of their cadre members, and will detail the performance management process for all employee types.

## Principles of Performance Management

As the primary Federal entity responsible for incident preparedness and response, FEMA relies on the incident workforce to accomplish the mission of helping survivors in their time of need. FEMA's greatest asset is its workforce. A robust FQS and performance assessment are essential to have a fully trained and qualified workforce. The performance assessment system aligns directly to mission goals and demonstrates mission success through evaluation of the workforce.

The goal of performance assessments is to foster and build a culture of responsibility and ownership amongst the workforce. The system informs each employee what is expected during deployment and provides employees information about their measures of success. The performance assessment system holds individuals accountable for their performance. The system of accountability fosters a high-performing workforce trained and capable of serving the nation.

Performance evaluations will be produced by the supervisor of record or the temporary duty supervisor. The Cadre Coordinator, FTE Coordinator, RPM, and IM CORE Program Manager will collect the field performance evaluations.

## Individual Incident Performance Evaluation

Performance assessment during incidents should align to individual performance. The process is conducive to timely and meaningful feedback and should provide a framework for administrative and operational management decisions as it relates to deployed personnel. For FTEs (PFTs, TFTs, COREs, and IM COREs), these evaluations serve as supplemental materials in the overall annual appraisal process that is facilitated through the supervisor of record by the Agency. For intermittent employees, the evaluations serve as a means for timely feedback at the end of the deployment.

The process for conducting an incident performance evaluation includes the following elements:

54

- Every member of an incident workforce cadre who is deployed for 20 days or more shall receive an incident performance evaluation, in accordance with FD010-8, FEMA Incident Workforce Deployment, Section VIII.C, or superseding policy.
- The temporary duty station supervisor conducts FTE evaluations and provides them to the supervisor of record.
- The temporary duty station supervisor conducts IM CORE and Reservist evaluations and provides them to the respective IM CORE Program Manager or RPM.
- The temporary duty supervisor executes the performance evaluation.
- The Cadre Coordinator (or delegate including RPMs, FTE coordinator, or IM CORE Program Manager) assists with the performance evaluation process as needed.

Incident performance evaluations may be factored into an FTE's annual performance appraisal. The supervisor of record will consider the incident performance evaluation as he/she deems appropriate when completing the annual rating of record in accordance with FM 255-1-1-1, Employee Performance Management Program.

Temporary duty supervisors must also consult with the Employee Relations Branch in OCCHCO and the employee's supervisor of record when they encounter poor performance and provide all documents to the supervisor of record. Prior to initiating any personnel actions, the supervisor of record must consult with OCCHCO Employee Relations to ensure that any such actions are consistent with Merit Systems and Equal Employment Opportunity principles as well as FEMA policy.

Table 15 lists the offices that support the performance management process and the roles they play in the process.

**Table 15: Performance Management Support Roles**

| Who | What |
|---|---|
| IWMD | Coordinates with OCCHCO to ensure individual incident performance evaluations are being completed throughout the cadres |
| OCCHCO | Ensures guidance and processes for performance management are implemented |
| FCO/FDRC/ Office Director | Coordinates with Human Resources Specialists to ensure the completion of individual incident performance evaluation forms |

# CHAPTER 7: EQUIPPING MEMBERS OF A CADRE

This chapter is designed to present information on equipment provided to individual cadre members. It is imperative that cadre members have immediate access to fully functional, position-appropriate equipment to achieve optimum operational readiness for their assigned incident duties. A fully equipped cadre member has received standard issue FEMA equipment, cadre specific equipment as identified by cadre leadership, a FEMA badge, FEMA branded clothing, and a government issued credit card.

All cadre members will receive standard FEMA equipment during their onboarding with the Agency. Standard FEMA equipment for FTEs and IM COREs will be funded by the employee's home office. Standard FEMA equipment for FEMA Reservists will be funded from the Disaster Relief Fund and procured by LMD in coordination with the OCIO and the OCAO.

Table 16 outlines the roles and responsibilities for members of cadre management and specific offices supporting the cadres in relation to the equipping of the cadres.

Table 16: Roles and Responsibilities for Equipping Cadre Members

| | Equipment Issuance/ Funding | Identifying equipment requirements | Authorization for distribution | Equipment Budget Determination | Equipment Status | Equipment Tracking | Badging | Reasonable Accommodations |
|---|---|---|---|---|---|---|---|---|
| **Cadre Management** | | | | | | | | |
| Cadre Coordinator | | ● | ● | ● | ● | | ● | ● |
| Reservist Program Manager | | ● | | ● | ● | | | ● |
| IM CORE Program Manager | | ● | | ● | ● | | | ● |
| APO | ● | | | | | ● | | |
| OCIO | ● | | | | ● | | | |
| OCSO | | | | | | | ● | |
| IWMD | ● | | | | | | | |
| **Cadre Support** | | | | | | | | |
| Logistics Management Directorate | ● | | | ● | ● | | | |

57

# Principles for Equipping Members of a Cadre

FEMA's incident workforce must be able to quickly deploy and build upon operations in advance of, or following, an incident. To effectively support the incident workforce, FEMA's equipment strategy states that FEMA must:

- Ensure FEMA can regularly communicate with all members of the incident workforce (whether they are deployed or not) to ensure readiness; this includes access to the most current information about FEMA policies and programs, equipment upgrades, and completion of required training
- Leverage opportunities to increase efficiencies and reduce costs
- Ensure members of the incident workforce have access to equipment that is most appropriate for their job functions
- Comply with personal property regulations and policy

The determination on the type of equipment issued will be dependent upon the cadre member's FQS job title.

Cadre Coordinators will communicate operational equipment requirements that are beyond or in lieu of standard FEMA equipment to IWMD, who will coordinate with LMD and OCIO to ensure position-appropriate equipment is procured and readily available for distribution to meet operational requirements.

# Primary Responsibilities for Equipping a Cadre

## Cadre Coordinators

- **Identifying equipment requirements:** Cadres identify the specific equipment necessary to complete the mission and communicate these requirements to LMD. Cadre Coordinators identify the equipment needs of their entire cadre. Cadre Coordinators or their designees communicate with cadre members to determine the status of staff equipment and assist in addressing any issues.
- **Authorization for distribution:** The Cadre Coordinator authorizes the distribution of cadre specific equipment to cadre members.
- **Equipment budget determination:** The Cadre Coordinator provides cost estimates for equipment needs to LMD for FY budget requirements.
- **Equipment status:** Cadre Coordinators maintain accurate data related to the equipment status of Reservist and IM CORE cadre members and ensure that information is updated in the FEMA system of record by collaborating with the designated Cadre Accountable

Property Officer (APO) in the Property Management Division of LMD (LMD-PMD).[7] The Cadre Coordinator also coordinates with the cadre's APO to track and order equipment, or coordinate the repair of issued equipment as necessary. Cadre Coordinators are able to access data related to equipment issued to cadre members, which they use to monitor the equipment status of their cadre and ensure accountability and operability of all assigned equipment. Cadre Coordinators communicate to and work directly with LMD and OCIO to resolve any identified equipment shortfalls (e.g., expired, lost, or broken equipment) among Reservist cadre members.

- **Badging:** The Cadre Coordinator approves cadre members badging requests.
- **Reasonable Accommodations:** Cadre Coordinators communicate operational equipment requirements that are beyond or in lieu of standard FEMA equipment to IWMD, who then coordinate with LMD and OCIO to ensure position-appropriate equipment is procured and readily available for distribution to meet operational requirements.

## Reservist Program Manager and IM CORE Program Manager

- **Identifying equipment requirements:** In support of the Cadre Coordinator, RPMs and IM CORE Program Managers provide accurate information related to equipment distribution, maintenance, and accountability of Reservists.
- **Equipment Budget Determination:** The RPMs and IM Core Program Managers provide cost estimates for equipment needs to the Cadre Coordinator for FY budget requirements.
- **Equipment Status:** At the direction of the Cadre Coordinator, the RPM/IM CORE Program Manager ensures that information is updated in the FEMA System of Record, in coordination with LMD.
- **Reasonable Accommodations:** The RPMs and IM Core Program Managers communicate operational equipment requirements that are beyond or in lieu of standard FEMA equipment to the Cadre Coordinator, who coordinates with LMD and OCIO to ensure position-appropriate equipment is procured and readily available for distribution to meet operational requirements.

## Office of the Chief Information Officer

- **Equipment Issuance/ Funding:** OCIO coordinates with IWMD and OCCHCO to support the issuing and set up of information technology and communications equipment during the onboarding of cadre members. OCIO provides cost analysis and breakdown of information technology and communications equipment.
- **Equipment Status:** The OCIO identifies and informs IWMD and LMD-PMD on the information technology and communication equipment FEMA has approved for procurement to support equipping the incident workforce.

---

[7] An APO is an individual designated in writing to maintain the accountability for FEMA property (in use or storage) in accordance with a prescribed system that shows the authorized debits, credits, and available balances on hand, or obligated for use, for such an activity.

## Office of the Chief Security Officer

- **Badging**: OCSO coordinates with Cadre Coordinators, supervisors of record, and Regional Security Officers to provide Personal Identify Verification (PIV) applicants in the incident workforce with badges. All applicants must meet the minimum requirements for a PIV in accordance with HSPD-12 policy based on the individual's position sensitivity. A background status check will determine if the applicant meets all requirements for badging issuance.

## Incident Workforce Management Division

- **Equipment Issuance/ Funding:** IWMD serves as a coordination and information conduit to the various organizations involved in equipping cadre members of the incident workforce with standardized equipment. Through coordination and partnership with all stakeholders, IWMD ensures position-appropriate equipment is procured and readily available for distribution to meet all operational requirements.

## Federal Coordinating Officers

In the event the employee does not have standard equipment already issued to them, FCOs work with their Logistics Section Chief and Program Lead(s) at the JFO to distribute equipment for any cadre members in the incident workforce. FCOs coordinate with the Logistics Section Chief and incident site APO to ensure equipment distribution information is recorded in the FEMA System of Record and subsequently transferred to the cadre accounts maintained by LMD-PM APO's. FCOs ensure distributed equipment at the JFO is retained by the cadre member.

## Logistics Management Directorate

- **Equipment Issuance/ Funding:** LMD issues equipment for the following cadre members: IM CORE and Reservist, while OCAO issues equipment for PFTs and COREs with the appropriate funding to either LMD or CAO.[8] LMD PMD will coordinate with Cadre Coordinators to distribute equipment to employees at the beginning of appointments/onboarding and retrieve equipment at the conclusion of employment appointments, when applicable, or when the equipment is no longer needed. LMD-PMD coordinates with OCIO on the distribution and property accountability for any electronic communications. LMD assigns an APO to each cadre and one for IM COREs.

- **Equipment Status:** Designated cadre APOs initiate and complete reports of survey in accordance with applicable Agency directives for equipment reported as lost or damaged. LMD, in coordination with the OCAO, maintains formal accountability and reporting in the FEMA System of Record. LMD Property Management maintains accountable records for fund code 06 employees and Support Services and Facilities Management Division (within OCAO) arranges for Accountable Officer support for fund code 90 employees

---

[8] Federal Emergency Management Agency. *Federal Personal Property Management.* Directive Number FD119-7, REV: 02, Issue Date 09/24/2013.

assigned to fixed sites. The Distribution Management Division within LMD maintains lifecycle maintenance and inventory controls of selected equipment in storage and informs IWMD when new procurements are required.

# Processes for Equipping Cadre Members

The processes for equipping cadre members with the basic, non-cadre specific items they need to perform their basic functions are provided below. Processes for equipping cadre members with cadre specific/unique equipment are not addressed below and should be contained in individual cadre standard operating procedures.

## Information Technology Equipment

Figures 4, 5, 6, and 7 below show the different processes for equipping various employee types with IT components, and for IT equipment replacement.



**Figure 4: Process for Equipping a New Reservist and IM CORE: FIWA**



**Figure 5: Process for Equipping a New Reservist and IM CORE: Deployment to a JFO**



**Figure 6: Process for Equipping a New PFT and New CORE**



**Figure 7: Process for Equipment Replacement**

A Cadre Coordinator may arrange for equipment to be issued during a mass cadre-specific training event. If a new hire's entry date falls close to FQS training, the equipment issuance may be rolled into that event.

See appendix H for more information on equipping the Reservist and resolution of equipment issues.

## FEMA Branded Clothing

Cadre Coordinators provide FEMA clothing to its members if they are serving in a public-facing job title. Cadre management and incident personnel use FEMA-branded equipment in accordance with FD123-18, Standard FEMA-Distinctive Clothing.

## Government Issued Charge Card

FTEs with IM positions, Reservists, and IM COREs receive travel cards through their supervisor of record. Cadre Coordinators inform the FTE supervisor of record that their employees are required to have a government issued charge card in good standing to deploy in their incident management roles. The supervisor of record contacts the appropriate Organizational Program Coordinator as soon as an entry onto duty notification is received from OCCHCO to ensure the expeditious delivery of the charge card.

## Badging Information

Every FEMA employee is required to retain a valid, federally-issued government identification card (FEMA PIV card) for the purpose of accessing Federal facilities and certain government issued equipment (laptop). The issuance and replacement of badges can be accomplished by coordination with facilities within 65 miles of applicant such as: regional offices, headquarters, transitional recovery offices, incidents, special badging assignments, or other nationwide DHS PIV card issuance facilities. Personnel who resign their position, are terminated, or no longer require a badge or credential, must forward item(s) to FEMA HQ Access Control Office, 500 C Street SW, Washington, DC 20472-3100. Upon notification, FEMA HQ Access Control Office

officially notifies the employee to return all FEMA issued badges, credentials, and equipment. Items will be returned at government's expense, utilizing appropriate tracking methods.

## Cadre Specific Equipment

Cadre specific supplemental and/or ancillary equipment is identified and reported to LMD by the Cadre Coordinator. Processes and procedures associated with the issuance and return of these items are addressed in cadre-specific standard operating procedures.

## Reasonable Accommodations

Deciding officials forward all adjudicated requests from all members of the cadre to OER for recordkeeping and reporting purposes in accordance with existing FEMA reasonable accommodation policy guidance. Funding for reasonable accommodations for Reservists is provided by IWMD from the Disaster Relief Fund. IWMD, in collaboration with OER, funds approved requests for reasonable accommodations. The Cadre Coordinator tracks all reasonable accommodation requests from origin to fulfillment. The Cadre Coordinator, along with IWMD and OER, conduct this approval process. .

## Support in Equipping a Cadre

Cadre Coordinators ensure the accountability of standardized equipment for members of their cadre. Table 17 outlines support and points of contact for equipping a cadre to provide guidance and responsibilities for stakeholders vested in equipment issuance, maintenance, and accountability.

**Table 17: Cadre Equipping Support Roles**

| Who | What | Why |
|-----|------|-----|
| OCCHCO | • Onboarding process for FTEs<br>• Onboarding Entry on Duty training | • Coordinates the hiring and onboarding for FTE new personnel |
| LMD | • Order equipment<br>• Issuance of equipment<br>• System of record<br>• APO coordination | • Coordinates equipment orders with Distribution Management<br>• Distributes and tracks assigned equipment<br>• Updates the FEMA System of Record to reflect issued equipment<br>• Orders or coordinates the repair of selected government issued equipment |
| OCIO | • Information technology and communication equipment | • Sets standards and specifications for IT procurement<br>• Maintains contracts with wireless service for communication equipment |
| OCAO | • Property accountability and reporting | • Maintains data in the FEMA System of Record<br>• Provides reports of survey for all FTE property |
| FCO | • JFO activities | • Allows the distributed equipment at the JFO<br>• Is responsible for overall equipment efforts at the JFO |
| RPM | • Reservist activities | • Provides accurate information related to equipment distribution, maintenance, and accountability of Reservists |
| IM CORE Program Manager | • IM CORE activities | • Provides accurate information related to equipment distribution, maintenance, and accountability of IM COREs |
| OER | • Reasonable accommodation | • Provides technical assistance to deciding officials to ensure that equipment and services are appropriate to accommodate employee's disability in accordance with the time frames established in existing FEMA reasonable accommodation policy |
| OCSO | • Badging | • Provides HSPD-12 PIV card badge issuance and Identity and Credential Management support |
| Pasadena Call Center | • Reservist equipment status | • Maintains and monitors equipment readiness data via updates to equipment status information provided by the Reservist workforce through email and telephone surveys |

# CHAPTER 8: CADRE READINESS ASSESSMENT

The purpose of this chapter is to summarize the various aspects of cadre readiness and inform leadership about the incident management cadres' ability to perform operations in the field/at the incident level.[9] Cadre readiness and its assessment is targeted at ensuring that cadres can apply the right person with the right skill at the right time in the event of an emergency, but should not be considered a comprehensive evaluation of a cadre's overall capabilities. Because these assessments are objective in nature, there are many subjective aspects of cadre performance not captured in these readiness assessments that vary by cadre and must be monitored and enforced by cadre management (e.g., exercises).

## Principles of Cadre Readiness Assessment

To provide cadre and FEMA leadership with a transparent picture of incident management cadre readiness, IWMD produces an objective report that demonstrates cadre readiness across various staffing, equipping, and training metrics. The primary combined cadre reporting tool used for this purpose is the *Cadre Operational Readiness and Deployability Status (CORDS)* report. Additionally, IWMD provides cadre management teams with access to the individual readiness data for all employees within their incident management population. Once fully implemented, both the CORDS report and the individual readiness data will be available in a real-time dashboard using the deployment and training system of record.

In the broadest sense, the CORDS assessment enables cadre managers and FEMA leadership to identify resource needs (personnel, equipment, and/or training) that will improve FEMA's ability to rapidly respond and appropriately sustain operations to meet the needs of survivors. The assessment will also inform a force structure assessment to help FEMA maintain an appropriately balanced workforce.

The CORDS report uses three categories to measure cadre performance (and variables within the category):

- **Staffing:** This includes cadre force strength, staff availability both of force strength (percent available to deploy out of those with incident management titles in a given cadre), and of force structure (the percent of employees available if the cadre were at full strength*)*, percent deployed and percent who have requested non-availability.
- **Training:** This includes the qualification percentage across the cadre in primary FQS job titles both out of current force strength (percent of those in the cadre who are currently qualified in their primary FQS job title) and out of force structure (the percent of qualified employees if the cadre were at full strength).

---

[9] The current list of IM Cadres can be found in appendix I. Appendices K-T contain additional information that may be helpful to the FEMA incident workforce.

- **Equipping**: This includes the measure of equipment readiness based on the percent of Reservists and IM COREs who have their standardized equipment on-hand.

This assessment uses objective metrics from the current systems of record to enforce use of these systems.

## Readiness Scores

The CORDS report can be considered a readiness report card indicating current-time health of the incident workforce. The CORDS algorithm assigns an overall Deployability-Rating (D-rating) to each cadre based on these pre-defined weights and thresholds. The percentages, weights, and qualifying thresholds used to "grade" the workforce, both within variables and categories, may adjust over time based on programmatic and leadership priority changes. The D-ratings will be established and maintained by the IWESC.

The readiness report card is a reflection of FEMA's ability to respond, and not solely a reflection of a cadre's performance. The cadres have a responsibility in ensuring their cadre is mission ready, as do the enabling organizations within the Agency.

## Assessment Methodology

To fully enforce the FEMA systems of record used to deploy the incident workforce, the systems of record will feed the CORDS and individual readiness data. All staffing and training metrics are pulled from the deployment and training systems of record. The equipment metrics are currently pulled from a survey-based system and eventually will be a data feed from the property book system of record to the deployment and training system of record. These systems of record pull their data from other sources (e.g., National Finance Center, National Emergency Training Center, etc.) and as such, processing and transaction delays will result in a slight variation to the results.

Categories are weighted to determine the overall D-rating with an emphasis on the *Staffing* category. Staffing is most heavily weighted to acknowledge that in critical situations, FEMA has the ability to surge equipment and execute on-the-job training, but may risk mission success when its cadres are not staffed in accordance with the force planning models.

## Responding to Cadre Scores

The CORDS report will allow the cadre management team and its leadership to take the appropriate corrective action to improve cadre readiness. Cadre Coordinators should formally submit resource requests beyond their internal capability to the CCWG.

# CHAPTER 9: COMMUNICATION AND COORDINATION

This chapter is designed to identify and describe methods for Cadre Coordinators to use in effectively communicating to members of their respective cadres. It provides guidance on communication and coordination efforts across all levels of the incident workforce and identifies best practices.

## Principles of Communication

To achieve the goal of a more-ready workforce, FEMA's cadre management communication guidance outlined below recognizes the need to increase awareness and understanding across the entire incident workforce regarding staffing, training, qualifying, equipping, and performance management processes and objectives. It further aims to increase buy-in and commitment from all stakeholders to maintain high-readiness levels.

FEMA has developed a number of methods and systems to support clear, consistent communication practices. These methods and systems include the use of individual readiness data, blast communications, coordination calls, and web-based collaboration sites. They are designed to support information sharing at the individual and collective levels and to ensure all employees, regardless of duty location, have access to the information they need to be successful. These tools will also support cadre management personnel in building a culture that prioritizes readiness and increases trust between all members of their respective cadres. FEMA aims to foster open lines of communication between senior leadership, management, and cadre members/employees, which will further contribute to the overall readiness and ability to respond as an agency.

While FEMA's distributed workforce will likely challenge Cadre Coordinators' ability to reach their respective incident workforce members, a varied communications strategy will assist them in leading all members of their team. To the greatest degree possible, all communication media should utilize, as necessary, alternative formats and other accommodation measures to ensure that cadre members have equal access to communications.

## Data Sharing

As described in the previous chapter, IWMD will assist all cadres in measuring their collective readiness through the development and distribution of the CORDS report. IWMD will also provide each Cadre Coordinator individual readiness data. The individual readiness data will provide availability, training, qualification, and equipment status of each member of their cadre.

This data will provide the Cadre Coordinator with an accurate picture of their cadre without requiring cadre management personnel to access multiple tools and databases. It will serve as a

ready reference of each employee's readiness to deploy, and will help Cadre Coordinators provide guidance and direction to each of their cadre members as they move through the training and qualification process. In addition, the individual readiness report will help Cadre Coordinators plan for the future needs of their cadre. It will allow Cadre Coordinators or Cadre Training Managers to identify common training and educational requirements and help enable them to prioritize course development or execution.

IWMD will maintain a system of record that captures readiness data pertaining to the incident workforce. When necessary, IWMD will ensure these systems interface with those of other divisions, directorates, and regions (IWM Liaison Teams) to ensure an accurate picture of readiness can be established.

## Cross Cadre Collaboration

In addition to regularly convening the CCWG, IWMD will support collaboration across cadres by maintaining a cadre management SharePoint site. The site, accessible to all cadre management personnel and members of the incident workforce, will house all policy and guidance documents, memos, manuals, and standard operating procedures pertinent to the incident workforce. The site will also house contact information of all cadre management personnel. IWMD will update the SharePoint site regularly and will communicate changes to the site to all stakeholders.

Separate from formal meetings of the CCWG, IWMD will host twice-monthly cadre management coordination calls to support day-to-day collaboration. These meetings will be open to all cadre management personnel including Cadre Coordinators, RPMs, FTE Coordinators, IM CORE Program Managers, Cadre Training Managers, and Regional IWM Liaison Team members. IWMD will schedule meetings, ensure dial-in capability is provided, distribute the agenda, and capture key discussion items for distribution to the group. If recurring issues are identified during these collaborative meetings, IWMD will ensure they are formally considered by the CCWG.

## Cadre Governance and Oversight

IWMD will ensure decisions made by the IWESC or CCWG are shared with the leadership of each cadre and regional stakeholders. The Director of IWMD, as the Chairman of the CCWG, will provide a summary of CCWG discussions to all CAs, COs, and Cadre Coordinators. The Director will also ensure issues identified by the CCWG that require the attention of the IWESC are conveyed to the DDO as the Chairman of the IWESC. In addition, the Director of IWMD, will distribute a summary of decisions from any IWESC meeting to all CAs, COs, and Cadre Coordinators. Cadre Coordinators should share information on any changes with their staff.

69

## Pasadena Call Center

IWMD will maintain a Call Center in Region IX, which will remain a point of engagement for FEMA employees. The Pasadena Call Center will remain open Monday-Friday to handle questions pertaining to any incident workforce issues.

# Coordination/Communication with Cadre Members

All Cadre Coordinators, RPMs, FTE Coordinators, Cadre Training Managers, IM CORE Program Managers, and Regional IWM Liaison teams, as applicable, will regularly communicate with each other and the individual employees of their cadre. As changes in policy or procedure affecting the incident workforce occur, and/or if an incident requiring the deployment of a large portion of the cadre takes place, cadre management personnel will communicate those changes to all cadre members in a timely manner. They will use a variety of communication methods to ensure information is passed effectively, including email blasts, quarterly teleconferences, mass mailings, and personal phone calls. Cadre management personnel will maintain accurate records of contact information for all members of their cadre. This communication should include messages to the entire cadre as well as individual outreach.

Cadre management personnel will endeavor to reach all personnel within their cadre individually to address their specific concerns. At least annually, each Cadre Coordinator, or RPM, FTE Coordinator, and IM CORE Program Manager, as applicable, will call every cadre member to validate the individual readiness data. If that information is not accurate, the Cadre Coordinator will record the discrepancy and take appropriate actions to correct the information. This may include gathering training certificates to update the employee's training record or collecting equipment barcodes. The Cadre Coordinator will then convey that information to IWMD so that it can be corrected in the appropriate data system.

## Annual Individual Readiness Cadre Call

All Cadre Coordinators, RPMs, FTE Coordinators, and IM CORE Program Managers, as applicable, will contact each cadre member individually on at least an annual basis, in addition to regular outreach and communication actions. The call should be geared towards policy updates, program changes, problem solving, lessons learned, and best practices, not just as a status check. Following are the steps involved in conducting annual individual readiness cadre calls:

### Preparation

1. E-mail communication to all cadre members announcing period of time when call will be conducted
   a. Include information regarding the nature of the call
   b. Inform cadre members of any information they will be asked to provide on the call (e.g., equipment serial numbers, availability status, etc.)
2. Review individual readiness data and make sure contact information for each employee is available

70

3. If any information will be requested on the call, ensure form is developed to capture information. Coordinate form with IWMD to ensure information collected can be input in the relevant system following the calls.

## During Call

1. Review individual readiness data with the cadre member and validate information on file
   a. Make sure contact information for each employee is accurate
   b. Make sure training and qualification status is accurate
   c. Review performance evaluations on file, if applicable
2. Record any discrepancies in employee's file
3. Keep track of length of call with each Reservist to ensure compensation in accordance with the Fair Labor Standards Act
4. Answer any questions the cadre member has and make note of any additional follow-on actions

## Following the Call

1. Pass any corrections in the employee's individual readiness data to IWMD for correction in the system of record
2. Update cadre rosters or contact information documents as necessary
3. Follow-up on any additional requests

# Quarterly Cadre Coordination Call

Cadre Coordinators have funding for Reservist participation up to 32 hours per year, eight hours per quarter, in order to coordinate with their cadre members via quarterly call. The procedures for this call are noted below. When desired, Cadre Coordinators can utilize additional tools such as Adobe Connect to support this call. Detailed instructions for setting up webinars through Adobe Connect can be found on the FEMA intranet at: http://on.fema.net/employee_tools/it_tools/esd/Pages/adobeconnect.aspx.

## Preparation

1. E-mail communication to all cadre members announcing call
   a. Include RSVP instructions, especially for Reservists so that their time can be accounted for
   b. Include meeting agenda with a precise purpose of the call noted
   c. Consider having call captioned
2. For Reservists, identify a "timekeeper" in WebTA
3. Evaluate each Reservist's WebTA profile and ensure they are currently active in the system to process their WebTA. With FEMA's newly implemented process, non-deployed status Reservists in the deployment system have their WebTA profiles automatically deactivated.

## During the Call

1. Identify participants on the call
   a. It is not recommended to have each cadre member announce themselves on the call
   b. Options for managing calls in larger cadres include:
      i. Requesting cadre members to e-mail the designated cadre mailbox and confirm their participation in the call, or
      ii. Setting up the call via Adobe Connect to record all active participants
2. Identify any "high level" issues that may require follow-up by the Cadre Coordinator or leadership
3. Keep the call focused to a specific topic and monitor the length of the call (as only a specific amount of time has been allocated to compensation for Reservists)

## Following the Call

1. Cadre Coordinator will provide list of confirmed Reservists to designated Timekeeper
   a. Review and certify time
   b. E-mail Reservists when time has been processed and validated in WebTA
2. E-mail a compilation of the questions and responses from the call, and address any that could not be answered during the call
3. Include in closeout e-mail the date for the next scheduled call
4. Remind cadre members of the cadre's main mailbox
5. Remind/reiterate any staff points of contact that handle specific functions for your cadre to include Reservists

# ANNEX 1: ACRONYMS

**ACQ**        Acquisitions

**ADR**        Alternative Dispute Resolution

**APO**        Accountable Property Officer

**CA**         Certifying Authority

**CCWG**       Cadre Coordinator Working Group

**CO**         Certifying Official

**CORDS**      Cadre Operational Readiness and Deployability Status

**CORE**       Cadre of On-call Response Employees

**DDO**        Director of Disaster Operations

**DEC**        Disaster Emergency Communications

**DFTO**       Disaster Field Training Operations

**DHS**        Department of Homeland Security

**DI**         Disability Integration

**DSA**        Disaster Survivor Assistance

**EA**         External Affairs

**EHP**        Environmental and Historic Preservation

**EMI**        Emergency Management Institute

**ER**         Equal Rights

**ERF**        Employee Request Form

**FA**         Financial Management

**FCO**        Federal Coordinating Officer

**FDRC**       Federal Disaster Recovery Coordinator

**FEMA**       Federal Emergency Management Agency

**FIWA**       Federal Incident Workforce Academy

**FQS**          FEMA Qualification System

**FS**           Force Structure

**FTE**          Full-Time Equivalent

**FTL**          FQS Transmittal Log

**HR**           Human Resources

**IA**           Individual Assistance

**ICS**          Incident Command System

**IM**           Incident Management

**IMAT**         Incident Management Assistance Team

**IT**           Information Technology

**IWESC**        Incident Workforce Executive Steering Committee

**IWM**          Incident Workforce Management

**IWMD**         Incident Workforce Management Division

**JFO**          Joint Field Office

**LAW**          Legal Assistance

**LMD**          Logistics Management Directorate

**LOG**          Logistics

**METL**         Mission Essential Task List

**MIT**          Mitigation

**NCCC**         National Civilian Community Corps

**NDRS**         National Disaster Recovery Support

**NRCC**         National Response Coordination Center

**OCAO**         Office of the Chief Administrative Officer

**OCC**          Office of the Chief Counsel

**OCCHCO**       Office of the Chief Component Human Capital Officer

**OCIO**      Office of the Chief Information Officer

**OER**       Office of Equal Rights

**OPM**       Office of Personnel Management

**OPS**       Operations

**PA**        Public Assistance

**PFT**       Permanent Full Time

**PIV**       Personal Identity Verification

**PL**        Planning

**PMD**       Property Management Division

**PTB**       Position Task Book

**QRB**       Qualification Review Board

**RA**        Regional Administrator

**RPM**       Reservist Program Manager

**RRCC**      Regional Response Coordination Center

**RSV**       Reservist

**SAT**       Systems Approach to Training

**SCF**       Surge Capacity Force

**SEC**       Security

**SF**        Safety

**SLTT**      State, local, tribal, and territorial

**SME**       Subject Matter Expert

**TFT**       Temporary Full Time

**TIAS**      Training Information Access System

# ANNEX 2: GLOSSARY

**Available:** The status of a FEMA incident workforce member who can readily deploy in support of an incident in either an Incident Management or Incident Support role.

**Cadre**: A group of FEMA FTE and intermittent employees organized by operational or programmatic functions and FQS positions that perform disaster-related duties during FEMA incident operations.

**Cadre Coordinator:** Each incident workforce cadre shall maintain one Cadre Coordinator, who has delegated authority from the CA to oversee all aspects of day-to day cadre management, including staffing, equipping, training, qualifying, and performance of the cadre and its members.

**Cadre Management:** The administration, coordination, and professional development of a FEMA cadre to ensure individual and collective operational readiness to perform disaster-related duties.

**Candidate:** An individual who is qualified in at least one FQS position and selected by a CO to open a new PTB for a higher FQS job title.

**Certification:** The validation and affirmation of the qualifications process for a FEMA FQS position.

**Certifying Authority (CA):** The CA is the highest-ranking FEMA official—Assistant Administrator equivalent or higher—for the cadre. The CA may delegate FQS authority (in accordance with the FQS Guide) and cadre management authorities to the Certifying Official and/or Cadre Coordinator, but ultimately bears responsibility for the effective management and performance of the cadre.

**Certifying Official (CO):** The CO is designated by the CA to manage FQS for a specific incident workforce cadre, including having the authority from the CA to issue PTBs and certify individuals for specific FQS positions. The CO cannot delegate this authority.

**Coach-Evaluator**: An individual certified by FEMA as an evaluator who is qualified in the position being evaluated and is assigned at an incident to mentor and/or evaluate a trainee's/candidate's performance. For tasks completed in a simulated environment (classroom, exercise, or simulation), successful completion of each task is documented by the instructor or assigned evaluator. A coach-evaluator is usually the same person providing instruction as a "coach" and subsequently evaluating the performance as an "evaluator."

**Decertification:** The process of rescinding an FQS qualification of an individual.

**Deployment:** The movement of personnel based on official orders to a temporary duty station to fulfill incident management or support requirements, including training related to those duties.

**Director of Disaster Operations (DDO):** A senior FEMA official designated by the FEMA Administrator to coordinate and synchronize all headquarters activities for credible threats as well as during major disaster or emergency activations. The DDO provides operational guidance and direction to the Chief of the National Response Coordination Staff.

**FEMA Qualification System (FQS):** A performance-based system for certifying FEMA employees as "Qualified" or "Trainee" in incident management and incident support positions; certification is based on successful completion of required experience, required training, and demonstrated performance.

**Final Evaluator:** The official responsible for signing the verification statement that all tasks have been certified in a trainee's/candidate's PTB by an evaluator and recommending that the trainee/candidate be considered for certification in the position.

**Force Package:** A predefined, standardized grouping of teams, personnel, and/or equipment to provide a specific programmatic or operational function.

**Force Strength:** The actual number of members in FEMA's incident workforce cadres who are qualified or trainees, and who are equipped for deployment.

**Force Structure:** A FEMA model that establishes incident personnel staffing requirements based on analysis of historical deployment data, readiness requirements, and likely future conditions.

**Full-Time Equivalent (FTE) Employee:** Includes PFT Employees, TFT Employees, and COREs.

**Incident Command System (ICS):** A standardized on-scene emergency management construct specifically designed to provide an integrated organizational structure that reflects the complexity and demands of single or multiple incidents, without being hindered by jurisdictional boundaries. ICS is the combination of facilities, equipment, personnel, procedures, and communications operating within a common organizational structure, designed to aid in the management of resources during incidents. It is used for all kinds of emergencies and is applicable to small as well as large and complex incidents. ICS is used by various jurisdictions and functional agencies, both public and private, to organize field-level incident management operations.

**Incident Level:** The level for which control of FEMA incident operations, including the Federal resources deployed to an incident and the establishment of a Unified Coordination Group, is delegated to the FCO or Federal Resource Coordinator.

**Incident Management:** The incident-level operation of the Federal role in emergency response, recovery, logistics, and mitigation. Responsibilities include the direct control and employment of resources, management of incident offices, operations, and delivery of Federal assistance through all phases of response and recovery.

**Incident Management COREs (IM COREs):** A CORE whose primary job duty is to perform an FQS incident management position above all other potential assignments.

**Incident Management and Support Keystone:** A FEMA document that establishes the foundational doctrine that guides FEMA's conduct of incident operations, including those undertaken based on a threat, in anticipation of or preparation for a significant event, or in response to an incident that has already occurred.

**Incident Management Assistance Team (IMAT)**: A NIMS/ICS-compliant, self-sufficient, highly mobile, rapidly deployable emergency response team organized and equipped to effectively manage all Federal support to a State, local, tribal, or territorial government during natural disasters, acts of terrorism, or other man-made disasters. For Stafford Act incidents, the primary mission of an IMAT is to organize and manage a coordinated and successful response and recovery operation to meet the emergent needs of State and local jurisdictions.

**Incident Management Typed Positions**: Positions for which different qualification levels called types have been established that reflect the size and complexity of the incident, based on FEMA incident levels, in which the employee is required to perform. Typed positions include FCOs and Command and General Staff positions, which are typed at levels I, II, and III to coincide with Level I, II, and III incidents; Branch Director positions are typed at levels I and II. An employee who is qualified for a typed position may fill his/her position in any incident level at or below his/her type. For example, type I staff members may be assigned to level I, II, or III incidents; type III employees may not be assigned to level I or II incidents (except as a trainee/candidate for a higher typed position).

**Incident Support:** The coordination of all Federal resources that support emergency response, recovery, logistics, and mitigation. Responsibilities include the deployment of national-level assets, support of national objectives and programs affected during the incident, and support of incident operations with resources, expertise, information, and guidance.

**Incident Workforce:** Individuals assigned to perform disaster-related duties in FEMA incident operations.

**Position Qualification Sheet:** A written document that identifies required experience, training, and external certification (if any) for a given position.

**Position Task Book (PTB):** A document that lists the critical behaviors, activities, and tasks required to become certified for a given incident management or incident support position within

FQS; successful completion of all tasks in the PTB, as determined by an authorized FQS evaluator, is the basis for recommending a trainee or candidate for certification.

**Program**: The FEMA component or office with authority for and oversight of the functions for which a particular cadre is responsible.

**Qualifications Review Board (QRB):** A group convened to evaluate employees' qualifications against established standards and provide fair and consistent recommendations for certification (including recertification or decertification).

**Qualified:** An individual who has met qualification requirements under FQS and received a qualification letter from his or her Certifying Authority.

**Readiness:** The condition of an individual, team, group, or organization that demonstrates their ability to meet a designated assignment.

**Recertification:** The process of reinstating the qualifications and certification of an employee.

**Reconsideration:** A process of reviewing a decision by a CA, based on a trainee's/candidate's written request within 60 days after receipt of a decision, with the intent of reversing or modifying the requester's incident qualification status.

**Reservist:** Employees appointed under Stafford Act authority, who work intermittently as required in support of incident operations.

**Subject-Matter Expert (SME):** A person who is an expert in a particular area or topic.

**Subordinate Job Title:** A job title that falls under an employee's FQS primary job title in the career progression chart. Subordinate job titles do not count against force structure numbers.

**Supervisor of Record:** The supervisor with the responsibility to exercise independent judgment to direct that employee on all matters relating, but not limited to, assignment and evaluation of work, administration, training, property accountability, and to discipline or terminate the employee.

**Temporary Duty Supervisor**: The manager under whose supervision a deployed employee will work.

**Temporary Full Time (TFT)**: An employee assigned a full-time work schedule and provided either a term appointment under 5 C.F.R. Part 316, subpart C or a permanent appointment under 5 C.F.R. § 213.3102(c).

**Trainee:** An individual that has an open PTB for an entry-level position in a cadre. A trainee does not hold any FQS qualification.

# APPENDIX A: GUIDANCE FOR WORKING AT THE RESIDENCE OF RECORD OR AT AN ALTERNATE LOCATION WHEN ON TEMPORARY DUTY

1. Work may not be performed from these locations if the work involves classified materials and/or requires daily face-to-face contact.
2. Information that is For Official Use Only may be accessed using employee-owned equipment and may only be saved on government-issued equipment.
3. Performance will be evaluated consistent with FEMA policy on Performance Management.
4. Expected work hours must be established in advance. Any work that would result in premium or overtime pay must be ordered and approved in advance in accordance with FEMA Manual 253.2-1 *FEMA Premium Pay Manual*.
5. An employee is covered by the Federal Employees Compensation Act at either of these worksites as long as the injury occurred while performing his/her official duties and in the designated work area approved by the Cadre Coordinator/functional supervisor. If an injury occurs, the employee must notify the supervisor of record (and temporary duty supervisor, if applicable) immediately, provide the details of the accident or injury, and complete Department of Labor CA-1, Federal Employee's Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation. The government is not liable for damages to the employee's personal or real property while the employee is working in either of these locations, except to the extent the government is held liable under the Federal Tort Claims Act or the Military and Civilian Employees Claims Act.
6. <u>For Reservist or IM CORE working from the residence of record:</u>
   a. For Reservists: Certain discrete, disaster related tasks and activities may be suitable for completion from the official duty station, when it is the residence of record. The CO will define the positions, if applicable, in his/her cadre that are authorized to complete work from home. For these authorized positions, the Reservist's RPM, or Cadre Coordinator if no RPM exists, must approve the completion of the task and ensure that the Reservist has been issued the proper equipment to perform the task. For IM COREs: The supervisor of record has broad discretion to assign work to be completed from the residence of record but must provide proper supervisory oversight.
   b. Prior to approval of any work at the residence of record, the employee must affirm to his/her supervisor of record that the residence of record is free from hazards and a safe environment in which to perform the assigned tasks(s); that the

employee will arrange for dependent care during the completion of the task (if applicable); and that he/she understands that the Government will not be responsible for any operating costs that are associated with the use of the employee's residence of record as an official worksite. The employee should refer to FEMA Form 123-9-0-2, Certification of Health and Safety Checklist when determining if his/her residence of record is free from hazards, but is not required to complete and submit the checklist to his/her supervisor of record. If the employee cannot agree to these conditions or the supervisor of record learns that the employee is not properly equipped to complete the requisite task, the supervisor of record must assign the task to a different employee.

c. Reservists and IM COREs who have already on-boarded at the time of publication of this policy whose position has been authorized for telework by their CO and who have completed a telework documentation package, in compliance with FEMA Manual 123-9-1, need not complete the preceding steps, despite the reality that working from their official duty station is not telework if their official duty station is their residence of record.

d. IM COREs and Reservists who are activated for training, cadre coordination meetings, or to update their equipment from their official duty station, when it is the residence of record, need not complete the preceding steps.

All employees who are deployed are on official travel, which is excluded from the definition of "telework" in the Telework Enhancement Act, OPM guidance and FEMA Manual 123-9-1 *FEMA Telework Policy*.

1. Even though not considered to be "telework," the following reasons may support approval of work at an alternative location while deployed, such as in a hotel room: (1) the employee has a need for uninterrupted time of five working days or fewer to complete work on a complex project or report; (2) an employee is recovering from an injury or illness, such as a contagious disease, and is temporarily unable to physically report to the temporary duty station, but is still able to work; or (3) the temporary duty station to which the employee is assigned is temporarily closed or inaccessible.[10] If the employee has a need for uninterrupted time of more than five work days to complete work on a complex project or report, the employee's temporary duty station supervisor must obtain approval from his/her Branch Chief prior to the employee commencing work at the alternative location.

2. The employee must have the proper equipment to complete the assigned duties.

---

[10] Working from a deployed employee's TDY lodging may be appropriate in lieu of administrative leave in circumstances where the temporary duty station is closed or inaccessible. See FM 253-4-1 for additional guidance on administrative leave for Reservists. Consult with OCCHCO for additional guidance on administrative leave for other appointment types.

3. The employee's temporary duty station supervisor must determine that working from the alternative location is appropriate for mission requirements and must clearly communicate expectations for completion of the tasks and the hours of work.

4. The temporary duty supervisor may modify the work arrangement or direct the employee to return to the temporary duty station to complete the task for any reason, including when the supervisor has determined that the employee is not performing the task according to expectations. In such circumstances, the supervisor should document this poor performance and include this feedback in the employee's deployment evaluation, coordinating with the employee's supervisor of record and OCCHCO as necessary.

5. This policy does not apply to circumstances in which deployed personnel perform mobile work, i.e., routine and regular travel to conduct work in other worksites as opposed to a single authorized alternative worksite. One form of mobile work on TDY is commonly known as "field work," in which a deployed employee performs work in various locations in support of Stafford Act activities and does not regularly work at a temporary, fixed facility.

# APPENDIX B: SYSTEMS APPROACH TO TRAINING[11]

## A Systems Approach to Training Management

Cadre training programs must pursue incident requirements while also meeting personnel and fiscal requirements. High personnel tempo, increased operational tempo, and decreased funding combine to present FEMA leaders at all levels with real challenges that directly impact operational readiness. Regardless of the challenges, all must continue to meet their mission requirements.

Training management focuses training on the tasks essential to a cadre's incident capabilities in a manner that maximizes results and focuses priorities. Training management relies on a systems approach to training (SAT) to incorporate FEMA training principles into course curricula, SAT is a systematic and problem solving model used to effectively develop FEMA's entire incident workforce training.

The SAT recognizes that proficiency cannot be achieved and sustained on every possible training task – FEMA has neither the funds nor the time for such an endeavor. As a result, SAT provides needed training management techniques to analyze, design, develop, implement, and evaluate performance-oriented training. It guides cadre managers and unit leaders in the use of scarce resources by identifying critical incident tasks and determining where resources are needed most to maintain readiness. Both formal schools and operational units can apply the SAT to improve operational efficiency and maintain readiness. For instance, if applied in a formal school setting, a program of instruction is generated; in an operational unit/team, a short-range training plan is generated.

No matter how it is applied, the SAT process, in regard to training management, consists of five phases: analysis, design, development, implementation, and evaluation.

---

[11] Additional guidance is currently under development by OCCHCO.



**Figure 8: SAT Process**

# System Phases

## Analysis

The *Analysis Phase* provides a method of responding to changes in resource requirements, solving mission performance problems, and learning from *"real world"* experience. In the analysis phase, detailed practical studies are performed to determine the incident tasks or areas that require instruction, the learning characteristics of the training audience, the cost-effectiveness of a selected delivery system (e.g., technology based training ), and the scope, timeline, and budget of a training project/program. These facts are gathered to make informed training development decisions and provide the linkage between mission and the training program. The following types of analysis may be completed:

- Needs or Performance Analysis
- Audience or Learner Characteristics Analysis
- Mission/Task Analysis
- Skill/Knowledge (Competency) Analysis
- Content, Learning, and/or Instructional Analysis

## Design

The *Design Phase* uses the performance information collected in the analysis phase to help the training project or program take shape. The information gathered specifies, in measurable terms, the knowledge, skills, and aptitudes the training will develop. This phase will lead to the creation of learning objectives, which are developed for groups of related knowledge and skills. These

written statements of learning outcomes define exactly when, what, and how well the learner must perform during training. Defining how individual tasks are performed focuses training development efforts. In addition, the information gathered permits more effective decisions regarding such things as:

- How the training materials will be organized and presented
- Which training activities and instructional strategies will be included
- How much time will be spent on each topic
- How to use presentation media
- How incident workforce members will be evaluated

The design phase will also consider how to best measure the achievement of course objectives. Evaluation instruments (practical measures as well as written/knowledge tests) will be produced to ensure that learning objectives are achieved and competencies are reliably evaluated.

## Development

The *Development Phase* organizes the instructional materials needed for incident workforce members to achieve the learning objectives. Activities are defined and these activities describe how the instructor and the incident workforce member will perform during training to achieve the learning objectives. Emphasis is on maximizing the use of existing materials and resources. Existing suitable training materials and lesson plans are selected and new ones produced as needed. Resulting training materials are reviewed for technical accuracy, tried out using a focus group, and revised as necessary. Standards-based, performance-oriented training materials are the products of this phase.

## Implementation

The *Implementation Phase* is the process of putting the training project/program into operation. In this phase, the finalized training is ready to be delivered to the target audience. If the training is to be instructor-led or facilitated, instructors are selected and trained usually with a train-the-trainer session. Training is delivered as planned, and cadre member and instructor performance is evaluated. These evaluations serve two purposes. First, they verify that learners have achieved the learning objectives. Second, incident workforce member evaluation results and instructor comments are useful for future program revisions and follow-up evaluation.

## Evaluation

The *Evaluation Phase* (or Control Phase) ensures the training project or program's continuing ability to produce qualified incident workforce members. A follow-up evaluation is conducted to get an assessment of how well the training prepared the incident workforce member to perform their mission in the field/at the incident level, for a period of time. Evaluation is the dynamic process of assessing performance, identifying concerns, and initiating corrective actions. Data

sources for evaluation often include surveys, interviews, tests, course evaluation results, service or product data, and observations.

The SAT process is an effective and efficient tool (not a program) used to control the mission training and requirements. It provides Cadre Coordinators/leaders/trainers with the training management techniques they need to analyze, design, develop, implement, and evaluate performance-oriented training. The application of SAT and training principles to cadre training occurs at all levels. Its most important product is the cadre's METL. The METL becomes the cadre's unique focus for effective and efficient training. Once a cadre's METL is developed, training priorities can be set and resources allocated based on how well the unit executes its METL tasks and the related collective and individual tasks drawn from the mission performance standards.

# APPENDIX C: ENTRY EMPLOYEE REQUEST FORM

## EMPLOYEE REQUEST FORM
### FEMA Qualification System (FQS) Incident Management Position Title

The FEMA Qualification System (FQS) is a performance based evaluation system designed to ensure a qualified disaster workforce through experience, training, and demonstrated performance. Only this form and supporting materials will be used during the review process. Only experiences that are applicable to the FQS position title(s) requested should be included. Incomplete packages will be returned.

**Applicant is responsible for filling out this form.**
**Use to apply for positions that do not require the Qualification Review Board (QRB) process**

Applicant **must coordinate** with Incident Workforce Management Division (IWMD) Liaison and/or Cadre Manager prior to filling out this form. Upon request, the IWMD Liaison/Cadre Manager will assist the applicant in collecting or locating the required materials listed below.

**Full-Time Equivalent (FTE) must use this form for the following actions:**
- Request an Initial Qualification FQS Incident Management FQS position title
  - Trainee or Qualified
- Request an Incident Management Candidate FQS Position Task Book (PTB)
  - Must be qualified in a subordinate or lateral FQS position title
- Request Review for Incident Management Certification of a completed Candidate or Trainee PTB

**Reservists (RSV) must use this form for the following actions:**
- Request an Incident Management Candidate FQS Position Task Book (PTB)
  - Must be qualified in a subordinate or lateral FQS position title
- Request Review for Incident Management Certification of a completed Candidate or Trainee PTB

**Documentation in support of request** *Check with cadre on required documentation*
- Verification of FQS position titles held during disaster deployments:
  - Required verification of disaster experience (see form for document options)
  - Automated Deployment Database (ADD) record to *supplement* verification of number and length of deployments. *Given limits within the Automated Deployment Database (ADD), the system may not accurately represent the disaster positions you have held.*
  - A completed and signed PTB (if applicable)
- Training Information Access System (TIAS)* AND FEMA Employee Knowledge Center (FEKC)** Records
- Equivalent experience applicable to experience or skills required by FQS and outlined in PTBs
- Equivalency for training required for FQS position titles
  - Include justification and course information for equivalency consideration for required FQS courses
  - Course equivalency may not be used to certify applicants for Type I FQS position titles
- Other (Resume, Professional Certification, training certificates, etc…)

**Submitting the forms and documentation:**
Applicants should submit completed packages to the email address below using the following naming convention in the subject line:

To: FEMA-FQS-Program@fema.dhs.gov
Subject: **FQS packet submission – Employee name – FQS position title Mnemonic – Program name**

*TIAS: http://netctraindl.fema.net/tias/tias/Demo/SelectDemo.asp
**FEKC: http://kc.fema.net/

## Employee Request Form for FQS Position Title

*<<To be filled out by employee/applicant>>*

---

**Employee Name** _____ **Employee Email** _____

**FQS Cadre Name** _____ **Employee Phone #** _____

**FQS Position Title for Consideration** _____

*Select the most appropriate FQS position title for which the applicant's qualifications best align. Applicants will automatically be considered for a subordinate FQS position title if not qualified in the selected title or if force structure will not permit. List more than one FQS position title if it is in a different technical progression within the same program.*

**Supervisor of Record** *(FTE only)* _____ **Signature** _____ **Date** _____

*Supervisor of Record signature not required for submission of completed Trainee or Candidate PTB*

---

| **Documentation in Support of Request.** *Check with your cadre for required documentation.* ☑ | |
|---|---|
| Verification of Disaster Experience<br>   ▪ Incident Action Plan (IAP)<br>   ▪ JFO Organization Chart<br>   ▪ ICS 204 form with assignment indicated<br>   ▪ Incident Performance Appraisal(s) relevant to requested FQS title (regular duty performance appraisal is not applicable)<br>   ▪ Verification letter from section chief or senior leadership<br>   ▪ Completed Trainee or Candidate PTB | ☐ |
| Automated Deployment Database (ADD) F2 Record and/or Employee Assignment History (required) | ☐ |
| Training Information Access System (TIAS) AND FEMA Employee Knowledge Center (FEKC) Records | ☐ |
| Equivalent experience applicable to experience or skills required by FQS and outlined in PTBs. (cadre specific) | ☐ |
| Equivalency for training required for FQS position titles. (cadre specific) | ☐ |
| Other (Resume, Professional Certification, training certificates, etc…) | ☐ |
| Qualification Sheet for FQS position title | ☐ |

---

### Required Training

Reference FQS title specific required training from corresponding FQS title Qualification Sheet and the FQS Required Courses for Command and General Staff Qualification Sheet: www.fema.gov/fema-qualification-system:  FQS Qualification Sheets

| **FQS position specific Training** *(Required)* | **Course #** | **Date Complete** |
|---|---|---|
| 1 | | |
| 2 | | |
| **Command and General Staff Training** *(Required)* | **Course #** | **Date Complete** |
| 1 | | |
| 2 | | |
| **Training Equivalent to FQS position title requirements** | **Course #** | **Date Complete** |
| 1 | | |
| 2 | | |

---

### Subordinate Titles

**List up to three (3) FQS position titles subordinate to the selected title that align with the applicant's qualifications.**
See FQS Cadre flow charts and associated position progression at www.fema.gov/fema-qualification-system:  FQS Flow Charts

| |
|---|
| 1. |
| 2. |
| 3. |

---

Send complete package to **FEMA-FQS-Program@fema.dhs.gov** with the following subject line:
**FQS packet submission – Employee name – FQS position title Mnemonic – Program name**

- 1 -

# APPENDIX D: QRB EMPLOYEE REQUEST FORM

| EMPLOYEE REQUEST FORM - QRB |
| :---: |
| **FEMA Qualification System (FQS) Incident Management QRB Position Title** |

The FEMA Qualification System (FQS) is a performance based evaluation system designed to ensure a qualified disaster workforce through experience, training, and demonstrated performance. Only this form and supporting materials will be used during the review process. Only experiences that are applicable to the FQS position title(s) requested should be included. Incomplete packages will be returned.

**_Applicant is responsible for filling out this form._**
**_This form is for FQS Position Titles that require the Qualification Review Board (QRB) process_**

**Applicant must coordinate with Incident Workforce Management Division (IWMD) Liaison and/or Cadre Manager prior to filling out this form. Upon request, the IWMD Liaison/Cadre Manager will assist the applicant in collecting or locating the required materials listed below.**

**Full-Time Equivalent (FTE) and Reservists (RSV) must use this form for the following actions:**
- Request a Supervisory Incident Management Candidate FQS Position Task Book (PTB)
  - Must be QUALIFIED in an FQS position title in immediate subordinate title progression
- Request Review for certification of a completed Supervisory Incident Management Candidate PTB
  - Supervisory FQS position titles are reviewed by the QRB
  - Employee will receive a response within 60 days of packet submission to the QRB
  - 60 days begins the date the QRB convenes for consideration
- Request for initial FQS position title with supervisory experience (must have program approval)

**Documentation in support of request:**
- Verification of FQS position titles held during disaster deployments:
  - Required verification of disaster experience (see form for document options)
  - Automated Deployment Database (ADD) record to _supplement_ verification of number and length of deployments. _Given limits within the Automated Deployment Database (ADD), the system may not accurately represent the disaster positions you have held._
  - A completed and signed PTB (if applicable)
- Required Qualification Training Information Access System (TIAS)* AND FEMA Employee Knowledge Center (FEKC)** Records
- Equivalent experience outside FEMA applicable to experience or skills required by FQS and outlined in position task books (PTBs)
- Equivalent training taken outside FEMA applicable to required for FQS position titles
  - Include justification and course information for equivalency consideration for required FQS courses
  - Course equivalency may not be used to certify applicants for Type I FQS position titles
- Other (Resume, Professional Certification, training certificates, etc…)

**Submitting the forms and documentation:**
Applicants should submit completed packages to the email address below using the following naming convention in the subject line:

   To: FEMA-FQS-Program@fema.dhs.gov
   Subject: **FQS packet submission – Employee name – FQS position title Mnemonic – Program name**

*TIAS: http://netctraindl.fema.net/tias/ : Student Participation Records
**FEKC: http://kc.fema.net/

## Employee Request Form for FQS Position Titles requiring QRB Review

**Employee Name** _____  **Employee Email** _____

**FQS Cadre Name** _____  **Employee Phone #** _____

**FQS Position Title for Consideration** _____
*Select the most appropriate FQS position title for which the applicant's qualifications best align. Applicants will automatically be considered for a subordinate FQS position title if not qualified in the selected title or if force structure will not permit. List more than one FQS position title if it is in a different technical progression within the same program.*

**Supervisor of Record** *(FTE only)* _____  **Signature** _____  **Date** _____

| Documentation in Support of Request. *Include as many items as possible:* | |
|---|---|
| Verification of Disaster Experience | ☐ |
| • Incident Action Plan (IAP) | |
| • JFO Organization Chart | |
| • ICS 204 form with assignment indicated | |
| • Incident Performance Appraisal(s) relevant to requested FQS title (regular duty performance appraisal is not applicable) | |
| • Verification letter from section chief or senior leadership | |
| • Completed Trainee or Candidate PTB **(required)** | |
| Automated Deployment Database (ADD) F2 Record and/or Employee Assignment History (required) | ☐ |
| Training Information Access System (TIAS) Records for position required courses (if applicable) | ☐ |
| FEMA Employee Knowledge Center (FEKC) Records for position required courses (if applicable) | ☐ |
| Non-FEMA disaster operations training and experience for FQS position title requested, description and verification | ☐ |
| Other (Resume, Professional Certification, training certificates, etc…) | ☐ |
| Qualification Sheet for FQS position title | ☐ |

| Required Training | | |
|---|---|---|
| Reference FQS title specific required training from corresponding FQS title Qualification Sheet and the FQS Required Courses for Command and General Staff Qualification Sheet: www.fema.gov/fema-qualification-system: FQS Qualification Sheets | | |
| **FQS position specific Training** *(Required)* | Course # | Date Complete |
| | | |
| | | |
| | | |
| **Command and General Staff Training** *(Required)* | Course # | Date Complete |
| | | |
| | | |
| | | |
| **Non-FEMA Training Equivalent to FQS position title** | Course # | Date Complete |
| | | |
| | | |

| Subordinate Titles |
|---|
| **List up to three (3) FQS position titles subordinate to the selected title that align with the applicant's qualifications.** See FQS position title qualification sheet and flow chart at www.fema.gov/fema-qualification-system: FQS Flow Charts |
| 1. |
| 2. |
| 3 |

**Employee Request Form for FQS Position Titles that require QRB Review** (continued)

| FEMA Emergency/Disaster Operations Experience | | | | | |
|---|---|---|---|---|---|
| Summarize FEMA emergency/disaster experience relevant to requested FQS positions title. Start by listing the target position and any disasters that were supported in that specific title. Then list other positions related or subordinate to the target position. | | | | | |
| **FQS Position Title(s)** | **DR#-State** | **Verification document or PTB** | **Disaster Type** | **Dates** | **# of Days** |
| [Requested Position] | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | Total # of deployments in position: | | | Total Days: | |
| [Related Position] | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | Total # of deployments in position: | | | Total Days: | |
| [Another Related Position] | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | Total # of deployments in position: | | | Total Days: | |

| Non-FEMA Emergency/Contingency Operations Experience (if applicable |
|---|
| Summarize applicable Non-FEMA emergency/contingency operations experience related to target position. List: specific experience, a brief description, justification, as well as dates, location, position/role and any other relevant information.  Add rows or attach additional justification, if needed. |
| 1. |
| 2. |
| 3. |

Send complete package to FEMA-FQS-Program@fema.dhs.gov with the following subject line:
**QRB packet submission – Employee name – FQS position title Mnemonic – Program name**

- 2 -

91

# APPENDIX E: TRANSMITTAL LOG FORM

## FQS Transmittal Log

*<<To be filled out by the Cadre Manager>>*

### Review reason:

☐ **Certification**          **Decertification**          **Transfer**

| Section A. | Employee Information |
|---|---|

| **Employee Name:** | | **ADD PID #:** |
|---|---|---|

**Employee Type:**   ☐RSV   ☐CORE   ☐PFT   ☐TFT   ☐IM CORE   ☐Other (*specify*):

| **Current FQS Title:** | **FQS Identifier:** | **Proficiency:** ☐ Trainee | ☐ Qualified |
|---|---|---|---|
| **Title for Review/Assignment:** | **FQS Identifier:** | **Proficiency:** ☐ Trainee | ☐ Qualified |

| Section B. | Documentation Received in Support of Request |
|---|---|

*Verification of Disaster Experience:* ☐ Incident Action Plan (IAP) ☐ JFO Organization Chart ☐ ICS 204 with assignment indicated ☐ Incident Performance Appraisals relevant to requested FQS title ☐ Verification letter from section chief or senior leadership ☐ Completed Trainee or Candidate PTB

☐ ADD F2 Record and/or Employee Assignment History
☐ TIAS Record(s)
☐ FEKC Record(s)
☐ Non-FEMA disaster operations training and experience
☐ FQS Qualification Sheet for position title
☐ Other (Resume, Professional Certification, training certificates, etc...) specify:

**Recommendation to Certifying Official: Certify** ☐ Yes ☐No* ☐ Recommend Alternate Title and Proficiency** ☐ Issue Candidate PTB

| **\*\* Alternate Title-** | **FQS Identifier:** | **Proficiency:** ☐ Trainee | ☐ Qualified |
|---|---|---|---|
| **Candidate PTB Title-** | **FQS Identifier:** | **PTB# Issued:** | |

**\*If no,** indicate rationale & recommended actions: ☐ Incomplete package    ☐ Force Structure #    ☐ Other (specify):

**For program administrative purposes for change in proficiency or title** (include justification below): ☐ **Administrative Error** ☐ **Experience Justification** ☐ **Other**

**Subordinate Title(s)-***If Primary title is Qualified you may add up to 3 subordinate positions.* ☐ No subordinate title (s)
Assign the following subordinate titles: (*Subordinate proficiency MUST be Qualified*)
1-FQS Title: _____ FQS Identifier: _____ Proficiency: **Qualified**
2-FQS Title: _____ FQS Identifier: _____ Proficiency: **Qualified**
3-FQS Title: _____ FQS Identifier: _____ Proficiency: **Qualified**

| **Cadre Manager** (*Print*): | (*Sign*): | *Date:* |
|---|---|---|

| Section C. | Certifying Official |
|---|---|

| ☐ **Non-Supervisory Position**<br>**Approve recommendation :** ☐Yes ☐No (include rationale & actions below) | ☐ **Supervisory Position**<br>Review package, sign, & forward to Qualification Review Board (QRB) Chair |
|---|---|

| **Certifying Official** (*Print*): | (*Sign*): | *Date:* |
|---|---|---|

| Section D. | Qualification Review Board *(Supervisory Positions Only)* |
|---|---|

**Recommendation to Certify:** ☐Yes ☐No (include rationale & actions below)

| **QRB Chair** (*Print*): | (*Sign*): | *Date:* |
|---|---|---|

| Section E. | Certifying Authority |
|---|---|

**Certify QRB recommendation:** ☐Yes ☐No (include justification below)          **Decertification:** ☐Yes (include justification below)

**Justification:**
*Provide justification as displayed in subject line of letter to the employee. Attach additional justification as necessary.*

| **Certifying Authority** (*Print*): | (*Sign*): | *Date:* |
|---|---|---|

| Section F. | Notification of Decision |
|---|---|

| ☐ Email Transmittal Log to- FEMA-FQS-Program@fema.dhs.gov | Date: _____ |
|---|---|

92

# APPENDIX F: NEW SPECIALTY REQUEST FORM

| | |
|---|---|
| RPM's Name: | |
| RPM's Contact #: | |
| RPM's Program Area: | |
| Date Submitted: | Click here to enter a date. |
| Proposed Specialty: | |
| # of employees Expected to Hold Specialty: | |
| Definition/Description: | |
| Justification: | |

REMEMBER: Attach a list of Employees expected to carry Specialty – Include name and last 4

| | | |
|---|---|---|
| Certifying Official: Choose an item. | Date: | Click here to enter a date. |
| Printed Name/Title: | Signature: | |
| FQS National Working Group: Choose an item. | Date: | Click here to enter a date. |
| Printed Name/Title: | Signature: | |
| Ex Oversight Committee (appeals only): Choose an item. | Date: | Click here to enter a date. |
| Printed Name/Title: | Signature: | |

# APPENDIX G: PROCESSES FOR ASSIGNMENT OF A FQS JOB TITLE

The process for initial assignment for Reservists and IM COREs is shorter as they were hired directly into their incident management positions. The FTEs normally fill a different steady-state role, and therefore, have more requirements in obtaining their initial assignment for their incident management role.

## Initial Assignment

### Reservist

The process is:

1. The Cadre Coordinator is notified, by OCCHCO, when a new employee is on-boarded and in process through Human Resources.
2. The cadre management will assign an initial FQS job title and the proficiency based upon the new employee's experience.
   - An FQS Transmittal Log (FTL) is **NOT** required for new hires. However, a letter, similar to the Certification Letter (available on the Resource Management Branch SharePoint), should be created and sent to the FEMA-FQS-Program@fema.dhs.gov e-mail to initiate entry into the deployment system and the qualification tracking system.
   - If the Reservist is qualified, a PTB for their position will be sent with the letter as a reference.
   - If the Reservist is not qualified (trainee or candidate), a PTB will be sent with the letter.

### IM CORE

The process is:

1. The Cadre Coordinator is notified by OCCHCO when a new employee is onboarded and in process through Human Resources.
2. The cadre management will assign an initial FQS job title and the proficiency based upon the new employee's experience. Typically, IM CORE and IMAT new employees are hired into specific positions.
3. An FTL is **NOT** required for new hires. However, a letter, similar to the Certification Letter (available on the RMB SharePoint), should be created and sent to the FEMA-FQS-Program@fema.dhs.gov e-mail to initiate entry into the deployment system and the qualification tracking system.

- o  If the IM CORE/IMAT is qualified, a PTB for their position will be sent with the letter as a reference.
- o  If the IM CORE/IMAT is not qualified (trainee or candidate), a PTB will be sent with the letter.

## FTE

The process is:

1. The FTE completes ERF or ERF – QRB and obtains Supervisor's signature as approval that the employee is available to deploy. The FTE submits ERF and supporting documentation listed on the instructions of the form to FEMA-FQS-Program@fema.dhs.gov. Supporting documentation includes:
   a. Deployment History from the deployment system
   b. Supplemental Incident Deployment Experience including personal records such as:
      I.    Incident Performance Appraisal(s)
      II.   Verification letter from section chief or senior leadership
      III.  JFO Organization Chart
      IV.   Incident Action Plan
      V.    ICS 204 form with assignment indicated
   c. Certification of required training (Training Information Access System and FEMA Employee Knowledge Center training records or training certificates)
   d. Relevant position-specific incident performance appraisal(s)
   e. Licenses and Certifications (as required for the position)
   f. Letters of recommendation from other certified employees with equal or higher qualifications (optional)
   g. Training and experience record(s) of previous qualifications in non-FEMA ICS organizations to include but not limited to:
      i.   Training certificates
      ii.  Incident evaluations
      iii. Letters from competent authorities
2. The Pasadena Call Center Data Entry Group will review the initial certification package for completeness. (Cadres may choose to complete the initial review instead.)
   a. If the packet is **not** complete it will be returned to the employee with an explanation and request for additional information.
      i.   If unable to acquire all information from the employee, the package will be forwarded to the program as incomplete.
   b. Once complete, the packet is forwarded to the Cadre Coordinator.
3. The Cadre Coordinator will evaluate the package and make a recommendation to the CO using an FTL. The Cadre Coordinator will also prepare a Decision Letter for the CO's signature. Cadres may choose to utilize a SME panel to assist in this process.

      a.  If incomplete, return certification package to employee with detailed explanation and request for additional information

4.  CO will review the certification package for qualification determination.
   a.  Non-supervisory positions:
      i.  Evaluate the certification package
      ii.  Elect to, or not to, recommend for certification
      iii.  Sign the FQS Transmittal Log and the decision letter (if authority is delegated by the CA)
      iv.  Signed documents are sent to [FEMA-FQS-Program@fema.dhs.gov](mailto:FEMA-FQS-Program@fema.dhs.gov) to be prepared with appropriate documents (PTB, Qualification Sheet, and Progression Chart) and sent to the employee, as well as being entered into the deployment and qualification tracking systems
   b.  Supervisory positions:
      i.  Forward the FTL to QRB Chair for review and recommendation.

5.  QRB (for supervisory positions only): The QRB Chair will review the certification package prior to convening the QRB.
   a.  QRB convenes to:
      i.  Evaluate the certification package
      ii.  Determine a recommendation for certification
      iii.  Prepare decision letter for CA

6.  CA: (This step can be delegated to the CO for non-supervisory positions)
   a.  Reviews the recommendation
   b.  Approves or disapproves the recommendation
   c.  Signs the FTL and Decision Letter
   d.  Signed documents are sent to [FEMA-FQS-Program@fema.dhs.gov](mailto:FEMA-FQS-Program@fema.dhs.gov) to be prepared with appropriate documents (PTB, Qualification Sheet, and Progression Chart) and sent to the employee, as well as being entered into the deployment and qualification tracking systems. The cadre management and the appropriate regional liaison, if applicable, are also notified.

7.  The Cadre Coordinator will maintain all decision letters and transmittal logs in the employee's personnel file.

# APPENDIX H: PTB ISSUANCE FORM

## Candidate Position Task Book (PTB) Issuance Form

*Candidate must hold a Qualified FQS position*

| Section A.  Employee Information | |
|---|---|
| Employee Name: | ADD PID#: |
| Employee Type:    ☐RSV  ☐CORE  ☐IM CORE   ☐PFT  ☐TFT  ☐Other (*specify*): | |
| Current FQS Title: | FQS Identifier:    **Qualified** |
| Candidate Position Title: | FQS Identifier: |
| PTB#: | Date Issued: |

| Section B.  Cadre Manager / Supervisor of Record | | |
|---|---|---|
| **Forward to Certifying Official:** ☐Yes  ☐No*  *If no, include rationale & recommended actions: | | |
| | | |
| Cadre Manager *(Print):* | *(Sign):* | *Date:* |
| Supervisor of Record *(FTE's Only) (Print):* | *(Sign):* | *Date:* |

| Section C.  Certifying Official | | |
|---|---|---|
| **Approval to Issue PTB :**☐Yes  ☐No*  *If no, include rationale & recommended actions: | | |
| | | |
| **Certifying Official***(Print)* | *(Sign)* | *Date:* |

| Section D.  Final Actions | | |
|---|---|---|
| Cadre Management final actions: | | |
| ☐ Email form to- ( FEMA-FQS-Program@fema.dhs.gov ) | | Date: |
| ☐ Create letter to employee | | Date: |

**Notes:**

# APPENDIX I: RESERVIST EQUIPMENT GUIDANCE

- In all cases Reservist 1-1-1 equipment will be fund code 06 (disaster) properties.
- Funding for airtime of the telecom services for Reservist is funded through fund code 06.
- Standard equipment issue for Reservist members is 1-1-1 (laptop, phone, RSA token) purchased with fund code 06.
- Any other equipment in addition to fund code 06 (1-1-1) needs to be funded and issued by the designated cadre.
- If the cadre wishes to pay for an upgrade this should be coordinated by the Cadre Manager through IT Telecom Services to provide all the pertinent funding information for this request. Reservist Program cannot authorize the UPGRADE to an IPHONE until the Blackberry stock has been depleted, the issuing APO should continue issuing what has been purchased and is currently stored.
- IPADS are authorized by FQS job title.
- Requesting Reservist equipment: local issuing APO should coordinate request(s) through IT coordinator via Network Inventory and Optimization Solution (NiOS) for Disaster Information Systems Clearinghouse (DISC) and Mobility Service Center (MSC) related equipment.
- <u>Scenario I</u>: New Reservist member; Reservist member may receive equipment at JFO or Regional office following the 1-1-1 Equipment standard operating procedures.
- <u>Scenario II</u>: Existing Reservist member with fund code 06 (disaster) equipment; issuing APO should execute a Hand Receipt (FEMA Form 119-7-1-3), Custody Receipt for Government Property (FEMA Form 119-7-1-3A) and complete property transfer to established CADRE Site Code. Documentation with signatures should be scanned and e-mailed to CADRE site code designated APO.

## Malfunctioning Equipment Guidance for Reservists

### Reservist at Home with Malfunctioning Equipment (Laptop)

- Call Enterprise Service Desk 888-457-3362 to have IT Tech troubleshoot the issue. Individual must obtain the remedy ticket number from IT Tech.
- If IT Tech determines the equipment (laptop) cannot be fixed remotely, the individual will be guided to a local FEMA office when available to them to correct the issue.
- If IT Tech determines the equipment (laptop) cannot be fixed and new equipment needs to be issued; pending funding, laptops can be shipped to an employee's residence but initial setup and authentication of the new equipment with employee must be done behind the FEMA firewall on FEMA (hard wired) network.

## Reservist at Home with Malfunctioning Equipment (Phone)

- Call ESD 888-457-3362 to have IT Tech troubleshoot the issue. Individual must obtain the remedy ticket number from IT Tech.
- If the IT Tech determines the equipment (phone) cannot be fixed, the individual would then send email to APO and carbon copy the cadre manager with the remedy ticket number, included an explanation of issue and the IT Tech recommendation.
- Cadre Manager would then coordinate with the local IT coordinator to place an equipment request through NIOS for a replacement phone. The new phone must be shipped/delivered to APO at the following address
  - o ATTN: Designated APO
  - o Property Management Division
  - o 430 Market Street
  - o Winchester, VA 22603
- Once this information has been validated the Reservist APO will re-issue the new phone and request the individual sign all pertinent documentation prior to the new equipment being shipped.
- Pending funding, once APO receives signed documentation, APO will ship via UPS to the address provided by the individual. Also included will be a return UPS label for the return of malfunctioning equipment (phone)
- When a member receives equipment they should then contact ESD (888)457-3362 or MSC (540)-678-2245 to activate and set up phone for use.

## Reservist at FEMA Location with Malfunctioning Equipment (Laptop, Phone)

- Contact local IT support to troubleshoot equipment. If IT Tech determines the equipment cannot be fixed, the individual should then contact the local APO to swap faulty equipment.

# APPENDIX J: LIST AND DESCRIPTION OF FEMA CADRES

**Table 18: FEMA Cadres**

| Headquarters Component/Office | | Cadre Name | Incident Management Assignment |
|---|---|---|---|
| Federal Insurance and Mitigation Administration | | Environmental and Historic Preservation (EHP) | Command Staff and Operations Section |
| | | Mitigation (MIT) | Operations Section |
| Mission Support | Office of the Chief Procurement Officer | Acquisitions (ACQ) | Finance and Administration Section |
| | Office of the Chief Component Human Capital Officer | Human Resources (HR) | Finance and Administration Section |
| | Office of the Chief Information Officer | Information Technology (IT) | Logistics Section |
| | Office of the Chief Administrative Officer | Safety (SF) | Command Staff |
| | Officer of the Chief Security Officer | Security (SEC) | Command Staff |
| Office of Disability Integration and Coordination | | Disability Integration (DI) | Command Staff |
| Office of Chief Counsel | | Alternative Dispute Resolution (ADR) | Command Staff |
| | | Legal (LAW) | Command Staff |
| Office of Chief Financial Officer | | Financial Management (FA) | Finance and Administration Section |
| Office of Equal Rights | | Equal Rights (ER) | Command Staff |
| Office of External Affairs | | External Affairs (EA) | Command Staff/Operations Section (ESF 15) |
| Office of Response and Recovery | Office of Federal Disaster Coordination | Federal Coordination Officer (FCO)/Federal Disaster Recovery Coordinator (FDRC) | Command Staff |
| | | National Disaster Recovery Support (NDRS) | FDRC Operations |
| | Logistics Management Directorate | Logistics (LOG) | Logistics Section |
| | Recovery Directorate | Public Assistance (PA) | Operations Section |
| | | Disaster Survivor Assistance (DSA) | Operations Section |
| | | Individual Assistance (IA) | Operations Section |
| | Response Directorate | Disaster Emergency Communications (DEC) | Operations Section |
| | | Operations (OPS) | Operations Section |
| | | Planning (PL) | Planning |
| Protection and National Preparedness | National Preparedness Directorate | Disaster Field Training Operations (DFTO) | Finance and Administration Section |

# Purpose of Each Cadre

- Acquisitions (ACQ)
  - Manages contracting activities by providing procurement advice, guidance, and information to coworkers, customers, and/or other contracting parties
- Alternative Dispute Resolution (ADR)
  - Supports field/incident-level employees, leads, supervisors, and managers by providing a range of decision-making, conflict prevention, and conflict resolution services on request to prevent escalation into formal actions or complaints
- Disaster Emergency Communications (DEC)
  - Deploys, installs, operates, maintains, and protects telecommunications and operations assets in response to all-hazards disasters and in support of planned special events
- Disaster Field Training Operations (DFTO)
  - Plans, develops, promotes, and delivers disaster performance improvement and training opportunities with EMI and Regional Offices
- Disaster Survivor Assistance (DSA)
  - Establishes a timely presence on the ground in the affected areas to address disaster survivors' immediate and emerging needs by meeting survivors at their homes or in their communities
- Disability Integration (DI)
  - In accordance with Federal civil rights laws and regulations, provides guidance, tools, methods, and strategies to integrate and coordinate emergency management inclusive of individuals with access and functional needs before, during, and after an incident
- Environmental/Historic Preservation (EHP)
  - Facilitates timely delivery of disaster assistance to communities and individuals; the EHP cadre provides appropriate technical expertise and develops necessary tools to address and resolve anticipated EHP issues relating to the compliance review and approval process for actions proposed to be funded by FEMA during emergency and recovery operations
- Equal Rights (ER)
  - Responsible for equal rights and civil rights function and diversity initiatives. Provides technical guidance on accommodation requests and receives accessible electronic and information technology requests in support of multiple statutory requirements.
- External Affairs (EA)
  - Maintains visibility regarding public and internal communications; coordinates routine and special communications; ensures accurate, useful, timely,

synchronized, and targeted communication; and provides continuous messaging to meet the needs of the situation

- Federal Coordination Officer (FCO)/Federal Disaster Recovery Coordinator (FDRC)
  - Coordinates the administration of disaster relief, including activities of State and local government and the other disaster assistance relief organizations
- Financial Management (FA)
  - Creates, monitors, and verifies allocations and obligations in the appropriate financial systems and prepares financial reports at incident field offices
- Human Resources (HR)
  - Identifies, acquires, sustains, and maintains a quality workforce to meet the FEMA mission
- Individual Assistance (IA)
  - Ensures that individuals and families affected by disasters have access to the full range of FEMA programs in a timely manner and that the best possible level of service is provided to applicants in the administration of these programs
- Information Technology (IT)
  - Provides the most efficient, expeditious, and cost saving information services at all incident locations during initial setup, continuation of operations, phase down, and at closure
- Legal (LAW)
  - Responsible for ensuring that FEMA field operations are consistent with all applicable statutes; regulations; and Agency policies, directives, and standards
- Logistics (LOG)
  - Coordinates and monitors all aspects of resource planning, movement, ordering, tracking, and property management of initial response resources (IRR), teams, and accountable property during the life of an incident
- Mitigation (MIT)
  - Manages risk reduction activities from all natural hazards to include public education, private sector partnership, technical assistance to local and State governments, grants management, insurance coordination, and community planning
- National Disaster Recovery Support (NDRS)
  - Assists the FDRC/FCO in facilitating disaster recovery coordination and collaboration between the Federal, State, local, and tribal, governments, the private sector and voluntary and faith-based community organizations
- Operations (OPS)
  - Encompasses the integration of Federal, State, local, and tribal response programs to ensure the efficient and effective delivery of immediate emergency assistance to individuals and communities impacted by major disasters, emergencies, or acts of terrorism

- Planning (PL)
  - Plans, collects, evaluates, disseminates, and manages information regarding the threat or incident and the status of Federal resources
- Public Assistance (PA)
  - Provides assistance for debris removal, implementation of emergency protective measures, and permanent restoration of infrastructure to assist States, local governments, and certain private non-profit entities under the Stafford Act
- Safety (SF)
  - Provides a safe and healthful work environment for FEMA employees and our emergency management partners at fixed sites, incident operations, and facilities
- Security (SEC)
  - Implements and manages physical security programs in support of the Agency's all- hazards emergency management programs for the protection of personnel, property, and facilities

# APPENDIX K: POSITIONS AND RESPONSIBILITIES

Table 19 serves as orienting material for positions with the cadre management enterprise. The purpose of these lists is to provide a reference for cadre management personnel and should be used as the basis for developing and coordinating cadre management activities and procedures.

**Table 19: Cadre Management Positions and Responsibilities**

| POSITION | RESPONSIBILITIES |
|---|---|
| Associate Administrator for Response and Recovery | - |
| Cadre Coordinator | - |

| POSITION | RESPONSIBILITIES |
|---|---|
| | • Identify required FQS training in coordination with the Cadre Training Manager, IWMD, and EMI<br>• Oversee administrative responsibilities for IM CORE and Reservist members of the cadre<br>• In consultation with OER, the Disability Employment Program Manager, and the applicable employee, expeditiously make decisions in accordance with existing FEMA reasonable accommodation policy guidance on reasonable accommodation requests made under Section 501 of the Rehabilitation Act from employees under their supervision<br>• Coordinate with the Regional IWM Liaison Teams regarding cadre; implementation for regional FTEs<br>• Ensure quality control over all internal cadre communications to ensure that all cadre members receive supportive customer service<br>• Ensure cadre members have access to program-specific information that is required to perform effectively during incident operations<br>• Assist with the development of Force Packages in coordination with the regions and IWMD<br>• Provide input for incident workforce policy and doctrine<br>• Initiate personnel actions, when appropriate, against employees under his/her supervision, including discipline or termination for misconduct or poor performance. Prior to affecting any personnel actions, the Cadre Coordinator must consult with OCCHCO Employee Relations to ensure that any such actions are consistent with Merit Systems and Equal Employment Opportunity principles as well as FEMA policy<br>• Serve as a second-line supervisor of record to any Program Specialists or Assistant Program Managers assigned to the cadre |
| **Cadre Members** | • Comply with incident workforce policy and doctrine and program-specific policies and procedures<br>• Maintain qualification and readiness to deploy in accordance with the FQS Guide and the FEMA Incident Management Handbook<br>• Ensure availability status and accurate contact information is maintained and approved in accordance with FD010-8, FEMA Incident Workforce Deployment, Section VII.B, or superseding policy<br>• Maintain condition and status of assigned equipment, including ensuring connectivity of FEMA-issued equipment, in accordance with FD119-7, Federal Personal Property Management, and supporting manual.<br>• Participate in cadre coordination calls and mandatory training |
| **Cadre Training Manager** | • Facilitate development, revision, and delivery of FQS training for each cadre position and serve as cadre's point of contact to the IWMD FQS Branch<br>• Ensure FQS required training is consistently delivered in order to meet force structure requirements for qualified individuals within the cadre<br>• Ensure program priorities and budget allocation for training development and delivery requirements are met and properly executed within the cadre |

| POSITION | RESPONSIBILITIES |
|---|---|
| | • Identify FQS and mandatory training requirements in coordination with IWMD, EMI Course Managers, and other partners as required<br>• Identify cadre training needs and develop strategies to eliminate shortfalls<br>• Coordinate with programs and appropriate course managers regarding development and revisions of curriculum and training materials<br>• Identify instructors to coordinate delivery of accurate and timely training.<br>• Facilitate cadre participation in exercises as required<br>• Coordinate with other Cadre Training Managers to maintain awareness of curriculum changes that may impact FQS within their own cadre of responsibility |
| Certifying Authority | • Ensure cadre has available, trained, qualified, and equipped staff to meet force structure requirements and to effectively perform incident duties<br>• Certify that employees are qualified for FQS positions within the cadre in accordance with the FQS guide<br>• Provide information related to cadre readiness as defined and directed by the IWESC |
| Certifying Official | • Ensure readiness requirements established by the IWESC, or the program, are conveyed to and met by the cadre<br>• Administer FQS for all cadre members in accordance with the FQS Guide or superseding doctrine<br>• Serve as the supervisor of record for the Cadre Coordinator |
| Federal Coordinating Officers and Federal Disaster Recovery Coordinators | • Support the qualification of FQS trainees and candidates by requesting or accepting up to 20 percent trainees or candidates to assigned incidents, in support of FD010-8, FEMA Incident Workforce Deployment, Section VII.C.3.v.<br>• Support the qualification of FQS trainees and candidates by requesting sufficient FQS evaluators to evaluate each employee with an open FQS PTB who is deployed for 20 days or more, in accordance with FD010-8, FEMA Incident Workforce Deployment, Section VIII.L.8.<br>• Ensure an incident performance evaluation is completed for every assigned employee deployed for 20 days or more, in accordance with FD010-8, FEMA Incident Workforce Deployment, Section VIII.C.1 and OCCHCO evaluation procedures |
| FEMA Administrator | • Execute or delegate authority for the readiness and use of FEMA's incident workforce in support of FEMA's authorities<br>• Assign and reallocate incident workforce resources as required to ensure effective delivery of FEMA incident programs |
| FEMA Headquarters Component Leadership | • Ensure cadres within component programs meet readiness requirements established by the IWESC<br>• Ensure cadres within component programs comply with applicable program policies and standards<br>• Ensure individuals within the component who do not hold an FQS position, but are eligible for an incident management or incident support title, are identified, and communicate this information to a |

106

| POSITION | RESPONSIBILITIES |
|---|---|
| | Cadre Coordinator, in compliance with any processes established by the CCWG, to obtain appropriate FQS assignment |
| FTE Coordinator | • Support FTEs with FQS job titles assigned to the cadre in meeting FQS and cadre requirements<br>• Coordinate with Regional IWM Liaison Teams and headquarters components to recruit FTEs for appropriate cadre vacancies<br>• Assist, track, and provide guidance on FQS training and qualification progress for FTEs<br>• Implement the Cadre Coordinator's quality control responsibilities over internal cadre communications for all FTE cadre members to ensure they receive supportive customer service, and coordinate with the Cadre Coordinator and other cadre management staff to ensure communications are consistent throughout the cadre<br>• Identify appropriate staff for FQS training courses through the Cadre Coordinator or Cadre Training Manager for coordination with the IWMD FQS Branch<br>• Provide support in identifying FQS required assignments and training opportunities in coordination with the Cadre Training Manager, Regional IWM Liaison Teams, and IWMD<br>• Review FTE Qualification Packages for the QRB<br>• Monitor and actively track FTE availability in coordination with Regional IWM Liaison Teams and IWMD<br>• Recommend FQS decertification of FTEs as needed to the CO and CA<br>• Perform the functions of the IM CORE Program Manager when the cadre's IM CORE population does not require this function as a full-time position<br>• Respond to FTE requests for cadre vacancy information |
| IM CORE Program Manager | • Serve as the supervisor of record for IM COREs in the cadre<br>• Recruit IM COREs based on vacancies within the cadre's force structure<br>• Assist, track, and provide guidance on FQS progression for IM COREs<br>• Identify appropriate staff for FQS training through the Cadre Coordinator or Training Manager for coordination with the IWMD FQS Branch<br>• Review and coordinate IM CORE Qualification Packages for QRBs<br>• Implement the Cadre Coordinator's quality control responsibilities over internal communications to IM CORE cadre members to ensure they receive supportive customer service, and coordinate with the Cadre Coordinator and other staff to ensure communications are consistent throughout the cadre<br>• Monitor and actively track IM CORE availability<br>• Collect and maintain incident performance evaluations of IM COREs from temporary duty supervisors after every deployment equal to or greater than 20 days, and collect and maintain all other documents related to performance and/or conduct of employees under direct supervision in accordance with FD141-1, Records Management Program<br>• When appropriate, initiate adverse personnel actions against IM |

| POSITION | RESPONSIBILITIES |
|---|---|
| | COREs or other employees under direct supervision, to include discipline or termination for poor performance and misconduct after consulting with OCCHCO, ensuring that the reasons for any such actions are documented, and that the actions and documentation are forwarded to OCCHCO for further action<br>• In coordination with the Cadre Coordinator, terminate or renew the appointments of IM COREs and other employees under direct supervision as required based on lack of work or other mission-related needs<br>• Serve as supervisor of record for any Assistant IM CORE Program Managers assigned to the cadre |
| Incident Workforce Management Division | • Coordinate and manage the programs, processes, and procedures required to develop, organize, deploy, and sustain a professional incident workforce<br>• Monitor and assess mission capability pursuant to readiness requirements and any related performance measures established by the IWESC<br>• Plan and execute the budget for incident workforce programs to ensure operational readiness<br>• Oversee the FQS program |
| Logistics Management Directorate | • Ensure, in coordination with OCIO and OCAO, the effective tracking of equipment assigned to the incident workforce<br>• Ensure, in coordination with OCIO and OCAO, Cadre Coordinators have access to data related to equipment issued to cadre members<br>• Manage a lifecycle maintenance program for equipment assigned to Reservist members of the incident workforce |
| Office of Equal Rights | • Provide technical resource information about reasonable accommodation to applicants for appointments, incident personnel, temporary duty supervisors, Cadre Coordinators, and supervisors of record, in accordance with existing FEMA reasonable accommodation policy guidance<br>• Provide civil rights, equal employment opportunity, sexual harassment, diversity, and other EEO-related training to cadre members |
| Office of the Chief Component Human Capital Officer | • Validate incident workforce hiring requests with IWMD and Cadre Coordinators to ensure such requests are based on force structure vacancies<br>• Ensure timely classification of incident workforce positions for FEMA job announcements, offers, and hiring actions, so that the FEMA incident workforce has sufficient personnel to meet force structure requirements<br>• Establish policies and procedures for incident performance evaluations<br>• Provide direct support to temporary duty supervisors regarding how to properly document poor performance and misconduct and to the supervisor of record regarding what discipline to take<br>• Advise the FCO, FDRC, or Office Director, after coordinating with the temporary duty supervisor and the supervisor of record, as to whether the release of an individual from an incident is appropriate due to |

108

| POSITION | RESPONSIBILITIES |
|---|---|
| | misconduct or poor performance<br>• Provide direct support to incident personnel with respect to individual issues requiring action in connection with the administration of pay, benefits, and other personnel matters |
| Office of the Chief Financial Officer | • Ensure timely review of position justifications and decisions on funding approval for CORE and IM CORE positions<br>• Adjudicate issues related to incident workforce budget and funding |
| Office of the Chief Information Officer | • Review and approve the development of IT systems required to support the incident workforce, including training and deployment systems<br>• Inform IWMD and LMD on the information technology equipment FEMA has approved for procurement to support equipping the incident workforce |
| Regional Administrators | • Ensure compliance with incident workforce policy and doctrine<br>• Ensure regional staff members who are assigned to a cadre meet readiness requirements |
| Regional Incident Workforce Management (IWM) Team Lead | • Provide incident workforce subject matter expertise, and convey incident workforce related policy and readiness standards<br>• Support the recruitment of FTE cadre members by ensuring that individuals within the region who do not hold an FQS position, but are eligible for an incident management or incident support title, are identified, and coordinate with Cadre Coordinators, FTE Coordinators, and FTE supervisors of record to obtain appropriate FQS assignment<br>• Coordinate with headquarters and regional program offices, regional supervisors, and employees to coordinate cadre requirements and facilitate readiness, training, qualification and availability for all regional FTEs<br>• Assist the FTE Coordinator in preparing regional FTE Qualification Packages for QRBs<br>• Support regional implementation of FQS with the Cadre Coordinators and assist, track, and provide guidance on FQS progression of Regional FTEs in coordination with the cadre's FTE Coordinator<br>• Identify regional FTE cadre-specific training requirements and staff for FQS training course in coordination with the cadre's FTE Program Coordinator and Training Manager<br>• Monitor readiness of regional FTEs for deployment in coordination with the cadre FTE Coordinator<br>• Assist with development of force packages in coordination with the Cadre Coordinator |
| Reservist Program Manager | • Serve as the supervisor of record for Reservists in the cadre<br>• Recruit Reservists based on vacancies within the cadre's force structure<br>• Assist, track, and provide guidance on FQS progression for Reservists<br>• Identify appropriate staff for FQS training courses through the Cadre Coordinator or Cadre Training Manager for coordination with the IWMD FQS Branch<br>• Prepare Reservist Qualification Packages for QRBs<br>• Implement the Cadre Coordinator's quality control responsibilities |

109

| POSITION | RESPONSIBILITIES |
|---|---|
| | over internal communications for all Reservist cadre members to ensure they receive supportive customer service, and coordinate with the Cadre Coordinator and other cadre management staff to ensure communications are consistent throughout the cadre |
| | • Monitor and actively track Reservist availability |
| | • Collect and maintain incident performance evaluations of Reservists from temporary duty supervisors after every deployment equal to or greater than 20 days, and collect and maintain all other documents related to performance and/or conduct of employees under direct supervision in accordance with FD141-1, Records Management Program |
| | • When appropriate, initiate adverse personnel actions against Reservists or other employees under direct supervision, to include discipline or termination for poor performance and misconduct after consulting with OCCHCO, ensuring that the reasons for any such action are documented, and that the action and documentation are forwarded to OCCHCO for further action |
| | • In coordination with the Cadre Coordinator, terminate or renew the appointments of Reservists and other employees under direct supervision as required based on lack of work or other mission-related needs |
| | • Serve as supervisor of record for any Assistant RPMs assigned to the cadre |

# APPENDIX L: ADMINISTRATIVE PROCESSES

Cadre Coordinators, RPMs, IM CORE Program Managers, Cadre Training Managers, and FTE Coordinators must support a number of administrative functions to assist their cadre members in arranging travel, pay, availability, and reasonable accommodations. The procedures for completing these processes change frequently, as do the specific points of contact. FEMA has therefore established a SharePoint site, which includes accurate, up-to-date references for these administrative functions. Specifically, the site contains:

- Process diagram for Reservist WebTA processing
- Process diagram for IM Core WebTA processing
- Funding of IM Core travel
- Funding for Reservist travel
- Additional administrative materials as required

The SharePoint site is updated regularly and maintained by IWMD. It can be found at: https://esw.fema.net/esw/ORR/Response/iwm/Reservist/CCU%20Documents/Forms/AllItems.aspx.

111

# APPENDIX M: CADRE COORDINATOR'S RESOURCE LIST

**Table 20: Cadre Coordinator's Resource List**

| Organization | Topics to Contact On |
|---|---|
| LMD | • Order equipment<br>• Issuance of equipment<br>• System of record<br>• APO coordination |
| IWMD | • Coordination and information repository<br>• Reasonable accommodations<br>• Funding |
| OCCHCO | • Guidance and processes for performance management<br>• Mandatory training<br>• Onboarding process for FTEs<br>• Onboarding entry on duty training |
| OCIO | • Information technology and communication equipment |
| OCAO | • Property accountability and reporting |
| FCO | • JFO activities |
| RPM | • Reservist activities |
| OER | • Reasonable Accommodation |
| FQS Branch | • Required training |

# APPENDIX N: TRAVEL AUTHORIZATION AND INFORMATION EMAIL TEMPLATE

Greetings!

You have been identified to ==instruct/attend== the upcoming delivery of ==**Course # Course Name scheduled for Date of Course at Location.**== Please read this message in its entirety as you will find important travel and course information below. Upon receipt of this email, you may begin making travel arrangements.

<u>TRAVEL AUTHORIZATION</u>

ALL students and instructors attending this course should make reservations through **National Travel by calling (800) 557-0842** and provide the travel authorization number provided on the attachment **(TA #)**.

At the conclusion of your trip, sign your completed voucher and send it to the Pasadena Call Center via email at [FEMA-IWMO-PROGRAM-TRAVEL@fema.dhs.gov](mailto:FEMA-IWMO-PROGRAM-TRAVEL@fema.dhs.gov). The Pasadena Call Center has the authority to sign off on completed vouchers. Vouchers may also be faxed to (626)431-3777. Links to helpful travel websites and travel training are provided below.

<u>Salary and Benefit Information</u>

- **FULL TIME EMPLOYEES (PFT/CORE/IMC/TFT):** For timekeeping purposes, FTEs should use their home/program office account codes in WebTA. Please document all non-duty hours travel time as "Comp Time/Travel Earned".
- Typically, classroom time does not involve overtime. If the class requires overtime for attendance, preapproval is required; the course manager or class instructors will provide instructions if overtime is approved.
- **RESERVISTS:** Will document all class time and travel time in WebTA.
- WebTA can be accessed here: [https://wta.hs.nfc.usda.gov/webta/servlet/com.threeis.webta.H000welcome](https://wta.hs.nfc.usda.gov/webta/servlet/com.threeis.webta.H000welcome).
- Reservists should charge travel time and course attendance time to the WebTA Account Code provided by the course manager.
- If you are unable login or for password reset, please contact the Pasadena Call Center via email at [FEMA-IWMO-PROGRAM-TRAVEL@fema.dhs.gov](mailto:FEMA-IWMO-PROGRAM-TRAVEL@fema.dhs.gov).

**Please note:** If you have recently attempted to log into WebTA while not deployed, your account may have been de-activated. It will be activated prior to the end of class.

<u>DEPLOYMENT ORDERS</u>

All Reservist attendees will receive a call from the deployment system with his/her deployment orders. All students must check in with the deployment system upon arrival. Call XXX-xxx-xxxx within x hours of arrival.

<u>HELPFUL TRAVEL LINKS</u>

- Travel Toolbox: http://on.fema.net/components/ocfo/fmd/Pages/TravelToolbox.aspx (accessible within the firewall or via a FEMA computer and using Virtual Private Network)
- IS-107.13 FEMA Travel Rules and Regulations 2013: http://training.fema.gov/EMIWeb/IS/courseOverview.aspx?code=is-107.13 (accessible from outside of the firewall, i.e. home)
- Go to Forms & Resources: http://on.fema.net/components/ocfo/fmd/Pages/TravelToolbox.aspx
- (accessible within the firewall or via a FEMA computer and using Virtual Private Network)

114

# APPENDIX H: STAFFING A FORCE STRUCTURE VACANCY

Staffing a Force Structure Vacancy for a Full-Time Employee (Temporary, Permanent, CORE)-Initial Assignment of Title, Non-Supervisory



**Figure 9: Staffing a Force Structure Vacancy for a FTE - Initial Assignment of Title, Non-Supervisory**

Staffing a Force Structure Vacancy for a Full-Time Employee (Temporary, Permanent, CORE)-*Initial Assignment of Title, Supervisory*



**Figure 10: Staffing a Force Structure Vacancy for a FTE – Initial Assignment of Title, Supervisory**

# Staffing a Force Structure Vacancy for a Full-Time Employee (Temporary, Permanent, CORE)-*Hiring*



**Figure 11: Staffing a Force Structure Vacancy for a FTE – Hiring[12]**

[12] This flowchart does not apply to the Legal cadre.

118

**Staffing a Force Structure Vacancy for a Reservist**-*Hiring and Initial Assignment of Title*



**Figure 12: Staffing a Force Structure Vacancy for a Reservist – Hiring and Initial Assignment of Title[13]**

[13] This flowchart does not apply to the Legal cadre.



**Figure 13: Staffing a Force Structure Vacancy for an IM CORE - Hiring and Initial Assignment of Title** [14]

---

[14] This flowchart does not apply to the Legal cadre.

# APPENDIX O: CERTIFICATION/DECERTIFICATION PROCESS

## Certification Process

1. The Employee will prepare and submit a certification package while retaining the original PTB for their records.
   a. Complete an ERF for non-supervisory positions or ERF-QRB for supervisory positions
   b. Compile a certification package to include:
      i. Completed copy of PTB
      ii. Certification of required training (certificates, training records)
      iii. Relevant position-specific incident performance appraisal(s)
      iv. Licenses and Certifications (as required for the position)
      v. Letters of recommendation from other certified employees with equal or higher qualifications (optional)
      vi. Training and experience record(s) of previous qualifications in an ICS organization(s) to include but not limited to:
         1. Training certificates
         2. Incident evaluations
         3. Letters from competent authorities
   c. E-mail certification package to FEMA-FQS-Program@fema.dhs.gov
2. The Data Entry Group will review the certification package for completeness and verify that all documents received are recorded in the qualification tracking system database.
   a. If complete, the Data Entry Group will forward the package to the Cadre Coordinator for review.
   b. If incomplete, the Data Entry Group will return the certification package to the employee with an explanation and request for additional information and copy the Cadre Coordinator for further action.
3. The Cadre Coordinator will evaluate the package for a recommendation to the CO on an FTL and prepare a Decision Letter. Cadres may choose to utilize an SME panel to assist in this process.
   a. Deployment History from the deployment system
   b. Supplemental Incident Deployment Experience including personal records such as:
      i. Incident Action Plan
      ii. JFO Organization Chart
      iii. ICS 204 form with assignment indicated

          iv.  Incident Performance Appraisal(s) relevant to requested FQS job title (regular duty performance appraisal is not applicable)

          v.  Verification letter from section chief or senior leadership

   c.  If incomplete, return certification package to employee with detailed explanation and request for additional information

4. CO will review the certification package for qualification determination.

   a.  Non-supervisory positions:

          i.  Evaluate the certification package

          ii.  Elect: to, or not to, recommend for certification

          iii.  Sign the Transmittal Log and the Decision Letter

          iv.  Signed documents are sent to FEMA-FQS-Program@fema.dhs.gov to be prepared with appropriate documents (PTB, Qualification Sheet, and Progression Chart) and sent to the employee, as well as being entered into the deployment and qualification tracking systems

   b.  Supervisory positions:

          i.  Forward the FTL to QRB Chair for review and recommendation.

5. For supervisory positions only, the QRB Chair will review the certification package prior to convening the QRB.

   a.  QRB convenes to:

          i.  Evaluate certification package

          ii.  Determine recommendation for certification

          iii.  Prepare decision letter for CA

6. CA: for supervisory positions only

   a.  Reviews recommendation

   b.  Approves or disapproves the recommendation

   c.  Signs transmittal log and decision letter

   d.  Signed documents are sent to FEMA-FQS-Program@fema.dhs.gov and to the employee to be prepared with appropriate documents (PTB, Qualification Sheet, and Progression Chart). They are also entered into the deployment and qualification tracking systems. The cadre management and the appropriate regional liaison, if applicable, are copied on the email notification to the employee.

7. The Cadre Coordinator will maintain all decision letters and transmittal logs in the employee's personnel file.

# Decertification Process

1. Cadre Coordinator will forward an FTL to the CO for decertification action.

2. CO will prepare and forward a notification letter for CA signature that includes:

   a.  Reason they have been decertified in the position

   b.  Those items required to recertify in the position

3. CA will:
   a. Review and sign decertification letter
   b. Return signed letter and FTL to CO
4. CO will return the signed letter and transmittal log to the Cadre Coordinator.
5. Cadre Coordinator will:
   a. Send the decertification letter and transmittal log to FEMA-FQS-Program@fema.dhs.gov for addition of appropriate documents (PTB, Qualification Sheet, and Progression Chart) and send to the employee, as well as entering it into the deployment and qualification tracking systems
   b. Place letter and FTL in employee file for record keeping

# APPENDIX P: CADRE COORDINATOR ROLE IN QRB REVIEW

1. Evaluate force structure availability in positions requested.
2. Evaluate potential candidates for position based upon force structure availability.
3. Confirm packet completion:
   a. Employee Request Form
   b. Supporting Documentation
4. Review employee submission packets:
   a. Verify deployments in positions required by baseline standard for the position, including number of days and levels of disaster with documents provided in packet (Verifying documentation must be in addition to the deployment system since position titles were not accurate in the past. This would include organizational charts, evaluations, ICS 204s, etc.)
   b. Confirm training required in baseline standard for the position with transcript/certificates provided in packet
   c. Evaluate evaluation sheets or performance appraisals in position requested, particularly for any management deficiencies or supervisory deficit issues
   d. If baseline standards are not met, evaluate documents provided for equivalent experience
   e. Determine if position requested will be evaluated with in the cadre (non-supervisory) or will need to be sent forward to the QRB
5. Work with program officials to determine which packets should be prepared for the QRB in which positions. Packets should be reviewed by a SME qualified in a typed cadre position. Program can use a SME panel.
6. Use baseline standard worksheet for each packet the program wants to send forward to the QRB.
7. Prepare Transmittal Logs with CO signatures for each packet to be submitted to the QRB. Forward employee packet, Transmittal Log, subordinate titles, and baseline standard worksheet to FEMA-FQS-Program@fema.dhs.gov by the due date with the following naming convention:
   a. **Command Staff:** CSQRB-LastName-FirstName-postionMnemonic-cadre
   b. **General Staff:** GSQRB-LastName-FirstName-postionMnemonic-cadre
   c. **Example:** GSQRB-Roach-Pamela-PSC3--Planning
8. Determine who will present each packet to the QRB. This can be the Cadre Coordinator or other cadre personnel. The program may also have a regional representative present packets for their region.
9. Presenter will prepare notes to be able to present employee to the QRB from the information in the Employee Request Form.

123

    a.   Employee Request Form will be shown to QRB on screen, as well as any other documents from the packet the QRB requests.

    b.   Baseline Standard will be available to QRB for recommendation decision, including Program's rating, if provided.

10. After deliberation, the QRB Chair will send final Transmittal Logs and FQS Result Letters to CA for signature (copy to Cadre Coordinator).

11. Signed Transmittal Logs and FQS Result Letters will be returned electronically to QRB Coordinator, Pamela.Roach@dhs.gov. Result Letters will be sent to employees from the Pasadena Call Center (copy Cadre Coordinator).

12. FQS Unit and Pasadena Call Center will update the deployment system with approved subtitles and new FQS job titles.

13. Employees have 60 days from FQS results letter to request reconsideration in writing to the program.

14. Programs have 60 days from the written employee reconsideration request to provide written employee notification of reconsideration results.

15. Cadre Coordinator will work with QRB Coordinator, Pamela.Roach@dhs.gov and the Pasadena Call Center, FEMA-FQS-Program@fema.dhs.gov to make reconsideration changes in the deployment system.

124

# APPENDIX Q: EMPLOYEE SELF – CERTIFICATION HEALTH AND SAFETY CHECKLIST

DEPARTMENT OF HOMELAND SECURITY
FEDERAL EMERGENCY MANAGEMENT AGENCY
**EMPLOYEE SELF - CERTIFICATION HEALTH and SAFETY CHECKLIST**

This self-certification safety checklist is designed to help employees assess the overall safety of their alternate worksite. Employees should inspect their alternate worksite, using this safety checklist as a reference. Employees should complete and submit this checklist to their supervisor, as part of the telework application process. To ensure a safe and productive work environment, employees should correct any item(s) with a 'NO' response prior to teleworking. Failure to do so will result in the disapproval of the Telework Application and Agreement.

Supervisors should review the checklist with employee, and document any discussion in which the information in this checklist was clarified.

| 1. Employee Name | 2. Organization | 3. Position Title | 4. Series and Grade |
|---|---|---|---|
| 5. Office Telephone Number | 6. Supervisor Name | | |

7. Describe the designated work area in the alternate worksite

| A. Workplace Environment Questions | Yes | No |
|---|---|---|
| 1. Are the temperature, noise, ventilation, and lighting levels adequate to maintain your normal level of job performance? | ☐ | ☐ |
| 2. Are all stairs with four or more steps equipped with handrails? | ☐ | ☐ |
| 3.  Are all circuit breakers and/or fuses in the electrical panel labeled as to intended service? | ☐ | ☐ |
| 4. Do circuit breakers clearly indicate if they are in the open or closed position? | ☐ | ☐ |
| 5. Is all electrical equipment free of recognized hazards that could cause physical harm (frayed wires, bare conductors, loose wires, flexible wires running through walls, exposed wires to the ceiling)? | ☐ | ☐ |
| 6. Will the building's electrical system permit the grounding of electrical equipment? | ☐ | ☐ |
| 7. Are aisles, doorways, and corners free of obstructions to permit visibility and movement? | ☐ | ☐ |
| 8. Are file cabinets and storage closets arranged so drawers and doors do not open into walkway? | ☐ | ☐ |
| 9. Are the chair casters (wheels) secure and the rungs and legs of the chair sturdy? | ☐ | ☐ |
| 10. Are the phone lines, electrical cords, and extension wires secured under a desk or alongside a baseboard? | ☐ | ☐ |
| 11. Is the office space neat, clean, and free of excessive amounts of combustibles? | ☐ | ☐ |
| 12. Are floor surfaces clean, dry, level, and free of worn or frayed seams? | ☐ | ☐ |
| 13. Are carpets well secured to the floor and free of frayed or worn seams? | ☐ | ☐ |
| 14. Is there enough light for reading? | ☐ | ☐ |

| B. Computer Workstation | Yes | No | B. Computer Workstation (Continued) | Yes | No |
|---|---|---|---|---|---|
| 1. Is your chair adjustable? | ☐ | ☐ | 8. Do you have enough leg room? | ☐ | ☐ |
| 2. Do you know how to adjust your chair? | ☐ | ☐ | 9. Is the screen free from noticeable glare? | ☐ | ☐ |
| 3. Is your back adequately supported by a backrest? | ☐ | ☐ | 10. Is the top of the screen eye level? | ☐ | ☐ |
| 4. Are your feet on the floor or fully supported by a footrest? | ☐ | ☐ | 11. Is there space to rest the arms while not keying? | ☐ | ☐ |
| 5. Are you satisfied with placement of your monitor and keyboard? | ☐ | ☐ | 12. When keying, are your forearms close to parallel with the floor? | ☐ | ☐ |
| 6. Is it easy to read the text on your screen? | ☐ | ☐ | | | |
| 7.  Do you need a document holder? | ☐ | ☐ | 13. Are your wrists fairly straight when keying? | ☐ | ☐ |

I certify that I have inspected my alternate worksite and the above information is true and correct to the best of my knowledge. I agree to correct any item(s) with a 'NO' response prior to teleworking.

_____
Employee's Signature                                                                                         Date

I certify that I have reviewed this checklist with the employee and advised (s)he to take all necessary corrective actions to eliminate any hazard(s) (as revealed by a negative response) before (s)he begins to telework.

_____
Supervisor's Signature                                                                                       Date

125

# APPENDIX R: TELEWORK APPLICATION AND AGREEMENT

DEPARTMENT OF HOMELAND SECURITY
FEDERAL EMERGENCY MANAGEMENT AGENCY
**TELEWORK APPLICATION AND AGREEMENT**

| 1. Check one of the following: | ☐ New Agreement | ☐ Change in Existing Agreement |
|---|---|---|

| 2. Employee Name | 3. Organization | 4. Position Title | 5. Series and Grade |
|---|---|---|---|

| 6. Office Telephone No. | 7. Supervisor (Name/Title) |
|---|---|

| 8. Type of Telework: | ☐ Regular (Core) | ☐ Situational (Episodic) |
|---|---|---|

**Part I - Completion of this agreement indicates that:**

1. The employee's telework arrangement begins on _____
(date)

2. The employee's official tour of duty and location are listed below.

| DAY | Telework Days (Week 1) | Start and End Times | Telework Days (Week 2) | Start and End Times |
|---|---|---|---|---|
| Monday | | | | |
| Tuesday | | | | |
| Wednesday | | | | |
| Thursday | | | | |
| Friday | | | | |

3. Employee volunteers to participate in the program and to adhere to the applicable guidelines and policies. Agency concurs with employee participation and agrees to the applicable guidelines and policies.

4. Employee understands that FEMA may require participating employee to work from their telework site, e.g., home, satellite office, or other location, during periods of Unscheduled Telework authorization due to area closures, dismissals, unforeseen emergencies or other reasons as authorized by the Supervisor.

5. Management reserves the right to alter the employee's established telework schedule to accommodate peak workload office demands or for any other official purpose with advance notifications.

6. Employee's official tour of duty must include at least a 30-minute uncompensated lunch.

7. Employee's official duty station is: _____ (City and State) for purposes such as pay, travel,

etc. The location at which the employee is designated to work (i.e., alternate work location) while not at the official duty station is: _____

The phone number of the alternate worksite is _____

8. Employee understands requirements for an adequate and safe office space and that these requirements must be met.

9. An employee approved for telework is required to satisfactorily complete all assigned work, consistent with the approach adopted for all other employees in the work group.

10. The employee will regularly meet/speak with the supervisor to receive assignments and to review completed work as necessary or appropriate. The employee's job performance will be evaluated on criteria and milestones determined by the supervisor with input form employee.

11. Employee's Time and Attendance (WebTA) for all official duty time spent in a Teleworking status will be recorded using the proper Telework code. The supervisor and employee are responsible for ensuring the accuracy of time and attendance reported for the employee's work at the official duty station and the alternative workplace. The supervisor agrees to certify biweekly the employee's Time and Attendance Daily Report for hours worked. The employee's timekeeper will retain a copy of the employee's work schedule.

12. Employee agrees to participate in surveys and data calls relative to the FEMA Telework Program, as requested.

13. The employee must obtain supervisory approval before taking leave in accordance with established office procedures in accordance with FEMAs Absence and Leave policies. Use of sick leave, annual leave, or other leave credits during regularly schedule telework time must be approved in advance by the supervisor. Overtime must be approved in advance by the supervisor.

14. Employee will utilize Government equipment for official business only and in accordance with applicable laws, regulations, policies, etc., as well as safeguard said equipment Employee is responsible for servicing and maintaining employee-owned equipment.

15. The employee agrees to permit access to their home by agency representatives when necessary to ensure proper maintenance of agency-owned equipment. Teleworkers should be given at least one day's advance notice of any such visit. Visits should only be done during regular working hours.

**FEMA Form 123-9-0-1, (1/13)**

126

16. Employee is covered under the Federal Employees Compensation Act in the course of performing official duties at the alternate work location or official duty station. Any accident or injury which occurs at the alternate work location must be brought immediately to the attention of the supervisor.

17. Employee's most recent performance rating must be at least equivalent to "proficient" or "achieved expectations".

18. Employee understands that telework is not a substitute for dependent care (child care or elder care) and that appropriate arrangements must be made to accommodate children and adults who cannot care for themselves, while performing official duties in a telework site.

19. The employee understands that the Government will not be responsible for any operating costs that are associated with the use of employee's home as an alternative workplace, for example home maintenance, insurance or utilities.

20. Employee will apply approved safeguards to protect Government records from unauthorized disclosure or damage and will comply with the provisions set forth in the Privacy Act of 1974, Public Act of 1974, Public Law 93-579, codified at Title 5, U.S.C., Section 55a.

21. The employee agrees to abide by the Department of Homeland Security and FEMA Standards of Ethical Conduct Standards while working on official duty.

22. Telework agreement**s** will be reviewed and discussed between the employee and supervisor on an annual basis.

23. Management may terminate participation in this arrangement at any time.

24. The employee may withdraw from the program at any time. The supervisor and employee understand that either party may terminate the Telework agreement with reasonable advance notice, generally fourteen calendar days, but not less than seven calendar days and require the employee to resume working at his/her official duty station. Reasons for termination will be documented by the supervisor and/or employee and filed with this agreement.

**Compliance with this Agreement**

The employee's failure to comply with the terms of this agreement may result in the termination of this agreement and the telework arrangement. Failure to comply with the provisions of this agreement may also result in appropriate disciplinary or adverse action against the employee.

**Part - II**

**Certification**

By signing this agreement, the employee certifies that (s)he has read the terms of this agreement and agrees to follow the policies and procedures outlined in them as well as all other applicable regulations, policies, and procedures.

| Employee's Signature | Title | Date |
| --- | --- | --- |
| Supervisor's Signature | Title | Date |
| Telework Coordinator's Signature | | Date Reviewed |

**Part III - Approval/Disapproval**

Your request to participate in the telework program is:  ☐ Approved as written     ☐ Approved with the following modification(s)

☐ **Disapproved for the following reason(s):**

☐ The employee does not have sufficient duties or work activities suitable for performance at an alternate work site.

☐ The employee's absence from the work place under a telework arrangement will unacceptably impact the operation of the work unit.

☐ The extent of supervision required for the employee could not be achieved in conjunction with a telework arrangement.

☐ The employee's alternative work site does not meet prescribed acceptability standards. (State the specific deficiency issue(s), such as: safety, two-way communications, access to required materials, IT security, or non-work related distractions and/or obligations.)

☐ The employee does not meet performance eligibility requirements. (State the specific deficiency issue(s) such as: writing, problem-solving, reliability for the following prescribed policies and procedures, organization/time management skills, or work quality/quantity.)

☐ The employee does not meet conduct-related eligibility requirements. (State the specific deficiency issues(s), such as: leave abuse, excessive absence, or a record of misconduct which precludes participation at this time. If no additional misconduct in one (1) year, employee may reapply.

☐ Other (please specify):

| Supervisor's Signature | Title | Date |
| --- | --- | --- |
| Telework Program Coordinators Signature | | Date |

127

# APPENDIX S: WORKFORCE ANALYSIS

The workforce analysis includes the following five tasks:

1. Develop a work plan, goals, and objectives
   a. The work plan will include doctrine and document research, an examination of historic and current data, and interviews with cadre management. IWMD will use a systems approach to determine the shortfalls associated with the current force structure and develop possible solutions for the future force structure.
2. Conduct a comprehensive force structure model review and mission analysis across all cadres
   a. Analyze cadre staffing levels and positions, and assess the capacity of the cadres to respond to an incident. The analysis will identify: the percentage of the permanent workforce required to perform incident management/incident support duties as compared to those who will hold ancillary and mission essential positions; total number of workforce members who hold positions solely dedicated to incident response (i.e., IM COREs, FEMA Corps); the Reservist incident responder requirement to provide for a scalable incident response using a temporary, intermittent workforce; and finally the SCF, which allows FEMA to leverage the Federal interagency workforce in response to a catastrophic Level I, or simultaneous incidents exceeding FEMA's organic incident responder capacity. It should be noted that the FEMA Corps members and SCF volunteers will not be counted into force structure calculations.
   b. Identify deficiencies or redundancies within the incident workforce in conducting the Federal response to incidents as determined through the review of relevant Federal Interagency Operations Plans, conducting interviews, reviewing regional incident staffing needs, and reviewing other sources as necessary.
3. Examine future technology
   a. Determine critical force package deployment architecture for response through analysis of existing data, requirement needs, and projected deployment template strategies.
4. Examine training, education, and qualification needs
   a. Examine needed future training courses, other types of developmental education, and necessary qualifications against existing standards in the FEMA Qualifications System.
5. Explore mitigation efforts
   a. Conduct outreach with mitigation to determine if and how hazard mitigation efforts have decreased Federal response and recovery requirements for certain incidents.

128

# APPENDIX T: OFFICE OF CHIEF COUNSEL

Unlike every other division and office in the Agency, FEMA's Office of Chief Counsel (OCC) provides legal advice to FEMA's Administrator and Agency staff under the direct supervision of the DHS General Counsel.[15] The General Counsel is the Department's chief legal officer and principal legal advisor to the Secretary of Homeland Security and, as such, has final authority and responsibility for legal policy determinations within the Department as well as its components (including FEMA).

As the employees of FEMA's OCC report to the General Counsel, they are subject to the policies of governance established by the General Counsel. As employees of the General Counsel, DHS Delegation 0400.2 "Delegation to the General Counsel" establishes the Office of the General Counsel as an organizational element for the purposes of appointment and administration of personnel, claims resolution, and the labor-management relations program. The General Counsel, with the concurrence of the Secretary, may determine that the Office of the General Counsel shall operate with other authorities and responsibilities of an organizational element, in accordance with Delegation 0160.1 "Delegation to the Department of Homeland Security Organizational Elements." Pursuant to that authority, the General Counsel has retained the authority to select, assign, reassign, classify, deploy, and discipline OCC personnel.

The control over FEMA attorneys by the General Counsel is in part because attorneys are subject to ethics and oversight responsibilities that other employees are not. State Bar membership is essential to the statutory duties and responsibilities of the attorneys of the Agency. Each employee who reports to the General Counsel and who is appointed to an 0905 (General Attorney) occupational series attorney position, must, at the time of appointment and throughout his or her tenure, be an active member in good standing of the Bar of at least one United States jurisdiction, which is any State, the District of Columbia, or a territory or commonwealth of the United States. In addition, he or she must comply with applicable local ethics codes in addition to all ethics codes for Federal attorneys. Failure to maintain current, active membership in good standing may be cause for disciplinary action, up to and including removal from Federal service.

As such, OCC employees may not be selected, assigned, deployed, or disciplined by offices outside OCC. This includes attorneys whose positions are funded by other FEMA offices, as well as attorneys whose duty stations may be co-located with regional cadres.

Due to the restrictions on OCC, some of the provisions of this guide do not pertain to OCC personnel. Please see the Associate Chief Counsel for Regional and Field Legal Operations for questions regarding the applicability of Cadre Management procedures to OCC personnel.

---

[15] See DHS Directive 0400 "General Counsel Organization" January 24, 2003.

Exhibit W



# National Response Framework

*Fourth Edition*
*October 28, 2019*



# Executive Summary

The National Response Framework (NRF) provides foundational emergency management doctrine for how the Nation responds to all types of incidents. The NRF is built on scalable, flexible, and adaptable concepts identified in the National Incident Management System (NIMS) to align key roles and responsibilities across the Nation. The structures, roles, and responsibilities described in this Framework can be partially or fully implemented in the context of a threat or hazard, in anticipation of a significant event, or in response to an incident. Implementation of the structures and procedures described herein allows for a scaled response, delivery of specific resources and capabilities, and a level of coordination appropriate to each incident.

Responding to disasters and emergencies requires the cooperation of a variety of organizations; the larger or more complex the incident, the greater the number and variety of organizations that must respond. Think of a residential fire: Firefighters are leading the charge; public works may be on scene providing traffic control; police are providing security; emergency medical services personnel are triaging, transporting, and redistributing injured to local hospitals; and a local nonprofit or voluntary organization (e.g., American Red Cross and Salvation Army) may be on hand to assist displaced residents. For large disasters, such as major hurricanes or earthquakes, the incident complexity is increased as others—such as states or tribes and, ultimately, the Federal Government—become involved. Businesses, voluntary organizations, and other elements of the private sector are also key stakeholders, providing the essential services that must be restored following an incident. The NRF provides the foundation for how these organizations coordinate, integrate, and unify their response.

The unprecedented scale of recent disasters has spurred continued innovation in response operations and highlighted the need for further progress to build resilient capabilities to respond to disasters of increasing frequency and magnitude. This fourth edition of the NRF embraces lessons-learned from those disasters and shares emerging best practices.

Since publication of the third edition of the NRF in 2016, disaster response operations have underscored the paramount importance of sustaining essential community lifelines. The Framework defines community lifelines as those services that enable the continuous operation of critical government and business functions and are essential to human health and safety or economic security. If disrupted, rapid stabilization of community lifelines is essential to restoring a sense of normalcy. Recent disasters have illuminated two underlying features of community lifelines that highlight opportunities to strengthen response planning and operations.

First, community lifelines are interdependent and vulnerable to cascading failures. For example, communications and electric power systems rely on each other to function; severe damage to one will disrupt the other. Most lifelines also rely on complex supply chains. Water and wastewater service depend on the resupply of a broad array of chemicals and—if power goes out—fuel for emergency generators. However, in a severe natural or human-caused incident, those supply chains themselves may be broken.

Second, community lifeline stabilization relies on businesses and infrastructure owners and operators who have the expertise and primary responsibility for managing their systems in emergencies. Accordingly, new doctrine and coordination mechanisms are needed to enable the private sector to play a larger, more comprehensive role in preparedness and response activities.

The NRF is structured to help jurisdictions, citizens, nongovernmental organizations (NGO), and businesses develop whole community plans, integrate continuity plans, and build capabilities to respond to cascading failures among businesses, supply chains, and infrastructure sectors, as well as collaborate with the private sector and NGOs to stabilize community lifelines and enable restoration

of services in severe incidents. Critical infrastructure sector leadership (sector-specific agencies, government coordinating councils, and sector coordinating councils) create an established network to collaborate with their respective private sector partners and support cross-sector[1] response operations. Often, Emergency Support Functions (ESF) work with sector leadership to bolster preparedness for cross-sector collaboration. This fourth edition of the NRF describes new initiatives that leverage existing networks and better integrate business interests and infrastructure owners and operators into the heart of emergency management.

The NRF describes ways to improve coordination and response structures to build preparedness for catastrophic incidents. Stabilizing community lifelines in catastrophic incidents is vital and extraordinarily difficult. Communities cannot meet these challenges solely by scaling up existing plans and capabilities. Rather, new mechanisms are needed to supplement and integrate those already in place and facilitate cross-sector coordination, while respecting the roles of private sector partners and authorities of agencies at all levels of government.

A new ESF #14 – Cross-Sector Business and Infrastructure is introduced to focus on engaging private sector interests and infrastructure owners and operators—particularly those in sectors not currently aligned to other ESFs—and conducting cross-sector analysis to help inform decision making. ESF #14 relies on other ESFs aligned with a critical infrastructure sector to continue coordination with their corresponding sector during response efforts. ESF #14 helps coordinate multi-sector response operations between (or across) the government and private sector for natural or human-caused catastrophic incidents that jeopardize national public health and safety, the economy, and national security.

This edition of the Framework also builds on the response approach in previous editions to address national security emergencies. The National Security Strategy of the United States of America notes that potential adversaries are developing advanced weapons and capabilities that could threaten U.S. critical infrastructure.[2] Adversaries may also strategically target attacks to exploit interdependencies between infrastructure sectors and magnify cascading failures between them, posing incident response challenges above and beyond those created by earthquakes or other catastrophic natural hazards. The initiatives in this Framework address the resulting challenges for consequence management in ways that supplement and support other government, private sector, and NGO plans and coordinating structures.

---

[1] Cross-sector operations are those actions taken by public and private sector organizations from one or more of the 16 critical infrastructure sectors to help entities or facilities associated with other sectors respond to an incident, being focused on preventing or mitigating cascading failures between sectors and restoring critical supply chains.
[2] For more information on the National Security Strategy of the United States of America, see https://www.whitehouse.gov/wp-content/uploads/2017/12/NSS-Final-12-18-2017-0905.pdf.

# Table of Contents

**Introduction** ...................................................................................................... 1

    Evolution of the Framework ..............................................................................1

    Framework Purpose and Organization ...........................................................2

    Scope...................................................................................................................3

    Intended Audience .............................................................................................5

    Guiding Principles .............................................................................................5

**Foundational Components** ........................................................................... 8

    Prioritized Stabilization of Community Lifelines ...........................................8

    National Incident Management System .........................................................11

    Core Capabilities.............................................................................................12

**Operational Coordination** ........................................................................ 15

    Private Sector Engagement ............................................................................15

    Locally Executed Response ............................................................................16

    State, Tribal, Territorial, and Insular Area Managed Response .................18

    Federally Supported Response ......................................................................19

**Roles and Responsibilities for Response** ............................................. 25

    Communities.....................................................................................................26

    Local Government ............................................................................................29

    State, Tribal, Territorial, and Insular Area Government................................30

    Federal Government ........................................................................................34

**Federal Authorities** .................................................................................... 42

    Federal Response and Assistance Under the Robert T. Stafford Disaster Relief and Emergency Assistance Act ................................................................................43

    Federal Departments and Agencies Acting Under Their Own Authorities ....44

    Federal-to-Federal Support ...........................................................................46

    International Support........................................................................................46

    Federal Response and Assistance Available Without a Stafford Act Declaration..........47

**Operational Planning** ................................................................... **47**

    **Federal Planning** .........................................................................48

    **Application for Planning** ...........................................................49

    **Continuity Considerations** .......................................................50

**Supporting Resources** ............................................................. **50**

    **Maintenance** ...............................................................................50

**Conclusion** .................................................................................... **51**

# Introduction

The National Preparedness System outlines an organized process for the whole community[3] to move forward with its preparedness activities and achieve the National Preparedness Goal. The National Response Framework (NRF) sets the strategy and doctrine for how the whole community builds, sustains, and delivers the response core capabilities identified in the National Preparedness Goal in an integrated manner with the other mission areas. The fourth edition of the NRF emphasizes enhancing the unity of effort between the government and the private sector through better coordination and collaboration.

## Evolution of the Framework

The NRF builds on over 25 years of federal response guidance, beginning with the Federal Response Plan, published in 1992, and the National Response Plan, published in 2004. This fourth edition **of the NRF reorganizes and streamlines the previous version of the NRF, expands principles and concepts to better integrate government and private sector response efforts, and introduces the community lifelines concept and terminology.**

> This document supersedes the National Response Framework, Third Edition that was issued in June 2016 and becomes effective 60 days after publication.

Community lifelines are those services that enable the continuous operation of critical government and business functions and are essential to human health and safety or economic security. In serious but purely local incidents, interruptions of water service, electric power, and other community lifeline components are typically brief and easy to mitigate. However, severe and widespread incidents can halt lifeline services for many weeks or months. Such disruptions are especially extensive in catastrophic incidents and may result in mass casualties and other cascading consequences.

Making community lifelines a core focus of incident response within the NRF offers unique benefits for incidents ranging from small-scale to catastrophic disasters. By building capabilities to stabilize[4] and accelerate the restoration of community lifeline services, it will be possible to save countless lives, limit damage to the economy, help maintain essential services for critical national security installations, reduce the initial impacts of disasters, and facilitate recovery operations. While the primary focus of incident response remains on stabilizing community lifelines, other secondary considerations regarding the natural and cultural environment and economic factors are equally as important.

---

[3] Whole community includes individuals and communities, businesses, private and public sector owners and operators of critical infrastructure, faith-based organizations, nonprofit organizations, and all levels of government (local, regional/metropolitan, state, tribal, territorial, insular area, and federal). Whole community is defined in the National Preparedness Goal as "a focus on enabling the participation in national preparedness activities of a wider range of players from the private sector, including nongovernmental organizations and the general public, in conjunction with the participation of all levels of governmental in order to foster better coordination and working relationships."

[4] Stabilization occurs when immediate threats to life and property are anticipated, resourced, and managed and basic community lifeline services are provided to survivors.

Community lifelines provide a valuable decision-making construct to integrate cross-sector[5] response operations and reporting. Each lifeline depends on multiple infrastructure sectors, businesses, and supply chains to function. Focusing on community lifelines allows emergency managers and their partners to account for these complex interdependencies and prioritize response operations to achieve high-impact, multi-sector benefits. The Framework describes how the resources and capabilities of the Federal Government support such operations, while the new Emergency Support Function (ESF) #14 – Cross-Sector Business and Infrastructure Annex describes how it facilitates coordination and collaboration with business and infrastructure owners and operators to provide assistance and integrate the private sector's support during response, particularly for those sectors not currently aligned to other ESFs. Additional detail on the community lifelines can be found in the *Prioritized Stabilization of Community Lifelines* section.

Finally, the Framework's focus on community lifelines necessitates deeper collaboration with the private sector and nongovernmental organizations (NGO). During the disasters of 2017 and 2018, individual businesses and infrastructure owners and operators (including public and private sectors) forged innovative, collaborative relationships with government agencies to help prioritize and accelerate the stabilization of community lifeline services. The fourth edition of the NRF and ESF #14 – Cross-Sector Business and Infrastructure Annex institutionalize their progress and build upon it in ways that respect the authorities, responsibilities, and roles of all public, private, and NGO partners essential to incident response.

## Framework Purpose and Organization

The NRF is a guide to how the Nation responds to all types of disasters and emergencies. The NRF is built on scalable, flexible, and adaptable concepts identified in the National Incident Management System (NIMS) to align key roles and responsibilities across the Nation. The NRF describes specific authorities and best practices for managing incidents that range from the serious but purely local to those that are catastrophic and national in scope.

Within the NRF, the term "response" includes actions to save lives, protect property and the environment, stabilize the incident, and meet basic human needs following an incident. Response also includes the execution of emergency plans and actions to enable recovery. The NRF describes doctrine for managing all types of disasters or emergencies, regardless of scale, scope, and complexity. The goals and objectives herein explain common response disciplines and processes that have been developed at all levels of government (local, state, tribal, territorial, insular area,[6] and federal) and have matured over time.

To achieve the National Preparedness Goal, the objectives of the NRF are to do the following:

- Describe coordinating structures, as well as key roles and responsibilities for integrating capabilities across the whole community, to support the efforts of governments, the private sector, and NGOs in responding to actual and potential incidents;

- Describe how unity of effort among public and private sectors, as well as NGOs, supports the stabilization of community lifelines and prioritized restoration of infrastructure during an incident

---

[5] Cross-sector operations are those actions taken by public and private sector organizations from one or more of the 16 critical infrastructure sectors to help entities or facilities associated with other sectors respond to an incident, focused on preventing or mitigating cascading failures between sectors and restoring critical supply chains. These operations include measures taken by infrastructure owners and operators, businesses, and their government partners to account for cross-sector interdependencies in incident response operations.

[6] Per the Stafford Act, insular areas include Guam, the Commonwealth of the Northern Mariana Islands, American Samoa, and the U.S. Virgin Islands. Other statutes or departments and agencies may define the term "insular area" differently.

and enables recovery, including the elements that support economic security, such as restoration of business operations and other commercial activities;

- Describe the steps needed to prepare for delivering the response core capabilities, including capabilities brought through businesses and infrastructure owners and operators in an incident;

- Foster integration and coordination of activities for response actions; and

- Provide guidance through doctrine and establish the foundation for continued improvement of the Response Federal Interagency Operational Plan (FIOP), its incident annexes, as well as department and agency plans that implement the FIOP.

The NRF also advances progress under the National Security Strategy of the United States of America. The Framework helps achieve the strategy's first pillar: to "protect the American people, the homeland, and the American way of life." To accomplish this goal, the strategy calls for initiatives to strengthen the Nation's ability to withstand and recover rapidly from attacks and natural disasters. The NRF is structured to help achieve these goals by establishing a new federal ESF coordinating structure to help mitigate the impact of catastrophic incidents on community lifelines and account for the risk that adversaries will seek to complicate and disrupt U.S. response operations.

The NRF is composed of a base document, ESF annexes, and support annexes. The annexes provide detailed information to assist with the implementation of the NRF.

- ESF annexes describe the federal coordinating structures that group resources and capabilities into functional areas most frequently needed in a national response.

- Support annexes describe other mechanisms by which support is organized among private sector, NGO, and federal partners. The support annexes describe the essential supporting processes and considerations common to most incidents. Content found within the support annexes is superseded by changes and updates to legislation. The support annexes include the following:

  - Financial management
  - International coordination
  - Public affairs
  - Tribal relations
  - Volunteer and donations management
  - Worker safety and health

The Critical Infrastructure and Key Resources Support Annex and Private Sector Coordination Support Annex, which supplemented previous versions of the NRF, have been superseded in this fourth edition of the NRF by ESF #14 – Cross-Sector Business and Infrastructure Annex, which has been added as part of this updated framework. All references to these support annexes within the ESF or support annexes should be read as referring to the ESF #14 – Cross-Sector Business and Infrastructure.

## Scope

The NRF is a framework for all types of threats and hazards, ranging from accidents, technological hazards, natural disasters, and human-caused incidents. This Framework is utilized to implement NIMS and describes whole community coordinating structures and response activities; in particular, the Framework outlines government, private sector, and nongovernmental roles to reinforce

collaborative incident response.[7] The NRF also describes the structure and mechanisms for national-level policy and operational direction for incident management to ensure timely and effective federal support to local, state, tribal, territorial, and insular area governmental activities and survivors. The NRF is applicable to all federal, local, state, tribal, territorial, and insular area departments and agencies that participate in operations requiring a coordinated federal response.

NRF elements can be implemented at any time for any hazard, including the employment of ESF mechanisms. The structures, roles, and responsibilities described herein can be partially or fully implemented in the context of a threat or hazard, in anticipation of a significant event, or in response to an incident. Implementation of NRF structures and procedures allows for a scaled response, delivery of the specific resources and capabilities, and a level of coordination appropriate to each incident.

The response mission area includes the capabilities necessary to stabilize an incident, save lives, protect property and the environment, meet basic human needs, restore community lifeline services and other basic community functionality, and establish a safe and secure environment to facilitate the integration of recovery activities.

In this fourth edition of the NRF, the thresholds for catastrophic incident response may vary depending on one's perspective. A localized flood can be catastrophic to an individual family who lost their home and possessions, a severe tornado can be catastrophic to a town or city, and a hurricane can be catastrophic to a state or territory. At the national level, a catastrophic incident[8] is one of such extreme and remarkable severity or magnitude that the Nation's collective capability to manage all response requirements would be overwhelmed, thereby posing potential threats to national security, national economic security, and/or the public health and safety of the Nation. A national catastrophic incident implies that the necessary resources are not available within expected timeframes for incident response. During a national catastrophic incident, decision makers would be forced to consider the landscape of requirements and prioritize resources to manage shortfalls rather than to address all needs at once. Such a situation would also require the extraordinary means of mobilizing and prioritizing national resources to alleviate human suffering; protect lives and property; reduce damage to natural, cultural, and historic resources; stabilize the Nation's economy; and ensure national security.

In this Framework, the term "incident" includes any occurrence, natural or manmade, that necessitates a response to protect life or property and includes planned events, as well as emergencies or disasters of all kinds and sizes. The NRF's structures and procedures address how federal departments and agencies coordinate support for local, state, tribal, territorial, and insular area governments and how government at all levels works in unity with private sector and NGOs.

Nothing in the NRF is intended to alter or impede the ability of a local, state, tribal, territorial, or insular area government or Federal Government department or agency to carry out its authorities or meet its responsibilities under applicable laws, Executive orders, and directives.

---

[7] The NRF must be consistent with all pertinent statutes and policies, particularly those involving privacy and civil and human rights, such as the Americans with Disabilities Act of 1990, the Rehabilitation Act of 1973, and the Civil Rights Act of 1964.
[8] The Post-Katrina Emergency Management Reform Act of 2006 defines the term "catastrophic incident" as "any natural disaster, act of terrorism, or other man-made disaster that results in extraordinary levels of casualties or damage or disruption severely affecting the population (including mass evacuations), infrastructure, environment, economy, national morale, or government functions in an area."

## *Intended Audience*

The NRF is intended to be used by communities; the private sector; NGOs; local, state, tribal, territorial, and insular area governments; and the Federal Government, as well as other entities involved in response. The private sector includes for-profit and nonprofit organizations, formal and informal structures, commerce, and industries that comprise the national economy and are not part of a government structure. NGOs are a distinct category of organizations within the private sector that can include voluntary, ethnic, faith-based, veteran-based, disability,[9] relief agency, and animal welfare organizations, among others, and are referenced separately. This all-inclusive whole community approach focuses efforts and enables a full range of stakeholders to participate in national preparedness activities and to be full partners in incident response, including emergency management practitioners, first responders, and community leaders.

Infrastructure owners and operators (in private and public sectors), and other elements of the private sector, are especially important partners for incident response and a key audience for the Framework. These partners are vital for strengthening the coordination between industry and government that is necessary to stabilize community lifelines after major incidents or events. They are also crucial partners for creating the plans and doctrine to support essential functions for cross-sector response operations, especially where their ability to volunteer capabilities and expertise provides vital (and in some cases irreplaceable) contributions to protecting public health and safety. Moreover, because catastrophic incidents will create far more requests for emergency resources and types of government assistance than can be immediately fulfilled, infrastructure owners and operators and other commercial interests can help government agencies establish objective, nationwide criteria to help inform the allocation of scarce resources to promote stabilization efforts, restore infrastructure, and to reduce morbidity and mortality.

The fourth edition of the NRF describes how the whole community contributes to and benefits from national preparedness and integrated incident response. This includes children;[10] older adults; individuals with disabilities and others with access and functional needs;[11] those from religious, racial, and ethnically diverse backgrounds; people with limited English proficiency; and owners of animals, including household pets and service and assistance animals. Their individual contributions and needs must be incorporated into response planning and delivery of the core capabilities. For further information, see the *Core Capabilities* section.

## *Guiding Principles*

The following principles establish fundamental doctrine for the response mission area to support locally executed, state managed, and federally supported disaster operations: (1) engaged partnership; (2) tiered response; (3) scalable, flexible, and adaptable operational capabilities; (4) unity of effort

---

[9] An individual who has a physical or mental impairment that substantially limits one or more major life activities (an "actual disability") or a record of a physical or mental impairment that substantially limits a major life activity ("record of") or an actual or perceived impairment, whether or not the impairment limits or is perceived to limit a major life activity that is not both transitory and minor ("regarded as"). Individuals with disabilities have civil rights protections that may not be waived under any circumstances, including throughout emergencies and disasters.

[10] Children require a unique set of considerations across the core capabilities contained within this document. Their needs must be taken into consideration as part of any integrated planning effort.

[11] Access and functional needs refer to persons who may have additional needs before, during, and after an incident in functional areas, including but not limited to maintaining health, independence, communication, transportation, support, services, self-determination, and medical care. Individuals in need of additional response assistance may include those who have disabilities, live in institutionalized settings, are older adults, are children, are from diverse cultures, have limited English proficiency or are non-English speaking, or are transportation disadvantaged.

through unified command; and (5) readiness to act. These principles are rooted in the federal system and the U.S. Constitution's division of responsibilities between federal and state governments. These principles reflect the history of emergency management and the distilled wisdom of responders and leaders across the whole community.

## Engaged Partnership

Local, state, tribal, territorial, and insular area governments understand their needs best and play a critical role in involving the whole community in preparing for and responding to disasters in order to manage risk to communities and infrastructure.

Those who lead emergency response efforts must communicate and support engagement with the whole community by developing shared goals and aligning capabilities to reduce the scope and duration of impacts to any jurisdiction in times of crisis. Layered, mutually supporting capabilities of individuals, communities, the private sector, NGOs, and governments at all levels allow for coordinated planning in times of calm and effective response in times of crisis. Engaged partnership and coalition building include ongoing clear, consistent, accessible, and culturally and linguistically appropriate communication to ensure an appropriate response. [12]

Partnership engagement entails continuous adaptation and improvements for incident preparedness and continuity of operations against all types of threats and hazards. The spectrum of viable threats is expanding. Most notably, cyber threats to the Nation's critical infrastructure and the community lifelines are intensifying. New challenges for incident response are also emerging. For example, in conjunction with cyberattacks, adversaries may spread false disaster reporting via social media and other means in order to incite panic and disrupt response operations. Thus, continuous engagement establishing regular and clear communication between response partners is essential to ensuring that accurate, accessible, and actionable information and situational awareness is made available in response to these and other emerging threats.

## Tiered Response

Most incidents begin and end locally and are managed and executed at the local or tribal level. Incidents require a unified response from local agencies, the private sector, tribes, and NGOs. Some may require additional support from neighboring jurisdictions or state governments. A smaller number of incidents require federal support.[13] Incidents that occur within or along the borders of federally managed lands and state, tribal, and territorial lands require unity of effort among federal, state, tribal, or territorial governments at the local level. National response processes are structured to provide tiered levels of support when additional resources or capabilities are needed.

---

[12] Information, warnings, and communications associated with emergency management must ensure effective communication, such as through the use of appropriate auxiliary aids and services (e.g., interpreters, captioning, and alternative format documents) for individuals with disabilities and provide meaningful access to limited English-proficient individuals. Accessible messaging should be employed for individuals who use assistive technology and employ non-technological means to reach those who do not have access to communication technology and those living in remote areas.

[13] Certain incidents such as a pandemic or cyberattack may not be limited to a specific geographic area and may be managed at the local, state, tribal, territorial, insular area, or federal level, depending on the nature of the incident.

When all levels of government become engaged, a response is federally supported, state managed, and locally executed, with tribes, territories, and insular area governments often managing the response, as well. The Federal Government's support and response during disasters build on and are affected by the capacity of state, tribal, territorial, insular, and local governments, as well as the business community and NGOs. Preparedness efforts with partners at all levels increase the effectiveness of tiered response.

## Scalable, Flexible, and Adaptable Operational Capabilities

As incidents change in size, scope, and complexity, response efforts must adapt to meet evolving requirements. The number, type, and sources of resources must be able to expand rapidly to meet the changing needs associated with a given incident and its cascading effects. As needs grow and change, response processes must remain nimble, adaptable, and resilient. The structures and processes described in the NRF must be able to apply resources from the whole community to support disaster survivors and stabilize the community. As incidents stabilize, response efforts must be flexible to facilitate the integration of recovery activities.

## Unity of Effort Through Unified Command

The NIMS concept of unified command[14] maximizes response efforts while integrating and respecting the roles, responsibilities, and capabilities of all participating organizations. The Incident Command System (ICS), as prescribed by NIMS, is important to ensuring interoperability across multijurisdictional or multiagency incident management activities. Unified command enables unity of effort when no single jurisdiction, agency, or organization has primary authority and/or the resources to manage an incident on its own. The use of unified command enables jurisdictions and those with authority or responsibility for the incident to jointly manage and direct incident activities through establishment of common incident objectives, strategies, and a single incident action plan. ICS is used by all levels of government, as well as by many NGOs and private sector organizations.

## Readiness To Act

From individuals and communities to businesses, nonprofit, faith-based, and voluntary organizations and all levels of government (local, state, tribal, territorial, insular area, and federal), national response depends on the ability to act decisively. A forward-leaning posture is imperative for incidents that may expand rapidly in size, scope, or complexity, as well as incidents that occur without warning. Decisive action is often required to save lives and protect property and the environment. Although some risk to responders may be unavoidable, all response personnel are responsible for anticipating and managing risk through proper planning, organizing, equipping, training, and exercising.

---

[14] The ICS "unified command" concept is distinct from the military use of this term. Concepts of "command" and "unity of command" have distinct legal and cultural meanings for military forces and military operations. Military forces always remain under the control of the military chain of command and are subject to redirection or recall at any time. Military forces do not operate under the command of the incident commander or under the unified command structure, but they do coordinate with response partners and work toward a unity of effort while maintaining their internal chain of command.

Prior to and during catastrophic incidents or a national security emergency[15], especially those that occur with little or no notice, the Federal Government may mobilize and deploy assets in anticipation of a formal request from the state, tribe, territory, insular area, or under existing federal response authorities. Proactive efforts are intended to ensure that federal resources reach the scene in time to assist in reducing disruption of normal functions of local, state, tribal, territorial, and insular area governments and are done in coordination and collaboration with the governments, private sector entities, and NGOs, when possible.

# Foundational Components

## *Prioritized Stabilization of Community Lifelines*

Stabilizing community lifelines is the primary effort during response to lessen threats and hazards to public health and safety, the economy, and security. A community lifeline enables the continuous operation of critical government and business functions and is essential to human health and safety or economic security. Together, the community lifelines reframe incident information to provide decision makers with root cause and impact analysis. This construct maximizes the effectiveness of federally supported, state managed, and locally executed response. Figure 1 identifies the seven community lifelines: Safety and Security; Food, Water, Shelter; Health and Medical; Energy (Power & Fuel); Communications; Transportation; and Hazardous Material.



**Figure 1: Community Lifelines for Incident Stabilization**

The seven community lifelines represent only the most basic services a community relies on and which, when stable, enable all other activity within a community. The lifelines are designed to enable emergency managers, infrastructure owners and operators, and other partners to analyze the root cause of an incident impact and then prioritize and deploy resources to effectively stabilize the lifeline. As explained later in the NRF, **ESFs deliver core capabilities to stabilize community lifelines for an effective response**. Similar to the ESFs, other whole community organizations can work together to stabilize lifelines and meet disaster needs. The community lifelines do not directly cover all important aspects of community life that can be affected by an incident, including impacts to natural, historical, and cultural resources. For example, financial and economic issues important to the life and safety of affected individuals may also arise indirectly from impacts to lifelines during an incident.

---

[15] National security emergency means any occurrence, including natural disaster, military attack, technological emergency, or other emergency, that seriously degrades or threatens the national security of the United States, as defined in Executive Order 12656.

> **Example of Impacts on Financial Services After a Community Lifeline Disruption**
>
> A tornado has caused massive devastation in a rural town. Among the major impacts to community lifelines is the community's inability to access money.
>
> - Power outages have kept several bank branches closed and automated teller machines (ATM) inoperable, and merchants who are open despite the power outages are only able to accept cash transactions.
>
> - Some merchants, ATMs, and bank branches are already open and have been energized through grid or generator power. However, communications outages prevent them from accessing systems to process an electronic transaction.
>
> - Transportation issues (road closures and blockages) limit survivors' ability to travel to the limited merchants, ATM locations, and bank branches in the area, as well as responders' ability to provide assets to stabilize critical infrastructure.
>
> These cumulative effects, while incredibly disruptive to the community, are caused by a confluence of impacts to specific lifelines. By using the community lifeline construct and root cause analysis, emergency managers can assess that the major limiting factors restricting community access to money are through the power, transportation, and communications lifelines. Accordingly, a local emergency manager may alleviate the situation by considering options, such as prioritized route clearance for emergency access by power and communications crews, generators for temporary power, or deployment of mobile cell towers, for establishing connectivity until other infrastructure is restored.

The community lifelines are composed of multiple components that encompass infrastructure, assets, and services. Table 1 provides a brief description of each community lifeline but is not a comprehensive list of all components that should be analyzed.

**Table 1: Community Lifeline Descriptions**

| Community Lifeline | Description |
|---|---|
| **Safety and Security** | • Law enforcement and government services, as well as the associated assets that maintain communal security, provide search and rescue, evacuations, and firefighting capabilities, and promote responder safety. |
| **Food, Water, Shelter** | • Support systems that enable the sustainment of life, such as water treatment, transmission, and distribution systems; food retail and distribution networks; wastewater collection and treatment systems; as well as sheltering, and agriculture. |
| **Health and Medical** | • Infrastructure and service providers for medical care, public health, patient movement, fatality management, behavioral health, veterinary support, and health or medical supply chains. |
| **Energy** | • Service providers for electric power infrastructure, composed of generation, transmission, and distribution systems, as well as gas and liquid fuel processing, transportation, and delivery systems. Disruptions can have a limiting effect on the functionality of other community lifelines. |
| **Communications** | • Infrastructure owners and operators of broadband Internet, cellular networks, landline telephony, cable services (to include undersea |

*National Response Framework*

| Community Lifeline | Description |
|---|---|
|  | cable), satellite communications services, and broadcast networks (radio and television). Communication systems encompass a large set of diverse modes of delivery and technologies, often intertwined but largely operating independently. Services include elements such as alerts, warnings, and messages, as well as 911 and dispatch. Also includes accessibility of financial services. |
| **Transportation** | • Multiple modes of transportation that often serve complementary functions and create redundancy, adding to the inherent resilience in overall transportation networks. Transportation infrastructure generally includes highway/roadways, mass transit, railway, aviation, maritime, pipeline, and intermodal systems. |
| **Hazardous Material** | • Systems that mitigate threats to public health/welfare and the environment. This includes assessment of facilities that use, generate, and store hazardous substances, as well as specialized conveyance assets and efforts to identify, contain, and remove incident debris, pollution, contaminants, oil or other hazardous substances. |

As described in Table 1, community lifelines rely on multiple government entities, businesses, and infrastructure sectors to function. As a result, response operations to stabilize a lifeline are unlikely to fit within a single department, agency, ESF, infrastructure sector, or industry. Moreover, because these sectors and the community lifelines they support are interdependent, failures in one will cascade across to others.

Accounting for these interdependencies and their associated requirements for cross-sector assistance they entail poses overarching challenges in building preparedness for complex incidents. The Department of Homeland Security (DHS), in coordination with the sector-specific agencies, has identified National Critical Functions[16] that enable the Federal Government, in partnership with infrastructure owners and operators, to improve the risk management process before and after an incident and can support community lifeline assessments and stabilization efforts.

Community lifelines can be used by all levels of government, the private sector, and other partners to facilitate operational coordination and drive outcome-based response. Figure 2 shows how community lifelines are applied to support decision-making.



**Figure 2: The Application of Community Lifelines to Support Emergency Management**

---

[16] National Critical Functions are the functions of government and the private sector so vital to the United States that their disruption, corruption, or dysfunction would have a debilitating effect on security, national economic security, national public health or safety, or any combination thereof.

After an incident, initial assessments of the community lifelines (i.e., whether they are impacted and to what extent) help establish incident priorities and objectives that drive response actions. Continuously reassessing the status of community lifelines enables decision-makers to adjust operations in ways that can accelerate incident stabilization.

Using the community lifelines enables emergency managers and decision makers at all levels (e.g., business and infrastructure owners and operators, economic development agencies, comptrollers, public health officials, and healthcare providers) to understand and assess impacts on a community, identify limiting factors, and quickly develop solutions following an incident. Decision makers must rapidly determine the scope, complexity, and interdependent impacts of a disaster, so applying the community lifeline construct will allow them to do the following:

- Prioritize, sequence, and focus response efforts toward maintaining or restoring the most critical services and infrastructure;

- Utilize a common lexicon to facilitate communication across various stakeholders;

- Promote a response that facilitates unity of effort among the whole community (e.g., Federal Government; state, tribal, territorial, insular area, and local governments; and private sector and nongovernmental entities); and

- Clarify which components of the disaster are complex (emergent) and/or complicated (difficult), requiring cross-sector coordination.

Response activities organized around the community lifelines allow local, state, tribal, territorial, insular, and Federal Government emergency managers, along with private sector and nongovernmental partners, to better align, sequence, and prioritize limited public and private sector resources. The intent is to efficiently stabilize the incident by anticipating, resourcing, and managing immediate threats to life and property and to set the conditions for longer-term infrastructure restoration and economic and community recovery. Community lifeline stabilization is not the end state in itself for incident response and recovery, but a construct to achieve efficacy and efficiency throughout the disaster response phase.

## *National Incident Management System*

The purpose of NIMS is to provide a common approach to managing incidents. NIMS concepts provide for standardized but flexible incident management and support practices that emphasize common principles, a consistent approach for operational structures and supporting mechanisms, and an integrated approach to resource management. The response protocols and structures described in the NRF align with NIMS. NIMS provides the template for the management of incidents, regardless of size, scope, cause, or complexity, while the NRF provides the structure and mechanisms for policy implementation and incident response. Standardizing national response doctrine on NIMS integrates the capabilities and resources of various governmental jurisdictions, incident management and emergency response disciplines, NGOs, and the private sector into a cohesive, coordinated, and seamless national framework for incident response.

All of the components of NIMS—resource management, command and coordination, and communications and information management—support response. The NIMS concept of unified command is described in the command and coordination component of NIMS. This concept is essential to effective response operations because it addresses the importance of (1) developing a single set of objectives; (2) using a collective, strategic approach; (3) improving information flow and coordination; (4) creating a common understanding of joint priorities and limitations; (5) ensuring that no agency's legal authorities are compromised or neglected; and (6) optimizing the combined efforts of all participants under a single plan.

## Mutual Aid

Communities apply NIMS principles to integrate response plans and resources across jurisdictions, departments, the private sector, and NGOs. Various public and private mutual aid systems can be leveraged. Neighboring communities or organizations play a key role by providing support through a network of mutual aid and assistance agreements that identify the resources that communities may share during an incident. Additionally, private sector organizations often establish mutual aid agreements with each other to increase capabilities and expedite their response.

The ability to provide mutual aid accurately and rapidly is critical during disasters, but mutual aid partners require a common language and process to support the sharing of qualified personnel. The National Qualification System (NQS) addresses this challenge by providing a common language and approach for qualifying, certifying, and credentialing incident management and support personnel. NQS provides the tools for jurisdictions and organizations to share resources seamlessly. Using the NQS approach helps to ensure personnel deploying through mutual aid agreements and compacts have the required capabilities to perform their assigned duties.[17]

## *Core Capabilities*

Each mission area—prevention, protection, mitigation, response, and recovery—identifies core capabilities required to address common threats and hazards. Using the core capabilities construct enables communities and organizations to focus on specific preparedness measures necessary to ensure that the capabilities are available when needed. By allowing communities and organizations to quantify response requirements and measure response capacity, core capabilities are the key performance management tool in emergency preparedness.[18]

The National Preparedness Goal describes the core capabilities necessary to be prepared for all threats and hazards. The core capabilities provide a common vocabulary describing the significant functions that must be maintained and executed across the whole community to achieve the goal of a "secure and resilient nation."

> **Prevention:** Avoiding, preventing, or stopping a threatened or actual act of terrorism. Within the context of national preparedness, the term "prevention" refers to dealing with imminent threats.
>
> **Protection:** Securing the homeland against acts of terrorism and human-caused or natural disasters.
>
> **Mitigation:** Reducing loss of life and property by lessening the impact of disasters.
>
> **Response:** Saving lives, stabilizing community lifelines, protecting property and the environment, and meeting basic human needs after an incident has occurred.
>
> **Recovery:** Assisting impacted communities with restoration and revitalization.

The response core capabilities are the activities that generally must be accomplished in incident response, regardless of which levels of government are involved. While core capabilities are organized by mission area, they do not operate exclusively within that mission area. Actions related to one core capability often can inform actions associated with another.

---

[17] For more information on NQS, see https://www.fema.gov/national-qualification-system; for more information on NQS typing tools, see https://rtlt.preptoolkit.fema.gov/Public/Combined.
[18] For a full list of the core capabilities, see https://www.fema.gov/core-capabilities.

## Community Lifeline Stabilization and the Core Capabilities

Core capabilities are used to organize, analyze, and build the functions and services needed in response. The core capabilities developed during the preparedness cycle are applied throughout response to stabilize community lifelines and enable recovery.

By engaging the whole community to build and deliver the response core capabilities, the Nation is better prepared to respond to a threat or hazard; to assist in restoring basic services, community functionality, and economic activity; and to facilitate the integration of recovery activities. Table 2 shows how response core capabilities may relate to the community lifelines.

**Table 2: Examples of a Steady-State Relationship Between Community Lifelines and Response Core Capabilities**

| Community Lifeline* | Related Response Core Capabilities** | Infrastructure Systems | Situational Assessment | Operational Coordination | Public Information and Warning | Planning |
|---|---|---|---|---|---|---|
| Safety and Security | • On-scene Security, Protection, and Law Enforcement<br>• Fire Management and Suppression<br>• Mass Search and Rescue Operations<br>• Public Health, Healthcare, and Emergency Medical Services<br>• Environmental Response/Health and Safety | | | | | |
| Food, Water, Shelter | • Mass Care Services<br>• Logistics and Supply Chain Management | | | | | |
| Health and Medical | • Public Health, Healthcare, and Emergency Medical Services<br>• Fatality Management Services<br>• Environmental Response/Health and Safety<br>• Logistics and Supply Chain Management<br>• Mass Care Services | | | | | |
| Energy (Power & Fuel) | • Logistics and Supply Chain Management | | | | | |
| Communications | • Operational Communications<br>• Public Information and Warning | | | | | |
| Transportation | • Critical Transportation | | | | | |
| Hazardous Material | • Environmental Response/Health and Safety | | | | | |

\* Community Lifelines: How emergency managers assess and prioritize employment of capabilities for stabilization.
\*\* Core Capabilities: An interoperable means to characterize capabilities that may be assessed, built, or validated during preparedness or applied to response operations.

## Integration Among Mission Areas

Potential points of intersection between the response mission area and other mission areas include the following:

**Prevention.** Response organizations coordinate with those responsible for preventing imminent acts of terrorism or an attack (e.g., a significant cyber incident causing cascading and/or physical impacts) to understand both potential and specific threats and to prepare accordingly by creating plans for general threats and crisis action plans for credible threats.

- When an incident may have been caused by an intentional act, response organizations coordinate closely with law enforcement agencies to attribute the cause and prevent additional follow-on instances.

- Response agencies coordinate with law enforcement agencies to enable themselves to prepare, train, stage, and plan for the delivery of consequence management capabilities.

- Response agencies must coordinate with the owners of properties impacted by a particular incident who have the first responsibility for prevention, protection, and response.

**Protection.** Protection of critical infrastructure systems and implementation of plans for the rapid restoration of commercial activities and critical infrastructure operations are crucial aspects of the protection mission area. Many of the 16 critical infrastructure sectors[19] within the protection mission area are also represented in the response mission area. The existing infrastructure plans and coordination mechanisms (e.g., sector-specific agencies and councils) provide strong foundations for strengthening incident response plans and capabilities. As part of the National Infrastructure Protection Plan, public and private sector partners in each of the 16 critical infrastructure sectors and agencies at all levels of government have developed and maintain sector-specific plans that focus on the unique operating conditions and risk landscape within that sector.

- Response agencies should utilize the sector coordination constructs (e.g., sector-specific agencies or sector coordinating councils) to elicit advice and recommendations regarding systemic vulnerabilities, cross-sector interdependencies, and sector-level challenges that could hinder restoration.

- Impacts to infrastructure may result in the need for consequence management (e.g., cyberattacks).

**Mitigation.** Effective mitigation efforts directly limit the impact of an emergency, disaster, or attack on community lifelines and systems, thereby reducing the required scale of response capabilities needed for an incident. The National Mitigation Investment Strategy recommends actions for all national stakeholders involved in disaster resilience to reduce risks to and impacts on lifelines, buildings, infrastructure, ecosystems, and cultural, historic, and natural resources. Planning, response, and regulatory organizations coordinate to reduce risks to critical infrastructure by evaluating potential threats, encouraging resiliency in infrastructure, and planning for redundancy in services. These organizations often have information and the data about hazards and risks that can be shared with response personnel to improve response planning and execution.

- Response operations should leverage those organizations with relevant risk management equities to ascertain threats and hazards, understand vulnerabilities, and predict lifeline and survivor impacts or needs to enable more expedient response operations.

- Opportunities to lessen the risks of future hazards are an important element to building national resilience.

**Recovery.** As response activities are underway, recovery operations must begin. Applying the community lifelines construct enables response officials to more effectively identify the requirements and sequence steps in the recovery process, including activities that support the economy, by focusing them on vital areas of community support. This includes providing essential public health and safety services; restoring interrupted utility and other essential services; reestablishing transportation routes and other infrastructure (e.g., agriculture), providing food, water, and shelter for those displaced by an incident; protecting natural and cultural resources and ensuring environmental compliance; ensuring

---

[19] The critical infrastructure sectors are described in the 2013 National Infrastructure Protection Plan, https://www.dhs.gov/sites/default/files/publications/national-infrastructure-protection-plan-2013-508.pdf.

equal access to services in accordance with applicable laws; reunifying children, adults, and household pets who have been separated from their families/guardians; and reopening schools and child care centers.

- Response organizations are responsible for setting the conditions that foster a quick and seamless integration of recovery operations and establish conditions that enable a community's recovery.

- Effective recovery support also depends on successful information sharing between the ESFs and the six Recovery Support Functions (RSF) under the National Disaster Recovery Framework (NDRF).

- Recovery programs—including sheltering and housing, volunteer organization coordination, donations management, small business and agriculture assistance or loans, as well as other disaster assistance—often support response and recovery objectives.

These overlapping areas are identified through comprehensive planning with the whole community to ensure they are properly addressed during the response to an incident. Ensuring that operational plans properly account for the integration of all mission areas is essential.

# Operational Coordination

Incident management begins and ends locally, and most incidents are managed or executed at the closest possible geographical, organizational, and jurisdictional levels. Successful incident management often depends on the cooperation of multiple jurisdictions, levels of government, functional agencies, NGOs and emergency responder disciplines, and the private sector, which requires effective coordination across a broad spectrum of activities and organizations. Accordingly, the optimal disaster response follows the model of being locally executed; state, tribal, territorial, or insular area managed; and federally supported with private sector and NGO engagement throughout.

Operational coordination occurs across all of these levels and consists of actions and activities that enable decision makers to determine appropriate courses of action and provide oversight for all types of incidents, including complex homeland security operations, to achieve unity of effort and effective outcomes.

## Private Sector Engagement

Public sector government resources alone cannot provide all the solutions when responding to incidents. Acting within regulatory and authoritative guidelines, government entities and the private sector can provide mutually beneficial incident-specific response support. When government, private sector, and NGO resources are mutually supportive and aligned, there is a much better chance of meeting communities' incident and economic recovery needs. All elements of the community should be activated, engaged, and integrated to respond to a major or catastrophic incident. This all-inclusive approach helps expand and expedite the availability of resources, capabilities, and solution sets for incident response. When severe incidents disrupt community lifelines, private sector and NGO capabilities can assist with stabilizing lifelines and restoring services. Similar to public sector mutual aid and support agreements, it is essential that government and private sector organizations engage in collaboration before an incident to effectively partner during incident response.

Businesses and infrastructure owners and operators have primary responsibility for operating and repairing their systems in emergencies. Businesses and infrastructure owners and operators also have unique expertise and capabilities to conduct restoration operations of their own systems, execute voluntary mutual assistance operations within their sectors, and provide valuable resources for cross-

sector support. When catastrophic incidents put a premium on the restoration of complex supply chains (especially for essential products and services needed for response efforts and stabilizing the economy), private sector coordination and assets are vital for public health and safety, the economy, and national security. The private sector can also help government agencies prioritize support missions (e.g., debris removal) to facilitate business and infrastructure response operations.

In coordination with local governments, private sector organizations have a critical role in re-establishing commercial activities and restoring critical infrastructure operations the community requires following a disruption. The resilience of private sector organizations directly affects community recovery by providing products and services, employment opportunities, other resources and re-establishing a functioning economy. In many cases, private sector organizations also have immediate access to commodities and services that support incident response.

Governmental response organizations should coordinate closely with private sector partners to do the following:

- Assess cross-sector interdependencies and obstacles to meeting survivor needs;

- Identify opportunities to enable or support prompt stabilization of community lifelines;

- Identify where government support is appropriate and available; and

- Identify opportunities to synchronize response operations with private sector efforts to ensure the most effective approach to reach as many survivors as possible.

### Private Sector Coordinating Structures

Coordinating structures for the private sector include business emergency operations centers (BEOC), industry trade groups and coordinating councils, information sharing and analysis centers, private sector information and intelligence centers, and other structural entities, such as healthcare coalitions. These organizations, composed of multiple businesses and entities brought together by shared geography or common function (e.g., banking, supply chain management, transportation, venue, and management), support the collaboration, communication, and sharing of information within the private sector. Such organizations can coordinate with and support NGOs and, in many cases, serve as a conduit to government coordinating structures. Strengthening the relationship between private sector and government coordinating structures enhances information sharing and operational response.

## *Locally Executed Response*

During a disaster, those closest to the impacted areas—individuals, families, neighbors, businesses, and emergency responders comprising the community—are the first ones active in response. Local partners know their community's needs, capabilities, and resources best and are positioned to have the most effective impact in the aftermath of an incident. Locally executed response focuses on how the complex network of local, voluntary, and private sector organizations integrate their capabilities to restore damaged infrastructure, restart the flow of products and services, and place essential items into the hands of survivors. Local governments and communities, therefore, provide the true operational coordination for executing an effective response and can draw on the support of additional state and federal resources when their own resources prove insufficient.

Emergency responders at all levels of government use NIMS and ICS command and coordinating structures to manage and support response operations (Figure 3). ICS is a management system designed to integrate on-scene facilities, equipment, personnel, procedures, and communications within a common organizational structure. Emergency operations centers (EOC) are facilities where staff

coordinate information and resources to support on-scene incident management. Staff in EOCs at all levels of government may also encourage participation by the private sector, including NGOs, academia, associations, and access and functional needs community organizations. Staff in EOCs at all levels of government may also encourage participation by private sector elements including NGOs, academia, associations, and organizations representing those with disabilities and others with access and functional needs.

At the local level, coordinating structures are usually composed of entities within specific functional areas, such as public works, law enforcement, emergency medical services, and fire departments. On-scene integration among these structures may occur at incident command posts (ICP) and more frequently at one or more local EOCs.



**Figure 3: Example of an ICS organization with a Single Incident Commander[20]**

Incident management may also involve Multiagency Coordination Groups (MAC Groups). A MAC Group is composed of senior officials, such as agency administrators, executives, or their designees, who are authorized to represent or commit agency resources and funds in support of incident activities. A MAC Group acts as an executive- or policy-level body during incidents, supporting resource prioritization and allocation, and enabling decision making among elected and appointed officials and those responsible for managing the incident (i.e., the incident commander). In some communities and jurisdictions, MAC Groups are located at or near EOCs in order to authorize additional resources, approve emergency authorities, and provide guidance on issues.

## Local Coordinating Structures

Local jurisdictions and states employ a variety of coordinating structures to help identify risks, establish relationships, and organize and build capabilities. Due to the unique partnerships, geographic conditions, threats, and capabilities, the coordinating structures vary. Examples of local response

---

[20] For more information on NIMS and ICS, see https://www.fema.gov/media-library-data/1508151197225-ced8c60378c3936adb92c1a3ee6f6564/FINAL_NIMS_2017.pdf.

coordinating structures include local planning committees, healthcare coalitions,[21] Community Emergency Response Teams (CERT), and chapters of national-level associations. These local and regional coordinating structures organize and integrate their capabilities and resources with neighboring jurisdictions, the state, the private sector, and NGOs.

## State, Tribal, Territorial, and Insular Area Managed Response

State governments serve as agents for local jurisdictions by managing the delivery of federal disaster assistance to meet local requirements. While the local incident command structure directs on-scene incident management activities and maintains command and control of on-scene incident operations, state EOCs are activated as necessary to support local EOCs and to help ensure that responders have the resources they need to conduct response activities. This is achieved through integration of state-level coordinating structures working with local coordinating structures or the local incident command structure.

State, tribal, territorial, and insular area EOCs also provide a common location for coordination of state/tribal/territorial/insular area—and in some cases, federal—support to local EOCs and/or incident personnel. Most states, tribal organizations, territories, and insular areas maintain an EOC to manage incidents requiring state-level assistance. Some of these governments have additional EOCs for coordinating information and resources within a region or area.

Many states involve their tribal counterparts within the EOC to ensure that tribal coordinating structures are integrated into the delivery of capabilities and tribal needs are addressed.

### State, Territorial, and Insular Area Coordinating Structures

States, territories, and insular areas also leverage the capabilities and resources of partners across the state/territory/insular area when identifying needs and building capabilities. The coordinating structures at the state, territorial, or insular area level also vary, depending on factors such as geography, population, industry, and the capabilities of the local jurisdictions. These structures are also designed to leverage appropriate representatives from across the whole community, some of whom may also participate in local or regional coordinating structures. Many states, territories, and insular areas create independent committees or councils focused on specific areas or functions as a sub-set of their emergency management agency.

### Tribal Managed Response

The United States has a trust responsibility with federally recognized Indian tribes and recognizes their right to self-government. This trust doctrine requires the Federal Government to protect tribal treaty rights, lands, assets, and resources while providing support through statutory authority and other programs. Under the Stafford Act, federally recognized Indian tribes may directly request their own emergency and major declaration or they may request assistance under a state request. In addition, federally recognized Indian tribes can request federal assistance for incidents that impact the tribe but do not result in a Stafford Act declaration. Given their unique position, tribal governments often have planning and response requirements that are the equivalent of state and local operational coordination during an incident.

---

[21] Healthcare coalitions are multi-agency coordination groups that integrate member organizations with the jurisdictional agency(s) in the geographic area in which they operate. Healthcare coalitions are invaluable as public-private partnerships integrating healthcare facilities with emergency medical services, public health, and emergency management.

### *Tribal Coordinating Structures*

Tribal coordinating structures vary depending on a variety of factors, such as individual tribal capabilities, population size, and economic circumstances. Tribes may have internal coordinating structures and facilities for incident response, as well as others that include bordering states and neighboring jurisdictions.

The Tribal Assistance Coordination Group (TAC-G) is a MAC Group that assists federally recognized tribes during emergencies and disasters and provides information and technical assistance for tribal emergency management programs in coordination with federal partners. The TAC-G is led and managed by the Bureau of Indian Affairs Emergency Management Program. The TAC-G consists of partners from all levels of government (local, state, tribal, territorial, insular, or federal), as well as nonprofit aid organizations and the private sector.

## *Federally Supported Response*

Federal support during response operations focuses on the capabilities necessary to save lives; protect property and the environment; meet basic human needs; prioritize operations to stabilize community lifelines and restore basic services and community functionality; establish a safe, secure, and accessible environment for responders and response operations; and support the transition to recovery. The desired end-state for federal incident response is achieved when local, state, tribal, territorial, and insular area entities no longer require Federal Government assistance to provide life-saving or life-sustaining support, thereby allowing for the transition to recovery.

When an incident occurs that exceeds or is anticipated to exceed local, state, tribal, territorial, or insular area resources or when an incident is managed by federal departments or agencies acting under their own authorities, the Federal Government may use the management structures described within the NRF. Additionally, the Federal Government may use supplementary or complementary plans to involve all necessary department and agency resources to organize the federal response and ensure coordination among all response partners.

Different federal departments and agencies may play significant roles in response activities, depending on the nature and size of an incident. Many of the arrangements by which departments and agencies participate are defined in the ESF annexes coordinated through pre-scripted mission assignments in a Stafford Act response, formalized in interagency agreements, or described in supplementary plans.

The following sections describe federal support operations at the incident, regional, and headquarters levels.

## Federal Incident-level Operations

To help deliver federal support or response at the incident level, coordinating structures are aligned to incident-level structures.

### *Unified Coordination*

Unified coordination is the term used to describe the primary state/tribal/territorial/insular area/federal incident management activities conducted at the incident level. Unified coordination is typically directed from a Joint Field Office (JFO), a temporary federal facility that provides a central location for coordination of response efforts by the private sector, NGOs, and all levels of government. Unified coordination is organized, staffed, and managed in a manner consistent with NIMS principles using an ICS structure. The Unified Coordination Group (UCG) is composed of senior leaders representing state, tribal, territorial, insular area and federal interests and, in certain circumstances, local

jurisdictions, the private sector, and NGOs. UCG members must have significant jurisdictional responsibility and authority. The composition of the UCG varies from incident to incident, depending on the scope and nature of the disaster. The UCG leads the unified coordination staff. Personnel from state, tribal, territorial, insular area, and federal departments and agencies; other jurisdictional entities; the private sector; and NGOs may be assigned to the unified coordination staff at various incident facilities (e.g., JFOs, staging areas, and other field offices). The UCG determines staffing of the unified coordination staff based on incident requirements.

Although unified coordination is based on the ICS structure, it does not manage on-scene operations. Instead, unified coordination supports on-scene response efforts and conducts broader support operations that may extend beyond the incident site. Unified coordination must include robust operations, planning, public information, and logistics capabilities that integrate local, state, and federal—as well as tribal, territorial, and insular area governments—personnel, when appropriate, so that all levels of government work together to achieve unity of effort.

When incidents affect multiple localities and states or the entire Nation, multiple UCGs with associated unified coordination staff may be established. In these situations, coordination occurs according to the principles of area command, as described in NIMS.

As the primary field entity for federal response, unified coordination integrates diverse federal authorities and capabilities and coordinates federal response and recovery operations. Figure 4 shows a unified coordination organization that might be assembled to deal with a major incident—such as a terrorist attack—that includes a law enforcement dimension. Federal agencies that conduct on-scene, tactical-level activities may also establish incident and area command structures, generally in conjunction with their counterpart local, state, tribal, territorial and/or insular area government agencies, to manage that work.



**UNIFIED COORDINATION STAFF\***

*References to state also refer to tribal, territorial, and insular area governments.

**Figure 4: Unified Coordination**

### *Emergency Support Functions as a Coordinating Structure*

ESFs are the primary, but not exclusive, response coordinating structures at the federal level. Communities, states, regions, and other tribal, territorial, insular area, and federal departments and agencies may use the ESF construct, or they may employ other coordinating structures or partners appropriate to their location, threats, or authorities. Whatever structures are used, they are encouraged to work closely with federal ESFs at the incident, regional, or headquarters levels if they are activated.

The Federal Government and many state governments organize their response resources and capabilities under the ESF construct. Each ESF is composed of a department or agency that has been designated as the ESF coordinator, along with a number of primary and support agencies. Primary agencies are designated on the basis of their authorities, resources, and capabilities. Support agencies are assigned based on resources or capabilities in a given functional area. To the extent possible, resources provided by the ESFs are identified consistently with NIMS resource typing categories.

ESFs have proven to be an effective way to organize and manage resources to deliver core capabilities. The federal ESFs are the primary, but not exclusive, federal coordinating structures for building, sustaining, and delivering the response core capabilities.

At the federal level, ESFs are groups of organizations that work together to deliver core capabilities to stabilize community lifelines in support of an effective response. Any ESF may assist in the delivery of a response core capability. Because a core capability may be required, each ESF can contribute to the stabilization of any of the community lifelines, depending on the circumstances of the incident. Table 3 provides an example of actions each ESF may take to support incident issues arising within the health and medical lifeline; these actions may impact more than one of the other community lifelines.

**Table 3: Example Actions That an ESF May Take in Support of Stabilizing the Health and Medical Lifeline During Incident Response Operations**

| ESF | Example Supporting Actions or Capabilities |
|---|---|
| ESF #1 Transportation | Coordinate the opening of roads and manage aviation airspace for access to health and medical facilities or services. |
| ESF #2 Communications | Provide and enable contingency communications required at health and medical facilities. |
| ESF #3 Public Works & Engineering | Install generators and provide other temporary emergency power sources for health and medical facilities. |
| ESF #4 Firefighting | Coordinates federal firefighting activities and supports resource requests for public health and medical facilities and teams. |
| ESF #5 Information & Planning | Develop coordinated interagency crisis action plans addressing health and medical issues. |
| ESF #6 Mass Care, Emergency Assistance, Temporary Housing, & Human Assistance | Integrate voluntary agency and other partner support, including other federal agencies and the private sector, to resource health and medical services and supplies. |
| ESF #7 Logistics | Provide logistics support for moving meals, water, or other commodities. |
| ESF #8 Public Health & Medical Services | Provide health and medical support to communities, and coordinate across capabilities of partner agencies. |
| ESF #9 Search & Rescue | Conduct initial health and medical needs assessments. |

| ESF | Example Supporting Actions or Capabilities |
|---|---|
| ESF #10 Oil & Hazardous Materials Response | Monitor air quality near health and medical facilities in close proximity to the incident area. |
| ESF #11 Agriculture & Natural Resources | Coordinate with health and medical entities to address incidents of zoonotic disease. |
| ESF #12 Energy | Coordinate power restoration efforts for health and medical facilities or power-dependent medical populations. |
| ESF #13 Public Safety & Security | Provide public safety needed security at health and medical facilities or mobile teams delivering services. |
| ESF #14 Cross-Sector Business and Infrastructure | Be informed of and assess cascading impacts of health or medical infrastructure or service disruptions, and deconflict or prioritize cross-sector requirements. |
| ESF #15 External Affairs | Conduct public messaging on the status of available health and medical services or public health risks. |

Additional detail on the scope of each ESF can be found in the *Emergency Support Function Roles and Responsibilities* section.

As previously noted, many local, state, tribal, territorial, and insular area jurisdictions have adopted and tailored the ESF construct. Because these jurisdictions established ESFs based on their specific risks and requirements, there is no mandatory or direct linkage to the federal ESFs. Governments are encouraged to engage members of the whole community as part of whatever coordinating processes they use.

Departments and agencies supporting federal ESFs may be selectively activated by FEMA or as requested by a lead federal agency to support response activities for incidents. Not all incidents requiring federal support result in the activation of ESFs.

When departments and agencies supporting federal ESFs are activated, they may assign staff at headquarters, regional, and incident levels. Through the Stafford Act and in accordance with 6 U.S.C. Sections 741(4) and 753(c), FEMA may issue mission assignments to obtain resources and services from federal departments and agencies.

### *Incidents Without a Stafford Act Declaration*

Most incidents where the NRF serves as the foundational federal response doctrine will not result in a federally declared disaster under the Stafford Act. For example, pre-incident operations for hurricanes, responses to biological incidents, electric grid emergencies, oil spills, migration crises, public health emergencies, and a host of other threats and hazards may not receive a Presidential disaster declaration but still require a coordinated national response.

For such non-Stafford Act incidents where the Federal Government is involved, the President may designate or the federal agencies involved may agree to recognize an agency to serve as the Lead Federal Agency (LFA) for the response. The LFA typically activates the response structures appropriate to its authorities. The LFA employs NIMS and this Framework to coordinate the federal response. Details regarding federal operations for non-Stafford incidents are contained within the relevant statutes and policies. Because the NRF is always in effect, ESFs may be activated and deployed to help manage any response in support of the LFA.

## Federal Regional Operational Support

Coordinating structures can be assembled and organized at the regional level to address incidents that cross state or international borders or have broad geographic or system-wide implications or to manage competing requirements for response assets among multiple incidents.

### Federal Regional Facilities

Most federal departments and agencies have regional or field offices that may participate with local, state, tribal, territorial, and insular area governments in planning for incidents and provide response assets when an incident occurs in their jurisdiction. Some federal departments and agencies share the same standard federal regional structure as FEMA. In larger-scale incidents, these regional and field offices may provide the initial response assets with additional support being provided from other department and agency offices across the Nation. Some federal regional and field offices have their own EOCs to support deployments of their assets.

- **FEMA Regional Response Coordination Center (RRCC).** FEMA has 10 regional offices, each headed by a Regional Administrator. Each of FEMA's regional offices maintains an RRCC. When activated, RRCCs are multi-agency coordination centers generally staffed by regional FEMA personnel and augmented by ESFs and other federal agencies in anticipation of or immediately following an incident. Operating under the direction of the FEMA Regional Administrator, the staff within the RRCCs coordinates federal regional response efforts and maintains connectivity with FEMA Headquarters and with state EOCs, state and major urban area fusion centers, Federal Executive Boards, tribal governments, and other federal, state, tribal, territorial, and insular area operations and coordination centers that potentially contribute to the development of situational awareness. The UCG assumes responsibility for coordinating federal response activities at the incident level once unified coordination is established, freeing the RRCC to deal with new incidents should they occur.

- **Joint Operations Center (JOC).** In response to significant threats within the criminal jurisdiction of the United States, the Federal Bureau of Investigation (FBI) may establish a JOC, which is a regional multi-jurisdictional, interagency operations center to lead and coordinate the operational law enforcement response, including but not limited to investigative operations and related intelligence activities. The JOC is led by an FBI on-scene commander (OSC) and is supported by a command group and a consequence management group, as appropriate. If the threat involves potential attacks or threats spanning multiple geographic areas, then multiple JOCs may be established. The JOC acts as the focal point for the strategic management and direction of on scene law enforcement activities and coordination with local, state, tribal, territorial, and insular area authorities. Additionally, the FBI OSC may be supported by the Domestic Emergency Support Team (if deployed), which may provide interagency technical or scientific expertise.

## Federal Headquarters Operational Support

Coordinating structures are assembled and organized at the federal headquarters level, particularly to address incidents that cross regional borders or have broad geographic or system-wide implications.

### Federal Operations Centers

Most Cabinet-level and some other federal departments and agencies have headquarters-level operations centers. A wide range of such centers maintain situational awareness within their functional

areas and provide relevant information to the DHS National Operations Center (NOC)[22] during an incident. These operations centers may also coordinate ESF activities, communicate with other federal operations centers, and communicate with their local, state, tribal, territorial, and insular area government counterparts. Examples of FOCs include the following:

- **National Operations Center.** In the event of an act of terrorism, natural disaster, or other emergency, the NOC, as the principal operations center for DHS, coordinates and integrates information from the NOC components to provide situational awareness and a common operating picture for the entire Federal Government, as well as for local, state, tribal, territorial, and insular area governments, as appropriate, to ensure that accurate and critical terrorism and disaster-related information reaches government decision makers in a timely manner. Additionally, the NOC serves as the national fusion center, collecting and synthesizing all-source information, including information from state and major urban area fusion centers, for all threats and hazards across the entire integrated National Preparedness System.

- **National Response Coordination Center.** When activated, the NRCC is a multiagency coordination center located at FEMA Headquarters. NRCC's staff coordinates the overall federal support for major disasters and emergencies, including catastrophic incidents and emergency management program implementation. FEMA maintains the NRCC as a functional component of the NOC for incident support operations.

> The National Business Emergency Operations Center is a FEMA component within the NRCC that acts as mechanism for information sharing between public and private sector stakeholders. The NRCC also includes the public affairs function of ESF #15, which acts as a mechanism to synchronize external messaging among all impacted and responding organizations.

- **Cybersecurity and Infrastructure Security Agency (CISA) Integrated Operations Coordination Center (CIOCC).** The CIOCC is composed of the National Cybersecurity and Communications Integration Center, the National Infrastructure Coordinating Center, and the National Coordinating Center for Communications. It is the focal point for federal partners, the private sector, and local, state, tribal, and territorial governments to obtain situational awareness, technical assistance, and integrated, actionable information to secure and defend the Nation's cyber, physical, and communications infrastructure. The CIOCC operates around the clock to integrate, coordinate, and share risk and threat information with the critical infrastructure community, perform consequence analyses of incidents affecting critical infrastructure, inform decision making, provide technical expertise to address cyber threats and communications outages, and coordinate infrastructure-related support for broader federal response efforts.

- **National Military Command Center (NMCC).** The Department of Defense's (DoD) NMCC is the Nation's focal point for continuous monitoring and coordination of worldwide military operations. The NMCC directly supports combatant commanders, the Chairman of the Joint Chiefs of Staff, the Secretary of Defense, and the President in the command of U.S. Armed Forces in peacetime contingencies and war. The NMCC participates in a wide variety of activities, ranging from missile warning and attack assessment to management of peacetime operations, such as

---

[22] The NOC is composed of the NOC Watch, Intelligence Watch, FEMA National Watch Center, National Response Coordination Center, and the Cybersecurity and Infrastructure Security Agency Integrated Operations Coordination Center.

defense support of civil authorities during special events, major disasters, and national emergencies.

- **Strategic Information and Operations Center (SIOC).** The SIOC acts as the FBI's worldwide EOC. The SIOC maintains situational awareness of criminal or terrorist threats and critical incidents and crises (foreign and domestic, regardless of cause or origin) and provides FBI headquarters executives, domestic field offices, and overseas legal attachés with timely notification and the dissemination of strategic information. The SIOC shares information and intelligence with other EOCs at all levels of government. Maintaining a constant state of readiness to support any crisis or major event, the SIOC provides a secure venue to support crisis management, special event monitoring, and significant operations. The SIOC provides command, control, communications connectivity, and a common operating picture for managing FBI operational responses and assets throughout the world on behalf of FBI Headquarters, divisions, field offices, and legal attachés. In the event of a crisis, the SIOC establishes the headquarters command post and develops connectivity to field command posts and JOCs. The FBI-led Weapons of Mass Destruction Strategic Group is activated within the SIOC when facing weapons of mass destruction terrorist threats. The Weapons of Mass Destruction Strategic Group is an interagency crisis action team that supports information exchange and the deconfliction of counterterrorism activities.

The specific structures activated for a given incident depend on the levels of government involved, as well as the legal authorities under which the response is being conducted.

### National Security Council

The National Security Council (NSC) is the principal policy body for consideration of national security policy issues requiring Presidential determination. The NSC advises and assists the President in integrating all aspects of national security policy as it affects the United States—domestic, foreign, military, intelligence, and economic (in conjunction with the National Economic Council).

# Roles and Responsibilities for Response

This section describes those roles and responsibilities and sharpens the focus on identifying who is involved with the response mission area. This section also addresses what the various partners must do to deliver the response core capabilities and to integrate successfully with the prevention, protection, mitigation, and recovery mission areas.

An effective, unified national response requires layered, mutually supporting capabilities. Individuals and communities, the private sector, NGOs, and all levels of government (local, state, tribal, territorial, insular area, and federal) should each understand their respective roles and responsibilities and how to complement each other in achieving shared goals. All elements of the whole community play roles in developing the core capabilities needed to respond to incidents. This includes developing plans that ensure continuity of operations, conducting assessments and exercises, providing and directing resources and capabilities, and gathering lessons-learned. These activities require that all partners understand how they fit within and are supported by the structures described in the NRF.

Emergency management staff in all jurisdictions and organizations have a fundamental responsibility to consider the needs of the whole community. These needs must be incorporated into response planning and delivery of the core capabilities. The potential contributions of all individuals toward delivering core capabilities during incident response (e.g., through associations and alliances that serve the people previously identified) should be incorporated into planning efforts.

Emergency management staff must also consider those who own or have responsibility for animals, both as members of the community who may be affected by incidents and as a potential means of supporting response efforts. This includes those with household pets, service and assistance animals, working dogs, and agricultural animals/livestock, as well as those who have responsibility for wildlife, exotic animals, zoo animals, research animals, and animals housed in shelters, rescue organizations, breeding facilities, and sanctuaries.

## *Communities*

Communities are groups that share goals, values, and institutions. Communities are not always limited by geographic boundaries or political divisions. Instead, communities may be faith-based organizations; voluntary organizations; neighborhood partnerships; advocacy groups; academia; cultural, social, and community groups; and associations. Communities bring people together in different ways for different reasons, but each community provides opportunities for sharing information and promoting collective action. These communities may have resources and information to stabilize community lifelines. Engaging these groups in preparedness efforts, particularly at the local, state, tribal, territorial, and insular area levels, is important to identifying their needs and taking advantage of their potential contributions.

## Private Sector

Private sector organizations engage in incident response through their own internal response and continuity actions, the commodities they provide, their partnerships with each level of government, and their roles within the supply chain. Elements of the private sector are most often the providers of community lifeline services and have a key interest in the stabilization and restoration of their own operations and those of other infrastructure systems. Private sector organizations also play a vital role in ensuring communities and survivors have the services and resources necessary to respond to and recover from all types of incidents. The private sector, comprised of small, medium, and large businesses, spans nationally significant infrastructure to locally owned and operated businesses that, while small, are staples of the community. The private sector includes commerce; healthcare; private, cultural, and educational institutions; and industry, as well as public/private partnerships that have been established specifically for emergency management purposes. During an incident, key private sector partners should have a direct link to emergency managers and other relevant officials, such as those from public health, economic development, and community planning agencies and, in some cases, be involved in the decision-making process. Strong integration into response efforts can offer many benefits to the public and private sectors.

As key elements of the national economy, it is important for private sector organizations of all types and sizes to engage in preparedness planning, conduct risk assessments, and identify critical community lifelines, functions, and resources that impact their businesses and communities. Understanding and collaborating on the cross-sector interdependencies and cascading effects of a potentially high-consequence incident on business, infrastructure, and supply chains improves community resilience and can help private sector organizations to quickly resume normal operations. Ultimately, the ability of the private sector to recover is inextricably linked to community recovery.

Owners and operators of certain regulated facilities or hazardous operations may be legally responsible for preparing for and preventing incidents and responding when an incident occurs. For example, the Atomic Energy Act, as amended, and associated regulations require owners and operators of commercial nuclear powerplants and offsite response organizations (OROs) to maintain emergency plans in order protect the health and safety of the public. Onsite response organizations and OROs perform exercises, assessments, notifications, and training for incident response. Because of their

significance in providing essential functions and services, it is vital that private critical infrastructure sectors, such as privately-owned transportation and transit, telecommunications, utilities, financial institutions, hospitals, and other health-related facilities, create and sustain effective business continuity plans.

Private sector entities may serve as partners in local, state, tribal, territorial, and insular area emergency preparedness and response organizations and activities and with federal sector-specific agencies. Private sector entities often participate in local, state, tribal, territorial, and insular area preparedness activities by providing resources (donated or compensated) during an incident—including specialized teams, essential services, equipment, and advanced technologies—through local public-private emergency plans or mutual aid and assistance agreements or in response to requests from government and nongovernmental initiatives.

Restoring economic activity in an impacted area is fundamental to the recovery of the community. Examples of key private sector activities that support this effort include the following:

- Planning, training, and exercising their response capabilities;

- Planning for, responding to, and recovering from incidents that impact their own infrastructure and facilities;

- Protecting information, and maintaining the continuity of business operations in order to ensure the integrity of supply chains or quickly establishing new supply chains to stabilize the community and reduce human suffering;

- Providing assistance specified under mutual aid and assistance agreements;

- Addressing the welfare of employees (including disbursement of wages);

- Executing their own immediate response activities and meeting the continuity needs of infrastructure, facilities, and business operations;

- Collaborating with emergency management personnel to determine what assistance may be required and how they can provide needed support;

- Contributing to communication and information-sharing efforts during incidents, and providing insight on the scope and scale of impacts;

- Identifying requirements for public sector support to enable stabilization of critical community lifelines; and

- Contributing resources, personnel, and expertise; helping to shape objectives; and receiving information about the status of the community.

## Individuals, Families, and Households

Individuals, families, and households reduce potential emergency response requirements and hazards in and around their homes by efforts such as raising utilities above flood level or securing unanchored objects against the threat of high winds. Individuals, families, and households should also prepare emergency supply kits and emergency plans, so they can take care of themselves and their neighbors until assistance arrives. Information on emergency preparedness can be found at many local, state, tribal, territorial, insular area, voluntary organization, and federal emergency management Websites, such as http://www.ready.gov.

Individuals can also contribute to the preparedness and resilience of their households and communities by volunteering with emergency organizations (e.g., the local chapter of the American Red Cross,

Medical Reserve Corps, Community Emergency Response Teams, or National Voluntary Organizations Active in Disaster [National VOAD]) and completing emergency response training courses. Individuals who have access and functional or medical needs should make preparations with family members. Their plans should include provisions for personal assistance service providers and any household pets or service and assistance animals. During an actual disaster, emergency, or threat, individuals, households, and families should monitor emergency communications and follow guidance and instructions provided by local authorities.

## Nongovernmental Organizations

NGOs are a distinct category of organizations within the private sector that can support disaster response and recovery. NGOs include voluntary, ethnic, faith-based, veteran-based, disability, and nonprofit organizations that provide sheltering, emergency food supplies, and other essential support services for people, household pets, and service animals. NGOs are inherently independent and committed to specific interests and values. These interests and values drive the groups' operational priorities and shape the resources they provide. NGOs bolster government efforts at all levels and often provide specialized services to the whole community. NGOs are key partners in preparedness activities and response operations.

Examples of NGO contributions include the following:

- Training, management, and coordination of volunteers and donated goods;

- Ensuring staff are screened, trained, and able to safely perform their tasks;

- Identifying sheltering locations, ensuring access to those facilities, and communicating their locations to the whole community;

- Providing emergency commodities and services, such as water, food, shelter, assistance with family reunification, clothing, and supplies for post-emergency cleanup;

- Supporting the evacuation, rescue, care, and sheltering of animals displaced by the incident;

- Supporting search and rescue, transportation, and logistics services and support;

- Identifying and supporting the unmet needs of survivors who have been affected by the disaster;

- Identifying and supporting the heath, medical, mental health, and behavior health resources of the impacted community; and

- Supporting disaster survivors, identifying unmet needs, and developing individual recovery plans.

At the same time, when NGOs support response core capabilities they may also require government assistance. When planning for local community emergency management resources, government organizations should consider the potential need to support NGOs in performing their essential response functions. Volunteers and donors support response efforts in many ways. Governments at all levels must plan ahead to incorporate volunteers and donated resources into response activities. Close collaboration with the voluntary organizations and agencies assists in managing the influx of volunteers and donations. Additional information can be found in the Volunteers and Donations Management Support Annex.

Some NGOs and functions are officially designated as support elements to national response capabilities, such as the following:

- **The American Red Cross.** The American Red Cross is chartered by Congress to provide relief to survivors of disasters and help people prevent, prepare for, respond to, and recover from

emergencies. The Red Cross has a legal status of a "federal chartered instrumentality" and maintains a special relationship with the Federal Government.[23] In this capacity, the American Red Cross is the co-lead of ESF #6 and supports several other ESFs and the delivery of multiple core capabilities.

- **National Voluntary Organizations Active in Disaster.**[24] National VOAD is an association of organizations that mitigates and alleviates the impact of disasters; provides a forum promoting cooperation, communication, coordination and collaboration; and fosters more effective delivery of services to communities impacted by a disaster. National VOAD is a consortium of over 70 national organizations and 56 territorial and state equivalents.

- **National Center for Missing & Exploited Children (NCMEC).** Within the NCMEC, the National Emergency Child Locator Center facilitates the expeditious identification and reunification of children with their families.

## Local Government

The responsibility for responding to natural and human-caused incidents that have recognizable geographic boundaries generally begins at the local level with individuals and public officials in the county, parish, city, or town affected by an incident. The following paragraphs describe the responsibilities of specific local officials who have emergency management responsibilities.

### *Chief Elected or Appointed Official*

Jurisdictional chief executives are responsible for the public safety and welfare of the people of their jurisdiction. Officials provide strategic guidance and resources across all five mission areas. Chief elected or appointed officials must have a clear understanding of their emergency management roles and responsibilities and how to apply the response core capabilities because they may need to make decisions regarding resources and operations during an incident to stabilize community lifelines. Lives may depend on their decisions. Elected and appointed officials also routinely shape or modify laws, policies, and budgets to aid preparedness efforts and improve emergency management and response capabilities. The local chief executive's response duties may include the following:

- Obtaining assistance from other governmental agencies,

- Providing direction for response activities, and

- Ensuring appropriate information is provided to the public.

### *Local Emergency Manager*

The jurisdiction's emergency manager oversees the day-to-day emergency management programs and activities. The emergency manager works with chief elected and appointed officials to establish unified objectives regarding the jurisdiction's emergency plans and activities. This role entails coordinating and integrating all elements of the community. The emergency manager coordinates the local emergency management program. This includes assessing the capacity and readiness to deliver the capabilities most likely required to stabilize community lifelines during an incident and identifying and correcting shortfalls. The local emergency manager's duties often include the following:

- Advising elected and appointed officials during a response;

---

[23] 36 U.S.C. Chapter 3001: The American Red Cross.
[24] Additional information is available at https://www.nvoad.org/.

- Conducting response operations in accordance with the NIMS.

- Coordinating the functions of local agencies;

- Coordinating the development of plans, and working cooperatively with other local agencies, community organizations, private sector businesses, and NGOs;

- Developing and maintaining mutual aid and assistance agreements;

- Coordinating resource requests during an incident through the management of an emergency operations center;

- Coordinating damage assessments during an incident;

- Advising and informing local officials and the public about emergency management activities during an incident to facilitate response operations such as sheltering, avoiding, evacuating, and resupply of food and water;

- Developing and executing accessible public awareness and education programs;

- Conducting exercises to rehearse response activities; test personnel, plans and systems; and identify areas for improvement;

- Coordinating integration of individuals with disabilities, individuals from racially and ethnically diverse backgrounds, and others with access and functional needs into emergency planning and response; and

- Helping to ensure the continuation of essential services and functions through the development and implementation of continuity of operations plans.

### *Other Local Departments and Agencies*

Local government department and agency heads collaborate with the emergency manager during the development of local emergency plans and provide key response resources. Participation in the planning process helps to ensure that specific capabilities are integrated into a workable plan to safeguard the community. The department and agency heads and their staffs develop, plan, and train on internal policies and procedures to meet response needs safely, and they participate in interagency training and exercises to develop and maintain necessary capabilities.

> Similar to the federal and state level, local emergency management agencies are not the only entities involved in incident response. Local departments, agencies, and offices, such as those for emergency medical services, economic development, public health, law enforcement, fire, public works, land use planning, building construction, and animal control, as well as other administrative elements of local government, have a significant role to play and provide valuable perspective, depending on the incident.

## State, Tribal, Territorial, and Insular Area Government

State, tribal, territorial, and insular area governments are responsible for the health and welfare of their residents, communities, lands, and cultural heritage.

### States

State governments supplement local efforts before, during, and after incidents by applying in-state resources first. When an incident expands or has the potential to expand beyond the capability of a

local jurisdiction and responders cannot meet the needs with mutual aid and assistance resources, local officials contact the state.

Upon receiving a request for assistance from a local or tribal government, state officials may do the following:

▪ Coordinate warnings and public information through the activation of the state's public communications strategy;

▪ Distribute supplies stockpiled to meet the needs of the emergency;

▪ Provide technical assistance and support to meet the response and recovery needs;

▪ Suspend or waive statutes, rules, ordinances, and orders, to the extent permitted by law, to ensure timely performance of response functions;

▪ Implement state volunteer and donations management plans, and coordinate with the private sector and voluntary organizations;

▪ Order or recommend evacuations ensuring the integration and inclusion of the requirements of populations such as children; individuals with disabilities and others with access and functional needs; those from religious, racial, and ethnically diverse communities; people with limited English proficiency; and owners of animals, including household pets and service and assistance animals; and

▪ Mobilize resources to meet the requirements of individuals with disabilities and others with access and functional needs in compliance with federal civil rights laws.

If additional resources are required, states can request assistance from other states through interstate mutual aid and assistance agreements such as the Emergency Management Assistance Compact (EMAC). Administered by the National Emergency Management Association, EMAC is an interstate mutual aid agreement that streamlines the interstate mutual aid and assistance process. If a state anticipates that its resources may be exceeded, the governor[25] may request assistance from the Federal Government through a Stafford Act declaration.

The following paragraphs describe some of the roles and responsibilities of key officials, as well as other departments and agencies.

### *Governor*

The public safety and welfare of a state's residents are the fundamental responsibilities of every governor. The governor coordinates state resources and provides the strategic guidance for response to all types of incidents. This includes supporting local governments, as needed, and coordinating assistance with other states and the Federal Government. A governor also does the following during response:

▪ In accordance with state law, may make, amend, or suspend certain orders or regulations associated with response efforts;

▪ Communicates to the public in an accessible manner (i.e., effective communications to address all members of the whole community), and helps people, businesses, and organizations cope with the consequences of and protective actions for any type of incident;

▪ Coordinates with tribal governments within the state; and

---

[25] "Governor" is used throughout this document to refer to the chief executive of states, territories, and insular areas.

■ Commands the state military forces (National Guard personnel not in federal service and state defense forces).

### State Homeland Security Adviser

Many states have designated homeland security advisers who serve as counsel to the governor on homeland security issues and may serve as a liaison between the governor's office, the state homeland security structure, and other organizations inside and outside of the state. The advisor may chair a committee composed of representatives of relevant state agencies, including public safety, the National Guard, emergency management, public health, environment, agriculture, and others charged with developing prevention, protection, mitigation, response, and recovery strategies.

### State Emergency Management Agency Director

All states have laws mandating the establishment of a state emergency management agency, as well as the emergency plans coordinated by that agency. The director of the state emergency management agency is responsible for ensuring that the state is prepared to deal with large-scale emergencies and coordinating the statewide response to such incidents. This includes supporting local and tribal governments, as needed; coordinating assistance with other states and the Federal Government; and, in some cases, with NGOs and private sector organizations. The state emergency management agency may dispatch personnel to assist in the response and recovery effort.

### National Guard

The National Guard is an important state resource available for planning, preparing, and responding to natural or human-caused incidents.[26] National Guard members have expertise in critical areas, such as emergency medical response; communications; logistics; search and rescue; civil engineering; chemical, biological, radiological, and nuclear response and planning; and decontamination.

The governor may order members of the National Guard to state active-duty status to support state functions and activities. The governor or the state adjutant general may assign members of the National Guard to assist with state, regional, and federal emergency management plans. In American Samoa, the governor coordinates response activities with the U.S. Army Reserve because it is the sole U.S. territory with no National Guard.

### Other State Departments and Agencies

State department and agency heads and their staffs develop, plan, and train on internal policies and procedures to meet response and recovery needs. As discussed earlier, these departments and agencies represent the full range of authorities and resources of the state government, such as law enforcement, transportation, housing, economic development, public works, health, social services, and agriculture. State department and agency heads also provide important links to regional voluntary organizations, business, and industry. Staff from these departments and agencies also participate in interagency training and exercises to develop and maintain the necessary capabilities and share resources through mutual aid agreements. State department and agency heads are vital to the state's overall emergency management program because they bring expertise spanning various response functions and serve as core members of the state EOC and ICP. Many state department and agency heads have direct

---

[26] The President may order National Guard forces to active duty (e.g., sections 12302 or 12304 of title 10, U.S.C.), call National Guard forces into Federal service (e.g., the Insurrection Act), or request National Guard force support of DoD operations or missions (e.g., section 502(f) of title 32 U.S.C.) in the United States. When ordered to active duty or called into Federal service, National Guard forces operate under the command of the Secretary of Defense.

experience in providing accessible and vital services to the whole community during response operations. State departments and agencies typically work in close coordination with their federal counterpart agencies during joint state and federal responses, and under some federal laws, they may request assistance from these federal partners.

## Tribes

In accordance with the Stafford Act, the chief executive[27] of an affected Indian tribal government may submit a request for a declaration by the President. Tribal governments are responsible for coordinating resources to address actual or potential incidents. When coordinating with tribes, language and cultural differences must be considered, as well as overlapping authorities.

Tribes are encouraged to build relationships with local jurisdictions and states because these entities may have resources most readily available. The NRF's Tribal Coordination Support Annex outlines processes and mechanisms that tribal governments may use to request federal assistance during an incident.

### *Chief Executive*

The chief executive is responsible for the public safety and welfare of his/her respective tribe. The chief executive coordinates tribal resources and helps guide the response to all types of incidents. This includes coordinating assistance with states, as well as the Federal Government. The chief executive does the following during response:

- In accordance with the law, may make, amend, or suspend certain orders or regulations associated with the response;
- Communicates with the public in an accessible manner, and helps people, businesses, and organizations cope with the consequences of all types of incidents;
- Negotiates mutual aid and assistance agreements with other local jurisdictions, states, tribes, territories, and insular area governments; and
- Can request federal assistance.

## Territorial and Insular Area Governments

Territorial and insular area governments are responsible for coordinating resources to address actual or potential incidents and have many of the same functions states have, as previously listed in this section. Because of their remote locations, territorial and insular area governments often face unique challenges in receiving assistance from outside the jurisdiction quickly and often request assistance from neighboring islands, other nearby countries, states, the private sector or NGO resources, or the Federal Government. Additionally, there are language and cultural differences that must be considered, as well as the potential for authorities that overlap with federal authorities.

### *Territorial/Insular Area Leader*

The territorial/insular area leader is responsible for the public safety and welfare of the people of his/her jurisdiction. As authorized by the territorial or insular area government, the leader does the following:

- Coordinates resources needed to respond to incidents of all types;

---

[27] The Stafford Act uses the term "chief executive" to refer to the person who is the chief, chairman, governor, president, or similar executive official of an Indian tribal government.

- In accordance with the law, may make, amend, or suspend certain orders or regulations associated with the response;

- Communicates with the public in an accessible manner, and helps people, businesses, and organizations cope with the consequences of all types of incidents;

- Commands the territory's military forces;

- Negotiates mutual aid and assistance agreements with other local jurisdictions, states, tribes, territories, and insular area governments; and

- Can request federal assistance.

## Federal Government

The Federal Government maintains a wide range of capabilities and resources that may be required to deal with domestic incidents in order to save lives and protect property and the environment while ensuring the protection of privacy, civil rights, and civil liberties and supporting the stabilization of community lifelines. To be successful, any approach to the delivery of response capabilities will require an all-of-nation approach. All federal departments and agencies must cooperate with one another and with local, state, tribal, territorial, and insular area governments, community members, voluntary organizations, and the private sector to the maximum extent possible.

The Federal Government becomes involved with a response when federal interests are involved; when local, state, tribal, territorial, or insular resources are insufficient and federal assistance is requested; or as authorized or required by statute, regulation, or policy. Accordingly, in some instances, the Federal Government may play a supporting role to local, state, tribal, territorial, or insular area authorities by providing federal assistance to the affected parties. For example, the Federal Government provides assistance to local, state, tribal, territorial, and insular area authorities when the President declares a major disaster or emergency under the Stafford Act. In other instances, the Federal Government may play a leading role in the response where the Federal Government has primary jurisdiction or when incidents occur on federal property (e.g., national parks and military bases).

Regardless of the type of incident, the President leads the Federal Government response effort to ensure that the necessary resources are applied quickly and efficiently to large-scale and catastrophic incidents. Different federal departments or agencies lead coordination of the Federal Government's response, depending on the type and magnitude of the incident, and are also supported by other agencies that bring their relevant capabilities to bear in responding to the incident.

### Secretary of Homeland Security

In conjunction with these efforts, the statutory mission of DHS is to act as a focal point regarding natural and human-caused crises and emergency planning. Pursuant to the Homeland Security Act and Presidential directive, the Secretary of Homeland Security is the principal federal official for domestic incident management. The Secretary of Homeland Security coordinates preparedness activities within the United States to respond to and recover from terrorist attacks, major disasters, and other emergencies. The Secretary of Homeland Security coordinates with federal entities to provide for federal unity of efforts for domestic incident management. As part of these responsibilities, the Secretary of Homeland Security does the following during response:

- Provides the executive branch with an overall architecture for domestic incident management, and coordinates the federal response, as required; and

- Monitors activities, assesses risk, and activates specific response mechanisms to support other federal departments and agencies without assuming the overall coordination of the federal response during incidents that do not require the Secretary of Homeland Security to coordinate the response or do not result in a Stafford Act declaration.

Other federal departments and agencies carry out their response authorities and responsibilities within this overarching construct of DHS coordination.

Unity of effort differs from unity of command. Various federal departments and agencies may have statutory responsibilities and lead roles based on the unique circumstances of the incident. Unity of effort provides coordination through cooperation and common interests and does not interfere with federal departments' and agencies' supervisory, command, or statutory authorities. The Secretary of Homeland Security does the following during response:

- Ensures that overall federal actions are unified, complete, and synchronized to prevent unfilled gaps in the Federal Government's overarching effort. This coordinated approach ensures that the federal actions undertaken by DHS and other departments and agencies are harmonized and mutually supportive.

- Executes these coordination responsibilities, in part, by engaging directly with the President and relevant Cabinet, department, agency, and DHS component heads, as is necessary, to ensure a focused, efficient, and unified federal preparedness posture. All federal departments and agencies, in turn, cooperate with the Secretary of Homeland Security in executing domestic incident management duties.

The Secretary of Homeland Security's responsibilities also include management of the broad emergency management and response authorities of FEMA and other DHS components. DHS component heads may have lead response roles or other significant roles, depending on the type and severity of the incident. For example, the U.S. Secret Service is the lead agency for security design, planning, and implementation of national special security events, while the Assistant Director for Cybersecurity for DHS's Cybersecurity and Infrastructure Security Agency (CISA) coordinates the response to significant cyber incidents.

### FEMA Administrator

The FEMA Administrator is the principal adviser to the President, the Secretary of Homeland Security, and the National Security Council regarding emergency management. The FEMA Administrator's duties include the following:

- Assisting the President, through the Secretary of Homeland Security, in carrying out the Stafford Act, operation of the NRCC and RRCCs, the effective support of all ESFs, and, more generally, preparation for, protection against, response to, and recovery from all types of incidents.

- Reporting to the Secretary of Homeland Security, the FEMA Administrator is also responsible for managing the core DHS grant programs supporting homeland security activities.[28]

### Attorney General

The Attorney General has lead responsibility for criminal investigations of terrorist acts or terrorist threats by individuals or groups inside the United States or directed at U.S. citizens or institutions abroad, where such acts are within the federal criminal jurisdiction of the United States. The Attorney

---

[28] See the Post-Katrina Emergency Management Reform Act, enacted as part of the Fiscal Year 2007 DHS Appropriations Act, Public Law 109-295.

General is also responsible for related intelligence collection activities within the United States, subject to the National Security Act of 1947 (as amended) and other applicable laws, Executive Order 12333 (as amended), and Attorney General-approved procedures pursuant to that Executive order.

- Acting through the FBI, the Attorney General, in cooperation with other federal departments and agencies engaged in activities to protect the national security, shall also coordinate the activities of the other members of the law enforcement community to detect, prevent, preempt, and disrupt terrorist attacks against the United States.

- In addition, the Attorney General, generally acting through the FBI Director, has primary responsibility for searching for, finding, and neutralizing weapons of mass destruction within the United States.

- The Attorney General approves requests submitted by state governors, pursuant to the Emergency Federal Law Enforcement Assistance Act, for personnel and other federal law enforcement support during incidents.

- The Attorney General also enforces federal civil rights laws, such as the Americans with Disabilities Act of 1990, the Rehabilitation Act of 1973, and the Civil Rights Act of 1964. Further information on the Attorney General's role is provided in the National Prevention Framework and Prevention FIOP.

### Secretary of Defense

The Secretary of Defense has authority, direction, and control over DoD.[29] DoD resources may be committed when requested by another federal agency and approved by the Secretary of Defense or when directed by the President. Certain DoD officials and DoD component heads, by statute and/or DoD policy, are authorized to approve or delegate the authority to approve certain types of support to civil authorities.[30] DoD policy regarding defense support of civil authorities can be found in DoD Directive 3025.18, Defense Support to Civil Authorities.[31] [32] When DoD resources are authorized to support civil authorities, command of those forces remains with the Secretary of Defense. Under the command and control of the Secretary of Defense, the operational coordination and employment of such resources are normally led by the designated Combatant Command (e.g., U.S. Northern Command, Southern Command, or Indo-Pacific Command). DoD elements in the incident area of operations coordinate closely with response organizations at all levels.

---

[29] 10 U.S.C. §113.

[30] For example, certain DoD officials may provide an immediate response by temporarily employing the resources under their control, subject to any supplemental direction provided by higher headquarters, to save lives, prevent human suffering, or mitigate great property damage within the United States in response to a request for assistance from a civil authority, under imminently serious conditions and, if time does not permit, obtaining approval from a higher authority. Immediate response authority does not permit actions that would subject civilians to the use of military power that is regulatory, prescriptive, proscriptive, or compulsory (DoD Directive 3025.18). DoD support may also include support provided through mutual or automatic aid agreements, pursuant to Chapter 15A of Title 42 U.S.C. or pursuant to other statutory authorities or agreements.

[31] For example, DoD Instruction 3025.24, "DoD Public Health and Medical Services in Support of Civil Authorities."
[32] For example, the U.S. Army Corps of Engineers has independent statutory authorities regarding emergency management, such as Section 5 of the Flood Control Act of 1941 (Public Law 84-99) (e.g., providing technical assistance; direct assistance, such as providing sandbags, pumps, and other types of flood fight materials; emergency contracting; and emergency water assistance due to contaminated water source). Also, the Defense Logistics Agency has an interagency agreement with FEMA to provide commodities, including fuel, to civil authorities responding to disasters.

### Secretary of State

A domestic incident may have international and diplomatic implications that call for coordination and consultation with foreign governments and international organizations. The Secretary of State is responsible for all communication and coordination between the U.S. Government and other nations regarding the response to a domestic crisis. The Department of State also coordinates international offers of assistance and formally accepts or declines these offers on behalf of the U.S. Government, based on needs conveyed by federal departments and agencies, as stated in the International Coordination Support Annex. Some types of international assistance are pre-identified, and bilateral agreements are already established. For example, the U.S. Department of Agriculture (USDA)/Forest Service and Department of the Interior have joint bilateral agreements with several countries for wildland firefighting support.

### Director of National Intelligence

The Director of National Intelligence serves as the head of the intelligence community, acts as the principal advisor to the President for intelligence matters relating to national security, and oversees and directs implementation of the National Intelligence Program. The intelligence community, comprising 17 elements across the Federal Government, functions consistent with laws, Executive orders, regulations, and policies to support the national security-related missions of the U.S. Government. The Director of National Intelligence provides a range of analytic products, including those that assess threats to the homeland and inform planning, capability development, and operational activities of homeland security enterprise partners and stakeholders. In addition to intelligence community elements with specific homeland security missions, the Office of the Director of National Intelligence maintains a number of mission and support centers that provide unique capabilities for homeland security partners.

## Emergency Support Function Roles and Responsibilities

ESFs are not solely attributed to any one organization, nor are they mechanisms for executing an agency's statutory authorities. The federal ESFs bring together the capabilities of federal departments and agencies and other national-level assets. Most federal ESFs support a number of the response core capabilities. The core capabilities are delivered to stabilize the community lifelines. Any core capability may be required to help stabilize any community lifeline; therefore, any ESF can contribute toward the stabilization of any community lifeline in coordination with the lead ESF.

Federal ESFs are groups of organizations that work together to deliver core capabilities to stabilize community lifelines in support of an effective response. In addition, there are responsibilities and actions associated with federal ESFs that extend beyond the core capabilities and support other response activities, as well as department and agency responsibilities. While ESFs are primarily a federal coordinating mechanism, states and other organizations or levels of government may adopt the construct, as well.

**Federal ESF coordinators** oversee the preparedness activities for a particular ESF and coordinate with its primary and support agencies. Responsibilities of the ESF coordinator include the following during response:

- Maintaining contact with ESF primary and support agencies through conference calls, meetings, training activities, and exercises;
- Monitoring the ESF's progress in delivering the core capabilities in an effort to stabilize the incident;
- Coordinating efforts with corresponding private sector, NGO, and federal partners;

- Ensuring the ESF is engaged in appropriate planning and preparedness activities; and
- Sharing information and coordinating across the spectrum of primary and support agencies.

**ESF primary agencies** have significant authorities, roles, resources, and capabilities for a particular function within an ESF. Primary agencies are responsible for the following:

- Orchestrating support and strategy development within their functional area for the appropriate response core capabilities and other ESF missions;
- Notifying and requesting assistance from support agencies;
- Managing mission assignments (in Stafford Act incidents), and coordinating with support agencies, as well as appropriate state officials, operations centers, and other stakeholders;
- Coordinating resources resulting from mission assignments;
- Working with all types of organizations to maximize the use of all available resources;
- Monitoring progress in delivering core capability and other ESF missions, and providing that information as part of situational and periodic readiness or preparedness assessments;
- Planning for incident management, short-term recovery operations, and transition to long-term recovery support operations;
- Maintaining trained personnel to support interagency emergency response and support teams;
- Identifying new equipment or capabilities required to prevent or respond to new or emerging threats and hazards or to validate and improve capabilities to address changing risks; and
- Promoting physical accessibility, programmatic inclusion, and effective communication for the whole community, including individuals with disabilities.

**ESF support agencies** have specific capabilities or resources that support primary agencies in executing the mission of the ESF. The activities of support agencies typically include the following:

- Participating in planning for incident management, short-term recovery operations, transition to long-term recovery support operations, and the development of supporting operational plans, standard operating procedures, checklists, or other job aids;
- Providing input to periodic readiness assessments;
- Maintaining trained personnel to support interagency emergency response and support teams;
- Identifying new equipment or capabilities required to respond to new or emerging threats and hazards or to improve the ability to address existing threats; and
- Coordinating resources resulting from response mission assignments.

Table 4 summarizes the federal ESFs and indicates the response core capabilities each ESF most directly supports. All ESFs support the common core capabilities—planning, public information and warning, and operational coordination—and many ESFs support more than those listed.

**Table 4: Emergency Support Functions and ESF Coordinators**

| ESF #1 – Transportation |
| --- |
| **ESF Coordinator: Department of Transportation** |

Coordinates the support of management of transportation systems and infrastructure, the regulation of transportation, management of the Nation's airspace, and ensuring the safety and security of the national transportation system. Functions include but are not limited to the following:

- Transportation modes management and control;
- Transportation safety;
- Stabilization and reestablishment of transportation infrastructure;
- Movement restrictions; and
- Damage and impact assessment.

| ESF #2 – Communications |
| --- |
| **ESF Coordinator: DHS/ Cybersecurity and Infrastructure Security Agency** |

Coordinates government and industry efforts for the reestablishment and provision of critical communications infrastructure and services, facilitates the stabilization of systems and applications from malicious activity (e.g., cyber), and coordinates communications support to response efforts (e.g., emergency communication services and emergency alerts and telecommunications).  Functions include but are not limited to the following:

- Coordination with telecommunications and information technology industries;
- Coordination of the reestablishment and provision of critical communications infrastructure;
- Protection, reestablishment, and sustainment of national cyber and information technology resources;
- Oversight of communications within the federal response structures; and
- Facilitation of the stabilization of systems and applications from cyber events.

| ESF #3 – Public Works and Engineering |
| --- |
| **ESF Coordinator: DOD/U.S. Army Corps of Engineers** |

Coordinates the capabilities and resources to facilitate the delivery of services, technical assistance, engineering expertise, construction management, and other support to prepare for, respond to, and recover from a disaster or an incident. Functions include but are not limited to the following:

- Infrastructure protection and emergency repair;
- Critical infrastructure reestablishment;
- Engineering services and construction management; and
- Emergency contracting support for life-saving and life-sustaining services.

| ESF #4 – Firefighting |
| --- |
| **ESF Coordinator: USDA/U.S. Forest Service and DHS/FEMA/U.S. Fire Administration** |

Coordinates the support for the detection and suppression of fires. Functions include but are not limited to supporting wildland, rural, and urban firefighting operations.

| ESF #5 – Information and Planning |
| --- |
| **ESF Coordinator: DHS/FEMA** |

Supports and facilitates multiagency planning and coordination for operations involving incidents requiring federal coordination. Functions include but are not limited to the following:

- Deliberate and crisis action planning; and
- Information collection, analysis, visualization and dissemination.

*National Response Framework*

---

### ESF #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services
### ESF Coordinator: DHS/FEMA

Coordinates the delivery of mass care and emergency assistance. Functions include but are not limited to the following:

- Mass care;
- Emergency assistance;
- Temporary housing; and
- Human services.

---

### ESF #7 – Logistics
### ESF Coordinator: General Services Administration and DHS/FEMA

Coordinates comprehensive incident resource planning, management, and sustainment capability to meet the needs of disaster survivors and responders. Functions include but are not limited to the following:

- Comprehensive national incident logistics planning, management, and sustainment capability; and
- Resource support (e.g., facility space, office equipment and supplies, and contracting services).

---

### ESF #8 – Public Health and Medical Services
### ESF Coordinator: Department of Health and Human Services (HHS)

Coordinates the mechanisms for assistance in response to an actual or potential public health and medical disaster or incident. Functions include but are not limited to the following:

- Public health;
- Medical surge support, including patient movement;
- Behavioral health services;
- Mass fatality management; and
- Veterinary, medical, and public health services.

---

### ESF #9 – Search and Rescue
### ESF Coordinator: DHS/FEMA

Coordinates the rapid deployment of search and rescue resources to provide specialized life-saving assistance. Functions include but are not limited to the following:

- Structural collapse (urban) search and rescue;
- Maritime/coastal/waterborne search and rescue; and
- Land search and rescue.

---

### ESF #10 – Oil and Hazardous Materials Response
### ESF Coordinator: Environmental Protection Agency

Coordinates support in response to an actual or potential discharge and/or release of oil or hazardous materials. Functions include but are not limited to the following:

- Environmental assessment of the nature and extent of oil and hazardous materials contamination; and
- Environmental decontamination and cleanup, including buildings/structures and management of contaminated waste.

---

### ESF #11 – Agriculture and Natural Resources
### ESF Coordinator: Department of Agriculture

Coordinates a variety of functions designed to protect the Nation's food supply, respond to pest and disease incidents impacting agriculture, and protect natural and cultural resources. Functions include but are not limited to the following:

- Nutrition assistance;
- Agricultural disease and pest response;
- Technical expertise, coordination, and support of animal and agricultural emergency management;
- Meat, poultry, and processed egg products safety and defense; and
- Natural and cultural resources and historic properties protection.

## ESF #12 – Energy
### ESF Coordinator: Department of Energy

Facilitates the reestablishment of damaged energy systems and components, and provides technical expertise during an incident involving radiological/nuclear materials. Functions include but are not limited to the following:

- Energy infrastructure assessment, repair, and reestablishment;
- Energy industry utilities coordination; and
- Energy forecast.

## ESF #13 – Public Safety and Security
### ESF Coordinator: Department of Justice/Bureau of Alcohol, Tobacco, Firearms, and Explosives

Coordinates the integration of public safety and security capabilities and resources to support the full range of incident management activities. Functions include but are not limited to the following:

- Facility and resource security;
- Security planning and technical resource assistance;
- Public safety and security support; and
- Support to access, traffic, and crowd control.

## ESF #14 – Cross-Sector Business and Infrastructure
### ESF Coordinator: DHS/Cybersecurity and Infrastructure Security Agency

Coordinates cross-sector operations with infrastructure owners and operators, businesses, and their government partners, with particular focus on actions taken by businesses and infrastructure owners and operators in one sector to assist other sectors to better prevent or mitigate cascading failures between them. Focuses particularly on those sectors not currently aligned to other ESFs (e.g., the Financial Services Sector). Functions include but are not limited to the following:

- Assessment, analysis, and situational awareness of cross-sector challenges; and
- Facilitates operational coordination with critical infrastructure sectors.

## ESF #15 – External Affairs
### ESF Coordinator: DHS

Coordinates the release of accurate, coordinated, timely, and accessible public information to affected audiences, including the government, media, NGOs, and the private sector. Works closely with state and local officials to ensure outreach to the whole community. Functions include but are not limited to the following:

- Public affairs and the Joint Information Center;
- Intergovernmental (local, state, tribal, territorial, nongovernmental, and private sector) affairs; and
- Congressional affairs.

**The Emergency Support Function Leadership Group (ESFLG)** is composed of federal departments and agencies designated as coordinators for ESFs or coordinating agencies for other NRF annexes. The ESFLG provides a forum for departments and agencies with roles in federal incident response to jointly address matters pertaining to the community lifelines, emergency response policy, preparedness, operations, and training. The ESFLG promotes federal unity of effort through the exchange of information and coordinated decision making during disaster response. FEMA leads the ESFLG and is responsible for coordinating steady-state and operational activities.

## Other Federal Department and Agency Heads

The heads of all federal departments and agencies provide their full and prompt cooperation, resources, and support, as appropriate and consistent with their own responsibilities, for protecting the national security. Various federal departments or agencies play primary, coordinating, or support roles in delivering response core capabilities. In some circumstances, other federal agencies may have a lead or support role in coordinating operations or elements of operations, consistent with applicable legal authorities. Nothing in the NRF precludes a federal department or agency from executing its existing authorities. For all incidents, federal department and agency heads serve as advisors for the executive branch relative to their areas of responsibility.

Federal departments and agencies designated as coordinating and cooperating agencies in NRF support annexes conduct a variety of activities, to include managing specific functions and missions and providing federal support within their functional areas.

# Federal Authorities

Federal assistance can be provided to local, state, tribal, territorial, and insular area jurisdictions, as well as to other federal departments and agencies, through several different mechanisms and authorities. Federal financial assistance may also be available for disability-related access and functional needs equipment.

Different federal departments or agencies lead coordination of the Federal Government's response actions, depending on their express and implied statutory authorities and based on the type and magnitude of the incident. Federal departments or agencies are supported by other agencies who bring relevant capabilities that support those affected by the incident. Figure 5 shows the authorities for coordination of federal response support described in the following sections.



\* The FEMA Administrator has additional standing authority for response under the Homeland Security Act and Title VI of the Stafford Act. Per the Homeland Security Act, the FEMA Administrator serves as the principal advisor to the President, Homeland Security Council, and Secretary of Homeland Security.

\*\* The Federal Coordinating Officer (FCO) is appointed under Section 302 of the Stafford Act.

**Figure 5: Incident Management and Response Authorities for the Federal Government**

## *Federal Response and Assistance Under the Robert T. Stafford Disaster Relief and Emergency Assistance Act*

The Federal Government may provide assistance in the form of funding, resources, and services. Federal departments and agencies respect the sovereignty and responsibilities of local, state, tribal, territorial, and insular area governments, while rendering assistance that supports the affected local, state, tribal, territorial, and insular governments.

Local, state, tribal, territorial, and insular area governments do not require federal assistance to respond to most incidents; however, when an incident is of such severity and magnitude that effective response is beyond the capabilities of the local, state, tribal, territorial, and insular area governments, the governor or chief executive of a tribe can request federal assistance under the Stafford Act. In certain circumstances, the President may declare an emergency without a request from a governor when the primary responsibility for response rests with the United States because the emergency involves a subject area for which, under the Constitution or laws of the United States, the United States exercises exclusive or preeminent responsibility and authority.

The Stafford Act authorizes the President to provide financial and other assistance to local, state, tribal, territorial, and insular area governments; certain private nonprofit organizations; and individuals to support response, recovery, and mitigation efforts following a Stafford Act emergency or major disaster declaration.[33] Most forms of Stafford Act assistance require a cost share. While federal assistance under the Stafford Act may only be delivered after a declaration, FEMA may pre-deploy federal assets when a declaration is likely and imminent. The Stafford Act provides for two types of declarations:

- An **emergency declaration** is more limited in scope than a major disaster declaration, involves fewer federal programs, and is not normally associated with recovery programs. However, the President may issue an emergency declaration prior to an actual incident to lessen or avert the threat of a catastrophe. Generally, federal assistance and funding are provided to meet specific emergency needs or to help prevent a catastrophe from occurring.

- A **major disaster declaration** provides more federal programs for response and recovery than an emergency declaration. Unlike an emergency declaration, a major disaster declaration may only be issued after an incident.

## Federal Departments and Agencies Acting Under Their Own Authorities

Immediate life-saving assistance to states, tribes, territories, and insular areas, as well as other types of assistance, such as wildland firefighting support or response to an agricultural disease or significant cyber incident, are performed by federal departments or agencies under their own authorities and funding or through reciprocal mutual assistance agreements. Some federal departments or agencies have authorities to declare specific types of disasters or emergencies and conduct or lead federal response actions using funding sources other than the Disaster Relief Fund. For example, specific trust funds are established under federal environmental laws to support and fund oil and hazardous substances response operations. Similarly, federal land management agencies are required at all times to respond to incidents of all magnitudes that occur on or impact federal lands managed by those agencies, while federal departments and agencies acting under the trust doctrine can provide financial and programmatic support to tribes, when requested.

When the Secretary of Homeland Security is not coordinating the overall response, federal departments and agencies may coordinate federal operations under their own statutory authorities or as designated by the President and may activate response structures applicable to those authorities. The head of the department or agency may also request the Secretary of Homeland Security to activate NRF structures and elements (e.g. Incident Management Assistance Teams and National Operation Center elements) to provide additional assistance, while still retaining leadership for the response.

---

[33] These authorities may be exercised independently of, concurrently with, or become part of a federal response coordinated by the Secretary of Homeland Security pursuant to Presidential directive.

Federal departments and agencies carry out their response authorities and responsibilities within the NRF's overarching construct or under supplementary or complementary operational plans. Table 5 provides examples of scenarios in which specific federal departments and agencies have the responsibility for coordinating response activities. This is not an all-inclusive list; incident annexes contained in FIOPs provide greater operational detail for these and other incidents.

**Table 5: Examples of Other Federal Department and Agency Authorities[34]**

| Scenario | Department/Agency | Authorities |
|---|---|---|
| **Agricultural and Food Incident** | USDA | The Secretary of Agriculture has the authority to declare an **extraordinary emergency** and take action because of the presence of a pest or disease of livestock that threatens livestock in the United States. (7 U.S.C. § 8306 [2007]). The Secretary of Agriculture also has the authority to declare an **extraordinary emergency** and take action because of the presence of a plant pest or noxious weed whose presence threatens plants or plant products of the United States. (7 U.S.C. § 7715 [2007]). |
| **Public Health and Medical Incident[35]** | Department of Health and Human Services (HHS) | The Secretary of the Department of Health and Human Services has the authority to take actions to protect the public health and welfare, declare a **public health emergency**, and to prepare for and respond to public health emergencies (Public Health Service Act, 42 U.S.C. §§ 201 et seq.). <br><br> The Public Health Service Act (PHSA), as amended by the Pandemic and All-Hazards Preparedness Reauthorization Act, Public Law No. 113-5, forms the foundation of HHS legal authority for responding to public health emergencies (Public Health Service Act, 42 U.S.C. §§ 201 et seq.). The Project BioShield Act amended the PHSA to provide flexible authorities to expedite and enhance research, development, procurement, and stockpiling of medical countermeasures for a biological incident (Public Law 108-276 (as amended at 21 U.S.C. § 360bbb-3; 42 U.S.C. §§ 247d-6a, 247d-6b). |
| **Oil and Hazardous Materials Spills** | Environmental Protection Agency (EPA) or U.S. Coast Guard (USCG) | The EPA and USCG have the authority to take actions to respond to oil discharges and releases of hazardous substances, pollutants, and contaminants, including leading the response. (42 U.S.C. § 9601 et seq., 33 U.S.C. § 1251 et seq.). The EPA Administrator and Commandant of the USCG[36] may also classify an oil discharge as a **spill of national significance** and designate senior officials to participate in the response. (40 CFR Part 300.323).[37] |
| **Cyber Incident** | FBI, Office of the | The FBI has the designation of federal lead agency for |

---

[34] These and other department or agency authorities may be exercised independently of, concurrently with, or become part of a federal response coordinated by the Secretary of Homeland Security pursuant to Presidential directive. Other department and agency authorities for specific incidents can be found in the FIOP's incident annexes.

[35] A declaration of a public health emergency may make available any funds appropriated to the Public Health Emergency Fund.

[36] The Commandant of the USCG coordinates the designation of a spill of national significance with the Secretary of Homeland Security, as appropriate.

[37] See ESF #10 – Oil and Hazardous Materials Response Annex for more information on these authorities.

| Scenario | Department/Agency | Authorities |
|---|---|---|
| | Director of National Intelligence (ODNI), and DHS/CISA | **threat response activities** (PPD-41). Threat response activities include the law enforcement and national security investigation of a cyber incident, including collecting evidence, linking related incidents, gathering intelligence, identifying opportunities for threat pursuit and disruption, and providing attribution. ODNI, through the Cyber Threat Intelligence Integration Center, is the lead federal agency for intelligence support and related activities. DHS has the responsibility for **asset response activities**, such as providing technical assets and assistance to mitigate vulnerabilities and reducing the impact of the incident, identifying and assessing the risk posed to other entities and mitigating those risks, and providing guidance on how to leverage federal resources and capabilities (PPD-41). The Cyber UCG will also include relevant sector-specific agencies if a cyber incident affects or is likely to affect the sectors they represent. FEMA maintains the responsibility for coordinating **consequence management** for physical impacts to the population. |

When a federal department or agency has responsibility for directing or managing a major aspect of a response coordinated by the Secretary of Homeland Security, that organization is part of the national leadership for the incident and is represented in field, regional, and headquarters unified command and coordination organizations.

## *Federal-to-Federal Support*

Federal departments and agencies may execute interagency or intra-agency reimbursable agreements in accordance with the Economy Act or other applicable authorities. The Financial Management Support Annex to the NRF contains information about this process. A federal department or agency responding to an incident under its own authorities may also request support from the Secretary of Homeland Security in obtaining and coordinating additional federal assistance. The Secretary of Homeland Security may activate one or more ESFs to provide the requested support.

## *International Support*

FEMA, the Department of State, and other Federal agencies use the International Assistance Systems Concept of Operations to manage the acceptance or request of international resources following a Stafford Act declaration. The Federal Government may execute a process to "pull" resources from international partners where the assistance meets known requirements identified by the local, state, tribal, territorial, insular or Federal officials in the disaster area based on a request from an authorized Federal response agency for resources that are urgently needed but not available in the United States. The Federal Government may operate a "push" process when accepting the assistance that addresses Federal Government diplomatic interests even when foreign assistance has not been requested. The Federal Government only accepts commodities that can enter the country without significant regulatory agency oversight or inspection and that can readily be used. FEMA coordinates through the ESFs and with regulatory agencies to ensure assets are appropriate to be applied to the disaster and meet statutory or regulatory requirements.

## *Federal Response and Assistance Available Without a Stafford Act Declaration*

The NRF covers the full range of complex and constantly changing requirements in anticipation of or in response to threats or actual incidents. In addition to Stafford Act support, the NRF or other supplementary or complementary operational plans may be applied to respond or provide other forms of support. During a non-Stafford Act response:

- The President may designate, and departments and agencies may recommend through the interagency policy process, an LFA to manage the incident.

- When an LFA is designated, the LFA appoints a senior response official to carry out its responsibilities employing the NRF, NDRF, and NIMS. The senior response official is the Federal Government's senior representative fully dedicated to the response, demonstrates national-level leadership in a time of crisis, and acts as the face and voice of the Federal response when interacting with other senior Federal, state, tribal, territorial, or insular, private sector, nongovernmental, and elected officials as well as the media and the public.

- When directed by the President or requested by an agency head, FEMA's incident management capabilities may be used on a reimbursable basis under the Economy Act to support an LFA in carrying out the aforementioned responsibilities. FEMA may adjust the scale of its support to ensure execution of its statutory responsibilities.

# Operational Planning

Operational planning is conducted across the whole community, including the private sector, NGOs, and all levels of government. Operational planning is guided by objectives and priorities identified in related strategic plans and an understanding of the risks that affect an organization or jurisdiction. The NRF fosters unity of effort for emergency operations planning by providing common doctrine and purpose, which integrates both the National Preparedness System and the National Planning System.

Planning is fundamental to national preparedness. Plans are a continuous, evolving instrument of anticipated actions that maximize opportunities and guide response operations. Because planning is an ongoing process, a plan is a product based on information and understanding at the moment and is subject to revision.

The National Planning System provides a unified approach and common terminology for deliberate and incident action planning. Deliberate planning involves developing strategic, operational, and tactical plans to prevent, protect against, mitigate the effects of, respond to, and recover from a jurisdiction's threats or hazards. Incident action planning, sometimes referred to as crisis action planning, occurs in a time-constrained environment to develop or rapidly adapt operational and tactical plans in response to an imminent or ongoing incident.[38]

Deliberate plans provide the starting point for incident response and recovery and provide much of the required information for incident action planning, which is then adapted to meet operational conditions. The planning process includes a feedback loop for continual refinement of deliberate and incident plans to more effectively address incident priorities and objectives. Incident plans are continually refined

---

[38] National Planning System, 2016, pages 4 and 5.

throughout an incident, based on emerging operational conditions. Incident plans can also support the modification and improvement of deliberate plans through after-action and lessons-learned processes.

Response to emergencies and disasters will be most effective when communities conduct risk- and capability-based planning. Support provided by the National Risk Management Center and tools such as the Threat and Hazard Identification and Risk Assessment, Stakeholder Preparedness Review, and Core Capability Development Sheets help communities to set risk-based capability targets, evaluate capability gaps, and develop strategies to build and sustain discrete capabilities. These activities inform resource investment and allocation, drive deliberate planning efforts focused on the most challenging risks, and help government and private sector officials understand response and recovery capacities and identify where mutual aid or other assistance may fill capability gaps.

The National Planning System and Comprehensive Preparedness Guide 101 provide further information on the various types of plans and guidance on the fundamentals of planning.

## Federal Planning

Federal planning is integrated to align, link, and synchronize response actions to enable federal departments and agencies and other national-level partners to provide the right resources at the right time to support local, state, tribal, territorial, and insular area government response operations. Integrated planning provides answers for which traditional and nontraditional partners can deliver capabilities that stabilize community lifelines and ultimately support the recovery of the community.

The NRF is based on the concept of tiered response with an understanding that most incidents start at the local or tribal level, and as needs exceed resources and capabilities, additional local, state, tribal, territorial, insular area, or federal assets may be required. The FIOP for response and recovery, therefore, is intended to align with other local, state, tribal, territorial, insular area government, and federal plans to ensure that all response partners share a common operational focus. Similarly, integration occurs at the federal level among the departments, agencies, and nongovernmental partners that compose the respective mission area through the frameworks, FIOPs, and departmental and agency operations plans.

Figure 6 provides an overview of how federal deliberate planning efforts are aligned under the National Preparedness System and are mutually supportive in their development, coordination, and use. Similarly, complementary and mutually supportive plans may be developed by organizations through incident action planning.



**Figure 6: Alignment of Planning Efforts with PPD 8 – National Preparedness**

## *Application for Planning*

Implementation of the concepts within the NRF and related FIOP are mandatory for federal departments and agencies. While the NRF does not direct the actions of other response elements, the guidance contained in the NRF and the FIOP is intended to inform local, state, tribal, territorial, and insular area governments, as well as NGOs and the private sector, regarding how the Federal Government responds to incidents. These partners can use this information to inform their planning and ensure that assumptions regarding federal assistance and response and the manner in which federal support will be provided are accurate.

At the federal level, the NRF is supported by the FIOP. Incident annexes to the FIOP address unique concepts of operations or capabilities for risks not otherwise addressed by the FIOP. The concepts in the NRF and NIMS guide federal operational response planning and the FIOP, which provides further information regarding roles and responsibilities and identifies the critical tasks, resourcing, and sourcing requirements. The NRF does not contain detailed descriptions of specific department or agency functions because such information is located in department- or agency-level operational plans. Federal department and agency plans should, at a minimum, address the execution of their roles and responsibilities in support of the NRF and FIOP to deliver the core capabilities.

## *Continuity Considerations*

National preparedness and sustainment of essential functions are a shared responsibility of the whole community. Continuity considerations should be incorporated into the planning process. Continuity is not strictly a governmental responsibility, nor is it limited to a specific critical infrastructure sector. Effective continuity planning helps to ensure the uninterrupted ability to engage partners; to respond appropriately with scaled, flexible, and adaptable operational capabilities; to specify succession to office and delegations of authority to protect the unity of effort and command; and to account for the availability of responders, regardless of the threat or hazard.[39]

Ensuring the continuity of community lifeline operations is a critical part of responding to a disaster. Continuity planning and operations increase the likelihood of uninterrupted coordination across jurisdictions, levels of government, and the private sector, particularly during catastrophic incidents. For example, effective response operations require the operability, interoperability, and continuity of communications. The National Emergency Communications Plan provides the whole community with a strategic plan that establishes a shared vision for and coordinates the complex mission of maintaining and improving emergency communications capabilities.

Continuity considerations, including community lifeline interdependencies, should be built into all plans and guidance and supported by leadership at all levels. Without the implementation of continuity principles, private sector organizations and governments at all levels may be unable to provide services and sustainment of community lifelines when needed the most.

# Supporting Resources

To assist NRF users, FEMA maintains electronic versions of the current NRF documents—the base document, ESF annexes, and support annexes—as well as other supporting materials. FEMA also provides information, training materials, and other tools, such as an overview of the main Stafford Act provisions, a guide to authorities and references, and an abbreviations list to assist response partners in understanding and executing their roles under the NRF. Materials are regularly evaluated, updated, and augmented, as necessary. Additional content may be added or modified at the request of response mission area partners and other users.

## *Maintenance*

The NRF is a living document, and it will be regularly reviewed to evaluate consistency with existing and new policies, evolving conditions, and the experience gained from its use. Reviews will be conducted in order to evaluate the effectiveness of the NRF on a quadrennial basis.

DHS will coordinate and oversee the review and maintenance process for the NRF. The revision process includes developing or updating documents necessary to carry out capabilities. Significant updates to the NRF will be vetted through a federal senior-level interagency review process. The NRF will be reviewed in order to accomplish the following:

- Assess and update information on the core capabilities in support of response goals and objectives;
- Ensure that the NRF adequately reflects the organization of responsible entities;
- Ensure that the NRF is consistent with the other four mission areas;
- Update processes based on changes in the national threat/hazard environment;

---

[39] For more information on continuity considerations, see https://www.fema.gov/continuity-guidance-circular-cgc.

- Incorporate lessons-learned and effective practices from day-to-day operations, exercises, and actual incidents and alerts; and

- Reflect progress in the Nation's response mission activities the need to execute new laws, Executive orders, and Presidential directives, as well as strategic changes to national priorities and guidance, critical tasks, or national capabilities.

In reviewing the implementation of the NRF, FEMA will consider effective practices and lessons-learned from exercises and operations, as well as pertinent new processes and technologies. Effective practices include continuity planning, which ensures that the capabilities contained in the NRF can continue to be executed, regardless of the threat or hazard. Pertinent new processes and technologies should enable the Nation to adapt efficiently to the evolving risk environment and use data relating to location, context, and interdependencies that allow for effective integration across all missions using a standards-based approach. Updates to the NRF annexes may occur independently from reviews of the base document.

# Conclusion

In implementing the NRF to build national preparedness and resilience, partners are encouraged to develop a shared understanding of broad-level strategic implications as they make critical decisions in building future capacity and capability. The whole community should be engaged in examining and implementing the strategy and doctrine contained in the NRF, considering current and future requirements in the process.

The whole community remains firm in its commitment to safeguard itself against its greatest risks, now and in the future. Through whole community engagement, the Nation will continue to improve its preparedness to face all emergencies or disaster challenges that may unfold.

Exhibit X

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| ESF Coordinator: | Support Agencies: |
|---|---|
| Department of Homeland Security/ Federal Emergency Management Agency | Corporation for National and Community Service |
| | Department of Agriculture |
| **Primary Agencies:** | Department of Defense |
| | Department of Health and Human Services |
| Department of Homeland Security/ Federal Emergency Management Agency American Red Cross | Department of Homeland Security |
| | Department of Housing and Urban Development |
| | Department of the Interior |
| | Department of Justice |
| | Department of Labor |
| | Department of Transportation |
| | Department of the Treasury |
| | Department of Veterans Affairs |
| | General Services Administration |
| | Social Security Administration |
| | U.S. Army Corps of Engineers |
| | U.S. Postal Service |
| | U.S. Small Business Administration |
| | American Red Cross |
| | National Center for Missing & Exploited Children |
| | National Voluntary Organizations Active in Disaster |
| | Other Nongovernmental Organizations |

## INTRODUCTION

### Purpose

Emergency Support Function (ESF) #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services coordinates and provides life-sustaining resources, essential services, and statutory programs when the needs of disaster survivors exceed local, state, tribal, territorial, and insular area government capabilities.

### Scope

Mass care, emergency assistance, temporary housing, and human services agencies and organizations at the local, state, tribal, territorial, insular area, and Federal levels work together to provide life-sustaining assistance to disaster survivors. The four primary functions of ESF #6 are:

**Mass Care:** Congregate sheltering, feeding, distribution of emergency supplies, and reunification of children with their parent(s)/legal guardians and adults with their families.

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

**Emergency Assistance:** Coordination of voluntary organizations and unsolicited donations and management of unaffiliated volunteers; essential community relief services; non-congregate and transitional sheltering; support to individuals with disabilities and others with access and functional needs in congregate facilities; support to children in disasters; support to mass evacuations; and support for the rescue, transportation, care, shelter, and essential needs of household pets and service animals.

**Temporary Housing:** Temporary housing options including rental, repair, and loan assistance; replacement; factory-built housing; semi-permanent construction; referrals; identification and provision of safe, secure, functional and physically-accessible housing; and access to other sources of temporary housing assistance.

**Human Services:** Disaster assistance programs that help survivors address unmet disaster-caused needs and/or non-housing losses through loans and grants; also includes supplemental nutrition assistance, crisis counseling, disaster case management, disaster unemployment, disaster legal services, and other state and Federal human services programs and benefits to survivors.

Federal ESF #6 agencies are linked closely with two Recovery Support Functions (RSFs) defined in the National Disaster Recovery Framework: (1) Housing and (2) Health and Social Services. Following an incident, these RSFs may be activated concurrently with ESF #6, although their initial focus will be on planning and information sharing rather than response. When active at the same time, the ESFs and RSFs collaborate and share information while focusing on their respective functions. There is intentional overlap between ESF and RSF missions but as ESF requirements diminish, RSFs assume the residual ESF activities that are associated with recovery. The timing of this transition depends on the scope of the incident and the needs of survivors. ESF #6 works closely with the Housing RSF to coordinate the transition of survivors from sheltering and temporary housing to long-term and permanent housing as quickly as possible.

ESF #6 also coordinates closely with the Health and Social Services RSF to ensure continuous support for social services needs in the impacted communities.

## RELATIONSHIP TO WHOLE COMMUNITY

A basic premise of emergency management is that disaster response begins and ends at the community level. This is particularly true for the functions of ESF #6, as many disasters occur with little or no warning, thereby requiring that life-sustaining services be provided quickly to prevent additional suffering and loss of life. ESF #6 partner agencies and organizations rely on the whole community to meet the needs of disaster survivors.

Key elements of the whole community include individuals with disabilities and others with access and functional needs whose needs must be considered well in advance when preparing for disasters and emergencies, and who are important partners to support the delivery of core capabilities during incident response (e.g., through associations and alliances that serve these populations). People with disabilities and others with access and functional needs include individuals who are from diverse cultures, races, and nations of origin; individuals who do not read, have limited English proficiency, or are non-English speaking; people who have physical, sensory, behavioral, mental health, intellectual, developmental and cognitive disabilities; senior citizens with and without

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

disabilities or other access and functional needs; children with and without disabilities or other access and functional needs and their parents and/or guardians; individuals who are economically or transportation-disadvantaged; women who are pregnant; individuals who have chronic medical conditions; and those with pharmacological dependency.

Community disaster and emergency plans should include provisions for individuals who own household pets or have responsibility for service and other animals. Planning factors should include resources and processes for the rescue, transportation, care, shelter, and essential needs of animals.

The whole community also includes local, state, tribal, territorial, insular area, and Federal governments; nongovernmental organizations (NGO), including voluntary, faith-based, community-based, and other nonprofit organizations in the civic/nonprofit sector; academia; the private sector; individuals; and communities. Partners from all elements of the whole community work together to address shortfalls and help to ensure that the life-sustaining needs of disaster survivors are met.

## Individuals/Households

Disaster response begins with individuals and households executing their disaster plans, which should include having sufficient food and water on hand; a plan for communication; pre-identified shelter locations; pre-identified evacuation routes; and a Go Kit that includes important documents, lists of medications, household pet or service animal vaccination records, and photo identification for all members of the household. Individuals with disabilities or others with access and functional needs implement their plan for accessible transportation and/or support resources, including service animals. Households with animals activate their plan for the evacuation, transportation, sheltering, and care of their animals.

## Private Sector/Nongovernmental Organizations

This ESF #6 Annex uses the term NGO to refer to voluntary, faith-based, community-based, and other nongovernmental organizations in the civic/nonprofit sector.

NGOs, together with academia and the private sector, are integral elements of the whole community response in coordinating with local, state, tribal, territorial, insular area, and/or Federal partners to provide ESF #6 resources, programs, and services to affected individuals/households and communities. These partners collaborate to resolve the disaster-related unmet needs of affected individuals and communities.

NGOs and the private sector also provide operational information to local, state, tribal, territorial, insular area, and Federal ESF #6 or equivalent points of contact. This information allows government ESF #6 planners to identify actual or potential shortfalls and/or excesses and adjust services to the needs of the community.

Local, state, tribal, territorial, insular area, and Federal agencies coordinate with NGOs and the private sector to support the management of unsolicited donated goods and services as well as unaffiliated volunteers and organizations. These resources, when incorporated effectively into the whole community response, can help accelerate the recovery of individuals, households, and communities.

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

## Local, State, Tribal, Territorial, and Insular Area Governments

Local, state, tribal, territorial, and insular area governments are responsible for the welfare of those who reside in their jurisdictions. State and territorial governments are usually organized using the ESF structure; however, local, tribal, and insular area jurisdictions may not address all of the components of ESF #6 or may have adopted a different emergency response structure. The state designates one or more official(s) to coordinate with Federal ESF #6 during incidents requiring a coordinated Federal response.

At the local level, government agencies, NGOs, and the private sector coordinate ESF #6 activities to meet the immediate needs of disaster survivors. When the impact of the incident exceeds local resources, the state may provide additional support. Resources from national-level NGOs and the private sector may augment local and state response capabilities. When these resources are insufficient, Federal assistance may be requested through the Federal Emergency Management Agency (FEMA) Regional Office. Other Federal departments and agencies may also respond under their own authorities to provide assistance to the affected community. Additionally, other Federal ESFs, including ESF #3, ESF #8, and ESF #11, may supplement or support activities under ESF #6.

Local, state, tribal, territorial, and insular area governments have obligations under civil rights laws to ensure equal opportunity for individuals with disabilities and others with access and functional needs when providing mass care services.[1]

## Federal Government

Specific information on Federal Government actions is described in the following sections.

# CORE CAPABILITIES AND ACTIONS

## ESF Role Aligned to Core Capabilities

The following table focuses on the response core capabilities that ESF #6 most directly supports, including the related ESF #6 actions. Though not listed in the table, all ESFs, including ESF #6, support the following core capabilities: Planning, Operational Coordination, and Public Information and Warning.

---

[1] See FEMA's Guidance on Planning for Integration of Functional Needs Support Services in General Population Shelters and Chapter 7 of the Department of Justice's Americans with Disabilities Act Best Practices Tool Kit for State and Local Governments for more information.

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Core Capability | ESF #6 – Mass Care, Emergency Assistance, **Temporary Housing, and Human Services** |
|---|---|
| **Mass Care Services** | • Supports local, tribal, territorial, and insular area governments and NGOs in the coordination and provision of mass care, emergency assistance, temporary housing, and human services resources, programs, and services.<br>• Provides life-sustaining services to the affected population, including hydration, feeding, and sheltering, as well as support for reunifying families.<br>• Supports the establishment, management, and operation of congregate and non-congregate care facilities.<br>• Coordinates with local, tribal, territorial, and insular area governments and NGOs to facilitate the return of evacuees to their pre-disaster or alternate locations.<br>• Develops an initial temporary housing strategy to transition survivors from congregate to non-congregate care alternatives and provides relocation assistance or interim housing solutions for households unable to return to their pre-disaster residence.<br>• Anticipates and identifies current and future ESF #6 requirements in coordination with local, state, tribal, territorial, insular area, and Federal governments, NGOs, and private sector partners.<br>• Activates Federal ESF #6 data systems.<br>• Acquires, transports, and delivers ESF #6 resources and services to meet the needs of disaster survivors, including children and individuals with disabilities and others with access and functional needs.<br>• Provides general care for separated/unaccompanied minors until they are placed in the care of appropriate authorities.<br>• Supports nontraditional congregate care facilities.<br>• Provides technical assistance for the development of local, state, tribal, territorial, insular area, Federal, NGO, and private sector operational plans for mass care, emergency assistance, temporary housing, and human services.<br>• **Mass Care**<br>• **Sheltering:** Provides life-sustaining services in congregate facilities that provide a safe, sanitary, and secure environment for individuals and households displaced by disasters. Also includes support to survivors sheltering in place and in ESF #8 medical shelters.<br>• **Feeding:** Provides feeding services at fixed sites and distribution sites and through mobile feeding units. Feeding services may include hot or shelf-stable meals, infant formula, baby food, snacks, beverages, and food packages, as well as diverse dietary and culturally appropriate meals (e.g., low sodium, low fat, vegetarian/vegan, halal, kosher). ESF #6 works in concert with ESF #11 and local, state, and tribal governments; NGOs; and the private sector to acquire, prepare, cook and/or distribute food and food supplies. Additional support may include the provision of technical assistance for the development of state feeding plans. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Core Capability | ESF #6 – Mass Care, Emergency Assistance, **Temporary Housing, and Human Services** |
|---|---|
| **Mass Care Services (continued)** | • **Distribution of Emergency Supplies:** Acquires and delivers life-sustaining resources, hygiene items, and cleanup items to meet the urgent needs of disaster survivors. Additional support includes transportation, warehousing, equipment, technical assistance, and other mission-critical services.<br><br>• **Reunification Services:** Provides facilitated assistance for children separated from their parent(s)/legal guardian(s), as well as adults from their families, due to disaster. Supports reunification efforts at the local, state, tribal, and/or territorial levels with technical assistance.<br><br>• **Emergency Assistance**<br><br>• Coordinates resources and emergency assistance in support of local, state, tribal, territorial, and insular area governments as well as NGOs  and the private sector.<br><br>• **Voluntary Agency Coordination:** Facilitates the coordination of NGOs, places of worship, and the private sector to ensure that capabilities, resources, and services are integrated into local, state, tribal, territorial, and insular area response.<br><br>• **Volunteer and Donation Management:** Coordinates unaffiliated volunteers, unaffiliated organizations, and unsolicited donated goods to support all ESFs.<br><br>• **Essential Community Relief Services:** Coordinates and delivers debris removal from disaster survivor residences; sandbagging; mud-out; tear-out; chainsaw work; warehouse management; transportation and distribution coordination; childcare services; emotional and spiritual care and counseling; financial assistance; financial counseling; disaster-related case work and case management; and other essential services.<br><br>• **Mass Evacuee Support:** Supports affected and host jurisdiction mass evacuation activities, including provision of mass care services and tracking the movement of evacuees, their household pets, service animals, and medical equipment. Deploys resources to support affected and host jurisdiction evacuation operations, including mass evacuation tracking system kits and staff to provide technical assistance. In coordination with ESF #8, provides mass care services to medical patient evacuees. (Note: Evacuees who have chronic medical conditions may be evacuated with the general population. For evacuation of patients, refer to ESF #8.)<br><br>• **Support for Access and Functional Needs:** Coordinates and provides equipment, supplies, and services required to assist children and adults with disabilities and others with access and functional needs to maintain their independence.<br><br>• **Household Pets and Service Animals:** Coordinates and provides rescue, transportation, shelter, reunification, care, and essential needs of household pets and service animals during response operations to ensure their safety and well-being. Service animals are not pets and may not be separated from the individual with a disability or other access and functional need; service animals should be permitted anywhere the public goes. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Core Capability | ESF #6 – Mass Care, Emergency Assistance, **Temporary Housing, and Human Services** |
|---|---|
| **Mass Care Services (continued)** | • **Nonconventional/Transitional Sheltering:** Provides resources and technical assistance in support of local, state, tribal, affected and host territory, and insular area governments, as well as NGOs when traditional sheltering is not available or feasible or when the impact of the disaster is of such magnitude that extended shelter operations are required.<br>• **Temporary Housing**<br>• **Temporary Roof Repair:** Provides quick repairs to damaged roofs on private homes that allow residents to return to and remain in their own homes while making permanent repairs.<br>• **Repair Program:** Provides financial assistance to homeowners or landlords for the repair of their primary residence, utilities, and residential infrastructure.<br>• **Replacement Program:** Provides financial assistance to homeowners to assist with the replacement of their destroyed primary residence.<br>• **Housing Resource Databases:** Identifies housing resources from the private sector and other Federal agencies available to disaster survivors, including physically accessible housing options.<br>• **Rental Assistance:** Provides financial assistance to eligible disaster survivors for the rental of a housing resource.<br>• **Transportation to Other Locations:** Assists individuals and families relocating outside of the disaster area to locations where short- or long-term housing resources are available. Transportation services may also include returning survivors to their pre-disaster location.<br>• **Direct Financial Housing:** Makes payments directly to landlords for a rental resource on behalf of disaster survivors.<br>• **Hotel/Motel Program:** Provides temporary accommodations for eligible displaced survivors unable to return to their pre-disaster primary residence.<br>• **Direct Housing Operations:** Provides temporary housing units to survivors when other housing resources are not available. Units provided are appropriate to the needs of the community and include units accessible to those with disabilities and others with access and functional needs.<br>• **Mortgage Relief:** Issues moratoriums on foreclosures of Federally insured loans. Loan servicers provide special forbearances, loan modifications, refinancing, and waivers of late charges.<br>• **Human Services**<br>• Provides assistance to address the non-housing needs of individuals and families.<br>• **Crisis Counseling:** Provides crisis counseling, mental health services, and other similar immediate, short-term psychological assistance to disaster survivors.<br>• **Disaster Case Management:** Assists eligible survivors with developing and carrying out a disaster recovery plan. Streamlines assistance, prevents duplication of benefits, and provides an efficient referral system. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Core Capability | ESF #6 – Mass Care, Emergency Assistance, **Temporary Housing, and Human Services** |
|---|---|
| **Mass Care Services (continued)** | • **Legal Services:** Provides low-income survivors with free legal advice.<br>• **Unmet Needs:** Helps disaster survivors with medical, dental, funeral, personal property, transportation, moving/storage, and other expenses.<br>• **Supplemental Nutrition Assistance:** Provides eligible households with supplemental nutrition assistance through established programs when income is lost due to a declared disaster.<br>• **Tax Relief:** State, territorial, and Federal governments provide reimbursement or tax relief to survivors with substantial verified disaster-caused losses.<br>• **Unemployment Assistance:** Provides survivors who have lost their jobs due to a disaster with unemployment benefits. |
| **Logistics and Supply Chain Management** | • Assesses the need for and coordinates the provision of life-sustaining ESF #6 services, resources, and supplies from government agencies, NGOs, and the private sector.<br>• Gathers, assesses, prioritizes, coordinates, and communicates resource requirements.<br>• Provides subject matter expertise to identify resource requirements to meet the life-sustaining needs of disaster survivors and their household pets and service animals.<br>• Gathers, assesses, prioritizes, and communicates relevant information.<br>• Communicates plans, requirements and strategies to core capability providers.<br>• Acquires and manages resources, supplies, and services from core capability providers via contracts, mission assignments, inter-agency agreements, and donations. |
| **Public Health, Healthcare, and Emergency Medical Services** | • Identifies and communicates requirements for life-saving and life-sustaining needs of disaster survivors and household pets and service animals.<br>• Coordinates with core capability service providers to ensure that ESF #6 service delivery locations are appropriately provisioned and operated in a safe, sanitary, secure, and timely manner.<br>• Gathers, assesses, prioritizes, coordinates, and communicates public health and medical requirements of survivors and their household pets and service animals in congregate care facilities to core capability providers.<br>• Gathers, assesses, prioritizes, and communicates relevant public health and medical needs information to survivors in facilities where mass care services are provided.<br>• Communicates plans, requirements, and strategies to core capability service providers.<br>• Acquires and manages resources, supplies, and services from core capability service providers via contracts, mission assignments, interagency agreements, and donations. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Core Capability | ESF #6 – Mass Care, Emergency Assistance, **Temporary Housing, and Human Services** |
|---|---|
| **Critical Transportation** | • Supports the collection, analysis, dissemination, and reporting of transportation infrastructure damage from ESF #6 service delivery sites.<br><br>• Identifies, requests, and acquires transportation resources for the delivery of life-sustaining supplies and services to the affected area(s).<br><br>• Identifies and provides critical transportation for survivors with disabilities and others with access and functional needs.<br><br>• Supports mobilization and implementation of mechanisms to track the movement of evacuees, resources, household pets, individuals with disabilities or other access and functional needs with their service animals, medical equipment, and luggage.<br><br>• Provides mass care support to survivors at embarkation, debarkation, and reception centers; evacuation transportation hubs; and post-decontamination areas to make sure that basic needs are met, including hydration, feeding, tracking, medical needs, and information.<br><br>• Provides resources, subject matter expertise, and coordination with other FEMA components and ESF #6 partners to support mass evacuation activities and ensure the safe evacuation of household pets and service animals. (Note: Evacuees who have chronic medical conditions may be evacuated with the general population. For evacuation of patients, refer to ESF #8.)<br><br>• Provides resources for the care of survivors evacuating from the affected area.<br><br>• Communicates plans, requirements, and strategies to core capability service providers.<br><br>• Acquires and manages resources, supplies, and services from core capability service providers via contracts, mission assignments, interagency agreements, and donations. |
| **Fatality Management Services** | • Provides mechanisms to support notification/transportation of family members to make appropriate arrangements for deceased relatives.<br><br>• Provides support and funding for crisis counseling services to the bereaved, as well as for local, state, tribal, territorial, and insular area crisis counseling programs.<br><br>• Provides transportation and mass care services for survivors reuniting with deceased family members.<br><br>• Communicates plans, requirements, and strategies to core capability service providers.<br><br>• Acquires and manages resources, supplies, and services from core capability service providers via contracts, mission assignments, interagency agreements, and donations. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

## Agency Actions

| Primary Agency | Actions |
|---|---|
| **Department of Homeland Security (DHS)** | **Federal Emergency Management Agency (FEMA)**<br>• FEMA financial and/or direct assistance is predicated on a disaster declaration (major or emergency) for Individual Assistance.<br>• Verifies survivors' disaster-related losses and makes referrals to appropriate Federal agencies and NGOs that provide disaster relief.<br>• Establishes Disaster Recovery Centers with other ESF # 6 partner agencies and affected states to provide survivors with a central location where they can receive information and services.<br>• Coordinates with ESF #6 partners and the private sector to identify available and physically accessible housing resources and provides this information to disaster survivors.<br>• Provides financial assistance to eligible disaster survivors to repair damage to their pre-disaster primary residence.<br>• Provides financial and/or direct assistance to eligible survivors for their disaster-related lodging and temporary housing needs, including physically accessible housing.<br>• Provides Other Needs Assistance, such as personal property, medical, and funeral expenses resulting from the disaster.<br>• Provides funding for the repair of multi-family housing in order to house disaster survivors.<br>• Provides essential assistance, including life-sustaining services, after a major disaster to meet immediate threats to life and property, including congregate, non-congregate, and transitional sheltering, feeding; reunification services; distribution of emergency supplies; rescue, transportation, care, shelter and essential needs of household pets and service animals; mass evacuation; support to children and adults with disabilities and others with access and functional needs in congregate facilities; warehousing and distribution of donations; emergency residential roof covering; and emergency repair of primary residences damaged as the result of a disaster.<br>• Provides grants and direct assistance to eligible survivors whose primary residence has been damaged or destroyed and whose losses are not covered by insurance under the Individuals and Households Program (IHP). |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Primary Agency | Actions |
|---|---|
| DHS (continued) | • Provides eligible survivors whose primary residence is damaged by a disaster with a safe, secure, and functional place to live under the Housing Program, which includes:<br><br>  – Temporary Housing: Provides funds to rent an alternate place to live or for a temporary housing unit when rental properties are not available.<br><br>  – Repair: Provides grants to repair damage from the disaster that is not covered by insurance.<br><br>  – Replacement: Provides funds up to the program limit for home replacement.<br><br>  – Semi-Permanent or Permanent Housing Construction: Provides financial or direct assistance to construct permanent or semi-permanent housing.<br><br>  – Direct Housing Assistance: Provides temporary housing units on private sites, commercial parks, or other temporary group sites.<br><br>• Provides eligible survivors with assistance that helps them recover from the disaster under the Human Services program, which includes:<br><br>  – Other Needs Assistance: Provides medical, dental, funeral, personal property, transportation, moving and storage, and critical needs assistance.<br><br>  – Disaster Unemployment Assistance: Provides unemployment benefits and re-employment services to individuals who have become unemployed because of major disasters.<br><br>  – Legal Services: Provides free legal assistance to disaster survivors.<br><br>  – Crisis Counseling: Provides supplemental funding to states for short-term crisis counseling services.<br><br>  – Transportation Assistance: Provides physically accessible transportation assistance to relocate or return individuals displaced from their pre-disaster primary residences or to and from alternative locations as a result of a declared disaster.<br><br>  – Disaster Case Management: Provides financial assistance to local or state government agencies or qualified private organizations.<br><br>  – Cora Brown Fund: Provides assistance to the disaster-related needs of uninsured or under-insured individuals or families who are unable to obtain adequate assistance from other local, state, tribal, territorial, insular area, and Federal government programs or from voluntary organizations. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Primary Agency | Actions |
|---|---|
| **American Red Cross** | • As the co-lead for mass care and support agency for ESF #6:<br><br>• Works with DHS/FEMA to identify available mass care capacity, anticipate mass care requirements, and establish strategies to address gaps in coordination with local, state, tribal, territorial, insular area, and other Federal agencies; NGOs; and private sector partners.<br><br>• Provides mass care technical assistance to DHS/FEMA and serves as its principal mass care subject matter expert.<br><br>• Facilitates coordination and planning among government, NGO, and private sector entities that provide mass care services in response to major disasters.<br><br>• Supports DHS/FEMA in working with designated state lead agencies for mass care in planning, preparedness, and response activities to include exercise participation.<br><br>• Works closely with DHS/FEMA at designated DHS/FEMA locations to support ESF #6 mass care activities as requested.<br><br>• Provides situational awareness and reports on current mass care activities before and during response operations.<br><br>• (In conjunction with DHS/FEMA) Facilitates the mobilization of NGO and private sector partners for the provision of mass care services in support of states.<br><br>• Supports reunification efforts through its Safe and Well website and reunification teams.<br><br>• Provides critical disaster relief and preparedness information to the public through proactive media.<br><br>• The American Red Cross' role as a service provider is separate and distinct from its role in the National Response Framework. In its role as a service provider, the American Red Cross works closely with local, state, tribal, territorial, and insular area governments, NGOs, and private sector entities to provide life-sustaining services to survivors of every disaster – large and small – to include sheltering, feeding, distribution of emergency supplies, and disaster health/mental health, reunification, and casework services. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | Actions |
|---|---|
| **Corporation for National and Community Service** | • Provides teams of trained National Service Participants (including AmeriCorps members and Retired and Senior Volunteer Program volunteers) to carry out a wide range of response support activities emphasizing disadvantaged communities and residents with disabilities and others with access and functional needs, including:<br><br>– Provides canvassing, needs assessment, and information distribution support for state and Federal operations.<br><br>– Provides shelter and feeding support and distribution of water, food, ice, and other emergency goods.<br><br>– Performs debris clearance, temporary roof repair, and elimination of identified health/safety hazards.<br><br>– Provides unaffiliated volunteer support and warehousing assistance.<br><br>– Performs registration and call center support.<br><br>– Provides case management assistance. |
| **Department of Agriculture (USDA)** | **Animal and Plant Health Inspection Service**<br>• Supports ESF #6 to coordinate an integrated Federal response to meet the mass care and emergency assistance needs of animals, including household pets, service animals, and their owners.<br>• Facilitates whole community multi-agency coordination with nongovernmental agencies for animal response activities.<br><br>– Provides technical assistance and subject matter expertise regarding animal response issues.<br><br>**Food and Nutrition Service (FNS)**<br>• **Non-Stafford Act Authority:** Locates and secures supplies of food, including U.S. Department of Agriculture (USDA) Foods in state and Federal inventories, to supplement those in the disaster area to the extent funds appropriated to FNS for disaster food assistance are available.<br>• **Stafford Act Authority (Section 412 and 413):** Provides disaster food assistance in accordance with ESF #11 that includes USDA foods, infant formula, and infant food for emergencies and major disasters, as well as authorization of the Disaster Supplemental Nutrition Assistance Program for major disasters.<br><br>**United States Forest Service**<br>• If available, provides appropriate resources (e.g., cots, blankets, sleeping bags, personnel) for shelters.<br>• Resources will be assigned commensurate with each unit's level of training and the adequacy and availability of equipment. ESF #4 or the USDA/Forest Service Disaster and Emergency Operations Branch is the contact for this support. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | Actions |
|---|---|
| **USDA (continued)** | **Rural Development**<br>• Provides information (i.e., location, type, owners, and/or management service) on USDA-financed housing units that are available and habitable.<br>• Provides technical advice through staff to assist with mass care and housing operations.<br>• Provides Letters of Priority Entitlement, allowing the holder of the letter (i.e., identified evacuee and/or survivor) to go to the top of waiting lists for placement in USDA financed housing.<br>• Assists eligible recipients to meet emergency housing assistance needs resulting from Stafford Act emergencies or major disasters. |
| **Department of Defense/U.S. Army Corps of Engineers** | • Provides construction, engineering, and project management expertise and support for temporary housing and sheltering (to include management of temporary roofing support following hurricane disasters).<br>• Provides assistance by inspecting mass care shelter sites to ensure suitability and accessibility of facilities to safely shelter survivors.<br>• Provides assistance in constructing temporary shelter facilities, including accessible shelters, in the affected area as required. |
| **Department of Health and Human Services (HHS)** | **Human Services**<br>• Executes requirements as defined under the Crisis Counseling Assistance and Training Program.<br>• Executes requirements as defined under the Disaster Case Management Program, which provides services to assist survivors with developing and carrying out a disaster recovery plan.<br>• Provides subject matter expertise, consultation, and technical assistance to ESF #6 partners on disaster human services issues (e.g., accessing HHS programs that address human services needs in an emergency, effective human services delivery to children, persons with disabilities and others with access and functional needs, economically disadvantaged persons, and other individuals and families served by HHS programs).<br>• Provides assistance as requested to state, tribal, territorial, and insular area agencies that administer emergency human services programs.<br>• Assists in the provision of medical pharmaceuticals, supplies, and services, including durable medical equipment, through the Emergency Prescription Assistance Program.<br>• Coordinates with ESF #6 partners in the area of disaster human services planning to promote seamless transition to HHS-led Health and Social Services Recovery Support Function under the National Disaster Recovery Framework. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | Actions |
|---|---|
| HHS (continued) | **Public Health and Medical Services**<br>• Provides HHS medical workers to augment health services personnel as appropriate.<br>• Provides medical care and mental/behavioral health services for impacted populations either in or outside the shelter locations in accordance with appropriate guidelines used by local health agencies.<br>• Provides technical assistance for shelter operations related to food, vectors, water supply, and waste disposal.<br>• Assists in the provision of medical supplies and services, including durable medical equipment.<br>• Coordinates emergency medical care in shelters, as needed and at the request of affected state(s), in accordance with appropriate guidelines used by local health agencies.<br>• Coordinates closely with the National Center for Missing and Exploited Children (NCMEC) to facilitate the expeditious reunification of pediatric patients displaced as a result of disaster.<br>• Provides technical expertise in issues related to the assessment of health and medical needs of shelter occupants.<br>• Assists with monitoring of public health conditions that can affect the health of all shelter occupants including shelter workers.<br>**Veterinary Medical Services**<br>• Identifies and provides qualified veterinary medical personnel for events requiring veterinary medical services or public health support for household pets and service animals.<br>• Coordinates and provides emergency and disaster-related veterinary medical care services to impacted animal populations and provides veterinary public health, zoonotic disease control, environmental health, and related services. |
| **Department of Housing and Urban Development (HUD)** | • Works with local and state partners to assess impacts to low-income families and families with members with disabilities or other access and functional needs in HUD-assisted housing; and helps support re-housing efforts with community partners.<br>• Works with partners to assess damages to HUD-assisted housing units and identify timelines for repairs to help re-house low-income families and families with members with disabilities or other access and functional needs.<br>• Reaches out to local and state housing and community development partners to identify issues, provide support, and enforce the Fair Housing Act and compliance with other civil rights statutes.<br>• Assesses impacts to HUD-supported community programs, including grantees under the Community Development Block Grant, Continuums of Care that supports homeless populations, and other HUD programs.<br>• Provides available HUD staff via mission assignments to help address housing and community development issues through existing programs and resources. When requested and funded by FEMA, administers the Disaster Housing Assistance Program.<br>• Works with HUD grantees, owner/operators, and industry groups to input vacancies into existing FEMA or state housing databases for use by FEMA and state caseworkers to house low-income households. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | Actions |
|---|---|
| **Department of Justice** | • In response to an act of criminal mass victimization (i.e., mass violence or domestic or international terrorism), may coordinate through the Office for Victims of Crime with local, state, tribal, territorial, insular area, and Federal agencies and NGOs to provide assistance via the Antiterrorism and Emergency Assistance Program or other mechanisms.<br><br>• As requested and approved pursuant to an ESF #13 mission, provides security at mass care facilities when necessary to augment the capacity of local, state, tribal, territorial, and insular area authorities.<br><br>• Provides guidance, promulgates regulations, conducts investigations and compliance reviews, and enforces Federal civil rights laws, including their general application to emergency management and specific application to mass care services, such as the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Civil Rights Act of 1964. |
| **Department of Labor** | **Occupational Safety and Health Administration**<br>• Provides technical assistance related to worker safety and health issues.<br><br>**Employment Training Administration**<br>• Executes requirements as defined under the Disaster Unemployment Assistance program to provide financial assistance to individuals whose employment or self-employment has been lost or interrupted as a direct result of a Presidentially-declared disaster. |
| **Department of Transportation** | • Provides highway information and other resources related to supporting transportation activities and information on status of and plans for transportation infrastructure and operations. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | Actions |
|---|---|
| Department of the Treasury | **Alcohol and Tobacco Tax and Trade Bureau**<br>• Provides Federal alcohol and tobacco excise tax refunds to businesses that have lost assets in a disaster.<br>**Bureau of the Public Debt**<br>• Assists disaster survivors by expediting replacement or redemption of U.S. savings bonds and may waive the minimum holding period for Series EE and I savings bonds presented to authorized paying agents for redemption.<br>**Internal Revenue Service**<br>• Assists survivors with filing claims for tax refunds and provides tax information and assistance.<br>• Distributes disaster kits containing tax forms and publications to help survivors determine the amount of a casualty loss deduction for destroyed property and provides information on ways to reconstruct destroyed financial records.<br>• Provides copies or transcripts of previously filed tax returns free of charge to taxpayers located in the federally declared disaster area.<br>• May postpone tax deadlines to provide extra time to file and pay before assessing any penalty or additional amount to the tax and executes agreement to supplement DHS/FEMA's teleregistration capabilities. |
| Department of Veterans Affairs (VA) | • May provide for food preparation and stockpiling in its facilities during the incident, as well as facilities for mass sheltering.<br>• Provides medical supplies and services and medical workers to augment health services personnel to support mass care operations.<br>• Administers the laws providing benefits and other services to veterans and the dependents and beneficiaries of veterans.<br>• During incident operations, provides emergency healthcare services to veteran beneficiaries in VA medical facilities, to active duty military personnel, and as resources permit, to civilians in communities affected by national security emergencies.<br>• Works with lenders concerning foreclosure/waiver/underwriting/credit protection flexibilities related to VA-issued home loans.<br>• Assists veterans affected by disasters to help them avoid defaulting on existing home mortgages and/or foreclosure on their homes, as well as assistance for veterans with disabilities or other access and function needs to retrofit their homes with necessary accessibility measures (e.g., wheelchair ramp).<br>• Develops and maintains plans to make available housing assets that are habitable, to which VA has title and possession, for use by survivors in catastrophic disasters. |
| General Services Administration | • Provides resource support for ESF #6 requirements as requested to meet the needs of the affected population. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | Actions |
|---|---|
| **Small Business Administration (SBA)** | • Provides low-interest, long-term disaster loan assistance for qualified homeowners and renters, nonagricultural businesses of all sizes, and nonprofit organizations to fund the repair and replacement of disaster-damaged property.<br><br>• Provides loan funds that also may include money for such things as relocation, mitigation, refinancing of existing liens, and code-required upgrades.<br><br>• Additionally, the SBA Administrator has the authority to declare an SBA Agency declaration if the SBA damage criteria is met. The request must come from the governor. |
| **Social Security Administration** | • Provides Social Security Disability, Social Security Retirement, Social Security Survivors, Special Veterans, and Supplemental Security Income benefits; ensures continuity of service to beneficiaries; and provides expedited processing of new Federal benefit claims during emergency operations. |
| **U.S. Postal Service (USPS)** | • Provides extended mail services to relocated persons.<br><br>• Provides change-of-address cards for survivors to notify the USPS of relocation addresses for mail forwarding; assists in the distribution, collection, and mailing of those cards; and provides an electronic file of address-change information furnished by survivors. |
| **National Center for Missing and Exploited Children** | • Serves as the Nation's resource on the issues of missing and sexually exploited children.<br><br>• Provides information and resources to law enforcement, parents, guardians, children (including child victims), and other professionals.<br><br>• Reunites children with their parents and/or guardians through the following activities:<br><br>  – Establishes a toll-free hotline as well as teletypewriter (TTY) and video relay service (VRS) lines to receive reports of displaced children; creates a website that is compliant with Section 508 to provide information about displaced children; and deploys staff to the location of the declared disaster event to gather information about displaced children.<br><br>  – Provides information to the public about additional resources.<br><br>  – Partners with local, state, tribal, territorial, insular area, and Federal law enforcement agencies.<br><br>  – Refers reports of displaced adults to the Attorney General's designated authority and the National Emergency Family Registry and Locator System. |
| **American Bar Association (ABA)** | • Through the ABA's Young Lawyers Program, provides free disaster legal services for low-income individuals who, before or because of the disaster, are unable to secure legal services adequate to meet their disaster-related needs. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | Actions |
|---|---|
| **National Voluntary Organizations Active in Disaster (NVOAD)** | • NVOAD is a nationwide coalition of organizations that work together in all phases of disaster to help communities prepare for and recover from disaster. Its 104 members include 50 national organizations (e.g., faith-based, community-based, and other NGOs) and 54 state and territorial VOAD members representing hundreds of additional local/regional VOAD members throughout the country.<br><br>• Facilitates and encourages collaboration, communication, cooperation, and coordination to build relationships among members while groups plan and prepare for emergencies and disaster incidents.<br><br>• Assists in communicating to the government and the public the services provided by its national member organizations.<br><br>• Facilitates information sharing during planning, preparedness, response, and recovery and after a disaster incident.<br><br>• Provides members with information pertaining to the severity of the disaster, needs identified, and actions of volunteers throughout the response, relief, and recovery process.<br><br>• Provides guidance in case management, sharing client information, promoting spiritual and emotional care, and managing unaffiliated volunteers and unsolicited donated goods, long term recovery, and other areas.<br><br>• Coordinates committees of NVOAD members and partners, including those focused on communications, disaster case management, donations management, emotional and spiritual care, government relations, housing, international affairs, long-term recovery groups, mass care, technology, and volunteer management.<br><br>• Creates and regularly updates documents for public and member use, such as points of consensus, guidelines, and manuals on particular topics of interest. Provides specific liaisons to work at designated DHS/FEMA locations to support ESF #6 activities as requested.<br><br>**Active Communities That Serve (ACTS) World Relief**<br>• Provides mobile feeding units of specialized unmet needs meals, and are staffed by trained responders who can prepare and distribute thousands of meals a day.<br><br>• Provides counseling and emotional and spiritual care; assists with cleanup activities; provides medical assistance; receives and distributes emergency supplies; trains volunteers to become responders in community emergency response, homeland security, psychological first aid, and food safety; and provides National Incident Management System–compliant badges to volunteers with a barcode to track volunteer hours and training and to check their backgrounds.<br><br>**Adventist Community Services**<br>• Receives, processes, and distributes clothing, bedding, and food products.<br><br>• Provides emergency food and counseling and disaster childcare. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | Actions |
|---|---|
| NVOAD (continued) | **All Hands Volunteers**<br>• Provides cleanup assistance including debris removal, mud-out, tear-out, tree removal, and other services expediting survivor return to their pre-disaster residence.<br>• Provides volunteer management, including the ability to affiliate spontaneous, unaffiliated volunteers and groups.<br>• Provides voluntary agency coordination, including the technical expertise to facilitate the coordination of voluntary, community, and faith-based organizations; the private sector; and other nonprofit organizations in collaboration with other NVOAD members to ensure that capabilities, resources, and services are integrated into response efforts to minimize duplication of organizational resources.<br>**American Baptist Men/USA**<br>• Provides cleanup, repair, and initial rebuilding. Short-term volunteers work cooperatively with Church World Service.<br>**American Disaster Reserve**<br>• Provides trained teams to assist government agencies and other organizations in the operation of emergency operations centers and the performance of disaster management functions.<br>• Provides trained teams to meet specific needs identified by local jurisdictions and established in memorandums of understanding.<br>• Provides technology applications of the Internet to disaster management.<br>**American Radio Relay League (ARRL) – Amateur Radio Emergency Services (ARES)**<br>• Provides volunteer radio communications services to local, county, state, and Federal governments, as well as to voluntary organizations.<br>**American Red Cross**<br>• In addition to its role as co-lead for the mass care function of ESF #6, serves as a support agency to the emergency assistance, temporary housing, and human services functions of the ESF.<br>• Provides disaster preparedness, response and recovery activities, and services throughout the country, consistent with its Congressional charter.<br>• For information on the American Red Cross role as co-lead for the mass care component of ESF #6, see the American Red Cross information in the Primary Agency section of the Agency Actions section.<br>**Ananda Marga Universal Relief Team (AMURT)**<br>• Provides food and clothing, shelters, and counseling.<br>• Renders emergency medical services and sanitation.<br>**Catholic Charities, USA**<br>• Provides assistance to communities in addressing the crisis and recovery needs of local families.<br>• Provides ongoing and long-term recovery services for individuals and families, including temporary housing assistance for low-income families, counseling programs for children and the elderly, and special counseling for disaster relief workers. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | Actions |
|---|---|
| **NVOAD (continued)** | **Christian Disaster Response**<br>• Provides an initial on-site disaster assessment program; emergency food service (i.e., fixed-site kitchen/feeding and mobile food service); in-kind donations of disaster recovery supplies; advocacy for disaster survivors (elderly, poor, minorities); and home repair or rebuilding.<br><br>**Christian Reformed World Relief Committee (CRWRC)**<br>• Collects information before CRWRC Disaster Response Services teams arrive on how they can best help.<br>• Addresses cleanup needs by removing downed trees and completing minor repairs, especially covering roofs to protect homes from the elements.<br>• Assesses needs by going door to door in disaster-affected communities to inventory unmet needs and provide a database of these needs to a community organization.<br>• Assists local recovery organizations to expand their ability to help disaster survivors.<br>• Signs a contract and stays the course repairing/rebuilding damaged homes until what was promised is delivered.<br>• Partners with a local organization in a disaster-affected area doing work from cleanup to reconstruction.<br>• As the last phase of support, provides community development consultation services to help local recovery organizations move from disaster response to addressing the long-term needs of their community.<br><br>**Church of the Brethren Disaster Ministries**<br>• Engages a network of faith-based volunteers to repair or rebuild storm-damaged homes, focusing on communities.<br>• Provides trained, skilled project leaders to supervise volunteer work teams.<br>• Cooperates with local recovery organization to enhance the long-term recovery of the community.<br>• Provides Maryland-based warehousing and distribution services in New Windsor, Maryland.<br>• Children's Disaster Services:<br>  – Supports families and children by setting up temporary respite centers in shelters and assistance centers.<br>  – Maintains a nationwide network of volunteers who are trained and screened to care for the unique needs of children impacted by disaster.<br>  – Consults with parents and/or guardians, caregivers, and community groups on their particular concerns about children and disaster.<br>  – Maintains a Critical Response Team on call for mass casualty incidents<br><br>**Church of Scientology Disaster Response**<br>• Assists relief crews in providing food and water and provides emotional and spiritual care. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | Actions |
|---|---|
| NVOAD (continued) | **Church World Service**<br>• Stands on the side of the oppressed through advocacy with and for those most in need.<br>• Seeks out unmet needs of all survivors, particularly people who were marginalized before the disaster.<br>• Provides a larger vision of life that includes emotional and spiritual care, physical rebuilding, and assistance with long-term recovery of those in need.<br>• Restores and builds community relationships.<br>**Convoy of Hope**<br>• Facilitates relief efforts between faith-based organizations, churches, and other NGOs.<br>• Deploys fleets of trucks to move bulk commodities to survivors, including water, food, ice, hygiene kits, and cleanup kits.<br>• Provides up to 300,000 sq. ft. warehouse headquarters with warehouse partnerships across the country; sets up and supports points of distribution (PODs); provides mobile distribution of supplies; coordinates and mobilizes volunteers and supports cleanup and debris removal teams.<br>**Disaster Psychiatry Outreach**<br>• Provides education and training in disaster mental health to a range of professionals in the emergency management sector.<br>**Episcopal Relief and Development**<br>• Sends immediate relief grants for basic items such as food, water, medical assistance, and financial aid within the first 90 days following a disaster.<br>• Provides ongoing recovery activities through rehabilitation grants, which offer the means to rebuild, replant ruined crops, and counsel those in trauma.<br>• Works primarily through Church World Service in providing disaster-related services.<br>**Feed the Children**<br>• Provides help to survivors of natural disasters occurring in the United States and around the world and depending on the situation; provides food, water, blankets, cleaning supplies, or other relief supplies to individuals and families affected.<br>**Feeding America**<br>• Collects, transports, warehouses, and distributes donated food and grocery products for other agencies involved in both feeding operations and distribution of relief supplies through its national network of food banks.<br>• Processes food products collected in food drives by communities wishing to help another disaster-affected community; develops, certifies, and supports their food banks; serves as a liaison between the food banks and the donors and educates the public about the problems and solutions of hunger. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | Actions |
|---|---|
| NVOAD (continued) | **Friends Disaster Service**<br>• Provides cleanup and rebuilding assistance to the elderly, disabled, low income, or uninsured survivors of disasters.<br>• Provides an outlet for Christian service to friends and volunteers, with an emphasis on love and caring.<br>**Habitat for Humanity International**<br>• Facilitates community involvement and support during the long-term recovery process; conducts community housing assessments for long-term recovery; works with partner families to build or rehabilitate simple, decent, and affordable homes after a disaster; and offers construction and development technical assistance to communities.<br>**Headwaters Relief Organization**<br>• Supports disaster survivors through emotional and spiritual care and mental health programs; provides support services; and engages in repair and rebuild activities.<br>**HOPE Coalition America**<br>• Supports disaster survivors by assisting with budgeting and developing financial recovery plans.<br>**Humane Society of the United States (HSUS)**<br>• Through the HSUS National Disaster Animal Response Team™:<br>• Serves as a resource for individuals, animal-related organizations, government agencies, and others concerned about the urgent needs of animals before, during, and after disasters.<br>• Provides assistance with animal rescue, handling, and transport in a timely and humane way.<br>**International Aid**<br>• Provides trained disaster aid and medical personnel, trauma counseling, food and medical supplies, and disease prevention products, including portable medical clinics and water purification systems.<br>**International Critical Incident Stress Foundation**<br>• Provides leadership, education, training, consultation, and support services in comprehensive crisis intervention and disaster behavioral health services to the emergency response professions, other organizations, and communities worldwide.<br>**International Relief and Development**<br>• Distributes food and critical supplies and helps communities develop effective social services through collaborative efforts to improve roads, renovate schools, establish health facilities, and rebuild utility, water, and sewage systems.<br>**International Relief Friendship Foundation**<br>• Provides needs assessment, case management, distribution of designated relief supplies, and spiritual care and counseling. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | |
|---|---|
| NVOAD (continued) | **Lutheran Disaster Response**<br>• Provides funding to assist with disaster response in both natural and technological disasters, volunteer coordination, long-term rebuilding efforts, and support for preparedness planning through synods, congregations, and Lutheran social ministry organizations.<br>• Provides spiritual and emotional counseling and pastoral care through trained coordinators based in its network of affiliated social ministry organizations.<br>**Medical Teams International**<br>• Enlists volunteers as needed to the stricken areas and sends money and supplies for cleaning and reconstruction.<br>**Mennonite Disaster Service**<br>• Assists disaster survivors by providing volunteer personnel to clean up and remove debris from damaged and destroyed homes and to repair or rebuild homes. Special emphasis is placed on assisting those less able to help themselves, such as the elderly and people with disabilities.<br>**Mercy Medical Airlift (Angel Flight)**<br>• Ensures that no needy patient is denied access to distant specialized medical evaluation, diagnosis, or treatment for lack of a means of long-distance medical air transportation and ensures the provision of urgent transportation in situations of compelling human need and homeland security emergencies.<br>**National Association of Jewish Chaplains**<br>• Provides emotional and spiritual care.<br>**National Baptist Convention USA Inc.**<br>• Provides facilities for shelter, shelter in place, reception centers, warehousing, POD sites, and distribution for donated goods including food, clothing, and household items.<br>• Provides volunteers for immediate disaster response in both natural and technological disasters; long-term rebuilding efforts; and support for preparedness planning through districts, and social ministry organizations.<br>**National Emergency Response Team**<br>• Provides coordinated emergency services with local, state, territorial, insular area, and Federal government agencies.<br>**National Organization for Victim Assistance**<br>• Provides social and mental health services for individuals and families who experience trauma after disaster, including traumatic reaction support, validation, stabilization, and education.<br>**Nazarene Disaster Response**<br>• Provides cleanup and rebuilding assistance, especially to the elderly, disabled, widowed, and those least able to help themselves.<br>• Works in the recovery phase by assisting with the emotional needs of disaster survivors. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | Actions |
|---|---|
| NVOAD (continued) | **NECHAMA – Jewish Response to Disaster**<br><br>• Manages spontaneous unaffiliated volunteers in direct fieldwork and assists in volunteer coordination and the operation of volunteer reception centers.<br><br>• Provides pre- and post-disaster event training related to disaster cleanup, chainsaw operation, safety, and volunteer management.<br><br>• Lends cleanup tools for extended periods to resource-challenged organizations responding to disaster. Program is open to established and/or community start-up organizations.<br><br>• Welcomes volunteers of all faiths and provides assistance to disaster survivors regardless of religious affiliation.<br><br>**Operation Blessing**<br><br>• Transports food and emergency supplies to disaster survivors.<br><br>**The Phoenix Society for Burn Survivors**<br><br>• Provides social services and emotional support for individuals who experience major burn injuries, as well as their families.<br><br>**Points of Light Foundation and Volunteer Center National Network**<br><br>• Coordinates spontaneous, unaffiliated volunteers and meets the needs of the local community and other disaster response agencies through its affiliated network of local volunteer centers.<br><br>**Presbyterian Church in America (PCA)/Mission to North America Disaster Response**<br><br>• Provides assistance with debris removal, roof tarping, chainsaw work, muck-out work, general cleanup, temporary repairs, and reconstruction.<br><br>• Provides Sheds of Hope, a project whereby PCA/Mission to North America Disaster Response builds a shed on personal property at the request of the owner to store recovered items or building materials for the repair/rebuild. The shed may be moved to another location should the property owner decide not to rebuild in the same location.<br><br>• Provides emotional and spiritual care for disaster affected survivors and disaster response volunteers.<br><br>• Provides training on how to prepare the presbytery or church for disasters; training for assessors and first responders; and training in emotional care.<br><br>**Presbyterian Disaster Assistance**<br><br>• Maintains a National Response Team of 90 people that is deployed to disaster-impacted areas to help connect the local church judicatories to the larger response and provides emotional and spiritual care to caregivers, responders, and faith community leadership. Responds to both natural and human-caused events. The team is highly trained and works collaboratively with other response agencies to provide both support and training.<br><br>• Provides support, training, and technical assistance both within the Presbyterian Church and in collaboration with other faith-based and voluntary organizations to provide volunteer work team hospitality (e.g., housing, food, sanitation, connection to case managed long-term recovery work, and tools if available) where long-term recovery is required. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | Actions |
|---|---|
| **NVOAD (continued)** | • Provides volunteer labor and material assistance at the local level. |
| | • Collaborates with other voluntary organizations to provide long-term recovery organizing and training to community-based long-term recovery groups. |
| | **REACT International** |
| | • Provides emergency communication facilities for other agencies through its national network of Citizens Band (CB) radio operators and volunteer teams. |
| | **The Salvation Army** |
| | • Provides mass care services including congregate sheltering, feeding, and the distribution of emergency supplies such as food, cleanup supplies, household items, and emergency communications. |
| | • Provides client assistance, immediate and long-term, through the casework and case management processes, including referrals to government organizations and NGOs for additional services. |
| | • Offers emotional and spiritual care, through trained caregivers, to disaster survivors and rescue workers. |
| | • Provides community recovery support, including cleanup and reconstruction programs, as warranted by circumstances and resources. |
| | **Samaritan's Purse** |
| | • Provides emotional and spiritual care as well as provides cleanup assistance. |
| | **Save the Children** |
| | • Provides trained staff and volunteers to offer temporary respite care for children in shelters; provides psychosocial recovery programs for children and adult caregivers; provides essential non-food items to support children and families; and provides assistance to help children and families access services, including childcare and afterschool programs. |
| | • Provides community and state child-focused disaster planning (e.g., assessments, training, exercising support, technical guidance). |
| | • Provides training in childcare emergency preparedness and children's disaster preparedness workshops; and provides training in temporary respite care for shelters and community hubs (e.g., child-friendly spaces). |
| | **Society of St. Vincent De Paul** |
| | • Provides social services to individuals and families and collects and distributes donated goods. |
| | • Makes stores' merchandise available to disaster survivors; operates retail stores, homeless shelters, and feeding facilities that are similar to those run by the Salvation Army; and provides warehousing facilities for storing and sorting donated merchandise during the emergency period. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | Actions |
|---|---|
| NVOAD (continued) | **Southern Baptist Convention Disaster Relief**<br><br>• Provides more than 200 mobile feeding units staffed by volunteers who can prepare and distribute thousands of meals a day.<br><br>• Provides disaster childcare. The agency has several mobile childcare units.<br><br>• Assists with cleanup activities, temporary repairs, reconstruction, counseling, and bilingual services.<br><br>**Tzu Chi Foundation**<br><br>• Provides emotional and spiritual care as well as provides medical and financial assistance.<br><br>**United Church of Christ**<br><br>• Provides local disaster response coordinators who help to organize local volunteers as needed for cleanup and rebuilding efforts; participates in response and long-term recovery committee efforts in communities affected by natural disasters.<br><br>• Provides personal protection equipment (e.g., Tyvek® suits, gloves, goggles, respirators) for volunteers and homeowners to clean out houses.<br><br>• Provides volunteer work groups to assist long-term recovery committees in rebuilding/repairing homes.<br><br>• Provides training on community preparedness, response, and recovery; provides assistance in communities impacted by technology-caused disasters.<br><br>**United Jewish Communities**<br><br>• Organizes direct assistance, such as financial and social services, to Jewish and general communities in the United States following disaster.<br><br>• Provides rebuilding services to neighborhoods and enters into long-term recovery partnerships with residents.<br><br>**United Methodist Committee on Relief**<br><br>• Trains and mobilizes community-based volunteers in response and recovery activities; provides funding for local United Methodist Committee on Relief units in response and recovery projects based on the needs of each situation.<br><br>• Provides spiritual and emotional care to disaster survivors and provides Disaster Case Management assistance by training local United Methodist and community-based volunteers.<br><br>**United Way Worldwide**<br><br>• Provides experience, expertise, and resources to local United Way organizations facing local, state, regional, or national emergencies.<br><br>• Provides support and coordination with Alliance of Information and Referral Systems to the network of 2-1-1 providers. |

**Emergency Support Function #6 – Mass Care, Emergency Assistance, Temporary Housing, and Human Services Annex**

| Support Agency | Actions |
|---|---|
| NVOAD (continued) | **Volunteers of America**<br>• Makes trucks available for transporting survivors and supplies to designated shelters; collects and distributes donated goods; and provides mental healthcare for survivors of disaster.<br>**World Vision**<br>• Trains and mobilizes community-based volunteers in major response and recovery activities; provides consultant services to local unaffiliated churches and Christian charities involved in locally designed recovery projects; and collects, manages, and organizes community-based distribution for donated goods. |

ExhibitY

**Emergency Support Function #7 – Logistics Annex**

**ESF Coordinators:**

General Services Administration
Department of Homeland Security/
Federal Emergency Management Agency

**Primary Agencies:**

General Services Administration
Department of Homeland Security/
Federal Emergency Management Agency

**Support Agencies:**

Department of Agriculture
Department of Commerce
Department of Defense
Department of Energy
Department of Health and Human Services
Department of the Interior
Department of Labor
Department of Transportation
Department of Veterans Affairs
National Aeronautics and Space Administration
Office of Personnel Management
U.S. Army Corps of Engineers
U.S. Postal Service
American Red Cross
National Voluntary Organizations Active in Disasters (NVOAD)

## INTRODUCTION

### Purpose

Emergency Support Function (ESF) #7 – Logistics integrates whole community logistics incident planning and support for timely and efficient delivery of supplies, equipment, services, and facilities. It also facilitates comprehensive logistics planning, technical assistance, training, education, exercise, incident response, and sustainment that leverage the capability and resources of Federal logistics partners, public and private stakeholders, and nongovernmental organizations (NGOs) in support of both responders and disaster survivors.

### Scope

ESF #7 provides centralized management of supply chain functions in support of local, state, tribal, territorial, insular area, and Federal governments for an actual or potential incident. Its scope includes coordination of resource sourcing; acquisition; delivery of supplies, equipment, and services; resource tracking; facility space acquisition; transportation coordination; and management and support of information technology systems services and other administrative services. Its specific activities within the scope include:

- Managing a collaborative and complex logistics supply chain that provides equipment, supplies, and services for incidents requiring an integrated whole community response capability.

- Providing for the integration of whole community logistics partners through deliberate and crisis collaboration in the planning, sourcing, acquisition, utilization, and disposition of resources.

**Emergency Support Function #7 – Logistics Annex**

- Facilitating communication and collaboration among all supply chain support elements in order to minimize recovery efforts in the impacted area and reestablish local and state self-sufficiency as rapidly as possible.

## RELATIONSHIP TO WHOLE COMMUNITY

This section describes how ESF #7 relates to other elements of the whole community.

### Local, State, Tribal, Territorial, and Insular Area Governments

ESF #7 conducts assessments, training, education, and exercise programs for regional entities and local governments to improve readiness, increase response capacity, and maximize the management and impact of homeland security resources. ESF #7 organizations develop collaborative tools for use by local, state, tribal, territorial, and insular area entities to evaluate current disaster logistics readiness, identify areas for targeted improvement, and develop a roadmap to mitigate weaknesses and enhance strengths to foster a collective whole community logistics concept.

### Private Sector/Nongovernmental Organizations

Support that cannot be provided from Federal resources is secured through direct procurement or donations.

ESF #7 works with retail, wholesale, and other similar private industry associations for information sharing, planning, and exercises that would produce mutually beneficial results in coordinating how, when, where, and by whom critical logistics resources will be provided during all types of incidents.

### Federal Government

ESF #7 fosters partnerships among Federal logistics stakeholders to maintain a robust and sustainable capability that is flexible and adaptable to meet the unpredictable demands of all hazards.

This unique interagency partnership enables ESF #7 to serve as the single integrator for the whole community logistics supply chain planning and coordination in response to domestic incidents and special events.

Specific information on Federal Government actions is described in the following sections.

## CORE CAPABILITIES AND ACTIONS

### ESF Roles Aligned to Core Capabilities

The following table lists the response core capabilities that ESF #7 most directly supports along with the related ESF #7 actions. All ESFs, including ESF #7, support the following core capabilities: Planning, Operational Coordination, and Public Information and Warning.

**Emergency Support Function #7 – Logistics Annex**

| Core Capability | ESF #7 – Logistics |
|---|---|
| **Mass Care Services** | • Acquires and manages resources, supplies, and services from core capability providers via contracts, mission assignments, interagency agreements, and donations.<br>• Supports the prioritization, coordination, and communication of mass care resource requirements.<br>• Communicates plans, requirements, and strategies to core capability providers.<br>• Supports requirements for physically accessible sheltering and feeding, as well as related activities to support survivors of disasters, including individuals with disabilities. |
| **Critical Transportation** | • Manages transportation that includes equipment and procedures for moving material from storage facilities and vendors to incident victims, particularly with emphasis on the surge and sustainment portions of response.<br>• Provides transportation management services, including fulfilling requests from other Federal organizations. |
| **Infrastructure Systems** | • Provides logistical support to fire and other first response services. |
| **Operational Communications** | • Coordinates the procurement of communications equipment and services. |
| **Logistics and Supply Chain Management** | • Coordinates resource support for survivors.<br>• Provides resource management that includes determining requirements, sourcing, ordering and replenishment, storage, and issuing of supplies and equipment.<br>• Provides facilities management that includes locating, selection, and acquisition of incident facilities, such as Joint Field Offices (JFO), as well as storage and distribution facilities.<br>• Establishes and operates logistics support facilities to include the management of services related to lodging and feeding incident support personnel.<br>• Provides personal property management to include policy and procedures guidance for maintaining accountability of material, as well as identification and reutilization of property acquired to support a Federal response operation.<br>• Manages electronic data interchanges to provide end-to-end visibility of response resources.<br>• Plans for transitional support to recovery operations concurrent with response operations. |

**Emergency Support Function #7 – Logistics Annex**

**Agency Actions**

| Primary Agency | Actions |
|---|---|
| Department of Homeland Security (DHS) | **Federal Emergency Management Agency (FEMA)**<br><br>• Works cooperatively with General Services Administration (GSA) to provide a nationally integrated process for the collaborative implementation of the logistics capability of Federal agencies, public and private sector partners, and NGOs.<br><br>• Serves as the coordinator for the core capability for public and private services and resources with GSA.<br><br>• Serves as single integrator for logistics support as part of the national response effort.<br><br>• Develops and maintains core capability logistics support requirements and capabilities, and visibility of resources.<br><br>• Collaborates and synchronizes resource support efforts with whole community disaster logistics response partners.<br><br>• Leverages efficiencies in vendor networks and maximizes full capacity across all partners.<br><br>• Facilitates development and execution of the public and private sector services and resources logistics supply chain strategy.<br><br>• Sets up and operates incident facilities.<br><br>• Establishes interagency agreements with other Federal departments and agencies/NGOs; memorandums of agreements/memorandums of understanding; and standby logistics contracts.<br><br>• Provides transportation assets and services contracts in support of the Mass Evacuation Incident Annex.<br><br>• Coordinates whole community logistics response for incident facilities with GSA. This support includes location, setup, voice and data communications, and other logistical support.<br><br>• Provides safeguards and accountability for Federal property and equipment assigned to the regions and incident.<br><br>• Manages or acts as contracting officer's representative for supporting contracts.<br><br>• Implements a single-point ordering process.<br><br>• Manages and directs DHS/FEMA-contracted transportation resources assigned to the incident. |

**Emergency Support Function #7 – Logistics Annex**

| Primary Agency | Actions |
|---|---|
| DHS (continued) | **Procurement**<br>• Provides robust contingency contracting services at the DHS/FEMA National Response Coordination Center (NRCC), Regional Response Coordination Centers (RRCCs), and JFOs.<br>• Provides central coordination for acquisition support of NRCC, urban search and rescue, incident support base/forward staging area, and National Responder Support Camps.<br>• Provides Contracting Officer's Technical Representatives from the RRCC, Incident Management Assistance Team, or NRCC Logistics or Operations Section for all ESF #7-executed procurement contracts as appropriate.<br>• Provides assistance with pre-planning requirements and creating milestones; assists with developing lifecycle cost; and provides guidance to pre-award activities including acquisition plan, statement of work, scope of objectives, performance work statement, market research, small business set-aside requirements, and congressional inquiries.<br>• Provides assistance with seeking alternative resources or solutions that are in the best interest of the government; and assists with developing lifecycle cost estimates and fostering partnerships with other government agencies.<br>• Provides assistance with the development of the Acquisition Review Board on major awards that may require DHS/FEMA executive and DHS review.<br>**Private Sector**<br>• Provides planning and response coordination with private sector businesses, associations, and other entities.<br>**Individual Assistance**<br>• Provides planning and response coordination for the provision of mass feeding, sheltering, and other services for survivors of disasters to include pets.<br>**Disability Integration**<br>• Provides subject matter expertise and participates in planning and response activities as they relate to survivors with disabilities or other access and functional needs.<br>**Tribal Affairs**<br>• Provides planning and response coordination with Federally recognized tribes and Bureau of Indian Affairs (BIA). |

**Emergency Support Function #7 – Logistics Annex**

| Primary Agency | Actions |
|---|---|
| **General Services Administration (GSA)** | • Works cooperatively with DHS/FEMA Logistics to provide an integrated process for the collaborative implementation of the logistics capability of Federal agencies, public and private sector partners, and NGOs.<br><br>• Serves as the coordinator for the core capability for Public and Private Services and Resources with DHS/FEMA.<br><br>• Provides emergency relief supplies; facility space; office equipment; office supplies; telecommunications support; transportation services; and contracting services through a centralized acquisition channel.<br><br>• Provides support for requirements not specifically identified in other ESFs, including excess and surplus property disposal.<br><br>**Headquarters-level ESF #7 Support**<br>• Operates under the direction of the GSA Emergency Coordinator (EC) in the GSA Central Office in Washington, D.C.<br><br>**GSA EC**<br>• Upon notification of an incident requiring a coordinated Federal response, the GSA EC notifies entities within the agency which are required to provide immediate support to include the GSA Emergency Operations Center (EOC), the Federal Acquisition Service (FAS), the Public Buildings Service (PBS), and senior management staff as appropriate.<br><br>• Represents ESF #7 in its interaction with the Domestic Resiliency Group and maintains liaison with the Regional Emergency Coordinator (REC) and other interested parties.<br><br>• Provides 24-hour staff support to the NRCC, as required, for the duration of the emergency response period to coordinate GSA activities at the National level.<br><br>**Regional ESF #7 Leader (i.e., GSA Regional Administrator, Regional Emergency Coordinator (REC), or Deputy REC)**<br>• Provides a team that may consist of one or more of the following: REC and/or Team Leader; contracting officer; telecommunications specialist; and real estate/leasing specialist, if needed, to coordinate the provision of ESF #7 support at the RRCC or JFOs.<br><br>• Coordinates with real estate/leasing specialist and DHS representative to select the location of a JFO or other Federal site, in conjunction with the affected state/tribal representative.<br><br>• Ensures that a suitable JFO facility or other Federal site is acquired and ready to occupy within 72 hours of receiving DHS requirements and/or DHS acceptance of the space to include provision of communications, office furniture, equipment, and office supplies.<br><br>• Provides 24-hour staff support to the RRCC or unified coordination, as required, for the duration of the emergency response period to coordinate GSA activities at the Regional level. |

**Emergency Support Function #7 – Logistics Annex**

| Support Agency | Actions |
|---|---|
| **Department of Agriculture** | • Provides feeding support, including meeting specific needs of infants and toddlers.<br><br>**United States Forest Service**<br>• Provides staff to support incident facilities facility, property, telecommunications, and transportation management. |
| **Department of Commerce** | • Provides facility management and telecommunications management support.<br>• Provides technical expertise on structural surveys and the procurement of external consulting services through the Interagency Committee on Seismic Safety in Construction/Building and Fire Research Laboratory of the National Institute of Standards and Technology. This procedure is necessary to assess the structural and fire safety of Federal and non-Federal damaged buildings and lifelines (e.g., public works and utilities). |
| **Department of Defense (DOD)** | • Provides planning support; subsistence; administrative supply; petroleum product; engineering and construction supply; water and mobile units; medical material; telecommunications management; and transportation management support when approved by DOD.<br><br>**United States Army Corps of Engineers**<br>• Provides construction materials and engineering services as required.<br>• Provides a robust capability of mobile field elements and logistics support teams as requested.<br>• Provides commodities distribution assistance and expertise to include points of distribution training and state-level project management support for commodities missions.<br>• Supports the hauling, installing, operations, and maintenance of DHS/FEMA generators for critical public facilities and provides generator lease and purchase support as required. |
| **Department of Energy** | • In accordance with ESF #12, coordinates with energy industries to assist in satisfying critical fuel, lubricant, and electrical power needs unable to be met by local, state tribal, or Federal resources or actions. |
| **Department of Health and Human Services** | • Maintains caches of medical equipment, supplies, and pharmaceuticals to support response teams.<br>• Provides medical supply/resupply contract capability. |
| **Department of Homeland Security** | • In support of ESF #2, assists in coordinating the provision of commercial telecommunications assets within the incident area. |
| **Department of Interior** | • Provides staff to support incident facilities, facility, property, telecommunications, and transportation management through ESF #4. |
| **Department of Labor** | • Provides technical personnel to assist in the identification and recruitment of individuals with specialized occupations needed to support response operations. The Job Corps at the regional level provides students and instructors capable of providing support. The Mine Safety and Health Administration provides engineering services to determine the cause or location of an event, performs structural integrity analysis, and recommends hazard mitigation. |

**Emergency Support Function #7 – Logistics Annex**

| Support Agency | Actions |
|---|---|
| **Department of Transportation** | • Monitors and reports damage to the transportation system and infrastructure as a result of the incident.<br>• Coordinates temporary alternative transportation solutions when systems or infrastructure are damaged or overwhelmed.<br>• Coordinates the stabilization and reestablishment of transportation systems and infrastructure.<br>• Coordinates prevention, preparedness, and mitigation activities among transportation infrastructure stakeholders within the authorities and resource limitations of ESF #1 agencies. |
| **Department of Veterans Affairs** | • Provides technical assistance to identify and procure medical supplies and other medical services.<br>• Provides personnel knowledgeable in Federal procurement and distribution operations.<br>• Provides computer support operations as appropriate. |
| **National Aeronautics and Space Administration** | • Provides available space, buildings, airports, and telecommunications as may be required for emergency support operations. |
| **Office of Personnel Management** | • Identifies, locates, and if necessary, recruits personnel needed to support incident operations after appropriate coordination with GSA. |
| **U.S. Postal Service** | • Provides support in the delivery of information/supplies to disaster survivors. |
| **American Red Cross** | • Provides support to develop the whole community logistics supply chain through synchronization of pre-planning activities and coordination during responses to major disasters. |
| **National Voluntary Organizations Active in Disaster (NVOAD)** | • Facilitates information sharing before and during a response by its member organizations. |

# Exhibit Z



# Disaster Relief Fund: Monthly Report

**as of November 30, 2025**

*January 14, 2026*
**Fiscal Year 2026 Report to Congress**



*Federal Emergency Management Agency*

# Message from the Administrator

January 14, 2026

I am pleased to present the following, "Disaster Relief Fund: Monthly Report," which has been prepared by the Federal Emergency Management Agency.

This document has been compiled pursuant to language set forth in the Fiscal Year 2026 Continuing Appropriations and Extensions Act (Public Law 119-37), which extends the terms and conditions of the Fiscal Year 2025 Full-Year Continuing Appropriations and Extensions Act (Public Law 119-4) and in the Coronavirus Aid, Relief, and Economic Security Act (Public Law 116-136).

Pursuant to congressional requirements, this report is being provided to the following Members of Congress:

Representative Tom Cole
Chairman, House Appropriations Committee

Representative Rosa DeLauro
Ranking Member, House Appropriations Committee

Senator Susan Collins
Chair, Senate Appropriations Committee

Senator Patty Murray
Vice Chair, Senate Appropriations Committee

Inquiries relating to this report may be directed to Greg James (228) 229-9864.

Sincerely,

Karen S. Evans
Senior Official Performing the Duties of the Administrator
Federal Emergency Management Agency

i



# Disaster Relief Fund:
# Monthly Report as of November 30, 2025

# Table of Contents

I.    Legislative Language ................................................................................................1

II.    Background ..............................................................................................................4

Appendix A:  Disaster Relief Fund Appropriations Summary ..........................................5

Appendix B:  Disaster Relief Fund Funding Activity ......................................................6

Appendix C:  Obligations and Estimates by Spending Category ....................................12

Appendix D:  Allocations, Obligations, & Expenditures................................................13

Appendix E:  Fund Exhaustion Date.............................................................................16

Appendix F:  Disaster Relief Fund Cost Estimation Bridge Table .................................17

Appendix G: Building Resilient Infrastructure and Communities - Predisaster Mitigation History and Fund Status................................................................................................................18

# I. Legislative Language

This document has been compiled pursuant to language set forth in the Fiscal Year 2026 Continuing Appropriations and Extensions Act (Public Law 119-37), which extends the terms and conditions of the Fiscal Year 2025 Full-Year Continuing Appropriations and Extensions Act (Public Law 119-4), in the Coronavirus Aid, Relief, and Economic Security Act (Public Law 116-136), and in section 430(c) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Public Law 93-288, as amended; codified at 42 U.S.C. § 5189h(c)).

Public Law 119-37 states:

>The following sums are hereby appropriated, out of any money in the Treasury not otherwise appropriated, and out of applicable corporate or other revenues, receipts, and funds, for the several departments, agencies, corporations, and other organizational units of Government for fiscal year 2026, and for other purposes, namely:

>SEC. 101. Such amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2025 and under the authority and conditions provided in such Acts, for continuing projects or activities (including the costs of direct loans and loan guarantees) that are not otherwise specifically provided for in this Act, that were conducted in fiscal year 2025, and for which appropriations, funds, or other authority were made available in the Full-Year Continuing Appropriations Act, 2025 (division A of Public Law 119–4), except sections 1110, 1113, and 1114; the proviso in paragraph (4) of section 1602; and sections 1708 and 1808; and except section 540 of division C, and sections 110 and 112 of division D of Public Law 118–42, as continued in effect by section 1101 of division A of Public Law 119– 4; and except section 7069(b) of division F of Public Law 118– 47, as continued in effect by section 1101 of division A of Public Law 119–4.

Division A of Public Law 119-4 (referenced above) states:

>The following sums are hereby appropriated, out of any money in the Treasury not otherwise appropriated, and out of applicable corporate or other revenues, receipts, and funds, for the several departments, agencies, corporations, and other organizational units of Government for fiscal year 2025, and for other purposes, namely:

>SEC. 1101. (a) Such amounts as may be necessary, at the level specified in subsection (c) and under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024, for projects or activities (including the costs of direct loans and loan guarantees) that are not otherwise specifically provided for, and for which appropriations, funds, or other authority were made available in the following appropriations Acts:

>…

>(6) The Department of Homeland Security Appropriations Act, 2024 (division C of Public Law

118–47), except sections 543 through 546, and including sections 102 through 105 of title I of division G of Public Law 118–47.

Section 306 of division C of Public Law 118-47 (referenced above) states:

> SEC. 306. The reporting requirements in paragraphs (1) and (2) under the heading ``Federal Emergency Management Agency–Disaster Relief Fund'' in the Department of Homeland Security Appropriations Act, 2015 (Public Law 114-4), related to reporting on the Disaster Relief Fund, shall be applied in fiscal year 2024 with respect to budget year 2025 and current fiscal year 2024, respectively-
>> (1) in paragraph (1) by substituting "fiscal year 2025" for "fiscal year 2016"; and
>> (2) in paragraph (2) by inserting "business" after "fifth".

Public Law 114-4 (referenced above) states, in relevant part:

> *Provided*, That the Administrator of the Federal Emergency Management Agency shall submit to the Committees on Appropriations of the Senate and the House of Representatives the following reports, including a specific description of the methodology and the source data used in developing such reports:

> …

>> (2) an estimate or actual amounts, if available, of the following for the current fiscal year shall be submitted not later than the fifth day of each month, and shall be published by the Administrator on the Agency's Web site not later than the fifth day of each month:
>>> (A) a summary of the amount of appropriations made available by source, the transfers executed, the previously allocated funds recovered, and the commitments, allocations, and obligations made;
>>> (B) a table of disaster relief activity delineated by month, including-
>>>> (i) the beginning and ending balances;
>>>> (ii) the total obligations to include amounts obligated for fire assistance, emergencies, surge, and disaster support activities;
>>>> (iii) the obligations for catastrophic events delineated by event and by state; and
>>>> (iv) the amount of previously obligated funds that are recovered;
>>> (C) a summary of allocations, obligations, and expenditures for catastrophic events delineated by event;

(D) in addition, for a disaster declaration related to Hurricane Sandy, the cost of the following categories of spending: public assistance, individual assistance, mitigation, administrative, operations, and any other relevant category (including emergency measures and disaster resources); and

(E) the date on which funds appropriated will be exhausted...

Public Law 116-136 states, in relevant part:

> *Provided further*, That every 30 days the Administrator shall provide the Committees on Appropriations of the Senate and the House of Representatives both projected and actual costs for funds provided under this heading for major disasters and any other expenses...

This report covers activities as of November 30, 2025

# II.  Background

Public Law 119-37 requires that the Federal Emergency Management Agency Administrator provide a report by the fifth business day of each month on the Disaster Relief Fund that includes a funding summary, a table delineating Disaster Relief Fund funding activities each month by state and event, a summary of the funding for the catastrophic events, and the fund exhaustion date, or end- of-fiscal-year balance. Public Law 116-136 requires that both projected and actual costs for funds provided by it for major disasters and any other expenses be provided to the House and Senate Appropriations Committees.
Consequently, the following report elements are included:

1. Appendix A is an appropriations summary that includes a synopsis of the amount of appropriations made available by source, the transfers executed, the previously allocated funds recovered, and the commitments, allocations, and obligations.
2. Appendix B presents details on the estimated and projected Disaster Relief Fund funding activities delineated by month and by catastrophic disaster.
3. Appendix C presents quarterly obligations and estimates by spending category for Hurricanes Sandy, Harvey, Irma, and Maria; Coronavirus Disease
2019; and declarations since August 1, 2017.
4. Appendix D presents funding summaries for the current active catastrophic events including the allocations, obligations, and expenditures.
5. Appendix E presents the fund exhaustion date, or end-of-fiscal-year balance.
6. Appendix F presents a bridge table that provides explanation for the monthly and baseline change for all activities to include details for catastrophic events.
7. Appendix G presents the fund history and current status of the Building Resilient Infrastructure and Communities/Predisaster Mitigation program.

4

APPENDIX A:  Disaster Relief Fund Appropriations Summary

| | Major Declarations | Base | Total |
|---|---|---|---|
| **Disaster Relief Fund Congressional Monthly Report** <br> **as of November 30, 2025** <br> (Dollars in Millions) | | | |
| Carryover From Fiscal Year 2025 [1] | $ 8,404 | $ 1,163 | $ 9,567 |
| Fiscal Year 2026 Continuing Appropriations and Extensions Act [2] | 22,510 | | 22,510 |
| Fiscal Year 2026 Recoveries | 1,093 | 28 | 1,121 |
| **Total Budget Authority** | **32,007** | **1,191** | **33,198** |
| Anticipated Transfers to Disaster Assistance Direct Loan Program [3] | (43) | | (43) |
| **Revised Budget Authority** | **31,964** | **1,191** | **33,155** |
| Obligations [4] | (1,005) | (72) | (1,077) |
| **Balance** | **30,959** | **1,119** | **32,078** |
| **Projections for the Remainder of Fiscal Year 2026** | | | |
| Projected Fiscal Year 2026 Additional Obligations | | | |
|   Based on Existing Spend Plans | | | |
|     Catastrophic Disasters | (25,254) | | (25,254) |
|     Disaster Readiness and Support and Other | | (471) | (471) |
|     **Subtotal Existing Spend Plans** | **(25,254)** | **(471)** | **(25,725)** |
|     Non-Catastrophic Disasters | (4,422) | | (4,422) |
|     Emergencies, Fire Management Assistance Grants, and Surge | | (386) | (386) |
|     **Subtotal** | **(4,422)** | **(386)** | **(4,808)** |
| **Total Projected Fiscal Year 2026 Additional Obligations** | **(29,676)** | **(857)** | **(30,533)** |
| Projected Additional Recoveries | 2,907 | 272 | 3,179 |
| **Reserve** | **(3,000)** | | **(3,000)** |
| **Balance** | $ **1,190** | $ **534** | $ **1,724** |

**Notes:**
(1) Amounts subject to change pending Fiscal Year 2025 closeout of the accounting system.
(2) Pursuant to P.L. 119-37, Continuing Appropriations and Extensions Act, 2026. Section 147 allows the DRF appropriation to be apportioned as necessary, up to the FY 2025 enacted levels, to carry out response and recovery activities.
(3) Anticipated transfers to the Disaster Assistance Direct Loan Program.
(4) As of November 30, 2025, unobligated commitments total $133 million and uncommitted/unobligated allocations totaled $252 million.

Source of financial information is the Integrated Financial Management Information System.

**APPENDIX B: Disaster Relief Funding Activity (Details)**

Disaster Relief Fund Monthly Obligations FY 2026
DRF Monthly Spend Plan (FY 2026)
($ in millions)
as of November 30, 2025

| | October-25 Actual | November-25 Actual | December-25 Estimated | January-26 Estimated | February-26 Estimated | March-26 Estimated | April-26 Estimated | May-26 Estimated | June-26 Estimated | July-26 Estimated | August-26 Estimated | September-26 Estimated | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning of Month Disaster Relief Fund Balance [1] | $ 9,567 | $ 9,708 | $ 32,078 | $ 30,262 | $ 24,631 | $ 21,251 | $ 17,321 | $ 14,028 | $ 12,229 | $ 10,459 | $ 9,006 | $ 7,293 | $ 1,724 |
| Fiscal Year 2026 Continuing Appropriations and Extensions Act [2] | - | 22,510 | | | | | | | | | | | |
| Anticipated Transfers to/from Disaster Assistance Direct Loan Program [3] | (43) | | | | | | | | | | | | |
| Total Available | 9,524 | 32,218 | 32,078 | 30,262 | 24,631 | 21,251 | 17,321 | 14,028 | 12,229 | 10,459 | 9,006 | 7,293 | 1,724 |
| Major Declarations | 8,361 | 31,077 | 30,959 | 29,205 | 23,642 | 20,316 | 16,455 | 13,206 | 11,458 | 9,739 | 8,329 | 6,669 | 1,190 |
| Base | 1,163 | 1,141 | 1,119 | 1,057 | 989 | 935 | 866 | 822 | 771 | 720 | 677 | 624 | 534 |
| **Disaster Relief Fund Base Activities** | | | | | | | | | | | | | |
| **Emergencies** | | | | | | | | | | | | | |
| Monthly Actual/Estimated Obligations | - | - | (15) | (15) | (15) | (15) | (14) | (14) | (14) | (14) | (14) | (14) | (144) |
| **Fire Management** | | | | | | | | | | | | | |
| Monthly Actual/Estimated Obligations | (1) | - | (17) | (17) | (17) | (17) | (17) | (18) | (18) | (18) | (18) | (18) | (176) |
| **Surge** | | | | | | | | | | | | | |
| Monthly Actual/Estimated Obligations | (12) | - | (6) | (6) | (6) | (7) | (7) | (7) | (7) | (7) | (7) | (7) | (79) |
| **Disaster Support & Other Activities** | | | | | | | | | | | | | |
| Disaster Readiness and Support Monthly Actual Obligations | (30) | (24) | (49) | (53) | (39) | (53) | (29) | (32) | (32) | (25) | (36) | (74) | (476) |
| Other Monthly Actual Obligations | - | (5) | (2) | (4) | (4) | (4) | (4) | (7) | (7) | (6) | (5) | (6) | (54) |
| Monthly Actual/Estimated Obligations | (30) | (29) | (51) | (57) | (43) | (57) | (33) | (39) | (39) | (31) | (41) | (80) | (530) |
| **Total Disaster Relief Fund Base Actual Obligations** | (43) | (29) | (89) | (95) | (81) | (96) | (71) | (78) | (78) | (70) | (80) | (119) | (929) |
| **Disaster Relief Fund DR Activities** | | | | | | | | | | | | | |
| **Actual/Estimated Monthly Major DR Activity (Non-Catastrophic)** | (243) | (189) | (489) | (364) | (247) | (261) | (496) | (562) | (459) | (328) | (728) | (488) | (4,854) |
| **Katrina Rita Wilma** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | (2) | - | (29) | (1) | (1) | (2) | - | - | - | - | - | (35) |
| Monthly Actual/Estimated Obligations | - | - | (2) | (29) | (1) | (1) | (2) | - | - | - | - | - | (35) |
| **Ike** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | (2) | - | (1) | - | - | - | - | - | - | - | - | (3) |
| Monthly Actual/Estimated Obligations | - | - | (2) | (1) | - | - | - | - | - | - | - | - | (3) |
| **Sandy** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | (6) | (2) | (137) | (19) | (47) | (2) | (7) | (1) | (2) | (1) | (3) | (227) |
| Monthly Actual/Estimated Obligations | - | - | (8) | (137) | (19) | (47) | (2) | (7) | (1) | (2) | (1) | (3) | (227) |
| **West Virginia Floods 4273** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | (1) | - | (2) | - | (1) | - | - | - | - | - | - | (4) |
| Monthly Actual/Estimated Obligations | - | - | (1) | (2) | - | (1) | - | - | - | - | - | - | (4) |
| **Louisiana Floods 4277** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | (1) | - | (2) | - | - | (1) | - | - | - | - | - | (4) |
| Monthly Actual/Estimated Obligations | - | - | (1) | (2) | - | - | (1) | - | - | - | - | - | (4) |
| **Matthew** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | - | - | - | - | (14) | - | (1) | - | - | (2) | (1) | (18) |
| Monthly Actual/Estimated Obligations | - | - | - | - | - | (14) | - | (1) | - | - | (2) | (1) | (18) |
| **California Winter Storms** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | (1) | - | - | (12) | - | - | - | - | - | - | - | (6) | (19) |
| Monthly Actual/Estimated Obligations | (1) | - | - | (12) | - | - | - | - | - | - | - | (6) | (19) |
| **Harvey** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | (3) | (1) | (47) | (14) | (42) | (7) | (25) | (4) | (7) | (4) | (8) | (162) |
| Monthly Actual/Estimated Obligations | - | (1) | (3) | (47) | (14) | (42) | (7) | (25) | (4) | (7) | (4) | (8) | (162) |
| **Irma** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | - | - | (37) | (8) | (3) | (1) | (2) | (2) | (1) | (1) | - | (55) |
| Monthly Actual/Estimated Obligations | - | - | - | (37) | (8) | (3) | (1) | (2) | (2) | (1) | (1) | - | (55) |
| **Maria** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | (3) | (24) | (12) | (566) | (399) | (784) | (115) | (79) | (318) | (83) | (22) | (556) | (2,961) |
| Monthly Actual/Estimated Obligations | (3) | (2) | (34) | (566) | (399) | (784) | (115) | (79) | (318) | (83) | (22) | (556) | (2,961) |
| **California Wildfires 2017** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | - | - | - | - | - | (1) | - | - | - | - | (2) | (3) |
| Monthly Actual/Estimated Obligations | - | - | - | - | - | - | (1) | - | - | - | - | (2) | (3) |
| **Florence** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | - | - | - | - | (11) | - | - | - | - | - | - | (11) |
| Monthly Actual/Estimated Obligations | - | (1) | - | - | - | (10) | - | - | - | - | - | - | (11) |
| **Michael** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | (1) | (1) | (128) | (14) | (8) | (14) | (2) | (2) | (4) | (4) | (3) | (181) |
| Monthly Actual/Estimated Obligations | - | - | (2) | (128) | (14) | (8) | (14) | (2) | (2) | (4) | (4) | (3) | (181) |
| **Yutu 4404** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | (2) | - | (4) | (2) | - | - | - | - | - | - | - | (8) |
| Monthly Actual/Estimated Obligations | - | - | (2) | (4) | (2) | - | - | - | - | - | - | - | (8) |

**APPENDIX B:  Disaster Relief Funding Activity (Details)**

Disaster Relief Fund Monthly Obligations by Month
DRF Monthly Spend Plan (FY 2026)
($ in millions)
as of November 30, 2025

| | October-25 Actual | November-25 Actual | December-25 Estimated | January-26 Estimated | February-26 Estimated | March-26 Estimated | April-26 Estimated | May-26 Estimated | June-26 Estimated | July-26 Estimated | August-26 Estimated | September-26 Estimated | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **California Wildfires 2018** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | - | (3) | (65) | - | - | - | - | - | - | - | - | (68) |
| Monthly Actual/Estimated Obligations | - | - | (3) | (65) | - | - | - | - | - | - | - | - | (68) |
| **Nebraska Winter Storm 2019** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | - | - | - | - | - | - | (1) | - | - | - | (1) | (2) |
| Monthly Actual/Estimated Obligations | - | - | - | - | - | - | - | (1) | - | - | - | (1) | (2) |
| **Puerto Rico Earthquakes 4473** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | (2) | (1) | (37) | (27) | (56) | (16) | (1) | (18) | (37) | (8) | (1) | (204) |
| Monthly Actual/Estimated Obligations | - | - | (3) | (37) | (27) | (56) | (16) | (1) | (18) | (37) | (8) | (1) | (204) |
| **Coronavirus Disease 2019** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | (129) | (26) | (13) | (2,302) | (2,300) | (2,300) | (2,131) | (655) | (657) | (656) | (662) | (721) | (12,552) |
| Monthly Actual/Estimated Obligations | (129) | (98) | (31) | (2,293) | (2,300) | (2,300) | (2,131) | (620) | (656) | (639) | (646) | (709) | (12,552) |
| **California Wildfires 2020** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | (83) | - | (30) | - | (1) | - | - | (9) | - | - | - | (123) |
| Monthly Actual/Estimated Obligations | - | - | - | (30) | (83) | (1) | - | - | (9) | - | - | - | (123) |
| **Laura** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | (4) | (2) | (102) | (15) | (15) | (12) | (10) | (12) | (23) | (11) | (30) | (236) |
| Monthly Actual/Estimated Obligations | - | (1) | (5) | (102) | (15) | (15) | (12) | (10) | (12) | (23) | (11) | (30) | (236) |
| **Oregon Wildfires 2020** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | (2) | (1) | (32) | (3) | (8) | (5) | (8) | (13) | (5) | (12) | - | (89) |
| Monthly Actual/Estimated Obligations | - | - | (3) | (32) | (3) | (8) | (5) | (8) | (13) | (5) | (12) | - | (89) |
| **Ida** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | (1) | (41) | (27) | (637) | (71) | (61) | (74) | (46) | (61) | (48) | (53) | (63) | (1,183) |
| Monthly Actual/Estimated Obligations | (1) | (1) | (67) | (637) | (71) | (61) | (74) | (46) | (61) | (48) | (53) | (63) | (1,183) |
| **Fiona** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | (28) | (2) | (189) | (3) | (19) | (11) | (26) | (4) | (34) | (31) | (24) | (371) |
| Monthly Actual/Estimated Obligations | - | (1) | (29) | (189) | (3) | (19) | (11) | (26) | (4) | (34) | (31) | (24) | (371) |
| **Ian** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | (2) | (62) | (15) | (165) | (28) | (25) | (129) | (104) | (58) | (32) | (26) | (130) | (776) |
| Monthly Actual/Estimated Obligations | (2) | (3) | (79) | (164) | (24) | (25) | (129) | (104) | (58) | (32) | (26) | (130) | (776) |
| **Hawaii Wildfires** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | (12) | (41) | (11) | (42) | (12) | (20) | (18) | (16) | (19) | (21) | (20) | (39) | (271) |
| Monthly Actual/Estimated Obligations | (12) | (3) | (49) | (42) | (12) | (20) | (18) | (16) | (19) | (21) | (20) | (39) | (271) |
| **Idalia** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | (8) | (11) | (63) | (47) | (4) | (73) | - | - | (5) | - | (1) | (212) |
| Monthly Actual/Estimated Obligations | - | (1) | (18) | (63) | (47) | (4) | (73) | - | - | (5) | - | (1) | (212) |
| **Kentucky Floods 2022** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | - | (86) | - | (1) | - | (2) | - | (2) | (13) | - | - | - | (104) |
| Monthly Actual/Estimated Obligations | - | - | (86) | (1) | - | (2) | - | (2) | (13) | - | - | - | (104) |
| **2024 Spring Storms** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | (5) | (11) | (5) | (69) | (15) | (14) | (19) | (10) | (10) | (7) | (3) | (2) | (170) |
| Monthly Actual/Estimated Obligations | (5) | (3) | (13) | (69) | (15) | (14) | (19) | (10) | (10) | (7) | (3) | (2) | (170) |
| **Beryl** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | (7) | (34) | (15) | (106) | (50) | (11) | (14) | (24) | (12) | (29) | (14) | (12) | (328) |
| Monthly Actual/Estimated Obligations | (7) | (4) | (51) | (101) | (50) | (11) | (14) | (24) | (11) | (29) | (14) | (12) | (328) |
| **Helene** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | (72) | (429) | (324) | (372) | (144) | (283) | (269) | (263) | (168) | (271) | (208) | (292) | (3,095) |
| Monthly Actual/Estimated Obligations | (72) | (181) | (572) | (372) | (144) | (283) | (269) | (263) | (168) | (271) | (208) | (292) | (3,095) |
| **Milton** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | (16) | (109) | (53) | (76) | (58) | (71) | (72) | (111) | (67) | (65) | (120) | (228) | (1,046) |
| Monthly Actual/Estimated Obligations | (16) | (13) | (155) | (75) | (58) | (58) | (70) | (72) | (110) | (67) | (65) | (119) | (226) | (1,046) |
| **California Wildfires 2025** | | | | | | | | | | | | | |
| Initial Fiscal Year 2025 Spend Plan Estimates | (9) | (244) | (96) | (253) | (61) | (92) | (58) | (120) | (105) | (60) | (38) | (170) | (1,306) |
| Monthly Actual/Estimated Obligations | (9) | (3) | (337) | (253) | (61) | (92) | (58) | (120) | (105) | (60) | (38) | (170) | (1,306) |
| **Actual/Estimated Major Declaration Obligations** | | | | | | | | | | | | | |
| Total DR Actual/Estimated Obligations | (500) | (505) | (2,045) | (5,854) | (3,617) | (4,152) | (3,540) | (2,039) | (2,010) | (1,701) | (1,951) | (2,767) | (30,681) |
| **Reserve for Catastrophic Event** | | | | | | | | | | | | (3,000) | (3,000) |
| **FY 2026 Actual/Estimated Recoveries** | | | | | | | | | | | | | |
| Monthly Recoveries | 727 | 394 | 318 | 318 | 318 | 318 | 318 | 318 | 318 | 318 | 318 | 317 | 4,300 |
| Major Declaration Actuals/Estimated | 706 | 387 | 291 | 291 | 291 | 291 | 291 | 291 | 291 | 291 | 291 | 288 | 4,000 |
| Base Actuals/Estimated | 21 | 7 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 29 | 300 |
| **Disaster Relief Fund Available at End of Month (Including Recoveries)** | $ 9,708 | $ 32,078 | $ 30,262 | $ 24,631 | $ 21,251 | $ 17,321 | $ 14,028 | $ 12,229 | $ 10,459 | $ 9,006 | $ 7,293 | $ 1,724 | |

**Notes:**
(1) Amounts subject to change pending Fiscal Year 2025 closeout of the accounting system.
(2) Pursuant to P.L. 119-37, Continuing Appropriations and Extensions Act, 2026. Section 147 allows the DRF appropriation to be apportioned as necessary, up to the FY 2025 enacted levels, to carry out response and recovery activities.
(3) Anticipated transfers to the Disaster Assistance Direct Loan Program.

APPENDIX B:  Disaster Relief Funding Activity (By Catastrophic Disaster)

### Disaster Relief Fund Monthly Detailed Obligations FY 2026
#### ($ in millions)

| Event/Disaster | Cumulative Obligations Through Fiscal Year 2025 | October Actual | November Actual | December Estimated | January Estimated | February Estimated | March Estimated | April Estimated | May Estimated | June Estimated | July Estimated | August Estimated | September Estimated | FY 2026 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Katrina Rita Wilma** | | | | | | | | | | | | | | |
| 1602-Florida | $ (233) | $ - | $ - | $ - | - | - | - | - | - | - | - | - | - | - |
| 1603-Louisiana | (32,943) | - | - | (2) | (29) | (1) | - | (2) | - | - | - | - | - | (34) |
| 1604-Mississippi | (10,110) | - | - | - | - | - | (1) | - | - | - | - | - | - | (1) |
| 1605-Alabama | (1,039) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1606-Texas | (1,877) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1607-Louisiana | (1,916) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1609-Florida | (2,565) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | **(50,683)** | **-** | **-** | **(2)** | **(29)** | **(1)** | **(1)** | **(2)** | **-** | **-** | **-** | **-** | **-** | **(35)** |
| **Ike** | | | | | | | | | | | | | | |
| 1791-Texas | (4,368) | - | - | (2) | (1) | - | - | - | - | - | - | - | - | (3) |
| 1792-Louisiana | (360) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1797-Alabama | (8) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1802-Kentucky | (24) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1804-Arkansas | (3) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1805-Ohio | (56) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | **(4,819)** | **-** | **-** | **(2)** | **(1)** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **(3)** |
| **Sandy** | | | | | | | | | | | | | | |
| 4085-New York | (18,575) | - | - | (4) | (70) | (18) | (3) | (1) | (3) | - | - | - | - | (99) |
| 4086-New Jersey | (3,703) | - | - | (4) | (67) | (1) | (44) | (1) | (4) | (1) | (2) | (1) | (1) | (126) |
| 4087-Connecticut | (122) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4089-Rhode Island | (19) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4090-Delaware | (8) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4091-Maryland | (48) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4092-Virginia | (14) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4093-West Virginia | (23) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4095-New Hampshire | (3) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4096-District of Columbia | (3) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4097-Massachusetts | (18) | - | - | - | - | - | - | - | - | - | - | - | (2) | (2) |
| 4098-Ohio | (24) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4099-Pennsylvania | (17) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | **(22,577)** | **-** | **-** | **(8)** | **(137)** | **(19)** | **(47)** | **(2)** | **(7)** | **(1)** | **(2)** | **(1)** | **(3)** | **(227)** |
| **West Virginia Floods 4273** | | | | | | | | | | | | | | |
| 4273-West Virginia | (644) | - | - | (1) | (2) | - | (1) | - | - | - | - | - | - | (4) |
| | **(644)** | **-** | **-** | **(1)** | **(2)** | **-** | **(1)** | **-** | **-** | **-** | **-** | **-** | **-** | **(4)** |
| **Louisiana Floods 4277** | | | | | | | | | | | | | | |
| 4277-Louisiana | (2,771) | - | - | (1) | (2) | - | - | (1) | - | - | - | - | - | (4) |
| | **(2,771)** | **-** | **-** | **(1)** | **(2)** | **-** | **-** | **(1)** | **-** | **-** | **-** | **-** | **-** | **(4)** |
| **Matthew** | | | | | | | | | | | | | | |
| 4283-Florida | (516) | - | - | - | - | - | (14) | - | - | - | - | (2) | (1) | (17) |
| 4284-Georgia | (150) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4285-North Carolina | (680) | - | - | - | - | - | - | - | (1) | - | - | - | - | (1) |
| 4286-South Carolina | (407) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4291-Virginia | (41) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | **(1,794)** | **-** | **-** | **-** | **-** | **-** | **(14)** | **-** | **(1)** | **-** | **-** | **(2)** | **(1)** | **(18)** |
| **California Winter Storms** | | | | | | | | | | | | | | |
| 4308-California | (1,032) | (1) | - | - | (12) | - | - | - | - | - | - | (6) | - | (19) |
| | **(1,032)** | **(1)** | **-** | **-** | **(12)** | **-** | **-** | **-** | **-** | **-** | **-** | **(6)** | **-** | **(19)** |
| **Harvey** | | | | | | | | | | | | | | |
| 4332-Texas | (8,217) | - | (1) | (3) | (47) | (14) | (42) | (7) | (25) | (4) | (7) | (4) | (8) | (162) |
| 4345-Louisiana | (13) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | **(8,230)** | **-** | **(1)** | **(3)** | **(47)** | **(14)** | **(42)** | **(7)** | **(25)** | **(4)** | **(7)** | **(4)** | **(8)** | **(162)** |
| **Irma** | | | | | | | | | | | | | | |
| 4335-Virgin Islands | (326) | - | - | - | (3) | - | - | (1) | - | - | - | - | - | (4) |
| 4336-Puerto Rico | (81) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4337-Florida | (5,206) | - | - | - | (30) | (8) | (2) | (1) | (2) | (1) | (1) | (1) | (1) | (47) |
| 4338-Georgia | (198) | - | - | - | (4) | - | - | - | - | - | - | - | - | (4) |

APPENDIX B:  Disaster Relief Funding Activity (By Catastrophic Disaster)

## Disaster Relief Fund Monthly Detailed Obligations FY 2026
($ in millions)

| Event/Disaster | Cumulative Obligations Through Fiscal Year 2025 | October Actual | November Actual | December Estimated | January Estimated | February Estimated | March Estimated | April Estimated | May Estimated | June Estimated | July Estimated | August Estimated | September Estimated | FY 2026 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4341-Florida | (3) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4346-South Carolina | (47) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | (5,861) | - | - | - | (37) | (8) | (3) | (1) | (2) | (2) | (1) | (1) | - | (55) |
| **Maria** | | | | | | | | | | | | | | |
| 4339-Puerto Rico | (45,419) | (3) | (2) | (16) | (516) | (396) | (641) | (42) | (76) | (301) | (76) | (18) | (231) | (2,318) |
| 4340-Virgin Islands | (22,717) | - | - | (18) | (50) | (3) | (143) | (73) | (3) | (17) | (7) | (4) | (325) | (643) |
| | (68,136) | (3) | (2) | (34) | (566) | (399) | (784) | (115) | (79) | (318) | (83) | (22) | (556) | (2,961) |
| **California Wildfires 2017** | | | | | | | | | | | | | | |
| 4344-California | (1,452) | - | - | - | - | - | - | (1) | - | - | - | - | (2) | (3) |
| | (1,452) | - | - | - | - | - | - | (1) | - | - | - | - | (2) | (3) |
| **Florence** | | | | | | | | | | | | | | |
| 4393-North Carolina | (1,528) | - | (1) | - | - | - | (10) | - | - | - | - | - | - | (11) |
| 4394-South Carolina | (252) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4401-Virginia | (47) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | (1,827) | - | (1) | - | - | - | (10) | - | - | - | - | - | - | (11) |
| **Michael** | | | | | | | | | | | | | | |
| 4399-Florida | (3,141) | - | - | (2) | (128) | (4) | (8) | (13) | (2) | (2) | (4) | (4) | (2) | (169) |
| 4400-Georgia | (368) | - | - | - | - | (10) | - | - | - | - | - | - | - | (10) |
| 4406-Alabama | (21) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4411-Virginia | (47) | - | - | - | - | - | (1) | - | - | - | - | - | (1) | (2) |
| 4412 -North Carolina | (24) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | (3,601) | - | - | (2) | (128) | (14) | (8) | (14) | (2) | (2) | (4) | (4) | (3) | (181) |
| **Nebraska Winter Storm 2019** | | | | | | | | | | | | | | |
| 4420-Nebraska | (732) | - | - | - | - | - | - | (1) | - | - | - | (1) | - | (2) |
| | (732) | - | - | - | - | - | - | (1) | - | - | - | (1) | - | (2) |
| **Yutu** | | | | | | | | | | | | | | |
| 4404-Northern Mariana Islands | (862) | - | - | (2) | (4) | (2) | - | - | - | - | - | - | - | (8) |
| | (862) | - | - | (2) | (4) | (2) | - | - | - | - | - | - | - | (8) |
| **California Wildfires 2018** | | | | | | | | | | | | | | |
| 4407-California | (2,634) | - | - | (3) | (65) | - | - | - | - | - | - | - | - | (68) |
| | (2,634) | - | - | (3) | (65) | - | - | - | - | - | - | - | - | (68) |
| **Puerto Rico Earthquakes 4473** | | | | | | | | | | | | | | |
| 4473-Puerto Rico | (1,322) | - | - | (3) | (37) | (27) | (56) | (16) | (1) | (18) | (37) | (8) | (1) | (204) |
| | (1,322) | - | - | (3) | (37) | (27) | (56) | (16) | (1) | (18) | (37) | (8) | (1) | (204) |
| **Coronavirus Disease 2019** | | | | | | | | | | | | | | |
| 4480-New York | (21,482) | (1) | (5) | (6) | (233) | (558) | (893) | (415) | (36) | (124) | (52) | (73) | (56) | (2,452) |
| 4481-Washington | (3,453) | - | - | (1) | (86) | (57) | (96) | (285) | (40) | (2) | - | - | (14) | (581) |
| 4482-California | (23,249) | (127) | - | (5) | (269) | (365) | (128) | (264) | (87) | (41) | (121) | (70) | (82) | (1,559) |
| 4483-Iowa | (705) | - | - | - | (28) | (2) | (1) | (1) | (12) | (1) | (18) | (14) | (22) | (99) |
| 4484-Louisiana | (3,076) | - | - | - | (44) | (11) | (14) | (31) | (15) | (34) | (8) | (79) | (26) | (262) |
| 4485-Texas | (18,320) | - | - | (3) | (88) | (18) | (28) | (139) | (43) | (19) | (87) | (28) | (82) | (535) |
| 4486-Florida | (5,921) | - | - | - | (146) | (197) | - | (108) | (62) | (54) | (42) | (42) | (19) | (689) |
| 4487-North Carolina | (2,866) | - | - | - | (39) | - | (1) | (36) | - | (6) | (20) | (15) | (19) | (136) |
| 4488-New Jersey | (5,049) | - | - | (1) | (121) | - | (106) | (1) | - | (1) | (21) | (23) | (33) | (307) |
| 4489-Illinois | (3,939) | - | (1) | - | (88) | (10) | (3) | (41) | - | (24) | - | - | (3) | (170) |
| 4490-Missouri | (1,462) | - | - | (1) | (32) | - | (92) | - | (67) | (24) | (19) | (16) | (32) | (283) |
| 4491-Maryland | (3,361) | - | - | (7) | (120) | (420) | (130) | (102) | (60) | (22) | (26) | (32) | (11) | (930) |
| 4492-South Carolina | (1,096) | - | - | - | (44) | - | (89) | (9) | - | - | (39) | (14) | (22) | (217) |
| 4493-Puerto Rico | (571) | - | - | - | (26) | - | - | (4) | - | (6) | - | (1) | - | (37) |
| 4494-Michigan | (3,488) | - | - | - | (68) | (14) | (44) | (3) | - | (1) | - | - | (45) | (181) |
| 4495-Guam | (139) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4496-Massachusetts | (4,980) | - | - | (2) | (40) | (1) | (154) | (1) | (1) | (24) | (1) | (17) | (2) | (243) |
| 4497-Kentucky | (548) | - | - | - | (34) | (10) | (12) | (42) | - | (25) | (19) | (14) | (36) | (192) |
| 4498-Colorado | (2,414) | - | - | - | (32) | - | - | - | - | (27) | (21) | - | (5) | (85) |
| 4499-Oregon | (2,406) | - | - | (1) | (14) | (1) | (92) | (43) | - | - | - | (15) | - | (166) |
| 4500-Connecticut | (1,494) | - | - | - | (24) | - | - | - | (31) | - | - | - | (12) | (67) |

APPENDIX B:  Disaster Relief Funding Activity (By Catastrophic Disaster)

**Disaster Relief Fund Monthly Detailed Obligations FY 2026**
($ in millions)

| Event/Disaster | Cumulative Obligations Through Fiscal Year 2025 | October Actual | November Actual | December Estimated | January Estimated | February Estimated | March Estimated | April Estimated | May Estimated | June Estimated | July Estimated | August Estimated | September Estimated | FY 2026 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4501-Georgia | (1,860) | - | - | - | (101) | (430) | (11) | (200) | (38) | (68) | (20) | (30) | (20) | (918) |
| 4502-District of Columbia | (1,251) | - | - | - | (5) | (3) | - | (3) | - | - | - | - | - | (11) |
| 4503-Alabama | (449) | - | - | - | (35) | - | - | - | (29) | - | (20) | - | - | (84) |
| 4504-Kansas | (733) | - | - | - | (1) | - | - | - | - | - | - | - | - | (1) |
| 4505-Rhode Island | (1,129) | - | - | - | (5) | - | - | - | - | (21) | - | - | - | (26) |
| 4506-Pennsylvania | (4,015) | (1) | - | (1) | (166) | (150) | (1) | (57) | - | (76) | (38) | (104) | (35) | (629) |
| 4507-Ohio | (2,046) | - | - | - | (94) | (31) | (75) | (47) | (1) | (9) | (20) | (30) | (10) | (317) |
| 4508-Montana | (170) | - | - | - | (6) | (1) | - | - | - | - | - | - | - | (7) |
| 4509-North Dakota | (318) | - | - | - | (9) | - | - | - | - | - | - | - | - | (9) |
| 4510-Hawaii | (764) | - | - | - | (1) | - | - | - | - | - | - | - | - | (1) |
| 4511-Northern Mariana Islands | (140) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4512-Virginia | (1,780) | - | - | - | (29) | (1) | (102) | (47) | (34) | (1) | - | (15) | (11) | (240) |
| 4513-Virgin Islands | (185) | - | - | - | (2) | - | - | - | - | - | - | - | - | (2) |
| 4514-Tennessee | (1,139) | - | - | - | (29) | (12) | (9) | - | - | (6) | - | - | (13) | (84) |
| 4515-Indiana | (900) | - | - | - | (15) | - | (9) | - | - | - | - | (50) | - | (74) |
| 4516-New Hampshire | (504) | - | - | - | (1) | - | - | - | - | - | - | - | - | (1) |
| 4517-West Virginia | (429) | - | (17) | (1) | (1) | - | (1) | - | - | - | - | - | - | (20) |
| 4518-Arkansas | (419) | - | - | - | (16) | - | - | - | - | - | - | - | (1) | (17) |
| 4520-Wisconsin | (1,310) | - | - | - | (40) | - | (6) | (1) | - | (2) | - | - | (13) | (62) |
| 4521-Nebraska | (401) | - | - | - | (19) | - | - | - | - | - | - | - | (4) | (23) |
| 4522-Maine | (625) | - | - | - | (5) | - | - | (114) | (33) | - | (36) | - | - | (188) |
| 4523-Nevada | (640) | - | - | - | (9) | - | - | - | - | - | - | - | - | (9) |
| 4524-Arizona | (1,786) | - | - | - | (25) | - | (187) | (44) | - | (25) | (5) | - | - | (286) |
| 4525-Utah | (610) | - | - | (1) | (4) | - | - | - | - | - | - | (1) | - | (6) |
| 4526-Delaware | (387) | - | - | - | (3) | - | - | (2) | - | - | - | - | - | (5) |
| 4527-South Dakota | (71) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4528-Mississippi | (739) | - | - | - | (15) | (2) | (4) | - | - | (16) | - | - | - | (37) |
| 4529-New Mexico | (802) | - | (75) | - | (1) | - | - | (2) | - | - | - | - | - | (78) |
| 4530-Oklahoma | (482) | - | - | (1) | (45) | (1) | (2) | (89) | - | - | - | (13) | - | (151) |
| 4531-Minnesota | (1,169) | - | - | - | (15) | (3) | - | - | (19) | - | - | - | (13) | (50) |
| 4532-Vermont | (592) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4533-Alaska | (576) | - | - | - | (2) | - | - | - | - | - | - | - | - | (2) |
| 4534-Idaho | (299) | - | - | - | (7) | (2) | (4) | - | - | (9) | - | - | - | (22) |
| 4535-Wyoming | (107) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4537-American Samoa | (26) | - | - | - | (1) | - | - | - | - | - | - | - | - | (1) |
| 4545-Seminole Tribe of Florida | (2) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4582-Navajo Nation | (17) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4591-Poarch Tribe of Creek Indians | (2) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | **(138,893)** | **(129)** | **(98)** | **(31)** | **(2,293)** | **(2,300)** | **(2,300)** | **(2,131)** | **(620)** | **(656)** | **(639)** | **(646)** | **(709)** | **(12,552)** |

**California Wildfires 2020**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4558-California | (663) | - | - | - | (30) | (83) | (1) | - | - | (9) | - | - | - | (123) |
| | **(663)** | **-** | **-** | **-** | **(30)** | **(83)** | **(1)** | **-** | **-** | **(9)** | **-** | **-** | **-** | **(123)** |

**Laura**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4559-Louisiana | (4,430) | - | (1) | (5) | (101) | (14) | (15) | (12) | (10) | (12) | (23) | (11) | (27) | (231) |
| 4572-Texas | (82) | - | - | - | (1) | (1) | - | - | - | - | - | - | (3) | (5) |
| | **(4,512)** | **-** | **(1)** | **(5)** | **(102)** | **(1)** | **(15)** | **(12)** | **(10)** | **(12)** | **(23)** | **(11)** | **(30)** | **(236)** |

**Oregon Wildfires 2020**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4562-Oregon | (878) | - | - | - | (3) | (32) | (3) | (8) | (5) | (8) | (13) | (5) | (12) | (89) |
| | **(878)** | **-** | **-** | **-** | **(3)** | **(32)** | **(3)** | **(8)** | **(5)** | **(8)** | **(13)** | **(5)** | **(12)** | **(89)** |

**Ida**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4611-Louisiana | (7,023) | (1) | (1) | (63) | (398) | (60) | (45) | (26) | (33) | (46) | (34) | (33) | (47) | (787) |
| 4614-New Jersey | (748) | - | - | (2) | (4) | - | - | (38) | (1) | (2) | - | - | - | (47) |
| 4615-New York | (852) | - | - | (2) | (228) | (10) | (12) | (10) | (10) | (10) | (14) | (18) | (11) | (325) |
| 4618-Pennsylvania | (367) | - | - | - | - | - | (4) | - | (2) | (3) | - | - | (5) | (18) |
| 4626-Mississippi | (54) | - | - | - | - | (1) | - | - | - | - | - | - | - | (1) |
| 4627-Delaware | (8) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4629-Connecticut | (30) | - | - | - | (5) | - | - | - | - | - | - | - | - | - |
| | **(9,082)** | **(1)** | **(1)** | **(67)** | **(637)** | **(71)** | **(61)** | **(74)** | **(46)** | **(61)** | **(48)** | **(53)** | **(63)** | **(1,183)** |

**Fiona**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4671-Puerto Rico | (3,889) | - | (1) | (29) | (189) | (3) | (19) | (11) | (26) | (4) | (34) | (31) | (24) | (371) |

10

APPENDIX B: Disaster Relief Funding Activity (By Catastrophic Disaster)

**Disaster Relief Fund Monthly Detailed Obligations FY 2026**

($ in millions)

| Event/Disaster | Cumulative Obligations Through Fiscal Year 2025 | October Actual | November Actual | December Estimated | January Estimated | February Estimated | March Estimated | April Estimated | May Estimated | June Estimated | July Estimated | August Estimated | September Estimated | FY 2026 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (3,889) | - | (1) | (29) | (189) | (3) | (19) | (11) | (26) | (4) | (34) | (31) | (24) | (371) |
| **Ian** | | | | | | | | | | | | | | |
| 4673-Florida | (5,485) | (2) | (3) | (79) | (160) | (24) | (25) | (129) | (104) | (58) | (32) | (26) | (128) | (770) |
| 4675-Seminole Tribe of Florida | (3) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4677-South Carolina | (34) | - | - | - | (4) | - | - | - | - | - | - | - | (2) | (6) |
| | (5,522) | (2) | (3) | (79) | (164) | (24) | (25) | (129) | (104) | (58) | (32) | (26) | (130) | (776) |
| **Hawaii Wildfires** | | | | | | | | | | | | | | |
| 4724-Hawaii | (3,026) | (12) | (3) | (49) | (42) | (12) | (20) | (18) | (16) | (19) | (21) | (20) | (39) | (271) |
| | (3,026) | (12) | (3) | (49) | (42) | (12) | (20) | (18) | (16) | (19) | (21) | (20) | (39) | (271) |
| **Idalia** | | | | | | | | | | | | | | |
| 4734-Florida | (719) | - | (1) | (18) | (63) | (47) | (4) | (73) | - | - | (5) | - | (1) | (212) |
| 4738-Georgia | (91) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | (810) | - | (1) | (18) | (63) | (47) | (4) | (73) | - | - | (5) | - | (1) | (212) |
| **Kentucky Floods 2022** | | | | | | | | | | | | | | |
| 4663-Kentucky | (843) | - | - | (86) | (1) | - | (2) | - | (2) | (13) | - | - | - | (104) |
| | (843) | - | - | (86) | (1) | - | (2) | - | (2) | (13) | - | - | - | (104) |
| **2024 Spring Storms** | | | | | | | | | | | | | | |
| 4776-Oklahoma | (76) | - | (1) | (1) | (4) | - | - | (3) | - | - | - | - | - | (9) |
| 4781-Texas | (841) | (5) | (2) | (12) | (65) | (15) | (14) | (16) | (10) | (10) | (7) | (3) | (2) | (161) |
| | (917) | (5) | (3) | (13) | (69) | (15) | (14) | (19) | (10) | (10) | (7) | (3) | (2) | (170) |
| **Beryl** | | | | | | | | | | | | | | |
| 4798-Texas | (1,396) | (7) | (4) | (51) | (101) | (50) | (11) | (14) | (24) | (11) | (29) | (14) | (12) | (328) |
| | (1,396) | (7) | (4) | (51) | (101) | (50) | (11) | (14) | (24) | (11) | (29) | (14) | (12) | (328) |
| **Helene** | | | | | | | | | | | | | | |
| 4827-North Carolina | (5,580) | (40) | (161) | (134) | (207) | (78) | (87) | (84) | (150) | (119) | (221) | (146) | (152) | (1,579) |
| 4828-Florida | (2,082) | (12) | (7) | (27) | (47) | (13) | (23) | (33) | (60) | (5) | (7) | (19) | (50) | (303) |
| 4829-South Carolina | (780) | (7) | (4) | (125) | (20) | (19) | (76) | (11) | (13) | (26) | (21) | (16) | (35) | (373) |
| 4830-Georgia | (1,648) | (8) | (4) | (270) | (49) | (6) | (44) | (127) | (7) | (5) | (8) | (8) | (17) | (553) |
| 4831-Virginia | (178) | (2) | (1) | (1) | (5) | (2) | (3) | (9) | (1) | (11) | (12) | (17) | (36) | (100) |
| 4832-Tennessee | (510) | (3) | (4) | (15) | (43) | (26) | (50) | (5) | (32) | (2) | (2) | (2) | (2) | (186) |
| 4848-Kentucky | (15) | - | - | - | (1) | - | - | - | - | - | - | - | - | (1) |
| 4851-West Virginia | (6) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | (10,799) | (72) | (181) | (572) | (372) | (144) | (283) | (269) | (263) | (168) | (271) | (208) | (292) | (3,095) |
| **Milton** | | | | | | | | | | | | | | |
| 4834-Florida | (3,072) | (16) | (13) | (155) | (74) | (57) | (70) | (72) | (110) | (67) | (65) | (119) | (225) | (1,043) |
| 4844-Seminole Tribe of Florida | (4) | - | - | - | (1) | (1) | - | - | - | - | - | - | (1) | (3) |
| | (3,076) | (16) | (13) | (155) | (75) | (58) | (70) | (72) | (110) | (67) | (65) | (119) | (226) | (1,046) |
| **California Wildfires 2025** | | | | | | | | | | | | | | |
| 4856-California | (2,658) | (9) | (3) | (337) | (253) | (61) | (92) | (58) | (120) | (105) | (60) | (38) | (170) | (1,306) |
| | (2,658) | (9) | (3) | (337) | (253) | (61) | (92) | (58) | (120) | (105) | (60) | (38) | (170) | (1,306) |
| **TOTAL** | $ (365,941) | $ (257) | $ (316) | $ (1,556) | $ (5,490) | $ (3,370) | $ (3,891) | $ (3,044) | $ (1,477) | $ (1,551) | $ (1,373) | $ (1,223) | $ (2,279) | $ (25,827) |

APPENDIX C:  Hurricanes Sandy, Harvey, Irma, and Maria, COVID-19 and Disasters Declared Since August 1, 2017 (Actuals/Estimated Obligations by Program)

Hurricanes Sandy, Harvey, Irma and Maria, Coronavirus Disease 2019, and Disasters Declared Since August 1, 2017
FY 2026 Actuals/Estimated
as of November 30, 2025
($ in millions)

| SANDY | Cumulative Obligations Through Fiscal Year 2025 [1] | Actual/Estimated 1st Quarter | Estimated 2nd Quarter | Estimated 3rd Quarter | Estimated 4th Quarter | Fiscal Year 2026 Totals | Totals Through Fiscal Year 2026 |
|---|---|---|---|---|---|---|---|
| Public Assistance | $ 17,336 | $ - | $ 199 | $ 3 | $ 2 | $ 204 | $ 17,540 |
| Individual Assistance | 1,596 | - | - | - | - | - | 1,596 |
| Mitigation | 1,710 | - | - | - | - | - | 1,710 |
| Operations | 318 | - | - | - | - | - | 318 |
| Administrative | 1,617 | 8 | 4 | 7 | 4 | 23 | 1,640 |
| **Total** | **$ 22,577** | **$ 8** | **$ 203** | **$ 10** | **$ 6** | **$ 227** | **$ 22,804** |

| HARVEY | Cumulative Obligations Through Fiscal Year 2025 [1] | Actual/Estimated 1st Quarter | Estimated 2nd Quarter | Estimated 3rd Quarter | Estimated 4th Quarter | Fiscal Year 2026 Totals | Totals Through Fiscal Year 2026 |
|---|---|---|---|---|---|---|---|
| Public Assistance | $ 2,922 | $ 2 | $ 35 | $ 33 | $ 17 | $ 87 | $ 3,009 |
| Individual Assistance | 2,817 | - | - | - | - | - | 2,817 |
| Mitigation | 481 | - | 64 | - | - | 64 | 545 |
| Operations | 185 | - | - | - | - | - | 185 |
| Administrative | 1,825 | 2 | 4 | 3 | 2 | 11 | 1,836 |
| **Total** | **$ 8,230** | **$ 4** | **$ 103** | **$ 36** | **$ 19** | **$ 162** | **$ 8,392** |

| IRMA | Cumulative Obligations Through Fiscal Year 2025 [1] | Actual/Estimated 1st Quarter | Estimated 2nd Quarter | Estimated 3rd Quarter | Estimated 4th Quarter | Fiscal Year 2026 Totals | Totals Through Fiscal Year 2026 |
|---|---|---|---|---|---|---|---|
| Public Assistance | $ 2,655 | $ - | $ 12 | $ - | $ - | $ 12 | $ 2,667 |
| Individual Assistance | 1,305 | - | - | - | - | - | 1,305 |
| Mitigation | 449 | - | 36 | 5 | 2 | 43 | 492 |
| Operations | 253 | - | - | - | - | - | 253 |
| Administrative | 1,199 | - | - | - | - | - | 1,199 |
| **Total** | **$ 5,861** | **$ -** | **$ 48** | **$ 5** | **$ 2** | **$ 55** | **$ 5,916** |

| MARIA | Cumulative Obligations Through Fiscal Year 2025 [1] | Actual/Estimated 1st Quarter | Estimated 2nd Quarter | Estimated 3rd Quarter | Estimated 4th Quarter | Fiscal Year 2026 Totals | Totals Through Fiscal Year 2026 |
|---|---|---|---|---|---|---|---|
| Public Assistance | $ 56,303 | $ 7 | $ 1,558 | $ 427 | $ 613 | $ 2,605 | $ 58,908 |
| Individual Assistance | 2,429 | - | - | - | - | - | 2,429 |
| Mitigation | 726 | - | 165 | 54 | 21 | 240 | 966 |
| Operations | 4,336 | - | - | - | - | - | 4,336 |
| Administrative | 4,342 | 32 | 26 | 31 | 27 | 116 | 4,458 |
| **Total** | **$ 68,136** | **$ 39** | **$ 1,749** | **$ 512** | **$ 661** | **$ 2,961** | **$ 71,097** |

| Coronavirus Disease 2019 | Cumulative Obligations Through Fiscal Year 2025 [1] | Actual/Estimated 1st Quarter | Estimated 2nd Quarter | Estimated 3rd Quarter | Estimated 4th Quarter | Fiscal Year 2026 Totals | Totals Through Fiscal Year 2026 |
|---|---|---|---|---|---|---|---|
| Public Assistance | $ 89,501 | $ 218 | $ 6,318 | $ 3,245 | $ 1,857 | $ 11,638 | $ 101,139 |
| Individual Assistance | 40,401 | 8 | 1 | - | - | 9 | 40,410 |
| Mitigation | 1,123 | - | 547 | 140 | 117 | 804 | 1,927 |
| Operations | 6,088 | - | - | - | - | - | 6,088 |
| Administrative | 1,780 | 32 | 27 | 22 | 20 | 101 | 1,881 |
| **Total** | **$ 138,893** | **$ 258** | **$ 6,893** | **$ 3,407** | **$ 1,994** | **$ 12,552** | **$ 151,445** |

| Disasters Declared Since 8/1/2017 [2] | Cumulative Obligations Through Fiscal Year 2025 [1] | Actual/Estimated 1st Quarter | Estimated 2nd Quarter | Actual 3rd Quarter | Estimated 4th Quarter | Fiscal Year 2026 Totals | Totals Through Fiscal Year 2026 |
|---|---|---|---|---|---|---|---|
| Public Assistance | $ 189,427 | $ 1,997 | $ 12,037 | $ 5,548 | $ 4,637 | $ 24,219 | $ 213,646 |
| Individual Assistance | 64,273 | 461 | 157 | 58 | 46 | 722 | 64,995 |
| Mitigation | 5,333 | 3 | 1,648 | 538 | 457 | 2,646 | 7,979 |
| Operations | 21,086 | 16 | 38 | - | - | 54 | 21,140 |
| Administrative | 23,426 | 492 | 498 | 440 | 409 | 1,839 | 25,265 |
| **Total** | **$ 303,545** | **$ 2,969** | **$ 14,378** | **$ 6,584** | **$ 5,549** | **$ 29,480** | **$ 333,025** |

(1)  Adjusted for recoveries that occur in Fiscal Year 2026 against prior-year obligations.
(2)  Per section 1224 of Disaster Recovery Reform Act (Public Law 115-254).

as of November 30, 2025



| | Katrina | Rita | Wilma | Sandy | Total |
|---|---|---|---|---|---|
| **Allocations** | $ 44,326 | $ 3,793 | $ 2,565 | $ 22,577 | $ 73,261 |
| **Obligations** | 44,325 | 3,793 | 2,565 | 22,577 | 73,260 |
| **Expenditures** | $ 43,281 | $ 3,775 | $ 2,565 | $ 18,504 | $ 68,125 |



| | Ike | West Virginia Floods | Louisiana Floods 4277 | Matthew | Total |
|---|---|---|---|---|---|
| **Allocations** | $ 4,819 | $ 644 | $ 2,771 | $ 1,794 | $ 10,028 |
| **Obligations** | 4,819 | 644 | 2,771 | 1,794 | 10,028 |
| **Expenditures** | $ 4,807 | $ 551 | $ 2,662 | $ 1,639 | $ 9,659 |



| | Harvey | Irma | Maria | Total |
|---|---|---|---|---|
| **Allocations** | $ 8,231 | $ 5,861 | $ 68,142 | $ 82,234 |
| **Obligations** | 8,231 | 5,861 | 68,141 | 82,233 |
| **Expenditures** | $ 7,322 | $ 5,348 | $ 25,828 | $ 38,498 |



| | California Winter Storms | Florence | Michael | Puerto Rico Earthquake | Total |
|---|---|---|---|---|---|
| **Allocations** | $ 1,033 | $ 1,828 | $ 3,601 | $ 1,322 | $ 7,784 |
| **Obligations** | 1,033 | 1,828 | 3,601 | 1,322 | 7,784 |
| **Expenditures** | $ 890 | $ 1,602 | $ 3,006 | $ 765 | $ 6,263 |

Source of financial information is Integrated Financial Management Information System.
Total obligations include prior-year deobligations.

as of November 30, 2025



| | Yutu | Nebraska Winter Storm 2019 | Oregon Wildfires | Total |
|---|---|---|---|---|
| Allocations | $ 862 | $ 732 | $ 878 | $ 2,472 |
| Obligations | 862 | 732 | 878 | 2,472 |
| Expenditures | $ 740 | $ 498 | $ 720 | $ 1,958 |



| | Coronavirus Disease 2019 | Total |
|---|---|---|
| Allocations | $ 139,121 | $ 139,121 |
| Obligations | 139,120 | 139,120 |
| Expenditures | $ 134,452 | $ 134,452 |



| | Wildfires 2017 | Wildfires 2018 | Wildfires 2020 | Wildfires 2025 | Total |
|---|---|---|---|---|---|
| Allocations | $ 1,452 | $ 2,634 | $ 663 | $ 2,669 | $ 7,418 |
| Obligations | 1,452 | 2,634 | 663 | 2,669 | 7,418 |
| Expenditures | $ 1,372 | $ 2,251 | $ 437 | $ 1,952 | $ 6,012 |



| | Laura | Ida | Fiona | Ian | Total |
|---|---|---|---|---|---|
| Allocations | $ 4,514 | $ 9,086 | $ 3,893 | $ 5,528 | $ 23,021 |
| Obligations | 4,513 | 9,084 | 3,890 | 5,527 | 23,014 |
| Expenditures | $ 3,669 | $ 7,519 | $ 2,924 | $ 4,858 | $ 18,970 |

Source of financial information is Integrated Financial Management Information System.
Total obligations include prior-year deobligations.

Case 3:25-cv-03698-SI    Document 303    Filed 02/10/26    Page 1504 of 1522

as of November 30, 2025





| | Idalia | 2022 Kentucky Storms | 2024 Spring Storms | Total |
|---|---|---|---|---|
| **Allocations** | $ 811 | $ 843 | $ 926 | $ 2,580 |
| **Obligations** | $ 811 | $ 843 | $ 925 | $ 2,579 |
| **Expenditures** | $ 615 | $ 725 | $ 847 | $ 2,187 |

| | Hawaii Wildfires | Beryl | Helene | Milton | Total |
|---|---|---|---|---|---|
| **Allocations** | $ 3,066 | $ 1,407 | $ 11,057 | $ 3,108 | $ 18,638 |
| **Obligations** | $ 3,041 | $ 1,407 | $ 11,052 | $ 3,105 | $ 18,605 |
| **Expenditures** | $ 2,547 | $ 1,298 | $ 9,154 | $ 2,264 | $ 15,263 |

Source of financial information is Integrated Financial Management Information System.

Total obligations include prior-year deobligations.

APPENDIX E:  Fund Exhaustion Date

as of November 30, 2025



**Disaster Relief Fund End-of-Year Balance**

($ in millions)

| Disaster Relief Fund End-of-Month Balance | October-25 | November-25 | December-25 | January-26 | February-26 | March-26 | April-26 | May-26 | June-26 | July-26 | August-26 | September-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base Balance | $ 1,141 | $ 1,119 | $ 1,057 | $ 989 | $ 935 | $ 866 | $ 822 | $ 771 | $ 720 | $ 677 | $ 624 | $ 534 |
| Majors Balance | 8,567 | 30,959 | 29,205 | 23,642 | 20,316 | 16,455 | 13,206 | 11,458 | 9,739 | 8,329 | 6,669 | 1,190 |
| Subtotal Major/Base Balance | 9,708 | 32,078 | 30,262 | 24,631 | 21,251 | 17,321 | 14,028 | 12,229 | 10,459 | 9,006 | 7,293 | 1,724 |
| Predisaster Mitigation [1] | 5,086 | 5,086 | 5,086 | 5,084 | 5,081 | 5,074 | 5,071 | 5,068 | 5,065 | 5,062 | 5,058 | 5,056 |
| Total Disaster Relief Fund Balance | $ 14,794 | $ 37,164 | $ 35,348 | $ 29,715 | $ 26,332 | $ 22,395 | $ 19,099 | $ 17,297 | $ 15,524 | $ 14,068 | $ 12,351 | $ 6,780 |

(1) Includes Building Resilient Infrastructure and Communities Balances

APPENDIX F: FY 2026 Disaster Relief Fund Bridge Table

**FY 2026 Disaster Relief Fund Bridge Table**

| FEMA | Event | | FY 2026 Total Actual Obligations ($ in millions) | | | | | Changes from Baseline | Month-to-Month Change |
|---|---|---|---|---|---|---|---|---|---|
| | | Baseline | Current Month as of December-25 | Previous Month as of November-25 | Change from Baseline | Change from Prior Month | | Cause/Reason | Cause/Reason |
| Total | | $  31,602 | $  31,610 | $  31,610 | $  8 | $  - | | No adjustments have been made to the Fiscal Year 2026 funding requirements for the Disaster Relief Fund. | No adjustments have been made to the Fiscal Year 2026 funding requirements for the Disaster Relief Fund. |

APPENDIX G:  Building Resilient Infrastructure and Communities/Predisaster Mitigation History and Fund Status

**Building Resilient Infrastructure and Communities/Predisaster Mitigation**
**History and Fund Status as of November 30, 2025**
**(Dollars in Millions)**

| | Amount |
|---|---|
| **Fiscal Year 2019 (Applications Due by January 31, 2020)** | |
| 6% Set-Aside | $          383 |
| Notice of Funding Opportunity | 250 |
| Notice of Funding Opportunity (Notice of Funding Opportunity) Awards to Date | (217) |
| Administrative and Technical Assistance Obligations | - |
| **Fiscal Year 2020 (Applications Due by January 29, 2021)** | |
| 6% Set-Aside | 613 |
| Notice of Funding Opportunity | 500 |
| Notice of Funding Opportunity Awards to Date | (252) |
| Administrative and Technical Assistance Obligations | (2) |
| **Fiscal Year 2021 (Applications Due by January 28, 2022)** | |
| 6% Set-Aside | 321 |
| Additional Set-Aside from Coronavirus Disease 2019 | 500 |
| Notice of Funding Opportunity | 1,000 |
| Notice of Funding Opportunity Awards to Date | (364) |
| Administrative and Technical Assistance Obligations | (15) |
| **Fiscal Year 2022 (Applications Due by January 27, 2023)** | |
| 6% Set-Aside | 330 |
| Additional Set-Aside from Coronavirus Disease 2019 | 1,792 |
| Infrastructure Investment and Jobs Act [1] | 200 |
| Notice of Funding Opportunity | 2,295 |
| Notice of Funding Opportunity Awards to Date | (359) |
| Infrastructure Investment and Jobs Act  Transfers [1] | (17) |
| Administrative and Technical Assistance Obligations | (19) |
| **Fiscal Year 2023 (Applications Due by February 29, 2024)** | |
| 6% Set-Aside | 686 |
| Infrastructure Investment and Jobs Act [1] | 200 |
| Notice of Funding Opportunity | 1,000 |
| Notice of Funding Opportunity Awards to Date | (39) |
| Infrastructure Investment and Jobs Act Transfers [1] | (1) |
| Administrative and Technical Assistance Obligations | (49) |
| **Fiscal Year 2024** | |
| 6% Set-Aside | 417 |
| Infrastructure Investment and Jobs Act [1] | 200 |
| Notice of Funding Opportunity | - |
| Predisaster Mitigation Transfer [2] | 137 |
| Notice of Funding Opportunity Awards to Date | - |
| Infrastructure Investment and Jobs Act Transfers [1] | (1) |
| Administrative and Technical Assistance Obligations | (48) |
| **Fiscal Year 2025** | |
| 6% Set-Aside | 276 |
| Infrastructure Investment and Jobs Act [1] | 200 |
| Notice of Funding Opportunity | - |
| Predisaster Mitigation Transfer [2] | 16 |
| Notice of Funding Opportunity Awards to Date | - |
| Infrastructure Investment and Jobs Act Anticipated Transfers [1] | (1) |
| Administrative and Technical Assistance Obligations | (39) |
| **Fiscal Year 2026** | |
| 6% Set-Aside | - |
| Infrastructure Investment and Jobs Act [1] | 200 |
| Notice of Funding Opportunity | - |
| Predisaster Mitigation Transfer [2] | 25 |
| Notice of Funding Opportunity Awards to Date | - |
| Infrastructure Investment and Jobs Act Anticipated Transfers [1] | (1) |
| Administrative and Technical Assistance Obligations | - |
| | |
| **Disaster Relief Fund Building Resilient Infrastructure and Communities Set- Aside Balance** | **4,071** |
| **Predisaster Mitigation Balance** | **167** |
| **Infrastructure Investment and Jobs Act Balance** | **848** |
| **Reversal of Building Resilient Infrastructure and Communities Set-Aside** | **-** |
| **Remaining Predisaster Mitigation/Infrastructure Investment and Jobs Act Balance** | $      **5,086** |

Footnotes:
(1) Pursuant to Public Law 117-58, Infrastructure Investment and Jobs Act.
(2) Pursuant to Public Law 118-47, Further Consolidated Appropriations Act, 2024, Predisaster Mitigation legacy balances transferred to Building Resilient Infrastructure and Communities.

Exhibit AA

# FEMA MANUAL 252-11-1
# CADRE OF ON-CALL RESPONSE/RECOVERY EMPLOYEE (CORE) PROGRAM
### APPROVAL DATE: 08/25/2015



**DEPARTMENT OF HOMELAND SECURITY**

**FEDERAL EMERGENCY MANAGEMENT AGENCY**

**OFFICE OF THE CHIEF COMPONENT HUMAN CAPITAL OFFICER**

**Corey J. Coleman**
Chief Component Human Capital Officer
Office of the Chief Component Human
Capital Officer
Date: _____5/25/15_____

**Edward H. Johnson**
Chief Financial Officer
Office of the Chief Financial Officer

Date: ____8/25/2015____

**David M. Robinson**
Associate Administrator
Mission Support

Date: ____Aug 25, 2015____

# Foreword

The Federal Emergency Management Agency (FEMA) intends to achieve business and management excellence by providing guidance and policy direction for the administration of FEMA's Cadre of On-call Response/Recovery Employees (COREs). FEMA's most valuable resource is its workforce; permanent and temporary employees who are focused on and committed to leading America to prepare for, prevent, respond to, and recover from all-hazards incidents. FEMA relies upon its temporary personnel, in particular, to carry out its role in incident management and support operations and to augment FEMA's permanent workforce.

The objective of the CORE Program is to attract and maintain a pool of highly skilled and motivated temporary personnel who are well trained and ready to respond and deliver quality and timely services to survivors and communities impacted by all-hazards incidents. The publication of this Manual will ensure consistent policy application and enable FEMA to better manage COREs in a cost effective and efficient manner, while offering the necessary incentives to recruit a professional incident workforce capable of assisting disaster survivors in their time of greatest need.

## CHAPTER 1:  GENERAL INFORMATION

**1-1.**  **Purpose**

This Manual establishes the policies and procedures for FEMA's Cadre of On-call Response/Recovery Employees (CORE) Program. FEMA will achieve consistency and facilitate the equitable and effective management of all COREs through the implementation of the policies and procedures set forth in this Manual.

**1-2.**  **Applicability and Scope**

A.  The provisions of this Manual apply to all FEMA COREs, unless otherwise indicated.

B.  FD 010-7, Incident Management Assistance Team (IMAT) Program Directive (IMAT Directive), is applicable to COREs who receive CORE-I appointments, also known as CORE-Incident Management Assistance Team (IMAT) Members or Pilot IMATs. Inconsistencies between this Manual and the IMAT Directive are resolved in favor of the IMAT Directive.

C.  The Attorney Hiring and Promotion Plan (AHPP), dated April 21, 2014, provides pay setting, pay adjustments, and promotion policy for CORE Attorneys. Inconsistencies between this Manual and the AHPP are resolved in favor of the AHPP.

**1-3.**  **Authorities**

Section 306 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, Pub. L. No. 93-288, as amended (Stafford Act), codified at 42 U.S.C. §§ 5121 et seq., provides FEMA with authority "to appoint and fix the compensation of such temporary personnel as may be necessary, without regard to the provisions of title 5, United States Code, governing appointments in the competitive service."

**1-4.**  **References**

The following list is not an exhaustive list of statutes, regulations, DHS and FEMA directives and manuals, policies, and guidance memorandums applicable to COREs.

A.  FEMA Policy 401-123-1, Equal Employment Opportunity (EEO) Policy Statement, October 1, 2014.

B.  Memorandum from the DHS Chief Human Capital Officer, Annual Leave Enhancements, February 17, 2006.

C.  DHS Instruction 121-01-007, DHS Personnel Suitability and Security Program, June 2009.

D.  DHS Management Directive 254-02, Employee Assistance Program, May 31, 2007.

## CHAPTER 2:  RECRUITMENT AND HIRING

**2-1.** <u>General</u>

A.  FEMA Offices and Directorates will identify the Selecting Official for each hire.

B.  FEMA Offices and Directorates may elect to recruit and hire candidates via a vacancy announcement as specified in section 2-4, or via a name request pursuant to section 2-5. FEMA maintains the flexibility to use alternative hiring procedures not specified in this Chapter when necessary to meet its mission requirements.

C.  Nepotism is prohibited by 5 U.S.C. § 3110 and is also a "prohibited personnel practice" under 5 U.S.C. § 2302(b)(7). Under 5 U.S.C. § 3110, a public official is prohibited from appointing, employing, promoting, advancing, or advocating for appointment, employment, promotion, or advancement of a relative in or to a civilian position in FEMA in which the public official is serving or over which the public official exercises jurisdiction or control of any individual who is a relative of the public official. Upon determining that a minimally qualified candidate is a relative or the relative of the Selecting Official, or of someone in the chain of command of the Selecting Official, the program office must refrain from taking action on the job vacancy and contact the servicing HR Specialist for guidance. Supervision of a relative is not generally considered to be "nepotism" but is prohibited as it presents an apparent conflict of interest. Supervision of employees with whom the supervisor has a "covered relationship" may also be an apparent conflict of interest (see 5 C.F.R. § 2635.502).

**2-2.** <u>Staffing Plans</u>

A.  Offices and Directorates authorized to fill CORE positions will conduct workload analyses every three years, or earlier if needed based on operational changes, to forecast and plan for future work and skills requirements based on historical data, technical estimates, directed requirements, and approved staffing models.

1.  The workload analysis will first identify all activities performed by each position (e.g., PFT, CORE, and Reservist) within an Office or Directorate, and designate current and planned future activities.

2.  The analysis will estimate how frequent the activity is performed, and the amount of time an employee will need to complete each of the identified activities for which a Distributed Group Activity Baseline has not been approved or is being modified.

3.  The analysis may identify shortages or overages in current staffing needs, which will be documented and maintained by the Offices and Directorates until superseded by a subsequent workload analysis or other staffing initiative.

25

B. Based on the workload analysis, Offices and Directorates requesting CORE positions will develop and submit staffing plans, subject to funding, to OCCHCO with the number of CORE positions by title, series, grade, and duty station.

   1. OCCHCO will review the entity's requested number of CORE positions and proposed length of appointment based on the workload analysis and staffing plan.

   2. Upon OCCHCO's review and approval of the staffing plan, OCCHCO will submit the plans to OCFO for approval if the plan includes a non-Direct Charge CORE, or a Distributed Group Activity Direct Charge CORE if the distributed group activity baseline has not been approved or has changed since the last approval.

   3. Upon any needed confirmation from OCFO, OCCHCO will authorize an Office or Directorate to create or renew a set number of CORE Positions.

   4. The Associate Administrator for Mission Support will review and resolve any disputes between an Office or Directorate and OCCHCO regarding the approval of a workload analysis or staffing plan.

C. Any request to add, move, rightsize, or adjust a CORE position (if rightsizing a position, see Chapter 12, Rightsizing) made between workload analysis cycles or that does not align with the current staffing plan must be submitted by the head of the Office or Directorate and will require a reexamination of the most recent workload analysis to determine whether the identified shortages or additional work exists to justify the requested position, its length, and pay band or grade. Upon OCCHCO's review and approval of the staffing plan, OCCHCO will submit the plans to OCFO for approval if the plan includes a non-Direct Charge CORE, or a Distributed Group Activity Direct Charge CORE if the distributed group activity baseline has not been approved or has changed since the last approval.

D. Duty stations for COREs will be established by the supervisor of record in conjunction with OCCHCO.

**2-3.    Annual Direct Charge CORE Certification**

A. An Annual Direct Charge CORE certification, validating and verifying the CORE's performance of DRF related duties and the continued need for all CORE positions (which have not been requested or funded elsewhere in FEMA's budget), is required by the Assistant Administrator, Associate Administrator, Regional Administrator, and any FEMA employee reporting directly to the Administrator.

B. CORE positions must be used to execute functions or activities funded solely by the DRF or DRS account and are not charged elsewhere in FEMA's budget. COREs may be used to administer support to FEMA's non-permanent workforce hired under the Stafford Act, performing duties including, but not limited to, hiring and staffing, training and development,

## CHAPTER 3:  APPOINTMENTS

**3-1.    Eligibility for Appointment**

All applicants selected for appointment to CORE positions must meet the following eligibility requirements:

A.  U.S. Citizenship, subject to limited exceptions;[4]

B.  Must be at least 18 years of age and:

    1.  Have graduated from high school or been awarded a certificate equivalent to graduating from high school;

    2.  Have completed a formal vocational training program;

    3.  Have received a statement from school authorities agreeing with their preference for employment rather than continuing their education; or

    4.  Be currently enrolled in a secondary school and either work only during school vacation periods or work part-time during the school year under a formal employment program;

C.  Must comply with selective service registration for males born after 12/31/59;

D.  Must satisfy fitness requirements for the position to which appointed;[5] and

E.  Must agree to accept an Incident Management or Incident Support assignment.[6]

**3-2.    CORE Appointments**

A.  COREs are hired under a Stafford Act appointment authority and their salaries and benefits are funded by the DRF, thus the scope of their duties must predominately carryout Stafford Act activities.

B.  Individuals appointed to CORE positions are given time-limited appointments for a period of not less than two years but not to exceed four years unless the appointment is renewed for another term. The length of the appointment requested by the Office or Directorate should be commensurate with the expected amount of work available for the CORE in question (the appointment can be less than two years if appropriate).

C.  A CORE appointment does not confer eligibility or priority consideration for a permanent appointment.

D.  A CORE's work schedule may be changed and a CORE may be assigned a Mission Essential, Incident Management, Incident Support, or Ancillary

---

[4] *See* DHS Management Directive 3120.2, Employment of Non-Citizens, March 22, 2004.

[5] *See* DHS Instruction 121-01-007, DHS Personnel Suitability and Security Program, June 2009.

[6] *See* Memorandum from the Deputy Administrator, Every Employee an Emergency Manager— Action Items, January 20, 2012.

Support title, irrespective of his or her position description, based on the operational needs of FEMA.

E. COREs are not subject to any protection afforded by reduction-in-force provisions, re-employment rights, or adverse action procedures established under any statutory or regulatory provision.

F. COREs must be ready to deploy wherever FEMA needs their services and have 24 hours to respond to a deployment order and may be required to work long hours under stressful and unfavorable conditions.

G. A CORE's appointment will end on the Not to Exceed (NTE) date of his or her appointment, unless it is extended or renewed based on the needs of FEMA.

H. COREs may be appointed to supervisory positions and serve as supervisors of record for other Stafford Act employees, provided that the CORE is hired into a position description classified as supervisory and completes mandatory supervisory training. COREs may serve as a temporary duty supervisor during a deployment, so long as the work supervised arises out of the Stafford Act and the period of supervision is temporary and/or short-term.

I. COREs, who serve as the supervisor of record for PFTs on the date when this Manual becomes effective, may continue to serve in such capacity until the CORE's current term expires.

**3-3.    <u>Conditions of Employment</u>**

All CORE appointees are required to sign a Conditions of Employment statement upon appointment, and upon renewal of an appointment. COEs contain significant, but not all of, the DHS/FEMA and other rules and regulations that COREs must abide by, including but not limited to:

A. Complying with FEMA's deployment procedures and policies;[7]

B. Using electronic funds transfer for salary payments and travel reimbursements;

C. Maintaining eligibility for a government issued travel charge card, and abiding by the terms and conditions established by the bank issuing the travel card and FEMA (see FD 122-9, Travel Charge Card, or superseding document);

D. Presenting and conducting themselves at all times in compliance with the standards of ethical conduct provided by the Office of Governmental Ethics (see 5 C.F.R. part 2635), preserving the public trust, and adhering to DHS/FEMA rules and regulations;

E. Traveling in the most expeditious and cost effective manner, abiding by DHS and FEMA travel policy to make all travel arrangements;

---

[7] *See* FD 010-8, FEMA Incident Workforce Deployment, January 29, 2014.

2. Non-Stafford Act Training Details. FEMA may authorize a non-Stafford Act detail of COREs under the following conditions:

   i. A determination must be made that the training of the CORE, and thus the increased ability of that CORE to carry out future Stafford Act activities, is the primary purpose and benefit of the non-Stafford Act assignment;

   ii. The detail may not exceed 30 days without a determination that a detail of more than 30 days is warranted;

   iii. Extensions of these details beyond 30 days are made every 30 days thereafter and shall not exceed 90 days per appointment; and

   iv. The detailed COREs may have their salaries and benefits funded by the DRF.

3. COREs carrying-out non-Stafford Act activities must be justified as either an urgent and compelling mission/operation-related detail or a training assignment. Under no circumstances, may FEMA use both of these justifications for the same non-Stafford Act activity. In both instances, the CORE is limited to one non-Stafford Act detail per appointment, unless approved by OCC.

## 3-9.  Reappointment Procedures

A. OCCHCO provides each Office and Directorate with a list of COREs and their expiration dates on a biweekly basis.

B. A CORE's appointment will end on the Not-to-Exceed (NTE) date of his or her appointment, unless it is renewed by the Office or Directorate. All requests to renew the appointment of a current CORE must be submitted by the supervisor of record to OCCHCO using an SF-52, Request for Personnel Action.

C. Two months before the end of a CORE's appointment, if a supervisor of record determines that a CORE's appointment should not be renewed, the supervisor must contact OCCHCO/Employee Relations on how to notify the CORE that the CORE's appointment will not be renewed.

## 3-10.  Resignation

COREs may resign at any time prior to the termination or expiration of their appointments. COREs must state in writing the reason for the resignation and the requested effective date of the resignation. A CORE may request rescission of the resignation prior to the effective date, but FEMA is not obligated to consider or grant such a request. FEMA is not obligated to grant the request in order to avoid removal for misconduct or poor performance. FEMA may not deny the request for any reason prohibited by Title 29, U.S. Code, or any applicable EEOC regulations.

## CHAPTER 8:  PERFORMANCE MANAGEMENT

**8-1.**  **General**

A. CORE performance management shall comply with the Employee Performance Management Program as established by FM 255-1-1.

B. A CORE who receives a rating of unacceptable, or equivalent, on his or her most recent appraisal (rating of record) may be subject to removal in accordance with Chapter 11 of this Manual. Such removal should be effected regardless of the timing of the CORE's NTE date. However, a supervisor is not precluded from terminating a CORE prior to issuance of a performance appraisal, so long as the supervisor has sufficient documentation to justify the action and has consulted with an OCCHCO Employee Relations Specialist.

**8-2.**  **Performance Management for CORE-Is**

The performance of IMAT members appointed as CORE-Is are subject to FD 010-7, and are not covered by FEMA Manual 255-1-1 or this Chapter.

**8-3.**  **Deployment Performance Management**

A. When deployed to a disaster for twenty days or more, a CORE qualified in a FQS position, and deployed to that position, will receive an evaluation of the CORE's deployment performance by a temporary duty supervisor. The evaluation period consists of the entire time the CORE is deployed.

B. COREs will be evaluated on their performance based on the performance goals developed by Cadre Coordinators for each position within a Cadre. The goals will align with the position-specific knowledge of program and technical protocols contained in the position's PTB, and the core competencies for deployed personnel.

C. The temporary duty supervisor will complete a deployment evaluation in a timely manner and transmit the evaluation to the CORE's supervisor of record. Additionally, the HR Unit Leader and his or her staff will ensure that any demobilized CORE who is deployed for at least twenty days is issued a performance evaluation prior to departing the incident work site.

D. If a CORE's deployment performance does not meet achieved expectations, the CORE's supervisor of record in coordination with the Cadre Coordinator and/or temporary duty supervisor will collaborate with OCCHCO to determine the appropriate course of action.

E. A CORE's progress review and appraisal (rating of record) should include input received after a deployment from the temporary duty supervisor. However, the supervisor of record has the discretion to consider the deployment performance evaluation as he or she deems appropriate when completing progress reviews and the annual appraisal (rating of record) subsequent to the deployment.

F.  If the CORE is deployed at the time that the CORE's quarterly progress review should take place, the supervisor of record will work with the CORE and his or her temporary duty supervisor to obtain feedback on the CORE's performance during the applicable quarter.

Exhibit BB

# FEMA Coordinating with States Ahead of Severe Winter Storm

**Release Date: January 23, 2026**

*FEMA shares safety guidance and urges people to prepare ahead of potential power outages, dangerous travel conditions and frigid temperatures.*

WASHINGTON -- On Thursday, U.S. Department of Homeland Security Secretary Kristi Noem provided updates on federal preparations ahead of the storm to the governors and state emergency directors in potentially affected areas. The following update is attributable to Secretary Noem:

"FEMA is actively working with states to monitor and prepare for the severe winter storm which is forecasted to produce heavy snow, dangerous freezing rain and life-threatening wind chills across most of the U.S. this weekend. In preparation, the agency activated its National Response Coordination Center and Regional Response Coordination Centers in FEMA Regions 1, 2, 3, 4, 5, 6 and 7 to synchronize federal readiness and interagency coordination. FEMA also embedded staff in State Emergency Operations Centers to ensure real-time coordination.

"Additionally, the agency deployed Incident Management Assistance Teams to support the states of Louisiana, Texas and the Commonwealth of Virginia and have 12 additional teams ready to deploy if requested by the states. Twenty-eight FEMA Urban Search and Rescue teams are on standby, prepared to deploy at the request of governors.

"FEMA's strategically located distribution centers across the South and East are collectively stocked with over 7 million meals, more than 2 million liters of water, over 600,000 blankets and more than 300 generators. FEMA is also establishing staging sites in Kentucky, Louisiana and Texas with additional meals, water and generators to enable rapid movement of resources at the request of affected states.



"The time to prepare is <u>now</u>. The agency urges people?to pay attention to local officials and take any necessary actions to keep safe?as severe winter weather moves across the nation.?There are several unique risks that?can be addressed by following the?winter?safety?tips below:??

- **Sign up for?state and?local emergency alerts** from your local public safety officials.?Download the?FEMA App?to receive real-time weather and emergency alerts?for up to five different areas nationwide, send notifications to loved ones,?locate?emergency shelters in your area, get preparedness strategies and more.?
- **Be prepared for a power outage.** Power outages can?impact?communications, transportation, utilities and much more. If experiencing an outage, keep freezers and refrigerators closed. Disconnect appliances and electronics to avoid damage from electrical surges.?Keep generators at least 20 feet from windows, doors and garages.
- **Never use generators indoors?**or use a gas stove, kerosene or propane heater or oven to heat your home.?Doing so can put you at risk for carbon monoxide poisoning.??
- **Prevent?house heating fires?**by keeping anything that can burn at least three feet from all heat sources including fireplaces, wood stoves, radiators, portable?heaters?or candles.?Always plug space heaters directly into an outlet and make sure its cord?isn't?damaged.??

- **If you?need to travel by?car**, check your local weather and traffic reports before heading out. During a winter storm, follow guidance from local officials. If they ask you to stay off the roads, please do so. If you must drive, tell others your route and?anticipated?arrival time.

  If your roads are not in?good shape, consider postponing non-essential travel until the roads are cleared. If you must drive, increase your following distance?to other vehicles?from 3-4 seconds to 5-6 seconds?and?watch for dangerous?conditions?on?bridges and overpasses.?It takes longer to slow down on frozen roads.

  Make sure you have your auto insurance provider and a towing company number in a place?that's?accessible.



Page 2 of 3

- **Have what you need to stay safe**. Roads may be impassable for days. Make sure you have several days of water and non-perishable food for every member of your family and your pets. Have enough warm clothing and blankets for every member of your household. If possible, get rock salt or pet-friendly products to melt walkways, sand or non-clumping kitty litter for traction, snow shovels and scrapers.

For more winter weather preparedness tips, visit Ready.gov."

