1   CRAIG H. MISSAKIAN (CABN 125202)
    United States Attorney

2       450 Golden Gate Avenue, Box 36055
3       San Francisco, California 94102-3495
        Telephone: (415) 436-7200
4       Fax: (415) 436-6748

5   ERIC J. HAMILTON (CABN 296283)
    Deputy Assistant Attorney General
6   DIANE KELLEHER
    Branch Director
7   CHRISTOPHER HALL
    Assistant Branch Director
8   ROBERT BOMBARD
    MARIANNE F. KIES
9   Trial Attorneys
    Civil Division, Federal Programs Branch
10
        1100 L Street, NW
11      Washington, DC 20005
        Telephone: (202) 598-9509
12      Robert.Bombard2@usdoj.gov

13  Counsel for Defendants

14

15              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
16                 SAN FRANCISCO DIVISION

17
    AMERICAN FEDERATION OF                   Case No. 3:25-cv-03698-SI
18  GOVERNMENT EMPLOYEES, *et al.*
                                             **DEFENDANTS' OPPOSITION TO**
19          Plaintiffs,                      **PLAINTIFFS' MOTION FOR A**
                                             **PRELIMINARY INJUNCTION;**
20          v.                               **MEMORANDUM OF POINTS AND**
                                             **AUTHORITIES**
21  DONALD J. TRUMP, in his official capacity as
    President of the United States, *et al.*,   Hearing Date: March 3, 2026
22                                           Time: 11:00 a.m.
            Defendants.                       Judge: Hon. Susan Illston
23                                           Place: San Francisco Courthouse
                                                         Courtroom 1
24

25

26

27

28

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

I.  Statutory and Regulatory Background ..................................................................... 2

    A.  The Establishment of FEMA ...................................................................... 2

    B.  DHS's Oversight of FEMA ......................................................................... 3

    C.  The Role of "CORE" Employees at FEMA ................................................ 3

    D.  Conditions of CORE Employment ............................................................. 5

    E.  Renewals and Non-Renewals of CORE Employees, Generally ................. 7

II.  The Decision Not to Reappoint Certain FEMA CORE Employees on Their NTE
    Dates ...................................................................................................................... 7

III.  Procedural History ................................................................................................ 8

STANDARD OF REVIEW ............................................................................................ 9

ARGUMENT ................................................................................................................ 10

I.  Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims. ...................... 10

    A.  The CSRA Precludes Judicial Review of Plaintiffs' Challenge to the Non-
        Renewal of CORE Appointments. ............................................................. 10

    B.  Plaintiffs Do Not Have Standing. ............................................................. 13

        1.  *Plaintiffs cannot premise standing on ephemeral concerns over the
            general effectiveness of FEMA.* ................................................... 14

        2.  *Plaintiff Local Governments lack organizational standing.* ..................... 15

        3.  *Plaintiff Unions and Non-Profits lack associational standing.* ............... 15

    C.  Even if Plaintiffs' Claims Were Reviewable, They Are Meritless. ....................... 17

        1.  *Plaintiffs' APA claims all fail because Plaintiffs do not show any
            "final agency action."* ................................................................ 17

        2.  *DHS and FEMA's actions are not "contrary to" any law.* ...................... 18

a.   FEMA's Statutory Duties Have Not Been Rendered "Impossible." ............................................................. 18

b.   DHS Involvement in Non-Renewals of COREs Does Not Violate the Post-Katrina Emergency Management Reform Act. ............................................................................. 20

c.   Non-Renewals of CORE Employees Do Not Violate the Recent Continuing Resolution. ...................................... 21

3.   *The challenged non-renewal decisions are not arbitrary or capricious.* ............................................................... 22

II.   Plaintiffs Have Not Demonstrated Irreparable Harm. ...................................... 23

III.   The Equities and Public Interest Do Not Favor a Preliminary Injunction. ...................... 24

IV.   Any Relief Should Be Limited and Cannot Include Reinstatement. ................................ 25

V.   Plaintiffs Should Be Ordered to Post Security in Connection with Any Relief. .............. 25

CONCLUSION ............................................................................................................. 25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

**Cases**

3

4

*Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force,*
716 F.3d 633 (D.C. Cir. 2013) ............................................................... 11

5

6

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
929 F.3d 748 (D.C. Cir. 2019) ............................................................... 12

7

8

*Atomic Oil Co. of Okla. v. Bardahl Oil Co.,*
419 F.2d 1097 (10th Cir. 1969) ............................................................. 25

9

10

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................................... 17

11

*Block v. Cmty. Nutrition Inst.,*
467 U.S. 340 (1984) ............................................................................... 12

12

13

*Carducci v. Regan,*
714 F.2d 171 (D.C. Cir. 1983) ............................................................... 13

14

15

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ......................................................................... 15, 16

16

17

*Disney Enters., Inc. v. VidAngel, Inc.,*
869 F.3d 848 (9th Cir. 2017) ................................................................. 23

18

19

*Elgin v. Dep't of the Treasury,*
567 U.S. 1 (2012) ........................................................................... 11, 16

20

21

*Env't Prot. Info. Ctr. v. Carlson,*
968 F.3d 985 (9th Cir. 2020) ................................................................. 10

22

23

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) .......................................................................... *passim*

24

*Fish v. Dep't of the Navy,*
29 M.S.P.R. 595 (1986) ......................................................................... 22

25

26

*Garcia v. Google, Inc.,*
786 F.3d 733 (9th Cir. 2015) ................................................................. 10

27

28

*Graham v. Ashcroft,*
358 F.3d 931 (D.C. Cir. 2004) ............................................................... 13

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)..................................................................................... 14

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)............................................................................... 14, 16

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)............................................................................... 21, 24

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..................................................................................... 15

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009) ....................................................................... 10

*Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*,
    737 F.3d 273 (4th Cir. 2013) ....................................................................... 11

*New York v. Kennedy*,
    789 F. Supp. 3d 174 (D.R.I. 2025)............................................................... 19

*Nken v. Holder*,
    556 U.S. 418 (2009)................................................................................... 9, 24

*OPM v. AFGE*,
    145 S. Ct. 1914 (Mem) (2025)..................................................................... 16

*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014) ..................................................................... 23

*Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*,
    400 U.S. 62 (1970)....................................................................................... 17

*Raines v. Byrd*,
    521 U.S. 811 (1997)..................................................................................... 13

*Sampson v. Murray*,
    415 U.S. 61 (1974)............................................................................... *passim*

*Sierra On- Line, Inc. v. Phoenix Software, Inc.*,
    739 F.2d 1415 (9th Cir. 1984) ....................................................................... 9

*Spagnola v. Mathis*,
    859 F.2d 223 (D.C. Cir. 1988) ..................................................................... 13

*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024) ............................................................................. 9

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ........................................................................... 14

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ........................................................................... 13

*United States v. Fausto*,
  484 U.S. 439 (1988) ................................................................... *passim*

*Washington v. FEMA*,
  2025 WL 3551751 (D. Mass. Dec. 11, 2025) .................................... 19

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ........................................................................... 15

*Widakuswara v. Lake*,
  2025 WL 1288817 (D.C. Cir. May 3, 2025) ..................................... 24

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ......................................................................... 9, 23

**Statutes**

5 U.S.C. § 702 ....................................................................................... 25
5 U.S.C. § 704 ....................................................................................... 17
5 U.S.C. § 2302 ..................................................................................... 11
5 U.S.C. § 7511 ....................................................................................... 6
5 U.S.C. § 7512 .................................................................................. 6, 12
5 U.S.C. § 7513 ................................................................................ 11, 12
5 U.S.C. §§ 3501–3504 .......................................................................... 22
5 U.S.C. §§ 7501–7504 .......................................................................... 11
5 U.S.C. §§ 7703 ................................................................................... 12
6 U.S.C. § 101 ......................................................................................... 3
6 U.S.C. § 112 ....................................................................................... 20
6 U.S.C. § 311 ......................................................................................... 3
6 U.S.C. § 313 ....................................................................................... 20
6 U.S.C. § 316 ....................................................................................... 21
6 U.S.C. § 317 ......................................................................................... 3
6 U.S.C. § 452 .................................................................................. 3, 20
42 U.S.C. § 5121 ..................................................................................... 2
42 U.S.C. § 5149 ........................................................................... *passim*
Pub. L. No. 95-454 ................................................................................ 11
Pub. L. No. 119-37 ................................................................................ 21

