# Exhibit 1

September 2020

The Fourth Edition of the Disaster Operations Legal Reference (DOLR 4.0) describes the legal authorities for FEMA's readiness, response, and recovery activities. It supersedes DOLR 3.1 issued in May 2018. Because this reference is not exhaustive, the legal authorities are subject to modification and change, and the specific facts surrounding an issue may change the legal analysis, use of the information contained here should be verified with the FEMA Office of Chief Counsel before becoming the basis for a final decision by the Agency.

**CHAPTER 10**
**Human Capital**
**Table of Contents**

Page

I. Introduction ................................................................10-1

II. Types of FEMA Employees ..........................................10-2
    A. Employee Classifications and Job Categories ..................10-2
    B. Job Categories and Status ...............................10-5
    C. Stafford Act Employees (SAEs) .......................10-7
    D. Re-Employed Annuitants and
       Federal Annuitant Waivers ..............................10-10
    E. The FEMA Qualification System ......................10-14
    F. FEMA Corps ..........................................10-14
    G. Employment – Monitoring Performance .......................10-17

III. The Privacy Act ......................................................10-19

IV. Employment-Related Statutes ...................................10-20
    A. Equal Rights Policies .....................................10-20
    B. Equal Opportunity and Affirmative Employment ...........10-21
    C. Harassment ...........................................10-22
    D. Reasonable Accommodation ............................10-23
    E. Retaliation and the No FEAR Act .....................10-26
    F. Alcohol- and Drug-Free Workplace ...................10-27
    G. Smoke-Free Workplace .................................10-28
    H. Violence in the Workplace ............................10-29
    I. Weapons, Security, and Safety .......................10-30
    J. Workers' Compensation ...............................10-32
    K. Unemployment Compensation .........................10-33
    L. Fair Labor Standards Act ..............................10-34
    M. Family and Medical Leave Act (FMLA) ...............10-35

V. Employee Misconduct .................................................10-36
    A. Required Notifications to the DHS Office of
       Inspector General ........................................10-36
    B. Administrative Discipline for Stafford Act Employees .......10-39
    C. Status of the Stafford Act Employee During
       Investigation into Misconduct ..........................10-43

    D. Stafford Act Employees and Appeals from Adverse
       Administrative Actions...................................................... 10-43
    E. Administrative Discipline for Title 5 Employees ............. 10-44
    F. Alternative Forums for Appeals ....................................... 10-45
    G. Alternative Dispute Resolution (ADR)............................. 10-47

**VI. Official Travel – Entitlement to Per Diem (Lodging,
Meals, and Incidental Expenses) ............................................ 10-48**
    A. Conditions Precedent for Per Diem................................. 10-48
    B. Determining Maximum Per Diem Allowance .................. 10-51
    C. Double and Triple Occupancy ......................................... 10-52
    D. Dual Lodging ................................................................... 10-54
    E. Staying at a Second Home or with a Family
       or Friend While on Official Travel ..................................... 10-55
    F. Actual Expenses .............................................................. 10-57

**VII. Making Travel Reservations....................................................... 10-63**

**VIII. Tax Implications of Travel Expenses Reimbursement
and Per Diems .......................................................................... 10-65**
    A. Overview of the Applicable Law Regarding the
       Reimbursement of Travel Expenses................................. 10-65

**CHAPTER 10**

# Human Capital

## I.    Introduction

One of FEMA's greatest resources and strengths is its employees. FEMA employees are dedicated to the mission and are called upon to work after hours, on weekends, and on holidays on disaster operations. They may be deployed with little notice for extended periods of time to disaster sites both within the continental United States (CONUS) and outside the continental United States (OCONUS) in sometimes austere circumstances.

FEMA's hiring authorities allow it to surge its workforce for disaster-related purposes dramatically with Cadre of On-Call Response/ Recovery Employees (COREs), Reservists, and Local Hire employees,[1] in addition to its limited term and permanent full-time (PFT) staff, who are hired under the authority of Title 5, United States Code (U.S.C.). FEMA may also call upon volunteers across the executive branch to assist as part of a surge capacity force.[2] This allows FEMA to scale its workforce as necessary and allows it to staff multiple operations with minimal notice.

During the pre-event phase, FEMA may primarily depend on its headquarters' and regional PFTs and COREs. FEMA may also deploy its nationally based Incident Management COREs (IM COREs) and Reservist Cadres as it readies for and begins to engage in the response phase and may deploy personnel who work for FEMA pursuant to an interagency agreement between FEMA and Corporation for National and Community Service (CNCS). These personnel are known as

---

[1] Stafford Act, Pub. L. No. 93–288, § 306(b)(1), 102 Stat. 4689 (1988), 42 U.S.C. 5149(b)(1) provides FEMA with the authority to appoint temporary personnel to perform Stafford Act services.

[2] Post Katrina Emergency Reform Act (PKEMRA), Pub. L. No. 109–295 § 624, 120 Stat. 1452 (Oct. 4, 2006), 6 U.S.C. § 711.

---

"FEMA Corps" personnel. FEMA Corps are not federal employees. As it sets up its disaster operations, such as its initial staging bases, joint field offices (JFOs), and disaster recovery centers, FEMA will also seek to hire locally in the affected communities.

As the recovery phase ramps up, the PFTs and many COREs return to their headquarters and regional offices while a dedicated staff of Reservists and Local Hires focus on the disaster-specific operations with regional guidance and support. Long-term recovery operations may result in hiring field office COREs to replace Reservists and Local Hires. Closeout operations then fold back to the regions and regional PFTs and COREs.

This chapter will address the various matters that may arise in the JFO workplace that impact employees. The issues addressed range from basic employment matters to more complex employee rights issues

## II.  Types of FEMA Employees

### A. Employee Classifications and Job Categories

#### 1. Employee Classifications

FEMA employees are divided into two basic categories: Title 5 employees and Stafford Act employees (SAEs). The Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act) authorizes FEMA "to appoint and fix the compensation of such temporary personnel as may be necessary, without regard to the provisions of Title 5 governing appointments in competitive service".[3] SAEs are further subdivided into three groups: COREs, Reservists, and Local Hires.[4]

---

[3]  Stafford Act § 306(b)(1), 42 U.S.C. § 5149.

[4]  *See*, supra, fn. 1

a. Title 5 Employees: Permanent Full-Time Employees (PFTs) and Temporary Full-Time Employees (TFTs)

Title 5 employees are appointed to positions in the "competitive service" or "excepted service" under the statutes and implementing Office of Personnel Management (OPM) regulations covering federal agencies and employees.[5] Appointees perform a variety of disaster and non-disaster-related functions consistent with the all-hazards mission of the agency.

Title 5 employees are entitled to the full range of benefits, including health and life insurance, retirement, Thrift Savings Plan, the Federal Long-Term Care Insurance Program, and the Flexible Spending Account. Title 5 employees are also entitled to accrue and use annual and sick leave. Different hiring procedures apply, depending on whether the employee is appointed to a competitive service or an excepted service position.

b. Stafford Act Employees – SAEs

i. COREs – Cadre of On-Call Response/Recovery Employees

COREs are hired to directly support the response and recovery operations related to disasters as well as perform some disaster readiness activities.[6] CORE appointments are generally for two-year terms. Work schedules are typically full-time. CORE appointments may be terminated at any time it is determined that the program or the work to be performed is eliminated. COREs receive the full range of benefits allowed for Title 5 employees. Employees assigned to a regular work schedule earn annual and sick leave.

ii. Reservists

Reservists are an intermittent employee workforce. Guidance for the Reservist Program can be found in *FEMA Directive 010-6, Revision*

---

[5] Title 5 of the United States Code (U.S.C.) and the Code of Federal Regulations (C.F.R.) are the main statutes and regulations that address the personnel life cycle of employees hired under its authority.

[6] *See* FEMA Manual 252-11-1, (2017); *Cadre of On-Call Response/Recovery Employees (CORE) Program*.

*Number 2, FEMA Reservist Program, 01/25/17.* FEMA provides Reservists with time-limited intermittent appointments in the excepted service. Like other SAEs, the appointment does not confer federal competitive status on the appointee. Reservists' appointments do not exceed 24 months and expire biennially on the last day of the sixth pay period of each even-numbered year (the "not-to-exceed date").[7]

FEMA pays Reservists only for those periods when they are activated by the Workforce Management Division and work or are in a travel or training status. At all other times, Reservists remain FEMA employees in a non-pay status during the period of their appointment. Reservists are paid only for those hours that they work unless authorized by applicable agency directives. Reservists are not entitled to night shift differential payment.[8]

Reservists are not entitled to civil service retirement by virtue of their employment as Reservists.[9] Of the enumerated benefits listed for Permanent Full-Time Employees (PFTs) and COREs, by FEMA policy, Reservists only earn sick leave.[10] and are entitled to holiday pay and administrative leave,[11] Further, as of December 2012, Reservists are eligible to receive health benefits (*see* subsequent discussion).

Reservists are protected by federal antidiscrimination laws mentioned in Section II(C), *Stafford Act Employees (SAEs)* that follows, including entitlement to reasonable accommodations.[12] and Reservists who sustain injuries or illnesses while in the performance of duty may be eligible for benefits under the Federal Employees Compensation Act (FECA).[13]

---

[7]  FEMA Directive 010-6, (2017) at Chapter IX.B.1

[8]  *Id.* at Chapter VIII.A.1.

[9]  *Id.* at Chapter VIII.B.1.

[10]  On July 31, 2009, FEMA Administrator Fugate issued an interim policy authorizing sick leave for actively deployed Disaster Reservists. *See Disaster Reservist Sick Leave Pay Policy* (2009), http://xa.yimg.com/kq/groups/16279885/607894126/name/Memo+-+Disaster+Reservist+Sick+Leave+Pay.pdf.

[11]  FEMA Directive 253-4, April 7, 2010; FEMA Manual 253-4-1 (2010).

[12]  Section 501 of the Rehabilitation Act of 1973 and in accordance with FEMA Manual 1430.1.

[13]  *See* FEMA Directive 010-6 (2017), https://www.fema.gov/media-library-data/1524579186868-9141f60ffe7e7e3429ffa24630cb0cc9/FEMAReservistProgramDirective.pdf.

---

In December 2012, the OPM approved FEMA's request to provide Federal Employees Health Benefits to its Reservists.[14] Reservists become eligible to enroll in the Federal Employees Health Benefits Program (FEHBP) to obtain coverage for themselves and their eligible family members when they deploy to a disaster and FEMA has the expectation that they will work at least 130 hours in a calendar month. If they wish to enroll in FEHBP, they must do so within 60 days of entering pay status.

Each time a Reservist who has enrolled in FEHBP demobilizes and enters into non-pay status, he or she will be given an opportunity to continue his or her health benefits. These health benefits will terminate the last day of the pay period in which the Reservist reaches the 366th day of non-pay status, or when the Reservist separates from the agency.[15]

### iii. Local Hires

Local Hires are hired under the authority of Section 306 of the Stafford Act and provided 120-day renewable appointments.[16] Local hires are not specifically addressed in the new FEMA Reservist Program Guidance, FEMA Directive 010-6. New guidance regarding Local Hires is under development but has not been released. If you have specific questions regarding Local Hires, contact Headquarters (HQ) Office of Chief Counsel (OCC).

### B. Job Categories and Status

There are two categories of jobs in the federal government: (1) competitive service and (2) excepted service. This section also discusses differing levels of status within the competitive service, that affect an employee's eligibility for promotions, reassignments, transfers or demotions within the federal civil service.

---

[14] *Id.*
[15] Refer to FEMA's FEHBP Health Care guidance for additional information and updates at https://www.fema.gov/reservist-program-frequently-asked-questions .
[16] 42 U.S.C. § 5149(b)(1).

### 1. <u>Competitive service jobs</u>

Competitive service jobs fall under OPM's jurisdiction and are subject
to the civil service laws passed by Congress to ensure that applicants
and employees receive fair and equal treatment in the hiring process.[17]
Competitive service jobs are filled according to a merit system based on an
application and interview process.[18] The competitive service has to follow
OPM hiring rules, pay scales, and so on. Veterans' preferences apply to
competitive service hiring.[19]

### 2. <u>Excepted service jobs</u>

Excepted service jobs consist of all positions in the executive branch
specifically exempted from the competitive service or the senior executive
service (SES). Excepted service is a special authority used by the federal
government that allows agencies to use a streamlined hiring process rather
than hiring through the traditional competitive process.[20] This authority
allows agencies to help meet an unusual or special hiring need.

### 3. <u>Competitive status</u>

Competitive status is a person's basic eligibility for assignment (by transfer,
promotion, reassignment, demotion, or reinstatement) to a position in the
competitive service without having to compete with members of the general
public in an open competitive examination.[21] When a vacancy indicates that
status candidates are eligible to apply, preference eligibles, career employees,
and career-conditional employees who have completed their probationary
period may apply.[22]

---

[17] 5 U.S.C. § 2102; 5 C.F.R. Part 212.
[18] Each agency is responsible for writing its own merit promotion plan in accordance with 5
C.F.R. Part 335. FEMA's merit promotion plan can be found on the agency's website within
FEMA Manual 253-11-1.
[19] *See* 5 C.F.R. Part 211 for veterans' preferences in federal hiring.
[20] 5 U.S.C. § 2103.
[21] 5 U.S.C. § 3302; 5 C.F.R. § 1.3(c); 5 C.F.R. § 212.301.
[22] For three years prior to gaining career tenure, a competitive service employee is
considered a career conditional employee. 5 C.F.R. § 315.302.

Subject to limited exceptions, appointments in the excepted service do not enable the employee to earn competitive status.[23] SAEs do not have competitive status (unless they qualify for it through some other exception, such as being a preference-eligible or in a limited manner under the Disaster Recovery Reform Act of 2018 (DRRA)).

### 4. Career conditional status

A competitive service employee will obtain career tenure after three years of continuous creditable service. Prior to that, the employee is in a "career conditional" status, during which the employee can apply for federal jobs under merit promotion procedures.[24] A career conditional employee who leaves the federal government prior to attaining career tenure is eligible to apply for another federal position under merit promotion procedures for three years from the separation date.[25]

As a general rule, after three years, the person is ineligible to apply under merit promotion procedures and must apply through delegated examining procedures open to all U.S. citizens, as if the person never worked for the federal government in a permanent full-time position.[26]

### C. Stafford Act Employees (SAEs)

(SAEs are appointed to federal employment under the authority of Section 306(b)(1) of the Stafford Act: "In performing any services under this act, any federal agency is authorized to appoint and fix the compensation of such temporary personnel as may be necessary, without regard to the provisions of Title 5, United States Code, governing appointments in the competitive service."[27]

SAEs are considered to be "excepted service" employees. However, the personnel rules (for example, the hiring regulations) promulgated

---

[23]  5 C.F.R. § 315.201; 5 C.F.R. § 315.301.

