# Exhibit 2

# FEMA MANUAL 252-11-1
# CADRE OF ON-CALL RESPONSE/RECOVERY EMPLOYEE (CORE) PROGRAM
## APPROVAL DATE: 08/25/2015



**DEPARTMENT OF HOMELAND SECURITY**

**FEDERAL EMERGENCY MANAGEMENT AGENCY**

**OFFICE OF THE CHIEF COMPONENT HUMAN CAPITAL OFFICER**

**Corey J. Coleman**
Chief Component Human Capital Officer
Office of the Chief Component Human
Capital Officer
Date: _____5/25/15_____

**Edward H. Johnson**
Chief Financial Officer
Office of the Chief Financial Officer

Date: __8/25/2015__

**David M. Robinson**
Associate Administrator
Mission Support

Date: __Aug 25, 2015__

# Foreword

The Federal Emergency Management Agency (FEMA) intends to achieve business and management excellence by providing guidance and policy direction for the administration of FEMA's Cadre of On-call Response/Recovery Employees (COREs). FEMA's most valuable resource is its workforce; permanent and temporary employees who are focused on and committed to leading America to prepare for, prevent, respond to, and recover from all-hazards incidents. FEMA relies upon its temporary personnel, in particular, to carry out its role in incident management and support operations and to augment FEMA's permanent workforce.

The objective of the CORE Program is to attract and maintain a pool of highly skilled and motivated temporary personnel who are well trained and ready to respond and deliver quality and timely services to survivors and communities impacted by all-hazards incidents. The publication of this Manual will ensure consistent policy application and enable FEMA to better manage COREs in a cost effective and efficient manner, while offering the necessary incentives to recruit a professional incident workforce capable of assisting disaster survivors in their time of greatest need.

## Table of Contents

Foreword ........................................................................................................ 2

**CHAPTER 1: GENERAL INFORMATION** ................................................. 7

1-1.  Purpose .............................................................................................. 7

1-2.  Applicability and Scope ..................................................................... 7

1-3.  Authorities.......................................................................................... 7

1-4.  References ......................................................................................... 7

1-5.  Policy ................................................................................................. 9

1-6.  Definitions........................................................................................ 10

1-7.  Responsibilities................................................................................ 15

1-8.  Reporting Requirement .................................................................... 24

1-9.  Forms Prescribed ............................................................................ 24

1-10.  No Private Right .............................................................................. 24

1-11.  Questions ........................................................................................ 24

**CHAPTER 2: RECRUITMENT AND HIRING** ......................................... 25

2-1.  General............................................................................................. 25

2-2.  Staffing Plans .................................................................................. 25

2-3.  Annual Direct Charge CORE Certification ...................................... 26

2-4.  Procedures for Soliciting Candidates............................................... 27

2-5.  Name Request.................................................................................. 30

2-6.  Interviews ......................................................................................... 30

2-7.  Reference Checks ............................................................................ 31

2-8.  Job Offers ........................................................................................ 31

2-9.  Notification to Applicants ................................................................. 32

2-10.  Recordkeeping Requirements ........................................................ 32

**CHAPTER 3: APPOINTMENTS** ............................................................ 33

3-1.  Eligibility for Appointment ............................................................... 33

3-2.  CORE Appointments ....................................................................... 33

3-3.  Conditions of Employment............................................................... 34

3-4.  Directed Work Location ................................................................... 35

3-5.  Oath of Office .................................................................................. 35

3-6.  Government Property ....................................................................... 35

3-7.  Reassignments to a New Position ........................................................ 36

3-8.  Detail Assignments ............................................................................... 36

3-9.  Reappointment Procedures .................................................................. 37

3-10.  Resignation........................................................................................... 37

**CHAPTER 4: COMPENSATION PROVISIONS** ............................................ 38

4-1.  Applicability........................................................................................... 38

4-2.  Establishment of CORE Pay Plan ........................................................ 38

4-3.  Conversion Actions ............................................................................... 38

4-4.  Position Management and Classification ............................................... 38

4-5.  Locality Pay .......................................................................................... 38

4-6.  Cost of Living Increase ......................................................................... 39

4-7.  Pay Ceilings and Premium Pay ............................................................ 39

4-8.  Recruitment, Relocation, or Retention Incentives................................. 39

4-9.  Offset Provision for Civilian Retirees ................................................... 41

**CHAPTER 5: COMPENSATION (PAY BANDS)** ........................................... 42

5-1.  General.................................................................................................. 42

5-2.  Setting Basic Rate of Pay ..................................................................... 42

5-3.  Pay Adjustments.................................................................................... 43

5-4.  Merit-Based Increase ............................................................................ 43

5-5.  Promotion .............................................................................................. 44

5-6.  Change to a Lower Pay Band................................................................ 44

**CHAPTER 6: COMPENSATION (GRADES AND STEPS)** ........................... 46

6-1.  General.................................................................................................. 46

6-2.  Setting Basic Rate of Pay ..................................................................... 46

6-3.  Pay Adjustments.................................................................................... 47

6-4.  Step Increases....................................................................................... 48

6-5.  Promotion .............................................................................................. 49

6-6.  Change to Lower Grade ........................................................................ 49

**CHAPTER 7: BENEFITS** ............................................................................... 51

7-1.  General.................................................................................................. 51

7-2.  Health Benefits ..................................................................................... 51

7-3.  FEDVIP (Dental and Vision) Program .................................................. 52

7-4.  Life Insurance....................................................................................... 52

7-5.    Retirement ........................................................................................... 52

7-6.    Thrift Savings Plan ............................................................................. 53

7-7.    Federal Long-Term Care Insurance Program ..................................... 53

7-8.    Flexible Spending Accounts ............................................................... 53

7-9.    Employee Assistance Program (EAP) ................................................ 53

7-10.   Transit Subsidy Program ................................................................... 53

**CHAPTER 8: PERFORMANCE MANAGEMENT** ........................................ 55

8-1.    General ............................................................................................... 55

8-2.    Performance Management for CORE-Is ............................................. 55

8-3.    Deployment Performance Management .............................................. 55

**CHAPTER 9: AWARDS AND RECOGNITION** ......................................... 57

9-1.    Awards and Recognition Program ...................................................... 57

**CHAPTER 10: SCHEDULING OF WORK AND TELEWORK** ................... 58

10-1.   Scheduling of Work and Telework ...................................................... 58

**CHAPTER 11: PROCEDURES FOR MISCONDUCT AND POOR PERFORMANCE** .. 59

11-1.   General ............................................................................................... 59

11-2.   Addressing Misconduct ...................................................................... 59

11-3.   Addressing Poor Performance ............................................................ 62

11-4.   Deployment Scenarios ....................................................................... 64

11-5.   Arrest, Indictment, and other Allegations of Misconduct .................... 64

11-6.   The Appeal Process ........................................................................... 66

11-7.   Allegations of Discrimination .............................................................. 66

11-8.   Allegations of Fraud, Waste, Abuse, and Mismanagement ............... 66

**CHAPTER 12: RIGHTSIZING** ................................................................... 67

12-1.   General ............................................................................................... 67

12-2.   Rightsizing Plan ................................................................................. 67

12-3.   Notice ................................................................................................. 68

12-4.   Retention Criteria ............................................................................... 68

12-5.   Transitional Options for Released COREs .......................................... 70

**CHAPTER 13: ABSENCE AND LEAVE** ................................................... 71

13-1.   Absence and Leave Policy ................................................................. 71

**CHAPTER 14: TRAINING AND ETHICS** .................................................. 72

14-1.   Training Provisions ............................................................................. 72

14-2.  Ethics Requirements ............................................................................ 72

**CHAPTER 15: CONTINUING SERVICE AGREEMENTS** ........................................... 74

15-1.  Service Agreement ............................................................................. 74

15-2.  Terminations of a CSA ........................................................................ 74

15-3.  Debt Recovery .................................................................................... 74

**APPENDIX A: TEMPORARY DEVIATIONS TO EXECUTE VACCINATION DISCIPLINARY PROCESS** ........................................................................................ 76

## CHAPTER 1:  GENERAL INFORMATION

**1-1.**  **Purpose**

This Manual establishes the policies and procedures for FEMA's Cadre of On-call Response/Recovery Employees (CORE) Program. FEMA will achieve consistency and facilitate the equitable and effective management of all COREs through the implementation of the policies and procedures set forth in this Manual.

**1-2.**  **Applicability and Scope**

A.  The provisions of this Manual apply to all FEMA COREs, unless otherwise indicated.

B.  FD 010-7, Incident Management Assistance Team (IMAT) Program Directive (IMAT Directive), is applicable to COREs who receive CORE-I appointments, also known as CORE-Incident Management Assistance Team (IMAT) Members or Pilot IMATs. Inconsistencies between this Manual and the IMAT Directive are resolved in favor of the IMAT Directive.

C.  The Attorney Hiring and Promotion Plan (AHPP), dated April 21, 2014, provides pay setting, pay adjustments, and promotion policy for CORE Attorneys. Inconsistencies between this Manual and the AHPP are resolved in favor of the AHPP.

**1-3.**  **Authorities**

Section 306 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, Pub. L. No. 93-288, as amended (Stafford Act), codified at 42 U.S.C. §§ 5121 et seq., provides FEMA with authority "to appoint and fix the compensation of such temporary personnel as may be necessary, without regard to the provisions of title 5, United States Code, governing appointments in the competitive service."

**1-4.**  **References**

The following list is not an exhaustive list of statutes, regulations, DHS and FEMA directives and manuals, policies, and guidance memorandums applicable to COREs.

A.  FEMA Policy 401-123-1, Equal Employment Opportunity (EEO) Policy Statement, October 1, 2014.

B.  Memorandum from the DHS Chief Human Capital Officer, Annual Leave Enhancements, February 17, 2006.

C.  DHS Instruction 121-01-007, DHS Personnel Suitability and Security Program, June 2009.

D.  DHS Management Directive 254-02, Employee Assistance Program, May 31, 2007.

E.  DHS Management Directive 0810.1, The Office of Inspector General, June 10, 2004.

F.  DHS Management Directive 3120.2, Employment of Non-Citizens, March 22, 2004.

G.  Memorandum from the Deputy Administrator, Every Employee an Emergency Manager—Action Items, January 20, 2012.

H.  FEMA Directive (FD) 010-7, Incident Management Assistance Team (IMAT) Program Directive, January 12, 2015.

I.  FEMA Directive 010-9, FEMA Incident Workforce Cadre Management, June 9, 2015.

J.  FEMA Directive 122-1, International Travel, October 24, 2011.

K.  FEMA Directive 122-2, Local Travel Reimbursement, March 12, 2013.

L.  FEMA Directive 122-4, Payment of Official Travel Expenses from a Non-Federal Source, June 27, 2013.

M.  FEMA Directive 122-7, Premium Class Travel, September 19, 2013.

N.  FEMA Directive 122-8, Invitational Travel, February 7, 2014.

O.  FEMA Directive 122-9, Travel Charge Card, April 18, 2014.

P.  FEMA Directive 119-6, Employee Physical Fitness Program, February 2, 2012.

Q.  FEMA Directive 141-1, Records Management Program Directive, March 6, 2014.

R.  FEMA Manual (FM) 106-1-1, Scheduling of Work, March 5, 2014.

S.  FEMA Manual 123-9-1, Telework, January 9, 2013.

T.  FEMA Manual 123-20-1, Drug-Free Workplace Program, July 28, 2014.

U.  FEMA Manual 253-2-1, Premium Pay, February 11, 2014.

V.  FEMA Manual 255-1-1, FEMA Employee Performance Management Program (EPMP), February 21, 2013.

W.  FEMA Manual 255-4-1, Employee Awards and Recognition, September 26, 2013.

X.  FEMA Manual 109-2-1, Privacy Program, June 4, 2013.

Y.  FEMA Manual 3300.3, FEMA Absence and Leave Policy, July 31, 2001.

Z.  FEMA Manual 6200.1, Travel Regulations, November 25, 1988.

AA. Memorandum from the FEMA Chief Counsel, Appointment and Compensation of Stafford Act Employees Under Section 306(b)(1) of the Stafford Act, June 25, 2012.

BB. Attorney Hiring and Promotion Plan, April 21, 2014.

CC. FEMA Interview and Selection Guidance, June 4, 2014.

DD. FEMA Budget Guidance on use of DRF/DRS resources, March 2015.

**1-5.** **Policy**

A. The authority provided by the Stafford Act allows FEMA to manage its CORE Program without being required to apply all of the provisions of Title 5, United States Code, and its implementing regulations. FEMA chooses, as a matter of policy, to administratively implement some Title 5 provisions and, in other circumstances, to use its Stafford Act authority to create and administer its own policies to more effectively manage Stafford Act employees consistent with the intent and program needs for these positions. In all circumstances, FEMA intends to develop and implement policies that are fair and equitable to its CORE workforce and that are consistently understood and implemented by FEMA managers and supervisors.

B. COREs are hired to directly support the response and recovery efforts related to disasters and are funded out of the Disaster Relief Fund (DRF). As temporary employees, COREs cannot replace the work performed and funded through annual appropriations by permanent full-time staff. COREs can perform Stafford Act duties that are not otherwise funded in FEMA's budget and can be charged to an open disaster. The use of COREs must be reviewed and validated on a recurring basis to ensure a continued need for the positions and consistent funding decisions across FEMA.

C. FEMA shall:

1. Staff positions with the best qualified persons available;

2. Develop and use COREs to the maximum extent possible consistent with the completion of FEMA's mission and the Stafford Act;

3. Establish CORE positions with a minimum of two-year appointments (unless otherwise justified for less than two years based on workload analyses) based on requests from Offices and Directorates authorized to fill CORE positions. Offices and Directorates will request the renewal of a CORE's appointment prior to the CORE's expiration date, subject to funding (see section 3-9);

4. Require COREs to sign a Conditions of Employment letter at the time of hiring and reappointment;

5. Ensure that all personnel actions are taken without regard to political, religious, or labor organization affiliation or non-affiliation, marital or family status, race, color, gender, sexual orientation, national origin, disability, genetic information, age, or prior Equal Employment Opportunity (EEO) activity; without regard to criteria unrelated to the position, such as personal friendship or patronage, and that selections are based solely on job-related criteria; and do not fall within prohibited personnel practices identified at 5 U.S.C. § 2302(b);

6. Establish a pay system that will improve the ability of FEMA to attract and retain quality candidates and employees;

7. Ensure that equal pay is provided for work of equal value, with appropriate consideration of both national and local pay rates paid by employers in the private sector, and that appropriate incentives and recognition should be provided for excellence in performance; and

8. Provide effective education and training, consistent with Stafford Act duties, which will result in enhanced organizational and individual performance.

D. COREs must:

1. Maintain high standards of integrity, conduct, and concern for the public interest; and

2. Be prepared at all times to deploy or work from alternate work locations other than their normal official duty station.

E. COREs may be terminated at any time, with cause (poor performance or misconduct), or without cause (such as when workload or funding diminishes or ends).

F. A CORE may be subject to removal if the CORE declines a deployment request without reasonable cause.

**1-6.** <u>**Definitions**</u>

A. <u>Algorithm</u>. A formula for allocating a CORE's salary and benefits across multiple disaster declarations. The allocation should correlate to the estimated amount of time the CORE performs work attributable to each declaration.

B. <u>Annual Direct Charge CORE Certification</u>. The annual process for verification of Disaster Relief Fund (DRF) related duties and the continued need for all CORE positions.

C. <u>Appointment</u>. A personnel action that results in an individual becoming a FEMA employee. Individuals, who accept CORE positions, are given excepted service appointments with FEMA under the Stafford Act. Generally, appointments may not be effective prior to the date of approval by the appointing official and are only effective from the date of acceptance of the offer of employment and entrance on duty, unless a later date is stated on the SF-52, or other approving document.

D. <u>Ancillary Support</u>. Personnel directly supporting disaster operations from their daily duty station.

E. <u>Backfill</u>. Hiring an employee to fill a previously approved vacant funded position.

F. <u>Basic pay</u>. The rate of pay fixed by administrative action for the position held before any deductions, but exclusive of additional pay of any other kind, including premium pay.

