Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*

[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 3:25-cv-03698-SI |
| Plaintiffs, | **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**TABLE OF CONTENTS**

I.  DEFENDANTS' DECLARATION PROVES THAT DHS AND FEMA ARE
    VIOLATING THE LAW ........................................................................................1

    A.   Defendants Admit that DHS Overruled FEMA's CORE Renewal
         Decisions and Directed Hundreds of Separations in January 2026..........................1

    B.   Defendants Admit that DHS Has Taken Over FEMA's Personnel
         Authority...............................................................................................3

    C.   The Evans Declaration Does Not Dispute the DHS Plan to Terminate Half
         of FEMA's Staff Including 41 Percent of CORE Employees. ...................................4

    D.   DHS Has Directly Undermined FEMA's Ability to Perform Required
         Functions ..............................................................................................5

II. DEFENDANTS' ACTIONS ARE UNLAWFUL ............................................................5

    A.   Defendants' Actions Violate the Post-Katrina Act, Which Prohibits DHS
         from Interfering with FEMA ......................................................................5

    B.   Defendants' Actions Eliminate Positions Required to Perform FEMA's
         Statutory Mandates .................................................................................9

    C.   Defendants' Actions Are Arbitrary and Capricious ....................................................10

    D.   Defendants Eliminated Positions in Violation of Section 120 .................................11

    E.   Defendants Took Final Agency Actions ........................................................................12

III. DEFENDANTS' JURISDICTIONAL ROADBLOCKS TO JUDICIAL REVIEW
     LACK MERIT ........................................................................................................13

    A.   Congress Did Not Impliedly Channel Plaintiffs' APA Claims ...............................13

    B.   Plaintiffs Have Standing to Bring these Claims .......................................................15

IV. AN INJUNCTION IS NEEDED TO PREVENT IRREPARABLE INJURY, AND
    THE EQUITIES AND PUBLIC INTEREST SUPPORT ENTRY OF INJUNCTIVE
    RELIEF.................................................................................................................19

V.  PLAINTIFFS' REQUESTED SCOPE OF RELIEF IS APPROPRIATE...........................19

VI. CONCLUSION ........................................................................................................20

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4
5

*AFGE v. OMB*,
   2025 WL 3018250 (N.D. Cal. Oct. 28, 2025) ................................................................*passim*

6
7

*AFGE v. OMB*,
   2025 WL 3654116 (N.D. Cal. Dec. 17, 2025) ................................................................ 13, 14

8

*AFGE v. OPM*,
   799 F.Supp.3d 967 (N.D. Cal. 2025)................................................................................ 13

9
10

*AFGE v. Trump*,
   139 F.4th 1020 (9th Cir. 2025)........................................................................................*passim*

11
12

*Aguayo v. Jewell*,
   827 F.3d 1213 (9th Cir. 2016) .......................................................................................... 12

13

*Ali v. Fed. Bureau of Prisons*,
   552 U.S. 214 (2008) ........................................................................................................ 11

14
15

*Axon Enters., Inc. v. FTC*,
   598 U.S. 175 (2023) ........................................................................................................ 13

16

*Bennett v. Spear*,
   520 U.S. 154 (1997) ........................................................................................................ 13

17
18

*Bhd. of Locomotive Eng'rs v. Fed. R.R. Admin.*,
   972 F.3d 83 (D.C. Cir. 2020)........................................................................................... 13

19
20

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ........................................................................................................ 13

21

*City of Sausalito v. O'Neill*,
   386 F.3d 1186 (9th Cir. 2004) ....................................................................................16, 17

22
23

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ....................................................................................................17, 18

24
25

*Cmty. Legal Servs. v. HHS*,
   137 F.4th 932 (9th Cir. 2025) .......................................................................................... 14

26

*Cnty. of Santa Clara v. Trump*,
   250 F.Supp.3d 497 (N.D. Cal. 2017)............................................................................... 17

27
28

*Dep't of Comm. v. New York*,
   588 U.S. 752 (2019) ........................................................................................................ 14

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ................................................................................ 11

*Driftless Area Land Conservancy v. Valcq*,
  16 F.4th 508 (7th Cir. 2021) ............................................................. 20

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) .................................................................... 16, 17

*Feds for Med. Freedom v. Biden*,
  63 F.4th 366 (5th Cir. 2023) ......................................................... 13, 14

*Fund Democracy, LLC v. S.E.C.*,
  278 F.3d 21 (D.C. Cir. 2002) ............................................................. 15

*Graham v. Ashcroft*,
  358 F.3d 931 (D.C. Cir. 2004) ........................................................... 13

*Griffin v. HM Florida-ORL, LLC*,
  144 S. Ct. 1 (2023) ............................................................................. 20

*Harris v. Bd. of Supervisors*,
  366 F.3d 754 (9th Cir. 2004) ................................................... 16, 17, 18

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ........................................................................... 13

*Jewel v. Nat'l Sec. Agency*,
  673 F.3d 902 (9th Cir. 2011) ............................................................. 18

*Johnson v. Couturier*,
  572 F.3d 1067 (9th Cir. 2009) ........................................................... 20

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ........................................................................... 13

*Lotus Vaping Techs., LLC v. FDA*,
  73 F.4th 657 (9th Cir. 2023) ............................................................. 11

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*,
  567 F.3d 521 (9th Cir. 2009) ............................................................. 15

*Nat'l TPS All. v. Noem*,
  __ F.4th __, 2026 WL 226573 (9th Cir. Jan. 28, 2026) ..................... 14

*New York v. Kennedy*,
  789 F.Supp.3d 174 (D.R.I. 2025) .................................................... 9, 10

*OPM v. AFGE*,
  145 S. Ct. 1914 (2025) ....................................................................... 19

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ........................................................................................ 8

*Sampson v. Murray*,
   415 U.S. 61 (1974) ........................................................................................ 20

*San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*,
   65 F.4th 1012 (9th Cir. 2023) ........................................................................ 18

*United States v. Fausto*,
   484 U.S. 439 (1988) ...................................................................................... 14

*United States v. Ramirez-Sanchez*,
   338 F.3d 977 (9th Cir. 2003) .......................................................................... 8

*Washington v. Fed. Emerg. Mgmt. Agency*,
   2025 WL 3551751 (D. Mass. Dec. 11, 2025) ........................................... 8, 9

*Washington v. U.S. Dep't of Educ.*,
   2025 WL 3004675 (W.D. Wash. Oct. 27, 2025) ......................................... 11

*Williams v. Taylor*,
   529 U.S. 362 (2000) ...................................................................................... 12

**Statutes**

5 U.S.C.

   §551(13) ........................................................................................................ 12
   §706 .............................................................................................................. 20
   §§3501-3504 ................................................................................................. 11

6 U.S.C.

   §101 ................................................................................................................ 7
   §112 ................................................................................................................ 8
   §313 .......................................................................................................... 5, 13
   §314(a)(13) ................................................................................................. 7, 13
   §315 ...................................................................................................... 4, 5, 8
   §316 ....................................................................................................... *passim*
   §452(a) ............................................................................................................ 8
   §762 ................................................................................................................ 7

28 U.S.C.

   §1331 ............................................................................................................ 13

42 U.S.C.

   §5149 .............................................................................................................. 4

Pub. L. No. 116-26 ................................................................................................................5

Pub. L. No. 117-328 ..............................................................................................................5

Pub. L. No 119-37 ...........................................................................................................11, 12

**Other Authorities**

90 Fed. Reg. 8247 (Jan. 20, 2025) .........................................................................................4

Defendants' filing confirms much of what Plaintiffs' evidence showed: ***first***, the Department of Homeland Security ("DHS") is making employment decisions for the Federal Emergency Management Agency ("FEMA"); ***second***, DHS ordered the January 2026 Cadre of On-Call Response and Recovery ("CORE") separations by overruling FEMA's decision to renew those positions; and ***third***, DHS made these decisions without any regard to FEMA's actual staffing or functional needs, or congressional authorization of and funding for these positions. Further, Defendants' evidence in no way refutes Plaintiffs' showing that these acts were part of an effort to reach DHS's target of reducing FEMA's workforce by half, including 41% of CORE positions.

