Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
dleonard@altber.com
bchishom@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*
[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 3:25-cv-03698-SI |
| Plaintiffs, | **DECLARATION OF DANIELLE LEONARD** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

## DECLARATION OF DANIELLE LEONARD

I, Danielle Leonard, declare as follows:

1.     I am a member in good standing of the State Bar of California and the bar of this Court.  I represent all union and organizational Plaintiffs in this action.  This declaration is based on my personal knowledge, information, and belief.

2.     Plaintiffs' earlier efforts at meeting and conferring on disputes about the Court's discovery orders (ECF 321, 328), and Defendants' noncompliance with those Orders, have been discussed in prior filings.  ECF 327, 332.  I provide a brief supplement to describe discovery and efforts in addition to the information provided in those previous filings.

3.     **Depositions:** On March 31, 2026, Plaintiffs deposed FEMA's Senior Official Performing the Duties of Administrator ("SOPDA"), Karen Evans.  A true and correct copy of pages excerpted from the transcript of that deposition is attached as **Exhibit A**.  In agreement with Defendants, Plaintiffs have redacted parts of pages 146, 160, and 161 to remove the phone numbers of Ms. Voorhies, Mr. Lewandowski, and Mr. Guy, which Ms. Evans provided during her testimony.  Defendants confirmed by email on April 8, 2026, that their confidentiality designation for Ms. Evans' deposition transcript is limited to those phone numbers.

4.     True and correct copies of the deposition exhibits that are referenced in the deposition transcript excerpts in Exhibit A are attached hereto as **Exhibits B to H**.  Exhibit B is deposition exhibit 10.  Exhibit C is deposition exhibit 17.  Exhibit D is deposition exhibit 18.  Exhibit E is deposition exhibit 25.  Exhibit F is deposition exhibit 24.  Exhibit G is deposition exhibit 20.  Exhibit H is deposition exhibit 9.  These documents are being submitted to the Court for in camera review in light of Defendants' designation as Confidential pursuant to the Protective Order in this case (ECF 261).

5.     Defendants made a blanket designation of *every* document in their document productions as Confidential.  By email on March 20, 2026, Plaintiffs provided notice of a challenge to the blanket confidentiality designations and immediately commenced the meet and confer process under the Protective Order.

6.    Defendants communicated by email on April 9, 2026 that they are withdrawing the Confidentiality designations of certain other deposition exhibits, but not those attached as Exhibits B to H.  Plaintiffs have submitted those documents in camera but are prepared to move to file those documents under seal, or to file on the public record once the designation issue is shortly resolved pursuant to the deadlines in the Protective Order.

7.    On April 2, 2026, Plaintiffs deposed the DHS Chief Human Capital Officer ("CHCO") Roland Edwards.  Defendants confirmed by email on April 8, 2026, that they are not designating any part of Edwards' April 2, 2026, deposition as confidential.

8.    On April 3, 2026, Plaintiffs deposed the FEMA Chief Human Capital Officer ("CHCO") La'Toya Prieur.  Defendants confirmed by email on April 9, 2026, that they are designating certain names in Prieur's April 3, 2026, deposition transcript as confidential.

9.    **Phone communications:** The Court issued an order on March 20, 2026 requiring the "production of relevant electronic phone communications" by March 26 from the "individuals identified in the Declaration of FEMA CHCO (Dkt. No. 327-1)," namely, DHS CHCO Roland Edwards, DHS Deputy Chief of Staff Joseph Guy, and DHS Principal Deputy Chief of Staff Troup Hemenway, along with "Kristi Noem, Corey Lewandowski, and the nine individuals identified as the 'Key' FEMA custodians."  ECF 336.

10.    On March 24, 2026, and March 26, 2026, the parties met and conferred in compliance with the Court's order.  Defendants' counsel took the position that Defendants would not include a search of personal phones in its search for "relevant electronic phone communications," ECF 336, even though Defendants' counsel confirmed that this position was not based on any investigation confirming that responsive communications did not take place on personal phones.  Defendants' counsel was unaware whether agency counsel had even asked any of its custodians whether they used their personal phones to conduct government business and, if so, whether any relevant messages were subsequently deleted.

11.    On March 26, Defendants produced two phone records, from the work phones of unidentified FEMA custodians later determined to be FEMA regional supervisors outside of headquarters.

Declaration of Danielle Leonard, Case No. 3:25-cv-03698-SI

12.     On March 27, Defendants filed a "Notice of Substantial Compliance" in which they confirmed that they had not in fact fully complied with the Court's order to produce phone records.  ECF 337.  The Court issued a clarifying order on March 27 in response to this filing, with respect to lower-level FEMA officials.  ECF 339.

    a.  In the notice, Defendants explained that "DHS has not yet been able to physically collect and forensically search the work phones of former Deputy Chief of Staff Joseph Guy or Kara Voorhies."  ECF 337 at 4.

    b.  The notice stated that Mr. Guy had left DHS but that DHS did not have custody of his DHS phone.  Mr. Guy had "been on international travel," but Defendants promised to "image Mr. Guy's phone and conduct a forensic search" on his return.  *Id.*

        i.  Plaintiffs asked Defendants why Mr. Guy still had his DHS phone and had taken it abroad after leaving DHS, but Defendants never provided any response.

        ii.  On April 8, 2026, Defendants informed Plaintiffs they had "obtained Mr. Guy's work phone and searched it," but that the "search did not reveal any responsive documents," with the caveat that "Defendants do not view documents generated for purposes of defending this lawsuit or updates regarding this lawsuit as responsive."

    c.  As for Ms. Voorhies, Defendants were "unable to image the DHS or FEMA phones issued to Kara Voorhies because those phones are not within Defendants' possession, custody, or control, pursuant to a preservation notice issued by the Office of the Inspector General for the Department of Homeland Security."  ECF 337 at 4.

        i.  Plaintiffs asked Defendants for a basis for their position that they did not have possession, custody, or control of those work phones and asked for a copy of the Office of the Inspector General's preservation notice. Defendants never provided the basis or a copy of the preservation notice.

Declaration of Danielle Leonard, Case No. 3:25-cv-03698-SI

ii. On April 8, 2026, Defendants informed Plaintiffs for the first time that they actually do have access to content from Ms. Voorhies' phone, and "will be able to obtain information extracted from Ms. Voorhies' FEMA phone from DHS OIG," and plan to "search it, and produce responsive, non-privileged documents" by an unspecified future date. Defendants claim to still not have access to her DHS phone *because they lack the password.*

13. During her March 31, 2026, deposition, Ms. Evans testified as to her use of her personal phone for FEMA business, including communications with other government officials, including then-DHS Secretary Kristi Noem, Chief Advisor to the Secretary Corey Lewandowski, DHS Deputy Chief of Staff Joseph Guy, and DHS "Senior Advisor" (and actual government contractor) Kara Voorhies. Ex. A (Evans Dep. Trans. 141:21-164:15). She identified the phone numbers of Ms. Voorhies and Mr. Guy as personal phones, and was not aware of whether others were personal phones or not. She also testified that in an attempt to comply with the Federal Records Act, she "took pictures of what [she] determined were appropriate records" and "sent those pictures into [her] email account." Ex. A (Evans Dep. Trans. 156:7-10).

a. In light of this testimony, Plaintiffs requested by email on April 1, 2026, that Defendants obtain and review responsive communications on the personal phones of Ms. Evans, Mr. Guy, Ms. Voorhies, and Mr. Lewandowski, and investigate and confirm whether any other individual subject to the Court's orders similarly used personal phones for government business, and, if so, complete a search for responsive materials.

b. On April 1, 2026, Defendants responded that they would not search DHS or FEMA employees' personal phones.

c. On April 6, 2026, Plaintiffs again raised the issue by email. On April 8, 2026, Defendants responded:

> Karen Evans testified that she emailed screenshots of chats on her personal phone to her work email. Defendants are reviewing those screenshots and will promptly produce any screenshots that are responsive and nonprivileged. Kristi Noem, Corey Lewandowski, and Kara Voorhies have confirmed that they did not use their personal phones to discuss FEMA

Declaration of Danielle Leonard, Case No. 3:25-cv-03698-SI

CORE renewals or targeted reductions of FEMA staffing between December 1, 2025 and March 6, 2026. We are working to obtain contact information for Joseph Guy and Troup Hemenway; once we receive that, we will reach out to them as well.

    d.  That same day, Plaintiffs responded that the partial and incomplete compliance was not acceptable, and they would raise the issue of compliance with the Court.

14.  **DHS and FEMA Communications Regarding FEMA's FY2026 Staffing Plan:** During her March 31, 2026, deposition, Ms. Evans confirmed that she sent a FEMA Annual Staffing Plan to DHS on December 4, 2025, with a projected target staff of only 11,383 employees, approximately 50% of FEMA's current staff, which was subsequently sent to OPM and OMB. Ex. A (Evans Dep. Trans. 219:21-222:9; 222:21-224:11; 228:16-231:2).

    a.  In light of this testimony, Plaintiffs inquired by email on April 1, 2026, why neither FEMA nor DHS produced this communication, nor any subsequent DHS communications regarding this FEMA plan, nor the transmission of that plan to OMB/OPM, nor the quarterly updates, given that such content fell squarely within the scope of the Court's discovery order.

    b.  Defendants replied on April 1, 2026, that "FEMA's search terms included 'staffing plan' and would have yielded communications, including with DHS, during the relevant timeframe," and so "Defendants do not agree to supplement their searches to search for documents related to FEMA's Annual Staffing Plan not previously produced."

    c.  After Plaintiffs again raised the issue on April 6, 2026, Defendants finally replied again on April 8, 2026, that although they "stand on the adequacy of their existing search terms," they "will endeavor to locate the DHS Annual Staffing Plan and any quarterly updates as transmitted from DHS to OMB and OPM between December 1, 2025 and March 6, 2026, to the extent such documents exist." Defendants did not agree to provide the responsive communications between FEMA and DHS or communications internal to DHS about this document.

15.     **"Talking Points for FY26 Staffing Strategy" document:** During Ms. Evans' March 31, 2026, deposition, Plaintiffs introduced as Exhibit 25 a document titled "Talking Points for FY26 Staffing Strategy," which Defendants produced to Plaintiffs with metadata of only a filename "DRAFT.docx" and a document creation date of December 11, 2025.  Ms. Evans testified that the content of the document aligns with the task that she gave to Stephanie Dobitsch, former Head of FEMA's Office of Policy & Program Analysis, and Will Bilicic, Special Advisor to the Administrator in December 2025.  Ex. A at 287:1-292:18; Ex. E (Talking Points document, in camera).

