# Exhibit 1

Hearing Transcript (March 3, 2026)

**Pages 1 - 67**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan Illston, Judge

AMERICAN FEDERATION OF )
GOVERNMENT EMPLOYEES, AFL-CIO )
(AFGE), et al., )
 )
      Plaintiffs, )
 )
  VS. ) **NO. 3:25-CV-03698-SI**
 )
PRESIDENT DONALD J. TRUMP, et )
al., )
 )
      Defendants. )
 )

San Francisco, California
Tuesday, March 4, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
        ALTSHULER BERZON, LLP
        177 Post Street, Suite 300
        San Francisco, CA 94108
   **BY: DANIELLE E. LEONARD, ATTORNEY AT LAW**
       **ELIZABETH ESHLEMAN, ATTORNEY AT LAW**
       **STACEY M. LEYTON, ATTORNEY AT LAW**

        OFFICE OF THE COUNTY COUNSEL
        70 West Hedding Street
        East Wing, Ninth Floor
        San Jose, CA 95110
   **BY: RAPHAEL N. RAJENDRA, ATTORNEY AT LAW**

(Appearances continued on following page.)

**APPEARANCES (CONT.'D):**

For Defendants:
                    DEPARTMENT OF JUSTICE
                    1100 L Street Northwest, Suite 12404
                    Washington, DC 20530
            **BY:  ROBERT BOMBARD, ATTORNEY AT LAW**

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
                        Official United States Reporter

**Tuesday - March 4, 2026**                    **10:58 a.m.**

                    **P R O C E E D I N G S**

                         ---o0o---

THE COURTROOM DEPUTY:  Now calling civil matter 25-CV-3698, American Federation of Government Employees, AFL-CIO, versus Trump, et al.  Counsel, please approach the podiums and state your appearances on the record.

MS. LEONARD:  Good morning, Your Honor.  Danielle Leonard, Altshuler Berzon, for the plaintiffs.

THE COURT:  Good morning.

MS. ESHLEMAN:  And Elizabeth Eshleman also for the plaintiffs.

THE COURT:  Good morning.

MS. LEYTON:  Good morning, Your Honor.  Stacey Leyton also for plaintiffs.

THE COURT:  Good morning.

MR. RAJENDRA:  Good morning, Your Honor.  Rafael Rajendra for plaintiff, County of Santa Clara.

THE COURT:  Good morning.

MR. RAJENDRA:  Good morning.

MR. BOMBARD:  Good morning, Your Honor.  Robert Bombard, United States Department of Justice, on behalf of defendants.

THE COURT:  Good morning.  Welcome.

     This is plaintiff's motion for a preliminary injunction

seeking to enjoin defendants from implementing, carrying out or effectuating DHS directives that remove FEMA authority over personnel decisions and that would rescind all notices of nonrenewal issued to FEMA CORE employees since January 1st, 2026.  It was initiated as a TRO, and the Court sua sponte converted it to a preliminary injunction because there's quite a lot going on in this motion.  And I'll tell you, my preliminary view is to deny the motion because the evidentiary record is not sufficiently developed on the key questions of whether DHS ordered or directed that FEMA make staffing cuts and cut staffing to a certain level and whether the CORE employees are historically always removed upon supervisor recommendation.  Plaintiffs are seeking extraordinary relief that goes well beyond the injunction to preserve the status quo, and at this early stage the evidence is not sufficiently developed to warrant granting such relief at the outset.

So that's my preliminary view, but I'm going to be happy to hear from all of you as we go through this.  And so I guess the plaintiffs should go first.

**MS. LEONARD:**  And thank you, Your Honor, and we appreciate your sharing of your inclination.

**THE COURT:**  Let me ask you this:  What is a SOPDA, senior official performing the duties for administrator?

**MS. LEONARD:**  I think that's a good question for defendants, actually, Your Honor, but my understanding it is

someone who is a political appointee who, Karen Evans has been appointed by Kristi Noem, the Secretary of the Department of Homeland Security, to, as she says in her own declaration, perform the, uh ...

THE COURT:  Duties of an administrator.

MS. LEONARD:  The duties previously assigned to FEMA, two incredibly important words in Ms. Evans' declaration, previously assigned to FEMA.  DHS has usurped those authorities, Your Honor, which we will get into.  But she is not the acting administrator.  That is not nominated.  She has not been proposed to the Senate for Senate confirmation.  She is simply a political appointee running FEMA because that's what they've decided to do.

THE COURT:  Okay.  Stay here.

Mr. Bombard.

MR. BOMBARD:  Yes, Your Honor.

THE COURT:  Would you please answer that question for me.

MR. BOMBARD:  The SOPDA is --

THE COURT:  The SOPDA.

MR. BOMBARD:  Yes, Your Honor.  That's the senior official performing the duties of administrator.

THE COURT:  Yes.

MR. BOMBARD:  Counsel for plaintiffs is correct that Ms. Evans has not been appointed, but she is basically

performing the duties as the administrator would.  So she's the senior official at FEMA.  She reports to the Secretary of the Department of Homeland Security.

**THE COURT:**  But she's not been nominated to be administrator?

**MR. BOMBARD:**  That is correct, Your Honor.

**THE COURT:**  So nobody has been nominated to be administrator?

**MR. BOMBARD:**  To my knowledge, Your Honor, that's correct.

**THE COURT:**  Why?  Why don't they want an administrator?

**MR. BOMBARD:**  Your Honor, I don't have the answer to that question.  I'm not sure what the nomination process is with --

**THE COURT:**  Has there ever been an administrator since this administration took over?

**MR. BOMBARD:**  I would have to go back and look.  I believe that there have been two different individuals who have been in that role.  I'm not sure if they were actually confirmed, you know, in that role or not, but she would be the third in the administration.

**THE COURT:**  Is that right?

**MS. LEONARD:**  I can answer this question.

The president has not nominated any administrator to the

Senate for FEMA.  The three people who have been in place since January 2025 have all been SOPDAs.  We think this is part and parcel of the scheme to dismantle this agency, Your Honor.  In the first Trump administration he nominated a FEMA administrator and they were Senate confirmed.  He has not done that here.

THE COURT:  Thank you.

Well, I interrupted you, so you can go ahead.

MS. LEONARD:  One other thing about a SOPDA, Your Honor, is that they are not authorized -- a SOPDA is not somebody who is authorized to be acting as the administrator under a statute called the Federal Vacancies Reform Act.

THE COURT:  Could you say that one more time?

MS. LEONARD:  Sure.

A SOPDA is not authorized to be an acting administrator under something called the Federal Vacancies Reform Act, which addresses what happens at the federal level for federal agencies, what Congress intends to happen when the president hasn't nominated someone yet.  We think it's a significant issue that they have a DHS political appointee running the agency who has told the Court in no uncertain terms these are the duties previously assigned to this agency.  That is part of what is very problematic here, Your Honor.

THE COURT: All right.  Thank you.

MS. LEONARD:  But turning back to the questions that

Your Honor started with, and just to set the stage, I intend to split the argument, if that's acceptable to the Court, with my colleague, Ms. Eshleman, who is going to talk about one subset of the merits issues.  I'm going to take everything else.

**THE COURT:**  Okay.

**MS. LEONARD:**  I'll talk about the record and what I'll call the threshold roadblocks to the extent the Court wants to get into those issues, but Ms. Eshleman will talk about the statutory duties and why we think they're being violated.

But I want to start with where Your Honor started, which is what the record shows about what is happening right now on the ground at DHS, and I believe Your Honor said that the first issue was whether DHS has actually ordered statutory -- sorry, staffing cuts to a particular level.  So what we believe the record shows to the Court -- and we do think it is sufficient to issue an injunction even if the Court is interested in further factual development, and I will try to explain why the Court would benefit from further factual development.

They~-- the evidence that we submitted to the Court shows that supervisors were told in early January that they were implementing the plan to cut CORE by NTE dates and that no CORE would be renewed by NTE date alone, that that is -- that the authority was removed from FEMA to renew or extend any of those.

**THE COURT:**  They were told by whom?

**MS. LEONARD:**  By ... the reports are that there were meetings in which supervisors were told this.  I am not --

**THE COURT:**  And the reports are what?  Are there any newspaper articles?

**MS. LEONARD:**  There are newspaper articles in which I understand, Your Honor -- this is very hard, because part of what is going on here as we've seen for the past year is there has been a remarkable lack of transparency from the agency about what they're actually doing.  We have had to dig and find information that they are not making public about people and plans and what they're doing with their staff.  This should be public information.  This is the federal government, and these are actions that they are actually taking, Your Honor.  These are not deliberative.  They are -- they have made these decisions, but they're not making it public.  So we are put in the position of listening to leaks.  So the Washington Post, CNN, the New York Times, they have contacts from people within FEMA who have told them that there were meetings of supervisors where the supervisors were told, we're not renewing anyone, and then that is what they did.  They rolled out this program consistent with the December 23rd e-mail, which we do have, we do have that e-mail, Your Honor has it.

