# Exhibit 2

Excerpts of Karen Evans Deposition Transcript (March 31, 2026)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--------------------------------x
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, et al.,

     Plaintiffs,

                           Case No.

  vs.

                       3:25-cv-03698-SI

DONALD J. TRUMP, in his official
capacity as President of the
United States, et al.,

     Defendants.
--------------------------------x

CONFIDENTIAL

PURSUANT TO THE PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF

KAREN STREHLE EVANS

Tuesday, March 31, 2026

Reported By:  SUSAN ASHE, CER

Job No.:  11973

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect,com

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 2

Tuesday, March 31, 2026

8:59 a.m. Eastern Daylight Time

Videotaped deposition of KAREN STREHLE EVANS, taken on behalf of the Plaintiffs, beginning at 8:59 a.m., on Tuesday, March~31, 2026, at the offices of Democracy Forward Foundation, 1445 New York Avenue, Northwest, Washington, D.C., before Susan Ashe, Certified Electronic Reporter and a Notary Public of the District of Columbia.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 3

APPEARANCE OF COUNSEL:

On behalf of All Union and Non-Profit

Organization Plaintiffs

ALTSHULER BERZON LLP

BY:  DANIELLE E. LEONARD, ESQ.

BY:  ELIZABETH ESHLEMAN, ESQ.

177 Post Street, Suite 300

San Francisco, California  94108

(415) 421-7151

dleonard@altshulerberzon.com

eeshleman@altshulerberzon.com


On behalf of All Union and Non-Profit

Organization Plaintiffs (except NRDC) and for

Plaintiffs City of Chicago, IL; Martin Luther,

Jr. County, WA; Harris County, TX; and City of

Baltimore, MD

DEMOCRACY FORWARD FOUNDATION

BY:  TSUKI HOSHIJIMA (pro hac vice)

Senior Counsel

P.O. Box 34553

Washington, D.C.  20043

(202) 448-9090

thoshijima@democracyforward.org

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 4

APPEARANCE OF COUNSEL (Continued):

On behalf of the Defendants and the Witness

UNITED STATES DEPARTMENT OF JUSTICE

BY:  MARIANNE F. KIES

BY:  JEREMY NEWMAN

BY:  CHRISTOPHER R. HALL

Trial Attorneys

Civil Division, Federal Programs

Branch

1101 L Street, Northwest

Washington, D.C.  20005

(202) 305-0693

marianne.f.kies@usdoj.gov

jeremy.s.newman@usdoj.gov

christopher.r.hall@usdoj.gov

-  and  -

FEDERAL EMERGENCY MANAGEMENT AGENCY

BY:  KEVIN YUSMAN

BY:  ASHLEY DARBO

BY:  JAMES EVANS, Chief Counsel

500 C Street, Southwest

Suite 840

Washington, D.C.  20472

kevin.yusman@fema.dhs.gov

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 5

APPEARANCE OF COUNSEL (Continued):

On behalf of the Defendants and the Witness

(Continued)

DEPARTMENT OF HOMELAND SECURITY

BY:  MATTHEW FLEISCHMAN

2700 Martin Luther King, Jr., Southeast

Washington, D.C.  20032

matthew.fleischman@hq.dhs.gov


On behalf of the Witness in Her Personal

Capacity

BINNALL LAW GROUP

BY:  JASON GREAVES, ESQ.

717 King Street, Suite 200

Alexandria, Virginia  22314

(703) 888-1943

jason@binnall.com

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 6

ALSO PRESENT:

          Jessica Levy, Esq.

          Altshuler Berzon LLP


          Olivia King, Legal Assistant

          Democracy Forward Foundation


          Sana Sinha, Legal Assistant

          Democracy Defenders Fund


          Jonathan Perry, Videographer

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 17

A.   Martinsburg, West Virginia.

Q.   And are you currently employed?

A.   Yes.

Q.   And what is your position?

A.   My position of record is the chief of staff at FEMA, but I am delegated the authorities as the Senior Official Performing the Duties of the Administrator at FEMA.

Q.   The Senior Official Performing the Duties of the FEMA Administrator, also known as the "SOPDA." Is that --

A.   Yes, ma'am.

Q.   -- right?

Okay.  I'll get to the deposition rules, but we're going to try really hard not to talk over each other today, because it becomes extraordinarily difficult for the court reporter to create a clean record.

So I would ask that you wait for me to finish my question before giving your answer.

It also allows your attorney to interpose any objections for the record that they intend to make.

And I will do the same by waiting for you to complete your answer.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 18

Does that make sense?

A.   Yes, ma'am.

Q.   Okay.  What's your current business address?

A.   The current business address of FEMA is 500 C Street, Southwest.

Q.   And have you resided in West Virginia the entirety of the time you've worked for FEMA?

A.   Yes.

Q.   And do you commute or work remotely, or both?

MS. KIES:  Object to form.

A.   I commute into D.C. every day.

Q.   Every workday.

A.   Um-hum.

Q.   For the past year -- so does that mean, on average, that you commute in every day from West Virginia for five days a week?

A.   Yes, ma'am.

Q.   Have you ever been deposed?

A.   No, ma'am.

Q.   So this is the first time.

All right.  I'll quickly go over some of the procedures, as we understand them, and you let me know if there's anything that you have questions

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 19

about.  Okay?

First one, in addition to the not talking over each other, I want to make sure that your answers are verbal, rather than shaking your head and nodding, because the court reporter can't write that down.

So -- does that make sense?

A.   Yes, ma'am.

Q.   Okay.  So I'll ask yes or no, not um-hum or a nod.

You understand that everything that we say is being recorded by the court reporter?

A.   Yes, ma'am.

Q.   Okay.  And if you don't understand a question, please do let me know.  I'm happy to clarify.  Okay?

A.   Yes, ma'am.

Q.   Okay.  And your attorney, Ms. Kies, may occasionally make objections, for the record, to the format of some of my questions.

Do you understand that?

A.   Yes, ma'am.

Q.   And you understand that even if your attorney makes an objection for the record, you are required to give a response?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 37

A.   Yes, ma'am.  That's a presidentially appointed position.

Q.   Okay.  But not Senate confirmed?

A.   Yes, ma'am.  It's not Senate confirmed.

Q.   Okay.  And again, was former Secretary Noem involved in your appointment to that position?

MS. KIES:  Object to form.

A.   I don't know.

Q.   Did you interview with her for that position?

A.   No, ma'am.

Q.   Okay.  And then at some point in 2025, you moved within DHS, from CISA to FEMA.  Correct?

A.   Yes, ma'am.

Q.   And that was roughly in May or June of 2025?

A.   It was, as I recall, around the May time period.

Q.   Do you remember the date that you moved over?

A.   No, I do not.

Q.   Beginning of the month?  End of the month?

A.   I really can't recall.  I know it was May.

Q.   And that position was your first time working for FEMA.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 38

A.   Yes, ma'am.

Q.   Okay.  So your time at CISA totaled roughly four months?

A.   Yes, ma'am.

Q.   Okay.  In your approximately four months at CISA in early 2025, were you involved in efforts to implement the President's directives pertaining to workforce reduction?

MS. KIES:  Object to form.

A.   Yes.

Q.   And you had an understanding that President Trump had issued some executive orders pertaining to workforce reduction early in his second term?

MS. KIES:  Object to form.

A.   Yes.

Q.   And OMB and OPM provided agencies with further direction with respect to those workforce reduction efforts?

MS. KIES:  Object to form.

A.   Yes.

Q.   And generally speaking, reducing the size of the federal workforce was one of the President's priorities?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 39

A.   That's what's outlined in the executive order.

Q.   And you understood that at the time you were in those positions at CISA.  Correct?

MS. KIES:  Object to form.

A.   I understand that I was to analyze the workforce based on those executive orders.

Q.   Okay.  So please explain your understanding of the President's directives that pertained to workforce reduction at the time that you were working for CISA.

MS. KIES:  Object to form.

A.   I was to look at the guidance of the executive orders and then to look at the work that the current workforce was conducting.

Q.   And do what with that information?

A.   And then I was to take a look at that and then make recommendations as it related to, "Was it on mission?" and related to statutory authorities.

Q.   And did you make such recommendations at CISA?

A.   Yes, I did.

Q.   And "fraud, waste, and abuse" -- were those some of the words used to describe by the adminis- -- the administration's goals?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 40

MS. KIES:  Object to form.

A.   Those are all in the executive orders, that are outlined, that we are to follow in the executive branch.

Q.   And you also understood that you were to be working with individuals from a new entity called DOGE?

MS. KIES:  Object to form.

A.   Yes.

Q.   And you did work with individuals affiliated with the entity called DOGE?

MS. KIES:  Object to form.

A.   Yes.

Q.   You also understood that DHS Secretary Noem, at the time, shared these goals for workforce reduction for CISA.  Correct?

MS. KIES:  Object to form, foundation.

A.   Yes.

Q.   Did you have any discussions with her, since you joined CISA, regarding workforce reduction?

MS. KIES:  Object to form.

A.   I did not have specific discussions with the secretary as it related to workforce reductions.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 41

I did have discussions with the secretary as it related to the workforce and their focus on statutory mission assignments.

Q.   And were the recommendations you were making at CISA with respect to workforce reductions -- were those recommendations to Secretary Noem?

