Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
dleonard@altber.com
bchishom@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*
[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Case No. 3:25-cv-03698-SI <br><br> **DECLARATION OF ELIZABETH ESHLEMAN** |

**DECLARATION OF ELIZABETH ESHLEMAN**

I, Elizabeth Eshleman, declare as follows:

1.    I am a member in good standing of the State Bar of California and the bar of this Court. I represent all Union and Non-Profit Organization Plaintiffs in this action. This declaration is based on my personal knowledge, information, and belief.

2.    The Court's deadline for production of phone records was March 26, 2026, which would have permitted review prior to the depositions scheduled for March 31 (Evans), April 2 (Edwards), and April 3 (Prieur). ECF 336.

3.    On April 15, 2026, Defendants produced for the first time what appear to be three screenshot images of content from a phone. Defendants' counsel described these images in an email as "3 responsive, non-privileged, Signal chat screenshots from Evans's personal phone." Defendants' counsel did not state whether they obtained the three "screenshots" directly from the phone, from Evans, or from Evans' work email account, nor did they produce any accompanying emails that would reveal information about the timing of these communications or Evans' purported preservation practices.

4.    Defendants have not designated the images of Evans' Signal messages as confidential. A true and correct copy of the image marked USA-AFGE-Exp.-0424415 is attached as **Exhibit A.** This document depicts a Signal chat group with the name "FEMA 2.0" and appears to include part of an exchange between Karen Evans and Kara Voorhies. Defendants did not reveal the date of this exchange.

5.    A true and correct copy of the image marked USA-AFGE-Exp.-0424413 is attached as **Exhibit B.** This document appears to be a partial capture of an exchange involving Karen Evans and Kara Voorhies.

6.    A true and correct copy of the image marked USA-AFGE-Exp.-0424414 is attached as **Exhibit C.** This document appears to be a partial capture of an exchange involving Kara Voorhies and others.

7.    Defendants also produced on April 15, 2026, for the first time, "outstanding responsive, non-privileged, Tier 1 FEMA custodian phone communications." Defendants did not

1

identify all custodians, and generally produced pdfs without metadata.  Defendants also redacted some of these documents without providing a privilege log or explanation.  Attached hereto as **Exhibit D** is a true and correct copy of one such document, marked USA-AFGE-Exp.-0424392 through USA-AFGE-Exp.-0424400, and containing communications between Victoria Barton and an individual or individuals whose name(s) were redacted before production.  This document is also not marked Confidential.

8.    **Exhibit E** is a true and correct copy of Plaintiffs' deposition exhibit 13, the Draft Final Report produced by the President's Council to Assess the Federal Emergency Management Agency dated December 11, 2025.

9.    **Exhibit F** is a true and correct copy of Plaintiffs' deposition exhibit 3, which is a June 20, 2025 article from Politico entitled *Top CISA appointee Karen Evans moves to FEMA*.

10.    On March 31, 2026, Plaintiffs deposed FEMA's Senior Official Performing the Duties of Administrator ("SOPDA"), Karen Evans. A true and correct copy of the transcript of that deposition is attached as **Exhibit G.**  Plaintiffs are providing the complete transcript to avoid the Court having to reconcile three sets of extensive excerpts provided with the filings on compliance.  In agreement with Defendants, Plaintiffs have redacted parts of pages 146, 160, and 161 to remove the phone numbers of Ms. Voorhies, Mr. Lewandowski, and Mr. Guy, which Evans provided during her testimony. Defendants confirmed by email on April 8, 2026, that their confidentiality designation for Evans' deposition transcript is limited to those phone numbers.

11.    On April 2, 2026, Plaintiffs deposed DHS's Chief Human Capital Officer, Roland Edwards. A true and correct copy of further excerpts of the transcript of that deposition is attached as **Exhibit H.** Defendants confirmed by email on April 8, 2026 that they have no confidentiality designations for Mr. Edwards deposition transcript.

12.    On April 3, 2026, Plaintiffs deposed FEMA's Chief Human Capital Officer, La'Toya Prieur. A true and correct copy of further excepts of that transcript of that deposition is attached as **Exhibit I.**  Defendants confirmed by email on April 9, 2026 that their confidentiality designations are limited to certain names that do not appear in the attached excerpts.

Declaration of Elizabeth Eshleman, Case No. 3:25-cv-03698-SI

13. After her deposition in this case, Karen Evans testified before the United States House of Representatives Appropriations Committee regarding fiscal year 2027 appropriations on April 16, 2026. A recording of that proceeding is available at: https://www.youtube.com/watch?v=eBOtrg6Asi4&t=1562s. During that hearing, Representative Underwood raised the conflicting explanations given in this case regarding who authorized the non-renewal of CORE employees earlier this year. Recording at 1:04:06-05:16. Representative Underwood then asked Evans, "Ms. Evans, then, are you saying that they were not fired? Their contract expired?" *Id.* at 1:06:40-59. Karen Evans responded: "I'm saying that their functions and their work were reviewed, and there was a determination made by the supervisor or the program office head that that work wasn't needed and therefore the contract wasn't renewed." *Id.*

14. On January 27, 2026 Plaintiffs sought leave to file their supplemental complaint in this case, which Defendants did not oppose. ECF 290. Defendants did not at that time request any schedule for pleading motions. Defendants have not raised the issue of moving to dismiss at any time prior to their April 15, 2026 filing.

15. On March 20, 2026, Plaintiffs served all Defendants with document requests pertaining to the implementation of Executive Orders 14210 and 14356, which require submission of the Annual Staffing Plans. Defendants' responses to those discovery requests were due today, April 20, 2026. Plaintiffs have agreed to a two-week extension of this discovery response deadline.

16. On April 9, 2026, Plaintiffs informed Defendants of their intention to notice the depositions of Joseph Guy and Kara Voorhies and requested availability. Having received no response, Plaintiffs served Defendants with notices the depositions on April 10, 2026, and indicated willingness to discuss dates and availability. Plaintiffs requested Defendants' position on whether they would be representing Guy and Voorhies in the depositions noticed by Plaintiffs. On April 13, Plaintiffs served revised notices for deposition on April 29 and 30 (in light of the Court's order setting a response deadline for Defendants of April 15 regarding compliance disputes). Plaintiffs again requested Defendants' position on availability and whether they will be

Declaration of Elizabeth Eshleman, Case No. 3:25-cv-03698-SI

representing these individuals.   Having received no response, on April 14, Plaintiffs asked again whether Defendants could provide a response regarding representation and availability.

17.    On April 14, 2026, Defendants responded for the first time with respect to the noticed depositions, explaining their position that they had not yet been authorized by the Court. A true and correct copy of counsels' further exchange regarding these depositions is attached hereto as **Exhibit J**.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed April 20, 2026, in San Francisco, California.


ELIZABETH ESHLEMAN

4

Declaration of Elizabeth Eshleman, Case No. 3:25-cv-03698-SI

# Exhibit A

USA-AFGE-Exp.-0424415

# Exhibit B



Tue, Feb 10

Along the lines of what we discussed earlier, Donna has her re-org plan ready so I told her to try to get on your calendar to present to you soon rather than wait until March 31

People are raising things in sync's that they don't know ow to move forward for decision. I'm just telling them how I would tee it up for you so they are not stuck in purgatory. Maybe that's what you're hearing about?

2:08 PM

**Kara Voorhis**
People are raising things in sync's that they don't know ow to move forward for...

That makes sense.

4:49 PM

I am going to think on the note on brick and send it when I get home

6:21 PM

Sounds good

USA-AFGE-Exp.-0424413

# Exhibit C



USA-AFGE-Exp.-0424414

# Exhibit D

Timeline (Aligned to Workforce Requirements)
- Late Jan–Early Feb: DHS concurrence
- February: Policy issuances, templates, and workforce assessment launch
- March 31: Staffing plans submitted with validated baseline
- April–May: Execution model pilots and closeout surge underway
- June 1: Workforce-aligned implementation begins
- June: Initial outcomes and decision on continuation or sunset

One-Sentence DHS Framing (Very Strong)

"These interim actions restore national consistency in FEMA's execution, align workforce capacity to mission needs, and improve deployability — without statutory change and with clear DHS visibility."

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▇▇▇▇▇▇▇▇ | | 1/21/2026 7:18:28 AM(UTC-5) | |

Status: Read
Platform:

1/21/2026 6:00:02 AM(UTC-5)

Source Extraction:
File System (3)
Source Info:
EXTRACTION_APP_SELECTIVE.zip/root/private/var/mobile/Library/SMS/sms.db : 0x178F83 (Table: message, handle, Size: 4120576 bytes)

From: +▇▇▇▇▇ Victoria Barton
To: +▇▇▇▇▇▇▇ (owner)

Slide 1 — Why This, Why Now

Interim Enterprise Standardization & Execution Discipline

(Pre–Review Council Action Package)

Context
- FEMA Review Council timing uncertain
- Disaster volume, workforce strain, and field variance increasing risk
- DHS requires consistency and visibility now — not a long-term redesign

Problem
- FEMA execution varies by region rather than policy
- Field interpretation has drifted across programs
- Workforce posture obscures true deployable capacity
- Legacy disasters consume staff time and distort workload

Bottom Line

FEMA needs interim, non-legislative actions to restore national consistency, execution discipline, and mission-aligned staffing — deliverable by June.

Slide 2 — What We're Proposing (Enterprise-Level)

Five Interim Initiatives (No Congress Required)
1. Re-Center Decision Authority & Interpretation
Restore national consistency by narrowing field discretion and routing high-risk decisions through centralized review.
2. National Execution Standards Across Programs
Establish common timelines, templates, benchmarks, and interpretation guidance — applicable enterprise-wide.
3. Portfolio Cleanup & Closeout Acceleration
Time-bound surge to close eligible legacy disasters and free operational capacity.
4. Execution Model Pilots (Oversight, Not Operations)
Pilot models where FEMA sets policy and funding while states/partners execute delivery, with FEMA oversight.
5. Workforce Alignment & Deployable Capacity Reset
Reconcile workforce programs and org charts to establish a true, auditable baseline aligned to FEMA's core mission.

2291

USA-AFGE-Exp.-0424392

USA-AFGE-Exp.-0424393

Slide 3 — Why This Works for DHS

Benefits
- Consistency: Outcomes no longer depend on geography
- Control: Clear national thresholds and decision lanes
- Visibility: Accurate view of staffing, capabilities, and workload
- Fiscal Discipline: Reduced DRF strain from misaligned staffing and prolonged closeouts
- Speed: Measurable improvements by June

Guardrails
- No statutory changes
- No permanent reorganization
- Time-limited, reversible actions
- DHS visibility at defined checkpoints
- Explicitly interim pending Review Council outcomes


Slide 4 — Timeline & Decision Ask

Timeline (Hard Dates)
- Late Jan–Early Feb: DHS concurrence
- February: Policy issuances + workforce assessment launch
- March 31: Staffing plans submitted with validated baseline
- April–May: Closeout surge and execution pilots underway
- June 1: Workforce-aligned implementation begins
- June: Initial outcomes and continuation decision

Decision Requested from DHS

Approval to proceed with interim enterprise standardization actions that restore execution discipline, align workforce capacity to mission needs, and improve deployability — pending Review Council recommendations.


Optional Verbal Close (Use If Helpful)

"This is not reform, restructuring, or a permanent redesign. It's disciplined execution — so FEMA delivers consistent outcomes, understands its true capacity, and reduces risk while broader decisions are pending."

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ███████████████ | | 1/21/2026 7:18:28 AM(UTC-5) | |

Status: Read
Platform:

1/21/2026 6:00:32 AM(UTC-5)

Source Extraction:
File System (3)
Source Info:
EXTRACTION_APP_SELECTIVE.zip/root/private/var/mobile/Library/SMS/sms.db : 0x17BF83 (Table: message, handle, Size: 4120576 bytes)


From: ███████ Victoria_Barton
To: ███████ (owner)

1. DHS Decision Memo (1 Page)

TO: Secretary
FROM: FEMA
SUBJECT: Interim Enterprise Standardization & Execution Discipline Actions (Pre–Review Council)

Purpose

Request approval to proceed with a limited set of interim, non-legislative actions to restore national consistency, execution discipline, and mission-aligned workforce posture across FEMA, pending FEMA Review Council outcomes.


Background

The timing and scope of the FEMA Review Council remain uncertain. In the interim, FEMA is experiencing increasing operational risk driven by:

2292

USA-AFGE-Exp.-0424394

- Regional variance in interpretation and execution of national policy
- Inconsistent program delivery standards across disasters
- Workforce misalignment that obscures true deployable capacity
- Legacy disasters remaining open and consuming staff and funding

These issues affect multiple FEMA programs and create reputational, fiscal, and oversight risk for DHS.

## Proposal

Approve FEMA to implement five time-limited, administrative initiatives under existing authority:

1. Re-Center Decision Authority & Interpretation

Narrow field discretion and establish national thresholds for high-risk decisions, policy exceptions, and non-standard approaches, with centralized review for edge cases.

2. National Execution Standards Across Programs

Implement common timelines, templates, benchmarks, and centralized interpretation guidance applicable enterprise-wide.

3. Portfolio Cleanup & Closeout Acceleration

Launch a focused, time-bound effort to close eligible legacy disasters and restore clarity to FEMA's operational and financial posture.

4. Execution Model Pilots (Oversight, Not Operations)

Pilot models where FEMA sets policy, eligibility, and funding while states or partners execute delivery, with FEMA retaining oversight and termination authority.

5. Workforce Alignment & Deployable Capacity Reset

Reevaluate temporary workforce programs and reconcile organizational charts to establish a true, auditable baseline of staffing and capabilities aligned to FEMA's core mission and deployable model.

This effort supports FEMA's March 31 staffing plan submission and June 1 implementation timeline.

## Benefits to DHS

- Restores national consistency in execution
- Improves leadership visibility into workforce capacity and workload
- Reduces DRF strain driven by prolonged closeouts and misaligned staffing
- Delivers measurable improvements by June
- Does not prejudge Review Council recommendations

## Guardrails

- No statutory changes
- No permanent reorganization
- Time-limited and reversible actions
- DHS visibility at defined decision points

## Decision Requested

Approve FEMA to proceed with the interim enterprise standardization and execution discipline actions outlined above.

## 2. Secretary / DCOS Talking Points (2–3 Minutes)

Opening
- "The Review Council timing is uncertain, but operational risk is increasing now."
- "This package is about execution discipline, not reform or restructuring."

Problem
- "Right now, FEMA outcomes vary by region rather than policy."
- "Field interpretation has drifted across programs."
- "Our workforce posture no longer reflects a clear picture of deployable capacity."
- "Legacy disasters remain open and consume staff and funding."

What We're Doing
- "We're proposing interim, non-legislative actions FEMA can execute immediately."
- "They standardize decision-making, improve consistency across programs, and realign staffing to mission needs."
- "Nothing here requires Congress or prejudges Review Council outcomes."

Why DHS Should Support This
- "It restores consistency and control."
- "It improves visibility into FEMA's true capacity."
- "It reduces DRF pressure and IG risk."
- "We can show tangible progress by June."

Guardrails
- "No permanent reorganization."

2293

USA-AFGE-Exp.-0424395

- "No statutory changes."
- "Time-limited, reversible, and DHS-visible."

Close
- "This is disciplined execution while broader decisions are pending."

Optional One-Liner (if pressed)

"This ensures FEMA executes national policy consistently, understands its true workforce capacity, and reduces risk — without locking in long-term decisions."

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ███████████████ | | 1/21/2026 7:18:28 AM(UTC-5) | |

Status: Read
Platform:

1/21/2026 6:01:37 AM(UTC-5)

Source Extraction:
File System (3)
Source Info:
EXTRACTION_APP_SELECTIVE.zip/root/private/var/mobile/Library/SMS/sms.db : 0x17EF83 (Table: message, handle, Size: 4120576 bytes)



From: ███████ Victoria Barton
To: +███████ (owner)

For too long, FEMA's mission has expanded without sufficient discipline around execution, accountability, and consistency. Over time, this has made it harder to clearly answer basic questions about who is responsible for what, how decisions are made, and how policies are applied across the country. FEMA is now taking deliberate steps to restore clarity, standardize execution, and ensure the agency is focused on its core mission — so communities receive predictable, timely, and equitable service regardless of where a disaster occurs.

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ███████████████ | | 1/21/2026 7:18:28 AM(UTC-5) | |

Status: Read
Platform:

1/21/2026 6:03:32 AM(UTC-5)

Source Extraction:
File System (3)
Source Info:
EXTRACTION_APP_SELECTIVE.zip/root/private/var/mobile/Library/SMS/sms.db : 0x17FF83 (Table: message, handle, Size: 4120576 bytes)

USA-AFGE-Exp.-0424396



From: [redacted] (owner)
To: [redacted] Victoria Barton

Just flagging for you that on the tribal call yesterday, we heard that four tribal liaisons are coming up for renewal in the short term and all native tribal members. I can only speak for my Tribal liaison, Cathy Bachhuber who is up 2/10 (we sent a justification up for her). She is a member of the Oneida Nation and well connected throughout the Midwest tribal communities.

Just flagging because I'm sure we will get external calls.

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Victoria Barton | 1/21/2026 9:15:37 AM(UTC-5) | 1/21/2026 9:15:39 AM(UTC-5) | |

Status: Sent
Platform:

1/21/2026 9:15:36 AM(UTC-5)

Source Extraction:
File System (3)
Source Info:
EXTRACTION_APP_SELECTIVE.zip/root/private/var/mobile/Library/SMS/sms.db : 0x181C8C (Table: message, handle, Size: 4120576 bytes)



From: [redacted] (owner)
To: + [redacted] Victoria Barton

1Quote post NWS – note that NWS will post key messages this afternoon as well so that will also be a good one to repost: https://x.com/NWSWPC/status/2013925322689749471

Message options:
2A massive winter storm will be affecting many areas of the country this weekend. Check your local weather forecast to know what to expect for your community. Visit @Readygov (https://x.com/Readygov) for tips and a checklist of what you should gather before the storm arrives. More: https://www.ready.gov/winter-weather

3When winter storms are in the forecast, take the time to make sure you're prepared for potential power outages by stocking up on non-perishable items. In case of emergency, have at least 3 days worth of food, water and necessary medications for each member of your household. More info: https://www.ready.gov/winter-weather#prepare

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] Victoria Barton | 1/21/2026 12:03:19 PM(UTC-5) | 1/21/2026 12:03:25 PM(UTC-5) | |

Status: Sent
Platform:

1/21/2026 12:03:18 PM(UTC-5)

Source Extraction:
File System (3)
Source Info:
EXTRACTION_APP_SELECTIVE.zip/root/private/var/mobile/Library/SMS/sms.db : 0x182F7C (Table: message, handle, Size: 4120576 bytes)

2297

USA-AFGE-Exp.-0424397



From: ▮▮▮▮ Victoria Barton
To: ▮▮▮▮▮▮ (owner)

"This is a mischaracterization of how FEMA's CORE program works. The CORE program consists of term-limited positions that are designed to FLUCTUATE based on disaster activity, operational NEED, and available funding. FEMA's National Response Coordination Center has been activated in response to a historic winter storm, in line with this mission. FEMA is following standard protocol to ensure mission functions are being met. We urge the media to report on how Americans can stay safe this weekend, not create manufactured drama while a winter storm looms."

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮▮▮ | | 1/22/2026 9:03:43 PM(UTC-5) | |

Status: Read
Platform:

1/22/2026 9:03:32 PM(UTC-5)

Source Extraction:
File System (3)
Source Info:
EXTRACTION_APP_SELECTIVE.zip/root/private/var/mobile/Library/SMS/sms.db : 0x1A3ACA (Table: message, handle, Size: 4120576 bytes)



From: +▮▮▮▮▮▮▮ (owner)
To: ▮▮▮▮ Victoria Barton

Flagging we just had seven attendees added to the S1 meeting tomorrow:

1. Walker Barrett
2. Jarrod Agen
3. Steve Feinberg
4. Steven Bradburg
5. Alex Meyer
6. Katie Sullivan
7. Brian Cavanaugh

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| ▮▮▮▮ Victoria Barton | 1/22/2026 11:43:15 PM(UTC-5) | 1/22/2026 11:43:18 PM(UTC-5) | |

Status: Sent
Platform:

1/22/2026 11:43:15 PM(UTC-5)

Source Extraction:
File System (3)
Source Info:
EXTRACTION_APP_SELECTIVE.zip/root/private/var/mobile/Library/SMS/sms.db : 0x1A4F7C (Table: message, handle, Size: 4120576 bytes)

2312

USA-AFGE-Exp.-0424398

From: [redacted] Victoria_Barton
To: [redacted] (owner)

Requesting approval to adjust FEMA's posture at the National Response Coordination Center as we transition from surge coordination to sustained disaster management. FEMA would remain activated at Level 3, and operational support for impacted states would continue across the agency.

Based on current conditions, state emergency operations center activity, and the absence of outstanding unmet requests for assistance, we believe we are at the point where round-the-clock surge coordination is no longer required at the national level. We are proposing full daytime operations with an enhanced overnight presence, rather than a full twenty-four-hour staffing model.

Overnight, watch officers and additional FEMA response staff would remain physically present in the coordination center to maintain continuous situational awareness, support any emerging needs, and immediately elevate issues if conditions change. Disaster response and recovery work would continue without interruption, and staff across FEMA would remain actively engaged with states and partners.

This approach reflects a conditions-based transition, not a reduction in federal support or readiness. FEMA would remain fully prepared to immediately return to full twenty-four-hour operations if conditions, weather, or state needs require it.

Requesting Department approval to proceed with this posture adjustment.

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| [redacted] | | 2/2/2026 12:20:23 PM(UTC-5) | |

Status: Read
Platform:

2/2/2026 12:20:13 PM(UTC-5)

Source Extraction:
File System (3)
Source Info:
EXTRACTION_APP_SELECTIVE.zip/root/private/var/mobile/Library/SMS/sms.db : 0x273F83 (Table: message, handle, Size: 4120576 bytes)

From: [redacted] Victoria_Barton
To: [redacted] (owner)

TO: FEMA Senior Leadership
FROM: Office of External Affairs
SUBJECT: Framing, Messaging, and Rollout Plan for Interim FEMA Reform Deliverables
DATE: February 2026

Purpose

Provide a proposed framing, messaging approach, and work plan to support near-term FEMA reform deliverables — including establishment of a time-limited FEMA task force and development of an interim Concept of Operations (CONOPS) — in alignment with the President's direction to reform FEMA and ahead of the 2026 hurricane season.

Context

The President has been clear in directing FEMA reform focused on effectiveness, accountability, and readiness. Over the past year, FEMA has largely awaited outcomes from the FEMA Review Council. While that work remains important, its timing is uncertain and has limited FEMA's ability to demonstrate visible progress toward reform.

At the same time:
- Hurricane season is approaching rapidly
- Staffing plans are due March 31
- FEMA lacks a single, authoritative baseline defining how it operates, deploys, and executes its mission

There is now an opportunity — and expectation — to demonstrate credible, disciplined reform activity that improves readiness and execution without requiring statutory change or waiting for long-term structural decisions.

Problem Statement (Enterprise-Level)

USA-AFGE-Exp.-0424399

FEMA currently lacks a clear, enterprise-wide baseline for:
- How national policy is executed across regions and programs
- Where decision authority resides and how exceptions are handled
- What workforce capacity is truly deployable
- How systems, staffing, and administrative processes support mission execution

Over time, mission growth, temporary workforce programs, hiring constraints, and informal field practices have obscured accountability, increased labor-intensive workarounds, and made it difficult to provide leadership with a straight answer on capacity, responsibility, and status.

As a result, FEMA risks entering hurricane season without the clarity and discipline required for effective response.

## Strategic Framing: What Reform Means Right Now

This effort should be framed not as "big-bang reform," but as interim enterprise standardization — the foundational work required before larger reforms can be responsibly implemented.

Key premise:

FEMA cannot reform what it has not clearly defined.

Before advancing large structural or policy changes, FEMA must establish a clear operational baseline.

## Proposed Reform Approach (Phase One)

### 1. Establish a Time-Limited FEMA Task Force

Leadership has expressed openness to a task force model. This task force should be framed as:
- Mission-driven, not advisory
- Deliverable-focused
- Sunset-dated
- Aligned to near-term readiness needs

Primary mandate:
Produce foundational reform deliverables that demonstrate progress, improve execution, and inform future decisions.

### 2. Anchor Deliverable: Interim FEMA CONOPS

The CONOPS should be positioned as the first concrete reform product, not an academic exercise.

Purpose of the CONOPS:
- Establish a single, authoritative description of how FEMA operates
- Define roles, responsibilities, and decision pathways
- Clarify how FEMA deploys, executes, and oversees mission delivery
- Serve as the operational baseline for workforce, systems, and policy alignment

This directly supports the President's reform intent by restoring discipline, clarity, and accountability.

### 3. Supporting Deliverables

The task force should also produce:
- Standardized administrative forms and execution templates
- Clarified authority and escalation pathways
- Inputs to workforce baselining and staffing plans
- Guidance that reduces reliance on informal practices and ad hoc workarounds

## Integration with Staffing Plans (March 31 Deadline)

Workforce alignment is a core reform component and must be integrated, not treated separately.

This effort supports staffing plans by:
- Reevaluating temporary workforce programs
- Reconciling organizational charts to reflect actual mission execution
- Establishing a clear accounting of deployable capacity
- Aligning personnel costs with FEMA's core mission and Disaster Relief Fund stewardship

2419

USA-AFGE-Exp.-0424400

# Exhibit E

# Draft Final Report

## The President's Council to Assess the Federal Emergency Management Agency

December 11, 2025

 



EXHIBIT

DATE:

SUSAN ASHE

Dear Mr. President,

On January 24, 2025, you established the Federal Emergency Management Agency Review Council (FEMA Review Council) through Executive Order 14180, *Council to Assess the Federal Emergency Management Agency*.

The FEMA Review Council was appointed to advise you, through the Assistant to the President for National Security Affairs, the Assistant to the President for Homeland Security, and the Director of the Office of Management and Budget, on FEMA's current ability to capably and impartially address disasters occurring within the United States, and to further provide recommendations related to FEMA that would best serve the national interest.

Under your leadership, the dedicated servants you appointed to the Council have worked tirelessly to pull back the curtain on how FEMA currently operates, and to understand how the bureaucracy and mission creep pulled FEMA away from its core mission: helping Americans on their worst day. History has shown that most of the agency's reforms have been made only in response to a major catastrophe, but this is a once-in-a-generation opportunity to proactively assess and determine what disaster management should be, and we are honored that you entrusted us with the opportunity to play a role in shaping the future of the nation's disaster response capabilities and efficiencies.

The Council was deliberate in its actions, taking the time to engage across jurisdictional levels and with various sectors across the country to hear about their interactions and experiences working with FEMA during and after disasters. The Council offered stakeholders and the general public a tremendous amount of time over the past year to provide their feedback into the record.

Throughout this lengthy process, the Council has focused their efforts on the key doctrine that *disaster response should be locally executed, state or tribally managed, and federally supported*. The first, best, and most effective response to disasters comes from the local community and first responders where the disaster strikes. This guarantees a people-first, community-centric response to ensure help arrives where it is most needed and without delay. State and local jurisdictions should have the best resources, training, and equipment to support its first responders. The federal government is available to support but should not be the first responders in a disaster. The Council also recognizes the need for *prudent spending of hard-earned American taxpayer dollars by reducing waste in long-term recovery efforts and accelerating how Americans get back on their feet after a disaster.*

After considering the wealth of information we learned from listening sessions, surveys, and meetings with disaster response experts, the Council has voted, affirmed, and further presents the following recommendations to put Americans first, which will eliminate FEMA as we know it today, and replace it with a new **to-be-named FEMA 2.0**, housed within the U.S. Department of Homeland Security (DHS).

Sincerely,


Kristi Noem
Secretary of Homeland Security

Pete Hegseth
Secretary of War

2



# Draft Executive Summary

## The President's Council to Assess the Federal Emergency Management Agency

December 11, 2025

  

DRAFT//PRE-DECISIONAL//DELIBERATIVE

## Table of Contents for Executive Summary

**Listening to the Nation: Stakeholder and Public Feedback**.......................................................... 5

**Guiding Principles and Key Recommendations**.......................................................................... 5

    1. FEMA 2.0 – A New Start ....................................................................................................... 7

    2. Recommend FEMA 2.0 remain in DHS ................................................................................ 8

    3. Equip States, Local governments, Tribes, and Territories to lead disaster response with the federal government in a supporting role ............................................................................... 8

    4. Keep Existing Federal Disaster Resources to Support Communities.................................... 9

    5. Realign the Criteria for Federal Disaster Assistance .......................................................... 10

    6. Replace the Hazard Mitigation Grant Program with a two-phase funding structure........ 10

    7. Streamline the Individual Assistance program into a single direct payment program ......11

    8. Reform the Public Assistance program to provide direct funding block grants ............... 12

    9. Reform the FEMA National Flood Insurance Program (NFIP) for Financial Stability and Risk Resilience.......................................................................................................................... 13

    10. Maximize every dollar spent by Reducing Administrative Costs.................................... 13

**Appendix A: Detailed Charts**.................................................................................................. 15

**Appendix B: RAPID Direct Funding Flow Chart** .................................................................. 17

**Appendix C: Looking Back - A History of Emergency Management and FEMA**................ 18

**Appendix D: FEMA Disaster Response (2021-2024)**.............................................................. 19

**About the FEMA Review Council**.......................................................................................... 20

**FEMA Review Council Members**........................................................................................... 21

**Acknowledgements**................................................................................................................. 21

**Report Addendum**...................................................................................................................23

DRAFT//PRE-DECISIONAL//DELIBERATIVE

# Listening to the Nation: Stakeholder and Public Feedback

In order to meet the mandate established by the president, the Council was deliberate in its actions over the past several months, devoting significant time to engage across jurisdictional levels and with various entities to hear about their experiences with FEMA during and after disasters. The Council solicited input from a broad range of stakeholders, including Americans affected by natural and man-made disasters; the research community; private sector; state, local, tribal, and territorial (SLTT) governments; foundations; faith-based and nonprofit organizations. In total, the Council received and reviewed (1) 11,708 public submissions, (2) a nationwide survey of SLTT agencies and non-government partners yielding 1,387 responses, (3) direct engagement with 50 states and territories, (4) listening sessions in 13 cities across the nation, and (5) four listening sessions with tribal nations.

The feedback received underscores widespread support for FEMA reform aimed at addressing inefficiencies, reducing bureaucratic barriers, and enhancing support for disaster survivors and local governments. Stakeholders consistently identified key priorities, including the need to streamline processes, decentralize decision-making, improve the access to mitigation and preparedness initiatives, and ensure fairness in disaster response and recovery efforts. Participants emphasized the importance of implementing reforms gradually, allowing for a phased approach that strengthens partnerships among federal, state, tribal, and local entities while minimizing disruptions.

This robust engagement process has provided the Council with invaluable insights into the challenges and opportunities facing FEMA's operations. The feedback serves as a cornerstone for shaping the future of FEMA's programs, ensuring that reforms are informed by the lived experiences of those directly impacted by disasters and those responsible for managing emergency response and recovery efforts. By integrating this input into its recommendations, the Council aims to create a more efficient and responsive FEMA that is better equipped to meet the needs of communities nationwide. The inclusion of public feedback reflects the Council's commitment to fostering collaboration and transparency in the pursuit of meaningful reform.

# Guiding Principles and Key Recommendations

At the direction of President Donald J. Trump, the FEMA Review Council (the Council) conducted a full-scale agency review in accordance with Executive Order 14180 and developed a comprehensive set of findings and recommendations for overhauling the federal government's approach before, during, and after disasters. This executive summary will provide the president with the Council's summarized recommendations, to include guiding principles for reform, recommendations for improvements, and structural changes to promote the national interest and enable national resilience. After the Council fully evaluated the country's history of disaster response, reviewed feedback from more than 11,000 individuals impacted by disasters, and met with stakeholders involved in emergency management, the Council agreed on this key doctrine: *Disaster response should be locally executed, state or tribally managed, and federally supported.*

Disaster response is complicated and increasingly expensive. With taxpayers bearing the burden of recovery funding, it is the responsibility of every American to embrace their individual responsibility to lessen this burden by being prepared for disaster. Prudent preparation through

5

DRAFT//PRE-DECISIONAL//DELIBERATIVE

planning, mitigation, insurance, capabilities, and seeking a fundamental understanding of their role in a disaster is vital to contributing to national preparedness. Active preparation and knowledge directly contribute to the effectiveness of local execution in any emergency or disaster. As our nation returns ownership of emergency management back to local communities and their states, tribes, and territories, we encourage every American to review their insurance policies and personal disaster plans as well as engaging with their local community leaders to be better prepared when disaster strikes.

States and local governments are the foundation of a successful emergency management system. As the immediate first responders, local public safety, infrastructure, and human service personnel require adequate training and equipment to manage all-hazard incidents effectively. States and local governments are on the frontline of recovery efforts following a disaster incident, working with states to reopen critical public and economic infrastructure. Beyond immediate response, local governments are essential for proactive community safety through proper land-use planning and by enforcing building codes to harden critical infrastructure against identified local risks. During a crisis, the visible leadership of state and local officials— demonstrated through decisive action and transparent public communication before, during, and after a disaster—is paramount for public trust and effective coordination. It is imperative that the Council's reforms are implemented in a phased approach manner over two to three years. This phased approach will ensure States, Locals, Tribes, and Territories are able to prepare their fiscal and physical capabilities for the new FEMA 2.0.

When local resources are overwhelmed, a robust system of state-coordinated mutual aid compacts becomes critical to ensuring communities receive necessary support and do not fail. This tiered support system, which can scale up to federal assistance, when necessary, guarantees a resilient national response. Ultimately, strengthening state and local government capability in disaster preparedness, response, recovery, and mitigation is a direct and essential investment in national safety and community resilience.

After an exhaustive national review of the nation's ability to prepare for, respond to, and recover from natural disasters, the Council developed five guiding principles for reform:



**Council Guiding Principles**

- Boldly transform FEMA into a lean organization that puts **Americans first**
- **Return** leadership for emergency response and recovery to the States, Tribes, and Territories
- **Reaffirm** that individual American preparedness is foundational to disaster readiness
- **Accelerate** federal assistance dollars to help Americans **recover from their worst day**
- **Maximize** the transparency and efficiency of federal and SLTT dollars spent in emergency management

6

DRAFT//PRE-DECISIONAL//DELIBERATIVE

The Council leveraged these five guiding principles to develop the following ten key recommendations.

## 1. FEMA 2.0 – A New Start

It is time to close the chapter on FEMA. "FEMA" as a brand and as an agency was irreparably damaged by the previous Administration's proclivity to mission creep and endemic program failures. A new agency should be established that retains the core missions of FEMA, while highlighting the renewed emphasis on locally executed, state or tribally managed, and federally supported emergency management. We propose renaming FEMA and reference the new agency as "FEMA 2.0" in this document.[1]

Beyond boldly transforming the agency, FEMA 2.0 should refocus on its core mission *to reduce the loss of life and property and protect the Nation from all hazards*[2] by reducing bureaucracy, improving efficiency, and building stronger partnerships with SLTT governments. Therefore, the agency will shift from a District of Columbia-centric bureaucracy and regulatory bottleneck to a new, lean coordination-focused workforce that empowers SLTT officials to provide relief for their citizens. FEMA 2.0 should reduce overall staffing by approximately 50% and address a recent surge in headquarters-based personnel by rebalancing their headquarters vs. field personnel ratio to reduce the agency's bureaucratic bloat. This reduction should be phased over a two-to-three-year timeline and would be dependent of the Council's recommendations being implemented and the existing workload of the FEMA 2.0 personnel being reduced. FEMA 2.0 should deliver any cost savings achieved through staffing efficiencies back to the States, Tribes, and Territories. As the agency transforms, there remains a need for partnerships between states and federal stakeholders and this can be best facilitated by active FEMA 2.0 regions.

To empower these partners, FEMA 2.0 should shift training execution to states, expand and leverage existing successful partnerships, continue support of Emergency Management Assistance Compact agreements, empower states with expedited funding, and limit federal on-the-ground response to only incidents that exceed the capabilities and capacities of SLTT stakeholders. Beyond these core actions, FEMA 2.0 should promote a "Whole Community" approach to national preparedness. To do this, the agency must address the existing gap in the emergency management landscape by returning to a network that enables government, private industry, and non-profit partners to build toward shared capabilities and integrated resources. This will formalize and streamline coordination between government agencies, critical private-sector partners, and nonprofit organizations.

The Council recommends reviewing all existing FEMA programs and maintaining those that are critical to our nation's security. Further, rather than replacing successful programs, FEMA 2.0 should double down on those with a proven track record of effective federal-state-local partnership such as the Emergency Management Assistance Compact, National Urban Search

---

[1] The Council recognizes this change will necessitate legislative action, however, the Council recommends in the interim for the president to create a secondary title for FEMA and further direct the Department of Homeland Security to recommend actions, to include legislative and executive actions, required to permanently rename FEMA into the new agency name.

[2] *The primary mission of the Agency is to reduce the loss of life and property and protect the Nation from all hazards, including natural disasters, acts of terrorism, and other man-made disasters, by leading and supporting the Nation in a risk-based, comprehensive emergency management system of preparedness, protection, response, recovery, and mitigation.* – Post-Katrina Emergency Management Reform Act of 2006

7

DRAFT//PRE-DECISIONAL//DELIBERATIVE

and Rescue Program, Centers for Domestic Preparedness, and U.S. Fire Administration among others.

FEMA 2.0 must look for opportunities to remove duplications of effort such as environmental and historical reviews, audits, and inspections that should be conducted by states. Further, FEMA 2.0 should endeavor to expedite the closeout of historical open disasters. Doing so will address and reduce lingering administrative costs as well as legacy information technology systems that are maintained solely to facilitate open disaster declarations. Both directly benefit Americans by accelerating ongoing recovery efforts and reducing taxpayer costs. Finally, as FEMA 2.0 is transformed, the below recommendations must be made with a comprehensive effort to streamline and modernize the agency's technology to support its refocus on the core mission.

## 2. Recommend FEMA 2.0 remain in DHS

Following the September 11, 2001, terrorist attacks, Congress created DHS to consolidate numerous agencies responsible for national security and public safety. The legislation explicitly reframed disaster response as a core component of national security. FEMA 2.0 should remain in DHS, as the Department provides critical resources, budgeting support, and intelligence capabilities, which enables stronger disaster preparedness, faster response, and better recovery efforts for states and communities while maintaining government stability and continuity during crises.[3] Keeping FEMA within DHS ensures communities can easily coordinate across all types of emergencies—from natural disasters to terrorism—by focusing their general response capabilities on their specific local risks.

## 3. Equip States, Local governments, Tribes, and Territories to lead disaster response with the federal government in a supporting role

The National Preparedness Goal aims to create a secure and resilient nation that can handle various threats and hazards.[4] As it stands today, most of the public's first instinct during a major natural disaster is to rely on or expect the federal government to complete a whole-of-government national response irrespective of whether that incident necessitates *any* federal response. However, contrary to that misconception, it is the SLTT governments that have always had the primary response role during a disaster. Reorienting the National Preparedness System to empower SLTT governments to manage the mitigation, response, and recovery of disasters effectively will return the federal role from *leading* to *supporting*.

To achieve this, the Council recommends addressing both the lack of a national standard for initial response and recovery as well as addressing the limited ability to share and coordinate resources. FEMA 2.0 must reinvigorate a national system to ensure SLTT, private, and non-profit capabilities can better integrate during disasters. Additionally, the Council recognizes the importance of Non-Disaster Grants, such as the Emergency Management Performance Grant (EMPG), that ensure our nation's security and recommends these programs be retained within

---

[3] Of note, emergency management stakeholder response on FEMA's location involved vigorous debate and some support for re-establishing FEMA as an independent agency. For all general public written comments, see Federal Register, Department of Homeland Security 2025-0013, https://www.federalregister.gov/documents/2025/03/26/2025-05057/request-for-public-input-on-experiences-with-fema-disaster-responses

[4] Federal Emergency Management Agency, "National Preparedness Goal," https://www.fema.gov/emergency-managers/national-preparedness/goal

8

DRAFT//PRE-DECISIONAL//DELIBERATIVE

FEMA 2.0. The Council encourages exploring how to leverage federal savings from other efficiencies gained to create a potential one-time EMPG increase to better facilitate the return of responsibilities to States, Tribes and Territories.

**To address a lack of a national standard for incident response and recovery:**

1. Encourage adoption of national capability standards at SLTT level

2. Incentivize building scalable training resources at SLTT level

3. Professionalize emergency management to promote professional development

4. Focus on catastrophic planning and promote a common approach to exercise standards

**To address the limited ability to share and coordinate resources:**

1. Revitalize and promote the use of the Unified Resource Catalog of all Federal and SLTT-typed capabilities and resources

2. Refocus SLTT grant investment on mission-ready teams, capabilities, and infrastructure that meet national standards (i.e. State Search and Rescue, Swift Water Rescue, and other teams as identified in National Resource Hub) in lieu of funding specialty equipment

3. Enhance and improve upon the existing credentialing framework under the National Incident Management System (NIMS) and National Qualification System (NQS)

4. Promote the integration of additional partners, to include volunteer and faith-based organizations

5. Incentivize investments in interoperable systems for communication and data sharing to improve real-time coordination

## 4. Keep Existing Federal Disaster Resources to Support Communities

The federal government must maintain the ability to provide federal support resources through a single federal entity, so that state and local officials can quickly and efficiently leverage the full force of the federal government when required. Although state and local authorities have the primary responsibility for responding to a wide range of hazards and protecting their citizens, the federal government should retain the responsibility to support these efforts when required. FEMA's current mission exists at the intersection of emergency management and national security. An essential component of this is FEMA's authority to coordinate other federal agencies in support of SLTT partners. These include federal capabilities and programs such as Urban Search and Rescue Task Forces, National Disaster Medical System, Radiological Emergency Preparedness, and public communication tools like the Integrated Public Alert and Warning System and the National Alert and Warning System.

Additionally, the agency maintains an arsenal of dual-use capabilities, regional offices, incident management teams, prepositioned logistic systems or programs, and the Disaster Relief Fund to ensure the American people are resilient in the face of any threat, whether natural or man-made. Therefore, sustaining and resourcing this mission in FEMA 2.0 is vital to public safety, economic stability, and national resilience.

DRAFT//PRE-DECISIONAL//DELIBERATIVE

## 5. Realign the Criteria for Federal Disaster Assistance

Federal assistance should only be reserved for truly significant events that exceed SLTT capacity and capability. Therefore, common criteria should be established on how to evaluate when this occurs. The current disaster declarations process for federal assistance does not adequately account for SLTT capacity and, therefore, is inconsistent with legislative intent and disincentivizes SLTT investment in disaster preparedness. In addition, the complexity and subjectivity within the existing process for granting federal assistance to individual citizens also creates frustration and tension between federal and state partners that distracts from a common desire to assist survivors efficiently and fairly.

FEMA 2.0 should implement common-sense approaches to update federal disaster declaration thresholds, thus rebalancing federal and state responsibilities. This includes a reset of the Per Capita Indicator threshold, using the Consumer Price Index to account for historical inflation. The Council recommends that disasters be evaluated for federal assistance based on the level of severity for public assistance and individual assistance funding. Additionally, an annual calendar year minimum expenditure should be established for small, medium, and large states prior to them being able to request a federal declaration (*see Appendix A for detailed guidance*).

## 6. Replace the Hazard Mitigation Grant Program with a two-phase funding structure

FEMA's current Hazard Mitigation Grant Program is hampered by administrative burdens that delay funding distribution until well after rebuilding begins, thus missing opportunities for cost-effective mitigation. Reviews indicate lengthy project approval times, inconsistent oversight, and a narrow focus on certain risk while neglecting others. The Council proposes a state-managed program, notionally titled "Refined Risk Reduction" Program (R3P), where project priorities are nationally set and environmental reviews are handled locally, with two phases of funding:

- **Rapid Mitigation Advance** (Within the first 30 days provide up to 5% of the federal government contribution for the disaster to facilitate immediate residential mitigation to primary residences and communities impacted by the event or in other high-risk zones)

- **Strategic Mitigation Allocation** (Within the first six months provide up to the remaining 10% of the federal government contribution to improve the performance of the NFIP by mitigating properties and critical infrastructure based on Federal Administration priorities)

For mitigation to work, the Council recommends states take on greater program management responsibility and continue to develop an improved and comprehensive state hazard mitigation process that identifies projects that are immediately implementable. The program would be structured with up to a 75% cost share based on performance metric (*see Appendix A)* with a 50% minimum. The program would focus on expediting funding for states and territories with approved hazard mitigation plans and a history of successful HMGP performance, encouraging identification and sharing of best practices, inventorying high risk properties and building sound funds management systems. Finally, winding down the legacy open disaster declarations by converting them to the new model would reduce the backlog and break the cycle of repetitive loss, improve fiscal sustainability, and enhance community resilience.

10

DRAFT//PRE-DECISIONAL//DELIBERATIVE

## 7. Streamline the Individual Assistance program into a single direct payment program

The current FEMA Individual Assistance (IA) Program,[5] which provides direct assistance to disaster survivors, is overly slow, confusing, and inefficient. It leaves many Americans frustrated by complex rules, inconsistent decisions, and long wait times for aid when they are most vulnerable. With at least 15 categories of assistance, the system bewilders and sidelines recipients and private-sector partners who are best positioned to help survivors. Furthermore, the program is not well integrated with other federal housing programs. It does not give Americans the quick certainty they need to drive their own recoveries, and instead centralizes control in Washington, D.C. The process spends taxpayer dollars inefficiently and with little accountability for outcomes. To address these challenges that survivors experience in receiving assistance, the Council proposes the *Framework for Accessible Individual Relief* (FAIR) Program:

- Consolidate existing programs into one direct payment to survivors whose homes are uninhabitable after a disaster.

- Transfer evacuation and temporary emergency sheltering responsibilities to state, tribal, and territorial (STT) governments.

- Focus FEMA 2.0's role on emergency and temporary housing (mass care/sheltering and temporary housing/rental assistance) instead of long-term housing, and only for Americans whose homes are uninhabitable (not those who experience minor damage).

- Affirm private insurance companies remain responsible for permanent housing, with the U.S. Department of Housing and Urban Development and Small Business Administration in lead federal roles.

Instead of bureaucratic, delayed payments that eventually provide only a few thousand dollars to the average American, swift support for emergency sheltering with a faster amount of monetary assistance would directly and positively impact affected Americans. Consolidating assistance into a single payment would provide all Americans clear, specific information on what assistance they would receive from the federal government in the event of a catastrophic loss.

- **Homeowner Assistance**
  - For homeowners, the payment package would be based on their level of need and no more than 15% of the local government's assessed value, capped at a $1 million valuation (i.e. maximum payment not to exceed $150,000).
  - Allowable use would include repairs, replacement, rental and other needs assistance (i.e. personal property loss, transportation, medical, funeral expenses).

- **Renter Assistance**

---

[5] FEMA's Individual Assistance program is designed to help disaster survivors with basic critical needs such as a safe, sanitary, and functional place to live during recovery from a disaster. It is not designed to make survivors whole and is not a substitute for insurance coverage. https://www.fema.gov/fact-sheet/questions-and-answers-about-individual-assistance#:~:text=FEMA%E2%80%99s%20Individual%20Assistance%20program%20is%20designed%20to%20help,and%20is%20not%20a%20substitute%20for%20insurance%20coverage.

11

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- For renters, the payment package would be based on level of need and cover 3 months of rent (first, last, and current month) at the HUD Fair Market Rate (FMR) for the appropriate household size. Individuals with greater need will have the option for 3 additional months of rental assistance for 6 months total.

- This covers rent and other needs assistance.

These reforms will provide quick, cost-effective, and transparent support to disaster survivors, within the limits of federal funding, as well as reduce administrative overhead and clarify federal agency responsibilities. Further, there should be an option for this to be a state-managed program if individual states wish to do so.

## 8. Reform the Public Assistance program to provide direct funding block grants

The current disaster recovery process under FEMA's Public Assistance (PA) program,[6] which provides funding to communities after a federally declared disaster, is burdened by bureaucracy, leading to significant delays and frustration from states and communities. To address this, the Council proposes the *Reformed and Partnered Initiative for Disasters* (RAPID) program, a modern and agile framework that converts the existing PA program into a direct funding model that leverages pre-defined objective event criteria and cost estimates to accelerate and streamline recovery. Utilizing a parametric trigger,[7] funding would be released to states within 30 days of a major federal disaster declaration, much like the Coronavirus Relief Fund that provided rapid financial assistance during the COVID-19 pandemic. This eliminates the need for time consuming loss assessments and quickly provides a financial backstop and cashflow for rapid response and recovery. When paired with traditional insurance of public facilities, this can enable communities to *quickly recover* with manageable financial risk and burden to local taxpayers.

The Council recommends FEMA 2.0 convene a group of STT and private sector representatives to collectively establish a parametric funding model that is based on existing data from the authoritative federal agency or organization over each type of eligible event (i.e. earthquake, hurricane, flood, etc.). The federal funding will be set with a minimum of 50% and increase up to 75% of the established parametric amount based on state performance (*see Appendix A for details*). STTs, in turn, would gain the autonomy to manage the funding, to include determination of project eligibility, and look for duplications of effort as referenced in the Council's first key recommendation.[8] Determination of eligibility would be simplified and limited to eligible applicants, eligible facilities, eligible work, and eligible costs.

Accountability would be maintained through a two-phase audit process: a one-time validation of costs within one year and a final program closeout. All federal funding provided under RAPID

---

[6] Public Assistance is FEMA's largest grant program providing funds to assist communities responding to and recovering from major disasters or emergencies declared by the President. The program provides funding for emergency assistance to save lives and protect property and assists with funding for permanently restoring community infrastructure affected by a federally declared incident. -FEMA Public Assistance Fact Sheet October 2019.

[7] Parametric, or index-based, is a concept where if an event reaches a pre-defined threshold, it automatically sets the payment amount based on the magnitude of the event. This is different than traditional payment based on the magnitude of assessed loss. The main benefit of a parametric model is the speed and certainty of payouts, which are triggered automatically *after* a federal disaster declaration is made, when pre-defined, objective event criteria are met, like wind speed or earthquake magnitude.

[8] This would be accomplished through congressional authorization for eligible, certified STT programs.

12

DRAFT//PRE-DECISIONAL//DELIBERATIVE

must be expended or returned within eight years. FEMA 2.0 should pursue the ability to convert historic disasters to the new RAPID Direct Funding program, making a onetime payout and immediately transitioning to the two-phased reconciliation approach described above. This will significantly reduce the administrative burden on all stakeholders and prevent added confusion from overlapping approaches. *See Appendix B for an example flow chart of how RAPID would function in a natural disaster.*

## 9. Reform the FEMA National Flood Insurance Program (NFIP) for Financial Stability and Risk Resilience

The National Flood Insurance Program (NFIP), administered by FEMA, faces significant challenges that threaten its long-term viability. The program is financially unsustainable, burdened by over $20 billion in debt,[9] and relies on outdated risk information.[10] This leads to a disconnect between the price of insurance, the public's perception of risk, and actions to mitigate or transfer it. A comprehensive reform plan centered on a strategic shift toward a primary role for the private market, with the goal of fostering a more resilient and financially stable flood risk management system. The Council recommends:

- Empowering communities with stronger land-use policies

- Modernizing risk data with continued implementation of Risk Rating 2.0 and revising flood maps to inform the American people about their true risk

- Implement risk-based pricing and actual costs

- Revising "Write Your Own" compensation to reduce overall administrative costs

- Incentivizing the launch of a "take-out" program to transfer policies to the private market and focus Hazard Mitigation funds on repetitive loss properties

- Engaging state insurance commissioners to facilitate this transfer, including exploring the establishment of a centralized flood insurance marketplace to serve as a clearinghouse for admitted insurers

These changes are expected to accelerate disaster recovery, reduce the federal government's financial burden, send clear financial signals, and provide predictable financial outcomes for homeowners, ultimately leading to a more prepared nation.

## 10. Maximize every dollar spent by Reducing Administrative Costs

A central issue with the current disaster management system is the amount of taxpayer money used for administrative costs. In fact, a substantial part of grant funding is spent on administrative and management expenses at both the federal and state/local levels. In total, almost 25 cents on every dollar can be provided for administrative expenses. As an example, since 2018 in Florida, the cost of a recovery consultant contract rate has increased from $100 to nearly $300 per hour. Most of these costs are expended during the grant development phase, which hinders the pace of recovery. The complexity of existing grant programs has resulted in a

---

[9] Federal Emergency Management Agency, NFIP Debt, https://www.fema.gov/case-study/nfip-debt
[10] *Underwater: How FEMA's outdated flood maps incentivize property owners to take risks.* https://www.nbcnews.com/science/environment/water-femas-outdated-flood-maps-incentivize-system-risk-negotiable-rcna220529

13

DRAFT//PRE-DECISIONAL//DELIBERATIVE

shift from using government staff to private contractors in exorbitantly high numbers. A FEMA official in Puerto Rico highlights this phenomenon stating, "I have 500 contracted employees that would not be needed if FEMA's grant process was not so complex."[11] The above recommendations offer efficient, streamlined programs that will reduce overall administrative cost burdens by replacing grant programs with direct funding that does not require administrative management.

Any sense of urgency emphasized in this report for providing assistance to SLTTs should be carefully balanced with a robust financial review and compliance. States should be required to utilize their state auditor and/or comptroller to complete timely audits of income and expenditure of all federal funds. Consideration of utilizing private, Certified Public Accountants, or accounting firms to assist in this critical process of accountability would be prudent as many state auditors of public accounts may be overburdened by current statutory responsibilities. Localities and Tribal Governments should be required to submit a standardized audit either from their public auditor or licensed accounting firm. By eliminating and simplifying programs, capping administrative costs, strengthening ethics rules, and increasing direct government support, policymakers would improve how disaster relief funds are used to build a more resilient nation.

### Benefits of the Ten Recommendations

These recommendations will lead to a more resilient *AMERICA*:

- *Accelerate* disaster response and recovery
- *Modernize* systems and technology for greater efficiency
- *Empower* local and state governments with better resources and tools
- *Reduce* administrative costs and federal burden
- *Improve* coordination across government, private sector, and nonprofits
- *Cultivate* public trust through transparency and accountability
- *Amplify* resilience for rural communities and critical infrastructure

These reforms aim to create a more resilient and prepared nation by ensuring that disaster response and recovery efforts are efficient, cost-effective, and locally executed. Such reforms also ensure that federal support will be available when significant events occur that overwhelm local systems.

---

[11] FEMA Review Council Listening Session, 24 September 2025, San Juan, Puerto Rico.

14

DRAFT//PRE-DECISIONAL//DELIBERATIVE

## Appendix A: Detailed Charts

### Cost Comparison of Current and Proposed Programs

| Current Program | Activity | Current Federal Cost Share | Proposed Program | Activity | Proposed Federal Cost Share |
|---|---|---|---|---|---|
| **Public Assistance** | Emergency Declarations | Not Less than 75% POTUS can increase Section 503(a) | **RAPID Direct Funding** | | • Up to 75% based on performance metric; 50% minimum<br><br>POTUS can increase |
| | Category A: Debris Removal | Not less than 75% POTUS can increase Section 407(d) | | | |
| | Category B: Emergency Protective Measures | Not less than 75% POTUS can increase Section 403(b) | | | |
| | Categories C-G: Permanent Work | Not less than 75% POTUS can increase Section 406(b)(1) | | | |
| **Individual Assistance** | Temporary Housing Assistance (homeowners and renters) | • 100% Section 408(g)(1) | **FAIR** | • Temporary Housing Assistance (homeowners and renters)<br>• Other Needs Assistance | 75% |
| | Other Needs Assistance | • 75% Section 408(g)(2) | | | |
| **Hazard Mitigation Grant** | | • Up to 75% Section 404(a) | **Refined Risk Reduction (R3P)** | • Rapid Mitigation Advance<br>• Strategic Mitigation Allocation | • Up to 75% based on performance metric; 50% minimum<br>• Rapid Mitigation Advance (up to 5% of overall federal contribution)<br>• Strategic Mitigation Allocation (up to 10% of overall federal contribution) |

15

DRAFT//PRE-DECISIONAL//DELIBERATIVE

## Proposed Cost Share Increase Criteria for States, Tribes, and Territories
*A quantitative index should incorporate these criteria to determine cost share increase(s).*

| | Preparedness | Financial Investment | Response | Recovery | Mitigation |
|---|---|---|---|---|---|
| **Required** | STT entity has implemented a statewide citizen preparedness campaign.[12] | STT entity certifies they have and are maintaining insurance on 100% past permanent work projects. | STT entity annually updates a resources list that includes their resources, typed and cost mapped for deployment outside of the STT (*tying costs to resources*) | The SLTT has the ability to collect, validate, and report preliminary damage assessment data for an affected jurisdiction within the first 30 days post-disaster, enabling timely activation of state and federal assistance mechanisms. | STT entity actively identifies risk through annual THIRA and SPR review and updates to track progress on building national preparedness capabilities. |
| **Recommended** | STT entity should have a statewide emergency management program that addresses the five national preparedness areas.[13] | STT entity has a minimum of 5% of their state budget in cash reserve | STT entity has an annually reviewed emergency operations plan and requires all localities to have an emergency operation plans and the STT reviews the plan at a minimum every three years | STT has an individual assistance program that includes: 1. Temporary housing assistance 2. Individual and family grant program that includes crisis counseling 3. Disaster unemployment assistance 4. Disaster case management for use during federal disaster. | STT entity manages a mitigation program with a state or local match that provides STT funding to localities to harden infrastructure. |
| | STT entity adopted consensus standard building codes | STT entity has a disaster reserve or relief fund that support state and local recovery costs; used for FEMA match and non-declared events. | STT entity has participated in EMAC (*outbound/inbound*) deployment in the past 5 years | STT entity must be an IPAWS participant and 75% of the state's localities have a local alert and warning system or participate in IPAWS. | |
| | | STT entity has 50% of their buildings and infrastructure covered by all hazard insurance (including floods) | | | |

[12] The program must include 2 of the following topics areas to qualify: 1) Preparedness education for their citizens; 2) Coordination with the private and non-profit sectors in planning and communication; 3) Public education related to the importance of personal insurance
[13] Demonstrate this through 1) Maintain current statewide plans for each mission area; 2) Use HSEEP-compliant exercises and implement corrective actions; 3) Integrate THIRA/SPR findings into budgets and strategy; 4) Provide annual preparedness or performance findings

16

DRAFT//PRE-DECISIONAL//DELIBERATIVE

## Appendix B: RAPID Direct Funding Flow Chart

Hurricane with category 3 winds hits Florida

Based on parametric model*, projected damages are $300 million which is well above the PA indicator for a federal disaster declaration

The Governor declares a State of Emergency and requests a major disaster declaration from FEMA 2.0

FEMA 2.0 recommends approval

Based on population of 23 million, $300 million is $13 per capita

President declares major disaster declaration

Within 30 days, FEMA 2.0 provides 50-75% of the parametric pay out of $300 million

Because Florida is a "high performing state", FEMA 2.0 would recommend the federal government provide 75% of the parametric amount ($225 million)

Florida receives $225 million of direct funding and is responsible for managing the money, removing debris, offsetting emergency costs, repairing infrastructure, and providing a final accounting of projects within one year that will be audited by certified auditor and provided to FEMA 2.0

-Florida determines eligibility for projects*** and uses state environmental review
-Florida uses state procurement requirements; not required to follow 2CFR200
-Florida distributes funding fairly, according to disaster caused needs

If there is an under-run, Florida may use extra money toward mitigation efforts

If there is an over-run after one year, Florida may request no more than the remaining 25% of the parametric pay out of $300 million from the President *

All funding must be expended and work completed within 8 years. Residual funding after 8 years must be returned to FEMA 2.0, along with one final certified audit demonstrating use of funds

17

DRAFT//PRE-DECISIONAL//DELIBERATIVE

## Appendix C: Looking Back - A History of Emergency Management and FEMA

The history of disaster and emergency management in the United States reflects the evolution of federal responses to crises, beginning with the first legislative act of disaster relief following the Portsmouth, New Hampshire fire in 1802. Early efforts were reactive, addressing individual emergencies through separate laws until the Federal Disaster Relief Act of 1950 established a comprehensive framework. During the mid-20th century, emergency management expanded to include wartime civil defense and preparation for nuclear attacks, while flooding emerged as a major challenge, prompting the creation of the National Flood Insurance Program (NFIP) in 1968.

The 1970s marked a shift toward a more coordinated approach to disaster management, spurred by large-scale disasters like Hurricane Agnes in 1972. The Disaster Relief Act of 1974 introduced planning and mitigation measures, professionalizing emergency management. This period also saw the establishment of FEMA in 1979 through Executive Order 12127, consolidating federal disaster-related functions under one agency. The Stafford Act of 1988 further defined FEMA's role in disaster response and recovery, emphasizing a systemic approach to preparedness and mitigation.

Major disasters such as Hurricane Katrina in 2005 and Hurricane Sandy in 2012 highlighted gaps in federal response and recovery efforts, leading to legislative reforms. The Post-Katrina Emergency Management Reform Act of 2006 clarified FEMA's authorities and responsibilities, while the Sandy Recovery Improvement Act of 2013 streamlined recovery processes and expanded disaster assistance. The Disaster Recovery Reform Act of 2018 introduced significant reforms, including dedicated funding for pre-disaster mitigation through the Building Resilient Infrastructure and Communities program.

The COVID-19 pandemic in 2020 required an unprecedented federal response, with FEMA coordinating efforts to distribute medical supplies, personal protective equipment, and vaccines, while supporting state and local governments. Lessons learned from the pandemic led to improvements in public health coordination and emergency preparedness. Legislative measures such as the American Rescue Plan Act of 2021 and the Infrastructure Investment and Jobs Act of 2021 provided substantial funding to enhance the Disaster Relief Fund and then subsequently attempt to legislate a solution of how to adjudicate the billions in unobligated funds leftover from the pandemic response.

Overall, the U.S. approach to disaster and emergency management has evolved from reactive measures to a comprehensive system that emphasizes preparedness, mitigation, response and recovery, reflecting the growing complexity and frequency of disasters over time. However, the cumulative effect of reactive legislation saddled FEMA with additional roles, responsibilities, and benefits has ultimately pulled FEMA away from its core mission.

DRAFT//PRE-DECISIONAL//DELIBERATIVE

## Appendix D: FEMA Disaster Response (2021-2024)

Over the previous four years, FEMA encountered one of the busiest disaster periods in recent history, responding to numerous complex and concurrent disasters while grappling with significant workforce and administrative challenges. This assessment highlights FEMA's operational shortcomings, particularly in staffing sufficiency, disaster response delays, and grant oversight failures, which collectively contributed to inadequate disaster response outcomes against an ever-growing mission portfolio. In February 2025, the Government Accountability Office added federal disaster assistance to its "High-Risk List," underscoring systemic issues within FEMA.

The bureaucracy and mission creep that has pulled FEMA away from its core mission combined with a persistent shortage of experienced staff to address these additional missions was a major factor affecting FEMA's performance. At the start of FY2022, FEMA had approximately 11,400 disaster employees, falling short of its staffing goal of 17,670 by roughly 35%. This gap hindered FEMA's ability to deploy surge capacity, retain institutional knowledge, and effectively manage complex operations. Although personnel gaps were routinely highlighted as a challenge, it was left unspoken that the root problem was the expanding mission portfolio, not simply personnel.

The impact of overreliance on the federal government and lack of personnel to conduct manual administrative tasks was evident in delayed disaster assistance, politicization allegations, and administrative inefficiencies. For example, following the cumulative impacts of Hurricanes Helene and Milton, FEMA faced a backlog of 500,000 assistance applications by December 2024, delaying aid delivery to survivors. FEMA's response to the Lahaina wildfires in 2023 also revealed weaknesses in housing logistics and survivor case management, with delays in constructing temporary housing and confusion over rent policies. Similarly, during Hurricane Ida in 2021 and the Eastern Kentucky floods in 2022, survivors reported long delays in receiving aid due to rigid verification rules and insufficient field staffing.

FEMA's administrative capacity was further strained by delays in disaster closeouts and grant oversight failures. The U.S. Department of Homeland Security's Office of Inspector General found that FEMA's oversight deficiencies prolonged disaster closeouts, complicating audits and grant reconciliation. Additionally, FEMA's insufficient oversight of COVID-19 emergency protective measures grants resulted in over $8.1 billion in questioned costs and improper payments, highlighting vulnerabilities in monitoring high-volume grant programs.

Where FEMA had pre-positioned capacity and adequate local partnerships, the agency delivered lifesaving functions and early recovery support. Where pre-existing local capacity was weak (notably some rural and underserved areas) or where multiple disasters clustered, FEMA's limited surge and administrative backstops produced slower assessments, longer grant processing, and protracted closeouts—outcomes that prolong community recovery and increase fiscal exposure. The combination of staffing shortfalls and administrative weaknesses therefore had an uneven but material effect on recovery speed and completeness. Meanwhile, state, local, and private stakeholders routinely delivered faster and effective responses to disasters.

The rising frequency and complexity of disasters have outpaced FEMA's static capacity, creating a strategic mismatch between demand and capability. This mismatch combined with increased responsibilities has constrained FEMA's ability to manage simultaneous large-scale incidents without sacrificing speed or oversight.

19

DRAFT//PRE-DECISIONAL//DELIBERATIVE

# About the FEMA Review Council

On January 24, 2025, President Donald J. Trump signed Executive Order (EO) 14180, "Council to Assess the Federal Emergency Management Agency (FEMA)," establishing a FEMA Review Council to recommend improvements or structural changes to the agency, promote the national interest, and enable national resilience. The Secretary of Homeland Security established the Council consistent with the Federal Advisory Committee Act on February 21, 2025.

The FEMA Review Council consists of two co-chairs and ten council members, who were all appointed by President Trump on April 28, 2025. After the appointment of the members, the Council created three subcommittees to address federal and state coordination, disaster response and recovery assessments, and the compilation of the final report.

The Council also coordinated requests from the President, through the Assistant to the President for National Security Affairs, the Assistant to the President for Homeland Security Affairs, and the Director of the Office of Management and Budget.

For additional information regarding the Council, visit:
https://www.dhs.gov/federal-emergency-management-agency-review-council

### *Work Performed*

The Council's work was conducted from approximately February 2025 through November 2025, during which time the following critical efforts were completed. In total, the Council engaged with representatives from all 50 states and territories, as well as numerous tribal leaders and representatives.

- **Council Public Meetings**. Council members met routinely, both virtually and in-person, for internal proceedings and public meetings.

- **DHS/FEMA Briefings**. The Council received multiple briefings from FEMA and other related DHS offices.

- **Stakeholder Listening Sessions**. The Council and its subcommittees conducted 17 listening sessions to hear from federal, state, local, and tribal partners, as well as relevant private sector entities and non-profit institutions, such as faith-based organizations. The Council traveled extensively throughout the nation to conduct meetings with key stakeholders to capture their concerns, ideas, and solutions.

- **Public Comment and National Survey**. In addition to the above efforts, the Council collected and assessed over 11,000 public responses received via Federal Register Notice solicitation for comment, as well as conducted a national survey of state, local, tribal, and territorial emergency managers.

DRAFT//PRE-DECISIONAL//DELIBERATIVE

## FEMA Review Council Members

Kristi Noem
Secretary of Homeland Security
*Co-Chair*

Pete Hegseth
Secretary of War
*Co-Chair*

Greg Abbott
Governor, State of Texas

Phil Bryant
Former Governor, State of Mississippi
*Vice Chair*

Jane Castor
Mayor, City of Tampa, FL

Mark Cooper
Former State Emergency Management
Director and Homeland Security Advisor,
State of Louisiana

Rosie Cordero-Stutz
Sheriff, Miami-Dade County, FL

Robert Fenton, Jr.
Region 9 Administrator, FEMA

Kevin Guthrie
Executive Director, Florida
Division of Emergency Management

W. Nim Kidd
Chief, Texas Division of Emergency
Management

Michael Whatley
Former Chairman,
Republican National Committee

Glenn Youngkin
Governor, Commonwealth of Virginia

## Acknowledgements

The Council would like to acknowledge and express its gratitude toward:

- The many outside experts who were willing to meet with us, for their time and insights,
- The members of state and local emergency management and homeland security entities and governments,
- Governors from many states and their chiefs of staff, and
- The current and former FEMA employees who offered their time and experience.

The Designated Federal Officer, Mr. Patrick Powers, for his exemplary leadership and effort to ensure the Council's work was coordinated, transparent, and effective to ensure a comprehensive effort to meet President Trump's directives – and the many incredible staff members directly supporting the Council, among countless others who made this report possible.

The Council also dedicates this report to the tens of thousands of hardworking emergency management professionals who have dedicated their careers to the preparation, response, recovery, and mitigation of natural and manmade disasters – notably, those who continue to recover from ongoing disasters.

21

# Draft Report Addendum

## The President's Council to Assess the Federal Emergency Management Agency

December 11, 2025



DRAFT//PRE-DECISIONAL//DELIBERATIVE

## Table of Contents – Report Addendum

**Key Recommendations** ............................................................................................... 24

1. FEMA 2.0 – A New Start ............................................................................................ 24

2. Recommend FEMA 2.0 remain in DHS ..................................................................... 28

3. Equip States, Local governments, Tribes, and Territories to lead disaster response with the federal government in a supporting role ................................................................... 30

4. Keep Existing Federal Disaster Resources to Support Communities ......................... 34

5. Realign the Criteria for Federal Disaster Assistance ................................................. 36

6. Replace the Existing Hazard Mitigation Grant Program with a two-phase funding structure 368

7. Streamline the Individual Assistance program into a single direct payment program ............. 40

8. Reform the Public Assistance program to provide direct funding block grants ....................... 44

9. Reform the National Flood Insurance Program (NFIP) for Financial Stability and Risk Resilience ........................................................................................................................... 51

10. Maximize every dollar spent by reducing administrative costs ............................................. 55

**Soliciting Input from Stakeholders Across the Nation** ............................................ 57

  Incorporating Public Feedback into FEMA Review Council Efforts ............................ 57

  Methodology ................................................................................................................. 58

  Analysis of Public Feedback Received ......................................................................... 60

  Tribal Engagements ...................................................................................................... 62

**Areas for Further Exploration / Engagement** .......................................................... 63

**Public Meeting Minutes** ............................................................................................. 64

**Engaged Subject Matter Experts and Stakeholders** ............................................... 64

**Detailed Public Comments and Survey Inputs – An Analysis** ................................. 67

DRAFT//PRE-DECISIONAL//DELIBERATIVE

# Key Recommendations

## 1. FEMA 2.0 – A New Start

**Issue Overview:**

FEMA needs to be fundamentally transformed from how it exists today, and the core missions must be remade into a new, supportive agency. "FEMA" as a brand and as an agency has been irreparably damaged by the last four years of mission creep and programmatic failures as noted later in this report. The time is now to close the chapter on FEMA and establish a new agency that retains the core missions of FEMA, while highlighting the renewed emphasis on locally executed, state or tribally managed, and federally **supported** emergency management. We propose renaming FEMA and reference the new agency as "FEMA 2.0" in this document.

The core objective is to realign the agency's mission to prioritize immediate, effective, and impartial disaster response and recovery for American citizens by shifting greater responsibility and direct funding to SLTTs. The current structure is criticized for mission creep, being too centralized, and for administrative bloat that diverts critical resources. Key recommendations include a 50% overall staff reduction, primarily targeting the disaster workforce through program efficiencies and increased accountability, exploring the relocation of physical headquarters, shifting certain missions like training to state authorities, and redefining FEMA's role as a "payer of last resort" to eliminate duplicative federal funding. A crucial element of this reform is to

*"Change is hard. It is especially hard for those invested in the status quo, who have forgotten that their duty is to the American people — not entrenched bureaucracy. I refuse to accept that FEMA red tape should stand between an American citizen suffering and the aid they desperately need. That's why I am working so hard to eliminate FEMA as it exists today and streamline this bloated organization into a tool that actually benefits Americans in crisis." – DHS Secretary Noem, DHS Press Release (August 29, 2025)*

build upon and expand successful federal-state partnership programs to leverage demonstrated value and expertise in the first-response community while establishing a cohesive framework that integrates government, private, and non-profit sectors for unified national resilience. These reforms are designed to create a lean, deployable disaster force that empowers state and local officials, reduces costs, and improves resilience against increasingly complex threats. The internal workforce adjustments should be conducted over a 2-3 year phased approach that allows the agency to realize the efficiencies while reducing staff. Further, these reforms are best achieved via the same timeline that allows for States, Locals, Tribes, and Territories to make corresponding fiscal, capability, and workforce adjustments to ensure a successful transition for all affected stakeholders.

**Problem:**
FEMA currently suffers from multiple systemic issues that hamper its effectiveness and accountability.

24

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- **Lost Mission Focus:** The agency's resources are diverted to missions outside its core disaster response and recovery responsibilities. This includes a significant financial outlay on issues unrelated to its primary mandate. The resulting mission creep saps limited staff and resources, compromising its ability to respond to actual disasters.

- **Lack of Integrated National Framework:** The current emergency management landscape lacks a comprehensive framework that effectively integrates the efforts of federal, state, and local governments with those of private industry and non-profit partners. This gap prevents the building of shared capabilities and national-level capacity, directly impacting the readiness and effectiveness of local first responders.

- **Inefficient Use of Federal Funds:** There is excessive overlap in federal benefits programs, with FEMA often providing duplicative funding. This bureaucratic redundancy leads to administrative bloat, delays in delivering aid, and unnecessary costs for taxpayers.

- **Centralized and Bloated Headquarters:** Compared to mission-focused federal agencies with comparable field operations, such as the U.S. Army Corps of Engineers (USACE) and the U.S. Forest Service (USFS), FEMA is significantly top-heavy. The concentration of personnel in a District of Columbia-centric headquarters creates bureaucratic inertia and slows down critical decision-making during emergencies.

**Recommendations:**

To address these problems, the following recommendations are proposed for FEMA 2.0:

1. **Transfer Training Responsibility and Empower States through Proven Programs**

   - **Shift Training Execution to States:** While FEMA 2.0 must establish and maintain national standards for disaster response, the direct execution of training should be shifted to the state level. This would eliminate current personnel requirements within FEMA 2.0 and empower states to build robust, tailored training programs.

   - **Expand and Leverage Successful Partnerships:** Rather than replacing successful programs, FEMA 2.0 will double down on those with a proven track record of effective federal-state-local partnership.

     o **National Urban Search and Rescue (US&R) Program:** This program, with its network of 28 task forces, has a decades-long history of successfully integrating federal, state, and local emergency response teams. FEMA 2.0 will enhance funding and expand capabilities for these task forces, ensuring they remain a cornerstone of specialized, on-the-ground support. Leverage this successful program as a model to expand the State Urban Search and Rescue (SUSAR) programs.

     o **Centers for Domestic Preparedness (CDP):** The CDP provides invaluable, federally funded training for state, local, tribal, and territorial emergency responders in areas such as incident management and mass casualty response. FEMA 2.0 will expand access to and funding for this training, ensuring first responders across the country are equipped for a wide array of threats, including complex disasters and terrorist acts.

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- o **U.S. Fire Administration (USFA):** The USFA already works with local fire departments to reduce fire-related injuries and fatalities through training and resource provision. FEMA 2.0 will build on this relationship by better integrating USFA support into overall disaster preparedness and response strategies, particularly for incidents involving complex hazards like wildfires.

2. **Empower States with Direct Funding and Limited Federal Coordination**

   - **Empower States to Take the Lead:** States will assume a greater role in managing disasters from preparedness to recovery, utilizing direct federal funding mechanisms. This empowers state and local officials who have a more direct understanding of their citizens' needs.

   - **Formalize Federal Role as a Coordinated Supporter:** The federal government will limit its on-the-ground response to incidents that exceed the capabilities of state and local resources. In these cases, FEMA 2.0 will act as the central coordinator, aligning resources from across the federal government, such as the Department of War, to provide supplemental support.

   - **Closeout of Historical Open Disasters:** FEMA 2.0 should endeavor to expedite the closeout of historical open disasters. Doing so will address and reduce lingering administrative costs as well as legacy information technology systems that are maintained solely to facilitate open disaster declarations. Both directly benefit Americans by accelerating ongoing recovery efforts and reducing taxpayer costs.

   - **Eliminate Duplicative Funding:** This approach, which establishes FEMA 2.0 as the payer of last resort, will require other federal agencies to provide assistance through their existing benefit programs first, thereby eliminating redundant funding mechanisms and associated administrative burdens. To achieve this, the Administration should work with the U.S. Congress to ensure other existing benefit programs are funded in a timely and responsive manner. Further, FEMA 2.0 must look for opportunities to remove duplications of effort such as environmental and historical reviews, audits, and inspections that should be conducted by states.

3. **Revitalize a Unified National Network for Partnership**

   - **Return an Integrated Network:** Disasters demand a unified national effort that leverages the strengths of all sectors. FEMA 2.0 will address the existing gap in the emergency management landscape by returning to a network that enables government, private industry, and non-profit partners to build toward a shared capability and integrated resources. This network will provide a common understanding of roles and responsibilities, promoting a "Whole Community" approach to national resilience.

   - **Enhance Public-Private Coordination:** The new framework will formalize and streamline coordination between government agencies, critical private-sector partners, and nonprofit organizations. Because the private sector owns and operates most of the nation's critical infrastructure, and nonprofits deliver essential services during emergencies, integrating these partners is essential to strengthening national capacity and improving readiness at the local level. This effort includes revitalizing the National Business Emergency Operations Center (BEOC) and relocating it to the Agency's operational directorate to reestablish its role as a central hub for communication,

26

DRAFT//PRE-DECISIONAL//DELIBERATIVE

problem-solving, and resource coordination among businesses and nonprofit partners during disasters. Additionally, the framework will support the development of Regional BEOCs that are aligned with the National by leveraging existing regional resources—particularly the FEMA Regions' private-sector liaison —to ensure closer alignment with state and local operations. As part of this effort, Regional BEOCs should convene key stakeholders—including major retailers, small business leaders, logistics providers, and nonprofit response partners—to assess current models, close coordination gaps, and identify priority needs for restoring services, stabilizing supply chains, and bringing communities back online following major disasters.

- **Leverage Technology for Shared Awareness:** The framework will also include a plan to develop and implement modern technology and communication protocols that ensure shared situational awareness and data sharing among all partners before, during, and after a disaster.

4. **Rebalance FEMA workforce and provide clarity across Headquarters, Regions and Field**

- **Clarity of roles and responsibilities:** Headquarters will focus on policy, procedures, guidance, oversight, administrative functions, and coordination for national response. The head of FEMA 2.0 is responsible to ensure a national system of emergency management that is locally led, state managed, and federally supported. The regions will focus on preparing and responding to incidents through forward embedded staff at State offices. Incidents will be led by Federal Coordinating Officers who report to Regional Administrators and are empowered to coordinate federal resources and support to States. In partnership with states, tribes, and territories, Regional Administrators will ensure the coordination, training, exercises and plans are in place for the most significant incidents across the United States.

- **Significant Staff Reduction:** Through a combination of program efficiencies, enhanced effectiveness, and greater accountability, it is estimated that FEMA 2.0 can reduce its overall staffing by 50% or more as implemented in this report. This reduction should be phased over a 2-3 year timeline and would be dependent on these recommendations being implemented and the existing workload of the FEMA 2.0 personnel being reduced. Most of this reduction is expected to come from its disaster workforce, which includes temporary, on-call, and permanent personnel deployed to disaster areas. The aim is to create a more strategic, less personnel-intensive response, reserving federal intervention for the largest and most complex events.

- **Transfer Logistics Operations:** Explore moving FEMA 2.0's logistics team to co-locate with the U.S. Transportation Command (USTRANSCOM). This would create efficiencies through direct collaboration with their Department of War counterparts.

- **Review Executive Structure:** Conduct a review of the Senior Executive Service (SES) billets to realign or reduce them in accordance with the proposed staffing efficiencies and mission refocusing.

**Conclusion**

The transformation into FEMA 2.0 is an imperative step toward restoring the agency's effectiveness, accountability, and public trust. By implementing a bold restructuring plan—

27

DRAFT//PRE-DECISIONAL//DELIBERATIVE

centered on significant staffing reductions, streamlining operations, eliminating redundancies, and empowering state partners—the federal government can ensure a more immediate, effective, and efficient response to disasters. This framework shifts the agency's focus from bureaucracy to boots-on-the-ground action, better positioning the United States to meet the complex disaster challenges of the future. The ultimate outcome will be a streamlined, responsive, and resilient organization that delivers timely relief and recovery to American citizens when they need it most.

## 2. Recommend FEMA 2.0 remain in DHS

Following the September 11, 2001, terrorist attacks, Congress created DHS to consolidate numerous agencies responsible for national security and public safety.[14] The legislation explicitly reframed disaster response as a core component of national security. FEMA 2.0 should remain in DHS, as the Department provides critical resources, budgeting support, and intelligence capabilities, which enabling stronger disaster preparedness, faster response, and better recovery efforts for states and communities while maintaining government stability and continuity during crises.[15] Keeping FEMA within DHS ensures communities can easily coordinate across all types of emergencies—from natural disasters to terrorism—by focusing their general response capabilities on their specific local risks. The Council strongly recommends FEMA's mission of continuity remains with the new agency moving forward. This vital national function is best situated within this agency and the Department of Homeland Security.

**Key Advantages of FEMA 2.0 Within DHS:**

1. **Unified National Security Approach:**
   - **Holistic Perspective:** FEMA 2.0's placement within DHS ensures coordinated responses to both natural disasters and terrorism.
   - **Preventing Stove piping:** Integration within DHS addresses pre-2002 challenges, such as the siloing of information and resources, by fostering cross-agency collaboration.
   - **Shared Resources:** FEMA 2.0 benefits from DHS's extensive resources, including advanced technology and intelligence-gathering capabilities, enhancing disaster preparedness and response.

2. **Improved Coordination and Resources:**

---

[14] Under the Post-Katrina Emergency Management Reform Act (PKEMRA), the Administrator of FEMA has a statutory responsibility to advise both the Secretary of Homeland Security and the President on emergency management and during a crisis. ((6 U.S.C. § 313(c)(4)). Further, PKEMRA also designates the FEMA Administrator as the "principal advisor to the President, Homeland Security Council and the Secretary on emergency management matters. ((6 U.S.C. § 313(c)(2)).

[15] Of note, emergency management stakeholder response on FEMA's location involved vigorous debate and some support for re-establishing FEMA as an independent agency. For all general public written comments, Federal Register, Department of Homeland Security 2025-0013, https://www.federalregister.gov/documents/2025/03/26/2025-05057/request-for-public-input-on-experiences-with-fema-disaster-responses

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- o **Synergy and Efficiency:** As part of DHS, FEMA 2.0 gains access to administrative support, such as human resources and IT services, which improve operational efficiency and reduce internal burdens.
- o **Congressional Leverage:** FEMA 2.0's inclusion in DHS provides visibility and funding advantages, ensuring its budget is protected within the broader national security framework.

3. **Enhanced Interagency Partnerships:**

- o **Integrated Response:** Complex disasters often require coordination among multiple federal agencies. FEMA 2.0's position within DHS streamlines interagency partnerships, enabling a more effective federal response.

**Challenges and Path Forward:**
While the integrated structure offers distinct advantages, operational challenges such as headquarters-centric decision-making and staffing shortages have hindered FEMA's effectiveness. However, these issues stem from mismanagement rather than the structural integration itself. The Council believes the benefits of a unified approach to national security and emergency management outweigh the challenges and recommends addressing internal inefficiencies through targeted reforms rather than separation.

**Recommendations for Improvement:**
These reforms will empower FEMA 2.0 to meet its mission effectively, leveraging the strengths of the DHS structure while addressing its weaknesses.

**Retain Continuity:**
The Council strongly emphasizes the importance of preserving FEMA's mission of continuity within DHS. Continuity of operations is a cornerstone of national preparedness, ensuring that government systems, critical infrastructure, and essential services remain functional and resilient during emergencies or disruptions. This vital function is integral to safeguarding public safety, maintaining stability, and enabling effective response and recovery efforts.

FEMA 2.0, under DHS, is uniquely positioned to oversee and execute this mission due to its established expertise, resources, and interagency coordination capabilities. To ensure the reliability and effectiveness of this critical function, the Council strongly recommends that no changes be made to this element of the agency's operations, structure, or focus. Preserving the continuity mission within FEMA 2.0 is essential to maintaining the nation's ability to respond to crises and uphold the stability of government functions during times of uncertainty.

**Conclusion**
The integration of the FEMA 2.0 within the Department of Homeland Security (DHS) remains a strategic decision that strengthens disaster preparedness and national security. While challenges exist, they stem from implementation issues rather than the structure itself. By addressing inefficiencies and investing in reforms, FEMA 2.0 can fully leverage the benefits of its placement within DHS, including enhanced coordination, resource sharing, and continuity of operations. Keeping FEMA within DHS ensures communities can easily coordinate across all types of emergencies—from natural disasters to terrorism—by focusing their general response capabilities on their specific local risks.

29

DRAFT//PRE-DECISIONAL//DELIBERATIVE

## 3. Equip States, Local governments, Tribes, and Territories to lead disaster response with the federal government in a supporting role

**Problem:**

Disasters demand unified action across government, private industry, and with non-profit partners, leveraging the strengths of these sectors to optimize national resilience. The national emergency management landscape lacks a framework that helps everyone involved in responding to emergencies build toward a shared capability and integrated resources to raise national-level capacity. This gap directly impacts the readiness of local responders.

**Problem 1: Lack of a National Standard for Incident Response and Recovery**

Standards that define the capabilities jurisdictions should have, how they are measured, and how personnel are qualified have not been adopted nationally, and the overall approach requires significant improvement. While there have been attempts over time to develop national standards and systems, such as the National Preparedness System and core capabilities, these efforts have been fragmented and lack cohesive implementation. Without uniform standards, training varies, equipment is purchased without common specifications, and response teams cannot reliably integrate across jurisdictions. These inconsistencies make it harder to field mission-ready teams, match resources to needs, and deliver timely assistance to survivors.

*"FEMA sets the tone and guides systems down to local jurisdictions through the provision of guidance, frameworks, and training." -Anonymous Stakeholder Feedback*

**Recommendations:**

1.  **Encourage National Capability Standards Adoption:** FEMA 2.0 shall establish a formal governing board of federal, state, local, tribal, and territorial (FSLTT) stakeholders to codify national minimum standards for incident response and recovery capabilities. These standards would build upon existing frameworks like the National Incident Management System (NIMS) Resource Typing and National Qualification System (NQS) and be published through a Resources Typing Library Tool or a similar platform. The goal is to define, in plain terms, the personnel, equipment, training, and performance criteria for common mission sets like mass care, communications, incident management, and logistics.

2.  **Build Scalable Training Resources:** State, locals, and tribal nations shall take responsibility for training delivery, with the federal role primarily shifting to developing curriculum and setting outcome-based standards. In addition to curriculum development, FEMA 2.0 will expand its "train-the-trainer" programs to scale instruction, certifying SLTT instructors from across the nation to provide the FEMA 2.0 curriculum. This will expand the number of trainings delivered local to emergency managers and allow for consistency in training to emergency management best practices. FEMA 2.0 schoolhouses would primarily be focused on hands on training not available elsewhere, to include existing live-agent training at the Center for Domestic Preparedness.

30

DRAFT//PRE-DECISIONAL//DELIBERATIVE

3. **Professionalization of Emergency Management:** To address the unique professional development needs of senior leaders in emergency management, FEMA 2.0 shall establish advanced education pathways focused on crisis leadership, interagency coordination, and strategic decision-making. These pathways will include specialized training programs, executive-level workshops, and mentorship opportunities designed to equip leaders with the skills required to navigate complex emergencies and coordinate effectively across agencies and jurisdictions. Such an initiative would strengthen the leadership pipeline by fostering a cadre of well-prepared professionals who can consistently apply national doctrine and make informed strategic decisions during crises. By investing in the professionalization of emergency management, FEMA 2.0 will promote a unified approach to leadership and decision-making, ensuring greater consistency and effectiveness in emergency response and recovery efforts nationwide.

4. **Catastrophic Planning and Exercise Standards:** FEMA 2.0 shall focus national plans and federally funded exercises on truly catastrophic scenarios, such as large-scale natural disasters, nation-wide cyberattacks, or coordinated terrorist events, to ensure preparedness for the most severe threats. FEMA 2.0 will also develop and implement standardized approaches for SLTT exercise and planning practitioners through shared training, doctrine, and evaluation criteria. By leveraging established frameworks such as the Homeland Security Exercise and Evaluation Program (HSEEP) and Community Planning Guidance, FEMA 2.0 will promote a common approach to how SLTT jurisdictions plan and prepare for incidents within their communities. This will be critical in fostering national resilience as an integrated network, enabling jurisdictions to identify resource gaps in relation to a national inventory and prioritize investments accordingly. This will enhance the ability of SLTT jurisdictions to respond effectively to significant events and integrate seamlessly into broader national response efforts.

**Problem 2: Limited Ability to Share and Coordinate Resources**

National readiness is constrained by the absence of a single, standards-driven operating picture that provides real-time visibility into capabilities and resources across jurisdictions and sectors. Without this shared view, resource sharing depends on uneven mutual aid processes, variable recognition of responder qualifications, and fragmented, non-interoperable data systems — conditions that slow decisions and erode trust in deployments. At the same time, non-disaster grant funding is not aligned to build and sustain typed, mission-ready capabilities that are discoverable and rapidly deployable nationwide, and significant private, nonprofit, and volunteer capacity remains outside formal operational workflows. The result is duplicated requests, delayed missions, and avoidable reliance on federal surge assets, while fragmented local investments fail to aggregate into a coherent, interoperable national capability.

**Recommendations:**

1. **Revitalize and promote the use of the Unified Resource Catalog:** FSLTT stakeholders should be required to identify and catalog their typed capabilities and resources within a defined period for implementation and updated routinely. Pre-vetted private sector resources and nonprofit capabilities should also be cataloged to present a complete national picture. FEMA 2.0 shall determine whether its Resource Inventory System or a new cloud-based platform is needed to establish a national inventory, creating a single, searchable online marketplace for all stakeholders to find available resources within

31

DRAFT//PRE-DECISIONAL//DELIBERATIVE

budget. Standardized resource typing and federal policies will formalize mutual aid frameworks to enable rapid, coordinated sharing of personnel, equipment, and resources during large-scale incidents.

2. **Prioritize Investment for Mission-Ready Teams, Capabilities, and Infrastructure:** We are a nation of local governments with resources residing at the local level. With this in mind, we must invest via grants to build and standardize this national coalition. FEMA 2.0 should update program guidance and regulations to prioritize investments in Mission Ready Teams (MRTs) for non-disaster grants. Funded capabilities meet national standards, be typed according to NIMS definitions, and be entered into the national inventory system. Federal non-disaster grant programs (NGDP) should be updated to prioritize investments in mission-ready capabilities and infrastructure that meet national standards and integrate into the national inventory system. These investments must directly support national preparedness objectives and ensure rapid deployment during emergencies. Further, these investments must emphasize building capabilities and capacities with a shift away from sustaining SLTT capabilities and capacities with federal grant dollars. The NDGP should be limited to a maximum of 3 years for personnel-related projects with the local jurisdiction funding that person(s) in perpetuity on SLTT funds. NDGP should be limited to building a new capability or capacity through capital outlay equipment once, then SLTT should pick up the cost for maintaining that new capability or capacity through SLTT funds in perpetuity. Additionally, the Council recognizes the importance of Non-Disaster Grants, such as the Emergency Management Performance Grant within the suite of FEMA's preparedness grants, in ensuring our nation's security and recommends these programs be retained within FEMA 2.0. The Council encourages exploring how to leverage federal savings from other efficiencies gained to create a potential one-time EMPG increase to better facilitate the return of responsibilities to States, Tribes and Territories. Linking federal funding to compliance with uniform standards for deployable capabilities will streamline mutual aid processes, enhance resource interoperability, and strengthen national preparedness by focusing on readily deployable resources.

3. **Credentialing:** To enhance the sharing of personnel nationally and improve upon the existing credentialing framework under the National Incident Management System (NIMS), the system must be modernized to ensure uniform standards, interoperability, and recognition of responder qualifications across jurisdictions. This includes expanding the National Qualification System (NQS) to cover emerging roles, integrating credentialing into a centralized national database for real-time visibility, streamlining verification processes using advanced technology, and incorporating volunteer, faith-based, and private sector responders into the credentialing framework. Federal policies should mandate compliance with updated credentialing standards for jurisdictions receiving non-disaster grant funding, while training and technical assistance should be provided to support adoption. These enhancements will ensure rapid deployment of qualified personnel, reduce delays, and strengthen national preparedness and resilience during large-scale incidents.

4. **Promote the Integration of Additional Partners, to include Volunteer and Faith-Based Organizations:** *To enhance the effectiveness and inclusivity of emergency management efforts, FEMA 2.0* **shall prioritize** *the integration of volunteer, faith-based,*

32

DRAFT//PRE-DECISIONAL//DELIBERATIVE

*and nonprofit organizations into national preparedness, response, and recovery frameworks.* FEMA 2.0 shall establish and maintain a national inventory of volunteer, faith-based, and 501(c)(3) organizations, and integrate pre-vetted private sector resources to create a comprehensive national capability picture. Federal policy shall require the integration of these entities into planning, coordination, and operational frameworks to leverage community networks, local knowledge, and additional workforce capacity. This integration will expand the reach and effectiveness of national response and recovery operations while strengthening community resilience.

5. **Fund and Promote Interoperable Systems:** Federal policy shall promote and incentivize shared investments in interoperable communications, data-sharing platforms, and information systems that enable real-time coordination across all levels of government and partner organizations. Open data standards shall be established and promoted by federal policy to ensure interoperability, consistency, and reliability of information exchange during incident response and recovery.

**Benefits:**

- **Speed:** Rapid pre-deployment of anticipated resources will ensure local readiness for impending peril

- **Consistent Expectations:** All local emergency managers know exactly the capabilities they will receive

- **Cost Transparency:** Allows local emergency managers to make better informed cost-benefit decisions to optimize their response

- **Predictability:** Helps jurisdictions plan and budget more effectively for disaster response

- **Capability-focused:** Creation of a national inventory connected to funding eligibility will create incentives for SLTT stakeholders to focus on core capabilities

- **Faster, Coordinated Response:** Joint planning and integrated frameworks reduce gaps and overlaps during disasters

- **Efficient Resource Use:** Shared investments in interoperable systems cut costs and eliminate duplicative infrastructure

- **Seamless Recovery:** Aligned federal programs simplify assistance for survivors and speed community rebuilding

- **Broader Capabilities:** Leveraging private sector innovation and nonprofit expertise expands surge capacity and specialized skills

- **Stronger Public Trust:** Clear roles and unified communication enhance transparency and confidence during crises

- **Nationwide Readiness:** Cross-sector partnerships create a more adaptable, scalable system for complex or cascading disasters

- **Faster Response Times:** Well-trained SLTT teams and regional hubs enable immediate action without waiting for federal assets to arrive

- **Stronger Self-Sufficiency:** Local governments gain the skills, equipment, and partnerships to manage crises, reducing dependency on federal surge capacity

33

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- **Scalable Support**: Regional hubs provide shared resources that can expand, or contract based on event size, optimizing efficiency
- **Improved Coordination:** Formalized mutual aid agreements streamline resource sharing across jurisdictions, minimizing gaps or duplication
- **Cost Efficiency:** Local capability and mutual aid reduce expensive federal deployments and allow resources to be used where most needed
- **Enhanced Resilience:** Communities build long-term readiness and confidence, ensuring sustained operations during back-to-back or prolonged disasters
- **Tailored Solutions:** Training and equipment investments reflect local hazards and demographics, improving effectiveness in diverse environments

**FEMA 2.0 Savings and Efficiencies Gained:**

To be determined through detailed analysis. Expected areas of savings include reduced reliance on costly federal surge deployments when SLTT and private resources are available; lower duplication of resource requests and overlapping contracts; more targeted grant spending on standardized MRPs; and productivity gains from interoperable communications and data systems. A formal cost-benefit framework should measure baseline response times, deployment costs, and coordination overhead before and after implementation to quantify savings.

**Conclusion:**

A truly resilient nation depends on seamless collaboration across government, private industry, and nonprofit partners. Empowering SLTT governments to take the lead in managing disasters is essential for a resilient national preparedness strategy. Further, implementation of a mandatory national inventory system achieves the goal of ensuring disasters are locally executed, state managed, and federally supported. Leveraging modern technology solutions to establish such a national inventory system that provides transparency to the availability of SLTT resources, alignment to national standards and the typing of those same resources, as well as the upfront costs of those resources will increase the national preparedness of the country.

# 4. Keep Existing Federal Disaster Resources to Support Communities

## Problem:

State and local governments are primarily responsible for responding to threats to life and property but may lack the full scope and scale of resources required to respond. Consistent standards, effective coordination, and robust and timely federal support capabilities are required to save American lives when threatened by a range of hazards. Man-made hazards and nation-state threats will challenge the national response capability in ways it has not been tested before. The federal government must continue to build its capability to support these efforts even if state and local governments assume greater responsibilities.

## Recommendation:

Preserve and modernize the federal government's capability to support state and local partners in lifesaving and life-sustaining efforts. Ensure robust national capability is available for the full range of hazards including natural hazards, cybers attacks, and nation-state threats. This capability must be able to evolve with an ever-changing threat environment. Regardless of the

34

DRAFT//PRE-DECISIONAL//DELIBERATIVE

incident type or requirement, ensure integrated, timely, and efficient federal support is available when needed.

*Protect and Improve National Support Capability*

1. **Sustain Core Standards to support effective and interoperable teams:**
   - Maintain national training and certification programs, including NIMS/ICS/NQS (continued further development) and resource typing

2. **Improve Federal Coordination:**
   - Maintain a central and coordinated response capability to support state and local requirements
   - Ensure a federal government-wide inventory of all available response assets to include type, costs, and available response times

3. **Build Capability for Emerging Threats**
   - Nation-state threats and cyber-attacks will challenge national resilience in ways the United States has not seen in a generation
   - Capability for consequence management and national resilience to these hazards must be driven from the federal government as a core function of our national security

4. **Integrate Emerging Technology:**
   - Leverage advanced analytics, AI, and communications platforms to enhance operational capability, predict requirements in advance, and reduce costs

5. **Leverage Supply Chains for National Security**
   - Ensure the federal government can support national preparedness, supply chain resilience, and consequence management during emergencies

6. **Continuity of Government**
   - FEMA leads federal efforts to develop and implement federal continuity programs by directly assigning responsibility for continuity of operations, continuity of government, and continuity of plans
   - These programs ensure important federal missions, and state and local governments, continue to function amidst any threat

<u>**Benefits:**</u>
   - **Faster Response Times:** Well-trained and interoperable SLTT teams enable immediate action without waiting for federal assets to arrive
   - **Guaranteed National Backbone:** Maintains critical capabilities (NIMS/ICS, US&R, REP, NDMS, IPAWS, DFA) that cannot be replicated at the state or local level
   - **Faster, Unified Response:** Consistent standards and trained teams enable seamless coordination across jurisdictions during complex, multi-state disasters
   - **Adaptation to Emerging Threats:** Expanding readiness for cyber-attacks, pandemics, and climate-driven disasters ensures relevance to evolving risks

35

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- **Enhanced Public Safety:** Reliable federal assets safeguard lives when significant events exceed local capacity

- **Technology-Driven Efficiency:** Advanced analytics, AI, and next-generation communications improve situational awareness and operational speed

- **Cost-Effective Preparedness:** Sustaining national programs avoids duplicative investments by localities while providing surge capabilities when needed

## Conclusion:

FEMA's current mission exists at the intersection of emergency management and national security. An essential component of this is FEMA's authority to coordinate other federal agencies in support of SLTT partners. Additionally, the agency maintains an arsenal of dual-use capabilities, regional offices, incident management teams, and prepositioned logistic systems or programs, and the Disaster Relief Fund to ensure the American people are resilient in the face of any threat, whether natural or man-made. Therefore, sustaining and resourcing this mission in FEMA 2.0 is vital to public safety, economic stability, and national resilience.

# 5. Realign the Criteria for Federal Disaster Assistance

Federal regulations describe the process required for a governor to request Federal disaster assistance, including factors FEMA considers when making a recommendation to the President to approve or deny a major disaster declaration request. The Stafford Act currently prohibits the sole use of "an arithmetic formula or sliding scale based on income or population" when considering declaration requests.[16] Consequently, FEMA uses a set of factors to make recommendations to the President. The existing disaster declarations process for Public Assistance (PA) under accounts for state, local, tribal, and territory (SLTT) capacity and, therefore, is inconsistent with legislative intent and disincentivizes SLTT investment in disaster preparedness. The complexity and subjectivity within the existing disaster declarations process for Individual Assistance (IA) creates frustration and tension between federal and state partners that distracts from a common desire to assist survivors. Realigning the criteria for federal disaster assistance will help rebalance responsibilities between the federal government and SLTT governments.

## Problem:

**Public Assistance (PA):** FEMA initially set a per capita indicator of $1 in 1986, which represented 0.008% of national per capita personal income and correlated closely to 0.1% of state general fund expenditures. Because of this, FEMA assumed $1 per person was a reasonable amount of assistance a state could contribute towards the cost of a disaster. FEMA did not increase the per capita indicator until 1999 when the Agency began adjusting the indicator for inflation.[17] For FY26, the per capita indicator is $1.94.

**Individual Assistance (IA):** FEMA has considered two principal factors since 2019: uninsured home and personal property losses. FEMA assesses these factors using a "cost-to-capacity" ratio to measure the severity and magnitude of a disaster relative to the state's fiscal capacity. To do this, FEMA uses the state's Total Taxable Resources (TTR)—or an estimate of the state's total

---

[16] Stafford Act, Section 320.

[17] Disaster Assistance; Subpart C, the Declaration Process and State Commitments, 51 Fed. Reg. 13332, Apr. 18, 1986.

DRAFT//PRE-DECISIONAL//DELIBERATIVE

*potential* tax base—divided by 1 million.[18] The complexity within the existing process for evaluating assistance to individuals and households creates frustration and tension between federal and state partners. Further, the IA declarations process also risks supplanting assistance within the fiscal capacity of a state because it has a disproportionate emphasis on total estimated cost of assistance over those costs in the context of state capacity.

**Solution:**

- **PA Solution:**
  - *Explore alternative methods for PA declarations. One option is to adjust the national per capita indicator for inflation from 1986-1999.* FEMA 2.0 would update the current Public Assistance per capita indicator to account for historic inflation from 1986 to 1999, realigning the current per capita indicator of $1.94 to $2.99 to account for inflation between 1986 and 1999.

- **IA Solution:**
  - *Eliminate the cost-to-capacity ratio and replace it with a simplified evaluation of damage to the impacted state.* FEMA 2.0 would revert to factors like those prior to the 2019 regulatory change. Under this approach, FEMA 2.0 would consider the number of primary residences that are destroyed or sustain major damage, along with other factors such as community impacts.

**Anticipated Benefits**

**Public Assistance:** *Fewer federal disaster declarations, leading to a rebalancing of state and federal responsibilities.* If the per capita indicator had been adjusted for inflation during the years it was not, analysis found that 29% of disasters declared between 2012 and 2025 would not have met the indicator, representing $1.5 billion or 0.69% of the total federal share of funding. Annually, this would have led to 16 fewer major disaster declarations and about $113 million less in funding per year.

**Individual Assistance:** *Simplified Individual Assistance declaration factors.* FEMA and its partners have experienced several challenges with the current approach. Many stakeholders find the cost-to-capacity approach overly complex and struggle to understand how FEMA makes recommendations based on it. Additionally, the current approach may also rely too heavily on total estimated costs of assistance, which favors larger states that more readily experience $7.5 million in damages for a given disaster.

**Implementation Requirements:** Updating both the IA and PA declaration thresholds would require regulatory changes. In the interim, the President could direct through executive action that generally only requests above higher thresholds will be considered.

**Minimum Expenditures:** An annual calendar year minimum expenditure should be established for small, medium, and large states prior to them being able to request a federal declaration (*see Appendix A for detailed guidance*). This will further incentivize states to take lead with their local partners for disaster mitigation.

**Conclusion:** Congress intended some executive discretionary authority within the disaster declarations process. Nevertheless, the law also stipulates federal assistance is provided only

---

[18] Based on annual estimates published by the Department of Treasury.

37

DRAFT//PRE-DECISIONAL//DELIBERATIVE

when a disaster is beyond the capabilities of SLTT partners and, therefore, necessitates common criteria for how to evaluate when those capabilities are overwhelmed. As described above, the existing disaster declarations process for Public Assistance under accounts for SLTT capacity and, therefore, is inconsistent with legislative intent and disincentivizes SLTT investment in disaster preparedness. The complexity and subjectivity within the existing disaster declarations process for Individual Assistance creates frustration and tension between federal and state partners that distracts from a common desire to assist survivors. FEMA 2.0 should implement common sense approaches to realign the criteria for federal assistance and rebalance federal and state responsibilities.

# 6. Replace the Existing Hazard Mitigation Grant Program with a two-phase funding structure

**Problem:**

FEMA's current Hazard Mitigation Grant Program is conceptually effective but constrained in execution. Although authorized to provide funding for mitigation, most funding is distributed well after the rebuilding process begins. This delay limits opportunities to integrate mitigation into reconstruction, when it is most cost-effective and impactful.

State and local partners consistently report that HMGP application processes are complex and administratively burdensome. GAO reviews found that delays in project approval and funding distribution frequently exceed 12 months, hindering early risk reduction. FEMA's mitigation analyses have also been concentrated on flooding, hurricanes, and tornadoes—leaving gaps in wildfire, drought, and earthquake mitigation.

OIG audits similarly noted that oversight of HMGP property acquisitions lacks consistency across FEMA regions and that opportunities to integrate mitigation during the initial recovery phase are often missed. These findings reflect a need for more agile, outcome-driven funding mechanisms that reduce administrative friction and better align mitigation with broader national resilience goals.

Without reform, FEMA 2.0 risks perpetuating a reactive recovery cycle—rebuilding to pre-disaster conditions and increasing future federal liabilities under the NFIP and Stafford Act disaster assistance programs.

**Recommendations**

**1. Establish a Two-Phase Funding Model**

FEMA 2.0 should eliminate the current HMGP and establish a two-phase funding structure of up to 15% of the disaster estimate in two allocations. This proposed state-managed program, notionally titled "Refined Risk Reduction" Program (R3P). The program would be structured with up to a 75% federal cost share with performance metric and a 50% minimum (*See Appendix A in the Executive Summary*):

A. **Rapid Mitigation Advance** (up to the first 5% of the federal government contribution for the disaster to facilitate immediate residential mitigation)

- Within 30 days of a federal disaster declaration, provide an initial up to 5% of the estimated mitigation allocation to states for immediate mitigation actions integrated into

38

DRAFT//PRE-DECISIONAL//DELIBERATIVE

rebuilding of disaster-impacted primary residences and communities. Alternatively, harden high risk residences and neighborhoods.

- o Some examples include elevation, seismic and wind retrofits, defensible space creation, and floodproofing.

B. **Strategic Mitigation Allocation** (up to the remaining 10% of the federal government contribution for the disaster for repetitive loss properties and critical infrastructure)

- Allocate up to 10% based on Federal Administration priorities that:
  - o Mitigate repetitive or severe repetitive loss properties to improve NFIP performance; or
  - o Reduce risks to critical infrastructure with the intent of improving the performance of the NFIP (power, water, transportation, communications systems).

## 2. Strengthen State Management

For mitigation to work, states must take on greater program management responsibility and continue to develop an improved and comprehensive state hazard mitigation process that identifies projects that are immediately implementable.

Under this proposal, standardized oversight requirements for R3P-funded property acquisitions and mitigation projects will be managed at the state level.

- o States and territories must provide and maintain an inventory of properties in high-risk areas not built to modern building codes or not in compliance with current NFIP requirements.
- o Funds management systems/processes should be established and validated annually.
- o The state will coordinate with Federal, State, Tribal, Local, and Private organizations to ensure implementation of hazard mitigation strategies and effective use of funds.
- o Encourage greater proactive coordination at state/territorial level with other agencies to expand use of pre-negotiated exemptions/exclusions that streamline environmental review processes that align with prioritized project types.
- o Strategic Mitigation Allocation-eligible projects must be prioritized and meet following criteria.
  - All projects must be approved and funded within one year.
  - Construction completion timelines should be explored to ensure accelerated rebuilding; time extensions will not be offered.

## 3. Prioritize States with Demonstrated Capacity

- Expedite funding for states and territories with approved hazard mitigation plans and a history of successful HMGP performance.
  - o Leverage state and territorial mitigation plans as a repository for program performance (demonstrate and track metrics for funds management and oversight, program coordination, etc.).

39

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- Encourage states/territories to assess performance of FEMA-funded projects (not just R3P-funded) and prioritize future investments.
- Support best practice sharing between states/territories at the regional level where hazards are often shared.

4. **Winding Down Current Program**

- **Reduce backlog by prioritizing high-risk projects**: Identify high risk unliquidated obligations that will either be drawn down by recipients or recovered by FEMA 2.0 within set timeframes, ensuring all stakeholders are accountable for the effective management of existing funds.
- **Convert historic disasters to the two-phase R3P model**: FEMA 2.0 should pursue the ability to convert historic disasters to the two-phase funding model described above.

### Conclusion

Eliminating HMGP and delivering funding via a rapid mitigation advance and strategic mitigation allocation will enable FEMA 2.0 to act faster and more strategically in reducing disaster risk. The R3P model incentivizes state programs to establish program management capacities while aligning directly to GAO and OIG recommendations for timelier and more flexible mitigation investments.

By providing early funding for residential mitigation and directing remaining resources to protect critical infrastructure and reduce NFIP exposure, FEMA 2.0 will:

- Break the cycle of repetitive loss.
- Improve fiscal sustainability.
- Strengthen community resilience; and
- Reinforce FEMA 2.0's mission to help people before, during, and after disasters.

This policy change represents a practical, evidence-based step toward building a mitigation framework that delivers measurable results and national benefit.

# 7. Streamline the Individual Assistance program into a single direct payment program

### The Problem:

**Unnecessary Complexity**: FEMA's current IA program is unnecessarily difficult for recipients and stakeholders to navigate and often results in delayed assistance to survivors. It has drifted from its core objective of providing immediate relief for temporary housing and other individual needs, instead centering on extensive documentation and verification that can feel adversarial to people in crisis. FEMA and the Federal government have received this feedback directly from the American people through customer surveys provided to the Council. As one survivor put it, "I was really frustrated with all the paperwork and having to prove I needed help. I told the case worker, 'I've already lost everything; haven't I shown you enough to show you I'm deserving? Do you not trust what I'm saying?'" Another recalled, "I just sort of remember sitting down and filling out a bunch of forms. [It was] confusing because we weren't sure what the point of it was, we didn't know what we were getting, but they told us to sign up for this stuff, so we did." As

40

DRAFT//PRE-DECISIONAL//DELIBERATIVE

shown in figure 1, the program offers at least 15 types of assistance that are at best overlapping but at worst, extremely confusing for Americans to navigate as they work to recover. The process itself compounds the trauma, leaving people to make rushed, painful decisions under stress.



Figure 1. Categories of assistance provided to individuals, maximum and average award amounts.

**Duplication & Inefficiency:** Compounding these challenges, the program is siloed and duplicative, forcing survivors to repeatedly provide the same information to multiple entities. "What was confusing during the middle of the chaos was trying to figure out what everyone's role was," said a survivor. A local emergency manager observed, "Over 80% of the information for FEMA, SBA, HUD, and state or local agencies is the same. Yet, the burden of providing the information is all on the survivor." This fragmentation drives inefficiency and cost. Staff encounter layers of administrative hurdles— "We will spend thousands not to pay [the citizen] $500," a FEMA employee remarked—and expensive delivery models can be misaligned with outcomes: "FEMA will pay 500 thousand dollars to put a trailer in your yard for a few months when we could have bought the house next door for half that," remarked a government official. As shown in Figure 2, FEMA incurs huge administrative expenses—over $3.6 billion over the last five years—even though most disaster survivors have very basic questions they cannot answer because FEMA's program is too complex and hard to understand. Together, bureaucracy, siloed processes, and costly implementation slow aid, increase



Figure 2. Overhead and expenditures of FEMA's Individual Assistance program compared to reasons survivors call or visit FEMA recovery centers.

41

DRAFT//PRE-DECISIONAL//DELIBERATIVE

expense, and move the program away from timely, practical relief for individuals.

**The Solution:**

**30-Day Damage Assessments**

- To shorten recovery timelines, FEMA 2.0 should leverage private sector best practices and work with STT stakeholders to ensure initial damage assessments can be completed within the first 30 days post-disaster.

**Direct Payments to Individuals**

- FEMA 2.0 should streamline the IA process by providing a direct payment package to individuals. This funding would focus solely on temporary assistance for individuals with destroyed or uninhabitable homes, excluding secondary homes.

  - Homeowner Assistance

    - For homeowners, the payment package would be based on their level of need and no more than 15% of the local government's assessed value, capped at a $1 million valuation (i.e. maximum payment not to exceed $150,000).

    - This covers repairs, replacement, rental and other needs assistance (i.e. personal property loss, transportation, medical, funeral expenses).

    - The federal government would cover two-thirds of the assistance and the state, local, tribe or territorial government cost share the remainder.

  - Renter Assistance

    - For renters, the payment package would be based on level of need and cover 3 months of rent (first, last, and current month) at the HUD Fair Market Rate (FMR) for the appropriate household size. Individuals with greater need will have the option for 3 additional months of rental assistance for 6 months total.

    - This covers rent and other needs assistance.

    - The Federal government would cover two-thirds of the assistance and the state, local, tribe or territorial government cost share the remainder.

    - Local governments are responsible for creating market conditions that ensure affordable rental properties are available and accessible to survivors.

**Shared Responsibility for Emergency Housing**

FEMA 2.0 will share responsibility with STT governments for the initial phases of emergency housing (mass care/sheltering and temporary housing/rental assistance). Private insurance companies will continue to take primary responsibility for permanent housing with HUD and SBA in supporting roles.

1. **Mass Care/Sheltering** (congregate and non-congregate):

   - STT responsibility

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- o Can be funded through RAPID Direct Funding Program/parametric amount

2. **Temporary Housing/Rental Assistance**

- Information sharing agreements between FEMA and STT stakeholders must be established to enable comprehensive recovery

- FEMA 2.0 will make direct payments to survivors

  - o STTs can take on this responsibility as desired if a pre-existing payment system is in place

- STTs can employ various types of assistance such as emergency home repairs or temporary housing units

  - o STTs can utilize their own funding or request a one-time funding allotment, provided within 30 days of the date of the disaster declaration. All federally provided funds must be used within one year.

3. **Permanent Housing**

- Responsibility of private insurance companies with HUD and SBA in key federal role

  - o Can also be funded through CDBG-DR or other federal housing programs

4. **Community Services Programs**

- **Disaster Unemployment** – No change to current program

- **Disaster Legal Services** – Combine with Disaster Case Management and provide direct grant by FEMA 2.0 to STT.

- **Crisis Counseling** – Direct funding provided by FEMA 2.0 to STT based on per capita cost and an estimate of those impacted and utilizing mass care or sheltering services. Limited to 6 months.

- **Disaster Case Management** - Direct funding provided by FEMA 2.0 to STT based on a per capita cost and an estimate of those impacted that will need temporary housing.

## Anticipated Benefits of IA Program Reform

**Speed:** Rapid distribution of funds directly to STTs will ensure affected citizens receive monetary relief quickly.

**Improved Information Sharing:** Establishing agreements between STT stakeholders and FEMA 2.0 for information sharing will accelerate the delivery of assistance to survivors.

**Clear Expectations for Survivors:** Individuals will know the exact amount of financial assistance and support they will receive after a disaster and can plan accordingly. This cost transparency creates an incentive for individuals to consider private insurance prior to a disaster occurring to optimize their personal recovery.

**Predictability:** Helps individuals and jurisdictions plan and budget more effectively for disaster recovery.

43

DRAFT//PRE-DECISIONAL//DELIBERATIVE

**Cost Savings:** Reduces administrative costs by an estimated $154 million per year.

**Shared Responsibilities:** Funding, authorities, and activities are shared and clearly articulated across FEMA 2.0, STTs, HUD, SBA, and private insurance companies to ensure each can provide efficient and effective support to the American public within their appropriate portfolio.

<u>Implementation Requirements</u>

1. Statutory change required to add cost share, change maximum amount to 15% of home value, cap temporary housing assistance, and eliminate federal option for direct temporary housing assistance.
2. Regulation change is required for STTs to be able to receive temporary housing assistance funding.
3. Policy change is required for streamlining forms of assistance, providing a direct payment package to individuals, and eliminating assistance for minor impacts.

<u>Conclusion</u>

Refocusing FEMA 2.0 on emergency and temporary housing relief and streamlining individual assistance into flat-rate reimbursements will provide transparent and immediate support to local communities and individual citizens in their hour of need. This effort should, and will, reduce burdensome administrative requirements, eliminate costly overhead with limited impact, and accelerate local recoveries.

# 8. Reform the Public Assistance program to provide direct funding block grants

### The Problem: Inefficient and Delayed Recovery

The current FEMA Public Assistance (PA) program is a reactive reimbursement model that often fails to meet the immediate needs of disaster-struck communities. An excruciatingly slow process, consisting of seven phases and involvement from multiple parties (as evidenced in Figure 3 below) prevents meaningful steps towards recovery.

- **Administrative Delays:** The project-by-project approval process under the current system is notoriously slow, with reimbursement often taking years or even decades. The existing model is rooted in an exact dollar assessment of estimated damages, which is a slow and tedious process. The focus is on accounting for damage rather than addressing the urgent needs of the affected community, and it is a fundamental flaw that hinders the speed and effectiveness of recovery. This forces States, Local, Tribes, or Territories (SLTTs) to rely on limited reserves or expensive credit to begin recovery efforts.

- **Compliance Overload:** Federal regulations, particularly those under the National Environmental Policy Act (NEPA), create additional layers of review and red tape. While important for environmental protection, applying a one-size-fits-all federal standard to urgent recovery work can create unnecessary and costly delays.

- **High Administrative Costs:** In the last five years, FEMA has provided approximately $180 billion in Public Assistance grants to states and local governments; $21 billion of this was used to manage these grants and pay project management costs incurred during project construction. FEMA has expended approximately $11 billion more to administer the $180

44

DRAFT//PRE-DECISIONAL//DELIBERATIVE

billion in grant funding. This model has created a disaster industrial complex that dilutes the impact of federal funding through multiple layers of administrative and contracting costs.

- **Unpredictable Cash Flow:** The reimbursement model provides no certainty for SLTTs, who must front costs with no guarantee of when, or how much, federal aid will arrive. This hinders effective financial planning, increases financing and debt costs, and slows the pace of recovery.

- **Centralized Decision-Making:** The top-down federal approach can disregard the unique needs and local expertise of individual SLTTs, leading to less efficient and less targeted recovery efforts.

- **Federal Overreach:** The threshold for authorizing the PA Program has become artificially low. This has resulted in increased federal involvement in several small events, many of which should be within the capabilities of the SLTTs.

- **Administrative Backlog:** FEMA is currently managing more than 300,000 projects (i.e., subgrants) on more than 600 open and active disasters. There are approximately 25,000 open projects that have exceeded their regulatory or administrative timelines, representing more than $54.8 billion in unliquidated obligations.



*Figure 1. Current FEMA Public Assistance bureaucratic process, with multiple parties engaged in multiple steps in multiple phases that can take decades to complete.*

DRAFT//PRE-DECISIONAL//DELIBERATIVE

### The Solution: A New Framework for Disaster Assistance

The RAPID Program fundamentally restructures the disaster funding model, shifting control and responsibility to the SLTT level while maintaining practical, limited federal oversight.

- **Fast Direct Funding:** Following a presidential major disaster declaration, federal funds would be directly transferred to the STT's treasury within 30 days. This moves away from a traditional grant and instead provides funding directly to the STT for use in adherence with its own procedures. An immediate injection of capital, like the Coronavirus Relief Fund model, provides STTs with the liquidity required to initiate rapid response and recovery.

- **Parametric Funding Mechanism:** FEMA 2.0 funding would be determined by a parametric formula based on objective, independently verifiable metrics like population impacted, wind speed, flood depth, or earthquake magnitude. Funding could be used for debris removal, first responder costs, permanent infrastructure repair and replacement, and mass care/sheltering. The federal funding would be up to 75% based on performance metric with a minimum of 50% of the parametric amount. This eliminates the need for detailed, time-consuming initial damage assessments and provides a predictable, reliable funding amount.

  > **Benefits of a Parametric Approach**
  > The main benefit of a parametric model is the **speed** and **certainty** of payouts, which are triggered automatically when pre-defined, **objective** event criteria are met, like wind speed or earthquake magnitude. This eliminates the need for time consuming loss assessments and quickly provides a financial backstop and cashflow for rapid response and recovery. When paired with traditional insurance of public facilities, this can enable communities to **quickly recover** with manageable financial risk and burden to local taxpayers.

  - FEMA 2.0 will convene a group of STT representatives to collectively establish a parametric funding model that is based on existing data from the authoritative federal agency or organization over each type of eligible event (i.e. earthquake, hurricane, flood, etc.)

- **RAPID Direct Funding Authorization Criteria:** While the requirements of the existing federal disaster declaration process would remain in place, the factors used to authorize FEMA Public Assistance funding via RAPID Direct Funding would be replaced with the following:

  > **What is a Parametric trigger?**
  > Parametric, or index-based, is a concept where if an event reaches a pre-defined threshold, it automatically triggers a set payment amount based on the magnitude of the event. This is different than traditional payment based on the magnitude of assessed loss.

  - Evidence the parametric trigger occurred; and

  - Evidence that response demands exceed the resources and capacity of local and state government.

    - The per capita threshold has historically not provided an accurate depiction of when the SLTT and effected local governments are truly overwhelmed during an event. As a result, federal assistance has often

46

DRAFT//PRE-DECISIONAL//DELIBERATIVE

erroneously been provided when the STT and local governments had adequate resources to respond.

- **Compliance Requirements:** To expedite recovery, the Program would grant STTs authorization to use their own certified environmental, construction, audit and inspection review processes for projects funded by the program, in lieu of federal NEPA and other environmental and historic preservation requirements. This differs from the U.S. Department of Housing and Urban Development (HUD) Community Development Block Grant-Disaster Recovery (CDBG-DR) program, which requires STTs to perform environmental and historic preservation (EHP) reviews on behalf of HUD, rather than substituting their own environmental process. Furthermore, STTs would no longer be required to adhere to federal procurement requirements and could use their own procurement standards and processes instead.

  o **Certified Local Programs:** STTs would apply to FEMA 2.0 for pre-disaster certification of their existing environmental review processes.

  o **Limited Waiver:** The waiver for federal EHP requirements would be exclusively for projects funded by RAPID Direct Funding.

  o **Consistency and Oversight:** This approach leverages existing STT-level expertise and procedures, creating a faster, more agile recovery without sacrificing environmental protection. FEMA 2.0 would retain oversight to ensure environmental reviews are appropriate and, if not, revoke certification.

- **Simplified and Broadened Eligibility:** Unlike the current PA program, which categorizes work in a rigid and complex manner, the RAPID Direct Funding program would offer a more simplified approach. This approach bolsters insurance requirements and transfers risks from American taxpayers to the private insurance market.

  o **State/Tribe/Territory Determination:** STTs would have the flexibility to fund projects that are necessary for timely response and recovery and should distribute funding in a fair manner based on disaster-caused need. To ensure project eligibility, the STT must certify projects meet the following criteria:

    ▪ **Eligible applicant.** The applicant must be a state, tribal, territorial, local government, or an eligible PNP organization.

    ▪ **Eligible facility.** The damage must have occurred at an eligible facility, which can include:

      ▪ Buildings (owned or leased)

      ▪ Public works systems

      ▪ Equipment

      ▪ Improved and maintained natural features, such as beaches or levees

    ▪ **Eligible work:** Work must fall into one of two categories:

      ▪ **Emergency Work:** Short-term activities to save lives, protect public health and safety, and protect property. This includes debris removal and emergency protective measures.

47

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- **Permanent Work:** Long-term work to restore a damaged public or PNP facility.
    - **Eligible cost:** The costs for eligible work must be necessary, reasonable, and adequately documented. Eligible costs can include labor, equipment, materials, and administrative costs.
    - **Emphasis on Outcome:** Eligibility and costs would be based on the outcome (restoring public function and safety) rather than on specific work types or detailed facility classifications.

- **Private Non-Profit (PNP) Eligibility:** The program would streamline the funding process for PNPs while retaining the existing distinction between "critical" and "non-critical" PNPs and the requirement for non-critical PNPs to first apply for an SBA loan.
    - **Expedited Verification of Non-profit Status:** STTs would be encouraged to establish a program to pre-certify PNPs eligibility, creating a verified database that eliminates the need for re-verification after a disaster.

- **Mandatory Two-Phased Reconciliation with Incentives:**
    - **Phase 1: One-Year Reconciliation:** Within one year of receiving initial funding, STTs must submit a certified public accounting (CPA)-conducted audit that provides a full accounting of all projects and costs and their plan to obtain and maintain insurance. Any funds not associated with an eligible project must be classified as underruns. STTs may either return underruns or request reallocation towards mitigation or insurance measures. Additional federal funding is not available for overruns.
        - **Reconciliation Incentives:** STTs that consistently submit timely, accurate, and transparent reconciliations in both audit phases could receive a "High-Performance Designation." For these high-performing STTs, the President may approve more than 75% of the parametric amount as a federal contribution for the current event.
    - **Phase 2: Program Closeout Audit:** Upon the conclusion of all projects, a final, comprehensive audit will be performed by the STT and submitted to FEMA 2.0 to close out the program. All federal funding provided under the RAPID Direct Funding Program must be expended or returned within eight years from the date of the initial award. This change eliminates the federal audit.

- **Insurance Requirements with Incentives:**
    - To ensure responsible risk management and reduce federal outlays, the RAPID Direct Funding Program would build upon the existing "obtain and maintain" insurance requirement by incorporating powerful incentives for STTs to prioritize insurance and self-insurance.
    - **Encouraging Self-Insurance and Risk Pools:**
        - **Swift State/Tribe/Territory Approval:** The program will provide a streamlined process and template for FEMA 2.0 approval of SLTT-level self-insurance plans and risk pools, reducing administrative burden and

48

DRAFT//PRE-DECISIONAL//DELIBERATIVE

encouraging SLTTs to create more affordable and stable insurance mechanisms. Although insurance would be required for damaged public facilities, the parametric based funding provided would not be reduced by insurance proceeds, incentivizing STTs to maximize insurance coverage. Every SLTT should declare their self-insured dollar amount.

- o **Funding for Program Establishment:** A portion of the unused funds can be used by the STT to establish a new self-insurance program or risk pool, demonstrating a direct federal investment in STT-led risk management.
- o **Tax Incentive(s):** To increase participation, create tax credits to mitigate the financial burden of flood insurance. Individuals doing the right thing by carrying insurance policies should be rewarded for their investment and effort to protect against disaster.

o **State/Tribe/Territory Verification and Compliance:**

- o **Centralized Asset Registry:** STTs will be required to maintain and publicly publish a centralized, digitized registry of all public and PNP facilities receiving permanent repair funding. This registry should be retroactive and will include insurance details, ensuring a transparent record for audit and enforcement.
- o **Verification Through Audit:** Compliance with requirements to obtain and maintain insurance will be verified through the two-phased state audit process rather than on a project-by-project basis by FEMA 2.0.

o **Linking Insurance to Mitigation:** The program will further incentivize risk reduction by linking insurance to mitigation measures.

- o **Premium Offset for Mitigation:** SLTTs may use the funds to support public entities and PNPs in implementing mitigation measures, potentially leading to lower insurance premiums and a stronger financial incentive for resilience.

o **Consequences of Non-compliance:** Failure to comply with insurance requirements, as identified in the reconciliation audits, will result in penalties for the STT, such as an automatic reduction in future federal share of the parametric payout.

- **Winding Down Current Program:** While the RAPID Direct Funding program will streamline future funding, FEMA 2.0 must also aggressively pursue closeout and reconciliation of existing disasters.

  - o **Convert Historic Disasters to RAPID Direct Funding:** FEMA 2.0 should pursue the ability to convert historic disasters to the new RAPID Direct Funding program, making a onetime payout and immediately transitioning to the two-phased reconciliation approach described above. This will significantly reduce the administrative burden on all stakeholders and prevent added confusion from overlapping approaches.
  - o **Reduce backlog through prioritizing high-risk projects:** Identify high risk unliquidated obligations that will either be drawn down by recipients or recovered by

DRAFT//PRE-DECISIONAL//DELIBERATIVE

FEMA 2.0 within set timeframes, ensuring all stakeholders are accountable for the effective management of existing funds.

**Precedent and Justification**

The RAPID Program is built upon proven concepts that prioritize speed, efficiency, and accountability:

- **The Coronavirus Relief Fund:** The Coronavirus Relief Fund demonstrated the effectiveness of distributing flexible, direct aid to STTs in an emergency.

- **Existing Block Grants:** Other federal block grants, like the Community Development Block Grant (CDBG) program, show the effectiveness of giving STTs autonomy in managing specific programs.

- **Parametric Triggers:** Used globally by risk insurers and governments, parametric triggers have a proven track record of providing rapid, predetermined payments following a triggering event.

**Anticipated Benefits**

The implementation of the RAPID Program would offer significant advantages for disaster-prone communities:

- **Accelerated Recovery:** Reduces funding delays from months or years to weeks, speeding up the rebuilding of vital public infrastructure and essential community services.

- **Empowered Local Leadership:** Allows SLTTs to leverage their local expertise and direct resources where they are most needed, fostering a more effective and agile recovery.

- **Increased Fiscal Discipline:** Replaces uncertain federal reimbursement with a predictable, rules-based funding model, while certified audits ensure transparency and accountability. The incentive-based reconciliation encourages performance and responsible stewardship of funds, with the potential for additional federal contributions for the current event based on merit. The eight-year expenditure deadline ensures funds are used efficiently.

- **Reduced Bureaucracy:** Significantly cuts down on the administrative burden for STT and local officials and PNPs, freeing up valuable time and resources.

- **Enhanced Public Trust:** Combines the speed of immediate aid and transparent adjudication with the robust oversight of a multi-phased audit process and incentive structure, assuring the public that funds are being used responsibly and effectively.

- **Improved Risk Management:** By linking insurance coverage to financial incentives, the program encourages STTs to take a proactive role in managing disaster risk for public and non-profit facilities.

- **Reduced Administrative Costs:** The RAPID Program is designed to drastically reduce superfluous administrative costs present in the disaster industrial complex and achieves efficiencies in the FEMA 2.0 staffing model by eliminating a variety of currently necessary roles PA program(s). The Program does so by limiting administrative costs to two audits and A&E for project construction. Furthermore, the use of a capped parametric amount for the federal contribution will inherently incentivize STTs to keep administrative costs as low as

50

DRAFT//PRE-DECISIONAL//DELIBERATIVE

possible. This ensures that the intent of the federal funding is realized, and taxpayer dollars are stewarded appropriately.

### Implementation Requirements

- Statutory change is required to implement a direct funding model, STT environmental and historic preservation reviews

- Regulation change is required for STTs to be able to determine eligibility for projects

### Conclusion

The RAPID Program offers a modern solution to the challenges of post-disaster recovery. By moving beyond the slow and reactive traditional PA program, it leverages STT autonomy, parametric funding, and transparent auditing to create a faster, more effective, and more accountable system for all Americans affected by disaster.

## 9. Reform the National Flood Insurance Program (NFIP) for Financial Stability and Risk Resilience

### The Problem:

The NFIP is financially unsustainable and operates with conflicting policy goals, which hinder its effectiveness.

- **Financial Instability:** The NFIP has previously accrued over $40 billion in debt ($16 billion of debt was canceled by Congress in 2017), primarily due to large-scale, catastrophic flooding events that the program's premiums were not designed to cover. The NFIP historically underpriced flood risk, leaving it unable to cover major losses without borrowing from the U.S. Treasury. This financial unsustainability and underpriced insurance has led to an increasing debt burden with no ability to repay. Current interest payments on the debt are $700 million annually.

- **Outdated Risk Information:** The program's current mapping methodology dates to the 1970's and do not fully capture current or emerging flood hazards, leading to an underestimation of risk. This outdated information does not support the pricing of insurance, leads to misunderstanding of flood risk, and has resulted in communities rebuilding and developing in flood prone areas. The NFIP also utilizes this outdated risk information to set standards for communities to regulate their flood risk. FEMA has not evolved its standards or science to support intuitive land use choices that result in predictable post-flood outcomes. This results in a one size fits all solution that limits local ownership of their flood risk. State and locally tailored standards would better reflect local flood risk choices and ideally decrease community, state, and federal cost.

> **Why do I need Flood Insurance?**
>
> Floods can happen anywhere – just one inch of water can cause thousands of dollars' worth of damage. Most homeowners' insurance does not cover flood damage. Flood insurance is a separate policy that can cover buildings, the contents of buildings, or both.

51

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- **Conflicting Goals:** Congress has instructed the NFIP to be affordable, financially sound, available to all, and risk informed. These goals often pull in opposite directions, and political pressures have frequently blocked meaningful reform, leading to dozens of short-term program reauthorizations. For example, maintaining affordable rates through subsidies directly conflicts with the goal of financial sustainability, and risk-informed pricing is politically unpopular in the most flood prone areas.

**The Solution:**

To address these critical shortcomings, the solution involves a strategic shift to a private market framework combined with strengthened federal oversight and community-level action. Implementing these proposals may require both federal administrative changes and Congressional action to align with current federal statutes, state-based insurance regulatory authorities, and privacy protection laws. FEMA in coordination with the Department of Treasury, state insurance commissioners, and the private insurance industry, should explore strategies for effectively operationalizing these proposals.

- **Empower Communities (Better Land-Use Policies):** Enhance NFIP participation standards administratively to support intuitive land use choices that result in predictable post-flood outcomes for communities. FEMA could explore ways to modernize the Community Rating System incentives to reward integration of property-level resilience activities; align floodplain standards with this proposal's modernization of mapping data; and provide support to states to promote risk communication with local land-use planning. FEMA should ensure any updates promote local decision making and state primacy in land use choices for flood prone areas. These changes place flood risk management squarely in the hands of those most capable of regulating it—state and local governments.

- **Modernize Risk Assessment (Update Risk Rating 2.0 & Improve Maps):** The NFIP's updated pricing methodology, Risk Rating 2.0, leveraged advanced technology and data sources to deliver fairer, more individualized rates, must continue to be implemented and updated based on better information and science. Risk Rating 2.0 was the first step in moving away from the use of mapped flood zones which are used for local floodplain management and to tell homeowners they are either "in or out". The new flood insurance rating methodology now uses a more comprehensive approach based on factors like distance to water, flood types, and the cost to rebuild. The program must also improve the accessibility, transparency, and quality of flood risk data and communication tools for all stakeholders. In addition to updating the mapping methodology to show property-level risk, FEMA should explore ways to expand the availability of anonymized flood loss and exposure data consistent with privacy and trade secret protections under federal law. Enhancing access to risk data will bridge the gap between insurance pricing and the outdated regulatory mapping methodology. Further, the NFIP must adopt an efficient model to identify and maintain flood risk information that connects land use choices and pricing.

- **Implement Risk-Based Pricing & Actual Costs:** A key to enabling the private market shift is to charge policyholders the actual costs of their policies. FEMA should continue to refine Risk Rating 2.0 implementation. The Council recommends exploring existing subsidies and working with Congress to address affordability challenges for select homeowners. FEMA can also evaluate opportunities to better align the Community Rating System Program eligible activities and discounts with measurable physical risk reduction actions communities

52

DRAFT//PRE-DECISIONAL//DELIBERATIVE

and policyholders can take to ensure premium prices are reflective of property-level risk. These refinements could improve consistency between mitigation outcomes, pricing, and private market participation.

- **Revise 'Write Your Own' Compensation:** FEMA provides an expense allowance to Write Your Own (WYO) private insurance companies of roughly $1 billion annually to sell, write, and service standard flood insurance policies under the National Flood Insurance Program. WYO companies do not underwrite the flood risk but serve as intermediaries. In FY25 the expense allowance was 29.1% of total written premium volume by company and projected at 28.4% for FY26. The compensation methodology is dated and doesn't reflect improvements in FEMA's systems, automated premium pricing methodology, or the expanded use of the direct-to-customer servicing platform. Compensation should be updated to ensure FEMA is not over-compensating Write Your Own insurance companies. FEMA should evaluate options through ongoing rulemaking to update the compensation framework that will reflect administrative costs and new operational efficiencies, which was Congressionally directed in the Biggert-Waters Flood Insurance Reform Act of 2012. Completing this rulemaking has the potential to save hundreds of millions of dollars and promote more private flood offerings.

- **Shift to Private Market through Depopulation of Existing NFIP Policies:** A core component of the solution is a gradual, structured transition of certain existing NFIP policies to the private market in areas where private capacity exists and consistent with state regulatory frameworks. This would be accomplished by pursuing a voluntary "take-out" program, which would allow FEMA to assess the feasibility of transferring eligible policies to qualified private insurers under existing statutory authority. Depopulation programs have historically been state-based so applying this approach at the federal level will require careful evaluation of operational, regulatory, and consumer protections. This approach, modeled on successful state depopulation programs for other perils, could reduce the NFIP's policy count. States could regulate the market to ensure consumer protection, with the direct involvement of state insurance commissioners.

- **Evaluate Development of Flood Insurance Marketplace:** To modernize and enhance the capacity of the national flood insurance system, it is recommended that FEMA evaluate the development of a flood insurance marketplace designed to provide consumers with access to both NFIP and qualified private insurance options when purchasing a new flood policy. The marketplace could leverage private sector capacity through a centralized clearinghouse model, allowing private participating insurers opportunity to offer coverage prior to placement with NFIP. This collaboration would serve as a clearinghouse opportunity for private flood insurers who could offer coverage prior to submission to the NFIP. FEMA should evaluate potential options with qualified insurance wholesalers or a consortium of insurers to assess the feasibility of administering a clearinghouse under their current authorities. A model of this kind would address the critical needs of market capacity, consumer protection, and improve administrative efficiency while offering consumers a choice between private coverage or the NFIP.

  o **Centralized Clearinghouse:** FEMA should evaluate models in which a wholesaler or consortium could manage a national market exchange that operates as a clearinghouse for consumers seeking private insurer and NFIP flood policies. This would standardize the policy origination processes, thereby reducing the administrative friction that currently limits private carrier participation.

53

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- o **Pricing Alignment:** The marketplace's pricing mechanism could reference FEMA's Risk Rating 2.0 framework as an actuarial benchmark. In addition, the marketplace could encourage depopulation by requiring the insured to select a private flood insurance policy from a marketplace approved insurer that is priced at no more than 10 percent above the NFIP Risk Rating 2.0 actuarial rate for comparable coverage for the same property. This approach aids in depopulation and helps ensure that while private market competition is encouraged, pricing remains tethered to actuarial science, state rate setting, and avoids significant market volatility.

- o **Rigorous Carrier Standards:** To protect consumers and ensure market resilience, FEMA, through its partnership with the wholesaler or consortium, would ensure all private carriers writing flood insurance through the marketplace meet eligibility requirements, in coordination with State Insurance Commissioners that is consistent with the McCarran Ferguson Act. These requirements would include robust financial stability metrics to prevent carrier failure during catastrophic events.

- o **Strategic Alignment with the NFIP:** This marketplace would operate in concert with the NFIP, providing a viable and standardized private option that helps offload risk from the federal program. This will ultimately contribute to the NFIP's long-term financial stability and reduce the taxpayer burden.

- **Address Repetitive Loss Properties:** Manage repetitive loss properties through targeted mitigation planning and accountability measures, such as those proposed in the "Repeatedly Flooded Communities Preparation Act" (S.1545). This legislation provides a structured plan to address the highest-risk properties and ensures mitigation is a priority in these areas, thereby reducing the financial burden of repeated claims.

**Anticipated Benefits:**

Implementing these changes would produce several key benefits for the public and the government.

- **Accelerated Recovery:** Broader insurance access and diversified coverage through a more competitive market, which will better sustain the overall market and ensure faster payments and more predictable recovery for local communities after a disaster.

- **Reduced Government Burden:** A more robust private market and stronger community-level, state owned land use management will reduce the financial burden on federal, state, and local governments by empowering individuals to understand and manage their own risk.

- **Predictable Financial Outcomes:** Homeowners will be better able to anticipate post-disaster compensation through knowledge of their personal policies, rather than relying on the uncertain nature of federal disaster aid.

- **Increased Resilience:** By aligning insurance rates with granular flood risk, improving publicly available flood risk information, and promoting local decision making and state primacy in land use choices, property owners and local governments will have a greater incentive to invest in mitigation measures, making communities safer and more resilient to the growing threat of flooding.

**Potential Next Steps**

54

DRAFT//PRE-DECISIONAL//DELIBERATIVE

The Council recommends that FEMA coordinate with the U.S. Department of Treasury, other relevant federal agencies, state insurance commissioners, and insurance industry stakeholders to further evaluate the NFIP solutions discussed in this section.

Additionally, FEMA, in coordination with the Department of Treasury should convene a roundtable of state insurance commissioners, federal lending regulators, consumer representatives and relevant insurance industry stakeholders, including insurers, reinsurers, and brokers to analyze the potential reforms outlined in the Council's proposal. These stakeholders can also assess how data, underwriting, and price information can be shared responsibly and maintain consumer protections consistent with statutory authorities and privacy requirements. Further, federal agencies should continue stakeholder engagement on increasing consumer engagement and understanding of flood risk and insurance options.

In relation to a shift to private market and a potential depopulation program, FEMA, the U.S. Department of Treasury, federal lending regulators, Government Sponsored Enterprises, and the state insurance commissioners should collaborate on developing a potential implementation strategy that would be compliant with the express authorities of the McCarran-Ferguson Act as well as the Flood Disaster Protection Act of 1973 mandatory purchase provisions.

**Conclusion:**

The National Flood Insurance Program is at a critical juncture. The current model is unsustainable and has not evolved since the 1970s—it cannot meet conflicting expectations of providing affordable insurance, mitigating flood risk, and maintaining financial solvency. By embracing a new strategy that encourages greater private market participation, modernizes risk assessment, and modifies the NFIP's role in state and community-level land use choices, the nation can move toward a more resilient and financially stable flood risk management system. This shift would reduce the federal government's financial burden, promote accurate risk pricing, and incentivize property owners and communities to invest in mitigation, ultimately leading to a more prepared nation in the face of flood-related disasters. While this proposal seeks to address NFIP's financial problems going forward, the existing debt would have to be addressed by Congress or other revenue sources.

# 10. Maximize every dollar spent by reducing administrative costs

A portion of U.S. federal disaster relief funds is used for administrative costs and contractor fees rather than directly for community recovery. This is due to a system with rising program complexity, significant administrative costs, and a trend of personnel moving between FEMA and private firms. This structure has prompted calls for reforms to simplify grant processes, manage administrative costs, and address the influence of private interests on public policy.

The management system has shifted from one primarily using federal and local government staff to one relying on private contractors. A key factor in this change is the increased complexity of FEMA's grant programs, such as the Public Assistance (PA) and Hazard Mitigation Grant Programs (HMGP). A FEMA official in Puerto Rico highlights this phenomenon: "I have 500 contracted employees that would not be needed if FEMA's grant process was not so complex." The detailed requirements of these programs have created challenges for state and local governments, especially smaller municipalities with limited resources, as noted in GAO reports.

DRAFT//PRE-DECISIONAL//DELIBERATIVE

This complexity has fostered a specialized industry of consultants and contractors who assist communities in navigating the grant application and compliance procedures. This industry's growth has been influenced by:

- **Personnel Transitions:** Former FEMA and state political appointees and career employees have joined or established private companies that now serve as major contractors in the disaster management space. This raises questions about whether former officials leverage insider knowledge and connections for private gain.

- **Financial Incentives:** The current system provides private sector financial incentives for state and local governments to hire them. Since administrative costs are largely reimbursable by FEMA, jurisdictions can pass these consultant fees on to the federal government. As one former FEMA official noted, this can lead to "a lot of money getting spent on process... and you end up with a lot of billable hours" without necessarily improving outcomes.

A central issue with the current system is the amount of taxpayer money used for administrative costs. A substantial part of grant funding is spent on administrative and management expenses at

*In total, almost 25 cents on every dollar can be provided for administrative expenses*

both the federal and state/local levels. In total, almost 25 cents on every dollar can be provided for administrative expenses. Most of these costs are expended during the grant development phase, which hinders the pace of recovery.

- **Overhead spending**: The administrative allowance for state and local governments has been increasing. For instance, DHS OIG audits have identified concerns regarding FEMA's oversight of grant funds and instances of over-obligated funds.
- **Incentive structure**: The reimbursement model may encourage state and local governments to keep disasters "open" longer than necessary to maximize management costs, which can delay project completion. The primary incentive for contractors is to maximize billable hours, not to expedite recovery.
- **Program complexity**: As grant programs become more complex, the demand for specialized consultants increases, which in turn raises administrative costs. The system's intricate nature can make it difficult for citizens and local officials to understand, creating a dependency on the private firms that benefit from this complexity.

To address these challenges, the following recommendations, informed by GAO and OIG findings, have been suggested:

- **Simplify and streamline grant programs**: FEMA could review its grant programs to reduce unnecessary bureaucratic requirements. Simpler applications and standardized documentation could decrease the need for consultants, especially for smaller communities.

- **Establish caps on administrative overhead**: To ensure more funds reach affected communities, FEMA could implement strict, federally mandated caps on the percentage of grant funds that can be used for administrative costs. A more transparent reporting system could also be established to track overhead spending.

56

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- **Strengthen post-employment rules**: Ethics rules for employees transitioning from FEMA to the private sector could be reinforced. This could involve extending "cooling-off" periods and increasing transparency requirements for former employees who become consultants, which would help to mitigate potential conflicts of interest.

- **Increase direct technical assistance**: Instead of increasing administrative reimbursement percentages, FEMA could provide direct, in-house technical assistance to local governments. By offering pre-packaged support and training, FEMA could reduce the reliance on third-party contractors and empower local officials to manage recovery efforts.

In conclusion, the current U.S. disaster management system, with its reliance on private contractors and complex processes, directs a significant amount of money away from community needs. By eliminating and simplifying programs, capping administrative costs, strengthening ethics rules, and increasing direct government support, policymakers could improve how disaster relief funds are used to build a more resilient nation.

# Soliciting Input from Stakeholders Across the Nation

## Incorporating Public Feedback into FEMA Review Council Efforts

The Council undertook extraordinary measures to ensure that public feedback was solicited from a broad range of stakeholders as part of its comprehensive review of FEMA's programs and operations. Recognizing the critical importance of stakeholder engagement, the Council employed multiple avenues to gather input, including public meetings, Federal Register Notices, in-person listening sessions, electronic and regular mail submissions, and virtual forums. These efforts were designed to ensure transparency and accessibility, enabling voices from across the nation to contribute to the reform process.

The feedback received underscores widespread support for FEMA reform aimed at addressing inefficiencies, reducing bureaucratic barriers, and enhancing support for disaster survivors and local governments. Stakeholders consistently identified key priorities, including the need to streamline processes, decentralize decision-making, increase funding for mitigation and preparedness initiatives, and ensure fairness in disaster response and recovery efforts. Participants emphasized the importance of implementing reforms gradually, allowing for a phased approach that strengthens partnerships among federal, state, tribal, and local entities while minimizing disruptions.

This robust engagement process has provided the Council with invaluable insights into the challenges and opportunities facing FEMA's operations. The feedback serves as a cornerstone for shaping the future of FEMA's programs, ensuring that reforms are informed by the lived experiences of those directly impacted by disasters and those responsible for managing emergency response and recovery efforts. By integrating this input into its recommendations, the Council aims to create a more efficient and responsive FEMA that is better equipped to meet the needs of communities nationwide. The inclusion of public feedback reflects the Council's commitment to fostering collaboration and transparency in the pursuit of meaningful reform.

DRAFT//PRE-DECISIONAL//DELIBERATIVE

## Methodology

We are a nation built upon local communities, thus the Council immediately recognized that they must canvas the country to capture the widest possible feedback from the American people for a reform effort that tragically may affect nearly every American at some point in their lifetime.

To achieve this objective, the Council leveraged the following tools. Of note, the views expressed from the survey are not endorsed by the Council but were taken into consideration during deliberations on its recommendations.

- National Survey
- Listening Sessions (in-person and virtual)
- Federal Register Notice Comments
- Public Meetings

### National Survey

The Council's State-Federal Coordination Subcommittee surveyed 1,387 stakeholders spanning state, local, tribal, and territorial (SLTT) agencies as well as non-governmental partners. The results revealed critical insights into the current state of national preparedness and response. The Council conducted surveys focused on mitigation, recovery, preparedness, and response, which collectively assessed key emergency management tasks. These surveys evaluated capabilities ranging from community resilience and long-term vulnerability reduction to infrastructure systems, cybersecurity, and mass care services.

With a total of 1,387 responses, the individual totals for the surveys were:

- Mitigation: 354 responses
- Recovery: 271 responses
- Preparedness: 479 responses
- Response: 283 responses

Most of the responses were from SLTT emergency management services, with some responses from non-governmental agencies such as universities, hospitals, and non-profits. Local agencies provided more than 75 percent of the responses. Geographically, the responses cover the entire United States, with a higher concentration of local agency responses coming from populations on the east and west coasts. Figure 1 shows the distribution of responses for the Response survey.

58

DRAFT//PRE-DECISIONAL//DELIBERATIVE



Figure 1: The geographic distribution of inputs from the Response Survey.

## Listening Sessions

Subcommittee listening sessions were facilitated to hear from state and local emergency managers throughout the country to hear their thoughts on disaster response, recovery, mitigation, and reforming FEMA's policies and operations. The listening sessions were attended and facilitated by Council members.

The locations for subcommittee listening sessions were strategically selected throughout the United States based on significant disasters that occurred in those areas, and the ability to meet with a bipartisan selection of state and local emergency managers across the regions.

The locations included: Asheville, North Carolina; Oklahoma City, Oklahoma; New Orleans, Louisiana; Los Angeles, California; Lincoln, Nebraska; Cheyenne, Wyoming; Minneapolis, Minnesota; Cape Coral, Florida; Washington, District of Columbia; Colorado Springs, Colorado; San Francisco, California; Waterbury, Vermont; San Juan, Puerto Rico; and virtually.

Additionally, the subcommittees held listening sessions in Los Angeles, California to discuss the recovery efforts of the 2025 Southern California wildfires; San Juan, Puerto Rico to discuss the ongoing impacts of Hurricane Maria in 2017; and Asheville, North Carolina to honor the one-year anniversary of Hurricane Helene.

In addition to these, the Council held an in-person listening session with over 20 Tribal Nations in Oklahoma City, Oklahoma as well as hosting three virtual listening sessions that cumulatively had over 100 Tribal Nations registrants.

## Federal Register Notice Public Comments

The FEMA Review Council published Federal Register Notice DHS-2025-0013 to solicit public feedback on the agency's reform. The 11,708 public comments received reflect a strong

DRAFT//PRE-DECISIONAL//DELIBERATIVE

consensus on the importance of FEMA's role in disaster response and recovery, while also capturing a broad spectrum of perspectives, experiences, and recommendations.

**Public Meetings**

The Council held public meetings in three locations: New Orleans, Louisiana; Oklahoma City, Oklahoma; and Washington, District of Columbia. The aim of these public meetings was to ensure the Council operated in a *transparent manner* while also leveraging the anniversaries of significant national disasters to further emphasize President Donald J. Trump's laser-focus on putting Americans first as part of FEMA's reform.

- **New Orleans, Louisiana**. In recognition of the 20-year anniversary of Hurricane Katrina.

- **Oklahoma City, Oklahoma**. To highlight that not every disaster is a natural one, such as the Alfred P. Murray Federal Building bombing in 1995, and to further acknowledge natural disasters are not just flooding events, given the number of catastrophic tornadoes in this state.

- **Washington, District of Columbia**. By conducting two public meetings in the nation's capital, the Council ensured in-person opportunities for senior leaders of the Administration to engage and participate with the Council.

## Analysis of Public Feedback Received

The FEMA Review Council's listening sessions, public comments, public meetings, and survey analysis revealed key themes, challenges, and recommendations for improving FEMA's disaster response, recovery, and mitigation efforts. Details of the below summary can be found in Appendix *Detailed Public Comments*.

**List of Common Issues and Challenges:**

- **Bureaucratic complexity**: FEMA's processes are overly complex, slow, and resource-intensive, creating barriers for smaller jurisdictions and tribal nations.

- **Delays in funding and reimbursements**: Cash flow challenges and slow FEMA reimbursements hinder recovery efforts, especially for smaller entities.

- **Workforce and capacity constraints**: There is high turnover among FEMA staff and limited capacity at the local level impact disaster response and recovery effectiveness.

- **Environmental and historic preservation reviews**: EHP reviews are major bottlenecks, delaying critical recovery projects.

- **Insurance and risk management**: Rising insurance costs, underinsurance, and concerns about FEMA's Risk Rating 2.0 system impact recovery efforts.

- **Disparities in aid**: Systemic inequities affect small, rural, and underserved communities, as well as vulnerable populations like renters, low-income families, and tribal nations.

- **Staffing gaps**: SLTT agencies face shortages in mass care, operational communications, and specialized disaster response capabilities.

- **Communication challenges**: Insufficient clarity and timeliness in FEMA's communication with local jurisdictions hinder coordination.

60

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- **Dependence on FEMA funding**: SLTT agencies rely heavily on FEMA funding for critical disaster response and recovery activities, with reduced funding threatening capabilities.

**List of Common / Core Recommendations:**

1. **Bureaucratic complexity**
   - o Simplify FEMA processes by streamlining disaster declarations, grant applications, and project reviews.
   - o Decentralize decision-making to regional offices and implement a single federal family individual assistance application for all federal assistance.

2. **Delays in funding and reimbursements**
   - o Enhance funding mechanisms by increasing funding for Emergency Management Performance Grant (EMPG), Hazard Mitigation Grant Program (HMGP), and Building Resilient Infrastructure and Communities (BRIC) programs.
   - o Transition to block grants for disaster recovery funding with safeguards for fair distribution to expedite aid delivery.

3. **Workforce and capacity constraints**
   - o Build local capacity by investing in training, technical assistance, and staffing for local emergency management agencies.
   - o Expand FEMA training programs and workforce development initiatives to address staffing shortages.

4. **Environmental and Historic Preservation (EHP) reviews**
   - o Streamline EHP reviews to reduce delays in recovery projects and empower local governments to conduct them.

5. **Insurance and risk management**
   - o Invest in mitigation and resilience by prioritizing pre-disaster mitigation funding, resilient infrastructure, and incentivizing stronger building codes and forward-looking plans.

6. **Disparities in aid**
   - o Address systemic disparities by tailoring FEMA programs to meet the needs of small, rural, underserved communities, tribal nations, and vulnerable populations.

7. **Staffing gaps**
   - o Build local capacity by expanding FEMA training programs and workforce development to address gaps in mass care, operational communications, and specialized disaster response capabilities.

8. **Communication challenges**
   - o Leverage technology to adopt modern tools like AI, geospatial systems, and real-time data sharing platforms to improve situational awareness and communication clarity.

9. **Dependence on FEMA funding**

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- o Maintain and strengthen FEMA's capabilities to ensure reforms prioritize disaster survivors' needs, improve aid delivery efficiency, and address increasing disaster frequency and severity.
- o Enhance public-private partnerships by integrating private sector and nonprofit organizations into disaster planning and operations to supplement FEMA's efforts.

# Tribal Engagements

The Council recognizes the distinct sovereignty of each individual Tribal Nation and Alaska Native Village and their respective government-to-government relationship with the federal government as outlined in the U.S. Constitution, treaties, statutes, and court decisions. The Council also recognizes the unique position Tribal Nations and Alaska Native Villages are in to be considered both states and locals when applied to the traditional levels of government. While the Council could not directly engage one-on-one with each of the 574 federally recognized tribes, the Council provided numerous opportunities for engagement comments from Tribal Nations as directed in the Executive Order. The Council held an in-person listening session with over 20 Tribal Nations in Oklahoma City, Oklahoma. Additionally, the Council hosted three virtual listening sessions that cumulatively had over 100 Tribal Nations registrants. These sessions aimed to gather input on improving FEMA's programs, services, and disaster response capabilities, with the Council committed to synthesizing feedback into recommendations for the President and Congress.

**Findings:**

Tribal leaders emphasized the need for FEMA to respect tribal sovereignty by maintaining direct government-to-government relationships and avoiding state or county intermediaries. They highlighted unique challenges faced by tribes, such as geographical isolation, cultural impacts, and infrastructure limitations, and called for tailored solutions like vertical evacuation structures for coastal tribes. Tribes offered the below key concerns and key proposals:

**Tribal Concerns:**

1. **Tribal Sovereignty and Direct Engagement:** Tribal leaders emphasized the importance of maintaining government-to-government relationships with FEMA, advocating against routing assistance through states or counties. They stressed the need for FEMA to respect tribal sovereignty and directly engage with tribal governments.

2. **Unique Tribal Challenges:** Tribes face distinct challenges, including geographical isolation, cultural impacts of disasters, and limited infrastructure. Alaska Native tribes highlighted erosion, flooding, and permafrost loss, while coastal tribes emphasized the need for vertical evacuation structures to mitigate tsunami risks.

3. **Funding and Grant Accessibility:** Tribes expressed concerns about limited access to FEMA grants, restrictive eligibility criteria, and the cancellation of the Building Resilient Infrastructure and Communities (BRIC) program. They called for streamlined grant processes and equitable funding opportunities.

4. **Disaster Thresholds and Cost Sharing:** FEMA's disaster declaration thresholds often exclude smaller tribes. Tribal leaders advocated for lowering thresholds and increasing cost-sharing flexibility to ensure equitable access to disaster relief.

DRAFT//PRE-DECISIONAL//DELIBERATIVE

5. **Emergency Management Capacity:** Many tribes operate with limited Emergency Management staff and infrastructure. Tribes requested increased technical assistance, training programs, and resources to enhance their capacity.

6. **Collaboration and Mutual Aid:** Tribes proposed the creation of a Tribal Emergency Management Assistance Compact (T-MAC) to facilitate mutual aid and resource sharing among tribal nations during disasters.

**Proposed Recommendations from the Tribes:**

- **Adopt a Tribal Disaster Act:** Establish a standalone act to address tribal-specific needs and organizational structures.

- **Revise the Stafford Act:** Amend the act to better reflect tribal realities, particularly for Alaska Native communities.

- **Restore BRIC and Expand Mitigation Funding:** Reinstate the BRIC program or similar initiatives to support hazard mitigation plans and infrastructure projects.

- **Improve Grant Processes:** Streamline application procedures and broaden eligibility criteria for FEMA grants.

- **Create a Tribal EMAC:** Establish a compact to facilitate mutual aid among tribes.

- **Enhance Technical Assistance:** Provide training, resources, and direct support to build tribal Emergency Management capacity.

- **Recognize Cultural Impacts:** Develop metrics to account for cultural losses in disaster declarations.

# Areas for Further Exploration / Engagement

The scope and scale of interconnected topics and challenges when investigating the nation's state of emergency management is impressively complex. During this journey, the Council identified a series of areas that would benefit from thoughtful exploration from other formal groups or experts that may be best positioned to offer cogent solutions to the President and the Nation.

1. Review and streamline disparate disaster grant programs across federal agencies to improve consistency and accessibility for states and localities

2. Additional analysis on opportunities within the National Flood Insurance Program

3. Assess viability and opportunities for a potential FEMA Headquarters location change

4. Explore how to better integrate emerging technologies including advanced analytics, AI, and communications platforms to enhance operational capability, predict requirements in advance, and reduce costs

5. National Disaster Medical System: How to evolve program to better mirror USAR

6. Qualifications and cultivation of the administrative, state directors, T&T, and major urban core directors

7. National Structure – Optimal/Desired Number of Personnel. Due to anticipating staffing efficiencies, recommend further exploration on FEMA 2.0 staffing as well as FEMA 2.0 Region structure

63

DRAFT//PRE-DECISIONAL//DELIBERATIVE

8. Explore the National Core Competencies of all FEMA-related programs

9. Explore EMPG eligibility for Tribes

10. Explore how to best leverage existing advisory councils for FEMA:

   a. FEMA National Advisory Council

   b. FEMA Technical Mapping Advisory Council

   c. Board of Visitors for the National Fire Academy

# Public Meeting Minutes

The Council held four public meetings during its operations, the first being an inaugural gathering of the Presidentially appointed members, the second and third meetings acting as updates to progress and actions taken during the operations of the Council, and the last being the formal presentation and voting of this report and recommendations. Full public meeting minutes can be found on the Council's website.

- Inaugural FEMA Review Council Meeting on May 20, 2025, located at the Eisenhower Executive Office Building in Washington, DC.

- Second FEMA Review Council Meeting on July 9, 2025, located at the DHS Customs and Border Protection's Customs House in New Orleans, Louisiana.

- Third Public FEMA Review Council Meeting on August 28, 2025, located at the Oklahoma State Capitol Building in Oklahoma City, Oklahoma.

- Final Public FEMA Review Council Meeting on December 11, 2025, located at the Eisenhower Executive Office Building in Washington, DC.

# Engaged Subject Matter Experts and Stakeholders

The FEMA Review Council would like to thank the more than 11,000 individuals and respondents who have participated and engaged with the Council to share their input and insight. A full listing of individuals and organizations who have submitted formal testimony can be found at: Regulations.gov

The Council would like to note the extensive participation from the organizations and entities listed below. This list is not exhaustive or granular as the Council has engaged with numerous subject matter experts that have met in closed subcommittee sessions. The following list has been provided as is to respect the integrity of the feedback provided in those sessions.

## Federal Agencies

Office of Management and Budget

Department of War

Department of Treasury

Department of Homeland Security

Federal Emergency Management Agency

## National Organizations

DRAFT//PRE-DECISIONAL//DELIBERATIVE

| | |
|---|---|
| Council of Governors | International Association of Emergency Managers |
| International Association of Fire Chiefs | National Association of Counties |
| National Association of Mutual Insurance Companies | National Emergency Management Association |
| National Governors Association Public Health and Disaster Reform Task Force | National League of Cities |
| National Volunteer Fire Council | U.S. Conference of Mayors |
| Reinsurance Association of America | National Association of Insurance Commissioners |
| American Flood Coalition | …and many additional organizations |

## Tribal Nations

| | | |
|---|---|---|
| Agua Caliente Band of Cahuilla Indians | Inter-Tribal Council of Arizona | Ponca Tribe of Nebraska |
| Ak-Chin Indian Community | Iñupiat Community of the Arctic Slope | Port Gamble S'Klallam Tribe |
| Alakanuk Tribe | Iowa Tribe of Oklahoma | Potawatomi Nation |
| Bear River Band of the Rohnerville Rancheria | Jena Band of Choctaw Indians | Prairie Island |
| Blue Lake Rancheria | Jicarilla Apache Nation | Prairie Island Indian Community |
| Brownfields Tribal Response Program Coordinator | Kaibab Band of Paiute Indians | Pueblo of Nambe |
| Burns Paiute Tribe | Karuk Tribe | Pueblo of Zia |
| Cabazon Band of Cahuilla Indians | Kickapoo Tribe of Oklahoma | Puyallup Tribe |
| Caddo Nation of Oklahoma | Kiowa Tribe | Quapaw Nation |
| Cahuilla Band of Indians | Lac Courte Oreilles Nation | Quinault Indian Nation |
| Catawba Nation | Leech Lake Ojibwe | Red Cliff Band |
| Cherokee Nation | Lummi Nation | Rincon Band of Luiseño Indians |
| Chickaloon | Makah Tribal Organization | Saint Regis Mohawk Tribe |
| Chickasaw Nation | Match-E-Be-Nash-She-Wish-Band of Pottawatomi (aka Gun Lake Tribe) | Salt River Pima - Maricopa Indian Community |
| Choctaw Nation | Miccosukee | Santo Domingo Pueblo |
| Coeur d'Alene Tribe | Middletown Rancheria | Seldovia Village Tribe |

65

DRAFT//PRE-DECISIONAL//DELIBERATIVE

| | | |
|---|---|---|
| Comanche Nation | Mille Lacs Band of Ojibwe | Seminole Tribe of Florida |
| Confederated Tribes of the Umatilla Indian Reservation | Morongo Band of Mission Indians | Shakopee Mdewakanton Sioux Community |
| Confederated Tribes of Warm Springs | Native Village of Atka | Shinnecock Indian Nation |
| Cow Creek Band of Umpqua Tribe of Indians | Native Village of Eklutna | Sisseton Wahpeton Oyate of Lake Traverse Reservation |
| Cowlitz Indian Tribe | Native Village of Kipnuk | Skagit River System Cooperative |
| Crow Creek Sioux | Native Village of Ouzinkie | Sokaogon Chippewa Community |
| Dry Creek Band of Pomo Indians | Native Village of Point Hope | Spokane Tribal Business Council |
| Eastern Band of Cherokee Indians | Native Village of Umkumiut | Summit Lake Paiute Tribe |
| Eastern Shawnee Tribe of Oklahoma | Navajo Nation | Suquamish Tribe |
| Federated Indians of Graton Rancheria | Nez Perce Tribe | The Native Village of Dot Lake |
| Flandreau Santee Sioux Tribe | North Fork Rancheria | Three Affiliated Tribes |
| Fond du Lac Band of Lake Superior Chippewa | Nottawaseppi Huron Band of the Potawatomi | Tlingit & Haida |
| Forest County Potawatomi | Oneida Nation | Trinidad Rancheria |
| Fort Sill Apache Tribe | Organized Village of Kwethluk | Tulalip Tribes |
| Gila River Indian Community | Pawnee Nation | Twenty-Nine Palms Band of Mission Indian |
| Grand Portage Band of Lake Superior Chippewa | Pinoleville Pomo Nation | Upper Sioux Community |
| Great Lakes Inter-Tribal Council, INC. | Pokagon Band of Potawatomi | Wampanoag Tribe of Gay Head Aquinnah |
| Hannahville Indian Community, Potawatomi Tribe | Pokagon band of Potawatomi Indians of Michigan and Indiana | Wichita and Affiliated Tribes |
| Ho-Chunk Nation | Pokagon Potawatomi | Winnebago Tribe |
| Hoh Tribal Business Committee | Pokégnek Bodéwadmik | Yakama Nation |
| Hoopa Valley Tribe | Ponca Tribe of NE | Ysleta Del Sur Pueblo |

**States/Territories**

| | | | |
|---|---|---|---|
| Alabama | Alaska | Arizona | Arkansas |

66

DRAFT//PRE-DECISIONAL//DELIBERATIVE

| California | Colorado | Connecticut | Delaware |
| --- | --- | --- | --- |
| Florida | Georgia | Hawaii | Idaho |
| Illinois | Indiana | Iowa | Kansas |
| Kentucky | Louisiana | Maine | Maryland |
| Massachusetts | Michigan | Minnesota | Mississippi |
| Missouri | Montana | Nebraska | Nevada |
| New Hampshire | New Jersey | New Mexico | New York |
| North Carolina | North Dakota | Ohio | Oklahoma |
| Oregon | Pennsylvania | Rhode Island | South Carolina |
| South Dakota | Tennessee | Texas | Utah |
| Vermont | Virginia | Washington | West Virginia |
| Wisconsin | Wyoming | Puerto Rico | |

### Private Industry and Faith-Based Organizations

| Artanis Capital | BuildSOS Inc | Rule One Consulting |
| --- | --- | --- |
| Mennonite Disaster Service | Samaritan's Purse | Convoy of Hope |
| Mercy Chefs | The Salvation Army | International Emergency Management |

# Detailed Public Comments and Survey Inputs – An Analysis

### Feedback Mechanism #1 FEMA Review Council Survey Overview

The FEMA Review Council's State-Federal Coordination (FSC) Subcommittee conducted a comprehensive survey of 1,387 stakeholders spanning state, local, tribal, and territorial (SLTT) agencies as well as non-governmental partners. This survey revealed critical insights into the current state of national preparedness and response. Findings highlight both the indispensable value of FEMA's resources and the urgent need for modernization, targeted capacity-building, and sustained partnerships. A recurring theme across responses was the need to streamline the bureaucracy and reduce red tape in administering federal funding. The survey findings outlined high-level strategic priorities to guide FEMA's transformation, ensuring the agency remains a catalyst for resilience in an evolving risk environment.

Survey responses confirm that FEMA plays a vital role in delivering funding, training, specialized assets, and nationally standardized systems. However, administrative inefficiencies, capability gaps among SLTT partners, and uneven resource distribution threaten the speed and effectiveness of disaster response.

At the same time, FEMA's unique capabilities, such as the nationwide Integrated Public Alert and Warning System (IPAWS), Urban Search and Rescue (USAR), National Incident Management System (NIMS) standards, financial support during catastrophic disasters remain

67

DRAFT//PRE-DECISIONAL//DELIBERATIVE

irreplaceable assets that underpin the nation's emergency management framework and should be focused on reducing impacts of future disasters.

**Current State**

Agencies responding to the survey indicated that FEMA support most commonly includes funding, training, technical assistance, and specialized assistance.

The most cited funding programs were the **Emergency Management Performance Grant (EMPG)**, the **State Homeland Security Grant (SHSP)**, and **Individual Assistance**. Survey responses cited **delays and bureaucracy** as a frequent problem. Funding delays were cited over 60 times in the Response survey. The following comment from Oklahoma Emergency Management describes the importance of Federal funding, while acknowledging that the process is burdensome and slow:

> **Question**: If FEMA no longer supported this capability, how would your organization/jurisdiction accomplish this task? If this task would no longer be accomplished without FEMA, why or why not?
>
> **Response**: *If FEMA were no longer involved in disaster recovery, our primary concern would not be the loss of personnel or technical assistance, it would be the loss of critical funding. FEMA's financial support is essential to helping states and communities recover from disasters. However, the current model is weighed down by excessive administrative burden, slow processes, and layers of compliance that often delay recovery efforts and divert resources away from survivors.*
>
> *Rather than deploying large numbers of federal staff to manage relatively small disasters or requiring states to navigate a complex and rigid grants system, FEMA should consider shifting to a block grant model. Providing states with flexible, upfront funding would allow us to tailor disaster recovery efforts to our unique needs and capabilities. This approach would reduce bureaucracy, increase efficiency, and expedite the delivery of aid where it's most needed.*
>
> *States like ours have built strong local response and recovery systems. What we need from FEMA is not manpower, but streamlined, predictable financial support. A block grant system, paired with accountability measures, would empower states to lead recovery more effectively while still maintaining transparency and federal oversight.*
>
> **Source**: Recovery Survey response from Oklahoma Emergency Management

According to the survey results, FEMA relies heavily on SLTT partners for **on-site security and law enforcement** (153 mentions), **mass care services** (176 mentions) and **operational communications** (120 mentions). FEMA partly relies on SLTT partners for these activities due to **staffing gaps**. 87 survey responses mentioned staffing gaps in mass care and 92 responses citing gaps in communications staffing. Lack of proper communication staffing results in **insufficient direct communications with local jurisdictions** (40 mentions) along with **unsatisfactory clarity and timeliness** (30 mentions).

Based on the survey results, FEMA provides more value in specialized areas, where SLTT partners sometimes lack resources or expertise. Respondents mentioned the FEMA **Incident Command System (ICS)** and **National Incident Management System (NIMS)** courses over 100 times, the deployment of specialized teams such as **Urban Search and Rescue (USAR)** and

68

DRAFT//PRE-DECISIONAL//DELIBERATIVE

**Disaster Mortuary Operational Response Teams (DMORT)** over 50 times, and the **Integrated Public Alert and Warning System (IPAWS)** over 20 times. The Snohomish County Department of Emergency Management in Washington state provides the following insight:

> **Question**: What training support does FEMA provide? This could include specific courses or other training support.
>
> **Response**: *All the ICS and NIMS courses. The entire NIMS Training Program which outlines standards processes to support mutual aid. Without nationally standardized training, it will not be long before each state has slightly different response structures or terminology, and state-to-state mutual aid becomes that much harder. We NEED national guidance to ensure we are all able to work together.*
>
> *I feel slightly less passionately about the basic Professional Development Series and Advanced Development Series and other independent study courses. In theory these could be replicated at the state level, but at 50x the effort as just having single courses provided by the federal government, which allow locals and states to build curriculum without having to each create the same content from scratch.*
>
> **Source**: Preparedness Survey response from Snohomish County Department of Emergency Management

### Impact of Potential Changes

Organizations highlighted **mass care services, operational communications, mass search and rescue,** and **preparedness** as areas where reduced funding could impact capabilities. Over 80 responses cited dependencies on FEMA funding for shelter, food, and housing. Potential impacts on operational communications include **insufficient funding for equipment upgrades** and **reduced interoperability** and over 40 SLTT teams stated that they lacked the ability to replace USAR capabilities. According to the survey results, reduced funding would impact jurisdictions rural jurisdictions and jurisdictions without specialized resources the most. Portsmouth, VA Emergency Management responded with the following:

> **Question**: If FEMA no longer supported this capability, how would your organization/jurisdiction accomplish this task? If this task would no longer be accomplished without FEMA, why or why not?
>
> **Response**: *In Portsmouth, Virginia, our Emergency Management team consists of only two full-time professionals working alongside the traditional city services like Social Services, Behavioral Health, Police, and the countless non-profit volunteer organizations that help the community daily with unmet mass care needs. Without FEMA's coordination, technical assistance, and resource alignment, we simply do not have the capacity to meet the wide-ranging and escalating demands of sheltering, feeding, hydration, reunification, and accessible services during a major incident.*
>
> **Source**: Response Survey response from Portsmouth (VA) Emergency Management

Additionally, survey results indicate that SLTT agencies could perform operations such as on-site security. However, reduced funding would limit the ability to scale operations for complex disasters. The St. Lucie County Emergency Management Division in Florida notes potential impacts to long-term or large-scale operations.

69

DRAFT//PRE-DECISIONAL//DELIBERATIVE

**Question:** If FEMA no longer supported this capability, how would your organization/jurisdiction accomplish this task? If this task would no longer be accomplished without FEMA, why or why not?

**Response:** *Local law enforcement and mutual aid partners would continue to manage security and protective operations with support from state resources. However, the ability to sustain long-term or large-scale security operations would be limited without FEMA funding and technical assistance.*

**Source:** Response Survey response from St Lucie County Emergency Management Division

Respondents cited **public information and warning** and **economic recovery** as areas where reduced funding would have less impact. Since FEMA manages systems such as IPAWS independently, reduced funding would not directly impact SLTT operations. However, responses such as this one from the Maryland Department of Emergency Management suggest that replicating FEMA systems such as IPAWS would be expensive.

**Question:** If FEMA no longer supported this capability, how would your organization/jurisdiction accomplish this task? If this task would no longer be accomplished without FEMA, why or why not?

**Response:** *The State could not replicate the IPAWS system, and to do so would be highly inefficient and expensive compared with common, distributed use of a nationally maintained system.*

**Source:** Response Survey from Maryland Department of Emergency Management

Additionally, partnerships with other agencies such as the Small Business Administration (SBA) and the U.S. Department of Agriculture (USDA) mitigate the impact of reduced funding on economic recovery.

**Feedback Mechanism #2 Listening Sessions Overview:**

The FEMA Review Council conducted extensive listening sessions, public comment analysis, and stakeholder surveys in 2025 to evaluate disaster response, recovery, mitigation, and FEMA's policies and operations. Feedback from state, local, tribal, and territorial (SLTT) agencies, nonprofit organizations, private sector representatives, and community groups highlighted critical flaws in FEMA's processes, funding mechanisms, communication strategies, and operational efficiency. Stakeholders repeatedly identified bureaucratic inefficiencies, delays in funding, inconsistent program administration, workforce constraints, and insufficient engagement with local governments as major barriers to effective disaster management.

The following is a comprehensive summary of the listening sessions held by the FEMA Review Council in 2025, focusing on disaster response, recovery, mitigation, and reforming FEMA's policies and operations.

This captures feedback from a wide range of stakeholders, including state and local emergency management officials, tribal leaders, nonprofit organizations, private sector representatives, and community groups. The views expressed during the listening sessions are not endorsed by the Council but were taken into consideration during deliberations on recommendations.

Below is an analysis of the themes, challenges, and recommendations from the sessions:

**Themes Across Sessions**

70

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- **FEMA Reform and Streamlining Processes:** Across all sessions, participants emphasized the need to simplify FEMA's processes, including grant applications, disaster declarations, and recovery programs. The Public Assistance flow chart, often referred to as "The Snake," and Environmental and Historic Preservation (EHP) reviews were repeatedly criticized for causing delays. Recommendations included decentralizing decision-making to FEMA regional offices, allowing parallel processing of project steps, and adopting technology to modernize operations.

- **Federal, State, and Local Roles:** There was strong support for empowering SLTT governments to lead disaster response and recovery efforts, with FEMA providing strategic oversight and technical assistance. Many participants advocated for a shift from FEMA's operational role to one of support and funding.

- **Funding and Grant Programs:** Emergency Management Performance Grants (EMPG), Hazard Mitigation Grant Program (HMGP), and Building Resilient Infrastructure and Communities (BRIC) were identified as critical funding mechanisms. Participants called for increased funding, streamlined application processes, and greater flexibility in how funds are used. Block grants and/or direct funding were proposed as a potential solution to reduce bureaucracy, but concerns about implementation challenges were noted.

- **Mitigation and Resilience:** Investment in pre-disaster mitigation and resilient infrastructure was emphasized as a cost-effective way to reduce disaster impacts. Participants highlighted the importance of incentivizing communities to adopt stronger building codes and forward-looking plans.

- **Fairness and Vulnerable Populations:** Fairness was a recurring theme, with calls to address systemic disparities faced by small, rural, and underserved communities. Vulnerable populations, including renters, low-income families, and tribal nations, were identified as needing tailored support.

- **Technology and Innovation:** Leveraging technology, such as AI, drones, databases, and geospatial tools, was recommended to improve damage assessments, streamline grant processes, and enhance situational awareness. Real-time data sharing and modernized systems were seen as critical to improving efficiency.

- **Tribal Sovereignty and Representation:** Tribal leaders emphasized the importance of respecting tribal sovereignty and maintaining direct government-to-government relationships. Unique challenges faced by tribal nations, such as geographic isolation and cultural impacts, were highlighted as areas requiring tailored solutions.

- **Public-Private and Private Nonprofit Partnerships:** Participants advocated for greater collaboration with private sector and nonprofit organizations, which were recognized as critical partners in disaster response and recovery. Pre-positioning contracts and integrating these entities into disaster plans were recommended.

**Challenges Identified**

- **Bureaucratic Complexity:** FEMA's processes were repeatedly described as overly complex, slow, and resource-intensive, creating barriers for smaller jurisdictions and tribal nations with limited capacity.

71

DRAFT//PRE-DECISIONAL//DELIBERATIVE

- **Delays in Funding and Reimbursements:** Cash flow challenges and delays in FEMA reimbursements were identified as major obstacles for local governments and tribes, particularly smaller entities.
- **Workforce and Capacity Constraints:** High turnover among FEMA staff and limited capacity at the local level hindered effective disaster response and recovery.
- **Insurance and Risk Management:** Rising insurance costs and underinsurance were noted as significant barriers to recovery. Concerns about FEMA's Risk Rating 2.0 system and its impact on flood insurance premiums were highlighted.
- **Environmental and Historic Preservation (EHP) Reviews:** EHP reviews were identified as a major bottleneck, delaying critical recovery projects. Participants called for streamlining these reviews and allowing local governments to conduct them.

**Recommendations**

- **Streamlining FEMA Processes:** (1) Simplify disaster declarations, grant applications, and project reviews. (2) Decentralize decision-making to FEMA regional offices and empower local governments to lead recovery efforts. (3) Have a single federal family individual assistance application.
- **Enhancing Funding Mechanisms:** (1) Increase funding for EMPG, HMGP, and BRIC programs. (2) Transition to block grants for disaster recovery funding, with safeguards to ensure fair distribution.
- **Investing in Mitigation and Resilience:** (1) Prioritize funding for pre-disaster mitigation and resilient infrastructure. (2) Incentivize communities to adopt stronger building codes and forward-looking plans.
- **Addressing Fairness:** (1) Tailor FEMA programs to address the unique needs of small, rural, and underserved communities. (2) Ensure fair access to resources for tribal nations and vulnerable populations.
- **Leveraging Technology:** (1) Adopt modern technology to improve damage assessments, streamline grant processes, and enhance situational awareness. (2) Invest in real-time data sharing and coordination platforms.
- **Strengthening Tribal Engagement:** (1) Respect tribal sovereignty and maintain direct government-to-government relationships. (2) Provide predictable, formula-driven funding allocations directly to tribes.
- **Building Local Capacity:** (1) Invest in training, technical assistance, and staffing for local emergency management agencies through federal standards delivered by states. (2) Expand FEMA's training programs and support workforce development.
- **Public-Private and Private Nonprofit Partnerships:** (1) Integrate private sector and nonprofit organizations into disaster planning and operations. (2) Pre-position contracts and leverage private sector expertise in recovery efforts.

**Feedback Mechanism #3 Analysis of Public Comments Submitted (11,708 Responses):**

On March 26, 2025, the FEMA Review Council published Federal Register Notice DHS-2025-0013 to provide the general public an opportunity to provide input on how to reform FEMA as it

72

DRAFT//PRE-DECISIONAL//DELIBERATIVE

stands today. The Council received 11,708 responses to this notice, underscoring the critical role FEMA plays in disaster management. The public comments submitted in response to the FEMA Review Council's request for feedback under Federal Register Notice DHS-2025-0013 reflect a broad spectrum of perspectives, experiences, and recommendations. These comments underscore the critical role FEMA plays in disaster response and recovery and provide actionable insights for reforming and strengthening the agency's operations. The views expressed in the public comments are not endorsed by the Council but were taken into consideration during deliberations on recommendations. Below is a thematic analysis of the feedback:

**FEMA's Role and Structure**

o **Insights**: FEMA is widely recognized as an essential agency in disaster response and recovery, particularly in coordinating multi-state disasters and providing resources to communities. Respondents emphasized the need for FEMA to focus on preparedness, soft skills training, and fostering strong relationships with local communities. Federal coordination and clear communication about FEMA's capabilities and limitations are seen as critical to its success. In addition, there was lack of clarity regarding which Individual Assistance or Public Assistance programs will be available.
o **Recommendations**: (1) Improve internal feedback mechanisms to ensure continuous improvement. (2) Invest in training programs that emphasize diplomacy, cultural competence, and community engagement.

**State and Federal Coordination**

o **Insights**: The Council of Governors submitted a detailed letter advocating for FEMA reforms, emphasizing that states cannot manage catastrophic disasters alone. Governors highlighted the importance of federal support in disaster response and recovery, particularly in standardizing and expanding Individual Assistance programs and improving interagency coordination.
o **Recommendations**: (1) Create a unified federal disaster assistance application to streamline survivor access to aid. (2) Ensure consistent funding for FEMA programs to support state and local recovery efforts. (3) Leverage state and local expertise to expedite recovery and improve efficiency.

**Strengthening FEMA's Capabilities**

o **Insights**: Respondents overwhelmingly opposed dismantling or downsizing FEMA, citing the increasing frequency and severity of disasters. FEMA's support was viewed as indispensable for states and communities, which lack the capacity to handle large-scale disasters independently. The public also said timely aid and resources provided by FEMA are critical to helping disaster survivors rebuild their communities and mitigate future risks.
o **Recommendations**: (1) Maintain and enhance FEMA's capabilities to better serve communities nationwide. (2) Focus on improving the speed and efficiency of aid delivery to ensure disaster survivors receive timely support.

**Community Feedback and Support**

o **Insights:** Community members, particularly in disaster-prone areas like Houston, Texas, shared both positive and negative experiences with FEMA. While FEMA's support was appreciated, concerns were raised about inconsistencies in assistance, lengthy wait times, and

73

DRAFT//PRE-DECISIONAL//DELIBERATIVE

communication challenges. Issues such as disparities in aid distribution, language barriers, and difficulties with the application process were frequently noted.

o **Recommendations:** (1) Standardize assistance programs to ensure fair and consistent distribution of aid. (2) Enhance training for FEMA staff to improve communication skills and cultural awareness. (3) Increase transparency in FEMA's processes to foster trust and confidence among disaster survivors.

### Diverse Regional and Stakeholder Perspectives

o **Insights**: Feedback from various regions and stakeholders highlighted unique challenges and recommendations. Puerto Rico called for mobile outreach, alternative proof of ownership, and improved communication. Tribal Nations praised FEMA's support but criticized of some disaster reservists' behavior. Gulf Coast areas urged restoration of FEMA funding and staffing. Nevada emphasized the importance of the National Flood Insurance Program and called for reforms. Florida highlighted positive experiences with FEMA during Hurricane Wilma but stressed the need for continued funding.

o **Recommendations**: (1) Tailor FEMA's programs to address regional and stakeholder-specific needs. (2) Streamline grant processes and ensure equitable resource allocation. (3) Invest in better training for FEMA personnel to improve efficiency and professionalism (soft skill development).

### Protecting FEMA's Mission

o **Insights**: Respondents overwhelmingly emphasized the need to protect and strengthen FEMA rather than dismantle or weaken it. Shifting the burden of disaster response to states was viewed as less effective and potentially harmful to local communities. Respondents also stressed that FEMA reforms should be guided by science, equity, and the experiences of disaster survivors, rather than political ideology.

o **Recommendations**: (1) Oppose efforts to weaken FEMA and ensure reforms prioritize the needs of disaster survivors. (2) Strengthen FEMA's capacity to respond to increasingly frequent and severe disasters. (3) Ensure reforms are informed by data, best practices, and input from affected communities.

The 11,708 public comments received reflect a strong consensus on the importance of FEMA's role in disaster response and recovery. While respondents identified areas for improvement, including streamlining processes, enhancing communication, and addressing equity, there was widespread support for maintaining and strengthening FEMA's capabilities. The feedback highlighted the need for FEMA to remain a robust and responsive agency that can effectively support communities during their most vulnerable times.



# Exhibit F

# POLITICOPRO

**FEDERAL**

# Top CISA appointee Karen Evans moves to FEMA

## Evans presided over the agency during a turbulent period of personnel and leadership departures.

 BY: **JOHN SAKELLARIADIS** | 06/10/2025 06:11 PM EDT

Karen Evans, a top political appointee at the Cybersecurity and Infrastructure Security Agency, has been assigned a new role elsewhere in the Department of Homeland Security.

**Why it matters:** As one of the most senior officials at CISA for much of the year, Evans presided over the agency during a turbulent period that saw hundreds of CISA staffers and swathes of its senior leadership depart under pressure from the Trump administration.

Evans was first tapped as a senior adviser at CISA in January, and one month later, she was slotted in as the agency's executive assistant director for cybersecurity. She was supplanted as the highest-ranking political appointee at CISA in May, when Madhu Gottumukkala was named the agency's new deputy director.

**Where she is now:** A spokesperson for DHS confirmed the move. "Karen Evans has moved over full-time to the Federal Emergency Management Agency. She was instrumental in helping cut waste, fraud, and abuse at CISA and her skill set is perfectly suited for the future of the Federal Emergency Management Agency."

Evans still appears on CISA's leadership page, and it is not clear what prompted her move to FEMA.

**What's next:** Evans, who served as an assistant secretary at the Energy Department in Trump's first term, was nominated to be the undersecretary for management at DHS in March. Her hearing has not yet been scheduled.



Evans 3

EXHIBIT

DATE: 3/31/26

SUSAN ASHE

 **YOUR ACCOUNT MANAGEMENT TEAM**

**Ruth Yemene**
Customer Engagement Specialist
ryemene@politico.com

**Ella Feinstein**
Associate Account Manager
efeinstein@politico.com

© 2026 POLITICO LLC

# Exhibit G

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--------------------------------x
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, et al.,

      Plaintiffs,

        vs.

DONALD J. TRUMP, in his official
capacity as President of the
United States, et al.,

      Defendants.
--------------------------------x

Case No.

3:25-cv-03698-SI

CONFIDENTIAL

PURSUANT TO THE PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF

KAREN STREHLE EVANS

Tuesday, March 31, 2026

Reported By:  SUSAN ASHE, CER

Job No.:  11973

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 2

Tuesday, March 31, 2026

8:59 a.m. Eastern Daylight Time

          Videotaped deposition of KAREN STREHLE
EVANS, taken on behalf of the Plaintiffs, beginning
at 8:59 a.m., on Tuesday, March~31, 2026, at the
offices of Democracy Forward Foundation, 1445 New
York Avenue, Northwest, Washington, D.C., before
Susan Ashe, Certified Electronic Reporter and a
Notary Public of the District of Columbia.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 3

APPEARANCE OF COUNSEL:

On behalf of All Union and Non-Profit

Organization Plaintiffs

ALTSHULER BERZON LLP

BY:  DANIELLE E. LEONARD, ESQ.

BY:  ELIZABETH ESHLEMAN, ESQ.

177 Post Street, Suite 300

San Francisco, California  94108

(415) 421-7151

dleonard@altshulerberzon.com

eeshleman@altshulerberzon.com


On behalf of All Union and Non-Profit

Organization Plaintiffs (except NRDC) and for

Plaintiffs City of Chicago, IL; Martin Luther,

Jr. County, WA; Harris County, TX; and City of

Baltimore, MD

DEMOCRACY FORWARD FOUNDATION

BY:  TSUKI HOSHIJIMA (pro hac vice)

Senior Counsel

P.O. Box 34553

Washington, D.C.  20043

(202) 448-9090

thoshijima@democracyforward.org

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 4

APPEARANCE OF COUNSEL (Continued):

On behalf of the Defendants and the Witness

UNITED STATES DEPARTMENT OF JUSTICE

BY:  MARIANNE F. KIES

BY:  JEREMY NEWMAN

BY:  CHRISTOPHER R. HALL

Trial Attorneys

Civil Division, Federal Programs

Branch

1101 L Street, Northwest

Washington, D.C.  20005

(202) 305-0693

marianne.f.kies@usdoj.gov

jeremy.s.newman@usdoj.gov

christopher.r.hall@usdoj.gov

- and -

FEDERAL EMERGENCY MANAGEMENT AGENCY

BY:  KEVIN YUSMAN

BY:  ASHLEY DARBO

BY:  JAMES EVANS, Chief Counsel

500 C Street, Southwest

Suite 840

Washington, D.C.  20472

kevin.yusman@fema.dhs.gov

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 5

APPEARANCE OF COUNSEL (Continued):

On behalf of the Defendants and the Witness

(Continued)

DEPARTMENT OF HOMELAND SECURITY

BY:  MATTHEW FLEISCHMAN

2700 Martin Luther King, Jr., Southeast

Washington, D.C.  20032

matthew.fleischman@hq.dhs.gov


On behalf of the Witness in Her Personal

Capacity

BINNALL LAW GROUP

BY:  JASON GREAVES, ESQ.

717 King Street, Suite 200

Alexandria, Virginia  22314

(703) 888-1943

jason@binnall.com

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 6

ALSO PRESENT:

Jessica Levy, Esq.

Altshuler Berzon LLP


Olivia King, Legal Assistant

Democracy Forward Foundation


Sana Sinha, Legal Assistant

Democracy Defenders Fund


Jonathan Perry, Videographer

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 7

CONTENTS

THE WITNESS

Karen Strehle Evans


  BY MS. LEONARD                                         16


                        EXHIBITS

PLAINTIFFS

Exhibit No.                                     Marked

Exhibit 1   Linked-In Printout

            Karen S. Evans

            Four Pages                               30

Exhibit 2   Organizational Chart - DHS               49

Exhibit 3   POLITICO PRO

            "Top CISA appointee Karen Evans

            moves to FEMA"                            67

Exhibit 4   US DHS FEMA Review Council

            Open Meeting Minutes

            May 20, 2025                              72

Exhibit 5   US DHS FEMA Review Council

            Open Meeting Minutes

            July 9, 2025                              78

Exhibit 6   "Exhibit 4"

            DHS Record of Clearance and

            Approval                                  82

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 8

                    EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                      Marked

Exhibit 7    "ICYMI:  SULLIVAN BRINGS SENIOR

             FEDERAL OFFICIALS TO STORM-

             RAVAGED WESTERN ALASKA

             VILLAGES"                           120

Exhibit 8    Press Release

             Office of U.S. Senator

             Dan Sullivan                        122

Exhibit 9    Email Correspondence

             "Reminder from Chief

             Information Officer Antoine

             McCord on Electronic Message

             Federal Records Preservation"       162

Exhibit 10   Redacted Handwritten Notes

             USA-AFGE-Exp-0033527

             through -544                        165

Exhibit 11   The Washington Post

             "FEMA head resigns.  Richardson

             had been hard to reach during

             Texas floods."                      177

Exhibit 12   The New York Times

             "In a Reversal, FEMA Won't

             Reinstate Suspended Workers"        183

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 9

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                    Marked

Exhibit 13  Draft Final Report
            "The President's Council to
            Assess the Federal Emergency
            Management Agency"
            December 11, 2025                  193

Exhibit 14  Email Correspondence
            USA-AFGE-Exp.-0007239
            through -241                       199

Exhibit 15  Executive Order 14356
            October 15, 2025                   205

Exhibit 16  Email Correspondence
            USA-AFGE-Exp.-0002353
            through -357                       207

Exhibit 17  Organization Information
            Chart
            USA-AFGE-Exp.-0006542              218

Exhibit 18  Email Correspondence
            USA-AFGE-Exp.-0007333
            through -343                       228

Exhibit 19  Email Correspondence
            USA-AFGE-Exp.-0006535
            through -538                       237

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 10

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                      Marked

Exhibit 20  Email Correspondence

            USA-AFGE-Exp.-0006686

            through -688                         254

Exhibit 21  May 14, 2025 Correspondence

            USA-AFGE-Exp.-0000405

            and -406                             265

Exhibit 22  Email Correspondence

            USA-AFGE-Exp.-0004575

            through -582                         268

Exhibit 23  Email Correspondence

            USA-AFGE-Exp.-0010683

            through -688                         271

Exhibit 24  Email Correspondence

            USA-AFGE-Exp.-0006997

            and -998                             278

Exhibit 25  "Talking Points for FY26

            Staffing Strategy"

            USA-AFGE-Exp.-0034341

            and -342                             287

Exhibit 26  Email Correspondence

            USA-AFGE-Exp.-0014520

            and -521                             297

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 11

                    EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                      Marked

Exhibit 27  Email Correspondence

            USA-AFGE-Exp.-0007258

            through -260                          305

Exhibit 28  Email Correspondence

            USA-AFGE-Exp.-0007219

            and -720                              326

Exhibit 29  Email Correspondence

            USA-AFGE-Exp.-0004518

            through -520                          334

Exhibit 30  Email Correspondence

            USA-AFGE-Exp.-0000363

            through -367                          340

Exhibit 31  Email Correspondence

            USA-AFGE-Exp.-0005054

            through -059                          346

Exhibit 32  Email Correspondence

            USA-AFGE-Exp.-0009465

            and -466                              349

Exhibit 33  Email Correspondence

            USA-AFGE-Exp.-0000576                 359

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 12

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                           Marked

Exhibit 34  "Declaration of Karen S. Evans

in Support of Defendants'

Opposition to Plaintiffs'

Motion for a Preliminary

Injunction"                            360


REQUEST FOR PRODUCTION

Page/Line              Page/Line              Page/Line

27/21                 175/19

(REPORTER'S NOTE:  All quotations from exhibits are

reflected in the manner in which they were read into

the record and do not necessarily denote an exact

quote from the document.)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 13

TUESDAY, MARCH 31, 2026;

8:59 A.M. EASTERN DAYLIGHT TIME

--o0o--

VIDEOGRAPHER:  We are now on the record.  This begins the video deposition of Karen Evans, taken in the matter of the American Federation of Government Employees, AFL-CIO, et al., versus Donald J. Trump, in his Official Capacity as President of the United States, et al. Case filed in the U.S. District Court for the Northern District of California, San Francisco Division, Case No. 3:25-cv-03698-SI.

We are at the offices of Democracy Forward, 1445 New York Avenue, Northwest, in Washington, D.C.  The date is March 31, 2026, and the time is approximately 8:59 a.m.

My name is Jonathan Perry.  I am a videographer representing TransPerfect. The court reporter is Susan Ashe, also with TransPerfect.

And would counsel present please introduce themselves and state whom they

Page 14

represent.

MS. LEONARD:  Good morning, everyone.  Danielle Leonard, from Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MR. HOSHIJIMA:  Good morning. Tsuki Hoshijima, representing all Union and Nonprofit Organization Plaintiffs except NRDC and Plaintiffs City of Chicago, Illinois; Martin Luther King, Jr. County, Washington; Harris County, Texas; and City of Baltimore, Maryland.

MS. ESHLEMAN:  Good morning. Elizabeth Eshleman, also from Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MS. LEVY:  Good morning. Jessica Levy, from Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MS. SINHA:  Good morning.  Sana Sinha with Democracy Defenders Fund, representing all Union and Organizational Plaintiffs.

MS. KING:  Good morning.  Olivia

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 15

King with Democracy Forward.

MS. LEONARD:  The last two are not attorneys making --

MS. KING:  Yeah.

MS. LEONARD:  -- their appearance.

MS. KING:  We're just legal assistants.

MS. LEONARD:  Sorry.

MS. KIES:  Good morning. Marianne Kies with the Department of Justice, on behalf of the Defendants in this case.  I'm here today for the witness.

MR. NEWMAN:  Jeremy Newman, Department of Justice, representing the Defendants.

MR. GREAVES:  Jason Greaves, from the Binnall Law Group, representing Karen Evans in her personal capacity.

MR. HALL:  Hi.  Christopher Hall, Department of Justice.

MR. YUSMAN:  Hello.  Kevin Yusman, FEMA Office of Chief Counsel.

MS. DARBO:  Good morning.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 16

Ashley Darbo for FEMA.

MR. EVANS:  James Evans, Chief Counsel for FEMA.

MR. FLEISCHMAN:  Matthew Fleischman from the Department of Homeland Security.

VIDEOGRAPHER:  And would the reporter please swear in the witness.

Whereupon,

KAREN STREHLE EVANS,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. LEONARD:

Q.   Good morning, Ms. Evans.  I introduced myself before, but let me do it again.  Danielle Leonard.

You understand that I represent the Plaintiffs in this lawsuit?

A.   Yes.

Q.   And could you state your full name for the record, please.

A.   My full name is Karen Strehle Evans.

Q.   And your -- the city and state where you currently reside?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 17

A.   Martinsburg, West Virginia.

Q.   And are you currently employed?

A.   Yes.

Q.   And what is your position?

A.   My position of record is the chief of staff at FEMA, but I am delegated the authorities as the Senior Official Performing the Duties of the Administrator at FEMA.

Q.   The Senior Official Performing the Duties of the FEMA Administrator, also known as the "SOPDA."  Is that --

A.   Yes, ma'am.

Q.   -- right?

Okay.  I'll get to the deposition rules, but we're going to try really hard not to talk over each other today, because it becomes extraordinarily difficult for the court reporter to create a clean record.

So I would ask that you wait for me to finish my question before giving your answer.

It also allows your attorney to interpose any objections for the record that they intend to make.

And I will do the same by waiting for you to complete your answer.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 18

Does that make sense?

A.   Yes, ma'am.

Q.   Okay.  What's your current business address?

A.   The current business address of FEMA is 500 C Street, Southwest.

Q.   And have you resided in West Virginia the entirety of the time you've worked for FEMA?

A.   Yes.

Q.   And do you commute or work remotely, or both?

MS. KIES:  Object to form.

A.   I commute into D.C. every day.

Q.   Every workday.

A.   Um-hum.

Q.   For the past year -- so does that mean, on average, that you commute in every day from West Virginia for five days a week?

A.   Yes, ma'am.

Q.   Have you ever been deposed?

A.   No, ma'am.

Q.   So this is the first time.

All right.  I'll quickly go over some of the procedures, as we understand them, and you let me know if there's anything that you have questions

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 19

about.  Okay?

First one, in addition to the not talking over each other, I want to make sure that your answers are verbal, rather than shaking your head and nodding, because the court reporter can't write that down.

So -- does that make sense?

A.   Yes, ma'am.

Q.   Okay.  So I'll ask yes or no, not um-hum or a nod.

You understand that everything that we say is being recorded by the court reporter?

A.   Yes, ma'am.

Q.   Okay.  And if you don't understand a question, please do let me know.  I'm happy to clarify.  Okay?

A.   Yes, ma'am.

Q.   Okay.  And your attorney, Ms. Kies, may occasionally make objections, for the record, to the format of some of my questions.

Do you understand that?

A.   Yes, ma'am.

Q.   And you understand that even if your attorney makes an objection for the record, you are required to give a response?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 20

A.   Yes, ma'am.

MS. KIES:  Object to form.

Q.   And the DOJ attorney defending your deposition may also invoke privilege on behalf of her clients.  If you have any questions regarding privilege, you may communicate with your counsel about that.

Do you understand that?

A.   Yes, ma'am.

Q.   Okay.  There is -- generally, you need to answer the question, if there's a question pending, unless there's an issue of privilege.

Do you understand?

A.   Yes, ma'am.

Q.   Okay.  Let me know if you need a break. We're going to take breaks -- I'll ask my colleagues to help me keep track of time.  We're going to take breaks probably every 45 minutes or so.  But you can take a break if you need one.

The only rule is you can't take a break if there's a question pending.

Does that make sense?

A.   Yes, ma'am.

Q.   And you understand that -- also that this is being videotaped?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 21

A.   Yes, ma'am.

Q.   Okay.  And you're aware that there is a possibility that the written transcript or the videotape may be used later in court?

A.   Yes, ma'am.

Q.   Okay.  So even though we're in a conference room filled with lawyers and not a courtroom, the testimony that you give here today should be as complete and accurate as if the judge were sitting at the head of the table.

Does that make sense?

A.   Yes, ma'am.

Q.   Okay.  And I'll ask you to explain things fully, as if the judge were sitting here.  Okay?

A.   Yes, ma'am.

Q.   Okay.  And things will go a lot faster if you directly answer the questions that I ask, so I'm going to ask you to do that.

And I'm going to be asking you some questions about documents today.  And the way that it works, since you haven't been deposed before, is the court reporter has these stickers, and they mark the number of the exhibit, and those become the official record that get attached to the transcript.

So I have the documents.  I'm going to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 22

hand her a copy.  She's going to put the number on, and then that one goes to you.

At the same time, I'm going to hand copies to your counsel so they get to look at the document and know what I'm showing you as well.

Does that make sense?

A.   Yes, ma'am.

Q.   Okay.  Are you taking any medication or other substances that would impair your ability to give full, complete, and accurate testimony here today?

A.   No.

Q.   Is there any other reason you can't give your full, complete, and accurate testimony here today?

A.   No.

Q.   Okay.  Do you have any questions about the rules that I've given you for the deposition?

A.   No.

Q.   What did you do to prepare for this deposition?

A.   I had sessions with the attorneys.

Q.   Which attorneys?

A.   Everybody who's sitting here at the table.

Q.   Including your personal counsel?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 23

A.    Yes.

Q.    Okay.  Mr. Greaves.  Is that right?

A.    Yes, ma'am.

Q.    Okay.  And how many sessions did you have?

A.    Three sessions.

Q.    And how long were each of those sessions?

A.    Two sessions were two hours.  And one session was probably -- I'm not a hundred percent sure.

Q.    Longer or shorter than the others?

A.    Shorter.

Q.    Was there anyone, other than your attorneys, present at -- sorry -- at -- I will rephrase that.

Was there anyone, other than the attorneys you have identified, present at any of these sessions?

A.    No, ma'am.

Q.    No one from any of the agencies who's not an attorney?

A.    No, ma'am.

Q.    Okay.  Did you talk to anyone, other than attorneys, about this deposition?

A.    Yes, I did, because I had to let my management know I'm at the deposition.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 24

Q. Okay. So who did you speak to, other than your attorneys, about the deposition?

A. I spoke to the new counselor for the Secretary of Homeland Security so that they would know where I was today.

Q. And who is the new counselor for the Secretary of Homeland Security that you spoke to?

A. His name is Brian Cavanaugh.

Q. And this is for Department of Homeland Security Secretary Mullin?

A. Yes, ma'am.

Q. Okay. And when you say "new," that's because he was recently confirmed for that position. Correct?

MS. KIES: Object to form.

A. Yes, ma'am.

Q. Okay. And did you speak with Mr. Cavanaugh about the substance of this deposition?

A. No, ma'am.

Q. Okay. Did you tell him what case it was about?

A. I don't recall.

Q. Do you recall anything else you told him about the deposition?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 25

A.   No.

Q.   Did you review any documents that helped refresh your recollection to prepare for this deposition?

A.   Yes, ma'am, I did.

Q.   And were those all documents provided by your lawyers, or did you review any on your own?

A.   I reviewed the documents that were provided by the lawyers.

Q.   Okay.  And did you participate in helping collect documents to produce to Plaintiffs in this litigation?

MS. KIES:  Object to form.

A.   I kept my own records.  And based on the, I guess -- I don't know what the legal term is called, but I produced my own records to the chief counsel of FEMA.

Q.   Can you describe for me the records that you used to refresh your recollection for this deposition?

A.   I read my -- I reread my declaration.  And I had to provide my notes, so I looked at my notes that I gave to the chief counsel.

Q.   Notes of what?

A.   Based on the information that you were

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 26

requesting, I keep, like, personal notes.

And so, anything that had a reference to CORE, I made sure I turned over to the chief counsel.

Q. And were those handwritten notes or typed?

A. My personal notes are handwritten notes.

Q. And is this a practice that you've had since you began working for FEMA?

MS. KIES: Object to form.

A. This is a practice that I've had ever since I've worked.

Q. So when -- before -- we'll get to your background and the trajectory at the Department of Homeland Security, but you also had handwritten notes while you worked for CISA? Is it CISA or CISA?

A. It's CISA.

And, yes, I have handwritten notes.

Q. Okay. Did you review any documents that were prior to your tenure at FEMA? Meaning before -- sometime in 2025.

A. I'm sorry. I don't really understand the question when you're asking me, did I review documents. Like -- I don't understand what you're talking about.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 27

Q.    Sure.  To prepare -- you mentioned documents that you reviewed to prepare for this deposition that --

A.    Uh-huh.

Q.    -- refresh your recollection.

And I'm wondering if you reviewed any that were from before 2025.

A.    No, ma'am.

Q.    Okay.  Did you review the 2024 force structure review that FEMA prepared?

MS. KIES:  Object to form.

A.    In preparation for this here, this deposition?  No, ma'am.

Q.    Have you -- do you know what that document is?

A.    I'm aware of the title.

Q.    And have you ever reviewed that document?

A.    I really can't recall specifically reviewing that document.

Q.    Okay.

MS. LEONARD:  We'll ask that Ms. Evans' personal notes be produced. We'll discuss that during a break.

They have not been produced to counsel in this deposition -- in this

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 28

proceeding.  And we're going to ask you officially to produce those documents today.

MS. KIES:  I believe they were --

MS. LEONARD:  So --

MS. KIES:  I'm sorry.

MS. LEONARD:  Okay.  Do you believe that they have been produced?

MS. KIES:  In Production 11, if you could check, please.

MS. LEONARD:  Okay.  Thank you.

Q.  Did you review anything to prepare for this deposition that you know your attorneys have withheld as privileged?

MS. KIES:  Object to form.

A.  I wouldn't know the answer to that question.

Q.  Let's start with some general questions regarding your educational and professional background.

Can you describe for me your post-high school education, naming the institutions and years?

A.  I went to West Virginia University for my undergraduate.  I don't have -- I can't recall

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 29

specifically all the due -- all the specific dates right now on my resume.

But I got my chemistry degree, I got my master's degree, and I was awarded an honorary doctorate degree.

I also have a certificate in public history that I got while I was attending West Virginia University as well. And that is related to -- because I was an undergraduate, and it was a new master's program that was going in place.

And I also had additional education through Shepherd University as it relates to accounting.

Q. Let's start with your B.A. That was in chemistry. Right?

A. Yes, ma'am.

Q. Okay. And then you had -- you mentioned a certificate, a master's certificate, in public history. Is that right?

A. Yes, ma'am.

Q. And then, you have an MBA?

A. Yes, ma'am.

MS. LEONARD: Okay. I'm going to mark -- we'll do this as the first exhibit. I'm going to mark, as Exhibit 1,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 30

a LinkedIn profile.

And I do not have copies for everyone at the table, but I will give you two copies to your counsel.

(Whereupon, Plaintiffs Exhibit 1 was marked for identification.)

Q.   So, Ms. Evans, you've been handed what's been marked as Exhibit 1.  I'll represent to you that this is something we printed from what we believe is your LinkedIn profile.

If you could take a look and let me know when you're ready.

A.   May I put my reading glasses on?

Q.   Of course.  I've got mine on.

(Witness reading.)

Q.   Are you ready?

A.   Yes, ma'am.

Q.   Ms. Evans, am I correct in understanding that this is a partial recounting of your educational and professional history?

A.   Yes, ma'am.

Q.   Okay.  And did you create your LinkedIn profile?

A.   Yes, ma'am.

Q.   And you intended for what was included to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 31

be accurate?

A.   Yes, ma'am.

Q.   Okay.  And if you flip to the back, it refers to your MBA in business administration and then a doctor's degree in business from West Virginia University, John Chambers College of Business and Economics.

You've told us about those?

A.   Yes.

Q.   Okay.  This profile generally describes, if you go to the first page, 30 years of executive level management experience focused on cybersecurity, national security, technology innovation, service delivery, and supply chain risk management.

That's generally accurate.  Correct?

A.   Yes, ma'am.

Q.   Okay.  And as you said, this summarizes only some of the jobs you've held over your lifetime.  Correct?

A.   Yes, ma'am.

Q.   Okay.  In addition to the jobs listed here, I'm going to list some that I believe that you've held.  Could you -- and if you could confirm whether that's accurate or not.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 32

So you have held the position of the Director of Information Resources Management, Management Division of the Office of Justice Programs?

A.   Yes, ma'am.

Q.   Okay.  You were the chief information officer for the Department of Energy?

A.   Yes, ma'am.

Q.   You were the administrator of the Office of Electronic Government and Information Technology at OMB?

A.   Yes, ma'am.

Q.   And "OMB," you understand I mean Office of Management and Budget?

A.   Yes, ma'am.

Q.   Okay.  And after that position, you went back to private practice.  Is that right?

A.   After that position, I retired.

Q.   You retired from federal government service?

A.   Yes, ma'am.

Q.   Okay.  And then you were engaged in some cybersecurity and technology consulting?

A.   Yes, ma'am.

Q.   Okay.  And you came back out of retirement

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 33

from federal service to the Department of Energy in 2018.  Is that right?

A.   Yes, ma'am.

Q.   Okay.  And you were the assistant secretary for cybersecurity there?

A.   I was the assistant secretary for Cybersecurity, Energy Security, and Emergency Response.

Q.   And then in approximately June 2020, you moved from the Department of Energy over to the Department of Homeland Security.  Is that correct?

A.   Yes, ma'am.

Q.   And you were the chief information officer at DHS?

A.   Yes, ma'am.

Q.   Okay.  That was your first position at the Department of Homeland Security.  Correct?

A.   Yes.

Q.   Okay.  You had the role of chief information officer for DHS until the end of the first Trump Administration in January 2020 -- '21.  Is that correct?

A.   Yes.

Q.   Okay.  And then after January 2021, you returned to the private sector when President Trump

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 34

left office?

A.   Yes.  I retired again.

Q.   And you returned to your consulting firm, KE&T Partners, for approximately the next four years.  Is that right?

A.   Yes, ma'am.

Q.   Okay.  And that's focused, again, on cybersecurity and technology consulting?

A.   Yes, ma'am.

Q.   Okay.  You were also managing director of something called the Cyber Readiness Institute?

A.   Yes, ma'am.

Q.   What is that?

A.   It's a global nonprofit focused on small business supply chain risk management as it relates to security, cybersecurity, and those types of issues.

Q.   Okay.  And after President Trump was elected the second time, you returned to DHS in January of 2025.  Right?

A.   Yes.

Q.   Okay.  Into another cybersecurity role. Correct?

A.   Yes.

Q.   Okay.  You were senior advisor to the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 35

Cybersecurity and Infrastructure Agency [sic] within DHS.  Is that right?

A.    I was the senior advisor to the -- he was the executive assistant director for cybersecurity.

Q.    And was that within CISA or within --

A.    It's within CISA.

Q.    Okay.  I'm going to ask for you --

A.    I'm sorry.

Q.    Yeah, no, it's really hard.  In normal conversation, we do this all the time.  But this is not a normal conversation, Ms. Evans, so I'm going to ask that you let me complete my question.

So we'll do that one again.

Was that position you just described within CISA or was it within the DHS front office?

A.    That position was within CISA.

Q.    Okay.  How did you come to have the position of senior advisor at CISA?

MS. KIES:  Object to form.

A.    I don't understand the question about how did I -- I don't understand that.  I was hired as part of the landing team to go in for this administration.

Q.    Did someone appoint you to the position of senior advisor?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 36

A.   I interviewed for the position, and, yes, it goes through an appointment process with presidential personnel.

Q.   Do you recall that DHS -- former DHS Secretary Noem was confirmed on, I believe, January 25, 2025?  Does that sound about right?

A.   Yes, ma'am.

Q.   Was former Secretary Noem involved in your appointment to the position of senior advisor at CISA?

MS. KIES:  Object to foundation.

A.   Secretary Noem interviewed me.

Q.   And did you discuss workforce reduction during that interview with Secretary Noem?

A.   I don't recall.

Q.   You quickly became the executive assistant director for cybersecurity at CISA.  Is that right?

MS. KIES:  Object to form.

A.   I was appointed by the President to take that position, yes, ma'am.

Q.   And that was sometime in February 2025?

A.   I don't recall the exact date, but I believe that that's the case.

Q.   And that is a political appointment.  That is a non-career position at DHS.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 37

A.   Yes, ma'am.  That's a presidentially appointed position.

Q.   Okay.  But not Senate confirmed?

A.   Yes, ma'am.  It's not Senate confirmed.

Q.   Okay.  And again, was former Secretary Noem involved in your appointment to that position?

MS. KIES:  Object to form.

A.   I don't know.

Q.   Did you interview with her for that position?

A.   No, ma'am.

Q.   Okay.  And then at some point in 2025, you moved within DHS, from CISA to FEMA.  Correct?

A.   Yes, ma'am.

Q.   And that was roughly in May or June of 2025?

A.   It was, as I recall, around the May time period.

Q.   Do you remember the date that you moved over?

A.   No, I do not.

Q.   Beginning of the month?  End of the month?

A.   I really can't recall.  I know it was May.

Q.   And that position was your first time working for FEMA.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 38

A.    Yes, ma'am.

Q.    Okay.  So your time at CISA totaled roughly four months?

A.    Yes, ma'am.

Q.    Okay.  In your approximately four months at CISA in early 2025, were you involved in efforts to implement the President's directives pertaining to workforce reduction?

MS. KIES:  Object to form.

A.    Yes.

Q.    And you had an understanding that President Trump had issued some executive orders pertaining to workforce reduction early in his second term?

MS. KIES:  Object to form.

A.    Yes.

Q.    And OMB and OPM provided agencies with further direction with respect to those workforce reduction efforts?

MS. KIES:  Object to form.

A.    Yes.

Q.    And generally speaking, reducing the size of the federal workforce was one of the President's priorities?

MS. KIES:  Object to form.

Page 39

A.   That's what's outlined in the executive order.

Q.   And you understood that at the time you were in those positions at CISA.  Correct?

MS. KIES:  Object to form.

A.   I understand that I was to analyze the workforce based on those executive orders.

Q.   Okay.  So please explain your understanding of the President's directives that pertained to workforce reduction at the time that you were working for CISA.

MS. KIES:  Object to form.

A.   I was to look at the guidance of the executive orders and then to look at the work that the current workforce was conducting.

Q.   And do what with that information?

A.   And then I was to take a look at that and then make recommendations as it related to, "Was it on mission?" and related to statutory authorities.

Q.   And did you make such recommendations at CISA?

A.   Yes, I did.

Q.   And "fraud, waste, and abuse" -- were those some of the words used to describe by the adminis- -- the administration's goals?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 40

MS. KIES:  Object to form.

A.   Those are all in the executive orders, that are outlined, that we are to follow in the executive branch.

Q.   And you also understood that you were to be working with individuals from a new entity called DOGE?

MS. KIES:  Object to form.

A.   Yes.

Q.   And you did work with individuals affiliated with the entity called DOGE?

MS. KIES:  Object to form.

A.   Yes.

Q.   You also understood that DHS Secretary Noem, at the time, shared these goals for workforce reduction for CISA.  Correct?

MS. KIES:  Object to form, foundation.

A.   Yes.

Q.   Did you have any discussions with her, since you joined CISA, regarding workforce reduction?

MS. KIES:  Object to form.

A.   I did not have specific discussions with the secretary as it related to workforce reductions.

Page 41

I did have discussions with the secretary as it related to the workforce and their focus on statutory mission assignments.

Q.   And were the recommendations you were making at CISA with respect to workforce reductions -- were those recommendations to Secretary Noem?

MR. GREAVES:  Object to form.

MS. LEONARD:  I'm going to ask the witness to answer the question, then we'll address the issue of multiple attorneys interposing objections.

Q.   But go ahead.  You can answer the question.

A.   Can you restate the question again?

Q.   Sure.

MS. LEONARD:  Can the court reporter read that one back.

COURT REPORTER:  Sure.

(Whereupon, the court reporter read back from the record as follows:

"Q    And were the recommendations you were making at CISA with respect to workforce reductions -- were

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 42

those recommendations to

Secretary Noem?")

A.   So in the time period that you're discussing, there were directions that came from OMB and OPM that, in this case, the Office of Management and Budget and the Office of Personnel Management, that gave guidance to components.

And we were to send our analysis up to the departmental chief -- I want to make sure I get the right -- I don't want to use acronyms -- chief human capital officer of where recommendations would be sent.

So those were sent to the chief human capital officer, based on the policies that were in place at that time.

Q.   The DHS Chief Human Capital Officer?

A.   Yes, ma'am.

Q.   Who was Roland Edwards?

A.   Yes, ma'am.

MS. LEONARD:  Okay.  Just a pause in the questioning.  Only one attorney is going to interpose objections during this deposition.  Okay?

MS. KIES:  So Mr. Greaves is here, and -- well, I mean, you can speak

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 43

for yourself.

But Mr. Greaves is here as Ms. Evans's personal attorney.  And if there is an objection that he needs to interpose that I have not, he'll interpose it.

But I think it's clear we're not obstructing or delaying the day by having that opportunity.

MS. LEONARD:  We're going to take a break, and we're going to address this off the record.

Can we go off the record.

VIDEOGRAPHER:  Off the record at 9:27.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 9:28.

BY MS. LEONARD:

Q.    Okay.  Ms. Evans, we were talking about your time at CISA and the efforts to implement the President's directives with respect to workforce reduction when we took a break.

Ms. Evans, you're aware that from approximately January to May of 2025, CISA lost

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 44

approximately a thousand employees?

MS. KIES:  Object to form.

A.   I'm not aware of the specific number.

Q.   But you know that CISA had a substantial workforce reduction during the time that you were at CISA.  Correct?

MS. KIES:  Object to form.

A.   I know that they were offered tools that were being offered across the entire federal government, like the deferred retirement program.

Q.   And did you consider your efforts to implement the President's workforce reduction goals at CISA to be successful?

MS. KIES:  Object to form.

A.   I would say that the objectives that I was sent there for, I did achieve.

Q.   And can you explain to me why.

A.   Because I believe that CISA is now back on mission and is focused on its statutory missions, versus some other activities that the previous administration viewed as priority but weren't necessarily tied in statute.

Q.   And one of the effects of that -- those efforts was a reduction in the number of staff at CISA?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 45

MS. KIES:  Object to form.

A.    That was not the objective.  The objective was to get CISA back focused on its statutory missions and get it so that the entity, especially after I became the executive assistant director for cybersecurity, focused on what resources did that particular group need in order to ensure that it was focused on its statutory missions.

Q.    But you understood that the President's priority was in actually reducing the size of the federal government.  Right?

MS. KIES:  Objection; asked and answer.

A.    I understand that that was the executive order, and that was how we were to analyze the workforce.

Q.    And that is what you did at CISA.  Right?

A.    I analyzed --

MS. KIES:  Object to form.

A.    -- the statutory missions associated with CISA.

Q.    Let's talk about the move from CISA to FEMA.

Your new position at FEMA was initially as a senior advisor to the person running FEMA at the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 46

time, who was David Richardson?

A.   Yes, ma'am.

Q.   Okay.  And he was the SOPDA at the time.
Correct?

A.   Yes, ma'am.

Q.   And that position, senior advisor to the
SOPDA, that was another non-career political
appointment.  Correct?

A.   Yes, ma'am.

Q.   And you were appointed to this new
position by former Secretary Noem.  Is that right?

A.   Yeah --

MS. KIES:  Object to form.

A.   Yes, ma'am.

COURT REPORTER:  Did you say
something?

MS. KIES:  Object to form.

COURT REPORTER:  Please keep
your voice up --

MS. KIES:  Sure.

COURT REPORTER:  -- for
accuracy.  Thank you.

Q.   SOPDA Richardson had replaced SOPDA
Hamilton after he was fired by Secretary Noem?

MS. KIES:  Object to form,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

foundation.

A.   I understand that Mr. Richardson went in, in May, as the SOPDA.

Q.   And you understand that, prior to that, there was a SOPDA named Cam Hamilton?

A.   Yes, ma'am.

Q.   And you are aware that Secretary Noem fired Mr. Hamilton after he testified to Congress that FEMA should not be abolished?

MS. KIES:  Objection; foundation.

A.   I'm not aware of the specific discussions that they had.  I read that in the newspaper, just like everybody else.

Q.   But the question about the timing is accurate?  Mr. Hamilton testified to Congress and then he was fired.  Correct?

MS. KIES:  Objection; foundation.

A.   I know Mr. Hamilton testified.  And then I know Mr. Hamilton was not in the position anymore.

Q.   Now, at some point during the first six months of 2025, you had actually hoped to have a different position at DHS as Under Secretary for Management.  Is that correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 48

MS. KIES:  Objection;

foundation.

A.    Yes, ma'am.

Q.    And in March 2025, you were actually nominated by the President to the Senate to be confirmed as Under Secretary for Management for all of DHS.  Correct?

A.    Yes, ma'am.

Q.    Okay.  Can you please explain where the Under Secretary of Management falls within the DHS organizational structure.

MS. KIES:  Object to form.

A.    According to statute, it is the S3, the second -- the third in the line of succession.

Q.    To the secretary?

A.    Yes, ma'am.

Q.    And at the Department of Homeland Security, S1 stands for the secretary.  Correct?

A.    Yes, ma'am.

Q.    So when something says "S1," they're talking about the Secretary of Homeland Security?

MS. KIES:  Object to form.

A.    Yes, ma'am.

Q.    And who is "S2"?

A.    "S2" is the deputy secretary.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 49

Q.   And then "S3" is...?

A.   The Under Secretary for Management.

MS. LEONARD:  Okay.  Let's mark this as Exhibit No. 2.

(Whereupon, Plaintiffs Exhibit 2 was marked for identification.)

Q.   What you see before you as Exhibit No. 2, I will represent that we printed from the Department of Homeland Security website.  And it appears to be an organizational chart for the Department of Homeland Security.

Does this look familiar to you, Ms. Evans?

A.   Yes, it does.

Q.   Okay.  And can you point out where the management directorate is on this.

A.   On this chart, it's over here to the left.

Q.   So the left column.

And below that, it lists the chief financial officer and chief information officer. Those report to the Under Secretary for Management. Correct?

MS. KIES:  Object to form.

A.   Yes, ma'am.

Q.   And then if you follow the line from the management directorate, there's a direct report to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 50

the secretary and deputy secretary.  Is that correct?

MS. KIES:  Object to form.

A.    Yes, ma'am.

Q.    Okay.  Is the office of the chief human capital officer within the management directorate?

A.    Yes, ma'am.

Q.    And the office of the chief human capital officer is also known as the OCHCO?

A.    Yes.  I call it CHCO.

Q.    So when you say "CHCO," are you referring to the person or the office, or both sometimes?

A.    It will depend on the circumstance of the question.

Q.    Okay.  This chart also shows CISA and FEMA.  Correct?

A.    Yes, ma'am.

Q.    And those also are direct reports to the secretary and deputy secretary.  Correct?

MS. KIES:  Object to form.

A.    Yes, ma'am.

Q.    Okay.  You were nom- -- you can set that aside.

You were nominated to the U.S. Senate in March of 2025.  Is that correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 51

A.    Yes, ma'am.

Q.    And did former Secretary Noem recommend you for that position?

MS. KIES:  Object to form, foundation.

A.    I do not know if she specifically recommended me.

Q.    And did you ever discuss with former Secretary Noem your potential role in that position?

A.    I don't recall a specific discussion with Secretary Noem about the Under Secretary for Management position.

Q.    And did you discuss your nomination for the Under Secretary of Management with Corey Lewandowski?

A.    I don't recall having a discussion with Corey Lewandowski about the Under Secretary for Management position.

Q.    Did you discuss that position with anyone else in the DHS Office of the Secretary?

A.    I have discussed, and did discuss, that position with the deputy secretary at that time.

Q.    And who was that?

A.    The deputy secretary of DHS is Troy Edgar.

Q.    Is it possible that you discussed the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 52

position with Secretary Noem or Corey Lewandowski?

MS. KIES:  Object to form.

A.   I don't recall having a specific discussion with either one of them about the under secretary -- specifically about the under secretary position.

Q.   And when you discussed the under secretary position with the deputy, or S2, did you discuss workforce reduction efforts?

MS. KIES:  Object to form.

A.   There are a lot of discussions that happened in that time period, based on the executive orders.  So I can't recall if it was specific, the way that you're asking the question today.

Q.   But it's possible that as part of your discussions about this potential position that you would hold, if confirmed, at the Department of Homeland Security, that you discussed the President's priorities for workforce reduction?

MS. KIES:  Object to form.

A.   Yes.  It's possible that we had discussions of the implementation of the executive orders.

Q.   But you never held the position of under secretary.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 53

A.   Yes, that's correct.

Q.   And the President withdrew your nomination to the U.S. Senate in June of 2025?

MS. KIES:  Object to form.

A.   I thought the withdrawal was in July, so I'm not a hundred percent sure.

Q.   Okay.  I stand corrected, if it was -- you believe the withdrawal was in July of 2025?

A.   Yes, ma'am.

Q.   Did you ask for your nomination to be withdrawn?

MS. KIES:  Object to form.

A.   I did not ask for the nomination to be withdrawn.

Q.   And was that disappointing?

MS. KIES:  Object to form.

A.   Yes, it's disappointing.

Q.   And can you tell me why you wanted to hold that position?

MS. KIES:  Object to form.

A.   I believe that I was qualified for the position and could assist the department in achieving its goals and its mission as it related to homeland security.

Q.   When you began discussing a new position

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 54

at FEMA with the DHS leadership, did you know your nomination for the under secretary position was going to be withdrawn?

MS. KIES:  Object to form.

A.   I don't really understand the question, the way that you're asking it, because the way that you're asking it makes it sound like there was a discussion about me being at FEMA full time with senior leadership at the department.

So I don't understand the question, the way that you're asking it.

Q.   Okay.  I can clarify.

So you moved over to FEMA, you said, sometime in May of 2025?

A.   Yes.

Q.   And did you know, at the time that you moved over, that your nomination for under secretary was going to be withdrawn?

A.   At the time of the move, I did not know that.

Q.   So was it your intention, at the time of the move, to only be at FEMA for a short period of time?

MS. KIES:  Object to form.

A.   It was my intention to do the assignment

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 55

that I was asked to do, and I did not know my nomination was being withdrawn at the time.

Q.   Was it your hope that you would only be at FEMA for a short period of time?

MS. KIES:  Object to form.

A.   It -- it was my hope that I would be confirmed for the position of under secretary.

Q.   And you said do the position you were assigned.

Who assigned you to move over to FEMA?

A.   I received a phone call from the deputy chief of staff that asked me to move to FEMA.

Q.   And who was the deputy chief of staff who made that phone call?

A.   It was made by Troup Hemenway.

Q.   And was Troup Hemenway the deputy chief of staff who was responsible for CISA or FEMA?

MS. KIES:  Objection; foundation.

A.   I'm not sure of all their portfolios, because when you are asking about the time period, that was all when we first came in to the administration.

And so, I worked with Troup and the other deputy chief of staff, which was Joe Guy.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 56

Q.    And you don't recall whether Troup or Joe were responsible for CISA, FEMA, or both?

A.    Right.  I do not recall that, because when we first came on board, they both met with the operational components.

Q.    And the operational components include CISA and FEMA?

A.    Yes.

Q.    If I use the term "front office," does that -- at the Department of Homeland Security, is that a term that you sometimes use?

MS. KIES:  Object to form.

A.    Actually, I don't use that term.  And the reason being is because I'm at a component.  And so, "front office" means front office of the component.

And so, depending on who I'm talking to, I am cognizant of using that terminology of "front office."

Q.    So "front office" could refer to the FEMA front office, meaning the office of the administrator?

A.    Yes, ma'am, it could.

Q.    And at times, some people do use the term "front office" to refer to the Office of the Homeland Security Secretary.  Is that fair?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 57

MS. KIES:  Object to form.

A.  I think that that is true, that some people use the "front office" terminology and could be referring to the front office at headquarters.

Q.  And do you have a term that you prefer to use, rather than "front office," for the Office of the Secretary?

A.  What I -- the terminology that I use is "headquarters."

Q.  "HQ"?

A.  Well, normally, I would say "headquarters."

Q.  Okay.  But you have sometimes said "HQ," referring to the Office of the Secretary at Homeland Security.  Correct?

MS. KIES:  Object to form.

A.  In my emails, I would refer to it as "HQ."

Q.  Okay.  And that is also sometimes referred to as "the office of S1."  Is that correct?

MS. KIES:  Object to form.

A.  I would have to say it would depend on who's actually using it.

Q.  And that office includes the individuals who report to S1, including the chief of staff, the deputy chiefs of staff, and senior advisors.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 58

Is that correct?

MS. KIES:  Objection; foundation.

A.    That is my understanding.

Q.    Who in the front office did you talk to about your new role at FEMA prior to moving over?

MS. KIES:  Object to form.

A.    As I mentioned, it was Troup Hemenway.

Q.    Was that the only person in the front office that you talked to about that role?

MS. KIES:  Object to form.

A.    About moving to FEMA?

Q.    Um-hum.

A.    Yes, ma'am.

Q.    And, I'm sorry, I just did it.  I said "um-hum."  I will do my best -- we all do it.  I will do my best to ask a verbal question.

And what do you recall about the conversation with Troup when he asked you to move over to FEMA?

MS. KIES:  Object to form.

A.    I recall that he called me and asked me if I was aware of the situation at FEMA.  And I said no.

And then he asked me to -- would I be

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 59

willing to go over and help out at FEMA.  And I said yes.

Q.   What did you understand he to be -- what did you understand Mr. Hemenway to be referring to regarding the situation at FEMA?

MS. KIES:  Object to form.

A.   At that time, when I had the conversation with him, I knew, because of the operational meetings, that Mr. Hamilton was working on several different initiatives, as all of us were when we came in on transition.

So I thought that that's what he meant.

Q.   And what types of initiatives do you have -- did you have an understanding that he was referring to?

MS. KIES:  Foundation.

A.   All of us were looking at the executive orders.  Each component had specific issues.

And as we previously discussed, I was specifically looking at statutory mission and making sure resources were aligned to statutory mission.

Q.   Including staffing resources.  Correct?

MS. KIES:  Object to form.

A.   I looked at all resources.

Q.   Including staffing resources.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 60

A.   Yes, ma'am.

Q.   Okay.  And you referred to "operational" -- "operations" meetings.  Is that what you -- how you described them?

A.   I described it as "operational components."

Q.   And those were meetings with the Office of the Secretary regarding -- and the operational components.  Is that correct?

MS. KIES:  Object to form.

A.   There were a few meetings in the beginning of the administration with the two chiefs of staff -- deputy chiefs of staff -- excuse me, I'm correcting myself -- the two deputy chiefs of staff at that time with the operational components.

Q.   And you participated in those meetings as a representative of CISA?

MS. KIES:  Object to form.

A.   Yes, ma'am.

Q.   But there were discussions of FEMA at those meetings?

MS. KIES:  Object to form.

A.   FEMA was present at those meetings.

Q.   And you said that you were aware of the leadership of FEMA because -- and it was because of

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 61

who was present at those meetings?

MS. KIES:  Object to form.

A.   Yes, ma'am.

Q.   And was there a meeting in May in which Mr. Richardson appeared instead of Mr. Hamilton?

A.   Those meetings did not continue beyond the first -- I want to say first few weeks, that I recall.

So those operational component meetings with the two deputy chiefs of staff did not continue.

Q.   So those operational component meetings with the deputy chiefs of staff were -- when you say beyond the "first few weeks," you're talking about the first few weeks of the administration?

A.   Yes, ma'am.

Q.   Okay.  So in approximately January or February of 2025?

A.   Yes, ma'am.

Q.   And those meetings were focused on the President's priorities for workforce reduction.  Is that correct?

MS. KIES:  Object to form.

A.   No, that's not correct.

Q.   Did they include discussions of the

Page 62

President's priorities for workforce reduction?

A.    They included the executive orders.  They were high-level meetings, and they only lasted for 30 minutes.

Q.    Were there representatives of DOGE present at those meetings?

MS. KIES:  Objection; foundation.

A.    No.

Q.    When you moved over after this conversation -- well, strike that.  Let me ask a different question.

You accepted Troup's invitation to move over to FEMA.  Is that correct?

MS. KIES:  Object to form.

A.    Yes, ma'am.

Q.    You agreed to take on this new role?

A.    Yes, ma'am.

Q.    Okay.  You understood, at the time, that one of the reasons you were being transferred to FEMA was to implement the President and Secretary Noem's workforce reduction efforts at FEMA. Correct?

MS. KIES:  Object to form.

A.    No, that's incorrect.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 63

I was asked to go over to FEMA to help support and look at grant programs.

Q.   Grant programs that Secretary Noem intended to cut?

MS. KIES:  Object to form.

A.   No, ma'am.  I was asked to look at grant programs.

Q.   Those grant programs that you were looking at eventually were cut.  Correct?

MS. KIES:  Object to form.

A.   That is not correct.

And so -- yeah, that's not correct.

Q.   There were a substantial number of grant programs that were terminated after you came to hold a role at FEMA.  Correct?

MS. KIES:  Object to form.

A.   There were grant programs that were evaluated.  And my assignment was to look at the process of how awardees were vetted.

Q.   There were a substantial number of grant programs that were terminated at FEMA after you came into your role at FEMA.  Correct?

MS. KIES:  Object to form.

A.   I don't recall that that's specifically the case.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 64

Q.   You know that the BRIC program was terminated?

A.   The BRIC --

MS. KIES:  Object to form.

WITNESS:  Excuse me.  I'm sorry.

I'm sorry.  I apologize.  I apologize.

A.   Okay.  So could you repeat the question again?

Q.   Sure.  You're familiar with the BRIC grant program?

A.   Yes, ma'am, I am.

Q.   And you understand that that was terminated after you came over to FEMA?

MS. KIES:  Object to form.

A.   I understand that that program was suspended.

Q.   And it was recently reinstated because of court orders that that was unlawful.  Correct?

MS. KIES:  Objection; foundation, form.

A.   It was recently reinstated.

There were court actions, but the analysis associated with the program was also completed.

Q.   Okay.  Can you describe for me your goals, your personal goals, in coming over into this new

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 65

role at FEMA?

MS. KIES:  Object to form.

A.   Can you state that again?

Q.   Sorry.  I have spilled my water, so I was a little distracted.

I believe the question was:  Could you describe for me your personal goals in coming into this new position at FEMA?

MS. KIES:  Object to form.

A.   My personal goals are always to do a good job and to achieve the outcomes -- program -- to evaluate a program and to achieve the outcomes that the program is intended to achieve.

Q.   And you understood that, ultimately, you reported to the Secretary of Homeland Security?

MS. KIES:  Object to form.

A.   Yes.  FEMA is a component of DHS.

Q.   And you measured your goals against the secretary's priorities for the program.  Correct?

MS. KIES:  Object to form.

A.   I measured my goals against the secretary's priorities, as well as the President's priorities.

Q.   And were you aware that when you moved from CISA to FEMA, the DHS spokesperson stated that

Page 66

you had been, quote, instrumental in cutting waste, fraud, and abuse at CISA?

MS. KIES:  Object to form.

A.   Yes.

Q.   That was a statement that was put out by the Department of Homeland Security through the spokesperson when you were transferred?

MS. KIES:  Objection; foundation.

A.   Yes, it was.

Q.   Did you vet that statement before it was put to the press?

MS. KIES:  Object to form.

A.   No, I did not.

Q.   Did you see it before it was released to the press?

A.   No, I did not.

Q.   Okay.  Sometimes you do participate in reviewing statements that are put out to the press at FEMA.  Correct?

MS. KIES:  Object to form.

A.   Yes, ma'am, I do.

Q.   But the one that was describing you personally, you had not seen before that went out?

A.   I don't recall seeing it.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 67

Q.   Is it possible that you saw it?

A.   No.  I mean, I really don't recall seeing it.

Q.   Okay.

MS. LEONARD:  Well, let's mark this as No. -- I believe Exhibit No. 3.

(Whereupon, Plaintiffs Exhibit 3 was marked for identification.)

Q.   You've been handed what's been marked as Exhibit No. 3.  I'll represent that it's an article that we printed from POLITICO Pro -- press organization.

And there's a reference to a statement from the spokesperson for DHS approximately halfway down the article.

Let me know when you are ready to proceed.

(Witness reading.)

A.   Okay.

Q.   Do you see the quote there from the Department of Homeland Security spokesperson?

A.   Yes, ma'am.

Q.   Okay.  And it is referring to you.  And it says:

She was instrumental in helping cut waste, fraud, and

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 68

abuse at CISA, and her skill
set is perfectly suited for the
future of the Federal Emergency
Management Agency.

You understood that that was the statement that DHS was putting out to the press about you?

MS. KIES:  Object to form.

A.    I understand that that's the statement that DHS put out.

Q.    And do you agree that you were instrumental in cutting waste -- fraud, waste, and abuse at CISA?

MS. KIES:  Object to form.

A.    I -- yes.  I believe that I focused the resources at CISA back on their statutory mission.

Q.    And you understood your role at FEMA was also going to involve cutting fraud, waste, and abuse?

MS. KIES:  Object to form.

A.    I believe that my role at CISA -- I mean, at FEMA was also to be focused on getting them looking at their statutory responsibilities.

Q.    And you understood, at the time, that the future of the Federal Emergency Management Agency was going to involve downsizing that agency?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 69

MS. KIES:  Object to form.

A.  I understand, at the time, that there were discussions associated with what the future of FEMA was going to be and what it was going to look like.

That was specifically talked about by the President.

Q.  And at the time, you understood that the discussions "including" making FEMA into a smaller agency.  Correct?

MS. KIES:  Object to form, foundation.

A.  I understand that the discussions were to look at FEMA, its resources associated with it doing its statutory mission, and making recommendations so that it would be aligned with the outcomes that the President had articulated for FEMA.

Q.  And you understood that that included a discussion of making FEMA into a smaller agency. Right, Ms. Evans?

MS. KIES:  Objection; asked and answered.

A.  I understand that that is what people had discussed.

My job was to actually analyze it and look at the resources and provide data so that the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 70

decisions could be made based on data.

Q.   And when you said "people had discussed," you understood that the President and DHS Secretary Noem had discussed making FEMA into a smaller agency at the time that you moved over.  Right?

MS. KIES:  Objection; foundation.

A.   They had discussed that publicly, yes.

Q.   And you supported that agenda?

MS. KIES:  Objection; form.

A.   I support President Trump's agenda as part of the executive branch.

Q.   You agreed with the agenda for making FEMA into a smaller agency, Ms. Evans.  Correct?

MS. KIES:  Objection; form.

A.   I agree that I was to look at FEMA and look at the resources that they had, and then look at its statutory missions and to make recommendations as to what were the right resources that they needed to accomplish the outcomes that the President had outlined.

Q.   And again, those resources including -- include staffing.  Correct?

MS. KIES:  Object to form.

A.   Yes, ma'am.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 71

Q.   You attended a meeting of the FEMA Review Council on May 20, 2025?

A.   Yes.  That's the meeting in New Orleans.

Q.   I actually don't know where this meeting was, but I would take your word for it.

And the FEMA -- you understand what the FEMA Review Council was?

MS. KIES:  Object to form.

A.   Okay.  The FEMA Review Council is a FACA-based council that the President put in place through executive order to also look at the future of FEMA and the resources associated with FEMA.

Q.   And in particular, the President had ordered this council to evaluate whether FEMA's bureaucracy in disaster response ultimately harms the agency's ability to successfully respond.

Do you recall that language?

MS. KIES:  Object to form.

A.   Yes.

Q.   Okay.  And by "bureaucracy," you understand that the President was referring to the size of FEMA's staff.  Correct?

MS. KIES:  Objection; foundation.

A.   So I would disagree that that's -- I would

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 72

disagree with that.  I would just -- I viewed it as bureaucracy also involves processes.

And is there a -- you know, unnecessary processes that would get in the way of delivering emergency response to people affected by disasters.

Q.  And you also understood, at the time, that the President had specifically stated his priority for reducing the size of the federal government. Right?

MS. KIES:  Object to form.

A.  I understand that those are the intentions of the executive order.

Q.  And in addition to the FEMA Review Council order, you understood your role was to implement the President's executive orders, including the executive orders addressing reducing the size of the federal government.  Correct?

MS. KIES:  Object to form.

A.  Yes, if -- if -- it was appropriate to do that as it relates to the statutory missions for that agency.

MS. LEONARD:  I'm going to mark the next as Exhibit 4.

(Whereupon, Plaintiffs Exhibit 4 was marked for identification.)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 73

Q.   And I'll represent --

A.   Oh.  Okay.

Q.   -- yeah -- these are the minutes from the May 20th FEMA Review Council meeting.

And I believe it shows the location at the top.  So we --

A.   Yes.

Q.   We will talk about this.  Let me know when you're ready.

(Witness reading.)

A.   Okay.

Q.   Okay.  So this, I will represent, is a document that we printed from the Department of Homeland Security webpage that contains the minutes for the FEMA Review Council meetings.

And if you look to the top, the date is given as May 20, 2025.

Do you see that?

A.   Yes, ma'am.

Q.   And the "Open Meeting Minutes," I assume that means the public -- public portion of the meeting?

MS. KIES:  Object to form.

A.   Yes, ma'am.

Q.   And the location is listed as the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 74

"Eisenhower Executive Office Building - Indian Treaty Room."

Do you see that?

A.   Yes, ma'am.

Q.   And does that refresh your recollection that this meeting happened in Washington, D.C., rather than New Orleans?

A.   Yes.  But I was also at the New Orleans meeting.

So I apologize for the confusion.

Q.   No -- understandable.

You are listed as a participant. Correct?  On the second page?

A.   Yes.

Q.   And it's listed -- your position is listed as "Senior Advisor to the Administrator, FEMA."

Do you see that?

A.   Yes, ma'am.

Q.   And that is the position you held as of May 20, 2025?

A.   Yes, ma'am.

Q.   So you moved from CISA to FEMA at some point on or prior to May 20, 2025?

A.   Yes.

Q.   And you don't recall exactly the day?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 75

A.   No, I don't.

Q.   Okay.  But it was before this meeting.  Is that right?

MS. KIES:  Object to form.

A.   Yes.

Q.   And what is your understanding of why you were present at this meeting?

MS. KIES:  Object to form.

A.   I was at this meeting because I was the senior advisor to Mr. Richardson.

Q.   Did someone ask you to attend?

A.   Yes.  Mr. Richardson.

Q.   Did anyone else ask you to attend?

A.   No.

Q.   At that May meeting, you heard Secretary Noem say that:

...President Trump has
said many times that FEMA
should be eliminated as it
exists today, and that we need
to reimagine the agency.

Do you recall her saying something like that?

A.   Yes, I do.

Q.   And former Secretary Noem also said at the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 76

meeting that:

    ...President Trump
believes FEMA should no longer
exist as it is today, and he
wants a new agency that
understands its role in
emergency response.

Do you recall that?

    MS. KIES:  Object to form.

A.   Yes, I do.

Q.   And you understood that former Secretary Noem was referring to reducing the size of FEMA. Correct?

    MS. KIES:  Object to form, foundation.

A.   I understood that we were -- I was to be focused and help Mr. Richardson focus on the statutory missions that FEMA has as it relates to all the statutory responsibilities of FEMA.

Q.   What did you understand Secretary Noem to mean when she was referring to "eliminating FEMA as it exists"?

    MS. KIES:  Object to form.

A.   I understood that she meant it to mean, similar to what is in the executive order to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 77

establish the FEMA Review Council, is to look at current processes, such as the bureaucracy, and how we could, like, streamline those processes.

Q.   And "streamlining" could have the effect of eliminating staff.  Correct?

MS. KIES:  Object to form.

A.   It could.

Q.   Since you returned to DHS in 2025, other than this FEMA Review Council meeting, have you ever heard former Secretary Noem talk about eliminating FEMA?

MS. KIES:  Object to form.

A.   I read the newspapers and see the comments, and her comments have been consistent with what is in the minutes of this meeting.

Q.   Have you ever personally communicated with Secretary Noem and heard her talk about eliminating FEMA?

MS. KIES:  Object to form.

A.   I don't recall specific discussions with the secretary where she specifically said, "Eliminate FEMA."

Q.   Have you -- do you recall communications involving Secretary Noem in which she talked about reducing the size of FEMA?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 78

MS. KIES:  Object to form.

A.  I don't recall having specific conversations with the secretary as it relates to reducing the size of FEMA.

Q.  You attended another FEMA advisory coun- -- Review Council meeting in July of 2025. Correct?

A.  Yes, ma'am.  That's the one that's in New Orleans.

MS. LEONARD:  Okay.  Well, let's mark this as No. 5.

(Whereupon, Plaintiffs Exhibit 5 was marked for identification.)

Q.  Okay.  So you've been handed Exhibit 5, which is the July 9, 2025 minutes of the meeting of the FEMA Review Council.

And the location listed at the top is New Orleans.

Do you see that?

A.  Yes, ma'am.

Q.  And you are listed here on July 9th also as "Senior Advisor to the Administrator" of FEMA.

Do you see that on the first page?

A.  Yes, I do.

Q.  If you look to the last page, actually, it

Page 79

appears that Secretary Noem signed off on these minutes.

Do you see that?

MS. KIES:  Object to form.

A.  Yes, I do.

Q.  And you had an understanding, at the time you attended these FEMA Review Council meetings, that Secretary Noem was the co-chair of the Review Council?

MS. KIES:  Object to form.

A.  Yes.

Q.  And at this July meeting, second page, second-to-last sentence of Secretary Noem's comments there, she reiterated that:

...federal emergency management should be state and locally led, which is why FEMA must be eliminated as it exists today and remade into a responsive agency.

Do you recall her saying something like that?

A.  Yes, ma'am.

Q.  And you understood, at the time, that by moving emergency management to the state and local

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 80

governments, Secretary -- former Secretary Noem intended to reduce the size of FEMA as an agency. Correct?

MS. KIES:  Objection; foundation, form.

A.    I understood that we were to look at the programs because it was to be locally led, state managed, and federally supported.

Q.    And "federally supported" meant that FEMA would have fewer staff than it currently did. Correct?

MS. KIES:  Objection; foundation.

A.    That had not been determined at that time.

It depends on where you sit, that you could interpret it that way.

Q.    And from where you sat, did you interpret it that way?

MS. KIES:  Object to form.

A.    I have it at -- where I sit and where I sat at that time, I hadn't completed my analysis.

Q.    As of the summer of 2025, Corey Lewandowski held the position of chief advisor to former Secretary Noem.  Is that correct?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 81

A.   I understand that that is his position, or was his position.

Q.   And what was your understanding at the time, in the summer of 2025, of Mr. Lewandowski's role in the front office -- sorry, headquarters?

A.   I understood that Mr. Lewandowski was an advisor to the secretary.

Q.   And did you have an understanding that Mr. Lewandowski played a role in the approval process for FEMA-related decisions?

MS. KIES:  Object to form, foundation.

A.   I have no knowledge or -- that he was providing a role in decisions as it related to FEMA.

MS. LEONARD:  Okay.  I think we've been going for over an hour.  I think this might be a good time to take a short break.

MS. KIES:  Sure.

MS. LEONARD:  I would love to keep the breaks relatively short.  Is five minutes enough time?

MS. KIES:  Is that enough time for you, Ms. Evans?

MS. LEONARD:  Or we can do 10,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 82

is also fine.

WITNESS:  I would appreciate 10.

MS. LEONARD:  Let's take a 10-minute break, and we'll come back at -- sorry.  By Susan's phone, it is 10:10.  We'll come back at 10:20.

VIDEOGRAPHER:  Off the record at 10:10.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 10:25.

BY MS. LEONARD:

Q.   Okay.  Ms. Evans, when we took a break, we were talking about Mr. Lewandowski's role in the DHS Office of the Secretary.

Do you recall that?

A.   Yes, ma'am.

Q.   Okay.

MS. LEONARD:  I'm going to show you an exhibit that we're going to mark as No. 6.

(Whereupon, Plaintiffs Exhibit 6 was marked for identification.)

Q.   And I will represent to you that this is a document that was introduced in different litigation

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 83

as a ExecSec routing sheet from the Department of Homeland Security.

Let me know when you are ready.

A.   Yes, ma'am.

Q.   You're familiar with ExecSec?

MS. KIES:   Object to form.

A.   I am familiar with the department's ExecSec.  FEMA also has an ExecSec.

Q.   And that stands for "Executive Secretary"?

A.   Yes, I believe that's the case.

Q.   And the executive -- please describe to me, at a high level, what your understanding is of the role of the Department of Homeland Security Executive Secretary in processing papers for the secretary.

MS. KIES:   Object to form.

A.   It's my understanding that what the executive secretary, the ExecSec, at headquarters does is they task out assignments to components, they accumulate the information from the components, and then they prepare the packages for review for DHS headquarters personnel.

Q.   And is what appears in front of you -- this appears, to me, to be a routing slip for an approval package.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 84

Is that a fair description?

MS. KIES:  Objection; foundation.

A.    That's what it says.  It says it's a "record of clearance and approval."

Q.    And ExecSec use something called STORM? Are you familiar with that system?

MS. KIES:  Object to form.

A.    I am familiar with the STORM system.

Q.    And is that a document system used by the DHS ExecSec?

MS. KIES:  Object to form, foundation.

A.    It's a system that the headquarters executive secretary uses with the component executive secretariats to track documents and assignments.

Q.    And on this document, it says "date submitted to FO."

Do you understand that that refers to "front office"?

MS. KIES:  Object to form.

A.    I'm sorry.  I'm looking --

Q.    The box at the top, right under the STORM number, it says "date submitted to FO."

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 85

A.   Oh, I see it now.

Yes, ma'am.

Q.   And do you have an understanding of whether that would mean the DHS front office?

A.   I would understand, based on this form, that that's the DHS front office.

Q.   Okay.  And DHS Executive Secretary uses documents similar to this for matters involving FEMA as well.  Correct?

MS. KIES:  Object to form, foundation.

A.   They would use -- it's my understanding they would use a form similar to this, if FEMA was sending something directly to the secretary for review.

Q.   And the list of names in order here, do you have an understanding of what that means in terms of order of review?

MS. KIES:  Object to form, foundation.

A.   It is my understanding that the department executive secretariat makes the determination of who does the review based on the subject matter.

Q.   And is this a review in order, moving from one person to the next?  Is that typically how it's

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 86

done?

MS. KIES:  Object to form, foundation.

A.   I am not sure how they actually run their process.  It depends on the subject matter.

And like I said, I'm not really sure how they actually run the process up there for clearances.

Q.   And on this form, Chief Advisor Corey Lewandowski is the last in line before S1.

Do you see that?

A.   Yes, I see that.

Q.   And....

Okay.  Did you have any prior experience working with Mr. Lewandowski before coming back to DHS in 2025?

MS. KIES:  Object to form.

A.   No, I did not.

Q.   When was the first time you met him?

A.   I met Mr. Lewandowski during the transition period.

Q.   "Transition period" meaning the period before President Trump took office for the second time?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 87

Q.   Okay.  And when was the first time you interacted with Mr. Lewandowski in his role at DHS?

MS. KIES:  Object to form.

A.   I don't recall specifically when I first started interacting with Mr. Lewandowski.

Q.   Was it early on in your tenure at DHS?

A.   It -- I believe my first interaction is when I was working on some management issues.

Q.   When you say "some management issues," what do you mean?

A.   I mean some issues associated with the management directorate.

Q.   When you were a nominee for the under secretary position?

A.   I had -- I don't recall the exact timing of when that interaction occurred.

But I did work as -- on some management issues when I was going to be nominated as the Under Secretary for Management.

Q.   Did those issues involve FEMA?

MS. KIES:  Object to form.

A.   As it relates to the question that you asked, which I believe is my interactions with Mr. Lewandowski, that interaction, my first interaction, was not related to FEMA.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 88

Q.   The issues you were working on at the time, the management issues, did those relate to FEMA?

MS. KIES:  Object to form.

A.   They did not.

Q.   And what was your understanding of Mr. Lewandowski's role and reason for interacting with you at the time?

MS. KIES:  Object to form.

A.   Mr. Lewandowski was asking some specific questions as it related to management issues.

Q.   And did you have any understanding as to the reason why he was doing that?

MS. KIES:  Objection; form.

A.   I understand that he was asking some issues as it related to space.

Q.   Office space or outer space?

A.   Office space.

Q.   Sorry.  I -- that was a legitimate question.  I didn't understand.

A.   Okay.

Q.   Office space, because Mr. Lewandowski was involved in shutting down parts of the Department of Homeland Security?

MS. KIES:  Objection;

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 89

foundation, form.

A.   I don't understand -- I don't know the basis of why he was asking some of the questions as it related to space.

In this particular case, it was related to a new building that was potentially going to be built on the St. Elizabeth campus.

Q.   Was Mr. Lewandowski present at the meetings for the operations components that you described having with Mr. Hemenway and Mr. Guy?

MS. KIES:  Object to form.

A.   No, he was not.

Q.   Prior to moving over from CISA to FEMA, did you have any discussions with Mr. Lewandowski about your new role at FEMA?

A.   No, I did not.

Q.   Did you ever hear or see Mr. Lewandowski talk about eliminating FEMA?

MS. KIES:  Object to form.

A.   I don't recall any discussions with him about eliminating FEMA.

Q.   Do you recall any statements that he has made about the size of FEMA?

MS. KIES:  Object to form.

A.   I don't recall him making any statements

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 90

to me about the size of FEMA.

Q.   Were you present when he made such statements, whether or not they were directed at you?

MS. KIES:   Object to form.

A.   I don't recall being in meetings with him where he discussed the size of FEMA.

Q.   You have been in meetings with Mr. Lewandowski, though, since you returned to the Department of Homeland Security.  Correct?

A.   Yes, I have been in meetings with him.

Q.   Approximately how many meetings have you been in with Mr. Lewandowski since you returned to the Department of Homeland Security in 2025?

MS. KIES:   Object to form.

A.   I really don't know a number.

Q.   Can you give me an estimate?

A.   I know that we had -- we had regular component head meetings.  And if I were -- I was attending the component head meetings, Mr. Lewandowski would be in those.

And those were regular meetings, but I always wasn't representing a component head.

Q.   Prior to becoming SOPDA, did you ever attend any of these component head meetings that you

Page 91

just referenced where Mr. Lewandowski was present?

A.   Yes.

Q.   And did you attend in your role as chief of staff of FEMA?

A.   Yes.

Q.   And were there any meetings, other than the component head meetings that you just described, where Mr. Lewandowski was present, since you've returned to the Department of Homeland Security in 2025?

MS. KIES:  Object to form.

A.   Yes.

Q.   What type of meetings were those?

A.   The one specific meeting that I can recall was about CISA and the secretary participating in the RSA Conference.

Q.   Any other meetings, other than that meeting about CISA and the meetings for the component heads, that you can recall where you were present and Mr. Lewandowski was present, since you returned to DHS?

MS. KIES:  Object to form.

WITNESS:  I'm sorry.

COURT REPORTER:  Did you say anything?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 92

MS. KIES:  We talked over each other accidentally.  But I said "object to form."

COURT REPORTER:  Thank you.

WITNESS:  I apologize.

A.  Yes, I have been in some meetings, for example, where we had to do the pre-brief for the secretary as it related to emergency declarations for FEMA.

And, also, I've been in meetings where we did pre-briefs for the secretary for her hearings as it related to budget.

Q.  Any other meetings that you haven't described today, since you returned to DHS, where Mr. Lewandowski was present?

A.  I can't recall any other meetings.  Those are the general types of meetings that he would be in.

Q.  Did you ever hear Mr. Lewandowski say, "What part of 'we are eliminating FEMA' don't you understand?"

MS. KIES:  Object to form.

A.  I don't recall him saying that to me.

Q.  Would it surprise you to hear that he said that in the summer of 2025?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 93

MS. KIES:  Object to form.

A.    I'm not going to speculate on whether I would be surprised or not if he said a statement such as that.

Q.    Well, based on your understanding of the priorities of the agency, would it surprise you to hear that Mr. Lewandowski said that in the summer of 2025?

MS. KIES:  Object to form.

A.    I would -- I would not be surprised.

Q.    Because you had an understanding that that was Mr. Lewandowski's goal for FEMA.  Right?

MS. KIES:  Objection; foundation, speculation.

A.    I --

MS. KIES:  You can answer.

WITNESS:  Okay.  Thank you.

A.    I'm not going to speculate on what Mr. Lewandowski's goals are for FEMA.

Q.    And if it was Mr. Lewandowski's goal, it was also Secretary Noem's goal.  Right?

MS. KIES:  Objection; foundation, speculation.

A.    I'm not going to speculate on Secretary Noem's goals as it relates to Mr. Lewandowski's

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 94

goals.

Q.    At some point in time after July 2025, you moved from being a senior advisor, to the FEMA SOPDA, to the FEMA Chief of Staff.  Correct?

A.    Yes.

Q.    When was that?

A.    When did I get assigned the chief of staff position?

Q.    Yes.

A.    That was -- I don't have the exact date, but it was toward the end of September, first of October, in that time period.

Q.    Was there a prior chief of staff, or was that -- before you took over the role, or was that position vacant?

A.    There was a prior chief of staff.

Q.    Okay.  And then you held the position of FEMA Chief of Staff from approximately the end of September, beginning of October, until you were appointed as SOPDA.  Correct?

A.    As I stated in the beginning of this, that is still my position of record.

Q.    Who appointed you as FEMA Chief of Staff?

A.    It went through presidential personnel and -- yeah, it went through presidential personnel.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 95

I don't have firsthand knowledge.  When you say who, like, I don't know the specific person.

But I know that the action was approved through presidential personnel.

Q.   Let's stay within the Department of Homeland Security.

Who approved your appointment as the FEMA Chief of Staff within the Department of Homeland Security?

MS. KIES:  Object to form.

A.   It's my understanding, the way that the process works is that "PPO," Presidential Personnel Office, there's a White House liaison person at headquarters -- and in this case, I mean DHS headquarters -- that they work with the secretary's office, as well as the deputy secretary's Office, on personnel selections, that then those recommendations go to the White House.

Q.   Do you have an understanding that DHS former Secretary Noem signed off and approved on your appointment as FEMA Chief of Staff?

MS. KIES:  Object to form.

A.   I would believe that, knowing the process, that that's the process that would have taken place.

Q.   And do you know whether senior -- Chief

Page 96

Advisor Lewandowski signed off and approved on your appointment as FEMA Chief of Staff?

A.   I would not know that.

Q.   And do you think it would have taken -- the approval process for the secretary would have taken the form of this record of clearance and approval from the DHS ExecSec that we looked at in Exhibit 6?  Would it have looked something like that?

MS. KIES:  Objection; foundation.

A.   I'm not going to speculate on what the front office process is for clearances between presidential personnel and the secretary.

Q.   You're aware that former Secretary Noem has been involved in other personnel decisions for FEMA since you returned to the Department of Homeland Security.  Correct?

MS. KIES:  Object to form.

A.   Yes, I am.

Q.   You worked for SOPDA Richardson when you were the FEMA Chief of Staff, before assuming the position also of SOPDA.  Correct?

A.   Yes, I did.

Q.   And when he was appointed SOPDA,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 97

Mr. Richardson was also an Assistant Secretary at DHS's Office for Countering Weapons of Mass Destruction.  Correct?

MS. KIES:  Objection; foundation.

A.    That's my understanding, yes.

Q.    And Mr. Richardson kept both jobs when he was the SOPDA of FEMA.  Correct?

MS. KIES:  Objection; foundation.

A.    That's my understanding, yes.

Q.    Ms. Evans, during the time that Mr. Richardson was SOPDA and you were chief of staff, was it fair to say you played a very significant role in running this agency?

MS. KIES:  Objection; form.

A.    I think it depends on what you mean by "significant."

I was his senior advisor, so I helped Mr. Richardson.

Q.    And you attended the component head meetings that you described earlier?

A.    Not during Mr. Richardson's tenure, no, unless he couldn't go.

And then he would then have me go in his

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 98

place, or he would have his chief of staff go in his place.

Q.   Do you remember how many times you went in his place because Mr. Richardson could not go to the component head meetings?

MS. KIES:  Object to form.

A.   I believe, in my case, it was only once.

Q.   Since moving to FEMA in May 2025, you also worked with someone named Kara Voorhies.  Correct?

MS. KIES:  Object to form.

A.   Yes, that's correct.

Q.   Who is Kara Voorhies?

MS. KIES:  Object to form.

A.   Okay.  I call her "Kara."

Q.   Sorry.  Okay.  "Kara," I will use that.

Who is --

A.   Kara --

Q.   Let me ask it again.

Who is Kara Voorhies?

A.   She's the senior advisor to the Secretary on FEMA issues.

Q.   Did you know Kara Voorhies prior to working at DHS in 2025?

A.   No, I did not.

Q.   And Ms. Voorhies was already working for

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 99

DHS when you moved from CISA to FEMA in May of 2025?

MS. KIES:  Object to form.

A.   Yes, she was there.

Q.   And what was Ms. Voorhies' role at DHS, exactly?

MS. KIES:  Object to form.

A.   She was the senior advisor to the Secretary on FEMA.

Q.   Ms. Voorhies was not a federal employee. Correct?

MS. KIES:  Object to form, foundation.

A.   That is not my understanding, initially.

Q.   You had an understanding, initially, that she was an employee?

A.   Yes.

Q.   And what was the basis for that understanding?

A.   I asked her.

Q.   And what did she say?

A.   She said that she was on a government appointment.

Q.   Were those her precise words?

A.   I can't attest to that that was her precise words.  But I asked her what position she

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 100

held.

Q.   Why did you ask her that?

MS. KIES:  Object to form.

A.   Because she was at FEMA and I was at FEMA. And so, I was trying to understand the people in the organization, because we all came over at the same time when Mr. Richardson was put in as the senior official performing the duties.

So there were several people that came with Mr. Richardson from "Counter" Weapons of Mass Destruction.

Q.   And did you have an understanding that Ms. Voorhies came with Mr. Richardson from Weapons of Mass Destruction?

A.   No, I didn't have an understanding. That's why I asked her.

Q.   And did you ask her who gave her the appointment?

A.   No, I didn't ask her.  I asked her what type of appointment she had.

Q.   And did she -- did you understand -- what was your understanding of -- let me ask this again.

Did you understand that she was representing that she had a "special employee" appointment?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 101

MS. KIES:  Object to form.

A.    She didn't know what type of appointment she had.  So I figured that she was a special government employee.

Q.    Because she wasn't familiar with all the standard positions that are held by federal employees?

MS. KIES:  Object to form, foundation.

A.    She didn't understand -- like, she definitely was not coming as a detailee from Counter Weapons of Mass Destruction.

So that's why I figured she was a special government employee.

Q.    And did you have any understanding of who appointed her?

A.    She told me that she came as requested by Mr. Lewandowski.

Q.    And when was this conversation that you're recalling?

A.    I don't know the exact timing of the conversation.  Because, as you said, and I've said, I got there in like the May time period, and there were a lot of staff that were coming in to work with Mr. Richardson.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 102

So I was trying to understand how Mr. Richardson would want to use me as a senior advisor to him on different issues associated with FEMA.

Q.   Did she say anything -- did Ms. Voorhies, at this time, say anything else about her background with Mr. Lewandowski?

MS. KIES:  Object to form.

A.   No, she did not.

Q.   Did you ask?

A.   No, I did not.

Q.   Did you have any understanding of his authority to appoint individuals to such positions?

MS. KIES:  Object to form, legal conclusion.

COURT REPORTER:  What was that last part?

MS. KIES:  Legal conclusion.

COURT REPORTER:  Thank you.

A.   I don't -- in the way that you've asked the question, I have no knowledge that Mr. Lewandowski appointed Kara Voorhies.

Q.   That's just what she said?

MS. KIES:  Object to form.

A.   She told me she knew Corey Lewandowski.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 103

She didn't say he appointed her, the way that you're asking the question.

Q.    But that she came over at his request?

MS. KIES:  Object to form.

A.    She said that she came because he had asked her to.

Q.    You -- at some point in time, you came to understand that Ms. Voorhies was actually a government contractor.  Correct?

MS. KIES:  Object to form.

A.    Yes.

Q.    When did you under- -- when did you learn that?

A.    I initially heard by one of the employees that stated that she was a contractor.

I don't know the exact time period of when that was, but an employee stated that she was a contractor.

Q.    A FEMA employee?

A.    Yes.

Q.    Okay.  Can you give me a rough estimate of when you came to have this understanding?

A.    Actually, I really can't recall it.  I really cannot recall it.

But I do know that the FEMA employee did

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 104

state and -- to other FEMA employees, and it was raised to me that this employee stated that she was a contractor.

Q.   And were you surprised to hear that?

MS. KIES:  Object to form.

A.   So it depends on what you mean by "surprised," but, yes, I -- it was different than what I thought she was.

Q.   Did you do any investigation into the nature of Ms. Voorhies' contract?

MS. KIES:  Object to form.

A.   I did not do investigation, but I did specifically ask her if she was a contractor.

Q.   And what did she say?

A.   She said yes.

Q.   Did you ask her any -- anything about that contract?

A.   I did not ask her about the contract, because she said that she was still the senior advisor to the secretary.

Q.   And the senior advisor to the secretary is a position within HQ?

MS. KIES:  Object to form.

Q.   Correct?

A.   The senior advisor to the secretary is at

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 105

DHS headquarters.  Yes.

Q.   And you understood that Ms. Voorhies was someone that you reported to.

MS. KIES:  Object to --

Q.   Correct?

MS. KIES:  Object to form.

A.   I would not state it that way.

I would state that she was the senior advisor to the secretary, and that I report to the deputy secretary to the secretary's office as a component head as -- starting at December 1st.

In the chief of staff role, I report to the administrator of FEMA.

And so, I didn't report to Ms. Voorhies at the time that you're bringing this up.  I reported to Mr. Richardson, as the senior advisor at FEMA.

Q.   But Ms. Voorhies was -- being in the front office and a senior advisor to the secretary, was above Mr. Richardson in the hierarchy at DHS.  Correct?

MS. KIES:  Object to form.

A.   That is not correctly stated.

Mr. Richardson is a component head at that time, and component heads report to the secretary.

Ms. Voorhies was a senior advisor to the

Page 106

secretary on FEMA issues.

Q.   Mr. Richardson was actually not a component head.  Correct?  He was a SOPDA.

MS. KIES:  Object to form.

A.   Correct.  He was acting as the Senior Official Performing the Duties of the Administrator.

Q.   Appointed by the DHS Secretary.  Correct?

A.   Yes.

Q.   Removable by the DHS Secretary?

A.   Yes.

Q.   And reporting to the DHS Secretary?

A.   Yes.

Q.   And the people in her office?

MS. KIES:  Object to form.

A.   It's my understanding that they're advisors to the secretary.

But as the Senior Official Performing the Duties of the Administrator, you do report to the secretary because you are performing the duties of a component head.

Q.   Did you have an understanding of whether Ms. Voorhies was working in person in Washington, D.C., or remotely?

MS. KIES:  Object to form.

A.   I'm not sure of all her living

Page 107

arrangements.  I did become aware that she had, I believe, an apartment here in Washington, D.C.

Q.   Did you have an understanding that she was from Houston, Texas?

MS. KIES:  Object to form.

A.   Yes.  She told me she was from Houston, Texas.

Q.   And that she did, at times, work remotely on her contract for FEMA?

MS. KIES:  Object to form.

A.   I'm not sure of all her working arrangements, because we could do virtual meetings.

So I'm not necessarily sure of where she was specifically located, because she would, you know, go home or she would be up at DHS headquarters.

Q.   And did you have Zoom meetings with Ms. Voorhies at times?

A.   We would actually have Microsoft Team meetings.

Q.   No offense to Microsoft.  I should have said videoconferencing.

Did you ever see her in person at any FEMA office?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 108

Q.   Did she have a FEMA office?

            MS. KIES:  Object to form.

A.   Yes, she did.

Q.   And Ms. Voorhies was given a FEMA email account.  Correct?

A.   She had a FEMA email account, yes.

Q.   Kara.Voorhies@FEMA.dhs.gov.  Correct?

A.   Yes.

Q.   Are you the person who authorized Ms. Voorhies to have a FEMA email account?

            MS. KIES:  Object to form.

A.   No, I am not.

Q.   Do you know who authorized Ms. Voorhies to have a FEMA.dhs.gov email account?

            MS. KIES:  Object to form.

A.   No, I do not.

Q.   Was that prior to your transferring from CISA to FEMA, that she had that FEMA email account?

            MS. KIES:  Object to form.

A.    I have no knowledge when she got the FEMA email account.

Q.   Do you have any understanding as to the reason that a senior advisor to the DHS Secretary would be given a FEMA employee email address?

            MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 109

A.   I really don't know the basis of why they gave her a FEMA employee email address.

Q.   And you don't know who the "they" is?

A.   I have no idea.

Q.   No idea, or do you suspect it was someone in the DHS front office?

MS. KIES:  Object to form, foundation.

A.   I would -- I don't know the process of how her email address got established, but there is a process for email addresses to be established, both at headquarters as well as component organizations.

For example, I had emails at CISA.  Then I also had an email account at headquarters.  And now I have an email account at FEMA.

Q.   When did you have an email account at DHS headquarters?

A.   When I was in transition.  And they thought -- "they," meaning headquarters and employees, right, the management directorate -- that I was going to be the Under Secretary for Management.

Q.   Did you ever use the headquarters email account for anything related to FEMA?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 110

A.    I would have to go back and look, because I'm not sure about the emails that are associated with the headquarters' accounts.

Q.    FEMA's contractors are not typically given a FEMA.dhs.gov email address.  Correct?

MS. KIES:  Objection; foundation, form.

A.    Contractors, in general, are not given government employees' email addresses.

Q.    You have an extensive background in cybersecurity.  Correct?

MS. KIES:  Object to form.

A.    Yes, I do.

Q.    Did you have any concerns with a government contractor being given a FEMA email address, Ms. Evans?

MS. KIES:  Object to form.

A.    I had concerns as it related to her contractor status.

And so, in the different roles that I had at FEMA, I ensured that the activities that I was involved in, I took proper precautions as it related to DHS policies and contractors.

Q.    Let's break that down.

Can you explain what the concerns were

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 111

that you had with respect to her being a government contractor?

MS. KIES:  Object to form.

A.   Government contractors have specific roles and responsibilities.

And in this case, depending on what role I was in as a -- as it related to the chief of staff, or now as the Senior Official Performing the Duties of the Administrator, I made sure, in particular, that Ms. Voorhies was not involved in any personnel decisions.

Q.   You made sure that Ms. Voorhies was not involved in personnel decisions at FEMA, Ms. Evans?

A.   Yes.

Q.   And what steps did you take to make sure that Ms. Voorhies was not involved in personnel decisions at FEMA?

A.   Meetings that we had specifically that were related to personnel decisions.

I have a weekly meeting with the FEMA Chief Human Capital Officer -- I'm making sure I'm not using acronyms, ma'am -- our legal counsel, the chief counsel, and the Office of Professional Responsibility.

And she did not participate in any of

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 112

those meetings.

Q.   In-person meetings?

A.   Or virtually.  She did not participate in any of those meetings.

Q.   Is that the step you took to ensure that Ms. Voorhies was not involved in personnel decisions?

MS. KIES:  Object to form.

A.   Yes.

Q.   Any other steps?

A.   I also, when I took over as chief of staff -- because part of the discussion that we had was making sure processes were put in place appropriately at FEMA -- that the FEMA leadership signed off on the documents before they went up to headquarters.

And then anything that headquarters, and in this case, DHS headquarters -- if she was on any signing sheet, she signed after FEMA employees.

Q.   Previous to that time, was Ms. Voorhies signing off before FEMA leadership on anything at FEMA?

MS. KIES:  Objection; foundation, form.

A.   I am not aware of the -- that process or

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 113

the clearance process.  I can attest to the processes that I put in place.

Q.   But there was a reason that you felt it necessary to make sure that Ms. Voorhies was signing off after FEMA leadership.  Correct?

MS. KIES:  Object to form.

A.   Yes.

Q.   And that's because you were concerned that previously she was making decisions before FEMA leadership?

MS. KIES:  Objection; foundation, form.

A.   I don't know what decisions that she was making directly, but I wanted to make sure that, when I took over as chief of staff for Mr. Richardson and when I took over as the Senior Official Performing the Duties, that there was a clear delineation between DHS headquarters and FEMA.

Q.   You are aware that Ms. Voorhies was making decisions with respect to FEMA contracts prior to your taking over as chief of staff.  Correct?

MS. KIES:  Objection; foundation, form.

A.   I'm aware that Ms. Voorhies was involved in reviewing contracts as a senior advisor to the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 114

secretary.

Q.   Did Ms. Voorhies have a security clearance?

MS. KIES:  Objection; foundation.

A.   Ms. Voorhies did get a security clearance late in her tenure.

Q.   When was that?

A.   I do not have the exact date of when she obtained her security clearance.

Q.   In 2026?

A.   I believe that that's the case, that it was 2026.  It's -- it is recently.  It was recently.

Q.   Was the contract that Ms. Voorhies had with DHS or with FEMA?

MS. KIES:  Objection; foundation.

A.   The contract was with DHS headquarters.

Q.   So you are aware that it was not a contract with FEMA.  Correct?

A.   I am aware that FEMA did not have a contract for Ms. Voorhies's services.

Q.   And do you know whether the DHS contract with -- was with Ms. Voorhies or a company she was affiliated with?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 115

MS. KIES:  Object to form.

A.   I do not know the details of her headquarters contract.

Q.   Do you know how much she was paid for her work?

MS. KIES:  Object to form.

A.   I do not know her compensation on that contract.

Q.   Did you ever talk to her about it?

A.   I did not discuss with her her compensation.

Q.   Did you discuss with her what services the contract was for?

MS. KIES:  Object to form.

A.   I did not discuss the terms and conditions of her contract.  She was the senior advisor to the secretary.

Q.   But she played a specific role with respect to FEMA.  You've said that already.  Right?

MS. KIES:  Object to form.

A.   She played -- the role that she did was she was the senior advisor to the secretary for FEMA issues.

Q.   And what was your understanding of Ms. Voorhies' qualifications providing any advice to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 116

the Secretary of Homeland Security on FEMA?

MS. KIES:  Object to form.

A.    Could you restate that?

Q.    Sure.

What was your understanding of Ms. Voorhies' qualifications for being the senior advisor to the "Department of Homeland" Secretary for FEMA?

A.    Ms. Voorhies expressed to me that she was a CFO for a global company.

Q.    Did Ms. Voorhies, to your understanding, have any background in disaster relief?

MS. KIES:  Object to form.

A.    To my understanding, what Ms. Voorhies said to me was that she was the CFO for a global company and that she led large, transformational projects.

Q.    So that's a no, that you don't have an understanding that she had any background in disaster relief.  Correct?

MS. KIES:  Object to form.

A.    We never discussed her background as it relates to disaster relief.

Q.    So you do not have an understanding that she had any background in disaster relief.  Right?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 117

MS. KIES:  Object to form.

A.   I do not have an understanding if her background includes disaster relief.

Q.   Or emergency management.  Correct?

MS. KIES:  Object to form.

A.   I do not have any understanding of her background, including emergency management.

Q.   And you said "transformational projects"?

A.   Yes.  That's what she said.

Q.   Okay.  And that -- by that, you understood her to mean downsizing of companies?

MS. KIES:  Objection; foundation.

A.   I do not understand that.

The context of which we were talking about that is the financial management modernization system that's happening at FEMA.

Q.   And was Ms. Voorhies involved in the financial management modernization system that's happening at FEMA?

MS. KIES:  Objection; foundation.

A.   I am not -- I do not know the extent that she went into understanding the financial management modernization.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 118

That project come -- came up and comes up through the contract review, which we've already discussed that she did review contracts.

Q.   Let's start with the time period where you were the chief of staff, September through -- sorry. I'm going to correct my questions.

Because I understand you are still the chief of staff, but where you were playing the role only of chief of staff; how about that?

From September through the beginning of December 2025, what work was Kara Voorhies performing with respect to FEMA?

MS. KIES:  Object to form.

A.   So that time period was actually the end of September.  Okay?  So I would actually say it's like October, in the time period of October.

It's my understanding, and based on as the chief of staff, that she was working directly with the Office of Response and Recovery as it related to -- and I'm trying not to use acronyms -- as it's related to like individual assistance, disaster declarations, as it relates to the reimbursements that would go out to states after presidential declarations have been made; that she was involved in a lot of that analysis.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 119

Q.   And you're familiar with DHS Secretary Noem's policy of requiring S1 approval for any amounts spent over $100,000?

MS. KIES:  Object to form.

A.   Yes, I am.

Q.   And Kara Voorhies was involved in implementing that policy.  Is that correct?

MS. KIES:  Object to form.

A.   Yes.

Q.   Okay.  You traveled with Ms. Voorhies to Alaska in October 2025.  Correct?

A.   Yes.

Q.   To tour the impacts of Typhoon Halong.  Is that correct?

A.   It was the typhoons in Alaska.

I will not venture how to say all the cities that we went to, I guess.

Q.   Okay.  But there was a big typhoon in Alaska, and you and Ms. Voorhies were sent as representatives of the Department of Homeland Security on this trip.  Right?

MS. KIES:  Object to form.

A.   Yes.  We were sent to go with Senator Sullivan.

Q.   So Alaska Senator Sullivan.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 120

MS. LEONARD:  I'm going to mark as the next, which I believe is 7, the press release from Senator Sullivan regarding that trip.

(Whereupon, Plaintiffs Exhibit 7 was marked for identification.)

Q.   You've been handed what's been marked as Exhibit 7.  It is, I will represent to you, a press release from Alaska Senator Sullivan.

And in the first paragraph here, you see your name and Ms. Voorhies' name?

A.   Yes.

Q.   Okay.  So it's accurate that you and Ms. Voorhies were -- attended this trip to Alaska?

A.   Yes.

Q.   And do you see that Mr. Sullivan -- I'm sorry -- Senator Sullivan refers to a group of senior federal officials?

Do you see that?

A.   Yes.

Q.   Was Ms. Voorhies a senior federal official?

MS. KIES:  Object to form.

A.   She, at this time, was the senior advisor to the Secretary of Homeland Security, as it states.

Page 121

So that's why it says senior officials.

Q.   How does a government contractor end up coming along on a trip to Alaska for senior federal officials, touring a disaster zone, Ms. Evans?

MS. KIES:  Object to form, foundation.

A.   I am not aware of the decisions that were made as to the attendance.  I know I was asked to attend.

Q.   And do you have an understanding that someone else asked Ms. Voorhies to attend as well?

MS. KIES:  Object to form.

A.   Yes, that's my understanding.

Q.   And what's your understanding of who asked Ms. Voorhies to attend?

MS. KIES:  Object to form.

A.   For the genesis of this trip, Mr. Lewandowski asked me to get this trip ready for us to go to FEMA -- to go to Alaska to support Senator Sullivan.

Q.   And you were aware, at the time, that he was also asking Ms. Voorhies to do that?

MS. KIES:  Object to form.

A.   I know that -- yes, that she was part of the team to go to Alaska.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 122

Q.   Okay.  I've got some photos that are from the link on this press release --

A.   Okay.

Q.   -- from Senator Sullivan.  We printed them in color.

MS. LEONARD:  Let's mark the three together as Exhibit 7.

MS. KIES:  8.

MS. LEONARD:  Sorry.  8.  Thank you.  That won't be the first time.

(Whereupon, Plaintiffs Exhibit 8 was marked for identification.)

MS. LEONARD:  And we're compiling them together, so we'll hand them to you.

Did you have one set?  Sorry.  I should have done that before.

Okay.  Counsel, here they are.

(Witness reading.)

BY MS. LEONARD:

Q.   Okay.  Have you looked at the photos?

A.   Yes, ma'am.

Q.   Are you depicted in these photos?

A.   Yes, I am.

Q.   Is Ms. Voorhies in these photos?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 123

A.   Yes, she is.

Q.   Which photo shows Ms. Voorhies?

A.   How do you want me to reference these?

Q.   Well, let's -- I think there are different times at the bottom of each page.

A.   Okay.

Q.   It's okay.  We can do it this way.

So there's a 604, a 602, and a 603.

A.   Okay.  So I have 602.  I do not see her in this photo.

In the photo of 603, I do see her in this photo.

And in the one that's 604, she is also in that photo.

Q.   Okay.  Let's -- 604 is a little closer in.

You're depicted -- you're in the center of that photo, 604.  Right?

A.   I'm in the photo.  I don't know that I'm in the center.

But I'm in the photo, yes, ma'am.

Q.   Okay.  And where is Ms. Voorhies?

A.   She is -- if you're looking at it this way from me, she is to the right of me in the photo.  So it would be -- yeah.

Q.   She's seated to the left of you at the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 124

table?

A.   Yes.

Q.   And is she wearing a FEMA Office of the Administrator fleece?

MS. KIES:  Object to form.

Q.   Can you tell?

A.   Yes, I believe that is the case.

Q.   Did you give that to her?

A.   No, I did not.

Q.   How did you get to Alaska?

A.   We flew on a government plane.

Q.   So you didn't fly commercial?

A.   No, we did not.

Q.   And did Ms. Voorhies fly with you?

A.   Yes, she did.

Q.   It took awhile, didn't it?

MS. KIES:  Object to form.

A.   It's a long flight to Alaska.

Q.   And did you talk to Ms. Voorhies along the way?

A.   Actually, I did not.

Q.   You weren't seated near her?

A.   No, I did not.  I sat with Mr. Ueland and talked with Mr. Ueland on the flight.

Q.   And what about during the trip; did you

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 125

have any conversations with Ms. Voorhies during this trip?

A.   Yes, I did.

Q.   And how many days were you there for?

A.   I'd have to -- I think it was less than 48 hours that we were up there.

Q.   Did you have any conversations during this trip about Ms. Voorhies' background before coming to do work at FEMA?

MS. KIES:  Object to form.

A.   I do not recall us having that kind of conversation.

Q.   And did you have any conversations during this trip about her relationship with Mr. Lewandowski?

MS. KIES:  Object to form.

A.   I did not have conversations with her about her relationships with Mr. Lewandowski.

Q.   Did you know how Ms. Voorhies knew -- did she ever -- strike that.

Did Ms. Voorhies ever say anything to you about how she knew Mr. Lewandowski before coming to work at DHS?

MS. KIES:  Object to form.

A.   No, she did not.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 126

Q.   Did you ever ask?

A.   No, I did not.

Q.   Did you ever hear anything about that from anyone else?

MS. KIES:  Object to form.

A.   I don't recall having discussions about her relationship with Mr. Lewandowski with anyone else.

Q.   But you knew that they knew each other before she came to DHS?

MS. KIES:  Object to form.

A.   Yes.

Q.   And -- but that's all you knew?

MS. KIES:  Object to form.

A.   Yes.  That's all I recall, yes.

Q.   Did you know that they had business relationships before her coming to DHS?

MS. KIES:  Object to form.

A.   I did not know that.

Q.   After you became the SOPDA, did Ms. Voorhies continue to perform the same type of work related to FEMA that you've previously described?

MS. KIES:  Object to form.

A.   Yeah.  I would say yes.  And she also did

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 127

other types of assignments.

Q.   What other types of assignments, beyond what you've already described?

MS. KIES:  Object to form, foundation.

A.   She was also working with DHS headquarters, and working directly with the Office of Management and Budget.

Q.   With respect to FEMA staffing?

MS. KIES:  Object to form.

A.   Not that I'm aware of.

Q.   You did not involve Ms. Voorhies in conversations about FEMA staffing, Ms. Evans?

MS. KIES:  Object to form.

A.   It depends on what you mean about the FEMA staffing and involving her in conversations.

There are discussions that I had with DHS headquarters after I took over as chief of staff about looking at FEMA resources again and what would be the result of any types of recommendations that would come from the FEMA Review Council.

So there were discussions, but -- but they were general and deliberative in nature.

Q.   And government contractor Kara Voorhies was involved in those conversations?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 128

A.    Not all of them, no.

Q.    But some of them?

A.    She would participate in meetings at DHS headquarters on FEMA issues.  And if some of the discussion would go that way, then she was there.  Yes.

Q.    And you copied her on emails about FEMA staffing, did you not, Ms. Evans?

MS. KIES:  Object to form, foundation?

A.    I CC'd her on FEMA issues, yes.

Q.    On all FEMA issues?

MS. KIES:  Object to form.

A.    It was a practice for me, for headquarters, DHS headquarters, that I would include her, as the senior advisor to the secretary.

Q.    You were directed to do that by someone at DHS headquarters?

MS. KIES:  Object to form.

A.    I was not directed.  I did it as a practice because she was a senior advisor.

And I did it so that a senior advisor would be aware of FEMA issues, so that if the secretary asked her questions, she would have answers.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 129

Q.   And you were not privy to all of the communications that Ms. Voorhies had with either Secretary Noem or Chief Advisor Lewandowski about FEMA.  Correct?

MS. KIES:  Object to form.

A.   Yes, that's correct.

Q.   But you did understand that she was talking to Secretary Noem and Corey Lewandowski about FEMA?

MS. KIES:  Object to form, foundation.

A.   Her job is the senior advisor to the secretary for FEMA issues.  So she would talk to the secretary and Mr. Lewandowski about FEMA issues.

Q.   Including things that you were copying her on.  Correct?

A.   I --

MS. KIES:  Object to form.

A.   I am not privy to those discussions, so I would not know the details of the discussions that she had with them.

Q.   But you did personally communicate with Ms. Voorhies regarding FEMA personnel matters, didn't you, Ms. Evans?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 130

A.   I would give her high-level information and direction that I was going with the analysis of the workforce.

Q.   Only high-level information, Ms. Evans? Are you sure?

MS. KIES:  Object to form.

A.   As you can see by the email, she was CC'd on a lot of the emails as it relates to clarification of the processes that we were putting in place as it related to personnel decisions.

Q.   You also talked to her about personnel matters at FEMA.  Correct?

MS. KIES:  Object to form.

A.   I would talk to her about a whole host of issues at FEMA.

Q.   And you talked to her on the phone?

A.   We would talk on the phone, yes.

Q.   You communicated with Ms. Voorhies regarding FEMA's authority to extend CORE appointments, for example?

MS. KIES:  Object to form.

A.   Yes, I would.

Q.   And you communicated with Ms. Voorhies about the non-renewals of COREs by NTE date. Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 131

MS. KIES:  Object to form.

A.   Yes, I did.

Q.   And you communicated with Ms. Voorhies about the approvals for 90-day renewals for some CORE appointments.  Correct?

MS. KIES:  Object to form.

A.   I communicated, not just with her, but also with DCOS Guy, because he was in charge of my portfolio.

So I specifically told them the decisions that I was making as it related to the delegated authority that FEMA did have, which expired on December 31st.

And then also communicated with DCOS Guy about the processes that I was putting in place for CORE renewals and then CORE nonrenewals.

Q.   We'll get to DCOS Guy, but I'm focused on Ms. Voorhies for right now.

Who gave Ms. Voorhies the authority to be involved in FEMA personnel and policy matters?

MS. KIES:  Object to form, foundation.

A.   I am unaware who gave her the authorities.

Q.   You didn't ask?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 132

A.   I talked specifically with Joe Guy, as my chief of staff -- my deputy chief of staff for my portfolio.

Q.   But you understood that Secretary Noem and Corey Lewandowski wanted you to communicate with Ms. Voorhies about these matters.  Correct?

MS. KIES:  Object to form, foundation.

A.   I understand that she was to be informed about the issues there and then decisions that I was making in the role from December 1st as the Senior Official Performing the Duties of the Administrator.

Q.   Who told you that?

MS. KIES:  Object to form.

A.   I'm sorry.  Who told me what?

Q.   What you just said, that you understood that she was to be informed.

Who in the front office of DHS told you that Ms. Voorhies was to be informed on these matters?

MS. KIES:  Object to form.

A.   Mr. Guy.

Q.   When was that?

A.   I don't have a specific date.

Q.   Was it before you became the SOPDA or

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 133

after?

A.    I would -- I really don't recall a specific conversation that said this.

She was involved -- I had weekly meetings -- when I took over the chief of staff position at FEMA, I had weekly meetings with DCOS Guy.

Q.    And did Ms. Voorhies participate in those meetings?

A.    Yes, she did.

Q.    Did Ms. Voorhies have the authority to see FEMA personnel documents, Ms. Evans?

MS. KIES:   Object to form, legal conclusion.

A.    I am unaware if she had the authority to see personnel documents.

Q.    You did not give her that authority. Correct?

MS. KIES:   Object to form.

A.    I did not give her authority to see personnel documents at FEMA.

Q.    And did Ms. Voorhies have the authority to make decisions regarding FEMA personnel matters, Ms. Evans?

MS. KIES:   Object to form, legal

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 134

conclusion.

A.    I did not give her authority in my role as the Senior Official Performing the Duties of the Administrator.

Q.    Did Ms. Voorhies have authority to make decisions regarding FEMA personnel matters, to your knowledge?

MS. KIES:  Object to form, legal conclusion.

A.    It is my understanding she did not.

Q.    But she was involved, wasn't she?

MS. KIES:  Object to form, asked and answered.

A.    She would be informed through these various meetings.

Q.    And email communications as well.  Right?

A.    Yes.

Q.    You did not personally make the decision to permit a government contractor with no experience in disaster relief or manage -- emergency management to perform work at FEMA.  Correct?

MS. KIES:  Objection; legal conclusion, facts not in evidence.

You can answer.

A.    I was not involved in that decision.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 135

MS. KIES:  We've been going for about an hour.  Maybe another five or 10-minute break?  Or what do you -- do you want to take lunch?  What do you think?

MS. LEONARD:  What time is it now?  We're not going to take lunch this early, but I am happy to take a short break right now.  That's fine.

MS. KIES:  Okay.

MS. LEONARD:  Why don't we take another 10-minute break.  And then maybe we'll aim for lunch after the next session, if that's all right.

VIDEOGRAPHER:  Off the record at 11:24.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 11:41.

BY MS. LEONARD:

Q.  Ms. Evans, going back to the trip to Alaska in October of 2025, did you or Ms. Voorhies, to your knowledge, have any communications with either former Secretary Noem or Corey Lewandowski during that trip?

A.  I can only speak about my communications,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 136

and I did not, as I recall, have specific communications with Mr. Lewandowski or the secretary during the trip.

Q.   And when you say "specific communications," what do you mean?

A.   I would say like a telephone call or any types of email, but primarily would be like a telephone call or anything.  I didn't -- I did not have discussions with them.

Q.   You're not aware of whether there were communications on which you and Ms. Noem or Mr. Lewandowski were all copied during that time?

A.   I do not recall, on that trip, of us having communications where we were all to -- all on, like -- yeah.  No, I don't recall that.

Q.   Did Ms. Voorhies ever communicate to you decisions related to FEMA that had been made by Secretary Noem or Corey Lewandowski?

MS. KIES:  Object to form.

A.   She would convey, to me and other FEMA leadership, decisions that were made by the secretary or she would represent them as decisions made by the secretary.

Q.   And let's start with the period during which you were chief of staff only.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 137

What decisions related to FEMA did Ms. Voorhies -- Voorhies convey to you that had been made by the secretary?

MS. KIES:  Object to form.

A.    It would depend on the circumstance, but the majority of those decisions would be related to contracts that were going up or disaster declarations that would go through the process.

And it went through a pre-established email process.

Q.    For the disaster declarations?

A.    Yes, ma'am.

Q.    Okay.  But those are decisions from the secretary that Ms. Voorhies informed you, as the FEMA leadership, of?

A.    Well --

MS. KIES:  Object to form.

WITNESS:  I apologize.

A.    She would make recommendations and then -- through different clearance processes, and then we would get decisions back.

For example, on the disaster declarations, there was a process that FEMA sent through on emails, which then would go through the clearance process.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 138

And it's the process that we discussed earlier with the ExecSec, and it would go into the ExecSec process and it would get a STORM number.

And then from there, the secretary would sign those, and they would proceed over to the White House.

Q.    After you became the SOPDA, did Ms. Voorhies ever convey decisions that had been made by secretary Noem or Corey Lewandowski regarding FEMA?

MS. KIES:  Object to form.

A.    It depends on the topic area of what you're talking about.

But there were decisions that would come down from DHS headquarters as it relates to, for example, the reimbursements that would go out as it related to disasters.

Q.    And the $100,000 policy?

MS. KIES:  Object to form.

A.    Those would go up through the process that we have described earlier, where it would then go -- there's a clearance form within FEMA.

And then I would sign it.  Then she would sign it.  There's a STORM number, the system that we talked about for ExecSec to manage documents between

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 139

the components and headquarters.  And it had a number on it.

It would go up to DHS headquarters.  It would go through a review process up there.  And then we would get a signed document back that said that the secretary has approved it.

Q.   So there was this established system through the ExecSec for routing decision-making documents that included the contracting and disaster declarations that you've described.  Is that right?

MS. KIES:  Object to form.

A.   Yes, ma'am.

Q.   And that system was also used for decisions related to FEMA staffing?

MS. KIES:  Object to form.

A.   It would depend on the assignment that was given to FEMA, as well as other components.

And as we have discussed earlier, there were executive orders and there were other assignments that would come from the Office of Management and Budget and the Office of Personnel Management.

We would be tasked through the DHS ExecSec process, and then we would send information up there, because that's how they tracked component

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 140

submissions.

And it would go through that process and then go to headquarters.

Q.    And Ms. Voorhies was also involved in the staffing-related decisions that were being sent to the DHS front office.  Right?

MS. KIES:  Object to form.

A.    Ms. Voorhies, depending on -- since you're only talking about from when I was the chief of staff time period.

So that's the period that we're talking about, from chief of staff to then taking over as the "Senior Official Performing the Duties of."

Those decisions, or those recommendations, that would go up for hiring did not go through the executive staff secretary process, because there was a different process -- it's my understanding there was a different process that was established by the department's chief human capital officer and how they worked with the component chief human capital officers.

Q.    So I was actually asking about after you became SOPDA.  And let me just ask a different question.

After you became SOPDA, did Ms. Voorhies

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 141

ever convey to you any decisions that had been made by the secretary with respect to FEMA staffing?

MS. KIES:  Object to form.

A.    No, she did not.

Q.    Did Ms. Voorhies have a telephone?

MS. KIES:  Object to form.

A.    Yes.

Q.    Did she have a Department of Homeland Security issued telephone?

MS. KIES:  Object to form, foundation.

A.    I do not know if she had a Department of Homeland Security telephone.

Q.    Did she have a FEMA business telephone?

MS. KIES:  Object to form.

A.    I do not know if she had a FEMA business telephone.

Q.    Did she have a personal telephone?

MS. KIES:  Object to form.

A.    Yes.

Q.    Did you communicate with Ms. Voorhies on her personal telephone?

MS. KIES:  Object to form.

A.    Yes, I did.

Q.    And did you have her personal telephone

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 142

number saved in your phone?

MS. KIES:  Object to form.

A.   Yes, I did.

Q.   And was that saved in your personal phone or your business phone?

A.   It was saved in both phones.

Q.   And do you have your personal telephone here with you today?

MS. KIES:  Object to form.

A.   Yes.

Q.   Can you please get your phone and tell me what Kara Voorhies' personal telephone number is?

A.   Am I allowed to do that?

Q.   Yes.

A.   I have to leave the room.

Q.   Okay.  We can --

A.   I guess.  I don't know.

Q.   We can take --

A.   I don't know who has my phone.  I gave -- I gave my phone --

MS. KIES:  Let's go off the record.  I'm not sure if we're able to do that, but let's go off the record.

MS. LEONARD:  Okay.

WITNESS:  Can we go off the

Page 143

record?  Because I don't have my phone.

MS. LEONARD:  I needed -- okay.
That's a fine answer.

Let's go off the record.

VIDEOGRAPHER:  Off the record at
11:49.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at
12:01.

BY MS. LEONARD:

Q.  Ms. Evans, before we took the break, I asked you if you could tell me, from your personal phone, Ms. Voorhies' personal phone number.

Can you do that, please?

MS. KIES:  So -- and I can also provide this to you now on the record.

And I would actually like to make this an exhibit, please.

MS. LEONARD:  I'm sorry.  Is this an objection to the question --

MS. KIES:  This is --

MS. LEONARD:  -- that I just asked?

MS. KIES:  I'm providing you the evidence that you're asking for.  And it

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 144

is -- it isn't -- it is, in a sense, an objection as well.  So I'm happy to explain why I am providing this, if you'd like me to.

MS. LEONARD:  Do you have an objection to the question that I just asked?

MS. KIES:  Yes.  So my objection -- our objection to the question asked is that, obviously, the witness is here in her official capacity, not in her personal capacity.  We do not have possession, custody, and control of the witness's personal phone.

And that is our objection to the question, notwithstanding, as I was referring to, we do have the telephone number that your question asked for.  I wanted to provide it to you on the record.

And I also wanted to make it very clear that this portion of the deposition, for the court reporter and videographer, should be sealed, because we do not know whether this telephone number is personal or governmental.  And

Page 145

regardless, it is, of course, PII.

MS. LEONARD:  So no speaking objections, first of all.  You can make your objections for the record.

And the questions are for the witness, not for counsel.  And the witness will be giving the testimony.

So we'll proceed with the deposition.

She is also here with her personal lawyer.  So I understand you are making an objection about the information that is on her personal phone, but her personal lawyer is here as well.

And do you have an objection to the question?

MR. GREAVES:  I join in the objection that she is here in her professional capacity, not in her personal capacity.

So you can continue with your question, but the objection stands.

BY MS. LEONARD:

Q.  Okay.  So do you have an answer to my question, Ms. Evans?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 146

A.    Yes.

Q.    And is that your phone that is sitting next to your -- to counsel?

A.    No, it is not.

Q.    Okay.  And when we broke, did you go into the other room to look at your phone?

A.    Yes, I did.

Q.    Okay.  And did you retrieve the phone number for Ms. Voorhies that you have on that phone?

A.    Yes, I did.

Q.    And did you write that phone number down on the piece of paper in front of you?

A.    Yes, I did.

Q.    Okay.  Counsel didn't write that down?

A.    No, they did not.

Q.    Okay.  Can you tell us, on the record, what that phone number is for Ms. Voorhies' personal phone that you use to communicate with Ms. Voorhies about FEMA business.

MS. KIES:  Object to form, foundation.

A.    The telephone number that I have to use to communicate with Ms. Voorhies was ███████████.

Q.    And I believe you testified previously that you used your personal phone to communicate

Page 147

with Ms. Voorhies on that telephone number. Correct?

MS. KIES:  Object to form.

A.   We would talk on this -- on that -- on my personal telephone, on this number.

Q.   Did you ever text her at that number from that -- from your personal phone?

MS. KIES:  Object to form.

A.   Yes.  There were text messages.

Q.   Did you ever communicate, using your personal phone, with anyone else in the DHS Office of the secretary?

MS. KIES:  Object to form.

A.   Yes.

Q.   Did you have the phone numbers saved on your personal phone for others in the DHS Office of the Secretary?

MS. KIES:  Object to form.

A.   I don't know all the numbers that I have saved.

Q.   Because you didn't bring the phone back in the room.  You went to the break room and looked at the phone to get this one phone number and brought it back.  Is that right?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 148

A.   I don't recall all the numbers that I save on my personal cell phone.

But I did look at my personal cell phone, as you requested, to get this telephone number.

Q.   But you also, I believe, just testified that you used that personal cell phone to communicate with others in the DHS Office of the Secretary.  Is that correct?

MS. KIES:  Object to form.

A.   Periodically, yes, ma'am.

Q.   Did you have DHS Secretary Noem's phone number saved in your personal cell phone?

A.   No, I do not.

Q.   Did you have Corey Lewandowski's phone number saved in your personal cell phone?

A.   I have a phone number that he would use to contact me periodically, yes.

Q.   And do you know whether that was his personal or business phone?

A.   I do not.

Q.   Okay.

MS. LEONARD:  We're going to ask for that phone number as well.  You can take a break.  We're going to continue with the conversation.  But we'll store up

Page 149

the number of phone numbers.

MR. GREAVES:  And I'm just going to lodge an objection that she's here in her professional capacity, official capacity, not in her personal capacity.

There's a process for, you know, subpoenaing records from her personal devices.  If you want to go through that process, we're happy to do that.  But we're not here to root around on her personal phone.

Q.  Did you have any personal relationship with Mr. Lewandowski outside of the work that you were doing at the Department of Homeland Security?

A.  No, I --

MS. KIES:  Object to form.

A.  -- do not.

Q.  Do you have the Signal app stored on any of your phones?

A.  Yes, I do.

Q.  Which phones do you have the Signal app on?

A.  I have the Signal app on my personal cell phone.

Q.  And did you use Signal to communicate with

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 150

Ms. Voorhies about FEMA?

MS. KIES:  Object to form.

A.  Periodically, yes.

Q.  Did you use the Signal app to communicate with Mr. Lewandowski about FEMA?

MS. KIES:  Object to form.

A.  Periodically.

Q.  Did you use the Signal app to communicate with former Secretary Noem about FEMA?

MS. KIES:  Object to form.

A.  Periodically.

Q.  Who else did you use the Signal app to communicate with about FEMA?

MS. KIES:  Object to form.

A.  So there were headquarters -- DHS headquarters employees that were working with FEMA during the storm, the ice storm that happened in January.

Q.  I believe it was Winter Storm Fern.  Is that the right name?

A.  Yes, ma'am.  That's what -- it's not -- that is not the official name, but that's what people called it.  Winter storms don't get an official name.

Q.  Other than with respect to the winter

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 151

storm in January of 2026, were you using the Signal app to communicate with anyone at DHS headquarters, other than Ms. Voorhies, Mr. Lewandowski, or Ms. Noem, at any time?

MS. KIES:  Object to form.

A.   I would use it with the DHS ExecSec.

Q.   Anyone else?

A.   And I would also use it periodically with DCOS Guy.

Q.   "DCOS" stands for "Deputy Chief of Staff"?

A.   Yes, ma'am.

Q.   Okay.

MS. LEONARD:  So for the court reporter, DCOS, all caps.

Q.   Guy, Jos- -- Joseph?

A.   Yes.  Joseph Guy, G-u-y.

Q.   And do you have his phone number saved on your phone?

MS. KIES:  Object to form.

A.   I believe so, yes.

Q.   In addition to having his contact information saved through the Signal app?

MS. KIES:  Object to form.

A.   The -- it's -- so the way it works is -- yeah, like the contact information is that way.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 152

And so -- yeah, he's on the Signal app, but he would also call me, because we worked together during transition.

So I know Mr. Guy from my time with the America First Policy Institute. So that's why it's saved.

Q. And when was your time with the America First Policy Institute?

A. I was a volunteer. So I don't have the exact dates associated with it, but I worked on transition documents for the America First Policy Institute.

Q. Transition documents related to the second Trump term?

MS. KIES: Object to form.

A. Yes.

Q. Were you involved in a Signal group that includes political appointees at DHS and FEMA?

MS. KIES: Object to form.

A. Can -- I -- I'm not sure exactly what you're asking about when you say "political appointees" in FEMA.

Q. Tell me all of the group chats that you were involved with on your Signal app that involved FEMA business, please.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 153

MS. KIES:  Object to form.

A.    There was one, as we previously mentioned, specifically for the winter storm.

There is one specifically for communications, to be able to respond to communications.

And then there's one for the ExecSec to make sure that we had the STORM numbers so that we could move disaster decs through.

Q.    And there was a Signal group chat that you were involved with that involved DHS Secretary Noem, Corey Lewandowski, Kara Voorhies, and yourself, and others.  Correct?

MS. KIES:  Object to form.

A.    That was related to the winter storm.

Q.    And it's your testimony that that group chat existed only for the winter storm?

MS. KIES:  Object to form.

A.    That is my understanding and my participation, that it was related to the winter storm.

Q.    You did not have a Signal group chat with Secretary Noem, Corey Lewandowski, Kara Voorhies prior to the winter storm in 2026?

A.    I did --

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 154

MS. KIES:  Object to form.

A.    -- not.

Q.    Did you have any Signal communications with Corey Lewandowski prior to the winter storm 2026?

MS. KIES:  Object to form.

A.    Not that I recall, no.  I did not.

Q.    What about Secretary Noem, prior to the winter storm 2026?

MS. KIES:  Object to form.

A.    I did not.

Q.    What about Kara Voorhies, prior to the winter storm 2026?

MS. KIES:  Object to form.

A.    I did have some Signal chats with her prior to the storm.

Q.    And were those Signal chats with Kara Voorhies that you had prior to the winter storm with others on a group, or individually, or both?

A.    It would be both.

Q.    So you had individual communications with Kara Voorhies about FEMA on Signal in 2025?

MS. KIES:  Object to form.

A.    Yes, but it depends on what you mean about FEMA.  Like, in -- if it's specific, probably not.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 155

These are Signal chats.  They were just like general chats, like not "specific, specific."

That's why I'm saying, depends on what you mean by the question.

Q.  You were discussing FEMA business.  Correct?

MS. KIES:  Object to form.

A.  Not necessarily on all the chats.  No, ma'am.

Q.  But on some of them.  Correct?

A.  Yes, ma'am.

Q.  Okay.  Are you familiar with the obligations of government employees to retain records under the Federal Records Act?

A.  Yes, I am.

MS. KIES:  Objection; calls for a legal conclusion.

Just give me one second to answer -- object, please.

WITNESS:  Go ahead.  I'm sorry.

MS. KIES:  No -- no problem.  You could --

MS. LEONARD:  Question was:  Was she familiar?

A.  Yes, I am.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 156

Q.   And did you always print out and save the content of the Signal chats that you've just described regarding FEMA?

MS. KIES:  Object to form.

A.   I took pictures, because that was also the guidance underneath that.

I took pictures of what I determined were appropriate records.  And I sent those pictures into my email account so that they would be saved as part of DHS records.

Q.   Are you certain that you screenshot -- you took a screenshot of every communication you had with Kara Voorhies regarding FEMA on your Signal chat?

MS. KIES:  Object to form.

A.   As I stated, I looked at those because I am familiar, and I made a determination of what were appropriate records.

I took the pictures, and I sent the records in so that they would be captured as records.

Q.   Who did you send them to?

A.   I sent them to my email account, because my email account is automatically backed up and, therefore, is part of the DHS records.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 157

Q.   You did not forward them from your email account to anyone else, these screenshots?

A.   No, I did not.

Q.   Was there any other method that you used to preserve the content of any of the Signal chats you've talked about today?

A.   No.  I followed the guidance that was given out to us.

And I took the pictures, and then I sent them in so that they would be captured as records.

Q.   Were you instructed by someone to use Signal on your personal phone for communications regarding FEMA?

MS. KIES:  Object to form.

A.   I don't recall being instructed to use my personal phone and Signal chat.

Q.   Are you aware of whether others in your Signal chat group were instructed to use their personal phones?

MS. KIES:  Object to form.

A.   I am unaware of any guidance that people were given as it relates to their personal phone use.

Q.   The messages that were sent on the Signal application were set to disappear.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 158

MS. KIES:  Object to form.

A.   I am not sure of all the different disappearing messages, as those can be sent -- that feature can be determined by the users.

Q.   Was the Signal group chat that you participated in involving Secretary Noem, Corey Lewandowski, and at least Kara Voorhies -- were any of the messages set to disappear in that group chat?

MS. KIES:  Object to form, foundation.

A.   I am unsure of that question, the answer to that question.

Q.   If we were to look at your personal phone here today and the Signal application, do you believe that it would contain a record of the group chat?

MS. KIES:  Object to form, foundation.

MR. GREAVES:  I'm just going to object to her being here in her official, not in her personal capacity.

Q.   You can answer the question.

A.   I'm unsure.

Q.   And why are you unsure?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 159

A.   Because I am not sure of the settings for the disappearing messages.

Q.   Have you ever noticed any of the messages disappearing when you look at it?

MS. KIES:  Object to form.

A.   Are you asking me about disappearing messages when I look at Signal chat?  Can you clarify --

Q.   Yes.

A.   -- that?

Q.   Yes.

A.   Okay.  That's how it -- people set it up.

So I am -- I am aware, because I don't use Signal just for work.

And so, there are disappearing messages.

Q.   Did you set up the communications with -- directly with Kara Voorhies to disappear?

MS. KIES:  Object to form.

A.   I don't recall.

MS. LEONARD:  Okay.  Why don't we take a five-minute break?  And then we'll come right back onto the record.

VIDEOGRAPHER:  Off the record at 12:18.

(Whereupon, a recess was taken.)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 160

VIDEOGRAPHER:  On the record at 12:35.

BY MS. LEONARD:

Q.    Ms. Evans, you previously testified that you had Mr. Lewandowski's phone number in your personal phone.

Can you provide that phone number to us, please.

A.    Yes.  Do you want me to read the number?

Q.    Sure.

And you have, in front of you, a piece of paper on which some phone numbers are written.

Is this information that you retrieved from your personal cell phone?

A.    Yes, ma'am.

Q.    And can you read the phone number for Mr. Lewandowski that you have written there?

A.    ██████████.

Q.    And is that the only phone number that you had for Mr. Lewandowski in your phone?

A.    Yes, ma'am.

Q.    And you previously testified you had a number for DCOS Joseph Guy in your phone.

Do you have his phone number there with you as well?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 161

A.    Yes, I do.

Q.    Can you read it, please.

A.    It is ███████████.

Q.    And are you aware of whether either of those phone numbers is a personal phone?

A.    I'm only aware of Mr. Guy's because we had a preexisting relationship through our work at the America First Policy Institute.

Q.    And you believe that is his personal phone number?

A.    I believe that is his personal cell phone number.

Q.    Because that's the phone number you used to communicate with him prior to his coming to the Department of Homeland Security?

A.    That's the phone number that I used to communicate with him prior to both of us being at DHS, yes.

Q.    And apologies if I just asked this.

Is that the only phone number for DCOS Guy that you have saved in your personal phone?

A.    Yes, it is.

Q.    Okay.  As the SOPDA, did you personally instruct employees who report to you that they are required to download and save their Signal

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 162

communications under federal law?

MS. KIES:  Object to form.

A.   I did not personally communicate.  We received guidance as a reminder that we needed to do proper records management.

Q.   And guidance from the Department of Homeland Security?

A.   We received guidance from the Department's Chief Information Officer.

MS. LEONARD:  Okay.  Let's just mark this one as Exhibit 9.

Here you go.

(Whereupon, Plaintiffs Exhibit 9 was marked for identification.)

Q.   Exhibit 9 is a -- sorry.  Thanks.

Exhibit 9 is a March 11, 2026 communication from DHS Management Communications that is titled "Reminder from Chief Information Officer."

Do you see that?

A.   Yes, ma'am.

Q.   Prior to March 10, 2026, when was the last reminder, if any, that you recall receiving regarding records preservation from the chief information officer at DHS?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 163

MS. KIES:  Object to form.

A.    I don't recall receiving something directly from the chief information officer at DHS on records preservation.

Q.    Prior to this message?

A.    Yes, ma'am.

Q.    Do you recall receiving something on records preservation from someone other than the chief information officer prior to this?

A.    When you come on board at FEMA as a senior executive, there's a whole series of training that they go through that every senior executive takes.

And so, I -- records management -- not to this level of specificity, but records management, cybersecurity, privacy, all those are part of the orientation when you come aboard FEMA.

Q.    Between the orientation for any person, including yourselves, and this March 10th communication from the chief information officer, are you aware of any communication from DHS which instructed employees to save Signal chats?

MS. KIES:  Object to form, foundation.

A.    I'm unaware of any specific guidance.

Q.    You don't recall receiving any

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 164

instructions from the chief information officer or anyone else at DHS regarding saving Signal chats, prior to this March 10th communication?

MS. KIES:  Object to form.

A.   I specified that we get training when we come on board at FEMA.  And then this came out.

I do not recall anything else specifically coming out from the Department headquarters.

Q.   And are you aware that March 10th is the day after the court, in this case, ordered discovery?

MS. KIES:  Object to form.

A.   I'm aware that there are several pending court cases.  I'm not aware of the specific dates associated with the discovery order.

MS. LEONARD:  Okay.  I think now is a good time to take a break for lunch.

So we can go off the record.

VIDEOGRAPHER:  Off the record at 12:41.

(Whereupon, a recess was taken for lunch at 12:41 p.m.)

- - -

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 165

A F T E R N O O N   S E S S I O N

(Time noted:  1:32 p.m.)

VIDEOGRAPHER:  On the record at 1:32.

MS. LEONARD:  Ms. Evans, I'm going to mark, as the next exhibit, which I believe is Exhibit 10, some notes that you produced.

(Whereupon, Plaintiffs Exhibit 10 was marked for identification.)

BY MS. LEONARD:

Q.   And I will represent that these are -- this is Bates number -33527 through -33544 in the form that they were produced to us by opposing counsel.

Ms. Evans, do you recognize these documents?

A.   Yes.

Q.   And what -- generally speaking, what is this?

A.   This -- these are notes from my day planner.

Q.   And that's a physical -- a physical day planner?

A.   Yes, ma'am.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 166

Q.   Okay.  Not on a computer?

A.   No, it's not on a computer.

Q.   Okay.  And do you have two day planners or just one? -- at a time.

Are you using one?

A.   I use one day planner, but I also have a briefing book.

Q.   What's the -- what is a "briefing book"?

A.   So a "briefing book" -- the way that they're designed is they give you the background information for meetings that are planned for the day, and there are read-ahead documents associated with that.

Q.   And does this compilation include pages from both your day planner and some of your briefing books?

A.   No, this compilation includes only notes from my day planner.

Q.   Okay.  And on some of the pages, the -- I will tell you, there's a date and calendar.  And on other pages, there is a -- like if you flip to the last page, the back --

A.   Yes.

Q.   -- there's a handwritten date.  Is this all from the same planner?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 167

A.   Yes.  These are from the same planner.

These are supplemental sheets that get added in if your day has a lot of notes.

Q.   Okay.  And I will tell you, this is the order in which we got it.

If you look at that back page, the date at the top is October 16, 2025.

Do you see that?

A.   Yes, ma'am.

Q.   And then if you flip to the front page, there is October 17th.

Do you see that?

A.   Yes.

Q.   Okay.  So I'm going to start on the 16th.

A.   Okay.

Q.   This is when you were acting only as the FEMA Chief of Staff.  Correct?

A.   Yes.

Q.   And the notes here indicate that you -- you have notes here related to the COREs.  Correct?

A.   Yes.

Q.   Does this reflect a meeting at which COREs were discussed?

A.   Yes.

Q.   Are the notes that you're taking in your

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 168

day planner generally reflecting notes from meetings?

MS. KIES:  Object to form.

A.   Notes that would be in my day planner would be reminders of me for activities or things that did occur in meetings.

Q.   And do you have any recollection as to what was being discussed with respect to COREs on October 16, 2025?

A.   I recall that this is during the time period when we had received specific tasking assignments from DHS headquarters that came from the Office of Personnel Management and the Office of Management and Budget as it related to potential staffing issues because we were in lapsed activities.

Q.   You believe that these notes reflect issues related to the appropriations lapse?

A.   Yes.  I know that in that time period, we were working under tasking that was given to DHS, the departments and the agencies, as it related to lapse of funding, staffing issues related to lapse of funding.

Q.   And if you look at the front page on October 17th, there are some notes related to COREs

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 169

at the bottom, it looks like.

And can you tell me -- can you explain for me what you were referencing here?

A. In these particular notes, it was -- what we were referencing, or what I was referencing, was getting specifics as it related to demobilization.

Q. And then the reference to "'something,' CHCO COREs in the field" at the bottom.

Do you see that, "more information"?

A. Yes.

Q. What was that referencing?

A. It's related to COREs in the field as far as it relates to demobilization, which also relates to local hires as it relates to demobilization.

Q. Okay. And then at some point in October, you began talking about the expiration of CORE authority at FEMA. Correct?

MS. KIES: Object to form.

A. I am not sure the exact timing that the issue was raised about the expiration of the waiver on delegation of authority that Mr. Richardson had.

Q. If you look at October 20th -- it's the one, two -- third physical page of this document. There's a "star" --

A. Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 170

Q.    -- "summary expiration of COREs" notation there?

A.    Yes.

Q.    Does that refresh your recollection that you were talking about the expiration of COREs on October 20th?

MS. KIES:  Could you give the Bates number?  I'm just having a hard time following.

MS. LEONARD:  -33529.

A.    So what was happening at this particular point is still related to the funding, overall funding of FEMA, and what the COREs expiration dates are associated with the funding source that they are funded from.

They're funded -- they are -- these are all terms of art, so let me try to explain it.

They are funded as exempted employees. They are not excepted employees.  And so, their funding source is different.

And so, in looking at the activities that we were working on from the Department about looking at overall plans, that's what this is about, is looking at the actual explanation of the COREs and the disasters, if they were working active

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 171

disasters.

Q.   So the COREs are funded through the Disaster Relief Fund under the Stafford Act. Correct?

A.   Yes, ma'am.

Q.   And that was not going to expire at the end of 2025.  Correct?

MS. KIES:  Object to form.

A.   The Disaster Relief Fund is funded differently, and it doesn't expire.

But there are rules that are associated with it, when we go into lapsed funding, about what total funding is available to be used in a disaster.

So if you're under a continuing resolution or you're under full funding, the funding levels change on what is available through the Disaster Relief Fund.

Q.   If you turn to the next page, October 29th, there's a reference at the bottom that says, I believe:

Expire in December.  CORE has to -- potentially -- come to S1 for approval.

Do you see that?

A.   Yes, I do.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 172

Q.   And that is a reference to the delegation of authority that you were referencing with respect to SOPDA Richardson of the authority to extend certain CORE positions.  Correct?

MS. KIES:  Object to form.

A.   Yes.  This is referencing the delegation of authority that he had that would expire December 31st.

Q.   If you look on the next page, there's -- it's -33531.

A.   Yes.

Q.   The date is October 29th.  There's a notation at the top that says "Principals" and then something in parentheses.

Do you know what that says?

A.   It says "Principals (continued)."

Q.   "Continued."

What is the "Principals" referring to?

A.   The principals is a standing weekly meeting with FEMA leadership.

Q.   Does that involve anyone from DHS headquarters?

A.   It could involve people from DHS headquarters, if they chose to participate in the meeting.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 173

Q.   Right.  Did Kara Voorhies ever participate in that principals meeting?

A.   I don't know if she participated in this particular principals meeting, but Ms. Voorhies would participate in principals meetings.

Q.   Okay.  And this note on October 29th says:

Extend CORE employees, may not be able extend.

Is that what that says?

A.   Yes.

Q.   And what did you mean by that?

A.   We were looking at the funding sources associated with where we were in the lapse, and we were looking to see how many would be affected by the extensions.

Q.   How many CORE employees would be affected by the extensions of what?

A.   In looking at their assignments and looking at -- because there's a regular process that -- they go through a review process.

And so, this was all coming up now through these meetings about what we were going to do, based on the expiration of the delegation of authority.

Q.   How is that related to the lapse in appropriations, Ms. Evans?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 174

A.   They're all related.

So when you're asking me about the lapse of the appropriations, those were activities -- because at that particular time, if you go over 30 days, then you have to run certain activities.

And that was the guidance that was being given by OMB and OPM.

And what we were doing was also looking at the extension of those types of activities, the rules of how it would apply, if it would apply, to the CORE appointments.

Q.   Okay.  We'll come back to that.

This document looks like it's -- certain things have been crossed out with a marker.

Do you see that?

A.   Yes.

Q.   Did you do that?

A.   Yes.

Q.   Did you do that before giving this document to your counsel?

A.   Yes.

Q.   Why did you do that?

A.   Because the guidance was to --

Q.   I'm going to stop you there and ask that you don't reveal attorney-client communications in

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 175

answering my questions, which I think your --

A.    Okay.

Q.    -- counsel for Defendants was about to interject.

So I can ask the question again.

A.    Okay.

Q.    I'm going to ask you why you did that.

A.    Okay.

Q.    And if you can tell me without revealing communications that you received from any of the many counsel sitting at this table, you may do so.

Can you answer that question without revealing communications from any counsel?

A.    I did the redactions based on the information that I redacted is deliberative, and there are other meetings that I attend.

And so, from my perspective, that information wasn't relative to the COREs.

MS. LEONARD:  We'll ask that the complete document be produced.

We can address that later.

Q.    Okay.  You can set that aside.

Okay.  You believe -- I believe you previously testified that Mr. Richardson resigned as SOPDA sometime towards the end of 2025.  Is that

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 176

correct?

MS. KIES:  Object to form.

A.   I didn't testify that he resigned.

Q.   At some point, Mr. Richardson was no longer the SOPDA of FEMA.  Correct?

A.   Yes.

Q.   And that occurred approximately sometime in late November 2025.  Is that right?

A.   He gave his notification in the November time frame.

Q.   Okay.  And I believe there -- the press reported, and DHS confirmed as of November 17th, that he would be leaving.

Does that sound about right?

A.   That sounds about right, yes, ma'am.

Q.   And at the same time that it was announced -- or, sorry.

At the same time that it was confirmed by DHS that SOPDA Richardson was leaving, DHS also announced that you would be taking over that position.  Correct?

MS. KIES:  Object to form.

A.   Yes.

MS. LEONARD:  Okay.  Let's mark this as the next, which I think is --

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 177

thank you -- 11.

(Whereupon, Plaintiffs Exhibit 11 was marked for identification.)

Q. Okay. And this is an article that we printed from The Washington Post that was dated November -- it says it was updated November 17, 2025.

Do you see that on the first page?

A. Yes.

Q. Do you remember reading this article around this time?

MS. KIES: Object to form.

A. I don't remember actually reading this particular article, but I know the article was out there.

Q. Okay. And if you look on the second page, there is a confirmation from the Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin that FEMA's current chief of staff, Karen Evans, will step "'into this important role' at the beginning of December."

Do you see that?

A. Yes.

Q. Okay. Did someone from DHS leadership ask you whether you wanted to accept the role of FEMA

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 178

SOPDA?

MS. KIES:  Object to form.

A.    Yes.

Q.    And who was that?

A.    Deputy Chief of Staff Guy.

Q.    And, presumably, you said yes?

A.    Yes.

Q.    Did you have any conversations directly with former Secretary Noem about taking over as the FEMA SOPDA before you stepped into that role?

MS. KIES:  Object to form.

A.    No, I did not have direct conversations with her.

Q.    But Secretary Noem is the person who appointed you to that position.  Correct?

MS. KIES:  Object to form.

A.    Yes.

Q.    Okay.  And do you remember what day you began as the SOPDA?

A.    December 1st.

Q.    Okay.  You understand that as SOPDA, you can be removed at any time by the DHS Secretary?

MS. KIES:  Object to form, legal conclusion.

A.    I serve at the pleasure of the President.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 179

I can be removed at any time.

Q.   But you also can be removed by the DHS Secretary.  Correct?

MS. KIES:  Object to form, legal conclusion.

A.   I can be removed at any time, as a political appointee.

Q.   You believe that the DHS Secretary has ultimate decision-making authority for FEMA because it's a component of DHS.  Correct?

MS. KIES:  Object to form.

A.   I believe that the secretary is involved in decisions as it relates to FEMA, but there are other decisions.

And, ultimately, the President of the United States is responsible for decisions for the executive branch.

Q.   As the SOPDA, you report to the -- you report directly to the DHS Secretary.  Correct?

A.   That is correct.

Q.   And in your view, decisions made by FEMA regarding staffing are ultimately subject to DHS decision-making.  Correct?

MS. KIES:  Object to form, misstates facts.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 180

You can answer.

A.   I think it depends on the way that you're asking that question.  Based on the ways that, yes, FEMA is a component of DHS.

But the way that you're asking that specific question, there are some decisions that the head of FEMA, the -- I don't say SOPDA, I apologize -- that in that role, that you're allowed -- that you make.

And -- but there are some decisions that the secretary, through policy, had asked to also make, and those are sent up to DHS headquarters.

Q.   And DHS, the secretary, can also make policy decisions that you implement as the SOPDA of FEMA.  Correct?

MS. KIES:  Object to form, foundation.

A.   As a component of DHS, the secretary has the authority over components of DHS and their resources.

Q.   Including FEMA?

MS. KIES:  Object to form.

A.   FEMA is a component of DHS.

Q.   And in your experience, the DHS -- individuals in the DHS Office of the secretary did

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 181

make personnel decisions related to FEMA?

MS. KIES:  Object to form.

A.   I think you need to clarify that question for me, because DHS makes decisions as it relates -- it was specific to hiring recommendations, just like any other department or agency.  For example, senior executives goes through an executive review board.

And so, those policies were updated, and those types of decisions do go to DHS headquarters.

Q.   But they -- the DHS front office made personnel decisions for FEMA in 2025 that went beyond hiring, didn't they?

MS. KIES:  Object to form, foundation.

A.   I am not sure exactly what hiring decisions you are referencing.

Q.   So I was using the term "personnel decisions."  So that -- personnel decisions, I'm using that to include far more than hiring.

Let me ask a different thing.

On December 1st, it was announced by DHS that the political appointees at DHS had made certain decisions with respect to individuals who had signed something called the Katrina petition.

Are you familiar with that?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 182

MS. KIES:  Object to form.

A.   Yes.

Q.   So that's the very day that you started in the role of SOPDA.

There was confirmation that the DHS front office had been making personnel decisions for FEMA. Correct?

MS. KIES:  Object to form.

A.   I am aware that those employees that have signed the Katrina letter were placed on administrative leave, but that was prior to me assuming the role of the SOPDA.

Q.   And then they -- but you were the FEMA Chief of Staff, correct, at the time?

A.   Yes.  But those decisions were also made prior to me being the FEMA Chief of Staff as well.

Q.   And then -- but the decision to reinstate those individual employees and notify them of that, that was made while you were the FEMA Chief of Staff.  Right?

MS. KIES:  Object to form.

A.   That decision was made, not in conjunction with me as the Chief of Staff.

Q.   And then the political appointees in the DHS headquarters overruled FEMA's decision to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 183

reinstate those employees.  Correct?

MS. KIES:  Object to form, foundation.

A.    That particular circumstance is -- my understanding is, is that the decision that was made there was made by a person within the FEMA CHCO office, and it did not clear through the office of the administrator.

MS. LEONARD:  Let's take a look at the next -- Exhibit 12, which is a New York Times article about those actions.

(Whereupon, Plaintiffs Exhibit 12 was marked for identification.)

Q.    Ms. Evans, you've been handed Exhibit 12, which is a article from the New York Times dated December 1, 2025, entitled "In a Reversal, FEMA Won't Reinstate Suspended Workers."

Did you read this article at the time?

MS. KIES:  Object to form.

A.    No, I did not.

Q.    If you look on the first page, there is a reference to Tricia McLaughlin, who we know is the spokesperson for DHS, and an email to the Times in which Ms. McLaughlin said:

...rogue "bureaucrats" had

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 184

sent those notices without the approval of senior department leaders.  After those leaders, who are political appointees, read news articles about the reinstatement, they reversed course....

Is that an accurate description?

MS. KIES:  Object to form, foundation.

A.   I think it depends on your point of reference when you use some of these words.

But the process that she's talking about in this particular case, as I previously stated, it was an employee in the FEMA CHCO office that did send out these letters to reinstate them.

Q.   But you also are aware that the DHS political appointees reversed that decision?

MS. KIES:  Object to form, foundation.

A.   Yes, I am aware of that.

Q.   And who made that decision?

MS. KIES:  Foundation.

A.   It's -- the way that this particular thing went down is I talked to DCOS Guy, and the guidance

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 185

was to reverse the decisions.

Q.   Do you know whether DCOS Guy, in fact, made that decision?

MS. KIES:  Object to form.

A.   I do not know if he made the decision on his own.

Q.   Because you're not aware of everyone that DCOS Guy discussed that personnel decision with within the Office of the Secretary.  Correct?

MS. KIES:  Object to form.

A.   Correct.

Q.   And you don't know whether DCOS Guy discussed it with Secretary Noem?

A.   I do not know the particulars of the discussions that happened at headquarters.

Q.   Or you don't know whether DCOS Guy discussed it with Corey Lewandowski either.  Right?

A.   I do not know who DCOS Guy discussed the decisions with at DHS headquarters.

Q.   If you look at the next page of the article, there's a quote from Ms. McLaughlin at the top paragraph.  And it says:

...adding that, quote,

this administration will not

tolerate rogue conduct,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 186

                    unauthorized actions, or

                    entrenched bureaucrats

                    resisting change.

          Do you have an understanding as to what change she was referring to there?

                         MS. KIES:  Object to form.

     A.   I do not know what resistance to change that she is referencing in this quote.

     Q.   You are familiar with the Katrina letter that was involved in this issue.  Right?

                         MS. KIES:  Object to form.

     A.   Yes.

     Q.   And the Katrina letter expressed concerns regarding the administration's efforts at downsizing the FEMA workforce, did it not?

                         MS. KIES:  Object to form.

     A.   Yes, it did.

     Q.   And so did you understand this reference by the DHS spokesperson to "bureaucrats resisting change" to be referencing changes to the workforce?

                         MS. KIES:  Objection; asked and answered.

     A.   I understand that, the way that this was worked, is the change is about changes to happen to FEMA overall.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 187

Q.   And what do you mean by that?

A.   What is happening, as we have previously discussed, is the FEMA Review Council was commissioned by the President.

And they're looking at potential changes and recommendations that would then go to the President, as it relates to changes for FEMA.

Q.   And you understood that Secretary Noem co-chaired that council.  Correct?

MS. KIES:  Object to form.

A.   Yes.

Q.   And that there was a draft report prepared for that council that was being edited by Ms. Noem around this time at the beginning of December 2025?

MS. KIES:  Object to form, foundation.

A.   I know that the FEMA Review Council was working on a draft report that -- because they had specific timelines that were outlined in the executive order, and that they were to then deliver the draft report and have a meeting, a public meeting, and then the report would go out for public comment.

Q.   Did you work on the draft report, Ms. Evans?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 188

A.    No, I --

MS. KIES:  Object to form.

A.    No, I did not.

Q.    Did you ever see it?

MS. KIES:  Object to form.

A.    I have seen different versions of the draft report.

Q.    And when did you first see a version of the draft report?

A.    I cannot recall the specific dates of when I had seen the draft report.

Q.    Do you think it was before or after you took the position -- that you assumed the position of SOPDA?

A.    I saw a draft version of the report before I assumed the position of SOPDA.

Q.    And was it a draft report that had been edited by Ms. Noem?

MS. KIES:  Object to form.

And just caution the witness not to discuss deliberative process privilege, to the extent your answer --

A.    I don't know --

MS. KIES:  -- would divulge that.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 189

A.   -- the answer to that question.

MS. LEONARD:  Do you represent the FEMA Review Council, Counsel?

MS. KIES:  I don't understand your question.

MS. LEONARD:  Do you represent the FEMA Review Council?

MS. KIES:  I represent the Department of Homeland Security, which has been sued as a Defendant, as well as FEMA and Ms. Evans, in her official capacity.

And if your question calls for deliberative process privilege, I'm just reminding the witness not to provide that.

MS. LEONARD:  On whose behalf are you asserting the deliberative process privilege?

MS. KIES:  The witness, in her official capacity.

BY MS. LEONARD:

Q.   Did you discuss the content of the report with anyone at DHS prior to December 12th?

A.   I participated in some meetings, because DCOS Guy, Deputy Chief of Staff Guy -- this was also in his -- the FEMA Review Council was also in his

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 190

portfolio, since he had FEMA.

Q.   You participated in some meetings that -- in which -- at which the draft report was discussed?

A.   In general, yes, ma'am.

Q.   And when did those meetings occur?

A.   I don't know the specific ones.

As I previously stated, I had weekly meetings with the DCOS.

And I know that he also had weekly meetings with the team that was working on the FEMA Review Council report.

Q.   And what do you recall DCOS Guy saying about the draft report?

MS. KIES:  Same instruction with respect to deliberative process privilege.

MS. LEONARD:  The --

MS. KIES:  You can answer, otherwise.

MS. LEONARD:  The question does not call for privilege, Counsel.

Q.   You can answer the question.

A.   Okay.  I don't really recall specific comments about the report.

Q.   At some point, you became aware of the content of the draft report.  Right?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 191

A.   At some point.  But the version that I had -- like, there were changing versions.  I was not actively engaged in the FEMA Review Council process.

Q.   And you don't know what Secretary Noem edited in that draft report and what she did not.  Correct?

MS. KIES:  Object to form.

A.   Yes.  I do not know.

Q.   At some point in time, you became aware that someone inserted a proposed 50% cut to the overall FEMA staff into that draft report.  Correct?

MS. KIES:  Object to form.

A.   Yes.  I became aware when that report was leaked to the press.

Q.   And how did you become aware that it was leaked to the press?

A.   Because the CNN article said it was leaked to the press.

Q.   Prior to that, did you know that there was a 50% cut in that draft report?

MS. KIES:  Object to form.

A.   Prior to that, I don't recall.  I would have to say no, I did not know that there was a 50% cut in that report.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 192

Q.    And as of the time you became SOPDA, FEMA had approximately 23,000 employees.  Is that right?

MS. KIES:  Object to form.

Q.    Roughly?

A.    It depends on what you call "employees" as well, but, roughly, yes.

Q.    So a 50% cut would be approximately 11,500 employees.  Is that right?

MS. KIES:  Object to form.

A.    So again, I'm going to go back to it depends on what you categorize as employees, because they are done -- the financing and the way that employees are categorized in FEMA is a little bit different.

And so, it depends on what you mean by "employees."

Q.    Well, FEMA considers its employees to include the civil service and the Stafford Act employees, including CORE and reservists.  Correct?

MS. KIES:  Object to form.

A.    So reservists, it depends.  They report the number -- the number that you have, they do report those numbers as the FEMA numbers.

Q.    So if the FEMA number was around 23,000 as of the time that you became SOPDA, a 50% cut would

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 193

be roughly 11,500 employees.  Correct?

MS. KIES:  Object to form.

A.   If I just go on the straight numbers the way that you're presenting them, yes.

MS. LEONARD:  Mark this as Exhibit 13.

(Whereupon, Plaintiffs Exhibit 13 was marked for identification.)

Q.   Ms. Evans --

MS. LEONARD:  This is the last page.

Q.   -- you've been handed what's been marked as Exhibit 13.  It's a document entitled "Draft Final Report, The President's Council to Assess the Federal Emergency Management Agency."  The date on the cover is December 11, 2025.

I'm not going to ask you questions about this entire report.  But let me know when you're ready.

A.   Okay.

Q.   This report has never been published in final form.  Correct?

MS. KIES:  Object to form, foundation.

A.   Yes, that's my understanding.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 194

Q.    And there was a scheduled December 12th meeting that was canceled.  Correct?

MS. KIES:  Object to form.

A.    Yes, that's correct.

Q.    And you have referenced earlier that you became aware through a CNN article that the report was leaked to the press.  Is that right?

A.    Yes, that there was a report that was leaked to the press.

Q.    And do you know who leaked the FEMA Review Council report to the press, Ms. Evans?

A.    No, I do not.

Q.    Do you know whether former Secretary Noem leaked the report to the press?

MS. KIES:  Object to form.

A.    No, I do not.

Q.    Have you ever heard anything about that?

MS. KIES:  Object to form.

A.    No.

Q.    What about Mr. Lewandowski; have you ever heard anything about his leaking the report to the press?

MS. KIES:  Object to form.

A.    No.

Q.    What about Ms. Voorhies; do you know

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 195

whether Ms. Voorhies had access to the draft DHS FEMA Council report?

MS. KIES:  Objection; form and foundation.

A.   I do not know what versions of the reports that Ms. Voorhies would have access to.

Q.   Are you aware that she had access to some version of the reports?

MS. KIES:  Object to form.

A.   I am aware that she participated in those meetings that I previously mentioned that were with the FEMA Review Council team.

But I don't know specifically what versions of the reports that she would have access to.

Q.   Do you know whether Ms. Voorhies edited the Review Council report?

MS. KIES:  Object to form.

A.   I do not know if she specifically edited the reports.

Q.   Do you know whether anyone in the DHS front office edited the report?

MS. KIES:  Object to form.

A.   I am not aware.  I do not know of anyone editing the report.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 196

Q.   Other than Ms. Noem?

MS. KIES:   Object to form.

A.   I do not know if Ms. Noem specifically edited the report.

Q.   Okay.  So if you turn to Page 7 of this draft that's in front of you, in the second paragraph, there's a sentence that says:

FEMA 2.0 should reduce overall staffing by approximately 50%....

Do you see that?

A.   Yes, I do.

Q.   Do you know who wrote that language?

A.   No, I do not.

Q.   You did not write that language.  Correct?

A.   I did not write that language, yes, ma'am.

Q.   And when did you first become aware that the draft council report contained this 50% staffing cut?

MS. KIES:   Object to form, asked and answered.

A.   When the report was leaked.

Q.   What is your understanding of the reason that the December 12th meeting of the FEMA Review Council was canceled?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 197

MS. KIES:  Objection; foundation.

A.    I don't know the reason why the meeting was canceled.

Q.    Do you have any understanding as to why it was canceled?

MS. KIES:  Object to form.

A.    I do not.  And I don't -- I wouldn't speculate on any reasons of why the White House would cancel a meeting, or DHS would cancel a meeting, as it relates to the FEMA Review Council.

Q.    Do you believe the White House canceled the meeting?

MS. KIES:  Object to form.

A.    I don't know.  That's why I'm saying I'm not speculating on who canceled the meeting.

Q.    Was someone named Stephanie Dobitsch involved in providing information to the White House that led to the cancellation of this meeting?

MS. KIES:  Object to form, foundation.

A.    I would have no knowledge of her providing information to the White House that would lead to the cancellation of the meeting.

Q.    Do you know who -- how do you pronounce

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 198

her name?

A.    You pronounced it correctly.

Q.    Okay.  Stephanie Dobitsch, who is -- who, at the time, was Stephanie Dobitsch?

A.    Stephanie Dobitsch was a principal, as we talked about previously.  She was a leader, career leader, within FEMA, working for Mr. Richardson.

Q.    And in -- at some point in December, you formed the belief that Ms. Dobitsch had provided information to the White House that was contrary to DHS leadership instructions.  Correct?

MS. KIES:  Object to form.

A.    I have no knowledge of Ms. Dobitsch providing information to the White House that's contrary to FEMA leadership or to DHS leadership.

Q.    And as a result of that belief, you asked the DHS management directorate to give her an MDR out of FEMA.  Correct?

MS. KIES:  Object to form, misstates testimony.

A.    That is not correct.  And that is not the basis for the management directed reassignment.

Q.    Please explain what a "MDR" is.

A.    A management directed reassignment is the ability to take SESs and move them to other SES

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 199

positions within the department or within the federal government as a whole.

Q.    And you did that -- you asked for Ms. Dobitsch to be MDR'd out of FEMA because you believed she was not sufficiently implementing the secretary's priorities and plans for FEMA.  Correct?

MS. KIES:  Object to form.

A.    That's incorrect.  That is not the basis of my request for her management directed reassignment.

Q.    And you talked about that action with Kara Voorhies before you requested that MDR.  Correct?

MS. KIES:  Object to form.

A.    I discussed that I requested the MDR, the management directed reassignment, for Stephanie Dobitsch with Kara Voorhies.

MS. LEONARD:  Let's take a look at Exhibit 14.

(Whereupon, Plaintiffs Exhibit 14 was marked for identification.)

Q.    Ms. Evans, you've been handed what's been marked as Exhibit 14.  And it is an email from you, on December 17th, to someone named Greyson McGill. And you copy Kara Voorhies.

And the email reads:

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 200

I need to have Stephanie Dobitsch MDR out of FEMA.

Do you see that?

A.    Yes, ma'am.

Q.    And you say:

Additionally, she bypassed DHS guidance and sent information directly to the White House which was incorrect.  These are just the issues this week.

Do you see that?

A.    Yes.  But that is not specifically related to the FEMA Review Council report, as you previously stated.

Q.    My question was generally whether you thought that she should be MDR'd because she passed information to the White House that was contrary to DHS priorities.

MS. KIES:  Object to form.

Q.    Did you agree with that?

MS. KIES:  Object to form.

A.    Okay.  The -- this email specifically says that she sent information directly to the White House which was incorrect.  Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 201

Q.   What information was that?

A.   I believe, and I have to go back and look, that it was specifically related to -- she -- her portfolio included the different policies that are associated like with the Defense Production Act and NATO and a couple other areas.

And so, there was some information that she passed on directly that did not clear through DHS policy.

Q.   And DHS did issue an MDR to move Ms. Dobitsch out of FEMA.  Correct?

MS. KIES:  Object to form.

A.   Yes, they did.

Q.   And they put her in the Office of Inspector General.  Is that right?

MS. KIES:  Object to foundation.

A.   That is not correct.  So Ms. Dobitsch had applied for a job at the Office of Inspector General, and that coincided at the same time that the MDR request was put in.

Q.   Do you know where she ended up?

A.   It's my understanding that she is at the inspector general's office.

Q.   Okay.  And you say here:

I have discussed the MDR

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 202

with Kara, and she agrees.

Please let me know what else

you may need.

Do you see that?

A.   Yes, I do.

Q.   Is that true, that you had discussed this MDR with Kara Voorhies?

MS. KIES:  Object to form, asked and answered.

A.   Yes.

Q.   And when you testified earlier that you made sure that Kara Voorhies was not involved in any personnel decisions at FEMA, that testimony was not accurate.  Correct?

MS. KIES:  Object to form.

A.   She didn't make this decision. Ms. Voorhies didn't make this decision.

I made the decision, and I informed her of the decision.

Q.   It says here that you "discussed the MDR with Kara, and she agrees."

Was that -- that's the discussion that you had.  Right?

MS. KIES:  Object to form.

A.   Yes.  But I made the decision and had

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 203

already contacted and talked to Greyson, and then followed up with this email.

And so, I did make the decision, contacted headquarters, and requested the MDR.  And then I did discuss it with her, and she agreed.

Q.    And you testified earlier that you made sure that Kara Voorhies was not involved in any personal decisions at FEMA.

And so, when you testified that way, you didn't mean that she wasn't involved in the discussions of personnel decisions?

MS. KIES:  Object to form.

Q.    Is that what you meant?

MS. KIES:  Object to form.

A.    What I meant was, I make the decisions. And as the senior advisor to the secretary, I inform her and discuss different decisions so that she's informed of actions that are happening at FEMA so that she's aware of issues as the advisor.

Q.    I understood your testimony that you took precautions so that she wouldn't be involved, including not having her at any meetings.

Wasn't that your testimony earlier?

MS. KIES:  Object to form.

A.    Yes, that is true.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 204

Q.   But there's an exception for talking to her on the phone?

MS. KIES:   Object to form, misstates testimony.

A.   This is not a meeting.  And this was me informing Ms. Voorhies that I made the decision to MDR Stephanie Dobitsch.

And I was discussing it with her and -- so that she would be aware of the issue.

Q.   And why did you feel the need to tell Greyson McGill that you had Kara's approval for this MDR?

MS. KIES:   Object to form, misstates evidence.

A.   Okay.  This doesn't say that I have her approval.  It says that she agrees.

Because she's the secretary's advisor for FEMA issues and since this affects FEMA, Greyson would check with her, or double-check with her, or check in with her -- I'm not sure of all the processes up there -- to make sure that she was aware of the actions that we were taking at FEMA.

Q.   And who is Greyson McGill?

A.   Greyson McGill is the Chief of Staff for the management directorate.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 205

Q.   Okay.  You can set that aside for now.

You understand that in October of 2025, the President issued an executive order called "Ensuring Continued Accountability in Federal Hiring" that required agencies to submit something called "annual staffing plans"?

MS. KIES:  Object to form.

A.   Yes.

Q.   Okay.  Let's -- I'm just going to show you -- this is the executive order.

MS. LEONARD:  We can mark it next line, which is 15.

There you go.  Okay.

(Whereupon, Plaintiffs Exhibit 15 was marked for identification.)

Q.   Okay.  And this is Executive Order 14356, dated October 15, 2025.

So you understand that this is the executive order that refers to annual staffing plans.  You see that reference at the bottom. Right?

A.   Yes, ma'am.

Q.   And you see that the President ordered agencies to submit final annual staffing plans to OPM and OMB.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 206

Do you see that?

A.   Yes.

Q.   Okay.  And that, I believe, the President gave a 60-day deadline in here for the submission of those final plans.

"Within 60 days of the date of the order."

Do you see that?

Sorry.  It's Section 2(c)(i).

A.   Oh.  Yes, I do.

Q.   Okay.  And you also understand that OMB and OPM subsequently issued implementing memorandum -- an implementing memorandum instructing agencies that they had a deadline of December 1st?

MS. KIES:  Object to form.

A.   We had guidance from them, yes.  I don't recall the due date.

Q.   Do you recall that it was around December 1st?

A.   I recall that we had an assignment in October to do this activity.

Q.   But -- and you were aware that there was a deadline for OPM and OMB?

MS. KIES:  Object to form.

A.   Yes.  There's a deadline for them, yes, based on this executive order.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 207

Q.   And do you recall that in November, the DHS Chief Human Capital Officer, Roland Edwards, asked the various components of DHS to submit information to contribute to the DHS final agency -- annual staffing plan?

MS. KIES:  Object to form.

A.   Yes.

MS. LEONARD:  Okay.  And -- all right.  We'll mark this next, Exhibit 15 -- 16.  Sorry.

(Whereupon, Plaintiffs Exhibit 16 was marked for identification.)

Q.   Okay.  This is an email chain that was produced to us by Defendants.  I'm going to direct your attention to the email that is, I think, the first in line, actually.

So on the very last page of this, there is a November 21st email from Roland Edwards.

Let me know when you're ready.

(Witness reading.)

A.   Okay.

Q.   So this November 21st email from Roland Edwards, is this the instructions from the DHS CHCO that you recall being sent out about the President's executive order?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 208

MS. KIES:  Object to form.

A.   I don't recall seeing this, but that is the -- what this email states.

Q.   And do you see here that he says:

> To facilitate this process, we have attached a standardized template that aligns with the OMB -- OPM/OMB reporting requirements.

In the second paragraph.

> To facilitate this process, we have attached....

A.   Oh, yes.  I see it.

Q.   And then he explains that:

> The staffing plan takes a bottoms-up approach to determine the appropriate staffing levels needed to support the president's priorities, mission-critical areas, and statutory obligations.

Do you see that?

A.   Yes.

Q.   So you understood that that -- at the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 209

time, that that was the instruction being given to the FEMA components, that they were -- I'm sorry.

Let me just restate that one.

You understood, at the time, that the various DHS components were being asked to conduct a bottoms-up approach to determining appropriate staffing levels and providing data to the DHS CHCO to support that?

MS. KIES:  Object to form.

A.    I understand we received the guidance, yes.

Q.    And it also says:

Components should distribute the template to their lowest level offices, as designated in the template.

A.    Yes.

Q.    Do you see that?  Okay.

And he gives a deadline of December 3rd. Right?

A.    Yes.

Q.    And that deadline was after you started performing the duties of FEMA administrator.  Right?

A.    Yes.

Q.    Okay.  And you complied with this request

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 210

from the DHS CHCO, on behalf of FEMA, by sending FEMA's contribution to the staff -- annual staffing plan?

MS. KIES:  Object to form.

A.    We worked to meet the assignment, yes.

Q.    And you personally sent FEMA's contribution to the annual staffing plan.  Isn't that correct?

MS. KIES:  Object to form.

A.    I don't recall sending it personally, because of the way that this went out.  I do not recall personally transmitting it.

Q.    Do you recall working on this?

MS. KIES:  Object to form.

A.    So in looking at this correspondence, yes, because, in different roles within FEMA, as I previously stated, we have worked on different levels of staffing.

Q.    Do you recall approving the FEMA submission as SOPDA?

MS. KIES:  Object to form.

A.    Yes.  I mean, no, I don't recall it, but, yes, I would have had to approve it.

Q.    And if you look on the second page, it's Bates No. -2354, there's a reference to the staffing

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 211

plan that was submitted by FEMA on December 4th.

Do you see that?

A.    I see the references to the email here, yes.

Q.    It's from someone named Puneet?

A.    Yes.

Q.    Puneet works in the Office of the Administrator.  Correct?

A.    Yes, she does.

Q.    And Puneet says:

Attached is the staffing plan that was submitted 12/4.

Do you see that?

A.    Yes.

Q.    Do you have any reason to believe that the FEMA contribution to the DHS annual staffing plan was submitted on any day other than December 4th?

MS. KIES:  Object to form.

A.    I do not have any knowledge of it being submitted any other date but than what's in this email.

Q.    Okay.  And you understood, at the time, that FEMA was submitting the plan for S1 approval. Correct?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 212

A.    I know that we were doing the assignment that was given to us as it related to the annual staffing plan and the second quarter updates.

Q.    And you also know that the FEMA staffing plan that you submitted on December 4th was, in fact, approved by S1 and included in what was sent to OMB and OPM.  Correct?

MS. KIES:  Object to form, foundation.

A.    I do not know the actual process after we submitted it up to DHS headquarters.

Q.    You know that the content of what FEMA included in that plan was submitted to OMB and OPM. Correct?

MS. KIES:  Object to form, foundation.

A.    I do not know if it was specifically submitted to OMB and OPM, but I know we completed the assignment.

Q.    It's your testimony, Ms. Evans, that you do not know what was submitted to OMB and OPM for the FEMA annual staffing plan?

MS. KIES:  Object to form.

A.    That's not my testimony.  My testimony is I do not know what DHS headquarters transmitted.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 213

I do know that we transmitted our staffing plan and the quarterly updates to DHS headquarters.

Q.   Did you transmit anything directly to OPM and OMB?

MS. KIES:  Object to form.

A.   I personally did not.  I do not know if the process included the FEMA CHCO to submit things concurrently to OMB and OPM.

Q.   You didn't receive a rejected FEMA staffing plan back from DHS Secretary Noem in December of 2025.  Correct?

MS. KIES:  Object to form.

A.   I did not receive any other information back, that I recall, related to this deliverable.

Q.   Did you participate in conversations with anyone in the DHS headquarters regarding the FEMA staffing plan in December of 2025?

MS. KIES:  Object to form.

A.   I do not recall having specific discussions with anyone at DHS headquarters about this deliverable.

Q.   It's possible that you did have those conversations, though?

MS. KIES:  Object to form.

A.   I do not recall any conversations about

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 214

this specific deliverable.

Q.   You are aware that FEMA's OCHCO worked with the various FEMA component offices to compile program and office-level information as part of the FEMA plan, and provided that to you for approval?

MS. KIES:  Object to form.

A.   I'm aware that that's the process, yes.

Q.   And you're aware that that actually happened.  Correct?

MS. KIES:  Object to form.

A.   So at this time, I am aware that that's what they said that they did.

And I'm talking about the FEMA CHCO office, that that's what they said that they did.

Q.   The FEMA CHCO compiled the program and office-level information and provided it to you for review and approval as the FEMA annual staffing plan.  Correct?

MS. KIES:  Object to form.

A.   The FEMA CHCO office would -- provided this deliverable through the process that FEMA has established for review.

And then I did the final review and approved it for submission.

Q.   You reviewed what the FEMA CHCO office

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 215

recommended to you to include in that plan.
Correct?

MS. KIES:  Object to form.

A.   I reviewed what the FEMA CHCO Officer sent to the FEMA leadership, because it runs through a process that includes offices to review it before it comes to me for final submission.

Q.   And you did not submit the FEMA CHCO's recommended annual staffing plan to DHS, did you?

MS. KIES:  Object to form.

A.   I did not submit the plan personally.

I know that we worked on due dates to submit information as the department tasked it to us.

Q.   FEMA did not submit the plan and the data that the FEMA CHCO office had provided to you as the annual staffing plan to DHS.  Correct?

MS. LEONARD:  Object to form, foundation.

A.   I cannot definitively answer that question.

Q.   You altered the recommendations of the FEMA CHCO by cutting the staff numbers for FEMA in that plan in half, did you not, Ms. Evans?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 216

A.    I do not recall the specific activities associated with this deliverable.

Q.    You don't recall cutting the number of FEMA staff in half in the plan that you submitted to the Department of Homeland Security?

MS. KIES:  Object to form.

A.    I know that at that time, to be consistent with other deliverables, there were numbers that we looked at, based on mission essential task analysis.

But for this specific deliverable, I do not recall modifying this deliverable.

Q.    Do you recall that the FEMA components projected a need for approximately 24.8 thousand FEMA staff for fiscal year 2026 in what they provided to you?

MS. KIES:  Object to form.

A.    I do not recall that specific number.

Q.    And that you sent a staffing plan to the Department of Homeland Security that included roughly 11,500 total FEMA employees for fiscal year 2026?

MS. KIES:  Object to form.

A.    I know I submitted information that was consistent with previous information that was submitted under these similar exercises that match

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 217

those numbers.

So I do not know the specific number that you're recalling.  And I do not recall, in particular, modifying this specific deliverable to those numbers.

Q.   You don't recall sending a staffing plan that cut FEMA in half days after you took over as the SOPDA of FEMA?

MS. KIES:  Objection; asked and answered.

A.   I know that I worked on multiple staffing plans.  And so, I do not recall the specific date of the deliverable.

Q.   But you know you cut the staff in half in what you gave to DHS, don't you, Ms. Evans?

MS. KIES:  Object to form; asked and answered.

A.   I know that on multiple staffing plans that we projected out the ability to reduce the staffing of FEMA.

Q.   In early December, Ms. Evans, you provided to DHS a FEMA annual staffing plan that cut the FEMA staffing in half, did you not?

MS. KIES:  Objection; asked and answered.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 218

A.    I do not recall that specific date.

Q.    Do you recall submitting a FEMA staffing plan that cut the staff in half?

MS. KIES:  Object to form.

A.    I recall submitting various staffing plans that had various scenarios that would cut the FEMA's staff.

Q.    And one of them cut it in half.  Right?

MS. KIES:  Object to form.

A.    That was one of the options that was sent forward.

MS. LEONARD:  Let's mark this as the next, which is 17.

(Whereupon, Plaintiffs Exhibit 17 was marked for identification.)

Q.    This is a document that was produced to us by counsel for Defendants.

MS. KIES:  Can I just ask, Danielle, did we include the, paren, employee plan with the Bates number?

MS. LEONARD:  No.  This was produced as a native spreadsheet in Excel format.

MS. KIES:  Right.

MS. LEONARD:  It was an

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 219

attachment to an email.  And the employee plan was the worksheet title of this page of the spreadsheet.

MS. KIES:  Okay.

MS. LEONARD:  Does that make sense?

MS. KIES:  Do you have the email, by any chance?

It does make sense.

MS. LEONARD:  We do have the email, which I can get to you in a moment.

But this was -- it was -- the Bates number is next in line for the attachment, and you submit -- you produced a "produced in native format" for that Bates number.  And that's the Bates number that appears on this document.

Does that make sense?

MS. KIES:  Okay.

BY MS. LEONARD:

Q.  Does this look familiar to you, Ms. Evans?

A.  Yes, it does.

Q.  And if you look at the bottom, what's the total projected 2026 staffing for FEMA that's listed on this document?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 220

A.    The number is 11,383.

Q.    And 11,383 represents a more than 50% cut in the then current numbers of FEMA staff, does it not?

MS. KIES:  Object to form.

A.    Well, I don't have the exact percentage, but it's a cut.

Q.    It's a -- it's approximately 50%. Correct?

MS. KIES:  Object to form.

A.    Yes.

Q.    And do you have any reason to believe this is not the document that you sent to DHS leadership to -- as the FEMA annual staffing plan?

MS. KIES:  Object to form.

A.    I have no reason to believe this is not the document.

Q.    And does this document refresh your recollection that this is what you sent to DHS leadership on December 4th as the FEMA annual staffing plan?

MS. KIES:  Object to form.

A.    Yes, because it's consistent with previous documents that we sent forward to OPM and OMB.

Q.    When did you first send forward to OPM and

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 221

OMB a document that showed a 50% staffing cut for FEMA?

MS. KIES:  Object to form.

A.   I don't recall specifically, but as I previously stated, there were multiple exercises where we had to look at the staffing.

And so, it was based on guidance that came from OPM and OMB.  And then we would send forward the numbers to the DHS CHCO, and then looked at the staffing according to those guidance.

So I do recall seeing that -- I recall these numbers, yes.

Q.   Can you tell me how the 11,383 number was calculated for the fiscal year 2026 projection of staff at FEMA?

MS. KIES:  Object to form.

A.   I can tell you that this was based on analysis that was previously done by the group that was working specifically with Mr. Richardson that was called -- it's OPPA, which is Office of Policy -- Policy, Planning and Analysis -- based on mission essential functions and the analysis that Mr. Richardson did based on mission essential functions.

Q.   And you approved this as the plan to be

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 222

sent to DHS?

MS. KIES:  Object to form.

A.   Yes.

Q.   And you knew, at the time, that this was a roughly 50% cut from what the FEMA components and programs were telling you that they needed for fiscal year 2026.  Correct?

MS. KIES:  Object to form.

A.   Yes.

MS. LEONARD:  I think now is a good time for -- I was just looking at the clock.  I think now is a good time for a break.  So let's do 10 minutes and resume at approximately 2- -- 2:47.

VIDEOGRAPHER:  Off the record at 2:37.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 2:49.

BY MS. LEONARD:

Q.   Ms. Evans, before we took the break, we were talking about the FEMA annual staffing plan numbers that were sent over to the Department of Homeland Security in Exhibit 17.

Do you recall that testimony?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 223

A.    Yes, ma'am.

Q.    Can you look at Exhibit 10 --

MS. LEONARD:  Is it 10 or 16?

Q.    Sorry.  Your notes from your planner, which I think is Exhibit 10.

MS. LEONARD:  Thanks.

A.    Okay.

Q.    Do you have it?

A.    Yes.

Q.    And if you turn internally, using the Bates numbers at the bottom, to Page -- the page that ends in -34.  So it's -33534.

The date at the top is Thursday, December 4, 2025.

A.    Okay.

Q.    You have that page in front of you?

A.    Yes.

Q.    And you see there's a notation here -- the last one at the bottom of the page.

Can you read that, please.  Out loud.

A.    The last number -- the last thing says:

Talked to Kara.

"RE" means subject.

The number is 11,383 and the top line.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 224

I can't read my own writing, and then it says:

CC her.

Q.    "Will CC her," potentially?

A.    That's probably what it says.

Q.    Does this refresh your recollection that you are the person who sent the FEMA annual staffing plan with the number 11,383 to DHS on December 4th, and you copied Kara Voorhies?

MS. KIES:  Object to form.

A.    Yes, that's what this indicates.

Q.    And this -- you did that.  Correct, Ms. Evans?

MS. KIES:  Object to form.

A.    I don't recall the exact email, but my notes say that I did that.

Q.    And you generally tried to take accurate notes.  Correct?

MS. KIES:  Object to form.

A.    Yes, ma'am.

Q.    You did not provide a copy of the FEMA annual staffing plan that you sent to DHS to FEMA leadership in December 2025, did you, Ms. Evans?

MS. KIES:  Object to form.

A.    I don't recall distributing this staffing

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 225

plan, yes, because it was still pre-decisional at that point.  So I did not widely distribute this staffing plan.

Q.  But you know that this staffing plan and that number was sent to OMB and OPM in the final DHS staffing plan, don't you?

MS. KIES:  Objection; foundation, misstates testimony.

A.  I do not know for a fact if this was the final number that was sent forward by DHS CHCO in the staffing plans that went to -- if they went to OMB and OPM.

Q.  But you do know that OMB and OPM were told of a 11,500, approximate, staffing number for fiscal year 2026 at some point.  Correct?

MS. KIES:  Object to form.

A.  I do know that we sent this number forward as a proposed number for fiscal year 2026.

Q.  To OMB and OPM?

MS. KIES:  Object to form.

A.  To DHS CHCO.

Q.  And that number was provided -- you know that that number was provided to OMB and OPM, don't you, Ms. Evans?

MS. KIES:  Object to form, asked

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 226

and answered, foundation.

A.   You're specifically asking me if I know that they transmitted this number directly to OPM and OMB, and I do not have knowledge of the transmission of this number by the DHS CHCO to OPM and OMB.

I know we transmitted the number to DHS CHCO.

Q.   And you know that S1 gave her approval for the staffing plan that included the FEMA staffing plan that cut FEMA in half in what was sent to OMB and OPM, don't you?

MS. KIES:  Objection; foundation, asked and answered.

A.   I do not know the process that DHS headquarters did as it relates to the secretary's approval on all the component staffing plans that were submitted to DHS CHCO.

MS. LEONARD:  Can you read that back to me, please.

(Whereupon, the court reporter read back from the record as follows:

"A    I do not know the process that DHS headquarters did as it relates to the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 227

secretary's approval on all the component staffing plans that were submitted to DHS 'OCHCO.'")

Q.   Ms. Evans, you know that DHS submitted the staffing plan for FEMA to OMB and OPM that cut FEMA's numbers in half, don't you?

MS. KIES:  Objection; foundation, asked and answered several times.

A.   I do not know for a fact that DHS CHCO submitted this staffing plan directly to OMB and OPM.

Q.   That is not my question.

You know that DHS gave the number of roughly 11,500 to OMB and OPM for the FEMA annual staffing plan for fiscal year 2026, don't you?

MS. KIES:  Objection; foundation.

A.   You are specifically asking me if I know that DHS gave this number, 11,383, specifically to OMB and OPM for FEMA.

And I do not know for a fact that this number, 11,383, was transmitted to OMB and OPM.

Q.   Do you know that the approximate number of

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 228

11,500 was transmitted to OMB and OPM for the FEMA staffing for fiscal year 2026?

MS. KIES:  Object to form, foundation.

A.    I know that we submitted this number.  I submitted this number.

And I do not know what the final submission looks like that the DHS CHCO submitted to OPM and OMB.

MS. LEONARD:  Okay.  Let's mark this as the next.

COURT REPORTER:  18.

MS. LEONARD:  18.

(Whereupon, Plaintiffs Exhibit 18 was marked for identification.)

Q.    Ms. Evans, you've been handed a email chain that was produced to us by Defendants.  The top email is dated December 23rd, but I am going to direct your attention to an email in the middle of the chain on the one, two, three, four -- fourth internal page that is numbered -7336 at the bottom.

It is an email from you, on December 17th. Let me know when you're there.

MS. KIES:  And, of course, if the witness wants to review the whole

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 229

document, she can.

(Witness reading.)

A.    Okay.

Q.    So I'm going to direct your attention to the email that you sent on December 17, 2025 at approximately 9:51 p.m.

Do you see that, on Page -7336?

A.    -7336?

Q.    It is to Micah Bock.

A.    Okay.  Hold on a second.

(Pause.)

Okay.

Q.    And in this -- Ms. Evans, do you recall writing this email?

A.    Yes.

Q.    And in this email, you say:

The number of 11,500 is also what we have provided to OMB -- to OPM/OMB at a high level but we haven't made that public.

Do you see that?

A.    Yes, I do.

Q.    Does that refresh your recollection that the number of FEMA staff for the fiscal year 2026

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 230

was provided to OPM/OMB as the FEMA final staffing plan?

A.   As I --

MS. KIES:  Object to form.

A.   As I previously stated, I submitted these numbers through the exercise that was directed by the department CHCO, and that those are the numbers.

And I -- you asked me specifically if I know that they actually transmitted them, and I do not know.

That's why I said these are the numbers that we provided.  And it was for that exercise.

Q.   But here on December 17th, you were saying, "We have provided to OPM and OMB at a high level," that number.  Right?

A.   Because it was part of the exercise.  Yes, ma'am.

Q.   But you believed this to be true on December 17th, that that number had been provided to OPM and OMB.  Correct?

MS. KIES:  Object to form.

A.   That's what my email states, yes.

Q.   And you believed that that was true, correct, when you wrote it?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 231

A.    I believed that that was true when I wrote the email, yes.

Q.    And the rest of the email is true as well, that 50%, referring to a 50% cut of the FEMA staff, was used internally.  Correct?

A.    Yes.

Q.    And the 50% was also in the "leaked report."  Correct?

A.    Yes.

Q.    And the "leaked report" refers to the FEMA Review Council report -- draft report that we've been discussing?

A.    Yes.

Q.    And the "high level" reference here, when you say, "We've provided that to OPM and OMB at a high level, but we haven't made that public," Exhibit 17 is the high level that you're talking about.  Right?

            MS. KIES:  Object to form, foundation.

A.    That could be, because -- but these numbers don't specifically match because there were -- as I previously stated in my testimony, there have been multiple exercises as it relates to different staffing within FEMA that we were working

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 232

on in different -- in my different roles.

And so, that's why it's an internal number. And that number is not public because it was delivered to....

Q. Ms. Evans, is it a coincidence that the 50% cut in the leaked draft report was the same as the 50% cut that you put in the FEMA staffing plan?

MS. KIES: Object to form.

A. I can't speak to the 50% cut that's in the FEMA Review Council report.

Q. You were implementing the DHS Secretary's priorities and plans for FEMA, as you understood them, when you put the 50% cut in the FEMA annual staffing plan, were you not?

MS. KIES: Object to form.

A. I was following through to make sure that our numbers were consistent, because my first role there was as the senior advisor to Mr. Richardson, and Mr. Richardson's analysis was projected to cut FEMA by 50%.

And so, the documents that were done through -- which I previously mentioned the mission essential tasks.

And looking at that, Mr. Richardson projected that he could cut the staff by 50%.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 233

Q.    That was DHS direction, was it not, Ms. Evans?

MS. KIES:  Object to form, foundation.

A.    I'm not sure of Mr. Richardson's direction to cut the staff by 50%.

Q.    So when you approved the FEMA annual staffing plan, it's your testimony you were simply relying on whatever Mr. Richardson had done before you?

MS. KIES:  Object to form.

A.    No.  It's my testimony that I was making sure that the data that we had submitted was consistent, because these exercises were all internal and were deliberative.

And so, I wanted to make sure that data was consistent with previous submissions that we had sent up to the department.

Q.    Ms. Evans, you understood, as we've talked about from the outset, that DHS was to provide a final annual staffing plan to OMB and OPM, per the President's executive order.  Correct?

MS. KIES:  Object to form.

A.    Yes, ma'am.

Q.    And you are contributing these numbers for

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 234

inclusion in the final annual staffing plan that was to go to OPM and OMB.  Correct?

MS. KIES:  Object to form.

A.   Yes, ma'am.

Q.   And you did not do any independent analysis yourself that resulted in a 50% cut to FEMA's staff based on FEMA functions or FEMA needs. Correct?

MS. KIES:  Object to form.

A.   That is not a correct statement.  I did the analysis based on the data that was provided to Mr. Richardson, based on analysis that was done by Stephanie Dobitsch in OPPA; and did that analysis to come up with these numbers, based on the functions that they said were aligned to the statutory responsibilities of FEMA.

Q.   Were those documents that you reviewed before cutting the FEMA numbers in half?

MS. KIES:  Object to form, misstates evidence.

A.   Those were internal documents that were produced, based on analysis of staffing that was currently there at FEMA.

And then -- also, then, the analysis of what functions, based on what was statutorily

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 235

required; also based on overall statements that were made of locally led, you know, state managed, federally supported.

Q.   Is it your testimony that you were not provided direction from the DHS headquarters to include a 50% cut in the FEMA annual staffing plan, Ms. Evans?

MS. KIES:  Object to form.

A.   Can you restate that one more time?

Q.   Sure.

Are you testifying that you were, in fact, not told by the DHS leadership to include a 50% cut in the annual staffing plan?

MS. KIES:  Object to form.

A.   I was told to include an option that would include a 50% cut.

Q.   And who told you that?

A.   Again, those discussions happened with the deputy chief of staff, Joe Guy.

Q.   And Kara Voorhies was aware of these conversations because, as we saw in your notes, you talked to her about the 11,383 number that was being submitted as the final number on December 4th. Correct?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 236

MS. KIES:  Object to form.

Q.   And she is also DHS front office. Correct?

MS. KIES:  Object to form.

A.   She -- as I previously stated, she's the senior advisor to the counselor for FEMA issues.

Q.   And you are not aware of who was directing DCS -- DCOS Joe Guy to tell you to include that 50% option.  Correct?

MS. KIES:  Object to form.

A.   I did not participate in specific discussions, other than the one that I mentioned with DCOS Guy.

Q.   And you're not aware of who was telling DCOS Guy to tell you to include a 50% cut in the FEMA annual staffing plan.  Correct?

MS. KIES:  Object to form.

A.   Yes, that is correct.

Q.   And you know that DCOS Guy reports to Secretary Noem.  Correct?

A.   Yes.

MS. KIES:  Object to form.

Q.   You also were aware, at the time that you submitted this 11,383 number, that the component -- FEMA component programs and offices were projecting

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 237

a much higher number as needed for fiscal year 2026.
Correct?

MS. KIES:  Object to form.

A.    Yes.  And that was based on their current understanding of the work that they were doing.

Q.    And that would -- they would need to do in 2026.  Correct?

MS. KIES:  Object to form.

A.    The work that they -- that was based on the work that they believed that they would be doing in 2026, as we had not received the final recommendations, as approved by the President, for the future of the FEMA Review Council.

MS. LEONARD:  Let's mark this as the next, 19.

(Whereupon, Plaintiffs Exhibit 19 was marked for identification.)

Q.    So, Ms. Evans, you're being handed an email that was sent on January 5th from someone named Jeffrey Neurauter.

My first question is going to be:  Do you know who Jeffrey Neurauter is?

A.    No, I do not.

Q.    Okay.  His signature says that he is the director of Policy, Planning and Accountability

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 238

Division in the FEMA, OCHCO Office.

Do you see that?

A.   Yes, I do.

Q.   Okay.  So Mr. Neurauter, in this email, is recounting a history of the annual staffing plan. And I'm going to point out -- and he has attached some of the spreadsheets and documents that we have been discussing.

And I'm going to ask you about a few of his statements here.

So he -- at the top, he's referring to the November 21, 2025 DHS OCHCO email.  We've already looked at that.

You're familiar with that.  Correct?

MS. KIES:  Object to form.

A.   Yes.

Q.   And then it says here:

Following the instructions provided, FEMA OCHCO sent the data call template to program/regional offices to collect information showing hiring and reduction estimates....

And a number of other things.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 239

Do you see that sentence?

A.    Yes.

Q.    Do you have any reason to believe that that was not true?

MS. KIES:  Object to form, foundation.

A.    No.  I have no reason to believe that's not true.

Q.    And then it says that:

Three versions of an Annual Staffing Plan were created and forwarded to the Office of the Administrator for consideration and approval.

Do you see that?

A.    Yes.

Q.    Do you have any reason to believe that's not true?

MS. KIES:  Object to form, foundation.

A.    No.

Q.    No reason to believe it's not true?

A.    I have no reason to believe that that statement's not true.

Q.    And then one of those plans provided by

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 240

the FEMA OCHCO'S office included hiring and reduction estimates, and two excluded any hiring estimates.

Q.    Do you have any reason to believe that's not true?

MS. KIES:  Object to form.

A.    I have no reason to believe that statement's not true.

Q.    If you go further down in the discussion, there's a sentence -- there's a -- the first paragraph is discussing "The Annual Staffing Plan created by FEMA OCHCO."

And you see that?

A.    The next paragraph?

Q.    The paragraph that starts:

The Annual Staffing Plan
created by --

A.    Oh, okay.

Q.    (Continued reading:)

-- FEMA OCHCO....

A.    I see it, yes.

Q.    And it says:

This plan showed a
staffing level of 24,812 by the
end of fiscal year 2026.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 241

Do you have any reason to believe that wasn't true?

MS. KIES:  Object to form.

A.   I have no reason to believe that's not true.

Q.   And then the next paragraph -- the next paragraph says:

The Annual Staffing Plan submitted to DHS by the Office of the Administrator contained FEMA Leadership's staffing goals at Organization Level 2, showing a staffing level of 11,383....

Do you see that?

A.   Yes.

Q.   And that is consistent with the document we've just been looking at in Exhibit 17.  Correct?

A.   Yes.

Q.   And if you go back up to the first paragraph, it says:

On December 4, 2025, SOPDA Evans forwarded FEMA's Annual Staffing Plan directly to DHS.

Do you see that?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 242

A.    Yes.

Q.    And that was correct?

MS. KIES:  Object to form.

A.    It must be correct, because it's in here. I have no reason to believe I didn't do that.

Q.    And there's a paragraph that starts:

On January 5, 2025, FEMA OCHCO received a copy of the Annual Staffing Plan submitted to DHS on December 4.  FEMA OCHCO had not previously received a copy of this submission.

Do you see that?

A.    Yes, I do.

Q.    Do you have any reason to believe that's not correct?

MS. KIES:  Object to form.

A.    No.  I have no reason to believe that statement's not correct.

Q.    So at the time that you submitted the FEMA annual staffing plan with numbers of 11,383, you were aware that the program offices had shown a staffing level needed, based on a bottoms-up approach, of 24,812 individuals.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 243

MS. KIES:  Object to form.

A.    That's what this says, yes.

Q.    Imposing a 50% cut in FEMA's annual staffing plan was not your idea, was it?

MS. KIES:  Object to form.

A.    I would say, to answer that question, that there were different options that were placed on the table in order to do the analysis associated with the staffing.

And the 50% cut was one of the options that I was to analyze.

Q.    And that's the one you chose to give to DHS.  Correct?

A.    Yes.

MS. KIES:  Object to form.

Q.    But it wasn't your idea to impose a 50% cut on FEMA's staff for fiscal year 2026, was it?

MS. KIES:  Object to form.

A.    It was my -- I'm trying to think of the right word here.

It was my analysis, and it was my decision to send forward a staffing plan that showed the 50% cut.

Q.    But you had -- you previously testified you had been told to include 50% as one of the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 244

options by the DHS front office.  Correct?

MS. KIES:  Object to form.

A.    That is what I testified to, yes.

Q.    And you were told that before you did any of the analysis you just referred to.  Correct?

MS. KIES:  Object to form.

A.    As I have previously mentioned, there have been several exercises, all the way up to this one, that looked at different staffing options associated with FEMA.  50% was one of the staffing options.

And then based on positions that I was in and also supporting Mr. Richardson, those different staffing options and different staffing levels were analyzed.  And that's what we did.

Q.    But when you made the decision to submit that number and picked the 50% cut as the FEMA annual staffing plan that you gave to DHS, you didn't conduct any new analysis.  Correct?

MS. KIES:  Object to form.

A.    I went back and looked at the analysis that we have previously done under the other different scenarios and made sure that the analysis was consistent.

Q.    Was that a written document that you looked at?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 245

MS. KIES:  Object to form.

A.   No.   They were documents that I previously mentioned, that the analysis was done about the mission essential tasks and the staffing levels that Mr. Richardson was also looking at, and then current staffing levels that the FEMA CHCO -- I'm making sure I'm using the right CHCOs here -- the FEMA CHCO have provided data for the current staffing levels in the different program offices.

Q.   The analysis that you were talking about, what document was the analysis that you looked at in order to make the decision to send over -- to comply with the request from DHS to give a 50% cut?

MS. KIES:  Object to form.

A.   So there were different documents, which I've previously mentioned, which was the mission essential task analysis, which also looked at staffing levels under these other exercises that we have done and then looked at these doc- -- this particular document, which was the staffing plan. That's what it says.

So I have no reason to believe that this email is incorrect.  And then I submitted the option with the 50% cut.

Q.   And you did not analyze -- or -- review or

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 246

analyze FEMA's own 2024 force structure review, because you testified earlier that you had not reviewed that document.  Correct?

MS. KIES:  Object to form.

A.    That's true, yes.

Q.    So FEMA had conducted a force structure review in 2024 to analyze its staffing needs, and you didn't look at it before giving a 50% cut plan to DHS?

MS. KIES:  Object to form.

A.    I did not look at that document because that document was based on work that they were previously doing.

And I looked at the documents that were associated with the new analysis that was looking at the statutory responsibilities of FEMA and the staffing associated with those functions and those offices.

Q.    And you didn't look at the 2024 -- 2024 force structure review because it was done by the Biden administration.  Correct?

MS. KIES:  Object to form, misstates testimony.

A.    I did not look at that document because it was done based on work that they were currently

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 247

doing and previously doing.

I looked at the new documents that were done based on the analysis, that was done based on the statutory requirements and the mission essential functions that were being conducted under Mr. Richardson's leadership.

Q.   And who created that analysis?

MS. KIES:  Object to form, foundation.

A.   As I previously stated, that analysis was being supported -- he was being supported by OPPA, which is the Office of Policy, Planning and Analysis -- OPPA.  Yes.  Office of Policy, Planning and Analysis.

Q.   And did one of the things that that analysis include -- description of the cost associated with the various parts -- staff at FEMA?

MS. KIES:  Object to form, foundation.

A.   I don't recall the specific dollars.

I know what I looked at was the funding sources associated with, for example, those positions that were funded under the Disaster Relief Fund, those positions that were funded under the National Flood Insurance Plan, and those positions

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 248

that are funded under regular appropriations.

Q.   And what cut, percentage cut, to the CORE does this 11,383 total number for FEMA staffing represent?

A.   In the specific chart that you're looking at, those projected proposed cuts were based on the mission essential task analysis that was done by OPPA, suggesting how they could do those functions for those offices.  That's why it's at a high level.

And this email -- also, the previous email says that it was at a high level.  It didn't go specifically down into PFTs versus COREs at that point.

Q.   But these numbers do include the CORE?

A.   Those numbers include all of what is considered FEMA employees at the time.

As we have previously discussed, and as I previously testified, there are permanent full-time employees, there are CORE employees, and there are reservists.

Q.   And you were aware, at the time, that there was no way to reach this 11,383 number without doing a very substantial elimination of CORE positions.  Correct?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 249

A.    I know that we had to really look at the CORE positions in order to be able to achieve a 50% cut.

Q.    That would mean reducing thousands of CORE positions, in order to achieve a 50% cut.  Correct?

MS. KIES:  Object to form.

A.    That means that it could lead to not renewing or relooking at the functions that the COREs were doing at the time that this analysis was happening.

Q.    In order to hit 11,383 in fiscal year 2026, you knew, at the time, that that meant eliminating thousands of CORE positions.  Correct?

MS. KIES:  Object to form.

A.    It meant that we would have to analyze the existing CORE population and not necessarily reviewing -- renewing those positions, because COREs are temporary.  They are term appointments.  They're not permanent employee -- appointments.

So to reach that number, we were going to have to do extensive analysis based on what the President would say are the approved recommendations coming from the FEMA Review Council, in order to really look at the functions according to the statutory requirements of what FEMA should be doing

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 250

after the President then approved that report.

Q.    My question was slightly different.

In order to achieve an 11,383 total number of FEMA employees for fiscal year 2026, you knew, at the time, that you would have to eliminate thousands of CORE positions, did you not?

MS. KIES:  Object to form, asked and answered.

A.    I know, at that time, that we were going to have to do extensive analysis as it related to CORE appointments and the work that they were doing, and then to make sure that that analysis and those positions were aligned to the recommendations that the President would approve coming from the FEMA Review Council.

Q.    It's a yes-or-no question, Ms. Evans, and I'd like a yes-or-no answer.

You knew, at the time, in order to achieve a number of 11,383 for fiscal year 2026, that you were going to have to eliminate thousands of CORE positions.  Correct?

MS. KIES:  Object to form, asked and answered.

Q.    Yes or no?

MS. KIES:  She should give

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 251

honest and complete testimony.  You can't tell her how to answer a question.

MS. LEONARD:  That's not an objection.  No more speaking objections and no coaching of your witness.

Q.    Please -- it's a yes-or-no question, Ms. Evans.  Please give me a yes-or-no answer.

A.    Can you restate the question again?

Q.    Sure.

You knew, at the time of this annual staffing plan, that to get to a total staffing number of 11,383 for FEMA in fiscal year 2026, you were going to have to eliminate thousands of CORE positions.  Correct?

MS. KIES:  Object to form, asked and answered.

A.    I knew we were going to have to do extensive analysis, and it definitely was going to affect the CORE population.

Q.    And you would have to eliminate thousands of CORE positions to get to 11,383.  Correct?  Yes or no?

MS. KIES:  Object to form, asked and answered.

A.    The answer is yes, because the majority of

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 252

the positions at FEMA are CORE positions, not full-time employees.

MS. LEONARD:  Okay.  Let's take another -- what time is it?  Let's take another break.  All right.  Now's a good time for another break.

VIDEOGRAPHER:  Off the record at 3:24.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 3:37.

BY MS. LEONARD:

Q.   Okay.  Ms. Evans, let's talk about what else you inherited with respect to FEMA's staffing when you took over the position as SOPDA from the former SOPDA, Mr. Richardson.

Is it fair to say that there were some pending decisions with respect to CORE staffing that you inherited when you took over from SOPDA Richardson?

MS. KIES:  Object to form.

A.   When I took over in December as the SOPDA, all personnel actions would then become my responsibility.

Q.   And there was a draft memo that was

Page 253

prepared, that had not been finalized at the time, for S1 approval to renew the FEMA authority to extend certain CORE positions.  Is that right?

MS. KIES:  Object to form.

A.   There was a draft memo, I believe, that was requesting the extension of the delegated authorities.

Q.   And if I refer to "MCO" and "nonMCO" CORE positions, will you know what I'm talking about?

A.   Yes, I would.

Q.   "MCO" means what?

A.   Mission critical occupations.

Q.   And "nonMCO" is everything else?

A.   Is nonmission critical occupations.

Q.   And there were specific occupation codes that were identified as mission critical that applied to FEMA.  Is that correct?

MS. KIES:  Object to form.

A.   There are mission critical occupation codes that apply to the federal government as a whole.

And then it's my understanding there is one specific for FEMA.

Q.   And your understanding of that memo that I just referenced extending the delegation of

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 254

authority back to FEMA to extend CORE positions applied to nonMCO positions.  Correct?

MS. KIES:  Object to form.

A.   I don't recall the specific text of the draft memo.  I know that the delegated authority for CORE positions was expiring on December 31st.

Q.   And you also knew that there were CORE NTE dates that were coming up in January of 2026.  Correct?

MS. KIES:  Object to form.

A.   Yes.

Q.   And there were requests for renewal of those CORE positions that had not yet been approved.  Correct?

MS. KIES:  Object to form.

A.   Yes.

MS. LEONARD:  Okay.  Let's look -- let me just make sure I have the right one.  Okay.

We're going to mark this as the next.  There you go.

(Whereupon, Plaintiffs Exhibit 20 was marked for identification.)

Q.   I'm going to hand you another email exchange -- 20, Exhibit 20.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 255

MS. LEONARD:  Thank you.

Q.   You've been handed an email chain that we were provided by Defendants that appears to be an exchange between you and Ms. Dobitsch in -- on December 4th and 5th of 2025.

Let me know when you are ready.

(Witness reading.)

A.   Okay.

Q.   Starting with the December 4th email, the first in line from Ms. Dobitsch, she is referencing the draft extension memo for the delegated authority with respect to certain CORE renewals.  Is that right?

MS. LEONARD:  Object to form.

A.   She -- yes, she is referencing the term appointments for CORE employees.

Q.   Well, it says:

...term extension memo that is with you for approval to push to the Secretary.

Do you see that?

A.   Yes.  "The term extension memo."

Q.   Okay.  And then she's also talking, in this email, about decisions on the CORE terms and their extensions that will be coming due in the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 256

coming months.  Correct?

A.    That's what her email states.

Q.    Okay.  And do you recall that you had a meeting with Ms. Dobitsch on December 4th at which you talked about these issues?

MS. KIES:  Object to form.

A.    I don't know specifically if we had an email -- a meeting.  I'm sure it's in my notes that you have.

Or it should be in the notes that you have.

Q.    If you can look at Exhibit 10, on December 4th, there is a -- on Page -33534 --

A.    Yes.

Q.    -- there is an entry that's above the one we previously discussed about the staffing plan and the number 11,383.

Do you see the entry above that?

A.    Well --

Q.    Looking --

A.    -- my notes on --

Q.    Yes.

A.    -- the one that's ended -33534?

Q.    Yes.  No. 1, "Looking at all CORE dates."

A.    Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 257

Q.   Is that -- are those notes from your meeting with Ms. Dobitsch?

MS. KIES:  Object to form.

A.   That's what it looks like, yes, that that would be the meeting.  Those are my notes.

Q.   Okay.  And on the first email -- and you can set that aside and look back at Exhibit 20.

And there's an email on -- the first email on -- sorry.  I'm tired.

The last email in the chain, which is the first one on the first page, on December 5th.

Do you see that?

From Stephanie to you.

A.   Okay.  You want me to look at --

Q.   The top page.

A.   -- December 5th --

Q.   Yes.

A.   -- the top page, which is marked -6686?

Q.   Yes.  Sorry.

A.   Okay.

Q.   You're doing a better job than I am.

-6686, there's a December 5th email from Stephanie Dobitsch to you, sent at 3:32 p.m.

Do you see that?

A.   Yes, I do.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 258

Q.   And she says:

            We're planning several

         meetings next week to dig into

         this as part of the plan you

         and I discussed for CORE

         rightsizing.

     Do you see that?

A.   Yes, I do.

Q.   So one of the things you were discussing, as you became the SOPDA, was rightsizing the CORE at FEMA?

            MS. KIES:  Object to form.

A.   Yes.

Q.   And this was -- that reference is the day after you sent the annual staffing plan to DHS that included a 50% cut to all of FEMA employees. Correct?

            MS. KIES:  Object to form.

A.   Based on the emails that you've provided today, yes.  That's -- that looks like the dates.

Q.   And so, rightsizing the CORE, that was part of the plan of implementing the 50% cut?

            MS. KIES:  Object to form.

A.   The rightsizing of the COREs was to really look at the CORE functions.  It wasn't necessarily

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 259

to implement the 50% cut.

It was to analyze the CORE positions, what disasters they were working on.  That's specifically what this email talks about.

Because I asked -- if you look at the next page, which is marked -6687, I specifically asked for what disasters they're assigned to.

And then -- and I asked for the breakout so that we would know exactly what disasters the COREs were working on.

Q.   You discussed a plan to release all COREs by NTE date with Ms. Dobitsch on December 4th, did you not?

MS. KIES:  Object to form, foundation.

A.   I discussed with Ms. Dobitsch the way to look at the CORE positions and analyze the CORE positions.

Again, if you look at this, it is based on what disaster that they were working on.  And that's why I was asking the specific question about including the disasters that the COREs are assigned to.

Q.   But you also discussed a plan to release CORE positions by NTE date, did you not?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 260

MS. KIES:  Object to form, foundation.

A.    We discussed what would be the process and what was the process that was ongoing within FEMA as it related to CORE renewals.

Q.    And you were, according to your notes:

Looking at all CORE dates

Propose plan reductions

Do you see that in your notes?

A.    Yes.

Q.    You were discussing with Ms. Dobitsch a plan to hit the 50% target by releasing CORE positions on their NTE dates, were you not?

MS. KIES:  Object to form, foundation.

A.    No.  My notes specifically talk about looking at all CORE dates.

And again, it says a -- propose plan for reductions, because, as I previously stated, these are options that were going forward.

And then also looking specifically -- because, if you notice, there's an A, B and an A -- 1A and a 1B that we were specifically looking at CORE dates as it related to Katrina as well.

Q.    The "Katrina" reference there is for the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 261

CORE dates of the people who were involved in the Katrina letter, is it not?

A.   No, that's not correct.

The CORE dates here are related to the people that are working the Katrina disaster.

Q.   Whose idea was it to reduce the size of the CORE by letting CORE appointments expire by NTE date?

MS. KIES:  Object to form, assumes facts not in evidence.

A.   Again, in looking at proposed options, what I was requesting -- and again, the same email that you're looking at was specific about the CORE dates and looking at the plans, and then what disasters COREs were assigned to, and then looking at the expiration dates, and then understanding the process associated with CORE renewals.

Q.   So when you refer to "options," you did not give the DHS front office any options when you sent over the final FEMA staffing plan that included a 50% cut.  Right?

MS. KIES:  Object to form.

A.   I, as I previously testified, submitted that number of 11,883 [sic].

Q.   There wasn't a plan B or an option B that

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 262

you submitted.  Correct?

MS. KIES:  Object to form.

A.    Not at that time.

Q.    Not at any time after that as well.
Correct?

MS. KIES:  Object to form.

A.    No, because right now we're in the process
of doing that analysis.

Q.    No, you have not submitted another number
for the final FEMA staffing plan to either DHS or
OMB and OPM.  Correct?

MS. KIES:  Object to form.

A.    No, because -- I have not submitted an
updated number because, based on the previous
document that you had, these were pre-decisional
information about potential options that we could
execute.

Q.    And at some point, you began discussing a
plan to release CORE positions by NTE date with
Ms. Dobitsch.  Correct?

MS. KIES:  Objection;
foundation, asked and answered.

A.    What I discussed with Ms. Dobitsch is what
is the impact of the CORE renewal dates and what
would be an appropriate plan to actually analyze

Page 263

those positions.

Because, as we previously discussed, there have been several exercises that FEMA had been looking at that would, in essence, do a bottoms-up or a zero-based type of approach for staffing.

Q.   And one of the things you -- you tasked Ms. Dobitsch with is coming up with a plan to get the CORE at the right number to hit that 50% cut to FEMA's staff, did you not?

MS. KIES:  Objection; foundation --

A.   Um --

MS. KIES:  -- form.

COURT REPORTER:  What was the last one?

MS. KIES:  Form.

A.   So what I asked Ms. Dobitsch to do was to look at those options associated with that.

And one option was, as we previously discussed, a 50% cut.

Q.   And one of the ways that you asked her to look at to get there was by nonrenewals of the CORE on their NTE dates.  Correct?

MS. KIES:  Object to form.

A.   That's incorrect, because I did not ask

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 264

her to specifically look at nonrenewals.

What we were discussing here, again, by this email, is that there are non -- there are extensions, there's renewal dates, that were coming up for COREs.

What this email is specifically talking about is that FEMA would no longer have the delegated authority to be able to continue to do the extensions for this work.

So what we were talking about with this analysis, as well as what she's talking about at rightsizing, is the analysis associated with COREs to do the work that is statutorily required by FEMA.

Q. Why didn't you want FEMA to have the authority to do the renewals to the nonMCO COREs, Ms. Evans?

MS. KIES: Objection; foundation.

A. I made the decision not to send that forward because we weren't in hurricane season.

And so, this was giving us enough opportunity to actually analyze the workforce.

Q. Let's talk about that decision.

So the renewal authority that had been, in your view, delegated back to FEMA by DHS, that was

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 265

done in a May 14th memo from S1.  Is that right?

MS. KIES:  Object to form.

A.    That's my understanding --

Q.    Okay.

A.    -- yes.

MS. KIES:  Let's mark that as the next exhibit, which is No. 21.

(Whereupon, Plaintiffs Exhibit 21 was marked for identification.)

Q.    So, Ms. Evans, you've been handed Exhibit 21, which is a May 14th memo signed by Kristi Noem, Secretary of DHS, as approved, that, in your view, delegates back to FEMA the authority to extend certain CORE positions by 180 days.  Correct?

MS. KIES:  Object to form.

A.    Yes, except this memo is -- does not include the annex.  And so -- Annex A has specific background information that should be included.

Q.    There's an attachment that we don't have. Is that correct?

A.    I don't know whether you have it or not, but this specifically says:

See Annex A for additional background.

And there is no Annex A associated with

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 266

this memo.

Q.   Okay.   But the memo that you see before you, this -- in general terms, this extends to FEMA the delegated authority to renew certain CORE positions by 180 days only.   Correct?

A.   That's my understanding.   But also, I believe there is specific discussion and background about what that actually means in Annex A.

Q.   Without this delegation of authority, DHS required, as of May 2025, all decisions regarding CORE positions to be sent to DHS for S1 approval. Correct?

MS. KIES:   Object to form, foundation.

A.   It's my understanding that the policy at that time, and continues to be the policy until rescinded by the current DHS Secretary, is hiring decisions are sent forward to DHS headquarters.

Q.   And you understand the extension of a CORE position to be a hiring decision?

MS. KIES:   Object to form.

A.   That is my interpretation of it, is that because it is a personnel action that cuts an SF-50, it counts as a hiring action.

Q.   And we'll get to that.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 267

You had a little bit of a dispute internally within FEMA whether -- whether that was the case, did you not, at the end of 2025?

MS. KIES:  Object to form.

A.   I believe that the emails outlined that discussion that we had -- that I had with the FEMA CHCO office.

Q.   But with respect to the nonMCO CORE positions addressed by this memo, you understood that FEMA, for six months, until that authority expired, had the ability to renew and extend nonMCO CORE positions for up to 180 days.  Correct?

MS. KIES:  Object to form.

A.   Yes, that's what this says.

Q.   And the limit of 180 days, that was a limit that was imposed by DHS, by the secretary's decision.  Correct?

MS. KIES:  Object to form.

A.   That's what this memo states, yes.

Q.   And without that authority, all of those decisions had to go to the DHS front office for approval.  Correct?

MS. KIES:  Object to form.

A.   The renewals had to go forward to DHS without this authority.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 268

Q.   Do you have any understanding of why this authority was granted to FEMA for roughly only a six-month period?

MS. KIES:  Object to form, foundation.

A.   This is when I arrived as the senior advisor to Mr. Richardson.  And I believe that this ability, as this states, was because we were coming up on hurricane season.

Q.   Hurricane season, which lasts, roughly, six months?

A.   It starts on June 1st.

Q.   And ends at the end of November?

A.   I believe it's --

MS. KIES:  Object to form.

A.   -- the end of November.

MS. LEONARD:  All right.  We're going to mark -- this is the next.  22.

(Whereupon, Plaintiffs Exhibit 22 was marked for identification.)

Q.   So, Ms. Evans, I've handed you what's been produced to us as an email with two attachments from the December 5th time frame.

The attachments appear to be a red-lined and a final FEMA CORE renewal S1 decision memo that

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 269

someone here is forwarding to FEMA ExecSec.

Let me know when you are ready for questions.

(Witness reading.)

Q.   Are you ready, Ms. Evans?

A.   Yes, ma'am.

Q.   Do you recognize the drafts of these memos, generally speaking?

MS. KIES:  Object to form.

A.   I do not.

Q.   Do you recall having a discussion with Ms. Dobitsch about the S1 approval memos that had been drafted extending the renewal authority?

A.   I know that I had discussions with Ms. Dobitsch about the recommendation that she was making from her team to do the extension of this delegated authority.

Q.   And did you give Ms. Dobitsch feedback on the memos?

A.   As you can clearly see on these emails, that I am not part of the review.  I'm not CC'd on these.

They were preparing this, based on what I'm reading, saying that it was going to come to me.

So I'm not -- I don't see myself on these.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 270

I don't recall seeing this specific email.

I know that I had discussions with Ms. Dobitsch about the delegated authority.

Q.   Okay.  At the top of the third page, it says:

> Based on feedback from SOPDA Evans provided to acting MS Associate Administrator Dobitsch, we have updated the memos --

Goes on a little further.

> My understanding is that Ms. Evans is expecting the updated version of the memos.

But you don't recall having seen the actual memos before you had that conversation with Ms. Dobitsch?

A.   No.  I know that in the discussion with Ms. Dobitsch, she was recommending that I seek this approval.

And, apparently, from this series of emails, she was preparing the memo for my signature.

Q.   And then that was accompanied by a memo for DHS Secretary Noem's signature that would delegate that authority?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 271

MS. KIES:  Object to form.

A.  The way that the process works is Ms. Dobitsch, as the head of OPPA, who was also performing duties dealing with mission support -- and so, in mission support, that's where the FEMA CHCO office resides -- that she was preparing this recommendation.

So she would send a memo to me, recommending that I seek this.  And then there would be a secondary memo that would then go forward to the secretary, if I agreed with the decision memo that Ms. Dobitsch would send forward.

Q.  And you're aware that these memos were sent to Kara Voorhies for her approval?

MS. KIES:  Object to form, foundation.

A.  I am not aware.  And this email chain does not show Ms. Voorhies receiving these memos.

MS. LEONARD:  Let's mark this as the next, 23.

(Whereupon, Plaintiffs Exhibit 23 was marked for identification.)

Q.  You've been handed what's been marked as Exhibit 23.  It's a December 25 [sic], 2025 email from someone named Andrew Clayton, referring to the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 272

CORE renewal memo.

I'm going to ask you about the top email.

(Witness reading.)

A.   Okay.

Q.   So you see here that Mr. Clayton is sending an email to FEMA's ExecSec that says:

Please allow Kara opportunity to review before packaging for signature.

Do you see that?

A.   Yes, I do.

Q.   And you understand that that's a reference to Ms. Voorhies?

MS. KIES:  Object to form, foundation.

A.   I believe that's the case, yes.

Q.   And do you have any reason to believe that these memos were not sent to Ms. Voorhies to give her an opportunity to review before packaging for signature?

MS. KIES:  Object to form, foundation.

A.   I have no reason to believe that they were not sent to her.

Q.   And did you discuss these memos or the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 273

renewal authority with Ms. Voorhies?

MS. KIES:  Object to form.

A.   I'm sure that I had discussions about the COREs, as we previously discussed, and then the authorities associated with hiring from the department and the delegated authorities.

Did I specifically talk about these memos? As you can see, again, I'm not on these emails.

Q.   Do you recall discussing the renewal authority with Ms. Voorhies in this early December time frame?

A.   I recall discussing that with her, but I also recall discussing it because, as I previously stated, I had weekly meetings with the deputy chief of staff, Joe Guy, and let him know that this was going to expire.

Q.   And did you discuss seeking renewal authority to extend that delegated authority with the DHS front office?

MS. KIES:  Object to form.

A.   I discussed with DCOS Guy that I was not going to seek the authority.

Q.   Who made the decision not to seek the Secretary of Homeland Security's approval to extend FEMA authority?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 274

MS. KIES:  Object to form.

A.   I made the decision not to send these memos forward and seek the approval after December 31st.

Q.   And was that before or after the memos were sent to Kara Voorhies?

MS. KIES:  Object to form, foundation.

A.   I'm unsure of the timing of this.  I really don't know the timing of this.

Q.   But you discussed this issue with Ms. Voorhies before you made that decision.  Correct?

MS. KIES:  Object to form.

A.   As my previous note showed, that I have been discussing issues of FEMA with DCOS Guy on a weekly basis.

And as I previously stated, Ms. Voorhies was present in those meetings.

Q.   Did DCOS Guy tell you not to seek approval to extend the FEMA authority?

MS. KIES:  Object to form.

A.   He did not.  I told him I was not going to do that.

Q.   Did you make that decision because you

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 275

understood that the DHS Secretary did not want to extend that authority?

MS. KIES:  Object to form.

A.   I made the decision because I felt that we didn't need the authority at this time period, because it was not -- we were not in hurricane season, and that this was going to give us the opportunity to actually analyze the workforce appropriately.

Q.   And you were frustrated with the FEMA CHCO's extension of CORE positions pursuant to this authority because it interfered with your plan to reduce the number of CORE staff at FEMA.  Correct?

MS. KIES:  Object to form, misstates testimony and evidence.

A.   I don't agree with the statement that you just made because I don't believe that that's the premise of why -- I know that's not the reason why I did not ask for this authority during this time period.

Q.   If you had received this delegated authority to extend for up to 180 days, and those 180-day extensions had been given, it would have made it more difficult to hit your 50% cut numbers. Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 276

MS. KIES:  Object to form.

A.  I, again, don't agree with the way that you're asking that question, because we would have done the analysis regardless of whether we had the authority to do the renewals for 180 days or not.

Q.  This was an impediment to your plan to reduce the number of CORE staff at FEMA, was it not?

MS. KIES:  Object to form, misstates testimony.

A.  Can you clarify the question?  Because I don't know what you mean by "this" is an impediment.

Q.  The idea of extending the authority to renew the CORE staff by up to 180 days would have been an impediment to your plan to cut the CORE staff.  Correct?

SP02:  Object to form, misstates evidence.

A.  I don't agree with that statement, because we were going to do the analysis.

And whether we had the authority or not, I viewed that authority as the ability for us to actually do the analysis and do meaningful analysis.

Q.  But you chose not to seek that authority from DHS because you didn't think it was necessary at the time?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 277

MS. KIES:  Object to form.

A.   Yes, that is correct.

Q.   And as a result of that decision, the authority reverted to DHS, and all action with respect to the CORE required S1 approval.  Correct?

MS. KIES:  Object to form, misstates testimony.

A.   Actually, I don't agree with that statement.  The way that the authorities are set up is hiring decisions go to headquarters.

Q.   All action with respect to any CORE renewal had to be approved by S1 as a result of your decision not to seek the extension of that authority.  Right?

MS. KIES:  Object to form, foundation.

A.   So I'm going to restate what my understanding is, which is renewal of CORE appointments would go forward to headquarters if we were going to renew CORE appointments.

Q.   Let's look at another exchange regarding your conversation with Ms. Dobitsch in early December.

MS. LEONARD:  Mark this as the next, 24.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 278

(Whereupon, Plaintiffs Exhibit 24 was marked for identification.)

(Witness reading.)

Q.   Okay.  Ms. Evans, are you ready?

A.   Yes, ma'am.

Q.   Okay.  So the first email in the chain, which is on the back, is an email from you on December 4th to Ms. Dobitsch, CC'ing Kara Voorhies. And its subject line is "Follow Up on Items."

Do you see that?

A.   Yes.

Q.   And then Ms. Dobitsch responds, and she says:

Some notes below for expectation setting on timing and materials.

And I understand what she has done here is to annotate the list that you sent her.  Is that correct?

A.   Yes, that appears so.

Q.   So in that original email, there is information that you wrote, and then there is information that she annotated.  Correct?

A.   That's what it appears to be, yes.

Q.   Okay.  And then you wrote this list coming

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 279

out of the meeting that you had, so that you say:

Just so that we are

tracking the same list per our

discussion.

And then you provide a list to her.

Correct?

A.   Yes.

Q.   And the first item on the list is:

Looking at all CORE dates.

By "dates," you are referring to NTE

dates.  Correct?

A.   Yes.  And this matches back to my

handwritten notes that you've already looked at.

Q.   Right.

And then under -- there's a crossed-out

item regarding the Katrina CORE dates.

And does this refresh your recollection

that you were talking about -- Katrina CORE dates

referred to the people who were on administrative

leave, and you wanted to know what their NTE dates

were?

MS. KIES:  Object to form.

(Witness reading.)

A.   Okay.  So, yes, that does appear that

that's what we were looking at, because we started

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 280

to include the Office of Professional Responsibility in these meetings.

Q.   And then b. is a:

                    Proposed plan to reduce

              COREs by date.

        So you discussed a proposed plan to reduce COREs by NTE date with Ms. Dobitsch on December 4th. Is that correct?

                    MS. KIES:  Object to form.

     A.   That's what this note says, yes.

     Q.   And you write accurate notes, don't you, Ms. Evans?

     A.   I write --

                    MS. KIES:  Object to form.

     A.   I write notes based on my understanding of what was discussed during the meeting.

     Q.   And then you also refer, under No. -- sorry -- 4, there's a reference to:

                    Overall CHCO numbers are

                 being worked by you and Will

                 (number is 11,383) Karen will

                 send a follow up note to HQ.

        That's a reference to the 11,383 overall FEMA staff in the FEMA staffing plan.  Correct?

                    MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 281

WITNESS:  Sorry.

A.   That is a reference to the spreadsheet that you already showed, because this is in the December 4th time period, based on the exercises that we were doing, sending forward to headquarters.

Q.   And you say "are being worked by you and Will."  You're referring to Stephanie Dobitsch and Will.

Who is Will?

A.   I never say his name right.  Up here, so Bilicic.

Q.   That's why I asked you to do it.

A.   Yeah.  I never -- I never say it right.

Q.   Okay.

A.   We joke around and call him Belichick, but it's Bilicic.

Q.   Got it.

So Stephanie and Dobitsch -- Stephanie Dobitsch and Will Bilicic, you had working the overall FEMA numbers --

MS. KIES:  Object --

Q.   -- to implement the annual staffing plan that reflected a 50% cut.  Is that fair?

MS. KIES:  Object to form.

A.   So as I previously stated, with this

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 282

number, we -- she had done the analysis on the mission essential functions, and there had been several different exercises within the Department to come up with what the staffing numbers would be at FEMA.

And in this particular case, this Item 4 was in the previous submissions.  Both Stephanie and Will had worked on that analysis together and those numbers.

So that's why this -- it says specifically that the two of them would be working on that.  Because those numbers, as we previously stated and you've seen in the emails, were not publicly released.

Q.   You specifically asked Stephanie and Will to work on a plan for implementing the 50% cut, reflected in the 11,383 number that you included in the final plan.  Correct?

MS. KIES:  Object to form.

A.   I asked them to look at those overall numbers, as I included here, because, as I previously stated, further analysis needed to be done, because on that spreadsheet, it's high-level numbers by the program offices.  It's not down to the level of specificity for the tasks.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 283

Q.   So I thought you told me the analysis was already done to justify those numbers.

And now you're saying that further analysis needed to be done to figure out how to get there?

MS. KIES:   Object to form.

A.   The high-level numbers that I stated were done by the mission essential tasks that got to the high-level numbers.

But to actually -- if you were going to actually implement that option, then you would have to go down, position by position, to actually analyze the positions and the functions that they were performing.

Q.   So you're -- have you told me everything that you considered in making the decision to approve the spreadsheet that included the 11,383 as the FEMA annual staffing plan, before sending that over to DHS?

MS. KIES:   Object to form.

A.   To my knowledge, I have answered your questions truthfully about the information that I reviewed to arrive at the 11,383 number.

Q.   And have you told me everything that you considered in approving that as the option that you

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 284

put forward to DHS to include in that final plan?

MS. KIES:  Object to form.

A.  To my knowledge, everything that I have stated is true in the documents and the analysis that was done to get to the 11,383 number.

Q.  But you understand that there was no way, without further analysis, to actually implement that plan at FEMA, without looking further at the functions performed by each position.

Is that what you said?

MS. KIES:  Object to form.

A.  Yes.  That's why we were looking at all CORE dates.

And then I believe what you'll have, further on, is the specific process that we were going to go through to have the program offices do the analysis of the functions that they were performing and the CORE positions that they were using to execute those functions.

Q.  So you don't say to look at the COREs by date.  What you say here is the "proposed plan to reduce COREs by date."  Right?  That's what you wrote there?

A.  It says:

Step 1.  Looking at all

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 285

CORE dates.

And then it says:

        b.  Proposed plan to reduce COREs by date.

Q.   And whose idea was the proposed plan to reduce COREs by date?

      MS. KIES:  Object to form, foundation.

A.   We had a discussion in the personnel meeting -- and when I say "we," it was Ms. Dobitsch, the FEMA CHCO.  Also that participated in these meetings would have been the Acting Chief Counsel.

And then we added, which we now -- I see the clarification here is the Office of Professional Responsibility.

Q.   And you also discussed the plan to reduce COREs by date with the DHS front office.  Correct?

      MS. KIES:  Object to form.

A.   I don't recall having that specific discussion.

I did have discussions, as I previously mentioned, with DCOS Guy.  And I'm sure we'll -- we'll be discussing the process where I outlined the process to him and then the logic that I would be following as we were reviewing CORE renewals.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 286

Q.   And you copied Kara Voorhies on this list and thereby informed the DHS front office?

MS. KIES:  Object to form.

A.   As I previously mentioned, it was my practice, as she was the senior advisor to the secretary on FEMA issues.

Q.   If you go to the next email, which is on December 12th from Stephanie Dobitsch to you, copying, again, Kara, Will, and Andrew Clayton, the second bullet down, it says:

On the plan to reduce COREs, I asked for 15 minutes with you this afternoon to discuss on my approach to develop the plan due to you in early January.

She's referring to her work developing the plan to implement the 50% cut.  Correct?

MS. KIES:  Object to form, foundation.

A.   I believe, if you look at it, that's part of the option here.

And then based on some of the other previous emails, Ms. Dobitsch would also describe this as rightsizing of the COREs.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 287

MS. LEONARD:  Okay.  Let's mark this as the next, which I believe is Exhibit 25.

(Whereupon, Plaintiffs Exhibit 25 was marked for identification.)

Q.   Another document that is produced to us by Defendants.

(Witness reading.)

MS. KIES:  Do you know if this was an attachment as well?

MS. LEONARD:  You didn't give us this document attached to anything, and you did not --

MS. KIES:  Okay.

MS. LEONARD:  -- provide custodian or author information.

We're requesting that you provide custodian and author information.

Do you know who the custodian and author is?

MS. KIES:  I do not.

(Witness reading.)

Q.   Okay.  Ms. Evans, you've been handed a document that's been produced to us by Defendants.

The metadata designates that the date of

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 288

this document is December 11th.  That's electronic data that we are given when we are given the document.  I can represent that for the record, that the metadata showed that it was December 11th.

Do you know who authored -- who authored this document?

A.   I do not.

Q.   Did you task someone at FEMA with developing a strategy to cut the FEMA workforce by 50% over fiscal year 2026?

A.   As we previously discussed, in this email, I have it documented, and we discussed that that was one of the plans that Ms. Dobitsch would be looking at.

So it's in the previous exhibit that we just discussed.

Q.   And do you believe that this is a document that is potentially authored by Ms. Dobitsch?

MS. KIES:  Objection; foundation.

A.   I don't know if Ms. Dobitsch authored this document.

Q.   And this also refers to you -- your "specific intent on the cuts to the workforce by employee type."

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 289

And it lists cuts there:

PFT:  Cut 35% or 1,362 positions.

Core:  Cut 68% or 10,843 positions.

Reservist/Local Hire:  Cut 76% or 7,039 positions.

At any time in 2025, did you discuss cuts of these levels with anyone at FEMA?

MS. KIES:  Object to form.

A.  As I previously stated, there were several exercises.  I'm looking at these specific numbers, and I don't recall talking about these specific numbers, such as like the 76% to reservists and local hires.

Q.  You don't recall, sitting here today, but it's possible that you informed someone at FEMA that you had this specific intent on the cuts to the workforce by the employee types listed here?

MS. KIES:  Object to form.

A.  I don't recall specifically giving direction to this level of specificity to these employee categories.

Q.  But you -- so you talked about a mission essential analysis previously.  And this refers to:

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 290

Ms. Evans has also directed targets for the overall workforce by Mission Essential Task.

Is this consistent with your recollection of the mission essential tasks that had been provided to you by Ms. Dobitsch?

MS. KIES:  Object to form.

A.   So I see, in the second piece of this, it says:

Ms. Evans also directed targets for the overall workforce by Mission Essential Task.

So, as I previously stated, I looked at the mission essential analysis that was done.

And Ms. Dobitsch is the one who also did this analysis and the numbers during Mr. Richardson's tenure.

And then as we just previously discussed in Exhibit 24, that's the reason why Item No. 4, "Overall CHCO numbers are being worked by you and Will" -- because it's related to the analysis that she has previously done based on mission essential tasks.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 291

Q.   And at the bottom of the page, this refers to:

                    Ms. Evans' intent to halve
              the workforce.

       Did you tell FEMA staff that you had an intent to halve the workforce in 2025?

              MS. KIES:  Object to form.

   A.   As I previously stated, those numbers were not released.

       And as you previously asked me, I did not distribute that agency workforce plan that we sent up to headquarters.

   Q.   You kept it close because you didn't want that to be public.  Correct?

              MS. KIES:  Object to form, misstates testimony.

   A.   I did not want the information to be public because it was still pre-decisional.

   Q.   And -- but you did talk about the plan to cut the workforce in half with a limited number of FEMA staff.  Correct?

              MS. KIES:  Object to form.

   A.   I talked about it specifically with Ms. Dobitsch because of the analysis that was previously done, and also because Mr. Bilicic was

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 292

involved.

And that's what they were going to work on.  That's clearly outlined in Exhibit 24.

Q.   And part of what they needed to do is figure out how to cut the positions in order to meet your 50% targets.  Right?

That's the task, at the highest level, that you gave Ms. Dobitsch and Mr. -- and Mr. Bilicic?

MS. KIES:  Object to form, misstates testimony.

A.   I believe, if you go back and look at Exhibit 24 again, it states that they're looking at the overall CHCO numbers and that the number that we previously talked about was 11,383.

And then the task is now to look to see, if there's a plan, what would the plan be to achieve that number to implement the 11,383 number.

Q.   If there's a plan --

A.   Well, we --

Q.   -- Ms. Evans?

A.   -- we -- it's clear, from this email, we didn't have a plan.  That's why I was tasking the plan.

Q.   Well, your plan was to cut the workforce

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 293

in half by 50%.  What you didn't have is an understanding of how to actually get there.  Correct?

MS. KIES:  Object to form, misstates evidence.

A.    Actually, your -- I don't necessarily agree with that statement.

The -- I would rephrase that to say that there is an option with -- to cut the plan -- to cut FEMA's staff by 50% -- was -- there is not an implementation plan.

And that's what Exhibit 24 is about, with me talking with Ms. Dobitsch about developing a plan.

Q.    An implementation plan?

MS. KIES:  Object to form.

A.    I would say that, yes, it would be an implementation plan, based on the way that we outlined the tasks.

Q.    And Exhibit 25, these Talking Points for FY 2026 Staffing Strategy that refer to your specific intent on the cuts and your intent to cut the -- to halve the workforce, again, you don't know who drafted this?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 294

A.   When I read the first piece, it says:

Ms. Evans has tasked me to

develop a strategy....

So the way that you're asking the question, I don't know for a fact, but it would seem to me that this was drafted by Stephanie Dobitsch.

Q.   Do you know whether Will Bilicic was involved?  Because you tasked the two of them to work together on this.  Right?

MS. KIES:  Object to form.

A.   According to my email, yes, from Exhibit 24, that the two of them were to work on this task.

Q.   And after Ms. Dobitsch was MDR'd out of FEMA, Mr. Bilicic continued to work on this task. Right?

MS. KIES:  Object to form.

A.   Actually, no, that's not the case.

Because what ended up happening was, we had to look specifically at the process associated with the decisions that were made as it related to CORE renewals.  So this was put on hold, this particular activity.

And then we focused on the actual process associated with reviewing CORE positions by function

Page 295

and making sure that that process was in place and that there was an established process that the program offices were involved in, and that they signed off on the recommendations that they were making.

Q.   And that happened in late January, that change that you're talking about.  Right?

MS. KIES:  Object to form.

A.   I believe, if you look at the emails -- and I'm not a hundred percent sure -- is that the discussion started in the December time period.

Q.   Well, what happened in the December time period is that you were talking with the DHS front office about the numbers of CORE that were coming up for renewal by NTE date.  Correct?

MS. KIES:  Object to form.

A.   I would restate what you just said and said that I had been meeting with my deputy chief of staff, and I was discussing the process and the issues that are associated with FEMA.

I met with him as the chief of staff, and then I met with him as the SOPDA and discussed the process that I was going to implement as it related to the analysis of the CORE appointments.

Q.   So the day after you and Ms. Dobitsch met

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 296

on December 4th and talked about a plan to cut the CORE by NTE date, do you have any -- do you have any understanding as to why all the CORE NTE dates were being collected to be sent to S1 on December 5th?

MS. KIES:  Object to form.

A.    Can you restate the question again?

Q.    Sure.

On December 4th, you have a meeting with Ms. Dobitsch where you discuss a plan to cut the CORE by NTE date.

And then, are you aware that on the very next day, December 5th, FEMA staff are collecting all the CORE by NTE date -- upcoming NTE dates and -- to send that data to S1?

MS. KIES:  Object to form and foundation.

A.    I believe, if you go back and look at Exhibit 24, when we are talking about the common understanding -- and I summarized it back to Ms. Dobitsch -- I did ask them, based on Item No. 1, to look at all the CORE dates.

Q.    Slightly different question.

Do you understand that the data on CORE by NTE date was being collected on December 5th for immediate transmission to S1?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 297

MS. KIES:  Object to form and foundation.

A.   The way that you're currently asking the question, am I aware that on December 5th, were they collecting that data, I don't recall it.

But based on Exhibit 24, they were collecting CORE dates.

MS. LEONARD:  Okay.  Let's take a look at Exhibit 26.

(Whereupon, Plaintiffs Exhibit 26 was marked for identification.)

WITNESS:  Thank you.

Q.   And you've been handed Exhibit 26, which is a email chain that I believe occurred all on December 25th [sic].

Let me know when you're ready.

(Witness reading.)

A.   Okay.

Q.   Okay.  So the very first email in the chain is from the FEMA CHCO, La' Toya Prieur -- how do you pronounce her name?

A.   I have no idea.  So you can go ahead and pronounce it any way, because I don't -- I'd say Prieur, but I'm not a hundred percent sure.

MS. LEONARD:  Well, we've got 10

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 298

people at the table.  Does anyone know how to pronounce Ms. Prieur's name?

A VOICE:  "Prieur."

MS. LEONARD:  "Prieur"?

Okay, that's what I'm going to go with.  Thank you.

MS. KIES:  Yeah, go with that.

Q.   All right.  So on Friday, December 5th, at 8:17 a.m.  So 8:17 a.m. on the day after you had this meeting with Ms. Dobitsch where you're talking about these plans, there is a message from the FEMA CHCO that says:

The Office of Administrator requests to track CORE expirations by month beginning with January 2026 data.  Please assign....

Please complete by 10am today ï¿½ the OA will send this to S1 today.

Do you know who asked Ms. Prieur to collect that data and told her that your office would send this to S1 today?

MS. KIES:  Object to form.

A.   I do not know who gave her that direction.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 299

Q.   Did you?

MS. KIES:  Object to form.

A.   I did not specifically give her that direction.  And as you can see, I'm not on this email.

Q.   Were you aware that -- of the plan to send this data to S1 on December 5th?

MS. KIES:  Object to form.

A.   As I previously stated, in the Exhibit 24, I -- this is the day after the meeting that I had with Ms. Dobitsch, and I clearly did include looking at all CORE dates.

Q.   But Ms. Dobitsch was not in the Office of the Administrator, was she?

MS. KIES:  Object to form.

A.   No.  She reported to the Office of the Admin- -- she reported to the SOPDA.

Q.   So who would have asked Ms. Prieur before 9:00 a.m. on the following morning to have -- to make this request and ask for this data by 10:00 a.m. because it was going over to S1?

MS. KIES:  Objection; foundation.

A.   You're asking me to make assumptions of who would give her this direction, and you're -- I

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 300

don't know who gave her this specific direction that said:

                    Please complete it by 10am
              today ￼ the OA will send this
              to S1.

You know -- "will send this to S1 today."

Q.   Do you have any reason to believe someone from your office did not give her that direction?

              MS. KIES:  Object to form, foundation.

A.   Again, I'm going to restate this:  I have no knowledge of who gave her this specific direction, especially as it relates to this sentence about:

                    Please complete by 10am
              today ￼ the OA will send this
              to S1 today.

Q.   Would someone from your office be sending CORE data over to S1 without your knowledge, Ms. Evans?

              MS. KIES:  Object to form, foundation.

A.   I would have no knowledge of someone from my office sending information directly to the secretary.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 301

Q.    You would have no knowledge of someone sending something directly to the -- it's possible that someone in your office was sending CORE NTE date data directly to the -- to Secretary Noem without your knowledge.

Is that what you're saying?

MS. KIES:  Object to form, foundation.

A.    That is not what I'm saying.

You specifically asked me if someone from my office would be sending data directly to the secretary without my knowledge.

And I answered I would have no knowledge of that, that someone from my office would be sending -- from the OA office would be sending something directly to the secretary that I am not aware of.

Q.    I think I understand, but just to -- so that the record is very clear, you don't have any reason to believe that someone from your office didn't ask Ms. Prieur to collect this data because it was going to be sent to the secretary that day?

MS. KIES:  Object to form, foundation.

A.    To my knowledge, I have no knowledge of

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 302

someone from my office giving this specific guidance of having it completed by 10:00 a.m. today, that OA will send this to S1.

Q.    Why was the OA sending the CORE NTE date data urgently over to S1 on December 5th, Ms. Evans?

MS. KIES:  Objection; foundation.

A.    I can't speculate that answer, because I just stated to you that I have no knowledge of the direction that was given to Ms. Prieur, especially as it relates to this specific sentence.

So I can't answer that question.

Q.    Do you know whether the CORE NTE date -- data was given over to S1 on December 5th?

MS. KIES:  Object to form.

A.    I don't recall that this data was given to S1.

Q.    You don't know whether it was or it wasn't?

MS. KIES:  Object to form.

A.    I don't recall, based on this statement where it says:

OA will send this data to S1 today.

Q.    I'm asking for you, based on your

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 303

understanding and your recollection of the items that you were responsible for as the SOPDA in December of 2025 -- whether the data on CORE NTE dates was sent over to S1 on December 5th.

MS. KIES:  Object to form.

A.   I don't recall that these date -- that this data, the way that this sentence is stated, was sent to S1 on December 5th.

Q.   Do you know whether it was ever sent to S1 in December?

MS. KIES:  Object to form.

A.   As I previously stated, I worked with my deputy chief of staff.

And so, when I talked about the COREs and CORE renewals and the CORE process, there was summary data that I would provide to the deputy chief of staff so that he would know the summary data's associated with these different positions.

Q.   So I'm asking a slightly different question, and this is a slightly different moment in time.

So this is early December, Ms. Evans, when you are making decisions about whether to seek extension authority to renew the COREs and whether -- and when you're discussing with

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 304

Ms. Dobitsch a plan to eliminate COREs by NTE date, and it appears that someone from your office is sending CORE NTE date data over to S1.

Do you know whether that happened?

MS. KIES:  Object to form.

A.    As I previously stated, I do not recall that someone from my office sent, on this day, CORE data to S1.

Q.    Do you know whether anyone sent that CORE data in December?

MS. KIES:  Object to form.

A.    I can only speak to what I did, and I gave summary CORE information to the deputy chief of staff, in summary numbers, based on what the affected population is that would be affected by me making the decision not to get the delegated authority back.

MS. LEONARD:  Okay.  Why don't we take the next break.  10 minutes?

MS. KIES:  Can we try to keep it to five, just in the interest of --

MS. LEONARD:  Sure.

MS. KIES:  Thank you.

VIDEOGRAPHER:  Off the record at 4:45.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 305

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 4:53.

MS. LEONARD:  Okay.  Ms. Evans, I'm going to hand you the next document in order, which is going to be Exhibit 27.

(Whereupon, Plaintiffs Exhibit 27 was marked for identification.)

BY MS. LEONARD:

Q.   It's another document from the mid-December time frame.

And the bottom of this chain, I will tell you, is, I believe, emails that we've already seen. And then the top one is an email that you sent to Kara Voorhies, Victoria Barton, Will Bilicic on December 18th.

Do you see that?

(Witness reading.)

A.   Okay.

Q.   Okay.  So my question for you is about this line in your email on December 18th where you say:

I raised this issue to the DCOS on December 10th.

Do you see that?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 306

A.    Yes.

Q.    So this was in the context of talking about the CORE renewal NTE dates and the numbers of COREs who were up for renewal by particular months. Is that correct?

MS. KIES:  Object to form.

A.    Yes.  As I previously stated when we were -- when you asked questions about the numbers, I did report summary numbers.

Q.    And when you say, "I raised this issue to DCOS December 10th," what are you referring to there?

(Witness reading.)

A.    I would have to -- I don't recall exactly this specific issue.  I know, in my meetings with the DCOS, we talked about CORE renewals.

Q.    And the summary numbers that you referred to, those were the total number of CORE positions that had NTE dates in particular upcoming months. Correct?

A.    Yes.  That's what my email states.  It's 932 in January, February, and March.

Q.    So as of at least December 10th, you were discussing this issue with the DCOS?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 307

A.    Yes, because my email states that I raised the issues about the COREs.

And this is also related to the delegated authority.

Q.    And were you asking for direction from the Department of Homeland Security headquarters regarding what to do with the COREs starting in January?

MS. KIES:  Object to form.

A.    No, that's not the case.

What I was talking with the DCOS about is how I was going to handle the analysis associated with CORE renewals.

Q.    Did you tell the DCOS that you were going to consider the total amount of spend on each of those CORE positions in that analysis?

MS. KIES:  Object to form.

A.    I don't recall a specific about the dollar amounts.

I know, in this time period, we were looking specifically about the number of renewals that would come up in this time period.

Q.    And you were also analyzing the amounts of money spent on their salaries and benefits. Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 308

A.    That --

MS. KIES:  Object to form.

WITNESS:  I'm sorry.  I apologize.

A.    Yes.  We were also looking at the CORE issues all together.

Q.    And that includes the amount of money that the agency was spending on these positions?

MS. KIES:  Object to form.

A.    What was coming up in this time period was also the pay associated with these positions.

And so, the FEMA CHCO was raising issues about the pay for the COREs, as well as the CFO was -- also was doing analysis about the pay associated with CORE positions.

Q.    Actually, at your direction, they were collecting information so that you could understand the amount of money that was being spent on these positions.  Correct?

MS. KIES:  Object to form.

A.    At my direction, I was trying to understand the whole picture associated with COREs and the CORE salaries and then also the COREs' rights and privileges associated with their term appointments.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 309

Q.   Did the 50% cut number come from a dollar amount of spend that you were aiming for?

MS. KIES:  Object to form, foundation.

A.   The estimates that were provided and the options that were provided were based on numbers, not dollars.

Q.   Was that analysis done so that you knew how much money would be cut by cutting the FEMA staff in half?

MS. KIES:  Object to form.

A.   As I previously stated, we were looking at the positions and then looking at, then, what would -- depending on where the positions were and how they were funded.

And so, I believe the previous exhibits also outline that, when it talks about the DRF and the DRS.

Q.   Did you ever provide information to the DHS front office that analyzed the amount of money spent on these positions in 2025?

MS. KIES:  Object to form.

A.   Can you restate that question again?

Q.   Sure.  Sorry.  It was a poorly worded question.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 310

Did you ever send information to the DHS front office regarding the amount of money that was spent on the CORE positions that were coming up for renewal?

MS. KIES:  Object to form.

A.    In this time period of what you're looking at, from the time that I was the -- put in as the SOPDA, from December 1st to now, I had the analysis done about what it was costing us to have COREs, because, as you know, we're in a lapse.

Q.    Well, the lapse ended, did it not?

MS. KIES:  Object to form.

A.    I am going to restate what I said again, is that:  In this time period, based on the way you asked the question, through December through March, I did provide analysis associated with the salaries that were being paid to the COREs because we are in a lapse, and the lapse affects the DRF.

Q.    I think I understand what you're saying.

Ms. Evans, you understood that DHS, at the direction of OMB and OPM, was supposed to provide a quarterly report updating on the implementation of the annual staffing plan in early January 2026. Correct?

MS. KIES:  Objection;

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 311

foundation.

A.   Based on the documents that you presented today and that I've reviewed, I know we did it in December.

Q.   Can you look at Exhibit 16, which should be in your pile.

A.   Sure.

Q.   It started with the email on November 22nd from the DHS CHCO.  And then -- yes, that one, 16.

So the first email in the chain at the back is the November 22nd [sic] email about the staffing plan, and then next in line is a December 18 email about the quarterly update to the staffing plan.

Do you see that?

A.   Yes, I do.

Q.   Okay.  So, again, I will -- and sorry.

The DHS CHCO gave components a January 6th deadline.  Correct?

MS. KIES:  Object to form.

A.   The January 6th is the date of the email.  And according to this email, it states the next update to OPM is due January 30th.

Q.   And if you look -- if you carry on to the next page, the CHCO is giving a deadline of

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 312

January 6th to the components to provide their submissions. It's action, the action is due --

A. Oh, I see right above it, where it says "I'm sharing" -- Puneet, where she's sharing the Annual Staffing Plan and says DHS issued a tasker for the update of the Quarter 2 FY '26 with a suspense date of January 6th.

Q. And the email from DHS CHCO under "Subject" says:

Action Due: January 6.

Do you see that?

A. Yes. It's in the middle of the page.

Q. Yeah.

A. Yes.

Q. It's -- there are a bunch of dates in here, but the deadline that the DHS CHCO was giving was January 6th. Correct?

MS. KIES: Object to form.

A. That's what this email states, yes.

Q. And you decided, at the end of December, to ask the FEMA components to, again, engage in a bottom-up exercise to determine their staffing needs for fiscal year 2026.

But this time, you asked them to use your 50% cut target. Right?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 313

MS. KIES:  Object to form.

A.    I'm not on this email.

And so, this is a tasker that is coming from the Department.

I believe you're referencing a tasker that is in line with the other discussions that we've had where then, because of the CORE renewals, we were -- I was specifically looking at the tasker associated with CORE renewals.

And that was also based on a process that we established between -- internally with the FEMA CHCO, that was reviewed by the Office of the Chief Counsel, in order for us to do the analysis.

And then I also requested from the principals -- which we've discussed it earlier what principles are, and they are the leads of the mission offices.

And I also discussed it with the regional administrators, who are direct reports to me, to work on a staffing plan that was due -- actually, it's due today.

Q.    Does that staffing plan continue to reflect a 50% cut?

A.    No, it does not.

That staffing plan, if you review the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 314

directions that were sent out, it was a zero-based staffing plan so that they could look at the functions that they were performing and then look at the staff associated with that.

And that they were supposed to then, in conjunction with that -- because the CORE renewals were coming up -- to send and -- do the analysis and send memos in regarding their CORE renewal recommendations that they wanted, while they were taking into consideration the overall staffing plans that are due today.

Q.    We'll come back to that.

But going back to the quarterly -- the Q2 quarterly update that was going to be due in January to OMB and OPM.

What you decided to do was to send out another bottom-up exercise to the FEMA component offices, but this time with a 50% target cut. Correct?

MS. KIES:  Object to form.

A.    That's not correct.  The email says do a bottom-up analysis and do zero-based analysis.

And it's my understanding -- and I did not review the spreadsheet, but the spreadsheet template -- that, initially, they were going to send

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 315

out -- or that they did send out -- that CHCO sent out did include a 50% option.

Q.    It included a 50% target.  Correct?

That was the word used on the spreadsheet. Correct?

MS. KIES:  Object to form.

A.    I did not review the specific spreadsheet, because it was a SharePoint spreadsheet, but -- so I don't know that it said "target," but it did consider a 50% option.

Q.    And you understood that exercise that was sent out on December 23rd to be a bottom-up analysis done by all the FEMA components?

MS. KIES:  Object to form.

A.    Yes.  That's what the -- that's what I directed them to do.  That's what the email says.

Q.    Okay.  And attached -- included with that email, there is a spreadsheet that includes your 50% cut as a target for that bottom-up exercise. Correct?

MS. KIES:  Object to form.

A.    It's my understanding that the spreadsheet was attached.

Q.    And just a month earlier, the FEMA components had just done a bottom-up analysis of the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 316

staffing needs for fiscal year 2026.  Correct?

MS. KIES:  Object to form, foundation.

A.    That's what the documentation today proves, yes.

Q.    And that was in response to the annual staffing plan request from the DHS CHCO that we saw on November 26th [sic] on Exhibit 16, which you have in front of you.  He says:

The staffing plan takes a bottom-up approach to determine the appropriate staffing levels....

Do you see that, on the November 21st email?

A.    Yes.  That's what this says.

Q.    So just a month later, having received their bottom-up staffing plan from all the FEMA components that totaled over 24,000 positions, you asked them to do it again because you didn't like that result, but this time to aim for your 50% cut.  Right?

MS. KIES:  Object to form, assumes facts not in evidence, misstates testimony.

Page 317

A.   I don't agree with the statement that you just made.

I asked them to look at it again.  And I asked for them to look at it -- for the staffing plan based on the way that we were also looking at CORE appointments.

And then also asking them to look at the staffing plan based on the work that they could be doing, based on pre-decisional information that I was sharing with the principals and the regional administrators about some potential for changes based on improving processes within FEMA.

Q.   At the time that you asked the FEMA component offices to just, again, do a bottom-up analysis of the staffing plan using the 50% target, you were aware that they had done that analysis just a month before.  Correct?

MS. KIES:  Object to form.

A.   I....

Can you restate that one more time.

Q.   At the time that you directed the FEMA OCHCO to send out this work -- workforce analysis on December 23rd and asked the FEMA component parts to do a bottom-up -- bottoms-up analysis of their staffing needs, you were aware that that bottoms-up

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 318

analysis had been done just a month before.
Correct?

MS. KIES:  Object to form.

A.   I would answer the question this way.

At the time that I was giving the direction, I was not taking into consideration the previous analysis that was done as part of the annual staffing plan.

Q.   Because you didn't like the result of that analysis.

MS. KIES:  Object to form.

A.   I don't agree with the statement that you just made.

Q.   Because that analysis resulted in staffing needs of 24,000 people at FEMA?

MS. KIES:  Object to form.

A.   As I previously stated, I don't agree with your statement.

What I asked them to do was to specifically look at all the staffing again, especially as it related to the CORE workforce.

Q.   And the original email that was going to go out about this do-over staffing planning exercise that you were ordering the FEMA components to do, that was originally drafted by Stephanie Dobitsch.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 319

Correct?

MS. KIES:  Objection; misstates testimony, foundation.

A.    Yes.  It's my understanding it was drafted by Ms. Dobitsch, and she sent it forward for review before it went out.

Q.    And that draft by Ms. Dobitsch referred expressly to the 50% target cuts.  Correct?

MS. KIES:  Object to form.

A.    I believe that that's the case.

Q.    And you were not happy with that draft because that information was not public.  Correct?

MS. KIES:  Object to form.

A.    Yes.  That was not publicly available information.

Q.    That was only information that you were using internally.  Correct?

MS. KIES:  Object to form.

A.    That information was pre-decisional, and there was no final decision made on the staffing levels associated with FEMA.

Q.    But you had provided it to OMB and OPM as the target, 50% cut for staffing.

MS. KIES:  Object to form.

Q.    Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 320

A.    As I previously testified, based on the emails, that number, the 11,383, did go forward as a proposed staffing level for FEMA.

Q.    And you were not happy with Stephanie Dobitsch putting that information in that draft email, were you?

MS. KIES:  Object to form, asked and answered.

A.    I would not characterize it emotionally as to whether I was happy or unhappy.

Q.    And you gave the assignment to Victoria Barton to edit that email?

MS. KIES:  Object to form.

A.    Ms. Barton is the associate administrator associated -- she runs external affairs, which includes communications.

And so, that's why Ms. Barton -- I forwarded it to her -- I believe it's in the emails -- to have her take another look at that message that Ms. Dobitsch wanted to send out.

Q.    And she edited that to remove the reference to the 50%, but it was still included in the spreadsheet.  Correct?

MS. KIES:  Object to form.

A.    It's my understanding that that's how the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 321

email was edited.  And, yes, it was still in the spreadsheet.

Q.   And then after the press reported on that in early January, you and Ms. Barton decided to characterize that, in hindsight, as a mistake. Correct?

MS. KIES:  Object to form.

A.   I believe, in previous examples, exhibits here, we already discussed that.

And we said that that number was an internal number and it was pre-decisional, and that number had not been released because, as you pointed out, that number had been sent as part of the agency staffing plans to OMB and OPM through the exercise that you're also referencing that occurred starting in November.

Q.   And there was a reason that you didn't want to use the previous bottom-up staffing analysis that had been done by the FEMA components to show the need for 24,000 people at FEMA.  Right?

MS. KIES:  Object to form, foundation.

A.   Yes, I had my reasons as to the reason why I wanted them to go back and revalidate the numbers.

Q.   And it's because you didn't trust those

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 322

staff recommendations.  Correct?

MS. KIES:  Object to form,

misstates testimony.

A.   I think that that's an incorrect statement to say that I didn't trust the numbers.

What I just stated was I wanted to revalidate and look at the bottom-up approach and make sure that everyone was actually analyzing this.

Because I also believe that in your exhibits, you will find that some decisions were being made by the CHCO, the FEMA CHCO office, and that program offices weren't necessarily -- had visibility into all the decisions that were being made by the FEMA CHCO office.

Q.   And you believed, then and now, that the FEMA OCHCO and the FEMA components were overstating the number of staff that they actually needed, didn't you?

MS. KIES:  Object to form.

A.   I don't believe that that's what I stated.

What I said was that I wanted the program offices and the regional administrators to do the analysis as it relates to a zero-based budgeting, for lack of a better term; to go back and really look at their staffing as it relates to the work

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 323

that they were performing as we were in the transition period.

Q.   The only reason to redo the analysis that had just been done the month before was to direct the FEMA program offices and components to use the 50% target.  Correct?

MS. KIES:  Object to form, misstates testimony.

A.   That is not correct, because that is not the guidance that I gave the program offices.

And that was not specifically stated that they needed to meet a 50% cut.

Q.   You just gave that to them in the spreadsheet that was attached.  Correct?

MS. KIES:  Object to form.

Q.   One of the reasons that you believe that the FEMA components are --

COURT REPORTER:  Excuse me.

MS. LEONARD:  Sorry.

COURT REPORTER:  Was there an answer?

MS. LEONARD:  Go ahead.

WITNESS:  She didn't allow me to answer.

MS. LEONARD:  Sorry.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 324

WITNESS:  She just went to the next question.

MS. LEONARD:  Go ahead.  You can reread the question to her.

(Whereupon, the court reporter read back from the record as follows:

"Q    You just gave that to them in the spreadsheet that was attached.  Correct?")

MS. KIES:  Object to form.

A.    The spreadsheet that was attached to the December 23rd email did have the 50% option included.  That's my understanding.

Q.    But is it your testimony today that you were not directing the components to aim for that 50% target, even though that is what was included in the final plan given to OMB and OPM, and even though the President had ordered the agency to submit quarterly reports explaining how they were implementing that plan?

MS. KIES:  Object to form, misstates testimony and evidence.

A.    The guidance that I gave the principals and the regional administrators, when that went out, was for them to, again, look at the zero-based

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 325

budgeting questions.

And again, this is pre-decisional, and deliberative discussions came up about the 50% target.

And I said to look at zero-based budgeting as it relates to the staffing, because I wanted to have the data to be able to understand what exactly the staffing levels would be needed based on potential recommendations that would come and be approved by the President as the FEMA Review Council would then determine.

Q.   And isn't it also true, Ms. Evans, that your staff, who were working on the plan to implement the 50% cut, which previously was Ms. Dobitsch with Will, but then it carried on with other people, could not figure out how to make the 50% cut work with the programs and offices that you actually had at FEMA?

MS. KIES:  Object to form, foundation.

A.   As I previously stated, we went to do this analysis by position, to look at the functions associated as it related also to the CORE positions.

And so, I don't agree with the way that you stated that question.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 326

Q.   And you were trying to force the programs and offices to give you that information of how to reach the 50% cut, just a month after they told you that their needs were for 24,000 people.

MS. KIES:  Object to form, misstates testimony, argumentative.

You can answer.

WITNESS:  Oh.

A.   I don't agree with your statement, because I was not forcing the offices.

It was clear in my direction for them to look at it and to justify the positions.

Q.   Do you believe that FEMA staff are paid to sit around and wait for disasters they barely respond to?

MS. KIES:  Object to form, argumentative.

You can answer.

A.   I'm not familiar with that particular email that you're looking at.

MS. LEONARD:  Okay.  Let's mark the next, 28.

(Whereupon, Plaintiffs Exhibit 28 was marked for identification.)

Q.   Being handed an exchange that is between

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 327

you and someone named John Jaggers at OMB.

(Witness reading.)

Q.   Let me know when you're ready.

(Witness reading.)

A.   Okay.

Q.   Is Mr. Jaggers a friend of yours?

MS. KIES:  Object to form.

A.   Yes, Mr. Jaggers is a friend of mine.

Q.   Was this communication -- does he have any responsibility or role with respect to FEMA?

A.   No, he --

MS. KIES:  Object to form.

A.   -- does not.

Q.   Okay.  When -- the top email, he's referring to an exchange you have here.  And he says:

...bummer not getting paid
to sit around and wait around
for disasters that they then
barely respond to ï¿½ CORE dump
needed.  Smiley face.

Do you see that?

A.   Yes, I see that.

Q.   Did you respond to Mr. Jaggers?

A.   I don't recall a response.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 328

Q.   Did you respond saying you did not agree with that characterization?

MS. KIES:  Object to form.

A.   I don't recall a response.

Q.   The deadline for the Q2 quarterly report required by DHS was January 6th.  Correct?

A.   That's what is included in the previous exhibits that you showed me.

Q.   And do you recall that your staff "remended" -- recommended not providing an update on behalf of FEMA?

MS. KIES:  Object to form.

A.   I believe -- I -- I don't know, based on these emails.  I'd have to go....

Q.   Do you recall whether FEMA provided a update or plan for implementation to DHS to include with the Q2 quarterly report to OMB?

MS. KIES:  Object to form.

A.   I don't recall us submitting an update to the plan.

Q.   Do you recall that you didn't?

MS. KIES:  Object to form.

A.   I don't recall that we did, and I don't recall that we didn't.

Q.   Okay.  Do you recall that one -- the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 329

reason that you could not submit an update to how you were implementing the plan is that the analysis at the Level 2 that was in the document provided to DHS for the annual staffing plan was impossible to reconcile with the information that the FEMA component programs had provided for their staffing needs?

MS. KIES:  Object to form.

A.  Can you restate that question again?  Can you say it again, please?

Q.  Sure.

Do you recall that your document that you sent on December 4th for the annual staffing plan was at a high level and was only the second level of the organization?

Do you recall that?

A.  Yes.

Q.  And that the information that the component program offices had given to you, both as part of that initial annual staffing plan and in response to the December 23rd exercise, was at a much more detailed Level 5.

MS. KIES:  Object to form.

Q.  Do you recall that?

A.  I recall that that's -- yes.  That's in

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 330

the emails.

Q.   And it was impossible to reconcile your plan at Level 2 with the staffing needs described by the FEMA programs and offices to the Level 5.

And so, therefore, your staff recommended not providing an update.

Do you recall that?

MS. KIES:  Object to form.

A.   I don't agree with the characterization of what you said.

And so, I do not recall anyone stating that it was impossible to submit a plan.

I do know that we submitted, like you said -- and we have established that there was a high-level plan and that much of this is pre-decisional.

Because as I previously stated, the FEMA Review Council report needed to be submitted to the President, and the President had to make final determinations of what recommendations he wanted implemented for the future of FEMA.

Q.   But did you communicate directly to DHS that FEMA would not be providing a Q2 report to include in the quarterly report on the annual staffing plan?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 331

MS. KIES:  Object to form.

A.    I don't recall communicating directly to DHS headquarters stating that I was not going to provide an update.

Q.    Do you recall the reasons -- any reasons why no update was provided?

MS. KIES:  Object to form.

A.    I do not recall.

I know that during this time period, again, I had outlined for the deputy chief of staff the process that we were going to use to make sure that we were analyzing CORE renewals, which is directly related to the staffing plan.

And then I also let him know that we were supposed to get staffing plans from all the offices on March 31st.

Q.    Do you -- if you could take a look at Mr. Neurauter's email, which I believe is Exhibit 19.

At the very bottom of that email, he - under "Discussion."

Do you see the three paragraphs there?

A.    Yes, I do.

Q.    And we've already been over the way he describes the exercise that led to the original FEMA

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 332

program and office total of 24,812.

Do you see that reference there?

A.   Yes, I do.

Q.   And then there's -- then there's a reference to the annual staffing plan that was actually submitted with 11,383.

Do you see that?

A.   Yes, I do.

Q.   Okay.  The final sentence here says:

The data gathered through the Workforce Capacity Planning Exercise resulted in an end FY2026 staffing level of 23,146.

Ms. Evans, the workforce capacity planning exercise that he's referring -- referring to on January 5th is the result of the December 23rd email when you gave the FEMA component parts a deadline of December 31st.  Correct?

MS. KIES:  Object to form, foundation.

A.   Can you say the -- all those dates again, please?

Q.   Sure.  Well, we can break it down.

A.   Okay.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 333

Q.   Do you recall that the workforce capacity planning exercise that was given to the FEMA components on December 23rd had a deadline of December 31st?

MS. KIES:  Object to form.

A.   I believe, and based on the dates that we've been talking about today, I'd have to go back and look at the exhibits.

And so, based on what you specifically said, that this is a result of the effort that the DHS CHCO gave that guidance for workforce planning.

Q.   Well, what Mr. Neurauter is saying here is that the original plan provided to you for review back in early December, from the FEMA OCHCO, for the annual staffing plan resulted in 24,812.

You provided the number 11,383 to DHS. And now he's talking about something different, which is the workforce capacity planning exercise.

That's the name of what you asked the components to do on December 23rd.  Correct?

MS. KIES:  Object to form.

A.   I would have to look specifically at the email that went out to the workforce on December 23rd.

Because this email says that it did say

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 334

that OCHCO, which is FEMA OCHCO, sent a workforce capacity planning exercise email to all program and regional office heads.

So I do not know if this data that he is saying here that is the 23,146 is a result of the workforce planning that happened on December 23rd.

Q.    Okay.  We can cut to it.

A.    Okay.

MS. LEONARD:  This is Exhibit 29.

(Whereupon, Plaintiffs Exhibit 29 was marked for identification.)

Q.    And if you look, it's titled "Workforce Capacity Planning Exercise."  This is the December 23rd email, Ms. Evans.

And if you see, there's a suspense for completion December 31, 2025.

(Witness reading.)

A.    Okay.

Q.    So does this refresh your recollection that the deadline that was given to the programs and offices for this new bottoms-up staffing planning exercise was December 31st?

MS. KIES:  Object to form.

A.    That's what this email says, yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 335

Q.   Okay.  And if you go back to the Neurauter email on January 5th, he is saying:

> The data gathered through the Workforce Capacity Planning Exercise resulted in a staffing level of 23,146.

Do you have any reason to believe that the female -- FEMA component programs and offices, as a result of your December 23rd workforce capacity planning exercise, did not tell you that they needed 23,143 [sic] staff for fiscal year 2026?

MS. KIES:  Object to form.

A.   Can you state that again one more time, please?

Q.   Sure.

Do you have any reason to believe that what Mr. Neurauter says here at the bottom of this email is not true, that:

> The data gathered through the Workforce Capacity Planning Exercise resulted in an end of fiscal year 2026 staffing level of 23,146?

A.   I --

MS. KIES:  Object to form.

Page 336

A.   I have no reason to believe that that's not what he stated here.

Q.   Do you have any reason to believe that that's not actually what the FEMA component programs and offices told you that they needed as a result of your workforce capacity planning exercise?

MS. KIES:  Object to form.

A.   I believe that this is the number, based on the way that you are presenting it, based on this email that went out and said that it was due on December 31st.

Q.   You believe that that is the number that the FEMA program offices came back with?

MS. KIES:  Object to form, foundation.

A.   I have no reason to believe that's not the number they came back with.

Q.   Do you know what the number is that they came back with?

A.   As you can see on this email, I was -- I'm not on this email.  So I do not recall the specific number that is in this email.

Q.   Do you recall the fact that after the second time that you've asked your FEMA components to do a bottoms-up analysis of their staffing needs,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 337

they came back to you again and said that they needed far more than the 50% cut you were aiming at?

Do you recall anything about that?

MS. KIES:  Object to form.

A.   I have not had specific discussions with the program office heads as it relates to this number, because, as I previously testified, program office heads, as well as the regional administrators, are sending their staffing plans in, their proposed staffing plans, and they're due, today, March 31st.

Q.   Because you had them do this exercise again after you received the 26,146 [sic] number. Correct?

MS. KIES:  Object to form.

A.   That's an incorrect statement, because I was having them analyze their workforce because, as I previously stated, there were several initiatives.

And one in particular was looking at the CORE renewal dates, based on how we had the staffing and what was happening with COREs, so that we could actually reconcile what would be the appropriate staffing levels, and should activities that are being charged to the Disaster Relief Fund really be COREs, or should they be converted to permanent,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 338

full-time employees.

Q.   Ms. Evans, you had the FEMA program offices do staffing analyses three times in a row because they told you, repeatedly, that they could not meet your 50% target.  Correct?

MS. KIES:  Object to form, misstates testimony, asked and answered.

A.   That's an incorrect statement.

And that is not the reason why I had them looking at the positions again and doing the staffing plan, because we didn't have all the recommendations coming from the FEMA Review Council.

And so, we were looking at functions, and there were things that we were looking at as it related to CORE renewals in conjunction with this activity that the Department was running; which, again, these are pre-decisional data points that are going forward to the Department.

Q.   We've discussed previously that at some point in time, the December 23rd email was leaked to the press.  Correct?

A.   We have not discussed that the December 23rd email was leaked to the press.

Q.   But you are aware of that, because the press reached out to DHS and FEMA to ask whether

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 339

there was a plan to cut 50% of the CORE.  Correct?

MS. KIES:  Object to form.

A.   We have discussed, in some of the other emails, I believe, that that was an internal number and not a -- and it was also included in the draft FEMA Review Council.

But that is not a publicly available number.

Q.   Okay.  But you became aware in January that the press was asking about the December 23rd email.  Correct?

A.   Yes, that is correct.

Q.   Okay.  And you worked on a response with individuals in the FEMA and DHS press offices?

MS. KIES:  Object to form.

A.   There was a response, or there was a discussion, as it related to the question that came as a result of the December 23rd email.

Q.   And Kara Voorhies was also included in the discussions of how to respond?

MS. KIES:  Object to form.

A.   As I previously stated, as a practice for myself, I would CC Ms. Voorhies on emails.

MS. LEONARD:  Okay.  Let's take a look at the next -- 30, I believe this

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 340

is.

(Whereupon, Plaintiffs Exhibit 30 was marked for identification.)

(Witness reading.)

Q.   My question is going to be about the email from you on January 5th that appears on the second page with Bates number -364.

So let me know when you're ready.

(Witness reading.)

A.   Okay.  So you want to specifically talk about the January 5th email.

Q.   Yes.  And you say here:

For the record, the 50% was NOT policy direction. Stephanie was following direction from Mr. Richardson throughout his tenure where he used the 50% for planning purposes.

Do you see that?

A.   Yes, I do.

Q.   You don't mention here the fact that you sent a 50% cut to DHS and then OMB/OPM as part of the final FEMA annual staffing plan for fiscal year 2026, do you?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 341

MS. KIES:  Object to form, misstates evidence.

A.    This email does not state that.

But as I previously testified today, is that that 50% cut was an option that was consistent with different options that Mr. Richardson was also looking at.

And I made sure that the numbers were consistent with options that we sent forward for a potential 50% cut.

Q.    You sent one document forward to DHS, and it contained a 50% cut as the final plan.  Right, Ms. Evans?  You didn't send forward options.

MS. KIES:  Object to form, asked and answered.

A.    As we talked about today, based on that assignment, I sent the one spreadsheet, which is an exhibit here, that shows the 11,383.

Q.    And, then when the press found out that you were asking the program components to aim for a 50% target cut and to tell you how they would achieve that cut through targets, you blamed Stephanie and former SOPDA Richardson.  Correct?

MS. KIES:  Object to form, misstates testimony, argumentative.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 342

You can answer.

A.   I would not characterize this sentence as I am blaming Ms. Dobitsch or Mr. Richardson.

I am saying that that was sent forward. The 50%, that it's not a final policy decision.

As I have been stating, it was the recommended plan and it was pre-decisional as we established that that was the 11,383 that was sent forward.

But it's still pre-decisional, and that is not policy direction at this point.

Q.   In the directions that you gave for the third round of the zero-based, bottoms-up staffing analysis that you gave to the components for the Q3 update, which I believe you said was due today, in the directions that you gave to your components, did you auto-populate the target numbers in the template spreadsheets that you asked them to complete?

MS. KIES:  Object to form, foundation.

A.   Okay.  So I think there is a distinction that needs to be made, because the staffing plans that are due today are not the Q3 update, as you have stated.

Q.   When is the Q3 update due?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 343

MS. KIES:  Object to form, foundation.

A.    I -- right now, to my knowledge, I do not have the due date.

Q.    It's upcoming.  Correct?

MS. KIES:  Object to form, foundation.

A.    I do not know the exact date.  I don't know if it's upcoming or not.

Q.    Have you approved a Q3 update from FEMA to go to the DHS leadership?

MS. KIES:  Object to form.

A.    To my knowledge, I have not approved a Q3 update to go to DHS CHCO.

Q.    But you asked the FEMA components to engage in another round of bottoms-up, zero-based staffing analysis recently.  Correct?

MS. KIES:  Object to form.

A.    As I stated, I asked them to submit a staffing plan that was also looking at the CORE appointments because, as I previously stated, we had CORE renewals and that we needed to have a process in place.

And so, as part of that process, I asked for them to look at staffing plans.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 344

So as I previously also stated as to what would be the right mix of the functions, and should they really be COREs or should they be permanent, full-time employees.

Q.   And did you give them a template to fill out that included auto-populated target numbers for the staff of their programs and offices?

MS. KIES:  Object to form.

A.   For the staffing plan that is due today, there was no template that was sent out, and there was no targets that were established; that they were to look at the functions that they were performing and that they were to put together a staffing plan that was also looking at the CORE renewals.

MS. LEONARD:  Okay.  Why don't we take another break?  10 minutes.

VIDEOGRAPHER:  Off the record at 5:45.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 5:59.

BY MS. LEONARD:

Q.   Ms. Evans, at some point in the month of December 2025, we've -- you testified previously that you made a decision not to ask for S1 approval

Page 345

to extend the delegated authority to renew some of the COREs.  Correct?

A.   Yes.

Q.   And as a result of that decision, the materials that had been packaged to you for those COREs with NTE dates in January had to be redone by FEMA staff.  Correct?

MS. KIES:  Object to form.

A.   Yes, that's my understanding.

Q.   Because they now needed to use the S1 verification form that DHS required for hiring decisions.  Correct?

MS. KIES:  Object to form.

A.   Yes, that's my understanding.

Q.   And FEMA staff worked very hard over the holidays to package and provide you with that information, did they not?

MS. KIES:  Object to form, foundation.

A.   I can't assess the level of effort that was put into putting together those packages.

Q.   During this same late December period, you were asking for information regarding the amount of money that these CORE employees cost FEMA.  Correct?

MS. KIES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 346

A.    I believe that what I previously testified was that, and also, issues that were being raised was about the pay associated with COREs.

MS. LEONARD:  Well, let's take a look at the next exhibit in line, which is 31.

(Whereupon, Plaintiffs Exhibit 31 was marked for identification.)

Q.    And it is an email from the FEMA CHCO to you, and it attaches some spreadsheets, but also a memorandum that she wrote.

And my question for you, Ms. Evans, is quite simple, which is:  Did you review this memorandum from La' Toya Prieur on or around December 17th?

(Witness reading.)

A.    Can you ask the question again?  I'm sorry.  I was reading the memo.

Q.    Sure.

Did you review the memo that Ms. -- the FEMA CHCO, Ms. Prieur, provided you about the mission effects of allowing the COREs to expire around December 17th?

A.    I would say I don't specifically recall reading all of this.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 347

Q.   Do you -- did you take this into consideration in making your decisions with respect to the COREs?

MS. KIES:  Object to form.

A.   What I was doing at that time period was working with the FEMA CHCO to make sure that we were establishing a process so that the program office heads and the regional administrators were reviewing their CORE renewals and doing it based on the functions.

Q.   Do you recall that you were very expressive regarding not including the names of employees on the documents that were being sent to you regarding the upcoming COREs with NTE dates expiring?

MS. KIES:  Object to form.

A.   Yes.

Q.   And why was that?

A.   Because the review was about the functions that the COREs were performing for either the program office head or for the regional administrator.

And I wanted it to be a functional analysis.

Q.   And you did not want the names of

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 348

employees on there.

Did you believe you didn't have the right to see those names, for some reason?

MS. KIES:  Object to form.

A.   I wanted to make sure that I wasn't looking at names because this was a functional review based on what the program office head would say for the functions and the work that's being performed by that position.

Q.   But you knew that when the materials were repackaged to send over to DHS for approval, one -- after the -- once the authority to FEMA had expired, that they were going to have to have names on them. Correct?

MS. KIES:  Object to form, foundation.

A.   The FEMA CHCO reported to me a way -- the way that the form had to be completed.

And so, I did not want to see the names.

So she did the forms.  And then based on that, there was a process of how those forms were completed and then sent up to DHS CHCO.

Q.   And you delegated the authority, actually, to Will Bilicic to sign those forms because you did not want to see the names.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 349

MS. KIES:  Object to form.

A.   That's correct.

MS. LEONARD:  Let's take a look at next.

(Whereupon, Plaintiffs Exhibit 32 was marked for identification.)

Q.   This email is dated December 26th, Exhibit 32, and it forwards to you an email from La' Toya Prieur that was sent to Puneet Khan on Christmas, December 25th, attaching the materials for the CORE individuals who had expirations in January.

Do you see that?

A.   Yes.

Q.   And do you recall that your response was to ask for more money about what a fully loaded CORE is receiving in pay?

Sorry.  Let me rephrase that.

Do you recall that your response to this information, justifications for all the CORE individuals who were expiring in January, was to ask how much money they were costing FEMA?

MS. KIES:  Object to form.

A.   I don't recall that email.

Q.   Do you recall you say, "I want to know

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 350

what a fully loaded CORE is receiving in pay," in response to receiving this information?

MS. KIES:  Object to form.

A.   I recall asking about a fully loaded CORE pay because, as you showed in Exhibit 31, we were looking at what funding that they were coming from and what their pay base was, what they're -- a fully loaded CORE was being paid.

Q.   As consideration for part of the decision-making as to whether to seek approval to renewal these CORE -- renew the COREs that were expiring in January, you were considering that information?

MS. KIES:  Object to form.

A.   As I have previously stated, there was several different analyses that were happening at that time.

And also, as I believe I previously stated, the pay associated with COREs, that issue was being raised at the same time because there was other exercises that were happening with the DHS CHCO and the FEMA CHCO.

So there was issues of pay that had to be addressed as well.

Q.   And in this -- the packaging of the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 351

request for approval, justifications for the COREs, extensions for the NTEs that were coming in January, you see here Ms. -- in Exhibit 32, Ms. Prieur was also asking for a 30-day -- authority to extend their appointments by 30 days so that a decision could be made.

Do you see that?

A.   I see her recommendation about the 20% of the appointments will expire the first week in January, and that she was seeking SOPDA approval to extend the appointments for 30 days, pending the determination from FEMA and DHS leadership.

Q.   And on December 31st, the decision was made not to seek approval to renew these COREs and not to grant a 30-day extension.  Correct?

MS. KIES:  Object to form.

A.   I made a decision not to sign the documents under the existing authority because this was coming at the end of the delegation of authority.

And these were positions that were going to be in January, so I made the decision not to sign these.

Q.   And you waited until December 31st to make that decision, despite receiving the information on

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 352

the 26th of December?

MS. KIES:  Object to form.

A.   So I got this information.  It was during the holidays.  And I was reviewing the information, and I made the decision not to renew January CORE appointments because the delegation of authority was expiring.

Q.   Was that the only reason you made the decision not to renew them?

MS. KIES:  Object to form.

A.   The reason why I also did this was because I did not want to renew appointments for the first week in January, knowing that my authority was expiring on December 31st.

Because those January decisions, with the expiring of the authority, if they were going to be renewed, needed to be reviewed by headquarters.

Q.   So you understood that by application of the DHS policies, those CORE positions were going to be eliminated?

MS. KIES:  Object to form.

A.   I understood, the way that we were doing this, is that I made the decision not to renew these appointments that were coming due in the first week in January, as is outlined here.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 353

Q.   And that was the result of your application of DHS policies that applied to these positions.  Is that correct?

MS. KIES:  Object to form.

A.   It's my determination based on the expiring authorities that FEMA had at the time, and then the DHS policy as it related to hiring.

Q.   When -- can you look at Exhibit 10, which is your notes.

And the entry on December 31st, which is -33536.

A.   Okay.  Hold on.  I don't have my notes yet.

Okay.  And then number, please?

Q.   -33536.  It's December 31st.

A.   Okay.

Q.   You have notes here:

Not going to approve the COREs (30 days extensions) and COREs in general.

Who was that meeting with?

MS. KIES:  Object to form.

A.   As I recall, this particular meeting, that was part of my meeting -- because this is on Wednesday -- with DCOS Guy.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 354

Q.   And, together, you made the decision not to renew the COREs?

MS. KIES:  Object; misstates testimony.

A.   No.  What I told Mr. Guy in the meeting was that I was not going to approve the 30-day extension, as you outlined here in "Exhibit -9465," as it related to the COREs because the authority was expiring December 31st and that these were for appointments in January.

Q.   And you understood that you were implementing DHS's policies and directives with respect to those COREs.

MS. KIES:  Objection --

Q.   Correct?

MS. KIES:  -- misstates testimony.

A.   I understand that what I was doing as a component within DHS, that with the expiring authority that FEMA had, that I was implementing DHS policy as it related to hiring actions.

Q.   And do you know who DCOS Guy spoke with about the decision to begin eliminating COREs by NTE date on January 1st?

MS. KIES:  Objection;

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 355

foundation, facts not in evidence.

You can answer.

A.   I do not know who he spoke to after I told him about my decision that I was doing based on the January nonrenewals.

Q.   Okay.  And at some point in January and then February, you set up a series of different processes for sending over the approvals of the CORE renewals to the DHS front office.  Correct?

MS. KIES:  Object to form.

A.   So in the time period when this issue was raised, in the -- as -- when I took over as the SOPDA, it was to establish a process that would have the program offices, as well as the regional administrators, to look at the CORE renewal dates by function and sign off on what they were recommending to go forward and what they were recommending on to --

VIDEOGRAPHER:  I'm sorry.
Careful.  You --

WITNESS:  Oh.  Sorry.

A.   Okay.  Sorry.

So that process included program office sign-off of their evaluation of the CORE renew- -- the CORE dates and the renewals based on function.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 356

Q.    But you know that the individuals who were not renewed beginning on January 1, for the first two weeks of January, were recommended by their programs and offices for renewal.

And, in fact, you made the decision, based on DHS policy, to separate those people from employment.  Correct?

MS. KIES:  Object to form, misstates testimony.

A.    What I did at the end of December was based on my understanding and my -- that FEMA is a component of DHS, and that my authority was expiring; that I made the decision not to send these CORE renewals forward to headquarters, DHS headquarters.

Q.    And after that, as you did send forward approvals in January and February, DHS made a policy decision that any extension of a CORE could only be for 90 days.  Correct?

MS. KIES:  Object to form, foundation.

A.    That is incorrect, because I'm the one who made the decision about the extensions for 90 days, because that relates to the period that we're in, in transition, right now.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 357

And it also relates to the staffing plans. And then the 90-day extensions, we would take that into consideration with their staffing plans.

And the idea was to have all of this resolved before hurricane season.

Q.   And the idea being that the 90 days extensions were to hold over until you figured out how to implement the staffing plan.  Correct?

MS. KIES:  Object to form, misstates testimony.

A.   So the 90-day extensions were based on functional analysis that the program offices did, based on their workload, so that the staffing plans that they were turning in, which are due today -- so that we could look at those, along with other analysis that we're doing, to streamline some of the processes within FEMA prior to the final FEMA Review Council report being released and the President making his decisions as it relates to the future of FEMA.

Q.   You didn't have the authority to extend any CORE position beyond 90 days, per DHS policy. Correct?

MS. KIES:  Object to form.

A.   That's not what I stated.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 358

What I stated was I made the decision that these were going to be 90-day renewals, and that we would do 90-day renewals on the COREs as they came up and as they were recommended from the program offices or the regional administrators.

Q.    In fact, headquarters had given you a policy that only allowed 90-day renewals, at the most, in -- after January of 2026.  Correct?

MS. KIES:  Object to form.

A.    I don't recall that.  I believe that if you look at the previous exhibits that we were talking about with the delegation of authority that you showed, that we had till December 31st.

I would have to -- as I pointed out, Annex A wasn't included.

And so, those specific authorities would have been outlined in Annex A.

So I don't recall specifically what you are saying.

Q.    You don't recall being given direction from DHS headquarters that you could not extend COREs longer than 90 days?

MS. KIES:  Object to form.

A.    I know I stated to DCOS Guy that I was going to extend them for 90 days.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 359

MS. LEONARD:  Okay.  Let's mark this as the next exhibit.  Got it.  33.

(Whereupon, Plaintiffs Exhibit 33 was marked for identification.)

WITNESS:  Thank you.

Q.   So this is a very short email from you to the FEMA CHCO.  And you say:

Hi La'Toya

Per our discussion, until further notice, please process CORE Renewals in accordance with HQ policy.  Their renewal dates should NTE 90 days for consistency.

What are your HQ -- what HQ policy are you referring to there?

A.   The HQ policy that I'm referring to is what you brought up previously, which is about the individual forms that need to be signed that have the names on them and that that authority for the signing was delegated to Will Bilicic.

Q.   If -- okay.  So it is your testimony that it was your decision, and your decision alone, that CORE renewals starting in January of 2026 would be limited to 90 days?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 360

MS. KIES:  Object to form.

A.   That's my recollection, yes.

MS. LEONARD:  Okay.  Let's mark this as the next, which is the declaration that you submitted in this case, Exhibit 34.

(Whereupon, Plaintiffs Exhibit 34 was marked for identification.)

Q.   You're familiar with this document, Ms. Evans?

A.   Yes, ma'am.

Q.   At the time you signed this, did you review all of the information in the declaration?

A.   Yes, I did.

Q.   Did you draft it, or was it drafted for you?

A.   The --

MS. KIES:  Object to form.

A.   The --

WITNESS:  I apologize again. Sorry.

A.   The -- it was drafted, and then I reviewed the draft.

Q.   Did you edit it?

A.   I don't recall if I did specific edits to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 361

this particular declaration.

Q.   And you intended for the information contained in this declaration to be true and accurate?

A.   Yes, I did.

Q.   And you state here in this declaration....

Give me one moment.

(Pause.)

On Page 6 -- apologies.

On Page 6, in Paragraph 25, you state here that "DHS decided not to reappoint" 192 COREs in January of 2026.

Do you see that statement?

A.   Yes, I do.

Q.   Is that statement accurate?

A.   I think that -- I have reviewed this, and I can see where this statement would be confusing, based on the context of how I reviewed this.

So the way that I reviewed this document is that FEMA is a component of DHS, and I was reviewing this document as FEMA is a component of DHS, and that this document was going externally.

And so, I was talking about FEMA as a component of DHS.

Q.   You refer to FEMA separately in this

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 362

document in many places.  Correct?

A.    Yes, I do.

Q.    Including in all the surrounding paragraphs to this statement.  Correct?

MS. KIES:  Object to form.

A.    Yes, that's what it says.

Q.    And in Paragraph 28, you say:

...FEMA and DHS are considering non-renewals of COREs....

So you're referring to the entities separately throughout this declaration.  Correct?

MS. KIES:  Object to form.

A.    I did in this.  And I would agree that this statement in 25 -- I can see where it would lead to confusion.

Q.    The terminations that -- well, let's put it this way:  The separations of CORE individuals that happened in January were the direct result of DHS directives and orders that you were implementing.  Correct?

MS. KIES:  Objection, misstates testimony and evidence.

A.    As I previously stated, the ones in January were based on that time period of the

Page 363

expiration of the authorities and the decision that I made not to renew those appointments that were in the first two weeks, I believe, of January.

Q. DHS continues to control all authority for FEMA CORE renewals. Correct?

MS. KIES: Objection; legal conclusion, misstates testimony and evidence.

You can answer.

A. I think that, based on what you just said, that's a misstatement. That's not correct.

Q. Do you believe it's accurate that DHS made the high-level decisions that led to the elimination of these positions, even if they didn't individually renew [sic] and reject each person?

MS. KIES: Object to form.

A. Can you restate that again?

Q. Sure.

Do you believe it's true that DHS made the high-level decisions that led to the elimination of these positions, even if they did not individually review and reject each person?

MS. KIES: Object to form.

A. I do not believe that that's the case.

Q. You don't believe that these terminations

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 364

came from the decisions and authorities of DHS?

MS. KIES:  Objection; asked and answered.

A.    As I said, I could have clarified this statement, especially where it says "pursuant to the lawful authority," because I'm the one who made the decisions not to renew these COREs, their appointments.

And so, I viewed that particular statement as I'm a component of DHS and that the policies that are in place as a component of DHS, I'm also responsible for following DHS policies.

Q.    And you understand that it is your job to implement the DHS priorities that are given to you by the secretary.  Correct?

MS. KIES:  Object to form.

A.    It is my job to implement the President's executive orders, as well as the secretary's priorities, as it relates to FEMA as a component of DHS.

Q.    And that is what you believed you were doing when you made the decisions with respect to the COREs for January.  Correct?

MS. KIES:  Object to form, misstates evidence and testimony, asked

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 365

and answered.

A.    The decision that I made at that point was not to renew those COREs because they were in January, and my authority that was delegated to me from the secretary to the position expired December 31st.

And so, I did not make the recommendations, and it did not go through the hiring process, which is the policy of DHS.

The non-renewals decision was made at FEMA.

Q.    And you believed, in making those decisions, that you were implementing the policy priorities of the Secretary of DHS.  Correct?

MS. KIES:  Objection; misstates testimony, asked and answered.

A.    In making these specific decisions, they were specifically related to these CORE renewals based on the authority that was delegated that was expiring.

And so, because I made the decision not to renew these --

VIDEOGRAPHER:  Oh, sorry.  You pulled --

WITNESS:  Oh, sorry.  I'm sorry.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 366

How about that?

VIDEOGRAPHER:  Okay.

WITNESS:  Sorry.

A.   Okay.  So I made the decision not to renew these appointments.

Q.   Let me ask the question again, Ms. Evans.

When you made these decisions, you believed you were implementing the policy priorities of the Secretary of DHS.  Correct?

MS. KIES:  Objection; asked and answered, misstates testimony.

A.   When I made this decision, as it related to potential renewals of these COREs, I was making the decision based on the authority that was delegated that was expiring on December 31st.

And the DHS policy at that point is:  Any hiring was to go forward to DHS headquarters.

Q.   I'm going to ask again, and it's a yes or no.

You believed, when you were making the decision with respect to the COREs in January, that you were implementing the DHS Secretary's policy priorities, didn't you, Ms. Evans?  Yes or no?

MS. KIES:  Objection; asked and answered, misstates testimony.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 367

A.    I am telling you the context of how this decision was made.  And this decision was made based on the expiration of the authority that had been delegated to FEMA.

And I was making the decision because these were positions that would be renewed in January, based on the policy that DHS had in place as it relates to hiring.

That is the basis of my decision.

Q.    And you certainly didn't think you were acting contrary to the policy priorities of the Secretary of DHS in making these decisions.  Correct?

MS. KIES:  Object to form.

A.    Again, I'm going to restate the basis of this decision, which was it was based on the authorities that were delegated and the authorities that were expiring.

Q.    Ms. Evans, I'm asking you a different question, and you need to give me an answer.  And I'm going to ask you directly one more time, and it's a yes-or-no question.

When you made these decisions, you understood that you were implementing the policy priorities of the DHS Secretary, didn't you?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 368

MS. KIES:  Objection --

Q.  Yes or no?

MS. KIES:  Objection; asked and answered, misstates testimony.

A.  The way that you're framing that question, I'm giving you the context of how I made this decision.

And I'm going to restate it again.

I made this decision based on the expiring authority that FEMA had and that these positions were in January.

And so, therefore, I made the decision, based on the policy that was in place, that hiring would have to go forward to headquarters.

And so, I did not send these forward.

Q.  And you understood, when you did that, that you were implementing the policy priorities of the Secretary of the Department of Homeland Security.  Correct?

MS. KIES:  Objection; asked and answered.

A.  I'm going to restate it again.

Q.  I'm going to -- I'm going to -- I'm going to ask you to give me a yes-or-no answer.  It's a yes-or-no question.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 369

You're not answering the question, Ms. Evans, and I'm entitled to an answer to the question, which is:  Did you believe that you were implementing the DHS Secretary's policy priorities when you made that decision?  Yes or no?

MS. KIES:  Objection; asked and answered.

(Simultaneous speaking.)

A.   You're asking me the context of the decision, and I am giving you the context of the decision.

And the context of the decision was based on the expiration of the authorities, and it was based on when these positions were going to be renewed, which is in January.

So you can -- you're asking me a specific question, and that -- that particular way that you are phrasing the question is not in the context of how this decision was made.

Q.   So are you saying, no, that you didn't believe you were implementing the priorities of the DHS Secretary when you made the decision?

MS. KIES:  Object to form.

A.   I'm not saying yes or no.  I'm giving you the context of how I made this decision.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 370

Q.    Okay.  So the record is very clear, you're refusing to answer the direct question that I am asking you.

I will give you one more time.

Yes or no:  Did you believe, when you made these decisions, that you were implementing the DHS Secretary's policy priorities?

MS. KIES:  Objection; asked and answered.

A.    You're specifically asking me about the policies, the priorities, and I'm answering you that -- what the context of this decision was made.

And the context of this decision was made based on the expiring authority and when these appointments would be in place in January.

So I am answering the question, and I'm answering the question around the context of how I made this decision, this specific decision.

Q.    Is there something about my question that you don't understand, Ms. Evans?

A.    I understand the question, but you're asking me about the context of this decision.

Q.    I'm asking whether you were implementing the DHS Secretary's policy priorities when you made the decision.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 371

It's a yes-or-no question, and you're refusing to give me an answer.

I would like an answer.

Will you please answer the question, yes or no:  Were you implementing the DHS Secretary policy priorities?

MS. KIES:  Object to form.

A.   I'm going to answer it again, trying to answer your question -- okay? -- is that the secretary's policy at this time, as it relates to this particular decision -- okay? -- it's a personnel decision -- the policy was in place that hiring for components was to go up to headquarters.

So in this particular case, I made the specific decision not to send these hiring requests up.

You're asking specifically about the secretary's priorities.  So the answer would be yes, because the secretary's priorities were related to hiring decisions.

Q.   Thank you, Ms. Evans.

Have you told us all the reasons that you -- have you told us all the bases for your decision not to seek the renewal of the CORE employees in January?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 372

MS. KIES:  Object to form.

A.   Can you clarify the question?

Q.   Sorry.  That was -- it's a long day, and that was a terrible question.

A.   Okay.

Q.   Have you given me here today all the reasons for your decision not to seek renewal or extension of the CORE appointments in January?

MS. KIES:  Object to form.

A.   I have stated the reason why I made the decision, yes, ma'am.

Q.   And that is a complete answer for all the reasons why you made that decision?

MS. KIES:  Object to form.

A.   Yes, ma'am.  As I have restated it several times today, through this discussion that we just had, that was the basis of the decision not to renew these particular positions in January.

MS. LEONARD:  Okay.  Well, we're going to take a very short break.  I believe there are probably about five minutes left of this, if my trusty colleague is correct.

We'll go off the record right now, and I'll see if we have any final

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 373

questions.

WITNESS:  Okay.  Thank you.

VIDEOGRAPHER:  Off the record at 6:35.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 6:45.

BY MS. LEONARD:

Q.   Ms. Evans, you testified earlier that you made the decision that renewals of CORE positions should be limited to 90 days only starting roughly in late January 2026.  Is that correct?

A.   I believe, based on this email, that was -- this is in February.  So I did make the decision about the nonrenewals.

But upon -- I would also like to clarify something, based on the last exchange that we just had.  Because you were asking the question in multiple different ways, and I clearly was saying that it had to do with the waiver expiring and that these appointments were in January.

So I just want to make sure that I clarify, the way that you asked the question, you were saying, if there were -- if that was the reason.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 374

And I want to make sure that the record is clear that during that time period, as I previously mentioned, we had an agreed-upon process.

And there were process vals that were happening in this time period, because I told you that the office heads and the regional administrators were to be signing off on the memos.

And, initially, when these memos were coming up in the December time period, and you specifically talked about the email that's associated with December 26th, those memos were not prepared appropriately.

And so, there were process vals.  And the main process val, to me, was that these memos were not signed off by the program office heads.

And so, those memos needed to be signed off, and they were not.

Q.   And what effort did you make between December 26th and December 31st to ensure that the program office heads would sign off on the recommendations that had been provided to you so that these people could keep their jobs, Ms. Evans?

A.   I sent --

MS. KIES:  Object to form.

WITNESS:  Oh, I apologize.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 375

A.   I sent the information back -- and I believe it's in the emails -- I sent it back and said that the memos had to be processed appropriately with the program office heads or the regional administrator signing off on the memos.

Q.   And you refused to allow the renewal of these CORE positions because of a paperwork flaw, Ms. Evans?

MS. KIES:  Object to form, misstates testimony.

A.   That's not what I'm saying.

What I'm saying is, is that the process was supposed to have the program office heads and the regional administrators to look at the functions and the work that was supposed to be performed by the COREs in these renewals.

Q.   And that is, indeed, how you justified your actions implementing the secretary's priorities and policies of eliminating the CORE.

You justified it by blaming the FEMA OCHCO staff for paperwork.  Right?

MS. KIES:  Objection; mistakes testimony, argumentative, form.

A.   I --

MS. KIES:  Asked and answered.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 376

A.   I am not saying that I eliminated CORE positions.  What I'm stating is, is that the program office heads and the regional administrators were supposed to renew -- review and make the recommendations for the renewals of the COREs that would be in this time period.

Q.   Have you given us all the reasons for your decisions regarding the January CORE renewals now?

MS. KIES:  Object to form.

A.   Yes, ma'am.  I just wanted to make sure I clarified that I wanted to ensure that the program office heads and the regional administrators had reviewed what was being recommended for renewal.

Q.   And have you given us all the reasons here today for your decision that the CORE renewals starting in January and February could not be more than 90 days?

MS. KIES:  Object to form.

A.   Yes.  I'm the one -- I believe that my -- I have stated that I'm the one who made the decision as it relates to 90 days, and I gave you the circumstance of the reason why I said it was 90 days.

Q.   And some of those renewals that were made in January and February, they're -- they're coming

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 377

up on the new NTE date.

Are you going to extend them for another 90 days?

MS. KIES:  Object to form.

A.  We -- right now, I have not made that determination, because the staffing plans, as I previously testified, are due in to us today.

And so, the idea was to do the analysis based on what the regional administrators and what the program offices were saying so that I could put together a recommendation as it related to hiring associated within FEMA.

Q.  So the decision on whether you're going to extend these people for another 90 days, to give the review council time to make the recommendations and for the staffing plan process to be completed, you haven't made that decision yet?

MS. KIES:  Object to form.

A.  Can you restate that again?

Q.  Sure.  I can -- sorry.  That was a combined question.

You haven't made the decision yet as to whether you're going to renew the people that you previously extended for 90 days for another 90 days. Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 378

A.   Yes.  That decision has not been made because I'm waiting for the staffing plan so that we can make the analysis.

MS. LEONARD:  Okay.  I think that's all we have.

Those are all the questions that I have for you today.

MS. KIES:  Okay.

MS. LEONARD:  For the record, we want to say that we believe that the production of documents from Defendants has been incomplete, including the production of information from the telephones, as we've heard about during this deposition.

We will be in contact with counsel about this, but we are going to hold this deposition open, pending a complete and accurate production of documents in compliance with the Court's orders.

MS. KIES:  Okay.  We understand your position.  We reserve all rights.

I believe there are two minutes left on the record.  Is that right?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 379

VIDEOGRAPHER:  Yes.

MS. KIES:  Okay.  Thank you.

And, of course, Ms. Evans will read and sign.  Thank you.

MS. LEONARD:  Thank you, Ms. Evans.

WITNESS:  Thank you for having me.

VIDEOGRAPHER:  Off the record at 6:52, and this ends today's testimony.

(Whereupon the deposition concluded at 6:52 p.m.)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 380

DEPONENT'S SIGNATURE

Please be advised I have read the foregoing deposition, pages 1 through 379, inclusive.  I hereby state there are:

(Check one)

_____ No corrections

_____ Corrections per attached

_____

KAREN STREHLE EVANS

( X ) Reading and signing was requested.

(    ) Reading and signing was waived.

(    ) Reading and signing was not requested.

Should the signature of the witness not be affixed to the deposition, the witness shall not have availed herself of the opportunity to sign or the signature has been waived.

--oOo--

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 381

ERRATA SHEET

NAME OF CASE:  American Federation of
                          Government Employees, et al. v.
                          Donald J. Trump, et al.

DATE OF DEPOSITION:  March 31, 2026

NAME OF WITNESS:  KAREN STREHLE EVANS

Reason Codes:

        1:  To clarify the record.

        2:  To conform to the facts.

        3:  To correct transcription error.

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

_____        _____

KAREN STREHLE EVANS                    DATE

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 382

DECLARATION UNDER PENALTY OF PERJURY

I am the witness in the foregoing deposition.

I have read the foregoing deposition or have had read to me the foregoing deposition, and having made such changes and corrections as I desired, I certify that the same is true in my own knowledge.

I hereby declare under penalty of perjury that the foregoing is true and correct.

In witness whereof, I hereby subscribe my name this _____ day of _____, 2026.

_____
KAREN STREHLE EVANS

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 383

CERTIFICATE

I, SUSAN ASHE, a Certified Electronic Reporter and Notary Public, hereby certify that the foregoing is a true and accurate transcript of the deposition of said witness, who was first duly sworn by me on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am neither attorney nor counsel, nor related to or employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

Dated this 6th day of April 2026.


_____

Susan Ashe, Notary Public

of the District of Columbia


My commission expires:  May 14, 2028.

**A**

**a.m** 2:2,9 13:2,19 298:9,9 299:19,21 302:2
**ability** 22:9 71:16 198:25 217:19 267:11 268:8 276:21
**able** 142:22 153:5 173:8 249:2 264:8 325:7
**aboard** 163:16
**abolished** 47:9
**abuse** 39:23 66:2 68:1,12,18
**accept** 177:25
**accepted** 62:13
**access** 195:1,6,7,14
**accidentally** 92:2
**accompanied** 270:23
**accomplish** 70:20
**account** 108:5,6,10 108:14,18,21 109:14,15,16,24 156:9,23,24 157:2
**Accountability** 205:4 237:25
**accounting** 29:13
**accounts** 110:3
**accumulate** 83:20
**accuracy** 46:22
**accurate** 21:9 22:10,14 31:1,16 31:25 47:16 120:13 184:8 202:14 224:17 280:11 361:4,15 363:12 378:19 383:5
**achieve** 44:16 65:11,12,13 249:2 249:5 250:3,18 292:17 341:22

**achieving** 53:23
**acronyms** 42:10 111:22 118:20
**Act** 155:14 171:3 192:18 201:5
**acting** 106:5 167:16 270:7 285:12 367:11
**action** 95:3 199:11 266:23,24 277:4 277:11 312:2,2,10 383:10,13
**actions** 64:22 183:11 186:1 203:18 204:22 252:23 354:21 375:18
**active** 170:25
**actively** 191:3
**activities** 44:20 110:21 168:5,16 170:21 174:3,5,9 216:1 337:23
**activity** 206:20 294:23 338:16
**actual** 170:24 212:10 270:16 294:24
**added** 167:3 285:13
**adding** 185:23
**addition** 19:2 31:22 72:13 151:21
**additional** 29:11 265:23
**Additionally** 200:6
**address** 18:4,5 41:11 43:11 108:24 109:2,10 110:5,16 175:21
**addressed** 267:9 350:24
**addresses** 109:11 110:9
**addressing** 72:16

**Admin-** 299:17
**adminis-** 39:25
**administration** 31:4 33:21 35:23 44:21 55:23 60:12 61:15 185:24 246:21
**administration's** 39:25 186:14
**administrative** 182:11 279:19
**administrator** 17:8 17:10 32:9 56:21 74:16 78:22 105:13 106:6,18 111:9 124:4 132:12 134:4 183:8 209:23 211:8 239:13 241:10 270:8 298:14 299:14 320:14 347:22 375:5
**administrators** 313:19 317:11 322:22 324:24 337:9 347:8 355:15 358:5 374:7 375:14 376:3,12 377:9
**advice** 115:25
**advised** 380:3
**advisor** 34:25 35:3 35:18,25 36:9 45:25 46:6 74:16 75:10 78:22 80:23 81:7 86:9 94:3 96:1 97:19 98:20 99:7 102:3 104:20 104:21,25 105:9 105:16,18,25 108:23 113:25 115:16,22 116:7 120:24 128:16,21

128:22 129:3,12 203:16,19 204:17 232:18 236:6 268:7 286:5
**advisors** 57:25 106:16
**advisory** 78:5
**affairs** 177:19 320:15
**affect** 251:19
**affiliated** 40:11 114:25
**affixed** 380:21
**AFL-CIO** 13:8
**afternoon** 286:13
**agencies** 23:19 38:17 168:21 205:5,24 206:13
**agency** 4:17 9:7 35:1 68:4,24,25 69:9,18 70:4,14 72:21 75:21 76:5 79:20 80:2 93:6 97:15 181:6 193:15 207:4 291:11 308:8 321:13 324:18
**agency's** 71:16
**agenda** 70:9,11,13
**agree** 68:10 70:16 200:21 275:16 276:2,18 277:8 293:7 317:1 318:12,17 325:24 326:9 328:1 330:9 362:14
**agreed** 62:17 70:13 203:5 271:11
**agreed-upon** 374:3
**agrees** 202:1,21 204:16
**ahead** 41:13 155:20 297:22 323:22 324:3

**aim** 135:12 316:21 324:15 341:20
**aiming** 309:2 337:2
**al** 1:5,9 13:8,10 381:3,4
**Alaska** 8:6 119:11 119:15,19,25 120:9,14 121:3,19 121:25 124:10,18 135:21
**Alexandria** 5:15
**aligned** 59:21 69:15 234:15 250:13
**aligns** 208:8
**allow** 272:7 323:23 375:6
**allowed** 142:13 180:9 358:7
**allowing** 346:22
**allows** 17:21
**altered** 215:22
**Altshuler** 3:4 6:3 14:4,14,18
**America** 152:5,7,11 161:8
**American** 1:4 13:7 381:2
**amount** 307:15 308:7,18 309:2,20 310:2 345:23
**amounts** 119:3 307:19,23
**analyses** 338:3 350:16
**analysis** 42:8 64:22 80:21 118:25 130:2 216:9 221:18,21,22 232:19 234:6,11 234:12,13,22,24 243:8,21 244:5,18 244:20,22 245:3 245:10,11,17 246:15 247:3,7,10

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 385

247:13,14,16
248:7 249:9,21
250:10,12 251:18
262:8 264:11,12
276:4,19,22,22
282:1,8,22 283:1
283:4 284:4,7,17
289:25 290:16,18
290:23 291:24
295:24 307:12,16
308:14 309:8
310:8,16 313:13
314:7,22,22
315:12,25 317:15
317:16,22,24
318:1,7,10,14
321:18 322:23
323:3 325:22
329:2 336:25
342:14 343:17
347:24 357:12,16
377:8 378:3
**analyze** 39:6 45:15
69:24 243:11
245:25 246:1,7
249:15 259:2,17
262:25 264:22
275:8 283:13
337:17
**analyzed** 45:18
244:14 309:20
**analyzing** 307:23
322:8 331:12
**Andrew** 271:25
286:9
**annex** 265:17,17,23
265:25 266:8
358:15,17
**annotate** 278:18
**annotated** 278:23
**announced** 176:17
176:20 181:21
**annual** 205:6,19,24
207:5 210:2,7

211:16 212:2,22
214:17 215:9,17
217:22 220:14,20
222:22 224:7,22
227:16 232:13
233:7,21 234:1
235:6,13 236:16
238:5 239:11
240:11,16 241:8
241:23 242:9,22
243:3 244:17
251:10 258:15
281:22 283:18
310:23 312:5
316:6 318:8 329:4
329:13,20 330:24
332:5 333:15
340:24
**answer** 17:20,25
20:11 21:17 28:17
41:10,13 45:13
93:16 134:24
143:3 145:24
155:19 158:11,22
175:12 180:1
188:22 189:1
190:17,21 215:20
243:6 250:17
251:2,7,25 302:8
302:12 318:4
323:21,24 326:7
326:18 342:1
355:2 363:9
367:20 368:24
369:2 370:2 371:2
371:3,4,8,9,18
372:12
**answered** 69:21
134:13 186:22
196:21 202:9
217:10,17,25
226:1,14 227:9
250:8,23 251:16
251:24 262:22

283:21 301:13
320:8 338:7
341:15 364:3
365:1,16 366:11
366:25 368:4,21
369:7 370:9
375:25
**answering** 175:1
369:1 370:11,16
370:17
**answers** 19:4
128:25
**Antoine** 8:13
**anymore** 47:21
**apartment** 107:2
**apologies** 161:19
361:9
**apologize** 64:6,6
74:10 92:5 137:18
180:8 308:4
360:20 374:25
**app** 149:18,21,23
150:4,8,12 151:2
151:22 152:1,24
**apparently** 270:21
**appear** 268:24
279:24
**appearance** 3:1 4:1
5:1 15:6
**appeared** 61:5
**appears** 49:9 79:1
83:23,24 219:17
255:3 278:20,24
304:2 340:6
**application** 157:25
158:14 352:18
353:2
**applied** 201:18
253:17 254:2
353:2
**apply** 174:10,10
253:20
**appoint** 35:24
102:13

**appointed** 36:19
37:2 46:10 94:20
94:23 96:25
101:16 102:22
103:1 106:7
178:15
**appointee** 7:15
179:7
**appointees** 152:18
152:22 181:22
182:24 184:4,18
**appointment** 36:2
36:9,24 37:6 46:8
95:7,21 96:2
99:22 100:18,20
100:25 101:2
**appointments**
130:20 131:5
174:11 249:18,19
250:11 255:16
261:7 277:19,20
295:24 308:25
317:6 343:21
351:5,9,11 352:6
352:12,24 354:10
363:2 364:8 366:5
370:15 372:8
373:21
**appreciate** 82:2
**approach** 208:16
209:6 242:25
263:5 286:14
316:11 322:7
**appropriate** 72:19
156:8,18 208:17
209:6 262:25
316:12 337:22
**appropriately**
112:14 275:9
374:12 375:4
**appropriations**
168:18 173:25
174:3 248:1
**approval** 7:25 81:9

83:25 84:5 96:5,7
119:2 171:23
184:2 204:11,16
211:23 214:5,17
226:9,17 227:1
239:14 253:2
255:19 266:11
267:22 269:12
270:20 271:14
273:24 274:3,20
277:5 344:25
348:11 350:10
351:1,10,14
**approvals** 131:4
355:8 356:17
**approve** 210:23
250:14 283:17
353:18 354:6
**approved** 95:3,7,20
96:1 139:6 212:6
214:24 221:25
233:7 237:12
249:22 250:1
254:13 265:12
277:12 325:10
343:10,13
**approving** 210:19
283:25
**approximate**
225:14 227:25
**approximately**
13:19 33:9 34:4
38:5 43:25 44:1
61:17 67:14 90:12
94:18 176:7 192:2
192:7 196:10
216:13 220:8
222:14 229:6
**April** 383:15
**area** 138:12
**areas** 201:6 208:21
**argumentative**
326:6,17 341:25
375:23

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 386

**arrangements**
107:1,12
**arrive** 283:23
**arrived** 268:6
**art** 170:17
**article** 67:10,15
177:4,10,14,14
183:11,15,18
185:21 191:18
194:6
**articles** 184:5
**articulated** 69:16
**Ashe** 1:24 2:12
13:22 383:3,19
**Ashley** 4:19 16:1
**aside** 50:23 175:22
205:1 257:7
**asked** 45:12 55:1
55:12 58:19,22,25
63:1,6 69:20
87:23 99:19,25
100:16,19 102:20
103:6 121:8,11,14
121:18 128:24
134:12 143:12,23
144:7,10,18
161:19 180:11
186:21 196:20
198:16 199:3
202:8 207:3 209:5
217:9,16,24
225:25 226:14
227:9 230:8 250:7
250:22 251:15,23
259:5,6,8 262:22
263:17,21 281:12
282:15,20 286:12
291:10 298:21
299:18 301:10
306:8 310:15
312:24 316:20
317:3,4,13,23
318:19 320:7
333:19 336:24

338:7 341:14
342:18 343:15,19
343:24 364:2,25
365:16 366:10,24
368:3,20 369:6
370:8 373:23
375:25
**asking** 21:19 26:23
52:14 54:6,7,11
55:21 88:10,15
89:3 103:2 121:22
140:22 143:25
152:21 159:6
174:2 180:3,5
226:2 227:20
259:21 276:3
294:4 297:3
299:24 302:25
303:19 307:5
317:7 339:10
341:20 345:23
350:4 351:4
367:19 369:9,16
370:3,10,22,23
371:17 373:18
**asserting** 189:16
**assess** 9:6 193:14
345:20
**assign** 298:17
**assigned** 55:9,10
94:7 259:7,22
261:15
**assignment** 54:25
63:18 139:16
206:19 210:5
212:1,19 320:11
341:17
**assignments** 41:3
83:19 84:17 127:1
127:2 139:20
168:12 173:18
**assist** 53:22
**assistance** 118:21
**assistant** 6:5,8 33:4

33:6 35:4 36:16
45:5 97:1 177:18
**assistants** 15:8
**associate** 270:8
320:14
**associated** 45:20
64:23 69:3,13
71:12 87:11 102:3
110:2 152:10
164:15 166:12
170:14 171:11
173:13 201:5
216:2 243:8 244:9
246:15,17 247:17
247:22 261:17
263:18 264:12
265:25 273:5
294:20,25 295:20
303:18 307:12
308:11,15,22,24
310:16 313:8
314:4 319:21
320:15 325:23
346:3 350:19
374:11 377:12
**assume** 73:20
**assumed** 188:13,16
**assumes** 261:10
316:24
**assuming** 96:22
182:12
**assumptions**
299:24
**attached** 21:24
208:6,12 211:11
238:6 287:12
315:17,23 323:14
324:9,11 380:8
**attaches** 346:10
**attaching** 349:10
**attachment** 219:1
219:14 265:19
287:10
**attachments**

268:22,24
**attend** 75:11,13
90:25 91:3 121:9
121:11,15 175:16
**attendance** 121:8
**attended** 71:1 78:5
79:7 97:21 120:14
**attending** 29:7
90:20
**attention** 207:15
228:19 229:4
**attest** 99:24 113:1
**attorney** 17:21
19:18,24 20:3
23:20 42:22 43:3
383:9,12
**attorney-client**
174:25
**attorneys** 4:7 15:3
22:22,23 23:13,15
23:23 24:2 28:14
41:12
**author** 287:16,18
287:20
**authored** 288:5,5
288:18,21
**authorities** 17:6
39:19 131:23
253:7 273:5,6
277:9 353:6
358:16 363:1
364:1 367:17,17
369:13
**authority** 102:13
130:19 131:12,19
133:11,15,17,20
133:22 134:2,5
169:17,21 172:2,3
172:7 173:23
179:9 180:19
253:2 254:1,5
255:11 264:8,15
264:24 265:13
266:4,9 267:10,20

267:25 268:2
269:13,17 270:3
270:25 273:1,10
273:18,18,22,25
274:21 275:2,5,12
275:19,22 276:5
276:12,20,21,23
277:4,14 303:24
304:17 307:4
345:1 348:12,23
351:4,18,20 352:6
352:13,16 354:8
354:20 356:12
357:21 358:12
359:20 363:4
364:6 365:4,19
366:14 367:3
368:10 370:14
**authorized** 108:9
108:13
**auto-populate**
342:17
**auto-populated**
344:6
**automatically**
156:24
**available** 171:13,16
319:14 339:7
**availed** 380:22
**Avenue** 2:11 13:16
**average** 18:17
**awarded** 29:4
**awardees** 63:19
**aware** 21:2 27:16
43:24 44:3 47:7
47:12 58:23 60:24
65:24 96:15 107:1
112:25 113:19,24
114:19,21 121:7
121:21 127:11
128:23 136:10
157:17 159:13
161:4,6 163:20
164:9,13,14 182:9

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

184:17,21 185:7
190:24 191:10,14
191:16 194:6
195:7,10,24
196:17 203:19
204:9,22 206:21
214:2,7,8,11
235:20 236:7,14
236:23 242:23
248:21 271:13,17
296:11 297:4
299:6 301:17
317:16,25 338:24
339:9
**awhile** 124:16

_____

**B**

**b** 260:22 261:25,25
280:3 285:3
**B.A** 29:14
**back** 31:3 32:17,25
41:18,20 44:18
45:3 68:15 82:4,6
86:15 110:1
135:20 137:21
139:5 147:21,24
159:22 166:22
167:6 174:12
192:10 201:2
213:10,14 226:20
226:21 241:20
244:20 254:1
257:7 264:25
265:13 278:7
279:12 292:12
296:17,19 304:17
311:11 314:12,13
321:24 322:24
324:5 333:7,14
335:1 336:13,17
336:19 337:1
375:1,2
**backed** 156:24
**background** 26:13

28:21 102:6
110:10 116:12,19
116:22,25 117:3,7
125:8 166:10
265:18,24 266:7
**Baltimore** 3:17
14:12
**barely** 326:14
327:20
**Barton** 305:15
320:12,14,17
321:4
**base** 350:7
**based** 25:14,25
39:7 42:14 52:12
70:1 85:5,23 93:5
118:17 173:22
175:14 180:3
206:25 216:9
221:7,17,21,23
234:7,11,12,14,22
234:25 235:1
237:4,9 242:24
244:11 246:12,25
247:3,3 248:6
249:21 258:19
259:19 262:14
269:23 270:6
280:15 281:4
286:23 290:24
293:18 296:20
297:6 302:21,25
304:14 309:6
310:14 311:2
313:10 317:5,8,9
317:12 320:1
325:8 328:13
333:6,9 336:8,9
337:20 341:16
347:9 348:7,20
353:5 355:4,25
356:5,11 357:11
357:13 361:18
362:25 363:10

365:19 366:14
367:2,7,16 368:9
368:13 369:12,14
370:14 373:13,17
377:9
**bases** 371:23
**basis** 89:3 99:17
109:1 198:22
199:8 274:17
367:9,15 372:17
**Bates** 165:13 170:8
210:25 218:20
219:13,16,16
223:11 340:7
**becoming** 90:24
**began** 26:8 53:25
169:16 178:19
262:18
**beginning** 2:8
37:22 60:11 94:19
94:21 118:10
177:21 187:14
298:16 356:2
**begins** 13:5
**behalf** 2:8 3:2,13
4:2 5:2,10 15:12
20:4 189:15 210:1
328:11
**Belichick** 281:15
**belief** 198:9,16
**believe** 28:4,9
30:10 31:23 36:5
36:23 44:18 53:8
53:21 65:6 67:6
68:14,20 73:5
83:10 87:7,23
95:23 98:7 107:2
114:12 120:2
124:7 146:24
148:5 150:19
151:20 158:15
161:9,11 165:7
168:17 171:20
175:23,23 176:11

179:8,12 197:12
201:2 206:3
211:15 220:12,16
239:3,7,17,22,23
240:4,7 241:1,4
242:5,16,19
245:22 253:5
266:7 267:5 268:7
268:14 272:16,17
272:23 275:17
284:14 286:21
287:2 288:17
292:12 295:9
296:17 297:14
300:7 301:20
305:13 309:16
313:5 319:10
320:18 321:8
322:9,20 323:16
326:13 328:13
331:18 333:6
335:7,16 336:1,3
336:8,12,16 339:4
339:25 342:15
346:1 348:2
350:18 358:10
363:3,12,19,24,25
369:3,21 370:5
372:21 373:13
375:2 376:19
378:10,24
**believed** 199:5
230:18,23 231:1
237:10 322:15
364:21 365:12
366:8,20
**believes** 76:3
**benefits** 307:24
**Berzon** 3:4 6:3 14:4
14:15,18
**best** 58:16,17
**better** 257:21
322:24
**beyond** 61:6,14

127:2 181:12
357:22
**Biden** 246:21
**big** 119:18
**Bilicic** 281:11,16
281:19 291:25
292:9 294:7,15
305:15 348:24
359:21
**Binnall** 5:12 15:19
**bit** 192:13 267:1
**blamed** 341:22
**blaming** 342:3
375:20
**board** 56:4 163:10
164:6 181:7
**Bock** 229:9
**book** 166:7,8,9
**books** 166:16
**bottom** 123:5 169:1
169:8 171:19
205:20 219:23
223:11,19 228:21
291:1 305:12
331:20 335:17
**bottom-up** 312:22
314:17,22 315:12
315:19,25 316:11
316:18 317:14,24
321:18 322:7
**bottoms-up** 208:16
209:6 242:24
263:4 317:24,25
334:22 336:25
342:13 343:16
**box** 3:21 84:24
**branch** 4:9 40:4
70:12 179:17
**break** 20:15,19,20
27:23 43:11,23
81:18 82:4,13
110:24 135:3,8,11
143:11 147:22
148:24 159:21

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

164:17 222:13,21
252:5,6 304:19
332:24 344:16
372:20
**breakout** 259:8
**breaks** 20:16,18
81:21
**Brian** 24:8
**BRIC** 64:1,3,9
**briefing** 166:7,8,9
166:15
**bring** 147:21
**bringing** 105:15
**BRINGS** 8:4
**broke** 146:5
**brought** 147:23
359:18
**budget** 32:14 42:6
92:12 127:8
139:21 168:14
**budgeting** 322:23
325:1,5
**building** 74:1 89:6
**built** 89:7
**bullet** 286:10
**bummer** 327:17
**bunch** 312:15
**bureaucracy** 71:15
71:20 72:2 77:2
**bureaucrats**
183:25 186:2,19
**business** 18:3,5
31:4,5,7 34:15
126:16 141:14,16
142:5 146:19
148:19 152:25
155:5
**bypassed** 200:6

**C**

**C** 4:21 18:6
**calculated** 221:14
**calendar** 166:20
**California** 1:2 3:8

13:12
**call** 50:10 55:11,14
98:14 136:6,8
152:2 190:20
192:5 238:20
281:15
**called** 25:16 34:11
40:6,11 58:22
84:6 150:23
181:24 205:3,6
221:20
**calls** 155:16 189:12
**Cam** 47:5
**campus** 89:7
**cancel** 197:10,10
**canceled** 194:2
196:25 197:4,6,12
197:16
**cancellation** 197:19
197:24
**capacity** 1:8 5:11
13:9 15:20 144:11
144:12 145:19,20
149:4,5,5 158:21
189:11,19 332:11
332:15 333:1,18
334:2,14 335:4,9
335:20 336:6
**capital** 42:11,14,16
50:6,8 111:21
140:19,20 207:2
**caps** 151:14
**captured** 156:20
157:10
**career** 198:6
**Careful** 355:20
**carried** 325:15
**carry** 311:24
**case** 1:6 13:11,13
15:13 24:21 36:23
42:5 63:25 83:10
89:5 95:14 98:7
111:6 112:18
114:12 124:7

164:10 184:14
267:3 272:16
282:6 294:18
307:10 319:10
360:5 363:24
371:14 381:2
383:14
**cases** 164:14
**categories** 289:23
**categorize** 192:11
**categorized** 192:13
**caution** 188:20
**Cavanaugh** 24:8,18
**CC** 224:3,4 339:23
**CC'd** 128:11 130:7
269:21
**CC'ing** 278:8
**cell** 148:2,3,6,12,15
149:23 160:14
161:11
**center** 123:16,19
**CER** 1:24
**certain** 156:11
172:4 174:5,13
181:23 253:3
255:12 265:14
266:4
**certainly** 367:10
**certificate** 29:6,18
29:18 383:1
**Certified** 2:12
383:3
**certify** 382:7 383:4
383:8
**CFO** 116:10,15
308:13
**chain** 31:14 34:15
207:13 228:17,20
255:2 257:10
271:17 278:6
297:14,20 305:12
311:10
**Chambers** 31:6
**chance** 219:8

**change** 171:16
186:3,5,7,20,24
295:7
**changes** 186:20,24
187:5,7 317:11
382:6
**changing** 191:2
**characterization**
328:2 330:9
**characterize** 320:9
321:5 342:2
**charge** 131:8
**charged** 337:24
**chart** 7:13 9:18
49:10,16 50:15
248:5
**chat** 153:10,17,22
156:14 157:16,18
158:5,8,16 159:7
**chats** 152:23
154:15,17 155:1,2
155:8 156:2 157:5
163:21 164:2
**CHCO** 50:10,11
169:8 183:6
184:15 207:23
209:7 210:1 213:7
214:13,15,20,25
215:4,16,23 221:9
225:10,21 226:5,8
226:18 227:11
228:8 230:7 245:6
245:7 267:7 271:6
280:19 285:11
290:22 292:14
297:20 298:12
308:12 311:9,18
311:25 312:8,16
313:12 315:1
316:7 322:11,11
322:14 333:11
343:14 346:9,21
347:6 348:17,22
350:22,22 359:7

**CHCO's** 215:8
275:11
**CHCOs** 245:7
**check** 28:11 204:19
204:20 380:6
**chemistry** 29:3,15
**Chicago** 3:15 14:10
**chief** 4:20 8:12
15:24 16:2 17:5
25:16,23 26:3
32:6 33:13,19
42:9,10,13,16
49:18,19 50:5,8
55:12,13,16,25
57:24 80:23 86:9
91:3 94:4,7,13,16
94:18,23 95:8,21
95:25 96:2,22
97:13 98:1 105:12
111:7,21,23
112:11 113:15,21
118:5,8,9,18
127:18 129:3
132:2,2 133:5
136:25 140:9,12
140:19,20 151:10
162:9,18,24 163:3
163:9,19 164:1
167:17 177:19
178:5 182:14,16
182:19,23 189:24
204:24 207:2
235:19 273:14
285:12 295:18,21
303:13,17 304:13
313:12 331:10
**chiefs** 57:25 60:12
60:13,14 61:10,13
**chose** 172:24
243:12 276:23
**Christmas** 349:10
**Christopher** 4:6
15:21
**christopher.r.hal...**

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

4:15
**circumstance** 50:13 137:5 183:4 376:22
**CISA** 7:15 26:15 26:15,16,17 35:5 35:6,15,16,18 36:10,17 37:13 38:2,6 39:4,11,21 40:16,21 41:5,24 43:21,25 44:4,6 44:13,18,25 45:3 45:17,21,22 50:15 55:17 56:2,7 60:17 65:25 66:2 68:1,12,15,20 74:22 89:13 91:15 91:18 99:1 108:18 109:13
**cities** 119:17
**city** 3:15,16 14:9,12 16:24
**civil** 4:8 192:18
**clarification** 130:9 285:14
**clarified** 364:4 376:11
**clarify** 19:16 54:12 159:8 181:3 276:10 372:2 373:16,23 381:8
**Clayton** 271:25 272:5 286:9
**clean** 17:17
**clear** 43:7 113:18 144:21 183:7 201:8 292:22 301:19 326:11 370:1 374:2
**clearance** 7:24 84:5 96:6 113:1 114:3 114:6,10 137:20 137:24 138:22
**clearances** 86:8

96:13
**clearly** 269:20 292:3 299:11 373:19
**clients** 20:5
**clock** 222:12
**close** 291:13
**closer** 123:15
**CNN** 191:18 194:6
**co-chair** 79:8
**co-chaired** 187:9
**coaching** 251:5
**codes** 253:15,20 381:7
**cognizant** 56:17
**coincided** 201:19
**coincidence** 232:5
**colleague** 372:23
**colleagues** 20:16
**collect** 25:11 238:22 298:22 301:21
**collected** 296:4,24
**collecting** 296:12 297:5,7 308:17
**College** 31:6
**color** 122:5
**Columbia** 2:13 383:20
**column** 49:17
**combined** 377:21
**come** 35:17 82:4,6 118:1 127:21 138:14 139:20 159:22 163:10,16 164:6 171:22 174:12 234:14 269:24 282:4 307:22 309:1 314:12 325:9
**comes** 118:1 215:7
**coming** 64:25 65:7 86:15 101:11,24 121:3 125:8,22

126:17 161:14 164:8 173:21 249:23 250:14 254:8 255:25 256:1 263:7 264:4 268:8 278:25 295:14 308:10 310:3 313:3 314:7 338:12 350:6 351:2,19 352:24 374:9 376:25
**comment** 187:23
**comments** 77:14,14 79:13 190:23
**commercial** 124:12
**commission** 383:22
**commissioned** 187:4
**common** 296:18
**communicate** 20:6 129:22 132:5 136:16 141:21 146:18,23,25 147:10 148:7 149:25 150:4,8,13 151:2 161:14,17 162:3 330:22
**communicated** 77:16 130:18,23 131:3,7,14
**communicating** 331:2
**communication** 156:12 162:17 163:19,20 164:3 327:9
**communications** 77:23 129:2 134:16 135:22,25 136:2,5,11,14 153:5,6 154:3,21 157:12 159:16 162:1,17 174:25 175:10,13 320:16

**commute** 18:10,13 18:17
**companies** 117:11
**company** 114:24 116:10,16
**compensation** 115:7,11
**compilation** 166:14 166:17
**compile** 214:3
**compiled** 214:15
**compiling** 122:14
**complete** 17:25 21:9 22:10,14 35:12 175:20 251:1 298:18 300:3,15 342:18 372:12 378:19
**completed** 64:23 80:21 212:18 302:2 348:18,22 377:16
**completion** 334:17
**compliance** 378:20
**complied** 209:25
**comply** 245:12
**component** 56:14 56:15 59:18 61:9 61:12 65:17 84:15 90:19,20,23,25 91:7,19 97:21 98:5 105:11,23,24 106:3,20 109:12 139:25 140:20 179:10 180:4,18 180:23 214:3 226:17 227:2 236:24,25 314:17 317:14,23 329:6 329:19 332:18 335:8 336:4 354:19 356:12 361:20,21,24 364:10,11,19

**components** 42:7 56:5,6 60:6,9,15 83:19,20 89:9 139:1,17 180:19 207:3 209:2,5,13 216:12 222:5 311:18 312:1,21 315:13,25 316:19 318:24 321:19 322:16 323:5,17 324:15 333:3,20 336:24 341:20 342:14,16 343:15 371:13
**computer** 166:1,2
**concerned** 113:8
**concerns** 110:14,18 110:25 186:13
**concluded** 379:11
**conclusion** 102:15 102:18 133:14 134:1,9,23 155:17 178:24 179:5 363:7
**concurrently** 213:8
**conditions** 115:15
**conduct** 185:25 209:5 244:18
**conducted** 246:6 247:5
**conducting** 39:15
**conference** 21:7 91:16
**CONFIDENTIAL** 1:12
**confirm** 31:24
**confirmation** 177:17 182:5
**confirmed** 24:13 36:5 37:3,4 48:6 52:17 55:7 176:12 176:18
**conform** 381:9
**confusing** 361:17

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

362:16
**Congress** 47:8,16
**conjunction** 182:22
314:6 338:15
**consider** 44:11
307:15 315:10
**consideration**
239:14 314:10
318:6 347:2 350:9
357:3
**considered** 248:16
283:16,25
**considering** 350:12
362:9
**considers** 192:17
**consistency** 359:14
**consistent** 77:14
216:7,24 220:23
232:17 233:14,17
241:17 244:23
290:5 341:5,9
**consulting** 32:23
34:3,8
**contact** 148:17
151:21,25 378:16
**contacted** 203:1,3
**contain** 158:15
**contained** 196:18
241:10 341:12
361:3
**contains** 73:14
**content** 156:2
157:5 189:21
190:25 212:12
**CONTENTS** 7:1
**context** 117:15
306:2 361:18
367:1 368:6 369:9
369:10,12,18,25
370:12,13,17,22
**continue** 61:6,11
126:21 145:21
148:24 264:8
313:22

**continued** 4:1 5:1,3
8:1 9:1 10:1 11:1
12:1 172:16,17
205:4 240:19
294:15
**continues** 266:16
363:4
**continuing** 171:14
**contract** 104:10,17
104:18 107:9
114:14,18,20,22
114:23 115:3,8,13
115:16 118:2
**contracting** 139:9
**contractor** 103:9
103:15,18 104:3
104:13 110:15,19
111:2 121:2
127:24 134:19
**contractors** 110:4,8
110:23 111:4
**contracts** 113:20
113:25 118:3
137:7
**contrary** 198:10,15
200:18 367:11
**contribute** 207:4
**contributing**
233:25
**contribution** 210:2
210:7 211:16
**control** 144:13
363:4
**conversation** 35:10
35:11 58:19 59:7
62:11 101:19,22
125:12 133:3
148:25 270:16
277:22
**conversations** 78:3
125:1,7,13,17
127:13,16,25
178:8,12 213:15
213:23,25 235:21

**converted** 337:25
**convey** 136:20
137:2 138:8 141:1
**copied** 128:7
136:12 224:9
286:1
**copies** 22:3 30:2,4
**copy** 22:1 199:24
224:21 242:8,12
**copying** 129:15
286:9
**Core** 26:3 130:19
131:5,16,16
169:16 171:21
172:4 173:7,16
174:11 192:19
248:2,14,19,23
249:2,4,13,16
250:6,11,20
251:13,19,21
252:1,18 253:3,8
254:1,6,7,13
255:12,16,24
256:24 258:5,10
258:21,25 259:2
259:17,17,25
260:5,7,12,17,24
261:1,4,7,7,13,17
262:19,24 263:8
263:22 265:14
266:4,11,19 267:8
267:12 268:25
272:1 275:11,13
276:7,13,14 277:5
277:11,18,20
279:9,16,18
284:13,18 285:1
285:25 289:4
294:22,25 295:14
295:24 296:2,3,10
296:13,21,23
297:7 298:15
299:12 300:19
301:3 302:4,13

303:3,15,15 304:3
304:7,9,13 306:3
306:16,18 307:13
307:16 308:5,15
308:23 310:3
313:7,9 314:6,8
317:6 318:21
325:23 327:20
331:12 337:20
338:15 339:1
343:20,22 344:14
345:24 347:9
349:11,16,20
350:1,4,8,11
352:5,19 355:8,15
355:24,25 356:14
356:18 357:22
359:11,24 362:18
363:5 365:18
371:24 372:8
373:10 375:7,19
376:1,8,15
**COREs** 130:24
167:20,22 168:8
168:25 169:8,12
170:1,5,13,24
171:2 175:18
248:12 249:9,17
258:24 259:10,11
259:22 261:15
264:5,12,15 273:4
280:5,7 284:20,22
285:4,6,17 286:12
286:25 303:14,24
304:1 306:4 307:2
307:7 308:13,22
310:9,17 337:21
337:25 344:3
345:2,6 346:3,22
347:3,14,20
350:11,19 351:1
351:14 353:19,20
354:2,8,13,23
358:3,22 361:11

362:10 364:7,23
365:3 366:13,21
375:16 376:5
**COREs'** 308:23
**Corey** 51:14,17
52:1 80:22 86:9
102:25 129:8
132:5 135:23
136:18 138:9
148:14 153:12,23
154:4 158:6
185:17
**correct** 24:14 30:18
31:16,20 33:11,17
33:22 34:23 36:25
37:13,25 39:4
40:16 44:6 46:4,8
47:17,25 48:7,18
49:21 50:2,16,19
50:25 52:25 53:1
57:15,19 58:1
59:22,25 60:9
61:22,24 62:14,23
63:9,11,12,15,22
64:18 65:19 66:20
69:9 70:14,23
71:22 72:17 74:13
76:13 77:5 78:7
80:3,11,24 85:9
90:10 94:4,20
96:18,23 97:3,8
98:9,11 99:10
103:9 104:24
105:5,20 106:3,5
106:7 108:5,7
110:5,11 113:5,21
114:20 116:20
117:4 118:6 119:7
119:11,14 129:4,6
129:16 130:12,25
131:5 132:6
133:18 134:21
147:2 148:8
153:13 155:6,10

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect,com

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 391

157:25 167:17,20 169:17 171:4,7 172:4 176:1,5,21 178:15 179:3,10 179:19,20,23 180:15 182:7,14 183:1 185:9,11 187:9 191:7,12 192:19 193:1,22 194:2,4 196:15 198:11,18,21 199:6,12 201:11 201:17 202:14 210:8 211:8,24 212:7,14 213:11 214:9,18 215:2,17 220:9 222:7 224:12,18 225:15 230:20,24 231:5,8 233:22 234:2,8,10 235:24 236:3,9,16 236:18,20 237:2,7 238:14 241:18 242:2,4,17,20,25 243:13 244:1,5,18 246:3,21 248:24 249:5,13 250:21 251:14,21 253:17 254:2,9,14 256:1 258:17 261:3 262:1,5,11,20 263:23 265:14,20 266:5,12 267:12 267:17,22 274:13 275:13,25 276:15 277:2,5 278:19,23 279:6,11 280:8,24 282:18 285:17 286:18 291:14,21 293:3 295:15 306:5,20 307:25 308:19 310:24 311:19 312:17 314:19,21 315:3,5

315:20 316:1 317:17 318:2 319:1,8,12,17,25 320:23 321:6 322:1 323:6,9,14 324:9 328:6 332:19 333:20 337:14 338:5,21 339:1,11,12 341:23 343:5,17 345:2,7,12,24 348:14,25 349:2 351:15 353:3 354:15 355:9 356:7,19 357:8,23 358:8 362:1,4,12 362:21 363:5,11 364:15,23 365:14 366:9 367:13 368:19 372:23 373:12 377:25 381:10 382:10
**corrected** 53:7
**correcting** 60:14
**corrections** 380:7,8 382:6
**correctly** 105:22 198:2
**correspondence** 8:11 9:9,14,20,23 10:4,7,10,13,16 10:23 11:4,7,10 11:13,16,19,22 210:15
**cost** 247:16 345:24
**costing** 310:9 349:22
**coun-** 78:6
**council** 7:17,20 9:5 71:2,7,9,10,14 72:13 73:4,15 77:1,9 78:6,16 79:7,9 127:21 187:3,9,13,17

189:3,7,25 190:11 191:3 193:14 194:11 195:2,12 195:17 196:18,25 197:11 200:14 231:11 232:10 237:13 249:23 250:15 325:10 330:18 338:12 339:6 357:18 377:15
**counsel** 3:1,20 4:1 4:20 5:1 13:24 15:24 16:3 20:6 22:4,25 25:17,23 26:4 27:25 30:4 111:22,23 122:18 145:6 146:3,14 165:15 174:20 175:3,11,13 189:3 190:20 218:17 285:12 313:13 378:17 383:9,12
**counselor** 24:3,6 236:6
**Counter** 100:10 101:11
**Countering** 97:2
**counts** 266:24
**County** 3:16,16 14:11,11
**couple** 201:6
**course** 30:14 145:1 184:7 228:24 379:3
**court** 1:1 13:11,22 17:17 19:5,12 21:4,22 41:17,19 41:20 46:15,18,21 64:18,22 91:24 92:4 102:16,19 144:22 151:13 164:10,14 226:21 228:12 263:14

323:18,20 324:5
**Court's** 378:20
**courtroom** 21:8
**cover** 193:16
**create** 17:17 30:22
**created** 239:12 240:12,17 247:7
**critical** 253:12,14 253:16,19
**crossed** 174:14
**crossed-out** 279:15
**current** 18:3,5 39:15 77:2 177:19 220:3 237:4 245:5 245:8 266:17
**currently** 16:25 17:2 80:10 234:23 246:25 297:3
**custodian** 287:16 287:18,19
**custody** 144:13
**cut** 63:4,9 67:25 191:11,21,25 192:7,25 196:19 217:7,14,22 218:3 218:6,8 220:2,7 221:1 222:5 226:11 227:6 231:4 232:6,7,9 232:13,19,25 233:6 234:6 235:6 235:12,16 236:15 243:3,10,17,23 244:16 245:13,24 246:8 248:2,2 249:3,5 258:16,22 259:1 261:21 263:8,20 275:24 276:14 281:23 282:16 286:18 288:9 289:2,4,6 291:20 292:5,25 293:9,9,22 296:1 296:9 309:1,9

312:25 313:23 314:18 315:19 316:21 319:23 323:12 325:14,17 326:3 334:7 337:2 339:1 340:23 341:5,10,12,21,22
**cuts** 248:6 266:23 288:24 289:1,8,18 293:22 319:8
**cutting** 66:1 68:11 68:17 215:23 216:3 234:18 309:9
**Cyber** 34:11
**cybersecurity** 31:13 32:23 33:5 33:7 34:8,16,22 35:1,4 36:17 45:6 110:11 163:15

---

### D

**D.C** 2:11 3:22 4:11 4:23 5:7 13:17 18:13 74:6 106:23 107:2
**Dan** 8:10
**Danielle** 3:5 14:3 16:16 218:19
**Darbo** 4:19 15:25 16:1
**data** 69:25 70:1 209:7 215:15 233:13,16 234:11 238:20 245:8 288:2 296:14,23 297:5 298:17,22 299:7,20 300:19 301:4,11,21 302:5 302:14,16,23 303:3,7,16 304:3 304:8,10 325:7 332:10 334:4 335:3,19 338:17

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

data's 303:18
date 13:17 36:22
  37:19 73:16 84:18
  84:25 94:10 114:9
  130:24 132:24
  166:20,24 167:6
  172:12 193:15
  206:6,16 211:20
  217:12 218:1
  223:13 259:12,25
  261:8 262:19
  280:5,7 284:21,22
  285:4,6,17 287:25
  295:15 296:2,10
  296:13,24 301:4
  302:4,13 303:6
  304:1,3 311:21
  312:7 343:4,8
  354:24 377:1
  381:5,25 383:7
dated 177:5 183:15
  205:17 228:18
  349:7 383:15
dates 29:1 152:10
  164:14 170:13
  188:10 215:12
  254:8 256:24
  258:20 260:7,13
  260:17,24 261:1,4
  261:14,16 262:24
  263:23 264:4
  279:9,10,11,16,18
  279:20 284:13
  285:1 296:3,13,21
  297:7 299:12
  303:4 306:3,19
  312:15 332:22
  333:6 337:20
  345:6 347:14
  355:15,25 359:13
David 46:1
day 18:13,17 43:8
  74:25 164:10
  165:21,23 166:3,6

166:12,15,18
167:3 168:1,4
178:18 182:3
211:17 258:14
295:25 296:12
298:9 299:10
301:22 304:7
372:3 382:12
383:15
Daylight 2:2 13:2
days 18:18 125:4
  174:5 206:6 217:7
  265:14 266:5
  267:12,15 275:22
  276:5,13 351:5,11
  353:19 356:19,23
  357:6,22 358:22
  358:25 359:13,25
  373:11 376:17,21
  376:23 377:3,14
  377:24,24
DCOS 131:8,14,17
  133:6 151:9,10,14
  160:23 161:20
  184:25 185:2,8,12
  185:16,18 189:24
  190:8,12 236:8,13
  236:15,19 273:21
  274:16,20 285:22
  305:24 306:11,16
  306:24 307:11,14
  353:25 354:22
  358:24
DCS 236:8
deadline 206:4,13
  206:22,24 209:19
  209:22 311:19,25
  312:16 328:5
  332:18 333:3
  334:21
dealing 271:4
December 9:8
  105:11 118:11
  131:13 132:11

171:21 172:8
177:21 178:20
181:21 183:16
187:14 189:22
193:16 194:1
196:24 198:8
199:23 206:13,18
209:19 211:1,17
212:5 213:11,17
217:21 220:20
223:14 224:8,23
228:18,22 229:5
230:13,19 235:23
241:22 242:10
252:22 254:6
255:5,9 256:4,13
257:11,16,22
259:12 268:23
271:24 273:10
274:4 277:23
278:8 280:7 281:4
286:8 288:1,4
295:11,12 296:1,4
296:8,12,24 297:4
297:15 298:8
299:7 302:5,14
303:3,4,8,10,22
304:10 305:16,21
305:24 306:11,23
310:8,15 311:4,13
312:20 315:12
317:23 324:12
329:13,21 332:17
332:19 333:3,4,14
333:20,24 334:6
334:15,17,23
335:9 336:11
338:20,23 339:10
339:18 344:24
345:22 346:15,23
349:7,10 351:13
351:24 352:1,14
353:10,15 354:9
356:10 358:13

365:6 366:15
374:9,11,19,19
decided 312:20
  314:16 321:4
  361:11
decision 134:18,25
  182:17,22,25
  183:5 184:18,22
  185:3,5,8 202:16
  202:17,18,19,25
  203:3 204:6
  243:21 244:15
  245:12 264:19,23
  266:20 267:17
  268:25 271:11
  273:23 274:2,12
  274:25 275:4
  277:3,13 283:16
  304:16 319:20
  342:5 344:25
  345:4 351:5,13,17
  351:22,25 352:5,9
  352:23 354:1,23
  355:4 356:5,13,18
  356:23 358:1
  359:23,23 363:1
  365:2,10,21 366:4
  366:12,14,21
  367:2,2,5,9,16
  368:7,9,12 369:5
  369:10,11,12,19
  369:22,25 370:12
  370:13,18,18,22
  370:25 371:11,12
  371:15,24 372:7
  372:11,13,17
  373:10,15 376:15
  376:20 377:13,17
  377:22 378:1
decision-making
  139:8 179:9,23
  350:10
decisions 70:1
  81:10,14 96:16

111:11,13,17,19
112:7 113:9,13,20
121:7 130:10
131:10 132:10
133:23 134:6
136:17,21,22
137:1,6,13,21
138:8,14 139:14
140:5,14 141:1
179:13,14,16,21
180:6,10,14 181:1
181:4,9,11,16,18
181:18,23 182:6
182:15 185:1,19
202:13 203:8,11
203:15,17 252:18
255:24 266:10,18
267:21 277:10
294:21 303:23
322:10,13 345:12
347:2 352:15
357:19 363:13,20
364:1,7,22 365:13
365:17 366:7
367:12,23 370:6
371:20 376:8
declaration 12:4
  25:21 360:4,13
  361:1,3,6 362:12
  382:1
declarations 92:8
  118:22,24 137:8
  137:11,22 139:10
declare 382:9
decs 153:9
Defendant 189:10
Defendants 1:10
  4:2 5:2 15:12,17
  175:3 207:14
  218:17 228:17
  255:3 287:7,24
  378:11
Defendants' 12:5
Defenders 6:9

14:22
**defending** 20:3
**Defense** 201:5
**deferred** 44:10
**definitely** 101:11
251:18
**definitively** 215:20
**degree** 29:3,4,5
31:5
**delaying** 43:8
**delegate** 270:25
**delegated** 17:6
131:11 253:6
254:5 255:11
264:8,25 266:4
269:17 270:3
273:6,18 275:21
304:16 307:3
345:1 348:23
359:21 365:4,19
366:15 367:4,17
**delegates** 265:13
**delegation** 169:21
172:1,6 173:23
253:25 266:9
351:19 352:6
358:12
**deliberative** 127:23
175:15 188:21
189:13,16 190:15
233:15 325:3
**delineation** 113:18
**deliver** 187:20
**deliverable** 213:14
213:21 214:1,21
216:2,10,11 217:4
217:13
**deliverables** 216:8
**delivered** 232:4
**delivering** 72:4
**delivery** 31:14
**demobilization**
169:6,13,14
**Democracy** 2:10

3:18 6:6,9 13:16
14:22 15:1
**denote** 12:24
**department** 4:3 5:4
15:11,16,22 16:5
24:9 26:13 32:7
33:1,10,11,17
48:17 49:8,10
52:17 53:22 54:9
56:10 66:6 67:20
73:13 83:1,13
85:21 88:23 90:10
90:14 91:9 95:5,8
96:17 116:7
119:20 141:8,12
149:14 161:15
162:6 164:8
170:22 177:17
181:6 184:2 189:9
199:1 215:13
216:5,19 222:23
230:7 233:18
273:6 282:3 307:6
313:4 338:16,18
368:18
**department's** 83:7
140:19 162:8
**departmental** 42:9
**departments**
168:21
**depend** 50:13 57:21
137:5 139:16
**depending** 56:16
111:6 140:8
309:14
**depends** 80:15 86:5
97:17 104:6
127:15 138:12
154:24 155:3
180:2 184:11
192:5,11,15,21
**depicted** 122:23
123:16
**DEPONENT'S**

380:1
**deposed** 18:20
21:21
**deposition** 1:15 2:7
13:5 17:14 20:4
22:18,21 23:23,25
24:2,19,25 25:4
25:20 27:3,13,25
28:14 42:23
144:22 145:9
378:15,18 379:11
380:4,21 381:5
382:3,4,5 383:6
383:11
**deputy** 48:25 50:1
50:19 51:22,24
52:8 55:11,13,16
55:25 57:25 60:13
60:14 61:10,13
95:16 105:10
132:2 151:10
178:5 189:24
235:19 273:14
295:18 303:13,16
304:13 331:10
**describe** 25:18
28:22 39:24 64:24
65:7 83:11 286:24
**described** 35:14
60:4,5 89:10 91:7
92:14 97:22
126:23 127:3
138:21 139:10
156:3 330:3
**describes** 31:10
331:25
**describing** 66:23
**description** 84:1
184:8 247:16
**designated** 209:16
**designates** 287:25
**designed** 166:10
**desired** 382:7
**despite** 351:25

**Destruction** 97:3
100:11,14 101:12
**detailed** 329:22
**detailee** 101:11
**details** 115:2
129:20
**determination**
85:22 156:17
351:12 353:5
377:6
**determinations**
330:20
**determine** 208:17
312:22 316:11
325:11
**determined** 80:14
156:7 158:4
**determining** 209:6
**develop** 286:15
294:3
**developing** 286:17
288:9 293:13
**devices** 149:8
**DHS** 7:13,17,20,24
33:14,20 34:19
35:2,15 36:4,4,25
37:13 40:14 42:16
47:24 48:7,10
51:20,24 54:1
65:17,25 67:14
68:6,9 70:3 77:8
82:14 83:22 84:11
85:4,6,7 86:16
87:2,6 91:21
92:14 95:14,19
96:7 98:23 99:1,4
105:1,19 106:7,9
106:11 107:15
108:23 109:6,16
110:23 112:18
113:18 114:15,18
114:23 119:1
125:23 126:10,17
127:6,17 128:3,15

128:18 132:18
138:15 139:3,23
140:6 147:11,16
148:7,11 150:15
151:2,6 152:18
153:11 156:10,25
161:18 162:17,25
163:3,20 164:2
168:12,20 172:21
172:23 176:12,19
176:19 177:24
178:22 179:2,8,10
179:19,22 180:4
180:12,13,18,19
180:23,24,25
181:4,9,10,21,22
182:5,25 183:23
184:17 185:19
186:19 189:22
195:1,21 197:10
198:11,15,17
200:7,19 201:9,10
207:2,3,4,23
209:5,7 210:1
211:16 212:11,25
213:2,10,16,20
215:9,17 217:15
217:22 220:13,19
221:9 222:1 224:8
224:22 225:5,10
225:21 226:5,7,15
226:18,24 227:3,5
227:11,15,21
228:8 232:11
233:1,20 235:5,12
236:2 238:12
241:9,24 242:10
243:13 244:1,17
245:13 246:9
258:15 261:19
262:10 264:25
265:12 266:9,11
266:17,18 267:16
267:21,24 270:24

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 394

273:19 275:1 276:24 277:4 283:19 284:1 285:17 286:2 295:13 309:20 310:1,20 311:9,18 312:5,8,16 316:7 328:6,16 329:4 330:22 331:3 333:11,16 338:25 339:14 340:23 341:11 343:11,14 345:11 348:11,22 350:21 351:12 352:19 353:2,7 354:19,20 355:9 356:6,12,14,17 357:22 358:21 361:11,20,22,24 362:8,20 363:4,12 363:19 364:1,10 364:11,12,14,20 365:9,14 366:9,16 366:17,22 367:7 367:12,25 369:4 369:22 370:6,24 371:5

**DHS's** 97:2 354:12

**different** 47:24 59:10 62:12 82:25 102:3 104:7 110:20 123:4 137:20 140:17,18 140:23 158:2 170:20 181:20 188:6 192:14 201:4 203:17 210:16,17 231:25 232:1,1 243:7 244:9,12,13,22 245:9,15 250:2 282:3 296:22 303:18,19,20 333:17 341:6

350:16 355:7 367:19 373:19

**differently** 171:10

**difficult** 17:17 275:24

**dig** 258:3

**direct** 49:25 50:18 178:12 207:14 228:19 229:4 313:19 323:4 362:19 370:2

**directed** 90:3 128:17,20 198:22 198:24 199:9,15 230:6 290:2,11 315:16 317:21

**directing** 236:7 324:15

**direction** 38:18 130:2 233:1,5 235:5 289:22 298:25 299:4,25 300:1,8,13 302:10 307:5 308:16,21 310:21 318:6 326:11 340:14,16 342:11 358:20

**directions** 42:4 314:1 342:12,16

**directives** 38:7 39:9 43:22 354:12 362:20

**directly** 21:17 85:14 113:14 118:18 127:7 159:17 163:3 178:8 179:19 200:8,24 201:8 213:3 226:3 227:12 241:24 300:24 301:2,4,11 301:16 330:22 331:2,13 367:21

**director** 32:2 34:10

35:4 36:17 45:5 237:25

**directorate** 49:15 49:25 50:6 87:12 109:20 198:17 204:25

**disagree** 71:25 72:1

**disappear** 157:25 158:8 159:17

**disappearing** 158:3 159:2,4,6,15

**disappointing** 53:15,17

**disaster** 71:15 116:12,20,23,25 117:3 118:21 121:4 134:20 137:7,11,22 139:9 153:9 171:3,9,13 171:16 247:23 259:20 261:5 337:24

**disasters** 72:5 138:17 170:25 171:1 259:3,7,9 259:22 261:15 326:14 327:19

**discovery** 164:11 164:15

**discuss** 27:23 36:13 51:8,13,19,21 52:8 115:10,12,15 188:21 189:21 203:5,17 272:25 273:17 286:14 289:8 296:9

**discussed** 51:21,25 52:7,18 59:19 69:23 70:2,4,8 90:7 116:22 118:3 138:1 139:18 167:23 168:8 185:8,13,17,18 187:3 190:3

199:14 201:25 202:6,20 248:17 256:16 258:5 259:11,16,24 260:3 262:23 263:2,20 273:4,21 274:11 280:6,16 285:16 288:11,12 288:16 290:20 295:22 313:15,18 321:9 338:19,22 339:3

**discussing** 42:4 53:25 155:5 204:8 231:12 238:8 240:11 258:9 260:11 262:18 264:2 273:9,12,13 274:16 285:23 295:19 303:25 306:24

**discussion** 51:10,16 52:4 54:8 69:18 112:12 128:5 202:22 240:9 266:7 267:6 269:11 270:18 279:4 285:9,20 295:11 331:21 339:17 359:9 372:16

**discussions** 40:20 40:24 41:1 47:12 52:11,16,22 60:20 61:25 69:3,8,12 77:20 89:14,20 126:6 127:17,22 129:19,20 136:9 185:15 203:11 213:20 235:18 236:12 269:14 270:2 273:3 285:21 313:6 325:3 337:5

339:20

**dispute** 267:1

**distinction** 342:21

**distracted** 65:5

**distribute** 209:14 225:2 291:11

**distributing** 224:25

**District** 1:1,2 2:13 13:11,12 383:20

**Division** 1:3 4:8 13:13 32:3 238:1

**divulge** 188:24

**dleonard@altsh...** 3:10

**do-over** 318:23

**Dobitsch** 197:17 198:3,4,5,9,13 199:4,16 200:2 201:11,17 204:7 234:13 255:4,10 256:4 257:2,23 259:12,16 260:11 262:20,23 263:7 263:17 269:12,15 269:18 270:3,9,17 270:19 271:3,12 277:22 278:8,12 280:7 281:7,18,19 285:10 286:8,24 288:13,18,21 290:7,17 291:24 292:8 293:13 294:6,14 295:25 296:9,20 298:10 299:11,13 304:1 318:25 319:5,7 320:5,20 325:15 342:3

**doc-** 245:19

**doctor's** 31:5

**doctorate** 29:5

**document** 12:25 22:4 27:14,17,19 73:13 82:25 84:10

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 395

84:18 139:5
169:23 174:13,20
175:20 193:13
218:16 219:17,25
220:13,17,18
221:1 229:1
241:17 244:24
245:11,20 246:3
246:11,12,24
262:15 287:6,12
287:24 288:1,3,6
288:17,22 305:5
305:10 329:3,12
341:11 360:9
361:19,21,22
362:1
**documentation**
316:4
**documented**
288:12
**documents** 21:20
21:25 25:2,6,8,11
26:19,24 27:2
28:2 84:16 85:8
112:15 133:12,16
133:21 138:25
139:9 152:11,13
165:17 166:12
220:24 232:21
234:17,21 238:7
245:2,15 246:14
247:2 284:4 311:2
347:13 351:18
378:11,20
**DOGE** 40:7,11
62:5
**doing** 69:13 88:13
149:14 174:8
212:1 237:5,10
246:13 247:1,1
248:23 249:9,25
250:11 257:21
262:8 281:5
308:14 317:9

338:10 347:5,9
352:22 354:18
355:4 357:16
364:22
**DOJ** 20:3
**dollar** 307:18 309:1
**dollars** 247:20
309:7
**Donald** 1:8 13:8
381:4
**double-check**
204:19
**download** 161:25
**downsizing** 68:25
117:11 186:14
**draft** 9:4 187:12,18
187:21,24 188:7,9
188:11,15,17
190:3,13,25 191:6
191:12,21 193:13
195:1 196:6,18
231:11 232:6
252:25 253:5
254:5 255:11
319:7,11 320:5
339:5 360:15,23
**drafted** 269:13
293:24 294:6
318:25 319:4
360:15,22
**drafts** 269:7
**DRF** 309:17 310:18
**DRS** 309:18
**due** 29:1 206:16
215:12 255:25
286:15 311:23
312:2,10 313:20
313:21 314:11,14
336:10 337:10
342:15,23,25
343:4 344:9
352:24 357:14
377:7
**duly** 16:11 383:6

**dump** 327:20
**duties** 17:7,9 100:8
106:6,18,19 111:8
113:17 132:12
134:3 140:13
209:23 271:4

**E**

**E** 3:5 165:1,1
**earlier** 97:22 138:2
138:21 139:18
194:5 202:11
203:6,23 246:2
313:15 315:24
373:9
**early** 38:6,13 87:6
135:7 217:21
273:10 277:22
286:16 303:22
310:23 321:4
333:14
**Eastern** 2:2 13:2
**Economics** 31:7
**Edgar** 51:24
**edit** 320:12 360:24
**edited** 187:13
188:18 191:6
195:16,19,22
196:4 320:21
321:1
**editing** 195:25
**edits** 360:25
**education** 28:23
29:11
**educational** 28:20
30:20
**Edwards** 42:18
207:2,18,23
**eeshleman@alts...**
3:11
**effect** 77:4
**effects** 44:23
346:22
**effort** 333:10

345:20 374:18
**efforts** 38:6,19
43:21 44:11,24
52:9 62:22 186:14
**Eisenhower** 74:1
**either** 52:4 129:2
135:23 161:4
185:17 262:10
347:20
**elected** 34:19
**electronic** 2:12
8:14 32:10 288:1
383:3
**eliminate** 77:22
250:5,20 251:13
251:20 304:1
**eliminated** 75:19
79:18 352:20
376:1
**eliminating** 76:21
77:5,10,17 89:18
89:21 92:20
249:13 354:23
375:19
**elimination** 248:23
363:13,20
**Elizabeth** 3:6 14:14
89:7
**email** 8:11 9:9,14
9:20,23 10:4,10
10:13,16,23 11:4
11:7,10,13,16,19
11:22 108:4,6,10
108:14,18,21,24
109:2,10,11,14,15
109:16,23 110:5,9
110:15 130:7
134:16 136:7
137:10 156:9,23
156:24 157:1
183:23 199:22,25
200:23 203:2
207:13,15,18,22
208:3 211:3,21

219:1,8,11 224:15
228:16,18,19,22
229:5,14,16
230:22 231:2,3
237:19 238:4,12
245:23 248:10,10
254:24 255:2,9,24
256:2,8 257:6,8,8
257:10,22 259:4
261:12 264:3,6
268:22 270:1
271:17,24 272:2,6
278:6,7,21 286:7
288:11 292:22
294:11 297:14,19
299:5 305:14,21
306:21 307:1
311:8,10,11,13,21
311:22 312:8,19
313:2 314:21
315:16,18 316:15
318:22 320:6,12
321:1 324:12
326:20 327:14
331:18,20 332:17
333:23,25 334:2
334:15,25 335:2
335:18 336:10,20
336:21,22 338:20
338:23 339:11,18
340:5,11 341:3
346:9 349:7,8,24
359:6 373:13
374:10
**emails** 57:17
109:13 110:2
128:7 130:8
137:24 258:19
267:5 269:20
270:22 273:8
282:13 286:24
295:9 305:13
320:2,19 328:14
330:1 339:4,23

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 396

375:2
**emergency** 4:17 9:6
33:7 68:3,24 72:5
76:7 79:15,25
92:8 117:4,7
134:20 193:15
**emotionally** 320:9
**employed** 17:2
383:9,13
**employee** 99:9,15
100:24 101:4,14
103:17,19,25
104:2 108:24
109:2 184:15
218:20 219:1
249:19 288:25
289:19,23 383:12
**employees** 1:5 13:8
44:1 101:7 103:14
104:1 109:20
112:19 150:16
155:13 161:24
163:21 170:18,19
173:7,16 182:9,18
183:1 192:2,5,8
192:11,13,16,17
192:19 193:1
216:20 248:16,19
248:19 250:4
252:2 255:16
258:16 338:1
344:4 345:24
347:13 348:1
371:25 381:3
**employees'** 110:9
**employment** 356:7
**ended** 201:21
256:23 294:19
310:11
**ends** 223:12 268:13
379:10
**Energy** 32:7 33:1,7
33:10
**engage** 312:21

343:16
**engaged** 32:22
191:3
**ensure** 45:7 112:5
374:19 376:11
**ensured** 110:21
**Ensuring** 205:4
**entire** 44:9 193:18
**entirety** 18:8
**entities** 362:11
**entitled** 183:16
193:13 369:2
**entity** 40:6,11 45:4
**entrenched** 186:2
**entry** 256:15,18
353:10
**ERRATA** 381:1
**error** 381:10
**Eshleman** 3:6
14:13,14
**especially** 45:4
300:13 302:10
318:21 364:5
**Esq** 3:5,6 5:13 6:2
**essence** 263:4
**essential** 216:9
221:22,23 232:23
245:4,17 247:4
248:7 282:2 283:8
289:25 290:4,6,13
290:16,24
**establish** 77:1
355:13
**established** 109:10
109:11 139:7
140:18 214:22
295:2 313:11
330:14 342:8
344:11
**establishing** 347:7
**estimate** 90:17
103:21
**estimates** 238:24
240:2,3 309:5

**et** 1:5,9 13:8,10
381:3,4
**evaluate** 65:12
71:14
**evaluated** 63:18
**evaluation** 355:24
**Evans** 1:17 2:8
4:20 7:3,11,15
12:4 13:6 15:20
16:2,2,10,15,23
30:7,18 35:11
43:20,24 49:12
69:19 70:14 81:24
82:13 97:12
110:16 111:13
121:4 127:13
128:8 129:24
130:4 133:12,24
135:20 143:11
145:25 160:4
165:5,16 173:25
177:20 183:14
187:25 189:11
193:9 194:11
199:21 212:20
215:24 217:15,21
219:21 222:21
224:13,23 225:24
227:5 228:16
229:13 232:5
233:2,19 235:7
237:18 241:23
250:16 251:7
252:13 264:16
265:10 268:21
269:5 270:7,13
278:4 280:12
287:23 290:1,11
292:21 294:2
300:20 302:5
303:22 305:4
310:20 325:12
332:15 334:15
338:2 341:13

344:23 346:12
360:10 366:6,23
367:19 369:2
370:20 371:21
373:9 374:22
375:8 379:3,6
380:13 381:6,25
382:15
**Evans'** 27:22 291:3
**Evans's** 43:3
**eventually** 63:9
**everybody** 22:24
47:14
**evidence** 134:23
143:25 204:14
234:20 261:10
275:15 276:17
293:5 316:24
324:22 341:2
355:1 362:23
363:8 364:25
**exact** 12:24 36:22
87:15 94:10
101:21 103:16
114:9 152:10
169:19 220:6
224:15 343:8
**exactly** 74:25 99:5
152:20 181:15
259:9 306:14
325:7
**EXAMINATION**
16:13
**examined** 16:11
**example** 92:7
109:13 130:20
137:22 138:16
181:6 247:22
**examples** 321:8
**Excel** 218:22
**excepted** 170:19
**exception** 204:1
**exchange** 254:25
255:4 277:21

326:25 327:15
373:17
**excluded** 240:2
**excuse** 60:13 64:5
323:18
**ExecSec** 83:1,5,8,8
83:18 84:6,11
96:7 138:2,3,25
139:8,23 151:6
153:7 269:1 272:6
**execute** 262:17
284:19
**executive** 9:12
31:11 35:4 36:16
38:12 39:1,7,14
40:2,4 45:5,14
52:12,22 59:17
62:2 70:12 71:11
72:12,15,16 74:1
76:25 83:9,11,14
83:18 84:15,16
85:7,22 139:19
140:16 163:11,12
179:17 181:7
187:20 205:3,10
205:16,19 206:25
207:25 233:22
364:18
**executives** 181:7
**exempted** 170:18
**exercise** 230:6,12
230:16 312:22
314:17 315:11,19
318:23 321:14
329:21 331:25
332:12,16 333:2
333:18 334:2,14
334:23 335:5,10
335:21 336:6
337:12
**exercises** 216:25
221:5 231:24
233:14 244:8
245:18 263:3

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 397

281:4 282:3
289:12 350:21
**exhibit** 7:9,10,13
7:14,17,20,23,23
8:3,4,8,11,16,19
8:23 9:3,4,9,12,14
9:17,20,23 10:3,4
10:7,10,13,16,19
10:23 11:3,4,7,10
11:13,16,19,22
12:3,4 21:23
29:25,25 30:5,8
49:4,5,7 67:6,7,10
72:23,24 78:12,14
82:20,22 96:8
120:5,8 122:7,11
143:18 162:11,13
162:15,16 165:6,7
165:9 177:2
183:10,12,14
193:6,7,13 199:18
199:19,22 205:14
207:10,11 218:14
222:24 223:2,5
228:14 231:17
237:16 241:18
254:22,25 256:12
257:7 265:7,8,11
268:19 271:21,24
278:1 287:3,4
288:15 290:21
292:3,13 293:12
293:20 294:12
296:18 297:6,9,10
297:13 299:9
305:6,7 311:5
316:8 326:23
331:19 334:10,11
340:2 341:18
346:5,7 349:5,8
350:5 351:3 353:8
354:7 359:2,3
360:6,7
**exhibits** 7:7 8:1 9:1

10:1 11:1 12:1,22
309:16 321:8
322:10 328:8
333:8 358:11
**exist** 76:4
**existed** 153:17
**existing** 249:16
351:18
**exists** 75:20 76:22
79:18
**expectation** 278:15
**expecting** 270:13
**experience** 31:12
86:14 134:19
180:24
**expiration** 169:16
169:20 170:1,5,13
173:23 261:16
363:1 367:3
369:13
**expirations** 298:15
349:11
**expire** 171:6,10,21
172:7 261:7
273:16 346:22
351:9
**expired** 131:12
267:11 348:12
365:5
**expires** 383:22
**expiring** 254:6
347:15 349:21
350:12 352:7,14
352:16 353:6
354:9,19 356:13
365:20 366:15
367:18 368:9
370:14 373:20
**explain** 21:13 39:8
44:17 48:9 110:25
144:3 169:2
170:17 198:23
**explaining** 324:19
**explains** 208:14

**explanation** 170:24
**expressed** 116:9
186:13
**expressive** 347:12
**expressly** 319:8
**extend** 130:19
172:3 173:7,8
253:3 254:1
265:14 267:11
273:18,24 274:21
275:2,22 345:1
351:4,11 357:21
358:21,25 377:2
377:14
**extended** 377:24
**extending** 253:25
269:13 276:12
**extends** 266:3
**extension** 174:9
253:6 255:11,18
255:22 266:19
269:16 275:11
277:13 303:24
351:15 354:7
356:18 372:8
**extensions** 173:15
173:17 255:25
264:4,9 275:23
351:2 353:19
356:23 357:2,7,11
**extensive** 110:10
249:21 250:10
251:18
**extent** 117:23
188:22
**external** 320:15
**externally** 361:22
**extraordinarily**
17:16

_____
F
_____
**F** 4:4 165:1
**FACA-based** 71:10
**face** 327:21

**facilitate** 208:5,11
**fact** 185:2 212:6
225:9 227:11,23
235:11 294:5
336:23 340:22
356:5 358:6
**facts** 134:23 179:25
261:10 316:24
355:1 381:9
**fair** 56:25 84:1
97:14 252:17
281:23
**falls** 48:10
**familiar** 49:12 64:9
83:5,7 84:7,9
101:5 119:1
155:12,24 156:17
181:25 186:9
219:21 238:14
326:19 360:9
**far** 169:12 181:19
337:2
**faster** 21:16
**feature** 158:4
**February** 36:21
61:18 306:22
355:7 356:17
373:14 376:16,25
**federal** 4:8,17 8:5
8:15 9:6 32:19
33:1 38:23 44:9
45:11 68:3,24
72:8,17 79:15
99:9 101:6 120:18
120:21 121:3
155:14 162:1
193:15 199:2
205:4 253:20
**federally** 80:8,9
235:3
**Federation** 1:4
13:7 381:2
**feedback** 269:18
270:6

**feel** 204:10
**felt** 113:3 275:4
**FEMA** 7:16,17,20
8:20,24 15:24
16:1,3 17:6,8,10
18:5,8 25:17 26:8
26:20 27:10 37:13
37:25 45:23,24,25
47:9 50:16 54:1,8
54:13,22 55:4,10
55:12,17 56:2,7
56:19 58:6,12,20
58:23 59:1,5
60:20,23,25 62:14
62:21,22 63:1,15
63:21,22 64:13
65:1,8,17,25
66:20 68:16,21
69:3,8,13,16,18
70:4,13,16 71:1,6
71:7,9,12,12
72:13 73:4,15
74:16,22 75:18
76:3,12,18,19,21
77:1,9,11,18,22
77:25 78:4,5,16
78:22 79:7,17
80:2,9 81:14 83:8
85:8,13 87:20,25
88:3 89:13,15,18
89:21,23 90:1,7
91:4 92:9 93:12
93:19 94:3,4,18
94:23 95:7,21
96:2,17,22 97:8
98:8,21 99:1,8
100:4,4 102:4
103:19,25 104:1
105:13,16 106:1
107:9,23 108:1,4
108:6,10,18,18,20
108:24 109:2,15
109:24 110:15,21
111:13,17,20

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

112:14,14,19,21
112:22 113:5,9,18
113:20 114:15,20
114:21 115:19,22
116:1,8 117:17,20
118:12 121:19
124:3 125:9
126:22 127:9,13
127:15,19,21
128:4,7,11,12,23
129:4,9,13,14,23
130:12,15 131:12
131:20 133:6,12
133:21,23 134:6
134:21 136:17,20
137:1,15,23
138:10,22 139:14
139:17 141:2,14
141:16 146:19
150:1,5,9,13,16
152:18,22,25
154:22,25 155:5
156:3,13 157:13
163:10,16 164:6
167:17 169:17
170:13 172:20
176:5 177:25
178:10 179:9,13
179:21 180:4,7,15
180:21,23 181:1
181:11 182:6,13
182:16,19 183:6
183:16 184:15
186:15,25 187:3,7
187:17 189:3,7,10
189:25 190:1,10
191:3,12 192:1,13
192:17,23,24
194:10 195:2,12
196:8,24 197:11
198:7,15,18 199:4
199:6 200:2,14
201:11 202:13
203:8,18 204:18

204:18,22 209:2
209:23 210:1,16
210:19 211:1,16
211:23 212:4,12
212:22 213:7,9,16
214:3,5,13,15,17
214:20,21,25
215:4,5,8,15,16
215:23,23 216:4
216:12,14,20
217:7,8,20,22,22
218:2 219:24
220:3,14,20 221:2
221:15 222:5,22
224:7,21,22
226:10,11 227:6
227:16,22 228:1
229:25 230:1
231:4,10,25 232:7
232:10,12,13,20
233:7 234:7,7,16
234:18,23 235:6
236:6,16,25
237:13 238:1,19
240:1,12,20
241:11 242:7,10
242:21 244:10,16
245:6,7 246:6,16
247:17 248:3,16
249:23,25 250:4
250:14 251:12
252:1 253:2,17,23
254:1 258:11,16
260:4 261:20
262:10 263:3
264:7,13,14,25
265:13 266:3
267:2,6,10 268:2
268:25 269:1
271:5 273:25
274:16,21 275:10
275:13 276:7
280:24,24 281:20
282:5 283:18

284:8 285:11
286:6 288:8,9
289:9,17 291:5,21
294:15 295:20
296:12 297:20
298:11 308:12
309:9 312:21
313:11 314:17
315:13,24 316:18
317:12,13,21,23
318:15,24 319:21
320:3 321:19,20
322:11,14,16,16
323:5,17 325:10
325:18 326:13
327:10 328:11,15
329:5 330:4,17,21
330:23 331:25
332:18 333:2,14
334:1 335:8 336:4
336:13,24 338:2
338:12,25 339:6
339:14 340:24
343:10,15 345:7
345:15,24 346:9
346:21 347:6
348:12,17 349:22
350:22 351:12
353:6 354:20
356:11 357:17,17
357:20 359:7
361:20,21,23,25
362:8 363:5
364:19 365:11
367:4 368:10
375:20 377:12
**FEMA'** 92:20
**FEMA's** 71:14,22
  110:4 130:19
  177:19 182:25
  210:2,6 214:2
  218:6 227:7 234:7
  241:23 243:3,17
  246:1 252:14

263:9 272:6
293:10
**FEMA-related**
  81:10
**FEMA.dhs.gov**
  108:14 110:5
**female** 335:8
**Fern** 150:19
**fewer** 80:10
**field** 169:8,12
**figure** 283:4 292:5
  325:16
**figured** 101:3,13
  357:7
**filed** 13:11
**fill** 344:5
**filled** 21:7
**final** 9:4 193:14,22
  205:24 206:5
  207:4 214:23
  215:7 225:5,10
  228:7 230:1
  233:21 234:1
  235:23 237:11
  261:20 262:10
  268:25 282:18
  284:1 319:20
  324:17 330:19
  332:9 340:24
  341:12 342:5
  357:17 372:25
**finalized** 253:1
**financial** 49:19
  117:16,19,24
**financially** 383:13
**financing** 192:12
**find** 322:10
**fine** 82:1 135:8
  143:3
**finish** 17:20
**fired** 46:24 47:8,17
**firm** 34:3
**first** 16:11 18:22
  19:2 29:24 31:11

33:16,21 37:24
47:22 55:22 56:4
61:7,7,14,15
78:23 86:19 87:1
87:4,7,24 94:11
120:10 122:10
145:3 152:5,8,11
161:8 177:8
183:21 188:8
196:17 207:16
220:25 232:17
237:21 240:10
241:20 255:10
257:6,8,11,11
278:6 279:8 294:1
297:19 311:10
351:9 352:12,24
356:2 363:3 383:6
**firsthand** 95:1
**fiscal** 216:14,20
  221:14 222:7
  225:14,18 227:17
  228:2 229:25
  237:1 240:25
  243:17 249:11
  250:4,19 251:12
  288:10 312:23
  316:1 335:11,22
  340:24
**five** 18:18 81:21
  135:2 304:21
  372:21
**five-minute** 159:21
**flaw** 375:7
**fleece** 124:4
**Fleischman** 5:5
  16:4,5
**flew** 124:11
**flight** 124:18,24
**flip** 31:3 166:21
  167:10
**Flood** 247:25
**floods** 8:22
**fly** 124:12,14

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 399

**FO** 84:19,25
**focus** 41:2 76:17
**focused** 31:12 34:7
    34:14 44:19 45:3
    45:6,8 61:20
    68:14,21 76:17
    131:17 294:24
**follow** 40:3 49:24
    278:9 280:22
**followed** 157:7
    203:2
**following** 170:9
    232:16 238:18
    285:25 299:19
    340:15 364:12
**follows** 16:12 41:21
    226:22 324:6
**force** 27:9 246:1,6
    246:20 326:1
**forcing** 326:10
**foregoing** 380:4
    382:2,4,5,10
    383:5
**form** 18:12 20:2
    24:15 25:13 26:9
    27:11 28:16 35:19
    36:18 37:7 38:9
    38:15,20,25 39:5
    39:12 40:1,8,12
    40:17,23 41:8
    44:2,7,14 45:1,19
    46:13,17,25 48:12
    48:22 49:22 50:3
    50:20 51:4 52:2
    52:10,20 53:4,12
    53:16,20 54:4,24
    55:5 56:12 57:1
    57:16,20 58:7,11
    58:21 59:6,23
    60:10,18,22 61:2
    61:23 62:15,24
    63:5,10,16,23
    64:4,14,20 65:2,9
    65:16,20 66:3,13

66:21 68:7,13,19
69:1,10 70:10,15
70:24 71:8,18
72:10,18 73:23
75:4,8 76:9,14,23
77:6,12,19 78:1
79:4,10 80:5,19
80:25 81:11 83:6
83:16 84:8,12,22
85:5,10,13,19
86:2,9,17 87:3,21
88:4,9,14 89:1,11
89:19,24 90:5,15
91:11,22 92:3,22
93:1,9 95:10,22
96:6,19 97:16
98:6,10,13 99:2,6
99:11 100:3 101:1
101:8 102:8,14,24
103:4,10 104:5,11
104:23 105:6,21
106:4,14,24 107:5
107:10 108:2,11
108:15,19,25
109:7,25 110:7,12
110:17 111:3
112:8,24 113:6,12
113:23 115:1,6,14
115:20 116:2,13
116:21 117:1,5
118:13 119:4,8,22
120:23 121:5,12
121:16,23 124:5
124:17 125:10,16
125:24 126:5,11
126:14,18,24
127:4,10,14 128:9
128:13,19 129:5
129:10,18,25
130:6,13,21 131:1
131:6,21,25 132:7
132:14,21 133:13
133:19,25 134:8
134:12 136:19

137:4,17 138:11
138:19,22 139:11
139:15 140:7
141:3,6,10,15,19
141:23 142:2,9
146:20 147:3,8,13
147:18,25 148:9
149:16 150:2,6,10
150:14 151:5,19
151:23 152:15,19
153:1,14,18 154:1
154:6,10,14,23
155:7 156:4,15
157:14,20 158:1,9
158:17,25 159:5
159:18 162:2
163:1,22 164:4,12
165:14 168:3
169:18 171:8
172:5 176:2,22
177:12 178:2,11
178:16,23 179:4
179:11,24 180:16
180:22 181:2,13
182:1,8,21 183:2
183:19 184:9,19
185:4,10 186:6,11
186:16 187:10,15
188:2,5,19 191:8
191:13,22 192:3,9
192:20 193:2,22
193:23 194:3,15
194:18,23 195:3,9
195:18,23 196:2
196:20 197:7,14
197:20 198:12,19
199:7,13 200:20
200:22 201:12
202:8,15,24
203:12,14,24
204:3,13 205:7
206:14,23 207:6
208:1 209:9 210:4
210:9,14,21

211:18,25 212:8
212:15,23 213:5
213:12,18,24
214:6,10,19 215:3
215:10,18,25
216:6,16,22
217:16 218:4,9
220:5,10,15,22
221:3,16 222:2,8
224:10,14,19,24
225:16,20,25
228:3 230:4,21,25
231:19 232:8,15
233:3,11,23 234:3
234:9,19 235:8,14
236:1,4,10,17,22
237:3,8 238:15
239:5,19 240:6
241:3 242:3,18
243:1,5,15,18
244:2,6,19 245:1
245:14 246:4,10
246:22 247:8,18
248:25 249:6,14
250:7,22 251:15
251:23 252:21
253:4,18 254:3,10
254:15 255:14
256:6 257:3
258:12,18,23
259:14 260:1,14
261:9,22 262:2,6
262:12 263:13,16
263:24 265:2,15
266:13,21 267:4
267:13,18,23
268:4,15 269:9
271:1,15 272:14
272:21 273:2,20
274:1,7,14,22
275:3,14 276:1,8
276:16 277:1,6,15
279:22 280:9,14
280:25 281:24

282:19 283:6,20
284:2,11 285:7,18
286:3,19 289:10
289:20 290:8
291:7,15,22
292:10 293:4,16
293:25 294:10,17
295:8,16 296:5,15
297:1 298:24
299:2,8,15 300:9
300:21 301:7,23
302:15,20 303:5
303:11 304:5,11
306:6,25 307:9,17
308:2,9,20 309:3
309:11,22 310:5
310:12 311:20
312:18 313:1
314:20 315:6,14
315:21 316:2,23
317:18 318:3,11
318:16 319:9,13
319:18,24 320:7
320:13,24 321:7
321:21 322:2,19
323:7,15 324:10
324:21 325:19
326:5,16 327:7,12
328:3,12,18,22
329:8,23 330:8
331:1,7 332:20
333:5,21 334:24
335:12,25 336:7
336:14 337:4,15
338:6 339:2,15,21
341:1,14,24
342:19 343:1,6,12
343:18 344:8
345:8,11,13,18,25
347:4,16 348:4,15
348:18 349:1,23
350:3,14 351:16
352:2,10,21 353:4
353:22 355:10

356:8,20 357:9,24 358:9,23 360:1,18 362:5,13 363:16 363:23 364:16,24 367:14 369:23 371:7 372:1,9,14 374:24 375:9,23 376:9,18 377:4,18

**format** 19:20 218:23 219:15

**formed** 198:9

**former** 36:4,8 37:5 46:11 51:2,8 75:25 76:11 77:10 80:1,24 95:20 96:15 135:23 150:9 178:9 194:13 252:16 341:23

**forms** 348:20,21,24 359:19

**forth** 383:7

**forward** 2:10 3:18 6:6 13:16 15:1 157:1 218:11 220:24,25 221:8 225:10,17 243:22 260:20 264:20 266:18 267:24 271:10,12 274:3 277:19 281:5 284:1 319:5 320:2 338:18 341:9,11 341:13 342:4,9 355:17 356:14,16 366:17 368:14,15

**forwarded** 239:12 241:23 320:18

**forwarding** 269:1

**forwards** 349:8

**found** 341:19

**foundation** 2:10 3:18 6:6 36:11 40:18 47:1,11,19

48:2 51:5 55:19 58:3 59:16 62:8 64:20 66:9 69:11 70:7 71:24 76:15 80:5,13 81:12 84:3,13 85:11,20 86:3 89:1 93:14 93:23 96:11 97:5 97:10 99:12 101:9 109:8 110:7 112:24 113:12,23 114:5,17 117:13 117:22 121:6 127:5 128:10 129:11 131:22 132:8 141:11 146:21 158:10,18 163:23 180:17 181:14 183:3 184:10,20,23 187:16 193:24 195:4 197:2,21 201:16 212:9,16 215:19 225:8 226:1,14 227:9,19 228:4 231:20 233:4 239:6,20 247:9,19 259:15 260:2,15 262:22 263:11 264:18 266:14 268:5 271:16 272:15,22 274:8 277:16 285:8 286:20 288:20 296:16 297:2 299:23 300:10,22 301:8 301:24 302:7 309:4 311:1 316:3 319:3 321:22 325:20 332:21 336:15 342:20 343:2,7 345:19 348:16 355:1

356:21

**four** 7:12 34:4 38:3 38:5 228:20

**fourth** 228:20

**frame** 176:10 268:23 273:11 305:11

**framing** 368:5

**Francisco** 1:3 3:8 13:13

**fraud** 39:23 66:2 67:25 68:11,17

**Friday** 298:8

**friend** 327:6,8

**front** 35:15 56:9,15 56:15,17,19,20,24 57:3,4,6 58:5,9 81:5 83:23 84:21 85:4,6 96:13 105:17 109:6 132:18 140:6 146:12 160:11 167:10 168:24 181:10 182:5 195:22 196:6 223:16 236:2 244:1 261:19 267:21 273:19 285:17 286:2 295:13 309:20 310:2 316:9 355:9

**frustrated** 275:10

**full** 16:21,23 22:10 22:14 54:8 171:15

**full-time** 248:18 252:2 338:1 344:4

**fully** 21:14 349:16 350:1,4,7

**function** 294:25 355:16,25

**functional** 347:23 348:6 357:12

**functions** 221:22 221:24 234:7,14

234:25 246:17 247:5 248:8 249:8 249:24 258:25 282:2 283:13 284:9,17,19 314:3 325:22 338:13 344:2,12 347:10 347:19 348:8 375:14

**Fund** 6:9 14:22 171:3,9,17 247:24 337:24

**funded** 170:15,16 170:18 171:2,9 247:23,24 248:1 309:15

**funding** 168:22,23 170:12,13,14,20 171:12,13,15,15 173:12 247:21 350:6

**further** 38:18 240:9 270:11 282:22 283:3 284:7,8,15 359:10 383:8,11

**future** 68:3,24 69:3 71:11 237:13 330:21 357:19

**FY** 293:21 312:6

**FY2026** 332:13

**FY26** 10:19

---

**G**

**G-u-y** 151:16

**gathered** 332:10 335:3,19

**general** 28:19 92:17 110:8 127:23 155:2 190:4 201:15,19 266:3 353:20

**general's** 201:23

**generally** 20:10 31:10,16 38:22

165:19 168:1 200:16 224:17 269:8

**genesis** 121:17

**getting** 68:21 169:6 327:17

**give** 19:25 21:8 22:10,13 30:3 90:17 103:21 124:8 130:1 133:17,20 134:2 155:18 166:10 170:7 198:17 243:12 245:13 250:25 251:7 261:19 269:18 272:18 275:7 287:11 299:3,25 300:8 326:2 344:5 361:7 367:20 368:24 370:4 371:2 377:14

**given** 22:18 73:17 108:4,24 110:4,8 110:15 139:17 157:8,22 168:20 174:7 209:1 212:2 275:23 288:2,2 302:10,14,16 324:17 329:19 333:2 334:21 358:6,20 364:14 372:6 376:7,14

**gives** 209:19

**giving** 17:20 145:7 174:19 246:8 264:21 289:21 302:1 311:25 312:16 318:5 368:6 369:10,24

**glasses** 30:13

**global** 34:14 116:10 116:15

**go** 18:23 21:16

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

31:11 35:22 41:13
43:13 59:1 63:1
95:18 97:24,25
98:1,4 107:15
110:1 118:23
119:23 121:19,19
121:25 128:5
137:8,24 138:2,16
138:20,21 139:3,4
140:2,3,15,15
142:21,23,25
143:4 146:5 149:8
155:20 162:12
163:12 164:18
171:12 173:20
174:4 181:9 187:6
187:22 192:10
193:3 201:2
205:13 234:2
240:9 241:20
248:11 254:21
267:21,24 271:10
277:10,19 283:12
284:16 286:7
292:12 296:17
297:22 298:6,7
318:23 320:2
321:24 322:24
323:22 324:3
328:14 333:7
335:1 343:11,14
355:17 365:8
366:17 368:14
371:13 372:24
**goal** 93:12,20,21
**goals** 39:25 40:15
  44:12 53:23 64:24
  64:25 65:7,10,18
  65:21 93:19,25
  94:1 241:12
**goes** 22:2 36:2
  181:7 270:11
**going** 17:15 20:16
  20:17 21:18,19,25

22:1,3 28:1 29:10
29:23,25 31:23
35:7,11 41:9
42:22 43:10,11
54:3,18 68:17,25
69:4,4 72:22
81:16 82:19,20
87:18 89:6 93:2
93:18,24 96:12
109:21 118:6
120:1 130:2 135:1
135:6,20 137:7
148:22,24 149:2
158:19 165:6
167:14 171:6
173:22 174:24
175:7 192:10
193:17 205:9
207:14 228:18
229:4 237:21
238:6,9 249:20
250:9,20 251:13
251:17,18 254:20
254:24 260:20
268:18 269:24
272:2 273:16,22
274:23 275:7
276:19 277:17,20
283:10 284:16
292:2 295:23
298:5 299:21
300:11 301:22
305:5,6 307:12,14
310:13 314:13,14
314:25 318:22
331:3,11 338:18
340:5 348:13
351:21 352:16,19
353:18 354:6
358:2,25 361:22
366:18 367:15,21
368:8,22,23,23,23
369:14 371:8
372:20 377:2,13

377:23 378:17
**good** 14:2,6,13,17
  14:21,25 15:10,25
  16:15 65:10 81:17
  164:17 222:11,12
  252:5
**government** 1:5
  13:7 32:10,19
  44:10 45:11 72:8
  72:17 99:21 101:4
  101:14 103:9
  110:9,15 111:1,4
  121:2 124:11
  127:24 134:19
  155:13 199:2
  253:20 381:3
**governmental**
  144:25
**governments** 80:1
**grant** 63:2,3,6,8,13
  63:17,20 64:9
  351:15
**granted** 268:2
**Greaves** 5:13 15:18
  15:18 23:2 41:8
  42:24 43:2 145:17
  149:2 158:19
**Greyson** 199:23
  203:1 204:11,18
  204:23,24
**group** 5:12 15:19
  45:7 120:17
  152:17,23 153:10
  153:16,22 154:19
  157:18 158:5,8,15
  221:18
**guess** 25:15 119:17
  142:17
**guidance** 39:13
  42:7 156:6 157:7
  157:21 162:4,6,8
  163:24 174:6,23
  184:25 200:7
  206:15 209:10

221:7,10 302:1
323:10 324:23
333:11
**Guy** 55:25 89:10
  131:8,14,17 132:1
  132:22 133:7
  151:9,15,16 152:4
  160:23 161:20
  178:5 184:25
  185:2,8,12,16,18
  189:24,24 190:12
  235:19 236:8,13
  236:15,19 273:15
  273:21 274:16,20
  285:22 353:25
  354:5,22 358:24
**Guy's** 161:6

_____

## H

**hac** 3:19
**half** 215:24 216:4
  217:7,14,23 218:3
  218:8 226:11
  227:7 234:18
  291:20 293:1
  309:10
**halfway** 67:14
**Hall** 4:6 15:21,22
**Halong** 119:13
**halve** 291:3,6
  293:23
**Hamilton** 46:24
  47:5,8,16,20,21
  59:9 61:5
**hand** 22:1,3 122:14
  254:24 305:5
**handed** 30:7 67:9
  78:14 120:7
  183:14 193:12
  199:21 228:16
  237:18 255:2
  265:10 268:21
  271:23 287:23
  297:13 326:25

**handle** 307:12
**handwritten** 8:16
  26:5,6,14,18
  166:24 279:13
**happen** 186:24
**happened** 52:12
  74:6 150:17
  185:15 214:9
  235:18 295:6,12
  304:4 334:6
  362:19
**happening** 117:17
  117:20 170:11
  187:2 203:18
  249:10 294:19
  337:21 350:16,21
  374:5
**happy** 19:15 135:7
  144:2 149:9
  319:11 320:4,10
**hard** 8:21 17:15
  35:9 170:8 345:15
**harms** 71:15
**Harris** 3:16 14:11
**he'll** 43:5
**head** 8:20 19:4
  21:10 90:19,20,23
  90:25 91:7 97:21
  98:5 105:11,23
  106:3,20 180:7
  271:3 347:21
  348:7
**headquarters** 57:4
  57:9,12 81:5
  83:18,22 84:14
  95:14,15 105:1
  107:16 109:12,14
  109:17,19,23
  112:16,17,18
  113:18 114:18
  115:3 127:7,18
  128:4,15,15,18
  138:15 139:1,3
  140:3 150:15,16

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 402

151:2 164:8 168:12 172:22,24 180:12 181:9 182:25 185:15,19 203:4 212:11,25 213:2,16,20 226:16,24 235:5 266:18 277:10,19 281:5 291:12 307:6 331:3 352:17 356:14,15 358:6,21 366:17 368:14 371:13
**headquarters'** 110:3
**heads** 91:19 105:24 334:3 337:6,8 347:8 374:6,15,20 375:4,13 376:3,12
**hear** 89:17 92:19 92:24 93:7 104:4 126:3
**heard** 75:15 77:10 77:17 103:14 194:17,21 378:14
**hearings** 92:11
**held** 31:19,24 32:1 52:24 74:19 80:23 94:17 100:1 101:6
**Hello** 15:23
**help** 20:17 59:1 63:1 76:17
**helped** 25:2 97:19
**helping** 25:10 67:25
**Hemenway** 55:15 55:16 58:8 59:4 89:10
**hereinbefore** 383:7
**Hi** 15:21 359:8
**hierarchy** 105:19
**high** 83:12 229:19 230:14 231:14,16 231:17 248:9,11

329:14
**high-level** 62:3 130:1,4 282:23 283:7,9 330:15 363:13,20
**higher** 237:1
**highest** 292:7
**hindsight** 321:5
**Hire** 289:6
**hired** 35:21
**hires** 169:14 289:15
**hiring** 140:15 181:5 181:12,15,19 205:5 238:23 240:1,2 266:17,20 266:24 273:5 277:10 345:11 353:7 354:21 365:9 366:17 367:8 368:13 371:13,15,20 377:11
**history** 29:7,19 30:20 238:5
**hit** 249:11 260:12 263:8 275:24
**hold** 52:17 53:18 63:14 229:10 294:22 353:12 357:7 378:18
**holidays** 345:16 352:4
**home** 107:15
**homeland** 5:4 16:5 24:4,7,9 26:14 33:11,17 48:17,21 49:9,11 52:18 53:24 56:10,25 57:14 65:15 66:6 67:20 73:14 83:2 83:13 88:24 90:10 90:14 91:9 95:6,8 96:18 116:1,7 119:20 120:25

141:8,13 149:14 161:15 162:7 177:18 189:9 216:5,19 222:24 273:24 307:6 368:18
**honest** 251:1
**honorary** 29:4
**hope** 55:3,6
**hoped** 47:23
**Hoshijima** 3:19 14:6,7
**host** 130:14
**hour** 81:16 135:2
**hours** 23:7 125:6
**House** 95:13,18 138:6 197:9,12,18 197:23 198:10,14 200:9,18,25
**Houston** 107:4,6
**HQ** 57:10,13,17 104:22 280:22 359:12,15,15,17
**human** 42:10,13,16 50:5,8 111:21 140:19,20 207:2
**hundred** 23:8 53:6 295:10 297:24
**hurricane** 264:20 268:9,10 275:6 357:5

_____

**I**

ï 298:19 300:4,16 327:20
**ice** 150:17
**ICYMI** 8:4
**idea** 109:4,5 243:4 243:16 261:6 276:12 285:5 297:22 357:4,6 377:8
**identification** 30:6 49:6 67:8 72:25

78:13 82:23 120:6 122:12 162:14 165:10 177:3 183:13 193:8 199:20 205:15 207:12 218:15 228:15 237:17 254:23 265:9 268:20 271:22 278:2 287:5 297:11 305:8 326:24 334:12 340:3 346:8 349:6 359:4 360:8
**identified** 23:16 253:16
**IL** 3:15
**Illinois** 14:10
**immediate** 296:25
**impact** 262:24
**impacts** 119:13
**impair** 22:9
**impediment** 276:6 276:11,14
**implement** 38:7 43:21 44:12 62:21 72:14 180:14 259:1 281:22 283:11 284:7 286:18 292:18 295:23 325:14 357:8 364:14,17
**implementation** 52:22 293:11,15 293:18 310:22 328:16
**implemented** 330:21
**implementing** 119:7 199:5 206:11,12 232:11 258:22 282:16 324:20 329:2 354:12,20 362:21

365:13 366:8,22 367:24 368:17 369:4,21 370:6,23 371:5 375:18
**important** 177:21
**impose** 243:16
**imposed** 267:16
**Imposing** 243:3
**impossible** 329:4 330:2,12
**improving** 317:12
**In-person** 112:2
**include** 56:6 61:25 70:23 128:15 166:14 181:19 192:18 215:1 218:19 235:6,12 235:15,16 236:8 236:15 243:25 247:16 248:14,15 265:17 280:1 284:1 299:11 315:2 328:16 330:24
**included** 30:25 62:2 69:17 139:9 201:4 212:6,13 213:7 216:19 226:10 240:1 258:16 261:20 265:18 282:17,21 283:17 315:3,17 320:22 324:13,16 328:7 339:5,19 344:6 355:23 358:15
**includes** 57:23 117:3 152:18 166:17 215:6 308:7 315:18 320:16
**including** 22:25 57:24 59:22,25 69:8 70:22 72:15

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 403

117:7 129:15
163:18 180:21
192:19 203:22
259:22 347:12
362:3 378:12
**inclusion** 234:1
**inclusive** 380:5
**incomplete** 378:12
**incorrect** 62:25
199:8 200:10,25
245:23 263:25
322:4 337:16
338:8 356:22
**independent** 234:5
**Indian** 74:1
**indicate** 167:19
**indicates** 224:11
**individual** 118:21
154:21 182:18
359:19
**individually** 154:19
363:14,21
**individuals** 40:6,10
57:23 102:13
180:25 181:23
242:25 339:14
349:11,21 356:1
362:18
**inform** 203:16
**information** 8:13
9:17 25:25 32:2,6
32:10 33:13,20
39:16 49:19 83:20
130:1,4 139:24
145:12 151:22,25
160:13 162:9,18
162:25 163:3,9,19
164:1 166:11
169:9 175:15,18
197:18,23 198:10
198:14 200:8,18
200:24 201:1,7
207:4 213:13
214:4,16 215:13

216:23,24 238:22
262:16 265:18
278:22,23 283:22
287:16,18 291:17
300:24 304:13
308:17 309:19
310:1 317:9
319:12,15,16,19
320:5 326:2 329:5
329:18 345:17,23
349:20 350:2,13
351:25 352:3,4
360:13 361:2
375:1 378:13
**informed** 132:9,17
132:19 134:14
137:14 202:18
203:18 286:2
289:17
**informing** 204:6
**Infrastructure**
35:1
**inherited** 252:14,19
**initial** 329:20
**initially** 45:24
99:13,14 103:14
314:25 374:8
**initiatives** 59:10,13
337:18
**Injunction** 12:8
**innovation** 31:14
**inserted** 191:11
**inspector** 201:15
201:18,23
**Institute** 34:11
152:5,8,12 161:8
**institutions** 28:23
**instruct** 161:24
**instructed** 157:11
157:15,18 163:21
**instructing** 206:12
**instruction** 190:14
209:1
**instructions** 164:1

198:11 207:23
238:18
**instrumental** 66:1
67:24 68:11
**Insurance** 247:25
**intend** 17:22
**intended** 30:25
63:4 65:13 80:2
361:2
**intent** 288:24
289:18 291:3,6
293:22,22
**intention** 54:21,25
**intentions** 72:11
**interacted** 87:2
**interacting** 87:5
88:7
**interaction** 87:7,16
87:24,25
**interactions** 87:23
**interest** 304:21
**interested** 383:14
**interfered** 275:12
**interject** 175:4
**internal** 228:21
232:2 233:15
234:21 321:11
339:4
**internally** 223:10
231:5 267:2
313:11 319:17
**interpose** 17:21
42:22 43:5,5
**interposing** 41:12
**interpret** 80:16,17
**interpretation**
266:22
**interview** 36:14
37:9
**interviewed** 36:1
36:12
**introduce** 13:25
**introduced** 16:15
82:25

**investigation** 104:9
104:12
**invitation** 62:13
**invoke** 20:4
**involve** 68:17,25
87:20 127:12
172:21,23
**involved** 36:8 37:6
38:6 88:23 96:16
110:22 111:10,13
111:16 112:6
113:24 117:18
118:24 119:6
127:25 131:20
133:4 134:11,25
140:4 152:17,24
152:24 153:11,11
179:12 186:10
197:18 202:12
203:7,10,21 261:1
292:1 294:8 295:3
**involves** 72:2
**involving** 77:24
85:8 127:16 158:6
**issue** 20:12 41:11
169:20 186:10
201:10 204:9
274:11 305:23
306:10,15,24
350:19 355:11
**issued** 38:12 141:9
205:3 206:11
312:5
**issues** 34:17 59:18
87:8,9,11,18,20
88:1,2,11,16
98:21 102:3 106:1
115:23 128:4,11
128:12,23 129:13
129:14 130:15
132:10 168:15,18
168:22 200:11
203:19 204:18
236:6 256:5

274:16 286:6
295:20 307:2
308:6,12 346:2
350:23
**item** 279:8,16 282:6
290:21 296:20
**items** 278:9 303:1

---

**J**

**J** 1:8 13:9 381:4
**Jaggers** 327:1,6,8
327:24
**James** 4:20 16:2
**January** 33:21,24
34:20 36:6 43:25
61:17 150:18
151:1 237:19
242:7 254:8
286:16 295:6
298:16 306:22
307:8 310:23
311:18,21,23
312:1,7,10,17
314:14 321:4
328:6 332:17
335:2 339:9 340:6
340:11 345:6
349:12,21 350:12
351:2,10,22 352:5
352:13,15,25
354:10,24 355:5,6
356:2,3,17 358:8
359:24 361:12
362:19,25 363:3
364:23 365:4
366:21 367:7
368:11 369:15
370:15 371:25
372:8,18 373:12
373:21 376:8,16
376:25
**Jason** 5:13 15:18
**jason@binnall.c...**
5:17

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 404

**Jeffrey** 237:20,22
**Jeremy** 4:5 15:15
jeremy.s.newma...
  4:14
**Jessica** 6:2 14:18
**job** 1:25 65:11
  69:24 129:12
  201:18 257:21
  364:13,17
**jobs** 31:19,22 97:7
  374:22
**Joe** 55:25 56:1
  132:1 235:19
  236:8 273:15
**John** 31:6 327:1
**join** 145:17
**joined** 40:21
**joke** 281:15
**Jonathan** 6:11
  13:20
**Jos-** 151:15
**Joseph** 151:15,16
  160:23
**Jr** 3:16 5:6 14:10
**judge** 21:9,14
**July** 7:22 53:5,8
  78:6,15,21 79:12
  94:2
**June** 33:9 37:15
  53:3 268:12
**Justice** 4:3 15:12
  15:16,22 32:3
**justifications**
  349:20 351:1
**justified** 375:17,20
**justify** 283:2
  326:12

_____
      **K**
_____
**Kara** 98:9,12,14,15
  98:17,19,22
  102:22 118:11
  119:6 127:24
  142:12 153:12,23

154:12,17,22
156:13 158:7
159:17 173:1
199:11,16,24
202:1,7,12,21
203:7 223:22
224:9 235:20
271:14 272:7
274:6 278:8 286:1
286:9 305:15
339:19
**Kara's** 204:11
**Kara.Voorhies@...**
  108:7
**Karen** 1:17 2:7 7:3
  7:11,15 12:4 13:6
  15:20 16:10,23
  177:20 280:21
  380:13 381:6,25
  382:15
**Katrina** 181:24
  182:10 186:9,13
  260:24,25 261:2,5
  279:16,18
**KE&T** 34:4
**keep** 20:17 26:1
  46:18 81:21
  304:20 374:22
**kept** 25:14 97:7
  291:13
**Kevin** 4:18 15:23
**kevin.yusman@f...**
  4:24
**Khan** 349:9
**Kies** 4:4 15:10,11
  18:12 19:18 20:2
  24:15 25:13 26:9
  27:11 28:4,7,10
  28:16 35:19 36:11
  36:18 37:7 38:9
  38:15,20,25 39:5
  39:12 40:1,8,12
  40:17,23 42:24
  44:2,7,14 45:1,12

45:19 46:13,17,20
46:25 47:10,18
48:1,12,22 49:22
50:3,20 51:4 52:2
52:10,20 53:4,12
53:16,20 54:4,24
55:5,18 56:12
57:1,16,20 58:2,7
58:11,21 59:6,16
59:23 60:10,18,22
61:2,23 62:7,15
62:24 63:5,10,16
63:23 64:4,14,19
65:2,9,16,20 66:3
66:8,13,21 68:7
68:13,19 69:1,10
69:20 70:6,10,15
70:24 71:8,18,23
72:10,18 73:23
75:4,8 76:9,14,23
77:6,12,19 78:1
79:4,10 80:4,12
80:19,25 81:11,19
81:23 83:6,16
84:2,8,12,22
85:10,19 86:2,17
87:3,21 88:4,9,14
88:25 89:11,19,24
90:5,15 91:11,22
92:1,22 93:1,9,13
93:16,22 95:10,22
96:10,19 97:4,9
97:16 98:6,10,13
99:2,6,11 100:3
101:1,8 102:8,14
102:18,24 103:4
103:10 104:5,11
104:23 105:4,6,21
106:4,14,24 107:5
107:10 108:2,11
108:15,19,25
109:7,25 110:6,12
110:17 111:3
112:8,23 113:6,11

113:22 114:4,16
115:1,6,14,20
116:2,13,21 117:1
117:5,12,21
118:13 119:4,8,22
120:23 121:5,12
121:16,23 122:8
124:5,17 125:10
125:16,24 126:5
126:11,14,18,24
127:4,10,14 128:9
128:13,19 129:5
129:10,18,25
130:6,13,21 131:1
131:6,21,25 132:7
132:14,21 133:13
133:19,25 134:8
134:12,22 135:1,9
136:19 137:4,17
138:11,19 139:11
139:15 140:7
141:3,6,10,15,19
141:23 142:2,9,21
143:15,21,24
144:8 146:20
147:3,8,13,18,25
148:9 149:16
150:2,6,10,14
151:5,19,23
152:15,19 153:1
153:14,18 154:1,6
154:10,14,23
155:7,16,21 156:4
156:15 157:14,20
158:1,9,17,25
159:5,18 162:2
163:1,22 164:4,12
168:3 169:18
170:7 171:8 172:5
176:2,22 177:12
178:2,11,16,23
179:4,11,24
180:16,22 181:2
181:13 182:1,8,21

183:2,19 184:9,19
184:23 185:4,10
186:6,11,16,21
187:10,15 188:2,5
188:19,24 189:4,8
189:18 190:14,17
191:8,13,22 192:3
192:9,20 193:2,23
194:3,15,18,23
195:3,9,18,23
196:2,20 197:1,7
197:14,20 198:12
198:19 199:7,13
200:20,22 201:12
201:16 202:8,15
202:24 203:12,14
203:24 204:3,13
205:7 206:14,23
207:6 208:1 209:9
210:4,9,14,21
211:18,25 212:8
212:15,23 213:5
213:12,18,24
214:6,10,19 215:3
215:10,25 216:6
216:16,22 217:9
217:16,24 218:4,9
218:18,24 219:4,7
219:19 220:5,10
220:15,22 221:3
221:16 222:2,8
224:10,14,19,24
225:7,16,20,25
226:13 227:8,18
228:3,24 230:4,21
230:25 231:19
232:8,15 233:3,11
233:23 234:3,9,19
235:8,14 236:1,4
236:10,17,22
237:3,8 238:15
239:5,19 240:6
241:3 242:3,18
243:1,5,15,18

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

244:2,6,19 245:1
245:14 246:4,10
246:22 247:8,18
248:25 249:6,14
250:7,22,25
251:15,23 252:21
253:4,18 254:3,10
254:15 256:6
257:3 258:12,18
258:23 259:14
260:1,14 261:9,22
262:2,6,12,21
263:10,13,16,24
264:17 265:2,6,15
266:13,21 267:4
267:13,18,23
268:4,15 269:9
271:1,15 272:14
272:21 273:2,20
274:1,7,14,22
275:3,14 276:1,8
277:1,6,15 279:22
280:9,14,25
281:21,24 282:19
283:6,20 284:2,11
285:7,18 286:3,19
287:9,14,21
288:19 289:10,20
290:8 291:7,15,22
292:10 293:4,16
293:25 294:10,17
295:8,16 296:5,15
297:1 298:7,24
299:2,8,15,22
300:9,21 301:7,23
302:6,15,20 303:5
303:11 304:5,11
304:20,23 306:6
306:25 307:9,17
308:2,9,20 309:3
309:11,22 310:5
310:12,25 311:20
312:18 313:1
314:20 315:6,14

315:21 316:2,23
317:18 318:3,11
318:16 319:2,9,13
319:18,24 320:7
320:13,24 321:7
321:21 322:2,19
323:7,15 324:10
324:21 325:19
326:5,16 327:7,12
328:3,12,18,22
329:8,23 330:8
331:1,7 332:20
333:5,21 334:24
335:12,25 336:7
336:14 337:4,15
338:6 339:2,15,21
341:1,14,24
342:19 343:1,6,12
343:18 344:8
345:8,13,18,25
347:4,16 348:4,15
349:1,23 350:3,14
351:16 352:2,10
352:21 353:4,22
354:3,14,16,25
355:10 356:8,20
357:9,24 358:9,23
360:1,18 362:5,13
362:22 363:6,16
363:23 364:2,16
364:24 365:15
366:10,24 367:14
368:1,3,20 369:6
369:23 370:8
371:7 372:1,9,14
374:24 375:9,22
375:25 376:9,18
377:4,18 378:8,22
379:2
**kind** 125:11
**King** 5:6,14 6:5
  14:10,25 15:1,4,7
**knew** 59:8 102:25
  125:19,22 126:9,9

126:13 222:4
249:12 250:4,18
251:10,17 254:7
309:8 348:10
**know** 18:25 19:15
  20:15 22:5 23:25
  24:5 25:15 27:14
  28:14,17 30:11
  37:8,23 44:4,8
  47:20,21 51:6
  54:1,16,19 55:1
  64:1 67:16 71:4
  72:3 73:8 83:3
  89:2 90:16,18
  95:2,3,25 96:3
  98:22 101:2,21
  103:16,25 107:15
  108:13 109:1,3,9
  113:13 114:23
  115:2,4,7 117:23
  121:8,24 123:18
  125:19 126:16,19
  129:20 141:12,16
  142:17,19 144:24
  147:19 148:18
  149:6 152:4
  168:19 172:15
  173:3 177:14
  183:22 185:2,5,12
  185:14,16,18
  186:7 187:17
  188:23 190:6,9
  191:5,9,20,24
  193:18 194:10,13
  194:25 195:5,13
  195:16,19,21,24
  196:3,13 197:3,15
  197:25 201:21
  202:2 207:19
  212:1,4,10,12,17
  212:18,21,25
  213:1,6 215:12
  216:7,23 217:2,11
  217:14,18 225:4,9

225:13,17,22
226:2,7,9,15,23
227:5,11,15,20,23
227:25 228:5,7,23
230:9,10 235:2
236:19 237:22
247:21 249:1
250:9 253:9 254:5
255:6 256:7 259:9
265:21 269:2,14
270:2,18 273:15
274:10 275:18
276:11 279:20
287:9,19 288:5,21
293:23 294:5,7
297:16 298:1,21
298:25 300:1,6
302:13,18 303:9
303:17 304:4,9
306:15 307:20
310:10 311:3
315:9 327:3
328:13 330:13
331:9,14 334:4
336:18 340:8
343:8,9 349:25
354:22 355:3
356:1 358:24
**knowing** 95:23
  352:13
**knowledge** 81:13
  95:1 102:21
  108:20 134:7
  135:22 197:22
  198:13 211:19
  226:4 283:21
  284:3 300:12,19
  300:23 301:1,5,12
  301:13,25,25
  302:9 343:3,13
  382:8
**known** 17:10 50:9
**Kristi** 265:12

**L**

**L** 4:10
**La'** 297:20 346:14
  349:9
**La'Toya** 359:8
**lack** 322:24
**landing** 35:22
**language** 71:17
  196:13,15,16
**lapse** 168:18,22,22
  173:13,24 174:2
  310:10,11,18,18
**lapsed** 168:15
  171:12
**large** 116:16
**lasted** 62:3
**lasts** 268:10
**late** 114:7 176:8
  295:6 345:22
  373:12
**law** 5:12 15:19
  162:1
**lawful** 364:6
**lawsuit** 16:19
**lawyer** 145:11,14
**lawyers** 21:7 25:7,9
**lead** 197:23 249:7
  362:16
**leader** 198:6,7
**leaders** 184:3,3
**leadership** 54:1,9
  60:25 112:14,21
  113:5,10 136:21
  137:15 172:20
  177:24 198:11,15
  198:15 215:5
  220:13,20 224:23
  235:12 247:6
  343:11 351:12
**Leadership's**
  241:11
**leads** 313:16
**leaked** 191:15,17
  191:18 194:7,9,10

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 406

194:14 196:22
231:7,10 232:6
338:20,23
**leaking** 194:21
**learn** 103:12
**leave** 142:15
182:11 279:20
**leaving** 176:13,19
**led** 79:17 80:7
116:16 197:19
235:2 331:25
363:13,20
**left** 34:1 49:16,17
123:25 372:22
378:25
**legal** 6:5,8 15:7
25:15 102:14,18
111:22 133:13,25
134:8,22 155:17
178:23 179:4
363:6
**legitimate** 88:19
**Leonard** 3:5 7:5
14:2,3 15:2,5,9
16:14,17 27:21
28:6,8,12 29:23
41:9,17 42:20
43:10,19 49:3
67:5 72:22 78:10
81:15,20,25 82:3
82:12,19 120:1
122:6,9,13,20
135:5,10,19
142:24 143:2,10
143:19,22 144:5
145:2,23 148:22
151:13 155:23
159:20 160:3
162:10 164:16
165:5,11 170:10
175:19 176:24
183:9 189:2,6,15
189:20 190:16,19
193:5,10 199:17

205:11 207:8
215:18 218:12,21
218:25 219:5,10
219:20 222:10,20
223:3,6 226:19
228:10,13 237:14
251:3 252:3,12
254:17 255:1,14
268:17 271:19
277:24 287:1,11
287:15 297:8,25
298:4 304:18,22
305:4,9 323:19,22
323:25 324:3
326:21 334:9
339:24 344:15,22
346:4 349:3 359:1
360:3 372:19
373:8 378:4,9
379:5
**let's** 28:19 29:14
45:22 49:3 67:5
78:10 82:3 95:5
110:24 118:4
122:6 123:4,15
136:24 142:21,23
143:4 162:10
176:24 183:9
199:17 205:9
218:12 222:13
228:10 237:14
252:3,4,13 254:17
264:23 265:6
271:19 277:21
287:1 297:8
326:21 339:24
346:4 349:3 359:1
360:3 362:17
**letter** 182:10 186:9
186:13 261:2
**letters** 184:16
**letting** 261:7
**level** 31:12 83:12
163:14 209:15

229:20 230:15
231:14,16,17
240:24 241:12,13
242:24 248:9,11
282:25 289:22
292:7 320:3 329:3
329:14,14,22
330:3,4 332:13
335:6,22 345:20
**levels** 171:15
208:18 209:7
210:18 244:13
245:4,6,8,18
289:9 316:13
319:21 325:8
337:23
**Levy** 6:2 14:17,18
**Lewandowski**
51:15,17 52:1
80:23 81:6,9
86:10,15,20 87:2
87:5,24 88:10,22
89:8,14,17 90:9
90:13,21 91:1,8
91:20 92:15,19
93:7 96:1 101:18
102:7,22,25
121:18 125:15,18
125:22 126:7
129:3,8,14 132:5
135:23 136:2,12
136:18 138:9
149:13 150:5
151:3 153:12,23
154:4 158:7
160:17,20 185:17
194:20
**Lewandowski's**
81:4 82:14 88:7
93:12,19,20,25
148:14 160:5
**liaison** 95:13
**lifetime** 31:20
**limit** 267:15,16

**limited** 291:20
359:25 373:11
**line** 48:14 49:24
86:10 205:12
207:16 219:13
223:25 255:10
278:9 305:21
311:12 313:6
346:5 381:11,13
381:15,17,19,21
**link** 122:2
**Linked-In** 7:10
**LinkedIn** 30:1,10
30:22
**list** 31:23 85:16
278:18,25 279:3,5
279:8 286:1
**listed** 31:22 73:25
74:12,15,15 78:17
78:21 219:24
289:19
**lists** 49:18 289:1
**litigation** 25:12
82:25
**little** 65:5 123:15
192:13 267:1
270:11
**living** 106:25
**LLP** 3:4 6:3
**loaded** 349:16
350:1,4,8
**local** 79:25 169:14
289:15
**locally** 79:17 80:7
235:2
**located** 107:14
**location** 73:5,25
78:17
**lodge** 149:3
**logic** 285:24
**long** 23:6 124:18
372:3
**longer** 23:10 76:3
176:5 264:7

358:22
**look** 22:4 30:11
39:13,14,17 49:12
63:2,6,18 69:4,13
69:24 70:16,17,17
71:11 73:16 77:1
78:25 80:6 110:1
146:6 148:3
158:13 159:4,7
167:6 168:24
169:22 172:9
177:16 183:9,21
185:20 199:17
201:2 210:24
219:21,23 221:6
223:2 246:8,11,19
246:24 249:1,24
254:18 256:12
257:7,14 258:25
259:5,17,19
263:18,22 264:1
277:21 282:20
284:20 286:21
292:12,16 294:20
295:9 296:17,21
297:9 311:5,24
314:2,3 317:3,4,7
318:20 320:19
322:7,25 324:25
325:5,22 326:12
331:17 333:8,22
334:13 339:25
343:25 344:12
346:5 349:3 353:8
355:15 357:15
358:11 375:14
**looked** 25:22 59:24
96:7,8 122:21
147:22 156:16
216:9 221:9
238:13 244:9,20
244:25 245:11,17
245:19 246:14
247:2,21 279:13

290:15
**looking** 59:17,20
  63:8 68:22 84:23
  123:22 127:19
  170:21,22,24
  173:12,14,18,19
  174:8 187:5
  210:15 222:11
  232:24 241:18
  245:5 246:15
  248:5 256:20,24
  260:7,17,21,23
  261:11,13,14,15
  263:4 279:9,25
  284:8,12,25
  288:13 289:12
  292:13 299:11
  307:21 308:5
  309:12,13 310:6
  313:8 317:5
  326:20 337:19
  338:10,13,14
  341:7 343:20
  344:14 348:6
  350:6
**looks** 169:1 174:13
  228:8 257:4
  258:20
**lost** 43:25
**lot** 21:16 52:11
  101:24 118:25
  130:8 167:3
**loud** 223:20
**love** 81:20
**lowest** 209:15
**lunch** 135:4,6,12
  164:17,21
**Luther** 3:15 5:6
  14:10

_____

**M**

**ma'am** 17:12 18:2
  18:19,21 19:8,13
  19:17,22 20:1,9

20:14,23 21:1,5
21:12,15 22:7
23:3,18,21 24:11
24:16,20 25:5
27:8,13 29:16,20
29:22 30:17,21,24
31:2,17,21 32:5,8
32:12,15,21,24
33:3,12,15 34:6,9
34:12 36:7,20
37:1,4,11,14 38:1
38:4 42:17,19
46:2,5,9,14 47:6
48:3,8,16,19,23
49:23 50:4,7,17
50:21 51:1 53:9
56:22 58:14 60:1
60:19 61:3,16,19
62:16,18 63:6
64:11 66:22 67:21
70:25 73:19,24
74:4,18,21 78:8
78:20 79:23 82:17
83:4 85:2 111:22
122:22 123:20
137:12 139:12
148:10 150:21
151:11 155:9,11
160:15,21 162:21
163:6 165:25
167:9 171:5
176:15 190:4
196:16 200:4
205:22 223:1
224:20 230:17
233:24 234:4
269:6 278:5
360:11 372:11,15
376:10
**main** 374:14
**majority** 137:6
  251:25
**making** 15:3 41:5
  41:23 59:20 69:8

69:14,18 70:4,13
89:25 111:21
112:13 113:9,14
113:19 131:11
132:11 145:12
182:6 233:12
245:6 269:16
283:16 295:1,5
303:23 304:16
347:2 357:19
365:12,17 366:13
366:20 367:5,12
**manage** 134:20
  138:25
**managed** 80:8
  235:2
**management** 4:17
  9:7 23:25 31:12
  31:15 32:2,3,14
  34:15 42:5,6
  47:25 48:6,10
  49:2,15,20,25
  50:6 51:12,14,18
  68:4,24 79:16,25
  87:8,9,12,17,19
  88:2,11 109:20,22
  117:4,7,16,19,24
  127:8 134:20
  139:21,22 162:5
  162:17 163:13,14
  168:13,14 193:15
  198:17,22,24
  199:9,15 204:25
**managing** 34:10
**manner** 12:23
**March** 1:19 2:1
  13:1,18 48:4
  50:25 162:16,22
  163:18 164:3,9
  306:22 310:15
  331:16 337:11
  381:5
**March~31** 2:9
**Marianne** 4:4

15:11
**marianne.f.kies...**
  4:13
**mark** 21:22 29:24
  29:25 49:3 67:5
  72:22 78:11 82:20
  120:1 122:6
  162:11 165:6
  176:24 193:5
  205:11 207:9
  218:12 228:10
  237:14 254:20
  265:6 268:18
  271:19 277:24
  287:1 326:21
  359:1 360:3
**marked** 7:9 8:3 9:3
  10:3 11:3 12:3
  30:6,8 49:6 67:8,9
  72:25 78:13 82:23
  120:6,7 122:12
  162:14 165:10
  177:3 183:13
  193:8,12 199:20
  199:22 205:15
  207:12 218:15
  228:15 237:17
  254:23 257:18
  259:6 265:9
  268:20 271:22,23
  278:2 287:5
  297:11 305:8
  326:24 334:12
  340:3 346:8 349:6
  359:4 360:8
**marker** 174:14
**Martin** 3:15 5:6
  14:10
**Martinsburg** 17:1
**Maryland** 14:12
**Mass** 97:2 100:10
  100:14 101:12
**master's** 29:4,10,18
**match** 216:25

231:22
**matches** 279:12
**materials** 278:16
  345:5 348:10
  349:10
**matter** 13:6 85:23
  86:5
**matters** 85:8
  129:23 130:12
  131:20 132:6,20
  133:23 134:6
**Matthew** 5:5 16:4
**matthew.fleisch...**
  5:8
**MBA** 29:21 31:4
**McCord** 8:14
**McGill** 199:23
  204:11,23,24
**McLaughlin**
  177:19 183:22,24
  185:21
**MCO** 253:8,11
**MD** 3:17
**MDR** 198:17,23
  199:12,14 200:2
  201:10,20,25
  202:7,20 203:4
  204:7,12
**MDR'd** 199:4
  200:17 294:14
**mean** 18:16 32:13
  42:25 67:2 68:20
  76:21,24 85:4
  87:10,11 95:14
  97:17 104:6
  117:11 127:15
  136:5 154:24
  155:4 173:11
  187:1 192:15
  203:10 210:22
  249:4 276:11
**meaning** 26:20
  56:20 86:22
  109:19

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

**meaningful** 276:22
**means** 56:15 73:21
  85:17 223:23
  249:7 253:11
  266:8
**meant** 59:12 76:24
  80:9 203:13,15
  249:12,15
**measured** 65:18,21
**medication** 22:8
**meet** 210:5 292:5
  323:12 338:5
**meeting** 7:18,21
  61:4 71:1,3,4 73:4
  73:20,22 74:6,9
  75:2,7,9,15 76:1
  77:9,15 78:6,15
  79:12 91:14,18
  111:20 167:22
  172:20,25 173:2,4
  187:21,22 194:2
  196:24 197:3,10
  197:11,13,16,19
  197:24 204:5
  256:4,8 257:2,5
  279:1 280:16
  285:10 295:18
  296:8 298:10
  299:10 353:21,23
  353:24 354:5
**meetings** 59:9 60:3
  60:7,11,16,21,23
  61:1,6,9,12,20
  62:3,6 73:15 79:7
  89:9 90:6,8,11,12
  90:19,20,22,25
  91:6,7,13,17,18
  92:6,10,13,16,17
  97:22 98:5 107:12
  107:17,20 111:18
  112:1,2,4 128:3
  133:5,6,9 134:15
  166:11 168:2,6
  173:5,22 175:16

189:23 190:2,5,8
  190:10 195:11
  203:22 258:3
  273:14 274:19
  280:2 285:12
  306:15
**memo** 252:25 253:5
  253:24 254:5
  255:11,18,22
  265:1,11,16 266:1
  266:2 267:9,19
  268:25 270:22,23
  271:8,10,11 272:1
  346:18,20
**memorandum**
  206:12,12 346:11
  346:14
**memos** 269:8,12,19
  270:10,14,16
  271:13,18 272:18
  272:25 273:7
  274:3,5 314:8
  374:7,8,11,14,16
  375:3,5
**mention** 340:22
**mentioned** 27:1
  29:17 58:8 153:2
  195:11 232:22
  236:12 244:7
  245:3,16 285:22
  286:4 374:3
**message** 8:14 163:5
  298:11 320:20
**messages** 147:9
  157:24 158:3,8
  159:2,3,7,15
**met** 56:4 86:19,20
  295:21,22,25
**metadata** 287:25
  288:4
**method** 157:4
**Micah** 229:9
**Microsoft** 107:19
  107:21

**mid-December**
  305:11
**middle** 228:19
  312:12
**mine** 30:14 327:8
**minutes** 7:18,21
  20:18 62:4 73:3
  73:14,20 77:15
  78:15 79:2 81:22
  222:13 286:12
  304:19 344:16
  372:22 378:24
**mission** 39:19 41:3
  44:19 53:23 59:20
  59:21 68:15 69:14
  216:9 221:22,23
  232:22 245:4,16
  247:4 248:7
  253:12,16,19
  271:4,5 282:2
  283:8 289:24
  290:3,6,13,16,24
  313:17 346:22
**mission-critical**
  208:20
**missions** 44:19 45:4
  45:8,20 70:18
  72:20 76:18
**misstatement**
  363:11
**misstates** 179:25
  198:20 204:4,14
  225:8 234:20
  246:23 275:15
  276:9,16 277:7
  291:16 292:11
  293:5 316:24
  319:2 322:3 323:8
  324:22 326:6
  338:7 341:2,25
  354:3,16 356:9
  357:10 362:22
  363:7 364:25
  365:15 366:11,25

368:4 375:10
**mistake** 321:5
**mistakes** 375:22
**mix** 344:2
**modernization**
  117:16,19,25
**modifying** 216:11
  217:4
**moment** 219:11
  303:20 361:7
**money** 307:24
  308:7,18 309:9,20
  310:2 345:24
  349:16,22
**month** 37:22,22
  298:15 315:24
  316:17 317:17
  318:1 323:4 326:3
  344:23
**months** 38:3,5
  47:23 256:1
  267:10 268:11
  306:4,19
**morning** 14:2,6,13
  14:17,21,25 15:10
  15:25 16:15
  299:19
**Motion** 12:7
**move** 45:22 54:19
  54:22 55:10,12
  58:19 62:13 153:9
  198:25 201:10
**moved** 33:10 37:13
  37:19 54:13,17
  62:10 65:24 70:5
  74:22 94:3 99:1
**moves** 7:16
**moving** 58:6,12
  79:25 85:24 89:13
  98:8
**Mullin** 24:10
**multiple** 41:11
  217:11,18 221:5
  231:24 373:19

**N**

**N** 165:1,1,1
**name** 13:20 16:21
  16:23 24:8 120:11
  120:11 150:20,22
  150:24 198:1
  281:10 297:21
  298:2 333:19
  381:2,6 382:12
**named** 47:5 98:9
  197:17 199:23
  211:5 237:20
  271:25 327:1
**names** 85:16
  347:12,25 348:3,6
  348:13,19,25
  359:20
**naming** 28:23
**national** 31:13
  247:25
**native** 218:22
  219:15
**NATO** 201:6
**nature** 104:10
  127:23
**near** 124:22
**necessarily** 12:24
  44:22 107:13
  155:8 249:16
  258:25 293:6
  322:12
**necessary** 113:4
  276:24
**need** 20:10,15,19
  45:7 75:20 181:3
  200:1 202:3
  204:10 216:13
  237:6 275:5
  321:20 359:19
  367:20
**needed** 70:20 143:2
  162:4 208:18
  222:6 237:1
  242:24 282:22

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

283:4 292:4 322:17 323:12 325:8 327:21 330:18 335:10 336:5 337:2 343:22 345:10 352:17 374:16
**needs** 43:4 234:7 246:7 312:22 316:1 317:25 318:15 326:4 329:7 330:3 336:25 342:22
**neither** 383:8
**Neurauter** 237:20 237:22 238:4 333:12 335:1,17
**Neurauter's** 331:18
**never** 52:24 116:22 193:21 281:10,13 281:13
**new** 2:10 8:23 13:16 24:3,6,12 29:10 40:6 45:24 46:10 53:25 58:6 62:17 64:25 65:8 71:3 74:7,8 76:5 78:8,17 89:6,15 183:10,15 244:18 246:15 247:2 334:22 377:1
**Newman** 4:5 15:15 15:15
**news** 184:5
**newspaper** 47:13
**newspapers** 77:13
**nod** 19:10
**nodding** 19:5
**Noem** 36:5,8,12,14 37:6 40:15 41:7 42:2 46:11,24 47:7 51:2,9,11 52:1 63:3 70:4 75:16,25 76:12,20

77:10,17,24 79:1 79:8 80:1,24 95:20 96:15 129:3 129:8 132:4 135:23 136:11,18 138:9 150:9 151:4 153:11,23 154:8 158:6 178:9,14 185:13 187:8,13 188:18 191:5 194:13 196:1,3 213:10 236:20 265:12 301:4
**Noem's** 62:22 79:13 93:21,25 119:2 148:11 270:24
**nom-** 50:22
**nominated** 48:5 50:24 87:18
**nomination** 51:13 53:2,10,13 54:2 54:17 55:2
**nominee** 87:13
**non** 264:3
**non-career** 36:25 46:7
**Non-Profit** 3:2,13
**non-renewals** 130:24 362:9 365:10
**nonMCO** 253:8,13 254:2 264:15 267:8,11
**nonmission** 253:14
**nonprofit** 14:8 34:14
**nonrenewals** 131:16 263:22 264:1 355:5 373:15
**normal** 35:9,11
**normally** 57:11
**Northern** 1:2 13:12

**Northwest** 2:11 4:10 13:17
**Notary** 2:13 383:4 383:19
**notation** 170:1 172:13 223:18
**note** 12:22 173:6 274:15 280:10,22
**noted** 165:2
**notes** 8:16 25:22,22 25:24 26:1,5,6,6 26:15,18 27:22 165:7,21 166:17 167:3,19,20,25 168:1,4,17,25 169:4 223:4 224:16,18 235:21 256:8,10,21 257:1 257:5 260:6,9,16 278:14 279:13 280:11,15 353:9 353:12,17
**notice** 260:22 359:10
**noticed** 159:3
**notices** 184:1
**notification** 176:9
**notify** 182:18
**notwithstanding** 144:16
**November** 176:8,9 176:12 177:6,6 207:1,18,22 238:12 268:13,16 311:8,11 316:8,14 321:16
**Now's** 252:5
**NRDC** 3:14 14:9
**NTE** 130:24 254:7 259:12,25 260:13 261:7 262:19 263:23 279:10,20 280:7 295:15 296:2,3,10,13,13

296:24 301:3 302:4,13 303:3 304:1,3 306:3,19 345:6 347:14 354:23 359:13 377:1
**NTEs** 351:2
**number** 21:23 22:1 44:3,24 63:13,20 84:25 90:16 138:3 138:24 139:2 142:1,12 143:13 144:18,24 146:9 146:11,17,22 147:1,5,6,23 148:4,12,15,16,23 149:1 151:17 160:5,7,9,16,19 160:23,24 161:10 161:12,13,16,20 165:13 170:8 192:22,22,24 216:3,17 217:2 218:20 219:13,16 219:16 220:1 221:13 223:21,24 224:8 225:5,10,14 225:17,18,22,23 226:3,5,7 227:15 227:21,24,25 228:5,6 229:17,25 230:15,19 232:3,3 235:22,23 236:24 237:1 238:25 244:16 248:3,22 249:20 250:3,19 251:12 256:17 261:24 262:9,14 263:8 275:13 276:7 280:21 282:1,17 283:23 284:5 291:20 292:14,18,18 306:18 307:21

309:1 320:2 321:10,11,12,13 322:17 333:16 336:8,12,17,18,22 337:7,13 339:4,8 340:7 353:14
**numbered** 228:21
**numbers** 147:15,19 148:1 149:1 153:8 160:12 161:5 192:23,23 193:3 215:23 216:8 217:1,5 220:3 221:9,12 222:23 223:11 227:7 230:6,7,11 231:22 232:17 233:25 234:14,18 242:22 248:14,15 275:24 280:19 281:20 282:4,9,12,21,24 283:2,7,9 289:12 289:14 290:18,22 291:8 292:14 295:14 304:14 306:3,8,9,17 309:6 321:24 322:5 341:8 342:17 344:6

**O**

**O** 165:1,1,1
**o0o--** 13:3
**OA** 298:19 300:4 300:16 301:15 302:2,4,23
**object** 18:12 20:2 24:15 25:13 26:9 27:11 28:16 35:19 36:11,18 37:7 38:9,15,20,25 39:5,12 40:1,8,12 40:17,23 41:8 44:2,7,14 45:1,19

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

| | | | | |
|---|---|---|---|---|
| 46:13,17,25 48:12 | 124:17 125:10,16 | 197:20 198:12,19 | 267:18,23 268:4 | 341:1,14,24 |
| 48:22 49:22 50:3 | 125:24 126:5,11 | 199:7,13 200:20 | 268:15 269:9 | 342:19 343:1,6,12 |
| 50:20 51:4 52:2 | 126:14,18,24 | 200:22 201:12,16 | 271:1,15 272:14 | 343:18 344:8 |
| 52:10,20 53:4,12 | 127:4,10,14 128:9 | 202:8,15,24 | 272:21 273:2,20 | 345:8,13,18,25 |
| 53:16,20 54:4,24 | 128:13,19 129:5 | 203:12,14,24 | 274:1,7,14,22 | 347:4,16 348:4,15 |
| 55:5 56:12 57:1 | 129:10,18,25 | 204:3,13 205:7 | 275:3,14 276:1,8 | 349:1,23 350:3,14 |
| 57:16,20 58:7,11 | 130:6,13,21 131:1 | 206:14,23 207:6 | 276:16 277:1,6,15 | 351:16 352:2,10 |
| 58:21 59:6,23 | 131:6,21,25 132:7 | 208:1 209:9 210:4 | 279:22 280:9,14 | 352:21 353:4,22 |
| 60:10,18,22 61:2 | 132:14,21 133:13 | 210:9,14,21 | 280:25 281:21,24 | 354:3 355:10 |
| 61:23 62:15,24 | 133:19,25 134:8 | 211:18,25 212:8 | 282:19 283:6,20 | 356:8,20 357:9,24 |
| 63:5,10,16,23 | 134:12 136:19 | 212:15,23 213:5 | 284:2,11 285:7,18 | 358:9,23 360:1,18 |
| 64:4,14 65:2,9,16 | 137:4,17 138:11 | 213:12,18,24 | 286:3,19 289:10 | 362:5,13 363:16 |
| 65:20 66:3,13,21 | 138:19 139:11,15 | 214:6,10,19 215:3 | 289:20 290:8 | 363:23 364:16,24 |
| 68:7,13,19 69:1 | 140:7 141:3,6,10 | 215:10,18,25 | 291:7,15,22 | 367:14 369:23 |
| 69:10 70:24 71:8 | 141:15,19,23 | 216:6,16,22 | 292:10 293:4,16 | 371:7 372:1,9,14 |
| 71:18 72:10,18 | 142:2,9 146:20 | 217:16 218:4,9 | 293:25 294:10,17 | 374:24 375:9 |
| 73:23 75:4,8 76:9 | 147:3,8,13,18,25 | 220:5,10,15,22 | 295:8,16 296:5,15 | 376:9,18 377:4,18 |
| 76:14,23 77:6,12 | 148:9 149:16 | 221:3,16 222:2,8 | 297:1 298:24 | **objection** 19:24 |
| 77:19 78:1 79:4 | 150:2,6,10,14 | 224:10,14,19,24 | 299:2,8,15 300:9 | 43:4 45:12 47:10 |
| 79:10 80:19,25 | 151:5,19,23 | 225:16,20,25 | 300:21 301:7,23 | 47:18 48:1 55:18 |
| 81:11 83:6,16 | 152:15,19 153:1 | 228:3 230:4,21,25 | 302:15,20 303:5 | 58:2 62:7 64:19 |
| 84:8,12,22 85:10 | 153:14,18 154:1,6 | 231:19 232:8,15 | 303:11 304:5,11 | 66:8 69:20 70:6 |
| 85:19 86:2,17 | 154:10,14,23 | 233:3,11,23 234:3 | 306:6,25 307:9,17 | 70:10,15 71:23 |
| 87:3,21 88:4,9 | 155:7,19 156:4,15 | 234:9,19 235:8,14 | 308:2,9,20 309:3 | 80:4,12 84:2 |
| 89:11,19,24 90:5 | 157:14,20 158:1,9 | 236:1,4,10,17,22 | 309:11,22 310:5 | 88:14,25 93:13,22 |
| 90:15 91:11,22 | 158:17,20,25 | 237:3,8 238:15 | 310:12 311:20 | 96:10 97:4,9,16 |
| 92:2,22 93:1,9 | 159:5,18 162:2 | 239:5,19 240:6 | 312:18 313:1 | 110:6 112:23 |
| 95:10,22 96:19 | 163:1,22 164:4,12 | 241:3 242:3,18 | 314:20 315:6,14 | 113:11,22 114:4 |
| 98:6,10,13 99:2,6 | 168:3 169:18 | 243:1,5,15,18 | 315:21 316:2,23 | 114:16 117:12,21 |
| 99:11 100:3 101:1 | 171:8 172:5 176:2 | 244:2,6,19 245:1 | 317:18 318:3,11 | 134:22 143:20 |
| 101:8 102:8,14,24 | 176:22 177:12 | 245:14 246:4,10 | 318:16 319:9,13 | 144:2,6,9,9,15 |
| 103:4,10 104:5,11 | 178:2,11,16,23 | 246:22 247:8,18 | 319:18,24 320:7 | 145:12,15,18,22 |
| 104:23 105:4,6,21 | 179:4,11,24 | 248:25 249:6,14 | 320:13,24 321:7 | 149:3 155:16 |
| 106:4,14,24 107:5 | 180:16,22 181:2 | 250:7,22 251:15 | 321:21 322:2,19 | 186:21 195:3 |
| 107:10 108:2,11 | 181:13 182:1,8,21 | 251:23 252:21 | 323:7,15 324:10 | 197:1 217:9,24 |
| 108:15,19,25 | 183:2,19 184:9,19 | 253:4,18 254:3,10 | 324:21 325:19 | 225:7 226:13 |
| 109:7,25 110:12 | 185:4,10 186:6,11 | 254:15 255:14 | 326:5,16 327:7,12 | 227:8,18 251:4 |
| 110:17 111:3 | 186:16 187:10,15 | 256:6 257:3 | 328:3,12,18,22 | 262:21 263:10 |
| 112:8 113:6 115:1 | 188:2,5,19 191:8 | 258:12,18,23 | 329:8,23 330:8 | 264:17 288:19 |
| 115:6,14,20 116:2 | 191:13,22 192:3,9 | 259:14 260:1,14 | 331:1,7 332:20 | 299:22 302:6 |
| 116:13,21 117:1,5 | 192:20 193:2,23 | 261:9,22 262:2,6 | 333:5,21 334:24 | 310:25 319:2 |
| 118:13 119:4,8,22 | 194:3,15,18,23 | 262:12 263:24 | 335:12,25 336:7 | 354:14,25 362:22 |
| 120:23 121:5,12 | 195:9,18,23 196:2 | 265:2,15 266:13 | 336:14 337:4,15 | 363:6 364:2 |
| 121:16,23 124:5 | 196:20 197:7,14 | 266:21 267:4,13 | 338:6 339:2,15,21 | 365:15 366:10,24 |

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 411

368:1,3,20 369:6
370:8 375:22
**objections** 17:22
19:19 41:12 42:22
145:3,4 251:4
**objective** 45:2,2
**objectives** 44:15
**obligations** 155:13
208:22
**obstructing** 43:8
**obtained** 114:10
**obviously** 144:10
**occasionally** 19:19
**occupation** 253:15
253:19
**occupations** 253:12
253:14
**occur** 168:6 190:5
**occurred** 87:16
176:7 297:14
321:15
**OCHCO** 50:9
214:2 238:1,12,19
240:12,20 242:8
242:11 317:22
322:16 333:14
334:1,1 375:20
**OCHCO'S** 240:1
**OCHCO.'** 227:4
**October** 9:13 94:12
94:19 118:16,16
119:11 135:21
167:7,11 168:9,25
169:15,22 170:6
171:19 172:12
173:6 205:2,17
206:20
**offense** 107:21
**offered** 44:8,9
**office** 8:9 15:24
32:3,9,13 34:1
35:15 42:5,6 50:5
50:8,12 51:20
56:9,15,15,18,19

56:20,20,24,24
57:3,4,6,6,14,19
57:23 58:5,10
60:7 74:1 81:5
82:15 84:21 85:4
85:6 86:23 88:17
88:18,22 95:13,16
95:16 96:13 97:2
105:10,18 106:13
107:24 108:1
109:6 111:23
118:19 124:3
127:7 132:18
139:20,21 140:6
147:11,16 148:7
168:13,13 180:25
181:10 182:6
183:7,7 184:15
185:9 195:22
201:14,18,23
211:7 214:14,20
214:25 215:16
221:20 236:2
238:1 239:13
240:1 241:9 244:1
247:12,13 261:19
267:7,21 271:6
273:19 280:1
285:14,17 286:2
295:14 298:13,22
299:13,16 300:8
300:18,24 301:3
301:11,14,15,20
302:1 304:2,7
309:20 310:2
313:12 322:11,14
332:1 334:3 337:6
337:8 347:7,21
348:7 355:9,23
374:6,15,20 375:4
375:13 376:3,12
**office-level** 214:4
214:16
**officer** 8:13 32:7

33:13,20 42:11,14
42:16 49:19,19
50:6,9 111:21
140:19 162:9,19
162:25 163:3,9,19
164:1 207:2 215:4
**officers** 140:21
**offices** 2:10 13:15
209:15 214:3
215:6 236:25
238:21 242:23
245:9 246:18
248:9 282:24
284:16 295:3
313:17 314:18
317:14 322:12,22
323:5,10 325:17
326:2,10 329:19
330:4 331:15
334:22 335:8
336:5,13 338:3
339:14 344:7
355:14 356:4
357:12 358:5
377:10
**official** 1:8 13:9
17:7,9 21:24
100:8 106:6,17
111:8 113:17
120:22 132:12
134:3 140:13
144:11 149:4
150:22,24 158:20
189:11,19
**officially** 28:2
**officials** 8:5 120:18
121:1,4
**Oh** 73:2 85:1 206:9
208:13 240:18
312:3 326:8
355:21 365:23,25
374:25
**okay** 17:14 18:3
19:1,9,14,16,18

20:10,15 21:2,6
21:13,14,16 22:8
22:17 23:2,4,22
24:1,12,17,21
25:10 26:19 27:9
27:20 28:8,12
29:17,23 30:22
31:3,10,18,22
32:6,16,22,25
33:4,16,19,24
34:7,10,18,22,25
35:7,17 37:3,5,12
38:2,5 39:8 42:20
42:23 43:20 46:3
48:9 49:3,14 50:5
50:15,22 53:7
54:12 57:13,18
60:2 61:17 62:19
64:7,24 66:18
67:4,18,22 71:9
71:20 73:2,11,12
75:2 78:10,14
81:15 82:13,18
85:7 86:14 87:1
88:21 93:17 94:17
98:14,15 103:21
117:10 118:15
119:10,18 120:13
122:1,3,18,21
123:6,7,9,15,21
135:9 137:13
142:16,24 143:2
145:24 146:5,8,14
146:16 148:21
151:12 155:12
159:12,20 161:23
162:10 164:16
166:1,3,19 167:4
167:14,15 169:15
173:6 174:12
175:2,6,8,22,23
176:11,24 177:4
177:16,24 178:18
178:21 190:22

193:20 196:5
198:3 200:23
201:24 204:15
205:1,9,13,16
206:3,10 207:8,13
207:21 209:18,25
211:22 219:4,19
223:7,15 228:10
229:3,10,12
237:24 238:4
240:18 252:3,13
254:17,19 255:8
255:23 256:3
257:6,14,20 265:4
266:2 270:4 272:4
278:4,6,25 279:24
281:14 287:1,14
287:23 297:8,18
297:19 298:5
304:18 305:4,19
305:20 311:17
315:17 326:21
327:5,14 328:25
332:9,25 334:7,8
334:19 335:1
339:9,13,24
340:10 342:21
344:15 353:12,14
353:16 355:6,22
359:1,22 360:3
366:2,4 370:1
371:9,11 372:5,19
373:2 378:4,8,22
379:2
**Olivia** 6:5 14:25
**OMB** 32:11,13
38:17 42:4 174:7
205:25 206:10,22
208:8 212:7,13,18
212:21 213:4,8
220:24 221:1,8
225:5,12,13,19,23
226:4,6,11 227:6
227:12,16,22,24

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 412

228:1,9 229:19 230:14,20 231:15 233:21 234:2 262:11 310:21 314:15 319:22 321:14 324:17 327:1 328:17
**OMB/OPM** 340:23
**once** 98:7 348:12
**ones** 190:6 362:24
**ongoing** 260:4
**oOo--** 380:25
**open** 7:18,21 73:20 378:18
**operational** 56:5,6 59:8 60:3,5,8,15 61:9,12
**operations** 60:3 89:9
**OPM** 38:17 42:5 174:7 205:25 206:11,22 212:7 212:13,18,21 213:3,8 220:24,25 221:8 225:5,12,13 225:19,23 226:3,5 226:12 227:6,13 227:16,22,24 228:1,9 230:14,20 231:15 233:21 234:2 262:11 310:21 311:23 314:15 319:22 321:14 324:17
**OPM/OMB** 208:8 229:19 230:1
**OPPA** 221:20 234:13 247:11,13 248:8 271:3
**opportunity** 43:9 264:22 272:8,19 275:8 380:22
**opposing** 165:14
**Opposition** 12:6

**option** 235:15 236:9 245:23 261:25 263:19 283:11,25 286:22 293:9 315:2,10 324:12 341:5
**options** 218:10 243:7,10 244:1,9 244:10,13 260:20 261:11,18,19 262:16 263:18 309:6 341:6,9,13
**order** 1:13 9:12 39:2 45:7,15 71:11 72:12,14 76:25 85:16,18,24 164:15 167:5 187:20 205:3,10 205:16,19 206:6 206:25 207:25 233:22 243:8 245:12 249:2,5,11 249:23 250:3,18 292:5 305:6 313:13
**ordered** 71:14 164:10 205:23 324:18
**ordering** 318:24
**orders** 38:12 39:7 39:14 40:2 52:13 52:23 59:18 62:2 64:18 72:15,16 139:19 362:20 364:18 378:21
**organization** 3:3,14 9:17 14:8 67:12 100:6 241:12 329:15
**organizational** 7:13 14:5,16,19 14:23 48:11 49:10
**organizations** 109:12

**orientation** 163:16 163:17
**original** 278:21 318:22 331:25 333:13
**originally** 318:25
**Orleans** 71:3 74:7 74:8 78:9,18
**outcomes** 65:11,12 69:15 70:20
**outer** 88:17
**outline** 309:17
**outlined** 39:1 40:3 70:21 187:19 267:5 285:23 292:3 293:19 331:10 352:25 354:7 358:17
**outset** 233:20
**outside** 149:13
**overall** 170:12,23 186:25 191:12 196:9 235:1 280:19,23 281:20 282:20 290:3,12 290:22 292:14 314:10
**overruled** 182:25
**overstating** 322:16

---
**P**
---

**p.m** 164:22 165:2 229:6 257:23 379:12
**P.O** 3:21
**package** 83:25 345:16
**packaged** 345:5
**packages** 83:21 345:21
**packaging** 272:9,19 350:25
**page** 31:11 74:13 78:23,25 79:12

123:5 166:22 167:6,10 168:24 169:23 171:18 172:9 177:8,16 183:21 185:20 193:11 196:5 207:17 210:24 219:2 223:11,11 223:16,19 228:21 229:7 256:13 257:11,15,18 259:6 270:4 291:1 311:25 312:12 340:7 361:9,10 381:11,13,15,17 381:19,21
**Page/Line** 12:12,12 12:12
**pages** 7:12 166:14 166:19,21 380:4
**paid** 115:4 310:17 326:13 327:17 350:8
**paper** 146:12 160:12
**papers** 83:14
**paperwork** 375:7 375:21
**paragraph** 120:10 185:22 196:7 208:10 240:11,14 240:15 241:6,7,21 242:6 361:10 362:7
**paragraphs** 331:22 362:4
**paren** 218:19
**parentheses** 172:14
**part** 35:22 52:15 70:11 92:20 102:17 112:12 121:24 156:9,25 163:15 214:4 230:16 258:4,22

269:21 286:21 292:4 318:7 321:13 329:20 340:23 343:24 350:9 353:24
**partial** 30:19
**participant** 74:12
**participate** 25:10 66:18 111:25 112:3 128:3 133:8 172:24 173:1,5 213:15 236:11
**participated** 60:16 158:6 173:3 189:23 190:2 195:10 285:11
**participating** 91:15
**participation** 153:20
**particular** 45:7 71:13 89:5 111:9 169:4 170:11 173:4 174:4 177:14 183:4 184:14,24 217:4 245:20 282:6 294:23 306:4,19 326:19 337:19 353:23 361:1 364:9 369:17 371:11,14 372:18
**particulars** 185:14
**parties** 383:10
**Partners** 34:4
**parts** 88:23 247:17 317:23 332:18
**passed** 200:17 201:8
**pause** 42:21 229:11 361:8
**pay** 308:11,13,14 346:3 349:17 350:1,5,7,19,23
**penalty** 382:1,9

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 413

**pending** 20:11,21 164:13 252:18 351:11 378:18
**people** 56:23 57:3 69:22 70:2 72:5 100:5,9 106:13 150:23 157:21 159:12 172:23 261:1,5 279:19 298:1 318:15 321:20 325:16 326:4 356:6 374:22 377:14,23
**percent** 23:8 53:6 295:10 297:24
**percentage** 220:6 248:2
**perfectly** 68:2
**perform** 126:21 134:21
**performed** 284:9 348:9 375:15
**performing** 17:7,9 100:8 106:6,17,19 111:8 113:17 118:12 132:12 134:3 140:13 209:23 271:4 283:14 284:18 314:3 323:1 344:12 347:20
**period** 37:18 42:3 52:12 54:22 55:4 55:21 86:21,22,22 94:12 101:23 103:16 118:4,14 118:16 136:24 140:10,11 168:11 168:19 268:3 275:5,20 281:4 295:11,13 307:20 307:22 308:10 310:6,14 323:2 331:9 345:22

347:5 355:11 356:24 362:25 374:2,5,9 376:6
**periodically** 148:10 148:17 150:3,7,11 151:8
**perjury** 382:1,9
**permanent** 248:18 249:19 337:25 344:3
**permit** 134:19
**Perry** 6:11 13:20
**person** 45:25 50:12 58:9 85:25 95:2 95:13 106:22 107:23 108:9 163:17 178:14 183:6 224:7 363:15,22
**personal** 5:10 15:20 22:25 26:1 26:6 27:22 43:3 64:25 65:7,10 141:18,22,25 142:4,7,12 143:12 143:13 144:12,14 144:25 145:11,13 145:14,19 146:17 146:25 147:5,7,11 147:16 148:2,3,6 148:12,15,19 149:5,7,11,12,23 157:12,16,19,22 158:13,21 160:6 160:14 161:5,9,11 161:21 203:8
**personally** 66:24 77:16 129:22 134:18 161:23 162:3 210:6,10,12 213:6 215:11
**personnel** 36:3 42:6 83:22 94:24 94:25 95:4,12,17

96:14,16 111:10 111:13,16,19 112:6 129:23 130:10,11 131:20 133:12,16,21,23 134:6 139:21 168:13 181:1,11 181:17,18 182:6 185:8 202:13 203:11 252:23 266:23 285:9 371:12
**perspective** 175:17
**pertained** 39:10
**pertaining** 38:7,13
**petition** 181:24
**PFT** 289:2
**PFTs** 248:12
**phone** 55:11,14 82:5 130:16,17 142:1,4,5,11,19 142:20 143:1,13 143:13 144:14 145:13 146:2,6,8 146:9,11,17,18,25 147:7,11,15,16,21 147:23,23 148:2,3 148:6,11,12,14,15 148:16,19,23 149:1,11,24 151:17,18 157:12 157:16,22 158:13 160:5,6,7,12,14 160:16,19,20,23 160:24 161:5,5,9 161:11,13,16,20 161:21 204:2
**phones** 142:6 149:19,21 157:19
**photo** 123:2,10,11 123:12,14,17,18 123:20,23
**photos** 122:1,21,23 122:25

**phrasing** 369:18
**physical** 165:23,23 169:23
**picked** 244:16
**picture** 308:22
**pictures** 156:5,7,8 156:19 157:9
**piece** 146:12 160:11 290:9 294:1
**PII** 145:1
**pile** 311:6
**place** 29:10 42:15 71:10 95:24 98:1 98:2,4 112:13 113:2 130:10 131:15 295:1 343:23 364:11 367:7 368:13 370:15 371:12 383:7
**placed** 182:10 243:7
**places** 362:1
**Plaintiffs** 1:6 2:8 3:3,14,15 7:8 8:2 9:2 10:2 11:2 12:2 14:5,8,9,16 14:20,24 16:19 25:11 30:5 49:5 67:7 72:24 78:12 82:22 120:5 122:11 162:13 165:9 177:2 183:12 193:7 199:19 205:14 207:11 218:14 228:14 237:16 254:22 265:8 268:19 271:21 278:1 287:4 297:10 305:7 326:23 334:11 340:2 346:7 349:5

359:3 360:7
**Plaintiffs'** 12:6
**plan** 207:5 208:15 210:3,7 211:1,12 211:16,23 212:3,5 212:13,22 213:2 213:10,17 214:5 214:18 215:1,9,11 215:15,17,24 216:4,18 217:6,22 218:3,20 219:2 220:14,21 221:25 222:22 224:8,22 225:1,3,4,6 226:10,11 227:6 227:12,17 230:2 232:7,14 233:8,21 234:1 235:6,13 236:16 238:5 239:11 240:11,16 240:23 241:8,24 242:9,22 243:4,22 244:17 245:20 246:8 247:25 251:11 256:16 258:4,15,22 259:11,24 260:8 260:12,18 261:20 261:25 262:10,19 262:25 263:7 275:12 276:6,14 280:4,6,24 281:22 282:16,18 283:18 284:1,8,21 285:3 285:5,16 286:11 286:15,18 291:11 291:19 292:17,17 292:19,23,24,25 293:9,11,14,15,18 296:1,9 299:6 304:1 310:23 311:12,14 312:5 313:20,22,25 314:2 316:7,10,18

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

317:5,8,15 318:8
324:17,20 325:13
328:16,20 329:2,4
329:13,20 330:3
330:12,15,25
331:13 332:5
333:13,15 338:11
339:1 340:24
341:12 342:7
343:20 344:9,13
357:8 377:16
378:2
**plane** 124:11
**planned** 166:11
**planner** 165:22,24
166:6,15,18,25
167:1 168:1,4
223:4
**planners** 166:3
**planning** 221:21
237:25 247:12,13
258:2 318:23
332:11,15 333:2
333:11,18 334:2,6
334:14,22 335:4
335:10,20 336:6
340:18
**plans** 170:23 199:6
205:6,20,24 206:5
217:12,18 218:5
225:11 226:17
227:2 232:12
239:25 261:14
288:13 298:11
314:10 321:14
331:15 337:9,10
342:22 343:25
357:1,3,13 377:6
**played** 81:9 97:14
115:18,21
**playing** 118:8
**please** 13:24 16:8
16:22 19:15 28:11
39:8 46:18 48:9

83:11 142:11
143:14,18 152:25
155:19 160:8
161:2 198:23
202:2 223:20
226:20 251:6,7
272:7 298:17,18
300:3,15 329:10
332:23 335:14
353:14 359:10
371:4 380:3
**pleasure** 178:25
**point** 37:12 47:22
49:14 74:23 94:2
103:7 169:15
170:12 176:4
184:11 190:24
191:1,10 198:8
225:2,15 238:6
248:13 262:18
338:20 342:11
344:23 355:6
365:2 366:16
**pointed** 321:12
358:14
**points** 10:19 293:20
338:17
**policies** 42:14
110:23 181:8
201:4 352:19
353:2 354:12
364:10,12 370:11
375:19
**policy** 119:2,7
131:20 138:18
152:5,8,11 161:8
180:11,14 201:9
221:21,21 237:25
247:12,13 266:15
266:16 340:14
342:5,11 353:7
354:21 356:6,17
357:22 358:7
359:12,15,17

365:9,13 366:8,16
366:22 367:7,11
367:24 368:13,17
369:4 370:7,24
371:6,10,12
**political** 36:24 46:7
152:18,21 179:7
181:22 182:24
184:4,18
**POLITICO** 7:14
67:11
**poorly** 309:24
**population** 249:16
251:19 304:15
**portfolio** 131:9
132:3 190:1 201:4
**portfolios** 55:20
**portion** 73:21
144:21
**position** 17:4,5
24:13 32:1,16,18
33:16 35:14,16,18
35:24 36:1,9,20
36:25 37:2,6,10
37:24 45:24 46:6
46:11 47:21,24
51:3,9,12,18,19
51:22 52:1,6,8,16
52:24 53:19,22,25
54:2 55:7,8 65:8
74:15,19 80:23
81:1,2 87:14 94:8
94:15,17,22 96:23
99:25 104:22
133:6 176:21
178:15 188:13,13
188:16 252:15
266:20 283:12,12
284:9 325:22
348:9 357:22
365:5 378:23
**positions** 39:4
101:6 102:13
172:4 199:1

244:11 247:23,24
247:25 248:24
249:2,5,13,17
250:6,13,21
251:14,21 252:1,1
253:3,9 254:1,2,6
254:13 259:2,17
259:18,25 260:13
262:19 263:1
265:14 266:5,11
267:9,12 275:11
283:13 284:18
289:3,5,7 292:5
294:25 303:18
306:18 307:16
308:8,11,15,19
309:13,14,21
310:3 316:19
325:23 326:12
338:10 351:21
352:19 353:3
363:14,21 367:6
368:10 369:14
372:18 373:10
375:7 376:2
**possession** 144:13
**possibility** 21:3
**possible** 51:25
52:15,21 67:1
213:22 289:17
301:2
**Post** 3:7 8:19 177:5
**post-high** 28:22
**potential** 51:9
52:16 168:14
187:5 262:16
317:11 325:9
341:10 366:13
**potentially** 89:6
171:22 224:4
288:18
**PPO** 95:12
**practice** 26:7,10
32:17 128:14,21

286:5 339:22
**pre-brief** 92:7
**pre-briefs** 92:11
**pre-decisional**
225:1 262:15
291:18 317:9
319:19 321:11
325:2 330:16
338:17 342:7,10
**pre-established**
137:9
**precautions** 110:22
203:21
**precise** 99:23,25
**preexisting** 161:7
**prefer** 57:5
**Preliminary** 12:7
**premise** 275:18
**preparation** 27:12
**prepare** 22:20 25:3
27:1,2 28:13
83:21
**prepared** 27:10
187:12 253:1
374:12
**preparing** 269:23
270:22 271:6
**present** 6:1 13:24
23:13,16 60:23
61:1 62:5 75:7
89:8 90:2 91:1,8
91:20,20 92:15
274:19
**presented** 311:2
**presenting** 193:4
336:9
**preservation** 8:15
162:24 163:4,8
**preserve** 157:5
**President** 1:8 13:10
33:25 34:18 36:19
38:12 48:5 53:2
62:21 69:6,16
70:3,11,21 71:10

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 415

71:13,21 72:7
75:17 76:2 86:23
178:25 179:15
187:4,7 205:3,23
206:3 237:12
249:22 250:1,14
324:18 325:10
330:19,19 357:18
**president's** 9:5
38:7,23 39:9
43:22 44:12 45:9
52:19 61:21 62:1
65:22 72:15
193:14 207:24
208:19 233:22
364:17
**presidential** 36:3
94:24,25 95:4,12
96:14 118:23
**presidentially** 37:1
**press** 8:8 66:12,16
66:19 67:11 68:6
120:3,8 122:2
176:11 191:15,17
191:19 194:7,9,11
194:14,22 321:3
338:21,23,25
339:10,14 341:19
**presumably** 178:6
**previous** 44:20
112:20 216:24
220:23 233:17
248:10 262:14
274:15 282:7
286:24 288:15
309:16 318:7
321:8,18 328:7
358:11
**previously** 59:19
113:9 126:22
146:24 153:2
160:4,22 175:24
184:14 187:2
190:7 195:11

198:6 200:14
210:17 221:5,18
230:5 231:23
232:22 236:5
242:11 243:24
244:7,21 245:2,16
246:13 247:1,10
248:17,18 256:16
260:19 261:23
263:2,19 273:4,13
274:18 281:25
282:12,22 285:21
286:4 288:11
289:11,25 290:15
290:20,24 291:8
291:10,25 292:15
299:9 303:12
304:6 306:7
309:12 318:17
320:1 325:14,21
330:17 337:7,18
338:19 339:22
341:4 343:21
344:1,24 346:1
350:15,18 359:18
362:24 374:2
377:7,24
**Prieur** 297:20,24
298:3,4,21 299:18
301:21 302:10
346:14,21 349:9
351:3
**Prieur's** 298:2
**primarily** 136:7
**principal** 198:5
**principals** 172:13
172:16,18,19
173:2,4,5 313:15
317:10 324:23
**principles** 313:16
**print** 156:1
**printed** 30:9 49:8
67:11 73:13 122:4
177:5

**Printout** 7:10
**prior** 26:20 47:4
58:6 74:23 86:14
89:13 90:24 94:13
94:16 98:22
108:17 113:20
153:24 154:4,8,12
154:16,18 161:14
161:17 162:22
163:5,9 164:3
182:11,16 189:22
191:20,23 357:17
**priorities** 38:24
52:19 61:21 62:1
65:19,22,23 93:6
199:6 200:19
208:20 232:12
364:14,19 365:14
366:8,23 367:11
367:25 368:17
369:4,21 370:7,11
370:24 371:6,18
371:19 375:18
**priority** 44:21
45:10 72:7
**privacy** 163:15
**private** 32:17 33:25
**privilege** 20:4,6,12
188:21 189:13,17
190:15,20
**privileged** 28:15
**privileges** 308:24
**privy** 129:1,19
**pro** 3:19 7:14 67:11
**probably** 20:18
23:8 154:25 224:5
372:21
**problem** 155:21
**procedures** 18:24
**proceed** 67:16
138:5 145:8
**proceeding** 28:1
**process** 36:2 63:19
81:10 86:5,7

95:12,23,24 96:5
96:13 109:9,11
112:25 113:1
137:8,10,23,25
138:1,3,20 139:4
139:24 140:2,16
140:17,18 149:6,9
173:19,20 184:13
188:21 189:13,16
190:15 191:4
208:6,12 212:10
213:7 214:7,21
215:6 226:15,24
260:3,4 261:17
262:7 271:2
284:15 285:23,24
294:20,24 295:1,2
295:19,23 303:15
313:10 331:11
343:22,24 347:7
348:21 355:13,23
359:10 365:9
374:3,4,13,14
375:12 377:16
**processed** 375:3
**processes** 72:2,4
77:2,3 112:13
113:2 130:9
131:15 137:20
204:21 317:12
355:8 357:17
**processing** 83:14
**produce** 25:11 28:2
**produced** 25:16
27:22,24 28:9
165:8,14 175:20
207:14 218:16,22
219:14,15 228:17
234:22 268:22
287:6,24
**production** 12:11
28:10 201:5
378:11,13,19
**professional** 28:20

30:20 111:23
145:19 149:4
280:1 285:14
**profile** 30:1,10,23
31:10
**program** 29:10
44:10 64:1,10,15
64:23 65:11,12,13
65:19 214:4,15
242:23 245:9
282:24 284:16
295:3 322:12,21
323:5,10 329:19
332:1 334:2
336:13 337:6,7
338:2 341:20
347:7,21 348:7
355:14,23 357:12
358:4 374:15,20
375:4,13 376:2,11
377:10
**program/regional**
238:21
**programs** 4:8 32:4
63:2,3,7,8,14,17
63:21 80:7 222:6
236:25 325:17
326:1 329:6 330:4
334:21 335:8
336:4 344:7 356:4
**project** 118:1
**projected** 216:13
217:19 219:24
232:19,25 248:6
**projecting** 236:25
**projection** 221:14
**projects** 116:17
117:8
**pronounce** 197:25
297:21,23 298:2
**pronounced** 198:2
**proper** 110:22
162:5
**propose** 260:8,18

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

**proposed** 191:11 225:18 248:6 261:11 280:4,6 284:21 285:3,5 320:3 337:10
**PROTECTIVE** 1:13
**proves** 316:5
**provide** 25:22 69:25 143:16 144:19 160:7 189:14 224:21 233:20 279:5 287:15,18 303:16 309:19 310:16,21 312:1 331:4 345:16
**provided** 25:6,9 38:17 198:9 214:5 214:16,20 215:16 216:15 217:21 225:22,23 229:18 230:1,12,14,19 231:15 234:11 235:5 238:19 239:25 245:8 255:3 258:19 270:7 290:7 309:5 309:6 319:22 328:15 329:3,6 331:6 333:13,16 346:21 374:21
**providing** 81:14 115:25 143:24 144:3 197:18,22 198:14 209:7 328:10 330:6,23
**public** 2:13 29:6,18 73:21,21 177:18 187:21,22 229:21 231:16 232:3 291:14,18 319:12 383:4,19
**publicly** 70:8

282:13 319:14 339:7
**published** 193:21
**pulled** 365:24
**Puneet** 211:5,7,10 312:4 349:9
**purposes** 340:19
**pursuant** 1:13 275:11 364:5
**push** 255:20
**put** 22:1 30:13 66:5 66:12,19 68:9 71:10 100:7 112:13 113:2 201:14,20 232:7 232:13 284:1 294:22 310:7 344:13 345:21 362:17 377:10
**putting** 68:6 130:9 131:15 320:5 345:21

_____

**Q**

**Q2** 314:13 328:5,17 330:23
**Q3** 342:14,23,25 343:10,13
**qualifications** 115:25 116:6
**qualified** 53:21
**quarter** 212:3 312:6
**quarterly** 213:2 310:22 311:13 314:13,14 324:19 328:5,17 330:24
**question** 17:20 19:15 20:11,11,21 26:23 28:18 35:12 35:20 41:10,14,15 47:15 50:14 52:14 54:5,10 58:17 62:12 64:7 65:6

87:22 88:20 102:21 103:2 140:24 143:20 144:6,9,16,18 145:16,22,25 155:4,23 158:11 158:12,22 175:5 175:12 180:3,6 181:3 189:1,5,12 190:19,21 200:16 215:21 227:14 237:21 243:6 250:2,16 251:2,6 251:8 259:21 276:3,10 294:5 296:6,22 297:4 302:12 303:20 305:20 309:23,25 310:15 318:4 324:2,4 325:25 329:9 339:17 340:5 346:12,17 366:6 367:20,22 368:5,25 369:1,3 369:17,18 370:2 370:16,17,19,21 371:1,4,9 372:2,4 373:18,23 377:21
**questioning** 42:21
**questions** 18:25 19:20 20:5 21:17 21:20 22:17 28:19 88:11 89:3 118:6 128:24 145:5 175:1 193:17 269:3 283:22 306:8 325:1 373:1 378:6
**quickly** 18:23 36:16
**quite** 346:13
**quotations** 12:22
**quote** 12:25 66:1 67:19 185:21,23

186:8

_____

**R**

**R** 4:6 165:1
**raised** 104:2 169:20 305:23 306:10 307:1 346:2 350:20 355:12
**raising** 308:12
**RAVAGED** 8:6
**reach** 8:21 248:22 249:20 326:3
**reached** 338:25
**read** 12:23 25:21 41:18,20 47:13 77:13 160:9,16 161:2 183:18 184:5 223:20 224:1 226:19,21 294:1 324:5 379:4 380:3 382:4,5
**read-ahead** 166:12
**Readiness** 34:11
**reading** 30:13,15 67:17 73:10 122:19 177:10,13 207:20 229:2 240:19 255:7 269:4,24 272:3 278:3 279:23 287:8,22 297:17 305:18 306:13 327:2,4 334:18 340:4,9 346:16,18 346:25 380:15,16 380:17
**reads** 199:25
**ready** 30:12,16 67:16 73:9 83:3 121:18 193:19 207:19 255:6 269:2,5 278:4 297:16 327:3 340:8

**really** 17:15 26:22 27:18 35:9 37:23 54:5 67:2 86:6 90:16 103:23,24 109:1 133:2 190:22 249:1,24 258:24 274:10 322:24 337:24 344:3
**reappoint** 361:11
**reason** 22:13 56:14 88:7,13 108:23 113:3 196:23 197:3 211:15 220:12,16 239:3,7 239:17,22,23 240:4,7 241:1,4 242:5,16,19 245:22 272:17,23 275:18 290:21 300:7 301:20 321:17,23 323:3 329:1 335:7,16 336:1,3,16 338:9 348:3 352:8,11 372:10 373:25 376:22 381:7,11 381:13,15,17,19 381:21
**reasons** 62:20 197:9 321:23 323:16 331:5,5 371:22 372:7,13 376:7,14
**reassignment** 198:22,24 199:10 199:15
**recall** 24:23,24 27:18 28:25 36:4 36:15,22 37:17,23 51:10,16 52:3,13 56:1,3 58:18,22 61:8 63:24 66:25 67:2 71:17 74:25

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

75:22 76:8 77:20 77:23 78:2 79:21 82:16 87:4,15 89:20,22,25 90:6 91:14,19 92:16,23 103:23,24 125:11 126:6,15 133:2 136:1,13,15 148:1 154:7 157:15 159:19 162:23 163:2,7,25 164:7 168:10 188:10 190:12,22 191:23 206:16,17,19 207:1,24 208:2 210:10,12,13,19 210:22 213:14,19 213:25 216:1,3,11 216:12,17 217:3,6 217:12 218:1,2,5 221:4,11,11 222:25 224:15,25 229:13 247:20 254:4 256:3 269:11 270:1,15 273:9,12,13 285:19 289:13,16 289:21 297:5 302:16,21 303:6 304:6 306:14 307:18 327:25 328:4,9,15,19,21 328:23,24,25 329:12,16,24,25 330:7,11 331:2,5 331:8 333:1 336:21,23 337:3 346:24 347:11 349:15,19,24,25 350:4 353:23 358:10,18,20 360:25
**recalling** 101:20 217:3

**receive** 213:9,13
**received** 55:11 162:4,8 168:11 175:10 209:10 237:11 242:8,12 275:21 316:17 337:13
**receiving** 162:23 163:2,7,25 271:18 349:17 350:1,2 351:25
**recess** 43:16 82:9 135:16 143:7 159:25 164:21 222:17 252:9 305:1 344:19 373:5
**recognize** 165:16 269:7
**recollection** 25:3 25:19 27:5 74:5 168:7 170:4 220:19 224:6 229:24 279:17 290:5 303:1 334:20 360:2
**recommend** 51:2
**recommendation** 269:15 271:7 351:8 377:11
**recommendations** 39:18,20 41:4,6 41:23 42:1,11 69:14 70:19 95:18 127:20 137:19 140:14 181:5 187:6 215:22 237:12 249:22 250:13 295:4 314:9 322:1 325:9 330:20 338:12 365:8 374:21 376:5 377:15
**recommended** 51:7

215:1,9 328:10 330:5 342:7 356:3 358:4 376:13
**recommending** 270:19 271:9 355:16,17
**reconcile** 329:5 330:2 337:22
**record** 7:24 12:24 13:5 16:22 17:5 17:18,22 19:19,24 21:24 41:21 43:12 43:13,14,17 82:7 82:10 84:5 94:22 96:6 135:14,17 142:22,23 143:1,4 143:5,8,16 144:19 145:4 146:16 158:15 159:22,23 160:1 164:18,19 165:3 222:15,18 226:22 252:7,10 288:3 301:19 304:24 305:2 324:6 340:13 344:17,20 370:1 372:24 373:3,6 374:1 378:9,25 379:9 381:8
**recorded** 19:12
**records** 8:15 25:14 25:16,18 149:7 155:14,14 156:8 156:10,18,20,21 156:25 157:10 162:5,24 163:4,8 163:13,14
**recounting** 30:19 238:5
**Recovery** 118:19
**red-lined** 268:24
**redacted** 8:16 175:15
**redactions** 175:14

**redo** 323:3
**redone** 345:6
**reduce** 80:2 196:8 217:19 261:6 275:13 276:7 280:4,6 284:22 285:4,6,16 286:11
**reducing** 38:22 45:10 72:8,16 76:12 77:25 78:4 249:4
**reduction** 36:13 38:8,13,19 39:10 40:16,22 43:23 44:5,12,24 52:9 52:19 61:21 62:1 62:22 238:23 240:2
**reductions** 40:25 41:6,25 260:8,19
**refer** 56:19,24 57:17 253:8 261:18 280:17 293:21 361:25
**reference** 26:2 67:13 123:3 169:7 171:19 172:1 183:22 184:12 186:18 205:20 210:25 231:14 258:14 260:25 272:12 280:18,23 281:2 320:22 332:2,5
**referenced** 91:1 194:5 253:25
**references** 211:3
**referencing** 169:3,5 169:5,11 172:2,6 181:16 186:8,20 255:10,15 313:5 321:15
**referred** 57:18 60:2 244:5 279:19

306:17 319:7
**referring** 50:11 57:4,14 59:4,15 67:22 71:21 76:12 76:21 144:17 172:18 186:5 231:4 238:11 271:25 279:10 281:7 286:17 306:11 327:15 332:16,16 359:16 359:17 362:11
**refers** 31:4 84:20 120:17 205:19 231:10 288:23 289:25 291:1
**reflect** 167:22 168:17 313:23
**reflected** 12:23 281:23 282:17
**reflecting** 168:1
**refresh** 25:3,19 27:5 74:5 170:4 220:18 224:6 229:24 279:17 334:20
**refused** 375:6
**refusing** 370:2 371:2
**regarding** 20:5 28:20 40:21 59:5 60:8 120:4 129:23 130:19 133:23 134:6 138:10 156:3,13 157:13 162:24 164:2 179:22 186:14 213:16 266:10 277:21 279:16 307:7 310:2 314:8 345:23 347:12,14 376:8
**regardless** 145:1 276:4

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 418

**regional** 313:18
317:10 322:22
324:24 334:3
337:8 347:8,21
355:14 358:5
374:6 375:5,14
376:3,12 377:9
**regular** 90:18,22
173:19 248:1
**reimagine** 75:21
**reimbursements**
118:22 138:16
**reinstate** 8:25
182:17 183:1,17
184:16
**reinstated** 64:17,21
**reinstatement**
184:6
**reiterated** 79:14
**reject** 363:15,22
**rejected** 213:9
**relate** 88:2
**related** 29:8 39:18
39:19 40:25 41:2
53:23 81:14 87:25
88:11,16 89:4,5
92:8,12 109:24
110:18,22 111:7
111:19 118:19,21
126:22 130:10
131:11 136:17
137:1,6 138:17
139:14 152:13
153:15,20 167:20
168:14,18,21,22
168:25 169:6,12
170:12 173:24
174:1 181:1
200:13 201:3
212:2 213:14
250:10 260:5,24
261:4 290:23
294:21 295:23
307:3 318:21

325:23 331:13
338:15 339:17
353:7 354:8,21
365:18 366:12
371:19 377:11
383:9
**relates** 29:12 34:15
72:20 76:18 78:3
87:22 93:25
116:23 118:22
130:8 138:15
157:22 169:13,13
169:14 179:13
181:4 187:7
197:11 226:16,25
231:24 300:13
302:11 322:23,25
325:6 337:6
356:24 357:1,19
364:19 367:8
371:10 376:21
**relationship** 125:14
126:7 149:12
161:7
**relationships**
125:18 126:17
**relative** 175:18
383:12
**relatively** 81:21
**release** 8:8 120:3,9
122:2 259:11,24
262:19
**released** 66:15
282:14 291:9
321:12 357:18
**releasing** 260:12
**relief** 116:12,20,23
116:25 117:3
134:20 171:3,9,17
247:23 337:24
**relooking** 249:8
**relying** 233:9
**remade** 79:19
**remember** 37:19

98:3 177:10,13
178:18
**remended** 328:10
**reminder** 8:12
162:4,18,23
**reminders** 168:5
**reminding** 189:14
**remotely** 18:10
106:23 107:8
**Removable** 106:9
**remove** 320:21
**removed** 178:22
179:1,2,6
**renew** 253:2 266:4
267:11 276:13
277:20 303:24
345:1 350:11
351:14 352:5,9,12
352:23 354:2
363:2,15 364:7
365:3,22 366:4
372:17 376:4
377:23
**renew-** 355:24
**renewal** 254:12
262:24 264:4,24
268:25 269:13
272:1 273:1,9,17
277:12,18 295:15
306:3,4 310:4
314:8 337:20
350:11 355:15
356:4 359:12
371:24 372:7
375:6 376:13
**renewals** 131:4,16
255:12 260:5
261:17 264:15
267:24 276:5
285:25 294:22
303:15 306:16
307:13,21 313:7,9
314:6 331:12
338:15 343:22

344:14 347:9
355:9,25 356:14
358:2,3,7 359:11
359:24 363:5
365:18 366:13
373:10 375:16
376:5,8,15,24
**renewed** 352:17
356:2 367:6
369:15
**renewing** 249:8,17
**repackaged** 348:11
**repeat** 64:7
**repeatedly** 338:4
**rephrase** 23:14
293:8 349:18
**replaced** 46:23
**report** 9:4 49:20,25
57:24 105:9,12,14
105:24 106:18
161:24 179:18,19
187:12,18,21,22
187:24 188:7,9,11
188:15,17 189:21
190:3,11,13,23,25
191:6,12,14,21,25
192:21,23 193:14
193:18,21 194:6,8
194:11,14,21
195:2,17,22,25
196:4,18,22
200:14 231:8,10
231:11,11 232:6
232:10 250:1
306:9 310:22
328:5,17 330:18
330:23,24 357:18
**reported** 1:24
65:15 105:3,15
176:12 299:16,17
321:3 348:17
**reporter** 2:12 13:22
16:8 17:17 19:5
19:12 21:22 41:18

41:19,20 46:15,18
46:21 91:24 92:4
102:16,19 144:22
151:14 226:21
228:12 263:14
323:18,20 324:5
383:4
**REPORTER'S**
12:22
**reporting** 106:11
208:9
**reports** 50:18 195:5
195:8,14,20
236:19 313:19
324:19
**represent** 14:1
16:18 30:8 49:8
67:10 73:1,12
82:24 120:8
136:22 165:12
189:2,6,8 248:4
288:3
**representative**
60:17
**representatives**
62:5 119:20
**representing** 13:21
14:4,7,15,19,23
15:16,19 90:23
100:24
**represents** 220:2
**request** 12:11
103:3 199:9
201:20 209:25
245:13 299:20
316:7 351:1
**requested** 101:17
148:4 199:12,14
203:4 313:14
380:15,17
**requesting** 26:1
253:6 261:12
287:17
**requests** 254:12

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 419

298:14 371:15
required 19:25
  161:25 205:5
  235:1 264:13
  266:10 277:5
  328:6 345:11
requirements
  208:9 247:4
  249:25
requiring 119:2
reread 25:21 324:4
rescinded 266:17
reserve 378:23
Reservist/Local
  289:6
reservists 192:19
  192:21 248:20
  289:14
reside 16:25
resided 18:7
resides 271:6
resigned 175:24
  176:3
resigns 8:20
resistance 186:7
resisting 186:3,19
resolution 171:14
resolved 357:5
resources 32:2 45:6
  59:21,22,24,25
  68:15 69:13,25
  70:17,19,22 71:12
  127:19 180:20
respect 38:18 41:5
  41:24 43:22 111:1
  113:20 115:19
  118:12 127:9
  141:2 150:25
  168:8 172:2
  181:23 190:15
  252:14,18 255:12
  267:8 277:5,11
  327:10 347:2
  354:13 364:22

366:21
respond 71:16
  153:5 326:15
  327:20,24 328:1
  339:20
responds 278:12
response 19:25
  33:8 71:15 72:5
  76:7 118:19 316:6
  327:25 328:4
  329:21 339:13,16
  349:15,19 350:2
responsibilities
  68:22 76:19 111:5
  234:16 246:16
responsibility
  111:24 252:24
  280:1 285:15
  327:10
responsible 55:17
  56:2 179:16 303:2
  364:12
responsive 79:20
rest 231:3
restate 41:15 116:3
  209:3 235:9 251:8
  277:17 295:17
  296:6 300:11
  309:23 310:13
  317:20 329:9
  363:17 367:15
  368:8,22 377:19
restated 372:15
result 127:20
  198:16 277:3,12
  316:21 318:9
  332:17 333:10
  334:5 335:9 336:5
  339:18 345:4
  353:1 362:19
resulted 234:6
  318:14 332:12
  333:15 335:5,21
resume 29:2 222:13

retain 155:13
retired 32:18,19
  34:2
retirement 32:25
  44:10
retrieve 146:8
retrieved 160:13
returned 33:25
  34:3,19 77:8 90:9
  90:13 91:9,21
  92:14 96:17
revalidate 321:24
  322:7
reveal 174:25
revealing 175:9,13
Reversal 8:24
  183:16
reverse 185:1
reversed 184:6,18
reverted 277:4
review 7:17,20 25:2
  25:7 26:19,23
  27:9,10 28:13
  71:1,7,9 72:13
  73:4,15 77:1,9
  78:6,16 79:7,8
  83:21 85:15,18,23
  85:24 118:2,3
  127:21 139:4
  173:20 181:7
  187:3,17 189:3,7
  189:25 190:11
  191:3 194:10
  195:12,17 196:24
  197:11 200:14
  214:17,22,23
  215:6 228:25
  231:11 232:10
  237:13 245:25
  246:1,7,20 249:23
  250:15 269:21
  272:8,19 313:25
  314:24 315:7
  319:5 325:10

330:18 333:13
338:12 339:6
346:13,20 347:19
348:7 357:17
360:13 363:22
376:4 377:15
reviewed 25:8 27:2
  27:6,17 214:25
  215:4 234:17
  246:3 283:23
  311:3 313:12
  352:17 360:22
  361:16,18,19
  376:13
reviewing 27:19
  66:19 113:25
  249:17 285:25
  294:25 347:8
  352:4 361:21
Richardson 8:20
  46:1,23 47:2 61:5
  75:10,12 76:17
  96:21 97:1,7,13
  97:20 98:4 100:7
  100:10,13 101:25
  102:2 105:16,19
  105:23 106:2
  113:16 169:21
  172:3 175:24
  176:4,19 198:7
  221:19,23 232:18
  232:24 233:9
  234:12 244:12
  245:5 252:16,20
  268:7 340:16
  341:6,23 342:3
Richardson's 97:23
  232:19 233:5
  247:6 290:19
right 17:13 18:23
  23:2 29:2,15,19
  32:17 33:2 34:5
  34:20 35:2 36:6
  36:17 42:10 45:11

45:17 46:11 56:3
69:19 70:5,19
72:9 75:3 84:24
93:12,21 109:20
115:19 116:25
119:21 123:17,23
131:18 134:16
135:8,13 139:10
140:6 147:24
150:20 159:22
173:1 176:8,14,15
182:20 185:17
186:10 190:25
192:2,8 194:7
201:15 202:23
205:21 207:9
209:20,23 218:8
218:24 230:15
231:18 243:20
245:7 252:5 253:3
254:19 255:13
261:21 262:7
263:8 265:1
268:17 277:14
279:14 281:10,13
284:22 292:6
294:9,16 295:7
298:8 312:3,25
316:22 321:20
341:12 343:3
344:2 348:2
356:25 372:24
375:21 377:5
378:25
rights 308:24
  378:23
rightsizing 258:6
  258:10,21,24
  264:12 286:25
risk 31:14 34:15
rogue 183:25
  185:25
Roland 42:18 207:2
  207:18,22

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 420

**role** 33:19 34:22
51:9 58:6,10
62:17 63:15,22
65:1 68:16,20
72:14 76:6 81:5,9
81:14 82:14 83:13
87:2 88:7 89:15
91:3 94:14 97:15
99:4 105:12 111:6
115:18,21 118:8
132:11 134:2
177:25 178:10
180:8 182:4,12
232:17 327:10
**role'** 177:21
**roles** 110:20 111:4
210:16 232:1
**room** 21:7 74:2
142:15 146:6
147:22,22
**root** 149:10
**rough** 103:21
**roughly** 37:15 38:3
192:4,6 193:1
216:20 222:5
227:16 268:2,10
373:11
**round** 342:13
343:16
**routing** 83:1,24
139:8
**row** 338:3
**RSA** 91:16
**rule** 20:20
**rules** 17:14 22:18
171:11 174:10
**run** 86:4,7 174:5
**running** 45:25
97:15 338:16
**runs** 215:5 320:15

———————
**S**
———————

**S** 7:11 12:4 165:1,1
165:1

**S1** 48:18,20 57:19
57:24 86:10 119:2
171:23 211:23
212:6 226:9 253:2
265:1 266:11
268:25 269:12
277:5,12 296:4,14
296:25 298:20,23
299:7,21 300:5,6
300:17,19 302:3,5
302:14,17,24
303:4,8,9 304:3,8
344:25 345:10
**S2** 48:24,25 52:8
**S3** 48:13 49:1
**salaries** 307:24
308:23 310:16
**San** 1:3 3:8 13:12
**Sana** 6:8 14:21
**sat** 80:17,21 124:23
**save** 148:1 156:1
161:25 163:21
**saved** 142:1,4,6
147:15,20 148:12
148:15 151:17,22
152:6 156:9
161:21
**saving** 164:2
**saw** 67:1 188:15
235:21 316:7
**saying** 75:22 79:21
92:23 155:3
190:12 197:15
230:14 269:24
283:3 301:6,9
310:19 328:1
333:12 334:5
335:2 342:4
358:19 369:20,24
373:19,24 375:11
375:12 376:1
377:10
**says** 48:20 67:23
84:4,4,18,25

121:1 171:20
172:13,15,16
173:6,9 177:6
185:22 196:7
200:23 202:20
204:16 208:4
209:12 211:10
223:21 224:2,5
237:24 238:17
239:9 240:22
241:7,21 243:2
245:21 248:11
255:17 258:1
260:18 265:22
267:14 270:5
272:6 278:13
280:10 282:10
284:24 285:2
286:10 290:10
294:1 298:12
302:22 312:3,5,9
314:21 315:16
316:9,16 327:16
332:9 333:25
334:25 335:17
362:6 364:5
**scenarios** 218:6
244:22
**scheduled** 194:1
**school** 28:23
**screenshot** 156:11
156:12
**screenshots** 157:2
**sealed** 144:23
**season** 264:20
268:9,10 275:7
357:5
**seated** 123:25
124:22
**second** 34:19 38:14
48:14 74:13 79:12
86:23 152:13
155:18 177:16
196:6 208:10

210:24 212:3
229:10 286:10
290:9 329:14
336:24 340:6
**second-to-last**
79:13
**secondary** 271:10
**secretariat** 85:22
**secretariats** 84:16
**secretary** 24:4,7,10
33:5,6 36:5,8,12
36:14 37:5 40:14
40:25 41:1,7 42:2
46:11,24 47:7,24
48:6,10,15,18,21
48:25 49:2,20
50:1,1,19,19 51:2
51:9,11,11,14,17
51:20,22,24 52:1
52:5,5,7,25 54:2
54:17 55:7 56:25
57:7,14 60:8
62:21 63:3 65:15
70:3 75:15,25
76:11,20 77:10,17
77:21,24 78:3
79:1,8,13 80:1,1
80:24 81:7 82:15
83:9,14,15,18
84:15 85:7,14
87:14,19 91:15
92:8,11 93:21,24
95:20 96:5,14,15
97:1 98:20 99:8
104:20,21,25
105:9,10,18,24
106:1,7,9,11,16
106:19 108:23
109:21 114:1
115:17,22 116:1,7
119:1 120:25
128:16,24 129:3,8
129:13,14 132:4
135:23 136:2,18

136:22,23 137:3
137:14 138:4,9
139:6 140:16
141:2 147:12,17
148:8,11 150:9
153:11,23 154:8
158:6 177:18
178:9,14,22 179:3
179:8,12,19
180:11,13,18,25
185:9,13 187:8
191:5 194:13
203:16 213:10
236:20 255:20
265:12 266:17
270:24 271:11
273:24 275:1
286:6 300:25
301:4,12,16,22
364:15 365:5,14
366:9 367:12,25
368:18 369:22
371:5
**secretary's** 65:19
65:22 95:15,16
105:10 199:6
204:17 226:16
227:1 232:11
267:16 364:18
366:22 369:4
370:7,24 371:10
371:18,19 375:18
**Section** 206:8
**sector** 33:25
**security** 5:4 16:6
24:4,7,10 26:14
31:13 33:7,11,17
34:16 48:18,21
49:9,11 52:18
53:24 56:10,25
57:15 65:15 66:6
67:20 73:14 83:2
83:13 88:24 90:10
90:14 91:9 95:6,9

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

96:18 114:2,6,10 116:1 119:21 120:25 141:9,13 149:14 161:15 162:7 177:18 189:9 216:5,19 222:24 307:6 368:19
**Security's** 273:24
**see** 49:7 66:15 67:19 73:18 74:3 74:17 77:13 78:19 78:23 79:3 85:1 86:11,12 89:17 107:23 120:10,16 120:19 123:9,11 130:7 133:11,16 133:20 162:20 167:8,12 169:9 171:24 173:14 174:15 177:8,22 188:4,8 196:11 200:3,12 202:4 205:20,23 206:1,7 208:4,13,23 209:18 211:2,3,13 223:18 229:7,22 238:2 239:1,15 240:13,21 241:15 241:25 242:14 255:21 256:18 257:12,24 258:7 260:9 265:23 266:2 269:20,25 272:5,10 273:8 278:10 285:13 290:9 292:16 299:4 305:17,25 311:15 312:3,11 316:14 327:22,23 331:22 332:2,7 334:16 336:20 340:20 348:3,19 348:25 349:13

351:3,7,8 361:13 361:17 362:15 372:25
**seeing** 66:25 67:2 208:2 221:11 270:1
**seek** 270:19 271:9 273:22,23 274:3 274:20 276:23 277:13 303:23 350:10 351:14 371:24 372:7
**seeking** 273:17 351:10
**seen** 66:24 188:6,11 270:15 282:13 305:13
**selections** 95:17
**Senate** 37:3,4 48:5 50:24 53:3
**Senator** 8:9 119:23 119:25 120:3,9,17 121:20 122:4
**send** 42:8 139:24 156:22 184:16 220:25 221:8 243:22 245:12 264:19 271:8,12 274:2 280:22 296:14 298:19,23 299:6 300:4,6,16 302:3,23 310:1 314:7,8,16,25 315:1 317:22 320:20 341:13 348:11 356:13,16 368:15 371:15
**sending** 85:14 210:1,10 217:6 272:6 281:5 283:18 300:18,24 301:2,3,11,15,15 302:4 304:3 337:9 355:8

**senior** 3:20 8:4 17:7,9 34:25 35:3 35:18,25 36:9 45:25 46:6 54:9 57:25 74:16 75:10 78:22 94:3 95:25 97:19 98:20 99:7 100:7 102:2 104:19,21,25 105:8,16,18,25 106:5,17 108:23 111:8 113:16,25 115:16,22 116:6 120:18,21,24 121:1,3 128:16,21 128:22 129:12 132:11 134:3 140:13 163:10,12 181:6 184:2 203:16 232:18 236:6 268:6 286:5
**sense** 18:1 19:7 20:22 21:11 22:6 144:1 219:6,9,18
**sent** 42:12,13 44:16 119:19,23 137:23 140:5 156:8,19,23 157:9,24 158:3 180:12 184:1 200:7,24 207:24 210:6 212:6 215:4 216:18 218:10 220:13,19,24 222:1,23 224:7,22 225:5,10,17 226:11 229:5 233:18 237:19 238:19 257:23 258:15 261:20 266:11,18 271:14 272:18,24 274:6 278:18 291:11 296:4 301:22 303:4,8,9 304:7,9

305:14 314:1 315:1,12 319:5 321:13 329:13 334:1 340:23 341:9,11,17 342:4 342:8 344:10 347:13 348:22 349:9 374:23 375:1,2
**sentence** 79:13 196:7 239:1 240:10 300:13 302:11 303:7 332:9 342:2
**separate** 356:6
**separately** 361:25 362:12
**separations** 362:18
**September** 94:11 94:19 118:5,10,15
**series** 163:11 270:21 355:7
**serve** 178:25
**service** 31:14 32:20 33:1 192:18
**services** 114:22 115:12
**SES** 198:25
**SESs** 198:25
**session** 23:8 135:13
**sessions** 22:22 23:4 23:5,6,7,17
**set** 50:22 68:2 122:16 157:25 158:8 159:12,16 175:22 205:1 257:7 277:9 355:7 383:7
**setting** 278:15
**settings** 159:1
**SF-50** 266:23
**shaking** 19:4
**shared** 40:15
**SharePoint** 315:8

**sharing** 312:4,4 317:10
**sheet** 83:1 112:19 381:1
**sheets** 167:2
**Shepherd** 29:12
**short** 54:22 55:4 81:18,21 135:7 359:6 372:20
**shorter** 23:10,11
**show** 82:19 205:9 271:18 321:19
**showed** 221:1 240:23 243:22 274:15 281:3 288:4 328:8 350:5 358:13
**showing** 22:5 238:22 241:13
**shown** 242:23
**shows** 50:15 73:5 123:2 341:18
**shutting** 88:23
**sic** 35:1 261:24 271:24 297:15 311:11 316:8 335:11 337:13 363:15
**sign** 138:5,23,24 348:24 351:17,22 355:16 374:20 379:4 380:22
**sign-off** 355:24
**Signal** 149:18,21 149:23,25 150:4,8 150:12 151:1,22 152:1,17,24 153:10,22 154:3 154:15,17,22 155:1 156:2,13 157:5,12,16,18,24 158:5,14 159:7,14 161:25 163:21 164:2

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 422

signature 237:24
  270:22,24 272:9
  272:20 380:1,20
  380:23
signed 79:1 95:20
  96:1 112:15,19
  139:5 181:24
  182:10 265:11
  295:4 359:19
  360:12 374:15,16
significant 97:15
  97:18
signing 112:19,21
  113:4 359:21
  374:7 375:5
  380:15,16,17
similar 76:25 85:8
  85:13 216:25
simple 346:13
simply 233:8
Simultaneous
  369:8
Sinha 6:8 14:21,22
sit 80:15,20 326:14
  327:18
sitting 21:10,14
  22:24 146:2
  175:11 289:16
situation 58:23
  59:5
six 47:22 267:10
  268:11
six-month 268:3
size 38:22 45:10
  71:22 72:8,16
  76:12 77:25 78:4
  80:2 89:23 90:1,7
  261:6
skill 68:1
slightly 250:2
  296:22 303:19,20
slip 83:24
small 34:14
smaller 69:8,18

70:4,14
Smiley 327:21
something,' 169:7
SOPDA 17:11 46:3
  46:7,23,23 47:3,5
  90:24 94:4,20
  96:21,23,25 97:8
  97:13 106:3
  126:20 132:25
  138:7 140:23,25
  161:23 172:3
  175:25 176:5,19
  178:1,10,19,21
  179:18 180:7,14
  182:4,12 188:14
  188:16 192:1,25
  210:20 217:8
  241:22 252:15,16
  252:19,22 258:10
  270:7 295:22
  299:17 303:2
  310:8 341:23
  351:10 355:13
sorry 15:9 23:13
  26:22 28:7 35:8
  58:15 64:5,6 65:4
  81:5 82:5 84:23
  88:19 91:23 98:15
  118:5 120:17
  122:9,16 132:15
  143:19 155:20
  162:15 176:17
  206:8 207:10
  209:2 223:4 257:9
  257:19 280:18
  281:1 308:3
  309:24 311:17
  323:19,25 346:18
  349:18 355:19,21
  355:22 360:21
  365:23,25,25
  366:3 372:3
  377:20
sound 36:6 54:7

176:14
sounds 176:15
source 170:14,20
sources 173:12
  247:22
Southeast 5:6
Southwest 4:21
  18:6
SP02 276:16
space 88:16,17,17
  88:18,22 89:4
speak 24:1,17
  42:25 135:25
  232:9 304:12
speaking 38:22
  145:2 165:19
  251:4 269:8 369:8
special 100:24
  101:3,13
specific 29:1 40:24
  44:3 47:12 51:10
  52:3,13 59:18
  77:20 78:2 88:10
  91:14 95:2 111:4
  115:18 132:24
  133:3 136:1,4
  154:25 155:2,2
  163:24 164:14
  168:11 180:6
  181:5 187:19
  188:10 190:6,22
  213:19 214:1
  216:1,10,17 217:2
  217:4,12 218:1
  236:11 247:20
  248:5 253:15,23
  254:4 259:21
  261:13 265:17
  266:7 270:1
  284:15 285:19
  288:24 289:12,13
  289:18 293:22
  300:1,12 302:1,11
  306:15 307:18

315:7 336:21
  337:5 358:16
  360:25 365:17
  369:16 370:18
  371:15
specifically 27:18
  29:1 51:6 52:5
  59:20 63:24 69:5
  72:7 77:21 87:4
  104:13 107:14
  111:18 131:10
  132:1 153:3,4
  164:7 195:13,19
  196:3 200:13,23
  201:3 212:17
  221:4,19 226:2
  227:20,21 230:8
  231:22 248:12
  256:7 259:3,6
  260:16,21,23
  264:1,6 265:22
  273:7 282:10,15
  289:21 291:23
  294:20 299:3
  301:10 307:21
  313:8 318:20
  323:11 333:9,22
  340:10 346:24
  358:18 365:18
  370:10 371:17
  374:10
specificity 163:14
  282:25 289:22
specifics 169:6
specified 164:5
speculate 93:2,18
  93:24 96:12 197:9
  302:8
speculating 197:16
speculation 93:14
  93:23
spend 307:15 309:2
spending 308:8
spent 119:3 307:24

308:18 309:21
  310:3
spilled 65:4
spoke 24:3,7
  354:22 355:3
spokesperson
  65:25 66:7 67:14
  67:20 183:23
  186:19
spreadsheet 218:22
  219:3 281:2
  282:23 283:17
  314:24,24 315:4,7
  315:8,18,22
  320:23 321:2
  323:14 324:8,11
  341:17
spreadsheets 238:7
  342:18 346:10
St 89:7
staff 17:6 44:24
  55:12,13,17,25
  57:24,25 60:13,13
  60:14 61:10,13
  71:22 77:5 80:10
  91:4 94:4,7,13,16
  94:18,23 95:8,21
  96:2,22 97:14
  98:1 101:24
  105:12 111:7
  112:12 113:15,21
  118:5,8,9,18
  127:18 132:2,2
  133:5 136:25
  140:10,12,16
  151:10 167:17
  177:20 178:5
  182:14,16,20,23
  189:24 191:12
  204:24 210:2
  215:23 216:4,14
  217:14 218:3,7
  220:3 221:15
  229:25 231:4

| | | | | |
|---|---|---|---|---|
| 232:25 233:6 | 243:9,22 244:9,10 | 118:4 136:24 | 234:10 275:16 | 294:6 318:25 |
| 234:7 235:19 | 244:13,13,17 | 167:14 | 276:18 277:9 | 320:4 340:15 |
| 243:17 247:17 | 245:4,6,8,18,20 | **started** 87:5 182:3 | 293:7 302:21 | 341:23 |
| 263:9 273:15 | 246:7,17 248:3 | 209:22 279:25 | 317:1 318:12,18 | **stepped** 178:10 |
| 275:13 276:7,13 | 251:11,11 252:14 | 295:11 311:8 | 322:4 326:9 | **steps** 111:15 112:10 |
| 276:15 280:24 | 252:18 256:16 | **starting** 105:11 | 337:16 338:8 | **stickers** 21:22 |
| 291:5,21 293:10 | 258:15 261:20 | 255:9 307:7 | 361:13,15,17 | **stop** 174:24 |
| 295:19,21 296:12 | 262:10 263:5 | 321:15 359:24 | 362:4,15 364:5,9 | **store** 148:25 |
| 303:13,17 304:14 | 280:24 281:22 | 373:11 376:16 | **statement's** 239:24 | **stored** 149:18 |
| 309:10 314:4 | 282:4 283:18 | **starts** 240:15 242:6 | 240:8 242:20 | **storm** 84:6,9,24 |
| 322:1,17 325:13 | 293:21 310:23 | 268:12 | **statements** 66:19 | 138:3,24 150:17 |
| 326:13 328:9 | 311:12,14 312:5 | **state** 13:25 16:21 | 89:22,25 90:3 | 150:17,19 151:1 |
| 330:5 331:10 | 312:22 313:20,22 | 16:24 65:3 79:16 | 235:1 238:10 | 153:3,8,15,17,21 |
| 335:11 344:7 | 313:25 314:2,10 | 79:25 80:7 104:1 | **states** 1:1,9 4:3 | 153:24 154:4,9,13 |
| 345:7,15 375:21 | 316:1,7,10,12,18 | 105:7,8 235:2 | 13:10 118:23 | 154:16,18 |
| **staffing** 10:20 | 317:4,8,15,25 | 335:13 341:3 | 120:25 179:16 | **STORM-** 8:5 |
| 59:22,25 70:23 | 318:8,14,20,23 | 361:6,10 380:5 | 208:3 230:22 | **storms** 150:23 |
| 127:9,13,16 128:8 | 319:20,23 320:3 | **stated** 65:25 72:7 | 256:2 267:19 | **straight** 193:3 |
| 139:14 141:2 | 321:14,18 322:25 | 94:21 103:15,17 | 268:8 292:13 | **strategy** 10:20 |
| 168:15,22 179:22 | 325:6,8 329:4,6 | 104:2 105:22 | 306:21 307:1 | 288:9 293:21 |
| 196:9,18 205:6,19 | 329:13,20 330:3 | 156:16 184:14 | 311:22 312:19 | 294:3 |
| 205:24 207:5 | 330:25 331:13,15 | 190:7 200:15 | **stating** 330:11 | **streamline** 77:3 |
| 208:15,18 209:7 | 332:5,13 333:15 | 210:17 221:5 | 331:3 342:6 376:2 | 357:16 |
| 210:2,7,18,25 | 334:22 335:5,22 | 230:5 231:23 | **status** 110:19 | **streamlining** 77:4 |
| 211:11,16 212:3,4 | 336:25 337:9,10 | 236:5 247:10 | **statute** 44:22 48:13 | **Street** 3:7 4:10,21 |
| 212:22 213:1,10 | 337:20,23 338:3 | 260:19 273:14 | **statutorily** 234:25 | 5:14 18:6 |
| 213:17 214:17 | 338:11 340:24 | 274:18 281:25 | 264:13 | **Strehle** 1:17 2:7 7:3 |
| 215:9,17 216:18 | 342:13,22 343:17 | 282:12,22 283:7 | **statutory** 39:19 | 16:10,23 380:13 |
| 217:6,11,18,20,22 | 343:20,25 344:9 | 284:4 289:11 | 41:3 44:19 45:3,8 | 381:6,25 382:15 |
| 217:23 218:2,5 | 344:13 357:1,3,8 | 290:15 291:8 | 45:20 59:20,21 | **strike** 62:11 125:20 |
| 219:24 220:14,21 | 357:13 377:6,16 | 299:9 302:9 303:7 | 68:15,22 69:14 | **structure** 27:10 |
| 221:1,6,10 222:22 | 378:2 | 303:12 304:6 | 70:18 72:20 76:18 | 48:11 246:1,6,20 |
| 224:7,22,25 225:3 | **staffing-related** | 306:7 309:12 | 76:19 208:21 | **subject** 85:23 86:5 |
| 225:4,6,11,14 | 140:5 | 318:17 322:6,20 | 234:15 246:16 | 179:22 223:23 |
| 226:10,10,17 | **Stafford** 171:3 | 323:11 325:21,25 | 247:4 249:25 | 278:9 312:9 |
| 227:2,6,12,17 | 192:18 | 330:17 336:2 | **stay** 95:5 | **submission** 206:4 |
| 228:2 230:1 | **stand** 53:7 | 337:18 339:22 | **step** 112:5 177:20 | 210:20 214:24 |
| 231:25 232:7,14 | **standard** 101:6 | 342:24 343:19,21 | 284:25 | 215:7 228:8 |
| 233:8,21 234:1,22 | **standardized** 208:7 | 344:1 350:15,19 | **Stephanie** 197:17 | 242:13 |
| 235:6,13 236:16 | **standing** 172:19 | 357:25 358:1,24 | 198:3,4,5 199:15 | **submissions** 140:1 |
| 238:5 239:11 | **stands** 48:18 83:9 | 362:24 372:10 | 200:1 204:7 | 233:17 282:7 |
| 240:11,16,24 | 145:22 151:10 | 376:20 | 234:13 257:13,23 | 312:2 |
| 241:8,11,13,24 | **star** 169:24 | **statement** 66:5,11 | 281:7,18,18 282:7 | **submit** 205:5,24 |
| 242:9,22,24 243:4 | **start** 28:19 29:14 | 67:13 68:5,8 93:3 | 282:15 286:8 | 207:3 213:7 215:8 |

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

215:11,13,15 219:14 244:15 324:18 329:1 330:12 343:19
**submitted** 84:19,25 211:1,12,17,20 212:5,11,13,18,21 216:4,23,25 226:18 227:3,5,12 228:5,6,8 230:5 233:13 235:23 236:24 241:9 242:9,21 245:23 261:23 262:1,9,13 330:13,18 332:6 360:5
**submitting** 211:23 218:2,5 328:19
**subpoenaing** 149:7
**subscribe** 382:11
**subsequently** 206:11
**substance** 24:18
**substances** 22:9
**substantial** 44:4 63:13,20 248:23
**successful** 44:13
**successfully** 71:16
**succession** 48:14
**sued** 189:10
**sufficiently** 199:5
**suggesting** 248:8
**Suite** 3:7 4:22 5:14
**suited** 68:2
**Sullivan** 8:4,10 119:24,25 120:3,9 120:16,17 121:20 122:4
**summarized** 296:19
**summarizes** 31:18
**summary** 170:1 303:16,17 304:13 304:14 306:9,17

**summer** 80:22 81:4 92:25 93:7
**supplemental** 167:2
**supply** 31:14 34:15
**support** 12:5 63:2 70:11 121:19 208:19 209:8 271:4,5
**supported** 70:9 80:8,9 235:3 247:11,11
**supporting** 244:12
**supposed** 310:21 314:5 331:15 375:13,15 376:4
**sure** 19:3 23:9 26:3 27:1 41:16,19 42:9 46:20 53:6 55:20 59:21 64:9 81:19 86:4,6 106:25 107:11,13 110:2 111:9,12,15 111:21 112:13 113:4,14 116:4 130:5 142:22 152:20 153:8 158:2 159:1 160:10 169:19 181:15 202:12 203:7 204:20,21 232:16 233:5,13 233:16 235:10 244:22 245:7 250:12 251:9 254:18 256:8 273:3 285:22 295:1,10 296:7 297:24 304:22 309:24 311:7 322:8 329:11 331:11 332:24 335:15 341:8 346:19 347:6

348:5 363:18 373:22 374:1 376:10 377:20
**surprise** 92:24 93:6
**surprised** 93:3,10 104:4,7
**surrounding** 362:3
**Susan** 1:24 2:12 13:22 383:3,19
**Susan's** 82:5
**suspect** 109:5
**suspended** 8:25 64:16 183:17
**suspense** 312:7 334:16
**swear** 16:8
**sworn** 16:11 383:6
**system** 84:7,9,10,14 117:17,19 138:24 139:7,13

---

**T**

**T** 165:1
**table** 21:10 22:24 30:3 124:1 175:11 243:8 298:1
**take** 20:16,17,19,20 30:11 36:19 39:17 43:11 62:17 71:5 81:17 82:3 111:15 135:4,6,7,10 142:18 148:24 159:21 164:17 183:9 198:25 199:17 224:17 252:3,4 297:8 304:19 320:19 331:17 339:24 344:16 346:4 347:1 349:3 357:2 372:20
**taken** 2:8 13:6 43:16 82:9 95:24 96:4,6 135:16

143:7 159:25 164:21 222:17 252:9 305:1 344:19 373:5 383:11
**takes** 163:12 208:15 316:10
**talk** 17:15 23:22 45:22 58:5 73:8 77:10,17 89:18 115:9 124:19 129:13 130:14,17 147:4 252:13 260:16 264:23 273:7 291:19 340:10
**talked** 58:10 69:5 77:24 92:1 124:24 130:11,16 132:1 138:25 157:6 184:25 198:6 199:11 203:1 223:22 233:19 235:22 256:5 289:24 291:23 292:15 296:1 303:14 306:16 341:16 374:10
**talking** 10:19 19:2 26:25 43:20 48:21 56:16 61:14 82:14 117:15 129:8 138:13 140:9,11 169:16 170:5 184:13 204:1 214:13 222:22 231:17 245:10 253:9 255:23 264:6,10,11 279:18 289:13 293:13,20 295:7 295:13 296:18 298:10 306:2 307:11 333:7,17

358:12 361:23
**talks** 259:4 309:17
**target** 260:12 312:25 314:18 315:3,9,19 317:15 319:8,23 323:6 324:16 325:4 338:5 341:21 342:17 344:6
**targets** 290:2,12 292:6 341:22 344:11
**task** 83:19 216:9 245:17 248:7 288:8 290:4,14 292:7,16 294:13 294:15
**tasked** 139:23 215:13 263:6 294:2,8
**tasker** 312:5 313:3 313:5,8
**tasking** 168:11,20 292:23
**tasks** 232:23 245:4 282:25 283:8 290:6,25 293:19
**team** 35:22 107:19 121:25 190:10 195:12 269:16
**technology** 31:13 32:10,23 34:8
**telephone** 136:6,8 141:5,9,13,14,17 141:18,22,25 142:7,12 144:17 144:24 146:22 147:1,5 148:4
**telephones** 378:14
**tell** 24:21 53:18 124:6 142:11 143:12 146:16 152:23 166:20 167:4 169:2 175:9

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 425

| | | | | |
|---|---|---|---|---|
| 204:10 221:13,17 | 22:10,14 145:7 | 175:1 176:25 | 97:12 100:7 | **timelines** 187:19 |
| 236:8,15 251:2 | 153:16 198:20 | 180:2 181:3 | 101:23 102:6 | **times** 8:23 56:23 |
| 274:20 291:5 | 202:13 203:20,23 | 184:11 188:12 | 103:7,16 105:15 | 75:18 98:3 107:8 |
| 305:12 307:14 | 204:4 212:20,24 | 207:15 222:10,12 | 105:24 112:20 | 107:18 123:5 |
| 335:10 341:21 | 212:24 222:25 | 223:5 243:19 | 118:4,14,16 | 183:11,15,23 |
| **telling** 222:6 | 225:8 231:23 | 276:24 301:18 | 120:24 121:21 | 227:10 338:3 |
| 236:14 367:1 | 233:8,12 235:4 | 310:19 322:4 | 122:10 135:5 | 372:16 |
| **template** 208:7 | 246:23 251:1 | 342:21 361:16 | 136:12 140:10 | **timing** 47:15 87:15 |
| 209:14,16 238:20 | 275:15 276:9 | 363:10 367:10 | 151:4 152:4,7 | 101:21 169:19 |
| 314:25 342:17 | 277:7 291:16 | 378:4 | 164:17 165:2 | 274:9,10 278:15 |
| 344:5,10 | 292:11 316:25 | **third** 48:14 169:23 | 166:4 168:10,19 | **tired** 257:9 |
| **temporary** 249:18 | 319:3 322:3 323:8 | 270:4 342:13 | 170:8 174:4 | **title** 27:16 219:2 |
| **tenure** 26:20 87:6 | 324:14,22 326:6 | **thoshijima@dem...** | 176:10,16,18 | **titled** 162:18 |
| 97:23 114:7 | 338:7 341:25 | 3:24 | 177:11 178:22 | 334:13 |
| 290:19 340:17 | 354:4,17 356:9 | **thought** 53:5 59:12 | 179:1,6 182:14 | **today** 15:13 17:16 |
| **term** 25:15 38:14 | 357:10 359:22 | 104:8 109:19 | 183:18 187:14 | 21:8,20 22:11,15 |
| 56:9,11,13,23 | 362:23 363:7 | 200:17 283:1 | 191:10 192:1,25 | 24:5 28:3 52:14 |
| 57:5 152:14 | 364:25 365:16 | **thousand** 44:1 | 198:4 201:19 | 75:20 76:4 79:19 |
| 181:17 249:18 | 366:11,25 368:4 | 216:13 | 209:1,4 211:22 | 92:14 142:8 157:6 |
| 255:15,18,22 | 375:10,23 379:10 | **thousands** 249:4,13 | 214:11 216:7 | 158:14 258:20 |
| 308:24 322:24 | **Texas** 8:22 14:11 | 250:5,20 251:13 | 222:4,11,12 235:9 | 289:16 298:19,20 |
| **terminated** 63:14 | 107:4,7 | 251:20 | 236:23 242:21 | 298:23 300:4,6,16 |
| 63:21 64:2,13 | **text** 147:6,9 254:4 | **three** 23:5 122:7 | 248:16,21 249:9 | 300:17 302:2,24 |
| **terminations** | **thank** 28:12 46:22 | 228:20 239:10 | 249:12 250:5,9,18 | 311:3 313:21 |
| 362:17 363:25 | 92:4 93:17 102:19 | 331:22 338:3 | 251:10 252:4,6 | 314:11 316:4 |
| **terminology** 56:17 | 122:9 177:1 255:1 | **Thursday** 223:13 | 253:1 262:3,4 | 324:14 333:7 |
| 57:3,8 | 297:12 298:6 | **tied** 44:22 | 266:16 268:23 | 337:11 341:4,16 |
| **terms** 85:18 115:15 | 304:23 359:5 | **till** 358:13 | 273:11 275:5,19 | 342:15,23 344:9 |
| 170:17 255:24 | 371:21 373:2 | **time** 2:2 13:2,18 | 276:25 281:4 | 357:14 372:6,16 |
| 266:3 | 379:2,4,5,7 | 18:8,22 20:17 | 289:8 295:11,12 | 376:15 377:7 |
| **terrible** 372:4 | **Thanks** 162:15 | 22:3 34:19 35:10 | 303:21 305:11 | 378:7 |
| **testified** 16:12 47:8 | 223:6 | 37:17,24 38:2 | 307:20,22 308:10 | **today's** 379:10 |
| 47:16,20 146:24 | **thing** 181:20 | 39:3,10 40:15 | 310:6,7,14 312:24 | **told** 24:24 31:8 |
| 148:5 160:4,22 | 184:24 223:21 | 42:3,15 43:21 | 314:18 316:21 | 101:17 102:25 |
| 175:24 202:11 | **things** 21:13,16 | 44:5 46:1,3 51:22 | 317:13,20,21 | 107:6 131:10 |
| 203:6,9 243:24 | 129:15 168:5 | 52:12 54:8,16,19 | 318:5 331:9 | 132:13,15,18 |
| 244:3 246:2 | 174:14 213:7 | 54:21,23 55:2,4 | 335:13 336:24 | 225:13 235:12,15 |
| 248:18 261:23 | 238:25 247:15 | 55:21 59:7 60:15 | 338:20 347:5 | 235:17 243:25 |
| 320:1 337:7 341:4 | 258:9 263:6 | 62:19 68:23 69:2 | 350:17,20 353:6 | 244:4 274:23 |
| 344:24 346:1 | 338:14 | 69:7 70:5 72:6 | 355:11 360:12 | 283:1,15,24 |
| 373:9 377:7 | **think** 43:7 57:2 | 79:6,24 80:14,21 | 362:25 367:21 | 298:22 326:3 |
| **testify** 176:3 | 81:15,17 96:4 | 81:4,17,22,23 | 370:4 371:10 | 336:5 338:4 354:5 |
| **testifying** 235:11 | 97:17 123:4 125:5 | 86:19,24 87:1 | 374:2,5,9 376:6 | 355:3 371:22,23 |
| **testimony** 21:8 | 135:4 164:16 | 88:2,8 94:2,12 | 377:15 | 374:5 |

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 426

tolerate 185:25
tools 44:8
top 7:15 73:6,16
  78:17 84:24 167:7
  172:13 185:22
  223:13,25 228:18
  238:11 257:15,18
  270:4 272:2
  305:14 327:14
topic 138:12
total 171:13 216:20
  219:24 248:3
  250:3 251:11
  306:18 307:15
  332:1
totaled 38:2 316:19
tour 119:13
touring 121:4
Toya 297:20
  346:14 349:9
track 20:17 84:16
  298:14
tracked 139:25
tracking 279:3
training 163:11
  164:5
trajectory 26:13
transcript 21:3,24
  383:5
transcription
  381:10
transferred 62:20
  66:7
transferring
  108:17
transformational
  116:16 117:8
transition 59:11
  86:21,22 109:18
  152:3,11,13 323:2
  356:25
transmission 226:5
  296:25
transmit 213:3

transmitted 212:25
  213:1 226:3,7
  227:24 228:1
  230:9
transmitting
  210:12
TransPerfect 13:21
  13:23
traveled 119:10
Treaty 74:2
Trial 4:7
Tricia 177:19
  183:22
tried 224:17
trip 119:21 120:4
  120:14 121:3,17
  121:18 124:25
  125:2,8,14 135:20
  135:24 136:3,13
Troup 55:15,16,24
  56:1 58:8,19
Troup's 62:13
Troy 51:24
true 57:2 202:6
  203:25 230:18,23
  231:1,3 239:4,8
  239:18,22,24
  240:5,8 241:2,5
  246:5 284:4
  325:12 335:18
  361:3 363:19
  382:7,10 383:5
Trump 1:8 13:9
  33:21,25 34:18
  38:12 75:17 76:2
  86:23 152:14
  381:4
Trump's 70:11
trust 321:25 322:5
trusty 372:22
truthfully 283:22
try 17:15 170:17
  304:20
trying 100:5 102:1

118:20 243:19
  308:21 326:1
  371:8
Tsuki 3:19 14:7
Tuesday 1:19 2:1,9
  13:1
turn 171:18 196:5
  223:10
turned 26:3
turning 357:14
two 15:2 23:7,7
  30:4 60:12,14
  61:10 166:3
  169:23 228:20
  240:2 268:22
  282:11 294:8,12
  356:3 363:3
  378:24
TX 3:16
type 91:13 100:20
  101:2 126:21
  263:5 288:25
typed 26:5
types 34:16 59:13
  92:17 127:1,2,20
  136:7 174:9 181:9
  289:19
typhoon 119:13,18
typhoons 119:15
typically 85:25
  110:4

---
**U**
---

U.S 8:9 13:11 50:24
  53:3
Ueland 124:23,24
Uh-huh 27:4
ultimate 179:9
ultimately 65:14
  71:15 179:15,22
Um 263:12
um-hum 18:15
  19:9 58:13,16
unauthorized

186:1
unaware 131:23
  133:15 157:21
  163:24
under- 103:12
undergraduate
  28:25 29:9
underneath 156:6
understand 16:18
  18:24 19:11,14,21
  19:23 20:8,13,24
  26:22,24 32:13
  35:20,21 39:6
  45:14 47:2,4 54:5
  54:10 59:3,4
  64:12,15 68:8
  69:2,12,22 71:6
  71:21 72:11 76:20
  81:1 84:20 85:5
  88:15,20 89:2
  92:21 100:5,21,23
  101:10 102:1
  103:8 117:14
  118:7 129:7 132:9
  145:11 178:21
  186:18,23 189:4
  205:2,18 206:10
  209:10 266:19
  272:12 278:17
  284:6 296:23
  301:18 308:17,22
  310:19 325:7
  354:18 364:13
  370:20,21 378:22
understandable
  74:11
understanding
  30:18 38:11 39:9
  58:4 59:14 75:6
  79:6 81:3,8 83:12
  83:17 85:3,12,17
  85:21 88:6,12
  93:5,11 95:11,19
  97:6,11 99:13,14

99:18 100:12,15
  100:22 101:15
  102:12 103:22
  106:15,21 107:3
  108:22 115:24
  116:5,11,14,19,24
  117:2,6,24 118:17
  121:10,13,14
  134:10 140:17
  153:19 183:5
  186:4 193:25
  196:23 197:5
  201:22 237:5
  253:22,24 261:16
  265:3 266:6,15
  268:1 270:12
  277:18 280:15
  293:2 296:3,19
  303:1 314:23
  315:22 319:4
  320:25 324:13
  345:9,14 356:11
understands 76:6
understood 39:3
  40:5,14 45:9
  62:19 65:14 68:5
  68:16,23 69:7,17
  70:3 72:6,14
  76:11,16,24 79:24
  80:6 81:6 105:2
  117:10 132:4,16
  187:8 203:20
  208:25 209:4
  211:22 232:12
  233:19 267:9
  275:1 310:20
  315:11 352:18,22
  354:11 367:24
  368:16
unhappy 320:10
Union 3:2,13 14:4,7
  14:15,19,23
United 1:1,9 4:3
  13:10 179:16

**University** 28:24 29:8,12 31:6
**unlawful** 64:18
**unnecessary** 72:3
**unsure** 158:11,23 158:24 274:9
**upcoming** 296:13 306:19 343:5,9 347:14
**update** 311:13,23 312:6 314:14 328:10,16,19 329:1 330:6 331:4 331:6 342:15,23 342:25 343:10,14
**updated** 177:6 181:8 262:14 270:9,14
**updates** 212:3 213:2
**updating** 310:22
**urgently** 302:5
**USA-AFGE-Exp...** 8:17
**USA-AFGE-Exp...** 11:14
**USA-AFGE-Exp...** 10:8
**USA-AFGE-Exp...** 11:23
**USA-AFGE-Exp...** 9:15
**USA-AFGE-Exp...** 11:11
**USA-AFGE-Exp...** 10:11
**USA-AFGE-Exp...** 11:17
**USA-AFGE-Exp...** 9:24
**USA-AFGE-Exp...** 9:19
**USA-AFGE-Exp...** 10:5

**USA-AFGE-Exp...** 10:17
**USA-AFGE-Exp...** 11:8
**USA-AFGE-Exp...** 9:10
**USA-AFGE-Exp...** 11:5
**USA-AFGE-Exp...** 9:21
**USA-AFGE-Exp...** 11:20
**USA-AFGE-Exp...** 10:14
**USA-AFGE-Exp...** 10:24
**USA-AFGE-Exp...** 10:21
**use** 42:10 56:9,11 56:13,23 57:3,6,8 84:6 85:12,13 98:15 102:2 109:23 118:20 146:18,22 148:16 149:25 150:4,8,12 151:6,8 157:11,15 157:18,23 159:13 166:6 184:12 312:24 321:18 323:5 331:11 345:10
**users** 158:4
**uses** 84:15 85:7

**V**

**v** 381:3
**vacant** 94:15
**val** 374:14
**vals** 374:4,13
**various** 134:15 207:3 209:5 214:3 218:5,6 247:17
**venture** 119:16
**verbal** 19:4 58:17

**verification** 345:11
**version** 188:8,15 191:1 195:8 270:14
**versions** 188:6 191:2 195:5,14 239:10
**versus** 13:8 44:20 248:12
**vet** 66:11
**vetted** 63:19
**vice** 3:19
**Victoria** 305:15 320:11
**video** 13:5
**videoconferencing** 107:22
**videographer** 6:11 13:4,21 16:7 43:14,17 82:7,10 135:14,17 143:5,8 144:23 159:23 160:1 164:19 165:3 222:15,18 252:7,10 304:24 305:2 344:17,20 355:19 365:23 366:2 373:3,6 379:1,9
**videotape** 21:4
**videotaped** 1:15 2:7 20:25
**view** 179:21 264:25 265:13
**viewed** 44:21 72:1 276:21 364:9
**VILLAGES** 8:7
**Virginia** 5:15 17:1 18:7,18 28:24 29:8 31:6
**virtual** 107:12
**virtually** 112:3
**visibility** 322:13
**voice** 46:19 298:3

**volunteer** 152:9
**Voorhies** 98:9,12 98:19,22,25 99:9 100:13 102:5,22 103:8 105:2,14,17 105:25 106:22 107:18 108:4,10 108:13 111:10,12 111:16 112:6,20 113:4,19,24 114:2 114:6,14,24 116:9 116:11,14 117:18 118:11 119:6,10 119:19 120:14,21 121:11,15,22 122:25 123:2,21 124:14,19 125:1 125:19,21 126:21 127:12,24 129:2 129:23 130:18,23 131:3,18,19 132:6 132:19 133:8,11 133:22 134:5 135:21 136:16 137:2,2,14 138:8 140:4,8,25 141:5 141:21 146:9,18 146:23 147:1 150:1 151:3 153:12,23 154:12 154:18,22 156:13 158:7 159:17 173:1,4 194:25 195:1,6,16 199:12 199:16,24 202:7 202:12,17 203:7 204:6 224:9 235:20 271:14,18 272:13,18 273:1 273:10 274:6,12 274:18 278:8 286:1 305:15 339:19,23
**Voorhies'** 99:4

104:10 115:25 116:6 120:11 125:8 142:12 143:13 146:17
**Voorhies's** 114:22
**vs** 1:7

**W**

**WA** 3:16
**wait** 17:19 326:14 327:18
**waited** 351:24
**waiting** 17:24 378:2
**waived** 380:16,23
**waiver** 169:20 373:20
**want** 19:3 42:9,10 61:7 102:2 123:3 135:4 149:8 160:9 257:14 264:14 275:1 291:13,17 321:18 340:10 347:25 348:19,25 349:25 352:12 373:22 374:1 378:10
**wanted** 53:18 113:14 132:5 144:19,20 177:25 233:16 279:20 314:9 320:20 321:24 322:6,21 325:6 330:20 347:23 348:5 376:10,11
**wants** 76:5 228:25
**Washington** 2:11 3:22 4:11,23 5:7 8:19 13:17 14:11 74:6 106:22 107:2 177:5
**wasn't** 90:23 101:5 134:11 175:18

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 428

203:10,23 241:2
243:16 258:25
261:25 302:19
348:5 358:15
**waste** 39:23 66:1
67:25 68:11,11,17
**water** 65:4
**way** 21:20 52:14
54:6,6,11 72:4
80:16,18 95:11
102:20 103:1
105:7 123:7,22
124:20 128:5
151:24,25 166:9
180:2,5 184:24
186:23 192:12
193:4 203:9
210:11 244:8
248:22 259:16
271:2 276:2 277:9
284:6 293:18
294:4 297:3,23
303:7 310:14
317:5 318:4
325:24 331:24
336:9 348:17,18
352:22 361:19
362:18 368:5
369:17 373:23
**ways** 180:3 263:21
373:19
**we'll** 26:12 27:21
27:23 29:24 35:13
41:11 82:4,6
122:14 131:17
135:12 145:8
148:25 159:22
174:12 175:19
207:9 266:25
285:22,23 314:12
372:24
**we're** 15:7 17:15
20:16,17 21:6
28:1 43:7,10,11

82:20 122:13
135:6 140:11
142:22 148:22,24
149:9,10 254:20
258:2 262:7
268:17 287:17
310:10 356:24
357:16 372:19
**we've** 81:16 118:2
135:1 231:11,15
233:19 238:12
241:18 297:25
305:13 313:6,15
331:24 333:7
338:19 344:24
378:14
**Weapons** 97:2
100:10,13 101:12
**wearing** 124:3
**webpage** 73:14
**website** 49:9
**Wednesday** 353:25
**week** 18:18 200:11
258:3 351:9
352:13,24
**weekly** 111:20
133:4,6 172:19
190:7,9 273:14
274:17
**weeks** 61:7,14,15
356:3 363:3
**went** 28:24 32:16
47:2 66:24 94:24
94:25 98:3 112:15
117:24 119:17
137:9 147:22
181:11 184:25
210:11 225:11,11
244:20 319:6
324:1,24 325:21
333:23 336:10
**weren't** 44:21
124:22 264:20
322:12

**West** 17:1 18:7,17
28:24 29:7 31:5
**WESTERN** 8:6
**whereof** 382:11
**White** 95:13,18
138:5 197:9,12,18
197:23 198:10,14
200:9,18,24
**widely** 225:2
**willing** 59:1
**winter** 150:19,23
150:25 153:3,15
153:17,20,24
154:4,9,13,18
**withdrawal** 53:5,8
**withdrawn** 53:11
53:14 54:3,18
55:2
**withdrew** 53:2
**withheld** 28:15
**witness** 4:2 5:2,10
7:2 15:14 16:8
30:15 41:10 64:5
67:17 73:10 82:2
91:23 92:5 93:17
122:19 137:18
142:25 144:10
145:6,6 155:20
188:20 189:14,18
207:20 228:25
229:2 251:5 255:7
269:4 272:3 278:3
279:23 281:1
287:8,22 297:12
297:17 305:18
306:13 308:3
323:23 324:1
326:8 327:2,4
334:18 340:4,9
346:16 355:21
359:5 360:20
365:25 366:3
373:2 374:25
379:7 380:20,21

381:6 382:2,11
383:6
**witness's** 144:14
**wondering** 27:6
**word** 71:5 243:20
315:4
**worded** 309:24
**words** 39:24 99:23
99:25 184:12
**work** 18:10 39:14
40:10 87:17 95:15
101:24 107:8
115:5 118:11
125:9,23 126:22
134:21 149:13
159:14 161:7
187:24 237:5,9,10
246:12,25 250:11
264:9,13 282:16
286:17 292:2
294:9,12,15
313:20 317:8,22
322:25 325:17
348:8 375:15
**workday** 18:14
**worked** 18:8 26:11
26:15 55:24 96:21
98:9 140:20 152:2
152:10 186:24
210:5,17 214:2
215:12 217:11
280:20 281:6
282:8 290:22
303:12 339:13
345:15
**Workers** 8:25
183:17
**workforce** 36:13
38:8,13,18,23
39:7,10,15 40:15
40:21,25 41:2,5
41:25 43:22 44:5
44:12 45:16 52:9
52:19 61:21 62:1

62:22 130:3
186:15,20 264:22
275:8 288:9,24
289:19 290:3,13
291:4,6,11,20
292:25 293:23
317:22 318:21
332:11,15 333:1
333:11,18,23
334:1,6,13 335:4
335:9,20 336:6
337:17
**working** 26:8 37:25
39:11 40:6 59:9
86:15 87:8 88:1
98:23,25 106:22
107:11 118:18
127:6,7 150:16
168:20 170:22,25
187:18 190:10
198:7 210:13
221:19 231:25
259:3,10,20 261:5
281:19 282:11
325:13 347:6
**workload** 357:13
**works** 21:21 95:12
151:24 211:7
271:2
**worksheet** 219:2
**wouldn't** 28:17
197:8 203:21
**write** 19:5 146:11
146:14 196:15,16
280:11,13,15
**writing** 224:1
229:14
**written** 21:3 160:12
160:17 244:24
**wrote** 196:13
230:24 231:1
278:22,25 284:23
346:11

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

**X**

x 1:4,10 380:15

**Y**

yeah 15:4 35:9
46:12 63:12 73:3
94:25 123:24
126:25 136:15
151:25 152:1
281:13 298:7
312:13
year 18:16 216:14
216:20 221:14
222:7 225:15,18
227:17 228:2
229:25 237:1
240:25 243:17
249:11 250:4,19
251:12 288:10
312:23 316:1
335:11,22 340:24
years 28:23 31:11
34:5
yes-or-no 250:16
250:17 251:6,7
367:22 368:24,25
371:1
York 2:11 8:23
13:16 183:11,15
Yusman 4:18 15:23
15:24

**Z**

zero-based 263:5
314:1,22 322:23
324:25 325:5
342:13 343:16
zone 121:4
Zoom 107:17

**0**

059 11:18

**1**

1 7:10 29:25 30:5,8

183:16 256:24
284:25 296:20
356:2 380:4 381:8
1,362 289:2
1:32 165:2,4
10 8:16 81:25 82:2
162:22 165:7,9
222:13 223:2,3,5
256:12 297:25
304:19 344:16
353:8
10-minute 82:4
135:3,11
10,843 289:4
10:00 299:21 302:2
10:10 82:5,8
10:20 82:6
10:25 82:11
100,000 119:3
138:18
10am 298:18 300:3
300:15
10th 163:18 164:3
164:9 305:24
306:11,23
11 8:19 9:8 28:10
162:16 177:1,2
193:16
11,383 220:1,2
221:13 223:24
224:8 227:21,24
235:22 236:24
241:14 242:22
248:3,22 249:11
250:3,19 251:12
251:21 256:17
280:21,23 282:17
283:17,23 284:5
292:15,18 320:2
332:6 333:16
341:18 342:8
11,500 192:8 193:1
216:20 225:14
227:16 228:1

229:17
11,883 261:24
11:24 135:15
11:41 135:18
11:49 143:6
1101 4:10
11973 1:25
11th 288:1,4
12 8:23 183:10,12
183:14
12/4 211:12
12:01 143:9
12:18 159:24
12:35 160:2
12:41 164:20,22
120 8:7
122 8:10
12th 189:22 194:1
196:24 286:8
13 9:4 193:6,7,13
14 9:9 10:7 199:18
199:19,22 383:22
14356 9:12 205:16
1445 2:10 13:16
14th 265:1,11
15 9:12,13 205:12
205:14,17 207:10
286:12
16 7:5 9:14 167:7
168:9 207:10,11
223:3 311:5,9
316:8
162 8:15
165 8:18
16th 167:14
17 9:17 177:6
218:13,14 222:24
229:5 231:17
241:18
175/19 12:13
177 3:7 8:22
17th 167:11 168:25
176:12 199:23
228:22 230:13,19

346:15,23
18 9:20 228:12,13
228:14 311:13
180 265:14 266:5
267:12,15 275:22
276:5,13
180-day 275:23
183 8:25
18th 305:16,21
19 9:23 237:15,16
331:19
192 361:11
193 9:8
199 9:11
1A 260:23
1B 260:23
1st 105:11 132:11
178:20 181:21
206:13,18 268:12
310:8 354:24

**2**

2 7:13 49:4,5,7
241:12 312:6
329:3 330:3 381:9
2- 222:14
2(c)(i) 206:8
2.0 196:8
2:37 222:16
2:47 222:14
2:49 222:19
20 7:19 10:4 71:2
73:17 74:20,23
254:22,25,25
257:7
20% 351:8
200 5:14
20005 4:11
20032 5:7
20043 3:22
2018 33:2
202 3:23 4:12
160:18
2020 33:9,21

2021 33:24
2024 27:9 246:1,7
246:19,19
2025 7:19,22 9:8,13
10:7 26:21 27:7
34:20 36:6,21
37:12,16 38:6
43:25 47:23 48:4
50:25 53:3,8
54:14 61:18 71:2
73:17 74:20,23
77:8 78:6,15
80:22 81:4 86:16
90:14 91:10 92:25
93:8 94:2 98:8,23
99:1 118:11
119:11 135:21
154:22 167:7
168:9 171:7
175:25 176:8
177:7 181:11
183:16 187:14
193:16 205:2,17
213:11,17 223:14
224:23 229:5
238:12 241:22
242:7 255:5
266:10 267:3
271:24 289:8
291:6 303:3
309:21 334:17
344:24
2026 1:19 2:1,9
13:1,18 114:11,13
151:1 153:24
154:5,9,13 162:16
162:22 216:14,21
219:24 221:14
222:7 225:15,18
227:17 228:2
229:25 237:1,7,11
240:25 243:17
249:12 250:4,19
251:12 254:8

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

288:10 293:21 298:16 310:23 312:23 316:1 335:11,22 340:25 358:8 359:24 361:12 373:12 381:5 382:12 383:15
**2028** 383:22
**20472** 4:23
**205** 9:13
**207** 9:16
**20th** 73:4 169:22 170:6
**21** 10:7 33:21 238:12 265:7,8,11
**218** 9:19
**21st** 207:18,22 316:14
**22** 10:10 268:18,19
**22314** 5:15
**228** 9:22
**22nd** 311:8,11
**23** 10:13 271:20,21 271:24
**23,000** 192:2,24
**23,143** 335:11
**23,146** 332:14 334:5 335:6,23
**2354** 210:25
**237** 9:25
**23rd** 228:18 315:12 317:23 324:12 329:21 332:17 333:3,20,24 334:6 334:15 335:9 338:20,23 339:10 339:18
**24** 10:16 277:25 278:1 290:21 292:3,13 293:12 294:12 296:18 297:6 299:9
**24,000** 316:19

318:15 321:20 326:4
**24,812** 240:24 242:25 332:1 333:15
**24.8** 216:13
**241** 9:11
**25** 10:19 36:6 271:24 287:3,4 293:20 361:10 362:15
**254** 10:6
**254-7740** 161:3
**25th** 297:15 349:10
**26** 10:23 297:9,10 297:13 312:6
**26,146** 337:13
**260** 11:6
**265** 10:9
**268** 10:12
**26th** 316:8 349:7 352:1 374:11,19
**27** 11:4 305:6,7
**27/21** 12:13
**2700** 5:6
**271** 10:15
**278** 10:18
**28** 11:7 326:22,23 362:7
**287** 10:22
**29** 11:10 334:10,11
**297** 10:25
**29th** 171:19 172:12 173:6

_____
**3**
_____
**3** 7:14 67:6,7,10 381:10
**3:24** 252:8
**3:25-cv-03698-SI** 1:7 13:14
**3:32** 257:23
**3:37** 252:11
**30** 7:12 11:13 31:11

62:4 174:5 339:25 340:2 351:5,11 353:19
**30-day** 351:4,15 354:6
**300** 3:7
**305** 11:6
**305-0693** 4:12
**30th** 311:23
**31** 1:19 2:1 11:16 13:1,18 334:17 346:6,7 350:5 381:5
**315** 161:3
**31st** 131:13 172:8 254:6 274:4 331:16 332:19 333:4 334:23 336:11 337:11 351:13,24 352:14 353:10,15 354:9 358:13 365:6 366:15 374:19
**32** 11:19 349:5,8 351:3
**326** 11:9
**33** 11:22 359:2,3
**334** 11:12
**33527** 165:13
**33529** 170:10
**33531** 172:10
**33534** 223:12 256:13,23
**33536** 353:11,15
**33544** 165:13
**34** 12:4 223:12 360:6,7
**340** 11:15
**342** 10:22
**343** 9:22
**34553** 3:21
**346** 11:18
**349** 11:21
**35%** 289:2

**357** 9:16
**359** 11:23
**360** 12:8
**364** 340:7
**367** 11:15
**379** 380:4
**3rd** 209:19

_____
**4**
_____
**4** 7:17,23 72:23,24 223:14 241:22 242:10 280:18 282:6 290:21
**4:45** 304:25
**4:53** 305:3
**406** 10:9
**415** 3:9
**421-7151** 3:9
**443-8688** 146:23
**448-9090** 3:23
**45** 20:18
**466** 11:21
**48** 125:6
**49** 7:13
**4th** 211:1,17 212:5 220:20 224:8 235:23 255:5,9 256:4,13 259:12 278:8 280:7 281:4 296:1,8 329:13

_____
**5**
_____
**5** 7:20 78:11,12,14 242:7 329:22 330:4
**5:45** 344:18
**5:59** 344:21
**50%** 191:11,21,24 192:7,25 196:10 196:18 220:2,8 221:1 222:5 231:4 231:4,7 232:6,7,9 232:13,20,25 233:6 234:6 235:6

235:12,16 236:8 236:15 243:3,10 243:16,22,25 244:10,16 245:13 245:24 246:8 249:2,5 258:16,22 259:1 260:12 261:21 263:8,20 275:24 281:23 282:16 286:18 288:10 292:6 293:1,10 309:1 312:25 313:23 314:18 315:2,3,10 315:18 316:21 317:15 319:8,23 320:22 323:6,12 324:12,16 325:3 325:14,17 326:3 337:2 338:5 339:1 340:13,18,23 341:5,10,12,21 342:5
**500** 4:21 18:6
**520** 11:12
**521** 10:25
**538** 9:25
**544** 8:18
**550-7839** 160:18
**582** 10:12
**5th** 237:19 255:5 257:11,16,22 268:23 296:4,12 296:24 297:4 298:8 299:7 302:5 302:14 303:4,8 332:17 335:2 340:6,11

_____
**6**
_____
**6** 7:23 82:21,22 96:8 312:10 361:9 361:10
**6:35** 373:4

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

**6:45** 373:7
**6:52** 379:10,12
**60** 206:6
**60-day** 206:4
**602** 123:8,9
**603** 123:8,11
**604** 123:8,13,15,17
**6686** 257:18,22
**6687** 259:6
**67** 7:16
**68%** 289:4
**688** 10:6,15
**6th** 311:18,21
   312:1,7,17 328:6
   383:15

_____
        **7**
_____
**7** 8:4 120:2,5,8
   122:7 196:5
**7,039** 289:7
**703** 5:16
**717** 5:14
**72** 7:19
**720** 11:9
**7336** 228:21 229:7
   229:8
**76%** 289:7,14
**78** 7:22

_____
        **8**
_____
**8** 8:8 122:8,9,11
**8:17** 298:9,9
**8:59** 2:2,9 13:2,19
**82** 7:25
**832** 146:23
**840** 4:22
**888-1943** 5:16

_____
        **9**
_____
**9** 7:22 8:11 78:15
   162:11,13,15,16
**9:00** 299:19
**9:27** 43:15
**9:28** 43:18
**9:51** 229:6

**90** 356:19,23 357:6
   357:22 358:22,25
   359:13,25 373:11
   376:17,21,23
   377:3,14,24,24
**90-day** 131:4 357:2
   357:11 358:2,3,7
**932** 306:22
**94108** 3:8
**9465** 354:7
**998** 10:18
**9th** 78:21

# Exhibit H

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--------------------------------x
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, et al.,

      Plaintiffs,

                           Case No.

   vs.

                     3:25-cv-03698-SI

DONALD J. TRUMP, in his official
capacity as President of the
United States, et al.,

      Defendants.
--------------------------------x

CONFIDENTIAL

PURSUANT TO THE PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF

ROLAND EDWARDS

Thursday, April 2, 2026

Reported By:  SUSAN ASHE, CER

Job No.:  11974

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 2

Thursday, April 2, 2026

8:58 a.m. Eastern Daylight Time

Videotaped deposition of ROLAND EDWARDS, taken on behalf of the Plaintiffs, beginning at 8:58 a.m., on Thursday, April~2, 2026, at the offices of Democracy Forward Foundation, 1445 New York Avenue, Northwest, Washington, D.C., before Susan Ashe, Certified Electronic Reporter and a Notary Public of the District of Columbia.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 3

APPEARANCE OF COUNSEL:

On behalf of All Union and Non-Profit

Organization Plaintiffs

ALTSHULER BERZON LLP

BY:  DANIELLE E. LEONARD, ESQ.

BY:  ELIZABETH ESHLEMAN, ESQ.

177 Post Street, Suite 300

San Francisco, California  94108

(415) 421-7151

dleonard@altshulerberzon.com

eeshleman@altshulerberzon.com


On behalf of All Union and Non-Profit

Organization Plaintiffs (except NRDC) and for

Plaintiffs City of Chicago, IL; Martin Luther,

Jr. County, WA; Harris County, TX; and City of

Baltimore, MD

DEMOCRACY FORWARD FOUNDATION

BY:  TSUKI HOSHIJIMA (pro hac vice)

Senior Counsel

P.O. Box 34553

Washington, D.C.  20043

(202) 448-9090

thoshijima@democracyforward.org

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 4

APPEARANCE OF COUNSEL (Continued):

On behalf of the Defendants and the Witness

UNITED STATES DEPARTMENT OF JUSTICE

BY:  JEREMY NEWMAN, Trial Attorney

BY:  BRAD P. ROSENBERG, Special Counsel

1101 L Street, Northwest

Washington, D.C.  20005

(202) 305-0693

jeremy.s.newman@usdoj.gov

brad.rosenberg@usdoj.gov

-  and  -

FEDERAL EMERGENCY MANAGEMENT AGENCY

BY:  KEVIN YUSMAN

500 C Street, Southwest

Suite 840

Washington, D.C.  20472

kevin.yusman@fema.dhs.gov

-  and  -

DEPARTMENT OF HOMELAND SECURITY

BY:  MATTHEW FLEISCHMAN

BY:  OKWEDE OKOH

2700 Martin Luther King, Jr., Southeast

Washington, D.C.  20032

matthew.fleischman@hq.dhs.gov

okwede.okoh@hq.dhs.gov

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 5

ALSO PRESENT:

Jessica Levy, Esq.

Altshuler Berzon LLP


Shreya Wankhade, Legal Assistant

Democracy Defenders Fund


Jonathan Perry, Videographer

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 6

CONTENTS

THE WITNESS

Roland Edwards


  BY MR. HOSHIJIMA                                      15


                          EXHIBITS

PLAINTIFFS

Exhibit No.                                        Marked

Exhibit 35  Profile of Roland Edwards                  22

Exhibit 36  Executive Order 14210

            February 11, 2025                          42

Exhibit 37  May 2023

            FEMA Disaster Workforce

            "Actions Needed to Improve

            Hiring Data and Address

            Staffing Gaps"                             87

Exhibit 38  January 20, 2025 Memorandum

            Re:  Federal Civilian

            Hiring Freeze Guidance                     90

Exhibit 39  Email Correspondence

            USA-AFGE-Exp.-0000435                      95

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 7

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                      Marked

Exhibit 40  March 14, 2025 Memorandum

            Subject:  DHS Hiring

            Verification Process              98

Exhibit 41  Email Correspondence

            USA-AFGE-Exp.-0000403

            and -404                          117

Exhibit 42  Executive Order 14356

            October 15, 2025                  132

Exhibit 43  November 5, 2025 Memorandum

            Re:  Guidance on Executive

            Order 14356, Ensuring

            Continued Accountability

            in Federal Hiring                 134

Exhibit 44  DHS STORM # 25-07536             141

Exhibit 45  Email Correspondence

            USA-AFGE-Exp.-0000400

            through -402                      199

Exhibit 46  Email Correspondence

            USA-AFGE-Exp.-0000415

            through -419                      204

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 8

EXHIBITS (Continued)

PLAINTIFFS

| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 47 | Email Correspondence USA-AFGE-Exp.-0000420 through -427 | 210 |
| Exhibit 48 | Email Correspondence USA-AFGE-Exp.-0000600 through -607 | 225 |
| Exhibit 49 | Email Correspondence USA-AFGE-Exp.-0000446 through -454 | 233 |
| Exhibit 50 | Email Correspondence USA-AFGE-Exp.-0000472 | 238 |
| Exhibit 51 | Email Correspondence USA-AFGE-Exp.-0010027 through -029 | 244 |
| Exhibit 52 | Email Correspondence USA-AFGE-Exp.-0000608 through -610 | 248 |
| Exhibit 53 | Email Correspondence USA-AFGE-Exp-0000643 and -644 | 254 |

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 9

EXHIBITS (Continued)

PLAINTIFFS

| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 54 | Email Correspondence | |
| | USA-AFGE-Exp.-0000473 | |
| | through -501 | 261 |
| Exhibit 55 | Email Correspondence | |
| | USA-AFGE-Exp.-0000504 | 269 |
| Exhibit 56 | Email Correspondence | |
| | USA-AFGE-Exp.-0000539 | 272 |
| Exhibit 57 | Email Correspondence | |
| | USA-AFGE-Exp.-0000642 | 273 |
| Exhibit 58 | Email Correspondence | |
| | USA-AFGE-Exp.-0000839 | 276 |
| Exhibit 59 | Email Correspondence | |
| | USA-AFGE-Exp.-0000076 | |
| | and -077 | 278 |
| Exhibit 60 | Email Correspondence | |
| | USA-AFGE-Exp.-0005677 | 286 |
| Exhibit 61 | Short Message Report | |
| | USA-AFGE-Exp.-0009457 | |
| | and -458 | 289 |
| Exhibit 62 | Email Correspondence | |
| | USA-AFGE-Exp.-0015928 | 293 |

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 10

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                          Marked

Exhibit 63  Email Correspondence

            USA-AFGE-Exp.-0000707

            and -708                                 294

Exhibit 64  Email Correspondence

            USA-AFGE-Exp.-0000713

            and -714                                 296

Exhibit 65  Email Correspondence

            USA-AFGE-Exp.-0008661

            and -662                                 299

Exhibit 66  Email Correspondence

            USA-AFGE-Exp.-0000160

            through -162                             304

Exhibit 67  Email Correspondence

            USA-AFGE-Exp.-0000180

            and -181                                 305

Exhibit 68  Spreadsheet attached to

            Exhibit 67                               309

Exhibit 69  Email Correspondence

            USA-AFGE-Exp.-0000186

            through -188                             314

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 11

EXHIBITS (Continued)

PLAINTIFFS

| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 70 | Email Correspondence | |
| | USA-AFGE-Exp.-0000388 | |
| | and -389 | 316 |

PREVIOUSLY MARKED EXHIBITS

PLAINTIFFS

| Exhibit No. | | Introduced |
|---|---|---|
| Exhibit 2 | Organizational Chart - DHS | 47 |
| Exhibit 17 | Organization Information Chart | |
| | USA-AFGE-Exp.-0006542 | 180 |
| Exhibit 19 | Email Correspondence | |
| | USA-AFGE-Exp.-0006535 | |
| | through -538 | 159 |
| Exhibit 21 | May 14, 2025 Memorandum | |
| | Subject:  Reinstating FEMA's | |
| | Ability to Renew Term | |
| | Employees Based on Mission | |
| | Requirements | |
| | USA-AFGE-Exp.-0000405 | |
| | and -406 | 125 |

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 12

PREVIOUSLY MARKED EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                    Introduced

Exhibit 26  Email Correspondence

            USA-AFGE-Exp.-0014520

            and -521                               192

INSTRUCT THE WITNESS

| Page/Line | Page/Line | Page/Line |
|-----------|-----------|-----------|
| 154/23    | 155/11    | 156/11    |
| 170/15    | 171/2     | 171/17    |
| 172/5     |           |           |

(REPORTER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily denote an exact quote from the document.)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 13

THURSDAY, APRIL 2, 2026;

8:58 A.M. EASTERN DAYLIGHT TIME

--o0o--

VIDEOGRAPHER:  We are now on the record.  This begins the video deposition of Roland Edwards, taken in the matter of the American Federation of Government Employees, et al., versus Donald J. Trump, in His Official Capacity as President of the United States, et al.  Case filed in the U.S. District Court for the Northern District of California, San Francisco Division, Case No. 3:25-cv-03698-SI.

We are at the offices of Democracy Forward, 1445 New York Avenue Northwest, in Washington, D.C.

The date is April 2, 2026.  Time is approximately 8:58 a.m.

My name is Jonathan Perry.  I am the videographer from TransPerfect.  The court reporter is Susan Ashe, also with TransPerfect.

And would counsel present please introduce themselves and state whom they represent.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 14

MR. HOSHIJIMA:  Good morning. Tsuki Hoshijima from Democracy Forward.  I represent certain of the Plaintiffs in this matter.

MS. LEONARD:  Danielle Leonard, Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MS. ESHLEMAN:  Elizabeth Eshleman, Altshuler Berzon, also representing all Union and Organizational Plaintiffs.

MS. LEVY:  Jessica Levy, Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MR. NEWMAN:  Jeremy Newman, Department of Justice, representing the Defendants and the witness in his official capacity.

MR. ROSENBERG:  Brad Rosenberg from the Department of Justice.

MR. FLEISCHMAN:  Matthew Fleischman from the Department of Homeland Security.

MS. OKOH:  Okwede Okoh from the Department of Homeland Security.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 15

MR. YUSMAN:  And Kevin Yusman from FEMA.

VIDEOGRAPHER:  And would the reporter please swear in the witness.

(Witness sworn.)

Whereupon,

BENJAMIN ROLAND EDWARDS,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HOSHIJIMA:

Q.  Good morning.

A.  Good morning, sir.

Q.  Can you state and spell your name for the record.

A.  My full name is Benjamin Roland Edwards. So Benjamin, B-e-n-j-a-m-i-n.  Middle name Roland, R-o-l-a-n-d.  Last name Edwards, E-d-w-a-r-d-s.

Q.  Have you ever had your deposition taken before?

A.  Yes, I have.

Q.  How many times?

A.  Just once.

Q.  Just once.

How long ago was that?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 75

Q.   Meeting him for what?

A.   "Meeting."

Q.   "Meeting him"?

A.   Yeah.

Q.   In person?

A.   Yes.

Q.   But you've never communicated with Corey Lewandowski about anything related to FEMA?

A.   No.

Q.   Have you ever communicated with Kara Voorhies?

A.   Yes.

Q.   Who is Kara Voorhies?

A.   I don't know her title.

Q.   If Karen Evans had testified that Kara Voorhies was a senior advisor to the DHS secretary for FEMA issues, does that sound correct to you?

           MR. NEWMAN:  Object to form.

A.   I'm just not sure what her title is.

Q.   Do you know if Kara Voorhies worked for DHS or for FEMA?

           MR. NEWMAN:  Object to form.

A.   Not sure.

Q.   Do you know if Kara Voorhies was a federal employee?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 76

A.   I'm not sure.

Q.   Do you know if she was a contractor?

A.   I'm not sure.

Q.   Do you know when she first joined the federal government?

A.   I don't know.

Q.   Do you know what her responsibilities were?

A.   I don't know.

Q.   How often did you communicate with Kara Voorhies?

A.   There was no regular cadence for those communications.  It was infrequent.

Q.   "Infrequent," as in less than ten times, like Corey Lewandowski, or more frequently than that?

MR. NEWMAN:  Object to form.

A.   It was certainly fewer times than -- I'm sorry.

It was more times than my communications with Corey Lewandowski, but it's still negligible.

Q.   You're saying -- your testimony is that you only had negligible communications with Kara Voorhies?

MR. NEWMAN:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 77

A.   That's correct.

So we are on a number of emails together, just because they're blast emails, and I know that she's listed on those.

But in terms of a direct communication, we've had very minimal direct communications.

Q.   How many times would you had -- would you have had direct communication with Kara Voorhies?

A.   It's really hard for me to put a number on it.  I don't know.

Q.   You have communicated directly with Kara Voorhies, though?

A.   Yes, I have.

Q.   More than once?

A.   Yes.

Q.   More than five times?

(Pause.)

A.   I don't know the answer to that.

Q.   Every communication you had with Kara Voorhies was about FEMA?

MR. NEWMAN:  Object to form.

A.   I don't -- I don't know.

Q.   Did you communicate with Kara Voorhies about FEMA?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 90

foundation.

A.   That's my understanding.

Q.   You can set that aside.

Turning to January 2025, do you recall the President issued a hiring freeze for all civilian positions when he took office on January 20, 2025?

A.   Yes.

MR. HOSHIJIMA:  I'm handing you Exhibit 38.

(Whereupon, Plaintiffs Exhibit 38 was marked for identification.)

Q.   This is an OMB/OPM memorandum dated January 20, 2025.  Bates number is -0428.

Do you recognize this document?

A.   I do.

Q.   And it's guidance from OMB and OPM on how to implement the President's hiring freeze.  Right?

A.   Yes.

Q.   Would your office, DHS OCHCO, have been involved in implementing this guidance?

A.   Yes.

Q.   And the President's hiring freeze.  Right?

A.   Yes.

Q.   So you're familiar with this document?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 91

Q.   Looking at the Mandatory Exemptions in Paragraph 3 that start at the bottom of the first page, if you turn to the next page, you see that the exemption in Paragraph 3b is for positions related to immigration enforcement, national security, or public safety?

A.   I see that.

Q.   Do you recall that exemption from the hiring freeze?

A.   I do.

Q.   Do you see that Paragraph 4 includes Other Exemptions?

A.   I do.

Q.   And if you turn to Page 3, the exemption in Paragraph 4m refers to:

Term and temporary
appointments of existing
Federal employees may be
extended up to the maximum
allowable time limit,
consistent with the
conditions/requirements of the
legal authority originally used
to appoint the employee.

A.   I see that.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 92

Q.   So these are two different exemptions to the government-wide hiring freeze.  Right?

A.   Correct.

Q.   This exemption in Paragraph 4m is an exemption that applies when you're extending the terms of existing term employees.  Right?

A.   Correct.

Q.   That exemption, then, would apply to FEMA COREs.  Right?

A.   I believe that exemption would apply, but Section 4 also says "are permitted."

So it allowed for agencies to still make determinations.

Q.   So DHS would have made the determination about whether the Paragraph 4m exception applied to FEMA COREs.  Right?

MR. NEWMAN:  Objection to form.

A.   Correct; for all of these.

Q.   That would have been your office in DHS OCHCO that made that decision?

A.   No, that would have been someone in senior leadership.

Q.   Someone at the DHS Office of the Secretary level?

A.   Office of the Secretary, deputy secretary,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 95

misstates testimony.

A.   I said that I'm not sure who would have made it and said it could have been -- any of DHS senior leadership or FEMA leadership could have made, probably, that decision.

Q.   But you don't know who made that decision?

MR. NEWMAN:  Objection; asked --

Q.   And you don't know --

MR. NEWMAN:  -- and answered.

Q.   -- the outcome of that decision?

A.   I do not.

MR. HOSHIJIMA:  Introducing Exhibit 39.

(Whereupon, Plaintiffs Exhibit 39 was marked for identification.)

Q.   This is an email produced to us by the government with Bates stamp -0435.  It's an email from Amanda Scales to you and Mischell Navarro.

Do you recognize this email?

A.   I do.

Q.   Amanda Scales was OPM chief of staff at this time of this email, which is January 21st --

MR. NEWMAN:  Objection --

Q.   -- of 2025?

MR. NEWMAN:  Objection;

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 96

foundation.

A.    I'm sorry.  Say the question one more time?

Q.    At the time of this email, which is January 21, 2025, Amanda Scales was the OPM chief of staff.  Right?

A.    I don't recall her title, but I know she was at OPM.

Q.    Taking a look back at the hiring freeze memorandum, or guidance, in Exhibit -- in the Exhibit 38, if you look at Page 6, at the top, it says Amanda Scales is chief of staff at OPM?

A.    I see that.

Q.    So this email is the next day.  Right?

A.    Yes.

Q.    She's following up over email, saying that:

                Given clear relevance to
             the exemption criteria, DHS is
             not impacted by the hiring
             freeze.

          Do you see that?

A.    I see that.

Q.    So Amanda Scales is following up because you reached out to OPM to ask if the President's

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 110

Q.    This is the form that components would use to request additional exceptions to the hiring prohibition.  Right?

MR. NEWMAN:  Objection; misstates evidence.

A.    To the -- yes.

Q.    Because, as a default, no component or office can hire somebody that's not on the list in Attachment 1?

A.    C- --

MR. NEWMAN:  Objection to form.

Q.    And Attachment 2 is the form that allows components to request additional exceptions?

A.    Correct.

Q.    The form is supposed to be submitted, according to the component instructions at the top, to an email address called hiringrequests@hq.dhs.gov?

A.    Yes.

Q.    Do you know where that email goes?

A.    My team.

Q.    In DHS OCHCO?

A.    Correct.

Q.    And approved forms, it says, will be sent back to the component, with a copy to DHS OCHCO.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 111

Right?

A.   Correct.

Q.   So you would -- so your office would get the form, as submitted by the components, and also any approvals of the form?

A.   Correct.

Q.   But your office isn't the one that actually decides whether to approve the request. Right?

A.   Correct.

Q.   That decision is by the Office of the Secretary?

A.   Correct.

Q.   That's the DHS Office of the Secretary?

A.   Yes.

Q.   At the bottom, then, where it says "for the Office of the Secretary's use only," do you know who in the Office of the Secretary can authorize the hiring of somebody through this form?

A.   I do not.  So I know the group that it went to.  I don't know if there are any other authorizers.

Q.   And the group that it went to would have been that group of four people that you told me about earlier?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 112

A.    Correct.

Q.    So you -- your office would have sent this form, as completed by a DHS component, and send it up to those four people?

A.    Correct.

Q.    But you don't know who in the Office of the Secretary is actually able to approve one of these verification requests?

A.    Correct.  We normally got them back from one of the people in the group.

And, actually, I think -- at least the ones that I directly saw always came back from someone from within that group.

Q.    Someone in that group of four would have emailed the approved form back to you?

A.    Or they would have emailed me back that it was approved.

Q.    And that would have been by email, not through the STORM system?

A.    Correct.

Q.    So when you saw the forms that came back approved, who had signed the Office of the Secretary's signature line?

A.    So most of the time, the actual form itself would not come back.  It would just be an

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 113

email saying that the action was approved to process.

Q.   So there may be a signed version with the approval signature in the Office of the Secretary, but it doesn't necessarily come back down to you?

          MR. NEWMAN:  Objection; foundation.

A.   Correct.

Q.   Even though the instructions at the top say:

          Approved forms will be sent back with a copy to DHS CHCO.

A.   Correct.

Q.   Did you see any approved forms with a signature in the Office of the Secretary's signature portion?

A.   Not that I personally recall, but the forms would have come -- if they went through the regular process, they would not have come back to me directly.  They would have gone to my team who was handling the process -- the hiring request box.

          But the ones that came back to me, no, I did not.

Q.   But sometimes you sent a component's

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 114

hiring verification process form to the four people that you mentioned earlier.  Right?

A.   Correct.

Q.   And in those cases, you would have gotten the approval decision?

A.   The decision -- correct.

Q.   But you don't recall ever seeing a form with a signature from the Office of the Secretary that indicates an approval?

A.   Not that I recall.

Q.   Do you know if Secretary Noem ever herself signed these forms to indicate approval?

A.   I do not.

Q.   Do you know if she delegated the authority to sign these to somebody else in the Office of the Secretary?

A.   I don't know.

Q.   The form, when the components sign it, would have been signed by somebody in the component.  Right?

A.   Correct.

Q.   It's -- where it says "component or office head signature"?

A.   Correct.

Q.   That would have been, for FEMA, the FEMA

Page 115

Senior Official Performing the Duties of the Administrator?

A.    Correct.

Q.    So what was DHS OCHCO'S role in deciding whether to approve one of these component requests?

A.    We did not have an approval role.

Q.    You just sent it up?

A.    Correct.

Q.    So DHS OCHCO received these forms from components, but you were just a link in the chain when you sent it up?

A.    Correct.

Q.    When you passed --

COURT REPORTER:  Excuse me.  Did you answer that question?

WITNESS:  I said, "Correct."

Q.    When you passed a component's form up the chain, DHS OCHCO didn't attach a recommendation about whether or not to approve it.  Right?

A.    That's correct.

Q.    You were just purely a conduit?

A.    Correct.

Q.    At the instructions up top, you saw where it says:

Disapproved forms will be

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 116

returned to the component or
office head.

A.   I see that.

Q.   Do you recall seeing disapprovals come back down the chain?

A.   No.

Q.   So when your office passed this form up to the four people we talked about, Joe Guy, Troup Hemenway, Greyson McGill, and Stephen Munoz, do you know what they did with the forms?

A.   I do not.

Q.   Do you know if those four people decided whether to make the approval?

A.   I don't know.

Q.   You don't know if they passed it up to people above them?

A.   I don't know.

Q.   You never asked?

A.   I did not.

Q.   You were never curious?

A.   No.

Q.   Why not?

A.   I needed the approval from someone who is in the leadership chain.

As far as I knew, the individuals that

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 117

were responding to me had the authority to approve, or had already gotten the approval that they needed.

So that's what I acted upon.

Q.   Who told you that those are the people you should reach out to for the approval?

A.   When we set the original process up, I believe we worked it through with Greyson McGill.

Q.   Who was the chief of staff of the Management Directorate?

A.   That's correct.  Who was.

MR. HOSHIJIMA:  We're up to Exhibit 41.

(Whereupon, Plaintiffs Exhibit 41 was marked for identification.)

COURT REPORTER:  Try to keep your voice up.  You're very soft-spoken.

WITNESS:  Okay.  Will do.

Q.   I'll represent this is a document produced to us by Defendants in this case with Bates No. -0403.

Do you recognize these emails?

(Witness reading.)

A.   I am -- I am familiar with the initial email that went out to the HCLC, which is the human leader -- Human Capital Leadership Council.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 134

A.   That's correct.

Q.   Because your office is generally involved in implementing executive orders?

A.   Executive orders --

Q.   Related -- related to personnel.

A.   Correct.

MR. HOSHIJIMA:  I'm handing you what we will mark as Exhibit 43.

(Whereupon, Plaintiffs Exhibit 43 was marked for identification.)

Q.   This is a memorandum from OMB and OPM to the "Heads of Executive Departments and Agencies," dated November 5, 2025, titled "Guidance on Executive Order 14356."

Do you recognize this guidance?

A.   I do.

Q.   This is OMB and OPM's guidance for the executive order we just reviewed in Exhibit 42. Correct?

A.   Yes.

Q.   And it's giving guidance on submission of those final annual staffing plans that were described in the executive order?

A.   Correct.

Q.   Under these directions from OMB and OPM,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 135

DHS's final annual staffing plan for fiscal year 2026 was due December 1, 2025.  Right?

A.    That's correct.

Q.    You were involved in transmitting DHS's final annual staffing plan for fiscal year 2026 to OMB and OPM?

A.    Correct.

Q.    Do you know how DHS sent that staffing plan to OMB and OPM?

A.    I am not aware.

I was involved in the preparation of it and putting it into clearance.  I do not have a final version of it.

Q.    You don't have a final version of DHS's annual staffing plan sent to OMB and OPM?

A.    I do not.

Q.    When you say you don't "have" it, you mean you never saw the final version of the staffing plan?

A.    I did not.

Q.    You said you were involved in the preparation and clearance?

A.    Correct.

Q.    What do you mean when you say you were involved in the preparation of that document?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 136

A.   So my office submit -- sent the template out to the components, received the template, aggregated them into the final plan, and then created the memos to send it forward in the STORM system up to the front office, through the clearance channels, for approval.

Q.   So that actually covers preparation and clearance, which is what I was going to ask about next.

A.   Okay.

Q.   So when you say "clearance," you mean that your office compiled everything you got from the various DHS components into a staffing plan and sent it up for approval through the STORM system. Correct?

A.   Correct.

Q.   Who did DHS OCHCO send that staffing plan to for clearance?

A.   So from my office, it would have gone then to the under secretary for management for clearance. So....

And then from there, it would go up the chain for the secretary's signature.

Q.   Do you know who else would have been along that chain?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 137

A.    I do not know.

Q.    When your office put the compiled annual staffing plan into STORM, would there have been a routing sheet that identifies all of the decision-makers along the way?

A.    So I mentioned earlier, I'm not quite sure how STORM works.

So my understanding is we would have put the document in.  We would have said that it was identified for secretary's signature.

And then throughout the process, whether it's our management ExecSec or otherwise, they would add in who their appropriate reviewers were, once it reached the particular office.

So, for instance, if it got to the DHS ExecSec, which supports the secretary and deputy secretary's office, they would then determine who else it may have needed to go to for review and concurrence.

Q.    You do know, though, that the staffing plan that DHS OCHCO compiled went all the way up to former Secretary Noem.  Right?

A.    I do not know that.

Q.    I thought that's what you had told me just now.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 138

A.    I said that we put it in clearance for routing to go to Secretary Noem.  I don't know that it made it to Secretary Noem.

Q.    Who would have made the decision about how far up that chain it went?

A.    Throughout the process, it could have been anybody, but it would have been in the DHS front office -- someone in, probably -- someone in the DHS front office -- the secretary or the deputy secretary's office.

MR. HOSHIJIMA:  I'm handing you an exhibit that was previously marked in this litigation as...let me double-check here...Exhibit 6.

Q.    This is a document that was produced in other litigation.

It appears to be a document called a "Department of Homeland Security Record of Clearance and Approval."  And it has a STORM number next to it.

Do you recognize this document?

A.    I have seen similar documents.

Q.    Similar documents related to personnel clearance -- related clearances that go into STORM?

A.    Correct.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 150

Q.    Have you asked anybody besides your team that you supervise whether you can see the final DHS annual staffing plan?

A.    I don't believe I have, no.

Q.    You've never asked anybody in the Management Directorate whether you could see the final annual staffing plan?

A.    So I recall pinging the front office, the management front office, to ask if they knew the status of it as well, or if they could give me an up- -- an update on it.

I don't recall what I got back from them.

Q.    Who did you ping for that update?

A.    Yeah.  That would have been Greyson McGill as the chief of staff.

Q.    Did you ever ask directly to anybody in the Office of the Secretary about the status of the final annual staffing plan?

A.    Not that I recall.

Q.    You never asked Joe Guy?

A.    No.

Q.    Never asked Troup Hemenway?

A.    I don't recall.

Q.    Your office is responsible for compiling the first quarterly update of the final annual

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 151

staffing plan.  Right?

A.    Yes.

Q.    But your office is doing so without having seen the final staffing plan that you're up- -- you're creating the update about?

A.    Correct.

Q.    How are you doing that?

A.    Components are still operating each and every day.

And so, what their needs are, while -- with a staffing plan and having the approved staffing plan would be great, they're operating each and every day.

And so, within the quarter, their -- they may know that their requirements have changed.

And so, my guidance to the components is, in the quarterly updates, assume that your staffing plan is approved, and then give me updates based on where you were when you submitted your original staffing plan.

Q.    So DHS components have asked you for updates about the status of the DHS staffing plan. Right?

A.    They have.

Q.    And you're telling them you just don't

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 152

know?

A.   Correct.

Q.   Your instructions to DHS components, then, has been to assume that what they submitted to DHS OCHCO previously has been approved?

A.   To assume that they need to operate -- that that's what they submitted, that's what their -- their requirements were, and they just need to update it based on what they originally submitted as their requirements.

Q.   Do you know if the DHS headquarters has disapproved any submission for the annual final staffing plan by a DHS component?

A.   Not that I'm aware.

Q.   So when you sent up the compiled version through the STORM system, you've heard nothing back?

A.   When we sent the original forward, it came back, at one point, with comments that we addressed the comments and then sent it back into the clearance process.

But I don't have a final version of it.

Q.   Would that have been in December 2025?

A.   I don't recall if it was December or if it was January.

Q.   Who were those comments from?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 197

Q.    When would those two requests have been?

A.    I don't know the exact date.  I know that one was received in January.

And I'm not sure the date -- the month of the other one.

Q.    Was the other one before or after the one you recall being in January?

A.    I don't remember if there was one that somehow came in December, in preparation for January, or if it was -- I saw the one in January, then there was one in February.

So that's the problem.

So there were two that came somewhere in that, I think, December to February time frame.

Q.    Those two transmissions, did they come from FEMA to you?

A.    They did.

Q.    Did you ask for them?

A.    I did not.

Q.    Why did FEMA send you those two sets of data about CORE expiration dates?

MR. NEWMAN:  Objection; foundation.

A.    They were in alignment with the approval process that we had put in place for hiring.  And

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 198

so, my team handled the hiring.

Ms. Evans had worked out a expedited review for the CORE renewals to try to ensure that the CORE renewals that they were recommending for approval were -- made it through our process expeditiously.

So those would have come to me directly, since she had the conversation with me to make sure that I could actually push them up to the front office.

Q.   You're not sure if those were directly related, though, to the data pulls we're talking about in Exhibit 26?

A.   Correct.

Q.   Do you know who in the office of S1 would have been asking for this information?

A.   I don't.

Q.   No idea?

A.   No.  No idea.

Q.   So you're aware that in December, FEMA's authority to renew some COREs on its own was expiring.  Right?

A.   Correct.

Q.   And that was because the Kristi Noem approval that we saw earlier, reinstating FEMA's

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 199

authority to renew COREs, went only until the end of December?

A.    Correct.

Q.    Do you know if FEMA ever requested to extend that reinstatement of FEMA's authority by DHS beyond the end of December?

A.    I don't recall.

Q.    Do you remember any discussions that you had with anyone about FEMA requesting an extension of that authority from DHS?

A.    Not that I recall.

Q.    You just remember that FEMA's authority was going to expire?

A.    The only way that I remember that is because of the document that you showed earlier.

So FEMA typically tracks what authorities they have or don't have.  And then in alignment with that, once it expired, then they knew that they had an obligation to come back.

MR. HOSHIJIMA:  I'm marking this as Exhibit 45.

(Whereupon, Plaintiffs Exhibit 45 was marked for identification.)

Q.    This is a document that was produced to us with Bates number starting -0400.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 200

Do you see that the top email in this chain is an email from Karen Evans to you?

A.    I do.

Q.    Do you remember this email?

(Witness reading.)

A.    Not specifically, no.

Q.    The emails lower down in the chain that Karen Evans is forwarding to you are emails about La' Toya Prieur, the FEMA CHCO, providing information to Karen Evans about CORE renewals. Right?

A.    I see that.

Q.    Do you know why Karen Evans was forwarding this information to you?

A.    I don't recall the context.

Q.    If you look at this middle email with the table in Ms. Prieur's email, do you see that it involves numbers about the numbers of COREs renewed and off-boarded in the second half of 2025?

A.    I see that.

Q.    And by "second half," I mean May 1st to November 30, 2025.

A.    I see that.

Q.    And there's also a discussion of a history of the delegation to renew COREs?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 201

A.   I see it.

Q.   Do you see that box next to the delegation to renew COREs recounts some of this history we've discussed today, starting with the March 2025 hiring verification memo, Roger Brown's email about MCO COREs, and the Noem memo reinstating FEMA's authority to renew COREs?

MR. NEWMAN:  Object to form.

A.   And, I'm sorry, the last point?

Q.   That this history involves S1's approval of FEMA's authority to extend non-MCO CORE appointments.

A.   Got it.  Yes.

Q.   Did you ask Karen Evans for this information?

A.   I don't recall.

Q.   Did somebody ask you to ask her for this information?

A.   I don't recall.

Q.   When you received the information from her, did you pass it on to anybody else in DHS?

A.   Yeah, I don't -- I don't know if I forwarded it or not.

Q.   How common would you say it was that Karen Evans would directly send you some information about

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 208

two years.

Do you see that?

A.    I do.

Q.    But that's not consistent with what Mr. Brown had told Ms. Prieur when the hiring verification process memo came out.  Right?

MR. NEWMAN:  Objection to form.

A.    I would need to go back and....

Do you happen to remember which exhibit that was?

Q.    Exhibit 41 is Mr. Brown's email to Ms. Prieur.

(Witness reading.)

A.    Okay.  And I'm sorry.  Your question again?

Q.    We discussed earlier that MCOs, or mission critical occupations, are excepted from the new hiring verification process by DHS.  Right?

A.    Correct.

Q.    So any COREs that are MCOs did not have to go through a DHS approval process to be renewed by FEMA.  Right?

A.    Any COREs that were a PMCO or MCO. Correct.

Q.    Sorry.  Can you say that again?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 209

A.    Any COREs that were a PMCO or MCO did not need to go through the approval process?  Is that what you asked?

Q.    Right.

A.    Correct.

Q.    So Ms. Evans is misreading Mr. Brown's email here when she says that it appears FEMA OCHCO has no authority to extend any MCO agreements for two years?

MR. NEWMAN:  Object to form.

A.    So I think that this is in conjunction with the other email for the -- from the secretary.

What's the timing on this?

Yeah, the other email from the secretary where the secretary said that they do not have the authority to go for two years, but they had the -- not the secretary -- yeah, from the secretary -- that they had the authority for a certain -- 180 days, I think, but not for two years.

Q.    You're referring to Secretary Noem's approval memo in Exhibit 21?

A.    Correct.

Q.    The memo that you said you had not recalled seeing before today?

A.    Correct.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 210

Q.   We discussed how this was reinstating FEMA's authority to renew COREs that had been taken away by the March 2025 hiring verification process. Right?

MR. NEWMAN:  Object to form.

A.   Correct.

Q.   But as to MCO COREs, FEMA never had to go through the hiring verification process to renew those COREs' terms.  Correct?

MR. NEWMAN:  Object to form.

A.   For PMCO, MCO.

And I don't know if there was any other conversation that occurred with the front office that limited them even further than what was in the initial memo.

But based on the memos, that's correct. They would have had approval for the PMCOs and MCOs.

MR. HOSHIJIMA:  Let's take a look at what I will label as Exhibit 47, as soon as I find it.

(Whereupon, Plaintiffs Exhibit 47 was marked for identification.)

Q.   Exhibit 47 is a document produced to us under Bates number starting -0420.

Do you see that it's another email from

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 211

Ms. Evans to you on December 19th?

A.   I do.

Q.   It's later in the same day after these two previous email forwards that you had received from her?

A.   I do.

Q.   She's forwarding you three different email threads about COREs within the space of an hour. Right?

A.   Correct.

Q.   Do you recall why she was forwarding you three email threads related to CORE renewals on that day?

A.   I still don't recall the genesis of -- of the email strings.

Q.   Based on what you recall was happening in mid-December of 2025, do you know why Karen Evans would be sending you information on FEMA COREs?

A.   The only thing that I can think of is that there....

I don't know for sure.

Q.   Do you have any recollection of what was happening in mid-December 2025 about FEMA CORE renewals that might have prompted Ms. Evans to send you this information?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 212

A.    So there are two things, and I'm just hazy on the timeline.

So one would have been the creation of the staffing plan, which would have identified the numbers and -- across the organization.

And then the other is just the tracking of how many employees were on the rolls and kind of seeing the increases or decreases of employees on the rolls across the Department.

Q.    Why would you and Ms. Evans have been talking about the number of FEMA employees on the rolls at this time in December 2025?

A.    So I don't know about at this time in 2025, because, again, I cannot recall if we had a specific conversation about that.

But again, we were just doing regular tracking.  I think she had just gotten to FEMA, and so she was trying to get a lay of the land for whether or not they were adhering to the hiring process.

And so, she probably looked at reporting to see where their -- where their numbers were.

Q.    Ms. Evans had been at FEMA since mid-summer.  Right?

A.    Right.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 213

Q.   But you're saying that because Ms. Evans had recently taken the top role at FEMA, that you think she may have been looking into the number of FEMA COREs on the rolls?

A.   And again, this is one of those times when it's not good for me to speculate, because I'm not sure what she was doing.

But we were working on the staffing plan during that time, so....

Q.   You were working on the staffing plan with Ms. Evans?

A.   No.  The components were working on their staffing plans to be able to submit them.

Q.   But Ms. Evans was sending this directly to you.  Right?

A.   So as the staffing plans were coming in, Ms. Evans probably noticed that maybe there was some issue.

So I don't know -- I don't know if that's the reason or not.

Q.   Because you had testified earlier that DHS components' submissions for the DHS staffing plan came in through your data team.

A.   Correct.

Q.   Right?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 214

And you have a whole data team of people that compiled that into a DHS staffing plan.  Right?

A.   Correct.

Q.   How many people are on that data team in DHS OCHCO?

A.   I don't know the full staffing.  I think it's between five and seven.

Q.   You have five to seven people working on your data team, collecting information from DHS components about staffing levels.

And yet, Karen Evans is sending some of this information about FEMA COREs directly to you.  Right?

MR. NEWMAN:  Object to form.

A.   Correct.

Q.   And you don't have any recollection of why?

A.   I don't.

Q.   Would it have been unusual for Ms. Evans, as the head of a DHS component, to be sending you that kind of data about COREs when you have a data team that's receiving this kind of information through a process that's established for that purpose?

MR. NEWMAN:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 228

So....

Q.   Even when she was at CISA, then, she may have weighed in on personnel matters at other DHS components?

MR. NEWMAN:  Objection; calls for speculation.

A.   I am -- I'm honestly not sure.

Q.   So what did you mean when you said she was very active at DHS?

A.   Yeah.  So she's -- she was one of the senior politicals in the Department.

So if -- you know, as -- we had a lot of actings, etc., across the Department.

It's -- she may or may not have also been tapped to help support another component from where she was currently sitting.

So I'm just not -- I'm just not sure.

Q.   Because she was successfully cutting a third of CISA.  Right?

MR. NEWMAN:  Objection -- objection to form.

A.   I'm not sure if that's the reason or it's just because she's just a successful manager.

Q.   Successful in cutting a third of CISA. Right?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 229

A.    I'm not sure if that's it or if she's just a successful manager.

Q.    Looking at Exhibit 48, which we just handed you.  This is a document produced to us with Bates number starting -0600.

Do you see the email on December 19th, 12 -- at 12:26 p.m., where you said that:

La' Toya and I had a quick chat and will sync on the numbers and respond back to you.

A.    I do see that.

Q.    This is a response to the prior email we reviewed, where Ms. Evans had forwarded you information about which you were both working on from the other side?

A.    I see that.

Q.    What did you and Ms. Prieur chat about after this email from Ms. Evans?

A.    From what I recall of the chat, it was just that -- whether or not she had any information about -- to try to answer Mrs. Evans' question about whether or not we had any additional authorities that I wasn't aware of, was one.

And then I think the second one was just

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 230

to try to get an understanding of all the CORE counts to make sure that they were accurate based on the -- what she was pulling on her -- from her data side.

Q. Why were you, as DHS CHCO, getting involved in confirming the numbers of FEMA COREs?

A. From a -- from a component perspective, they have data systems to be able to pull their information directly.

As a Department, we also have the ability to go in and validate whether or not the numbers are correct, once they've gone through all of the pay processing rules.

So we would have access to the data. They would also have access to the data.

So I think it was just a validation point.

Q. Do you recall checking the data that DHS had on CORE renewals?

A. I do recall pulling a report, or having the team pull a report.

I don't recall what the balance looked like between our report and with -- and the FEMA report.

Q. If you look back at Exhibit 48, do you see that Ms. Prieur, later that afternoon, sends you an

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 231

email saying:

I have the following data re: CORE employees.

A.   I see that.

Q.   That email is just to you.  Right?

A.   It is.

Q.   Not responding to Ms. Evans?

A.   I think this was the two of us thinking -- to make sure that we could go to Ms. Evans with a consolidated response.

Q.   You forwarded these numbers to Huy Le?

A.   Huy Le?  Yes.

Q.   Why did you forward these numbers to Huy Le?

A.   Huy is the head of the data analytics team that we talked about.

And so, Huy would have then pulled the -- he would have been the person who could pull the data for me to determine if our numbers matched with what FEMA provided.

Q.   Who else would you have shared these numbers with?

A.   At this stage?

Q.   Right.

A.   It would have just been Huy.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 232

Q.   Are there other stages when you would have shared data about CORE renewals with somebody in DHS headquarters?

MR. NEWMAN:  Object to form.

A.   Not -- not as a part of this issue, I don't believe, no.

Q.   As a part of other issues?

A.   If there was an issue, like, I would certainly let my leadership know.  But there weren't any.

But in theory, if there were, I would let my leadership know if there was something I thought would raise to their level.

Q.   Do you see that the information that Ms. Prieur is sending you breaks out the number of CORE renewals for two different time periods, between January 1st and November 30th and January 20th and November 30th?

Do you see that?

A.   I see that.

Q.   Did you ask for her to break out those numbers between two different time frames?

A.   I don't recall specifically asking her for those time frames.

Q.   Who asked her to break those numbers down

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 233

in those time frames?

MR. NEWMAN:  Objection;
foundation.

A.   I don't know.

MR. HOSHIJIMA:  Good time for a
quick break?

WITNESS:  Works for me.

MR. HOSHIJIMA:  Let's go off the
record.

VIDEOGRAPHER:  Off the record at
3:02.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at
3:18.

MR. HOSHIJIMA:  Mr. Edwards, I'm
handing you Exhibit 49.

(Whereupon, Plaintiffs Exhibit 49 was
marked for identification.)

BY MR. HOSHIJIMA:

Q.   This is a document produced to us with
Bates number starting -0446.  The top email is an
email from Ms. Prieur to you and Ms. Evans,
continuing on December 19, 2025.

That's the day we were talking about with
the last few emails.  Right?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 234

A.   Yes, sir.

Q.   This is a continuation of that last email thread we were discussing?

A.   I see that.

Q.   You and Ms. Prieur were going to sync on the numbers and respond back to Ms. Evans?

A.   Correct.

Q.   And this is Ms. Prieur sharing more data about CORE appointments with a lot of people who were originally on the thread?

A.   I see that.

Q.   Including Ms. Evans and Ms. Voorhies?

A.   I see that.

Q.   Do you see that the CORE renewals for different time periods are broken out by different mission critical occupations?

A.   I see that.

Q.   Did you ask for the data to be broken out that way?

A.   Not that I recall.

Q.   Did somebody at DHS ask for that data to be broken out that way?

A.   Not that I recall.

Q.   Do you see that the data shows that COREs perform various mission critical occupations,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 274

Do you see that?

A.   Yes.

Q.   If you pull up Exhibits 53 and 54, which were Ms. Glaze's email with an expedited summary -- request summary and Ms. Prieur's email to you with the 28 personnel action requests, do you see how those -- the subject lines of those emails are the attachments to your January 22nd email?

(Witness reading.)

A.   I do.

Q.   So are you saying that those two prior batches of FEMA requests have been approved?

MR. NEWMAN:  Object to form.

A.   I believe that's what I was saying.

Q.   And you're now communicating that approval back to FEMA.  Right?

A.   That's correct.

Q.   Who told you that these FEMA requests have been approved?

A.   I actually don't recall who gave me that approval.

Q.   You're not the person who made the approval decision.  Right?

A.   No, I'm not.

Q.   It's somebody higher up the chain of

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 275

command that you sent the requests to?

A.   That's correct.

Q.   Or that somebody on your team had sent the requests to?

A.   That's correct.

Q.   Do you know if it was somebody in the DHS Personnel Verifications Actions Leadership group?

A.   I don't recall who it came from.

Q.   Do you know if somebody in the DHS Personnel Verifications Actions Leadership group would have sought approval from someone above them?

A.   I'm not sure.

Q.   So you don't know who's actually making this approval decision.  Right?

A.   I do not.

Q.   When you send up these requests and you're told that they're approved, how do you usually find out about the approvals?

A.   Normally, the approvals come back by email.

Q.   Email from who?

A.   It just depends.  The large majority of them came to me from Troup Hemenway.

Q.   Troup Hemenway, the principal deputy chief of staff at --

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 276

A.    Correct.

Q.    -- DHS?

So in this email in Exhibit 57, where you're reporting to Ms. Prieur that all of these FEMA requests are approved, that approval came from somebody like Troup?

MR. NEWMAN:   Object to form.

A.    It would have come from someone in the DHS front office, yes.

MR. HOSHIJIMA:   Turning to Exhibit 58.

(Whereupon, Plaintiffs Exhibit 58 was marked for identification.)

Q.    This is a document produced to us with the Bates stamp -0839 and an email chain, where the bottom email in the thread is your email on January 22nd communicating approvals to FEMA.

Do you see that?

A.    I do.

Q.    And Ms. Glaze is forwarding the email to DHS Personnel Actions to say:

Annotate approval in the
tracker.

A.    I see that.

Q.    Is that the tracker that we were

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 296

Q.   And when you say you just sent it forward, who did you send that forward to?

A.   I would have -- I believe I would have sent it to Joe Guy, Troup Hemenway, Steve Munoz, and Grey McGill.

Q.   Those are the people that you send the verification requests to?

A.   Correct.

Q.   But you don't know if they're the ones making the decision.  Right?

A.   That's correct.

MR. HOSHIJIMA:  Are we up to Exhibit 64?

COURT REPORTER:  Um-hum.

(Whereupon, Plaintiffs Exhibit 64 was marked for identification.)

Q.   This is a document produced to us with Bates stamp -0713.

Do you see that?

A.   I do.

Q.   This is your response to Ms. Prieur saying:

These are clear to move
out on.

Do you see that?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 297

A.   I did.

Q.   And you're attaching an email, if you go to the second page, that was Ms. Prieur's request for renewal of 130 COREs with renewal dates between January 19th and February 9th?

A.   Yes.

Q.   So these are the requests that, because Ms. Glaze was out, you forwarded on, on February 3rd.  Right?

A.   Correct.

Q.   And a week later, you are communicating the approval to Ms. Prieur?

A.   Correct.

Q.   Do you know what happened between when you sent up the approval to Mr. Guy and the others and February 10th, when you're communicating the approval to FEMA?

A.   I do not.

Q.   Do you know who, over the course of the week, reviewed these requests?

A.   I do not.

Q.   When you say, "These are clear to move out on," who told you that these requests are approved?

A.   I don't remember.

Q.   Would it have been Mr. Guy?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 298

A.    It could have been.

Q.    And you are still personally involved in this process, even though you have a whole big staff of 200-some people in DHS OCHCO.

Why is that?

MR. NEWMAN:  Object to form.

A.    In particular, during this period, we were furloughed.  So we have a skeleton crew right now.

So we are all doing double- and triple-duty at this time.

Q.    So you're personally involved in passing on the paperwork that you get from FEMA further up the chain?

A.    Yes, sir.

Q.    Without weighing in on the recommendations at all?

A.    Yes, sir.

Q.    Were you instructed by someone at DHS to send these approvals up the chain without weighing in on them?

A.    No.

Q.    Who was the one who instructed you to send these approval requests you got from FEMA to Mr. Guy?

MR. NEWMAN:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 299

A.   So he would have been in the group anyway that I believe Grey McGill gave me that -- the group of -- like, the verification group anyway.

So he would have been in that group anyway.

What I did when I got them, because I knew that this was a topic that he had weighed in on, I just made sure that he specifically got it called out from me.

Because I didn't have access to the group box that the team was actually sending it to.

Q.   You knew that Joe Guy is the person that you're supposed to send these requests to?

A.   Because he handles the FEMA portfolio.

And that was the conversation that Ms. Evans had weighed in with me on and shared the email string.

MR. HOSHIJIMA:  Exhibit 65.

(Whereupon, Plaintiffs Exhibit 65 was marked for identification.)

Q.   These are emails produced with the starting Bates -8661.

And do you see that you're copied on this email thread?

A.   I do.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 304

A.    Correct.

Q.    They're Joe Guy and a few other people that are part of that group?

A.    Correct.

MR. HOSHIJIMA:    Exhibit 66.

(Whereupon, Plaintiffs Exhibit 66 was marked for identification.)

Q.    This is a document produced to us with starting Bates -0160.

This is a continuation of the last email thread we saw.  Right?

(Witness reading.)

A.    Correct.

Q.    You are continuing that email thread by checking in with Mr. Guy about a FEMA request for CORE renewals.  Right?

A.    Correct.

Q.    And Mr. Guy responds to say that the renewal requests have been approved?

MR. NEWMAN:    Object --

A.    Correct.

MR. NEWMAN:    -- to the form.

Q.    And you say you'll let FEMA know.  Right?

A.    Correct.

Q.    Do you know what process Mr. Guy went

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 305

through to determine if these renewal requests are approved?

A. I do not.

Q. You don't know anything about what happens more than a level above you?

A. I don't.

Q. You're not curious about what happens up the chain of command?

MR. NEWMAN: Objection to form.

A. I am not.

Q. You just keep your head down and don't ask questions?

MR. NEWMAN: Objection; argumentative.

A. I ask questions when I need to.

Q. And you didn't need to know what Joe Guy was doing with the requests you sent up to him?

A. I did not.

MR. NEWMAN: Let's go to a document I'll have marked as Exhibit 67.

(Whereupon, Plaintiffs Exhibit 67 was marked for identification.)

Q. This is an email chain produced to us with Bates starting -0180.

And the top email in this chain is from

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 314

of 188 CORE renewal requests you received from FEMA.

Do you remember that?

A.   I do.

Q.   You sent those renewal requests to Mr. Guy, Mr. Hemenway, and Mr. McGill?

A.   Correct.

MR. HOSHIJIMA:  I am sending you -- not sending you -- handing you what we'll mark as Exhibit 69.

(Whereupon, Plaintiffs Exhibit 69 was marked for identification.)

Q.   This is a document that was produced to us with Bates number starting -0186.

And it's a continuation of that previous thread.

Do you recognize this email thread?

A.   It looks familiar.

Q.   If you look at the email that starts at the bottom of the first page, the 12:57 p.m. email on February 26th, that's the email you sent to Mr. Guy, Mr. Hemenway, and Mr. McGill with the request for 188 CORE renewals.  Right?

A.   Yes, sir.

Q.   Mr. Guy responds and says:

Unless Troup has

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 315

objections, this is good with

me.

Do you see that?

A.   I do.

Q.   Mr. Hemenway responds to the thread to say:

Send it.

Do you see that?

A.   I do.

Q.   And you understand that to be an approval?

A.   I do.

Q.   Which is why you respond to that thread and say:

Thanks.  I will get it
back to FEMA now.

A.   Correct.

Q.   Is this typically how you would find out when a renewal request from FEMA that you sent up had been approved?

A.   Yes.

Q.   But you don't know if Mr. Guy or Mr. Hemenway had shared this request with anybody else to seek approval?

A.   I do not know.

Q.   You don't know if they had approved this

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 316

on the direction of former Secretary Noem, do you?

A.    I don't know.

Q.    Do you know if Mr. Lewandowski might have been involved in the decision-making process?

A.    I don't know.

Q.    If Mr. Guy or Mr. Hemenway had been running these requests past Mr. Lewandowski, would you know?

A.    I would not know.

Q.    It's possible that's been happening. Right?

A.    It's possible.

Q.    You just don't have visibility into that part of the process?

A.    I do not.

MR. HOSHIJIMA:  I'm turning to a document that we will mark as Exhibit 70.

(Whereupon, Plaintiffs Exhibit 70 was marked for identification.)

Q.    This is a document produced to us with a Bates start of -0388.

Mr. Edwards, do you see that the second email in the thread is your email to Mr. Guy, Mr. Hemenway, and Mr. McGill with the 188 CORE renewals that we have been discussing?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 317

A.    I do.

Q.    Do you see, at the top of the thread, that Mr. Guy forwards that email to Ms. Voorhies?

A.    I see that.

Q.    Do you know why Mr. Guy forwards that email to Ms. Voorhies?

A.    I do not.

Q.    Do you know what Ms. Voorhies's role in this decision-making process is?

MR. NEWMAN:  Objection; calls for speculation.

A.    I do not.

Q.    Does it surprise you that Mr. Guy is sending this to Ms. Voorhies?

A.    I don't know that it surprises me.

Q.    Is it because you expected Ms. Voorhies might be involved in that process?

A.    No.  It's just that I don't know who they coordinate with, so I don't know that I would -- I don't know that I would be surprised that they coordinate with other people on the requests.

Q.    You testified earlier you're not actually sure what Ms. Voorhies's role in the agency is. Right?

A.    Correct.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 318

Q.   You don't know what her responsibilities are.  Right?

A.   I do not.

MR. NEWMAN:  Object to form.

Q.   But you don't know that she's in a position that's superior to Joe Guy, do you?

MR. NEWMAN:  Object to form.

A.   I do not know that.

Q.   She may be, but you don't know?

MR. NEWMAN:  Object to form.

A.   I don't believe that she is.

Q.   You don't believe that she's in a position superior to Joe Guy?

A.   I don't believe that she is, no.

Q.   What's your basis for thinking that?

A.   Serving in the secretary's office with the -- in terms of the principal -- the chief of staff, principal deputy chief of staff, and the deputy chief of staff, I don't -- I don't believe, in the hierarchy, that -- that this was -- that Kara Voorhies, whatever position she has, would fall above that, unless she was maybe a component head or a deputy component head.

Q.   Because there aren't that many levels between Mr. Guy and Secretary Noem?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 319

A.   That is correct.

Q.   And you're familiar with the people who are in that high level of the agency.  Right?

A.   Generally.

Q.   And you know that Mr. Guy is fairly high up in the agency, in the Office of the Secretary.  Right?

A.   Correct.

Q.   And you don't think that Ms. Voorhies is someone you are aware of as being in that part of the hierarchy?

MR. NEWMAN:  Object to form.

A.   That is correct.

Q.   So why do you think that Mr. Guy would be sending this approval request to Ms. Voorhies?

MR. NEWMAN:  Objection; calls for speculation.

A.   I do not know.

Q.   If she's not in that top of the hierarchy at DHS, wouldn't it be surprising that Mr. Guy is sending this to Ms. Voorhies?

MR. NEWMAN:  Objection; asked and answered.

A.   I am -- I'm not sure that I would be surprised.  I know that they coordinate with people

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 320

on these requests.

Q.   You know that they coordinate on what?

A.   I would expect that they would do whatever coordination they feel is necessary.

I just -- I don't have visibility into what that process looks like.

Q.   Are you aware of other situations in which Mr. Guy has coordinated with Ms. Voorhies on issues related to FEMA CORE renewals?

A.   Not that I'm aware of.

Q.   Do you know anything about any other topics on which Mr. Guy and Ms. Voorhies would have communicated?

A.   I do not.

Q.   Do you know how often they communicated?

A.   I do not.

Q.   Do you know what kind of relationship the two of them had?

A.   I do not.

Q.   What is the most recent set of not to exceed dates for which DHS has approved FEMA's renewal requests?

A.   I don't know which -- the -- you mean the requests that are coming up for all of the -- the package requests for the CORE renewals?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 321

Q.   For FEMA CORE renewals.

A.   I don't remember the last date that we got the package.

Q.   Do you recall seeing FEMA renewal requests coming up recently?

A.   I don't recall.

Q.   DHS, still today, has to approve the renewal of any FEMA CORE.  Right?

A.   As far as I know, yes.

Q.   And so, that would still be going up to DHS through the process that DHS set up.  Right?

A.   That is my understanding.

Q.   The process that never existed before March 2025?

MR. NEWMAN:  Object to form.

A.   That is my understanding.

MR. HOSHIJIMA:  Let's go off the record.

MR. NEWMAN:  Off the record at 5:19.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 5:27.

BY MR. HOSHIJIMA:

Q.   Mr. Edwards, as DHS CHCO, is part of your

Page 322

job responsibility to be familiar with some of the legal requirements that relate to personnel issues?

A.   Yes.

Q.   So legal requirements that pertain, for example, to information about department personnel. Right?

MR. NEWMAN:  Object to form.

A.   Yes.

Q.   Are you familiar with the Privacy Act?

A.   I am.

Q.   Looking to this email in Exhibit 70 that Mr. Guy sends to Ms. Voorhies, do you see that he's forwarding your email with the attachment that we saw in Exhibit 68, which was a spreadsheet containing individual justifications for CORE renewals?

MR. NEWMAN:  Object to form.

A.   I do.

Q.   Because the email that Mr. Guy is forwarding is your email that is Exhibit 67.

Exhibit 68 was that attachment.  Right?

A.   Correct.  I just wanted to just validate the attachment --

Q.   Yes.

A.   -- label, yeah.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 323

Q.   Mr. Guy forwarding this information about FEMA personnel to Ms. Voorhies, with the attachment of all this information, is that concerning to you?

A.   It would just depend on the need to know, of why she was involved.  And I -- and I don't know that, so....

Q.   Ms. Voorhies is a contractor for DHS?

MR. NEWMAN:  Objection; foundation.

A.   I am not sure.

Q.   You don't know if she's an employee or a contractor?

A.   I do not.

Q.   Even though your job is to be overseeing DHS personnel?

MR. NEWMAN:  Objection; asked and answered.

A.   That is correct.

Q.   If she were a contractor, would you be concerned with Mr. Guy sending over some of these employee personal information?

MR. NEWMAN:  Object to form.

A.   It just depends on how her contract was structured and what her role was and responsibility was in terms of using the data that he sent.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 324

Q.   You don't have any concerns about the Privacy Act implications of that?

MR. NEWMAN:  Objection; calls for a legal conclusion.

And also, I'll instruct the witness, you can give your understanding. But to the extent that you've had communications with counsel regarding the Privacy Act, please don't disclose the -- those communications.

WITNESS:  Understood.

A.   The question, one more time?

Q.   You don't have any Privacy Act concerns with Mr. Guy sending over employees' personally identifiable information to a contractor?

MR. NEWMAN:  Same objection.

A.   Again, it just depends on how the contractor is vetted and what their role is in the Department.

Q.   And you don't know what Ms. Voorhies' role in the Department is.  Right?

A.   I don't, at this time.

Q.   You don't know how she was vetted?

A.   I don't -- if she is on a contract, I am not sure.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 325

I'm not sure what role she was serving and whether or not there was a need to know.

Q. You don't know if Ms. Voorhies had a need to know this information. Right?

A. I don't know, no.

Q. Because you have no idea why Mr. Guy's sending her this information?

A. That is correct.

Q. Do you know if Ms. Voorhies was contracted by DHS to maintain any personnel records databases?

A. I don't. I don't know.

Q. And if she were not contracted for that purpose, would there be concerns with sending some of this PII over to her?

MR. NEWMAN: Objection to the extent it calls for a legal conclusion.

A. And again, I would say that it would be the same answer as before, that I am not sure what her role was, whether -- if she is a contractor, what she is vetted to do on behalf of the Department, and what information she can be privy to.

Q. Do you know who in DHS would know what her contract is?

A. If she is a contractor, then the officer,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 326

the chief procurement officer, would be able to let us know under which contract she -- she works.

Q.   And Mr. Guy would know, because she's -- he's sending this information over to her.  Right?

MR. NEWMAN:  Objection; foundation.

A.   I'm not sure if he actually knows what contract she is on.

Q.   If he doesn't know what the nature of her contract is and Mr. Guy is sending over some of this personally identifiable information of employees, would that be a concern to you?

MR. NEWMAN:  Objection; calls for a legal conclusion.

A.   I don't know that that would still be a concern, as long as she's been appropriately vetted within the Department.

Q.   If Mr. Guy were not aware of how Ms. Voorhies were vetted and he was sending this information over to her, would that be a concern to you?

A.   If Mr. Guy was not aware of Ms. Voorhies' role within the Department, that would be a concern for me.

MR. HOSHIJIMA:  I have no

# Exhibit I

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--------------------------------x
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, et al.,

      Plaintiffs,

                           Case No.

   vs.

                   3:25-cv-03698-SI

DONALD J. TRUMP, in his official
capacity as President of the
United States, et al.,

      Defendants.
--------------------------------x

CONFIDENTIAL

PURSUANT TO THE PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF

LA'TOYA MICHELLE PRIEUR

Friday, April 3, 2026

Reported By:  SUSAN ASHE, CER

Job No.:  11975

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 2

Friday, April 3, 2026

8:56 a.m. Eastern Daylight Time

Videotaped deposition of LA' TOYA MICHELLE PRIEUR, taken on behalf of the Plaintiffs, beginning at 8:56 a.m., on Friday, April~3, 2026, at the offices of Democracy Forward Foundation, 1445 New York Avenue, Northwest, Washington, D.C., before Susan Ashe, Certified Electronic Reporter and a Notary Public of the District of Columbia.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 3

APPEARANCE OF COUNSEL:

On behalf of All Union and Non-Profit

Organization Plaintiffs

ALTSHULER BERZON LLP

BY:  DANIELLE E. LEONARD, ESQ.

BY:  ELIZABETH ESHLEMAN, ESQ.

177 Post Street, Suite 300

San Francisco, California  94108

(415) 421-7151

dleonard@altshulerberzon.com

eeshleman@altshulerberzon.com


On behalf of All Union and Non-Profit

Organization Plaintiffs (except NRDC) and for

Plaintiffs City of Chicago, IL; Martin Luther,

Jr. County, WA; Harris County, TX; and City of

Baltimore, MD

DEMOCRACY FORWARD FOUNDATION

BY:  TSUKI HOSHIJIMA (pro hac vice)

Senior Counsel

P.O. Box 34553

Washington, D.C.  20043

(202) 448-9090

thoshijima@democracyforward.org

(Via Teleconference)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 4

APPEARANCE OF COUNSEL (Continued):

On behalf of the Defendants and the Witness

UNITED STATES DEPARTMENT OF JUSTICE

BY:  BRAD P. ROSENBERG, Special Counsel

BY:  ROBERT BOMBARD

1101 L Street, Northwest

Washington, D.C.  20005

(202) 305-0693

brad.rosenberg@usdoj.gov

robert.bombard2@usdoj.gov

- and -

FEDERAL EMERGENCY MANAGEMENT AGENCY

BY:  ASHLEY DARBO

500 C Street, Southwest

Suite 840

Washington, D.C.  20472

ashley.darbo@fema.dhs.gov

- and -

DEPARTMENT OF HOMELAND SECURITY

BY:  MATTHEW FLEISCHMAN

2700 Martin Luther King, Jr., Southeast

Washington, D.C.  20032

matthew.fleischman@hq.dhs.gov

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 5

ALSO PRESENT:

Jessica Levy, Esquire

Altshuler Berzon LLP


Melody Dodoo, Legal Assistant


Jonathan Perry, Videographer

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 6

CONTENTS

THE WITNESS

La' Toya Michelle Prieur


  BY MS. LEONARD                                    16


                        EXHIBITS

PLAINTIFFS

Exhibit No.                                     Marked

Exhibit 71   La' Toya Prieur

             LinkedIn Printout                    27

Exhibit 72   FEMA Manual 252-11-1                 77

Exhibit 73   Email Correspondence

             USA-AFGE-Exp.-0004693

             and -694                            110

Exhibit 74   Summary Table

             USA-AFGE-Exp.-0006539

             (Natively) Three Pages              153

Exhibit 75   Email Correspondence

             USA-AFGE-Exp.-0009729

             through -731                         173

Exhibit 76   Email Correspondence

             USA-AFGE-Exp.-0001244

             through -249                         193

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 7

EXHIBITS (Continued)

PLAINTIFFS

| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 77 | Email Correspondence | |
| | USA-AFGE-Exp.-0004518 | |
| | through -520 | 201 |
| Exhibit 78 | Email Correspondence | |
| | USA-AFGE-Exp.-0004553 | |
| | through -555 | 212 |
| Exhibit 79 | Email Correspondence | |
| | USA-AFGE-Exp.-0004824 | 213 |
| Exhibit 80 | Email Correspondence | |
| | USA-AFGE-Exp.-0004961 | 225 |
| Exhibit 81 | Email Correspondence | |
| | USA-AFGE-Exp.-0016768 | |
| | and -769 | 226 |
| Exhibit 82 | Email Correspondence | |
| | USA-AFGE-Exp.-0004990 | 228 |
| Exhibit 83 | Email Correspondence | |
| | USA-AFGE-Exp.-0004594 | |
| | through -4597 | 232 |
| Exhibit 84 | Email Correspondence | |
| | USA-AFGE-Exp.-00024154 | |
| | through -161 | 233 |

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 8

EXHIBITS (Continued)

PLAINTIFFS

| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 85 | Email Correspondence USA-AFGE-Exp.-0007228 and -229 | 236 |
| Exhibit 86 | Email Correspondence USA-AFGE-Exp.-0031448 through -467 | 238 |
| Exhibit 87 | Email Correspondence USA-AFGE-Exp.-0007249 through -251 | 239 |
| Exhibit 88 | Email Correspondence USA-AFGE-Exp.-0007230 and -231 | 242 |
| Exhibit 89 | Email Correspondence USA-AFGE-Exp.-0007242 through -245 | 248 |
| Exhibit 90 | Email Correspondence USA-AFGE-Exp.-0011844 | 250 |
| Exhibit 91 | Email Correspondence USA-AFGE-Exp.-0007265 through -269 | 254 |

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 9

                        EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                      Marked

Exhibit 92    Email Correspondence

              USA-AFGE-Exp.-0007374

              and -375                            269

Exhibit 93    Email Correspondence

              USA-AFGE-Exp.-0007350

              through -361                        282

Exhibit 94    Email Correspondence

              USA-AFGE-Exp.-0006441

              through -443                        285

Exhibit 95    Email Correspondence

              USA-AFGE-Exp.-0000141

              and -142                            306

Exhibit 96    Email Correspondence

              USA-AFGE-Exp.-0005428

              and -429                            310

Exhibit 97    Email Correspondence

              USA-AFGE-Exp.-0007095

              through -100                        313

Exhibit 98    Email Correspondence

              USA-AFGE-Exp.-0005639              319

Exhibit 99    Email Correspondence

              USA-AFGE-Exp.-0005748              329

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 10

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                   Marked

Exhibit 100  Short Message Report

             USA-AFGE-Exp.-0020962

             and -963                          334


                 PREVIOUSLY MARKED EXHIBITS

PLAINTIFFS

Exhibit No.                                Introduced

Exhibit 17  Organization Information

            Chart

            USA-AFGE-Exp.-0006542             156

Exhibit 19  Email Correspondence

            USA-AFGE-Exp.-0006535

            through -538                       197

Exhibit 20  Email Correspondence

            USA-AFGE-Exp.-0006686

            through -688                       186

Exhibit 21  May 14, 2025 Correspondence

            USA-AFGE-Exp.-0000405

            and -406                           113

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 11

PREVIOUSLY MARKED EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                    Introduced

Exhibit 24   Email Correspondence
             USA-AFGE-Exp.-0006997
             and -998                                182

Exhibit 25   "Talking Points for FY26
             Staffing Strategy"
             USA-AFGE-Exp.-0034341
             and -342                                148

Exhibit 26   Email Correspondence
             USA-AFGE-Exp.-0014520
             and -521                                189

Exhibit 31   Email Correspondence
             USA-AFGE-Exp.-0005054
             through -059                             218

Exhibit 32   Email Correspondence
             USA-AFGE-Exp.-0009465
             and -466                                252

Exhibit 37   May 2023
             FEMA Disaster Workforce
             "Actions Needed to Improve
             Hiring Data and Address
             Staffing Gaps"                          127

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 12

PREVIOUSLY MARKED EXHIBITS (Continued)

PLAINTIFFS

| Exhibit No. | | Introduced |
|---|---|---|
| Exhibit 38 | January 20, 2025 Memorandum Re:  Federal Civilian Hiring Freeze Guidance | 92 |
| Exhibit 39 | Email Correspondence USA-AFGE-Exp.-0000435 | 94 |
| Exhibit 40 | March 14, 2025 Memorandum Subject:  DHS Hiring Verification Process | 96 |
| Exhibit 41 | Email Correspondence USA-AFGE-Exp.-0000403 and -404 | 103 |
| Exhibit 49 | Email Correspondence USA-AFGE-Exp.-0000446 through -454 | 262 |
| Exhibit 59 | Email Correspondence USA-AFGE-Exp.-0000076 and -077 | 289 |
| Exhibit 65 | Email Correspondence USA-AFGE-Exp.-0008661 and -662 | 301 |

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 13

(REPORTER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily denote an exact quote from the document.)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 14

FRIDAY, APRIL 3, 2026;

8:56 A.M. EASTERN DAYLIGHT TIME

--o0o--

VIDEOGRAPHER:  We are now on the record.

This begins the video deposition of La' Toya Prieur, taken in the matter of the American Federation of Government Employees, et al. versus Donald J. Trump in His Official Capacity as President of the United States, et al., case filed in the U.S. District Court for the Northern District of California, San Francisco Division, Case No. 3:25-cv-03698-SI.

We are at the offices of Democracy Forward, 1445 New York Avenue, Northwest in Washington, D.C.

The date is April 3, 2026.  The time is approximately 8:56 a.m.

My name is Jonathan Perry.  I am the videographer from the firm of TransPerfect.  The court reporter is Susan Ashe, also with TransPerfect.

And would counsel present please introduce themselves and please state whom

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 15

they represent.

MS. LEONARD:  Good morning, everyone.  Danielle Leonard, Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MS. ESHLEMAN:  Elizabeth Eshleman, also Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MS. LEVY:  Jessica Levy, Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MS. LEONARD:  And on the phone...Tsuki?

MR. HOSHIJIMA:  Good morning. Tsuki Hoshijima, from Democracy Forward, representing certain other Plaintiffs.

MR. ROSENBERG:  Brad Rosenberg, from the Department of Justice, Civil Division, Federal Programs Branch, on behalf of Defendants.

MR. BOMBARD:  Good morning, Robert Bombard, Department of Justice, Civil Division, Federal Programs Branch, on behalf of Defendants.

Page 16

MS. DARBO:  Ashley Darbo, representing FEMA.

MR. FLEISCHMAN:  Matthew Fleischman, Department of Homeland Security.

MS. LEONARD:  And for Plaintiffs, we have staff from one of our co-counsel who are observing here today.

VIDEOGRAPHER:  And would the reporter please swear in the witness.

Whereupon,

LA' TOYA MICHELLE PRIEUR

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. LEONARD:

Q.  Good morning.  The first question I'm going to ask you is how to pronounce your last name prior.

A.  "Prieur."

Q.  "Prieur," okay.

A.  But "La' Toya" is fine.

Q.  I will go with "Ms. Prieur."

A.  Okay.

Q.  But I'm Danielle, Danielle Leonard.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 48

to end of November of 2025, did anyone from DHS ever participate in those senior leadership meetings?

A.   Not that I was in.

Q.   Are you aware that there were participants from DHS in those meetings at times?

A.   No, I am not.

Q.   Were there any meetings that you participated in with Ms. Evans where there were representatives of DHS there -- in that time frame?

A.   Yes.

Q.   Could you explain to me what those were.

A.   It -- I believe Kara Voorhies worked with DHS, and she would sporadically be in some of the meetings that I attended with Ms. Evans.

Q.   Can you remember what types of meetings?

A.   GS-15 or the termination meetings.

Q.   And Kara Voorhies was a senior advisor to the secretary of Homeland Security?

A.   Yes.

Q.   Were you aware at the time of whether she was an employee or a contractor?

A.   I was not.

Q.   Did you ever talk to her about that?

A.   No.

Q.   What was your understanding of why she was

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 49

there?

A.   I understood her to be a liaison between FEMA and DHS.

Q.   Did you have any understanding of who directed her to be at those meetings?

A.   No.

Q.   Did you ever hear her reference communicating with other DHS leadership?

A.   No.

Q.   Did she talk much at those meetings?

A.   No.

Q.   Did you -- did she ever talk?

A.   Rarely.

Q.   Okay.  Do you recall anything in particular that Ms. Voorhies said at any of these GS-15/SES or termination meetings in the time period of September through the end of November?

A.   Nothing specific.

Q.   You understood -- I think you said you understood her to be a liaison?

A.   Correct.

Q.   What does that mean to you?

A.   Sharing information between entities.

Q.   Did anyone else from DHS, the DHS front office, ever participate in any of the meetings that

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 50

you've described from the end of September through the end of November?

A.    Not when I was present.

Q.    Okay.  So deputy chief of staff Joseph Guy, you're familiar with him?

A.    Yes.

Q.    So "DCOS Guy" -- if I say that, you'll understand who I'm talking about?

A.    I do.

Q.    Is that what you call him?

A.    Yes.

Q.    Okay.  So DCOS Guy, was he ever present in any meeting that you were in before the end of November?

A.    No.

Q.    Okay.  Had you ever met him?

A.    No.

Q.    Okay.  But you knew who he was?

A.    Yes.

Q.    Okay.  What was your understanding of his role with respect to FEMA?

A.    I understood that he did site visits in the regions to assess readiness for disasters.

Q.    DCOS Guy did site visits to assess readiness for disasters?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 51

A.   That is my understanding.

Q.   Do you have any understanding of why he was doing that?

A.   I do not.

Q.   Do you have any understanding of his qualification to do that?

A.   No.

Q.   Do you believe that DCOS Guy had any qualification to do that?

A.   I don't know.

Q.   No one ever explained to you that he was qualified to do that, correct?

A.   No.

Q.   Okay.  What about Ms. Voorhies; did you have any understanding of her qualifications to be involved with FEMA?

A.   No.

Q.   Okay.  Do you know what her background was?

A.   No.

Q.   Okay.  Do you have any understanding of the nature of her contract with DHS?

A.   No.

Q.   You came to understand that she's a government contractor, correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 52

A.    Yes.

Q.    Okay.  Was that a surprise to you?

A.    No.

Q.    Why not?

A.    At some point -- it would have been in the third or fourth quarter of fiscal year 2025 -- I was asked to see if she was on my payroll.

Q.    The third or fourth quarter of fiscal 2025 -- who asked you, during that time frame, to see if Ms. Voorhies was on your payroll?

A.    Roland Edwards.

Q.    Was that by email?

A.    It may have been a Microsoft Teams call.

Q.    What else do you remember about that conversation with Mr. Edwards?

A.    I told him I would check.

Q.    Anything else?

A.    That was it.

Q.    Did he tell you why he was asking?

A.    He did not.

Q.    Did you have any understanding as to why he was asking?

A.    Yes.

Q.    And what was that understanding?

A.    Mr. Edwards wanted to know how she was

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 53

being paid and if FEMA was paying her.

Q. Did he express any concerns?

A. No.

Q. Did you have any concerns?

A. No.

Q. Did you investigate?

A. Yes.

Q. And what was the answer?

A. She was not on my payroll.

Q. Did you have any other communications with anyone from DHS, other than Mr. Edwards, regarding Ms. Voorhies?

A. No.

Q. What about Ms. Evans; did you ever talk to Ms. Evans about Ms. Voorhies?

A. No.

Q. Did Ms. Evans know that Mr. Edwards was asking whether Ms. Voorhies was on the FEMA payroll?

A. I don't know.

Q. She wasn't on that Teams call?

A. No.

Q. That was a Teams call between you and Mr. Edwards?

A. Correct.

Q. Okay. In this -- and you said quarter --

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 97

March 14, 2025 memorandum by DHS, the deputy under secretary of management to all component and office heads.

Are you familiar with this document?

A.   Yes.

Q.   Okay.  And what's your understanding of what this document is requiring?

A.   I'll need a second to refresh my memory.

Q.   Sure, sure.

(Witness reading.)

A.   Okay.  I think I'm good.

Q.   So you see under "Key Provisions," it says:

No hiring without prior approval.

A.   Yes.

Q.   And comparing this memorandum with the OPM email, did you understand that DHS had decided to apply the hiring freeze to DHS, notwithstanding the fact that OPM had given it an exemption?

A.   Yes.

Q.   Okay.  So you understood, as a result of this memo, that FEMA could not hire without seeking approval from the secretary of Homeland Security through this new procedure?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 98

A.    Unless it was in one of the excepted positions, that's correct.

Q.    Okay.  And the excepted positions are PMCOs and MCOs.

A.    Correct.

Q.    Okay.  And some of those apply to FEMA.

A.    Correct.

Q.    And those are listed on Attachment 1?

A.    Yes.

Q.    And under the priority mission critical occupations, that includes FEMA Emergency Management Specialists 0089.

A.    Correct.

Q.    So your understanding at the time, with respect to FEMA's authority to hire with respect to those positions, was what?

A.    Was permission was required, unless one of the series listed....

There was an exemption for the series listed.  If hiring was for another series, then the hiring verification process applied.

Q.    So FEMA no longer had the authority to hire for any position other than the PMCOs and MCOs.  Correct?

A.    Unless S1 verification was provided,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 99

that's correct.

Q.   But FEMA, on its own, did not have that authority under these new procedures and directive from DHS.  Correct?

A.   That is correct.

Q.   Okay.  So prior to this directive, FEMA could hire for career positions, correct?

A.   Yes.

Q.   And prior to this directive, FEMA could hire for CORE positions.

A.   That's correct.

Q.   And prior to this directive from DHS, FEMA could hire for reservists.

A.   Correct.

Q.   And this March memorandum removed the authority from -- for FEMA itself to hire into those positions, other than the MCO and PMCO.

A.   That's correct.

Q.   That was a very significant development, wasn't it?

A.   It was different.

Q.   It was significant for FEMA, wasn't it?

A.   Yes.

Q.   Okay.  Did you know at the time whether you were going to be getting any secretary approval

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 104

ready.

(Witness reading.)

A.   Okay.

Q.   Starting at the bottom of the chain, there appears to be an email from Roger Brown.

Who was -- well, he's listed right here as the Deputy CHCO at DHS.

Did you know Mr. Brown?

A.   Yes.

Q.   Okay.  And what -- this is a message communicating the March 14th memorandum.  Correct?

A.   Correct.

Q.   Okay.  And then you write a response to Mr. Brown asking for confirmation of whether extending the appointment of an existing CORE employee is considered a hiring action.

A.   Correct.

Q.   And he responds.

A.   Yes.

Q.   And his response is:

If it is not in the realm of a PMCO or MCO, you would need to ask for a waiver to extend for two additional years.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 105

A.   Correct.

Q.   What was your understanding of what Mr. Brown was communicating with regard to FEMA's ability to renew CORE appointments?

A.   Sure.  Previously, FEMA had the authority to renew without going through the hiring verification process.  And there was -- there were two different interpretations of CORE hires.

At the time, MaryAnn Tierney was the SOPDA.  And MaryAnn's...in having talks with MaryAnn, extending a CORE did not constitute a new hire, which is why I reachout out to the Department for clarification, because this was a Department directive.

And according to the Department, extending a CORE renewal was a new hire -- therefore, if it was not an MCO or a PMCO, approval would need to be requested and FEMA did not have the authority to automatically extend that employee.

Q.   Was the basis of the understanding by Ms. Tierney at the time, as far as you understood it, the exemption listed in the OMB memorandum for term?

A.   That is correct.

Q.   But you understood Mr. Brown to be

Page 106

communicating on behalf of DHS that DHS took a different view on whether renewal constituted a new hire.

A.   Correct.

Q.   Did you have any understanding, based on any other statements or interactions with DHS leadership, about whether COREs constituted new -- renewing COREs constituted new hires at the time, or was it only this email?

A.   It was only in this email.

Q.   Did you have any understanding of an incident in March 2025 where information regarding the number of new hires at FEMA had been communicated to Secretary Noem that included CORE renewals?

A.   I am aware that DHS provided a report to the secretary, yes.

Q.   That included CORE renewals in the numbers of new hires?

A.   Correct.

Q.   How are you aware of that?

A.   In talks with Roland Edwards.

Q.   And did you understand how that came to be?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 110

respect to FEMA's authority with respect to PMCO or MCO positions?

A.   My understanding was, permission was not required.

MS. LEONARD:  Okay.  Let's look at the next.

And this one, I believe, is a new exhibit.  So we'll mark it 72 -- 73.

(Whereupon, Plaintiffs Exhibit 73 was marked for identification.)

Q.   Ms. Prieur, do you recognize this document?

A.   I do, but I need to read it.

Q.   Sure.

(Witness reading.)

A.   Okay.  I'm ready.

Q.   Did you approve this message, Ms. Prieur?

A.   Yes.

Q.   Okay.  And can you just generally say -- explain who this was from and to.

A.   This was -- this came from the Mission Support mailbox -- so, my supervisor at the time, Ms. Tami Franklin, and Mr. Eric Leckey.

And in this update, I summarized what the Department's new hiring verification process

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 111

required.

Q.   And that's your summ- -- key provisions; "firm" term -- FEMA term appointments; Cadre of On-Call Response Employees, CORE; reservists; local hires; and temporary full-time employees -- renewals and extensions must be submitted to the secretary of Homeland Security for decision unless they fall within an excepted position.

That was your understanding of what had been communicated to you by Mr. Brown, correct?

A.   That's correct.

Q.   Okay.  And you described this as a "change," correct?

A.   Correct.

Q.   Because it was a change, correct?

A.   Yes.

Q.   And you refer -- you drafted this.

A.   Yes.

Q.   Okay.  And you refer at the top to "Executive Order 14210."  Do you see that?

A.   I do.

Q.   And you understand that that is an executive order -- order that pertains to workforce reduction.  Correct?

A.   Workforce optimization.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 112

Q.   Do you recall that the President said he wanted to engage in a transformation of the federal government?

A.   I do.

Q.   And that he ordered agencies to consider large-scale RIFs and reorganization?

A.   Yes.

Q.   Okay.  And you understood these actions to be in alignment with that executive order.

A.   That is correct.

Q.   Did someone instruct you to include that?

A.   No.

Q.   Okay.  The list here, we see Emergency Management Specialist again, 0089.

     What percentage of the CORE, roughly, fall into that occupational category?

A.   If I had to estimate, I would say 40%.

Q.   So that's a -- that's a big one for the CORE?

A.   Correct.

Q.   Okay.  And these other ones on this list for MCOs, are those -- are any of those nearly as large as that?

A.   No.

Q.   Okay.  At some point in time, FEMA

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 113

obtained some approval from DHS to re-delegate
authority back to it with respect to some CORE
renewals.  Correct?

A.   That's correct.

Q.   Okay.  And that was a May 14th memo signed
by Secretary Noem?

A.   That's correct.

MS. LEONARD:  Okay.  Let's take
a look.

This has previously been marked
as Exhibit 21.

(Whereupon, Plaintiffs Exhibit 21,
previously marked, was introduced to the witness.)

Q.   Okay.  Ms. Prieur, you've been handed
what's been previously marked as Exhibit 21.  It's a
May 14, 2025 approval memorandum for Secretary Noem
from SOPDA Richardson.

Are you familiar with this document?

A.   Yes, I am.

Q.   Okay.  What is your understanding of what
authority was being delegated back to FEMA?

A.   Secretary Noem delegated authority to
SOPDA Richardson to approve CORE renewals in 180-day
increments through December 31, 2025.

Q.   And this is approving FEMA authority to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 114

use an internal process to renew COREs.

A.    That's correct.

Q.    That's what it says.

So that means FEMA making its own decisions.

A.    Correct.

Q.    Without submitting those for approval to the DHS secretary.

A.    That's correct.

Q.    Okay.  And the title describes reinstatement, because FEMA previously had that authority before DHS removed it in March of 2025. Correct?

A.    Correct.

Q.    Did you work on this approval memo?

A.    I provided data regarding the number of CORE employees, but I did not draft the memo.

Q.    Do you know who did?

A.    I don't know.

Q.    Did you have an understanding of the reason for asking -- asking for this approval to be sent back -- approval of this authority to be sent back to FEMA?

A.    Yes.

Q.    And what was your understanding?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 134

review.

And then I task that to get ahead of whatever DHS may request.

Q.   And is it fair that you have a team that stalks the White House website because there have been a lot of executive orders from this administration that pertain to staffing?

A.   Yes.

Q.   Okay.  So it's through your role as CHCO that you became familiar with the annual staffing plan requirement.

And you recall that DHS gave directions to components to compile the information that DHS was putting into the staffing plan to send to OMB and OPM?

A.   That's correct.

Q.   And there was a November 21st email from DHS CHCO Edwards that provided a spreadsheet that was to be filled out.  Do you recall that?

A.   I do.

Q.   Okay.  And your office coordinated the effort at FEMA to compile the information from the programs and regions to respond to that request?

A.   Yes.

Q.   And that meant that you were collecting

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 135

the programs' and regions' assessments of their staffing needs to inform the FEMA annual staffing plan. Correct?

A.    Correct.

Q.    Okay.  And that work started prior to Karen Evans becoming the SOPDA on December 1st, right?

A.    That's correct.

Q.    Was she involved, prior to that, as the chief of staff?

A.    She may have been.  I don't recall specifically.

Q.    Okay.  Outgoing SOPDA Richardson did not approve the FEMA annual staffing plan before he left.  Correct?

A.    That's correct.

Q.    Okay.  So SOPDA Evans is the one that approved that and sent it to DHS in December.

A.    Correct.

Q.    Okay.  Do you recall the total number of staff that the FEMA components and offices result of the bottoms-up exercise you just described?

A.    I believe that we had 23,000 employees at the end of fiscal year 2025 and no reduction was requested.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 136

Q.   No -- no reduction was recommended.

A.   Was --

Q.   Right?

A.   Correct; by the program and regional offices.

Q.   After conducting the bottoms-up analysis of mission critical and mission-supporting functions that you just described?

A.   Yes.

Q.   Okay.  And statutorily required functions.

A.   Correct.

Q.   Okay.  In compliance with the DHS instructions for how to fill out that report -- sorry, in compliance with the DHS instructions for how to fill out the data that they were asking for.

A.   Correct.

Q.   And it's your understanding that the FEMA component offices did comply with the DHS instructions.

A.   Yes.

Q.   Do you recall the number -- the total staffing number that the FEMA CHCO presented to SOPDA Evans in its recommendation?

A.   I did not present to SOPDA Evans.

My direct supervisors at the time were

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 137

Tami Franklin and Stephanie Dobitsch.  And I believe the numbers that were presented were roughly 23,000 to remain flat.

Q.   Do you -- you compiled the recommended contribution for FEMA to the annual staffing plan, and you transmitted it to someone?

A.   Yes.

Q.   Okay.  Who was that?

A.   That was Tami Franklin and Stephanie Dobitsch.

Q.   And it's your understanding that that information that you had compiled was presented to SOPDA Evans.

A.   That's correct.

Q.   You were aware, as of early December 2025, that DHS leadership wanted to cut FEMA in half, weren't you?

A.   I did not have any direct communication with DHS that provided that data.

Q.   But...did you have an indirect understanding of that?

A.   I did.

Q.   And what was the basis of your indirect understanding?

A.   Under SOPDA Richardson, I believe there

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 166

half?

A.   No.

Q.   Did you ever hear SOPDA Evans ask any questions regarding detail in the FEMA OCHCO's annual staffing plan submission?

A.   No.

Q.   Do you have any reason to believe that she didn't even read it?

A.   No.

Q.   You don't have reason to believe that?

A.   No.

Q.   You think she read it?

A.   I don't know.

Q.   Do you have any understanding as to why she subbed out a 50% cut, rejecting the recommendations of FEMA OCHCO and all of the program and regional offices?

          MR. ROSENBERG:  Objection; calls
     for speculation.

A.   I don't know.

Q.   But you certainly don't know the analysis, if any, that was based on.  Right?

A.   I do not.

Q.   Okay.  And you are not aware of whether she was being -- she was discussing this annual

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 167

staffing plan with individuals in the DHS front office, such as DCOS Guy.  Correct?

A.   I don't.

Q.   But you are aware that she was discussing with Ms. Voorhies.  Is that right?

A.   Ms. Voorhies was in some of the meetings.

Q.   Where 50% cuts were discussed?

A.   Not where 50% cuts were discussed.

Where Ms. Evans -- the discussion surrounded COREs being used to supplement PFT staff.

Q.   And what did Ms. Voorhies say in these meetings, if anything?

A.   She rarely said anything.

Q.   Do you recall her saying anything?

A.   I don't.

Q.   Again, did you have any understanding as to why she was there?

A.   My understanding was:  She was a liaison between DHS leadership and FEMA leadership.

Q.   So it was your understanding that she was there to report back to DHS leadership regarding the subject matter of those meetings.

MR. ROSENBERG:  Objection.

A.   My understanding of Ms. Voorhies' role was to be a liaison and share information between DHS

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 168

and FEMA, and vice versa.

Q.    Did you ever hear that Ms. Voorhies had a preexisting relationship with Corey Lewandowski?

A.    Yes.

Q.    And where did you hear that?

A.    I heard that in the newspaper -- I want to say, when Secretary Noem was fired.

Q.    Did you ever hear it before that?

A.    No.

(Pause.)

A.    I'm so sorry.  My stomach just growled so loud.  My apologies.

Q.    Mine did as well, and we'll see if it shows up on the videotape.

I understand.  We'll break for lunch relatively soon, actually, given -- given that.

A.    So embarrassing.

Q.    We can mark that -- we can mark that confidential.

Okay.  You never came to -- there's no point in time at which you came to learn that DHS had rejected the annual staffing plan that Ms. Evans provided to it on December 4th.  Correct?

A.    I'm not aware of that.

Q.    Okay.  You never heard that?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 182

date.

A.    I do not know that.

Q.    Are you aware that Ms. Evans and Ms. Dobitsch had a meeting in early December to discuss plans to cut the COREs by NTE date?

A.    No.

MS. LEONARD:  Okay.  Well, let's take a look.

This is, previously, Exhibit 24.

(Whereupon, Plaintiffs Exhibit 24, previously marked, was introduced to the witness.)

WITNESS:  Thank you.

Q.    And if you could take a moment to read through the emails from early Decem- -- there's the top ones -- December 18th, but it is forwarding a December 12th, and which is responding to some emails from December 4th.

If you could take a moment to read through those.

(Witness reading.)

A.    Okay.

Q.    Ms. Prieur, have you ever seen this email before?

A.    No.

Q.    I'm going to focus on the December 4th

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 183

email between Karen Evans and Stephanie Dobitsch, which -- and copied to Kara Voorhies and Will "Bilicic"? --

A.   Yes.

Q.   -- which is on the back.

My understanding is that Ms. Evans wrote this email -- and then if you can see from the next email in the line, that Ms. Dobitsch did some annotations to the list.  That appeared how it reads.

You see the first item:

Looking at all CORE dates.

Were you aware, as of December 4th, that Ms. Evans and Ms. Dobitsch were working together to look at all CORE dates?

A.   I was aware.

Q.   And that there were upcoming CORE NTE dates?

A.   Yes.

Q.   And were you aware that they were discussing a proposed plan to reduce COREs by date?

A.   No.

Q.   That she had tasked Ms. Dobitsch to work on?

A.   No.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 184

Q.   Are you surprised to hear that?

A.   Yes.

Q.   And...because you hadn't heard of it previously?

A.   Correct.

Q.   You see No. 4:

          Overall, CHCO numbers are
       being worked by you and Will.
       Number is 11,383.  Karen will
       send a follow-up note to HQ.

A.   Okay.

Q.   "11,383" is the number from the FEMA annual staffing plan that Ms. Evans sent to DHS.

     Does that look familiar?

A.   Yes.

Q.   Okay.  From the documents that we showed you earlier today.

A.   Correct.

Q.   Okay.  You had no understanding that Ms. Dobitsch and Will Bilicic were continuing the work of how to implement the 11,383 number across FEMA?

A.   No.

Q.   You weren't involved in that work?

A.   No.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 185

Q.   Okay.  But you don't have any reason to believe that this isn't true.

A.   Correct.

Q.   Okay.  And you don't have any reason to believe that it isn't true that Ms. Dobitsch and Ms. Evans were talking about a plan to reduce COREs by date.

A.   Correct.

Q.   Okay.  And you don't know, other than Kara Voorhies, who is copied on this email -- you don't know who else at DHS leadership was involved in the plan to cut COREs by date.  Correct?

A.   Correct.

Q.   Okay.  But you understood that Kara Voorhies was acting as a liaison between FEMA and the DHS leadership.

A.   Correct.

Q.   You did understand that Ms. Voorhies and Ms. Evans were talking about right-sizing FEMA, right?

(Pause.)

Q.   And you can set that aside.

Now I'm just asking for your general recollection.

Around this period of time, do you

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 186

understand that Ms. Evans and Ms. Voorhies were talking about right-sizing FEMA?

A.   I was not in any meetings or emails when that was discussed between the two of them.

MS. LEONARD:  Okay.  Well, let's look at something that might refresh your recollection.

WITNESS:  Okay.

MS. LEONARD:  This has previously been marked as Exhibit 20.

(Whereupon, Plaintiffs Exhibit 20, previously marked, was introduced to the witness.)

Q.   Ms. Prieur, Exhibit 20 is a email exchange between Ms. Evans and Ms. Dobitsch that starts on December 4th --

A.   Um-hum.

Q.   -- and continues on to December 5th.

And the top email contains a spreadsheet attachment that is entitled "Copy of CORE Expirations (January 2026)."  Do you see that?

A.   I do.  I just need a moment to --

Q.   Sure.  Please.

A.   -- read and see.

(Witness reading.)

A.   Okay.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 187

Q.   Okay.  Ms. Prieur, on the top email, December 5th -- you are copied on that email, correct?

A.   Yes.

Q.   And in the third paragraph, Stephanie says to Karen:

                    We're planning several
               meetings next week to dig in --
               into -- to dig into this as
               part of the plan you and I
               discussed for CORE rightsizing.

          Do you see that?

A.   Yes.

Q.   Does this refresh your recollection that you were --

A.   It does.

Q.   -- you were aware that Ms. Evans and Ms. Dobitsch were working on CORE right-sizing?

A.   Yes.

Q.   And that this was connected to CORE NTE dates -- do you see that?

A.   Yes.

Q.   Okay.  Did you participate in those meetings?

A.   I did not.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 188

I provided a copy of the CORE expirations for January, that attachment.

Q.    And this is the day after Ms. Evans has sent the annual staffing plan to DHS that cuts FEMA in half.  Right?

A.    Yes.

Q.    You were asked, on the morning of December 5th, early, to obtain the list of CORE expirations by month.  Correct?

A.    Yes.

Q.    Do you recall that?

A.    Yes.

Q.    Who asked you to do that?

A.    Probably Stephanie.

Q.    Do you -- was it that morning, or was it late the prior night, do you remember?

A.    It could have been either.

MS. LEONARD:  And let's take a look at that now.

Q.    First, before I show you the email, do you recall what she said about that request?

A.    She was probably asking, when I looked at the email, to see the number of all COREs who expired in Quarter 2, which would be January 1st to March 31st.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 189

Q.  Do you recall that she told you it was for S1 review?

A.  I don't, but it could be in here.

MS. LEONARD:  We'll take a look.

It's Exhibit 26.

(Whereupon, Plaintiffs Exhibit 26, previously marked, was introduced to the witness.)

(Witness reading.)

A.  Okay.

Q.  Okay.  So you've looked at the email exchange from December 5th in Exhibit 26.

Does this refresh your recollection that Ms. Dobitsch told you this was for S1 review?

A.  Yes.

Q.  And -- because that's what you told Daniel Peterson?

A.  Correct.

Q.  And I'm assuming, on this first-in-the-chain email sent at 8:17 a.m. by you, that these are individuals on your staff.

A.  That's correct.

Q.  Okay.  And you were saying that -- here, that the Office of the Administrator requests to track CORE expirations by month, beginning with the January data.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 190

And at 8:17, you ask them to complete this by 10 a.m. that day because the OA would send it to S1.

That's an urgent request, right?

A.    Yes.

Q.    Okay.  And did you have any understanding of why it was so urgent?

A.    Yes.

Q.    What was that?

A.    I understood that we had less than 30 days before the first January CORE would expire.  So we needed to provide information to FEMA leadership that would later be sent to DHS leadership on how we would approve renewal or non-renewal of CORE employees.

Q.    You believed, at the time, that the request for this data was because of approval?

A.    Yes.

Q.    Did you have any understanding that this request for data was because of a plan to reduce COREs by date?

A.    Not by date.

I knew at this point that we would be required to -- as an agency, to justify any CORE that we were requesting an extension for.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 191

Q.   Does reviewing the email between -- exchange between Ms. Evans and Ms. Dobitsch that I showed you from December 4th --

A.   Um-hum.

Q.   -- at 4:05 p.m. shed any light on your understanding of why Ms. Dobitsch was asking you for this data early in the morning, urgently, on December 5th?

A.   Yes.

Q.   And is it possible that she was asking you for this data of tracking CORE expiration NTE dates by month because of a plan to reduce COREs by date?

A.   Yes.

Q.   And such a plan would not be in the interests of FEMA, would it?

MR. ROSENBERG:  Objection; calls for speculation, lack of foundation.

Q.   Let me ask it a different way.

A.   Um-hum.

Q.   Such a plan would interfere with FEMA's ability to perform its mission.  Correct?

MR. ROSENBERG:  Same objection.

A.   It could.

Q.   Eliminating FEMA CORE employees by NTE date would....

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 192

Let me ask a different question.

Stephanie Dobitsch forwards the spreadsheet that you sent her on December 5th to Karen Evans on the afternoon of December 5th. Correct?

It's Exhibit 20.

A.   Okay.  Yes, she did.

Q.   Okay.  So that -- that is the spreadsheet that you were discussing in Exhibit 26.

A.   Okay.

Q.   Is that your recollection?

A.   Yes.

Q.   Okay.  Kara Voorhies is copied on this email.  Do you see that?

A.   I did, yes.

Q.   Part of your job as the FEMA CHCO is to understand the Privacy Act, correct?

A.   Yes.

Q.   If Kara Voorhies were a government contractor, does it give you concern that she was copied on a spreadsheet of -- that contains employees' PII?

A.   It could.

Q.   But you didn't know at the time whether she was a government employee or a government

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 193

contractor.

A.    I still don't.

Q.    Do you have any understanding as to why Stephanie Dobitsch would be copying Kara Voorhies on an email attaching a list of CORE expirations?

A.    Yes.

Q.    Why is that?

A.    Because Kara Voorhies was a liaison, again, between FEMA and DHS leadership.

So if the S1 was going to track CORE expirations, it would be appropriate for the liaison to have knowledge of that information.

Q.    So it's possible that Kara Voorhies provided this information to S1?

A.    She could have.

Q.    Okay.  And you understood, in fact, that her role was as a liaison to that office?

A.    Correct.

MS. LEONARD:  Let's look at another exhibit.

We'll mark this one 76.

(Whereupon, Plaintiffs Exhibit 76 was marked for identification.)

A.    Oh, this is a long one.

Q.    It is.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 204

A.    Yes.

Q.    Who?

A.    Ms. Dobitsch.

Q.    Okay.  And that --

But you don't know whether Ms. Evans directed her?

A.    Correct.

Q.    And that included 50% targets, which match the annual staffing plan 50% cut that was sent to DHS in early December by Ms. Evans.  Correct?

A.    Correct.

Q.    Well, in response to this, FEMA's component programs and offices did not agree that FEMA's staffing should be cut in half, right?

A.    Correct.

        MR. ROSENBERG:  Objection.

        MS. LEONARD:  Can we have that clear for the record.

        MR. ROSENBERG:  Yeah.

Objection; form, vague.

Q.    Can you give your answer again, please.

A.    "Correct."

Q.    The number that the FEMA components recommended to FEMA OCHCO as a result of the December 23rd exercise was roughly 23,000 staff for

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 205

FEMA for fiscal year 2026, correct?

A.   Yes.

Q.   Okay.  Can you look at Exhibit...Mr. Neurauter's email.

A.   Okay.  19?

Q.   Yes, 19 -- the top email.

So --

"Neurauter," is that right?

A.   "Neurauter."

Q.   "Neurauter."

A.   Yes.

Q.   Thank you.

Mr. Neurauter; here he is recounting some facts regarding the steps that have happened in this staffing plan -- "progression," I will call it.

And I'm going to ask you of certain things, whether you know if they're true.

He refers to -- under "Discussion" at the bottom, do you see he's --

A.   Okay.

Q.   -- he's got a discussion of the annual staffing plan created by FEMA CHCO that showed a level of 24,812 by the end of fiscal year 2026.

Do you see that?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 219

previously marked, was introduced to the witness.)

Q.    There you go.

Okay.  Ms. Prieur, you're being hand- -- handed what has been marked as Exhibit 31.

There's a cover email from you.  And then, you had attached several spreadsheets, as well as a December 17th --

A.    Okay.  Let me just --

Q.    -- memo.

Yep.

A.    -- run through this.

(Witness reading.)

A.    Okay.

Q.    Okay.  So earlier, we had seen, in Exhibits 20 and 26, that you had been asked for monthly reports of COREs by NTE date.

And I believe the information you provided on December 5th was January.  Is that right?

A.    That's correct.

Q.    Okay.  So at some point in time, Ms. Evans asked you for more information about the upcoming COREs by NTE date, is that correct?

A.    That's correct.

Q.    Okay.  And here, in the top email, you are providing to her information on the 950 COREs up for

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 220

renewal by NTE date for the first three months of 2026.  Correct?

A.   Right.

Q.   So January 1 through March 31st.

A.   Correct.

Q.   And there are 950 of them, and you break down in -- certain information.

Ms. Evans asked you for financial information about how much those employees cost?

A.   She did.

Q.   Okay.  And you provide that information in this cover email.

A.   I did.

Q.   And then you attach a memo.

Could you turn to the memo, please.

A.   Sure.

Q.   So the document beginning on Bates number -5056 is a December 17, 2025 email -- memo that you wrote to Ms. Evans?

A.   Yes.

Q.   Why did you write this memo?

A.   I wrote this memo at the request of Ms. Evans.

Q.   And what does this -- what was -- the purpose of this memo was to describe the mission

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 221

effects of not renewing the CORE appointments by NTE date, correct?

A.    Correct.

Q.    And you run through all the program effects that would happen if the CORE were not renewed by NTE date, correct?

A.    That's correct.

Q.    And there are a significant number of effects.  Is that fair to say?

A.    Yes.

Q.    And you worked with staff to prepare this list?

A.    I worked with my executive colleagues in the field and in headquarters to make sure that I accurately communicated the needs of their organization.

Q.    And it says here:

Based on program feedback, the following effects of not renewing these employees would include....

So you were compiling information provided to you from the FEMA program offices that employ the COREs.

A.    That's correct.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 222

Q.    And your recommendation on the very last page is:  You recommend to SOPDA Evans to allow FEMA to review based on mission requirements and appropriately renewed term limited appointments.

Do you see that?

A.    Yes.

Q.    You were asking Ms. Evans to allow FEMA to do these renewals.

A.    The recommendation is to allow FEMA to look at each renewal on an individual basis and determine if that position is needed.

So it wasn't for a 100% request to renew, but to at least look at the position function and the employee's level of competence and renew based on that justification.

Q.    And you felt the need that you had to ask Ms. Evans to allow FEMA to do that?

MR. ROSENBERG:  Objection; mischaracterizes the document.

Q.    Go ahead.

A.    My professional opinion is that:  In the role of CHCO, it is my responsibility to consult with leadership and provide them a full picture of what may or may not occur based on the decision they may make.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 248

CORE renewals were discussed for January.

A.   Correct.

Q.   And was there any discussion of not renewing by NTE date?

A.   Not to my recollection.

Q.   There was a discussion of the need to seek S1 approval for these renewals.

A.   That's correct.

Q.   And to use the hiring verification process.

A.   Correct.

Q.   And that it was ultimately DHS's decision whether or not to renew these employees.

A.   Correct.

Q.   Did Ms. Evans, at this meeting, express anything else about DHS direction?

A.   No.

Q.   Was Ms. Voorhies there?

A.   She could have been.

Q.   The liaison to the DHS leadership.

A.   Correct.

Q.   Have you told me everything you remember about that meeting?

A.   Yes.

Q.   Were any decisions made at that meeting?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 264

Ms. Evans.  You are providing the data to Mr. Edwards here.  Correct?

A.   With a copy to Puneet Khan, who was my acting supervisor at the time.

Q.   Understood.

Ms. Prieur, it appears that this data was requested by DHS.

Is that true?

A.   Not to my knowledge.

MR. ROSENBERG:  Objection.

Q.   You don't recall that DHS requested you to provide this data?

A.   This data was requested by Ms. Evans.

Q.   Do you know whether Ms. Evans was discussing with DHS the issue of COREs that had been reassigned to MCO positions in 2025?

A.   I do not know.

Q.   But she was certainly discussing it with Mr. Edwards at DHS.  Correct?

A.   That's correct.

Q.   And also, apparently, with Kara Voorhies, who is copied on emails.  Correct?

A.   Correct.

Q.   And the data that was requested is a comparison between the renewals provided between

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 265

January 1 and November 30th and January 20th and November 30th.

A.   That's correct.

Q.   And the significance of those dates...?

A.   I gave year-to-date information in the first bullet point.

This was sent on December 19th.

And our payroll systems generally run a pay period behind.  So November 30th would have been the most up-to-date information I had for 2025 at that date.

So I gave year-to-date information in the first bullet.

The second bullet was data from the presidential transition to date.

Q.   So the comparison here that is being requested is the comparison between the year that includes the time period before the presidential transition and after the presidential transition.

A.   That's correct.

Q.   To see the difference between those numbers, presumably.

A.   Correct.

Q.   Okay.  And do you have any other information as to why Ms. Evans was asking you for a

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 275

Q.   Sure.  Had she ever expressed to you that she was -- she didn't understand whether the program and region officers -- offices had requested these renewals?

A.   We did have conversations in December, where I explained the renewal process.

There was a time that Ms. Evans was not aware if the program heads approved those renewals.

And I did go through the process and explained that the regional and program heads were respons- -- ultimately responsible for making those decisions.

Q.   Ms. Evans didn't understand the process that was in the CORE manual?

A.   I don't know if she didn't understand the process.

I did provide clarifying language.

Q.   And the information you had repeatedly provided to her in multiple formats indicated that the programs and regions had requested these renewals, correct?

A.   Yes.

Q.   Are you aware of any communication from Ms. Evans during the point in time where she was renewing -- reviewing the information you provided

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 276

her, where she asked for any information regarding the functions that these CORE employees actually performed for FEMA?

A.   She did ask, and that information was provided in the attachments exactly what the individual -- of course, the name was redacted -- but what that individual was responsible for accomplishing.

Q.   Ms. Evans repeatedly asked for information regarding how much these employees cost.  Correct?

A.   She did.

Q.   And she conveyed that information to DHS.  Correct?

A.   I don't know --

If you consider Kara Voorhies DHS, then, yes.  But I don't know if it was conveyed outside of Kara.

Q.   And information regarding spending on these employees was conveyed to Mr. Edwards as well.  Correct?

A.   I believe so.

Q.   While we look for that document, let's switch back to something I wanted to follow up on with respect to the annual staffing plan.

A.   Okay.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 283

A.   I believe I shared that information.

Q.   Okay.  But she is responding to your email on Christmas -- on New Year's Eve, with a series of additional requests.  Correct?

A.   Correct.

Q.   Including, she wants to know what a fully loaded CORE is receiving in pay, correct?

A.   Yes.

Q.   And she wants the package -- packages being prepared to include the pay proposed, correct?

A.   Yes.

Q.   And then she asks for additional justifications for determinations for all COREs who were renewed the three and four years.

Do you see that?

A.   Yes.

Q.   So she is talking about previous renewals here --

A.   Correct.

Q.   -- that she believes were for the lengths of three or four years.  Correct?

A.   Correct.

Q.   And it -- had they been --

Are you aware of any COREs who were renewed for three years?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 284

A.   Yes.

Q.   Okay.  Did you understand that she -- when you read this email, whether it was then on this day or when you returned, that Ms. Evans was asking, going forward, that the amount that the COREs cost the agency be included in the renewal packets?

A.   Yes.

Q.   Do you have any understanding as to whether Ms. Evans was asking for this information because someone at DHS wanted it?

A.   I don't know.

Q.   It's possible.  Right?

A.   Yes.

Q.   Because other information regarding the cost of COREs who were coming up for expiration had been conveyed to DHS by this point in time. Correct?

A.   I do not know that.

Q.   It was conveyed to Ms. Voorhies and Mr. Edwards, correct?

A.   Yes.

Q.   Had Ms. Evans at some point reversed course on whether an option of becoming a reservist would be conveyed to COREs who were being released from service in January?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 292

Q.    Sorry, can I get a clear answer.

A.    "They could."

Q.    Would you be surprised if I told you that Ms. Evans confirmed in her testimony that she never completely read your memo?

A.    Yes.

Q.    As the FEMA SOPDA, she should have read your memo.  Right?

MR. ROSENBERG:  Objection; form.

A.    I am a consultant.  And what she reads is at her discretion.

Q.    If DHS had not imposed on FEMA a rule that they couldn't review -- renew the COREs without DHS's approval, would -- do you believe that FEMA would have renewed nearly all of the COREs up for renewal in January?

MR. ROSENBERG:  Objection; confusing and calls for speculation.

A.    Will you restate, please?

Q.    Sure.  If DHS had not imposed on FEMA a rule that they couldn't renew COREs without DHS's approval --

A.    Um-hum.

Q.    -- do you believe that FEMA would have renewed nearly all of the COREs up for renewal in

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 293

January?

MR. ROSENBERG:  Objection; calls for speculation.

Q.   You can answer.

A.   It has been FEMA's past practice to renew most expiring COREs.

Q.   So if FEMA and -- the FEMA program and regional offices -- the heads of those offices recommended 300 and -- all 303 COREs that you had put forward to Ms. Evans for -- that -- who were up for renewal in January.  Correct?

A.   Correct.

Q.   And if FEMA had followed its CORE manual, those program offices' and regional heads' approval would have allowed for the renewal of those COREs. Correct.

A.   Had not the process been in place?

Q.   Yes.

A.   Yes, that's correct.

Q.   So is it fair to say that the separations that occurred in January are the result of the DHS's secretary's priorities and policies being imposed on FEMA?

MR. ROSENBERG:  Objection; lack of foundation, misleading, calls for

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 304

So, yes, Ms. Evans would have provided me with that information.

Q.   You didn't draft that declaration.

A.   I did not.

Q.   You were told what individuals to include in that declaration?

MR. ROSENBERG:   Objection --

A.   No.

MR. ROSENBERG:   -- mischaracterizes.

Q.   You received information from Ms. Evans regarding which individuals to include in that declaration.

A.   I searched my emails.  So Ms. Evans did not provide me with the email.

When the draft declaration came out, I went through my emails to see who in leadership was communicated with.  And I found one where two officials from DHS were involved, and that's why their names were listed.

Q.   But you don't actually know who at DHS was actually involved in the decision-making process for the CORE renewals.  Correct?

A.   There was a singular email from Ms. Evans, where I was -- I wasn't initially included.  She

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 305

forward- -- she forwarded the email to me, and it showed a discussion about CORE renewals with DHS senior officials.

Q.   She forwarded that email to you?

A.   Yes.

Q.   And are those the names you included in the declaration?

A.   Yes.

Q.   Okay.  There were no other individuals shown on that email?

A.   No, not to my knowledge.

Q.   You were aware that Ms. Voorhies was communicating with Ms. Evans regarding these issues, correct?

A.   I was aware that Ms. Voorhies was in meetings.

I do not recall receiving any specific requests for information from Ms. Voorhies.

Q.   Did Ms. Evans tell you not to include Ms. Voorhies' name on that declaration?

A.   Oh, no.  She did not.

Q.   Okay.  But you're not aware of -- that declaration was given to your knowledge, correct?

A.   Yes.

Q.   It was -- but you're not aware of all the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 306

individuals in DHS leadership who were actually involved in the decision-making with respect to the CORE, correct?

A.   If there were additional officials involved, I do not have knowledge of that.

MS. LEONARD:  Sorry.  Give us one second.

WITNESS:  Um-hum.

(Pause.)

MS. LEONARD:  Okay.  Thanks.

Let's mark this as the next, which is 95.

(Whereupon, Plaintiffs Exhibit 95 was marked for identification.)

MS. LEONARD:  Is this the same email?  I think this is the same one we just marked.  Right?

WITNESS:  Yeah.

MS. LEONARD:  This is what happens at the end of the day -- look at that.  We've got -- we've got two of them. We're not all crazy.  Okay.

MR. ROSENBERG:  I was actually going to ask if you needed a break. But....

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 319

Q.   But no decision had been made, at this point in time, as to what -- how to instruct them yet.  Correct?

A.   Correct.

          MS. LEONARD:  All right.  Let's mark this 98.

          (Whereupon, Plaintiffs Exhibit 98 was marked for identification.)

Q.   There you go.

A.   Thank you.

Q.   And I can represent to you that we redacted the individual names that are on this document in the black box.

          (Witness reading.)

A.   Okay.

Q.   So on January 20th, you are -- this is an email from you, on January 20th, to someone named Thomas Layou.

A.   Yes.

Q.   Who is that?

A.   He is the deputy chief financial officer.

Q.   And in this email on January 20th, you say:

          At present, renewals are
          limited to 90 days to allow

Page 320

program and regional offices an opportunity to submit an annual staffing plan by March 31st.

Do you see that?

A. Yes.

Q. So that was correct.

A. Yes.

Q. And that was direction -- that was not a decision that you made. Correct?

A. Correct.

Q. That was direction that you were given.

A. Correct.

Q. And then you say:

I'm hopeful the staffing plan template will be released this week.

Was it?

A. No.

Q. Okay. Has the staffing plan template been released since this email at some point in time?

A. Yes.

Q. And when was that?

A. I want to say late January, early February.

Q. And were instructions provided to the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 321

regions and programs regarding how to complete that template?

A.    Yes.

Q.    They were not provided in an email similar to the December 23rd email.  Correct?

A.    That's correct.

Q.    Were you instructed to provide those instructions in a different format?

A.    I was instructed not to provide an email.

Q.    To FEMA leadership.

A.    Correct.

Q.    Because SOPDA Evans was concerned about leaks?

A.    That is correct.

Q.    Because the December 23rd email had been provided to the press, who had asked questions about the 50% cut plan.  Right?

A.    That is correct.

Q.    Okay.  So how were you instructed to provide the template instructions to the offices and programs, then?

A.    I was not instructed on how to provide.  I was instructed on what not to do.

Q.    But you were instructed to give -- to provide the template in some way.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 322

A.   No.

Q.   Can you explain to me what Ms. Evans said to you about this.

A.   Ms. Evans told me she did not want an email being sent because emails were being leaked to the press.

Q.   But did she give you direction that you were to require programs and offices to engage in the staffing planning?

A.   I believe Ms. Evans gave those instructions at a principals meeting, where all of the principals and regional administrators were present.

Q.   And then at some point, did you make available the template in some way?

A.   What I then did was reached out to everyone individually and provided them with a link to a secure SharePoint where their data was housed.

And each principal or regional administrator then reached out and told me if a few members of their staff should be provided access.

Q.   And in doing so, you were implementing SOPDA Evans' desire not to send these instructions by email.

A.   Correct.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 333

timeline is, in terms of determining what the FEMA contribution for the Q3 quarterly report will be?

A.   I don't know, because we are still furloughed.

Q.   Because the DHS staff -- the DHS CHCO staff are furloughed who would be handling that.

A.   That's accurate.

Q.   Okay.  Is there an intention to implement whatever the result of the staffing planning is by June 30th?

MR. ROSENBERG:  Objection; vague.

A.   I'm not sure.

Q.   Have you ever heard Ms. Evans convey that she expects the programs and regions to implement the staffing plan by June 30th?

A.   I believe, in one of these exhibits, there was a June date for implementation.

Q.   And is that consistent with your understanding that Ms. Evans intends to have the staffing plan implemented by June 30th?

A.   I don't know what the date is in June, but I understand the intent was to implement by the month of June.

MS. LEONARD:  Okay.  I'm going

# Exhibit J

 Outlook

---

## RE: [EXTERNAL] Re: AFGE v. Trump, 25-cv-03698-SI (N.D. Cal.): ECF 343

---

**From** Rosenberg, Brad (CIV) <Brad.Rosenberg@usdoj.gov>

**Date** Mon 4/20/2026 12:19 PM

**To** Tsuki Hoshijima <thoshijima@democracyforward.org>; Danielle Leonard <dleonard@altshulerberzon.com>

**Cc** Hall, Christopher (CIV) <Christopher.Hall@usdoj.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Azrak, Cesar E (CIV) <Cesar.E.Azrak@usdoj.gov>; Bombard, Robert (CIV) <Robert.Bombard2@usdoj.gov>; Newman , Jeremy S. (CIV) <Jeremy.S.Newman@usdoj.gov>; Stacey Leyton <sleyton@altshulerberzon.com>; BJ Chisholm <bchisholm@altshulerberzon.com>; Elle Eshleman <eeshleman@altshulerberzon.com>; Jessica Levy <jlevy@altshulerberzon.com>

Hello Plaintiffs' Team,

Thank you for agreeing to an extension for defendants' response date on the document requests, assuming the Court authorizes them.

Regarding Mr. Guy, he is available for a deposition on April 30, if the Court authorizes it.  As for Ms. Voorhies, DHS OGC was able to obtain information regarding her phone.  As she is no longer a government employee or government contractor, plaintiffs will need to serve her with a Rule 45 subpoena (again, if the court authorizes this deposition).

Regarding a motion to dismiss, we believe we should have an opportunity to test, among other things, the Court's subject-matter jurisdiction over the supplemental complaint.  The timing of a motion to dismiss would depend on several factors, including how the court resolves the PI and whether it first orders supplemental briefing on that pending motion.  So, for example, defendants could file their motion to dismiss within 14 days of the court's final decision on the pending PI motion, assuming discovery remains stayed during that time period.  But as you can appreciate, there are a lot of moving parts right now, including potential appeals, so it's hard to commit to a specific schedule without knowing how the pieces would align.

Best,
Brad

---

**From:** Tsuki Hoshijima <thoshijima@democracyforward.org>
**Sent:** Monday, April 20, 2026 12:52 PM
**To:** Danielle Leonard <dleonard@altshulerberzon.com>
**Cc:** Rosenberg, Brad (CIV) <Brad.Rosenberg@usdoj.gov>; Hall, Christopher (CIV) <Christopher.Hall@usdoj.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Azrak, Cesar E (CIV) <Cesar.E.Azrak@usdoj.gov>; Bombard, Robert (CIV) <Robert.Bombard2@usdoj.gov>; Newman , Jeremy S. (CIV) <Jeremy.S.Newman@usdoj.gov>; Stacey Leyton <sleyton@altshulerberzon.com>; BJ Chisholm <bchisholm@altshulerberzon.com>; Elle Eshleman <eeshleman@altshulerberzon.com>; Jessica Levy <jlevy@altshulerberzon.com>
**Subject:** Re: [EXTERNAL] Re: AFGE v. Trump, 25-cv-03698-SI (N.D. Cal.): ECF 343

Brad, we're following up on this email and adding one more question related to your contemplated motion to dismiss. In addition to sharing the basis for the motion, as Danielle requested, can you also let us know if you have a proposal for a briefing schedule on such a motion?

On Fri, Apr 17, 2026 at 3:09 PM Danielle Leonard <dleonard@altshulerberzon.com> wrote:

Brad-

In Defendants' Wednesday filing, Defendants raised with the Court, for the first time, requests to stay discovery and certain requests regarding other scheduling in the case, including to be allowed to file a motion to dismiss the supplemental complaint that was filed in January.  There was no meet and confer on these new requests prior to raising them with the Court.  Please share what is the basis for the MTD, and the reason this was not raised before submitting the request to the Court?

We do not agree to stay discovery in this case.  We will agree, as a courtesy, to a two-week extension on your response date for the response and document production due Monday, notwithstanding the day of this request even though the discovery was served weeks earlier.

With respect to Guy, he is a current employee of a defendant in this case, and we have noticed his deposition.  If Defendants have information regarding logistics or representation that you'd like to share, please do so.

With respect to Voorhies, you have not responded to our question regarding what appear to be inconsistent statements regarding Defendants' ability to reach her.  You represented to us that Defendants were in contact with her and that she confirmed there were no responsive materials on her personal phone, and then told us that Defendants did not know how to contact her.  Please explain.

Thanks,
Danielle

Danielle Leonard
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, California 94108
(415) 421-7151
Pronouns: she/her

**ALTSHULER BERZON LLP**

*This email message and any attached documentation are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information. If the reader or recipient of this communication is not the intended recipient or someone authorized to receive the message for the intended recipient, please notify the sender immediately by reply email or telephone, and delete the original communication and any attached documentation without copying or disclosing the contents. Any unauthorized review, use, copying, disclosure, or distribution of this communication and any attached documentation is strictly prohibited. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work product privilege. Any advice contained in this communication (including attachments) is not intended or written to be used, and cannot be used, as tax advice.  Issues regarding taxation or tax law should be referred to the intended recipient's tax advisor.*

**From:** Rosenberg, Brad (CIV) <Brad.Rosenberg@usdoj.gov>
**Sent:** Thursday, April 16, 2026 2:42 PM
**To:** Danielle Leonard <dleonard@altshulerberzon.com>; Hall, Christopher (CIV) <Christopher.Hall@usdoj.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Azrak, Cesar E (CIV) <Cesar.E.Azrak@usdoj.gov>; Bombard, Robert (CIV) <Robert.Bombard2@usdoj.gov>; Newman , Jeremy S. (CIV) <Jeremy.S.Newman@usdoj.gov>
**Cc:** Tsuki Hoshijima <thoshijima@democracyforward.org>; Stacey Leyton <sleyton@altshulerberzon.com>; BJ Chisholm <bchisholm@altshulerberzon.com>; Elle Eshleman <eeshleman@altshulerberzon.com>; Jessica Levy <jlevy@altshulerberzon.com>
**Subject:** RE: [EXTERNAL] Re: AFGE v. Trump, 25-cv-03698-SI (N.D. Cal.): ECF 343

Hi Danielle,

As you saw from our filing yesterday, we don't think continued discovery—including additional depositions—is appropriate at this time.  That said, we're still looking into how we would handle Guy's deposition if it goes forward and will follow-up as soon as we can.  As for Voorhies, I don't have an update regarding her.  If that changes I will let you know, but I suggest that plaintiffs explore serving her with a subpoena.

Separately, we wanted to inquire about whether plaintiffs would be willing to agree to stay defendants' obligation to respond to the March 20 Requests for Production of Documents (Set Two) until after we receive guidance from the court regarding further discovery.  Those responses are currently due Monday, which is the same day that the court has allowed plaintiffs to file their response to our discovery filing.  Please let us know your thoughts.

Thanks,
-Brad

---

**From:** Danielle Leonard <dleonard@altshulerberzon.com>
**Sent:** Tuesday, April 14, 2026 4:39 PM
**To:** Rosenberg, Brad (CIV) <Brad.Rosenberg@usdoj.gov>; Hall, Christopher (CIV) <Christopher.Hall@usdoj.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Azrak, Cesar E (CIV) <Cesar.E.Azrak@usdoj.gov>; Bombard, Robert (CIV) <Robert.Bombard2@usdoj.gov>; Newman , Jeremy S. (CIV) <Jeremy.S.Newman@usdoj.gov>
**Cc:** Tsuki Hoshijima <thoshijima@democracyforward.org>; Stacey Leyton <sleyton@altshulerberzon.com>; BJ Chisholm <bchisholm@altshulerberzon.com>; Elle Eshleman <eeshleman@altshulerberzon.com>; Jessica Levy <jlevy@altshulerberzon.com>
**Subject:** RE: [EXTERNAL] Re: AFGE v. Trump, 25-cv-03698-SI (N.D. Cal.): ECF 343

Brad-
Discovery in this case has been open for some time, and Plaintiffs do not need to seek the Court's permission to take these or any other depositions pursuant to Rule 30.  Please confirm counsel and the witnesses' availability on the dates we have noticed, and whether DOJ intends to represent the witnesses.

Your prior communications have confirmed that you (or your clients) are directly in contact with Ms. Voorhies:  *i.e.*, your email of April 8, 2026, received at 5:09 pm PT:  "Kristi Noem, Corey Lewandowski**, and Kara Voorhies have confirmed that they did not use their personal phones** to discuss FEMA CORE renewals or targeted reductions of FEMA staffing between December 1, 2025 and March 6, 2026.").  Please explain how you obtained this

information without having "any information regarding her, including whether she is represented by private counsel."

Thanks,
Danielle

Danielle Leonard
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, California 94108
(415) 421-7151
Pronouns: she/her

**ALTSHULER BERZON LLP**

*This email message and any attached documentation are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information. If the reader or recipient of this communication is not the intended recipient or someone authorized to receive the message for the intended recipient, please notify the sender immediately by reply email or telephone, and delete the original communication and any attached documentation without copying or disclosing the contents. Any unauthorized review, use, copying, disclosure, or distribution of this communication and any attached documentation is strictly prohibited. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work product privilege. Any advice contained in this communication (including attachments) is not intended or written to be used, and cannot be used, as tax advice.  Issues regarding taxation or tax law should be referred to the intended recipient's tax advisor.*

---

**From:** Rosenberg, Brad (CIV) <Brad.Rosenberg@usdoj.gov>
**Sent:** Tuesday, April 14, 2026 12:59 PM
**To:** Danielle Leonard <dleonard@altshulerberzon.com>; Hall, Christopher (CIV) <Christopher.Hall@usdoj.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Azrak, Cesar E (CIV) <Cesar.E.Azrak@usdoj.gov>; Bombard, Robert (CIV) <Robert.Bombard2@usdoj.gov>; Newman , Jeremy S. (CIV) <Jeremy.S.Newman@usdoj.gov>
**Cc:** Tsuki Hoshijima <thoshijima@democracyforward.org>; Stacey Leyton <sleyton@altshulerberzon.com>; BJ Chisholm <bchisholm@altshulerberzon.com>; Elle Eshleman <eeshleman@altshulerberzon.com>; Jessica Levy <jlevy@altshulerberzon.com>
**Subject:** RE: [EXTERNAL] Re: AFGE v. Trump, 25-cv-03698-SI (N.D. Cal.): ECF 343

Danielle,

Thanks for the update on your filing.  Regarding the depositions, neither are currently authorized by the court, so its forthcoming decision will inform how we proceed.  That said, we are looking into how a potential deposition of Mr. Guy would be handled if the court allows the deposition—we will follow-up on that as soon as we can.  As for Ms. Voorhies, we do not have any information regarding her, including whether she is represented by private counsel. To that end, we understand that plaintiffs may need to serve her with a subpoena.

Hope this helps.

Best,
Brad

---

**From:** Danielle Leonard <dleonard@altshulerberzon.com>
**Sent:** Tuesday, April 14, 2026 1:24 PM

**To:** Rosenberg, Brad (CIV) <Brad.Rosenberg@usdoj.gov>; Hall, Christopher (CIV) <Christopher.Hall@usdoj.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Azrak, Cesar E (CIV) <Cesar.E.Azrak@usdoj.gov>; Bombard, Robert (CIV) <Robert.Bombard2@usdoj.gov>; Newman , Jeremy S. (CIV) <Jeremy.S.Newman@usdoj.gov>
**Cc:** Tsuki Hoshijima <thoshijima@democracyforward.org>; Stacey Leyton <sleyton@altshulerberzon.com>; BJ Chisholm <bchisholm@altshulerberzon.com>; Elle Eshleman <eeshleman@altshulerberzon.com>; Jessica Levy <jlevy@altshulerberzon.com>
**Subject:** RE: [EXTERNAL] Re: AFGE v. Trump, 25-cv-03698-SI (N.D. Cal.): ECF 343

Brad-

Thanks, we can agree to the usual seven days for your reply, and will present the schedule and request to move up the hearing to the Court at the Court's convenience with our response papers.  We will include that we do not oppose your request that any hearing be held by zoom.

Are you able to give us Defendants' position on whether you will be intending to represent Guy and Voorhies in the upcoming depositions, and any issue with the specific dates?  We are moving forward with arrangements.  With respect to Guy, we understand that he remains a government employee (and therefore would be represented by DOJ), if that is incorrect please let us know.

With respect to Voorhies, if you cannot give us your position and intentions on this, we will have no choice but to serve her with a subpoena and will understand that you are not claiming any representational relationship, including with respect to Defendants' recent conversations with her.  Or, if you or your clients are aware that she is represented by private counsel, please provide us with their information so that we can communicate through her counsel.

Thanks,
Danielle


Danielle Leonard
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, California 94108
(415) 421-7151
Pronouns: she/her


## ALTSHULER BERZON LLP

*This email message and any attached documentation are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information. If the reader or recipient of this communication is not the intended recipient or someone authorized to receive the message for the intended recipient, please notify the sender immediately by reply email or telephone, and delete the original communication and any attached documentation without copying or disclosing the contents. Any unauthorized review, use, copying, disclosure, or distribution of this communication and any attached documentation is strictly prohibited. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work product privilege. Any advice contained in this communication (including attachments) is not intended or written to be used, and cannot be used, as tax advice.  Issues regarding taxation or tax law should be referred to the intended recipient's tax advisor.*

---

**From:** Rosenberg, Brad (CIV) <Brad.Rosenberg@usdoj.gov>
**Sent:** Tuesday, April 14, 2026 9:14 AM
**To:** Danielle Leonard <dleonard@altshulerberzon.com>; Hall, Christopher (CIV) <Christopher.Hall@usdoj.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Azrak, Cesar E (CIV) <Cesar.E.Azrak@usdoj.gov>; Bombard, Robert (CIV) <Robert.Bombard2@usdoj.gov>; Newman , Jeremy S. (CIV) <Jeremy.S.Newman@usdoj.gov>
**Cc:** Tsuki Hoshijima <thoshijima@democracyforward.org>; Stacey Leyton <sleyton@altshulerberzon.com>; BJ

Chisholm <bchisholm@altshulerberzon.com>; Elle Eshleman <eeshleman@altshulerberzon.com>; Jessica Levy <jlevy@altshulerberzon.com>
**Subject:** RE: [EXTERNAL] Re: AFGE v. Trump, 25-cv-03698-SI (N.D. Cal.): ECF 343

Hi Danielle,

Thank you for your email.  Regarding your proposal to shorten the schedule, plaintiffs can file their opposition this Wednesday (in other words, tomorrow), and we consent to a hearing as needed at the Court's convenience if we have the option to appear virtually (due to travel logistics if the Court schedules a hearing on short notice), but we need the seven days provided by the local rules to file our reply in support of our own motion.  Thus, if plaintiffs file their opposition tomorrow, our reply would be due on Wednesday, April 22.  Unfortunately, we cannot agree to filing our reply before then due to various conflicts.

We will get back to you separately regarding the deposition exhibits.

Best,
Brad

---

**From:** Danielle Leonard <dleonard@altshulerberzon.com>
**Sent:** Monday, April 13, 2026 8:03 PM
**To:** Rosenberg, Brad (CIV) <Brad.Rosenberg@usdoj.gov>; Hall, Christopher (CIV) <Christopher.Hall@usdoj.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Azrak, Cesar E (CIV) <Cesar.E.Azrak@usdoj.gov>; Bombard, Robert (CIV) <Robert.Bombard2@usdoj.gov>; Newman , Jeremy S. (CIV) <Jeremy.S.Newman@usdoj.gov>
**Cc:** Tsuki Hoshijima <thoshijima@democracyforward.org>; Stacey Leyton <sleyton@altshulerberzon.com>; BJ Chisholm <bchisholm@altshulerberzon.com>; Elle Eshleman <eeshleman@altshulerberzon.com>; Jessica Levy <jlevy@altshulerberzon.com>
**Subject:** RE: [EXTERNAL] Re: AFGE v. Trump, 25-cv-03698-SI (N.D. Cal.): ECF 343

Counsel-

We have reviewed your motion filed Friday for a blanket order maintaining your blanket confidentiality designations, as well as the spreadsheet provided on Thursday evening regarding deposition exhibits for which you have lifted or continue to assert confidentiality designations.  Upon review of your spreadsheet, Defendants appear to be asserting that "PII" includes all names and government email addresses of individuals communicating about government business by e-mail, given that the documents for which you assert "Confidential- PII Only" contain no confidential PII.  For six documents, the designation is listed, without explanation, as "Confidential," which we assume means something other than the document contains information that you assert is PII.

With respect to the motion, we will propose to the Court a shortened time on the schedule, in light of the expedited nature of these proceedings. We will file our response by Wednesday, and will propose deadline of Monday, April 20 for your reply, with a hearing as needed at the Court's convenience. Please let us know if you consent to this shortened schedule.

With respect to the deposition exhibits, Defendants' continued assertions of confidentiality do not meet their burden with respect to any of these designations, and we believe the designations should be lifted by operation of the Protective Order.  Without waiving those arguments, we respond further

in the attached with respect to each document for which you continue to assert confidentiality, in whole or part.

Danielle

Danielle Leonard
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, California 94108
(415) 421-7151
Pronouns: she/her

**ALTSHULER BERZON LLP**

*This email message and any attached documentation are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information. If the reader or recipient of this communication is not the intended recipient or someone authorized to receive the message for the intended recipient, please notify the sender immediately by reply email or telephone, and delete the original communication and any attached documentation without copying or disclosing the contents. Any unauthorized review, use, copying, disclosure, or distribution of this communication and any attached documentation is strictly prohibited. Receipt by anyone other than the intended recipient is not a waiver of any attorney-client or work product privilege. Any advice contained in this communication (including attachments) is not intended or written to be used, and cannot be used, as tax advice.  Issues regarding taxation or tax law should be referred to the intended recipient's tax advisor.*