Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*

[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.,<br><br>    Plaintiffs,<br><br>   v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>    Defendants. | Case No. 3:25-cv-03698-SI<br><br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTIVE RELIEF AND TO SET A PROMPT SCHEDULE ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

PROCEDURAL HISTORY ............................................................................................................3

ADDITIONAL EVIDENTIARY RECORD ...................................................................................6

      I.     DHS Directs 50% Cut to FEMA Staffing for Fiscal Year 2026 ................................6

           A.     DHS Assigned DHS Officials to Downsize FEMA Who Had No Background in Emergency Management or Disaster Relief or Knowledge of FEMA Functions ........................................................................6

           B.     DHS Develops Plans in 2025 to Downsize FEMA Staff By 50% ...............12

           C.     The December 4 2025 FEMA FY2026 Staffing Plan Also Cuts FEMA By 50% .......................................................................................................15

                 1.     The Staffing Plan cuts FEMA to 11,500 ..........................................15

                 2.     The 50% Cut Was Contrary to FEMA Staff's Recommended Plan ..................................................................................................16

           D.     Implementing the 50% Cut Plan Required Cutting CORE ...........................17

           E.     DHS Involvement in Plan to Reduce COREs by NTE Date .........................19

      II.     DHS Implements its Plan to Reduce FEMA Staffing by Eliminating CORE Positions Beginning January 1, 2026..............................................................23

      III.     Plaintiffs' January 2026 Lawsuit Halts Further Implementation of the Plan............24

      IV.     Defendants' Recent Actions .....................................................................................25

ARGUMENT ................................................................................................................................27

      I.     The Uncontroverted Evidentiary Record Confirms the Unlawfulness of the Actions of DHS and FEMA with Respect to the CORE Employees ........................27

           A.     DHS Has Violated and Continues to Violate the Post-Katrina Act by Removing FEMA Authority and Interfering with FEMA Capabilities.........27

           B.     Plan to Cut FEMA in Half Violated Authorizing Statutes ...........................31

           C.     DHS Directives to FEMA Were Arbitrary and Capricious ..........................31

           D.     DHS and FEMA Violated Section 120 of the CR .......................................35

      II.     Evidence Confirms This Lawsuit Has Halted Some, but not all Unlawful Action by DHS and FEMA ......................................................................................36

      III.     Evidence Also Supports Authorizing Plaintiffs to Seek Partial Summary Judgment on DHS/FEMA Claims ............................................................................39

A.   Consideration of Partial Summary Judgment Now Would Be Appropriate ............................................................................................................40

B.   The Record Supports Partial Summary Judgment to Plaintiffs on Supplemental Claims VIII – XIII Arising from DHS and FEMA's Actions .....................................................................................................................41

1.   DHS ........................................................................................................42

2.   FEMA ......................................................................................................43

C.   Permanent Relief Is Appropriate ...................................................................43

CONCLUSION ...................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ..................................................................................................................32

*AFGE v. OPM*,
   799 F. Supp. 3d 967 (N.D. Cal. 2025)..............................................................................32, 40, 41

*AFGE v. Trump*,
   139 F.4th 1020 (9th Cir. 2025) ............................................................................................43

*Ali v. Fed. Bureau of Prisons*,
   552 U.S. 214 (2008) .............................................................................................................35

*Am. Council of Learned Societies v. Nat'l Endowment for the Humans*,
   No. 25-CV-3657 (CM), 2026 WL 1256545 (S.D.N.Y. May 7, 2026) ...................................40

*Animal Legal Def. Fund v. U.S. Dep't of Ag.*,
   789 F.3d 1206 (11th Cir. 2015) ...........................................................................................41

*Asarco, Inc. v. E.P.A.*,
   616 F.2d 1153 (9th Cir.1980) ..............................................................................................40

*Bennett v. Spear*,
   520 U.S. 154 (1997) .............................................................................................................43

*Bentley v. AutoZoners, LLC*,
   935 F.3d 76 (2d Cir. 2019) ..................................................................................................40

*Center for Biological Diversity v. U.S. Fish and Wildlife Serv.*,
   67 F.4th 1027 (9th Cir. 2023) ..............................................................................................32

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) .............................................................................................................41

*Driftless Area Land Conservancy v. Valcq*,
   16 F.4th 508 (7th Cir. 2021)..................................................................................................44

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) .............................................................................................................32

*Griffin v. HM Fla.-ORL, LLC*,
   __ U.S. __, 144 S. Ct. 1 (2023) ...........................................................................................44

*Jane Doe 1 v. Nielsen*,
   357 F.Supp.3d 972 (N.D. Cal. 2018)....................................................................................45

*Karuk Tribe of California v. U.S. Forest Service*,
    681 F.3d 1006 (9th Cir. 2012) ..................................................................................42

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
    384 F.3d 1163 (9th Cir. 2004) ..................................................................................40

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
    477 F.3d 668 (9th Cir. 2007) ....................................................................................44

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
    465 F.3d 977 (9th Cir. 2006) ....................................................................................43

*Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*,
    128 F.4th 1089 (9th Cir. 2025) ................................................................................43

*Sackett v. E.P.A.*,
    566 U.S. 120 (2012) ..................................................................................................43

*San Francisco Herring Ass'n v. Dep't of Interior*,
    946 F.3d 564 (9th Cir. 2019) ....................................................................................43

*Southwest Ctr. for Biological Diversity v. United States Forest Serv.*,
    100 F.3d 1443 (9th Cir. 1996) ..................................................................................41

*State v. United States Bureau of Land Mgmt.*,
    277 F.Supp.3d 1106 (N.D. Cal. 2017).......................................................................41

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) (*ultra vires*) ...........................................................................44

*Washington v. Fed. Emergency Mgmt. Agency*,
    2025 WL 3551751 (D. Mass. Dec. 11, 2025) .........................................................30

**Federal Statutes**

5 U.S.C.
    § 704 ..........................................................................................................................43
    § 706 .....................................................................................................................40, 42

6 U.S.C.
    §§ 311-323 .................................................................................................................42
    § 315 .....................................................................................................................28, 42
    § 316 ...................................................................................................................*passim*
    § 711-825 ...................................................................................................................42

42 U.S.C.
    § 5149 ...................................................................................................................27, 35

Pub. L. No. 107-296
    § 503, 116 Stat. 2135................................................................................................28

Pub. L. No. 119-75, Div. H
    § 101 (2026) ........................................................................................................... 35

Pub. L. No 119-37
    § 120 (2025) ..................................................................................................... 35, 36

**INTRODUCTION**

In 2025 and early 2026, Defendant Department of Homeland Security ("DHS") leadership created and began implementing a plan to cut the staff of Defendant Federal Emergency Management Authority ("FEMA") in half by the end of the 2026 fiscal year—from roughly 23,000 to 11,500 employees, starting with the elimination of CORE employee positions.[1]  Since Plaintiffs filed their February 10, 2026 motion for preliminary relief, Defendants have repeatedly told this Court there was no such DHS plan.  *E.g.*, ECF 402, 344, 322, 312.  But the record established under this Court's expedited discovery orders conclusively shows otherwise.

That evidentiary record establishes the existence of the DHS plan to cut FEMA in half, in furtherance of the President's and DHS Secretary's stated priorities of downsizing FEMA and further shifting responsibility for disaster relief and emergency management from FEMA to state and local governments.  That plan was discussed throughout 2025 and documented in a December 4, 2025 Fiscal Year 2026 Annual Staffing Plan to reduce FEMA staffing by 50%.  And DHS began to implement that plan both by removing FEMA's authority to extend any CORE appointments and by directing FEMA to eliminate CORE positions at the end of their terms beginning in January 2026.  Thus, the discovery record has conclusively established the falsity of Defendants' repeated representations to this Court that 1) DHS did not direct FEMA's actions, and 2) there was no "plan" to reduce CORE positions (*e.g.*, ECF 402 at 24-25; ECF 312 at 7).

Discovery has also revealed that after the January 2026 filing of Plaintiffs' Supplemental Complaint—indeed, in *reaction* to this lawsuit—Defendants shifted tactics to put that downsizing plan on pause, holding FEMA and its employees in limbo by granting uniform CORE extensions for only 90 days at a time (rather than the usual one or two year terms needed by FEMA to plan and perform its functions).  That remained the status quo until recently, when in early May 2026 Defendants again shifted tactics in response to this litigation and decided to offer previously terminated FEMA employees new positions at FEMA (without backpay, retroactive benefits

---

[1] CORE stands for the "Cadre of On-Call Response/Recovery Employees," a type of federal employee that is statutorily authorized and funded by the Stafford Act and the Disaster Relief Fund, and which comprise over half of FEMA's full-time employees.  ECF 301-1 at 2, 6-7.

coverage, or reinstatement of all service accruals).  Further, at DHS direction, in May 2026, FEMA also began, temporarily, to extend other CORE positions for six months or a year.

These DHS and FEMA pivots occurred after two significant developments:  First, DHS leadership changed when the President fired DHS Secretary Kristi Noem and she, along with other DHS officials directing FEMA's actions, left DHS.  Second, this Court denied Defendants' request to suspend discovery into the relevant events and instead directed compliance with its discovery orders, allowing Plaintiffs to uncover a sustained effort by Defendants to conceal and even destroy documents and information pertaining to DHS decision-making and the plan to radically reduce FEMA.  This process resulted in the disclosure of evidence that DHS and FEMA officials conducted substantial FEMA-related communications on personal phones using the Signal application without preserving them, and deleted communications from the relevant time periods through the use of auto-delete settings and other actions.  Because Defendants' failure to preserve and intentional deletion of directly relevant electronic records violate both federal law and Rule 37(e), Plaintiffs accompany this brief with a Rule 37(e) motion for appropriate remedies.  Plaintiffs have also filed an unopposed request that the Court set that motion on the same schedule as the existing briefing and hearing schedule, and have included an additional proposed order that sets forth appropriate relief.  While the record supports preliminary injunctive relief even without these spoliation remedies, the remedies would reinforce the record that Plaintiffs have assembled here.

The supplemental record developed since the original preliminary injunction briefing conclusively establishes that Defendants' actions were unlawful and that, rather than carefully considered decision-making that accounted for FEMA's statutory mission and functions, DHS officials with little to no understanding of FEMA made decisions for FEMA.  These unlawful actions caused substantial harm to FEMA and its employees.  Contrary to Defendants' repeated suggestions, recent developments have not mooted the need for relief: the welcome development of bringing valued employees back to an agency that needs them falls short of complete relief with respect to the unlawful DHS and FEMA actions challenged in this case (in particular, DHS's removal of FEMA authority and the DHS plan to cut FEMA staff).  This brief is accompanied by a revised proposed order that sets forth the preliminary relief that remains presently warranted.

Finally, in addition to supporting preliminary injunctive relief, the substantial factual record assembled through expedited discovery (and likelihood that Defendants have deleted any relevant unproduced evidence) allow this Court to resolve Plaintiffs' claims efficiently and on a final basis. In light of Defendants' spoliation of evidence and because the existing documentary record is uncontroverted, no material factual disputes remain regarding the relevant events. The Court may therefore decide whether permanent relief is warranted via partial summary judgment on Plaintiffs' supplemental claims VIII through XIII. Indeed, Defendants apparently agree that dispositive motions are appropriate, having filed a motion to dismiss that relies on their version of the evidentiary record and which would have more properly been brought under Rule 56. ECF 402 at 24-25. Plaintiffs therefore also respectfully request that the Court find good cause to establish an expedited schedule for briefing and hearing of Plaintiffs' motion for partial summary judgment with respect to their supplemental claims against DHS and FEMA, notwithstanding the Court's usual one-summary-judgment-motion rule, as also set forth in the accompanying proposed order.

## PROCEDURAL HISTORY

In January 2026, DHS and FEMA began eliminating CORE positions based on not-to-exceed ("NTE") dates. *See* ECF 298. Neither made these actions public, and when news broke of these terminations, Defendants issued dismissive denials, in particular denying any "plan" to cut the CORE. ECF 301-1 at 17. On January 30, 2026, Plaintiffs filed a Supplemental Complaint, which challenged, among other things, DHS actions requiring FEMA to reduce itself by half, thereby threatening the jobs of more than 10,000 employees and FEMA's ability to function and fulfill its complex statutory mandates. ECF 298. Plaintiffs claimed that these DHS and FEMA actions were ultra vires and violated the APA—in particular, the statutory provisions enacted in the wake of Hurricane Katrina that specifically prohibit DHS from reducing FEMA's authorities or capacity to perform its functions (6 U.S.C. §316(c)). ECF 298 at 43-53 (Claims VIII-XIII).

On February 10, 2026, Plaintiffs moved for a temporary restraining order halting further elimination of CORE positions by DHS and FEMA and reinstating employees who had been unlawfully separated. ECF 301, 301-1, 301-2. This Court converted Plaintiffs' motion into a preliminary injunction motion and scheduled briefing and a hearing on March 3, 2026. ECF 304.

Plaintiffs' motion was supported by record evidence that DHS had directed the actions of FEMA, removed FEMA's authority with respect to the CORE, and created and implemented a plan to radically downsize FEMA, and that DHS and FEMA had begun implementing this plan by separating CORE employees by NTE date and intended to continue implementing that plan going forward through fiscal year 2026, ultimately removing thousands of employees. *See* ECF 301-1 at 14-19. In response, Defendants submitted a single declaration in which Senior Official Performing the Duties of Administrator ("SOPDA") Karen Evans admitted that she was appointed by and reported to DHS leadership (exercising authority "previously assigned" to FEMA), admitted that *DHS* had separated a few hundred CORE employees in January 2026, and denied that there was a plan to remove "all" of the CORE. ECF 312-1. Defendants told this Court that the CORE separations "reflect[ed] reasoned operational judgments." ECF 312 at 1.

At the March 3, 2026 hearing, Defendants' counsel "presented a version of the facts markedly different from what is contained in the sworn declaration by Karen S. Evans." ECF 321 at 1. Because the disputed facts went "to the core question in this case: whether DHS ordered or directed that FEMA make staffing cuts (and cut staffing to a certain level)," *t*he Court ordered expedited document and deposition discovery. *Id*. at 1-2. The Court also ordered Defendants to file a declaration identifying who was involved in the CORE decisions. *Id*.

