Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*

[Additional counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Case No. 3:25-cv-03698-SI <br><br> **SECOND SUPPLEMENTAL DECLARATION OF KHAALIS JACKSON** |

Second Supplemental Declaration of AFGE Local 4060 President Khaalis Jackson, No. 3:25-cv-03698-SI

**DECLARATION OF KHAALIS JACKSON**

I, Khaalis Jackson, declare as follows:

1.      I am over 18 years old and competent to give this declaration.  This declaration is based on my personal knowledge, information, and belief and supplements the two declarations I previously provided in support of Plaintiffs' motion for preliminary injunction (ECF 303, 314-2).

2.      I am the President of the American Federation of Government Employees Local 4060 ("AFGE Local 4060" or the "Union").  The American Federation of Government Employees, AFL-CIO ("AFGE"), is a labor organization and unincorporated association that represents approximately 800,000 federal civilian employees through its affiliated councils and locals nationwide.  AFGE Local 4060 represents Federal Emergency Management Agency ("FEMA") employees throughout the United States.

3.      My prior declarations addressed the services that AFGE Local 4060 provides to FEMA employees, including both dues-paying union members and members of former bargaining units, notwithstanding this Administration's efforts to remove our right to union representation and bargaining.  Those declarations remain accurate.

4.      This declaration sets forth the events and actions taken by DHS and FEMA with respect to the CORE employees since I provided my last declaration on February 25, 2026.

5.      On March 3, 2026, President Trump publicly announced that he was firing DHS Secretary Kristi Noem.  My understanding is that, after that announcement, some of the individuals at DHS with responsibility for FEMA also left DHS (including, from public reports, Deputy Chief of Staff Joseph Guy, and former government contractor and "Senior Advisor" to DHS for FEMA Kara Voorhies).

6.      As of approximately March 24, 2026, the new DHS Secretary is Markwayne Mullen.

7.      Karen Evans remained installed as FEMA SOPDA until very recently.

8.      On Monday, May 11, 2026, the President announced that he was going to nominate Cameron Hamilton as FEMA Administrator.  Mr. Hamilton had been the SOPDA from January through May 2025 before he was fired by DHS Secretary Noem.

Second Supplemental Declaration of AFGE Local 4060 President Khaalis Jackson, No. 3:25-cv-03698-SI

1

9.    On Tuesday, May 12, 2026, FEMA staff were informed that Ms. Evans was being replaced as SOPDA, and moving to another role within DHS. According to public reporting, the DHS spokesperson confirmed that Ms. Evans has been asked to lead special projects at the Department of Homeland Security as director of the so-called Waste, Fraud and Abuse Task Force. We do not know whether Ms. Evans will have continued responsibility with respect to FEMA as part of this "Task Force."

10.    Ms. Evans was temporarily replaced with SOPDA Robert Fenton (who is currently the Regional Administrator for FEMA Region 9). A true and correct copy of the current FEMA leadership website is attached hereto as Exhibit A.

11.    On May 7, 2026, the FEMA Review Council released a final report. A true and correct copy of that report is attached hereto as Exhibit B. Former DHS Secretary Noem has been replaced by current DHS Secretary Mullen as the Co-Chair, along with Defense Secretary Hegseth.

12.    The prior draft report that had been publicly leaked from December 2026 included recommendations called "FEMA 2.0" that included a transformed agency, including a recommendation to cut FEMA staff by 50 percent.

13.    The May 7, 2026 final report deleted the sentence referring to the 50 percent cut, but continues to include the key recommendation of a "Transformed Agency." The report states the following:

> It is time to close the chapter on FEMA. "FEMA" as a brand and as an agency was irreparably damaged by the previous Administration's proclivity to mission creep and endemic program failures. A transformed agency should be established that retains the core missions of FEMA, while highlighting the renewed emphasis on locally executed, state or tribally managed, and federally supported emergency management.

14.    A true and correct copy of the FEMA Review Council presentation is attached hereto as Exhibit C. The presentation recognized that the "transformed" agency requires legislative action.

15.    Government officials immediately expressed concerns regarding the implications of the FEMA Council Report for further workforce reduction. A true and correct copy of a May 14, 2026 letter from members of the U.S. House of Representatives Committee on Homeland Security

is attached hereto as Exhibit D. A true and correct copy of a May 21, 2025 letter from Texas Representative Jon Rosenthal regarding the report is attached hereto as Exhibit E.

16.    DHS continues to make decisions for FEMA and regarding FEMA staffing. As my previous declarations explained, DHS first implemented a plan to offboard FEMA COREs by NTE date starting in early January. After this lawsuit was filed, DHS and FEMA began granting extensions to COREs, approved by "S1" for 90 days only. Employees were granted extensions reflected in new SF-52 forms uploaded to their personnel records. Unlike in the past, the SF-52 forms did not include a new NTE date, but just described the 90-day temporary extension. That practice continued until very recently.

17.    On April 28, 2028, the FEMA Administrator's Office send an all-staff email stating that "Under Secretary Markwayne Mullin's leadership, we are focusing on stabilizing our workforce..." The email, which was unsigned, further stated that "Over the coming days and weeks, you will see several actions taking place" including:

- CORE staff with initial not-to-exceed (NTE) dates between January through May 2026 who were previously extended for 90 days **may** be reappointed for up to one year, depending on performance, availability of work, and funding.

- CORE staff with expiring appointments in June 2026 and beyond will undergo a functional review with supervisors, which will follow the prescribed assessment requirements and mission analysis. These CORE staff **may** have the opportunity for a one-year appointment.

A true and correct copy of this email is attached hereto as Exhibit F.

18.    Neither DHS nor FEMA have shared with employees either FEMA's Annual Staffing Plan, or the results of the further staffing planning exercise, in support of implementation of FEMA's Annual Staffing Plan, for which components were provided a deadline of March 31, 2026.

19.    On Tuesday, May 19, 2026, FEMA held the first all-employee meeting in approximately one year. Nominated Administrator Hamilton as well as current SOPDA Benton were there, as well as other current FEMA leadership. (Approximately 18 of the 38 leadership positions at FEMA are vacant, see Ex. A).

Second Supplemental Declaration of AFGE Local 4060 President Khaalis Jackson, No. 3:25-cv-03698-SI

3

20. At that meeting, FEMA leadership stated that DHS is still controlling decisions regarding FEMA CORE staffing. They described decisions to renew CORE positions going forward, and that they were "working with the department" to establish the renewal periods. FEMA leadership stated that COREs renewed between now and June would be renewed for one year, and that COREs renewed after June would be on a "case by case" basis. They stated that DHS had to approve these plans, which were being "worked out" with the department. FEMA leadership also explained that DHS had yet to approve the most recent staffing plan for FEMA.

21. There are different categories of CORE employees impacted by the DHS and FEMA actions since the beginning of January: the employees who were initially separated from employment by NTE date; the thousands of remaining CORE employees, including many hundreds who were given 90-day extensions (many of which have expired or are expiring); and other CORE employees with upcoming NTE dates in May, June, and thereafter.

22. From information provided by impacted employees, in approximately early May 2026, FEMA began offering new positions to COREs who had been released back in January. Neither DHS nor FEMA has provided any information to AFGE Local 4060 as the representative of FEMA employees, including regarding the employees who were separated, the 90-day extensions, or plans with respect to further extensions.

23. I have reviewed the letters submitted by Mr. Neureuter to the Court and the Neureuter Declaration, which states that FEMA sent letters to 142 COREs offering them a new CORE appointment for either one year or a six-month term of employment. My understanding, based on the May 19 all hands meeting and the statements of DHS leadership, is that DHS is making the decisions regarding the length of time that COREs may be extended. Mr. Neureuter's statement that *some* employees are being given one-year extensions and others only six months is consistent with the information we are receiving from affected employees.

24. The aforementioned letters provided these former FEMA employees with a deadline of only one to three days to accept these offers of new positions. The letters also stated that the start dates would occur at an unidentified future date, and that employees would have to go through pre-employment and security background screening procedures, after which they may receive a

Second Supplemental Declaration of AFGE Local 4060 President Khaalis Jackson, No. 3:25-cv-03698-SI

4

"final" offer. The letters state, "You should not make any life changes until you receive a **final offer** from us."

25. The prior Declaration of Karen Evans stated that DHS decided not to reappoint 192 CORE employees whose terms were expiring in January 2026, but then DHS rescinded 33 of those non-renewals (ECF 312-1, ¶ 26). Mr. Neureuter now says there were 148 CORE employees not renewed in January 2026, setting aside those who voluntarily left government service (ECF 383-1). This does not account for the difference of 11 people.

26. The actions by DHS and FEMA do not return these CORE employees to the positions they previously held, nor provide any remedy for the time during which they were separated. FEMA has not provided back pay or retroactive benefits. FEMA did not reinstate employees to their prior positions.

27. Offering new jobs rather than extending the prior positions also disrupts federal service. It appears that the new positions offer the same grade and step that the employees had at the point that they left, but do not offer credit for the "time in step" that some employees had. For COREs who had previously been given a 180-day extension, this likely erased six months of time worked towards the next step. The disruption also may have affected vacation time accruals and other collateral benefits.

28. With respect to the CORE employees who were previously given 90-day extensions that were up in May or June, *some* are receiving one-year or six-month further extensions, consistent with the information provided in the recent meeting. We cannot confirm that all CORE employees are being provided with extensions. Some employees with 90-day extensions expiring at the same time have received further extensions, while others have not. FEMA is saying that plans depend on DHS approval of the unknown "staffing plan" that they have not released. Similarly, for other CORE employees whose NTE dates fall in May, June, and thereafter, the current information does not confirm whether or not extensions will be granted, or for how long.

29. Leaving FEMA CORE staff in continued limbo has had extremely detrimental effects on the morale of FEMA employees and the ability of FEMA to perform its functions. Short extensions were never previously the practice at FEMA (and indeed, are inconsistent with the

Second Supplemental Declaration of AFGE Local 4060 President Khaalis Jackson, No. 3:25-cv-03698-SI

5

governing CORE Manual), because this does not allow for sufficient planning and generally keeps employees who make up half the FEMA workforce in a state of extreme uncertainty.

30.    We welcome the efforts to bring back these valued FEMA staffers, who never should have been separated at the direction of DHS over the recommendations of their FEMA supervisors.  However, in light of DHS and FEMA leadership's continued efforts to keep staffing plans non-public, and the new FEMA Council report (for which DHS Secretary Mullen was the Co-Chair), we are reasonably concerned that DHS will continue to implement its efforts to reduce the size of the CORE, to the detriment of FEMA and its staff.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed May 28, 2026, in Kansas City, Missouri.

Khaalis Jackson

# Exhibit A



An official website of the United States government   Here's how you know

FEMA

Apply for Assistance

About Us

# Offices & Leadership

 English

## Find an Office

**See All Offices**

## Office of the Administrator

The [Office of the Administrator](#) contains program offices that directly support the Administrator and Deputy Administrator in the performance of their duties, as well as several program offices that provide agency-wide coordination, guidance, and oversight on key topics.

 **Robert J. Fenton**, Senior Official Performing the Duties of FEMA Administrator

 FEMA Deputy Administrator

 Chief of Staff

 Deputy Chief of Staff

## External Affairs

The [Office of External Affairs](#) engages, informs and educates our partners and the public to achieve the FEMA mission of helping people before, during and after disasters.

## Download the FEMA App

Get real-time weather and emergency alerts, disaster news, and more with the FEMA app.



## National Continuity Programs

The [Office of National Continuity Programs](#) guide the planning, implementation and assessment of continuity programs that enable federal, state, local, tribal and territorial governments to continue performance of essential functions and deliver critical services across a broad spectrum of emergencies when normal operations are disrupted.

  Associate Administrator

  **Thomas Breslin**, Deputy Associate Administrator

## Policy and Program Analysis

**Download the FEMA App**

Get real-time weather and emergency alerts, disaster news, and more with the FEMA app.



 Deputy Associate Administrator

# Mission Support

[Mission Support](#) delivers quality, mission-focused business excellence across five lines of business, which include human resources; information technology; facilities and administrative services; security; and procurement.

 **Shila Cooch**, Associate Administrator

Deputy Associate Administrator

## Download the FEMA App

Get real-time weather and emergency alerts, disaster news, and more with the FEMA app.



## Region 1

[Region 1](#) includes Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont and 10 Tribal Nations.

 **Frederick Doucette**, Regional Administrator

 **Jarrett W. Devine**, Deputy Regional Administrator

## Region 2

[Region 2](#) includes New Jersey, New York, Puerto Rico, the Virgin Islands and eight Tribal Nations.

## Download the FEMA App

Get real-time weather and emergency alerts, disaster news, and more with the FEMA app.



## Region 3

[Region 3](#) includes Delaware, Maryland, Pennsylvania, Virginia, District of Columbia, West Virginia and seven Tribal Nations.

 Regional Administrator

 **Lilian Hutchinson**, Deputy Regional Administrator

## Region 4

[Region 4](#) includes Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee and six Tribal Nations.

## Download the FEMA App

Get real-time weather and emergency alerts, disaster news, and more with the FEMA app.



## Region 5

[Region 5](#) includes Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin and 34 Tribal Nations.



Regional Administrator



**Michael Chesney**, Deputy Regional Administrator

## Region 6

[Region 6](#) includes Arkansas, Louisiana, New Mexico, Oklahoma, Texas and 68 Tribal Nations.

## Download the FEMA App

Get real-time weather and emergency alerts, disaster news, and more with the FEMA app.



## Region 7

Region 7 includes Iowa, Kansas, Missouri, Nebraska and 9 Tribal Nations.



Regional Administrator



**Catherine Sanders**, Deputy Regional Administrator

## Region 8

Region 8 includes Colorado, Montana, North Dakota, South Dakota, Utah, Wyoming and 29 Tribal Nations.

## Download the FEMA App

Get real-time weather and emergency alerts, disaster news, and more with the FEMA app.



## Region 9

[Region 9](#) includes Arizona, California, Hawaii, Nevada, Guam, American Samoa, Commonwealth of Northern Mariana Islands, Republic of Marshall Islands, Federated States of Micronesia and 150 Tribal Nations.



**Robert J. Fenton**, Regional Administrator



**Tammy Littrell**, Deputy Regional Administrator

## Region 10

[Region 10](#) includes Alaska, Idaho, Oregon, Washington and 271 Tribal Nations.

**Download the FEMA App**

Get real-time weather and emergency alerts, disaster news, and more with the FEMA app.



# Resilience

FEMA [Resilience](#) prepares communities, reduces suffering, and speeds recovery.



Deputy Administrator



Associate Administrator

# Response and Recovery

## Download the FEMA App

Get real-time weather and emergency alerts, disaster news, and more with the FEMA app.



   **Keith Turi**, Deputy Associate Administrator

# U.S. Fire Administration

The U.S. Fire Administration supports and strengthens fire and emergency medical services and stakeholders to prepare for, prevent, mitigate and respond to all hazards.

   Paul D. Matheis, Administrator

Deputy Administrator

## Download the FEMA App

Get real-time weather and emergency alerts, disaster news, and more with the FEMA app.



[Return to top](#)

**Disasters & Assistance**     **Grants**     **Floods & Maps**     **Emergency Management**     **About**     **Work With Us**



**Contact FEMA**

## Download the FEMA App

Get real-time weather and emergency alerts, disaster news, and more with the FEMA app.



# Exhibit B



# Final Report

## The President's Council to Assess the Federal Emergency Management Agency

**May 7, 2026**

This page is intentionally left blank to hold for co-chair letter.

3

*This Page Intentionally Left Blank*

# Table of Contents for Executive Summary

**Listening to the Nation: Stakeholder and Public Feedback**......................................................**5**

**Guiding Principles and Key Recommendations**.........................................................................**5**

    1. Equip States, Local governments, Tribes, and Territories to lead disaster response with the federal government in a supporting role .......................................................................... 7

    2. Enhance Critical Federal Programs & Resources to Support Communities....................... 8

    3. Realign the Criteria for Federal Disaster Assistance ........................................................ 8

    4. Replace the Hazard Mitigation Grant Program with a Two-Phase Funding Structure ...... 8

    5. Streamline the Individual Assistance Program into a Single Direct Payment Program ..... 9

    6.Reform the Public Assistance Program to Provide Direct Funding.................................. 10

    7. Reform the FEMA National Flood Insurance Program (NFIP) for Financial Stability and Risk Resilience........................................................................................................................ 11

    8. Maximize every dollar spent by Reducing Administrative Costs.................................... 12

    9. Revitalize A Unified National Network for Partnership .................................................. 13

    10. A Transformed Agency ............................................................................................... 13

**Appendix A: Detailed Charts**..................................................................................................**16**

**Appendix B: RAPID Direct Funding Flow Chart** ..................................................................**18**

**Appendix C: Looking Back - A History of Emergency Management and FEMA**................**19**

**Appendix D: FEMA Disaster Response (2021-2024)** ..............................................................**20**

**About the FEMA Review Council** ..........................................................................................**21**

**FEMA Review Council Members**............................................................................................**22**

**Acknowledgements** ..................................................................................................................**22**

# Listening to the Nation: Stakeholder and Public Feedback

In order to meet the mandate established by the President, for over a year the Council was deliberate in its actions, devoting significant time to engage across jurisdictional levels and with various entities to hear about their experiences with FEMA during and after disasters. The Council solicited input from a broad range of stakeholders, including Americans affected by natural and man-made disasters; the research community; private sector; state, local, tribal, and territorial (SLTT) governments; foundations; faith-based and nonprofit organizations. In total, the Council received and reviewed (1) 11,708 public submissions, (2) a nationwide survey of SLTT agencies and non-government partners yielding 1,387 responses, (3) direct engagement with 50 states and territories, (4) listening sessions in 13 cities across the nation, and (5) four listening sessions with tribal nations.

The feedback received underscores widespread support for FEMA reform aimed at addressing inefficiencies, reducing bureaucratic barriers, and enhancing support for disaster survivors and local governments. Stakeholders consistently identified key priorities, including the need to streamline processes, decentralize decision-making, improve the access to mitigation and preparedness initiatives, and ensure fairness in disaster response and recovery efforts. Participants emphasized the importance of implementing reforms gradually, allowing for a phased approach that strengthens partnerships among federal, state, tribal, and local entities while minimizing disruptions.

This robust engagement process has provided the Council with invaluable insights into the challenges and opportunities facing FEMA's operations. The feedback serves as a cornerstone for shaping the Council's recommendations, ensuring that potential reforms are informed by the lived experiences of those directly impacted by disasters and those responsible for managing emergency response and recovery efforts. By integrating this input into its recommendations, the Council aims to create a more efficient and responsive FEMA that is better equipped to meet the needs of communities nationwide. The inclusion of public feedback reflects the Council's commitment to fostering collaboration and transparency in the pursuit of meaningful reform.

# Guiding Principles and Key Recommendations

At the direction of President Donald J. Trump, the FEMA Review Council (the Council) conducted a full-scale agency review in accordance with Executive Order 14180 and developed a comprehensive set of recommendations for overhauling the federal government's approach before, during, and after disasters. This executive summary provides the President with the Council's summarized recommendations, to include guiding principles for reform, recommendations for improvements, and proposed structural changes to promote the national interest and enable national resilience. After the Council fully evaluated the country's history of disaster response, reviewed feedback from more than 13,000 individuals impacted by disasters, and met with stakeholders involved in emergency management, the Council agreed on this key doctrine to guide the Council's recommendations: *Disaster response should be locally executed, state or tribally managed, and federally supported.*

Disaster response is complicated and increasingly expensive. With taxpayers bearing the burden of funding emergency management in the United States, it is the responsibility of every

5

American to embrace their individual responsibility to lessen this burden by being prepared for disasters. Prudent preparation through planning, mitigation, insurance, capabilities, and seeking a fundamental understanding of their role in a disaster is vital to contributing to national preparedness. Active preparation and knowledge directly contribute to the effectiveness of local execution in any emergency or disaster. As our nation returns ownership of emergency management back to local communities and their states, tribes, and territories, we encourage every American to review their insurance policies and personal disaster plans as well as engaging with their local community leaders to be better prepared when disaster strikes.

States and local governments are the foundation of a successful emergency management system. As the immediate first responders, local public safety, infrastructure, and human service personnel require adequate training and equipment to manage all incidents effectively. States and local governments are on the frontline of recovery efforts following a disaster incident, working with states to reopen critical public and economic infrastructure. Beyond immediate response, local governments are essential for proactive community safety through proper land-use planning and by enforcing building codes to harden critical infrastructure against identified local risks. During a crisis, the visible leadership of state and local officials—demonstrated through decisive action and transparent public communication before, during, and after a disaster—is paramount for public trust and effective coordination. It is imperative that the Council's reforms are implemented in a phased approach manner over two to three years. This phased approach ensures States, Locals, Tribes, and Territories are able to prepare their fiscal and physical capabilities for the new transformed agency.

When local resources are overwhelmed, a robust system of state-coordinated mutual aid compacts becomes critical to ensuring communities receive necessary support and do not fail. This tiered support system, which can scale up to federal assistance, when necessary, guarantees a resilient national response. Ultimately, strengthening state and local government capability in disaster preparedness, response, recovery, and mitigation is a direct and essential investment in national safety and community resilience.

After an exhaustive national review of the nation's ability to prepare for, respond to, and recover from natural disasters, the Council developed five guiding principles for reform:



**Council Guiding Principles**

**Return** leadership for emergency response and recovery to the States, Tribes, and Territories

**Reaffirm** that individual American preparedness is foundational to disaster readiness

**Accelerate** federal assistance dollars to help Americans **recover from their worst day**

**Maximize** the transparency and efficiency of federal and SLTT dollars spent in emergency management

**Boldly transform** FEMA into a lean organization that puts **Americans first**

6

The Council leveraged these five guiding principles to develop the following ten key recommendations.

## 1. Equip States, Local governments, Tribes, and Territories to Lead Disaster Response with the Federal Government in a Supporting Role

The National Preparedness Goal aims to create a secure and resilient nation that can handle various threats and hazards.[1] As it stands today, most of the public's first instinct during a major natural disaster is to rely on or expect the federal government to complete a whole-of-government national response irrespective of whether that incident necessitates *any* federal response. However, contrary to that misconception, it is the SLTT governments that have always had the primary response role during a disaster. Reorienting the National Preparedness System to empower SLTT governments to manage the mitigation, response, and recovery of disasters effectively returns the federal role from *leading* to *supporting*.

To achieve this, the Council recommends addressing both the lack of a national standard for initial response and recovery as well as addressing the limited ability to share and coordinate resources. The transformed agency must reinvigorate a national system to ensure SLTT, private, and non-profit capabilities can better integrate during disasters. Additionally, the Council recognizes the importance of Non-Disaster Grants, such as the Emergency Management Performance Grant (EMPG), that ensure our nation's security and recommends these programs be retained within the future agency. The Council encourages exploring how to leverage federal savings from other efficiencies gained to create a potential one-time EMPG increase to better facilitate the return of responsibilities to States, Tribes and Territories.

**To address a lack of a national standard for incident response and recovery:**

1. Encourage adoption of national capability standards at SLTT level

2. Incentivize building scalable training resources at SLTT level

3. Professionalize emergency management to promote professional development

4. Focus on catastrophic planning and promote a common approach to exercise standards

**To address the limited ability to share and coordinate resources:**

1. Revitalize and promote the use of the Unified Resource Catalog of all Federal and SLTT-typed capabilities and resources

2. Refocus SLTT grant investment on mission-ready teams, capabilities, and infrastructure that meet national standards (i.e. State Search and Rescue, Swift Water Rescue, and other teams as identified in National Resource Hub) in lieu of funding specialty equipment

3. Enhance and improve upon the existing credentialing framework under the National Incident Management System (NIMS) and National Qualification System (NQS)

4. Promote the integration of additional partners, to include volunteer and faith-based organizations

---

[1] Federal Emergency Management Agency, "National Preparedness Goal," https://www.fema.gov/emergency-managers/national-preparedness/goal

5.  Incentivize investments in interoperable systems for communication and data sharing to improve real-time coordination

## 2. Enhance Critical Federal Programs & Resources to Support Communities

The federal government must maintain the ability to provide federal support resources through a single federal entity, so that state and local officials can quickly and efficiently leverage the full force of the federal government when required. Although state and local authorities have the primary responsibility for responding to a wide range of hazards and protecting their citizens, the federal government should retain the responsibility to support these efforts when required. FEMA's current mission exists at the intersection of emergency management and national security. An essential component of this is FEMA's authority to coordinate other federal agencies in support of SLTT partners. These include federal capabilities and programs such as Urban Search and Rescue Task Forces, National Disaster Medical System, Radiological Emergency Preparedness, and public communication tools like the Integrated Public Alert and Warning System and the National Alert and Warning System.