**Rules and Regulations**

Fed. R. Civ. P. 65 ................................................................................................................. 25
5 C.F.R. § 316.303 ................................................................................................................ 7
5 C.F.R. § 752.401 ................................................................................................................ 6

**Other Authorities**

44 Fed. Reg. 19 .................................................................................................................... 2
90 Fed. Reg. 9669. ............................................................................................................... 8
90 Fed. Reg. 8247 ................................................................................................................ 18
Executive Order No. 12,127 ................................................................................................. 2
Executive Order No. 14,210 ................................................................................................. 8
Executive Order No. 14,356 ................................................................................................. 8

1

## INTRODUCTION

2      The Federal Emergency Management Agency ("FEMA"), an agency within the

3   Department of Homeland Security ("DHS"), employs over 10,000 employees known as the "Cadre

4   of On-Call Response and Recovery," or "CORE." CORE employees serve on temporary

5   appointments—appointments that, by design, expire on a "not to exceed" ("NTE") date. Every

6   CORE employee accepted this condition in writing when they were hired. Congress built that

7   workforce flexibility into the Stafford Act deliberately, authorizing FEMA to appoint temporary

8   personnel "as may be necessary" to meet the Nation's disaster response needs. When a CORE

9   employee is not re-appointed at the end of their term, no law is broken, and—in any case—this

10  Court lacks jurisdiction to intervene. Plaintiffs' Motion for Preliminary Injunction should be

11  denied, for several independent reasons.

12     *First*, Plaintiffs cannot establish a clear likelihood of success on the merits because the

13  Civil Service Reform Act's comprehensive scheme for resolving federal employment disputes

14  forecloses district court jurisdiction. *Second*, even if Plaintiffs' claims were not precluded, none of

15  them—a collection of unions, advocacy organizations, and local governments—has suffered a

16  concrete, particularized injury sufficient to establish Article III standing (or, by extension, any

17  certainly impending irreparable injury). Instead, their claims rest on speculation about hypothetical

18  future disasters and uncertain funding consequences of non-renewals. *Third*, in any case, Plaintiffs'

19  claims fail on their substance. There is no "final agency action" sufficient to establish Plaintiffs'

20  APA claims, including because—contrary to Plaintiffs' perception—DHS has not issued a blanket

21  (or any type of) "directive" to FEMA not to renew its COREs. Nothing about the non-renewal of

22  FEMA COREs in January 2026 violates any provision of law, and agency decisions about

23  personnel management reflect reasoned operational judgments—not arbitrary conduct. The

24  equities and public interest do not favor interfering with these judgments.

25

26

27

28

**BACKGROUND**

## I. Statutory and Regulatory Background

### A. The Establishment of FEMA

For much of American history, a lack of comprehensive legislation led to a "cumbersome system" that required Congress to pass a law following each disaster to provide support to the affected communities. *See* ECF 303 (Jackson Decl.), Ex. S (*We Are FEMA: Publication 1*, FEMA ("Pub. 1")), at 16. By 1978, more than 100 separate federal agencies had jurisdiction over aspects of emergency management. *Id.* at 17. In response to requests by state governments, President Carter submitted a proposal to Congress that would "consolidate emergency preparedness, mitigation, and response activities into one Federal emergency management agency." *Id.* After a March 1979 meltdown at the Three Mile Island Nuclear Generating Station in Harrisburg, Pennsylvania, President Carter signed Executive Order No. 12,127, establishing the Federal Emergency Management Agency (FEMA). *Id.*; *History of FEMA*, FEMA (Jan. 4, 2021), https://www.fema.gov/about/history; 44 Fed. Reg. 19,367 (Apr. 3, 1979).

FEMA's authorities were "further defined and expanded by" the Disaster Relief and Emergency Assistance Amendments of 1988, which amended the Disaster Relief Act of 1974 and renamed it the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"). *History of FEMA*; *see* 42 U.S.C. §§ 5121 *et seq.* The Stafford Act "provided clear direction for emergency management and established the current statutory framework for disaster response and recovery through presidential disaster declarations." *History of FEMA*. Among other things, the Act described Congress's intent to "ensure continued and orderly assistance from the federal government to state and local governments to relieve hardship and damage that result from disasters." *Stafford Act*, FEMA (Dec. 3, 2025), https://www.fema.gov/disaster/stafford-act. The Stafford Act "establishes the current statutory framework for disaster response and recovery through Presidential disaster declarations." Pub. 1 at 18. *Inter alia*, when resources exceed state or local capabilities, a Governor or Tribal Chief Executive may submit a request for supplemental federal assistance. *Id.* To carry out the Stafford Act, Congress makes appropriations to the Disaster Relief Fund ("DRF"). *Id.*

B.    DHS's Oversight of FEMA

The terrorist attacks of September 11, 2001, "changed the face of homeland security and emergency management" and "drove major statute and policy changes to reorganize the federal government." *History of FEMA.* In 2002, President George W. Bush signed the Homeland Security Act, leading to the creation of the U.S. Department of Homeland Security ("DHS"). *History of FEMA*; *see* 6 U.S.C. §§ 101, *et seq.* DHS was created on March 1, 2003, and "united FEMA and 21 other organizations." *History of FEMA.* Section 872 of the Homeland Security Act, codified at 6 U.S.C. § 452, gives the Secretary of Homeland Security authority to "reorganize" the Department, including by "allocat[ing] or reallocat[ing] functions among the officers of the Department," and by "establish[ing], consolidate[ing], alter[ig], or discontinu[ing] organizational units within the Department," provided it gives proper notice. 6 U.S.C. § 452(a). The only exception to DHS's reorganization authority is that it cannot "aboli[sh]" any "agency, entity, organizational unit, program, or function" that is established or required to be maintained by [Chapter 1 of the statute]." *Id.* § 452(b).

In response to Hurricane Katrina in August 2005, Congress passed the Post-Katrina Emergency Management Reform Act of 2006 (6 U.S.C. §§ 311, *et seq.*), "PKEMRA," which established FEMA as a distinct agency within DHS; defined FEMA's primary mission; and designated the FEMA Administrator as the principal advisor to the President, the Homeland Security Council, and the Secretary of Homeland Security for "all matters relating to emergency management in the United States." *Id.* § 313. The FEMA Administrator reports directly to the Secretary of Homeland Security. *Id.* § 313(c)(3). Consistent with Section 872 of the Homeland Security Act, the PKEMRA provides that DHS cannot "substantially or significantly reduce" FEMA's "authorities, responsibilities, or functions" or FEMA's "capability . . . to perform those missions, authorities, [and] responsibilities." *Id.* § 316(c).

C.    The Role of "CORE" Employees at FEMA

FEMA's workforce, covering FEMA's ten geographic regions, is divided into two basic categories: Title 5 employees and Stafford Act employees. **Ex. 1** to Evans Decl. (Ch. 10 of Disaster Operations Legal Reference, 4th ed. (Sep. 2020) ("DOLR 4.0")), § II.A.1; *see* 6 U.S.C. § 317(a).

Stafford Act Employees are further subdivided into COREs, Reservists, and Local Hires. DOLR 4.0 § II.A.1; *see* 42 U.S.C. § 5149(b). FEMA's hiring authorities "allow[] FEMA to scale its workforce as necessary and allow[] it to staff multiple operations with minimal notice." *Id.* § I.