[24]  5 C.F.R. § 315.201(a).

[25]  5 C.F.R. Part 315, subpart D; 5 C.F.R. § 315.401 (b).

[26]  *Id.*

[27]  42 U.S.C. § 5121, *et seq.*

by OPM for Title 5 excepted service employees do not apply.[28] For example, veterans' preference rules under the Veterans Employment Opportunities Act are not applicable to hiring of SAEs.[29] Their pay and benefits are set by FEMA as a matter of policy, which the Federal Circuit upheld in *Thiess v. Witt*:[30]

> [T]he plain text of § 5149(b) (1) excludes the statutory obligations of title 5 for appointments in the competitive service. In implementation of the national purpose of facilitating the hiring of short-term, temporary personnel in emergency situations, **§ 5149(b)(1) authorizes the agency to appoint temporary personnel and fix their compensation, and specifically exempts the agency from the provisions of title 5 that apply to appointments in the competitive service.** These provisions include the general schedule pay terms, classification requirements, leave and holiday provisions, and other aspects of title 5, all directed to permanent appointments. An example of the legislative history confirms that the purpose was to authorize the agency to 'temporarily employ additional personnel without regard to civil service laws . . . .' Conf. Rep. No. 91-1752, 91st Cong., 2d Sess., reprinted in 1970 USCCAN 5498, 5500.[31]

The Disaster Relief Act is specific to authorizing and facilitating governmental action in response to emergencies and disasters. Thus, the statutory provision authorizing the agency to fix compensation for temporary disaster relief employees would take precedence over the

---

[28] *Id.*

[29] *See Broughton v. DHS*, 2005 MSPB LEXIS 3558 (2005).

[30] *Thiess v. Witt,* 100 F. 3d 915 (Fed. Cir. 1996) (holding that the Stafford Act gave FEMA the authority to set the compensation of SAEs and upholding FEMA's decision to preclude DAEs from accruing annual leave, sick leave, and holiday pay).

[31] *Id.*

Family and Medical Leave Act (FMLA),[32] as the statute states.[33] By policy, FEMA has applied many Title 5 regulations to SAEs.

FEMA's SAE hirings are subject to federal laws prohibiting discrimination in hiring on the basis of a protected class, such as race, color, sex, disability, religion, national origin, and veteran status.[34] These include: the Uniformed Services Employment and Reemployment Rights Act of 1994 (prohibiting discrimination against veterans);[35] Title VII of the Civil Rights Act (Title VII);[36] the Age Discrimination in Employment Act.[37] the Equal Pay Act;[38] the Rehabilitation Act;[39] and the Genetic Information Nondiscrimination Act.[40] In addition, discrimination on the basis of sexual orientation is prohibited by executive order.[41]

FEMA SAEs may also be eligible for unpaid leave under the FMLA[42] and pay protections provided under the Fair Labor Standards Act.[43]

---

[32] Leave Act, 5 U.S.C. § 6301, *et seq.*

[33] *See D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, (1932) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling."); *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574 (Fed. Cir. 1990). It is a standard rule of construction that "a specific statute controls over a general one 'without regard to priority of enactment.'" *Bulova Watch Co. v. United States*, 365 U.S. 753, (1961) (*quoting Townsend v. Little*, 109 U.S. 504, 512, (1883))."

[34] 42 U.S.C. § 2000ff, *et seq.* (prohibiting discrimination on the basis of race, color, religion, sex, national origin, age, disability, or information); *See also* 29 C.F.R. § 1614.101.

[35] *See* 38 U.S.C. § 4311.

[36] 42 U.S.C. § 2000e, *et seq.*

[37] 29 U.S.C. § 621, *et seq.*

[38] 29 U.S.C. § 206(d).

[39] 29 U.S.C. § 791, *et seq.*

[40] 42 U.S.C. § 2000ff, *et seq.* (prohibiting discrimination on the basis of race, color, religion, sex, national origin, age, disability, or genetic information).

[41] Exec. Order 11478 (1969), 3 C.F.R., 1966-1970 Comp., p. 803, 34 12985 (August 8, 1969), as amended by Exec. Order No. 13087, 3 C.F.R. § 1998 Comp., p. 191, Fed. Reg. 30097 (May 28, 1998).

[42] *See* 29 U.S.C., Chapter 28 and 5 C.F.R. Part 825.

[43] *See* 29 U.S.C., Chapter 29 and 5 C.F.R. Part 551; 5 U.S.C. 6381-6387 and 5 CFR part 630, subpart L.

## 1. <u>DRRA and Competitive Status for Stafford Act Employees</u>

Section 1222 of the DRAA is an amendment to the hiring authority granted to the FEMA Administrator under Section 306 of the Stafford Act. Section 1222 permits FEMA to allow eligible SAEs to compete for PFT positions within FEMA under Merit Promotion procedures.

Current and former FEMA Stafford Act personnel are eligible to compete under this authority if they can provide documentation to show that they have or had been employed by FEMA for a minimum of three continuous years since August 1, 2014. Specifically, to be eligible under this authority, a current or former SAE must have 64 or more hours of paid time, with no breaks in service, for 78 or more consecutive pay periods since August 1, 2014.

A "break- in service" is defined as three or more consecutive workdays in non-pay status, except as allowed under 5 C.F.R. § 315.201(b)(3)(ii) for special circumstances such as military deployment, FMLA leave, etc. Demobilization and rotations longer than three days constitute a "break in service" and neither Pre-Approved Non-Availability (PANA) or Extended Reservist Leave (ERL) changes that. Eligible SAEs are required to submit documentation verifying DRRA eligibility.

If you are selected for a position under this authority, you will be placed in "career conditional" status and will be eligible to compete for federal PFT positions with agencies other than FEMA after 90 days (5 C.F.R. part 315). Once you have served in a Competitive appointment for three years you will have earned career tenure, which means you could separate from Federal Service and later reapply to any federal job (not just FEMA jobs) as a Merit Promotion-eligible candidate.

### D. Re-Employed Annuitants and Federal Annuitant Waivers[44]

An "annuitant" is "a current or former civilian employee who is receiving, or meets the legal requirements and is applying or has announced intention to apply for, an annuity under subchapter III of

---

[44] 5 C.F.R. part 553.

chapter 83 or chapter 84 of Title 5, United States Code, based on his or her service.[45]

Annuitants under the Federal Employees' Retirement System (FERS) and under the Civil Service Retirement System (CSRS) are generally subject to termination of their annuity or an annuity offset on re-employment into federal service if they serve in an appointive or elective position.[46] If the re-employed annuitant's pay is reduced, it is reduced in "an amount equal to the annuity allocable to the period of actual employment.[47]

FEMA and other agencies may, at that agency's discretion, request OPM approval for an exception from the re-employed annuity provisions of 5 U.S.C. §§ 8344 and 8468, or request a delegation of authority from OPM to grant an exception.[48] Specifically, an agency head may:

- On a case-by-case basis, request OPM approval for an individual annuitant's re-employment without reduction or termination of the individual's annuity to meet temporary needs based on an emergency or other unusual circumstance or when the agency has encountered exceptional difficulty in recruiting or retaining a qualified candidate for a particular position;[49] or

- Request OPM to delegate to the agency the authority to approve individual exceptions on a case-by-case basis in situations resulting from emergencies posing immediate and direct threat to life or property or from other specific circumstances.[50]

"In deciding whether to request an exception or grant an exception under delegated authority, each agency is expected to weigh fiscal responsibility and employee equity and should consider such factors as availability of funds" and other criteria set out in 5 C.F.R. Part 553.[51]

---

[45] 5 C.F.R. § 553.102(b).
[46] *See* 5 U.S.C. § 8344 (for CSRS annuitants); 5 U.S.C. § 8468 (for FERS annuitants).
[47] *Id.*
[48] 5 U.S.C. §§ 8344(i) and 8468(f); 5 C.F.R. Part 553.
[49] 5 C.F.R. § 553.201(a), (c), (d), (e), and (f).
[50] 5 C.F.R. § 553.202(a).
[51] 5 C.F.R. § 553.103(a).

On January 11, 1995, FEMA received a delegation from OPM to issue annuitant waivers, limited to the first 120 days of a presidentially declared disaster,[52] requiring issuance on an individual, case-by-case basis and requiring a statement from the individual indicating that he or she will not accept the job without the waiver.[53]

Exceptions to the salary offset provisions authorized by OPM or by an agency by delegation under Part 553 apply only to the particular individual for whom it was authorized and only while that individual continues to serve in the same or a successor position.[54] The exception terminates upon the individual's assignment to a different position unless a new 5 C.F.R. part 553 exception is authorized.[55]

Annuitants re-employed with full salary and annuity under an exception granted in accordance with 5 C.F.R. Part 553 are not considered employees for purposes of 5 U.S.C., chapter 83, subchapter III or 5 U.S.C., chapter 84 (FERS); may not elect to have retirement contributions withheld from their pay; may not use any employment for which an exception is granted as a basis for a supplemental or recomputed annuity; and may not participate in the Thrift Savings Plan.[56]

In addition to delegated authority described, the FEMA Administrator may issue waivers to annuitants appointed to temporary appointments of one year or less if the Administrator determines that the annuitant's employment is necessary to do the following:

- Fulfill functions critical to the mission of the agency or any component of that agency;

---

[52] "Where an annuitant works under a single disaster for the 120-day period, the annuitant must complete a second waiver in order to work under a different disaster for another 120 days.

[53] OPM Delegation Letter, January 11, 1995; *See OCC Memoranda re Annuitant Waivers* at OPM Delegation Letter, January 11, 1995.

[54] 5 C.F.R. § 553.103(b).

[55] *Id.*

[56] 5 C.F.R. § 553.203.

- Assist in the implementation or oversight of the American Recovery and Reinvestment Act of 2009,[57] or the Troubled Asset Relief Program under Title I of the Emergency Economic Stabilization Act of 2008;[58]

- Assist in the development, management, or oversight of agency procurement actions;

- Assist the Inspector General for that agency in the performance of the mission of that Inspector General;

- Promote appropriate training or mentoring programs of employees; and

- Assist in the recruitment or retention of employees; or respond to an emergency involving a direct threat to life or property or other unusual circumstances.[59]

This authority also has significant hour limitations. Waiver of the annuitant offset may not exceed 520 hours of service performed by that annuitant during the period ending six months following the individual's annuity commencement date; 1,040 hours of service performed by that annuitant during any 12-month period; or a total of 3,120 hours of service performed by that annuitant.[60]

Finally, the total number of annuitants granted a waiver under this authority may not exceed 2.5 percent of the total number of full-time employees of that agency; if the total number of annuitants granted a waiver exceeds 1 percent, congressional reporting is required.[61]

---

[57] American Recovery and Reinvestment Act of 2009 (ARRA), Pub. L. No. 111-5, 123 Stat. 115 (2009).
[58] Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343 (2008).
[59] 5 U.S.C. §§ 8344(l)(2) and 8468(i)(2), as amended by the October 28, 2009, National Defense Authorizations Act. Subsections A, C, E, F, and G are most relevant to FEMA employees.
[60] 5 U.S.C. §§ 8344(l)(3) and 8468(i)(3).
[61] 5 U.S.C. §§ 8344(l)(4) and 8468(i)(4).

### E. The FEMA Qualification System

The FEMA Qualification System (FQS)[62] establishes the system for qualification and certification for the FEMA incident workforce through experience, training, and demonstrated performance, as required pursuant to the Homeland Security Act of 2002.[63] FQS requires FEMA employees who work in incident management and support positions to be formally certified for these positions. Qualification and certification processes provide consistent standards for every field position at FEMA while also professionalizing the entire emergency management workforce.

By establishing qualification standards that are consistent across the agency, FQS helps ensure that FEMA employees have the knowledge, skills, and experience to perform in their incident management and incident support positions. FQS also helps employees by providing a pathway for career development and goal achievement.

FQS requirements apply to all FEMA employees who work on disasters and emergencies in incident management and incident support positions. These include COREs and Reservists under the Stafford Act; employees who are part of the Incident Management Assistance Teams (IMATs), the Mobile Emergency Response Support, and the Federal Coordinating Officers (FCOs); and other PFT (Title 5) and temporary full-time (TFT) employees covered under the provisions of Title 5, U.S.C., who are required or volunteer to work in incident management and incident support activities during disasters and emergencies.

### F. FEMA Corps

FEMA Corps was created in 2012 through a partnership between FEMA and the CNCS as a FEMA-devoted unit of service members within AmeriCorps National Civilian Community Corps dedicated

---

[62] http://www.fema.gov/fema-qualification-system; *see FEMA Qualification System (FQS) Guide* (2019), http://www.fema.gov/media-library/assets/documents/112338.
[63] Homeland Security Act of 2002 § 510; Pub. L. No. 109-295, § 624 (2006), 116 Stat. 2135, 6 U.S.C. §§ 320 and 711.

to assisting with disaster operations.[64] It is a full-time, team-based, residential, national service program for men and women between the ages of 18 and 24.

FEMA funds the program through the Disaster Relief Fund (DRF). Because of this, FEMA Corps' primary mission is assisting with response and recovery efforts for disasters or emergencies declared under the Stafford Act. When deployed to work on declared disasters or emergencies, teams may engage in any direct assistance activities that FEMA performs and charges to the DRF.

This work can include working directly with disaster survivors and supporting Disaster Recovery Centers. It would not, however, include activities that FEMA charges to a non-DRF appropriation (i.e., Fund 90 work), nor would it include activities that FEMA does not perform (i.e., work performed by a contractor or another federal agency).

Absent a declaration, the Stafford Act authorizes certain preparedness activities in which FEMA Corps may engage. When performing preparedness activities, however, members may not provide the kinds of direct assistance that FEMA could otherwise provide under a declaration. As a result, FEMA Corps' preparedness projects could include working with partners like the American Red Cross to enhance community preparedness and resiliency through non-direct activities. Such non-direct activities may include training, exercises, recruitment, assessments, surveys, evaluations, research, outreach, planning, presentations, educating, messaging, communications, and dissemination of information.[65]

---

[64] Interagency Agreement between the Corporation for National and Community Service (CNCS) and the Federal Emergency Management Agency (Mar. 2, 2012). The initial term of agreement between FEMA and CNCS ran through February 15, 2017, and the parties have the option to extend the agreement. Id. at 2.0(B). *See also* Corporation for National and Community Service, http://www.nationalservice.gov/programs/americorps/fema-corps.
[65] The combined authorities of 42 U.S.C. §§ 5131(a)(1)-(7), 5196, and 5196f authorize these activities. For more information, *see* Federal Emergency Management Agency, *FEMA Corps Whole Community Preparedness Partnership Guide: A guide for utilizing FEMA Corps teams to enhance Individual and Community Preparedness efforts* (2015–2016).