G. <u>Career path</u>. A progression of positions in one or more occupational series leading to an increase in responsibility and proficiency.

H. <u>Confidential Financial Disclosure (OGE Form 450) Filer</u>. A CORE who, because of the duties of his or her assigned position, must file confidential financial disclosure reports (OGE Form 450s) as directed by the Office of Government Ethics and FEMA's Office of the Chief Counsel pursuant to 5 C.F.R. § 2634 Subpart I. COREs in these positions are assigned FEMA duties that involve the exercise of significant discretion in certain sensitive areas. OGE Form 450 disclosures serve to ensure confidence in the integrity of FEMA operations by identifying and preventing potential conflicts of interest. If a CORE's position description indicates duties requiring a confidential financial disclosure, timely filing of OGE Form 450 is a condition of employment.

I. <u>Continuing Service Agreement (CSA)</u>. A written agreement between FEMA and a CORE under which the CORE agrees to a specified period of employment with FEMA in return for a monetary incentive or participation in a training or developmental program.

J. <u>Conversion Action</u>. The process by which a non-CORE FEMA employee is appointed to a CORE position.

K. <u>CORE-I (IMAT CORE)</u>. A CORE assigned full-time to an IMAT and to an IMAT position description. CORE-Is receive four-year appointments and are the first FEMA personnel deployed to an incident, serving in leadership roles as part of an IMAT. When not deployed, IMAT CORE base salaries are paid from the Disaster Readiness and Support (DRS) account; however, when deployed their salaries are paid by the disaster (under the declaration). IMAT COREs are non-direct charge COREs and new, backfill, or reassignment actions are not subject to direct charge CORE requirements.

L. <u>Declaration</u>. Declarations for DRF-funded events, including major disasters, emergencies, fire management declarations, and disasters under the Compact of Free Association.

M. <u>Demotion</u>. A change to a lower grade or pay band and a decrease in pay as a result of an adverse action or poor performance.

N. <u>Direct Charge CORE</u>. Employees whose primary duty is to carry out Stafford Act functions in support of open, active declarations or pre-event surge activities to an event for which a declaration is reasonably likely and imminent. The salary of a Direct Charge CORE is charged to Major Disasters, Emergencies, Fire Management Assistance Grants or the Disaster Surge account. Direct Charge COREs working on specific events should charge their time directly to those events. Direct Charge COREs working on multiple events or working as a part of a distributed group defined below should charge their time to an algorithm that accurately reflects the amount of work performed for each of those events. Specifically, the salary of a Direct Charge CORE may be structured in one of the following ways:

1. Specific Declaration: Salary is based on work performed on a single, specific declaration.

2. Multiple Declarations: Salary is based on work that provides services to multiple declarations and is charged based on an established algorithm.

3. Distributed Group Activities: Activities comprised of non-segregable declaration and non-declaration related functions that will be performed collectively by COREs and non-COREs. The number of COREs carrying out a particular Distributed Group Activity is based on the percentage of time required for the disaster related functions of that Distributed Group Activity. Charges are allocated across multiple disasters based on an established algorithm for the Distributed Group Activity.[1]

Duties related to preparedness, readiness, and planning for future events are not allowable Direct Charge CORE duties. Charging a CORE's salary to declarations when the duties performed by the CORE do not support those declarations could result in a violation of the Anti-Deficiency Act (ADA) and result in adverse actions against the responsible officials.

O. Distributed Group Activity Baseline. The ratio of COREs and non-COREs carrying out a particular Distributed Group Activity as determined by the percentage declaration and non-declaration functions performed for that Activity based on verifiable workload data and evaluation of current or past budget justification materials.

P. FEMA Qualification System (FQS). A performance-based system for certifying FEMA employees as "Qualified" or "Trainee" in IM and IS positions; certification is based on successful completion of required experience, required training, and demonstrated performance (see FEMA Directive 010-9, Incident Workforce Cadre Management, dated June 9, 2014).

Q. Fitness Determination. "Fitness" means "the level of character and conduct determined for an individual to perform work for or on behalf of a Federal agency as an employee in the excepted service (other than a position subject to suitability) or as a contractor employee." Executive Order 13,488, § 2(d); implemented in DHS Instruction 121-01-007, Chapter 3.

R. IM CORE. A CORE assigned to a two-year appointment and whose primary job duty is to perform an FQS incident management position. When not deployed, IM CORE base salaries are paid from the Disaster Readiness and Support (DRS) account; however, when deployed their salaries are paid by the disaster (under the declaration). IM COREs are non-direct charge COREs

---

[1] For example, OCFO's FEMA Finance Center has a Distributed Group Activity that processes and pays invoices related to both disaster and non-disaster activities. Determining the number of CORE positions that should populate this Distributed Group Activity requires an analysis of the ratio of disaster functions versus non-disaster functions. If the analysis concludes that 70% of the functions are disaster related and the entire Distributed Group Activity requires 10 positions, then the analysis would justify 7 CORE positions out of the 10 needed to perform those functions.

and new, backfill, or reassignment actions are not subject to direct charge CORE requirements

S. <u>Incident Management (IM)</u>. The incident-level operation of the Federal role in emergency response, recovery, logistics, and mitigation. Responsibilities include the direct control and employment of resources, management of incident offices, operations, and delivery of Federal assistance through all phases of response and recovery.

T. <u>Incident Support (IS)</u>. The coordination of all Federal resources that support emergency response, recovery, logistics, and mitigation. Responsibilities include the deployment of national-level assets, support of national objectives and programs affected during the disaster, and support of incident operations with resources, expertise, information, and guidance.

U. <u>Locality Payment</u>. A locality-based comparability payment (see 5 U.S.C. § 5304 and 5 C.F.R. Part 531, subpart F).

V. <u>Mission Essential</u>. Personnel who perform a limited set of FEMA functions that must be continued throughout, or resumed rapidly after, a disruption of normal activities.

W. <u>Non-Direct Charge CORE</u>. COREs whose salaries are partially or wholly funded by the DRS account within the DRF. These employees' functions support operational readiness, response, and recovery functions of the Stafford Act that are not directly attributable to the response and recovery efforts of any specific declaration or pre-event surge activities to an event for which a declaration is reasonably likely and imminent. Examples of Non-Direct Charge COREs include IM and IMAT COREs when not deployed or working for an open disaster.

X. <u>Offices and Directorates</u>. Office of the Administrator, Office of Chief Counsel, Office of the Chief Financial Officer, Office of External Affairs, Office of Policy and Program Analysis, Office of Response and Recovery, Response Directorate, Recovery Directorate, Logistics Management Directorate, Protection and National Preparedness, National Preparedness Directorate, National Continuity Programs Directorate, Grant Programs Directorate, Mission Support, Office of the Chief Administrative Officer, Office of the Chief Component Human Capital Officer, Office of the Chief Information Officer, Office of the Chief Procurement Officer, Office of the Chief Security Officer, Federal Insurance and Mitigation Administration, FIA Mitigation, FIA Insurance, United States Fire Administration, and Offices of Regional Administrators.

Y. <u>Pay Adjustment</u>. Any increase or decrease in a CORE's basic pay when there is no change in the duties or responsibilities of the CORE's position within the same career path and pay plan (see sections 5-3 and 6-3).

Z. <u>Pay Band</u>. A range of pay for a group or categories of employees that FEMA established according to FEMA's Stafford Act authority.

AA. Permanent Full-Time (PFT). A permanent FEMA employees who meets the definition of "employee" under 5 U.S.C. § 2105.

BB. Post-Action Review. An internal control established to ensure compliance with the Annual Direct Charge CORE Certification review and documentation requirements established for Direct Charge CORE positions.

CC. Program Area. A discrete subdivision within an Office, Division, Branch, or Unit that performs work that is substantially different from the work performed by other subdivisions.

DD. Promotion. A personnel action that moves a CORE (1) to a higher grade; (2) from one pay band to a higher pay band in the same career path; or (3) to a position in another career path in combination with an increase in the CORE's basic pay.

EE. Qualifying Life Event (QLE). OPM designated events deemed acceptable to the IRS that may allow premium conversion participants to change their participation election for premium conversion outside of an open season. For more information, see OPM's Healthcare Reference Materials for a listing of the authorized Qualifying Life Events.

FF. Reassignment. A personnel action that moves a CORE from one position to another without promotion or change to a lower pay band, grade, or step, at management discretion and based on necessary approvals. Reassignment includes: (1) movement to a position in a new occupational series, or to another position in the same series; (2) assignment to a position that has been reclassified due to the introduction of a new or revised classification or job grading standard; (3) assignment to a position that has been reclassified as a result of a position review; and (4) movement to a different position at the same band but with a change in salary that is the result of a different locality payment.

GG. Relative. A father, mother, son, daughter, brother, sister, uncle, aunt, first cousin, nephew, niece, husband, wife, unmarried domestic partner, father-in-law, mother-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half-brother, or half-sister. The definition of "relative" for sick leave, Family Medical Leave Act (FMLA), and other leave purposes may be different; for more information see FEMA Manual 3300.3, Absence and Leave.

HH. Rightsizing. The process by which FEMA reduces CORE staff levels in response to changed conditions such as a diminished workload, or budgetary or statutory changes.

II. Selecting Official. A FEMA employee who is authorized to make a hiring decision.

JJ. Specialized Experience Statement. A written description of any specialized experience that a candidate must possess in order to be considered minimally qualified for the vacancy. Any candidate who does not meet the specialized

experience requirements will not be referred to Office or Directorate by OCCHCO.

KK. Supervisor. An employee who accomplishes work through the direction of other people. A supervisor must spend at least 25 percent of their time exercising independent judgment over other employees on matters relating to, but not limited to, work assignments, performance management, administration, training, and property accountability.

LL. Supervisor of Record. The supervisor of record has the delegated authority to assign work, discipline, and remove a CORE from federal employment in accordance with the procedures found in Chapter 11 (discipline) and Chapter 8 (performance management).

MM. Temporary Duty Supervisor. The individual (PFT, CORE, or Reservist) on-site or in virtual communication with deployed PFTs, COREs, or Reservists and authorized to exercise independent judgment to assign work. The temporary duty supervisor is not authorized to take personnel actions against a CORE under his or her functional authority, unless the temporary supervisor is also the supervisor of record.

## 1-7.  Responsibilities

A. FEMA Administrator or Deputy Administrator is responsible for:

1. Approving details of COREs to perform non-Stafford Act activities; and

2. Approving written recommendations for pay of recruitment, relocation, and retention incentives that are greater than 25% of a CORE's base pay and, if approved, forwarding concurrence to the head of the requesting Office or Directorate and to OCCHCO.

B. Associate Administrators, Headquarters' Office Chiefs Reporting Directly to the Administrator, and Regional Administrators are responsible for:

1. Reviewing and approving the creation or renewal of Direct Charge CORE positions, confirming funding, and forwarding to OCCHCO for requisite personnel processing actions;

2. Conducting an annual certification of Direct Charge CORE positions approved by authorized officials based on required supporting documentation and any follow-up, including referrals to the Office of Chief Counsel (OCC) or appropriate offices for further action (see section 2-3);

3. Ensuring that all personnel involved in the hiring of COREs are familiar with the appropriate legal use of CORE positions, the funding factors involved in the hiring process, and comply with all legal and budgetary requirements;

4. Ensuring all baselines are established and validated on a recurring basis for Distributed Group Activity Direct Charge COREs and all new baselines or baseline changes are approved by OCFO;

5. Certifying that all Direct Charge COREs are carrying out only DRF-related duties performed on open, active disasters;

6. Providing timely, supporting documentation to OCFO and any oversight organization to complete post-action reviews (see section 2-3);

7. Reviewing requests for recruitment, relocation, or retention incentives that require approval by the Administrator and, if in concurrence, sending the request to OCCHCO, OCFO, and the Administrator for approval; and

8. Reviewing requests for recruitment, relocation, or retention incentive repayment waivers and, if in concurrence, transmitting to OCCHCO for review.

C. <u>Assistant Administrators, Deputy Associate Administrators, and Office Directors Not Reporting Directly to the Administrator</u> are responsible for:

1. Requesting to advance a CORE's initial rate of pay to step five or greater of the grade;

2. Reviewing requests for recruitment, relocation, or retention incentive repayment waivers that do not require approval by the Administrator and, if in concurrence, transmitting to OCCHCO and OCFO for review and approval; and

3. Ensuring all CORE hiring actions submitted for higher level approval meet the standards promulgated herein.

D. <u>Headquarters Office or Directorate Chiefs or Regional Administrators</u> are responsible for:

1. Approving the reassignment of a CORE based on workload needs and subject to funding;

2. Conducting workload analyses to justify the need for new or continued use of CORE positions;

3. Submitting staffing plans to OCCHCO with the requested number of CORE positions by title, series, grade, and duty station for OCCHCO's approval which should also support Disaster Spend Plans required by OCFO;

4. Coordinating with OCCHCO to announce and hire CORE positions;

5. Renewing CORE appointments based on workload needs and subject to funding;

6. Approving recruitment, relocation, or retention incentives that do not need Administrator approval; and

7. Approving Functional Area SMEs in the event of a rightsizing.

E. <u>Office of Chief Counsel (OCC)</u> is responsible for:

1. Reviewing and advising on legal sufficiency of FEMA matters to include: spending legislation, fiscal policy and potential ADA violations;

2. Providing guidance, as necessary, regarding the appropriate use of the Disaster Relief Fund to charge CORE salaries;

3. Supporting OCFO and OCCHO in conducting the Annual Post-Action Review of direct charge COREs;

4. Reviewing and approving the use of COREs for limited non-Stafford Act activities in furtherance of FEMA's mission;

5. Providing all COREs entering Federal service with an Initial Ethics Orientation as required by 5 C.F.R. § 2638.703;

6. Identifying all COREs that need to be designated as Confidential Financial Disclosure filers who must complete annual ethics training as required by 5 C.F.R. § 2638.705, and auditing the content of said training for compliance with 5 C.F.R. § 2638.704;

7. Notifying all COREs of the requirement to file a new entrant report within 30 days of assuming a position designated as requiring a Confidential Financial Disclosure Report per 5 C.F.R. § 2634.903(b);

8. Notifying all COREs designated as Confidential Financial Disclosure filers to file annual reports as required by 5 C.F.R. § 2634.903(a);

9. Reviewing Confidential Financial Disclosure reports, and providing advisory opinions to COREs, as appropriate, with regard to real or apparent conflicts of interest identified in the CORE's financial disclosure report;

10. Designating ethics attorneys to provide ethics advice to COREs;

11. Providing legal review of performance and disciplinary actions; and

12. Providing legal advice on policy development and implementation.

F. <u>Office of the Chief Financial Officer (OCFO)</u> is responsible for:

1. Managing use and oversight of the DRF;

2. Ensuring the establishment of internal controls designed to prevent and detect non-compliance with applicable laws, standards, and accounting principles;

3. Reviewing and approving initial baseline and subsequent baseline adjustments for "distributed group" CORE positions;

4. Working with OCC and OCCHCO on the Annual Post-Action Review of direct charge COREs;

5. Conducting periodic audits and annual certifications of Direct Charge CORE positions and post-action reviews to validate and verify that all Direct Charge CORE duties are DRF-related and the appropriate approvals and documentation are evident, and taking action as appropriate on potential ADA violations;

17

6.  Referring instances that cannot be validated or verified as DRF-related duties to OCC or appropriate offices for further action;

7.  Determining whether funding exists for each recruitment, relocation, or retention incentive request; and

8.  Establishing an annual awards cap for COREs subject to funding.

G.  <u>Associate Administrator for Mission Support</u> is responsible for reviewing all workload analysis disputes between the head of an Office or Directorate and OCCHCO and issuing a final decision.

H.  <u>Associate Administrator for Response and Recovery</u> is responsible for deciding appeals from an FCO decision on whether to demobilize a CORE due to misconduct.