These concessions, by themselves, are sufficient to establish Plaintiffs' likely success on the merits. DHS has reduced and assumed for itself FEMA's statutory authority, but the Post-Katrina Act expressly prohibits DHS from interfering with FEMA's authorities, functions, responsibilities, mission, or capabilities. FEMA also cannot fulfill its statutory mandate without the CORE staff funded by the Disaster Relief Fund, and DHS lacks any authority to decide that these functions are not needed or to impose dramatic workforce reductions in disregard of FEMA's own assessment of staffing needs. The January separations also plainly violated Congress's mandatory reprieve from reductions of employee positions across the government, and are arbitrary and capricious.

To date, DHS's ill-conceived scheme to downsize FEMA has resulted in the unlawful termination of hundreds of FEMA employees, and many more face the imminent threat of job loss absent injunctive relief. Defendants' various threshold objections—based on standing, channeling, and final agency action—lack merit. The appropriate relief under the Administrative Procedure Act ("APA") and this Court's equitable authority is to restore the status quo ante and enjoin further unlawful acts, to prevent DHS from further efforts to interfere with FEMA's critical mission.

I.      **Defendants' Declaration Proves that DHS and FEMA Are Violating the Law**

      A.      **Defendants Admit that DHS Overruled FEMA's CORE Renewal Decisions and Directed Hundreds of Separations in January 2026**

Defendants' sole declaration, from FEMA political appointee Karen Evans, ECF 312-1, confirms facts that are dispositive as to Plaintiffs' claims. Critically, Evans confirms that DHS made the January 2026 nonrenewal decisions, overriding FEMA's renewal decisions. Specifically,

during Evans' tenure, as FEMA's CORE employees approach their NTE date, their FEMA

Supervisor of Record requests renewal.  ECF 312-1 ¶22.  These "requests to renew" are sent to

Evans for "review and approval."  *Id*.  Evans then "forward[s] the approved requests to DHS's

OCHCO."  *Id*.  This is consistent with Plaintiffs' evidence that FEMA sends *FEMA-approved*

*requests* for renewal to DHS for final decision.  ECF 303, Ex. B.  Notably, Evans does not state

that she has ever denied a CORE renewal recommended by a Supervisor of Record, nor sent a

CORE package to DHS with a recommendation from FEMA *not* to renew.  ECF 312-1 ¶¶22-28.

Evans then confirms that "*DHS decided not to reappoint 192*" CORE employees in January

2026.  ECF 312-1 ¶25 (emphasis added).  As noted, the renewal requests that DHS disapproved,

resulting in hundreds of CORE employee terminations in January 2026, had been *approved by*

*FEMA supervisors and Evans herself.  Id.* ¶22.  While Defendants assert that the DHS decisions to

reject FEMA's approvals were made based on "reasoned operational judgments," ECF 312

("Opp.") 1, Evans says nothing of the sort, and identifies no basis at all for these decisions to

override FEMA's approved renewals of CORE positions.  ECF 312-1 ¶¶25-26.

In an apparent attempt to deny that DHS was directing FEMA to eliminate CORE positions

by NTE date alone, Evans says that 111 employees with January NTE dates were not removed and

that 33 CORE non-renewals were rescinded within a week.  ECF 312-1 ¶¶25-26.  But notably,

DHS paused separations on January 22 in advance of Winter Storm Fern—and Evans says nothing

specific about the timing of the 111 employees' NTE dates—suggesting that these employees'

NTE dates fell *after* the January 22 pause.  ECF 303, Ex. F.[1]  And, Evans does *not* state that the

111 employees were renewed.  ECF 312-1 ¶25.  These employees—and hundreds whose NTE

dates fell in February—have largely been left in limbo, having neither been renewed nor non-

renewed and continuing to work in the meantime.  Jackson Supp. Decl. ¶4; ECF 303-5 ¶18.[2]

The January 22, 2026 pause may also explain the rescission of 33 non-renewal decisions.

The January 22 FEMA message also stated that the removals of CORE employees earlier that day

---

[1] On January 22, FEMA sent a message that announced: "Effective immediately, FEMAs Office of the Chief Human Capital Officer (OCHCO) *will cease offboarding Stafford Act employees with NTE dates of January 22, 2026, or later*."  ECF 303, Ex. F (emphasis added).

[2] Some of these employees eventually received 90-day NTE extensions.  Jackson Supp. Decl. ¶5.

were being reversed.  ECF 303, Ex. F.  If anything, the quick rescission of non-renewal decisions would corroborate that DHS did not take into account agency need when deciding not to renew employees in the first place.  Further, these employees continue to face the threat of separation: DHS approved extensions of only 90 days (until roughly mid-April).  Jackson Supp. Decl. ¶6.

Seeking to justify DHS and FEMA's actions, Evans asserts that "[n]on-renewals of COREs are commonplace."  ECF 312-1 ¶24.  But as support, Evans points only to 2025, the first year of this Administration.  *Id.*  And even then, the bare fact that "349 COREs were released at the end of their terms" in 2025 fails to explain whether any of these individuals voluntarily left federal employment, or whether their supervisors recommended their retention.  Coen Supp. Decl. ¶11.  It also ignores that the rate of CORE non-renewals during the first three weeks of January would result in annual non-renewals of *thousands* of CORE employees, far exceeding the 2025 numbers.[3] And evidence from individuals with actual knowledge of FEMA's past practices shows that non-renewals were in fact unusual, not "commonplace."  ECF 301-1 at 18-19; Coen Supp. Decl. ¶¶4-6.

Finally, Evans does not deny Plaintiffs' evidence that DHS Secretary Noem rejected the suggestion to extend these positions "until the agency has had enough time to review the need for the roles" and ordered non-renewals by NTE date beginning January 1, 2026.  ECF 301-1 at 18.

## B.    Defendants Admit that DHS Has Taken Over FEMA's Personnel Authority

There is no real dispute that DHS removed FEMA's authority over renewal decisions and assumed that authority for itself; Evans acknowledges that "DHS has final authority over non-renewal decisions."  ECF 312-1 ¶22.  She attempts to explain away the FEMA website statement that "FEMA's authority to extend CORE appointments ended on December 31, 2025" as related to the President's hiring freeze and reflecting only termination of a prior DHS authorization of 180-day extensions.  *Id.* ¶¶29-32.  But the timing is irrelevant; whether the website statement reflected a new decision to remove FEMA's renewal authority or the withdrawal of approval to grant 180-day extensions (as opposed to the standard 2-4 year renewals), it still concedes that DHS seized

---

[3] 159 non-renewals over three weeks (192 non-renewals, of which 33 were rescinded, ECF 312-1 ¶25) works out to a rate of 53 non-renewals per week or 2,756 per year.

1    FEMA's authority over personnel decisions.  *Id.*  That is exactly the problem.[4]

2    **C.    The Evans Declaration Does Not Dispute the DHS Plan to Terminate Half of
      FEMA's Staff Including 41 Percent of CORE Employees**

3

4    Notwithstanding Defendants' suggestions (Opp. 18, 23), Evans does *not* deny that FEMA

5    management were instructed on December 23, 2025 to target a 50% reduction of the FEMA

6    workforce, including 41% of CORE.  ECF 301-1 at 15.  In fact, Evans does not even address the

7    December 23 instructions or the "target" cuts, beyond attaching the email as an exhibit.  ECF 312-

8    1; ECF 312-6.  Nor does Evans deny that FEMA leadership was ordered in late December to begin

9    implementing this plan (ECF 303, Exs. C, D, E); that FEMA held January 2026 meetings to inform

10   supervisors that CORE employees would not be renewed even if actively working on rebuilding

11   efforts for recent disasters (ECF 303-21, Exs. E, U, V); or that FEMA supervisors were told that

12   thousands of FEMA employees would lose their positions within months (*id.*).