16.     During Ms. Evans' March 31, 2026, deposition, Plaintiffs introduced as Exhibit 24 an email exchange between Stephanie Dobitsch and Karen Evans, which Defendants produced as USA-AFGE-Exp.-0006997-98. Ex. A (Evans Dep. Trans. 255:1-258:20).  That email exchange supports the fact that the "Talking Points for FY26 Staffing Strategy" document was created at Ms. Evans' direction.  Ex. F (in camera).  A document introduced as Exhibit 20, USA-AFGE-Exp.-0006686-88, which is referenced in the relevant deposition excerpt, is further evidence that Ms. Evans directed the creation of this document. Ex. A (Evans Dep. Trans. 257:6-258:20); Ex. G (in camera).

17.     On April 1, 2026, Plaintiffs asked Defendants to produce all metadata for the "Talking Points for FY26 Staffing Strategy" document.  In response, Defendants claimed no additional metadata exists and identified the custodian as "FEMA."  Counsel for Defendants subsequently made unsupported representations on April 8, 2026 regarding the origins of the document, but claimed again not to have any further metadata.

18.     **Karen Evans' self-redacted notes:** On March 17, 2026, Defendants produced 314 documents from DHS and 11,944 documents that they represented were from FEMA leadership custodians.  On March 18, 2026, Defendants produced 234 supplemental FEMA documents at Plaintiffs' request, that were previously marked on Defendants' initial privilege log as "[w]ithheld in error; will produce."

19.     Plaintiffs agreed to a short extension of the production deadline for documents from the remaining FEMA custodians, on the basis of Defendants' representation that all

Declaration of Danielle Leonard, Case No. 3:25-cv-03698-SI

responsive documents were produced for the deponents (including Ms. Evans), DHS, and FEMA leadership on March 17, the Court's original deadline.

20.    On March 20, 2026, Defendants produced 43,152 documents ostensibly collected from lower-level FEMA custodians in compliance with the Court's partial extension of time.

21.    The March 20, 2026 productions included the document that Ms. Evans subsequently identified during her deposition as her hand-written notes from her day planner. Defendants did not inform Plaintiffs that the production included late-produced documents from Ms. Evans and did not alert Plaintiffs that the documents had been altered by marker.

22.    Defendants produced a privilege log for FEMA documents that they produced on March 20, 2026, but that privilege log did not include any entry for redactions on Ms. Evans' notes.

23.    During Ms. Evans' March 31, 2026, deposition, Plaintiffs introduced as Exhibit 10 a document that Ms. Evans identified as pages of day planner containing her hand-written notes. Ex. B (in camera). The notes contained significant redactions which appeared to be made by black marker.

24.    Twice during breaks in the deposition I asked defense counsel for the basis for the redactions and was told that counsel did not know, and that I should "ask the witness." I questioned the witness, and Ms. Evans testified she had herself completed the redactions based on her view of what was deliberative and what was relevant to the COREs. Ex. A (Evans Dep. Trans. 174:13-175:18).

      a.    Immediately following this testimony, and additionally by email on April 1, 2026, Plaintiffs asked Defendants for an unaltered version.

      b.    On April 1, 2026, Defendants replied that the "production copy, which included notes regarding matters neither responsive to Plaintiffs' discovery requests nor relevant to the subject-matter of this ligation, was hand-redacted under the deliberative process privilege, with review by agency counsel," and "Defendants will provide a privilege log as soon as reasonably possible."

      c.    Plaintiffs objected and requested the documents in unaltered form.

7

Declaration of Danielle Leonard, Case No. 3:25-cv-03698-SI

d. On April 8, 2026, Defendants responded further, claiming to still be "re-reviewing" the notes "to assess which redactions are necessary, and which, if any, can be lifted" and stating that they intend to re-produce the document with new redactions and a privilege log, by some unspecified date.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed April 10, 2026, in Houston, Texas.

DANIELLE LEONARD

Declaration of Danielle Leonard, Case No. 3:25-cv-03698-SI

# Exhibit A

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--------------------------------x
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, et al.,

        Plaintiffs,

                                    Case No.

    vs.
                                  3:25-cv-03698-SI

DONALD J. TRUMP, in his official
capacity as President of the
United States, et al.,

        Defendants.
--------------------------------x


CONFIDENTIAL

PURSUANT TO THE PROTECTIVE ORDER


VIDEOTAPED DEPOSITION OF


KAREN STREHLE EVANS


Tuesday, March 31, 2026


Reported By:  SUSAN ASHE, CER

Job No.:  11973

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect,com

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 2

Tuesday, March 31, 2026

8:59 a.m. Eastern Daylight Time

Videotaped deposition of KAREN STREHLE EVANS, taken on behalf of the Plaintiffs, beginning at 8:59 a.m., on Tuesday, March~31, 2026, at the offices of Democracy Forward Foundation, 1445 New York Avenue, Northwest, Washington, D.C., before Susan Ashe, Certified Electronic Reporter and a Notary Public of the District of Columbia.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

APPEARANCE OF COUNSEL:

On behalf of All Union and Non-Profit

Organization Plaintiffs

ALTSHULER BERZON LLP

BY:  DANIELLE E. LEONARD, ESQ.

BY:  ELIZABETH ESHLEMAN, ESQ.

177 Post Street, Suite 300

San Francisco, California  94108

(415) 421-7151

dleonard@altshulerberzon.com

eeshleman@altshulerberzon.com

On behalf of All Union and Non-Profit

Organization Plaintiffs (except NRDC) and for

Plaintiffs City of Chicago, IL; Martin Luther,

Jr. County, WA; Harris County, TX; and City of

Baltimore, MD

DEMOCRACY FORWARD FOUNDATION

BY:  TSUKI HOSHIJIMA (pro hac vice)

Senior Counsel

P.O. Box 34553

Washington, D.C.  20043

(202) 448-9090

thoshijima@democracyforward.org

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 4

APPEARANCE OF COUNSEL (Continued):

On behalf of the Defendants and the Witness

UNITED STATES DEPARTMENT OF JUSTICE

BY:  MARIANNE F. KIES

BY:  JEREMY NEWMAN

BY:  CHRISTOPHER R. HALL

Trial Attorneys

Civil Division, Federal Programs

Branch

1101 L Street, Northwest

Washington, D.C.  20005

(202) 305-0693

marianne.f.kies@usdoj.gov

jeremy.s.newman@usdoj.gov

christopher.r.hall@usdoj.gov

-  and  -

FEDERAL EMERGENCY MANAGEMENT AGENCY

BY:  KEVIN YUSMAN

BY:  ASHLEY DARBO

BY:  JAMES EVANS, Chief Counsel

500 C Street, Southwest

Suite 840

Washington, D.C.  20472

kevin.yusman@fema.dhs.gov

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 5

APPEARANCE OF COUNSEL (Continued):

On behalf of the Defendants and the Witness

(Continued)

DEPARTMENT OF HOMELAND SECURITY

BY:  MATTHEW FLEISCHMAN

2700 Martin Luther King, Jr., Southeast

Washington, D.C.  20032

matthew.fleischman@hq.dhs.gov


On behalf of the Witness in Her Personal

Capacity

BINNALL LAW GROUP

BY:  JASON GREAVES, ESQ.

717 King Street, Suite 200

Alexandria, Virginia  22314

(703) 888-1943

jason@binnall.com

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 6

ALSO PRESENT:

Jessica Levy, Esq.

Altshuler Berzon LLP

Olivia King, Legal Assistant

Democracy Forward Foundation

Sana Sinha, Legal Assistant

Democracy Defenders Fund

Jonathan Perry, Videographer

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 7

CONTENTS

THE WITNESS

Karen Strehle Evans

  BY MS. LEONARD                                      16

                        EXHIBITS

PLAINTIFFS

Exhibit No.                                      Marked

Exhibit 1    Linked-In Printout

             Karen S. Evans

             Four Pages                               30

Exhibit 2    Organizational Chart - DHS          49

Exhibit 3    POLITICO PRO

             "Top CISA appointee Karen Evans

             moves to FEMA"                       67

Exhibit 4    US DHS FEMA Review Council

             Open Meeting Minutes

             May 20, 2025                         72

Exhibit 5    US DHS FEMA Review Council

             Open Meeting Minutes

             July 9, 2025                         78

Exhibit 6    "Exhibit 4"

             DHS Record of Clearance and

             Approval                             82

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 8

                    EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                    Marked

Exhibit 7    "ICYMI:  SULLIVAN BRINGS SENIOR

             FEDERAL OFFICIALS TO STORM-

             RAVAGED WESTERN ALASKA

             VILLAGES"                         120

Exhibit 8    Press Release

             Office of U.S. Senator

             Dan Sullivan                      122

Exhibit 9    Email Correspondence

             "Reminder from Chief

             Information Officer Antoine

             McCord on Electronic Message

             Federal Records Preservation"     162

Exhibit 10   Redacted Handwritten Notes

             USA-AFGE-Exp-0033527

             through -544                       165

Exhibit 11   The Washington Post

             "FEMA head resigns.  Richardson

             had been hard to reach during

             Texas floods."                     177

Exhibit 12   The New York Times

             "In a Reversal, FEMA Won't

             Reinstate Suspended Workers"       183

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 9

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                          Marked

Exhibit 13  Draft Final Report
            "The President's Council to
            Assess the Federal Emergency
            Management Agency"
            December 11, 2025                        193

Exhibit 14  Email Correspondence
            USA-AFGE-Exp.-0007239
            through -241                             199

Exhibit 15  Executive Order 14356
            October 15, 2025                         205

Exhibit 16  Email Correspondence
            USA-AFGE-Exp.-0002353
            through -357                             207

Exhibit 17  Organization Information
            Chart
            USA-AFGE-Exp.-0006542                    218

Exhibit 18  Email Correspondence
            USA-AFGE-Exp.-0007333
            through -343                             228

Exhibit 19  Email Correspondence
            USA-AFGE-Exp.-0006535
            through -538                             237

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 10

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                  Marked

Exhibit 20  Email Correspondence

            USA-AFGE-Exp.-0006686

            through -688                      254

Exhibit 21  May 14, 2025 Correspondence

            USA-AFGE-Exp.-0000405

            and -406                          265

Exhibit 22  Email Correspondence

            USA-AFGE-Exp.-0004575

            through -582                      268

Exhibit 23  Email Correspondence

            USA-AFGE-Exp.-0010683

            through -688                      271

Exhibit 24  Email Correspondence

            USA-AFGE-Exp.-0006997

            and -998                          278

Exhibit 25  "Talking Points for FY26

            Staffing Strategy"

            USA-AFGE-Exp.-0034341

            and -342                          287

Exhibit 26  Email Correspondence

            USA-AFGE-Exp.-0014520

            and -521                          297

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 11

EXHIBITS (Continued)