**THE COURT:**  I have it, but of course it's from somebody in FEMA, right?

**MS. LEONARD:** Correct. But Karen Evans has told you, Your Honor, in no uncertain terms that DHS is the decision-maker, and in fact, it's Secretary Noem who is the decision-maker. The website for FEMA, the OCHCO website, the chief human capital officer, the OCHCO website said --

**THE COURT:** OCHCO?

**MS. LEONARD:** OCHCO. Office of the Chief Human Capital Officer, OCHCO. So the CHCO is the person, and the OCHCO is the office of the person.

That website, we gave you two screenshots. One says FEMA has no authority, it ends December 31st, to extend any positions for the CORE. The other part of the other screenshot we gave you says, send everything to DHS for S1 approval. S1 is Secretary Noem, Your Honor. And the evidence that we've been able to obtain and confirmed by Karen Evans in her declaration is DHS had -- we send everything to DHS and DHS is making the decisions. That's in paragraph 22 of her declaration. And, in fact, what she said in paragraph 22 is, we sent the approved renewals to DHS in January, Your Honor, the approved renewals. FEMA approved these positions for renewal because FEMA needs these CORE people, and DHS vetoed it, Your Honor. That's what Karen Evans told you in paragraph 22.

**THE COURT:** Okay. Let me just find her declaration. Okay. Paragraph 22?

**MS. LEONARD:**  Yes.

**THE COURT:**  So you're referring to:  "As FEMA is a component of DHS, DHS has final authority over nonrenewal decisions"?

**MS. LEONARD:**  And the immediately preceding part of that:  "I then forward the approved requests to DHS' OCHCO," Your Honor.  What FEMA is doing and what Karen Evans confirmed is when an NTE date comes up, the FEMA staff, the supervisor of record I believe she refers to --

**THE COURT:**  Uh-huh.

**MS. LEONARD:**  -- recommends them for renewal.  That is pretty much standard practice, because this agency needs all of these people.  They've trained them, they've been working, they're experienced.  If there is a performance issue they handle it otherwise.  If they recommend them for renewal, it goes now to, apparently, Ms. Evans through the chain.  That's not the way they've always handled it.  It used to be renewed upon supervisor approval.  But that's how they're handling it now, fine.  And then FEMA --

**THE COURT:**  So she says yay or nay.

**MS. LEONARD:**  We don't know whether she has said -- she has not said here that she said nay to anyone in January, because again, FEMA needs these people.  What she said --

**THE COURT:**  That she sends approved requests --

**MS. LEONARD:**  Correct, to DHS' OCHCO.

**THE COURT:**  -- to DHS.

**MS. LEONARD:**  And then DHS makes the decisions.

She doesn't say, I send both sets that I've carefully culled to look at agency need.  They didn't do that, Your Honor.  She sent them over and DHS denied them all by NTE date.  The evidence appears very clear.

**THE COURT:**  The evidence of that, that they denied them all by NTE date, is what?

**MS. LEONARD:**  Is that that is what started happening as of January 1 when they took away the authority.  The evidence is the website that says FEMA's authority to renew after December 31st is gone, and the fact that they did start separating employees as of January 1.  So all the employees that we've showed to the Court, as well as that are reported in the press, as well as what Ms. Evans admits through at least we'll say January 22nd, we'll call it the winter storm pause.  So in that window they were rolling this out, and we believe that the evidence fairly supports the inference.  Yes, this is circumstantial, because we haven't been able to depose anyone yet, Your Honor, but the inference that they were implementing the plan, that's what the supervisors were told, and they were rolling it out.  So that's step one.

They had -- you know, they told their supervisors, tell us what staff you need from a zero-based system to get to a 50 percent target cut.  There is no universe, Your Honor, in

which a 50 percent target cut at this agency is in this agency's interests.  There is no universe in which that is true.

You've heard from the former FEMA officials that we've given, you know, when we come to this, these cases, and have our crash course in understanding what is going on here, the first thing we do is talk to the experts who know the agency and look at the government reports and what they've said about staffing, et cetera.

So how do we know that they intend to implement this going forward?  They started to implement it, they stopped it because of a winter storm, and they did not say, we're not rolling out that staffing cut plan.  What they said -- and I believe it's Exhibit F to the Jackson declaration is the message, and they said, we're gonna pause the off-boarding because of the winter storm.  The optics of that were pretty bad at that moment in time.  It happened exactly with the events in Minnesota, and Kristi Noem was, you know ...

**THE COURT:**  Busy.

**MS. LEONARD:**  Apparently under pressure from some of the midwestern states in the winter storm.  So they paused the off-boarding.  The off-boarding is the implementation of the plan to cut these positions by NTE date, Your Honor.

And then what have they done since?  We sued them, and they have not renewed these positions.  DHS has removed

authority from FEMA to renew the positions that they need, and what they're doing is they're holding everyone in limbo.  As best we can tell, they've renewed a few of them maybe for a total of 90 days, but for the bulk of what's happened since January 22nd, the bulk of what's happened is they have not released them and they have not extended their terms.  They're holding them in limbo.  That's a DHS decision, Your Honor, and we believe that alone violates the Post-Katrina act because DHS has usurped the authority that Congress gave to FEMA to control its personnel and to make these decisions, and it's interfering with FEMA's functions by holding these people in limbo.

That has direct harm now.  It's not that they're just not making any decisions, Your Honor.  They are making decisions.  They've made the decision to take that authority away from FEMA.  FEMA would renew those people, Your Honor, because they need them.  FEMA would renew those positions because they need them.

So the evidence is it's not that there's just no decision being made, it's that they have been making decisions since January 20' -- this pause.  They have not clearly rescinded this plan.

And then there's one further piece of information that I think is very telling on is this really a target cut, and that is what Kristi Noem, Secretary of DHS, did with the FEMA advisory council report.  The reason we included that in our

evidence to you, Your Honor, it was widely reported, including by the Washington Post, that she made the edits to that advisory council report and inserted a 50 percent cut. We don't know -- that hasn't been released yet, that report in final form. We don't know whether it's going to contain the 50 percent cut as edited by Kristi Noem, but it sure is evidence that she wants that cut.

And when they were provided the opportunity to tell this Court what they're doing, the silence in Ms. Evans' declaration is deafening, Your Honor. They don't say, we -- Ms. Evans attached the e-mail. She does not say there is no plan to make a 50 percent cut. The only sentence in that declaration is, we don't plan to cut all of the CORE. That's not our point, Your Honor. She did not -- why didn't they tell the Court there is no plan to make target cuts? She didn't do that under penalty of perjury, Your Honor, because we believe she couldn't because there is such a plan. That's what they'll aiming for. They've only paused it because we sued them, and they're waiting to see what this Court is going to do.

THE COURT: Well, she says: "There's no plan under consideration which calls for the blanket or indiscriminate nonrenewal of all COREs."

MS. LEONARD: Correct.

THE COURT: That's what she says.

MS. LEONARD: That's not our argument, Your Honor,

and that's not what the December is 23rd e-mail says.

THE COURT: Okay. Tell me what your argument is.

MS. LEONARD: It's that they have a plan to cut 40, 41 percent of the CORE, which feeds into their plan to cut 50 percent of all FEMA staff. That's what Kristi Noem has said, we want a 50 percent cut. And the December 23rd e-mail says 41 percent of the CORE, and the way they were going to do it is by rolling cuts as of NTE date. That is not the same thing as what Ms. Evans said. We didn't say they were going to cut all of the CORE. No one has ever said that. Kristi Noem hasn't said that. It's 41 percent of the CORE. And what the former FEMA officials have told this Court in no uncertain terms is if they implement that 41 percent cut to the CORE, they're going to dismantle this agency and eviscerate the ability of this agency to perform its mandatory functions.

FEMA itself has not told Congress, we don't need 40 percent of the CORE. FEMA has told Congress in its budget justifications, in its most recent disaster fund report. We gave the Court the Cohen declaration Exhibit A. We've given the Court the most recent one from January -- sorry, December 31st, I believe, of 2025, where they project their needs for disaster relief and recovery through fiscal year 2026. They didn't tell Congress that they don't need to spend this money because they can do their job with 60 percent of the people. No one at this agency believes that, Your Honor, and

that is coming from DHS.

And what do we know about what has happened in this country when DHS makes decisions like this for FEMA?  Disaster.  That is what the Post-Katrina act is all about, Your Honor.  The findings of the lessons learned are specifically about uninformed and inexperienced people at DHS making disaster relief and recovery decisions for FEMA, and they prohibited that from happening.  That is happening right now.  DHS made the decisions in January.  They removed FEMA authority.  The Post-Katrina act, Your Honor, says no significant reductions in authority.  That's absolutely a reduction in authority.  They removed authority to make those decisions from FEMA.  That is FEMA's authority per Congress, Your Honor.

Ms. Evans says, I'm exercising the duties previously assigned to FEMA, assigned by Congress to FEMA, Your Honor.  Kristi Noem and DHS cannot remove those authorities without violating the Post-Katrina act.  That's exactly what's happening now.  And then they're making the decisions on an ongoing basis not to allow FEMA to renew these people in real time.  That is impacting this agency.  Everyone is in limbo, Your Honor.  What are these employees supposed to do, and then what are the local governments supposed to do who are planning?  Because a huge part of the way this ecosystem works is preparedness and planning.