MR. GREAVES:  Object to form.

MS. LEONARD:  I'm going to ask the witness to answer the question, then we'll address the issue of multiple attorneys interposing objections.

Q.   But go ahead.  You can answer the question.

A.   Can you restate the question again?

Q.   Sure.

MS. LEONARD:  Can the court reporter read that one back.

COURT REPORTER:  Sure.

(Whereupon, the court reporter read back from the record as follows:

"Q   And were the recommendations you were making at CISA with respect to workforce reductions -- were

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 42

those recommendations to Secretary Noem?")

A.   So in the time period that you're discussing, there were directions that came from OMB and OPM that, in this case, the Office of Management and Budget and the Office of Personnel Management, that gave guidance to components.

And we were to send our analysis up to the departmental chief -- I want to make sure I get the right -- I don't want to use acronyms -- chief human capital officer of where recommendations would be sent.

So those were sent to the chief human capital officer, based on the policies that were in place at that time.

Q.   The DHS Chief Human Capital Officer?

A.   Yes, ma'am.

Q.   Who was Roland Edwards?

A.   Yes, ma'am.

MS. LEONARD:  Okay.  Just a pause in the questioning.  Only one attorney is going to interpose objections during this deposition.  Okay?

MS. KIES:  So Mr. Greaves is here, and -- well, I mean, you can speak

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 43

for yourself.

But Mr. Greaves is here as Ms. Evans's personal attorney.  And if there is an objection that he needs to interpose that I have not, he'll interpose it.

But I think it's clear we're not obstructing or delaying the day by having that opportunity.

MS. LEONARD:  We're going to take a break, and we're going to address this off the record.

Can we go off the record.

VIDEOGRAPHER:  Off the record at 9:27.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 9:28.

BY MS. LEONARD:

Q.   Okay.  Ms. Evans, we were talking about your time at CISA and the efforts to implement the President's directives with respect to workforce reduction when we took a break.

Ms. Evans, you're aware that from approximately January to May of 2025, CISA lost

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 44

approximately a thousand employees?

MS. KIES:  Object to form.

A.   I'm not aware of the specific number.

Q.   But you know that CISA had a substantial workforce reduction during the time that you were at CISA.  Correct?

MS. KIES:  Object to form.

A.   I know that they were offered tools that were being offered across the entire federal government, like the deferred retirement program.

Q.   And did you consider your efforts to implement the President's workforce reduction goals at CISA to be successful?

MS. KIES:  Object to form.

A.   I would say that the objectives that I was sent there for, I did achieve.

Q.   And can you explain to me why.

A.   Because I believe that CISA is now back on mission and is focused on its statutory missions, versus some other activities that the previous administration viewed as priority but weren't necessarily tied in statute.

Q.   And one of the effects of that -- those efforts was a reduction in the number of staff at CISA?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 45

MS. KIES: Object to form.

A.   That was not the objective. The objective was to get CISA back focused on its statutory missions and get it so that the entity, especially after I became the executive assistant director for cybersecurity, focused on what resources did that particular group need in order to ensure that it was focused on its statutory missions.

Q.   But you understood that the President's priority was in actually reducing the size of the federal government. Right?

MS. KIES: Objection; asked and answer.

A.   I understand that that was the executive order, and that was how we were to analyze the workforce.

Q.   And that is what you did at CISA. Right?

A.   I analyzed --

MS. KIES: Object to form.

A.   -- the statutory missions associated with CISA.

Q.   Let's talk about the move from CISA to FEMA.

Your new position at FEMA was initially as a senior advisor to the person running FEMA at the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 46

time, who was David Richardson?

A.   Yes, ma'am.

Q.   Okay.  And he was the SOPDA at the time.  Correct?

A.   Yes, ma'am.

Q.   And that position, senior advisor to the SOPDA, that was another non-career political appointment.  Correct?

A.   Yes, ma'am.

Q.   And you were appointed to this new position by former Secretary Noem.  Is that right?

A.   Yeah --

MS. KIES:  Object to form.

A.   Yes, ma'am.

COURT REPORTER:  Did you say something?

MS. KIES:  Object to form.

COURT REPORTER:  Please keep your voice up --

MS. KIES:  Sure.

COURT REPORTER:  -- for accuracy.  Thank you.

Q.   SOPDA Richardson had replaced SOPDA Hamilton after he was fired by Secretary Noem?

MS. KIES:  Object to form,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 109

A.   I really don't know the basis of why they gave her a FEMA employee email address.

Q.   And you don't know who the "they" is?

A.   I have no idea.

Q.   No idea, or do you suspect it was someone in the DHS front office?

MS. KIES:  Object to form, foundation.

A.   I would -- I don't know the process of how her email address got established, but there is a process for email addresses to be established, both at headquarters as well as component organizations.

For example, I had emails at CISA.  Then I also had an email account at headquarters.  And now I have an email account at FEMA.

Q.   When did you have an email account at DHS headquarters?

A.   When I was in transition.  And they thought -- "they," meaning headquarters and employees, right, the management directorate -- that I was going to be the Under Secretary for Management.

Q.   Did you ever use the headquarters email account for anything related to FEMA?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 110

A.    I would have to go back and look, because I'm not sure about the emails that are associated with the headquarters' accounts.

Q.    FEMA's contractors are not typically given a FEMA.dhs.gov email address.  Correct?

MS. KIES:  Objection; foundation, form.

A.    Contractors, in general, are not given government employees' email addresses.

Q.    You have an extensive background in cybersecurity.  Correct?

MS. KIES:  Object to form.

A.    Yes, I do.

Q.    Did you have any concerns with a government contractor being given a FEMA email address, Ms. Evans?

MS. KIES:  Object to form.

A.    I had concerns as it related to her contractor status.

And so, in the different roles that I had at FEMA, I ensured that the activities that I was involved in, I took proper precautions as it related to DHS policies and contractors.

Q.    Let's break that down.

Can you explain what the concerns were

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 111

that you had with respect to her being a government contractor?

MS. KIES:  Object to form.

A.   Government contractors have specific roles and responsibilities.

And in this case, depending on what role I was in as a -- as it related to the chief of staff, or now as the Senior Official Performing the Duties of the Administrator, I made sure, in particular, that Ms. Voorhies was not involved in any personnel decisions.

Q.   You made sure that Ms. Voorhies was not involved in personnel decisions at FEMA, Ms. Evans?

A.   Yes.

Q.   And what steps did you take to make sure that Ms. Voorhies was not involved in personnel decisions at FEMA?

A.   Meetings that we had specifically that were related to personnel decisions.

I have a weekly meeting with the FEMA Chief Human Capital Officer -- I'm making sure I'm not using acronyms, ma'am -- our legal counsel, the chief counsel, and the Office of Professional Responsibility.

And she did not participate in any of

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 112

those meetings.

Q.   In-person meetings?

A.   Or virtually.  She did not participate in any of those meetings.

Q.   Is that the step you took to ensure that Ms. Voorhies was not involved in personnel decisions?

MS. KIES:  Object to form.

A.   Yes.

Q.   Any other steps?

A.   I also, when I took over as chief of staff -- because part of the discussion that we had was making sure processes were put in place appropriately at FEMA -- that the FEMA leadership signed off on the documents before they went up to headquarters.

And then anything that headquarters, and in this case, DHS headquarters -- if she was on any signing sheet, she signed after FEMA employees.

Q.   Previous to that time, was Ms. Voorhies signing off before FEMA leadership on anything at FEMA?

MS. KIES:  Objection; foundation, form.

A.   I am not aware of the -- that process or

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 118

That project come -- came up and comes up through the contract review, which we've already discussed that she did review contracts.

Q.   Let's start with the time period where you were the chief of staff, September through -- sorry. I'm going to correct my questions.

Because I understand you are still the chief of staff, but where you were playing the role only of chief of staff; how about that?

From September through the beginning of December 2025, what work was Kara Voorhies performing with respect to FEMA?

MS. KIES:  Object to form.

A.   So that time period was actually the end of September.  Okay?  So I would actually say it's like October, in the time period of October.

It's my understanding, and based on as the chief of staff, that she was working directly with the Office of Response and Recovery as it related to -- and I'm trying not to use acronyms -- as it's related to like individual assistance, disaster declarations, as it relates to the reimbursements that would go out to states after presidential declarations have been made; that she was involved in a lot of that analysis.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 119

Q.   And you're familiar with DHS Secretary Noem's policy of requiring S1 approval for any amounts spent over $100,000?

MS. KIES:  Object to form.

A.   Yes, I am.

Q.   And Kara Voorhies was involved in implementing that policy.  Is that correct?

MS. KIES:  Object to form.

A.   Yes.

Q.   Okay.  You traveled with Ms. Voorhies to Alaska in October 2025.  Correct?

A.   Yes.

Q.   To tour the impacts of Typhoon Halong.  Is that correct?

A.   It was the typhoons in Alaska.

I will not venture how to say all the cities that we went to, I guess.

Q.   Okay.  But there was a big typhoon in Alaska, and you and Ms. Voorhies were sent as representatives of the Department of Homeland Security on this trip.  Right?

MS. KIES:  Object to form.