What transpired next was sustained non-compliance with the Court's orders, as reflected in subsequent filings and disputes and Court orders requiring further compliance. *See* ECF 332-400 (discussed further in the accompanying Plaintiffs' Motion for Rule 37(e) Remedies). Plaintiffs ultimately deposed five individuals: SOPDA Evans, DHS Chief Human Capital Officer ("CHCO") Roland Edwards, FEMA CHCO La'Toya Prieur, former DHS Deputy Chief of Staff ("DCOS") Joseph Guy, and former DHS "Senior Advisor" (and actually government subcontractor) Kara Voorhies. Two, Guy and Evans, had to be re-deposed in light of revelations of concealed and destroyed evidence. ECF 381, 400. Ultimately, Plaintiffs had to seek, and this Court had to order, further compliance to require Defendants to produce directly relevant documents, including substantial work-related communications conducted on DHS and FEMA officials' personal phones. ECF 351. The Court issued its further order to produce these communications after

Defendants unsuccessfully attempted to convince this Court to halt all further discovery, ECF 344, without having revealed the existence of thousands of Signal communications on dozens of group and individual chats or produced the ones that still existed.

It was only after this Court rejected Defendants' request to stay discovery, ordered the search and production from personal phones used for government business, ordered the submission of preservation declarations from Evans, Voorhies, and Guy (to be filed by April 29) (ECF 351 at 1, 4-6), and issued further search and production orders on April 30 and May 1, that Defendants offered new positions to the COREs who had been separated in January. *See* ECF 383-1.

As discussed further in the accompanying Rule 37 Motion, the Court's compliance orders allowed Plaintiffs to uncover Defendants' rampant failure to preserve government communications, including the use of auto-delete functions to eliminate government records directly relevant to these issues, particularly by Evans (who also changed those functions on key Signal chats including "FEMA 2.0" to shorten deletion settings *after* this Court's production orders). Plaintiffs also uncovered actions taken by Defendants and their officials, again after this Court's production and preservation orders, that directly resulted in the loss of relevant evidence.

The most recent further deposition of Evans (conducted with Defendants' consent after Plaintiffs identified further missing and deleted Signal communications) further revealed that Defendants *and* their counsel were aware all along of the existence of thousands of Signal chat communications in dozens of government-related chats conducted on personal phones, throughout 2025 and into 2026. That deposition further showed that Defendants and their counsel were aware that Evans had created *backups* of some of those Signal chats as early as April 25 (prior to this Court's production and preservation declaration deadline of April 29, and further production order of May 1), which they failed to produce or disclose in subsequent filings. In the end, Plaintiffs were able to obtain only some of the documents still in existence that Defendants failed to initially disclose. It is also notable that many of these documents were not revealed by Defendants, but uncovered only by the deposition of a former DHS official (Guy, who admitted the extent of FEMA-related Signal chats involving government officials on personal phones), and through a third-party subpoena to Voorhies, a former government subcontractor who was served and deposed

PLFS' SUPP. BRIEF ISO PRELIMINARY INJUNCTION, No. 3:25-cv-03698-SI

in Texas.  Worse yet, Defendants tried to conceal the existence of these Signal communications, their failure to preserve evidence, and this spoliation at every turn throughout this case.

Finally, on May 22, 2026, Defendants filed a motion to dismiss Plaintiffs' January 30, 2026 Supplemental Complaint, requesting that this Court set that motion on shortened time (ECF 402), and a renewed request for this Court to stay discovery (ECF 403), notwithstanding the Court's previous stay denial (ECF 351).  This Court scheduled the hearing on that motion on June 23, 2026, to coincide with the presently scheduled hearing on further injunctive relief.  ECF 410.[2]

## ADDITIONAL EVIDENTIARY RECORD

## I.      DHS Directs 50% Cut to FEMA Staffing for Fiscal Year 2026

### A.      DHS Assigned DHS Officials to Downsize FEMA Who Had No Background in Emergency Management or Disaster Relief or Knowledge of FEMA Functions

From January 2025 through late March 2026, DHS was led by Secretary Noem.  5/4 Guy Depo. at 21:10-17.[3]  As Plaintiffs' initial evidence established and depositions further confirmed, Secretary Noem made no secret of her desire to "eliminate" FEMA and replace it with a smaller agency, in furtherance of the President's priorities.  ECF 301-1 at 12-13; *see also* 3/31 Evans Depo. at 70:2-25, 77:8-15; 5/4 Guy Depo. at 175:20-176:2; Voorhies Depo. at 96:6-23.  To that end, DHS put into place officials at DHS headquarters and in FEMA leadership who had no emergency management or disaster relief experience but who did have a mandate to downsize FEMA.

From January 2025 through May 2026, Secretary Noem installed three successive DHS political appointees to perform the role of FEMA SOPDA.  3/31 Evans Depo. at 178:14-20; ECF 301-1 at 12.  Each of these non-career, political appointees reported to the DHS Secretary and none were Senate-confirmed.  3/31 Evans Depo. at 17:5-8, 65:14-23, 106:5-12; Depo. Ex. 34 (ECF 312-1).  Secretary Noem required the first SOPDA, Cameron Hamilton, who held the position from

---

[2] Plaintiffs' opposition to that motion to dismiss is due June 5, 2026.  Local Rule 7-3(a).
[3] Plaintiffs' evidence is attached to a series of Plaintiffs' counsel declarations, divided to facilitate separate filing on the ECF system.  Deposition transcripts are attached in chronological order as exhibits A-F to the First Leonard Declaration, and are labeled in this brief by name and, where depositions were continued to a further date, by date.  The deposition exhibits were consecutively numbered and are attached in numerical order as exhibits to the Second through Tenth Leonard Declaration and identified in this brief by Deposition Exhibit Number.  Additional documents produced in discovery are attached and identified as Exhibits to the First Leyton Declaration.

January through early May 2025, to write an "Abolish FEMA" memo and then fired him after he testified to Congress that FEMA should not be eliminated.  Voorhies Depo. at 65:20-24; ECF 301-1 at 13; *see also* In Camera Leyton Decl., Ex. G.[4]  The second SOPDA, David Richardson, lasted just about as long as the 2025 hurricane season, through November 2025.  Voorhies Depo. at 85:10-19.  Once that season was winding down, the plan to create a smaller FEMA organization wound up.  Voorhies Depo. at 63:23-25-65:4-5 ("Ultimately, we were not given enough time to do much and make that many improvements due to the impending hurricane season. Everything stopped and waited until after hurricane season"); *id*. at 121:8-14 (discussing "FEMA 2.0").

Ms. Evans, who served as FEMA Chief of Staff beginning roughly September 2025, was appointed as SOPDA to replace Richardson on December 1, 2025.  3/31 Evans Depo. at 94:2-12, 178:18-20.  As she was planning to assume the helm at FEMA, in November 2025 Evans created the "FEMA 2.0" signal chat between herself and two individuals from the DHS front office (Voorhies and Guy), which was the shorthand name for a radically restructured and downsized agency.  5/26 Evans Depo. at 10:6-25; Depo Ex. 13 (draft FEMA Review Council Report describing downsized FEMA 2.0); Depo Exs. 103, 300, 301 (excerpts of Signal FEMA 2.0 chat).[5]

Ms. Evans' background was in cybersecurity (not disaster relief), and she was originally placed at a different DHS subcomponent: the Cybersecurity and Infrastructure Security Agency ("CISA").  3/31 Evans Depo. at 31:10-17; Depo. Exs. 1, 3.  In the first few months of the Trump Administration, while Evans helped run CISA, the agency eliminated hundreds of positions.  Depo. Ex. 3; 3/31 Evans Depo. at 38:5-40:19 (describing understanding of President's workforce

---

[4] On May 27, 2026, Defendants sent Plaintiffs a list of over 211 documents containing thousands of WhatsApp and Signal communications involving Voorhies and others that they seek to "claw back" based largely on deliberative process privilege.  All of these documents were produced by third-party former government subcontractor Voorhies on May 11, 2026 in response to Plaintiffs' subpoena, with which Defendants were served on April 21, 2026.  Plaintiffs have initiated a meet and confer process to resolve these disputes, but given the timing of Defendants' communication, cannot submit these on the public record.  Plaintiffs have provided the Court with certain relevant exhibits on Defendants' list from the Voorhies production through an additional declaration submitted in camera by email, even where they were used as deposition exhibits.  Plaintiffs are prepared to file a motion to seal, if needed, in light of the Court's in camera review.  These documents are attached as Exhibits to the Second Leyton Declaration for In Camera Review.
[5] As discussed further in Plaintiffs' Rule 37 Motion, SOPDA Evans created this chat and engaged the "auto-delete" setting to delete after four weeks.  That setting remained through March 11, 2026, when Evans *shortened* the auto-delete setting to one week.  Depo. Ex. 300, 301.

reduction priorities and confirming her role in "workforce reduction" at CISA). When Evans was transferred over to work at FEMA, the DHS Spokesperson explained: "Karen Evans has moved full-time over to the [FEMA]. She was instrumental in helping cut waste, fraud, and abuse at CISA and her skill set is perfectly suited for the future of the [FEMA]." *Id*.; *see also* 3/31 Evans Depo. at 67:19-70:25. Evans confirmed that her role was to help reform FEMA, including staffing:

> Q. You agreed with the agenda for making FEMA into a smaller agency Ms. Evans. Correct?
> A. I agree that I was to look at FEMA and look at the resources that they had, and then look at its statutory missions and to make recommendations as to what were the right resources that they needed to accomplish the outcomes that the President had outlined.
> Q. And again, those resources including—include staffing. Correct?
> A. Yes, ma'am.

*Id*. at 58:21-60:1.

Former Secretary Noem's "Chief Advisor" Corey Lewandowski was involved in decision-making regarding FEMA, including regarding FEMA personnel. 3/31 Evans Depo. at 184:17-19 (DHS leadership involved in FEMA personnel decisions); Voorhies Depo. at 49:5-50:14, 78:10-79:8, 96:20-97:21, 117:2-9, 154:23-155:10. His involvement was more fully revealed with production of the Voorhies Signal communications (not by Defendants). *E.g.*, Ex. 140 at KLV_000364; Second Leyton Dec. Exs. A (KLV_000007-10), J (KLV_000184-196), (KLV_000012-14), C (KLV_000027), N (KLV _000047); M (KLV_0000399-403, 405, 407-410) (in camera); First Leyton Dec. Ex. J (KLV_0000226-29); Depo. Ex. 303. He was also involved in recruiting individuals to come work for DHS, including Kara Voorhies. Voorhies Depo. at 20:20-30:19; 34:7-37:16, 54:9-57:1; Depo. Exs. 132, 135; 3/31 Evans Depo. at 101:15-18, 102:25-103:7.

Secretary Noem's "front office" or "headquarters" staff included chiefs of staff and other advisors within the Office of the Secretary also assigned to work on FEMA. Depo. Ex. 2 (DHS Organizational Chat)). The two individuals who both reported to Secretary Noem and Lewandowski and were given primary responsibility for FEMA were Voorhies and Guy. 5/4 Guy Depo. at 180:2-181:1; Voorhies Depo. at 26:23-27:8, 39:19-40:17 ("I reported to him [Corey Lewandowski] and Joseph Guy"); 3/31 Evans Depo. at 115:18-23, 130:18-131:9 (Re: CORE employees, "I communicated with [Voorhies], not just with her, but also with DCOS Guy, because

he was in charge of my portfolio"), 132:18-22; 136:16-23 (Voorhies would "convey, to me and other FEMA leadership, decisions that were made by the secretary or she would represent them as decisions made by the secretary.").

Voorhies had no disaster relief or emergency management experience; nor did she have any knowledge of what FEMA did or how FEMA worked before accepting a position at DHS to work entirely on FEMA. Voorhies Depo. at 16:19-19:16, 29:17-30:8; 64:4-14; 3/31 Evans. Depo. at 116:5-117:7. Voorhies was brought into DHS as the result of Lewandowski's personal connections with her then-boss at a wealth management firm. Voorhies Depo. at 20:1-22:8, 34:8-37:8; Depo. Ex. 132. Her background was entirely in accounting, business administration, and private wealth management. Voorhies Depo. at 16:19-19:16, 29:17-30:8.

Voorhies's role from the outset was to help downsize FEMA. Voorhies Depo. at 63:15-25; 149:20-150:23. She was told that was the goal, having been brought in by Lewandowski, who was discussing a "downsized organization for FEMA" and reducing the number of FEMA employees. Voorhies Depo. at 154:20-156:15; Depo. Exs. 140 (April 4, 2025 Signal communication); *see also* Ex. 141 (in camera); Voorhies Depo. at 96:6-23 (Noem and Lewandowski expressing sentiment "FEMA needed to be eliminated as it exists today"); *id.* 97:13 ("I think that they understood that the workforce needed to be looked at in terms of how it could be more effective for the American public."). Voorhies admitted that her only experience relevant to her DHS work was in organizational efficiency, Voorhies Depo. at 29:17-30:5, and she told Evans that her background was in "transformational projects," 3/31 Evans Depo. at 116:14-17. Voorhies claimed at deposition to initially have been an unpaid special government employee, but in October 2025 she became a government contractor, subcontracted through a DHS subcontract with an individual who worked for DOGE. Voorhies Depo. at 41:4-46:11 (explaining subcontract through DOGE team member Kyle Schutt); 49:6-51:23; 67:13-24 (Kyle Schutt was "with DOGE"); Depo. Ex. 133.[6]

---

[6] Voorhies testified she refused to become a federal employee because the pay was too low, and preferred the financial arrangement of her contract. Voorhies Depo. at 51:10-13. When asked whether she kept her contract terms quiet, Voorhies testified that Lewandowski "may have suggested that it was not … anybody's business" (despite being a public contract with a federal agency). *Id*. at 106:23-108:6. Voorhies' Signal communications reflect disdain for the work of

DOGE was instrumental in this Administration's workforce reduction efforts, and Kara Voorhies's contract was set up through a DOGE subcontract. Depo. Ex. 133; *see also* Voorhies Depo. at 66:17-18 (describing information regarding FEMA provided to her by DOGE).[7]

Voorhies worked only on FEMA throughout her time affiliated with DHS, which lasted from approximately May 2025 through March 2026, when her subcontract was terminated in the wake of Secretary Noem's firing.  Voorhies Depo. at 57:3-60:23; Depo. Ex. 134.  Voorhies was involved in reviewing many FEMA actions and decisions, including contracts, grants, and personnel actions and actions involving CORE personnel.  Voorhies Depo. at 87:16- 88:9, 89:16-90:3, 143:5-16, 250:17-21; Depo. Exs. 18, 23-24, 27, 117; 3/31 Evans Depo. at 129:22-131:2, 132:4-22; Ex. 142 at -0425328, -0425358.  SOPDA Evans said that she copied Voorhies on every FEMA-related email.  Evans Depo. at 128:7-16.  Signal communications that Voorhies (not Defendants) produced confirmed her involvement in many FEMA-related chats, including at least 10 chats with Guy and at least 9 with Evans.