Additionally, the agency maintains an arsenal of dual-use capabilities, regional offices, incident management teams, prepositioned logistic systems or programs, and the Disaster Relief Fund to ensure the American people are resilient in the face of any threat, whether natural or man-made. Therefore, sustaining and resourcing this mission in the transformed agency is vital to public safety, economic stability, and national resilience.

## 3. Realign the Criteria for Federal Disaster Assistance

Federal assistance should only be reserved for truly significant events that exceed SLTT capacity and capability. Therefore, common criteria should be established on how to evaluate when this occurs. The current disaster declarations process for federal assistance does not adequately account for SLTT capacity and, therefore, is inconsistent with legislative intent and disincentivizes SLTT investment in disaster preparedness. In addition, the complexity and subjectivity within the existing process for granting federal assistance to individual citizens also creates frustration and tension between federal and state partners that distract from a common desire to assist survivors efficiently and fairly.

The transformed agency should implement common-sense approaches to update federal disaster declaration thresholds, thus rebalancing federal and state responsibilities. This includes a reset of the Per Capita Indicator threshold, using the Consumer Price Index to account for historical inflation. The Council recommends that disasters be evaluated for federal assistance based on the level of severity for public assistance and individual assistance funding. Additionally, an annual calendar year minimum expenditure should be established for small, medium, and large states prior to them being able to request a federal declaration (s*ee Appendix A for detailed guidance).*

## 4. Replace the Hazard Mitigation Grant Program with a Two-Phase Funding Structure

FEMA's current Hazard Mitigation Grant Program is hampered by administrative burdens that delay funding distribution until well after rebuilding begins, thus missing opportunities for cost-effective mitigation. Reviews indicate lengthy project approval times, inconsistent oversight, and a narrow focus on certain risk while neglecting others. The Council proposes a state-managed

program, notionally titled "Refined Risk Reduction" Program (R3P), where project priorities are nationally set and environmental reviews are handled locally, with two phases of funding:

- **Rapid Mitigation Advance** (Within the first 30 days provide up to 5% of the federal government contribution for the disaster to facilitate immediate residential mitigation to primary residences and communities impacted by the event or in other high-risk zones)

- **Strategic Mitigation Allocation** (Within the first six months provide up to the remaining 10% of the federal government contribution to improve the performance of the NFIP by mitigating properties and critical infrastructure based on Federal Administration priorities)

For mitigation to work, the Council recommends states take on greater program management responsibility and continue to develop an improved and comprehensive state hazard mitigation process that identifies projects that are immediately implementable. The program would be structured with up to a 75% cost share based on performance metric (*see Appendix A)* with a 50% minimum. The program would focus on expediting funding for states and territories with approved hazard mitigation plans and a history of successful HMGP performance, encouraging identification and sharing of best practices, inventorying high risk properties and building sound funds management systems. All projects should be completed as soon as practicable and must be completed within eight years, including completion of all required federal permits and any other federal closeout actions. Finally, winding down the legacy open disaster declarations by converting them to the new model would reduce the backlog and break the cycle of repetitive loss, improve fiscal sustainability, and enhance community resilience.

## 5. Streamline the Individual Assistance Program into a Single Direct Payment Program

The current FEMA Individual Assistance (IA) Program,[2] which provides direct assistance to disaster survivors, is overly slow, confusing, and inefficient. It leaves many Americans frustrated by complex rules, inconsistent decisions, and long wait times for aid when they are most vulnerable. With at least 15 categories of assistance, the system bewilders and sidelines recipients and private-sector partners who are best positioned to help survivors. Furthermore, the program is not well integrated with other federal housing programs. It does not give Americans the quick certainty they need to drive their own recoveries, and instead centralizes control in Washington, D.C. The process spends taxpayer dollars inefficiently and with little accountability for outcomes. To address these challenges that survivors experience in receiving assistance, the Council proposes the *Framework for Accessible Individual Relief* (FAIR) Program:

- Consolidate existing programs into one direct payment to survivors whose homes are uninhabitable after a disaster.

- Transfer evacuation and temporary emergency sheltering responsibilities to state, tribal, and territorial (STT) governments.

---

[2] FEMA's Individual Assistance program is designed to help disaster survivors with basic critical needs such as a safe, sanitary, and functional place to live during recovery from a disaster. It is not designed to make survivors whole and is not a substitute for insurance coverage. https://www.fema.gov/fact-sheet/questions-and-answers-about-individual-assistance#:~:text=FEMA%E2%80%99s%20Individual%20Assistance%20program%20is%20designed%20to%20help,and%20is%20not%20a%20substitute%20for%20insurance%20coverage.

9

- Focus the transformed agency's role on emergency and temporary housing (mass care/sheltering and temporary housing/rental assistance) instead of long-term housing, and only for Americans whose homes are uninhabitable (not those who experience minor damage).

- Affirm private insurance companies remain responsible for permanent housing, with the U.S. Department of Housing and Urban Development and Small Business Administration in lead federal roles.

Instead of bureaucratic, delayed payments that eventually provide only a few thousand dollars to the average American, swift support for emergency sheltering with a faster amount of monetary assistance would directly and positively impact affected Americans. Consolidating assistance into a single payment would provide all Americans clear, specific information on what assistance they would receive from the federal government in the event of a catastrophic loss.

- **Homeowner Assistance**

  - For homeowners, the payment package would be based on their level of need and no more than 15% of the local government's assessed value, capped at a $1 million valuation (i.e. maximum payment not to exceed $150,000).

  - Allowable use would include repairs, replacement, rental and other needs assistance (i.e. personal property loss, transportation, medical, funeral expenses).

- **Renter Assistance**

  - For renters, the payment package would be based on level of need and cover 3 months of rent (first, last, and current month) at the HUD Fair Market Rate (FMR) for the appropriate household size. Individuals with greater need could have the option for 3 additional months of rental assistance for 6 months total.

  - This covers rent and Other Needs Assistance.

These reforms provide quick, cost-effective, and transparent support to disaster survivors, within the limits of federal funding, as well as reduce administrative overhead and clarify federal agency responsibilities. Further, there should be an option for this to be a state-managed program if individual states wish to do so.

## 6. Reform the Public Assistance Program to Provide Direct Funding

The current disaster recovery process under FEMA's Public Assistance (PA) program,[3] which provides funding to communities after a federally declared disaster, is burdened by bureaucracy, leading to significant delays and frustration from states and communities. To address this, the Council proposes the *Reformed and Partnered Initiative for Disasters* (RAPID) program, a modern and agile framework that converts the existing PA program into a direct funding model that leverages pre-defined objective event criteria and cost estimates to accelerate and streamline

---

[3] Public Assistance is FEMA's largest grant program providing funds to assist communities responding to and recovering from major disasters or emergencies declared by the President. The program provides funding for emergency assistance to save lives and protect property and assists with funding for permanently restoring community infrastructure affected by a federally declared incident. -FEMA Public Assistance Fact Sheet October 2019.

10

recovery. Utilizing a parametric trigger,[4] funding would be released to states within 30 days of a major federal disaster declaration. This eliminates the need for time-consuming loss assessments and quickly provides a financial backstop and cashflow for rapid response and recovery. When paired with traditional insurance of public facilities, this can enable communities to *quickly recover* with manageable financial risk and burden to local taxpayers.

The Council recommends the future agency convene a group of STT and private sector representatives to collectively establish a parametric funding model that is based on existing data from the authoritative federal agency or organization over each type of eligible event (i.e. earthquake, hurricane, flood, etc.). The federal funding should be set with a minimum of 50% and increase up to 75% of the established parametric amount based on state performance (*see Appendix A for details*). STTs, in turn, would gain the autonomy to manage the funding, to include determination of project eligibility, and look for duplications of effort as referenced in the Council's first key recommendation.[5] Determination of eligibility would be simplified and limited to eligible applicants, eligible facilities, eligible work, and eligible costs.

Accountability would be maintained through a two-phase audit process: a one-time validation of costs within one year and a final program closeout. All federal funding provided under RAPID must be expended or returned within eight years. The transformed agency should pursue the ability to convert historic disasters to the new RAPID Direct Funding program, making a onetime payout and immediately transitioning to the two-phase reconciliation approach described above. This significantly reduces the administrative burden on all stakeholders and prevents added confusion from overlapping approaches. *See Appendix B for an example flow chart of how RAPID would function in a natural disaster.*

## 7. Reform the FEMA National Flood Insurance Program (NFIP) for Financial Stability and Risk Resilience

The National Flood Insurance Program (NFIP), administered by FEMA, faces significant challenges that threaten its long-term viability. The program is financially unsustainable, burdened by over $20 billion in debt,[6] and relies on outdated risk information.[7] This leads to a disconnect between the price of insurance, the public's perception of risk, and actions to mitigate or transfer it. A comprehensive reform plan centered on a strategic shift toward a primary role for the private market, with the goal of fostering a more resilient and financially stable flood risk management system. The Council recommends:

- Empowering communities with stronger land-use policies

---

[4] Parametric, or index-based, is a concept where if an event reaches a pre-defined threshold, it automatically sets the payment amount based on the magnitude of the event. This is different than traditional payment based on the magnitude of assessed loss. The main benefit of a parametric model is the speed and certainty of payouts, which are triggered automatically *after* a federal disaster declaration is made, when pre-defined, objective event criteria are met, like wind speed or earthquake magnitude.

[5] This would be accomplished through congressional authorization for eligible, certified STT programs.

[6] Federal Emergency Management Agency, NFIP Debt, https://www.fema.gov/case-study/nfip-debt

[7] *Underwater: How FEMA's outdated flood maps incentivize property owners to take risks.* https://www.nbcnews.com/science/environment/water-femas-outdated-flood-maps-incentivize-system-risk-negotiable-rcna220529

- Modernizing risk data with continued implementation of Risk Rating 2.0 and revising flood maps to inform the American people about their true risk

- Implement risk-based pricing and actual costs

- Revising "Write Your Own" compensation to reduce overall administrative costs

- Incentivizing the launch of a "take-out" program to transfer policies to the private market and focus Hazard Mitigation funds on repetitive loss properties

- Engaging state insurance commissioners to facilitate this transfer, including exploring the establishment of a centralized flood insurance marketplace to serve as a clearinghouse for admitted insurers

These changes are expected to accelerate disaster recovery, reduce the federal government's financial burden, send clear financial signals, and provide predictable financial outcomes for homeowners, ultimately leading to a more prepared nation.

## 8. Maximize Every Dollar Spent by Reducing Administrative Costs

A central issue with the current disaster management system is the amount of taxpayer money used for administrative costs. In fact, a substantial part of grant funding is spent on administrative and management expenses at both the federal and state/local levels. In total, almost 25 cents on every dollar can be provided for administrative expenses. As an example, since 2018 in Florida, the cost of a recovery consultant contract rate has increased from $100 to nearly $300 per hour. Most of these costs are expended during the grant development phase, which hinders the pace of recovery. The complexity of existing grant programs has resulted in a shift from using government staff to private contractors in exorbitantly high numbers. A FEMA official in Puerto Rico highlights this phenomenon stating, "I have 500 contracted employees that would not be needed if FEMA's grant process was not so complex."[8] The above recommendations offer efficient, streamlined programs that reduce overall administrative cost burdens by replacing grant programs with direct funding that does not require administrative management.

Any sense of urgency emphasized in this report for providing assistance to SLTTs should be carefully balanced with a robust financial review and compliance. It is critically important that states should be required to utilize their state auditor and/or comptroller to complete timely audits of income and expenditure of all federal funds. Consideration of utilizing private, Certified Public Accountants, or accounting firms to assist in this critical process of accountability would be prudent as many state auditors of public accounts may be overburdened by current statutory responsibilities. Localities and Tribal Governments should be required to submit a standardized audit either from their public auditor or licensed accounting firm. By eliminating and simplifying programs, capping administrative costs, strengthening ethics rules, and increasing direct government support, policymakers would improve how disaster relief funds are used to build a more resilient nation.

---

[8] FEMA Review Council Listening Session, 24 September 2025, San Juan, Puerto Rico.

## 9. Revitalize A Unified National Network for Partnership

The current emergency management landscape lacks a comprehensive framework that effectively integrates the efforts of federal, state, and local governments with those of private industry, faith based, and non-profit partners. The current system of laws, executive orders, and policies causes confusion by using the following terms interchangeably: frameworks, incident command systems, lifelines, core capabilities, and emergency support functions. This gap prevents the building of shared capabilities and national-level capacity, directly impacting the readiness and effectiveness of local first responders.

The transformed agency should promote a "Whole Community" approach to national preparedness. To do this, the agency must address the existing gap in the emergency management landscape by returning to a network that enables government, private industry, faith based, and non-profit partners to build toward shared capabilities and integrated resources. This formalizes and streamlines coordination between government agencies, critical private-sector partners, and non-profit organizations.

## 10. A Transformed Agency

It is time to close the chapter on FEMA. "FEMA" as a brand and as an agency was irreparably damaged by the previous Administration's proclivity to mission creep and endemic program failures. A transformed agency should be established that retains the core missions of FEMA, while highlighting the renewed emphasis on locally executed, state or tribally managed, and federally supported emergency management.

Beyond boldly transforming the agency, it should refocus on its core mission *to reduce the loss of life and property and protect the Nation from all hazards*[9] by reducing bureaucracy, improving efficiency, and building stronger partnerships with SLTT governments. Therefore, the agency should shift from a District of Columbia-centric bureaucracy and regulatory bottleneck to a new, lean coordination-focused workforce that empowers SLTT officials to provide relief for their citizens. The transformed agency should conduct a strategic review of requirements to determine appropriate staffing levels and address a recent surge in headquarters-based personnel by rebalancing their headquarters vs. field personnel ratio to reduce the agency's bureaucratic bloat. This assessment and determination should occur over a two-to-three-year period and would be dependent on the Council's recommendations being implemented. The transformed agency should deliver any cost savings achieved through staffing efficiencies back to the States, Tribes, and Territories. As the agency transforms, there remains a need for partnerships between states and federal stakeholders, and this can be best facilitated by active regions.

To empower these partners, the transformed agency should shift training execution to states, expand and leverage existing successful partnerships, continue support of Emergency

---

[9] *The primary mission of the Agency is to reduce the loss of life and property and protect the Nation from all hazards, including natural disasters, acts of terrorism, and other man-made disasters, by leading and supporting the Nation in a risk-based, comprehensive emergency management system of preparedness, protection, response, recovery, and mitigation.* – Post-Katrina Emergency Management Reform Act of 2006

Management Assistance Compact agreements, empower states with expedited funding, and limit federal on-the-ground response to only incidents that exceed the capabilities and capacities of SLTT stakeholders.

The Council recommends reviewing all existing FEMA programs and maintaining those that are critical to our nation's security. Further, rather than replacing successful programs, the future agency should double down on those with a proven track record of effective federal-state-local partnership such as the Emergency Management Assistance Compact, National Urban Search and Rescue Program, Centers for Domestic Preparedness, and U.S. Fire Administration among others.

The transformed agency must look for opportunities to remove duplications of effort such as environmental and historical reviews, audits, and inspections that should be conducted by states. Further, the agency should endeavor to expedite the closeout of historical open disasters. Doing so will address and reduce lingering administrative costs as well as legacy information technology systems that are maintained solely to facilitate open disaster declarations. Both directly benefit Americans by accelerating ongoing recovery efforts and reducing taxpayer costs. Finally, as FEMA is transformed, the recommendations below must be made with a comprehensive effort to streamline and modernize the agency's technology to support its refocus on the core mission.

**Benefits of the Ten Recommendations**

These recommendations lead to a more resilient *AMERICA*:

- *__Accelerate__* disaster response and recovery

- *__Modernize__* systems and technology for greater efficiency

- *__Empower__* local and state governments with better resources and tools

- *__Reduce__* administrative costs and federal burden

- *__Improve__* coordination across government, private sector, and nonprofits

- *__Cultivate__* public trust through transparency and accountability

- *__Amplify__* resilience for rural communities and critical infrastructure

These reforms aim to create a more resilient and prepared nation by ensuring that disaster response and recovery efforts are efficient, cost-effective, and locally executed. Such reforms also ensure that federal support is available when catastrophic events occur that overwhelm local systems.

**Implementation Requirements by Recommendation**

Based on the Council's interpretation of existing policy, legislation, and regulation, the following actions are required to achieve the full intent of each recommendation. The table below shows the minimum action required to implement each of the Council's recommendations. It is important to note that all recommendations requiring legislative action will also need to be accompanied by regulations, but since they cannot be accomplished through regulation alone that

14

action is not checked. While Executive Orders may be used to make some of the proposed changes, the Council advocates for legislative action to ensure a systemic and sustained transformation of the current approach to disaster management.

| Recommendation | Minimum Action Required to Implement | | | |
| --- | --- | --- | --- | --- |
| | Policy | Legislation | Regulation | Executive Order |
| #1 Equip SLTT to Lead | ✓ | | | |
| #2 Enhance Critical Programs | ✓ | | ✓ | |
| #3 Realign Criteria for Assistance | | | ✓ | |
| #4 Replace HMGP | | ✓ | | |
| #5 Streamline IA | | ✓ | | |
| #6 Reform PA | | ✓ | | |
| #7 Reform NFIP | | ✓ | | |
| #8 Reduce Admin Costs | | | | ✓ |
| #9 Network for Partnership | ✓ | | | |
| #10 Transform FEMA | | ✓ | | ✓ |

15

# Appendix A: Detailed Charts

**Cost Comparison of Current and Proposed Programs**

| Current Program | Activity | Current Federal Cost Share | Proposed Program | Activity | Proposed Federal Cost Share |
|---|---|---|---|---|---|
| Public Assistance | Emergency Declarations | Not Less than 75% POTUS can increase *Section 503(a)* | RAPID Direct Funding | | • Up to 75% based on performance metric; 50% minimum POTUS can increase |
| | Category A: Debris Removal | Not less than 75% POTUS can increase *Section 407(d)* | | | |
| | Category B: Emergency Protective Measures | Not less than 75% POTUS can increase *Section 403(b)* | | | |
| | Categories C-G: Permanent Work | Not less than 75% POTUS can increase *Section 406(b)(1)* | | | |
| Individual Assistance | Temporary Housing Assistance (homeowners and renters) | • 100% *Section 408(g)(1)* | FAIR | • Temporary Housing Assistance (homeowners and renters) • Other Needs Assistance | 75% |
| | Other Needs Assistance | • 75% *Section 408(g)(2)* | | | |
| Hazard Mitigation Grant | | • Up to 75% *Section 404(a)* | Refined Risk Reduction (R3P) | • Rapid Mitigation Advance • Strategic Mitigation Allocation | • Up to 75% based on performance metric; 50% minimum • Rapid Mitigation Advance (up to 5% of overall federal contribution) • Strategic Mitigation Allocation (up to 10% of overall federal contribution) |

16

## Proposed Cost Share Increase Criteria for States, Tribes, and Territories

*A quantitative index should incorporate these criteria to determine cost share increase(s).*

| | Preparedness | Financial Investment | Response | Recovery | Mitigation |
|---|---|---|---|---|---|
| **Required** | STT entity has implemented a statewide citizen preparedness campaign.[10] | STT entity certifies they have and are maintaining insurance on 100% past permanent work projects. | STT entity annually updates a resources list that includes their resources, typed and cost mapped for deployment outside of the STT (*tying costs to resources*) | The SLTT has the ability to collect, validate, and report preliminary damage assessment data for an affected jurisdiction within the first 30 days post-disaster, enabling timely activation of state and federal assistance mechanisms. | STT entity actively identifies risk through annual THIRA and SPR review and updates to track progress on building national preparedness capabilities. |
| **Recommended** | *STT entity should have a statewide emergency management program that addresses the five national preparedness areas.[11]* | STT entity has a minimum of 5% of their state budget in cash reserve | STT entity has an annually reviewed emergency operations plan and requires all localities to have an emergency operation plans and the STT reviews the plan at a minimum every three years | STT has an individual assistance program that includes:<br><br>1. Temporary housing assistance<br>2. Individual and family grant program that includes crisis counseling<br>3. Disaster unemployment assistance<br>4. Disaster case management for use during federal disaster. | STT entity manages a mitigation program with a state or local match that provides STT funding to localities to harden infrastructure. |
| | STT entity adopted consensus standard building codes | STT entity has a disaster reserve or relief fund that support state and local recovery costs; used for FEMA match and non-declared events. | STT entity has participated in EMAC (*outbound/inbound*) deployment in the past 5 years | STT entity must be an IPAWS participant and 75% of the state's localities have a local alert and warning system or participate in IPAWS. | |
| | | STT entity has 50% of their buildings and infrastructure covered by all hazard insurance (including floods) | | | |

---

[10] The program must include 2 of the following topics areas to qualify: 1) Preparedness education for their citizens; 2) Coordination with the private and non-profit sectors in planning and communication; 3) Public education related to the importance of personal insurance

[11] Demonstrate this through 1) Maintain current statewide plans for each mission area; 2) Use HSEEP-compliant exercises and implement corrective actions; 3) Integrate THIRA/SPR findings into budgets and strategy; 4) Provide annual preparedness or performance findings

## Appendix B: RAPID Direct Funding Flow Chart

**Hurricane with category 3 winds hits Florida**

**Based on parametric model*, projected damages are $300 million which is well above the PA indicator for a federal disaster declaration**

**The Governor declares a State of Emergency and requests a major disaster declaration from the transformed agency**

**The transformed agency recommends approval**
**Based on population of 23 million, $300 million is $13 per capita**

**President declares major disaster declaration**

**Within 30 days, the transformed agency provides 50-75% of the parametric pay out of $300 million**

**Because Florida is a "high performing state", the transformed agency would recommend the federal government provide 75% of the parametric amount ($225 million)**

**Florida receives $225 million of direct funding and is responsible for managing the money, removing debris, offsetting emergency costs, repairing infrastructure, and providing a final accounting of projects within one year that will be audited by certified auditor and provided to the transformed agency**

**-Florida determines eligibility for projects*** and uses state environmental review**
**-Florida uses state procurement requirements; not required to follow 2CFR200**
**-Florida distributes funding fairly, according to disaster caused needs**

**If there is an under-run, Florida may use extra money toward mitigation efforts**
**If there is an over-run after one year, Florida may request no more than the remaining 25% of the parametric pay out of $300 million from the President ***

**All funding must be expended and work completed within 8 years. Residual funding after 8 years must be returned to the transformed agency, along with one final certified audit demonstrating use of funds**

18

## Appendix C: Looking Back - A History of Emergency Management and FEMA

The history of disaster and emergency management in the United States reflects the evolution of federal responses to crises, beginning with the first legislative act of disaster relief following the Portsmouth, New Hampshire fire in 1802. Early efforts were reactive, addressing individual emergencies through separate laws until the Federal Disaster Relief Act of 1950 established a comprehensive framework. During the mid-20th century, emergency management expanded to include wartime civil defense and preparation for nuclear attacks, while flooding emerged as a major challenge, prompting the creation of the National Flood Insurance Program (NFIP) in 1968.

The 1970s marked a shift toward a more coordinated approach to disaster management, spurred by large-scale disasters like Hurricane Agnes in 1972. The Disaster Relief Act of 1974 introduced planning and mitigation measures, professionalizing emergency management. This period also saw the establishment of FEMA in 1979 through Executive Order 12127, consolidating federal disaster-related functions under one agency. The Stafford Act of 1988 further defined FEMA's role in disaster response and recovery, emphasizing a systemic approach to preparedness and mitigation.

Major disasters such as Hurricane Katrina in 2005 and Hurricane Sandy in 2012 highlighted gaps in federal response and recovery efforts, leading to legislative reforms. The Post-Katrina Emergency Management Reform Act of 2006 clarified FEMA's authorities and responsibilities, while the Sandy Recovery Improvement Act of 2013 streamlined recovery processes and expanded disaster assistance. The Disaster Recovery Reform Act of 2018 introduced significant reforms, including dedicated funding for pre-disaster mitigation through the Building Resilient Infrastructure and Communities program.

The COVID-19 pandemic in 2020 required an unprecedented federal response, with FEMA coordinating efforts to distribute medical supplies, personal protective equipment, and vaccines, while supporting state and local governments. Lessons learned from the pandemic led to improvements in public health coordination and emergency preparedness. Legislative measures such as the American Rescue Plan Act of 2021 and the Infrastructure Investment and Jobs Act of 2021 provided substantial funding to enhance the Disaster Relief Fund and then subsequently attempt to legislate a solution of how to adjudicate the billions in unobligated funds leftover from the pandemic response.

Overall, the U.S. approach to disaster and emergency management has evolved from reactive measures to a comprehensive system that emphasizes preparedness, mitigation, response and recovery, reflecting the growing complexity and frequency of disasters over time. However, the cumulative effect of reactive legislation saddled FEMA with additional roles, responsibilities, and benefits has ultimately pulled FEMA away from its core mission.