At FEMA, Title 5 employees are appointed to positions in the "competitive service" or "excepted service" under the statutes and implementing Office of Personnel Management ("OPM") regulations covering federal agencies and employees. DOLR 4.0 § II.A.1.a. Title 5 employees "perform a variety of disaster and non-disaster-related functions consistent with the all-hazards mission of the agency." *Id.* By contrast, employees hired under the Stafford Act—which include COREs—are in the excepted service. *Id.* § II.C; **Ex. 2** to Evans Decl. (FEMA Manual 252-11-1) ("CORE Manual"), § 1-6(C). COREs work full-time, on temporary appointments, to directly support the response and recovery efforts of open disasters. Evans Decl. ¶ 12; *see infra* § I.D. Specifically, COREs perform disaster work, such as applicant processing services, and other recurring work, such as financial management of disaster operations, long-term recovery projects, and close out activities. Evans Decl. ¶ 12. Most FEMA program divisions and office locations utilize both Title 5 employees and CORE employees. *Id.* ¶ 11. A Title 5 employee may share the same title as a CORE employee and work on the same projects. *Id.* Unlike Title 5 employees, however, COREs are limited to disaster and emergency-specific work. *Id.* Finally, reservists are an intermittent employee workforce. DOLR 4.0 § II.A.1.b.

FEMA's work has expanded beyond its statutorily mandated mission and traditional disaster response to non-disaster-related humanitarian aid. Evans Decl. ¶ 14. FEMA has grown as a result of this unexpected expansion, leading to concerns that FEMA has allowed "mission creep" and overstretched its finite resources. *Id.* ¶ 16. The CORE program, first developed, in 1996, comprised 286 positions. *Id.* ¶ 15. Since then, it has steadily grown. By the end of 2015, FEMA employed approximately 3,416 CORE employees. *Id.* By the end of 2020, that number had more than doubled, to 6,958. *Id.* By the end of 2024, the number of COREs surpassed 11,000. *Id.*

FEMA currently employs 10,168 COREs. *Id.*

D.    Conditions of CORE Employment

FEMA Manual 252-11-1 "establishes the policies and procedures" for FEMA's CORE program, and its provisions "apply to all FEMA COREs." CORE Manual, §§ 1-1, 1-2.[1] As explained therein, FEMA is not required to apply "all of" the provisions of Title 5 of the U.S. Code in managing its CORE program. *Id.* § 1-5 ("Policy"). Rather, "FEMA chooses, as a matter of policy, to administratively implement some Title 5 provisions and, in other circumstances, to use its Stafford Act authority to create and administer its own policies to more effectively manage Stafford Act employees consistent with the intent and program needs for these positions." *Id.* § 1-5(A). Chapter 2 of the CORE Manual sets forth the recruitment and hiring process. FEMA Offices and Directorates authorized to fill CORE positions conduct workload analyses to forecast and plan for future work and skills requirements based on historical data, technical estimates, directed requirements, and approved staffing models. *Id.* § 2-2(A). Based on the analyses, Offices and Directorates requesting CORE positions "develop and submit staffing plans, subject to funding, to [the Office of the Chief Human Capital Officer ('OCHCO')] with the number of CORE positions by title, series, grade, and duty station." *Id.* § 2-2(B).

FEMA is authorized to "appoint and fix the compensation of such temporary personnel as may be necessary, without regard to the provisions of title 5 governing appointments in competitive service." 42 U.S.C. § 5149(b)(1). Once appointed, COREs generally serve fixed two-year terms. CORE Manual, §§ 1-5(C), 3-2(B); DOLR 4.0 § II.A.1.b. A CORE appointment "does not confer eligibility or priority consideration for a permanent appointment." CORE Manual, §§ 3-2(C), 12-1(A).[2] Further, "[t]he use of COREs must be reviewed and validated on a recurring basis to ensure a continued need for the positions and consistent funding decisions across FEMA." *Id.* § 1-5(B). COREs "may be terminated at any time, with cause (poor performance or misconduct), or without cause (such as when workload or funding diminishes or ends)." *Id.* §§ 1-5(E), 12-1(A).

---

[1] Although the CORE Manual provides important factual background and context for the CORE program, it is not binding: FEMA retains the discretion to update and implement new procedures not in violation of law, in between new versions of the policy, to address changing agency direction and needs. Evans Decl. ¶ 4.

[2] A small proportion of CORE employees are hired for periods greater than two years, not to exceed four years. Evans Decl. ¶ 19 n.1.

*See also generally id.*, Ch. 12 (Rightsizing).[3] Except in very limited circumstances, the Manual provides that COREs "are not subject to any protection afforded by reduction-in-force provisions, re-employment rights, or adverse action procedures established under any statutory or regulatory provision." *Id.* §§ 3-2(E), 12-1(A). For instance, as non-Title 5 employees, COREs "normally do not have appeal rights to the Merit Systems Protection Board [MSPB]." *Id.* § 11-1(A); *see* Evans Decl. ¶ 19 (explaining that COREs are not entitled to seek review with the MSPB *unless* they have served over two years of an appointment that is over two years in length or are a preference-eligible employee who has served over one year).[4]

Under the CORE Manual, when accepting an offer of employment, CORE employees sign a document affirming, *inter alia*, that: (i) the position is a "temporary civil service excepted service position that does not confer eligibility or priority consideration for permanent appointment"; (ii) the individual "may be released from an assignment at any time and with little or no notice based on the needs of the operation"; (iii) the individual also "be terminated at any time, with cause (e.g. poor performance or misconduct) or without cause (e.g. downsizing of workforce, change in program direction or operational needs)"; and (iv) "my appointment will end on the Not to Exceed (NTE) date of my appointment, unless it is extended based on the needs of the Agency." **Ex. 3** to Evans Decl.; *see also* CORE Manual, §§ 1-5(C)(4), 3-3 (requiring COREs to "sign a Conditions of Employment letter at the time of hiring and reappointment").

---

[3] Rightsizing results in termination of appointment *prior* to the expiration date of an appointment. CORE Manual, § 12-1(C).

[4] On rare occasion, an excepted employee who has "completed 2 years of current continuous service in the same or similar positions in an Executive agency under other than a temporary appointment limited to 2 years or less" is considered an "employee" under Title 5 for the purpose of appealing adverse actions to the MSPB. *See* 5 U.S.C. §7511(c)(ii) (defining employee); *see also* 5 U.S.C. § 7512 (defining the five types of adverse actions); *see* Chapter 75 of Title 5, Part III, Subpart F ("Adverse Actions"). *But see* 5 C.F.R. § 752.401(b)(11) (defining "[t]ermination of appointment on the expiration date specified as a basic condition of employment at the time the appointment was made" as an "excluded action" and not an "adverse action").

Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction
3:25-cv-3698-SI

CORE employees do not have collective bargaining representation. *See* Evans Decl. ¶ 20 & **Ex. 4** (Aug. 8, 2025, Memo.); *accord* Jackson Decl. (ECF 303) ¶¶ 4–5. AFGE Local 4060, the sole union at FEMA, represents only sixty employees, all of whom are Title 5. Evans Decl. ¶ 20.

E.    Renewals and Non-Renewals of CORE Employees, Generally

"A CORE's appointment will end on the Not to Exceed (NTE) date of his or her appointment, unless it is extended or renewed based on the needs of FEMA." CORE Manual, § 3-9(B); 5 C.F.R. § 316.303 ("employment of a term employee ends automatically on the expiration of his term appointment unless he has been separated earlier in accordance with this chapter").

OCHCO provides each FEMA Office and Directorate with a list of COREs and their expiration dates on a biweekly basis. CORE Manual, § 3-9(A). The FEMA official who requests to reappoint a CORE is called a "Supervisor of Record." *Id.* §§ 1-6(LL), 1-7(Q). Supervisors of Record requests to reappoint are sent to FEMA's Senior Official Performing the Duties of Administrator, who then forwards the requests to DHS's OCHCO. Evans Decl. ¶ 22. As FEMA is a component of DHS, DHS has final authority over non-renewal decisions. *Id.*

Non-renewals are distinct from *removals* (also known as *terminations*), which are covered elsewhere in the CORE Manual. *See, e.g.*, CORE Manual, Ch. 11; Evans Decl. ¶ 23. Non-renewals are also distinct from agency *rightsizing*. *Id.*; *see, e.g.*, CORE Manual § 12-1(E) ("A Rightsizing does not occur when FEMA declines to renew a CORE's appointment at the end of a CORE's appointment term."). Non-renewals of COREs are commonplace at FEMA; for instance, in 2025, 349 CORE employees were released at the end of their terms. Evans Decl. ¶ 24.