---

FEMA Corps members are not FEMA employees.[66] Members are directly supervised by their FEMA Corps Team Leader, who usually oversees a team of eight to 12 members. While members do not report to FEMA employees, the team's point of contact (usually a FEMA manager) may provide technical direction and feedback related to members' duties to ensure they carry out their service assignments safely.

The training, experience, and educational opportunities provided to members improve their knowledge, skills, and abilities for future careers in emergency management and related fields. Members are given FQS Position Task Books, and serve in one of the following FQS positions:

- External Affairs

- Private Sector Specialist

- Reports Specialist

- Media Relations Specialist

- Congressional Affairs Specialist

- Planning

- Planning Specialist

- Geospatial Information Systems Specialist

- Logistics

- Logistics Specialist

- Individual Assistance

---

[66] Members are not federal employees. They may, however, be treated as federal employees only for purposes of the Federal Tort Claims Act and Federal Employees Compensation Act. Interagency Agreement between the Corporation for National and Community Service and the Federal Emergency Management Agency (Mar. 2, 2012) at 14.0(B).

- Disaster Survivor Assistance Specialist

- Individual Assistance Applicant Services Program Specialist

- Public Assistance; or

- PA Project Specialist

In addition, members may also serve as a FEMA Corps team leader or as support to a team leader. As mission needs dictate, FEMA Corps teams deploy via the Deployment Tracking System. FEMA Corps members deploy after Incident Management COREs, but before Reservists, FTE employees other than Incident Management COREs, and Department of Homeland Security (DHS) Surge Capacity Force volunteers.[67] ach member is issued a smartphone and a laptop and given access to the FEMA network.

### G. Employment – Monitoring Performance

#### 1. Reservists

The performance of Reservists is managed by their temporary duty supervisors who refer recommendations for adverse personnel actions against Reservists, to include discipline or termination, to the HQ-based supervisor of record for review and coordination with OCC, Office of the Chief Component Human Capital Officer (OCCHCO), and Labor and Employee Relations (LER). Temporary duty supervisors must ensure that any observed poor performance is documented and referred to the supervisor of record for review and coordination with LER.[68]

FEMA's Administrative Grievance Manual 256-3-1 does not cover SAEs,[69] so Reservists generally may not grieve their performance rating. Reservists may look to the Equal Employment Opportunity (EEO) process if they believe that the evaluation was the result of illegal discrimination.

---

[67] FEMA Directive 010-8, *FEMA Incident Workforce Deployment*, C.3.i, "Selection of Personnel to Deploy" (Oct. 16, 2014).

[68] FD 010-6 Revision Number 02 at Requirements, Section F.

[69] FEMA Manual 256-3-1, *Administrative Grievance System Section* 1-2.A (2014).

### 2. Title 5 Employees and COREs

Most Title 5 employees and COREs are covered by the FEMA Employee Performance Management Program (EPMP).[70]

#### a. Performance Appraisal Cycle

The EPMP performance appraisal cycle is a calendar year cycle, January 1 to December 31.[71]

#### b. Performance Plans

Performance planning is the critical first step in a successful performance management process and is an essential factor to achieving and sustaining a high-performance culture. At the beginning of the performance cycle, a written performance plan is developed identifying the specific performance expectations for which the employee will be held accountable.

The performance plan contains pre-established DHS-wide core competencies as well as individual performance goals. Rating officials are expected to involve employees in the development of their performance plans insofar as practical, and all employees are required to develop individual development plans. Rating officials will develop and submit performance plans to employees within 30 days after the beginning of the performance cycle.

#### c. Performance Monitoring and Summary Ratings

Rating officials must monitor employee performance continuously throughout the performance cycle and conduct quarterly progress reviews with employees. At any time during the appraisal period, if a rating official

---

[70] The substantive content in this section is drawn from *FEMA Manual 255-1-1, FEMA Employee Performance Management Program (EPMP)*. See Section 1–2 for Title 5 employees excluded from the program. COREs are covered by the EPMP by FEMA Manual 252-11-1, CORE Program, (2015) with the exception of CORE IMATs, whose performance is governed by FEMA Directive 010-7.

[71] FEMA Manual 255-1-1, *Employee Management Performance Program*, Section 2.1 (2013).

determines that an employee is performing poorly in one or more critical elements, appropriate action must be taken to address the performance deficiencies. In such cases, the supervisor must consult with an OCCHCO LER specialist for advice and guidance. Ratings officials must complete ratings of record within 30 days after the end of the performance cycle, subject to exceptions noted in the EPMP manual.

### III.  The Privacy Act

As discussed in Chapter 9, *Information Management,* the Privacy Act[72] regulates the collection, maintenance, use, and dissemination of personally identifiable information (PII)[73] about individuals by federal executive branch agencies. The Privacy Act strives to balance the government's need to maintain information about individuals with the rights of individuals to be protected against unwarranted invasions of their privacy by doing the following:

- Restricting the disclosure of individually identifiable records maintained by agencies;

- Granting individuals, the right to access agency records maintained on that individual;

- Granting individuals, the right to seek amendment of agency records maintained on that individual, if the records are inaccurate; and

- Establishing norms for agencies to comply with in the collection, maintenance, and dissemination of records.

---

[72] Privacy Act, Pub. L. No. 93-579, 88 Stat. 1896, 5 U.S.C. § 552(a), as amended.

[73] Examples of PII are name, home address, home and personal cell phone numbers, disaster registration/case number, credit card number, social security number, or any identifying symbol or particular that is assigned to the individual, such as a photo or thumb print. *Department of Homeland Security Privacy Incident Handling Guidance* (DHS PIHG), Version 3.0, January 26, 2012 Section  1.4.9, https://www.dhs.gov/xlibrary/assets/privacy/privacy_guide_pihg.pdf.

The Privacy Act requires federal agencies to publish in the *Federal Register* a notice of the existence and character of each system of records the agencies maintain that contain information about individuals and from which information is retrieved by name or other personal identifier. With respect to personnel records, see the listing of Privacy Act System of Records Notices covering FEMA employees and contractors in Chapter 9, *Information Management.*

## IV.  Employment-Related Statutes

### A. Equal Rights Policies

Federal discrimination laws cover all FEMA personnel, including applicants for employment. FEMA subscribes to, and implements to the fullest, the requirements of Title VII of the Civil Rights Act of 1964;[74] the Rehabilitation Act of 1973;[75] the Genetic Information Nondiscrimination Act of 2008;[76] the Age Discrimination in Employment Act of 1967;[77] and Executive Order 13087 (Further Amendment to Executive Order 11478, Equal Employment Opportunity in the Federal Government) prohibiting discrimination based on sexual orientation in the federal workforce).[78]

---

[74]  Title VI of the Civil Rights Act of 1964, Pub. L. No. 88–352, as amended, 78 Stat. 241 (July 2,1964), 42 U.S.C. § 2000e, *et seq.*

[75]  Rehabilitation Act of 1973, Pub. L. No. 93–112, 87 Stat. 355 (Sept. 26, 1973) 29 U.S.C. § 701, *et seq.*

[76]  Genetic Information Nondiscrimination Act of 2008, Pub. L. No. 110–233, 122 Stat. 881 (May 21, 2008), 29 U.S.C. § 1182(b).

[77]  Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 602, 29 U.S.C. § 621, *et seq.*

[78]  Title VII of the Civil Rights Act of 1964 provides protection from discrimination on the basis of race, color, national origin, sex (including sexual harassment), religion, and retaliation; § 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, added individuals with disabilities to this list; the Genetic Information Nondiscrimination Act of 2008, Pub. L. No. 110-233 protects genetic information; the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 634, prohibits age discrimination in federal employment; and Exec. Order No. 13087 (1998), 3 C.F.R. 1998 § Comp., p. 191, 63 Fed. Reg. 6067 (May 28, 1998), and Exec. Order No.13152, (2000), 3 C.F.R. § 2000 Comp. p. 264, Fed. Reg. 30097 (May 2, 2000), which prohibit discrimination based on sexual orientation in the federal workforce.

Employees who believes they have had their equal rights violated should report it to any level of management and the Office of Equal Rights (OER).[79] Employees must treat each other fairly and equitably regardless of role or position; and, where complaints of discrimination arise, it is expected that managers and employees will work together to resolve the issues at the earliest possible stage. FEMA provides annual online EEO training for each employee.

### B. Equal Opportunity and Affirmative Employment

It is legally required to provide equal opportunity in employment for all employees and applicants and to prohibit discrimination in every aspect of personnel policies, practices, and working conditions.[80] FEMA fully supports and is committed to EEO and the implementation of a solid and effective affirmative employment program without regard to race, sex, religion, color, national origin, age or disability, sexual orientation, parental status, or genetic information. FEMA is committed to EEO goals that will aggressively pursue a program to recruit, retain, and advance a qualified workforce that reflects our nation and provides an environment free of all discriminatory practices.[81]

---

[79] Contact must be made with the OER within 45 days of occurrence of the alleged discriminatory action.

[80] "It is the policy of the Government of the United States to provide equal opportunity in Federal employment for all persons, to prohibit discrimination in employment because of race, color, religion, sex, national origin, handicap, or age, and to promote the full realization of equal employment opportunity through a continuing affirmative program in each executive department and agency. This policy of equal opportunity applies to and must be an integral part of every aspect of personnel policy and practice in the employment, development, advancement, and treatment of civilian employees of the Federal Government." Executive Order 11478, August 8, 1969; amended by Exec. Order No. 13087 (1998), 3 C.F.R. § 1998 Comp., p. 191, 63 Fed. Reg. 6067 (May 28, 1998), Exec. Order No. 13152, (2000), Exec. Order No.13152, (2000), 3 C.F.R. § 2000 Comp. p. 264, 65 Fed. Reg., 26115 (May 2, 2000); and 2011-OER-01 FEMA EEO Statement.

[81] Office of the Under Secretary, FEMA, Policy No. 7-03, *Harassment and Retaliation* (Sept. 2, 2003), https://www.fema.gov/media-library-data/20130726-1823-25045-5821/no._3_03_harassment_and_retaliation_9_2_03.pdf.

---

## C. Harassment

DHS and FEMA are committed to maintaining a work environment that is free from harassment and sexual harassment, and employees are responsible for creating and maintaining that environment. FEMA has a zero-tolerance policy regarding harassment and sexual harassment that applies to all FEMA employees, as well as to all contractors, students, visitors, and guests engaging in business at any FEMA facility.[82]

**Harassment** is any unwelcome verbal or physical conduct based on one of the bases protected under Title VII of the Civil Rights Act[83] (race, color, religion, sex, national origin, age [over 40], disability, and reprisal) that is so objectively offensive as to alter the conditions of one's employment where the conduct culminates in a tangible employment action or is sufficiently severe or pervasive so as to create a hostile work environment.[84] Examples of prohibited harassment include but are not limited to the following:

- Making inappropriate comments or remarks regarding an individual because of his or her religion or national origin;

- Continually scrutinizing, criticizing, or requiring tasks of an individual because of a protected basis while not treating a similarly situated employee in the same manner; and

- Making derogatory or intimidating references to an individual's mental or physical impairment.

- **Sexual harassment**[85] is unwelcome sexual advances, requests for sexual favors, and verbal or physical conduct of a sexual nature when—

---

[82] FEMA Directives 256-4 and 256-5.

[83] 42 U.S.C. § 2000e, *et seq.*

[84] FEMA Directive 256-4, 265-5; 29 C.F.R. § 1604.11; *see* Office of the Under Secretary, FEMA, Policy No. 3-03, (Sept. 2, 2003), https://www.fema.gov/media-library-data/20130726-1823-25045-5821/no._3_03_harassment_and_retaliation_9_2_03.pdf.

[85] 42 U.S.C. § 2000e-3(a); FD 256-5.

- Submission to such conduct is made a term or condition or an individual's employment;

- Submission to or rejection of such conduct forms the basis of an employment decision affecting such individual; or

- Such conduct has the purpose or effect of interfering with work performance or creates an intimidating, hostile, or offensive work environment

FEMA has a duty to promptly investigate allegations of harassment.[86] Courts have found "prompt" to mean almost immediate upon learning of the harassment allegations. When allegations are raised, managers should contact OER and follow the procedures set forth in FEMA Directive 123-19 on administrative investigations.[87]

## D. Reasonable Accommodation

FEMA's commitment to serving persons equally extends to providing access to applicants and employees with disabilities that is equal to the access provided to individuals without disabilities under any program or activity conducted by the agency.[88]

FEMA's policy is to comply with the reasonable accommodation requirements of the Rehabilitation Act and Americans with Disabilities Act (ADA)[89] and the Americans with Disabilities Amendments Act (ADAA).[90] These requirements have been implemented by regulations promulgated by the Equal Employment Opportunity Commission (EEOC) and other federal agencies.[91]

---

[86] EEOC, *Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment* by Supervisors, 915.002 (June 18, 1999).

[87] FEMA Directive 123-19 (2012), https://intranet.fema.net/org/occ/FEMAs%20Tool%20 Kit/FEMA%20ADMINISTRATIVE%20INVESTIGATIONS%20POLICY.pdf.

[88] 44 C.F.R. § 16.140; Rehabilitation Act, Pub. L. No. 93-112; 29 U.S.C. § 701, et seq., 42 U.S.C. § 12101, et seq. 29 C.F.R. 1614.203; Exec. Order No. 13164 (2000), 3 C.F.R. § 286 (2000), 65 Fed. Reg. 46565, (July 28, 2000).

[89] ADA, Pub. L. No. 101-336, 104 Stat. 327, 42 U.S.C. § 12101, *et seq.*

[90] ADA Amendments Act of 2008, Pub. L. No. 110–325 (2008).

[91] FEMA Director's Policy No. 4-05 (2005), http://www.fema.gov/pdf/oer/state_4_05.pdf

---

FEMA is required to take all reasonable steps in making accommodations for employees with disabilities.[92] In addition, federal agencies are required to develop written procedures for providing reasonable accommodations.[93] FEMA's written procedures are outlined in FEMA's Manual 123-6-1, Reasonable Accommodation Program,[94] and Director's Policy No. 4-05.[95]

In general, a reasonable accommodation is any change to the work environment or in the way things are customarily done that enables a qualified individual with a disability to have employment opportunities equal to those of an individual without a disability.[96]

A request for reasonable accommodation is an oral or written statement in which an employee identifies his or her function limitation(s) and requests a modification or adjustment to (1) a job application process to enable him or her to be considered for the position; or (2) the work environment, or to the manner or circumstances under which the position is customarily performed, to enable him or her to perform the essential functions of the position.