I.  <u>Office of the Chief Administrative Officer (OCAO)</u> is responsible for:

1.  Maintaining responsibility for the management and oversight of all Government-owned personal property within FEMA and for enforcing all applicable statutes, rules, regulations, and official guidance relating to Government-owned personal property; and

2.  Administering the transit subsidy program.

J.  <u>Office of the Chief Component Human Capital Officer (OCCHCO)</u> is responsible for:

1.  Approving and administering all human capital programs and policies to include appointment and compensation programs;

2.  Providing timely information to COREs regarding available benefit options, election periods, and technical direction on how to apply for available benefit options;

3.  Making final decisions on all pay setting and requests for adjustments for CORE pay;

4.  In consultation with the requesting Office or Directorate, approving workload analyses and staffing plans submitted by an Office or Directorate to justify CORE positions;

5.  Providing Offices and Directorates with a list of COREs and their not-to-exceed expiration dates who are assigned to the Office or Directorate on a biweekly basis;

6.  In consultation with the requesting Office or Directorate, revalidating the request based on position management for a CORE position prior to the expiration of the position when an Office or Directorate requests a renewal of a CORE position;

7.  Providing support for post-action reviews and the annual certifications, as well as supporting OCFO in execution of its responsibilities;

8. Approving and administering the recruitment, appointment, placement, and separation of COREs, including setting the length of the appointment term;

9. Providing advice, guidance, training, and direct support to temporary duty supervisors and supervisors of record regarding how to properly document and address performance and misconduct;

10. Coordinating affirmative employment programs with the Office of Equal Rights;

11. Establishing and maintaining personnel records;

12. Assuming responsibility for all EAP operations within FEMA;

13. Administering the performance management and awards and recognition programs;

14. Through the Human Resources cadre, ensuring that any demobilized CORE who has been deployed for at least 20 days has been issued a performance evaluation prior to departing the incident work site;

15. Coordinating with OCC Ethics and supervisors of record to properly designate positions as Confidential Financial Disclosure filers and providing OCC Ethics with monthly reports identifying when a CORE has been appointed to or is no longer serving in a position designated as a Confidential Financial Disclosure filer;

16. Providing technical guidance to Offices and Directorates in the planning of rightsizing procedures and approving the execution of rightsizing procedures;

17. Providing direct support to COREs with respect to individual issues requiring action in connection with the administration of pay, benefits, and other personnel matters;

18. Reviewing and approving requests for recruitment, relocation, or retention incentives;

19. Administering FEMA's Drug-Free Workplace program; and

20. Providing information to managers and supervisors regarding the procedures for performance and disciplinary actions, recommendations for disposition in each case; and any relevant appeal process.

K. Office of the Chief Security Officer (OCSO) is responsible for:

1. Using standardized policies and procedures for verifying applicants' personal identity;

2. Determining the fitness of applicants and COREs by conducting background checks; and

3. Authorizing facility access and issuing identification badges for COREs in a manner that ensures nationwide consistency across the CORE program.

L.  <u>Division Chiefs</u> are responsible for reviewing and providing a final decision on any hire via name request within their area of responsibility.

M.  <u>Second Level Supervisors</u> are responsible for:

1.  Overseeing the use of COREs consistent with the requirements established herein;

2.  Requesting to advance a CORE's basic rate of pay to step two, three, or four of the grade in conjunction with the CORE's supervisor of record;

3.  In coordination with OCCHCO, reviewing and issuing final decisions on disciplinary action appeals;

4.  In coordination with OCCHCO, reviewing and issuing final decisions on all actions to terminate a CORE's position for lack of FEMA need;

5.  Reviewing and providing a final decision on all requests for merit-based increases, step increases, and to set pay for a new hire above the minimum rate for the position; and

6.  Developing a Rightsizing Plan.

N.  <u>Federal Coordinating Officers (FCO)</u> are responsible for deciding to demobilize a CORE due to misconduct.

O.  <u>Cadre Coordinators</u> are responsible for:

1.  Establishing and implementing individual performance goals on an annual basis for each position in the cadre, utilizing the position-specific behaviors found in the position's PTB or any other sources approved by OCCHCO, and consulting with employees with Incident Management Titles in the cadre on the substance of the performance goals insofar as practical; and

2.  Receiving and reviewing completed evaluations for their cadre personnel. Completed evaluations will be archived for each employee.

P.  <u>Selecting Officials</u> are responsible for:

1.  Recruiting and selecting COREs in accordance with this Manual, transmitting any request for hire via name request to his or her program area's Division Chief (or higher) for review; and

2.  Documenting the reasons for the selection of any CORE, and ensuring that all relevant records documenting such reasons are transmitted to OCCHCO for retention, including all interview notes.

Q.  <u>Supervisors of Record</u> are responsible for:

1.  Ensuring COREs are used for authorized purposes as outlined herein;

2.  Providing day-to-day supervision of the performance and conduct of COREs under their supervision;

3.  Assigning and evaluating work performed by a CORE when a CORE is not deployed;

4. Requesting to renew appointments based on a workload analyses and staffing plan, subject to funding;

5. Requesting pay adjustments, conversion actions, and pay settings when a CORE voluntarily requests a change to a lower pay band or rate;

6. Requesting to advance a CORE's basic rate of pay to step two, three, or four of the grade in conjunction with the CORE's second level supervisor;

7. Initiating all recommendations for merit-based pay and step increases;

8. Establish performance and development plans, and evaluating employee performance in accordance with FEMA Manual 255-1-1;

9. Recommending performance awards consistent with FEMA guidelines;

10. Retaining performance appraisals and all other documents related to the performance and/or conduct of COREs under their direct supervision, for a duration to be determined by FD 141-1, FEMA Records Management Program and relevant Equal Employment Opportunity Commission (EEOC) regulations, if applicable;

11. Submitting all requests for recruitment, relocation, or retention incentives to the head of their Office or Directorate for approval;

12. Communicating proper conduct and performance standards to COREs consistent with FEMA policy;

13. Receiving all deployment evaluations for COREs under their direct supervision and completing applicable progress reviews and annual performance ratings, considering as appropriate any deployment evaluations provided to the CORE by the temporary duty supervisor while deployed;

14. Coordinating with OCC Ethics and OCCHCO to properly designate positions as Confidential Financial Disclosure Filers, and ensure that COREs complete required new entrant and annual ethics training requirements;

15. Approving a CORE's work schedule, telework schedule (if requested), and time and attendance records;

16. Monitoring a CORE's performance while teleworking in accordance with FM 123-9-1;

17. Coordinating with COREs under their supervision to identify any real or apparent conflicts of interest or other standards of conduct issues prior to deployment, raising any such issues to the appropriate ethics counselor and, if applicable, mitigating any of these issues in accordance with recommendations from the ethics counselor and the temporary duty supervisor;

18. Providing performance feedback and mentoring to maximize the success of a CORE in achieving performance goals and objectives;

19. Coordinating with OCCHCO's Employee Relations Specialists to document incidents of poor performance and misconduct as they occur, and following up with the CORE to ensure that he or she understands the seriousness of his or her performance deficiencies or misconduct;

20. Initiating personnel actions against COREs, to include discipline or removal for misconduct or poor performance after consulting with OCCHCO, and ensuring that any such actions are consistent with Merit Systems and EEO principles;

21. In coordination with OCCHCO, documenting the reasons for all other personnel actions, including assignments, reassignments, promotions, demobilizations, rightsizing, and non-renewal of CORE appointments, and ensuring that such documentation is forwarded to OCCHCO along with any request or recommendation for personnel action;

22. Collecting all government equipment prior to the effective date of a CORE's removal or resignation;

23. Overseeing and managing the resignation process when a CORE submits a resignation notification and forwarding all documentation to OCCHCO for processing;

24. In coordination with OCCHCO, adopting the rightsizing procedures provided in this Manual; and

25. Ensuring the professional development for COREs under their supervision.

R. Temporary Duty Supervisors are responsible for:

1. Ensuring COREs are used for authorized purposes as outlined herein;

2. Providing day-to-day supervision of the performance and conduct of deployed COREs;

3. Communicating proper conduct and performance standards to deployed COREs, included but not limited to, the basis for a deployment performance evaluation consistent with FEMA policy;

4. Completing performance evaluations for all COREs under their functional authority who are deployed for at least 20 days, and transmitting performance evaluation records to the CORE's supervisor of record within 30 days of the date of the demobilization; and

5. Advising the CORE and consulting with OCCHCO regarding issues of CORE misconduct and poor performance and referring allegations of misconduct to the CORE's supervisor of record for review and coordination with OCCHCO prior to initiating disciplinary action.

S. COREs are responsible for the following, including, but not limited to:

1. Performing assigned duties and responsibilities acceptably;

2. Conducting themselves in a manner that will bring credit to FEMA and supervisors directing their work, and observing the spirit and letter of the laws and regulations which govern the conduct of COREs;

3. Signing and complying with the terms and conditions of their appointments (including any conditions relating to receiving a security clearance), and other applicable FEMA directives;

4. Working at a Directed Work Location if directed by a supervisor or other properly designated FEMA official;

5. Reviewing benefit options and making selections within prescribed election periods;

6. Properly using, caring for, and protecting any assigned government property issued to them by FEMA.

7. Completing and signing a Self Certification of Health and Safety Checklist prior to beginning work, if the CORE's home is his or her official duty station;

8. Following FEMA's Absence and Leave and Scheduling of Work policies and procedures;

9. Completing Initial Ethics Orientation within 90 days of entry on duty as required by 5 C.F.R. § 2638.703;

10. Complying with the ethics statutes in Title 18, United States Code, and the implementing ethics regulations promulgated by the Office of Government Ethics and DHS. COREs should seek guidance from his or her designated ethics attorney if issues arise that may be governed by these laws and regulations (contact FEMA's Privacy Office for additional information and a listing of OCC Ethics Counselors);

11. If designated as a Confidential Financial Disclosure filer, timely filing New Entrant and Annual OGE Form 450 reports (as required by 5 C.F.R. § 2634 Subpart I);

12. Completing annual ethics training, FQS training, and other required training;

13. If the CORE is a reemployed civilian retiree receiving an annuity, providing a copy of his or her most recent annuity notice and all subsequent notices of change, indicating the monthly annuity amounts to OCCHCO prior to or at the time of appointment;

14. Signing and complying with the conditions of a Continued Service Agreement (CSA) if approved to receive a recruitment, relocation, or retention incentive;

15. Signing and abiding by the conditions of a CSA if selected to participate in a leadership development program;

16. Returning all FEMA-owned equipment before separating from FEMA; and

17. Engaging in activities to promote their professional development.

**1-8.** **Reporting Requirement**

The CORE program will be evaluated periodically to ensure that stated objectives are being met. Recommendations for improvement will be forwarded to the Chief Component Human Capital Officer and the Chief Financial Officer.

**1-9.** **Forms Prescribed**

A. FEMA Form 252-11-1-1, Request for CORE Action.

B. FEMA Form 30-35, Telephone Reference Check.

C. FEMA Form 106-1-1-1, Request for Work Schedule.

D. FEMA Form 119-7-1-3, Custody Receipt for Government Property On Personal Charge.

E. FEMA Form 123-9-0-1, Telework Application and Agreement Form.

F. FEMA Form 123-9-0-2, Employee Self Certification Health and Safety Checklist.

G. FEMA Form 254-1-1, Public Transportation Benefit Program Application.

H. Standard Form-50, Notification of Personnel Action.

I. Standard Form-52, Request for Personnel Action.

J. Standard Form 2809, Health Benefits Election Form.

K. TSP-1 Thrift Saving Plan Election Form.

**1-10.** **No Private Right**

Nothing in this Manual shall be interpreted to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative or civil matter.

**1-11.** **Questions**

Questions concerning the CORE Program should be addressed to OCCHCO at 202-212-3962. Questions concerning the funding or certification process for Direct Charge CORE positions or requests for Distributed Cost COREs should be addressed to OCFO Field Based Operations at FEMA-fbo-action-tracker@fema.dhs.gov.

# CHAPTER 2:  RECRUITMENT AND HIRING

**2-1.**  <u>**General**</u>

A.  FEMA Offices and Directorates will identify the Selecting Official for each hire.

B.  FEMA Offices and Directorates may elect to recruit and hire candidates via a vacancy announcement as specified in section 2-4, or via a name request pursuant to section 2-5. FEMA maintains the flexibility to use alternative hiring procedures not specified in this Chapter when necessary to meet its mission requirements.

C.  Nepotism is prohibited by 5 U.S.C. § 3110 and is also a "prohibited personnel practice" under 5 U.S.C. § 2302(b)(7). Under 5 U.S.C. § 3110, a public official is prohibited from appointing, employing, promoting, advancing, or advocating for appointment, employment, promotion, or advancement of a relative in or to a civilian position in FEMA in which the public official is serving or over which the public official exercises jurisdiction or control of any individual who is a relative of the public official. Upon determining that a minimally qualified candidate is a relative or the relative of the Selecting Official, or of someone in the chain of command of the Selecting Official, the program office must refrain from taking action on the job vacancy and contact the servicing HR Specialist for guidance. Supervision of a relative is not generally considered to be "nepotism" but is prohibited as it presents an apparent conflict of interest. Supervision of employees with whom the supervisor has a "covered relationship" may also be an apparent conflict of interest (see 5 C.F.R. § 2635.502).

**2-2.**  <u>**Staffing Plans**</u>

A.  Offices and Directorates authorized to fill CORE positions will conduct workload analyses every three years, or earlier if needed based on operational changes, to forecast and plan for future work and skills requirements based on historical data, technical estimates, directed requirements, and approved staffing models.

1.  The workload analysis will first identify all activities performed by each position (e.g., PFT, CORE, and Reservist) within an Office or Directorate, and designate current and planned future activities.

2.  The analysis will estimate how frequent the activity is performed, and the amount of time an employee will need to complete each of the identified activities for which a Distributed Group Activity Baseline has not been approved or is being modified.

3.  The analysis may identify shortages or overages in current staffing needs, which will be documented and maintained by the Offices and Directorates until superseded by a subsequent workload analysis or other staffing initiative.

B. Based on the workload analysis, Offices and Directorates requesting CORE positions will develop and submit staffing plans, subject to funding, to OCCHCO with the number of CORE positions by title, series, grade, and duty station.

   1. OCCHCO will review the entity's requested number of CORE positions and proposed length of appointment based on the workload analysis and staffing plan.

   2. Upon OCCHCO's review and approval of the staffing plan, OCCHCO will submit the plans to OCFO for approval if the plan includes a non-Direct Charge CORE, or a Distributed Group Activity Direct Charge CORE if the distributed group activity baseline has not been approved or has changed since the last approval.

   3. Upon any needed confirmation from OCFO, OCCHCO will authorize an Office or Directorate to create or renew a set number of CORE Positions.

   4. The Associate Administrator for Mission Support will review and resolve any disputes between an Office or Directorate and OCCHCO regarding the approval of a workload analysis or staffing plan.

C. Any request to add, move, rightsize, or adjust a CORE position (if rightsizing a position, see Chapter 12, Rightsizing) made between workload analysis cycles or that does not align with the current staffing plan must be submitted by the head of the Office or Directorate and will require a reexamination of the most recent workload analysis to determine whether the identified shortages or additional work exists to justify the requested position, its length, and pay band or grade. Upon OCCHCO's review and approval of the staffing plan, OCCHCO will submit the plans to OCFO for approval if the plan includes a non-Direct Charge CORE, or a Distributed Group Activity Direct Charge CORE if the distributed group activity baseline has not been approved or has changed since the last approval.

D. Duty stations for COREs will be established by the supervisor of record in conjunction with OCCHCO.

**2-3.** **Annual Direct Charge CORE Certification**

A. An Annual Direct Charge CORE certification, validating and verifying the CORE's performance of DRF related duties and the continued need for all CORE positions (which have not been requested or funded elsewhere in FEMA's budget), is required by the Assistant Administrator, Associate Administrator, Regional Administrator, and any FEMA employee reporting directly to the Administrator.

B. CORE positions must be used to execute functions or activities funded solely by the DRF or DRS account and are not charged elsewhere in FEMA's budget. COREs may be used to administer support to FEMA's non-permanent workforce hired under the Stafford Act, performing duties including, but not limited to, hiring and staffing, training and development,

personnel and payroll processing, legal support, developing and implementing disaster policies and decisions, supervising Stafford Act employees, maintaining information technology and telecommunications services for Stafford Act employees or events, financial management, property and facility management, and auditing and program oversight. OCFO and OCC will provide Directorates and Offices with supplemental guidance on the proper use of CORE positions as needed.