13   Instead, Evans' one-sentence denial aims at a strawman target: "There is no plan under

14   consideration which calls for the 'blanket' or indiscriminate non-renewal of all COREs."  ECF

15   312-1 at ¶28.  But Plaintiffs never contended otherwise; DHS directed FEMA to commence the

16   elimination of 41% of the CORE—not "all COREs."  *The Evans declaration does not deny this.*

17   Side-stepping the target cuts entirely, Evans asserts that, going forward, "FEMA and DHS

18   are considering nonrenewals of COREs for whom there are performance or misconduct issues, or

19   where a supervisor determines they are overstaffed."  ECF 312-1 ¶28.  Notably, this predictive

20   statement does *not* claim the January 2026 CORE removals reflected "performance or misconduct

21   issues" or supervisor determinations that the position was "overstaffed."  Nor could it: Evans

22   affirms that all the non-renewal decisions were made *by DHS* after FEMA supervisors and Evans

23   herself recommended renewal.  *See supra* at 1-2.  In any event, Evans' statement lacks credibility,

24   given Plaintiffs' evidence (which she does not dispute) that in mid-January DHS instructed FEMA

25

26   ───────────────

      [4] Further, invocation of the hiring freeze is a nonsequitur.  That freeze applied only to *vacant
      positions* and exempted renewals or extensions of term-limited employment like CORE employees.
27   Hiring Freeze, 90 Fed. Reg. 8247 (Jan. 20, 2025); Shively Supp. Decl., Ex. A.  OPM and OMB
      instructed that "Term and temporary appointments of existing Federal employees may be extended
      up to the maximum allowable time limit …."  Shively Supp. Decl., Ex. A at 3.  Nothing in the
28   President's directive allowed DHS to usurp FEMA's statutory employment authorities (6 U.S.C.
      §315; 42 U.S.C. §5149(b)) or restrict the extension of CORE terms.

to stop providing justifications for CORE position approvals, so would lack any basis to evaluate need. ECF 301-1 at 19 ("DHS will be making the calls without collecting justifications.").[5]

Finally, Evans' declaration pointedly ignores—and does not deny—the President and DHS Secretary Noem's repeated explanations that the plan to reduce FEMA staffing is driven by the express policy of pushing disaster relief and recovery responsibility and cost onto state and local governments. ECF 301-1 at 12-14.[6]

### D.    DHS Has Directly Undermined FEMA's Ability to Perform Required Functions

Without addressing any role or function of even a single eliminated employee position, Evans opines that "The 159 non-renewals of CORE employees in January 2026 do not jeopardize FEMA's mission, or impair specific response teams." ECF 312-1 ¶26.  Plaintiffs' evidence, discussed in greater detail *infra* at 7-8, is to the contrary, and not refuted by this conclusory statement. *See, e.g.*, ECF 303-2 ¶15; ECF 303-3 ¶¶7-10; ECF 303-5 ¶11; ECF 303-9 ¶14.[7] Conspicuously absent from Evans' declaration is any statement that elimination of half of FEMA's staff pursuant to the December 23, 2025 staffing reduction targets would not impact FEMA's ability to perform its statutory obligations (much less any explanation as to how this could be true).

## II.    Defendants' Actions Are Unlawful

### A.    Defendants' Actions Violate the Post-Katrina Act, Which Prohibits DHS from Interfering with FEMA

In formulating the Post-Katrina Act's provisions prohibiting DHS interference with FEMA authorities, functions, responsibilities, and capability, 6 U.S.C. §§315, 316, Congress relied heavily

---

[5] If the Court believes resolution of this or any other factual dispute is necessary to rule on Plaintiffs' motion, Plaintiffs would request either an evidentiary hearing or expedited discovery.

[6] Notably, this stated purpose supports the standing of directly affected local governments. *Infra* at 16-18.  Further, although Evans suggests DHS's actions may be based on disapproval of CORE employees' involvement in "humanitarian aid," ECF 312-1 ¶¶12-17, those tasks were performed at the instruction of Congress. Coen Supp. Decl. ¶9; *see, e.g.*, Pub. L. No. 116-26, 133 Stat. 1018, 1020-21 (2019); Pub. L. No. 117-328, §211(a), 136 Stat. 4459, 4736 (2022).

[7] Evans became Senior Official Performing the Duties of Administrator on December 3, 2025, after one prior political appointee quit and another was fired for testifying to Congress that FEMA should not be eliminated, ECF 301-1 at 12-13.  She does not meet the qualifications Congress required of the FEMA Administrator after Hurricane Katrina (6 U.S.C. §313(c)(2)) and could not be confirmed into that role.  Her assertions warrant little if any deference given her lack of experience and expertise in emergency management. Coen Supp. Decl. ¶14 & Ex. B.

1    on the White House Katrina Report.  *See* H. Rep. 109-476, 92-93 (2006).  That Report highlighted

2    that DHS was ill-equipped to manage the response including because the DHS Secretary lacked

3    knowledge about "the facts from the disaster area as well as the on-going response activities,"

4    officials "were not familiar with the [disaster response] plans," and DHS processes were "far too

5    bureaucratic to support the response to a catastrophe."  ECF 303, Ex. Q at 52-53.  The Report

6    specifically criticized DHS for "spread[ing] FEMA's planning and coordination capabilities and

7    responsibilities among DHS's other offices and bureaus" and for failing to "maintain the personnel

8    and resources of FEMA's regional offices."  *Id.* at 53.  The Report somberly concluded:  "The

9    magnitude of Hurricane Katrina does not excuse our inadequate preparedness and response, but

10    rather it must serve as a catalyst for far-reaching reform and transformation."  *Id.* at 5.

11           Evidently unwilling to heed these costly lessons or to comply with the resultant statutory

12    mandates, DHS now seeks to unlawfully seize FEMA's decision-making authority and replicate

13    the precise conditions that caused that disaster to be so deadly.  ECF 303-1 ¶25.  Just as in the pre-

14    Katrina years, DHS decisionmakers with no incident management expertise now attempt to make

15    structural changes that will leave FEMA understaffed and ill-prepared for impending disasters.

16    While their brief asserts that DHS merely "provided input" into personnel decisions, Opp. 20,

17    Defendants' *evidence* actually supports Plaintiffs' showing that DHS seized control of FEMA's

18    authority to renew CORE employees, created the December 23 staffing reduction targets, and

19    directed the resultant non-renewals of CORE employees based on their NTE dates.  Opp. 20-21;

20    ECF 312-1 ¶25; *supra* at 1-4.  In fact, Defendants' evidence *confirms* that decisions regarding

21    FEMA's personnel and functions are being made by DHS political appointees.  ECF 312-1 ¶22.

22           Unable to deny DHS's role in the challenged actions, Defendants instead resort to

23    mischaracterizing the Post-Katrina Act's extensive prohibitions on DHS interference with FEMA

24    and disregarding record evidence of the devastating impact of the DHS-directed cuts to FEMA's

25    staff.  Opp. 20.  They summarily assert that DHS has not violated 6 U.S.C. §316(c) because the

26    DHS-directed non-renewals "do[] not discontinue, alter, or amend any of FEMA's functions."

27    Opp. 20.  But this argument is entirely untethered from the language of §316(c), which precludes

28    DHS from "substantially or significantly reduc[ing]" not only FEMA's "authorities,

responsibilities, or functions" but also FEMA's "*capability* … to perform those missions, authorities, responsibilities,[1] except as otherwise specifically provided in an Act enacted after October 4, 2006." 6 U.S.C. §316(c) (emphasis added).[8] Contrary to Defendants' attempts to narrow these prohibitions, the statute gives these terms broad meaning, defining "functions" to include "authorities, powers, rights, privileges, immunities, programs, projects, activities, duties, and responsibilities." 6 U.S.C. §101(9); *see also id.* §313(b) (defining FEMA's "mission"); *id.* §314(a) (listing the FEMA Administrator's "[a]uthor[ities] and responsibilities").

When the statute is read correctly, Defendants have no real response, except to baldly assert that "FEMA remains fully able to perform its missions and responsibilities." Opp. 21. This ignores that removing FEMA's renewal authority *by itself* violates §316(c)'s plain language.[9] Further, the January 2026 CORE non-renewals have *already* impaired FEMA's "capability" to perform its "missions, authorities, [or] responsibilities." For example, "no one else [is] left" in Region 8 with "the practical, historical, or institutional knowledge to manage the [Emergency Management Preparedness Grant] program," ECF 303-9 ¶14, which FEMA is statutorily obligated to administer, 6 U.S.C. §762. Similarly, the non-renewals have left FEMA without "the capability to maintain" certain "housing units and to deploy them as necessary," ECF 303-2 ¶15, despite its obligation to "ensur[e] the readiness of each emergency support function under the National Response Plan," which include delivering temporary housing units to disaster survivors, 6 U.S.C. §314(a)(13); ECF 303, Ex. X at 10-11. Other FEMA responsibilities, including performing required environmental project reviews (ECF 303-8 ¶19), training disaster responders (ECF 303-3 ¶¶7-10), and auditing grants (ECF 303-5 ¶11), have also been impaired. And even if that were not the case, common sense and record evidence dictate that continued implementation of DHS's target of eliminating *half* of FEMA's already understaffed workforce—which Defendants' Post-Katrina Act argument fails to address entirely—will not only "reduce" FEMA's capabilities in violation of

---

[8] Note [1] as shown in the U.S. Code states, "So in original. Probably should be 'authorities, responsibilities, or functions.'"