PLAINTIFFS

| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 27 | Email Correspondence USA-AFGE-Exp.-0007258 through -260 | 305 |
| Exhibit 28 | Email Correspondence USA-AFGE-Exp.-0007219 and -720 | 326 |
| Exhibit 29 | Email Correspondence USA-AFGE-Exp.-0004518 through -520 | 334 |
| Exhibit 30 | Email Correspondence USA-AFGE-Exp.-0000363 through -367 | 340 |
| Exhibit 31 | Email Correspondence USA-AFGE-Exp.-0005054 through -059 | 346 |
| Exhibit 32 | Email Correspondence USA-AFGE-Exp.-0009465 and -466 | 349 |
| Exhibit 33 | Email Correspondence USA-AFGE-Exp.-0000576 | 359 |

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 12

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                    Marked

Exhibit 34  "Declaration of Karen S. Evans
            in Support of Defendants'
            Opposition to Plaintiffs'
            Motion for a Preliminary
            Injunction"                        360


REQUEST FOR PRODUCTION

Page/Line              Page/Line              Page/Line
  27/21                 175/19

(REPORTER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily denote an exact quote from the document.)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 13

TUESDAY, MARCH 31, 2026;

8:59 A.M. EASTERN DAYLIGHT TIME

                --o0o--

                VIDEOGRAPHER:  We are now on the record.  This begins the video deposition of Karen Evans, taken in the matter of the American Federation of Government Employees, AFL-CIO, et al., versus Donald J. Trump, in his Official Capacity as President of the United States, et al. Case filed in the U.S. District Court for the Northern District of California, San Francisco Division, Case No. 3:25-cv-03698-SI.

                We are at the offices of Democracy Forward, 1445 New York Avenue, Northwest, in Washington, D.C.  The date is March 31, 2026, and the time is approximately 8:59 a.m.

                My name is Jonathan Perry.  I am a videographer representing TransPerfect. The court reporter is Susan Ashe, also with TransPerfect.

                And would counsel present please introduce themselves and state whom they

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 14

represent.

MS. LEONARD:  Good morning, everyone.  Danielle Leonard, from Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MR. HOSHIJIMA:  Good morning.  Tsuki Hoshijima, representing all Union and Nonprofit Organization Plaintiffs except NRDC and Plaintiffs City of Chicago, Illinois; Martin Luther King, Jr. County, Washington; Harris County, Texas; and City of Baltimore, Maryland.

MS. ESHLEMAN:  Good morning.  Elizabeth Eshleman, also from Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MS. LEVY:  Good morning.  Jessica Levy, from Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MS. SINHA:  Good morning.  Sana Sinha with Democracy Defenders Fund, representing all Union and Organizational Plaintiffs.

MS. KING:  Good morning.  Olivia

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 15

King with Democracy Forward.

MS. LEONARD:  The last two are not attorneys making --

MS. KING:  Yeah.

MS. LEONARD:  -- their appearance.

MS. KING:  We're just legal assistants.

MS. LEONARD:  Sorry.

MS. KIES:  Good morning. Marianne Kies with the Department of Justice, on behalf of the Defendants in this case.  I'm here today for the witness.

MR. NEWMAN:  Jeremy Newman, Department of Justice, representing the Defendants.

MR. GREAVES:  Jason Greaves, from the Binnall Law Group, representing Karen Evans in her personal capacity.

MR. HALL:  Hi.  Christopher Hall, Department of Justice.

MR. YUSMAN:  Hello.  Kevin Yusman, FEMA Office of Chief Counsel.

MS. DARBO:  Good morning.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 16

Ashley Darbo for FEMA.

MR. EVANS:  James Evans, Chief Counsel for FEMA.

MR. FLEISCHMAN:  Matthew Fleischman from the Department of Homeland Security.

VIDEOGRAPHER:  And would the reporter please swear in the witness.

Whereupon,

KAREN STREHLE EVANS,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. LEONARD:

Q.   Good morning, Ms. Evans.  I introduced myself before, but let me do it again.  Danielle Leonard.

You understand that I represent the Plaintiffs in this lawsuit?

A.   Yes.

Q.   And could you state your full name for the record, please.

A.   My full name is Karen Strehle Evans.

Q.   And your -- the city and state where you currently reside?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 98

place, or he would have his chief of staff go in his place.

Q. Do you remember how many times you went in his place because Mr. Richardson could not go to the component head meetings?

MS. KIES: Object to form.

A. I believe, in my case, it was only once.

Q. Since moving to FEMA in May 2025, you also worked with someone named Kara Voorhies. Correct?

MS. KIES: Object to form.

A. Yes, that's correct.

Q. Who is Kara Voorhies?

MS. KIES: Object to form.

A. Okay. I call her "Kara."

Q. Sorry. Okay. "Kara," I will use that.

Who is --

A. Kara --

Q. Let me ask it again.

Who is Kara Voorhies?

A. She's the senior advisor to the Secretary on FEMA issues.

Q. Did you know Kara Voorhies prior to working at DHS in 2025?

A. No, I did not.

Q. And Ms. Voorhies was already working for

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 99

DHS when you moved from CISA to FEMA in May of 2025?

MS. KIES:  Object to form.

A.    Yes, she was there.

Q.    And what was Ms. Voorhies' role at DHS, exactly?

MS. KIES:  Object to form.

A.    She was the senior advisor to the Secretary on FEMA.

Q.    Ms. Voorhies was not a federal employee. Correct?

MS. KIES:  Object to form, foundation.

A.    That is not my understanding, initially.

Q.    You had an understanding, initially, that she was an employee?

A.    Yes.

Q.    And what was the basis for that understanding?

A.    I asked her.

Q.    And what did she say?

A.    She said that she was on a government appointment.

Q.    Were those her precise words?

A.    I can't attest to that that was her precise words.  But I asked her what position she

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 100

held.

Q.   Why did you ask her that?

MS. KIES:  Object to form.

A.   Because she was at FEMA and I was at FEMA. And so, I was trying to understand the people in the organization, because we all came over at the same time when Mr. Richardson was put in as the senior official performing the duties.

So there were several people that came with Mr. Richardson from "Counter" Weapons of Mass Destruction.

Q.   And did you have an understanding that Ms. Voorhies came with Mr. Richardson from Weapons of Mass Destruction?

A.   No, I didn't have an understanding. That's why I asked her.

Q.   And did you ask her who gave her the appointment?

A.   No, I didn't ask her.  I asked her what type of appointment she had.

Q.   And did she -- did you understand -- what was your understanding of -- let me ask this again.

Did you understand that she was representing that she had a "special employee" appointment?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 101

MS. KIES:  Object to form.

A.   She didn't know what type of appointment she had.  So I figured that she was a special government employee.

Q.   Because she wasn't familiar with all the standard positions that are held by federal employees?

MS. KIES:  Object to form, foundation.

A.   She didn't understand -- like, she definitely was not coming as a detailee from Counter Weapons of Mass Destruction.

So that's why I figured she was a special government employee.

Q.   And did you have any understanding of who appointed her?

A.   She told me that she came as requested by Mr. Lewandowski.

Q.   And when was this conversation that you're recalling?

A.   I don't know the exact timing of the conversation.  Because, as you said, and I've said, I got there in like the May time period, and there were a lot of staff that were coming in to work with Mr. Richardson.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 102

So I was trying to understand how Mr. Richardson would want to use me as a senior advisor to him on different issues associated with FEMA.

Q.   Did she say anything -- did Ms. Voorhies, at this time, say anything else about her background with Mr. Lewandowski?

MS. KIES:  Object to form.

A.   No, she did not.

Q.   Did you ask?

A.   No, I did not.

Q.   Did you have any understanding of his authority to appoint individuals to such positions?

MS. KIES:  Object to form, legal conclusion.

COURT REPORTER:  What was that last part?

MS. KIES:  Legal conclusion.

COURT REPORTER:  Thank you.

A.   I don't -- in the way that you've asked the question, I have no knowledge that Mr. Lewandowski appointed Kara Voorhies.

Q.   That's just what she said?

MS. KIES:  Object to form.

A.   She told me she knew Corey Lewandowski.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 103

She didn't say he appointed her, the way that you're asking the question.

Q.   But that she came over at his request?

MS. KIES:  Object to form.

A.   She said that she came because he had asked her to.

Q.   You -- at some point in time, you came to understand that Ms. Voorhies was actually a government contractor.  Correct?

MS. KIES:  Object to form.

A.   Yes.

Q.   When did you under- -- when did you learn that?

A.   I initially heard by one of the employees that stated that she was a contractor.

I don't know the exact time period of when that was, but an employee stated that she was a contractor.

Q.   A FEMA employee?

A.   Yes.

Q.   Okay.  Can you give me a rough estimate of when you came to have this understanding?

A.   Actually, I really can't recall it.  I really cannot recall it.

But I do know that the FEMA employee did

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 104

state and -- to other FEMA employees, and it was raised to me that this employee stated that she was a contractor.

Q.   And were you surprised to hear that?

MS. KIES:  Object to form.

A.   So it depends on what you mean by "surprised," but, yes, I -- it was different than what I thought she was.

Q.   Did you do any investigation into the nature of Ms. Voorhies' contract?

MS. KIES:  Object to form.

A.   I did not do investigation, but I did specifically ask her if she was a contractor.

Q.   And what did she say?

A.   She said yes.

Q.   Did you ask her any -- anything about that contract?

A.   I did not ask her about the contract, because she said that she was still the senior advisor to the secretary.

Q.   And the senior advisor to the secretary is a position within HQ?

MS. KIES:  Object to form.

Q.   Correct?

A.   The senior advisor to the secretary is at

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 105

DHS headquarters.  Yes.

Q.   And you understood that Ms. Voorhies was someone that you reported to.

MS. KIES:  Object to --

Q.   Correct?

MS. KIES:  Object to form.

A.   I would not state it that way.

I would state that she was the senior advisor to the secretary, and that I report to the deputy secretary to the secretary's office as a component head as -- starting at December 1st.

In the chief of staff role, I report to the administrator of FEMA.

And so, I didn't report to Ms. Voorhies at the time that you're bringing this up.  I reported to Mr. Richardson, as the senior advisor at FEMA.

Q.   But Ms. Voorhies was -- being in the front office and a senior advisor to the secretary, was above Mr. Richardson in the hierarchy at DHS. Correct?

MS. KIES:  Object to form.

A.   That is not correctly stated.

Mr. Richardson is a component head at that time, and component heads report to the secretary.

Ms. Voorhies was a senior advisor to the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 106

secretary on FEMA issues.