We've got Santa Clara, representative of Santa Clara here.

Santa Clara is going to host the World Cup.  So is Chicago.  So is Houston.  They are planning for manmade emergencies and natural disaster.

What if there are concurrent natural disasters?  What if there are concurrent -- I mean, this is how the system works. It's not reactive, it's planning in advance, when everyone at FEMA is being held in limbo and they don't know whether those staff are going to be available.  That is realtime -- a realtime problem, and we think it is significant enough of a problem given Congress' language in the Post-Katrina act and the level of risk that this type of decision-making is imposing to warrant the injunction now.  We --

THE COURT:  When did they start using these contracts, these term contracts --

MS. LEONARD:  So they're not -- sorry.  They're not contract employees.  They're just a different statutory system.

So the Stafford Act is where this comes from when they set up the disaster relief fund.  I think the disaster relief fund, Ms. Eshleman probably knows this better than I do, might have predated the Stafford Act, but it really all comes -- we call then Stafford Act employees.  It's a statutory authorization for the temporary appointment, which is --

THE COURT:  Temporary.

MS. LEONARD:  It is, but it is -- these are not surge.  These are not the type of local hires that, you know,

are limited in time to a particular disaster.  It's an indication of the funding source from the disaster relief fund, and they are term limited.

There are other Title 42 employees throughout the federal government.  This is not unique in any way to FEMA.  But they are in the -- historically, one-, two- or four-year appointments, and then renewed according to agency need.  And many of them have been there for a very long time because they're -- this is the bulk -- the CORE is the core of how FEMA does its job, and Congress set it up that way so that the funding would be insulated from -- it rolls over.  It would be insulated from the usual appropriations, which we're seeing right now, discretionary fights.  It doesn't hinge -- they are excepted under shutdowns, Your Honor, because it's a source, a standalone source of funding.  They add to it, Congress adds to it, but the disaster relief fund which funds the CORE rolls over from year to year.  So they've got a bunch of money right now.  They're being paid right now.

But, so that --

**THE COURT:**  So you said it wasn't a contract.  What is it?

**MS. LEONARD:**  It's a -- they are statutory -- they're federal employees who are appointed under statutory authority.  They're just not subject to Title 5 civil service protections in the same way that the Civil Service is.  There are other --

it's a different type of federal statutory employment authority.

THE COURT: But the employment that they have says what about terms?

MS. LEONARD: They have a not-to-exceed date. So they're appointed for a particular period of time, and they have an NTE, which is the end date of that term, and it is subject to renewal according to agency need. That is how everyone has understood it.

THE COURT: At the agency's election.

MS. LEONARD: At the agency's election.

And these individuals in January, Ms. Evans has told you, were approved by FEMA, Your Honor. They were approved by FEMA, and DHS vetoed it.

THE COURT: Okay. Tell me where she told me that.

MS. LEONARD: In paragraph 22: "I forward the approved requests, and DHS makes the decisions."

THE COURT: That's -- she says that.

How do I know that the people who just got non-renewed had been approved by her?

MS. LEONARD: Because DHS made the decisions not to do the renewals, Your Honor, and they removed authority from FEMA to make those decisions. That's on the website. And so therefore if someone was not renewed, it was DHS' decision, not FEMA's decision, and she has told you that they were all sent

over as approved.  It's a straight logical conclusion from the evidence that's before you.

THE COURT:  Okay.  And the website, is that the -- is that the screenshot in your complaint?

MS. LEONARD:  Yes; and I believe that it is Exhibit A to the original Jackson declaration.

Oh, thank you, Ms. Leyton.

In paragraph 25 -- I knew there was -- I was looking for this.  There is another place where Ms. Evans says, DHS decided not to reappoint 192 of them.  She's told you directly that DHS made the decision not to reappoint.  If the papers were in front -- it's on paragraph 25.

If the papers were in front of DHS for that decision, Your Honor, according to Ms. Evans, it's because she sent over the approved request for renewal.  That's the key to our status quo argument with respect to these individuals, Your Honor.  It's absolutely part of the merits of why it's a violation as well, because DHS does not have the authority to remove this authority from FEMA.  They should not be making these decisions.  They don't have the authority to reduce FEMA's capabilities either.

But the status quo with these individuals is FEMA approved the renewal.  DHS made an unlawful decision and took an unlawful action when they decided not to reappoint them.

THE COURT:  So looking at paragraph 25 where it says:

"Pursuant to its lawful authority, DHS decided not to reappoint."  You're saying it did not have lawful authority.

MS. LEONARD:  Correct, Your Honor.  Correct, Your Honor.  That's what Congress directly took away from DHS.

THE COURT:  And that's post-Katrina.

MS. LEONARD:  The Post-Katrina act, absolutely, Your Honor.

And that's the unlawful act.  That's the unlawful act that is the direct cause of those individuals being separated from federal service and not being renewed, because the renewal was approved.  The status quo, the status quo prior to the unlawful act, is renewal.  FEMA's already made the decision for these, Your Honor.

So that is the key to our argument.  And we don't read the government as contesting that status quo argument.  It's not in their brief anywhere contesting that.  And we think that's a pretty strong status quo argument given the specific facts that are already before the Court.

And then the question becomes, the question Your Honor started -- so that's the people who have already been separated.  We think it's a straightforward violation.  It -- Ms. Eshleman will talk about the impact on the functions, as well, that we've already shown with what's happened with these people who they, you know, out of the blue separated.  It's absolutely by DHS an arbitrary and capricious action because

they were not considered -- you know, it's contrary to the recommendation of the agency that actually knows what the agency need it.  It's made by political appointees at DHS.  We know Secretary Noem, S1, was required to sign off on these.  She's the person who made these decisions, Your Honor.  They have nothing to do with the agency need.

Ms. Evans has not told you that they considered reliance, agency need, that there was any connection between these spontaneous separation by NTE date in January and what this agency actually needs.  She noticeably does not say they conducted that analysis because she knows that they didn't.

So then the question becomes -- so that's part one, what have they already done and should there be relief for them.  We think the status quo should be maintained by bringing them back because they were approved for renewal.  Then the question becomes, have we shown enough to show that there is a plan to continue these cuts.  And for all the reasons I explained previously, they rolled it out, they have not said -- the Evans declaration is very carefully worded, Your Honor, to avoid telling the Court that they're not going to implement this plan going forward.  She attaches the e-mail and doesn't say anything about it.  What she says is there's no plan to cut all the CORE.  Again, not the point.  And that ... there's another sentence here that is important.  I'll point you to it.

Apologies.  Well, sorry.  Paragraph 28:  "We're

considering nonrenewals for whom there are performance or misconduct issues."  She doesn't tell you what they're actually doing right now, Your Honor, with respect to the people whose NTE dates are coming and going.  We put that evidence before the Court.  They're holding them in limbo.  She's certainly not saying, we are careful evaluating agency need, because everyone knows the agency needs these people, and all of the evidence we've put before the Court shows that a dramatic cut that Kristi Noem intends to make at FEMA is not in this agency's interest.

So we think that there's enough before the Court right now, including Kristi Noem's 50 percent goal, and that inserting that into the advisory council report, there's enough before the Court right now to make the inference that they have not rolled back this plan, they're just waiting to see what the Court's going to do, and there's enough to show that they have indicated, taken real action to implement this going forward, and the risks are so high that this isn't just -- I'm going to use another federal agency as an example -- the processing of some sort of paperwork or permits.  Even tax returns, which are money and important to people.  But this is federal emergency management for which Congress has said this agency must have the capability to nationwide react and respond and prepare for concurrent disasters and emergencies.

We know what happens when DHS makes this kind of decision,

Hurricane Katrina and its aftermath and the number of people who died.  And that's not an overstatement.  The White House found that, that it was directly the result of DHS decision-making instead of FEMA.  That's why Congress said FEMA has to make these decisions.  There's enough here to issue an injunction to halt this incredibly ill-considered plan.  Even if they're going to adjust it and say, maybe it's not 41 percent of the CORE, maybe we only want to cut 30 percent of the CORE.  None of that is in this agency's interest, Your Honor, and DHS shouldn't be making the decisions at all.

That's what we are asking the Court to halt and stop and to maintain the status quo.  And we are happy to take discovery quickly as to what is going on to confirm, and if they can confirm they're not going to implement this plan, that's great. We would be very happy to see that.  If Ms. Evans had said that in her declaration, fine, but that's not what she said, Your Honor, and we're very, very concerned about the risk that they're imposing to this country and to my clients by not telling the Court that they are not going to do this, because that's what they've done here is the silence, again, is pretty deafening.

**THE COURT:**  All right.  Thank you.

Let me hear from the government about what you've just said, please.

**MR. BOMBARD:**  Thank you, Your Honor.

Just in response to a few of the things plaintiff said, I think it's important to just sort of step back and understand sort of the context here and what the scope of what we're really talking about.  And first and foremost is that these are, you know, as you noted, these are personnel decisions, and a limited number of them at that.  And so the CORE employees that is really the subject of this whole entire dispute is a CORE of approximately 10,166 at present moment right now, and I think some information -- I mean, you asked what year did it start, and at first the CORE began with about 300 members in 1996.  At the beginning of President Trump's first term the number of CORE employees was about 3400.  By the end of his first term it almost doubled to about 7000.  And then by the end of President Biden's term it had almost doubled again to over 11,000, I believe 300.  And so it's kind of exponentially grown over the years.  Almost doubling, as I said, just in the short span of about a decade.