A.   Yes.  We were sent to go with Senator Sullivan.

Q.   So Alaska Senator Sullivan.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 120

MS. LEONARD:  I'm going to mark as the next, which I believe is 7, the press release from Senator Sullivan regarding that trip.

(Whereupon, Plaintiffs Exhibit 7 was marked for identification.)

Q.   You've been handed what's been marked as Exhibit 7.  It is, I will represent to you, a press release from Alaska Senator Sullivan.

And in the first paragraph here, you see your name and Ms. Voorhies' name?

A.   Yes.

Q.   Okay.  So it's accurate that you and Ms. Voorhies were -- attended this trip to Alaska?

A.   Yes.

Q.   And do you see that Mr. Sullivan -- I'm sorry -- Senator Sullivan refers to a group of senior federal officials?

Do you see that?

A.   Yes.

Q.   Was Ms. Voorhies a senior federal official?

MS. KIES:  Object to form.

A.   She, at this time, was the senior advisor to the Secretary of Homeland Security, as it states.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 121

So that's why it says senior officials.

Q.   How does a government contractor end up coming along on a trip to Alaska for senior federal officials, touring a disaster zone, Ms. Evans?

MS. KIES:  Object to form, foundation.

A.   I am not aware of the decisions that were made as to the attendance.  I know I was asked to attend.

Q.   And do you have an understanding that someone else asked Ms. Voorhies to attend as well?

MS. KIES:  Object to form.

A.   Yes, that's my understanding.

Q.   And what's your understanding of who asked Ms. Voorhies to attend?

MS. KIES:  Object to form.

A.   For the genesis of this trip, Mr. Lewandowski asked me to get this trip ready for us to go to FEMA -- to go to Alaska to support Senator Sullivan.

Q.   And you were aware, at the time, that he was also asking Ms. Voorhies to do that?

MS. KIES:  Object to form.

A.   I know that -- yes, that she was part of the team to go to Alaska.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 122

Q.   Okay.  I've got some photos that are from the link on this press release --

A.   Okay.

Q.   -- from Senator Sullivan.  We printed them in color.

MS. LEONARD:  Let's mark the three together as Exhibit 7.

MS. KIES:  8.

MS. LEONARD:  Sorry.  8.  Thank you.  That won't be the first time.

(Whereupon, Plaintiffs Exhibit 8 was marked for identification.)

MS. LEONARD:  And we're compiling them together, so we'll hand them to you.

Did you have one set?  Sorry.  I should have done that before.

Okay.  Counsel, here they are.

(Witness reading.)

BY MS. LEONARD:

Q.   Okay.  Have you looked at the photos?

A.   Yes, ma'am.

Q.   Are you depicted in these photos?

A.   Yes, I am.

Q.   Is Ms. Voorhies in these photos?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 123

A.   Yes, she is.

Q.   Which photo shows Ms. Voorhies?

A.   How do you want me to reference these?

Q.   Well, let's -- I think there are different times at the bottom of each page.

A.   Okay.

Q.   It's okay.  We can do it this way.

So there's a 604, a 602, and a 603.

A.   Okay.  So I have 602.  I do not see her in this photo.

In the photo of 603, I do see her in this photo.

And in the one that's 604, she is also in that photo.

Q.   Okay.  Let's -- 604 is a little closer in.

You're depicted -- you're in the center of that photo, 604.  Right?

A.   I'm in the photo.  I don't know that I'm in the center.

But I'm in the photo, yes, ma'am.

Q.   Okay.  And where is Ms. Voorhies?

A.   She is -- if you're looking at it this way from me, she is to the right of me in the photo.  So it would be -- yeah.

Q.   She's seated to the left of you at the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 124

table?

A.   Yes.

Q.   And is she wearing a FEMA Office of the Administrator fleece?

MS. KIES:  Object to form.

Q.   Can you tell?

A.   Yes, I believe that is the case.

Q.   Did you give that to her?

A.   No, I did not.

Q.   How did you get to Alaska?

A.   We flew on a government plane.

Q.   So you didn't fly commercial?

A.   No, we did not.

Q.   And did Ms. Voorhies fly with you?

A.   Yes, she did.

Q.   It took awhile, didn't it?

MS. KIES:  Object to form.

A.   It's a long flight to Alaska.

Q.   And did you talk to Ms. Voorhies along the way?

A.   Actually, I did not.

Q.   You weren't seated near her?

A.   No, I did not.  I sat with Mr. Ueland and talked with Mr. Ueland on the flight.

Q.   And what about during the trip; did you

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 125

have any conversations with Ms. Voorhies during this trip?

A.   Yes, I did.

Q.   And how many days were you there for?

A.   I'd have to -- I think it was less than 48 hours that we were up there.

Q.   Did you have any conversations during this trip about Ms. Voorhies' background before coming to do work at FEMA?

MS. KIES:  Object to form.

A.   I do not recall us having that kind of conversation.

Q.   And did you have any conversations during this trip about her relationship with Mr. Lewandowski?

MS. KIES:  Object to form.

A.   I did not have conversations with her about her relationships with Mr. Lewandowski.

Q.   Did you know how Ms. Voorhies knew -- did she ever -- strike that.

Did Ms. Voorhies ever say anything to you about how she knew Mr. Lewandowski before coming to work at DHS?

MS. KIES:  Object to form.

A.   No, she did not.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 126

Q.   Did you ever ask?

A.   No, I did not.

Q.   Did you ever hear anything about that from anyone else?

MS. KIES:  Object to form.

A.   I don't recall having discussions about her relationship with Mr. Lewandowski with anyone else.

Q.   But you knew that they knew each other before she came to DHS?

MS. KIES:  Object to form.

A.   Yes.

Q.   And -- but that's all you knew?

MS. KIES:  Object to form.

A.   Yes.  That's all I recall, yes.

Q.   Did you know that they had business relationships before her coming to DHS?

MS. KIES:  Object to form.

A.   I did not know that.

Q.   After you became the SOPDA, did Ms. Voorhies continue to perform the same type of work related to FEMA that you've previously described?

MS. KIES:  Object to form.

A.   Yeah.  I would say yes.  And she also did

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 127

other types of assignments.

Q.   What other types of assignments, beyond what you've already described?

MS. KIES:  Object to form, foundation.

A.   She was also working with DHS headquarters, and working directly with the Office of Management and Budget.

Q.   With respect to FEMA staffing?

MS. KIES:  Object to form.

A.   Not that I'm aware of.

Q.   You did not involve Ms. Voorhies in conversations about FEMA staffing, Ms. Evans?

MS. KIES:  Object to form.

A.   It depends on what you mean about the FEMA staffing and involving her in conversations.

There are discussions that I had with DHS headquarters after I took over as chief of staff about looking at FEMA resources again and what would be the result of any types of recommendations that would come from the FEMA Review Council.

So there were discussions, but -- but they were general and deliberative in nature.

Q.   And government contractor Kara Voorhies was involved in those conversations?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 128

A.   Not all of them, no.

Q.   But some of them?

A.   She would participate in meetings at DHS headquarters on FEMA issues.  And if some of the discussion would go that way, then she was there.  Yes.

Q.   And you copied her on emails about FEMA staffing, did you not, Ms. Evans?

MS. KIES:  Object to form, foundation?

A.   I CC'd her on FEMA issues, yes.

Q.   On all FEMA issues?

MS. KIES:  Object to form.

A.   It was a practice for me, for headquarters, DHS headquarters, that I would include her, as the senior advisor to the secretary.

Q.   You were directed to do that by someone at DHS headquarters?

MS. KIES:  Object to form.

A.   I was not directed.  I did it as a practice because she was a senior advisor.

And I did it so that a senior advisor would be aware of FEMA issues, so that if the secretary asked her questions, she would have answers.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 129

Q.   And you were not privy to all of the communications that Ms. Voorhies had with either Secretary Noem or Chief Advisor Lewandowski about FEMA.  Correct?

MS. KIES:  Object to form.

A.   Yes, that's correct.

Q.   But you did understand that she was talking to Secretary Noem and Corey Lewandowski about FEMA?

MS. KIES:  Object to form, foundation.

A.   Her job is the senior advisor to the secretary for FEMA issues.  So she would talk to the secretary and Mr. Lewandowski about FEMA issues.

Q.   Including things that you were copying her on.  Correct?

A.   I --

MS. KIES:  Object to form.

A.   I am not privy to those discussions, so I would not know the details of the discussions that she had with them.

Q.   But you did personally communicate with Ms. Voorhies regarding FEMA personnel matters, didn't you, Ms. Evans?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 132

A.   I talked specifically with Joe Guy, as my chief of staff -- my deputy chief of staff for my portfolio.

Q.   But you understood that Secretary Noem and Corey Lewandowski wanted you to communicate with Ms. Voorhies about these matters.  Correct?

MS. KIES:  Object to form, foundation.

A.   I understand that she was to be informed about the issues there and then decisions that I was making in the role from December 1st as the Senior Official Performing the Duties of the Administrator.

Q.   Who told you that?

MS. KIES:  Object to form.

A.   I'm sorry.  Who told me what?

Q.   What you just said, that you understood that she was to be informed.

Who in the front office of DHS told you that Ms. Voorhies was to be informed on these matters?

MS. KIES:  Object to form.

A.   Mr. Guy.

Q.   When was that?

A.   I don't have a specific date.

Q.   Was it before you became the SOPDA or

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 133

after?