Voorhies denied involvement in decision-making about FEMA staffing and the CORE, but admitted on cross-examination that the documents demonstrated her substantial involvement. Voorhies Depo. at 77:16-79:8; Depo. Ex. 117; *see also, e.g.*, Second Leyton Decl. Ex. D (KLV_000083), E (KLV_000088-89); F (KLV_0000134-37); H (KLV_0000275-82); L (KLV_0000318-23); K (KLV_0000388) (in camera); First Leyton Dec. M (KLV_0000113). Indeed, Voorhies generally disclaimed any decision-making authority, and said that her role was to act as a conduit of information between FEMA and DHS Leadership.  Voorhies Depo. at 78:23-79:4 (job was to "liaise" with DHS decisionmakers and FEMA); 79:14-80:4 (admitting she would give "direction to people at FEMA" if she had been given a "steer" from DHS); 80:12-15 ("The

FEMA as an agency and for federal employees who work there.  *E.g.*, Second Leyton Dec. Ex. P (KLV_00297) (in camera).  These are sentiments shared by other DHS and FEMA political appointees throughout the communications that were eventually disclosed to Plaintiffs.  *E.g.*, Second Leyton Dec. Ex. O (KLV_000151) (in camera).

[7] Voorhies' Signal chat production also reveals her extensive involvement in other DOGE-related efforts, including work to terminate FEMA grants and review contracts (in service of the DHS Secretary's policy of refusing FEMA and other components the authority to approve anything over $100,000).  Defendants have admitted her participation in these decisions by attempting to invoke deliberative process privilege for hundreds of her communications (including regarding personnel and staffing plan matters at issue here).  *Supra*, n. 4

intent was to make sure that I was aware of what was going on so that I could liaise between the department and the agency to make sure that there was alignment."); *see also* Prieur Depo. at 48:17-49:3.  Voorhies admitted she reported to Lewandowski and took direction from him regarding implementing DHS priorities at FEMA, and did not know whether or what he discussed with Secretary Noem.  Voorhies Depo. at 80:16-81:1; Second Leyton Dec. Ex. C (KLV_000027-28); *see also* 3/31 Evans Depo. at 110:14-114:1; 121:14-25; 127:2-8; 129-7-14.[8]

Among Guy's responsibilities as the deputy with oversight responsibility for FEMA was a weekly "sync" meeting with FEMA leadership, which he used to collect information from FEMA for DHS leadership and convey information from DHS leadership to FEMA.  5/4 Guy Depo. at 199:10-201:16; Ex. 142 at -0425379 (Karen Evans' notes).  DCOS Guy also testified that he acted as a conduit between FEMA leadership and DHS leadership and that he lacked authority to make independent decisions.  5/4 Guy Depo. at 28:9-20, 229:6-16.  Guy claimed not to recall involvement in decisions about FEMA staffing or COREs, but documents revealed he participated in *many* meetings, conversations, and emails in 2025 and 2026 regarding plans to cut FEMA staff and decision-making about FEMA employees, including CORE renewals.  5/15 Guy Depo. at 107:1-117:24, 121:8-129:10; Second Leyton Decl. Exs. L (KLV_000375), N (KLV_0000169-70), K (KLV_000387-388) (in camera).  Guy testified that while he was the individual with the primary assignment to FEMA within the Office of the DHS Secretary, he also lacked basic knowledge regarding what FEMA does and what functions the CORE performs.  5/4 Guy Depo. at 226:2-5 ("Q. Okay. So you don't know what the CORE manual says about when CORE employees should be renewed? A. I don't know what "CORE" stands for"); *see also id*. at 221:14-229:2 (no knowledge of National Response Framework or FEMA's role; no understanding of FEMA's statutory missions or obligations; no knowledge of the CORE cadres; never read the CORE Manual or other basic documents regarding FEMA and its functions).

Besides identifying Guy (but *not* Voorhies), Defendants named two other DHS individuals

---

[8] The document record obtained by Plaintiffs, including by subpoenaing the Voorhies Signal and WhatsApp chats, revealed that Voorhies *was* involved in the decision-making about CORE employees, and yet she was not included in Defendants' court-ordered declaration to identify DHS individuals involved in those decisions.  *Compare* Depo. Exs. 23-24, 27, 146, *with* ECF 327-1.

involved in decision-making regarding FEMA COREs, ECF 327-1, although the record reveals there were likely others.  The first, DHS Chief Human Capital Officer ("CHCO") Roland Edwards, disclaimed any decision-making responsibility or knowledge of CORE issues, and admitted only to being a conduit of information between FEMA and DHS leadership (including passing on substantial information regarding FEMA COREs and their NTE dates in late December 2025, *see infra*).  Edwards Depo. at 115:4-12, 298:11-17.  FEMA CHCO Prieur, whom Evans required to submit a declaration, explained that the other DHS official named (Troup Hemenway, the former Principal Deputy Chief of Staff) was added to the court-ordered declaration at Evans' instruction because he appeared on an approval email (Prieur Depo. at 304:14-305:8).  Guy testified that he, not Hemenway, was the Deputy Chief of Staff assigned to FEMA (5/4 Guy Depo. at 179:2-181:1).[9]

Overall, the evidence shows sustained involvement in FEMA matters by high-level DHS officials who lacked emergency management experience but were put into their positions for the purpose of downsizing and significantly reshaping FEMA.

**B.    DHS Develops Plans in 2025 to Downsize FEMA Staff By 50%**

Evans admitted that, on December 4, 2025, at DHS leadership's direction, she submitted an Annual Staffing Plan for fiscal year 2026 containing a 50% cut to FEMA's workforce.  Depo. Ex. 17; Evans Depo. at 220:12-24 (Regarding Exhibit 17: "Q.  And does this document refresh your recollection that this is what you sent to DHS leadership on December 4 as the FEMA annual staffing plan?  A. Yes, because it's consistent with previous documents that we sent forward to OPM and OMB."); see also 219:21-220:24, 223:10-224:11, 341:11-18; *see infra*.   Discovery revealed this was not the first time in 2025 that DHS discussed or attempted to effectuate a 50% cut

---

[9] Hemenway worked with Guy both before and after DHS, when they both moved over to the State Department with former Secretary Noem.  5/4 Guy Depo. at 24:23-25:18, 180:10-13.  Prior to DHS, Guy and Hemenway worked together at various political organizations including the American First transition project (as did Evans) and as contributors to the Heritage Foundation's Project 2025.  5/4 Guy Depo. at 176:6-24.  Hemenway appears to have been involved in reviewing some personnel and hiring decisions at DHS, but does not appear on a substantial number of documents produced by Defendants.  He did participate in Signal communications regarding FEMA.  Guy Depo. at 163:9-164:17.  Documents eventually produced from Evans' computer backups revealed actions taken with respect to Guy *and* Hemenway's Signal accounts on the same day in May 2026, which potentially reflect reinstallation (and thereby deletion of content).  5/15 Guy Depo. at 26:2-30:14; Depo. Ex. 203.

in FEMA's workforce.  The same 50% cut appears in (1) the FEMA Review Council report drafted by a DHS team that involved Voorhies and Guy and (2) other DHS and FEMA communications.

1. <u>FEMA Review Council Draft Report</u>.  The FEMA Review Council was established by the President to examine downsizing FEMA.  90 Fed. Reg. 8743 (Jan. 24, 2025) (*inter alia*, "evaluating whether FEMA's bureaucracy in disaster response ultimately harms the agency's ability to successfully respond").  It was co-chaired by then-DHS Secretary Noem, who repeatedly asserted at Review Council meetings that "FEMA must be eliminated as it exists today."  Ex. 5 at 2; Ex. 4 at 2, 4.  The Council was set to release its report and vote on the report's recommendations at a meeting scheduled for December 12, 2025.  But a draft report dated December 11 was leaked to the press and the meeting was canceled.  See Ex. 13 (draft report); Evans Depo. at 194:1-9.  Consistent with Secretary Noem's views regarding the elimination of FEMA, one of the primary recommendations in the draft report was that "FEMA 2.0 should reduce overall staffing by approximately 50%."  Ex. 13 at 7; *id.* at 24 ("*Key recommendations include a 50% overall staff reduction.*") (emphasis added); *id.* at 27 ("[I]t is estimated that FEMA 2.0 can reduce its overall staffing by 50% or more as implemented in this report…. Most of this reduction is expected to come from its disaster workforce.").

DHS exercised substantial control over this draft Review Council report.  DHS personnel, including Secretary Noem herself, were involved in writing it.  5/4 Guy Depo. at 236:12-23, 237:24-238:3; see also Voorhies Depo. at 120:18-20 (stating that others at DHS, besides herself, worked on the draft report); Voorhies Depo. at  94:8-18 (stating that the "writing sub council" responsible for drafting the report met at DHS).  Guy had weekly meetings with "the team that was working on the FEMA Review Council report" (Evans Depo. at 189:21-190:11), which Voorhies also participated in (Evans Depo. at 195:7-15); *see also* Second Leyton Dec. Ex. M (KLV_000397-98 (in camera), KLV_000400-02, 407-10).

Evans, Guy, and Voorhies all admitted knowledge that the draft report recommended a 50% cut of the FEMA staff but disclaimed personal responsibility or knowledge of who created that language.  Evans Depo. at 196:5-16; 5/4 Guy Depo. at 250:18-23; Voorhies Depo. at 121:8-18.  However, later produced Signal communications suggest knowledge that the 50% direction came

from DHS leadership. Voorhies Depo. at 147:22-148:7 (admitting that the 50% referenced in the messages was the draft report's 50% workforce reduction recommendation); Second Leyton Dec. Ex. M (KLV_000407-410) (in camera). It appears that DHS decisionmakers ensured the inclusion of the 50% staffing cut in the report over the objections of at least one Review Counsel member.[10]

2. FEMA RIFs. The draft FEMA Review Council report is not the first time DHS was involved in planning a 50% reduction in FEMA's staff during 2025. Voorhies Depo. 169:22-25. In late September 2025, as the federal government approached a lapse in appropriations, Evans, Voorhies, and Guy created a "FEMA RIF" Signal chat. Voorhies Depo. at 138:18-139:16; 5/4 Guy Depo. at 162:23-25; Second Leyton Decl. Ex. L (KLV_000318-23) (in camera). Voorhies' deposition testimony confirmed that this group discussed implementing a FEMA RIF during the upcoming government shutdown. Voorhies Depo. at 169:22-25 see also Second Leyton Decl. Exs. Q (KLV_0000350-357) (discussion on "FEMA Sanity Club" chat); F (KLV_0000134-137 (discussion on "FEMA QUEENS" chat), L; (KLV_0000318-23) (discussion on "FEMA RIF" chat) (in camera). Voorhies also confirmed that she instructed Evans to copy her on all communications about a FEMA RIF. Voorhies Depo. at 143:11-14 (Q: "And so now you're talking about anything pertaining to RIFs to the FEMA staff, you want to see that as well, correct? A: That's the plan."). Voorhies and Guy further confirmed that DHS was communicating with OMB about these RIF plans. Voorhies Depo. at 139:3-140:9; 5/15 Guy Depo. at 98:25-99:15. And Guy admitted that DHS met with OMB "once a week" during this time period, and that he was involved in discussions of the FEMA RIF plan. 5/15 Guy Depo. at 78:2-79:21, 101:24-4.[11]

3. Additional 50% Planning. DHS continued working on a plan to reduce FEMA's workforce as the end of 2025 approached. FEMA CHCO Prieur testified to her understanding that DHS leadership wanted to cut FEMA in half, revealing that there "was a request to see what the

---

[10] As explained *infra*, Voorhies, Evans, and Guy participated in a Signal group chat also named "FEMA 2.0" from November 15, 2025 through March 2026, the entire contents of which have been destroyed aside from two screenshots of a handful of messages that Evans created in March 2026.

[11] No RIF was implemented at DHS or FEMA during the government shutdown; those agencies were among the Defendants in the case in which this Court issued a series of injunctions enjoining shutdown RIFs and then enforcing the subsequent Continuing Resolution enacted by Congress. *AFGE v. OMB*, N.D. Cal. Case No. 25-cv-08302-SI, ECF Nos. 56, 70, 94, 125, 139.

agency would look like if staffing was reduced by 50%," which she worked on in November 2025. Prieur Depo. at 137:15-138:2, 141:5; *see also id.* 139:12-15 (describing document with structure of 11,500 FEMA employees split into COREs, reservists, and PFTs). This work was completed "in parallel with the response to the DHS request for FEMA's annual staffing plan" while Evans was the Chief of Staff for SOPDA Richardson. *Id.* 139:3-6.

**C.     The December 4 2025 FEMA FY2026 Staffing Plan Also Cuts FEMA By 50%**

**1.     The Staffing Plan cuts FEMA to 11,500**

In late November DHS instructed its components, including FEMA, to submit their Executive Order ("EO") 14356 Annual Staffing Plan spreadsheets to DHS by early December for inclusion in the plan that DHS was to submit to OMB and OPM. Evans Depo. at 207:1-209:11; Depo. Ex. 16. This plan was being developed as Evans assumed the role as SOPDA and was due to be submitted to DHS just four days later on December 4. Depo. Ex. 16.

DHS leadership saw a new opportunity to implement substantial reductions to FEMA's workforce. In response to the Annual Staffing Plan assignment, DHS directed Evans to submit a plan that would cut FEMA's staff by 50%. Evans Depo. at 235:10-25 (50% came from DCOS Guy). Obeying this directive, Evans submitted an Annual Staffing Plan to DHS on December 4, 2025 that would reduce FEMA's workforce of roughly 23,000 employees to **11,383 employees**. *See* Depo. Ex. 17 (FEMA's Annual Staffing Plan); Evans Depo. at 220:12-24 (confirming that Exhibit 17 was the Annual Staffing Plan she submitted to DHS on December 4); Ex. 19.

Uncontroverted evidence shows that, as Evans admitted, this Annual Staffing Plan outlining deep cuts to all categories of FEMA employees was created to comply with EO 14356 and OMB/ OPM implementing directives. Evans Depo. at 205:1-210:5, 219:21-220:24; Depo. Ex. 16; see also Prieur Depo. at 133:10-136:11.[12] Prieur testified there has been no revision or further FEMA Annual Staffing Plan for FY2026 created since, nor has this plan been somehow withdrawn. Prieur Depo. at 281:6-17. Evans also admitted, when confronted with her email correspondence, that "[t]he number of 11,500 is also what we have provided to OPM/OMB at a high level but we

---

[12] This evidence (along with the language of the EO and OPM/OPM directives) refutes any claim that EO 14356 and these Annual Staffing Plans pertain only to *hiring*. ECF 402 at 11.

haven't made that public." Depo. Ex. 18 at -0007336; Evans Depo. at 229:4-231:6.