## Appendix D: FEMA Disaster Response (2021-2024)

Over the previous four years, FEMA encountered one of the busiest disaster periods in recent history, responding to numerous complex and concurrent disasters while grappling with significant workforce and administrative challenges. This assessment highlights FEMA's operational shortcomings, particularly in staffing sufficiency, disaster response delays, and grant oversight failures, which collectively contributed to inadequate disaster response outcomes against an ever-growing mission portfolio. In February 2025, the Government Accountability Office added federal disaster assistance to its "High-Risk List," underscoring systemic issues within FEMA.

The bureaucracy and mission creep that has pulled FEMA away from its core mission combined with a persistent shortage of experienced staff to address these additional missions was a major factor affecting FEMA's performance. At the start of FY2022, FEMA had approximately 11,400 disaster employees, falling short of its staffing goal of 17,670 by roughly 35%. This gap hindered FEMA's ability to deploy surge capacity, retain institutional knowledge, and effectively manage complex operations. Although personnel gaps were routinely highlighted as a challenge, it was left unspoken that the root problem was the expanding mission portfolio, not simply personnel.

The impact of overreliance on the federal government and lack of personnel to conduct manual administrative tasks was evident in delayed disaster assistance, politicization allegations, and administrative inefficiencies. For example, following the cumulative impacts of Hurricanes Helene and Milton, FEMA faced a backlog of 500,000 assistance applications by December 2024, delaying aid delivery to survivors. FEMA's response to the Lahaina wildfires in 2023 also revealed weaknesses in housing logistics and survivor case management, with delays in constructing temporary housing and confusion over rent policies. Similarly, during Hurricane Ida in 2021 and the Eastern Kentucky floods in 2022, survivors reported long delays in receiving aid due to rigid verification rules and insufficient field staffing.

FEMA's administrative capacity was further strained by delays in disaster closeouts and grant oversight failures. The U.S. Department of Homeland Security's Office of Inspector General found that FEMA's oversight deficiencies prolonged disaster closeouts, complicating audits and grant reconciliation. Additionally, FEMA's insufficient oversight of COVID-19 emergency protective measures grants resulted in over $8.1 billion in questioned costs and improper payments, highlighting vulnerabilities in monitoring high-volume grant programs.

Where FEMA had pre-positioned capacity and adequate local partnerships, the agency delivered lifesaving functions and early recovery support. Where pre-existing local capacity was weak (notably some rural and underserved areas) or where multiple disasters clustered, FEMA's limited surge and administrative backstops produced slower assessments, longer grant processing, and protracted closeouts—outcomes that prolong community recovery and increase fiscal exposure. The combination of staffing shortfalls and administrative weaknesses therefore had an uneven but material effect on recovery speed and completeness. Meanwhile, state, local, and private stakeholders routinely delivered faster and effective responses to disasters.

The rising frequency and complexity of disasters have outpaced FEMA's static capacity, creating a strategic mismatch between demand and capability. This mismatch combined with increased responsibilities has constrained FEMA's ability to manage simultaneous large-scale incidents without sacrificing speed or oversight.

## About the FEMA Review Council

On January 24, 2025, President Donald J. Trump signed Executive Order (EO) 14180, "Council to Assess the Federal Emergency Management Agency (FEMA)," establishing a FEMA Review Council to recommend improvements or structural changes to the agency, promote the national interest, and enable national resilience. The Secretary of Homeland Security established the Council consistent with the Federal Advisory Committee Act on February 21, 2025.

The FEMA Review Council consists of two co-chairs and ten council members, who were all appointed by President Trump on April 28, 2025. After the appointment of the members, the Council created three subcommittees to address federal and state coordination, disaster response and recovery assessments, and the compilation of the final report.

The Council also coordinated requests from the President, through the Assistant to the President for National Security Affairs, the Assistant to the President for Homeland Security Affairs, and the Director of the Office of Management and Budget.

For additional information regarding the Council, visit:
https://www.dhs.gov/federal-emergency-management-agency-review-council

### *Work Performed*

The Council's work was conducted from approximately February 2025 through November 2025, during which time the following critical efforts were completed. In total, the Council engaged with representatives from all 50 states and territories, as well as numerous tribal leaders and representatives.

- **Council Public Meetings**. Council members met routinely, both virtually and in-person, for internal proceedings and public meetings.

- **DHS/FEMA Briefings**. The Council received multiple briefings from FEMA and other related DHS offices.

- **Stakeholder Listening Sessions**. The Council and its subcommittees conducted 17 listening sessions to hear from federal, state, local, and tribal partners, as well as relevant private sector entities and non-profit institutions, such as faith-based organizations. The Council traveled extensively throughout the nation to conduct meetings with key stakeholders to capture their concerns, ideas, and solutions.

- **Public Comment and National Survey**. In addition to the above efforts, the Council collected and assessed over 11,000 public responses received via Federal Register Notice solicitation for comment, as well as conducted a national survey of state, local, tribal, and territorial emergency managers.

## FEMA Review Council Members

Markwayne Mullin
Secretary of Homeland Security
*Co-Chair*

Pete Hegseth
Secretary of War
*Co-Chair*

Greg Abbott
Governor, State of Texas

Phil Bryant
Former Governor, State of Mississippi
*Vice Chair*

Jane Castor
Mayor, City of Tampa, FL

Mark Cooper
Former State Emergency Management
Director and Homeland Security Advisor,
State of Louisiana

Rosie Cordero-Stutz
Sheriff, Miami-Dade County, FL

Robert Fenton, Jr.
Region 9 Administrator, FEMA

Kevin Guthrie
Executive Director, Florida
Division of Emergency Management

W. Nim Kidd
Chief, Texas Division of Emergency
Management

Michael Whatley
Former Chairman,
Republican National Committee

Glenn Youngkin
Former Governor, Commonwealth of
Virginia

## Acknowledgements

The Council would like to acknowledge and express its gratitude toward:

- The outside experts who offered their time and insights,

- The members of state and local emergency management and homeland security entities and governments,

- Governors from many states and their chiefs of staff, and

- The current and former FEMA employees who offered their time and experience.

The Designated Federal Officer, Mr. Patrick Powers, for his exemplary leadership and effort to ensure the Council's work was coordinated, transparent, and effective to ensure a comprehensive effort to meet President Trump's directives – and the many incredible staff members directly supporting the Council, among countless others who made this report possible.

The Council also dedicates this report to the tens of thousands of hardworking emergency management professionals who have dedicated their careers to the preparation, response, recovery, and mitigation of natural and manmade disasters – notably, those who continue to recover from ongoing disasters.



# Report Addendum for Implementation Considerations

## The President's Council to Assess the Federal Emergency Management Agency

**May 7, 2026**

## Table of Contents – Report Addendum for Implementation Considerations

**1. Equip States, Local governments, Tribes, and Territories to Lead Disaster Response with the Federal Government in a Supporting Role**....................................................................25

**2. Enhance Critical Federal Programs & Resources to Support Communities**..................29

**3. Realign the Criteria for Federal Disaster Assistance**......................................................31

**4. Replace the Existing Hazard Mitigation Grant Program with a Two-Phase Funding Structure** ................................................................................................................................33

**5. Streamline the Individual Assistance Program into a Single Direct Payment Program** ..36

**6. Reform the Public Assistance Program to Provide Direct Funding**...............................40

**7. Reform the National Flood Insurance Program (NFIP) for Financial Stability and Risk Resilience** .............................................................................................................................47

**8. Maximize Every Dollar Spent by Reducing Administrative Costs** ................................51

**9. Revitalize A Unified National Network for Partnership** ................................................53

**10. A Transformed Agency**................................................................................................54

**Soliciting Input from Stakeholders Across the Nation** ......................................................**57**

    Incorporating Public Feedback into FEMA Review Council Efforts ...................................57

    **Methodology** ......................................................................................................................58

    **Analysis of Public Feedback Received** ............................................................................60

    **Tribal Engagements**..........................................................................................................62

**Areas for Further Exploration / Engagement** .........................................................................**63**

**Public Meeting Minutes**.........................................................................................................**64**

**Engaged Subject Matter Experts and Stakeholders**..............................................................**64**

**Detailed Public Comments and Survey Inputs – An Analysis** ..............................................**67**

# Key Recommendations

## 1. Equip States, Local governments, Tribes, and Territories to Lead Disaster Response with the Federal Government in a Supporting Role

Disasters demand unified action across government, private industry, and with non-profit partners, leveraging the strengths of these sectors to optimize national resilience. The national emergency management landscape lacks a framework that helps everyone involved in responding to emergencies build toward a shared capability and integrated resources to raise national-level capacity. This gap directly impacts the readiness of local responders.

**Problem 1: Lack of a National Standard for Incident Response and Recovery**

Standards that define the capabilities jurisdictions should have, how they are measured, and how personnel are qualified have not been adopted nationally, and the overall approach requires significant improvement. While there have been attempts over time to develop national standards and systems, such as the National Preparedness System and core capabilities, these efforts have been fragmented and lack cohesive implementation. Without uniform standards, training varies, equipment is purchased without common specifications, and response teams cannot reliably integrate across jurisdictions. These inconsistencies make it harder to field mission-ready teams, match resources to needs, and deliver timely assistance to survivors.

*"FEMA sets the tone and guides systems down to local jurisdictions through the provision of guidance, frameworks, and training." -Anonymous Stakeholder Feedback*

**Recommendations:**

1. **Encourage National Capability Standards Adoption:** The transformed agency should establish a formal governing board of federal, state, local, tribal, and territorial (FSLTT) stakeholders to codify national minimum standards for incident response and recovery capabilities. These standards would build upon existing frameworks like the National Incident Management System (NIMS) Resource Typing and National Qualification System (NQS) and be published through a Resources Typing Library Tool or a similar platform. The goal is to define, in plain terms, the personnel, equipment, training, and performance criteria for common mission sets like mass care, communications, incident management, and logistics.

2. **Build Scalable Training Resources:** State, locals, and tribal nations should take responsibility for training delivery, with the federal role primarily shifting to developing curriculum and setting outcome-based standards. In addition to curriculum development, the transformed agency should expand its "train-the-trainer" programs to scale instruction, certifying SLTT instructors from across the nation to provide the curriculum. This would expand the number of trainings delivered locally to emergency managers and allow for consistency in training for emergency management best practices. The transformed agency's schoolhouses would primarily be focused on hands on training not

available elsewhere, to include existing live-agent training at the Center for Domestic Preparedness.

3. **Professionalization of Emergency Management:** To address the unique professional development needs of senior leaders in emergency management, the transformed agency should establish advanced education pathways focused on crisis leadership, interagency coordination, and strategic decision-making. These pathways should include specialized training programs, executive-level workshops, and mentorship opportunities designed to equip leaders with the skills required to navigate complex emergencies and coordinate effectively across agencies and jurisdictions. Such an initiative would strengthen the leadership pipeline by fostering a cadre of well-prepared professionals who can consistently apply national doctrine and make informed strategic decisions during crises. By investing in the professionalization of emergency management, the transformed agency should promote a unified approach to leadership and decision-making, ensuring greater consistency and effectiveness in emergency response and recovery efforts nationwide.

4. **Catastrophic Planning and Exercise Standards:** The transformed agency should focus national plans and federally funded exercises on truly catastrophic scenarios, such as large-scale natural disasters, nation-wide cyberattacks, or coordinated terrorist events, to ensure preparedness for the most severe threats. The transformed agency should also develop and implement standardized approaches for SLTT exercise and planning practitioners through shared training, doctrine, and evaluation criteria. By leveraging established frameworks such as the Homeland Security Exercise and Evaluation Program (HSEEP) and Community Planning Guidance, the transformed agency should promote a common approach to how SLTT jurisdictions plan and prepare for incidents within their communities. This will be critical in fostering national resilience as an integrated network, enabling jurisdictions to identify resource gaps in relation to a national inventory and prioritize investments accordingly. This will enhance the ability of SLTT jurisdictions to respond effectively to catastrophic events and integrate seamlessly into broader national response efforts.

**Problem 2: Limited Ability to Share and Coordinate Resources**

National readiness is constrained by an inconsistent application of a single, standards-driven effort that provides real-time visibility into capabilities and resources across jurisdictions and sectors. Without this, resource sharing depends on uneven mutual aid processes, variable recognition of responder qualifications, and fragmented, non-interoperable data systems — conditions that slow decisions and erode trust in deployments. At the same time, non-disaster grant funding is not aligned to build and sustain typed, mission-ready capabilities that are discoverable and rapidly deployable nationwide. Significant private, nonprofit, and volunteer capacity remains outside formal operational workflows. The result is duplicated requests, delayed missions, and avoidable reliance on federal surge assets, while local investments fail to aggregate into a coherent, interoperable national capability.

**Recommendations:**

1. **Revitalize and promote the use of the Unified Resource Catalog:** FSLTT stakeholders should be required to identify and catalog their typed capabilities and resources within a

26

defined period for implementation and updated routinely. Pre-vetted private sector resources and nonprofit capabilities should also be cataloged to present a complete national picture. The transformed agency should determine whether its Resource Inventory System or a new cloud-based platform is needed to establish a national inventory, creating a single, searchable online marketplace for all stakeholders to find available resources within budget. Standardized resource typing and federal policies would formalize mutual aid frameworks to enable rapid, coordinated sharing of personnel, equipment, and resources during large-scale incidents.

2. **Credentialing:** To enhance the sharing of personnel nationally and improve upon the existing credentialing framework under the National Incident Management System (NIMS), the system must be modernized to ensure uniform standards, interoperability, and recognition of responder qualifications across jurisdictions. This includes expanding the National Qualification System (NQS) to cover emerging roles, integrating credentialing into a centralized national database for real-time visibility, streamlining verification processes using advanced technology, and incorporating volunteer, faith-based, and private sector responders into the credentialing framework. Federal policies should mandate compliance with updated credentialing standards for jurisdictions receiving non-disaster grant funding, while training and technical assistance should be provided to support adoption. These enhancements would ensure rapid deployment of qualified personnel, reduce delays, and strengthen national preparedness and resilience during large-scale incidents.

3. **Prioritize Investment for Mission-Ready Teams, Capabilities, and Infrastructure:** We are a nation of local governments with resources residing at the local level. With this in mind, we must invest via grants to build and standardize this national coalition. The transformed agency should update program guidance and regulations to prioritize investments in Mission Ready Teams (MRTs) for non-disaster grants. Funded capabilities should meet national standards, be typed according to NIMS definitions, and be entered into the national inventory system. Federal non-disaster grant programs (NGDP) should be updated to prioritize investments in mission-ready capabilities and infrastructure that meet national standards and integrate into the national inventory system. These investments must directly support national preparedness objectives and ensure rapid deployment during emergencies. Further, these investments must emphasize building capabilities and capacities with a shift away from sustaining SLTT capabilities and capacities with federal grant dollars. The NDGP should be limited to a maximum of 3 years for personnel-related projects with the local jurisdiction funding that person(s) in perpetuity on SLTT funds. NDGP should be limited to building a new capability or capacity through capital outlay equipment once, then SLTT should pick up the cost for maintaining that new capability or capacity through SLTT funds in perpetuity. Additionally, the Council recognizes the importance of Non-Disaster Grants, such as the Emergency Management Performance Grant within the suite of FEMA's preparedness grants, in ensuring our nation's security and recommends these programs be retained within the transformed agency. The Council encourages exploring how to leverage federal savings from other efficiencies gained to create a potential one-time EMPG increase to better facilitate the return of responsibilities to States, Tribes and Territories. Linking federal funding to compliance with uniform standards for deployable capabilities

27

would streamline mutual aid processes, enhance resource interoperability, and strengthen national preparedness by focusing on readily deployable resources.

4. **Promote the Integration of Additional Partners, to include Volunteer and Faith-Based Organizations:** *To enhance the effectiveness and inclusivity of emergency management efforts, the transformed agency **should prioritize** the integration of volunteer, faith-based, and nonprofit organizations into national preparedness, response, and recovery frameworks.* The transformed agency should establish and maintain a national inventory of volunteer, faith-based, and 501(c)(3) organizations, and integrate pre-vetted private sector resources to create a comprehensive national capability picture. Federal policy should require the integration of these entities into planning, coordination, and operational frameworks to leverage community networks, local knowledge, and additional workforce capacity. This integration would expand the reach and effectiveness of national response and recovery operations while strengthening community resilience.

5. **Fund and Promote Interoperable Systems:** Federal policy should promote and incentivize shared investments in interoperable communications, data-sharing platforms, and information systems that enable real-time coordination across all levels of government and partner organizations. Open data standards should be established and promoted by federal policy to ensure interoperability, consistency, and reliability of information exchange during incident response and recovery.

**Benefits:**

- **Speed:** Rapid pre-deployment of anticipated resources would ensure local readiness for impending peril

- **Consistent Expectations:** All local emergency managers know exactly the capabilities they would receive

- **Cost Transparency:** Allows local emergency managers to make better informed cost-benefit decisions to optimize their response

- **Predictability:** Helps jurisdictions plan and budget more effectively for disaster response

- **Capability-focused**: Creation of a national inventory connected to funding eligibility would create incentives for SLTT stakeholders to focus on core capabilities

- **Faster, Coordinated Response**: Joint planning and integrated frameworks reduce gaps and overlaps during disasters

- **Efficient Resource Use**: Shared investments in interoperable systems cut costs and eliminate duplicative infrastructure

- **Seamless Recovery**: Aligned federal programs simplify assistance for survivors and speed community rebuilding

- **Broader Capabilities:** Leveraging private sector innovation and nonprofit expertise expands surge capacity and specialized skills

- **Stronger Public Trust:** Clear roles and unified communication enhance transparency and confidence during crises

28

- **Nationwide Readiness:** Cross-sector partnerships create a more adaptable, scalable system for complex or cascading disasters

- **Faster Response Times**: Well-trained SLTT teams and regional hubs enable immediate action without waiting for federal assets to arrive

- **Stronger Self-Sufficiency:** Local governments gain the skills, equipment, and partnerships to manage crises, reducing dependency on federal surge capacity

- **Scalable Support**: Regional hubs provide shared resources that can expand, or contract based on event size, optimizing efficiency

- **Improved Coordination:** Formalized mutual aid agreements streamline resource sharing across jurisdictions, minimizing gaps or duplication

- **Cost Efficiency:** Local capability and mutual aid reduce expensive federal deployments and allow resources to be used where most needed

- **Enhanced Resilience:** Communities build long-term readiness and confidence, ensuring sustained operations during back-to-back or prolonged disasters

- **Tailored Solutions:** Training and equipment investments reflect local hazards and demographics, improving effectiveness in diverse environments

**Savings and Efficiencies Gained:**

To be determined through detailed analysis. Expected areas of savings include reduced reliance on costly federal surge deployments when SLTT and private resources are available; lower duplication of resource requests and overlapping contracts; more targeted grant spending on standardized MRPs; and productivity gains from interoperable communications and data systems. A formal cost-benefit framework should measure baseline response times, deployment costs, and coordination overhead before and after implementation to quantify savings.

**Conclusion:**

A truly resilient nation depends on seamless collaboration across government, private industry, and nonprofit partners. Empowering SLTT governments to take the lead in managing disasters is essential for a resilient national preparedness strategy. Further, implementation of a mandatory national inventory system achieves the goal of ensuring disasters are locally executed, state managed, and federally supported. Leveraging modern technology solutions to establish such a national inventory system that provides transparency to the availability of SLTT resources, alignment to national standards and the typing of those same resources, as well as the upfront costs of those resources would increase the national preparedness of the country.

## 2. Enhance Critical Federal Programs & Resources to Support Communities

**Problem:**
State and local governments are primarily responsible for responding to threats to life and property but may lack the full scope and scale of resources required to respond. Consistent standards, effective coordination, and robust and timely federal support capabilities are required to save American lives when threatened by a range of hazards. Man-made hazards and nation-state threats will challenge the national response capability in ways it has not been tested before.

The federal government must continue to build its capability to support these efforts even if state and local governments assume greater responsibilities.

**Recommendation:**

Preserve and modernize the federal government's capability to support state and local partners in lifesaving and life-sustaining efforts. Ensure robust national capability is available for the full range of hazards including natural hazards, cybers attacks, and nation-state threats. This capability must be able to evolve with an ever-changing threat environment. Regardless of the incident type or requirement, ensure integrated, timely, and efficient federal support is available when needed.

*Protect and Improve National Support Capability*

1. **Sustain Core Standards to support effective and interoperable teams:**

   - Maintain national training and certification programs, including NIMS/ICS/NQS (continued further development) and resource typing

2. **Improve Federal Coordination:**

   - Maintain a central and coordinated response capability to support state and local requirements

   - Ensure a federal government-wide inventory of all available response assets to include type, costs, and available response times

3. **Build Capability for Emerging Threats**

   - Nation-state threats and cyber-attacks challenge national resilience in ways the United States has not seen in a generation

   - Capability for consequence management and national resilience to these hazards must be driven from the federal government as a core function of our national security

4. **Integrate Emerging Technology:**

   - Leverage advanced analytics, AI, and communications platforms to enhance operational capability, predict requirements in advance, and reduce costs

5. **Leverage Supply Chains for National Security**

   - Ensure the federal government can support national preparedness, supply chain resilience, and consequence management during emergencies

6. **Continuity of Government**

   - FEMA leads federal efforts to develop and implement federal continuity programs by directly assigning responsibility for continuity of operations, continuity of government, and continuity of plans

   - These programs ensure important federal missions, and state and local governments, continue to function amidst any threat

**Benefits:**

   - **Faster Response Times:** Well-trained and interoperable SLTT teams enable immediate action without waiting for federal assets to arrive

30

- **Guaranteed National Backbone:** Maintains critical capabilities (NIMS/ICS, US&R, REP, NDMS, IPAWS, DFA) that cannot be replicated at the state or local level

- **Faster, Unified Response:** Consistent standards and trained teams enable seamless coordination across jurisdictions during complex, multi-state disasters

- **Adaptation to Emerging Threats:** Expanding readiness for cyber-attacks, pandemics, and climate-driven disasters ensures relevance to evolving risks

- **Enhanced Public Safety:** Reliable federal assets safeguard lives when catastrophic events exceed local capacity

- **Technology-Driven Efficiency:** Advanced analytics, AI, and next-generation communications improve situational awareness and operational speed

- **Cost-Effective Preparedness:** Sustaining national programs avoids duplicative investments by localities while providing surge capabilities when needed

**Conclusion:**

FEMA's current mission exists at the intersection of emergency management and national security. An essential component of this is FEMA's authority to coordinate other federal agencies in support of SLTT partners. Additionally, the agency maintains an arsenal of dual-use capabilities, regional offices, incident management teams, and prepositioned logistic systems or programs, and the Disaster Relief Fund to ensure the American people are resilient in the face of any threat, whether natural or man-made. Therefore, sustaining and resourcing this mission in the transformed agency is vital to public safety, economic stability, and national resilience.

## 3. Realign the Criteria for Federal Disaster Assistance

Federal regulations describe the process required for a governor to request Federal disaster assistance, including factors FEMA considers when making a recommendation to the President to approve or deny a major disaster declaration request. The Stafford Act currently prohibits the sole use of "an arithmetic formula or sliding scale based on income or population" when considering declaration requests.[12] Consequently, FEMA uses a set of factors to make recommendations to the President. The existing disaster declarations process for Public Assistance (PA) under accounts for state, local, tribal, and territory (SLTT) capacity and, therefore, is inconsistent with legislative intent and disincentivizes SLTT investment in disaster preparedness. The complexity and subjectivity within the existing disaster declarations process for Individual Assistance (IA) creates frustration and tension between federal and state partners that distract from a common desire to assist survivors. Realigning the criteria for federal disaster assistance could help rebalance responsibilities between the federal government and SLTT governments.

**Problem**:

**Public Assistance (PA)**: FEMA initially set a per capita indicator of $1 in 1986, which represented 0.008% of national per capita personal income and correlated closely to 0.1% of state general fund expenditures. Because of this, FEMA assumed $1 per person was a reasonable amount of assistance a state could contribute towards the cost of a disaster. FEMA did not

---

[12] Stafford Act, Section 320.

increase the per capita indicator until 1999 when the Agency began adjusting the indicator for inflation.[13] For FY26, the per capita indicator is $1.94.

**Individual Assistance (IA):** FEMA has considered two principal factors since 2019: uninsured home and personal property losses. FEMA assesses these factors using a "cost-to-capacity" ratio to measure the severity and magnitude of a disaster relative to the state's fiscal capacity. To do this, FEMA uses the state's Total Taxable Resources (TTR)—or an estimate of the state's total *potential* tax base—divided by 1 million.[14] The complexity within the existing process for evaluating assistance to individuals and households creates frustration and tension between federal and state partners. Further, the IA declarations process also risks supplanting assistance within the fiscal capacity of a state because it has a disproportionate emphasis on total estimated cost of assistance over those costs in the context of state capacity.