## II.  The Decision Not to Reappoint Certain FEMA CORE Employees on Their NTE Dates

During January 2026, 303 CORE employees reached the end of their terms of employment. *Id.* ¶ 25. Pursuant to its lawful authority, DHS decided not to reappoint 192 of them. *Id.* However, DHS rescinded non-renewals for 33 of those 192 COREs within one week. *Id.*

There is no plan under consideration which calls for the "blanket" or indiscriminate non-renewal of all COREs. *Id.* ¶ 28. Just the opposite: FEMA and DHS are considering non-renewals of COREs for whom there are performance or misconduct issues, or where a supervisor determines they are overstaffed. *Id.* Moreover, the January 2026 non-renewals of COREs do not threaten

FEMA's ability to perform its statutory mandate. *Id.* ¶ 27. FEMA routinely surges personnel (and equipment and other assistance), as needed. *Id.*; DOLR 4.0, § I.

### III.  Procedural History

This lawsuit challenges Reductions in Force ("RIFs") putatively conducted in 2025 under Executive Order No. 14210 ("Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative"). 90 Fed. Reg. 9669 (Feb. 11, 2025); *see generally* ECF 1 (Compl.), ECF 100 (Am. Compl.), ECF 270 (Second Am. Compl.). Plaintiffs alleged that the Executive Order was *ultra vires* and usurped congressional authority, and that the Office of Personnel Management ("OPM") and Office of Management and Budget ("OMB") (and more than twenty federal agencies) unlawfully implemented it in planning and carrying out RIFs. *See generally* ECF 1. The parties are now in discovery regarding the agencies' alleged implementation of the Executive Order. *See, e.g.*, ECF 285.

On January 30, 2026, Plaintiffs broadened that original scope by filing a 57-page "Supplemental" Complaint challenging a different Executive Order and subsequent agency actions. ECF 298. The Supplemental Complaint brings two new challenges. First, it challenges the lawfulness of an October 15, 2025, Executive Order, Ensuring Continued Accountability in Federal Hiring, 90 Fed. Reg. 48,387 (Oct. 15, 2025), and a November 5, 2025, implementing memorandum issued by OPM and OMB, *see* ECF 298 (Supp. Compl.) ¶¶ 441–55. Second, it challenges DHS and FEMA's alleged "blanket" decision in December 2025 not to re-appoint FEMA COREs at the end of their existing terms of employment. *Id.* ¶¶ 456–568. For their challenge to Executive Order No. 14356 and OPM/OMB's implementing memorandum, Plaintiffs merely supplement their already-existing claims. *Id.* ¶¶ 569–74. By contrast, as to their challenge to the DHS/FEMA conduct regarding COREs, Plaintiffs bring six entirely new claims, asserting that DHS and FEMA's actions are: (1) not in accordance with law and exceed statutory authority under the APA (Claims 8 and 11); (2) *ultra vires*, unlawful and unconstitutional (Claims 9 and 12); and (3) arbitrary and capricious in violation of the APA (Claims 10 and 13). *Id.* ¶¶ 575–604.

Approximately seven weeks after DHS and FEMA's allegedly unlawful decisions, Plaintiffs filed an emergency motion for temporary restraining order to enjoin them. ECF 301.[5] The 40-page motion (ECF 301) attached 23 declarations, totaling over 1,800 pages. ECF 303. The Court converted Plaintiffs' motion to a preliminary injunction and directed them to clarify their requested relief against DHS. ECF 304. Plaintiffs clarified that they seek to enjoin: (1) "DHS's removal of FEMA decision-making authority over CORE positions"; (2) "DHS's imposition of a workforce reduction plan to eliminate half of FEMA staff, including 41 percent of CORE positions;" and (3) "DHS's order to eliminate CORE positions on their Not to Exceed ("NTE") dates beginning on January 1, 2026 regardless of agency need or employee performance." ECF 307. Plaintiffs seek to enjoin FEMA from "taking any action to implement, carry out, or effective DHS['s] directives," and specifically "[f]rom taking any action to separate CORE employees from federal employment by disapproving term renewals." ECF 301-2. Plaintiffs also ask the Court to require FEMA to "rescind all notices of non-renewal separating CORE employees from FEMA employment since January 1, 2026." *Id.*

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs must make a clear showing that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Winter*, 555 U.S. at 20). The final two factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Preliminary relief is meant to preserve the status quo pending final judgment. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). When preliminary relief changes the status quo and "orders a responsible party to take action," it is "particularly

---

[5] Plaintiffs' Motion addresses only the likelihood of success of their contrary-to-law and arbitrary and capricious claims under the APA. *See generally* ECF 301-1.

disfavored." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citations omitted). In such cases, the moving party "must establish that the law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

## ARGUMENT

## I.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims.

Likelihood of success "is a threshold inquiry and is the most important factor." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). And it is dispositive here, for multiple independent reasons. *First*, the Civil Service Reform Act of 1978 ("CSRA") precludes jurisdiction. *Second*, Plaintiffs lack Article III standing. *Third*, even if there were jurisdiction, Plaintiffs' claims fail on their merits, because the challenged DHS and FEMA conduct was not contrary to any law; nor was it arbitrary and capricious.

### A.    The CSRA Precludes Judicial Review of Plaintiffs' Challenge to the Non-Renewal of CORE Appointments.

At one level, this is a textbook, broad-scale personnel matter: Plaintiffs seek a preliminary injunction governing when and how CORE employees can be removed from federal service; ask the Court to dictate the interplay between FEMA and its parent agency, DHS, in that process; and essentially demand that CORE employees must be retained beyond the expiration of their explicitly temporary term appointments, whether or not FEMA determines their continued service is necessary or represents an efficient use of government resources. At the same time, Plaintiffs themselves are strangers to the comprehensive, reticulated scheme Congress created to govern federal personnel matters, the CSRA, and cannot seek relief centering on the retention or reinstatement of federal employees. The CSRA thus precludes district court jurisdiction over Plaintiffs' new claims and the intrusive relief they seek.

To begin with, the CORE employees whose term appointments have been non-renewed—who are not parties to this action—would not be able to bring the claims at issue against either FEMA or DHS in district court. Congress "established a comprehensive system for reviewing the personnel action[s] taken against federal employees," which provides the "exclusive means" for

review. *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 5, 8 (2012) (citation omitted). Namely, the CSRA, Pub. L. No. 95-454, 92 Stat. 1111 (Oct. 13, 1978), sets out an "integrated scheme of administrative and judicial review" for challenges to personnel actions taken against members of the civil service, *United States v. Fausto*, 484 U.S. 439, 445 (1988). Through that comprehensive scheme, "Congress intentionally provided—and intentionally chose not to provide—particular for[a] and procedures for particular kinds of claims." *Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (citation modified); *see also Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 737 F.3d 273, 277 (4th Cir. 2013). Even if the claims asserted in Plaintiffs' Supplemental Complaint were brought by non-renewed CORE employees themselves, they would fall outside of district court jurisdiction.

That is because non-renewals of CORE employee term appointments represent personnel actions under the CSRA over which administrative and judicial review, if any, is exclusively channeled through that scheme. *See* 5 U.S.C. § 2302(a)(2)(A) (identifying personnel actions that can provide the factual basis for alleged "prohibited personnel practices"). In the context of CORE appointments, reviewability is generally limited, in accord with the Stafford Act's emphasis on affording FEMA greater staffing flexibility to help it meet its duties in responding to disasters. The Stafford Act authorizes federal agencies to "appoint and fix the compensation of such temporary personnel as may be necessary, *without regard to the provisions of title 5* governing appointments in competitive service." 42 U.S.C. § 5149(b)(1) (emphasis added). Congress thereby gave FEMA the flexibility to hire temporary disaster personnel on an expedited basis, free from the procedural requirements that govern the permanent career civil service. Inherent in that grant of flexibility is that these employees would generally forgo the protections that Title 5 affords to permanent employees, including the adverse action protections of §§ 7511–7514 and corresponding MSPB appeal rights under 5 U.S.C. § 7513(d).