An employee with a disability may request a reasonable accommodation at any time, even if the employee has not previously disclosed the existence of a disability; however, the individual must state his or her functional limitation at the time of the request.[97] FEMA has an affirmative duty to accommodate an employee with an obvious disability to ensure effective reasonable accommodation solutions are provided.[98]

All reasonable accommodation requests should be documented as soon as possible on FEMA Form 256-0-1; however, FEMA will begin

---

[92] FEMA Manual 123-6-1, *Reasonable Accommodations Manual* (2015), Chapter 1-7.
[93] The provisions of FEMA Manual 123-6-1, are applicable to Title 5 and part-time employees, CORE employees, reservists, disaster local hires, and applicants for any of these positions at FEMA. FEMA Manual 123-6-1, Chapter 1-1
[94] FEMA Manual 123-6-1 (2015).
[95] Director's Policy 4.05 (2005).
[96] 29 C.F.R. Part 1630; FEMA Manual 123-6-1, Chapter 1-5.
[97] FEMA Manual 123-6-1, Chapter 2.1.
[98] FEMA Manual 123-6-1, Chapter 3.1.E.

processing the request as soon as it is made, whether or not the form has been completed.[99]

A deciding official, usually a first-line supervisor, manager, or other designated official, in coordination with FEMA's Disability Employment Program Manager (DPM) located in FEMA's OER, determine whether reasonable accommodations will be provided by the agency. The DPM is the deciding official for applicants for employment. The Director of Equal Rights has been delegated the final authority in denying such accommodations.[100]

A variety of accommodations may be made available to employees and applicants. Specific examples of accommodations outlined in FEMA Manual 123-6-1 include but are not limited to—[101]

- computers and electronic assistive devices
- reader or sign language interpreter
- telework
- service animals, and
- reassignment.

Accommodations should be based on the individual's needs rather than what others with similar conditions received. Pursuant to FEMA policy, all requests for reasonable accommodation must be kept confidential.[102] Deciding officials should engage FEMA's DPM to receive and review medical documents associated with reasonable accommodation requests.[103]

Federal law requires that medical information obtained by FEMA in connection with the reasonable accommodation process must be kept confidential.[104] This includes medical information about functional limitations and reasonable accommodation needs. Others, including

---

[99] FEMA Manual 123-6-1, Chapter 3.2.
[100] *Director's Policy No*. 4-05 (2005).
[101] *FEMA Manual 123-6-1*, Chapter 2; 29 C.F.R. 1614.203(c)(2).
[102] FEMA Manual 123-6-1, Chapter 6.1.
[103] FEMA Manual 123-6-1, Chapter 3.4.
[104] 29 U.S.C. § 701, *et seq*.

those managers in the employee's chain of command do not need to receive information regarding the employee's medical diagnosis, prognosis, or treatment.

Requests for reasonable accommodation must also be kept in files separate from the individual's personnel file. Any FEMA employee who obtains or receives such information is strictly bound by these confidentiality requirements.

## E. Retaliation and the No FEAR Act[105]

It is unlawful to retaliate or engage in adverse treatment against anyone who has articulated concerns regarding unlawful harassment (sexual or nonsexual), discrimination, requested reasonable accommodation, or religious accommodation.[106] Adverse treatment is any action or omission that would deter a reasonable person from participating in the EEOC process.[107]

It is an unlawful employment practice for an employer to discriminate against any employee or applicant for employment because the employee or applicant made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing.

The Notification and Federal Employee Antidiscrimination and Retaliation (No FEAR) Act of 2002[108] acknowledges Congress' recognition that federal agencies cannot be run effectively if those agencies practice or tolerate discrimination, and that the United States and its citizens are best served when the federal workplace is free of discrimination and retaliation.

Further, in order to maintain a productive workplace that is fully engaged with the many important missions before the government, it is

---

[105] No FEAR Act of 2002, § 101. Pub. L. No. 107-174 (2002), as amended, 5 U.S.C. § 2301, *et seq.*
[106] *EEOC Compliance Manual*, Section 8-3.
[107] Burlington Northern and Santa Fe Railway Company v. White, 548 U.S. 54 (2006).
[108] The Notification and Federal Employee Antidiscrimination and Retaliation (No FEAR) Act of 2002, Pub. L. No. 107-174, 116 Stat. 566 was passed by both houses of Congress and was signed into law by President George W. Bush on May 15, 2002.

essential that the rights of employees, former employees, and applicants for federal employment under discrimination, whistleblower, and retaliation laws be steadfastly protected, and that agencies that violate these rights be held accountable.

The No FEAR Act increased accountability of federal departments and agencies for acts of discrimination or retaliation/reprisal against employees resulting from whistleblower complaints and complaints before the Merit Systems Protection Board (MSPB) and EEOC by —

- requiring federal agencies to be accountable for antidiscrimination and whistleblower laws,

- prohibiting retaliation in discrimination, and

- ensuring adequate posting of notices regarding rights and responsibilities.

### F. Alcohol- and Drug-Free Workplace

Pursuant to federal law, FEMA facilities provide a drug- and alcohol-free workplace.[109] The use of alcohol is prohibited in all federal facilities;[110] and the use, possession, or distribution of illegal drugs by employees, whether on or off the job, will not be tolerated. These are zero-tolerance policies.[111]

Employees may not consume alcoholic beverages while at work, report to work under the influence of alcohol, perform FEMA-related work under the influence of alcohol, or operate any agency vehicle under the influence of alcohol. Law enforcement personnel on federal property may administer voluntary alcohol tests when there is an accident or reasonable cause to do so.[112]

---

[109] Exec. Order 12564 (1986) 3 C.F.R. § 1986 Comp. p. 224, 51 Fed, Reg. 32889 (September 15, 1986); Federal Property Management Regulations, 41 C.F.R. § 102-74.405; the Drug-Free Workplace Act of 1988; 41 U.S.C. § 701.

[110] *Id.*

[111] *Id.*

[112] *Id.*

---

Executive Order 12564 (Drug-Free Federal Workplace) establishes standards and procedures for a drug-free federal workplace and mandates testing for the use of illegal drugs for all federal employees in safety and security-sensitive positions.[113] The unlawful use, manufacture, distribution, possession, solicitation, or transfer of a controlled substance is strictly prohibited on any FEMA premises or worksite (including parking lots).

FEMA implements this executive order via its Drug-Free Workplace Program, which provides policies and procedures on drug testing, employee assistance programs, and training and education for supervisors and employees.[114]

## G. Smoke-Free Workplace

Pursuant to Executive Order 13058 (Protecting Federal Employees and the Public from Exposure to Tobacco Smoke in the Federal Workplace), a policy was established to provide a smoke-free environment for federal employees and members of the public visiting or using federal facilities.[115] "The smoking of tobacco products is prohibited in all interior space owned, rented, or leased by the executive branch of the federal government and in any outdoor areas under executive branch control in front of air intake ducts."[116] Smoking is further "prohibited in courtyards and within 25 feet of doorways and air intake ducts on outdoor spaces under the jurisdiction, custody or control of GSA."[117]

Accordingly, FEMA installations are designated as non-smoking facilities.[118] There is no smoking inside any FEMA facility, including restrooms, break rooms, hallways, lobbies, elevators, tunnels, dorm

---

[113] Exec. Order 12564, 3 C.F.R. § 1986 Comp. p. 224, 51 Fed, Reg. 32889 (September 15, 1986); 41 C.F.R. §§ 102-74-400.

[114] FEMA Manual 123-20-1, Drug-Free Workplace, (February 20, 2015).

[115] Exec. Order 13058 (1997), 3 C.F.R. § 1997 Comp., p. 216, 73 Fed, Reg. 77518 (December 19, 2008), 41 C.F.R. §§ 102-74.400); *See also* Federal Management Regulation, 41 C.F.R § 102-74.315.

[116] *Id.*; FEMA Instructions 6900.1 (January 11, 2002).

[117] Federal Management Regulations (FMR), 41 C.F.R. § 102-74.330.

[118] DHS Instruction Number 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, Smoking Policy (August 17, 2011).

rooms, or any other part of the facility, unless the area is designated for smoking.[119]

Current DHS policy does not include e-cigarettes or "vaping" in the definition of smoking.[120] However, the DHS Office of Health Affairs "strongly recommends that e-cigarettes be treated as tobacco products in the workplace."[121] Smoking (including "vaping") is also prohibited in all FEMA-owned or leased vehicles.[122]

### H. Violence in the Workplace

FEMA's policy regarding violent acts or threats of violence or other inappropriate behaviors that have the potential for causing harm to one's self or others in the performance of official duties is as follows:

FEMA strives to minimize the likelihood of violence in the workplace through early intervention and will not tolerate acts or threats of violence (explicit or implied). Employees found in violation of this policy will be subject to disciplinary action, up to and including termination of employment, and referral to appropriate law enforcement authorities. For other than FEMA employees, comparable appropriate action will be taken.[123]

It is strictly forbidden to commit any action which causes, is intended to cause, or is perceived as an intent to cause harm to persons or damage to property. Any such behavior will be subject to immediate disciplinary action. The prohibition includes acts, remarks, or gestures that communicate a threat of harm or otherwise cause concern for the safety of any individual; or damage, destruction, or sabotage of property at a FEMA facility; or any such actions by an employee while on or because of his or her official duties. This prohibition also applies to contractors

---

[119] *Id.*

[120] *Id.*

[121] DHS Office of Health Affairs, Occupational Health and Safety Advisory, February 19, 2015.

[122] DHS Instruction Number 066-03-1, DHS Manual 118-01-01, Motor Vehicle Fleet Program Manual (March 18, 2011); FEMA Manual 119-24-1, Fleet Management Manual (October 13, 2011).

[123] FEMA Instruction 1200.1, Violence in the Workplace (2000).

and personnel from other agencies that are performing official duties in support of FEMA's mission.[124]

All managers, supervisors, and employees should immediately contact the Office of the Chief Security Officer (OCSO), OCC, or the OCCHCO LER Branch if they witness or are informed of violent, abusive, or threatening behavior. In instances of imminent danger, appropriate law enforcement authorities should be immediately contacted.

### I. Weapons, Security, and Safety

#### 1. Weapons

Employees are expressly forbidden from bringing firearms or other dangerous weapons on to any FEMA facility; doing so constitutes grounds for immediate dismissal.[125]

Persons who knowingly possess, or cause to be present, a firearm or other dangerous weapon in a federal facility, or attempt to do so, shall be fined pursuant to federal law or imprisoned not more than one year, or both.[126]

Persons who, with intent that a firearm or other dangerous weapon be used in the commission of a crime, knowingly possess or cause to be present such firearm or dangerous weapon in a federal facility, or attempt to do so, shall be fined pursuant to federal law or imprisoned not more than five years, or both.[127]

#### 2. Security

FEMA facilities are secured and have controlled access. All individuals entering FEMA facilities must be properly identified and in possession of

---

[124] *Id.*
[125] 18 U.S.C. § 930, Possession of Firearms and Dangerous Weapons in Federal Facilities.
[126] *Id.* at § 930(a).
[127] *Id.* at § 930(b).

a recognized and accepted identity credential or access badge before being granted access to FEMA facilities.[128]

In addition, the removal of government property from FEMA facilities must be monitored in order to avoid losses, negligence, and unauthorized use. Federal property management regulations state that "packages, briefcases and other containers in the immediate possession of visitors, employees, or other persons arriving on, working at, visiting, or departing from Federal property" are subject to inspection.[129] Property can only be removed from a FEMA facility with an authorized property pass.[130]

### 3. **Safety**

Federal workers have a right to a safe and secure workplace, and anyone who depends on the work of the federal government for their health, safety and security has a right to a reliable and productive federal workforce.[131]

FEMA adheres to the provisions of regulatory statutes applicable to FEMA's goal of ensuring, to the highest degree possible, a safe and healthful workplace wherever FEMA employees are assigned, or the agency's mission is executed.[132]

Under FEMA's Occupational Safety and Health Administration (OSHA) Program, goals and objectives are established for reducing and eliminating occupational accidents, injuries, and illnesses, and for appropriate corrective actions to be taken.[133] Qualified and authorized occupational safety and health inspectors inspect FEMA worksites; management and supervisory evaluations measure performance in meeting the program requirements;

---

[128] *See FEMA Manual 121-3, Facility Access (2015) and FEMA Manual 121-3-1, FEMA Credentialing Access Manual (2012); See also Homeland Security Presidential Directive 12 (HSPD-12), Policy for a Common Identification Standard for Federal Employees and Contractors* (2004).
[129] 41 C.F.R. § 102-74.370.
[130] *FEMA Manual 119-7-1, Personal Property* (2013).
[131] Occupational Safety and Health Administration (OSHA) Regulations, Basic Program Elements for Federal Employee Occupational Safety and Health Programs and Related Matters; 29 C.F.R. § 1960.8(a).
[132] FEMA Occupational Safety and Health Program, FEMA Manual 066-3-1 (January 28, 2013).
[133] *Id.*

and all agency employees and bargaining unit representatives have an opportunity to participate in the program without restraint, coercion, interference, or reprisal.[134]

Employees are responsible for complying with OSHA standards and following all FEMA safety and health rules; they are encouraged to report hazardous workplace conditions and promptly report any job-related injury, illness, or accident to supervisors.[135]

### J. Workers' Compensation[136]

All federal civilian employees (including SAEs, but with the exception of non-appropriated fund employees[137]) are covered under the FECA, more commonly referred to as workers' compensation.[138] The rules governing administration of all claims filed under the FECA are set forth at 20 C.F.R. Part 10.

The FECA provides compensation for wage loss, medical care, and vocational rehabilitation for federal employees who are injured in the performance of their duties or who develop illnesses as a result of factors of their federal employment.[139]

---

[134] *Id.*

[135] *Id.*

[136] For general reference concerning benefits of the Federal Employees' Compensation Act, see U.S. Department of Labor, Division of Federal Employees' Compensation: Federal Employees' Compensation Act—Frequently Asked Questions, http://www.dol.gov/owcp/dfec/regs/compliance/feca550q.htm.

[137] Non-appropriated fund employee means a civilian employee who is paid from non-appropriated funds of Army and Air Force Exchange Service, Navy Exchange Service Command, Marine Corps exchanges, or any other instrumentality of the United States under the jurisdiction of the armed forces which is conducted for the comfort, pleasure, contentment, or physical or mental improvement of members of the armed forces. Such term includes a civilian employee of a support organization within the Department of Defense or a military department, such as the Defense Finance and Accounting Service, who is paid from non-appropriated funds on account of the nature of the employee's duties. They are typically paid from funds generated by those activities.

[138] The Federal Employees' Compensation Act, Pub. L. No. 16-176 (1916), as amended, 5 U.S.C. § 8101, *et seq.*

[139] Damage to or destruction of medical braces, artificial limbs, and other prosthetic devices incidental to a job-related personal injury is also compensable. 5 U.S.C. § 8101(5).