C. Offices and Directorates must also electronically maintain documentation supporting the creation, backfilling or reassignment of CORE positions. Offices and Directorates will maintain workload analyses, position justifications, and staffing plans. The electronic files[2] are also subject to independent post-action compliance review by OCFO and/or OCCHCO.

D. Documentation requirements for "Direct Charge" COREs

1. Comprehensive list of all COREs to include position title, area assigned, branch/office, duty station, grade, PIN, and CORE type.

2. Algorithm(s), to include methodology and frequency of analysis, used to determine allocation of salary costs to open active disasters.

3. A description of duties for each position or group of positions performing the same work that validates the relationship of work being performed to open, active disasters. Example: This Public Assistance (PA) Specialist will: (1) be responsible for the closeout of project worksheets, (2) deploy to disasters to support the development and obligation of PA projects, and (3) conduct eligibility review of public assistance projects.

4. Baselines and supporting documentation for establishing the baselines for Distributed Activity Group "Direct-Charge" COREs.

5. Documentation shall be maintained on OCFO's SharePoint (see footnote 2) and shall be made available to the OCFO and/or OCCHCO for review. Files must be maintained in accordance with the most current DHS records retention policy.

## 2-4.  Procedures for Soliciting Candidates

FEMA uses the procedures listed below to hire qualified candidates for CORE appointments unless a name request procedure is used (see section 2-5).

A. To advertise a CORE position, an Office or Directorate shall submit a Standard Form (SF-52) to OCCHCO with a position description. If desired, the Office or Directorate may also submit a draft vacancy announcement or instead, request that OCCHCO draft it. Additionally, the Office or Directorate may, but is not required to, submit a specialized experience statement and any assessment screen-out questions that should be included in the announcement for the purpose of screening out applicants who are not

---

[2] Electronic files should be uploaded to https://portalapps.fema.net/apps/ocfocore/Pages/default.aspx.

minimally qualified for the position. Upon receipt of all required and optional documentation, the HR Specialist prepares (or reviews, if submitted) the Vacancy Announcement and sends the draft to the Office or Directorate for final approval.

B. The Office or Directorate, in consultation with the HR Specialist, may search for qualified candidates utilizing one or more of the following recruitment sources:

   1. An email to all FEMA employees, FEMA employees who reside in a specific geographic area, or FEMA employees who already work in the Office or Directorate advertising the position;

   2. Electronic posting on OPM's USAJOBS website (https://usajobs.gov);

   3. Outside sources, including but not limited to, other Federal agencies, state employment services, state and local emergency management organizations, professional societies, minority organizations, local colleges/universities and other educational facilities and sources; or

   4. Other sources which, as approved by OCCHCO, will provide adequate competition.

C. At a minimum, the vacancy announcement posted through USA Jobs must include:

   1. FEMA's name;

   2. Announcement number (for USA Jobs announcements only);

   3. Title, series, and grade of the position, including promotion potential;

   4. Opening and closing dates (except in the case of open announcements);

   5. Duty location;

   6. Number of vacancies;

   7. Major duties of the position;

   8. Length of appointment;

   9. Qualification requirements;

   10. How to apply, including required supporting documentation;

   11. Statement that the appointment(s) is excepted from the competitive service, and are authorized under the Stafford Act;

   12. Statement that the selectee must sign a "conditions of employment" form;

   13. Statement that the selectee is subject to the "Every Employee Is An Emergency Manager" Memorandum, requiring capability to deploy for up to 30 consecutive days and changes to work locations, including a requirement to work at home in the event of emergencies or when otherwise directed;

   14. Equal employment opportunity statement; and

    15. Reasonable accommodation statement.

D. All other vacancy announcement postings, authorized by section 2-4.B., must include, at a minimum:

    1. Title, series, and grade of the position, including promotion potential;

    2. Opening and closing dates (except in the case of open announcements);

    3. Duty location;

    4. Major duties of the position;

    5. Length of appointment;

    6. How to apply, including required supporting documentation;

    7. Statement that the appointment(s) is excepted from the competitive service, and are authorized under the Stafford Act;

    8. Statement that the selectee must sign a "conditions of employment" form; and

    9. Statement that the selectee is subject to the "Every Employee Is An Emergency Manager" Memorandum, requiring capability to deploy for up to 30 consecutive days and changes to work locations, including a requirement to work at home in the event of emergencies or when otherwise directed.

E. Vacancy Announcements that are restricted to a particular geographical area or to FEMA employees will clearly identify any such restrictions and indicate that non-compliant applications will not receive consideration.

F. Once the Office or Directorate has approved the vacancy announcement, the Staffing HR Specialist posts the vacancy announcement via the sources previously agreed upon and notifies the Office or Directorate that the position has been posted.

G. Vacancy announcements shall be posted for a minimum of five days. If requested, OCCHCO may approve a shorter posting for good cause.

H. Minimum qualifications: Normally, OCCHCO reviews all submitted applications to ensure that applications have met the minimum qualifications and eligibility requirements and then refers all candidates deemed minimally qualified to the Selecting Official via a Certificate of Eligibles (CERT). Selecting Officials may request to receive all applications prior to OCCHCO's review, in which case OCCHCO will conduct its review prior to issuance of any offer. Final qualification determinations are made by OCCHCO.

I. After a selection is made, the Selecting Official shall provide all selection documentation to OCCHCO for retention in accordance with A and B above (see section 3-9). The Selecting Official will indicate the action taken (selection, non-selection, declination, etc.) on each CERT and will return the CERT to the HR Specialist by the expiration date of the CERT, unless an extension is authorized by OCCHCO.

**2-5.**   **Name Request**

A.  In lieu of utilizing the hiring procedures specified in section 2-4, Offices and Directorates may hire qualified candidates (eligible U.S. citizens, current Federal employees, or current FEMA COREs) via a name request to meet a hiring need or to promote a CORE to a grade outside of the CORE's current position ladder. Such a promotion must include the same justification and approval established for name request hires (see Chapters 5 and 6 for more information on promotions).

B.  The Office or Directorate must submit a justification that describes the individual's qualifications with the SF-52 and resume.

C.  Any name request must be approved in writing by the requesting organization's Division Chief (or higher).

D.  Name requests may be approved even if the Office or Directorate has not posted a vacancy announcement for the position or otherwise competed the position.

E.  The HR Specialist will review the package to determine if the applicant meets the basic qualifications for the position and promptly notify the Selecting Official if the applicant is not minimally qualified.

F.  Name request hiring actions must follow the interview, reference check, and job offer procedures outlined below.

**2-6.**   **Interviews**

Interviews are conducted for candidates referred to the supervisor as a means of obtaining supplemental information on their qualifications.

A.  At a minimum, the Selecting Official must interview the candidate selected for the position. The Selecting Official may designate one or more appropriate persons to conduct or participate in the interviews.

B.  The Selecting Official should ask all candidates the same job-related questions and document the responses in writing. The Selecting Official should maintain such documentation for a minimum of two years. The Selecting Official should ask the same questions, in the same order, of all interviewed candidates. Follow-up questions to clarify information are permissible. It is preferable to conduct interviews in person and to use the same interview method for all applicants.

C.  The Selecting Official should not ask questions regarding a candidate's race, religion, sex, family status, national origin, religion, age, genetic background, health history, disability, political affiliation, or any other prohibited questions found in FEMA's Interview and Selection Guidance, June 4, 2014.

D.  The Selecting Official or his or her designee(s) may conduct a subsequent interview or contact one or more of the candidates for additional or clarifying information after completing and evaluating the initial interviews. The

supervisor should consult with the HR Specialist if a subsequent interview is deemed advisable to ensure that the reason for the subsequent interview is related to the requirements of the position.

E. Interview notes must be retained in accordance with section 2-10 and must not be destroyed.

F. In accordance with the Every Employee is an Emergency Manager (EE-EM) initiative,[3] all employees conducting hiring interviews must explain and reiterate, using a set of standard questions and briefing points, the EE-EM vision that all COREs must be willing to receive incident support or incident management assignments. Additionally, all new COREs are required to sign an acknowledgment form confirming their understanding of the EE-EM policy. The supervisor must ensure that the EE-EM vision is explained in all initial interviews and that any candidate who is referred for hire or further examination has completed the applicable acknowledgment form. This form can be obtained from the serving HR Specialist.

G. All new COREs must acknowledge the requirement to work at a Directed Work Location, which may be the CORE's Residence of Record or another alternate duty location, in the event of office closures, emergencies, or when otherwise directed.

## 2-7.  Reference Checks

The Selecting Official must check and document a candidate's references before the candidate receives a job offer. Reference checking is a vital part of a successful hiring strategy and is primarily used to verify information provided by the candidate; better predict the candidate's on-the-job success; and gain additional information about the candidate's qualifications for the position. Selecting Officials may use FEMA Form 30-35, Telephone Reference Check, to satisfy the requirement to document reference checks. Selecting Officials should coordinate with OCCHCO prior to deciding not to hire a candidate because of a reference check.

## 2-8.  Job Offers

All offers of employment must be made by OCCHCO. The servicing HR Specialist must confirm qualifications and the proposed rate of pay for the candidate with the Selecting Official prior to extending an offer. Additionally, the HR Specialist will confirm acceptance of the offer and will consult with the Selecting Official in establishing an entrance on duty (EOD) date once the appropriate background check has been made by OCSO.

---

[3] *See* Memorandum from the Deputy Administrator, Every Employee an Emergency Manager—Action Items, January 20, 2012.

**2-9.    Notification to Applicants**

OCCHCO Talent Acquisition Division will acknowledge receipt of all applications and notify all applicants if they have or have not been selected for the position.

**2-10.  Recordkeeping Requirements**

A. Supervisors shall create, maintain, use and dispose of FEMA records in accordance with applicable law and FD 141-1, FEMA Records Management Program.

B. Pursuant to 29 C.F.R. § 1602.14 and in accordance with Equal Employment Opportunity Commission (EEOC) regulations, all personnel records made or kept by FEMA, including but not limited to, application forms submitted by applicants, name request justifications, interview notes, reference check documents, and other records having to do with hiring, shall be preserved for one year from the date of the making of the record or of the personnel action involved, whichever occurs later.

C. If applicable, when a non-selectee challenges the non-selection before an administrative or judicial body, OCCHCO and the supervisor must retain the aforementioned documentation until the final disposition of the charge or lawsuit. OCC will notify OCCHCO and the supervisor of any litigation holds and when documentation relating to a charge or lawsuit may be disposed of according to FEMA's record retention policy.

## CHAPTER 3:  APPOINTMENTS

**3-1.** **Eligibility for Appointment**

All applicants selected for appointment to CORE positions must meet the following eligibility requirements:

A. U.S. Citizenship, subject to limited exceptions;[4]

B. Must be at least 18 years of age and:

    1. Have graduated from high school or been awarded a certificate equivalent to graduating from high school;

    2. Have completed a formal vocational training program;

    3. Have received a statement from school authorities agreeing with their preference for employment rather than continuing their education; or

    4. Be currently enrolled in a secondary school and either work only during school vacation periods or work part-time during the school year under a formal employment program;

C. Must comply with selective service registration for males born after 12/31/59;

D. Must satisfy fitness requirements for the position to which appointed;[5] and

E. Must agree to accept an Incident Management or Incident Support assignment.[6]

**3-2.** **CORE Appointments**

A. COREs are hired under a Stafford Act appointment authority and their salaries and benefits are funded by the DRF, thus the scope of their duties must predominately carryout Stafford Act activities.

B. Individuals appointed to CORE positions are given time-limited appointments for a period of not less than two years but not to exceed four years unless the appointment is renewed for another term. The length of the appointment requested by the Office or Directorate should be commensurate with the expected amount of work available for the CORE in question (the appointment can be less than two years if appropriate).

C. A CORE appointment does not confer eligibility or priority consideration for a permanent appointment.

D. A CORE's work schedule may be changed and a CORE may be assigned a Mission Essential, Incident Management, Incident Support, or Ancillary

---

[4] *See* DHS Management Directive 3120.2, Employment of Non-Citizens, March 22, 2004.

[5] *See* DHS Instruction 121-01-007, DHS Personnel Suitability and Security Program, June 2009.

[6] *See* Memorandum from the Deputy Administrator, Every Employee an Emergency Manager—Action Items, January 20, 2012.

Support title, irrespective of his or her position description, based on the operational needs of FEMA.

E. COREs are not subject to any protection afforded by reduction-in-force provisions, re-employment rights, or adverse action procedures established under any statutory or regulatory provision.

F. COREs must be ready to deploy wherever FEMA needs their services and have 24 hours to respond to a deployment order and may be required to work long hours under stressful and unfavorable conditions.

G. A CORE's appointment will end on the Not to Exceed (NTE) date of his or her appointment, unless it is extended or renewed based on the needs of FEMA.

H. COREs may be appointed to supervisory positions and serve as supervisors of record for other Stafford Act employees, provided that the CORE is hired into a position description classified as supervisory and completes mandatory supervisory training. COREs may serve as a temporary duty supervisor during a deployment, so long as the work supervised arises out of the Stafford Act and the period of supervision is temporary and/or short-term.

I. COREs, who serve as the supervisor of record for PFTs on the date when this Manual becomes effective, may continue to serve in such capacity until the CORE's current term expires.

**3-3.** **Conditions of Employment**

All CORE appointees are required to sign a Conditions of Employment statement upon appointment, and upon renewal of an appointment. COEs contain significant, but not all of, the DHS/FEMA and other rules and regulations that COREs must abide by, including but not limited to:

A. Complying with FEMA's deployment procedures and policies;[7]

B. Using electronic funds transfer for salary payments and travel reimbursements;

C. Maintaining eligibility for a government issued travel charge card, and abiding by the terms and conditions established by the bank issuing the travel card and FEMA (see FD 122-9, Travel Charge Card, or superseding document);

D. Presenting and conducting themselves at all times in compliance with the standards of ethical conduct provided by the Office of Governmental Ethics (see 5 C.F.R. part 2635), preserving the public trust, and adhering to DHS/FEMA rules and regulations;

E. Traveling in the most expeditious and cost effective manner, abiding by DHS and FEMA travel policy to make all travel arrangements;

---

[7] *See* FD 010-8, FEMA Incident Workforce Deployment, January 29, 2014.

F. If authorized to use a motor vehicle for official business, complying with all applicable laws, regulations, and policies related to official motor vehicle usage;

G. Abiding by the terms of use in all revocable licensing agreements with respect to all FEMA-issued property, and using FEMA-issued property for official purposes only; and

H. Complying with FEMA Manual 123-9-1, Telework, if their supervisor authorizes telework.

Failure to comply with these conditions of employment, or any other standards of conduct, may result in disciplinary action, up to and including removal from Federal service (see Chapter 11).

**3-4.** **Directed Work Location**

COREs will work at their Residence of Record or other designated locations by FEMA supervisors and managers, if so directed. COREs may be directed to work at alternate locations on days when their regular worksite is closed due, but not limited to, weather closures, localized emergencies, facility safety, or for operational needs. COREs working at a Directed Work Location are not teleworking.

**3-5.** **Oath of Office**

A. The following FEMA personnel are authorized to administer the oath of office to newly appointed COREs or to delegate this authority:

1. The Administrator;

2. Deputy Administrator;

3. Regional Administrators;

4. The Chief Component Human Capital Officer;

5. Federal Coordinating Officers; and

6. Federal Disaster Recovery Coordinators.

B. The above officials may delegate authority to administer the oath of office to an employee at initial onboarding.

**3-6.** **Government Property**

A. As soon as practicable after appointment, FEMA shall furnish each CORE with appropriate mobile communication and/or computing equipment as determined by the current property authorization list.

B. COREs shall keep the equipment charged and accessible, and shall seek prompt assistance for malfunctioning equipment.

C. All COREs are required to accept receipt of all FEMA-issued equipment and sign FEMA Form 119-7-1-3. By signing this form, the CORE acknowledges

acceptance of and responsibility for the equipment and becomes a Custodian of the equipment, as set forth in FEMA Directive 119-7, Federal Personal Property Management, dated September 24, 2013. Violation of this agreement may result in disciplinary action, up to and including removal.