[9] Defendants' insistence that "FEMA retains every power Congress conferred on it, including its Stafford Act authority," Opp. 20, is flatly contradicted by Defendants' own admission that as of December 31, 2025, FEMA cannot authorize CORE renewals without DHS approval, *id.* at 18.

the Act but will utterly incapacitate FEMA.  ECF 303-2 ¶30; ECF 303-1 ¶25; ECF 303-5 ¶12.[10]

As to the other provisions of the Post-Katrina Act, Defendants fare no better.  Defendants entirely ignore that the Act transferred control over FEMA's "functions … including all of its personnel" from DHS back to FEMA, 6 U.S.C. §315(a)(1), and present *no* argument as to how DHS's expropriation of FEMA's authority over its own staffing, and thus its ability to perform its functions, is consistent with this provision.  *See* ECF 301-1 at 32.  And to the extent Defendants rely on the Secretary's authority over DHS pursuant to 6 U.S.C. §112(a)(2)-(3), that earlier, general provision must yield to Congress's subsequent, specific transfer of authority over FEMA's functions and personnel from DHS back to FEMA in §315(a)(1).[11]

Finally, notwithstanding their lengthy explanation of DHS's reorganization authority, Defendants ultimately admit that, under the Post-Katrina Act, "the Secretary cannot use" that reorganization authority "with respect to FEMA."  Opp. 20.  Thus, the Secretary may not "allocate or reallocate [FEMA's] functions" or "establish, consolidate, alter, or discontinue organizational units within" FEMA.  6 U.S.C. §452(a); *id.* §316(b).[12]  Although Defendants summarily assert that DHS has not violated this provision, they again ignore record evidence that the January non-renewals have *already* eliminated "entire departments," ECF 303-5 ¶11, and, if DHS is allowed to continue implementing its staffing reduction targets, more are certain to follow.  ECF 303-1 ¶¶9-16, 25; ECF 303-2 ¶¶11-20; ECF 303-7 ¶11; ECF 303-8 ¶19; ECF 303-9 ¶14.

---

[10] Nor do Defendants identify any statute that "specifically provided" DHS with the authority to strip FEMA of decision-making authority and the staff needed to perform its missions, authorities, responsibilities, and functions.  6 U.S.C. §316(c); *see Washington*, 2025 WL 3551751, at *5.

[11] "It is a commonplace of statutory construction that the specific governs the general," and so "the specific provision" regarding FEMA's functions in §315(a)(1) must be "construed as an exception to the general" provision regarding the Secretary's authority over DHS in §112(a)(2)-(3).  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

[12] Defendants suggest, without explanation, that the scope of §316(b)'s limitation on the Secretary's reorganization authority over FEMA "track[s]" the scope of §452(b)'s entirely separate reorganization exception, which prevents the Secretary from abolishing "any" statutorily required "agency, entity, organizational unit, program, or function."  6 U.S.C. §452(b)(2); *see* Opp. 20.  But there is nothing in the text of §316(b) to suggest it prohibits only the reorganizations that are already disallowed under §452(b)(2).  Such an interpretation would impermissibly render §316(b) "mere surplusage."  *United States v. Ramirez-Sanchez*, 338 F.3d 977, 979 (9th Cir. 2003).  Indeed, §316(b) deprives the Secretary of *any* reorganization authority over FEMA.  *See* Opp. 20 (conceding that under §316(b) DHS may not "add[] to … or subtract[] from" "FEMA's functions.").

**B.     Defendants' Actions Eliminate Positions Required to Perform FEMA's Statutory Mandates**

Congress has entrusted FEMA with extensive, mandatory duties.  ECF 301-1 at 27-31.  These functions are not self-executing; they require staff to carry them out.  As Plaintiffs have shown, the DHS-directed plan to eliminate half of FEMA's employees, including 41% of CORE positions, would prevent FEMA from fulfilling its vast statutory mandate.  *Id.*

Conspicuously absent from Defendants' response is any explanation as to how FEMA would be able to perform its considerable preparedness, protection, mitigation, response, and recovery duties if DHS is permitted to continue executing its plan to eliminate half of FEMA's staff.  Instead, Defendants simply assert that future staffing reductions are "speculat[ive]."  Opp. 19.  But no speculation is required: the DHS-directed staffing reduction targets identify the precise number of each type of employee DHS seeks to eliminate from each FEMA division.  ECF 298 at 13.  Defendants do not deny these reduction targets.  Nor could they, as DHS began effectuating the targets days after issuing them, through the indiscriminate January CORE non-renewals.  DHS also does not deny it plans to pursue these cuts, which would plainly render FEMA unable to fulfill its statutory duties, ECF 301-1 at 27-31, and are contrary to law.  *See New York v. Kennedy*, 789 F.Supp.3d 174, 209 (D.R.I. 2025); *Washington v. Fed. Emerg. Mgmt. Agency*, 2025 WL 3551751, at *5 (D. Mass. Dec. 11, 2025); *AFGE v. Trump*, 139 F.4th 1020, 1034–35 (9th Cir. 2025).[13]

Defendants next posit that if the non-renewal targets "reflect anything at all, it is decision-making about FEMA's changing needs and how to meet them."  Opp. 19.  But they presented no evidence that DHS's plan to cut half of FEMA's staff—or even its elimination of hundreds of CORE positions in January 2026—is based on *any* evaluation of agency need.  To the contrary, FEMA's own analyses concluded it was badly understaffed, and DHS's initial implementation of its staffing reduction plan was carried out despite FEMA supervisors' written explanations of why the non-renewed employees were necessary for FEMA's functioning.  ECF 301-1 at 10-11, 18.

---

[13] *Kennedy* and *Washington* did not "involve[] something categorically different from the factual allegations here."  Opp. 19.  In fact, the challenged actions present even more extreme cuts than the RIF notices in *Kennedy*, which were issued to 10,000 of the 80,000 Health and Human Services employees, 789 F.Supp.3d at 189, and will impact more than the single grant program at issue in *Washington*, 2025 WL 3551751, at *5.

Nor does the expansion of the CORE workforce over the last 30 years suggest that these employees are unnecessary; it reflects the rising rates of major disasters and as well as Congress's broadening of FEMA missions and functions over that period. Coen Supp. Decl. ¶¶6-9; ECF 301-1 at 3, 28.

Unable to defend DHS's plans to incapacitate FEMA's functions and shift to state and local governments sole responsibility for disaster relief, ECF 303-21, Exs. B, I, Defendants focus only on the non-renewals that have already been executed. Opp. 18-19. But even their blanket assertion that FEMA retains the ability to perform its functions fails to respond to Plaintiffs' evidence showing specific ways that mandatory functions have already been impaired. *See supra* at 7-8.

### C. Defendants' Actions Are Arbitrary and Capricious

Defendants fail to respond to the primary reason why DHS's removal of FEMA's renewal authority, imposition of extensive staffing cut targets, and directive not to renew CORE employees based on NTE date are arbitrary and capricious: DHS failed to consider FEMA's needs or the impact on FEMA's functions, and these acts were counter to evidence before the agency including supervisor renewal decisions and FEMA's own analysis that is extremely understaffed. ECF 301-1 at 33-35. That DHS has not separated every CORE employee with a January NTE date, Opp. 23, does not show that FEMA or DHS actually considered the agency's need for certain CORE employees.[14] And far from suggesting that these separations were justified by reasoned decisionmaking, the fact that DHS subsequently rescinded 33 of the non-renewals, ECF 312-1 ¶25, highlights the haphazard and arbitrary nature of the terminations. *Cf. AFGE v. OMB*, 2025 WL 3018250, *1 (N.D. Cal. Oct. 28, 2025) ("*OMB I*"); *Kennedy*, 789 F.Supp.3d at 190, 204-06.