Q.   Mr. Richardson was actually not a component head.  Correct?  He was a SOPDA.

MS. KIES:  Object to form.

A.   Correct.  He was acting as the Senior Official Performing the Duties of the Administrator.

Q.   Appointed by the DHS Secretary.  Correct?

A.   Yes.

Q.   Removable by the DHS Secretary?

A.   Yes.

Q.   And reporting to the DHS Secretary?

A.   Yes.

Q.   And the people in her office?

MS. KIES:  Object to form.

A.   It's my understanding that they're advisors to the secretary.

But as the Senior Official Performing the Duties of the Administrator, you do report to the secretary because you are performing the duties of a component head.

Q.   Did you have an understanding of whether Ms. Voorhies was working in person in Washington, D.C., or remotely?

MS. KIES:  Object to form.

A.   I'm not sure of all her living

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 107

arrangements.  I did become aware that she had, I believe, an apartment here in Washington, D.C.

Q.   Did you have an understanding that she was from Houston, Texas?

MS. KIES:  Object to form.

A.   Yes.  She told me she was from Houston, Texas.

Q.   And that she did, at times, work remotely on her contract for FEMA?

MS. KIES:  Object to form.

A.   I'm not sure of all her working arrangements, because we could do virtual meetings.

So I'm not necessarily sure of where she was specifically located, because she would, you know, go home or she would be up at DHS headquarters.

Q.   And did you have Zoom meetings with Ms. Voorhies at times?

A.   We would actually have Microsoft Team meetings.

Q.   No offense to Microsoft.  I should have said videoconferencing.

Did you ever see her in person at any FEMA office?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 108

Q. Did she have a FEMA office?

MS. KIES: Object to form.

A. Yes, she did.

Q. And Ms. Voorhies was given a FEMA email account. Correct?

A. She had a FEMA email account, yes.

Q. Kara.Voorhies@FEMA.dhs.gov. Correct?

A. Yes.

Q. Are you the person who authorized Ms. Voorhies to have a FEMA email account?

MS. KIES: Object to form.

A. No, I am not.

Q. Do you know who authorized Ms. Voorhies to have a FEMA.dhs.gov email account?

MS. KIES: Object to form.

A. No, I do not.

Q. Was that prior to your transferring from CISA to FEMA, that she had that FEMA email account?

MS. KIES: Object to form.

A. I have no knowledge when she got the FEMA email account.

Q. Do you have any understanding as to the reason that a senior advisor to the DHS Secretary would be given a FEMA employee email address?

MS. KIES: Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 109

A.    I really don't know the basis of why they gave her a FEMA employee email address.

Q.    And you don't know who the "they" is?

A.    I have no idea.

Q.    No idea, or do you suspect it was someone in the DHS front office?

MS. KIES:  Object to form, foundation.

A.    I would -- I don't know the process of how her email address got established, but there is a process for email addresses to be established, both at headquarters as well as component organizations.

For example, I had emails at CISA.  Then I also had an email account at headquarters.  And now I have an email account at FEMA.

Q.    When did you have an email account at DHS headquarters?

A.    When I was in transition.  And they thought -- "they," meaning headquarters and employees, right, the management directorate -- that I was going to be the Under Secretary for Management.

Q.    Did you ever use the headquarters email account for anything related to FEMA?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 110

A.   I would have to go back and look, because I'm not sure about the emails that are associated with the headquarters' accounts.

Q.   FEMA's contractors are not typically given a FEMA.dhs.gov email address.  Correct?

MS. KIES:  Objection; foundation, form.

A.   Contractors, in general, are not given government employees' email addresses.

Q.   You have an extensive background in cybersecurity.  Correct?

MS. KIES:  Object to form.

A.   Yes, I do.

Q.   Did you have any concerns with a government contractor being given a FEMA email address, Ms. Evans?

MS. KIES:  Object to form.

A.   I had concerns as it related to her contractor status.

And so, in the different roles that I had at FEMA, I ensured that the activities that I was involved in, I took proper precautions as it related to DHS policies and contractors.

Q.   Let's break that down.

Can you explain what the concerns were

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 129

Q.   And you were not privy to all of the communications that Ms. Voorhies had with either Secretary Noem or Chief Advisor Lewandowski about FEMA.  Correct?

MS. KIES:  Object to form.

A.   Yes, that's correct.

Q.   But you did understand that she was talking to Secretary Noem and Corey Lewandowski about FEMA?

MS. KIES:  Object to form, foundation.

A.   Her job is the senior advisor to the secretary for FEMA issues.  So she would talk to the secretary and Mr. Lewandowski about FEMA issues.

Q.   Including things that you were copying her on.  Correct?

A.   I --

MS. KIES:  Object to form.

A.   I am not privy to those discussions, so I would not know the details of the discussions that she had with them.

Q.   But you did personally communicate with Ms. Voorhies regarding FEMA personnel matters, didn't you, Ms. Evans?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 130

A.   I would give her high-level information and direction that I was going with the analysis of the workforce.

Q.   Only high-level information, Ms. Evans? Are you sure?

MS. KIES:  Object to form.

A.   As you can see by the email, she was CC'd on a lot of the emails as it relates to clarification of the processes that we were putting in place as it related to personnel decisions.

Q.   You also talked to her about personnel matters at FEMA.  Correct?

MS. KIES:  Object to form.

A.   I would talk to her about a whole host of issues at FEMA.

Q.   And you talked to her on the phone?

A.   We would talk on the phone, yes.

Q.   You communicated with Ms. Voorhies regarding FEMA's authority to extend CORE appointments, for example?

MS. KIES:  Object to form.

A.   Yes, I would.

Q.   And you communicated with Ms. Voorhies about the non-renewals of COREs by NTE date. Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 131

MS. KIES:  Object to form.

A.   Yes, I did.

Q.   And you communicated with Ms. Voorhies about the approvals for 90-day renewals for some CORE appointments.  Correct?

MS. KIES:  Object to form.

A.   I communicated, not just with her, but also with DCOS Guy, because he was in charge of my portfolio.

So I specifically told them the decisions that I was making as it related to the delegated authority that FEMA did have, which expired on December 31st.

And then also communicated with DCOS Guy about the processes that I was putting in place for CORE renewals and then CORE nonrenewals.

Q.   We'll get to DCOS Guy, but I'm focused on Ms. Voorhies for right now.

Who gave Ms. Voorhies the authority to be involved in FEMA personnel and policy matters?

MS. KIES:  Object to form, foundation.

A.   I am unaware who gave her the authorities.

Q.   You didn't ask?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 132

A.    I talked specifically with Joe Guy, as my chief of staff -- my deputy chief of staff for my portfolio.

Q.    But you understood that Secretary Noem and Corey Lewandowski wanted you to communicate with Ms. Voorhies about these matters.  Correct?

MS. KIES:  Object to form, foundation.

A.    I understand that she was to be informed about the issues there and then decisions that I was making in the role from December 1st as the Senior Official Performing the Duties of the Administrator.

Q.    Who told you that?

MS. KIES:  Object to form.

A.    I'm sorry.  Who told me what?

Q.    What you just said, that you understood that she was to be informed.

Who in the front office of DHS told you that Ms. Voorhies was to be informed on these matters?

MS. KIES:  Object to form.

A.    Mr. Guy.

Q.    When was that?

A.    I don't have a specific date.

Q.    Was it before you became the SOPDA or

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 133

after?

A.   I would -- I really don't recall a specific conversation that said this.

She was involved -- I had weekly meetings -- when I took over the chief of staff position at FEMA, I had weekly meetings with DCOS Guy.

Q.   And did Ms. Voorhies participate in those meetings?

A.   Yes, she did.

Q.   Did Ms. Voorhies have the authority to see FEMA personnel documents, Ms. Evans?

MS. KIES:  Object to form, legal conclusion.

A.   I am unaware if she had the authority to see personnel documents.

Q.   You did not give her that authority. Correct?

MS. KIES:  Object to form.

A.   I did not give her authority to see personnel documents at FEMA.

Q.   And did Ms. Voorhies have the authority to make decisions regarding FEMA personnel matters, Ms. Evans?

MS. KIES:  Object to form, legal

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 134

conclusion.

A.    I did not give her authority in my role as the Senior Official Performing the Duties of the Administrator.

Q.    Did Ms. Voorhies have authority to make decisions regarding FEMA personnel matters, to your knowledge?

MS. KIES:  Object to form, legal conclusion.

A.    It is my understanding she did not.

Q.    But she was involved, wasn't she?

MS. KIES:  Object to form, asked and answered.

A.    She would be informed through these various meetings.

Q.    And email communications as well.  Right?

A.    Yes.

Q.    You did not personally make the decision to permit a government contractor with no experience in disaster relief or manage -- emergency management to perform work at FEMA.  Correct?

MS. KIES:  Objection; legal conclusion, facts not in evidence.

You can answer.

A.    I was not involved in that decision.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 135

MS. KIES:  We've been going for about an hour.  Maybe another five or 10-minute break?  Or what do you -- do you want to take lunch?  What do you think?

MS. LEONARD:  What time is it now?  We're not going to take lunch this early, but I am happy to take a short break right now.  That's fine.

MS. KIES:  Okay.

MS. LEONARD:  Why don't we take another 10-minute break.  And then maybe we'll aim for lunch after the next session, if that's all right.

VIDEOGRAPHER:  Off the record at 11:24.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 11:41.

BY MS. LEONARD:

Q.  Ms. Evans, going back to the trip to Alaska in October of 2025, did you or Ms. Voorhies, to your knowledge, have any communications with either former Secretary Noem or Corey Lewandowski during that trip?

A.  I can only speak about my communications,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 136

and I did not, as I recall, have specific communications with Mr. Lewandowski or the secretary during the trip.

Q.   And when you say "specific communications," what do you mean?

A.   I would say like a telephone call or any types of email, but primarily would be like a telephone call or anything.  I didn't -- I did not have discussions with them.

Q.   You're not aware of whether there were communications on which you and Ms. Noem or Mr. Lewandowski were all copied during that time?

A.   I do not recall, on that trip, of us having communications where we were all to -- all on, like -- yeah.  No, I don't recall that.

Q.   Did Ms. Voorhies ever communicate to you decisions related to FEMA that had been made by Secretary Noem or Corey Lewandowski?

MS. KIES:  Object to form.

A.   She would convey, to me and other FEMA leadership, decisions that were made by the secretary or she would represent them as decisions made by the secretary.

Q.   And let's start with the period during which you were chief of staff only.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 137

What decisions related to FEMA did Ms. Voorhies -- Voorhies convey to you that had been made by the secretary?

MS. KIES:  Object to form.