And so these decisions to -- and its inherent within the way that Congress set up the CORE in the first place with the Stafford Act authority, which gives them the flexibility to plus up and also plus down these appointments.

**THE COURT:**  Gives who the flexibility?

**MR. BOMBARD:**  I'm sorry, Your Honor?

**THE COURT:**  Gives who the flexibility to plus up and plus down?

**MR. BOMBARD:** Your Honor, gives FEMA, and by extension DHS, the authority to plus up and plus down given the agency's need. And so I think that --

**THE COURT:** FEMA, and extension DHS?

**MR. BOMBARD:** DHS is the -- as the parent, you know. FEMA's being a subcomponent of the Department of Homeland Security, Your Honor.

**THE COURT:** Right.

So you're talking with the Stafford Act, which was prior to the Post-Katrina act.

**MR. BOMBARD:** That's correct, Your Honor.

But the Stafford Act basically allows FEMA to quickly appoint as is necessary under the circumstances. And so that's why these types of -- the employment relationship here is unique. They're term employees, they have these NTE dates, and by the very terms for the individuals who are involved here that have NTE dates this past January, they entered into those, you could call them contracts, in January of 2024, acknowledging that, you know, unless they're renewed, that appointment expires. It sunsets on the NTE date. And so --

**THE COURT:** By the way, the plaintiffs allege that traditionally the terms are extended.

**MR. BOMBARD:** Your Honor, that's my understanding, as well, is that that has been sort of custom, but that doesn't bind the current FEMA -- you know, the current FEMA

organization isn't -- there's no requirement, A, that Congress has set a mandatory minimum for COREs, for the numbers of CORE in any given year, and just that there's been, you know, renewals in the past, I think that the exponential growth over the last 10 years has shown that it's not just a one -- you know, plaintiffs' kind of entire theme and their entire argument is like this is just a one-way street.  It can only go -- it can only increase, and what's really before the Court is less than 200 nonrenewals out of a CORE force that still stands at 10,100 personnel strong as of this date.

**THE COURT:**  All right.  Let me ask you this, then. What I was told in the documents that were submitted is that 303 CORE employees reached the end of their contract terms in January 2026.  Of those, DHS decided not to reappoint 192, but then DHS rescinded the nonrenewals for 33.

With respect to the folks DHS didn't decide not to reappoint, were they reappointed?

**MR. BOMBARD:**  Your Honor, the current information that I have is that there was 123 renewal recommendations that were made by the SOPDA at FEMA --

**THE COURT:**  Yeah.

**MR. BOMBARD:**  -- and those were 100 percent adopted by DHS and were renewed.  So 123 out of 123 that FEMA recommended renewal of --

**THE COURT:**  So you're saying that FEMA recommended

that the SOPDA recommended axing the 303?  I mean, the 192?

**MR. BOMBARD:**  The information that I have, the most up to date -- this has kind of been a static and fluid situation getting the latest information.  The latest information I have -- and the defendants are happy to provide a supplemental declaration on these points with the latest figures.

**THE COURT:**  I would like that.

**MR. BOMBARD:**  Yes, Your Honor.  Defendants will submit that.

Of the renewals of this cohort, 123 were recommended for renewal.  All 123 were approved by DHS.  So from FEMA to DHS, all of them that were recommended for approval were approved.

For the others, there were no termin -- there were no nonrenewals that were made at the behest of or decided by DHS. And so there were some nonrenewals that were rejected by the SOPDA, and those people were not renewed, and there was also a subset of those folks who actually didn't even get up to the SOPDA level but were at more of a regional lower tier in the chain of command that were also non-recommended for renewal, and those people were not renewed.

**THE COURT:**  So you're saying that DHS approved the renewals of everybody that FEMA wanted renewed?

**MR. BOMBARD:**  Your Honor, that's the latest information I have, correct.

THE COURT: And that DHS only just approved FEMA's decision not to renew the 100' --

MR. BOMBARD: Your Honor, I'll --

THE COURT: -- '92.

MR. BOMBARD: It's unclear in the Evans declaration --

THE COURT: The Evans declaration appears to be quite different from that.

MR. BOMBARD: Correct; with -- particularly with the reference to DHS.

We will file a supplemental declaration attempting, you know, to clear that up with the latest information we have. There was some challenges given the briefing posture and the furlough and certain personnel in the CHCO offices that were difficult to reach, but the understanding that I have is that there were --

THE COURT: So you're saying there's nothing to see here. FEMA said don't reappoint some of these guys, and DHS said, fine. And FEMA said, do reappoint some of these guys, and DHS said, fine.

MR. BOMBARD: Yes, Your Honor. And it didn't even get up to -- my understanding is it didn't even get -- for the nonrenewals, it never even got up to that next level at DHS is my understanding.

THE COURT: No, I'm talking about renewals.

**MR. BOMBARD:**  Yes, Your Honor.  For the renewals, every one of the renewal recommendations that came from FEMA were approved, 123 of this 300-some-odd cohort.

**THE COURT:**  So that's different from what you said.

**MS. LEONARD:**  It's different from what Ms. Evans said, Your Honor.

Counsel is trying to testify as to facts that are directly contrary to the sworn-under-penalty-of-perjury declaration from the person running this agency.  That's what's happening right here, right now, Your Honor.  I am shocked that we're hearing this.  This is the first we have heard this.  It wasn't in their reply brief or in their oppositions brief.  All of the people at FEMA who they need to talk to have been working all along, so whatever counsel just said about people not being unavailable is completely untrue.

DHS decided not to reappoint them.  She said she transmitted the approved renewals and DHS made the decision. He is now trying to go back on the evidence that is before the Court to try to say that FEMA made these decisions.  It's pretty outrageous that we're hearing this from counsel at this moment in time.  Certainly if there is any issue here this is going to lead directly to discovery quickly, Your Honor, including of DHS and the decision-makers.  But I -- so I would say that if they really are going to put this forward and we're going to have a factual dispute with their own evidence, we are

going to ask to take immediate steps to deal with that.

But the more important thing is Your Honor should not consider this at all with respect to the record.  This is not record evidence, Your Honor.  This is counsel making representations directly contrary to his own witness' record evidence.

THE COURT:  How do you square what you said with what she said, what the SOPDA said?

MR. BOMBARD:  Your Honor, I think that we just want to give you the facts so that you have the clearest factual --

THE COURT:  Well, I'd love the facts.

MR. BOMBARD:  Yes.

THE COURT:  That'd be great.

MR. BOMBARD:  Yes.

THE COURT:  But --

MR. BOMBARD:  I think that --

THE COURT:  -- you're not a witness.

MR. BOMBARD:  Correct, Your Honor.  Which is why we will -- we're happy to provide a supplemental declaration that gives the latest information about the exact renewal process that --

THE COURT:  All right.  But what you just told me was all the recommendations from FEMA for renewal were approved.

MR. BOMBARD:  Your Honor, that's the information that I've received from this office, the CHCO office, is that that

is what happened.  Yes, Your Honor.

THE COURT:  So then everybody who was non-renewed, it was FEMA, the SOPDA who recommended nonrenewal?

MR. BOMBARD:  Only that I -- I -- only that information I have with regard to that is there is a subset that were not -- yes, that were not recommended for renewal by the SOPDA and were not, and that -- but that basically that those nonrenewals never got -- no nonrenewal decision was made at the DHS level is the information I have.

THE COURT:  At the DHS level.

MR. BOMBARD:  Correct.

MS. LEONARD:  That is extraordinary, Your Honor.

MR. BOMBARD:  That the -- that the DH -- at DHS above FEMA, that there was not the nonrenewal decision is the information that I have, but we will submit --

THE COURT:  Well, she said that the non -- that it -- she says, page 4, line 24:  "As FEMA is a component of DHS, DHS has final authority over nonrenewal decisions."

MR. BOMBARD:  That is the position, is that -- and the argument in our brief is that DHS, as the parent authority, has that authority and oversight over these kinds of decisions. That's not violating the Post-Katrina act and some of the other contrary-to-law arguments.

THE COURT:  But in fact here they didn't do that, they just embraced renewal.

**MR. BOMBARD:**  They embraced the recommendations from the SOPDA for the subset that were recommended for renewal, yes, for the 123 from January 1st of this year to January 18th of this year.

**THE COURT:**  Well, but what about -- what about the 192 that were non-renewed?  You say FEMA recommended that and DHS just said, that's great?

**MR. BOMBARD:**  The information I have is that DHS did not have a review role in that process is what the information I have is.

**THE COURT:**  So DHS is good with firing, but it's -- or its nonrenewals.  It doesn't even talk about nonrenewals. It only has to review things that are recommended renewals, is that what you're saying?