A.   I would -- I really don't recall a specific conversation that said this.

She was involved -- I had weekly meetings -- when I took over the chief of staff position at FEMA, I had weekly meetings with DCOS Guy.

Q.   And did Ms. Voorhies participate in those meetings?

A.   Yes, she did.

Q.   Did Ms. Voorhies have the authority to see FEMA personnel documents, Ms. Evans?

MS. KIES:  Object to form, legal conclusion.

A.   I am unaware if she had the authority to see personnel documents.

Q.   You did not give her that authority. Correct?

MS. KIES:  Object to form.

A.   I did not give her authority to see personnel documents at FEMA.

Q.   And did Ms. Voorhies have the authority to make decisions regarding FEMA personnel matters, Ms. Evans?

MS. KIES:  Object to form, legal

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 134

conclusion.

A.    I did not give her authority in my role as the Senior Official Performing the Duties of the Administrator.

Q.    Did Ms. Voorhies have authority to make decisions regarding FEMA personnel matters, to your knowledge?

MS. KIES:  Object to form, legal conclusion.

A.    It is my understanding she did not.

Q.    But she was involved, wasn't she?

MS. KIES:  Object to form, asked and answered.

A.    She would be informed through these various meetings.

Q.    And email communications as well.  Right?

A.    Yes.

Q.    You did not personally make the decision to permit a government contractor with no experience in disaster relief or manage -- emergency management to perform work at FEMA.  Correct?

MS. KIES:  Objection; legal conclusion, facts not in evidence.

You can answer.

A.    I was not involved in that decision.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 135

MS. KIES:  We've been going for about an hour.  Maybe another five or 10-minute break?  Or what do you -- do you want to take lunch?  What do you think?

MS. LEONARD:  What time is it now?  We're not going to take lunch this early, but I am happy to take a short break right now.  That's fine.

MS. KIES:  Okay.

MS. LEONARD:  Why don't we take another 10-minute break.  And then maybe we'll aim for lunch after the next session, if that's all right.

VIDEOGRAPHER:  Off the record at 11:24.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 11:41.

BY MS. LEONARD:

Q.  Ms. Evans, going back to the trip to Alaska in October of 2025, did you or Ms. Voorhies, to your knowledge, have any communications with either former Secretary Noem or Corey Lewandowski during that trip?

A.  I can only speak about my communications,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 140

submissions.

And it would go through that process and then go to headquarters.

Q.   And Ms. Voorhies was also involved in the staffing-related decisions that were being sent to the DHS front office.  Right?

MS. KIES:  Object to form.

A.   Ms. Voorhies, depending on -- since you're only talking about from when I was the chief of staff time period.

So that's the period that we're talking about, from chief of staff to then taking over as the "Senior Official Performing the Duties of."

Those decisions, or those recommendations, that would go up for hiring did not go through the executive staff secretary process, because there was a different process -- it's my understanding there was a different process that was established by the department's chief human capital officer and how they worked with the component chief human capital officers.

Q.   So I was actually asking about after you became SOPDA.  And let me just ask a different question.

After you became SOPDA, did Ms. Voorhies

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 151

storm in January of 2026, were you using the Signal app to communicate with anyone at DHS headquarters, other than Ms. Voorhies, Mr. Lewandowski, or Ms. Noem, at any time?

MS. KIES:  Object to form.

A.   I would use it with the DHS ExecSec.

Q.   Anyone else?

A.   And I would also use it periodically with DCOS Guy.

Q.   "DCOS" stands for "Deputy Chief of Staff"?

A.   Yes, ma'am.

Q.   Okay.

MS. LEONARD:  So for the court reporter, DCOS, all caps.

Q.   Guy, Jos- -- Joseph?

A.   Yes.  Joseph Guy, G-u-y.

Q.   And do you have his phone number saved on your phone?

MS. KIES:  Object to form.

A.   I believe so, yes.

Q.   In addition to having his contact information saved through the Signal app?

MS. KIES:  Object to form.

A.   The -- it's -- so the way it works is -- yeah, like the contact information is that way.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 152

And so -- yeah, he's on the Signal app, but he would also call me, because we worked together during transition.

So I know Mr. Guy from my time with the America First Policy Institute.  So that's why it's saved.

Q.    And when was your time with the America First Policy Institute?

A.    I was a volunteer.  So I don't have the exact dates associated with it, but I worked on transition documents for the America First Policy Institute.

Q.    Transition documents related to the second Trump term?

MS. KIES:  Object to form.

A.    Yes.

Q.    Were you involved in a Signal group that includes political appointees at DHS and FEMA?

MS. KIES:  Object to form.

A.    Can -- I -- I'm not sure exactly what you're asking about when you say "political appointees" in FEMA.

Q.    Tell me all of the group chats that you were involved with on your Signal app that involved FEMA business, please.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 153

MS. KIES:  Object to form.

A.  There was one, as we previously mentioned, specifically for the winter storm.

There is one specifically for communications, to be able to respond to communications.

And then there's one for the ExecSec to make sure that we had the STORM numbers so that we could move disaster decs through.

Q.  And there was a Signal group chat that you were involved with that involved DHS Secretary Noem, Corey Lewandowski, Kara Voorhies, and yourself, and others.  Correct?

MS. KIES:  Object to form.

A.  That was related to the winter storm.

Q.  And it's your testimony that that group chat existed only for the winter storm?

MS. KIES:  Object to form.

A.  That is my understanding and my participation, that it was related to the winter storm.

Q.  You did not have a Signal group chat with Secretary Noem, Corey Lewandowski, Kara Voorhies prior to the winter storm in 2026?

A.  I did --

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 154

MS. KIES:  Object to form.

A.    -- not.

Q.    Did you have any Signal communications with Corey Lewandowski prior to the winter storm 2026?

MS. KIES:  Object to form.

A.    Not that I recall, no.  I did not.

Q.    What about Secretary Noem, prior to the winter storm 2026?

MS. KIES:  Object to form.

A.    I did not.

Q.    What about Kara Voorhies, prior to the winter storm 2026?

MS. KIES:  Object to form.

A.    I did have some Signal chats with her prior to the storm.

Q.    And were those Signal chats with Kara Voorhies that you had prior to the winter storm with others on a group, or individually, or both?

A.    It would be both.

Q.    So you had individual communications with Kara Voorhies about FEMA on Signal in 2025?

MS. KIES:  Object to form.

A.    Yes, but it depends on what you mean about FEMA.  Like, in -- if it's specific, probably not.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 155

These are Signal chats.  They were just like general chats, like not "specific, specific."

That's why I'm saying, depends on what you mean by the question.

Q.   You were discussing FEMA business.  Correct?

MS. KIES:  Object to form.

A.   Not necessarily on all the chats.  No, ma'am.

Q.   But on some of them.  Correct?

A.   Yes, ma'am.

Q.   Okay.  Are you familiar with the obligations of government employees to retain records under the Federal Records Act?

A.   Yes, I am.

MS. KIES:  Objection; calls for a legal conclusion.

Just give me one second to answer -- object, please.

WITNESS:  Go ahead.  I'm sorry.

MS. KIES:  No -- no problem.  You could --

MS. LEONARD:  Question was:  Was she familiar?

A.   Yes, I am.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 156

Q.   And did you always print out and save the content of the Signal chats that you've just described regarding FEMA?

MS. KIES:  Object to form.

A.   I took pictures, because that was also the guidance underneath that.

I took pictures of what I determined were appropriate records.  And I sent those pictures into my email account so that they would be saved as part of DHS records.

Q.   Are you certain that you screenshot -- you took a screenshot of every communication you had with Kara Voorhies regarding FEMA on your Signal chat?

MS. KIES:  Object to form.

A.   As I stated, I looked at those because I am familiar, and I made a determination of what were appropriate records.

I took the pictures, and I sent the records in so that they would be captured as records.

Q.   Who did you send them to?

A.   I sent them to my email account, because my email account is automatically backed up and, therefore, is part of the DHS records.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 159

A.   Because I am not sure of the settings for the disappearing messages.

Q.   Have you ever noticed any of the messages disappearing when you look at it?

MS. KIES:  Object to form.

A.   Are you asking me about disappearing messages when I look at Signal chat?  Can you clarify --

Q.   Yes.

A.   -- that?

Q.   Yes.

A.   Okay.  That's how it -- people set it up.

So I am -- I am aware, because I don't use Signal just for work.

And so, there are disappearing messages.

Q.   Did you set up the communications with -- directly with Kara Voorhies to disappear?

MS. KIES:  Object to form.

A.   I don't recall.

MS. LEONARD:  Okay.  Why don't we take a five-minute break?  And then we'll come right back onto the record.

VIDEOGRAPHER:  Off the record at 12:18.

(Whereupon, a recess was taken.)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 162

communications under federal law?

MS. KIES:  Object to form.

A.   I did not personally communicate.  We received guidance as a reminder that we needed to do proper records management.

Q.   And guidance from the Department of Homeland Security?

A.   We received guidance from the Department's Chief Information Officer.

MS. LEONARD:  Okay.  Let's just mark this one as Exhibit 9.

Here you go.

(Whereupon, Plaintiffs Exhibit 9 was marked for identification.)