Evans' admission that the 50% cut in the Annual Staffing Plan was directed by DHS through Guy is corroborated by her contemporaneously kept notes (revealed after this Court ordered complete production, and in unredacted form). The unredacted notes reveal that she spoke with DHS officials Guy and Voorhies multiple times in the days leading up to December 4 about FEMA's personnel and the staffing plan numbers.[13] On December 2, Evans "talked w/ Joe/Kara" about "personnel issues." Depo. Ex. 142 at -0425318. The same day, she had a "sync" meeting involving Voorhies where "staffing plan #'s" were discussed. *Id.* at -0425321. On Wednesday December 3, Evans' notes indicate a meeting with "Joe Guy" in which one of the topics discussed was "the # for personnel."[14] *Id.* at -0425324. And on December 4, the very day Evans submitted the staffing plan, she "talked to Kara re: the number is 11,383" and would "cc her." *Id.* at -0425328; *see also* 3/31 Evans Depo. at 223:13-224:11.

### 2.    The 50% Cut Was Contrary to FEMA Staff's Recommended Plan

The Annual Staffing Plan containing the DHS-directed 50% cut to FEMA staff was not the only FEMA staffing plan that had been created. After receiving instructions from DHS in late November to conduct a "bottom up" analysis of staffing needs to meet statutory missions, FEMA components and program heads recommended that the agency maintain a total of roughly 23,000 employees (current levels). Prieur Depo. at 134:9-136:20, 134:9-137:3; Depo. Ex. 19; Evans Depo. at 238:4-243:2.[15] That recommendation to maintain FEMA staffing levels was, unlike Evans' 50% cut plan, informed by component- and program-level analysis of operational needs. The "bottom up" analysis justifying maintenance of current staffing levels was presented to Evans, Prieur Depo. at 137:4-14, but she submitted a plan contrary to those recommendations (after being told by DCOS Guy to include the 50% cut). And she did so without telling her own staff. Other

---

[13] As Evans explained, "Notes that would be in my day planner would be reminders of me for activities or things that did occur in meetings." Evans Depo. at 167:25-168:6.

[14] This clearly relevant and responsive page of Evans' notes was not included by Defendants in either their first or second production of Evans' notes. In their third production, it was redacted. It was not until their fourth version of Evans' notes, two months after the Court-ordered expedited discovery production deadline, that it was finally produced.

[15] This is the same type of "bottom-up" staffing exercise that SOPDA Evans later required FEMA to do again on December 23, 2025, but this time with a 50% target, discussed, *infra*.

documents indicated that Evans kept FEMA's OCHCO in the dark regarding her submission of the 50% plan until later in January.  Depo. Ex. 19; Prieur Depo. at 156:22-160:22.

### D.    Implementing the 50% Cut Plan Required Cutting CORE

CORE employees make up approximately half of all FEMA employees.  Because of the composition of FEMA's staff, an overall 50% staffing cut would require terminating a significant number of CORE employees.  Evans Depo. at 249:1-10, 251:20-252:2 Depo. Ex. 25.

On December 4, 2025, to effectuate the reduction in COREs necessary for the 50% cut in the FEMA Annual Staffing Plan, Evans immediately tasked FEMA staff with "**Looking at all CORE dates**" and working on a "**Proposed plan to reduce COREs by date**."  Ex. 24; Ex. 142 at.-0425328; Evans Depo. at 279:8-280:16; *see also* Depo. Ex. 76 (December discussions re: "strategic opportunities for FEMA to become a smaller organization" required "get[ting] a handle on []CORE expiration dates"); Depo. Ex. 20 (discussion of "rightsizing" FEMA).

But a "plan to reduce COREs by date" required information about how many COREs had upcoming NTE dates.  So, at 8 a.m. on December 5—the morning after Evans submitted the Annual Staffing Plan with the 50% cut to DHS and made plans to reduce COREs by NTE date— the FEMA CHCO began collecting data regarding "CORE expirations by month beginning with January 2026," which was to be sent "to S1 today."  Depo. Ex. 26; *see also* Depo. Ex. 20 (copying Voorhies on November 5 emails containing information about upcoming CORE NTE dates).

In addition to collecting data on upcoming CORE renewal dates, "further analysis needed to be done" to achieve the Annual Staffing Plan's 50% cut.  3/31 Evans Depo. at 282:20-25.  The plan Evans submitted on December 4 contained only "high-level numbers" to be eliminated from each program office.  *Id.*; *see also* Depo. Ex. 17.  By contrast, the FEMA staff's recommended annual staffing plan analysis had complied with the DHS CHCO's directive to include analysis down to the "lowest-level offices."  Ex. 16 at -0002357.  SOPDA Evans' plan contained only top-level numbers, with no information on how to implement the cuts.  Depo. Ex. 17.  More granular data on where to make cuts was needed in order to operationalize the DHS-directed 50% workforce

reduction across such a complex agency.[16]

Accordingly, during the same December 4 meeting discussing non-renewal of COREs by NTE date and the Annual Staffing Plan, Evans tasked FEMA staff with determining specifically where staff could be cut to reach that "high-level" number. *See* Ex. 24 (December 4 email from Evans stating "[o]verall CHCO numbers are being worked by you and Will (number is 11,383)."); Depo. Ex. 142 at -0425328 (Evans' notes from December 4 meeting re: "working numbers"); 3/31 Evans Depo. at 280:17-281:5, 282:15-25.  This assignment is also reflected in another FEMA staff document produced by Defendants titled "Talking Points for FY26 Staffing Strategy," which was drafted on December 11, 2025 and states, "**Ms. Evans has tasked me to develop a strategy to cut the FEMA workforce by 50% over FY26**."  Depo. Ex. 25.  And, in accordance with the plan to carry out the 50% reduction through the non-renewal of COREs, it states, "**Our first task will be focused on the Disaster Workforce, primarily our use of COREs across the Agency**."  *Id.*

In an effort to work the numbers to support the 50% staffing cut, the same FEMA official who Evans met with on December 4, and tasked with implementing the 50% cut plan drafted an email soliciting data from FEMA components *again* regarding "personnel requirements for each program's minimum operating capabilities," but this time assuming "a 50% reduction" and "a goal of retaining approximately 11,500 total positions across the Agency."  Depo. Ex. 18 at-0007342.  Here too DHS was involved, with Evans specifically sending the draft data solicitation to Voorhies and Guy to review.  *Id.* at -0007336; *see also id.* at -0007339-42 (Voorhies copied on earlier emails regarding the workforce planning assignment).  Evans also evidently discussed this issue with Voorhies over the phone; on the same day, she recorded in her notes that she "Talked to Kara on the way home re: COREs."[17]  Depo. Ex. 142 at -0425358 .

This assignment eventually became the December 23, 2025 "workforce capacity planning

---

[16] As FEMA manager Jeff Neurauter later recognized when he learned of the 11,383 annual staffing plan submission, "there is no way to utilize the data obtained through the Workforce Capacity Planning Exercise to update the Annual Staffing Plan" because the intent of the Office of the Administer to have 11,383 FEMA employees could not be squared with the level of detail needed, which had been gathered to show a staffing level need of 23,146.  Depo. Ex. 19.

[17] This entry in Evans' notes, although plainly responsive and relevant, was not provided by Defendants until their second production of her notes on April 29, 2026.

exercise" (*see* ECF 301-1 at 15). *See* Depo. Ex. 142 at 0007334-35; Ex. 29 (December 23 email sent to components). Following communications (again, including DHS officials) about the potential for the language of the assignment to leak, the description of the 50% cut was eventually removed. However, the 50% "target" remained in the associated spreadsheet that components were required to fill in with the data from their "bottom-up, zero-based" staffing analysis. Depo. Ex 29; ECF 326.1 at 48; *see also* Ex. 79 (FEMA component given instruction to get to 60% cut).[18]

FEMA components did not agree with the 50% targets they had been given. Conducting their second analysis of staffing needs in two months, FEMA program offices and components again indicated a need for at least 23,000 employees. Prieur Depo. at 210:12-211:13; Depo. Ex. 19. In fact, many components responded that they needed an *increase* in their staffing levels to perform their functions. *See, e.g.*, First Leyton Decl. Exs. E, H; Depo. Ex. 78. Yet DHS and FEMA ignored the data and analysis from the components and forged ahead with plans to reduce FEMA's CORE employees.

**E.    DHS Involvement in Plan to Reduce COREs by NTE Date**

In addition to directing FEMA multiple times to develop a plan for reducing its staff by 50%, the evidence also demonstrates extensive, high-level DHS involvement in the plan to achieve that dramatic staffing reduction in part through the non-renewal of COREs by NTE date.

First, throughout December, DHS requested, and Evans collected and transmitted, voluminous data regarding CORE renewals and upcoming CORE NTE dates to DHS leadership. E.g., Depo. Ex. 26 (December 5 email requesting urgent data on COREs for "S1"); Depo. Ex. 20 (copying Voorhies on December 5 email with a spreadsheet of all CORE NTE expirations in January 2026 as background for "the plan…for CORE rightsizing"). Several days later, on December 10, Evans shared with DCOS Guy information about the number of COREs with upcoming NTE dates in January, February, and March. Evans Depo. at 305:20-308:6; *see also id.* at 306:14-16 ("I know, in my meetings with the DCOS [Guy], we talked about CORE renewals.").

---

[18] It was in the context of editing this email that SOPDA Evans discussed with DCOS Guy and DHS Senior Advisor Voorhies that she had given the 50% cut numbers to OMB/OPM but had a plan to keep those numbers non-public. Depo. Ex. 18 at -0007336.

SOPDA Evans' calendar reflects a briefing for "S1" on FEMA on December 19. Depo. Ex. 142 at -0425364; *see also id.* at -0425359. A great deal of data on COREs was collected and transmitted to DHS in the two days leading up to this meeting. On December 18, Evans shared with Voorhies data about the number of upcoming CORE NTE dates in early 2026. Depo. Ex. 27; *see also* Depo. Ex. 90 (collecting data). That same day, Evans also urgently requested data from FEMA staff, which was sent to both her and Voorhies, about the cost of each CORE employee with a January 2026 NTE date. First Leyton Decl., Ex. I; *see also* Prieur Depo. at 276:9-21 (Evans requested data on CORE costs during December 2025). The morning of December 19, Evans sent additional data on CORE NTEs and renewals to the DHS CHCO Roland Edwards (and to Voorhies), including details about the number of COREs with NTE dates in the next 180 days broken down by job title (Depo. Ex. 46) and information about the number of COREs renewed or offboarded at various points in 2025 (Depo. Exs. 45, 47, 49).[19] Evans' notes for December 19 recorded a meeting with Edwards and Guy shortly before her S1 Briefing, in which they discussed CORE categories including the "089" Emergency Management Specialist series, and Evans writes "No New." Depo. Ex. 142 (-0425363).[20]

Also during December, Evans had weekly meetings with Guy, which Voorhies also attended (Evans Depo. at 133:2-10, 190:5-8, 273:9-16), and where they discussed issues related to "CORE renewals" (3/31 Evans Depo. at 306:10-16). *See also* Edwards Depo. at 219:21-25 ("Q: So [Guy] was involved in this issue of CORE renewals? A: He was."). Moreover, Evans admitted that she spoke to Voorhies specifically about "the non-renewal of COREs by NTE date." 3/31 Evans Depo. at 130:23-131:2. Evans' notes reflect similar conversations with Guy.

Also in December 2025, DHS retracted FEMA's authority to renew certain COREs without approval of the DHS Secretary. Prior to this Administration, FEMA has traditionally hired and

---

[19] Edwards disclaimed memory of these events, but agreed he "was just a link in the chain" to higher levels of DHS leadership. Edwards Depo. at at 115:4-12, 211:22-212:9, 213:1-9.

[20] When asked, all witnesses claimed not to remember the subject of the December 19 briefing for S1. Voorhies initially denied participation until confronted with Signal chats asking Evans for a ride back to FEMA. Voorhies Depo. at 222:23-223:10; 225:22-7. Guy insisted it was highly unlikely that he talked to either S1 or Roland Edwards about COREs on December 19, 5/15 Guy Depo. at 121:19-123:22, and then repeatedly claimed a lack of memory even when confronted with the email traffic and Evans' notes showing otherwise, 124:11-129:10.

renewed the terms of CORE employees without DHS input or approval. Prieur Depo. at 99:6-18. On March 14, 2025, DHS took that authority away from FEMA by instituting a new hiring freeze policy under which "[n]o component or office may hire any individual without prior authorization from the Office of the Secretary." Depo. Ex. 40; Edwards Depo. at 97:24-100:13. DHS adopted this hiring freeze independently of the federal government hiring freeze instituted by the President on January 20, 2025. *See* Presidential Memorandum, Hiring Freeze, 90 Fed. Reg. 8247 (Jan. 20, 2025). As the OPM chief of staff explicitly instructed DHS, "given clear relevance to the exemption criteria, DHS is not impacted by the hiring freeze." Depo. Ex. 39; Edwards Depo. at 95:16-96:13. Further, under OMB and OPM guidance, the government-wide hiring freeze explicitly did not preclude extending the employment of term employees such as COREs. Depo. Ex. 38 at USA-AFGE-Ex.-000430; Edwards Depo. at 90:16-92:13. Nonetheless, DHS decided to adopt a hiring freeze that could only be bypassed through the Secretary's approval, and eventually instructed FEMA that renewal of CORE employees would qualify as a "new hires" requiring the Secretary's approval. Prieur Depo. at 104:4-106:4; Depo. Ex. 41.[21]

On May 14, 2025, DHS restored a limited portion of FEMA's renewal authority, authorizing FEMA to grant 180-day extensions to COREs with upcoming NTE dates. Depo. Ex. 21. As the decision memo explained, the absence of such authority would result in the expiration of those employees' terms, impairing "FEMA's ability to conduct its mission during the 2025 hurricane season." *Id.* This grant of limited authority (against the backdrop of having removed all authority previously) was time-limited, as DHS set a December 31, 2025 expiration. *Id.*; Prieur Depo. at 113:20-114:9. Evans began discussing this expiration of authority with others at DHS in October 2025. 5/4 Guy Depo. at 243:7-245:20.

Leading up to the December 31 expiration of the previously "delegated" authority, FEMA staff had prepared a draft memorandum requesting that the Secretary extend FEMA's CORE renewal authority. Depo. Ex. 22. Here, too, Voorhies and Guy were involved. *See, e.g.*, Depo.

---

[21] A process was put into place where FEMA, like other components, could seek S1 approval through the submission of DHS Hiring Verification Forms that justified the need for personnel. Prieur Depo. at 110:19-111:11.

Ex. 114 at -0425287; Guy Depo. at 243:18-245:20; Voorhies Depo. at 108:7-11, 110:2-9, 194:18-195:1.  FEMA staff were instructed to ensure that Voorhies reviewed the memo.  Depo. Ex. 23.  Following these discussions, Evans did not ultimately send the memo attempting to persuade DHS to extend FEMA's limited renewal authority.  Evans Depo. at 272:25-274:4.  DHS's original decision purporting to *remove* FEMA's authority returned to effect, as did the requirement that any CORE extensions be submitted for "S1" approval, under DHS's March 2025 directives.