**Recommendation:**

- **PA Solution:**
  - *Explore alternative methods for PA declarations. One option is to adjust the national per capita indicator for inflation from 1986-1999.* The transformed agency would update the current Public Assistance per capita indicator to account for historic inflation from 1986 to 1999, realigning the current per capita indicator of $1.94 to $2.99 to account for inflation between 1986 and 1999.

- **IA Solution:**
  - *Eliminate the cost-to-capacity ratio and replace it with a simplified evaluation of damage to the impacted state.* The transformed agency would revert to factors like those prior to the 2019 regulatory change. Under this approach, the transformed agency would consider the number of primary residences that are destroyed or sustain major damage, along with other factors such as community impacts.

**Benefits:**

**Public Assistance:** *Fewer federal disaster declarations, leading to a rebalancing of state and federal responsibilities.* If the per capita indicator had been adjusted for inflation during the years it was not, analysis found that 29% of disasters declared between 2012 and 2025 would not have met the indicator, representing $1.5 billion or 0.69% of the total federal share of funding. Annually, this would have led to 16 fewer major disaster declarations and about $113 million less in funding per year.

**Individual Assistance:** *Simplified Individual Assistance declaration factors.* FEMA and its partners have experienced several challenges with the current approach. Many stakeholders find the cost-to-capacity approach overly complex and struggle to understand how FEMA makes recommendations based on it. Additionally, the current approach may also rely too heavily on total estimated costs of assistance, which favors larger states that more readily experience $7.5 million in damages for a given disaster.

---

[13] Disaster Assistance; Subpart C, the Declaration Process and State Commitments, 51 Fed. Reg. 13332, Apr. 18, 1986.
[14] Based on annual estimates published by the Department of Treasury.

**Implementation Requirements:** Updating both the IA and PA declaration thresholds would require regulatory changes. In the interim, the President could direct through executive action that generally only requests above higher thresholds may be considered.

**Minimum Expenditures**: An annual calendar year minimum expenditure should be established for small, medium, and large states prior to them being able to request a federal declaration (s*ee Appendix A for detailed guidance).* This further incentivizes states to take the lead with their local partners for disaster mitigation.

**Conclusion**: Congress intended some executive discretionary authority within the disaster declarations process. Nevertheless, the law also stipulates federal assistance is provided only when a disaster is beyond the capabilities of SLTT partners and, therefore, necessitates common criteria for how to evaluate when those capabilities are overwhelmed. As described above, the existing disaster declarations process for Public Assistance under accounts for SLTT capacity and, therefore, is inconsistent with legislative intent and disincentivizes SLTT investment in disaster preparedness. The transformed agency should implement common sense approaches to realign the criteria for federal assistance and rebalance federal and state responsibilities.

## 4. Replace the Existing Hazard Mitigation Grant Program with a Two-Phase Funding Structure

**Problem:**

FEMA's current Hazard Mitigation Grant Program is conceptually effective but constrained in execution. Although authorized to provide funding for mitigation, most funding is distributed well after the rebuilding process begins. This delay limits opportunities to integrate mitigation into reconstruction, when it is most cost-effective and impactful.

State and local partners consistently report that HMGP application processes are complex and administratively burdensome. GAO reviews found that delays in project approval and funding distribution frequently exceed 12 months, hindering early risk reduction. FEMA's mitigation analyses have also been concentrated on flooding, hurricanes, and tornadoes—leaving gaps in wildfire, drought, and earthquake mitigation.

OIG audits similarly noted that oversight of HMGP property acquisitions lacks consistency across FEMA regions and that opportunities to integrate mitigation during the initial recovery phase are often missed. These findings reflect a need for more agile, outcome-driven funding mechanisms that reduce administrative friction and better align mitigation with broader national resilience goals.

Without reform, the transformed agency risks perpetuating a reactive recovery cycle—rebuilding to pre-disaster conditions and increasing future federal liabilities under the NFIP and Stafford Act disaster assistance programs.

**Recommendations:**

**1. Establish a Two-Phase Funding Model**

The transformed agency should eliminate the current HMGP and establish a two-phase funding structure of up to 15% of the disaster estimate in two allocations. This proposed state-managed program, notionally titled "Refined Risk Reduction" Program (R3P), would be structured with

33

up to a 75% federal cost share with performance metric and a 50% minimum (*See Appendix A in the Executive Summary*):

A. **Rapid Mitigation Advance** (up to the first 5% of the federal government contribution for the disaster to facilitate immediate residential mitigation)

- Initial Allocation: Within 30 days of a federal disaster declaration, provide up to 5% of the estimated mitigation allocation to states for immediate mitigation actions integrated into rebuilding disaster-impacted primary residences and communities. Alternatively, funds could be used to harden high risk residences and neighborhoods.

    o Some examples include elevation, seismic and wind retrofits, defensible space creation, and floodproofing.

B. **Strategic Mitigation Allocation** (up to the remaining 10% of the federal government contribution for the disaster for repetitive loss properties and critical infrastructure)

- Remaining Allocation: Allocate up to 10% based on Federal Administration priorities that:

    o Mitigate repetitive or severe repetitive loss properties to improve NFIP performance; or

    o Reduce risks to critical infrastructure with the intent of improving the performance of the NFIP as applicable (power, water, transportation, communications systems).

**2. Strengthen State Management**

For mitigation to work, states must take on greater program management responsibility and continue to develop an improved and comprehensive state hazard mitigation process that identifies projects that are immediately implementable.

Under this proposal, standardized oversight requirements for R3P-funded property acquisitions and mitigation projects should be managed at the state level.

    o States and territories must provide and maintain an inventory of properties in high-risk areas not built to modern building codes or not in compliance with current NFIP requirements.

    o Funds management systems/processes should be established and validated annually.

    o The state should coordinate with Federal, State, Tribal, Local, and Private organizations to ensure implementation of hazard mitigation strategies and effective use of funds.

    o Encourage greater proactive coordination at state/territorial level with other agencies to expand use of pre-negotiated exemptions/exclusions that streamline environmental review processes that align with prioritized project types.

    o Strategic Mitigation Allocation-eligible projects must be prioritized and meet following criteria.

        ▪ All projects must be approved and funded within one year.

34

▪ Construction completion timelines should be consistent with PA project close-out deadlines of eight years; time extensions may not be offered.

**3. Prioritize States with Demonstrated Capacity**

- Expedite funding for states and territories with approved hazard mitigation plans and a history of successful HMGP performance.

  o Leverage state and territorial mitigation plans as a repository for program performance (demonstrate and track metrics for funds management and oversight, program coordination, etc.).

- Encourage states/territories to assess performance of FEMA-funded projects (not just R3P-funded) and prioritize future investments.

- Support best practice sharing between states/territories at the regional level where hazards are often shared.

**4.  Winding Down Current Program**

- **Reduce backlog by prioritizing high-risk projects**: Identify high risk unliquidated obligations that could either be drawn down by recipients or recovered by the transformed agency within set timeframes, ensuring all stakeholders are accountable for the effective management of existing funds.

- **Convert historic disasters to the two-phase R3P model**: The transformed agency should pursue the ability to convert historic disasters to the two-phase funding model described above.

**Conclusion:**

Eliminating HMGP and delivering funding via a rapid mitigation advance and strategic mitigation allocation could enable the transformed agency to act faster and more strategically in reducing disaster risk. The R3P model incentivizes state programs to establish program management capacities while aligning directly to GAO and OIG recommendations for timelier and more flexible mitigation investments.

By providing early funding for residential mitigation and directing remaining resources to protect critical infrastructure and reduce NFIP exposure, the transformed agency could:

- Break the cycle of repetitive loss.

- Improve fiscal sustainability.

- Strengthen community resilience; and

- Reinforce the transformed agency's mission to help people before, during, and after disasters.

This policy change represents a practical, evidence-based step toward building a mitigation framework that delivers measurable results and national benefit.

35

# 5. Streamline the Individual Assistance Program into a Single Direct Payment Program

**Problem**:

**Unnecessary Complexity**: FEMA's current IA program is unnecessarily difficult for recipients and stakeholders to navigate and often results in delayed assistance to survivors. It has drifted from its core objective of providing immediate relief for temporary housing and other individual needs, instead centering on extensive documentation and verification that can feel adversarial to people in crisis. FEMA and the Federal government have received this feedback directly from the American people through customer surveys provided to the Council. As one survivor put it, "I was really frustrated with all the paperwork and having to prove I needed help. I told the case worker, 'I've already lost everything; haven't I shown you enough to show you I'm deserving? Do you not trust what I'm saying?'" Another recalled, "I just sort of remember sitting down and filling out a bunch of forms. [It was] confusing because we weren't sure what the point of it was, we didn't know what we were getting, but they told us to sign up for this stuff, so we did." As shown in figure 1, the program offers at least 15 types of assistance that are at best overlapping but at worst, extremely confusing for Americans to navigate as they work to recover. The process itself compounds the trauma, leaving people to make rushed, painful decisions under stress.



*Figure 1. Categories of assistance provided to individuals, maximum and average award amounts.*

**Duplication & Inefficiency:** Compounding these challenges, the program is siloed and duplicative, forcing survivors to repeatedly provide the same information to multiple entities. "What was confusing during the middle of the chaos was trying to figure out what everyone's role was," said a survivor. A local emergency manager observed, "Over 80% of the information for FEMA, SBA, HUD, and state or local agencies is the same. Yet, the burden of providing the information is all on the survivor." This fragmentation drives inefficiency and cost. Staff encounter layers of administrative hurdles— "We will spend thousands not to pay [the citizen] $500," a FEMA employee remarked—and expensive delivery models can be misaligned with outcomes: "FEMA will pay 500 thousand dollars to put a trailer in your yard for a few months when we could have bought the house next door for half that," remarked a government official. As shown in Figure 2, FEMA incurs huge administrative expenses—over $3.6 billion over the last five years—even though most disaster survivors have very basic questions they cannot answer because FEMA's program is too complex and hard to understand. Together, bureaucracy, siloed processes, and costly implementation slow aid, increase expense, and move the program away from timely, practical relief for individuals.



*Figure 2. Overhead and expenditures of FEMA's Individual Assistance program compared to reasons survivors call or visit FEMA recovery centers.*

### Recommendation:

### 30-Day Damage Assessments

- To shorten recovery timelines, the transformed agency should leverage private sector best practices and work with STT stakeholders to ensure initial damage assessments can be completed within the first 30 days post-disaster.

### Direct Payments to Individuals

- The transformed agency should streamline the IA process by providing a direct payment package to individuals. This funding would focus solely on temporary assistance for individuals with destroyed or uninhabitable homes, excluding secondary homes.
  - o Homeowner Assistance
    - For homeowners, the payment package would be based on their level of need and no more than 15% of the local government's assessed value, capped at a $1 million valuation (i.e. maximum payment not to exceed $150,000).

- This covers repairs, replacement, rental and other needs assistance (i.e. personal property loss, transportation, medical, funeral expenses).
- The federal government would cover three-quarters of the assistance and the state, local, tribe or territorial government would cover the remainder.

- Renter Assistance
  - For renters, the payment package would be based on level of need and cover 3 months of rent (first, last, and current month) at the HUD Fair Market Rate (FMR) for the appropriate household size. Individuals with greater need could have the option for 3 additional months of rental assistance for 6 months total.
  - This covers rent and Other Needs Assistance.
  - The Federal government would cover three-quarters of the assistance and the state, local, tribe or territorial government would cover the remainder.
  - Local governments are responsible for creating market conditions that ensure affordable rental properties are available and accessible to survivors.

**Shared Responsibility for Emergency Housing**

The transformed agency should share responsibility with STT governments for the initial phases of emergency housing (mass care/sheltering and temporary housing/rental assistance). Private insurance companies should continue to take primary responsibility for permanent housing with HUD and SBA in supporting roles.

1. **Mass Care/Sheltering** (congregate and non-congregate):
   - STT responsibility
     - Can be funded through RAPID Direct Funding Program/parametric amount

2. **Temporary Housing/Rental Assistance**
   - Information sharing agreements between FEMA and STT stakeholders must be established to enable comprehensive recovery
   - The transformed agency could make direct payments to survivors
     - STTs can take on this responsibility as desired if a pre-existing payment system is in place
   - STTs can employ various types of assistance such as emergency home repairs or temporary housing units
     - STTs can utilize their own funding or request a one-time funding allotment, provided within 30 days of the date of the disaster declaration. All federally provided funds must be used within one year.

38

3. **Permanent Housing**

- Responsibility of private insurance companies with HUD and SBA in key federal role

    o Can also be funded through CDBG-DR or other federal housing programs

4. **Community Services Programs**

- **Disaster Unemployment** – No change to current program

- **Disaster Legal Services –** Combine with Disaster Case Management and provide direct grant by the transformed agency to STT.

- **Crisis Counseling –** Direct funding provided by the transformed agency to STT based on per capita cost and an estimate of those impacted and utilizing mass care or sheltering services. Limited to 6 months.

- **Disaster Case Management -** Direct funding provided by the transformed agency to STT based on a per capita cost and an estimate of those impacted that will need temporary housing.

**Benefits of IA Program Reform**

**Speed:** Rapid distribution of funds directly to STTs should ensure affected citizens receive monetary relief quickly.

**Improved Information Sharing**: Establishing agreements between STT stakeholders and the transformed agency for information sharing could accelerate the delivery of assistance to survivors.

**Clear Expectations for Survivors:** Individuals would know the exact amount of financial assistance and support they may receive after a disaster and can plan accordingly. This cost transparency creates an incentive for individuals to consider private insurance prior to a disaster occurring to optimize their personal recovery.

**Predictability:** Helps individuals and jurisdictions plan and budget more effectively for disaster recovery.

**Cost Savings:** Reduces administrative costs by an estimated $154 million per year.

**Shared Responsibilities:** Funding, authorities, and activities are shared and clearly articulated across the transformed agency, STTs, HUD, SBA, and private insurance companies to ensure each can provide efficient and effective support to the American public within their appropriate portfolio.

**Conclusion:**

Refocusing the transformed agency on emergency and temporary housing relief and streamlining individual assistance into flat-rate reimbursements would provide transparent and immediate support to local communities and individual citizens in their hour of need. This effort should reduce burdensome administrative requirements, eliminate costly overhead with limited impact, and accelerate local recoveries.

# 6. Reform the Public Assistance Program to Provide Direct Funding

**Problem:**

The current FEMA Public Assistance (PA) program is a reactive reimbursement model that often fails to meet the immediate needs of disaster-struck communities. An excruciatingly slow process, consisting of seven phases and involvement from multiple parties (as evidenced in Figure 3 below) prevents meaningful steps towards recovery.

- **Administrative Delays:** The project-by-project approval process under the current system is notoriously slow, with reimbursement often taking years or even decades. The existing model is rooted in an exact dollar assessment of estimated damages, which is a tedious process. The focus is on accounting for damage rather than addressing the urgent needs of the affected community, and it is a fundamental flaw that hinders the speed and effectiveness of recovery. This forces States, Local, Tribes, or Territories (SLTTs) to rely on limited reserves or expensive credit to begin recovery efforts.

- **Compliance Overload:** Federal regulations, particularly those under the National Environmental Policy Act (NEPA), create additional layers of review and red tape. While important for environmental protection, applying a one-size-fits-all federal standard to urgent recovery work can create unnecessary and costly delays.

- **High Administrative Costs:** In the last five years, FEMA has provided approximately $180 billion in Public Assistance grants to states and local governments; $21 billion of this was used to manage these grants and pay project management costs incurred during project construction. FEMA has expended approximately $11 billion more to administer the $180 billion in grant funding. This model has created a disaster industrial complex that dilutes the impact of federal funding through multiple layers of administrative and contracting costs.

- **Unpredictable Cash Flow:** The reimbursement model provides no certainty for SLTTs, who must front costs with no guarantee of when, or how much, federal aid will arrive. This hinders effective financial planning, increases financing and debt costs, and slows the pace of recovery.

- **Centralized Decision-Making:** The top-down federal approach can disregard the unique needs and local expertise of individual SLTTs, leading to less efficient and less targeted recovery efforts.

- **Federal Overreach:** The threshold for authorizing the PA Program has become artificially low. This has resulted in increased federal involvement in several small events, many of which should be within the capabilities of the SLTTs.

- **Administrative Backlog:** FEMA is currently managing more than 300,000 projects (i.e., subgrants) on more than 600 open and active disasters. There are approximately 25,000 open projects that have exceeded their regulatory or administrative timelines, representing more than $54.8 billion in unliquidated obligations.

40



*Figure 1. Current FEMA Public Assistance bureaucratic process, with multiple parties engaged in multiple steps in multiple phases that can take decades to complete.*

**Recommendation:**

The RAPID Program fundamentally restructures the disaster funding model, shifting control and responsibility to the SLTT level while maintaining practical, limited federal oversight.

- **Fast Direct Funding:** Following a presidential major disaster declaration, federal funds would be directly transferred to the STT's treasury within 30 days. This moves away from a traditional grant and instead provides funding directly to the STT for use in adherence with its own procedures. An immediate injection of capital, like the Coronavirus Relief Fund model, provides STTs with the liquidity required to initiate rapid response and recovery.

- **Parametric Funding Mechanism:** The transformed agency's funding would be determined by a parametric formula based on objective, independently verifiable metrics like population impacted, wind speed, flood depth, or earthquake magnitude. Funding could be used for debris removal, first responder costs, permanent infrastructure repair and replacement, and mass care/sheltering. The federal funding would be up to 75% based on performance metric with a minimum of 50% of the parametric amount. This eliminates the need for detailed, time-consuming initial damage assessments and provides a predictable, reliable funding amount.

> **Benefits of a Parametric Approach**
> The main benefit of a parametric model is the **speed** and **certainty** of payouts, which are triggered automatically when pre-defined, **objective** event criteria are met, like wind speed or earthquake magnitude. This eliminates the need for time consuming loss assessments and quickly provides a financial backstop and cashflow for rapid response and recovery. When paired with traditional insurance of public facilities, this can enable communities to **quickly recover** with manageable financial risk and burden to local taxpayers.

  - The transformed agency should convene a group of STT representatives to collectively establish a parametric funding model that is based on existing data from the authoritative federal agency or organization over each type of eligible event (i.e. earthquake, hurricane, flood, etc.)

- **RAPID Direct Funding Authorization Criteria:** While the requirements of the existing federal disaster declaration process would remain in place, the factors used to authorize FEMA Public Assistance funding via RAPID Direct Funding would be replaced with the following:

> **What is a Parametric trigger?**
> Parametric, or index-based, is a concept where if an event reaches a pre-defined threshold, it automatically triggers a set payment amount based on the magnitude of the event. This is different than traditional payment based on the magnitude of assessed loss.

  - Evidence the parametric trigger occurred; and

  - Evidence that response demands exceed the resources and capacity of local and state government.

    - The per capita threshold has historically not provided an accurate depiction of when the SLTT and affected local governments are truly overwhelmed during an event. As a result, federal assistance has often erroneously been provided when the STT and local governments had adequate resources to respond.

- **Compliance Requirements:** To expedite recovery, the Program would grant STTs authorization to use their own certified environmental, construction, audit and inspection review processes for projects funded by the program, in lieu of federal NEPA and other environmental and historic preservation requirements. This differs from the U.S. Department of Housing and Urban Development (HUD) Community Development Block Grant-Disaster Recovery (CDBG-DR) program, which requires STTs to perform environmental and historic preservation (EHP) reviews on behalf of HUD, rather than substituting their own

environmental process. Furthermore, STTs would no longer be required to adhere to federal procurement requirements and could use their own procurement standards and processes instead.

- o **Certified Local Programs:** STTs would apply to the transformed agency for pre-disaster certification of their existing environmental review processes.

- o **Limited Waiver:** The waiver for federal EHP requirements would be exclusively for projects funded by RAPID Direct Funding.

- o **Consistency and Oversight:** This approach leverages existing STT-level expertise and procedures, creating a faster, more agile recovery without sacrificing environmental protection. The transformed agency would retain oversight to ensure environmental reviews are appropriate and, if not, revoke certification.

- **Simplified and Broadened Eligibility:** Unlike the current PA program, which categorizes work in a rigid and complex manner, the RAPID Direct Funding program would offer a more simplified approach. This approach bolsters insurance requirements and transfers risks from American taxpayers to the private insurance market.

- o **State/Tribe/Territory Determination:** STTs would have the flexibility to fund projects that are necessary for timely response and recovery and should distribute funding in a fair manner based on disaster-caused need. To ensure project eligibility, the STT must certify projects meet the following criteria:

  - ▪ **Eligible applicant.** The applicant must be a state, tribal, territorial, local government, or an eligible PNP organization.

  - ▪ **Eligible facility.** The damage must have occurred at an eligible facility, which can include:

    - ▪ Buildings (owned or leased)

    - ▪ Public works systems

    - ▪ Equipment

    - ▪ Improved and maintained natural features, such as beaches or levees

  - ▪ **Eligible work**: Work must fall into one of two categories:

    - ▪ **Emergency Work:** Short-term activities to save lives, protect public health and safety, and protect property. This includes debris removal and emergency protective measures.

    - ▪ **Permanent Work:** Long-term work to restore a damaged public or PNP facility.

  - ▪ **Eligible cost**: The costs for eligible work must be necessary, reasonable, and adequately documented. Eligible costs can include labor, equipment, materials, and administrative costs.

  - ▪ **Emphasis on Outcome:** Eligibility and costs would be based on the outcome (restoring public function and safety) rather than on specific work types or detailed facility classifications.

43

- **Private Non-Profit (PNP) Eligibility:** The program would streamline the funding process for PNPs while retaining the existing distinction between "critical" and "non-critical" PNPs and the requirement for non-critical PNPs to first apply for an SBA loan.

  - **Expedited Verification of Non-profit Status:** STTs would be encouraged to establish a program to pre-certify PNPs eligibility, creating a verified database that eliminates the need for re-verification after a disaster.

- **Mandatory Two-Phase Reconciliation with Incentives:**

  - **Phase 1: One-Year Reconciliation:** Within one year of receiving initial funding, STTs must submit a certified public accounting (CPA)-conducted audit that provides a full accounting of all projects and costs and their plan to obtain and maintain insurance. Any funds not associated with an eligible project must be classified as underruns. STTs may either return underruns or request reallocation towards mitigation or insurance measures. Additional federal funding is not available for overruns.

    - **Reconciliation Incentives:** STTs that consistently submit timely, accurate, and transparent reconciliations in both audit phases could receive a "High-Performance Designation." For these high-performing STTs, the President may approve more than 75% of the parametric amount as a federal contribution for the current event.

  - **Phase 2: Program Closeout Audit:** Upon the conclusion of all projects, a final, comprehensive audit should be performed by the STT and submitted to the transformed agency to close out the program. All federal funding provided under the RAPID Direct Funding Program must be expended or returned within eight years from the date of the initial award. This change eliminates the federal audit.

- **Insurance Requirements with Incentives:**

  - To ensure responsible risk management and reduce federal outlays, the RAPID Direct Funding Program would build upon the existing "obtain and maintain" insurance requirement by incorporating powerful incentives for STTs to prioritize insurance and self-insurance.

  - **Encouraging Self-Insurance and Risk Pools:**

    - **Swift State/Local/Tribe/Territory Approval:** The program provides a streamlined process and template for the transformed agency's approval of SLTT-level self-insurance plans and risk pools, reducing administrative burden and encouraging SLTTs to create more affordable and stable insurance mechanisms. Although insurance would be required for damaged public facilities, the parametric based funding provided would not be reduced by insurance proceeds, incentivizing SLTTs to maximize insurance coverage. Every SLTT should declare their self-insured dollar amount.

    - **Funding for Program Establishment:** A portion of the unused funds can be used by the STT to establish a new self-insurance program or risk pool, demonstrating a direct federal investment in STT-led risk management.

44

- o **Tax Incentive(s):** To increase participation, create tax credits to mitigate the financial burden of flood insurance. Individuals doing the right thing by carrying insurance policies should be rewarded for their investment and effort to protect against disaster.
- o **State/Tribe/Territory Verification and Compliance:**
  - o **Centralized Asset Registry:** STTs may be required to maintain and publicly publish a centralized, digitized registry of all public and PNP facilities receiving permanent repair funding. This registry should be retroactive and could include insurance details, ensuring a transparent record for audit and enforcement.
  - o **Verification Through Audit:** Compliance with requirements to obtain and maintain insurance may be verified through the two-phase state audit process rather than on a project-by-project basis by the transformed agency.
- o **Linking Insurance to Mitigation:** The program further incentivizes risk reduction by linking insurance to mitigation measures.
  - o **Premium Offset for Mitigation:** SLTTs may use the funds to support public entities and PNPs in implementing mitigation measures, potentially leading to lower insurance premiums and a stronger financial incentive for resilience.
- o **Consequences of Non-compliance:** Failure to comply with insurance requirements, as identified in the reconciliation audits, could result in penalties for the STT, such as an automatic reduction in future federal share of the parametric payout.