And even if CORE non-renewals could be analogized to removals from federal service, jurisdiction to hear claims challenging those non-renewals would be exclusively channeled through the CSRA. *See* 5 U.S.C. §§ 7501–7504, 7511–7515. In that scenario, employees must "litigat[e] their claims through the statutory scheme in the context of [a] concrete" dispute. *See*

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 757 (D.C. Cir. 2019); *see also* 5 U.S.C. §§ 7703(b)(1), 7105(a)(2), 7123(a). Most relevant here, the CSRA's Chapter 75 "governs adverse action taken against employees for the 'efficiency of the service,'" including removals from service. *Fausto*, 484 U.S. at 446–47; *see* 5 U.S.C. § 7512. Covered employees who have been removed may seek review of such adverse action before the Merit System Protection Board ("MSPB"), followed by judicial review in the Federal Circuit. 5 U.S.C. §§ 7513(d), 7703.

Turning to the actual Plaintiffs here—federal employee unions, advocacy groups, and city and county governments—they are likewise precluded from challenging non-renewals of CORE employees' term appointments in this Court. When a comprehensive statutory scheme authorizes only certain plaintiffs' claims, it implicitly precludes review of all others. In *Block v. Community Nutrition Institute*, the Supreme Court considered a statute that permitted dairy *handlers* to obtain judicial review of certain "market orders" (after administrative exhaustion), but did not expressly authorize review of *consumers'* (or anyone else's) claims. *See* 467 U.S. 340, 346–47 (1984). When a group of dairy consumers sought review, the Court held that the statute's omission of a "provision for participation by consumers in any proceeding" was "sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347. Any other holding would facilitate circumvention of the comprehensive statutory scheme. *Id.* at 348.

This principle applies with full force to the CSRA, as the Supreme Court has recognized. In *Fausto*, a suspended federal employee sought relief under the Back Pay Act in the Court of Federal Claims, arguing that because Congress had not (at that time) provided MSPB appeal rights to non-preference-eligible, excepted-service employees such as him, he was free to pursue relief through other judicial channels. 484 U.S. at 443. The Court rejected that argument. Examining the CSRA's "comprehensive nature," "structure," and "the fact that it did not include [nonpreference excepted service employees] in provisions for administrative and judicial review," the Court held that the absence of review rights was not an oversight, but a deliberate legislative choice. *Id.* at 448; *see also id.* (under *Block*, employees who lack CSRA appeal rights "should not be able to demand judicial review for the type of personnel action covered by that chapter").

At bottom, the lack of judicial review of agency decisions not to re-appoint COREs makes sense, no matter who the party seeking to invoke district court jurisdiction is. Allowing non-Title 5 temporary employees with term-limited appointments to obtain judicial review of non-adverse actions like non-renewals—without any of the CSRA's restrictions applicable to claims of actual termination—would turn the CSRA's comprehensive structure "upside down." *Id.* at 449. In other words, the exclusion of temporary Stafford Act employees from the CSRA's review scheme reflects Congress's considered judgment about which employees can challenge personnel decisions, and is not *carte blanche* to circumvent the CSRA entirely. *See Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.) ("the comprehensiveness of the statutory scheme involved, not the 'adequacy' of the specific remedies," precludes jurisdiction (quoting *Spagnola v. Mathis*, 859 F.2d 223, 227 (D.C. Cir. 1988))).[6]

## B.    Plaintiffs Do Not Have Standing.

The courts do not sit to adjudicate the public's views about how the government should be run, but to redress legally cognizable injuries to specific protected interests. Namely, under Article III, federal courts "do not exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021), and a plaintiff must therefore establish an injury that is both "legally and judicially cognizable," *Raines v. Byrd*, 521 U.S. 811, 819 (1997). Specifically, to have standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused

---

[6] In *Graham*, an FBI Special Agent sued in district court alleging that the FBI's censure of him for alleged irregularities in a surveillance operation violated the APA. 358 F.3d at 932. Then-Judge Roberts focused on the *Fausto* opinion, specifically footnote 3, in which Justice Scalia, quoting his own D.C. Circuit opinion in *Carducci v. Regan*, held that the APA did not provide judicial review for employment claims where the CSRA offered no relief to anyone because the alleged adverse actions were too minor. 714 F.2d 171, 174–75 (D.C. Cir. 1983). Then-Judge Roberts reasoned that permitting review in such cases "presented 'an even more aggravated form of the problem'" than allowing employees—whose claims the CSRA addressed but without judicial review—to obtain direct judicial review, when the CSRA did not even make such review available for the most serious claims. *Graham*, 358 F.3d at 935 (quoting *Carducci*, 714 F.2d at 174). Here, as in *Graham*, granting CORE employees a right to direct judicial review for non-renewals would give them "greater rights than the CSRA affords for major adverse actions." *Id.*

by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

Plaintiffs are unions, membership-based non-profit organizations, and local governments. There are no *individual* plaintiffs in this case. In other words, none of the *Plaintiffs* are themselves CORE employees who were either non-renewed in January 2026 or have been informed that they will be. Plaintiffs submit declarations from *non*-party COREs who were not renewed or have upcoming NTE dates.[7] But those individuals are not Plaintiffs. Nor does any declarant claim to be a current member of any Plaintiff—even by virtue of simply paying dues.[8]

An organization may establish standing by showing (in addition to other requirements) the standing of its members, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or by identifying "injuries [the organizations themselves] have sustained," and establishing "injury in fact, causation, and redressability" as to those injuries, *Alliance*, 602 U.S. at 393–94 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). Plaintiffs' Motion does not contain any argument regarding a basis for Article III standing. If Plaintiffs claim that past or future decisions not to re-appoint COREs suffice, they are mistaken.

> 1. *Plaintiffs cannot premise standing on ephemeral concerns over the general effectiveness of FEMA.*

As a threshold matter, Plaintiffs cannot establish standing based on their global concerns over FEMA's ability to carry out ongoing and future disaster response work nationwide, for at least two reasons. ECF 301-1 at 19–22; *e.g.*, ECF 303-1 (Coen Decl.) ¶ 8; ECF 303-2 (Tierney Decl.) ¶ 10; ECF 303-3 (Burton Decl.) ¶ 13. First, to show injury in fact, a plaintiff must show that

---

[7] Declarant COREs who were not renewed are: Blanton, Heath, Nelson, Newton, Prell, Shell, and Young. ECF 303-4 ¶ 2, 303-6 ¶¶ 10, 12; 303-7 ¶¶ 2, 14; ECF 303-8 ¶ 2; ECF 303-9 ¶ 2; ECF 303-10 ¶ 2; 303-11 ¶ 2. Declarant COREs with upcoming NTEs are: Fleming. ECF 303-5 ¶ 2.

[8] The declarants are not formal members of Plaintiff unions, insofar as—as Plaintiffs concede—CORE employees do not have collective bargaining representation. *See* Evans Decl. ¶ 20 & **Ex. 4** (Aug. 8, 2025 Memo.); *accord* Jackson Decl. (ECF 303) ¶¶ 4–5. AFGE Local 4060, the sole union at FEMA, represents only sixty Title 5 employees. Evans Decl. ¶ 20.
Defendants do not concede that standing would exist if these individuals were dues-paying members, which, again, they do not claim to be. *Supra* n.7.

the defendant's action affects him or her in a "personal and individual way," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992), rather than being a "generalized grievance," *Alliance*, 602 U.S. at 381. Plaintiffs' theory fails for this reason alone. Second, Plaintiffs' theory of harm is also speculative. A plaintiff must show more than a "possible future injury"; he or she must show that harm has actually occurred or is "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (citation omitted). "[A]llegations of *possible* future injury are not sufficient" to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). In sum, Plaintiffs' general fear that (i) an indeterminate number of COREs will not be re-appointed (ii) at some time in the indeterminate future, leading to (iii) unspecified impairment of FEMA's disaster response efforts, at (iv) unknown locations, in (v) unknown ways, is not concrete injury. As discussed *infra*, to the extent Plaintiffs offer more concrete bases for standing, they fare no better.