---

FECA also provides monetary benefits to dependents if a job-related injury, illness, or disease causes the employee's death. Benefits cannot be paid if the injury, illness, or death is caused by the employee's willful misconduct, intent, or intoxication by alcohol or illegal drugs.[140]

The FECA is administered by the U.S. Department of Labor, Office of Workers' Compensation Program, Division of Federal Employees' Compensation, through district offices located throughout the United States. Seventeen district offices adjudicate claims and pay benefits, and the costs of those benefits are charged back to the employing agency.

### K. Unemployment Compensation[141]

Subject to individual state regulations, FEMA employees (including Reservists and other SAEs) may, upon completion of assignment, placement in non-pay status, or expiration of appointment, be eligible to receive unemployment insurance (UI) benefits.

UI benefits are intended to provide temporary financial assistance to unemployed workers who meet the requirements of state law. The Unemployment Compensation for Federal Employees program provides UI benefits for eligible former civilian federal employees who are unemployed through no fault of their own (as determined under state law) and meet other state law eligibility requirements.

Generally, FEMA challenges employee claims where the employee has quit or has been terminated for misconduct or poor performance. OCC represents FEMA in unemployment proceedings

The UI program is administered by states as agents of the federal government, within guidelines established by federal law, and operated under the same terms and conditions that apply to regular state unemployment insurance.[142] Eligibility for UI benefits, benefit amounts,

---

[140] 5 U.S.C. § 8102(a).

[141] *See generally,* U.S. Department of Labor, *How Do I File for Unemployment Insurance,* http://www.dol.gov/dol/topic/unemployment-insurance/index.htm.

[142] Social Security Act, Pub. L. No. 74-271 (1935), as amended, 5 U.S.C. § 8501 *et seq.*; 5 C.F.R. § 8501, *et seq.*

and the length of time benefits are available and are determined by the state law in which unemployment insurance claims are established.

In the majority of states, benefit funding is based solely on a tax imposed on employers. UI for unemployed federal workers is paid from U.S. government funds. There is no payroll deduction from a FEMA or other federal employee's wages for UI protection.

## L. Fair Labor Standards Act[143]

The Fair Labor Standards Act prescribes standards for the basic minimum wage and overtime pay, child labor, equal pay, and portal-to-portal activities.[144]

FLSA exempts specified employees or groups of employees from the application of certain provisions; requires government agencies to pay covered employees (who are not otherwise exempt) at least the federal minimum wage and overtime pay of one and one-half times the regular rate of pay; and prescribes penalties for the commission of specifically prohibited acts.

OPM administers the provisions of the FLSA with respect to FEMA employees and other persons employed by a federal agency, except as otherwise provided.[145]

---

[143] The Fair Labor Standards Act Pub. L. No. 75-718 (1938), as amended, is published at 29 U.S.C. §§ 201–219; OPM's FLSA regulations are published at 5 C.F.R. Part 551, §§ 551.101–551.710.

[144] "Section 3(e)(2) of the Act authorizes the application of the provisions of the Act to any person employed by the Government of the United States, as specified in that section." 5 C.F.R. § 551.102.

[145] 5 C.F.R. § 551.102(a). The U.S. EEOC administers the equal pay provisions contained in § 6(d) of the act. Under the Congressional Accountability Act of 1995, as amended, 5 U.S.C. § 1301, et seq., the U.S. Office of Compliance administers the provisions of the FLSA for employees of the U.S. House of Representatives, U.S. Senate, Capitol Guide Service, Capitol Police, Congressional Budget Office, Office of the Architect of the Capitol, Office of the Attending Physician, and Office of Compliance. The U.S. Department of Labor, Wage and Hour Division, administers FLSA provisions for private employers, state and local governments, the Library of Congress, the United States Postal Service, the Postal Rate Commission, and the Tennessee Valley Authority. 5 C.F.R. § 551.102(b), (c), and (d).

---

### M. Family and Medical Leave Act (FMLA)

The FMLA[146] allows employees to take up to 12 workweeks of unpaid leave during any 12-month period for the following purposes:[147]

- A serious health condition of the employee who makes the employee unable to perform the essential functions of his or her position;

- The care of a spouse, son, daughter, or parent of the employee who has a serious health condition;

- The birth of a son or daughter of the employee and the care of such son or daughter; or

- The placement of a son or daughter with the employee for adoption or foster care.

The rights and the conditions under which an employee can take leave under FMLA depend on the nature of the FEMA appointment and the schedule. Generally, permanent employees with a scheduled tour of duty and employees on temporary appointments not limited to one year or less (typically CORE employees) are covered by OPM regulations published at 5 C.F.R., Part 630, subpart L.[148]

Employees who do not have a scheduled tour of duty (i.e., those on an intermittent duty schedule, such as Reservists) and employees on temporary appointments of one year or less are subject to Department of Labor regulations published at 29 C.F.R., Part 825.[149]

Employee rights and requirements are similar under both regulations. Both sets of regulations require 12 months of service to be eligible for FMLA leave, but the total service does not have to be recent or continuous.

---

[146] 29 U.S.C. § 2601, 29 C.F.R. § 825. Also *see* FEMA Manual 123-10-1, A*bsence and Leave,* (Dec. 29, 2015).
[147] 5 C.F.R. § 630.1203.
[148] 29 C.F.R. § 825.109(a).
[149] 29 C.F.R. § 825.109(b)(3), (4).

For permanent and CORE employees, the service must have been as a permanent or CORE employee. Time in temporary or intermittent service will not count toward meeting the basic eligibility requirement.

Reservist or intermittent employees must have 12 months of service and the employee must have worked for at least 1,250 hours during the previous 12 months prior to the period for which FMLA is to be used. Further, the employee must work at a location in the United States (or one of its territories or possessions) where at least 50 persons are employed by the federal government within 75 miles.

Under certain circumstances, leave taken under the FMLA does not have to be taken all at once or continuously.[150] Employees may elect to substitute annual leave and/or sick leave, consistent with current laws and OPM regulations for using annual and sick leave, for any unpaid leave under the FMLA.[151]

## V.   Employee Misconduct

### A. Required Notifications to the DHS Office of Inspector General

The DHS Office of Inspector General (OIG) operates independent of DHS and all DHS offices. The OIG receives and investigates complaints "concerning the possible existence of criminal or other misconduct constituting a violation of law, rules, or regulations, a cause for suspension or debarment, mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to the public health and safety:[152] DHS MD 0810.1 requires that the following matters be reported to the OIG:

• All allegations of criminal misconduct against a DHS employee;

---

[150]  5 C.F.R. § 630.1204.
[151]  5 C.F.R. § 630.1205.
[152]  *See DHS Management Directive (DHS-MD) 0810.1,* (2004)*, Section VI(A)(6). See also FEMA Manual 123-19-1 Administrative Investigations Policy* (Apr. 5, 2012)*,* https://portalapps.fema.net/apps/policy/Lists/Master_Inventory/DispForm.aspx?ID=215.

---

- All allegations concerning employees at the GS-15 level or higher;

- All allegations against a law enforcement officer of serious, non-criminal misconduct;

- All instances regarding discharge of a firearm that results in death or personal injury or otherwise warrants referral to the Civil Rights Criminal Division of the Department of Justice;

- All allegations of fraud by contractors, grantees, or other individuals or entities receiving DHS funds or otherwise engaged in the operation of DHS programs or operations;

- All allegations of visa fraud by DHS employees working in the visa issuance process; and

- Allegations against individuals or entities that do not fit into the categories identified here if the allegations reflect systemic violations, such as abuse of civil rights, civil liberties, or racial and ethnic profiling; demonstrate serious management problems within the department; or otherwise represent a serious danger to public health and safety.[153]

The FEMA OCSO is the primary point of contact with the DHS OIG and regularly refers allegations fitting within the named parameters to the DHS OIG; however, all federal employees are required to refer the allegations shown here and may do so on their own. Until advised by the DHS OIG, investigation into the allegation should not be undertaken by the agency.[154]

---

[153] *Id.* at Appendix A-1.
[154] Exception to DHS OIG required notifications: Criminal activity that occurs on FEMA owned or leased facilities should be immediately reported to the Office of Federal Protective Service (FPS) with concurrent notification to FEMA's OCSO. See 40 U.S.C. 1315 for FPS' operational authority. If the FPS has no police officers or investigators in close proximity to the FEMA property, criminal activity should be reported to local law enforcement with jurisdiction (sheriff, local police, state police), generally by dialing 9-1-1, with separate notifications to FPS and FEMA's OCSO.

All FEMA counsel must refer to the OCC Criminal Misconduct Checklist[155] when they become aware of any allegation of possible criminal misconduct by any FEMA employee. This checklist provides essential instructions for how to respond to, report, and investigate allegations of criminal misconduct.

## 1. Administrative Disciplinary Action

**What happens next?** If the DHS OIG or Office of Federal Protective Service (FPS) decline to investigate reportable misconduct, then the matter is returned to FEMA for whatever administrative action is deemed advisable. FEMA has the right to conduct investigations into alleged employee misconduct issues. [156] The authority to investigate is derived from statutes that authorize discipline for employees.[157]

**Who does the investigation?** Any allegation should be elevated to one or all of the following: OCC Personnel Law Branch (PLB) representative, local Human Capital LER representative, and the Office of Professional Responsibility. Following coordination with appropriate headquarters counterparts, a decision will be made as to who will further investigate the matter. Once complete, any substantiated allegation of misconduct may be subject to administrative disciplinary action.[158]

The Human Capital Division LER at FEMA headquarters, has overall responsibility for ensuring equitable application of employee discipline and compliance with statutory and regulatory requirements in the proposing and effecting of actions.

---

[155] Memorandum from the Chief Counsel, FEMA OCC Criminal Misconduct Checklist (February 28, 2013). https://intranet.fema.net/org/occ/collab/Newsletter/Shared%20 Documents/Of%20Counse%20-%20April%202013/MEMO%20-%20FEMA%20OCC%20 Criminal%20Misconduct%20Checklist%20SIGNED.pdf

[156] *See, e.g.,* 5 U.S.C. § 7106 (a) (authorizing the agency to take disciplinary action against employees).

[157] *See*, for example, 5 U.S.C. § 7503 (authorizing suspensions for 14 days or less against employees [non-SES] for such cause as will promote the efficiency of the service); 5 U.S.C. § 7513 (authorizing suspensions in pay for more than 14 days, reductions in grade or pay, removal, and furloughs of 30 days or less against employees [non-SES] for such cause as will promote the efficiency of the service); and 5 U.S.C. § 7542 (authorizing adverse action against SES employees), *inter alia*.

[158] *FEMA CORE Manual 252-11-1*, Chapter 11 (2015).

---

PLB reviews any adverse employment action upon request and must review those that may result in litigation (e.g., suspensions, terminations, grievances that are going to be arbitrated). PLB represents the agency at formal hearings and appeals.

### B. Administrative Discipline for Stafford Act Employees

The disciplinary/adverse action process is conducted with fairness and integrity as management considers all important factors relevant to employee discipline. All discipline should be discussed with LER prior to implementation to ensure fair application of discipline across the agency. While SAEs are not subject to Title 5 protections, management has the prerogative to consider the following types of discipline:

#### 1. Counseling

The purpose of counseling is to correct behavior or performance problems soon after they occur in order to prevent the need for formal discipline. This would be appropriate where the violation is minor and where the employee has a good record with no prior instance of misconduct (or performance issues, if the violation involves poor performance) and is committed to correcting the problem.

Documentation of the conversation, such as a follow-up email recounting the conversation entitled "Discussion Dated XX" can be provided to the employee and is strongly recommended. At a minimum, the supervisor shall send an email to himself or herself to document the content of the conversation. Such memoranda can be used to demonstrate that the employee was put on notice about the problem and knew of the potential for a harsh penalty if the problem continued. A memorandum documenting the counseling is not to be placed in the employee's official personnel folder (OPF).

#### 2. Reprimand

A written reprimand is the lowest level of formal discipline; it is addressed to the employee and signed by the immediate supervisor (or higher-level supervisor in the chain of command) for repeated lesser infractions or

inadequate performance.[159] It is appropriate for a first offense of misconduct for which written formal discipline is necessary or where counseling and written warnings have not been effective, or were deemed inadequate for the behavior, in preventing continued problems.

The reprimand should, at a minimum: reference previous counseling or other action that was relied on to support the action (if any); advise the employee of any appeal rights, such as—

- the right to file an appeal with the next higher-level supervisor within five workdays after receipt of the reprimand;

- advise of negative consequences for future misconduct; advise of Employee Assistance Program services available to assist with any work-related or personal concerns that may have an impact on performance and/or behavior at work;

- inform the employee of the Alternative Dispute Resolution (ADR) Program and of his or her right to seek counseling with an EEO advisor if he or she believes the reprimand is based on a prohibited factor;

- provide a signature line upon which the employee will acknowledge receipt of the notice of reprimand;

- state whether a copy will be placed in the OPF for a period not to exceed three years; and

- identify the servicing LER specialist to contact for advice and assistance.

### 3. Suspension without Pay (COREs Only)

A notice of suspension is a memorandum on FEMA letterhead, addressed to the employee and signed by the immediate supervisor (or higher-level supervisor in the chain of command), that notifies the employee that he or

---

[159] *Id.*

she is being placed in a non-duty, non-pay status for a serious offense or repeated lesser infractions.[160]

The notice should identify the specific charge(s) with supporting information, regulations, or policies violated; identify the effective date of the action; advise of any applicable appeal rights, such as—

> • the right to appeal the suspension to the next-higher level supervisor within five calendar days of receipt of the notice and of the employee's right to file a grievance under any applicable collective bargaining agreement (if the employee is a bargaining unit employee);
>
> • advise the employee of the right to file a discrimination complaint if the person believes the action is based on a discriminatory factor;
>
> • contain information on the Employee Assistance Program;
>
> • provide a signature line upon which the employee will acknowledge receipt of the notice of suspension; and
>
> • identify the servicing LER Specialist's name and phone number to contact for advice and assistance.

A copy of the notice (signed and dated by the supervisor) and the Request for Personnel Action (SF-52) are forwarded to the LER Specialist. The Specialist codes the SF-52 and forwards it to the Human Resources operations staff for processing

### 4. Termination

A notice of termination is a memorandum on FEMA letterhead, addressed to the employee from the immediate supervisor (or higher-level supervisor in the chain of command). A termination may be appropriate when the facts and supporting information cause the supervisor to conclude that the employee has demonstrated an unwillingness or refusal to conform to

---

[160] *Id.*

acceptable standards of conduct, a lesser penalty would not deter future misconduct, or there is little probability of the employee's rehabilitation.

The notice should include the same items identified in the suspension notice[161] and should advise the employee to return all government property obtained during the period of employment.