D. COREs shall only use, display, or present their FEMA-issued government identification card for lawful and authorized purposes.

## 3-7.  Reassignments to a New Position

If a CORE is reassigned to a new position, the CORE must meet the minimum qualifications for the position and an Office or Directorate head must approve the reassignment.

## 3-8.  Detail Assignments

A. A CORE may be temporarily placed on a detail to carry out a discrete function. If a CORE is placed on a detail, the duties and responsibilities performed by the CORE must be payable under the Stafford Act with the exception described in part C below.

B. Details to perform Stafford Act activities. Absent approval from OPM, a CORE may not be detailed to a competitive service position. A CORE may be placed on a detail assignment for up to 120 days that may be renewed for one additional 120 day period. OCCHCO must approve a CORE detailed to a position for more than 120 days or to positions at a higher pay level. See Chapter 14 for more information on rotational assignments.

C. A CORE may be detailed for mission and operational needs or for training to perform non-Stafford Act activities described below:

1. Non-Stafford Act Mission and Operational Detail. Pursuant to 6 U.S.C. § 314 the Administrator is vested with the authority to carry out all authorities of FEMA. Upon a determination that urgent and compelling circumstances exist in order to carry out the FEMA mission or support to other Federal agency incident operations, a CORE may be placed on a temporary detail to perform non-Stafford Act activities under the following conditions:

    i. The detail shall not exceed 90 days per appointment unless approved by OCC; and

    ii. The detailed CORE's salaries, benefits, and associated expenses must be paid from the account normally charged for carrying out the gaining program or activity for the duration of the detail.

    iii. Note that training activities and other duties needed to prepare a CORE for a mission essential detail may be conducted outside of the 90 day detail period but must be justified and approved in advance. In such circumstances, the training time and the detail time, will be charged to the receiving program or office.

2. Non-Stafford Act Training Details. FEMA may authorize a non-Stafford Act detail of COREs under the following conditions:

    i. A determination must be made that the training of the CORE, and thus the increased ability of that CORE to carry out future Stafford Act activities, is the primary purpose and benefit of the non-Stafford Act assignment;

    ii. The detail may not exceed 30 days without a determination that a detail of more than 30 days is warranted;

    iii. Extensions of these details beyond 30 days are made every 30 days thereafter and shall not exceed 90 days per appointment; and

    iv. The detailed COREs may have their salaries and benefits funded by the DRF.

3. COREs carrying-out non-Stafford Act activities must be justified as either an urgent and compelling mission/operation-related detail or a training assignment. Under no circumstances, may FEMA use both of these justifications for the same non-Stafford Act activity. In both instances, the CORE is limited to one non-Stafford Act detail per appointment, unless approved by OCC.

## 3-9.  Reappointment Procedures

A. OCCHCO provides each Office and Directorate with a list of COREs and their expiration dates on a biweekly basis.

B. A CORE's appointment will end on the Not-to-Exceed (NTE) date of his or her appointment, unless it is renewed by the Office or Directorate. All requests to renew the appointment of a current CORE must be submitted by the supervisor of record to OCCHCO using an SF-52, Request for Personnel Action.

C. Two months before the end of a CORE's appointment, if a supervisor of record determines that a CORE's appointment should not be renewed, the supervisor must contact OCCHCO/Employee Relations on how to notify the CORE that the CORE's appointment will not be renewed.

## 3-10.  Resignation

COREs may resign at any time prior to the termination or expiration of their appointments. COREs must state in writing the reason for the resignation and the requested effective date of the resignation. A CORE may request rescission of the resignation prior to the effective date, but FEMA is not obligated to consider or grant such a request. FEMA is not obligated to grant the request in order to avoid removal for misconduct or poor performance. FEMA may not deny the request for any reason prohibited by Title 29, U.S. Code, or any applicable EEOC regulations.

# CHAPTER 4:  COMPENSATION PROVISIONS

**4-1.  <u>Applicability</u>**

The compensation provided to COREs includes the provisions found in this Chapter regardless of the pay plan covering the CORE, unless otherwise stated.

**4-2.  <u>Establishment of CORE Pay Plan</u>**

COREs are paid via an administratively determined "IC" pay plan. COREs paid via the GS scale or GS based pay bands will be transferred to the IC pay plan of either grades and steps or pay bands at their current rate of pay. FEMA managers, in conjunction with OCCHCO, are given the option to utilize one of two pay scales; a pay scale consisting of pay bands or a pay scale consisting of grades and steps (see Chapters 5 and 6). Offices or Directorates may change the pay plan for all COREs assigned to the Office or Directorate with OCCHCO approval.

**4-3.  <u>Conversion Actions</u>**

The first-level supervisor may recommend adjustment of pay upon conversion from another FEMA appointment to a CORE appointment (see sections 5-3 and 6-3 for information on conversions that result in a decrease in pay).

**4-4.  <u>Position Management and Classification</u>**

The Position Management and Classification Manual, FM 252-2-1, June 19, 2014, provides guidance for the classification and position management of CORE positions. The rules and procedures for position classification reviews (i.e., desk audits) and classification appeals found in FM 252-2-1 do not apply to CORE positions.

**4-5.  <u>Locality Pay</u>**

A. Locality pay is an additional sum of money administratively-determined by OCCHCO and added to a CORE's base pay to account for the difference between the pay of government workers and private sector workers in a given geographic location. Locality pay is considered a part of basic pay and is applied to the minimum and maximum rates of each pay plan.

B. COREs, such as IM COREs, who physically work full time from their residence of record, will receive the locality pay assigned to their residence of record's locality pay area, even if the CORE reports or is assigned to a FEMA fixed facility with a different locality pay rate.

C. When a CORE moves from an official duty station in one locality pay area to an official duty station in a different locality pay area, OCCHCO will adjust the CORE's basic pay to reflect the difference in the administratively-determined locality pay rates. Pay retention is not applicable to geographic changes in locality.

**4-6.** **Cost of Living Increase**

OCCHCO may periodically recommend that the Administrator adjust pay scales for the CORE program. For example, an adjustment may be appropriate to reflect a cost of living increase, but need not coincide with changes to pay and wage schedules by Congress, OPM, or OPM's designee. In such circumstances, OCCHCO will review current CORE pay rates and recommend the proper percentage adjustment that is appropriate.

**4-7.** **Pay Ceilings and Premium Pay**

Absent a waiver for the bi-weekly pay cap, the maximum rate of basic pay for a FLSA-exempt CORE may not exceed the rate payable for Level V of the Executive Schedule or the rate for GS-15 Step 10 employees (including locality pay), whichever is higher (see FM 253-2-1, Premium Pay). The maximum aggregate amount any CORE may receive in basic pay, bonuses, and allowances is the rate for Level I of the Executive Schedule.

The rules and regulations governing premium pay, including, but not limited to, the bi-weekly and annual pay caps, overtime, compensatory time off, and night differential for COREs is found in FM 253-2-1, Premium Pay.

**4-8.** **Recruitment, Relocation, or Retention Incentives**

A. In General

1. A recruitment incentive is a one-time, lump-sum payment to a newly appointed CORE to a position that is determined to be critical to FEMA's mission and in the absence of the incentive, would be difficult to fill.

2. A relocation incentive is a one-time, lump-sum payment to a current CORE who agrees to relocate with no break in service to accept a FEMA position in a different geographic area if the position is likely to be difficult to fill in the absence of the incentive.

3. A retention incentive is paid to a current CORE if the CORE has unusually high or unique qualifications, or an Office or Directorate has a special need for the CORE's services that makes it essential to retain the CORE, and the CORE would likely leave the Federal service in the absence of a retention incentive. The CORE must have stated an intent to resign or retire, in writing, or must have submitted his or her resignation or retirement paperwork prior to authorization.

4. The employing office must consider at least the following factors, as applicable to the case at hand, when deciding whether to pay a recruitment or relocation incentive:

   i. The success of recent efforts to recruit candidates for similar positions, including indicators such as offer acceptance rates, the proportion of positions filled, and the length of time required to fill similar positions;

   ii. Recent turnover in similar positions;

iii. Labor-market factors that may affect the ability of the office to recruit candidates for similar positions now or in the future;

iv. Special qualifications needed for the position; and

v. The practicality of using an advanced rate alone or in combination with a recruitment or relocation incentive.

5. The employing office must consider at least the following factors, as applicable to the case at hand, when deciding whether to pay a retention incentive:

i. The success of recent efforts to recruit candidates and retain employees with qualifications similar to those possessed by the CORE for positions similar to the position held by the CORE; and

ii. The availability in the labor market of candidates for employment who, with minimal training or disruption of service to the public, could perform the full range of duties and responsibilities assigned to the position held by the CORE.

6. The use of a recruitment, relocation, or retention incentive is not to be used as a substitute for traditional recruiting efforts that could yield a competent and qualified employee without the use of such an incentive.

B. Justification and Approval. The Selecting Official or supervisor of record shall submit a justification for any request for a recruitment, relocation, or retention incentive through the head of his or her Office or Directorate for approval. Office or Directorate heads may approve an incentive amount less than $20,000, or less than 25% of a CORE's base pay. Any incentive request with a lump sum greater than or equal to $20,000, or greater than or equal to 25% of a CORE's base pay must be submitted by the Associate Administrator or Office Chief (if the Office Chief reports directly to the Administrator) overseeing the requesting organization and be approved by the Administrator or designee, but at least by the Chief of Staff and OCCHCO. In all cases, OCCHCO must approve the incentive request and OCFO must certify the availability of funds prior to authorizing payment. All justifications shall include, at a minimum, the following information:

1. The amount and timing of the approved incentive;

2. For retention incentives, the payment schedule for the incentives and the maximum number of payments or end date for the payments; and

3. The basis for determination that the skills and work experience of the applicant or CORE are of substantial value, or that, without such an incentive, the position would be difficult-to-fill. The basis should be based on at least one factor from subsection A.4 if a recruitment or relocation bonus, or one factor from subsection A.5 if a retention incentive.

C. COREs who receive a recruitment, relocation, or retention incentive must sign and comply with the terms of a Continuing Service Agreement (CSA). See Chapter 15, Continuing Service Agreements, for more information.

**4-9.** **<u>Offset Provision for Civilian Retirees</u>**

    A.   Retirees from the federal service who are receiving a federal retirement annuity and become reemployed by the federal government, absent a waiver, will have their salaries reduced by the amount of the annuity they are entitled to receive during the period of reemployment, pursuant to 5 U.S.C. § 8344(a).

    B.   COREs who are reemployed annuitants must provide OCCHCO with a copy of their most recent annuity notice issued by OPM, and all subsequent notices of change, indicating the monthly annuity amount to the Payroll and Processing Operations Division, OCCHCO prior to or at the time of appointment.

## CHAPTER 5:  COMPENSATION (PAY BANDS)

**5-1.**  <u>**General**</u>

    A.  This Chapter addresses the rules and procedures associated with compensating COREs via pay bands, which is one of the pay scales under the IC pay plan.

    B.  Each pay band established for the IC pay plan corresponds to a range of pay and classification levels, such that bands replace grades and steps, and series are retained. Positions are classified by title, career path, and occupational series. The pay range for each pay band is equivalent to the pay range of GS and IC grades and steps within the pay band. A CORE may not receive base pay in excess of his or her pay band unless they are promoted to a position classified at a higher pay band.

        1.  Band 1 corresponds to GS 1 to GS 6.

        2.  Band 2 corresponds to GS 7 to GS 9.

        3.  Band 3 corresponds to GS 10 to GS 11.

        4.  Band 4 corresponds to GS 12 to GS 13.

        5.  Band 5 corresponds to GS 14 to GS 15.

    C.  The major duties and responsibilities of each CORE position are included in the position description. The position description is analyzed by a Human Resources Classification Specialist to determine the title and pay band of the position. This analysis of the work to be performed and comparison of the work to established standards is referred to as position classification and applies the principle of equal pay for equal work.

    D.  Exceptions to the policies and procedures contained within this Chapter may be authorized by the CCHCO to respond to an emergent and unexpected mission need arising from a Level I disaster, to alleviate severe hardship to individuals resulting from any error on the part of FEMA in effecting personnel actions, or to address unusual situations that were not anticipated when this policy was drafted.

**5-2.**  <u>**Setting Basic Rate of Pay**</u>

    A.  The Selecting Official is delegated the authority to assign a yearly basic pay amount within the position classified pay band. Pay setting criteria may include:

        1.  The prior salary of the candidate;

        2.  The overall qualifications of the candidate;

        3.  The recency of the individual's relevant experience;

        4.  The qualifications and pay of employees in similar positions in the work unit;

    5.   Salary comparability to non-Federal pay rates for similar work;

    6.   Special qualification requirements associated with the vacant position;

    7.   Turnover rates for the position;

    8.   Scarcity of qualified candidates; or

    9.   Programmatic urgency.

B.  Any request for a rate above the minimum rate within the position classified pay band(s) must include a justification drafted by the Selecting Official and approved by the second level supervisor. This justification must include:

    1.   The candidate's name;

    2.   The title, grade, and recommended rate of the vacant position; and

    3.   The factors and determination that support the pay rate determination.

C.  Pursuant to 29 C.F.R. § 1602.14 and in accordance with Equal Employment Opportunity Commission regulations, the justification for setting pay higher than the minimum rate shall be preserved for one year from the date of its making.

## 5-3.  Pay Adjustments

Adjustments to pay within a classified pay band may be requested by the supervisor of record for review and approval by the Human Resources Specialist without written justification or approval from the second level supervisor. Such adjustments may be given under the following circumstances:

A.  Reassignment of a CORE from one position to another position within the same classified pay band if the responsibilities of the new position warrant an increase or decrease in base pay to further the principles of equal pay for equal work;

B.  A pay change, of either an increase or decrease, to compensate for an increase or decrease in locality pay in conjunction with a move to another geographic area; or

C.  Receipt of a merit-based increase (see section 5-4).

## 5-4.  Merit-Based Increase

A.  A CORE who is not already receiving the maximum basic pay for his or her position may receive a merit-based increase at the conclusion of the performance year.

B.  A CORE, who receives a rating of record of "Achieved Expectations", or equivalent, is eligible for a merit-based increase of up to 3%; a rating of record of "Exceeded Expectations" or equivalent, is eligible for a merit-based increase of up to 4%; or a rating of record of "Achieved Excellence" or equivalent, is eligible for a merit-based increase of up to 5%.

C.  A CORE, who receives a rating of "unacceptable", or equivalent, is not eligible for a merit-based increase.[8]

D.  A CORE's supervisor of record must send an SF-52, approved by the second level supervisor, to the Payroll and Processing Division, OCCHCO for processing, certifying that the CORE has received an annual rating of record for the most recent performance cycle and that the percentage increase to basic pay sought by the supervisor of record is in compliance with the requirements established by section 5-3 above.

**5-5.  Promotion**

A.  A promotion is a personnel action that moves a CORE from one classified band to another in the same career path. A promotion may also be the selection and appointment of a CORE to a position in another career path or region to which the CORE applies. This may result in a combination of an increase in the CORE's salary and a change in position description. If the CORE is moved to a different position, in the same pay band, with the same or similar duties, the personnel action is a reassignment with retained pay.

B.  The CORE's supervisor of record must certify that the CORE's most recent performance rating was at least "Achieved Expectations" or equivalent, next higher graded work exists for the CORE to perform, the CORE's new position description captures the duties to be performed, and the higher graded position is approved and funded. A CORE may be hired into a position in a higher pay band via vacancy announcement or a name request, if the Office or Directorate has an existing higher position available or creates a new position according to the procedures detailed in section 2-2.

C.  The new basic pay rate upon promotion may be set at any level in the new band, but the CORE must receive at least a six percent minimum pay increase over his or her previous salary. If the CORE moves to a different career path, any band in the new career path would be considered a "new band" for the purposes of determining his or her salary.

**5-6.  Change to a Lower Pay Band**

When a CORE moves from his or her current position to a position at a lower pay band the action is referred to as a change to a lower pay band. The circumstances underlying the supervisor's recommendation to initiate a change to a lower pay band will determine how pay is set.