Plaintiffs' argument thus does not depend upon CORE employees' reliance interests. Even if it did, Defendants' assertion that FEMA's "historical … practice of routine renewals" cannot engender reliance interests because renewal is not guaranteed ignores binding precedent. Opp. 22. That a program "provided benefits only in two-year increments" and explicitly stated that grant of

---

[14] As explained *supra* at 2, this is likely the result of DHS's January 22 pause of across-the-board non-renewals in advance of the winter storm. Plaintiffs moved to file a supplemental complaint challenging the non-renewals on January 27, less than a week after the pause, and then, after reports that Defendants were lifting the pause, moved for a TRO. ECF 301-1 at 19. Defendants could have, in response, disclaimed any plan to proceed with further separations, but did not do so. Instead, they have left most CORE employees with NTE dates in limbo. *Supra* at 2.

such benefits "conferred no substantive rights," does not "automatically preclude reliance interests." *Regents*, 591 U.S. at 31.  Rather, "consideration" of those reliance interests must still "be undertaken by the agency in the first instance," and an agency's failure to do so renders its decision arbitrary and capricious.  *Id.*; *see also Washington v. U.S. Dep't of Educ.*, 2025 WL 3004675, at *8 (W.D. Wash. Oct. 27, 2025).  That the decision overrode FEMA supervisors' recommendations renders it all the more unreasonable.

Finally, Defendants' arguments regarding the strength of CORE employees' reliance interests and the January non-renewal statistics fundamentally misconstrue the arbitrary and capricious inquiry.  "[A]n agency must defend its actions based on the reasons it gave when it acted, not with post hoc rationalizations."  *Lotus Vaping Techs., LLC v. FDA*, 73 F.4th 657, 668 (9th Cir. 2023) (quotation omitted).  Defendants' failure to provide any evidence related to "the grounds that the agency invoked when it took the action" is itself dispositive.  *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (quotation omitted).

### D.    Defendants Eliminated Positions in Violation of Section 120

Defendants' arguments all rest on their unsupported assertion that Section 120 intends only to address "the specific problem of agencies using formal RIF procedures to eliminate positions." Opp. 22 (referencing unspecified "legislative history").  But the best evidence of congressional intent is the statute's language, which expressly defines "reduction in force" to include not only formal RIFs of Title 5 employees but also "*any similar reduction of positions* at any department, agency, or office of the Federal Government."  Pub. L. No 119-37, §120(d) (emphasis added). This provision and its use of "the expansive word 'any'" show that Congress intended a broad application beyond formal RIFs.  *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008).

Defendants argue that "CORE non-renewals are outside this definition" because CORE employees have "temporary appointments" and non-renewals do not "'reduce' a position."  Opp. 21.  Neither argument has a basis in the text or other authority.

First, Section 120 applies "to all civilian positions, whether permanent, *temporary*, full-time, part-time, or intermittent, and without regard to the source of funding."  Pub. L. No 119-37, §120(b) (emphasis added).  If Congress merely intended to prohibit "RIF[s] under 5 U.S.C.

§§3501-3504," Opp. 22, Section 120(d)'s inclusion of "any similar reduction of positions" would be surplusage, as would Section 120(b)'s expansive list of covered positions (many of which could be eliminated without RIF procedures). *Contra Williams v. Taylor*, 529 U.S. 362, 404 (2000).

Second, CORE non-renewals by definition reduce the number of CORE positions at FEMA. Defendants' bare assertion that "Congress does not consider a non-renewal to be a termination, a removal, or a RIF," Opp. 22, is irrelevant to the question whether the systematic non-renewal of CORE employees is a "similar reduction in positions" under Section 120(d), which it is. *See* 301-1 at 33 (defining "similar"). DHS's implementation and execution of its planned non-renewals before February 13, 2026 was squarely prohibited by the CR.

### E.    Defendants Took Final Agency Actions

Defendants contend that Plaintiffs "misunderstand, and therefore misinterpret" the FEMA OCHCO statement regarding removing FEMA authority to renew CORE positions. Opp. 17-18. But as discussed *supra* at 3-4, regardless of whether Defendants were newly seizing FEMA's authority or merely revoking some prior authorization to renew for 180 days, DHS has made a final, reviewable decision to remove FEMA authority.[15]  Defendants have no contrary argument.

Defendants' argument that DHS's adoption of the workforce reduction plan and FEMA's implementation are not final agency actions is based solely on caveats in the email's text. Opp. 18. Defendants ignore uncontroverted evidence that DHS ordered FEMA to begin implementing that plan—and FEMA did so—on January 1. *Supra* at 4. Evans does not dispute (or even address) the finality or commencement of this plan. *Id*. And even if Defendants were correct that the effects of DHS's plan "remain contingent on future action," Opp. 23, "a federal agency's assessment, plan, or decision qualifies as final agency action even if the ultimate impact of that action rests on some other occurrence." *AFGE v. Trump*, 139 F.4th at 1039 (citation omitted).

---

[15] To the extent Defendants suggest that DHS merely failed to extend that authorization after it expired, that does not matter. "[A]gency action" may include "failure to act." 5 U.S.C. §551(13); *Aguayo v. Jewell*, 827 F.3d 1213, 1223 (9th Cir. 2016). Similarly, Plaintiffs are not required to "establish[] that non-renewal of CORE appointments on their NTE dates constitutes affirmative agency action" rather than inaction. Opp. 22. Defendants' own evidence establishes that DHS made the affirmative decision to reject FEMA's approval of renewed terms. And Defendants cannot claim non-renewals are self-executing on the NTE date as many COREs whose NTE dates passed after January 22 continue to work pending a renewal decision. Jackson Supp. Decl. ¶4; ECF 303-5 ¶18.

Finally, Defendants fault Plaintiffs for failing to "cite, by exhibit number or otherwise, the directives they contend are 'final.'"  Opp. 17.  Besides being false, ECF 307, this highlights that Defendants seek to shield their final decisions from judicial review by hiding them from public scrutiny.  Notwithstanding Defendants' nondisclosure of relevant plans, Plaintiffs have uncovered the evidence that DHS made these decisions and FEMA began implementing them, with real-world consequences for FEMA employees and those who depend on the agency's services.  *See also Bhd. of Locomotive Eng'rs v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) ("Agency action generally need not be committed to writing to be final and judicially reviewable.").[16]

## III.    Defendants' Jurisdictional Roadblocks to Judicial Review Lack Merit

### A.     Congress Did Not Impliedly Channel Plaintiffs' APA Claims

Defendants do not deny that this Court has express federal jurisdiction over Plaintiffs' APA claims, *see* 28 U.S.C. §1331, but recycle implied preclusion arguments based on the Civil Service Reform Act ("CSRA") that the Ninth Circuit and this Court have conclusively and repeatedly rejected.  *AFGE v. Trump*, 139 F.4th at 1033, *stayed pending appeal on other grounds*, 145 S. Ct. 2635 (2025).[17]  As this Court recently observed, "The parties, and this Court, have been down this road before."  *AFGE v. OMB*, 2025 WL 3654116, at *6 (N.D. Cal. Dec. 17, 2025) ("*OMB II*").[18]

---

[16] Nor are Defendants' actions "unreviewable" as "committed to agency discretion by law" (Opp. 21), a "very narrow" category that applies "rare[ly] where ... there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).  Congress has triply provided "judicially manageable standards" (*Heckler v. Chaney*, 470 U.S. 821, 830 (1985)) here: (1) restrictions on DHS interference (6 U.S.C. §316); (2) myriad authorizing statutes defining FEMA's mandatory functions (*e.g.*, 6 U.S.C. §§313, 314); and (3) Section 120.  *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993), involved "an agency's allocation of funds from a lump-sum appropriation" unconstrained by statutory mandates, and affirmed that agencies are "not free simply to disregard statutory responsibilities" or constraints that Congress imposes. *Id.*

[17] *See also* ECF 259 at 10-11; ECF 124 at 18-27; *OMB I*, 2025 WL 3018250, *10-11; *AFGE v. OPM*, 799 F.Supp.3d 967, 98 (N.D. Cal. 2025) and 771 F.Supp.3d 1127 (N.D. Cal. 2025).