A.   It would depend on the circumstance, but the majority of those decisions would be related to contracts that were going up or disaster declarations that would go through the process.

And it went through a pre-established email process.

Q.   For the disaster declarations?

A.   Yes, ma'am.

Q.   Okay.  But those are decisions from the secretary that Ms. Voorhies informed you, as the FEMA leadership, of?

A.   Well --

MS. KIES:  Object to form.

WITNESS:  I apologize.

A.   She would make recommendations and then -- through different clearance processes, and then we would get decisions back.

For example, on the disaster declarations, there was a process that FEMA sent through on emails, which then would go through the clearance process.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 138

And it's the process that we discussed earlier with the ExecSec, and it would go into the ExecSec process and it would get a STORM number.

And then from there, the secretary would sign those, and they would proceed over to the White House.

Q.   After you became the SOPDA, did Ms. Voorhies ever convey decisions that had been made by secretary Noem or Corey Lewandowski regarding FEMA?

MS. KIES:   Object to form.

A.   It depends on the topic area of what you're talking about.

But there were decisions that would come down from DHS headquarters as it relates to, for example, the reimbursements that would go out as it related to disasters.

Q.   And the $100,000 policy?

MS. KIES:   Object to form.

A.   Those would go up through the process that we have described earlier, where it would then go -- there's a clearance form within FEMA.

And then I would sign it.  Then she would sign it.  There's a STORM number, the system that we talked about for ExecSec to manage documents between

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 139

the components and headquarters.  And it had a number on it.

It would go up to DHS headquarters.  It would go through a review process up there.  And then we would get a signed document back that said that the secretary has approved it.

Q.   So there was this established system through the ExecSec for routing decision-making documents that included the contracting and disaster declarations that you've described.  Is that right?

MS. KIES:  Object to form.

A.   Yes, ma'am.

Q.   And that system was also used for decisions related to FEMA staffing?

MS. KIES:  Object to form.

A.   It would depend on the assignment that was given to FEMA, as well as other components.

And as we have discussed earlier, there were executive orders and there were other assignments that would come from the Office of Management and Budget and the Office of Personnel Management.

We would be tasked through the DHS ExecSec process, and then we would send information up there, because that's how they tracked component

Page 140

submissions.

And it would go through that process and then go to headquarters.

Q.   And Ms. Voorhies was also involved in the staffing-related decisions that were being sent to the DHS front office.  Right?

MS. KIES:  Object to form.

A.   Ms. Voorhies, depending on -- since you're only talking about from when I was the chief of staff time period.

So that's the period that we're talking about, from chief of staff to then taking over as the "Senior Official Performing the Duties of."

Those decisions, or those recommendations, that would go up for hiring did not go through the executive staff secretary process, because there was a different process -- it's my understanding there was a different process that was established by the department's chief human capital officer and how they worked with the component chief human capital officers.

Q.   So I was actually asking about after you became SOPDA.  And let me just ask a different question.

After you became SOPDA, did Ms. Voorhies

Page 141

ever convey to you any decisions that had been made by the secretary with respect to FEMA staffing?

MS. KIES:  Object to form.

A.   No, she did not.

Q.   Did Ms. Voorhies have a telephone?

MS. KIES:  Object to form.

A.   Yes.

Q.   Did she have a Department of Homeland Security issued telephone?

MS. KIES:  Object to form, foundation.

A.   I do not know if she had a Department of Homeland Security telephone.

Q.   Did she have a FEMA business telephone?

MS. KIES:  Object to form.

A.   I do not know if she had a FEMA business telephone.

Q.   Did she have a personal telephone?

MS. KIES:  Object to form.

A.   Yes.

Q.   Did you communicate with Ms. Voorhies on her personal telephone?

MS. KIES:  Object to form.

A.   Yes, I did.

Q.   And did you have her personal telephone

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 142

number saved in your phone?

MS. KIES:  Object to form.

A.   Yes, I did.

Q.   And was that saved in your personal phone or your business phone?

A.   It was saved in both phones.

Q.   And do you have your personal telephone here with you today?

MS. KIES:  Object to form.

A.   Yes.

Q.   Can you please get your phone and tell me what Kara Voorhies' personal telephone number is?

A.   Am I allowed to do that?

Q.   Yes.

A.   I have to leave the room.

Q.   Okay.  We can --

A.   I guess.  I don't know.

Q.   We can take --

A.   I don't know who has my phone.  I gave -- I gave my phone --

MS. KIES:  Let's go off the record.  I'm not sure if we're able to do that, but let's go off the record.

MS. LEONARD:  Okay.

WITNESS:  Can we go off the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 143

record?  Because I don't have my phone.

MS. LEONARD:  I needed -- okay.
That's a fine answer.

Let's go off the record.

VIDEOGRAPHER:  Off the record at
11:49.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at
12:01.

BY MS. LEONARD:

Q.  Ms. Evans, before we took the break, I
asked you if you could tell me, from your personal
phone, Ms. Voorhies' personal phone number.
Can you do that, please?

MS. KIES:  So -- and I can also
provide this to you now on the record.
And I would actually like to
make this an exhibit, please.

MS. LEONARD:  I'm sorry.  Is
this an objection to the question --

MS. KIES:  This is --

MS. LEONARD:  -- that I just
asked?

MS. KIES:  I'm providing you the
evidence that you're asking for.  And it

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 144

is -- it isn't -- it is, in a sense, an objection as well.  So I'm happy to explain why I am providing this, if you'd like me to.

MS. LEONARD:  Do you have an objection to the question that I just asked?

MS. KIES:  Yes.  So my objection -- our objection to the question asked is that, obviously, the witness is here in her official capacity, not in her personal capacity.  We do not have possession, custody, and control of the witness's personal phone.

And that is our objection to the question, notwithstanding, as I was referring to, we do have the telephone number that your question asked for.  I wanted to provide it to you on the record.

And I also wanted to make it very clear that this portion of the deposition, for the court reporter and videographer, should be sealed, because we do not know whether this telephone number is personal or governmental.  And

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 145

regardless, it is, of course, PII.

MS. LEONARD:  So no speaking objections, first of all.  You can make your objections for the record.

And the questions are for the witness, not for counsel.  And the witness will be giving the testimony.

So we'll proceed with the deposition.

She is also here with her personal lawyer.  So I understand you are making an objection about the information that is on her personal phone, but her personal lawyer is here as well.

And do you have an objection to the question?

MR. GREAVES:  I join in the objection that she is here in her professional capacity, not in her personal capacity.

So you can continue with your question, but the objection stands.

BY MS. LEONARD:

Q.  Okay.  So do you have an answer to my question, Ms. Evans?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 146

A.   Yes.

Q.   And is that your phone that is sitting next to your -- to counsel?

A.   No, it is not.

Q.   Okay.  And when we broke, did you go into the other room to look at your phone?

A.   Yes, I did.

Q.   Okay.  And did you retrieve the phone number for Ms. Voorhies that you have on that phone?

A.   Yes, I did.

Q.   And did you write that phone number down on the piece of paper in front of you?

A.   Yes, I did.

Q.   Okay.  Counsel didn't write that down?

A.   No, they did not.

Q.   Okay.  Can you tell us, on the record, what that phone number is for Ms. Voorhies' personal phone that you use to communicate with Ms. Voorhies about FEMA business.

MS. KIES:  Object to form, foundation.

A.   The telephone number that I have to use to communicate with Ms. Voorhies was ███████████.

Q.   And I believe you testified previously that you used your personal phone to communicate

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 147

with Ms. Voorhies on that telephone number. Correct?

MS. KIES:  Object to form.

A.    We would talk on this -- on that -- on my personal telephone, on this number.

Q.    Did you ever text her at that number from that -- from your personal phone?

MS. KIES:  Object to form.

A.    Yes.  There were text messages.

Q.    Did you ever communicate, using your personal phone, with anyone else in the DHS Office of the secretary?

MS. KIES:  Object to form.

A.    Yes.

Q.    Did you have the phone numbers saved on your personal phone for others in the DHS Office of the Secretary?

MS. KIES:  Object to form.

A.    I don't know all the numbers that I have saved.

Q.    Because you didn't bring the phone back in the room.  You went to the break room and looked at the phone to get this one phone number and brought it back.  Is that right?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 148

A.    I don't recall all the numbers that I save on my personal cell phone.

But I did look at my personal cell phone, as you requested, to get this telephone number.

Q.    But you also, I believe, just testified that you used that personal cell phone to communicate with others in the DHS Office of the Secretary.  Is that correct?

MS. KIES:  Object to form.

A.    Periodically, yes, ma'am.

Q.    Did you have DHS Secretary Noem's phone number saved in your personal cell phone?

A.    No, I do not.

Q.    Did you have Corey Lewandowski's phone number saved in your personal cell phone?

A.    I have a phone number that he would use to contact me periodically, yes.

Q.    And do you know whether that was his personal or business phone?

A.    I do not.

Q.    Okay.

MS. LEONARD:  We're going to ask for that phone number as well.  You can take a break.  We're going to continue with the conversation.  But we'll store up

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 149

the number of phone numbers.

MR. GREAVES:  And I'm just going to lodge an objection that she's here in her professional capacity, official capacity, not in her personal capacity.

There's a process for, you know, subpoenaing records from her personal devices.  If you want to go through that process, we're happy to do that.  But we're not here to root around on her personal phone.

Q.    Did you have any personal relationship with Mr. Lewandowski outside of the work that you were doing at the Department of Homeland Security?

A.    No, I --

MS. KIES:  Object to form.

A.    -- do not.

Q.    Do you have the Signal app stored on any of your phones?

A.    Yes, I do.

Q.    Which phones do you have the Signal app on?

A.    I have the Signal app on my personal cell phone.

Q.    And did you use Signal to communicate with

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 150

Ms. Voorhies about FEMA?

MS. KIES:  Object to form.

A.   Periodically, yes.

Q.   Did you use the Signal app to communicate with Mr. Lewandowski about FEMA?

MS. KIES:  Object to form.

A.   Periodically.

Q.   Did you use the Signal app to communicate with former Secretary Noem about FEMA?

MS. KIES:  Object to form.

A.   Periodically.

Q.   Who else did you use the Signal app to communicate with about FEMA?

MS. KIES:  Object to form.

A.   So there were headquarters -- DHS headquarters employees that were working with FEMA during the storm, the ice storm that happened in January.

Q.   I believe it was Winter Storm Fern.  Is that the right name?

A.   Yes, ma'am.  That's what -- it's not -- that is not the official name, but that's what people called it.  Winter storms don't get an official name.

Q.   Other than with respect to the winter

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 151

storm in January of 2026, were you using the Signal app to communicate with anyone at DHS headquarters, other than Ms. Voorhies, Mr. Lewandowski, or Ms. Noem, at any time?