**MR. BOMBARD:**  That's just my understanding of how it played out for these three weeks in the new year.

**THE COURT:**  How does it play out in the ordinary course?

**MR. BOMBARD:**  My understanding is that I think that if the SOPDA's recommending a nonrenewal, I think that that is the -- usually the end of the inquiry, and that that CORE employee would not be renewed based on that recommendation. But I don't want to say that that's -- the DHS could have a say in that as the parent organization with the supervisory authority of the subcomponent, FEMA, but the information that I

have is that in none of those renewal -- like nonrenewal decisions, those were not made at the behest of or by DHS from January 1st to January 18th.

THE COURT:  They were made by FEMA, by the SOPDA or below at FEMA.

MR. BOMBARD:  I don't have that specific information for the who made the nonrenewals in all cases, but I just have the information that it wasn't at DHS for the nonrenewals.

MS. LEONARD:  Why did Ms. Evans give the Court incorrect information, then, if counsel -- if counsel is testifying as to these facts and running away from the, what she directly said under penalty of perjury, that DHS made these decisions, why did Ms. Evans say something directly contrary to that under penalty of perjury, Your Honor?

This is extraordinary.  They are trying to avoid depositions of people at DHS who very clearly made these decisions, Your Honor.  That's what's happening here.  And I don't think Your Honor should consider any of this in the record on this PI, because this is directly contrary to the evidence they have put before this Court.  They had all the time in the world to correct this declaration which was filed on February 19th, Your Honor.  February 19th, what is that, nearly two weeks ago?  And this is the first we're hearing of such an extraordinary difference in who made the decisions, when we are making an argument that DHS has removed authority?

Exhibit A of the Jackson declaration:  "FEMA's authority to extend CORE appointments ended on December 31st, 2025," and now, and now counsel is saying that, no, sorry, FEMA actually did make those decisions.

This is extraordinary, Your Honor.

THE COURT:  Well, and paragraph 25 of Ms. -- of the SOPDA's declaration says:  "During January 2026, 303 CORE employees reached the end of their terms of employment. Pursuant to its lawful authority, DHS decided not to reappoint 192 of them.  However, DHS rescinded nonrenewals for 33 of those."

So you're saying that's just incorrect.  That it was FEMA, not DHS.

MR. BOMBARD:  I -- Your Honor, I think that that could -- I mean, I don't know if it's maybe speaking writ large in terms of DHS overseeing FEMA.

THE COURT:  Well, she's certainly not doing that.  I mean, the whole case is about that, right?

MR. BOMBARD:  Right.

THE COURT:  Surely she wouldn't make that mistake.

MR. BOMBARD:  Your Honor, I don't have a great explanation for that.  I just, we will file a supplementary declaration that explains the information we received from the human capital office with --

THE COURT:  All right.  And one other thing, put in

that declaration something else, which is why we have a SOPDA instead of an administrator from FEMA.

MS. LEONARD:  Who is -- who is this information coming from, Your Honor?

THE COURT:  Who is this information coming from?

MR. BOMBARD:  The chief human --

THE COURT:  CHCO?

MR. BOMBARD:  Yeah, the CHCO office.

MS. LEONARD:  Of FEMA or DHS?

MR. BOMBARD:  Of both.

MS. LEONARD:  They are not the people making the decisions here, Your Honor.  That is quite clear.

This is really problematic if they're going to put these people up to testify directly contrary to the SOPDA's testimony.  They are pressuring those people to submit declarations with false information.  That is what's happening here, Your Honor, and there should be severe consequences for this.

Let me just point out another fact that is before the Court, which is, I mean, if this new story is that somehow FEMA wanted not to renew these people, we can take that on, too, but the FEMA supervisors recommended renewal.  How do we know that?  Our declarations from the people who were separated were told that.  We've got the Young declaration, the Blanton declaration, and they know that they were put up and have seen

the papers recommending renewal.

So they're now saying, I guess, that the FEMA CHCO overruled the direct line supervisors' recommendations for renewal, or Ms. Evans, the person acting under authority previously assigned to FEMA, but at the direct -- she's a good soldier, Your Honor. She's working for Kristi Noem, she's appointed by Kristi Noem, she reports to Kristi Noem, she does what Kristi Noem says. So this is a political appointee --

**THE COURT:** Maybe what we should do is just have depositions of all these folks before any further declarations are filed.

**MS. LEONARD:** And we'd like some documents, too, Your Honor, if we're going to do that. But we were --

**THE COURT:** Because this says: "The FEMA official who requests to renew a CORE is called a supervisor of record." So that's who you say your folks talked to when they were told they were going to be reappointed; is that correct?

**MS. LEONARD:** Yes. They certainly -- the supervisors were shocked by this, Your Honor.

**THE COURT:** And then supervisors of record request to renew. So assuming that your folks were correct, their renewal recommendations were sent to SOPDA for review and approval.

**MS. LEONARD:** The Blanton declaration, paragraph 11: "In November 2025, my supervisor submitted the paperwork justifying the renewal of my position to upper management. I

learned this from my supervisor in January '26, 2026."

This is revisionist history of a extraordinary level by counsel, Your Honor, and I think they should think pretty hard before making these factual representations to the Court.

They also intentionally did not give us this information before the hearing, Your Honor. I think Your Honor's aware that we submitted a supplemental declaration last week, one day after because of someone who was tied up with the storm, and they indicated that they potentially wanted to provide additional information then, and we said that it -- why didn't you provide this before. They -- they -- shifting sands of explanations saying it's because people were tied up, and then they never submitted it, Your Honor, and now they never submitted it under penalty of perjury, and now counsel is trying to change the facts before this Court.

**MR. BOMBARD:** Your Honor, if I may.

Plaintiffs opposed that when we reached out before, and the only reason why this was brought up is in response to statements and questions and providing what I have, which is -- this is not a static situation, and these -- this is relevant information that I --

**THE COURT:** Well --

**MR. BOMBARD:** We will --

**THE COURT:** -- the things that she's describing in her declaration under penalty of perjury, those are allegedly

just things that happened.  So they're static; they happened.  And what she said happened is completely different from what you say happened.  So those are -- they were static things; they're not evolving.  They happened or they didn't.

MR. BOMBARD:  Yeah, we -- Your Honor, we wanted to just provide the latest information with respect to the, you know, what happened with these 303, and we will, at your leave, provide that supplemental declaration.

THE COURT:  Well, I think what we should do is get a transcript of this hearing, and then I think we should have -- I think you folks should do some discovery to figure out who's right or what did happen, which is going to be a challenge, but ...

MS. LEONARD:  I think we have an idea of how to do that, Your Honor.  I would ask -- this is a pretty extraordinary development.  I would ask could we take a short break so I can consult with my team and then make a proposal for how to proceed?

THE COURT:  Sure.  You want to take a 15-minute recess?

MS. LEONARD:  That would be terrific.

THE COURT:  All right.  So Mr. Franklin, we'll take a 15-minute recess.

That's our court reporter.

All right.  Thank you.

**MS. LEONARD:**  Thank you, Your Honor.

**THE COURT:**  (To Mr. Bombard) You check with your folks, too.

(A recess was taken from 11:57 p.m. to 12:19 p.m.)

**THE COURT:**  You may be seated.

So does anyone have any recommendations for me?

**MS. LEONARD:**  We do, Your Honor.

So one of the difficulties here just to be totally frank, is that what we're dealing with is a record that was established on our PI motion and then counsel for the defendants attempting to controvert the evidence and admissions -- admissions; they are sworn admissions of their own witness -- in order to disrupt our ability to obtain that PI.  And plaintiffs' position, and we'd be happy to continue the argument, is that the PI is warranted on the record before the Court and that this attempt to disrupt the record and the proceedings with testimony by counsel shouldn't be permitted to delay the issuance of that PI, recognizing that if the Court disagrees we are prepared and ready to immediately go into expedited discovery.  But I just wanted to make very clear, taking a step back, that the record is what it is before the Court, and as I was arguing as adamantly as I could earlier, that based on the record before the Court, the people who have been separated and non-renewed according to their own witness testimony were approved by FEMA.

That is arbitrary and capricious. It's a Section 120 violation, Your Honor, also. We haven't even gotten to 120, but this is a Second 120 violation. It is an elimination of a position of a temporary employee covered by that act through February 13th. Anyone that they separated before that violated what Congress just directed. They did not want any positions reduced across the federal government during that timeframe, and that's what they did.

Their argument under 120 is not very good, that this is not the equivalent of a reduction in force. It is. So there's a 120 violation here, too.

We have shown that there is, as my colleague is prepared to talk about, we've showed that they've already impacted mandatory statutory functions with these -- the eliminations of these positions, and there is absolutely irreparable harm to these people who are losing their healthcare coverage because of the actions of DHS, which are unlawful under the Post-Katrina act.

So for the people who have already been affected, the status quo is renewal, and we would ask the Court to enter the injunction renewing them for the actions going forward. We think the evidence, the evidentiary record is sufficient that DHS is calling the shots, that's what they've said. That's a Post-Katrina act violation. That the plan to cut further CORE is imminent and real and very concerning. It causes all of the

effects that we've talked about.