Q.   Exhibit 9 is a -- sorry.  Thanks.

Exhibit 9 is a March 11, 2026 communication from DHS Management Communications that is titled "Reminder from Chief Information Officer."

Do you see that?

A.   Yes, ma'am.

Q.   Prior to March 10, 2026, when was the last reminder, if any, that you recall receiving regarding records preservation from the chief information officer at DHS?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 180

You can answer.

A.   I think it depends on the way that you're asking that question.  Based on the ways that, yes, FEMA is a component of DHS.

But the way that you're asking that specific question, there are some decisions that the head of FEMA, the -- I don't say SOPDA, I apologize -- that in that role, that you're allowed -- that you make.

And -- but there are some decisions that the secretary, through policy, had asked to also make, and those are sent up to DHS headquarters.

Q.   And DHS, the secretary, can also make policy decisions that you implement as the SOPDA of FEMA.  Correct?

MS. KIES:  Object to form, foundation.

A.   As a component of DHS, the secretary has the authority over components of DHS and their resources.

Q.   Including FEMA?

MS. KIES:  Object to form.

A.   FEMA is a component of DHS.

Q.   And in your experience, the DHS -- individuals in the DHS Office of the secretary did

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 181

make personnel decisions related to FEMA?

MS. KIES:  Object to form.

A.    I think you need to clarify that question for me, because DHS makes decisions as it relates -- it was specific to hiring recommendations, just like any other department or agency.  For example, senior executives goes through an executive review board.

And so, those policies were updated, and those types of decisions do go to DHS headquarters.

Q.    But they -- the DHS front office made personnel decisions for FEMA in 2025 that went beyond hiring, didn't they?

MS. KIES:  Object to form, foundation.

A.    I am not sure exactly what hiring decisions you are referencing.

Q.    So I was using the term "personnel decisions."  So that -- personnel decisions, I'm using that to include far more than hiring.

Let me ask a different thing.

On December 1st, it was announced by DHS that the political appointees at DHS had made certain decisions with respect to individuals who had signed something called the Katrina petition.

Are you familiar with that?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 182

MS. KIES:  Object to form.

A.   Yes.

Q.   So that's the very day that you started in the role of SOPDA.

There was confirmation that the DHS front office had been making personnel decisions for FEMA. Correct?

MS. KIES:  Object to form.

A.   I am aware that those employees that have signed the Katrina letter were placed on administrative leave, but that was prior to me assuming the role of the SOPDA.

Q.   And then they -- but you were the FEMA Chief of Staff, correct, at the time?

A.   Yes.  But those decisions were also made prior to me being the FEMA Chief of Staff as well.

Q.   And then -- but the decision to reinstate those individual employees and notify them of that, that was made while you were the FEMA Chief of Staff.  Right?

MS. KIES:  Object to form.

A.   That decision was made, not in conjunction with me as the Chief of Staff.

Q.   And then the political appointees in the DHS headquarters overruled FEMA's decision to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 183

reinstate those employees.  Correct?

MS. KIES:  Object to form, foundation.

A.    That particular circumstance is -- my understanding is, is that the decision that was made there was made by a person within the FEMA CHCO office, and it did not clear through the office of the administrator.

MS. LEONARD:  Let's take a look at the next -- Exhibit 12, which is a New York Times article about those actions.

(Whereupon, Plaintiffs Exhibit 12 was marked for identification.)

Q.    Ms. Evans, you've been handed Exhibit 12, which is a article from the New York Times dated December 1, 2025, entitled "In a Reversal, FEMA Won't Reinstate Suspended Workers."

Did you read this article at the time?

MS. KIES:  Object to form.

A.    No, I did not.

Q.    If you look on the first page, there is a reference to Tricia McLaughlin, who we know is the spokesperson for DHS, and an email to the Times in which Ms. McLaughlin said:

...rogue "bureaucrats" had

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 184

sent those notices without the approval of senior department leaders.  After those leaders, who are political appointees, read news articles about the reinstatement, they reversed course....

Is that an accurate description?

MS. KIES:  Object to form, foundation.

A.   I think it depends on your point of reference when you use some of these words.

But the process that she's talking about in this particular case, as I previously stated, it was an employee in the FEMA CHCO office that did send out these letters to reinstate them.

Q.   But you also are aware that the DHS political appointees reversed that decision?

MS. KIES:  Object to form, foundation.

A.   Yes, I am aware of that.

Q.   And who made that decision?

MS. KIES:  Foundation.

A.   It's -- the way that this particular thing went down is I talked to DCOS Guy, and the guidance

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 185

was to reverse the decisions.

Q.    Do you know whether DCOS Guy, in fact, made that decision?

MS. KIES:   Object to form.

A.    I do not know if he made the decision on his own.

Q.    Because you're not aware of everyone that DCOS Guy discussed that personnel decision with within the Office of the Secretary.  Correct?

MS. KIES:   Object to form.

A.    Correct.

Q.    And you don't know whether DCOS Guy discussed it with Secretary Noem?

A.    I do not know the particulars of the discussions that happened at headquarters.

Q.    Or you don't know whether DCOS Guy discussed it with Corey Lewandowski either.  Right?

A.    I do not know who DCOS Guy discussed the decisions with at DHS headquarters.

Q.    If you look at the next page of the article, there's a quote from Ms. McLaughlin at the top paragraph.  And it says:

                 ...adding that, quote,

                 this administration will not

                 tolerate rogue conduct,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 186

unauthorized actions, or

entrenched bureaucrats

resisting change.

Do you have an understanding as to what change she was referring to there?

MS. KIES:  Object to form.

A.  I do not know what resistance to change that she is referencing in this quote.

Q.  You are familiar with the Katrina letter that was involved in this issue.  Right?

MS. KIES:  Object to form.

A.  Yes.

Q.  And the Katrina letter expressed concerns regarding the administration's efforts at downsizing the FEMA workforce, did it not?

MS. KIES:  Object to form.

A.  Yes, it did.

Q.  And so did you understand this reference by the DHS spokesperson to "bureaucrats resisting change" to be referencing changes to the workforce?

MS. KIES:  Objection; asked and answered.

A.  I understand that, the way that this was worked, is the change is about changes to happen to FEMA overall.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 187

Q.   And what do you mean by that?

A.   What is happening, as we have previously discussed, is the FEMA Review Council was commissioned by the President.

And they're looking at potential changes and recommendations that would then go to the President, as it relates to changes for FEMA.

Q.   And you understood that Secretary Noem co-chaired that council.  Correct?

MS. KIES:  Object to form.

A.   Yes.

Q.   And that there was a draft report prepared for that council that was being edited by Ms. Noem around this time at the beginning of December 2025?

MS. KIES:  Object to form, foundation.

A.   I know that the FEMA Review Council was working on a draft report that -- because they had specific timelines that were outlined in the executive order, and that they were to then deliver the draft report and have a meeting, a public meeting, and then the report would go out for public comment.

Q.   Did you work on the draft report, Ms. Evans?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 193

be roughly 11,500 employees.  Correct?

MS. KIES:  Object to form.

A.   If I just go on the straight numbers the way that you're presenting them, yes.

MS. LEONARD:  Mark this as Exhibit 13.

(Whereupon, Plaintiffs Exhibit 13 was marked for identification.)

Q.   Ms. Evans --

MS. LEONARD:  This is the last page.

Q.   -- you've been handed what's been marked as Exhibit 13.  It's a document entitled "Draft Final Report, The President's Council to Assess the Federal Emergency Management Agency."  The date on the cover is December 11, 2025.

I'm not going to ask you questions about this entire report.  But let me know when you're ready.

A.   Okay.

Q.   This report has never been published in final form.  Correct?

MS. KIES:  Object to form, foundation.

A.   Yes, that's my understanding.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 194

Q.   And there was a scheduled December 12th meeting that was canceled.  Correct?

MS. KIES:  Object to form.

A.   Yes, that's correct.

Q.   And you have referenced earlier that you became aware through a CNN article that the report was leaked to the press.  Is that right?

A.   Yes, that there was a report that was leaked to the press.

Q.   And do you know who leaked the FEMA Review Council report to the press, Ms. Evans?

A.   No, I do not.

Q.   Do you know whether former Secretary Noem leaked the report to the press?

MS. KIES:  Object to form.

A.   No, I do not.

Q.   Have you ever heard anything about that?

MS. KIES:  Object to form.

A.   No.

Q.   What about Mr. Lewandowski; have you ever heard anything about his leaking the report to the press?

MS. KIES:  Object to form.

A.   No.

Q.   What about Ms. Voorhies; do you know

Page 195

whether Ms. Voorhies had access to the draft DHS FEMA Council report?

MS. KIES:  Objection; form and foundation.

A.   I do not know what versions of the reports that Ms. Voorhies would have access to.

Q.   Are you aware that she had access to some version of the reports?

MS. KIES:  Object to form.

A.   I am aware that she participated in those meetings that I previously mentioned that were with the FEMA Review Council team.

But I don't know specifically what versions of the reports that she would have access to.

Q.   Do you know whether Ms. Voorhies edited the Review Council report?

MS. KIES:  Object to form.

A.   I do not know if she specifically edited the reports.

Q.   Do you know whether anyone in the DHS front office edited the report?

MS. KIES:  Object to form.