DHS's decision to remove FEMA's authority to make employment decisions (and require S1 approval for any CORE extensions) had clear implications for FEMA's workforce.  Indeed, Evans claimed that the January non-renewals were the result of the expiration of FEMA's renewal authority.  Evans Depo. at 365:2-9, 365:17-20; *see also* Prieur Depo. at 293:7-294:5 (the non-renewed COREs with January NTE dates would have been renewed under the old process set forth in the CORE manual and occurred because of the lack of DHS-delegated authority).  As one FEMA employee informed Evans, "If we do not receive the Secretary's approval" to extend the FEMA's renewal authority "before December 31st, 312 term employees will be offboard[ed] beginning on January 1 and through the remainder of the month."  Ex. 27 at USA-AFGE-Exp.-0007260; *see also* Voorhies Depo. at at 110:2:9 (conversations about the delegation of renewal authority happening in conjunction with discussions about the size of FEMA's workforce).

Because FEMA did not have the delegated authority to renew COREs, all COREs with an upcoming NTE could be considered for renewal only through the submission of a Hiring Verification Form for S1 approval.  Prieur Depo. at 230:3-12.  The FEMA programs, regions, and OCHCO staff worked tirelessly in December to prepare all the forms and create easily digestible packets for Evans' review.  Prieur Depo. at 230:3-231:22, 234:11-235:23, 253:10-254:16.  Indeed, Prieur worked through Christmas Day to ensure that Evans had all of the packets prepared according to instructions, with signed forms ready for submission six days before the authority was set to expire on December 31.  *Id.* 251:24-252:15, 273:1-24.

But instead of seeking S1 approval of any COREs for January 2026, on December 31, 2025, Evans met with DCOS Guy.  Evans' (unredacted) notes reveal the existence of that meeting and read: "**Not going to approve the COREs (30 days extensions) and COREs in general**."

Evans Depo. at 353:17-25; Depo. Ex. 142 at-0425379.

## II.    DHS Implements its Plan to Reduce FEMA Staffing by Eliminating CORE Positions Beginning January 1, 2026

On January 1, 2026, FEMA began carrying out DHS's 50% workforce reduction plan through the non-renewal of COREs by NTE date.  Although Evans initially disavowed the existence of any blanket non-renewal of COREs by NTE date (ECF 312-1), Defendants have now admitted to the Court that COREs were being eliminated by NTE date starting at the beginning of January.  "Between January 1, 2026 and January 21, 2026, FEMA had 178 COREs whose terms of employment were set to end in that time period."  ECF 383-1, Neurauter Decl. ¶4.  "Thirty of these COREs resigned or retired from employment before their term of employment expired, leaving a balance of 148 COREs whose terms of employment expired in January 2026."  *Id.*  Stated differently, *none* of the COREs with NTE dates between January 1 and 21 were renewed.

Thus, beginning January 1, 2026, no CORE employees were renewed, regardless of their cadre, mission function, job performance, or level of experience.  Many non-renewed CORE employees were given just a few hours of notice, an insufficient amount of time to wrap up projects or transition tasks before they were forced out.  *See* ECF 301-1 at 16-17.

Both Guy and Voorhies claimed not to remember much about these CORE separations.  However, in addition to all of the communications in December 2025, Guy and Voorhies' Signal messages from early January 2026 corroborate DHS's involvement.  On January 2, in response to a CNN story about the CORE non-renewals, Guy stated, "These were contract employees who knew their terms were up. *We're finally enforcing accountability*."  Depo. Ex. 220 at -0425677.

These separations were contrary to the recommendations and requests for renewal by their program offices.  Depo. Ex. 82 (programs and regions requested and justified renewal of 303 out of the 325 COREs with January NTEs).  FEMA staff had raised concerns about these separations.  In particular, on December 17, the FEMA CHCO Prieur had sent Evans a detailed memo explaining "the mission effects of not renewing FEMA term appointments that expire" in January, February, and March 2026.  Ex. 31 at USA-AFGE-Exp.-0005056.  This memo warned that non-renewal of COREs with NTE dates in early 2026 would "impair FEMA's ability to comply with Stafford Act

requirements," and harm FEMA's disaster logistics capabilities, individual and public assistance programs, training programs, preparedness initiatives, and grant programs, among other things. Ex. 31 at USA-AFGE-Exp.-0005056-58. During her deposition, Evans dismissed this memo, stating that she did not believe she had fully read it. Evans Depo. at 347:9-25.

**III.    Plaintiffs' January 2026 Lawsuit Halts Further Implementation of the Plan**

Despite the immediate uproar by internal FEMA staff and the press, the non-renewal policy continued until January 22, 2026, when—on the precipice of a major winter storm—FEMA temporarily paused offboarding employees.[22] On January 27, 2026, Plaintiffs moved for leave to file a supplemental complaint with allegations of unlawful action at FEMA and DHS. ECF 290.

The following Tuesday, February 3, 2026, Evans told FEMA leadership that they would resume the CORE non-renewal—a report that was later leaked to the press. Depo. Ex. 118 (USA-AFGE-Exp.-0425305). In light of reports that the temporary pause in implementation of the DHS plan was being lifted, on February 10, 2026, Plaintiffs moved for a temporary restraining order. ECF 301, 307. DHS then approved 90-day extensions for all CORE employees who had NTEs during the temporary pause. Depo. Ex. 66 (USA-AFGE-Exp.-0000160). Since then, DHS has approved 90-day extensions for CORE employees with NTEs that fall between February and May. Prieur Depo. at 295:21-296:16. Prior to this lawsuit, FEMA had never previously limited CORE extensions to 90 days. Prieur Depo. at 309:9-12.[23] These 90-day DHS-endorsed extensions were submitted to DHS for "S1" approval, but in fact, were rubber-stamped quickly by either DHS CHCO Edwards, DCOS Guy, or others at DHS. *E.g.*, Depo. Exs. 120, 121.

In the meantime, FEMA required components to submit to yet another staffing planning exercise, in support of the FEMA Annual Staffing Plan and the requirement that DHS provide quarterly reports to OMB/OPM about that annual plan. Prieur Depo. at 30:15-31:22. Evans testified that the submissions were due the day of her deposition and did not provide further

---

[22] ECF 303, Ex. F ("Effective immediately, FEMAs [OCHCO] will cease offboarding Stafford Act employees with NTE dates of January 22, 2026, or later." ).
[23] FEMA CHCO Prieur testified in her deposition that CORE appointments should be at least one year in order to ensure the stability of FEMA's services and to retain employees, avoiding the tens of thousands of dollars it costs to train new employees. Prieur Depo. at 115:20-116:16.

information regarding the instructions provided.  Evans Depo. at 337:5-11.  Prieur confirmed Evans personally provided instructions to components.  Prieur Depo. at 319:22-322:13.  Prieur also confirmed in early April 2026 that the then-current plan was to implement the results of that additional staffing planning exercise *by June 2026*.  Prieur Depo. at 333:14-335:12; Depo. Ex. 100.

### IV.    Defendants' Recent Actions

While Plaintiffs were seeking expedited discovery, DHS Secretary Noem was fired and other individuals at DHS with responsibility for FEMA also left DHS (including Guy and Voorhies).  Supp. Jackson Dec. ¶5.  *Id.*  As of approximately March 24, 2026, the new DHS Secretary was Markwayne Mullen.  *Id.* ¶6.

Evans, however, remained installed as FEMA SOPDA until mid-May.  5/26 Evans Depo. at 8:23-4.  On Monday, May 11, 2026, the President announced that he was going to nominate former SOPDA Cameron Hamilton as FEMA Administrator.  Supp. Jackson Dec. ¶8.  On Tuesday, May 12, 2026, FEMA staff were informed that Evans was being replaced as SOPDA and moving to another role within DHS.  *Id.* ¶9.  Evans will be the director of a new "Waste, Fraud and Abuse Task Force" within DHS.  5/26 Evans Depo. at 5:5-8.  FEMA is under the purview of the task force, and Evans "will be working closely with FEMA" in this new role.  *Id.* 5:22-6:6.

On May 7, 2026, the FEMA Review Council released a final report.  *Id.* ¶11.  Former DHS Secretary Noem has been replaced by current DHS Secretary Mullen as the Co-Chair, along with Defense Secretary Hegseth.  *Id.*  The May 7 final report deleted the sentence in the leaked draft report referring to the 50% cut to FEMA staffing but continued to include the key recommendation of a "Transformed Agency."  *Id.* ¶13.  The report states:

> It is time to close the chapter on FEMA.  'FEMA' as a brand and as an agency was irreparably damaged by the previous Administration's proclivity to mission creep and endemic program failures. A transformed agency should be established that retains the core missions of FEMA, while highlighting the renewed emphasis on locally executed, state or tribally managed, and federally supported emergency management.

*Id.*  Government officials immediately expressed concerns regarding the implications of the FEMA Council Report for further workforce reduction.  *Id.* ¶15.

DHS continues to make decisions for FEMA and regarding FEMA staffing.  On Tuesday,

May 19, 2026, FEMA held the first all-employee meeting in approximately a year. *Id.* ¶19. At that meeting, FEMA leadership stated that DHS is continuing to control decisions regarding FEMA CORE staffing. *Id.* ¶20. They described decisions to renew CORE positions going forward and that they were "working with the department" to establish the renewal periods. *Id.* FEMA leadership stated that COREs renewed between now and June would be renewed for one year, and that COREs renewed after June would be on a "case by case" basis. *Id.* They stated that DHS had to approve these plans, which were being "worked out" with the department. *Id.*

Neither DHS nor FEMA have shared with employees either FEMA's Annual Staffing Plan or the results of the further staffing planning exercise in support of implementation of FEMA's Annual Staffing Plan, for which components were provided a March 31, 2026 deadline. *Id.* ¶18.

There are different categories of CORE employees impacted by the DHS and FEMA actions since the beginning of January: employees who were initially separated from employment by NTE date; thousands of remaining CORE employees, including many hundreds who were given 90-day extensions (many of which have or are expiring); and other CORE employees with upcoming NTE dates in May, June, and thereafter. *Id.* ¶21. In approximately early May, FEMA began offering new positions to COREs who had been released back in January. *Id.* ¶22. The actions by DHS and FEMA do not reinstate these employees to the positions they previously held, nor provide any remedy, backpay, or retroactive benefits for the time they were separated, but function as a new hire into the position that was vacant because of their separation. Offering new jobs rather than extending the prior positions disrupts federal service because although the new positions offer the same grade and step, they do not offer credit for the "time in step" some employees had. *Id.* ¶27. For COREs who had previously been given a 180-day extension, this likely erased six months of time worked towards the next step. *Id.* It also reset any vacation time accruals and may have affected other collateral benefits. *Id.*

With respect to the CORES were who previously given 90-day extensions that were up in May or June, *some* are receiving one-year or six-month further extensions, consistent with the information provided in the recent meeting. *Id.* ¶28. Some employees with 90-day extensions expiring at the same time have received further extensions, and others have not. *Id.* FEMA is

saying that plans depend on DHS approval of the unknown "staffing plan" that they have not released. *Id.*

**ARGUMENT**

I.      **The Uncontroverted Evidentiary Record Confirms the Unlawfulness of the Actions of DHS and FEMA with Respect to the CORE Employees**

      A.      **DHS Has Violated and Continues to Violate the Post-Katrina Act by Removing FEMA Authority and Interfering with FEMA Capabilities**

To prevent a repetition of the structural errors that undergirded the federal government's catastrophic response to Hurricane Katrina, the Post-Katrina Act insulates FEMA from DHS decision making.  ECF 301-1 at 5-6, 31; ECF 314 at 5-6.  Accordingly, DHS and FEMA's binding statutory authorities (enacted by Congress and signed into law by the President) prohibit the DHS Secretary from "substantially or significantly reduc[ing] … the authorities, responsibilities, or functions of [FEMA] or the capability of [FEMA] to perform those missions, authorities, [and] responsibilities."  6 U.S.C. §316(c)(1).

The expedited discovery record established that DHS's actions with respect to the CORE renewals violated and are continuing to violate the Act's prohibition on interference with FEMA's authorities or capabilities.  The record now shows that DHS violated this provision by (1) removing FEMA's authority over CORE renewals, and (2) impairing the capability of FEMA to perform its missions and responsibilities through the creation and implementation of its plan to reduce the FEMA workforce.  Had this lawsuit not halted the implementation of this plan, it is *certain* that DHS would have further violated the law by actually eviscerating FEMA's ability to function as the law intends and requires.  As it stands, DHS's existing and ongoing actions reduced FEMA's authority and capability, and that is more than enough to violate this law.

**Removal of FEMA's renewal authority:** FEMA has authority under the Stafford Act to appoint its own temporary personnel.  *See* 42 U.S.C. §5149(b) ("any Federal agency" providing the services described in the Stafford Act "is authorized … to appoint and fix the compensation of such temporary personnel as may be necessary).  The Stafford Act places no limitation on the terms for such temporary personnel, and delegates that authority to FEMA as the employing agency.  Congress has also been clear that FEMA, not DHS, has authority over FEMA's personnel.

Although Congress had consolidated FEMA into DHS (*see* Homeland Security Act of 2002, Pub. L. No. 107-296 §503, 116 Stat. 2135, 2213), it reestablished FEMA as "a distinct entity within the Department" a few years later in the Post-Katrina Act (6 U.S.C. §316(a)).  In doing so, the Post-Katrina Act transferred "[a]ll functions of [FEMA]" as well as "all of its *personnel*, assets, components, authorities, grant programs, and liabilities" back "to the Agency." 6 U.S.C. §315(a)(1) (emphasis added); *see* ECF 301-1 at 5, 32.

The uncontroverted evidence discussed *supra* establishes that DHS has "substantially or significantly reduc[ed]" FEMA's statutory "authorit[y]" over its personnel, including over FEMA's authority to renew CORE employees.  6 U.S.C. §316(c)(1).  Before DHS imposed its hiring freeze in early March 2025, FEMA had autonomy to renew COREs and to do so for whatever term it deemed appropriate.  *See supra*.  In March 2025, DHS took that authority away.  *See supra*. Through the DHS policy requiring S1 approval for all new hires, and the DHS decision to classify CORE renewals as new hires, DHS removed FEMA's authority to renew COREs.  Although DHS purported to delegate back to FEMA limited authority to grant 180-day extensions to certain CORE employees (which itself constitutes a significant reduction of FEMA's renewal authority) in May 2025, there is no dispute that this delegation expired at the end of 2025.  In light of DHS's policies and control asserted over FEMA, FEMA no longer can grant renewals.  *See supra*.  This authority has not been restored to date (and the most recent May 19 all hands FEMA employee meeting indicates that DHS continues to control the authority to grant any CORE renewals as well as the length of any extensions).  *See supra*.  As a result, DHS has gone beyond simply "reduc[ing]" FEMA's renewal authority; it has eliminated it entirely.  This plainly violates the Post-Katrina Act.