- **Winding Down Current Program:** While the RAPID Direct Funding program could streamline future funding, the transformed agency must also aggressively pursue closeout and reconciliation of existing disasters.
  - o **Convert Historic Disasters to RAPID Direct Funding**: The transformed agency should pursue the ability to convert historic disasters to the new RAPID Direct Funding program, making a one-time payout and immediately transitioning to the two-phase reconciliation approach described above. This would significantly reduce the administrative burden on all stakeholders and prevent added confusion from overlapping approaches.
  - o **Reduce backlog through prioritizing high-risk projects**: Identify high risk unliquidated obligations that could either be drawn down by recipients or recovered by the transformed agency within set timeframes, ensuring all stakeholders are accountable for the effective management of existing funds.

**Precedent and Justification:**

The RAPID Program is built upon proven concepts that prioritize speed, efficiency, and accountability:

- **The Coronavirus Relief Fund:** The Coronavirus Relief Fund demonstrated the effectiveness of distributing flexible, direct aid to STTs in an emergency.

45

- **Existing Block Grants:** Other federal block grants, like the Community Development Block Grant (CDBG) program, show the effectiveness of giving STTs autonomy in managing specific programs.
- **Parametric Triggers:** Used globally by risk insurers and governments, parametric triggers have a proven track record of providing rapid, predetermined payments following a triggering event.

**Benefits:**

The implementation of the RAPID Program would offer significant advantages for disaster-prone communities:

- **Accelerated Recovery:** Reduces funding delays from months or years to weeks, speeding up the rebuilding of vital public infrastructure and essential community services.

- **Empowered Local Leadership:** Allows SLTTs to leverage their local expertise and direct resources where they are most needed, fostering a more effective and agile recovery.

- **Increased Fiscal Discipline:** Replaces uncertain federal reimbursement with a predictable, rules-based funding model, while certified audits ensure transparency and accountability. The incentive-based reconciliation encourages performance and responsible stewardship of funds, with the potential for additional federal contributions for the current event based on merit. The eight-year expenditure deadline ensures funds are used efficiently.

- **Reduced Bureaucracy:** Significantly cuts down on the administrative burden for STT and local officials and PNPs, freeing up valuable time and resources.

- **Enhanced Public Trust:** Combines the speed of immediate aid and transparent adjudication with the robust oversight of a multi-phased audit process and incentive structure, assuring the public that funds are being used responsibly and effectively.

- **Improved Risk Management:** By linking insurance coverage to financial incentives, the program encourages STTs to take a proactive role in managing disaster risk for public and non-profit facilities.

- **Reduced Administrative Costs:** The RAPID Program is designed to drastically reduce superfluous administrative costs present in the disaster industrial complex and achieves efficiencies in the transformed agency's staffing model by eliminating a variety of currently necessary roles in PA program(s). The Program does so by limiting administrative costs to two audits and A&E for project construction. Furthermore, the use of a capped parametric amount for the federal contribution should inherently incentivize STTs to keep administrative costs as low as possible. This ensures that the intent of the federal funding is realized, and taxpayer dollars are stewarded appropriately.

**Conclusion:**

The RAPID Program offers a modern solution to the challenges of post-disaster recovery. By moving beyond the slow and reactive traditional PA program, it leverages STT autonomy, parametric funding, and transparent auditing to create a faster, more effective, and more accountable system for all Americans affected by disaster.

# 7. Reform the National Flood Insurance Program (NFIP) for Financial Stability and Risk Resilience

**Problem:**

The NFIP is financially unsustainable and operates with conflicting policy goals, which hinder its effectiveness.

- **Financial Instability:** The NFIP has previously accrued over $40 billion in debt ($16 billion of debt was canceled by Congress in 2017), primarily due to large-scale, catastrophic flooding events that the program's premiums were not designed to cover. The NFIP historically underpriced flood risk, leaving it unable to cover major losses without borrowing from the U.S. Treasury. This financial unsustainability and underpriced insurance has led to an increasing debt burden with no ability to repay. Current interest payments on the debt are $700 million annually.

> **Why do I need Flood Insurance?**
>
> Floods can happen anywhere – just one inch of water can cause thousands of dollars' worth of damage. Most homeowners' insurance does not cover flood damage. Flood insurance is a separate policy that can cover buildings, the contents of buildings, or both.

- **Outdated Risk Information:** The program's current mapping methodology dates to the 1970's and does not fully capture current or emerging flood hazards, leading to an underestimation of risk. This outdated information does not support the pricing of insurance, leads to misunderstanding of flood risk, and has resulted in communities rebuilding and developing in flood prone areas. The NFIP also utilizes this outdated risk information to set standards for communities to regulate their flood risk. FEMA has not evolved its standards or science to support intuitive land use choices that result in predictable post-flood outcomes. This results in a one size fits all solution that limits local ownership of their flood risk. State and locally tailored standards would better reflect local flood risk choices and ideally decrease community, state, and federal cost.

- **Conflicting Goals:** Congress has instructed the NFIP to be affordable, financially sound, available to all, and risk informed. These goals often pull in opposite directions, and political pressures have frequently blocked meaningful reform, leading to dozens of short-term program reauthorizations. For example, maintaining affordable rates through subsidies directly conflicts with the goal of financial sustainability, and risk-informed pricing is politically unpopular in the most flood prone areas.

- **Duplicative Endangered Species Act (ESA) Requirements:** FEMA has been sued numerous times over its implementation of the NFIP for noncompliance with the Endangered Species Act (ESA). Although the influence of the NFIP on species is insignificant, ESA requirements result in FEMA being forced to impose duplicative and burdensome requirements at the local level, impacting property owners, developers, and local officials. FEMA needs to be able to implement the NFIP without having to engage in complicated, costly, and time-consuming Section 7(a)(2) consultations.

47

**Recommendations:**

To address these critical shortcomings, the solution involves a strategic shift to a private market framework combined with strengthened federal oversight and community-level action. Implementing these proposals may require both federal administrative changes and Congressional action to align with current federal statutes, state-based insurance regulatory authorities, and privacy protection laws. FEMA in coordination with the Department of Treasury, state insurance commissioners, and the private insurance industry, should explore strategies for effectively operationalizing these proposals.

- **Empower Communities (Better Land-Use Policies):** Enhance NFIP participation standards administratively to support intuitive land use choices that result in predictable post-flood outcomes for communities. FEMA could explore ways to modernize the Community Rating System incentives to reward integration of property-level resilience activities; align floodplain standards with this proposal's modernization of mapping data; and provide support to states to promote risk communication with local land-use planning. FEMA should ensure any updates promote local decision making and state primacy in land use choices for flood prone areas. These changes place flood risk management squarely in the hands of those most capable of regulating it—state and local governments.

- **Modernize Risk Assessment (Update Risk Rating 2.0 & Improve Maps):** The NFIP's updated pricing methodology, Risk Rating 2.0, leveraged advanced technology and data sources to deliver fairer, more individualized rates, must continue to be implemented and updated based on better information and science. Risk Rating 2.0 was the first step in moving away from the use of mapped flood zones which are used for local floodplain management and to tell homeowners they are either "in or out". The new flood insurance rating methodology now uses a more comprehensive approach based on factors like distance to water, flood types, and the cost to rebuild. The program must also improve the accessibility, transparency, and quality of flood risk data and communication tools for all stakeholders. In addition to updating the mapping methodology to show property-level risk, FEMA should explore ways to expand the availability of anonymized flood loss and exposure data consistent with privacy and trade secret protections under federal law. Enhancing access to risk data would bridge the gap between insurance pricing and the outdated regulatory mapping methodology. Further, the NFIP must adopt an efficient model to identify and maintain flood risk information that connects land use choices and pricing.

- **Implement Risk-Based Pricing & Actual Costs:** A key to enabling the private market shift is to charge policyholders the actual costs of their policies. FEMA should continue to refine Risk Rating 2.0 implementation. The Council recommends exploring existing subsidies and working with Congress to address affordability challenges for select homeowners. FEMA can also evaluate opportunities to better align the Community Rating System Program eligible activities and discounts with measurable physical risk reduction actions communities and policyholders can take to ensure premium prices are reflective of property-level risk. These refinements could improve consistency between mitigation outcomes, pricing, and private market participation.

- **Revise 'Write Your Own' Compensation:** FEMA provides an expense allowance to Write Your Own (WYO) private insurance companies of roughly $1 billion annually to sell, write, and service standard flood insurance policies under the National Flood Insurance Program.

48

WYO companies do not underwrite the flood risk but serve as intermediaries. In FY25, the expense allowance was 29.1% of total written premium volume by company and projected at 28.4% for FY26. The compensation methodology is dated and doesn't reflect improvements in FEMA's systems, automated premium pricing methodology, or the expanded use of the direct-to-customer servicing platform. Compensation should be updated to ensure FEMA is not over-compensating Write Your Own insurance companies. FEMA should evaluate options through ongoing rulemaking to update the compensation framework that reflect administrative costs and new operational efficiencies, which was Congressionally directed in the Biggert-Waters Flood Insurance Reform Act of 2012. Completing this rulemaking has the potential to save hundreds of millions of dollars and promote more private flood offerings.

- **Shift to Private Market through Depopulation of Existing NFIP Policies:** A core component of the solution is a gradual, structured transition of certain existing NFIP policies to the private market in areas where private capacity exists and are consistent with state regulatory frameworks. This would be accomplished by pursuing a voluntary "take-out" program, which would allow FEMA to assess the feasibility of transferring eligible policies to qualified private insurers under existing statutory authority. Depopulation programs have historically been state-based so applying this approach at the federal level will require careful evaluation of operational, regulatory, and consumer protections.  This approach, modeled on successful state depopulation programs for other perils, could reduce the NFIP's policy count. States could regulate the market to ensure consumer protection, with the direct involvement of state insurance commissioners.

- **Evaluate Development of Flood Insurance Marketplace:** To modernize and enhance the capacity of the national flood insurance system, it is recommended that FEMA evaluate the development of a flood insurance marketplace designed to provide consumers with access to both NFIP and qualified private insurance options when purchasing a new flood policy. The marketplace could leverage private sector capacity through a centralized clearinghouse model, allowing private participating insurers opportunity to offer coverage prior to placement with NFIP. This collaboration would serve as a clearinghouse opportunity for private flood insurers who could offer coverage prior to submission to the NFIP. FEMA should evaluate potential options with qualified insurance wholesalers or a consortium of insurers to assess the feasibility of administering a clearinghouse under their current authorities.  A model of this kind would address the critical needs of market capacity, consumer protection, and improve administrative efficiency while offering consumers a choice between private coverage or the NFIP.

  o **Centralized Clearinghouse:** FEMA should evaluate models in which a wholesaler or consortium could manage a national market exchange that operates as a clearinghouse for consumers seeking private insurer and NFIP flood policies. This would standardize the policy origination processes, thereby reducing the administrative friction that currently limits private carrier participation.

  o **Pricing Alignment:** The marketplace's pricing mechanism could reference FEMA's Risk Rating 2.0 framework as an actuarial benchmark. In addition, the marketplace could encourage depopulation by requiring the insured to select a private flood insurance policy from a marketplace approved insurer that is priced at no more than 10 percent above the NFIP Risk Rating 2.0 actuarial rate for comparable coverage for the same property. This approach aids in depopulation and helps ensure that while private market competition is

49

encouraged, pricing remains tethered to actuarial science, state rate setting, and avoids significant market volatility.

    o **Rigorous Carrier Standards:** To protect consumers and ensure market resilience, FEMA, through its partnership with the wholesaler or consortium, would ensure all private carriers writing flood insurance through the marketplace meet eligibility requirements, in coordination with State Insurance Commissioners that is consistent with the McCarran Ferguson Act. These requirements would include robust financial stability metrics to prevent carrier failure during catastrophic events.

    o **Strategic Alignment with the NFIP:** This marketplace would operate in concert with the NFIP, providing a viable and standardized private option that helps offload risk from the federal program. This would ultimately contribute to the NFIP's long-term financial stability and reduce the taxpayer burden.

- **Address Repetitive Loss Properties:** Manage repetitive loss properties through targeted mitigation planning and accountability measures, such as those proposed in the "Repeatedly Flooded Communities Preparation Act" (S.1545). This legislation provides a structured plan to address the highest-risk properties and ensures mitigation is a priority in these areas, thereby reducing the financial burden of repeated claims.

- **Reduce Duplicative ESA Burden on the NFIP:** The Council recommends that National Marine Fisheries Service (NMFS) be directed to 1) rescind all Biological Opinions (BiOps) relating to FEMA's implementation of the NFIP and 2) statutorily exempt the NFIP from the ESA. FEMA should focus on a national ESA solution for the NFIP through a renewed partnership with NMFS.

**Benefits:**

Implementing these changes would produce several key benefits for the public and the government.

- **Accelerated Recovery:** Broader insurance access and diversified coverage through a more competitive market, which could better sustain the overall market and ensure faster payments and more predictable recovery for local communities after a disaster.

- **Reduced Government Burden:** A more robust private market and stronger community-level, state owned land use management could reduce the financial burden on federal, state, and local governments by empowering individuals to understand and manage their own risk.

- **Predictable Financial Outcomes:** Homeowners will be better able to anticipate post-disaster compensation through knowledge of their personal policies, rather than relying on the uncertain nature of federal disaster aid.

- **Increased Resilience:** By aligning insurance rates with granular flood risk, improving publicly available flood risk information, and promoting local decision making and state primacy in land use choices, property owners and local governments have a greater incentive to invest in mitigation measures, making communities safer and more resilient to the growing threat of flooding.

**Potential Next Steps:**

The Council recommends that FEMA coordinate with the U.S. Department of Treasury, other relevant federal agencies, state insurance commissioners, and insurance industry stakeholders to further evaluate the NFIP solutions discussed in this section.

Additionally, FEMA, in coordination with the Department of Treasury, should convene a roundtable of state insurance commissioners, federal lending regulators, consumer representatives and relevant insurance industry stakeholders, including insurers, reinsurers, and brokers to analyze the potential reforms outlined in the Council's proposal. These stakeholders can also assess how data, underwriting, and price information can be shared responsibly and maintain consumer protections consistent with statutory authorities and privacy requirements. Further, federal agencies should continue stakeholder engagement on increasing consumer engagement and understanding of flood risk and insurance options.

In relation to a shift to private market and a potential depopulation program, FEMA, the U.S. Department of Treasury, federal lending regulators, Government Sponsored Enterprises, and the state insurance commissioners should collaborate on developing a potential implementation strategy that would be compliant with the express authorities of the McCarran-Ferguson Act as well as the Flood Disaster Protection Act of 1973 mandatory purchase provisions.

**Conclusion:**

The National Flood Insurance Program is at a critical juncture. The current model is unsustainable and has not evolved since the 1970s—it cannot meet conflicting expectations of providing affordable insurance, mitigating flood risk, and maintaining financial solvency. By embracing a new strategy that encourages greater private market participation, modernizes risk assessment, and modifies the NFIP's role in state and community-level land use choices, the nation can move toward a more resilient and financially stable flood risk management system. This shift would reduce the federal government's financial burden, promote accurate risk pricing, and incentivize property owners and communities to invest in mitigation, ultimately leading to a more prepared nation in the face of flood-related disasters. While this proposal seeks to address NFIP's financial problems going forward, the existing debt would have to be addressed by Congress or other revenue sources.

## 8. Maximize Every Dollar Spent by Reducing Administrative Costs

**Problem:**

A portion of U.S. federal disaster relief funds is used for administrative costs and contractor fees rather than directly for community recovery. This is due to a system with rising program complexity, significant administrative costs, and a trend of personnel moving between FEMA and private firms. This structure has prompted calls for reforms to simplify grant processes, manage administrative costs, and address the influence of private interests on public policy.

The management system has shifted from one primarily using federal and local government staff to one relying on private contractors. A key factor in this change is the increased complexity of FEMA's grant programs, such as the Public Assistance (PA) and Hazard Mitigation Grant Programs (HMGP). A FEMA official in Puerto Rico highlights this phenomenon: "I have 500 contracted employees that would not be needed if FEMA's grant process was not so complex."

The detailed requirements of these programs have created challenges for state and local governments, especially smaller municipalities with limited resources, as noted in GAO reports.

This complexity has fostered a specialized industry of consultants and contractors who assist communities in navigating the grant application and compliance procedures. This industry's growth has been influenced by:

- **Personnel Transitions:** Former FEMA and state political appointees and career employees have joined or established private companies that now serve as major contractors in the disaster management space. This raises questions about whether former officials leverage insider knowledge and connections for private gain.

- **Financial Incentives:** The current system provides private sector financial incentives for state and local governments to hire them. Since administrative costs are largely reimbursable by FEMA, jurisdictions can pass these consultant fees on to the federal government. As one former FEMA official noted, this can lead to "a lot of money getting spent on process... and you end up with a lot of billable hours" without necessarily improving outcomes.

A central issue with the current system is the amount of taxpayer money used for administrative costs. A substantial part of grant funding is spent on administrative and management expenses at

*In total, almost 25 cents on every dollar can be provided for administrative expenses*

both the federal and state/local levels. In total, almost 25 cents on every dollar can be provided for administrative expenses. Most of these costs are expended during the grant development phase, which hinders the pace of recovery.

- **Overhead spending**: The administrative allowance for state and local governments has been increasing. For instance, DHS OIG audits have identified concerns regarding FEMA's oversight of grant funds and instances of over-obligated funds.

- **Incentive structure**: The reimbursement model may encourage state and local governments to keep disasters "open" longer than necessary to maximize management costs, which can delay project completion. The primary incentive for contractors is to maximize billable hours, not to expedite recovery.

- **Program complexity**: As grant programs become more complex, the demand for specialized consultants increases, which in turn raises administrative costs. The system's intricate nature can make it difficult for citizens and local officials to understand, creating a dependency on the private firms that benefit from this complexity.

**Recommendations:**

To address these challenges, the following recommendations, informed by GAO and OIG findings, have been suggested:

- **Simplify and streamline grant programs**: FEMA could review its grant programs to reduce unnecessary bureaucratic requirements. Simpler applications and standardized documentation could decrease the need for consultants, especially for smaller communities.

- **Establish caps on administrative overhead**: To ensure more funds reach affected communities, FEMA could implement strict, federally mandated caps on the percentage of grant funds that can be used for administrative costs. A more transparent reporting system could also be established to track overhead spending.

- **Strengthen post-employment rules**: Ethics rules for employees transitioning from FEMA to the private sector could be reinforced. This could involve extending "cooling-off" periods and increasing transparency requirements for former employees who become consultants, which would help to mitigate potential conflicts of interest.

- **Increase direct technical assistance**: Instead of increasing administrative reimbursement percentages, FEMA could provide direct, in-house technical assistance to local governments. By offering pre-packaged support and training, FEMA could reduce the reliance on third-party contractors and empower local officials to manage recovery efforts.

In conclusion, the current U.S. disaster management system, with its reliance on private contractors and complex processes, directs a significant amount of money away from community needs. By eliminating and simplifying programs, capping administrative costs, strengthening ethics rules, and increasing direct government support, policymakers could improve how disaster relief funds are used to build a more resilient nation.

## 9. Revitalize A Unified National Network for Partnership

**Problem:**

The current emergency management landscape lacks a comprehensive framework that effectively integrates the efforts of federal, state, and local governments with those of private industry, faith based, and non-profit partners. The current system of laws, executive orders, and policies causes confusion by using the following terms interchangeably: frameworks, incident command systems, lifelines, core capabilities, and emergency support functions. This gap prevents the building of shared capabilities and national-level capacity, directly impacting the readiness and effectiveness of local first responders.

**Recommendations:**

- **Return to an Integrated Network:** Disasters demand a unified national effort that leverages the strengths of all sectors. The transformed agency would address the existing gap in the emergency management landscape by returning to a network that enables government, private industry, faith-based, and non-profit partners to build toward a shared capability and integrated resources. This network would provide a common understanding of roles and responsibilities, promoting a "Whole Community" approach to national resilience.

- **Enhance Public-Private Coordination:** The new framework would formalize and streamline coordination between government agencies, critical private-sector partners, and non-profit organizations. Because the private sector owns and operates most of the nation's critical infrastructure, and non-profits deliver essential services during emergencies, integrating these partners is essential to strengthening national capacity and improving readiness at the local level. This effort includes revitalizing the National Business Emergency Operations Center (BEOC) and relocating it to the Agency's operational directorate to re-establish its role as a central hub for communication, problem-solving, and resource coordination among businesses and non-profit partners during disasters. Additionally, the

framework would support the development of Regional BEOCs that are aligned with the National by leveraging existing regional resources—particularly the FEMA Regions' private-sector liaison —to ensure closer alignment with state and local operations. As part of this effort, Regional BEOCs should convene key stakeholders—including major retailers, small business leaders, logistics providers, and non-profit response partners—to assess current models, close coordination gaps, and identify priority needs for restoring services, stabilizing supply chains, and bringing communities back online following major disasters.

- **Leverage Technology for Shared Awareness:** The framework would also include a plan to develop and implement modern technology and communication protocols that ensure shared situational awareness and data sharing among all partners before, during, and after a disaster.

## 10. A Transformed Agency

FEMA needs to be fundamentally transformed from how it exists today and must be remade into a new, supportive agency. "FEMA" as a brand and as an agency has been irreparably damaged by the last four years of mission creep and programmatic failures as noted later in this report. The time is now to transform FEMA into an agency that retains the core missions of FEMA, while highlighting the renewed emphasis on locally executed, state or tribally managed, and federally *supported* emergency management.

The core objective is to realign the agency's mission to prioritize immediate, effective, and impartial disaster response and recovery for American citizens by shifting greater responsibility and direct funding to SLTTs. The current structure is criticized for mission creep, being too centralized, and for administrative bloat that diverts critical resources. Key recommendations include conducting a strategic review of personnel requirements to determine appropriate staffing levels, primarily targeting the disaster workforce through program efficiencies and increased accountability, exploring the relocation of physical headquarters, shifting certain missions, like training, to state authorities, and redefining FEMA's role as a "payer of last resort" to eliminate duplicative federal funding. A crucial element of this reform is to build upon and expand successful federal-state partnership programs to leverage demonstrated value and expertise in the first-response community while establishing a cohesive framework that integrates government, private, and non-profit sectors for unified national resilience. These reforms are designed to create a lean, deployable disaster force that empowers state and local officials, reduces costs, and improves resilience against increasingly complex threats. The internal workforce adjustments should be conducted over a 2-3 year phased approach that allows the agency to realize the efficiencies while reducing staff. Further, these reforms are best achieved via the same timeline that allows for States, Locals, Tribes, and Territories to make corresponding fiscal, capability, and workforce adjustments to ensure a successful transition for all affected stakeholders.

**Problem:**
FEMA currently suffers from multiple systemic issues that hamper its effectiveness and accountability.

- **Lost Mission Focus:** The agency's resources are diverted to missions outside its core disaster response and recovery responsibilities. This includes a significant financial outlay on issues unrelated to its primary mandate. The resulting mission creep saps limited staff and resources, compromising its ability to respond to actual disasters.

54

- **Inefficient Use of Federal Funds:** There is excessive overlap in federal benefits programs, with FEMA often providing duplicative funding. This bureaucratic redundancy leads to administrative bloat, delays in delivering aid, and unnecessary costs for taxpayers.

- **Centralized and Bloated Headquarters:** Compared to mission-focused federal agencies with comparable field operations, such as the U.S. Army Corps of Engineers (USACE) and the U.S. Forest Service (USFS), FEMA is significantly top-heavy. The concentration of personnel in a District of Columbia-centric headquarters creates bureaucratic inertia and slows down critical decision-making during emergencies.

**Recommendations:**

To address these problems, the following recommendations are proposed for the transformed agency:

1. **Transfer Training Responsibility and Empower States through Proven Programs**

   - **Shift Training Execution to States:** While the future agency must establish and maintain national standards for disaster response, the direct execution of training should be shifted to the state level. This would eliminate current personnel requirements within the transformed agency and empower states to build robust, tailored training programs.