### 2. Plaintiff Local Governments lack organizational standing.

Plaintiffs include six local governments, who assert that they depend on various pre-disaster programs and services that CORE employees administer or provide. ECF 301-1 at 22–24; *see, e.g.*, ECF 303-12 (Santa Clara), 303-17 (King), 303-14 (Baltimore), 303-16 (Harris), 303-15 (Chicago), 303-18 (San Francisco). According to the Local Governments, "[t]he services CORE employees provide, and the funding they administer, are critical to public health and safety because the full cost of response, recovery, and restoration from a major disaster or emergency can outstrip a local government's own resources." ECF 301-1 at 23. Even if true, it does not establish standing. Namely, as with Plaintiffs' overarching concerns about the efficacy of disaster relief in the event of future decisions not to re-appoint certain COREs, the Local Governments can only speculate about whether, how, when, and to what extent any non-appointments of COREs would specifically injure *their* programs and services in the event of a future disaster event—the occurrence and scope of which is necessarily unknowable. *Clapper*, 568 U.S. at 409.

### 3. Plaintiff Unions and Non-Profits lack associational standing.

Membership-based Plaintiffs in this case include unions and membership-based non-profit organizations, such as the American Federation of Government Employees ("AFGE"); the American Federation of State, County and Municipal Employees ("AFSCME"); the Service

Employees International Union ("SEIU"); and the Alliance for Retired Americans (hereafter, collectively, "the Associations"). They seemingly assert associational standing.

A plaintiff organization has associational standing when (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members. *Hunt*, 432 U.S. at 343. To have standing to sue in one's own right, a plaintiff must show: "(i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Alliance*, 602 U.S. at 380. Plaintiffs fail (at least) at the first and third prongs.

Plaintiff Associations argue that the challenged conduct will "harm" them in two respects. *First*, Plaintiffs AFSCME and SEIU assert that they represent employees in states' departments of emergency management, health, ecology, and natural resources, "whose jobs are funded by FEMA grants." ECF 301-1 at 24. "CORE employees play a key role in facilitating the grant programs that fund these positions." *Id.* (citing, *e.g.*, ECF 303-20 (Spiegel Decl.) ¶¶ 17–24). But there is no evidence to support the apparent chain of inferences that: (i) a critical mass of CORE employees who "facilitate" these specific state employees' specific grant programs will not be re-appointed, (ii) to such an extent that the grant programs will not be facilitated, so that (iii) funding for the state employees will lapse, and (iv) the state employees will be fired. *See id.* at 25 (arguing that, "[t]he elimination of FEMA employees who administer these grants and the resulting funding puts the jobs of employees represented by AFSCME at risk"). This theory of downstream harm rests on a "highly attenuated" chain of inferences insufficient to establish an Article III injury that is certainly impending. *Clapper*, 568 U.S. at 410; *see also, e.g.*, *OPM v. AFGE*, 145 S. Ct. 1914 (Mem) (2025) (staying injunction).

*Second*, Plaintiff AFGE asserts that it "represents and has as members federal employees who work for FEMA, including CORE and other FEMA employees who have been or will be separated from employment." ECF 301-1 at 25. But in support, AFGE identifies only: (i) a subparagraph of the Jackson declaration (ECF 303 ¶ 46a) and (ii) the Heath declaration (ECF 303-

06 ¶ 11). Neither supports Plaintiffs' assertion. Declarant Jackson, President of AFGE Local 4060, references "[o]ne [anonymous] bargaining unit member" who is afraid of being unable to cover future costs, but stops short of indicating whether this anonymous member was actually non-renewed, or when. In any event, AFGE Local 4060 is not a named Plaintiff (and COREs are not represented by bargaining units anymore). These vague assertions do not provide a sufficient, clear factual basis for standing. And Declarant Heath states that she "was" within the bargaining unit represented by AFGE, but it is undisputed that that is no longer true. Evans Decl. ¶ 20 & **Ex. 4**. Declarant Heath does not state that she remains a voluntary dues-paying member.

Finally, Plaintiffs' claims are not redressable: As discussed above, the CSRA precludes this Court from granting judicial relief. Argument § I.A.

C.    Even if Plaintiffs' Claims Were Reviewable, They Are Meritless.

1.    *Plaintiffs' APA claims all fail because Plaintiffs do not show any "final agency action."*

The APA allows judicial review only of "final agency action." 5 U.S.C. § 704. Two conditions must be met for finality. First, the challenged action must mark the "consummation" of the agency's decision-making process. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). It may not be a "preliminary, procedural, or intermediate agency action or ruling." 5 U.S.C. § 704. Second, the challenged action "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Plaintiffs attempt to satisfy the finality requirement only in passing, pointing to: (1) DHS's "removal of FEMA decision-making authority over positions at FEMA," (2) the December 23, 2025, "workforce reduction plan" to "eliminate . . . 41 percent of CORE positions," (3) the "directive to eliminate CORE positions by NTE date," and (4) FEMA's "actions implementing DHS's policies and directives." ECF 301-1 at 35–36. Plaintiffs do not cite, by exhibit number or otherwise, the directives they contend are "final." The evidence shows that there are none.

The first and third alleged directives—DHS's purported "removal of FEMA decision-making authority over positions at FEMA" and a purported "directive to eliminate CORE positions

by NTE date"—seemingly relate to a posting on the FEMA website stating that "FEMA's authority to extend CORE appointments ended on December 31, 2025." *E.g.*, ECF 301-1 at 15–16, 35; *see* Ex. A to ECF 303. Plaintiffs misunderstand, and therefore misinterpret, what that meant. One year earlier, on January 20, 2025, the President had announced a government-wide hiring freeze. 90 Fed. Reg. 8247 (Jan. 20, 2025); Evans Decl. ¶ 29. DHS thereafter implemented certain procedures for review of hiring decisions. Evans Decl. ¶ 30. On March 18, 2025, FEMA received DHS permission to approve CORE appointment extensions for COREs in mission-critical positions, for up to two years. *Id.* CORE appointments in non-mission critical positions could receive 30-day incremental appointments while awaiting DHS approval. *Id.* On May 19, 2025, the DHS reauthorized FEMA to re-appoint non-mission critical COREs, this time for 180-day periods. *Id.* ¶ 31. That reauthorization existed until its expiration on December 31, 2025. *Id.* FEMA's observation that "FEMA's authority to extend CORE appointments ended on December 31, 2025" relates back to the May 2025 reauthorization—not a blanket policy not to renew COREs in the future. *Id.* ¶ 32. It is not agency "action" at all, much less "final" under the APA.

The second and fourth alleged directives identified by Plaintiffs—DHS's alleged "workforce reduction plan," which FEMA "implemented" (ECF 301-1 at 14–15, 16)—also do not qualify. As stated in the plain text of the underlying December 23, 2025, communication, sent by FEMA's Chief Human Capital Officer with the subject-matter line "Request for Input: Workforce Capacity Planning Exercise": "The exercise is pre-decisional in nature; no staffing actions or personnel decisions are being directed or implemented as part of this request." **Ex. 5** to Evans Decl. To the extent Plaintiffs instead claim that each decision not to a renew a particular CORE employee constitutes final agency action, they lack standing. *See supra* Argument § I.B.

### 2.     DHS and FEMA's actions are not "contrary to" any law.

Plaintiffs' "contrary to law" argument rests on three theories, none of which have merit.