If the employee refuses to acknowledge the notice, the supervisor should place a note on the last page to indicate that the notice was given to the employee and the employee refused to acknowledge receipt. Failure to acknowledge receipt has no impact on implementing the decision.

If the notice is mailed, the date should be set so that the effective date is on or around the date of receipt of the notice. Send by overnight mail to ensure prompt delivery and for tracking purposes. The original is given to the employee. A copy of the notice is maintained in the employee relations case file and is not placed in the employee's OPF. The OPF is documented with the Notification of Personnel Action (SF-50).

A copy of the notice (signed and dated by the supervisor) and the SF-52 are forwarded to the LER Specialist. The Specialist codes the SF-52 and forwards it to the HR operations staff for processing. The notice should be given to the employee at or before the effective date of the action.

Termination of an SAE is done by the <u>supervisor of record</u>. For SAEs who regularly deploy, this is often not the temporary duty supervisor; that is, the employee directing the SAE's work on the deployment.

Questions as to the supervisor of record should be answered through LER (National Finance Center database). That supervisor may delegate his or her authority, but the delegation MUST be coordinated prior to the action being taken.

---

[161] *Id.*

### C. Status of the Stafford Act Employee During Investigation into Misconduct

Normally, employees continue to work their regular duties during the time an investigation or facts are being gathered. However, there are times where allegations or work problems are so serious that the employee's continued performance of regular duties or presence at work could be disruptive to the organization and work of other employees. In these situations, the following options are available:

Assign other work to the employee, or place the employee in a non-duty, non-pay status while the investigation/fact-finding is being conducted and until other administrative decisions are made. (FEMA does not place SAEs on paid administrative leave.)

### D. Stafford Act Employees and Appeals from Adverse Administrative Actions

FEMA provides, as noted, a five-day internal appeal to the next higher supervisory level for reprimands, suspensions, and termination actions. COREs are currently expressly or implicitly in four of FEMA's union certifications: Region 2 (express); National Emergency Training Center (NETC) (implicit); Region V (implicit); and Region VII (implicit).

For COREs expressly or implicitly covered by a FEMA union certification, the applicable CBA may contain appeal provisions for disciplinary/adverse actions. Generally, SAEs have no right to appeal to the MSPB. SAEs may, however, file an EEO complaint with FEMA's OER if alleging that a personnel action was taken against the employee based on illegal discrimination.

#### 1. Note about Performance-Based Actions and Stafford Act Employees

When dealing with poor performance that does not involve misconduct, the steps taken, and options vary; SAE supervisors should consult FEMA Manual 255-1-1, *Employee Performance Management Program*. Most performance problems can be resolved through effective communications

---

between the supervisor and employee. The supervisor should take the following steps:

**Counsel Employee:** It is critical that supervisors counsel employees early when their performance is first not at an acceptable level. The counseling session provides the opportunity for the supervisor to clarify job expectations, identify performance deficiencies, and to identify what the employee needs to do to bring performance up to an acceptable level. Document the session and provide the employee with a copy to prevent misunderstandings or mischaracterization of the discussion.

**Monitor performance:** Monitor the employee's performance following the discussion and document the employee's progress toward improving his or her performance.

**Discuss with an LER specialist:** If the employee's performance has not improved subsequent to the initial counseling, the supervisor must discuss the employee's performance deficiencies with the LER specialist to determine (1) whether to remove the employee for substandard performance immediately or (2) whether to provide the employee time to demonstrate improvement and, if so, the length of time to do so.

If the employee fails to improve acceptably, the supervisor can initiate action to demote, reassign, or terminate employment and should ensure that the employee does not receive a within-grade increase prior to the termination's effective date.[162]

### E. Administrative Discipline for Title 5 Employees

Statutory and regulatory due process rules apply to Title 5 employees when taking disciplinary or performance-based actions.[163] During investigations, the same considerations apply as for SAEs in deciding whether or not to assign other work or to make them leave the workplace pending the outcome of the investigation.

---

[162] *Id.*
[163] *See* for example, 5 U.S.C. Chapters 43, 75; 5 C.F.R. Parts 430, 432, 735, and 752.

When the agency terminates or suspends without pay for 15 days or more, Title 5 employees may appeal the matter to the MSPB.[164] If the employee also alleges that the matter is the result of unlawful discrimination, that claim may be added to the grounds for appeal. PLB represents FEMA in MSPB appeals.

### F. Alternative Forums for Appeals

#### 1. Negotiated Grievance Procedure

Employees who are members of a bargaining unit are covered by a negotiated agreement between FEMA and the American Federation of Government Employees (AFGE).[165] These negotiated agreements include grievance procedures that allow employees to challenge management actions and decisions. Employees who receive disciplinary actions may appeal that action using the negotiate grievance procedures, which include the ability to request an arbitration hearing for some cases.

The AFGE is the recognized exclusive representative of the bargaining units comprised of a specified group or groups of FEMA employees whose workplace is FEMA Headquarters; Mount Weather; the NETC; and Regions II, III, IV, V, VII, and IX. Members of the recognized bargaining unit generally do not include part-time, temporary, or intermittent employees and consist of PFTs only.[166]

#### 2. Administrative Grievance System

Under FEMA Manual 256-3-1, the Administrative Grievance System, suspensions without pay of 14 days or less, other personnel actions, and any matter of employee concern or dissatisfaction for which personal relief is possible and is subject to the control of FEMA management may be grieved

---

[164] These are not the only personnel actions that can be appealed to the MSPB by Title 5 employees; however, they are the most commonly appealed actions in FEMA. See 5 C.F.R. Part 1201.
[165] *Collective Bargaining Agreement between FEMA and AFGE* (Dec. 5, 2016), https://www.afge.org/globalassets/documents/cbas/l4060---fema-contract.pdf.
[166] As noted, COREs at NETC and regions II, V, and VII are covered by the CBA.

by Title 5 employees who are not covered by a negotiated agreement's grievance procedures.[167]

The Administrative Grievance System does not cover SAEs;[168] is not available for grievances of reprimands or suspensions for 15 calendar days or more;[169] and, for bargaining unit employees, may be preempted by a negotiated grievance procedure.

### 3. FEMA Equal Rights Office

All employees may file complaints alleging that personnel actions were the result of unlawful discrimination. However, once a formal complaint has been filed, the employees may not also file the same complaint at the MSPB.[170] Employees cannot bring new complaints for matters raised in formal grievance procedures or negotiated in ADR.[171]

Individuals who believe they were the victim of discrimination must consult an OER counselor prior to filing a complaint in order to try to informally resolve the matter.[172] OER contact must be initiated within 45 days of the alleged discriminatory act.[173] Accepted allegations of discrimination are investigated by the agency pursuant to EEOC guidelines.[174] After an investigation is completed, employees may elect to have their claims heard by an EEOC administrative judge or request an immediate decision based on the investigative report by the DHS Division of Civil Rights and Civil Liberties.[175]

---

[167] FEMA Manual 256-3-1, Administrative Grievance, Section 1-2 (Sept. 2014).
[168] *Id.*
[169] For a list of all issues not covered by the administrative grievance system, see Id., Chapter 2 2 (b).
[170] 29 C.F.R. § 1614.107.
[171] *Id.*
[172] *Id.* at § 1614.105(a).
[173] *Id.*
[174] 29 C.F.R. § 1614.108.
[175] *Id.* at § 1614.110.

### G. Alternative Dispute Resolution (ADR)

Alternative Dispute Resolution (ADR) refers to a broad range of organizational, conflict management methods that eschew traditional approaches, such as litigation and formal administrative venues, in favor of less expensive and more expeditious techniques. ADR options for dispute resolution include conflict coaching, facilitated group work, and mediation.

ADR also encourages conflict prevention measures, such as team building, conflict management training, assessments, and informal listening and problem solving. ADR can promote workplace communication, readiness, and resiliency because it can be used to do the following:

- Build and maintain professional relationships;

- Work with individual employees and/or groups to bolster engagement, trust, and motivation;

- Increase the capacity of all employees to manage and reduce the sources of conflict at the lowest possible level;

- Learn about, appreciate, and capitalize on different perspectives;

- Advance a high-quality work environment where employees feel valued;

- Multiply skill competencies and use work challenges as opportunities to excel;

- Help create and develop best practices to foster success, integrity, honesty, and accountability; and

- Enhance the operation of FEMA and better serve the public.

ADR is simple and effective. Participation in an ADR process generally does not prevent parties from pursuing a formal grievance or complaint process if no agreement is reached. Deadlines for initiating a formal

---

grievance, an administrative claim (such as EEO and MSPB claims), or a lawsuit are not tolled when parties choose ADR.[176] Processes are generally confidential to encourage frank discussions. Certain information such as sexual harassment, threats of harm to self or others, fraud, or criminal acts, however, may have to be disclosed.

## VI.  Official Travel – Entitlement to Per Diem (Lodging, Meals, and Incidental Expenses)

Federal employees may be entitled to per diem while on official travel.[177] The per diem allowance is an established daily amount intended to provide for an employee's daily lodging and meal and incidental expenses while in travel status. The Federal Travel Regulations and agency policies define employee eligibility for the per diem allowance.[178]

### A. Conditions Precedent for Per Diem

FEMA Directive 126-2 provides that a FEMA employee is eligible for a per diem allowance when all of the following conditions have been met:

- Per diem has been authorized on the travel authorization by an Approving Official; and

- The employee is performing official travel at least 50 miles from his or her permanent duty station and his or her residence of record; and the employee has been in a travel status for more than twelve hours.[179]

---

[176] *See, e.g.*, Int'l Union of Elec. v. Robbins & Myers, 429 U.S. 229 (1976) (holding that use of an alternative procedure or forum other than the EEOC to resolve or pursue remedies under Title VII of the Civil Rights Act does not toll the time limit for contacting an EEO counselor); See also *Stewart v. Memphis Hous. Auth.*, 287 F. Supp. 2d 853 (W.D. Tenn. 2003); See also *Pearson v. Napolitano*, 2012 U.S. Dist. LEXIS 30707 (E.D. La. 2012).
[177] 5 U.S.C. § 5702.
[178] 41 C.F.R. Subtitle F (Federal Travel Regulation System).
[179] FEMA Travel Manual 22-1-1, Chapter 4 (Sept. 23, 2015); 41 C.F.R. § 301-11.1.

---

---

**Examples: Determining Entitlement to Per Diem**

The following examples illustrate the application of the rules under the Federal Travel Regulations, DHS Financial Management Policy Manual, and FEMA Directive No. 126-2 for determining whether a FEMA employee is entitled to per diem.

***Example 1 – Travel Time Is Less Than 12 Hours:*** A FEMA employee assigned to Region I uses a fleet vehicle to travel to a JFO in New Hampshire that is 75 miles away from the Regional Office in Boston, Massachusetts. The employee departs from the Regional Office at 8 a.m., arrives at the location at 9:30 a.m., conducts a two-hour meeting, departs at 11:30 a.m., and returns to the Regional Office at 1 p.m. In this case, the employee is ineligible for per diem, as the employee was not in a travel status for at least 12 hours.[180]

***Example 2 – Determining Distance to Temporary Duty Location:*** A FEMA employee assigned to the FEMA Region I Regional Office in Boston, Massachusetts, travels with a privately-owned vehicle to a JFO in Connecticut. The employee will be in a travel status for more than 12 hours, the Approving Official has authorized per diem in the travel orders, and the employee's residence is more than 50 miles from the JFO. Furthermore, the JFO is 55 miles away from the Regional Office as shown in a standard highway mileage guide, but only 48 miles in straight-line distance from the Regional Office. Per diem would be appropriate in this case, as the Federal Travel Regulations provide that if an employee travels via privately owned automobile, the distance between the point of origin and the destination is as shown in paper or electronic standard highway mileage guides, or the actual miles driven as determined from odometer readings.[181] In this case, that distance is 55 miles.

***Example 3 – Complimentary Meals at Hotel:*** A FEMA employee is on official travel and staying at a hotel that offers complimentary free breakfast. In this case, FEMA will not reduce the amount of per diem. The Federal Travel Regulations provide that a complimentary

---

[180] 41 C.F.R. §§ 301-11.7
[181] *Howard L. Magnas - Per Diem Allowance -- Meals Furnished at Conference,* B-231703 (Oct. 31, 1989).

meal provided by a hotel/motel does not affect an employee's per diem.[182]

### Example 4 – Inclement Weather Precluding the Return Trip Home from the Temporary Duty

*Location:* A FEMA employee from the Regional Office in Boston, Massachusetts, had been on a 2-month deployment to Texas and returned to Boston via a scheduled flight from Dallas. Unfortunately, Boston was experiencing a heavy blizzard at the time with over three feet of snow and heavy icing. Soon after landing, the Governor of Massachusetts issued a travel ban, and it was not possible for the employee to make it back safely to his home north of Boston. There were no taxis available at the airport; busses, the subway, and trains had suspended service. Since there was no safe way possible to get home due to the lack of transportation and dangerous road conditions, the only option was to secure a hotel room located near the airport.

In this case, reimbursement for the one-night hotel would be permissible, even though the employee is from the Regional Office in Boston and located within the official station. The regulation at 41 C.F.R.§ 301-11.9 provides that an employee's per diem or actual expense entitlement starts on the day the employee departs his home, office, or other authorized point and ends on the day the employee returns to his home, office, or other authorized point. Here, the employee's per diem allowance had not ceased simply because his airplane had touched the ground at the Boston airport, and the weather conditions prevented his return to his home until the next day. Under the regulation, he is entitled to per diem reimbursement until the day he was able to return to his home, which was the authorized point of departure under his travel authorization.[183]

---

[182] FEMA Travel Manual 122-1-1, Chapter 4, Per Diem and Miscellaneous Travel Expenses, (September 23, 2015). ("Employees unable to secure accommodations in the locality specified on their approved TA must find lodging at an alternate location. However, the per diem allowance will remain consistent with that of the original location shown on the approved TA. For circumstances beyond an employee's control, see Section III(E)(2)").

[183] *Id.* at Sections III(C)(1)(b) and III(E)(2).

This is unlike the situation where an employee is on official travel and reaches his official station but, on his own, elects to take a hotel room rather than driving home even though it is possible to continue.[184] This is also distinguishable for those cases where employees were never on official travel that took them away from their duty stations.[185]

### B. Determining Maximum Per Diem Allowance

The Federal Travel Regulations provide that a temporary duty (TDY) location determines the maximum per diem rate.[186] If lodging is not available at a TDY location, then the Federal Travel Regulations allow FEMA to authorize or approve the maximum per diem rate for the location where lodging is obtained.[187]

FEMA Directive No. 126-2 provides that employees unable to secure accommodations in the locality specified on their approved travel authorization must find lodging at an alternate location, but that the per diem allowance will remain consistent with that of the original location shown in the travel authorization.[188]

Notwithstanding this general policy, an employee may—in the case where the only available lodging is in a different locality with a higher per diem and federal room rate—request to be reimbursed for his "actual expense" for the increased cost of lodging.[189]

---

[184] Bureau of Indian Affairs -- Procurement of Lodgings and Meals for Employees on Temporary Duty, B-195133 (Jan. 19, 1981). http://archive.gao.gov/lglpapr2pdf12/114194.pdf.