A.  A CORE who exhibits poor performance and fails to improve acceptably will be terminated (see Chapter 11 for more information). In rare occasions, COREs may be demoted in lieu of removal due to poor performance. In such circumstances, pay is set at a lower pay band such that there is a reduction in

---

[8] Supervisors who encounter poor performance should consult Chapter 11: Procedures for Misconduct and Poor Performance.

pay equivalent to at least two steps (using the pay intervals from the grades and steps scale) below the higher banded position.

B. When a CORE requests a change to lower pay band for personal reasons or convenience, including through application for an announced vacancy at a lower pay band, the action is considered a voluntary change to a lower pay band. For voluntary changes to a lower pay band, the new rate will be set according to the procedures in section 5-2, and should include any merit based increases that the CORE would have received during the qualified period.

C. The reclassification of a position by OCCHCO to a lower pay band will result in a reduction in pay and pay will be set in accordance with the classification decision. Pay will be set according to the procedures detailed in section 5-2. No appeal of the reclassification decision or pay retention is permitted, subject to any applicable collective bargaining agreement.

## CHAPTER 6:  COMPENSATION (GRADES AND STEPS)

**6-1.  General**

    A. A CORE may be paid via an administratively-determined "IC" grades and steps pay scale, as described in this Chapter. The pay scale consists of 15 pay grades (IC-1 to IC-15) with 10 steps per grade. The pay sums associated with the IC pay scale mirror the GS scale.

       For example, a CORE hired at IC-11, Step 1 under the IC pay plan would be paid at the same basic rate of pay as a GS-11, Step 1 employee under the GS scale.

    B. Exceptions to the policies and procedures contained within this Chapter may be authorized by the CCHCO to respond to an emergent and unexpected mission need arising from a Level 1 disaster, to alleviate severe hardship to individuals resulting from any error on the part of FEMA in effecting personnel actions or to address unusual situations that were not anticipated when this policy was drafted.

**6-2.  Setting Basic Rate of Pay**

    A. The position description is the primary source of information used in setting pay in the IC pay series. Other information used in setting pay is (1) the geographic location (official duty station) of the position; and, (2) the individual's prior employment, salary history, and qualifications.

    B. The major duties and responsibilities of each CORE position are included in its position description. The position description is analyzed by a Human Resources Specialist to determine the title and grade range of the position. This analysis of the work to be performed and comparison of the work to established standards is referred to as position classification and applies the principle of equal pay for equal work.

    C. A new appointment is an individual's first appointment as an employee of the Federal government. Pay for all new COREs will be set at the minimum rate (Step 1) of the grade of the position, unless the CORE is approved for an advanced rate (see part E Advanced to a Higher Step).

    D. If the CORE has prior federal service (including as a current or former FEMA employee), OCCHCO sets the basic rate of pay at the minimum rate for the position, unless they receive an advanced rate (as discussed below) or the highest pay rate previously received during Federal service, whichever is higher.[9] Before setting pay at the highest pay rate previously received during Federal service, the Selecting Official should consider:

       1. The overall qualifications of the individual;

       2. The recency of the individual's relevant experience;

---

[9] If the employee's highest previously-received pay rate falls between two steps of the IC pay scale, the Selecting Official may request that the employee's pay be set at the higher step.

3.  The qualifications and pay of employees in similar positions in the work unit; and

4.  The potential impact on the morale of those employees if the candidate were to receive the maximum payable rate.

E.  Advanced to a Higher Step.

1.  Prior to a candidate entering on duty, the Selecting Official will consider whether pay above the minimum rate of the grade should be made for a CORE.

2.  Pay rate decisions maintain equity between the pay of the new hire and that of current employees, including COREs, performing comparable work. The advanced rate may not exceed step 10 of the applicable grade to which the candidate will be hired.

3.  Required documentation and approval:

    i.   A request to advance a CORE up to step four may be submitted by the first or second level supervisor to OCCHCO for approval. A request to advance a CORE to step five and above must be submitted by the head of an Office or Directorate to OCCHCO for approval. The request must be accompanied by a written justification that includes:

        a.  The candidate's name;

        b.  The title, grade, and recommended rate of the vacant position; and

        c.  The factors and determination that support the pay rate determination. This may include, but is not limited to, salary comparability, special qualification requirements, turnover rates, scarcity of qualified candidates, or programmatic urgency.

    ii.  The first or second level supervisor must submit a recommendation for an advanced rate appointment well in advance of establishing an entrance on duty date to ensure sufficient time for OCCHCO to act on the request before the appointment becomes effective.

    iii. Pursuant to 29 C.F.R. § 1602.14 and in accordance with EEOC regulations, the justification shall be preserved for one year from the date of its making.

**6-3.  <u>Pay Adjustments</u>**

Adjustments to pay within a grade after the pay rate is initially set may be given under the following circumstances:

A.  Reassignment of a CORE from one position to another position if the responsibilities of the new position warrant an increase or decrease in base pay to further the principles of equal pay for equal work;

B. A pay change, of either an increase or decrease, to compensate for an increase or decrease in locality pay in conjunction with a move to a different official duty station in another geographic area; or

C. Receipt of a step increase (see section 6-4).

**6-4.**  <u>**Step Increases**</u>

A. A CORE who is not already at the highest step of his or her current grade may be advanced to the next higher step at the conclusion of the waiting period assigned to their current rate.

1. While FEMA's Stafford Act authorities permit FEMA the authority to compensate without regard to Title 5, FEMA adopts the waiting periods for advancement to the next highest step established by 5 U.S.C. § 5335 and its implementing regulation at 5 C.F.R. § 531.405 as a matter of policy for all COREs paid via grades and steps.

2. A CORE is not automatically entitled to receive a step increase at the conclusion of his or her waiting period.

3. To receive the step increase, the CORE's supervisor of record must sign the step increase document and return to OCCHCO for processing, certifying that the CORE:

   i.  Has completed the requisite waiting period;

   ii.  Has not received an equivalent increase during the waiting period; and

   iii.  His or her summary rating level for the most recent performance was at least "Achieved Expectations" or equivalent.

4. If a supervisor determines that a CORE's performance is not at an acceptable level, the supervisor should contact OCCHCO/Employee Relations at least two months before the end of the required waiting period for a step increase, to draft a notification to the CORE stating that the CORE's next step increase is being withheld, the reason for the negative determination, and what the CORE must do to improve his or her performance to be granted the step increase.

B. Prior to the completion of the requisite waiting period, a supervisor may recommend one additional step increase if warranted by the CORE's performance. To receive the additional step increase, the CORE's supervisor of record must send a justification describing the accomplishments and performance exhibited by the CORE that would warrant an increase in pay, and an SF-52 approved by the second level supervisor to OCCHCO for processing. OCCHCO will review the request to ensure COREs who exhibit similar performance receive similar pay.

**6-5.  Promotion**

    A.  A promotion is a personnel action that moves a qualified CORE from one grade to another in the same career path or to a grade in another career path in combination with an increase in the CORE's salary.

    B.  The CORE's supervisor of record must certify that the CORE's most recent performance rating was at least "Achieved Expectations" or equivalent, next higher graded work exists for the CORE to perform, the CORE's new position description captures the duties to be performed, and the higher graded position is approved and funded. A CORE may be hired into a position at a higher grade via vacancy announcement or a name request, if the Office or Directorate has an existing higher graded position available or creates a new position according to the procedures detailed in section 2-2.

    C.  For promotions, pay is set at the lowest pay rate in the new grade; however, the new pay rate must exceed the CORE's existing pay rate by at least two steps. If the annual rate of the new position falls between two steps of the new grade, the higher step may be used. For example, an IC-7, Step 3 at FEMA HQ, with an annual pay rate of $45,473, who is promoted to an IC-8, is entitled to at least an increase in pay equal to two steps from the position from which she was promoted at IC-7 Step 5, or $48,315. Because the annual pay rate for an IC-8, Step 1 is $47,212, it does not satisfy the two-step increase requirement. Therefore, pay is set at IC-8, Step 2 or $48,786.

**6-6.  Change to Lower Grade**

When a CORE moves from his or her current position to a position at a lower grade the action is referred to as a change to lower grade. The circumstances underlying the supervisor's recommendation to initiate a change to lower grade will determine how pay is set.

    A.  A CORE who exhibits poor performance and fails to improve acceptably will be terminated (see Chapter 11 for more information). In rare occasions, COREs may be demoted in lieu of removal due to poor performance. Upon demotion, the pay rate must be set at least two steps below the current pay rate. If the two-step reduction results in a rate that falls between two steps of the lower grade, the lower step must be used.

    B.  When a CORE requests a change to lower grade for personal reasons or convenience, including through application for an announced vacancy at a lower grade, the action is considered a voluntary change to a lower grade. For voluntary changes to a lower grade, the new rate should include any step increase that the CORE would have received during the qualifying period and pay should be set at:

        1.  The minimum  payable rate of basic pay for the lower grade; or

        2.  The highest previous rate received under Federal service, if the action is fair and equitable after considering the factors listed in section 6-2, and if the action serves the convenience of the Government.

C.  The reclassification of a position by OCCHCO to a lower grade range will result in a reduction in pay and pay will be set in accordance with the classification decision. Pay will be set according to the procedures detailed in section 6-2. No appeal of the reclassification decision or pay retention is permitted, subject to any applicable collective bargaining agreement.

# CHAPTER 7:  BENEFITS

**7-1.**  **General**

    A.  With certain exceptions that apply to individuals such as reemployed annuitants, CORE are eligible for Federal Employees Health Benefits (FEHB), Federal Employees Dental/Vision Insurance Program (FEDVIP), Federal Employees Group Life Insurance (FEGLI), Federal Employees Retirement System (FERS), Flexible Spending Account (FSA), Federal Long Term Care Insurance (FLTCIP), and participation in the Thrift Savings Plan (TSP).

    B.  COREs must review their benefit options and make selections within prescribed election periods. OCCHCO, Employee Services Division, will provide timely information to COREs with regard to available benefit options, election periods, and technical direction regarding how to apply for these options.

    C.  OCCHCO staff is prohibited from making any type of recommendation that may influence a CORE's benefit election. COREs need to evaluate cost, personal needs, and eligible family members and their needs when preparing to make a benefits selection.

    D.  FEMA applies guidance contained within OPM Benefits Administration Letter, No. 13-203, when extending benefits to legally married same-sex spouses and common law marriages in certain states, of Federal employees and annuitants, and to the children of those marriages.

**7-2.**  **Health Benefits**

    A.  COREs are given an opportunity to enroll in the Federal Employees Health Benefits Program (FEHB) at the time of appointment to a CORE position.

    B.  A CORE must decide whether to elect to enroll in FEHB within 60 days after the effective date of appointment. A CORE who elects to enroll must submit SF-2809 to his or her HR Specialist. A CORE who fails to return the completed form within the prescribed time frame, or who cancels enrollment will not have another opportunity to enroll until an FEHB open season is offered (generally once per year), or as a result of a Qualifying Life Event (QLE).

    C.  The CORE's share of the premium for the benefits plan chosen will be deducted from the CORE's bi-weekly pay on a pre-tax basis.  A CORE may cancel health benefits coverage during an extended period of non-pay status or may continue the coverage and pay the premium each pay period or upon return to pay status. Effective dates for enrollment, changes in enrollment, and cancellation of enrollment will be established in accordance with guidance prescribed by the U.S. Office of Personnel Management (OPM).

**7-3.** **FEDVIP (Dental and Vision) Program**

    A. The Federal Employees' Dental/Vision Program (FEDVIP) is a supplemental program offering vision and dental coverage to Federal employees, retirees, and their eligible family members on an enrollee-pay-all basis.

    B. COREs, retirees, and their eligible family members are eligible to enroll in FEDVIP if they are eligible to enroll in FEHB and the CORE's position is not excluded by law or regulation.[10] COREs who are not enrolled in FEHB may still be eligible for FEDVIP, providing they are eligible to enroll in FEHB.

    C. New and newly eligible COREs may enroll within 60 days after they become eligible. COREs may also enroll during the annual Federal Benefits Open Season in November and December.

**7-4.** **Life Insurance**

Unless a CORE elects to waive coverage prior to the end of the pay period in which appointed, eligible COREs are automatically insured for basic life coverage on the day the CORE enters on duty in a pay status. Within 60 days after the effective date of appointment to a CORE position, a CORE who has basic life insurance coverage may also elect standard, additional, and/or family optional insurance. A CORE may decrease or waive all life insurance coverage at any time. Effective dates of life insurance coverage and waivers will be in accordance with the Federal Employees Group Life Insurance (FEGLI) program and OPM guidance. FEGLI is not included in the annual benefits open season and open season periods are rare.

**7-5.** **Retirement**

    A. As a general rule, employees appointed to CORE positions are automatically covered by the Federal Employees Retirement System (FERS). Exceptions include certain former Federal employees who were hired prior to January 1, 1984, and were covered under the Civil Service Retirement System (CSRS). Retirement coverage, whether FERS, CSRS, or CSRS Offset, begins on the effective date of appointment to a CORE position.

    B. COREs who are covered by FERS, and first appointed:

        1. Before 2013, contribute 0.8% of pay to the Civil Service Retirement and Disability Fund (CSRDF);

        2. In 2013, contribute 3.1% of pay to the CSRDF; or

        3. After December 31, 2013, contribute 4.4% of pay to the CSRDF.

        4. Employee contributions to the CSRDF may change according to changes in the FERS program.

---

[10] *See* 5 C.F.R. § 894.302 or an HR Specialist to determine whether a position is excluded from FEDVIP.

**7-6.**   **Thrift Savings Plan**

    A.  The Thrift Savings Plan (TSP) is a tax-deferred retirement savings and investment plan that provides COREs with an opportunity to save a portion of their income for retirement and reduce current taxes.

    B.  Eligibility for participation is determined by FEMA in accordance with law and TSP regulations published by the Federal Retirement Thrift Investment Board.

    C.  COREs, covered by FERS, appointed after July 31, 2010, are automatically enrolled in the TSP.

    D.  COREs can elect, change their election, or stop their contributions at any time through the Employee Personal Page (EPP) or by completing and submitting a TSP-1 Election form.

**7-7.**   **Federal Long-Term Care Insurance Program**

Long-Term Care insurance provides financial protection to enrollees who are in need of assistance with their daily activities due to a lengthy or lifelong illness, injury, or cognitive impairment. Long-Term Care insurance is medically underwritten; therefore, a CORE and eligible family members must qualify for the insurance. Eligible COREs can enroll at any time; however, newly-hired COREs and their spouses receive a 60-day window to enroll using an abbreviated underwriting process.

**7-8.**   **Flexible Spending Accounts**

Flexible Spending Accounts (FSA) allows COREs to set aside money on a pre-tax basis to cover out-of-pocket health care or dependent care expenses. A newly eligible CORE has 60 days from the date of his or her appointment to elect to set aside this money by payroll deduction. A CORE who wishes to participate or continue to participate from one plan year to the next must make a positive election during the annual open season, which runs concurrent with the health insurance open season. Changes can be made outside of the benefits open season as a result of a Qualifying Life Event (QLE).

**7-9.**   **Employee Assistance Program (EAP)**

COREs have access to confidential work life enhancement services through the EAP, free of charge. The EAP is a professional resource available to help COREs resolve life challenges. A CORE may call the toll-free EAP number at 1-800-222-0364, 24 hours a day, 7 days a week. A CORE can also access EAP services online at www.FOH4you.com.

**7-10.**   **Transit Subsidy Program**

Subject to the availability of funds, all COREs who are currently using public transportation to commute to work are eligible for transit subsidy benefits.  The Office of the Chief Administrative Officer (OCAO), Support Services and Facilities Management Division (SSFMD), administers the transit subsidy program.

COREs interested in receiving a transit subsidy must complete FEMA Form 254-1-1, Public Transportation Benefit Program Application, and email it to the Transit Subsidy Program at FEMA-Transit-Subsidy@fema.dhs.gov.

# CHAPTER 8:  PERFORMANCE MANAGEMENT

**8-1.**  **General**

    A. CORE performance management shall comply with the Employee Performance Management Program as established by FM 255-1-1.