[18] Defendants do not acknowledge Ninth Circuit authority foreclosing their argument, instead citing out-of-circuit authority.  Opp. 13.  *Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004), was an individual employee challenge to his employing agency's censure, not agency action comparable to that at issue here.  *AFGE v. Trump* explains the distinction between challenges to agency-level policy decisions and those to the resulting individual personnel actions. 139 F.4th at 1031-33; *see also Feds for Med. Freedom v. Biden*, 63 F.4th 366 (5th Cir. 2023), *vacated as moot*, 144 S. Ct. 480 (2023).  These decisions are consistent with the "here and now" injury the APA deems sufficiently important to permit pre-implementation challenges and relief, triggered only by "consummation of the agency's decisionmaking process."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *see also Axon Enters., Inc. v. FTC*, 598 U.S. 175, 191 (2023) (recognizing that here and now

Defendants' argument rests on characterizing the issues as typical personnel decisions within FEMA's discretion (Opp. 10-13), but as discussed *supra*, the DHS directives removing FEMA authority to make these decisions, imposing large-scale plans to downsize FEMA, and ordering the elimination of CORE positions by NTE date irrespective of FEMA approval and need are anything but run-of-the-mill personnel decisions.  Rather, like those addressed previously in this case and in *OMB*, these claims challenge agency-level decisions and actions, not any particular personnel action taken as to any individual federal employee.  *See AFGE*, 139 F.4th at 1031 ("Whether or not the federal agencies' 'transformation[s]' and 'large-scale reductions in force' can be characterized as an 'agglomeration' of 'individual employment actions,' Plaintiffs are not challenging those employment decisions with respect to individual employees [but] … Defendants' constitutional and statutory authority to direct the federal agencies to take such actions in the first place.").[19]  Plaintiffs' APA claims are not the "type" that Congress intended to be heard in the first instance by the administrative processes set up by the CSRA, *AFGE*, 139 F.4th at 1030-33, and the APA "command[s]"judicial review.  *Dep't of Comm. v. New York*, 588 U.S. 752, 771-72 (2019).

Defendants further argue that under *United States v. Fausto*, 484 U.S. 439, 445 (1988), the CSRA deprives this Court of jurisdiction because individual CORE employees could not obtain MSPB review of their non-renewals.  Opp. 12-13.  But the Ninth Circuit has already rejected extending *Fausto* in this very case, "find[ing] it unlikely that Congress intended for the CSRA to preclude review for parties not even covered by that statute who allege claims outside the MSPB's and FLRA's jurisdiction."  *AFGE v. Trump*, 139 F.4th at 1032-33.[20]  Indeed, Congress decided that these employees are governed by the Stafford Act, not the CSRA.  The Stafford Act, FEMA statutes, and Section 120 neither create any administrative review scheme for these employees nor

---

injuries evade meaningful judicial review and weigh heavily against implied preclusion).

[19] *See also Feds*, 63 F.4th at 377; *OMB II*, 2025 WL 3654116, at *6 ("the heart of plaintiffs' claims lies not with the individual termination decisions themselves but with OMB and OPM's legal positions that purport to authorize and/or direct mass terminations at the federal agency level").

[20] *See Nat'l TPS All. v. Noem*, __ F.4th __, 2026 WL 226573, at *7 (9th Cir. Jan. 28, 2026) ("The assertion that a statute bars substantial statutory and constitutional claims is an 'extreme position.'") (citation omitted); *Cmty. Legal Servs. v. HHS*, 137 F.4th 932, 939 (9th Cir. 2025) (conclusion that "no court has jurisdiction to hear plaintiffs' claims" would be "contrary to common sense" and "conflict[] with the strong presumption favoring judicial review of administrative action").

suggest that Congress intended to remove APA judicial review.  Nor is there any indication that Congress intended to preclude jurisdiction over claims by Local Government Plaintiffs.

### B.    Plaintiffs Have Standing to Bring these Claims

Each moving plaintiff has shown actual or imminent injury from DHS's unlawful plan to dramatically reduce CORE employees at FEMA, although the "court need not address standing of each plaintiff if it concludes that one plaintiff has standing," *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).  Plaintiffs' injuries are similar to those this Court previously found sufficient to support standing.  *See* ECF 124 at 11-18.

AFGE has shown associational standing based on injuries to CORE and other FEMA employees who it represents and has as members.  *See* ECF 124 at 13.  Defendants argue that AFGE needs evidence of separated members who voluntarily paid dues after Executive Order 14251 purported to revoke collective bargaining representation (and ended dues deduction through paychecks).  *See* Opp. 16-17.  Even if this were required for standing—which it is not—AFGE has current dues-paying members who have been non-renewed, whose NTE dates have already passed without renewal and remain in limbo, and who have upcoming NTE dates.  Schwarz Decl. ¶¶5-6.

Defendants also have no valid basis to reject Plaintiffs' associational standing as a representative of former bargaining unit members (Opp. 17).  *E.g.*, ECF 303-6 ¶11; ECF 303 ¶36, 46a.[21]  First, the legal effect of the Executive Order is unsettled, as it is the subject of litigation and pending resolution on appeal.  ECF 303 ¶5; *see* Case No. 25-4014 (9th Cir.).  Second, evidence of dues-paying membership is not required.  To the contrary, organizations without *any* formal members may show associational standing if they are "the functional equivalent of a traditional membership organization."  *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002).  Here, "AFGE Local 4060 continues to provide representational services to FEMA employees from its former bargaining units, notwithstanding the Executive Order, including advice, assistance and representation with respect to disciplinary actions and other employment-related issues," and thus

---

[21] Defendants wrongly assert that AFGE Local 4060 President Jackson "stops short of indicating whether [the] anonymous member" he describes "was actually non-renewed."  Opp. at 17.  Jackson's declaration clearly discusses the impact of that employee's non-renewal.  ECF 303 ¶46, ¶46a.

can stand in the shoes of those employees to challenge DHS's unlawful actions.  ECF 303 ¶6.[22]

Moreover, Defendants do not even attempt to counter AFGE's showing of organizational standing.  DHS's unlawful actions harmed AFGE's core organizational activities and require AFGE to spend considerable additional resources responding to the non-renewals.  ECF at 301-1 at 26-27; ECF 303 ¶¶38, 48; *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).  The termination of members also harms AFGE through loss of dues.  ECF 303 ¶6; *see* ECF 124 at 14.

Local Government Plaintiffs separately have standing.  Indeed, President Trump and Secretary Noem *announced* that DHS's objective is to shift the burden for disaster relief onto state and local governments.  ECF 301-1 at 12-13.  "[A] municipality … may sue to protect its own 'proprietary interests,'" which are "as varied as a municipality's responsibilities, powers, and assets.  *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004); ECF 124 at 16.[23]

Initially, Defendants' actions directly harm the monetary interests of Local Government Plaintiffs, which receive FEMA-administered grants that "are essential for cities to strengthen their infrastructure and reduce long-term vulnerability" and would be delayed by large-scale cuts.  ECF 303-15 ¶9 (Chicago); ECF 303-17 ¶26 (King County); ECF 303-14 ¶14 (Baltimore).  Multiple Plaintiffs are also awaiting millions of dollars in reimbursements for prior disasters, and given "the historical lengthy duration in processing these requests due to inadequate staffing, further staff reductions at FEMA would further extend the delay in reimbursement for these funds."  ECF 303-16 ¶19 (Harris County); *see also* ECF 303-17 ¶¶15-18 (King County); ECF 303-18 ¶9 (San Francisco).  This Court has found similar "impending financial harm" from delays in other agency grant processing sufficient to establish standing.  ECF 124 at 17; *see also Harris v. Bd. of Supervisors*, 366 F.3d 754, 762 (9th Cir. 2004) (it was "not speculative" that cuts to health system with "existing shortages and delays" would "further impede the County's ability to deliver medical treatment to plaintiffs in their times of need").  Monetary injuries caused by delays are certainly

---

[22] Defendants erroneously suggest that AFGE cannot assert associational standing on behalf of AFGE Local 4060 members, Opp. 17, but AFGE represents all members of its affiliated locals. Schwartz Decl. ¶4; *see also* ECF 37-23 ¶4 (Declaration of AFGE National President Kelley).