MS. KIES:  Object to form.

A.   I would use it with the DHS ExecSec.

Q.   Anyone else?

A.   And I would also use it periodically with DCOS Guy.

Q.   "DCOS" stands for "Deputy Chief of Staff"?

A.   Yes, ma'am.

Q.   Okay.

MS. LEONARD:  So for the court reporter, DCOS, all caps.

Q.   Guy, Jos- -- Joseph?

A.   Yes.  Joseph Guy, G-u-y.

Q.   And do you have his phone number saved on your phone?

MS. KIES:  Object to form.

A.   I believe so, yes.

Q.   In addition to having his contact information saved through the Signal app?

MS. KIES:  Object to form.

A.   The -- it's -- so the way it works is -- yeah, like the contact information is that way.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 152

And so -- yeah, he's on the Signal app, but he would also call me, because we worked together during transition.

So I know Mr. Guy from my time with the America First Policy Institute.  So that's why it's saved.

Q.   And when was your time with the America First Policy Institute?

A.   I was a volunteer.  So I don't have the exact dates associated with it, but I worked on transition documents for the America First Policy Institute.

Q.   Transition documents related to the second Trump term?

MS. KIES:  Object to form.

A.   Yes.

Q.   Were you involved in a Signal group that includes political appointees at DHS and FEMA?

MS. KIES:  Object to form.

A.   Can -- I -- I'm not sure exactly what you're asking about when you say "political appointees" in FEMA.

Q.   Tell me all of the group chats that you were involved with on your Signal app that involved FEMA business, please.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 153

MS. KIES: Object to form.

A.   There was one, as we previously mentioned, specifically for the winter storm.

There is one specifically for communications, to be able to respond to communications.

And then there's one for the ExecSec to make sure that we had the STORM numbers so that we could move disaster decs through.

Q.   And there was a Signal group chat that you were involved with that involved DHS Secretary Noem, Corey Lewandowski, Kara Voorhies, and yourself, and others.  Correct?

MS. KIES: Object to form.

A.   That was related to the winter storm.

Q.   And it's your testimony that that group chat existed only for the winter storm?

MS. KIES: Object to form.

A.   That is my understanding and my participation, that it was related to the winter storm.

Q.   You did not have a Signal group chat with Secretary Noem, Corey Lewandowski, Kara Voorhies prior to the winter storm in 2026?

A.   I did --

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 154

MS. KIES:  Object to form.

A.   -- not.

Q.   Did you have any Signal communications with Corey Lewandowski prior to the winter storm 2026?

MS. KIES:  Object to form.

A.   Not that I recall, no.  I did not.

Q.   What about Secretary Noem, prior to the winter storm 2026?

MS. KIES:  Object to form.

A.   I did not.

Q.   What about Kara Voorhies, prior to the winter storm 2026?

MS. KIES:  Object to form.

A.   I did have some Signal chats with her prior to the storm.

Q.   And were those Signal chats with Kara Voorhies that you had prior to the winter storm with others on a group, or individually, or both?

A.   It would be both.

Q.   So you had individual communications with Kara Voorhies about FEMA on Signal in 2025?

MS. KIES:  Object to form.

A.   Yes, but it depends on what you mean about FEMA.  Like, in -- if it's specific, probably not.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 155

These are Signal chats.  They were just like general chats, like not "specific, specific."

That's why I'm saying, depends on what you mean by the question.

Q.   You were discussing FEMA business.  Correct?

MS. KIES:  Object to form.

A.   Not necessarily on all the chats.  No, ma'am.

Q.   But on some of them.  Correct?

A.   Yes, ma'am.

Q.   Okay.  Are you familiar with the obligations of government employees to retain records under the Federal Records Act?

A.   Yes, I am.

MS. KIES:  Objection; calls for a legal conclusion.

Just give me one second to answer -- object, please.

WITNESS:  Go ahead.  I'm sorry.

MS. KIES:  No -- no problem.  You could --

MS. LEONARD:  Question was:  Was she familiar?

A.   Yes, I am.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 156

Q.   And did you always print out and save the content of the Signal chats that you've just described regarding FEMA?

MS. KIES:  Object to form.

A.   I took pictures, because that was also the guidance underneath that.

I took pictures of what I determined were appropriate records.  And I sent those pictures into my email account so that they would be saved as part of DHS records.

Q.   Are you certain that you screenshot -- you took a screenshot of every communication you had with Kara Voorhies regarding FEMA on your Signal chat?

MS. KIES:  Object to form.

A.   As I stated, I looked at those because I am familiar, and I made a determination of what were appropriate records.

I took the pictures, and I sent the records in so that they would be captured as records.

Q.   Who did you send them to?

A.   I sent them to my email account, because my email account is automatically backed up and, therefore, is part of the DHS records.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 157

Q.   You did not forward them from your email account to anyone else, these screenshots?

A.   No, I did not.

Q.   Was there any other method that you used to preserve the content of any of the Signal chats you've talked about today?

A.   No.  I followed the guidance that was given out to us.

And I took the pictures, and then I sent them in so that they would be captured as records.

Q.   Were you instructed by someone to use Signal on your personal phone for communications regarding FEMA?

MS. KIES:  Object to form.

A.   I don't recall being instructed to use my personal phone and Signal chat.

Q.   Are you aware of whether others in your Signal chat group were instructed to use their personal phones?

MS. KIES:  Object to form.

A.   I am unaware of any guidance that people were given as it relates to their personal phone use.

Q.   The messages that were sent on the Signal application were set to disappear.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 158

MS. KIES:  Object to form.

A.   I am not sure of all the different disappearing messages, as those can be sent -- that feature can be determined by the users.

Q.   Was the Signal group chat that you participated in involving Secretary Noem, Corey Lewandowski, and at least Kara Voorhies -- were any of the messages set to disappear in that group chat?

MS. KIES:  Object to form, foundation.

A.   I am unsure of that question, the answer to that question.

Q.   If we were to look at your personal phone here today and the Signal application, do you believe that it would contain a record of the group chat?

MS. KIES:  Object to form, foundation.

MR. GREAVES:  I'm just going to object to her being here in her official, not in her personal capacity.

Q.   You can answer the question.

A.   I'm unsure.

Q.   And why are you unsure?

MS. KIES:  Object to form.

Page 159

A.   Because I am not sure of the settings for the disappearing messages.

Q.   Have you ever noticed any of the messages disappearing when you look at it?

MS. KIES:  Object to form.

A.   Are you asking me about disappearing messages when I look at Signal chat?  Can you clarify --

Q.   Yes.

A.   -- that?

Q.   Yes.

A.   Okay.  That's how it -- people set it up.

So I am -- I am aware, because I don't use Signal just for work.

And so, there are disappearing messages.

Q.   Did you set up the communications with -- directly with Kara Voorhies to disappear?

MS. KIES:  Object to form.

A.   I don't recall.

MS. LEONARD:  Okay.  Why don't we take a five-minute break?  And then we'll come right back onto the record.

VIDEOGRAPHER:  Off the record at 12:18.

(Whereupon, a recess was taken.)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 160

VIDEOGRAPHER:  On the record at 12:35.

BY MS. LEONARD:

Q.   Ms. Evans, you previously testified that you had Mr. Lewandowski's phone number in your personal phone.

Can you provide that phone number to us, please.

A.   Yes.  Do you want me to read the number?

Q.   Sure.

And you have, in front of you, a piece of paper on which some phone numbers are written.

Is this information that you retrieved from your personal cell phone?

A.   Yes, ma'am.

Q.   And can you read the phone number for Mr. Lewandowski that you have written there?

A.   ████████████

Q.   And is that the only phone number that you had for Mr. Lewandowski in your phone?

A.   Yes, ma'am.

Q.   And you previously testified you had a number for DCOS Joseph Guy in your phone.

Do you have his phone number there with you as well?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 161

A.   Yes, I do.

Q.   Can you read it, please.

A.   It is ████████████████

Q.   And are you aware of whether either of those phone numbers is a personal phone?

A.   I'm only aware of Mr. Guy's because we had a preexisting relationship through our work at the America First Policy Institute.

Q.   And you believe that is his personal phone number?

A.   I believe that is his personal cell phone number.

Q.   Because that's the phone number you used to communicate with him prior to his coming to the Department of Homeland Security?

A.   That's the phone number that I used to communicate with him prior to both of us being at DHS, yes.

Q.   And apologies if I just asked this.

Is that the only phone number for DCOS Guy that you have saved in your personal phone?

A.   Yes, it is.

Q.   Okay.  As the SOPDA, did you personally instruct employees who report to you that they are required to download and save their Signal

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 162

communications under federal law?

MS. KIES:  Object to form.

A.   I did not personally communicate.  We received guidance as a reminder that we needed to do proper records management.

Q.   And guidance from the Department of Homeland Security?

A.   We received guidance from the Department's Chief Information Officer.

MS. LEONARD:  Okay.  Let's just mark this one as Exhibit 9.

Here you go.

(Whereupon, Plaintiffs Exhibit 9 was marked for identification.)

Q.   Exhibit 9 is a -- sorry.  Thanks.

Exhibit 9 is a March 11, 2026 communication from DHS Management Communications that is titled "Reminder from Chief Information Officer."

Do you see that?

A.   Yes, ma'am.

Q.   Prior to March 10, 2026, when was the last reminder, if any, that you recall receiving regarding records preservation from the chief information officer at DHS?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 163

MS. KIES:  Object to form.

A.    I don't recall receiving something directly from the chief information officer at DHS on records preservation.

Q.    Prior to this message?

A.    Yes, ma'am.

Q.    Do you recall receiving something on records preservation from someone other than the chief information officer prior to this?

A.    When you come on board at FEMA as a senior executive, there's a whole series of training that they go through that every senior executive takes.

And so, I -- records management -- not to this level of specificity, but records management, cybersecurity, privacy, all those are part of the orientation when you come aboard FEMA.

Q.    Between the orientation for any person, including yourselves, and this March 10th communication from the chief information officer, are you aware of any communication from DHS which instructed employees to save Signal chats?

MS. KIES:  Object to form, foundation.

A.    I'm unaware of any specific guidance.

Q.    You don't recall receiving any

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 164

instructions from the chief information officer or anyone else at DHS regarding saving Signal chats, prior to this March 10th communication?

MS. KIES:  Object to form.

A.    I specified that we get training when we come on board at FEMA.  And then this came out.

I do not recall anything else specifically coming out from the Department headquarters.

Q.    And are you aware that March 10th is the day after the court, in this case, ordered discovery?

MS. KIES:  Object to form.