We are happy to get into the other issues if the Court wants to hear argument on that as to scope of injunction, et cetera, et cetera, but we are asking the Court -- we don't want -- we're in a difficult position of having the injunction delayed because of what counsel has attempted to do here, Your Honor, and we think the record should stand before the Court.

Now, having said all of that, we are ready to go on discovery if that -- we could also ask for the Court to enter an injunction, and if discovery shows that it should be modified because counsel is right, which I don't think he is, then they can move for modification.  But we are ready to go for discovery if that's the direction the Court wants us to go in, holding this open, this motion for preliminary injunction open.

The discovery we would need, Your Honor, would be at a minimum document discovery pertaining to these renewals.  We'd be -- we'd write up the specific and targeted requests.  We could issue them today.  We would ask for those documents to be given within a week, communications about those renewals between DHS, within DHS, within FEMA.  The, you know, any communications about the first question that Your Honor had about the target reductions, as well.

The individuals, from what we understand from what counsel has represented, would need to include at least Karen Evans,

Kristi Noem and the CHCOs of FEMA and DHS, and we would be prepared to do those depositions very quickly, Your Honor.

And we would also ask, because counsel was not able to tell the Court exactly who was giving him this information, for, within two days, a under-penalty-of-perjury declaration identifying the individuals supposedly involved in these decisions with respect to the renewal of the CORE, and we'd reserve the right to depose additional individuals identified on that list.

THE COURT:  Have you spoken with --

MR. BOMBARD:  We have not.

THE COURT:  -- counsel about this?

Mr. Bombard, what say you?

MR. BOMBARD:  First I just want to state for the record that there is no basis for the assertion that Ms. Evans has perjured herself based on what plaintiffs have said. Government's position would be that to do a supplemental declaration as we stated to the Court at the outsit when there were statements being made by plaintiffs and we wanted to make sure that you had the most up to date information about what was really going on with these CORE appointments --

THE COURT:  Well, and as I responded to you then, the declaration talks about things that happened in January.  So there was no -- it was not an ongoing moving target thing.

MR. BOMBARD:  That is correct.  There has been a

lapse of time, readily acknowledge that.  The information was late coming to the government, and that's why we wanted to present it to you, so you had the full record when deciding this preliminary injunction.

If I may address some of the other arguments about the preliminary injunction.  I don't -- you know, I think that --

THE COURT:  I want to hear about what you think about what she just recommended to me.

MR. BOMBARD:  Our position would be to submit a declaration from the FEMA OCHCO that sets out --

THE COURT:  OCHCO?

MR. BOMBARD:  Office of the Human Capital Officer.

THE COURT:  Oh, that's the CHCO thing.

MR. BOMBARD:  Yes, Your Honor.

THE COURT:  Okay.

MR. BOMBARD:  For FEMA.

I think that that would be a good first step and so that plaintiffs can review that and then determine what, if anything, is necessary.

THE COURT:  Well, actually the first step is in the binder in front of me.  That would be a second or a third step.

MR. BOMBARD:  Yes, Your Honor.

So that would be the government's position would be a supplemental declaration with --

THE COURT:  All right.  So I understand that, then.

So did you want to argue about the preliminary injunction?

MR. BOMBARD: Yes, Your Honor.

THE COURT: All right.

MR. BOMBARD: So we got very much into the weeds on the mechanics of what was going on in these three weeks, but again, I want to zoom out.

Our position is that this Court doesn't have jurisdiction because these kinds of personnel decisions and personnel claims are expressly precluded.

THE COURT: I read that in your papers, and I think we'll submit that on the papers.

MR. BOMBARD: Yes, Your Honor.

And that that forecloses just, you know, obviously the jurisdiction, but even when it comes to standing, there's no redressability because the redress of these -- you know, that even the unions are seeking would be in the form of basically trying to reinstate these term appointments and to renewing them for an unspecified, you know, period of time. And so that's not the kind of equitable relief that this Court can grant.

And for those reasons this is the kind of, you know, personnel decisions, the flexibility of these positions grants FEMA the ability to size up, size down. They excluded them from Title 5 Civil Service protections, and that there's no -- you know, for some of these there could be folks who have

appointments that are longer than the two years, and perhaps they would have an ability to go into the merit systems protection board for that limited subset. For the other ones, their claims are, again, precluded.

THE COURT: Yeah, so you're saying that it would be better that they be consigned to a system that they are not entitled to take advantage of.

MR. BOMBARD: I'm sorry. I don't understand the --

THE COURT: I mean, if I say you're right, they go to the merit systems protection board. They can't go there.

MR. BOMBARD: No, that's correct, Your Honor. That is -- that is -- and there's cases that we cite in our brief that stand for, you know, there's the adverse actions and certain claims that fall below that threshold doesn't mean that the comprehensive scheme doesn't preclude them and sweep those claims away. It just means that, you know, the remedy isn't like the final point for the CSRA. It's a comprehensive scheme for all federal -- the federal employment relationship.

And what they're really asking is to grant these non-renewed CORE employees and give them their jobs back. And so despite -- they want to talk about these directives. They make a big deal out of the December 23rd e-mail and cite that that is, you know, somehow evidence of like a 50 percent plan to reduce FEMA or 41 percent cuts to that. That perhaps wasn't addressed as specifically --

THE COURT: All right. Well, let's talk about that.

MR. BOMBARD: Sure.

THE COURT: Do you have the attachment to the e-mail?

MR. BOMBARD: I have the e-mail. I don't --

THE COURT: I have the e-mail, too. I don't have the attachment to the e-mail.

MR. BOMBARD: I can absolutely get the attachment to the e-mail.

THE COURT: All right. Thank you.

MR. BOMBARD: Yes, Your Honor.

But the e-mail speaks for itself, and in bold-faced font it explains that this is a planning exercise, doesn't have any legal effect. But that's one of the foundational underpinnings of their entire motion for PI or for a TRO that's converted to a PI. And then the other ones, Your Honor, as you pointed out, are speculation based on media reports about such and such a plan is afoot or this might happen, but it's all speculation. And there is no plan, so there's nothing, there's no directive to enjoin.

THE COURT: There is no plan, is that what you're saying?

MR. BOMBARD: There is no plan at this time for these kinds of cuts. There is no plan to my knowledge that there's -- that exists.

THE COURT: No plan that exists to cut by --

**MR. BOMBARD:**  Fifty percent or 41 percent.

**THE COURT:**  -- 41 percent?

**MR. BOMBARD:**  That is my understanding.

**THE COURT:**  And how did you get that understanding?

**MR. BOMBARD:**  Discussions with agency counsel in preparation for the hearing.

And, you know, obviously it's not to say that agencies across the government don't look at their manning requirements and they don't look at their proper size and where perhaps they're overstaffed or perhaps they're understaffed.  It's not to say that planning can't exist, but as far as the concrete fears that are forming the basis for the plaintiffs' action here, there is no substantive agency plan that's in place at this time that I'm aware of.

And so ultimately what's really being requested by the plaintiffs is just the reinstatement of these term appointments, and these contracts -- not contracts, but these appointments naturally expired, and the terms of those agreements that the CORE employees enter with FEMA explicitly state that, and they're required to sign it and acknowledge that that they may not be renewed.

And so just once again, if you take away all the other concerns about statements by the Secretary or by, you know, other media reports, there's just really nothing here but a limited number of people who are wanting to get a temporary job

back with FEMA, and it's not to undermine or to downplay the concerns of those public servants have with not having their positions renewed, but that ultimately sounds in personnel law. It's exactly the kind of thing that Congress enacted with the CSRA.  It's not like some of the earlier phases of this case which were much more widespread across dozens of federal agencies with RIFs.

And furthermore, on the continuing resolution arguments that plaintiffs make with CR Section 120, that actually makes very clear that Congress was focused on RIFs.  And the language, you know, a RIF is a very precise term, and even within the same Code of Federal Regulations that defines what a RIF is, there's also the same definition for these kinds of term appointments, and they're not the same thing.  And that was what Congress was attempting to address during that time this fall of 2025 was, you know, the government or a federal agency going in and downsizing a particular employee or a particular position.

These NTE dates were all determined two years, almost two years before in January of 2024.  They're not a downsize, they're just the natural, they're just a natural termination of that, and so they can't be characterized as a RIF.

In Section 120 they do make note that it could be for temporary employees, and that's true.  But again, it's talking about a RIF.  It would be like as if the COREs who had an NTE

date in January of 2027.  You know, that would be maybe a closer argument to what plaintiffs are trying to make as sort of akin to a RIF, but that, their interpretation of 120 doesn't apply to just the natural expiration on the terms that were entered into by the parties.

And then just some other highlights about this is plaintiffs really I think exaggerate and overstate sort of the like autonomy and independence of FEMA.  FEMA is not independent.  FEMA is within the Department of Homeland Security, and it reports to the Secretary of Homeland Security, who has, you know, the usual control over all subcomponents and subagencies.  It is true that in the wake of the disastrous, you know, consequences and devastation of Hurricane Katrina Congress sought to reform some of those things, but those reforms are so far afield from what they're trying to make out here with, you know, less than 200 CORE nonrenewals.  The reforms there were really trying to say -- to protect FEMA's, you know, emergency management mission and to make sure that it couldn't be scattered or dissolved or abolished or any things like that, and everything that's going on here that's at issue is really just like an HR personnel decision about a subset of employees who, as we stated, has seen a really significant increase in the personnel, and they're just taking a look. There's a new administration.  They just have, they're taking a different assessment and looking and seeing where they --

whether or not they need this exact amount of COREs.  The Stafford Act gives them that same flexibility.  Congress has never mandated that they have a certain baseline number for that.