A.   I am not aware.  I do not know of anyone editing the report.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 196

Q.   Other than Ms. Noem?

MS. KIES:   Object to form.

A.   I do not know if Ms. Noem specifically edited the report.

Q.   Okay.  So if you turn to Page 7 of this draft that's in front of you, in the second paragraph, there's a sentence that says:

FEMA 2.0 should reduce overall staffing by approximately 50%....

Do you see that?

A.   Yes, I do.

Q.   Do you know who wrote that language?

A.   No, I do not.

Q.   You did not write that language.  Correct?

A.   I did not write that language, yes, ma'am.

Q.   And when did you first become aware that the draft council report contained this 50% staffing cut?

MS. KIES:   Object to form, asked and answered.

A.   When the report was leaked.

Q.   What is your understanding of the reason that the December 12th meeting of the FEMA Review Council was canceled?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 197

MS. KIES:  Objection;
foundation.

A.   I don't know the reason why the meeting was canceled.

Q.   Do you have any understanding as to why it was canceled?

MS. KIES:  Object to form.

A.   I do not.  And I don't -- I wouldn't speculate on any reasons of why the White House would cancel a meeting, or DHS would cancel a meeting, as it relates to the FEMA Review Council.

Q.   Do you believe the White House canceled the meeting?

MS. KIES:  Object to form.

A.   I don't know.  That's why I'm saying I'm not speculating on who canceled the meeting.

Q.   Was someone named Stephanie Dobitsch involved in providing information to the White House that led to the cancellation of this meeting?

MS. KIES:  Object to form, foundation.

A.   I would have no knowledge of her providing information to the White House that would lead to the cancellation of the meeting.

Q.   Do you know who -- how do you pronounce

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 198

her name?

A.    You pronounced it correctly.

Q.    Okay.  Stephanie Dobitsch, who is -- who, at the time, was Stephanie Dobitsch?

A.    Stephanie Dobitsch was a principal, as we talked about previously.  She was a leader, career leader, within FEMA, working for Mr. Richardson.

Q.    And in -- at some point in December, you formed the belief that Ms. Dobitsch had provided information to the White House that was contrary to DHS leadership instructions.  Correct?

MS. KIES:  Object to form.

A.    I have no knowledge of Ms. Dobitsch providing information to the White House that's contrary to FEMA leadership or to DHS leadership.

Q.    And as a result of that belief, you asked the DHS management directorate to give her an MDR out of FEMA.  Correct?

MS. KIES:  Object to form, misstates testimony.

A.    That is not correct.  And that is not the basis for the management directed reassignment.

Q.    Please explain what a "MDR" is.

A.    A management directed reassignment is the ability to take SESs and move them to other SES

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 199

positions within the department or within the federal government as a whole.

Q.   And you did that -- you asked for Ms. Dobitsch to be MDR'd out of FEMA because you believed she was not sufficiently implementing the secretary's priorities and plans for FEMA.  Correct?

MS. KIES:  Object to form.

A.   That's incorrect.  That is not the basis of my request for her management directed reassignment.

Q.   And you talked about that action with Kara Voorhies before you requested that MDR.  Correct?

MS. KIES:  Object to form.

A.   I discussed that I requested the MDR, the management directed reassignment, for Stephanie Dobitsch with Kara Voorhies.

MS. LEONARD:  Let's take a look at Exhibit 14.

(Whereupon, Plaintiffs Exhibit 14 was marked for identification.)

Q.   Ms. Evans, you've been handed what's been marked as Exhibit 14.  And it is an email from you, on December 17th, to someone named Greyson McGill. And you copy Kara Voorhies.

And the email reads:

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 200

I need to have Stephanie Dobitsch MDR out of FEMA.

Do you see that?

A.    Yes, ma'am.

Q.    And you say:

Additionally, she bypassed DHS guidance and sent information directly to the White House which was incorrect.  These are just the issues this week.

Do you see that?

A.    Yes.  But that is not specifically related to the FEMA Review Council report, as you previously stated.

Q.    My question was generally whether you thought that she should be MDR'd because she passed information to the White House that was contrary to DHS priorities.

MS. KIES:  Object to form.

Q.    Did you agree with that?

MS. KIES:  Object to form.

A.    Okay.  The -- this email specifically says that she sent information directly to the White House which was incorrect.  Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 201

Q.   What information was that?

A.   I believe, and I have to go back and look, that it was specifically related to -- she -- her portfolio included the different policies that are associated like with the Defense Production Act and NATO and a couple other areas.

And so, there was some information that she passed on directly that did not clear through DHS policy.

Q.   And DHS did issue an MDR to move Ms. Dobitsch out of FEMA.  Correct?

MS. KIES:  Object to form.

A.   Yes, they did.

Q.   And they put her in the Office of Inspector General.  Is that right?

MS. KIES:  Object to foundation.

A.   That is not correct.  So Ms. Dobitsch had applied for a job at the Office of Inspector General, and that coincided at the same time that the MDR request was put in.

Q.   Do you know where she ended up?

A.   It's my understanding that she is at the inspector general's office.

Q.   Okay.  And you say here:

I have discussed the MDR

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 202

with Kara, and she agrees.

Please let me know what else you may need.

Do you see that?

A.   Yes, I do.

Q.   Is that true, that you had discussed this MDR with Kara Voorhies?

MS. KIES:  Object to form, asked and answered.

A.   Yes.

Q.   And when you testified earlier that you made sure that Kara Voorhies was not involved in any personnel decisions at FEMA, that testimony was not accurate.  Correct?

MS. KIES:  Object to form.

A.   She didn't make this decision. Ms. Voorhies didn't make this decision.

I made the decision, and I informed her of the decision.

Q.   It says here that you "discussed the MDR with Kara, and she agrees."

Was that -- that's the discussion that you had.  Right?

MS. KIES:  Object to form.

A.   Yes.  But I made the decision and had

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 203

already contacted and talked to Greyson, and then followed up with this email.

And so, I did make the decision, contacted headquarters, and requested the MDR.  And then I did discuss it with her, and she agreed.

Q.   And you testified earlier that you made sure that Kara Voorhies was not involved in any personal decisions at FEMA.

And so, when you testified that way, you didn't mean that she wasn't involved in the discussions of personnel decisions?

MS. KIES:  Object to form.

Q.   Is that what you meant?

MS. KIES:  Object to form.

A.   What I meant was, I make the decisions. And as the senior advisor to the secretary, I inform her and discuss different decisions so that she's informed of actions that are happening at FEMA so that she's aware of issues as the advisor.

Q.   I understood your testimony that you took precautions so that she wouldn't be involved, including not having her at any meetings.

Wasn't that your testimony earlier?

MS. KIES:  Object to form.

A.   Yes, that is true.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 204

Q.   But there's an exception for talking to her on the phone?

MS. KIES:  Object to form, misstates testimony.

A.   This is not a meeting.  And this was me informing Ms. Voorhies that I made the decision to MDR Stephanie Dobitsch.

And I was discussing it with her and -- so that she would be aware of the issue.

Q.   And why did you feel the need to tell Greyson McGill that you had Kara's approval for this MDR?

MS. KIES:  Object to form, misstates evidence.

A.   Okay.  This doesn't say that I have her approval.  It says that she agrees.

Because she's the secretary's advisor for FEMA issues and since this affects FEMA, Greyson would check with her, or double-check with her, or check in with her -- I'm not sure of all the processes up there -- to make sure that she was aware of the actions that we were taking at FEMA.

Q.   And who is Greyson McGill?

A.   Greyson McGill is the Chief of Staff for the management directorate.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 205

Q.   Okay.  You can set that aside for now.

You understand that in October of 2025, the President issued an executive order called "Ensuring Continued Accountability in Federal Hiring" that required agencies to submit something called "annual staffing plans"?

MS. KIES:  Object to form.

A.   Yes.

Q.   Okay.  Let's -- I'm just going to show you -- this is the executive order.

MS. LEONARD:  We can mark it next line, which is 15.

There you go.  Okay.

(Whereupon, Plaintiffs Exhibit 15 was marked for identification.)

Q.   Okay.  And this is Executive Order 14356, dated October 15, 2025.

So you understand that this is the executive order that refers to annual staffing plans.  You see that reference at the bottom. Right?

A.   Yes, ma'am.

Q.   And you see that the President ordered agencies to submit final annual staffing plans to OPM and OMB.

Page 209

time, that that was the instruction being given to the FEMA components, that they were -- I'm sorry.

Let me just restate that one.

You understood, at the time, that the various DHS components were being asked to conduct a bottoms-up approach to determining appropriate staffing levels and providing data to the DHS CHCO to support that?

MS. KIES:  Object to form.

A.   I understand we received the guidance, yes.

Q.   And it also says:

Components should distribute the template to their lowest level offices, as designated in the template.

A.   Yes.

Q.   Do you see that?  Okay.

And he gives a deadline of December 3rd. Right?

A.   Yes.

Q.   And that deadline was after you started performing the duties of FEMA administrator.  Right?

A.   Yes.

Q.   Okay.  And you complied with this request

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 210

from the DHS CHCO, on behalf of FEMA, by sending FEMA's contribution to the staff -- annual staffing plan?

MS. KIES:  Object to form.

A.   We worked to meet the assignment, yes.

Q.   And you personally sent FEMA's contribution to the annual staffing plan.  Isn't that correct?

MS. KIES:  Object to form.