To the extent that former SOPDA Evans gave self-serving hindsight deposition testimony stating that after she was appointed to SOPDA by DHS Secretary Noem she made the decision not to put forward a request to renew FEMA's authority, that matters not at all.[24]  DHS removed all of that authority to begin with, made the decision to "delegate" back only limited authority with an

---

[24] In light of her admitted spoliation of evidence, this Court should exclude this testimony. *See* accompanying Rule 37 Motion.  Further, this testimony is refuted by the substantial record of DHS involvement discussed herein.

expiration date, and then allowed that delegation to expire. Absent DHS's earlier decision to usurp FEMA's authority, DHS's hand-selected political appointee to run the agency would not have been required to ask DHS to return authority that rightfully belonged to FEMA.[25]

**Reduction in FEMA's Capabilities:** After hurricane season ended and SOPDA Evans was installed, Defendants moved forward with implementation of long-planned staffing cuts, beginning with eliminating CORE positions by NTE date, irrespective of function or need and over agency recommendations. The decision to implement this plan was a decision to reduce FEMA's capability to perform its functions. DHS thereby violated the Post-Katrina Act's mandate against "substantially or significantly reduc[ing]" FEMA's "capability" to perform its "missions, authorities, responsibilities." 6 U.S.C. §316(c)(1); *see* ECF 301-1 at 27-31. Plaintiffs previously explained how a 50% reduction in FEMA's workforce would have a catastrophic effect on FEMA's capability to carry out its missions, authorities, and responsibilities, especially in light of the well-documented understaffing that FEMA components already contend with. ECF 301-1 at 10-11, 19-22, 27-31. The evidence obtained during discovery confirms the commonsense conclusion (as well as the conclusions of former FEMA officials) that halving FEMA's workforce would utterly incapacitate the agency. *See supra*. Given that FEMA components have determined through a bottoms-up analysis of agency functions that approximately 23,000 employees are necessary "to sustain FEMA's core mission delivery and minimum operating capabilities" (Depo. Ex. 29), the DHS-directed Annual Staffing Plan's proposal to maintain only 11,383 employees would substantially impact FEMA's capabilities to perform its missions, authorities, and responsibilities.

Stated simply, a 50% workforce reduction is fundamentally incompatible with maintaining FEMA's functions and capabilities.

As to the plan to begin implementing this extreme reduction in staff through the non-renewal of COREs by NTE date, the evidence of FEMA's staff assessments is similarly clear: such

---

[25] Further, even if DHS had granted FEMA another temporary extension of this limited renewal authority, a temporary grant of authority to provide brief extensions of CORE employees' terms would still constitute a substantial reduction of FEMA's renewal authority.

terminations would seriously impair FEMA's ability to perform its functions. *See supra*. The deleterious effects of terminating COREs by NTE date were set forth in a memo from FEMA staff and included, among numerous other effects, "directly diminish[ing] FEMA's ability to move, track, and maintain lifesaving commodities, housing units, and IT assets"; "impair[ing] FEMA's ability to comply with Stafford Act requirements" including requirements regarding individual assistance and public assistance programs; "erod[ing] the readiness and management of large deployable workforces"; "limiting FEMA's ability to staff disasters with qualified personnel"; "reduc[ing] FEMA's ability to comply with ESA/NHPA and streamline EHP reviews"; "reduc[ing] FEMA's ability to prevent and resolve civil rights complaints [and] and ensure accessible programs"; "slow[ing] delivery of disaster assistance and project approvals across Public Assistance, Individual Assistance, Hazard Mitigation, and recovery programs, resulting in delated funding to states, territories, tribes, local governments, and survivors"; "impair[ing] reliable communications and IT services for staff, undermining operation continuity during disasters"; "increase[ing] fraud, waste, and abuse risks"; and rendering FEMA "unable to perform statutorily required Public Assistance improper payments testing and associated reporting." Depo. Ex. 31. And that analysis addressed only the impact from releasing the 950 COREs with NTE dates in the first three months of 2026. *Id.* The disastrous impact on FEMA's preparedness, mitigation, response, and recovery functions would be multiplied severalfold by eliminating the thousands of COREs necessary to carry out the 50% workforce reduction plan. Once again, DHS's actions regarding FEMA's workforce ran afoul of the Post-Katrina Act. *See* 6 U.S.C. §316(c)(1); *see also* 6 U.S.C. §316(b) (excepting FEMA from DHS's reorganization authority); *Washington v. Fed. Emergency Mgmt. Agency*, 2025 WL 3551751, at *5 (D. Mass. Dec. 11, 2025) (holding that cancelation of one of FEMA's mitigation grant programs was "a substantial reduction of FEMA's mitigation responsibilities").

That this litigation has halted that reduction does not alter the nature of this decision or the violation of the Act. But the record also establishes that DHS and FEMA's initial implementation of the plan to terminate COREs by NTE date in January already substantially reduced FEMA's capabilities. ECF 301-1 at 21-22. Because of the arbitrary nature of those non-renewals, which

were based not on any functional analysis but rather on NTE date, many of the terminated employees performed functions critical to FEMA carrying out its mission.  As previously described, those COREs performed key roles across a range of functions.  The arbitrary January non-renewals have had a significant impact on FEMA's ability to, for example, administer its Emergency Management Performance Grant program, provide temporary housing to disaster survivors, train emergency management personnel, and perform required auditing of certain programs.  ECF 301-1 at 21-22.

The evidence produced during discovery confirms Plaintiffs' earlier allegations that the non-renewal of these employees resulted in a substantial reduction of FEMA's capabilities.  For example, as one component head explained, the non-renewal of several COREs responsible for administering the Hazard Mitigation Grant Program at FEMA headquarters rendered the program able to operate at only "50% capacity."   USA-AFGE-Exp.-0001046 (memo requesting an appeal of non-renewal decision); see also USA-AFGE-Exp.-0001045 (email attaching memo).  "These losses have already and will continue to negatively impact the agency's ability to simply implement the [Hazard Mitigation Grant Program]," including by limiting the agency's ability to ensure the program "compl[ies] with statute[s] and regulation[s]."  USA-AFGE-Exp.-0001046-47.  In another example, the non-renewal of the Environmental and Historical Preservation Cadre coordinator, who "leads 600+ field staff in the national Environmental Planning and Historic Preservation (EHP) Cadre," eliminated a key position responsible for leading an entire cadre, which "negatively impacted" FEMA's "operational readiness."  First Leyton Decl. Ex. B (memo requesting an appeal of non-renewal decision); *see also Id.* Ex. A (email attaching memo).

**B.    Plan to Cut FEMA in Half Violated Authorizing Statutes**

In addition to violating the Post-Katrina Act, DHS's creation and implementation of the plan to downsize FEMA violates FEMA's authorizing statutes, for all the reasons previously explained by Plaintiffs.  ECF 301-1 at 14-16; ECF 314 at 9-10.

**C.    DHS Directives to FEMA Were Arbitrary and Capricious**

The APA requires federal agencies to engage in "reasoned decisionmaking," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), which means that agency

action must be both "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Agency action is arbitrary and capricious when the agency 'relies on factors which Congress has not intended it to consider, entirely fails to consider an important aspect of the problem, or offers an explanation for its decision that runs counter to the evidence before the agency.'" *Center for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 67 F.4th 1027, 1035 (9th Cir. 2023) (quoting *State Farm*, 463 U.S. at 43).

When first opposing this lawsuit, Defendants represented to this Court that the CORE non-renewals that were occurring were driven by performance, conduct, or operational analysis. ECF 312 at 7 ("There is no plan under consideration which calls for the 'blanket' or indiscriminate on renewal of all COREs. Just the opposite: FEMA and DHS are considering non-renewals of COREs for whom there are performance or misconduct issues, or where a supervisor determines they are overstaffed.").[26] DHS likewise publicly denied any plan to reduce FEMA and claimed the CORE reductions were just typical supervisor decisions.[27] After the discovery ordered by this Court, Defendants pivoted, admitting that everyone was released between January 1 and 22 by NTE date. ECF 383-1, 402. Evans now claims to have made that decision herself (without DHS), having previously told Congress that the FEMA supervisors did it: She testified to the House Appropriations Committee that the non-renewal decisions were "based on function and whether the work is still there for them to do," Apr. 16, 2026 FEMA Budget Hrg. at 1:05:14-57, and that the determinations were "made by the supervisor or program office head," id. 1:06:45-58.[28] Indeed, there is now a mountain of evidence showing that the programs and regions requested renewal of almost all the COREs, and that there was no basis for the January 2026 non-renewals except the happenstance of an employees' NTE date and the now revealed DHS plan to downsize FEMA. *See*

---

[26] This is not the first time this Administration has sought to falsely blame its efforts to downsize agencies on employee performance. *AFGE v. OPM,* 799 F. Supp. 3d 967 (N.D. Cal. 2025)

[27] The DHS public statements contemporaneous with these CORE separations stated, falsely, that it was a "routine staff adjustment of 50" based on "disaster activity, operational need, and available funding." ECF 301-1 at 17.

[28] House Appropriations Committee, Budget Hearing—Department of Homeland Security: CISA, TSA, U.S. Coast Guard, U.S. Secret Service, and FEMA (Apr. 16, 2026), at 103:44-, available at https://democrats-appropriations.house.gov/events/hearings/budget-hearing-department-homeland-security-cisa-tsa-us-coast-guard-us-secret.

*supra*.

The record also establishes that the actions to implement the DHS plan for FEMA by cutting COREs by NTE date were directly contrary to FEMA's program and regional office recommendations. *See, e.g.*, Prieur Depo. at 293:7-19 (FEMA program and regional offices recommended 303 COREs with January NTEs up for renewal and they would have been approved under the prior process as set forth in the CORE Manual). The record is clear that the separations that Defendants now admit occurred of every CORE employee with an NTE date between January 1 and 22, 2026 (ECF 383-1) were not based on any evaluation of employee performance, function, or agency need. Indeed, the DHS individuals who were directing FEMA's actions at this time (whether themselves or as a proxy for Secretary Noem or Corey Lewandowski), had no real knowledge of FEMA's functions at all. *See supra*.

The 50% cut directive was untethered to and in conflict with the staffing levels supported by the agency's own mission analysis. DHS directed components to complete a "bottom up" staffing analysis in November 2025 for purposes of complying with the OMB/OPM directive implementing the President's Annual Staffing Plan requirement. *See supra*. When Evans asked FEMA's programs and regions to complete that analysis of what staffing levels for fiscal year 2026 they needed to perform their statutory functions, the programs and officers told Evans they needed a force structure of at least 23,000. Prieur Depo. at 135:20-25, 201:16-202:22, 210:5-211:22. *See supra*. After submitting the Annual Staffing Plan with the 50% cut, as directed by DHS DOC Guy, SOPDA Evans next included a 50% target cut instruction and made the FEMA components repeat the exercise. *See supra*. The programs and regions rebuked the target and again articulated that they needed all of their existing staff, if not more, in order to fulfill their mandates. *See supra*; Prieur Depo. at 210:5-211:22; Depo. Ex. 19; Depo. Ex. 78.

SOPDA Evans admitted in her deposition that she had to ask FEMA staff to develop a plan for how to implement her 11,383 number because it had been selected without any analysis of how it would actually map onto specific positions at the agency. Evans Depo. at 282:15-283:14. Indeed, she had selected that staffing level at the instruction of DCOS Guy, *id.* 235:10-19, who—despite being the Deputy Chief of Staff for DHS with responsibility for FEMA—does not even

"know what 'CORE' stands for." *See supra.* 5/4 Guy Depo. at 226:5.[29] No one admitted to knowing where the 50% cut had come from or who had made that decision, other than pointing the finger up, at DHS leadership. 3/31 Evans Depo. at 235:10-19; 5/4 Guy Depo. at 251:25-252:11; Edwards Depo. at 178:13-180:3.

The plan to implement a 50% cut by not renewing COREs on their NTE date was arbitrary and capricious for additional reasons. Evans admitted that she knew they "had to really look at the CORE positions in order to be able to achieve a 50% cut," 3/31 Evans Depo. at 249:1-3, which "mean[t] that it could lead to not renewing or relooking at the functions that the COREs were doing," *id.* 249:7-10, because they were "temporary," *id.* at 249:18. Accordingly, the same day that she submitted the 50% plan as FEMA's annual staffing plan (December 4, 2025), she met with FEMA staff and instructed them to "Look[] at all CORE dates" and "Propose[] plan to reduce COREs by date." Depo. Ex. 24; *see also* Depo. Ex. 142 at -0425328. The decision to effectuate a 50% cut by non-renewing COREs based merely on the date they were first hired (which dictated their NTE) and not based on their job description, their performance evaluations, the capacity of the rest of their team, or any other indicator of their mission need was definitionally arbitrary. The program and regional administrators had repeatedly justified the need for almost every CORE with a January NTE, Prieur Depo. at 228:18-25, 235:4-15, yet they were all indiscriminately non-renewed simply because their NTE date made them an easy target for reducing overall staff numbers. This was unjustified and contrary to agency needs. *See, e.g.*, Depo. Ex. 31 (December 17 memo on detrimental program effects of non-renewing CORE appointments by NTE).[30]

___

[29] The only analysis Evans even claims to have done is checking that the number was consistent with a previous exercise done in November 2025 when DHS had requested that FEMA evaluate a 50% cut. Evans Depo. at 243:3-246:5; *see also infra* (Prieur testimony that she understood DHS had asked FEMA to evaluate a 50% cut in November 2025). Evans' "analysis" checking that the 50% target Guy instructed her to include was consistent with DHS's earlier target cut is not mission-driven or based on the needs of the agency. The 50% in both instances was arbitrarily imposed top-down from DHS, and Evans admitted it was not backed by any analysis of the force structure report, id., or the specific programs and ongoing tasks conducted by the programs and regions, id. 282:15-283:14; see also Voorhies Depo. at 123:13-16 (not aware of any analysis supporting 50% cut).