   - **Expand and Leverage Successful Partnerships:** Rather than replacing successful programs, the future agency doubles down on those with a proven track record of effective federal-state-local partnership.

     o **National Urban Search and Rescue (US&R) Program:** This program, with its network of 28 task forces, has a decades-long history of successfully integrating federal, state, and local emergency response teams. The future agency enhances funding and expands capabilities for these task forces, ensuring they remain a cornerstone of specialized, on-the-ground support. Leverage this successful program as a model to expand the State Urban Search and Rescue (SUSAR) programs.

     o **Centers for Domestic Preparedness (CDP):** The CDP provides invaluable, federally funded training for state, local, tribal, and territorial emergency responders in areas such as incident management and mass casualty response. A transformed agency expands access to and funding for this training, ensuring first responders across the country are equipped for a wide array of threats, including complex disasters and terrorist acts.

     o **U.S. Fire Administration (USFA):** The USFA already works with local fire departments to reduce fire-related injuries and fatalities through training and resource provision. The transformed agency builds on this relationship by better integrating USFA support into overall disaster preparedness and response strategies, particularly for incidents involving complex hazards like wildfires.

2. **Empower States with Direct Funding and Limited Federal Coordination**

   - **Empower States to Take the Lead:** States should assume a greater role in managing disasters from preparedness to recovery, utilizing direct federal funding mechanisms.

This empowers state and local officials who have a more direct understanding of their citizens' needs.

- **Formalize Federal Role as a Coordinated Supporter:** The federal government should limit its on-the-ground response to incidents that exceed the capabilities of state and local resources. In these cases, the transformed agency acts as the central coordinator, aligning resources from across the federal government, such as the Department of War, to provide supplemental support.

- **Closeout of Historical Open Disasters:** The transformed agency should endeavor to expedite the closeout of historical open disasters. Doing so reduces the lingering administrative costs as well as legacy information technology systems that are maintained solely to facilitate open disaster declarations. Both directly benefit Americans by accelerating ongoing recovery efforts and reducing taxpayer costs.

- **Eliminate Duplicative Funding:** This approach, which establishes the future agency as the payer of last resort, would require other federal agencies to provide assistance through their existing benefit programs first, thereby eliminating redundant funding mechanisms and associated administrative burdens. To achieve this, the Administration should work with the U.S. Congress to ensure other existing benefit programs are funded in a timely and responsive manner. Further, the future agency must look for opportunities to remove duplications of effort such as environmental and historical reviews, audits, and inspections that should be conducted by states.

3. **Rebalance FEMA workforce and provide clarity across Headquarters, Regions and Field**

- **Clarity of roles and responsibilities:** Headquarters should focus on policy, procedures, guidance, oversight, administrative functions, and coordination for national response. The head of the transformed agency is responsible to ensure a national system of emergency management that is locally led, state managed, and federally supported. The regions should focus on preparing and responding to incidents through forward embedded staff at State offices. Incidents should be led by Federal Coordinating Officers who report to Regional Administrators and are empowered to coordinate federal resources and support to States. In partnership with states, tribes, and territories, Regional Administrators should ensure the coordination, training, exercises and plans are in place for the most significant incidents across the United States.

- **Align Personnel with Requirements:** Appropriate staffing levels will need to be assessed and determined as the policy, legislative, and administrative changes called for in this report are implemented. The transformed agency can align personnel with future requirements that are rooted in program efficiency, enhanced effectiveness, and greater accountability. This strategic review should be conducted over a 2-3 year timeline and would be dependent on the Report's recommendations being implemented. The aim is to create a more deliberate approach to FEMA staffing, reserving federal intervention for the largest and most complex events, and ensuring that when needed, FEMA is equipped to succeed in accomplishing its mission.

- **Transfer Logistics Operations:** Explore moving the transformed agency's logistics team to co-locate with the U.S. Transportation Command (USTRANSCOM). This would

create efficiencies through direct collaboration with their Department of War counterparts.

- **Review Executive Structure:** Conduct a review of the Senior Executive Service (SES) billets to realign or reduce them in accordance with the proposed staffing efficiencies and mission refocusing.

**Conclusion**

This transformation is an imperative step toward restoring the agency's effectiveness, accountability, and public trust. By implementing a bold restructuring plan—centered on staffing alignment, streamlining operations, eliminating redundancies, and empowering state partners— the federal government can ensure a more immediate, effective, and efficient response to disasters. This framework shifts the agency's focus from bureaucracy to boots-on-the-ground action, better positioning the United States to meet the complex disaster challenges of the future. The ultimate outcome would be a streamlined, responsive, and resilient organization that delivers timely relief and recovery to American citizens when they need it most.

# Soliciting Input from Stakeholders Across the Nation

## Incorporating Public Feedback into FEMA Review Council Efforts

The Council undertook extraordinary measures to ensure that public feedback was solicited from a broad range of stakeholders as part of its comprehensive review of FEMA's programs and operations. Recognizing the critical importance of stakeholder engagement, the Council employed multiple avenues to gather input, including public meetings, Federal Register Notices, in-person listening sessions, electronic and regular mail submissions, and virtual forums. These efforts were designed to ensure transparency and accessibility, enabling voices from across the nation to contribute to the reform process.

The feedback received underscores widespread support for FEMA reform aimed at addressing inefficiencies, reducing bureaucratic barriers, and enhancing support for disaster survivors and local governments. Stakeholders consistently identified key priorities, including the need to streamline processes, decentralize decision-making, increase funding for mitigation and preparedness initiatives, and ensure fairness in disaster response and recovery efforts. Participants emphasized the importance of implementing reforms gradually, allowing for a phased approach that strengthens partnerships among federal, state, tribal, and local entities while minimizing disruptions.

This robust engagement process has provided the Council with invaluable insights into the challenges and opportunities facing FEMA's operations. The feedback serves as a cornerstone for shaping the future of FEMA's programs, ensuring that reforms are informed by the lived experiences of those directly impacted by disasters and those responsible for managing emergency response and recovery efforts. By integrating this input into its recommendations, the Council aims to create a more efficient and responsive FEMA that is better equipped to meet the needs of communities nationwide. The inclusion of public feedback reflects the Council's commitment to fostering collaboration and transparency in the pursuit of meaningful reform.

## Methodology

We are a nation built upon local communities, thus the Council immediately recognized that they must canvas the country to capture the widest possible feedback from the American people for a reform effort that tragically may affect nearly every American at some point in their lifetime.

To achieve this objective, the Council leveraged the following tools. Of note, the views expressed from the survey are not endorsed by the Council but were taken into consideration during deliberations on its recommendations.

- National Survey
- Listening Sessions (in-person and virtual)
- Federal Register Notice Comments
- Public Meetings

**National Survey**

The Council's State-Federal Coordination Subcommittee surveyed 1,387 stakeholders spanning state, local, tribal, and territorial (SLTT) agencies as well as non-governmental partners. The results revealed critical insights into the current state of national preparedness and response. The Council conducted surveys focused on mitigation, recovery, preparedness, and response, which collectively assessed key emergency management tasks. These surveys evaluated capabilities ranging from community resilience and long-term vulnerability reduction to infrastructure systems, cybersecurity, and mass care services.

With a total of 1,387 responses, the individual totals for the surveys were:

- Mitigation: 354 responses
- Recovery: 271 responses
- Preparedness: 479 responses
- Response: 283 responses

Most of the responses were from SLTT emergency management services, with some responses from non-governmental agencies such as universities, hospitals, and non-profits. Local agencies provided more than 75 percent of the responses. Geographically, the responses cover the entire United States, with a higher concentration of local agency responses coming from populations on the east and west coasts. Figure 1 shows the distribution of responses for the Response survey.

58



Figure 1: The geographic distribution of inputs from the Response Survey.

## Listening Sessions

Subcommittee listening sessions were facilitated to hear from state and local emergency managers throughout the country to hear their thoughts on disaster response, recovery, mitigation, and reforming FEMA's policies and operations. The listening sessions were attended and facilitated by Council members.

The locations for subcommittee listening sessions were strategically selected throughout the United States based on significant disasters that occurred in those areas, and the ability to meet with a bipartisan selection of state and local emergency managers across the regions.

The locations included: Asheville, North Carolina; Oklahoma City, Oklahoma; New Orleans, Louisiana; Los Angeles, California; Lincoln, Nebraska; Cheyenne, Wyoming; Minneapolis, Minnesota; Cape Coral, Florida; Washington, District of Columbia; Colorado Springs, Colorado; San Francisco, California; Waterbury, Vermont; San Juan, Puerto Rico; and virtually.

Additionally, the subcommittees held listening sessions in Los Angeles, California to discuss the recovery efforts of the 2025 Southern California wildfires; San Juan, Puerto Rico to discuss the ongoing impacts of Hurricane Maria in 2017; and Asheville, North Carolina to honor the one-year anniversary of Hurricane Helene.

In addition to these, the Council held an in-person listening session with over 20 Tribal Nations in Oklahoma City, Oklahoma as well as hosting three virtual listening sessions that cumulatively had over 100 Tribal Nations registrants.

## Federal Register Notice Public Comments

The FEMA Review Council published Federal Register Notice DHS-2025-0013 to solicit public feedback on the agency's reform. The 11,708 public comments received reflect a strong

consensus on the importance of FEMA's role in disaster response and recovery, while also capturing a broad spectrum of perspectives, experiences, and recommendations.

**Public Meetings**

The Council held public meetings in three locations: New Orleans, Louisiana; Oklahoma City, Oklahoma; and Washington, District of Columbia. The aim of these public meetings was to ensure the Council operated in a ***transparent manner*** while also leveraging the anniversaries of significant national disasters to further emphasize President Donald J. Trump's laser-focus on putting Americans first as part of FEMA's reform.

- **New Orleans, Louisiana**. In recognition of the 20-year anniversary of Hurricane Katrina.

- **Oklahoma City, Oklahoma**. To highlight that not every disaster is a natural one, such as the Alfred P. Murray Federal Building bombing in 1995, and to further acknowledge natural disasters are not just flooding events, given the number of catastrophic tornadoes in this state.

- **Washington, District of Columbia**. By conducting two public meetings in the nation's capital, the Council ensured in-person opportunities for senior leaders of the Administration to engage and participate with the Council.

## Analysis of Public Feedback Received

The FEMA Review Council's listening sessions, public comments, public meetings, and survey analysis revealed key themes, challenges, and recommendations for improving FEMA's disaster response, recovery, and mitigation efforts. Details of the below summary can be found in Appendix *Detailed Public Comments*.

**List of Common Issues and Challenges:**

- **Bureaucratic complexity**: FEMA's processes are overly complex, slow, and resource-intensive, creating barriers for smaller jurisdictions and tribal nations.

- **Delays in funding and reimbursements**: Cash flow challenges and slow FEMA reimbursements hinder recovery efforts, especially for smaller entities.

- **Workforce and capacity constraints**: There is high turnover among FEMA staff and limited capacity at the local level impact disaster response and recovery effectiveness.

- **Environmental and historic preservation reviews**: EHP reviews are major bottlenecks, delaying critical recovery projects.

- **Insurance and risk management**: Rising insurance costs, underinsurance, and concerns about FEMA's Risk Rating 2.0 system impact recovery efforts.

- **Disparities in aid**: Systemic inequities affect small, rural, and underserved communities, as well as vulnerable populations like renters, low-income families, and tribal nations.

- **Staffing gaps**: SLTT agencies face shortages in mass care, operational communications, and specialized disaster response capabilities.

- **Communication challenges**: Insufficient clarity and timeliness in FEMA's communication with local jurisdictions hinder coordination.

- **Dependence on FEMA funding**: SLTT agencies rely heavily on FEMA funding for critical disaster response and recovery activities, with reduced funding threatening capabilities.

**List of Common / Core Recommendations:**

1. **Bureaucratic complexity**

   o Simplify FEMA processes by streamlining disaster declarations, grant applications, and project reviews.
   o Decentralize decision-making to regional offices and implement a single federal family individual assistance application for all federal assistance.

2. **Delays in funding and reimbursements**

   o Enhance funding mechanisms by increasing funding for Emergency Management Performance Grant (EMPG), Hazard Mitigation Grant Program (HMGP), and Building Resilient Infrastructure and Communities (BRIC) programs.
   o Transition to block grants for disaster recovery funding with safeguards for fair distribution to expedite aid delivery.

3. **Workforce and capacity constraints**

   o Build local capacity by investing in training, technical assistance, and staffing for local emergency management agencies.
   o Expand FEMA training programs and workforce development initiatives to address staffing shortages.

4. **Environmental and Historic Preservation (EHP) reviews**

   o Streamline EHP reviews to reduce delays in recovery projects and empower local governments to conduct them.

5. **Insurance and risk management**

   o Invest in mitigation and resilience by prioritizing pre-disaster mitigation funding, resilient infrastructure, and incentivizing stronger building codes and forward-looking plans.

6. **Disparities in aid**

   o Address systemic disparities by tailoring FEMA programs to meet the needs of small, rural, underserved communities, tribal nations, and vulnerable populations.

7. **Staffing gaps**

   o Build local capacity by expanding FEMA training programs and workforce development to address gaps in mass care, operational communications, and specialized disaster response capabilities.

8. **Communication challenges**

   o Leverage technology to adopt modern tools like AI, geospatial systems, and real-time data sharing platforms to improve situational awareness and communication clarity.

9. **Dependence on FEMA funding**

- o Maintain and strengthen FEMA's capabilities to ensure reforms prioritize disaster survivors' needs, improve aid delivery efficiency, and address increasing disaster frequency and severity.
- o Enhance public-private partnerships by integrating private sector and nonprofit organizations into disaster planning and operations to supplement FEMA's efforts.

# Tribal Engagements

The Council recognizes the distinct sovereignty of each individual Tribal Nation and Alaska Native Village and their respective government-to-government relationship with the federal government as outlined in the U.S. Constitution, treaties, statutes, and court decisions. The Council also recognizes the unique position Tribal Nations and Alaska Native Villages are in to be considered both states and locals when applied to the traditional levels of government. While the Council could not directly engage one-on-one with each of the 574 federally recognized tribes, the Council provided numerous opportunities for engagement comments from Tribal Nations as directed in the Executive Order. The Council held an in-person listening session with over 20 Tribal Nations in Oklahoma City, Oklahoma. Additionally, the Council hosted three virtual listening sessions that cumulatively had over 100 Tribal Nations registrants. These sessions aimed to gather input on improving FEMA's programs, services, and disaster response capabilities, with the Council committed to synthesizing feedback into recommendations for the President and Congress.

**Findings:**

Tribal leaders emphasized the need for FEMA to respect tribal sovereignty by maintaining direct government-to-government relationships and avoiding state or county intermediaries. They highlighted unique challenges faced by tribes, such as geographical isolation, cultural impacts, and infrastructure limitations, and called for tailored solutions like vertical evacuation structures for coastal tribes. Tribes offered the below key concerns and key proposals:

**Tribal Concerns:**

1. **Tribal Sovereignty and Direct Engagement:** Tribal leaders emphasized the importance of maintaining government-to-government relationships with FEMA, advocating against routing assistance through states or counties. They stressed the need for FEMA to respect tribal sovereignty and directly engage with tribal governments.

2. **Unique Tribal Challenges:** Tribes face distinct challenges, including geographical isolation, cultural impacts of disasters, and limited infrastructure. Alaska Native tribes highlighted erosion, flooding, and permafrost loss, while coastal tribes emphasized the need for vertical evacuation structures to mitigate tsunami risks.

3. **Funding and Grant Accessibility:** Tribes expressed concerns about limited access to FEMA grants, restrictive eligibility criteria, and the cancellation of the Building Resilient Infrastructure and Communities (BRIC) program. They called for streamlined grant processes and equitable funding opportunities.

4. **Disaster Thresholds and Cost Sharing:** FEMA's disaster declaration thresholds often exclude smaller tribes. Tribal leaders advocated for lowering thresholds and increasing cost-sharing flexibility to ensure equitable access to disaster relief.

62

5. **Emergency Management Capacity:** Many tribes operate with limited Emergency Management staff and infrastructure. Tribes requested increased technical assistance, training programs, and resources to enhance their capacity.

6. **Collaboration and Mutual Aid:** Tribes proposed the creation of a Tribal Emergency Management Assistance Compact (T-MAC) to facilitate mutual aid and resource sharing among tribal nations during disasters.

**Proposed Recommendations from the Tribes:**

- **Adopt a Tribal Disaster Act:** Establish a standalone act to address tribal-specific needs and organizational structures.

- **Revise the Stafford Act:** Amend the act to better reflect tribal realities, particularly for Alaska Native communities.

- **Restore BRIC and Expand Mitigation Funding:** Reinstate the BRIC program or similar initiatives to support hazard mitigation plans and infrastructure projects.

- **Improve Grant Processes:** Streamline application procedures and broaden eligibility criteria for FEMA grants.

- **Create a Tribal EMAC:** Establish a compact to facilitate mutual aid among tribes.

- **Enhance Technical Assistance:** Provide training, resources, and direct support to build tribal Emergency Management capacity.

- **Recognize Cultural Impacts:** Develop metrics to account for cultural losses in disaster declarations.

# Areas for Further Exploration / Engagement

The scope and scale of interconnected topics and challenges when investigating the nation's state of emergency management is impressively complex. During this journey, the Council identified a series of areas that would benefit from thoughtful exploration from other formal groups or experts that may be best positioned to offer cogent solutions to the President and the Nation.

1. Review and streamline disparate disaster grant programs across federal agencies to improve consistency and accessibility for states and localities

2. Additional analysis on opportunities within the National Flood Insurance Program

3. Assess viability and opportunities for a potential FEMA Headquarters location change

4. Explore how to better integrate emerging technologies including advanced analytics, AI, and communications platforms to enhance operational capability, predict requirements in advance, and reduce costs

5. National Disaster Medical System: How to evolve program to better mirror USAR

6. Qualifications and cultivation of the administrative, state directors, T&T, and major urban core directors

7. National Structure – Optimal/Desired Number of Personnel. Due to anticipating staffing efficiencies, recommend further exploration on staffing as well as Region structure

8.  Explore the National Core Competencies of all FEMA-related programs

9.  Explore EMPG eligibility for Tribes

10. Explore how to best leverage existing advisory councils for FEMA:

    a.  FEMA National Advisory Council

    b.  FEMA Technical Mapping Advisory Council

    c.  Board of Visitors for the National Fire Academy

# Public Meeting Minutes

The Council held four public meetings during its operations, the first being an inaugural gathering of the presidentially appointed members, the second and third meetings acting as updates to progress and actions taken during the operations of the Council, and the last being the formal presentation and voting of this report and recommendations. Full public meeting minutes can be found on the Council's website.

- Inaugural FEMA Review Council Meeting on May 20, 2025, located at the Eisenhower Executive Office Building in Washington, DC.

- Second FEMA Review Council Meeting on July 9, 2025, located at the DHS Customs and Border Protection's Customs House in New Orleans, Louisiana.

- Third Public FEMA Review Council Meeting on August 28, 2025, located at the Oklahoma State Capitol Building in Oklahoma City, Oklahoma.

- Final Public FEMA Review Council Meeting on May 7, 2026, located at the Eisenhower Executive Office Building in Washington, DC.

# Engaged Subject Matter Experts and Stakeholders

The FEMA Review Council would like to thank the more than 13,000 individuals and respondents who have participated and engaged with the Council to share their input and insight. A full listing of individuals and organizations who have submitted formal testimony can be found at: Regulations.gov

The Council would like to note the extensive participation from the organizations and entities listed below. This list is not exhaustive or granular as the Council has engaged with numerous subject matter experts that have met in closed subcommittee sessions. The following list has been provided as is to respect the integrity of the feedback provided in those sessions.

**Federal Agencies**

Office of Management and Budget    Department of Homeland Security

Department of War    Federal Emergency Management Agency

Department of Treasury

**National Organizations**

64

Council of Governors

International Association of Emergency Managers

International Association of Fire Chiefs

National Association of Counties

National Association of Mutual Insurance Companies

National Emergency Management Association

National Governors Association Public Health and Disaster Reform Task Force

National League of Cities

National Volunteer Fire Council

U.S. Conference of Mayors

Reinsurance Association of America

National Association of Insurance Commissioners

American Flood Coalition

…and many additional organizations

**Tribal Nations**

| | | |
|---|---|---|
| Agua Caliente Band of Cahuilla Indians | Inter-Tribal Council of Arizona | Ponca Tribe of Nebraska |
| Ak-Chin Indian Community | Iñupiat Community of the Arctic Slope | Port Gamble S'Klallam Tribe |
| Alakanuk Tribe | Iowa Tribe of Oklahoma | Potawatomi Nation |
| Bear River Band of the Rohnerville Rancheria | Jena Band of Choctaw Indians | Prairie Island |
| Blue Lake Rancheria | Jicarilla Apache Nation | Prairie Island Indian Community |
| Brownfields Tribal Response Program Coordinator | Kaibab Band of Paiute Indians | Pueblo of Nambe |
| Burns Paiute Tribe | Karuk Tribe | Pueblo of Zia |
| Cabazon Band of Cahuilla Indians | Kickapoo Tribe of Oklahoma | Puyallup Tribe |
| Caddo Nation of Oklahoma | Kiowa Tribe | Quapaw Nation |
| Cahuilla Band of Indians | Lac Courte Oreilles Nation | Quinault Indian Nation |
| Catawba Nation | Leech Lake Ojibwe | Red Cliff Band |
| Cherokee Nation | Lummi Nation | Rincon Band of Luiseño Indians |
| Chickaloon | Makah Tribal Organization | Saint Regis Mohawk Tribe |
| Chickasaw Nation | Match-E-Be-Nash-She-Wish-Band of Pottawatomi (aka Gun Lake Tribe) | Salt River Pima - Maricopa Indian Community |
| Choctaw Nation | Miccosukee | Santo Domingo Pueblo |
| Coeur d'Alene Tribe | Middletown Rancheria | Seldovia Village Tribe |

65

| | | |
|---|---|---|
| Comanche Nation | Mille Lacs Band of Ojibwe | Seminole Tribe of Florida |
| Confederated Tribes of the Umatilla Indian Reservation | Morongo Band of Mission Indians | Shakopee Mdewakanton Sioux Community |
| Confederated Tribes of Warm Springs | Native Village of Atka | Shinnecock Indian Nation |
| Cow Creek Band of Umpqua Tribe of Indians | Native Village of Eklutna | Sisseton Wahpeton Oyate of Lake Traverse Reservation |
| Cowlitz Indian Tribe | Native Village of Kipnuk | Skagit River System Cooperative |
| Crow Creek Sioux | Native Village of Ouzinkie | Sokaogon Chippewa Community |
| Dry Creek Band of Pomo Indians | Native Village of Point Hope | Spokane Tribal Business Council |
| Eastern Band of Cherokee Indians | Native Village of Umkumiut | Summit Lake Paiute Tribe |
| Eastern Shawnee Tribe of Oklahoma | Navajo Nation | Suquamish Tribe |
| Federated Indians of Graton Rancheria | Nez Perce Tribe | The Native Village of Dot Lake |
| Flandreau Santee Sioux Tribe | North Fork Rancheria | Three Affiliated Tribes |
| Fond du Lac Band of Lake Superior Chippewa | Nottawaseppi Huron Band of the Potawatomi | Tlingit & Haida |
| Forest County Potawatomi | Oneida Nation | Trinidad Rancheria |
| Fort Sill Apache Tribe | Organized Village of Kwethluk | Tulalip Tribes |
| Gila River Indian Community | Pawnee Nation | Twenty-Nine Palms Band of Mission Indian |
| Grand Portage Band of Lake Superior Chippewa | Pinoleville Pomo Nation | Upper Sioux Community |
| Great Lakes Inter-Tribal Council, INC. | Pokagon Band of Potawatomi | Wampanoag Tribe of Gay Head Aquinnah |
| Hannahville Indian Community, Potawatomi Tribe | Pokagon band of Potawatomi Indians of Michigan and Indiana | Wichita and Affiliated Tribes |
| Ho-Chunk Nation | Pokagon Potawatomi | Winnebago Tribe |
| Hoh Tribal Business Committee | Pokégnek Bodéwadmik | Yakama Nation |
| Hoopa Valley Tribe | Ponca Tribe of NE | Ysleta Del Sur Pueblo |

**States/Territories**

| | | | |
|---|---|---|---|
| Alabama | Alaska | Arizona | Arkansas |

66

| | | | |
|---|---|---|---|
| California | Colorado | Connecticut | Delaware |
| Florida | Georgia | Hawaii | Idaho |
| Illinois | Indiana | Iowa | Kansas |
| Kentucky | Louisiana | Maine | Maryland |
| Massachusetts | Michigan | Minnesota | Mississippi |
| Missouri | Montana | Nebraska | Nevada |
| New Hampshire | New Jersey | New Mexico | New York |
| North Carolina | North Dakota | Ohio | Oklahoma |
| Oregon | Pennsylvania | Rhode Island | South Carolina |
| South Dakota | Tennessee | Texas | Utah |
| Vermont | Virginia | Washington | West Virginia |
| Wisconsin | Wyoming | Puerto Rico | |

**Private Industry and Faith-Based Organizations**

| | | |
|---|---|---|
| Artanis Capital | BuildSOS Inc | Rule One Consulting |
| Mennonite Disaster Service | Samaritan's Purse | Convoy of Hope |
| Mercy Chefs | The Salvation Army | International Emergency Management |

# Detailed Public Comments and Survey Inputs – An Analysis

**Feedback Mechanism #1 FEMA Review Council Survey Overview**

The FEMA Review Council's State-Federal Coordination (FSC) Subcommittee conducted a comprehensive survey of 1,387 stakeholders spanning state, local, tribal, and territorial (SLTT) agencies as well as non-governmental partners. This survey revealed critical insights into the current state of national preparedness and response. Findings highlight both the indispensable value of FEMA's resources and the urgent need for modernization, targeted capacity-building, and sustained partnerships. A recurring theme across responses was the need to streamline the bureaucracy and reduce red tape in administering federal funding. The survey findings outlined high-level strategic priorities to guide FEMA's transformation, ensuring the agency remains a catalyst for resilience in an evolving risk environment.