#### a.   FEMA's Statutory Duties Have Not Been Rendered "Impossible."

Plaintiffs first argue that where Congress has used "mandatory language" to impose "duties" on an agency (like FEMA), the agency cannot "so dramatically cut its staff so as to render performance of these mandatory duties impossible." ECF 301-1 at 27–31. But that principle has

no applicability here because it rests on a false premise: That DHS and/or FEMA have decided to issue "blanket" non-renewals of CORE employees akin to large-scale RIFs. As explained in Argument § I.C.1, *supra*, Plaintiffs misunderstand the directives from which they claim the blanket policy originated. FEMA does not have any plan to "blanket" non-renew its COREs. Evans Decl. ¶¶ 28, 32. Stripped of its false premise, Plaintiffs' argument fails. Plaintiffs cannot show that the 159 non-renewals of CORE employees in January 2026 would jeopardize FEMA's mission, much less impair specific response teams. *See id.* ¶ 26. They do not. *Id.* Plaintiffs can only speculate about the nature, scope, and extent of CORE non-renewals in the future. And if those non-renewals reflect anything at all, it is decision-making about FEMA's changing needs and how to meet them. *See id.* ¶ 13. FEMA's CORE staffing levels have skyrocketed since the program's inception, increasing from just 286 positions in 1996 to over 11,200 by the end of 2024. *Id.* ¶ 15. Agencies cannot grow indefinitely, and federal courts should not second-guess DHS and FEMA's determinations regarding evolving operational and workforce needs. *See* 42 U.S.C. § 5149(b)(1) (granting FEMA broad discretion to appoint "such temporary personnel as may be necessary").

Plaintiffs cite *New York v. Kennedy*, 789 F. Supp. 3d 174, 209 (D.R.I. 2025) and *Washington v. FEMA*, 2025 WL 3551751, at *5 (D. Mass. Dec. 11, 2025) for the proposition that reducing CORE personnel will paralyze FEMA's disaster response and render its mandatory duties impossible to perform. But those cases involved something categorically different from the factual allegations here. In *New York*, HHS noticed broad-scale RIFs that would have resulted in the removal of thousands of federal employees, which the Court found would have effectively "shuttered" programs, research labs, and projects nationwide. 789 F. Supp. 3d at 189, 206–09. In *Washington*, the plaintiffs allege that FEMA completely eliminated its largest mitigation grant program, with no replacement and no alternative. 2025 WL 3551751, at *5. Here, DHS declined to renew a discrete subset of expired temporary appointments within a workforce of over 10,000 CORE employees (in addition to thousands of Title 5 employees). FEMA's statutory authority remains intact, its programs remain operational, and Plaintiffs do not establish with evidence that current staffing levels prevent FEMA from fulfilling a single mandatory duty.

**b.  DHS Involvement in Non-Renewals of COREs Does Not Violate the Post-Katrina Emergency Management Reform Act.**

The challenged conduct also does not violate PKEMRA. *See* ECF 301-1 at 31–32.

The Homeland Security Act is unambiguous: the Secretary of Homeland Security "shall have direction, authority, and control over" the Department, and "[a]ll functions of all officers, employees, and organizational units of the Department are vested in the Secretary." 6 U.S.C. § 112(a)(2)-(3). Section 872 of the Homeland Security Act (codified at 6 U.S.C. § 452) gives the Secretary broad authority to reorganize the Department. The statute authorizes the Secretary to allocate or reallocate functions among the officers of the Department and establish, consolidate, alter, or discontinue organizational units of the Department. *Id.* § 452(a). This includes transferring authorities or altering organizations established by statute. *Id.* The Secretary may do all of these things on 60 days' notice to Congress. The only exception to section 872 is that it cannot be used to *abolish* any organization or function that is required to be maintained by the Homeland Security Act or any other statute. *Id.* § 452(b). Tracking that exception, PKERMA prohibits the use of DHS's reorganization authority to alter FEMA's functions—either by adding to them or subtracting from them. *Id.* § 316. PKEMRA basically turns Section 872 "off" with respect to FEMA, which means the Secretary cannot use it. But the fact that DHS cannot restructure FEMA's function does not mean that FEMA is "independen[t] from DHS decision-making," as Plaintiffs would suggest. ECF 301-1 at 31. Just the opposite. To prevent the bureaucratic isolation that hampered the Hurricane Katrina response, Congress directed that the FEMA Administrator report directly to the Secretary of Homeland Security. 6 U.S.C. § 313(c)(3).

There is no credible allegation that DHS has restructured FEMA under Section 872. At most, DHS provided input into narrow decisions not to renew certain CORE employees at the expiration of their term appointments, which does not discontinue, alter, or amend any of FEMA's functions. *See id.* § 316(c)(1). FEMA retains every power Congress conferred on it, including its Stafford Act authority to "appoint. . . such temporary personnel as may be necessary." 42 U.S.C. § 5149(b)(1). The CORE program continues to exist, operate, and fulfill its mission, and FEMA's functions continue unaltered, regardless of the number of employees they have performing them. *See* Evans Decl. ¶¶ 9, 26. Similarly, reducing FEMA's staff, or providing FEMA with direction,

does not mean that FEMA no longer exists as an organizational entity. *See* 6 U.S.C. § 316(a). What has changed is only the number of individuals currently serving under that authority—the kind of resource-allocation decisions the Supreme Court has recognized as "committed to agency discretion by law" and unreviewable. *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (quoting 5 U.S.C. 701(a)(2)). FEMA remains fully able to perform its missions and responsibilities. Evans Decl. ¶ 26. No violation of PKERMA has occurred.[9]

### c. Non-Renewals of CORE Employees Do Not Violate the Recent Continuing Resolution.

As their final salvo, Plaintiffs argue that "[t]he reduction of CORE positions by NTE date directly violates CR Section 120(a), recently extended through February 13, 2026." ECF 301-1 at 32–33. Plaintiffs are mistaken. Section 120(a) of the Continuing Appropriations Act, 2026, Pub. L. No. 119-37, 139 Stat 495, 500 (2025), prohibits the use of federal funds to "initiate, carry out, implement, or otherwise notice a reduction in force." A "reduction in force" is defined as "actions taken by an agency pursuant to section 3501 to 3504 of title 5, United States Code or section 3595 of such title, or any similar reduction of positions." *Id.* § 120(d). CORE non-renewals are outside this definition. CORE employees serve under temporary appointments authorized by the Stafford Act, not under Title 5 competitive or excepted service procedures subject to RIF regulations. Plaintiffs do not claim that any COREs have been removed from their positions prematurely, *i.e.*, before their NTE date, much less on any broad scale that might be analogized to a RIF. The decision not to extend or renew a term appointment that has expired is not an "action taken" to "reduce" a position—it is the natural conclusion of a time-limited appointment by its own terms.

Plaintiffs point to subsection (b)'s statement that the prohibition "shall apply to all civilian positions, whether permanent, temporary, full-time, part-time, or intermittent." *Id.* § 120(b). But

---

[9] Plaintiffs' reference to FEMA's human-resources website posting (that "FEMA's authority to extend CORE appointments ended on December 31, 2025") is a red herring. ECF 301-1 at 32 (citation omitted). As already discussed in Argument § I.C.1 (re: lack of final agency action), the posting referred back in time to an expired reauthorization relating to a January 20, 2025, hiring freeze. Nor can Plaintiffs rely on a DHS "plan" to eliminate 50% of FEMA's staff. *Id.* As also previously discussed, this was merely a planning exercise that did not effectuate any actual personnel decisions. *See* **Ex. 5** to Evans Decl.

subsection (b) broadens the *types of positions* protected from a RIF; it does not redefine what constitutes a RIF. The word "temporary" in subsection (b) merely ensures that, when an agency conducts a RIF under 5 U.S.C. §§ 3501–3504, it cannot circumvent the prohibition by targeting probationary or part-time employees rather than permanent ones.

The legislative history confirms this reading. Congress enacted Section 120 to reverse and prohibit RIF notices issued or implemented during the lapse in appropriations that began in October 2025. *See id.* § 120(e) (retroactively voiding RIFs "proposed, noticed, initiated, executed, implemented, or otherwise taken by an Executive Agency between October 1, 2025, and the date of enactment"). The provision addressed what Congress regarded as the specific problem of agencies using formal RIF procedures to eliminate positions—not the routine administration of temporary appointment authorities under the Stafford Act.