[185] *Howard L. Magnas - Per Diem Allowance – Meals Furnished at Conference*, B-231703 (Oct. 31, 1989).

[186] FEMA Chief Financial Officer Bulletin 152, *Shared Lodging for Disasters or Other Unique Requirements* (Oct. 31, 2012); *Laurie S. Meade, Jr. – Official Travel – Per Diem – Shared Lodgings*, B-222155 (Jul. 25, 1988).

[187] Chief Financial Officer Bulletin 152; FEMA Travel Manual 122-1-1, Chapter 4, *Per Diem and Miscellaneous Travel Expenses* (Sept. 23, 2015) Section III(G)(5)(a); 41 C.F.R. § 301-11.13; Chief Financial Officer Bulletin 152.

[188] *Howard L. Magnas – Per Diem Allowance – Meals Furnished at Conference*, B-231703 (Oct. 31, 1989).

[189] *Id.*; Savings and Loan Examiners, B-198008 (Sept. 17, 1980).

---

The cost for meals may be provided by direct procurement by FEMA in lieu of a per diem allowance.[190] If meals are provided directly by FEMA, the traveler must deduct the value of these meals from his or her per diem allowance when submitting travel vouchers.[191]

The employee will also not normally be reimbursed for alternate meals where the government directly provides meals unless the employee is unable to consume the government provided meal for bona fide reasons that transcend personal taste or choice, such as medical requirements or an employee's religious beliefs.[192]

## C. Double and Triple Occupancy

FEMA has the responsibility and the discretionary authority to reduce a per diem allowance rate to an amount less than the maximum authorized when warranted by the circumstances affecting the travel.[193] Under an emergency or major disaster or other unique requirements, FEMA may determine that there is an operational need to maximize available billeting for FEMA response and other personnel, and which may require FEMA employees to share lodging accommodations (i.e., double and triple occupancy).[194]

FEMA employees sharing a room at double or greater occupancy will be limited to reimbursement of one-half or appropriate share of the double or greater occupancy rate (e.g., those with triple occupancy will be limited to a third of the rate).[195]

---

[190]  FEMA Chief Financial Officer Bulletin; *Laurie S. Meade, Jr. – Official Travel – Per Diem – Shared Lodgings*, B-222155 (Jul. 25, 1988).

[191]  Chief Financial Officer Bulletin 152; FEMA Travel Manual 122-1-1, Chapter 4, *Per Diem and Miscellaneous Travel Expenses*, (September 23, 2015) III(G)(5)(a); 41 C.F.R. § 301-11.13.

[192]  Chief Financial Officer Bulletin 152.

[193]  *Howard L. Magnas – Per Diem Allowance – Meals Furnished at Conference,* B-231703 (Oct. 31, 1989).

[194]  *Id.; Savings and Loan Examiners*, B-198008 (Sept. 17, 1980).

[195]  *Chief Financial Officer Bulletin 152; FEMA Travel Manual 122-1-1, Chapter 4, Per Diem and Miscellaneous Travel Expenses,* (September 23, 2015) III(G)(5)(a); 41 C.F.R. § 301-11.13.)

The following comprise the guidelines from the FEMA Chief Financial Officer for shared lodging:

- Authorizing officials should issue travel authorizations that specifically enumerate the requirement for shared lodging.

- Shared lodging arrangements must be same sex.

- Employees should be given the opportunity to select their shared lodging partner(s) as practical.[196]

FEMA is not required to establish identical maximum expense reimbursement rates for different employees performing the same or similar travel assignments, but reimbursement rates should be reasonably fixed under uniform policies applicable to all employees.[197] As such, FEMA authorizing officials may exempt an employee from shared lodging for reasonable cause on a case-by-case basis (such as a medical problem).[198]

---

**Example: Double Occupancy**

A catastrophic hurricane impacts the State of New York, causing widespread devastation and flooding. The President declares a major disaster and the FCO establish a JFO near New York City. To support response and recovery efforts, FEMA activates 500 Disaster Reservists to work out of the JFO.

Due to the paucity of lodging accommodations and size of the response and recovery effort, FEMA reduces the per diem rate by one-half and requires all Disaster Reservists to have double occupancy with another Disaster Reservist, placing such a requirement in the travel authorization.

Disaster Reservist Joe decides not to share hotel accommodations as a matter of personal preference and seeks a higher per diem rate on the basis of the theory that the shared lodging policy is invalid. The FCO properly denies the claim.

---

[196] *Chief Financial Officer Bulletin 152.*
[197] *Howard L. Magnas - Per Diem Allowance -- Meals Furnished at Conference,* B-231703 (Oct. 31, 1989).
[198] *Id.*; Savings and Loan Examiners, B-198008 (Sep. 17, 1980).

**D. Dual Lodging**

In special and unusual circumstances, employees may require reimbursement for dual lodging while on official travel.[199] Dual lodging may occur when an employee has obtained lodging at two different lodging locations on the same day. For example, dual lodging may occur when an employee is on official travel at a TDY location (primary worksite) and, due to mission requirements, is required to travel to a second TDY location (secondary worksite).

If an employee has lodging at his or her primary worksite and is unable to check out of the primary worksite lodging without incurring substantial cost or penalties, the employee may be reimbursed for lodging at the primary worksite in addition to lodging at the secondary worksite. Dual lodging requires specific authorization.

---

**Examples: Dual Lodging**

***Example of Permissible Dual Lodging:*** A FEMA employee is on official travel to JFO (primary worksite) in City Y. Due to mission requirements, he is directed by his supervisor at 5 p.m. to travel to a second TDY location in City Z (second worksite is 100 miles away from the JFO). The employee checks out of his primary worksite lodging after being notified of the need to travel to City Z, but the deadline for cancelling the room was 4 p.m. and the employee must pay for the daily rate. The employee checks into lodging at the secondary worksite. In this case, the FCO may authorize dual lodging.

***Example of Impermissible Dual Lodging:*** A FEMA employee is on official travel to a JFO (primary worksite) in City Y. This employee is also a member of the Regional IMAT and scheduled to go on official travel to participate for a week-long training event in Washington, DC (second worksite), where he will incur additional lodging expenses. Following the week of training, he will return to the JFO.

---

[199] *Id.; Savings and Loan Examiners*, B-198008 (Sep. 17, 1980).

> The employee requests to keep his primary worksite lodging during the week's exercise to avoid the inconvenience of checking out of his primary worksite lodging and storing his personal items at the JFO while he is away for a week. Based on this information, the Disaster Recovery Manager may not authorize dual lodging.

### E. Staying at a Second Home or with a Family or Friend While on Official Travel

The per diem allowance for employees on official travel and lodging in a private residence will depend upon whether the residence is owned by the employee, owned by a friend or relative of the employee, or owned by neither the employee nor a friend or relative.

A FEMA employee otherwise eligible for a per diem allowance that chooses to lodge at his privately-owned secondary residence is eligible for the meals and incidental expenses (M&IE) portion of his per diem entitlement but is not eligible for any lodging costs.[200] The agency, however, cannot mandate that an employee lodge in a privately-owned secondary residence.[201]

A FEMA employee otherwise eligible for a per diem allowance that chooses to lodge at the residence of friends or relatives may be reimbursed lodging expenses for additional costs the host incurs in accommodating the employee only if the costs can be substantiated

---

[200] 41 C.F.R. § 301-11.12(b)(1) ("You will not be reimbursed for any lodging expenses for staying at your personally-owned residence or for any real estate expenses associated with the purchase or sale of a personal residence at the TDY location…"); *Neil I. Messer*, GSBCA 16975-TRAV, 16988-TRAV, 2007-1 B.C.A. (CCH) P33, 454 (Nov. 29, 2006) ("Our conclusion is consistent with those cases holding that when an employee travels on TDY and stays in a house the employee owns at the TDY location, the employee is entitled to at least the M &IE portion of the per diem allowance.").

[201] *Daniel Brady*, GSBCA No. 16580-TRAV, 2005-1 B.C.A. (CCH) P32, 908 (Feb. 22, 2005) ("We are aware of no authority that would permit an agency to require an employee to stay with friends, relatives, or even at a second residence in order to lower TDY costs.").

and FEMA determines them to be reasonable.[202] In such instances, the additional costs must be substantiated (with receipts) and authorized by the FEMA approving official.

Should the employee claim that lodging at a private source was not secured as a result of a personal relationship, but a commercial transaction, it is incumbent upon the employee to establish that the lodging was secured as a result of genuine business transaction).[203] The best evidence that noncommercial lodging was procured through an arms-length business transaction is the demonstration of a continuing practice of the homeowner renting the room for an established price.[204]

---

**Example: Disaster Reservist Staying at Residence within 50 Miles of the Worksite**

A Disaster Reservist maintains two residences in Massachusetts, one in Cape Cod and one in Springfield. The Springfield address is her mailing address and her address in FEMA's files. Following a Presidential declaration for a severe storm, the Disaster Reservist is deployed to Greenfield, Massachusetts, to perform duties at a JFO. While working in Greenfield, the Disaster Reservist lives in her Springfield residence, which is 38 miles from Greenfield.

---

[202] 41 C.F.R. § 301-11.12(a)(3) ("You may be reimbursed for additional costs your host incurs in accommodating you only if you are able to substantiate the costs and your agency determines them to be reasonable. You will not be reimbursed the cost of comparable conventional lodging in the area or a flat "token" amount."); *Javier R. Hernandez*, GSBCA No. 15338-TRAV, 2000-2 B.C.A. (CCH) P31,139 (Oct. 11, 2000); *Robert J. Gofus - Reimbursement for Noncommercial Lodging*, B-223805 (Mar. 20, 1987); *Jerome R. Serie*, B-219477 (Feb. 11, 1986); *Decision of the Comptroller General*, B-193382 (Feb. 16, 1979)..

[203] *Theresa E. Kanter*, GSBCA No. 16770-TRAV, 2006-1 B.C.A. (CCH) P33,224; 2006 GSBCA LEXIS 32 (Feb. 24, 2006) ("the underlying concern when an employee secures lodging from a private source is 'whether the expenses claimed were actually spent for the lodgings or were merely transfers of money arranged for the purpose of supporting a claim against the Government and thereby enriching both the employee and the host'" *citing Guy E. Mercier*, GSBCA No. 13795-RELO, 97-1 B.C.A. (CCH) P28,925; 1997 GSBCA LEXIS 85 (Mar. 20, 1997)).

[204] *Id.; Jerome R. Serie,* B-219477 (Feb. 11, 1986); FEMA Directive 126-2, 2626 Section III(G)(4).

> The Disaster Reservist asserts that her primary residence is on Cape Cod (which is more than 50 miles from Greenfield) and requests per diem. If not approved, she alternatively requests that FEMA approve her daily transportation expenses to travel back and forth between her residence in Springfield and the JFO in Greenfield.
>
> FEMA appropriately denies both requests. First, the employee is not entitled to per diem, as she is staying at her primary residence as listed in FEMA files, and this location is within 50 miles of the JFO in Greenfield. Second, the employee is not entitled to local travel reimbursement, as Disaster Reservists are not entitled to travel reimbursement for the costs to commute back and forth from the JFO if they live within 50 miles of the JFO.[205]

## F. Actual Expenses

"Actual expense" reimbursement is an authorized payment of actual expenses incurred by an employee while on official travel that may occur when special or unusual circumstances beyond the employee's control preclude an employee from obtaining lodging and/or M& IE using the established per diem rate.[206] The Federal Travel Regulations and FEMA policy provide that actual expense reimbursement is warranted when—

- lodging and/or meals are procured at a prearranged place such as a hotel where a meeting, conference,[207] or training session is held; or

- costs have escalated because of special events (e.g., missile launching periods, sporting events, World's Fair, conventions, natural or manmade disasters); lodging and meal expenses within prescribed allowances cannot be obtained nearby; and costs to commute to/from the nearby location consume most or all of the savings achieved from occupying less expensive lodging.

---

[205] *In re Facchini*, CBCA No. 2861-TRAV, 2012 CIVBCA LEXIS 261 (Oct. 4, 2012).
[206] 41 C.F.R. § 300-3.1.
[207] FEMA policy is that, in the event of a conference, conference planners may authorize attendees an additional 25% over the established per diem rate for the location of the conference. The approval for the increased rate must be noted on the TA and supported by a conference itinerary. FEMA Travel Manual 1221-1.

The TDY location is subject to a presidentially declared disaster and FEMA has issued a blanket actual expense authorization for the location—

- because of mission requirements; or

- reasons justified and approved by the FEMA approving official and/or FEMA Chief Financial Officer.[208]

The appropriate FEMA approving official may approve actual expenses up to 150 percent of the established per diem rate, and the FEMA Chief Financial Officer may approve actual expenses greater than 150 percent and up to 300 percent.[209] FEMA does not have the authority to increase the approval amount above 300 percent of the established per diem rate.[210]

A FEMA employee must request actual expense reimbursement on the travel authorization before travelling, and a FEMA approving official must authorize the actual expense reimbursement before travel commences.[211]

The FEMA approving official must document the reasons for actual expense reimbursement, and the documentation must show that multiple hotels were contacted (i.e., the names and rates at each hotel) and that no lodging was available within the approved federal government rate.[212]

If an employee has already commenced travel and special and unusual circumstances exist that require actual expense reimbursement, the employee must obtain written approval from the FEMA approving official and file an amended travel authorization after approval is complete.[213]

---

[208] 41 C.F.R. § 301-11.300; FEMA Travel Manual 1221-1.
[209] FEMA Travel Manual 1221-1.
[210] *Id.;* 41 C.F.R. § 301-11.303; FEMA Travel Manual 1221-1.
[211] *Id.*
[212] *Id.*
[213] *Id.*

If an employee is authorized to use actual expense reimbursement, an employee has certain itemization and documentation requirements set forth in FEMA Travel Manual 122-1-1.

---

**Example: Actual Expense**

FEMA is operating a JFO in Town, Vermont, to coordinate the response and recovery efforts to a flooding event for which the President declared a major disaster under the Stafford Act. Approximately 50 Disaster Reservists assigned to the JFO are staying at the Marlon Residence Hotel and began their stay approximately 30 days ago when the JFO first opened. In the coming week, there will be a large golf tournament in town, which has caused the Marlon Residence Hotel to raise its rates significantly so that there are no rooms available at the federal lodging rate.