    B. A CORE who receives a rating of unacceptable, or equivalent, on his or her most recent appraisal (rating of record) may be subject to removal in accordance with Chapter 11 of this Manual. Such removal should be effected regardless of the timing of the CORE's NTE date. However, a supervisor is not precluded from terminating a CORE prior to issuance of a performance appraisal, so long as the supervisor has sufficient documentation to justify the action and has consulted with an OCCHCO Employee Relations Specialist.

**8-2.**  **Performance Management for CORE-Is**

The performance of IMAT members appointed as CORE-Is are subject to FD 010-7, and are not covered by FEMA Manual 255-1-1 or this Chapter.

**8-3.**  **Deployment Performance Management**

    A. When deployed to a disaster for twenty days or more, a CORE qualified in a FQS position, and deployed to that position, will receive an evaluation of the CORE's deployment performance by a temporary duty supervisor. The evaluation period consists of the entire time the CORE is deployed.

    B. COREs will be evaluated on their performance based on the performance goals developed by Cadre Coordinators for each position within a Cadre. The goals will align with the position-specific knowledge of program and technical protocols contained in the position's PTB, and the core competencies for deployed personnel.

    C. The temporary duty supervisor will complete a deployment evaluation in a timely manner and transmit the evaluation to the CORE's supervisor of record. Additionally, the HR Unit Leader and his or her staff will ensure that any demobilized CORE who is deployed for at least twenty days is issued a performance evaluation prior to departing the incident work site.

    D. If a CORE's deployment performance does not meet achieved expectations, the CORE's supervisor of record in coordination with the Cadre Coordinator and/or temporary duty supervisor will collaborate with OCCHCO to determine the appropriate course of action.

    E. A CORE's progress review and appraisal (rating of record) should include input received after a deployment from the temporary duty supervisor. However, the supervisor of record has the discretion to consider the deployment performance evaluation as he or she deems appropriate when completing progress reviews and the annual appraisal (rating of record) subsequent to the deployment.

F.  If the CORE is deployed at the time that the CORE's quarterly progress review should take place, the supervisor of record will work with the CORE and his or her temporary duty supervisor to obtain feedback on the CORE's performance during the applicable quarter.

## CHAPTER 9:  AWARDS AND RECOGNITION

**9-1.**   <u>**Awards and Recognition Program**</u>

The Awards and Recognition program applicable to Title 5 employees and captured in FEMA Manual 255-4-1 is also applicable to COREs, with the exception of CORE-Is. Awards and recognition policy applicable to CORE-I IMATs is found in FD 010-7.

## CHAPTER 10:  SCHEDULING OF WORK AND TELEWORK

**10-1.** <u>**Scheduling of Work and Telework**</u>

    A. FM 106-1-1, Scheduling of Work, applies to all COREs. To establish a work schedule a CORE must submit a copy of FEMA Form 106-1-1-1, Request for Work Schedule, to his or her supervisor of record for approval.

    B. COREs will use FEMA approved timekeeping policies and procedures to account for all hours of work.

    C. FM 123-9-1, Telework Manual, applies to all COREs. To establish a telework agreement and schedule a CORE must submit a copy of FEMA Form 123-9-0-1, Telework Application and Agreement Form, and FEMA Form 123-9-0-2, Employee Self-Certification Safety and Health Checklist, to his or her supervisor of record for approval.

    D. COREs whose Residence of Record is their permanent duty station are not teleworking when on duty. However, all COREs whose Residence of Record is their official duty station must have a completed and approved Employee Self-Certification Safety and Health Checklist forms on-file with FEMA prior to being permitted to work.

## CHAPTER 11:  PROCEDURES FOR MISCONDUCT AND POOR PERFORMANCE

**11-1.** **General**

A. COREs are non-Title 5 employees and, therefore normally do not have appeal rights to the Merit Systems Protection Board.

B. Supervisors must communicate proper conduct and performance standards. Supervisors must also set an example for proper conduct and performance for their subordinates.

C.  Supervisors must identify and deal with misconduct and unacceptable performance as they occur.

D. Supervisors must document problems as they occur and follow up with COREs to ensure they understand the seriousness of their behavior and/or performance deficiencies. Documentation does not have to be lengthy. It can be a brief summary of key facts and issues, with names, dates and times that the incident(s) occurred. This documentation must be created in a timely manner and preserved for potential litigation and may be subject to discovery.

E. Supervisors should immediately contact their servicing Employee Relations Specialist when misconduct or performance issues occur to obtain advice and guidance before taking any official action. If this issue involves misconduct, supervisors must report the matter as required by FD 123-19, paragraph III.D.

F. When making a determination of lack of fitness to encumber a FEMA position, or that the CORE's security clearance is being suspended or revoked under DHS Instruction 121-01-007, OCSO shall immediately notify Employee Relations.

**11-2.** **Addressing Misconduct**

A. Misconduct must be reported to FEMA HQ in accordance with FD 123-19, Administrative Investigations Directive (AID), and, depending on the status of the CORE and the alleged misconduct, to the DHS OIG. It can be difficult to determine whether a CORE's actions constitute misconduct or poor performance, or whether suspected misconduct triggers the requirements to report the suspected misconduct to DHS OIG or the AID Committee. As such, consultation with OCCHCO is critical to determining the proper course of action. The Employee Relations Specialist will recommend the appropriate option and provide the required documentation to the manager for issuance to the CORE. FD 123-19 and its accompanying Manual, FM 123-19-1, provide procedures for reporting misconduct and investigating it prior to determining if disciplinary action for any substantiated misconduct is to be recommended.

B. **Options to Address Misconduct**

1. **Counseling.** A counsel is an informal verbal advisement by a supervisor to a CORE of misconduct that must be corrected, yet which avoids any lasting adverse effect on a CORE's personnel record. The purpose of counseling is to correct misconduct problems soon after they occur in

order to prevent the need for formal discipline. Counseling is an appropriate response to minor misconduct when the CORE has a generally good record, with no prior instances of misconduct, and is committed to correcting the problem. Documentation is not required; however, a follow-up e-mail recounting the conversation entitled "Discussion dated XX" can be provided to the CORE and is strongly recommended. At a minimum the supervisor shall send an email to himself or herself to document the content of the conversation. Counseling can be used to demonstrate that the CORE was put on notice about the problem and knew of the potential for a harsh penalty if the problem continued. A memorandum documenting the counseling is not placed in the CORE's Official Personnel Folder (OPF).

2. **Reprimand.** A written reprimand is the lowest level of formal discipline addressed to the CORE and signed by the immediate supervisor (or higher level supervisor in the chain of command). Depending on the severity of the misconduct, it may be appropriate for a first offense of misconduct, when written formal discipline is necessary or, when verbal counseling has been ineffective in correcting misconduct. The reprimand should include, as a minimum, the following information:

   i. Reference previous counseling or other action that was relied on to support the action (if any);

   ii. Advise the CORE of any applicable appeal rights, such as the right to file an appeal with the next higher level supervisor within five calendar days after receipt of the reprimand;

   iii. Advise the CORE of the potential negative consequences of future misconduct;

   iv. Advise the CORE of Employee Assistance Program (EAP) services available to assist with any work-related or personal concerns that may have an impact on performance and/or behavior at work;

   v. Inform the CORE of the Alternative Dispute Resolution (ADR) Program and of his or her right to seek counseling with an EEO advisor if he or she believes the reprimand is based on a prohibited factor;

   vi. State whether a copy of the reprimand will be placed in the CORE's OPF, which may be for a period not to exceed 3 years;

   vii. Identify the servicing Employee Relations Specialist to contact for questions concerning the reprimand; and

   viii. Provide a signature line upon which the CORE will acknowledge receipt of the notice of reprimand.

3. **Suspension.** A suspension temporarily removes the CORE from the performance of duties without pay for a specified period, and is recorded in the CORE's official personnel record. A notice of suspension is a memorandum on FEMA letterhead, addressed to the CORE, and signed

by the immediate supervisor (or higher level supervisor in the chain of command.

i. The supervisor of record forwards a copy of the notice (signed and dated by the supervisor) and the SF-52 to the Employee Relations Specialist. The Specialist codes the SF-52 and forwards it to the OCCHCO for processing.

ii. The notice of a suspension should include, as a minimum, the following information:

   a. Identify the specific charge(s), supporting information, regulations or policies violated;

   b. Identify the effective date of the action;

   c. Advise the CORE of any applicable appeal rights, such as the right to appeal the suspension to the next-higher level supervisor within five calendar days of receipt of the notice, and of the CORE's right to file a grievance under any applicable collective bargaining agreement;

   d. Inform the CORE of his or her right to seek counseling with an EEO advisor if he or she believes the suspension is based on a prohibited factor;

   e. Advise the CORE how to contact the EAP to assist with any work-related or personal concerns that may have an impact on the CORE's conduct at work;

   f. Provide the name and telephone number of the servicing Employee Relations Specialist whom the CORE may contact for questions; and

   g. Provide a signature line upon which the CORE will acknowledge receipt of the notice of suspension.

4. **Removal from Federal Service.** A removal from federal service is recorded in the CORE's personnel record, and is the most severe form of discipline available to a manager. Removal may be appropriate when the facts and supporting information cause the supervisor to conclude that the CORE has demonstrated an unwillingness or refusal to conform to acceptable standards of conduct, a lesser penalty would not deter future misconduct, or there is little probability of the CORE's rehabilitation.

i. A notice of removal is a memorandum on FEMA Letterhead addressed to the CORE from the immediate supervisor (or higher level supervisor in the chain of command). The notice should include the same items identified in section 11-2.B.3.ii. (Content of a suspension notice).

ii. The CORE's immediate supervisor, or any higher-level supervisor in the CORE's chain of command, should give the notice to the CORE at or before the effective date of the notice and request that the CORE

acknowledge receipt at the bottom of the last page of the notice. If the CORE refuses to sign the notice acknowledging receipt, the supervisor should place a note on the last page to indicate that the notice was given to the CORE and the CORE refused to acknowledge receipt. Failure to acknowledge receipt has no impact on implementation of the decision.

5. **Removal Based on a Determination of Lack of Fitness for a FEMA Position**. All COREs must meet fitness standards established in DHS Instruction 121-01-007.

   i. OCSO has the authority to determine a CORE's fitness, based on a background investigation at the time of entry on duty and every five years thereafter (or more frequently as circumstances warrant).

   ii. When OCSO has determined that a CORE does not meet the fitness standard, in accordance with the procedures in DHS Instruction 121-01-007, OCSO shall notify OCCHCO/Employee Relations, which shall coordinate with the CORE's supervisor and OCSO to deny the CORE unescorted access to DHS/FEMA facilities. In addition, DHS Sensitive Systems Policy Directive 4300A requires that DHS employees have a favorably adjudicated background investigation to be granted access to DHS Information Technology systems. Therefore, COREs who do not meet the fitness standard are normally required to turn in their FEMA equipment (e.g., laptop, Blackberry, etc.) and are placed on non-duty, non-pay status. The CORE may request to use any available accrued leave during this period.

   iii. With the concurrence of OCCHCO/Employee Relations and the Office of Chief Counsel, the supervisor of record issues a removal decision to a CORE under his or her supervision deemed unfit to encumber a FEMA position. The notice should include the same items identified in section 11-2.B.3.ii. (content of a suspension notice).

   iv. The removal decision shall include the right to appeal within five calendar days after the removal is effective. Appeals from removal decisions are decided by the Associate or Deputy Associate Administrator, Mission Support.

6. **Recovery of Government Equipment**. Supervisors shall collect all government equipment prior to the effective date of the removal.

## 11-3.  **Addressing Poor Performance**

CORE supervisors and managers should consult FM 255-1-1, Employee Performance Management Program, for more information on dealing with poor performance. Most performance problems can be resolved through effective communication between the supervisor and CORE. The supervisor should, at a minimum, take the following steps:

A. Discuss performance deficiencies with any CORE whose performance is substandard. This discussion provides the supervisor the opportunity to clarify job expectations, and to identify performance deficiencies. It provides the CORE with clear direction as to what he or she needs to do to improve his or her performance to an acceptable level. The supervisor should document the discussion and provide the CORE with a copy of the documentation to prevent misunderstandings, or mischaracterization of the discussion.

B. Monitor the CORE's performance following the discussion, and document the CORE's progress toward improving his or her performance.

C. The supervisor must discuss the CORE's performance deficiencies with the Employee Relations Specialist for guidance on (1) whether to remove a CORE for substandard performance immediately or (2) to provide the CORE time to demonstrate improvement, and if so, the length of time to do so. A "performance expectations" memorandum is a helpful tool that the supervisor can issue to the CORE. The Employee Relations Specialist will assist the supervisor with drafting any correspondence regarding performance problems. The supervisor will provide the Specialist with a signed and dated copy of the final document. The supervisor must document the deficiencies with memoranda, emails, work products and any other documentation that demonstrates the deficiencies. COREs are not placed on formal Performance Improvement Plans (PIPs).

D. Removal from Federal Service.

1. A removal from federal service is recorded in the CORE's personnel record, and is the most severe form of discipline available to a manager. A notice of removal is a memorandum on FEMA Letterhead addressed to the CORE from the immediate supervisor (or higher level supervisor in the chain of command).

2. The notice should include the same items identified in section 11-2.B.3.ii (content of a suspension notice).

3. The CORE's immediate supervisor, or any higher-level supervisor in the CORE's chain of command, must give the notice to the CORE at or before the effective date of the notice and request that the CORE acknowledge receipt at the bottom of the last page of the notice. If the CORE refuses to sign the notice acknowledging receipt, the supervisor should place a note on the last page to indicate that the notice was given to the CORE and the CORE refused to acknowledge receipt. Failure to acknowledge receipt has no impact on implementation of the decision.

E. In rare circumstances, the supervisor may initiate a reassignment to another position in a lower pay band or IC pay grade, whichever is applicable, in lieu of removal, to address poor performance after receiving concurrence from the Employee Relations Specialist and the Office of Chief Counsel. In such circumstances, the CORE's rate of pay will be reduced in accordance with Chapters 5 and 6.

**11-4.**  **Deployment Scenarios**

COREs may be assigned to perform incident management and incident support duties based on the operational needs of FEMA and subject to the policies contained within FD 010-8, FEMA Incident Workforce Deployment. During deployment, supervisors of record receive feedback on the performance of COREs during deployments from the CORE's temporary duty supervisors. Temporary duty supervisors provide day-to-day supervision of the performance of deployed COREs.

A.  Temporary duty supervisors must consult with the supervisor of record and OCCHCO/Employee Relations Branch when they encounter poor performance, and provide all documents to the supervisor of record.

B.  Temporary duty supervisors who become aware of allegations of misconduct shall notify the supervisor of record of the allegation. The supervisor of record shall consult with OCCHCO/Employee Relations before initiating disciplinary action. The supervisor of record will notify the temporary duty supervisor of any impending disciplinary action. In all cases in which misconduct is alleged, the Employee Relations Branch shall provide advice to the Federal Coordinating Officer (FCO) and the supervisor of record as to the propriety of the following options:

   1.  Releasing the CORE from the deployment into a non-duty, non-pay status;

   2.  Releasing the CORE and returning him or her to the official duty station, or

   3.  Keeping the CORE deployed pending completion of any needed investigation or issuance of disciplinary action.

C.  If the supervisor of record and FCO disagree whether to demobilize the CORE, the issue will be resolved by the Associate Administrator of Response and Recovery.

**11-5.**  **Arrest, Indictment, and other Allegations of Misconduct**

A.  FEMA may receive information that a CORE has been arrested, indicted for a crime, used an illegal drug, or has allegedly committed other serious misconduct. Supervisors may learn of this information in a variety of ways, including the CORE's self-report or via other employees, the Office of the Chief Security Office (OCSO), or press reports. Upon receipt of such information, the supervisor of record, FCO, or temporary duty supervisor shall contact Employee Relations for guidance.

B.  If the CORE is incarcerated or otherwise unable to come to work, the supervisor must first address the leave status. COREs may use available leave, if requested and approved by the supervisor. If the request is denied, the CORE shall be placed in a non-duty, non-pay status. The supervisor is not obligated to approve a leave request submitted by the CORE.