[23] Defendants incorrectly describe Local Government Plaintiffs as asserting "organizational standing," Opp. 15, rather than standing as local governments to challenge harm to their interests.

impending from DHS's intended cuts, even before any future emergencies or disasters occur.[24]

A large-scale reduction of CORE employees also severely impairs these Plaintiffs' ability to manage emergencies and provide critical disaster response.  Impairment of a local government's "public safety functions," including fire, police, and other emergency services, is a "concrete 'injury in fact' to its proprietary interests." *City of Sausalito*, 386 F.3d at 1198.  Given CORE employees' crucial role in both preparing for and responding to major disasters and emergencies, Defendants' staffing reductions will immediately impede public safety functions and overburden local emergency and other services when an emergency occurs.[25]  Defendants do not dispute that Local Government Plaintiffs rely on CORE employees for essential emergency and disaster response services, but contend any injury is too speculative under *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013).  But neither the monetary nor public safety injuries asserted depend on a lengthy chain of causation or speculation about "how third parties would react to government action or cause downstream injury to plaintiffs." *All. For Hippocratic Med.*, 602 U.S. at 383.  Large-scale non-renewals of CORE employees necessarily and directly reduce the employees available for grant management, emergency preparation, and disaster response.

Nor does the "necessarily unknowable" nature of disasters make standing too speculative.  Opp. 15.  *Clapper* does not require Plaintiffs to wait until a hurricane forms or the first tremors of an earthquake hit before rushing to court.  *Harris* rejected a similar argument, holding that

---

[24] The CORE non-renewals also impose on the Local Government Plaintiffs the "present injury" of needing to take budgetary, emergency planning, and other "steps to mitigate the risk" to themselves and their residents. *Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 527, 537 (N.D. Cal. 2017), *aff'd sub nom.*, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018); *see* ECF 303-12 ¶13 (Santa Clara) (current emergency plans "assume[] the existence and availability of trained FEMA staff in disasters and emergencies"); ECF 303-18 ¶8 (San Francisco) (same).

[25] *See, e.g.*, ECF 303-18 ¶10 (San Francisco) ("CORE employees provide trainings and support preparedness initiatives"); ECF 303-16 ¶12-14 ("A reduction in FEMA staffing would very likely mean fewer employees available for preparedness training and exercises…"); *id.* ¶15 ("Having fewer personnel to assist with disaster recovery and distribution of critical resources would also have a direct negative impact on Harris County's agencies, services, and finances."); ECF 303-14 ¶9 (reductions to CORE employees "substantially burden local systems that are already stretched, impeding [Baltimore]'s ability to provide critical services to its residents"); *id.* ¶17 ("Baltimore relies upon trainings provided by FEMA"); ECF 303-15 ¶4, 6, 8 (Chicago) (local and state resources "would not have the capacity to fill the gap if FEMA were to be absent during a major disaster"); ECF 303-12 ¶11-13 (Santa Clara) (similar, and FEMA delays could also lead to further degradation of public infrastructure damaged by a disaster); ECF 303-17 ¶11 (reductions in FEMA staff "would severely impair King County's ability to protect life, property, and public infrastructure").

chronically ill individuals' "future need for medical attention" was "not speculative" and noting that "[t]he only true uncertainty here is *when* plaintiffs will next require medical treatment," not *whether* hospital cutbacks would impact their access to care. 366 F.3d at 762-63; *see San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1023 (9th Cir. 2023) ("*Clapper* does not require plaintiffs … to demonstrate that it is literally certain that the harms they identify will come about. Rather, *Clapper* recognized that standing may exist when there is a substantial risk that the harm will occur….") (citation omitted). Likewise here, Local Government Plaintiffs have provided more than sufficient evidence that they are likely to experience a future emergency or disaster, making harms from reduced FEMA support certainly impending. For example, "Harris County is prone to flooding and other natural disasters": the county "experiences a major flood event approximately every two years," and "[d]uring the past ten years, FEMA has declared thirteen disasters and emergencies," including one already in 2026. ECF 303-4 ¶¶5, 8, 20; *see also, e.g.*, ECF 303-15 ¶6 (Chicago had three declared disasters in the past two years); ECF 303-14 ¶12 (Baltimore is susceptible to floods). Multiple Plaintiffs are also poised to host 2026 FIFA World Cup matches and rely on FEMA to help prepare for and respond to emergencies that may affect large-scale events.[26] This evidence is more than sufficient to show impending harm.

Finally, Plaintiffs AFSCME and SEIU have associational standing as representatives of state employees who rely on FEMA and CORE employees to process grants to support their work. ECF 303-20 ¶¶17-24; ECF 303-19 ¶¶4-5; *see* ECF 303-9 ¶¶5-7, 14; ECF 303-2 ¶13. Given the size of planned CORE cuts and state employees' reliance on FEMA staff and funding, Defendants' actions put these employees' jobs at serious risk, ECF 303-20 ¶26; ECF 303-19 ¶¶14, 20-30, which also weakens AFSCME's bargaining strength (giving it organizational standing). ECF 303-20 ¶30; ECF 303-19 ¶¶32-33. This Court found similar harm to grant-funded non-federal employees from large-scale federal RIFs, while "slightly more attenuated," supported standing. ECF 124 at 15; *see*

---

[26] ECF 303-12 ¶¶14-16 (Santa Clara); ECF 303-13 ¶¶16 (Harris County); ECF 303-17 ¶10 (King County). Defendants' bare assertion that Plaintiffs allege only a "generalized grievance" fares no better. *See* Opp. 15. That DHS's conduct will *also* cause nationwide harm does not defeat standing for those with concrete injuries. *See Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 909 (9th Cir. 2011) ("[T]he fact that a harm is widely shared does not necessarily render it a generalized grievance.").

1   *also OMB I*, 2025 WL 3018250, at *22.  Defendants do not address this Court's prior decision,

2   instead citing the Supreme Court's stay in *OPM v. AFGE*, 145 S. Ct. 1914 (2025), which did not

3   involve sweeping cuts at any individual agency.  Opp. 16.

4   **IV.    An Injunction Is Needed to Prevent Irreparable Injury, and the Equities and Public
         Interest Support Entry of Injunctive Relief**

5       Defendants deny that income loss is irreparable but apparently admit the loss of health

6   benefits is.  Opp. 23.  They protest that CORE employees "are not Plaintiffs in this case," *id.*, but

7   Plaintiff AFGE stands in the shoes of its members and members of its bargaining units who have

8   experienced or imminently face such harm.  *See supra* at 15-16; *e.g.,* ECF 303 ¶46a (bargaining

9   unit member whose insurance ended February 13 will be unable to afford needed medication or

10  specialist appointments); Schwarz Decl. ¶5.  Further, those AFGE-represented employees who are

11  *not* separated face irreparable injury from "radically altered workplaces and increased workload."

12  *OMB I*, 2025 WL 3018250, at *22.  Defendants also ignore Plaintiff Unions' organizational injury.

13  *See supra* at 16, 18; ECF 301-1 at 37, 39.  And their conclusory rejection of Local Governments'

14  irreparable monetary and public safety injuries as "subjective fear" and "speculat[ion]," Opp. 24,

15  lacks persuasive force for reasons explained *supra* at 16-18.  *See also* ECF 301-1 at 38-39.

16      Defendants' arguments that the equities and public interest weigh against injunctive relief

17  rest entirely on their erroneous merits positions.  Opp. 24.  DHS, not FEMA, is making the relevant

18  decisions and disregarding the needs and functions of the agency, in violation of statutory

19  mandates.  *See supra* at 1-8; *see also OMB I*, 2025 WL 3018250, at *23.

20  **V.    Plaintiffs' Requested Scope of Relief Is Appropriate**

21      Defendants do not deny that the proposed injunction would restore the status quo.  They

22  first argue that such relief should be narrowly tailored to Plaintiffs.  Opp. 25.  But the Court has the

23  authority to grant "complete relief to plaintiffs" even if that results in incidental benefits to non-

24  parties.  *OMB I*, 2025 WL 3108250, at *24 (citing *Trump v. CASA*, 606 U.S. 831, 847 n.10, 851-52

25  (2025), and noting that APA supports broad relief).  Plaintiffs have demonstrated that suspension

26  of Defendants' plans to dismantle FEMA is necessary to avoid irreparable injury to Plaintiffs.

27      For Local Government Plaintiffs and unions that represent local and state public employees,

28

the only relief that would prevent their injuries—including grant processing delays; interference with disaster preparedness and the ability to budget, plan for the future, and properly serve residents; and lessened ability to respond effectively to disasters, *see supra* at 16-18—is halting the dismantling of FEMA and its CORE workforce.[27]  *See* ECF 124 at 45 (irreparable harm when "agencies will not easily return to their prior level of operations").