A.    I'm aware that there are several pending court cases.  I'm not aware of the specific dates associated with the discovery order.

MS. LEONARD:  Okay.  I think now is a good time to take a break for lunch.

So we can go off the record.

VIDEOGRAPHER:  Off the record at 12:41.

(Whereupon, a recess was taken for lunch at 12:41 p.m.)

- - -

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 174

A.   They're all related.

So when you're asking me about the lapse of the appropriations, those were activities -- because at that particular time, if you go over 30 days, then you have to run certain activities.

And that was the guidance that was being given by OMB and OPM.

And what we were doing was also looking at the extension of those types of activities, the rules of how it would apply, if it would apply, to the CORE appointments.

Q.   Okay.  We'll come back to that.

This document looks like it's -- certain things have been crossed out with a marker.

Do you see that?

A.   Yes.

Q.   Did you do that?

A.   Yes.

Q.   Did you do that before giving this document to your counsel?

A.   Yes.

Q.   Why did you do that?

A.   Because the guidance was to --

Q.   I'm going to stop you there and ask that you don't reveal attorney-client communications in

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 175

answering my questions, which I think your --

A.    Okay.

Q.    -- counsel for Defendants was about to interject.

So I can ask the question again.

A.    Okay.

Q.    I'm going to ask you why you did that.

A.    Okay.

Q.    And if you can tell me without revealing communications that you received from any of the many counsel sitting at this table, you may do so.

Can you answer that question without revealing communications from any counsel?

A.    I did the redactions based on the information that I redacted is deliberative, and there are other meetings that I attend.

And so, from my perspective, that information wasn't relative to the COREs.

MS. LEONARD:  We'll ask that the complete document be produced.

We can address that later.

Q.    Okay.  You can set that aside.

Okay.  You believe -- I believe you previously testified that Mr. Richardson resigned as SOPDA sometime towards the end of 2025.  Is that

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 218

A.    I do not recall that specific date.

Q.    Do you recall submitting a FEMA staffing plan that cut the staff in half?

MS. KIES:  Object to form.

A.    I recall submitting various staffing plans that had various scenarios that would cut the FEMA's staff.

Q.    And one of them cut it in half.  Right?

MS. KIES:  Object to form.

A.    That was one of the options that was sent forward.

MS. LEONARD:  Let's mark this as the next, which is 17.

(Whereupon, Plaintiffs Exhibit 17 was marked for identification.)

Q.    This is a document that was produced to us by counsel for Defendants.

MS. KIES:  Can I just ask, Danielle, did we include the, paren, employee plan with the Bates number?

MS. LEONARD:  No.  This was produced as a native spreadsheet in Excel format.

MS. KIES:  Right.

MS. LEONARD:  It was an

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 219

attachment to an email.  And the employee plan was the worksheet title of this page of the spreadsheet.

MS. KIES:  Okay.

MS. LEONARD:  Does that make sense?

MS. KIES:  Do you have the email, by any chance?

It does make sense.

MS. LEONARD:  We do have the email, which I can get to you in a moment.

But this was -- it was -- the Bates number is next in line for the attachment, and you submit -- you produced a "produced in native format" for that Bates number.  And that's the Bates number that appears on this document.

Does that make sense?

MS. KIES:  Okay.

BY MS. LEONARD:

Q.  Does this look familiar to you, Ms. Evans?

A.  Yes, it does.

Q.  And if you look at the bottom, what's the total projected 2026 staffing for FEMA that's listed on this document?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 220

A.   The number is 11,383.

Q.   And 11,383 represents a more than 50% cut in the then current numbers of FEMA staff, does it not?

MS. KIES:  Object to form.

A.   Well, I don't have the exact percentage, but it's a cut.

Q.   It's a -- it's approximately 50%. Correct?

MS. KIES:  Object to form.

A.   Yes.

Q.   And do you have any reason to believe this is not the document that you sent to DHS leadership to -- as the FEMA annual staffing plan?

MS. KIES:  Object to form.

A.   I have no reason to believe this is not the document.

Q.   And does this document refresh your recollection that this is what you sent to DHS leadership on December 4th as the FEMA annual staffing plan?

MS. KIES:  Object to form.

A.   Yes, because it's consistent with previous documents that we sent forward to OPM and OMB.

Q.   When did you first send forward to OPM and

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 221

OMB a document that showed a 50% staffing cut for FEMA?

MS. KIES:  Object to form.

A.  I don't recall specifically, but as I previously stated, there were multiple exercises where we had to look at the staffing.

And so, it was based on guidance that came from OPM and OMB.  And then we would send forward the numbers to the DHS CHCO, and then looked at the staffing according to those guidance.

So I do recall seeing that -- I recall these numbers, yes.

Q.  Can you tell me how the 11,383 number was calculated for the fiscal year 2026 projection of staff at FEMA?

MS. KIES:  Object to form.

A.  I can tell you that this was based on analysis that was previously done by the group that was working specifically with Mr. Richardson that was called -- it's OPPA, which is Office of Policy -- Policy, Planning and Analysis -- based on mission essential functions and the analysis that Mr. Richardson did based on mission essential functions.

Q.  And you approved this as the plan to be

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 222

sent to DHS?

MS. KIES:  Object to form.

A.   Yes.

Q.   And you knew, at the time, that this was a roughly 50% cut from what the FEMA components and programs were telling you that they needed for fiscal year 2026.  Correct?

MS. KIES:  Object to form.

A.   Yes.

MS. LEONARD:  I think now is a good time for -- I was just looking at the clock.  I think now is a good time for a break.  So let's do 10 minutes and resume at approximately 2- -- 2:47.

VIDEOGRAPHER:  Off the record at 2:37.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 2:49.

BY MS. LEONARD:

Q.   Ms. Evans, before we took the break, we were talking about the FEMA annual staffing plan numbers that were sent over to the Department of Homeland Security in Exhibit 17.

Do you recall that testimony?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 223

A.    Yes, ma'am.

Q.    Can you look at Exhibit 10 --

MS. LEONARD:  Is it 10 or 16?

Q.    Sorry.  Your notes from your planner, which I think is Exhibit 10.

MS. LEONARD:  Thanks.

A.    Okay.

Q.    Do you have it?

A.    Yes.

Q.    And if you turn internally, using the Bates numbers at the bottom, to Page -- the page that ends in -34.  So it's -33534.

The date at the top is Thursday, December 4, 2025.

A.    Okay.

Q.    You have that page in front of you?

A.    Yes.

Q.    And you see there's a notation here -- the last one at the bottom of the page.

Can you read that, please.  Out loud.

A.    The last number -- the last thing says:

Talked to Kara.

"RE" means subject.

The number is 11,383 and the top line.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 224

I can't read my own writing, and then it says:

CC her.

Q.    "Will CC her," potentially?

A.    That's probably what it says.

Q.    Does this refresh your recollection that you are the person who sent the FEMA annual staffing plan with the number 11,383 to DHS on December 4th, and you copied Kara Voorhies?

MS. KIES:  Object to form.

A.    Yes, that's what this indicates.

Q.    And this -- you did that.  Correct, Ms. Evans?

MS. KIES:  Object to form.

A.    I don't recall the exact email, but my notes say that I did that.

Q.    And you generally tried to take accurate notes.  Correct?

MS. KIES:  Object to form.

A.    Yes, ma'am.

Q.    You did not provide a copy of the FEMA annual staffing plan that you sent to DHS to FEMA leadership in December 2025, did you, Ms. Evans?

MS. KIES:  Object to form.

A.    I don't recall distributing this staffing

11,500 was transmitted to OMB and OPM for the FEMA staffing for fiscal year 2026?

MS. KIES: Object to form, foundation.

A. I know that we submitted this number. I submitted this number.

And I do not know what the final submission looks like that the DHS CHCO submitted to OPM and OMB.

MS. LEONARD: Okay. Let's mark this as the next.

COURT REPORTER: 18.

MS. LEONARD: 18.

(Whereupon, Plaintiffs Exhibit 18 was marked for identification.)

Q. Ms. Evans, you've been handed a email chain that was produced to us by Defendants. The top email is dated December 23rd, but I am going to direct your attention to an email in the middle of the chain on the one, two, three, four -- fourth internal page that is numbered -7336 at the bottom.

It is an email from you, on December 17th. Let me know when you're there.

MS. KIES: And, of course, if the witness wants to review the whole

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 229

document, she can.

(Witness reading.)

A.   Okay.

Q.   So I'm going to direct your attention to the email that you sent on December 17, 2025 at approximately 9:51 p.m.

Do you see that, on Page -7336?

A.   -7336?

Q.   It is to Micah Bock.

A.   Okay.  Hold on a second.

(Pause.)

Okay.

Q.   And in this -- Ms. Evans, do you recall writing this email?

A.   Yes.

Q.   And in this email, you say:

The number of 11,500 is also what we have provided to OMB -- to OPM/OMB at a high level but we haven't made that public.

Do you see that?

A.   Yes, I do.

Q.   Does that refresh your recollection that the number of FEMA staff for the fiscal year 2026

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 230

was provided to OPM/OMB as the FEMA final staffing plan?

A.    As I --

MS. KIES:  Object to form.

A.    As I previously stated, I submitted these numbers through the exercise that was directed by the department CHCO, and that those are the numbers.

And I -- you asked me specifically if I know that they actually transmitted them, and I do not know.

That's why I said these are the numbers that we provided.  And it was for that exercise.

Q.    But here on December 17th, you were saying, "We have provided to OPM and OMB at a high level," that number.  Right?

A.    Because it was part of the exercise.  Yes, ma'am.

Q.    But you believed this to be true on December 17th, that that number had been provided to OPM and OMB.  Correct?

MS. KIES:  Object to form.

A.    That's what my email states, yes.

Q.    And you believed that that was true, correct, when you wrote it?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 231

A.   I believed that that was true when I wrote the email, yes.

Q.   And the rest of the email is true as well, that 50%, referring to a 50% cut of the FEMA staff, was used internally.  Correct?

A.   Yes.

Q.   And the 50% was also in the "leaked report."  Correct?

A.   Yes.

Q.   And the "leaked report" refers to the FEMA Review Council report -- draft report that we've been discussing?

A.   Yes.

Q.   And the "high level" reference here, when you say, "We've provided that to OPM and OMB at a high level, but we haven't made that public," Exhibit 17 is the high level that you're talking about.  Right?

                    MS. KIES:  Object to form,
          foundation.

A.   That could be, because -- but these numbers don't specifically match because there were -- as I previously stated in my testimony, there have been multiple exercises as it relates to different staffing within FEMA that we were working

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 235

required; also based on overall statements that were made of locally led, you know, state managed, federally supported.