THE COURT:  The Stafford Act gives who that kind of ability?

MR. BOMBARD:  FEMA, Your Honor, FEMA.  Or actually it says the agency, and I suppose that would include DHS, as well.  So the -- it says the agency --

THE COURT:  The agency is FEMA in the Stafford Act.  I mean, in the Katrina act.

MR. BOMBARD:  The Katrina act is focused on, yes, FEMA's -- their arguments on the Katrina act are mistaking, you know, functions, missions, you know, just sort of the emergency response mission.

THE COURT:  Capability.

MR. BOMBARD:  Capabilities.

But here again, just a mere 10 years ago the CORE had 3600 members.  The types of natural disasters and so forth I don't think anybody can say have changed that much over the span of 10 years necessarily.  These things are also dependent only presidential declarations of disasters, and those also vary with the thresholds that a president may determine to set or for different things like that, so --

THE COURT:  Disasters change depending on who the

president is?

MR. BOMBARD: Well, I -- the -- there are certain criteria, I mean, when -- and there can be different, you know, different determinations made whether or not a certain event is significant enough to warrant a presidential declaration of a disaster.

And so, you know, all that is to say is that what was okay with 2015 with, you know, 3500 COREs, plaintiffs' argument now is saying that going from 11,000-some-odd down to, you know, 10,100 now, you know, substantially or significantly reduces the functions and capacities of FEMA, and I don't believe they've put forth any persuasive evidence to show that. The declarations are very much limited to these -- it's very speculative, and there's not any -- you know, it takes -- it's quite the causal chain of inferences to suggest that these kinds of decisions would have the kind of impacts that they forecast.

THE COURT: Well, the complaint anyway, and you'll -- you said you'd get me the attachment to that e-mail, so then maybe I can see it -- says that the target cuts are 41 percent.

MR. BOMBARD: For the planning exercise e-mail, Your Honor?

THE COURT: Yes.

MR. BOMBARD: That's correct. I mean, the e-mail speaks for itself. It says that in the planning e-mail, but

again, it doesn't have any legal effect.  It was a drill or an exercise to get them to think about different things.  I don't think that we can make the leap that that is the plan, that is what's happened.  There has been, again, to my knowledge, no official plan, and --

THE COURT:  Are they still planning to cut 41 percent or 50 percent?

MR. BOMBARD:  I'm not aware of -- I'm not aware of what the planning, if any, is going on at FEMA.  I just know --

THE COURT:  You just don't know.

MR. BOMBARD:  Your Honor, I don't.  I don't know.

THE COURT:  But the idea to non-renew everybody in January was a start, right?

MR. BOMBARD:  I think that we, as we explain in our brief, was -- there was, you know, the presidential hiring freeze in the beginning of 2025, and --

THE COURT:  Yeah, consistent with all the executive orders saying cut everything to the bone.

MR. BOMBARD:  Yes, Your Honor.

And I think for DHS context, for like mission critical areas there was sort of a thaw on that, which was allowing them to reappoint COREs for mission critical areas for 180 days, non-mission critical for a smaller period of time, and so on.  And then that expired on -- at the end of 2025.  And so that web page that they cite is really, it, like, looks worse maybe

than it is in terms of it's just the expiration of that authority.  And so that was sort of the grant where FEMA was, or DHS was allowing FEMA to give these renewal extensions during that time, and then --

**THE COURT:**  DHS was allowing FEMA to do that --

**MR. BOMBARD:**  Yes, that's my understanding --

**THE COURT:**  -- in that time?

**MR. BOMBARD:**  Your Honor, yes.

**THE COURT:**  But DHS was not going to allow that after that time?

**MR. BOMBARD:**  The -- that's correct.  The -- post January they've made some changes to that process, Your Honor.

**THE COURT:**  And "they" is FEMA?  "They" is DHS?

**MR. BOMBARD:**  I believe in conjunction with, you know, FEMA, they have worked out sort of this new process going forward for renewing the review process for COREs.

**THE COURT:**  And what is that now?

**MR. BOMBARD:**  I think, Your Honor, it would be best to have somebody declare to that in a supplemental declaration.

**THE COURT:**  You don't know, or do you know?

**MR. BOMBARD:**  I don't know the intricacies of it.  I want to be cautious on the exact process, but generally speaking it's outlined in Ms. Evans' declaration.

**THE COURT:**  Okay.  Well, generally speaking, then, she says that first the approvals go to -- through supervisors

and then up to her, and then if she approves it she sends that off to DHS.  And as I think you said earlier, if it's not approved, those things kinda just drop by the wayside.  The things she needs to get approved at DHS is nonrenewals -- is approvals, I'm sorry, to renew.  Correct?

MR. BOMBARD:  That's my understanding, Your Honor.

THE COURT:  So that means DHS is in charge of everybody who gets renewed.

MR. BOMBARD:  That would -- that's correct, Your Honor.  It's my understanding for the COREs that they have --

THE COURT:  And you think that's consistent with the Post-Katrina act?

MR. BOMBARD:  Your Honor, I do.  I think the Post-Katrina act, again, is really concerned with, you know, limiting their functions, limiting their --

THE COURT:  Well, if they don't have any people to do things, then the functions won't get done, right?

MR. BOMBARD:  Your Honor, that's correct.  And which is why I think it's a strong point in our favor to point out that just 10 years ago they had 3500.

THE COURT:  When did Katrina happen?

MR. BOMBARD:  Katrina was I believe 2005, Your Honor.  And so 10 -- you know, so that's 10 years after Katrina they were at 3500.  After the end of the Biden administration they were above 11,000, almost doubling since after the first Trump

administration.

THE COURT:  Well, things actually have -- there have been more natural disasters occurring, too, what, with global warning and all of that.

MR. BOMBARD:  And again, I just think our position is just that in this space it's, things are exigent, they need to be agile, FEMA needs to be able to -- but it's not just a one-way street.  It's not only ratcheting up, and it's not only CORE can just go only in one direction necessarily.  We think it's appropriate and there's no contrary law that we're aware of that says that they can't decide that perhaps CORE appointees are not necessary to meet the mission in a particular domain, or perhaps there are reasons why, based on perhaps it could be performance issues, it could be even misconduct, that they just decline to renew.

And again, it's -- you know, these are -- these are meant to give them the flexibility they need to do a very challenging and important mission, and so that's why they're outside of the Title 5 strictures, and that's why we don't think that they -- you know, the language in the CERMA is, you know, the "significantly or substantially reduce," and at this -- on this record plaintiffs cannot show sufficient evidence to support an injunction, which would effectively -- which would effectively be tantamount to converting these people into almost de facto permanent employees, to basically say, FEMA, you're capped at,

you know, the last admin -- you know, or whatever this number we think is sound based on declarations from former employees of the last administration at FEMA who liked the way that they had managed their personnel. That would be, I think, a bridge too far, and I think FEMA should have the ability to gauge with its own people, with its own priorities, with its own agenda to fulfill its mission. In Ms. Evans' declaration she states that that is her responsibility to the American public and the American people, and I think that everybody at FEMA takes that very, very seriously. But there are some times I think, disagreements, you know, and it's not just a one-way street when it comes to automatic blanket renewals no matter what.

THE COURT: Well, she has all those responsibilities, you say, and she respects them, but then she recommends renewals to DHS, and it can say yay or nay.

MR. BOMBARD: And Your Honor, I think that that is just classic, you know, Article II Executive Branch chain of command hierarchy. I mean, the ...

THE COURT: Well, didn't the Post-Katrina act alter garden variety agency chain of command? Wasn't that the point?

MR. BOMBARD: I don't think that was the point, Your Honor. I don't believe it was altering chain of command.

If Congress want to make FEMA a totally independent agency with, you know, its own cabinet level they could have done that and taken it out of the chain of command. It remains a

subcomponent, and it still has the same reporting duties from the FEMA administrator, when there is one, or the senior officer performing the duties of his administrator.  They report to the Secretary of Homeland Security, and that's just a -- that is just a normal -- that is a normal Article II chain of command principle, and I don't think there's anything that offends withholding, you know, something like this.

It would be different if perhaps DHS like completely eliminated, you know, some -- completely took out the entire, you know, some sort of entire program of some kind.  You know, then that might get more into that territory where we're asking whether or not they are eliminating function and trespassing on what Congress was trying to protect FEMA from after Katrina, but they're just a parent agency seeking to have a little bit more supervision on the renewals for the agency, and I don't think Post-Katrina act, I don't think any law says that that's improper or unconstitutional.