A.   I don't recall sending it personally, because of the way that this went out.  I do not recall personally transmitting it.

Q.   Do you recall working on this?

MS. KIES:  Object to form.

A.   So in looking at this correspondence, yes, because, in different roles within FEMA, as I previously stated, we have worked on different levels of staffing.

Q.   Do you recall approving the FEMA submission as SOPDA?

MS. KIES:  Object to form.

A.   Yes.  I mean, no, I don't recall it, but, yes, I would have had to approve it.

Q.   And if you look on the second page, it's Bates No. -2354, there's a reference to the staffing

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 211

plan that was submitted by FEMA on December 4th.

Do you see that?

A.   I see the references to the email here, yes.

Q.   It's from someone named Puneet?

A.   Yes.

Q.   Puneet works in the Office of the Administrator.  Correct?

A.   Yes, she does.

Q.   And Puneet says:

Attached is the staffing plan that was submitted 12/4.

Do you see that?

A.   Yes.

Q.   Do you have any reason to believe that the FEMA contribution to the DHS annual staffing plan was submitted on any day other than December 4th?

MS. KIES:  Object to form.

A.   I do not have any knowledge of it being submitted any other date but than what's in this email.

Q.   Okay.  And you understood, at the time, that FEMA was submitting the plan for S1 approval. Correct?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 212

A.    I know that we were doing the assignment that was given to us as it related to the annual staffing plan and the second quarter updates.

Q.    And you also know that the FEMA staffing plan that you submitted on December 4th was, in fact, approved by S1 and included in what was sent to OMB and OPM.  Correct?

MS. KIES:  Object to form, foundation.

A.    I do not know the actual process after we submitted it up to DHS headquarters.

Q.    You know that the content of what FEMA included in that plan was submitted to OMB and OPM. Correct?

MS. KIES:  Object to form, foundation.

A.    I do not know if it was specifically submitted to OMB and OPM, but I know we completed the assignment.

Q.    It's your testimony, Ms. Evans, that you do not know what was submitted to OMB and OPM for the FEMA annual staffing plan?

MS. KIES:  Object to form.

A.    That's not my testimony.  My testimony is I do not know what DHS headquarters transmitted.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 213

I do know that we transmitted our staffing plan and the quarterly updates to DHS headquarters.

Q.   Did you transmit anything directly to OPM and OMB?

MS. KIES:  Object to form.

A.   I personally did not.  I do not know if the process included the FEMA CHCO to submit things concurrently to OMB and OPM.

Q.   You didn't receive a rejected FEMA staffing plan back from DHS Secretary Noem in December of 2025.  Correct?

MS. KIES:  Object to form.

A.   I did not receive any other information back, that I recall, related to this deliverable.

Q.   Did you participate in conversations with anyone in the DHS headquarters regarding the FEMA staffing plan in December of 2025?

MS. KIES:  Object to form.

A.   I do not recall having specific discussions with anyone at DHS headquarters about this deliverable.

Q.   It's possible that you did have those conversations, though?

MS. KIES:  Object to form.

A.   I do not recall any conversations about

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 214

this specific deliverable.

Q.   You are aware that FEMA's OCHCO worked with the various FEMA component offices to compile program and office-level information as part of the FEMA plan, and provided that to you for approval?

MS. KIES:  Object to form.

A.   I'm aware that that's the process, yes.

Q.   And you're aware that that actually happened.  Correct?

MS. KIES:  Object to form.

A.   So at this time, I am aware that that's what they said that they did.

And I'm talking about the FEMA CHCO office, that that's what they said that they did.

Q.   The FEMA CHCO compiled the program and office-level information and provided it to you for review and approval as the FEMA annual staffing plan.  Correct?

MS. KIES:  Object to form.

A.   The FEMA CHCO office would -- provided this deliverable through the process that FEMA has established for review.

And then I did the final review and approved it for submission.

Q.   You reviewed what the FEMA CHCO office

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 265

done in a May 14th memo from S1.  Is that right?

MS. KIES:  Object to form.

A.    That's my understanding --

Q.    Okay.

A.    -- yes.

MS. KIES:  Let's mark that as the next exhibit, which is No. 21.

(Whereupon, Plaintiffs Exhibit 21 was marked for identification.)

Q.    So, Ms. Evans, you've been handed Exhibit 21, which is a May 14th memo signed by Kristi Noem, Secretary of DHS, as approved, that, in your view, delegates back to FEMA the authority to extend certain CORE positions by 180 days.  Correct?

MS. KIES:  Object to form.

A.    Yes, except this memo is -- does not include the annex.  And so -- Annex A has specific background information that should be included.

Q.    There's an attachment that we don't have. Is that correct?

A.    I don't know whether you have it or not, but this specifically says:

See Annex A for additional background.

And there is no Annex A associated with

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 266

this memo.

Q.   Okay.  But the memo that you see before you, this -- in general terms, this extends to FEMA the delegated authority to renew certain CORE positions by 180 days only.  Correct?

A.   That's my understanding.  But also, I believe there is specific discussion and background about what that actually means in Annex A.

Q.   Without this delegation of authority, DHS required, as of May 2025, all decisions regarding CORE positions to be sent to DHS for S1 approval.  Correct?

MS. KIES:  Object to form, foundation.

A.   It's my understanding that the policy at that time, and continues to be the policy until rescinded by the current DHS Secretary, is hiring decisions are sent forward to DHS headquarters.

Q.   And you understand the extension of a CORE position to be a hiring decision?

MS. KIES:  Object to form.

A.   That is my interpretation of it, is that because it is a personnel action that cuts an SF-50, it counts as a hiring action.

Q.   And we'll get to that.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 267

You had a little bit of a dispute internally within FEMA whether -- whether that was the case, did you not, at the end of 2025?

MS. KIES:  Object to form.

A.    I believe that the emails outlined that discussion that we had -- that I had with the FEMA CHCO office.

Q.    But with respect to the nonMCO CORE positions addressed by this memo, you understood that FEMA, for six months, until that authority expired, had the ability to renew and extend nonMCO CORE positions for up to 180 days.  Correct?

MS. KIES:  Object to form.

A.    Yes, that's what this says.

Q.    And the limit of 180 days, that was a limit that was imposed by DHS, by the secretary's decision.  Correct?

MS. KIES:  Object to form.

A.    That's what this memo states, yes.

Q.    And without that authority, all of those decisions had to go to the DHS front office for approval.  Correct?

MS. KIES:  Object to form.

A.    The renewals had to go forward to DHS without this authority.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 268

Q.    Do you have any understanding of why this authority was granted to FEMA for roughly only a six-month period?

MS. KIES:  Object to form, foundation.

A.    This is when I arrived as the senior advisor to Mr. Richardson.  And I believe that this ability, as this states, was because we were coming up on hurricane season.

Q.    Hurricane season, which lasts, roughly, six months?

A.    It starts on June 1st.

Q.    And ends at the end of November?

A.    I believe it's --

MS. KIES:  Object to form.

A.    -- the end of November.

MS. LEONARD:  All right.  We're going to mark -- this is the next.  22.

(Whereupon, Plaintiffs Exhibit 22 was marked for identification.)

Q.    So, Ms. Evans, I've handed you what's been produced to us as an email with two attachments from the December 5th time frame.

The attachments appear to be a red-lined and a final FEMA CORE renewal S1 decision memo that

Page 272

CORE renewal memo.

I'm going to ask you about the top email.

(Witness reading.)

A.    Okay.

Q.    So you see here that Mr. Clayton is sending an email to FEMA's ExecSec that says:

Please allow Kara opportunity to review before packaging for signature.

Do you see that?

A.    Yes, I do.

Q.    And you understand that that's a reference to Ms. Voorhies?

MS. KIES:  Object to form, foundation.

A.    I believe that's the case, yes.

Q.    And do you have any reason to believe that these memos were not sent to Ms. Voorhies to give her an opportunity to review before packaging for signature?

MS. KIES:  Object to form, foundation.

A.    I have no reason to believe that they were not sent to her.

Q.    And did you discuss these memos or the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 273

renewal authority with Ms. Voorhies?

MS. KIES:  Object to form.

A.   I'm sure that I had discussions about the COREs, as we previously discussed, and then the authorities associated with hiring from the department and the delegated authorities.

Did I specifically talk about these memos? As you can see, again, I'm not on these emails.

Q.   Do you recall discussing the renewal authority with Ms. Voorhies in this early December time frame?

A.   I recall discussing that with her, but I also recall discussing it because, as I previously stated, I had weekly meetings with the deputy chief of staff, Joe Guy, and let him know that this was going to expire.

Q.   And did you discuss seeking renewal authority to extend that delegated authority with the DHS front office?

MS. KIES:  Object to form.

A.   I discussed with DCOS Guy that I was not going to seek the authority.

Q.   Who made the decision not to seek the Secretary of Homeland Security's approval to extend FEMA authority?

Page 274

MS. KIES:  Object to form.

A.   I made the decision not to send these memos forward and seek the approval after December 31st.

Q.   And was that before or after the memos were sent to Kara Voorhies?

MS. KIES:  Object to form, foundation.