[30] *See also, e.g.*, First Leyton Dec Ex. D (HMGP appeal for three non-renewed COREs because renders program unable to delivery high priority actions); Ex. F at USA-AFGE-Exp.-0004817-18 ("The loss of the sole/only cadre coordinator for a large cadre will have significant ripple effects to

### D.    DHS and FEMA Violated Section 120 of the CR

The reduction of CORE positions by NTE date also violated Section 120(a) of the Continuing Resolution ("CR") passed on November 12, 2025.  Pub. L. No 119-37, §120 (2025). That legislation prohibited the use of federal funds through January 30, 2026 "to initiate, carry out, implement, or otherwise notice a reduction in force to reduce the number of employees within any department, agency, or office of the Federal Government."  *Id.* §120(a).  Further appropriations bills replaced the operative date of the CR incorporated into Section 120(a), extending this prohibition through April 30, 2026.[31]

Congress defined "reduction in force" broadly to encompass not only reductions in force for Title 5 civil service employees, but also "any similar reduction of positions at any department, agency, or office of the Federal Government."  *Id*. §120(d).  This provision and its use of "the expansive word 'any'" show that Congress intended a broad application beyond formal RIFs.  *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008).  In line with that expansive reading, Congress also expressly applied the prohibition "to all civilian positions, whether permanent, *temporary*, full-time, part-time, or intermittent, and without regard to the source of funding for such positions." *Id.* §120(b) (emphasis added).  CORE employees hold full-time, temporary civilian positions, s*ee* 42 U.S.C. §5149(b)(1), and are covered by Section 120(a).

DHS's elimination of CORE positions through a policy of non-renewals without any regard to individual performance directly reduces the number of positions available at the agency.  This elimination of positions as part of an effort to reduce FEMA staff by 50% has relevant "characteristics in common" with Title 5 reductions in force and is thus a "similar" reduction

---

operational capability."); *id.* ("I believe that DHS/FEMA still expect delivery of mission critical services and that there will be times when their decision unknowingly prevents that success."); Ex. G at USA-AFGE-Exp.-0017106 ("Non-extension of these positions will prevent OCFO from completing the required PITA testing and meeting DHS mandated reporting timelines for inclusion in the FY 2026 and FY 2027 DHS Agency Annual Reports to Congress.").

[31] Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, Div. H, §101 (2026) (extending the CR through February 13, 2026); Homeland Security and Further Additional Continuing Appropriations Act, 2026, Pub. L. No 119-86, div. B §§101-102 (April 30, 2026) (replacing CR's operative date with "the date of enactment of this Act" and deeming it to cover the period beginning "February 14, 2026, during which there occurred a lapse in appropriations" at DHS).

covered by Section 120.[32]  In fact, before adopting the non-renewal policy, DHS had previously planned to carry out the same 50% reduction earlier in 2025.  *See supra*.  DHS's actions to implement and execute its planned non-renewals were thus squarely contrary to this law as well.

## II.    Evidence Confirms This Lawsuit Has Halted Some, but not all Unlawful Action by DHS and FEMA

The CORE employees who were terminated in January 2026 suffered ongoing irreparable injury during the time that they were separated from FEMA—which includes, at least, part of January; all of February, March, and April; and part of May 2026.  As documented in Plaintiffs' previous filing, these CORE employees lost income needed to pay their mortgages, their children's college tuition, and their heating bills.  ECF 301-1 at 25 (citing declarations).[33]  Many families lost their sole source of income during this time period.  *Id*.[34]  They suffered the psychological injury of losing not only their current job but a career to which they had dedicated their working lives.  Id. at 26 (citing declarations).[35]  And as a result of their non-renewal, CORE employees and their families lost vision and dental coverage immediately and health care coverage either a month later or, in the case of an employee who relies on life-saving technology to address his neurological movement disorder and was in the process of changing his insurance, immediately.  *Id*.[36]  This loss of health care coverage forced employees to forego vital medications and to cancel critical health care appointments as well as family members' surgeries.  *Id*.  And it forced others to expend additional funds to cover medical needs or alternative coverage.  *Id*.

Thousands of other CORE employees, including hundreds who had been given brief,

---

[32] *Similar*, Merriam-Webster Online Dictionary (last accessed May 28, 2026).
[33] *See* ECF 303-6 (Heath Decl.) ¶17 (loss of income from imminent non-renewal will "force us into impossible choices, such as deciding between paying our mortgage or keeping our home adequately heated"); ECF 303-10 (Newton Decl.) ¶16 (concern that loss of income will require son to withdraw from college); ECF 303-8 (Blanton Decl. ¶16) (non-renewal of "dream career" left her "scrambling to figure out healthcare and finances to support my family").
[34] ECF 303-8 (Blanton Decl.) ¶13; ECF 303-10 (Newton Decl. ) ¶17; ECF 303-11 (Prell Decl.) ¶13.
[35] ECF 303-4 (Young Decl.) ¶23 (devasted by loss of career she worked towards since age 19); ECF 303-5 (Fleming Decl.) ¶4 ("worked [her] way up to [her] dream position" over the a decade at FEMA); ECF 303-8 (Blanton Decl.) ¶14 (job at FEMA was "a life changing opportunity" after putting herself through graduate school while working full time and raising three children but abrupt non-renewal plunged her family back into "survival mode").
[36] ECF 303 (Jackson Decl.) ¶¶46(a), (b); ECF 303-11(Prell Decl.) ¶¶11-12; ECF 303-8 (Blanton Decl.) ¶17; ECF 303-09 (Nelson Decl.) ¶10.

temporary 90-day extensions after Plaintiffs filed this lawsuit, faced ongoing uncertainty as to whether they would soon face harms similar to those they saw befall their unlucky colleagues in January.  DHS and FEMA continued to engage in ongoing staffing planning in support of the existing Annual Staffing Plan with massive cuts; the offboarding was only ever explained to be temporarily paused; and, as discovery revealed, DHS was still working on implementing the staffing plan by June 2026.  *See supra*.  While this lawsuit plainly interrupted this imposition of harm, the threat of harm to hundreds (if not thousands) of FEMA employees remained.

Through May, these existing irreparable harms continued to compound, and the threat of imminent such harm to others remained.  Even after the President announced the termination of DHS Secretary Noem, there was no public recission of this plan (because DHS still refused to admit that it existed), staffing planning exercises continued, and there was no announcement of any further change in plans with respect to the CORE.[37]  Thus, before Defendants submitted evidence demonstrating that they were bringing CORE employees back to FEMA, Plaintiffs diligently sought the expedited discovery that would allow Plaintiffs to obtain preliminary injunctive relief that would require reinstatement of these employees and block further non-renewals as called for by the plan to cut FEMA by 50%.

On May 7, 2026, Defendants for the first time presented evidence supporting their assertion (see ECF 361) that the CORE employees who had been non-renewed in January 2026 were being brought back to FEMA.  ECF 383, 383-1.  The timing of when unlawfully terminated employees actually will be reemployed, however, remains unclear.  Defendants' evidence says only that former employees were contacted by e-mail in early May.  ECF 383-1.  But these emails, which gave employees a mere one to three days to accept these preliminary offers of new positions, stated that start dates would occur at *an unidentified future date*, and that employees would need to go through pre-employment and security background screening procedures, after which they might receive a "final" offer.  2d Supp. Jackson Decl. ¶24; ECF 383-1 at 5-6.  The letters specifically

---

[37] The most employees were told was an April 28 email that remaining FEMA staff "*may*" be extended, and that said nothing about the individuals who had been unlawfully separated.  2d Supp. Jackson Dec., Ex. F.

advised employees: "You should not make any life changes until you receive a *final offer* from us." Id. (emphasis in original).[38]  These preliminary offers of "new hire" expressly reserve the agency's ability to rescind them.  In other words, the offers do not guarantee that the agency will actually resume filling these positions (or having the capacity that it needs).

Moreover, the harmful effects of these employees' unlawful January 2026 terminations would not be eradicated when and if they are rehired by FEMA.  Notably, Defendants' recent actions do not propose to reinstate these previously terminated CORE employees to their positions. 2d Supp. Jackson Decl. ¶26.  Rather, at most, they have been offered new CORE appointments for a duration of a year or six months.  *Id*. ¶23.  As a result, among other harms, these employees have lost any credit for their "time in step" during their most recent NTE period.  *Id*. ¶27.  Further, Defendants have not offered these employees any back pay for the more than three months that they were unemployed.  Id. ¶26.  Nor have they provided any retroactive benefits or other compensation for the loss of health, vision, and dental coverage for many months.  *Id*.

Further, FEMA and DHS have continued to implement unlawful actions.  As previously detailed, DHS continues to control FEMA's renewal authority.  Plaintiffs have seen no indication that the new DHS Secretary has changed the "S1" approval requirement for FEMA, including CORE renewals.  FEMA leadership specifically told employees on May 19 that they were "working with the department" (referring to DHS) to establish CORE renewal periods and that they were still waiting for DHS approval of the latest FEMA staffing plan.  2d Supp. Jackson Decl. ¶¶19-20.  And, while FEMA employees were told for the first time at that May 19 meeting that current CORE employees with NTE dates in May and June would now receive either six-month or one-year extensions, no promises were made to individuals after June, who will be evaluated on a

---

[38] Defendants also have not explained the difference of 11 people between the statements in the Declaration of Karen Evans (that DHS non-renewed 192 CORE employees whose terms were expiring in January 2026, but then rescinded 33 of those non-renewals, leaving 159 terminated COREs, ECF 312-1, ¶26), and the more recent Declaration of Jeff Neurauter (which represents that 148 CORE employees non-renewed in January 2026, setting aside those who voluntarily left government service, ECF 383-1).

"case-by-case" basis.  *Id.* ¶20.[39]  Nothing has yet to alter or rescind the currently operative Staffing Plan, which continues to contain a 50% cut (and which the President's EO *mandates* that agencies implement during FY 2026, *see* EO 14356 §2(c)(ii) ("Agencies shall comply with the Annual Staffing Plans throughout the fiscal year").

Thus, two of the three DHS directives from which Plaintiffs originally sought preliminary injunctive relief (*see* ECF 307) have not been rescinded: the DHS directive that "FEMA's authority to extend CORE appointments ended on December 31, 2025," and a workforce reduction plan imposed on FEMA by DHS.  CORE employees have been given, by this litigation, what appears to be a temporary reprieve but DHS has made no guarantees after June.

Accordingly, Plaintiffs' request for injunctive relief is not moot.  Plaintiffs have modified their proposed order to reflect Defendants' actions in response to this litigation, and the harms that have yet to be rescinded.

## III.    Evidence Also Supports Authorizing Plaintiffs to Seek Partial Summary Judgment on DHS/FEMA Claims

In addition to preliminary injunctive relief, the existing record supports partial summary judgment on Plaintiffs' supplemental claims against DHS and FEMA and the entry of permanent relief.  Therefore, in recognition of this Court's standing order, Plaintiffs seek authorization to file a motion for partial summary judgment on Claims VIII through XIII.  Good cause exists for an exception to the Court's one-summary-judgment-motion rule in light of the evidentiary record that has been assembled through what Defendants describe as "exhaustive" discovery, the appropriateness of Rule 37(e) relief for Defendants' spoliation of evidence (as set forth in the accompanying motion), and the ongoing litigation of other claims.  This will permit the Court to enter permanent rather than preliminary relief and reach a final resolution of these claims.  For those reasons, Plaintiffs ask this Court to set a prompt schedule for briefing and hearing on partial summary judgment.  In setting that schedule, this Court could treat this preliminary injunction brief

---

[39] DHS Secretary Mullen replaced DHS Secretary Noem as co-chair of the FEMA Review Council, and on May 7, 2026, released the final FEMA Review Council report, which removed the 50% cut language but continues to say that "[i]t is time to close the chapter on FEMA," and advocates for a "transformed" agency. *Id.,* Ex B.

as Plaintiffs' opening summary judgment brief and set a schedule accordingly.

### A.    Consideration of Partial Summary Judgment Now Would Be Appropriate

Plaintiffs assert both ultra vires and APA claims against DHS and FEMA arising from the plan to downsize FEMA staff and eliminate CORE positions (see ECF 298, Supplemental Claims VIII–XIII).  In light of discovery into these issues that Defendants characterize as "exhaustive" and the absence of disputes regarding the material facts,[40] Plaintiffs' ultra vires claims are appropriate for final resolution.  ECF 402 at 8; see Fed. R. Civ. P. 56(b) ("a party may file a motion for summary judgment at any time until 30 days after the close of all discovery").

In addition, Plaintiffs' APA claims are appropriate for resolution at this stage.  APA claims are resolved on the "whole record" of agency action, which consists of the record at the time the agency made its decision—the record that this discovery has uncovered.  5 U.S.C. §706; *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs,* 384 F.3d 1163, 1170 (9th Cir. 2004); *Asarco, Inc. v. E.P.A.*, 616 F.2d 1153, 1159 (9th Cir.1980); *see also AFGE v. OPM*, 799 F.Supp.3d 967, 978 (N.D. Cal. 2025) ("[T]he so-called 'record rule' limits judicial review of informal agency action to the 'closed' and 'contemporaneous' record before an agency at decision time, even though the "whole record," *composed* of documents contemporaneous to the challenged action, will be *compiled* retrospectively, from some larger corpus of evidence and during some specific litigation.") (emphasis in original).  Plaintiffs may use discovery tools to supplement the record in a variety of circumstances (see, e.g., *Southwest Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)) including where, as here, there is evidence of bad faith and improper agency behavior (as further documented in the accompanying Rule 37 motion).  Id.

---

[40] Defendants' witnesses' post hoc testimony would not give rise to material factual disputes that defeat summary judgment.  Initially, "post hoc statements' characterizing an agency action do not belong in the administrative record."  *AFGE v. OPM*, 799 F.Supp.3d at 979).  Further, self-serving, hindsight testimony does not create a material issue of disputed fact with respect to an otherwise uncontroverted documentary record.  *See Am. Council of Learned Societies v. Nat'l Endowment for the Humans*, No. 25-CV-3657 (CM), 2026 WL 1256545, at *41 (S.D.N.Y. May 7, 2026) (granting summary judgment to plaintiffs notwithstanding agency head's testimony that he, rather than DOGE, made the relevant decisions) (citing *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 86 (2d Cir. 2019) (explaining that self-serving testimony need not be credited when it is "so compromised and contradicted" by the record).  And finally, Plaintiffs' Rule 37 motion, if granted, would exclude any attempt by Defendants to offer testimony to refute the record.

at 978; see also *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019).

Resolution of summary judgment on APA claims prior to Defendants' submission of an record is not unprecedented, including in this Court. *E.g., State v. United States Bureau of Land Mgmt.*, 277 F.Supp.3d 1106, 1116 (N.D. Cal. 2017); *cf. also AFGE v. OPM*, 799 F.Supp.3d at 978 ("The Supreme Court has not provided guidance on the outer bounds of 'the whole record,' requiring only that the constituent parts of the record must be contemporaneous to the agency action, and that the record be robust enough to provide *some* basis for judicial review of the agency decision. [citation omitted]. The outer bounds of the informal administrative record have otherwise been left for the lower courts to chart."); *Animal Legal Def. Fund v. U.S. Dep't of Ag.*, 789 F.3d 1206, 1224 n.13 (11th Cir. 2015) ("Because there is no factual dispute ... the district court had no reason to examine the administrative record. Directing the district court to scrutinize the administrative record ... would be the height of pointlessness.").