Survey responses confirm that FEMA plays a vital role in delivering funding, training, specialized assets, and nationally standardized systems. However, administrative inefficiencies, capability gaps among SLTT partners, and uneven resource distribution threaten the speed and effectiveness of disaster response.

At the same time, FEMA's unique capabilities, such as the nationwide Integrated Public Alert and Warning System (IPAWS), Urban Search and Rescue (USAR), National Incident Management System (NIMS) standards, financial support during catastrophic disasters remain

irreplaceable assets that underpin the nation's emergency management framework and should be focused on reducing impacts of future disasters.

**Current State**

Agencies responding to the survey indicated that FEMA support most commonly includes funding, training, technical assistance, and specialized assistance.

The most cited funding programs were the **Emergency Management Performance Grant (EMPG)**, the **State Homeland Security Grant (SHSP)**, and **Individual Assistance**. Survey responses cited **delays and bureaucracy** as a frequent problem. Funding delays were cited over 60 times in the Response survey. The following comment from Oklahoma Emergency Management describes the importance of Federal funding, while acknowledging that the process is burdensome and slow:

> **Question**: If FEMA no longer supported this capability, how would your organization/jurisdiction accomplish this task? If this task would no longer be accomplished without FEMA, why or why not?
>
> **Response**: *If FEMA were no longer involved in disaster recovery, our primary concern would not be the loss of personnel or technical assistance, it would be the loss of critical funding. FEMA's financial support is essential to helping states and communities recover from disasters. However, the current model is weighed down by excessive administrative burden, slow processes, and layers of compliance that often delay recovery efforts and divert resources away from survivors.*
>
> *Rather than deploying large numbers of federal staff to manage relatively small disasters or requiring states to navigate a complex and rigid grants system, FEMA should consider shifting to a block grant model. Providing states with flexible, upfront funding would allow us to tailor disaster recovery efforts to our unique needs and capabilities. This approach would reduce bureaucracy, increase efficiency, and expedite the delivery of aid where it's most needed.*
>
> *States like ours have built strong local response and recovery systems. What we need from FEMA is not manpower, but streamlined, predictable financial support. A block grant system, paired with accountability measures, would empower states to lead recovery more effectively while still maintaining transparency and federal oversight.*
>
> **Source**: Recovery Survey response from Oklahoma Emergency Management

According to the survey results, FEMA relies heavily on SLTT partners for **on-site security and law enforcement** (153 mentions), **mass care services** (176 mentions) and **operational communications** (120 mentions). FEMA partly relies on SLTT partners for these activities due to **staffing gaps**. 87 survey responses mentioned staffing gaps in mass care and 92 responses citing gaps in communications staffing. Lack of proper communication staffing results in **insufficient direct communications with local jurisdictions** (40 mentions) along with **unsatisfactory clarity and timeliness** (30 mentions).

Based on the survey results, FEMA provides more value in specialized areas, where SLTT partners sometimes lack resources or expertise. Respondents mentioned the FEMA **Incident Command System (ICS)** and **National Incident Management System (NIMS)** courses over 100 times, the deployment of specialized teams such as **Urban Search and Rescue (USAR)** and

**Disaster Mortuary Operational Response Teams (DMORT)** over 50 times, and the **Integrated Public Alert and Warning System (IPAWS)** over 20 times. The Snohomish County Department of Emergency Management in Washington state provides the following insight:

> **Question**: What training support does FEMA provide? This could include specific courses or other training support.
>
> **Response**: *All the ICS and NIMS courses. The entire NIMS Training Program which outlines standards processes to support mutual aid. Without nationally standardized training, it will not be long before each state has slightly different response structures or terminology, and state-to-state mutual aid becomes that much harder. We NEED national guidance to ensure we are all able to work together.*
>
> *I feel slightly less passionately about the basic Professional Development Series and Advanced Development Series and other independent study courses. In theory these could be replicated at the state level, but at 50x the effort as just having single courses provided by the federal government, which allow locals and states to build curriculum without having to each create the same content from scratch.*
>
> **Source**: Preparedness Survey response from Snohomish County Department of Emergency Management

**Impact of Potential Changes**

Organizations highlighted **mass care services**, **operational communications**, **mass search and rescue**, and **preparedness** as areas where reduced funding could impact capabilities. Over 80 responses cited dependencies on FEMA funding for shelter, food, and housing. Potential impacts on operational communications include **insufficient funding for equipment upgrades** and **reduced interoperability** and over 40 SLTT teams stated that they lacked the ability to replace USAR capabilities. According to the survey results, reduced funding would impact jurisdictions, rural jurisdictions and jurisdictions without specialized resources the most. Portsmouth, VA Emergency Management responded with the following:

> **Question**: If FEMA no longer supported this capability, how would your organization/jurisdiction accomplish this task? If this task would no longer be accomplished without FEMA, why or why not?
>
> **Response**: *In Portsmouth, Virginia, our Emergency Management team consists of only two full-time professionals working alongside the traditional city services like Social Services, Behavioral Health, Police, and the countless non-profit volunteer organizations that help the community daily with unmet mass care needs. Without FEMA's coordination, technical assistance, and resource alignment, we simply do not have the capacity to meet the wide-ranging and escalating demands of sheltering, feeding, hydration, reunification, and accessible services during a major incident.*
>
> **Source**: Response Survey response from Portsmouth (VA) Emergency Management

Additionally, survey results indicate that SLTT agencies could perform operations such as on-site security. However, reduced funding would limit the ability to scale operations for complex disasters. The St. Lucie County Emergency Management Division in Florida notes potential impacts to long-term or large-scale operations.

69

**Question:** If FEMA no longer supported this capability, how would your organization/jurisdiction accomplish this task? If this task would no longer be accomplished without FEMA, why or why not?

**Response:** *Local law enforcement and mutual aid partners would continue to manage security and protective operations with support from state resources. However, the ability to sustain long-term or large-scale security operations would be limited without FEMA funding and technical assistance.*

Source: Response Survey response from St Lucie County Emergency Management Division

Respondents cited **public information and warning** and **economic recovery** as areas where reduced funding would have less impact. Since FEMA manages systems such as IPAWS independently, reduced funding would not directly impact SLTT operations. However, responses such as this one from the Maryland Department of Emergency Management suggest that replicating FEMA systems such as IPAWS would be expensive.

**Question:** If FEMA no longer supported this capability, how would your organization/jurisdiction accomplish this task? If this task would no longer be accomplished without FEMA, why or why not?

**Response:** *The State could not replicate the IPAWS system, and to do so would be highly inefficient and expensive compared with common, distributed use of a nationally maintained system.*

Source: Response Survey from Maryland Department of Emergency Management

Additionally, partnerships with other agencies such as the Small Business Administration (SBA) and the U.S. Department of Agriculture (USDA) mitigate the impact of reduced funding on economic recovery.

**Feedback Mechanism #2 Listening Sessions Overview:**

The FEMA Review Council conducted extensive listening sessions, public comment analysis, and stakeholder surveys in 2025 to evaluate disaster response, recovery, mitigation, and FEMA's policies and operations. Feedback from state, local, tribal, and territorial (SLTT) agencies, nonprofit organizations, private sector representatives, and community groups highlighted critical flaws in FEMA's processes, funding mechanisms, communication strategies, and operational efficiency. Stakeholders repeatedly identified bureaucratic inefficiencies, delays in funding, inconsistent program administration, workforce constraints, and insufficient engagement with local governments as major barriers to effective disaster management.

The following is a comprehensive summary of the listening sessions held by the FEMA Review Council in 2025, focusing on disaster response, recovery, mitigation, and reforming FEMA's policies and operations.

This captures feedback from a wide range of stakeholders, including state and local emergency management officials, tribal leaders, nonprofit organizations, private sector representatives, and community groups. The views expressed during the listening sessions are not endorsed by the Council but were taken into consideration during deliberations on recommendations.

Below is an analysis of the themes, challenges, and recommendations from the sessions:

**Themes Across Sessions**

70

- **FEMA Reform and Streamlining Processes:** Across all sessions, participants emphasized the need to simplify FEMA's processes, including grant applications, disaster declarations, and recovery programs. The Public Assistance flow chart, often referred to as "The Snake," and Environmental and Historic Preservation (EHP) reviews were repeatedly criticized for causing delays. Recommendations included decentralizing decision-making to FEMA regional offices, allowing parallel processing of project steps, and adopting technology to modernize operations.

- **Federal, State, and Local Roles:** There was strong support for empowering SLTT governments to lead disaster response and recovery efforts, with FEMA providing strategic oversight and technical assistance. Many participants advocated for a shift from FEMA's operational role to one of support and funding.

- **Funding and Grant Programs:** Emergency Management Performance Grants (EMPG), Hazard Mitigation Grant Program (HMGP), and Building Resilient Infrastructure and Communities (BRIC) were identified as critical funding mechanisms. Participants called for increased funding, streamlined application processes, and greater flexibility in how funds are used. Block grants and/or direct funding were proposed as a potential solution to reduce bureaucracy, but concerns about implementation challenges were noted.

- **Mitigation and Resilience:** Investment in pre-disaster mitigation and resilient infrastructure was emphasized as a cost-effective way to reduce disaster impacts. Participants highlighted the importance of incentivizing communities to adopt stronger building codes and forward-looking plans.

- **Fairness and Vulnerable Populations:** Fairness was a recurring theme, with calls to address systemic disparities faced by small, rural, and underserved communities. Vulnerable populations, including renters, low-income families, and tribal nations, were identified as needing tailored support.

- **Technology and Innovation:** Leveraging technology, such as AI, drones, databases, and geospatial tools, was recommended to improve damage assessments, streamline grant processes, and enhance situational awareness. Real-time data sharing and modernized systems were seen as critical to improving efficiency.

- **Tribal Sovereignty and Representation:** Tribal leaders emphasized the importance of respecting tribal sovereignty and maintaining direct government-to-government relationships. Unique challenges faced by tribal nations, such as geographic isolation and cultural impacts, were highlighted as areas requiring tailored solutions.

- **Public-Private and Private Nonprofit Partnerships:** Participants advocated for greater collaboration with private sector and nonprofit organizations, which were recognized as critical partners in disaster response and recovery. Pre-positioning contracts and integrating these entities into disaster plans were recommended.

## Challenges Identified

- **Bureaucratic Complexity:** FEMA's processes were repeatedly described as overly complex, slow, and resource-intensive, creating barriers for smaller jurisdictions and tribal nations with limited capacity.

- **Delays in Funding and Reimbursements:** Cash flow challenges and delays in FEMA reimbursements were identified as major obstacles for local governments and tribes, particularly smaller entities.

- **Workforce and Capacity Constraints:** High turnover among FEMA staff and limited capacity at the local level hindered effective disaster response and recovery.

- **Insurance and Risk Management:** Rising insurance costs and underinsurance were noted as significant barriers to recovery. Concerns about FEMA's Risk Rating 2.0 system and its impact on flood insurance premiums were highlighted.

- **Environmental and Historic Preservation (EHP) Reviews:** EHP reviews were identified as a major bottleneck, delaying critical recovery projects. Participants called for streamlining these reviews and allowing local governments to conduct them.

**Recommendations**

- **Streamlining FEMA Processes:** (1) Simplify disaster declarations, grant applications, and project reviews. (2) Decentralize decision-making to FEMA regional offices and empower local governments to lead recovery efforts. (3) Have a single federal family individual assistance application.

- **Enhancing Funding Mechanisms:** (1) Increase funding for EMPG, HMGP, and BRIC programs. (2) Transition to block grants for disaster recovery funding, with safeguards to ensure fair distribution.

- **Investing in Mitigation and Resilience:** (1) Prioritize funding for pre-disaster mitigation and resilient infrastructure. (2) Incentivize communities to adopt stronger building codes and forward-looking plans.

- **Addressing Fairness:** (1) Tailor FEMA programs to address the unique needs of small, rural, and underserved communities. (2) Ensure fair access to resources for tribal nations and vulnerable populations.

- **Leveraging Technology:** (1) Adopt modern technology to improve damage assessments, streamline grant processes, and enhance situational awareness. (2) Invest in real-time data sharing and coordination platforms.

- **Strengthening Tribal Engagement:** (1) Respect tribal sovereignty and maintain direct government-to-government relationships. (2) Provide predictable, formula-driven funding allocations directly to tribes.

- **Building Local Capacity:** (1) Invest in training, technical assistance, and staffing for local emergency management agencies through federal standards delivered by states. (2) Expand FEMA's training programs and support workforce development.

- **Public-Private and Private Nonprofit Partnerships:** (1) Integrate private sector and nonprofit organizations into disaster planning and operations. (2) Pre-position contracts and leverage private sector expertise in recovery efforts.

**Feedback Mechanism #3 Analysis of Public Comments Submitted (11,708 Responses):**

On March 26, 2025, the FEMA Review Council published Federal Register Notice DHS-2025-0013 to provide the general public an opportunity to provide input on how to reform FEMA as it

stands today. The Council received 11,708 responses to this notice, underscoring the critical role FEMA plays in disaster management. The public comments submitted in response to the FEMA Review Council's request for feedback under Federal Register Notice DHS-2025-0013 reflect a broad spectrum of perspectives, experiences, and recommendations. These comments underscore the critical role FEMA plays in disaster response and recovery and provide actionable insights for reforming and strengthening the agency's operations. The views expressed in the public comments are not endorsed by the Council but were taken into consideration during deliberations on recommendations. Below is a thematic analysis of the feedback:

**FEMA's Role and Structure**

o **Insights**: FEMA is widely recognized as an essential agency in disaster response and recovery, particularly in coordinating multi-state disasters and providing resources to communities. Respondents emphasized the need for FEMA to focus on preparedness, soft skills training, and fostering strong relationships with local communities. Federal coordination and clear communication about FEMA's capabilities and limitations are seen as critical to its success. In addition, there was lack of clarity regarding which Individual Assistance or Public Assistance programs will be available.

o **Recommendations**: (1) Improve internal feedback mechanisms to ensure continuous improvement. (2) Invest in training programs that emphasize diplomacy, cultural competence, and community engagement.

**State and Federal Coordination**

o **Insights**: The Council of Governors submitted a detailed letter advocating for FEMA reforms, emphasizing that states cannot manage catastrophic disasters alone. Governors highlighted the importance of federal support in disaster response and recovery, particularly in standardizing and expanding Individual Assistance programs and improving interagency coordination.

o **Recommendations**: (1) Create a unified federal disaster assistance application to streamline survivor access to aid. (2) Ensure consistent funding for FEMA programs to support state and local recovery efforts. (3) Leverage state and local expertise to expedite recovery and improve efficiency.

**Strengthening FEMA's Capabilities**

o **Insights**: Respondents overwhelmingly opposed dismantling or downsizing FEMA, citing the increasing frequency and severity of disasters. FEMA's support was viewed as indispensable for states and communities, which lack the capacity to handle large-scale disasters independently. The public also said timely aid and resources provided by FEMA are critical to helping disaster survivors rebuild their communities and mitigate future risks.

o **Recommendations**: (1) Maintain and enhance FEMA's capabilities to better serve communities nationwide. (2) Focus on improving the speed and efficiency of aid delivery to ensure disaster survivors receive timely support.

**Community Feedback and Support**

o **Insights:** Community members, particularly in disaster-prone areas like Houston, Texas, shared both positive and negative experiences with FEMA. While FEMA's support was appreciated, concerns were raised about inconsistencies in assistance, lengthy wait times, and

communication challenges. Issues such as disparities in aid distribution, language barriers, and difficulties with the application process were frequently noted.

o **Recommendations:** (1) Standardize assistance programs to ensure fair and consistent distribution of aid. (2) Enhance training for FEMA staff to improve communication skills and cultural awareness. (3) Increase transparency in FEMA's processes to foster trust and confidence among disaster survivors.

**Diverse Regional and Stakeholder Perspectives**

o **Insights**: Feedback from various regions and stakeholders highlighted unique challenges and recommendations. Puerto Rico called for mobile outreach, alternative proof of ownership, and improved communication. Tribal Nations praised FEMA's support but criticized some disaster reservists' behavior. Gulf Coast areas urged restoration of FEMA funding and staffing. Nevada emphasized the importance of the National Flood Insurance Program and called for reforms. Florida highlighted positive experiences with FEMA during Hurricane Wilma but stressed the need for continued funding.

o **Recommendations**: (1) Tailor FEMA's programs to address regional and stakeholder-specific needs. (2) Streamline grant processes and ensure equitable resource allocation. (3) Invest in better training for FEMA personnel to improve efficiency and professionalism (soft skill development).

**Protecting FEMA's Mission**

o **Insights**: Respondents overwhelmingly emphasized the need to protect and strengthen FEMA rather than dismantle or weaken it. Shifting the burden of disaster response to states was viewed as less effective and potentially harmful to local communities. Respondents also stressed that FEMA reforms should be guided by science, equity, and the experiences of disaster survivors, rather than political ideology.

o **Recommendations**: (1) Oppose efforts to weaken FEMA and ensure reforms prioritize the needs of disaster survivors. (2) Strengthen FEMA's capacity to respond to increasingly frequent and severe disasters. (3) Ensure reforms are informed by data, best practices, and input from affected communities.

The 11,708 public comments received reflect a strong consensus on the importance of FEMA's role in disaster response and recovery. While respondents identified areas for improvement, including streamlining processes, enhancing communication, and addressing equity, there was widespread support for maintaining and strengthening FEMA's capabilities. The feedback highlighted the need for FEMA to remain a robust and responsive agency that can effectively support communities during their most vulnerable times.



# Exhibit C



# The President's Council to Assess the Federal Emergency Management Agency

## Final Report Overview

1

# Discussion Points

**The Council's Task**

**Guiding Principles**

**Listening to the Nation**

**Key Recommendations**

**Looking Forward**



2

# The Council's Task: Executive Order 14180

*President Donald J. Trump appointed ten Council members with two Co-Chairs, Secretary Mullin and Secretary Hegseth, to conduct a full-scale review to recommend to the President improvements or structural changes to promote the national interest and enable national resilience.*

| | | |
|---|---|---|
| Advise…on the existing ability of FEMA to capably and impartially address disasters | A comparison of the FEMA responses with State, Local, and private sector responses | Traditional role of States and their coordination with the Federal Government |
| Shall advise the President on all recommended changes related to FEMA to best serve the national interest | An account of the commentary and debate about the role and operation of FEMA in our Federal system | An evaluation of whether FEMA can serve its functions as a support agency, providing supplemental Federal Assistance |
| Assessment of the adequacy of FEMA's response to disasters during previous 4 years, including sufficiency of staffing | Historical background of other periods in the Nation's history…methods by which disaster aid and relief were then provided | Other recommended improvements to FEMA in the current statutory structure |

On January 24, 2025, President Donald J. Trump established the Federal Emergency Management Agency Review Council (FEMA Review Council) through Executive Order 14180, *Council to Assess the Federal Emergency Management Agency*.

# Listening to the Nation

*In order to meet the mandate established by the President, for over a year the Council was deliberate in its actions, devoting significant time to engage across jurisdictional levels and with various entities to hear about their experiences with FEMA during and after disasters.*



**11,708**

Public comments received and considered by the Council



**1,387**

Nationwide survey respondents that represented emergency management stakeholders across SLTT and non-governmental partners



**16**

In-person and virtual listening sessions that engaged all 50 states, as well as local, tribal, and territorial stakeholders



This robust engagement process has provided the Council with invaluable insights into the challenges and opportunities facing FEMA's operations. The feedback serves as a cornerstone for shaping the future of FEMA's programs, ensuring that reforms are informed by the lived experiences of those directly impacted by disasters and those responsible for managing emergency response and recovery efforts.

4

# Guiding Principles

After an exhaustive national review of the nation's ability to prepare for, respond to, and recover from natural disasters, the Council developed five guiding principles for reform:

**Council Guiding Principles**

 **Return** leadership for emergency response and recovery to the States, Tribes, and Territories

 **Reaffirm** that individual American preparedness is foundational to disaster readiness

 **Accelerate** federal assistance dollars to help Americans **recover from their worst day**

 **Maximize** the transparency and efficiency of federal and SLTT dollars spent in emergency management

**Boldly transform** FEMA into a lean organization that puts **Americans first**



5

# Key Recommendations

*With the aforementioned guiding principles as a framework, the Council's report provides ten key recommendations that will boldly transform FEMA as an agency as well as address the return of leadership and responsibility for disaster management to the States, Local Communities, Tribes, and Territories.*

1 Equip SLTT to lead disaster response with the federal government in a supporting role

2 Enhance critical federal programs & resources to support communities

3 Realign the criteria for federal disaster assistance

4 Replace the Hazard Mitigation Grant Program with a two-phase funding structure

5 Streamline the Individual Assistance program into a single direct payment program

6 Reform the Public Assistance program to provide direct funding

7 Reform the National Flood Insurance Program for financial stability and risk resilience

8 Maximize every dollar spent by reducing administrative costs

9 Revitalize A Unified National Network for Partnership

10 A Transformed Agency

6

# Equip SLTT to Lead Disaster Response with the Federal Government in a Supporting Role

*Reorienting the National Preparedness System to empower SLTT governments to manage the mitigation, response, and recovery of disasters effectively will return the federal role from leading to supporting.*

## Lack of a national standard for incident response and recovery

- Encourage adoption of national capability standards
- Incentivize building scalable training resources
- Professionalize emergency management to promote professional development
- Focus on catastrophic planning and promote a common approach to exercise standards

## Limited ability to share and coordinate resources

- Revitalize and promote the use of the Unified Resource Catalog
- Refocus SLTT grant investment on mission-ready teams, capabilities, and infrastructure
- Enhance and improve upon the existing credentialing framework
- Promote the integration of additional partners including volunteer/faith-based
- Incentivize investments in interoperable systems for communication and data sharing



A truly resilient nation depends on seamless collaboration across government, private industry, and nonprofit partners. Empowering SLTT governments to take the lead in managing disasters is essential for a resilient national preparedness strategy.

7

# Enhance Critical Federal Programs & Resources to Support Communities

*The Council recommends that the future agency preserve and modernize the federal government's capability to support state and local partners in lifesaving and life-sustaining efforts.*

- Sustain Core Standards to support effective and interoperable teams
- Integrate Emerging Technology
- Improve Federal Coordination
- Leverage Supply Chains for National Security
- Build Capacity for Emerging Threats
- Continuity of Government



The agency maintains an arsenal of dual-use capabilities, regional offices, incident management teams, and prepositioned logistic systems or programs and the Disaster Relief Fund to ensure the American people are resilient in the face of any threat, whether natural or man-made. Therefore, sustaining and resourcing this mission in the transformed agency is vital to public safety, economic stability, and national resilience.

8

# Realign the Criteria for Federal Disaster Assistance

*Federal assistance should only be reserved for truly significant events that exceed SLTT capacity and capability. Therefore, common criteria should be established on how to evaluate when this occurs. This includes a reset of the Per Capita Indicator (PCI) threshold using the Consumer Price Index to account for historical inflation. The current disaster declarations process for federal assistance does not adequately account for SLTT capacity and, therefore, is inconsistent with legislative intent and disincentivizes SLTT investment in disaster preparedness.*










## Reassess

Review existing methodologies to realign criteria to  reduce federal disaster declarations, leading to a rebalancing of state and federal responsibilities

## Simplify

Eliminate the cost-to-capacity ratio and replace with an evaluation based on targeted factors like primary residence damage and other community impacts

## Transparent

Utilize clear methodologies that help Americans easily understand federal responsibilities

The transformed agency should implement common-sense approaches to realign criteria for federal disaster declaration thresholds to return responsibility to the States, Tribes, and Territories.