The CORE appointments at issue had fixed end dates and expired, or were soon to expire, by their own terms. Congress does not consider a non-renewal to be a termination, a removal, or a RIF; it is the agency's decision not to create a *new* appointment. Section 120's operative verbs ("initiate," "carry out," "implement," "notice") all contemplate affirmative agency action to eliminate existing agency positions. Declining to extend or renew an appointment that has already lapsed is the *absence* of action—not a reduction in force.

3.      *The challenged non-renewal decisions are not arbitrary or capricious.*

Plaintiffs are not clearly likely to succeed on their claim that DHS and FEMA have acted arbitrarily and capriciously. *See* ECF 301-1 at 33–35. As a threshold matter, Plaintiffs have not established that non-renewal of CORE appointments on their NTE dates constitutes affirmative agency action subject to arbitrary and capricious review under § 706(2)(A). No regulation, statute, or binding agency directive mandates extension or renewal. And by the contractual terms signed by the CORE employees themselves, they acknowledge they have no right to renewal, diminishing any claim that there is a reasonable reliance interest. FEMA's recent, historical informal practice of routine renewals creates no legally cognizable entitlement to continued employment. *See Fish v. Dep't of the Navy*, 29 M.S.P.R. 595, 598 (1986) (temporary federal employee's appeal of termination after eight consecutive appointments dismissed).

Plaintiffs' arbitrary-and-capricious theory, like their contrary to law theory, fundamentally misinterprets the record. There was no decision by DHS to "remove [FEMA's] authority to make employment decisions." ECF 301-1 at 34. And as the Evans Declaration explains, FEMA does not have a blanket, "indiscriminate" plan not to renew its COREs. Evans Decl. ¶ 28. To the contrary, in January 2026, when 303 CORE employees reached their NTE dates, nearly half (144) were either re-appointed or reinstated within a week after initially being non-renewed. Evans Decl. ¶ 25.

The record Plaintiffs have assembled consists largely of news articles reporting on anticipated workforce cuts that have not occurred, declarations from former supervisors and employees who lack authority over agency-wide staffing decisions, and projections about large-scale workforce reduction plans that remain contingent on future action. None of that carries the weight Plaintiffs need it to. The only concrete, completed actions before this Court are the non-renewals of a discrete subset of CORE employees whose NTE dates have passed. Evans Decl. ¶ 25. Those limited, lawful decisions—not speculative future reductions—define the scope of what is actually reviewable, and Plaintiffs' attempt to enjoin DHS from imposing any future workforce reduction plan based on these lawful decisions asks this Court to reach well beyond the record.

## II.    Plaintiffs Have Not Demonstrated Irreparable Harm.

If a movant fails to show a likelihood of success on the merits, a court "need not consider the other factors." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). Should this Court consider the irreparable-harm requirement, Plaintiffs fail to meet it. Plaintiffs must establish a "likelihood of irreparable harm that is grounded in evidence, not in conclusory or speculative allegations of harm." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1133 (9th Cir. 2014). A "possibility" of irreparable harm is insufficient; "irreparable injury [must be] *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

Plaintiffs argue that "CORE employees have lost and will lose their income, their health benefits, and other incidents of employment." ECF 301-1 at 36. But loss of employment and income is not irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 89–90 (1974). Moreover, as addressed *supra* Argument § I.B, COREs whose expiring term appointments have not been renewed are not Plaintiffs in this case. And the declarations submitted by *non*-party COREs whose

expiring term appointments were not renewed stop short of attesting to being current members of any Plaintiff. There is no causal connection between any injury *to Plaintiff Associations* and the injunctive relief they seek. And given the circumscribed nature of non-renewals in January 2026, Plaintiffs can only speculate that any additional, future non-renewals would cause harm to their organizations or members. The Local Governments' assertions of injury likewise fail, because their subjective fear that future elimination of CORE employee positions will "decimate" programs and services FEMA would provide them is not evidence. ECF 301-1 at 37–38.

**III.    The Equities and Public Interest Do Not Favor a Preliminary Injunction.**

When the nonmovant is the government, the last two *Winter* factors "merge." *Nken*, 556 U.S. at 435. Plaintiffs argue that there is no public interest in "the perpetuation of unlawful agency action." ECF 301-1 at 39. But for the reasons discussed herein, Plaintiffs cannot show a clear likelihood of success on the merits of their claims. On the other hand, it is "well-established" that the Government is to be granted "the widest latitude in the dispatch of its own internal affairs." *Sampson*, 415 U.S. at 83 (citation omitted). The public interest is served by permitting the Executive to manage a temporary disaster-response workforce according to its operational judgment—precisely the flexibility Congress built into the Stafford Act by authorizing FEMA to appoint temporary personnel "as may be necessary." 42 U.S.C. § 5149(b)(1). An injunction compelling renewal of expired appointments would substitute a judicial staffing mandate for the executive discretion Congress deliberately conferred, in a domain where courts have recognized the government's need for an especially free hand. *See Lincoln*, 508 U.S. at 192. Further, "the public has an interest in the Judicial Branch's respect for the jurisdictional boundaries laid down by Congress." *Widakuswara v. Lake*, 2025 WL 1288817, at *6 (D.C. Cir. May 3, 2025). "Because personnel . . . disputes directly concern the public fisc, Congress has limited the resolution of these potentially costly claims to specialized tribunals such as the MSPB and the" Court of Federal Claims. *Id.* The public interest is served when courts "respect those boundaries." *Id.*

Plaintiffs' claimed equities (ECF 301-1 at 40) cannot overcome the government's interest. Every CORE appointment carried a fixed end date; every appointee accepted employment knowing renewal was discretionary. Evans Decl. ¶ 21 & **Ex. 2**. The loss of a temporary position

that expired by its own terms is not irreparable injury; it is the foreseeable consequence of the temporary employment these individuals voluntarily accepted. *See Sampson*, 415 U.S. at 90.

## IV.    Any Relief Should Be Limited and Cannot Include Reinstatement.

As relief in this case, Plaintiffs seek to enjoin (1) "DHS's removal of FEMA decision-making authority over CORE positions"; (2) "DHS's imposition of a workforce reduction plan"; and (3) "DHS's order to eliminate CORE positions on their Not to Exceed ("NTE") dates beginning on January 1, 2026." ECF 307. Plaintiffs seek to enjoin FEMA from "taking any action to implement, carry out, or effectuate DHS['s] directives," and specifically "[f]rom taking any action to separate CORE employees from federal employment by disapproving term renewals." ECF 301-2. Plaintiffs also ask the Court to require FEMA to "rescind all notices of non-renewal separating CORE employees from FEMA employment since January 1, 2026." *Id.* If any relief here is appropriate, it must be narrowly tailored to Plaintiffs who have established standing in their own right. Generalized reinstatement of all CORE employees who have been non-renewed since January 1, 2026, is not tailored by any definition. Even if it were, reinstatement is not an available remedy for Plaintiffs' APA claims, which are the only claims they address in their Motion for Preliminary Injunction. *See* 5 U.S.C. § 702(1); *Sampson*, 415 U.S. at 83, 84.

## V.    Plaintiffs Should Be Ordered to Post Security in Connection with Any Relief.

Should the Court order any injunctive relief, the Court should order security. The Court may issue an injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). That language is mandatory. *See Atomic Oil Co. of Okla. v. Bardahl Oil Co.*, 419 F.2d 1097, 1100–01 (10th Cir. 1969). In the event the Court issues an injunction, therefore, the Court must require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. Here, an appropriate bond would be commensurate to the salaries and benefits the government must pay for any employees that it would prefer to separate from federal service but is unable to for the duration of any preliminary relief.

## CONCLUSION

The Court should deny the motion for preliminary injunction.

Dated: February 19, 2026                              Respectfully submitted,

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC J. HAMILTON (CABN 296283)
Deputy Assistant Attorney General

DIANE KELLEHER
Branch Director

CHRISTOPHER HALL
Assistant Branch Director

*/s/ Robert Bombard*
ROBERT BOMBARD
MARIANNE F. KIES
Trial Attorneys
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 598-9509
robert.bombard2@usdoj.gov

*Counsel for Defendants*

Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction
3:25-cv-3698-SI

26