The FEMA staff does not want to move out of the Marlon Residence Hotel and requested that the FCO approve "actual expenses." The actual expense request would involve an increase from the federal lodging rate of $85 to a daily rate of $150 for the seven days of the golf tournament.

The FCO calls National Travel and requests a hotel survey of available hotels in the commuting area of the JFO. National Travel completes the survey and informs the FCO that there are more than 50 available rooms in the commuting area at the federal rate of $85. Based on this information, the FCO properly denies the request for actual expenses.

---

### 1. Emergency Lodging

Under certain, extremely rare circumstances, FEMA may use appropriated funds to pay an employee's expenses for lodging within the employee's official station despite the general prohibition against paying such expenses. Such payments for lodging can only be authorized in extreme emergencies that meet the following conditions:

- The President has declared or is expected to imminently declare an emergency or major disaster under the Stafford Act in the

---

      geographical area where an employee performs Stafford Act
      response duties;

- The emergency or major disaster presents an immediate threat to
  life and property, and FEMA is carrying out its statutory response
  authorities under the Stafford Act to address those threats;

- The employee's physical presence at the duty location is essential
  for FEMA operations necessary to respond to the emergency or
  major disaster; and

- Extreme conditions render it impossible or perilous for the
  employee to travel between his or her home and place of duty,
  raising significant risk that the employee would not be able to
  return to the place of duty after returning home.

If all of the foregoing conditions are present, the Associate Administrator
for Response and Recovery (or Deputy), the Assistant Administrator for
Response (or Deputy), or the applicable Regional Administrator (or Deputy)
may authorize emergency lodging by issuing a written authorization
that certifies the presence of the emergency conditions and identifies the
employees for whom lodging is authorized. The official who issued the
authorization must review and reassess the authorization every 24 hours.

Authorizations for emergency lodging must not exceed the minimum cost
necessary to sustain response operations and must not extend beyond the
duration of the emergency conditions.

FEMA's procedures for approving emergency lodging are based, in large
part, on a Comptroller General decision in a case involving the question of
"whether it is appropriate for [FEMA] to reimburse, from the President's
Disaster Relief Fund, the hotel costs of 17 workers whose services were
essential to performing urgent disaster relief duties pursuant to the Stafford
Act."[214]

Under the facts of the case, the President had declared a major disaster for
the District of Columbia and Maryland on January 11, 1996, due to winter

---

[214] *In re Carey,* B-271666, 1996 U.S. Comp. Gen. LEXIS 235 (Apr. 24, 1996).

storms, and five other disaster declarations were imminent for winter storms in other states. Another severe storm was predicted to begin later in the day on January 11. Because of the ongoing and imminent disaster response activity, the FEMA Director determined that it was essential for FEMA's response activities to continue through the night of January 11 and into the next day.

The FEMA Director, activated the then Emergency Support Team at midday on January 11 to serve as the federal government's mechanism for coordinating the entire federal government's response to the severe winter storm, which was predicted to begin later on January 11. The challenge FEMA faced was that the winter storm conditions would have prevented 17 members of the 30-member Emergency Support Team from returning to duty at FEMA headquarters if they went home between duty shifts.[215] FEMA's solution was to authorize those 17 employees to obtain lodging at a hotel adjacent to FEMA headquarters.

In reviewing the matter, the Comptroller General decided that the particular facts of this situation warranted an exception to the general prohibition against payment from appropriated funds of an employee's lodging expenses at the employee's official station.[216]

The Comptroller General found that, under the particular circumstances of a major winter storm disaster with immediate danger to life and property, FEMA could reasonably determine that providing lodging for these 17 Emergency Support Team members was necessary to fulfill disaster relief duties because those employees were essential disaster workers, and it would have been impossible for them to travel through the winter storm from home to their duty station.[217] Thus, the FEMA Director could provide lodging near FEMA headquarters for those employees for the night of the storm.[218]

---

[215] The remaining 13 members of the Emergency Support Team reportedly had access to four-wheel-drive vehicles that allowed them to traverse the snow-covered roads or lived near the Washington metropolitan area's underground subway stations such that they could commute to FEMA headquarters relatively unimpeded. *Id*. at \*3-4.

[216] *Id.* at \*5-7

[217] *Id.* at \*6-7

[218] *Id.*

FEMA's Travel Policy Manual, FEMA Manual 121-1-1, Chapter 7, "Emergency Food & Lodging," describes FEMA's policy and procedures for providing emergency lodging and emergency food for employees directly supporting FEMA's response to emergencies or major disasters declared by the President pursuant to the Stafford Act and for providing an allowance to reimburse employees for any lodging and food costs they incur directly. [219]

---

**Examples: Emergency Lodging**

*Example of Impermissible Use – Employee Fatigue*. The Regional Administrator has activated the FEMA Region I Regional Response Coordination Center (RRCC) to Level I to coordinate the federal response to severe storms and tornadoes which impacted two counties in western Massachusetts and for which the President declared an emergency under the Stafford Act.

The RRCC is located in Maynard, Massachusetts, which is less than 50 miles from the Regional Office in Boston and is in the eastern portion of the state in an area unaffected by the severe storms and tornadoes. Many of the employees staffing the RRCC live more than 50 miles from the RRCC and are working 12-hour shifts, which has raised concerns over employee safety in travelling back and forth from their residences and the RRCC because of fatigue.

Emergency lodging would be not appropriate, as there are not conditions rendering it impossible or perilous for the employees to travel between their home and the RRCC, and the conditions do not raise a significant risk that the employees would be unavailable to perform emergency response duties. The fact that an employee is fatigued from working long hours is not sufficient by itself to meet these elements.

*Example of Permissible Use – Designated Watch Employee*. The Regional Administrator has activated the FEMA Region I RRCC to Level I to coordinate the federal response to a hurricane that is currently impacting Massachusetts and for which the President has declared an emergency under the Stafford Act. As part of this activation, the Regional Administrator deployed the Regional IMAT

---

[219] M 121-1-1, Travel Policy Manual

> to the Massachusetts Emergency Operations Center in Framingham, Massachusetts, which is also within 50 miles of the Boston Regional Office.
>
> The IMAT's presence at the Massachusetts Emergency Operations Center is necessary for FEMA to perform statutorily required disaster response and relief duties, and these duties are directly related to the protection of lives and property from imminent danger and directly support RRCC activation.
>
> The presidentially declared emergency—a hurricane—impacts the area of the IMAT members' duty station and presents an immediate threat to life and property. To the extent that the hurricane conditions render travel between the IMAT members' homes and duty station impossible or perilous, the Regional Administrator could reasonably determine that all conditions necessary for emergency lodging have been met and approve emergency lodging for the affected IMAT members.

## 2. Delay or Interruption of Personal Travel Plans

There can be situations where the need to perform official duties causes delays or cancellation of personal travel plans and results in increased personal travelling expenses to the employee. In these cases, there is no legal basis for FEMA to reimburse those additional costs.[220]

## VII. Making Travel Reservations

The Federal Travel Regulations require federal employees to "use the eTravel Service when your agency makes it available to you. Until then, you must use your agency's existing Travel Management Service (TMS) to make your travel arrangements." [221]

The Federal Travel Regulations also provide that, where an employee fails to use either the eTravel Service or its agency's TMS, he or she will

---

[220] *Alexander Baumgarten, M.D.*, B-252599 (Aug. 5, 1993); *Matter of Rod W. Schmit*, GSBCA No. 16146-TRAV, 2004-1 B.C.A. (CCH) P32,422 (Aug. 6, 2003).
[221] 41 C.F.R. § 301-50.3.

---

have to bear responsibility for any additional costs,[222] including service fees, cancellation penalties, or other additional costs (e.g., higher airfares, rental car changes, or hotel rates). For FEMA employees, this means making lodging and other travel reservations through the Concur travel system or FEMA Travel Management Center (TMC).[223]

---

**Examples: Liability of Employee That Does Not Use Concur or TMC**

An employee assigned to Region I Regional Office in Boston is ordered to deploy to a JFO in New Hampshire, which is more than 50 miles from both his home and the Regional Office. Upon receiving the order, he asks an employee from the Regional Office's Mission Support Division whether he needs to make the reservation through Concur or TMC, and the employee tells him that this is not required. Based upon this representation, the employee calls a hotel near JFO and makes a reservation but does not make the reservation through Concur or the TMC.

At 8:00 a.m. on the date of scheduled departure, he drives to the JFO (which was approved under the travel authorization). Upon arrival at the hotel later that evening, the federal employee discovers that the hotel has raised the rates above the federal per diem rate, as the room was not reserved through Concur or the TMC.

The employee, in turn, checks out of his room the next day and into another hotel where he could obtain the federal rate. He requests reimbursement for his lodging expenses on the first night that exceeded the federal lodging rate.

FEMA properly denied the request because the employee did not schedule the travel through Concur or TMC.[224] It makes no difference that the employee detrimentally relied upon the erroneous advice from the employee in the Mission Support Division.

---

[222] *Id., FEMA Travel Manual* 122-1-1 (Sept. 23, 2015).

[223] *Nicholas Kozauer*, CBCA No. 2525-TRAV, 2011 CIVBCA 335 (Dec. 20, 2011).

[224] 26 U.S.C. § 162(a); 26 C.F.R. §§ 1.262-1 and 1.262-2. A taxpayer's abode in a "real and substantial sense" is a residence where the taxpayer maintains certain personal and business connections; Rev. Rul. 73-529, 1973-2 C.B. 37.

### VIII. Tax Implications of Travel Expenses Reimbursement and Per Diems

#### A. Overview of the Applicable Law Regarding the Reimbursement of Travel Expenses

FEMA employees, especially Reservists, are often required to deploy far from home for significant periods of time. For the purposes of Section 162(a)(2) of the Internal Revenue Code, a taxpayer's "home" is generally considered to be located at (1) the taxpayer's regular or principal (if more than one regular) place of business, or (2) if the taxpayer has no regular or principal place of business, then at the taxpayer's abode in a real and substantial sense.[225]

If the taxpayer comes within neither of these categories, then the taxpayer is considered to be an itinerant whose "home" is wherever the taxpayer happens to work.[226] Generally, an employee's regular work location is a location at which the employee works or performs services on a regular basis, whether or not the employee works or performs services at that location every week or on a set schedule.[227]

A taxpayer may be away from home on a temporary, as opposed to an indefinite or permanent, work assignment away from the taxpayer's regular or principal place of employment.[228] Employment is temporary for this purpose only if its termination can be foreseen within a reasonably short period of time.

Section 162(a)(2) allows a deduction for ordinary and necessary business expenses, which include travel expenses while away from home in

---

[225] *See* Rev. Rul. 73-529, 1973-2 C.B. 2; Rev. Rul. 60-189, 1960-1 C.B. 60. 3.

[226] *See* Rev. Rul. 90-23, 1990-1 C.B. 28 (obsolete on other grounds by Rev. Rul. 99-7).

[227] *See* Rev. Rul. 54-147, 1954-1 C.B. 51; *Norwood v. Commissioner*, 66 T.C. 467 (1976). In *Norwood*, a welder was employed at a temporary job location for five months and, after that, had multiple jobs at the same site for over a period of two years. The court held that the first assignment was temporary and that the expenses related to that period were deductible. However, once the taxpayer was retained and not let go with the rest of the crew, the job became of indefinite duration, as it was reasonable for the taxpayer to assume that he would be employed there for some time.

[228] *Id.*

pursuit of a trade or business.[229] A taxpayer may be in the "trade or business" of being an employee.[230]

In order to be "away from home," a taxpayer must be far enough away to require sleep or rest.[231] Section 162(a) provides that a taxpayer shall be treated as not being temporarily away from home during any period of employment that exceeds one year.

Revenue Ruling 93-86 holds that, if the employment is realistically expected to last (and does in fact last) for one year or less, the employment is temporary, unless facts and circumstances indicate otherwise. If, at some point during that year, the expectation as to the duration of the employment changes to exceed one year, the employment will be treated as temporary only until the date at which the employee's realistic expectation changes, in the absence of facts and circumstances indicating otherwise. If the employment lasts for more than one year, the employment is not temporary and the taxpayer's tax home has switched to the new location.[232]

Case law regarding whether or not employment is temporary, or indefinite remains relevant for purposes of determining whether employment for periods under one year is temporary. Further, case law determining whether and when the tax home of the taxpayer has shifted to what was termed the temporary location, making the original location no longer the taxpayer's tax home, and whether a series of assignments should be considered as one assignment or separate assignments, remains important.

A taxpayer might be said to change his tax home if there is reasonable probability known to him that he may be employed for a long period of time at his new station. What "constitutes a long period of time varies with circumstances surrounding each case. If such be the case, it is reasonable to expect the taxpayer to move his permanent abode to his

---

[229] 26 U.S.C. § 162(a)(2).
[230] *Id.*
[231] *See Primuth v. Commissioner*, 54 T.C. 374 (1990).
[232] *See United States v. Correll*, 389 U.S. 299 (1967).

new station, and thus avoid the double burden that the Congress intended to mitigate."[233]

The determination of whether a job location is temporary, or indefinite is a question of facts and circumstances. The court looks at such factors as: length of time actually spent away from home; how long the employment is reasonably expected to last; the degree of certainty that it will come to an end in a reasonably short period; the strength of the taxpayer's business, personal, and economic ties with his original home; the extent that the living expenses are duplicated; and the foreseeable economic cost of moving one's home and family to the new location and back again.[234]

Brief interruptions of work at a particular location do not, standing alone, cause employment that would otherwise be indefinite to become temporary.[235]

In *Blatnick v. Commissioner*, the taxpayer had a three-week break due to inclement weather at his remote job site. The court found that the taxpayer's employment was indefinite despite this break and held that his travel expenses were not deductible.[236] The IRS has not published guidance regarding whether, or to what extent, a break in service at a work location will affect the determination that a taxpayer is or is not employed in a single location for one year or less.[237]

An employee's transportation expenses incurred in going between the employee's residence and a work location not involving overnight travel generally are nondeductible personal commuting expenses rather than deductible business expenses.

There are, however, three exceptions to this rule.[238] One of these exceptions is that if a taxpayer has one or more regular work locations away from the

---

[233] *Harvey v. Commissioner*, 283 F. 2d 491, 495 (9th Cir. 1960), *rev'g* 32 T.C. 1368 (1959).

[234] *Blatnick v. Commissioner*, 56 T.C. 1344, 1348; *Id.*

[235] *Id.*

[236] *See Blatnick v. Commissioner*, 56 T.C. 1344, 1348 (1971) (brief interruptions of work at a particular location do not, standing alone, cause employment that would otherwise be infinite to become temporary).

[237] Rev. Rul. 99-7, 1997-5 I.R.B. 4

[238] *Id.*

---

taxpayer's residence, the taxpayer may deduct daily transportation expenses incurred in going between the taxpayer's residence and a temporary work location in the same trade or business, regardless of the distance.