C. If the CORE is available for duty following arrest, or, if not arrested, but is under investigation for alleged misconduct, the following factors must be considered in determining whether the CORE shall be permitted to return to duty pending resolution of the criminal action or other serious misconduct:

1. If the CORE has a security clearance, OCSO, Personnel Security Division (PSD), may suspend a CORE's security clearance upon receipt of adverse information, such as an arrest or indictment. If PSD suspends the CORE's clearance, or revokes it, PSD shall notify ER. Normally, COREs would be placed in non-duty, non-pay status until a recommendation on removal can be made by ER to the supervisor of record.

2. For COREs without security clearances, OCSO must determine if the CORE is fit for continued employment. Thus, until OCSO has rendered a determination on the CORE's fitness, the supervisor of record must determine whether the CORE should be allowed to continue to work (including telework), be placed in a non-duty, non-pay status or be terminated pending the outcome of the criminal case, considering the following factors after consultation with ER, OCC's Personnel Law Branch, and OCSO:

   i. What is the nature of the offense or other serious misconduct? The more serious the offense, the more likely that the CORE should not return to duty.

   ii. What evidence is there as to the commission of the offense? The lack of corroboration or confession especially with a minor offense, may weigh in favor of the CORE's retention on duty.

   iii. Does the known evidence suggest that the CORE is a physical or logical security risk?

   iv. Impact on the Mission: Are there other factors that indicate that the mission will be adversely affected if the CORE is returned to duty, such as notoriety? Is the offense known, causing perceived damage to a Directorate's, Office's, or JFO's ability to conduct business or its credibility due to the CORE's continued presence?

3. Authority to return the CORE to duty pending resolution of criminal matters: After consultation with ER, and subject to approval, if required, by the Office of Inspector General:

   i. For COREs who are deployed, the FCO shall make the final decision as to whether the CORE shall remain at the JFO, after consultation with the supervisor of record (see section 11-4 for resolution of disputes on this matter between FCO and the supervisor of record).

   ii. For COREs at their official duty station, the supervisor of record shall make the final decision as to whether the CORE shall return to duty.

**11-6.  The Appeal Process**

A CORE who wishes to appeal a reprimand, suspension, or removal decision may do so in writing to his or her second level supervisor no later than 5:00 p.m. (the local time of the second level supervisor) on the fifth calendar day following the effective date of the disciplinary action. COREs included within collective bargaining units must follow the procedures for that unit. Oral appeals are not permitted. This appeal process is not applicable to non-disciplinary actions, such as right-sizing, demobilization, or the expiration of appointments.

A. The CORE may provide a narrative and any documentation that he or she considers relevant for the second level supervisor to consider prior to issuing his or her final decision.

B. The second level supervisor may gather additional documents that he or she deems necessary to make a final decision. The second level supervisor should complete any additional investigation within five working days of the receipt of a timely appeal and issue a decision within five working days after finishing an investigation.

C. The Employee Relations Specialist will review the written decision drafted by the second level supervisor prior to its issuance to the CORE. Additionally, the Employee Relations Specialist will gather and preserve any and all additional documents acquired by the second level supervisor to issue the final decision and the final decision itself.

**11-7.  Allegations of Discrimination**

If a CORE alleges discrimination to his or her supervisor, the CORE must be referred to the Office of Equal Rights for appropriate guidance on the EEO complaint process. The supervisor may contact the Office of Chief Counsel's Personnel Law Branch with any questions concerning the EEO process.

**11-8.  Allegations of Fraud, Waste, Abuse, and Mismanagement**

Supervisors must not ignore allegations of fraud, waste, abuse, or mismanagement, and must take steps to inquire into the allegations or refer them to appropriate management officials for investigation. Allegations of misconduct against COREs at the IC-15 or equivalent level or higher must be referred to the Office of Inspector General (ref: DHS Management Directive 0810.1) for investigation.

# CHAPTER 12:  RIGHTSIZING

## 12-1. General

A. COREs receive temporary appointments that do not confer eligibility or priority consideration for permanent appointment. They may be removed from Federal service at any time for poor performance, misconduct, reduction in work, or for other agency mission needs, so long as adequate documentation exists to justify the removal, and are not subject to protection afforded by reduction-in-force provisions or reemployment rights established under any statutory or regulatory provision.

B. When FEMA requires reductions in staff levels in one or more functional areas due to a lack of work or funding, FEMA may conduct a rightsizing of its CORE workforce. A rightsizing may occur when an Office or Directorate anticipates needing fewer positions through the annual workload analysis and staffing plan process, or if an immediate need to reduce positions or workload is realized between annual workload analyses.

C. Rightsizing results in termination of appointment prior to the expiration date of an appointment, unless the CORE is selected for or is reassigned to another vacant position in FEMA.

D. Rightsizing procedures should not be used to remove CORE employees due to poor performance or misconduct.

E. A Rightsizing does not occur when FEMA declines to renew a CORE's appointment at the end of a CORE's appointment term.

F. Program Areas shall be clearly defined, with appropriate justification, in the Plan. The Plan shall be in writing and approved by OCCHCO prior to implementation.

## 12-2. Rightsizing Plan

A. The second level supervisor, in coordination with OCCHCO, develops a Rightsizing Plan to affect the rightsizing procedures described in this Chapter that will impact the COREs under his or her supervisory authority. The Plan shall be in writing and approved by OCCHCO prior to implementation.

B. Based on the Office or Directorate's most recent workload analysis and staffing plan, the second level supervisor will identify the activities that will cease to be performed or require an adjustment in the amount of time for performance.

C. Using this adjusted workload analysis, the supervisor or manager will develop a revised Staffing Plan for the positions under his or her authority that will propose the number of CORE positions by title, series, grade, and duty station that will continue to be needed. The remaining positions will be identified for rightsizing.

D. The Rightsizing Plan will consist of the updated staffing plan, any Functional Area SMEs identified for retention (see section 12-4.B.), the proposed timeline for providing the general and specific notices of rightsizing to the affected COREs, and the proposed effective date of the rightsizing.

## 12-3. Notice

The second level supervisor will issue both general and specific notice of upcoming rightsizing efforts.

A. General Advance Notice. COREs will be given a 30 calendar day advance official notification concerning decisions which may result in their being affected by a rightsizing effort. This notification will be in writing and will include: the reasons for the rightsizing effort, such as lack of work or funds, reorganization, or a realignment of functions; and, whom to contact about assistance available for affected employees.

B. Specific Notice. Specific written notice of separation will be issued to individual affected COREs prior to the proposed date of their release. FEMA's goal is to provide notice no less than 30 calendar days from their date of release unless extenuating circumstances dictate a shorter notice period.

## 12-4. Retention Criteria

Upon determining that rightsizing procedures are required, the second level supervisor, in consultation with OCCHCO, shall utilize the following criteria to determine the order in which COREs will be released. An incumbent will only be compared to other incumbents under the supervision of that second level supervisor.

A. **Position**. Identify (1) the affected area; (2) the existing positions staffing that area; and (3) pay levels within each position. Each position is reviewed and listed by pay and location, and positions are identified for retention based on lack of work or funds, reorganization, or a realignment of functions. The determination as to the number of needed positions to staff the reduced workforce must be documented in the Rightsizing Plan.

**Example**. In this example, the program area is identified as "Applicant Services" and the existing positions are "Applicant Services Specialists." There are currently 10 IC-12s, 15 IC-11s, and 15 IC-9s Applicant Services Specialist positions. The remaining work only requires 3 IC-12s, 10 IC-11s, and no IC-9s Applicant Services Specialists.[11] Therefore, 7 IC-12s, 5 IC-11s, and all IC-9s will be released. Consequently, the second level supervisor must examine the incumbent IC-12s and IC-11s to determine who will fill the

---

[11] For this example, substitute the pay band numbers for grade level if the COREs with positions targeted for rightsizing are paid via an administratively-determined pay scale utilizing pay bands.

remaining positions utilizing the following retention criteria. OCCHCO must approve this Plan prior to implementation.

| Current Staffing | Needed | Release | Remaining |
|---|---|---|---|
| 10 – Applicant Services Specialists, IC-12 | 3 – Applicant Services Specialists, IC-12 | 7 – Applicant Services Specialists, IC-12 | 3 – Applicant Services Specialists, IC-12 |
| 15 – Applicant Services Specialists, IC-11 | 10 – Applicant Services Specialist, IC-11 | 5 – Applicant Services Specialists, IC-11 | 10 – Applicant Services Specialists, IC-11 |
| 15 – Applicant Service Specialists, IC-9 | 0 – Applicant Services Specialists, IC-9 | 15 –Applicant Services Specialists IC-9 | 0 – Applicant Services Specialists, IC-9 |

B. **Functional Area SME.** To ensure accomplishment of mission objectives, the supervisor of a functional area subject to rightsizing procedures may identify one SME from the supervisor's functional area that should be excluded from rightsizing procedures because of the SME's subject matter expertise. Any request for a SME's exclusion from rightsizing must be accompanied by a justification that establishes that a need exists for this SME position, and that the requested employee is most qualified for the SME position. This request must be approved by the supervisor's chain of command with the final concurrence of the Head of the Office or Directorate, who will then inform OCCHCO of the SME designation and transmit to OCCHCO all documents justifying his or her selection. OCCHCO must review and approve the SME designation as part of the review of the Rightsizing Plan. A SME who is thereafter reassigned to a different functional area will lose his or her SME designation, thereby losing his or her exemption from rightsizing procedures.

C. **Performance Evaluation.** The second level supervisor will provide to OCCHCO the summary rating level of all COREs in positions that must be rightsized, based on their most recent annual performance appraisals. Incumbents will be released in inverse order of performance rating (lowest to highest). Normally, incumbents with summary rating levels of Achieved Excellence (or equivalent) will be excluded from release unless the total number of positions that must be released exceeds the number of incumbents who received a summary rating below Achieved Excellence (or equivalent).

D. **Service Computation Date (SCD).** If reviewing the performance evaluations of all COREs in positions that must be rightsized has not distinguished the incumbents for release from those who will be excluded from release for the current round of rightsizing, OCCHCO shall further review incumbents by SCD and shall identify those with the most recent SCDs for release.

E. **Ties.** The official who would normally make the selection for the position from which the CORE is being released will determine, on the basis of

qualifications and competencies for the specific position, which employee(s) will be retained when two or more employees have identical service computation dates. The rationale for retention versus removal must be documented with the specific reasons for each decision. OCCHCO must review and approve the stated rationale.

F. **Recovery Office Closure.**

1. Some COREs will remain in their positions until the closure of the Recovery Office.

2. Upon the closure of the Recovery Office, the remaining COREs must have applied and been selected for a vacant FEMA position or they will be released from their employment with FEMA, using the notice procedures above.

## 12-5.  <u>Transitional Options for Released COREs</u>

CORE staff identified for release will not be automatically reassigned directly into vacant positions elsewhere in FEMA and must apply and be appointed through the hiring procedures identified in this Manual. COREs will be released from their current appointments for lack of work if, by the date of their release, they have not been selected for another vacant position within FEMA. The Director of the Recovery Office or the Head of the Office or Directorate may assist COREs identified for release with career transition, as appropriate, by arranging for assistance with resume writing and interview preparation.

## CHAPTER 13:  ABSENCE AND LEAVE

**13-1.  <u>Absence and Leave Policy</u>**

FEMA administratively applies FM 3300.3, FEMA Absence and Leave Policy to COREs, with the exception of CORE-Is, whose absence and leave policies are governed by FD 010-7, Incident Management Assistance Team (IMAT) Program Directive.

## CHAPTER 14:  TRAINING AND ETHICS

**14-1.  <u>Training Provisions</u>**

A. The CORE and his or her supervisor of record share the responsibility for ensuring the CORE's professional development.

B. OCCHCO, Employee Development Division, is responsible for drafting guidance on various topics, including but not limited to, continuing service agreements relating participation in employee development programs, supervisory training, and individual and executive development plans.

C. A CORE may be temporarily placed on a rotational assignment as part of a professional development program. In such circumstances, the duties and responsibilities performed by the CORE must be authorized under the Stafford Act. A CORE may be placed on a rotational assignment for up to 120 days that may be renewed for one additional 120 day period. As the CORE IMAT program maintains its own professional development program, CORE IMATs are not eligible for rotational assignments.

D. Eligibility for training programs for a CORE paid via the grades and steps system is determined by the applicable grade and years of service requirement. Eligibility for training programs for a CORE paid via the pay band system is determined by comparing the current salary level of the CORE to the salary range of the GS levels eligible for the training program and the years of service requirement. The CORE will be eligible for a training program if the CORE's salary is within the salary range of the GS employees eligible for the training and satisfying the years of service requirement.

E. IM COREs are eligible to participate in applicable leadership development programs so long as the training program does not have an impact on mission requirements. If an IM CORE is directed to deploy during a training program the CORE must deploy and may not finish the training program.

F. COREs participating in a leadership development program will be required to sign and comply with the terms of a three year Continuing Service Agreement (CSA). See Chapter 15, Continuing Service Agreements, for more information.

**14-2.  <u>Ethics Requirements</u>**

A. All COREs are subject to the federal ethics laws and regulations, including the criminal conflict of interest statutes, the Standards of Ethical Conduct for Employees of the Executive Branch, and any supplemental ethics regulations promulgated by DHS.

1. Federal ethics laws and regulations apply to COREs at all times and may affect a CORE's ability to seek and enter into outside employment.

2. A CORE's outside employment may also create a real or apparent conflict of interest with his or her FEMA duties.

    3.  COREs must be informed of these rules and regulations prior to hiring.

B.  All COREs shall receive training in fraud detection and prevention, equal rights, privacy, and security.

C.  All COREs must complete Initial Ethics Orientation provided by OCC Ethics within 90 days of their date of entry, in accordance with 5 C.F.R. § 2638.703.

D.  Confidential financial disclosure filers must complete one hour of annual ethics training per calendar year, as required by 5 C.F.R. § 2638.705.  All other COREs must complete annual ethics training per FEMA policy.

E.  All annual ethics training is provided by OCC Ethics.

# CHAPTER 15:  CONTINUING SERVICE AGREEMENTS

**15-1.  Service Agreement**

    A. An applicant or CORE who receives a recruitment, relocation, or retention incentive is required to sign a two-year CSA prior to receiving the incentive. The Selecting Official or supervisor of record will preserve a signed copy of the service agreement and transmit a copy to OCCHCO.

    B. A CORE participating in a leadership development program will be required to sign a three-year CSA.

    C. A CORE must fulfill the terms of the CSA, including when the appointment is renewed for another appointment period.

**15-2.  Terminations of a CSA**

    A. If a CORE voluntarily separates from FEMA prior to completing the service obligation period, to begin employment with DHS Headquarters or another DHS Component, the CORE must give his or her supervisor of record at least 30 days advance notice in writing, during which time the supervisor shall notify OCCHCO to transfer the remaining service obligation to the gaining agency. If the CORE separates from the Federal service or begins employment with another Federal agency, the CORE will be indebted to FEMA for the remaining service period.

    B. A CORE who is demoted, removed from Federal service for misconduct or poor performance, or receives a rating of record lower than Achieved Expectations or equivalent, before fulfilling the terms of a CSA will be indebted to the Federal Government for the remaining service period.

    C. Repayment is not required when a CORE is involuntarily separated for reasons other than misconduct or poor performance, or when the circumstances are otherwise beyond the CORE's control.

    D. A CSA may be unilaterally terminated by the head of an Office or Directorate based solely on management needs. Examples of discretionary removals include, but are not limited to, rightsizings or insufficient funds to continue planned payments. When a removal is based on management needs, the employee is entitled to all payments attributable to completed service and to retain any portion of a payment received that is attributable to uncompleted service.

**15-3.  Debt Recovery**

    A. When reimbursement is required, the repayment amount will be reduced on a pro rata basis for the percentage of completion of the obligated service period.

    B. If a CORE's appointment is not renewed, and the CORE is not appointed to a different position within FEMA, recovery is waived.

C. An indebted CORE may request a waiver of any debt relating to a CSA to his or her Office or Directorate head. The Officer or Directorate head must send the request along with his or her recommendation through OCCHCO to the Administrator, who will render a written decision. Waivers in whole or in part will be rare and will be based on a determination that the recovery would be against equity and good conscience, or against the public interest.