Plaintiffs have also shown that members of AFGE and of its bargaining units who remain employed will be injured by the severe reduction of FEMA staffing, regardless of whether the separated individuals belong to AFGE.  *See* ECF 303-3 ¶¶8-10; ECF 303-1 ¶24; *OMB I*, 2025 WL 3018250, at *24 ("work and stress" that still-employed union members will face after widespread layoffs support broader scope of relief). This harm is particularly acute for CORE employees who may at any time be required to deploy to emergency and disaster situations nationwide, *supra* n.27; staffing cuts will necessarily require the fewer remaining employees to cover those deployments.

Second, Defendants contend reinstatement is unavailable under the APA,[28] Opp. 25, but their authority says nothing of the sort.  *See Sampson v. Murray*, 415 U.S. 61, 84 (1974) ("showing of irreparable injury sufficient in kind and degree" may justify injunctive relief in personnel case); ECF 124 at 45.  The APA's "set aside" remedy authorizes courts to unwind the effects of unlawful agency action.  *See* 5 U.S.C. §706 (granting authority to "issue all necessary and appropriate process … to preserve status or rights pending conclusion of the review proceedings" to prevent irreparable injury); *Griffin v. HM Florida-ORL, LLC*, 144 S. Ct. 1, 2 n.1 (2023) (Mem.) (Kavanaugh, J., concurring in denial of stay); *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021) (vacatur "retroactively undoes" and "unwinds" agency action).[29]

## VI.    Conclusion

For the reasons discussed, the Court should grant the requested preliminary injunction.

---

[27] Relief cannot be limited to CORE employees working in any individual region, as FEMA often "pull[s] disaster response staff from across the country, not just the regional office where a disaster occurs."  ECF 303 ¶16; *see, e.g.*, ECF 303-18 ¶7 (San Francisco relies on COREs who can deploy to disaster sites); ECF 303-16 ¶11 (Harris County, same); ECF 303-12 ¶¶8, 12 (Santa Clara, same).

[28] Contrary to Defendants' assertion, Opp 9 n.5, Plaintiffs moved for relief on the grounds that the challenged actions are *ultra vires* and violate 5 U.S.C. §706(2)(A), (C). ECF 301-1 at 27.

[29] The Court should waive any bond.  *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).  Defendants' actions are unlawful and this case implicates significant public interest.

DATED: February 24, 2026

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
Robin S. Tholin
Elizabeth Eshleman
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
Fax: (415) 362-8064
sleyton@altshulerberzon.com
bchisholm@altshulerberzon.com
dleonard@altshulerberzon.com

By: */s/ Stacey M. Leyton*

*Attorneys for All Union and Non-Profit Organization Plaintiffs*


Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

By: */s/ Elena Goldstein*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC) and for Plaintiffs City of Chicago, IL; Martin Luther King, Jr. County, WA; Harris County, TX; and City of Baltimore, MD*


Jules Torti (pro hac vice)
PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038

Erica J. Newland (pro hac vice)
Jacek Pruski (pro hac vice)
PROTECT DEMOCRACY PROJECT

2020 Pennsylvania Ave., N.W., Suite 163
Washington, D.C. 20006
Tel: 202-579-4582
jules.torti@protectdemocracy.org
erica.newland@protectdemocracy.org
jacek.pruski@protectdemocracy.org

By: */s/ Jules Torti*_____

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC)*


Norman L. Eisen (pro hac vice)
Spencer W. Klein (pro hac vice app. forthcoming)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Spencer@statedemocracydefenders.org

By: */s/ Norman L. Eisen*_____

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC)*


Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*_____

*Attorney for Plaintiffs American Federation of Government Employees, AFL-CIO (AFGE) and AFGE locals*


Teague Paterson (SBN 226659)
Matthew Blumin (pro hac vice)
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.

Washington, D.C. 20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

By: */s/ Teague Paterson*

*Attorneys for Plaintiff American Federation of State County and Municipal Employees, AFL-CIO (AFSCME)*

Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

By: */s/ Steven K. Ury*

*Attorney for Plaintiff Service Employees International Union, AFL-CIO (SEIU)*

David Chiu (SBN 189542)
City Attorney
Yvonne R. Meré (SBN 175394)
Chief Deputy City Attorney
Mollie M. Lee (SBN 251404)
Chief of Strategic Advocacy
Sara J. Eisenberg (SBN 269303)
Chief of Complex and Affirmative Litigation
Molly J. Alarcon (SBN 315244)
Alexander J. Holtzman (SBN 311813)
Deputy City Attorneys
OFFICE OF THE CITY ATTORNEY FOR THE CITY AND COUNTY OF SAN FRANCISCO
1390 Market Street, 7th Floor
San Francisco, CA 94102
molly.alarcon@sfcityatty.org
alexander.holtzman@sfcityatty.org

By: */s/ David Chiu*

*Attorneys for Plaintiff City and County of San Francisco*

1

2    Tony LoPresti (SBN 289269)
     COUNTY COUNSEL
3    Kavita Narayan (SBN 264191)
     Meredith A. Johnson (SBN 291018)
4    Raphael N. Rajendra (SBN 255096)
     Hannah M. Godbey (SBN 334475)
5    OFFICE OF THE COUNTY COUNSEL
     COUNTY OF SANTA CLARA
6    70 West Hedding Street, East Wing, 9th Floor
     San José, CA 95110
7    Tel: (408) 299-5900

8    By: */s/ Tony LoPresti*

9
     *Attorneys for Plaintiff County of Santa Clara, Calif.*
10

11
     Christopher Sanders (pro hac vice)
12   General Counsel
     Erin King-Clancy (SBN 249197)
13   Senior Deputy Prosecuting Attorney
     OFFICE OF KING COUNTY PROSECUTING
14   ATTORNEY LEESA MANION
     401 5th Avenue, Suite 800
15   Seattle, WA 98104
     (206) 477-9483
16   chrsanders@kingcounty.gov
     eclancy@kingcounty.gov
17

     By: */s/ Erin King-Clancy*
18

     *Attorneys for Plaintiff Martin Luther King, Jr. County*
19

20   Sharanya Mohan (SBN 350675)
     Eliana Greenberg (SBN 366319)
21   Toby Merrill (pro hac vice)
     PUBLIC RIGHTS PROJECT
22   490 43rd Street, Unit #115
     Oakland, CA 94609
23   Tel: (510) 738-6788
     sai@publicrightsproject.org
24   eliana@publicrightsproject.org
     toby@publicrightsproject.org
25

26   By: */s/ Eliana Greenberg*

27   *Attorneys for Plaintiffs Baltimore, MD, Chicago, IL,*
     *Harris County, TX, and Martin Luther King, Jr.*
28   *County, WA*

1

2          Jonathan G.C. Fombonne
           Harris County Attorney
3

4          Sarah Utley (pro hac vice app. forthcoming)
           Managing Counsel
5          Bethany Dwyer (pro hac vice app. forthcoming)
           Deputy Division Director - Environmental Division
6          R. Chan Tysor (pro hac vice)
           Senior Assistant County Attorney
7          Alexandra "Alex" Keiser (pro hac vice)
           Assistant County Attorney
8          1019 Congress, 15th Floor
           Houston, Texas 77002
9          Tel.: (713) 274-5102
           Fax: (713) 437-4211
10

11         jonathan.fombonne@harriscountytx.gov
           sarah.utley@harriscountytx.gov
12         bethany.dwyer@harriscountytx.gov
           chan.tysor@harriscountytx.gov
13         alex.keiser@harriscountytx.gov

14

15     By: */s/ Jonathan G.C. Fombonne*

16         *Attorneys for Plaintiff Harris County, Texas*

17

18         Mary B. Richardson-Lowry,
           Corporation Counsel of the City of Chicago
19

20         Rebecca A. Hirsch (pro hac vice)
           Lucy Prather (pro hac vice)
21         City of Chicago Department of Law,
           Affirmative Litigation Division
22         121 N LaSalle Street, Suite 600
           Chicago, Illinois 60602
23         Tel: (312) 744-6934
           Rebecca.Hirsch2@cityofchicago.org
24         Lucy.Prather@cityofchicago.org

25

26     By: */s/ Rebecca Hirsch*

27         *Attorneys for Plaintiff City of Chicago*

28

Ebony M. Thompson
Baltimore City Solicitor

Christopher Sousa (SBN 264874)
Chief Solicitor
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Tel: (410) 396-3947
christopher.sousa@baltimorecity.gov

By: */s/ Christopher Sousa*

*Attorneys for Plaintiff City of Baltimore*