Q.  Is it your testimony that you were not provided direction from the DHS headquarters to include a 50% cut in the FEMA annual staffing plan, Ms. Evans?

MS. KIES:  Object to form.

A.  Can you restate that one more time?

Q.  Sure.

Are you testifying that you were, in fact, not told by the DHS leadership to include a 50% cut in the annual staffing plan?

MS. KIES:  Object to form.

A.  I was told to include an option that would include a 50% cut.

Q.  And who told you that?

A.  Again, those discussions happened with the deputy chief of staff, Joe Guy.

Q.  And Kara Voorhies was aware of these conversations because, as we saw in your notes, you talked to her about the 11,383 number that was being submitted as the final number on December 4th. Correct?

A.  Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 255

MS. LEONARD:  Thank you.

Q.   You've been handed an email chain that we were provided by Defendants that appears to be an exchange between you and Ms. Dobitsch in -- on December 4th and 5th of 2025.

Let me know when you are ready.

(Witness reading.)

A.   Okay.

Q.   Starting with the December 4th email, the first in line from Ms. Dobitsch, she is referencing the draft extension memo for the delegated authority with respect to certain CORE renewals.  Is that right?

MS. LEONARD:  Object to form.

A.   She -- yes, she is referencing the term appointments for CORE employees.

Q.   Well, it says:

...term extension memo that is with you for approval to push to the Secretary.

Do you see that?

A.   Yes.  "The term extension memo."

Q.   Okay.  And then she's also talking, in this email, about decisions on the CORE terms and their extensions that will be coming due in the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 256

coming months.  Correct?

A.   That's what her email states.

Q.   Okay.  And do you recall that you had a meeting with Ms. Dobitsch on December 4th at which you talked about these issues?

MS. KIES:  Object to form.

A.   I don't know specifically if we had an email -- a meeting.  I'm sure it's in my notes that you have.

Or it should be in the notes that you have.

Q.   If you can look at Exhibit 10, on December 4th, there is a -- on Page -33534 --

A.   Yes.

Q.   -- there is an entry that's above the one we previously discussed about the staffing plan and the number 11,383.

Do you see the entry above that?

A.   Well --

Q.   Looking --

A.   -- my notes on --

Q.   Yes.

A.   -- the one that's ended -33534?

Q.   Yes.  No. 1, "Looking at all CORE dates."

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 257

Q.   Is that -- are those notes from your meeting with Ms. Dobitsch?

MS. KIES:  Object to form.

A.   That's what it looks like, yes, that that would be the meeting.  Those are my notes.

Q.   Okay.  And on the first email -- and you can set that aside and look back at Exhibit 20.

And there's an email on -- the first email on -- sorry.  I'm tired.

The last email in the chain, which is the first one on the first page, on December 5th.

Do you see that?

From Stephanie to you.

A.   Okay.  You want me to look at --

Q.   The top page.

A.   -- December 5th --

Q.   Yes.

A.   -- the top page, which is marked -6686?

Q.   Yes.  Sorry.

A.   Okay.

Q.   You're doing a better job than I am.

-6686, there's a December 5th email from Stephanie Dobitsch to you, sent at 3:32 p.m.

Do you see that?

A.   Yes, I do.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 258

Q.    And she says:

                    We're planning several

                meetings next week to dig into

                this as part of the plan you

                and I discussed for CORE

                rightsizing.

        Do you see that?

A.    Yes, I do.

Q.    So one of the things you were discussing, as you became the SOPDA, was rightsizing the CORE at FEMA?

                    MS. KIES:   Object to form.

A.    Yes.

Q.    And this was -- that reference is the day after you sent the annual staffing plan to DHS that included a 50% cut to all of FEMA employees. Correct?

                    MS. KIES:   Object to form.

A.    Based on the emails that you've provided today, yes.   That's -- that looks like the dates.

Q.    And so, rightsizing the CORE, that was part of the plan of implementing the 50% cut?

                    MS. KIES:   Object to form.

A.    The rightsizing of the COREs was to really look at the CORE functions.   It wasn't necessarily

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 287

MS. LEONARD:  Okay.  Let's mark this as the next, which I believe is Exhibit 25.

(Whereupon, Plaintiffs Exhibit 25 was marked for identification.)

Q.  Another document that is produced to us by Defendants.

(Witness reading.)

MS. KIES:  Do you know if this was an attachment as well?

MS. LEONARD:  You didn't give us this document attached to anything, and you did not --

MS. KIES:  Okay.

MS. LEONARD:  -- provide custodian or author information.

We're requesting that you provide custodian and author information.

Do you know who the custodian and author is?

MS. KIES:  I do not.

(Witness reading.)

Q.  Okay.  Ms. Evans, you've been handed a document that's been produced to us by Defendants.

The metadata designates that the date of

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 288

this document is December 11th.  That's electronic data that we are given when we are given the document.  I can represent that for the record, that the metadata showed that it was December 11th.

Do you know who authored -- who authored this document?

A.   I do not.

Q.   Did you task someone at FEMA with developing a strategy to cut the FEMA workforce by 50% over fiscal year 2026?

A.   As we previously discussed, in this email, I have it documented, and we discussed that that was one of the plans that Ms. Dobitsch would be looking at.

So it's in the previous exhibit that we just discussed.

Q.   And do you believe that this is a document that is potentially authored by Ms. Dobitsch?

MS. KIES:  Objection; foundation.

A.   I don't know if Ms. Dobitsch authored this document.

Q.   And this also refers to you -- your "specific intent on the cuts to the workforce by employee type."

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 289

And it lists cuts there:

                        PFT:  Cut 35% or 1,362
            positions.
                        Core:  Cut 68% or 10,843
            positions.
                        Reservist/Local Hire:  Cut
            76% or 7,039 positions.

        At any time in 2025, did you discuss cuts of these levels with anyone at FEMA?

                MS. KIES:  Object to form.

    A.   As I previously stated, there were several exercises.  I'm looking at these specific numbers, and I don't recall talking about these specific numbers, such as like the 76% to reservists and local hires.

    Q.   You don't recall, sitting here today, but it's possible that you informed someone at FEMA that you had this specific intent on the cuts to the workforce by the employee types listed here?

                MS. KIES:  Object to form.

    A.   I don't recall specifically giving direction to this level of specificity to these employee categories.

    Q.   But you -- so you talked about a mission essential analysis previously.  And this refers to:

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 290

                    Ms. Evans has also

                    directed targets for the

                    overall workforce by Mission

                    Essential Task.

          Is this consistent with your recollection

of the mission essential tasks that had been

provided to you by Ms. Dobitsch?

                    MS. KIES:  Object to form.

     A.   So I see, in the second piece of this, it

says:

                    Ms. Evans also directed

                    targets for the overall

                    workforce by Mission Essential

                    Task.

          So, as I previously stated, I looked at

the mission essential analysis that was done.

          And Ms. Dobitsch is the one who also did

this analysis and the numbers during

Mr. Richardson's tenure.

          And then as we just previously discussed

in Exhibit 24, that's the reason why Item No. 4,

"Overall CHCO numbers are being worked by you and

Will" -- because it's related to the analysis that

she has previously done based on mission essential

tasks.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 291

Q.   And at the bottom of the page, this refers to:

                         Ms. Evans' intent to halve
               the workforce.

Did you tell FEMA staff that you had an intent to halve the workforce in 2025?

MS. KIES:  Object to form.

A.   As I previously stated, those numbers were not released.

And as you previously asked me, I did not distribute that agency workforce plan that we sent up to headquarters.

Q.   You kept it close because you didn't want that to be public.  Correct?

MS. KIES:  Object to form, misstates testimony.

A.   I did not want the information to be public because it was still pre-decisional.

Q.   And -- but you did talk about the plan to cut the workforce in half with a limited number of FEMA staff.  Correct?

MS. KIES:  Object to form.

A.   I talked about it specifically with Ms. Dobitsch because of the analysis that was previously done, and also because Mr. Bilicic was

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 292

involved.

And that's what they were going to work on.  That's clearly outlined in Exhibit 24.

Q.   And part of what they needed to do is figure out how to cut the positions in order to meet your 50% targets.  Right?

That's the task, at the highest level, that you gave Ms. Dobitsch and Mr. -- and Mr. Bilicic?

MS. KIES:  Object to form, misstates testimony.

A.   I believe, if you go back and look at Exhibit 24 again, it states that they're looking at the overall CHCO numbers and that the number that we previously talked about was 11,383.

And then the task is now to look to see, if there's a plan, what would the plan be to achieve that number to implement the 11,383 number.

Q.   If there's a plan --

A.   Well, we --

Q.   -- Ms. Evans?

A.   -- we -- it's clear, from this email, we didn't have a plan.  That's why I was tasking the plan.

Q.   Well, your plan was to cut the workforce

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 293

in half by 50%.  What you didn't have is an understanding of how to actually get there.  Correct?

MS. KIES:  Object to form, misstates evidence.

A.   Actually, your -- I don't necessarily agree with that statement.

The -- I would rephrase that to say that there is an option with -- to cut the plan -- to cut FEMA's staff by 50% -- was -- there is not an implementation plan.

And that's what Exhibit 24 is about, with me talking with Ms. Dobitsch about developing a plan.

Q.   An implementation plan?

MS. KIES:  Object to form.

A.   I would say that, yes, it would be an implementation plan, based on the way that we outlined the tasks.

Q.   And Exhibit 25, these Talking Points for FY 2026 Staffing Strategy that refer to your specific intent on the cuts and your intent to cut the -- to halve the workforce, again, you don't know who drafted this?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 294

A.   When I read the first piece, it says:

          Ms. Evans has tasked me to
        develop a strategy....

So the way that you're asking the question, I don't know for a fact, but it would seem to me that this was drafted by Stephanie Dobitsch.

Q.   Do you know whether Will Bilicic was involved?  Because you tasked the two of them to work together on this.  Right?

          MS. KIES:  Object to form.

A.   According to my email, yes, from Exhibit 24, that the two of them were to work on this task.

Q.   And after Ms. Dobitsch was MDR'd out of FEMA, Mr. Bilicic continued to work on this task.  Right?

          MS. KIES:  Object to form.

A.   Actually, no, that's not the case.

          Because what ended up happening was, we had to look specifically at the process associated with the decisions that were made as it related to CORE renewals.  So this was put on hold, this particular activity.

          And then we focused on the actual process associated with reviewing CORE positions by function

# Exhibit B
## *in camera*

# Exhibit C
## *in camera*

# Exhibit D
*in camera*

# Exhibit E
*in camera*

# Exhibit F
## *in camera*

# Exhibit G
*in camera*

# Exhibit H
*in camera*