So in general, again, plaintiffs' motion here is really, you know, it is a lot to work through, as you stated at the outset.  There's quite a lot in there.  There's quite a voluminous number of declarations and briefing on this.  There is a lot going on.  But at the end of the day they're really seeking, you know, redress for employee/employer personnel actions, and those sound squarely within the CSRA, and those claims are precluded from the district court, and it matters

not that certain COREs may not be entitled to MSPV review and followed by Article III judicial review at the Federal Circuit.

Congress wanted to get rid of this patchwork scheme that had been a problem for a hundred years when they passed the CSRA, and so when you have something like we have today, when it's just a clearcut employment issue, these people hoped to have another renewal of their CORE terms, it didn't happen, they're seeking a remedy which is getting their appointment back for however long, that's CSRA, that's preclusion, and so this Court lacks jurisdiction.

And all the arguments that plaintiffs try to make on the merits, again, they're trying to say that an e-mail that explicitly states that it's nothing but a planning exercise, that there is no legal effect to take -- to take -- no legal effect of this e-mail, and that, you know, various newspaper articles from the Washington Post or CNN talking about rumors in Washington, D.C., that's not enough.  They can't meet their burden on that either.  So there wouldn't be anything to enjoin in that regard because we'd be -- we're talking about a planning e-mail and then unsubstantiated reports about speculating what FEMA or DHS may or may not do at some point down the road in the future.

**THE COURT:**  And you say FEMA has no plans to cut 41 percent or 50 percent of the CORE employees at this time?

**MR. BOMBARD:**  I think the claim is -- the plaintiffs'

claim is there is a plan to reduce FEMA by 50 percent, which I think would be reducing like the Title 5 permanent civil service people is what I think they're arguing, and then 41 percent of the COREs, there is no plan that I'm aware of for that.

THE COURT:  Okay.  Do you know, by the way, the 33 people whose nonrenewals were rescinded, were they -- a rescinded nonrenewal is like a renewal.  Were they renewed for a full term?

MR. BOMBARD:  I believe, based on my understanding, and we will address these questions in the supplemental declaration, my understanding is that for the renewals now, I'll just say this.  I don't know about these 33, but I believe that renewals for COREs are 90 days.

THE COURT:  Renewal is what?

MR. BOMBARD:  The renewal periods for COREs are for 90 days is my understanding.

THE COURT:  As of now they're all 90 days?

MR. BOMBARD:  Yes, Your Honor.

THE COURT:  Didn't it used to be they'd be renewed for a full term?

MR. BOMBARD:  That's correct, Your Honor.

THE COURT:  But now they only renew for 90 days across the board?

MR. BOMBARD:  Your Honor, that is my understanding.

I don't know whether that applies to the 33, but we can address that in supplemental declaration.

THE COURT:  All right.  Thank you.

MR. BOMBARD:  Thank you, Your Honor.

THE COURT:  I don't mean to preclude Ms. Eshleman from arguing, although I will say that right now I'm concerned more about the merits.

MS. LEONARD:  Understood, Your Honor.  And I don't mean to preclude her from arguing either, but I want to get to these other points.

My first point I was going to make is who made the 90-day decision, Your Honor?  DHS, not FEMA.  And our understanding and the evidence --

THE COURT:  We know that because?

MS. LEONARD:  Because DHS is making the decisions.

And as Mr. -- as my opposing counsel admitted, DHS removed FEMA's ability as of December 31st, 2025, to make extensions. He talked all about the hiring freeze and the 180 days, which they've admitted was a DHS decision previously, saying you can't renew for more than 180 days.  And their whole explanation of that statement on the FEMA OCHCO website, that the authority to renew is -- has ended, is that they were just taking away the hundred~-- the authority to renew for 180 days. DHS made that decision.  DHS is making the decision about the 90 days.  DHS is making all of these decisions, Your Honor.

The idea that -- and I believe counsel admitted that DHS has removed FEMA's authority.  Authority is part of the Post-Katrina act, Your Honor.  It is not just functions.  The language in 316(c)(1) includes a reduction in authorities, and we have conclusive proof that DHS has reduced FEMA's authority.  It is FEMA's authority over their own personnel that has been taken away by DHS.  That is not the normal chain of command, but even if it were, Your Honor -- because FEMA employs these people, not DHS.  Even if it were, Your Honor, they're ignoring 6 U.S.C. 315, which is the immediately preceding statute, to -- it's part of the Post-Katrina act.  That's the one that transferred the functions back from DHS to FEMA, including personnel.  DHS and the Secretary of DHS do not have these authorities.  They are taking them away from FEMA.  That, in and of itself, is a violation without even getting into whether they have substantially reduced the functions.

I believe Ms. Eshleman is prepared to tell you why they have even with the ones that we've seen already, but certainly with the ones that they were planning and are planning to continue with.  But they're ignoring the word "authorities" in that statute, and that is incredibly significant.  It's the combination of 316, 315 that really proves it, Your Honor.

Also, I think if there's any question as to what Congress meant and how broad the Post-Katrina act really is supposed to be -- authorities, functions, missions -- all of those

preceding statutes talk about what those things are, the transfer of functions back from DHS to FEMA.  The missions, those are set forth in 313, 314.  So you take it all of a piece, it's very, very clear that it goes so far beyond what counsel and the government are trying to argue here in terms of what the Post-Katrina act is supposed to do.  They really wanted DHS to keep its hands off of FEMA's decision-making, and that is a violation already, and it's ongoing, and counsel has admitted it's ongoing.  If DHS is making decisions to renew for 90 days and telling FEMA it can only renew for 90 days, that destabilizes everything at FEMA and among the local governments that rely on them.  Ninety days from January is, well, April, I think.  That's not very far.  So are we going to go through this all again?  They should not -- they don't have the authority.  That's why we have asked in the preliminary injunction for DHS to stay out of it.

And it's not true that we've asked this Court to prohibit FEMA from making proper individualized decisions about particular employees if there is actually a basis.  Our proposed order for the preliminary injunction includes the carve-out for FEMA, without the involvement of DHS, to make decisions based for individual employees based on performance, and, you know, if there were a bona fide reason for the agency to do that, they could explain that to the employee when they don't renew them.

Agencies have to state reasons for their actions. The nonrenewal letters that the employees got, we gave you examples, don't give any reasons. It's just based on NTE date so far. And if they are going to not renew anyone going forward, if FEMA is truly going to be able to do that, they should give the employee the reasons, Your Honor. That should be part of what they have to put in that letter. If they say it's really based on agency need, they need to give the reasons.

But otherwise, we think there is more than enough in the record to show a Post-Katrina act violation for sure, Section 120. This is how you eliminate temporary positions.

And they were not only concerned, Congress was not only concerned with reductions in force under Title 5. That's quite clear. They said, or any other similar elimination of positions. That's what this is. That is what Secretary Noem is trying to do in her work. She said it over, and over, and over again last year, we want to reduce this workforce. We want to push these responsibilities onto the state and local governments.

The hiring freeze, Your Honor, by the way, that explanation of that language that they've come up with, the hiring freeze did not apply to temporary Title 42 positions like the CORE. It's in the OMB memorandum that we gave Your Honor. That makes absolutely no since. The hiring freeze did

not apply to these positions.  They are existing employees at the time.  The president was saying don't hire any new employees, and they excluded existing employees, including these temporary people.

I want to clarify one important point that I believe counsel started with.  We are not saying that Karen Evans has perjured herself.  Oh, quite the opposite, Your Honor.  I think Karen Evans told the truth when she said that DHS is making these decisions.  I think that counsel is giving incorrect information to the Court here today, and we're very concerned about what's going to be in the declaration that they're going to submit and whether it's going to conflict with the sworn testimony that Ms. Evans has already given.  But we're not saying that Ms. Evans has perjured herself.  We think she actually told the Court the truth, and they've realized that it support -- what she said actually supports the fact that they're violating the law.

Channeling.  I don't think we've -- I think Your Honor has said we've been down that road before.

These are Stafford Act.  The other additional thing that I would say, Your Honor, is that these are Stafford Act.

I don't know if we want to add to the record, it's one of the AUSAs who has come to the courtroom for the defendants.

These are Stafford Act employees.  They're not even CSRA.

There's a decision from the Ninth Circuit that just came

out last Thursday from Judge Bress, Bumatay and Owens on the CBA executive order holding no channeling when things are outside the statute I think directly applies here.  We're happy to provide it as supplemental authority if the Court doesn't have it.

**THE COURT:**  I have it.

**MS. LEONARD:**  Okay.  Thank you.

And with that I'm not going -- I don't think I need -- unless the Court has any other questions ... does the Court want to hear about the interference with the statutory functions, or should we hold that for the merits of that, or should we hold that for another time?

**THE COURT:**  I think we should hold that for another time.  We've been going quite a while here.

So I think the entire matter will be submitted.  You'll hear from me.  I'm not at this -- right this moment I am not requesting further briefing on anything, but I shall let you know, briefing, or declarations, or evidence or anything, except what you've promised me, which is you promised to get me the spreadsheet that was attached to the e-mail, and other than that, I will let you know.

So thank you very much.  We're in recess.

(Proceedings concluded at 1:00 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Wednesday, March 4, 2026

Stephen W. Franklin, RMR, CRR
Official Reporter, U.S. District Court