A.   I'm unsure of the timing of this.  I really don't know the timing of this.

Q.   But you discussed this issue with Ms. Voorhies before you made that decision. Correct?

MS. KIES:  Object to form.

A.   As my previous note showed, that I have been discussing issues of FEMA with DCOS Guy on a weekly basis.

And as I previously stated, Ms. Voorhies was present in those meetings.

Q.   Did DCOS Guy tell you not to seek approval to extend the FEMA authority?

MS. KIES:  Object to form.

A.   He did not.  I told him I was not going to do that.

Q.   Did you make that decision because you

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 275

understood that the DHS Secretary did not want to extend that authority?

MS. KIES:  Object to form.

A.   I made the decision because I felt that we didn't need the authority at this time period, because it was not -- we were not in hurricane season, and that this was going to give us the opportunity to actually analyze the workforce appropriately.

Q.   And you were frustrated with the FEMA CHCO's extension of CORE positions pursuant to this authority because it interfered with your plan to reduce the number of CORE staff at FEMA.  Correct?

MS. KIES:  Object to form, misstates testimony and evidence.

A.   I don't agree with the statement that you just made because I don't believe that that's the premise of why -- I know that's not the reason why I did not ask for this authority during this time period.

Q.   If you had received this delegated authority to extend for up to 180 days, and those 180-day extensions had been given, it would have made it more difficult to hit your 50% cut numbers. Correct?

Page 276

MS. KIES:  Object to form.

A.  I, again, don't agree with the way that you're asking that question, because we would have done the analysis regardless of whether we had the authority to do the renewals for 180 days or not.

Q.  This was an impediment to your plan to reduce the number of CORE staff at FEMA, was it not?

MS. KIES:  Object to form, misstates testimony.

A.  Can you clarify the question?  Because I don't know what you mean by "this" is an impediment.

Q.  The idea of extending the authority to renew the CORE staff by up to 180 days would have been an impediment to your plan to cut the CORE staff.  Correct?

SP02:  Object to form, misstates evidence.

A.  I don't agree with that statement, because we were going to do the analysis.

And whether we had the authority or not, I viewed that authority as the ability for us to actually do the analysis and do meaningful analysis.

Q.  But you chose not to seek that authority from DHS because you didn't think it was necessary at the time?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 359

MS. LEONARD:  Okay.  Let's mark this as the next exhibit.  Got it.  33.

(Whereupon, Plaintiffs Exhibit 33 was marked for identification.)

WITNESS:  Thank you.

Q.  So this is a very short email from you to the FEMA CHCO.  And you say:

Hi La'Toya

Per our discussion, until further notice, please process CORE Renewals in accordance with HQ policy.  Their renewal dates should NTE 90 days for consistency.

What are your HQ -- what HQ policy are you referring to there?

A.  The HQ policy that I'm referring to is what you brought up previously, which is about the individual forms that need to be signed that have the names on them and that that authority for the signing was delegated to Will Bilicic.

Q.  If -- okay.  So it is your testimony that it was your decision, and your decision alone, that CORE renewals starting in January of 2026 would be limited to 90 days?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 360

MS. KIES:  Object to form.

A.   That's my recollection, yes.

MS. LEONARD:  Okay.  Let's mark this as the next, which is the declaration that you submitted in this case, Exhibit 34.

(Whereupon, Plaintiffs Exhibit 34 was marked for identification.)

Q.   You're familiar with this document, Ms. Evans?

A.   Yes, ma'am.

Q.   At the time you signed this, did you review all of the information in the declaration?

A.   Yes, I did.

Q.   Did you draft it, or was it drafted for you?

A.   The --

MS. KIES:  Object to form.

A.   The --

WITNESS:  I apologize again.  Sorry.

A.   The -- it was drafted, and then I reviewed the draft.

Q.   Did you edit it?

A.   I don't recall if I did specific edits to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 361

this particular declaration.

Q.   And you intended for the information contained in this declaration to be true and accurate?

A.   Yes, I did.

Q.   And you state here in this declaration....

Give me one moment.

(Pause.)

On Page 6 -- apologies.

On Page 6, in Paragraph 25, you state here that "DHS decided not to reappoint" 192 COREs in January of 2026.

Do you see that statement?

A.   Yes, I do.

Q.   Is that statement accurate?

A.   I think that -- I have reviewed this, and I can see where this statement would be confusing, based on the context of how I reviewed this.

So the way that I reviewed this document is that FEMA is a component of DHS, and I was reviewing this document as FEMA is a component of DHS, and that this document was going externally.

And so, I was talking about FEMA as a component of DHS.

Q.   You refer to FEMA separately in this

Page 362

document in many places.  Correct?

A.    Yes, I do.

Q.    Including in all the surrounding paragraphs to this statement.  Correct?

MS. KIES:  Object to form.

A.    Yes, that's what it says.

Q.    And in Paragraph 28, you say:

...FEMA and DHS are considering non-renewals of COREs....

So you're referring to the entities separately throughout this declaration.  Correct?

MS. KIES:  Object to form.

A.    I did in this.  And I would agree that this statement in 25 -- I can see where it would lead to confusion.

Q.    The terminations that -- well, let's put it this way:  The separations of CORE individuals that happened in January were the direct result of DHS directives and orders that you were implementing.  Correct?

MS. KIES:  Objection, misstates testimony and evidence.

A.    As I previously stated, the ones in January were based on that time period of the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 363

expiration of the authorities and the decision that I made not to renew those appointments that were in the first two weeks, I believe, of January.

Q.    DHS continues to control all authority for FEMA CORE renewals.  Correct?

MS. KIES:  Objection; legal conclusion, misstates testimony and evidence.

You can answer.

A.    I think that, based on what you just said, that's a misstatement.  That's not correct.

Q.    Do you believe it's accurate that DHS made the high-level decisions that led to the elimination of these positions, even if they didn't individually renew [sic] and reject each person?

MS. KIES:  Object to form.

A.    Can you restate that again?

Q.    Sure.

Do you believe it's true that DHS made the high-level decisions that led to the elimination of these positions, even if they did not individually review and reject each person?

MS. KIES:  Object to form.

A.    I do not believe that that's the case.

Q.    You don't believe that these terminations

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 364

came from the decisions and authorities of DHS?

MS. KIES:  Objection; asked and answered.

A.    As I said, I could have clarified this statement, especially where it says "pursuant to the lawful authority," because I'm the one who made the decisions not to renew these COREs, their appointments.

And so, I viewed that particular statement as I'm a component of DHS and that the policies that are in place as a component of DHS, I'm also responsible for following DHS policies.

Q.    And you understand that it is your job to implement the DHS priorities that are given to you by the secretary.  Correct?

MS. KIES:  Object to form.

A.    It is my job to implement the President's executive orders, as well as the secretary's priorities, as it relates to FEMA as a component of DHS.

Q.    And that is what you believed you were doing when you made the decisions with respect to the COREs for January.  Correct?

MS. KIES:  Object to form, misstates evidence and testimony, asked

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 365

and answered.

A.   The decision that I made at that point was not to renew those COREs because they were in January, and my authority that was delegated to me from the secretary to the position expired December 31st.

And so, I did not make the recommendations, and it did not go through the hiring process, which is the policy of DHS.

The non-renewals decision was made at FEMA.

Q.   And you believed, in making those decisions, that you were implementing the policy priorities of the Secretary of DHS.  Correct?

MS. KIES:  Objection; misstates testimony, asked and answered.

A.   In making these specific decisions, they were specifically related to these CORE renewals based on the authority that was delegated that was expiring.

And so, because I made the decision not to renew these --

VIDEOGRAPHER:  Oh, sorry.  You pulled --

WITNESS:  Oh, sorry.  I'm sorry.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 366

How about that?

VIDEOGRAPHER:  Okay.

WITNESS:  Sorry.

A.   Okay.  So I made the decision not to renew these appointments.

Q.   Let me ask the question again, Ms. Evans.

When you made these decisions, you believed you were implementing the policy priorities of the Secretary of DHS.  Correct?

MS. KIES:  Objection; asked and answered, misstates testimony.

A.   When I made this decision, as it related to potential renewals of these COREs, I was making the decision based on the authority that was delegated that was expiring on December 31st.

And the DHS policy at that point is:  Any hiring was to go forward to DHS headquarters.

Q.   I'm going to ask again, and it's a yes or no.

You believed, when you were making the decision with respect to the COREs in January, that you were implementing the DHS Secretary's policy priorities, didn't you, Ms. Evans?  Yes or no?

MS. KIES:  Objection; asked and answered, misstates testimony.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 367

A.    I am telling you the context of how this decision was made.  And this decision was made based on the expiration of the authority that had been delegated to FEMA.

And I was making the decision because these were positions that would be renewed in January, based on the policy that DHS had in place as it relates to hiring.

That is the basis of my decision.

Q.    And you certainly didn't think you were acting contrary to the policy priorities of the Secretary of DHS in making these decisions.  Correct?

MS. KIES:  Object to form.

A.    Again, I'm going to restate the basis of this decision, which was it was based on the authorities that were delegated and the authorities that were expiring.

Q.    Ms. Evans, I'm asking you a different question, and you need to give me an answer.  And I'm going to ask you directly one more time, and it's a yes-or-no question.

When you made these decisions, you understood that you were implementing the policy priorities of the DHS Secretary, didn't you?