The record of DHS and FEMA's actions and the information that was before the agency at the time of the relevant actions has been conclusively established by the evidence assembled in compliance with the Court's discovery orders. It is implausible that Defendants would need to add to the administrative record additional materials relevant to FEMA staffing or CORE renewals that they have withheld during this discovery process (and if they did so, it would violate this Court's orders). As such, the relevant record has been established, and in their brief opposing summary judgment Defendants would have the opportunity to identify the documents on which they intend to rely to oppose summary judgment and to oppose the Court's consideration of any evidence that they contend should not be part of the administrative record. Alternatively, the Court could grant Defendants a brief time period to identify the administrative record.

**B.      The Record Supports Partial Summary Judgment to Plaintiffs on Supplemental Claims VIII – XIII Arising from DHS and FEMA's Actions**

The Court may, if it elects, treat this preliminary injunction brief as Plaintiffs' opening summary judgment brief. Summary judgment on a claim is warranted where, as here, "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Karuk Tribe of California v. U.S. Forest Service*, 681 F.3d 1006, 1014 (9th Cir. 2012) (en banc).

### 1.    DHS

The above discussion of each of Plaintiffs' ultra vires claims against DHS and FEMA, on the uncontroverted record before this Court, establishes that DHS exceed authority and violated applicable law by: 1) Violating, and causing FEMA to violate, the Post-Katrina Act by "substantially and significantly reduc[ing]" FEMA's "authority" over employment decisions and capability of [FEMA] to perform those missions, authorities, responsibilities" (6 U.S.C. §316(c)); 2) Violating, and/or causing FEMA to violate, FEMA's mandatory statutory duties as set forth in the Stafford Act and subsequent statutes for "preparedness, protection, mitigation, response, and recovery" from emergencies and disasters nationwide, 6 U.S.C. §§311-323, 711-825; 42 U.S.C. Chapter 68 (Disaster Relief), by eliminating the staff required to perform those duties adequately; 3) Violating Congress' express prohibition of exercising any reorganization authority with respect to FEMA (6 U.S.C. §316(b); 4) Disregarding the transfer of "[a]ll functions" of FEMA "including existing responsibilities for emergency alert systems and continuity of operations and continuity of government plans and programs … including all of its personnel, assets, components, authorities, grant programs, and liabilities" away from DHS and back to FEMA (6 U.S.C. §315); 4) Violating Section 120(a) of the CR by imposing a reduction in force "or any similar reduction of positions" on FEMA's temporary employees; and 5) Ignoring and defying statutory requirements and prohibitions and thereby usurping Congress' Article I legislative authority, and violating the separation of powers principles embodied in the U.S. Constitution.

Each of these DHS violations also establishes a violation of the APA's prohibition on conduct inconsistent with law, contrary to the Constitution, and/or in excess of authority. 5 U.S.C. §706(2)(A)-(C). DHS's actions were also arbitrary and capricious unlawful action in violation of APA, 5 U.S.C. §706(2)(A), for all of the reasons explained above.

Defendants have previously argued that the DHS and FEMA actions at issue were not "final." ECF 312 at 17-18. The record evidence establishes the contrary. DHS's removal of FEMA decision-making authority over positions at FEMA, workforce reduction plan to eliminate half of FEMA staff including 41% of CORE positions, directive to eliminate CORE positions by NTE date, and implementation of that directive are all final agency actions reviewable under the

APA. 5 U.S.C. §704.  To be final, an "action must (1) 'mark the consummation of the agency's decisionmaking process' and (2) 'be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

Each of the actions at issue satisfy this "pragmatic and flexible" finality standard.  *Oregon Nat. Desert Ass'n*, 465 F.3d at 982.  DHS's removal of FEMA's authority over renewal of CORE positions was a "definitive statement of the agency's position[]," with which FEMA's "immediate compliance [was] expected." *Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025) (citation omitted).  These actions have and continue to yield real "legal consequences," having already led to the termination of hundreds of FEMA employees. *Id.*  Nor does DHS's brief pause in off-boarding or later pivot to offering new positions alter the finality of these earlier actions.  *See Sackett v. E.P.A.,* 566 U.S. 120, 127 (2012) (the "possibility that an agency might reconsider … does not suffice to make an otherwise final agency action nonfinal").  As the Ninth Circuit previously explained in this case, "a federal agency's assessment, plan, or decision qualifies as final agency action even if the ultimate impact of that action rests on some other occurrence." *AFGE v. Trump*, 139 F.4th at 1039.  An agency thus engages in "final" action, for instance, when it "state[s] a definitive position in formal notices, confirm[s] that position orally, and then send[s] officers out into the field to execute on the directive." *San Francisco Herring Ass'n v. Dep't of Interior,* 946 F.3d 564, 579 (9th Cir. 2019).

## 2.    FEMA

FEMA and its then-SOPDA Evans likewise violated the law by implementing DHS directives.  For all the reasons previously explained, these actions with respect to staffing and CORE separations were ultra vires and violated the APA.  In particular, the decision by FEMA's acting head to cede authority to DHS and to work with DHS to overrule FEMA's career staff recommendations in order to serve DHS directives was unlawful and arbitrary and capricious, for reasons previously explained.  These actions were, for the same reasons as the actions by DHS, final for purposes of the APA.

## C.    Permanent Relief Is Appropriate

Because the record leaves no disputes of material fact, and Plaintiffs are entitled to judgment as a matter of law on that record, if the Court authorizes Plaintiffs to move for partial summary judgment, permanent declaratory and permanent injunctive relief would be warranted.

First, appropriate relief would include a declaratory judgment that the actions of DHS and FEMA in creating and implementing a plan to dramatically downsize FEMA were ultra vires and violated the APA, for the reasons previously discussed.

Second, appropriate relief would include vacatur of DHS's directives to FEMA that (i) usurp FEMA's authority to make employment decisions and limit FEMA's authority to extend CORE positions, including with respect to the duration of any extension; and (ii) impose any plan to reduce the size of FEMA, including by separating CORE employees.  Relief as necessary to fully unwind those unlawful actions would also be warranted, by enjoining DHS and FEMA from giving any further effect to those unlawful directives.  *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496 (2001) ("[W]hen district courts are properly acting as courts of equity, they have discretion unless a statute clearly provides otherwise.") (*ultra vires*); *Kaweah*, 123 F.4th at 953 ("Section 706(2) of the APA states that if a reviewing court finds that an agency action is 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right' then the court '*shall* ... hold unlawful and set aside' that agency action.") (emphasis in original). The "statutory power [under the APA] to 'set aside' agency action is more than a mere non-enforcement remedy," and encompasses "the power to 'strike down' an agency's work, and the disapproved agency action is treated *as though it had never happened*." *Griffin v. HM Fla.-ORL, LLC*, __ U.S. __, 144 S. Ct. 1, 2 n.1 (2023) (Kavanaugh, J.) (quotation omitted) (emphasis added).

"[T]his court, as a court of equity conducting judicial review under the APA, has broad powers to order mandatory affirmative relief, if such relief is necessary to accomplish complete justice." *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 680–81 (9th Cir. 2007) (internal quotation marks and citations omitted); *see also Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021) ("Vacatur [of agency action] retroactively undoes or expunges a past [agency] action....*vacatur unwinds the challenged agency action*.") (emphasis added); *Jane Doe 1 v. Nielsen*, 357 F.Supp.3d 972, 1003–04 (N.D. Cal. 2018) (exercising equitable

authority under the APA to unwind unlawful denials of refugee status by setting aside the unlawful notices of ineligibility, requiring that any future notices be corrected and re-issued, and reinstating the time within which potential refugees could seek review).  Notwithstanding DHS and FEMA's recent actions, employees who were separated (or given shorter extensions than they would have otherwise been given) continue to suffer consequences that must be "unw[ou]nd" to effectively strike down that unlawful action.  *Valcq*, 16 F.4th at 522.

The corrective orders that are necessary to fully unwind the effects of DHS and FEMA's unlawful actions and make permanent the preliminary relief sought in Plaintiffs' modified preliminary injunction would include the following:

- With respect to FEMA's existing employees: injunctive relief prohibiting DHS interference with FEMA decision-making, including with respect to staffing and CORE renewals, and requiring DHS to recognize and cease interference with FEMA's authority to assess and offer CORE employees extensions of one to two years; and

- With respect to the CORE employees separated in January 2026: returning those employees to the position they held before these unlawful actions by requiring FEMA to offer those employees the ability to return to the same position as they previously held, including with any credits for federal service, and to provide back pay and restore benefits retroactively. The Court should order the parties to meet and confer regarding the most efficient and expeditious process for ensuring employees have been provided retroactive benefits and made whole for any expenses incurred from the unlawful disruption of their federal employment and benefits.

**CONCLUSION**

For the reasons discussed, the Court should grant Plaintiffs' motion.

DATED: May 29, 2026                    Respectfully submitted,

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
Robin S. Tholin
Elizabeth Eshleman

PLFS' SUPP. BRIEF ISO PRELIMINARY INJUNCTION, No. 3:25-cv-03698-SI

ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
sleyton@altshulerberzon.com
bchisholm@altshulerberzon.com
dleonard@altshulerberzon.com

By: */s/ Danielle Leonard*

*Attorneys for All Union and Non-Profit Organization Plaintiffs*

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

By: */s/ Tsuki Hoshijima*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC) and for Plaintiffs City of Chicago, IL; Martin Luther King, Jr. County, WA; Harris County, TX; and City of Baltimore, MD*

Jules Torti (pro hac vice)
PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038

Erica J. Newland (pro hac vice)
Jacek Pruski (pro hac vice)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave., N.W., Suite 163
Washington, D.C. 20006
Tel: 202-579-4582
jules.torti@protectdemocracy.org
erica.newland@protectdemocracy.org
jacek.pruski@protectdemocracy.org

By: */s/ Jules Torti*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC)*

Norman L. Eisen (pro hac vice)
Spencer W. Klein (pro hac vice)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Spencer@statedemocracydefenders.org

By: */s/ Norman L. Eisen*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC)*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*

*Attorneys for Plaintiffs American Federation of Government Employees, AFL-CIO (AFGE) and AFGE locals*

Teague Paterson (SBN 226659)
Matthew Blumin  (pro hac vice)
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

By: */s/ Teague Paterson*

*Attorneys for Plaintiff American Federation of State County and Municipal Employees, AFL-CIO (AFSCME)*

Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL
UNION, AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

By: */s/ Steven K. Ury*

*Attorneys for Plaintiff Service Employees
International Union, AFL-CIO (SEIU)*

David Chiu (SBN 189542)
City Attorney
Yvonne R. Meré (SBN 175394)
Chief Deputy City Attorney
Mollie M. Lee (SBN 251404)
Chief of Strategic Advocacy
Sara J. Eisenberg (SBN 269303)
Chief of Complex and Affirmative Litigation
Molly J. Alarcon (SBN 315244)
Alexander J. Holtzman (SBN 311813)
Deputy City Attorneys
OFFICE OF THE CITY ATTORNEY FOR THE
CITY AND COUNTY OF SAN FRANCISCO
1390 Market Street, 7th Floor
San Francisco, CA 94102
molly.alarcon@sfcityatty.org
alexander.holtzman@sfcityatty.org

By:  */s/ David Chiu*

*Attorneys for Plaintiff City and County of San
Francisco*

Tony LoPresti (SBN 289269)
COUNTY COUNSEL
Kavita Narayan (SBN 264191)
Meredith A. Johnson (SBN 291018)
Raphael N. Rajendra (SBN 255096)
Hannah M. Godbey (SBN 334475)
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, 9th Floor
San José, CA 95110
Tel: (408) 299-5900

PLFS' SUPP. BRIEF ISO PRELIMINARY INJUNCTION, No. 3:25-cv-03698-SI
48

Kavita.Narayan@cco.sccgov.org
Meredith.Johnson@cco.sccgov.org
Raphael.Rajendra@cco.sccgov.org
Hannah.Godbey@cco.sccgov.org

By: */s/ Tony LoPresti*

*Attorneys for Plaintiff County of Santa Clara, Calif.*

Christopher Sanders (pro hac vice)
General Counsel
Erin King-Clancy (SBN 249197)
Senior Deputy Prosecuting Attorney
OFFICE OF KING COUNTY PROSECUTING
ATTORNEY LEESA MANION
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
chrsanders@kingcounty.gov
eclancy@kingcounty.gov

By: */s/ Erin King-Clancy*

*Attorneys for Plaintiff Martin Luther King, Jr. County*

Sharanya Mohan (SBN 350675)
Eliana Greenberg (SBN 366319)
Toby Merrill (pro hac vice)
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
sai@publicrightsproject.org
eliana@publicrightsproject.org
toby@publicrightsproject.org

By: */s/ Eliana Greenberg*

*Attorney for Plaintiffs Baltimore, MD, Chicago, IL, Harris County, TX, and Martin Luther King, Jr. County, WA*

Jonathan G.C. Fombonne
Harris County Attorney

Sarah Utley (pro hac vice app. forthcoming)
Managing Counsel
Bethany Dwyer (pro hac vice app. forthcoming)
Deputy Division Director - Environmental Division
R. Chan Tysor (pro hac vice)

Senior Assistant County Attorney
Alexandra "Alex" Keiser (pro hac vice)
Assistant County Attorney
1019 Congress, 15th Floor
Houston, Texas 77002
Tel: (713) 274-5102
Fax: (713) 437-4211

jonathan.fombonne@harriscountytx.gov
sarah.utley@harriscountytx.gov
bethany.dwyer@harriscoupntytx.gov
chan.tysor@harriscountytx.gov
alex.keiser@harriscountytx.gov

By: /s/ Jonathan G.C. Fombonne

*Attorneys for Plaintiff Harris County, Texas*

Mary B. Richardson-Lowry,
Corporation Counsel of the City of Chicago

Rebecca A. Hirsch (IL ARDC 6279592) (pro hac vice)
City of Chicago Department of Law,
Affirmative Litigation Division
121 N LaSalle Street, Suite 600
Chicago, Illinois 60602
Tel: (312) 744-6934
Rebecca.Hirsch2@cityofchicago.org

By: /s/ Rebecca Hirsch

*Attorneys for Plaintiff City of Chicago*

Ebony M. Thompson
Baltimore City Solicitor

Christopher Sousa (SBN 264874)
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Tel: (410) 396-3947
sara.gross@baltimorecity.gov

By: /s/ Christopher Sousa

*Attorneys for Plaintiff City of Baltimore*