9

# Replace the Hazard Mitigation Grant Program with a Two-Phase Funding Structure

*The Council proposes a state-managed program where project priorities are nationally set and environmental reviews are handled locally, with two phases of funding.*



## Rapid Mitigation

Within the first 30 days provide up to 5% of the federal government contribution for the disaster to facilitate immediate residential mitigation to primary residences and communities impacted by the event or in other high-risk zones



## Strategic Mitigation

Within the first six months provide up to the remaining 10% of the federal government contribution to improve the performance of the NFIP by mitigating properties and critical infrastructure based on Federal Administration priorities

For mitigation to work, the Council recommends states take on greater program management responsibility and continue to develop an improved and comprehensive state hazard mitigation process that identifies projects that are immediately implementable.

10

# Accelerating Federal Assistance

*The transformed agency must accelerate federal assistance dollars to help Americans recover from their worst day.*



By moving beyond slow and reactive traditional assistance programs, the new programs leverage flat-rate reimbursements for individuals, SLTT autonomy, near-immediate funding, and transparent auditing to reduce bureaucracy while creating faster, more effective, and more accountable systems for all Americans which will also remove FEMA from long-term recovery burdens.

11

Case 3:25-cv-03698-SI    Document 414    Filed 05/30/26    Page 109 of 129

# Streamline the Individual Assistance Program into a Single Direct Payment Program

*Swift support for emergency sheltering with a faster amount of monetary assistance would directly and positively impact affected Americans. Consolidating assistance into a single payment would provide all Americans clear, specific information on what assistance they would receive from the federal government in the event of a catastrophic loss.*



## Single Payment

Consolidate existing programs into one direct payment to survivors whose homes are uninhabitable after a disaster.



## Focus on Emergency Housing

Focus the future agency's role on emergency and temporary housing (mass care/sheltering and temporary housing/rental assistance) instead of long-term housing, and only for Americans whose homes are uninhabitable (not those who experience minor damage).



These reforms will provide quick, cost-effective, and transparent support to disaster survivors, within the limits of federal funding, as well as reduce administrative overhead and clarify federal agency responsibilities. Further, there should be an option for this to be a state-managed program if individual states wish to do so.

12

# Reform the Public Assistance Program to Provide Direct Funding

*The Council proposes a modern and agile framework that converts the existing PA program into a direct funding model that leverages pre-defined objective event criteria and cost estimates to accelerate and streamline recovery.*





## Parametric Threshold

Utilizing a parametric threshold, funding would be released to states within 30 days of a major federal disaster declaration. This eliminates the need for time consuming loss assessments and quickly provides a financial backstop and cashflow for rapid response and recovery.



## Accountability

Accountability would be maintained through a two-phase audit process: a one-time validation of costs within one year and a final program closeout. All federal funding provided in this program must be expended or returned within eight years.

The new program offers a modern solution to the challenges of post-disaster recovery. By moving beyond the slow and reactive traditional PA program, it leverages States, Tribes, and Territories' autonomy, parametric funding, and transparent auditing to create a faster, more effective, and more accountable system for all Americans affected by disaster.

13

# Reform the National Flood Insurance Program for Financial Stability and Risk Resilience

*The Council recommends a comprehensive reform plan centered on a strategic shift toward a primary role for the private market, with the goal of fostering a more resilient and financially stable flood risk management system.*



Empower communities with stronger land-use policies

Engage State insurance commissioners

Modernize risk data; continue risk rating 2.0 and revise flood maps

Reform NFIP

Incentivize the launch of a 'take-out' program

Implement risk-based pricing and actual costs

Revise 'Write Your Own' compensation

These changes are expected to accelerate disaster recovery, reduce the federal government's financial burden, send clear financial signals, and provide predictable financial outcomes for homeowners, ultimately leading to a more prepared nation.

# Maximize Every Dollar Spent by Reducing Administrative Costs

*To put Americans first, it is vital to maximize the efficiency of federal and SLTT dollars spent in emergency management.*



**Increased** percentage of each federal dollar directly impacting affected Americans achieved through implemented efficiencies

**Streamlined** direct federal assistance programs

**Reduced** need for federal employees to deploy and/or manage direct programs

**Decreased** administrative costs for FSLTT

Highlighted reforms will reduce administrative and overhead costs, which preserves more of each federal or SLTT dollar to be spent on emergency management. Federal assistance reforms will create significant efficiencies that will generate upfront savings and increase the impact of each dollar distributed by accelerating the payments to enable faster recoveries.

15

# Revitalize A Unified National Network for Partnership

The new framework would formalize and streamline coordination between government agencies, critical private-sector partners, and nonprofit organizations.

## Whole Community Approach

Disasters demand a unified national effort that leverages the strengths of all sectors

## Public-Private Coordination

Formalize and streamline coordination between government agencies, critical private-sector partners, and nonprofit organizations.

## Shared Information

Develop and implement modern technology and communication protocols that ensure shared data and situational awareness among all partners



*The transformed agency would address the existing gap in the emergency management landscape by returning to a network that enables government, private industry, faith-based, and non-profit partners to build toward a shared capability and integrated resources.*

16

# A Transformed Agency

*To address these shortcomings and national challenges in emergency management, transform FEMA into a new lean agency.*



**Phased Approach**

This transformation should be conducted over a 2-3 year phased approach.



**Review of Requirements**

Conduct a strategic review to determine appropriate staffing levels against mission requirements.



**Empower States**

States will assume a greater role in managing disasters from preparedness to recovery, utilizing direct federal funding mechanisms.

**Shift Training**

While the future agency must establish and maintain national standards for disaster response, the direct execution of training should be shifted to the regional and state level.

The transformation is an imperative step toward restoring the agency's effectiveness, accountability, and public trust. By implementing a bold restructuring plan—centered on reviewing mission requirements, streamlining operations, eliminating redundancies, and empowering state partners—the federal government can ensure a more immediate, effective, and efficient response to disasters.

17

# Implementation Requirements by Recommendation

*While Executive Orders may be used to make some of the proposed changes, the Council advocates for legislative action to ensure a systemic and sustained transformation of the current approach to disaster management.*



| Recommendation | Minimum Action Required to Implement | | | |
|---|---|---|---|---|
| | Policy | Legislation | Regulation | Executive Order |
| #1 Equip SLTT to Lead | ✓ | | | |
| #2 Enhance Critical Programs | ✓ | | ✓ | |
| #3 Realign Criteria for Assistance | | | ✓ | |
| #4 Replace HMGP | | ✓ | | |
| #5 Streamline IA | | ✓ | | |
| #6 Reform PA | | ✓ | | |
| #7 Reform NFIP | | ✓ | | |
| #8 Reduce Admin Costs | | | | ✓ |
| #9 Network for Partnership | ✓ | | | |
| #10 Transform FEMA | | ✓ | | ✓ |



It is important to note that all recommendations requiring legislative action will also need to be accompanied by regulations, but since they cannot be accomplished through regulation alone that action is not checked.

18

# A more resilient AMERICA

These recommendations will lead to a more resilient *AMERICA*:

- **A**ccelerate disaster response and recovery

- **M**odernize systems and technology for greater efficiency

- **E**mpower local and state governments with better resources and tools

- **R**educe administrative costs and federal burden

- **I**mprove coordination across government, private sector, and nonprofits

- **C**ultivate public trust through transparency and accountability

- **A**mplify resilience for rural communities and critical infrastructure



These reforms aim to create a more resilient and prepared nation by ensuring that disaster response and recovery efforts are efficient, cost-effective, and locally executed. Such reforms also ensure that federal support will be available when significant events occur that overwhelm local systems.

19

# Exhibit D



ANDREW R. GARBARINO, NEW YORK
CHAIRMAN

BENNIE G. THOMPSON, MISSISSIPPI
RANKING MEMBER

**One Hundred Nineteenth Congress**
**Committee on Homeland Security**
**U.S. House of Representatives**
**Washington, DC 20515**

May 14, 2026

The Honorable Markwayne Mullin
Secretary
U.S. Department of Homeland Security
Washington, DC 20528

Mr. Robert J. Fenton, Jr.
Senior Official Performing the Duties of the Administrator
Federal Emergency Management Agency
500 C Street SW
Washington, DC 20024

Dear Secretary Mullin and Mr. Fenton:

As the 2026 hurricane season approaches, we write to express our serious and growing alarm over the Federal Emergency Management Agency's (FEMA) deteriorating readiness to protect the American people. The Trump administration spent much of the past year systematically weakening FEMA—forcing out thousands of staff, halting critical preparedness programs, and stalling up to $17 billion in disaster relief funding.[1] Hurricane season begins June 1st, and by every available measure FEMA is less prepared to respond than it has been in a generation.

The Trump administration has taken sweeping steps to hollow out our Nation's disaster preparedness infrastructure. In April 2025, FEMA announced it was ending the Building Resilient Infrastructure and Communities program, calling it "wasteful and ineffective" and canceling billions of dollars in projects for communities trying to improve their disaster resilience.[2] FEMA also withdrew Flood Mitigation Assistance funding for fiscal year 2025.[3] Eliminating the two largest Federal programs dedicated to pre-disaster mitigation—both of which enjoyed broad bipartisan support—is not eliminating "waste." It is simply transferring vulnerabilities directly to

---

[1] Scott Dance, *Extra Scrutiny of FEMA Aid to States Has Created a $17 Billion Bottleneck,* NY TIMES (Jan. 27, 2026), https://www.nytimes.com/2026/01/27/climate/fema-aid-kristi-noem.html.
[2] *FEMA Ends Wasteful, Politicized Grant Program, Returning Agency to Core Mission of Helping Americans Recovering from Natural Disasters,* FEMA (Apr. 4, 2025), https://web.archive.org/web/20250426001312/https://www.fema.gov/press-release/20250404/fema-ends-wasteful-politicized-grant-program-returning-agency-core-mission.
[3] *FEMA Is Eliminating Hazard Mitigation Programs, Leaving Americans Nationwide at Risk as Disasters Worsen,* URBAN INST. (Apr. 18, 2025), https://www.urban.org/urban-wire/fema-eliminating-hazard-mitigation-programs-leaving-americans-nationwide-risk-disasters-worsen.

The Honorable Markwayne Mullin
Mr. Robert J. Fenton, Jr.
Page 2

States, Tribes, territories, and localities, most of which do not have the resources to replicate these programs. Though FEMA recently restarted aspects of these programs in response to litigation, there is no indication that FEMA intends to continue these programs long term.

The Trump administration has simultaneously gutted FEMA's workforce, including at the highest levels. Nearly half of FEMA's top 38 leadership positions are currently vacant.[4] For nearly a year and a half, President Trump failed to nominate a FEMA Administrator, leaving the Agency without permanent, qualified leadership. The Agency's most recently departed leader, Ms. Karen Evans, was assigned the duties of both Administrator and Chief of Staff. However, reportedly, Ms. Evans was not performing those jobs; a contractor named Kara Voorhies required Evans to route decisions through her.[5] For more than a year, Voorhies acted as FEMA's "shadow Administrator," making decisions regarding FEMA's budget, grant and contract funding, workforce, and other matters that should only be the purview of Federal Government employees.[6]

The Trump administration has similarly gutted FEMA's on-the-ground workforce, virtually guaranteeing that the Agency will not be able to adequately respond to major incidents. Despite FEMA's longstanding severe staffing shortage,[7] the Trump administration has overseen the departure of over 5,000 FEMA employees since January 2025.[8] Last year, these cuts had severe implications for hurricane season readiness. On June 1, 2025, FEMA had only 12 percent of its incident management workforce available to respond to disasters—much less than in prior years.[9] Recent reports indicate that the Department of Homeland Security (DHS) was planning to reduce FEMA's remaining workforce by as much as half, which would virtually guarantee that FEMA will begin the 2026 hurricane season with a record low number of employees.[10] President Trump's hand-picked FEMA Review Council also recently recommended "reducing" FEMA's workforce.[11]

DHS's interference in FEMA's ability to function has not been limited to workforce cuts. Former Secretary Kristi Noem's policy of reviewing contracts and grants over $100,000 caused an unprecedented backlog of funding and, in many cases, the expiration of vital contracts. For example, FEMA officials reportedly spent months trying to renew the contract for HURREVAC— a hurricane evacuation planning tool used by tens of thousands of communities to calculate life-

---

[4] *FEMA Offices & Leadership,* (last updated Feb. 10, 2026), https://www.fema.gov/about/organization/offices-leadership.

[5] Gabe Cohen, *'Shadow administrator' at FEMA part of investigation by DHS internal watchdog, sources say*, CNN (Mar. 29, 2026), https://edition.cnn.com/2026/03/29/politics/fema-dhs-investigation-watchdog-kara-voorhies.

[6] Brianna Sacks et al., *What spending probes at DHS reveal about Kristi Noem's time in office*, NY TIMES (Apr. 7, 2026), https://www.washingtonpost.com/immigration/2026/04/05/noem-trump-dhs-fema-contracts/.

[7] Disaster Assistance High-Risk Series: Federal Response Workforce Readiness (GAO-25-108598), U.S. GOV'T ACCOUNTABILITY OFF. (Sept. 2025), https://www.gao.gov/assets/gao-25-108598.pdf.

[8] Email from FEMA on file with the Committee.

[9] *Id.*

[10] Brianna Sacks, *Emails outline potential cuts affecting thousands of FEMA disaster responders*, WASH. POST (Jan. 5, 2026), https://www.washingtonpost.com/weather/2026/01/05/fema-disaster-core-cuts-dhs-emails/ .

[11] DHS, *FEMA Review Council Final Report* (May 7, 2026), https://www.dhs.gov/sites/default/files/2026-05/26_0507_fema%20review%20council_final%20report.pdf.

The Honorable Markwayne Mullin
Mr. Robert J. Fenton, Jr.
Page 3

or-death evacuation timing—but were stymied by Noem's approval process.[12] This process also reportedly delayed life-saving search-and-rescue teams by three days after historic flooding struck Central Texas.[13] The floods ultimately claimed the lives of over 130 people, including 36 children. Though Secretary Mullin rescinded this $100,000 review policy, the backlog of lapsed contracts and the damaged relationships with contractors will have lasting consequences.

Given the life-or-death consequences of decisions about FEMA funding, perhaps most concerning is the administration's unprecedented use of disaster relief as a political instrument. Under the Trump administration, Democratic-led States have seen their disaster aid requests approved at a rate of just 23 percent—compared to 89 percent for Republican-led States.[14] In six cases, President Trump denied disaster assistance for Democratic-led States even after FEMA's own on-the-ground inspections documented that the damage met the financial threshold for Federal assistance.[15] And when the administration recently began releasing a portion of backlogged disaster funding, it excluded California, Illinois, Minnesota, and Colorado— States whose governors President Trump has clashed with.[16]

Forecasters project 11 to 16 named storms during the 2026 Atlantic hurricane season, including four to seven hurricanes.[17] Regardless of seasonal forecasts, it only takes one storm to produce catastrophic loss of life and property. Americans in hurricane-prone communities deserve a FEMA that is fully staffed, operationally ready, and nonpartisan. By every measure, they do not have that today.

We therefore urge DHS and FEMA to immediately release any remaining withheld disaster relief funding; restore the HURREVAC contract and any other contracts needed to minimize the impacts of hurricanes; reverse workforce reductions and fill all vacant leadership positions with qualified, competent individuals; depoliticize the disaster declaration process; and provide Congress with a full and transparent accounting of the Agency's current readiness posture. The American people cannot wait.

---

[12] Andrew Freedman, *Emergency planners around the country are about to lose access to a critical hurricane evacuation planning tool*, CNN (Mar. 25, 2026), https://www.cnn.com/2026/03/24/weather/hurricane-evacuation-planning-lapse-fema.

[13] Gabe Cohen and Michael Williams, *FEMA's response to Texas flood slowed by Noem's cost controls*, CNN (July 10, 2025), https://www.cnn.com/2025/07/09/politics/fema-texas-flood-noem.

[14] Thomas Frank, *It's 3 times harder for blue states to get disaster funding under Trump*, POLITICO (Mar. 23, 2026), https://www.politico.com/news/2026/03/23/trump-denies-disaster-aid-for-democratic-led-states-00831199.

[15] Id.

[16] Gabe Cohen, *FEMA Disaster Aid: Trump Is About to Release Billions in Aid, but Several Blue States Won't Be Included*, CNN (Feb. 26, 2026), https://www.cnn.com/2026/02/26/politics/disaster-aid-fema-states-trump-shutdown.

[17] Brian Lada, *Atlantic Hurricane Season Forecast 2026: 11–16 Named Storms Predicted by AccuWeather*, ACCUWEATHER (Mar. 25, 2026), https://www.accuweather.com/en/hurricane/atlantic-hurricane-season-forecast-2026-11-16-named-storms-predicted-by-accuweather/1875776.

The Honorable Markwayne Mullin
Mr. Robert J. Fenton, Jr.
Page 4

Sincerely,

Bennie G. Thompson
Ranking Member
Committee on Homeland Security

Timothy M. Kennedy
Ranking Member
Subcommittee on Emergency Management
and Technology

cc: The Honorable Andrew R. Garbarino
    Chairman, Committee on Homeland Security

# Exhibit E



# TEXAS HOUSE of REPRESENTATIVES

# JON E. ROSENTHAL



## DISTRICT 135

The Honorable Greg Abbott
Governor of Texas
P.O. Box 12428
Austin, Texas 78711-2428

May 21, 2026

Dear Governor Abbott,

Nearly a year ago, 135 Texans lost their lives in one of the most tragic  disasters our state has seen in decades, the July 4, 2025 Kerr County floods.  While FEMA's acting administrator was unreachable for nearly 24 hours, survivors. called for help and couldn't get through. Families applied for assistance and were turned away. And yet, last month, you joined the President's Federal Emergency Management Agency (FEMA) Review Council designed to gut FEMA as an agency.

This will be particularly disastrous for Texans as we rely on FEMA to support disaster relief and recovery efforts. FEMA provides financial assistance and temporary housing for displaced survivors, funds the repair of public infrastructure, and offers hazard mitigation grants to rebuild communities more resiliently. .

**Governor Abbott, you are putting politics over the lives of Texans — and it needs to stop.**

Did you forget that Texas receives about 1.8% of its state budget from FEMA? In fact, Texas is one of the largest beneficiaries of FEMA programs, receiving an average of $1.4 billion per year in federal disaster aid since 2015.

Texas already has a $44 billion flood infrastructure gap. With 2.1 million properties facing flooding in the next 30 years and Texas accounting for over 150,000 National Flood Insurance Program (NFIP) claims already, investing in flooding-resistant infrastructure and a strong insurance program is more important to Texans than ever. But the FEMA Review Council suggested shrinking the program even as hurricane season approaches.

The consequences of further dismantling FEMA would fall squarely on Texas. Emergency management experts have warned that replacing FEMA with state-run programs would multiply costs by 50 times. Because Texas must balance its budget, a major disaster without federal support would force devastating cuts to schools, public safety, healthcare, and roads.

Governor Abbott, you have sought FEMA assistance for Texas time and again — after Winter Storm Uri, after the Derecho, after Hurricane Beryl, Hurricane Harvey, and disaster after disaster. You understand the consequences when FEMA fails to show up. When floods hit Texas last summer, FEMA missed 58% of emergency calls in the wake of the

**DISTRICT OFFICE**
8440 Greenhouse Rd., Ste. #A104
Cypress, Texas 77433

**CAPITOL OFFICE**
P.O. Box 12910
Austin, Texas 78711-2910

Phone (512) 463-0722
jon.rosenthal@house.texas.gov



# JON E. ROSENTHAL

☆

### DISTRICT 135

floods—our neighbors, friends, and family were ignored by the agency meant to support them through the disaster, while water rushed into their homes and streets.

The Trump administration has cycled through three FEMA administrators in just months, gutted its workforce from 29,000 to 23,000 employees, canceled key mitigation grant programs, and left Kerr County — which had already twice been denied funding for a flood warning system — completely unprotected when the floods came.

Research shows that every $1 invested in pre-disaster mitigation saves up to $13 in recovery costs. Texas has already left $225 million in federal mitigation grants on the table over the past decade. We cannot afford to keep making this mistake.

The people of Texas did not send you to Austin to dismantle a lifeline they depend on. I am calling on you to withdraw your support from the FEMA Review Council's recommendations, to publicly oppose any further cuts to the FEMA's workforce and programs, and to demand that the federal government fulfill its obligation to Texans before the next disaster strikes. Most importantly, I'm calling on you to stop playing politics with Texans' lives.

Sincerely,



Representative Jon Rosenthal, District 135

**DISTRICT OFFICE**
8440 GREENHOUSE RD., STE. #A104
CYPRESS, TEXAS 77433

**CAPITOL OFFICE**
P.O. BOX 12910
AUSTIN, TEXAS 78711-2910

PHONE (512) 463-0722
JON.ROSENTHAL@HOUSE.TEXAS.GOV

# Exhibit F

**Sent:** Tuesday, April 28, 2026 6:09 PM
**To:** FEMA-ALL <FEMA-ALL@fema.dhs.gov>
**Subject:** Preparing Personnel for Hurricane Season: Workforce and Readiness Update



April 28, 2026

Dear FEMA Team,

As we approach the start of the Atlantic hurricane season on June 1, I want to first thank you for your continued dedication, especially as we navigate the challenges of an ongoing funding lapse that has now lasted more than 60 days. Your professionalism and resilience keep us ready to help communities in need.

With that in mind, I'm providing an update on several important actions we are taking to strengthen FEMA's readiness for the upcoming hurricane season.

Under Secretary Markwayne Mullin's leadership, we are focusing on stabilizing our workforce and embracing a "Ready State" philosophy, so FEMA can respond swiftly and effectively to any disaster. Hurricanes and other incidents can strike with little warning, requiring a rapid response from our agency. Our readiness directly impacts our ability to help Americans in need, and every employee plays a critical role in meeting these challenges.

To promote transparency and keep everyone informed, we are sharing an overview of the steps we are taking to strengthen and stabilize our Stafford workforce and ensure it is suited to meet the mission requirements. Over the coming days and weeks, you will see several actions taking place:

- Eligible Reservists will be renewed for two-year appointments.

- CORE staff with initial not-to-exceed (NTE) dates between January through May 2026 who were previously extended for 90 days **may** be reappointed for up to one year, depending on performance, availability of work, and funding.

- CORE staff with expiring appointments in June 2026 and beyond will undergo a functional review with supervisors, which will follow the prescribed assessment requirements and mission analysis. These CORE staff **may** have the opportunity for a one-year appointment.

These actions are about providing stability and support so we can continue to serve the American people when they need us most. Together, we are establishing accountability and high performance as the new gold standard for the American Emergency Manager. We are grateful for your dedication and flexibility as we take these steps to strengthen our team and prepare for hurricane season.

As you look ahead and lead your teams, please take time to review the following resources and reminders:

## Prepare Yourself

Deployment readiness is critical. All employees are expected to review and update their availability and contact information in the DTS Responder Portal. Each of us is responsible for maintaining our availability status in DTS and should ensure our availability is accurate and up to date. Once updated in DTS, deployment may occur without supervisory approval. You should also ensure you are meeting your performance goals aligned with the "Every Employee is an Emergency Manager" memorandum.

Additionally, confirm your FEMA Travel Card is active, verify that your personal identification is not expiring soon, and prepare a go-bag with toiletries, extra clothes, medicine, snacks, and other essentials you may need. Refer to the Travel Toolbox for additional information about FEMA travel.

We also encourage you to have conversations with your household about the possibility of deployment for extended periods or working longer hours to support the FEMA mission. The FEMA Responder Mobilization SharePoint page offers resources and events to help manage stress, work-life balance, and other challenges you may experience.

## Prepare Your Team

Team readiness is equally important. Ensure that core responsibilities are covered when staff are out due to operations. Assign and train backups for key functions and arrange continuity measures as necessary. Keep your calendars up to date and share them with your team to communicate leave and coverage plans.

It is also important to recognize that we are currently in a lapse of appropriations. During this period, only certain types of work are permitted. Please consult with your leadership to ensure you understand which activities are authorized and to clarify your priorities. Please plan accordingly and ensure your teams are prepared to transition seamlessly as circumstances change.

## Support the Mission

Encourage other federal partners to participate in the Surge Capacity Force, a DHS-wide initiative that enables employees from across the Department and other federal agencies to support FEMA's response and recovery operations during major disasters. By encouraging participation in the Surge Capacity Force, you can act as a force multiplier for the FEMA mission, helping to expand our ability to serve communities in need. To learn more about the Surge Capacity Force, visit https://www.dhs.gov/surge-capacity-force.

Your commitment to deployment readiness is vital to ensuring FEMA is prepared to respond when needed. By taking these steps, you are directly supporting our mission to help Americans before, during and after disasters. Thank you for your continued dedication and service to our mission. If you have any questions, please contact your supervisor. For additional information, visit the Deployment SharePoint page.

Federal Emergency Management Agency

FEMA.gov